**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **LIFESTYLE COMMUNITIES, LTD.**, | : | Case No. 22-CV-01775 |
| 230 West Street, Suite 200 | : | |
| Columbus, Ohio 43215, | : | |
| | : | JUDGE _____ |
| **WORTHINGTON CAMPUS, LLC**, | : | |
| 230 West Street, Suite 200 | : | |
| Columbus, Ohio 43215, | : | MAGISTRATE JUDGE _____ |
| | : | |
| Plaintiffs, | : | |
| | : | **Demand for Jury Trial** |
| v. | : | |
| | : | |
| **CITY OF WORTHINGTON, OHIO**, | : | |
| 6550 N. High Street | : | |
| Worthington, Ohio 43085, | : | |
| | : | |
| Defendant. | : | |

## COMPLAINT

Plaintiffs Lifestyle Communities, Ltd. and Worthington Campus, LLC (collectively, "Lifestyle"), for their Complaint against Defendant City of Worthington, Ohio ("Worthington" or the "City") aver and allege:

### I. INTRODUCTION

1.     Lifestyle owns the largest, undeveloped property on High Street in Worthington (the "Property").  The Property is centrally located – situated directly across the street from City Hall.  Under ordinary circumstances, this private property would be prime real estate that would easily attract new, vibrant economic development and diversity to an otherwise landlocked and homogenous area.  To be sure, numerous residential and commercial developers, health care providers, and a grocery chain have sought to develop the Property.  Yet, the City has delayed and ultimately blocked the Property's development through completely arbitrary and capricious abuses of power that disregard Lifestyle's rights secured by the United States and Ohio Constitutions.

2. Because the Property was historically used by a church as a residential home for orphaned and troubled youth, the vast majority of the Property is zoned within the City's "Special" zoning classification, which permits a variety of public uses but prevents the Property from being put to any real economic use absent a rezoning. Recognizing this, the City amended its Comprehensive Plan in 2014 solely to prescribe a specific land use plan for this Property alone and its future development as a "Planned Unit Development." The amendment specifies that the Property be developed with a mix of residential, commercial/office, and open space uses (the "Property's Land Use Plan").

3. Unlike other political subdivisions, Worthington's City Charter requires the rezoning of land within the City to be consistent with Worthington's Comprehensive Plan. Consequently, the Property's Land Use Plan governs the Property's rezoning and development.

4. The City and a vocal minority of "not-in-my-backyard" residents, however, have their own designs for the land. Led by David Robinson, current President of City Council, the City's officials intend to convert the vast majority of Lifestyle's private property into a public park. The City's Parks and Recreation Commission unanimously expressed to Council that it "would like for the site to be 100% parkland and recreation space available for community access and events." Yet, after the City evaluated the costs to purchase the Property, the City declined to do so. Members of City Council instead concluded that they could force Lifestyle to part with the Property by preventing Lifestyle from developing it, thereby allowing the City to acquire the Property at a distressed price.

5. According to a 2018 memorandum that members of Council circulated as "confidential," the first step in the scheme required City Council to rescind the Property's Land Use Plan and adopt a new one because "[a]ll development of the [Property] *must* proceed in a

manner consistent with the [Property's Land Use Plan]." Once the City acquired the Property, the City could then turnaround and sell small portions of the Property, such as commercial space along High Street, at a significant profit. The City would then use the proceeds from the sale to defray the costs of the acquisition and amenities for a large park on the unsold portions of the Property. Under this scheme, the City would directly control who could purchase and develop the Property all while enabling the City to impose "assessments" on the ultimate purchasers to fund the park's ongoing maintenance and fill the City's coffers.

6. In fact, in February 2019, well before Lifestyle filed any application to develop its Property, City Council member Doug Smith declared that anything Lifestyle proposed to develop on the Property would be denied. Councilman Robinson likewise proclaimed that once Lifestyle's efforts to develop the Property were denied by City Council, Lifestyle would buckle and realize the only option remaining would be to sell the Property to the City.

7. Unaware of this illegal scheme by public officials, Lifestyle spent significant time, resources, and effort to plan and design a $197 million development. In October 2020, Lifestyle filed a 455-page application to rezone the Property to a Planned Unit Development and a development plan that is entirely consistent with the Property's Land Use Plan.

8. It is the City's custom and practice for its officials to meet with applicants and advise them on the criteria the City will apply during its consideration of a development plan. For Lifestyle's application, however, the City abandoned its established procedures and subjected Lifestyle to a completely arbitrary and unconstitutional process. City officials informed Lifestyle that discussions involving Lifestyle's development would be limited to hearings conducted by the City's Municipal Planning Commission ("MPC") and Architectural Review Board ("ARB").[1]

---

[1] The MPC and ARB typically hear matters jointly.

9.     During the first MPC/ARB hearing, members of the MPC and ARB refused to provide any objective consideration of Lifestyle's development plan.  City officials instead voiced completely arbitrary and contrived objections, demanding that Lifestyle somehow address vague speculation such as:

  a.  Reducing the residential density to some unspecified amount;

  b.  Redesigning the development so that it is "uniquely Worthington";

  c.  Adding some unspecified, undefined, and subjective "wow factor";

  d.  Redesigning unspecified "childish" elements so that the development conveys Worthington's story through "poetry"; and

  e.  Redesigning the layout of the streets, again in some unspecified manner, because the layout of the streets was somehow "absolutely boring."

10.     Despite the City's utter lack of any objective criteria or legitimate health, safety, or welfare concerns with the development plan, Lifestyle nonetheless offered to revise its plan to address the concerns that were articulated.

11.     Contrary to its established procedures, and its own engagement with other developers, the City and its staff continued to refuse to provide any specific concerns about the development to Lifestyle.  After enduring eight months of the City's stonewalling, Lifestyle submitted a revised concept plan in September 2021 to obtain feedback from the MPC on the development plan's general composition and layout.  The concept plan significantly reduced the number of residential units that would be built, increased the amount of commercial space, and increased the amount of open green space.  The plan remained entirely consistent with the Property's Land Use Plan.

12.     During the second MPC/ARB hearing, City officials again arbitrarily deemed the development plan insufficient without identifying any legitimate grounds that the plan did not satisfy.  Worse, when Lifestyle requested to amend its plan to address the City's unspecified

concerns, MPC refused. Incredibly, MPC instead voted to recommend denial of the applications for a purported failure to address MPC's concerns, which the MPC prevented Lifestyle from doing.

13. In December 2021, City Council conducted its one-and-only hearing on Lifestyle's applications. Lifestyle requested that City Council cure MPC's subterfuge by referring the matter back to MPC/ARB and directing City officials to disclose the specific requirements being imposed on Lifestyle's Property. For example, rather than vaguely divining that the number of apartments is "too high," the specific, legitimate limit on apartment density being applied by the City should be identified. City Council refused.

14. Incredibly, and again contrary to its treatment of other developers, Council instead informed Lifestyle at the hearing that the City would be arbitrarily denying Lifestyle's applications and barring Lifestyle from re-applying to rezone its Property until at least April 2022. Consistent with City Council's "confidential" acquisition strategy, Councilman Scott Myers left Lifestyle with a Hobson's choice: Lifestyle could "walk away and explore other options" or, come back in April 2022 to reapply and repeat the same process and preordained result all over again.

15. On January 18, 2022, in flagrant violation of Lifestyle's rights to due process and equal protection of law, City Council abruptly rescinded the Property's Land Use Plan and replaced it with utterly vague, hastily drafted "Guiding Principles" and "General Components" to prevent Lifestyle from reapplying or developing the Property. For example, under the purported amendment, residential housing is only permitted on the Property if it is "creatively executed" and that any future development of the Property must contain "a large contiguous" park that is "highly desirable." Although this action applied only to the Property, Council intentionally concealed the matter from its agenda and from Lifestyle. The purported amendment was not shared publicly, nor even with all members of Council until just prior to the hearing, and enacted near midnight

without Lifestyle's or the public's input.  City Council's furtive actions purposely robbed Lifestyle of any notice or meaningful opportunity to be heard on illegal restrictions that solely targeted its private property.

