## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**LIFESTYLE COMMUNITIES, LTD.,**
*et al.,*

          **Plaintiffs,**

    **v.**

**CITY OF WORTHINGTON, OHIO,**

       **Defendant.**

**Case No. 2:22-cv-1775**
**Judge Sarah D. Morrison**
**Magistrate Judge Elizabeth**
**Preston Deavers**

## OPINION AND ORDER

This litigation involves land use and zoning in a Central Ohio suburb. Lifestyle Communities Ltd. and Worthington Campus, LLC (collectively "Lifestyle") seek to develop approximately 37.6 acres of land in the City of Worthington (the "Property"). Lifestyle claims that Worthington's city leaders have illegally stonewalled its efforts at developing the Property so that the City can purchase it at a reduced price to develop it as a public park.

Now before the Court is Worthington's Motion to Dismiss.[1] (ECF No. 20.) For the reasons set forth below, that Motion is **GRANTED in part** and **DENIED in part**.

---

[1]Lifestyle requested oral argument on the Motion to Dismiss. Because the Court does not believe additional argument would be helpful, that request is **DENIED**.

## I.    BACKGROUND

The following draws from the factual allegations in the Complaint. Lifestyle's factual allegations are considered as true for purposes of the pending motion, but its legal assertions are not. *See Gavitt v. Born*, 835 F.3d 623, 639–40 (6th Cir. 2016).[2]

Lifestyle is an experienced developer that owns and/or manages mixed-use developments in five states, including Ohio. (¶¶ 1, 25, 46.)

The Property is centrally located "prime" real estate. (¶ 1.) Various developers and companies have tried to develop the Property in the past, but Worthington has delayed and blocked development; the Property is currently zoned within the City's "special" zoning classification, which permits a variety of public uses but requires rezoning to put the Property to economic use. (¶¶ 1, 2.)

In 2014, Worthington amended its Comprehensive Plan to prescribe a specific land use plan for the Property (the "Land Use Plan"). (¶ 2; Land Use Plan, ECF No. 20-1.) The Land Use Plan called for the Property to be rezoned as a Planned Unit Development and specified that it be developed with a mix of residential, commercial/office, and open space uses. (¶¶ 2, 41–43.)

After the Land Use Plan was adopted, in 2015, Lifestyle met with Worthington officials to discuss the Property's development. (¶ 45.) Lifestyle provided the City with initial sketches and met with various stakeholders to preview its concept for the Property. (¶¶ 52, 53–55.) At that time, the City

---

[2]The Court can consider the documents attached to Worthington's Motion to Dismiss. *See Armengau v. Cline*, 7 F. App'x 336, 344 (6th Cir. 2001) ("If referred to in a complaint and central to the claim, documents attached to a motion to dismiss form part of the pleadings.") (citation omitted).

committed that, if Lifestyle would develop the Property in accordance with the Land Use Plan, the City would provide the necessary approvals for the project. (¶ 48.) Based on the City's assurances, Lifestyle[3] purchased the Property. (¶ 50.)

Despite the Land Use Plan, the City and some residents made plans to convert the majority of the Property into a public park—at least, that was their plan until the City evaluated the costs to purchase the Property from Lifestyle. (¶¶ 4, 58–59.) Then, members of City Council decided they would prevent Lifestyle from developing the Property so that the City could buy it at a distressed price (the "Scheme"). (¶ 4.) According to a 2018 confidential memorandum, the Scheme required City Council to rescind the Land Use Plan and adopt a new plan. (¶ 5.). The City would then purchase the Property before selling off smaller parcels at a profit to fund construction of a large park on what is left of the Property. (*Id.*)

Even before Lifestyle filed a development application, Councilman Doug Smith declared that any development proposals from Lifestyle would be denied. (¶ 6.) Councilman David Robinson said that, after the City denied Lifestyle's efforts to develop the Property, Lifestyle would "buckle and realize the only remaining option would be to sell the Property to the City." (*Id.*)

Unaware of the Scheme, Lifestyle spent significant time, resources, and effort to plan and design a $197 million development. (¶ 7.) In October 2020, Lifestyle filed a 455-page application to rezone the Property to a Planned Unit Development with a development plan that was consistent with the Land Use Plan. (¶¶ 7, 77–80.)

---

[3]According to the Complaint, Worthington Campus owns the Property. (¶ 19.)

Worthington's usual practice is for city officials to meet with rezoning applicants and advise them on the criteria that it will apply to consider a development plan, but it did not follow this practice with Lifestyle's application. (¶¶ 8, 81–84.) Instead, the City informed Lifestyle that discussions about the proposed development would be limited to hearings conducted jointly by the City's Municipal Planning Commission ("MPC") and Architectural Review Board ("ARB"). (¶ 8.)

