**EXHIBIT B**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| LIFESTYLE COMMUNITIES, LTD., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF WORTHINGTON, OHIO,<br><br>Defendant. | CASE NO. 2:22-cv-01775-SDM-EPD<br><br>JUDGE SARAH D. MORRISON<br><br>MAGISTRATE JUDGE<br>ELIZABETH PRESTON DEAVERS |

### AFFIDAVIT OF COLLEEN PARRY

1. My name is Colleen Parry.

2. I am 18 years of age or older and I am competent to render the foregoing testimony under oath.

3. I currently serve as the Director of Word Processing for Dickie, McCamey & Chilcote, P.C.

4. In my capacity as the Director of Word Processing, I certify that the attached Franklin County Auditor Board of Revision transcript is a true and accurate transcription of the publicly available recording to the best of the transcriber's ability.

*FURTHER AFFIANT SAYETH NAUGHT.*

_____
COLLEEN PARRY

Sworn to and signed in my presence this 29th day of February, 2024.

_____
Notary Public

Kimberly Rae Bauder
Notary Public, State of Ohio
My Commission Expires 05-17-2027

# BOR RECORD
## Lifestyle Communities Claim Against City of Worthington

| | |
|---|---|
| Mr. Phillips: | Today is October 19, 2020. Franklin County Board of Revision is now in session. I'm Art Phillips representing the County Treasurer. |
| | _____ _____ representing the County Auditor. |
| Ms. Riley: | Amy Riley representing the County Commissioner. |
| Mr. Phillips: | We now consider case 19-832 involving District 100, Parcel 6774. Here representing the property owner. |
| Mr. Zieger: | It is Matthew Zieger on behalf of The United Methodist Children's Home. |
| Mr. Phillips: | And with you? |
| Mr. Brownlee: | Bo Brownlee, on behalf of Lifestyle Communities. |
| Ms. Spirit: | Melissa Spirit with The Robert Weiler Company, Real Estate Appraiser. |
| Mr. Phillips: | Raise your right hands please. Do you swear and affirm that the information you give will be the truth to the best of your knowledge and belief? |
| Mr. Brownlee: | I do. |
| Ms. Spirit: | Yes. |
| Mr. Phillips: | And here representing the school board? |
| Ms. Sanburn | Michelle Sanburn _____ _____, _____and on behalf of the Worthington City School. |
| Mr. Phillips | Okay. Mr. Zieger you can go ahead and present your case. |
| Mr. Zieger: | Great. Thank you very much. The property owner calls Bo Brownlee. Mr. Brownlee could you please state your full name? |
| Mr. Brownlee: | Yes, Thomas Robert Brownlee. |
| Mr. Zieger: | And are you currently employed? |
| Mr. Brownlee: | I am. |
| Mr. Zieger: | By whom are you currently employed? |
| Mr. Brownlee: | Builders Resource Group. |
| Mr. Zieger: | What is your position with Builders Resource Group? |

| | |
|---|---|
| Mr. Brownlee: | General Counsel. |
| Mr. Zieger: | Are you familiar with an entity called Lifestyle Real Estate Holdings Limited? |
| Mr. Brownlee: | Yes. That is one of our affiliates. |
| Mr. Zieger: | Does that entity fall under your responsibilities as general counsel? |
| Mr. Brownlee: | It does. |
| Mr. Zieger: | Are you familiar with the United Methodist Children's Home site in Worthington? |
| Mr. Brownlee: | I am. |
| Mr. Zieger: | Is Lifestyle Real Estate Holdings in contract to purchase the UMCH site? |
| Mr. Brownlee: | Yes it is. |
| Mr. Zieger: | Alright. And, do you have Exhibit A before you? |
| Mr. Brownlee: | I do. |
| Mr. Zieger: | Okay. And, do we need to publish that for anyone or is everybody good since it is on the email? |
| Man: | We have copies uh, Chris scanned at this point on base? |
| Woman: | We have them. |
| Man: | Okay. I am getting nod yes. So we are in good shape. |
| Mr. Zieger: | Okay. Great. Thank you. |
| Woman: | Can we _____ this contract just so I make sure I am on the same page? |
| Mr. Zieger: | It is. It is the Real Estate Purchase Contract. |
| Man: | Thank you. |
| Mr. Zieger: | Mr. Brownlee, have you ever seen Exhibit A? |
| Mr. Brownlee: | Yes. |
| Mr. Zieger: | What is Exhibit A? |
| Mr. Brownlee: | It's the Real Estate Purchase Contract between Lifestyle Real Estate Holdings and UMCH for the acquisition and sale of the UMCH property on |

