

PORTION OF THE MINUTES OF THE REGULAR MEETING
WORTHINGTON ARCHITECTURAL REVIEW BOARD
WORTHINGTON MUNICIPAL PLANNING COMMISSION
October 14, 2021

The regular meeting of the Worthington Architectural Review Board and the Worthington Municipal Planning Commission was called to order at 7:00 p.m. with the following members present: Mikel Coulter, Chair; Thomas Reis, Vice-Chair; Kathy Holcombe, Secretary; David Foust; Richard Schuster; and Susan Hinz. Also present were: Council Representative Scott Myers; Lee Brown, Director of Planning & Building; and Lynda Bitar, Development Coordinator. Worthington City, and Kenneth Ganter, Planning & Building Assistant. Commission member Edwin Hofmann was absent.

**A. Call to Order – 7:00 p.m.**

1.    Roll Call

2.    Pledge of Allegiance

3.    Approval of the minutes of the September 23, 2021 meeting.

 Mr. Foust moved to approve the minutes and Mr. Reis seconded the motion.
 All Board members voted, "Aye," and the minutes were approved.

**B. Architectural Review Board – Regular Agenda – Unfinished Business**

Mr. Reis moved to remove the following Agenda item from the table and Mr. Schuster seconded the motion. All Board members voted, "Aye," and motion was approved.

**C. Architecture Review Board – Old Business**
1. Mixed Use – **1033 High St.** (Thomas Hart/Lifestyle Communities) **AR 70-2020**

&

Mrs. Holcombe moved to remove the following Agenda item from the table and Mr. Reis seconded the motion. All Board member voted, "Aye," and the motion was approved.

**D. Municipal Planning Commission – Old Business**
1. **Planned Unit Development**
a. Mixed Use – **1033 High St.** (Thomas Hart/Lifestyle Communities) **PUD 03-2020**

**<u>Findings of Fact & Conclusions</u>**

Ex. 83

**Executive Summary**

Thomas Hart on behalf of Lifestyle Communities has applied to rezone 37.8-acres from R-10 (Low Density Residential), S-1 (Special), C-2 (Community Shopping Center) and C-3 (Institutions & Office) to PUD, Planned Use District for the redevelopment of the United Methodist Children's Home site to a mixed-use development that would include detached single-family home sites, townhomes, apartments, retail, restaurants, office and greenspace.

**Applicable Plans**

- Comprehensive Plan Update and 2005 Strategic Plan – UMCH Focus Area – 2014
- Comprehensive Plan Update and 2005 Strategic Plan
- Bicycle & Pedestrian Master Plan – 2019
- Park Master Plan – 2017
- Chapter 1177 – Architectural District
- Chapter 1174 – PUD Planned Unit Development

**Recommendation**

Staff is recommending ***denial*** of these applications as they currently stand today. The proposal does not meet the recommendations found in the Comprehensive Plan and 2005 Strategic Update - UMCH Focus Area – 2014, Bicycle & Pedestrian Plan – 2019 and the Park Master Plan - 2017. Please see Staff Comments/Analysis below for additional details related to the recommendation.

**Brief Background/Description**

The United Methodist Children's Home (UMCH) site located at 1033 High St. is approximately 37-acres in size, that until recently had fifteen existing vacant buildings, parking lots and driveways on the site that the Board approved for demolition. The majority of the property is zoned S-1, Special, except in 1987 just under 10-acres of land along the N. High St. frontage was rezoned to C-3, Institutions and Offices (~9.2-acres) and C-2, Community Shopping Center (~0.6-acres). The parcels at 47 Larrimer Ave. and 57 Larrimer Ave. are zoned R-10, Low Density Residential (~0.5-acres) and are currently single-family homes that are vacant.

Approximately 3.42-acres at the northwest corner of High St. and Wesley Blvd. (private drive) with 428-feet of High St. frontage was purchased in 2017 by the West Ohio Annual Conference of the United Methodist Church and is not part of this application. Bickford Assisted Living & Memory Care facility at the southwest corner of High St. and Wesley Blvd. (private drive) is a separate 3.58-acre parcel and is also not part of this application.

**Current Zoning - Development Standards**

| Zoning | Minimum Lot Width | Minimum Lot Area | Front Setback | Rear Setback | Side Setback | Max Height of Building Stories | Max Height |
|--------|-------------------|------------------|---------------|--------------|--------------|-------------------------------|------------|
|        |                   |                  |               |              |              |                               |            |

| S-1 | 250-feet | 3-acres | 60-feet | 60-feet | 50-feet | 4-stories | 45-feet |
|-----|----------|---------|---------|---------|---------|-----------|---------|
| C-2 | 150-feet | 1-acre | 50-feet | 30-feet | 20-feet | 3-stories | 45-feet |
| C-3 | 100-feet | 20,000 sq. ft. | 50-feet | 30-feet | 15-feet | 3-stories | 45-feet |
| R-10 | 80-feet | 10,400 sq. ft./4.2 DU/acre | 30-feet | 30-feet | 8-feet | 2 ½-stories | 30-feet |
| Section 1149.07 – 100' front setback along this area of High Street | | | | | | | |

## Surrounding Zoning & Land Use

The surrounding zoning is a mix of the following:
- R-10 - Low Density Residential – Worthington Estates and Greenbriar Hill
- R-16 – Very Low Density Residential – Worthingway & Medick Estates
- C-1 – Neighborhood Commercial – O'Reilly Family Pharmacy
- C-3 – Heritage Professional Building, AT&T, FC Bank, Worthington Municipal Complex, Laurels of Worthington, West Ohio Conference Center and The Grove
- SC – Senior Citizen – Bickford of Worthington

*Current Zoning Map*



*Aerial*



**Recent Land Use and Planning History Related to the Site (since 2014)**

- On September 2, 2014 City Council adopted an Amendment to the Comprehensive Plan Update & 2005 Strategic Plan for the United Methodist Children's Home Focus Area for the City of Worthington with the anticipation of redevelopment on the site that would include a mix of uses and open space across the entire site.
- On June 29, 2015 Lifestyle Communities presented an informal proposal to the Worthington Community for their vision for the UMCH site.
  - No formal application was submitted to the City to start the rezoning process.
  - Lifestyle Communities proposed the following:
    - 42.3-acres
    - 571± Total Residential Units
      - 350 Apartments
      - 221± Detached single-family estate lots, manor lots, cottage lots and townhomes.
        - Mix of for sale and for rent product
    - Approximately 150,000± sq. ft of medical office and a 20,000 sq. ft. conference center
    - Retail on first floor of the apartment buildings
    - Mix of 3 to 4 story buildings along High St.
    - Open Space
      - Shelter house – Tucker Creek Preserve
      - Multi-use trail – Tucker Creek Preserve
      - Formal greenspace in the form of a village green at the entrance to High St.
      - Community park to the rear of the site
      - Scattered open space throughout the site
- On February 9, 2017, OhioHealth made application to construct a new 20,000 sq. ft. two-story medical office building along the High Street frontage just north of the Conference Center.
  - The application was eventually withdrawn by OhioHealth when the West Ohio Annual Conference decided to exercise their option to purchase 3.42-acres of land that include the area where the new medical office building was to be constructed.
- On June 8, 2017, the Municipal Planning Commission reviewed and approved a request by the West Ohio Conference Annual Conference of the United Methodist Church to create a new 3.42-acre lot for their existing building and parking at the corner of High St. and Wesley Blvd. that met all the legal requirements to create a new lot as outlined in the Planning & Zoning Code. City Council ultimately approved the request on June 19, 2017.
- On March 26, 2020, the Municipal Planning Commission was scheduled to review a request by OhioHealth to rezone 3.35-acres at the corner of Larrimer Ave. and N. High St. from R-10 (Low Density Residential), S-1 (Special) and C-2 (Community Shopping Center) to the C-3 (Institutions & Office) to permit the construction of a new 60,000 sq. ft. three-story medical office facility that would house medical services, including an emergency department, primary care, imaging and a host of specialty services.
  - The application was withdrawn by OhioHealth after they were unable to come to

an agreement with the property owner to move forward on the site.

- On October 6, 2020, Thomas Hart, on behalf of Lifestyle Communities, filed an application to rezone 37.843-acres from the R-10 (Low Density Residential), S-1 (Special) and C-2 (Community Shopping Center) and C-3 (Institutions & Office) to a PUD, Planned Use District for the redevelopment of the United Methodist Children's Home site to a mixed-use development that would include detached single-family home sites, townhomes, apartments, retail, restaurants, office and greenspace.
- On January 14, 2021, the Architectural Review Board and the Municipal Planning Commission heard a presentation by the applicant for the development of the site. The Board and Commission ultimately tabled the applications.
  - Lifestyle Communities proposed the following:
    - 37.8-acres
    - 730 Residential Units
      - 24 – Single-family
      - 94 – Multi-family – Townhome's w/garages
      - 72 – Multi-family – Townhomes & flats
      - 540 – Multi-family – Apartment's w/parking garage
    - 60,000 sq. ft. – Commercial/retail
    - 25,000 sq. ft. – Medical office
    - 6.4-acres – Tucker Creek
- On February 11, 2021, the Architectural Review Board approved the demolition and remediation of the fifteen vacant buildings, parking lots and access drives on the site.
- On September 9, 2021, Thomas Hart, on behalf of Lifestyle Communities, filed amended materials to their previously tabled rezoning application. These materials take a high-level look at density, mix of uses, height, layout, connections and open space. If the concepts are deemed workable, more details will be required before the MPC can complete its review of the proposal.

## September 9, 2021 – Proposal by the Applicant

- Total Acreage = 37.8-acres (Parcel #s:100-006774, 100-002425 & 100-002427)
- 600 Residential Units
  - 22 units – Single-family – For sale
  - 86 units – Multi-family - Townhome's w/garages – For sale
  - 72 units – Multi-family – Townhomes & flats – For Rent
  - 420 units – Multi-family – Parking Garage – For Rent
- 24,000 sq. ft. – Commercial/retail
- 96,000 sq. ft. – Medical office
- 6.4 acres – Tucker Creek

| SUBAREA | USE | LOTS/UNIT/SQUARE FOOTAGE | STORIES | ACRES | DENSITY |
|---|---|---|---|---|---|
| #1 | Single-family | 22 units | *2 ½ | 5.9-acres | 3.72 lots/acre |
| #2 | Multi-family | 86 units | *3 | 9-acres | 9.55 DU/acre |
| #3 | Multi-family | 72 units | *3 | 5.1-acres | 14.4 DU/acre |
| #4 | Multi-family Commercial/Retail Medical Office | 420 units 24,000 sq. ft. 96,000 sq. ft. | *4 & 5 *3, 4 & 5 *3 | 11.4-acres | 37.16 DU/acre |
| #5 | Tucker Creek | | | 6.4-acres | N/A |
| TOTAL | | 600-units | | 37.8-acres | 15.95 DU/acre |

*Staff Comments:*
\* The actual height has not been provided at this time, however, will be required in the future.


**Project Details as described in the application**

**Subarea #1**
- 5.9-acres
- 22 single-family lots
  - For sale product
  - 2 parking spaces per dwelling unit
  - Lot Width: Minimum – not referenced, however the information will be required in the future for review
  - Minimum Lot Size – not referenced, however the information will be required in the future for review
  - Unit Square Footage Minimum – not referenced, however the information will be required in the future for review
  - 2 ½ stories, 1 ½ stories or single-story buildings – max height information will be required in the future for review
  - Front Setback – not referenced, however the information will be required in the future for review
  - Rear Setback – not referenced, however the information will be required in the future for review
  - Side Yard – not referenced, however the information will be required in the future for review
  - Fronting on a proposed public roadway
  - 3.72 Dwelling Units/acre
  - Architectural Design & Standards Proposed – not referenced, however the details will be needed in the future to obtain architectural approval

**Subarea #2**
- 9-acres
- 86 townhomes
    - For sale product
    - Garages
    - 2.3 parking spaces per dwelling unit including the garage and parking lot
    - Unit Square Footage Minimum – not referenced, however the information will be required in the future for review
    - 2-3 stories: max height information will be required in the future for review
    - Lot sizes – not referenced, however the information will be required in the future for review
    - Front Setback – not referenced, however the information will be required in the future for review
    - Fronting on a proposed public and private roadway
    - Public and private open/green space – neighborhood green & linear green – acreage not provided, however will be required in the future
    - 9.55 Dwelling Units/acre
    - Architectural Design & Standards Proposed – not referenced, however details will be needed in the future to obtain architectural approval

**Subarea #3**
- 5-acres
- 72 townhomes
    - For rent product
    - Mix of garages & parking lot
    - 1.9 parking spaces per dwelling unit including the garage and parking lot
    - 3 stories – max height information will be required in the future
    - Mix of one-bedroom, two-bedroom and three-bedroom units
    - Front Setback – not referenced, however the information will be required in the future for review
    - Fronting on a proposed private roadway
    - Public and private open/green space – multi-family green – acreage not provided; however the information will be required in the future for review
    - 14.4 Dwelling Units/acre
    - Architectural Design & Standards Proposed – not referenced, however details will be needed in the future to obtain architectural approval

**Subarea #4**
- 11.3-acres
- 420 multi-family units
    - For rent product
    - Parking Garage – 4-story
    - Mix of 4 & 5 stories – max height will be required in the future
    - Mix of one-bedroom, two-bedroom and three-bedroom units
    - 37.16 Dwelling Units/acre

- o Architectural Design & Standards Proposed – not referenced, however details will be needed in the future to obtain architectural approval
- Commercial/Retail – first floor of the 5-story portion of Building A & Building B along the linear green
  - o 24,000 sq. ft.
  - o Access to two 4-level parking garages, surface lot and on-street parking
- Medical Office
  - o 96,000 sq. ft.
  - o Access to two 4-level parking garages, surface lot and on-street parking
  - o 3 stories along High Street
- Setbacks:
  - o High St. – not provided, however the information will be required in the future for review
  - o Longfellow Ave. – not provided, however the information will be required in the future for review
  - o Larrimer Ave. – not provided, however the information will be required in the future for review
  - o Private Streets – not provided, however the information will be required in the future for review
  - o Southeastern property line – not provided, however the information will be required in the future for review
- Fronting on a mixture of private roadways and existing roadways (High St., Larrimer Ave. and Longfellow Ave.)
- The previous proposal stated that the private streets will be 36-feet in width, 20-feet wide drive aisles and 8-feet for parallel parking spaces on each side and placed in a reserve that is 56-feet in width.
- Alleys are proposed to be 16-feet wide and placed in a reserve that is 20-feet in width.
- Surface parking lots shall be constructed with 9'x19' parking spaces with a drive aisle of 22-feet in width.
- Bicycle parking will be provided throughout the site.
- Cross access easements are proposed throughout the site.
- Public and private open/green space – linear green & trail connection – detailed acreage not provided, however will be required in the future
- Architectural Design & Standards Proposed – not referenced, however details will be needed in the future to obtain architectural approval

**Subarea #5**
- Tucker Creek Preserve
  - o 6.4-acres
    - ▪ Proposed to be preserved as a natural area with a conservation easement, and/or possibly dedicated to the City for public ownership and use
    - ▪ A portion of the acreage will be dedicated as a stormwater basin for the development, will not be conveyed to the City and will be required to be maintained by the homeowners' association (HOA).

