

# City Council Agenda

Minutes

**Monday, December 13, 2021 at 7:30 pm**

**6550 N. High Street, Worthington, Ohio 43085**

## Virtual Meeting Information

1. **Call to Order**

   **Minutes:**
   Worthington City Council met remotely in Regular Session on Monday, December 13, 2021, via Microsoft Teams videoconference. President Michael called the meeting to order at or about 7:30 p.m.

2. **Roll Call**

   **Minutes:**
   **Members Present:** Peter Bucher, Rachael Dorothy, Beth Kowalczyk, Scott Myers, David Robinson, Doug Smith and Bonnie Michael
   **Member(s) Absent:** None
   **Also Present:** City Manager Matt Greeson, Assistant City Manager Robyn Stewart, Assistant City Manager Economic Development Director David McCorkle, Law Director Tom Lindsey, Director of Finance Scott Bartter, Director of Service & Engineering Dan Whited, Director of Planning & Building Lee Brown, Director of Parks & Recreation Darren Hurley, Chief of Police Robert Ware, Chief of Fire & EMS Mark Zambito, Management Assistant Ethan Barnhardt, Clerk of Council D. Kay Thress

3. **Pledge of Allegiance**

   **Minutes:**
   President Michael invited all to stand and join in reciting the Pledge of Allegiance to the flag.

4. **Visitor Comments**

   **Minutes:**
   There were no visitor comments.

## Approval of the Minutes

5. **Approval of Minutes - November 8, 2021**

> **Minutes:**
> **MOTION:** Mr. Bucher moved, Ms. Kowalczyk seconded a motion to approve the November 8, 2021 minutes as presented.
> **The motion carried unanimously by a voice vote**

# Public Hearings on Legislation

6. **Ordinance No. 58-2021 Former United Methodist Children's Home Rezoning Application**
   To Amend the Official Zoning Map of the City of Worthington, Ohio, to Change Zoning of Certain Land from R-10 (Low Density Residential), S-1 (Special), C-2 (Community Shopping Center) and C-3 (Institutions & Office) to PUD, Planned Use District at 1033 N. High St., 47 Larrimer Ave. and 57 Larrimer Ave. (100-006774, 100-002427 & 100-002425).

   > **Minutes:**
   > Mr. Brown overviewed that the request here is to rezone approximately 37.8 acres at 1033 North High Street from our R-10 Low-Density Residential district, our S-1 Special District, our C-2 Community Shopping Center District, and our C-3 Institutions and Offices to a Planned Unit Development (PUD) for the United Methodist Children's Home Site (UMCH). As with any rezoning request, the steps include the application going before the Municipal Planning Commission (MPC) and then to the City Council. The MPC makes a recommendation to the City Council, but Council has the ability to approve, approve with modifications, or deny an application. This request is to rezone to allow for up to 600 residential units consisting of 22 single-family homes, 86 townhomes, 72 townhomes/flats, and 420 apartments along the High Street Frontage. It would also include a little over 24,000 square feet of commercial/retail, 96,000 square feet of medical office, and a 6.4-acre dedication along Tucker Creek along with the various open spaces on the lot. As a background, the application was made in October 2021 and went before the MPC/ARB in January 2021 where it was tabled. It came back with revised materials in September 2021 and went before the MPC in October. The MPC did unanimously deny the application due to the overall density of the site, the housing types provided, contiguous open space, heights of buildings, and connection points. Staff also recommended denial for similar reasons in addition to not meeting the recommendations of the Comprehensive Plan Strategic Update, the Bicycle and Pedestrian Plan, and the Parks Master Plan.
   > Mr. Bo Brownless on behalf of the applicant discussed the background of the application and how Lifestyle Communities now owns the property. They intend to develop the site in a way that is consistent with the City's Comprehensive Plan and that can be viable under evolving market conditions. The mutual goals with the City should be to create a vibrant, live, work, entertainment, mixed-use development, offering housing diversity, as well as updated commercial, restaurant, and service use at the City, moving the City forward economically with a viable development that will stand the test of time. The rezoning here was specifically designed to be consistent with the Comprehensive Plan, with an emphasis on density in the High Street mixed-use zone. The Comprehensive Plan states that the objective of this zone is to create a

high-quality, dense, walkable, connected, mixed-use development that creates a dynamic space and signature address to attract Class-A offices along High Street. Buildings in this zone should be a minimum of two stories and a maximum of five stories. To achieve the desired densities, parking decks are encouraged to be integrated in the site. It is clear that the Comprehensive Plan is calling for density and height, and density is a key driver of a vibrant and successful mixed-use development.

