*LIFESTYLE COMMUNITIES*

*vs.*

*CITY OF WORTHINGTON*

---

Deposition of

**Bo Brownlee**

November 13, 2023

---



614.460.5000 | www.priohio.com | pri@priohio.com

1      IN THE UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF OHIO
2           EASTERN DIVISION

3  LIFESTYLE COMMUNITIES,    )
    LTD., ET AL.,          )
4                     )
      Plaintiffs,      )
5                     )
      vs.             )  Case No.
6                     )  2:22-cv-1775
    CITY OF WORTHINGTON,    )
7  OHIO,                  )
                     )
8      Defendant.       )

9

10

11                DEPOSITION

12           of BO BROWNLEE

13

14        Taken at the offices of
      Vorys Sater Seymour and Pease LLP
15          52 East Gay Street
         Columbus, Ohio 43215
16

17

18      on November 13, 2023, at 9:10 a.m.

19

20      Reported by: Julia Lamb, RPR, CRR

21

22             -=0=-

23

24

1    APPEARANCES:

2        Christopher L. Ingram
         VORYS SATER SEYMOUR AND PEASE LLP
3        52 East Gay Street
         Columbus, Ohio 43215
4        614.464.5480
         clingram@vorys.com
5
             on behalf of the Plaintiffs.
6

7        Yazan S. Ashrawi
         FROST BROWN TODD
8        One Columbus, Suite 2300
         10 West Broad Street
9        Columbus, Ohio 43215
         614.559.7202
10       yashrawi@fbtlaw.com

11           on behalf of the Defendant.

12

13

14

15

16

17

18

19                     -=0=-

20

21

22

23

24

1                    STIPULATIONS

2              It is stipulated by and between

3    counsel for the respective parties that the

4    deposition of BO BROWNLEE, the Witness herein,

5    called by the Defendant under the applicable

6    Rules of Federal Civil Court Procedure, may be

7    taken at this time by the stenographic court

8    reporter and notary public by agreement of

9    counsel; that said deposition may be reduced to

10   writing stenographically by the court reporter,

11   whose notes thereafter may be transcribed

12   outside the presence of the witness; and that

13   the proof of the official character and

14   qualification of the notary is waived.

15                    -=0=-

16

17

18

19

20

21

22

23

24

1                    INDEX OF EXAMINATION

2                                            PAGE

3    BY MR. ASHRAWI:                          5

4

5

6                    INDEX OF EXHIBITS

7    EXHIBIT              DESCRIPTION          PAGE

8      1    1145.05 Reconsideration of     22
            Prior Formal Rezoning Action
9
       2    Development Agreement          24
10
       3    Real Estate Purchase Contract  35
11
       4    Complaint Against the          40
12          Valuation of Real Property

13     5    Retrospective Appraisal,       49
            1-1-19
14
       6    Staff Memorandum, 11-8-21      52
15
       7    Resolution No. 04-2022         74
16

17

18

19

20

21

22

23

24

 1                    BO BROWNLEE

 2  being first duly sworn, as hereinafter certified,

 3  deposes and says as follows:

 4                 CROSS-EXAMINATION

 5  BY MR. ASHRAWI:

 6     Q.  Mr. Brownlee, can you please state and

 7  spell your full name for the record.

 8     A.  Sure.  It's Thomas Robert Brownlee.

 9         Did you say spell?

10     Q.  I think we have -- it's spelled all

11  normally?

12     A.  All normally.  I go by Bo.  You're

13  welcome to call me Bo.

14     Q.  And that's B-O?

15     A.  Correct.

16     Q.  Great.  Thank you.

17         Have you ever been deposed before?

18     A.  I have.

19     Q.  How many times?

20     A.  I believe only once.

21     Q.  And when was that?

22     A.  I'm guessing the past -- between two and

23  four years ago, maybe just before pre-pandemic;

24  so 2019, 2020, 2021.

 1       Q.  And were you deposed as a representative

 2   of Lifestyle or in a different capacity?

 3       A.  As a representative of an affiliate of

 4   Lifestyle.

 5       Q.  And I assume that deposition was related

 6   to a lawsuit of some sort?

 7       A.  Correct.

 8       Q.  What was the nature of that lawsuit?

 9       A.  A homeowner's association dispute.

10       Q.  What was the affiliate of Lifestyle that

11   you referenced earlier or who was the affiliate?

12       A.  It would have been Hawksmoor,

13   H-A-W-K-S-M-O-O-R, is a single-family

14   development in New Albany.

15       Q.  Is that suit ongoing or has it been

16   concluded?

17       A.  It's been resolved.

18       Q.  Since you've been deposed, you probably

19   generally know the ground rules, but just for

20   purposes of the record and for the court

21   reporter, I'll go over a few of them for our

22   purposes.  If you can speak loudly and clearly.

23   You're doing a good job so far.  It'd be great

24   to avoid any nonverbal responses such as head

1  nods or uh-huhs or huh-uhs.  And if you don't

2  understand a question I ask, just please ask me

3  to rephrase it.  If you don't, I'll assume you

4  understand my question.  And then if you need a

5  break at any time, just let me know.  The only

6  caveat would be I would ask you to answer any

7  pending question before we go on a break.

8        Are those all acceptable to you?

9    A.  Yes.

10    Q.  And do you understand that you are here

11  to testify with respect to a federal lawsuit

12  that Lifestyle Communities and Worthington

13  Campus, LLC filed against the City of

14  Worthington?

15    A.  Yes.

16    Q.  Do you understand that the lawsuit

17  centers around a property in Worthington

18  commonly known as the United Methodist

19  Children's Home or UMCH property?

20    A.  Yes.

21    Q.  When I refer to the property moving

22  forward or the UMCH property, you'll understand

23  that I'm referring to the property that's the

24  subject of this case?

 1     A.  Yes.

 2     Q.  And you're familiar with that property?

 3     A.  Yes.

 4     Q.  What did you do to prepare for this

 5  deposition?

 6     A.  I reviewed -- I reviewed the minutes

 7  from some planning commission meetings regarding

 8  the property.  I reviewed the minutes from the

 9  city council meeting on this property.  I

10  reviewed the ordinance that was passed by the

11  city after city council rejected our zoning

12  application.  I think that's about it.

13     Q.  Did you review the complaint at all?

14     A.  I did.

15     Q.  Did you review any of the expert reports

16  or appraisal reports that have been completed

17  for this property?

18     A.  No.

19     Q.  Any other document that you can think of

20  that you reviewed?

21     A.  The land plan.  The comprehensive plan.

22     Q.  When you refer to the comprehensive

23  plan, you're referring to the city's

24  comprehensive plan?

1      A.  Yes.  The concept plan that was filed

2  with our zoning application as well as the

3  revised concept plan that we filed with the

4  planning commission in later 2021.  I think

5  that's it.

6      Q.  When you were preparing and reviewing

7  these documents, was there any particular reason

8  you chose to review these documents and not

9  others, or were they provided to you?  What was

10  the reason you chose to review these documents?

11      A.  Either they were provided to me or I

12  thought they would be helpful and truthful

13  answering my questions today.

14      Q.  I assume you met with your attorney, but

15  I don't want to know about any of those

16  discussions.  I do want to know, but I can't

17  know.  Did you meet with anyone else?

18      A.  No.

19      Q.  So you did not speak with anyone within

20  the Lifestyle Communities entity or any of their

21  affiliates about your deposition here today?

22          MR. INGRAM:  Objection.  Asked and

23  answered.

24      A.  No.

1      Q.  You mentioned earlier when I asked you

2   about being deposed before an affiliate of

3   Lifestyle Communities.  Can you tell me how

4   Lifestyle as an entity is structured in terms of

5   is there a parent company?  It has obviously at

6   least one affiliate.  Does it have other

7   affiliates?  What is the corporate structure of

8   Worthington -- excuse me, of Lifestyle

9   Communities?

10          MR. INGRAM:  Objection to form.

11      A.  So Lifestyle -- your question is not

12   easily answered because Lifestyle is a large

13   company that has numerous -- dozens and dozens

14   of entities, does business across multiple

15   states, and whose organizational chart has

16   changed over the years, and it's been years

17   since I've been responsible for those sort of

18   corporate affairs; so...

19      Q.  Fair enough.  Large with several

20   affiliates?

21      A.  A number of affiliates, dozens of

22   affiliates.

23      Q.  You are currently -- what is your

24   current position?

1    A.  I'm retired.

2    Q.  Congratulations and good for you.

3    A.  Thank you very much.

4    Q.  When did you retire?

5    A.  My last day at Lifestyle was April 30th

6  of this year.

7    Q.  Lucky you --

8    A.  Yes.

9    Q.  -- to be brought back into this.

10        Prior to your retirement, what was your

11  position?

12    A.  Chief development officer.

13    Q.  And I understand there's a complicated

14  corporate structure, but was your employer

15  Lifestyle Communities or a different entity?

16        MR. INGRAM:  Objection to form.

17    A.  I believe my paycheck was from an entity

18  called Builders Resource Group.  That was a

19  shared services company and was an affiliate of

20  Lifestyle Communities.

21    Q.  For all intents and purposes, would you

22  consider yourself an employee of Lifestyle

23  Communities?

24    A.  Yes.

 1     Q.  How long were you the chief development

 2     officer for Lifestyle?

 3     A.  Effectively two years, but I think the

 4     title was made permanent in 2022.

 5     Q.  Were you with Lifestyle prior to being

 6     the chief development officer?

 7     A.  Yes.

 8     Q.  What was your position prior to taking

 9     the chief development officer position?

10     A.  General counsel.

11     Q.  How long were you in that position?

12     A.  Since 2005.  There was an interim

13     period, and I don't remember the dates, in the

14     late teens, '17, 18, where my title was simply

15     senior vice president, and a different person

16     was hired for the role of general counsel.  That

17     didn't go well and didn't last long, six months

18     or less, at which time I resumed the title

19     general counsel.  So there was, I'll call it, a

20     six- to eight-month interruption, but with the

21     exception of that I've been general counsel from

22     2005 to 2022.

23     Q.  What did you do before 2005 for work?

24     A.  I was a partner at Bricker & Eckler.

1    Q.  How long were you at Bricker?

2    A.  Eleven years.

3    Q.  So from '94 to 2005?

4    A.  Yes.

5    Q.  And were you in school immediately

6  before then?

7    A.  No.  I graduated from law school in

8  1989.

9    Q.  What did you do between '89 and 1994?

10    A.  I started my legal career at the Vorys

11  law firm, had a short stop at the firm formerly

12  known as -- well, now known as Isaac Wiles, and

13  then landed at Bricker and was there until 2005.

14    Q.  Where did you go to law school?

15    A.  Georgetown.

16    Q.  And where was your undergraduate degree

17  from?

18    A.  Denison University.

19    Q.  What did you study at Denison?

20    A.  Liberal arts.

21    Q.  I'm sorry?

22    A.  Liberal arts.

23    Q.  During your time at Lifestyle as a

24  general counsel, what was your role there?  Did

1    you have anything to do outside of the legal

2    work or what I will call standard general

3    counsel work?

4            MR. INGRAM:  Objection to form.

5        A.  Can you rephrase the question?

6        Q.  Sure.  During your time as general

7    counsel, what were your duties and

8    responsibilities?

9        A.  To oversee transactions, acquisitions,

10   dispositions, financings, to provide legal

11   advice to ownership, fellow executives and

12   others employees of the company were my primary

13   responsibilities.

14       Q.  Were you involved in land developments

15   during your time as general counsel?

16       A.  Yes.

17       Q.  In what capacity?

18       A.  As general counsel.

19       Q.  So as it relates to development of real

20   property you oversaw that process and provided

21   legal advice to executives and others as it

22   related to the development process.  Is that

23   fair?

24           MR. INGRAM:  Objection to form.

 1      A.  Yes.

 2      Q.  Did you do anything else during your

 3  time as general counsel as it related to

 4  development such as working with the development

 5  team on land use, zoning, engineering, things of

 6  that nature?

 7      A.  Yes.

 8      Q.  Can you describe that aspect of your

 9  role to me when you were general counsel?

10      A.  It would vary from year to year and

11  project to project depending on the project,

12  depending on where we were from a staffing

13  perspective.  My involvement in development

14  projects could vary widely.

15      Q.  Shifting gears, can you describe your

16  role/responsibilities as the chief development

17  officer?

18      A.  I would describe them as three-fold.  To

19  build and manage a team of development leaders

20  in each of the six markets that Lifestyle

21  Communities was in, to build a development

22  pipeline that is a group of -- pieces of real

23  estate either in contract or that we owned that

24  could be developed in the future, and finally to

1    push through the properties that we owned

2    through the development pipeline to a position

3    that we could turn the projects over to the

4    construction team to start to commence

5    construction.

6        Q.  You mentioned six markets, I believe?

7        A.  Yes.

8        Q.  What markets are those?

9        A.  Ohio, Tennessee, North Carolina, South

10   Carolina, Texas, and Colorado.

11       Q.  And did you work on developments or work

12   with teams or develop pipelines for development

13   in all six of those markets?

14           MR. INGRAM:  Objection to form.

15       A.  Yes.

16       Q.  Forgot to ask, but when you were in

17   private practice, what type of law did you

18   practice?

19       A.  Real estate and corporate.

20       Q.  Are you involved in all of Lifestyle's

21   real estate developments, or excuse me, were you

22   involved in all of Lifestyle's real estate

23   developments?

24           MR. INGRAM:  Objection.  Form.

1      A.  Yes, but again to varying degrees.

2      Q.  You would agree that Lifestyle is an

3  experienced developer?

4      A.  Yes.

5      Q.  How many mixed use development projects

6  has Lifestyle completed since 2015 that you're

7  aware of in all six markets?

8          MR. INGRAM:  Objection to form.

9      A.  I honestly -- the years have blended

10  together.  I couldn't tell since 2015.

11      Q.  Sure.  How about on an annual basis how

12  many mixed use developments are at least in the

13  construction phase or further?

14          MR. INGRAM:  Same objection.

15      A.  The best way for me to answer that

16  question is to tell you that we own -- that

17  Lifestyle Communities owns around 7, 8,000

18  apartment, multi-family units, and has probably

19  developed twice that many.

20      Q.  Has Lifestyle -- does Lifestyle own any

21  non-apartment unit projects?

22      A.  Yes.

23      Q.  They own commercial units or projects?

24      A.  Yes.

1    Q.  How many as compared to the apartment

2  units?

3        MR. INGRAM:  Objection to form.

4    A.  Almost every one of our developments has

5  a commercial component to it so if you

6  counted -- if you counted the number of

7  developments in our six markets, you could

8  almost certainly find a commercial component in

9  each one of those developments.

10    Q.  Does Lifestyle own/develop office uses?

11    A.  Minimal, but yes.

12    Q.  Is there any other type of development

13  that is -- can be found within Lifestyle's

14  developments?

15        MR. INGRAM:  Objection to form.

16    A.  Single family for sale, single family

17  for rent, hospitality, restaurants, bars,

18  coworking, fitness and office.

19    Q.  Lifestyle is associated with a

20  restaurant called a -- chain, for lack of a

21  better term, called The Goat.  Is that accurate?

22    A.  Yes.

23    Q.  What's the affiliation there?

24        MR. INGRAM:  Objection to form.

1      A.  Ownership.

2      Q.  As a chief development officer did you

3  get involved with the entitlement processes for

4  Lifestyle's different projects?

5          MR. INGRAM:  Objection to form.

6      A.  Yes.  In varying degrees depending on

7  the project.

8      Q.  Are you generally familiar with local

9  government entitlement processes across your

10  markets?

11      A.  Yes.

12          MR. INGRAM:  Same objection.

13      Q.  Would you agree that local governments

14  have differences and varying processes for their

15  local entitlements?

16          MR. INGRAM:  Objection.  Calls for

17  speculation.

18          You may answer.

19      A.  Yes.

20      Q.  In what way from your perspective?

21          MR. INGRAM:  Same objection.

22      A.  Different procedures, different

23  procedures for getting to approval or denial of

24  an application.

1          Q.  And in different communities there are

2    different requirements and different land uses

3    and different just local ordinances generally,

4    right?

5          MR. INGRAM:  Objection.

6          A.  Yes.

7          Q.  In any part of your involvement in the

8    development process as an employee or

9    representative of Lifestyle did you get involved

10   in the review of the zoning ordinances or the

11   entitlement processes specifically?

12         MR. INGRAM:  Objection to form.

13         A.  No.  We would typically hire experts,

14   local counsel to help us in that regard.

15         Q.  Turning now to the property at issue in

16   this case, did you have any involvement in the

17   review of the zoning ordinances or the city of

18   Worthington's zoning and entitlement processes?

19         MR. INGRAM:  Objection.  Form.

20         A.  Did you ask if I had any involvement?

21         Q.  Yes.

22         A.  Yes.

23         Q.  Did you review personally the city of

24   Worthington's zoning ordinances and/or

 1   entitlement processes?

 2        MR. INGRAM:  Objection to form.

 3     A.  I read the land plan and I reviewed the

 4   processes with our attorney that we hired to

 5   help us navigate the zoning application.

 6     Q.  Was that Tom Hart?

 7     A.  Yes.

 8     Q.  Were you aware that once an

 9   application -- a rezoning application was

10   formally heard by the municipal planning

11   commission or the city council in Worthington,

12   that the property could not then be reconsidered

13   for rezoning within 180 days after that?

14        MR. INGRAM:  Objection.  Calls for

15   speculation.

16     A.  I don't recall.

17     Q.  You don't recall if you ever knew that?

18     A.  Correct.

19        MR. INGRAM:  Objection.

20     Q.  Do you know that now sitting here?

21        MR. INGRAM:  Objection.  Misstates his

22   testimony.

23     A.  All I recall is what someone during the

24   city council hearing in late 2021 said as to

1   what our rights were and weren't.  I never tried

2   to verify whether that was the case.

3                      -=0=-

4           (Deposition Exhibit 1 marked.)

5                      -=0=-

6   BY MR. ASHRAWI:

7       Q.  I'm going to hand you what we'll mark as

8   Exhibit 1.  Mr. Brownlee, what I'm handing to

9   you is Section 1145.05 of the Worthington City

10  Code.  Have you seen this code section before?

11      A.  No.

12      Q.  You originally -- excuse me, Lifestyle

13  originally submitted a proposal, not a formal

14  application, but a proposal sometime in 2015.

15  Is that accurate?

16          MR. INGRAM:  Objection to form.

17      A.  I believe so.

18      Q.  Do you recall what that proposal

19  entailed?

20      A.  I do not.

21      Q.  Were you involved in 2015 with the

22  presentation or submission of that informal

23  proposal to the city?

24      A.  No.

1          MR. INGRAM:  Objection to form.

2     Q.  Do you know who was?

3          MR. INGRAM:  Same objection.

4     A.  Yes.  I believe it was our former

5  president and a former employee of the

6  development team.

7     Q.  And who was that former president?

8     A.  Brent Miller.

9     Q.  And you said a former development

10  representative?

11     A.  Correct.

12     Q.  Who would that have been?

13     A.  Chase Miller.

14     Q.  And where is Brent Miller now?

15     A.  Retired.

16     Q.  What about Chase Miller?

17     A.  Chase owns his own real estate firm

18  whose name escapes me right now.

19     Q.  Were you involved in any capacity with

20  the subject property in 2015?

21          MR. INGRAM:  Objection to form.

22     A.  I don't recall, but if I was, it would

23  have been much more on the legal side so

24  contracts, negotiation and documentation.

1                    -=0=-

2           (Deposition Exhibit 2 marked.)

3                    -=0=-

4  BY MR. ASHRAWI:

5      Q.  I'm going to hand you what we'll mark as

6  Exhibit 2.  Take your time and look through that

7  document, Mr. Brownlee, and when you've

8  completed your review, I'm going to ask you if

9  you've seen this document before?

10     A.  I have seen this document before, yes.

11     Q.  And what is this document?

12     A.  I don't recall what it says, but the

13 title is a development agreement between the

14 United Methodist Children's Home, West Ohio

15 Conference of the United Methodist Church and LC

16 North High Street, Ltd.

17     Q.  You would agree that -- well, the

18 effective date of this agreement is June 26,

19 2015.  Do you see that in the first paragraph?

20     A.  Yes.

21     Q.  You would agree that around this time or

22 sometime in 2015 Lifestyle was considering the

23 acquisition, the rezoning and the development of

24 the property?

 1          MR. INGRAM:  Objection to form.

 2     A.  Yes.

 3     Q.  To the best of your knowledge, is this a

 4  true and accurate copy of the development

 5  agreement?

 6     A.  I don't know.

 7     Q.  Did you have any involvement in

 8  negotiating or drafting this development

 9  agreement?

10     A.  Almost certainly, yes.  I don't

11  specifically recall it, doing so, but yes, I

12  believe I did.

13     Q.  It was eight years ago; so...

14     A.  Yeah.  Right.

15     Q.  As you flip through that and to the best

16  of your recollection from Lifestyle's

17  perspective what did this development agreement

18  entail or require Lifestyle to do?

19          MR. INGRAM:  Objection to form.

20          You may answer to the extent of your

21  personal knowledge, but you've not been

22  designated to testify on behalf of Lifestyle in

23  any capacity.

24     A.  I don't -- I just don't recall without

1   rereading the document.

2     Q.  Does Lifestyle typically enter into

3   these -- into development agreements in advance

4   of acquiring a piece of property for

5   development?

6       MR. INGRAM:  Objection.  Calls for

7   speculation.

8     A.  It's not uncommon.

9     Q.  And generally speaking what would be the

10  purpose of that type of development agreement?

11      MR. INGRAM:  Same objection.

12    A.  Cooperation with the landowner or others

13  towards the development of the project.

14    Q.  On page 4 of the agreement under Section

15  3.2 there's a paragraph titled right to market

16  that gives Lifestyle the right to market for

17  sale or lease any portion of the property.  Do

18  you know whether Lifestyle, in 2015, marketed

19  for sale or lease any portion of this property?

20      MR. INGRAM:  Objection to form.

21    A.  I don't recall.

22    Q.  I guess I forgot to ask an important

23  question.  As of June 26, 2015 Lifestyle did not

24  own the property, right?

1          MR. INGRAM:  Calls for legal conclusion.

2  Objection.

3      A.  That's correct.

4      Q.  And I'm sorry, you said you did not

5  recall whether at this time Lifestyle marketed

6  for sale or lease any or all of the property?

7      A.  Correct.

8          MR. INGRAM:  Objection to form.

9      Q.  In 2015 was Lifestyle working with UMCH

10  on a mutually acceptable development plan for

11  the property?

12      A.  I don't know.  My involvement was

13  limited to negotiating and drafting contracts

14  such as this at that time.

15      Q.  And forgive me if you already answered

16  this question.  You were not involved with the

17  submittal or proposal for a redevelopment to the

18  city in 2015.  Is that accurate?

19          MR. INGRAM:  Objection.  Misstates his

20  prior testimony.

21      A.  Yes.

22      Q.  Were you made aware of that 2015

23  proposal and any feedback from the city about

24  that proposal?

1    A.  Yes.

2    Q.  What do you recall about the proposal

3  itself and any feedback from what was submitted

4  in 2015?

5       MR. INGRAM:  Objection to form.

6       You may answer.

7    A.  Can you repeat the question?

8    Q.  Sure.  You were made aware that in 2015

9  Lifestyle, through Brent Miller and Chase

10  Miller, had submitted an informal plan or

11  concept plan or proposal to the city, right?

12    A.  Yes.

13    Q.  My question was were you then made aware

14  of any feedback that was received from that

15  proposal?

16    A.  Yes.

17    Q.  And what was your recollection of that

18  feedback?

19    A.  My recollection was that the concept

20  plan that was presented met with mixed reviews,

21  that there were elements that either city

22  representatives or city residents really liked

23  and there were others that were met with

24  resistance.

1     Q.  Between that 2015 submission and the

2  first actual application that was submitted to

3  the city, more than five years passed.  Is that

4  accurate?

5     A.  Yes.

6     Q.  Why did Lifestyle wait that long to

7  submit something formally to the city?

8        MR. INGRAM:  Objection to form.  Calls

9  for speculation.

10     A.  I don't recall.

11     Q.  Taking a step back, generally speaking

12  when Lifestyle gets involved in acquisition and

13  development of property across its markets, is

14  it typical or standard for Lifestyle to obtain a

15  third-party zoning report about the property?

16        MR. INGRAM:  Objection.  Calls for

17  speculation.  Incomplete hypothetical.

18        You may answer if you can.

19     A.  Sometimes we do and sometimes we don't.

20     Q.  Based on your recollection and

21  knowledge, is there any determining factor that

22  Lifestyle looks at when it's determining whether

23  to obtain a third-party zoning report or not?

24        MR. INGRAM:  Same objections.

1    A.  Familiarity with the market.

2    Q.  So is it safe to say that the less

3  familiarity with the market the more likely

4  Lifestyle would obtain a third-party zoning

5  report?

6        MR. INGRAM:  Objection.  Misstates this

7  witness' prior testimony.

8    A.  Correct.

9    Q.  Do you know whether Lifestyle obtained a

10  third-party zoning report for the property at

11  issue in this case?

12    A.  I don't know.

13    Q.  Similar question relating to Lifestyle

14  and its developments generally across its

15  markets.  Does Lifestyle typically engage with

16  the local government and neighbors and residents

17  of the community for input when it's beginning

18  to develop a property?

19        MR. INGRAM:  Objection.  Calls for

20  speculation.  Incomplete hypothetical.

21        You may answer to the extent you can.

22    A.  Yes, but that's often done through

23  experts that we hire or legal counsel.

24    Q.  Do you know in this case did Lifestyle

1    through those individuals engage with the city

2    of Worthington and the residents of the city of

3    Worthington?

4         MR. INGRAM:  Objection to form.

5    A.  Yes.

6    Q.  Do you recall -- strike that.

7         I want to turn back to the development

8    agreement that we've marked as Exhibit 2.  On

9    page 5 there's a section, Section 5.2, titled

10   budget.

11   A.  Yes.

12   Q.  Do you know what -- and it appears to

13   give the developer or Lifestyle a budget within

14   which to work.  Do you know what that budget

15   represents?

16        MR. INGRAM:  Objection to form.

17   Q.  Take your time and review that section.

18        MR. INGRAM:  Further objection calls for

19   legal conclusion.

20   A.  This would be the budget to actually

21   develop the property.

22   Q.  Do you know or recall whether a budget

23   at this time in 2015 was ever prepared?

24   A.  I don't know.  I don't know.

1      Q.  Who would have been involved in 2015

2  with respect to developing a budget for the

3  development?

4      A.  I don't -- I don't recall who would have

5  been part of the development team back in 2015

6  that would have had this responsibility.  The

7  creation of a budget would not have been

8  necessarily the executive level.  I just don't

9  remember who was around at the time.

10     Q.  Sure.  That's okay.

11         I'll ask you to flip couple pages to

12  page 6 under Section 6.2, which is titled other

13  approvals.  That section discusses the

14  developer, Lifestyle, and the owner, UMCH,

15  seeking input from city of Worthington planning

16  staff and the Worthington Area Residents for

17  Responsible Development.  Do you see that?

18     A.  Yes.

19     Q.  Are you familiar with the Worthington

20  Area Residents for Responsible Development or

21  W-A-R-R-D?

22     A.  Yes, generally.

23     Q.  What's your understanding of WARD?

24     A.  My understanding is that WARD is a group

1  of citizens who are concerned with the

2  development -- the real estate development

3  within the city of Worthington and will serve as

4  a bridge to city representatives to express

5  thoughts and concerns of residents about various

6  real estate developments.

7     Q.  WARD is not a part of the city of

8  Worthington, right?

9     A.  Correct.

10     Q.  Is it.  Based on your knowledge and work

11  with Lifestyle, typical for a resident

12  organization to be called out specifically as --

13  for Lifestyle to seek comment and discussion for

14  a particular development?

15     MR. INGRAM:  Objection to form.  Calls

16  for speculation.

17     A.  It's not uncommon again depending on the

18  jurisdiction and the particular development.

19     Q.  In this instance it was fairly well

20  known that WARD was vocal and involved in most

21  developments of real estate in the city of

22  Worthington.  Is that accurate?

23     MR. INGRAM:  Objection to form.  Calls

24  for speculation.

1      A.  I believe that's the case.

2      Q.  If you flip to page 7, the top of the

3  page, Section 6.5, Lifestyle agrees and the

4  owner acknowledged that there's no guarantee

5  that any plan will get approved -- any

6  development plan will get approved for this

7  property.  Do you see that?

8          MR. INGRAM:  Objection to form.  Calls

9  for speculation.  Misstates what this document

10  says.

11      A.  Yes, I see that.

12      Q.  Is that an accurate reflection of what

13  that section says based on your knowledge and

14  understanding?

15          MR. INGRAM:  Same objections.

16      A.  Yes.  That section says that the owner

17  acknowledges that the developer has not

18  guaranteed owner that the master plan or any

19  portion thereof will be approved by any

20  particular governmental authority.

21      Q.  Last question for now on this document,

22  I'm going to ask you to turn to page 8.  There's

23  an Article 9 on page 8 titled reimbursement and

24  compensation of developer, and under 9.1 it

1 looks like Lifestyle is eligible for certain

2 reimbursement for its master planning and

3 entitlement costs.  Do you see that?

4     A.  Yes.

5     Q.  Do you know whether either under that

6 section or otherwise whether UMCH reimbursed

7 Lifestyle for any development costs or master

8 planning?

9     A.  I don't know.

10         MR. INGRAM:  Objection to form.

11         MR. ASHRAWI:  We've been going for about

12 an hour.  Do we want to take a short five-minute

13 break?

14         MR. INGRAM:  That'd be great.

15             (Recess taken.)

16                 -=0=-

17      (Deposition Exhibit 3 marked.)

18                 -=0=-

19 BY MR. ASHRAWI:

20     Q.  Mr. Brownlee, I'm going to hand you what

21 we'll mark as Exhibit 3.  Take your time and

22 look through that document and let me know if

23 you have seen it before?

24     A.  Yes, I've seen this before.

1      Q.  What is it?

2      A.  Real estate purchase contract dated

3  April 20th, 2017, between the United Methodist

4  Children's Home West Ohio Conference and

5  Lifestyle Real Estate Holdings, Ltd.

6      Q.  To the best of your knowledge and

7  recollection, is this the -- or was this the

8  most recent real estate purchase contract

9  between the two parties?

10      MR. INGRAM:  Objection to form.

11      A.  I don't recall.

12      Q.  Take a -- were you involved in the

13  drafting or negotiation of this document?

14      A.  I believe so, yes.

15      Q.  If I'm not mistaken, this was not one of

16  the documents you reviewed in preparation for

17  this deposition, correct?

18      A.  Yes, correct.

19      Q.  Is this, again based on your review and

20  recollection, a true and accurate copy of the

21  purchase contract?

22      A.  I don't know.

23      Q.  Lifestyle eventually closed on the

24  property pursuant to this contract.  Is that

1    right?

2        MR. INGRAM:  Objection to form.  Calls

3    for legal conclusion.

4        A.  Yes.

5        Q.  Do you recall when the closing happened?

6        A.  I believe January of 2021.

7        Q.  The contract, what we've marked as

8    Exhibit 3 that's before you, describes a phased

9    approach to closing on the various parcels.  Do

10   you recall that approach to closing being

11   discussed or contemplated?

12       A.  I don't.

13       Q.  In January of 2021 when Lifestyle closed

14   on the property, do you know if it closed on the

15   entire UMCH property?

16       A.  Yes.

17       MR. INGRAM:  Objection to form.

18       A.  Yes.  I believe that's the case.

19       Q.  By the time Lifestyle had entered into

20   this contract in 2017, it already had

21   discussions -- preliminary discussions with the

22   city about developing this property.  Is that

23   right?

24       A.  I don't know.

1      Q.  So you personally had not had any

2  discussions with the city about developing this

3  property in 2017.  Is that accurate?

4      A.  Not that I recall.

5      Q.  At the time this contract was executed

6  the closing of the property was contingent on

7  Lifestyle obtaining a rezoning under a planned

8  unit development for a mixed use project.  Is

9  that right?

10          MR. INGRAM:  Objection.  Calls for legal

11  conclusion.

12      A.  I don't recall.

13      Q.  Is it typical for Lifestyle to enter

14  into purchase contracts and include a

15  contingency for a successful rezoning prior to

16  closing on the property?

17          MR. INGRAM:  Objection.  Calls for

18  speculation.

19      A.  Yes.

20      Q.  Do you know if that contingency was a

21  part of this contract?  And I can direct you to

22  the closing deliveries and closings under

23  Article 11 which is on page 10 of the document

24  if that helps.

1        MR. INGRAM:  Objection to form.

2     A.  Can you rephrase the question or restate

3  the question?

4     Q.  Sure.  My question was, was this

5  contract and the closing on the property

6  contingent on a successful rezoning by the city

7  of Worthington to a planned unit development?

8        MR. INGRAM:  Objection to form.  Calls

9  for legal conclusion.  Document speaks for

10  itself.

11     A.  I'm just not seeing the condition to

12  closing.  I see in Section 11 where it says the

13  initial closing shall occur on or before the

14  date which is the later of June 30th, 2017 or

15  the business day that is 10 business days after

16  the approval of the applicable subdivision plat

17  for the initial acquisition parcels.

18     Q.  Let me ask a different question then.

19  Lifestyle closed on this property prior to

20  obtaining any rezoning, correct?

21     A.  Correct.

22     Q.  So even had there been a contingency,

23  Lifestyle would have waived that contingency?

24        MR. INGRAM:  Objection.  Calls for legal

1  conclusion.

2      A.  Correct.

3                        -=0=-

4        (Deposition Exhibit 4 marked.)

5                        -=0=-

6  BY MR. ASHRAWI:

7      Q.  I'm going to hand you what we'll mark as

8  Exhibit 4.  Exhibit 4, Mr. Brownlee, is just a

9  single page, but take a look at it and let me

10  know if you've seen this document before?

11      A.  I don't recall.

12      Q.  You don't recall if you've seen this

13  document?

14      A.  Correct.

15      Q.  This document is a complaint against the

16  valuation of real property that was filed on

17  behalf of Lifestyle.  Is that correct?

18      A.  Correct.

19      Q.  And it was filed in March of 2020.  Is

20  that accurate?

21          MR. INGRAM:  Objection.

22      A.  Yes.

23      Q.  And this complaint sought a reduction in

24  the valuation of the property for tax purposes.

1   Is that right?

2          MR. INGRAM:  Objection.  Calls for

3   speculation.  This witness has already testified

4   he's never even seen this document before.

