*LIFESTYLE COMMUNITIES*

*vs.*

*CITY OF WORTHINGTON*

---

Deposition of

**David Robinson**

October 31, 2023

---



614.460.5000 | www.priohio.com | pri@priohio.com

1

         IN THE UNITED STATES DISTRICT COURT
2            SOUTHERN DISTRICT OF OHIO
                 EASTERN DIVISION
3


4   LIFESTYLE COMMUNITIES,      )
    LTD., ET AL.,               )
5                               )
         Plaintiffs,            )
6                               )
         vs.                    )  Case No.
7                               )  2:22-cv-1775
    CITY OF WORTHINGTON,        )
8   OHIO,                       )
                                )
9        Defendant.             )

10

11

12              DEPOSITION

13            of DAVID ROBINSON

14

15      Taken at Worthington City Hall
            6550 North High Street
16         Worthington, Ohio 43085

17      on October 31, 2023, at 9:02 a.m.

18

19      Reported by: Rhonda Lawrence

20

21                  -=0=-

22

23

24

 1    APPEARANCES:

 2

           Joseph R. Miller
 3         VORYS SATER SEYMOUR AND PEASE LLP
           52 East Gay Street
 4         Columbus, Ohio 43215
           614.464.5480
 5         jrmiller@vorys.com

 6              on behalf of the Plaintiffs.

 7

           Paul J. Schumacher
 8         DICKIE McCAMEY
           600 Superior Avenue East, Suite 2330
 9         Cleveland, Ohio 44114
           216.390.1795
10         pschumacher@dmclaw.com

11              on behalf of the Defendant.

12

13

14

15

16

17

18

19                     -=0=-

20

21

22

23

24

1                                    STIPULATIONS

2                    It is stipulated by and between

3      counsel for the respective parties that the

4      deposition of DAVID ROBINSON, the Witness

5      herein, called by the Plaintiff under the

6      applicable Rules of Federal Civil Court

7      Procedure, may be taken at this time by the

8      stenographic court reporter and notary public

9      pursuant to notice; that said deposition may be

10     reduced to writing stenographically by the court

11     reporter, whose notes thereafter may be

12     transcribed outside the presence of the witness;

13     and that the proof of the official character and

14     qualification of the notary is waived.

15                            -=O=-

16

17

18

19

20

21

22

23

24

1                    INDEX OF EXAMINATION

2                                                    PAGE

3    BY MR. MILLER:                                  6

4

5

6                     INDEX OF EXHIBITS

7    EXHIBIT          DESCRIPTION               PAGE

8    6         Ordinance 04-2022               131

9    7         Resolution 04-2022              136

10   9         Meeting minutes, 1-18-22        139

11   31        Summary of Phases for           58
               Development of UMCH Property
12
     32        Memo from Greeson to City       61
13             Council, 1-22-19

14   34        Email chain                     93

15   42        Email chain                     61

16   61        Email chain                     120

17   85        UMCH Development, a Multi-Use   25
               Community Center Proposal
18
     86        WARD pamphlet                   25
19
     87        Memo titled UMCH               30
20             Responsibility and
               Accountability
21
     88        Email chain                     38
22
     89        Email chain                     42
23
     90        Email chain                     46
24
     91        Email chain                     49

1                   INDEX OF EXHIBITS (continued)

2    EXHIBIT              DESCRIPTION                    PAGE

3      92        Email chain                            53

4      93        Project Community Park           54
                 Worthington's Mission and
5                Guiding Principles

6      94        Email from Greeson, 1-31-20      66

7      95        Email chain                            71

8      96        Email from Robinson to           75
                 Michael, 4-9-20
9
       97        Email chain                            81
10
       98        WARD Presents Proposals for      83
11               UMCH Sith, 1-2018

12     99        Email chain                            99

13     100       Blog, 11-24-20                        104

14     101       Email chain                           104

15     102       Email chain                           110

16     103       Blog post, 5-11-21                    119

17     104       Blog post, 10-18-21                   123

18     105       Email chain                           126

19     106       Blog post, 12-14-21                   131

20     107       Email chain                           142

21     108       Blog post, 1-30-22                    143

22     109       Email chain                           144

23

24

1                    DAVID ROBINSON

2    being first duly sworn, as hereinafter

3    certified, deposes and says as follows:

4                    CROSS-EXAMINATION

5    BY MR. MILLER:

6        Q.  Good morning, Mr. Robinson.

7        A.  Hi, Mr. Miller.

8        Q.  Have you given a deposition before?

9        A.  You mean like a video deposition?

10       Q.  Exactly what we're doing here.  Have you

11   done this before?

12       A.  I have not.

13       Q.  Okay.  Rhonda will be taking down every

14   word we say today.  We may fail at this at

15   times, but let's both try to endeavor not to

16   speak over one another.  There will be times

17   where you know what my question is before I

18   finish.  I'd ask that you wait.  Likewise, if I

19   accidentally intrude when you have not yet

20   finished your answer, please let me know, and

21   I'll try to refrain from doing so.

22       A.  Sure.

23       Q.  Also, if you could answer my questions

24   verbally rather than with a nod or shake of the

1    head, I would appreciate it.

2        A.  I will do that.

3        Q.  Do you understand that you're giving

4    testimony here under oath today related to a

5    lawsuit that Lifestyle Communities has brought

6    against the City of Worthington?

7        A.  I do.

8        Q.  That was very good, how you waited until

9    the end of my question to answer.

10            I understand you own a business.  Could

11   you describe for me that business, where it's

12   located, what your role is?

13       A.  Would you repeat that, please?

14           (Record read as requested.)

15       A.  Yeah.  I'm a co-owner of a -- of a

16   manufacturing business called Marcy Enterprises.

17   I've been there about 30 years.  Became a

18   co-owner roughly ten years ago.  It's a

19   manufacturing business.

20           I would describe it as a small

21   family-owned business.  A friend of mine from

22   college, Steve Meizlish, his father started the

23   business 50 years ago, and Steve is now the

24   primary owner, I'm a secondary owner.

1          We manufacture in-house, in Columbus

2     here, parts for the automotive aftermarket,

3     specifically for auto glass replacement.  We

4     export about half of our product overseas.

5     We've got five, six patents.

6          My primary responsibility is business

7     development, marketing, sales, prospecting.  But

8     being a small business, you know, I do all kinds

9     of things, as my partner does.  Every day I'm

10    out on the manufacturing floor talking about new

11    products, talking to clients.  So I like my job.

12    I enjoy it every day and consider it a creative,

13    inventive enterprise.  So that's what I do.

14       Q.  Approximately how many people work for

15    Marcy Enterprises?

16       A.  Approximately 20.  It goes up and down a

17    little bit, depending on machines we have.

18    We've been growing.  Probably we've added maybe

19    five employees over the last few years, but it's

20    roughly 20 people.

21       Q.  And you're also the president of the

22    City Council here in Worthington?

23       A.  Yeah.  You know that.

24       Q.  How long have you been the president of

1  City Council?

2      A.  Since early January.  I forget if it was

3  the 2nd or 3rd.  It was the first meeting in

4  January of 2022.  I'm in the middle of my second

5  term right now.  I was first elected in 2017,

6  and I started serving on council in January of

7  2018.

8      Q.  How would you describe your civic life

9  before being elected to council?  Were you

10  involved here in the community?

11      A.  My wife and I moved here in -- and my

12  stepdaughter, Julia -- moved here in 2009, in

13  May of 2009.  And I was not involved in city

14  affairs until 2015, something like that.

15      Q.  And Mr. Robinson, what role did that

16  take in 2015?

17      A.  Well, actually, it was probably December

18  of 2014.  I came back from a trip -- business

19  trip overseas to England, and my wife had said

20  that she had spoken with a neighbor who was

21  saying that there was some issues up at the New

22  England and High Street Masonic properties, and

23  there was some residents there that were

24  speaking with the city about the possibility of

1    creating a small little -- it was like a real

2    small, little parcel, creating a little pocket

3    park there.  And it was a group of citizens.

4    Ended up basically -- I don't know -- probably

5    150 folks that eventually got interested in

6    this, and that's when I first got drawn into

7    local affairs, civic affairs here in

8    Worthington, was talking with the city about the

9    possibility of creating a little pocket park

10   there.

11       Q.  And that is a matter or issue separate

12   and apart from what brings us here today, the

13   Lifestyle Communities property?

14       A.  Well, I certainly think it is, but

15   you're asking me questions that make me wonder

16   where --

17          MR. SCHUMACHER:  Just answer the

18   question he asks you.

19       A.  Yeah, it's separate, sure.  Yeah.

20       Q.  Was that 150 people or so that you

21   mentioned, was that part of an organized group,

22   as you recall it?

23       A.  First of all, I was just a member.  I

24   was peripheral, so I don't know details.  But I

1    mentioned 150 because at one point the group

2    took out a newspaper ad.  I think there were 148

3    signatures.  So it was organized.  It never even

4    had a name.  I would describe it as an ad hoc

5    neighborhood group.

6        Q.  Now, you have a personal blog which at

7    times you've used to post about the Lifestyle

8    Communities or UMCH property, correct?

9        A.  Yeah, I have a personal blog, yeah.

10        Q.  How long have you maintained that blog?

11    When did it begin, if you recall?

12        A.  I think it began -- let's see.  I think

13    it began in 2018.  I think so.  Yeah, it would

14    have been, I think, coinciding with my City

15    Council.

16        Q.  Could it have been earlier than that,

17    prior to your run for City Council, even as

18    early as 2015?

19        A.  No.  I'm pretty sure it was -- I think

20    it started as part of -- at the core of my idea

21    of being a citizen representative on City

22    Council is to help keep the public informed.

23    One of my sayings, I guess, is an informed and

24    engaged citizenry is the basis of sound public

1   policy.  And so back in -- all the way back in

2   2015, '16, '17 there was cries from the public

3   to City Council you're not listening to us, a

4   sense of disconnect between the public and their

5   elected officials.  And so I created the blog in

6   order to provide a conduit for communications

7   with the public.

8       Q.  You may have touched upon this a moment

9   ago, Mr. Robinson, but why did you decide to run

10  for City Council?

11      A.  Why did I -- a sense of responsibility.

12  I'm a member of a community that I care a lot

13  about.  I believe I was at a point in life where

14  I had the time and the abilities to think well

15  about public issues and to engage the public.

16  So it was a sense of giving back to the

17  community that was giving me and my family a lot

18  at the time.

19      Q.  Were you in part motivated by the issue

20  related to the UMCH/Lifestyle Communities

21  property?

22          MR. SCHUMACHER:  I'm sorry, I didn't

23  catch the end of the question.

24      Q.  Sure.  Were you motivated in part by the

1    issue of the development of the UMCH or

2    Lifestyle Communities property?

3        A.  Back in 2017 -- the UMCH issue has been

4    a significant issue for the whole community for

5    ten years.  So yeah, of course it was.  It was

6    that along with many other issues.

7        Q.  Did you hold any role with the city

8    prior to becoming on City Council?

9        A.  Could you repeat that?

10        (Record read as requested.)

11        A.  No.

12        Q.  Are you familiar with an organization

13    called WARD, or Worthington Alliance for

14    Responsible Development?

15        A.  I am.

16        Q.  How would you describe your relationship

17    with WARD, if at all, prior to your election to

18    City Council?

19        A.  They are a citizen's group, one that I

20    admire.  They formed back in 2012, I think is

21    when it was.  Tom and Kathy Emmer were founding

22    members.  And so being a grassroots

23    organization, I admire citizens attempting to

24    engage and effect public policy.

1          So I knew and know members of WARD.

2    They have a planning group, is what they call

3    this, the leadership group.  I spoke with them

4    during the Keep Worthington Beautiful campaign.

5    They were, as a group, supportive of the effort.

6    That's when I got to know them to some degree.

7        Q.  I'm sorry to interrupt, but the Keep

8    Worthington Beautiful campaign, just so I'm

9    clear, you're referring to Issue 38 in 2015?

10       A.  Correct.  Yeah.  The campaign was called

11   Keep Worthington Beautiful.  It became Issue 38

12   as a ballot issue.  But the campaign itself was

13   called Keep Worthington Beautiful.

14       Q.  And you spearheaded that; is that fair

15   to say?

16       A.  Yeah, I'd say my wife and I, but very

17   quickly it became a community effort.  I think,

18   you know, just at one indication there were

19   probably 700 yard signs up by the end of the

20   campaign.  It was a loosely organized campaign,

21   volunteer group entirely, and I was happy to be

22   a part of that.

23       Q.  You know and I know, but for the record,

24   how would you describe Issue 38?  What did it

1  seek to do?  What did it achieve?

2       MR. SCHUMACHER:  Objection.  Compound

3  question.  Which question are you asking?

4     Q.  Did you understand my question?

5     A.  Not really.  It's multiple, it sounded

6  like, but what is the question?

7     Q.  I'm just trying to help you, sir, move

8  things along, great.  If your counsel continues

9  to object, it won't.

10       MR. SCHUMACHER:  Excuse me, Joe.  I just

11  want to make sure the record is clear, so if you

12  ask a compound question, I'm just bound to point

13  it out.

14     Q.  How would you describe Issue 38,

15  Mr. Robinson?

16     A.  The heart of the Keep Worthington

17  Beautiful campaign was -- I think it was the

18  heart of really an American tradition of

19  citizens seeking to have a voice in the affairs

20  of their community.  It did so by amending our

21  city charter specific to the right of

22  referendum, specifically related to rezoning

23  ordinances.  And it made the right of referendum

24  for rezoning ordinances an actual right; meaning

1    that, practically speaking, prior to Keep

2    Worthington Beautiful, there was a 20-day

3    effective date of rezoning ordinances.  And

4    anyone who's led or gotten involved with citizen

5    initiatives or campaign efforts knows that 20

6    days is not sufficient time to organize, to

7    speak with lawyers, to get language identified,

8    to gather the seven, eight hundred signatures

9    and so forth in a matter of 20 days.  If it's

10   wintertime, there's no conceivable way that can

11   be done.

12         So the simple but effective mechanism of

13   Keep Worthington Beautiful was give the citizens

14   more time, 60 days instead of 20, and not to

15   allow emergency rezoning either, rezoning.  So

16   that's what it did.  It really restored the

17   right of folks in the city to have a say about

18   rezoning, which is a big issue.  You know,

19   rezoning often creates effectively permanent

20   change in the community.

21       Q.  I've already done this at times,

22   Mr. Robinson, and I apologize for not --

23       A.  I'm sorry, I wasn't done.

24       Q.  Oh, go ahead.

1      A.  So in sum, Keep Worthington Beautiful

2  really was about giving the people a voice about

3  matters of real concern for their community, and

4  fortunately we succeeded.

5      Q.  Are you finished?

6      A.  Yeah, I am.

7      Q.  I've referred at times already to the

8  Lifestyle Communities property or the UMCH

9  property.  I should be more clear or establish

10  this with you.  When I make that reference, can

11  we agree I'm referring to the vast vacant

12  acreage across the street; is that fair?

13      A.  If you refer to it as UMCH or --

14      Q.  Lifestyle Communities property.

15      A.  Yeah.  You're referring to the -- I

16  think it's 37 and a half acres or something like

17  that, yeah.

18      Q.  You'll understand that reference?

19      A.  Yeah.

20      Q.  And if we need to get more specific

21  about parts of it or acreage, please let me

22  know.

23      A.  Okay.

24      Q.  All right.  Circling back for a moment,

1  we were talking about WARD.  Prior to your

2  election to City Council in November of 2017,

3  were you a member of WARD?

4      A.  No.

5      Q.  What do you understand WARD's objectives

6  to be, as it relates to the UMCH property?

7      A.  Well, I have available public statements

8  of mission and purpose.  I mean, that's what I

9  would refer you to, is to understand what their

10  purpose is is just to read their documents.

11      Q.  And you've read their documents and

12  understand their stated purpose?

13      A.  Over the years I have.  It's been a long

14  story.  It's been, what, eight years or so.  But

15  at some point in the past I've read their

16  purposes, yeah.

17      Q.  And we'll talk about it more

18  specifically, but in general, you agree with

19  those purposes?

20      A.  I'm not sure what you mean by do I agree

21  with their purposes.

22      Q.  You don't know whether you do or not?

23      A.  Well, the question itself, do I agree

24  with their purposes, I think I have a sense of

1    their -- what their purposes are.

2        Q.  And I'm simply asking you, do you agree

3    with those purposes?

4        A.  The question didn't make sense to me.

5        Q.  Okay.

6        A.  Like do you agree with the U.S.

7    Constitution or something like that.  I

8    understand it.  Do I embrace it, do I share it,

9    but agree with, it's not a --

10       Q.  Okay.  Do you embrace or share those

11   purposes?

12       A.  Here's the way I understand -- here's

13   the way I would understand -- here's the way I

14   think about WARD, is they were asserting the

15   basic right of the citizens to be heard by their

16   city on an issue that's of real importance to

17   them.  And I agree with that.  The city should

18   do that.  WARD and the citizenry in general

19   ought to be engaged, listened to, and really

20   fundamental to the city's position on

21   significant issues in the city.  Yeah, so I

22   agree with that.

23       Q.  Are you familiar with an organization

24   called Project Community Park Worthington?

1      A.  I am.

2      Q.  Do you consider yourself to be a member

3  of that organization?

4      A.  No.  I did sign their petition, along

5  with 1,200 other people or so, but they don't

6  really have a membership, per se.

7      Q.  And what was set forth in that petition,

8  if you recall?

9      A.  Something like this -- again, it's been

10  years since I've read the mission and the

11  elements of the petition.  But essentially,

12  here's a broad stroke -- remember, this is back

13  in 2018, back when the United Methodist

14  Children's owned the property.  It was three

15  years after Lifestyle's presentation at the WEC.

16  There's not been any stirrings or messages from

17  the city about the property.  And so PCPW, the

18  citizens that started it and the people that,

19  you know, quickly gravitated around it, felt

20  like someone, apparently us, needs to come out

21  with an idea that -- for the property that

22  conforms with broad public opinion.

23      Q.  And I don't mean to interrupt you, but

24  you said "apparently us."  I took that to mean

1   the city?

2      A.  No.  This is PCPW, the citizens that

3   were forming it.

4      Q.  Okay.

5      A.  And --

6      Q.  And you said "the property."  I took

7   that to mean the UMCH property?

8      A.  Correct.

9      Q.  Okay.

10     A.  Thanks for clarification.

11     Q.  Go ahead.

12     A.  And so they said, hey, someone needs to

13  come out with a vision, an idea, because no

14  one's speaking about this right now, not UMCH,

15  not the city.  It's been three long years since

16  Lifestyle presented their idea.  Let's come out

17  with something to at least stimulate dialogue.

18  And our proposed vision is -- I think they used

19  terms like a multiuse or a mixed-use outcome

20  there that had substantial commercial along High

21  Street basically conforming with existing

22  zoning.  And then residential -- modest

23  residential in the northern perimeter, some

24  apartments, if I remember correctly, in with the

1  commercial properties, and then a large

2  contiguous green space in the middle that would

3  be -- I think they called it a community

4  commons.

5          And so the petition was here's our idea,

6  the outcome at the UMCH property.  It ought to

7  be in the public interest, conform with general

8  public opinion, ought to be focused long-term,

9  not short-term, and here's the rough idea of

10  what we have, the commercial, the housing, the

11  green space.  If you embrace and support this

12  general vision, would you sign this petition.

13  That was the gist of it.

14     Q.  And you signed the petition because you

15  embraced and supported that vision?

16     A.  Yeah.  I supported the idea that a

17  positive idea to facilitate and really prompt

18  discussion in the community and at the city was

19  a good thing and that their basic outline was a

20  reasonable place to start because it's in

21  conformity with public opinion.

22     Q.  You believe a large contiguous park on

23  the Lifestyle Communities property conforms with

24  the public vision?

1          MR. SCHUMACHER:  I'm sorry.  What was

2     the end of it?

3          MR. MILLER:  Conforms with the public

4     vision.

5          MR. SCHUMACHER:  Thank you.

6     A.  The desire for green space -- and

7     contiguous -- large contiguous green space over

8     at the UMCH property is something that is widely

9     supported by the public.  And that's -- I say

10     that, you know, based on a number of sources,

11     not just an anecdotal.  I say it's based on, you

12     know, essentially since I started engaging the

13     issue from the meeting at the WEC, which I did

14     go to, and listened, observed.  That's when I

15     got a palpable sense of public sentiment in the

16     immediate audience there, but beyond that,

17     there's been surveys.  I know WARD's done a

18     couple surveys, 2013, I think, and one maybe

19     2018, with six, seven, eight hundred

20     respondents.  And the desire for green space was

21     clear and unequivocal there.

22          And then the PCPW petition which readily

23     obtained -- I think the group got a

24     thousand-plus signatures in the matter of just a

1  few months.  And then another indication would

2  be the letters that the city receives.  Since

3  I've been on council, the one -- we receive

4  periodic letters, and then depending on what's

5  happening with city processes and whether

6  there's a proposal before the city, you know,

7  letters increase.  I know back in -- I think it

8  would have been '20 -- was it '21?  Yeah, '21

9  when Lifestyles had their proposal at the city

10 and it was before coming before the MPC, the ARB

11 and then council, we received 300-plus letters

12 from the public on that.  And the overwhelming

13 majority -- and by that I mean, 80, 90 percent

14 of it was stark, were calling for large

15 contiguous green space, and so all indications

16 are that is broad public sentiment.  And being

17 an elected official, you know, that's -- that is

18 what I feel compelled to represent.

19     Q.  It's fair to say, isn't it,

20 Mr. Robinson, that you pushed for the city to

21 purchase the UMCH for years for use as parkland?

22     A.  I wouldn't say that.

23     Q.  Okay.  We can discuss that in more

24 detail later.

 1     A.  Yeah.

 2     Q.  Let me show you, if I could --

 3         MR. SCHUMACHER:  Are these new?

 4         MR. MILLER:  Yeah.

 5                      -=0=-

 6      (Deposition Exhibit 85 and 86 marked.)

 7                      -=0=-

 8  BY MR. MILLER:

 9     Q.  I'd like to ask you first about 85.  You

10  can see it's entitled UMCH Development, a

11  Multi-Use Community Center Proposal, and it says

12  it was presented by Project Community Park

13  Worthington.  Do you see that?

14     A.  I see it in front of me, yeah.

15     Q.  And if you turn -- the pages are not

16  numbered, but if you turn to a page that begins

17  at the top, conceptual design.

18     A.  It's page 7, it looks like.

19     Q.  Thank you.  Is this the vision you were

20  describing earlier by this organization, Project

21  Community Park Worthington?

22     A.  It's a representation of it, yeah.

23     Q.  And you are generally supportive of this

24  vision?

1       MR. SCHUMACHER:  Wait, the conceptual

2  design or the vision?

3       MR. MILLER:  I believe it's under the

4  section entitled the vision; so...

5       MR. SCHUMACHER:  That's page 6, I think.

6  Mine's stapled.  Wait a minute.  I'm just

7  saying, is it under vision --

8  BY MR. MILLER:

9    Q.  Do you understand my question,

10  Mr. Robinson?

11    A.  I don't even know what the question is.

12  What is it?

13    Q.  Are you generally supportive of the

14  vision and the conceptual design depicted on

15  this exhibit?

16    A.  Here's what I support, is I support

17  stimulating this conversation.  Yeah.

18    Q.  Well, we can agree, can we not, that

19  your name appears near the back of this

20  document, David Robinson, along with that of

21  your wife, Lorraine Robinson, as signators to

22  that PCPW petition you mentioned earlier?

23    A.  Yeah.  I already said I signed it.

24    Q.  And likewise, if we look at Exhibit 86,

1  do you understand this to be a handout that WARD

2  is using this fall in the 2023 campaign?

3      A.  I do.

4      Q.  And it contains the same conceptual

5  design?

6      A.  It does.

7      Q.  And I'll ask again, just because I'm not

8  sure I understand your answer.  Do you support

9  this conceptual design?

10         MR. SCHUMACHER:  Objection.  Asked and

11  answered.

12     Q.  You still have to answer, sir.

13         MR. SCHUMACHER:  Yes.

14     A.  As I said, I support what WARD -- or

15  what PCPW is doing here, is advancing public

16  discussion around broad, mixed-use design.

17     Q.  We'll see it later, but just let me ask

18  your recollection first.  Do you recall, in

19  fact, saying you support WARD and PCPW's

20  conceptual design and vision?

21     A.  Repeat the question, please.

22     Q.  Sure.

23         MR. MILLER:  If you could read it back.

24         (Record read as requested.)

1      Q.  You have said that in the past, have you

2  not?

3      A.  You're talking about today?

4      Q.  Do you recall ever saying that?

5          MR. SCHUMACHER:  That's a different

6  question.

7          You can answer.

8      A.  Yeah.  I probably have said in many

9  ways -- I've talked about this issue a lot --

10  that what I support is broad public opinion

11  about a desirable outcome of the property.  And

12  this vision here, my understanding what PCPW has

13  done is they have said this is a broad stroke

14  outline of an outcome of the property that would

15  conform to public opinion, public interest.  I

16  support that process of engaging property owners

17  of the city and talking about this as a possible

18  outcome.  I think it's got a lot of strong

19  elements to it and the mixed-use, the housing,

20  the commercial, the big green space.  So I think

21  it's got some strong elements, yeah.

22      Q.  Okay.  You became the president of City

23  Council when, Mr. Robinson?

24          MR. SCHUMACHER:  Objection.  Asked and

1  answered.

2       Tell him again.

3    A.  January of '22.

4    Q.  And since that time, it's fair to say

5  that you control the legislative agenda for the

6  City Council for the City of Worthington?

7    A.  I would not say that.

8    Q.  Why not?

9    A.  I'm one of seven, although I am

10  president.  The actual ability to get things

11  done is dependent on a lot of factors, whether

12  ideas have support of a majority of council

13  fundamentally.  And then the actual agenda is

14  prepared by the city manager on a weekly basis

15  in consultation with the president, but it's

16  really a group effort.

17    Q.  Ms. Michael was the president of City

18  Council before you became the president?

19    A.  She was.

20    Q.  She was pretty good at blocking things

21  you wanted on the agenda, wasn't she?

22    A.  I wouldn't say that.

23    Q.  Okay.  Or blocking legislation that you

24  wished to bring forward?

1          MR. SCHUMACHER:  Objection.  Asked and

2   answered.

3      A.  I wouldn't say that.

4      Q.  Okay.

5      A.  In fact, Ms. Michael and I, we had a

6   cooperative relationship in many ways.

7                     -=0=-

8          (Deposition Exhibit 87 marked.)

9                     -=0=-

10  BY MR. MILLER:

11     Q.  What is Exhibit 87, if you know,

12  Mr. Robinson?

13     A.  What is it?

14     Q.  Yes.

15     A.  It is a four-page memo titled UMCH

16  Responsibility and Accountability by David

17  Robinson, 6-24-15.

18     Q.  And you authored this document?

19     A.  That is correct.

20     Q.  Why?

21     A.  I'm going to look it over here.

22     Q.  Oh, absolutely.  As with any document I

23  hand you today, take what time you need to

24  familiarize yourself with it.

1      A.  Yeah.  It's eight years old, so let me

2  look it over.

3      Q.  Certainly.

4          THE WITNESS:  Can I make notes to myself

5  on a separate piece of paper?

6          MR. SCHUMACHER:  You don't need to make

7  notes.

8          THE WITNESS:  This is a complicated

9  thing.  I want to organize my answer to this

10  question.

11          MR. MILLER:  There's no question

12  pending.

13          MR. SCHUMACHER:  I was going to say,

14  wait for the question, and then we'll see what

15  we need to do.

16          THE WITNESS:  Okay.

17          Okay.  Ready for a question.

18  BY MR. MILLER:

19      Q.  Do you recall why you authored this

20  document?

21      A.  This was back in June of 2015.  It

22  was -- I don't remember the exact date of the

23  Lifestyle presentation at the WEC.  I think it

24  might have been right before this or right

 1  around this time.  And that was when the Keep

 2  Worthington Beautiful campaign was -- again, I

 3  don't remember the exact timing of it, but it

 4  was around the same time when the start of that

 5  effort was happening.  And apparently, reading

 6  here, the May 18th council meeting UMCH was

 7  discussed, and I think the effort here was to --

 8  when the audience was both the City Council,

 9  ARB/MPC, staff, and the public, to make several

10  points.  I mean, the first would be to get city

11  officials to acknowledge that they aren't simply

12  passive in this whole process, but have a

13  responsibility to the public.

14      Q.  And, in fact, I don't mean to interrupt

15  you, but is one way in which --

16          MR. SCHUMACHER:  You --

17      Q.  I want to ask you about this point

18  specifically.

19          MR. SCHUMACHER:  Let him finish his

20  answer, Joe.  That's only fair.

21      A.  I'm thinking and now you've disrupted.

22  I'm trying to make a coherent answer to your

23  question.

24          So -- so back to 2015, council,

1    public -- because there was a sense I know in

2    the public that our elected officials and city

3    were acting like they had no responsibility or

4    capacity to affect the outcome at the UMCH

5    property.  And so that was the -- I think the

6    first point here was you -- and I'm talking to

7    elected officials and staff -- you can't act

8    like you're helpless here and you don't have a

9    role and responsibility.  You do.  And a

10   significant issue there was the zoning, because

11   the -- there is existing zoning.  That's the

12   status quo.  And the proposal is calling for

13   specific action on the part of the city to

14   rezone the property, and that is where the

15   city's responsibility enters.  That point needed

16   to be made, because it was being ignored and

17   side-stepped.  So that was the first point, was,

18   hey, this is going to require conscious decision

19   on the part of elected officials and staff if

20   we're going to have this happen.

21          And -- and importantly, the third point

22   I made in here was that pointing to the

23   September 2014 amendment to the comprehensive

24   plan, which claimed in the text itself to be a

1 consensus document -- and to me, the way I read

2 that, is if something claims to be a consensus

3 document, it's claiming an authority, and from

4 all that I had seen and heard at that point in

5 time, that wasn't the case.  And so I was

6 reminding, calling attention of this to the

7 public that, hey, you shouldn't allow yourself

8 to be gaslighted.  You can believe your own ears

9 and eyes and conversations with neighbors that

10 you're not alone, that there's widespread desire

11 for a more sensible, compatible outcome at this

12 property.  And that just because the comp update

13 claims that it's a consensus doesn't mean that

14 it is.  And back then 2015 that was -- that was

15 a message that hadn't been voiced before, and I

16 felt needed to be.  And the city itself needed

17 to hear that, too, that there are members of the

18 public, myself included -- and bear in mind,

19 this is 2015.  I was a citizen, and attempting

20 to weigh in and effect public processes for the

21 good of the community.

22        So that was the gist of it.  It was a

23 message to the public and a message to council.

24 I don't remember where or how it was -- I

1  probably sent it to some folks by email, but it

2  was pre-blog days, so I didn't put it up then.

3  But that's what it is.

4      Q.  Fair to say you did not care for the

5  conclusions of the 2014 MKSK comp plan update?

6      A.  I wouldn't answer in a universal way

7  like that.  There were elements that I think

8  were reasonable.  It's been years since I've

9  read it, but some of the things I remember was

10  saying that, for instance -- I think the

11  emphasis on commercial along High Street was of

12  sound, and then there was some language in there

13  that talked about green space and it needing to

14  be somehow in relationship to density and

15  contiguous.  I mean, much of that is open to

16  interpretation and needs to be specifically

17  proposed.