16.  The City's conduct towards Lifestyle is an outrageous abuse of power and an affront to private property rights.  Lifestyle simply seeks to build a Planned Unit Development consistent with the Property's Land Use Plan, which a majority of Worthington's population likewise desires.  Lifestyle's right to do so is "inviolate." *See* OHIO CONSTITUTION Art. I, Sec. 19.  Yet, the City has arbitrarily and capriciously singled Lifestyle out, deprived it of any legitimate process, and subjugated Lifestyle's private property rights to the unfettered discretion of City officials' arbitrary whims and fancies.

17.  Lifestyle seeks to use its private property free from illegitimate restrictions and to recoup tens of millions of dollars in damages, costs, and expenses that it incurred as a result of the City's sham process. Lifestyle therefore seeks injunctive, monetary, and declaratory relief for the City's egregious violations of the United States and Ohio Constitutions and Ohio zoning law.

## II.  PARTIES

18.  Plaintiff Lifestyle Communities, Ltd. is an Ohio limited liability company with a principal place of business in Columbus, Ohio.

19.  Plaintiff Worthington Campus, LLC is an Ohio limited liability company with a principal place of business in Columbus, Ohio.  Worthington Campus, LLC owns the Property, as defined below.

20.  Defendant the City of Worthington, Ohio is a chartered municipal corporation located in Franklin County, Ohio and subject to the laws of the State of Ohio.

21.  In addition to the foregoing parties, the Attorney General of the State of Ohio is

being served with a copy of this Complaint pursuant to Ohio Revised Code § 2721.12(A).

### III. JURISDICTION AND VENUE

22.     This action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983.

23.     Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(3), and 28 U.S.C. § 2201.  Jurisdiction supporting Lifestyle's supplemental Ohio Constitution claims is conferred by 28 U.S.C. § 1367.  Jurisdiction supporting Lifestyle's claims for attorneys' fees is conferred by 42 U.S.C. § 1988.

24.     Venue in this Court is proper under 28 U.S.C. § 1391(b)(2) as this is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

### IV. FACTS COMMON TO ALL CLAIMS

**A.     The Property Has Been Vacant Since 2010.**

25.     The Property presently consists of approximately 37.6 acres located at 1033 High Street, in Worthington, Ohio, including permanent parcels 100-006774-00, 100-002425-00, and 100-002427-00.

26.     The Property was originally part of hundreds of acres of land that extended to the Olentangy River and was the site for a residential home for orphaned, neglected, and troubled youth, owned and operated by the United Methodist Children's Home ("UMCH").

27.     Upon information and belief, UMCH and its affiliates owned the Property for nearly a century.  As the land surrounding UMCH's property was developed for residential homes, its youth treatment facility fell out of favor in the community, and UMCH ceased its youth treatment operations on the Property in or around 2010.

28.     UMCH also notified City leadership that it desired to sell the Property within three to five years.

29.     The City took steps to "direct appropriate land development" on the Property. City leadership agreed that the Worthington Comprehensive Plan, adopted in 2005, set forth the site plan and design that would serve as the guide for the Property's redevelopment.

30.     The City designated the site as the "UMCH Focus Area," outlined in red below:



31.     In 2012, a large grocery chain sought to build a grocery store and gas station on the Property, however, that proposal was rejected.

**B.      The City Amends the Comprehensive Plan to Prescribe the Uses Deemed Appropriate for the Property's Redevelopment.**

32.     In 2013, City leadership concluded that the Property "present[ed] a rare opportunity for Worthington to experience redevelopment on a highly visible site near the heart of Worthington."

33.     The City therefore commenced a months-long process to update the Worthington Comprehensive Plan's provisions applicable to the Property.

34.     Importantly, zoning in Worthington is unique among Ohio political subdivisions in that its Charter requires zoning decisions to be based on the City's Comprehensive Plan.

35.     Specifically, the City's Charter requires rezoning decisions to be consistent with the City's Comprehensive Plan:

In rendering a decision or recommendation, the Municipal Planning Commission shall articulate its basis therefore, in writing, by reference to *the relationship that decision or recommendation has to the overall comprehensive planning goals of the City*, *which may be found in the Master Plan*, the zoning map, a course of zoning or subdivision practices by the City, or any other acknowledged comprehensive strategy or goals previously established at the time of the decision or recommendation.

Worthington Charter § 6.03 (Emphasis added.).

36.     As such, the City's discretion to act on rezoning and development plan applications is circumscribed by the Comprehensive Plan.

37.     The City therefore retained MKSK, a professional land planning and architecture firm to evaluate and update the Comprehensive Plan's provisions applicable to the Property. Under the City's direction, MKSK conducted a comprehensive assessment of improvement opportunities, economic development needs, and anticipated market demand for the Property. The City spent more than $150,000 on this work – which only applied to the Property.

38.     Over a period of many months, MKSK interviewed UMCH, numerous resident and business organizations such as the Worthington Community Improvement Corporation, Worthington Chamber of Commerce, Old Worthington Association, Olde Worthington Business Association (now known as the Old Worthington Partnership), Worthington Alliance for Responsible Development, the Convention & Visitors Bureau of Worthington, many central Ohio developers, Worthington High School graduates attending college, and numerous City officials including the Worthington Parks & Recreation Commission.

39.     MKSK held numerous public meetings and interviews that focused on an array of conceptual ideas for the Property's development. MKSK also conducted walking and bus tours of the Property and other mixed-use communities around Central Ohio, including Grandview Yard, Harrison Park, and North Bank Park.

40.     The City also launched a webpage dedicated to the Property's development,

referred to as "Visioning UMCH."

41. Following that extensive effort and investment, City Council adopted the Property's Land Use Plan on or about September 2, 2014.

42. As set forth in the amendment, it represented a consensus of the entire Worthington community's views on the Property's redevelopment, prescribing "the range of desired land uses and development in the event the private land owner [*sic*] and/or future developer requests rezoning of the property; and to assist the City with its review and evaluation of any [such] proposal." The amendment also specified that it "provide[s] a framework and direction to the City, reviewing Boards and Commissions, and potential developers as to Worthington's desired vision for any change of use and redevelopment that might occur on the site."

43. The amendment calls for the Property to be rezoned as a Planned Unit Development and divides the Property into four zones with specific uses delineated within each zone as depicted and summarized below:



*Future land use zones for the UMCH focus area.*

a.   **High Street Mixed Use**:  Is "a prime location for walkable residential development and denser, amenity-rich housing types" such as apartments, combined with a mix of commercial, office, and limited retail uses.  Among other things, buildings within this zone are limited to five stories in height.  This zone's objective "is to create a high-

quality, dense, walkable, connected, mixed-use development . . . ."

b.   **Worthington Estates Edge**:  Consists of single family homes with a residential density of up to approx. 5 residential units/acre.

c.   **Neighborhood Core**:  "[R]epresents the most flexible zone . . . because it is internal to the site."  This zone calls for residential development of up to 14 dwelling units/acre with buildings of up to three stories in height.  More than one housing type is anticipated within this zone, along with park space and amenities that are relative to this zone's developed density.

d.   **Tucker Creek Preserve**:  To be preserved as a natural green space amenity.

44.   These prescribed uses paralleled results from a separate Worthington Area 360 Visioning study, which found that a broad consensus within Worthington agreed that the landlocked City needed more flexible housing options and that the Property should be developed with a mix of residential and other uses.

**C.   Lifestyle Meets with the City About Its Plans for the Property.**

45.   Shortly after the Property's Land Use Plan was adopted, Lifestyle met with City officials to discuss the Property's potential development.