During the first MPC/ARB hearing on Lifestyle's application, the members refused to conduct any objective consideration of Lifestyle's development plan. (¶ 9.) Instead, city officials voiced "arbitrary and contrived objections" and demanded that Lifestyle address "vague speculation" by the members. (*Id*.) Nevertheless, Lifestyle offered to revise its plan. (¶ 10.)

For the next 8 months, Worthington refused to provide Lifestyle with any specific concerns about the proposed development. (¶ 11.)  In September 2021, Lifestyle submitted a revised concept plan that significantly reduced the number of residential units to be built, increased commercial space, and increased open green space. (¶¶ 11, 93–95.) This revised plan was also consistent with the Land Use Plan. (*Id*.)

On the morning of October 14, 2021, shortly before the second MPC/ARB hearing, Councilman Robinson emailed the members of the MPC/ARB to suggest that they not follow MPC's standard practices and that they deny Lifestyle's application. (¶¶ 96–97.) Then, at the hearing, the MPC/ARB again arbitrarily deemed the development plan insufficient without identifying any specific,

legitimate grounds. (¶¶ 12, 98–100.) This time, instead of allowing Lifestyle to amend its plan to address the City's concerns, MPC/ARB voted to recommend denial of Lifestyle's application. (¶¶ 12, 102–04.)

In December 2021, Worthington City Council conducted it's only hearing on Lifestyle's application. (¶ 13.) Lifestyle requested that City Council refer the matter back to MPC/ARB and direct that they disclose the criteria that they are using to review Lifestyle's plan for the Property, but City Council refused. (*Id.*) Lifestyle objected to the treatment that it had received, arguing that the outcome of its application had been predetermined. (¶ 106.) Still, City Council denied Lifestyle's application and barred it from re-applying to rezone the Property until at least April 2022. (¶¶ 14, 108–111.) According to Lifestyle, this was part of the Scheme— Lifestyle was left "with a Hobson's choice": it could either walk away and explore other options or reapply in April 2022, repeating the same process with the same preordained result. (¶ 14.)

But in January 2022, Worthington City Council rescinded the Land Use Plan and replaced it with "Guiding Principles" and "General Components" to prevent Lifestyle from reapplying for a zoning change or developing the Property ("Resolution 04-2022"). (¶¶ 15, 114–15; *see also* Resolution 04-2022, ECF No. 22-2.) Resolution 04-2022 was not shared publicly in advance and was adopted by City Council near midnight without any public input. (¶ 15.) Although the resolution only impacted the Property, Lifestyle was not given any notice or opportunity to be heard on it. (*Id.*) Lifestyle asserts that the "Guiding Principles" and "General

5

Components" imposed by the resolution are vague, specific to the Property, and will be used to stop Lifestyle from developing the Property. (¶¶ 15, 127.) Lifestyle further claims that it is infeasible to develop the Property under the current zoning restrictions. (¶¶ 128–132.)

Based on the City's interference with Lifestyle's development of its Property, Lifestyle brings ten claims against the City:

- Count I—Violation of Equal Protection;

- Count II—Violation of Procedural Due Process;

- Count III—Violation of Substantive Due Process;

- Counts IV and V—Violation of Due Process;

- Count VI—Violation of Free Expression;

- Count VII—§ 1983 First Amendment Retaliation;

- Count VIII—for Declaratory Judgment;

- Count IX—Due Process Taking, and;

- Count X—in the alternative, Regulatory Taking.

Worthington now moves to dismiss the Complaint for failure to state a claim.

## II.   STANDARD OF REVIEW

Federal Rule of Civil Procedure 8(a) requires a plaintiff to plead each claim with sufficient specificity to "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal alteration and quotations omitted). A complaint which falls short of the Rule 8(a) standard may be dismissed if it fails to state a claim upon which relief

can be granted. Fed. R. Civ. P. 12(b)(6). The Supreme Court has explained:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations and quotations omitted). The complaint need not contain detailed factual allegations, but it must include more than labels, conclusions, and formulaic recitations of the elements of a cause of action. *Directv, Inc. v. Treesh*, 487 F.3d, 471, 476 (6th Cir. 2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 555).

## III. ANALYSIS

### A. Due Process Claims (Counts II–V and IX)

Worthington argues that Lifestyle's Due Process claims must be dismissed because Lifestyle cannot, as a matter of law, demonstrate a protected property or liberty interest protected by the Due Process Clause.[4] (Mot., PAGEID # 128.)

---

[4]Lifestyle brings its due process claims under the Due Process Clause as applied to states through the Fourteenth Amendment to the United States Constitution and under Article I, Section 16 of the Ohio Constitution. The Ohio Supreme Court treats such claims brought under the Ohio Constitution as equivalent to their federal counterpart. *State v. Aalim,* 2017-Ohio-2956, ¶ 15, 150 Ohio St. 3d 489, 494, 83 N.E.3d 883, 890.