| | |
|---|---|
| HMr. Zieger: | And is Exhibit A a true and accurate and correct copy of the April 20, 2017 Real Estate Purchase Contract between UMCH and Lifestyle? |
| Mr. Brownlee: | Yes. |
| Mr. Zieger: | And did you negotiate that document? |
| Mr. Brownlee: | I did. |
| Mr. Zieger: | Are you familiar with the price of the purchase? |
| Mr. Brownlee: | Yes. |
| Mr. Zieger: | And do you know what that is? |
| Mr. Brownlee: | Yes. It is $200,000 multiplied by the number of developable acres. |
| Mr. Zieger: | And do you know what the aggregate purchase price would be under the contract? |
| Mr. Brownlee: | It is approximately six million dollars. |
| Mr. Zieger: | And is that price contingent upon getting the property rezoned? |
| Mr. Brownlee: | Yes, it is. |
| Mr. Zieger: | Alright. And has Lifestyle closed on the UMCH property yet? |
| Mr. Brownlee: | No. We have not. |
| Mr. Zieger: | Alright is the closing scheduled at this point? |
| Mr. Brownlee: | We anticipate scheduling the closing for yet this year in December probably. |
| Mr. Zieger: | Alright and have you personally been to the UMCH site? |
| Mr. Brownlee: | Yes, I have. |
| Mr. Zieger: | And are you familiar with improvements on that site? |
| Mr. Brownlee: | Yes. |
| Mr. Zieger: | Alright. And are you familiar with the condition of those improvements on the site? |
| Mr. Brownlee: | Yes. |

| | |
|---|---|
| Mr. Zieger: | Could you explain to the Board the conditions of the improvements on the UMCH parcel? |
| Mr. Brownlee: | Yes. The buildings scattered throughout the campus, the property, are in remarkably poor condition. There's water intrusion, mold, asbestos that needs to be remediated prior to any demolition. Quite frankly, none of the buildings are salvageable and our development plans would call for the removal of all the buildings. |
| Mr. Zieger: | Alright. And have those buildings been vacant? |
| Mr. Brownlee: | Yes. For quite some time. |
| Mr. Zieger: | Have those buildings been vacant since Lifestyle got into contract in 2017? |
| Mr. Brownlee: | Yes. |
| Mr. Zieger: | Has Lifestyle submitted a rezoning plan? |
| Mr. Brownlee: | Yes, we have recently. |
| Mr. Zieger: | And are those structures that are existing part of that new plan? |
| Mr. Brownlee: | No. In order for us to execute the plan that we've proposed in our rezoning application, the structures would need to be removed. |
| Mr. Zieger: | Okay. And how would those structures be removed? |
| Mr. Brownlee: | Yea. Well, first, we would need to abate the asbestos in many of the buildings and then pull a demolition permit and then demolish the buildings. |
| Mr. Zieger: | Has Lifestyle received any estimates for cost of abating the asbestos? |
| Mr. Brownlee: | Yes. |
| Mr. Zieger: | And do you know what the amount of money it would cost for Lifestyle to remediate the asbestos? |
| Mr. Brownlee: | Approximately $350,000. |
| Mr. Zieger: | Has Lifestyle received any quotes for demo-ing the buildings that are onsite? |
| Mr. Brownlee: | Yes. |
| Mr. Zieger: | How much would it cost Lifestyle to demo the buildings that are currently on the UMCH site? |