- 3.1 acres of the 6.4 acres is already located in an easement that restricts development in this area. This includes a mix of slope, stormwater, sanitary, water and channel easements.
  - o Parking does not appear to be provided for those that would want to utilize the Tucker Creek Preserve. There is on street parking in the area, however not in the immediate vicinity.
  - o Possible amenities:
    - Trails
    - Pavilion
    - Benches

## Traffic

The applicant previously provided a Traffic Impact Study that was reviewed by the City's traffic consultant. The Traffic Impact Study will be required to be updated once we have a better understanding of the density, mix of land uses and connection points throughout the site. Preliminary findings of the Study included the following:

- When warranted, a new signal should be installed on High St. across from the Worthington Municipal Building.
- When a new signal is constructed, the existing southbound fire signal control should be moved to the new High St. signal.
- Pavement markings should be revised on High St. for a 100-feet northbound left turn lane at the new entrance on High. St.
- Pavement markings should be revised on High St. for a 200-feet southbound left turn lane to Worthington-Galena Rd.
- Signs, pavement markings and signal operation should be modified to allow for east/west movements at the intersection of High St., Wesley Blvd, Worthington-Galena Rd. and Crandall Dr.

## Parking

The applicant provided the following summarizing the proposed parking included in the application.

| Subarea | Lots/Unit/SF | Parking Required | Proposed Surface Parking | Proposed Garage/Structure | Total |
|---------|--------------|------------------|--------------------------|---------------------------|-------|
| #1 | 22 | 1/unit = 22 | Garage/Driveway | 44 | 44 |
| #2 | 86 | 1/unit = 86 | 86 On-street 26 Parking Lot | 172 | 284 |
| #3 | 72 | 1/unit = 72 | 18 On-street & 55 Parking Lot | 80 | 153 |
| #4 | 420 units 24,000 SF 96,000 SF | 1/unit = 420 1/150 = 160 | 49 (On-Street) | 504 Building A 328 Build B (4 Level Parking Garage) | 881 |

| | | 1/250 = 384 Total = 964 | | | |
|---|---|---|---|---|---|
| #5 | N/A | N/A | N/A | N/A | N/A |
| TOTAL | 600 | 1,144 | 234 | 1,128 | 1,392 |

*Staff Comments:*

Chapter 1174.05(b)(2) of the Planning & Zoning Code provides the following parking standards:

- Design. Parking and service areas shall be designed and located to protect the character of the area.
- Parking and service areas shall be designed and located to protect the character of the area.
- Non-Residential Uses – Parking shall be adequate to serve the proposed uses but shall not exceed 120% of the required parking found in Section 1171.01.
- Residential Uses – Not less than one parking space per dwelling unit.
- Bicycle Parking – Should be adequate to serve the proposed uses.
- The required parking referenced in the chart above appears to be inconsistent with the parking requirements found in the Planning & Zoning Code.

**Tree Preservation & Replacement**

A Tree Survey & Preservation Plan was previously provided by the applicant and was reviewed by the City Arborist. The following items were noted in the Tree Survey:

- 365 trees to be removed = 6,264 caliper inches
  - 29 dead
  - 28 poor condition
  - 2 Ash trees
  - 306 healthy trees
- 6,264 caliper inches – 1,069 caliper inches* = 5,195 caliper inches

\* The dead and poor condition trees and Ash trees are not counted in determining the loss of caliper inches of trees for either replacement or fee payment, thus the associated caliper inches (1,069) associated with those trees is deleted from the total caliper inches of trees to be removed.

The previously submitted Tree Survey and Preservation Plan indicated tree replacement will be included as part of the redevelopment of the site and will be finalized with a detailed landscape plan at the Final Development Plan for the PUD. Tree replacement was described in the application as follows:

- Street Trees – provided on all public and private streets at 1 tree per 40 linear feet of street.
  - Minimum of 3-inch caliper at installation
  - Approximately 284 trees at 3 inches = 852 inches
- Alley/Parking Lot Island Trees
  - 30 trees at 2.5 inches = 75 inches
- Open Space Tree Plantings
  - 80 trees at 2.5 inches = 200 inches
- Buffer Plantings
  - Stormwater Pond – 10 trees at 2.5 inches = 25 inches

- o Bickford Assisted Living Facility – 8 evergreens at 3 inches/6 feet high = 24 inches
- Other Locations
  - o Replacement trees can be located in other off-site public property locations.
- When considering the amount of caliper inches to be lost (5,195) and the total caliper inches of proposed replacement trees (1,176), the submittal notes there remains 4,019 inches that would need to be replaced with additional trees or a Tree Replacement Fee of $150/caliper inch for a total fee of $602,850.00 would be applied.

*Staff Comments:*
- Staff calculates the fee at $150/caliper inch for 4,019-inches for a fee of $602,850.00, not $554,400.00 per the previously submitted plan.
  - o An Tree Preservation & Replacement Plan will likely be required to be updated to reflect the current proposal.
- All street trees and landscaping plans will need to be reviewed by the City Arborist.

Per the previous application, the applicant requested the following items in relation to the Tree Replacement Standards
- Requesting the dedication of Tucker Creek Preserve to count towards the Fee-in-lieu of Tree Replacement.
- Requesting the Fee-in-lieu of Tree Replacement and/or the number of trees replaced off-site shall be based on $150/caliper inch.
- The applicant states that full on-site replacement is not feasible and would result in overcrowding on the site.
- The applicant states this is an unreasonable burden on the property if the fee-in-lieu is paid or if replacement occurs off-site. The applicant previously requested a waiver of all fees.
- The applicant states that they are committed to a reasonable and balanced tree replacement standard that includes on-site replacement, off-site replacement, and crediting in order to meet the spirit and intent of the code, while resulting in fairness.
  - o Applicant states they will work in good faith with City to find other off-site replacement location on public lands to help reduce the credit.

**Public Area Payments – Special Park Fund**

City Code contains the following requirements for contributions to the Special Park Fund:
- Commercial & Industrial Space = $100.00 per 1,000 sq. ft.
- Residential = $250.00 per dwelling unit

- Utilizing the Code requirements and applying them to the proposed development results in the following fee calculation: Proposed Uses:
  - o Commercial – 120,000 sq. ft. = $12,000.00
  - o Residential – 600 units = $150,000.00
  - o Total Fee = $162,000.00

The applicant previously stated the property is valued at $165,688.00 per acre and believes the value of Tucker Creek Preserve is valued at $944,422.00 and believes there is a credit balance to the developer since the developer is proposing to dedicate the Tucker Creek Preserve to the City.

*Staff Comment:*
- The 3.1 acres of the 6.4 acres of the Tucker Creek Preserve is already located in an easement that restricts development in this area. This includes a mix of slope, stormwater, sanitary, water and channel easements. Staff questions the suggested value of the Tucker Creek Preserve given these easements and the associated restrictions on development.

## Public Space Amenities

City Code requires public amenities which directly affect the quality and character of the public domain as part of PUD developments. The amount of required public amenities is calculated based on gross floor area.

*Staff Comment:*
- Not provided, however information related to public space amenities will be required in the future for review.

## Utilities

The previous application included the following information concerning utilities:
- Water, sanitary sewer, surface drainage and utility facilities will be serviced by the existing available water/sewer lines and connections.
- Sanitary Sewer:
  - Existing 12-inch located along the southern property line
  - Existing 10-inch extends into the site from the 12-inch sewer line
- Water:
  - Existing 12-inch located along N. High St.
  - Existing 12-inch located along Wesley Blvd.
- Stormwater:
  - Proposed wet detention basin along the Tucker Creek Preserve near Evening St.
    - Mix of stormwater storage vaults and surface detention to be utilized in the open space areas and parking areas.
    - Proposed to be designed to meet all stormwater requirements for water quantity and water quality per Ohio EPA standards and City of Columbus stormwater requirements.

## Easements

The previous application provided the following information regarding easements:
- Cross access easements, shared parking agreements, utility and access easements between subareas will be required.

*Staff Comment:*

- Cross access easements, shared parking agreements, utility and access easements between West Ohio Conference Center and the site should be discussed to assist in future redevelopment opportunities.

**Phasing Plan**

The previous application proposed the following phasing plan for construction:
- Developed based on zoning approval and finalized at the time of the Final Development Plan.
- Construction to begin with the single-family development. The commercial/office uses along High St. are subject to market conditions.

*Staff Comments:*
- The commercial office included in this proposal is the portion of the development that would provide economic benefit to the City and help offset the cost of services that are provided given the City's heavy reliance on income tax as a revenue stream. Staff is concerned that only the residential and retail portion of the project would get constructed without the commercial office needed in the High-Street Mixed-Use Zone.
- Staff is also concerned about the timeliness of construction of the open space that is to be provided on the site.

**Land Use Plans**
This section of the memorandum highlights the language related to this site contained in various land use plans and regulations of the City. Links to the full documents are included at the beginning of this memorandum and in the highlights below.

Worthington Comprehensive Plan – UMCH Focus Area - 2014
Since the Comprehensive Plan was updated in 2005 and included a strategic redevelopment plan for the site, City leaders have anticipated a redevelopment on the site that would include a mix of uses and open space across the site. The City studied the property again in 2014 and adopted amendments to the 2005 Comprehensive Plan in 2014, refining the stated desired outcome for the property. This area has been identified in the 2014 document as a good location for a mix of commercial uses along the High St. frontage, mix of residential uses and a significant amount of usable open space.

The 2005 Comprehensive Plan identified the UMCH site as strategic for future growth, a matter particularly critical for an established community like Worthington. While the 2005 plan presented an example of two possible redevelopment scenarios, this update document provides a more in-depth consideration of appropriate redevelopment parameters.

This section of the agenda item memorandum will highlight the language from the 2014 update to the Comprehensive Plan regarding types of land use on the site. The Plan update indicates ". . . redevelopment of this site must create a high-quality, mixed-use development that is walkable, connected, and integrated within the site and with the City. This mix of uses should contain a range of residential types together with commercial office and neighborhood retail uses integrated with contributing and shared green space and amenities – all of which complement each other to create an active, vibrant place. Any proposed design must be sensitive to the neighborhoods adjacent to the UMCH site, as well as to the natural features related to Tucker Creek. Any development that occurs within the focus area should relate internally to the site and to an overall plan, even if it is built at different times."

*Future Land Use Zones:* The 2014 update identified four general zones for the property:
- High Street Mixed Use
- Worthington Estates Edge
- Neighborhood Core
- Tucker Creek Preserve

*High Street Mixed Use:*

The High Street Mixed Use zone is described in the 2014 document as follows:

> North High Street is the commercial spine of the City of Worthington . . . [and] is a good location for commercial office use. . . [I]ncome tax generating employment uses such as office are critical to the fiscal sustainability of the City. In addition, this site's close proximity to historic Old Worthington makes it a prime location for walkable residential development and denser, amenity-rich housing types. . . This location along High Street is attractive for retail and service uses as well. It is not the desire of the City, however, to create a third retail center in close proximity to Old Worthington and the Shops at Worthington Place. Retail in this location should be neighborhood scale and serve the development that occurs on this site and that exists in the surrounding neighborhood; and it should help to activate the High Street frontage.

> The High Street Mixed Use zone consists of the frontage of the UMCH site along High Street. It permits a mix of office, residential, and retail uses with the focus on commercial office and medical uses with subordinate residential and limited retail uses. Buildings in this zone should be a minimum of two stories and a maximum of five stories in height with attractive, four-sided architecture. Buildings in this zone should address the streets, activate the street frontage, and include opportunities for outdoor dining and other pedestrian-focused activities.

> It is expected that the buildings adjacent to High Street will be commercial offices. Residential uses might occur behind as a transition to the Neighborhood Core. Neighborhood-oriented retail uses can complement the development in the first floors of office and residential buildings. The objective of the High-Street Mixed-Use zone is to create a high-quality, dense, walkable, connected, mixed-use development that creates a dynamic space and signature address to attract Class A office tenants along High Street and add vitality and life to the High Street corridor.

> In order to create a walkable environment, it is expected that buildings will line public streets and most parking will be located at the center of blocks, screened from public streets by attractive buildings. Parking beneath buildings may also be considered, provided the public street frontage of a building is activated. By providing a mix of uses within the High-Street Mixed-Use zone, parking areas can be shared to optimize their use. To achieve the desired densities, parking decks are encouraged to be integrated into the site. Features expected as part of any parking deck or structure include masonry and architectural elements to dress up the exterior, windowed stair towers, and lush landscaping and pedestrian connections.

Parking structures and/or parking lots could be lined with residential and/or retail development to separate and screen them from the Neighborhood Core. Where the High-Street Mixed-Use zone is opposite existing single-family residential development, it is expected that the new development will consist of residential development and/or substantial and attractive buffers.

As with all development in the UMCH focus area, it is to be high-quality in character and design with four-sided architecture. It should follow the *Worthington Design Guidelines*.

*Worthington Estates Edge:*
The Worthington Estates Edge is described as follows:

This zone is where development in the UMCH focus area should create a desirable transition between it and the existing single-family housing development that surround its north and west sides. The surrounding development consists of homes on third-of-an-acre lots. The Worthington Estates Edge zone calls for single-family residential development on lots between a third-of-an-acre and a fifth-of-an-acre. This equates to a residential density similar to Worthington Estates (3 dwelling units/acre) and Old Worthington (4-5 dwelling units/acre). The structures are limited to the same two-and-a-half story height as the surrounding neighborhood.

These may be single-family, detached homes that are more current, updated versions of what is found in the surrounding neighborhoods. Or they may be smaller homes with smaller yards that provide first floor living opportunities for Worthington residents — an option in which many residents expressed an interest during the community meetings. They may be something in between. Regardless, these homes must be of high-quality design, differentiated architecture, and in close proximity to amenities. This zone is for custom-built, individualized homes and not one for homes with repetitious floor plans.

Housing in this zone should consist of individual units, potentially with lots of different sizes, fronting on a street or streets. The use of cul-de-sacs is strongly discouraged. These new lots must include rear or side yards to provide a substantial buffer and green landscape between these structures and the rear yards of existing homes. Attractive storm water systems designed as a naturalized amenity can be placed within the Worthington Estates Edge zone.

As with all development in the UMCH focus area, it is to be of high-quality in character and design with four-sided architecture. It should follow the *Worthington Design Guidelines*.

*Neighborhood Core:*
The document describes the Neighborhood Core zone as follows:

> The Neighborhood Core zone represents the most flexible zone of the UMCH focus area because it is internal to the site. It consists of a higher density neighborhood that creates a transition from the single-family homes along the periphery of the site to the more active uses proposed closer to High Street.

> The Neighborhood Core calls for residential development at a density between six and fourteen dwelling units per acre (6-14du/ac) gross density with a height limit of three stories. It is expected that the Neighborhood Core will be developed with more than one housing type and at more than one density level. The expected amount of park space and amenities correspondingly increases with the density. For a density reference, Ville Charmante along West Wilson Bridge Road is over seven dwelling units per acre.

> This area creates the opportunity to introduce different types of housing options that are not readily available in the city. This area should provide residential living that is underrepresented in the market and complements Worthington's current offerings, addressing the needs of aging Worthington residents, future young professionals, and those desiring amenity-rich living. . .

> Examples include a mix of single-family detached homes on small lots with rear alley garages, homes with great front porches for outdoor gathering, custom homes designed for first-floor living, luxury residences with integrated front auto courts, well-appointed walk-up townhomes, and a limited number of high-end flats. To be successful, the Neighborhood Core must incorporate common areas/shared green space(s). These parks create the community gathering and development focal point(s). Shared amenities and facilities should also be provided. In all cases, the buildings must have front doors on inviting tree and sidewalk-lined streets. The objective is not to have streets dominated by garages, so garages must be de-emphasized – set back or placed to the rear of structures, creating a very walkable neighborhood.

> As with all development in this focus area, the community expects this development to be of high-quality in character and design and adhere to the *Worthington Design Guidelines*.