The level of density LC is proposing here is not unusual and comparable to other successful infills, redevelopment, and mixed-use projects that are also led by residential components. The revised development plan introduced made many improvements and noted that the applicants listened to comments made during community outreach and from City Staff. This revised plan is less dense overall, reducing apartments by 19%, adding more office and commercial space, approving open space and path connections, improving access to existing neighborhoods, and activating the Tucker Creek Preserve for public use. They moved the height from Longfellow and Larrimer and towards High Street and the revised plan has nearly 25% open space, opening the site to be integrated with existing neighborhoods. As for the process, they filed a complete rezoning application consistent with the Comp Plan and had limited access or input from the City outside from their staff reports. The City leaders told them that they were unable or unwilling to meet the applicant outside the context of public MPC hearings in order to work through the development and site plan issues. Subsequently, the applicant has been left guessing about what type of plan would get MPC and Council support. The City agreed in order to move forward, the applicant could submit a revised site plan without fully amending the rezoning application in order to determine if the applicant was on the right path. The applicant then voluntarily made changes to reduce residential density and increase office space. When the applicant presented this new plan to the MPC to gather constructive feedback, the MPC refused to table the applicant and simply rejected the original applicant and moved it to City Council for approval or rejection. In their experience, it is unprecedented for any jurisdiction to refuse to work with an applicant on rezoning involving a PUD. The applicant wants the City and residents to know that LC remains committed to a path forward that satisfies mutual goals. In conclusion, three requests are being made to City Council this evening: 1) Refer the application back to the MPC with instructions they should provide a genuine and collaborative effort with respect to the development proposal 2) Empower the City staff to communicate and work directly on the development plan and serve as a liaison to the MPC and Council 3) They be afforded the opportunity to amend their initial rezoning application with a revised site plan as was initially discussed with staff, and be afforded a full hearing at the MPC to work through that revised application.

Mr. Tom Hart explained how we got here and how a greater detailed discussion with City Staff and leadership is required. Through this process, they were told that MPC is the only option to move forward. They had no other entry point for a key discussion on this proposal, but they did expect full and fair deliberations with multiple hearings.

Instead of those full hearings, after one hearing the MPC made their negative recommendation and they did not amend the application to include the updated plan. MPC's actions do not meet the standards for full, fair, and meaningful hearings on this application. What has occurred to date falls short of any applicant's right to full, fair, and meaningful public hearings on the record and in the context of a PUD request with all issues on the table and fully deliberated. It serves no clear purpose to recommend a negative vote when LC was actively attempting and is still willing to work towards a positive outcome. Over the course of his career, he has not seen any other significant redevelopment site in Central Ohio be handled this way. The MPC did not provide the opportunity for the give and take that would be necessary to refine the proposal and take into account all the input from residents and City leaders. The staff report identifies remaining issues and also identifies several improvements from the revised plan that was submitted. The handling and outcome of this application seem predetermined and the City appears to have treated this proposal differently than other similarly situated applicants. In terms of the next steps, this applicant has presented a complete application that meets the Comprehensive Plan and has reasonably requested to amend their site plan. They are asking for greater deliberation and negotiation, along with the opportunity to reach compromises. They would also like to have meaningful and detailed meetings with the professional City Staff on a variety of issues such as economic development, traffic, and incentives for public improvements. This applicant wants to work with the City and its professional staff to move this site forward and make it work in the real world.

Mr. Chet Ridenour expressed that the current LC proposal for the UMCH site is a bad proposal in many ways and bad for the City of Worthington and should be rejected. The housing density is too high for that site and the building heights are too tall. This proposal is not consistent with the center of Worthington. Our City is supposedly modeled after a small New England town, and he asked how many New England towns have multi-story high-rise apartment buildings in the center of town. We do not need it here. The current plan is very similar to all of the past iterations, with only small tweaks along the way, and LC just does not get it. How many times do people have to say to LC to decrease the density and amount of apartments. At the last MPC meeting, Mr. Hart stated that LC decreased the amount of aggregate green space when residents have been saying it should be increased. He reminded Council that in the last election, four of the candidates were supported by the WARD group and supported the WARD position for development on the UMCH property. Of the four candidates, they received 68% of the votes cast for City Council with Mr. Robinson and Ms. Brewer being the top two vote-getters. That should tell you something about what the people of Worthington want. Lastly, he would like to remind Council that they are here to represent the people of Worthington, not LC, and he asked that Council reject this plan for the UMCH site.