5          You may answer to the extent you can.

6      A.  Yes.

7      Q.  You were involved in the filing of this

8   complaint and the hearing before the Franklin

9   County Board of Revision, correct?

10     A.  Correct.

11     Q.  And you testified under oath in the

12  Board of Revision hearing in October of 2020.

13  Is that right?

14     A.  I don't recall the date, but yes, I

15  testified in front of the board.

16     Q.  Did you review your Board of Revision

17  testimony as part of the preparation for this

18  deposition?

19     A.  I listened to portions of the recording.

20     Q.  Do you recall testifying about the 2017

21  purchase contract that we've labeled in this

22  deposition as Exhibit 3?

23         MR. INGRAM:  Objection.  Assumes facts

24  not in evidence.

1      A.  I do recall testifying as to the then

2  current contract between Lifestyle and United

3  Methodist Church.

4      Q.  Do you recall if the contract you

5  testified in that Board of Revision case is the

6  same contract you have here before you as

7  Exhibit 3?

8      A.  I don't.

9      Q.  Do you recall then testifying at the BOR

10  hearing that there was a $200,000 per

11  developable acre price tag for the property?

12         MR. INGRAM:  Objection to form.

13      A.  Yes.  Yes, I recall that.

14      Q.  And you recall that you indicated at the

15  BOR that the price was contingent on a

16  successful rezoning?

17         MR. INGRAM:  Objection to form.

18  Misstates this witness' prior testimony.

19      A.  I don't recall making that statement.

20      Q.  Did Lifestyle pay $200,000 per

21  developable acre for this property?

22      A.  No.

23      Q.  What did Lifestyle pay for the property?

24      A.  As I recall, we paid $5.2 million.

1    Q.  If you turn back to Exhibit 3.  Strike

2  that.

3        Let me just ask it this way.  Was that

4  price of $5.2 million less than what was

5  originally agreed upon for the price?

6        MR. INGRAM:  Objection.  Assumes facts

7  not in evidence.

8    A.  Yes.

9    Q.  What was the original agreed upon price?

10    A.  According to Section 2.A, would be

11  $200,000 multiplied by the number of developable

12  acres.

13    Q.  And that total is greater than the

14  $5.2 million Lifestyle paid?

15    A.  Correct.

16    Q.  Do you know how much greater?

17    A.  My recollection is $800,000 greater.  I

18  believe my testimony at the BOR was that the

19  price of $200,000 per developable acre equaled

20  to about $6 million.

21    Q.  The $800,000 reduction from the original

22  agreed upon price to what Lifestyle paid, was

23  that related to the waiver of the rezoning

24  contingency?

1        MR. INGRAM:  Objection to form.

2    A.  I believe it was related to just the

3  time value of money.

4    Q.  And was that because UMCH did not want

5  to be involved in what you described as a

6  prolonged rezoning battle?

7        MR. INGRAM:  Objection to form.  Calls

8  for speculation.

9        THE WITNESS:  I can answer?

10        MR. INGRAM:  Yes, to the extent you can.

11    A.  Can you repeat the question?

12    Q.  Sure.  Do you recall testifying at the

13  Board of Revision that UMCH expressed an

14  interest in reducing the purchase price and

15  waiving the rezoning contingencies?

16    A.  I'm sorry, one more time.

17    Q.  Sure.

18    A.  Do I recall?

19    Q.  Do you recall testifying at the Board of

20  Revision that UMCH, the owner at the time,

21  expressed an interest in reducing the purchase

22  price and waiving the rezoning contingencies?

23    A.  I don't recall testifying to that.

24    Q.  Do you recall testifying about UMCH not

1   wanting to be involved in a prolonged rezoning

2   battle?

3       A.  I don't.

4       Q.  When you say the $800,000 reduction was

5   related to the time value of money, what do you

6   mean by that?

7       A.  That UMCH was looking to getting paid on

8   the ground and closing sooner than later.  They

9   were more interested in getting paid today than

10  waiting for the zoning process through

11  completion and getting paid thereafter.

12      Q.  And that's because the contract included

13  a contingency on the closing for a complete and

14  successful rezoning, right?

15          MR. INGRAM:  Objection.  Calls for

16  speculation.  Calls for legal conclusion and

17  objection to form.

18      A.  I don't recall.

19      Q.  As you were sitting at the Board of

20  Revision hearing, do you recall what steps still

21  needed to take place for Lifestyle to obtain a

22  rezoning of the property?

23          MR. INGRAM:  Objection.  Calls for legal

24  conclusion.

1      A.  At the time we still needed to file --

2  can you ask the question one more time?

3      Q.  Sure.  As you were sitting at the Board

4  of Revision hearing in October of 2020, what

5  still needed to happen for Lifestyle to obtain a

6  successful rezoning of the property?

7          MR. INGRAM:  Same objection.

8      A.  We needed to attend a certain number of

9  hearings at the planning commission to

10 eventually receive either a recommendation or

11 denial that would eventually lead to a city

12 council hearing as to the rezoning application.

13     Q.  Are you familiar with the referendum

14 process when it comes to rezonings?

15     A.  Yes.

16     Q.  And you would agree that a successful

17 rezoning would include a passage of that 30-day

18 referendum time such that the zoning would be

19 effective.  Is that fair?

20         MR. INGRAM:  Objection.  Calls for legal

21 conclusion.  Incomplete hypothetical.

22         You may answer to the extent you can.

23     A.  Yes.

24     Q.  At that time were you made aware or were

1    you aware of any citizen discussion or citizen

2    action related to our referendum process?

3            MR. INGRAM:  Objection to form.

4        A.  I don't recall.

5        Q.  At any time during your involvement with

6    the property at issue were you made aware of any

7    citizen group seeking to file a referendum if

8    there was a rezoning that was approved?

9            MR. INGRAM:  Objection.

10       A.  No.

11           MR. INGRAM:  Calls for speculation.

12   Incomplete hypothetical.

13       A.  No.

14       Q.  The school board attorney at the Board

15   of Revision hearing asked you whether Lifestyle

16   had been given any indication as to the

17   likelihood of the rezoning.  Do you recall that?

18       A.  I don't.

19       Q.  Do you recall testifying that you were

20   told that the city believes this will be a very

21   difficult rezoning application to get approved?

22           MR. INGRAM:  Objection to form.

23           And Mr. Ashrawi, if you have a

24   transcript of the testimony -- I mean, are we

1　going to go through this bit by bit as you're

2　summarizing?  I mean, is there something this

3　witness can refer to?

4　　　　MR. ASHRAWI:  Sure.  Well, the witness

5　testified that he listened to portions of the

6　recording so I'm asking him his recollection of

7　what he remembers.  If he doesn't remember,

8　that's fine.

9　　　A.  I don't recall.

10　　　Q.  Do you recall testifying that the

11　rezoning is not a sure thing?

12　　　A.  No.

13　　　Q.  You would agree, Mr. Brownlee, that you

14　were under oath during the Board of Revision

15　hearing?

16　　　A.  Yes.

17　　　Q.  And you would agree that everything you

18　testified at the Board of Revision hearing was

19　true and accurate to the best of your knowledge?

20　　　A.  Yes.

21　　　Q.  Is there any portion of the -- your

22　Board of Revision testimony that you listened to

23　that you disagreed with or you disagree with

24　now?

1          MR. INGRAM:  Objection to form.

2          You can answer to the extent you can.

3      A.  No.

4      Q.  What was the result of that Board of

5  Revision hearing, if you recall?

6      A.  Settled on a new value of the property.

7      Q.  Settled with the school board?

8      A.  Yes.  I'm giving you my memory because

9  we were represented by outside counsel.

10     Q.  Sure.  Do you recall what that number

11  was?

12     A.  I don't.

13                    -=0=-

14       (Deposition Exhibit 5 marked.)

15                    -=0=-

16  BY MR. ASHRAWI:

17     Q.  I'm going to hand you what we've marked

18  as Exhibit 5.  Please take a look through

19  Exhibit 5 and let me know if you've seen this

20  document before.

21          MR. INGRAM:  Counsel, I'll object to the

22  relevance of this document to this lawsuit and

23  any questions thereto.  Can I have a standing

24  objection to your questions on this document?

1          MR. ASHRAWI:  Yes.

2     A.  I don't recall if I've seen this

3  document before.  What I can tell you is I don't

4  remember reading it in detail.

5     Q.  This is the appraisal report that was

6  prepared for the property as part of the

7  Franklin County Board of Revision proceedings

8  that we were just talking about, right?

9     A.  That's what it appears to be.

10    Q.  Do you recall if you reviewed this in

11 advance of the Board of Revision hearing?

12    A.  I did not.

13    Q.  Just so I'm clear, you're saying you

14 affirmatively did not review it or you don't

15 remember?

16    A.  Sorry.  I don't recall.

17    Q.  And you didn't review in advance of this

18 deposition.  Is that right?

19    A.  Correct.

20    Q.  On page 2, middle of the page, last

21 sentence of the third paragraph says the subject

22 is in contract with Lifestyle Real Estate

23 Holdings, Ltd., a local developer.  Do you see

24 that?

 1      A.  Yes.

 2      Q.  And the next paragraph indicates that

 3  the subject will have to be rezoned and we have

 4  factored the unknowns of the rezoning process

 5  within our analysis and have valued the subject

 6  property accordingly.

 7          Did I read that correctly?

 8      A.  Yes.

 9      Q.  You would agree that the rezoning

10  process is not guaranteed, right?

11          MR. INGRAM:  Objection to form.  Calls

12  for speculation.  Calls for legal conclusion.

13          You may answer to the extent you can.

14      A.  Yes.

15      Q.  And it certainly wasn't guaranteed in

16  this case, right?

17          MR. INGRAM:  Same objections.

18      A.  What was the question?

19          MR. ASHRAWI:  I'm sorry, do you mind

20  reading that back, please.

21              (Record read as requested.)

22      A.  Correct.

23      Q.  On page 28 of the report the existing

24  zoning of the property is outlined.  Do you see

1  that?

2      A.  Yes.

3      Q.  So the property is zoned -- or at the

4  time was zoned S1 special purpose for a majority

5  of the property, and then portions of the

6  property were C2, community shopping center, and

7  C3, institutions and offices.  Is that accurate

8  to the best of your knowledge?

9      A.  I don't recall the then current zoning

10  of the property, but I agree that you've

11  accurately read what the report said.

12      Q.  Do you know what the current zoning of

13  the property is?

14      A.  I don't.

15      Q.  Do you know whether -- since the Board

16  of Revision hearing whether this property has

17  been rezoned at all?

18      A.  I don't believe that it has.

19                    -=0=-

20        (Deposition Exhibit 6 marked.)

21                    -=0=-

22  BY MR. ASHRAWI:

23      Q.  Hand you what we'll mark as Exhibit 6.

24  Take your time and look through this document.

1 I will represent to you that this is the staff

2 memorandum for the ordinance to rezone this

3 property that's dated -- it's for a council

4 meeting that took place on December 13th, 2021.

5 Take your time, look through it, and I'm going

6 to ask you whether you have seen this document

7 or any portions of this document before.

8          MR. INGRAM:  Counsel, I'll just note

9 it's 130-page exhibit.

10          MR. ASHRAWI:  Yes, it is quite large.

11     A.   In preparation for the deposition I

12 recall reviewing the minutes from the city

13 council meeting in December 13th, 2021.  The

14 document you've given me, which is the staff

15 memorandum for that meeting, I don't recall

16 seeing this.

17     Q.   Okay.  You also testified that you

18 reviewed the minutes from the MPC meeting, and I

19 will represent to you and ask you to confirm

20 those meeting minutes are included in this

21 document beginning on page 95 of 201.  Can you

22 turn to that page and let me know if these are

23 the same minutes that you reviewed from the

24 October 14th, 2021 meeting?

1          MR. INGRAM:  Counsel, I'll just note for

2    the record it says portion of the minutes of the

3    regular meeting you're referring to on the

4    document.

5          MR. ASHRAWI:  Thank you.  It does say

6    that on page 95 of 201.

7     A.  Yes.  This looks familiar to the

8    document that I reviewed prior to the

9    deposition.

10     Q.  Did you attend that October 14th, 2021

11    municipal planning commission meeting?

12     A.  Yes.

13     Q.  What was your role at the meeting?

14     A.  Attorney Tom Hart and I were the

15    representatives of the applicant for rezoning.

16     Q.  At the conclusion of that meeting there

17    was a vote and a recommendation to deny the

18    rezoning request.  Is that correct?

19     A.  That is correct.

20     Q.  Do you recall the reasons given for that

21    recommendation?

22     A.  No.

23     Q.  Do you recall whether the city or the

24    MPC or city staff had ever advised Lifestyle

1   that the residential density was too high?

2        MR. INGRAM:  Objection to form.

3        A.  Yes.

4        Q.  So density of the residential units was

5   an issue for the city and the MPC.  Is that

6   accurate?

7        MR. INGRAM:  Objection.  Calls for

8   speculation.

9        A.  Yes.

10       Q.  And if you turn to page 100 of 201 in

11  Exhibit 6, you'll notice a history related to

12  the site, and it indicates that in 2015 when

13  there was an informal proposal sent to the city

14  for review there were 571 total residential

15  units.  Do you see that?

16       MR. INGRAM:  Objection to form.

17  Misstates what the document says.

18       A.  I see where that says that on page 100,

19  yes.

20       Q.  Do you recall if that's accurate or not?

21       A.  I do not.

22       MR. INGRAM:  Same objection.

23       Q.  The September 9th, 2021 proposal by the

24  applicant, the one that was heard and ruled

1  upon, included 600 residential units.  Is that

2  accurate?

3        MR. INGRAM:  Objection to form.

4     A.  I don't recall.

5     Q.  Do you recall anything else about the

6  municipal planning commission meeting or

7  anything you recall from your review of the

8  minutes?

9        MR. INGRAM:  Objection to form.

10  Ambiguous.

11     A.  I distinctly remember some of the

12  statements that I made in that hearing that

13  appear on page 132 of 201.

14     Q.  What statements were those?

15     A.  Mr. Brownlee said they were presenting a

16  revised conceptual -- so under discussion, the

17  second -- third sentence:  Mr. Brownlee said

18  they were presenting a revised conceptual site

19  plan with the goal of gaining feedback on such

20  topics as the revised mix and location of uses,

21  the configuration of open space and open space

22  amenities, and the adjusted connectivity plan,

23  and neighborhood engagement elements.  This

24  concept plan filing -- with this concept plan

1  filing, they were not asking for a vote or

2  recommendation at this stage, but rather

3  requesting dialogue on the updated conceptual

4  land plan.

5      That -- I recall that specifically from

6  reviewing the minutes and at the hearing.

7    Q.  Why is it that you recall that

8  particular statement from everything that we've

9  talked about today?

10    A.  Because I was -- I was desperately

11  looking for the city to work with me and give me

12  feedback that would help advance the concept

13  plan towards rezoning.

14    Q.  On the top of page 133 it says,

15  Mr. Brownlee said with the apartment reduction

16  noted, he would like to say they continue to

17  have a strong belief that a residential presence

18  is needed at a site like this.

19      But you indicated you had not -- you

20  were not aware about how many apartment units

21  were suggested in the 2015 plan, right?

22      MR. INGRAM:  Objection to form.

23  Misstates this witness' testimony.

24      THE WITNESS:  I can answer?

1          MR. INGRAM:  Yes, to the extent you can.

2      A.  That's correct.  But when we prepared

3  our zoning application that was filed in 2020,

4  we were complying with the land plan.  We

5  weren't cross-referencing the 2015 plan.

6      Q.  So what you filed in October of 2020 was

7  independent and didn't even consider what was

8  proposed in 2015?

9      A.  That's my recollection.

10      Q.  And so your statement here about the

11  apartment reduction was as it related to the

12  October 2020 submission?

13      A.  Correct.

14      Q.  Is there anything else you recall

15  specifically about that municipal planning

16  commission meeting as it related to the

17  reasoning that there was a recommendation for

18  denial?

19          MR. INGRAM:  Objection.  Asked and

20  answered.

21      A.  No.

22      Q.  You didn't attend the December 13th city

23  council meeting, correct?

24      A.  Of 2021?

1    Q.  Yes.

2    A.  I was there.

3    Q.  You were at the December 13th, 2021

4  meeting?

5    A.  Remotely.

6    Q.  Did you speak at all at that meeting?

7    A.  Yes.

8    Q.  What do you recall speaking about at the

9  meeting?

10    A.  Do you happen to have a copy of the

11  minutes?

12    Q.  I do not.  And this is based on your

13  firsthand recollections.  I certainly don't want

14  you to guess, and we have minutes for things

15  like that.  I was just referring...

16    A.  The thing that I remember is

17  expressing -- in my memory, expressing

18  disappointment that the planning commission

19  rejected our application as opposed to working

20  with us, and that I was asking the city council

21  to -- if they weren't prepared to approve the

22  zoning application, to please refer it back to

23  planning commission with some direction to the

24  planning commission members so that we could

1    continue to collaborate -- so that we could

2    collaborate and make some progress on our

3    application.  I believe that was in my opening

4    statement of the city council hearing.

5        Q.  Lifestyle can submit another application

6    as we sit here today, right?

7        A.  I assume so.

8        Q.  So the original submission to the city

9    of Worthington was in October of 2020, correct?

10       A.  Correct.

11       Q.  And you were involved in that process.

12           MR. INGRAM:  Objection to form.

13       Q.  Right?

14       A.  Yes.

15       Q.  And Lifestyle received feedback from the

16   municipal planning commission, city staff,

17   residents, and the city council on its

18   October 2020 submission.  Is that accurate?

19           MR. INGRAM:  Objection.  Assumes facts

20   not in evidence.  Calls for speculation.

21           You can answer.

22       A.  Yes.

23       Q.  That's all accurate?

24       A.  Yes.

1      Q.  It took about 11 months to submit a

2   revised rezoning application, which was

3   submitted in September of 2021, right?

4         MR. INGRAM:  Objection to form.

5      A.  It didn't take 11 months.  Well, how are

6   you measuring that?

7      Q.  Let me back up.  There was a revised

8   rezoning application that was submitted in

9   September of 2021, right?

10     A.  There was a revised concept plan that

11  was submitted in September of 2021, correct.

12     Q.  So that's 11 months after the original

13  submission, right?

14     A.  Yes.

15     Q.  What took place in those 11 months with

16  respect to the revisions of the concept plan?

17        MR. INGRAM:  Objection to form.

18     A.  The three most significant developments

19  in that time frame as I recall was, first, we

20  had our initial hearing at the planning

21  commission.  I don't recall when that was, but

22  call it first quarter 2021.

23     Q.  And just so I'm clear, you're

24  referring -- that was the original hearing for

1  the 2020 application?

2      A.  Correct.

3          MR. INGRAM:  Counsel, if you can permit

4  the witness to complete his answers.

5      Q.  Yes.  Forgive me.  I just wanted to make

6  sure I was clear.

7      A.  That was important development.  Number

8  two, I had some meetings with city

9  representatives -- actually multiple meetings

10  with city representatives in 2021 regarding our

11  zoning application, trying to build consensus,

12  unity, path forward.  And once it was made clear

13  to me by the city that they would not work with

14  us outside of the context of public hearings, we

15  spent the better part of that summer trying to

16  guess on how we could modify our concept plan to

17  appease various factions of the city, whether it

18  was planning commission or city council.

19          So while you say it was 11 months,

20  really it was just that summer after we realized

21  after the first planning commission hearing and

22  our private meetings with city representatives

23  that we would have to rework the concept plan on

24  our own.

1    Q.  So you mentioned you had multiple

2  private meetings with city representatives, and

3  then you also mentioned that the city indicated

4  it would not work outside of the public hearing

5  process.  So I want to understand the timing of

6  those two things.  When were your multiple

7  meetings with city representatives?

8    A.  When I say multiple meetings, I'm really

9  just referring to two.  I remember meeting one

10  on one with Scott Myers who was at the time a

11  member of city council and also the city council

12  rep that sat on planning commission.  He and I

13  met for coffee.  I don't recall the date.  I'm

14  confident it was the first half of 2021.

15    Q.  This was after your MPC -- what you

16  refer to as the original hearing, right?

17    A.  That's my recollection, but then in late

18  March, early April Tom Hart and I met with call

19  it a half dozen, 10 different city

20  representatives -- city attorney, Scott Myer,

21  city manager, I think, city attorney, head of

22  planning, I think -- at which the message was

23  then delivered that the city had neither the

24  political capital nor the political will to work

1  with us outside of public hearings which was

2  shocking to me.

3     Q.  Do you know, did you meet with any city

4  officials after that meeting?

5     A.  I believe that Tom Hart and I, in 2021,

6  met with the school board or school board

7  representatives in a continuing effort to

8  collect stakeholder feedback, and I recall once

9  meeting with Tom Hart and the city planner, but

10  I don't recall the substance of that latter

11  meeting.

12     Q.  When you refer to the city planner, are

13  you referring to Lee Brown?

14     A.  Yes.

15     Q.  And do you recall who from the school

16  board?

17     A.  I don't.  I don't.

18     Q.  Do you recall what the school board

19  representative's feedback was as it related to

20  the development of this property?

21     A.  I don't.

22     Q.  You don't recall whether it was positive

23  or negative in terms of what you all had

24  previously proposed?

1        MR. INGRAM:  Objection.  Asked and

2  answered.

3        A.  I believe it was positive in that I

4  think the school board understood that the

5  potential revenue recognition from this property

6  over years would be a benefit to the school

7  board.

8        Q.  You also mentioned the meeting Tom Hart

9  and you had with Lee Brown.  Subsequent to the

10  delivery of the message that you referred to

11  earlier, any other meetings that you had that

12  you can recall?

13        A.  No.

14        Q.  Do you know whether Tom Hart continued

15  to meet or speak with Lee Brown or other city

16  representatives?

17        A.  He did.

18        Q.  Did you or Tom or anyone from Lifestyle

19  during this time meet with other stakeholders

20  beyond the city and the school board?

21        MR. INGRAM:  Objection.  Calls for

22  speculation.

23        You may answer to the extent you know.

24        A.  Yes.

1      Q.  Who did you meet with beyond the city

2   and the school board?

3      A.  Personally, the only other meeting I can

4   recall -- I don't remember his name, but he

5   represented a group of business people who were

6   very interested in what development along High

7   Street looked like.  I recall that they were --

8   I want to say it was the Worthington mile group.

9   That he was very favorable to our concept plan.

10   I attended that meeting personally.

11      Q.  Who else from Lifestyle's team was

12   there?

13      A.  I believe Tom Hart.  It may have been

14   just the two of us.

15      Q.  Any other meeting that you can recall

16   that you personally attended?

17      A.  No.

18      Q.  And my question may have been a little

19   bit too specific so let me ask it a little bit

20   differently.  Are there any other meetings

21   generally whether by phone or email

22   communication with city representatives or other

23   stakeholders related to the development of this

24   property after the early April meeting you

1    described earlier?

2         MR. INGRAM:  Objection to form.

3    A.  Not that I recall.  And to be clear, I

4    don't remember the sequence of all these

5    meetings.  I'm confident they happened after we

6    filed the rezoning application, but I

7    couldn't -- I can't help you with the sequence.

8    Q.  Sure.

9    A.  And my answer speaks only to me meeting,

10   not Tom Hart.

11   Q.  Of course.

12        Would there have been anyone else from

13   the Lifestyle's team other than you and Tom that

14   would have been involved in meetings or outreach

15   or correspondence with stakeholders?

16        MR. INGRAM:  Objection to form.

17   A.  Only one possibly.  Joe Ballard was a --

18   was on the development team at Lifestyle at the

19   time and was helping me with this project.

20   Q.  Could you spell his last name for

21   purposes of the record if you know it?

22   A.  B-A-L-L-A-R-D.

23   Q.  And he was part of the development team

24   at Lifestyle?

1    A.  Correct.

2    Q.  Is he still with Lifestyle?

3    A.  No.

4    Q.  Do you know where he is?

5    A.  He moved out of state.  I believe south,

6  but it's been years.

7    Q.  Good for him.

8        If you turn back to Exhibit 6, on the

9  very first page below the executive summary

10  there are recommendations.  Do you see that?

11    A.  Yes.

12    Q.  And as it relates to the MPC's

13  recommending denial, the document, Exhibit 6,

14  indicates that the commission discussed the need

15  to significantly reduce density, height of

16  buildings, increase contiguous usable open space

17  and vehicular connections.  Do you recall those

18  discussions about those items specifically when

19  you attended the MPC?

20        MR. INGRAM:  Objection.  Asked and

21  answered.

22    A.  Not specifically.

23    Q.  If you go down to the next paragraph

24  which relates to the staff's recommendation, do

 1  you see that?

 2      A.  Yes.

 3      Q.  It talks about the proposal not meeting

 4  the recommendations found in the comprehensive

 5  plan and 2005 strategic update for the UMCH

 6  focus area, the bicycle and pedestrian plan from

 7  2019, and the park master plan of 2017.  Do you

 8  see that?

 9      A.  I see that.

10      Q.  Do you recall having those discussions

11  or hearing those reasonings from staff at any

12  point?

13          MR. INGRAM:  Objection to form.

14      A.  All I recall is the staff report that

15  was issued.

16      Q.  You don't recall whether these items

17  were included in the staff report?

18      A.  I don't.

19          MR. INGRAM:  Objection.

20          THE WITNESS:  Sorry.

21      Q.  Do you know whether the parks master

22  plan has been changed or amended since the

23  September 2021 proposal?

24      A.  I don't, no.

1      Q.  Do you know whether the bicycle and

2   pedestrian plan has been amended or changed

3   since the Lifestyle's September 2021 proposal?

4      A.  I don't know.

5         MR. ASHRAWI:  Quick five-minute break?

6         MR. INGRAM:  Sure.

7                (Recess taken.)

8   BY MR. ASHRAWI:

9      Q.  Mr. Brownlee, was it Lifestyle's intent

10   to file an amended concept plan after the

11   September one that was filed?

12         MR. INGRAM:  Objection.  Calls for

13   speculation.  This witness is here to testify as

14   to his own personal knowledge and has not been

15   designated to testify on behalf of Lifestyle.

16         You may answer to the extent you can.

17      Q.  Just to be clear, I'm asking from your

18   personal knowledge.

19      A.  Can you rephrase the question?

20      Q.  Yes.  You testified earlier that you had

21   asked both the MPC and the city council to

22   provide feedback such that Lifestyle could

23   resubmit an amended concept plan.  Is that

24   accurate?

 1          MR. INGRAM:  Objection.  Misstates this

 2     witness' prior testimony.

 3          A.  Yes.

 4          Q.  So was it Lifestyle's intent to the best

 5     of your knowledge that it would file something

 6     new after receiving feedback at the municipal

 7     planning commission hearing and the city council

 8     hearing?

 9          MR. INGRAM:  Objection to form.

10          A.  Yes.

11          Q.  Why hasn't, the best of your personal

12     knowledge, Lifestyle filed anything new since

13     the September 2021 application?

14          MR. INGRAM:  Objection.  Calls for

15     speculation, and I instruct you not to answer

16     anything that would disclose any attorney-client

17     communications.

18          A.  I believe we haven't filed anything

19     since the city -- since the December 2021 city

20     council meeting because it was clear to us that

21     the city never intended to work with us towards

22     anything that would pass.

23          Q.  But you agree that you are permitted to

24     file something today, right?

 1          MR. INGRAM:  Objection.  Calls for legal

 2   conclusion.  Calls for speculation.  Incomplete

 3   hypothetical.

 4       A.  I assume so, yes.

 5       Q.  You mentioned earlier that the municipal

 6   planning commission at the October 2021 meeting

 7   had recommended denial.  At any point in time

 8   did either staff or the municipal planning

 9   commission ever recommend approval of

10   Lifestyle's proposed rezoning application?

11          MR. INGRAM:  Objection to form.

12       A.  Not that I recall.

13       Q.  At any point in time in your discussions

14   with Lee Brown specifically, did he ever

15   indicate that he believed either the MPC or the

16   council would approve Lifestyle's rezoning

17   application?

18          MR. INGRAM:  Objection to form.

19       A.  I don't recall.

20       Q.  When Lifestyle, in 2015, was first

21   considering first engaging with this landowner,

22   was it aware that multiple other residential

23   commercial developers, healthcare provider, and

24   a grocery chain had previously sought to acquire

1   and develop the property?

2         MR. INGRAM:  Objection to form.  And

3   again, this witness is here on his own personal

4   knowledge, not for the knowledge of the company.

5         You can answer to the extent you can.

6      A.  I knew generally that we weren't the

7   first to try to redevelop the ground, but I

8   didn't know the particulars.

9      Q.  How did you become aware of that

10  generally?

11     A.  I don't recall.

12     Q.  Knowing that there were others before

13  Lifestyle that attempted to develop the

14  property, that didn't deter Lifestyle from

15  pursuing the development?

16        MR. INGRAM:  Objection.  Again, Counsel,

17  this witness is here to testify on his own

18  personal knowledge, not that on behalf of the

19  company.

20        You can answer to the extent you can.

21     A.  We had the benefit of a city

22  comprehensive plan that we believe the city

23  spent a lot of time and money producing, and we

24  were confident we could produce a development

1    that was consistent with that.  So we weren't

2    concerned about what had happened in the past.

3        Q.  And I'm going to preface the next series

4    of questions with I'm only asking you in your

5    personal knowledge and recollection.

6           Do you know how much money Lifestyle has

7    spent to date in its rezoning efforts for this

8    property?

9        A.  No.

10       Q.  You mentioned I believe early on that

11   you had reviewed an ordinance that was adopted

12   by the city after the rezoning was rejected.  Is

13   my recollection of your testimony correct?

14       A.  Briefly reviewed that ordinance,

15   correct.

16                       -=0=-

17          (Deposition Exhibit 7 marked.)

18                       -=0=-

19   BY MR. ASHRAWI:

20       Q.  I'm going to hand you what we'll mark as

21   Exhibit 7.  Exhibit 7 before you, Mr. Brownlee,

22   is titled resolution number 04-22.  My first

23   question is have you seen this document before?

24       A.  I believe so.

1    Q.  Is this the document that you referred

2  to as the ordinance that was adopted after the

3  rejection of the rezoning?

4    A.  I believe it is.

5    Q.  Other than this resolution number 04-22,

6  you're not aware of any other formal action by

7  way of legislation the city has taken with

8  respect to the property since its rejection of

9  the rezoning.  Is that right?

10       MR. INGRAM:  Objection to form.  Calls

11  for speculation.  Compound.

12    A.  Other than the attempted what I'm going

13  to call moratorium that was tried to pass at

14  about the same hearing or about the same time

15  that I don't believe did pass, I'm not aware of

16  any other legislation.

17    Q.  You're referring to legislation that was

18  proposed at some point that would have

19  established a moratorium on the submission of

20  development applications.  Is that what you're

21  referring to?

22    A.  That's my recollection.

23    Q.  And you indicated that legislation did

24  not pass, correct?

1      A.  That's my understanding.

2      Q.  And you're aware that in order to pass

3  legislation there needs to be a majority vote of

4  the seven members of council, right?

5      A.  I don't know how the city of Worthington

6  works.

7      Q.  This resolution 04-22, which is labeled

8  as Exhibit 7, it didn't change the zoning

9  classifications on the property, right?

10         MR. INGRAM:  Objection.  Calls for legal

11  conclusion.  Document speaks for itself.

12      A.  I haven't read it word for word, but I

13  believe it speaks for itself.

14      Q.  And is what I have in front of you as

15  Exhibit 7 true and accurate to the best of your

16  knowledge and consistent with what you reviewed

17  in anticipation of this deposition?

18         MR. INGRAM:  Objection to form.

19      A.  I have no idea if this is true and

20  accurate, but this generally looks like the

21  resolution that I reviewed prior to my

22  deposition.

23      Q.  To your knowledge, has the -- since the

24  denial of Lifestyle's September 2021 rezoning

1 application, to your knowledge has the city

2 council ever rezoned the subject property to be

3 a park exclusively?

4      MR. INGRAM:  Objection to form.

5     A.  Not to --

6      MR. INGRAM:  Assumes facts not in

7 evidence.

8     A.  Not to my knowledge.

9     Q.  To your knowledge, has the city ever

10 voted on a measure that would permit the city to

11 purchase the property from Lifestyle either

12 voluntarily or involuntarily?

13      MR. INGRAM:  Objection to form.

14     A.  I don't know.

15     Q.  To your knowledge, has the city ever

16 appropriated funds to allow them to purchase or

17 otherwise acquire the property?

18      MR. INGRAM:  Same objection.

19     A.  I don't know.

20     Q.  Are you aware of how many prior rezoning

21 applications for this property have been filed

22 with the city of Worthington?

23     A.  No.

24      MR. ASHRAWI:  I have no more questions

1    for you, Mr. Brownlee, at this time.  Thank you

2    for your time this morning.

3            THE WITNESS:  Yep.  Thank you.

4            MR. INGRAM:  We'll read.

5            COURT REPORTER:  You want this

6    transcribed?

7            MR. ASHRAWI:  Yes, please.

8            COURT REPORTER:  Two weeks okay?

9            MR. ASHRAWI:  Yes.

10           COURT REPORTER:  Copy?

11           MR. INGRAM:  Please.

12               (Signature not waived.)

13                    -=O=-

14           Thereupon, the testimony of November

15    13, 2023, was concluded at 11:34 a.m.