18          But there were also parts of the 2014

19  plan that I thought, again, were not

20  justifiably, call it, consensus.  Some of the

21  visuals which I don't -- in some ways are hard

22  to square with some of the text.  The visual

23  shed a lot of density in the middle and not the

24  large contiguous green space that I think the

1   public wants.  So it was kind of a mixed bag, I

2   would say.

3        Q.  And you wanted to call out to council in

4   this document, on the first page, at the end of

5   the first paragraph so which I'm pointing near

6   the bottom, quote, and to prevent apartments,

7   all the council needs to do is table any

8   rezoning motion that includes the apartments, or

9   more boldly, vote no?

10       A.  What about it?

11       Q.  You wanted council to know that, that

12  was of interest to you?

13       A.  Yeah, this fits in with not wanting

14  council to act like that they had no capacity

15  and responsibility to act on this issue.  And

16  that -- I know that may sound, you know,

17  farfetched.  But if you go back and watch -- and

18  I don't think they are actually archived.  But

19  if you go back and read transcripts for the many

20  folks in the public, there was frustration that

21  council wasn't acknowledging that for

22  development outside of existing zoning to happen

23  at the property, they would have to -- they

24  meaning council -- would have to consciously

1 choose and do something.  And sounds elemental,

2 and it is.  But that was the important point to

3 make is please don't act like a development is

4 going to happen outside of existing zoning

5 willy-nilly.  It's going to happen, if it does

6 happen, because you consciously choose to do so,

7 and that's -- that's the -- I think the intent

8 of that sentence there.

9       Q.  And for years, you chose to seek to

10 rescind the 2014 comp plan update?

11       A.  Just for time reference, the document we

12 were just looking at was written back in 2015,

13 when I was, you know, not on council.  I got

14 onto council in 2018.  And so I don't know

15 whether my public statements began before being

16 on council or when I was on council, but I

17 have -- I have voiced in a number of ways my

18 belief that the 2014 comp plan update is not the

19 consensus document it claims to be, and that all

20 parties would be better off if the comp plan

21 reflected the broad public consensus, and

22 therefore, we ought to amend it, change it,

23 update it.

24       Q.  And ultimately, in 2022, you were

1    successful in that regard?

2        A.  In January of '22, yes, council -- I

3    brought to council first the proposal that we

4    enact by ordinance a moratorium which would have

5    a life if it had passed and it did not.  As an

6    example --

7            THE REPORTER:  I'm sorry?

8        Q.  I'm not trying to interrupt, but I

9    didn't hear you.  If you could speak to the

10   moratorium again.

11           MR. SCHUMACHER:  What's the question?

12   Can we have the question read back?

13           (Record read as requested.)

14       A.  Short answer is in '22, January of '22,

15   a majority of councilmembers did vote to update

16   the comp plan.  Yeah, that would be the short

17   answer.

18       Q.  I'll give you a chance to give a longer

19   answer on those subjects later.

20           THE WITNESS:  Can we take a break?

21           MR. MILLER:  Sure.

22           (Recess.)

23                    -=0=-

24            (Deposition Exhibit 88 marked.)

1                       -=0=-

2    BY MR. MILLER:

3        Q.  We've put before you what I had marked

4    as Exhibit 88.

5            MR. SCHUMACHER:  Hang on a minute.

6        Q.  It's a two-page document, and feel free

7    to review it.  My first question is simply do

8    you recognize this as an exchange of emails

9    between and among you and Ms. Bonnie Michael and

10   Mr. Greeson?

11       A.  Yeah.

12           MR. SCHUMACHER:  Hang on a second.

13           MR. MILLER:  Ready, Paul?

14           MR. SCHUMACHER:  Yeah.

15   BY MR. MILLER:

16       Q.  Mr. Robinson, this email exchange

17   predates your time on council; is that fair to

18   say?

19       A.  Yeah.  It's 2016.

20       Q.  If we look at the second page, which is

21   actually the earliest email, does this appear to

22   be an email that you sent to Ms. Michael and

23   Mr. Greeson on July 29th, 2016?

24       A.  From the heading signature, yeah, but

1    the content I'm looking at right now, if you're

2    going to follow up with a question.

3            MR. SCHUMACHER:  Go ahead and read it.

4        A.  Okay.  So what about the July 29?

5        Q.  Let me start with a few easy questions.

6    I think I know most of these, but can you help

7    me with the alphabet soup of acronyms in the

8    next-to-last paragraph of your email on the

9    second page.  We discussed WARD, correct, just

10   in terms of what it stands for?

11       A.  Yeah, so there's WARD, and OWA stood

12   for -- they're no longer in existence -- Old

13   Worthington Association.  KWB was Keep

14   Worthington Beautiful.

15       Q.  I'm sorry to interrupt, did you and your

16   wife found that organization?

17       A.  Which one?

18       Q.  Keep Worthington Beautiful.

19       A.  We talked about that before.  It was a

20   citizen-led group.  I was there with a number of

21   people initiating the campaign.  That was the

22   campaign that became Issue 38.

23       Q.  CHW?

24       A.  Looking at CHW and WWR, I do not

1  recognize those, but then I'm looking at the end

2  of that sentence and it says Colonial Hills.  So

3  maybe CH refers to something about Colonial

4  Hills Worthington.  I don't know.  And then WWR,

5  honestly, I don't even remember.

6     Q.  I'm not trying to cherrypick words, and

7  you've had a moment to review the email, but for

8  instance, in the second sentence of the email

9  you say, we're glad that you and councilmembers

10  are reviewing our letter, and you described

11  those acronyms you say would be part of our

12  contingent.  If you recall, on whose behalf were

13  you acting and sending this email?

14     A.  I don't even remember writing this

15  email, to be honest.  I mean, when I read it

16  now, I understand what was going on.  I think it

17  was representative of what was going on back

18  then, is that the citizens didn't feel listened

19  to by their own government.

20         So as the text itself reads, there was

21  an effort by these groups to meet with city

22  officials.  So I would assume that the effort

23  was for just that, is for representatives from

24  citizens groups to meet with council.

1     Q.  In fact, if we look at the first page of

2  the exhibit at the bottom, does it appear as

3  though you had follow-up with Ms. Michael and

4  Mr. Greeson on August 4th, 2016?

5     A.  The question again, please.

6         (Record read as requested.)

7     A.  That's correct.

8     Q.  And you informed them in the second

9  paragraph that one thing the residents wish to

10  discuss with the city was the acquisition of

11  green space at UMCH?

12     A.  That's correct.  That would be in

13  conformity with what residents had been talking

14  about for many years, so it doesn't surprise me

15  that would be one thing we'd want to talk about.

16                    -=0=-

17         (Deposition Exhibit 89 marked.)

18                    -=0=-

19  BY MR. MILLER:

20     Q.  You've been handed a three-page exhibit

21  we've had marked as Exhibit 89.  Feel free to

22  take what time you need to review the document.

23         Just let me know, Mr. Robinson, when

24  you're prepared to proceed.

 1     A.  I will.

 2         Okay.  What was the question, please?

 3     Q.  As may often be the case, I'd like to

 4  direct your attention to the last page of the

 5  exhibit since it reflects an email chain going

 6  back and forth.

 7     A.  Okay.

 8     Q.  Does that appear to be an email that you

 9  had sent to Bonnie Michael on December 31st,

10  2017?

11     A.  Yes.

12     Q.  And so this was prior -- this was after

13  you being elected to council, but prior to you

14  taking the oath of office; fair to say?

15     A.  That's correct.

16     Q.  And you're describing a phone

17  conversation you had with Ms. Robinson on

18  12-29-17?

19     A.  Ms. Michael.

20     Q.  Excuse me.  I misspoke.  Ms. Michael.

21  Forgive me.

22     A.  Yeah, correct.  It was me emailing to

23  her just recapping the -- I don't know whether

24  it was an actual conversation or voice mail or

1    both.  Yeah.  So that was sent December 31st,

2    2017.

3        Q.  Okay.  And if we look at that final

4    paragraph of the email, you wrote that when you

5    two spoke you said, quote, I asked her to agree

6    to put on the City Council agenda for discussion

7    at the 1-8-18 meeting the topic of the UMCH

8    portion of the comprehensive plan.  She declined

9    to do so.

10        Do you see that?

11        A.  I do.  Yeah.

12        Q.  What do you recall about that

13    conversation with Ms. Michael?

14        A.  Nothing.  Actually, I would not have

15    remembered it if you hadn't put this document in

16    front of me.  Yeah.

17        Q.  You don't recall why you were asking her

18    to put that on the council agenda?

19        A.  Well, because the comprehensive plan,

20    the UMCH portion of the comprehensive plan, as

21    the many documents you're putting in front of me

22    today attest, I had felt it to be not

23    representative of public opinion.

24        Q.  Okay.  Do you recall why she declined?

1      A.  Just take her at her word here.  She

2   felt it could be discussed more applicably at

3   the retreat.  I think probably six weeks later,

4   apparently, is what it was, based on what I read

5   here in this email.

6      Q.  And was it discussed at that retreat, if

7   you recall?

8      A.  I don't recall.  I would guess it would

9   have been, but I do not recall.

10     Q.  With regard to the UMCH property, we've

11  looked at some emails from 2016, and then you

12  were elected in the fall of 2017.  How, if at

13  all, would you describe your role or your

14  advocacy to the city in the interim, from 2016

15  until your election in the fall of 2017, as

16  relates to the UMCH property?

17         MR. SCHUMACHER:  Objection.  Compound.

18     A.  What is the question, please?

19     Q.  How would you describe your role, if

20  any, as relates to advocacy related to the UMCH

21  property from 2016 until your election in the

22  fall of 2017?

23     A.  I don't have vivid recollections.

24  Again, it's been a long, complicated story, and

1   what happened after the passage of Keep

2   Worthington Beautiful and my election, I don't

3   have clear memory.

4       Q.  But you, in fact, wrote the email that

5   is on the first page of Exhibit 89 on January

6   2nd, 2018, to Ms. Michael?

7       A.  Yeah.  Sure.

8       Q.  With a CC to Mr. Greeson and Ms. Stewart

9   and Mr. Myers?

10       A.  Yeah.

11       Q.  Is Ms. Stewart still employed by the

12   City of Worthington?

13       A.  She is.

14       Q.  What is her role today, as you

15   understand it?

16       A.  She is the acting city manager and has

17   been since mid December of '22.

18       Q.  The city has not hired a full-time city

19   manager to replace Mr. Greeson?

20       A.  That's correct.

21                    -=0=-

22          (Deposition Exhibit 90 marked.)

23                    -=0=-

24

1    BY MR. MILLER:

2        Q.  Take what time you need to review the

3    document, and let me know when you're prepared

4    to proceed.

5        A.  I will.

6            Okay.  I think I have a rough

7    recollection of what this is about.

8        Q.  Does Exhibit 90 appear to reflect emails

9    from you to Mr. Greeson in which you requested

10   an analysis from him and his staff that, in

11   part, examined the city's potential acquisition

12   of the UMCH property and its green space?

13       A.  What I recall about this was at the

14   retreat there was discussion about the UMCH comp

15   plan and whether we as a council and staff would

16   look at updating it separate from or as part of

17   a comp plan review, or not at all.

18           As part of that conversation, and really

19   motivated by, I'd say, an ongoing perspective of

20   mine is that we need informed -- we need

21   information and facts to be able to talk

22   intelligently with the property owner, any

23   prospective developers, with the public about

24   outcomes at UMCH rather than, you know, broad

1   assertions.

2          And so in an effort to be able to have

3   rational, informed discussion about the UMCH

4   property, I had asked staff -- and apparently,

5   if I'm reading this email correctly, apparently

6   enough support from council that we had directed

7   staff to propose a way of providing some

8   information to us.  And that was the heart of

9   it, is really to give us some informed

10  information about different outcomes at the

11  property, what that would do to city finances.

12  And that was the motivation and intent of the

13  email.

14      Q.  And one requested outcome to be analyzed

15  was potential acquisition of the property and

16  use of the majority of it as parkland, correct?

17      A.  That's not my recollection.  My

18  recollection was the thrust of the request was

19  impacts of different types of outcomes.  You

20  know, basically a commercial, residential and

21  green space and without a focus on questions of

22  ownership and development and so forth, but just

23  in terms of outcome.  I think the result was the

24  cost-to-serve analysis which looked at impacts

1    on city budget, you know, and excluding a lot of

2    other considerations, but that was the thrust of

3    this, was that gave us a starting point for

4    looking at the impact on city budget so people

5    don't just make assertions without a basis.

6         Q.  Would you agree that Mr. Greeson did not

7    act promptly upon your request?

8         A.  He's a busy guy, was a busy guy.

9         Q.  You would agree with that?

10        A.  You know, it's -- city government's got

11   a lot going on all the time, and I did send a

12   follow-up email prompting him further, but

13   that's not unusual in city government.

14        Q.  In fact, the first email -- excuse me,

15   the first page of Exhibit 90 is a follow-up

16   email to Mr. Greeson on March 19th, 2018,

17   correct?

18        A.  That's right.

19        Q.  Okay.

20                        -=0=-

21         (Deposition Exhibit 91 marked.)

22                        -=0=-

23         THE WITNESS:  Is the second email on

24   here the same as what was in there?

 1              MR. MILLER:  I believe it is.  I'll be

 2     asking you about the first two pages.

 3              MR. SCHUMACHER:  Good thing you brought

 4     your reading glasses.  Make sure.

 5              THE WITNESS:  Yeah.

 6              Do you know where that sound is coming

 7     from?  It's kind of bothering me.

 8              MR. SCHUMACHER:  I think it's the

 9     conference room over there.

10              (Pause.)

11     BY MR. MILLER:

12        Q.  My first question concerning Exhibit 91

13     is it appeared you had to follow up with

14     Mr. Greeson again regarding this requested

15     analysis on May 23rd, 2018?

16        A.  Yeah.  As I said, Matt was a busy guy,

17     and I wrote to him a number of times about this

18     issue.

19        Q.  But in fact, on the second page, you

20     told him that the significance of success at

21     UMCH warrants the highest degree of attention on

22     your part, did you not?

23        A.  Yeah, but bear in mind, I'm one of seven

24     councilmembers and I was newly elected, and the

1    city manager's a busy guy and I was doing what I

2    could to get his ear and -- and make my point

3    with him.

4         Q.  But that's certainly what you thought

5    and believed at the time, that it warranted the

6    highest degree of attention on his part?

7         A.  Yeah, I was trying to get his attention.

8    Yeah.

9         Q.  If you take a look at this paragraph,

10   Mr. Robinson, on the second page, the second

11   full paragraph, which begins, the context of

12   this email for me...

13        A.  Uh-huh.

14        Q.  Does that describe in part your

15   motivation for obtaining this analysis?

16        A.  Yeah, the broad picture for years is

17   that the public -- and bear in mind, I was newly

18   elected to represent the public, and public for

19   years had been asking for and frustrated that

20   they hadn't obtained information that would

21   relate to different outcomes at the property

22   that they felt was important for them to be

23   informed and be able to be part of rational

24   conversations with folks.  And so that's really

1    what I was doing.  I was advocating on behalf of

2    residents trying to get information and response

3    from City Council and the city.

4          You know, back in 2015, the frame not

5    listening, you know, the other half of that was

6    you're not talking with us.  So really I was

7    just trying to get informed dialogue and

8    information moving between the city government

9    and the public they serve.

10    Q.  Is that to what you were referring when

11    you said in the next paragraph, I will not allow

12    myself to become complicit in enabling the

13    status quo to remain unchallenged?

14    A.  I wanted to be true to my pledges and

15    commitment to the public that I made during my

16    campaign, and that was that I would represent

17    them actively in the city government and not

18    simply become part of the city government that

19    there was a lot of frustration about, and that

20    requires intentional mindfulness as an elected

21    official, is to remain in touch with the public

22    you're serving.  It's not an easy thing to do.

23    Q.  You conclude that sentence by saying, as

24    we move toward public frustration and probable

1    dispute.  What did you mean by probable dispute?

2        A.  In some ways that was probably an

3    understatement because dispute and conflict was

4    already existing, expressed frustration by the

5    public about their city government.

6        Q.  I just want to understand, over the UMCH

7    property?

8        A.  Over the city's lack of clear engagement

9    with the public about the UMCH property.  You

10   know, there were other issues certainly, but

11   that's the most pointed one.

12                      -=0=-

13        (Deposition Exhibit 92 marked.)

14                      -=0=-

15   BY MR. MILLER:

16       Q.  You let me know when you're ready to

17   proceed, Mr. Robinson.

18       A.  I will.

19        Okay.

20       Q.  Does this refresh your recollection that

21   you actually considered yourself to be a member

22   of and advocate for Project Community Park

23   Worthington?

24       A.  Yeah.  The email reminds me about my

1   first outreach to council about the group and

2   telling them about my being asked by some of

3   them to be part of talking about the issue

4   publicly and how I shared the mission statement

5   and principles of the group with council.  Yeah.

6        Q.  This is an email that you asked

7   Ms. Thress to send to City Council members on

8   August 29th, 2018, correct?

9        A.  Yeah.  Kay Thress, yeah.  Corporate

10  counsel.

11            MR. MILLER:  Let's mark this as 93.

12  Paul, I do not have another copy.  Take whatever

13  time you need.

14                      -=0=-

15        (Deposition Exhibit 93 marked.)

16                      -=0=-

17  BY MR. MILLER:

18        Q.  You have in front of you Exhibit 93.

19  I'll represent to you that that is Project

20  Community Park Worthington's mission and guiding

21  principles as of this week, probably as

22  evidenced to you by the tagline on the back.

23  Take what time you need to review the document,

24  but I simply want to ask if you still today

1    strongly support this group's mission as well as

2    its guiding principles.

3        A.   Okay.   Repeat the question, please.

4            (Record read as requested.)

5        A.   It's been five years since the group was

6    formed, and since I sent that email.

7            MR. SCHUMACHER:   Exhibit 92?

8        A.   Yeah, 92.   Now I'm one of seven

9    councilmembers.   What I do support here is the

10   right of the citizen's group to advocate like

11   this.   But five years have elapsed, and we're in

12   a very different context now than back in 2018.

13   Property was owned by UMCH.   Yaromir Steiner

14   might have been involved at that time, but I

15   don't remember exactly.   Today, you know, we're

16   under litigation, and my perception of what this

17   means is quite different.

18       Q.   Well, I don't want to intrude upon

19   anything that you may have learned from your

20   counsel about litigation.   But is it fair to say

21   you can't agree with this statement you strongly

22   support this group's mission as well as its

23   guiding principles?

24           MR. SCHUMACHER:   Objection.   That's

1  compound.

2      A.  The question again, please?

3      Q.  Sure.

4          MR. SCHUMACHER:  It is.

5      Q.  So you're saying you can't say today

6  that you strongly agree with the mission and

7  guiding principles set forth in Exhibit 93?

8      A.  The way I respond to this document is

9  that I respect and support the right of the

10  citizen's group to continue to advocate for

11  this, and as an elected official, it's important

12  for me to let them know that I support their

13  right to do this.

14      Q.  Well, as an elected official in 2018,

15  you told your fellow elected officials that you

16  strongly support this group's mission as well as

17  its guiding principles.  You're not willing to

18  say that's still so today?

19          MR. SCHUMACHER:  Objection.  Compound.

20      A.  Yeah, what is the question?

21          MR. MILLER:  He's taking instruction

22  from you exceedingly well, Paul.  The fact of

23  the matter is, you should trust your witness

24  more to answer questions.

1      MR. SCHUMACHER:  Move to strike the

2  comments from counsel.  You asked him two

3  questions, Joe.  I want to make sure that I keep

4  the record clear.

5  BY MR. MILLER:

6      Q.  In 2018, you said that you strongly

7  support this group's mission as well as its

8  guiding principles.

9      A.  Uh-huh.

10      Q.  You need to answer yes or no.

11      A.  The question did I say that in 2018?

12      Q.  Yes.

13      A.  In writing here in my email, that's what

14  it says.  The actual quote is --

15      Q.  I strongly support this group's mission,

16  as well as its guiding principles.

17      A.  Okay.

18      Q.  And I understand your prior answer

19  completely.

20      A.  Yeah.

21      Q.  But my question is -- yes or no --

22  today, do you strongly support this group's

23  mission, as well as its guiding principles?

24      MR. SCHUMACHER:  Objection.  Asked and

1    answered.

2        A.  Yeah.  As a city councilman, I respect

3    and support their right to advocate, and that's

4    my primary function as an elected official, is

5    to let them know that.

6        Q.  And that answer sounds like a

7    politician, respectfully, sir.

8            MR. SCHUMACHER:  Objection.  Move to

9    strike the comment of counsel.

10       Q.  I'd like to show you what's been

11   previously marked as Exhibit 31.

12           MR. SCHUMACHER:  Hang on.

13           MR. MILLER:  I haven't asked a question

14   yet, Paul.

15           MR. SCHUMACHER:  I know.  I just want to

16   make sure it's efficient and I have the exhibit

17   in front of me before the question is asked.

18           THE WITNESS:  Do I leave this in here?

19           MR. MILLER:  You can take it out if it

20   makes your review easier.

21           THE WITNESS:  Do you need to take a

22   picture of this?

23           MR. SCHUMACHER:  No.  I have it.

24           THE WITNESS:  Oh, okay.

1          Okay.  I think I have a slight

2    recollection now of the document.

3    BY MR. MILLER:

4        Q.  What is Exhibit 42, to your knowledge

5    and recollection?

6        A.  The title reads Summary of Phases for

7    Development of the UMCH Property.  It was

8    prepared by a guy name Florey, who appears to be

9    legal counsel.

10       Q.  Do you know Mr. Florey?

11       A.  I know him superficially.  A friend of a

12   friend.  Someone who was involved with Project

13   Community Park Worthington knew Mr. Florey.  And

14   in the citizens not being professionals, not

15   being lawyers, developers, city staff had

16   received questions from other citizens about,

17   hey, your idea for the UMCH property -- you

18   know, we haven't heard anything for years.  Your

19   idea seems sensible.  How would it actually

20   happen?  What would this take for this to

21   happen?  UMCH owns the property.

22       Q.  I'm sorry, I'm making a face because I'm

23   trying to understand your answer.  You referred

24   to your idea made sense.  Who are you speaking

1    on behalf of or to whom are you referring?

2       A.  I'm describing the -- the -- the Project

3    Community Park leaders at the time, the folks

4    who were promoting the idea of -- a positive

5    idea, I would say, of a vision for the UMCH

6    property, received questions how would this

7    happen.  And so my understanding is that

8    Mr. Florey, who's a lawyer apparently involved

9    in some way or in some capacity with the zoning

10   and land use, prepared this for the Project

11   Community Park folks just saying here's how your

12   idea is not just fanciful, but a way that this

13   could be realized.

14      Q.  And you received it at some point,

15   Exhibit 32?

16      A.  I don't know.

17      Q.  You don't recall?

18      A.  I don't recall.  I do recall discussing

19   it, but I don't know if I ever actually got the

20   document.

21      Q.  You recall discussing with other

22   councilmembers, correct?

23      A.  I don't recall that.  I recall talking

24   about it as a citizen with other citizens.

1      Q.  What other citizens are you thinking of?

2      A.  Well, the Project Community Park folks,

3   some of the people that were involved early on

4   with forming the group.

5      Q.  Could you take a look at Exhibit 42.  It

6   appears to be in that same binder.  Does this

7   refresh your recollection that you did, in fact,

8   share Exhibit 32 with other members of council?

9      A.  It looks like this is saying that in

10   2020 I shared it with Steve Bucher.

11      Q.  That was my question, is it your

12   recollection that you shared this with other

13   members of council?

14      A.  I'm trying to understand the document

15   here.  Yeah, that's correct.  Yeah, shared it

16   with one City Council member.

17      Q.  Any others, to your recollection?

18      A.  I don't recall.

19          I have to go to the bathroom again.

20          MR. MILLER:  Sure.  Any time.

21          (Recess.)

22   BY MR. MILLER:

23      Q.  I'd ask in that same binder, sir, if

24   you'd turn to 32.

1          This is a big one.  You can take what

2    time you need to review the document.  Although

3    we'd be here through dinner if you do.  Let me

4    ask my question first, and then see if you can

5    answer it.

6          At long last, is this the memo and

7    analysis you asked Mr. Greeson for related to

8    alternatives for the UMCH property?

9          MR. SCHUMACHER:  Object to form.

10          MR. MILLER:  He agrees with the form.

11          MR. SCHUMACHER:  I'm just objecting to

12    the form of the question.

13          MR. MILLER:  I'm joking.

14    BY MR. MILLER:

15     Q.  Go ahead, Mr. Robinson.  Go ahead and

16    answer.

17          MR. SCHUMACHER:  I thought there was no

18    joking.

19     A.  Could you repeat the question?

20     Q.  Sure.  Does this appear to be the memo

21    and analysis of options for the UMCH property

22    that you had been asking Mr. Greeson to prepare?

23     A.  The reason why I'm answering carefully

24    here is because this is not exactly what I asked

1    for, but it is the -- this is the output that

2    eventually emerged from the city in response to

3    the issue that had been raised and discussed at

4    the retreat, I think -- geez -- 11 months

5    before.  That I had followed up on several -- on

6    several occasions with the purpose of giving

7    council and the public information so they could

8    think intelligently about impacts of different

9    outcomes at the UMCH property.

10          And if I remember correctly, this is

11   what is called a cost-to-serve analysis, so it

12   was limited and focused upon impacts on the city

13   budget in terms of expenses or costs related to

14   serving different types of outcomes, commercial,

15   residential, green space, as well as projections

16   about different forms of revenue and so forth.

17   So that was -- this was what they produced.

18      Q.  How was it not exactly what you were

19   expecting, or how, if at all, in your opinion,

20   did it miss the mark?

21      A.  Well, first of all, my reaction was one

22   of gratitude that, in fact, even this had been

23   prepared.  This was good information, more than

24   had been prepared and delivered by the city to

1   the public beforehand.  So it was worthy in that

2   sense.  And back in 2019, you know, was a good

3   starting point.  Obviously, and this was, I

4   think, acknowledged in here, and acknowledged in

5   some of my earlier emails as to what a realistic

6   expectation was.  There are many other facets

7   of -- to consider, you know, when looking at

8   development, traffic, so forth, that were not

9   included in this analysis; so...

10      Q.  Do you recall that this memo, Exhibit

11  32, caused you to ask several follow-on

12  questions of Mr. Greeson and city staff?

13      A.  I don't, but I'm not surprised, being an

14  inquisitive person, I'm not surprised that I had

15  follow-up, but I don't remember if I did or not.

16      Q.  Do you recall that Exhibit 32 did not

17  evaluate Lifestyle Communities' plan for the

18  property?

19      A.  I do not, but I believe you, if you're

20  telling me that.

21      Q.  Would that have been in line with your

22  expectations that was not what you were asking

23  of Mr. Greeson, but he was to look at other

24  alternatives?

1      A.  Yeah, the idea was not -- I think the

2    basic impulse was to look at development

3    outcomes generally and not specifically, and

4    sort of in categories.  I think the way the

5    paper was prepared was in terms of residential,

6    commercial, green space, and without reference

7    to specific proposals.

8      Q.  Take a look at page 4, if you would.

9      A.  Of Exhibit 32?

10     Q.  Yes.  Excuse me.

11     A.  Okay.

12     Q.  You see scenario 4, primarily park WARD

13   proposal?

14     A.  I do.

15     Q.  And it says, park 25.5 acres?

16     A.  Okay.

17     Q.  Do you understand that to be consistent

18   with what WARD is proposing?

19     A.  I don't know that WARD -- frankly, I

20   didn't think WARD had specific acreage.  Maybe

21   they have, but I'm not aware of it; so...

22     Q.  You don't recall whether they have

23   previously proposed acreage similar to this in

24   addition to the Tucker Creek ravine as part of a

1  public park?

2     A.  I don't recall.  Again, this was four

3  years ago now.  I don't recall.  I suppose

4  probably the thing to do would be to ask Robyn

5  Stewart who prepared this, you know, what -- on

6  that; so...

7          Am I done with this exhibit?

8     Q.  I think so, sir.

9                    -=0=-

10        (Deposition Exhibit 94 marked.)

11                   -=0=-

12  BY MR. MILLER:

13     Q.  I don't outset -- and I don't want to

14  rush your review.

15     A.  That's all right.  I'm looking at the

16  dates here.

17     Q.  I was just asking can we agree Exhibit

18  94 is dated January 31, nine days -- excuse me,

19  they're in different years.

20     A.  Yeah.

21     Q.  But this was a communication put out by

22  Mr. Greeson to city councilmembers to provide

23  responses to questions you posed regarding the

24  UMCH comprehensive plan update?

1    A.  What's the question?

2    Q.  Let me ask it like this:  Do you believe

3  that Exhibit 94 was produced by Mr. Greeson in

4  response to questions that you posed related to

5  Exhibit 32?

6    A.  Okay.  I've looked at it a little bit.

7         MR. MILLER:  If you could read the

8  question back, Rhonda.

9         (Record read as requested.)

10    A.  That's what the text says, so I accept

11  that as what this is, yes.

12    Q.  Can we agree that in bold in Exhibit

13  Number -- excuse me?

14    A.  94.

15    Q.  94.  Thank you.

16         -- are the questions you posed to

17  Mr. Greeson and below those are answers that he

18  provided?

19    A.  It looks like my writing.

20    Q.  And if we look at the second page of the

21  exhibit, which is actually the first page of

22  Mr. Greeson's memo dated 1-31-2020 --

23    A.  Uh-huh.

24    Q.  -- at the bottom of that page he stated

1    that, until amended, replaced or appealed by

2    council action, the UMCH comp plan update

3    remains a part of the adopted policy framework

4    by which development is and would be reviewed.

5         Do you see that?

6    A.  I do.

7    Q.  And you have made that statement in the

8    past to citizens when they inquired as to how

9    development needed to be evaluated on Lifestyle

10   Communities' property, correct?

11   A.  What's the question?

12   Q.  You have likewise told citizens when

13   they've inquired that Lifestyle Communities'

14   application needed to be evaluated against the

15   comp plan update as relates to that property?

16   A.  I wouldn't have used those words.

17   Q.  Okay.  You, in fact, would have used in

18   the past the words Lifestyle Communities has a

19   vested interest or a vested right in that comp

20   plan update, correct?

21   A.  I don't recall saying that.

22   Q.  You don't recall one way or the other?

23   A.  Correct.  I mean, my understanding of

24   the comp plan is it's part of the city's

1  planning process and goals, and that's how I

2  think of it.

3      Q.  If you turn to the third page of

4  Mr. Greeson's memo.  It's number 3 at the

5  bottom.

6      A.  Okay.

7      Q.  And I'm not trying to cherrypick

8  language, but I do want to ask you about one

9  thing set forth in this memo.  Specifically --

10  forgive me for approaching the witness here --

11  if you look at the second-to-last full

12  paragraph, near the bottom of this page,

13  Mr. Greeson has written, council has in recent

14  years discouraged staff from proactively working

15  with LC.