46.   Lifestyle is an experienced developer that owns and/or manages very successful mixed-use developments across Ohio, North Carolina, South Carolina, Tennessee, and Texas. Locally, Lifestyle developed and manages several significant mixed-use developments, including on High Street in the middle of downtown Columbus, as well as in New Albany, Sunbury, Dublin, Hilliard, and Gahanna.  Lifestyle's approach to its developments emphasizes creating amenity rich spaces that engage and connect residents, visitors, and employees.

47.   Lifestyle was attracted to develop the Property given that Lifestyle's approach to development aligned very closely with the style and approach described in the Property's Land Use Plan (again, what the City itself said that it wanted on the Property).

-11-

48.     The City's officials committed to Lifestyle that, if it would develop the Property in accordance with the Property's Land Use Plan, the City would provide the necessary approvals in accordance with the City's Charter.

49.     The City wrote to its residents in 2015 that in the event Lifestyle filed an application to develop the Property, "the criteria outlined in the City's Comprehensive Plan [*i.e.*, the Property's Land Use Plan] will be used to evaluate the submittal."

50.     Based on the assurances from the City and upon the Property's Land Use Plan, Lifestyle entered into an agreement to purchase the Property.

**D.     Lifestyle Announces Its Intentions to Develop the Property.**

51.     In 2015, Lifestyle met with City officials to discuss the Property's development.

52.     Lifestyle created initial sketches that called for a mix of apartments, single-family homes, townhomes, office space, limited retail, and substantial open space throughout the development.  The sketches included a preserve along Tucker Creek, multi-use trails throughout, a village green, and a community park in the western portion of the Property.

53.     In April 2015, Lifestyle and UMCH met with representatives from the Worthington Alliance for Responsible Development, and the Old Worthington Association to preview its concept with them despite having no obligation to do so.  A City official who attended the meeting described the organizations' feedback as "positive" and "constructive."

54.     Following that meeting and contrary to the Property's Land Use Plan, future Councilman Robinson wrote a memorandum concerning the Property, criticizing the Property's Land Use Plan because he disagreed with its result and advocating that with respect to the Property, City Council "table any rezoning motion that includes . . . apartments, or, more boldly, vote 'no.'"

55.     Lifestyle thereafter voluntarily presented its initial sketches to the public and City officials in an informal meeting at the Worthington Education Center.  A vocal group of

individuals, led in part by future Councilman Robinson, disagreed with the Property's Land Use Plan and objected to building rental apartments on the Property. The individuals' objections were based upon speculation, unfounded fears, and illegitimate biases.

56. Instead of moving forward with its initial concept, Lifestyle decided to refine its development plans based on the feedback it received from the public and City officials.

57. Meanwhile, the City set its sights on converting a significant portion of the Property into a park.

**E. City Officials Devise an Illegal Scheme to Wrest Control of the Property From Private Ownership.**

58. In October 2016, City officials considered two initial options to obtain land for its desired park: (1) the City could negotiate with the developer and somehow require that a park be part of the Property's future development, or (2) the City could purchase the land for a park.

59. City officials concluded that purchasing the park was problematic because, among other things, the City likely could not afford to purchase the land:

> Pursue fee simple acquisition of the land – This presumes that Lifestyle and UMCH would be willing sellers. This would require appraisals, analysis of site development costs, funding for acquisition, development and operations. A benefit to this approach is it brings clarity to this issue by eliminating the question of whether a park can be achieved. **The downside is that this is financially costly**; some of this acquisition and expense could be achieved through development negotiations at less cost to taxpayers. **Limited cash flow in the City's CIP (capital plan) makes it difficult to pursue this option, possibly necessitating additional revenues through fees or taxes**.

60. David Robinson was elected to City Council in the fall of 2017. Before even being seated on Council, Mr. Robinson informed the City Manager and Law Director that he believed the Property, "a central and strategic property, is of vital interest to all in the city," and that he intended to propose a Resolution to "void/invalidate/suspend" the Property's Land Use Plan and any other provisions applicable to the Property within the Worthington Comprehensive Plan.

61.     In or around January 2018, City leadership asked the author of the Property's Land Use Plan to review it.  Chris Hermann, of MKSK, suggested that Council could address most of the vocal criticisms by amending "a few parameters related to maximum height and density, and possibly restricting residential development to for sale."  City Council declined to do so.

62.     Meanwhile, Councilman Robinson directed City officials to revisit the evaluation of potential impacts to the City's finances if the City acquired the Property.  Among other things, City officials were directed to consider the range of estimated net income tax revenue different types of commercial development could generate over time for the City, along with estimated one-time and continuing cost estimates arising from the acquisition and development of different types of public greenspace.

63.     Councilman Robinson publicly aired his animus for Lifestyle and his disdain for its efforts to develop the Property in lieu of his desired park: "This is a once-in-history opportunity. . . .  It's now or never. **We can achieve an outcome that greatly benefits the life of our community while benefiting the city financially, or we can develop a variation of Lifestyle Communities' project with all of its problems and mediocrity**."

64.     Councilman Robinson also co-organized "Project Community Park Worthington." His group's sole mission is to build a large public park on Lifestyle's Property and that "city government [is urged] to embrace this once-in-history opportunity by acquiring the property, thereby gaining full creative control of this public-private project for the benefit of our city and its residents for generations to come."

65.     As part of this effort, Councilman Robinson obtained a memorandum from a local zoning lawyer, dated November 27, 2018, that set forth a plan outlining the steps the City could take in order for the City to develop the Property itself (the "Acquisition Plan").

66.     According to the Acquisition Plan, the City would first have to change the Property's Land Use Plan (referred to as the "MKSK Plan") because, in accordance with the City's Charter, it governed the Property's future development:

> As background, on September 2, 2014, the Council passed Resolution No. 39-2014 (the "Resolution"), which adopted the land use plan for the UMCH Property prepared by MKSK (the "MKSK Plan"). Further, by adopting the MKSK Plan, the Council amended Worthington's 2005 Master Plan.
>
> All development of the area must proceed in a manner consistent with the MKSK Plan. Accordingly, the Council must pass a new resolution that (1) rescinds the Resolution, and ideally (2) adopts a new resident focused plan for the UMCH Property.

(Emphasis added).

67.     The Acquisition Plan's next phase called for the City to acquire the Property. Thereafter, the City could enjoy the spoils from its acquisition by selling targeted portions of the Property for private development by a developer of the City's choosing:

> **PHASE 3: SALE OF TARGETED PORTIONS OF THE UMCH PROPERTY**
>
> Municipalities are expressly authorized to sell or lease real property owned by the municipality if it is no longer needed for any municipal purposes. The Ohio Revised Code requires that a contract for the sale or lease of real property be made only upon approval of two-thirds of the members of the legislative authority, as well as by the board or officer having supervision or management of such real estate. After such authorization, the contract must be made with the highest bidder after competitive bidding by advertising once a week for five consecutive weeks in a newspaper of general circulation.
>
> Note that the competitive bidding requirements associated with the sale of real property may be bypassed through the use of Worthington's CIC. As noted, any sale of a portion or portions of the UMCH Property would then be used to service or pay off debt incurred in the initial purchase; and to fund improvements or maintenance of the dedicated park.

(Emphasis added).

**F.     Members of City Council Pledge to Deny Any Development Application Filed By Lifestyle – Well Before Lifestyle Even Filed One.**

68.     On February 9, 2019, City Council and City Officials held a retreat during which Lifestyle and the Property were discussed.

69.     During the retreat, Councilman Robinson falsely claimed that Lifestyle was not trustworthy and lied to City Council members. He encouraged the City to block Lifestyle from

-15-

developing the Property so that Lifestyle's only option would be to relinquish the Property to the City.

70.     Consistent with the Acquisition Plan, the City Manager proposed that after the City acquired the Property, the City could consider selling portions of the Property near High Street and using the proceeds to offset the acquisition costs.