"Governmental action may be challenged as a violation of due process only when it may be shown that it deprives a litigant of a property or a liberty interest." *Gen. Elec. Co. v. New York State Dep't of Lab.*, 936 F.2d 1448, 1453 (2d Cir. 1991). That showing is therefore a "constitutional threshold" to raising a successful due process claim. *Id. See also* U.S. CONST. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law. . ..").

"'Liberty' and 'property' are broad and majestic terms." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 571 (1972). For the terms to have "some meaning," they must be subject to "certain boundaries." *Id.* at 572. The Supreme Court described the kinds of interests protected by the Fourteenth Amendment:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. . ..
>
> Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Id.* at 577.

So, to determine whether Lifestyle has a protected property interest in re-zoning the Property, the Court asks whether it had a legitimate claim of entitlement to that outcome. "A party cannot possess a property interest in the receipt of a benefit when the state's decision to award or withhold the benefit is wholly discretionary." *Med Corp., Inc. v. City of Lima*, 296 F.3d 404, 409 (6th Cir. 2002) (citation omitted). In other words, if the government "has unconstrained

8

discretion to deny the benefit, a prospective recipient of that benefit can establish no more than a 'unilateral expectation' to it." *Id*. at 410 (quoting *Roth*, 408 U.S. at 577). For a rezoning applicant "to establish a property right in a future, rezoned land use, [he] must point to some policy, law, or mutually explicit understanding that both confers the benefit and limits the discretion of the [government] to rescind the benefit." *Braun v. Ann Arbor Charter Twp.*, 519 F.3d 564, 573 (6th Cir. 2008) (internal quotation, citation, and alteration omitted). *Cf. EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 856 (6th Cir. 2012) (explaining that owners of real property have a protected "interest in a discretionary benefit, such as a re-zoning ordinance" only "<u>after</u> it is conferred.") (emphasis added). Thus, to establish a property interest in the rezoning ordinance it seeks, Lifestyle must demonstrate that Worthington City Council lacked discretion to deny Lifestyle's proposed use of the Property if Lifestyle complied with certain, minimum, mandatory requirements. *See, e.g., EJS Props.*, at 856 (citing *Silver v. Franklin Tsp., Bd. of Zoning Appeals*, 966 F.2d 1031, 1036 (6th Cir. 1992)).

Lifestyle's Due Process claims are premised on the Comprehensive Plan, the Land Use Plan, and Resolution 04-2022.[5] It asserts that the City's Charter requires

---

[5]Lifestyle also argues that it has a liberty interest in engaging in "whatever business [it] elects to pursue." (Resp., PAGEID # 413.) However, the list of liberty interests recognized by courts "is short, and the Supreme Court has expressed very little interest in expanding it." *EJS Props.*, at 860 (citation omitted). Lifestyle's proposed liberty interest is not on the list—particularly in light of the fact that a municipality or other zoning body is justified by its police powers to enact zoning for the public welfare and safety. These powers, though not unlimited, need only bear a rational relation to the health, safety, morals or general welfare. *See Vill. of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 391 (1926).

rezoning decisions be based on its Comprehensive Plan, including amendments to that plan (*i.e.* the Land Use Plan and Resolution 04-2022). (Compl. ¶ 66 ; Resp., PAGEID # 380.) Lifestyle also claims that it has a vested right to develop the Property pursuant to the Land Use Plan based on a mutually exclusive understanding between it and the City. (Compl. ¶ 144; Resp., PAGEID # 407–412.) Lifestyle alleges that Resolution 04-2022 is "utterly vague," imposes new requirements on the Property, and was adopted without Lifestyle receiving notice or an opportunity to be heard. (Compl., ¶¶ 114–15, 123–25.)

> ### 1. The Comprehensive Plan does not limit Worthington's discretion on zoning matters.

In arguing that the Comprehensive Plan is binding on all zoning decisions, Lifestyle relies on Section 6.03 of Worthington's City Charter, which lays out the powers and duties of the MPC as follows:

> The Municipal Planning Commission shall have the power to:
>
> (1) Review and recommend any revisions to the Master Plan, official map, area plans, and development standards of the City as often as necessary but not less frequently than every five (5) years;
> (2) Recommend to Council the disposition of requests for subdivision platting;
> (3) Recommend to Council amendments to the zoning plan and ordinance of the Municipality;
> (4) Recommend to Council zoning changes and zoning for newly annexed areas;
> (5) Determine or recommend to Council, as provided by ordinance, the disposition of requests for conditional use permits;
> (6) Cooperate with the regional planning commission and the planning commissions of area municipalities;
> (7) Act as the Board of Architectural Review as provided by ordinance. The Council shall annually appoint as additional voting members of the Board of Architectural Review two representatives of the Architectural Review District, one or both of whom shall be a resident

10

freeholder of said District;
(8) Perform such other duties, not inconsistent with this Charter, as may be required by ordinance.