| | |
|---|---|
| Mr. Brownlee: | Approximately $450,000. |
| Mr. Zieger: | And that's independent of the asbestos abatement costs? |
| Mr. Brownlee: | Correct. So a total for asbestos abatement and demolition is approximately $800,000. |
| Mr. Zieger: | Is there any value in those improvements? |
| Mr. Brownlee: | None. |
| Mr. Zieger: | Would you have, would Lifestyle had paid more for the parcel had the improvements already been demo-ed? |
| Mr. Brownlee: | Yes. |
| Mr. Zieger: | Okay. Thank you sir. That's all the questions I have. |
| Mr. Phillips: | Ms. \_\_\_\_ford. Any questions for Mr. Brownlee? |
| Ms. \_\_\_\_ford: | Yes. A few sir. Thank you. When did you first become personally familiar with the subject property? |
| Mr. Brownlee: | I believe about 2015. |
| Ms. \_\_\_\_ford: | In Exhibit A, the real estate purchase contract that has been submitted is dated April 20, 2017. Correct? |
| Mr. Brownlee: | Correct. |
| Ms. \_\_\_\_ford: | And as I was reading through it, it appears that there were prior real estate purchase contracts. Is that accurate? |
| Mr. Brownlee: | I believe our initial contract with UMCH was entered into in 2015 and I can't recall if it expired or if the parties agreed to terminate it. But then we signed the contract that's currently in front of you. |
| Ms. \_\_\_\_ford: | Okay. And that is outlined, it looks like, in Recital C. Correct? |
| Mr. Brownlee: | Correct. |
| Ms. \_\_\_\_ford: | Okay. And so if the property owner and Lifestyles wanted to enter into another purchase contract, that would make this one null and void as well. Is that correct? |
| Mr. Brownlee: | Yes, correct. |

5

| Ms. \_\_\_\_ford: | Okay. How long has Lifestyles been working to change the zoning on the property? |
|---|---|
| Mr. Brownlee: | Well, uh, we've been thinking about what the development wants to be on the site literally since we signed the contract. But the rezoning application that we filed with the city was only recently, in fact just this month. So passively, we've been thinking about the development plan and how we would get the property rezoned literally for years. But now with the rezoning application having been filed, I suspect the activity will pick up significantly now. |
| Ms. \_\_\_\_ford: | Okay. And what steps are left. I understand you filed the application. What are any steps left before the property is potentially rezoned or not? |
| Mr. Brownlee: | Yea. I would describe it as three steps. First we need to get through Planning Commission, then we need to get through a Board of Architectural review and approval and then we would be seeking city council approval. I'm still working with our zoning council to understand what the timeline might look like. But it's clear we're not going to be any sooner than sometime into 2021. |
| Ms. \_\_\_\_ford: | And, have you been given any indication as to the likelihood of the passing of your rezoning _____. |
| Mr. Brownlee: | Um, uh, the city believes this will be a very difficult rezoning application to get approved. But we're hopeful that with compromises and working with the city we can get there. |
| Ms. \_\_\_\_ford: | So it's not a sure thing, I guess \_\_\_\_. |
| Mr. Brownlee: | No. |
| Ms. \_\_\_\_ford: | You mentioned that the purchase price in the purchase contract is $200,000 per developable acre which totalled around $6,000,000. Correct? |
| Mr. Brownlee: | Correct? |
| Ms. \_\_\_\_ford: | How was the total number of developable acres determined and who \_\_\_\_ that? |
| Mr. Brownlee: | We worked, the parties worked with EMH&T, a local engineering and survey company, to measure the undevelopable acres including Tucker Creek area which is to the south of, it's included within the UMCH ground, but it's the southern portion of the ground. And the total undevelopable acres, I'm sorry, the total developable acres is approximately 30 acres. |
| Ms. \_\_\_\_ford: | Those are all the questions I have. Thank you. |

| | |
|---|---|
| Mr. Brownlee: | Yep. |
| Mr. Phillips: | Thank you. |
| Mr. Ziegler: | And Mr. Brownlee, a bit of redirect based on counsel's questions. Counsel had mentioned a rezoning application that was filed by Lifestyle. Do you recall that? |
| Mr. Brownlee: | Yes. |
| Mr. Ziegler: | Alright. And did you have occasion to talk with UMCH at the when Lifestyle was going to file that application? |
| Mr. Brownlee: | Yes. |
| Mr. Ziegler: | And did you have occasion to talk with UMCH about Lifestyle purchasing the ground absent a rezoning at that time? |
| Mr. Brownlee: | Ah, yes. So. |
| Mr. Ziegler: | Ah. |
| Mr. Brownlee: | Go ahead. |
| Mr. Ziegler: | No, go ahead and tell the Board what occurred. |
| Mr. Brownlee: | So, when we sought, uh we needed UMCH's signature on the rezoning application, both the applicant and the current owner needed to sign the rezoning application. We, we secured their signature but in doing so, UMCH expressed an interest in possibly discounting our purchase price and having us close early and waiving the rezoning contingency because probably for multiple reasons but the reason that I can recall being stated was they just didn't have the appetite for what was probably going to be a prolonged rezoning battle and so we recently agreed to acquire the property at a discount provided that we closed yet this year. |
| Mr. Ziegler: | Alright. And what was the discount? |
| Mr. Brownlee: | It's a total of $5.2 million. |
| Mr. Ziegler: | And does Lifestyle expect to close for that amount yet this year? |
| Mr. Brownlee: | Yes. |
| Mr. Ziegler: | Thank you. I have no further questions. |
| Mr. Phillips: | Okay Mr. Zeigler, you can go ahead and continue with your person. |