*Tucker Creek Preserve:*
Finally, the Tucker Creek Preserve zone is described in the document as follows:

> The southern boundary of the UMCH focus area is the beautiful and wooded Tucker Creek ravine. This plan calls for preserving this area as a natural green space amenity for the site and the community. The creek and the steep slopes that surround it are not developable and the wooded areas along it are important contributing and environmental features.

The community expressed a strong desire to continue linking neighborhoods, parks, and destinations with multi-use trails throughout the City. This includes achieving a dedicated trail along Tucker Creek that highlights this natural feature and provides an amenity and potential bicycle and pedestrian connection between High Street and Evening Street.

As part of any development that occurs on the UMCH site, it is expected that any future developer preserves the Tucker Creek ravine and wooded area. Any storm water systems in this area must be designed as a naturalized, aesthetic landscape feature that fits in the environment.

The 2014 document goes on to indicate the boundaries of these zones are flexible and provides information about ways in which the size of the areas may vary. It then indicates the importance of park space with the following language:

The creation of park space for community and public enjoyment is an important component for any redevelopment on the UMCH site. This is in addition to the Tucker Creek Preserve. Beyond serving community-gathering functions, the park space is critical to providing place-making in development layouts as well as a green space balance to the built environment contemplated in the High Street Mixed Use and Neighborhood Core zones.

In potential redevelopment scenarios, this additional park space has several acres divided between the High Street Mixed Use and Neighborhood Core zones. Park space could be used to provide linear park "windows" into the site from High Street; neighborhood-oriented parks internal to the site; and/or extension of the Tucker Creek preserve. The expected amount of park space and amenities correspondingly increases with the density of development proposed on the UMCH site. Park space as discussed here must be useable, contributing ground for residents, workers, and visitors of the redeveloped site, and not, for example, storm water controls or left-over ground.

It is expected that the developer(s) of the UMCH site will integrate usable park land into the development and work with the City to provide acreage in the High Street Mixed Use and Neighborhood Core zones as park space useable by the community.

Creating this additional park space within the UMCH focus area will address the community's desire for park space and amenities here. The public process generated numerous ideas for amenities worthy of further consideration. It is important that the City and the Worthington Parks and Recreation Commission work with the community to plan for and create parks that include the desired amenities in the appropriate places within the City and at this site.

The 2014 document goes on to include information related to Design Guidelines, connectivity, street intersections, the High Street frontage, landscaping and buffers, storm water and public private partnerships which can be found in the full document.

Worthington Comprehensive Plan – UMCH Focus Area – 2014 - High Street Frontage Guidelines:
The potential redevelopment of the UMCH focus area creates a change in the consideration of setbacks along High Street in these blocks. To achieve the desired walkability, vitality, and screening of parking along Worthington's signature street, it is expected that multi-story buildings will be constructed closer to the High Street right-of-way, with parking located behind the buildings. The buildings should engage High Street with broad sidewalks, storefronts, front entries, and outdoor seating that provide an inviting strolling environment for pedestrians. The buildings constructed along High Street will set the tone and impression for the entire UMCH focus area. As such their architecture, materials, quality, interest, aesthetics, and vitality are critical. These buildings should have a predominance of brick and complement the community character. Buildings along High Street must have the majority of their building face fronting/ parallel to the street. Buildings are expected to be at least two stories in height with substantially transparent storefronts on the first floor, whether retail or office, to activate the street. Operational building entries must be provided along High Street regardless of parking orientation. Neither single-story commercial buildings nor retail buildings on out lots are part of the vision for the UMCH focus area, nor are buildings placed in the middle of parking lots.

Generally, it is anticipated that buildings will be setback from the High Street curb line an appropriate distance based upon the architecture and use(s) of the buildings. The streetscape section between the building and the curb should include a sizable tree lawn or street trees in planters (ten feet +/-), at least an eight-foot-wide unobstructed sidewalk, and an outdoor seating and/or landscape planting area. As the building height increases, the buildings should consider the relationship between the setback, the street corridor, and the building height. It is expected that if fourth or fifth stories are included, a variety of techniques will be implemented to mitigate any potential "canyon" effect along High Street, such as the use of floor terracing, changes in building massing, insertion of a green commons, recessed seating and dining areas, and lush landscaping to name a few.

While it is preferred that parking be provided to the rear of building, if parking is provided in front, it should be consistent across the frontage and be limited to either one row (single bay) of parking or on-street parking for short customer visits. Parking visible between buildings should be screened by landscape and/or masonry wall.

Development within the UMCH should be well landscaped, with particular focus on the streetscapes, building edges, buffers, and public park/community commons. Landscaping should be substantial, lush, well-planned, and commonly maintained. Landscape should emphasize native species where possible.

Worthington Comprehensive Plan - 2005
The 2005 Comprehensive Plan identifies portions of High Street outside of the historic core as High Street Corridor (Extents Area) and as a place where consistent site design should be encouraged such as landscape screening and interior planting of surface parking areas, and where the location of large parking areas should be to the rear of the site. The corridor could accommodate redevelopment at a higher density, with such projects meeting the needs of the City, providing green setbacks and meeting the Architectural Design Guidelines. The plan recommends promoting

a high-quality physical environment, encouraging the City to continue to emphasize strong physical and aesthetic design, and high-quality development. Also recommended is encouraging the private market to add additional commercial office space within the City. The UMCH property was specifically addressed in that section of the plan, with concepts establish for mixed use development on the site. This section specifically focused on the UMCH property was updated with the 2014 document.

Bicycle & Pedestrian Master Plan – 2019
The 2019 Bicycle & Pedestrian Master Plan was created to guide the development of bicycle and pedestrian routes, linking activity centers within the City, as well as the regional network. The plan recommends a multi-use path along High Street and sidewalks along the southern side of Longfellow Ave. to Larrimer Ave. The intersection of High Street/Worthington-Galena Rd./Wesley Blvd. was a signalized crossing that has been identified where there may be opportunities to improve safety and convenience for pedestrian crossings.

Park Master Plan – 2017
The 2017 Park Master Plan was created as a plan dedicated to maintaining our existing parks, meeting the needs of residents, and benchmarked effectively with other progressive cities is vitally important. The plan endeavors to provide City Council and the residents of Worthington prioritized park improvements for the years to come in an organized and strategic planning document. The plan recommends focusing on improving and maintaining existing park space, however as opportunities arise for additional park space as part of the UMCH site redevelopment the following should be considered:
- Natural spaces for passive recreation and the area along Tucker Creek would provide an opportunity for nature trails, education and interpretation opportunities, and a natural playground.
- Possible three season shelter is highly desirable for the community.
- Circular multi-use path around the perimeter of the development would be an opportunity.

Chapter 1177 - Worthington Design Guidelines and Architectural District Ordinance
This property is located within the Architectural Review District and as such is subject to the Architectural District Code (Ordinance) and the Worthington Design Guidelines. The Design Guidelines contain the following recommendations for new commercial/institutional and new residential construction in the parts of the District outside of Old Worthington:
New Commercial/Institutional Sites
1. Scale, Form & Massing: Extension of the pleasant scale of Old Worthington into new areas is desirable. Consider breaking down larger buildings into a series of smaller masses with connectors between them. Inclusion of sidewalks, pedestrian-scaled signage, and planting and lawn areas will help communicate a sense of a walkable pedestrian scale. Simple geometric forms and uncomplicated massing tend to make buildings more user-friendly and help to extend the character of Old Worthington into the newer development

areas. Carefully designed building facades that employ traditional storefronts -- or similarly sized windows on the first floor -- will help make new buildings more pedestrian-friendly.

2. Setbacks: Parking areas should be located toward the rear and not in the front setbacks if at all possible. Unimpeded pedestrian access to the front building facade from the sidewalk should be a primary goal. Building up to the required setback is desirable as a means of getting pedestrians closer to the building and into the main entrance as easily as possible.

3. Roof Shape: Generally, a traditional roof shape such as gable or hip is preferable to a flat roof on a new building. Roof shapes in a development do not have to be identical but can vary – just as in Old Worthington – to provide visual variety. Roof shapes should be in scale with the buildings on which they are placed. Study traditional building designs in Old Worthington to get a sense of how much of the facade composition is wall surface and how much is roof.

4. Materials: Traditional materials such as wood and brick are desirable in newer areas, but other materials are also acceptable. These include various metals and plastics; poured concrete and concrete block should be confined primarily to foundation walls. Large areas of glass are appropriate for the first floors of new buildings, where they resemble the commercial storefronts typical of older buildings. On upper floors, avoid large areas of glass in favor of a more traditional pattern of window openings spaced regularly across the building's wall. Avoid any use of glass with highly reflective coatings. Some of these may have a blue, orange, or silver color and can be as reflective as mirrors; they generally are not compatible with other development in Worthington. Before making a final selection of materials, prepare a sample board with preferred and optional materials.

5. Windows: On long facades, consider breaking the composition down into smaller "storefront" units, with some variation in first and upper floor window design. Use traditional sizes, proportions and spacing for first and upper floor windows. Doing so will help link Old Worthington and newer areas through consistent design elements.

6. Entries: Primary building entrances should be on the street-facing principal facade. Rear or side entries from parking lots are desirable, but primary emphasis should be given to the street entry. Use simple door and trim designs compatible with both the building and with adjacent and nearby development.

7. Ornamentation: Use ornamentation sparingly in new developments. Decorative treatments at entries, windows and cornices can work well in distinguishing a building and giving it character, but only a few such elements can achieve the desired effect. Traditional wood ornamentation is the simplest to build, but on new buildings it is possible to use substitute materials such as metal and fiberglass. On brick buildings substitute materials can be used to resemble the stone or metal ornamental elements traditionally found on older brick buildings. As with all ornamentation, simple designs and limited quantities give the best results.

8. Color: For new brick buildings, consider letting the natural brick color be the body color, and select trim colors that are compatible with the color of the bricks. It may be acceptable to paint new brick walls. Generally, lighter colors should be used for this purpose, with darker colors for trim. Prepare a color board showing proposed colors.

9. Signage: Keep and repair any historic signage that is appropriate to the Architectural Review District. While the regulations permit a certain maximum square footage of signs for a business, try to minimize the size and number of signs. Place only basic names and graphics on signs along the street so that drive-by traffic is not bombarded with too much

information. Free-standing signs should be of the "monument" type; they should be as low as possible. Such signs should have an appropriate base such as a brick planting area with appropriate landscaping or no lighting. Colors for signs should be chosen for compatibility with the age, architecture and colors of the buildings they serve, whether placed on the ground or mounted on the building. Signs must be distinctive enough to be readily visible, but avoid incompatible modern colors such as "fluorescent orange" and similar colors. Bright color shades generally are discouraged in favor more subtle and toned-down shades.

10. Sustainability: The City of Worthington and its Architectural Review Board are interested in encouraging sustainable design and building practices, while preserving the character and integrity of the Architectural Review District. Energy conservation methods are encouraged. Landscape concepts often complement energy conservation and should be maintained and replenished. Utilize indigenous plant materials, trees, and landscape features, especially those which perform passive solar energy functions such as sun shading and wind breaks. Preserve and enhance green/open spaces wherever practicable. Manage storm water run-off through the use of rain gardens, permeable forms of pavement, rain barrels and other such means that conserve water and filter pollutants. Utilize solar panels where appropriate that meet the guidelines outline in the Design Guidelines. Bike racks and other methods of facilitating alternative transportation should be utilized. Streetscape elements should be of a human scale. Make use of recycled materials; rapidly renewable materials; and energy efficient materials. Use of natural and controlled light for interior spaces and natural ventilation is recommended. Minimize light pollution.

New Residential Sites

1. Form, massing and scale: New structures should complement the form, massing, and scale of existing nearby structures. Also, building placement and orientation are important design considerations. Most main entrances should face the street and garages should avoid facing the street.

2. Setbacks: Observe the setbacks of adjacent and nearby structures.

3. Roof: Roof shapes for new buildings should be appropriate to the style or design of the building. If a new building does not follow a particular style but is instead a vernacular design, then roof shapes and heights similar to those in the neighborhood or nearby would be most appropriate.

4. Materials: Contemporary materials that simulate traditional ones are appropriate, but the preferred option is to use true traditional materials such as wood siding. Incompatible contemporary materials should be avoided. Brick has long been a traditional material in Worthington. Prepare a sample board for review by the Architectural Review Board.

5. Windows: For new buildings, multiple-paned windows generally are not appropriate. The exception is a building being built in a particular style -- such as Federal, Greek Revival or Colonial Revival -- that would have employed this window type. When in doubt, simple 1 over 1 double-hung sash windows are usually the simplest, least expensive and most appropriate choice. Using the excellent precedents of Worthington's many historic structures, carefully design the pattern of window openings; window sizes and proportions (they must be appropriate for the size and proportions of the wall in which they are placed); pattern of windowpanes and muntins; and trim around the windows. Good quality wood windows are readily available and more affordable than in the past. True wood windows are always the first preference. Aluminum- or vinyl-clad windows

can be appropriate, but primarily on secondary facades and less conspicuous locations. All-aluminum or vinyl windows are not prohibited but are not encouraged. Avoid blank walls.

6. Entries: As with other design considerations, study Worthington's rich collection of 19th and 20th century architecture for design ideas for entrances and doors. For newly built buildings, simpler designs usually look better than more ornate ones. Avoid heavy ornamentation on doors and entrances. Observe entry placement on existing buildings. Whether located symmetrically or asymmetrically, entries usually are aligned with a window on the second floor so that a regular rhythm of openings is maintained on both floors. Entries should be located so they are easily visible, and they should be oriented toward the street.

7. Ornamentation: Observe Worthington's excellent historic architecture for information on the kinds and amounts of ornamentation employed on various building styles and periods. Use ornamentation conservatively. It will be most successful if used in traditional locations: around windows and doors; along a building's cornice or at the corners; in gables; or on gates and fences. Most ornamentation historically was made of simple forms built up to a desired level of complexity. When in doubt, follow the old rule that "less is more." Sometimes just a little ornamentation, well placed, can have a major impact without the need for more extensive (and expensive, and hard-to-maintain) ornamentation. Use compatible materials in ornamental elements. Frame houses should have wood ornamentation, although in cases where the ornamental elements are some distance from the viewer it may be possible to use substitute materials such as fiberglass.

8. Color: In general, avoid bright colors not typical in Worthington neighborhoods, such as various shades of purple or orange. For infill buildings being placed in an existing streetscape, select colors compatible with those already used along the streetscape. Many buildings follow a pattern of light colors for the building body and darker colors for the trim. Following this pattern is encouraged. In Worthington, the use of white or cream-colored trim also is common and would be appropriate for new construction. Avoid using too many colors. Usually one body color and one trim color are sufficient.

9. Landscaping: Worthington's mature shade trees are the primary landscaping feature throughout the community. They are a major contributor to its character and help define its neighborhoods as stable, desirable places to live. In general, lawns are generous but not overly large, which contributes to the sense of human scale that is one of Worthington's important attributes. Other landscaping elements tend to be properly scaled and well-tended, which also tends to enhance neighborhood character. Maintain and nurture mature trees to prolong their lives. Plant and maintain street trees in planting areas between the street and sidewalk. Paving can sometimes reduce water absorption of the soil so much that trees do not get the moisture they require.