Mr. John Byrnes of 161 Tucker Drive commented how he agrees with the MPC's unanimous decision to deny the LC proposal and he urges Council to listen to staff's reasons for denial as well. These were all well-considered decisions over a significant

amount of time with resident input, as well as plenty of input from LC. There have been plenty of opportunities for LC to listen to the residents to create a new plan. He underscored how there is no need to change the current zoning plan for the property to achieve the City's goal of increased tax revenues. The current zoning would permit commercial development along High Street with public green space, or less dense residential development. The commercial development to generate tax revenues could be obtained without any change in the current zoning. The problem is that LC is an apartment developer and they want to put in their apartments first. In one of the focus groups he attended with LC's Tom Hart, he expressed doubts that there was actually sufficient market demand in Worthington for the amount of Class-A office space the City wants to have. He thinks that once LC builds their apartment complex, they will sell the property along High Street and some other company will have to take the risk to see if there is commercial demand there. In terms of the balance of the property, the best outcome would keep with the quiet residential neighborhoods that have been nearby for over 60-years. You go into the neighborhoods, not to destroy what property owners bought into when they entered into these neighborhoods, that is normal residential streets without being converted into thoroughfares for cars that come from the 600 new residents with a density of 49 units per acre. All streets in Worthington Estates and Worthington would be choked off and routed north to Wilson Bridge Road. This will have a huge impact on the current residents and their property values. It is telling that in the many years LC has been developing this plan, they have not conducted a legitimate, up-to-date traffic impact study. They are not being sincere when they have sought out community input. There are questions about whether or not the City's current master plan needs to be updated to reflect current realities. The illustrations put forth by LC with al-fresco dining and wine shops, do not take into consideration that the Worthington Inn has been vacant for almost two years. La Chatelaine does not open for dinner. There are already destination restaurants on High Street. He asked where the entrepreneurs are going to come from for these new restaurants and businesses. Our Economic Development team should work to fill in the holes we have already before paving over this gem of greenspace and leaving us with more vacancies. He remembers The Continent when it was new and gleaming, with all the premium amenities. Maybe LC should look to redevelop the Continent, rather than in downtown Worthington. We only have five square miles here, and this is a significant piece of downtown Worthington.

Ms. Beth Mitchell of 58 Larrimer Avenue shared how she is speaking tonight on behalf of WARD, the Worthington Alliance for Responsible Development. They want to go on record with the document they submitted and she will read it into the record tonight,

*To City Council Members:*

*At the Council Meeting, Monday, December 13, 2021, Lifestyle Communities (LC) will be asking Council for a rezoning of much of the UMCH property so they can proceed with their latest development proposal.*

*MPC and ARB Board members unanimously denied the LC proposal at their meeting*

*October 14, 2021. The MPC members stated:*
*• LC has not been listening to the city or residents. Over 450 emails were received- most not supporting the LC proposal. In addition, many residents spoke against the proposal. • Proposed development is too dense for this location in the Architectural Review District. • Does not have the look and feel of a New England village as called for in architectural review guidelines. • Proposed buildings are too tall for this location. • Does not provide significant contiguous greenspace. • Does not provide acceptable connectivity to neighborhoods with responsible traffic flow. WARD also notes: • Residents have stated multiple times the need for affordable housing and empty nester residences, neither of which are provided in this proposal. • Why would Council set aside the unanimous MPC and staff recommendations to reject the LC proposal, particularly considering the telling feedback received from residents? • Some who spoke in favor of the LC proposal at the MPC meeting, do not live within the City district (43085). Is it appropriate for non-residents to speak at our Worthington meetings? WARD supports the denial by MPC/ARB and requests that Council also deny rezoning of the Lifestyle Communities proposal.*

*WARD continues to recognize the UMCH property as centrally located and a legacy space with the potential to become a prime community asset."*

*Respectfully submitted by the WARD Planning Group*

Mr. Blair Davis commented that the argument commented by LC tonight is that the City has not treated them fairly. The reality, the MPC told them what we wanted in very specific terms, and three times they came back and ignored it. The people who are being unfair are LC towards the City.

Mr. Michael Sharvin and Ms. Amber Evans of 360 Tucker Drive expressed how they appreciate the comments from the residents and as a community we have come together in opposition to this project. Mr. Sharvin said that he has seen little to no reason to rezone any hardship that LC has brought or is asking for community input or work with the MPC. As Mr. Davis said, it seems like they are complaining they have not had enough communication, but he still sees zero reasons to rezone to allow the type of use being proposed. If they would like to use this property the way it is currently zoned, maybe he would be upset about that but would be in their power to do. LC is looking to rezone for its own economic purposes and they have always known what they are getting into with this property. They agree with the unanimous MPC decision to recommend denial of this rezoning.