16                    -=O=-

17

18

19

20

21

22

23

24

1                    CERTIFICATE

2    STATE OF OHIO      :
                          SS:
3    COUNTY OF FRANKLIN :

4              I, Julia Lamb, RPR, CRR, a
     stenographic court reporter and notary public in
5    and for the State of Ohio, duly commissioned and
     qualified, do hereby certify that the
6    within-named BO BROWNLEE was first duly sworn to
     testify to the truth, the whole truth, and
7    nothing but the truth in the cause aforesaid;
     that the testimony then given was taken down by
8    me stenographically in the presence of said
     witness, afterwards transcribed; that the
9    foregoing is a true and correct transcript of
     the testimony; that this deposition was taken at
10   the time and place in the foregoing caption
     specified.
11
               I do further certify that I am not a
12   relative, employee or attorney of any of the
     parties hereto; that I am not a relative or
13   employee of any attorney or counsel employed by
     the parties hereto; that I am not financially
14   interested in the action; and further, I am not,
     nor is the court reporting firm with which I am
15   affiliated, under contract as defined in Civil
     Rule 28(D).
16
               In witness whereof, I have hereunto
17   set my hand at Columbus, Ohio, on this 27th day
     of November, 2023.
18

19

20            *Julia Lamb*
21
               Julia Lamb, RPR, CRR
22             Notary Public, State of Ohio

23   My commission expires:  10-10-27

24

**Exhibits**

**Exhibit 1** 22:4,8
**Exhibit 2** 24:2,6 31:8
**Exhibit 3** 35:17,21 37:8 41:22 42:7 43:1
**Exhibit 4** 40:4,8
**Exhibit 5** 49:14,18,19
**Exhibit 6** 52:20,23 55:11 68:8,13
**Exhibit 7** 74:17,21 76:8,15

**$**

**$200,000** 42:10,20 43:11,19
**$5.2** 42:24 43:4,14
**$6** 43:20
**$800,000** 43:17,21 45:4

**-**

**-=0=-** 22:3,5 24:1,3 35:16,18 40:3,5 49:13, 15 52:19,21 74:16,18
**-=O=-** 78:13,16

**0**

**04-22** 74:22 75:5 76:7

**1**

**1** 22:4,8
**10** 38:23 39:15 63:19
**100** 55:10,18
**11** 38:23 39:12 61:1,5, 12,15 62:19
**1145.05** 22:9
**11:34** 78:15
**13** 78:15

**130-page** 53:9
**132** 56:13
**133** 57:14
**13th** 53:4,13 58:22 59:3
**14th** 53:24 54:10
**17** 12:14
**18** 12:14
**180** 21:13
**1989** 13:8
**1994** 13:9

**2**

**2** 24:2,6 31:8 50:20
**2.A** 43:10
**2005** 12:12,22,23 13:3, 13 69:5
**201** 53:21 54:6 55:10 56:13
**2015** 17:6,10 22:14,21 23:20 24:19,22 26:18, 23 27:9,18,22 28:4,8 29:1 31:23 32:1,5 55:12 57:21 58:5,8 72:20
**2017** 36:3 37:20 38:3 39:14 41:20 69:7
**2019** 5:24 69:7
**2020** 5:24 40:19 41:12 46:4 58:3,6,12 60:9,18 62:1
**2021** 5:24 9:4 21:24 37:6,13 53:4,13,24 54:10 55:23 58:24 59:3 61:3,9,11,22 62:10 63:14 64:5 69:23 70:3 71:13,19 72:6 76:24
**2022** 12:4,22
**2023** 78:15
**20th** 36:3
**26** 24:18 26:23

**28** 51:23

**3**

**3** 35:17,21 37:8 41:22 42:7 43:1
**3.2** 26:15
**30-day** 46:17
**30th** 11:5 39:14

**4**

**4** 26:14 40:4,8

**5**

**5** 31:9 49:14,18,19
**5.2** 31:9
**571** 55:14

**6**

**6** 32:12 52:20,23 55:11 68:8,13
**6.2** 32:12
**6.5** 34:3
**600** 56:1

**7**

**7** 17:17 34:2 74:17,21 76:8,15

**8**

**8** 34:22,23
**8,000** 17:17
**89** 13:9

**9**

**9** 34:23
**9.1** 34:24
**94** 13:3

**95** 53:21 54:6
**9th** 55:23

**A**

**a.m.** 78:15
**acceptable** 7:8 27:10
**accurate** 18:21 22:15 25:4 27:18 29:4 33:22 34:12 36:20 38:3 40:20 48:19 52:7 55:6, 20 56:2 60:18,23 70:24 76:15,20
**accurately** 52:11
**acknowledged** 34:4
**acknowledges** 34:17
**acquire** 72:24 77:17
**acquiring** 26:4
**acquisition** 24:23 29:12 39:17
**acquisitions** 14:9
**acre** 42:11,21 43:19
**acres** 43:12
**action** 47:2 75:6
**actual** 29:2
**adjusted** 56:22
**adopted** 74:11 75:2
**advance** 26:3 50:11, 17 57:12
**advice** 14:11,21
**advised** 54:24
**affairs** 10:18
**affiliate** 6:3,10,11 10:2,6 11:19
**affiliates** 9:21 10:7, 20,21,22
**affiliation** 18:23
**affirmatively** 50:14
**agree** 17:2 19:13 24:17,21 46:16 48:13, 17 51:9 52:10 71:23

**agreed** 43:5,9,22

**agreement** 24:13,18 25:5,9,17 26:10,14 31:8

**agreements** 26:3

**agrees** 34:3

**Albany** 6:14

**Ambiguous** 56:10

**amended** 69:22 70:2, 10,23

**amenities** 56:22

**analysis** 51:5

**and/or** 20:24

**annual** 17:11

**answering** 9:13

**answers** 62:4

**anticipation** 76:17

**apartment** 17:18 18:1 57:15,20 58:11

**appears** 31:12 50:9

**appease** 62:17

**applicable** 39:16

**applicant** 54:15 55:24

**application** 8:12 9:2 19:24 21:5,9 22:14 29:2 46:12 47:21 58:3 59:19,22 60:3,5 61:2,8 62:1,11 67:6 71:13 72:10,17 77:1

**applications** 75:20 77:21

**appraisal** 8:16 50:5

**approach** 37:9,10

**appropriated** 77:16

**approval** 19:23 39:16 72:9

**approvals** 32:13

**approve** 59:21 72:16

**approved** 34:5,6,19 47:8,21

**April** 11:5 36:3 63:18

66:24

**area** 32:16,20 69:6

**Article** 34:23 38:23

**arts** 13:20,22

**Ashrawi** 5:5 22:6 24:4 35:11,19 40:6 47:23 48:4 49:16 50:1 51:19 52:22 53:10 54:5 70:5, 8 74:19 77:24 78:7,9

**aspect** 15:8

**association** 6:9

**assume** 6:5 7:3 9:14 60:7 72:4

**Assumes** 41:23 43:6 60:19 77:6

**attempted** 73:13 75:12

**attend** 46:8 54:10 58:22

**attended** 66:10,16 68:19

**attorney** 9:14 21:4 47:14 54:14 63:20,21

**attorney-client** 71:16

**authority** 34:20

**avoid** 6:24

**aware** 17:7 21:8 27:22 28:8,13 46:24 47:1,6 57:20 72:22 73:9 75:6, 15 76:2 77:20

---

**B**

**B-A-L-L-A-R-D** 67:22

**B-O** 5:14

**back** 11:9 29:11 31:7 32:5 43:1 51:20 59:22 61:7 68:8

**Ballard** 67:17

**bars** 18:17

**based** 29:20 33:10 34:13 36:19 59:12

**basis** 17:11

**battle** 44:6 45:2

**beginning** 30:17 53:21

**behalf** 25:22 40:17 70:15 73:18

**belief** 57:17

**believed** 72:15

**believes** 47:20

**benefit** 65:6 73:21

**bicycle** 69:6 70:1

**bit** 48:1 66:19

**blended** 17:9

**Bo** 5:1,12,13

**board** 41:9,12,15,16 42:5 44:13,19 45:19 46:3 47:14 48:14,18, 22 49:4,7 50:7,11 52:15 64:6,16,18 65:4, 7,20 66:2

**BOR** 42:9,15 43:18

**break** 7:5,7 35:13 70:5

**Brent** 23:8,14 28:9

**Bricker** 12:24 13:1,13

**bridge** 33:4

**Briefly** 74:14

**brought** 11:9

**Brown** 64:13 65:9,15 72:14

**Brownlee** 5:1,6,8 22:8 24:7 35:20 40:8 48:13 56:15,17 57:15 70:9 74:21 78:1

**budget** 31:10,13,14, 20,22 32:2,7

**build** 15:19,21 62:11

**Builders** 11:18

**buildings** 68:16

**business** 10:14 39:15 66:5

---

**C**

**C2** 52:6

**C3** 52:7

**call** 5:13 12:19 14:2 61:22 63:18 75:13

**called** 11:18 18:20,21 33:12

**calls** 19:16 21:14 26:6 27:1 29:8,16 30:19 31:18 33:15,23 34:8 37:2 38:10,17 39:8,24 41:2 44:7 45:15,16,23 46:20 47:11 51:11,12 55:7 60:20 65:21 70:12 71:14 72:1,2 75:10 76:10

**Campus** 7:13

**capacity** 6:2 14:17 23:19 25:23

**capital** 63:24

**career** 13:10

**Carolina** 16:9,10

**case** 7:24 20:16 22:2 30:11,24 34:1 37:18 42:5 51:16

**caveat** 7:6

**center** 52:6

**centers** 7:17

**certified** 5:2

**chain** 18:20 72:24

**change** 76:8

**changed** 10:16 69:22 70:2

**chart** 10:15

**Chase** 23:13,16,17 28:9

**chief** 11:12 12:1,6,9 15:16 19:2

**Children's** 7:19 24:14 36:4

**chose** 9:8,10

**Church** 24:15 42:3

**citizen** 47:1,7

**citizens** 33:1

**city** 7:13 8:9,11 20:17, 23 21:11,24 22:9,23 27:18,23 28:11,21,22 29:3,7 31:1,2 32:15 33:3,4,7,21 37:22 38:2 39:6 46:11 47:20 53:12 54:23,24 55:5, 13 57:11 58:22 59:20 60:4,8,16,17 62:8,10, 13,17,18,22 63:2,3,7, 11,19,20,21,23 64:3,9, 12 65:15,20 66:1,22 70:21 71:7,19,21 73:21,22 74:12 75:7 76:5 77:1,9,10,15,22

**city's** 8:23

**classifications** 76:9

**clear** 50:13 61:23 62:6,12 67:3 70:17 71:20

**closed** 36:23 37:13,14 39:19

**closing** 37:5,9,10 38:6,16,22 39:5,12,13 45:8,13

**closings** 38:22

**code** 22:10

**coffee** 63:13

**collaborate** 60:1,2

**collect** 64:8

**Colorado** 16:10

**commence** 16:4

**comment** 33:13

**commercial** 17:23 18:5,8 72:23

**commission** 8:7 9:4 21:11 46:9 54:11 56:6 58:16 59:18,23,24 60:16 61:21 62:18,21 63:12 68:14 71:7 72:6, 9

**commonly** 7:18

**communication** 66:22

**communications** 71:17

**communities** 7:12 9:20 10:3,9 11:15,20, 23 15:21 17:17 20:1

**community** 30:17 52:6

**company** 10:5,13 11:19 14:12 73:4,19

**compared** 18:1

**compensation** 34:24

**complaint** 8:13 40:15, 23 41:8

**complete** 45:13 62:4

**completed** 8:16 17:6 24:8

**completion** 45:11

**complicated** 11:13

**complying** 58:4

**component** 18:5,8

**Compound** 75:11

**comprehensive** 8:21,22,24 69:4 73:22

**concept** 9:1,3 28:11, 19 56:24 57:12 61:10, 16 62:16,23 66:9 70:10,23

**conceptual** 56:16,18 57:3

**concerned** 33:1 74:2

**concerns** 33:5

**concluded** 6:16 78:15

**conclusion** 27:1 31:19 37:3 38:11 39:9 40:1 45:16,24 46:21 51:12 54:16 72:2 76:11

**condition** 39:11

**Conference** 24:15 36:4

**confident** 63:14 67:5

73:24

**configuration** 56:21

**confirm** 53:19

**Congratulations** 11:2

**connections** 68:17

**connectivity** 56:22

**consensus** 62:11

**consistent** 74:1 76:16

**construction** 16:4,5 17:13

**contemplated** 37:11

**context** 62:14

**contiguous** 68:16

**contingencies** 44:15, 22

**contingency** 38:15, 20 39:22,23 43:24 45:13

**contingent** 38:6 39:6 42:15

**continue** 57:16 60:1

**continued** 65:14

**continuing** 64:7

**contract** 15:23 36:2,8, 21,24 37:7,20 38:5,21 39:5 41:21 42:2,4,6 45:12 50:22

**contracts** 23:24 27:13 38:14

**Cooperation** 26:12

**copy** 25:4 36:20 59:10 78:10

**corporate** 10:7,18 11:14 16:19

**correct** 5:15 6:7 21:18 23:11 27:3,7 30:8 33:9 36:17,18 39:20,21 40:2,14,17,18 41:9,10 43:15 50:19 51:22 54:18,19 58:2,13,23 60:9,10 61:11 62:2 68:1 74:13,15 75:24

**correctly** 51:7

**correspondence** 67:15

**costs** 35:3,7

**council** 8:9,11 21:11, 24 46:12 53:3,13 58:23 59:20 60:4,17 62:18 63:11 70:21 71:7,20 72:16 76:4 77:2

**counsel** 12:10,16,19, 21 13:24 14:3,7,15,18 15:3,9 20:14 30:23 49:9,21 53:8 54:1 62:3 73:16

**counted** 18:6

**County** 41:9 50:7

**couple** 32:11

**court** 6:20 78:5,8,10

**coworking** 18:18

**creation** 32:7

**CROSS-EXAMINATION** 5:4

**cross-referencing** 58:5

**current** 10:24 42:2 52:9,12

**D**

**date** 24:18 39:14 41:14 63:13 74:7

**dated** 36:2 53:3

**dates** 12:13

**day** 11:5 39:15

**days** 21:13 39:15

**December** 53:4,13 58:22 59:3 71:19

**degree** 13:16

**degrees** 17:1 19:6

**delivered** 63:23

**deliveries** 38:22

**delivery** 65:10

**denial** 19:23 46:11 58:18 68:13 72:7 76:24

**Denison** 13:18,19

**density** 55:1,4 68:15

**deny** 54:17

**depending** 15:11,12 19:6 33:17

**deposed** 5:17 6:1,18 10:2

**deposes** 5:3

**deposition** 6:5 8:5 9:21 22:4 24:2 35:17 36:17 40:4 41:18,22 49:14 50:18 52:20 53:11 54:9 74:17 76:17,22

**describe** 15:8,15,18

**describes** 37:8

**designated** 25:22 70:15

**desperately** 57:10

**detail** 50:4

**deter** 73:14

**determining** 29:21,22

**develop** 16:12 30:18 31:21 73:1,13

**developable** 42:11, 21 43:11,19

**developed** 15:24 17:19

**developer** 17:3 31:13 32:14 34:17,24 50:23

**developers** 72:23

**developing** 32:2 37:22 38:2

**development** 6:14 11:12 12:1,6,9 14:19, 22 15:4,13,16,19,21 16:2,12 17:5 18:12 19:2 20:8 23:6,9 24:13,23 25:4,8,17 26:3,5,10,13 27:10 29:13 31:7 32:3,5,17, 20 33:2,14,18 34:6

35:7 38:8 39:7 62:7 64:20 66:6,23 67:18, 23 73:15,24 75:20

**developments** 14:14 16:11,21,23 17:12 18:4,7,9,14 30:14 33:6,21 61:18

**dialogue** 57:3

**differences** 19:14

**differently** 66:20

**difficult** 47:21

**direct** 38:21

**direction** 59:23

**disagree** 48:23

**disagreed** 48:23

**disappointment** 59:18

**disclose** 71:16

**discussed** 37:11 68:14

**discusses** 32:13

**discussion** 33:13 47:1 56:16

**discussions** 9:16 37:21 38:2 68:18 69:10 72:13

**dispositions** 14:10

**dispute** 6:9

**distinctly** 56:11

**document** 8:19 24:7, 9,10,11 26:1 34:9,21 35:22 36:13 38:23 39:9 40:10,13,15 41:4 49:20,22,24 50:3 52:24 53:6,7,14,21 54:4,8 55:17 68:13 74:23 75:1 76:11

**documentation** 23:24

**documents** 9:7,8,10 36:16

**dozen** 63:19

**dozens** 10:13,21

**drafting** 25:8 27:13 36:13

**duly** 5:2

**duties** 14:7

**E**

**earlier** 6:11 10:1 65:11 67:1 70:20 72:5

**early** 63:18 66:24 74:10

**easily** 10:12

**Eckler** 12:24

**effective** 24:18 46:19

**Effectively** 12:3

**effort** 64:7

**efforts** 74:7

**eight-month** 12:20

**elements** 28:21 56:23

**Eleven** 13:2

**eligible** 35:1

**email** 66:21

**employee** 11:22 20:8 23:5

**employees** 14:12

**employer** 11:14

**engage** 30:15 31:1

**engagement** 56:23

**engaging** 72:21

**engineering** 15:5

**entail** 25:18

**entailed** 22:19

**enter** 26:2 38:13

**entered** 37:19

**entire** 37:15

**entities** 10:14

**entitlement** 19:3,9 20:11,18 21:1 35:3

**entitlements** 19:15

**entity** 9:20 10:4 11:15, 17

**equaled** 43:19

**escapes** 23:18

**established** 75:19

**estate** 15:23 16:19,21, 22 23:17 33:2,6,21 36:2,5,8 50:22

**eventually** 36:23 46:10,11

**evidence** 41:24 43:7 60:20 77:7

**exception** 12:21

**exclusively** 77:3

**excuse** 10:8 16:21 22:12

**executed** 38:5

**executive** 32:8 68:9

**executives** 14:11,21

**exhibit** 22:4,8 24:2,6 31:8 35:17,21 37:8 40:4,8 41:22 42:7 43:1 49:14,18,19 52:20,23 53:9 55:11 68:8,13 74:17,21 76:8,15

**existing** 51:23

**experienced** 17:3

**expert** 8:15

**experts** 20:13 30:23

**express** 33:4

**expressed** 44:13,21

**expressing** 59:17

**extent** 25:20 30:21 41:5 44:10 46:22 49:2 51:13 58:1 65:23 70:16 73:5,20

**F**

**factions** 62:17

**factor** 29:21

**factored** 51:4

**facts** 41:23 43:6 60:19 77:6

**fair** 10:19 14:23 46:19

**fairly** 33:19

**familiar** 8:2 19:8 32:19 46:13 54:7

**familiarity** 30:1,3

**family** 18:16

**favorable** 66:9

**federal** 7:11

**feedback** 27:23 28:3, 14,18 56:19 57:12 60:15 64:8,19 70:22 71:6

**fellow** 14:11

**file** 46:1 47:7 70:10 71:5,24

**filed** 7:13 9:1,3 40:16, 19 58:3,6 67:6 70:11 71:12,18 77:21

**filing** 41:7 56:24 57:1

**finally** 15:24

**financings** 14:10

**find** 18:8

**fine** 48:8

**firm** 13:11 23:17

**firsthand** 59:13

**fitness** 18:18

**five-minute** 35:12 70:5

**flip** 25:15 32:11 34:2

**focus** 69:6

**forgive** 27:15 62:5

**forgot** 16:16 26:22

**form** 10:10 11:16 14:4, 24 16:14,24 17:8 18:3, 15,24 19:5 20:12,19 21:2 22:16 23:1,21 25:1,19 26:20 27:8 28:5 29:8 31:4,16 33:15,23 34:8 35:10 36:10 37:2,17 39:1,8 42:12,17 44:1,7 45:17

47:3,22 49:1 51:11 55:2,16 56:3,9 57:22 60:12 61:4,17 67:2,16 69:13 71:9 72:11,18 73:2 75:10 76:18 77:4, 13

**formal** 22:13 75:6

**formally** 21:10 29:7

**forward** 7:22 62:12

**found** 18:13 69:4

**frame** 61:19

**Franklin** 41:8 50:7

**front** 41:15 76:14

**full** 5:7

**funds** 77:16

**future** 15:24

---

**G**

**gaining** 56:19

**gears** 15:15

**general** 12:10,16,19, 21 13:24 14:2,6,15,18 15:3,9

**generally** 6:19 19:8 20:3 26:9 29:11 30:14 32:22 66:21 73:6,10 76:20

**Georgetown** 13:15

**give** 31:13 57:11

**giving** 49:8

**goal** 56:19

**Goat** 18:21

**good** 6:23 11:2 68:7

**government** 19:9 30:16

**governmental** 34:20

**governments** 19:13

**graduated** 13:7

**great** 5:16 6:23 35:14

**greater** 43:13,16,17

**grocery** 72:24

**ground** 6:19 45:8 73:7

**group** 11:18 15:22 32:24 47:7 66:5,8

**guarantee** 34:4

**guaranteed** 34:18 51:10,15

**guess** 26:22 59:14 62:16

**guessing** 5:22

---

**H**

**H-A-W-K-S-M-O-O-R** 6:13

**half** 63:14,19

**hand** 22:7 24:5 35:20 40:7 49:17 52:23 74:20

**handing** 22:8

**happen** 46:5 59:10

**happened** 37:5 67:5 74:2

**Hart** 21:6 54:14 63:18 64:5,9 65:8,14 66:13 67:10

**Hawksmoor** 6:12

**head** 6:24 63:21

**healthcare** 72:23

**heard** 21:10 55:24

**hearing** 21:24 41:8,12 42:10 45:20 46:4,12 47:15 48:15,18 49:5 50:11 52:16 56:12 57:6 60:4 61:20,24 62:21 63:4,16 69:11 71:7,8 75:14

**hearings** 46:9 62:14 64:1

**height** 68:15

**helpful** 9:12

**helping** 67:19

**helps** 38:24

**hereinafter** 5:2

**high** 24:16 55:1 66:6

**hire** 20:13 30:23

**hired** 12:16 21:4

**history** 55:11

**Holdings** 36:5 50:23

**Home** 7:19 24:14 36:4

**homeowner's** 6:9

**honestly** 17:9

**hospitality** 18:17

**hour** 35:12

**huh-uhs** 7:1

**hypothetical** 29:17 30:20 46:21 47:12 72:3

---

**I**

**idea** 76:19

**immediately** 13:5

**important** 26:22 62:7

**include** 38:14 46:17

**included** 45:12 53:20 56:1 69:17

**Incomplete** 29:17 30:20 46:21 47:12 72:2

**increase** 68:16

**independent** 58:7

**indication** 47:16

**individuals** 31:1

**informal** 22:22 28:10 55:13

**INGRAM** 9:22 10:10 11:16 14:4,24 16:14, 24 17:8,14 18:3,15,24 19:5,12,16,21 20:5,12, 19 21:2,14,19,21 22:16 23:1,3,21 25:1, 19 26:6,11,20 27:1,8, 19 28:5 29:8,16,24 30:6,19 31:4,16,18 33:15,23 34:8,15

35:10,14 36:10 37:2,
17 38:10,17 39:1,8,24
40:21 41:2,23 42:12,
17 43:6 44:1,7,10
45:15,23 46:7,20 47:3,
9,11,22 49:1,21 51:11,
17 53:8 54:1 55:2,7,
16,22 56:3,9 57:22
58:1,19 60:12,19 61:4,
17 62:3 65:1,21 67:2,
16 68:20 69:13,19
70:6,12 71:1,9,14
72:1,11,18 73:2,16
75:10 76:10,18 77:4,6,
13,18 78:4,11

**initial** 39:13,17 61:20

**input** 30:17 32:15

**instance** 33:19

**institutions** 52:7

**instruct** 71:15

**intended** 71:21

**intent** 70:9 71:4

**intents** 11:21

**interest** 44:14,21

**interested** 45:9 66:6

**interim** 12:12

**interruption** 12:20

**involuntarily** 77:12

**involved** 14:14 16:20,
22 19:3 20:9 22:21
23:19 27:16 29:12
32:1 33:20 36:12 41:7
44:5 45:1 60:11 67:14

**involvement** 15:13
20:7,16,20 25:7 27:12
47:5

**Isaac** 13:12

**issue** 20:15 30:11
47:6 55:5

**issued** 69:15

**items** 68:18 69:16

---

**J**

**January** 37:6,13

---

**job** 6:23

**Joe** 67:17

**June** 24:18 26:23
39:14

**jurisdiction** 33:18

---

**K**

**knew** 21:17 73:6

**Knowing** 73:12

**knowledge** 25:3,21
29:21 33:10 34:13
36:6 48:19 52:8 70:14,
18 71:5,12 73:4,18
74:5 76:16,23 77:1,8,
9,15

---

**L**

**labeled** 41:21 76:7

**lack** 18:20

**land** 8:21 14:14 15:5
20:2 21:3 57:4 58:4

**landed** 13:13

**landowner** 26:12
72:21

**large** 10:12,19 53:10

**late** 12:14 21:24 63:17

**law** 13:7,11,14 16:17

**lawsuit** 6:6,8 7:11,16
49:22

**LC** 24:15

**lead** 46:11

**leaders** 15:19

**lease** 26:17,19 27:6

**Lee** 64:13 65:9,15
72:14

**legal** 13:10 14:1,10,21
23:23 27:1 30:23
31:19 37:3 38:10 39:9,
24 45:16,23 46:20
51:12 72:1 76:10

**legislation** 75:7,16,
17,23 76:3

---

**level** 32:8

**Liberal** 13:20,22

**Lifestyle** 6:2,4,10
7:12 9:20 10:3,4,8,11,
12 11:5,15,20,22 12:2,
5 13:23 15:20 17:2,6,
17,20 18:10,19 20:9
22:12 24:22 25:18,22
26:2,16,18,23 27:5,9
28:9 29:6,12,14,22
30:4,9,13,15,24 31:13
32:14 33:11,13 34:3
35:1,7 36:5,23 37:13,
19 38:7,13 39:19,23
40:17 42:2,20,23
43:14,22 45:21 46:5
47:15 50:22 54:24
60:5,15 65:18 67:18,
24 68:2 70:15,22
71:12 72:20 73:13,14
74:6 77:11

**Lifestyle's** 16:20,22
18:13 19:4 25:16
66:11 67:13 70:3,9
71:4 72:10,16 76:24

**likelihood** 47:17

**limited** 27:13

**listened** 41:19 48:5,
22

**LLC** 7:13

**local** 19:8,13,15 20:3,
14 30:16 50:23

**location** 56:20

**long** 12:1,11,17 13:1
29:6

**looked** 66:7

**lot** 73:23

**loudly** 6:22

**Lucky** 11:7

---

**M**

**made** 12:4 27:22 28:8,
13 46:24 47:6 56:12
62:12

**majority** 52:4 76:3

---

**make** 60:2 62:5

**making** 42:19

**manage** 15:19

**manager** 63:21

**March** 40:19 63:18

**mark** 22:7 24:5 35:21
40:7 52:23 74:20

**marked** 22:4 24:2
31:8 35:17 37:7 40:4
49:14,17 52:20 74:17

**market** 26:15,16 30:1,
3

**marketed** 26:18 27:5

**markets** 15:20 16:6,8,
13 17:7 18:7 19:10
29:13 30:15

**master** 34:18 35:2,7
69:7,21

**measure** 77:10

**measuring** 61:6

**meet** 9:17 64:3 65:15,
19 66:1

**meeting** 8:9 53:4,13,
15,18,20,24 54:3,11,
13,16 56:6 58:16,23
59:4,6,9 63:9 64:4,9,
11 65:8 66:3,10,15,24
67:9 69:3 71:20 72:6

**meetings** 8:7 62:8,9,
22 63:2,7,8 65:11
66:20 67:5,14

**member** 63:11

**members** 59:24 76:4

**memorandum** 53:2,
15

**memory** 49:8 59:17

**mentioned** 10:1 16:6
63:1,3 65:8 72:5 74:10

**message** 63:22 65:10

**met** 9:14 28:20,23
63:13,18 64:6

**Methodist** 7:18 24:14,
15 36:3 42:3

middle 50:20

mile 66:8

Miller 23:8,13,14,16
28:9,10

million 42:24 43:4,14,
20

mind 51:19

Minimal 18:11

minutes 8:6,8 53:12,
18,20,23 54:2 56:8
57:6 59:11,14

Misstates 21:21
27:19 30:6 34:9 42:18
55:17 57:23 71:1

mistaken 36:15

mix 56:20

mixed 17:5,12 28:20
38:8

modify 62:16

money 44:3 45:5
73:23 74:6

months 12:17 61:1,5,
12,15 62:19

moratorium 75:13,19

morning 78:2

moved 68:5

moving 7:21

MPC 53:18 54:24 55:5
63:15 68:19 70:21
72:15

MPC's 68:12

multi-family 17:18

multiple 10:14 62:9
63:1,6,8 72:22

multiplied 43:11

municipal 21:10
54:11 56:6 58:15
60:16 71:6 72:5,8

mutually 27:10

Myer 63:20

Myers 63:10

**N**

nature 6:8 15:6

navigate 21:5

necessarily 32:8

needed 45:21 46:1,5,8
57:18

negative 64:23

negotiating 25:8
27:13

negotiation 23:24
36:13

neighborhood 56:23

neighbors 30:16

nods 7:1

non-apartment 17:21

nonverbal 6:24

North 16:9 24:16

note 53:8 54:1

noted 57:16

notice 55:11

November 78:14

number 10:21 18:6
43:11 46:8 49:10 62:7
74:22 75:5

numerous 10:13

**O**

oath 41:11 48:14

object 49:21

objection 9:22 10:10
11:16 14:4,24 16:14,
24 17:8,14 18:3,15,24
19:5,12,16,21 20:5,12,
19 21:2,14,19,21
22:16 23:1,3,21 25:1,
19 26:6,11,20 27:2,8,
19 28:5 29:8,16 30:6,
19 31:4,16,18 33:15,
23 34:8 35:10 36:10
37:2,17 38:10,17 39:1,
8,24 40:21 41:2,23
42:12,17 43:6 44:1,7

45:15,17,23 46:7,20
47:3,9,22 49:1,24
51:11 55:2,7,16,22
56:3,9 57:22 58:19
60:12,19 61:4,17 65:1,
21 67:2,16 68:20
69:13,19 70:12 71:1,9,
14 72:1,11,18 73:2,16
75:10 76:10,18 77:4,
13,18

objections 29:24
34:15 51:17

obtain 29:14,23 30:4
45:21 46:5

obtained 30:9

obtaining 38:7 39:20

occur 39:13

October 41:12 46:4
53:24 54:10 58:6,12
60:9,18 72:6

office 18:10,18

officer 11:12 12:2,6,9
15:17 19:2

offices 52:7

officials 64:4

Ohio 16:9 24:14 36:4

ongoing 6:15

open 56:21 68:16

opening 60:3

opposed 59:19

order 76:2

ordinance 8:10 53:2
74:11,14 75:2

ordinances 20:3,10,
17,24

organization 33:12

organizational 10:15

original 43:9,21 60:8
61:12,24 63:16

originally 22:12,13
43:5

outlined 51:24

outreach 67:14

oversaw 14:20

oversee 14:9

own/develop 18:10

owned 15:23 16:1

owner 32:14 34:4,16,
18 44:20

ownership 14:11 19:1

owns 17:17 23:17

**P**

pages 32:11

paid 42:24 43:14,22
45:7,9,11

paragraph 24:19
26:15 50:21 51:2
68:23

parcels 37:9 39:17

parent 10:5

park 69:7 77:3

parks 69:21

part 20:7 32:5 33:7
38:21 41:17 50:6
62:15 67:23

particulars 73:8

parties 36:9

partner 12:24

pass 71:22 75:13,15,
24 76:2

passage 46:17

passed 8:10 29:3

past 5:22 74:2

path 62:12

pay 42:20,23

paycheck 11:17

pedestrian 69:6 70:2

pending 7:7

people 66:5

period 12:13

permanent 12:4

**permit** 62:3 77:10

**permitted** 71:23

**person** 12:15

**personal** 25:21 70:14, 18 71:11 73:3,18 74:5

**personally** 20:23 38:1 66:3,10,16

**perspective** 15:13 19:20 25:17

**phase** 17:13

**phased** 37:8

**phone** 66:21

**piece** 26:4

**pieces** 15:22

**pipeline** 15:22 16:2

**pipelines** 16:12

**place** 45:21 53:4 61:15

**plan** 8:21,23,24 9:1,3 21:3 27:10 28:10,11, 20 34:5,6,18 56:19,22, 24 57:4,13,21 58:4,5 61:10,16 62:16,23 66:9 69:5,6,7,22 70:2, 10,23 73:22

**planned** 38:7 39:7

**planner** 64:9,12

**planning** 8:7 9:4 21:10 32:15 35:2,8 46:9 54:11 56:6 58:15 59:18,23,24 60:16 61:20 62:18,21 63:12, 22 71:7 72:6,8

**plat** 39:16

**point** 69:12 72:7,13 75:18

**political** 63:24

**portion** 26:17,19 34:19 48:21 54:2

**portions** 41:19 48:5 52:5 53:7

**position** 10:24 11:11 12:8,9,11 16:2

**positive** 64:22 65:3

**possibly** 67:17

**potential** 65:5

**practice** 16:17,18

**pre-pandemic** 5:23

**preface** 74:3

**preliminary** 37:21

**preparation** 36:16 41:17 53:11

**prepare** 8:4

**prepared** 31:23 50:6 58:2 59:21

**preparing** 9:6

**presence** 57:17

**presentation** 22:22

**presented** 28:20

**presenting** 56:15,18

**president** 12:15 23:5, 7

**previously** 64:24 72:24

**price** 42:11,15 43:4,5, 9,19,22 44:14,22

**primary** 14:12

**prior** 11:10 12:5,8 27:20 30:7 38:15 39:19 42:18 54:8 71:2 76:21 77:20

**private** 16:17 62:22 63:2

**procedures** 19:22,23

**proceedings** 50:7

**process** 14:20,22 20:8 45:10 46:14 47:2 51:4,10 60:11 63:5

**processes** 19:3,9,14 20:11,18 21:1,4

**produce** 73:24

**producing** 73:23

**progress** 60:2

**project** 15:11 19:7

26:13 38:8 67:19

**projects** 15:14 16:3 17:5,21,23 19:4

**prolonged** 44:6 45:1

**properties** 16:1

**property** 7:17,19,21, 22,23 8:2,8,9,17 14:20 20:15 21:12 23:20 24:24 26:4,17,19,24 27:6,11 29:13,15 30:10,18 31:21 34:7 36:24 37:14,15,22 38:3,6,16 39:5,19 40:16,24 42:11,21,23 45:22 46:6 47:6 49:6 50:6 51:6,24 52:3,5,6, 10,13,16 53:3 64:20 65:5 66:24 73:1,14 74:8 75:8 76:9 77:2, 11,17,21