16          Do you see that?

17      A.  I see that.

18      Q.  Did you understand that to be a true

19  statement?

20          MR. SCHUMACHER:  That wasn't the full

21  sentence.  I'll just make a note.

22          MR. MILLER:  Okay.

23  BY MR. MILLER:

24      Q.  Did you understand that to be the case,

1    Mr. Robinson?

2        A.  I don't remember -- again, this is years

3    ago, and I don't remember reading it back then.

4    I don't know what my reaction was then.  And so

5    I don't -- I don't have anything to say that.  I

6    mean, I do know that there was a desire to have

7    as much public engagement as possible on the

8    issue of the UMCH property and to have

9    discussions at public meetings, and that might

10   be what he is referring to, but you'd have to

11   ask Mr. Greeson.

12       Q.  Are you aware that ultimately city staff

13   would not meet with Lifestyle Communities'

14   representatives outside of public meetings?

15           MR. SCHUMACHER:  Objection.

16       A.  When are you talking about and --

17       Q.  Were you ever aware of that fact?

18       A.  I wouldn't phrase it that way.  Again,

19   my recollection was because the public was so

20   interested in the issue, that there was a

21   governing idea that we need to talk about these

22   things in public.  And that's what I recall.

23       Q.  You're aware in matters of development

24   city staff often gives informal feedback to

1    developers outside of public meetings, correct?

2        A.  I'm not very intimately aware of how

3    staff interacts with developers.

4        Q.  You just don't know?

5        A.  I really don't know the details of the

6    process, no.  I would have felt the idea that

7    having public discourse with UMCH and/or LC on

8    this issue would be a good idea and have public

9    discussions.

10       Q.  And you would support staff not

11   interacting informally outside of public

12   meetings with Lifestyle Communities'

13   representatives?

14       A.  I wouldn't make a blanket statement like

15   that, no.

16                        -=0=-

17         (Deposition Exhibit 95 marked.)

18                        -=0=-

19       A.  Let's see.  Back to 2019.  Okay.

20          Okay.

21       Q.  As a savvy witness, I note that you read

22   this document from the last page forward.  I

23   want to refer you to that next-to-last page, and

24   in particular what appears to be an email

1  exchange, an email that you sent to Bonnie

2  Michael on April 17th, 2019.  Do you see that?

3      A.  Yes.

4      Q.  Mr. Greeson had informed councilmembers

5  below that that Steiner & Associates is no

6  longer pursuing UMCH as a development

7  opportunity.

8          Do you see that?

9      A.  I do.

10      Q.  You wrote to Ms. Michael, I'd like to

11  discuss this with you at the earliest possible

12  date, ideally with Scott and/or Matt, but most

13  important to me is that we talk soon.

14          Do you see that?

15      A.  I do.

16      Q.  Why was that?  Did you want to move

17  quickly to see if the city could acquire the

18  property?

19      A.  That was two questions.  Why did I send

20  the email?

21      Q.  You can answer that one if you'd like,

22  Mr. Robinson.

23          MR. SCHUMACHER:  Doing my job for me.

24      A.  Well, again, this was four and a half

1 years ago.  What I remember is when Yaromir

2 Steiner emerged as possibly being involved with

3 development at the UMCH property -- and it was

4 never fully clear what his role and status was

5 in relationship to UMCH, but he was -- you know,

6 it was his reputation is well known and there

7 were members of council that were excited about

8 the possibility of working with him.  So him

9 apparently notifying Matt that he was not

10 pursuing the development opportunity at UMCH was

11 significant news.  And so I want to talk about

12 it.  It's a significant issue in the city.

13      Q.  Do you recall what, if anything in

14 particular, you wished to discuss with

15 Ms. Michael?

16      A.  Well, if you go forward to the first

17 page, the 21st of April, the suggestion was that

18 we reached out to UMCH and try to establish a

19 dialogue with them.  It's that basic.

20      Q.  To what end and for what purpose, if you

21 recall?

22      A.  For years there had been no

23 communication between UMCH and the city.  I

24 mean, from what I recall.  Again, I was one of

1    seven councilmembers.  I wasn't in leadership.

2    But my perception was there's no dialogue and --

3    you know, from the owner of a significant

4    property across the street from City Hall.  And,

5    you know, I'm the kind of person, maybe it's my

6    business background, but if you're not talking,

7    there's no potential for forward movement or

8    positive change.  And so my request -- and I

9    think I say it here, is I suggest nothing more

10   nor less than a direct ask UMCH for a meeting,

11   no agenda, no expectations.  Because that's the

12   way to begin making good things happen instead

13   of nothing happening.  So that was -- that was

14   the motivation.

15      Q.  Looking at the first page of this

16   Exhibit Number 95, you conclude in your email to

17   Ms. Michael, with a copy to Mr. Greeson and

18   Mr. Myers, do we have protocol for staff if they

19   are contacted?  Can they initiate communication

20   or only respond?  Are all inquiries to staff

21   immediately directed to the city manager?  And

22   what is Matt authorized to say at present?

23          Do you recall if you received any

24   response to those questions from anybody?

1      A.  I don't recall.

2                        -=0=-

3          (Deposition Exhibit 96 marked.)

4                        -=0=-

5    BY MR. MILLER:

6      Q.  You have before you Exhibit 96.  Again,

7    take what time you need to review it.

8          MR. SCHUMACHER:  100 exhibits and we're

9    done.

10         THE WITNESS:  100 we're done?  Okay.

11         Okay.

12   BY MR. MILLER:

13     Q.  Is this an email that you sent to

14   Ms. Michael with a copy to Mr. Greeson on April

15   9th, 2020?

16     A.  Yes, at 11:06 a.m.

17     Q.  Ms. Michael was the president of council

18   at that time?

19     A.  She was.

20     Q.  And you wrote to formally request the

21   topic of UMCH, and specifically the status of

22   the 2014 UMCH portion comprehensive plan update,

23   be placed on a council meeting agenda in the

24   very near future, preferably the third meeting

1   of April?

2       A.  Yeah, that's what the text says, yes.

3       Q.  And as we've seen, you made this request

4   previously that the UMCH comprehensive plan

5   update be placed on the agenda for discussion?

6       A.  Okay, I'll take your word for it.  I

7   can't recall.  Yeah.

8       Q.  Why did you make this request in April

9   of 2020?

10      A.  As you've seen in reviewing these many

11  documents, the issue of the UMCH portion of the

12  comp plan has been a recurring issue of interest

13  to me because, as I've said before, the comp

14  plan update, from all evidence, did not

15  represent a consensus viewpoint, and I wanted to

16  see if we could not amend the comp plan so that

17  it would more accurately reflect public opinion,

18  thereby benefiting all parties so that proposals

19  using the comp plan as a guide that would be

20  proposed that would end up being a productive

21  and ultimately successful through city

22  processes.  So this is just -- it's a -- it's

23  a -- an ongoing issue of mine to try to get this

24  discussed directly at council.

 1      Q.  And you were concerned at this time, in

 2  April of 2020, that Lifestyle Communities may

 3  submit an application for development in the

 4  meantime, correct?

 5      A.  I don't recall, but as you can see, I've

 6  been asking for us to look at the comp plan

 7  update, you know, repeatedly, so I don't

 8  remember the specifics of April 2020.

 9      Q.  Another acronym for you, in the third

10  full paragraph references BWF.  Do you know what

11  organization is?

12      A.  Yeah.  It stands for Building

13  Worthington's Future.

14      Q.  Describe for me, if you would, that

15  organization's purpose, as you understand it.

16      A.  I believe it was back in 2018.  I think

17  it was -- the group was started by a former

18  resident of Worthington, Parker McDonald.  He

19  sent an email to Mr. Greeson saying that we

20  ought to form another group that essentially

21  advocates from a business perspective.

22  Mr. McDonald's in banking and finance.  And

23  wanted to provide a -- a counterpoint to other

24  resident groups who he identified specifically

1    as a group forum to oppose or provide an

2    alternative vision for UMCH in contrast to WARD

3    and PCPW.

4        Q.  Does Building Worthington's Future still

5    exist, to your knowledge, today?

6        A.  They do.

7        Q.  And is Mr. McDonald still involved, to

8    your knowledge?

9        A.  I don't believe so.  He moved away from

10   the city one or two years ago and is -- I'm

11   pretty sure he's not actively involved, but I

12   don't know.

13       Q.  Do you understand Building Worthington

14   Future's position as it relates to Lifestyle

15   Communities' property?

16           MR. SCHUMACHER:  Objection.  Asked and

17   answered.

18       A.  Again, the nuance stated again, please.

19       Q.  If you know, what do you understand to

20   be Building Worthington Future's position as it

21   relates to Lifestyle Communities' property?

22       A.  I'm not going to try to characterize it.

23   They put out many position statements, and their

24   language is often soft and vague, and I can't

1    tell you what they really want to do.

2       Q.  Have you heard of the organization

3    Worthington Partnership?

4       A.  I have.

5       Q.  What is the Worthington Partnership, as

6    best you know?

7       A.  I think it is -- are you referring to

8    the group that's part of what you described like

9    Main Street USA?

10      Q.  This is truly a discovery deposition.

11   So I just want to know what you know.  I think

12   you just said a moment ago you know of the

13   organization?

14      A.  Yeah.  The name I believe -- because

15   names change.  I don't know what their --

16      Q.  I have laid successfully many traps for

17   you.  This is not one of them; so...

18      A.  Well, I --

19         MR. SCHUMACHER:  Objection.  Move to

20   strike that comment.

21      Q.  Sorry.  What is Worthington Partnership,

22   as best you know?

23      A.  I think it is a -- the organization that

24   is an outgrowth of the Old Worthington's

1    Business Association.  I'm pretty sure that's

2    the origin.  And I would describe them as a

3    quasi governmental group.  They receive some

4    funding from City Council annually.  They

5    organize and manage, you know, most notably The

6    Farmers Market, and then a range of other

7    initiatives and actions.  No longer just focused

8    on the historic downtown area, but now their

9    purview is the whole city.  They absorbed the

10   visitors and convention bureau or organization

11   when they went out of operation.  So they now

12   are charged with creating, I would say,

13   successful public events, public art.  So that's

14   what I think the Worthington Partnership is.

15       Q.  Do you have an understanding or do you

16   know whether they've taken a position on what

17   development should occur on Lifestyle

18   Communities' property?

19       A.  I don't know for sure.  Again, I can't

20   track every group's communications.  But I don't

21   think they have.  Maybe individual members have

22   and staff members.  I don't think as a group

23   they have.  But again, I could be wrong.

24                        -=0=-

1          (Deposition Exhibit 97 marked.)

2                    -=0=-

3     BY MR. MILLER:

4          Q.  Take what time you need to review the

5     document.

6          A.  Okay.

7          Q.  Turning back to Exhibit 96, I forgot to

8     ask you a few questions.

9          A.  Is that allowed?

10         Q.  Do you recall whether, in fact,

11    Ms. Michael placed the UMC comp plan update on

12    the agenda for council discussion in April of

13    2020?

14         A.  I do not recall.

15         Q.  Do you recall whether it was discussed

16    at your request in April of 2020?

17         A.  I don't recall.

18         Q.  Do you recall whether you made a motion

19    to rescind that plan update in April of 2020?

20         A.  I don't recall.  I don't think I did in

21    April.

22         Q.  Do you recall doing so at another time?

23         A.  The years, I'm trying to keep them

24    straight in my head.  '22, '21.  I think in

1    September of '20 we had a discussion about the

2    comp plan, in September of 2020.

3         Q.  And did you make such a motion?

4         A.  I don't remember whether an actual

5    motion was made or not.  I don't recall.  I know

6    it was discussed at council.  But I don't know

7    whether an actual motion to do anything was made

8    or not.

9         Q.  In fact, action was not taken at that

10   time in September of 2020?

11        A.  That's correct.  Yeah.

12        Q.  I apologize.  Turning back to Exhibit

13   97.

14        A.  Let me look at this again.

15        Q.  Sure.

16        A.  Okay.

17        Q.  You wrote this email to Mike Bates with

18   a copy to your fellow councilmembers on April

19   13th, 2020?

20        MR. SCHUMACHER:  Objection.  I think you

21   misspoke.

22        Q.  Are you able to answer the question?

23        MR. SCHUMACHER:  You said you wrote this

24   to Michael Bates and all members of council.

1    That was the question you just asked.

2        A.   Could you repeat the question?

3            MR. SCHUMACHER:   I think you misspoke.

4        Q.   You wrote this email or sent this email

5    to Mr. Bates of WARD on April 13th, 2020,

6    copying members of council and the

7    administration at the city?

8        A.   That's correct.

9        Q.   And we can agree that you wrote at the

10   bottom of the first paragraph and into the

11   second paragraph, will you, in response to any

12   development proposal for the UMCH site, publicly

13   support and recommend an outcome as described in

14   the basic vision of the WARD white paper?   The

15   short answer is yes, I absolutely will.

16           Do you see that?

17       A.   Yes, I see the word.   Sure.

18       Q.   Let's have this marked as Exhibit 98.

19                      -=0=-

20         (Deposition Exhibit 98 marked.)

21                      -=0=-

22       A.   I want to make clear for the record that

23   the quote you read, the phrase, will you, in

24   response to my development proposal for the UMCH

1    site, publicly support and recommend an outcome

2    as described in the basic vision of the WARD

3    white paper, that was written by WARD and

4    Michael Bates.  My reply was yes.  So that's

5    just to clarify who was saying what.

6       Q.  Certainly.  Your response was actually

7    yes, I absolutely will.

8          And is this, in fact, what you recognize

9    to be WARD's white paper?

10          MR. SCHUMACHER:  Do you have a copy?

11          MR. MILLER:  I do not.  I apologize.

12    It's publicly available on WARD's website.

13          MR. SCHUMACHER:  I'm going to have to

14    get a copy.  Can I see it, please?

15          THE WITNESS:  Yeah.  Sure.  Okay.

16          MR. MILLER:  Would you read back the

17    question, please.

18          (Record read as requested.)

19       A.  I would call it WARD's position

20    statement of 2018, but I don't know where the

21    term white paper comes from.  Is that what they

22    call it?

23       Q.  That is what they call it.  Do you have

24    any reason to doubt this is what WARD holds out

1  on its website as its white paper?

2      A.  I have no reason to doubt that.

3      Q.  In the first bullet point of Exhibit 97,

4  your email to Mr. Bates --

5      A.  This one here?

6      Q.  Yeah.  Referring to the first bullet

7  point you state that you agree with the

8  overarching goal that the property should be

9  developed in such a way that is, quote, enjoyed

10  by the entire community for generations to come,

11  end quote.  Do you see that?

12      A.  I do.

13      Q.  Do you still believe this?

14      A.  Yeah.  And the way I think about this

15  is, as an elected official, my job is to

16  advocate on behalf of the public.  I'm one of

17  seven councilmembers.  That's what I attempt to

18  do.  In this 4-13 email to Bates, I state that I

19  will support their outcomes as described in the

20  basic vision, and as I'm looking at the basic

21  vision contained in the white paper right now,

22  the things that jump out at me that I did and do

23  support is the idea of -- they say here

24  neighborhoods, family, history, schools,

1    walkability.  Those are common themes that have

2    emerged in dialogue with the public.  They state

3    here what happens to UMCH in terms of density,

4    green space, traffic, and the ability of

5    Worthington to keep and attract the residents,

6    we need to ensure our future will be felt

7    throughout the city for generations to come.

8    You know, I agree with their recognition of the

9    importance of the outcome of this distinctive

10   property in the heart of our historic city.

11        They acknowledge that it's a challenging

12   issue.  There's multiple entities involved here,

13   residents, the city, business community, the

14   property owner, and prospective developers, and

15   they're proposing that we enter into dialogue

16   and include right at the center of that a

17   recognition of the interest of the residents,

18   you know, and they quote City Council President

19   Bonnie Michael stating in the 2016 edition of

20   This Week Worthington News, quote, Bonnie

21   Michael, we have to be clear the best approach

22   would be to extensively engage the community and

23   involve them in the planning for the future of

24   the UMCH property.  And these are all things I

1  affirm in their approach.

2      Q.  All things I didn't ask you,

3  respectfully, Mr. Robinson.  Do you still

4  agree --

5          MR. SCHUMACHER:  Objection.  Move to

6  strike.

7      Q.   -- that the property should be

8  developed in such a way that is enjoyed by the

9  entire community for generations to come?

10         MR. SCHUMACHER:  Objection.  Move to

11 strike the comment of counsel.

12     A.  Repeat the question, please.

13         (Record read as requested.)

14     A.  Maybe it's my years on council that have

15 shaped my sense of realistic outcomes.  I would

16 say now that I would hope the outcome would

17 satisfy most for many years to come.

18     Q.  You said several times you're one of

19 seven.  Let me just ask you as one.  What do you

20 think should happen to Lifestyle Communities'

21 property?

22     A.  I think there ought to be a process

23 whereby the outcome is realized, you know,

24 through a transparent robust process of public

1    engagement.

2        Q.  As an individual, you, David Robinson,

3    what would you like to see on the property

4    across the street?

5        A.  I don't think like that anymore.  I'm an

6    elected official, and I think in terms of my

7    responsibility to the public.

8        Q.  You have no personal opinion whatsoever?

9        A.  It's not -- it's not -- it's not

10   prominent in my thinking, no.

11       Q.  Well, what is your personal opinion?

12       A.  I just said it's not prominent, and I

13   think in terms of as an elected official about

14   my responsibility to the public.

15       Q.  That's your sworn testimony here today,

16   you don't care what happens across the street

17   personally?

18           MR. SCHUMACHER:  Objection.

19   Argumentative.

20       A.  I didn't say that.  I said it's -- what

21   governs my thinking about the property is my

22   responsibility to the public.

23       Q.  We can agree you didn't care for what

24   was in the MKSK plan update, correct?

1          MR. SCHUMACHER:  Objection.  Misstates

2     testimony.

3          A.  Yeah, that is not what I said.  It was a

4     more complicated response.  There were things in

5     the plan that are probably in accord with public

6     opinion and other things that are not.  It's a

7     complicated issue.

8          Q.  But we can agree, can we not, that you

9     thought it should be rescinded so it did not

10    guide evaluation of future proposals for the

11    property?

12         A.  Yeah.  I think it -- for years, as you

13    know, I advocated that it be amended, changed,

14    and brought into conformity with broad public

15    opinion as a way of making future proposals

16    productive and fruitful for all entities,

17    including prospective developers.

18         Q.  Do you believe you've achieved that,

19    that the plan has been brought into conformity

20    with public opinion?

21         A.  The action in January of 2022, in

22    general terms, because it was -- it was a fairly

23    concise statement in general terms.  I do

24    believe it conforms with general public opinion.

1 It was written to a pretty abundant flexibility

2 in terms of commercial housing and green space,

3 and also with, I think, an expectation that when

4 time permitted and when possible that a more

5 robust deliberative process would be undertaken

6 to update the comp plan UMCH portion.

7   And, in fact, at a recent council

8 meeting, it must have been the last one or two

9 meetings ago, when we were discussing the budget

10 for '24, there is the expectation that there

11 will be a budget amount to embark on a 12- to

12 18-month process of updating the comp plan in

13 its entirety. And I don't know the details

14 about whether that would also include UMCH, you

15 know, given the litigation, or would not. But

16 the plan is to have a deliberative process to

17 update the comp plan.

18  Q. Do you feel that the January '22

19 amendment to the comp plan for Lifestyle

20 Communities' properties needs to be updated?

21  A. State the question again, please.

22   (Record read as requested.)

23   MR. SCHUMACHER: Objection to the

24 relevance of the hypothetical, but you can

1    answer.

2        A.  I would expect it to be reviewed and

3    almost certainly expanded under a more

4    deliberative process.

5        Q.  Why?

6            MR. SCHUMACHER:  Same objection.

7        A.  I'm sorry?

8        Q.  Why?

9        A.  If you look at the rest of the comp

10   plan, every other portion of the city there's

11   illustrations and so forth.  So that would be

12   why.  Yeah.

13       Q.  To understand your prior answer, you

14   would expect it to be updated in a more

15   deliberative process than took place in January

16   of 2022, correct?

17       A.  Repeat the question.

18           (Record read as requested.)

19       A.  Yeah, the proposed and then adopted

20   update in '22, it was the result of actually

21   many years of listening to the public and taking

22   into consideration the many sources of public

23   opinion that I've talked about earlier, surveys,

24   petitions, letters.  So in that sense, the '22

1  process was based on much discussion and

2  deliberation.  When the whole comp plan is

3  updated moving forward, there will be

4  consultants, public meetings to get current

5  additional input.  So it would be a different

6  process moving forward.

7      Q.  We'll look at it later, but who wrote

8  the January 2022 update to the comp plan as

9  applied to the Lifestyle Communities' --

10     A.  I did.

11     Q.   -- property?  When did you do so?

12     A.  In the days or weeks before -- again,

13  this is something I thought about for many

14  years, but I don't remember the exact days that

15  I put it on paper.

16     Q.  January '22, though, is it fair to say?

17     A.  It is.

18     Q.  How long did it take you?

19     A.  I don't recall.

20     Q.  If you can look at what was marked

21  previously as Exhibit 34.

22     A.  I've not looked at 34.  Can I use the

23  restroom?

24         MR. MILLER:  We can take a break.

1        (Recess.)

2    BY MR. MILLER:

3        Q.  Let's take a look at what's been

4    previously marked as Exhibit 34, Mr. Robinson.

5        A.  Have we looked at this before?

6        Q.  No, but feel free to take it out of the

7    binder if it's easier for you to review it.  I

8    think it is something we touched upon and talked

9    about earlier as relates to September of 2020.

10        If it's helpful in your review, my

11    question is simply, is this an email that you

12    sent to your fellow members of council and

13    copied certain city officials on September 20,

14    2020?

15        A.  Question, the formatting of some of

16    these documents, that's odd.  Is this the way it

17    was delivered to you by the city?

18        Q.  Yes.  There's a document number at the

19    top of it, and it was produced to us by the

20    city.

21        A.  Okay.  Okay.  What's the question?

22        (Record read as requested.)

23        A.  That's correct.

24        Q.  And is this reflective of certain

1    efforts you described earlier in September of

2    2020 to rescind or suspend the comprehensive

3    plan update as related to Lifestyle Communities'

4    properties?

5        A.  At the time, I believed UMCH owned the

6    property and, yeah, the effort was to have

7    council -- again, I'm asking my colleagues to

8    discuss the UMCH update and suggesting that we

9    rescinded or suspended or take some action so

10   that it's brought in line again with broad

11   public opinion so that the process could be

12   productive, and I lay out several reasons why I

13   felt this was needed.

14            I think a very cogent one was the first

15   one where I state that the -- at this point in

16   time, the update was already six years old.  The

17   world was very different from 2013, 2014.  We

18   were in the middle of COVID.  George Floyd

19   murder had happened.  Issue of inequality were

20   at the forefront.  Climate change was impacting

21   us.  A number of factors, I think, warranted us

22   taking a new look at the comp plan.  And then as

23   I said several times today already, importantly,

24   public opinion.  I did not view the comp plan

1    update as a consensus, and that to productively

2    move forward with the property owner, that we

3    ought to take a fresh look at the comp plan.

4    That was my motivation.

5         Q.  Well, in fact, you wrote in the second

6    paragraph of this email on the first page of

7    Exhibit 34, quote, to the point, I believe we

8    now face what may be a very short window of

9    opportunity to discuss and act on this issue.

10   That's because you knew Lifestyle Communities

11   was preparing to apply based upon the

12   comprehensive plan, correct?

13        MR. SCHUMACHER:  Objection.  Compound.

14        A.  Yeah, what is the question, please?

15        Q.  You thought there was a very short

16   window to act on this issue because you knew

17   Lifestyle Communities was going to apply based

18   upon the comprehensive plan?

19        A.  A couple things:  One, I did not know.

20        Q.  You're under oath, Mr. Robinson.

21        A.  Yeah, I know.  And what Lifestyle was

22   going to do I had no privy, particular

23   knowledge.  I mean, at most there were rumors

24   circulating.  And my driving interest here was

1  to avoid the city, the community, property

2  owners, prospective developer to get into a

3  fruitless process.

4       And if I remember correctly, given the

5  dates and all, this was September of 2020.  What

6  happened was the next month there was a proposal

7  put forward that cited regularly or consistently

8  throughout the 2013-14 comp plan as really the

9  basis of the proposal, and 14 months later,

10  after being tabled several times at the request

11  of the developer, and a thorough review and,

12  again, 14-month process by the city's ARB/MPC,

13  they issued a lengthy report, as did staff, you

14  know, about the proposal, recommending that

15  council deny it.  And then in December '14,

16  unanimously council did deny it.

17       So for 14 months there was unproductive

18  action, in some ways with the 2013-14 comp plan

19  being identified as the driving basis by the

20  prospective developer, and that's exactly the

21  kind of fruitless action and wasted time and

22  money and public acrimony that I was trying to

23  avoid through this action of council in

24  September.

1            MR. MILLER:  Move to strike as

2    completely nonresponsive and evasive.

3        Q.  If you can turn to the second page of

4    the exhibit.  If we can agree on nothing else,

5    Mr. Robinson, we can agree that on number 4 in

6    your email you urged your colleagues to support

7    a motion to suspend comp plan update to avoid

8    the possibility of the city being placed in a

9    vulnerable defensive position if a submitted

10   development plan conforms in general with the

11   comp plan and yet is rejected, correct?

12           MR. SCHUMACHER:  Objection.  Compound.

13       A.  What is the question?

14           MR. MILLER:  Those are his words that

15   are compound, Paul.  You can continue to

16   obstruct this deposition.  I'm reading from his

17   email.

18           MR. SCHUMACHER:  Joe, you prefaced your

19   quote from the document by asking a different

20   question.  And I'm simply objecting to the

21   compound nature.  He can certainly answer the

22   question.

23   BY MR. MILLER:

24       Q.  You urged your colleagues to support

1   your motion to suspend the comp plan update

2   based on the reasons you set forth in number 4

3   of Exhibit 34, correct?

4        A.  I'm sorry.  What's the question?

5             (Record read as requested.)

6        A.  Yeah, I made four points, and urged them

7   to -- explained to them my reasons for making

8   the motion and I outlined four reasons.

9        Q.  Did you make a motion to suspend the

10  comp plan update at council's meeting on

11  September 21st, 2020?

12       A.  I don't know if I did or not.

13       Q.  You don't recall one way or the other?

14       A.  I don't know if I made a motion or not.

15  I know it was discussed, but I don't know

16  whether it actually reached the point where a

17  motion was made or not.

18       Q.  If you could share with me whatever you

19  recall about the discussion that evening as it

20  relates to any motion to suspend or suspension

21  of the plan update in general?

22       A.  I primarily remember that, again, as one

23  of seven, that I was successful in my efforts.

24       Q.  But as we'll talk about, you were

1  successful with a majority of councilmembers in

2  2022, correct?

3      A.  Successful in regard to?

4      Q.  Updating the comp plan as it related to

5  Lifestyle Communities' property.

6      A.  That's correct, a year and a half later,

7  in January of '22, following a failed effort to

8  pass a moratorium ordinance, then a resolution

9  was passed updating the comp plan UMCH portion.

10                    -=0=-

11          (Deposition Exhibit 99 marked.)

12                    -=0=-

13  BY MR. MILLER:

14      Q.  If we look at the second page -- I guess

15  it starts at the bottom of the first page, but

16  is this an email you sent to Mr. Greeson on

17  September 29th, 2020, at 6:25 a.m. copying

18  certain members of City Council and city

19  officials?

20      A.  Yeah, I think it was to the full

21  council.  Yep, to city officials, Lee Brown, Tom

22  Lindsey.

23      Q.  You asked Mr. Greeson, why did you bring

24  to Mr. Hart's attention the UMCH-related

1    discussion we just had at council, correct?

2       A.  Yeah, that's what the words say.

3       Q.  Mr. Hart was Lifestyle Communities'

4    counsel?

5       A.  Okay.

6       Q.  Why did you ask this question of

7    Mr. Greeson?

8       A.  I wanted to see if he was responding to

9    or acting sort of at the suggestion of

10   Councilmember Smith or whether there was some

11   other issue I wasn't aware of.

12      Q.  And did Mr. Greeson respond, in fact, he

13   was essentially acting in response to

14   Councilmember Smith's direction?

15      A.  Yeah, as Matt's words say, Councilmember

16   Smith's request was consistent with the good

17   government practice of trying to be transparent

18   and open.  So yeah, he says basically is what

19   his motivation was answering my question.

20      Q.  Did you disagree with letting

21   applicant's counsel know the discussion  --

22   Lifestyle Communities' counsel know of the

23   discussion at council?

24      A.  My motivation here was to understand why

1    Mr. Greeson asked the question, and he answered

2    my question saying Mr. Smith's prompt is what

3    directed him.

4        Q.  Is that why you said, I'll reserve

5    comment pending your reply?

6            MR. SCHUMACHER:  I'm sorry.  I didn't

7    hear that.  You trailed off, Joe.

8        Q.  Is that why you said I'll reserve

9    comment pending your reply to Mr. Greeson?

10       A.  Is why what?

11       Q.  You wanted to hear his explanation of

12   why he reached out to Mr. Hart.

13       A.  Yeah, sure, that was the purpose of my

14   email.

15       Q.  Do you know whether you then responded

16   to Mr. Greeson after --

17       A.  I do not.

18       Q.  -- he provided his explanation?

19           We've done better than expected today,

20   Mr. Robinson.  Would you --

21           MR. SCHUMACHER:  He was asking a

22   question, you started to answer.

23           THE WITNESS:  My apologies.

24           MR. SCHUMACHER:  We need to slow down.

1  BY MR. MILLER:

2     Q.  Do you recall whether you replied to

3  Mr. Greeson's email on the first page of Exhibit

4  99 after he provided his explanation?

5     A.  I do not recall.

6     Q.  Do you agree that it was consistent with

7  good government practice to reach out to

8  Lifestyle Communities' counsel to let him know

9  the discussion?

10     A.  I would say it's not in contradiction to

11  good government practice.

12     Q.  What does that mean to you?  Because I'm

13  not sure I understand your answer.

14     A.  There's a range of actions that Matt

15  could have taken, and this was one of them.

16        How about lunch?

17        MR. SCHUMACHER:  Yeah.  Do you expect to

18  have much more?

19        MR. MILLER:  Yeah.  The way things are

20  going, for sure.

21        MR. SCHUMACHER:  I'm sorry?

22        MR. MILLER:  The way things are going,

23  for sure.  I'll speak up.  Sorry, Paul.

24                  -=O=-

1          Thereupon, the luncheon recess was taken

2   at 12:24 p.m.

3                        -=O=-

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

 1              OCTOBER 31, 2023

 2              TUESDAY AFTERNOON SESSION

 3              1:13 P.M.

 4                   -=O=-

 5         (Deposition Exhibit 100 marked.)

 6                   -=O=-

 7   BY MR. MILLER:

 8      Q.  Does Exhibit 100 appear to be a true and

 9   accurate copy of a blog post that you put out,

10   Mr. Robinson, on November 24th, 2020?

11      A.  Yeah, it appears to be.

12      Q.  Thank you.

13                   -=O=-

14         (Deposition Exhibit 101 marked.)