71.     Councilman Doug Smith concluded that anything proposed to be developed on the Property by Lifestyle would be denied.

### G.     Councilman Robinson Seeks to Initiate the Acquisition Plan.

72.     On Sunday, September 20, 2020, Councilman Robinson emailed members of Council and City Officials to inform them that he intended to "temporarily suspend" the Property's Land Use Plan at Council's meeting the following day. This "suspension" would only apply to Lifestyle's Property.

73.     Councilman Robinson acknowledged that the City would be "vulnerable" if City Council were to reject a development plan for the Property that generally conforms with the Property's Land Use Plan:

> 4. Lastly, and importantly, by proactively suspending the 2014 Plan, we can avoid the possibility of the city being placed in a vulnerable, defensive position, if a submitted development plan conforms in general with the Comp Plan and yet is rejected.

74.     During the City Council meeting the following day, without any reference to the matter on the agenda or any public notice whatsoever, Councilman Robinson proposed near the end of the meeting to suspend the Property's Land Use Plan.

75.     A member of Council expressed concern that Councilman Robinson was seeking to set aside the Property's Land Use Plan that took years of extensive effort to create through an action that was not even disclosed on the City Council meeting's agenda. Moreover, a concern

was raised that such action could violate the Equal Protections Clause.

76.     City Council did not act upon Councilman Robinson's proposal at that time.

**H.     Lifestyle Files Applications to Rezone the Property in a Manner Entirely Consistent with the Property's Land Use Plan.**

77.     On or about October 6, 2020, Lifestyle filed with the City a Planned Unit Development Preliminary Plan Application and a Certificate of Appropriateness Application (together, the "Applications").

78.     As a matter of law, Lifestyle's right to use and develop the Property consistent with the Property's Land Use Plan vested upon the filing of the Applications.

79.     The Property's Land Use Plan prescribes that the Property be zoned for use as a planned unit development.  Lifestyle's Applications contained a development plan for a planned unit development (the "Development") that was specifically designed to be and is entirely consistent with all of the City's legitimate, applicable land use restrictions, including the Property's Land Use Plan.

80.     Lifestyle's filing of its Applications angered the City because it vested Lifestyle's rights under the Property's Land Use Plan and interfered with the City's scheme to acquire the Property.  Due in part to Lifestyle's interference with the City's scheme, the City took measures to retaliate against Lifestyle and the Development.

**I.     Lifestyle Is Denied Any Meaningful Consideration of Its Applications.**

81.     The City's Charter, Ordinances, and established procedure require the City and its staff to meet with and proactively work with applicants seeking to rezone and/or redevelop property within the City.  Under ordinary circumstances with similarly situated applicants, there is considerable back-and-forth in which, among other things, the City's staff identifies the specific requirements the development must meet and the acceptable methods for satisfying such

requirements and then affords the applicant an opportunity to address those requirements.  The City uses this process with other similarly situated applicants seeking to develop property within the City into planned unit developments, including the prior owner of this Property – UMCH. Such process is necessary to have a meaningful review of development applications.

82.    Contrary to the City's established procedures, the City singled out Lifestyle and treated Lifestyle differently than other similarly situated applicants.

83.    The City knew and anticipated that Lifestyle would file the Applications.  Before the Applications were even filed, the City Manager requested City Council to provide direction on how City staff should treat development plan applications submitted by Lifestyle because City Council previously "discouraged" City staff from working with Lifestyle:

> Lastly, I think it will be important for the Council to discuss, possibly at the retreat, what role it wants the staff to play.  In addition to providing a technical review as I have described above, staff often works to help steer developments towards desirable community outcomes.  This is most easily achieved when our goals are clearly discernable.  Examples include using tax increment financing (TIFs) for beneficial public infrastructure and tax abatements or income tax incentives to encourage office or other income producing activities.  Council has in recent years discouraged staff from proactively working with LC (or Steiner); appetite for using alternative resolution processes has been limited.

84.    Contrary to its established procedures, City officials directed City staff to stonewall Lifestyle.  City staff was directed to refrain from deliberating or negotiating with Lifestyle on the City's behalf in connection with Lifestyle's 455-page Applications.

85.    Unaware of this arbitrary departure from the City's established procedures, Lifestyle sought to meet with and obtain meaningful feedback from City staff on the Development. City staff, however, were not permitted to provide any feedback on the City's behalf concerning the Development outside of ARB/MPC or City Council hearings.

86.    ARB/MPC first heard the Applications on the evening of January 14, 2021.

87.    The City's Director of Planning & Building submitted a report to ARB/MPC

members prior to the hearing. The report explained that City staff only had the benefit of two meetings with Lifestyle prior to the January hearing on the Applications and that "[m]ore timely and productive meetings are needed for City staff to better understand the applications and materials that have been provided." The report made no mention of City officials' private order "discouraging" City staff from deliberating with Lifestyle about its Applications.

88. Despite acknowledging that City staff needed additional information about the Development for its review, the report arrived at City Council's preordained result, which was to deny the Applications. The report reached this conclusion without identifying any material, objective restrictions the Development could not satisfy.

89. At the hearing and as set forth above, ARB/MPC members provided only vague, subjective comments on the Development that were not applicable to the legitimate criteria pursuant to which ARB/MPC was supposed to review the Applications. *Supra* at ¶ 9. Rather than evaluate the Development against the criteria set forth in the Property's Land Use Plan, the Development was compared to Lifestyle's initial sketches from 2015, which were utterly irrelevant to ARB/MPC's review.

90. Lifestyle was therefore forced to table its Applications. Frustrated by the extraordinary lack of a meaningful review by the ARB/MPC, Lifestyle proposed during the hearing that the City and Lifestyle collaborate on the Development's overall concept and layout first. The parties could thereafter refine the Development's architectural and other technical details.

91. While not required to do so, Lifestyle worked in good faith over the course of several months to revise the Development's overall concept plan to address certain comments raised in the January ARB/MPC hearing.

92.     Meanwhile, the City continued to stonewall Lifestyle.

93.     On September 9, 2021, Lifestyle submitted a revised concept plan solely to obtain feedback from ARB/MPC members.  The Development remained entirely consistent with the Property's Land Use Plan, providing a well-planned, vibrant, walkable, and integrated Planned Unit Development with a mix of desirable uses and integrated green space that are compatible with the surrounding neighborhood and containing new and different housing types that are underrepresented in Worthington:



94.     The Development is comprised of five separate Subareas that correspond with the zones in the Property's Land Use Plan as follows:

a.  Subarea 1 (5.9 acres) – Worthington Estates Edge zone – includes twenty-two 2.5-story single-family home lots approximately 1/4 acres in size.

b.  Subareas 2 and 3 (14.0 acres) – Neighborhood Core zone – includes a mixture of townhomes and flats that are a maximum of three stories in height.  Eighty-six units will be developed for sale and seventy-two will be developed for lease.  These Subareas include tree-lined streets, large neighborhood green spaces

(approximately three acres) including a park area with a pavilion, and connected sidewalks and multi-use paths.

c. Subarea 4 (11.3 acres) – High Street Mixed Use zone – includes three large buildings situated so that the building along High Street will contain 96,000 square feet of commercial/office space and the potential for limited ground floor retail. The other two buildings are located along the western side of this zone and away from High Street. One mixed-use building will have up to 8,000 square feet of ground floor commercial use and up to two hundred fifty-five multifamily residential units. The other mixed-use building will have up to 16,000 square feet of ground floor commercial with up to one hundred sixty-five multifamily residential units. All buildings are a maximum of five stories.

d. Subarea 5 (6.4 acres) – Tucker Creek Preserve zone – is completely open, green space with a trail running along Tucker Creek. There are also multiuse paths and trails that extend throughout the Preserve and connect with the broader Development.