In rendering a decision or recommendation, the Municipal Planning Commission shall articulate its basis therefor, in writing, by reference to the relationship that decision or recommendation has to the overall comprehensive planning goals of the City, which may be found in the Master Plan, the zoning map, a course of zoning or subdivision practices by the City, or any other acknowledged comprehensive strategy or goals previously established at the time of the decision or recommendation.

(City of Worthington Charter, § 6.03 (Amended November 8, 2016), ECF No. 20-9.)

Lifestyle's reliance on Section 6.03 fails because this language does not "require[] zoning decisions to be consistent with the City's Comprehensive Plan" as alleged in the Complaint. (Compl., ¶ 35). Rather, this language applies only to the MPC, not to City Council.

The MPC is not authorized to make final, binding zoning decisions. The only authority that the MPC has is to make recommendations about zoning to City Council. And, while the MPC must provide the "basis" for its recommendations, its recommendations need not be based on the Comprehensive Plan. (City Charter, § 6.03, ECF No. 20-9.) Instead, the MPC may consider: "the overall comprehensive planning goals of the City, which may be found in the Master Plan [*i.e.,* the Comprehensive Plan], the zoning map, a course of zoning or subdivision practices by the City, or any other acknowledged comprehensive strategy or goals previously established." (*Id.* (emphasis added).)

It is Worthington City Council that makes final decisions on zoning within the City, and it has complete discretion in rendering those decisions. *See* Ohio Rev.

11

Code § 713.10 ("[T]he legislative authority of [a] municipal corporation <u>may</u> amend or change the. . . [zoning] regulations of or within any district.") (emphasis added). That discretion is set out in Worthington's Codified Ordinances with regard to planned unit development rezoning:

> <u>City Council</u>. Upon receipt of the recommendation of the Municipal Planning Commission, the requested [planned unit development rezoning] shall be set forth in Ordinance form and shall thereafter be introduced in writing at a meeting of the City Council, and the City Council shall fix a date for a public hearing. . ..
>
> After receiving from the Municipal Planning Commission the recommendations for the proposed PUD and after holding the above public hearing, the City Council shall consider such recommendations and vote on the passage of the proposed PUD Ordinance. The City Council **may**, by a majority of all its members, adopt or reject the proposed Ordinance, with or without change.

(Worthington Ord. 1174.08 (passed 1-17-17), ECF No. 20-10 (emphasis added).)

Like in *EJS Properties*, the "word 'may' establishes 'sufficient discretion to undercut any argument that the language of the zoning regulations vested in [Lifestyle] an entitlement to the [re-zoning ordinance] once the [minimum requirements] were fulfilled.'" *Id.*. at 856 (citing *Triomphe Investors v. City of Northwood*, 49 F.3d 198, 203 (6th Cir. 1995) and *Braun v. Ann Arbor Charter Twp.*, 519 F.3d 564, 573 (6th Cir. 2008)).

Thus, Worthington had the discretion to deny Lifestyle's application even if Lifestyle complied with the Comprehensive Plan and/or amendments to that plan—which means that the Comprehensive Plan did not create a cognizable property interest in Lifestyle's requested rezoning of the Property. *See also Silver*, 966 F.2d at 1036 (landowner has no property right for his due process claim where the board

12

had discretion to deny the zoning permit); *Triomphe*, at 201 (property owner did not possess a legitimate claim of entitlement where zoning regulation gave the city council discretion to issue special use permits).

### 2. The Land Use Plan did not limit Worthington's discretion on zoning matters.

Lifestyle next argues that Worthington spent a great deal of time and expense to develop a Land Use Plan for the Property, which was codified to "guide future development of the [Property]." (Land Use Plan, ECF No. 22-1; *see also* Compl. ¶ 61; Memo, PAGEID # 409.) Lifestyle claims that this "codified" Plan is a "binding obligation" by the City and that the City's conduct is evidence of the binding nature of the Plan. (Compl. ¶¶ 41, 66, 72–75.) it also argues that City officials "committed to Lifestyle that, if it would develop the Property in accordance with the Property's Land Use Plan, the City would provide the necessary approvals." (Compl. ¶¶ 48–50.)

Lifestyle's arguments that the Plan is binding fail for at least two reasons. First, as already discussed, Worthington City Council has complete discretion in deciding rezoning matters. This discretion was not limited by the Land Use Plan, which is simply an amendment to the Comprehensive Plan.

Second, Lifestyle's allegation that it had a mutually explicit understanding with the City that it would approve Lifestyle's rezoning application if it was consistent with the Land Use Plan is insufficient to create a binding property interest.