| | |
|---|---|
| Mr. Ziegler: | Thank. It's thank you. The property owner calls Melissa Spirit. And will the, will the school board stipulate as to Ms. Spirit's qualifications? |
| Woman: | We will as they are contained in her report. Yes. |
| Mr. Ziegler: | Okay. And Ms. Spirit, are your qualifications contained in your report. |
| Ms. Spirit: | Yes, yes they are. |
| Mr. Ziegler: | Okay. And that's on Page 7 of your report? |
| Ms. Spirit: | Yes. Page 7. |
| Mr. Ziegler: | Then, Ms. Spirit, were you retained to appraise the UMCH property in Worthington? |
| Ms. Spirit: | Yes I was. |
| Mr. Ziegler: | Alright. And when you were retained, did you personally go to the site and look at the property? |
| Ms. Spirit: | Yes I did. |
| Mr. Ziegler: | Alright. And did you visualize, or did you see, did you observe the conditions of the improvements on the property? |
| Ms. Spirit: | Yes, I did. |
| Mr. Ziegler: | Alright. And could you explain to the Board what you saw? |
| Ms. Spirit: | The, all of the buildings are in a delipidated state. And I've got a variety of pictures in the report which I'll, I'll point to later. But, yes, to answer your question ____, all of the buildings were overgrown, um, had a significant amount of deferred maintenance. It was very apparent that they had been vacant and just left for a long period of time. You know, years and years and years of being vacant and just not being kept up. Really uninhabitable. Um, safety, there was some safety concerns of being, you know, in or around some of those buildings. So, in my opinion, all of the b, none of the buildings had any contributory value to the underlying land. |
| Mr. Ziegler: | And after reviewing the improvements did you decide to value all of the improvements plus the land or just the land? |
| Ms. Spirit: | Just the land. And I did a testifies_____ in there, which there's just no value in the buildings and even if you wanted to put money into the buildings, that would be so significant that it just wouldn't, the land is just so much more valuable than being improved with, you know, a variety of delipidated cottages and a chapel, and you know, this was a children's home |

|||||
|---|---|
| | site so those types of buildings were, there is just no market for that in this day and age and especially not on a 37 acre tract on High Street. |
| Mr. Ziegler: | And, did you ultimately prepare a report? |
| Ms. Spirit: | Yes I did. |
| Mr. Ziegler: | Alright. And, is Exhibit B a true, accurate and correct copy of your report related to the United Methodist Children's Home site? |
| Ms. Spirit: | Yes it is. |
| Mr. Ziegler: | Alright. Could you please walk the Board through your report? |
| Ms. Spirit: | Yes I can. So the report that you have in front of you is a retrospective appraisal of the Children's Methodist Home, uh, site that consists of 37.35 acres located on the west side of High Street at Wesley Boulevard in Worthington, Franklin County, Ohio. The effective date of this report is January 1, 2019. And then the parcel number is 100-006774-00. So again, I just want to point out that the property is located on the west side of High Street. It's a regular configuration. And at 5a, on Page 27 of the report and also on the front cover of the report is a plat. So, um, and you can see that the site has a lot of frontage. Even frontage on other roads besides High Street. So it also has frontage on Evening Street and Greenbriar Court. Per the city of Worthington Zoning Department, the subject is zoned as 1 for special purpose, c2 for community shopping and c3 for institution and offices. Again, I had the opportunity to view these improvements that again were constructed either in the 1930's or 1960's so these are older buildings. And if you just want to go to Page 31 at the beginning of the photographs of these buildings. Again with a testifies and _____ and considering this location which is a desirable location in Worthington, but the improvements should be removed, that was our determination that the improvements should be removed and the subject should be redeveloped and the most likely use based on our analysis would be a mixed use zoning for this type of, um, for this size and for the location along High Street and it abuts some residential properties in the back, we felt that a mixed use zoning would be very consistent with what we're seeing not only in redevelopment areas like Worthington but also, you know, in and around Columbus, for this type of location, we would expect to see like a mixed use zoning a PUD type of zoning. And in fact, that's what the client is looking to get the property rezoned to. So that is very in line with what we would think the market would do for this particular site. I just want to point out that though because the subject is not currently zoned PUD we did factor that into our appraisal report so there are some unknowns at the rezoning as we have already discussed so those particular factors were taken into consideration in the analysis. Because we have determined that the |