Chapter 1177.05 Standards for Review: Certificate of Appropriateness
**1177.05 Standards for Review: Certificate of Appropriateness**
The Board of Architectural Review, in deciding whether to issue a certificate of appropriateness, shall determine that the application under consideration promotes, preserves and enhances the distinctive historical village character of the community and would not be at variance with existing structures within that portion of the district in which the structure is or is proposed to be located

as to be detrimental to the interests of the Districts as set forth in Section 1177.01. In conducting its review, the Board shall make examination of and give consideration to the elements of the application including, but not necessarily limited to:

(1) <u>Height</u>, which shall include the requirements of Chapter 1149;
(2) <u>Building massing</u>, which shall include in addition to the requirements of Chapter 1149, the relationship of the building width to its height and depth, and its relationship to the viewer's and pedestrian's visual perspective;
(3) <u>Window treatment</u>, which shall include the size, shape and materials of the individual window units and the overall harmonious relationship of window openings;
(4) <u>Exterior detail and relationships</u>, which shall include all projecting and receding elements of the exterior, including but not limited to, porches and overhangs and the horizontal or vertical expression which is conveyed by these elements;
(5) <u>Roof shape</u>, which shall include type, form and materials;
(6) <u>Materials</u>, texture and color, which shall include a consideration of material compatibility among various elements of the structure;
(7) <u>Compatibility of design and materials</u>, which shall include the appropriateness of the use of exterior design details;
(8) <u>Landscape design and plant materials</u>, which shall include, in addition to requirements of this Zoning Code, lighting and the use of landscape details to highlight architectural features or screen or soften undesirable views;
(9) <u>Pedestrian environment</u>, which shall include the provision of features which enhance pedestrian movement and environment and which relate to the pedestrian's visual perspective; and
(10) <u>Signage</u>, which shall include, in addition to requirements of Chapter 1170, the appropriateness of signage to the building.
(11) <u>Sustainable Features</u>, which shall include environmentally friendly details and conservation practices such as solar energy panels, bike racks, and rain barrels.

<u>Chapter 1174 - Planned Unit District - PUD</u>
The PUD: Planned Unit Development chapter of the Codified Ordinances includes the following purpose statement:

> The purpose of Planned Unit Development is to promote variety, flexibility and quality for the development of properties in the City of Worthington. Planned Unit Development allows for more creative planning and design and enables a greater range of uses than traditional Zoning regulations  Planned Unit Development allows for the design and mix of uses necessary to meet changing economic and demographic demands; permits implementation of development standards, plans, studies, and guidelines adopted by the City Council; and provides the opportunity to retain and enhance the character of the City, and the health, safety and general welfare of the inhabitants.

The chapter goes on to provide additional detail regarding PUD provisions, uses, standards, submission requirements, procedures, natural features and coordination with other provisions of the Planning and Zoning Code, which can be found in <u>Chapter 1174</u> of the Codified Ordinances of the City.

**Staff Comments/Analysis**

Staff has focused on broad discussion topics in this section and compared them to the language in the 2014 Comprehensive Plan Update to manage the initial review of the applications and materials. City staff comments/analysis included below is our interpretation of the materials provided. A full review of the detailed criteria in Chapter 1174 PUD Planned Unit Development is still needed and could not yet be completed due to the limited information available from the applicant.

***Discussion Topics:***
- Residential Density, Height & Housing Types
- Mix of Land Uses
- Greenspace/Open Space/Parkland
- Traffic/Connections
- Bicycle & Pedestrian Accommodations

***Residential Density, Height & Housing Types***

The overall density proposed on the site has been reduced by approximately 19% from 730 units to 600 units, however the density is still higher than the 2015 proposal and there is less acreage involved. The 2015 version included more acreage and High St. frontage that has since been sold. The overall site has been reduced by 3.4-acres and 428± feet of road frontage. The 2015 density discussed was 14 units/acre on 41.22-acres and is now 15.95 units/acre on 37.8-acres. The 2015 version was presented at a meeting that had over 350 people attend, and overall, the community was not supportive of the previous density, layout and amount of usable open space and this proposal still has 29 additional units with less acreage than the 2015 proposal.

The applicant proposes a mix of for-sale and for-rent products throughout the site that include a mix of floorplans. The mix of floor plans has only few options for single-level living, which is one of the key things we have heard from our residents that they would like to see offered in the community.

The overall density should be dramatically reduced to better reflect what is recommended in the Plan and by the community. The variety of housing types should also be re-considered to address the variety of housing options needed and desired in the community.

*Worthington Estates Edge*

This area is identified in the 2014 Comprehensive Plan Update ("Plan") as a transition zone between the existing single-family housing to the west and north and application proposes single-family residential development on lots between a third-of-an-acre and a fifth-of-an-acre. Staff's review noted the proposal is generally consistent with the density recommendations found in the 2014 Comprehensive Plan Update with the following comments:

- The rear yard setbacks abutting the existing residential to the west should have a rear yard setback of 30-feet and the lots fronting on Longfellow Ave. should have a front yard setback of 30 feet to match the existing required setbacks of those homes found in Worthington Estates.
- Landscaping and buffers are key between the UMCH focus area and the neighboring residential.

- First-floor living opportunities are important to Worthington residents.
- Custom-built, individualized homes are desired according to the Plan and recommended to not have repetitious floor plans.
  - The previous submittal referenced a partnership with Bob Webb Homes. The previous application submitted a sample of 4-home plans that would be built by Bob Webb Homes with the caveat that the house models with the same footprint may be allowed under certain circumstances.
    - Not referenced, however information for this most recent will be required in the future for review.
  - The Plan states that architecture and design should be rich and varied (not repetitive/homogeneous) with great attention to detail.
- The Residential Design Guidelines provide guidance on site development, form, massing, scale, setbacks, roof shape, exterior materials, windows, entries and color.
- The Worthington Estates Edge would remain in the Architectural Review District.

*Neighborhood Core*

The Plan recommends this area for higher density residential development that creates a transition from the single-family homes along the periphery of the site to the more active uses proposed closer to High St. The recommendation in the Plan is for 6-14-units/acre with a height of 3-stories with more than one housing type at more than one density with appropriate open space associated with the proposed density. Staff has the following comments:

- The applicant is proposing an overall density of 11.3-units/acre in this area with a for sale and for rent product that is 3 stories in height. Some units will have a garage and finished lower level.
- Residential development in this area of the site is recommended in the Plan at 6-14 units/acre with more than one housing type and at more than one density level. The proposed 11.3-units/acre does not incorporate a true mix of housing options. This area should provide a mix of residential living that is underrepresented in the Worthington market and addresses the needs of aging residents, future young professionals, and those desiring amenity-rich living.
- The 2015 proposal from Lifestyle Communities expressed a mix of estate lots, cottage lots, manor lots and townhomes on the site at approximately 178-units for 13-units/acre; however, the community comments received on that proposal indicated the density and product was not what the community wanted to see on the site.
- The 2020 proposal from Lifestyle Communities expressed a mix of smaller estate lots, townhomes, and flats at approximately 12-units/acre; however, the community comments received indicated the density and product was not what the community wanted to see on the site.
- Subarea #2 and subarea #3 are proposed to develop at different densities with a minimal mix of styles, however, there appears to be minimal units that provide single-level living.
  - Single-level living is one of the things the City has heard is desired by residents and is not abundantly provided for in this proposal.

- The Plan notes that this area creates the opportunity to introduce different types of housing options that are not available in the City.
  - Townhomes are the only housing option offered in this location besides a few single level living flat options.
- The northern portion of the Neighborhood Core (subarea #2) has been identified in the proposal as townhomes at 3 stories in height with garages that will be a for sale product.
  - This for sale product would serve as a transition from the detached single-family lots to the west and north to the rental products proposed to the south and east towards High St.
- The Comprehensive Plan recommends a mix of single-family detached homes on small lots with alley garages, homes with great front porches for outdoor gathering, custom homes designed for first-floor living, luxury residences with integrated auto courts, well-appointed walk-up townhomes, and a limited number of high-end flats.
- The southern portion of the Neighborhood Core (subarea #3) has been identified as townhomes at 3 stories in height with some units having attached garages and are a for rent product. This subarea #3 does appear to offer a limited amount of single level living options and is at the maximum density recommended in the Neighborhood Core.
- The rental product located in the southern portion of the Neighborhood Core (subarea #3) does not have a mix of housing types that included detached homes on small lots with rear alley garages and front porches as referenced in the 2014 Plan.
- The application states that the total amount of public/private open space is approximately 1.3-acres in size, however there are only a few areas that are reasonably sized areas of open space in the Neighborhood Core. The areas shown are proposed for recreation, pavilion, seating area and other small green spaces between the townhomes and space at the end of buildings.
  - The Plan recommends the creation of park space for the community and public enjoyment as an important component for any development on the site in addition to the area identified as the Tucker Creek Preserve.
  - Park space is critical to providing place-making in development layouts.
  - The proposed open space is an improvement over the previous proposal as it creates a linear green from High Street to the interior of the site to a neighborhood green.
    - This is a positive improvement towards meeting the goals found within the Plan.
  - The proposed open space does not seem to meet the goal of creating contiguous usable open space for those living in this development and in all of Worthington. The proposed green space does not appear to build upon the green space that is identified as the Tucker Creek Preserve.
  - The Plan calls for several acres of park space between the High Street Mixed Use and Neighborhood Core zones.
  - According to the Plan, park space and amenities should increase with density and should be useable, contributing ground for residents, workers, and visitors to the site. Some areas shown appear to be squeezed in to provide open space. There is also an area identified for stormwater control, which is identified in the Plan as the type of ground that does not meet the park space goal, however stormwater management is critical for any development on the site.

- The Plan and the community have asked for additional park space with amenities within the UMCH site. At this time, it does not appear that the proposed green space meets the need for usable contiguous open space that can build upon the Tucker Creek Preserve as described in the Plan.

*High Street Mixed Use*

This area consists of the frontage of the UMCH site along High St. and is recommended in the Plan for a mix of office, residential, and retail uses with the focus on commercial office and medical uses with subordinate residential and limited retail uses. Staff has the following comments:

- The proposed 420 apartments with access to a proposed parking garage in this area does not appear to meet the intent of being subordinate residential.
- The apartments range in height of 4-5 stories in height with some buildings having first-floor retail.
- The location and height associated with the northern building (Building A) has been pulled away from Longfellow Ave. and Larrimer Ave.
  - The increased setback, reduced height and gateway green helps to buffer the proposed building from the neighboring residential uses to the northwest.
    - This is a positive improvement towards meeting the goals found within the Plan.
  - The 4-story parking garage will be completely wrapped by the building and will have access from Larrimer Ave.
    - This is a positive improvement towards meeting the goals found within the Plan.
    - Access to the parking garage is provided from Larrimer Ave, however a secondary access should be discussed to provide easier access to the parking garage from the proposed new roadways.
- The location and height associated with the southern building (Building B) has been adjusted to be closer to the southern property line.
  - The setback along the southern property line has not been identified at this time, however, this information will be required in the future for review.
  - The 4-story parking garage will be wrapped on three sides.
    - The southern elevation of the parking garage will need to be addressed in the future as Worthington requires four-sided architecture.
    - Access to the parking garage is provided from the new roadway on the west side of southern building (Building B).
- There appears to be approximately 1.7-acres of open space along a linear green, trail connection and a gateway green.
- The amenities associated with the apartments are now separated from the communal open space, and the amenities are now screened by the apartment building and the medical office building along High Street whereas the previous version had the amenities adjacent to the Longfellow Ave. right-of-way.
  - This is a positive improvement towards meeting the goals found within the Plan.
- The 2015 version expressed a mix of medical office buildings, first-floor retail, and apartments at 350-units. Many community members previously stated that they felt that

350 apartments were too much on the site, however today we have 420 apartments proposed with less usable acreage.

- The site is 3.42 acres smaller with less High St. frontage and the apartment count is still 70-units higher in the area along High St.
- Residential use should be subordinate to the primary need for commercial office and medical uses in the High-Street Mixed-Use zone.
- According to the Plan, where the High Street Mixed Use is opposite existing single-family residential, it is expected that the new development will consist of residential development and/or substantial attractive buffers.
  - o The apartments are now 4-stories in height towards the intersection of Larrimer Ave. and Longfellow Ave. and the buildings have been pulled away from the intersection and a gateway green has been proposed that provides an additional buffer to the residential to the northwest.
    - This is a positive improvement towards meeting the goals found within the Plan.

### *Mix of Land Uses*

As stated in the Plan, redevelopment on this site must create a high-quality, mixed-use development that is walkable, connected, and integrated within the site and with the City. This mix of uses should contain a range of residential types together with commercial office and neighborhood retail uses integrated with contributing and shared green space and amenities – all of which complement each other to create an active, vibrant place. Staff has the following comments:

- Commercial Uses:
  - o The application proposes 24,000 sq. ft. of commercial retail/restaurant space and 96,000 sq. ft. of medical office space. The proposed square footages are a positive change from the previous proposal. Office uses are more consistent with the recommendations found in the Plan.
    - This is a positive improvement towards meeting the goals found within the Plan, however it still hasn't reached the desired expectations. The amount of office space is still small in comparison with the amount of residential proposed on the site.
  - o Income tax generating employment uses such as office are critical to the fiscal sustainability of the City.
  - o Neighborhood scale retail was recommended in the Plan due to the proximity of this site to Old Worthington and the Shops at Worthington Place as a means to not create a third retail center.
  - o The Plan calls for a mix of office, residential and retail uses with the focus on commercial office and medical uses with subordinate residential and limited retail uses.
    - The residential uses are not subordinate to the commercial office and medical use recommendations for the site. The proposed retail square footage appears to be more in line with the recommendations found in the Plan.

- o As a fully developed community there are few opportunities to attract new Class A office tenants in Worthington that are seeking new construction. This site is key to attracting new office development.
- o According to the Plan, neighborhood retail can complement the development in the first floors of office and residential buildings, however an abundance of retail would be out of alignment with the needs of the City seeking more opportunities for new commercial office development.
- Residential Uses:
  - o The proposal shows a total of 600-units on the site with a mix of housing types and are marketed as a rental product and a for sale product. There would be 492 rental units and 108 for sale units on the site.
    - The City has heard from the community that there is a desire for owner-occupied housing units and housing types as a means to age in place and stay within the Worthington community.
  - o The 2015 proposal from Lifestyle Communities included more acreage and High St. frontage; however, it had a lower density than what is proposed today. The overall site has been reduced by 3.4 acres and 428± feet of road frontage. The previous density discussed was 14 units/acre on 41.22 acres and is now 15.95 units/acre on 37.8 acres. Over 350 people attend a meeting on this 2015 proposal, and the community was not supportive of the previous density, layout and amount of usable open space and this new proposal has approximately 70 additional units with less acreage.
    - The City has received over 320 online comments with the majority of the comments referencing the density is still too high on the site.
  - o The Plan recommends a range of residential types together with office and neighborhood retail and shared green space and amenities designed to be sensitive to the neighborhoods adjacent to the site, and protect the natural features related to Tucker Creek.
  - o The proposed number of units does not seem consistent with the Plan and what has been expressed by the Worthington community.

### *Greenspace/Open Space/Parkland*
The Tucker Creek Preserve has been identified in the Plan as an area to preserve as a natural green space amenity for the site and the community. The creek and the steep slopes are not developable, and the wooded areas are important contributing and environmental features. There is a strong desire to continue linking neighborhoods, parks, and destinations with multi-use trails throughout the City. The creation of park space for community and public enjoyment is an important component for any development on the site in addition to the Tucker Creek Preserve. Staff has the following comments:

- The 2019 Bicycle & Pedestrian Master Plan also recommends a multi-use path along High Street and sidewalks along the southside of Longfellow Ave.
  - o These recommendations will need to be incorporated into any streetscape improvements along High Street and development along the Longfellow Ave. frontage.