Ms. Eleana Drakatos of 305 Bryant Avenue explained how she and her family are recent new residents of Worthington, moving in about three months ago. They moved here because of the uniqueness of the neighborhood. She offered that Council stated that Worthington is similarly situated with other communities where Worthington has had other developments, however, she would pose that it is not. The square mileage of Worthington itself is much smaller than somewhere like Upper Arlington. There would also be congestion and pollution generated with such a densely populated area and there is the potential for accidents and there would be difficulty in enforcing the speed limits near Evening Street.

Ms. Susie Kneedler stated that this plan would take away our location, changing life forever. We would never be able to have the Gary Smith Run. Worthington really needs a central park and we are park starved according to data that was put together comparing us to other communities. She added that with the Comprehensive Plan, everyone she met said that they were upset with the outcome by Chris Hermann and MKSK, and it did not represent what was asked for. Everyone really wanted to keep that beautiful land for some sort of park.

Mr. Joe Sherman conveyed how LC detailed how they own this property and plan to develop it, to satisfy a mutual need and would make it work in the real world. If we are going to make this happen, LC should respond and respect our needs as a City and not propose another self-serving development with so many residences and height of buildings. The long-term financial consequences of a high-density residential development will not be an economic boon to our City. LC has largely ignored that our City needs to generate income tax revenue from a multi-use development on the UMCH property. The UMCH site should serve the long-term interests of the residents, not the short-term interests of a developer. LC's business model is inflexible and incompatible with Worthington's needs and values, ignoring what the residents want and expect. LC only sees Worthington as a place to bulldoze both literally and figuratively your development into place. He joins those raising their voices in opposition, not out of fear of change, but out of simple common sense. He urges the Council to vote no.

Ms. Thress noted that all emails that came in before 4:20 pm today have been posted on the City's website. There have been about 12 emails since that time.

Mr. Smith asked the applicant for a better understanding of the comment of how the staff has not been communicating with them. He wondered if the staff has not been cooperating since 2011. Mr. Hart responded that after their initial presentation in January of this year, they asked for more detailed discussions with the professional folks in the City to go over things such as traffic, stormwater, how to program open space, connectivity, and architecture. These are things that you have to get to in order to reach a successful land-use plan and need some internal dialogue before going to the MPC. All these processes are open in the light of day because that is how zoning occurs. There is no infill site in any other community in Central Ohio that is not afforded that detailed discussion with the professional staff and City leadership. Mr. Smith clarified to be clear that prior to 2021, LC did not communicate or coordinate with City staff. Mr. Hart said that it is inaccurate to say that in total, Mr. Brown and the planning staff are always available to clarify code and procedure, but the difficult decision making is a collection of leadership and staff at all levels. Mr. Brown does a very good job representing the City as a professional. Mr. Smith asked about the relationship between LC and the City beginning in 2021. Mr. Hart said they filed their initial application in October of 2020. If you want to talk about 2015, he is ready to talk about that but is not relevant to today's climate. Mr. Brown helped in the months leading up to that application, but previously there was no formal application adjudicated or heard in the public hearing process in 2015, that was just an informal

public meeting.

President Michael explained how she remembers meeting with LC over ten years ago and they were talking about their plans, and she took out a City map and highlighter, stating what neighborhoods and people they needed to talk to get input. To this date, nobody has used that map or suggestion. LC has not really reached out to the community about what they feel. She wrote a letter to the editor six years ago about this property and has had several meetings with LC, to bring LC and the community closer together, but she feels like LC has not listened. Mr. Hart responded that they have conducted significant outreach, and what is being cited are examples before they submitted an application. When the application is actually filed, that is when there is greater detail on things like traffic and stormwater are done. He said that they are good listeners and there were about 100 people who commented on the application through virtual meetings and outreach, meeting with WARD, school district leaders, and business leaders. He does a lot of meetings, but there is a point where you getting yelled at and are just a venue for someone to vent their anger on you, and telling you a client should just socialize their site and turn it into a public space, there is a point where that is not productive anymore. There is a time when they want the process that can only come with MPC and Council consideration.