**proposal** 22:13,14,18, 23 27:17,23,24 28:2, 11,15 55:13,23 69:3, 23 70:3

**proposed** 58:8 64:24 72:10 75:18

**provide** 14:10 70:22

**provided** 9:9,11 14:20

**provider** 72:23

**public** 62:14 63:4 64:1

**purchase** 36:2,8,21 38:14 41:21 44:14,21 77:11,16

**purpose** 26:10 52:4

**purposes** 6:20,22 11:21 40:24 67:21

**pursuant** 36:24

**pursuing** 73:15

**push** 16:1

**Q**

**quarter** 61:22

**question** 7:2,4,7 10:11 14:5 17:16 26:23 27:16 28:7,13

30:13 34:21 39:2,3,4, 18 44:11 46:2 51:18 66:18 70:19 74:23

**questions** 9:13 49:23, 24 74:4 77:24

**Quick** 70:5

**R**

**read** 21:3 51:7,21 52:11 76:12 78:4

**reading** 50:4 51:20

**real** 14:19 15:22 16:19,21,22 23:17 33:2,6,21 36:2,5,8 40:16 50:22

**realized** 62:20

**reason** 9:7,10

**reasoning** 58:17

**reasonings** 69:11

**reasons** 54:20

**recall** 21:16,17,23 22:18 23:22 24:12 25:11,24 26:21 27:5 28:2 29:10 31:6,22 32:4 36:11 37:5,10 38:4,12 40:11,12 41:14,20 42:1,4,9,13, 14,19,24 44:12,18,19, 23,24 45:18,20 47:4, 17,19 48:9,10 49:5,10 50:2,10,16 52:9 53:12, 15 54:20,23 55:20 56:4,5,7 57:5,7 58:14 59:8 61:19,21 63:13 64:8,10,15,18,22 65:12 66:4,7,15 67:3 68:17 69:10,14,16 72:12,19 73:11

**receive** 46:10

**received** 28:14 60:15

**receiving** 71:6

**recent** 36:8

**recess** 35:15 70:7

**recognition** 65:5

**recollection** 25:16

28:17,19 29:20 36:7,
20 43:17 48:6 58:9
63:17 74:5,13 75:22

**recollections** 59:13

**recommend** 72:9

**recommendation**
46:10 54:17,21 57:2
58:17 68:24

**recommendations**
68:10 69:4

**recommended** 72:7

**recommending**
68:13

**reconsidered** 21:12

**record** 5:7 6:20 51:21
54:2 67:21

**recording** 41:19 48:6

**redevelop** 73:7

**redevelopment**
27:17

**reduce** 68:15

**reducing** 44:14,21

**reduction** 40:23
43:21 45:4 57:15
58:11

**refer** 7:21 8:22 48:3
59:22 63:16 64:12

**referenced** 6:11

**referendum** 46:13,18
47:2,7

**referred** 65:10 75:1

**referring** 7:23 8:23
54:3 59:15 61:24 63:9
64:13 75:17,21

**reflection** 34:12

**regard** 20:14

**regular** 54:3

**reimbursed** 35:6

**reimbursement**
34:23 35:2

**rejected** 8:11 59:19
74:12

**rejection** 75:3,8

**related** 6:5 14:22 15:3
43:23 44:2 45:5 47:2
55:11 58:11,16 64:19
66:23

**relates** 14:19 68:12,24

**relating** 30:13

**relevance** 49:22

**remember** 12:13 32:9
48:7 50:4,15 56:11
59:16 63:9 66:4 67:4

**remembers** 48:7

**Remotely** 59:5

**rent** 18:17

**rep** 63:12

**repeat** 28:7 44:11

**rephrase** 7:3 14:5
39:2 70:19

**report** 29:15,23 30:5,
10 50:5 51:23 52:11
69:14,17

**reporter** 6:21 78:5,8,
10

**reports** 8:15,16

**represent** 53:1,19

**representative** 6:1,3
20:9 23:10

**representative's**
64:19

**representatives**
28:22 33:4 54:15 62:9,
10,22 63:2,7,20 64:7
65:16 66:22

**represented** 49:9
66:5

**represents** 31:15

**request** 54:18

**requested** 51:21

**requesting** 57:3

**require** 25:18

**requirements** 20:2

**rereading** 26:1

**resident** 33:11

**residential** 55:1,4,14
56:1 57:17 72:22

**residents** 28:22 30:16
31:2 32:16,20 33:5
60:17

**resistance** 28:24

**resolution** 74:22 75:5
76:7,21

**resolved** 6:17

**Resource** 11:18

**respect** 7:11 32:2
61:16 75:8

**responses** 6:24

**responsibilities**
14:8,13

**responsibility** 32:6

**responsible** 10:17
32:17,20

**restate** 39:2

**restaurant** 18:20

**restaurants** 18:17

**resubmit** 70:23

**result** 49:4

**resumed** 12:18

**retire** 11:4

**retired** 11:1 23:15

**retirement** 11:10

**revenue** 65:5

**review** 8:13,15 9:8,10
20:10,17,23 24:8
31:17 36:19 41:16
50:14,17 55:14 56:7

**reviewed** 8:6,8,10,20
21:3 36:16 50:10
53:18,23 54:8 74:11,
14 76:16,21

**reviewing** 9:6 53:12
57:6

**reviews** 28:20

**revised** 9:3 56:16,18,
20 61:2,7,10

**Revision** 41:9,12,16
42:5 44:13,20 45:20
46:4 47:15 48:14,18,
22 49:5 50:7,11 52:16

**revisions** 61:16

**rework** 62:23

**rezone** 53:2

**rezoned** 51:3 52:17
77:2

**rezoning** 21:9,13
24:23 38:7,15 39:6,20
42:16 43:23 44:6,15,
22 45:1,14,22 46:6,12,
17 47:8,17,21 48:11
51:4,9 54:15,18 57:13
61:2,8 67:6 72:10,16
74:7,12 75:3,9 76:24
77:20

**rezonings** 46:14

**rights** 22:1

**Robert** 5:8

**role** 12:16 13:24 15:9
54:13

**role/responsibilities**
15:16

**ruled** 55:24

**rules** 6:19

**S**

**S1** 52:4

**safe** 30:2

**sale** 18:16 26:17,19
27:6

**sat** 63:12

**school** 13:5,7,14
47:14 49:7 64:6,15,18
65:4,6,20 66:2

**Scott** 63:10,20

**section** 22:9,10 26:14
31:9,17 32:12,13 34:3,
13,16 35:6 39:12
43:10

**seek** 33:13

**seeking** 32:15 47:7

**senior** 12:15

**sentence** 50:21 56:17

**September** 55:23
61:3,9,11 69:23 70:3,
11 71:13 76:24

**sequence** 67:4,7

**series** 74:3

**serve** 33:3

**services** 11:19

**Settled** 49:6,7

**shared** 11:19

**Shifting** 15:15

**shocking** 64:2

**shopping** 52:6

**short** 13:11 35:12

**side** 23:23

**signature** 78:12

**significant** 61:18

**significantly** 68:15

**Similar** 30:13

**simply** 12:14

**single** 18:16 40:9

**single-family** 6:13

**sit** 60:6

**site** 55:12 56:18 57:18

**sitting** 21:20 45:19
46:3

**six-** 12:20

**sooner** 45:8

**sort** 6:6 10:17

**sought** 40:23 72:24

**south** 16:9 68:5

**space** 56:21 68:16

**speak** 6:22 9:19 59:6
65:15

**speaking** 26:9 29:11
59:8

**speaks** 39:9 67:9
76:11,13

**special** 52:4

**specific** 66:19

**specifically** 20:11
25:11 33:12 57:5
58:15 68:18,22 72:14

**speculation** 19:17
21:15 26:7 29:9,17
30:20 33:16,24 34:9
38:18 41:3 44:8 45:16
47:11 51:12 55:8
60:20 65:22 70:13
71:15 72:2 75:11

**spell** 5:7,9 67:20

**spelled** 5:10

**spent** 62:15 73:23
74:7

**staff** 32:16 53:1,14
54:24 60:16 69:11,14,
17 72:8

**staff's** 68:24

**staffing** 15:12

**stage** 57:2

**stakeholder** 64:8

**stakeholders** 65:19
66:23 67:15

**standard** 14:2 29:14

**standing** 49:23

**start** 16:4

**started** 13:10

**state** 5:6 68:5

**statement** 42:19 57:8
58:10 60:4

**statements** 56:12,14

**states** 10:15

**step** 29:11

**steps** 45:20

**stop** 13:11

**strategic** 69:5

**Street** 24:16 66:7

**strike** 31:6 43:1

**strong** 57:17

**structure** 10:7 11:14

**structured** 10:4

**study** 13:19

**subdivision** 39:16

**subject** 7:24 23:20
50:21 51:3,5 77:2

**submission** 22:22
29:1 58:12 60:8,18
61:13 75:19

**submit** 29:7 60:5 61:1

**submittal** 27:17

**submitted** 22:13 28:3,
10 29:2 61:3,8,11

**Subsequent** 65:9

**substance** 64:10

**successful** 38:15
39:6 42:16 45:14 46:6,
16

**suggested** 57:21

**suit** 6:15

**summarizing** 48:2

**summary** 68:9

**summer** 62:15,20

**sworn** 5:2

---

T

**tag** 42:11

**taking** 12:8 29:11

**talked** 57:9

**talking** 50:8

**talks** 69:3

**tax** 40:24

**team** 15:5,19 16:4
23:6 32:5 66:11 67:13,
18,23

**teams** 16:12

**teens** 12:14

**Tennessee** 16:9

**term** 18:21

**terms** 10:4 64:23

**testified** 41:3,11,15
42:5 48:5,18 53:17
70:20

**testify** 7:11 25:22
70:13,15 73:17

**testifying** 41:20 42:1,
9 44:12,19,23,24
47:19 48:10

**testimony** 21:22
27:20 30:7 41:17
42:18 43:18 47:24
48:22 57:23 71:2
74:13 78:14

**Texas** 16:10

**That'd** 35:14

**thereof** 34:19

**thereto** 49:23

**thing** 48:11 59:16

**things** 15:5 59:14 63:6

**third-party** 29:15,23
30:4,10

**Thomas** 5:8

**thought** 9:12

**thoughts** 33:5

**three-fold** 15:18

**time** 7:5 12:18 13:23
14:6,15 15:3 24:6,21
27:5,14 31:17,23 32:9
35:21 37:19 38:5 44:3,
16,20 45:5 46:1,2,18,
24 47:5 52:4,24 53:5
61:19 63:10 65:19
67:19 72:7,13 73:23
75:14 78:1,2

**times** 5:19

**timing** 63:5

**title** 12:4,14,18 24:13

**titled** 26:15 31:9 32:12
34:23 74:22

**today** 9:13,21 45:9
57:9 60:6 71:24

**told** 47:20

**Tom** 21:6 54:14 63:18
64:5,9 65:8,14,18
66:13 67:10,13

**top** 34:2 57:14

**topics** 56:20

**total** 43:13 55:14

**transactions** 14:9

**transcribed** 78:6

**transcript** 47:24

**true** 25:4 36:20 48:19
76:15,19

**truthful** 9:12

**turn** 16:3 31:7 34:22
43:1 53:22 55:10 68:8

**Turning** 20:15

**type** 16:17 18:12
26:10

**typical** 29:14 33:11
38:13

**typically** 20:13 26:2
30:15

---

**U**

**uh-huhs** 7:1

**UMCH** 7:19,22 27:9
32:14 35:6 37:15 44:4,
13,20,24 45:7 69:5

**uncommon** 26:8
33:17

**undergraduate** 13:16

**understand** 7:2,4,10,
16,22 11:13 63:5

**understanding**
32:23,24 34:14 76:1

**understood** 65:4

**unit** 17:21 38:8 39:7

**United** 7:18 24:14,15
36:3 42:2

**units** 17:18,23 18:2
55:4,15 56:1 57:20

**unity** 62:12

**University** 13:18

**unknowns** 51:4

**update** 69:5

**updated** 57:3

**usable** 68:16

---

**V**

**valuation** 40:16,24

**valued** 51:5

**vary** 15:10,14

**varying** 17:1 19:6,14

**vehicular** 68:17

**verify** 22:2

**vice** 12:15

**vocal** 33:20

**voluntarily** 77:12

**Vorys** 13:10

**vote** 54:17 57:1 76:3

**voted** 77:10

---

**W**

**W-A-R-R-D** 32:21

**wait** 29:6

**waiting** 45:10

**waived** 39:23 78:12

**waiver** 43:23

**waiving** 44:15,22

**wanted** 62:5

**wanting** 45:1

**WARD** 32:23,24 33:7,
20

**weeks** 78:8

**West** 24:14 36:4

**widely** 15:14

**Wiles** 13:12

**witness'** 30:7 42:18

57:23 71:2

**word** 76:12

**work** 12:23 14:2,3
16:11 31:14 33:10
57:11 62:13 63:4,24
71:21

**working** 15:4 27:9
59:19

**works** 76:6

**Worthington** 7:12,14,
17 10:8 21:11 22:9
31:2,3 32:15,16,19
33:3,8,22 39:7 60:9
66:8 76:5 77:22

**Worthington's** 20:18,
24

---

**Y**

**year** 11:6 15:10

**years** 5:23 10:16 12:3
13:2 17:9 25:13 29:3
65:6 68:6

---

**Z**

**zoned** 52:3,4

**zoning** 8:11 9:2 15:5
20:10,17,18,24 21:5
29:15,23 30:4,10
45:10 46:18 51:24
52:9,12 58:3 59:22
62:11 76:8

# REAL ESTATE PURCHASE CONTRACT

**THIS REAL ESTATE PURCHASE CONTRACT** (the "Agreement") is entered into and effective as of April _20_ , 2017 (the "Acceptance Date"), by and between: (i) **THE UNITED METHODIST CHILDREN'S HOME WEST OHIO CONFERENCE OF THE UNITED METHODIST CHURCH**, an Ohio non-profit corporation ("Seller"), and (ii) **LIFESTYLE REAL ESTATE HOLDINGS, LTD.**, an Ohio limited liability company ("Buyer").

## RECITALS:

**A.** Seller owns certain real property containing approximately 40.763 acres located on the west side of High Street in the City of Worthington, Ohio, being Lot 2 of United Methodist Children's Home Subdivision, as the same is numbered and delineated on the plat thereof recorded in Plat Book 77, Page 38, as amended in recorded plat thereof recorded in Plat Book 83, Page 53, of the Franklin County, Ohio Records. Such Lot 2, less and excepting an approximately 3.5285 acre portion thereof located at the southeast corner of Lot 2 that is subject to a purchase option held by the West Ohio Conference of the United Methodist Church ("WOC") and, pursuant to Section 21 hereof, potentially excluding Wesley Boulevard, as defined below, is referred to herein as the "Property". Exhibit A attached hereto and made a part hereof, being an ALTA/ACSM Land Title Survey dated April 21, 2015, by EMHT of all lands currently owned by Seller, generally depicts the aforementioned exception and potential exception to the Property.

**B.** Seller desires to sell and Buyer desires to purchase the Property, upon the terms and conditions hereinafter set forth.

**C.** Seller and Buyer are parties to a pre-existing Real Estate Purchase Contract pertaining to the Property and other lands dated June 26, 2015 (the "Previous Purchase Agreement") and a Development Agreement pertaining to the Property and other lands dated June 26, 2015 (the "Previous Development Agreement"), both of which are null and void and of no further force or effect.

## AGREEMENT:

**NOW, THEREFORE,** the parties hereto, intending to be legally bound, hereby agree as follows:

**1. AGREEMENT TO PURCHASE AND SELL.** In consideration of the mutual covenants set forth herein, Buyer agrees to purchase and Seller agrees to sell and convey, upon the terms and conditions hereinafter set forth, the Property, together with all appurtenant rights, easements, tenements, hereditaments and appurtenances thereto. The purchase and sale of all of the Property shall occur in a number of closings (each a "Closing", collectively the "Closings") over a period of years not to exceed ten (10) years from the date hereof ("Final Permitted Closing Date"), subject to the further terms and conditions hereof. Notwithstanding anything to the contrary herein, at the Initial Closing (as hereinafter defined) Buyer shall acquire a portion of the Property resulting in payment of a Purchase Price (as hereinafter defined) of not less than One

EXHIBIT

3

Million Dollars ($1,000,000.00) pursuant to the terms and conditions set forth herein. Further, notwithstanding anything to the contrary contained herein, Buyer shall be obligated to purchase all of the Property on or before the Final Permitted Closing Date.

2. **PURCHASE PRICE; PROPERTY EXPENSE PAYMENTS.**

*(a)* Subject to the terms and conditions of Section 2(b) below, the total purchase price for the Property shall be the product of: (a) Two Hundred Thousand Dollars ($200,000.00), multiplied by (b) the number of Developable Acres, as hereinafter defined (the "Purchase Price"). The Purchase Price, less adjustments, credits and prorations as described in this Agreement, shall be paid in installments by Buyer in immediately available funds at each Closing pursuant to the terms and conditions set forth in this Agreement. "Developable Acres" shall mean all portions of the Property other than such portions containing a stream channel known as Tucker Creek and adjoining slopes that are not suitable for development by Buyer ("Tucker Creek Area") and the portion of the currently existing private street located in Lot 2 known as Wesley Boulevard from High Street to the Wesley Boulevard Western Terminus to be determined in accordance with Section 21 hereof ("Wesley Boulevard") (the Tucker Creek Area and Wesley Boulevard are referred to herein as the "Non-Developable Acres"). Notwithstanding anything to the contrary contained in this Agreement, to the extent Buyer is able to increase the density of use (e.g. housing units) on any Developable Acres or reduce the open space requirements on any Developable Acres, in each case, by use of the Tucker Creek Area in its density or open space calculations, the Tucker Creek Area shall be considered Developable Acres hereunder. Within thirty (30) days after the Acceptance Date, Buyer and Seller shall agree on a preliminary determination of Developable Acres and Non-Developable Acres based on engineering studies and recommendations made by EMHT, as surveyors and engineers for the development of the Property. Wesley Boulevard may be included in the portion of the Property acquired by Buyer at no cost subject to Section 21 hereof. To the extent Non-Developable Acres, other than Wesley Boulevard, are not considered Developable Acres as above provided but either Seller or Buyer desires them to be transferred to Buyer at no cost, Seller and Buyer agree, respectively, to convey and accept title to such Non-Developable Acres; provided Buyer shall not be obligated to accept such conveyance: (i) unless the same are free and clear of any environmental conditions unacceptable to Buyer or (ii) if such conveyance otherwise causes Buyer to incur any obligation with respect to such Non-Developable Acres not otherwise provided in the Wesley Boulevard Easement, as defined and provided in Section 21 hereof. In the event any Non-Developable Acres are sold by Seller to the City of Worthington or any park district or association for use as parkland and/or open space, all proceeds of such sale shall be the sole property of Seller and shall not act to offset the Purchase Price per Developable Acre to be paid by Buyer hereunder.

*(b)* Notwithstanding the foregoing provisions of Section 2(a) pertaining to establishment of the Purchase Price, in the event: (i) OhioHealth Corporation or an affiliate thereof proceeds with the development of a medical office building, freestanding emergency department or similar healthcare facility on a portion of the Property, either independently or through a lease transaction with Buyer or an affiliate of Buyer, and (ii) Closing with respect to such Property occurs within two (2) years after the Acceptance

Date, the Purchase Price for the portion of the Property so developed, up to a maximum of one and one-half (1.50) acres, shall be sold at a Purchase Price of Seven Hundred Fifty Thousand Dollars ($750,000) and no credit or offset shall be given to Buyer for the remaining Property to be purchased by Buyer hereunder as a consequence of such increased Purchase Price.

*(c)* For and in consideration of Seller's agreement to extend the period for Closings hereunder over an extended period of time through the Final Permitted Closing Date, Buyer covenants and agrees to pay certain ongoing expenses incurred by Seller for the upkeep, maintenance and potential taxation of the Property (each a "Property Expense Payment"). The upkeep and maintenance portion of such Property Expense Payment shall consist of a quarterly sum to be paid in advance for each calendar quarter based on an amount agreed to on a commercially reasonable basis between Buyer and Seller within thirty (30) days after the Acceptance Date, based on historical data provided by Seller to demonstrate and justify such upkeep and maintenance costs, including utility and insurance costs. Upon agreement between the parties as to the Property Expense Payment, Buyer shall immediately pay to Seller the quarterly sum due, prorated commencing on the Acceptance Date for the current calendar quarter. The Property Expense Payment shall be subject to following adjustments: (i) on a calendar year basis to the extent Seller demonstrates to Buyer on a commercially reasonable basis that its upkeep and maintenance costs have increased; provided that no annual increase shall exceed five percent (5%) of the annualized Property Expense Payments incurred during the previous calendar year; and (ii) in the event Seller loses its exemption from real estate taxes on any portion of the Property not yet purchased by Buyer or the Property becomes subject to any governmental assessments and Seller has complied with the provisions of Section 25 hereof, an increase to cover all real estate taxes or assessments applicable to such Property, subject to the further provisions of Section 25 hereof. All Property Expense Payments for upkeep and maintenance as above provided shall be due and payable five (5) Business Days after initial agreement within thirty (30) days after the Acceptance Date, as above provided, and thereafter on each January 1, April 1, July 1 and October 1 without further notice or billing from Seller, except with respect to adjustments as above provided. All Property Expense Payments applicable to real estate taxes and assessments shall be due and payable within thirty (30) days after written notice from Seller to Buyer. To the extent any Property Expense Payment is not paid by Buyer on its due date, Seller shall give Buyer notice of such failure to pay and Buyer shall have ten (10) days to cure such default. In the event Buyer fails to cure such default within such ten (10) day cure period, Seller shall have the right to terminate this Agreement. All Property Expense Payments shall be non-refundable to Buyer and non-applicable to the Purchase Price.

**3. DUE DILIGENCE DELIVERIES.** Pursuant to the Previous Purchase Agreement, Seller has provided to Buyer copies of all documentation in Seller's possession or to which Seller has reasonable access regarding the Property (the "Due Diligence Materials") and Seller has certified in writing to Buyer that all Due Diligence Materials have been delivered to Buyer. By execution and delivery of this Agreement, Seller ratifies, confirms and reconfirms such certification and certifies that no additional Due Diligence Materials have come into Seller's possession and control that would constitute Due Diligence Materials under the Previous

Contract. In the event that during the pendency of this Agreement, Seller comes into possession of or creates new Due Diligence Materials, Seller shall promptly provide copies of same to Buyer.

**4.    BUYER'S CONTINGENCY.** Buyer's obligations to purchase the Property pursuant to the terms of this Agreement shall be subject to the following contingency. Buyer and/or its agents shall have a period commencing on the Acceptance Date and continuing until 5:00 P.M. Eastern time on June 9, 2017 (hereinafter the "Inspection Period") to fully inspect the Property and to evaluate Buyer's acquisition of the Property. Seller agrees to cooperate fully with Buyer in Buyer's inspection of the Property, including, but not limited to: (i) providing evidence that the Property is owned or controlled by Seller; and (ii) providing access to the Property at all reasonable times (subject to rights of tenants and privacy considerations for clients being served by Seller). In the event Buyer is not satisfied with the results of its investigations, the condition of the Property or is otherwise not prepared to purchase the Property for any reason, then Buyer shall have the right, by delivery of written notice to the Seller on or before the last day of the Inspection Period, to terminate this Agreement, whereupon this Agreement shall be deemed terminated. In the event Buyer fails to timely deliver a written notice to Seller terminating this Agreement pursuant to this Section 4, this Buyer contingency shall be irrevocably waived.

**5.    PROPERTY CONFIGURATIONS FOR CLOSING AND OTHER PROPERTY DEVELOPMENT MATTERS.**

*(a)*    The Developable Acres shall consist of "High Street Corridor Land" as depicted on the attached <u>Exhibit A</u> and all other portions of the Property consisting of Developable Acres which shall be referred to herein as "Non-High Street Corridor Land". The ratio of: (i) the aggregate amount of High Street Corridor Land that has been purchased by Buyer at any time to (ii) the aggregate amount of Non-High Street Corridor Land that has been purchased by Buyer at any time, is referred to herein as the "Property Allocation Ratio". At such time as Buyer and Seller agree on the Developable Acres and Non-Developable Acres pursuant to Section 2(a) hereof, the parties shall establish a maximum ratio between the High Street Corridor Land and the Non-High Street Corridor Land based on the initial acreage contained in each that shall be the basis for all purchases of High Street Corridor Land hereunder (the "Maximum Property Allocation Ratio"). Thereafter, with respect to all purchases of High Street Corridor Land by Buyer hereunder, at the time of each such purchase, Buyer shall be required to simultaneously purchase a portion of Non-High Street Corridor Land such that after such purchase the Property Allocation Ratio shall not be greater than the Maximum Property Allocation Ratio; provided that Buyer shall not be required to purchase any Non-High Street Corridor Land at the time of the purchase of High Street Corridor Land if the Property Allocation Ratio after such purchase of High Street Corridor Land remains less than the Maximum Property Allocation Ratio. By way of example if the Maximum Property Allocation Ratio is determined to be 1 acre of Developable Acres on the High Street Corridor Land to 2 acres of Developable Acres on the Non-High Street Corridor Land, for each acre of High Street Corridor Land purchased by Buyer in the aggregate, it must previously or simultaneously close on and purchase not less than 2 acres of Non-High Street Corridor Land in the aggregate.

*(b)* Based on the foregoing provisions of Section 5(a) above, Buyer and Seller shall determine the portion of the Property to be acquired at the Initial Closing, as hereinafter defined within thirty (30) days after the Acceptance Date (the "Initial Acquisition Parcels"). For purposes of this Agreement, all portions of the Property which are not included in the Initial Acquisition Parcels shall be defined as the "Remaining Property" until such time as Buyer acquires portions thereof, thereafter the Remaining Property shall mean all of the Property less the Initial Acquisition Parcels and additional portions of the Property subsequently acquired by Buyer hereunder. For each closing of the Remaining Property, Buyer and Seller shall agree on the Property included in such closing and Buyer shall be required to give Seller thirty days written notice of Buyer's intention to acquire all or a portion of the Remaining Property and each such Subsequent Acquisition Parcel (as hereinafter defined).

*(c)* With respect to the determination by Buyer and Seller of the Initial Acquisition Parcels and each Subsequent Acquisition Parcel, Buyer shall provide to Seller initially with respect to the Initial Acquisitions Parcels and thereafter from time to time with respect to Subsequent Acquisition Parcels to the extent modified, a Master Development Plan for the Property identifying all Initial Acquisition Parcels and Subsequent Acquisition Parcels as then anticipated by Seller (the "Master Development Plan") in order to assist Buyer and Seller in anticipating and agreeing on the logical and sequential development of the Property and in agreeing on terms of Development Agreements, as hereinafter defined, including, but not limited to, easements and other development agreements that impact portions of the Property not yet purchased by Buyer hereunder. From time to time as anticipated development of the Property is changed due to market, zoning, planning or engineering issues, Buyer shall have the right to update the Master Development Plan and promptly provide a copy of such updated Master Development Plan to Seller. Seller shall have no right to approve any update to the Master Development Plan unless same materially and adversely affects anticipated development of the remainder of the Property in accordance with the terms and conditions of this Agreement. The Master Development Plan shall at all times remain a confidential document, proprietary to Buyer in connection with its anticipated marketing, zoning and development of the Property and shall not be disclosed by Seller or its representatives without the express written consent of Buyer; subject to required disclosure due to legal process, in which event, Seller will cooperate with Buyer to limit disclosure of the Master Development Plan.

*(d)* Buyer's obligation to close on the Initial Acquisition Parcels is contingent upon Buyer and Seller entering into a cross easement and development agreement relating to Buyer's right to have access, as necessary, to and through the Remaining Property for purposes of ingress, egress and utilities, including without limitation regional storm drainage facilities and construction staging areas reasonably requested from time to time by Buyer (the "Development Agreement"). To the extent required, Seller shall execute specific recordable easements from time to time on the Remaining Property as required by Buyer on a commercially reasonable basis in connection with the development of portions of the Property acquired by Buyer. Notwithstanding the foregoing but subject to the provisions of Section 5(c) hereof with respect to the Master Development Plan, (i) Seller shall not be required to enter into any Development

Agreement or easement that will result in the Remaining Property having materially reduced development value if Buyer fails to close thereon hereunder, taking into consideration the then applicable Master Development Plan (ii) any access and utility easement rights shall be subject to the provisions of Section 21 hereof.

## 6. EVIDENCE OF TITLE AND SURVEY.

*(a)* Within fifteen (15) days following the Acceptance Date, Seller shall provide to Buyer a commitment for the issuance of an owner's title insurance policy for the Property and all appurtenant easements relating to the Property ("Preliminary Commitment") from Stewart Title Guaranty Company ("Escrow Agent" and "Title Insurer"). Such commitment shall show in Seller good and marketable title in fee simple, free and clear of all liens and encumbrances except: (a) those that Seller can discharge at each Closing, as applicable, by the payment of money; (b) those created by or assumed by Buyer; (c) the lien of real estate taxes and assessments not due at the time of each applicable Closing; (d) zoning ordinances; and (e) legal highways and covenants, restrictions, conditions and easements of record which, in Buyer's sole determination, do not interfere with Buyer's intended use of the Property (items (b) through (e) are referred to herein as the "Permitted Encumbrances") If title to all or part of the Property is unmarketable, or is subject to liens, encumbrances, easements, conditions, restrictions or encroachments which, in Buyer's sole judgment, would interfere with Buyer's proposed development of the Property (any such matter being hereinafter referred to as a "Title Defect"), then Buyer shall forthwith notify Seller of such Title Defect. Buyer has previously obtained an ALTA Survey of the Property from EMHT (the "Survey"). Buyer shall have ten (10) Business Days after receipt of the Preliminary Commitment to object to any Title Defect contained in the Preliminary Commitment or Survey by written notice to Seller. Buyer's failure to notify Seller of a Title Defect within such ten (10) Business Day period shall be deemed Buyer's acceptance of all exceptions set forth in the Title Commitment except for liens which are required to be paid at applicable Closing(s) by Seller and standard exceptions that are to be removed based on the closing affidavit to be provided as set forth below. Seller shall, within ten (10) Business Days after receipt of written notice of any Title Defect, use its best efforts to remedy or remove any Title Defect or notify Buyer that it will remedy or remove same as of an applicable Closing. If Seller is unable to remedy or remove any Title Defect, or advise Buyer that it will remedy or remove same as of an applicable Closing, Buyer may, on or before the tenth (10th) Business Day after the date of the expiration of Seller's ten (10) Business Day cure period, elect to terminate this Agreement. Notwithstanding any other provision of this Agreement, Seller shall cause all mortgages and other monetary liens on the respective portions of the Property to be released at applicable Closing(s).

*(b)* Within ten (10) days after the determination of the Initial Acquisition Parcels, Buyer shall obtain a title insurance commitment from the Title Company for the Initial Acquisition Parcels ("Initial Acquisition Commitment") in the applicable amount of the Purchase Price. The Initial Acquisition Commitment shall be subject only to Permitted Exceptions applicable to the Initial Acquisition Parcels. On the date of Initial

Closing, Buyer shall receive an owner's title insurance policy (in form and issued by the Title Company reasonably satisfactory to Buyer) in the amount of the Purchase Price of the Initial Acquisition Parcels. Seller shall pay for the cost of the owner's title insurance policy. Buyer shall pay any costs associated with any special endorsements and additional coverage requested by Buyer or Buyer's lender.

(c)     With respect to any Closings of the Remaining Property, within fifteen (15) days after Buyer's notice to Seller of Buyer's intention to Close on all or a portion of the Remaining Property (each a "Subsequent Acquisition Parcel"), Buyer shall obtain a title insurance commitment (each a "Subsequent Commitment", collectively, the "Subsequent Commitments") for the applicable Subsequent Acquisition Parcel that Buyer intends to acquire in the applicable amount of the Purchase Price for such Subsequent Acquisition Parcel. Each Subsequent Commitment shall be subject only to Permitted Exceptions applicable to the Subsequent Acquisition Parcel. On the date of the Closing of the applicable Subsequent Acquisition Parcel, Buyer shall receive an owner's title insurance policy (in form and issued by the Title Company reasonably satisfactory to Buyer) in the amount of the Purchase Price of the Subsequent Acquisition Parcel. Seller shall pay for the cost of the owner's title insurance policy. Buyer shall pay any costs associated with any special endorsements and additional coverage requested by Buyer or Buyer's lender.

(d)     From and after the full execution of this Agreement and during the term of this Agreement, through and including the Final Permitted Closing Date, Seller shall take no action nor allow actions to be taken which would render the title to the Remaining Property unmarketable nor shall it encumber the Remaining Property in any manner without the prior written consent of Buyer.

(e)     Within thirty (30) days after the determination of the Initial Acquisition Parcels, Buyer, at Buyer's expense, shall obtain a new survey of the Initial Acquisition Parcels ("Buyer's Initial Acquisition Parcels Survey"). With respect to any Closings of the Remaining Property, within thirty (30) days after of Buyer's notice to Seller of Buyer's intention to Close on a Subsequent Acquisition Parcel, at Buyer's expense, shall obtain a new survey of the applicable Subsequent Acquisition Parcel (each a "Buyer's Subsequent Acquisition Parcel Survey"). With respect to all Closings hereunder, any modifications to subdivision plats to create Initial Acquisition Parcels or Subsequent Acquisition Parcels shall be at the sole cost and expense of Buyer; provided Seller will cooperate in the preparation and approval of the modification of such plats and shall sign and cause its mortgagees to sign any and all applications, plats and other documents necessary or appropriate to effect such modifications.

7.     **TAXES AND ASSESSMENTS.** The Property is currently exempt from real estate taxation due to the exempt use of the Property by Seller and it is the agreement and intention of Buyer and Seller to maintain such exemption throughout the pendency of this Agreement for all portions of the Property not yet purchased by Buyer hereunder. There are currently no assessments on the Property. To the extent the Property becomes subject to real estate taxes or assessments during the pendency of the transactions contemplated hereby, the

provisions of Section 2(c) and Section 25 hereof shall apply. There shall be no proration of real estate taxes and assessments at any Closing beyond any proration necessary to accomplish the provisions of Section 2(c) hereof.

8. **COVENANTS, WARRANTIES AND REPRESENTATIONS.** Seller covenants, warrants and represents to Buyer as follows. These covenants, warranties and representations shall be deemed made and restated at each Closing of the Property. After the Initial Closing, all references in this Section to the Property shall be as to the Remaining Property.

(a) *Authority.* Seller has the full right and authority to enter into this Agreement and to consummate or cause to be consummated the actions and transactions contemplated by this Agreement. Each individual executing this Agreement on behalf of Seller has the requisite authority to do so for and on behalf of Seller.

(b) *Execution, Delivery and Enforceability.* This Agreement has been duly executed and delivered by Seller and is the valid and binding obligation of Seller, enforceable in accordance with its terms, subject as to enforceability to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium, and similar laws affecting creditors' rights and remedies generally and to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

(c) *No Conflict.* Performance under this Agreement will not result in any breach of or default (or an event which would, with the passage of time or the giving of notice or both, constitute a default) under any material agreement or other instrument which is either binding upon or enforceable against Seller.

(d) *Assessments.* As of the applicable Closing Date, Seller has not received any notice of any assessments constituting, or that will constitute, a lien on the Property, and no improvements have been installed by any public authority, the cost of which is to be assessed against the Property in the future; and Seller has not received any notice of any possible future improvements by any public authority, any part of the cost of which would or might be assessed against the Property.