15                   -=O=-

16      A.  Maybe you can ask the questions.  It's

17   lengthy.  I'm not going to read it all.

18      Q.  I'll direct your attention to page 2.

19   Beginning in the middle of that page, does that

20   appear to be a March 27th, 2021, email that you

21   sent at 2:41 p.m. to a Matthew Mowry?

22      A.  It appears to be.

23      Q.  Do you know Mr. Mowry?

24      A.  I don't.  As far as I know.  I mean, the

1  name rings a bell, but I don't think I know him

2  personally at all.

3      Q.  Take what time you need, but was this an

4  email you sent responding to a constituent

5  concern?

6      A.  Let me study it.

7      Q.  Sure.

8      A.  His email is quite long, too.

9      Q.  It is quite long.  I agree.

10     A.  Give me a few minutes here.

11     Q.  Do you recall my question, Mr. Robinson?

12     A.  No, but I figure when I get done reading

13  I can -- I mean, if you want to ask it again.

14     Q.  No, if you're not finished.

15     A.  Okay.

16         MR. MILLER:  Would you read back the

17  last question, please.

18     A.  Sorry.  I'm not done reading this whole

19  thing.  I realize it goes on.  Hang on.  My

20  apologies.

21         Okay.

22         MR. MILLER:  Would you read back my

23  question, please.

24         (Record read as requested.)

1      A.  Yeah.  There's a back-and-forth exchange

2  between me and a constituent.  Correct.

3      Q.  Specifically related to Lifestyle

4  Communities' proposal for the property?

5      A.  Yeah.  The -- I mean, I would describe

6  it as his concern about the UMCH property and

7  what type of outcome there would be desirable.

8      Q.  And looking at that email to which I

9  directed your attention previously, the second

10  page of the exhibit that you sent to Mr. Mowry

11  on March 27th, 2021, you told him in that first

12  paragraph, the third sentence, that be assured

13  that I will do all that I can to prevent its

14  realization, referring to Lifestyle's latest

15  proposal?

16      A.  What are you asking?

17      Q.  You told him, with regard to Lifestyle's

18  latest proposal, be assured that I will do all

19  that I can to prevent its realization, correct?

20      A.  Yeah.  As a representative, the proposal

21  I thought was poorly constructed and I would try

22  to prevent it being realized.

23      Q.  In fact, you say later, I am struck also

24  by the sheer mediocrity of it all.

1          Can you explain that statement or why

2     you felt the proposal to have sheer mediocrity?

3          A.  We are a historic community, founded in

4     1803, with distinctive architecture, use of

5     land.  The proposal put forward in the fall of

6     '20 was even larger and denser and more units

7     than what was presented to the public back in

8     2015.  And from what I recall looking at some of

9     the graphics and descriptions, the proposal, the

10    plan could have been made at any number of sites

11    around central Ohio.  I think the ARB and MPC

12    and staff's response to it said similar things

13    about its lack of responsiveness to community

14    expectations, and I think that reflects the fact

15    that LC didn't engage the public.  So that's --

16    I think that's what I was getting at there.

17         Q.  And you've made that comment to other

18    citizens, have you not, that you were struck by

19    what you call the sheer mediocrity of it all?

20         A.  I don't know, but the language I would

21    agree with.

22         Q.  You told Mr. Mowry that you thought the

23    site -- I'm looking at that same paragraph --

24    could become a positive focal point for

1  community activity, benefiting all for all time,

2  correct?

3      A.  I don't know where you're pointing to.

4      Q.  I'm sorry.  I thought you had read the

5  exhibit, sir.

6          MR. SCHUMACHER:  You're pointing at

7  certain sentences now, so you're going to have

8  to show him where.

9      A.  Yeah, the site could become a positive

10  focal point for community activity, benefiting

11  all for all time.

12          Yeah, those are my words, yes

13      Q.  And you made that statement to citizens

14  on other occasions, that the primary priority in

15  development of the property should be the public

16  at large, correct?

17      A.  I have stated repeatedly before and on

18  this day that public opinion -- in support of

19  the general public of any change of the zoning

20  and land use there is of central importance.

21      Q.  Respectfully, sir, I didn't ask you

22  about public opinion.  You said repeatedly, have

23  you not, the property should be developed for

24  the benefit of the public?

1    A.  If there is a change in zoning, that

2  that ought to take place only under

3  consideration of the public welfare.

4    Q.  Can you flip to the first page of the

5  exhibit.  You said in the first paragraph, if I

6  may, I find myself thinking there is simply no

7  way that LC will ever build their massive

8  development.

9         Why did you believe that in March of

10  2021?

11    A.  Any massive development, where we're

12  talking many hundreds of apartments, would not

13  be supported by the public.  And I would expect

14  council to -- myself as one, but I would think

15  that other members would as well -- listen to

16  the public and not approve a project not

17  supported by the community.  And then if that

18  failed, I think the public itself would probably

19  wage a referendum campaign against a project

20  regardless of who's doing it at the property.

21    Q.  In fact, you think the public would like

22  to see a large scale public park on the

23  property, correct?

24         MR. SCHUMACHER:  Objection.  Misstates

1  his testimony.

2       A.  Your question again, please.

3          MR. MILLER:  If you would read it back,

4  please.

5          (Record read as requested.)

6       A.  From multiple sources over ten years

7  now, the public has been consistent in

8  describing what they believe would be an

9  appropriate outcome of the property, and that

10  consistently includes significant contiguous

11  green space.

12                      -=0=-

13          (Deposition Exhibit 102 marked.)

14                      -=0=-

15  BY MR. MILLER:

16       Q.  Mr. Robinson, you've been handed what

17  we've had marked, I believe, Exhibit 102.

18  Please let me know when you're prepared to

19  proceed with examination on the document.

20       A.  Okay.  Okay.  I think I've got my mind

21  wrapped around it.  What's the question?

22       Q.  The question is, regarding the first

23  page of Exhibit 102, on April 11th, 2021, email

24  that you sent to Mr. Greeson?

1        A.  Yeah.

2        Q.  In your own words, describe for me what

3    you were trying to communicate to Mr. Greeson in

4    this email?

5            MR. SCHUMACHER:  Objection.

6        A.  Repeat the question.

7            (Record read as requested.)

8        A.  I was conveying to them, I believe, that

9    the statement in the park's master plan was not

10   consistent with broad public opinion,

11   specifically the phrase about the parks

12   commission is determined that there is -- what's

13   the phrasing here?

14       Q.  Our existing parks provide ample park

15   space per resident.

16       A.  Yeah, that's it.  And I draw the

17   connection here that this is analogous to the

18   claim in the 2013-14 comp plan update that it's

19   a consensus document, and I felt like this was

20   not constructive to be sending out as an

21   indication of current public sentiment at the

22   time.

23       Q.  In fact, you said in the middle of the

24   second paragraph, if I may -- forgive me for

1    reaching in -- you said to Mr. Greeson, the

2    truth is otherwise, correct?

3        A.  Yeah, truth is otherwise because the

4    general public, based on all of the documented

5    sources I've talked about several times today,

6    don't agree with that statement.

7        Q.  In fact, they, based on what you've

8    heard/reviewed, want to see significant public

9    parkland at the Lifestyle Communities' property?

10           MR. SCHUMACHER:  Objection.

11   Mischaracterizes prior testimony.

12       A.  Yeah, again, as I said repeatedly, broad

13   public opinion has felt that a desirable outcome

14   at that property would involve a mix of uses,

15   including significant contiguous green space.

16       Q.  You told Mr. Greeson in the first

17   sentence of the second paragraph, Matt, this

18   sentence exemplifies the problem with how you

19   have mismanaged the entire issue of UMCH.

20           Could you please describe for me how

21   Mr. Greeson mismanaged the entire issue of UMCH?

22       A.  The fundamental issue I had with Matt

23   about this issue was not putting as at the

24   center of the city's disposition and position of

1    UMCH broad public opinion, as reflected in the

2    comp plan update, his citing of the park's

3    master plan, not proactively developing

4    information like was developed in the

5    cost-to-serve analysis, and I spoke with Matt

6    about this directly.  This was not radical to

7    him.  This was a common refrain.

8        Q.  I think you touched upon at least one

9    aspect of it a moment ago.  What do you believe

10   Mr. Greeson could have done differently to not

11   mismanage the entire issue of UMCH?

12       A.  Listen to the public.

13       Q.  You felt he did not do that?

14       A.  Did not do it consistently robustly

15   enough, no.

16       Q.  How about Ms. Stewart?

17       A.  I'm not in a position to really evaluate

18   her performance.  She was assistant city manager

19   and working at the direction of Mr. Greeson, so

20   it was really Mr. Greeson that I can attribute

21   responsibility to.

22       Q.  That's fair.  If we look at the final

23   paragraph of your email on the first page of

24   Exhibit 102, you state --

1    A.  Final paragraph?

2    Q.  Yes.  Let's discuss the larger paragraph

3  above that.  You state --

4        MR. SCHUMACHER:  I'm sorry.  You

5  confused me now.  What are we looking at?

6        MR. MILLER:  The final paragraph on page

7  1 of Exhibit 102, that begins you see, Matt.

8        MR. SCHUMACHER:  Thank you.

9  BY MR. MILLER:

10   Q.  You told Mr. Greeson, this is why I have

11  ineffectively tried for three years to get the

12  CP rescinded.

13       You're referring to the comprehensive

14  plan update regarding the UMCH property?

15   A.  Yeah, CP, comprehensive plan, yeah.

16   Q.  In the remainder of that sentence, who

17  or what is the VC, where you write, and this is

18  why I've attempted to not let the VC go in that

19  direction?

20   A.  I think -- I'll have to think through

21  all the angles of this, but I think the VC

22  refers to the visioning commission or committee,

23  is my guess.  I think it was underway at that

24  time, yeah.

1      Q.  Describe for me, as you understand it,

2  the purpose or objectives of the visioning

3  committee.

4      A.  That's a big question.  Visioning

5  commission -- I would read the documents

6  themselves, because they clearly state it.  But

7  basically it reflects -- the creation of it

8  reflects a -- an effort by city leadership and

9  the community to get clarity on where we want to

10  go as a community, really in all facets.  I

11  mean, the output of the visioning commission --

12  I think it was visioning report, is what came

13  out.  It had seven different vision statements,

14  and it ran the full gamut of high quality of

15  life to inclusive, diverse community.  So it was

16  really every aspect of communal life.  And I

17  think it reflects a sense that times they are

18  changing.  And demographic change in the city, a

19  lot of cultural changes, and express as desire

20  that we don't just move forward without

21  conscious clarity about where we want to go as a

22  community.  So it's an attempt to get conscious

23  understanding of where we want to go.

24      Q.  Was the visioning committee created

1    before or after you joined City Council?

2        A.  It was formed -- must have been after.

3    Must have been after.

4        Q.  Do you recall what, if any, role you had

5    in forming the visioning committee?

6        A.  I was a participant in discussions at

7    council.  I mean, that's what I remember.  We

8    were -- it probably was 2018, 2019.  There was

9    discussion at a retreat about forming it.  I

10   can't remember which it was year, 2018 or 2019.

11   And this is speculation, but I think the way it

12   would have worked is after a discussion at the

13   retreat that city leadership, Matt Greeson and

14   staff, would have come back with a proposal

15   about how to proceed with it.  I remember

16   discussions at council with Scott Myers.  He was

17   involved in talking about this.  And a strong

18   sentiment of council was that the visioning

19   committee needs to be fairly independent of

20   council direction and supervision.  We really

21   wanted the visioning report to reflect the views

22   of the public and basically be a grassroots

23   bottom-up type of process.  And must have taken

24   many months for us to develop the structure and

1   the framework, and then I think each

2   councilmember could nominate one or more

3   persons.  I don't remember exactly how that

4   worked.  But we were involved in the composition

5   of the -- I think it was a 13-member committee.

6   And then they were off and running on their own

7   and they came back periodically and made

8   reports.  That's my recollection.

9        Q.  You referenced a moment ago the report.

10  Did they ultimately issue a final report as a

11  body, if you know?

12       A.  Yeah.  I forget the exact title, but

13  it's something like Vision of Worthington, maybe

14  report.  It's in a binder not unlike that.

15  Yeah, there's a report, and it was, I think,

16  issued probably back in '21 or something like

17  that.

18       Q.  Have you read it?

19       A.  I have.

20            MR. SCHUMACHER:  Wait.  You got to

21  finish your answer.

22       A.  Yeah, thanks.  Just the relevant

23  information that was issued, and it has been

24  difficult for the city to develop a process for

1 actually implementing and making real and acting

2 upon the different vision statements. I don't

3 know whether they were called recommendations,

4 but ideas and concepts. And so in '23, at the

5 retreat, Pro-Tem Brewer recommended the creation

6 of vision implementation teams for each of the

7 seven statements would have co-chairs,

8 councilmember and someone else and we'd form

9 different groups and come back, which is, in

10 fact, happening just about right now, come back

11 to council with three, four, five ideas for each

12 vision, and then to engage it in another public

13 process of getting feedback and comments on the

14 different actionable ideas to those seven

15 statements, and then council will somehow sift

16 through and decide which ones are of highest

17 priority and we could act upon. So that's the

18 plan process.

19     Q.  Have you reviewed the vision committee

20 report?

21     A.  I have.

22     Q.  Do they still exist as a body, if you

23 know?

24     A.  No, they do not.

1        I'm sorry, this Coke's going through me.

2   I'll be back.

3        (Pause.)

4                    -=0=-

5        (Deposition Exhibit 103 marked.)

6                    -=0=-

7   BY MR. MILLER:

8     Q.  We've had placed before you what we've

9   had marked as Exhibit 103.

10    A.  102 is done?

11    Q.  Correct.

12        MR. MILLER:  Paul, you know you're

13  humming on the record, right?

14        MR. SCHUMACHER:  I'm sorry.

15        MR. MILLER:  Just now and previously you

16  realize you've been humming on the record,

17  right?

18        MR. SCHUMACHER:  Was I?

19        MR. MILLER:  Yes.  Just wanted to make

20  you aware.

21        MR. SCHUMACHER:  Rhonda, were you

22  getting that?

23  BY MR. MILLER:

24    Q.  If you look at Exhibit 103, does this

1    appear to be a true and accurate copy of a blog

2    post that you put out on your blog on May 11th,

3    2021?

4        A.  It appears to be.

5        Q.  If you could take a look at Exhibit 61.

6    It might be in a different binder.  I'm not

7    sure.

8            MR. SCHUMACHER:  Rhonda, there was no

9    humming on the record, right?

10           THE WITNESS:  I wasn't aware of it;

11   so...

12           MR. SCHUMACHER:  Okay.

13   BY MR. MILLER:

14       Q.  Do you have in front of you Exhibit 61?

15       A.  Yeah.  Am I still to keep 103 in front

16   of me?

17       Q.  You can put it right here, sir.

18           Take what time you need to review

19   Exhibit 61, if you would, please.  I don't

20   believe I'll be asking you about the first page,

21   if that's helpful, but certainly the emails that

22   follow on the second and third page, I would

23   intend to do so.

24       A.  Okay.

1      Q.  If we look at the second page of the

2  exhibit, is it fair to say you forwarded to

3  Mr. Brown on October 14th, 2021, an email that

4  you said you had sent to six members of the

5  ARB/MPC?

6      A.  Yeah, that's right.

7      Q.  And you did, in fact, send that email to

8  six of the members of the ARB/MPC?

9      A.  Yeah, I think I sent it to Mr. Brown

10  because I didn't have the email address of the

11  seventh member.

12      Q.  And it specifically relates to their

13  consideration of Lifestyle Communities'

14  proposal, correct?

15      A.  Two different issues, but LC is one of

16  them.

17      Q.  And you yourself acknowledge in the

18  email to Mr. Brown that doing so was unusual,

19  correct?

20      A.  Yeah.

21      Q.  You state, then, that council

22  effectively doesn't have a liaison with the

23  ARB/MPC, at least as I understand that role.

24          Mr. Myers was, in fact, the

1   councilmember on the ARB/MPC, correct?

2    A.  Uh-huh.  Yeah, he was.  Yeah.

3    Q.  So why did you not believe that council

4   effectively had a liaison with the ARB/MPC?

5    A.  I think what I was referring to there

6   was communications between the two bodies, and

7   the ability to have questions and issues raised

8   by councilmembers be effectively delivered to

9   the ARB/MPC, and so that's what I meant.

10    Q.  You felt that Mr. Myers was not

11   effectively doing so?

12    A.  This email was sent -- I think it was

13   the morning of the meeting that they were going

14   to have that evening, and I felt like if I

15   wanted to get the message I was conveying to

16   them, it needed to be sent directly.

17    Q.  Okay.  Have you done so since then?

18    A.  I don't think I have.

19    Q.  Had you done so before this with regard

20   to applications before the ARB/MPC?

21    A.  No, I'm pretty sure I did not.  This

22   was -- this was an issue of great interest to

23   the public, and members of the public had

24   expressed concern to me, and I was acting as an

1   elected official conveying the message of some

2   of the residents to the ARB/MPC.  That was the

3   motivation.

4          Are we done with this?

5      Q.  Yes.

6                      -=0=-

7          (Deposition Exhibit 104 marked.)

8                      -=0=-

9   BY MR. MILLER:

10     Q.  As with other blog posts, Mr. Robinson,

11  Exhibit 104, my question for you is:  Does this

12  appear to be a true and accurate copy of a post

13  that you put on your blog on October 18th, 2021?

14     A.  Okay.

15         MR. MILLER:  Could you read back my

16  question.

17         (Record read as requested.)

18     A.  It does.

19     Q.  If we look at the second page of this

20  exhibit, at the bottom of that page -- if I may?

21     A.  Yeah.

22     Q.  You wrote, if either LC withdraws their

23  proposal or council affirms the MPC

24  recommendation of denial, LC will need to wait

1  six months from the date of the 10-14 MPC

2  meeting to resubmit a development proposal.

3         If you know, or if you recall, upon what

4  authority are you basing that statement?

5         MR. SCHUMACHER:  Objection.

6         You can answer.  Go ahead.

7    A.  I think that's city code.

8    Q.  You can't recall offhand?

9    A.  I said I think that's city code.

10   Q.  Okay.

11   A.  That would pertain to any applicant,

12  that if it's denied they have to wait six months

13  before they resubmit.

14   Q.  Are you likewise familiar with the city

15  charter that rezonings within the city need to

16  be in accordance with the city's comprehensive

17  plan?

18        MR. SCHUMACHER:  Objection.  Relevance.

19   A.  State the question again.

20        (Record read as requested.)

21        MR. SCHUMACHER:  Also note my objection

22  to the extent it asks for a legal conclusion.

23        You can answer.

24   A.  It's a confusing question to me.  So I

1    can't answer directly the way it's phrased.

2        Q.  Are you aware of whether the city

3    charter requires that the city rezone properties

4    in accordance with its comprehensive plan?

5            MR. SCHUMACHER:  I'm sorry.  I can't

6    hear your question.

7        Q.  Are you aware --

8            MR. SCHUMACHER:  Thank you --

9        Q.  -- that the city charter requires the

10   city, if it's going to rezone a piece of

11   property, to rezone it in accordance with the

12   comprehensive plan?

13           MR. SCHUMACHER:  Objection.  That

14   misstates the city charter, and also calls for a

15   legal conclusion.

16           MR. MILLER:  And also attempts to

17   improperly instruct the witness.

18           You may answer, if you know,

19   Mr. Robinson.

20       A.  The comprehensive plan is subordinate to

21   code and charter, and it's just one of many

22   planning documents, so it would be bizarre to me

23   if our charter said it had to comply with the

24   plan.

1    BY MR. MILLER:

2        Q.  Okay.  It would be bizarre to you, but

3    sitting here right now, you don't know one way

4    or the other?

5            MR. SCHUMACHER:  Objection.  Same

6    objections.

7        A.  Yeah, no, it's -- what I do know is the

8    plan is subordinate to code and charter.

9                        -=0=-

10           (Deposition Exhibit 105 marked.)

11                        -=0=-

12   BY MR. MILLER:

13       Q.  As always, Mr. Robinson, take what time

14   you need to familiarize yourself with Exhibit

15   105, and let me know when you're ready to

16   proceed.

17       A.  Okay.

18       Q.  I'd like to direct your attention, if I

19   could, to the second page of the exhibit;

20   namely, what appears to me to be an email from

21   the Worthington Partnership on November 15th,

22   2021, to members of council.  Do you see that?

23       A.  Yeah, the memo's not attached, but there

24   is an email.

1             MR. MILLER:  And actually, I'd like to

2    ask Mr. Schumacher if you can look into that.  I

3    don't know that we have the attachment.  If I

4    can just make that request.  Ms. Parini

5    references a memo from our board of directors

6    regarding the request before you today.

7    BY MR. MILLER:

8         Q.  Likewise, I do not have the attachment,

9    Mr. Robinson.  My apologies.  But do you recall

10   seeing a memo from the board of directors of the

11   Worthington Partnership in November of 2021 as

12   it related to a request to expand CRA?

13        A.  I don't remember, but this email here

14   jars my memory well enough, and I'm pretty sure

15   I know what the issue was.

16        Q.  What was the issue, as you recall?

17        A.  I think it related to a company

18   called -- I think it's New England Development,

19   owned by the Showe family.

20        Q.  Which family?

21        A.  The Showe family.

22        Q.  Could you spell it?

23        A.  S-H-O-W-E.  Kevin Showe is the primary

24   person, I think.  Asking that the city expand

1 the CRA as part of their initial effort to --

2 they never made a proposal, but to develop a

3 hotel on West New England in the downtown area.

4      Q.  Did it have to do with the Worthington

5 Inn building, or not necessarily?

6      A.  It depends who you ask.  The Worthington

7 Inn also is owned by the New England Development

8 Company; so...

9      Q.  I muddied the waters.  I apologize.

10      A.  Just real quick, in initial discussions

11 they brought -- they made statements relating

12 the two projects or two properties; but...

13      Q.  The Showe family, or New England

14 Development, sought to develop a hotel near the

15 Worthington Inn is probably more accurately

16 stated; is that fair to say?

17      A.  They made -- they came before council

18 and talked about the possibility of making a

19 proposal for the development of a hotel.  And

20 the expansion of the CRA to include that

21 property was important to them as a preliminary

22 step for them to consider moving forward.

23      Q.  Was the CRA ultimately expanded, if you

24 recall?

1    A.  It was.

2    Q.  Okay.  And this does not bear upon the

3  UMCH property, fair to say?

4    A.  It was -- in my mind, it's an unrelated

5  issue.  I mean, it's related in that they're

6  both in Worthington, but there's no direct

7  correlation.

8    Q.  Fair to say, based upon your review of

9  these emails, you didn't care to have the

10  Worthington Partnership weighing in on the

11  issue, though?

12    A.  Yeah, I felt it was inappropriate for

13  a -- I think I described them earlier as a quasi

14  governmental entity, one that receives public

15  funds, to be taking a strong position, lobbying

16  essentially on one -- on an issue like that

17  that's -- yeah, it's a contentious issue in the

18  community.

19    Q.  In fact, on the first page, in an email

20  to Mr. Greeson, if I may, you expressed a

21  concern --

22    A.  Yeah, right here.

23    Q.  Thank you.

24        Is WP going to start lobbying on the

1    issue of UMCH, et cetera?

2         Did they, to your recollection?

3         A.  Never publicly overtly that I know of.

4         Q.  Okay.  Did they ever lobby or try to

5    persuade you regarding that project?

6         A.  Which project?

7         Q.  The project on the UMCH property.

8    Lifestyle Communities' proposal.  Excuse me.

9         A.  First of all, when we talk about WP, are

10   we talking about as an organization or

11   individual --

12        Q.  Yeah, I'll withdraw that question.

13        Do you recall the Worthington

14   Partnership, or any of its members, seeking to

15   persuade you to approve or deny the Lifestyle

16   Communities' proposal?

17        A.  I want to answer carefully because WP, I

18   don't know all the members or all the staff.  I

19   have not and never tried to persuade the key

20   members, the leadership, Annina Parini, and one

21   or two other folks I know and associate with WP,

22   I've not had any kind of extensive conversations

23   with them about UMCH.

24        Q.  Okay.

1     A.  They never lobbied me, I know that.

2                    -=0=-

3          (Deposition Exhibit 106 marked.)

4                    -=0=-

5   BY MR. MILLER:

6     Q.  This question about Exhibit 106 may

7   sound familiar to you by now, Mr. Robinson.

8   Does Exhibit 106 appear to be a true and

9   accurate copy of a blog post that you put on

10  your blog on December 14th, 2021?

11    A.  It does.

12    Q.  You know what, this has been previously

13  marked.  I've got it.  It's Exhibit 6.  Put that

14  binder aside for a moment, Mr. Robinson.  I'd

15  like to ask you about what we've had previously

16  marked as Exhibit 6.

17        We talked about this previously today,

18  but is this the emergency moratorium ordinance

19  that you introduced at council's meeting on

20  January 18th, 2022?

21    A.  Yeah, this appears to be.

22    Q.  Did you draft this ordinance,

23  Mr. Robinson?

24    A.  I'm pretty sure that I drafted this in

1  conjunction with law director, Tom Lindsey.

2      Q.  I don't care if you disclose any

3  communications you had with Mr. Lindsey, but

4  it's your belief that you and he drafted this

5  either together or portions of it?  How did that

6  work exactly?

7          MR. SCHUMACHER:  Objection.  To the

8  extent that --

9          MR. MILLER:  It was inartful?  That's

10  fine.

11          MR. SCHUMACHER:  Obviously, it may

12  request communications with counsel.

13          MR. MILLER:  Fair enough.  Withdrawn.

14  BY MR. MILLER:

15      Q.  Without disclosing any communications

16  you had with Mr. Lindsey, to your recollection,

17  how did you work together to prepare Ordinance

18  04-2022?

19          MR. SCHUMACHER:  Again, object.  I think

20  he's answered that.  And anything further really

21  does invade the attorney-client communication.

22  But it is what it is, Joe; so...

23      A.  Yeah, the process would have been I

24  would have communicated with him and he with me.

1    Q.  Who is the primary drafter or author of

2  this ordinance?

3        MR. SCHUMACHER:  Same objection.

4    A.  Yeah.

5        MR. MILLER:  No, that does not -- I

6  understand your objection for the record.

7    Q.  But who was the primary author of this

8  ordinance?

9    A.  I can't say.

10    Q.  It's a combination of both your work

11  efforts?

12        MR. SCHUMACHER:  Same objection.

13    A.  Yeah, I can't say.  He and I spoke with

14  one another and collaborated.

15    Q.  Okay.  When was it drafted?

16    A.  I don't recall exactly when.  Obviously,

17  before the January 18th meeting.  I don't know

18  whether it was a week before, two weeks, day

19  before.  I can't remember.  But in the month of

20  January.

21    Q.  Okay.  Other than Mr. Lindsey, did

22  anyone else provide input to you on this

23  ordinance prior to its introduction that

24  evening?

1      A.  Well, broad answer would be, yeah,

2   hundreds of people over a decade.

3      Q.  I'm sorry, I'm asking specifically about

4   Ordinance 04-2022, as drafted, did you receive

5   input from anyone else on this ordinance prior

6   to its introduction?

7      A.  I don't recall.  It's so interrelated,

8   there's so many other issues I don't recall the

9   exact nature of how the wording and the issues

10  were formed.

11     Q.  Why did you seek its passage that

12  evening?

13         MR. SCHUMACHER:  Objection.  Relevance.

14         You can answer.

15     A.  It would have enabled the city to have

16  breathing space and time to reconsider the

17  comprehensive plan, to engage the public on the

18  issue.  We had just gotten through a 14-month

19  process that was unproductive for all parties,

20  and so it really was an effort, which I think,

21  as you know, ultimately failed, didn't get the

22  votes needed, to give us breathing space and to

23  sort of reset how we were approaching the issue

24  and engaging a property owner.

1      Q.  Why did you seek to have it passed as an

2  emergency?

3      A.  So that it would go into effect

4  immediately.

5      Q.  You felt that was necessary?

6      A.  Desirable.

7      Q.  Why?

8      A.  The sooner the better.

9      Q.  I should have asked this earlier, at

10  least in this fashion, so perhaps you can

11  understand it.  To whom, if anyone, did you

12  provide drafts of this ordinance in advance of

13  its introduction, other than your collaboration

14  with Mr. Lindsey?

15      A.  I don't recall.  I know that -- I don't

16  recall whether the document was actually

17  distributed at all beforehand.  Maybe it was.  I

18  can't recall.  If so, it would have been to

19  council colleagues, but I don't remember.

20      Q.  Now, you're aware that Lifestyle was not

21  informed of your intention to propose and vote

22  on this ordinance that evening, January 18th,

23  2022?

24      A.  State the question again, please.

1            (Record read as requested.)

2      A.  I don't know whether Lifestyles was

3  informed or not.  I don't know all their sources

4  of information and so forth, so I don't know.

5      Q.  Do you recall that it wasn't listed as

6  an agenda item for that evening's meeting?

7      A.  I do.

8      Q.  You also introduced a resolution that

9  evening, 04-2022, correct?

10      A.  Do you have it?

11      Q.  This has been previously marked as

12  Exhibit 7.  If you'd turn to Exhibit 7, please.

13  Do you recognize Exhibit 7, Mr. Robinson?

14      A.  I do recognize it.  Yes.

15      Q.  It's a resolution that you introduced on

16  January 18th, 2022, to amend the comprehensive

17  plan as it related to Lifestyle Communities'

18  property, correct?

19      A.  As related to the United Methodist

20  Children's Home focus area and comprehensive

21  plan, yes.

22      Q.  We discussed previously how you drafted

23  the attachment to Resolution 04-2022, correct?

24      A.  Your question is?

1      Q.  We've already discussed how you drafted

2   the update to the comp plan attached to this

3   resolution, correct?  Do you recall that

4   discussion this morning?

5      A.  Earlier today?

6      Q.  Yes.

7      A.  I'll take your word for it.

8      Q.  Okay.  What was the purpose of this

9   resolution?  Why did you draft it?

10      A.  As we have discussed multiple times

11   today, based on multiple sources of public

12   opinion, the 2013-14 UMCH area comp plan update

13   did not reflect broad public opinion, and the

14   result of that was a cycle of unproductive

15   activity and inactivity not benefiting any of

16   the interested parties, including property

17   owner, developer, city residents.

18         And that in order to establish the basis

19   of a productive way forward, the updating of the

20   comp plan to more closely align with broad

21   public opinion was a necessary step.  And the

22   resolution and the specific elements were

23   articulated in a way that, in my judgment,

24   reflected the general contours of public opinion

1    of a mixed-use development including commercial,

2    residential, and contiguous green space.  And

3    with enough flexibility in the language to

4    accommodate a range of plans, is the way I

5    thought of it as I drafted the language.  So it

6    really was an effort to break out of a cycle of

7    unproductive state of things.  So that's why --

8    that's why the action was taken.

9        Q.  Since you've been in office,

10   Mr. Robinson, have you required any other

11   property within the City of Worthington to be

12   developed with a large contiguous green space

13   central to the property?

14       MR. SCHUMACHER:  Objection.

15       You can answer.

16       A.  State the question again, please.

17       (Record read as requested.)

18       A.  The UMCH property would be the only

19   property in which that could be done, so the

20   answer would be no.