95. Approximately 24.92% of the Development is dedicated open space with 9.37 acres of integrated park space and nearly a mile of multi-use trails and walkways.

**J.      Councilman Robinson Directs ARB/MPC to Refuse to Table Lifestyle's Applications and to Recommend Denial.**

96. The ARB/MPC's second hearing on the Applications was held on October 14, 2021.

97. That morning, Councilman Robinson emailed members of the ARB/MPC from his official City Council email account directing the members to treat Lifestyle's Applications differently from the standard practice for similarly-situated applicants:

> I know the ARB/MPC has got a lot on its plate, so I'll get right to the point. . . .
> Regarding the LC proposal for the UMCH property, I hope you are still open as to
> whether to table or deny the application. **While I recognize the sensibility and
> fairness of the MPC's standard practice of giving applicants a chance to
> change course, by way of tabling a proposal**, **I would suggest that this approach
> does not apply to the proposal on hand from LifeStyle Communities (LC)**. . . .
> [A] denial would clean the slate in certain respects, **enabling Council a freer hand
> to consider creative ways forward by way of a fresh start** with LC.

Emphasis added. Councilman Robinson electronically signed the message in his capacity as a "City Council Member."

98. That evening the ARB/MPC did not provide Lifestyle with a fair or remotely impartial hearing. The members did not identify a single legitimate basis under the Property's Land Use Plan to deny the Applications.

99. Rather, the members insisted upon vague and completely arbitrary standards for evaluating the Development, including blatant contraventions of the Property's Land Use Plan. For example, Chairman Mikel Coulter claimed that the Property should be "developed sensibly," that the plan "was unimaginative," and that he "felt five-story buildings on this site were too tall" and that "**even if the Comprehensive Plan allowed five stories along High Street, it is not something he would agree with**." Member Thomas Reis likewise disapproved of the five-story mixed-use buildings because "he felt the density needed to be controlled with some reasonable height . . . ." Yet, density within the High Street Mixed Use zone is controlled by building height limits, which expressly permits five-story buildings. *See* Property's Land Use Plan at 92.

100. Member David Foust said that, among other things, any development of the Property must have "a wow factor that everyone in this community and the Board and the majority of residents say wow this is wonderful, this is what we want to see." Yet, it is plainly unconstitutional to subjugate Lifestyle's ability to develop its Property to a standardless delegation of the City's land use decision making to the fancies of random strangers. *See, e.g.*, *Rice v. Village*

*of Johnstown*, S.D.Ohio No. 2:19-cv-504, 2020 U.S. Dist. LEXIS 19752, at *17 (Feb. 5, 2020) ("[A] legislative body may not constitutionally delegate to private parties the power to determine the nature of rights to property in which other individuals have a property interest, without supplying standards to guide the private parties' discretion." (quoting *Gen. Elec. Co. v. New York State Dep't of Labor*, 936 F.2d 1448, 1455 (2d Cir. 1991))).

101.     Lifestyle objected to the imposition of vague, unfounded, standardless criteria to its Application and requested ARB/MPC identify the limits it was imposing. For example, if the City contends the density is "too high," the City must reveal the density standard they are imposing. The ARB/MPC refused to do so.

102.     Lifestyle requested that its Applications be tabled so that it could update its development plan to address the feedback it received during the hearing.

103.     Echoing Councilman's Robinson's direction, Mr. Foust said that "instead of tabling this that they start with a fresh new proposal . . . ."

104.     The ARB/MPC intentionally departed from its standard procedure and refused to table the Applications in order to prevent Lifestyle from revising the plans to address ARB/MPC's purported concerns. Contrary to law, the ARB/MPC recommended the Applications be denied.

**K.     City Council Denies the Applications and Prohibits Lifestyle from Re-Filing Until April 2022.**

105.     City Council conducted its one-and-only hearing on Lifestyle's Applications on December 13, 2021.

106.     Lifestyle objected to the fundamentally unfair treatment it received, explaining during the hearing that "[t]he handling and outcome of [the Applications] seem predetermined and the City appears to have treated this proposal differently than other similarly situated applicants."

107.     Lifestyle requested City Council refer the Applications back to ARB/MPC with

direction to ARB/MPC and City staff to collaborate and work with Lifestyle on the Applications.

108.    City Council refused.

109.    Prior to voting, several members of City Council confirmed that if City Council denied the Applications, Lifestyle would be prohibited from re-applying until April 2022.

110.    City Council then refused to table the Applications.

111.    City Council denied Lifestyle's Application without a legitimate basis.

**L.    City Council Illegally Amends the Property's Land Use Plan and Imposes a De Facto Moratorium on Lifestyle's Development of the Property.**

112.    Beginning in January 2022, Councilman Robinson became the President of City Council.

113.    One of Councilman Robinson's first acts as the President of Council was to further the confidential scheme to acquire the Property at a distressed price.  He acted swiftly to complete the first step, which was to replace the Property's Land Use Plan with another version that sets up the City's acquisition of the Property.

114.    At City Council's January 18, 2022 meeting, without any notice to Lifestyle whatsoever, or even any indication on the meeting's public agenda, Council President Robinson: (1) sought approval for an emergency ordinance (Ordinance 04-2022) to impose a moratorium on the acceptance of any development application relating to the Property in order to prevent Lifestyle from doing anything further with its Property for up to an entire year, and (2) sought the immediate replacement of the Property's Land Use Plan with utterly vague "Guiding Principles" and "General Components" (Resolution No. 04-2022).

115.    Neither Ordinance 04-2022, nor Resolution No. 04-2022 are measures of general concern.  Rather, both measures apply only to Lifestyle and its Property.

116.    President Robinson knew or should have known that considering and voting on

Ordinance 04-2022 and Resolution No. 04-2022 without advance notice to Lifestyle was unconstitutional. Among other reasons, President Robinson was warned during his prior attempt to take a nearly identical action during Council's September 20, 2020 meeting without putting the measure on the agenda or notifying the property owner, among other things, violated the Equal Protections Clause.

117. President Robinson intentionally refused to put Ordinance 04-2022 and Resolution No. 04-2022 on the agenda for the meeting and instructed certain City officials not to mention or discuss the measures prior to the meeting.

118. President Robinson did not want Lifestyle to know that Ordinance 04-2022 and Resolution No. 04-2022 would be considered by City Council at its January 18, 2022 meeting.

119. Further, President Robinson waited until mere hours before the meeting to circulate the measures to certain members of City Council.

120. City Council members lacked the supermajority necessary to pass Ordinance 04-2022 in one hearing, so the ordinance was pushed to the following Council meeting.

121. City Council, however, approved Resolution No. 04-2022 with only one reading.

122. Unlike the Property's Land Use Plan that reflected the consensus of input amassed over 18 months from residents and stakeholders across the City, President Robinson drafted the purported Comprehensive Plan amendment set forth in Resolution No. 04-2022 on his own, with no notice, and certainly no input from Lifestyle or the public.

123. Resolution No. 04-2022 requires future development of the Property to include "a large contiguous greenspace, central to the property and inclusive of the Tucker Creek acreage."

124. Resolution No. 04-2022 requires future development of the Property to "be considered and executed holistically, as an integrated whole."

125.    Among other things, the City intends to prevent Lifestyle from putting any portion of its Property to economic use without obtaining City Council's approval for the development of the entire Property that also includes a large public park (or "greenspace") that is "central to the property."

126.    As part of its scheme, the City therefore intends to delay and block Lifestyle from developing its private property in order to force Lifestyle to relinquish the Property to the City at a distressed price.

127.    During City Council's next meeting on February 7, 2022, President Robinson withdrew the proposed moratorium explaining that its goal "has been met through another means, and there is no desire on my part to pursue a moratorium at this point in time." President Robinson was referring to Resolution No. 04-2022 and the practical reality that it constitutes a de facto moratorium against the Property's development because the vague "Guiding Principles" and "General Components" will be used as grounds to stop Lifestyle from developing the Property for virtually any reason or no reason at all.