Whether a property interest may be created in the absence of explicit contractual or legal provisions establishing a claim of entitlement is determined by state law. *Roth*, 408 U.S. at 577. And, although Ohio law does recognize contracts implied in fact, *Legros v. Tarr*, 44 Ohio St.3d 1 (1989), "it is well established that municipal corporations are without power to make contracts delegating or bargaining away their legislative or governmental powers, or which would disable them from performing their public functions and duties. . .." *State ex rel. Gordon v. Taylor*, 149 Ohio St. 427, 436 (1948); *see also Dyke v. City of Shaker Heights*, No. 83010, 2004 WL 231792, *10 (Ohio App. Feb. 5, 2004) (recognizing that a city cannot bargain away its legislative discretion on zoning matters); *compare Bauss v. Plymouth Twp.*, 233 Fed. Appx. 490, 497 (6th Cir. 2007) (under Michigan law, a property interest in a rezoning may be created when a "Planning Commission or the Township Board engaged in words or conduct that created an implicit, but nonetheless legally-binding, obligation to grant his rezoning application.").

Thus, Worthington's alleged representations and actions cannot create a legally binding obligation on the part of the City.

### 3. Resolution 04-2022 does not bind the City's zoning decisions and did not change the zoning for the Property.

Lifestyle alleges that Worthington "abruptly rescinded the Property's Land Use Plan and replaced it with Resolution 04-2022," which it describes as "utterly vague, hastily drafted 'Guiding Principles' and 'General Components' to prevent Lifestyle from reapplying or developing the Property." (Compl., ¶¶ 15, 114.) Lifestyle alleges that Resolution 04-2022 imposed certain requirements on the

14

future development of the Property including, among other things, "a large contiguous greenspace." (*Id.*, ¶¶ 123–24.) But Lifestyle's due process claims also fail to the extent they are based on Resolution 04-2022.

As an amendment to the Comprehensive Plan, Resolution 04-2022 is not binding on the City's zoning decisions; it does not implicate any property interests for Lifestyle. (ECF No. 22-2.) Even if City Council were required to follow the Resolution, it does not "require" that particular features be included in future developments of the Property as Lifestyle alleges it does. (Compl., ¶¶ 123–25.) Instead, the Resolution simply outlines the features and attributes that are "important" or "highly desirable" to future development of the Property. (ECF No. 22-2.)

Accordingly, Worthington's Motion to Dismiss is **GRANTED** on Counts II–V and IX.

### B.    Equal Protection Claim (Count I)

Worthington moves to dismiss Lifestyle's Equal Protection[6] claim because, among other reasons, Lifestyle failed to identify any similarly situated applicants that are similar to Lifestyle in all relevant respects. (Resp., PAGEID # 139.)

"The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and

---

[6]Lifestyle brings its equal protection claim under the Fourteenth Amendment to the United States Constitution and the Ohio Constitution. Both provisions are governed by predominantly the same standards. *Ullmo v. Ohio Tpk. & Infrastructure Comm'n*, 126 F. Supp. 3d 910, 919 (N.D. Ohio 2015) (citing *Warren v. City of Athens, Ohio,* 411 F.3d 697, 704, n. 6 (6th Cir.2005)).

arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Sioux City Bridge Co. v. Dakota Cty*, 260 U.S. 441, 445 (1923) (internal quotation marks and citation omitted).

An equal protection claim can be brought by a "class of one," when the plaintiff alleges that (1) the state treated her differently from "others similarly situated" and (2) "that there is no rational basis for such difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

A plaintiff bringing a "class of one" claim faces an "uphill climb." *In re City of Detroit*, 841 F.3d 684, 701 (6th Cir. 2016). Such claims are evaluated under a rational-basis review, which means that the challenged "government action is afforded a strong presumption of validity." *Id*. The plaintiff's burden to overcome the presumption of validity begins with the complaint. *See also Club Italia Soccer & Sports Org. Inc. v. Charter Twp. of Shelby*, 470 F.3d 286, 298 (6th Cir. 2006).

As a class-of-one plaintiff, Lifestyle is held to a higher, particularized standard when identifying others "similarly situated." *See Leib v. Hillsborough Cty. Pub. Trans. Comm'n*, 558 F.3d 1301, 1307 (11th Cir. 2009); *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006); *JDC Mgmt., LLC v. Reich*, 644 F.Supp.2d 905, 926–27 (W.D. Mich. 2009) (collecting cases). It "must show not just that [it was] treated differently than others outside of [its] 'class' but that, in comparison to those outside [its] class, [it was] 'similarly situated *in all relevant respects*.'" *Anders v. Cuevas*, 984 F.3d 1166, 1180 (6th Cir. 2021) (emphasis added)

16

(quoting *Johnson v. Morales*, 946 F.3d 911, 939 (6th Cir. 2020)); *accord Rondigo, LLC v. Twp. of Richmond*, 641 F.3d 673, 682 (6th Cir. 2011). The plaintiff's burden is particularly onerous in a discretionary rezoning case, where the government must balance a "complex and multidimensional" set of conflicting considerations in making its decision. *Carruth v. Bentley*, 942 F.3d 1047, 1058 (11th Cir. 2019).