improvements have no contributory value we have only done a sales comparison approach on the property so again there is the pictures of the exterior on page 31 and a little bit of discussion about the improvement and then on page 36 of the report is the highest and best use and there is some discussion there on page 37 and then starting on page 40 is the beginning of the sales comparison approach. Page 41, so looking at the market and looking in Columbus and looking in Worthington. You know Worthington is an area that is pretty land tight. There is not a big significant you know thirty acres available like the subject available in the Worthington market that wouldn't require some sort of redevelopment. So we expanded our search to include those areas that are seeing some of the new construction, new development and have land tracts available, so page 41 there is six comparable sales and then also below there is a location map of where these comparable sales are located. These sales are all development sales some of them with different types of zoning and we have included those that have had somewhat similar zoning as the subject. Again, we have that special purpose zoning which is not a zoning that you would see for a commercial or office development that is more of an educational zoning so we have got on page 41 there is a breakdown of each one of the zoning classifications by the comparable sales, and then we have made adjustments to account for the differences in zoning and some of the other characteristics of each comparable sale. So, starting on page 42 is a discussion of each comparable sale. Some of these properties we had the opportunity to either appraise or our brokerage side sold, so we have a lot of inside details on each one of those. Page 51 is a discussion of the adjustments and then on page 52 is a breakdown of each adjustment applied to the comparable sale. So, items for market conditions, locations, typography, zoning, access, utility configuration, land size and just overall development potential. So page 52 there is a breakdown of those comparable sales and after considering the subject location along High Street within a _____ corridor, again, we are in a desirable area with road frontage on multiple streets, site size, the existing zoning that is in place knowing that this property is going to require rezoning and the overall market appeal we determine a value of $150,000 per acre is deemed applicable. That is toward the entire site of 37.35 acres. Applying $150,000 per acre indicates a market value of $5,602,000. We rounded that to $5,600,000. Also I just want to point out which I know we listened to earlier is that there is going to be some cost and at the time of this appraisal we did not have those demolition costs so you will see a paragraph at the bottom of page 52 that just notes that we have made the assumption in this report that there was no asbestos or lead or some additional costs. We know now that there are. Those tests have come back. So, I just want to point that out. At the time we did not know that the demolition costs would be, we anticipated given the age that there could be but since we didn't have that knowledge at the time I just want to point out that our value did not consider those buildings having any sort of contaminant and it sounds like

|              |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                 |
| ------------ | --------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- |
|              | they do. So in conclusion our value as of January 1, 2019 is $5,600,000 for the subject property.                                                                                                                                                                                                                                                                                                                                                                                                               |
| Mr. Ziegler: | Great thank you. And, I have no further questions.                                                                                                                                                                                                                                                                                                                                                                                                                                                              |
|              | Ms. _____ Court.                                                                                                                                                                                                                                                                                                                                                                                                                                                                                       |
| Ms. _____: | Yes. Thank you. Um, Ms. Spirit, my first question is on page 2 of your report and you discuss how you considered the effects of having to rezone the property in your analysis. Can you specifically describe how exactly you figure that into your analysis?                                                                                                                                                                                                                                                   |
| Ms. Spirit:  | The subject, the highest and best use of the subject is for a mixed use development in our opinion. That is just consistent with what we see happening in other markets too. Like in Arlington which is a similar market as Worthington and then what we have seen in Dublin and Howe and um, you know comparable areas as to Worthington and what they are doing. So, but because we have the existing zoning, the existing zoning is really especially the back half which is that special purpose zoning, that allows for the Children's Home site. Well, we now know that that is no longer the highest and best use of this property so in our opinion we think, and this is pretty standard, that this property would need to be rezoned to a PUD due to the size. It would allow for a multiple of uses. You know we have the commercial zoning in the front which is great and you may not even have to change some of that but all over a PUD would allow you to have everything as far as some residential if you wanted to do residential and then also the commercial or office or whatever type of use for that size we thought would be the most ideal. But we did have to factor those things in. There are a lot of risks and unknowns with getting the rezoning which is what we heard earlier. There is a lot of different things, some unknowns to that. So we do have to factor that in and again we have some sales. If you notice in the chart of sales, those sales that are already zoned PUD are at the upper end of the value range because they had the zoning in place when they sold so we had to make some adjustments there to account for the fact that our subject does not have the PUD zoning but is still a great redevelopment site. It just has to get the zoning in line. |
| Ms. _____: | So your adjustment for that is in the line item of zoning is that correct?                                                                                                                                                                                                                                                                                                                                                                                                                                      |
| Ms. Spirit:  | Let's go back there and look. Yeah, so page 52 in the chart there is an adjustment for zoning.                                                                                                                                                                                                                                                                                                                                                                                                                  |
| Ms. _____: | Okay. And how did you determine those adjustments? Did you look at the market for particular different types of zoning and make that determination? Or, how did you do that?                                                                                                                                                                                                                                                                                                                                    |