- There is an opportunity to have a bicycle and pedestrian connection between High St. and Evening St. and around the entire site that would promote additional bicycle and pedestrian opportunities and access to greenspace/open space on the site.
  - Sidewalks are proposed throughout the site and a multi-use trail running throughout the Tucker Creek Preserve and a north/south multi-use trail running through the center of the site. The Plan's vision was to build upon the Tucker Creek Preserve's existing assets.
  - This proposal appears to address some of the amenities that we have heard the community would like to see on the site, however the contiguous usable open space appears to be lacking.
- The 2017 Park Master Plan also recommends focusing on improving and maintaining existing park space, however as opportunities arise for additional park space as part of the UMCH site redevelopment the following should be considered:
  - Natural spaces for passive recreation and the area along Tucker Creek would provide an opportunity for nature trails, education and interpretation opportunities, and a natural playground.
  - Possible three season shelter is highly desirable for the community.
  - Circular multi-use path around the perimeter of the development would be an opportunity.
- Park space is recommended in the Plan to provide a place for community gathering functions and to provide place-making in the development's layout as well as a greenspace balance to the uses proposed on the site.
  - Contiguous usable greenspace/open space is key to what the community expects to the see on the site.
- According to the Plan, the amount of greenspace/open space is expected to increase as the density on the site increases.
  - This proposal does not appear to be in line with that recommendation.
- The Plan indicates park space should be useable, contributing ground for residents, workers, and visitors to the site and not stormwater ponds or left-over ground.
  - Tucker Creek Preserve is proposed to have trails, entry pavilion, trailhead pavilion, and linear green space in subarea #3, however it still appears to be cut off from the rest of the site.
  - A stormwater pond is proposed along the Evening St. frontage abutting the Tucker Creek Preserve.
    - There might be better ways to incorporate stormwater management on the site that would be an attraction and benefit to the development.
  - The Plan envisioned a possible three season shelter house, outdoor amphitheater, multi-use paths and more passive recreational uses in the areas around and in the Tucker Creek Preserve. The materials provided indicate the desire to add additional amenities in the appropriate places on this site that the community desires.
  - Overall access to the Tucker Creek Preserve has been improved by incorporating open space and a trail connection through the site.
    - Contiguous usable greenspace/open space is key to what the community expects to the see on the site.
  - It is expected that greenspace/open space be incorporated into the Neighborhood Core and the High Street Mixed Use zones as park space useable by the community.

- The Tree Survey & Preservation Plan has been provided. There appears to be an opportunity to save some high-quality species of trees along the perimeter of the site, however, there does appear to be some high-quality species of trees in the center of the site that will likely need to be removed as part of any development. There might be the possibility to incorporate some of these trees into the overall design.

***Traffic/Connections***

The City originally requested an updated Traffic Study for the site, however until there is more consensus on the density and uses on the site we have asked the applicant to hold off on submitting an updated study. The previous Traffic Study was prepared in 2015, updated in 2017 and again in 2018. City staff felt that it was appropriate for an updated Traffic Study using previous traffic counts for the City since traffic patterns and volume have substantially changed since the pandemic. Staff has the following comments to the previous Traffic Study:
- Bicycle and pedestrian improvements could be better incorporated into the overall design.
- Public and private roadways proposed on the site.
  - o Wesley Blvd. has been proposed to become a public roadway and dedicated to the City for maintenance.
    - City staff has concerns about how this road was constructed and whether it was constructed to public road standards since it was originally constructed as a private road.
- Compliance with the City's Complete Street Policy will be required for all newly constructed streets.
- The need for vehicular, bicycle and pedestrian connections to the existing roadways at Evening St., Longfellow Ave., Larrimer Ave., Wesley Blvd. and High St. and proposed new roadways on the site should be further discussed and reviewed.
  - o Bicycle and pedestrian connections through the site as well as with the adjacent neighborhoods and uses are important to meet the City's goals of enhancing bicycle and pedestrian accommodations.
  - o Vehicular connections to Evening, Longfellow and Larrimer are extremely sensitive and will need careful evaluation for the amount of traffic that may utilize these connections. Any connections should be constructed so as to limit cut through traffic and negative impacts on the neighborhood.
    - An updated Traffic Study will eventually be needed.
- Improvements along High St. as proposed with the development and streetscape improvements associated with these improvements need further consideration.
  - o Streetscape improvements will need to be discussed and incorporated into the overall design.
  - o Multi-use path along High Street should be incorporated into any streetscape improvements.
- Intersection streetscape improvements at Larrimer Ave. and High St. will need to be discussed and incorporated into the overall design.
- There is a need to address the intersection of High St., Wesley Blvd, Worthington-Galena Rd. and Crandall Dr. as part of this development as it relates to traffic being able to go east/west through the intersection and to provide improved bicycle and pedestrian connections.

*Stormwater*

Stormwater management will be extremely important as this site develops. The previous application identifies a wet detention basin along Evening St. and stormwater storage vaults and surface detention facilities located within the open spaces and parking areas on the site. The City and its consultant, ms consultants, will be reviewing the final stormwater design to ensure compliance with Ohio EPA standards and the City's Stormwater Manual as the project progresses. The stormwater design has been proposed to outlet to the existing Tucker Creek along the southern property line. Staff has the following comments:

- A comprehensive look at the entire site for stormwater will be needed that can be developed in stages as the overall site would likely develop in phases over multiple years.
- According to the Plan, stormwater controls should be aesthetically integrated into the site and be natural in appearance and serve as an amenity to the site. The current proposal just has the detention pond located along Evening St. and the proposed new roadway to the site. Vehicular and pedestrian safety will need to be discussed concerning the detention pond.
- Sustainable and green infrastructure needs to be incorporated into the overall development as stated in the Plan.
- The Plan states the expectation that stormwater controls on the site will be required to meet or exceed all requirements.

*Architecture*

The property is located in the Architectural Review District and any new construction will need to meet the Worthington Design Guidelines and would be subject to review by the Architectural Review Board. The Plan provides additional guidelines for residential and commercial development. The two parcels that are currently zoned R-10 fronting on Larrimer Ave. would need to be added to the Architectural Review District. Staff has the following comments:

- Residential Development:
  - o As the Plan states, architecture and design should be rich and varied (not repetitive/homogeneous) with attention to detail.
    - Once there is more agreement on density and layout on the site, architecture will be very important on the site and will require four-sided architecture throughout the development.
    - All proposed materials should follow the Worthington Design Guidelines.
    - The applicant has stated that the renderings provided in the application are just examples, and not intended to be the final design.
    - There are additional Residential Design Guidelines called out in the Plan and the Plan notes development should adhere to the Worthington Design Guidelines.
- Commercial Development:
  - o The Plan notes the Worthington Design Guidelines provide guidance on site development, scale, form, and massing, setbacks, roof shape, materials, windows and signage. The Plan further states development should improve the pedestrian scale and walkability of the City's commercial heart and create four-sided architecture that is attractive on all sides. Building forms, materials, and setbacks should be consistent with historic patterns.
    - The southern building (Building B) parking garage appears to be exposed to the southern end.

- Four-sided architecture will be required.
- Setbacks from the southern property line should be discussed.

■ The scale, form and massing of Building B appears out of character for the portion of the building extending towards High Street.

■ The applicants has indicated the elevations provided are just examples, however the overall design and the scale, form and massing of the site will need to meet the intent of the guidelines.

■ Elevation examples were not provided for the medical office building along High St., however the applicant previously stated that the buildings will have a setback of 25-feet from the public right-of-way.
- A setback of 25-feet is recommended; however, the street frontage should be activated and have usable entries according to the Plan.
- A multi-use path is also recommended along this portion of High Street.

■ Streetscape improvements will need to be discussed at some point in the process. This would include new mast arms at Larrimer Ave. and High St. streetlights, street trees, landscaping, pedestrian sidewalks and/or paths.

■ The small surface parking lot north of the northern building (Building A) will be required to be screened.

■ There are additional Commercial Design Guidelines called out in the Plan that reference the Worthington Design Guidelines that should be considered.

**Miscellaneous:**

The UMCH Development Update is available at worthington.org/umch project page on the City's website offers the following additional information:

- Applications & materials associated with the current proposal.
- Ways to learn more about the proposal and understanding the rezoning and development review process while explaining what a PUD is.
- Ways to provide feedback throughout the public process.
- What are other people saying in the community. We have posted all comments at (UMCH Public Comments) or go to worthington.org/umch to view all comments. All comments are posted to the website and have been shared with the Board & Commission members and are now part of the record.
- UMCH Background Materials
- Notify Me – Gives you the opportunity to receive updates by email when there is new information available.

**Worthington City Charter**

The Charter provides the following information regarding the role of the Municipal Planning Commission:

The Municipal Planning Commission shall have the power to:

(1) Review and recommend any revisions to the Master Plan, official map, area plans, and development standards of the City as often as necessary but not less frequently than every five (5) years;

(2) Recommend to Council the disposition of requests for subdivision platting;

(3) Recommend to Council amendments to the zoning plan and ordinance of the Municipality;

(4) Recommend to Council zoning changes and zoning for newly annexed areas;

(5) Determine or recommend to Council, as provided by ordinance, the disposition of requests for conditional use permits;

(6) Cooperate with the regional planning commission and the planning commissions of area municipalities;

(7) Act as the Board of Architectural Review as provided by ordinance. The Council shall annually appoint as additional voting members of the Board of Architectural Review two representatives of the Architectural Review District, one or both of whom shall be a resident freeholder of said District;

(8) Perform such other duties, not inconsistent with this Charter, as may be required by ordinance.

In rendering a decision or recommendation, the Municipal Planning Commission shall articulate its basis therefor, in writing, by reference to the relationship that decision or recommendation has to the overall comprehensive planning goals of the City, which may be found in the Master Plan, the zoning map, a course of zoning or subdivision practices by the City, or any other acknowledged comprehensive strategy or goals previously established at the time of the decision or recommendation.

The Commission has three choices: approval of the following motion, denial of the following motion, or a vote to table for additional information. Given the lack of detailed information with this revised application, staff advises against a motion recommending approval until additional information is provided and reviewed. As noted above, staff's recommendation is denial of the applications as they stand today.

**Discussion:**
Mr. Brown swore in the applicants. Mr. Thomas Hart said they would start off the presentation with Mr. Bo Brownlee, General Counsel, Lifestyle Communities. Mr. Brownlee said they were presenting a revised conceptual site plan with the goal of gaining feedback on such topics as the revised mix and location of uses, the configuration of open space and open space amenities and the adjusted connectivity plan and neighborhood engagement elements. With this concept plan filing, they were not asking for a vote or recommendation at this stage, but rather requesting dialogue on the updated conceptual land plan. On the presentation specifically, Mr. Hart would walk them through a detailed description of the changes that they made. What would become obvious during the presentation is that they listened, but they have reacted to previous comments from the city and the Planning Commission. Mr. Brownlee said among other changes, they have increased park and open space, as well as, substantially improving the park space connectivity and access. Further, without any real guidance from the city or its representatives, they have taken the initiative to substantially reduce the residential density by approximately twenty percent, as well as, substantially increasing the commercial space by approximately forty percent, notwithstanding the challenge in retail and office environment in today's market.

Mr. Brownlee said with the apartment reduction noted, he would like to say they continue to have a strong belief that a large residential presence is needed at this site like most urban and suburban infill sites residential density is a solution not the enemy. Density creates the economies of scale and critical mass vibrancy to support mixed use and stimulate the demand for other key uses such as office, commercial restaurant service and other retail. In fact, the success of such a mixed-use development as called for under the Comp Plan relies on such economy of scale, critical mass and density. So, what next after this hearing? After gaining feedback and direction on the revised concept they will be better prepared to address the more technical aspects of the pending application such as traffic impacts, storm water, utility adjustments, and architecture. Mr. Brownlee said he just asks that as a reminder, the plan is conceptual, and they really view the purpose of tonight as generating dialogue, on this plan and the changes they made in order to better assess the need for further changes and next steps. Mr. Brownlee said they respectfully ask for the focus and comments on this conceptual plan rather than other topics that are not part of this filing. Mr. Brownlee said thank you and turned the discussion over to Mr. Hart for further review of their revised concept plan.

Mr. Hart reviewed the revised concept plan and how they acted on the feedback they received from lots of different sources along the way and as Mr. Brownlee stated earlier, they were focused on more site access, and engagement with the existing neighborhoods, more effective connectivity and use of Tucker Preserve and they also have a reflection of a reduction in density and in increase in office and commercial components.

Mr. Hart said one of first key goals to the plan changes is to improve access to and from existing neighborhoods and around the site and make the site part of the neighborhood, not separate from it. He explained the slide presentation showing the path and greenway access. Mr. Hart said they went to a plan that provides welcoming entries, and pavilions, and green spaces at all the neighborhood access points. There are parks, green spaces and pavilions at Evening Street on the south at the beginning of Tucker Drive, at Larrimer and Longfellow Streets on the north as well as a trailhead pavilion that gets you to the multi-use path at Wesley Boulevard. He said they opened up the site and added public gathering spaces at High Street, across from City Hall, with a connection to what is a significant linear grade that runs east to west which is about .81 acres and leads to an internal neighborhood drain to the west which is about a half of an acre that includes a larger pavilion amenity. Mr. Hart said the improved connectivity from neighborhood access and High Street with the path system crosses both north, south, east, and west. He explained the blue lines were the multi-use path, the yellow lines were the internal paths and sidewalks that lead to all parts of the site. One clear goal of this revised plan is to draw pedestrians into the site and draw neighbors into the site and to get Tucker Reserve activated as green space and also allow people to get to High Street where there will gathering areas, activities, and restaurants.

Mr. Hart said another example of what they are trying to do is engage High Street, so they made that area more open, more pedestrian, and really designed to drive the vibrancy they believe in that the site needs, more of an upfront gathering area with outdoor restaurant spaces and activity at the street level. They are trying to establish an attractive European Style outdoor plaza and bistro table setting. They are looking for what would be a vibrant oasis along High Street that is really part of people's daily lives, with both existing neighbors and future residents.

Mr. Hart said another related goal in what they are trying to do on High Street is to make it a key anchor for what they have heard about and had some discussions about with residents. The larger vision

of the Worthington Mile concept which is to connect old Worthington to Wilson Bridge Road and then loop around to the Olentangy Trail with a multi-use path loop to create a more pedestrian friendly environment, and to lessen the impact of traffic at the street level and to stimulate other development and redevelopment opportunities along the way in that key corridor. Mr. Hart said they feel that site could be a key anchor to that concept and really help launch what is a greater community vision of the Worthington Mile Concept.

Mr. Hart explained the next slide discussed how they would imagine Tucker Creek and it would be programmed with an internal path system, connecting the site to High Street, to the existing neighborhood by Evening Street and then into the site to the north and the west. Mr. Hart said for perspective slide 14 showed the Tucker Creek acreage and the relation to McPherson Commons down in the arena district, Tucker Creek is almost double the size of McPherson Commons and what they are really trying to do is activate Tucker and make it more usable. He said the path system is conceptual. When you are trying to activate a natural area, a wonderful area like Tucker, you have to be very careful how you locate paths inside that site and be as least disruptive as possible. He said they believed Tucker should be activated that way with that type of path system and other amenities. Mr. Hart said this would be an example of where they would want and need to collaborate with the city's professional staff as to how to program Tucker, but this showed their intent. He said there was another green within the multi-family area north of Tucker at the middle of the site and then another redundant connection trying to get people from Tucker into the site and onto the other path systems to the other green spaces.

Mr. Hart said he wanted to briefly discuss the storm pond which is required based upon regulatory requirements to control the volume of storm water, but it is on the western edge of Tucker. He said they propose it is their intent to naturalize the pond as a water feature, it would not look like a typical 1970's storm pond, the pond would look natural and be activated with the path system and have benches for seating. There would be a significant welcome Pavilion that would bring people into a nice water feature and be a focal point as they engage the Tucker Preserve. A water feature like that, with the proper safety features and done in a way that is nice and stays natural and is another way to buffer existing homes from new housing.