Mr. Robinson asked if Mr. Hart was at the 2015 public meeting. Mr. Hart said he was not, however, he does not believe it is relevant to today. Mr. Robinson asked what was heard from the community at that time and how was that expressed if at all in the October 2020 proposal. Mr. Hart explained that in 2015 they had a different amount of land under contract at that time with more acreage and High Street frontage, so the flexibility then compared to now is different, and more limited. We have been through an incredible change in office and medical uses, which are key things that the City has emphasized and they are trying to get there. The applicant wants to deliver on the tax base uses of office, commercial, and medical that are in the City comprehensive plan, but they think there is a different way to get there. Many people expect to work from home or close to home, which is part of their strategy. Mr. Robinson clarified that his question was focused on how you understand what the message was from the community in 2015 and how that translated, if at all, to the 2020 proposal. Mr. Hart explained that it is not an easy answer and relates to how things have changed since 2015. The housing market is what is dominant today and monetize this site to make the office and commercial be supported economically. That is the emphasis that is showing up all over Central Ohio in these mixed-use, infill sites that create work, live, play, entertainment vibrancy. You need the housing component because it will fund it. The comments LC is hearing from the residents about the plans are almost the same and almost breaks down into that a lot of people think they can control other people's property and want a public space there. A public park is not what is in the City's comprehensive plan and they would not be meeting the comprehensive plan. In the new plan, they have opened up the site to and from High Street, and in the north with a gateway green and a bumper space to the northern neighborhood, and to the south with two entries, one at Wesley and another

through Tucker. He cited that as a way they have listened, but it cannot be a public park and that is contrary to the comprehensive plan. Trying to socialize the site like this and making it into a public park that somebody else owns and has property rights and developer rights with, is also contrary to law. He is struggling with the harkening back to 2015 because it's not like there was a lot of support for any development on this site, and they are trying to move past 2015, and the City needs to do that as well.

Mr. Myers expressed his disappointment, he thought that he had explained where he was coming from, and he thought there was progress being made. When it is said that the 2015 situation is not relevant, he explained the relevance of 2015 and how it directly ties to the decision he made in March of 2021. He first met with LC in the spring of 2015 and was presented with a plan that he said he could support because he is committed to new urbanism and mixed-use, and this is the right property for the right mixed-use development. Then July of 2015 hits and the rug was pulled out from under him because there was a completely different plan presented then than was earlier that year and he felt like he had been taken. It wasn't about the development, the issue was trust and regaining that trust. 2015 is highly relevant to this community and him personally. Then we got a plan that is even denser. In March of 2021, he totally lost faith though he has tried so many times personally, and he went to staff and said that this is going to need to be done in the open. It is interesting how it is brought up how LC has heard meetings where citizens vent their anger, but that does not compare to what he has heard over the past seven years on this issue and in two campaigns he went through. That is why this had to be done in the public. He got the impression at the end of the MPC meeting, the majority of the MPC members thought that LC would withdraw the application and start from ground zero to restart the process. Tonight he has not heard a lot about the plan, but rather how LC is being unfairly treated.

Mr. Smith asked what is the current rental rate per month for a two-bedroom unit in a property similar to a demographic like Worthington. Mr. Hart replied that it is about $1700.

Ms. Dorothy emphasized that she still believes in the comprehensive plan and that Worthington is part of the Central Ohio area that is growing and it is a good problem to have. We have a little over 14,800 people here and we had our peak in 1970 with around 15,300 people. We have added more housing units but the family size for each of these units has decreased and we need more units. We have about the same amount of people in our 5.5 square miles as the City of Bexley which is 2.5 square miles, they have double the density but it is a very walkable community. Worthington was founded on a mixed-use development at the human scale and anything more than 4-5 stories become more than the human scale. We were founded as a New England town, but James Kilbourne also wanted Worthington to be the capital of Ohio and to grow with more opportunities for more people. The space at UMCH has been developed, it was forest space and there have been buildings on the site. There are sewer and water lines underneath the site, but it is not a pristine site and a perfect

green space. It is a space that should be mixed-use with opportunities for people in Worthington, including people who want to move here. Property values have been increasing and it is a very desirable place to be. People need a place to live, and they will tear down green space outside of Worthington to build. We need to provide some new spaces for people in live in Worthington and let them be a part of this vibrant community. There have been many twists and turns in this development saga for UMCH, and she would like the MPC to go back and work with LC, but there are a lot of things we need to think of other than just keeping things the way that they are. The question is if we are afraid of people or cars if we have mixed-use spaces that are walkable, we should not be nearly as afraid of cars as people seem to be. Every time we talk about more people, we talk about being afraid of cars. What if we created opportunities where we did not have to get in a car to get somewhere.

Mr. Smith explained how Council has heard a lot of feedback from residents and received close to 100 or more individual comments not supporting this proposal. LC has done a lot of outreach and he wondered if there are 100 or more resident comments supporting their proposal. Mr. Hart replied that they do not, but the City has nearly 15,000 residents. They are aware of the email campaign and input, but also know there are people who also want a more vibrant future for the community with diverse housing options, entertainment, retail, and employment opportunities. To let this site remain as is, they know there are many people who do not support that. Mr. Smith asked out of the City's residents if LC has ten letters of support. Mr. Hart replied that they do. Mr. Smith asked if those could be produced. Mr. Hart replied that he could do so.