(e) *Title.* Seller owns marketable title to the Property, free and clear of all liens and encumbrances except zoning ordinances, legal highways, and covenants, conditions, easements and restrictions of record, and there are no rights of possession, use or otherwise, outstanding in third persons and there are no unrecorded leases, land contracts, sale contracts, options or other documents affecting the Property.

(f) *Mechanics' Liens.* No work has been done by or on behalf of Seller or, to the best of Seller's knowledge, any tenant, permittee or licensee of Seller on the Property or any other portion of Seller's Property (other than Buyer and its agents and representatives) which could give rise to any mechanics or similar liens, and no contracts are outstanding or are in effect with respect to the performance of any such work. If any such work is performed prior to Closing, Seller shall discharge all obligations arising therefrom, and shall remain liable after the Closing for the discharge of all such obligations.

*(g)* *Claims*. There is no litigation or claim pending or, to the best of Seller's knowledge, threatened against or involving or relating to the Property and, to the best of Seller's knowledge, there are no facts or circumstances which could give rise to such claim or litigation.

*(h)* *Condemnation*. Seller has not received notice of, and has no other knowledge or information of, any pending or contemplated condemnation action with respect to the Property, or any part thereof, or change in any governmental regulation or private restriction applicable to the Property, any pending or threatened judicial or administrative action or proceedings in any court or before any governmental authority or arbitration board or tribunal, or any such action or proceeding pending or threatened by adjacent landowners or other persons, any of which would result in any material change in the condition of the Property, or any part thereof, or to the access to the Property.

*(i)* *Environmental Violations*. The provisions of this Section 8(i) are subject to the provisions of the last paragraph of this Section 8 whereby Seller has disclosed the possible presence of asbestos containing materials in certain buildings located on the Property and Buyer's agreement that any removal of the same from buildings acquired by Buyer hereunder shall be at Buyer's expense. Seller has not been provided with written notice: (i) that the Property has been used for the treatment, storage or disposal of any "Hazardous Substances" (as hereinafter defined); or (ii) of any pending investigations concerning the Property by any governmental agency charged by law with the enforcement of any Environmental Law. For purposes of this Agreement, the term "Environmental Laws" shall mean all federal, state and local laws, including statutes, regulations, ordinances, codes, rules and other governmental restrictions and requirements, relating to environmental pollution, contamination or other impairment of any nature, any hazardous or other toxic substances, materials or wastes of any nature, whether liquid, solid and/or gaseous, including smoke vapor, fumes, soot, petroleum products, alides, alkalis, chemicals, wastes, by-products and recycled materials. These Environmental Laws shall include, but not be limited to, the Federal Solid Waste Disposal Act, the Federal Clean Air Act, the Federal Clean Water Act, the Federal Resource Conservation and Recovery Act of 1976, the Federal Comprehensive Environmental Responsibility Cleanup and Liability Act of 1980, regulations of the Environmental Protection Agency, regulations of the Nuclear Regulatory Agency, regulations of any state department of natural resources or state environmental protection agency now or at any time hereafter in effect and local health department ordinances. As used herein, "Hazardous Substances" means any quantities of hazardous substances, hazardous waste, hazardous materials, petroleum hydrocarbons, PCBs, urea formaldehyde foam insulation or asbestos substances as those terms are defined in any applicable local, state or federal law or regulation which are in excess of allowable levels prescribed by such applicable local, state or federal law or regulation.

*(j)* *No Moratorium*. Seller represents and warrants to Buyer that no moratorium has been imposed by any applicable governmental or quasi-governmental authority which would prohibit or adversely affect the development of the Property.

*(k)* *Status Quo*. Subject to the provisions of Section 21 hereof, after the execution of this Agreement, and at any time prior to the Final Permitted Closing Date, Seller shall not grant, sell or convey any interest in the Property, including easements or rights-of-way, to any person, corporation, public or private, governmental body or political subdivision without the

written permission of Buyer, nor permit entry on the Property by any person or contractor to change the physical condition of the Property. Compliance by Seller with the foregoing requirements shall be a condition to Buyer's obligation to close.

The covenants, representations and warranties in this Section 8 shall survive each Closing and shall not be deemed to have merged with the deed delivered by Seller at the applicable Closing; provided that if Buyer has not notified Seller in writing within twelve (12) months after any applicable Closing that one or more of the representations or warranties set forth herein was untrue when made or remade with respect to an applicable portion of the Property, Buyer shall have no rights against Seller in connection with such untrue representation or warranty. Notwithstanding the foregoing, the Property and all improvements located thereon shall be sold by Seller in their AS IS, WHERE IS condition, with all faults, without any representation by Seller as to the condition thereof and with the disclosure by Seller that due to the age of certain buildings, they may contain asbestos requiring abatement and removal at Buyer's expense.

9. **REAL ESTATE COMMISSION.** Seller and Buyer warrant and covenant that no person, realtor or real estate broker has acted as agent or broker in respect of the transaction herein contemplated. Seller and Buyer agree to indemnify, defend and hold the other harmless from all claims for any commission by any person arising out of the actions of the indemnifying party. Notwithstanding anything contained herein to the contrary, the indemnities contained herein shall survive each Closing.

10. **POSSESSION.** Possession of the applicable portion of the Property being purchased shall pass to Buyer at each applicable Closing; subject, in each case, to cooperation with Seller in the moving of its business and operations to a new site which may take up to sixty (60) days, so long as during such time period, Buyer shall be permitted to engage in full scale site development activities throughout the applicable portion of the Property. Seller shall indemnify and hold harmless Buyer, its successors and assigns, their members, managers, officers, employees, and agents, from any actual loss, cost or damages to persons or property arising out of Seller's possession of the Property after any Closing of the applicable Property, and, if Seller will maintain a presence on a portion of the Property after an applicable Closing pursuant to this Section, prior to such Closing, Seller shall provide to Buyer evidence of commercial general liability coverage for Seller and its agents, employees, contractors and representatives on an occurrence basis with minimum limits of not less than Three Million Dollars ($3,000,000) per occurrence. Notwithstanding anything to the contrary contained herein, the provisions of this Section shall survive Closing.

11. **CLOSING DELIVERIES AND CLOSINGS.**

*(a)* *Date of Closing.* The closing of the Initial Acquisition Parcels shall be referred to and defined herein as the "Initial Closing" and the date of the Initial Closing shall be referred to and defined herein as the "Initial Closing Date". The Initial Closing shall occur on or before the date which is the later of: (i) June 30, 2017, or (ii) the Business Day that is ten (10) Business Days after the approval of the applicable subdivision plat for the Initial Acquisition Parcels by all applicable parties. Thereafter, each applicable Closing for Subsequent Acquisition Parcels shall occur: (iii) if all Subsequent Acquisition Parcels have been zoned and planned by the City of Worthington pursuant to a planned unit development (PUD) zoning, within thirty (30) days after

such zoning has been approved free of any right of appeal or referendum, Buyer shall close on Subsequent Acquisition Parcels having a Purchase Price of not less than One Million Dollars ($1,000,000), and thereafter, Buyer shall close on one or more remaining Subsequent Acquisition Parcels on or before each anniversary of such first Subsequent Acquisition Parcel pursuant to this clause (iii) but in any event, all such Subsequent Acquisition Parcels shall be purchased by Buyer hereunder no later than the fifth (5th) anniversary of the first Subsequent Acquisition Parcels purchase pursuant to this clause (iii); (iv) if select Subsequent Acquisition Parcels but not all Subsequent Acquisition Parcels have been zoned and planned by the City of Worthington for single family home, patio home or for sale condominium development, within thirty (30) days after a final development plan has been approved for such Subsequent Acquisition Parcels for the portion of the Subsequent Acquisition Parcels to be purchased at such Closing, free of any right of appeal or referendum; (v) if select Subsequent Acquisition Parcels but not all Subsequent Acquisition Parcels have been zoned and planned by the City of Worthington for multifamily development (including condominiums to be developed and owned and rented under common ownership), within thirty (30) days after a final development plan has been approved for all such Subsequent Acquisition Parcels so zoned and planned, free or any right of appeal or referendum; and (vi) with respect to all Subsequent Acquisition Parcels being developed in accordance with their current zoning classification, within thirty (30) days after a final development plan has been approved for such Subsequent Acquisition Parcels free of any right of appeal or referendum. Notwithstanding the foregoing provisions of this Section 11(a), in any event, all portions of the Property shall be purchased by Buyer and all Closings hereunder shall occur prior to the Final Permitted Closing Date. Further notwithstanding the foregoing, Buyer shall not be obligated to purchase any Subsequent Acquisition Parcel until the Business Day that is ten (10) Business Days after the approval of the applicable subdivision plat for the respective Subsequent Acquisition Parcel by all applicable parties. Buyer covenants and agrees to use commercially reasonable efforts to obtain all required plat approvals at the earliest possible time in order that Closings are not materially delayed beyond the Closing time frames as outlined above.

      *(b)*    ***Seller's Deliverables.***  At each Closing, Seller shall deliver to Buyer and the Title Insurer, if necessary, the following:

      *(1)*    Limited Warranty Deed conveying to Buyer fee simple title to the applicable portion of the Property being acquired subject only to the Permitted Encumbrances ("Deed");

      *(2)*    A Non-Foreign Affidavit;

      *(3)*    Evidence of Seller's authority to consummate the transactions described herein as may be reasonably required by Buyer and the Title Insurer;

      *(4)*    An affidavit with respect to off-record title matters in accordance with community custom that is sufficient to cause the Title Insurer to delete all "standard exceptions" other than the "survey exception" from the Title Commitment;

      *(5)*    With respect to the Initial Closing only, an executed counterpart of the Development Agreement;

(6)     All easements, dedication plats and other documents required to be executed by Seller in connection with the Development Agreement; and

(7)     A closing statement executed by Seller.

*(c)     Buyer's Deliverables.*  At the Closing, Buyer shall deliver an amount equal to the applicable Purchase Price for the portion of the Property being acquired subject to all credits and prorations provided for in this Agreement and a closing statement executed by Buyer.  At the Initial Closing, Buyer shall deliver an executed counterpart of the Development Agreement and any easements required pursuant to the terms hereof.

*(d)     Buyer's Closing Conditions.*  Buyer's obligations under this Agreement at each applicable Closing are further expressly conditioned upon the occurrence (or non-occurrence, as the case may be) of the following, unless waived by Buyer (collectively, "Buyer's Closing Conditions"):

(1)     Buyer obtaining at the applicable Closing from the Title Company an owner's policy of title insurance insuring marketable fee simple title to the portion of the Property being acquired, in the amount of the applicable Purchase Price subject only to the Permitted Encumbrances.

(2)     The representations and warranties of Seller set forth in this Agreement shall have been true and correct when made and are true and correct as of the date of each respective Closing; provided that any change in any facts or circumstance between the Acceptance Date and the applicable Closing that would render any one or more of such representations and warranties untrue, while constituting a failure of Buyer's Closing Conditions, shall not constitute a default by Seller hereunder.

(3)     Seller shall have executed and delivered the items set forth in Section 11(b) hereof and shall have performed all of its obligations under this Agreement.

(4)     No action or proceeding brought by any person shall be pending before any court or administrative body or, to the best knowledge of Seller, be threatened to restrain, enjoin or otherwise prevent the consummation of the transactions contemplated by this Agreement or to recover any damages or obtain other relief as a result of the consummation of the transactions contemplated by this Agreement.

*(e)     Costs and Expenses of Closing.*  All title charges and conveyance fees, 50% of all escrow closing fees, and all other customary seller's expenses due, payable or incurred in connection with the transactions described herein shall be paid by Seller from the proceeds of the applicable Closing.  Buyer shall be responsible for all fees associated with Buyer's preclosing investigation, 50% of all escrow closing fees and all costs arising in connection with any financing obtained by Buyer, and recording fees for the applicable Deed.  Buyer and Seller shall each pay the fees and expenses of their respective legal counsel incurred in connection with the transaction described herein.

**12.     DEFAULTS; REMEDIES.**

*(a)* Seller Default - If the purchase and sale of the Property, or any portion thereof, is not consummated because of Seller's failure or refusal to perform Seller's obligations hereunder, Buyer shall have as its sole and exclusive remedy the right to bring an action against Seller for specific performance, together with damages in the amount of actual costs incurred as a result of the need for Seller to enforce this Agreement, including, but not limited to, attorney's fees and other litigation expenses, and any actual costs directly attributable to the delay resulting from Seller's failure or refusal to perform. Buyer shall not be permitted to bring an action against Seller for other damages unless Seller has conveyed or encumbered the Property, or any portion thereof, in such a way that the remedy of specific performance is not available to Buyer. In no event shall Buyer be permitted to seek damages from Seller beyond its actual damages incurred and consequently, Buyer shall not be entitled to make a claim for damages in the nature of punitive, consequential, exemplary or lost profits damages. Any change in any facts or circumstances outside the control of Seller between the Acceptance Date and the Final Permitted Closing Date that would render any one or more of Seller's representations and warranties untrue shall not constitute a default by Seller or entitle Buyer to damages.

*(b)* Buyer Default – If Buyer shall default in any of its obligations hereunder, Seller's sole and exclusive remedy, except as otherwise provided in Section 14 hereof with respect to certain indemnification and hold harmless obligations of Buyer to Seller, shall be the right to terminate this Agreement after written notice of such default has been provided to Buyer and Buyer has failed to cure such default within a period of thirty (30) days after receipt of such notice.

13. **DAMAGE, DESTRUCTION OR EMINENT DOMAIN.** In the event that any portion of the Property not yet purchased hereunder by Buyer shall be materially impaired, damaged or destroyed by environmental casualty between the date of execution hereof and the date of such purchase, Buyer shall have the option to: (a) elect to proceed to close the purchase of the Property in accordance with the terms of this Agreement, in which event the Buyer shall be entitled to all insurance proceeds received or receivable by Seller as a result of such environmental casualty under any and all insurance policies covering that portion of the Property so damaged or destroyed; or (b) elect to terminate this Agreement with respect to such portion of the Property, in which event Seller shall retain all insurance proceeds and both parties shall be released from further liability or obligation hereunder, except as otherwise expressly provided herein to the contrary. Seller agrees that it shall give notice to Buyer of any such environmental casualty within ten (10) days after the occurrence thereof, and upon the receiving of such notice, Buyer shall have thirty (30) days within which to exercise the options granted in this Section 13. If Buyer fails to so exercise such options within said 30-day period, this Agreement shall terminate and thereafter both parties shall be released from further liability or obligation hereunder, except as otherwise expressly provided herein to the contrary. Buyer acknowledges that since all buildings and improvements located on the Property will be demolished in connection with Buyer's proposed development, the casualty or destruction of any of such buildings or improvements shall not give rise to a Buyer termination right hereunder and all insurance proceeds paid to Seller as a consequence of any such damage or destruction shall be the sole property of Seller; provided that if the cost of temporarily stabilizing, securing, demolishing and removing the buildings on the Property is increased as a result of a casualty over the cost of demolishing and removing the buildings without a casualty, Seller shall pay to Buyer such increased cost.

If, prior to the date of any applicable Closing, eminent domain proceedings shall be threatened or commenced against all or any part of the Property, Buyer may: (a) elect to proceed to close the purchase of such portion of the Property in accordance with the terms of this Agreement, in which event the Buyer shall be entitled to all payments payable to Seller on account of such taking as is applicable to the portion of the Property being purchased; or (b) elect to rescind this Agreement with respect to such portion of the Property affected by such proceedings, and in event such rescission applies to all the Property or all remaining portions of the Property not yet acquired by Buyer hereunder, and thereafter both parties shall be released from all further liability or obligation hereunder except as otherwise expressly provided herein to the contrary. If Buyer elects to rescind the Agreement in whole or in part, it shall so notify Seller in writing within twenty (20) days after Buyer has received written notice from Seller of such taking. Failure by Buyer to so notify Seller shall constitute an election to proceed to close on the purchase of such portion of the Property, and Buyer shall be entitled to all payments on account of such taking.

**14. BUYER INDEMNITY AND HOLD HARMLESS.** Buyer shall indemnify and hold harmless Seller, its officers, trustees, employees, sole member and agents, from any actual loss, cost or damages to persons or property arising out of inspections, surveys and studies undertaken by Buyer and its agents, consultants and representatives on the Property and prior to undertaking any such inspections, surveys and studies, Buyer shall provide to Seller evidence of commercial general liability coverage for Buyer and its agents, consultants and representatives on an occurrence basis with minimum limits of not less than Three Million Dollars ($3,000,000) per occurrence. Notwithstanding anything to the contrary contained herein, the provisions of this Section shall survive Closing and any termination of this Agreement by lapse of time or otherwise.

**15. NOTICES.** All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered by hand, within three (3) business days after deposited in the United States mail, Registered or Certified, Return Receipt Requested, postage prepaid or within one (1) Business Day after deposited with a well-known national overnight courier (e.g. Federal Express), as follows in the case of Buyer and Seller, or to such other address as may be hereafter notified by the respective parties.

|  |  |
|---|---|
| If to Buyer: | Lifestyle Real Estate Holdings, Ltd.<br>230 West Street, Suite 200<br>Columbus, Ohio 43215<br>Attn: Legal Department<br>Email: bbrownlee@lifestylecommunities.com |
| with a copy to: | Bricker & Eckler LLP<br>100 South Third Street<br>Columbus, Ohio 43215<br>Attn: Stephen Intihar<br>Email: sintihar@bricker.com |
| If to Seller: | The United Methodist Children's Home |

West Ohio Conference of the United
Methodist Church
431 East Broad Street
Columbus, Ohio 43215
Attn: Sean Reilly
Email: sreilly@umchohio.org

with a copy to:      Kephart Fisher LLC
207 North Fourth Street
Columbus, Ohio 43215
Attn: David Fisher
Email: davidfisher@kephartfisher.com

**16.    ENTIRE AGREEMENT.** This Agreement embodies the entire agreement among the parties in respect to the transaction herein contemplated. Any amendments hereto shall be in writing and executed by the parties hereto.

**17.    ASSIGNMENT.** Neither Buyer nor Seller shall have the right to assign this Agreement without first obtaining the prior written consent of the other party hereto; provided that Buyer may assign this Agreement at any time to one or more of its affiliates. Any entity that is managed by one or more of the individuals that manage Buyer, including Michael J. DeAscentis II or L. Brent Miller, shall be considered an "affiliate" for purposes of this Section. Any such permitted assignment by named Buyer herein shall not relieve such named Buyer from its obligations hereunder.

**18.    AUTHORIZED REPRESENTATIVE.** Seller hereby appoints its Board Chair as its Authorized Representative for purposes of dealing with Buyer on behalf of Seller in respect of any and all matters in connection with this Agreement. Authorized Representative shall have the power, in his or her discretion, to give and receive all notices, monies, consents, approvals, and other documents and instruments, and to take any other action on behalf of Seller. All actions by Authorized Representative shall be final and binding on Seller. Buyer may rely on the authority given to Cyndy Garn as the Authorized Representative until actual receipt by Buyer of a duly authorized resolution substituting a different person as Authorized Representative.

**19.    RELATIONSHIP TO PREVIOUS PURCHASE AGREEMENT AND PREVIOUS DEVELOPMENT AGREEMENT.** Notwithstanding anything to the contrary contained in the Previous Purchase Agreement and/or the Previous Development Agreement, neither the Previous Purchase Agreement nor the Previous Development Agreement is of any further force and effect and the same shall be null and void from and after the Acceptance Date.

**20.    WEST OHIO CONFERENCE LANDS.** Buyer acknowledges its understanding and agreement that the southeastern most portion of Lot 2 of the United Methodist Children's Home Subdivision of which the Property is a part, consisting of approximately 3.5285 acres ("Conference Center Parcel") and currently the location of the WOC, is being sold and conveyed to WOC pursuant to a purchase option contained in the current lease between Seller and WOC. Notwithstanding any previous disclosures or assurances made by Seller to Buyer or its affiliates, there can be no assurances given by Seller to Buyer that the Conference Center Parcel can be

reconfigured in such a way as to increase the amount of developable High Street frontage available to Buyer for purchase and/or development.

21. **WESLEY BOULEVARD.** Buyer acknowledges its understanding and agreement that Wesley Boulevard currently provides access to the Conference Center Parcel and the Sunrise Assisted Living Facility located adjacent to the southeastern end of the Property. Wesley Boulevard will be the subject of an Access and Utility Easement Agreement or Declaration ("Wesley Boulevard Easement") for the benefit initially of the Conference Center Parcel and the Sunrise Assisted Living Facility, but will allow for Buyer to elect to expand the benefit to extend to the Property. Any Wesley Boulevard Easement shall be subject to the approval of Buyer before it is executed and filed for record. The western terminus of the Wesley Boulevard Easement has yet to be determined, but Seller will attempt to cause such western terminus to be as depicted on the attached Exhibit A. In the event Buyer desires to use the Wesley Boulevard Easement for access to portions of the Property, Buyer will be required to join in the Wesley Boulevard Easement and participate in maintenance and other costs incurred thereunder, until such time, if ever, as Wesley Boulevard becomes a publicly dedicated street and join in the costs incurred in connection with the public dedication of Wesley Boulevard. If the Wesley Boulevard Easement calls for the inclusion of Wesley Boulevard in a reserve owned by an association of property owners created pursuant to the Wesley Boulevard Easement, Wesley Boulevard shall be excluded from the Property.

22. **TAX EXEMPTION; ASSESSMENTS.** The parties acknowledge the importance of maintaining the Property as exempt from real estate taxation based on Seller's continued use of the Property in furtherance of its tax exempt activities and agree to cooperate on a commercially reasonable basis to protect and preserve such tax exempt status for as long as possible with respect to all portions of the Property not yet acquired by Buyer hereunder. Seller agrees to exercise commercially reasonable efforts to maintain tax exempt activities on the Property until such time as Buyer's development activities render the continuation of such activities commercially unreasonable. Seller will not conduct or allow to be conducted any activities that would render the portions of the Property not acquired by Buyer to lose their tax exempt status. Seller will not consent to or impose any assessment on the Property without the prior written consent of Buyer. In the event that at any time, any portion of the Property still owned by Seller loses its exempt status and becomes subject to real estate taxation, the provisions of Section 2(a) and Section 25 hereof shall apply.

23. **RESTRICTIVE COVENANTS.** Prior to the Closing on the Initial Acquisition Parcels, Seller shall place of record on the entire property a Declaration of Restrictive Covenants restricting uses of the type listed on the attached Exhibit B. Buyer shall have the right to review and approve on a commercially reasonable basis, such Declaration of Restrictive Covenants prior to its recording.

24. **COOPERATION IN ZONING.** Seller agrees to cooperate with Buyer in all zoning and entitlement efforts pertaining to the Property.

25. **LOSS OF REAL ESTATE TAX EXEMPTION.** Notwithstanding anything to the contrary contained herein, to the extent any portions of the Property still owned by Seller lose their exemption for real property taxes, in lieu of the provisions of Section 2(c)(ii) hereof, Buyer

may elect to close on the remainder of the Property immediately, with Seller agreeing to Seller financing at 0% interest secured by a mortgage on such Property in lieu of cash at Closing, so long as Seller provides credit support for such obligation reasonably acceptable to Seller and agrees to repay the debt evidenced by such mortgage on each prorata portion of the Property mortgaged at the time any such portion of Property is rezoned, sold or otherwise developed. Repayment of such mortgage shall in any event be on the same terms as if Buyer had closed on all portions of the Property pursuant to Section 11(a) hereof.

26. **MISCELLANEOUS.** Each of the parties hereby represents and warrants to the other that it has all requisite power to enter into this Agreement and to perform the terms, covenants and conditions hereof; that the execution and delivery of this Agreement has been duly authorized by all necessary persons or entities, and when executed and delivered, this Agreement will be a legal, valid and binding obligation of such party, enforceable against it in accordance with its terms; and that its signatory is duly authorized and empowered to execute this Agreement on its behalf. Whenever a date specified herein shall fall on a weekend or legal holiday, the date shall be extended to the next business day. The headings used in this Agreement are for convenience only and are not to be considered as defining or limiting in any way the scope or intent of the provisions hereof. This Agreement shall be governed by and interpreted under the laws of the State of Ohio. Time shall be of the essence in the performance of all obligations under this Agreement. The term "Business Day" when used herein shall mean any day other than a Saturday, Sunday, legal holiday in Central Ohio or any other day on which banks located in Central Ohio are authorized or required to close for business. This Agreement has been the subject of negotiation by and between Buyer and Seller, each of whom has been represented by competent legal counsel and therefore no rule of constructively interpreting this Agreement more favorably to one party than the other shall apply.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, the parties have entered into this Agreement as of the date first written above.

SELLER:

**THE UNITED METHODIST CHILDREN'S HOME WEST OHIO CONFERENCE OF THE UNITED METHODIST CHURCH,**
an Ohio non-profit corporation

By: _Cyndy L. Garn_
Name: _Cyndy L. Garn_
Title: _Chairperson, UMCH Family Service_

BUYER:

**LIFESTYLE REAL ESTATE HOLDINGS, LTD.,** an Ohio limited liability company

By: _____
Name: _Michael DeAscentis II_
Title: _CEO_

**EXHIBIT A**

ALTA/ACSM LAND TITLE SURVEY
LOTS 30, 31 & 32, QUARTER TOWNSHIP 3, TOWNSHIP 2, RANGE 18
UNITED STATES MILITARY LANDS
CITY OF WORTHINGTON, COUNTY OF FRANKLIN, STATE OF OHIO
HIGH STREET CORRIDOR LAND
WESLEY BOULEVARD EASEMENT WESTERN TERMINUS
UTILITY LEGEND

# EXHIBIT B

## RESTRICTIVE COVENANTS FOR UMCH LAND

The following activities and business shall be prohibited:

- Dance hall or disco where principal purpose is a dance venue
- Sale of sexually explicit products, materials or pornography
- Businesses engaging in sexually explicit activities (to be further defined)
- Sale of drug paraphernalia
- The operation of any smoke shop (e.g. "Tobacco for Less"), cigar and/or pipe store, or electronic smoke shop (e.g. selling e-cigarettes) that is primarily dedicated to the sale of tobacco and tobacco related products.
- Sale of beer, wine or liquor, except where at least Thirty-Five Percent (35%) of gross sales on an annual basis are from the sale of food and no general carry out sales of beer, wine or liquor are permitted to the general public as a so-called "carry-out store."
- Sales of firearms, ammunition or military armaments.

DTE 1
Rev. 01/19

Tax year ___2019___ BOR no. _19-832_

County ___Franklin___ Date received _____

## Complaint Against the Valuation of Real Property

Answer all questions and type or print all information. Read instructions on back before completing form.
Attach additional pages if necessary.
This form is for full market value complaints only. All other complaints should use DTE Form 2

☒ Original complaint    ☐ Counter complaint
Notices will be sent only to those named below.

| | Name | Mailing address, City ,State, ZIP code |
|---|---|---|
| 1. Owner of property | The United Meth. Children's Home West Ohio Conf. United Methodist Church | 431 East Broad Street Columbus, Ohio 43215 |
| 2. Complainant if not owner | | |
| 3. Complainant's agent | Matthew S. Zeiger, Esq. | 41 South High Street, Suite 3500, Columbus, Ohio 43215 |
| 4. Telephone number of complainant | 614.365.9900 | |
| 5. Email address of complainant | zeigerm@litohio.com | |
| 6. Complainant's relationship to property, if not owner N/A | | |

**If more than one parcel is included, see "Multiple Parcels" on back.**

| 7. Parcel numbers from tax bill | Address of property |
|---|---|
| 100-006774-00 | Lot 4 Replat of Lot 2 UMCH AMD SUB |
| | |
| | |

| 8. Principal use of property | Owned by Non-Profit |
|---|---|

9. The increase or decrease in market value sought. Counter-complaints supporting auditor's value may have -0- in Column C.

| Parcel number | Column A Complainant's Opinion of Value (Full Market Value) | Columbus B Current Value (Full Market Value) | Column C Change in Value |
|---|---|---|---|
| 100-006774-00 | 6,000,000 | 12,973,200 | 6,973,200 |
| | | | |

10. The requested change in value is justified for the following reasons:

Land previously exempt. Assessed value far in excess of market value.

11. Was property sold within the last three years? ☐ Yes ☒ No ☐ Unknown If yes, show date of sale _____
and sale price $_____ ; and attach information explained in "Instructions for Question 10" on back.

12. If property was not sold but was listed for sale in the last three years, attach a copy of listing agreement or other available evidence.

13. If any improvements were completed in the last three years, show date _____ and total cost $_____ .

14. Do you intend to present the testimony or report of a professional appraiser? ☐ Yes ☐ No ☒ Unknown

15. If you have filed a prior complaint on this parcel since the last reappraisal or update of property values in the county, the reason for the valuation change requested must be one of those below. Please check all that apply and explain on attached sheet. See R.C. section 5715.19(A)(2) for a complete explanation.
☐ The property was sold in an arm's length transaction.  ☐ The property lost value due to a casualty.
☐ A substantial improvement was added to the property.  ☐ Occupancy change of at least 15% had a substantial economic impact on my property.

I declare under penalties or perjury that this complaint (including any attachments) has been examined by me and to the best of my knowledge and belief is true, correct and complete.

Date 3/31/20   Complainant or agent _____ Title (if agency) _Attorney_

Signature

Sworn to and signed in my presence, this _31st_ day of _March_ year _2020_

Notary _Terri L. Gleason Woodson_

Signature

852969

EXHIBIT

4

# RETROSPECTIVE APPRAISAL OF:
UNITED METHODIST CHILDREN SITE
"37.35± ACRES OF REDEVELOPMENT LAND"



**LOCATION:**
WEST SIDE OF N. HIGH STREET AT WESLEY BOULEVARD
WORTHINGTON, FRANKLIN COUNTY, OHIO

**EFFECTIVE DATE:**
JANUARY 1, 2019

**PREPARED FOR:**
MR. MATTHEW S. ZEIGER, ESQ.
ZEIGER, TIGGES & LITTLE LLP
41 SOUTH HIGH STREET, SUITE 3500
COLUMBUS, OHIO 43215

**ROBERT WEILER COMPANY FILE NO:**
14552



THE ROBERT
**WEILER**
COMPANY
Appraisal Brokerage Consulting Development



EXHIBIT

5

10 North High Street, Suite 401
Columbus, Ohio 43215
Phone: (614) 221-4286
Fax: (614) 221-7069
www.rweiler.com
UMCH000021



**THE ROBERT
WEILER
COMPANY**

Appraisal Brokerage Consulting Development
10 NORTH HIGH STREET, SUITE 401
COLUMBUS, OHIO 43215
614.221.4286 office
mspeert@rweiler.com

October 6, 2020

Mr. Matthew S. Zeiger, Esq.
Zeiger, Tigges & Little LLP
41 South High Street, Suite 3500
Columbus, Ohio 43215

Re:     *Retrospective Appraisal Report*
        United Methodist Children's Home of West Ohio
        West side of N. High Street
        City of Worthington, Franklin County, Ohio
        Parcel No.: 100-006774-00
        Effective Date:  January 1, 2019

Dear Mr. Zeiger:

Pursuant to your request, the above captioned property has been physically viewed and appraised. The purpose of this appraisal report is to estimate the retrospective market value of the subject property, as of the effective date of this appraisal report.

The effective date of value is January 1, 2019. The date of this report is the date of this transmittal letter. This report is intended to be used by the client, Mr. Matthew S. Zeiger with Zeiger, Tigges & Little LLP, the attorney for the property owner, as supporting documentation regarding the retrospective valuation of the subject property for real estate taxation. The value conclusion contained within this report is based on economic conditions and market performances which existed as of the effective date of the appraisal. The subject property was physically viewed by Melissa Speert on September 29, 2020.

The attached analysis is subject to the various contingent conditions and assumptions made throughout this report. The intent for this report is to be completed in accordance with accepted appraisal standards promulgated in the Appraisal Standards Board of the Appraisal Foundation. This appraisal was also prepared in conformity with the Code of Professional Ethics and Standards of the Appraisal Institute and the USPAP.

UMCH000022

The subject property is located on the west side of N. High Street at the terminus of Wesley Boulevard with frontage along the east side of Evening Street and the north side of Greenbier Court, just south of I-270 and north of Dublin Granville Road within the city of Worthington, Franklin County, Ohio. The subject property consists of one parcel identified by the Franklin County Auditor as parcel number 100-006774-00 and contains 37.35± acres. The site is irregular in configuration, is accessed via both N. High Street and Wesley Boulevard and features a generally level to gently sloping topography. All public utilities are available. Per the City of Worthington Zoning Department, the subject property is zoned S-1, Special purpose; C-2, Community Shopping Center; and C-3 Institutions and Offices.

The subject property containing 37.35± acres is improved with the former United Methodist Children's home campus featuring several residential cottages, administration and maintenance buildings, a small school, a chapel, dining hall and a variety of outdoor recreation areas. Several improvements were constructed in the 1930's and the 1960's. Overall, the improvements are very old and have been vacant for many years. The buildings are overgrown with vegetation, are boarded up and are in dilapidated condition. Exterior photographs are located within this report. The overall condition of both the building and site improvements is considered to be poor.

After considering the subject's very desirable location within the city of Worthington along N. High Street and considering the condition of the existing buildings, we have determined that the current children's home improvements should be removed and the subject property would be redeveloped with a mixed-use development consisting of both retail and residential uses. The subject is in-contract with Lifestyle Real Estate Holdings, Ltd. a local developer.

Upon redevelopment, the subject will have to be rezoned. We have factored the unknowns of the rezoning process within our analysis and have valued the subject property accordingly.

The highest and best use of the subject property as "vacant and available" is to rezone and redevelop the subject property with a mixed-use development that can take advantage of the subject's significant amount of frontage along High Street within the premium Worthington market. The highest and best use of the subject property as "improved" is to remove the existing improvements.

Based upon this analysis and the subject's location, development potential, size and access, it is our opinion that the market value of the subject property as of *January 1, 2019*, in terms of financial arrangements equivalent to cash is estimated to be **$5,600,000**.

---

### FIVE MILLION SIX HUNDRED THOUSAND DOLLARS
*($5,600,000)*

---

UMCH000023

The Robert Weiler Company and its employees have no present or contemplated future interest in the real estate that is the subject of this report; have no personal interest or bias with respect to the subject matter of this report or the parties involved; and the amount of the fee is not contingent upon reporting a predetermined value or upon the amount of the value estimate.