21       Q.  Would you agree with me that Resolution

22   Number 04-2022 did not appear on the public

23   agenda that evening for City Council's meeting

24   on January 18th, 2022?

1      A.   That's correct.

2           Can we take a break?

3      Q.   Sure.

4           (Recess.)

5   BY MR. MILLER:

6      Q.   Turn, if you would, in that binder to

7   Exhibit 9.

8      A.   It's a thick packet.  Anything

9   specifically?

10      Q.   Well, take what time you need.  I just

11   want to ask you, does this appear to be a true

12   and accurate copy of the minutes from the

13   meeting of Tuesday, January 18th, 2022?

14           MR. SCHUMACHER:  We'll stipulate.

15           MR. MILLER:  Say that again.

16           MR. SCHUMACHER:  We'll stipulate that it

17   is.

18           MR. MILLER:  Okay.  Great.

19           MR. SCHUMACHER:  In the interest of

20   time.

21           MR. MILLER:  Sure.

22      A.   I would say one thing.  The minutes are

23   not a transcript.  They're often in dispute and

24   very few people read them to check for accuracy.

1  So I will say these are the minutes, yes, but as

2  to the accuracy of the discussion, if that's an

3  issue, then I'm not willing to say I agree with

4  that.

5      Q.  Sitting here today, do you recall at the

6  next meeting whether you objected to any portion

7  of the minutes prior to their approval?

8      A.  I don't remember, but I don't think I

9  did.  Again, I almost never read the minutes and

10  look for accuracy, but I don't recall.

11      Q.  Is it fair to say that Ordinance 04-2022

12  and Resolution 04-2022 were discussed late at

13  night on Tuesday, January 18th, 2022?

14      A.  I think they were toward the end of the

15  meeting.

16      Q.  And the meeting let out after midnight,

17  correct?

18      A.  I don't remember.

19      Q.  But at least the minutes, if we look at

20  the last page --

21      A.  I know it was a long meeting.

22      Q.   -- reflect that the meeting concluded

23  at 12:09 a.m.?

24      A.  Okay.  Yeah.  I usually try to keep the

1  meetings short, but that was an exception, that

2  evening.

3  Q.  And this meeting, if you recall, was, in

4  fact, your first meeting as the president of

5  council?

6  A.  No, I don't think so.

7  Q.  There was an organizational meeting that

8  predated this?

9  A.  I'd have to look -- let's see, this was

10  on Tuesday, the 18th.  So it would have been

11  Monday the 17th, backing out the 10th, so it was

12  probably the third meeting, because I think -- I

13  think the organizational meeting would have been

14  Monday, the 3rd, and then there would have been

15  a meeting on the 10th, and then 17th, but since

16  that's MLK day -- so it would have been the

17  third meeting, I think.

18  Q.  If you could, I'm guilty of this, as

19  well.  If we can just keep our voices up for the

20  court reporter.

21  A.  Sure.

22  Q.  But you would agree with me, this was

23  the month, January 2022, in which you were first

24  elected president of council?

 1     A.  Yeah.

 2                    -=0=-

 3     (Deposition Exhibit 107 marked.)

 4                    -=0=-

 5          MR. SCHUMACHER:  I could be wrong, but I

 6     think we've already marked this as well.

 7          MR. MILLER:  Well, unless you want to

 8     comb through 106 of them to find it, let's go

 9     with it.

10          MR. SCHUMACHER:  If you give me just a

11     second, I bet you I can find it.

12          MR. MILLER:  If you care to.

13          MR. SCHUMACHER:  Well, let's take a

14     shot.  You know, I've been here a lot --

15          THE WITNESS:  Looks good to me.  I don't

16     remember Phil Hein.

17          MR. SCHUMACHER:  Hang on a second.  I

18     give up.  I thought I could find it quickly,

19     Counselor.  I couldn't.  But I think it has been

20     marked.

21     BY MR. MILLER:

22     Q.  Mr. Robinson, in the middle of the first

23     page of Exhibit 107, to approximately the middle

24     of the second page of 107, is that an email that

1    you sent to Phil Hein on Friday, January 21 --

2    excuse me, Friday, January 21st, 2022, at 1:03

3    p.m.?

4        A.  I'm reading it.

5            Okay, the question again, please?

6        Q.  Sure.  The middle of the first page of

7    Exhibit 107, through approximately the middle of

8    the second page of Exhibit 107, a three-page

9    exhibit, is that an email that you sent to Phil

10   Hein on Friday, January 21st, 2022, at 1:03

11   p.m.?

12       A.  That's what it says, yes.

13                      -=0=-

14           (Deposition Exhibit 108 marked.)

15                      -=0=-

16   BY MR. MILLER:

17       Q.  I know it's a long document.  If it's

18   helpful to you in your review with it, as with

19   many of these blog posts, my question is simply,

20   does this appear to be a true and accurate copy

21   of a post that you put on your blog on January

22   30th, 2022?

23       A.  It does appear as such.

24       Q.  Thank you.

1                    -=0=-

2          (Deposition Exhibit 109 marked.)

3                    -=0=-

4          MR. SCHUMACHER:  Been here long enough

5     the grass has grown.

6              THE WITNESS:  I guess they're blowing

7     leaves.

8              Mr. Miller, I have reviewed the

9     document.

10    BY MR. MILLER:

11       Q.  Do you recognize Exhibit 109 as an email

12    exchange between you and Mr. Brownlee, a

13    representative of Lifestyle Communities?

14              MR. SCHUMACHER:  Objection.  Note my

15    objection to the email exchange between the

16    parties.  Obviously Rule 408 settlement

17    negotiation occurring, apparently unsuccessful,

18    but note my objection.

19              MR. MILLER:  Note my disagreement to the

20    word obviously, but the record will speak for

21    itself.

22    BY MR. MILLER:

23       Q.  You do recall this as an email exchange

24    between you and Mr. Brownlee in March of 2022?

1          A.  I do.

2          Q.  You had suggested, looking at your email

3     on the second page of Exhibit 109, that a

4     meeting take place between the city and

5     Lifestyle Communities to discuss your UMCH

6     property and the way forward?

7               MR. SCHUMACHER:  Same objection.  Also

8     misstates the document.

9          Q.  Is that what you requested in your

10    email, Mr. Robinson?

11         A.  Yeah, requested a meeting between the

12    city and Lifestyle Communities to discuss your

13    UMCH property and the way forward.  Those are my

14    words.

15         Q.  Mr. Brownlee responded on the first page

16    of the exhibit that same day.  And while I

17    certainly don't expect you to concede to

18    anything he's written in this email, we can

19    agree that he said, please send me the written

20    proposal?

21              MR. SCHUMACHER:  Again, I renew my

22    objection.

23              MR. MILLER:  You can have a continuing

24    objection, Paul, but you can also let your

1  witness answer these questions.

2       MR. SCHUMACHER:  I'm just objecting to

3  the 408 evidence rule.  Objection.

4  BY MR. MILLER:

5     Q.  Mr. Brownlee asked that you please send

6  the written proposal to him?

7     A.  Yeah.  I was -- from what I recall, I

8  was disappointed in Mr. Brownlee's response.

9  Council being under new leadership, I felt there

10  was an opportunity to have productive

11  conversation, especially after the 14-month

12  process that the city and Lifestyles has gone

13  through unproductively.  So frankly, I was a bit

14  taken back.  I would have thought that he would

15  have been interested and willing to sit down

16  with me.

17     Q.  And you never did send him a written

18  proposal; is that correct?

19       MR. SCHUMACHER:  Same objection.

20     A.  My experience in business and in life,

21  getting together and talking is the most

22  fruitful way to develop productive

23  relationships.  You can see people's reactions,

24  you can -- when you're in face-to-face dialogue

1    with people, you have the opportunity to

2    communicate on multiple levels.  And this was

3    sent really in the context of it's been years of

4    partial, limited, at times silent communication,

5    and my outreach was let's get together and talk.

6    And his reply was saying I'm just posturing,

7    which I was not.

8        Q.  And I'm not interested in arguing any of

9    that with you, Mr. Robinson.  My question was

10   simply, you never did send him a written

11   proposal, correct?

12        MR. SCHUMACHER:  Well, given the lawsuit

13   was filed a week later --

14        MR. MILLER:  Who's testifying, you?  Are

15   you testifying now?  You're the witness?

16        MR. SCHUMACHER:  Come on, Joe.

17        MR. MILLER:  It's a simple yes-or-no

18   question.

19        MR. SCHUMACHER:  You filed the lawsuit a

20   week after this email.

21        MR. MILLER:  So since you're testifying

22   for the witness, is the answer no, I never sent

23   him --

24        MR. SCHUMACHER:  I can enforce my

 1   objection to a 408 settlement discussion which

 2   apparently you weren't in.

 3        MR. MILLER:  Which you made four times

 4   now for the record.

 5        MR. SCHUMACHER:  Okay.  Let's move on.

 6   BY MR. MILLER:

 7     Q.  Is the answer to my question,

 8   Mr. Robinson, you never did send a written

 9   proposal in response to this?

10        MR. SCHUMACHER:  Same objection.

11     A.  Prior to the lawsuit being filed, we did

12   not have the opportunity to do that.  Yeah.  So

13   that pretty much shut down this ability to

14   engage.

15     Q.  Instead, you expressed to Mr. Brownlee

16   an interest in the city's acquisition of the

17   land in its entirety, correct?

18        MR. SCHUMACHER:  Same objections.

19     A.  What I stated here was, we suggest that

20   we meet to cordially discuss options for a way

21   forward, including city acquisition of the land

22   in its entirety, while recognizing your

23   expectations to realize a reasonable profit on

24   the transaction.

1    Q.  That was of interest to you and the city

2    after denial of the rezoning application,

3    acquisition of the land in its entirety?

4         MR. SCHUMACHER:  Objection.

5    A.  I'm sorry.

6    Q.  I can repeat it if you'd like.

7    A.  Yeah.

8    Q.  After the denial of the rezoning

9    application, that was of interest to you and the

10   city, that being acquisition of the land in its

11   entirety?

12        MR. SCHUMACHER:  Objection.

13   A.  Yeah.  Again, the purpose of the

14   outreach to Mr. Brownlee was to sit down with no

15   agenda to discuss all options available to all

16   parties.

17   Q.  And the one option you mentioned

18   specifically in Exhibit 109 was the acquisition

19   of the land by the city in its entirety,

20   correct?

21        MR. SCHUMACHER:  Objection.  Rule 408.

22   A.  Yeah.

23   Q.  Was that yes?

24   A.  No.  The --

1      Q.  I mean, what did I misstate about the

2   email, sir?  The one option that you mentioned

3   to Mr. Brownlee, after denial of the rezoning

4   application, was acquisition by the city of the

5   land in its entirety, correct?

6          MR. SCHUMACHER:  Objection.  408.

7      A.  No, that's not accurate.

8      Q.  Tell me how that's inaccurate when you

9   say, options, and the only one you mention is

10  city acquisition of the land in its entirety?

11  Is that the only option you raised?

12         MR. SCHUMACHER:  Objection.

13  Argumentative.

14     A.  The purpose of the email, and the way I

15  would hope it would have been received by

16  Mr. Brownlee, was let's get together and talk,

17  let's look at options.

18     Q.  And recognizing that you're under oath,

19  my question is simple:  And the option that you

20  mentioned in this email that was of interest to

21  the city, after denial of the rezoning

22  application, was acquisition of the land in its

23  entirety, correct?

24         MR. SCHUMACHER:  Objection.  Compound

1   question.

2       A.  The --

3       Q.  Correct?

4           MR. SCHUMACHER:  Same objection.

5       A.  I'm going to answer.

6       Q.  I'm waiting.

7       A.  But I'm not -- the message to

8   Mr. Brownlee was let's meet and discuss options,

9   including the possibility of acquisition and

10  Lifestyles realizing a profit.

11      Q.  That was of interest to the city after

12  the denial of the rezoning application, correct?

13      A.  Well, keep in mind, this was me, a

14  councilmember, writing to Mr. Brownlee.  I'm not

15  speaking for the city.  This is me writing him

16  as an elected official.

17      Q.  So you potentially were interested in

18  that outcome, acquisition of the land in its

19  entirety by the city?

20          MR. SCHUMACHER:  Same objection.  Rule

21  408.

22      Q.  Correct?

23      A.  As an elected official, my

24  responsibility is to advocate and represent

1    public interest, and that possibility has been

2    raised and discussed countless times in the

3    public for ten years.  That is what I was

4    conveying.

5        Q.  You were conveying that that option was

6    of interest to you, correct?

7            MR. SCHUMACHER:  Objection.

8        A.  You're not listening to what I just

9    said.

10       Q.  One day a Judge and a jury are going to

11   listen to what you've said, and they're going to

12   know you're not answering this question, even

13   though it's plain as day on the face of the

14   document, Mr. Robinson.  Good luck to you.

15           MR. SCHUMACHER:  Objection.  Move to

16   strike the comment of counsel.

17           Do you have any more questions for the

18   witness?

19           MR. MILLER:  Let me see if I do.  He's

20   given us plenty to work with.

21           MR. SCHUMACHER:  I know he has.

22           THE WITNESS:  Mr. Miller, do you want to

23   take a break?  Can we take a five-minute break?

24           MR. MILLER:  Sure.

1          (Recess.)

2          MR. MILLER:  I have no further questions

3   at this time.  Thank you.

4                        -=O=-

5          Thereupon, the testimony of October

6   31, 2023, was concluded at 3:02 p.m.

7                        -=O=-

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1                    CERTIFICATE

2    STATE OF OHIO       :
                            SS:
3    COUNTY OF FRANKLIN :

4          I, Rhonda Lawrence, a stenographic
     court reporter and notary public in and for the
5    State of Ohio, duly commissioned and qualified,
     do hereby certify that the within-named DAVID
6    ROBINSON was first duly sworn to testify to the
     truth, the whole truth, and nothing but the
7    truth in the cause aforesaid; that the testimony
     then given was taken down by me stenographically
8    in the presence of said witness, afterwards
     transcribed; that the foregoing is a true and
9    correct transcript of the testimony; that this
     deposition was taken at the time and place in
10   the foregoing caption specified.

11         I certify that I am not a relative or
     employee of any attorney or counsel employed by
12   the parties hereto and that I am not financially
     interested in the action.  I further certify
13   review of the transcript was not requested.

14         In witness whereof, I have hereunto
     set my hand at Columbus, Ohio, on this 14th day
15   of November, 2023.

16

17

18

19

20
                 *Rhonda Lawrence*
21
                 Rhonda Lawrence
22               Notary Public, State of Ohio

23   My commission expires:  October 9, 2028

24

## Exhibits

**Exhibit 6** 131:13,16

**Exhibit 7** 136:12,13

**Exhibit 9** 139:7

**Exhibit 31** 58:11

**Exhibit 32** 60:15 61:8 64:10,11,16 65:9 67:5

**Exhibit 34** 92:21 93:4 95:7 98:3

**Exhibit 42** 59:4 61:5

**Exhibit 61** 120:5,14, 19

**Exhibit 85** 25:6

**Exhibit 86** 26:24

**Exhibit 87** 30:8,11

**Exhibit 88** 38:24 39:4

**Exhibit 89** 42:17,21 46:5

**Exhibit 90** 46:22 47:8 49:15

**Exhibit 91** 49:21 50:12

**Exhibit 92** 53:13 55:7

**Exhibit 93** 54:15,18 56:7

**Exhibit 94** 66:10,17, 18 67:3

**Exhibit 95** 71:17 74:16

**Exhibit 96** 75:3,6 81:7

**Exhibit 97** 81:1 82:12, 13 85:3

**Exhibit 98** 83:18,20

**Exhibit 99** 99:11 102:3,4

**Exhibit 100** 104:5,8

**Exhibit 101** 104:14

**Exhibit 102** 110:13, 17,23 113:24 114:7

**Exhibit 103** 119:5,9, 24

**Exhibit 104** 123:7,11

**Exhibit 105** 126:10, 14,15

**Exhibit 106** 131:3,6,8

**Exhibit 107** 142:3,23 143:7,8

**Exhibit 108** 143:14

**Exhibit 109** 144:2,11 145:3 149:18

## -

-=0=- 25:5,7 30:7,9 38:23 39:1 42:16,18 46:21,23 49:20,22 53:12,14 54:14,16 66:9,11 71:16,18 75:2, 4 80:24 81:2 83:19,21 99:10,12 104:6,13,15 110:12,14 119:4,6 123:6,8 126:9,11 131:2,4 142:2,4 143:13,15 144:1,3

-=O=- 102:24 103:3 104:4 153:4,7

## 0

04-2022 132:18 134:4 136:9,23 138:22 140:11,12

## 1

1 114:7

1,200 20:5

1-31-2020 67:22

1-8-18 44:7

10-14 124:1

100 75:8,10 104:5,8

101 104:14

102 110:13,17,23 113:24 114:7 119:10

103 119:5,9,24 120:15

104 123:7,11

105 126:10,15

106 131:3,6,8 142:8

107 142:3,23,24 143:7, 8

108 143:14

109 144:2,11 145:3 149:18

10th 141:11,15

11 63:4

11:06 75:16

11th 110:23 120:2

12- 90:11

12-29-17 43:18

12:09 140:23

12:24 103:2

13-member 117:5

13th 82:19 83:5

14 96:9,15,17

14-month 96:12 134:18 146:11

148 11:2

14th 121:3 131:10

150 10:5,20 11:1

15th 126:21

16 12:2

17 12:2

17th 72:2 141:11,15

18-month 90:12

1803 107:4

18th 32:6 123:13 131:20 133:17 135:22 136:16 138:24 139:13 140:13 141:10

19th 49:16

1:03 143:2,10

1:13 104:3

## 2

2 104:18

20 8:16,20 16:5,9,14 24:8 82:1 93:13 107:6

20-day 16:2

2009 9:12,13

2012 13:20

2013 23:18 94:17

2013-14 96:8,18 111:18 137:12

2014 9:18 33:23 35:5, 18 37:10,18 75:22 94:17

2015 9:14,16 11:18 12:2 14:9 31:21 32:24 34:14,19 37:12 52:4 107:8

2016 39:19,23 42:4 45:11,14,21 86:19

2017 9:5 13:3 18:2 43:10 44:2 45:12,15, 22

2018 9:7 11:13 20:13 23:19 37:14 46:6 49:16 50:15 54:8 55:12 56:14 57:6,11 77:16 84:20 116:8,10

2019 64:2 71:19 72:2 116:8,10

2020 61:10 75:15 76:9 77:2,8 81:13,16,19 82:2,10,19 83:5 93:9, 14 94:2 96:5 98:11 99:17 104:10

2021 104:20 106:11 109:10 110:23 120:3 121:3 123:13 126:22 127:11 131:10

2022 9:4 37:24 89:21 91:16 92:8 99:2 131:20 135:23 136:16 138:24 139:13 140:13 141:23 143:2,10,22 144:24

2023 27:2 104:1 153:6

**21** 24:8 81:24 117:16
 143:1

**21st** 73:17 98:11
 143:2,10

**22** 29:3 38:2,14 46:17
 81:24 90:18 91:20,24
 92:16 99:7

**23** 118:4

**23rd** 50:15

**24** 90:10

**24th** 104:10

**25.5** 65:15

**27th** 104:20 106:11

**29** 40:4

**29th** 39:23 54:8 99:17

**2:41** 104:21

**2nd** 9:3 46:6

---

**3**

**3** 69:4

**30** 7:17

**300-plus** 24:11

**30th** 143:22

**31** 58:11 66:18 104:1
 153:6

**31st** 43:9 44:1

**32** 60:15 61:8,24
 64:11,16 65:9 67:5

**34** 92:21,22 93:4 95:7
 98:3

**37** 17:16

**38** 14:9,11,24 15:14
 40:22

**3:02** 153:6

**3rd** 9:3 141:14

---

**4**

**4** 65:8,12 97:5 98:2

**4-13** 85:18

**408** 144:16 146:3
 148:1 149:21 150:6
 151:21

**42** 59:4 61:5

**4th** 42:4

---

**5**

**50** 7:23

---

**6**

**6** 26:5 131:13,16

**6-24-15** 30:17

**60** 16:14

**61** 120:5,14,19

**6:25** 99:17

---

**7**

**7** 25:18 136:12,13

**700** 14:19

---

**8**

**80** 24:13

**85** 25:6,9

**86** 25:6 26:24

**87** 30:8,11

**88** 38:24 39:4

**89** 42:17,21 46:5

---

**9**

**9** 139:7

**90** 24:13 46:22 47:8
 49:15

**91** 49:21 50:12

**92** 53:13 55:7,8

**93** 54:11,15,18 56:7

**94** 66:10,18 67:3,14,15

**95** 71:17 74:16

**96** 75:3,6 81:7

**97** 81:1 82:13 85:3

**98** 83:18,20

**99** 99:11 102:4

**9th** 75:15

---

**A**

**a.m.** 75:16 99:17
 140:23

**abilities** 12:14

**ability** 29:10 86:4
 122:7 148:13

**absolutely** 30:22
 83:15 84:7

**absorbed** 80:9

**abundant** 90:1

**accept** 67:10

**accidentally** 6:19

**accommodate** 138:4

**accord** 89:5

**accordance** 124:16
 125:4,11

**Accountability** 30:16

**accuracy** 139:24
 140:2,10

**accurate** 104:9 120:1
 123:12 131:9 139:12
 143:20 150:7

**accurately** 76:17
 128:15

**achieve** 15:1

**achieved** 89:18

**acknowledge** 32:11
 86:11 121:17

**acknowledged** 64:4

**acknowledging**
 36:21

**acquire** 72:17

**acquisition** 42:10
 47:11 48:15 148:16,21
 149:3,10,18 150:4,10,

**22** 151:9,18

**acreage** 17:12,21
 65:20,23

**acres** 17:16 65:15

**acrimony** 96:22

**acronym** 77:9

**acronyms** 40:7 41:11

**act** 33:7 36:14,15 37:3
 49:7 95:9,16 118:17

**acting** 33:3 41:13
 46:16 100:9,13 118:1
 122:24

**action** 33:13 68:2 82:9
 89:21 94:9 96:18,21,
 23 138:8

**actionable** 118:14

**actions** 80:7 102:14

**actively** 52:17 78:11

**activity** 108:1,10
 137:15

**actual** 15:24 29:10,13
 43:24 57:14 82:4,7

**ad** 11:2,4

**added** 8:18

**addition** 65:24

**additional** 92:5

**address** 121:10

**administration** 83:7

**admire** 13:20,23

**adopted** 68:3 91:19

**advance** 135:12

**advancing** 27:15

**advocacy** 45:14,20

**advocate** 53:22 55:10
 56:10 58:3 85:16
 151:24

**advocated** 89:13

**advocates** 77:21

**advocating** 52:1

**affairs** 9:14 10:7 15:19

**affect** 33:4

**affirm** 87:1

**affirms** 123:23

**aftermarket** 8:2

**AFTERNOON** 104:2

**agenda** 29:5,13,21
44:6,18 74:11 75:23
76:5 81:12 136:6
138:23 149:15

**agree** 17:11 18:18,20,
23 19:2,6,9,17,22
26:18 44:5 49:6,9
55:21 56:6 66:17
67:12 83:9 85:7 86:8
87:4 88:23 89:8 97:4,5
102:6 105:9 107:21
112:6 138:21 140:3
141:22 145:19

**agrees** 62:10

**ahead** 16:24 21:11
40:3 62:15 124:6

**align** 137:20

**Alliance** 13:13

**allowed** 81:9

**alphabet** 40:7

**alternative** 78:2

**alternatives** 62:8
64:24

**amend** 37:22 76:16
136:16

**amended** 68:1 89:13

**amending** 15:20

**amendment** 33:23
90:19

**American** 15:18

**amount** 90:11

**ample** 111:14

**analogous** 111:17

**analysis** 47:10 48:24
50:15 51:15 62:7,21
63:11 64:9 113:5

**analyzed** 48:14

**and/or** 71:7 72:12

**anecdotal** 23:11

**angles** 114:21

**Annina** 130:20

**annually** 80:4

**answering** 62:23
100:19 152:12

**answers** 67:17

**anymore** 88:5

**apartments** 21:24
36:6,8 109:12

**apologies** 101:23
105:20 127:9

**apologize** 16:22
82:12 84:11 128:9

**apparently** 20:20,24
32:5 45:4 48:4,5 60:8
73:9 144:17 148:2

**appealed** 68:1

**appeared** 50:13

**appears** 26:19 59:8
61:6 71:24 104:11,22
120:4 126:20 131:21

**applicably** 45:2

**applicant** 124:11

**applicant's** 100:21

**application** 68:14
77:3 149:2,9 150:4,22
151:12

**applications** 122:20

**applied** 92:9

**apply** 95:11,17

**approach** 86:21 87:1

**approaching** 69:10
134:23

**approval** 140:7

**approve** 109:16
130:15

**approximately** 8:14,
16 142:23 143:7

**April** 72:2 73:17 75:14
76:1,8 77:2,8 81:12,

16,19,21 82:18 83:5
110:23

**ARB** 24:10 107:11

**ARB/MPC** 32:9 96:12
121:5,8,23 122:1,4,9,
20 123:2

**architecture** 107:4

**archived** 36:18

**area** 80:8 128:3
136:20 137:12

**arguing** 147:8

**Argumentative** 88:19
150:13

**art** 80:13

**articulated** 137:23

**asks** 10:18 124:22

**aspect** 113:9 115:16

**asserting** 19:14

**assertions** 48:1 49:5

**assistant** 113:18

**associate** 130:21

**Associates** 72:5

**Association** 40:13
80:1

**assume** 41:22

**assured** 106:12,18

**attached** 126:23
137:2

**attachment** 127:3,8
136:23

**attempt** 85:17 115:22

**attempted** 114:18

**attempting** 13:23
34:19

**attempts** 125:16

**attention** 34:6 43:4
50:21 51:6,7 99:24
104:18 106:9 126:18

**attest** 44:22

**attorney-client**
132:21

**attract** 86:5

**attribute** 113:20

**audience** 23:16 32:8

**August** 42:4 54:8

**author** 133:1,7

**authored** 30:18 31:19

**authority** 34:3 124:4

**authorized** 74:22

**auto** 8:3

**automotive** 8:2

**avoid** 96:1,23 97:7

**aware** 65:21 70:12,17,
23 71:2 100:11 119:20
120:10 125:2,7 135:20

**B**

**back** 9:18 12:1,16
13:3,20 17:24 20:12,
13 24:7 26:19 27:23
31:21 32:24 34:14
36:17,19 37:12 38:12
41:17 43:6 52:4 54:22
55:12 64:2 67:8 70:3
71:19 77:16 81:7
82:12 84:16 105:16,22
107:7 110:3 116:14
117:7,16 118:9,10
119:2 123:15 146:14

**back-and-forth** 106:1

**background** 74:6

**backing** 141:11

**bag** 36:1

**ballot** 14:12

**banking** 77:22

**based** 23:10,11 45:4
92:1 95:11,17 98:2
112:4,7 129:8 137:11

**basic** 19:15 22:19
65:2 73:19 83:14 84:2
85:20

**basically** 10:4 21:21
48:20 100:18 115:7
116:22

basing 124:4

basis 11:24 29:14 49:5 96:9,19 137:18

Bates 82:17,24 83:5 84:4 85:4,18

bathroom 61:19

bear 34:18 50:23 51:17 129:2

Beautiful 14:4,8,11, 13 15:17 16:2,13 17:1 32:2 40:14,18 46:2

began 11:12,13 37:15

begin 11:11 74:12

Beginning 104:19

begins 25:16 51:11 114:7

behalf 41:12 52:1 60:1 85:16

belief 37:18 132:4

believed 51:5 94:5

bell 105:1

benefit 108:24

benefiting 76:18 108:1,10 137:15

bet 142:11

big 16:18 28:20 62:1 115:4

binder 61:6,23 93:7 117:14 120:6 131:14 139:6

bit 8:17 67:6 146:13

bizarre 125:22 126:2

blanket 71:14

blocking 29:20,23

blog 11:6,9,10 12:5 104:9 120:1,2 123:10, 13 131:9,10 143:19,21

blowing 144:6

board 127:5,10

bodies 122:6

body 117:11 118:22

bold 67:12

boldly 36:9

Bonnie 39:9 43:9 72:1 86:19,20

bothering 50:7

bottom 36:6 42:2 67:24 69:5,12 83:10 99:15 123:20

bottom-up 116:23

bound 15:12

break 38:20 92:24 138:6 139:2 152:23

breathing 134:16,22

Brewer 118:5

bring 29:24 99:23

brings 10:12

broad 20:12,22 24:16 27:16 28:10,13 37:21 47:24 51:16 89:14 94:10 111:10 112:12 113:1 134:1 137:13,20

brought 7:5 38:3 50:3 89:14,19 94:10 128:11

Brown 99:21 121:3,9, 18

Brownlee 144:12,24 145:15 146:5 148:15 149:14 150:3,16 151:8,14

Brownlee's 146:8

Bucher 61:10

budget 49:1,4 63:13 90:9,11

build 109:7

building 77:12 78:4, 13,20 128:5

bullet 85:3,6

bureau 80:10

business 7:10,11,16, 19,21,23 8:6,8 9:18 74:6 77:21 80:1 86:13 146:20

busy 49:8 50:16 51:1

BWF 77:10

C

call 14:2 35:20 36:3 84:19,22,23 107:19

called 7:16 13:13 14:10,13 19:24 22:3 63:11 118:3 127:18

calling 24:14 33:12 34:6

calls 125:14

campaign 14:4,8,10, 12,20 15:17 16:5 27:2 32:2 40:21,22 52:16 109:19

capacity 33:4 36:14 60:9

care 12:12 35:4 88:16, 23 129:9 132:2 142:12

carefully 62:23 130:17

case 34:5 43:3 69:24

catch 12:23

categories 65:4

caused 64:11

center 25:11 86:16 112:24

central 107:11 108:20 138:13

certified 6:3

cetera 130:1

CH 41:3

chain 43:5

challenging 86:11

chance 38:18

change 16:20 37:22 74:8 79:15 94:20 108:19 109:1 115:18

changed 89:13

changing 115:18

characterize 78:22

charged 80:12

charter 15:21 124:15 125:3,9,14,21,23 126:8

check 139:24

cherrypick 41:6 69:7

Children's 20:14 136:20

choose 37:1,6

chose 37:9

CHW 40:23,24

Circling 17:24

circulating 95:24

cited 96:7

citing 113:2

citizen 11:21 16:4 34:19 60:24

citizen's 13:19 55:10 56:10

citizen-led 40:20

citizenry 11:24 19:18

citizens 10:3 13:23 15:19 16:13 19:15 20:18 21:2 41:18,24 59:14,16 60:24 61:1 68:8,12 107:18 108:13

city 7:6 8:22 9:1,13,24 10:8 11:14,17,21 12:3, 10 13:7,8,18 15:21 16:17 18:2 19:16,17, 21 20:17 21:1,15 22:18 24:2,5,6,9,20 28:17,22 29:6,14,17 32:8,10 33:2,13 34:16 41:21 42:10 44:6 45:14 46:12,16,18 48:11 49:1,4,10,13 51:1 52:3,8,17,18 53:5 54:7 58:2 59:15 61:16 63:2,12,24 64:12 66:22 70:12,24 72:17 73:12,23 74:4,21 76:21 78:10 80:4,9 83:7 86:7,10,13,18 91:10 93:13,17,20 96:1 97:8 99:18,21 113:18 115:8,18