**M.    It Is Infeasible to Develop the Property Under the Current Zoning Restrictions and the City's Actions.**

128.    The Property is currently zoned as follows:

a.    A small portion (+/-0.5 acres) at the northern-most part of the Property is zoned R-10 (Low Density Residential) and houses vacant single-family homes;

b.    The eastern portion (+/- 9.8 acres) of the Property abutting High Street is zoned C-2 (Community Shopping Center) and C-3 (Institutions & Office);

       c.       The majority of the Property (+/- 27.5 acres) is zoned S-1 (Special), which includes uses such as churches, parochial schools, and other institutional uses.

129.     The Property is largely undeveloped and has sat vacant for over a decade.

130.     The City continues to block any effort to develop the Property.  Instead, the City seeks to acquire the Property through illegal means.

131.     As such, the City is blocking any opportunity for Lifestyle to use its Property in a productive and economically beneficial manner to reduce the Property's value, intimidate Lifestyle to give up on the Property's development, and force Lifestyle to sell the Property at a lower price than the City would otherwise pay through a legal acquisition.

132.     Lifestyle has tried in vain to develop the Property into some practical and economic development.  But as the City has made clear, no development plan, no matter how closely it comports with the Property's Land Use Plan, will be approved.

## V.  CLAIMS FOR RELIEF

### COUNT I – Violation of Equal Protection
### Under 42 U.S.C. Section 1983 and the Ohio Constitution

133.     Lifestyle incorporates the allegations contained in the previous paragraphs as if fully rewritten herein.

134.     The City subjected Lifestyle to unequal treatment of the law under color of law in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 2 of the Ohio Constitution.

135.     Previously, the City has rezoned numerous other properties that, similar to Lifestyle, sought to rezone from a S-1 zoning classification to a Planned Use District zoning classification.

136.    Additionally, the City has established a specific process for land use applications for all other similarly situated developers and property owners.  For example, the City engaged the prior property owner, UMCH, in the standard process for the exact same property.

137.    Lifestyle's Applications were either as compliant, or more compliant, with all legitimate zoning standards set by the City than the land use applications that were approved by the City in the past.

138.    The City treated Lifestyle differently than the other similarly situated applicants, including, but not limited to, the following ways:

        a.    The City arbitrarily and unreasonably subjected Lifestyle to an application process different from other similarly situated property owners who filed land use applications in the City;

        b.    The City arbitrarily and unreasonably denied the Applications;

        c.    The City arbitrarily and unreasonably singled out Lifestyle's Property through Resolution No. 04-2022 and imposed restrictions on the use of the Property without any notice whatsoever to Lifestyle; and

        d.    The City has imposed a de facto moratorium against the development of the Property without subjecting any other property or landowner in the City to that moratorium.

139.    The City acted with animus towards Lifestyle and its development plan and has no rational basis for the discriminatory treatment of Lifestyle.

140.    As a result, Lifestyle has suffered and will continue to suffer from the City's unequal treatment of law.

**COUNT II – Violation of Procedural Due Process**
**Under 42 U.S.C. Section 1983 and the Ohio Constitution**

141. Lifestyle incorporates the allegations contained in the previous paragraphs as if fully rewritten herein.

142. The City has deprived Lifestyle of its property and liberty interests under color of law without due process of law in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, Sections 1 and 16 of the Ohio Constitution.

143. Lifestyle's property and liberty interests are of a type protected by the Fourteenth Amendment to the United States Constitution and the Ohio Constitution.

144. Lifestyle possesses legitimate claims of entitlement and justifiable expectations in their property interests, for among other reasons:

    a. The City's current zoning of Lifestyle's Property is not in accordance with the Property's Land Use Plan;

    b. The City, through its Charter and own admission, states that the Comprehensive Plan governs all development within the City and cabins the City's discretion as to its land use decisions;

    c. Lifestyle has the right to use the Property for a planned unit development;

    d. Lifestyle's Applications are in accordance with the City's Charter, Ordinance, and Comprehensive Plan, including the Property's Land Use Plan, such that the City did not have discretion to deny the Applications;

    e. Lifestyle undertook significant actions and made substantial investments in its Property such that the City's action against Lifestyle and the Property and the City's denial of Lifestyle's Applications – an arbitrary departure

from the Property's Land Use Plan – caused substantial detriment to Lifestyle; and

f.  Lifestyle expended significant sums to design and plan the development plan.

145.    Specifically, as to the Property, the Property's Land Use Plan was not merely an aspirational, forward-looking guide.  Rather, by the City's own admission, the Property's Land Use Plan prescribed that the Property be used for a planned unit development and delineated concrete and objective criteria for development of the Property in that manner.  As such, the City had no discretion to deny the Applications which sought to put the property to use for a planned unit development and complied with the Property's Land Use Plan development criteria and all other legitimate land use restrictions applicable to the Property.

146.    Lifestyle has the right to develop its Property free from arbitrary restrictions imposed by biased officials.

147.    Additionally, Lifestyle possesses a liberty interest to engage in "whatever legal business [it] elects to pursue," including the design and construction of apartments, free from the City's interference based solely on the fact that its municipal officials simply do not desire apartments and other affordable housing options. *See Sanderson v. Village of Greenhills*, 726 F.2d 284, 286–87 (6th Cir. 1984).

148.    The City denied Lifestyle due process by prohibiting Lifestyle from engaging in the City's land use application process afforded to other landowners in the City.  Among other things, the City stonewalled its land use and planning staff from working with Lifestyle and prevented Lifestyle from revising its Application to address concerns raised by members of ARB/MPC as well as City Council.

149.    Instead of working with or even providing Lifestyle with objective criteria the City was imposing on the Property, the City's officials schemed to ensure that Lifestyle's Applications were futile.  The City subjected Lifestyle to a 14-month process in which the outcome was preordained against Lifestyle in order to prevent Lifestyle's use of the Property in a manner consistent with all applicable, legitimate land use restrictions.

150.    The City's actions and omissions have prevented Lifestyle from putting its Property to economic use and foreclosed Lifestyle from engaging in its lawful profession within the City.

151.    The City deprived Lifestyle of its property and liberty interests by denying Lifestyle the opportunity to have its Applications reviewed and evaluated by an unbiased arbitrator.

152.    Through Resolution No. 04-2022, the City also deprived Lifestyle of its property and liberty interests by imposing restrictions and a de facto development moratorium on the Property without providing Lifestyle or the public notice and the opportunity to be heard on the imposition of restrictions on the Property.

153.    As a result, Lifestyle has suffered and will continue to suffer the deprivation of its vested rights under the United States Constitution and the Ohio Constitution.

## COUNT III – Violation of Substantive Due Process
## Under 42 U.S.C. Section 1983 and the Ohio Constitution

154.    Lifestyle incorporates the allegations contained in the previous paragraphs as if fully rewritten herein.

155.    The City has deprived Lifestyle of its property and liberty interests under color of law without due process of law in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, Sections 1 and 16 of the Ohio Constitution.

156.     Lifestyle's property and liberty interests are of a type protected by the Fourteenth Amendment to the United States Constitution and the Ohio Constitution.

157.     Lifestyle possesses legitimate claims of entitlement and justifiable expectations in their property interests, for among other reasons:

      a.      The City's current zoning of Lifestyle's Property is not in accordance with the Property's Land Use Plan;

      b.      The City, through its Charter and own admission, states that the Comprehensive Plan governs all development within the City and cabins the City's discretion as to its land use decisions;

      c.      Lifestyle has the right to use the Property for a planned unit development;

      d.      Lifestyle's Applications are in accordance with the City's Charter, Ordinance, and Comprehensive Plan, including the Property's Land Use Plan, such that the City did not have discretion to deny the Applications;

      e.      Lifestyle undertook significant actions and made substantial investments in its Property such that the City's action against Lifestyle and the Property and the City's denial of Lifestyle's Applications – an arbitrary departure from the Property's Land Use Plan – caused substantial detriment to Lifestyle; and

      f.      Lifestyle expended significant sums to design and plan the development plan.