"When evaluating whether parties are similarly situated, 'courts should not demand exact correlation, but should instead seek relevant similarity.'" *EJS Props.*, 698 F.3d at 864–65 (quoting *Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir. 2000)). Nonetheless, the similarly-situated requirement "is inevitably more demanding where a difference in treatment could legitimately be based on a number of different factors," as is the case in the land-use context. *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1218 (10th Cir. 2011). Thus, "[t]he 'similarly situated' requirement must be enforced with particular rigor in the land-use context because zoning decisions 'will often, perhaps almost always, treat one landowner differently from another.'" *Cordi-Allen v. Conlon*, 494 F.3d 245, 251 (1st Cir. 2007) (quoting *Olech*, 528 U.S. at 565 (Breyer, J., concurring)).

Lifestyle asserts similarity in only a conclusory manner—not only are there no factual allegations that could provide the Court with a basis for evaluating the similar nature of its alleged comparators, but Lifestyle never identifies any specific applicant, property, developer, or property owner as similarly situated in its Complaint.[7] Instead, Lifestyle's Complaint includes only general references to

---

[7]In contrast, in *Andrews v. City of Mentor*, the plaintiff alleged that both its property and the comparator property consisted of approximately sixteen acres of

"similarly situated applicants" (¶¶ 81–83, 97, 138), properties "similar to Lifestyle [that] sought to rezone from a S-1 classification to a Planned Use District zoning classification" (¶ 135), and "similarly situated developers and property owners" (¶¶ 136, 138). Those references are insufficient to adequately identify similarly situated comparators for purposes of its Equal Protection Claim. *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1205 (11th Cir. 2007) (plaintiff "fail[ed] to state a claim by omitting key factual details in alleging that it is 'similarly situated' to [the other entities].").

Lifestyle's threadbare allegations fail to demonstrate an appropriate class of comparators sufficient to support its Equal Protection claim. *See Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level.").

Accordingly, Worthington's Motion to Dismiss is **GRANTED** as to Count I.

## C.     First Amendment Claims (Counts VI, VII)

Lifestyle asserts two claims under the First Amendment[8]: a freedom of expression claim (Count VI) and a retaliation claim (Count VII). Worthington seeks dismissal of both. (Mot., PAGEID # 147.)

---

land, they both planned to use the land for the development of a materially similar number of residential units, they both planned to leave the same amount of open space, would have two access points to public roads, and fit the maximum density requirements for the proposed zoning. 11 F.4th 462, 474 (6th Cir. 2021). Those allegations were sufficient to satisfy the "similarly situated" requirement for a class-of-one claim at the pleading stage. *Id.*

[8]Lifestyle's First Amendment claims are brought under the First Amendment to the United States Constitution and Article I, Section 11 of the Ohio Constitution. "[I]t is well settled that 'the free speech guarantees accorded by the Ohio Constitution are no broader than the First Amendment, and that the First Amendment is the proper basis for interpretation of Section 11, Article I of the Ohio Constitution.'" *Phillips v. DeWine*, 92 F. Supp. 3d 702, 717 (S.D. Ohio

### 1.    Freedom of Expression Claim

Lifestyle's freedom of expression claim is based on the artistic or architectural nature of its proposed development plans. (Resp., PAGEID # 422.) Because Lifestyle's freedom of expression claim fails as a matter of law on other grounds, the Court assumes without deciding that Lifestyle's architectural plans are protected First Amendment speech.

"[W]hen 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *United States v. O'Brien*, 391 U.S. 367, 376–77 (1968); *see also Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

> [A] government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*O'Brien*, at 376–77.

It is well-settled that local governments are justified to enact zoning regulations and, when they do so, zoning furthers an important governmental interest. Here, there are no allegations that Worthington enacted its zoning ordinance or refused to rezone the Property to stifle speech. Instead, the City's actions were content-neutral zoning regulations. *Alexander v. City of Oakwood*, No.

---

2015) (Frost, J.), *aff'd*, 841 F.3d 405 (6th Cir. 2016) (quoting *Eastwood Mall, Inc. v. Slanco,* 68 Ohio St.3d 221, 222, 626 N.E.2d 59, 61 (1994)).

C-3-87-011, 1993 WL 1318608, at *7 (S.D. Ohio Jan. 27, 1993) (Rice, J.)