| | |
|---|---|
| Ms. Spirit: | Yeah, there is a lot that goes into that. We go back to the market and consistently across the board those sales that have already gone through the zoning process and they get the PUD zoning tend to sell for more. If that is the highest and best use of that property. Because the zoning is now established. Those unknowns are now known so that risk factor is no longer there. We see that a lot in the real estate world. I mean almost every contract you see is going to have some sort of contingency upon zoning if it is a redevelopment site. So, that all has to be factored into the value as a buyer you have to factor in what you are willing to pay for a property that you may not get the zoning for and if you don't get the zoning, if this property were not to get the PUD zoning then it is only worth $150,000 an acre. If it were zoned then it would be worth something more than that. |
| Ms. _____: | Okay. Did you have access to the purchase contract when you were out writing your report? |
| Ms. Spirit: | Yes, I did. |
| Ms. _____: | Okay. Does the subject property have utilities? Working utilities hooked up to it? |
| Ms. Spirit: | Yes. |
| Ms. _____: | Okay, and all of your comparable sales do as well? |
| Ms. Spirit: | Yes. |
| Ms. _____: | Okay. Which property of your six comparable sales do you feel is most similar to the subject property? |
| Ms. Spirit: | Well I like, I thought all of the six sales were good indicators of value. Um sale one is on Home Road in Orange Township which has seen a lot of developments over the last five or ten years and there is a lot of demand in that area. A lot of growth from mixed use and multi-family office commercial, lots of demand and it is just north of our subject property. So, I liked sale one but it required a lot of adjustments because you know as you can see through the charts, you can see this was zoned for a multi-family development and that is what it ended up being developed was like patio home developments. So I thought that was a pretty good sale. Now that sold for $105,000 but it didn't have the commercial component like our subject, so that is why our subject was superior. Sale two this is near that Evans Farm development on Lewis Center Road which is really a fastly growing, high demand property that is just expanding like crazy over there. But, this piece was purchased as more of, under our verification, he was interested in more of like a, they have a huge next door to this they have a big home development piece so now they are looking for a mixed use piece. That sold in June of 2019. But, I still think our subject is a much better |