Mr. Hart said overall on open space, there were fewer open spaces than what they had before, but they are aggregated, less formal in terms of internal green spaces, but they do function for gathering, for active and passive use, and to get people connected and moving once they are in the site. The plan does create redundant pedestrian access and allows flow to the interior with the connected green spaces. Mr. Hart said they are trying to be welcoming, trying to facilitate gathering and make this part of the neighborhood not set apart from the neighborhood, which is some of the strong feedback they got, not only from staff, and the Planning Commission, but also the community members from the community meetings that were held.

The second main strategy in what they tried to do differently is that they tried to mitigate height better. Mr. Hart referred to slide seven and showed where the height was located in the interior portions of the site and mainly the High Street sub area with the darkest blue being five stories and the middle blue being three to four stories. He said they placed the most height on the site in the limited portion near High Street, near existing offices, and the institutional uses that are there where some height already exists and away from residential neighbors at the Larrimer and Longfellow Street area. They moved activities and height away from that same Larrimer and Longfellow Street corner and putting it towards High Street and closest to the other commercial buildings that are north of the site on High Street itself.

Mr. Hart said they tried to lessen the impact of garage height by wrapping it with residential and also by putting trail connections and other green spaces near the street level where the height is located so people are focused on that level on those green spaces and not the height of them. The five-story residential buildings face each other and are located away from other residential. The east west linear green that runs between the two five-story buildings reduces the canyon effect with space along with the green active area on the street level. On the north, the gateway green that they have located at Longfellow and Larrimer Streets and the trails at the pedestrian level are also used to buffer height from existing residential. In the middle of the site, there is graduation from five stories to four, and the existing institutional building, the office conference center use immediately to the south. Mr. Hart said generally height is also mitigated by the engagement of the street level uses like retail, like service, like office, restaurants in the plaza area along the High Street opening. He said they put planned intense uses like volleyball, pool, and restaurants away from existing residential, so they are shielded by buildings and close to High Street.

Mr. Hart said another one of major changes was the mix of their uses. They have less apartments and more commercial office space. The reduced apartment density is 19%, from 540 units to 420 units which was the number one comment they received. LC acted upon the suggestion with a significant reduction. The office square footage has increased in proportion to the apartment unit decrease. In terms of office and commercial the plan is updated from 85,000 square feet to 120,000 square feet for office and commercial. Mr. Hart said they listened to the city staff leadership who requested more economic impact and jobs and income tax at this site. He said they believe the adjusted plan is in line with the Comprehensive Plan goals about city jobs and income tax needs, He said they also believe this expanded the job base in this plan will help support the greater food, service, restaurant and entertainment uses and to build that 24/7 live, work, and play environment mixed-use site they are trying to accomplish. Mr. Hart said they do want to be clear that they agree with city staff's focus on that employment and tax base goal and the Comprehensive Plan goals, and this site needs to succeed as an office and commercial hub and support the city's tax base. He said they probably seek getting there differently than your professional staff and that is they do not see a sight here that automatically screams out to the market Class A office. Nothing around the site supports that notion. The best evidence of that is that the site has not delivered that use in over a decade. The Class A office environment and employment environment in today's market must be created. This site does not exist in a vacuum as far as what works for suburban infill and other mixed-use type development. Any city today has to be competitive and flexible to attract and fulfill employment tax needs. This site has to have that critical mass and value to the market of a vibrant live work play environment to attract the attention of employers and to accommodate what today's employees want and need in terms of living close to work, working at home, and the type of environment they seek. Anybody can look at other successful infill successful projects across central Ohio, really any major city, and its density that drives urban and suburban infill, that is what attracts employment uses today and it attracts employees. In this life, density is what pays the bills. It pays for upscale architecture, it pays for buying open space and protecting natural areas and setting them aside for community use, it pays for regional path infrastructure and other community facilities. Density is the key strategy to keep housing prices reasonable today, to the market and to meet people's goals of affordability, diversity, and opportunity in housing, density pays the bills.

Lifestyle Communities has their goat restaurant that opens up at the street level on High Street to the street plaza and they would expect to attract other restaurants to create synergies in addition to the goat, other food, coffee, and beverage users, medical offices, health and wellness services, personal care, yoga, fitness and professional services. He described the drawing and said they used color coding to

show the engagement of High Street in that area, where those uses would be, and how they would be aggregated to energize that opening from High Street into the site. Slide 10 showed the garage locations in gray and how they are wrapped and how traffic would access them and the goal was to keep traffic accessing from High Street and keep the traffic out of existing neighborhoods and keep it out of the interior of the site and mainly utilize High Street. Mr. Hart briefly walked through the character slides portion of the presentation.

Mr. Hart said they were asking the Planning Commission for dialogue, this is a very complex site, and this issue has been around for many years. He said they want dialogue and collaboration at this level with the Commission and with the community to get to a baseline of site planning so they can move on and take care of the other technical issues, the architecture, the traffic, storm water and so forth.

Mr. Coulter said before they get into questions and comments from Board and Commission members they asked the public as to who would like to speak this evening. Approximately ten people signed up and they would start speaking in the order that they signed up. The first three speakers were representatives of WARD. Mr. Brown said he wanted to remind the Board members and those who were listening to the meeting there was a big difference in the amount of the materials that were submitted. One of the reasons why was to look more broader in scope more at the 50,000-foot level looking down instead of getting into the detail. He said if they were not able to get into the broader topic discussion of residential density and height and housing types, the mix of land uses, green space and park land, and traffic connection comments, and bike and pedestrian, that it kind of negated even spending the time and money on their part and/or the city's part of looking at that level of detail until the broader topics. Mr. Brown said that was the goal tonight to have those broader topic discussions before getting into the nitty gritty detail you would typically see at the Architectural Review Board (ARB) and Municipal Planning Commission (MPC) and then ultimately City Council reviewing, but much more detail is needed. Mr. Brown said as it stands today, staff's recommendation was for the denial based on the existing land use plan.

The discussion was opened to the public. Mr. Brown swore in each speaker before speaking.

Mr. Michael Bates, 6560 Evening St., Worthington, Ohio. Mr. Bates said Mrs. Ellen Scherer would be delivering the statement from WARD. He said he was going to give his opinion as an abutting property owner. He appreciated Lifestyles' presentation and felt that staff did an excellent job of detailing the pluses and minuses of the proposal. He said what has him concerned is that there is still no evidence even though the presentation by Lifestyles' said they had community engagement but to his knowledge there has not been any community engagement. Mr. Bates said they had one meeting between Lifestyle and the WARD folks back on the previous proposal and then since then it's been totally quiet. What he wanted to remind the Commission specifically is they have a model now of community engagement. He said he saw it with Stafford Village, saw it with Granby Place, and the former Holiday Inn site, and even the High North project. Mr. Bates said he would expect that Lifestyle would have that community engagement especially considering their proposed density plan which he felt is still way too dense.

Mrs. Ellen Scherer, 112 E. New England Ave., Worthington, Ohio. Mrs. Scherer said Worthington Alliance for Responsible Development (WARD) is entering a statement into the record for tonight's meeting. The statement is as follows:

"This third time is NOT a charm. For the third time Lifestyle Communities (LC) has approached the City of Worthington with a high rise, high density development plan

for UMCH. And once again their plan is meeting substantial community opposition. The problem is they keep presenting things people don't want. There is little substantive change in what LC is now proposing. Six hundred residential units with two persons per unit would mean 1200 new residents, or the equivalent of 8.5% of Worthington's total population of 13,700 squeezed into the 25 acres that are available for residential use. Included are 420 apartments in four and five story towers. There is no provision for affordable housing; it's all at market rate. There is precious little greenspace in that 25 acres and what is there is broken up into piecemeal segments, most of which are walled off by the buildings that would be constructed. There is no sense of greater community engagement here; this is strictly a private for-profit proposal. Traffic is always a concern for Worthington residents. How will they feel about 1362 vehicles on the property? WARD supports responsible commercial development along High St. as a revenue generator for the city. But, echoing city staff, we are "concerned that only the residential and retail portion of the project would get constructed without the commercial office needed in the High Street Mixed-Use Zone." Especially since residential development is always a cost to the city. It is now abundantly clear after three tries that LC's business model requires high density with a preponderance of apartments. UMCH, on the other hand, is a beautiful open gem near the center of our city. These two visions of what might be are not compatible. Once UMCH is paved over it's gone for good. What's needed now is to reject LC and their plan and move to a discussion of how UMCH can become a resource for the entire community to enjoy. This is LC's third strike and they are out."

Ms. Maggie Sutton 250 Highgate Ave., Worthington, Ohio. "This is now the third time that LC has come to the city with a proposal, each one no better than the previous. This new proposal is being met with the same or even more opposition from the residents. They do not want high-rise high-density housing on this property. Research studies have shown that development projects with density higher than 50 units have a negative impact of crime in the area. Residential units or development projects with less than 50 units do not have a negative impact of crime in the area. Increased crime is not what any Worthington resident wants in our city. Additionally, LC's plan is not in conformity with the Comprehensive Plan updated in 2014. This plan calls for between six to fourteen dwelling units per acre which is still too high in her opinion, but she will digress. LC's proposal is to put over 37 dwelling units per acre. This Comprehensive Plan indicated no more than three stories and LC's plan has up to five. Even if LC promised to decrease the number of dwelling units per acre and keep the height to three stories, as has been done many other times in Worthington with other developers, give the developer an inch and they come back and ask for a mile, and they are usually granted that additional length. I don't trust that LC would keep their word and guarantee we would be looking at hundreds of apartments that are many stories tall and not what the majority of the residents want. The history of the land dates back over one hundred years when it was purchased by the United Methodist Church and used as an orphanage. Their mission was to strengthen our community by providing care, nurture and treatment for hurting children and families. Here we are a hundred years later and LC wants to come in and build apartments on this historically significant land that is almost directly in the heart of Worthington and the residents do not want that. Just look at the number of yard signs surrounding that property that endorse candidates in this year's City Council election that will not support what LC is proposing. To preserve the history of the land its critical that it continue to strengthen our community by providing for children and families. I implore you the Board to please deny LC's current proposal, thank you."

Mr. Chet Ridenour, 398 Highgate Ave., Worthington, Ohio said he has been a proud Worthington resident for thirty years. He thanked the ARB and MPC for giving him this time to speak at the meeting. He appreciated the opportunity and he thanked everyone that sits on the ARB and MPC committees. Both groups have a very difficult but important job, and their work is very much appreciated. Mr. Ridenour said he would like to echo the comments of the previous speakers. He said how many times are they going to listen to LC come back with the same old plan, it's the same song, the third verse, and he could almost sing it in his sleep. There are not significant changes as they professed in their presentation, and he felt by looking at the current LC plans and the one they previously presented it is evident that the LC company is just not listening. They are not listening to the citizens of Worthington. The current LC plan has too high of housing density and that would be greater than any other area in the City of Worthington. The plan has too many apartments and multiple high-rise buildings that are in appropriate and out of character for Worthington in its central core. Also, their plan shows little regard for the vast majority of Worthington's residents desire to have significant community green space. They even said in their opening plan that they reduced the amount of green space, but they have aggregated it and aggregation is fine but do not take it away. They need to add more green space. Mr. Ridenour said looking at the LC site plan reminded him of the long-ago Wendy's commercial when they asked the question, "Where's the beef?" He said he looks at the site plan and says "Where's the green space?" The vast majority of residents would like to see green space. This is a forty plus acre site with twenty-five acres for residential so why can't there be more green space? He said they can, but they are not listening, and they are ignoring the recommendation and wishes of the vast majority of Worthington residents. He asked that the members of the ARB and MPC remember that they are in a position to represent the people, not the LC company. He said he did not believe that most people in Worthington were anti-development, however, he does believe that the majority of people in Worthington are anti bad development and the current plan by LC is a bad development plan. The newest LC plan is bad for many reasons.

First of all, it will crowd our already overcrowded school system, there are lotteries for kindergarten, and there is a great number of people who are having trouble getting their children into after school care. Also, with the current LC plan there will be increased traffic along Larrimer, Evening, and Longfellow Streets. They will turn these streets into what were once nice quiet residential streets into high traffic streets. These are streets where children walk and cross everyday to go to school and they need to keep that in mind. Also, for anyone out there, that travel down State Route 161 and have to turn north on Evening Street to go to your home or business or take your children to or from school, just remember what all of this increased high-density housing is going to do to that turn. He said he has had to do that for years and right now, sometimes has to sit and wait through multiple lights to make the turn north on Evening Street from State Route 161. With high density housing on the children's home site, it will become a nightmare. Also, the current LC plan if approved will cause the people of Worthington to lose a once in a lifetime opportunity to create green space and add to the character and charm that is already present in Worthington. The LC plan if approved would be at the expense of the people of Worthington just so that the LC company can make more money. Please remember not one single apartment has to be built on this property for LC to make a significant amount of money. They will make millions even if not one single apartment is built, and they know that and there are multiple residents in this city that are familiar with large scale real estate developments and they know that and hopes that ARB and MPC people also appreciate that. Mr. Ridenour said if he was a teacher and the LC

company was one of my students and he gave them an assignment to come up with a site plan that was appropriate and supported by the majority of people in Worthington, if that was the assignment that he gave the LC company as his student, he would give them an F on this assignment. He said he would also recommend that the LC student be evaluated for a learning disability because he felt that they had one. He said the LC plan was bad and to please reject the plan and vote no for LC.

Mr. Michael Ball, 925 Robbins Way, Worthington, Ohio. Mr. Ball said he had two points and a question. He thanked the Board members for this opportunity to speak. He said he and his wife both support the idea of a mixed-use development at the children's home's former site. Mr. Ball said he understood that for commercial development to be successful you need density. In order for the shops in downtown Worthington, in order for them to be successful, they need shoppers, they need people here shopping and going to the restaurants. He said for him, density is not a bad word and density is a very good thing. He believes density is the engine that will allow this project to happen and will allow Worthington to continue to move forward because they are able to attract great businesses and great jobs. Mr. Ball said on a personal note, just his reaction to the plan that has been shown, he and his wife are ready to give up their four-bedroom home and he would love to have a patio home on this site. He said he would be delighted if all the single-family home housing went away, and it all became patio homes because he is not the only one in Worthington that would like one of those, so Worthington needs a lot of those. Mr. Ball said he is curious as to what the development and planning process should look like. He said they have heard a lot of criticism tonight about the plans submitted by LC and he was wondering what the collaborative process was that the city envisions that allows the city's point of view, their goals and aspirations for what is going to be helpful for the city and be able to be communicated and worked with the developer so that the developer is moving in the same direction. Mr. Ball said it seemed awfully time consuming for a developer to come up with a plan and then attend the meeting and get some input and then go back and re-do another plan and then come back again. He said he understood that this site is a potentially a 200-million-dollar investment in our city and how could they make this a more collaborative success.

Mr. Brown said with the history since he has been around for the past eight years in Worthington and with the life of this, that the discussion needed to be played out in public and not behind closed doors. There has been a large fear and discussion that city staff or Board and Commissions members were meeting with developers and trying to offer some guidance which is always great but with this proposal and this site being so sensitive that it needed to play out in public where everyone had the opportunity to hear comments and offer the guidance as we would move forward.