President Michael brought up the importance of economic development and the potential for medical. She is concerned about the Ohio Health project, which was ready to be the economic cornerstone for this property, and then all of a sudden it disappeared. There were many supportive people of them being on that corner. She wondered what happened. Mr. Hart said he does not know the exact workings of their decision-making at that time, but since then, investment by healthcare organizations has been very difficult. However, residential is in demand and will drive this site. President Michael asked what was being offered that is not an apartment, for people who want to downsize and stay in the community. She has heard how people want to be able to downsize to age-friendly housing and have it not be an apartment. Mr. Hart explained how they are offering two townhome products in the middle of the site, away from High Street, some of those would be flats with first-floor living. Some of the homes would also be empty-nester housing. President Michael asked how many owner-occupied townhouse units are included in this plan. Mr. Hart responded that there are 86 owner-occupied and there are 72 townhomes with walk-ups and flats. The townhomes that are for sale, are not single-story and are walk-ups. President Michael explained how people want single-floor living space and she wrote that six years ago in a letter to the editor. That is where she feels flustered because it does not seem like it has made it into the plan. Mr. Hart explained how with ranch housing in a single-story, they take up a large footprint on the earth. The balance on this plan

is about having more open space and there is 25% open space on the plan amended to MPC. The more single-floor ranches take up more space.

Mr. Bucher explained how some of the community engagement has been outlined and he asked about the process from LC on how community input has been considered and deliberate. We are clearly not seeing some of the things that are being raised. What is stopping LC from putting forward something less dense and accomplishing other goals. Mr. Hart replied that the portions of the staff report document the positive changes that have been made. That report when it gets into the analysis of the different subareas and changes made cites multiple improvements from the site plan between 2020 and 2021. There is good documentation in the staff report about the improvement, relating to more office square footage, a decrease of apartments, opening up the site with connection paths, and greenspace treatment. Zoning works by trying to balance property owner rights with community needs, there is no shot clock or sudden death, and requires a lot of work and give and take. While they are ready to make more improvements, to say they have not moved is not accurate.

Ms. Kowalczyk asked Council, respecting everything that has been said and understanding the history, what we are considering in terms of process. The applicant has asked for a particular outcome tonight about referring back to the MPC. She wondered what is the impact of that versus a denial and what should be the appropriate consideration regarding that process. President Michael replied that there are three options, we can approve, deny, or refer back to the MPC. If there is a referral back, there needs to be input to the MPC on why it was referred back and what Council is expecting them to be looking at. If there is a denial, there is a period of time that must pass before LC can submit a new plan. Mr. Smith asked of those three options that it is each member's prerogative to vote as they see necessary. Mr. Lindsey replied that like any legislative matter, Council as individuals vote on the matter before them. In this instance, the question of which of those three options to approve, deny or refer, those would require some discussion amongst Council leading to a motion to refer back, or to an up or down vote on what has been presented. Due to LC's desire to submit it as a conceptual plan, the staff report calls out the density and height and other considerations that do exist in the plan as submitted. If you were to approve it, it would be based upon those factors. When it goes to a final plan, that is when you would need significant additional information provided by the applicant including the PUD text, with more specific standards. Mr. Robinson asked for clarification that if the proposal is denied tonight, LC would be free to resubmit a proposal at the six-month mark from the MPC, in mid-April. Mr. Lindsey replied that is correct. Mr. Robinson brought up how each Councilmember would be free to vote yea or nay, and asked if a motion is made, would that be for approval or denial, or as opposed to yes or not on the proposal in general. Mr. Lindsey explained that if Councilmembers in discussion prior to voting were to be interested in the referring back, that is where it would be a motion because you would not be voting on the specific ordinance before you. President Michael explained how we have an ordinance in place and Council always votes in a positive mode, so the vote would be for

approval for the ordinance as submitted, yes or no, or someone could file a motion to amend the ordinance to do something other than vote yes or no.

Mr. Myers shared he is of the opinion that the best course of action is to affirm the denial so we can have a clean start. The parties can either walk away and explore other options, or LC can come back and resubmit their application in April starting the process over again. It would be easier to start fresh rather than trying to put a round peg in a square hole.

**MOTION:** Ms. Dorothy moved to send Ordinance No. 58-2021 back to the MPC. There was no second.

**The motion failed**

**There being no additional comments, the clerk called the roll on Ordinance No. 58-2021. Passage of the Ordinance failed by the following vote:**

**Vote Results:** Ayes: 0 / Nays: 7

7. **Ordinance No. 60-2021 Appropriation for New and Replacement Equipment and Various Projects**
   Amending Ordinance No. 53-2021 (As Amended) to Adjust the Annual Budget by Providing for Appropriations from the Capital Improvements Fund Unappropriated Balance to Pay the Cost of the 2022 New and Replacement Equipment Items and for Certain Projects as Identified in the 2022 Five-Year Capital Improvements Program and all Related Expenses and Determining to Proceed with said Projects.