It is assumed that the above referenced property is in compliance with applicable federal, state and local laws, rules, regulations and orders, including building, zoning and environmental requirements and that title thereto is marketable. In this analysis, no inquiry, review or independent examination with respect to the foregoing matters has been conducted.

Thank you for this opportunity to be of service. Should you have questions, please feel free to call.

Respectfully submitted,

THE ROBERT WEILER COMPANY

Robert J. Weiler, Sr., MAI
Senior Real Estate Appraiser
License No. 382759, Expires 10/11/2020

Melissa Dean Speert
Senior Real Estate Appraiser
License No. 2007006485, Expires 5/1/2021

UMCH000024

## SUMMARY OF SALIENT FACTS AND CONCLUSIONS

Location:

The subject property is located on the west side of N. High Street at the terminus of Wesley Boulevard with frontage along the east side of Evening Street and the north side of Greenbier Court, just south of I-270 and north of Dublin Granville Road within the city of Worthington, Franklin County, Ohio. The subject property is located within the Worthington City School District. The physical address of the subject property is 1033 N. High Street, Worthington, Ohio 43085.

Parcel Number:

100-006774-00

Site Features:

The subject's building improvements are situated upon a 37.35± acre site, which is irregular in configuration. Public utilities including water, sewer and electric are connected to the site. The subject property features 950± feet of non-continuous frontage along the west side of N. High Street. The site is features a generally level to gently sloping topography.

Zoning:

Per the City of Worthington Zoning Department, the subject property is zoned S-1, Special purpose; C-2, Community Shopping Center; and C-3 Institutions and Offices.

Improvements:

The subject property is improved with the former United Methodist Children's home campus featuring several residential cottages, administration and maintenance buildings, a small school, a chapel, dining hall and a variety of outdoor recreation areas. Several improvements were constructed in the 1930's and the 1960's. Overall, the improvements are very old and have been vacant for many years. The buildings are overgrown with vegetation, are boarded up and are in dilapidated condition. The buildings and site improvements are considered to be poor.

After considering the subject's very desirable location within the city of Worthington along N. High Street and considering the condition of the existing buildings, we have determined that the current children's home improvements should be removed and the subject property would be redeveloped with a mixed-use development consisting of both retail and residential uses. The subject is in-contract with Lifestyle Real Estate Holdings, Ltd. a local developer.

Current Use of the Property:            Redevelopment Land

Highest and Best Use:                   Rezone and Redevelop with a Mixed-Use Development

Indications of Value:
   Cost Approach:                       N/A
   Income Capitalization Approach:      N/A
   Sales Comparison Approach (Land Only): $5,600,000

**Market Value Estimate:**              **$5,600,000**

Last Date of Property Viewing:          September 29, 2020
Effective Date of Appraisal:            January 1, 2019
Date of Report:                         October 6, 2020

UMCH000026

## TABLE OF CONTENTS

### PREFACE
TITLE PAGE
LETTER OF TRANSMITTAL
SUMMARY OF SALIENT FACTS AND CONCLUSIONS
TABLE OF CONTENTS

### THE REPORT ... PAGE

| | PAGE |
|---|---|
| LIMITING CONDITIONS | 1 |
| CERTIFICATE OF APPRAISAL | 5 |
| QUALIFICATIONS OF ROBERT J. WEILER, MAI | 6 |
| QUALIFICATIONS OF MELISSA DEAN SPEERT | 7 |
| PURPOSE OF THE APPRAISAL | 8 |
| IDENTIFICATION OF THE CLIENT AND INTENDED USE OF THE APPRAISAL | 8 |
| SCOPE OF THE ASSIGNMENT | 9 |
| OWNERSHIP HISTORY | 10 |
| LEGAL DESCRIPTION | 10 |
| EXTRAORDINARY ASSUMPTIONS AND HYPOTHETICAL CONDITIONS | 10 |
| COMPETENCY AND CERTIFICATION | 12 |
| MARKETING PERIOD AND EXPOSURE PERIOD | 12 |
| ECONOMIC OVERVIEW OF THE MARKET AREA | 13 |
| CITY OF WORTHINGTON ECONOMIC OVERVIEW | 22 |
| DESCRIPTION OF THE NEIGHBORHOOD | 25 |
| DESCRIPTION OF THE SITE | 27 |
| DESCRIPTION OF THE IMPROVEMENTS | 30 |
| PHOTOGRAPHS OF THE SUBJECT PROPERTY | 31 |
| HIGHEST AND BEST USE | 36 |
| VALUATION PROCEDURE | 38 |
| THE SALES COMPARISON APPROACH – LAND VALUATION ONLY | 40 |
| SUMMATION AND FINAL RECONCILIATION | 58 |

### THE ADDENDUM



## *PHOTOGRAPH AND LOCATION MAP OF THE SUBJECT PROPERTY*

*Photo taken on September 29, 2020*

UMCH000028

## *LIMITING CONDITIONS*

The appraisal attached hereto is made expressly subject to the following conditions, limitations and stipulations. Possession of this report, or any copy thereof, does not carry with it the right of publication, duplication or distribution, nor may the same be used for any purpose by any but the applicant without the previous written consent of the appraiser or the applicant, and any event, only in its entirety.

- No responsibility is assumed for the legal description provided or for matters pertaining to legal or title considerations. Title to the property is assumed to be good and marketable unless otherwise stated.

- The property is appraised free and clear of any or all liens or encumbrances unless otherwise stated.

- Responsible ownership and competent property management are assumed.

- Information furnished by others is believed to be reliable, but no warranty is given for its accuracy.

- All engineering studies are assumed to be correct. The plot plans and illustrative material in this report are included only to help the reader visualize the property.

- It is assumed that there are no hidden or unapparent conditions of the property, subsoil, or structures that render it more or less valuable. No responsibility is assumed for such conditions or for obtaining the engineering studies that may be required to discover them.

- It is assumed that the property is in full compliance with all applicable federal, state, and local environmental regulations and laws unless the lack of compliance is stated in the appraisal report.

- It is assumed that the property conforms to all applicable zoning and use regulations and restrictions unless a nonconformity has been described in the appraisal report.

- It is assumed that all required licenses, certificates of occupancy, consents, and other legislative or administrative authority from any local, state, or national government or private entity or organization have been or can be obtained or renewed for any use on which the opinion of value contained in this report is based.

- It is assumed that the use of the land and improvements is confined within the boundaries or property lines of the property described and that there is no encroachment or trespass noted in the report.

2

UMCH000029

- Unless otherwise stated in this report, the existence of hazardous materials, which may or may not be present on the property, was not observed by the appraiser. The appraiser has no knowledge of the existence of such materials on or in the property. The appraiser, however, is not qualified to detect such substances. The presence of substances such as asbestos, urea-formaldehyde foam insulation, and other potentially hazardous materials may affect the value of the property. The value estimated is predicated on the assumption that there is no such material on or in the property that would cause a loss in value. No responsibility is assumed for such conditions or for any expertise or engineering knowledge required to discover them. The intended user is urged to retain an expert in this field, if desired.

- The forecasts, projections or operating estimates contained herein are based on current market conditions, anticipated short-term supply and demand factors, and a continued stable economy. These forecasts are, therefore, subject to changes with future conditions.

- This appraisal has been made with the following general limiting conditions:

- Any allocation of the total value estimated in this report between the land and the improvements applies only under the stated program of utilization. The separate values allocated to the land and buildings must not be used in conjunction with any other appraisal and are invalid if they are.

Appraisal Institute, *The Appraisal of Real Estate*, 14th ed. (Chicago: Appraisal Institute, 2013), 664.

1) The appraiser, by reason of this report, is not required to give further consultation or testimony or to be in attendance in court with reference to the property in question unless arrangements have been previously made.

2) Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraiser, or the firm with which the appraiser is connected) shall be disseminated to the public through advertising, public relations, news, sales, or other media without the prior written consent and approval of the appraiser.

3) No legal description or survey was furnished, so the appraiser used the county tax plat to ascertain the physical dimensions and acreage of the property. Should a survey prove this information to be inaccurate, it may be necessary for this appraisal to be adjusted.

4) The analyst assumed good title to all the property described or mentioned in the report and is appraised free and clear of any or all liens or encumbrances unless otherwise stated. No responsibility is assumed for matter legal in nature.

5) The valuation indicated in this report is valid only for the valuation date and for the purpose stated.

6) The appraisal assignment was not based upon a requested minimum valuation, a specific valuation or the approval of a loan.

3

UMCH000030

7) The Americans with Disabilities Act (ADA) became effective January 26, 1992. The appraiser has not made a specific compliance survey or analysis of the property to determine whether or not it is in conformity with the various detailed requirements of ADA. It is possible that a compliance survey of the property and a detailed analysis of the requirements of the ADA would reveal that the property is not in compliance with one or more of the requirements of the act. If so, this fact could have a negative impact on the value of the property. Since the appraiser has no direct evidence relating to this issue, possible noncompliance with the requirements of ADA was not considered in estimating the value of the property.

8) Unless otherwise stated in this report, the existence of mold, which may or may not be present on the property, was not observe by the appraiser. The appraiser has no knowledge of the existence of mold on the property; however, mold does exist in most every property and usually causes no harm but it can be toxic in some situations. The appraiser is not qualified to detect such substances. The presence of mold may affect the value of the property. The value estimated herein is predicated on the assumption that there is no mold problem on or in the property that would cause a loss in value. No responsibility is assumed for such conditions or for any expertise or engineering knowledge required to discover them. The intended user is urged to retain an expert in this field, if desired.

9) This appraisal is not a "building inspection" and the appraiser is not acting as a "building inspector" when preparing this report. The appraiser visually observed areas that were readily accessible. This report is not intended to be technically exhaustive.

4

## *CERTIFICATE OF APPRAISAL*

The undersigned do hereby certify as follows:

1) The Appraisal Institute conducts a program of continuing education for its designated members. As of the date of this report, Robert J. Weiler and Melissa Dean Speert, have completed the requirements of the continuing education program of the Appraisal Institute.

2) The use of this report is subject to the requirements of the Appraisal Institute and the American Society of Appraisers relating to review by its duly authorized representatives and is subject to duly authorized representatives of the courts (subpoenaed or requested).

3) The statements of fact contained in this report are true and correct.

4) The reported analyses, opinions and conclusions are limited only by the reported assumptions and limiting conditions and our personal, unbiased professional analyses, opinions and conclusions.

5) We have no present or prospective interest in the property that is the subject of this report, and we have no personal interest or bias with respect to the parties involved. The Robert Weiler Company has not performed professional services on the subject property within the previous five years.

6) Our engagement in this assignment was not contingent upon developing or reporting predetermined results. Our compensation is not contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value estimate, the attainment of a stipulated result, or the occurrence of a subsequent event.

7) The analyses, opinions, and conclusions were developed and this report have been prepared in conformity with the Code of Professional Ethics & Standards of Professional Appraisal Practice of the Appraisal Foundation, the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute, the Principles of Appraisal Practice and Code of Ethics of the American Society of Appraisers, and The Counselors of Real Estate.

8) The property was physically viewed on the exterior on September 29, 2020.

9) No one aided in the professional assistance to the persons signing this report.

10) The real estate, which is the subject of this report, was valued as of January 1, 2019. The date of this report is October 6, 2020.

11) The appraisal assignment is not based on a specific or requested minimum valuation or the approval of a loan.


_____
Robert J. Weiler, MAI
State Certified General Appraiser No. 382759

_____
Melissa Dean Speert
State Certified General Appraiser No. 2007006485

5

EDUCATIONAL BACKGROUND
- Bachelor of Science Degree in Business Administration, University of Arizona, 1957
- Master of Arts Degree in Real Estate, The Ohio State University, 1964
- Doctor of Philosophy (Ph.D.), The Ohio State University, 1968
- Juris Doctor (J.D.) Degree, Capital University Law School, 1983

REAL ESTATE EXPERIENCE
- Realtor® since 1957
- Full time real estate appraisal profession since 1959
- Chairman of the Board of The Robert Weiler Company
- Developer of numerous subdivisions and apartment/office/industrial complexes in Central Ohio
- Real estate consulting since 1970
- Adjunct Professor, Capital University Law School and Capital University MBA Program
- Adjunct Professor, OSU Moritz College of Law
- Contributing Editor, *The Appraisal of Real Estate*

CLIENTS REPRESENTED
- Individuals
- Investors
- Mortgage Lenders
- Realtors®
- Churches
- City of Columbus
- State of Ohio
- Franklin County Auditor
- Department of Development
- The Ohio State University
- Attorneys
- Numerous large corporations, including several listed on the New York Stock Exchange

MEMBERSHIPS
- Licensed Certified General Real Estate Appraiser, State of Ohio
- Columbus Board of Realtors®; Director, Past President
- Ohio and National Association of Realtors®; Board of Directors, 1977-79, National Association of Realtors®
- American Institute of Real Estate Appraisers;[1] Past President, Ohio Chapter #3; MAI designation
- Society of Real Estate Appraisers;[1] Past President, Columbus Chapter, Instructor of SRA courses
- Columbus and Ohio State Bar Associations
- Past Chairman, Ohio Real Estate Appraisal Board
- Past Chairman, Capital University Board of Trustees
- Past Member, Columbus Board of Education; President 1987
- Board of Trustees, Metropolitan YMCA; Past Chairman
- Former Member, Center of Science and Industry (COSI)
- Board of Trustees, Affordable Housing Trust
- Board of Trustees, Ohio Capital Corporation for Housing
- Board of Trustees, Columbus Urban League
- Former Member, Central Ohio Transit Authority (COTA)
- Board of Trustees, Columbus Bar Foundation
- Founding Member, Central Ohio Community Improvement Corporation (COCIC)
- Managing Partner, Polaris Centers of Commerce

[1]Unified as the Appraisal Institute, January 1, 1991

UMCH000033

Melissa Dean Speert
President, Appraisal Division
The Robert Weiler Company
10 North High Street, Suite 401
Columbus, Ohio 43215

- Chief senior appraiser with The Robert Weiler Company, Real Estate Counselors, Appraisers and Brokers. Work Scope includes appraisals, consulting services, research and governmental clients throughout the Columbus metropolitan area, Franklin County and the State of Ohio.
- Certified General Real Estate Appraiser No. 2007006485
- ODOT Prequalified

## EDUCATIONAL BACKGROUND
- Capital University: Marketing and Business Studies
- Appraisal Institute, Appraisal Principals
- Appraisal Institute, Appraisal Procedures
- Appraisal Institute, Basic Income Capitalization
- Appraisal Institute, Advanced Income Capitalization
- Appraisal Institute, Uniform Standards of Professional Appraisal Practice
- Appraisal Institute, Fair Housing
- Various seminars and classes reflecting current trends in valuation of real property

## APPRAISAL EXPERIENCE
- May 2005 – Present:  Senior Appraiser, The Robert Weiler Company
  Commercial, Industrial, Office, Multi-Family, Investment Properties
- Jan. 1999 – May 2005: Appraiser, Anthony F. Mollica and Assoc. Residential, Commercial, Industrial, and Multi-Family Properties

## TYPES OF PROPERTIES APPRAISED
- Special Purpose Properties
- Service Stations
- Various Types of Commercial and Retail Properties
- Manufacturing Facilities
- Office/Warehouse Properties
- General and Medical Office Buildings
- Development Land
- Shopping Centers
- Single-Family Residential
- Multi-Family Complexes
- Eminent Domain (all types)
- Automobile Dealerships
- Car Washes
- Institutional Uses
- Proposed Subdivisions
- Agricultural Land

## APPRAISAL PRACTICE
_Full time real estate appraiser for over ten years and have completed several courses sponsored by the Appraisal Institute and continue to attend real estate courses and seminars. My real property valuation experience includes a wide variety of commercial, industrial, office, single-family, multi-family, development land and special purposes properties throughout the Columbus Metropolitan area and the State of Ohio. The list of clients served include mortgage lending institutions; corporations, organizations and churches; Universities and Colleges (Ohio University, OSU, Ohio Northern University); attorneys and law firms; Ohio Department of Transportation; numerous municipalities; investors and developers; and property owners._

7

## PURPOSE OF THE APPRAISAL

The purpose of this appraisal is to estimate the market value of the retrospective *fee simple estate* of the subject property as of the effective date of valuation, *January 1, 2019*.

*Market value* is defined as "the most probable price, as of a specified date, in cash, or in terms equivalent to cash, or in other precisely revealed terms, for which the specified property rights should sell after reasonable exposure in a competitive market under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under undue duress. Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 6th ed. (Chicago: Appraisal Institute, 2015), 141.

Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1. Buyer and seller are typically motivated;
2. Both parties are well informed or well advised, and acting in what they consider their best interests;
3. A reasonable time is allowed for exposure in the open market;
4. Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
5. The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale."

*Fee Simple Estate* is defined as "absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat." Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 6th ed. (Chicago: Appraisal Institute, 2015), 90.

## IDENTIFICATION OF THE CLIENT AND INTENDED USE OF THE APPRAISAL

This report is intended to be used by the client, Mr. Matthew S. Zeiger with Zeiger, Tigges, and Little LLP, Attorney for the property owner, as supporting documentation regarding the retrospective valuation of the subject property for real estate taxation. Other intended users include the Franklin County Board of Revision and the Ohio Board of Tax Appeals.

UMCH000035

Regional and local economic factors as well as neighborhood economic influences have been evaluated and an analysis of those most pertinent factors has been included. These factors, as well as the zoning of the property and the surrounding development, play a role in analyzing the subject's highest and best use, which influences the data researched in the valuation process.

> A viewing of the subject property was conducted with particular attention being given to its physical and functional characteristics and its ability or inability to function within its market area.

> An analysis of the subject's highest and best use, both as if vacant and as improved, was conducted to estimate the subject's highest potential value while considering what is legally permissible, physically possible, financially feasible, and maximally productive.

> Market data was collected and analyzed for the purpose of estimating the subject's market value.

> The collected market data was verified with the appropriate knowledgeable parties in order to obtain an accurate account of the transaction, eliminating those comparables which are not arm's length or which are not consistent with the highest and best use of the subject property.

The three traditional approaches to value (sales comparison, cost, and income capitalization) were analyzed for purposes of this report. The applicable approaches to value are then correlated and reconciled into a final market value conclusion.

The cost approach and income capitalization approach are not applicable, as the subject property is improved with a former children's home campus that is improved with residential and institutional buildings that were constructed in the 1930's and 1960's that no longer contribute to value. The sales comparison approach, land valuation, is the only approach deemed applicable to this analysis.

The sales comparison approach involves the research and analysis of sales of properties which represent alternatives to the subject property in the marketplace. The sales are verified with a knowledgeable party and are compared to the subject property. After adjustments qualitative for items of dissimilarity, the adjusted unit indicators provide the basis for the valuation of the subject property.

In arriving at a final value estimate for the subject property, consideration is given to each of the approaches which have been developed. The strengths and weaknesses of each approach are analyzed, culminating in the final value estimate.

UMCH000036

## OWNERSHIP HISTORY

Per a review of public records data, the subject property is entirely titled to the United Methodist Children's Home of West Ohio. There have been no other arm's-length transfers of the subject property within the previous five years.

The subject is in-contract with Lifestyle Real Estate Holdings, Ltd. a local developer. The contract went into effect on April 20, 2017. The contract is contingent upon rezoning. A copy of the purchase contract is located within our work-file.

## LEGAL DESCRIPTION

We have relied upon public records and information provided by the client as to the site's size and dimensions. A copy of the most recent General Warranty Deed (Instrument #201606030069609) is provided within the addenda of this report, which include a brief legal description of the subject property.

## EXTRAORDINARY ASSUMPTIONS AND HYPOTHETICAL CONDITIONS

The Uniform Standards of Professional Appraisal Practice (USPAP) requires that an appraisal clearly and accurately discloses any extraordinary assumptions or hypothetical conditions that directly affect the appraisal and the final value estimate.

An **extraordinary assumption** is defined as:

> "An assumption, directly related to a specific assignment, as of the effective date of the assignment results, which, if found to be false, could alter the appraiser's opinions or conclusions. Extraordinary assumptions presume as fact otherwise uncertain information about physical, legal, or economic characteristics of the subject property; or about conditions external to the property such as market conditions or trends; or about the integrity of data used in an analysis. (USPAP, 2016-2017 ed.)" Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 6th ed. (Chicago: Appraisal Institute, 2015), 84.

The market value estimated herein is based on the following extraordinary assumptions:

- The sizes of the subject building improvements, apartment units, and land areas are based upon information obtained from public records and information provided during the site visit of the subject property by a representative of the property owner. The market value reported herein is based on the assumption that the information provided is accurate.

- We were unable to view the interior of the buildings due to their conditions. This report is based upon the extraordinary assumption that the interior condition of the subject property improvements was similar to the exterior, which is poor. We are also assuming that the improvements were in the same condition as of January 1, 2019 as they were on the last physical property viewing which took place on September 29, 2020.

- It is assumed that the property conforms to applicable zoning, building, and fire codes.

10

- There are no hazardous environmental conditions or ADA non-compliance issues which would impact the value of the subject property.

- The subject property is not encumbered by any easements which would negatively impact the market value of the property.

*Environmental Concerns*: Although the presence of toxic wastes or any other hazardous substances were not discovered upon inspection of the subject site, a comprehensive testing program was not conducted. **Testing for hazardous substances is considered to be out of the area of appraisal expertise. If concern over this matter exists, the reader is urged to seek professional assistance in determining the nature and extent of any said hazardous substances. The value estimate provided herein is based on the assumption that none exist.**

There are no other extraordinary assumptions which have been made within this report which would affect the value estimate of the property being analyzed.

A *hypothetical condition* is defined as:

"1. A condition that is presumed to be true when it is known to be false.
2. A condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis. Hypothetical conditions are contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis. (USPAP, 2016-2017 ed.)" Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 6th ed. (Chicago: Appraisal Institute, 2015), 113.

There are no hypothetical conditions that affect the valuation of the subject property reported herein.

UMCH000038

## *COMPETENCY AND CERTIFICATION*

In accordance with the Uniform Standards of Professional Appraisal Practice (USPAP) adopted by the Appraisal Standards Board of the Appraisal Foundation, it is certified that the signatories of this report have prior experience in and are familiar with the type of property being appraised. Qualifications for Robert J. Weiler and Melissa Dean Speert are located previously following the Certificate of Appraisal of this appraisal report.

The compensation for this report is not contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value estimate, the attainment of a stipulated result, or the occurrence of a subsequent event.

## *MARKETING PERIOD AND EXPOSURE PERIOD*

A reasonable marketing period for the subject property has been considered. Marketing time is defined as "an opinion of the amount of time it might take to sell a real or personal property interest at the concluded market value level during the period immediately after the effective date of the appraisal." Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 6th ed. (Chicago: Appraisal Institute, 2015), 140. Our estimation of a reasonable marketing period is contingent upon an asking price near the estimate of market value provided in this appraisal report, assuming competent and aggressive marketing. Per discussions with local real estate professionals and investors, we estimate a marketing time of six months for the subject property.

A reasonable exposure period for the subject property has also been considered. A reasonable exposure period may be defined as "1. The time a property remains on the market. 2. [The] estimated length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal." Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 6th ed. (Chicago: Appraisal Institute, 2015), 83. The estimation of a reasonable exposure period is contingent upon an asking price near the estimate of market value provided in this report. Based on the subject's physical, location, economic and competitive characteristics, it is our opinion that an exposure period of six months is appropriate.

UMCH000039

## ECONOMIC OVERVIEW OF THE MARKET AREA

### Introduction
The market value of the subject property is influenced in a general manner by the economic, political, physical, and social characteristics of the Columbus Metropolitan Statistical Area (MSA). The Columbus MSA is defined by the United States Bureau of the Census as the Ohio counties of Delaware, Fairfield, Franklin, Hocking, Licking, Madison, Morrow, Perry, Pickaway, and Union, with Columbus as the Principal City. Union and Morrow counties were added to the Columbus MSA in June 2003, and Hocking and Perry Counties were added in February, 2013. Therefore, when comparing trends for the MSA, numbers may need to be adjusted for certain years to include these counties.



*Franklin County*



*Columbus MSA*

### General Information
Columbus is the capital of the State of Ohio, the county seat of Franklin County, and the major metropolitan area in the ten county MSA. According to the most recent census, Columbus is the fourteenth largest city in America and the second largest in the Midwest. Situated in the geographical center of the state, it is accessible from all metropolitan areas within the state of Ohio. The city has been successful in attracting many services, research, and transportation-oriented businesses; however, no single activity, public or private, dominates the local economy. Significantly, Columbus is the nation's largest municipality to have both the city and the county earn AAA ratings from the nation's two leading bond-rating services.

### Administration
The city of Columbus operates under a mayor-city council form of government. It consists of a mayor and seven at-large council members. Franklin County has a three-commissioner system which is primarily involved with the administration of unincorporated areas of the county.

13

UMCH000040

*Area and Population*

Columbus has experienced physical and population growth over the past ten years. According to the U.S. Census Bureau's Geography QuickFacts, Columbus contained over 212 square miles in 2010. The goal of city officials is to promote growth in areas where services such as utilities and schools are already present or easily available. The 2010 census population of Franklin County was 1,163,414. This represents an approximate 8.12% increase over the 2000 census population of 1,068,978. The increase in the county population mirrors that of the City of Columbus. Specifically, Columbus' 2000 census population was 711,470. The 2010 census population of 787,033 reflects an increase of approximately 10.6% since 2000. Part of the increase in population is a result of annexations by Columbus during this period. Additionally, there has been an overall 11.05% increase in the Franklin County total population since 2010.

The following chart illustrates population changes for Columbus, Franklin County, the Columbus MSA, and for Ohio.

| | | | | | POPULATION GROWTH | | | | |
|------|----------|------------------|---------------------|------------------|--------------------|------------------|------------|------------------|
| Year | Columbus | Annual Change | Franklin County | Annual Change | Columbus MSA(1) | Annual Change | Ohio | Annual Change |
| 2018 | 892,533 | 2.2% | 1,310,300 | 2.2% | 2,078,725 | -1.3% | 11,689,100 | 0.3% |
| 2017 | 879,170 | 2.2% | 1,291,987 | 2.2% | 2,078,725 | -1.3% | 11,658,609 | 0.3% |
| 2016 | 860,090 | 1.2% | 1,264,518 | 1.0% | 2,106,616 | 4.2% | 11,614,373 | 0.0% |
| 2015 | 850,106 | 1.7% | 1,251,722 | 1.5% | 2,021,632 | 1.4% | 11,613,423 | 0.2% |
| 2014 | 835,937 | 1.6% | 1,231,393 | 1.6% | 1,994,534 | 1.4% | 11,594,163 | 0.2% |
| 2013 | 822,553 | 1.6% | 1,212,263 | 1.4% | 1,967,066 | 3.4% | 11,570,808 | 0.2% |
| 2012 | 809,798 | 1.3% | 1,195,537 | 1.4% | 1,901,974 | 2.3% | 11,544,225 | 0.0% |
| 2011 | 799,086 | 1.5% | 1,179,264 | 1.4% | 1,858,464 | 1.2% | 11,541,007 | 0.0% |
| 2010 | 787,033 | 2.3% | 1,163,414 | 1.2% | 1,836,536 | 1.9% | 11,536,504 | -0.1% |
| 2009 | 769,332 | 1.3% | 1,150,122 | 1.9% | 1,801,848 | 1.6% | 11,542,645 | 0.5% |
| 2008 | 759,360 | 1.2% | 1,129,067 | 1.0% | 1,773,120 | 1.1% | 11,485,910 | 0.2% |
| 2007 | 750,700 | 0.8% | 1,118,107 | 0.8% | 1,754,337 | 1.1% | 11,466,917 | 0.0% |
| 2006 | 744,473 | 0.8% | 1,109,067 | 0.7% | 1,734,563 | 1.1% | 11,463,513 | 0.0% |
| 2005 | 738,665 | 0.4% | 1,101,432 | 0.4% | 1,715,265 | 1.1% | 11,459,776 | 0.1% |
| 2004 | 736,073 | 0.3% | 1,096,810 | 0.3% | 1,697,284 | 1.0% | 11,452,808 | 0.1% |
| 2003 | 733,795 | 0.8% | 1,093,073 | 0.5% | 1,679,709 | 1.2% | 11,435,980 | 0.2% |
| 2002 | 727,920 | 0.6% | 1,087,882 | 0.5% | 1,660,036 | 1.1% | 11,414,816 | 0.2% |
| 2001 | 723,634 | 1.7% | 1,082,686 | 1.3% | 1,642,443 | 1.8% | 11,392,869 | 0.3% |
| 2000 | 711,470 | 6.2% | 1,068,978 | 4.0% | 1,612,694 | 8.3% | 11,353,140 | 0.9% |
| 1999 | 669,969 | 0.2% | 1,027,821 | 0.6% | 1,489,487 | 1.4% | 11,256,654 | 0.2% |
| 1998 | 668,804 | 0.2% | 1,021,194 | 0.4% | 1,469,604 | 0.6% | 11,237,752 | 0.2% |
| 1997 | 667,635 | 0.8% | 1,017,274 | 0.1% | 1,460,242 | 0.9% | 11,212,498 | 0.2% |
| 1996 | 662,174 | 0.4% | 1,016,700 | 0.7% | 1,446,800 | 1.1% | 11,187,032 | 0.3% |
| 1995 | 659,831 | 4.3% | 1,009,800 | 5.0% | 1,431,500 | 1.9% | 11,155,493 | 2.8% |
| 1990 | 632,910 | N/A | 961,437 | N/A | 1,405,168 | N/A | 10,847,115 | N/A |

Note: (1) 1990-1999 data does not include Union or Morrow Counties
*Source: U.S. Bureau of the Census*

UMCH000041

The growth of Columbus satellite communities is a concern of city officials and planners. Over the past two decades, these satellite communities have exhibited percentage increases in population greater than the central city and outlying agricultural areas. More recently, movement has occurred from inner city areas to suburban areas. This is most evident in the substantial increase in residential and commercial real estate development in the north, northeast, and northwest Columbus suburbs. Based on development activity over the past several years, this pattern is expected to continue into the future. As a result, suburban Franklin County is anticipated to experience greater population growth than the urban and rural areas.

## Industries and Employment

The economy of Columbus is diverse with a sound commercial, industrial and financial base. The table below illustrates a more intricate breakdown of establishments, employment, and wages by section in 2016 in Franklin County.

### Establishments, Employment, and Wages by Sector: 2017

| Industrial Sector | Number of Establishments | Average Employment | Total Wages | Average Weekly Wage |
|---|---|---|---|---|
| Private Sector | 31,204 | 633,301 | $33,176,262,468 | $1,007 |
| Goods-Producing | 2,785 | 64,638 | $4,104,345,701 | $1,221 |
| Natural Resources and Mining | 39 | 661 | $36,741,472 | $1,089 |
| Construction | 1,799 | 25,921 | $1,707,798,186 | $1,267 |
| Manufacturing | 947 | 38,056 | $2,359,806,043 | $1,192 |
| Service-Providing | 28,419 | 568,663 | $29,071,916,767 | $983 |
| Trade, Transportation and Utilities | 6,761 | 147,604 | $6,821,984,507 | $889 |
| Information | 561 | 14,624 | $1,081,188,872 | $1,422 |
| Financial Services | 3,746 | 61,506 | $4,594,521,095 | $1,437 |
| Professional and Business Services | 6,999 | 126,034 | $8,456,608,069 | $1,290 |
| Education and Health Services | 4,357 | 123,526 | $5,660,758,398 | $881 |
| Leisure and Hospitality | 3,402 | 73,402 | $1,564,260,833 | $410 |
| Other Services | 2,546 | 21,919 | $890,392,256 | $781 |
| Federal Government | | 13,141 | $970,468,805 | $1,420 |
| State Government | | 53,902 | $3,945,600,102 | $1,408 |
| Local Government | | 51,270 | $2,929,996,636 | $1,099 |

Private Sector total includes Unclassified establishments not shown.

*Source: Ohio Development Services Agency*

The table below illustrates the comparison of the Columbus MSA's unemployment rates to Franklin County, Ohio, and the USA since 1990.

| AVERAGE UNEMPLOYMENT RATES | | | | |
|---|---|---|---|---|
| Year | Franklin County | Columbus MSA | Ohio | USA |
| 2018 | 3.8% | 3.8% | 4.6% | 3.9% |
| 2017 | 4.0% | 4.2% | 5.0% | 4.4% |
| 2016 | 4.1% | 4.2% | 4.9% | 4.9% |
| 2015 | 3.8% | 4.3% | 4.7% | 5.3% |
| 2014 | 4.8% | 4.8% | 5.7% | 6.2% |
| 2013 | 6.2% | 6.2% | 7.2% | 7.4% |
| 2012 | 6.1% | 6.1% | 7.2% | 8.1% |
| 2011 | 7.5% | 7.5% | 8.6% | 8.9% |
| 2010 | 8.7% | 8.7% | 10.0% | 9.6% |
| 2009 | 8.3% | 8.4% | 10.1% | 9.3% |
| 2008 | 5.5% | 5.5% | 6.5% | 5.8% |
| 2007 | 4.7% | 4.7% | 5.6% | 4.6% |
| 2006 | 4.6% | 4.7% | 5.4% | 4.6% |
| 2005 | 5.2% | 5.2% | 5.9% | 5.1% |
| 2004 | 5.4% | 5.4% | 6.1% | 5.5% |
| 2003 | 5.3% | 5.4% | 6.2% | 6.0% |
| 2002 | 5.0% | 5.0% | 5.7% | 5.8% |
| 2001 | 3.4% | 3.5% | 4.4% | 4.7% |
| 2000 | 3.1% | 3.2% | 4.0% | 4.0% |
| 1999 | 2.6% | 2.6% | 4.3% | 4.2% |
| 1998 | 2.6% | 2.7% | 4.3% | 4.5% |
| 1997 | 2.8% | 2.9% | 4.6% | 4.9% |
| 1996 | 3.0% | 3.1% | 4.9% | 5.4% |
| 1995 | 3.0% | 3.5% | 4.8% | 5.6% |

*Source:  Ohio Labor Market Information*

Generally speaking, according to the Columbus Chamber of Commerce, the Columbus regional economy remains much stronger than average. A study by Woods & Poole Economics Inc. says the Columbus MSA will gain 350,000 jobs and 550,000 people through 2020.