116:1,13 117:24
124:7,9,14,15 125:2,3,
9,10,14 127:24 134:15
137:17 138:11,23
145:4,12 146:12
148:21 149:1,10,19
150:4,10,21 151:11,
15,19

**city's** 19:20 33:15
47:11 53:8 68:24
96:12 112:24 124:16
148:16

**civic** 9:8 10:7

**claim** 111:18

**claimed** 33:24

**claiming** 34:3

**claims** 34:2,13 37:19

**clarification** 21:10

**clarify** 84:5

**clarity** 115:9,21

**clear** 14:9 15:11 17:9
23:21 46:3 53:8 57:4
73:4 83:22 86:21

**clients** 8:11

**Climate** 94:20

**closely** 137:20

**co-chairs** 118:7

**co-owner** 7:15,18

**code** 124:7,9 125:21
126:8

**cogent** 94:14

**coherent** 32:22

**coinciding** 11:14

**Coke's** 119:1

**collaborated** 133:14

**collaboration** 135:13

**colleagues** 94:7 97:6,
24 135:19

**college** 7:22

**Colonial** 41:2,3

**Columbus** 8:1

**comb** 142:8

**combination** 133:10

**comment** 58:9 79:20
87:11 101:5,9 107:17
152:16

**comments** 57:2
118:13

**commercial** 21:20
22:1,10 28:20 35:11
48:20 63:14 65:6 90:2
138:1

**commission** 111:12
114:22 115:5,11

**commitment** 52:15

**committee** 114:22
115:3,24 116:5,19
117:5 118:19

**common** 86:1 113:7

**commons** 22:4

**communal** 115:16

**communicate** 111:3
147:2

**communicated**
132:24

**communication**
66:21 73:23 74:19
132:21 147:4

**communications**
12:6 80:20 122:6
132:3,12,15

**Communities** 7:5
10:13 11:8 12:20 13:2
17:8,14 22:23 68:18
77:2 95:10,17 144:13
145:5,12

**Communities'** 64:17
68:10,13 70:13 71:12
78:15,21 80:18 87:20
90:20 92:9 94:3 99:5
100:3,22 102:8 106:4
112:9 121:13 130:8,16
136:17

**community** 9:10
12:12,17 13:4 14:17
15:20 16:20 17:3
19:24 22:3,18 25:11,
12,21 34:21 53:22

**comb** 142:8

54:20 59:13 60:3,11
61:2 85:10 86:13,22
87:9 96:1 107:3,13
108:1,10 109:17
115:9,10,15,22 129:18

**comp** 34:12 35:5
37:10,18,20 38:16
47:14,17 68:2,15,19,
24 76:12,13,16,19
77:6 81:11 82:2 90:6,
12,17,19 91:9 92:2,8
94:22,24 95:3 96:8,18
97:7,11 98:1,10 99:4,9
111:18 113:2 137:2,
12,20

**company** 127:17
128:8

**compatible** 34:11

**compelled** 24:18

**completely** 57:19
97:2

**complicated** 31:8
45:24 89:4,7

**complicit** 52:12

**comply** 125:23

**composition** 117:4

**compound** 15:2,12
45:17 56:1,19 95:13
97:12,15,21 150:24

**comprehensive**
33:23 44:8,19,20
66:24 75:22 76:4 94:2
95:12,18 114:13,15
124:16 125:4,12,20
134:17 136:16,20

**concede** 145:17

**conceivable** 16:10

**concepts** 118:4

**conceptual** 25:17
26:1,14 27:4,9,20

**concern** 17:3 105:5
106:6 122:24 129:21

**concerned** 77:1

**concise** 89:23

**conclude** 52:23 74:16

**concluded** 140:22
153:6

**conclusion** 124:22
125:15

**conclusions** 35:5

**conduit** 12:6

**conference** 50:9

**conflict** 53:3

**conform** 22:7 28:15

**conforming** 21:21

**conformity** 22:21
42:13 89:14,19

**conforms** 20:22
22:23 23:3 89:24
97:10

**confused** 114:5

**confusing** 124:24

**conjunction** 132:1

**connection** 111:17

**conscious** 33:18
115:21,22

**consciously** 36:24
37:6

**consensus** 34:1,2,13
35:20 37:19,21 76:15
95:1 111:19

**consideration** 91:22
109:3 121:13

**considerations** 49:2

**considered** 53:21

**consistent** 65:17
100:16 102:6 110:7
111:10

**consistently** 96:7
110:10 113:14

**constituent** 105:4
106:2

**Constitution** 19:7

**constructed** 106:21

**constructive** 111:20

**consultants** 92:4

consultation 29:15

contacted 74:19

contained 85:21

content 40:1

contentious 129:17

context 51:11 55:12 147:3

contiguous 22:2,22 23:7 24:11 35:15,24 110:10 112:15 138:2, 12

contingent 41:12

continue 56:10 97:15

continues 15:8

continuing 145:23

contours 137:24

contradiction 102:10

contrast 78:2

control 29:5

convention 80:10

conversation 26:17 43:17,24 44:13 47:18 146:11

conversations 34:9 51:24 130:22

conveying 111:8 122:15 123:1 152:4,5

cooperative 30:6

copied 93:13

copy 54:12 74:17 75:14 82:18 84:10,14 104:9 120:1 123:12 131:9 139:12 143:20

copying 83:6 99:17

cordially 148:20

core 11:20

Corporate 54:9

correct 11:8 14:10 21:8 30:19 40:9 42:7, 12 43:15,22 46:20 48:16 49:17 54:8 60:22 61:15 68:10,20,

23 71:1 77:4 82:11 83:8 88:24 91:16 93:23 95:12 97:11 98:3 99:2,6 100:1 106:2,19 108:2,16 109:23 112:2 119:11 121:14,19 122:1 136:9,18,23 137:3 139:1 140:17 146:18 147:11 148:17 149:20 150:5,23 151:3,12,22 152:6

correctly 21:24 48:5 63:10 96:4

correlation 129:7

cost-to-serve 48:24 63:11 113:5

costs 63:13

council 8:22 9:1,6,9 11:15,17,22 12:3,10 13:8,18 18:2 24:3,11 28:23 29:6,12,18 32:6, 8,24 34:23 36:3,7,11, 14,21,24 37:13,14,16 38:2,3 39:17 41:24 43:13 44:6,18 47:15 48:6 52:3 54:1,5,7 61:8,13,16 63:7 68:2 69:13 73:7 75:17,23 76:24 80:4 81:12 82:6, 24 83:6 86:18 87:14 90:7 93:12 94:7 96:15, 16,23 99:18,21 100:1, 23 109:14 116:1,7,16, 18,20 118:11,15 121:21 122:3 123:23 126:22 128:17 135:19 141:5,24 146:9

council's 98:10 131:19 138:23

councilman 58:2

councilmember 100:10,14,15 117:2 118:8 122:1 151:14

councilmembers 38:15 41:9 50:24 55:9 60:22 66:22 72:4 74:1 82:18 85:17 99:1 122:8

counsel 15:8 54:10 55:20 57:2 58:9 59:9

87:11 100:4,21,22 102:8 132:12 152:16

Counselor 142:19

counterpoint 77:23

countless 152:2

couple 23:18 95:19

court 141:20

COVID 94:18

CP 114:12,15

CRA 127:12 128:1,20, 23

created 12:5 115:24

creates 16:19

creating 10:1,2,9 80:12

creation 115:7 118:5

creative 8:12

Creek 65:24

cries 12:2

CROSS-EXAMINATION 6:4

cultural 115:19

current 92:4 111:21

cycle 137:14 138:6

## D

date 16:3 31:22 72:12 124:1

dated 66:18 67:22

dates 66:16 96:5

David 6:1 26:20 30:16 88:2

day 8:9,12 108:18 133:18 141:16 145:16 152:10,13

days 16:6,9,14 35:2 66:18 92:12,14

decade 134:2

December 9:17 43:9 44:1 46:17 96:15 131:10

decide 12:9 118:16

decision 33:18

declined 44:8,24

defensive 97:9

degree 14:6 50:21 51:6

deliberation 92:2

deliberative 90:5,16 91:4,15

delivered 63:24 93:17 122:8

demographic 115:18

denial 123:24 149:2,8 150:3,21 151:12

denied 124:12

denser 107:6

density 35:14,23 86:3

deny 96:15,16 130:15

dependent 29:11

depending 8:17 24:4

depends 128:6

depicted 26:14

deposes 6:3

deposition 6:8,9 25:6 30:8 38:24 42:17 46:22 49:21 53:13 54:15 66:10 71:17 75:3 79:10 81:1 83:20 97:16 99:11 104:5,14 110:13 119:5 123:7 126:10 131:3 142:3 143:14 144:2

describe 7:11,20 9:8 11:4 13:16 14:24 15:14 45:13,19 51:14 77:14 80:2 106:5 111:2 112:20 115:1

describing 25:20 43:16 60:2 110:8

descriptions 107:9

design 25:17 26:2,14 27:5,9,16,20

desirable 28:11 106:7

desire 23:6,20 34:10
70:6 115:19

detail 24:24

details 10:24 71:5
90:13

determined 111:12

develop 116:24
117:24 128:2,14
146:22

developed 85:9 87:8
108:23 113:4 138:12

developer 96:2,11,20
137:17

developers 47:23
59:15 71:1,3 86:14
89:17

developing 113:3

development 8:7
13:1,14 25:10 36:22
37:3 48:22 59:7 64:8
65:2 68:4,9 70:23 72:6
73:3,10 77:3 80:17
83:12,24 97:10 108:15
109:8,11 124:2 127:18
128:7,14,19 138:1

dialogue 21:17 52:7
73:19 74:2 86:2,15
146:24

differently 113:10

difficult 117:24

dinner 62:3

direct 43:4 74:10
104:18 126:18 129:6

directed 48:6 74:21
101:3 106:9

direction 100:14
113:19 114:19 116:20

directly 76:24 113:6
122:16 125:1

director 132:1

directors 127:5,10

disagree 100:20

disagreement 144:19

disappointed 146:8

disclose 132:2

disclosing 132:15

disconnect 12:4

discouraged 69:14

discourse 71:7

discovery 79:10

discuss 24:23 42:10
72:11 73:14 94:8 95:9
114:2 145:5,12 148:20
149:15 151:8

discussed 32:7 40:9
45:2,6 63:3 76:24
81:15 82:6 98:15
136:22 137:1,10
140:12 152:2

discussing 60:18,21
90:9

discussion 22:18
27:16 44:6 47:14 48:3
76:5 81:12 82:1 92:1
98:19 100:1,21,23
102:9 116:9,12 137:4
140:2 148:1

discussions 70:9
71:9 116:6,16 128:10

disposition 112:24

dispute 53:1,3 139:23

disrupted 32:21

distinctive 86:9 107:4

distributed 135:17

diverse 115:15

document 26:20
30:18,22 31:20 34:1,3
36:4 37:11,19 39:6
42:22 44:15 47:3
54:23 56:8 59:2 60:20
61:14 62:2 71:22 81:5
93:18 97:19 110:19
111:19 135:16 143:17
144:9 145:8 152:14

documented 112:4

documents 18:10,11
44:21 76:11 93:16
115:5 125:22

doubt 84:24 85:2

downtown 80:8 128:3

draft 131:22 137:9

drafted 131:24 132:4
133:15 134:4 136:22
137:1 138:5

drafter 133:1

drafts 135:12

draw 111:16

drawn 10:6

driving 95:24 96:19

duly 6:2

### E

ear 51:2

earlier 11:16 25:20
26:22 64:5 91:23 93:9
94:1 129:13 135:9
137:5

earliest 39:21 72:11

early 9:2 11:18 61:3

ears 34:8

easier 58:20 93:7

easy 40:5 52:22

edition 86:19

effect 13:24 34:20
135:3

effective 16:3,12

effectively 16:19
121:22 122:4,8,11

efficient 58:16

effort 14:5,17 29:16
32:5,7 41:21,22 48:2
94:6 99:7 115:8 128:1
134:20 138:6

efforts 16:5 94:1
98:23 133:11

elapsed 55:11

elected 9:5,9 12:5
24:17 33:2,7,19 43:13
45:12 50:24 51:18
52:20 56:11,14,15

58:4 85:15 88:6,13
123:1 141:24 151:16,
23

election 13:17 18:2
45:15,21 46:2

elemental 37:1

elements 20:11
28:19,21 35:7 137:22

email 35:1 39:16,21,
22 40:8 41:7,8,13,15
43:5,8 44:4 45:5 46:4
48:5,13 49:12,14,16,
23 51:12 53:24 54:6
55:6 57:13 71:24 72:1,
20 74:16 75:13 77:19
82:17 83:4 85:4,18
93:11 95:6 97:6,17
99:16 101:14 102:3
104:20 105:4,8 106:8
110:23 111:4 113:23
121:3,7,10,18 122:12
126:20,24 127:13
129:19 142:24 143:9
144:11,15,23 145:2,
10,18 147:20 150:2,
14,20

emailing 43:22

emails 39:8 45:11
47:8 64:5 120:21
129:9

embark 90:11

embrace 19:8,10
22:11

embraced 22:15

emerged 63:2 73:2
86:2

emergency 16:15
131:18 135:2

Emmer 13:21

emphasis 35:11

employed 46:11

employees 8:19

enabled 134:15

enabling 52:12

enact 38:4

end 7:9 12:23 14:19

23:2 36:4 41:1 73:20
76:20 85:11 140:14

**endeavor** 6:15

**Ended** 10:4

**enforce** 147:24

**engage** 12:15 13:24
86:22 107:15 118:12
134:17 148:14

**engaged** 11:24 19:19

**engagement** 53:8
70:7 88:1

**engaging** 23:12 28:16
134:24

**England** 9:19,22
127:18 128:3,7,13

**enjoy** 8:12

**enjoyed** 85:9 87:8

**ensure** 86:6

**enter** 86:15

**enterprise** 8:13

**Enterprises** 7:16 8:15

**enters** 33:15

**entire** 85:10 87:9
112:19,21 113:11

**entirety** 90:13 148:17,
22 149:3,11,19 150:5,
10,23 151:19

**entities** 86:12 89:16

**entitled** 25:10 26:4

**entity** 129:14

**essentially** 20:11
23:12 77:20 100:13
129:16

**establish** 17:9 73:18
137:18

**evaluate** 64:17 113:17

**evaluated** 68:9,14

**evaluation** 89:10

**evasive** 97:2

**evening** 98:19 122:14
133:24 134:12 135:22
136:9 138:23 141:2

**evening's** 136:6

**events** 80:13

**eventually** 10:5 63:2

**evidence** 76:14 146:3

**evidenced** 54:22

**exact** 31:22 32:3
92:14 117:12 134:9

**examination** 110:19

**examined** 47:11

**exceedingly** 56:22

**exception** 141:1

**exchange** 39:8,16
72:1 106:1 144:12,15,
23

**excited** 73:7

**excluding** 49:1

**excuse** 15:10 43:20
49:14 65:10 66:18
67:13 130:8 143:2

**exemplifies** 112:18

**exhibit** 25:6 26:15,24
30:8,11 38:24 39:4
42:2,17,20,21 43:5
46:5,22 47:8 49:15,21
50:12 53:13 54:15,18
55:7 56:7 58:11,16
59:4 60:15 61:5,8
64:10,16 65:9 66:7,10,
17 67:3,5,12,21 71:17
74:16 75:3,6 81:1,7
82:12 83:18,20 85:3
92:21 93:4 95:7 97:4
98:3 99:11 102:3
104:5,8,14 106:10
108:5 109:5 110:13,
17,23 113:24 114:7
119:5,9,24 120:5,14,
19 121:2 123:7,11,20
126:10,14,19 131:3,6,
8,13,16 136:12,13
139:7 142:3,23 143:7,
8,9,14 144:2,11 145:3,
16 149:18

**exhibits** 75:8

**exist** 78:5 118:22

**existence** 40:12

**existing** 21:21 33:11
36:22 37:4 53:4
111:14

**expand** 127:12,24

**expanded** 91:3
128:23

**expansion** 128:20

**expect** 91:2,14 102:17
109:13 145:17

**expectation** 64:6
90:3,10

**expectations** 64:22
74:11 107:14 148:23

**expected** 101:19

**expecting** 63:19

**expenses** 63:13

**experience** 146:20

**explain** 107:1

**explained** 98:7

**explanation** 101:11,
18 102:4

**export** 8:4

**express** 115:19

**expressed** 53:4
122:24 129:20 148:15

**extensive** 130:22

**extensively** 86:22

**extent** 124:22 132:8

**eyes** 34:9

**F**

**face** 59:22 95:8 152:13

**face-to-face** 146:24

**facets** 64:6 115:10

**facilitate** 22:17

**fact** 27:19 30:5 32:14
42:1 46:4 49:14 50:19
56:22 61:7 63:22
68:17 70:17 81:10
82:9 84:8 90:7 95:5
100:12 106:23 107:14
109:21 111:23 112:7

118:10 121:7,24
129:19 141:4

**factors** 29:11 94:21

**facts** 47:21

**fail** 6:14

**failed** 99:7 109:18
134:21

**fair** 14:14 17:12 24:19
29:4 32:20 35:4 39:17
43:14 55:20 92:16
113:22 121:2 128:16
129:3,8 132:13 140:11

**fairly** 89:22 116:19

**fall** 27:2 45:12,15,22
107:5

**familiar** 13:12 19:23
124:14 131:7

**familiarize** 30:24
126:14

**family** 12:17 85:24
127:19,20,21 128:13

**family-owned** 7:21

**fanciful** 60:12

**farfetched** 36:17

**Farmers** 80:6

**fashion** 135:10

**father** 7:22

**feedback** 70:24
118:13

**feel** 24:18 39:6 41:18
42:21 90:18 93:6

**fellow** 56:15 82:18
93:12

**felt** 20:19 34:16 44:22
45:2 51:22 71:6 86:6
94:13 107:2 111:19
112:13 113:13 122:10,
14 129:12 135:5 146:9

**figure** 105:12

**filed** 147:13,19 148:11

**final** 44:3 113:22
114:1,6 117:10

**finance** 77:22

finances 48:11

find 109:6 142:8,11,18

fine 132:10

finish 6:18 32:19 117:21

finished 6:20 17:5 105:14

fits 36:13

five-minute 152:23

flexibility 90:1 138:3

flip 109:4

floor 8:10

Florey 59:8,10,13 60:8

Floyd 94:18

focal 107:24 108:10

focus 48:21 136:20

focused 22:8 63:12 80:7

folks 10:5 16:17 35:1 36:20 51:24 60:3,11 61:2 130:21

follow 40:2 50:13 120:22

follow-on 64:11

follow-up 42:3 49:12, 15 64:15

forefront 94:20

forget 9:2 117:12

forgive 43:21 69:10 111:24

forgot 81:7

form 62:9,10,12 77:20 118:8

formally 75:20

formatting 93:15

formed 13:20 55:6 116:2 134:10

forming 21:3 61:4 116:5,9

forms 63:16

fortunately 17:4

forum 78:1

forward 29:24 71:22 73:16 74:7 92:3,6 95:2 96:7 107:5 115:20 128:22 137:19 145:6, 13 148:21

forwarded 121:2

found 40:16

founded 107:3

founding 13:21

four-page 30:15

frame 52:4

framework 68:3 117:1

frankly 65:19 146:13

free 39:6 42:21 93:6

fresh 95:3

Friday 143:1,2,10

friend 7:21 59:11,12

front 25:14 44:16,21 54:18 58:17 120:14,15

fruitful 89:16 146:22

fruitless 96:3,21

frustrated 51:19

frustration 36:20 52:19,24 53:4

full 51:11 69:11,20 77:10 99:20 115:14

full-time 46:18

fully 73:4

function 58:4

fundamental 19:20 112:22

fundamentally 29:13

funding 80:4

funds 129:15

future 75:24 77:13 78:4 86:6,23 89:10,15

Future's 78:14,20

## G

gamut 115:14

gaslighted 34:8

gather 16:8

gave 49:3

geez 63:4

general 18:18 19:18 22:7,12 89:22,23,24 97:10 98:21 108:19 112:4 137:24

generally 25:23 26:13 65:3

generations 85:10 86:7 87:9

George 94:18

gist 22:13 34:22

give 16:13 38:18 48:9 105:10 134:22 142:10, 18

giving 7:3 12:16,17 17:2 63:6

glad 41:9

glass 8:3

glasses 50:4

goal 85:8

goals 69:1

good 6:6 7:8 22:19 29:20 34:21 50:3 63:23 64:2 71:8 74:12 100:16 102:7,11 142:15 152:14

governing 70:21

government 41:19 49:13 52:8,17,18 53:5 100:17 102:7,11

government's 49:10

governmental 80:3 129:14

governs 88:21

graphics 107:9

grass 144:5

grassroots 13:22 116:22

gratitude 63:22

gravitated 20:19

great 15:8 122:22 139:18

green 22:2,11 23:6,7, 20 24:15 28:20 35:13, 24 42:11 47:12 48:21 63:15 65:6 86:4 90:2 110:11 112:15 138:2, 12

Greeson 39:10,23 42:4 46:8,19 47:9 49:6,16 50:14 62:7,22 64:12,23 66:22 67:3, 17 69:13 70:11 72:4 74:17 75:14 77:19 99:16,23 100:7,12 101:1,9,16 110:24 111:3 112:1,16,21 113:10,19,20 114:10 116:13 129:20

Greeson's 67:22 69:4 102:3

group 10:3,21 11:1,5 13:19 14:2,3,5,21 23:23 29:16 40:20 54:1,5 55:5,10 56:10 61:4 77:17,20 78:1 79:8 80:3,22

group's 55:1,22 56:16 57:7,15,22 80:20

groups 41:21,24 77:24 118:9

growing 8:18

grown 144:5

guess 11:23 45:8 99:14 114:23 144:6

guide 76:19 89:10

guiding 54:20 55:2,23 56:7,17 57:8,16,23

guilty 141:18

guy 49:8 50:16 51:1 59:8

**H**

**half** 8:4 17:16 52:5
72:24 99:6

**Hall** 74:4

**hand** 30:23

**handed** 42:20 110:16

**handout** 27:1

**Hang** 39:5,12 58:12
105:19 142:17

**happen** 33:20 36:22
37:4,5,6 59:20,21 60:7
74:12 87:20

**happened** 46:1 94:19
96:6

**happening** 24:5 32:5
74:13 118:10

**happy** 14:21

**hard** 35:21

**Hart** 100:3 101:12

**Hart's** 99:24

**head** 7:1 81:24

**heading** 39:24

**hear** 34:17 38:9 101:7,
11 125:6

**heard** 19:15 34:4
59:18 79:2

**heard/reviewed**
112:8

**heart** 15:16,18 48:8
86:10

**Hein** 142:16 143:1,10

**helpful** 93:10 120:21
143:18

**helpless** 33:8

**hereinafter** 6:2

**hey** 21:12 33:18 34:7
59:17

**high** 9:22 21:20 35:11
115:14

**highest** 50:21 51:6
118:16

**Hills** 41:2,4

**hired** 46:18

**historic** 80:8 86:10
107:3

**history** 85:24

**hoc** 11:4

**hold** 13:7

**holds** 84:24

**Home** 136:20

**honest** 41:15

**honestly** 41:5

**hope** 87:16 150:15

**hotel** 128:3,14,19

**housing** 22:10 28:19
90:2

**humming** 119:13,16
120:9

**hundred** 16:8 23:19

**hundreds** 109:12
134:2

**hypothetical** 90:24

**I**

**idea** 11:20 20:21
21:13,16 22:5,9,16,17
59:17,19,24 60:4,5,12
65:1 70:21 71:6,8
85:23

**ideally** 72:12

**ideas** 29:12 118:4,11,
14

**identified** 16:7 77:24
96:19

**illustrations** 91:11

**immediately** 74:21
135:4

**impact** 49:4

**impacting** 94:20

**impacts** 48:19,24
63:8,12

**implementation**

118:6

**implementing** 118:1

**importance** 19:16
86:9 108:20

**important** 37:2 51:22
56:11 72:13 128:21

**importantly** 33:21
94:23

**improperly** 125:17

**impulse** 65:2

**in-house** 8:1

**inaccurate** 150:8

**inactivity** 137:15

**inappropriate** 129:12

**inartful** 132:9

**include** 86:16 90:14
128:20

**included** 34:18 64:9

**includes** 36:8 110:10

**including** 89:17
112:15 137:16 138:1
148:21 151:9

**inclusive** 115:15

**increase** 24:7

**independent** 116:19

**indication** 14:18 24:1
111:21

**indications** 24:15

**individual** 80:21 88:2
130:11

**ineffectively** 114:11

**inequality** 94:19

**informal** 70:24

**informally** 71:11

**information** 47:21
48:8,10 51:20 52:2,8
63:7,23 113:4 117:23
136:4

**informed** 11:22,23
42:8 47:20 48:3,9
51:23 52:7 72:4
135:21 136:3

**initial** 128:1,10

**initiate** 74:19

**initiating** 40:21

**initiatives** 16:5 80:7

**Inn** 128:5,7,15

**input** 92:5 133:22
134:5

**inquired** 68:8,13

**inquiries** 74:20

**inquisitive** 64:14

**instance** 35:10 41:8

**instruct** 125:17

**instruction** 56:21

**intelligently** 47:22
63:8

**intend** 120:23

**intent** 37:7 48:12

**intention** 135:21

**intentional** 52:20

**interacting** 71:11

**interacts** 71:3

**interest** 22:7 28:15
36:12 68:19 76:12
86:17 95:24 122:22
139:19 148:16 149:1,9
150:20 151:1 152:1,6

**interested** 10:5 70:20
137:16 146:15 147:8
151:17

**interim** 45:14

**interpretation** 35:16

**interrelated** 134:7

**interrupt** 14:7 20:23
32:14 38:8 40:15

**intimately** 71:2

**introduced** 131:19
136:8,15

**introduction** 133:23
134:6 135:13

**intrude** 6:19 55:18

**invade** 132:21

**inventive** 8:13

**involve** 86:23 112:14

**involved** 9:10,13 16:4 55:14 59:12 60:8 61:3 73:2 78:7,11 86:12 116:17 117:4

**issue** 10:11 12:19 13:1,3,4 14:9,11,12,24 15:14 16:18 19:16 23:13 28:9 33:10 36:15 40:22 50:18 54:3 63:3 70:8,20 71:8 73:12 76:11,12,23 86:12 89:7 94:19 95:9, 16 100:11 112:19,21, 22,23 113:11 117:10 122:22 127:15,16 129:5,11,16,17 130:1 134:18,23 140:3

**issued** 96:13 117:16, 23

**issues** 9:21 12:15 13:6 19:21 53:10 121:15 122:7 134:8,9

**item** 136:6

**J**

**January** 9:2,4,6 29:3 38:2,14 46:5 66:18 89:21 90:18 91:15 92:8,16 99:7 131:20 133:17,20 135:22 136:16 138:24 139:13 140:13 141:23 143:1, 2,10,21

**jars** 127:14

**job** 8:11 72:23 85:15

**Joe** 15:10 32:20 57:3 97:18 101:7 132:22 147:16

**joined** 116:1

**joking** 62:13,18

**Judge** 152:10

**judgment** 137:23

**Julia** 9:12

**July** 39:23 40:4

**jump** 85:22

**June** 31:21

**jury** 152:10

**justifiably** 35:20

**K**

**Kathy** 13:21

**Kay** 54:9

**Kevin** 127:23

**key** 130:19

**kind** 36:1 50:7 74:5 96:21 130:22

**kinds** 8:8

**knew** 14:1 59:13 95:10,16

**knowledge** 59:4 78:5, 8 95:23

**KWB** 40:13

**L**

**lack** 53:8 107:13

**laid** 79:16

**land** 60:10 107:5 108:20 148:17,21 149:3,10,19 150:5,10, 22 151:18

**language** 16:7 35:12 69:8 78:24 107:20 138:3,5

**large** 22:1,22 23:7 24:14 35:24 108:16 109:22 138:12

**larger** 107:6 114:2

**late** 140:12

**latest** 106:14,18

**law** 132:1

**lawsuit** 7:5 147:12,19 148:11

**lawyer** 60:8

**lawyers** 16:7 59:15

**lay** 94:12

**LC** 69:15 71:7 107:15 109:7 121:15 123:22, 24

**leaders** 60:3

**leadership** 14:3 74:1 115:8 116:13 130:20 146:9

**learned** 55:19

**leave** 58:18

**leaves** 144:7

**led** 16:4

**Lee** 99:21

**legal** 59:9 124:22 125:15

**legislation** 29:23

**legislative** 29:5

**lengthy** 96:13 104:17

**letter** 41:10

**letters** 24:2,4,7,11 91:24

**letting** 100:20

**levels** 147:2

**liaison** 121:22 122:4

**life** 9:8 12:13 38:5 115:15,16 146:20

**Lifestyle** 7:5 10:13 11:7 13:2 17:8,14 21:16 22:23 31:23 64:17 68:9,13,18 70:13 71:12 77:2 78:14,21 80:17 87:20 90:19 92:9 94:3 95:10, 17,21 99:5 100:3,22 102:8 106:3 112:9 121:13 130:8,15 135:20 136:17 144:13 145:5,12

**Lifestyle's** 20:15 106:14,17

**Lifestyles** 24:9 136:2 146:12 151:10

**likewise** 6:18 26:24 68:12 124:14 127:8

**limited** 63:12 147:4

**Lindsey** 99:22 132:1, 3,16 133:21 135:14

**listed** 136:5

**listen** 109:15 113:12 152:11

**listened** 19:19 23:14 41:18

**listening** 12:3 52:5 91:21 152:8

**litigation** 55:16,20 90:15

**lobbied** 131:1

**lobby** 130:4

**lobbying** 129:15,24

**local** 10:7

**located** 7:12

**long** 8:24 11:10 18:13 21:15 45:24 62:6 92:18 105:8,9 140:21 143:17 144:4

**long-term** 22:8

**longer** 38:18 40:12 72:6 80:7

**looked** 45:11 48:24 67:6 92:22 93:5

**loosely** 14:20

**Lorraine** 26:21

**lot** 12:12,17 28:9,18 29:11 35:23 49:1,11 52:19 115:19 142:14

**luck** 152:14

**lunch** 102:16

**luncheon** 103:1

**M**

**machines** 8:17

**made** 15:23 33:16,22 52:15 59:24 68:7 76:3 81:18 82:5,7 98:6,14,

17 107:10,17 108:13
117:7 128:2,11,17
148:3

**mail** 43:24

**Main** 79:9

**maintained** 11:10

**majority** 24:13 29:12
38:15 48:16 99:1

**make** 10:15 15:11
17:10 19:4 31:4,6
32:9,22 37:3 49:5 50:4
51:2 57:3 58:16 69:21
71:14 76:8 82:3 83:22
98:9 119:19 127:4