158.     Specifically, as to the Property, the Property's Land Use Plan was not merely an aspirational, forward-looking guide.  Rather, by the City's own admission, the Property's Land Use Plan prescribed that the Property be used for a planned unit development and delineated

concrete and objective criteria for development of the Property in that manner. As such, the City had no discretion to deny the Applications which sought to put the property to use for a planned unit development and complied with the Property's Land Use Plan development criteria and all other legitimate land use restrictions applicable to the Property.

159. Lifestyle has the right to develop its Property free from arbitrary restrictions imposed by biased officials.

160. Additionally, Lifestyle possesses a liberty interest to engage in "whatever legal business [it] elects to pursue," including the design and construction of apartments, free from the City's interference based solely on the fact that its municipal officials simply do not desire apartments and other affordable housing options. *See Sanderson v. Village of Greenhills*, 726 F.2d 284, 286–87 (6th Cir. 1984).

161. The City's actions against Lifestyle, the Property, and Lifestyle's Applications are arbitrary, capricious, unreasonable, and do not bear a substantial relationship to the City's Charter and Ordinances, the Property's Land Use Plan, or the circumstances of the case.

162. Additionally, the City has arbitrarily interfered with and prevented Lifestyle from using its Property and foreclosed Lifestyle from engaging in its lawful profession within the City.

163. As a result of the City's arbitrary and capricious actions, Lifestyle has suffered and will continue to suffer the deprivation of its vested rights under the United States Constitution and the Ohio Constitution.

## COUNT IV – Violation of Due Process – Spot Zoning Under 42 U.S.C. Section 1983 and the Ohio Constitution

164. Lifestyle incorporates the allegations contained in the previous paragraphs as if fully rewritten herein.

165.     The City has deprived Lifestyle of its property and liberty interests under color of law without due process of law in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, Sections 1 and 16 of the Ohio Constitution.

166.     Lifestyle's property and liberty interests are of a type protected by the Fourteenth Amendment to the United States Constitution and the Ohio Constitution.

167.     Lifestyle possesses legitimate claims of entitlement and justifiable expectations in their property interests, for among other reasons:

a.     The City's current zoning of Lifestyle's Property is not in accordance with the Property's Land Use Plan;

b.     The City, through its Charter and own admission, states that the Comprehensive Plan governs all development within the City and cabins the City's discretion as to its land use decisions;

c.     Lifestyle has the right to use the Property for a planned unit development;

d.     Lifestyle's Applications are in accordance with the City's Charter, Ordinance, and Comprehensive Plan, including the Property's Land Use Plan, such that the City did not have discretion to deny the Applications;

e.     Lifestyle undertook significant actions and made substantial investments in its Property such that the City's action against Lifestyle and the Property and the City's denial of Lifestyle's Applications – an arbitrary departure from the Property's Land Use Plan – caused substantial detriment to Lifestyle; and

f.     Lifestyle expended significant sums to design and plan the development

plan.

168.    Lifestyle's property and liberty interests were singled out by the City through Resolution No. 04-2022 and by the de facto moratorium imposed against the Property alone.

169.    Other properties within the City were unaffected by the City's actions.

170.    The City has no legitimate reason to single out Lifestyle or its Property.

171.    The City's actions against Lifestyle, the Property, and the Applications are arbitrary, capricious, unreasonable, and do not bear a substantial relationship to the City's Charter and Ordinances, the Comprehensive Plan, or the circumstances of the case.

172.    As a result, Lifestyle has suffered and will continue to suffer the deprivation of its vested rights under the United States Constitution and the Ohio Constitution.

<u>**COUNT V – Violation of Due Process – Void for Vagueness<br>Under 42 U.S.C. Section 1983 and the Ohio Constitution**</u>

173.    Lifestyle incorporates the allegations contained in the previous paragraphs as if fully rewritten herein.

174.    The City has deprived Lifestyle of its property and liberty interests under color of law pursuant to an unconstitutionally vague Comprehensive Plan in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, Sections 1 and 16 of the Ohio Constitution.

175.    Lifestyle's property and liberty interests are of a type protected by the Fourteenth Amendment to the United States Constitution and the Ohio Constitution.

176.    Lifestyle possesses legitimate claims of entitlement and justifiable expectations in their property interests, for among other reasons:

    a.    The City's current zoning of Lifestyle's Property is not in accordance with the Property's Land Use Plan;

b. The City, through its Charter and own admission, states that the Comprehensive Plan governs all development within the City and cabins the City's discretion as to its land use decisions;

c. Lifestyle has the right to use the Property for a planned unit development;

d. Lifestyle's Applications are in accordance with the City's Charter, Ordinance, and Comprehensive Plan, including the Property's Land Use Plan, such that the City did not have discretion to deny the Applications;

e. Lifestyle undertook significant actions and made substantial investments in its Property such that the City's action against Lifestyle and the Property and the City's denial of Lifestyle's Applications – an arbitrary departure from the Property's Land Use Plan – caused substantial detriment to Lifestyle; and

f. Lifestyle expended significant sums to design and plan the development plan.

177. The City admits, and the City's Charter and zoning ordinance provide, that the Comprehensive Plan governs development in the City.

178. The City's Comprehensive Plan, as amended by Resolution No. 04-2022, on its face and as applied to Lifestyle and its Property is written in a manner that permits and encourages arbitrary, capricious, and discriminatory enforcement of the Comprehensive Plan.

179. The Comprehensive Plan, as amended by Resolution No. 04-2022, states in part:

a. The Property "represents a singular opportunity for the City of Worthington to develop the property in a manner that is extraordinary and that serves the long-term interests of the community."

    b.   The Property "should increase community well-being and vibrancy, [contain] opportunities for social activities for persons of all ages, bicycle and pedestrian connectivity, commercial opportunities, and housing, appropriate in scale and type, that support these goals."

    c.   The Property must, "[c]ompatible with current S-1 zoning, [include] a large contiguous greenspace, central to the property and inclusive of the Tucker Creek acreage."

    d.   Residential housing is "desirable," but must be "creatively executed" and be "harmonious."

180.    As such, the City's Comprehensive Plan, as amended by Resolution No. 04-2022, fails to prescribe objective or meaningful guidelines for the Property's development.

181.    The City's Comprehensive Plan, as amended by Resolution No. 04-2022, as applied to the Property is, in fact, arbitrary, capricious, and irrational.

182.    The City's enforcement and threatened continued enforcement of the unconstitutionally vague Comprehensive Plan on the Property has and will continue to cause the deprivation of Lifestyle's property and liberty interests protected under the United States Constitution and the Ohio Constitution.

### COUNT VI – Violation of Free Expression
### Under 42 U.S.C. Section 1983 and the Ohio Constitution

183.    Lifestyle incorporates the allegations contained in the previous paragraphs as if fully rewritten herein.

184.    Architecture, architectural design, development design, and residential construction are forms of expression that are protected by the First Amendment of the United States Constitution and the Ohio Constitution.

185. The City, by its actions, and by application of the City's Comprehensive Plan, as amended by Resolution No. 04-2022 to the Property, has improperly regulated protected forms of expression utilizing vague, overbroad, subjective, unverifiable, and irrational and arbitrary standards that deny and infringe Lifestyle's right to expression under the First Amendment of the United States Constitution and the Ohio Constitution.

186. As a result, the City's denial of Lifestyle's First Amendment rights has caused Lifestyle significant damages and stifled Lifestyle's freedom of expression through the Development's architecture, architectural design, development design, and construction.