("Government regulation of expressive activity is content neutral so long as it is

justified without reference to the content of the regulated speech.") (citations and

quotations omitted). Lifestyle's allegations make clear that the Property's existing

zoning is based on the Property's historical use (Compl. ¶ 2) and that Worthington's

denial of Lifestyle's request to rezone was based on a desire to use the Property as a

park—which is a use the Property is currently zoned for. (Compl. ¶ 15.) Thus

Lifestyle's allegations establish that the zoning and actions of Worthington are

"justified without reference to the content of the regulated speech." *Ward*, at 791;

*see also Alexander*, at *7–9 (the challenged ordinance did not violate the First

Amendment when it operated to control the appearance of residential lots and took

into consideration residents' aesthetic impression of the lots).

The Property's existing zoning and actions by City Council were not designed

to suppress speech. Any restriction on Lifestyle's alleged First Amendment freedom

to express itself through architecture is incidental and no greater than what is

essential to the furtherance of Worthington's important government interests.

Worthington's Motion to Dismiss Count VI is **GRANTED**.

### 2. Retaliation Claim

Lifestyle's retaliation claim is based its right to petition the government for

rezoning. (Resp., PAGEID # 422.) Lifestyle claims that, when it engaged in its right

to petition the City for a rezoning, Worthington retaliated against Lifestyle by the

City's handling of the petition and by denying Lifestyle's rezoning request. (*Id.* at

20

426.) A creative attempt to re-frame its due process claims, Lifestyle's retaliation claim fails.

"Nothing in the First Amendment or in th[e Sixth Circuit]'s case law interpreting it suggests that the rights to speak, associate, and petition require government policymakers to listen or respond to individuals' communications on public issues." *EJS Props.*, 698 F.3d at 863 (citing *Minn. State Bd. for Cmty. Colls. v. Knight*, 465 U.S. 271, 285 (1984)). Thus, the First Amendment right to petition is a right to "adequate, effective and meaningful" <u>access</u>—it is not a right to have a particular <u>process</u> or <u>result</u> from the government. *John L. v. Adams*, 969 F.2d 228, 233–34 (6th Cir. 1992). The distinction between access and process "is consistent with the Supreme Court jurisprudence establishing that the right to petition does not 'require government policymakers to listen or respond.'" *Id.* (quoting *Minn. State Bd.*, 465 U.S. at 285).

Lifestyle's complaints about the process and the results of its petition are properly brought as due process claims and are not First Amendment retaliation claims.

Worthington's Motion to Dismiss Count VII is **GRANTED**.

### D.    Regulatory Takings Claim (Count X)

Worthington argues that Lifestyle's takings claim fails because it has not been deprived of all economically viable uses for the Property. (Mot., PAGEID # 154.) However, for its takings claim, Lifestyle alleges that Worthington's actions constitute both a "total" and a "partial" regulatory taking. (Resp., PAGEID # 428.)

21

The Takings Clause of the Fifth Amendment[9] provides that private property shall not 'be taken for public use, without just compensation." *Murr v. Wisconsin*, ---U.S. ---- , 137 S.Ct. 1933 (2017) (citations and quotations omitted). *See also Dolan v. City of Tigard*, 512 U.S. 374, 383 (1994) (the Takings Clause applies to the states via the Fourteenth Amendment). The Fifth Amendment's guarantee that the government will not take private property for public use without just compensation is "'designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Penn Cent. Transp. Co. v. City of New York* (*"Penn Central"*), 438 U.S. 104, 123–24 (1978) (quoting *Armstrong v. U.S.*, 364 U.S. 40, 49 (1960)).

Takings claims come in a few shapes and sizes. A "regulatory taking" concerns land-use regulations. *Id.* A total regulatory taking is one that allows the property owner "*no* productive or economically beneficial use of land" and entitles the property owner to just compensation under the Fifth Amendment. *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019 (1992) (emphasis in original); *see D.A.B.E., Inc. v. City of Toledo*, 292 F. Supp. 2d 968, 971 (N.D. Ohio 2003), *aff'd*, 393 F.3d 692 (6th Cir. 2005). A partial regulatory taking is a less intrusive regulation that

---

[9]Lifestyle brings its takings claim under the federal Takings Clause applied to the states through the Fourteenth Amendment to the United States Constitution and Article I, Section 19 of the Ohio Constitution. "The Ohio Supreme Court has held. . . that Article I, § 19 of the Ohio Constitution affords greater protection than the federal Takings Clause." *McCarthy v. City of Cleveland*, 626 F.3d 280, 287 (6th Cir. 2010) (citing *City of Norwood v. Horney,* 110 Ohio St.3d 353, 853 N.E.2d 1115, 1136–42 (2006)). Worthington has not addressed why Lifestyle's claim fails under the Ohio Constitution. Accordingly, Worthington's Motion to Dismiss is **DENIED** on Count X to the extent it alleges violation of the Ohio Constitution.

prevents the property owner from some, but not all economic use of his land.
*D.A.B.E.*, at 971; *Lucas*, 505 U.S. at 1019. *See also Andrews*, 11 F.4th at 468 (citing
*Penn Central*, at 124). A partial taking may still entitle the property owner to just
compensation, depending on the level of intrusion and the governmental interest at
stake. *D.A.B.E.,* at 971–72; *see Anderson v. Charter Twp. of Ypsilanti*, 266 F.3d 487,
493 (6th Cir. 2001).