12

location. This is on Lewis Center Road. It is on a corner, abuts a railroad. Still, I think our subject being on High Street is a much better location. So, those kinds of adjustments were made. That sold for $110,000 in Lewis Center, as part of a much bigger development so a good property but I still think the subject has a superior location so I liked that one. Again, adjustments had to be made for the subject being just a superior piece. Grief and High, that one again is in Liberty Township so that is on High Street which is considered 23 up there, so I liked that one. That one sold for $135,000 an acre. Again though, I still think the subject was superior. I mean this had the frontage on High Street. It is near a complex. You know Children's just put an urgent care there. You have all of these other, all kinds of new uses going in near this property so very, very, sought after area for development. Again that one sold for $135,000 an acre. The subject still being superior. This one had the planned commercial zoning and so did the Lewis Center had the planned commercial zoning. The Eiterman Road, we are familiar with this piece. The City of Dublin actually purchased this site. This is near the hospital and Perimeter Road and all that, sort of the next phase of development area for Dublin. Just south of the OU satellite campus there. So that whole area they are really trying to sort of the last corridor for them, just north of there is where they have the new Costco and all this other stuff. So, now this one had the visibility on the freeway which we don't have but again this sold for $154,000. Some adjustments were made. Again, this one had more of an office type zoning so that had to be adjusted upward which did allow for commercial. And then, we have sale five and sale six. Sale five is in Hilliard. This was a PUD zoning. Part of an area that actually the City of Columbus just did a project through there with sidewalks and some other stuff to really, because there is so much interest and demand, I think just close to there in New _____ville. So a lot of stuff happening in this little corridor of Hilliard. So I liked that sale. That sold for $156,000. That was a 2016 sale. So that required some market adjustments and also that had the PUD zoning in place at the time of sale so an adjustment would have to be made for that. Sale six, this is over by Mount Carmel. This is Cleveland Avenue where Mount Carmel is starting to expand and they have got, where Cooper Road is now. That whole area right there is really starting to really grow and we are starting to see a lot more assisted living over there. That whole corridor right there. The project is done on tracts so I think that whole area is starting to grow. We just did sort of a market study for them in that little section of the world on you know what are some good uses. They are right in line. Everything over there just is starting to get zoned PUD. This one had that PUD in place and it sold for $174,000 an acre in 2018. Some adjustments had to be made that had the PUD zoning in place. So I liked all of these comps. I think each one brought an aspect that the subject has. But when you look at these overall our range before adjustments is $105,000 to $174,000 and then when you consider the subject has got a fantastic location on High Street with frontage and access in an area that has a very, very limited amount of development

|            | opportunities of large tracts without getting into tearing down a bunch of or assembling a bunch of properties. You don't have to do that for this site. So, I thought all six sales were good for our subject. |
| --- | --- |
| Ms. _____: | Okay. Just a question about land sale number 6 on page 50 of your report. In the comments you say the _____ was approved with a new office building. For that property how did you figure out kind of what the allocation to the land was if it was also approved with an office building? |
| Ms. Spirit: | Oh no. That is what it was improved with after they purchased the land. |
| Ms. _____: | Okay. Thank you for that clarification. Since you did have the purchase contract and were able to view that, what weight did you give the amount listed in the purchase contract in your analysis? |
| Ms. Spirit: | Well, the purchase contract specified to a certain amount of acres for a usable area only. It doesn't specifically say in the purchase contract how many usable areas there acknowledging for their development. That part of I didn't have what their usable acres was. But, I noted that I am appraising the entire parcel so that includes that some of those areas around the Tucker Creek that is sloping and wooded and then some of the back areas of the property that have, you know, this thing has an angulating topography so it is not a perfectly flat site and it does have some elevation on different boundary lines. But, I factored everything in so the $150,000 an acre as a site as a whole. So, that is considering all the developable areas and the areas that may not be usable or you know as you can see this thing also has an irregular configuration so there is some dimensions on this property if you look at the plat that are very irregular and you really, I understand what they are saying is that some of those areas you wouldn't be able to develop but we are looking at the parcel as a whole so my value of $150,000 acres is capturing the entire parcel. Not just pulling out what is usable and what is not usable. |
| Ms. _____: | Okay. And just to kind of sum things up, am I correct in my understanding that if the subject rezones PUD as you indicated, your value would be higher than it is at its current zoning? |
| Ms. Spirit: | Yes. |
| Ms. _____: | Okay. That is all the questions I have. Thank you. |
| Man: | Mr. Zieger, anything further? |
| Mr. Ziegler: | Nothing further. |
| Man: | Okay. Anything from the Board? |

| | |
|---|---|
| Woman: | No. |
| Man: | No, thank you. |
| Man: | If the Board does not have any testimony to offer, I would simply ask to amend the Complaint to the $5.6 million dollar number that Ms. Spirit had testified to. I think the testimony has been undisputed that the improvements have not been used in years that were dilapidated, they have asbestos, huge asbestos costs for abatement and demo. I would direct the Board to take a look at the *Windsor v. Cuyahoga County* case, 1993 Ohio Tax LEXIS 465 where a similar situation was held that it should be the land value minus the demolition costs as the true market value. Because this is being valued as of 1/1/19 we are simply asking for the true market value to be Ms. Spirit's appraised value given that the improvements to be demo'd still remained as of that date. But we believe that there is sufficient evidence to support the $5.6 million dollar number and we would ask that it be entered. Thank you. |
| | It is so amended. Thank you. |
| | We will consider all the evidence and testimony presented and notify both parties of a decision by mail. |

16763809.1