Mr. Coulter said they have really encouraged the developer, whoever it is, to get out and meet with the neighbors and get that input so that instead of coming into a meeting tonight where you do not hear a whole lot of positive from the neighbors they kind of have those discussions and they kind of come to some conclusions between the developers and the neighbors so when it does come forward in a public venue that everything is worked out and closer to a solution. Mr. Coulter said the issue with this one is that this is the third time around and he was not sure they were any closer now than when they were in 2015 when they looked at their first plan. He said in a lot of regards he liked the plan in 2015 better than this one. He would like to see this site developed sensibly and sensitive to the neighbors and to the city. This has to be a collaborative process and a public process, but it starts where whether it was Lifestyle or the previous developer to come forward

with a plan, they have to meet with the neighbors and have those discussions. Mr. Ball asked if that would a simultaneous process where they are meeting with the community simultaneously with the city members in order to move the project forward. Mr. Coulter said it can be and it has been in the past. He said Lifestyle has made a couple of presentations to city staff that he has attended in trying to get some direction, but it comes back to the same thing. He said he has not seen the progress in the plans that have come forward based on the comments that he and staff had and the comments from people in the community. Mr. Ball said the crux of the matter is what is the ratio of apartments necessary to support the maximum commercial and office space that they can get. He said obviously, commercial draws people but is not a big money maker for the city. Office buildings are a big money maker for the city so there is a ratio that says in order to support that amount of office space and commercial you need this much apartment building. He asked whose responsibility it was to come up with that and if it was Lifestyle Communities and do they listen to what they say or is it something that the city knows and the city could say to the developer, "This is what we are looking for." This is what we think will work because we want to maximum office space on this site because that is going to generate the revenue that allows the city to do all the things the city needs to do.

Mr. Coulter said the tax dollars are extremely important to the city such as the payroll taxes for the office space. He said in terms of the number of units that depends on the type of investment the developer wants to make. He said it is not their job to help the developers make money. Their job is to make sure they have a development that comes in and works for them, for the community and for the city. Mr. Brown said in working with the applicant over the years they have given guidance as to what they would like to see as far as office space square footage and tenant. There are studies that can be done. If LC did a study, this is what it would cost, and the city would take the study and have the city's consultants review it just to make sure they were not just listening to someone else's information without doing our due diligence. Mr. Brown said it was a balance of all those different uses and needs that need to be on the site. When you look at the Comprehensive Plan it does call for a mixed-use development, but it is looking at the true mix of uses but one of the common themes about the Comprehensive Plan has been with increased density there needs to be increased open space and that the residential should be subordinate in a lot of these areas. Mr. Brown said it needed to be that balance in those key talking points that he referenced earlier.

Ms. Paula Ryan, 1035 Bluffway Dr., Columbus, Ohio. Ms. Ryan said she was supportive of a development on this site, but not this particular plan. She said she would like to remind this group that the population of Central Ohio is expected to grow by one million people by the year 2050 according to a study done by the Mid-Ohio Regional Planning Commission (MORPC). She said if you need to see the data to go to MORPC's website. Ms. Ryan said Worthington just completed a very lengthy visioning process and identified some very key components for how to move the city forward. She said she would like to encourage this group to understand the population is going to grow significantly and how is Worthington going to take advantage of that, capture that, and what can that mean to our city in relationship to the visioning plan. She would like the group to focus on the visioning plan and the population growth. Ms. Ryan said she would politely like to understand where Ms. Sutton got her statistics because she thought she said any development over 50 units has an increase in crime. She said there are developments being built all over this area that are larger than 50 units such as Bridge Park in Dublin, Ohio, and crime has not increased in Bridge Park. She said using crime as a crutch is the wrong solution. Ms. Ryan said the collaborative

approach is something that is needed, and she also liked the questions Mr. Ball asked and the way Br. Brown responded to his questions. She would like to see this go one step further and asked what density means to Worthington because this was not the first-time density has been brought up and density will continue to be discussed as a development issue. Ms. Ryan felt it would be good for the group to determine what would be a good density for Worthington.

Mrs. Ellen Scherer said she emailed a letter of her own opinion to the city, as an individual resident. Mrs. Scherer said she felt the proposal would have a devastating effect in so many ways and they have not engaged with the residents, and she questioned how serious they are because they do not seem to listen and come back. They know that Tucker Creek can not be developed anyway. They are not offering diversity, and profit is their main goal.

Mr. Josh Posey, 238 Highgate Ave., Worthington, Ohio. Mr. Posey thanked the Board members for their time. He said he has been a lifelong resident of Worthington is whole life. Before moving to the corner of Evening Street and Highgate Avenue, his parents moved to Greenbrier Court in 1981 when they built their house, so the UMCH property has been in both in either his side yard or front yard his whole life. He said there was a saying, "Reasonable people with reasonable issues can come up with reasonable solutions. He felt LC needs to talk with the residents a little more, but the residents need to be open minded because LC has to be able to run a business as well. Mr. Posey said they need to move forward on this one way or another and if that requires a little more green space to accommodate the folks but LC should have the right to do something here, but for in order for them to do that here they need to do a better job of reaching out to the neighbors and the community to get their input. Mr. Posey said besides that, Worthington needs development, and more places to live in Worthington. Worthington needs more tax revenue, and more jobs. Other suburbs around Columbus have been able to make the mixed-use concept work, and he felt that Worthington should not be any different from that. He said everybody will not get all that they want but there should be a goal of compromise, by not only the residents, the City of Worthington, and LC.

Mr. Coulter said there were over 400+ email responses, and the vast majority shared the comments which were heard earlier this evening. There were also comments from others who were in favor of development on this site for mixed and there are also people who would like to see this site left as a park. Mr. Coulter explained that all the Board members read the emails and they do take those into consideration.

Mr. Hart said he would like to comment on some misinformation and rebut some of the things that have been said.

Mr. Ridenour asked how many times LC could come back with the same plan and Mr. Brown said anyone has a right if they want to change something on their property or go through a process, they can come through and make application, go through the Boards and Commission, and the Board has the opportunity to approve or with modifications, or table or deny applications and there is a waiting period that was denied to come back but it could be a Groundhog Day experience. Mr. Ridenour asked the staff and the Boards if they could be approached on an unlimited time and Mr. Brown said yes. Mr. Ridenour said he has lived in his community for 30 years and he loves living here and if people think Dublin, and Upper Arlington as so great because of the new developments

then those people can just move there. He said there are many people trying to find a spot to live in Worthington, and residents can sell their properties before the For Sale sign goes up in the yard.

Mr. Brown swore in Mr. Joe Sherman, 6603 McBurney Pl., Worthington, Ohio. Mr. Sherman said he was speaking as a resident, and that he also served on the Visioning Committee.

"My name is Joe Sherman and I come before you as a fellow resident and as the past Chair of the Worthington Community Visioning Committee. I am reaching out regarding Lifestyle Communities (LC) updated proposal for the UMCH property in advance of their presentation and discussion at your October 14, 2021 ARB/MPC meeting. Frankly after reading their revised concept plan for the future for Worthington, I was disappointed and under-whelmed as this proposal is nothing more than a rehash of their 2015 and 2020 submissions. Lifestyle Communities should respect and respond to our needs as a city not propose a development with its 4 and 5 story structures and 600 additional residences. The long-term financial consequences of a high-density residential development is not an economic boon to a city in the long term. The UMCH site should serve the long-term interests of the residents, not the short-term interests of a developer. LC's previous two submissions were soundly rejected by the community in 2015 at the WEC, and in 2021 by way of 300+ residents speaking out in opposition and only 4 in favor. I expect additional opposition will follow in response to this latest submission. LC has largely ignored that our city needs to generate income tax revenue from a multi-use development of the UMCH site in the ten acres of land along High Street already zoned for commercial use. Most fundamentally, their business model is simply inflexible and incompatible with Worthington's needs and values, simply ignoring what the resident's have said they want and expect. They are not the least bit interested in Worthington as a community, but merely as a place to bulldoze, literally and figuratively, a Lifestyle development into place.

As a refresher, let me share with you one of the seven vision statements from the Vision Worthington project: "Worthington's Leadership is Open, Forward Thinking and Collaborative. As a community we said that our elected leaders are known for listening and responding to the voice of its residents and carefully considering actions that affect our community. All the while striving for consensus building by encouraging and modeling respectful public dialogue demonstrating benefits for the common good and then making hard decisions to further progress." With this in mind, I would ask you to explicitly deny, as opposed to tabling, the Lifestyle Communities proposal for UMCH, thereby creating the context where a city acquisition becomes a possibility. By taking both ownership of the parcel and responsibility for its development, our city government would be in a position to finally realize the desires of Worthington. Why not ask the community if they would support the concept of a signature park project as we do not have any community gathering space like other cities. This public engagement and collaboration could lead to a different kind of development generating a lot of public spirit and could possibly be the cornerstone of the next phase of the Visioning Committee's work. It's this sense of community that ought to be cultivated and preserved above all else. Our future rests in each other.

Thank you for your consideration and best wishes on your decision."

Mr. Brown said as of 6:00 p.m. this evening, staff had received 437 emails concerning this project. He said the emails would be summarized and posted to the City's website tomorrow.

Mr. Hart said he wanted to make a couple of clarifications. He said in 2015, they did not officially file an application and never went through an official public hearing process through ARB, MPC or City Council. He said their only application was filed last October 2020, and their last hearing on this case was this past January. Mr. Hart said these three strikes you are out thing is not constitutional law as it applies to land use. He said they asked after January, after getting feedback, they did a tremendous amount of community outreach in lots of different ways. They asked for feedback from city professionals and with a couple of key city leaders and we were told you had to go to the Planning Commission for that. Mr. Hart said he did not have the political will or the political capital to meet with you behind closed doors, we were told to go to the Planning Commission. This is the first opportunity they had for actual dialogue at Planning Commission to listen and to talk with Planning Commission members because that is what they were told they had to do. So now, the residents have commented, and they heard about this movement of deny them, shut them down, three strikes you are out and that is a bunch of hooey, those are not the facts, and that is not reality. He said we are here, and we did adjust our plan. They have twenty percent less residential and a lot more office. The site plan they have today has twenty-five percent open space on thirty-seven acres. To put that into perspective, there are suburban single-family coves that do not require twenty-five percent open space. This is an infill site. Mr. Hart said it was wrong and legally inappropriate to tell us, "We are going to shut you down, at a concept plan hearing and the city is going to recommend denial before we had the dialogue and before we had a chance to discuss what we have done and how we improved the site." Mr. Hart said the staff plan, staff comment letter, staff report, is full of examples of how the site was improved. City staff made that clear on the record. He said they do not support everything obviously, but the staff report has many examples of how the site has been improved and he mentioned those in his presentation.

Mr. Hart said in fact, the Comprehensive Plan for this site says the building can have up to five stories and the plan says this is a site that can support density. He said they stand by the fact that the best proof and the best evidence that residential has to drive modern mixed-use developments and deliver that tax and employment nod that the city wants and needs. The best evidence of that are the projects all around Central Ohio. Worthington is not in a vacuum away from that market reality. Mr. Hart said he was sorry for jumping in, and he would normally never do such a thing in front of Planning Commission members but there was enough misinformation and lack of factual information that was provided that he felt he had to do that, and he apologized.

Mr. Coulter said he would take one last exception, when they last met, Mr. Hart was encouraged to meet with the neighborhood groups and specifically W.A.R.D., and when he checked with W.A.R.D. two weeks ago, no one had contacted them. Mr. Hart said he has done a lot of neighborhood outreach in his life, and he had met with them previously, and had a lot of dialogue, and he felt they acted upon some of the things they were asked to do, but they do not see it that way at all. Mr. Hart said there is a time when being told that you should just go away and we do not want to deal with you at all is not productive anymore. Mr. Coulter said there are people that want the developers to go away, but he was not one of those people. He said if you look at all of the individual Board members as a whole, versus individuals, they would like to see the property developed, but developed sensibly. Mr. Coulter said they need a better understanding of what is going to happen.

Mrs. Holcombe said she has read almost every letter or email that has been sent to the city. She said she felt a strong objection over LC not listening to what the residents are saying has been the number one thing that has come out of here. She said all of this has been said tonight and in emails that they are talking about the density, green space, and traffic control. She said it is mostly about the apartments and the residents are mostly uncomfortable with the number of apartments. Mrs. Holcombe said why they cannot control who buys the land and the buildings, they can help control the use. She said as a realtor, that has lived in Worthington for over forty years, this is an amazing piece of land she hopes the owners would come to some agreement with the residents and with the city. She felt Mr. Ball made some great comments and what does it take to make this sustainable. Mrs. Holcombe said she personally objected to the number of apartments that were proposed for this site. She said the city does need housing and people are clawing to get into Worthington and find housing. There is not enough housing here to represent all phases of life span. She said she was not against this project, but she believed they had a long way to go to figure out what is happening.

Mr. Reis said a lot had been said this evening, and there have been a lot of emails, and he has been on the Board now for seven years and they have been talking about this project for seven years. Worthington is landlocked. Worthington is not like Dublin, Hilliard, or Westerville, or Pickerington, Worthington is landlocked, so how this site is developed is important. He said he did not feel they need a dense style of build out just because the population in the greater metropolitan area is going to grow by a million people in 2025, he did not feel you have to have all million people within the City of Worthington. He said what they do need is responsible development and Worthington has great services and the cost of services is going to go up over time. Worthington has great schools and the cost for schools is going to go up over time. Both of those elements are recipients of the development of this site, so you need to think about that, and keep that in perspective. This site cannot be a big park, but they can have responsible greenspace and pathways but that is all a part of good planning. Residential housing is important, commercial development along High Street is important and there needs to be a compromise that generates revenue for the schools, which is residential development, and revenue for the city so they can continue the good services they have. This space cannot be a big green park and that is absolutely insane, but this site can be developed responsibly. If LC listens to what they have heard tonight from fellow Board members, and they work with the City Planner, and the City Manager, they can come to a compromise. He said he did not think five story apartments was a good scale for this area, and you can talk about that like other suburbs such as Dublin's Bridge Park, but this is almost within the historic downtown, and it is abutting the residents who are all-in single-family homes and understands they do not want five story buildings looking down into their homes. He felt the density needed to be controlled with some reasonable height and the multi-use along High Street is a requirement. He felt there was sensitivity brought to the meeting tonight with the addition of more greenspace and that is a step in the right direction. Mr. Reis said whatever is done here there will be more traffic and there is no doubt about it and there will be more wait time in traffic, but that is a part of progress and part of what we are going to have to do when this site is developed. Mr. Reis felt there needed to be some behind the scenes conversations that can be made public that can come to a reasonable solution here and LC must realize that they might not be able to make as much money as they wanted to turn around on this project and still come away with some money in their pockets. We all know developers want to make money and business is what this is all about.

Mr. Foust said he was like to expand on something Mr. Reis discussed about Worthington fitting in with the entire urban metropolitan, Central Ohio area. He said the charges they have been given by City Council and the community and one of the things they have looked at very clearly is how to define Worthington. What is Worthington's image, what is their look. He said the thing they keep coming back to is working with city staff, the residents, and City Council, is ideally what makes them unique is the village green, some of the older smaller buildings and what they described as unique New England village like character of the community. That is what defines Worthington and that is what makes them different from the other surrounding suburbs and Columbus. He said the developed proposed here would be a great defining feature if it were in the short north, or in parts of Arlington, or Grandview, but there are other residential areas in Arlington and Grandview where this would be at odds with the look and the feel of those communities, and he felt this is what they are up against here. He said what he believes needs to happen is that something needs to come back to them that is so clearly based on scale, proportion, living conditions that are characteristic of a New England type of environment of a village, and environment that it has a wow factor that everyone in this community and the Board and the majority of residents say wow this is wonderful, this is what we want to see. He said that is a hell of a challenge, and a hell of a charge, and he did not know if there were many developers that were willing to do that, but if the developer would like to get his involvement and his support of input, and the community, that is what is going to have to come back. Mr. Foust said he also wanted to point out some changes in land use ideas over the years where they are going through that right now over at East Wilson Bridge Road where the residents ten years ago thought it would be okay to have a certain type of development and now they are looking for ideas for different types of development, so things do change. Just because something was set five or ten years ago does not mean it would be valid now. He said Worthington needs something that makes it look like New England village.