   **Minutes:**
   Mr. Greeson explained how last week, Council approved the five-year CIP. In the first year of that plan, there were equipment and amounts listed here in this ordinance. It is customary for Council to appropriate funds to implement the new and replacement equipment in the plan. Staff recommends approval.

   **There being no additional comments, the clerk called the roll of Ordinance No. 60-2021. The motion carried by the following vote:**

   **Vote Results:** Ayes: 7 / Nays: 0

8. **Ordinance No. 61-2021 Community Reinvestment Area Amendment**
   An Ordinance Authorizing the City Manager to Enter into an Amended Community Reinvestment Area Agreement with Worthington 17, LLC, an Ohio Limited Liability Company, to Change the Starting Year of the Existing Abatement Period from Tax Year 2021 to Tax Year 2024.

   **Minutes:**
   Mr. McCorkle described how this ordinance is to amend the CRA exemption for 6700 North High Street which is the former Anthem Blue Cross/Blue Shield building. This was approved in 2019 with Ordinance 21-2019 and is a 75% ten-year tax abatement. When it was originally approved, it was anticipated renovations would occur in the building by 2020, however, that did not occur. In an effort to keep the full ten-year abatement in place as originally planned to attract prospective tenants, the staff is recommending that the exemption be amended. If approved, this would amend the start year of the CRA exemption for that property to the tax year 2024, and all other terms of the agreement will remain the same.

   **There being no additional comments, the clerk called the roll of Ordinance No. 61-2021. The motion carried by the following vote:**

   **Vote Results:** Ayes: 7 / Nays: 0

## New Legislation to Be Introduced

9. **Resolution No. 67-2021 Premium Pay for Lifeguards**
   Authorizing a Temporary Premium Pay Rate for Part-Time Lifeguards (Class Specification Number 209)

   > **Minutes:**
   > **Introduced by Mr. Smith**
   > **MOTION:** Mr. Myers moved, seconded by Ms. Dorothy to adopt Resolution 67-2021
   > Mr. Hurley overviewed how we are experiencing an extreme shortage of lifeguard staff, which is impacting our service levels and ability to provide our swim facilities to our residents. We have had to scale hours back significantly and defer providing services such as swim lessons, water aerobics, and birthday party rentals. This is not just a Worthington issue, it is a widescale issue in both the public and private sector. There are many things that could help other than just pay, and we are examining other incentives. In the short term, we believe the best thing is to offer up to $2 per hour increase in pay to help recruit new lifeguards.
   > Mr. Myers clarified that this is a temporary premium on the rate and does not change the actual payscale. His understanding was confirmed.
   > **The motion carried unanimously by a voice vote**

10. **Resolution No. 68-2021 Expense Reimbursement for Future Debt Issuance**
    Authorizing the Use of a Portion of the Proceeds of Bonds or Bond Anticipation Notes of the City of Worthington, in the Estimated Principal Amount of Not to Exceed $2,550,000, to be Issued for the Purpose of (I) Designing, Replacing, and Constructing Waterline Improvements on Colonial and Foster Avenues; and (II) Designing, Repairing, Rehabilitating, and Replacing Sanitary Sewer System Infrastructure, to Reimburse the City's General, Permanent Improvement, or Bond Construction Fund for Moneys Previously Advanced for such Purpose.

    > **Minutes:**
    > **Introduced by Mr. Robinson**
    > **MOTION:** Mr. Bucher moved, seconded by Ms. Kowalczyk to adopt Resolution No. 68-2021
    > Mr. Greeson explained how this is a reimbursement resolution that authorizes us to spend capital improvement funds to accomplish a couple of projects and then, later on, reimburse the CIP with bond proceeds once bonds are issued.
    > **The motion carried unanimously by a voice vote**

11. **Resolution No. 69-2021 Transfer of Funds**
    Adjusting the Annual Budget by Providing for a Transfer of Previously Appropriated Funds.

    > **Minutes:**
    > **Introduced by Mr. Robinson**
    > **MOTION:** Mr. Bucher moved, seconded by Ms. Kowalczyk to adopt Resolution No. 69-2021
    > Mr. Greeson stated that this is a standard transfer resolution for a transfer of about $6500.
    > **The motion carried unanimously by a voice vote**

12. **Ordinance No. 62-2021 Amend Code Chapters 1151 (Nonconforming Uses) and 1181 (Wilson Bridge Corridor)**

To Amend Chapter 1151 Nonconforming Uses and Chapter 1181 Wilson Bridge Corridor Districts of the Codified Ordinances of the City of Worthington.