Fifteen Fortune 1000 companies are headquartered in the Columbus MSA, including six Fortune 500 companies. Several other Fortune 1000 and major international companies are among the region's largest employers including government, education, retailers, insurance, research, healthcare, manufacturing, distribution, and services. Home of Battelle Memorial Institute, Chemical Abstracts Service, CompuServe Inc., The Ohio State University, and Online Computer Library Center, the city has developed a reputation as a center for technological information and research. Banking and insurance are also vital to the local economy, as JP Morgan Chase Bank, Huntington National Bank, Fifth Third Bank, KeyBank, Nationwide Insurance, Continental Heritage Insurance Company, Grange Mutual Casualty Company, Motorists

16

UMCH000043

Mutual Insurance Company, The Columbus Life Insurance Company, and the Midland Mutual Life Insurance Company are located in Columbus. Other large firms headquartered in Columbus include American Electric Power, Abercrombie & Fitch Co., Cardinal Health Inc., Mettler-Toledo, Inc., Scotts Miracle-Gro Co., and Limited Brands.

The table below highlights the 2018 largest employers (private sector) in the Central Ohio area.

| 15 LARGEST PRIVATE COLUMBUS AREA EMPLOYERS | | |
|---|---|---|
| Organization | Sector | Employe |
| JP Morgan Chase | F.I.R.E. (1) | 20,475 |
| Nationwide | Health Care | 13,400 |
| Ascena Retail Group, Inc. | Retail | 11,615 |
| Honda of America Mfg., Inc. | Manufacturing | 10,701 |
| Mount Carmel Health System | Health Care | 8,448 |
| Limited Brands | Retail Trade | 7,800 |
| Nationwide Children's Hospital | Health Care | 5,762 |
| Kroger Company | Retail Trade | 5,417 |
| Huntington Bancshares Inc. | Financial Activities | 4,170 |
| Cardinal Health | Health Care | 4,030 |
| Medco Health Solutions | Health Care | 3,831 |
| American Electric Power | Utilities | 3,527 |
| Battelle Memorial Institute | Professional Service | 2,618 |
| Abbott Nutrition | Manufacturing | 2,055 |
| Alliance Data | Information | 2,030 |
| Note:<br>     (1) Total includes subset branches/divisions shown below,<br>     (2) Finance, Insurance, and Real Estate | | |

*Source: Columbusregion.com*

*Transportation and Infrastructure*

A well-developed, efficient transportation system is vital to the development of an MSA and the communities within it. The Columbus metropolitan area is well serviced by the interstate highway system and other major local and state routes. Interstate 71, a north/south interstate artery, bisects Columbus and connects with Cleveland and Cincinnati. With numerous interchanges, Interstate 71 provides northern and southern Columbus residents with direct access to the downtown central business district. The primary east/west freeway in Columbus is Interstate 70. Interstate 70 traverses the downtown along its southern boundary and interchanges with Interstate 71 at the southeast fringe of the Columbus CBD. The numerous interchanges along Interstate 70 provide the eastern and western suburbs of Columbus access to the downtown central business district.

17

UMCH000044

Three other major freeways are Interstates 270 and 670 and State Route 315. Interstate 270 is Columbus' outerbelt. It is approximately sixty miles in circumference and encompasses much of the city. It provides outlying areas with access to the two major expressway systems, as well as other surrounding Columbus suburbs. Interstate 670 provides a cross-town connection between Interstate 70 and Interstate 270, roughly parallel to U.S. 62. The highway composes the northern half of the innerbelt, a system of freeways including State Route 315, Interstate 70 and Interstate 71. Interstate 670 provides congestion relief to the southern inner belt alignment of the Interstate 70-71 overlap. The freeway carries up to eight lanes of traffic. State Route 315 is a north/south freeway that connects Delaware County and northwest Columbus to downtown.

Columbus benefits from its strategic location and proximity to the entire U. S. market. According to the Columbus Chamber of Commerce, the city of Columbus is within a one-day truck drive or one-hour flight of 51 percent of the U.S. population and 53 percent of the U.S. manufacturing capacity. One-third (32.9%) of the Canadian population are within a 10-hour drive from Columbus. A survey of driving mileage between Columbus and major population centers in the Midwest and Eastern United States is listed as follows.

| MILEAGE | |
| --- | --- |
| **Location** | **Miles** |
| Cincinnati | 106 |
| Cleveland | 142 |
| Indianapolis | 176 |
| Pittsburgh | 185 |
| Detroit | 204 |
| Louisville | 206 |
| Chicago | 359 |
| Nashville | 378 |
| St. Louis | 418 |
| Washington, D.C. | 419 |
| New York City | 535 |
| Atlanta | 567 |
| Boston | 765 |

*Source: Rand McNally*

The relocation of major warehouse users to the Columbus market is evidence of Columbus' emergence as a primary distribution center. The desirability of the Columbus market continues to be confirmed by the proliferation of build-to-suit construction and the selection of Columbus by national retail and distribution firms. In addition to its excellent distribution logistics, Columbus also compares favorably to competitive markets with regard to land and construction costs and labor force characteristics.

18

### Rickenbacker Inland Port

Rickenbacker is an international logistics center home to a tremendous base of air, rail, and road transport companies. It handles more than 300,000 lifts a year, offers $660 million in transportation cost savings to shippers, and is home to Foreign Trade Zone #138 which encompasses nearly 5,200 acres.

Rickenbacker International Airport is located 10 miles south of Columbus and contains two 12,000 ft. runways and over 200,000 sq. ft. of air cargo facility space. Rickenbacker is a high-speed international, multi-modal logistics hub and strategically planned cargo complex that serves several key business segments, including international airfreight, cargo airlines, freight forwarders, logistics companies, e-retailers, corporate aviation businesses, manufacturers, and distributors.

Rickenbacker Inland Port is serviced by two of the largest national rail providers in the U.S., Norfolk Southern and CSX, and one regional rail carrier, Ohio Central. The new Heartland Corridor allows double-stacked freight trains to travel directly from the Port of Virginia to a state-of-the-art intermodal facility located at Rickenbacker. The Heartland Corridor connects Columbus to Virginia ports that will increase their capacity in anticipation of the Panama Canal's expansion in 2014. The National Gateway Corridor provides the Columbus Region additional port connections in Baltimore, MD and Wilmington, NC.

Strategically located in the center of Rickenbacker Inland Port is the Rickenbacker Global Logistics Park. This industrial development initiative by The Columbus Regional Airport Authority will include up to 29 million square feet of development, accommodate up to 30 buildings, and provide thousands of jobs and a huge economic boost to Central Ohio.

### John Glenn Columbus International Airport

Airlines providing service from CMH include American, Delta, Frontier, Southwest, United, US Airways, Air Canada Jazz, as well as the regional affiliates associated with many of these major airlines. The airport contains three concourses with a total of 39 gates encompassing over 800,000 square feet; flies to 34 destination airports with over 140 daily flights.

The renovated Federal Inspection Services (FIS) facility at John Glenn Columbus International Airport includes new security measures, administrative space featuring offices and a break room, holding cells, a lab for testing plant material, updated aesthetics and more. Future projects include constructing a new, consolidated rental car facility designed to reduce traffic on airport roadways and provide more garage parking for the public.

### Central Ohio Transit Authority (COTA)

The Columbus metropolitan area is serviced by the Central Ohio Transit Authority (COTA), providing commuter bus service throughout Franklin County, and parts of Delaware, Fairfield, Licking, and Union Counties. COTA serves 1.2 million residents and provides nearly 19 million passenger trips annually.

The area's transportation systems form a comprehensive transportation network which will ensure growth and development in all the communities within the greater Columbus metropolitan area. Its central Midwest location has enabled Columbus to develop into a major distribution center.

UMCH000046

## Housing

There are a wide variety of housing opportunities in central Ohio, from historic neighborhoods near downtown to new subdivisions in rapidly expanding suburbs. The suburban communities around Columbus continue to grow in all directions. There has also been a significant "re-birth" within the city's center in the past three years. The increased number of listings on the market combined with an increased number of active buyer's has caused decreased market times and a significant increase in overall property values. Most of the segments from the local market continue to experience appreciation over this period. The growth of property value tends to continue in the next couple of years.

## Taxation

Columbus is similar to other cities in the respect that it relies on tax revenues for expenses incurred by the day-to-day municipal operations. Properties in Ohio are assessed at 35% of their estimated market value and are reappraised every six years. Based upon a survey of other Midwest cities, the average tax rate for Columbus appears to be favorable and enables Columbus to be competitive in attracting new industry.

Tax revenues are also derived from sources other than real property. Specifically, the state imposes excise taxes on cigarettes, alcoholic beverages, as well as gasoline and licensing fees for automobiles. The state also imposes sales tax at the retail level. At the present time, the Franklin County sales and use tax is 7.50%. Though levied statewide, some of this sales tax is redistributed to local areas. In Columbus, additional tax revenue is derived from a city income tax of 2.5% on gross wages of individuals and net profits of businesses.

## Education

Franklin County is home to several institutions of higher learning. The Ohio State University has the second largest single-campus population in the world with approximately 50,000 students enrolled on its 1,705 acre campus. OSU has more than fifty individual facilities engaged in a variety of research, analysis, design, testing, and consultation projects. Other colleges located in the area include Otterbein University, Capital University, Columbus College of Art and Design, Columbus State Community College, Denison University, DeVry Institute of Technology, Franklin University, Ohio Dominican College, and Ohio Wesleyan University. Educational institutions provide a stable employment base as they are less vulnerable to downturns in the business cycle.

## Local Attractions

Columbus is a focal point in central Ohio for a variety of entertainment activities. Sports enthusiasts can follow the Columbus Clippers, an AAA baseball affiliate of the Cleveland Indians with a new stadium downtown. Other sports opportunities in the area include the Columbus Crew, a Major League Soccer franchise; the Columbus Blue Jackets, a major league professional hockey team; and the numerous NCAA teams at The Ohio State University, including nationally recognized football and basketball programs. The Memorial Tournament, a popular PGA event hosted by Jack Nicklaus, draws national exposure every year. Scioto Downs offers thoroughbred and harness racing. Other attractions include the nationally recognized Columbus Zoo and Aquarium, The Ohio State Fair, Hollywood Casino, and an extensive metro park system. The Schottenstein Arena has been constructed on the western portion of the campus area and provides a center for basketball, concerts, and special events.

The Nationwide Arena located in downtown Columbus is home to the NHL's Columbus Blue Jackets and also provides a center for concerts and special events.

Columbus' cultural activities include Ballet Met, Opera/Columbus, The Ohio Historical Center, The Columbus Museum of Art, Olentangy Indian Caverns, The Kings Arts Complex, Ohio's Center of Science and Industry (COSI), The Wexner Center for the Arts, the Ohio Theater, and the Palace Theater, as well as numerous art galleries in the Short North and other areas.

20

UMCH000047

*Conclusion*

The city of Columbus is the central focus of the MSA in which the subject is located. Though, partially due to the efforts of annexation; the city and its MSA have experienced population growth over the past decade at a rate greater than any other MSA in the state of Ohio, as well as the United States in general. Unemployment in Franklin County continues to be well below the national average. Columbus' transportation network of freeway, air, and rail systems is efficient and well designed, thereby permitting greater efficiencies in land development within the city and its suburbs. All of these factors have combined to impact the city in a positive manner. This is evidenced by the increase in development and business activities within the central business district as well as outlying suburban business districts. As a result, the city of Columbus is considered to have a stable and diverse economy; and all indications are that it should remain as such for years to come.

UMCH000048

### Introduction

Situated in the city of Worthington, Franklin County, Ohio the subject property's market value is influenced in a general manner by the economic, political, and social characteristics found near the central point of Ohio. The city of Worthington covers an area of approximately 5.6 square miles.



### General Information

The city of Worthington, a suburb of Columbus, Ohio, is located in the center of Ohio's crossroads surrounding the intersection of State Route 161 and U.S. State Route 23 in the northern portion of Franklin County. Worthington is located approximately twelve miles north of downtown Columbus and sixteen miles northwest of John Glenn International Airport and is bordered by the city of Columbus to the south, the village of Riverlea to the east, and Westerville to the northeast. The city of Dublin is located west of Worthington. Area hospitals include Mount Carmel St. Ann's in Westerville, Dublin Methodist Hospital located northwest of Worthington, and Riverside Methodist Hospital located southwest of Worthington.

### Administration

Worthington operates under a council-manager form of government. The city council consists of seven members who are elected to four-year terms on an at-large, non-partisan basis. City council appoints a city manager who implements their policy decisions, appoints all city employees, and prepares and administers the operating and capital budgets. Worthington has its own police and fire departments, library system, and public schools.

### Population

According to the population counts provided by the U.S. Census Bureau, there has been an increase of 8.2% in the city of Worthington from 2010 to 2019. Worthington had a population of 14,692 in 2019, compared to 13,575 in 2010. The following chart illustrates population changes for city of Worthington, Franklin County and Ohio:

22

UMCH000049

| POPULATION STATISTICS | | | |
|---|---|---|---|
| Year | City of Worthington | Franklin County | Ohio |
| 2019 | 14,692 | 1,316,756 | 11,689,100 |
| 2018 | 14,696 | 1,310,300 | 11,689,442 |
| 2017 | 14,646 | 1,264,518 | 11,613,423 |
| 2016 | 14,528 | 1,264,518 | 11,614,373 |
| 2015 | 14,498 | 1,251,722 | 11,613,423 |
| 2014 | 14,384 | 1,231,393 | 11,594,163 |
| 2013 | 13,837 | 1,212,263 | 11,572,005 |
| 2012 | 13,757 | 1,195,537 | 11,544,225 |
| 2011 | 13,654 | 1,178,799 | 11,544,951 |
| 2010 | 13,575 | 1,163,414 | 11,536,504 |
| 2009 | 13,493 | 1,150,122 | 11,542,645 |
| 2008 | 13,314 | 1,129,067 | 11,485,910 |
| 2007 | 13,258 | 1,118,107 | 11,477,641 |
| 2006 | 13,217 | 1,109,067 | 11,458,390 |
| 2005 | 13,303 | 1,101,432 | 11,450,954 |
| 2004 | 13,397 | 1,096,810 | 11,445,095 |
| 2003 | 13,594 | 1,093,073 | 11,430,306 |
| 2002 | 13,795 | 1,087,882 | 11,410,582 |
| 2001 | 13,982 | 1,082,686 | 11,391,298 |
| 2000 | 14,125 | 1,068,978 | 11,353,140 |
| 1995 | 14,627 | 1,009,800 | 11,155,493 |

*Source: U.S. Census Bureau*

### Transportation and Infrastructure

The city of Worthington is located at the intersection of US Route 23 and State Route 161. It provides immediate access to Interstate 71, is within close proximity to Interstate 70 and is also linked to the Interstate 270 and State Route 315 interchanges. The city of Worthington is located within a one-hour flight or one-day truck drive of 58 percent of the US population and 50 percent of Canada's population.

23

UMCH000050

The Columbus metropolitan area is serviced by the Central Ohio Transit Authority (COTA), providing commuter bus service within Franklin County. Five extensive COTA bus routes serve Worthington every day of the week. Three airports serve the city of Worthington: John Glenn International Airport, Rickenbacker International Airport and The Ohio State University Airport at Don Scott Field. John Glenn Columbus International Airport serves the greater Columbus metro area with dozens of major airlines providing flights to destinations throughout North America and more than 110 international connections. Rickenbacker International Airport is one of the world's few cargo-dedicated airports and one of North America's busiest cargo airports. It combines a world-class airfield with the economic advantages of a general-purpose Foreign Trade Zone. The Ohio State University Airport at Don Scott Field provides aircraft services to many central Ohio pilots and business ranking fourth in Ohio for the number of take-offs and landings, and its 180 out of 403 in towered airports in the United States. In addition to airways, CSX, Norfolk Southern and Ohio Central railroads serve the area.

### Household Income
According to the U.S. Census Bureau, the median household income between 2014 and 2018 for Worthington was $102,731 (in 2018 dollars). Additionally, the per capita income during the same time period was $52,410.

### Housing and Taxation
Housing in Worthington is diverse - ranging from historic homes, subdivisions, apartments, condos, and 50+ communities. A statistical analysis provided by The Columbus Board of Realtors' Multiple Listing Services showed 731 single-family and residences sold within the Worthington City School District between January 1, 2019 and December 31, 2019.* The average sale price was $323,542. In 2018, the median value of owner-occupied housing units during 2014-2018 was $273,000, with a median gross rent during the same time period of $1,048. Currently, the effective real property tax rate for properties within the city of Worthington is 102.845852 per $1,000 of assessed valuation with a city income tax of 2.5%.

### Education
Worthington has its own school district consisting of two high schools, four middle schools, and eleven elementary schools. The Worthington City School District serves 9,925 students in 2015-2016 school year. Worthington City Schools is one of the top school districts in the Columbus, Ohio area. 90% of its students move on to higher education; 80% of its teachers have a graduate degree or higher. For higher education there is The Ohio State University, Columbus State Community College, Otterbein College, DeVry University, and Franklin University - all located within minutes of Worthington.

### Recreation
The city of Worthington has 13 different parks containing over 200 acres offering activities from picnicking, walking and biking paths, swimming, and summer concerts. A 72,000 square foot Community Center includes two gymnasiums, an art room, pottery studio, pools, and an indoor track and fitness floor. There is also a skate park that features over 6,000 square feet of technical challenges, including six ramps, a slide, and handrails.

### Conclusion
The city of Worthington provides an abundance of recreational opportunities to enhance the lives of the area's citizens, youth, and the community by providing plenty of open space and leisure-time opportunities. Worthington is not only a desirable residential area but also has a thriving business community and vibrant economy.

UMCH000051

The area of influence, commonly called a neighborhood, can be defined as "a group of complementary land uses; a congruous grouping of inhabitants, buildings, or business enterprises." Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 6th ed. (Chicago: Appraisal Institute, 2015), 156. A residential neighborhood, for example, may contain single-family homes and commercial properties that provide services for local residents. A district, on the other hand, has one predominant land use. In broader terms, appraisers analyze the market area within which a subject property competes for the attentions of buyers and sellers in the real estate market. A market area can encompass one or more neighborhoods and/or districts.

The subject property is located on the west side of N. High Street at the terminus of Wesley Boulevard with frontage along the east side of Evening Street and the north side of Greenbier Court, just south of I-270 and north of Dublin Granville Road within the city of Worthington, Franklin County, Ohio.

The subject's immediate neighborhood boundaries are delineated by Interstate 71 to the east, State Route 315 to the west, Dublin-Granville Road (SR 161) to the north, and Morse Road to the south. The primary north-south street in the neighborhood is North High Street. Access to the area's primary highways is via an interchange at Interstate 71 and Dublin-Granville Road (SR 161) less than three miles northeast of the subject. Access to State Route 315 is two miles northwest of the subject at Dublin-Granville Road (SR 161) and is just south of the interchange of I-270 and US 23 (High Street), both providing access to the downtown central business district of Columbus, as well as other interstate and local freeways that connects the subject property to the majority areas in central Ohio. Therefore, highway accessibility within the immediate neighborhood is considered good.

The immediate area is characterized by a heterogeneous mixture of single-family residences and neighborhood commercial, office, and retail uses along North High Street. Interior streets for the area are generally improved with an established housing stock of older average quality residences. Located adjacent to the subject is an assisted living facility.

N. High Street is a primary north-south artery for the neighborhood. Uses along N. High Street within the subject's immediate area include neighborhood shopping centers, retail stores, places for worship, free-standing local restaurants, fast-food restaurants, retirement communities and neighborhood office. Just south of the subject is the Graceland shopping center. This center features approximately 460,000 square feet of retail spaces, including a Kroger Marketplace, Target, LA Fitness, Jack's Pets, and Michaels.

The area draws its appeal from its availability of all amenities including local shopping, employment, and freeway access.

Overall, the subject is located within an established area that has good access to major highways and neighborhood amenities. The subject's neighborhood should continue to be a favorable location for residential and commercial users. The Worthington Local City School District serves the area and has a good academic reputation.

Maps exhibiting the location of the subject property are located on the following pages.

25

UMCH000052

## Neighborhood Location Map



## General Location Map



UMCH000053

## DESCRIPTION OF THE SITE

### Location

The subject property is located on the west side of N. High Street at the terminus of Wesley Boulevard with frontage along the east side of Evening Street and the north side of Greenbier Court, just south of I-270 and north of Dublin Granville Road within the city of Worthington, Franklin County, Ohio. The subject property is located within the Worthington City School District. The physical address of the subject property is 1033 N. High Street, Worthington, Ohio 43085.

### Configuration, Dimensions, and Area

The subject property consists of one parcel identified by the Franklin County Auditor as parcel number 100-006774-00 and contains 37.35± acres. The subject site is irregular in configuration and features 950± feet of non-continuous frontage along the west side of N. High Street. A plat map is provided below exhibiting the site's configuration.

### Aerial Plat Map



*Image courtesy of Franklin County Auditor*

UMCH000054

*Topography, Drainage and Soil Conditions*
The subject site is generally level along its frontage along N. High Street and gently slopes to its western and southern boundaries. Tucker Creek extends along the subject's southern boundary within a heavily treed area. Drainage appears to be adequate. No soil or subsoil tests have been provided; however, soil conditions appear to be adequate to support the improvements.

*Availability and Description of Utilities*
Public utilities including municipal water, municipal sewer, electric, and telephone are available to the subject property and in service.

*Access and Easements*
Vehicular access is available via two full motion ingress/egress driveways along the west side of High Street and a full motion ingress/egress from the terminus of Wesley Boulevard. Typical utility easements encumber the subject property.

*Zoning*
Per the City of Worthington Zoning Department, the subject property is zoned S-1, Special purpose; C-2, Community Shopping Center; and C-3 Institutions and Offices. Under this zoning classification, the subject's current use appears to represent a legal conforming use. A copy of the zoning map is located below. A copy of the permitted uses and development standards for each zoning district is located within the addenda of this report. A discussion of the permitted uses for each zoning classification is located below.



*S-1 District – Special*
This zoning category permits public uses, semi-public uses, parks, essential services, accessory uses, conservation and highway interchange, non-commercial recreational facilities, plant production, preschool, nursery, schools and daycares.

28

UMCH000055

## C-2 District – Community Shopping Center

This zoning category permits the sale of goods for retail purposes, administrative and business office, medical/dental office, personal services, public uses, essential services, accessory uses, banks, pet shops, arts and crafts, commercial entertainment facilities, restaurants, lawn and garden centers, bakeries and diary processing, bed and breakfast, drive-in pharmacy, residential uses and animal hospitals.

## C-3 District – Institutional and Offices

This zoning category permits nonretail establishments which are of a social, educational, religious, medical, research, charitable or philanthropic nature, including local, regional and national administrative offices in which affairs of a business, professional persons, branch of government or organizations are conducted. Conditional uses include laboratories, nursing homes, drive-in banks, mortuaries, and nursery schools.

## Flood Plain

According to the Federal Emergency Management Agency's Flood Insurance Map #39049C0159K, dated June 17, 2008, the subject is located within Zone X, an area determined to be outside the 500-year flood plain. A copy of the flood plain map can be found in the addendum section of this report.



29

UMCH000056

## *DESCRIPTION OF THE IMPROVEMENTS*

Information included in this report is based upon a personal viewing, courthouse records and information provided by the client.

The subject property containing 37.35± acres is improved with the former United Methodist Children's home campus featuring several residential cottages, administration and maintenance buildings, a small school, a chapel, dining hall and a variety of outdoor recreation areas. Several improvements were constructed in the 1930's and the 1960's. Overall, the improvements are very old and have been vacant for many years. The buildings are overgrown with vegetation, are boarded up and are in dilapidated condition. Exterior photographs are located within this report. The overall condition of both the building and site improvements is considered to be poor.

The subject's building improvements do not have any contributory value and are therefore, not considered in this analysis.

Photographs of the subject property are included on the following pages.

UMCH000057

*PHOTOGRAPHS OF THE SUBJECT PROPERTY*

 

 

 

31

UMCH000058

## PHOTOGRAPHS OF THE SUBJECT PROPERTY

 

 

 

32

UMCH000059

*PHOTOGRAPHS OF THE SUBJECT PROPERTY*

 

 

 

33

UMCH000060

*PHOTOGRAPHS OF THE SUBJECT PROPERTY*

View of N. High Street looking north



View of the intersection of N. High Street and Wesley Boulevard



34

UMCH000061

View of N. High Street looking south



View of the property and one of the access points looking from N. High Street



UMCH000062

Highest and best use is defined as:

Highest and best use is defined as: "the reasonably probable use of property that results in the highest value. The four criteria that the highest and best use must meet are legal permissibility, physical possibility, financially feasibility and maximum productivity." Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 6th ed. (Chicago: Appraisal Institute, 2015), 109.

In analyzing the highest and best use of a property, two steps are necessary. The first is to analyze the site as if vacant and ready to be improved. After this has been accomplished, the second step is to analyze the property, as improved, which includes the land, existing structures, and site improvements.

Both the "as if vacant" analysis and the "as improved" analysis require that four tests are applied for reason and logic. Summarily, these tests sustain the sequential premises of:

1. The legal permissibility,
2. The physical possibility,
3. The financial feasibility and
4. The maximum productivity of the intended improvements.

### Highest and Best Use, "As if Vacant"

Legally Permissible
The first test is that the site must be legally permissible. Per the City of Worthington Zoning Department, the subject property is zoned S-1, Special purpose; C-2, Community Shopping Center; and C-3 Institutions and Offices. Under this zoning classification, the subject's current use appears to represent a legal conforming use.

Physically Possible
The subject property is located on the west side of N. High Street at the terminus of Wesley Boulevard with frontage along the east side of Evening Street and the north side of Greenbier Court, just south of I-270 and north of Dublin Granville Road within the city of Worthington, Franklin County, Ohio. The subject property consists of one parcel identified by the Franklin County Auditor as parcel number 100-006774-00 and contains 37.35± acres. The site is irregular in configuration, is accessed via both N. High Street and Wesley Boulevard and features a generally level to gently sloping topography. The site features 950± feet of non-continuous frontage along the west side of N. High Street, is not located within a flood zone and has access to public water and public sewer utilities. There are no known hazards or nuisances that would adversely affect the marketability or value of the site. In summary, there are no known major physical restrictions which would prevent the subject site from being developed with a use in conformance with the zoning regulations and area trends.

Financially Feasible and Maximally Productive
The third criterion which must be met by all legally permissible sites is that the use be financially feasible. Important in considering the financial feasibility of the subject property is the potential use would be highest when there is conformity with the surrounding land uses. The subject's neighborhood is an established suburban area featuring an eclectic mix of neighborhood commercial and office uses with a strong residential background. There are a very limited number of larger development tracts within the city of Worthington which adds to the appeal of the subject property.

UMCH000063

The last criterion which must be met is that the use, which is the site's highest and best use, be the most profitable among the alternatives which meet the other criteria. The location of the subject site with multiple access points and frontage along multiple thoroughfares with close proximity to downtown Worthington and southern Delaware County which has been experiencing significant ongoing real estate investment is ideal for a mixed-use development.

Upon redevelopment, the subject will have to be rezoned. We have factored the unknowns of the rezoning process within our analysis and have valued the subject property accordingly.

Considering the neighborhood and local area trends, the current zoning of the site, and the surrounding uses, a mixed-use l development would be economically feasible and maximally productive. Therefore, the highest and best use of the subject site *"as if vacant and available"* is to rezone the subject property for a mixed-use development that conforms to local area trends and current zoning restrictions.

### *"As Improved"*

It is also necessary to recognize that the highest and best use of the site as if vacant may or may not conform to the highest and best use of the site as improved. Therefore, the second portion of the highest and best use analysis takes into consideration the subject's improvements. In this analysis, the four tests of highest and best use are applied to the improved property.

The subject property containing 37.35± acres is improved with the former United Methodist Children's home campus featuring several residential cottages, administration and maintenance buildings, a small school, a chapel, dining hall and a variety of outdoor recreation areas. Several improvements were constructed in the 1930's and the 1960's. Overall, the improvements are very old and have been vacant for many years. The buildings are overgrown with vegetation, are boarded up and are in dilapidated condition. Exterior photographs are located within this report. The overall condition of both the building and site improvements is considered to be poor.

After considering the subject's very desirable location within the city of Worthington along N. High Street and considering the condition of the existing buildings, we have determined that the current children's home improvements should be removed and the subject property would be redeveloped with a mixed-use development consisting of both retail and residential uses.

UMCH000064

## VALUATION PROCEDURE

### Introduction

There are three generally accepted techniques available for estimating the value of real estate. These techniques or approaches include a cost approach, an income capitalization approach, and a sales comparison approach. In addition to these three approaches, the value of the subject site can be estimated via a land valuation analysis, or a sales comparison approach utilized exclusively for site valuation. It is significant to note that all three approaches are not always relevant and applicable to an appraisal problem. The appropriate techniques are selected and applied based upon the particular characteristics of the type of property being appraised. From the value indications of the appropriate techniques and the weight accorded each, an opinion of value is reached based on experience and judgment within the outline of the appraisal process. A brief overview of these four analyses follows.

### Land Valuation Analysis

This approach is based upon the principle of substitution; i.e., when a property is placed on the market, its value tends to be set at the cost of acquiring an equally desirable, substitute property, assuming no costly delay in obtaining the substitution. Sales of sites with similar physical characteristics and utility are researched and are adjusted based upon their comparability to the subject property. Since no two sites are identical, the necessary adjustments for the dissimilarities are a function of appraisal expertise and judgment.

The land valuation is developed under the sales comparison approach, based on the principle of substitution; that is, when a property is replaceable in the market, its value tends to be set at the cost of acquiring an equally desirable substitute property, assuming no costly delay in making the substitution. Sales of similar properties are researched, analyzed and adjusted based upon their comparability to the subject property. Since no properties are ever identical, the necessary adjustment for differences in quality, location, size, market appeal and etcetera are a function of appraisal experience and judgment. This approach is most effective when there are a sufficient number of comparable sales, which have recently transferred, with the accuracy of this approach being contingent upon the quality of the comparable market data. The sales comparison approach has been included herein for the purpose of estimating the subject's land value.

### Cost Approach

This approach consists of estimating the reproduction or replacement cost new of the improvements, subtracting accrued depreciation from all causes, and adding the depreciated value of the site improvements as well as the value of the site, as estimated in the land valuation analysis.

Depreciation includes loss in value from all causes. This includes physical deterioration, functional obsolescence, and economic obsolescence. Deterioration is evidenced by wear and tear and is measured by a field inspection. Functional obsolescence reflects the lack of desirability by reason of layout, style, or design. Economic obsolescence is due to environmental factors affecting the property from outside its boundaries.

### Income Capitalization Approach

The income capitalization approach is based on the premise that it is appropriate to measure value by estimating the present worth of any anticipated future income stream to be generated by a property. The estimated net annual income is capitalized at a rate commensurate with the relative certainty of the continuation of the income stream and the risk involved in ownership of the property.

UMCH000065

### *Sales Comparison Approach*

This approach is also based on the principle of substitution. Sales of similar properties are researched and adjusted based upon their comparability to the subject property. Since no properties are ever identical, the necessary adjustment for differences in quality, location, size, services, and market appeal are a function of appraisal experience and judgment.

In arriving at a final value estimate for the subject property, consideration is given to each of the approaches which have been developed. The strengths and weaknesses of each approach are analyzed, culminating in the final value estimate. The sales comparison approach to value – land only is the only approach deemed applicable as described withing the Scope section of this report.

UMCH000066

## THE SALES COMPARISON APPROACH – LAND VALUATION ONLY

The sales comparison approach is defined as "the process of deriving a value indication for the subject property by comparing sales of similar properties to the property being appraised, identifying appropriate units of comparison, and making adjustments to the sale prices (or unit prices, as appropriate) of the comparable properties based on relevant, market-derived elements of comparison." The sales comparison approach may be used to value improved properties, vacant land, or land being considered as though vacant when an adequate supply of comparable sales is available. Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 6th ed. (Chicago: Appraisal Institute, 2015), 207.

The sales comparison approach is generally applied in the following steps:

1. Research the market to obtain information about transactions, listings, and other offerings of properties similar to the subject property.

2. Verify the accuracy of the information by considering whether the data obtained is factually accurate and reflects arm's length market considerations. Information is verified by consulting a knowledgeable source, typically one of the participants in the transaction.

3. Determine the relevant units of comparison (e.g., per acre, per square foot, income multiplier) and develop a comparative analysis for each unit.

4. Compare the subject and the comparable sales according to the elements of comparison and adjust the sale price of each comparable appropriately.

5. Reconcile the multiple value indications that result from the comparable sales into a single value indication or a valuation range.

In the market data search for recent comparable sales, the current market is investigated; and comparable sales capable of providing a reliable indication of value for the subject property are identified. Once this data is compiled, an appropriate unit of comparison or common denominator typical for this type of property is selected in order that the sales may be analyzed and related to the subject.

As a basis for estimating the value of the subject property from a market standpoint, a search was made of the local market in effort to locate transfers of land sales similar to the subject site.

Locating comparable land sales included a review of publicly recorded ownership transfers as compiled by the Franklin County Auditor and Recorder, The Haines Report, and CoStar Group (a national business which tracks recorded transfers throughout Ohio and the Midwest). Additional research included discussions with active market participants including owners, real estate brokers and real estate participants.

UMCH000067

## Comparable Sales Analysis

As a basis for estimating the value of the subject property from a market standpoint, a search was made of the subject's immediate neighborhood and surrounding areas to locate land sales considered comparable to the subject site. We were able to locate several sales of comparable vacant development tracts from which a reliable indication of market value could be derived. The sales utilized for purposes of this analysis are presented on the following pages. The salient portions of these sales and a location map are provided below. Full comparable sale summaries follow.

| | | | | | Cash Eq. | | |
|---|---|---|---|---|---|---|---|
| Sale | Location | Zoning | Sale Date | Size (Ac.) | Sale Price | $/Acre | $/SF |
| 1 | Home Road<br>Orange Twp., Delaware Cnty, OH | MFPRD | 5/20/2019 | 27.370 | $2,880,000 | $105,225 | $2.42 |
| 2 | NEC Lewis Center Rd. & North Rd.<br>Orange Twp., Delaware Cnty, OH | PC | 12/16/2019 | 19.729 | $2,176,800 | $110,335 | $2.53 |
| 3 | NEC Greif Pkwy & High Street<br>Liberty Twp., Delaware Cnty, OH | PC | 9/18/2019 | 8.511 | $1,157,360 | $135,984 | $3.12 |
| 4 | Eiterman Road<br>Dublin, Franklin Cnty, OH | ID1 | 12/18/2018 | 27.676 | $4,263,000 | $154,032 | $3.54 |
| 5 | Leap Road<br>Hilliard, Franklin Cnty, OH | PUD | 6/2/2016 | 23.591 | $3,690,000 | $156,416 | $3.59 |
| 6 | Cleveland Ave<br>Westerville, Franklin Cnty, OH | PD | 8/17/2018 | 10.143 | $1,767,500 | $174,258 | $4.00 |

Comparable Land Sales

## Comparable Sales Location Map



### _Land Sale No. 1_

| | |
|---|---|
| Address: | Home Road |
| County: | Delaware County |
| City: | N/A |
| Township: | Orange |
| School District: | Olentangy LSD |
| Recording Data: | Parcel Number 318-230-01-001-006 |
| Grantor: | Kerbler Farms LLC |
| Grantee: | Orange Grand, LLC |
| Date of Transaction: | May 20, 2019 |
| Dimensions: | Nearly rectangular (see sketch) |
| Size: | 27.37± Gross/Net Acres (1,192,237± SF) |
| Topography: | Generally level |
| Cash Equivalent Sale Price: | $2,880,000 |
| Unit Price: | **$105,225/Net Acre ($2.42/Sq.Ft.)** |
| Type of Instrument: | Limited Warranty Deed #2019-00012210 |
| Zoning: | MFPRD; Multi-Family Planned Residential District |
| FEMA Flood Plain: | Not Located within a 100-year flood hazard; FEMA Map #39041C0234K, dated April 16, 2009 |
| Present Use: | Vacant Land |
| Highest and Best Use: | Multi-family |
| Type of Financing: | Conventional |
| Encumbrances: | Permitted Exceptions |
| Type of Improvements: | None |
| Utilities: | Public water available |
| Motivation of Parties: | Willing buyer/willing seller |

Remarks: This sale represents the transfer of 27.37± net acres of land located along the south side of Home Road (future extension) east of US Route 23, within Orange Township, Delaware County, Ohio. The site is characterized by a generally level topography. The site was subdivided from parent parcel 318-230-01-001-000.