**makes** 58:20

**making** 59:22 74:12
89:15 98:7 118:1
128:18

**manage** 80:5

**manager** 29:14 46:16,
19 74:21 113:18

**manager's** 51:1

**manufacture** 8:1

**manufacturing** 7:16,
19 8:10

**March** 49:16 104:20
106:11 109:9 144:24

**Marcy** 7:16 8:15

**mark** 54:11 63:20

**marked** 25:6 30:8
38:24 39:3 42:17,21
46:22 49:21 53:13
54:15 58:11 66:10
71:17 75:3 81:1 83:18,
20 92:20 93:4 99:11
104:5,14 110:13,17
119:5,9 123:7 126:10
131:3,13,16 136:11
142:3,6,20 143:14
144:2

**Market** 80:6

**marketing** 8:7

**Masonic** 9:22

**massive** 109:7,11

**master** 111:9 113:3

**Matt** 50:16 72:12 73:9
74:22 102:14 112:17,
22 113:5 114:7 116:13

**Matt's** 100:15

**matter** 10:11 16:9
23:24 56:23

**matters** 17:3 70:23

**Matthew** 104:21

**Mcdonald** 77:18 78:7

**Mcdonald's** 77:22

**meaning** 15:24 36:24

**means** 55:17

**meant** 122:9

**meantime** 77:4

**mechanism** 16:12

**mediocrity** 106:24
107:2,19

**meet** 41:21,24 70:13
148:20 151:8

**meeting** 9:3 23:13
32:6 44:7 74:10 75:23,
24 90:8 98:10 122:13
124:2 131:19 133:17
136:6 138:23 139:13
140:6,15,16,21,22
141:3,4,7,12,13,15,17
145:4,11

**meetings** 70:9,14
71:1,12 90:9 92:4
141:1

**Meizlish** 7:22

**member** 10:23 12:12
18:3 20:2 53:21 61:16
121:11

**members** 13:22 14:1
34:17 54:7 61:8,13
73:7 80:21,22 82:24
83:6 93:12 99:18
109:15 121:4,8 122:23
126:22 130:14,18,20

**membership** 20:6

**memo** 30:15 62:6,20
64:10 67:22 69:4,9
127:5,10

**memo's** 126:23

**memory** 46:3 127:14

**mention** 150:9

**mentioned** 10:21
11:1 26:22 149:17
150:2,20

**message** 34:15,23
122:15 123:1 151:7

**messages** 20:16

**Methodist** 20:13
136:19

**Michael** 29:17 30:5
39:9,22 42:3 43:9,19,
20 44:13 46:6 72:2,10
73:15 74:17 75:14,17
81:11 82:24 84:4
86:19,21

**mid** 46:17

**middle** 9:4 22:2 35:23
94:18 104:19 111:23
142:22,23 143:6,7

**midnight** 140:16

**Mike** 82:17

**Miller** 6:5,7 23:3 25:4,
8 26:3,8 27:23 30:10
31:11,18 38:21 39:2,
13,15 42:19 47:1 50:1,
11 53:15 54:11,17
56:21 57:5 58:13,19
59:3 61:20,22 62:10,
13,14 66:12 67:7
69:22,23 75:5,12 81:3
84:11,16 92:24 93:2
97:1,14,23 99:13
102:1,19,22 104:7
105:16,22 110:3,15
114:6,9 119:7,12,15,
19,23 120:13 123:9,15
125:16 126:1,12
127:1,7 131:5 132:9,
13,14 133:5 139:5,15,
18,21 142:7,12,21
143:16 144:8,10,19,22
145:23 146:4 147:14,
17,21 148:3,6 152:19,
22,24 153:2

**mind** 34:18 50:23
51:17 110:20 129:4
151:13

**mindfulness** 52:20

**mine** 7:21 47:20 76:23

**Mine's** 26:6

**minute** 26:6 39:5

**minutes** 105:10
139:12,22 140:1,7,9,
19

**Mischaracterizes**
112:11

**mismanage** 113:11

**mismanaged** 112:19,
21

**mission** 18:8 20:10
54:4,20 55:1,22 56:6,
16 57:7,15,23

**misspoke** 43:20
82:21 83:3

**misstate** 150:1

**misstates** 89:1
109:24 125:14 145:8

**mix** 112:14

**mixed** 36:1

**mixed-use** 21:19
27:16 28:19 138:1

**MKSK** 35:5 88:24

**MLK** 141:16

**modest** 21:22

**moment** 12:8 17:24
41:7 79:12 113:9
117:9 131:14

**Monday** 141:11,14

**money** 96:22

**month** 96:6 133:19
141:23

**months** 24:1 63:4
96:9,17 116:24 124:1,
12

**moratorium** 38:4,10
99:8 131:18

**morning** 6:6 122:13
137:4

**motion** 36:8 81:18
82:3,5,7 97:7 98:1,8,9,
14,17,20

motivated 12:19,24
47:19

motivation 48:12
51:15 74:14 95:4
100:19,24 123:3

move 15:7 52:24 57:1
58:8 72:16 79:19 87:5,
10 95:2 97:1 115:20
148:5 152:15

moved 9:11,12 78:9

movement 74:7

moving 52:8 92:3,6
128:22

Mowry 104:21,23
106:10 107:22

MPC 24:10 107:11
123:23 124:1

muddied 128:9

Multi-use 25:11

multiple 15:5 86:12
110:6 137:10,11 147:2

multiuse 21:19

murder 94:19

Myers 46:9 74:18
116:16 121:24 122:10

N

names 79:15

nature 97:21 134:9

necessarily 128:5

needed 33:15 34:16
68:9,14 94:13 122:16
134:22

needing 35:13

negotiation 144:17

neighbor 9:20

neighborhood 11:5

neighborhoods
85:24

neighbors 34:9

newly 50:24 51:17

news 73:11 86:20

newspaper 11:2

next-to-last 40:8
71:23

night 140:13

nod 6:24

nominate 117:2

nonresponsive 97:2

northern 21:23

notably 80:5

note 69:21 71:21
124:21 144:14,18,19

notes 31:4,7

notifying 73:9

November 18:2
104:10 126:21 127:11

nuance 78:18

number 23:10 37:17
40:20 50:17 67:13
69:4 74:16 93:18
94:21 97:5 98:2
107:10 138:22

numbered 25:16

O

oath 7:4 43:14 95:20
150:18

object 15:9 62:9
132:19

objected 140:6

objecting 62:11 97:20
146:2

objection 15:2 27:10
28:24 30:1 45:17
55:24 56:19 57:24
58:8 70:15 78:16
79:19 82:20 87:5,10
88:18 89:1 90:23 91:6
95:13 97:12 109:24
111:5 112:10 124:5,
18,21 125:13 126:5
132:7 133:3,6,12
134:13 138:14 144:14,
15,18 145:7,22,24

146:3,19 148:1,10
149:4,12,21 150:6,12,
24 151:4,20 152:7,15

objections 126:6
148:18

objectives 18:5 115:2

observed 23:14

obstruct 97:16

obtained 23:23 51:20

obtaining 51:15

occasions 63:6
108:14

occur 80:17

occurring 144:17

October 104:1 121:3
123:13 153:5

odd 93:16

offhand 124:8

office 43:14 138:9

official 24:17 52:21
56:11,14 58:4 85:15
88:6,13 123:1 151:16,
23

officials 12:5 32:11
33:2,7,19 41:22 56:15
93:13 99:19,21

Ohio 107:11

one's 21:14

ongoing 47:19 76:23

open 35:15 100:18

operation 80:11

opinion 20:22 22:8,21
28:10,15 44:23 63:19
76:17 88:8,11 89:6,15,
20,24 91:23 94:11,24
108:18,22 111:10
112:13 113:1 137:12,
13,21,24

opportunity 72:7
73:10 95:9 146:10
147:1 148:12

oppose 78:1

option 149:17 150:2,

11,19 152:5

options 62:21 148:20
149:15 150:9,17 151:8

order 12:6 137:18

ordinance 38:4 99:8
131:18,22 132:17
133:2,8,23 134:4,5
135:12,22 140:11

ordinances 15:23,24
16:3

organization 13:12,
23 19:23 20:3 25:20
40:16 77:11 79:2,13,
23 80:10 130:10

organization's 77:15

organizational 141:7,
13

organize 16:6 31:9
80:5

organized 10:21 11:3
14:20

origin 80:2

outcome 21:19 22:6
28:11,14,18 33:4
34:11 48:14,23 83:13
84:1 86:9 87:16,23
106:7 110:9 112:13
151:18

outcomes 47:24
48:10,19 51:21 63:9,
14 65:3 85:19 87:15

outgrowth 79:24

outline 22:19 28:14

outlined 98:8

output 63:1 115:11

outreach 54:1 147:5
149:14

outset 66:13

overarching 85:8

overseas 8:4 9:19

overtly 130:3

overwhelming 24:12

OWA 40:11

owned 20:14 55:13 94:5 127:19 128:7

owner 7:24 47:22 74:3 86:14 95:2 134:24 137:17

owners 28:16 96:2

ownership 48:22

owns 59:21

## P

p.m. 103:2 104:3,21 143:3,11 153:6

packet 139:8

pages 25:15 50:2

palpable 23:15

paper 31:5 65:5 83:14 84:3,9,21 85:1,21 92:15

paragraph 36:5 40:8 42:9 44:4 51:9,11 52:11 69:12 77:10 83:10,11 95:6 106:12 107:23 109:5 111:24 112:17 113:23 114:1, 2,6

parcel 10:2

Parini 127:4 130:20

park 10:3,9 19:24 22:22 25:12,21 53:22 54:20 59:13 60:3,11 61:2 65:12,15 66:1 109:22 111:14

park's 111:9 113:2

Parker 77:18

parkland 24:21 48:16 112:9

parks 111:11,14

part 10:21 11:20 12:19,24 14:22 33:13, 19 41:11 47:11,16,18 50:22 51:6,14,23 52:18 54:3 65:24 68:3, 24 79:8 128:1

partial 147:4

participant 116:6

parties 37:20 76:18 134:19 137:16 144:16 149:16

partner 8:9

Partnership 79:3,5, 21 80:14 126:21 127:11 129:10 130:14

parts 8:2 17:21 35:18

pass 99:8

passage 46:1 134:11

passed 38:5 99:9 135:1

passive 32:12

past 18:15 28:1 68:8, 18

patents 8:5

Paul 39:13 54:12 56:22 58:14 97:15 102:23 119:12 145:24

Pause 50:10 119:3

PCPW 20:17 21:2 23:22 26:22 27:15 28:12 78:3

PCPW's 27:19

pending 31:12 101:5, 9

people 8:14,20 10:20 17:2 20:5,18 40:21 49:4 61:3 134:2 139:24 147:1

people's 146:23

percent 24:13

perception 55:16 74:2

performance 113:18

perimeter 21:23

periodic 24:4

periodically 117:7

peripheral 10:24

permanent 16:19

permitted 90:4

person 64:14 74:5 127:24

personal 11:6,9 88:8, 11

personally 88:17 105:2

persons 117:3

perspective 47:19 77:21

persuade 130:5,15,19

pertain 124:11

petition 20:4,7,11 22:5,12,14 23:22 26:22

petitions 91:24

Phases 59:6

Phil 142:16 143:1,9

phone 43:16

phrase 70:18 83:23 111:11

phrased 125:1

phrasing 111:13

picture 51:16 58:22

piece 31:5 125:10

place 22:20 91:15 109:2 145:4

plain 152:13

plan 33:24 35:5,19 37:10,18,20 38:16 44:8,19,20 47:15,17 64:17 66:24 68:2,15, 20,24 75:22 76:4,12, 14,16,19 77:6 81:11, 19 82:2 88:24 89:5,19 90:6,12,16,17,19 91:10 92:2,8 94:3,22, 24 95:3,12,18 96:8,18 97:7,10,11 98:1,10,21 99:4,9 107:10 111:9, 18 113:2,3 114:14,15 118:18 124:17 125:4, 12,20,24 126:8 134:17 136:17,21 137:2,12,20

planning 14:2 69:1 86:23 125:22

plans 138:4

pledges 52:14

plenty 152:20

pocket 10:2,9

point 11:1 12:13 15:12 18:15 32:17 33:6,15, 17,21 34:4 37:2 49:3 51:2 60:14 64:3 85:3,7 94:15 95:7 98:16 107:24 108:10

pointed 53:11

pointing 33:22 36:5 108:3,6

points 32:10 98:6

policy 12:1 13:24 68:3

politician 58:7

poorly 106:21

portion 44:8,20 75:22 76:11 90:6 91:10 99:9 140:6

portions 132:5

posed 66:23 67:4,16

position 19:20 78:14, 20,23 80:16 84:19 97:9 112:24 113:17 129:15

positive 22:17 60:4 74:8 107:24 108:9

possibility 9:24 10:9 73:8 97:8 128:18 151:9 152:1

possibly 73:2

post 11:7 104:9 120:2 123:12 131:9 143:21

posts 123:10 143:19

posturing 147:6

potential 47:11 48:15 74:7

potentially 151:17

practically 16:1

practice 100:17 102:7,11

**pre-blog** 35:2

**predated** 141:8

**predates** 39:17

**prefaced** 97:18

**preferably** 75:24

**preliminary** 128:21

**prepare** 62:22 132:17

**prepared** 29:14 42:24
47:3 59:8 60:10 63:23,
24 65:5 66:5 110:18

**preparing** 95:11

**present** 74:22

**presentation** 20:15
31:23

**presented** 21:16
25:12 107:7

**president** 8:21,24
28:22 29:10,15,17,18
75:17 86:18 141:4,24

**pretty** 11:19 29:20
78:11 80:1 90:1
122:21 127:14 131:24
148:13

**prevent** 36:6 106:13,
19,22

**previously** 58:11
65:23 76:4 92:21 93:4
106:9 119:15 131:12,
15,17 136:11,22

**primarily** 65:12 98:22

**primary** 7:24 8:6 58:4
108:14 127:23 133:1,7

**principles** 54:5,21
55:2,23 56:7,17 57:8,
16,23

**prior** 11:17 13:8,17
16:1 18:1 43:12,13
57:18 91:13 112:11
133:23 134:5 140:7
148:11

**priority** 108:14 118:17

**privy** 95:22

**Pro-tem** 118:5

**proactively** 69:14
113:3

**probable** 52:24 53:1

**problem** 112:18

**proceed** 42:24 47:4
53:17 110:19 116:15
126:16

**process** 28:16 32:12
69:1 71:6 87:22,24
90:5,12,16 91:4,15
92:1,6 94:11 96:3,12
116:23 117:24 118:13,
18 132:23 134:19
146:12

**processes** 24:5 34:20
76:22

**produced** 63:17 67:3
93:19

**product** 8:4

**productive** 76:20
89:16 94:12 137:19
146:10,22

**productively** 95:1

**products** 8:11

**professionals** 59:14

**profit** 148:23 151:10

**project** 19:24 25:12,
20 53:22 54:19 59:12
60:2,10 61:2 109:16,
19 130:5,6,7

**projections** 63:15

**projects** 128:12

**prominent** 88:10,12

**promoting** 60:4

**prompt** 22:17 101:2

**prompting** 49:12

**promptly** 49:7

**properties** 9:22 22:1
90:20 94:4 125:3
128:12

**property** 10:13 11:8
12:21 13:2 17:8,9,14
18:6 20:14,17,21 21:6,
7 22:6,23 23:8 28:11,

14,16 33:5,14 34:12
36:23 45:10,16,21
47:12,22 48:4,11,15
51:21 53:7,9 55:13
59:7,17,21 60:6 62:8,
21 63:9 64:18 68:10,
15 70:8 72:18 73:3
74:4 78:15,21 80:18
85:8 86:10,14,24 87:7,
21 88:3,21 89:11
92:11 94:6 95:2 96:1
99:5 106:4,6 108:15,
23 109:20,23 110:9
112:9,14 114:14
125:11 128:21 129:3
130:7 134:24 136:18
137:16 138:11,13,18,
19 145:6,13

**proposal** 24:6,9 25:11
33:12 38:3 65:13
83:12,24 96:6,9,14
106:4,15,18,20 107:2,
5,9 116:14 121:14
123:23 124:2 128:2,19
130:8,16 145:20
146:6,18 147:11 148:9

**proposals** 65:7 76:18
89:10,15

**propose** 48:7 135:21

**proposed** 21:18
35:17 65:23 76:20
91:19

**proposing** 65:18
86:15

**prospecting** 8:7

**prospective** 47:23
86:14 89:17 96:2,20

**protocol** 74:18

**provide** 12:6 66:22
77:23 78:1 111:14
133:22 135:12

**provided** 67:18
101:18 102:4

**providing** 48:7

**public** 11:22,24 12:2,
4,7,15 13:24 18:7
20:22 22:7,8,21,24
23:3,9,15 24:12,16
27:15 28:10,15 32:9,
13 33:1,2 34:7,18,20,

23 36:1,20 37:15,21
44:23 47:23 51:17,18
52:9,15,21,24 53:5,9
63:7 64:1 66:1 70:7,9,
14,19,22 71:1,7,8,11
76:17 80:13 85:16
86:2 87:24 88:7,14,22
89:5,14,20,24 91:21,
22 92:4 94:11,24
96:22 107:7,15
108:15,18,19,22,24
109:3,13,16,18,21,22
110:7 111:10,21
112:4,8,13 113:1,12
116:22 118:12 122:23
129:14 134:17 137:11,
13,21,24 138:22
152:1,3

**publicly** 54:4 83:12
84:1,12 130:3

**purchase** 24:21

**purpose** 18:8,10,12
63:6 73:20 77:15
101:13 115:2 137:8
149:13 150:14

**purposes** 18:16,19,
21,24 19:1,3,11

**pursuing** 72:6 73:10

**purview** 80:9

**pushed** 24:20

**put** 35:2 39:3 44:6,15,
18 66:21 78:23 92:15
96:7 104:9 107:5
120:2,17 123:13
131:9,13 143:21

**putting** 44:21 112:23

**Q**

**quality** 115:14

**quasi** 80:3 129:13

**question** 6:17 7:9
10:18 12:23 15:3,4,6,
12 18:23 19:4 26:9,11
27:21 28:6 31:10,11,
14,17 32:23 38:11,12
39:7 40:2 42:5 43:2
45:18 50:12 55:3 56:2,
20 57:11,21 58:13,17

61:11 62:4,12,19 67:1,
8 68:11 82:22 83:1,2
84:17 87:12 90:21
91:17 93:11,15,21
95:14 97:13,20,22
98:4 100:6,19 101:1,2,
22 105:11,17,23
110:2,21,22 111:6
115:4 123:11,16
124:19,24 125:6
130:12 131:6 135:24
136:24 138:16 143:5,
19 147:9,18 148:7
150:19 151:1 152:12

**questions** 6:23 10:15
40:5 48:21 56:24 57:3
59:16 60:6 64:12
66:23 67:4,16 72:19
74:24 81:8 104:16
122:7 146:1 152:17
153:2

**quick** 128:10

**quickly** 14:17 20:19
72:17 142:18

**quo** 33:12 52:13

**quote** 36:6 44:5 57:14
83:23 85:9,11 86:18,
20 95:7 97:19

---

## R

**radical** 113:6

**raised** 63:3 122:7
150:11 152:2

**ran** 115:14

**range** 80:6 102:14
138:4

**rational** 48:3 51:23

**ravine** 65:24

**reach** 102:7

**reached** 73:18 98:16
101:12

**reaching** 112:1

**reaction** 63:21 70:4

**reactions** 146:23

**read** 7:14 13:10 18:10,
11,15 20:10 27:23,24
34:1 35:9 36:19 38:12,
13 40:3 41:15 42:6
45:4 55:4 67:7,9 71:21
83:23 84:16,18 87:13
90:22 91:18 93:22
98:5 104:17 105:16,
22,24 108:4 110:3,5
111:7 115:5 117:18
123:15,17 124:20
136:1 138:17 139:24
140:9

**readily** 23:22

**reading** 32:5 48:5
50:4 70:3 97:16
105:12,18 143:4

**reads** 41:20 59:6

**ready** 31:17 39:13
53:16 126:15

**real** 10:1 17:3 19:16
118:1 128:10

**realistic** 64:5 87:15

**realization** 106:14,19

**realize** 105:19 119:16
148:23

**realized** 60:13 87:23
106:22

**realizing** 151:10

**reason** 62:23 84:24
85:2

**reasonable** 22:20
35:8 148:23

**reasons** 94:12 98:2,7,
8

**recall** 10:22 11:11
20:8 27:18 28:4 31:19
41:12 44:12,17,24
45:7,8,9 47:13 60:17,
18,21,23 61:18 64:10,
16 65:22 66:2,3 68:21,
22 70:22 73:13,21,24
74:23 75:1 76:7 77:5
81:10,14,15,17,18,20,
22 82:5 92:19 98:13,
19 102:2,5 105:11
107:8 116:4 124:3,8
127:9,16 128:24
130:13 133:16 134:7,8
135:15,16,18 136:5
137:3 140:5,10 141:3

144:23 146:7

**recapping** 43:23

**receive** 24:3 80:3
134:4

**received** 24:11 59:16
60:6,14 74:23 150:15

**receives** 24:2 129:14

**recent** 69:13 90:7

**recess** 38:22 61:21
93:1 103:1 139:4
153:1

**recognition** 86:8,17

**recognize** 39:8 41:1
84:8 136:13,14 144:11

**recognizing** 148:22
150:18

**recollection** 27:18
47:7 48:17,18 53:20
59:2,5 61:7,12,17
70:19 117:8 130:2
132:16

**recollections** 45:23

**recommend** 83:13
84:1

**recommendation**
123:24

**recommendations**
118:3

**recommended** 118:5

**recommending**
96:14

**reconsider** 134:16

**record** 7:14 13:10
14:23 15:11 27:24
38:13 42:6 55:4 57:4
67:9 83:22 84:18
87:13 90:22 91:18
93:22 98:5 105:24
110:5 111:7 119:13,16
120:9 123:17 124:20
133:6 136:1 138:17
144:20 148:4

**recurring** 76:12

**refer** 17:13 18:9 71:23

**reference** 17:10,18

37:11 65:6

**referenced** 117:9

**references** 77:10
127:5

**referendum** 15:22,23
109:19

**referred** 17:7 59:23

**referring** 14:9 17:11,
15 52:10 60:1 70:10
79:7 85:6 106:14
114:13 122:5

**refers** 41:3 114:22

**reflect** 47:8 76:17
116:21 137:13 140:22

**reflected** 37:21 113:1
137:24

**reflective** 93:24

**reflects** 43:5 107:14
115:7,8,17

**refrain** 6:21 113:7

**refresh** 53:20 61:7

**regard** 38:1 45:10
99:3 106:17 122:19

**regularly** 96:7

**rejected** 97:11

**relate** 51:21

**related** 7:4 12:20
15:22 45:20 62:7
63:13 67:4 94:3 99:4
106:3 127:12,17 129:5
136:17,19

**relates** 18:6 45:16,20
68:15 78:14,21 93:9
98:20 121:12

**relating** 128:11

**relationship** 13:16
30:6 35:14 73:5

**relationships** 146:23

**relevance** 90:24
124:18 134:13

**relevant** 117:22

**remain** 52:13,21

remainder 114:16

remains 68:3

remember 20:12
21:24 31:22 32:3
34:24 35:9 41:5,14
55:15 63:10 64:15
70:2,3 73:1 77:8 82:4
92:14 96:4 98:22
116:7,10,15 117:3
127:13 133:19 135:19
140:8,18 142:16

remembered 44:15

reminding 34:6

reminds 53:24

renew 145:21

repeat 7:13 13:9 27:21
55:3 62:19 83:2 87:12
91:17 111:6 149:6

repeatedly 77:7
108:17,22 112:12

replace 46:19

replaced 68:1

replacement 8:3

replied 102:2

reply 84:4 101:5,9
147:6

report 96:13 115:12
116:21 117:9,10,14,15
118:20

reporter 38:7 141:20

reports 117:8

represent 24:18
51:18 52:16 54:19
76:15 151:24

representation 25:22

representative 11:21
41:17 44:23 106:20
144:13

representatives
41:23 70:14 71:13

reputation 73:6

request 48:18 49:7
74:8 75:20 76:3,8
81:16 96:10 100:16

127:4,6,12 132:12

requested 7:14 13:10
27:24 38:13 42:6 47:9
48:14 50:14 55:4 67:9
84:18 87:13 90:22
91:18 93:22 98:5
105:24 110:5 111:7
123:17 124:20 136:1
138:17 145:9,11

require 33:18

required 138:10

requires 52:20 125:3,
9

rescind 37:10 81:19
94:2

rescinded 89:9 94:9
114:12

reserve 101:4,8

reset 134:23

resident 77:18,24
111:15

residential 21:22,23
48:20 63:15 65:5
138:2

residents 9:23 42:9,
13 52:2 86:5,13,17
123:2 137:17

resolution 99:8
136:8,15,23 137:3,9,
22 138:21 140:12

respect 56:9 58:2

respectfully 58:7
87:3 108:21

respond 56:8 74:20
100:12

responded 101:15
145:15

respondents 23:20

responding 100:8
105:4

response 52:2 63:2
67:4 74:24 83:11,24
84:6 89:4 100:13
107:12 146:8 148:9

responses 66:23

responsibility 8:6
12:11 30:16 32:13
33:3,9,15 36:15 88:7,
14,22 113:21 151:24

Responsible 13:14

responsiveness
107:13

rest 91:9

restored 16:16

restroom 92:23

resubmit 124:2,13

result 48:23 91:20
137:14

retreat 45:3,6 47:14
63:4 116:9,13 118:5

revenue 63:16

review 39:7 41:7
42:22 47:2,17 54:23
58:20 62:2 66:14 75:7
81:4 93:7,10 96:11
120:18 129:8 143:18

reviewed 68:4 91:2
118:19 144:8

reviewing 41:10
76:10

rezone 33:14 125:3,
10,11

rezoning 15:22,24
16:3,15,18,19 36:8
149:2,8 150:3,21
151:12

rezonings 124:15

Rhonda 6:13 67:8
119:21 120:8

rings 105:1

Robinson 6:1,6 9:15
12:9 15:15 16:22
24:20 26:10,20,21
28:23 30:12,17 39:16
42:23 43:17 51:10
53:17 62:15 70:1
72:22 87:3 88:2 93:4
95:20 97:5 101:20
104:10 105:11 110:16
123:10 125:19 126:13
127:9 131:7,14,23
136:13 138:10 142:22

145:10 147:9 148:8
152:14

robust 87:24 90:5

robustly 113:14

Robyn 66:4

role 7:12 9:15 13:7
33:9 45:13,19 46:14
73:4 116:4 121:23

room 50:9

rough 22:9 47:6

roughly 7:18 8:20

rule 144:16 146:3
149:21 151:20

rumors 95:23

run 11:17 12:9

running 117:6

rush 66:14

S

S-H-O-W-E 127:23

sales 8:7

satisfy 87:17

savvy 71:21

sayings 11:23

scale 109:22

scenario 65:12

schools 85:24

Schumacher 10:17
12:22 15:2,10 23:1,5
25:3 26:1,5 27:10,13
28:5,24 30:1 31:6,13
32:16,19 38:11 39:5,
12,14 40:3 45:17 50:3,
8 55:7,24 56:4,19
57:1,24 58:8,12,15,23
62:9,11,17 69:20
70:15 72:23 75:8
78:16 79:19 82:20,23
83:3 84:10,13 87:5,10
88:18 89:1 90:23 91:6
95:13 97:12,18 101:6,
21,24 102:17,21 108:6
109:24 111:5 112:10
114:4,8 117:20

119:14,18,21 120:8,12 124:5,18,21 125:5,8, 13 126:5 127:2 132:7, 11,19 133:3,12 134:13 138:14 139:14,16,19 142:5,10,13,17 144:4, 14 145:7,21 146:2,19 147:12,16,19,24 148:5,10,18 149:4,12, 21 150:6,12,24 151:4, 20 152:7,15,21

**Scott** 72:12 116:16

**second-to-last** 69:11

**secondary** 7:24

**section** 26:4

**seek** 15:1 37:9 134:11 135:1

**seeking** 15:19 130:14

**send** 49:11 54:7 72:19 121:7 145:19 146:5,17 147:10 148:8

**sending** 41:13 111:20

**sense** 12:4,11,16 18:24 19:4 23:15 33:1 59:24 64:2 87:15 91:24 115:17

**sentence** 37:8 41:2,8 52:23 69:21 106:12 112:17,18 114:16

**sentences** 108:7

**sentiment** 23:15 24:16 111:21 116:18

**separate** 10:11,19 31:5 47:16

**September** 33:23 82:1,2,10 93:9,13 94:1 96:5,24 98:11 99:17

**serve** 52:9

**serving** 9:6 52:22 63:14

**SESSION** 104:2

**set** 20:7 56:7 69:9 98:2

**settlement** 144:16 148:1

**seventh** 121:11

**shake** 6:24

**shaped** 87:15

**share** 19:8,10 61:8 98:18

**shared** 54:4 61:10,12, 15

**shed** 35:23

**sheer** 106:24 107:2,19

**short** 38:14,16 83:15 95:8,15 141:1

**short-term** 22:9

**shot** 142:14

**show** 25:2 58:10 108:8

**Showe** 127:19,21,23 128:13

**shut** 148:13

**side-stepped** 33:17

**sift** 118:15

**sign** 20:4 22:12

**signators** 26:21

**signature** 39:24

**signatures** 11:3 16:8 23:24

**signed** 22:14 26:23

**significance** 50:20

**significant** 13:4 19:21 33:10 73:11,12 74:3 110:10 112:8,15

**signs** 14:19

**silent** 147:4

**similar** 65:23 107:12

**simple** 16:12 147:17 150:19

**simply** 19:2 32:11 39:7 52:18 54:24 93:11 97:20 109:6 143:19 147:10

**sir** 15:7 27:12 58:7 61:23 66:8 108:5,21 120:17 150:2

**sit** 146:15 149:14

**site** 83:12 84:1 107:23 108:9

**sites** 107:10

**sitting** 126:3 140:5

**slight** 59:1

**slow** 101:24

**small** 7:20 8:8 10:1,2

**Smith** 100:10

**Smith's** 100:14,16 101:2

**soft** 78:24

**sooner** 135:8

**sort** 65:4 100:9 134:23

**sought** 128:14

**sound** 11:24 35:12 36:16 50:6 131:7

**sounded** 15:5

**sounds** 37:1 58:6

**soup** 40:7

**sources** 23:10 91:22 110:6 112:5 136:3 137:11

**space** 22:2,11 23:6,7, 20 24:15 28:20 35:13, 24 42:11 47:12 48:21 63:15 65:6 86:4 90:2 110:11 111:15 112:15 134:16,22 138:2,12