## COUNT VII – Retaliation
## Under 42 U.S.C. Section 1983 and the Ohio Constitution

187. Lifestyle incorporates the allegations contained in the previous paragraphs as if fully rewritten herein.

188. Lifestyle has been engaging in activity protected by the First Amendment of the United States Constitution and the Ohio Constitution by exercising its right to apply to the City for land use approvals, including filing the Applications. Specifically, Lifestyle's activity constitutes petitioning activity under the United States Constitution and the Ohio Constitution.

189. Lifestyle's exercise of its First Amendment rights angered City officials.

190. The City, in continuing retaliation for Lifestyle's exercise of its First Amendment rights, has continuously and systematically fought Lifestyle's efforts to develop its Property contrary to Ohio law, the Ohio Constitution, and the United States Constitution for the purpose of grinding down and gradually destroying Lifestyle's will to exercise its First Amendment rights.

191. The City's retaliatory actions against Lifestyle would in their totality chill or deter an ordinary person from exercising one's First Amendment right to petition the City for a land use approval concerning the Property's development or for approval of the Applications.

192. Lifestyle's First Amendment activity was a motivating factor for the City's retaliatory actions, as indicated by the City's unequal, inequitable, arbitrary, and unreasonable treatment of Lifestyle and the City's ongoing campaign of adverse actions against Lifestyle.

193. The totality of the City's retaliatory acts violates Lifestyle's First and Fourteenth Amendment rights under the United States Constitution and the Ohio Constitution.

194. As a result, Lifestyle has suffered and will continue to suffer the violation of its rights under the United States Constitution and the Ohio Constitution.

195. The City's actions are ongoing and Lifestyle needs declaratory and injunctive relief to stop the retaliation.

## COUNT VIII – Declaratory Judgment

196. Lifestyle incorporates the allegations contained in the previous paragraphs as if fully rewritten herein.

197. The current zoning designations as applied to the Property are unconstitutional, unreasonable, inconsistent with the City's Comprehensive Plan in effect at the time that Lifestyle filed its Application, and not substantially related to the circumstances of the case.

198. Imposing the current zoning restrictions on the Property is arbitrary, capricious, unreasonable, and prevents Lifestyle from putting its property to legitimate and economical uses consistent with the City's Comprehensive Plan in effect at the time that Lifestyle filed its Application.

199. Accordingly, Lifestyle is entitled to a declaration that the City's imposition of the current restrictions on the Property is unconstitutional, unreasonable, inconsistent with the Comprehensive Plan, and not substantially related to the public health, safety, or welfare.

200. Use of the Property for a planned unit development within a Planned Use District, as set forth in Lifestyle's Applications, is constitutional, reasonable, substantially related to the public health, safety, welfare, and consistent with the Comprehensive Plan.

201. Accordingly, Lifestyle is entitled to a declaration that use of the Property to permit a planned unit development within a Planned Use District and approving the Applications is constitutional, reasonable, substantially related to the public health, safety, welfare, and consistent with the City's Comprehensive Plan.

**COUNT IX – Due Process Taking**
**Under 42 U.S.C. Section 1983 and the Ohio Constitution**

202. Lifestyle incorporates the allegations contained in the previous paragraphs as if fully rewritten herein.

203. The City has deprived Lifestyle of its property and liberty interests under color of law without due process of law in violation of the Fourteenth Amendment of the United States Constitution and Article I, Sections 1, 16, and 19 of the Ohio Constitution.

204. Lifestyle's property and liberty interests are of a type protected by the Fourteenth Amendment of the United States Constitution and the Ohio Constitution.

205. The City's actions concerning Lifestyle and its Property go so far and destroys the value of Lifestyle's Property to such an extent that it has the same effect as a taking by eminent domain, in several ways, such as:

    a. The City denied the Applications despite their compliance with all legitimate land use restrictions;

    b. The City's refusal to approve any application by Lifestyle to put its Property to economic use;

  c.  The imposition of a sham, 14-month process in which the outcome was preordained to prohibit Lifestyle from putting the Property to legitimate economic use;

  d.  The City's arbitrary requirement that the Property be put to use as an integrated whole such that portions of the Property cannot be separately put to economic use; and

  e.  Imposition of a de facto moratorium on the Property's development for an undefined period of time.

206. The City's aforementioned actions and/or omissions are an invalid exercise of the police power.

207. Lifestyle has suffered significant monetary damages as a result of the City's invalid exercise of the police power, and the City's actions must be declared invalid and enjoined.

## COUNT X – In the Alternative, Regulatory Taking
## Under 42 U.S.C. Section 1983 and the Ohio Constitution

208. Lifestyle incorporates the allegations contained in the previous paragraphs as if fully rewritten herein.

209. Under the current S-1 zoning classification, the vast majority of the Property cannot be put to any productive or economically beneficial use.

210. The City's refusal to rezone the Property to a zoning classification consistent with the Property's Land Use Plan and its arbitrary requirement that the Property must be developed as "an integrated whole" prevents Lifestyle from putting its Property to any productive or economically beneficial use.

211. The City's aforementioned actions and omissions interfere with Lifestyle's investment-backed expectations and results in severe detrimental impacts to Lifestyle.

212. The City's aforementioned actions and omissions are functionally equivalent to a direct appropriation of the Property and therefore constitutes a regulatory taking.

213. The City has not provided Lifestyle just compensation for its Property as required by the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 19 of the Ohio Constitution.

214. The City continues to act as though it owns the Property, imposing its preferences and desires for the Property that have no basis in the City Charter, Ordinances, or Comprehensive Plan.

215. If the City wants to impose these extralegal preferences on the Property, it must purchase the Property from Lifestyle. Only then can the City develop the Property the way it wants.

216. As a result, Lifestyle has suffered and will continue to suffer the taking of its Property without just compensation in violation of the Fifth and Fourteenth Amendments of the United States Constitution and Article I, Section 19 of the Ohio Constitution.

217. The City is liable for just compensation for the period of time that it has and continues to take Lifestyle's Property. Further, the City's taking of the Property must be declared invalid and enjoined.

## VI. PRAYER FOR RELIEF

WHEREFORE, in consideration of the foregoing, Lifestyle seeks:

A) Compensatory damages in an amount to be determined by a jury;

B) A declaration that Resolution No. 04-2022 is unconstitutional;

C) A declaration that subjecting the Property to an S-1 zoning designation is unconstitutional, unreasonable, and/or not substantially related to the public health, safety, or welfare;

D) A declaration that the City's denial of Lifestyle's Applications was unconstitutional and unlawful;

E) A declaration that use of the Property for a planned unit development within a Planned Unit District and approving the Applications is constitutional, reasonable, and substantially related to the public health, safety, or welfare;

F) An injunction requiring the City to refrain from any action to prevent Lifestyle from developing the Property consistent with the Applications;

G) Pre- and post-judgment interest;

H) Attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

I) Any other declarative, injunctive, or other equitable relief this Court deems just and appropriate.

Respectfully submitted,

VORYS, SATER, SEYMOUR AND PEASE LLP

*s/ Joseph R. Miller*
Joseph R. Miller (0068463), *Trial Attorney*
Christopher L. Ingram (0086325)
Emily J. Taft (0098037)
Jordan C. Patterson (0101174)
52 East Gay Street, P.O. Box 1008
Columbus, Ohio 43216-1008
Phone: (614) 464-6233
Fax: (614) 719-4630
jrmiller@vorys.com
clingram@vorys.com
ejtaft@vorys.com
jcpatterson@vorys.com
*Counsel for Plaintiffs*
*Lifestyle Communities, Ltd. and*
*Worthington Campus, LLC*

## DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs Lifestyle Communities, Ltd.

and Worthington Campus, LLC demand a trial by jury on all issues so triable.


*/s/ Joseph R. Miller*
Joseph R. Miller