### 1. Total Regulatory Taking

Lifestyle first contends it suffered a total regulatory taking because it has
been deprived of all economically beneficial use of the Property. (Resp., PAGEID #
429.) However, according to the Complaint, the Property is currently subject to four
zoning restrictions: R-10, C-2, C-3, and S-1. (Compl., ¶ 128.) These zoning
restrictions allow multiple economic uses, including parks, churches, Sunday
schools, parochial schools, plant production, preschools, nursery schools, and
daycare centers. (*Id.*; Worthington Ordinance 1147.01 re. Permitted and
Conditional Uses.) Thus, the zoning restrictions on the Property do not deny
Lifestyle of all economically viable use of its land.

### 2. Partial Regulatory Taking

Lifestyle next contends that it has alleged sufficient facts to meet the *Penn
Central* test for a partial regulatory taking. (Resp., PAGEID # 429.) In *Penn
Central*, the Supreme Court established standards for evaluating whether a
government regulation gives rise to a takings claim, explaining that courts must
engage in an *ad hoc* factual inquiry that considers a myriad of factors including: (1)

the economic impact of the regulation, (2) its interference with reasonable investment-backed expectations, and (3) the character of the government action. *Id.* at 124.

The Court's inquiry focuses "upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests." *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 540 (2005). The issue is "the severity of the burden that government imposes upon private property rights." *Id.* at 539. The Fifth Amendment's guarantee that the government will not take private property for public use without just compensation is "'designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Penn Central*, at 123–24 (quoting *Armstrong*, at 49).

Here, Lifestyle has sufficiently alleged a partial regulatory taking. Looking at the *Penn Central* factors, it has alleged: (1) that the economic impact of the existing zoning and Worthington's actions has been substantial[10]; (2) that it had the reasonable expectation that it would be able to develop the Property and put it to full economic business use[11]; and (3) that Worthington's efforts to develop the

---

[10]While a "mere diminution in the value of property, however serious, is insufficient to demonstrate a taking," *Concrete Pipe & Prod. Of Cal., Inc. v. Const. Laborers' Pension Tr. for S.Cal.*, 508 U.S. 602, 645 (1993) (collecting cases), the allegations in the Complaint are sufficient to allow the claim to move forward.

[11]Worthington argues that a rezoning denial cannot interfere with a reasonable investment-backed expectation when the applicant was aware of a property restriction before entering into negotiations. (Reply, PAGEID # 491.) However, that a restriction predates the landowner's acquisition is not dispositive, but rather one of several factors to consider. *Murr*, --- U.S. at ----, 137 S. Ct. at 1945

Property as a public park have forced Lifestyle alone to bear a burden that should be shared by the community as whole and the character of that burden is not temporary. *See Tennessee Scrap Recyclers Ass'n v. Bredesen*, 556 F.3d 442, 453–55 (6th Cir. 2009) (character of burden did not weigh in favor of unconstitutional taking where burden was temporary lasting for only 10 days).

Worthington's Motion to Dismiss is **DENIED** as to Count X for a partial regulatory taking and is **GRANTED** to the extent that the claim is for a total regulatory taking.

### E. Declaratory Judgment Claim (Count VIII)

Finally, Worthington seeks dismissal of Lifestyle's declaratory judgment claim for the same reasons it sought dismissal of Lifestyle's other claims. (Mot., PAGEID # 156.) In light of the Court's ruling that the partial regulatory takings claim and the Ohio constitutional takings claim survive, it will not dismiss Lifestyle's declaratory judgment claim.

Worthington's Motion to Dismiss is **DENIED** as to Count VIII to the extent that Lifestyle's takings claim survives.

## IV. CONCLUSION

For the reasons set forth above, Worthington's Motion to Dismiss (ECF No. 20) is **GRANTED in part** and **DENIED in part**. Lifestyle may proceed on Count X to the extent it alleges a partial regulatory taking under the federal constitution

---

("[N]o single consideration can supply the exclusive test" for whether an unconstitutional taking has occurred.).

and a taking under the Ohio Constitution and on Count VIII to the extent Lifestyle

seeks declaratory judgment for its surviving taking claims.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**