Mr. Schuster said he would like to echo what Mr. Foust just said and he also wanted to recognize some of the staff's beginning steps that LC has taken, and he appreciates those because it does give him some encouragement that they can continue to work through this and ultimately end up with an outstanding project. One of the things that concerned him was the apartments, and in that same visioning statement that was mentioned before it indicated very clearly that the residential portion should be subordinate to the commercial portions on the site, and they have the exact opposite relative to the apartments. So, in his opinion, that means there needs to be a significant reduction in the apartments because he is also very concerned about sending that much additional traffic down residential streets such as Evening and Larrimer Streets, where children are walking to school and some of those streets do not have sidewalks and that is a tremendous concern to him.

Mr. Schuster said in addition, while he appreciated the 25% additional greenspace, unfortunately that greenspace is not specifically contiguous. The Tucker Preserve is unusable space. Mr. Schuster said he strongly encouraged the developer, as they look at the townhomes, and single homes, one of the significant needs is that they have as a community is housing for seniors who would like to stay in the community but who really are not interested in going up three flights of stairs and all the townhomes have three flights of stairs. He encouraged the developer to take a look at that, and perhaps come up with a way to increase even more the number of homes that would be appropriate for those that are getting a little older and do not want to climb the stairs. Mr. Schuster said he was also concerned about the significant loss of trees. They all love the mature

trees as part of the whole New England look and as far as he read through the proposal there are a significant number of trees that are going to be sacrificed. He said he understood some of those trees would be replaced but they would be replaced with really small caliber trees, but as we all know, that takes years and years to replace.

Mr. Schuster said he would like to thank LC for some of the adjustments they made, and that was a nice first baby step, but they would like to see more significant adjustments based upon the community feedback and on the Visioning Statement as well.

Mrs. Hinz said she would not repeat everything that was said but she wanted to follow up on two things Mr. Schuster mentioned. She felt that seniors were not the only ones who did not want to climb multiple flights of stairs and that people with small children moving in do not want to do that either. She said understanding the diversity of housing product and how people use it is important. Mrs. Hinz said at the City Council meeting last week about Central Ohio's economic segregation and that diversity and the housing product is important but many of the emails mentioned diversity. She said there are people banging on the doors to get into Worthington and they cannot make it economically impossible for new residents to come in. She said as far as the greenspace, she appreciated the aggregation of it, but she does feel like it is hidden, you cannot see it from High Street and cannot see it from and it's located behind Greenbrier Court. Mrs. Hinz was also concerned about the trees. She mentioned the previous meeting the Board members heard a very emotional story about a tree being destroyed. There are hundreds of trees being projected to come down which is devastating. The advertises that they are a "Tree City." She felt the trees were a very important part of the New England look and would like to see something that brings people here and keeps people here after they downsize.

Mr. Coulter said he was in favor of good development, and as an Architect, like many other members of the Board they look forward to projects like this. They have all seen projects that were not good developments that just did not belong where they were. He did not say this was one of those, but this needs to be thoughtfully carried out, so this works for everybody. The number of units is too many, even at 420, but he appreciated the fact that LC came back and did reduce the number by twenty percent but felt there were still too many apartments and what was driving that was the five stories. He said he had difficult seeing a five-story building in that location and maybe that would be better located along High Street where the commercial property is, but he would have a difficult time with that as well. He felt five-story buildings on this site were too tall. Mr. Coulter said if you took the five-story buildings and made them into three-story buildings he might be more comfortable with that. He said people have advocated to leave the area as a park, but this site has never been used as a park. This is a piece of land that in points of time was used as soccer fields and other things, but this was never zoned a park. Mr. Coulter said when you talk about greenspace to him, greenspace is usable greenspace, not just a boulevard where you have a lot of nice trees and landscaping going down on streets on either side. That is something you can take your child to and play, it does not need to be a two-acre plot, but maybe a third acre.

Mr. Coulter said he had mentioned before the plan has had very little community input and that is something that every project they deal with is extremely important and is encouraged by City Council, and encouraged by City Staff, and they look forward to listening to everybody who writes or makes telephone calls. They might not always agree with everybody, but it is important for them

to know that they do get the community input. Mr. Coulter said they would never get one percent of the people to fall in love with this project, but they need to get more than ten percent, and they have got to get closer to the middle. The plan that was presented was unimaginative. He said there was nothing that he looked at from a bird's eye view that was a zing. There were a couple of things he did like, such as the entrance coming in off of High Street, that was somewhat monumental, but appropriate for a project like that. He also liked the larger pieces of property up against Evening Street on the west side, but he does not like rectangles and squares when it comes to residential neighborhoods. When you look at Worthington Estates, there is kind of a mix where you have some curbed streets, and some cul-de-sacs, some rectangles, but here a rectilinear shape would work best and if there was an opportunity to add vibrancy and make that look a little more exciting. Mr. Coulter said they talked about the diversity of housing, and Worthington is not known for having a lot of diversity in housing and any number of people, including the past City Council President who moved out of Worthington because he could not find a place to live in a home that was one story that was like a condominium where other people were taking care of the maintenance. He said to look at the townhomes and as Mrs. Hinz mentioned earlier, there are people who do not want to go up and down stairs. Mr. Coulter said he was only a couple of years away from not wanting to climb stairs and his wife is already at that point, so he will be looking for something more akin to that.

Mr. Myers said he did not want to be accusatory in any way, or anyone to be defensive about this, but there was a comment Mr. Hart made that peaked his ears. Mr. Myers said Mr. Hart said he was here with the conceptual plan for feedback, and he did not feel it was appropriate for the Board to act on the plan tonight. Mr. Myers said he had met with Mr. Hart on multiple occasions, and he met with Mr. Brownlee's predecessor, and met with the predecessor's predecessor, and over the last seven years he believed he has tried to be very straight forward, blunt and consistent in what he thought Worthington wanted from this developer. Mr. Myers said Mr. Hart has been given multiple opportunities with clear directive as to what they want, some of which was heard tonight, and one thing they have asked from Mr. Hart for repeatedly, was the economics of this. He said Mr. Hart first presented this project to the Board, there were a certain number of apartments that has ballooned. He asked if that was driven by economics, or by ask high and get low and they have had other questions asked which have not been answered. Mr. Myers said they made it very clear to them for seven years what it is that they want, and they have been consistent with that message, and he said he did not expect a response.

Mr. Hart said denying a conceptual plan they were trying to get feedback for was very unusual. He said "You feel like you have been clear and consistent," but what is the number? What is the open space number, what is the density number the city would find acceptable. Mr. Hart said they would like to know that too. What is the number that is going to work in a changing market? Think about how much the world has changed since 2015. He said they are stuck in a mode where they have been told the same thing all along, but he was not a part of most of that history. He said over that time period the world is dramatically different. What drives development and what drives employment uses, what drives office uses, is dramatically different. What they are trying to convey, they are in the market, they honestly believe this has to start with residential, there has to be that quantum, that threshold that economy scale to drive a project like this to get the city what it wants in terms of the economics and what is in the Comprehensive Plan and that does call for density. The condition is different than it was in 2015 and even last year. People are trying to get

a handle on the office market today to understand some landlords, people in the lease business, are not even legally sure if they can collect rent until recently. He said he was not disagreeing with Mr. Myers about having dialogue, but nobody has ever said this number would not meet our Comprehensive Plan. This number of office and commercial would meet our needs. This number of residential would be acceptable, and that has not been said. Mr. Hart said he was told to come to this process to have dialogue on those key issues and start with the land plan and so that is what they tried to do and that is the conversation they had last. Mr. Hart said he had a couple of clarifying questions he wanted to ask Mr. Coulter. Mr. Hart said he gave them specific information on the land plan and one of the things said was he did not want to see five stories but that it might be okay along High Street and he wanted to say height is how they save open space. Height limits the footprint of a building on the earth so that they can have more open space. Height is where it is acceptable of how it can work and how they can work it in is something that does help the amoeba of getting more open space. He said that is the kind of thing they want to sit down and do right now if this is their opportunity to go over that point.

Mr. Hart said they do have 420 units that would be single living with elevators, and some townhomes would also be flats, but all of the apartments would be single floor living with elevator service. He said his main point was height is also a solution that can work. Mr. Hart asked Mr. Coulter if height would work along High Street. Mr. Coulter said he did not want to see five stories in the interior of the project, and he could not make that any clearer. Mr. Coulter said they have looked at different scenarios along High Street. He said even if the Comprehensive Plan allowed five stories along High Street, it is not something he would agree with. Part of it comes down to the architecture, part of it comes down to do they really need to fit in with the other properties up and down High Street. Mr. Coulter said he was not in love with five story buildings near the heart of Worthington. He said as Mr. Foust pointed out, when he was giving his considerations, this and one other property in Worthington are the two largest single properties the City has left to see development. He said your building happens to be first, and your building was more prominent in visibility along High Street. Mr. Coulter said the density is too high, too many apartments and that is why he raised the question a few moments ago if you took the five-story apartment buildings down to three stories, what number of apartments does that leave you and can you make that financially work. Mr. Coulter said he could not answer that, and that Mr. Hart would have to answer that. He would like to get to a point where they can work with the density and get more comfortable with it. When you take the five-story building down to three-stories what that become. Is it 380? Is it 360? What is that number? Mr. Hart said that was clear helpful productive guidance. Mr. Hart said they also have to hit a mark where they are attracting the office and the restaurant and the services and the other dynamics and that is the key to the tension here in that marketplace. How much is enough to attract what the city wants there in terms of that income tax and need. Mr. Coulter said he appreciated that and agreed with that comment and it's a give and take. Mr. Hart said the only other thing he would like to ask about for himself is they tried really hard to have an open space plan that opens up the site to the neighborhood and it was a very clear comment they got from the W.A.R.D. meeting and the other community meetings that were closed off. He said they put greenspace on the perimeter and opened up parts of the site and the comment they have heard tonight its more about additional aggregation but is opening up the site like that at those key entrances for pedestrians is that something that you favor? Is that appropriate?

Mr. Coulter said for him personally, he liked the idea of opening the area up, but he could not see enough detail to completely understand it. He asked Mr. Hart what opening up meant. He also said he liked the apartments being pulled further away from Longfellow Avenue and closer to High Street, but the height was still an issue for him. He also liked there were several one-story units, but he could not tell what that was from the land plan.

Mr. Foust said the proposed entrance or exit off of Evening Street he would support that only if it were a cul-de-sac, that led to smaller or single-family homes in that area, he would not, under any circumstance, support a development that allows a way to cut through from High Street over to Evening Street.

Mr. Coulter said the real issue there, is if you look where Evening Street Elementary School is and you look where the sidewalks are along the side. Evening Street is a huge traffic jam at certain times of the day and you have little kids running around. The teachers and the parents do a wonderful job of watching them but there is enough traffic on Evening Street already without opening it up to the entire development. Mrs. Holcombe said she agreed with making Evening Street a cul-de-sac and not having a cut through from High Street or any of the businesses that are located in that area to be able to exit on High Street. Mr. Schuster said he felt the same thing applies to Larrimer and whether that ends up being a right turn only out of the development, so they have to go onto High Street, but that is the same issue with Larrimer Avenue. He said he would also be very concerned about running traffic through those areas. Mr. Coulter said a traffic plan would be needed and required further down the road but not in the immediate future. Mr. Coulter asked if the Board members or anyone else in the community wanted to make any additional comments. Mr. Coulter asked Mr. Hart how he wanted to proceed with this. Mr. Hart said he would appreciate tabling to a date certain so there was some certainty in the next hearing. He said he felt they got some substantive feedback tonight that they can work with and they would update the application. He said realistically with the holidays a February meeting would probably make sense because you lose about a month with holiday time but they would appreciate the ability to come back and update the plan again and update some of the technical information that goes with the plan. For example the issues with Evening and Larrimer Streets, and take a look at those from a traffic standpoint and update the plan along those lines.

Mr. Foust said every time they have had a big development before them and tabled it, not this specific developer, but in general, the developers have come back with some very minor changes and said we have listened to you and we made all these changes and here they are and they are looking at ninety to ninety-five percent of what they looked at before. Mr. Foust said they need something entirely different here and felt instead of tabling this that they start with a fresh new proposal and recommended that they vote on it. Mr. Coulter explained the applicant has asked to table the application and if they did not get a motion to table they would take a vote of either up or down. Mr. Brown explained they can either table, or deny, and if denied, then the vote would be up to City Council. If the Board moves to table, there needs to be a date certain for the next hearing.

Mr. Hart said to be recommended for denial on a concept plan where they do not have the full application in front of them with all of the technical information and they talked to the city about coming to the Planning Commission to have dialogue and to be denied or recommended denial

after that is not fair and does not meet basic due process equal protection standards, its not collaborative. There are citizens in the community that want them to have a collaborative process on this site. Knocking them down and sending them packing on a concept plan is not consistent with that request for collaboration. Mr. Foust said he was concerned what would be interpreted here if this is tabled is that this Board and this community fully support the concept plan with minor changes and that is why he suggested getting it off the table and start fresh with a new proposal, and if the rest of the Board members chose not to do that he would understand that perfectly well. Mr. Coulter asked for a motion to table. No one moved to table the application so a vote was taken.

**Municipal Planning Commission Motion:**
Mr. Foust moved:

**THAT THE REQUEST BY THOMAS HART ON BEHALF OF LIFESTYLE COMMUNITIES FOR APPROVAL TO REZONE THE PROPERTY 1033 HIGH ST., 47 LARRIMER AVE. AND 57 LARRIMER AVE. PER THE LEGAL DESCRIPTION PROVIDED SHOWING 37.843-ACRES AS A PLANNED UNIT DEVELOPMENT, AS PER CASE NO. PUD 03-2020, DRAWINGS NO. PUD 03-2020, DATED SEPTEMBER 9, 2021, BE RECOMMENDED TO THE CITY COUNCIL FOR APPROVAL BASED ON THE PLANNING GOALS OF THE CITY, AS REFERENCED IN THE <u>LAND USE PLANS</u> AND ON THE FINDINGS OF FACT AND CONCLUSIONS IN THE STAFF MEMO AND PRESENTED AT THE MEETING.**

Mrs. Holcombe seconded the motion. Mr. Brown called the roll. Mr. Reis, nay, he said enough earlier he did not feel they were ready yet; Mrs. Holcombe, nay for the same reason stated by Mr. Reis and more information is needed to make this feasible; Mr. Foust, nay, because they need a development plan that supports the New England Village concept that the community has committed us to push forward; and Mr. Coulter, nay, because of the reasons given earlier having to do with the height of the buildings; density; how the greenspace is used, and the diversity of housing. The motion failed.

There was no ARB motion in the staff memo.

Mr. Foust moved that the architectural design presented to us in the current plans information at the city meeting and discussion be approved. Mr. Reis seconded the motion. Mr. Brown called the roll. Mr. Schuster, nay, based on earlier comments; Mrs. Hinz, nay, based on previous conversation; Mrs. Holcombe, nay, based on not enough information; Mr. Reis, nay, for all the reasons stated earlier; Mr. Foust, nay, based on the reasons stated for the PUD denial; and Mr. Coulter, nay, based on not enough information. The motion failed.

Mr. Brown explained the PUD would go on to City Council for final review or the applicant has the opportunity to withdraw.

Mr. Reis moved to take the following three Agenda items off the table and Mrs. Holcombe seconded the motion. All Board members voted, "Aye," and the motion was approved.

**G. Other**

There was no other business to discuss.

**H. Adjournment**

Mr. Foust moved to adjourn the meeting and Mrs. Holcombe seconded the motion. All Board members voted, "Aye," and the meeting adjourned at 9:45 p.m.