**Minutes:**
**Introduced by Mr. Smith**

Mr. Robinson asked for more information on what we are referring the MPC to do and the breadth of their considerations. Mr. Greeson replied that last week when we were discussing the zoning cases, specifically the two that created nonconforming uses, Council expressed a desire to send to MPC a couple of general issues. The first is to consider amending Chapter 1151 that deals with nonconforming uses to make it more flexible for some of the homeowners that may have been affected by our rezoning decision. An example of that would be increasing the percentage of annual maintenance that can be done. The second is to refer Chapter 1181 which is the actual creation of the actual Wilson Bridge Road zoning districts and whether there can be any flexibility granted in amending that section of the code. Mr. Brown explained how what was heard from Council was to look at the maintenance and repair section of the nonconforming use section and ways to lessen the impact of the single-family uses. Hopefully, over the next month, we can start working on language for the MPC to consider to get a recommendation back to Council to change the planning and zoning code.

**MOTION:** Mr. Smith moved, seconded by Mr. Myers to refer this to the Municipal Planning Commission for review and send the recommendations back to Council.

**The motion carried unanimously by a voice vote**

13. **Ordinance No. 63-2021 Approving Revised Final Plat (6700 N High St)**

    Approving a Final Plat for the Subdivision, Platting of an Access Easement, and Dedication of Land Currently Used for Public Right-of-Way on a Property at 6700 N. High St. (Advanced Civil Design/Worthington 17 LLC)

    **Minutes:**
    **Introduced by Mr. Smith**
    **Set for public hearing on December 20, 2021**

## Reports of City Officials

14. **Policy Item(s)**
    a. **Motion to Withdraw - Ordinance No. 09-2020 (Rezone 47 and 57 Larrimer Ave, and a small portion of 1033 N. High St.)**

        **Minutes:**

        Mr. Lindsey explained how it was discovered in a review of past actions of Council that has not passed final conclusion, these two ordinances had been introduced but no action was taken on them. From Robert's Rules, tabling something to a date uncertain is a means of killing things, but generally, Councils vote up or down or withdraw to truly end a piece of legislation that was introduced. The first one involved the ordinance that would have dealt with Ohio Health's proposed development. Since Ohio Health requested it be withdrawn, we are now taking the action based on their request last March. On the next ordinance, in the efforts to get the pool refinished, we went out a couple of

different times to get bids and we had an ordinance introduced where we did not get bids and that ordinance was tabled. We then after further work, went back out to move forward with bids and a new ordinance was introduced. We were able to negotiate the work and came back to Council and went with the original ordinance introduce and still had this open ordinance on the same subject matter. It does not seem appropriate to vote down the respective ordinances, and staff is asking Council to withdraw the ordinanes.
**MOTION:** Mr. Myers moved, seconded by Ms. Dorothy to withdraw Ordinance No. 09-2020
**The motion carried unanimously by a voice vote**

  b. **Motion to Withdraw - Ordinance No. 06-2021 (Community Center Pool Resurfacing)**
  **Minutes:**
  **MOTION:** Mr. Robinson moved, seconded by Mr. Bucher to withdraw Ordinance No. 06-2021
  **The motion carried unanimously by a voice vote**

  c. **Financial Report - November 2021**
  **Minutes:**
  Mr. Bartter explained that there is nothing particularly new with this report and income tax collections remain robust.
  **MOTION:** Mr. Myers moved, seconded by Ms. Kowalczyk to accept the November 2021 financial report.
  **The motion carried unanimously by a voice vote**

## Reports of Council Members

15. **Reports of Council Members**
  **Minutes:**
  Mr. Robinson thanked his colleagues for the discussion tonight and that he took personal satisfaction by voting with Mr. Myers. It is meaningful to find himself thinking accord with him.

## Other

## Executive Session

## Adjournment

16. **Motion to Adjourn**
  **Minutes:**
  **MOTION:** Mr. Myers moved, Ms. Dorothy seconded a motion to adjourn. The motion

carried unanimously by a voice vote.

**President Michael declared the meeting adjourned at 9:40 p.m.**

Contact: D. Kay Thress, Clerk of Council (Kay.Thress@worthington.org (614) 436-3100) | Minutes published on 01/13/2022, adopted on 01/18/2022

   /s/ Ethan C. Barnhardt
Management Assistant

Attest

   /s/ David Robinson
President of Council