UMCH000069

## Land Sale No. 1

### Aerial Plat Map



*Image courtesy of Delaware County Auditor*

UMCH000070

## *Land Sale No. 2*

| | |
|---|---|
| Address: | NEC Lewis Center Road & North Road |
| County: | Delaware County |
| City: | N/A |
| Township: | Orange |
| School District: | Olentangy LSD |
| Recording Data: | Parcel Number 318-213-02-006-000 |
| Grantor: | Evans Farm Land Development Company, LLC |
| Grantee: | BZ Evans LLC |
| Date of Transaction: | December 16, 2019 |
| Dimensions: | Nearly rectangular (see sketch) |
| Size: | 21.768± Gross/19.729 Net Acres (859,395± SF) |
| Topography: | Generally level/heavily wooded |
| Cash Equivalent Sale Price: | $2,176,800 |
| Unit Price: | **$110,335/Net Acre ($2.53/Sq.Ft.)** |
| Type of Instrument: | General Warranty Deed #2019-00036624 |
| Zoning: | PC; Planned Commercial & Office District |
| FEMA Flood Plain: | Not Located within a 100-year flood hazard; FEMA Map #39041C0234K, dated April 16, 2009 |
| Present Use: | Vacant Land |
| Highest and Best Use: | Commercial |
| Type of Financing: | Conventional |
| Encumbrances: | None noted |
| Type of Improvements: | Barn (no contributory value) |
| Utilities: | Public water available |
| Motivation of Parties: | Willing buyer/willing seller |

Remarks: This sale represents the transfer of 19.729± net acres of land located in the northeast corner of Lewis Center Road and North Road, within Orange Township, Delaware County, Ohio. The site is characterized by a generally level topography and is heavily wooded.

44

UMCH000071

*Land Sale No. 2*

*Aerial Plat Map*



*Image courtesy of Delaware County Auditor*

45

UMCH000072

## *Land Sale No. 3*

| | |
|---|---|
| Address: | Northwest Corner of Greif Parkway and US Route 23 |
| County: | Delaware County |
| City: | N/A |
| Township: | Liberty |
| School District: | Olentangy LSD |
| Parcel Numbers: | 419-440-05-001-000, 419-440-05-001-001, & 419-440-05-002-000 |
| Grantor: | Greif Packaging LLC |
| Grantee: | Adventure Church |
| Date of Transaction: | September 18, 2019 |
| Dimensions: | Nearly Rectangular (see sketch) |
| Size: | 8.511± Gross/Net Acres (370,739± SF) |
| Topography: | Generally level |
| Cash Equivalent Sale Price: | $1,157,360 |
| Unit Price: | **$135,984/Net Acre ($3.12/Sq.Ft.)** |
| Type of Instrument: | Limited Warranty Deed #2019-00025759 |
| Zoning: | PC; Planned Commercial and Office District |
| FEMA Flood Plain: | Not Located within a 100-year flood hazard; FEMA Map #39041C0231L, Dated February 17, 2016 |
| Present Use: | Vacant Land |
| Highest and Best Use: | Commercial |
| Type of Financing: | Conventional |
| Encumbrances: | None noted |
| Type of Improvements: | None |
| Utilities: | All public available |
| Motivation of Parties: | Willing buyer/willing seller |

Remarks: This sale represents the transfer of a combined 8.511± net acres of land located at the northwest corner of Greif Parkway and Columbus Pike (US Route 23), within Liberty Township, Delaware County, Ohio. The site is characterized by a generally level topography and has frontage along Cornerstone Drive.

UMCH000073

*Land Sale No. 3*

*Aerial Plat Map*



*Image courtesy of Delaware County Auditor*

UMCH000074

*Land Sale No. 4*

| Location: | Eiterman Road |
| --- | --- |
| | Dublin, Franklin County, Ohio |
| School District: | Dublin CSD |
| Parcel Numbers: | 273-008174-00, 273-008175-00, 273-008176-00 |
| Grantor: | Stephen A. and Sally Young |
| Grantee: | City of Dublin |
| Date of Sale: | December 18, 2018 |
| Sale Price: | $4,263,000 |
| Property Rights Transferred: | Fee Simple |
| Financing: | Cash |
| Recording Reference: | General Warranty Deed #201812180170863 |
| Circumstances of Sale: | Arm's-Length |
| Site Size: | 27.676± Gross/Net Acres |
| Site Configuration: | Irregular |
| Utilities: | All public available |
| Zoning: | ID-1; Research Office District |
| Indication: | **$154,032/Acre** |

Comments:
The site is located along the east side of Eiterman Road north of Shier Rings Road within the city of Dublin, Franklin County, Ohio. This sale includes portions of the site described herein that is the subject of this analysis. This property was listed on the open market. The Robert Weiler Company represented the buyer.



*Image courtesy of Franklin County Auditor*

48

UMCH000075

*Land Sale No. 5*

| | |
|---|---|
| Location: | Leap Road |
| | Hilliard, Franklin County, Ohio |
| School District: | Hilliard CSD |
| Parcel Numbers: | 050-011436-00 and 050-011437-00 (see comments) |
| Grantor: | Greenwich Investors Hickory Chase, LLC |
| Grantee: | Greyson at Hickory Chase LLC |
| Date of Sale: | June 3, 2016 |
| Sale Price: | $3,690,000 |
| Property Rights Transferred: | Fee Simple |
| Financing: | Cash |
| Recording Reference: | Limited Warranty Deed #201606030069609 |
| Circumstances of Sale: | Arm's-Length |
| Site Size: | 23.591± Gross/Net Acres |
| Site Configuration: | Irregular |
| Utilities: | All public available |
| Zoning: | PUD; Planned Unit Development District |
| Indication: | **$156,416/Acre** |

Comments:
The site is located along the east of Leap Road south of Hickory Chase Way, within the city of Hilliard, Franklin County, Ohio. The subject site was originally one parcel identified as 050-011431-00; subsequent to the sale the site was split into two parcels as referenced above.



*Image courtesy of Franklin County Auditor*

49

UMCH000076

*Land Sale No. 6*

| | |
|---|---|
| Location: | North of Westar Boulevard, East of N. Cleveland Avenue<br>City of Westerville, Delaware County, Ohio |
| Parcel Number: | 317-333-01-003-014 |
| Grantor: | City of Westerville |
| Grantee: | Hyperion Properties Inc. |
| Date of Sale: | August 17, 2018 |
| Sale Price: | $1,767,500 |
| Property Rights Transferred: | Fee Simple |
| Financing: | Cash to seller |
| Recording Reference: | General Warranty Deed # 2018-00022263 |
| Circumstances of Sale: | Arm's length |
| Site Size: | 10.143± Acres |
| Site Configuration: | Irregular |
| Utilities: | All Public Available |
| Zoning: | PD; Planned Development |
| Intended Use: | Commercial |
| **Indication:** | **$174,258/Acre** |

Comments:
The sale site consists of one parcel 317-333-01-003-014 located north of Westar Boulevard, east of N. Cleveland Avenue within the city of Westerville, Delaware County, Ohio. This property was improved with a new office building.



*Image Courtesy of Delaware County Auditor*

UMCH000077

## Analysis of Comparable Sales

The sales presented herein took place between June of 2016 and December of 2019. The sales indicate a range in site size from 8.511 acres to 27.676 acres. Based on their purchase prices, the sales indicate a range, prior to adjustments, from $105,225 per acre to $174,258 per acre. The sales were analyzed based upon their dates of transfer, location, highest and best use, and zoning classifications.

*Property Rights Conveyed*: All sales involved the conveyance of similar property rights. No adjustment is necessary.

*Financing*: All sales involved cash transactions or were sold using conventional financing. No adjustments are deemed warranted.

*Conditions of Sale*: This category of adjustment addresses the motivations of the seller and the buyer. All sales closed on an arm's-length basis with neither the buyer nor the seller under undue duress. No adjustments are utilized.

*Expenditures after sale* adjustments account for additional costs associated with the transaction. No adjustments were deemed necessary.

*Market Conditions*: Sale No. 5 took place in 2016, which is considered a slightly inferior economic time as compared to the effective date of value herein (2019). Therefore, an upward adjustment is applied to this sale. No adjustments are required for the other sales.

### Overall Adjustments

The sales are also adjusted based upon road frontage and access, site configuration, site size, and overall market appeal. Upon redevelopment, the subject will have to be rezoned. We have factored the unknowns of the rezoning process within our analysis and have valued the subject property accordingly.

Sale No. 1 is adjusted upward for its inferior location along Home Road as compared to High Street, upward for its zoning with no commercial component and upward for its inferior access as compared to the subject.

Sale No. 2 is adjusted upward for its inferior location along Lewis Center Road as compared to High Street, upwards for its average access and average overall development potential when compared to the subject property. This sale is also adjusted downward for its superior configuration and smaller site size.

Sale No. 3 is adjusted upward for its inferior location and access and downward for its superior configuration and smaller site size.

Sale No. 4 is adjusted downward for its superior location and downwards for its inferior zoning with no commercial component.

Sale No. 5 is adjusted upward for marketing conditions and location and downwards for its superior PUD zoning and smaller site size.

Sale No. 6 is adjusted upward for its location and downward for its superior planned unit zoning and smaller site size.

*An adjustment grid exhibiting the adjustments applied to the comparable sales is located on the following page.*

51

UMCH000078

## LAND SALES ADJUSTMENT GRID

| Element | Subject | Sale #1 | Sale #2 | Sale #3 | Sale #4 | Sale #5 | Sale #6 |
|---|---|---|---|---|---|---|---|
| Location: | N. High Street Worthington, OH | Home Road Orange Twp, OH | NEC Lewis Center Orange Twp, OH | NWC Grief & High St. Liberty Twp, OH | Eiterman Road Dublin, OH | Leap Rd. Hilliard, OH | Cleveland Ave Westerville, OH |
| Land Size (Acres): | 37.350 | 27.370 | 19.729 | 8.511 | 27.676 | 23.591 | 10.143 |
| Sale Price: | - | $2,880,000 | $2,176,800 | $1,157,360 | $4,263,000 | $3,690,000 | $1,767,500 |
| Indicated Price Per Acre: | - | $105,225 | $110,335 | $135,984 | $154,032 | $156,416 | $174,258 |
| Indicated Price Per Sq.Ft. | - | $2.42 | $2.53 | $3.12 | $3.54 | $3.59 | $4.00 |
| Property Rights Conveyed | - | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
| Financing Terms: | - | Market | Market | Market | Market | Market | Market |
| Condition of Sale: | - | Arm's-Length | Arm's-Length | Arm's-Length | Arm's-Length | Arm's-Length | Arm's-Length |
| Expenditures After Sale: | - | None Noted | None Noted | None Noted | None Noted | None Noted | None Noted |
| Market Conditions: | - | May-19 | Jun-19 | Sep-18 | Dec-18 | Jun-16 | Aug-18 |
| Cash Equivalent Sale Price | - | $2,880,000 | $2,176,800 | $1,157,360 | $4,263,000 | $3,690,000 | $1,767,500 |
| Land Size (Acres): | 37.350 | 27.370 | 19.729 | 8.511 | 27.676 | 23.591 | 10.143 |
| Price per Acre: | - | $105,225 | $110,335 | $135,984 | $154,032 | $156,416 | $174,258 |
| Price per Sq.Ft.: | - | $2.42 | $2.53 | $3.12 | $3.54 | $3.59 | $4.00 |

### Cumulative Adjustments

| Element | Subject | Sale #1 | Sale #2 | Sale #3 | Sale #4 | Sale #5 | Sale #6 |
|---|---|---|---|---|---|---|---|
| Market Conditions | - | May-19 | Dec-19 | Sep-19 | Dec-18 | Jun-16 | Aug-18 |
| *Adjustment* | | *Similar* | *Similar* | *Similar* | *Similar* | *Similar* | *Similar* |
| Location | Good | Interior/Average | Corner/Average | Corner/Average(+) | Good (+) | Interior/Average | Interior/Good |
| *Adjustment* | | *Upward* | *Upward* | *Upward* | *Downward* | *Upward* | *Upward* |
| Topography | Generally Level | Level | Level | Level | Level | Level | Level |
| *Adjustment* | | *Similar* | *Similar* | *Similar* | *Similar* | *Similar* | *Similar* |
| Zoning | S-1, C2, C3 | MFPRD | PC | PC | ID-1 | PUD | PD |
| *Adjustment* | | *Upward* | *Similar* | *Similar* | *Upward* | *Downward* | *Downward* |
| Access | Good | Average | Average | Average | Good | Good | Good |
| *Adjustment* | | *Upward* | *Upward* | *Upward* | *Similar* | *Similar* | *Similar* |
| Utilities | All Public | All Public | All Public | All Public | All Public | All Public | All Public |
| *Adjustment* | | *Similar* | *Similar* | *Similar* | *Similar* | *Similar* | *Similar* |
| Configuration | Irregular | Irregular | Nearly Rec. | Nearly Rec. | Irregular | Irregular | Irregular |
| *Adjustment* | | *Similar* | *Downward* | *Downward* | *Similar* | *Similar* | *Similar* |
| Land Size | 37.350 | 27.370 | 19.729 | 8.511 | 27.676 | 23.591 | 10.143 |
| *Adjustment* | | *Similar* | *Downward* | *Downward* | *Similar* | *Similar* | *Downward* |
| Development Potential | Good | Good | Average | Good | Good | Good | Good |
| *Adjustment* | | *Similar* | *Upward* | *Similar* | *Similar* | *Similar* | *Similar* |

## Discussion and Analysis

Sale No. 5 and No. 6 represent the upper end of the value range and were zoned for planned unit development at the time of sale. As previously indicated, the subject will require rezoning upon redevelopment and there is no guarantee that zoning will be permitted. We have considered this in our estimate of market value.

After considering the subject's location along a heavily traveled mixed-use corridor within a desirable area, road frontage along multiple streets, site size, current zoning in-place that will require rezoning and overall market appeal, a market value of say, $150,000 per sq.ft. is deemed applicable. Multiplying the subject's 37.35 acres by $150,000 per acre indicates an applicable market value of $5,602,500 or say, $5,600,000.

A demolition cost has not been provided. We have the right to revise this analysis if one is provided. We have assumed herein that the existing structures do not contain containments such as asbestos, lead, etc. and they cost to demolish the buildings would be within industry standards for this type of property.

**Market Value Indication**
**Via Sales Comparison Approach (Land Value Only):**       $5,600,000

UMCH000079

## *SUMMATION AND FINAL RECONCILIATION*

As a basis for estimating the value of the subject property, the appraiser relied upon the sales comparison approach to value as this is considered the best indicator of value for properties such as the subject and reflects the activities of typical buyers and sellers of this type property in the market place.

The subject property has been thoroughly examined; information regarding the improvements has been analyzed; and comparable sales data have been studied. Based upon this analysis, it is our opinion that the market value of the fee simple estate of the subject property as of *January 1, 2019*, in terms of financial arrangements equivalent to cash is estimated to be from **$5,600,000**:

**FIVE MILLION SIX HUNDRED THOUSAND DOLLARS**
**($5,600,000)**

UMCH000080

*THE ADDENDA*

54

UMCH000081

Franklin County Auditor - Michael Stinziano 100-006774-00

| | | | |
|---|---|---|---|
| Owner Name | UNITED METHODIST CHILDREN HOME WEST OHIO | Prop. Class | C - Commercial |
| | | Land Use | 499 - OTHER COMMERCIAL STRUCTURE |
| | | Tax District | 100 - CITY OF WORTHINGTON |
| Site Address | N HIGH ST | Sch. District | 2516 - WORTHINGTON CSD |
| | | App Nbrhd | X3101 |
| | | Tax Lein | No |
| LegalDescriptions | LOT 4 | CAUV Property | No |
| | REPLAT OF LOT 2 OF UNITED | Owner Occ. Credit | 2019: No 2020: No |
| | METHODIST | Homestead Credit | 2019: No 2020: No |
| | CHILDREN'S HOME AMD SUB | Rental Registration | No |
| Owner Address | | Board of Revision | Yes |
| | | Zip Code | 43085 |
| | | Annual Taxes | 478,915.74 |
| Transfer Date | | Taxes Paid | 478,915.74 |
| Transfer Price | 07/19/2017 | Calculated Acreage | 37.35 |
| Instrument Type | .00 | Legal Acreage | .00 |

| | Current Market Value | | | | Taxable Value | | |
|---|---|---|---|---|---|---|---|
| | Land | Improv | Total | | Land | Improv | Total |
| Base | $6,263,000 | $6,710,200 | $12,973,200 | | $2,192,050 | $2,348,570 | $4,540,620 |
| TIF | $0 | $0 | $0 | | $0 | $0 | $0 |
| Exempt | $0 | $0 | $0 | | $0 | $0 | $0 |
| Total | $6,263,000 | $6,710,200 | $12,973,200 | | $2,192,050 | $2,348,570 | $4,540,620 |
| CAUV | $0 | | | | | | |

**Building Data**

| | |
|---|---|
| Land Use | 499-OTHER COMMERCIAL STRUCTURE |
| Year Built | 1962 |
| Total Sq Ft | 9284 |
| Stories | 01 |
| Grade | AVERAGE QUALITY |

**Sketch Legend**
2 A0 - 063:RELIGIOUS INST 9284 Sq Ft
1 A1 - OFP OPEN FRAME PORCH 592 Sq Ft
1 - 101:UNF BSMT 9284 Sq Ft





Sorry, no photo available for this record

Disclaimer:The information on this web site is prepared from the real property inventory maintained by the Franklin County Auditor's Office. Users of this data are notified that the primary information source should be consulted for verification of the information contained on this site. The county and vendors assume no legal responsibility for the information contained on this site. Please notify the Franklin County Auditor's Real Estate Division of any discrepancies.

UMCH000082

## *REAL ESTATE TAXES*

---

*FRANKLIN COUNTY AUDITOR'S DATA*

*District & Parcel Number(s):*    100-006774-00

*Property Owner:*    United Methodist Children Home West Ohio
*Location:*    0 N High Street, Columbus OH 43085

| | *2019 Appraised Values* | | |
| --- | --- | --- | --- |
| *Parcel Number* | *Land* | *Building* | *Total* |
| 100-006774-00 | $6,263,000 | $6,710,200 | $12,973,200 |

| | *2019 Assessed Values* | | |
| --- | --- | --- | --- |
| *Parcel Number* | *Land* | *Building* | *Total* |
| 100-006774-00 | $2,192,050 | $2,348,570 | $4,540,620 |

| | *2019 Annual Taxes (Payable in 2020)* |
| --- | --- |
| *Parcel Number* | *Annual Taxes* |
| 100-006774-00 | $478,915.74 |

*Taxing Jurisdiction:*    City of Worthington
*Auditor's Effective Tax Rate:*    105.473644    per $1,000 of assessed value

56

UMCH000083

## Zoning Districts



| | | |
|---|---|---|
| **OPEN AREA** | F-1 | Flood Plain |
| | S-1 | Special |
| | VM | Veterans Memorial |
| **RESIDENTIAL** | R-16 | Very Low Density Residential |
| | R-10 | Low Density Residential |
| | R-7.5 | Medium Density Residential |
| | R-6.5 | One and Two Family Residence |
| | AR-4.5 | Low Density Apartment Residence |
| | AR-3 | Medium Density Apartment Residence |
| | SC | Senior Citizen |
| **COMMERCIAL** | C-1 | Neighborhood Commercial |
| | C-2 | Community Shopping Center |
| | C-3 | Institutions and Offices |
| | C-4 | Highway and Automotive Services |
| | C-5 | Central Commercial |
| **INDUSTRIAL** | I-1 | Restricted Industrial: Research and Offices |
| | I-2 | General Industrial |



57

UMCH000084

Print

Worthington, OH Code of Ordinances

**CHAPTER 1147**
**Use Regulations**

**1147.01   Permitted and conditional uses.**

CROSS REFERENCES

Definitions of uses in categorical terms - see P. & Z. Ch. 1123
Certificates of Compliance - see P. & Z. 1125.02
Procedure for conditional use permits - see P. & Z. 1127.02 et seq.
Temporary use permits - see P. & Z. 1129.05(b)(5), 1175.07
Nonconforming uses - see P. & Z. Ch. 1151
Junk storage and sales prohibited - see P. & Z. 1171.02(f)

**1147.01 PERMITTED AND CONDITIONAL USES.**

    The permitted and conditional uses for each district, except districts designated as Planned Use Districts, are shown in the accompanying tabulation which shall constitute Chapter 1147 of the Zoning Ordinance. All uses in Zoning Districts designated Planned Use District shall be in accordance with the Preliminary Plan adopted by the City Council pursuant to Chapter 1174 of the Codified Ordinances. The interpretation of uses given in categorical terms shall be as defined in Chapter 1123. Uses not specifically listed or interpreted by municipal officials to be included categorically under this chapter and Chapter 1123 shall not be permitted except by amendment to the Zoning Ordinance. Man-made impoundments, lakes or ponds shall not be permitted in the City, except as part of a planned development in a Community Development Project, Integrated Commercial Center and Integrated Office, Research or Restricted Industrial Centers. This prohibition on impoundments, lakes, or ponds shall not apply in residential districts to back yard fish ponds or decorative water features with a depth of thirty inches or less, a surface of less than seventy-five square feet and located to the rear of a dwelling or structure. The cultivation, processing and dispensing of medical marijuana, as defined in Section 1123.491, shall not be permitted in any zoning district within the City.

(Ord. 04-2013. Passed 2-19-13; Ord. 12-2017. Passed 4-3-17.)

PERMITTED USES

| "F-1"<br>Flood Plain | "S-1"<br>Special | "R-16" Very Low<br>Density Residence | "R-10" Low<br>Density Residence |
|---|---|---|---|
| Park<br>Public uses<br>Noncommercial recreational facilities<br>Agriculture and forestry<br>Plant production<br>Essential services<br>Accessory uses | Parks<br>Public uses<br>Semipublic uses<br>Essential services<br>Accessory uses<br>Conservation and highway interchange areas<br>Noncommercial recreational facilities<br>Plant production<br>Preschool, nursery school, child daycare | Single-family dwelling<br>Public uses<br>Essential services<br>Accessory uses<br>Home occupations | Single-family dwelling<br>Public uses<br>Essential services<br>Accessory uses<br>Home occupation |

58

UMCH000085

| | | | |
|---|---|---|---|
| | centers | | |

## CONDITIONAL USES REQUIRING MUNICIPAL PLANNING COMMISSION APPROVAL

| "F-1"<br>Flood Plain | "S-1"<br>Special | "R-16" Very Low<br>Density Residence | "R-10" Low<br>Density Residence |
|---|---|---|---|
| Public service facility<br>Restriction commercial<br>recreational facilities<br>Specialized animal<br>raising and care<br>Marinas<br>Sale of agricultural<br>products | Public service facility<br>Cemetery<br>Caretaker's residence | Cemetery<br>Noncommercial<br>recreational facilities<br>Plant production<br>Semipublic uses<br>Public service facility<br>Co-located child day<br>care center, nursery<br>school and preschool | Public service facility<br>Plant production<br>Noncommercial<br>recreational facility<br>Semipublic uses<br>Co-located child day<br>care center, nursery<br>school and preschool |

## PERMITTED USES

| "R-6.5" One and Two<br>Family Residence | "AR-4.5" Low<br>Density Apartment | "AR-3" Medium<br>Density Apartment | "SC"<br>Senior Citizen |
|---|---|---|---|
| Single-family dwelling<br>Two-family dwelling<br>Public uses<br>Essential services<br>Accessory uses<br>Home occupation | Single-family dwelling<br>Two-family dwelling<br>Multiple family<br>dwelling<br>Public uses<br>Essential services<br>Accessory uses<br>Home occupation | Single-family dwelling<br>Two-family dwelling<br>Multiple family<br>dwelling<br>Public uses<br>Essential services<br>Accessory uses<br>Home occupation | Senior residential |

## CONDITIONAL USES REQUIRING MUNICIPAL PLANNING COMMISSION APPROVAL

| "R-6.5" One and Two<br>Family Residence | "AR-4.5" Low<br>Density Apartment | "AR-3" Medium<br>Density Apartment | "SC"<br>Senior Citizen |
|---|---|---|---|
| Conversion of dwellings<br>Plant production<br>Noncommercial<br>recreational facilities<br>Public service facility<br>Semipublic uses | Bed and breakfast<br>Conversion of dwellings<br>Plant production<br>Noncommercial<br>recreational facilities<br>Public service facility<br>Semipublic uses | Bed and breakfast<br>Noncommercial<br>recreational facilities<br>Nursing homes<br>Conversion of dwellings<br>Neighborhood<br>commercial<br>Public service facility<br>Semipublic uses | Nursing home<br>Senior residential<br>(including efficiency<br>units)<br>Senior assisted living |

## PERMITTED USES

| "C-1" Neighborhood<br>Commercial | "C-2" Community<br>Shopping Center | "C-3" Institutions and<br>Offices | "C-4" Highway and<br>Automotive Services |
|---|---|---|---|

59

UMCH000086

| | | | |
|---|---|---|---|
| Neighborhood commercial<br>Personal services<br>Public uses<br>Semipublic uses<br>Essential services<br>Accessory uses | Sale of goods at retail<br>Administrative and business office<br>Medical/dental office or clinic<br>Personal services<br>Public uses<br>Essential services<br>Accessory uses<br>Banks<br>Pet shops<br>Arts and crafts<br>Entertainment facilities (commercial)<br>Commercial recreational facilities<br>Restaurants | Administrative and business office<br>Medical/dental office or clinic<br>Business services - philanthropic<br>Institutions:<br>  religious<br>  charitable<br>  philanthropic<br>Public uses<br>Semipublic uses<br>Essential services<br>Accessory uses | Personal services<br>Business services<br>Motels and hotels<br>Restaurants<br>Essential services<br>Accessory uses<br>Public and semipublic uses |

## CONDITIONAL USES REQUIRING MUNICIPAL PLANNING COMMISSION APPROVAL

| "C-1" Neighborhood Commercial | "C-2" Community Shopping Center | "C-3" Institutions and Offices | "C-4"Highway and Automotive Services |
|---|---|---|---|
| Public service facility<br>Plant production and grocery stores<br>Bed and breakfast<br>Ancillary on-premise dining/waiting area (nonalcoholic)<br>Administrative and business office<br>Medical/dental office or clinic<br>Residential uses | Drive-in banks<br>Semi-public uses<br>Lawn and garden centers<br>Public service facility<br>Bakeries and dairy processing and sales<br>Plant production<br>Bed and breakfast<br>Dense-pack-open-plan office<br>Drive-in pharmacy<br>Dog and cat day care center<br>Residential uses<br>Animal Hospital and Veterinary care center | Laboratories<br>Scientific research facilities<br>Nursing homes<br>Drive-in banks<br>Mortuaries<br>Social activities<br>Animal hospital<br>Veterinary care center<br>Feeding facilities, in-plant<br>Nursery school, pre-school, child day care centers<br>Public service facilities<br>Plant production<br>Instructional institution<br>Personal services<br>Bed and breakfast<br>Dense-pack-open-plan office<br>Arts and crafts<br>Neighborhood bakery | Administrative and business offices<br>Automotive sales, service and storage<br>Dense-pack-open-plan-office<br>Mortuaries<br>Social activities<br>Gasoline/convenience store station<br>Public service facility<br>Entertainment facilities (commercial)<br>Restricted and noncommercial recreational facilities<br>Drive-in commercial uses<br>Commercial recreational facilities<br>Plant production<br>Gasoline service stations<br>Bed and breakfast<br>Medical/dental offices and clinics<br>Restaurants/specialty goods |

## PERMITTED USES

60

UMCH000087

| "C-5" Central Commercial | "I-1" Restricted Light Industrial | "I-2" General Industrial |
|---|---|---|
| Sale of goods at retail<br>Personal services<br>Business services<br>Specialty goods<br>Arts and crafts<br>Financial services<br>Public uses<br>Semipublic uses<br>Social activities<br>Essential services<br>Accessory uses | Light manufacturing and assembly<br>Automotive services<br>Animal hospitals<br>Plant production<br>Equipment sales/storage<br>Offices<br>Essential services<br>Accessory uses<br>Warehousing<br>Veterinary Care Center<br>Sexually Oriented Business | Printing and publishing<br>Manufacturing and assembly<br>Food processing<br>Laboratories and clinical testing<br>Wholesale business<br>Essential services<br>Accessory uses<br>Plant production<br>Warehousing<br>Entertainmenmt facilities (commercial)<br>Restaurants<br>Sexually Oriented Business |

CONDITIONAL USES REQUIRING MUNICIPAL PLANNING COMMISSION APPROVAL

| "C-5" Central Commercial | "I-1" Restricted Light Industrial | "I-2" General Industrial |
|---|---|---|
| Drive-in commercial uses<br>Recreational facilities<br>Printing and publishing<br>Public service facility<br>Entertainment facilities<br>Theaters<br>Off-street parking<br>Motels and hotels<br>Banks<br>Administrative and business office<br>Residential uses<br>Bed and breakfast<br>Medical/dental offices and restaurants | Ancillary retail/service<br>Restaurants<br>Printing and publishing<br>Wholesale business<br>Heliports<br>Public service facilities<br>Agriculture<br>Recreational facilities<br>Laboratories, research and development, and clinical testing facilities<br>Vocational instruction<br>Unit storage facility<br>Resident manager's residence<br>Automotive services - major<br>Sale and storage of building materials<br>Dog and cat day care center<br>Breweries, distilleries and wineries | Ancilliary retail/service<br>Equipment sales/storage<br>Automotive services<br>Automotive services - major<br>Transport and trucking terminals<br>Manufacturing or processing of: paint, fertilizer, chemicals, brick and clay products<br>Sale and storage of building materials<br>Offices<br>Public Service facilities<br>Heliports<br>Restaurants<br>Nursery schools, preschools and day care centers<br>Laboratories, research and development, and clinical testing facilities<br>Vocational instruction<br>Breweries, distilleries and wineries |

PERMITTED USES

61

UMCH000088

| "VM" |
| --- |
| Veterans Memorial |
| Memorial to commemorate the service of all members and veterans of the armed forces of the United States |
| Veterans' organizations business offices and recreational facilities |
| Veterans' support organizations |
| Public Uses |
| Accessory Uses |
| Essential Services |

### CONDITIONAL USES REQUIRING MUNICIPAL PLANNING COMMISSION APPROVAL

| "VM" |
| --- |
| Veterans Memorial |
| Semi-public Uses |
| Institutions - religious, charitable, philanthropic and instructional |
| Offices |
| Residential Uses |
| Social Activities |
| Bed and Breakfast |
| Arts and Crafts |

(Ord. 22-87. Passed 5-11-87; Ord. 71-87. Passed 10-26-87; Ord. 56-88. Passed 7-11-88; Ord. 45-91. Passed 5-13-91; Ord. 128-92. Passed 1-11-93; Ord. 75-92. Passed 7-27-92; Ord. 95-94. Passed 10-11-94; Ord. 23-95. Passed 3-27-95; Ord. 34-95. Passed 6-12-95; Ord. 43-95. Passed 7-10-95; Ord. 14-96. Passed 4-22-96; Ord. 46-97. Passed 9-22-97; Ord. 17-99. Passed 4-12-99; Ord. 27-99. Passed 4-16-99; Ord. 74-99. Passed 12-13-99; Ord. 63-2000. Passed 11-20-00; Ord. 02-2001. Passed 2-5-01; Ord. 10-2001. Passed 4-2-01; Ord. 68-2001. Passed 1-7-02; Ord. 64-2002. Passed 12-16-02; Ord. 65-2002. Passed 12-16-02; Ord. 20-2004. Passed 5-17-04; Ord. 15-2006. Passed 4-17-06; Ord. 56-2006. Passed 11-6-06; Ord. 77-2006. Passed 1-3-07; Ord. 27-2007. Passed 5-21-07; Ord. 11-2009. Passed 3-16-09; Ord. 13-2010. Passed 4-19-10; Ord. 40-2010. Passed 10-4-10; Ord. 13-2015. Passed 4-6-15; Ord. 23-2015. Passed 7-6-15.)

UMCH000089

## *FLOOD MAP*

AREA OF MINIMAL FLOOD HAZARD
PIN
MAP PANELS
OTHER AREAS
SPECIAL FLOOD HAZARD AREAS
OTHER AREAS OF FLOOD HAZARD
Without Base Flood Elevation (BFE)
With BFE or Depth
Regulatory Floodway
Future Conditions 1% Annual Chance Flood Hazard
Area with Reduced Flood Risk due to Levee. See Notes.
Area with Flood Risk due to Levee
Cross Sections with 1% Annual Chance
Water Surface Elevation
Coastal Transect
Base Flood Elevation Line (BFE)
Limit of Study
Jurisdiction Boundary
Coastal Transect Baseline
Profile Baseline
Hydrographic Feature
OTHER FEATURES
GENERAL STRUCTURES
Channel, Culvert, or Storm Sewer
Levee, Dike, or Floodwall
Otherwise Protected Area
Coastal Barrier Resource System Area