**speak** 6:16 16:7 38:9 102:23 144:20

**speaking** 9:24 16:1 21:14 59:24 151:15

**spearheaded** 14:14

**specific** 15:21 17:20 33:13 65:7,20 137:22

**specifically** 8:3 15:22 18:18 32:18 35:16 65:3 69:9 75:21 77:24 106:3 111:11 121:12 134:3 139:9 149:18

**specifics** 77:8

**speculation** 116:11

**spell** 127:22

**spoke** 14:3 44:5 113:5 133:13

**spoken** 9:20

**square** 35:22

**staff** 32:9 33:7,19 47:10,15 48:4,7 59:15 64:12 69:14 70:12,24 71:3,10 74:18,20 80:22 96:13 116:14 130:18

**staff's** 107:12

**stands** 40:10 77:12

**stapled** 26:6

**stark** 24:14

**start** 22:20 32:4 40:5 129:24

**started** 7:22 9:6 11:20 20:18 23:12 77:17 101:22

**starting** 49:3 64:3

**starts** 99:15

**state** 85:7,18 86:2 90:21 94:15 113:24 114:3 115:6 121:21 124:19 135:24 138:7, 16

**stated** 18:12 67:24 78:18 108:17 128:16 148:19

**statement** 54:4 55:21 68:7 69:19 71:14 84:20 89:23 107:1 108:13 111:9 112:6 124:4

**statements** 18:7 37:15 78:23 115:13 118:2,7,15 128:11

**stating** 86:19

**status** 33:12 52:13 73:4 75:21

**Steiner** 55:13 72:5 73:2

**step** 128:22 137:21

**stepdaughter** 9:12

**Steve** 7:22,23 61:10

**Stewart** 46:8,11 66:5
113:16

**stimulate** 21:17

**stimulating** 26:17

**stipulate** 139:14,16

**stirrings** 20:16

**stood** 40:11

**story** 18:14 45:24

**straight** 81:24

**street** 9:22 17:12
21:21 35:11 74:4 79:9
88:4,16

**strike** 57:1 58:9 79:20
87:6,11 97:1 152:16

**stroke** 20:12 28:13

**strong** 28:18,21
116:17 129:15

**strongly** 55:1,21 56:6,
16 57:6,15,22

**struck** 106:23 107:18

**structure** 116:24

**study** 105:6

**subjects** 38:19

**submit** 77:3

**submitted** 97:9

**subordinate** 125:20
126:8

**substantial** 21:20

**succeeded** 17:4

**success** 50:20

**successful** 38:1
76:21 80:13 98:23
99:1,3

**successfully** 79:16

**sufficient** 16:6

**suggest** 74:9 148:19

**suggested** 145:2

**suggesting** 94:8

**suggestion** 73:17
100:9

**sum** 17:1

**Summary** 59:6

**superficially** 59:11

**supervision** 116:20

**support** 22:11 26:16
27:8,14,19 28:10,16
29:12 48:6 55:1,9,22
56:9,12,16 57:7,15,22
58:3 71:10 83:13 84:1
85:19,23 97:6,24
108:18

**supported** 22:15,16
23:9 109:13,17

**supportive** 14:5
25:23 26:13

**suppose** 66:3

**surprise** 42:14

**surprised** 64:13,14

**surveys** 23:17,18
91:23

**suspend** 94:2 97:7
98:1,9,20

**suspended** 94:9

**suspension** 98:20

**sworn** 6:2 88:15

---

**T**

**table** 36:7

**tabled** 96:10

**tagline** 54:22

**taking** 6:13 43:14
56:21 91:21 94:22
129:15

**talk** 18:17 42:15 47:21
70:21 72:13 73:11
98:24 130:9 147:5
150:16

**talked** 28:9 35:13
40:19 91:23 93:8
112:5 128:18 131:17

**talking** 8:10,11 10:8

18:1 28:3,17 33:6
42:13 52:6 54:3 60:23
70:16 74:6 109:12
116:17 130:10 146:21

**teams** 118:6

**telling** 54:2 64:20

**ten** 7:18 13:5 110:6
152:3

**term** 9:5 84:21

**terms** 21:19 40:10
48:23 63:13 65:5 86:3
88:6,13 89:22,23 90:2

**testifying** 147:14,15,
21

**testimony** 7:4 88:15
89:2 110:1 112:11
153:5

**text** 33:24 35:22 41:20
67:10 76:2

**themes** 86:1

**thick** 139:8

**thing** 22:19 31:9 42:9,
15 50:3 52:22 66:4
69:9 105:19 139:22

**things** 8:9 15:8 29:10,
20 35:9 70:22 74:12
85:22 86:24 87:2 89:4,
6 95:19 102:19,22
107:12 138:7

**thinking** 32:21 61:1
88:10,21 109:6

**thought** 35:19 51:4
62:17 89:9 92:13
95:15 106:21 107:22
108:4 138:5 142:18
146:14

**thousand-plus** 23:24

**three-page** 42:20
143:8

**Thress** 54:7,9

**thrust** 48:18 49:2

**time** 12:14,18 16:6,14
29:4 30:23 32:1,4 34:5
37:11 39:17 42:22
47:2 49:11 51:5 54:13,
23 55:14 60:3 61:20

62:2 75:7,18 77:1
81:4,22 82:10 90:4
94:5,16 96:21 105:3
108:1,11 111:22
114:24 120:18 126:13
134:16 139:10,20
153:3

**times** 6:15,16 11:7
16:21 17:7 50:17
87:18 94:23 96:10
112:5 115:17 137:10
147:4 148:3 152:2

**timing** 32:3

**title** 59:6 117:12

**titled** 30:15

**today** 6:14 7:4 10:12
28:3 30:23 44:22
46:14 54:24 55:15
56:5,18 57:22 78:5
88:15 94:23 101:19
112:5 127:6 131:17
137:5,11 140:5

**told** 50:20 56:15 68:12
106:11,17 107:22
112:16 114:10

**Tom** 13:21 99:21
132:1

**top** 25:17 93:19

**topic** 44:7 75:21

**touch** 52:21

**touched** 12:8 93:8
113:8

**track** 80:20

**tradition** 15:18

**traffic** 64:8 86:4

**trailed** 101:7

**transaction** 148:24

**transcript** 139:23

**transcripts** 36:19

**transparent** 87:24
100:17

**traps** 79:16

**trip** 9:18,19

**true** 52:14 69:18 104:8

120:1 123:12 131:8
139:11 143:20

**trust** 56:23

**truth** 112:2,3

**Tucker** 65:24

**Tuesday** 104:2
139:13 140:13 141:10

**turn** 25:15,16 61:24
69:3 97:3 136:12
139:6

**Turning** 81:7 82:12

**two-page** 39:6

**type** 106:7 116:23

**types** 48:19 63:14


**U**

**U.S.** 19:6

**Uh-huh** 51:13 57:9
67:23 122:2

**ultimately** 37:24
70:12 76:21 117:10
128:23 134:21

**UMC** 81:11

**UMCH** 11:8 13:1,3
17:8,13 18:6 21:7,14
22:6 23:8 24:21 25:10
30:15 32:6 33:4 42:11
44:7,20 45:10,16,20
47:12,14,24 48:3
50:21 53:6,9 55:13
59:7,17,21 60:5 62:8,
21 63:9 66:24 68:2
70:8 71:7 72:6 73:3,5,
10,18,23 74:10 75:21,
22 76:4,11 78:2 83:12,
24 86:3,24 90:6,14
94:5,8 99:9 106:6
112:19,21 113:1,11
114:14 129:3 130:1,7,
23 137:12 138:18
145:5,13

**UMCH-RELATED**
99:24

**UMCH/LIFESTYLE**
12:20

**unanimously** 96:16

**unchallenged** 52:13

**understand** 7:3,10
15:4 17:18 18:5,9,12
19:8,12,13 26:9 27:1,8
41:16 46:15 53:6
57:18 59:23 61:14
65:17 69:18,24 77:15
78:13,19 91:13 100:24
102:13 115:1 121:23
133:6 135:11

**understanding** 28:12
60:7 68:23 80:15
115:23

**understatement** 53:3

**undertaken** 90:5

**underway** 114:23

**unequivocal** 23:21

**United** 20:13 136:19

**units** 107:6

**universal** 35:6

**unlike** 117:14

**unproductive** 96:17
134:19 137:14 138:7

**unproductively**
146:13

**unrelated** 129:4

**unsuccessful** 144:17

**unusual** 49:13 121:18

**update** 34:12 35:5
37:10,18,23 38:15
66:24 68:2,15,20
75:22 76:5,14 77:7
81:11,19 88:24 90:6,
17 91:20 92:8 94:3,8,
16 95:1 97:7 98:1,10,
21 111:18 113:2
114:14 137:2,12

**updated** 90:20 91:14
92:3

**updating** 47:16 90:12
99:4,9 137:19

**urged** 97:6,24 98:6

**USA** 79:9

**V**

**vacant** 17:11

**vague** 78:24

**vast** 17:11

**VC** 114:17,18,21

**verbally** 6:24

**vested** 68:19

**video** 6:9

**view** 94:24

**viewpoint** 76:15

**views** 116:21

**vision** 21:13,18 22:12,
15,24 23:4 25:19,24
26:2,4,7,14 27:20
28:12 60:5 78:2 83:14
84:2 85:20,21 115:13
117:13 118:2,6,12,19

**visioning** 114:22
115:2,4,11,12,24
116:5,18,21

**visitors** 80:10

**visual** 35:22

**visuals** 35:21

**vivid** 45:23

**voice** 15:19 17:2
43:24

**voiced** 34:15 37:17

**voices** 141:19

**volunteer** 14:21

**vote** 36:9 38:15
135:21

**votes** 134:22

**vulnerable** 97:9

**W**

**wage** 109:19

**wait** 6:18 26:1,6 31:14
117:20 123:24 124:12

**waited** 7:8

**waiting** 151:6

**walkability** 86:1

**wanted** 29:21 36:3,11
52:14 76:15 77:7
100:8 101:11 116:21
119:19 122:15

**wanting** 36:13

**WARD** 13:13,17 14:1
18:1,3 19:14,18 27:1,
14,19 40:9,11 65:12,
18,19,20 78:2 83:5,14
84:2,3,24

**WARD's** 18:5 23:17
84:9,12,19

**warranted** 51:5 94:21

**warrants** 50:21

**wasted** 96:21

**watch** 36:17

**waters** 128:9

**ways** 28:9 30:6 35:21
37:17 53:2 96:18

**website** 84:12 85:1

**WEC** 20:15 23:13
31:23

**week** 54:21 86:20
133:18 147:13,20

**weekly** 29:14

**weeks** 45:3 92:12
133:18

**weigh** 34:20

**weighing** 129:10

**welfare** 109:3

**West** 128:3

**whatsoever** 88:8

**white** 83:14 84:3,9,21
85:1,21

**widely** 23:8

**widespread** 34:10

**wife** 9:11,19 14:16
26:21 40:16

**willy-nilly** 37:5

window 95:8,16

wintertime 16:10

wished 29:24 73:14

withdraw 130:12

Withdrawn 132:13

withdraws 123:22

word 6:14 45:1 76:6
83:17 137:7 144:20

wording 134:9

words 41:6 68:16,18
97:14 100:2,15 108:12
111:2 145:14

work 8:14 132:6,17
133:10 152:20

worked 116:12 117:4

working 69:14 73:8
113:19

world 94:17

Worthington 7:6 8:22
10:8 13:13 14:4,8,11,
13 15:16 16:2,13 17:1
19:24 25:13,21 29:6
32:2 40:13,14,18 41:4
46:2,12 53:23 59:13
77:18 78:13,20 79:3,5,
21 80:14 86:5,20
117:13 126:21 127:11
128:4,6,15 129:6,10
130:13 138:11

Worthington's 54:20
77:13 78:4 79:24

worthy 64:1

WP 129:24 130:9,17,
21

wrapped 110:21

write 114:17

writing 41:14 57:13
67:19 151:14,15

written 37:12 69:13
84:3 90:1 145:18,19
146:6,17 147:10 148:8

wrong 80:23 142:5

wrote 44:4 46:4 50:17
72:10 75:20 82:17,23

83:4,9 92:7 95:5
123:22

WWR 40:24 41:4

**Y**

yard 14:19

Yaromir 55:13 73:1

year 99:6 116:10

years 7:17,18,23 8:19
13:5 18:13,14 20:10,
15 21:15 24:21 31:1
35:8 37:9 42:14 51:16,
19 55:5,11 59:18 66:3,
19 69:14 70:2 73:1,22
78:10 81:23 87:14,17
89:12 91:21 92:14
94:16 110:6 114:11
147:3 152:3

yes-or-no 147:17

**Z**

zoning 21:22 33:10,11
36:22 37:4 60:9
108:19 109:1

**Michael, Bonnie**

| | |
|---|---|
| From: | Bonnie.Michael@worthington.org |
| Sent: | Mon 9/21/2020 1:03 PM (GMT-00:00) |
| To: | Greeson, Matt <Matt.Greeson@worthington.org> |
| Cc: | |
| Bcc: | |
| Subject: | Fwd: 2014 UMCH Comprehensive Plan Update -- motion to temporarily suspend |

Matt

We need to talk on logistics.   I am free till 9:40 or 12:15-1:45 and 2:44 to 7:15

What's good for you?

Bonnie

Sent from my iPhone

Begin forwarded message:

**From:** "Robinson, David" <David.Robinson@worthington.org>
**Date:** September 20, 2020 at 4:32:25 PM EDT
**To:** "Bucher, Peter" <Peter.Bucher@worthington.org>, "Dorothy, Rachael"
<Rachael.Dorothy@worthington.org>, "Kowalczyk, Beth"
<Beth.Kowalczyk@worthington.org>, "Michael, Bonnie"
<Bonnie.Michael@worthington.org>, "Myers, Scott" <Scott.Myers@worthington.org>,
"Robinson, David" <David.Robinson@worthington.org>, "Smith, Doug"
<Doug.Smith@worthington.org>
**Cc:** "Greeson, Matt" <Matt.Greeson@worthington.org>, "Stewart, Robyn"
<Robyn.Stewart@worthington.org>, "Lindsey, Tom" <Tom.Lindsey@worthington.org>,
"Thress, D. Kay" <Kay.Thress@worthington.org>
**Subject: 2014 UMCH Comprehensive Plan Update -- motion to temporarily suspend**

***Please do not Reply All***

Dear fellow Council Members,

Way back when, pre-covid, prior to what was going to be our retreat weekend, I had
proposed to Matt and Council leadership that we discuss the status of the 2014 UMCH
Comprehensive Plan Update.  Matt addressed this issue on 1.31.2020 via a
Memorandum to City Council, answering questions and presenting several possible
options for action by Council.  As we know, covid struck, overtaking most agenda items
for the city other than those deemed essential and time-critical in that moment.  As a
result, the status of the UMCH Update was pushed to a very back burner.



EXHIBIT

3 4

To the point: I believe we now face what may be a very short window of opportunity to discuss and act on this issue, and that we owe it to ourselves and the community to do so. The issue of UMCH, more than any other during the prior decade, has generated continued and intense interest—and acrimony—among the residents, and will continue to do so until successfully resolved. Accordingly, I will be making a motion at tomorrow night's meeting to "temporarily suspend" the UMCH portion of the Comprehensive Plan pending further update. Please know that I am going to make this motion in this rather sudden manner because of the urgency that we act while we can. I anticipate a thoughtful discussion—not about the whole of UMCH—but about the rationale for a suspension of the 2014 Update. I of course hope you will, upon reflection, support this motion.

In sum, my reasons for making the motion for suspension are:

1. The Update is already old, in years (prepared 2013-14) and content. Significant cultural and economic changes have taken place during the last seven years, and within Worthington itself significant demographic shifts further compound these broader societal evolutions. I believe that our commissioning of the current visioning process demonstrates our recognition that change is taking place. Our Comp Plan, especially regarding the central issue of UMCH, should likewise acknowledge, reflect, and support harmonization with these changes.
2. Experience (2012, 2015, to the present) has demonstrated that the current Plan does not enjoy the "consensus" status that it claims for itself. If we leave the current Plan in place, perpetuating this claim of authority, I believe it will continue to sour the mood, provoking further division in our community. Legitimate questions will arise as to why City Council has failed to listen and learn—and to act. Let's not embody the popular definition of insanity: To repeatedly do the same thing and expect different results.
3. Conversely, suspending the 2014 Plan would clear the air, clean the slate. We would create open psychological space for fresh thinking and new ideas, unburdened from having to defend prior plans and processes. All concepts and ideas—including high-density New Urbanism—could receive fair and equal treatment.
4. Lastly, and importantly, by proactively suspending the 2014 Plan, we can avoid the possibility of the city being placed in a vulnerable, defensive position, if a submitted development plan conforms in general with the Comp Plan and yet is rejected.

There are more reasons, and countless ways to express them, but this is a fourfold outline that I hope makes sense and is persuasive in some way for all of you. I look forward to discussing the motion at tomorrow's Council meeting. Thank you for your consideration.

David

David Robinson

14000

City Council Member
Worthington, Ohio
mobile - 614-893-4573
david.robinson@worthington.org
davidrobinsonblog.com

To the casual observer, the UMCH-LC project may seem to have taken on a life of its own, gaining momentum as the wheels of government steadily turn, leading inevitably to that day of a done deal. At the May 18th Council meeting where UMCH was discussed, the impression of unstoppable motion was likely reinforced, as city staff and council members, each in their own way, suggested that they were not the responsible agents in this affair. One was led to believe that it is other persons, other entities, other processes that are driving the train and pulling the strings. But not the City.

This disposition is a potential problem for residents concerned about the fate of UMCH. If one is not responsible, then one is not accountable. And accountability, as the guarantor of wise public policy, is what we now need most.

Here are a few highlights from the meeting that illustrate this issue:

1) Does the City have "control" over the UMCH property?

2) Is the City a bystander regarding the solicitation of prospective developers?

3) Is the 9/3/14 amended Comprehensive Plan a "consensus" document (and therefore authoritative)?

## 1) Does the city have "control" over the UMCH property?

In opening remarks about the UMCH project, a city official said the city doesn't "control" the property. Yes, UMCH owns the land and possesses the private property rights. That's understood. However, our City Council <u>does</u> have legal authority over the zoning of the property, which represents a powerful element of control over what can and cannot be done with the land.

Fully 70% (31 acres)* of the property is zoned S-1 (institutional, e.g., religious, educational, medical), which means that apartments and other residential buildings cannot be built unless the zoning is changed. The current status is "no apartments." So it is only by a deliberate, conscious act by the members of Council—by a majority of them saying "yes" to a rezoning ordinance—that there will be high-density apartments at UMCH. And to prevent apartments, all that Council needs to do is table any rezoning motion that includes the apartments, or, more boldly, vote "no." It is their choice.

So the city staff member's characterization of control represents only half the picture. The full picture is that City Council has legal authority to exercise significant control over the future use of this beautiful plot of land in the heart of our city. Given the far-reaching



EXHIBIT
87
IGAD 800-531-6989

Worthington 041889

consequences, this legal authority is not only a right—it is a responsibility—which I hope our City Council members will acknowledge and exercise for the long-term benefit of our community.

* The remaining 30% of the property is zoned either commercial/office (10 acres along High Street), or Senior Citizen (3.5 acres at the Sunrise facility).

## 2) Is the city a bystander regarding the solicitation of prospective developers?

During the public comment period, resident Erin Armstrong suggested that the UMCH property would be suitable for a higher education facility (consistent with Worthington's traditions), and that the city should look in to this possibility. In response, a member of Council suggested that it would not be appropriate, or even possible, for the city to try to influence who buys or uses the UMCH property. This echo of "we don't control it" was hard to understand. Sure, I expect UMCH and private businesses to initiate and engage in whatever negotiations they see fit. But doesn't the city have an economic development staff that is tasked with attracting businesses and institutions to Worthington? That's their job. So why would it be different with UMCH?

But the city's efforts to determine the future of UMCH precede, and are far more basic, than the soliciting of specific tenants or developers. For example, early in the process the city made the consequential decision to hire MKSK, the consulting firm, to write the amended Comprehensive Plan, and to manage the associated public relations campaign. Given the close history between the City and MKSK (they wrote the 2005 Plan), the possibility of an independent and fresh perspective was precluded. A different consulting firm, with a different range of expertise, a different agenda, and different deliberative process, could have afforded us a very different outcome than the one we currently face. But the city hired MKSK, which largely determined the contents of the amended Plan from the outset.

To understand how MKSK shaped the parameters and terms of the process, it's useful to go back and look at the slides that structured their 12/4/13 public forum (http://www.worthington.org/DocumentCenter/View/1496). For example, at the beginning of their presentation, MKSK tells us that the "market," "city finances," and our "community" (symbolized by three interlocking, equal-sized circles) represent a "balance of needs." Really? Aren't "city finances" part of the community's interests? Why show them as competing entities? After all, isn't the entire apparatus of city government supposed to serve the community's interests? Further, why should we (and our city council and staff) give the "market" equal status to the "community?" Who established that? Yes, I realize that finances and business interests are critical factors to be included in any analysis, but to say that the "community" is only a third of some decision-making formula is a strange calculus to me.

2

Worthington 041890

Following the "Balance of Needs" slide, MKSK proceeds to tell us what the market "needs." We are asked to accept the self-contradictory idea that in order to stay prosperous we ought to follow "societal trends" such as creating "distinctiveness." People want something "authentic," therefore (we are told) our already-distinctive, historic community should try to be like others by building high-density population urban centers. Sound confusing? It is, but this is what their slides promote. And this is who the city hired.

So the city, protests notwithstanding, has been <u>very involved</u> in determining what ideas, and which persons, will be brought in to the process for meaningful consideration—and what is to be excluded. Not surprisingly, the resulting amended Comprehensive Plan prepared by MKSK reflects a very specific perspective and agenda. Which brings me to a third point.

### 3) Is the 9/3/14 amended Comprehensive Plan a "consensus" document (and therefore authoritative)?

Toward the end of the Council meeting's public comments period, a lead member of Council said that a large public majority had supported the amended Comprehensive Plan. This statement is consistent with the claim on the city's website that the amended plan is a "consensus" document (http://www.worthington.org/DocumentCenter/View/2035). The subtext of these claims of broad-based public support, is that the amended Comprehensive Plan is, and ought to be, the defining authority regarding the future of the UMCH property. And indeed, the city's website explicitly states this: "Once the application [for UMCH development] is submitted, the criteria outlined in the City's Comprehensive Plan will be used to evaluate the submittal." (http://worthington.org/index.aspx?NID=624#). So the status we accord the revised Comprehensive Plan is of critical importance. Is it in fact a consensus document imbued with substantial authority?

Recent facts, in the form of public comment, suggest the opposite. If you look at the long string of WARD blog comments (https://groups.google.com/forum/?utm_source=digest&utm_medium=email/#!forum/ward-members-google), as well Representative Mike Duffey's Facebook posting and comments regarding UMCH (https://www.facebook.com/StateRepMikeDuffey?fref=ts, particularly the posting from 5/4/15, 1:13 p.m.), the public reaction to the Lifestyle Communities' proposal has been one of widespread, visceral opposition. For example, "No way!", "PASS", "This is shameful!!!", "no", "No", "Horrible!", "No thank you." And, one of my favorites, "Too bad that Facebook does not have a DISLIKE button."

This reflexive opposition appears to be the real consensus, suggesting that the amended Plan, and the project it birthed, reflects the ideas and ambitions of city staff, their

Worthington 041891

consultants, and other members of city government, and not the predominant views and interests of the Worthington community itself.

Perhaps some will protest that this has been a very open process with public hearings, etc.? But simply because there have been public forums, and meetings between staff, council, and members of WARD, etc., does not mean that the expressed interests of the public have been meaningfully incorporated in to the amended Plan—or the LC project now before us. The mere fact that hearings are held does not mean that the public's words are heard. Or respected. If the speech of an individual, or the public at large, is to have meaning in a democratic society, then their ideas must have real potential to tangibly shape resulting policy. I don't see evidence of this within the amended Plan or the LC project, since the contents conform closely to what was proposed by the consultants at the outset.

So I can't accept the claim that the amended Comprehensive Plan represents a mandate. Instead, I see it as the city-consultants' plan, and not the residents' plan. This is not to say that the Plan is not a thoughtful and valuable document. It is. But it represents a specific interest and viewpoint, and should be given just that much authority and no more. To claim otherwise is demeaning to those who do not see their own repeated objections, suggestions, and requests reflected in either the amended Plan or the LC proposal.

For a development project to legitimately claim public endorsement, a very different process from what we have experienced would need to be pursued: a very public, and publicized, exploration of a broad range of truly distinct options for the property (and not minor variations of the same theme), tapping in to multiple sources of inspiration and expertise. For all viable development options, our city would make public comparative analyses of impacts on traffic patterns, schools, existing home values, our quality of life, and our city's coffers. Without these comparative studies, the public cannot make an informed judgment, and is rendered more vulnerable to the arguments and claims of those who suggest they know better.

In sum, I would hope for a process whereby we, the Worthington residents, broadly informed about different development scenarios, have a central role in determining the future character and quality of our community. This would be in the best of democratic traditions, which is why some try to skirt it, and we must assert it.

| | |
|---|---|
| From: | Greeson, Matt [/O=COW-EXCHANGE/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=MGREESON] |
| Sent: | 3/19/2018 1:13:47 PM |
| To: | Michael, Bonnie [BMichael@ci.worthington.oh.us]; Myers, Scott [SMyers@ci.worthington.oh.us]; Scott Myers [William.Myers2@ohioattorneygeneral.gov] |
| Subject: | FW: Retreat follow-up: UMCH info |

I am going to contact each of you to discuss the email below. I have had a follow with Council Member Robinson regarding it.

*Matt Greeson*
City Manager
City of Worthington
6550 N. High Street
Worthington, OH 43085
614-436-0368 (Direct)
614-436-3100 (Main Office)
614-786-7355 (Fax)
mgreeson@ci.worthington.oh.us

**From:** David Robinson [mailto:davidwhitfieldrobinson@gmail.com]
**Sent:** Monday, March 19, 2018 10:39 AM
**To:** Greeson, Matt
**Cc:** Robinson, David
**Subject:** Fwd: Retreat follow-up: UMCH info

Good morning Matt,

As you'll recall, the February 9/10, 2018, Council/Staff retreat concluded with a discussion about UMCH. As an outgrowth of the conversation, and at the concurrence of Council members, you agreed to provide rough information related to impacts on city finances of a possible acquisition of property at UMCH. A week after the retreat, not having received any of the requested information from you, I drafted and sent you an email (copied below) in an effort to help you focus and simplify your fulfillment of this task.

It is now four weeks since I sent the earlier email, and Council has still not received a reply to you in any form, much less the satisfaction of Council's instructions to you to generate and provide this basic information. I find your lack of response on this pivotal, time-sensitive issue to be a serious matter, and I ask that you answer this current request promptly with either the information requested, or a specific description of your timeline and plans to do so.

I look forward to your reply.

Best Regards,

David

David Robinson
614-893-4573 - cell
195 E Dublin Granville Rd
Worthington, OH 43085



EXHIBIT

90

PENGAD 800-631-6989

---------- Forwarded message ----------
From: **Robinson, David** <DRobinson@ci.worthington.oh.us>
Date: Mon, Feb 19, 2018 at 11:34 AM
Subject: Retreat follow-up: UMCH info
To: "Greeson, Matt" <MGreeson@ci.worthington.oh.us>
Cc: "Michael, Bonnie" <BMichael@ci.worthington.oh.us>, "Myers, Scott" <SMyers@ci.worthington.oh.us>,
"Dorothy, Rachael" <RDorothy@ci.worthington.oh.us>, "Foust, Douglas"
<Doug.Foust@ci.worthington.oh.us>, "Kowalczyk, Beth" <BKowalczyk@ci.worthington.oh.us>, "Smith,
Doug" <DSmith@ci.worthington.oh.us>, "Brown, Lee" <LBrown@ci.worthington.oh.us>, "Bartter, Scott"
<SBartter@ci.worthington.oh.us>, "Hurley, Darren" <DHurley@ci.worthington.oh.us>

Hello Matt,

Thank you for your candor, thoughtfulness, and focus at the recent Council/Staff retreat. I found the time
together to be very productive, both regarding specific issues and in furthering group understanding and
cohesion. This may sound over-the-top, but I wish we could hold such meetings every quarter or so if
circumstances warrant.

I wanted to follow-up on one specific item—the provisioning of information regarding different land-use
scenarios at UMCH. As you made clear, what you will generate will not be concrete, specific, validated, ready-
for-the-bank numbers, but will be in the nature of estimates and probabilities, all based on the best information
and most reasonable range of assumptions available to us today. Further, my understanding is that the scope of
your analysis will be limited to impacts on city finances, and will not attempt to address issues regarding
impacts on traffic, sustainability, quality of life, community appeal and identity, or business environment. These
issues I believe will be engaged robustly in the upcoming public CP review process.

My basic request is that you focus on gathering and presenting information that is geared toward Council's
actual decision-making processes, and that you and staff not be burdened with the task of trying to be
comprehensive in order to address a wide range of inquiry. The core questions I have are as follows:
•       What is the range of estimated net income tax revenue (over time), per acre, for different types of
commercial development (e.g., office, medical-service, retail, and "mixed-use"); please provide statement of
assumptions behind the estimates so that we can assess probabilities and alternatives.
•       What is the range of estimated costs (one-time, and continuing), per acre, for different types
of residential development (e.g., single-family, condos, and apartments; will the Dublin study help here?);
please provide statement of assumptions behind the estimates so that we can assess probabilities and
alternatives.
•       What is the range of estimated costs (one-time, and continuing), per acre, for different types of public
greenspace acquisition/development (e.g., passive, recreational, etc.); please provide statement of assumptions
behind the estimates so that we can assess probabilities and alternatives.
In addition to providing raw numbers, I believe it would be helpful if you provided several scenarios in order to
illustrate overall impact of different land-use options using the income/expense numbers you will have
developed. If you do this, I would suggest that your scenarios remain simple and focused on enabling Council to
make clear, comparative assessments. In other words, the most useful analysis would keep constant certain
factors (those that enjoy, in general terms, basic agreement) while varying others (those that may be seen as
most contested, and are therefore at the heart of upcoming decisions). What would not be helpful would be the
presentation of several scenarios where many factors blur and mix among the different scenarios in such a way
that we are left with no basis for discerning the pros and cons of different options. Please keep things
differentiated, clear, and explicit.

Specifically, I believe that a central issue before us is the relative costs and benefits of residential vs. public
greenspace. As such, it would be most helpful if you could provide several scenarios that would keep constant
two assumed factors: a) the front ten acres will be developed commercial (or, if you prefer, the front 6.5 acres,

which would be excluding the conference center's acreage); b) the seven along Tucker Creek will remain undeveloped; while the third element would be variable: c) the back twenty six acres, presented with varying proportions of residential and public greenspace. One scenario could be twenty six acres of residential, another could be twenty six acres of greenspace, and a third could be thirteen each. I fully realize that these scenarios are crude and simplistic, but they will give us a means of thinking based on numbers and not vague hunches or biases.

Lastly, I want to acknowledge that the actual, final development of the property is likely to not fit neatly in to the three categories of commercial, residential, and greenspace, and that the acreage allotted to each is fluid and possibly overlapping. The possibility of "mixed-use development" e.g., apartments above commercial, is an example of this. I understand this. But this fluidity makes it all the more important that City Council be provided with clear numbers based on discrete land-use categories, and the explicit assumptions underlying them, so that Council members can get a grasp on the essentials in our effort to make informed decisions in the public interest.

Thank you again Matt. I of course welcome any discussion about this request for information, with you, staff and/or other Council members. I look forward to working with all to bringing the UMCH issue to successful resolution.

David

Sent from my iPad

Information from ESET Endpoint Security, version of detection engine 17082 (20180319)

The message was checked by ESET Endpoint Security.

http://www.eset.com