*LIFESTYLE COMMUNITIES*

*vs.*

*CITY OF WORTHINGTON*

---

Deposition of

**Doug Smith**

October 10, 2023

---



614.460.5000 | www.priohio.com | pri@priohio.com

1

IN THE UNITED STATES DISTRICT COURT
2       SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

3

4   LIFESTYLE COMMUNITIES,      )
LTD., ET AL.,               )
5                               )
     Plaintiffs,            )
6                               )
     vs.                    )   Case No.
7                               )   2:22-cv-1775
CITY OF WORTHINGTON,        )
8   OHIO,                       )
                                )
9        Defendant.            )

10

11

12                  DEPOSITION

13                 of DOUG SMITH

14

15        Taken at Worthington City Hall
6550 North High Street
16        Worthington, Ohio 43085

17     on October 10, 2023, at 1:08 p.m.

18

19        Reported by: Rhonda Lawrence

20

21                  -=0=-

22

23

24

1   APPEARANCES:

2

        Christopher L. Ingram
3       Emily J. Taft
        VORYS SATER SEYMOUR AND PEASE LLP
4       52 East Gay Street
        Columbus, Ohio 43215
5       614.464.5480
        clingram@vorys.com
6       ejtaft@vorys.com

7            on behalf of the Plaintiffs.

8

9       Richard J. Silk, Jr.
        DICKIE McCAMEY
10      10 West Broad Street, Suite 1950
        Columbus, Ohio 43215
11      614.258.6000
        rsilk@dmclaw.com
12
             on behalf of the Defendant.
13

14

15

16

17

18

19

20                  -=0=-

21

22

23

24

1                        STIPULATIONS

2                It is stipulated by and among counsel

3    for the respective parties that the deposition

4    of DOUG SMITH, the Witness herein, called by the

5    Plaintiffs under the applicable Rules of Federal

6    Civil Court Procedure, may be taken at this time

7    by the stenographic court reporter and notary

8    public pursuant to notice; that said deposition

9    may be reduced to writing stenographically by

10   the court reporter, whose notes thereafter may

11   be transcribed outside the presence of the

12   witness; and that the proof of the official

13   character and qualification of the notary is

14   waived.

15                        -=0=-

16

17

18

19

20

21

22

23

24

1                    INDEX OF EXAMINATION

2                                              PAGE

3    BY MR. INGRAM:                              6

4

5

6                    INDEX OF EXHIBITS

7    EXHIBIT              DESCRIPTION           PAGE

8      1     Land Use Plan                       72

9      6     Ordinance No. 04-2022               91

10     7     Resolution No. 04-2022             107

11    10     Agenda, 1-18-22                    116

12    27     Memo from Management Partners       60
            to Greeson/Stewart, 4-2-18
13
      31     Florey Todd Summary of Phases       71
14          for Development of the UHMC
            Property
15
      34     Email chain                         74
16
      36     Email chain                         82
17
      41     Meeting Minutes, 9-21-21            77
18
      43     City Council Minutes,               52
19          12-13-21

20    44     Email chain                         21

21    45     Email from Lee Brown, 10-5-20       39

22    46     Village Talks article               58

23    47     Email from Smith to                 85
            Michael/Myers, 10-13-20
24

1                INDEX OF EXHIBITS (continued)

2    EXHIBIT              DESCRIPTION              PAGE

3     48      Email from Smith to City          88
              Council, 1-23-21
4
      49      Blog, "I'm running for            147
5             re-election."

6     50      Screenshot of 12-21 hearing       153

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

  1                    DOUG SMITH

  2  being first duly sworn, as hereinafter

  3  certified, deposes and says as follows:

  4                 CROSS-EXAMINATION

  5  BY MR. INGRAM:

  6     Q.  Please state your name for the record.

  7     A.  My name is Doug Smith.

  8     Q.  Mr. Smith, good afternoon.  My name is

  9  Chris Ingram.  I know we just met.  I represent

 10  Lifestyles Communities.  And for ease of

 11  reference, how about we both refer to Lifestyle

 12  Communities as either Lifestyle or LC?

 13     A.  LC would be great.  Let's do it.

 14     Q.  Have you been deposed before, Mr. Smith?

 15     A.  I have.

 16     Q.  How many times?

 17     A.  Let's see.  Two depositions.

 18     Q.  When was the first deposition?

 19     A.  Would have been April of '21.  2021.

 20     Q.  And what was the subject matter of that

 21  case?

 22     A.  It was an Attorney General of Ohio

 23  versus Making Healthy Relationships, which was a

 24  nonprofit that I operated.

 1        MR. SILK:  Can I have a continuing

 2  objection on this?

 3        MR. INGRAM:  Sure.

 4        MR. SILK:  Thanks.

 5  BY MR. INGRAM:

 6     Q.  And you were a defendant in that case?

 7     A.  I was.

 8     Q.  And how about the second time you were

 9  deposed, when did that happen?

10     A.  Would have been June -- or July of 2022.

11     Q.  And what was the subject matter --

12     A.  Sorry, 2021.  They were three months

13  apart.

14     Q.  So it was July of 2021 --

15     A.  Uh-huh.

16     Q.   -- was your second time?

17     A.  That's correct.

18     Q.  And what was the subject matter?

19     A.  It was the same.

20     Q.  Same case?

21     A.  Uh-huh.  Yes.

22     Q.  I can tell you recall some of the ground

23  rules from your prior depositions for

24  depositions.  We are joined this afternoon with

1    Ms. Lawrence, who is our court reporter, and she

2    will be transcribing my questions and your

3    answers.  And so to the extent, you know, you

4    respond to questions with uh-huhs and huh-uhs,

5    you can see how that can be ambiguous on the

6    transcript.

7         A.  Sure.

8         Q.  So will you try to respond with yeses

9    and nos where appropriate and without any body

10   language, you know, shaking of the head or nods

11   of the head.  Those don't get transcribed very

12   well either.

13        A.  Understood.

14        Q.  All right.  If you do not understand one

15   of my questions, Mr. Smith, please let me know,

16   and I'll do my best to rephrase or restate the

17   question.  Okay?

18        A.  Okay.

19        Q.  And if you do not ask me to repeat or

20   rephrase a question, we're all going to assume

21   that you understood the question.  Fair enough?

22        A.  Yep.  Sounds good.

23        Q.  It's important that you and I do not

24   talk over each other.  You've done well to avoid

1   that so far.  So I will do my best to wait until

2   you finish your answers before I ask my next

3   question.  And if you could wait until I finish

4   asking my question before you begin your answer.

5   That will make things a lot easier on

6   Ms. Lawrence.

7       A.  Very good.  Very professional of you.

8       Q.  Mr. Smith, if you need to take a break

9   at any time during your deposition this

10  afternoon, just let me know.  And I'll certainly

11  need you to finish answering whatever question

12  is pending, and then I may have a couple more

13  questions or whatever, but we'll see what we can

14  do to -- when an appropriate time would be to

15  take a break.

16      A.  You can gauge my breaks based on how

17  much coffee I pour myself.

18      Q.  You have a rather large mug there.

19      A.  I have a lot to handle here.  He did a

20  full pot here for me.  So happy to share.

21      Q.  Now, it's important, Mr. Smith, that we

22  get your full, complete and accurate testimony

23  today.  So I have to ask you whether you have

24  taken any medication or are under any drugs or

1  anything at all that may make it difficult for

2  you to understand and answer my questions today?

3       A.  No.

4       Q.  Is there any reason at all why you

5  cannot give your full, complete and accurate

6  testimony today?

7       A.  No.

8       Q.  Now, earlier you swore an oath to tell

9  the truth for today's deposition.  Do you

10  understand that that is the same oath that

11  you'll be asked to testify in court?

12       A.  Yes.

13       Q.  Mr. Smith, Mr. Silk is sitting here to

14  your left today.  Is he your attorney?

15       A.  Yes, he is.

16       Q.  And what did you do to prepare for this

17  deposition?

18       A.  We had a prep session.

19       Q.  When was the prep session?

20       A.  Two weeks ago.

21       Q.  Okay.  Did you speak to anyone other

22  than your attorney to prepare for today's

23  deposition?

24       A.  No.

1     Q.  Did you review any documents to prepare

2  for today's deposition?

3     A.  Yeah, we did.

4     Q.  What documents did you review?

5     A.  Some of the public records from council

6  meetings.

7     Q.  When you refer to public records from

8  council meetings, can you be more specific?

9     A.  The December of 2020 -- all the years

10 blend together -- 2021 council meeting.

11    Q.  So you reviewed the documents in the

12 public record concerning the December 2020

13 council meeting?

14    A.  2021, correct.

15    Q.  You said December 2020 and then January

16 2021.

17    A.  December 2021, which is, I believe, the

18 application for LC in front of council.

19    Q.  Let's start with the December 2021 City

20 Council meeting.  You reviewed, you said, the

21 public records concerning Lifestyle's rezoning

22 application; is that right?

23    A.  We reviewed the minutes of that meeting.

24    Q.  Anything other than the minutes --

      1      A.  No.

      2      Q.   -- pertaining to that meeting?

      3      A.  Not that I recall.

      4      Q.  How about the January 2022 City Council

      5   meeting?

      6      A.  No.

      7      Q.  How about the February 2022 City Council

      8   meeting?

      9      A.  No.

     10      Q.  Did you review any documents other than

     11   the minutes from City Council's December 2021

     12   meeting?

     13      A.  Not that I recall.

     14      Q.  And I should have pointed this out

     15   earlier.  When I say documents, I'm also

     16   referring to any emails or anything in writing

     17   at all.

     18      A.  My statement stands.  Best I can recall.

     19      Q.  Okay.  So did you review the complaint

     20   that was filed in this case to prepare for

     21   today's deposition?

     22      A.  Are you talking about in the prep

     23   session, or did I individually -- can you

     24   clarify that?

1    Q.  Sure.  My question's broader than your

2  prep session.  My question is -- pertains to

3  whatever you did to prepare for today's

4  deposition, whether that was in the prep session

5  or beyond that.

6    A.  I did review -- independently of

7  counsel, I did review the minutes of the January

8  2022 meeting, City Council meeting minutes, and

9  reviewed the complaint statement as well.

10    Q.  Okay.  Independently, to prepare for

11  today's deposition, I understand that you did

12  review the minutes from that January 2022

13  hearing?

14    A.  Correct.

15    Q.  The complaint that was filed?

16    A.  Correct.

17    Q.  Did you review any other documents to

18  prepare for today?

19    A.  Not that I recall.

20    Q.  Okay.  Did you talk to anyone other than

21  your counsel to prepare for today's deposition?

22    A.  No.

23    Q.  You've been a member of City Council

24  since 2012; is that correct, Mr. Smith?

1    A.  That's correct.

2    Q.  Do you communicate via text message

3  about City Council matters?

4    A.  No.

5    Q.  Okay.  Why not?

6    A.  I don't like to text because I don't

7  text people back.

8    Q.  Fair enough.  How do you generally

9  communicate with other City Council members

10  pertaining or concerning to City Council

11  matters?

12    A.  I do that in public forum.

13    Q.  Do you ever have phone conversations

14  with them?

15    A.  Occasionally.

16    Q.  Okay.  Do you ever email?

17    A.  I can't say never, but I've rarely

18  emailed other councilmembers.

19    Q.  Do you ever speak with City Council

20  members outside of the City Council hearings or

21  executive sessions about City Council matters?

22    A.  Rarely.

23    Q.  Councilman Smith, have you ever run for

24  any other offices?

1    A.  I have.

2    Q.  What were those?

3    A.  I ran for the Ohio House of

4  Representatives in 2017.  Would have been the

5  2018 election.

6    Q.  Any other offices?

7    A.  No, I have not.

8    Q.  Being elected to City Council here in

9  Worthington in 2012 is the first office you've

10  held?

11    A.  It is.

12    Q.  Have you served on any boards or

13  commissions prior to being on City Council?

14    A.  Prior to being on City Council, yes.

15  Yeah, I think the answer's yes to that.

16    Q.  I appreciate it was in 2012.

17    A.  It's hard to remember that.

18    Q.  Do you recall any boards or commissions

19  prior to 2012?

20    A.  I do.  I served on the International

21  Board of Trustees for Circle K, which is the

22  college version of Kiwanis.  I don't know if

23  that's what you're looking for, but...

24    Q.  Okay.  Since you've been a member of

1    City Council, what boards or commissions have

2    you served on?

3        A.  The Worthington Community Improvement

4    Corporation, the CIC.  I was appointed by

5    council -- sorry, recommended by council to

6    serve on the CIC as the council liaison, and

7    that was -- math -- I served for nine years, and

8    I was term limited, and it ended December '22.

9    So if you do the math backwards from that, there

10   you go.

11       Q.  2013 to --

12       A.  January '14 through December of '22.

13           MR. SILK:  Make sure he finishes his

14   question.  Okay?

15           THE WITNESS:  Got it.

16   BY MR. INGRAM:

17       Q.  Any other boards or commissions that

18   you've served upon while you've been a member of

19   council?

20       A.  No.

21       Q.  Do you have any educational training

22   that, in your mind, has any bearing upon zoning

23   matters?

24       A.  Can you define educational training?

1     Q.  Sure.  Did you take any college courses,

2  major in any subject matter that would have

3  bearing upon zoning matters?

4     A.  I don't think so.

5     Q.  Do you have any professional

6  certifications that have -- would have any

7  bearing upon zoning matters?

8     A.  I have no professional certifications.

9     Q.  That would have been a better question

10  to start with.  Thank you.

11        What experience, Councilman Smith, do

12  you have in zoning or planned unit developments?

13     A.  As a member of council, I've seen, you

14  know, zoning policies, including PUD policies in

15  front of council and discussed with staff.

16     Q.  Okay.  Anything else?

17     A.  That's it.

18     Q.  How about in connection with your

19  position on the CIC?

20     A.  No.

21     Q.  When you referred to zoning policies,

22  can you describe or explain what you're

23  referring to when you say zoning policies?

24     A.  Yeah, zoning policies as it relates to

1    the City of Worthington, the codes, the

2    ordinances, the zoning map itself.  I defer to

3    staff on the expertise that they have, but they

4    do bring that information to council for

5    educational sessions and occasionally policy

6    changes.

7        Q.  Okay.  And with respect to your

8    deference to staff, any particular members of

9    Worthington staff that you would defer zoning or

10   plan unit development questions to?

11       A.  I think by charter our council's role --

12   and my understanding is -- you know, we work

13   with the city manager directly, and then they

14   defer whatever appropriate experts on staff

15   exist, or experts in some cases.

16       Q.  Generally speaking, Councilman Smith,

17   with respect to zoning or planned unit

18   development matters, would you interact with the

19   planning commission members?

20       A.  No, not generally.

21       Q.  Okay.  Why not?

22       A.  As a councilmember?

23       Q.  Yes.

24       A.  Do I -- can you describe that a little

1    bit more.  What do you mean, interact?

2        Q.  Sure.  Do you email them, talk to them,

3    review any zoning applications or planning and

4    development site plans, those types of

5    interactions?

6        A.  I do not interact with the zoning

7    members or the Municipal Planning Commission

8    members in that way.

9        Q.  Okay.  Why not?

10       A.  I don't personally believe that it's my

11   job.

12       Q.  So fair to say your interaction would be

13   with the city manager, to the extent you had any

14   interactions?

15       A.  City manager, interactions regarding?

16       Q.  A zoning or planned unit --

17       A.  Yeah, I mean, standard process was --

18   they would -- city manager would bring in

19   information to council and they might defer to a

20   staff expert to talk a little bit more about a

21   specific policy or issue.

22       Q.  So, for example, a staff member with

23   expertise, would you put Mr. Brown in that

24   category?

1      A.  I believe the city manager has relied on

2   Mr. Brown in that capacity.

3      Q.  Can you think of any other city staff

4   members?

5      A.  Mr. Brown is the director of planning,

6   so I believe he is the point person for those

7   matters.

8      Q.  But you yourself, can you think of

9   anyone else other than Mr. Brown?

10      A.  I can't.

11      Q.  Now, you mentioned you were the City

12   Council liaison to the CIC between January 2014

13   and December of 2022.  In your capacity as that

14   liaison, did you attend the CIC meetings?

15      A.  I did.

16      Q.  Okay.  Did the CIC ever discuss the UMCH

17   property?

18      A.  I don't remember a time when we ever

19   discussed the property.

20      Q.  And I want to be clear, what I'm

21   referring to -- when I say the UMCH property,

22   I'm referring to the property directly across

23   the street from us today.

24      A.  (Nods.)

1      Q.  And you're nodding your head and in

2  agreement.  Do you understand which property I'm

3  referring to?

4      A.  I understand the UMCH property, yes.

5      Q.  Okay.  And for purposes of our

6  conversation or your deposition today, I may

7  refer to it as the UMCH property, Lifestyle's

8  property, or the property.  Either way, I'm

9  talking about this property directly to --

10  across the street from us today.

11      A.  Yeah.  For the record, I too am pointing

12  across the street and agreeing.

13      Q.  Fair enough.

14                     -=0=-

15       (Deposition Exhibit 44 marked.)

16                     -=0=-

17  BY MR. INGRAM:

18      Q.  Mr. Smith, I'm handing you what's been

19  marked as Exhibit 44.

20      A.  Shall I review this?

21      Q.  Yes.  So for purposes of the record,

22  what's been marked as Exhibit 44 is an email

23  from Anne Brown to you and others, Bates

24  numbered Worthington 51994 through 51995.  Go

1 ahead and take an opportunity to review this, if

2 you want.

3    A.  I am done.

4    Q.  All right.  You've had an opportunity to

5 review Exhibit 44?

6    A.  I have.

7    Q.  My first question is, just looking at

8 the top of the first page there, the email

9 address, it says Doug Smith,

10 smith@bluestreakstrategies.net.  Is that your

11 email address?

12    A.  At the time, yes.

13    Q.  So you would have received this email

14 set forth in Exhibit 44?

15    A.  Yes.

16    Q.  At the time, do you recall reviewing the

17 city's talking points that are set forth on page

18 2 of Exhibit 44?

19    A.  I don't recall it, but I do recall the

20 concept, yes.

21    Q.  Do you recall whether you would have

22 suggested any revisions to the city's talking

23 points set forth on page 2 of Exhibit 44?

24    A.  I don't recall.

1      Q.  Are you aware, Councilman Smith, of

2  Project Community Park here in Worthington?

3      A.  I'm familiar with the name.

4      Q.  Are you familiar with what Project

5  Community Park seeks to do with the UMCH

6  property?

7      A.  You're going to have to shine some more

8  light on that for me.

9      Q.  You don't know?

10      A.  I'm not sure what you're referring to

11  exactly.

12      Q.  Okay.  Well, what I'm referring to is

13  your understanding.  Do you have any

14  understanding of what the Project Community Park

15  organization in Worthington is seeking to do

16  with the UMCH property, or not?

17      A.  It's a tricky question.  Because it

18  doesn't fully make sense to me.

19      Q.  Okay.  In what way?

20      A.  So you referred to Project Community

21  Park as an organization, which it's not.

22      Q.  Okay.  What is Project Community Park?

23      A.  It is a -- it is a vernacular of a

24  slogan, as far as I understand it, from some

1  residents who have a vision.

2    Q.  Okay.  And what is your understanding of

3  those residents' vision?

4    A.  My understanding is that they -- those

5  particular residents desire green space on the

6  UMCH property, green space and mixed-use

7  commercial and residential on the property as

8  well.

9    Q.  And how did you come to understand this

10  information?  In other words, how do you know

11  that?

12    A.  Well, my constituents are everywhere and

13  believe all sorts of things, and they talk to

14  me, and I hear things through other

15  constituents, and I can't pinpoint a specific

16  time or place where I've learned the

17  information.  It's just an accumulation of

18  wisdom.

19    Q.  You referred to a group of residents.

20  Do you know which residents are comprised or

21  call themselves Project Community Park?

22    A.  Well, my understanding is there are a

23  thousand-plus residents on a list somewhere of

24  folks who agree with my understanding of what

1    the vision is.

2         Q.  Okay.  A thousand or more residents on a

3    list somewhere.  Which list are you referring

4    to?

5         A.  There's been made reference through

6    constituent outreach to City Council that a

7    petition of some sort exists, a list of a

8    thousand-plus residents who have agreed that the

9    vision -- that their particular vision, or a

10   variation of that vision, as I understand it,

11   exists, and that those folks had signed onto

12   that.

13        Q.  Have you received or in any way reviewed

14   the petition that you're referring to?

15        A.  I have.  I have.  Yeah.

16        Q.  And when was that?

17        A.  I reviewed it -- I'm trying to remember

18   when it first came out.  I don't recall.

19        Q.  Okay.  Would it have been before October

20   of 2020?

21        A.  No, I don't recall the timeline.

22        Q.  Okay.  When you reviewed this petition,

23   was it emailed to you in your capacity as a city

24   councilman, or not?

1    A.  I don't believe anybody ever emailed me

2  the petition.  I believe it's on a website

3  somewhere, public facing.

4    Q.  Okay.  When you reviewed the petition,

5  did you go to Project Community Park's website

6  to review it, or was it sent to you?

7    A.  I believe I went to their website

8  proactively.

9    Q.  Do you recall who brought that website

10  to your attention?

11    A.  No, I don't.

12    Q.  With respect to the group of citizens

13  of -- who are part of Project Community Park,

14  what is your understanding of who the leadership

15  or leaders are of that group?

16    A.  Again, it's not a form of -- structure

17  of organization I'm familiar with, so I don't

18  know that there are leaders.  I'm not sure.

19    Q.  Have you attended any Project Community

20  Park meetings?

21    A.  No.

22    Q.  Do you remember --

23    A.  Not that I'm aware of.

24    Q.  To your knowledge, have you met with

1    anyone associated with Project Community Park

2    concerning the UMCH property?

3        A.  Have I met with anybody concerning the

4    UMCH property?  You might need to clarify that

5    question.  I'm not sure I understand that.

6        Q.  Okay.  Do you recall any meetings with

7    any representatives from the Project Community

8    Park group?

9        A.  Yes.

10       Q.  And when did those meetings occur?

11       A.  Within the past year, 2023.

12       Q.  Was that in connection with your

13   re-election campaign?

14       A.  I'll say that's fair.  Uh-huh.

15       Q.  Okay.  And have you met with any

16   representatives from Project Community Park

17   prior to the last year?

18       A.  Yes, I believe so.

19       Q.  Okay.  And what meeting or meetings do

20   you recall prior to 2023?

21       A.  Well, I can't remember the month or

22   maybe even the year because of -- you know,

23   COVID messes everything up, but the one meeting

24   I do recall was over beers at Porch Growler.

1    Q.  And that was post-COVID?

2    A.  It would have been, yes.  That's

3  correct.

4    Q.  Would the meeting with representatives

5  from Project Community Park at the Porch Growler

6  have been before or after City Council's

7  December 2021 hearing?

8    A.  We sat outside, so placing an exact

9  timeline on that, I don't remember.

10    Q.  Do you recall the substance of what was

11  discussed during that meeting at the Porch

12  Growler?

13    A.  I do.  They -- when I say they -- yeah,

14  they were asking me about my -- my civil lawsuit

15  action and wanting to understand to the best

16  that I could share.

17    Q.  Did the UMCH property come up at all in

18  that meeting?

19    A.  I don't remember talking about UMCH

20  property.

21    Q.  Who all was at the meeting at the Porch

22  Growler?

23    A.  That was myself, Scott Taylor, and Roger

24  Beck.

1    Q.  And then the meeting -- or the meeting

2  you had in 2023 with the Project Community Park

3  representatives, who attended those meetings?

4    A.  Scott Taylor.

5    Q.  Anyone else?

6    A.  No.

7    Q.  Did you have any meetings with any

8  representatives from Project Community Park

9  about the UMCH property prior to that Porch

10  Growler session?

11    A.  I don't recall any meetings about that,

12  no.

13    Q.  Have you worked with Councilmember

14  Robinson in connection with any Project

15  Community Park matters?

16    A.  No, I don't believe so.

17    Q.  And Councilman Smith, are you familiar

18  with the Worthington Alliance for Responsible

19  Development?

20    A.  I am.

21    Q.  You are nodding your head with a smile.

22    A.  Yes.

23    Q.  Okay.  I'm going to refer to that

24  alliance as WARD.  Fair enough?

1      A.  That is fair.  Yeah.

2      Q.  Okay.  And you've attended meetings with

3  WARD, correct?

4      A.  I have, yes.

5      Q.  And what is your understanding of what

6  WARD seeks for the UMCH property?

7      A.  You know, they've been consistent all

8  along with kind of their -- what I would call

9  modus operandi, their MO of existence as a

10  resident group, and really promoting responsible

11  development throughout the city and including

12  the UMCH property.  I believe one of their more

13  recent positions on paper documented and

14  submitted to council was in line with that --

15  and I'm paraphrasing here based on my

16  understanding -- was green space, mixed-use

17  commercial and development apartments -- or

18  sorry, commercial and residential.

19      Q.  Okay.  So mixed-use of commercial and

20  residential, what style residential?

21      A.  You'd have to ask them exactly.

22      Q.  You said apartment, and then -- I wanted

23  a clarification of what your testimony is.

24      A.  Yeah, strike apartment.  Just mixed-use

1  commercial and residential.

2      Q.  And you don't know whether it's

3  apartments or what style residential; is that

4  fair?

5      A.  I don't know that they've expressed

6  exactly the type of residential stock.  They may

7  have that somewhere.  I don't remember seeing

8  it.

9      Q.  And with respect to WARD, what is your

10  understanding of what type of organization is

11  it?

12      A.  Today I believe it's a city resident

13  group.  I believe they do have a PAC that

14  they've submitted.  I don't remember when.  But

15  at some point through their existence they

16  decided to have a PAC, but they've always been

17  pretty strong with their just being a resident

18  group and having neighbors, you know, join the

19  organization.

20      Q.  Okay.  And with respect to the WARD

21  organization, who, in your mind, constitutes

22  their leaders?

23      A.  They have what's called a planning

24  group, and that is the -- what you might

1    consider their leadership.

2        Q.  And who all is on that planning group,

3    to the extent you know?

4        A.  I can think of Michael Bates, Beth

5    Mitchel, Eric Gnezda, and that's all.  Those are

6    the only names I can recall.

7        Q.  Do you know about how large that

8    planning group is, how many people?

9        A.  Five or six.

10       Q.  And going back to your tenure on City

11   Council in 2015 and '16, you've had several

12   meetings with WARD representatives, correct?

13       A.  I would say I've had several meetings

14   with WARD representatives over the past 12

15   years, yes.

16       Q.  And those meetings pertain to the UMCH

17   property; fair enough?

18       A.  They relate to development in general,

19   of which UMCH property is a topic on some

20   occasions.

21       Q.  Fair to say that UMCH is a rather

22   significant topic to the folks in the WARD

23   organization?

24       A.  I'm not going to speak for them.

1      Q.  All right.  How about your understanding

2  based on all the meetings you've had with that

3  organization over the past decade?

4      A.  Well, they are constituents, and as a

5  constituent residential group I'm there to

6  listen and help and represent wherever I can.

7      Q.  Okay.  I asked a slightly different

8  question, but we'll move on.

9          Do you know about how many members there

10  are that -- of WARD?

11      A.  Outside the planning group, I don't

12  know.

13      Q.  Are you familiar with a paper called The

14  Spectator?

15      A.  I am familiar.

16      Q.  What is The Spectator?

17      A.  I believe it's an ad hoc publication

18  that informs residents of community issues and

19  topics.

20      Q.  Is The Spectator printed on behalf of

21  the city, or does the city have any involvement

22  with The Spectator?

23      A.  I don't believe so.

24      Q.  Do you recall preparing an article for

1  The Spectator back in June 2015 pertaining to

2  the UMCH property?

3       A.  Vaguely the idea, yes.

4       Q.  Okay.  And what do you recall from that?

5       A.  I recall it exists.  That's about it.

6       Q.  And in connection with your article in

7  The Spectator, WARD agreed to provide support to

8  you; isn't that fair?

9       A.  I wouldn't say that.

10      Q.  No?

11      A.  I would not say that.

12      Q.  Why not?

13      A.  I don't know what you're talking about,

14  first of all.  I'm not sure if WARD has anything

15  to do with what you're talking about.  I'm going

16  to need some clarification.

17      Q.  You don't recall one way or the other?

18      A.  I don't recall.

19      Q.  Do you recall at all what you wrote

20  about the UMCH property in The Spectator in June

21  of '15?

22      A.  I don't remember.

23      Q.  Did you keep any copies of the article

24  or drafts of the article that you prepared?

1      A.  I don't think so.

2      Q.  You said you don't think so.  Do you

3  know?

4      A.  Do I know if I kept some records?

5      Q.  Yes.

6      A.  No, I don't know if I kept records.

7      Q.  Did you assist WARD in preparing a

8  survey pertaining to the UMCH property?

9          MR. SILK:  Objection to form.

10         Go ahead.

11     A.  I was aware of the survey and did

12  provide some guidance to make an objective

13  survey.

14     Q.  Okay.  And what survey are you referring

15  to?

16     A.  There was a community survey.  I can't

17  remember the timeline on that.  You just stated

18  a year.  2015?

19     Q.  2016.

20     A.  2016?  I can't confirm that timeline,

21  but between 2014 and 2017, I did help them with

22  a survey, with guidance on making an objective

23  methodology based on point methodologies

24  specific to getting public feedback about

1  responsible development.

2    Q.  Okay.  So the survey concerned, you

3  said, responsible development.  Can you help me

4  understand what the survey was seeking and to

5  whom you were surveying?

6    A.  Yeah.  Gosh, you're asking from a

7  lifetime ago.  I just know my background prior

8  to that point in public polling and market

9  research, the WARD group asked if there was any

10  way I could give them some guidance, I guess, in

11  informing questions that they would -- that they

12  would then ask the public at large, all the

13  residents.  As a councilmember and a market

14  strategist, I guess, I always like to get data

15  and information, get feedback from people in the

16  most objective way possible.  So what those were

17  and the questions themselves I can't remember,

18  but I know the general take was certainly, you

19  know, to get public feedback.

20    Q.  Okay.  And in connection with your

21  assistance on WARD's survey, did you keep any of

22  the work or any notes that you would have

23  prepared in connection with that work?

24    A.  I'm not really a note taker.  I don't --

1  I can't recall if I have any notes, and if I

2  ever did, they're probably long gone; so...

3      Q.  How about any of the actual survey

4  questions or survey results, did you keep that?

5      A.  I believe WARD has those.  I don't.

6      Q.  And what did you do with the results

7  from WARD's survey that you helped prepare?

8          MR. SILK:  Objection to form.

9          Go ahead.

10     A.  So I guided them in the process which

11  led to them hiring a polling consultant, and

12  that particular person was in charge of the

13  oversight of data collection, I guess is how I

14  might qualify that.  And so I know the output of

15  the results was basically a WARD outcome

16  statement, here's what the public thinks and so

17  on.

18     Q.  Which polling firm did WARD use?

19     A.  I don't think it was a firm.  I think it

20  was an individual who specialized in polling.

21     Q.  And who was that?

22     A.  I believe it was Dr. Erin Armstrong

23  from -- I'll leave it at that.

24     Q.  What did you do with the survey results,

1    if anything?

2        A.  Personally?

3        Q.  Yes.

4        A.  Much like any individual in the

5    community, I absorbed the information.  As a

6    member of council, obviously, it's one data

7    point in a bunch of data points that become part

8    of my kind of tapestry of decision-making

9    process.

10        Q.  Did you share the survey results with

11    anyone on council?

12        A.  I believe they were publicly available.

13        Q.  My question is a little bit different.

14    Did you share the survey results with anyone

15    from council?

16        A.  I don't believe I did.

17        Q.  Do you recall whether you shared the

18    survey results with anyone at all?

19        A.  I don't see why I would have.  They were

20    publicly available.  I don't recall sharing them

21    with anybody.

22        Q.  I want to ask you about Lifestyle's

23    rezoning application that was filed in October

24    of 2020.  Do you recall that?

 1     A.  I do.

 2     Q.  When Lifestyles filed the application,

 3  when did you first read it?  Or did you read?

 4     A.  Those are two different questions.

 5     Q.  Let's start with did you read it or not

 6  first?

 7     A.  I only read it when it -- when it was

 8  brought to council's attention much later in the

 9  process.  So yes, I did read it.

10        MR. SCHUMCHER:  Make sure he doesn't

11  mark exhibits twice.  That makes more paper for

12  Rhonda to carry.

13                     -=0=-

14      (Deposition Exhibit 46 marked.)

15                     -=0=-

16  BY MR. INGRAM:

17     Q.  Councilman Smith, you've been handed

18  what's been marked as Exhibit 45, which is an

19  email from Lee Brown to you and others, dated

20  October 5, 2020.

21     A.  Do you want to confirm that that's a 45?

22     Q.  That is Exhibit 45, but I do have

23  terrible handwriting.

24        MS. TAFT:  I should have written them.

1  Sorry.

2     A.  Lawyer's writing, hmm.  I do have

3  Exhibit 45.  And it is an email from -- appears

4  to be an email from Lee Brown.

5     Q.  And take a moment to review the email.

6     A.  Okay.  I've reviewed it.

7     Q.  And so does this refresh your

8  recollection, Councilman Smith, that council was

9  notified of Lifestyle's rezoning application as

10  of October 5, 2020?

11     A.  Council was notified, according to this

12  email, yes.

13     Q.  And so did you -- I'm trying to

14  understand whether you reviewed Lifestyle's

15  application or site plan?

16     A.  At this point?

17     Q.  Did you ever?

18     A.  I reviewed the application when it was

19  in front of council for sure.  At this point,

20  when council was notified of the application, I

21  likely did not, and I have no recollection of

22  reviewing it.

23     Q.  When's the first time you recall

24  reviewing Lifestyle's application?

1      A.  The first time I recall is the week

2  leading up to the December of 2021 council

3  meeting where council had to vote on it.

4      Q.  And with respect to that week leading up

5  to City Council's hearing on Lifestyle's

6  application, what did you review?  What did you

7  read?

8      A.  Leading up to the meeting, council was

9  provided a packet of information from staff, an

10  agenda packet.  That's all public record, of

11  course.  And I review -- in that particular

12  packet, there were the MPC, Municipal Planning

13  Commission, meeting minutes for the pertinent

14  meetings, and staff notes and memos, memorandum.

15  And then there were some additional pieces of

16  information and the application itself.

17      Q.  With respect to additional pieces of

18  information, what are you referring to?

19      A.  I think not included in the packet

20  specifically, but the constituents, the

21  residents, of course, are allowed to email

22  council at any time regarding any issue, and

23  when a communication from a resident to council

24  is pertinent, relates to a specific topic, then

1    I go back and review those -- those

2    correspondence.  So that's additional pieces of

3    information.

4         Q.  Did you review anything else?

5         A.  Everything that was included in the

6    packet I reviewed.  I think I mentioned

7    everything that was in the packet.  May have

8    missed something.

9         Q.  Did you do any independent research?

10        A.  Such as?

11        Q.  In other words, did you review the

12   zoning code, the comprehensive plan, any of the

13   other --

14        A.  Well, most of that was cited in the

15   staff memos and MPC minutes, so I felt

16   comfortable with the package.

17        Q.  So is the answer to my question, no, you

18   didn't review anything else other than what was

19   in the packet and the additional information?

20        A.  Correct.

21        Q.  Okay.  So did you review any of

22   Lifestyle's materials at all between October of

23   2020 and January of 2021 in connection with the

24   planning commission's review and consideration

1    of the application?

2        A.  No, not that I recall.

3        Q.  Did you talk to anyone during that time

4    frame?

5        A.  No, not that I recall.

6        Q.  During the time that Lifestyle's

7    application was before the planning commission

8    and Architectural Review Board -- well, first of

9    all, the planning commission and Architectural

10   Review Board, can we just agree to refer to it

11   as the planning commission?

12       A.  Please do.

13       Q.  Okay.  Thank you.  Let me start over,

14   then.  During the time that Lifestyle's

15   application was pending before the planning

16   commission, did you ever talk with any member of

17   the planning commission concerning that

18   application?

19       A.  No.

20       Q.  Similar question, did you email or write

21   anything to any member of planning commission

22   during that time frame?

23       A.  No.

24       Q.  Did you ask anyone to convey anything on

1    your behalf to the planning commission

2    pertaining to the application?

3        A.  No.

4        Q.  Did you attend any of the planning

5    commission hearings -- I believe there were two,

6    on the Lifestyle's application?

7        A.  No.

8            MR. SILK:  Cap we take a quick break?  I

9    think Paul's getting ready to --

10           MR. SCHUMCHER:  Don't break on my

11   account.

12           MR. SILK:  Well, I want to talk to you.

13   Is that all right?

14           MR. INGRAM:  Yes.

15           (Recess.)

16           (Mr. Schumacher not present.)

17   BY MR. INGRAM:

18       Q.  All right.  Councilman Smith, we are

19   back from our first break this afternoon, and we

20   were talking about the time frame when

21   Lifestyle's rezoning application was pending

22   before the planning commission.  Do you recall

23   that?

24       A.  Yes, I recall.

1     Q.  And so that would be roughly -- call it

2  December 2020 through October of 2021, fair?

3     A.  Yes.

4     Q.  And I just want to have an understanding

5  with your involvement, or lack thereof,

6  concerning Lifestyle's application during that

7  time frame, and since you -- earlier you said

8  you didn't review anything until the week before

9  City Council's hearing, right?

10     A.  Correct.

11     Q.  Okay.  Now, with respect to the duration

12  while the application was pending before the

13  planning commission, did you meet with or talk

14  to any representatives from WARD while

15  Lifestyle's application was pending?

16     A.  '21.  No, I don't believe.

17     Q.  Did you meet with any representatives

18  from Project Community Park about Lifestyle's

19  application while the application was pending

20  before the planning commission?

21     A.  Not about -- not about the application,

22  no.

23     Q.  Do you recall meeting with them about

24  something else?

1     A.  I believe that's the time frame that I

2  mentioned earlier, yeah, at the beers.

3     Q.  Project -- I'm sorry, Porch Growler?

4     A.  Porch Growler.  Yeah.

5     Q.  Did you meet with any representatives

6  from Lifestyle while the Lifestyle application

7  was pending before planning commission?

8     A.  No.

9     Q.  Did you meet with anyone about

10  Lifestyle's application while that application

11  was pending before the planning commission?

12     A.  No.

13     Q.  Did you watch the planning commission's

14  first hearing on Lifestyle's application?

15     A.  I did not.

16     Q.  Did you review the minutes from that

17  hearing?

18     A.  I did.

19     Q.  And when did you review those minutes?

20     A.  The week prior to the December council

21  meeting.

22     Q.  That would have been in the packet of

23  materials you referenced?

24     A.  Uh-huh.

1          Q.  Did you watch the October 14, 2021,

2     planning commission hearing on Lifestyle's

3     application?

4          A.  No.

5          Q.  But you reviewed the minutes from that

6     hearing?

7          A.  I did.

8          Q.  So, now, once the planning commission

9     made its recommendation to City Council in

10    October of 2021, let's talk about what you did

11    or didn't do in connection with City Council's

12    review of that application.  So, first off, did

13    you meet with or talk to anyone about

14    Lifestyle's application during that time frame?

15         A.  No.

16         Q.  Do you recall sending any emails to

17    anyone about Lifestyle's application during that

18    time frame?

19         A.  I don't believe so.

20         Q.  Did you send any text messages to anyone

21    concerning Lifestyle's application --

22         A.  No.

23         Q.  -- during that time frame?

24         A.  Sorry.  No.

1    Q.  And I apologize if I already asked you

2  this, but did you meet with anyone concerning

3  their application during that time frame?

4    A.  No.

5    Q.  Did you review Lifestyle's revised

6  concept plan that was presented to the planning

7  commission during that prior hearing?

8    A.  I'm not sure.  Do you mean as part of

9  the packet leading up to the council meeting or

10  for the planning commission?

11    Q.  Let me clarify.  So I'm asking you about

12  the time frame after planning commission made

13  its recommendation to council.  Did you review

14  Lifestyle's concept plan that Lifestyles

15  proposed at the October 14, 2021, planning

16  commission meeting?

17        MR. SILK:  I'm going to object based on

18  lack of foundation, but go ahead.

19    A.  I guess, is that part of the

20  application?  Are you referring to something as

21  part of the application?

22    Q.  Okay.

23    A.  If it was part of the application, yes.

24    Q.  All right.  Well, let's back up.

 1      A.  Yeah.

 2      Q.  And you'll recall that Lifestyle applied

 3   in October of 2020?

 4      A.  (Nods.)

 5      Q.  Do you recall that?

 6          MR. SILK:  A verbal answer.

 7      A.  Yeah.

 8      Q.  You nodded your head yes.

 9      A.  Yes, I do recall that.

10      Q.  And do you recall, in the October 14,

11   2021, planning commission hearing, Lifestyles

12   proposed a revised concept plan?

13      A.  Yes, I'm aware of that in concept, yes.

14      Q.  Commission did not permit Lifestyles to

15   amend its application to address that revised

16   concept plan?

17          MR. SILK:  Objection to form.

18          Go ahead.

19      A.  As whatever was stated in the minutes, I

20   was aware of that.

21      Q.  So is the answer to my question yes, you

22   do recall that?

23      A.  I don't remember those exact words in

24   the minutes, but the concept.  The concept of

1  what you're talking about being in the minutes,

2  yeah.

3       Q.  All right.  So you recall that

4  Lifestyles was not permitted to amend its zoning

5  application to incorporate that concept plan?

6           MR. SILK:  Same objection.

7           Go ahead.

8       A.  I guess I don't understand the question,

9  but I'm going to take a stab here and say it was

10  in minutes -- not those exact words, I don't

11  believe.  My understanding is I'm going to

12  answer yes to you.

13      Q.  Okay.  Sure.  And so previously my

14  questions pertaining to Lifestyle's application,

15  same questions regarding that concept plan.

16  Because you had one document which was 400-plus

17  pages of the rezoning application and the

18  development plan, shall we say?

19      A.  We can say that.

20      Q.  Okay.  And then you had the concept plan

21  which was, you know, PowerPoint materials, you

22  know, a high-level plan that was proposed to the

23  planning commission, different document?

24      A.  Right.

 1     Q.  Right?

 2     A.  Right.

 3     Q.  Okay.  Did you talk to anyone about

 4  Lifestyle's concept plan prior to the December

 5  2021 City Council hearing?

 6     A.  No.

 7     Q.  Did you review that concept plan prior

 8  to the City Council December hearing?

 9     A.  I don't recall reviewing it.  If it was

10  part of the minutes in the package, I did.

11     Q.  Did you talk to anyone prior to that

12  December 2021 meeting about Lifestyle's concept

13  plan?

14     A.  No.

15     Q.  During City Council's December 13, 2021,

16  meeting, do you recall Mr. Hart's request of

17  City Council to refer Lifestyle's application

18  back to planning commission with instructions

19  that council provide a genuine and collaborative

20  effort with respect to the development proposal

21  and empower city staff to communicate and work

22  directly on the development plan and serve as a

23  liaison to the planning commission and council,

24  and that Lifestyles be afforded the opportunity

1  to amend their initial zoning application with a

2  revised site plan, as was initially discussed

3  with staff, and be afforded a full hearing at

4  the planning commission to work through that

5  revised application?

6       MR. SILK:  Objection.  Did you mean that

7  to be a question?  Because there's a lot in

8  there.  Are you just asking him that's a quote

9  from something?

10      MR. INGRAM:  I'm asking him if he

11  recalls that.

12      MR. SILK:  Okay.  Recalls that exact

13  statement; that's what you're asking him?

14      MR. INGRAM:  Correct.

15    A.  I don't recall that exact statement, no.

16    Q.  Okay.

17    A.  That's a lot of words, for the record.

18    Q.  I'm handing you what's been previously

19  marked as Exhibit 43, Councilman Smith.  And

20  you'll see Exhibit 43 containing minutes from

21  the December 13 City Council meeting?

22    A.  Yes.

23    Q.  And to refresh your recollection, I

24  would direct your attention to page 3.

1            MR. SILK:  Read as much as you need.

2       A.  I've read that portion.

3       Q.  So does that refresh your recollection

4  that Attorney Hart, in his presentation to

5  council, made three requests to members of City

6  Council that evening:  First, to refer the

7  application back to the planning commission with

8  instructions they should provide a genuine and

9  collaborative effort with respect to the

10  development proposal; second, empower the city

11  staff to communicate and work directly on the

12  development plan and serve as a liaison to the

13  planning commission and council; third, they be

14  afforded the opportunity to amend their initial

15  zoning -- or rezoning application with a revised

16  site plan, as was initially discussed with

17  staff, and be afforded a full hearing at the

18  planning commission to work through that revised

19  application?

20            Do you recall that now, Mr. Smith?

21       A.  As written in the City Council minutes

22  for December 13, 2021, yes, that's correct.

23       Q.  Okay.  My question is a little bit

24  different.  I understand that's what's written

1   in the minutes.  You were there that evening as

2   a member of council.  Do you recall that?

3       A.  I do recall that, yeah.

4       Q.  Okay.  So why, Councilman Smith, did you

5   decline the opportunity to refer Lifestyle's

6   application back to the planning commission as

7   Mr. Hart requested?

8           MR. SILK:  Objection to form.

9           Go ahead.

10      A.  Council's job is to vote on the policy

11  in front of them.  In this case, none of those

12  requests were policies in front of council to

13  vote yes or no on.

14      Q.  Okay.  Councilman Smith, however,

15  Councilman Dorothy made a motion to send the

16  rezoning application back to the planning

17  commission.  Do you recall that?

18      A.  I do recall.

19      Q.  There was no second, correct?

20      A.  Correct.

21      Q.  Okay.  Why did you decline the

22  opportunity, as a member of council, to second

23  or support Ms. Dorothy's motion?

24      A.  As one member of council, I believe our

1  job is to vote on the policy question in front

2  of us, yes or no.  As you said, Ms. Dorothy did

3  not receive a second; therefore, it was not a

4  policy question.

5      Q.  Is that the only reason you did not

6  support Ms. Dorothy's motion?

7      A.  The reason that I wanted to vote on the

8  question -- I guess my answer is the reason I

9  wanted to vote on the question at hand, which

10  was the policy question.

11      Q.  Any other reasons, other than you wanted

12  to vote on the Lifestyle's application as it was

13  initially filed?

14      A.  Correct.

15      Q.  No other reason?

16      A.  I don't see -- if there was no question

17  in front of us, there was nothing to consider.

18      Q.  Okay.  With respect to Ms. Dorothy's

19  motion, that was a question before council, and

20  before you is as a voting member of council.  I

21  just want to understand what reasons you had, if

22  any, to not support her motion?

23          MR. SILK:  Objection.  Form.

24  Argumentative.

1        Go ahead.

2    A.  I mean, Ms. Dorothy is one member of

3  council, and I'm one member of council, and

4  we're each -- you know, it's an open forum,

5  Robert's Rules type of organization where

6  anybody can make any motion at any point.

7  Doesn't mean it's an actionable question of

8  policy in front of us.  In this case, her motion

9  was not.  So I didn't support it.

10    Q.  Why did you vote to deny the approval of

11  Lifestyle's application, then?

12    A.  Reviewing all the information provided

13  in the package, the minutes, the planning

14  commission minutes and the staff memos and

15  recommendations, reviewing the application,

16  hearing responses, communications from

17  residents, constituents, hearing the applicant

18  themselves talk about the application at the

19  meeting December 13th, I just -- there wasn't a

20  good enough reason to vote yes.

21    Q.  Okay.  Other than based on the materials

22  you reviewed during the meeting and leading up

23  to the meeting that there wasn't a good enough

24  reason to vote yes, was there any other reasons

1  why you did not vote to approve the rezoning

2  application?

3      A.  I make decisions as one member of

4  council.  My thought process and decision-making

5  process is very much what I just described to

6  you.

7      Q.  When you say there wasn't a good enough

8  reason, what were you looking for in connection

9  with the rezoning of Lifestyle's property?

10         MR. SILK:  Objection.

11         Go ahead.

12     A.  Yeah, you know, looking at the minutes

13  over the past year from initial application,

14  staff comments and memo and the information

15  provided, the resident feedback, you know,

16  it's -- it just wasn't good enough, so I voted

17  no.

18     Q.  When you say it wasn't good enough, what

19  standard were you applying; in other words, what

20  benchmark or what bar did they have to overcome,

21  in your mind, to get your vote?

22         MR. SILK:  Objection.  Form.  He

23  answered the question what he considered.

24         Go ahead.

1    A.  I believe I already answered that based

2  on what I considered.  I'm one member of

3  council, and how I determine decisions of

4  policies is very much based on all those facets

5  for pretty much every policy that comes in.

6    Q.  Anything else other than it wasn't good

7  enough in your mind?  Was there any other reason

8  that you voted to deny the approval of

9  Lifestyle's application?

10    A.  I believe that's a pretty comprehensive

11  look from my part to what I would say every time

12  I vote on a policy yes or no to justify my vote

13  as one member of council, so no, I have no

14  reason other than that.

15                      -=0=-

16        (Deposition Exhibit 46 marked.)

17                      -=0=-

18  BY MR. INGRAM:

19    A.  I've reviewed document 46.

20    Q.  All right.  So Councilman Smith, you've

21  been handed what's been marked Exhibit 46, which

22  is the summer 2005 -- or 2015 issue from Village

23  Talks, the official newsletter of the City of

24  Worthington, and the article is entitled "UMCH

1    Development Information."  Do you see that?

2        A.  I do.  Blast from the past.

3        Q.  What is the Village Talks publication?

4        A.  It's the official newsletter of the City

5    of Worthington.

6        Q.  Okay.  And this is -- Exhibit 46 was put

7    out on behalf of the City of Worthington; is

8    that fair?

9        A.  Correct.

10       Q.  Okay.  In your capacity as a member of

11   City Council, did you have an opportunity to

12   review or revise Exhibit 46?

13       A.  Review or revise it prior to it being

14   published?

15       Q.  Yes.

16       A.  I don't think that -- I don't believe

17   so.  That's not common practice.

18       Q.  Okay.  Councilman Smith, I understand

19   that City Council conducts annual retreats?

20       A.  We do.  We try to.

21       Q.  Okay.  Fair enough.  And those are

22   public meetings?

23       A.  They are.

24       Q.  In 2018, do you recall that particular

1  City Council retreat?

2     A.  Not specifically, no.

3     Q.  If you could turn to what's been

4  previously marked Exhibit 27.  I want to refresh

5  your recollection.

6        Can you recall, Councilman Smith, just

7  briefly here, Management Partners facilitated

8  the 2018 City Council retreat?

9     A.  That's what it appears, yeah.  I'm

10  trying to remember, but yeah, that's what it

11  says.

12     Q.  And Exhibit 27 is a memorandum that

13  Management Partners provided to the city manager

14  and assistant city manager summarizing the City

15  Council discussion during that retreat, fair?

16     A.  Just give me a moment.

17     Q.  Sure.  Councilman Smith, I can see

18  you're on page 6.  I'll help you out, I'm going

19  to be asking you about the contents of page 3.

20     A.  Good to know.  Thank you.

21        Do you know where this was?  I'm trying

22  to --

23     Q.  Oh, the location?

24     A.  Uh-huh.  We jump around.

1          MS. TAFT:  Worthington Education Center.

2     Q.  The 2018 retreat, do you recall it

3  occurring at the WEC?

4     A.  Yeah, I can recall that.

5     Q.  All right.

6     A.  It's not the only time we met at the

7  WEC, but in that time frame I think -- I think

8  it's the one I'm thinking of, so yes.  Please go

9  on.

10     Q.  Specifically, I wanted to ask you about

11  City Council's discussion on Saturday, February

12  10, 2018, that pertained to the UMCH site.  And

13  as set forth in Exhibit 27 on page 3, I want to

14  direct your attention to the discussion points

15  that were captured.  Let me know when you get

16  there.

17     A.  I see the discussion points on page 3,

18  yes.

19     Q.  Have you had an opportunity to review

20  this?

21     A.  I just reviewed them, yes.

22     Q.  So City Council discussed the desired

23  uses for the UMCH property during that session,

24  correct?

1     A.  That's one of the points, yes.

2     Q.  And do you recall that discussion,

3  participating in that discussion?

4     A.  Not specifically, no.

5     Q.  Do you recall, then, whether a

6  commercial mixed-use along High Street was a

7  desired use for the UMCH property?

8     A.  During this conversation, you're

9  referring to?

10    Q.  Yes.

11    A.  I don't recall that.

12    Q.  And this line of questioning is

13  pertaining to that Saturday, February 10

14  discussion at the City Council retreat in 2018.

15    A.  Very good.

16    Q.  Okay.  Do you recall the discussion of a

17  park amenity or green space being a desired use

18  of the UMCH property?

19    A.  I don't recall that.

20    Q.  And Management Partners noted that in

21  connection with any park amenity or green space,

22  a need to determine the appropriate size.  Do

23  you see that?

24    A.  Yeah, it does say that.

1      Q.  Who would make the determination of the

2   size of any park or green space on the UMCH

3   property?

4      A.  Number of factors to that.  There's

5   public engagement with a property owner, a

6   potential developer, a process of Municipal

7   Planning Commission, and then ultimately

8   possibly getting approved by City Council.

9      Q.  As a member of City Council, do you

10   agree or not that a park amenity or green space

11   should be developed on the UMCH property?

12      A.  As an individual member of council, I

13   think it would be -- it would be nice to have

14   green space amenities.

15      Q.  Okay.  And of what size?

16      A.  I don't want to say something specific,

17   but conceptually significant.

18      Q.  Okay.  And can you provide or elaborate

19   on the context of what you describe as

20   significant?

21      A.  Programmable.  So being able to -- for

22   the record, I'm getting looks of confusion from

23   opposing counsel, so I'll elaborate.

24   Programmable in the sense of the parks and recs

1   industry is very much, you know, can you play

2   soccer, can you have a children's activity,

3   something like that that's a program activity.

4       Q.  Okay.  You said, with respect to any

5   park amenity or green space, that it should be

6   significant and programmable?

7       A.  Programmable would be ideal

8   conceptually, yes.

9       Q.  Okay.  And with respect to a

10  programmable park amenity or green space, other

11  than a soccer field, are you aware of anything

12  else, or are you anticipating soccer fields on

13  that site?

14      A.  No.  I don't -- I'm in no position to

15  dictate what's there and mandate or anything

16  like that, but I think, conceptually,

17  programmable soccer is one example of a

18  programmable space where you can -- you can have

19  an activity, whether it's a team sport or a --

20  you know, a field day activity, something like

21  that.

22      Q.  Okay.  Help me understand, when you're

23  referring to a programmable activity, I mean, do

24  you have anything specific in mind or not, other

1   than a soccer field?

2      A.  I don't have anything particular in

3   mind, even including a soccer field.  I think

4   there's a whole variety.  I'm not a parks

5   specialist, so I defer to our people out in the

6   community who live that world, and youth

7   boosters and stuff like that who understand that

8   world.  I try to avoid team sports whenever

9   possible.  So, you know, it's very much a

10  variety.  There's a spectrum of programmable

11  space, anything from a playground to a -- all

12  the way up to a soccer field and anything in

13  between.

14     Q.  Okay.  Earlier you did mention that City

15  Council would play a role in the development --

16  the future development of the UMCH site, right?

17     A.  I don't believe that's what I said, no.

18  I can say that City Council would possibly get

19  to make a decision on approval or not of any

20  development that's proposed.

21     Q.  Because earlier when I asked, you listed

22  the process would be public engagement,

23  landowner's input, developer's input, planning

24  commission's input, City Council.  So that's

1    what I'm referring to.

2       A.  I think I specifically said possibly

3    City Council.  We can have the record read back

4    to us, if you'd like.

5       Q.  Okay.  So, in your mind, does City

6    Council have a role or not in the future

7    redevelopment of the future UMCH site?

8       A.  City Council has policy questions that

9    are in front of them, and if those policy

10   questions come in front of them, they vote yes

11   or no based on what's in front of them.  As far

12   as being an elected official representing the

13   community, it's always, you know, a good idea

14   for any elected official to get feedback from

15   the community and understand what the

16   temperature is, so to speak, what the feelings

17   are, what the thoughts are from all the

18   stakeholders, including the resident

19   constituents, property owners, other

20   stakeholders who might be involved.

21      Q.  Okay.  And with respect to determining

22   the appropriate size of any park amenity or

23   green space that is programmable, what source or

24   resource would you, in your capacity as a member

 1  of City Council, refer to to determine what's

 2  appropriate or not?

 3       MR. SILK:  I'm going to object as to

 4  foundation, but go ahead.

 5    A.  You're talking hypothetically, like in

 6  concept what would be a --

 7    Q.  I'm talking about in connection with

 8  City Council's discussion about a desire to have

 9  a park amenity or green space on the UMCH site.

10  You then in connection with that have told me

11  that you yourself desire a significant park

12  amenity or green space that is -- functions as

13  something as programmable.  And I'm trying to

14  understand, you know, is there any resource or

15  source you would go to to determine how much?

16    A.  I see.  I understand.  Personally, what

17  resource am I questioning?

18    Q.  Yes.

19    A.  I think, as an elected official

20  representing the community, my resource would be

21  all the facets of a process that exists to, you

22  know, accumulate information, and a lot of that

23  is resident feedback, of course, what the needs

24  are in the community, what a developer or

1    property owner is interested in and willing to

2    work with the community on.

3        Q.  Okay.  Is there any specific documents,

4    plans, guidelines, anything specific you would

5    refer to?

6        A.  I mean, there's a smorgasbord of

7    information out there.  One document that would

8    be a part of, again, a broader pool of

9    information, you know, we have comprehensive

10   plan documents.  We have, you know, resident

11   feedback, documents, white papers.  We've got

12   emails from hundreds of folks in the community,

13   and then also the desires of any developer or

14   property owner.

15       Q.  Okay.  Anything else influence your

16   thinking on what would be an appropriate park

17   amenity, green space or programmable park on the

18   UMCH site?

19           MR. SILK:  Objection.  Asked and

20   answered.

21           Go ahead.

22       A.  I don't think so.

23       Q.  Back in 2018, City Council discussed

24   preparing a density analysis or density analyses

1   scenarios for the UMCH site.  Do you recall that

2   discussion?

3          MR. SILK:  Objection.  Form.

4      A.  I do not recall that discussion.

5      Q.  Okay.  Do you know whether a density

6   analysis of the UMCH site was ever prepared?

7          MR. SILK:  Same objection.

8          Go ahead.

9      A.  I am aware of a basic governmental

10  analysis of different types of development and

11  how they impact city finances.  I don't know if

12  that's the same thing, but in my mind --

13     Q.  Is there anything other than

14  Mr. Greeson's analysis that was provided to

15  council?

16     A.  No, not that I'm aware of.

17     Q.  Now, according to Management Partner's

18  summary of City Council's discussion on February

19  10 of 2018, there was discussion about the

20  potential for revenue generation at the UMCH

21  site.  Do you recall what revenue generation was

22  discussed?

23     A.  For the record, with the previous

24  statement, I'm not aware that that was

1  Mr. Greeson's analysis.  Very well could have

2  been, but I can't confirm that.

3        This question, I don't recall any --

4  what was the word you used?  Revenue --

5     Q.  It's the last bullet point there on page

6  3.

7     A.  Revenue generation.

8     Q.  Yes.

9     A.  I don't recall that specific

10  conversation.  Unless it had to do with that

11  same report I just mentioned.

12     Q.  You don't recall one way or the other?

13     A.  Let's make that my answer.  I don't

14  recall.

15     Q.  Okay.  On February 9 of 2019, City

16  Council conducted another retreat.  Do you

17  recall that?

18     A.  Yes.

19     Q.  And Dr. Herb Marlowe was the

20  facilitator?

21     A.  Yes.

22     Q.  Do you recall what you said about any

23  future application that Lifestyle proposed for

24  the UMCH site?

1      A.  I don't recall saying anything.

2      Q.  If you could turn to Exhibit 31,

3  Councilman Smith.

4      A.  That's summary of phases for

5  development.

6      Q.  For purposes of the record, Exhibit 31

7  is a summary of phases for the development of

8  the UMCH property dated November 27, 2018,

9  prepared by Attorney Adam Florey.  Do you see

10  that?

11     A.  I do see that, yeah.

12     Q.  Go ahead and take your time to review

13  Attorney Florey's summary.

14     A.  Okay.  I've reviewed it.

15     Q.  Have you had an opportunity to review

16  Exhibit 31?

17     A.  Yes.

18     Q.  Great.  When's the first time you've

19  seen Exhibit 31?

20         MR. SILK:  Objection.  Form.

21         Go ahead.

22     A.  I don't -- I don't remember seeing this.

23  I think this is the first time I've seen it.

24     Q.  Do you think, or do you know?

1    A.  I don't know if this is the first time

2  I've seen it, but this is the first time I can

3  recall seeing this document.

4    Q.  Okay.  Looking at the second paragraph

5  there on the first page, it says, a more

6  detailed memorandum is provided along with this

7  summary.  Do you see that?

8    A.  Yeah, I do see that.

9    Q.  Have you reviewed or been provided a

10  copy of that memorandum?

11    A.  I have not.

12    Q.  Have you had any discussions with

13  Council President Robinson regarding

14  Mr. Florey's summary?

15    A.  No, not that I recall.

16    Q.  Have you had any discussions with

17  Council President Robinson regarding Attorney

18  Florey's memorandum?

19    A.  No, not that I recall.

20    Q.  Just for clarity, my next line of

21  questions will be pertaining to Exhibit 1.

22  Exhibit 1 is the 2014 amendment to the city's

23  comprehensive plan that applied to the UMCH

24  property.  Do you see that?

1    A.  I see it, yes.

2        MR. SILK:  Do you want him to read it?

3    Q.  No.  Just review it and make sure you

4  understand what's in Exhibit 1.  I'm not going

5  to ask anything specific to it.

6    A.  Okay.

7    Q.  At least I don't intend to.

8    A.  I have seen this before.

9    Q.  Okay.  For the sake of my questions, I'm

10  going to refer to Exhibit 1 as the land use

11  plan.

12    A.  Okay.

13        MR. SILK:  Objection to that form.

14        Go ahead.

15    Q.  Just to distinguish it from the city's

16  comprehensive plan.

17    A.  Got it.

18    Q.  Councilman Smith, you supported amending

19  the land use plan, correct?

20    A.  In 2014, yes, I did.

21    Q.  And then thereafter, do you recall that

22  Councilman Robinson sought to amend the land use

23  plan in September of 2020?

24    A.  I do recall that, yes.

1      Q.  Okay.  And did you support amending the

2  land use plan in September of 2020?

3      A.  I wouldn't say that.

4      Q.  Okay.  What would you say?

5      A.  I would say I supported the idea of

6  talking in more depth about the -- what you

7  referred to as the land use plan in September of

8  2020.

9      Q.  I'm going to direct your attention here

10  to Exhibit 34.  And my question pertaining to

11  Exhibit 34 -- I'll give you a chance to read it

12  here in a second -- but just to help you, will

13  be related to Mr. Robinson's email to the

14  members of council and the statement he made at

15  the top of page 2 of this exhibit.

16      A.  Okay.

17      Q.  So do you recall, Councilman Smith, on

18  September 20 of 2020, Councilman Robinson

19  emailing you and the other members of City

20  Council and stating that he, Councilman

21  Robinson, will be making a motion at tomorrow

22  night's meeting to temporarily suspend the UMCH

23  portion of the comprehensive plan pending

24  further update?  Please know that I am going to

1    make this motion in this rather sudden manner

2    because of the urgency that we act while we can.

3         Do you see that?

4         MR. SILK:  Objection.  Form.  It's

5    compound.

6         You can answer.

7    Q.  You can answer.

8    A.  Okay.

9         MR. SILK:  If you're sure what you're

10   answering.

11   A.  Yeah, I agree it's an interesting

12   question.  I do not recall this and being sent

13   this.  I've now seen it and I recall it.  I

14   recall because it's in front of me.  But I do

15   not recall having received it or reading it at

16   the time.  I do not recall that.

17   Q.  So you don't remember receiving it back

18   in September 20 of 2020.  Do you have any reason

19   to doubt that you, in fact, received it?

20   A.  I mean, my email is on here, so it

21   seemed like I received it, yes.

22   Q.  And your email here is

23   doug.smith@worthington.org, correct?

24   A.  Correct.

1      Q.  So earlier you testified that your email

2  changed at a certain point in time.

3      A.  Yeah.

4      Q.  But for purposes of the record, that was

5  your City Council email address?

6      A.  Yes.

7      Q.  So do you recall doing anything upon

8  receipt of Councilman Robinson's email set forth

9  in Exhibit 34?

10      A.  No, I don't remember doing anything.

11      Q.  In fact, Councilman Robinson, on Monday,

12  September 21 of 2020, did seek to either impose

13  a moratorium or repeal the land use plan or

14  temporarily suspend the land use plan.  Do you

15  recall that?

16      A.  I do.

17      Q.  And towards the end of the discussion

18  about Mr. Robinson's proposal, you asked if

19  staff could inform any potential applicant of

20  what Mr. Robinson's proposing.  Do you recall

21  what you're referring to?

22      A.  Yeah.  I mean, the comment was in the

23  context of this motion that he had made.  Does

24  that answer the question?

1     Q.  Sure.  Was there any -- in other words,

2  why did you think it -- or why did you ask or

3  want to ask staff that they inform any potential

4  applicant about Mr. Robinson's proposal?

5     A.  I can't remember exactly the source, but

6  I remember hearing that that application was

7  going to be potentially coming forward on the

8  property, about the property, and just wanted to

9  see if staff -- you know, the spirit of that

10  comment from me, my thought process was wanted

11  to see if staff had known anything about that,

12  where that stands and inform the property owner

13  of such.

14     Q.  Okay.  So you wanted staff to inform the

15  property owner of Mr. Robinson's proposal before

16  it was acted upon?

17     A.  I think, the spirit of the comment I

18  made was more just in general about the status,

19  I think, to see if they could learn anything

20  about the status, and part of that status being

21  what we had discussed previously in the council

22  meeting.

23     Q.  Let me direct your attention, Councilman

24  Smith, to Exhibit 41.

1      A.  It's blank.

2      Q.  It's right here.

3      A.  Old lawyer's trick, huh.

4      Q.  I didn't have a three-hole punch.

5          I just handed you what was marked as

6   Exhibit 41, which are the minutes of that

7   September 21, 2021, council hearing.  And I want

8   to direct your attention to the second-to-last

9   page of that exhibit.

10     A.  I'm just going to breeze through the

11  process here.

12     Q.  Take your time.

13     A.  Oh, yeah.  Sidebar.  One of the worst

14  decisions I ever made about the trick or treat

15  policy.

16         You referred me to the second-to-last

17  page?

18     Q.  Yeah, the second-to-last page.

19     A.  Okay.  Let me peruse that real quick.

20     Q.  My question's really going to pertain to

21  the last paragraph above "other" on that page.

22     A.  All right.  I have reviewed it.

23     Q.  Councilman Smith, earlier you had

24  mentioned about status and notifying -- and

1    asking staff to obtain the status from the

2    potential applicant.  However, I think, at least

3    when I reviewed the minutes, it seemed to be a

4    little different than that, and so I just wanted

5    to make sure we're both on the same page.

6    Because when I look at the minutes, generally,

7    it says here that Mr. Lindsey explained that the

8    question is with any moratorium prompted, and

9    he's referring to Councilman Robinson's proposed

10   moratorium on development of the UMCH property;

11   is that fair?

12       A.  I believe Mr. Lindsey was referring to

13   Mr. Robinson's proposed idea, yeah.

14       Q.  But it pertained to the UMCH property?

15       A.  To the entire comprehensive plan, I

16   believe.  Isn't that what it is?

17       Q.  Well, the 2014 comprehensive plan.

18       A.  That's certainly one pathway.  I'm not

19   sure I would have ruled out the entire

20   comprehensive plan.  Referring to Mr. Lindsey

21   saying if you were to suspend any or all

22   comprehensive plans.  I mean, I wouldn't rule it

23   out.

24       Q.  Okay.  Mr. Lindsey went on to say that

1    there's a legal process to accomplish in

2    consideration of what degree of transparency or

3    process that City Council wanted to go through

4    to get to a moratorium.  Do you recall that?

5       A.  He refers to that here, yes.

6       Q.  And Councilmember Kowalczyk stated that

7    made her feel better and is more transparent.

8    Do you recall that?

9       A.  So said the minutes, yes, I recall.

10       Q.  And Mr. Greeson described how the risk

11    is that we get an application prior to then and

12    it would then fall under the existing

13    comprehensive plan.  Do you recall that?

14       A.  Correct, yes.

15       Q.  And he's referring to an application to

16    the development of the UMCH property, fair?

17       A.  I think in this context the conversation

18    is just in general, how much the process works,

19    how the -- you know, Mr. Lindsey likes to -- at

20    least my take on it, likes to talk in broad

21    strokes of the law and how as a municipality we

22    have processes and what the laws are according

23    to him.

24       Q.  And then according to the minutes, you

 1  asked if staff could inform any potential

 2  applicant of that possibility?

 3      A.  Yes.

 4      Q.  And so my question is, what did you mean

 5  by that?  What were you directing staff to do or

 6  asking staff to do there?

 7      A.  Again, like I stated earlier, I stand on

 8  that statement.  The spirit of that statement,

 9  even though -- the spirit of that statement was

10  certainly to figure out what the status actually

11  is on any application that might or might not be

12  coming to the city, and specific to the UMCH

13  property.

14      Q.  Okay.  Do you have anything else to add?

15      A.  I don't.

16          MR. INGRAM:  I'll tell you what, we've

17  been going for some time.  Do you want to take a

18  break?

19          THE WITNESS:  Sure.

20          (Recess.)

21  BY MR. INGRAM:

22      Q.  Councilman Smith, we are back from our

23  break, and just prior to our break we were

24  talking about your comments from the September

1    21, 2020, City Council meeting.  Do you recall

2    that?

3        A.  Yes.

4        Q.  I want to direct your attention to what

5    was previously marked as Exhibit 36.  And while

6    you review Exhibit 36, for purposes of the

7    record, that is an email chain sent from

8    Mr. Greeson to David Robinson and CC'ing other

9    members of City Council, regarding the UMCH

10   discussion with LC.

11       A.  Okay.  I reviewed it.

12       Q.  So with respect to -- from

13   Mr. Robinson's perspective of City Council's

14   discussion, he framed it differently than you

15   just did.  He framed it as a UMCH discussion.

16   Do you see that?

17           MR. SILK:  Objection to your commentary.

18           Go ahead.

19       A.  Do I see where he's asking a simple

20   question?

21       Q.  Yes.

22       A.  Yeah, I see that.

23       Q.  Okay.  And if you turn to Mr. Greeson's

24   response to Councilmember Robinson on page 1 of

1  Exhibit 36, Mr. Greeson says, we committed doing

2  so during the council discussion about the

3  matter on September 21st.  For reference, at

4  about the two-hour, four-minute and 19-second

5  mark on the video, there is a specific part of

6  the conversation towards the end where we talked

7  about when the issue will be placed on the

8  agenda.

9        Do you see that?

10    A.  I do see that.

11    Q.  Mr. Greeson goes on to say,

12  Councilmember Smith asks staff to make the

13  potential applicant aware of the conversation.

14  While initially hesitant, I answered that we

15  would; saying, sure, because Councilmember

16  Smith's request was consistent with a good

17  government practice of trying to be transparent

18  and open, particularly as it relates to things

19  being publicly discussed by council and directly

20  affecting a party who has asked to meet with us.

21    A.  I see that.

22    Q.  Do you see that?

23    A.  I do.

24    Q.  Do you recall receiving this email?

1      A.  I do not recall receiving this email,

2  no.

3      Q.  But it was sent to you?

4      A.  It was.

5      Q.  Okay.  And so at least from

6  Mr. Greeson's perspective, the conversation on

7  the -- during the September 21, 2020, meeting

8  concerned Lifestyle, correct?

9      A.  From Mr. Greeson's perspective, you'd

10  have to ask him.

11      Q.  Do you disagree with Mr. Greeson's

12  characterization of that meeting that's set

13  forth in Exhibit 36?

14      A.  I would frame it as possibly Mr. Greeson

15  did not understand the spirit of my question to

16  staff if they could inform any potential

17  applicant of the possible conversation.

18      Q.  Did you respond to anyone on this email

19  chain here on Exhibit 36 to correct

20  Mr. Greeson's characterization?

21      A.  I did not.

22      Q.  Why not?

23      A.  I can't be sure I even read this.

24      Q.  Do you typically ignore the city

1    manager's emails that are sent to you about

2    matters before the city?

3        A.  I do not ignore emails that are sent

4    directly to me.  When there are communications

5    to all councilmembers, I may -- may or may not

6    ignore them.

7        Q.  You don't recall one way or the other

8    whether you would have read Exhibit 36?

9            MR. SILK:  Objection.  You asked him

10   that.

11       A.  I don't recall.

12                    -=0=-

13        (Deposition Exhibit 47 marked.)

14                    -=0=-

15   BY MR. INGRAM:

16       A.  I've reviewed this.

17       Q.  Okay.  For purposes of the record,

18   what's been marked as Exhibit 47 is an email

19   from you to President Michael, President Pro-Tem

20   Myers and the city manager CC'ing other members

21   of council and the city's law director, dated

22   October 13, 2020; is that correct?

23       A.  That is correct, yes.

24       Q.  Is this an email that you sent?

1          A.  Yes.

2          Q.  Okay.  And at the time you sent this

3     email, you had not reviewed Lifestyle's

4     application, correct?

5          A.  That's correct.

6          Q.  Okay.  Directing your attention to the

7     last sentence of your email, you wrote, I think

8     it is important to give the community, our

9     boards, and the applicant direction, or at least

10    reiteration of our thoughts.

11              Do you see that?

12         A.  I see that.

13         Q.  What direction did you provide to

14    Lifestyles with respect to their application?

15         A.  In response to this, or ever?

16         Q.  In connection with your email set forth

17    in Exhibit 47, what direction did you provide to

18    Lifestyles?

19         A.  I guess I still don't understand the

20    question.  Like, at this moment in time, or

21    leading up prior to this email?

22         Q.  As follow-up to your October 13, 2020

23    email.

24         A.  What direction did I give them?

1        Q.  Yes.

2        A.  None.

3        Q.  What direction did you provide to any

4    city board in connection with Lifestyle's

5    application?

6        A.  None.

7        Q.  What direction did you provide to the

8    community in connection with Lifestyle's

9    application?

10       A.  None.

11       Q.  What thoughts did you provide to

12   Lifestyle in connection with its application?

13           MR. SILK:  Objection.  Asked and

14   answered.

15           Go ahead.

16       A.  None.

17       Q.  Earlier I asked about direction.  Now

18   I'm asking about any general thoughts.

19       A.  None.

20       Q.  What thoughts did you provide to any

21   city board concerning Lifestyle's application?

22       A.  I guess I'm still on the idea of as it

23   pertains to this email at this point in time,

24   subsequent communications were none from me.

1    Q.  Okay.  None being to either Lifestyle,

2  any city board or community; is that correct?

3    A.  Correct.

4    Q.  Okay.

5              -=0=-

6     (Deposition Exhibit 48 marked.)

7              -=0=-

8  BY MR. INGRAM:

9    Q.  Councilman Smith, you've been provided

10  what was marked as Exhibit 48, which is an email

11  from you to members of City Council and other

12  Worthington officials, dated January 23rd, 2021.

13  Do you see that?

14    A.  5:01 a.m.  Yes, I see that.

15    Q.  So is this an email that you wrote?

16    A.  It is.

17    Q.  With the subject matter of UMCH property

18  transfer?

19    A.  Correct.

20    Q.  And at this time, you're aware of,

21  obviously, Lifestyle's application that was

22  pending before the city at that time?

23    A.  At that time, yes.

24    Q.  And you wrote to all of your City

1    Council members, on public record:  This opaque

2    transaction reeks of highly unethical behavior.

3         Do you see that?

4    A.  I see that, yes.

5    Q.  What highly unethical behavior are you

6    accusing Lifestyle of?

7    A.  I'm not accusing Lifestyles of any

8    unethical behavior.

9    Q.  Okay.  Then what are you referring to

10   here when you say this reeks of highly unethical

11   behavior?

12   A.  I'm referring to a property transferred

13   to Worthington Campus, LLC.

14   Q.  Okay.  And what is unethical about a

15   property transfer?

16   A.  That I'm still at that point, and even

17   still today, unclear about what is Worthington

18   Campus, LLC.

19   Q.  Okay.  In your mind, what is the

20   unethical behavior you're referring to here to

21   all members of council?

22   A.  That according to the Secretary of

23   State's website, the articles of incorporation

24   for Worthington Campus, LLC appear to have been

1   filed by the law firm Ice Miller, in general,

2   and I know Ice Miller is a law firm in downtown

3   Columbus. In general, has nothing to do with

4   Lifestyles. I don't even know if they're

5   related to this property transfer. I still have

6   no idea. I think, in general, though, to have a

7   law firm file articles of incorporation on

8   behalf of an LLC is -- is, in my opinion, highly

9   unethical behavior.

10     Q. Any other reason that you're

11   referring -- strike that. Let me start over.

12       Anything else here do you believe was

13   unethical? Anything else?

14     A. No.

15     Q. Are you aware that Worthington Campus,

16   LLC was the applicant?

17     A. The applicant for what?

18     Q. Lifestyle's rezoning.

19     A. How could that be?

20     Q. Were you aware, or not?

21     A. No.

22     Q. And didn't City Council have a rule

23   against reply all emails to members of council?

24     A. I believe this was not a reply all, but

1    me actually sending a message to all of council.

2        Q.  Okay.

3        A.  And to answer your question, I don't

4    know that there's a rule against it.

5        Q.  Is there a policy against reply alls to

6    all members of council?

7        A.  Not that I'm aware.  I believe council

8    has the option to, when they want something on

9    public record, knowing that it will be on public

10   record, to send it to all members of council.

11       Q.  Let me direct your attention, Councilman

12   Smith, to what was marked as Exhibit 6.

13       A.  Exhibit 6.

14       Q.  You can see that Exhibit 6 is Ordinance

15   No. 04-2022, correct?

16       A.  Yes.

17       Q.  Go ahead and take your time to review

18   it.

19       A.  Okay.

20       Q.  You introduced Ordinance Number 4-2022

21   at the January 18, 2022, City Council hearing,

22   correct?

23       A.  I did.

24       Q.  Were you familiar with this proposed

1  ordinance before you introduced it?

2       A.  The concept, yes.

3       Q.  Who drafted this ordinance?

4       A.  I don't know.

5       Q.  At any time before you introduced the

6  ordinance, did you propose any revisions to its

7  substance?

8       A.  No.

9       Q.  When's the first time you reviewed

10 Exhibit 6?

11      A.  When was the meeting?

12      Q.  January 18th.

13      A.  Then January 18th.

14      Q.  Did you review any prior drafts of

15 Exhibit 6?

16      A.  No.  Unless it was provided -- I don't

17 know -- I didn't read word for word, so if this

18 was an amended draft, I can't confirm that

19 without reading it and having the actual package

20 in front of me from the day.  But no, I didn't.

21      Q.  Are you aware of any -- strike that.

22          How many versions of Ordinance 4-2022

23 are you aware existed?

24      A.  This is the only version I'm aware of.

1 Q. Okay. It's not like there were any

2 exchange of drafts or anything like that?

3 A. No, not that I'm aware of.

4 Q. Okay. So the first time you were

5 provided with this proposed ordinance was the

6 day of City Council's hearing?

7 A. Correct.

8 Q. And who provided that to you?

9 A. I can't recall. I can't recall.

10 Q. Did you share this proposed ordinance

11 with anyone prior to the January 18 hearing?

12 A. No.

13 Q. You said you were familiar with the

14 concept behind Ordinance No. 4-2022 prior to the

15 hearing. Please elaborate on your familiarity

16 with this concept and what you're referring to.

17 A. The concept, as we've discussed earlier

18 today, was essentially a continuation of the

19 concept presented in September of 2020 at

20 council. So the concept's been floating around

21 for some time. So the words on the paper

22 manifest the concept, of course, but the concept

23 I was familiar with.

24 Q. What discussions did you have about this

1    concept you're referring to prior to the January

2    18 hearing?

3        A.  Can you define discussion?

4        Q.  Did you have -- did you talk about

5    imposing a moratorium against the rezoning or

6    development of the LC property prior to the

7    January 18, 2022, hearing?

8        A.  I'm still not comfortable with the

9    question the way it's worded.  I did not have a

10   conversation about this with anybody.

11       Q.  Okay.  Did you have any emails or text

12   messages about a moratorium on LC's property

13   prior to the January 18 hearing?

14       A.  No.

15       Q.  And as the member of council who

16   introduced Exhibit 6, I take it you reviewed

17   that ordinance or that proposed ordinance?

18       A.  I did.

19       Q.  In advance of introducing it?

20       A.  Yes.

21       Q.  And that ordinance only applies to the

22   UMCH site, correct?

23       A.  That is correct.

24       Q.  And it, therefore, only applies to LC,

1   the owner of the UMCH property, correct?

2       A.  It applies to whoever the property owner

3   may be.

4       Q.  Okay.  What is your understanding of why

5   this moratorium was sought to be placed on

6   Lifestyle's property at the time?

7       A.  Sorry, I was lost in the whole

8   Worthington Campus thing in my mind, so can you

9   repeat that?

10          MR. INGRAM:  Can you read that back,

11  please.

12          (Record read as requested.)

13      A.  Again, I -- is it Lifestyle's property?

14  Can I get clarity on that?

15      Q.  All right.  How about we just refer to

16  it as the property.

17      A.  The property.  I can agree with that.

18          So like I said, it's a continuation of a

19  conversation that was put on pause in September

20  of 2020.  This manifested in words that concept,

21  that idea, to give us a little time so you can

22  take and think and engage with the appropriate

23  stakeholders.

24      Q.  What is your understanding of why

1  Ordinance 4-2022 was proposed as an emergency?

2      A.  My understanding, as one member of

3  council, was there was some urgency to making it

4  clear to the community and all the stakeholders

5  who would have an interest in this property that

6  were open for conversation.

7      Q.  What do you mean by open for

8  conversation?

9      A.  I think the intent of at least how I

10  read Ordinance 4-2022 is to really give the city

11  and the community and the -- whoever the

12  property owner might be the ability to engage

13  with each other in a robust and respectful way

14  to understand what the best use for the property

15  is.

16      Q.  But it would prevent the property owner

17  from submitting an application to redevelop the

18  property, correct?

19      A.  It would allow a community conversation

20  to happen, which would then guide any potential

21  applicant to the best use for the property based

22  on that feedback.

23      Q.  This community conversation that you

24  referred to, what community conversation could

1  the property owner rely upon?  What are you

2  referring to to guide its development of its

3  property?

4      A.  A property owner who wants to submit a

5  rezoning application is free to engage with the

6  public, and I think, as I see it, encouraged to

7  engage with the public, resident groups,

8  neighbors, the public at large, other

9  stakeholders, businesses, city representatives,

10  experts in various fields to get inputs from

11  those stakeholders so that they can be well

12  informed about how they could best develop their

13  property.

14      Q.  Okay.  And Councilman Smith, how much

15  community conversations -- how much community

16  engagement must an applicant complete in order

17  to rezone their property in this city?

18          MR. SILK:  Objection to foundation.

19          Go ahead.

20      A.  There is no quantitative measurement of

21  engagements, other than the qualitative

22  measurement of getting feedback from the

23  community and its representatives at whatever

24  appropriate forum that might be throughout the

1    process.

2       Q.  Okay.

3       A.  And that goes for -- that goes for any

4    property throughout the city with any

5    development.

6       Q.  And Councilman Smith, with respect to

7    LC, what would be the appropriate forums, in

8    your mind, that you just referenced?

9          MR. SILK:  Same objection.

10         Go ahead.

11      A.  It's up to any applicant to determine

12   what the appropriate forum is for them.  You

13   know, there's a smorgasbord -- sorry if that's

14   hard to spell -- smorgasbord of options

15   available to any developer to reach out to the

16   public, community groups, residents, getting

17   letters of -- letters of acceptance,

18   essentially, of plans and stakeholders'

19   feedback.  Folks I mentioned just a minute ago.

20      Q.  To your knowledge, is there a provision

21   in the zoning code that requires an applicant to

22   engage in community conversations in connection

23   with applying to rezone their property?

24         MR. SILK:  You mean if they want to

1   survive Issue 38?

2      A.  I think -- I can't speak to the zoning

3   code.  I can speak as an elected official,

4   understanding that there was an Issue 38 that

5   did make it very clear to any property owner

6   submitting application for rezoning that they

7   would be subject to the community feedback

8   structure in any case on any property so that it

9   is important to engage with the public prior to

10  and throughout that process.

11     Q.  But that's not a requirement, is it?

12     A.  That is a subjective question with a

13  subjective answer.  I -- that's what I'll say.

14     Q.  Is it a requirement, or not?

15     A.  I don't know if it's a requirement.

16        MR. INGRAM:  Counsel, I'd ask that you

17  refrain from testifying and stick with the

18  objections.

19        MR. SILK:  Assuming you reciprocate,

20  happy to do it.

21  BY MR. INGRAM:

22     Q.  The ordinance you proposed here in

23  Ordinance 4-2022, it makes a reference to Sixth

24  Circuit Court of Appeals decision.  Do you

1    recall that?

2        A.  I recall.  Yes.

3        Q.  Regarding tree ordinances?

4        A.  Yes.

5        Q.  What, if anything, did City Council pass

6    pertaining to any tree ordinance, subsequent to

7    January 18 of 2021 -- I'm sorry, 2022?

8        A.  Other than what we have had as policy, I

9    don't think we passed anything.

10       Q.  Other than consideration of Ordinance

11   No. 4-2022, did City Council consider any

12   revision to its policies concerning trees?

13       A.  Subsequent to the January meeting?

14       Q.  Correct.

15       A.  I don't believe so.

16       Q.  Has City Council completed a

17   comprehensive review of the current city

18   comprehensive plan since January 18 of 2022?

19           MR. SILK:  Objection to form.

20           Go ahead.

21       A.  Has City Council reviewed

22   comprehensively the comprehensive plan?

23       Q.  Completed a comprehensive review of the

24   current comprehensive plan.

1      A.  Can you be more specific with that

2  question?

3      Q.  Sure.  In the ordinance you introduced,

4  there's a reference to the fact that the city

5  had not conducted a comprehensive review of the

6  current comprehensive plan.  And my question to

7  you is:  Has City Council conducted a

8  comprehensive review of the city's current

9  comprehensive plan since January 18 of 2022?

10      A.  I understand.  Yeah.  We have taken

11  steps to begin a -- what I would call a

12  comprehensive review broken into different

13  studies.

14      Q.  Okay.  And what steps are you referring

15  to that the City Council's completed?

16      A.  Directing staff to undergo a variety of

17  different types of studies.

18      Q.  And what studies are those?

19      A.  The industrial corridor study for the

20  eastern part of the city, the industrial

21  corridor.  The housing study, which will be a

22  big factor in the comprehensive plan.  And

23  there's another one on the tip of my tongue.  I

24  can't think of it.  And of course, the visioning

1    process, which is going on.

2        Q.  Any others?

3        A.  That's all I can think of.

4        Q.  Would the industrial corridor study

5    pertain to the Lifestyle/LC property?

6        A.  I think all of these studies will inform

7    and impact the entire comprehensive plan,

8    including the UMCH site property.

9        Q.  Is the LC's property in the industrial

10   city's corridor?

11       A.  No, not a part of that study.

12       Q.  Okay.  You mentioned the visioning

13   process?

14       A.  Correct.

15       Q.  What is the visioning process?

16       A.  So circa 2019, the City Council decided

17   to engage a consultant to help with a visioning

18   process, and the visioning process purpose was

19   to be -- to find aspirational statements for the

20   city which ultimately led to a visioning

21   committee of residents, driven by residents, who

22   did come up with a visioning plan, a visioning

23   statement plan, which was seven vision

24   statements.  And that -- fast-forward a piece of

1  time, and council earlier this year decided

2  to -- each councilmember takes one visioning

3  statement of the seven -- since there are seven

4  of us -- and work with an implementation team to

5  figure out more specifically what those

6  aspirational vision statements could be turned

7  into tangible products or projects.  And that's

8  where we stand today.

9     Q.  So the visioning process started four

10  years ago, roughly?

11     A.  Roughly, yeah.

12     Q.  And what consultant was engaged by the

13  city?

14     A.  Poggemeyer.  That's P-O-G-G-E-M-E-Y-E-R.

15     Q.  And there was seven aspirational vision

16  statements?

17     A.  That's correct.

18     Q.  Have any of the seven aspirational

19  vision statements been converted into any

20  tangible projects, as you, I believe, phrased

21  it?

22     A.  I believe there's public outreach on

23  that happening in October and November, and we

24  discussed even this week at council that that

1  public feedback will then come back to council

2  likely November and we'll be deciding what

3  tangible projects to include for next year.

4     Q.  Do any -- in your mind as a member of

5  council, do any of the seven aspirational vision

6  statements bear upon the development of LC's

7  property?

8     A.  Bear on the development, can you

9  elaborate that?

10    Q.  Sure.  I'm trying to gauge whether the

11 visioning process in any of these aspirational

12 statements are at all relevant to LC's property

13 or not.

14    A.  I might say personally that all of the

15 statements are relevant to all properties in

16 Worthington because they're aspirational and

17 kind of chiseling down into -- you know, there's

18 a line of demarcation of aspirational down to

19 tangible products and projects.  So I don't know

20 how to answer that exactly.  But yes, I would

21 say the aspirational statements all impact every

22 property in Worthington.

23    Q.  Since 2019, has there been numerous

24 residential rezonings in the city, correct?

 1    A.  Residential rezoning since 2019?

 2    Q.  Yes.

 3    A.  I can think of one.  There might be

 4  more.

 5    Q.  Which one are you thinking of or

 6  recalling?

 7    A.  The -- what's now called the Hartford or

 8  the Stafford Village.

 9    Q.  And what's the Stafford Village, for the

10  record?

11    A.  It is a property in Old Worthington

12  owned by the National Church Residences, plural,

13  and they wanted to demolish the existing

14  residential properties for senior living and

15  construct a -- kind of a different style of

16  residential property.

17    Q.  And when did that occur?  When did the

18  rezoning occur, I should say?

19    A.  Council voted on that in January of

20  2020, I believe.

21    Q.  You referenced a housing study earlier.

22  Has the housing study you referenced been

23  completed?

24    A.  It's not completed.

1          Q.  When was it started?

2          A.  Sometime in the spring or late winter of

3    this year.

4          Q.  Of 2022?

5          A.  '23.  Yeah, I understand.

6          Q.  So why did you vote in favor of imposing

7    this moratorium set forth in Exhibit 6 against

8    the -- considering any future development of

9    LC's property?

10         A.  I might word that slightly differently.

11   I voted --

12         Q.  Okay.  Go ahead.

13         A.  I voted to support Ordinance No. 4-2022

14   because I believe President Robinson's

15   introductory remarks about the ordinance itself

16   were accurate.  They rang true to me in the

17   sense that, you know, we had just come off of a

18   vote on this property.  And this particular

19   ordinance is a continuation of a conversation we

20   had prior to the application for that property

21   back in September of 2020, and it just seemed

22   like the appropriate thing to do to signal to

23   the community and to the stakeholders and the

24   property owner that we can have a conversation

 1   about it.

 2       Q.  Anything else?  Any other reasons?

 3       A.  No, I don't believe so.

 4       Q.  Now I'd like to direct your attention,

 5   Councilman Smith, to Exhibit 7.  Go ahead and

 6   take a moment to refresh your recollection of

 7   Exhibit 7, which was -- which is Resolution

 8   4-2022.

 9       A.  Okay.  Thank you.

10       Q.  Councilman Smith, now that you've had an

11   opportunity to review Exhibit 7, do you recall

12   that Resolution Number 4-2022 substituted or

13   replaced the land use plan within the city's

14   comprehensive plan?

15           MR. SILK:  Objection to form.

16           Go ahead.

17       A.  Yeah, I don't think that's accurate, and

18   I don't see it that way.  I see it as an

19   augmentation, a supplement, an addition even to

20   the land use plan.

21       Q.  Councilman Smith, is the land use plan

22   still in effect?

23           MR. SILK:  Same objection.

24           Go ahead.

1    A.  I don't know.

2    Q.  As a member of City Council who voted

3  for Resolution Number 4-2022, do you recall

4  voting for this?

5    A.  I did.  I did vote for this.

6    Q.  Okay.  What is your understanding of

7  whether or not -- after council adopted

8  Resolution Number 4-2022, what is your

9  understanding of whether the land use plan that

10  we reviewed in Exhibit 1 -- of whether it still

11  applied to the future development of LC's

12  property or not?

13        MR. SILK:  Objection to form and legal

14  conclusion.

15        Go ahead.

16    A.  Based on the information from January

17  18th of 2022 and the resolution language, it's

18  resolved that the attached amendment -- an

19  amendment to the comprehensive plan, including

20  the 2014 amendment -- including the 2014

21  amendment, be adopted.

22    Q.  So does --

23    A.  I believe it's an aggregate, an

24  accumulated thing.

1    Q.  So Councilman Smith, it's your

2  understanding -- and I'm just trying to

3  understand what that is -- that pages 1 and 2

4  that are attached to the resolution set forth in

5  Exhibit 7 are in addition to the land use plan

6  in Exhibit 1; is that fair?

7    A.  That's my understanding of the

8  resolution, they're including it, this

9  attachment that he just referenced, to the 2014

10  amendment.

11    Q.  Okay.  So for the landowner's purposes,

12  LC's purposes, or Worthington Campus' purposes,

13  both Exhibit 1 and Exhibit 7 serve as guides to

14  the future development of the UMCH property; is

15  that fair?

16      MR. SILK:  Objection to foundation.

17      Go ahead and answer.

18    A.  As of January 18th, 2022, I think it's

19  my understanding, as one member of council, that

20  the guide that is the 2014 land use plan,

21  quote/unquote, is added to and supplemented by

22  the Resolution 04-2022.

23    Q.  So in your mind, do both documents still

24  apply, or not?  That's what I'm trying to get

 1  to.

 2       MR. SILK:  Objection.  Asked and

 3  answered.

 4       Go ahead.

 5    A.  I believe a developer can interpret it

 6  that way, if they so choose.

 7    Q.  My question is different, though.  How

 8  do you interpret it as a member of council who

 9  voted for Resolution 4-2022?

10       MR. SILK:  Objection.  This is the last

11  time he's going to answer the question.

12       MR. INGRAM:  He didn't answer it the

13  last time.

14       MR. SILK:  He did.

15    A.  I feel that I have sufficiently answered

16  it by reading the resolution section 1 verbatim.

17  That's how I interpret it.  The wording is black

18  and white.

19    Q.  When did you first receive a copy of

20  Resolution 4-2022?

21    A.  On January 18th, 2022.

22    Q.  So the day of the City Council meeting?

23    A.  The day of the meeting.

24    Q.  Do you recall what time of day?

1      A.  Afternoon, I believe.

2      Q.  Who, to your knowledge, received a copy

3  of Resolution 4-2022 in advance of the hearing?

4      A.  I don't know.  I don't know.

5      Q.  Who provided you with your copy prior to

6  the hearing?

7      A.  I want to say staff, but I don't know

8  for sure.

9      Q.  If it wasn't staff, who would it have

10  been?

11      A.  Resolutions typically come from staff,

12  or the president of council sets the agenda, so

13  could have been.

14      Q.  The president of council sets the

15  agenda?

16      A.  According to our charter, the city

17  manager, along with the president of council,

18  set the agenda, yes.

19      Q.  Do you know who drafted this resolution?

20      A.  No, I don't know who drafted it.

21      Q.  Do you know when it was drafted?

22      A.  I don't know.

23      Q.  How was -- I know you said you couldn't

24  recall who provided you with an advance copy of

1  this resolution.  How was it provided to you?

2      A.  Via the city email.

3      Q.  Why was LC not provided a copy of

4  Resolution 4-2022 in advance of the January 18

5  hearing?

6      A.  I don't know.

7      Q.  Did you talk to anyone prior to the

8  January 18, 2022, hearing about Resolution

9  Number 4-2022?

10     A.  I did, yeah.

11     Q.  Okay.  Tell me about that.  Who did you

12  talk to?

13     A.  President Robinson.

14     Q.  Anyone else?

15     A.  No.

16     Q.  Okay.  And when did you talk to

17  President Robinson about it?

18     A.  Within a day or two prior to the

19  meeting.

20     Q.  So a Saturday or Sunday?

21     A.  Meetings are on Mondays, and that

22  particular meeting was -- was that a Tuesday?

23  Was that MLK day?  So it could have been that

24  Monday.

1    Q.  So it was Tuesday, January 18?

2    A.  Tuesday, January 18.

3    Q.  Your memory is correct, it was after MLK

4  day.

5    A.  Likely.

6    Q.  And so when you say a day or two before,

7  it would have been over the weekend, then?

8    A.  More likely, just because of my MO,

9  Monday.

10    Q.  But you don't recall one way or the

11  other?

12    A.  I can't say for sure.

13    Q.  And this was via a phone call?

14    A.  A phone call.

15    Q.  And was this in the same conversation

16  that the ordinance in Exhibit 6 was discussed?

17    A.  I never admitted we discussed ordinance

18  6.

19    Q.  Sorry.  All right.  So you talked about

20  Resolution 4-2022 in advance of the hearing, but

21  you didn't talk about the ordinance that you

22  introduced prior to the hearing?

23    A.  We didn't talk about them by name at

24  all.  I think, more accurately, President

1  Robinson had told me that he had an idea that he

2  may or may not come up with at the January 18th

3  meeting and just wanted to give me a heads-up.

4  Wasn't soliciting feedback or insights.  Didn't

5  ask any questions of me.  It was more of a

6  courtesy call, I think.

7      Q.  And this would have been a conversation

8  about the concept of the moratorium or amendment

9  to the comprehensive plan?

10     A.  Both.  Both concepts of the moratorium

11  and the -- and the resolution concept.  Again, I

12  don't -- I don't distinguish that as a

13  conversation.  I did no talking other than maybe

14  hello, nice weather.  Which, by the way, it

15  wasn't nice weather probably, because it was

16  January.  So it was more of an informative thing

17  as president of council him contacting me to let

18  me know.

19     Q.  Okay.  And once you and President

20  Robinson discussed the concept of a moratorium

21  pertaining to the Lifestyle's property or LC's

22  property or the concept of amending the land use

23  plan that applied to LC's property, did you

24  share that concept or that discussion with

1   anyone?

2      A.  Again, I wouldn't call President

3   Robinson's phone call with me a conversation or

4   a discussion.  It was a courtesy heads-up on

5   what he intended to maybe or maybe not do on the

6   January 18th meeting.  And no, I didn't -- I

7   didn't talk to anybody about it.

8      Q.  Why didn't you call LC?

9      A.  I can't think of a reason why I would.

10  It's not in my MO to reach out to property

11  owners.

12     Q.  Did you contact the city manager or any

13  city staff and direct them to reach out to LC

14  based on what President Robinson told you?

15     A.  It is not my personal MO to -- to do

16  that, no.

17     Q.  Did President Robinson tell you not to

18  share the contents of your discussion or these

19  concepts with anyone?

20     A.  No, he didn't tell me that.

21     Q.  In your experience on City Council,

22  Councilman Smith, has City Council ever amended

23  the city's comprehensive plan through a

24  resolution that was not on City Council's agenda

1  and never publicly disclosed before City

2  Council's meeting before?

3          MR. SILK:  Objection to form.

4          Go ahead.

5      A.  So to be completely accurate, this

6  was -- this resolution you're referring to,

7  Resolution 04-2022, was on the agenda in the

8  broader sense, and it was publicly -- the

9  wording you used, it fits with that form,

10  because it was sent out via the city email.  So

11  it was publicly available.

12      Q.  Let's go to Exhibit 10, Councilman

13  Smith.  Exhibit 10 is the City Council agenda

14  for the Tuesday, January 18, 2022, meeting.

15  Please review Exhibit 10, and let me know when

16  you're done.

17      A.  Okay.  Thank you.

18      Q.  Now that you've had an opportunity to

19  review the agenda for that hearing, please show

20  me where Resolution Number 4-2022 is listed.

21          MR. SILK:  Objection.  Misstates his

22  testimony.

23          Go ahead and answer.

24      A.  Any -- at any time, being that council

1    follows by charter Robert's Rules of Order, any

2    councilmember is allowed to make any motion,

3    resolution, ordinance introduced at any meeting

4    at any time.  It's a simple fact that it's a

5    public meeting makes it public.  During the

6    reports of councilmembers and other is the

7    appropriate time for resolutions to be made.

8        Q.  Okay.  So where in this agenda is there

9    any reference that would put anyone on notice

10   that the substance of Resolution 4-2022 would be

11   considered by City Council that night?

12       A.  We publish our livestream videos and the

13   announcements as required by the Ohio Revised

14   Code to the public in advance of every meeting,

15   and the public can easily watch at any point in

16   time, and so that's the notification.  Public

17   notice.

18       Q.  My question was pertaining to this

19   agenda.

20       A.  I understand.

21       Q.  And you're now referring to some other

22   public announcement other than the agenda?

23       A.  I'm referring to this agenda being like

24   every other agenda, available prior to the

1  meeting and announced as a public meeting where

2  council follows the charter and the Robert's

3  Rules of Order to, you know, propose motions and

4  amendments and resolutions and anything else

5  that any particular one councilmember wants to

6  propose and get a second and have a policy

7  discussion and vote.

8     Q.  Okay.  So with respect to council's

9  consideration of Resolution 4-2022, the advanced

10  public notice of council's consideration of that

11  measure is based on the word "other" in the

12  agenda; is that your testimony?

13     MR. SILK:  Objection.

14     Go ahead.

15     A.  It's based on the fact that every public

16  meeting that we have is publicly notified

17  through the standards set forth by the Ohio

18  Revised Code, and council has the allowance and

19  the authority to have considerations and propose

20  new language and amendments and motions and

21  resolutions like we did.

22     Q.  But there is no explicit reference in

23  this meeting agenda to Resolution Number 4-2022,

24  is there, Councilman Smith?

1        MR. SILK:  Objection.  Asked and

2   answered.

3        Go ahead.  Try again.

4   A.  Sorry.  I was -- there is no explicit --

5   can you repeat that?

6        (Record read as requested.)

7   A.  Members of the public and stakeholders

8   and anybody in the community at large is welcome

9   to pull a public records request of any email

10  communication of anything relating to an agenda

11  item or nonagenda item at any point according to

12  the Ohio Revised Code.

13  Q.  Anything else in response to that

14  question, Councilman Smith?

15  A.  No.

16  Q.  Earlier you mentioned -- you made a

17  reference to a city email that was sent out that

18  would make Resolution No. 4-2022 public?

19  A.  Correct.

20  Q.  Okay.  Can you elaborate on what you're

21  referring to there?

22  A.  Any correspondence and communication not

23  protected by attorney-client privilege is public

24  record, according to Ohio Revised Code Sunshine

1    Laws.  And so any communication sent by --

2    whether it be staff or David Robinson as

3    president to council would be -- would be public

4    record, and so any member of the public at any

5    point for any reason can request those records

6    and they can be aware of those communications.

7         Q.  So to your knowledge, was any version or

8    copy of Resolution No. 4-2022 made available to

9    anyone in the public prior to January 18?

10        A.  By virtue of being sent on the city

11   email to city councilmembers, it is public.

12        Q.  My question is a little bit different.

13   Was, to your knowledge, any version of this

14   resolution provided to anyone of the public, to

15   anyone who is not a member of council, or not?

16        MR. SILK:  Objection.  Asked and

17   answered.

18        A.  I can't speak to that specifically.

19        Q.  So you don't know?

20        A.  I don't know.

21        Q.  Okay.  Councilman Smith, the amendment

22   to the land use plan set forth in pages 1 and 2

23   of Exhibit 7, that amendment is to serve as a

24   guide for the future use and development of LC's

1  property, correct?

2        MR. SILK:  Objection.  Form.

3        Go ahead.

4    A.  I wouldn't necessarily word it that way.

5  I would say it is an accumulation of information

6  that can be used -- can be used as a guide as

7  one of the pieces of information or, you know,

8  other pieces of information that a developer

9  might use to propose an application.

10   Q.  So Councilman Smith, in Section 1 of the

11  resolution that -- it says, the attached

12  amendment be adopted to serve as a guide for

13  future use in development of the site.  Do you

14  see that?

15   A.  The attached amendment to the -- be

16  adopted to serve as a guide for future use in

17  development of the site.  Yeah.

18   Q.  So do you agree with that?

19   A.  I agree with what's written here, yes.

20   Q.  Okay.  So looking at the first guiding

21  principle in the amendment, it says, it is

22  important that the development of the property

23  be considered and executed holistically as an

24  integrated whole.  Do you see that?

1      A.  I do.

2      Q.  In your capacity as a member of City

3  Council, under this first guiding principle, can

4  Lifestyles, or LC, move forward and develop only

5  a portion of its property?

6          MR. SILK:  Objection.  Form.

7          Go ahead.

8      Q.  You're giving a confused expression, so

9  let me just give you a concrete or tangible

10  example.  Can LC move forward with developing or

11  rezoning only enough of their property for a

12  24,000 square foot commercial development and

13  nothing else?

14          MR. SILK:  Objection.  Form.

15          Go ahead.

16      A.  I'm going to ask to have that repeated

17  in a second, but let me read this first.

18          Will you repeat that, please?

19          (Record read as requested.)

20      A.  That would be highly inaccurate.  I

21  think this first guiding principle paints a

22  broad stroke of guidance that the property be

23  considered and executed holistically as an

24  integrated whole.  LC is welcome to submit

1 application at any point with whatever proposal

2 they see necessary.

3     Q.  Okay.  And as a member of council who

4 voted to approve this guiding principle, how

5 would you apply it to an application that only

6 pertains to 24,000 square feet of the site?

7         MR. SILK:  Objection.

8         You haven't established any foundation.

9         Go ahead.

10     A.  Yeah, I'm not -- I'm not sure I

11 understand where 24,000 -- I mean, is this a

12 hypothetical --

13     Q.  Yeah.  I'm giving you a tangible --

14 remember, you were confused with my general

15 question, so I'm giving you a tangible example,

16 and I'm trying to ascertain how you would apply

17 this first guiding principle.

18     A.  Specifically to a 24,000 square foot

19 commercial development and that's it?

20     Q.  Correct.

21         MR. SILK:  Same objection.

22         Go ahead.

23     A.  I mean, is that something that an

24 applicant would do on this property?  That's a

1    rough hypothetical.  I can't wrap my head around

2    that.

3         Q.  Okay.  So if LC tomorrow filed an

4    application to rezone a small portion of this

5    site, solely and only for a 24,000 square foot

6    development, it wouldn't -- it wouldn't include

7    the entirety of the site.  Do you see that?

8         A.  Oh, I see what you're saying.  Okay.

9    That was not clear to me a minute ago.

10            In a hypothetical situation, when any

11   property owner submits an application to the

12   city, it goes through the appropriate process.

13   By that point of the application submission, an

14   applicant should have reviewed guiding

15   principles, done the appropriate community

16   outreach, all those things that any property

17   owner would do with any application and then go

18   through the process, and then be prepared to

19   defend its position of the application

20   submission, based on how they interpreted the

21   guidelines.

22        Q.  And my question is, how do you interpret

23   this first guiding principle with respect to an

24   application that does not include the entirety

1  of the -- of LC's property and only involves a

2  small portion of it?

3        MR. SILK:  Same objection.

4        Go ahead.

5     A.  If this comes to council, any

6  hypothetical -- any application, reviewing words

7  on a guiding document, I, as one member of

8  council, referring back to my original kind of

9  thought process and decision-making process and

10  looking at not only this and these words on the

11  paper, but how the applicant is defending those

12  words on the paper based on their application

13  submission, community feedback, communications

14  from residents, staff, expertise and notes and

15  the planning commission's minutes as well and

16  what conversations were had there.  So that's

17  how I am approaching this as one ingredient of a

18  resolution.

19     Q.  Okay.  How do you interpret -- what is

20  your understanding of this first guiding

21  principle, then?

22        MR. SILK:  Objection.  Asked and

23  answered.

24        Go ahead.

1      A.  I feel that that is not my role as a

2   councilmember to interpret this in a vacuum.

3   That I interpret it based on an application

4   that's in front of me as a policy question in

5   front of council.  That's my answer.

6      Q.  Okay.  How would you direct an applicant

7   to interpret this first guiding principle, then?

8      A.  I would not be directing an applicant in

9   any way.  I would defer to staff.

10      Q.  Let's take a look at the general

11   components on the second page of the amendment

12   in Exhibit 7.  Do you see the reference to a

13   large contiguous green space?

14      A.  First paragraph, yes.

15      Q.  That's undefined, correct?

16      A.  That is undefined, yes.

17      Q.  What constitutes green space?

18      A.  I personally believe green space would

19   be -- back to part of our previous conversation

20   about, in my mind, programmable space that can

21   host activities.  Green itself being simply

22   grass or park space or, you know, they're more

23   nature-focused oriented kind of spaces as well

24   that can be considered green space.  There's a

1  variety of types of green spaces, but I refer

2  back to the original conversation we had about

3  that.

4      Q.  Okay.  So with respect to general

5  component one, how large of a large

6  continuous -- contiguous green space is required

7  for LC's property?

8          MR. SILK:  Objection to form.

9          Go ahead.

10     A.  There is no requirement specifically.  I

11  see applications and processes and development

12  proposals as a developer or landowner whoever

13  wants to submit an application has the

14  opportunity to interpret a variety of sources

15  and try to explain and justify their position

16  throughout the process.  And if they do that,

17  and it comes to council, council can decide to

18  approve or deny, and that's the process.

19     Q.  Okay.  Let me restate my question.

20     A.  Okay.

21     Q.  I want to -- I'm asking something a

22  little different.  What's the minimum number of

23  acres that satisfies this large contiguous green

24  space component?

1    A.  The response is the same.  I don't think

2  there is a specific minimum.  It's not spelled

3  out here, certainly, in the wording.  But as a

4  guide, again, you know, a developer is welcome

5  to submit an application and justify and argue

6  and fight for their position.

7    Q.  So is there any standard that an

8  applicant should look to to have context in what

9  constitutes a large contiguous green space?

10    A.  I defer to staff on those standards as a

11  professional expertise and where they might find

12  sources for that kind of standard.

13    Q.  So the process is going to require,

14  entail back and forth between staff and the

15  applicant; is that fair?

16    A.  I wouldn't say that specifically.  I'd

17  say there's an opportunity to propose an

18  application and go through the process, which

19  I'll defer to the planning commission and staff

20  on what those initial steps are, they can follow

21  that process.

22    Q.  Okay.  Sticking with that first general

23  component, do you see where it says that the

24  large contiguous green space is to be central to

1    the property?

2        A.  I see central to the property, yes.

3        Q.  Central to the property is likewise

4    undefined, correct?

5        A.  Correct, yeah.

6        Q.  So where specifically on LC's property

7    must this large contiguous green space be

8    located?

9        A.  Well, I'm not a developer, I'm not the

10   property owner.  I can -- if I were, I could

11   interpret central to the property as a

12   geo-spacial context or -- or more less literal

13   and more of a central as in significant.  So it

14   just depends how they want to interpret that and

15   how they want to defend their position.

16       Q.  Councilman Smith, I'm asking you these

17   questions based on your support, your vote for

18   the adoption of this very language.  But I'll

19   move on.

20           The next part of this first component,

21   do you see where it says, inclusive of the

22   Tucker Creek acreage?

23       A.  Yes.

24       Q.  Specifically where on LC's property --

1  where is the Tucker Creek acreage, as that is

2  specified here?

3      A.  I believe that's pretty well documented

4  that the Tucker Creek acreage is a

5  non-developable piece of land based on the creek

6  that -- the Tucker Creek that runs through

7  there.  So I'm fairly certain that's well

8  documented.

9      Q.  Do you have any understanding or do you

10  know how many acres constitute the Tucker Creek

11  acreage that is referenced here?

12      A.  If memory serves, it's somewhere in the

13  7 acres ballpark.  The length of the creek.

14      Q.  So looking at the first general

15  component, it says a large contiguous green

16  space central to the property and inclusive of

17  the Tucker Creek acreage.  Do you see that?

18      A.  Yeah, I see that.

19      Q.  So is it fair to say that this undefined

20  large contiguous green space must span both the

21  Tucker Creek acreage as well as the central

22  portion of the property?

23          MR. SILK:  Objection.  Form.

24          Go ahead.

1    Q.  Or not?

2    A.  You mean -- you mean geo-spacially?

3    Q.  Yes.

4    A.  Span?

5    Q.  Yes.

6    A.  Like literally -- boy, I wish I had that

7  map.  Like literally taking over from Tucker

8  Creek frontage to the physical center of the

9  site?

10    Q.  Yeah.

11    A.  I forget your wording, but I don't agree

12  with that.

13    Q.  Okay.  As a member of council and as one

14  who voted to adopt this language, how do you

15  interpret this first general component, then?

16    A.  Personally, I would say central means

17  significant as opposed to geo-spacial.  So a

18  significant -- significant to the property.

19  Again, any developer's welcome to interpret that

20  and defend their position any way they see fit.

21  But me, as an individual councilperson, I see it

22  as significant.

23    Q.  And just so that you and I are on the

24  same page, this first general component you're

1   saying significant.  Are you also making

2   reference to our prior conversation that it

3   include the programmable park amenity and things

4   of that nature?

5      A.  Yeah, in my mind, significant would

6   allow for that programmable kind of activity.

7   Uh-huh.

8      Q.  And with respect to this first general

9   component, do you have any specific park

10  amenities in mind, or not?

11     A.  I don't.  There's a lot of ideas out

12  there about, you know, from a park and recs kind

13  of perspective what you can do in a space from,

14  you know, 1 acre to 20 acres, and I'm not saying

15  that that's specific to this site, but the

16  concepts are out there, and I think it would be

17  interesting to explore all those concepts.

18     Q.  Okay.  When you say the concepts are out

19  there, are you referring to anything specific?

20     A.  I'm talking about, you know, going to

21  the websites at like Ohio Parks and Rec

22  Association and things like that.  They're

23  always talking about kind of the newest parks

24  programming and what's hip and trendy and what's

1   going to stand the test of time, new playground

2   equipment, stuff like that.  So I'm not talking

3   about anything specific.  I'm talking about just

4   generally capturing ideas and getting feedback

5   on those ideas.

6        Q.  Okay.  With respect to the second

7   general component, do you see the reference to

8   select service-oriented retail?

9        A.  I do, yeah, I see that.

10       Q.  What constitutes select service-oriented

11  retail?

12       A.  Again, that's wording that's meant for,

13  you know, anybody who's developing to interpret

14  that the way they'd like and engage the

15  community to determine what the parameters might

16  be for a select service-oriented retail and then

17  defend that position during an application

18  process.

19       Q.  As a member of council who voted to

20  adopt this language, how do you interpret select

21  service-oriented retail to include or exclude,

22  frankly?

23       A.  Yeah, I would -- I would say the wording

24  here is interesting because, again, like central

1   could be -- on the first part central could be

2   physically central or significant central.

3   Select could be, you know, seen as select

4   service-oriented, like we're selecting specific

5   types of services, or select as any number of a

6   selection which could be literally anything that

7   is retail.  So I tend to widen the net a little

8   bit, and personally, as one member of council, I

9   think that could mean any service-oriented

10  retail.

11       Q.  Is there any specific source or resource

12  that LC could go to to make a determination as

13  to what constitutes select service-oriented

14  retail?

15       A.  I think those who use retail, and even

16  the inverse of that, the community members

17  themselves who would support retail here

18  locally, what kinds of service-oriented retail

19  the members of community would like.  I think

20  that's probably not only a smart market-driven

21  approach, but also you'd get buy-in from the

22  community itself.

23       Q.  And then with respect to commercial

24  development aimed at revenue generation for the

1  city, what does that general component mean to

2  you, Councilman Smith?

3      A.  Well, it's no secret that the city

4  revenue comes a lot from -- mostly, 70 percent,

5  income tax revenue, taxes.  So looking at those

6  considerations where, you know, it's not a --

7  not fully a financial burden for the city,

8  whatever the development may be, on any

9  property, not just this property.  So if it's

10  commercial development, we would hopefully have

11  some sort of income tax revenue for the city

12  generated from that.

13      Q.  What types of commercial development are

14  excluded from this general component?  In other

15  words, can you think of any commercial

16  development that would not produce revenue for

17  the city through income taxes?

18      A.  The question is, can I think of any

19  commercial developments that would not produce

20  income tax revenue?

21      Q.  Correct.

22      A.  There are commercial developments who to

23  develop would require a -- both an abatement, an

24  adventure grant essentially nullifying all the

1    income taxes for a period of time.  That has

2    happened before.  I can't remember specifics,

3    but I know that has happened.  And I know city

4    staff doesn't like to do that.  So we would

5    probably, as a city, in general, be more

6    interested in commercial developments that would

7    be interested in not taking advantage of any tax

8    rebates or offsetting any income tax to the

9    city.

10       Q.  Looking at the third general component,

11   do you see the reference to creatively executed

12   residential housing?

13       A.  I do.  Yeah.

14       Q.  Who gets to decide what residential

15   housing qualifies as creatively executed?

16       A.  The applicant themselves can define what

17   creatively executed is, as long as they can

18   defend their position appropriately through the

19   process.  And the best way to start that is with

20   reaching out to the community members.

21       Q.  Okay.  With respect to defending their

22   interpretation of the creative execution,

23   whom -- who's the adjudicator, who makes the

24   decision as to whether or not it's creatively

1    executed?

2       A.  I mean, through the application process

3    itself, those -- that -- I wouldn't use the word

4    adjudication.  I would say those decisions are

5    made based on a variety of sources, including

6    community feedback and whatever best practices

7    the experts at the staff level and the planning

8    commission level have in their background, as

9    well as the applicant themselves and why they

10   feel they propose this is the best use.

11      Q.  What standards exist for the

12   applicant -- strike that.  Let me start over.

13          What standards exist to guide any

14   decision-maker here at the city on what

15   constitutes creatively executed residential

16   housing here in this general component?

17      A.  I can't speak for other members of

18   council or decision-makers in the city.  Myself

19   only, I can say, you know, I'm leaning on

20   staff's notes and recommendations, I'm leaning

21   on the Municipal Planning Commission's process,

22   I'm leaning on the residents and communications,

23   I'm leaning on just general, you know, articles

24   that exist out in the world, TED Talks, you

1  know, of creative concepts, innovative ideas on

2  both housing and other forms of development.  So

3  there are resources out there.  Again, it's up

4  to the developer, in my mind, to -- to find some

5  information that best justifies their position

6  and defend it.

7      Q.  So as a member of City Council who

8  adopted this phrasing, can you identify any

9  actual standard that the city will impose to

10  define what creatively -- creatively executed

11  residential housing constitutes?

12      MR. SILK:  Objection to form and asked

13  and answered.

14      Go ahead.

15      A.  I would say that that question is

16  relevant to this document because it speaks to

17  standards and policies, you know, in an

18  aggregate kind of form.  This document is meant

19  as a guide.  We've talked on council many times

20  about what this document, the comprehensive

21  plan, in general means.  And it is, it's a

22  guide.  It's meant to be a guiding document, not

23  asserting any one thing over another

24  specifically.

1      Q.  All right.  Well, looking across the

2  street at LC's property, are single family homes

3  considered to be -- or fall within the

4  creatively executed residential housing

5  component?

6      A.  You're asking me as an individual

7  councilmember if I think that single family

8  homes would be creative?  That's the question?

9      Q.  Yeah.  Under this component.

10     A.  I think it can be, if they can justify

11  how it's creative.

12     Q.  How many single family homes?

13     A.  I don't set limits, minimum or maximum.

14     Q.  Okay.  How about apartments?

15     A.  I believe apartments can be creatively

16  executed as well.

17     Q.  Okay.  And patio homes?

18     A.  I believe patio homes can be creatively

19  executed.

20     Q.  How about multifamily homes?

21     A.  I believe multifamily homes can be

22  creatively executed.

23     Q.  Okay.  So for each of these -- each of

24  these types of housing stock, how can -- how are

1    they creatively executed?  In your mind, how can

2    they be for this site?

3           MR. SILK:  Objection.

4           Go ahead.

5       A.  Yeah, I think, you know, you're cutting

6    the conversation short if you're only focusing

7    on number one of residential; whereas, it says

8    right in there in the statement to signal to the

9    reader that this -- this point is not over.  Go

10   to number 2 and you'll see that no matter what

11   the residential housing is, what form it is, as

12   long as it's harmonious with overall mass and

13   scale, form, basically the balance of the

14   proposal itself and where residential fits in,

15   that's the answer.  I mean, that's it right

16   there.

17      Q.  So then what density of residential

18   housing is harmonious as it applies to this

19   site; so in other words, how many apartments are

20   harmonious to the surrounding neighborhoods?

21      A.  You know, I don't place a number on it,

22   and I don't think that's the intent of this

23   particular wording.  It is meant to be a guide

24   where a reader can read this and say -- think

1  critically about what decisions they need to

2  make in a proposal to -- to make it harmonious.

3  So it would be disingenuous to say what density

4  of apartments, what density of single family,

5  what density of patio homes, because none of

6  those can be looked at in a vacuum, unless

7  you're looking at it in a vacuum, which I don't

8  think you're doing here, so they have to look at

9  it, again, holistically to make sure it is a

10  harmonious development.  I think there's a way

11  to do that.  And if they can creatively execute

12  it, hey, I don't see an issue with that.

13      Q.  So based on your knowledge and

14  experience of this site, this property, and

15  everything that's happened, how many apartments

16  are appropriate for this site?

17      A.  How many did they propose in December of

18  '21 that came to council?

19      Q.  420.

20      A.  Less than 420.

21      Q.  Okay.  How many less?

22      A.  I don't want to put a number on it.

23      Q.  Why not?

24      A.  I think that would skew potentially the

1  application process.  If I were to speak here

2  and somebody -- an applicant/property owner were

3  to read that, then it wouldn't be -- it wouldn't

4  be fair to the process.

5      Q.  So when you voted upon a proposal that

6  contained 420 apartments on the site, did you

7  have any set number of apartments in mind that

8  would be appropriate for that site?

9      A.  Well, I mean, the apartments were in

10  addition to all the other physical developments,

11  so the proposal itself, some of the mind-set

12  that I have when voting against the proposal in

13  December of '21, it very much is consistent with

14  this concept.  Again, I didn't have this

15  concept -- the wording specifically at the time,

16  but the concept has been there for a long time.

17  How does the development in total impact the

18  city?  What is the harmony with the project and

19  the neighborhoods and the community at large?

20  So there is no specific number minimum or

21  maximum necessarily.

22      Q.  Why did you vote for Resolution No.

23  4-2022?

24      A.  I truly believe it provides some

1 additional guidance to property owners,

2 stakeholders, the community about what -- it's

3 kind of a -- I won't say aspirational, but it

4 kind of is an aspirational kind of text, right?

5 We're not setting limitations or specific

6 numbers on things.  We're allowing the developer

7 to propose an application and defend its

8 position.  It's a conversation that had been

9 going on since 2015, the concept of Resolution

10 No. 4-2022.  And so this was the fruition of the

11 past -- the previous eight years.

12     Q.  So would a PUD be appropriate for this

13 site, PUD being a planned unit development?

14     A.  A PUD could be appropriate.

15     Q.  And City Council's not passed any new

16 guidelines for the development of LC's property

17 since Resolution 4-2022, correct?

18     A.  That is correct.

19     Q.  Very early on this afternoon you

20 referenced the phrase or you used the phrase

21 responsible development.

22     A.  (Nods head.)

23     Q.  What, in your mind, with respect to

24 Lifestyle's property, does responsible

1   development mean?

2      A.  I think, you know, speaking as one

3   member of council kind of philosophically,

4   responsible is -- just as I have a

5   responsibility as an elected official to engage

6   with the public, really understand what the

7   concerns are, what the issues are, what the

8   topics are that mattered to people, and then try

9   to take those inputs and create an output that

10  is responsible based on the information that I

11  received.

12          So just like me, as an elected official,

13  taking those inputs and responsibly creating

14  policy or voting or whatever the action is, the

15  activity that I would expect of any -- that I

16  would hope for any developer on any property

17  throughout the city is to engage with residents

18  and understand what the desires and the needs

19  and the wants and the -- you know, what might be

20  some issues that can be worked out ahead of time

21  and take those inputs and create an output that

22  is responsible.

23      Q.  Okay.  You also were familiar with

24  WARD's political action committee.  Do you

1    recall that?

2        A.  I recall that.

3        Q.  Did WARD's political action committee

4    contribute to your re-election campaign?

5        A.  No.

6        Q.  You kind of shook your head there.

7        A.  I don't believe so.  I don't remember

8    that.

9        Q.  Has WARD's political action committee

10   sent any communications, to your knowledge,

11   referring to your re-election?

12       A.  For this year?

13       Q.  For this year, yes.

14       A.  For this year's re-election?  They just

15   came out with a -- I don't know -- postcard,

16   maybe something, door hanger, yes.

17       Q.  Okay.  Is WARD, based on that door

18   hanger, promoting your re-election?

19       A.  In a way, they are.  They're promoting

20   four people's candidacies and people can only

21   vote for three seats.  So you tell me.

22       Q.  Which four candidates is WARD

23   supporting?

24       A.  In addition to myself, Pete Bucher, Mike

1  Duffey, and Felicity Beck, and myself.

2      Q.  I'm a little dense.  Sorry.  So you --

3      A.  Pete Bucher, Mike Duffey, Felicity Beck.

4      Q.  Thank you.

5          Do you have any understanding of why

6  WARD is supporting you for re-election?

7      A.  I'm a great listener to all residents

8  and no different with the residents of WARD.

9  They understood that I am a thoughtful leader

10  and have been since day one and have been there

11  to listen.  Again, with the inputs and the

12  outputs and making decisions that are based on

13  those inputs from all residents, including WARD

14  residents.  So I believe that's my

15  interpretation of why they're supporting my

16  candidacy.

17      Q.  Do you know whether their support in any

18  way relates to the positions you've taken with

19  respect to Lifestyle's property?

20      A.  I can't say for sure.

21      Q.  You have a blog on the internet that is

22  posted at www.dougsmithohio.com, correct?

23      A.  That's correct.

24      Q.  Who writes those blog posts?

1      A.  I write those blog posts.

2      Q.  Does anyone review them before they're

3   published?

4      A.  No, I don't think so.

5      Q.  And you have written about the LC

6   property on your blog, correct?

7      A.  I have.

8      Q.  And you've written about this lawsuit on

9   your blog; is that correct?

10      A.  Within the parameters of public record,

11   yes.

12      Q.  What do you mean, parameters of public

13   record?

14      A.  Why don't you go on with your

15   questioning and I'll maybe shine some light on

16   that.

17      Q.  I'm just confused at what you're talking

18   about.

19      A.  The things that I say in council or that

20   other people have said during meetings, on the

21   public record, that's what I try to stick to.

22      Q.  Gotcha.

23                    -=0=-

24          (Deposition Exhibit 49 marked.)

1                    -=0=-

2   BY MR. INGRAM:

3       Q.  Mr. Smith, I've handed you what's been

4   marked as Exhibit 49, which is a printout from

5   your blog with a title:  "I'm running for

6   re-election," dated June 30.  Do you see that?

7       A.  Yes.

8       Q.  And is Exhibit 49 a copy of a blog entry

9   on your blog that you wrote?

10      A.  It is, yes.

11      Q.  And that was June 30 of 2023; is that

12  correct?

13      A.  That's what appears here.  That sounds

14  right.

15      Q.  Now, in your blog entry, Mr. Smith, you

16  use the term high density apartment.  Do you see

17  that?

18      A.  I do.

19      Q.  What constitutes high density

20  apartments, in your mind?

21      A.  In general, high density apartments, in

22  my mind, are any density that's greater than the

23  density that's allowed by city code currently on

24  any property throughout the city.

1      Q.  And what is that density in the City of

2  Worthington?

3      A.  It depends on the zone, on the code

4  zone, whether it's a residential R-10, R-6.  So

5  it depends.

6      Q.  Okay.  What's that density in a planned

7  unit development zone?

8      A.  The planned unit development itself

9  determines what the density is.

10      Q.  So if we were to rezone the LC property,

11  what would the density in your mind be?

12      A.  So I think probably a better question

13  might be what the current zoning is, and that's

14  S-1, which is zero residential.

15      Q.  Okay.  But with respect to the rezoning

16  of the LC property to a PUD, what level or

17  what's the density in the number of apartments

18  that would constitute high density apartments,

19  in your mind?

20          MR. SILK:  Objection to form.  That's

21  compound.

22          Go ahead.

23      A.  There has been no rezoning to a PUD on

24  that parcel.  So I refer back to my original

1  statement, you asked me what high density means

2  to me.  High density apartments are any number

3  of apartment units more than what is allowed by

4  the zoning code presently.

5      Q.  How many apartments are allowed by

6  Worthington's zoning code for planned unit

7  developments?

8      A.  The PUD itself decided how many

9  apartment units are allowed to be built --

10      Q.  Okay.

11      A.  -- when proposed by the developer.

12      Q.  All right.  So with respect to

13  Lifestyle's application to rezone the property

14  to a PUD, what constituted high density

15  apartments, in your mind, under LC's

16  application?

17      A.  The general concept of any property in

18  Worthington, again, is any number of apartment

19  units more than what is currently zoned.  I

20  think what you're asking me, and probably

21  against my lawyer's advice, is -- and I'm going

22  to answer -- is I don't have a direct answer for

23  that.  I don't have a specific number in mind,

24  which I think we covered that earlier.

1      Q.  What constitutes a high density

2   development, as you've phrased it here in

3   Exhibit 49?

4      A.  Which paragraph?

5      Q.  Looking at Exhibit 49, under the bold

6   heading of UMCH property, in the second

7   paragraph you wrote, however, as the lawsuit

8   continues into 2024, electing council candidates

9   who support high density developments could

10   completely change the outcome through stand-down

11   settlements that allow the developer to build

12   high density apartments.

13          And my question to you is what are you

14   referring to as high density developments?

15      A.  I have no specific number of units in

16   mind.  I just know -- yeah, I'll leave it at

17   that.  I have no specific number of units in

18   mind.

19      Q.  High density developments is different

20   than high density apartments, so I'm trying to

21   understand what the distinction between your two

22   phrases are, as you've used it here?

23      A.  You're right, they are different by

24   definition.  I think generally a high density

1    development would include high density

2    apartments, in my mind personally.

3        Q.  And would high density development

4    include anything other than a high density level

5    of apartments, as you put it?

6        A.  It could.

7        Q.  What would that be?

8        A.  It could include mixed-use of commercial

9    and retail as well.

10        Q.  Okay.  So are you opposed to high

11    density developments?

12        A.  I am not opposed to high density

13    developments.  I've even voted for some.

14        Q.  Which ones?

15        A.  The Heights up here at the mall on West

16    Wilson Bridge Road, in whatever year that was.

17    I voted in favor of that.

18        Q.  Is The Heights project that you voted in

19    favor of part of what the CIC is overseeing?

20        A.  No, I don't think so.  I'm not sure what

21    you're referring to.

22        Q.  The East Wilson --

23        A.  Oh, right.  No.  Two different -- yeah.

24        Q.  You used the phrase stand-down

1  settlements here.  What are you referring to

2  there?

3      A.  I'm not really referring to anything

4  specific.

5      Q.  What did you mean when you used that

6  phrase in this blog entry?

7      A.  I think my mind-set at the time of

8  writing this was very much thinking about, you

9  know, this refers to a lawsuit, and having been

10  through prior lawsuits personally that I

11  mentioned earlier, it's a word that kind of

12  stuck with me through -- through that process.

13  So that's a word that I picked up from my past.

14  It doesn't mean anything specific.

15                    -=0=-

16      (Deposition Exhibit 50 marked.)

17                    -=0=-

18  BY MR. INGRAM:

19      Q.  Councilman Smith, you've been handed

20  what's been marked Exhibit 50.  And Exhibit 50

21  is a screenshot taken from the December 2021

22  City Council hearing and Mr. Brown's

23  presentation to City Council.  You'll see from

24  the screenshot it was at the 31-minute,

1  21-second mark of the meeting, if I read that

2  correctly.

3  　　　A.  Yeah, sure, let's go with that.

4  　　　Q.  Or thereabouts.  And do you recall

5  Mr. Brown providing this as part of his

6  presentation as depicted here in Exhibit 50?

7  　　　A.  Yeah, I do.

8  　　　Q.  And you can see, as far as the revised

9  concept that LC proposed, there were 420

10  apartments proposed?

11  　　　A.  Yeah, it says here.  Uh-huh.

12  　　　Q.  So then when I look at Exhibit 49, what

13  is the basis for your representation that there

14  is a 700-unit apartment complex proposed in the

15  first paragraph there on Exhibit 49?

16  　　　A.  Yeah, 700-unit apartment complex refers

17  to the 700 units in total-ish.  It's

18  approximate.  We're not dealing with exact

19  numbers in my blogs, typically.  And apartments

20  in this context is not owner-occupied units.

21  　　　Q.  All right.  Where in Exhibit 50 do we

22  even come close to 700 -- a 700-unit apartment

23  complex?

24  　　　A.  420 plus 86 plus 72 gets us to 600,

1  somewhere close to 700.

2     Q.  Okay.  But not all the townhomes or

3  townhome flats were going to be for rent, were

4  they?  Do you recall that?

5     A.  I don't recall exactly the number, no.

6     Q.  But regardless, it doesn't add up to 700

7  apartment units, does it?

8     A.  Well, that's correct.

9     Q.  Councilman Smith, your attorneys have

10  indicated that there may be yet additional

11  documents to be produced in this case, and

12  subject to the production of those documents, I

13  don't have any further questions for you today,

14  but I am going to leave your deposition open.

15     A.  Okay.  Can I clarify that statement

16  based on the question you asked?

17     Q.  Okay.

18     A.  Sorry.

19     Q.  Which statement -- you're pointing to

20  Exhibit 49.

21     A.  Yeah.  49, the first paragraph where you

22  called into question my math on 700 units, which

23  in your questioning, yes, you're correct, the

24  math does not add up, but in this statement on

1  my blog on Exhibit 49, first paragraph, never

2  does it refer to that presentation.  So I just

3  feel it was a little disingenuous to connect the

4  presentation to my blog, which I wasn't doing.

5  So let's just clear the record there.

6     Q.  Okay.  The presentation set forth in

7  Exhibit 50, however, reflects Lifestyle's

8  concept plan that was before council, correct?

9     A.  That's true.

10        MR. INGRAM:  Okay.  And as I said, I'm

11  going to leave your deposition open.

12        THE WITNESS:  That sounds good.  I'm

13  available for whatever you need.

14        MR. SILK:  Don't get carried away.

15                    -=O=-

16        Thereupon, the testimony of October

17  10, 2023, was concluded at 5:13 p.m.

18                    -=O=-

19

20

21

22

23

24

1                    CERTIFICATE

2    STATE OF OHIO        :
                          SS:
3    COUNTY OF FRANKLIN :

4           I, Rhonda Lawrence, a stenographic
     court reporter and notary public in and for the
5    State of Ohio, duly commissioned and qualified,
     do hereby certify that the within-named DOUG
6    SMITH was first duly sworn to testify to the
     truth, the whole truth, and nothing but the
7    truth in the cause aforesaid; that the testimony
     then given was taken down by me stenographically
8    in the presence of said witness, afterwards
     transcribed; that the foregoing is a true and
9    correct transcript of the testimony; that this
     deposition was taken at the time and place in
10   the foregoing caption specified.

11          I certify that I am not a relative or
     employee of any attorney or counsel employed by
12   the parties hereto and that I am not financially
     interested in the action.  I further certify
13   review of the transcript was requested.

14          In witness whereof, I have hereunto
     set my hand at Columbus, Ohio, on this 24th day
15   of October, 2023.

16

17

18

19

20
                    *Rhonda Lawrence*
21                  Rhonda Lawrence
22                  Notary Public, State of Ohio

23   My commission expires:  October 9, 2028

24

## Exhibits

**Exhibit 1** 72:21,22 73:4,10 108:10 109:6, 13

**Exhibit 6** 91:12,13,14 92:10,15 94:16 106:7 113:16

**Exhibit 7** 107:5,7,11 109:5,13 120:23 126:12

**Exhibit 10** 116:12,13, 15

**Exhibit 27** 60:4,12 61:13

**Exhibit 31** 71:2,6,16, 19

**Exhibit 34** 74:10,11 76:9

**Exhibit 36** 82:5,6 83:1 84:13,19 85:8

**Exhibit 41** 77:24 78:6

**Exhibit 43** 52:19,20

**Exhibit 44** 21:15,19, 22 22:5,14,18,23

**Exhibit 45** 39:18,22 40:3

**Exhibit 46** 39:14 58:16,21 59:6,12

**Exhibit 47** 85:13,18 86:17

**Exhibit 48** 88:6,10

**Exhibit 49** 147:24 148:4,8 151:3,5 154:12,15 155:20 156:1

**Exhibit 50** 153:16,20 154:6,21 156:7

## -

**-=0=-** 21:14,16 39:13, 15 58:15,17 85:12,14 88:5,7 147:23 148:1 153:15,17

**-=O=-** 156:15,18

## 0

**04-2022** 91:15 109:22 116:7

## 1

**1** 72:21,22 73:4,10 82:24 108:10 109:3,6, 13 110:16 120:22 121:10 132:14

**10** 61:12 62:13 69:19 116:12,13,15 156:17

**12** 32:14

**13** 51:15 52:21 53:22 85:22 86:22

**13th** 56:19

**14** 16:12 47:1 48:15 49:10

**15** 34:21

**16** 32:11

**18** 91:21 93:11 94:2,7, 13 100:7,18 101:9 112:4,8 113:1,2 116:14 120:9

**18th** 92:12,13 108:17 109:18 110:21 114:2 115:6

**19-second** 83:4

## 2

**2** 22:18,23 74:15 109:3 120:22 140:10

**20** 74:18 75:18 132:14

**2005** 58:22

**2012** 13:24 15:9,16,19

**2013** 16:11

**2014** 20:12 35:21 72:22 73:20 79:17 108:20 109:9,20

**2015** 32:11 34:1 35:18 58:22 143:9

**2016** 35:19,20

**2017** 15:4 35:21

**2018** 15:5 59:24 60:8 61:2,12 62:14 68:23 69:19 71:8

**2019** 70:15 102:16 104:23 105:1

**2020** 11:9,12,15 25:20 38:24 39:20 40:10 42:23 45:2 49:3 73:23 74:2,8,18 75:18 76:12 82:1 84:7 85:22 86:22 93:19 95:20 105:20 106:21

**2021** 6:19 7:12,14 11:10,14,16,17,19 12:11 28:7 41:2 42:23 45:2 47:1,10 48:15 49:11 51:5,12,15 53:22 78:7 88:12 100:7 153:21

**2022** 7:10 12:4,7 13:8, 12 20:13 91:21 94:7 100:7,18 101:9 106:4 108:17 109:18 110:21 112:8 116:14

**2023** 27:11,20 29:2 148:11 156:17

**2024** 151:8

**21** 6:19 45:16 76:12 78:7 82:1 84:7 141:18 142:13

**21-second** 154:1

**21st** 83:3

**22** 16:8,12

**23** 106:5

**23rd** 88:12

**24,000** 122:12 123:6, 11,18 124:5

**27** 60:4,12 61:13 71:8

## 3

**3** 52:24 60:19 61:13,17 70:6

**30** 148:6,11

**31** 71:2,6,16,19

**31-minute** 153:24

**34** 74:10,11 76:9

**36** 82:5,6 83:1 84:13, 19 85:8

**38** 99:1,4

## 4

**4-2022** 91:20 92:22 93:14 96:1,10 99:23 100:11 106:13 107:8, 12 108:3,8 110:9,20 111:3 112:4,9 113:20 116:20 117:10 118:9, 23 119:18 120:8 142:23 143:10,17

**400-plus** 50:16

**41** 77:24 78:6

**420** 141:19,20 142:6 154:9,24

**43** 52:19,20

**44** 21:15,19,22 22:5, 14,18,23

**45** 39:18,21,22 40:3

**46** 39:14 58:16,19,21 59:6,12

**47** 85:13,18 86:17

**48** 88:6,10

**49** 147:24 148:4,8 151:3,5 154:12,15 155:20,21 156:1

## 5

**5** 39:20 40:10

**50** 153:16,20 154:6,21 156:7

**51994** 21:24

**51995** 21:24

**5:01** 88:14

**5:13** 156:17

**6**

**6** 60:18 91:12,13,14
92:10,15 94:16 106:7
113:16,18

**600** 154:24

**7**

**7** 107:5,7,11 109:5,13
120:23 126:12 130:13

**70** 135:4

**700** 154:17,22 155:1,6,
22

**700-unit** 154:14,16,22

**72** 154:24

**8**

**86** 154:24

**9**

**9** 70:15

**A**

**a.m.** 88:14

**abatement** 135:23

**ability** 96:12

**absorbed** 38:5

**acceptance** 98:17

**accomplish** 80:1

**account** 44:11

**accumulate** 67:22

**accumulated** 108:24

**accumulation** 24:17
121:5

**accurate** 9:22 10:5
106:16 107:17 116:5

**accurately** 113:24

**accusing** 89:6,7

**acre** 132:14

**acreage** 129:22
130:1,4,11,17,21

**acres** 127:23 130:10,
13 132:14

**act** 75:2

**acted** 77:16

**action** 28:15 144:14,
24 145:3,9

**actionable** 56:7

**activities** 126:21

**activity** 64:2,3,19,20,
23 132:6 144:15

**actual** 37:3 92:19
138:9

**ad** 33:17

**Adam** 71:9

**add** 81:14 155:6,24

**added** 109:21

**addition** 107:19 109:5
142:10 145:24

**additional** 41:15,17
42:2,19 143:1 155:10

**address** 22:9,11
49:15 76:5

**adjudication** 137:4

**adjudicator** 136:23

**admitted** 113:17

**adopt** 131:14 133:20

**adopted** 108:7,21
121:12,16 138:8

**adoption** 129:18

**advance** 94:19 111:3,
24 112:4 113:20
117:14

**advanced** 118:9

**advantage** 136:7

**adventure** 135:24

**advice** 150:21

**affecting** 83:20

**afforded** 51:24 52:3
53:14,17

**afternoon** 6:8 7:24
9:10 44:19 111:1
143:19

**agenda** 41:10 83:8
111:12,15,18 115:24
116:7,13,19 117:8,19,
22,23,24 118:12,23
119:10

**aggregate** 108:23
138:18

**agree** 24:24 43:10
63:10 75:11 95:17
121:18,19 131:11

**agreed** 25:8 34:7

**agreeing** 21:12

**agreement** 21:2

**ahead** 22:1 35:10 37:9
48:18 49:18 50:7 54:9
56:1 57:11,24 67:4
68:21 69:8 71:12,21
73:14 82:18 87:15
91:17 97:19 98:10
100:20 106:12 107:5,
16,24 108:15 109:17
110:4 116:4,23 118:14
119:3 121:3 122:7,15
123:9,22 125:4,24
127:9 130:24 138:14
140:4 144:20 149:22

**aimed** 134:24

**alliance** 29:18,24

**allowance** 118:18

**allowed** 41:21 117:2
148:23 150:3,5,9

**allowing** 143:6

**alls** 91:5

**ambiguous** 8:5

**amend** 49:15 50:4
52:1 53:14 73:22

**amended** 92:18
115:22

**amending** 73:18 74:1
114:22

**amendment** 72:22

**108**:18,19,20,21
109:10 114:8 120:21,
23 121:12,15,21
126:11

**amendments** 118:4,
20

**amenities** 63:14
132:10

**amenity** 62:17,21
63:10 64:5,10 66:22
67:9,12 68:17 132:3

**analyses** 68:24

**analysis** 68:24 69:6,
10,14 70:1

**Anne** 21:23

**announced** 118:1

**announcement**
117:22

**announcements**
117:13

**annual** 59:19

**answer's** 15:15

**answering** 9:11 75:10

**answers** 8:3 9:2

**anticipating** 64:12

**apartment** 30:22,24
148:16 150:3,9,18
154:14,16,22 155:7

**apartments** 30:17
31:3 139:14,15 140:19
141:4,15 142:6,7,9
148:20,21 149:17,18
150:2,5,15 151:12,20
152:2,5 154:10,19

**apologize** 48:1

**Appeals** 99:24

**appears** 40:3 60:9
148:13

**applicant** 56:17 76:19
77:4 79:2 81:2 83:13
84:17 86:9 90:16,17
96:21 97:16 98:11,21
123:24 124:14 125:11
126:6,8 128:8,15
136:16 137:9,12

**applicant/property** 142:2

**application** 11:18,22 38:23 39:2 40:9,15,18, 20,24 41:6,16 43:1,7, 15,18 44:2,6,21 45:6, 12,15,19,21 46:6,10, 14 47:3,12,14,17,21 48:3,20,21,23 49:15 50:5,14,17 51:17 52:1, 5 53:7,15,19 54:6,16 55:12 56:11,15,18 57:2,13 58:9 70:23 77:6 80:11,15 81:11 86:4,14 87:5,9,12,21 88:21 96:17 97:5 99:6 106:20 121:9 123:1,5 124:4,11,13,17,19,24 125:6,12 126:3 127:13 128:5,18 133:17 137:2 142:1 143:7 150:13,16

**applications** 19:3 127:11

**applied** 49:2 72:23 108:11 114:23

**applies** 94:21,24 95:2 140:18

**apply** 109:24 123:5,16

**applying** 57:19 98:23

**appointed** 16:4

**approach** 134:21

**approaching** 125:17

**appropriately** 136:18

**approval** 56:10 58:8 65:19

**approve** 57:1 123:4 127:18

**approved** 63:8

**approximate** 154:18

**April** 6:19

**Architectural** 43:8,9

**argue** 128:5

**Argumentative** 55:24

**Armstrong** 37:22

**article** 33:24 34:6,23, 24 58:24

**articles** 89:23 90:7 137:23

**ascertain** 123:16

**asks** 83:12

**aspirational** 102:19 103:6,15,18 104:5,11, 16,18,21 143:3,4

**asserting** 138:23

**assist** 35:7

**assistance** 36:21

**assistant** 60:14

**Association** 132:22

**assume** 8:20

**Assuming** 99:19

**attached** 108:18 109:4 121:11,15

**attachment** 109:9

**attend** 20:14 44:4

**attended** 26:19 29:3 30:2

**attention** 26:10 39:8 52:24 61:14 74:9 77:23 78:8 82:4 86:6 91:11 107:4

**attorney** 6:22 10:14, 22 53:4 71:9,13 72:17

**attorney-client** 119:23

**attorneys** 155:9

**augmentation** 107:19

**authority** 118:19

**avoid** 8:24 65:8

**aware** 23:1 26:23 35:11 49:13,20 64:11 69:9,16,24 83:13 88:20 90:15,20 91:7 92:21,23,24 93:3 120:6

**B**

**back** 14:7 32:10 34:1 42:1 44:19 48:24

51:18 53:7 54:6,16 66:3 68:23 75:17 81:22 95:10 104:1 106:21 125:8 126:19 127:2 128:14 149:24

**background** 36:7 137:8

**backwards** 16:9

**balance** 140:13

**ballpark** 130:13

**bar** 57:20

**based** 9:16 30:15 33:2 35:23 48:17 56:21 58:1,4 66:11 96:21 108:16 115:14 118:11, 15 124:20 125:12 126:3 129:17 130:5 137:5 141:13 144:10 145:17 146:12 155:16

**basic** 69:9

**basically** 37:15 140:13

**basis** 154:13

**Bates** 21:23 32:4

**bear** 104:6,8

**bearing** 16:22 17:3,7

**Beck** 28:24 146:1,3

**beers** 27:24 46:2

**begin** 9:4 101:11

**behalf** 33:20 44:1 59:7 90:8

**behavior** 89:2,5,8,11, 20 90:9

**benchmark** 57:20

**Beth** 32:4

**big** 101:22

**bit** 19:1,20 38:13 53:23 120:12 134:8

**black** 110:17

**blank** 78:1

**Blast** 59:2

**blend** 11:10

**blog** 146:21,24 147:1, 6,9 148:5,8,9,15 153:6 156:1,4

**blogs** 154:19

**board** 15:21 43:8,10 87:4,21 88:2

**boards** 15:12,18 16:1, 17 86:9

**body** 8:9

**bold** 151:5

**boosters** 65:7

**boy** 131:6

**break** 9:8,15 44:8,10, 19 81:18,23

**breaks** 9:16

**breeze** 78:10

**Bridge** 152:16

**briefly** 60:7

**bring** 18:4 19:18

**broad** 80:20 122:22

**broader** 13:1 68:8 116:8

**broken** 101:12

**brought** 26:9 39:8

**Brown** 19:23 20:2,5,9 21:23 39:19 40:4 154:5

**Brown's** 153:22

**Bucher** 145:24 146:3

**build** 151:11

**built** 150:9

**bullet** 70:5

**bunch** 38:7

**burden** 135:7

**businesses** 97:9

**buy-in** 134:21

**C**

**call** 24:21 30:8 45:1 101:11 113:13,14

114:6 115:2,3,8

**called** 31:23 33:13
105:7 155:22

**campaign** 27:13
145:4

**Campus** 89:13,18,24
90:15 95:8

**Campus'** 109:12

**candidacies** 145:20

**candidacy** 146:16

**candidates** 145:22
151:8

**Cap** 44:8

**capacity** 20:2,13
25:23 59:10 66:24
122:2

**captured** 61:15

**capturing** 133:4

**carried** 156:14

**carry** 39:12

**case** 6:21 7:6,20 12:20
54:11 56:8 99:8
155:11

**cases** 18:15

**category** 19:24

**CC'ING** 82:8 85:20

**center** 61:1 131:8

**central** 128:24 129:2,
3,11,13 130:16,21
131:16 133:24 134:1,2

**certifications** 17:6,8

**certified** 6:3

**chain** 82:7 84:19

**chance** 74:11

**change** 151:10

**changed** 76:2

**characterization**
84:12,20

**charge** 37:12

**charter** 18:11 111:16
117:1 118:2

**children's** 64:2

**chiseling** 104:17

**choose** 110:6

**Chris** 6:9

**Church** 105:12

**CIC** 16:4,6 17:19
20:12,14,16 152:19

**circa** 102:16

**Circle** 15:21

**Circuit** 99:24

**cited** 42:14

**citizens** 26:12

**city** 11:19 12:4,7,11
13:8,23 14:3,9,10,19,
20,21 15:8,13,14 16:1
18:1,13 19:13,15,18
20:1,3,11 25:6,23 28:6
30:11 31:12 32:10
33:21 41:5 45:9 47:9,
11 51:5,8,15,17,21
52:21 53:5,10,21
58:23 59:4,7,11,19
60:1,8,13,14 61:11,22
62:14 63:8,9 65:14,18,
24 66:3,5,8 67:1,8
68:23 69:11,18 70:15
74:19 76:5 80:3 81:12
82:1,9,13 84:24 85:2,
20 87:4,21 88:2,11,22,
24 90:22 91:21 93:6
96:10 97:9,17 98:4
100:5,11,16,17,21
101:4,7,15,20 102:16,
20 103:13 104:24
108:2 110:22 111:16
112:2 115:12,13,21,
22,24 116:1,10,13
117:11 119:17 120:10,
11 122:2 124:12
135:1,3,7,11,17 136:3,
5,9 137:14,18 138:7,9
142:18 143:15 144:17
148:23,24 149:1
153:22,23

**city's** 22:17,22 72:22
73:15 85:21 101:8
102:10 107:13 115:23

**civil** 28:14

**clarification** 30:23
34:16

**clarify** 12:24 27:4
48:11 155:15

**clarity** 72:20 95:14

**clear** 20:20 96:4 99:5
124:9 156:5

**close** 154:22 155:1

**code** 42:12 98:21 99:3
117:14 118:18 119:12,
24 148:23 149:3
150:4,6

**codes** 18:1

**coffee** 9:17

**collaborative** 51:19
53:9

**collection** 37:13

**college** 15:22 17:1

**Columbus** 90:3

**comfortable** 42:16
94:8

**comment** 76:22
77:10,17

**commentary** 82:17

**comments** 57:14
81:24

**commercial** 24:7
30:17,18,19 31:1 62:6
122:12 123:19 134:23
135:10,13,15,19,22
136:6 152:8

**commission** 18:19
19:7 41:13 43:7,9,11,
16,17,21 44:1,5,22
45:13,20 46:7,11 47:2,
8 48:7,10,12,16 49:11,
14 50:23 51:18,23
52:4 53:7,13,18 54:6,
17 56:14 63:7 128:19
137:8

**commission's** 42:24
46:13 65:24 125:15
137:21

**commissions** 15:13,
18 16:1,17

**committed** 83:1

**committee** 102:21
144:24 145:3,9

**common** 59:17

**communicate** 14:2,9
51:21 53:11

**communication**
41:23 119:10,22 120:1

**communications**
56:16 85:4 87:24
120:6 125:13 137:22
145:10

**Communities** 6:10,
12

**community** 16:3
23:2,5,14,20,22 24:21
26:5,13,19 27:1,7,16
28:5 29:2,8,15 33:18
35:16 38:5 45:18 65:6
66:13,15 67:20,24
68:2,12 86:8 87:8 88:2
96:4,11,19,23,24
97:15,23 98:16,22
99:7 106:23 119:8
124:15 125:13 133:15
134:16,19,22 136:20
137:6 142:19 143:2

**complaint** 12:19 13:9,
15

**complete** 9:22 10:5
97:16

**completed** 100:16,23
101:15 105:23,24

**completely** 116:5
151:10

**complex** 154:14,16,
23

**component** 127:5,24
128:23 129:20 130:15
131:15,24 132:9 133:7
135:1,14 136:10
137:16 139:5,9

**components** 126:11

**compound** 75:5
149:21

**comprehensive**
42:12 58:10 68:9
72:23 73:16 74:23

79:15,17,20,22 80:13
100:17,18,22,23,24
101:5,6,8,9,12,22
102:7 107:14 108:19
114:9 115:23 138:20

**comprehensively**
100:22

**comprised** 24:20

**concept** 22:20 48:6,
14 49:12,13,16,24
50:5,15,20 51:4,7,12
67:6 92:2 93:14,16,17,
19,22 94:1 95:20
114:8,11,20,22,24
142:14,15,16 143:9
150:17 154:9 156:8

**concept's** 93:20

**concepts** 114:10
115:19 132:16,17,18
138:1

**conceptually** 63:17
64:8,16

**concerned** 36:2 84:8

**concerns** 144:7

**concluded** 156:17

**conclusion** 108:14

**concrete** 122:9

**conducted** 70:16
101:5,7

**conducts** 59:19

**confirm** 35:20 39:21
70:2 92:18

**confused** 122:8
123:14 147:17

**confusion** 63:22

**connect** 156:3

**connection** 17:18
27:12 29:14 34:6
36:20,23 42:23 47:11
57:8 62:21 67:7,10
86:16 87:4,8,12 98:22

**consideration** 42:24
80:2 100:10 118:9,10

**considerations**
118:19 135:6

**considered** 57:23
58:2 117:11 121:23
122:23 126:24 139:3

**consistent** 30:7 83:16
142:13

**constituent** 25:6 33:5

**constituents** 24:12,
15 33:4 41:20 56:17
66:19

**constitute** 130:10
149:18

**constituted** 150:14

**constitutes** 31:21
126:17 128:9 133:10
134:13 137:15 138:11
148:19 151:1

**construct** 105:15

**consultant** 37:11
102:17 103:12

**contact** 115:12

**contacting** 114:17

**contained** 142:6

**contents** 60:19
115:18

**context** 63:19 76:23
80:17 128:8 129:12
154:20

**contiguous** 126:13
127:6,23 128:9,24
129:7 130:15,20

**continuation** 93:18
95:18 106:19

**continues** 151:8

**continuing** 7:1

**continuous** 127:6

**contribute** 145:4

**conversation** 21:6
62:8 70:10 80:17 83:6,
13 84:6,17 94:10
95:19 96:6,8,19,23,24
106:19,24 113:15
114:7,13 115:3 126:19
127:2 132:2 140:6
143:8

**conversations** 14:13

**converted** 103:19

**convey** 43:24

**copies** 34:23

**copy** 72:10 110:19
111:2,5,24 112:3
120:8 148:8

**Corporation** 16:4

**correct** 7:17 11:14
13:14,16,24 14:1 28:3
30:3 32:12 42:20
45:10 52:14 53:22
54:19,20 55:14 59:9
61:24 73:19 75:23,24
80:14 84:8,19 85:22,
23 86:4,5 88:2,3,19
91:15,22 93:7 94:22,
23 95:1 96:18 100:14
102:14 103:17 104:24
113:3 119:19 121:1
123:20 126:15 129:4,5
135:21 143:17,18
146:22,23 147:6,9
148:12 155:8,23 156:8

**correctly** 154:2

**correspondence**
42:2 119:22

**corridor** 101:19,21
102:4,10

**council** 11:5,8,10,13,
18,20 12:4,7 13:8,23
14:3,9,10,19,20,21
15:8,13,14 16:1,5,6,19
17:13,15 18:4 19:19
20:12 25:6 30:14
32:11 38:6,11,15 40:8,
11,19,20 41:2,3,8,22,
23 46:20 47:9 48:9,13
51:5,8,17,19,23 52:21
53:5,6,13,21 54:2,12,
22,24 55:19,20 56:3
57:4 58:3,13 59:11,19
60:1,8,15 61:22 62:14
63:8,9,12 65:15,18,24
66:3,6,8 67:1 68:23
69:15 70:16 72:13,17
74:14,20 76:5 77:21
78:7 80:3 82:1,9 83:2,
19 85:21 88:11 89:1,
21 90:22,23 91:1,6,7,
10,21 93:20 94:15

**97:15 98:22 125:16**

96:3 100:5,11,16,21
101:7 102:16 103:1,24
104:1,5 105:19 108:2,
7 109:19 110:8,22
111:12,14,17 114:17
115:21,22 116:13,24
117:11 118:2,18
120:3,15 122:3 123:3
125:5,8 126:5 127:17
131:13 133:19 134:8
137:18 138:7,19
141:18 144:3 147:19
151:8 153:22,23 156:8

**council's** 12:11 18:11
28:6 39:8 41:5 45:9
47:11 51:15 54:10
61:11 67:8 69:18
82:13 93:6 101:15
115:24 116:2 118:8,10
143:15

**councilman** 14:23
17:11 18:16 23:1
25:24 29:17 39:17
40:8 44:18 52:19 54:4,
14,15 58:20 59:18
60:6,17 71:3 73:18,22
74:17,18,20 76:8,11
77:23 78:23 79:9
81:22 88:9 91:11
97:14 98:6 107:5,10,
21 109:1 115:22
116:12 118:24 119:14
120:21 121:10 129:16
135:2 153:19 155:9

**councilmember**
18:22 29:13 36:13
80:6 82:24 83:12,15
103:2 117:2 118:5
126:2 139:7

**councilmembers**
14:18 85:5 117:6
120:11

**councilperson**
131:21

**counsel** 13:7,21
63:23 99:16

**couple** 9:12

**courses** 17:1

**court** 8:1 10:11 99:24

**courtesy** 114:6 115:4

covered 150:24

COVID 27:23

create 144:9,21

creating 144:13

creative 136:22 138:1 139:8,11

creatively 136:11,15, 17,24 137:15 138:10 139:4,15,18,22 140:1 141:11

creek 129:22 130:1,4, 5,6,10,13,17,21 131:8

critically 141:1

CROSS-EXAMINATION 6:4

current 100:17,24 101:6,8 149:13

cutting 140:5

**D**

data 36:14 37:13 38:6, 7

dated 39:19 71:8 85:21 88:12 148:6

David 82:8 120:2

day 64:20 92:20 93:6 110:22,23,24 112:18, 23 113:4,6 146:10

dealing 154:18

decade 33:3

December 11:9,12, 15,17,19 12:11 16:8, 12 20:13 28:7 41:2 45:2 46:20 51:4,8,12, 15 52:21 53:22 56:19 141:17 142:13 153:21

decide 127:17 136:14

decided 31:16 102:16 103:1 150:8

deciding 104:2

decision 65:19 99:24 136:24

decision-maker

137:14

decision-makers 137:18

decision-making 38:8 57:4 125:9

decisions 57:3 58:3 78:14 137:4 141:1 146:12

decline 54:5,21

defend 124:19 129:15 131:20 133:17 136:18 138:6 143:7

defendant 7:6

defending 125:11 136:21

defer 18:2,9,14 19:19 65:5 126:9 128:10,19

deference 18:8

define 16:24 94:3 136:16 138:10

definition 151:24

degree 80:2

demarcation 104:18

demolish 105:13

dense 146:2

density 68:24 69:5 140:17 141:3,4,5 148:16,19,21,22,23 149:1,6,9,11,17,18 150:1,2,14 151:1,9,12, 14,19,20,24 152:1,3,4, 11,12

deny 56:10 58:8 127:18

depends 129:14 149:3,5

depicted 154:6

deposed 6:14 7:9

deposes 6:3

deposition 6:18 9:9 10:9,17,23 11:2 12:21 13:4,11,21 21:6,15 39:14 58:16 85:13 88:6 147:24 153:16

depositions 6:17 7:23,24

depth 74:6

describe 17:22 18:24 63:19

desire 24:5 67:8,11

desired 61:22 62:7,17

desires 68:13 144:18

detailed 72:6

determination 63:1 134:12

determine 58:3 62:22 67:1,15 98:11 133:15

determines 149:9

determining 66:21

develop 97:12 122:4 135:23

developed 63:11

developer 63:6 67:24 68:13 98:15 110:5 121:8 127:12 128:4 129:9 138:4 143:6 144:16 150:11 151:11

developer's 65:23 131:19

developing 122:10 133:13

development 18:10, 18 19:4 29:19 30:11, 17 32:18 36:1,3 50:18 51:20,22 53:10,12 59:1 65:15,16,20 69:10 71:5,7 79:10 80:16 94:6 97:2 98:5 104:6,8 106:8 108:11 109:14 120:24 121:13, 17,22 122:12 123:19 124:6 127:11 134:24 135:8,10,13,16 138:2 141:10 142:17 143:13, 16,21 144:1 149:7,8 151:2 152:1,3

developments 17:12 135:19,22 136:6 142:10 150:7 151:9, 14,19 152:11,13

dictate 64:15

differently 82:14 106:10

difficult 10:1

direct 52:24 61:14 74:9 77:23 78:8 82:4 91:11 107:4 115:13 126:6 150:22

directing 81:5 86:6 101:16 126:8

direction 86:9,13,17, 24 87:3,7,17

directly 18:13 20:22 21:9 51:22 53:11 83:19 85:4

director 20:5 85:21

disagree 84:11

disclosed 116:1

discuss 20:16

discussed 17:15 20:19 28:11 52:2 53:16 61:22 68:23 69:22 77:21 83:19 93:17 103:24 113:16, 17 114:20

discussion 60:15 61:11,14,17 62:2,3,14, 16 67:8 69:2,4,18,19 76:17 82:10,14,15 83:2 94:3 114:24 115:4,18 118:7

discussions 72:12, 16 93:24

disingenuous 141:3 156:3

distinction 151:21

distinguish 73:15 114:12

document 50:16,23 58:19 68:7 72:3 125:7 138:16,18,20,22

documented 30:13 130:3,8

documents 11:1,4,11 12:10,15 13:17 68:3, 10,11 109:23 155:11,

12

**door** 145:16,17

**Dorothy** 54:15 55:2
56:2

**Dorothy's** 54:23 55:6,
18

**doubt** 75:19

**Doug** 6:1,7 22:9

**doug.smith@
worthington.org**
75:23

**downtown** 90:2

**draft** 92:18

**drafted** 92:3 111:19,
20,21

**drafts** 34:24 92:14
93:2

**driven** 102:21

**drugs** 9:24

**Duffey** 146:1,3

**duly** 6:2

**duration** 45:11

---

**E**

---

**earlier** 10:8 12:15 45:7
46:2 65:14,21 76:1
78:23 81:7 87:17
93:17 103:1 105:21
119:16 150:24 153:11

**early** 143:19

**ease** 6:10

**easier** 9:5

**easily** 117:15

**East** 152:22

**eastern** 101:20

**Education** 61:1

**educational** 16:21,24
18:5

**effect** 107:22

**effort** 51:20 53:9

**elaborate** 63:18,23
93:15 104:9 119:20

**elected** 15:8 66:12,14
67:19 99:3 144:5,12

**electing** 151:8

**election** 15:5

**email** 14:16 19:2
21:22 22:8,11,13
39:19 40:3,4,5,12
41:21 43:20 74:13
75:20,22 76:1,5,8 82:7
83:24 84:1,18 85:18,
24 86:3,7,16,21,23
87:23 88:10,15 112:2
116:10 119:9,17
120:11

**emailed** 14:18 25:23
26:1

**emailing** 74:19

**emails** 12:16 47:16
68:12 85:1,3 90:23
94:11

**emergency** 96:1

**empower** 51:21 53:10

**encouraged** 97:6

**end** 76:17 83:6

**ended** 16:8

**engage** 95:22 96:12
97:5,7 98:22 99:9
102:17 133:14 144:5,
17

**engaged** 103:12

**engagement** 63:5
65:22 97:16

**engagements** 97:21

**entail** 128:14

**entire** 79:15,19 102:7

**entirety** 124:7,24

**entitled** 58:24

**entry** 148:8,15 153:6

**equipment** 133:2

**Eric** 32:5

**Erin** 37:22

**essentially** 93:18
98:18 135:24

**established** 123:8

**evening** 53:6 54:1

**exact** 28:8 49:23
50:10 52:12,15 154:18

**exchange** 93:2

**exclude** 133:21

**excluded** 135:14

**execute** 141:11

**executed** 121:23
122:23 136:11,15,17
137:1,15 138:10
139:4,16,19,22 140:1

**execution** 136:22

**executive** 14:21

**exhibit** 21:15,19,22
22:5,14,18,23 39:14,
18,22 40:3 52:19,20
58:16,21 59:6,12 60:4,
12 61:13 71:2,6,16,19
72:21,22 73:4,10
74:10,11,15 76:9
77:24 78:6,9 82:5,6
83:1 84:13,19 85:8,13,
18 86:17 88:6,10
91:12,13,14 92:10,15
94:16 106:7 107:5,7,
11 108:10 109:5,6,13
113:16 116:12,13,15
120:23 126:12 147:24
148:4,8 151:3,5
153:16,20 154:6,12,
15,21 155:20 156:1,7

**exhibits** 39:11

**exist** 18:15 137:11,13,
24

**existed** 92:23

**existence** 30:9 31:15

**existing** 80:12 105:13

**exists** 25:7,11 34:5
67:21

**expect** 144:15

**experience** 17:11
115:21 141:14

**expert** 19:20

**expertise** 18:3 19:23
125:14 128:11

**experts** 18:14,15
97:10 137:7

**explain** 17:22 127:15

**explained** 79:7

**explicit** 118:22 119:4

**explore** 132:17

**expressed** 31:5

**expression** 122:8

**extent** 8:3 19:13 32:3

---

**F**

---

**facets** 58:4 67:21

**facilitated** 60:7

**facilitator** 70:20

**facing** 26:3

**fact** 75:19 76:11 101:4
117:4 118:15

**factor** 101:22

**factors** 63:4

**fair** 8:21 14:8 19:12
21:13 27:14 29:24
30:1 31:4 32:17,21
34:8 45:2 59:8,21
60:15 79:11 80:16
109:6,15 128:15
130:19 142:4

**fairly** 130:7

**fall** 80:12 139:3

**familiar** 23:3,4 26:17
29:17 33:13,15 91:24
93:13,23 144:23

**familiarity** 93:15

**family** 139:2,7,12
141:4

**fast-forward** 102:24

**favor** 106:6 152:17,19

**February** 12:7 61:11
62:13 69:18 70:15

**feedback** 35:24 36:15,19 57:15 66:14 67:23 68:11 96:22 97:22 98:19 99:7 104:1 114:4 125:13 133:4 137:6

**feel** 80:7 110:15 126:1 137:10 156:3

**feelings** 66:16

**feet** 123:6

**Felicity** 146:1,3

**felt** 42:15

**field** 64:11,20 65:1,3, 12

**fields** 64:12 97:10

**fight** 128:6

**figure** 81:10 103:5

**file** 90:7

**filed** 12:20 13:15 38:23 39:2 55:13 90:1 124:3

**finances** 69:11

**financial** 135:7

**find** 102:19 128:11 138:4

**finish** 9:2,3,11

**finishes** 16:13

**firm** 37:18,19 90:1,2,7

**fit** 131:20

**fits** 116:9 140:14

**flats** 155:3

**floating** 93:20

**Florey** 71:9

**Florey's** 71:13 72:14, 18

**focusing** 140:6

**folks** 24:24 25:11 32:22 68:12 98:19

**follow** 128:20

**follow-up** 86:22

**foot** 122:12 123:18

124:5

**forget** 131:11

**form** 26:16 35:9 37:8 49:17 54:8 55:23 57:22 69:3 71:20 73:13 75:4 100:19 107:15 108:13 116:3,9 121:2 122:6,14 127:8 130:23 138:12,18 140:11,13 149:20

**forms** 138:2

**forum** 14:12 56:4 97:24 98:12

**forums** 98:7

**forward** 77:7 122:4,10

**foundation** 48:18 67:4 97:18 109:16 123:8

**four-minute** 83:4

**frame** 43:4,22 44:20 45:7 46:1 47:14,18,23 48:3,12 61:7 84:14

**framed** 82:14,15

**frankly** 133:22

**free** 97:5

**front** 11:18 17:15 40:19 54:11,12 55:1, 17 56:8 66:9,10,11 75:14 92:20 126:4,5

**frontage** 131:8

**fruition** 143:10

**full** 9:20,22 10:5 52:3 53:17

**fully** 23:18 135:7

**functions** 67:12

**future** 65:16 66:6,7 70:23 106:8 108:11 109:14 120:24 121:13, 16

## G

**gauge** 9:16 104:10

**general** 6:22 32:18 36:18 77:18 80:18

87:18 90:1,3,6 123:14 126:10 127:4 128:22 130:14 131:15,24 132:8 133:7 135:1,14 136:5,10 137:16,23 138:21 148:21 150:17

**generally** 14:8 18:16, 20 79:6 133:4 151:24

**generated** 135:12

**generation** 69:20,21 70:7 134:24

**genuine** 51:19 53:8

**geo-spacial** 129:12 131:17

**geo-spacially** 131:2

**give** 10:5 36:10 60:16 74:11 86:8,24 95:21 96:10 114:3 122:9

**giving** 122:8 123:13, 15

**Gnezda** 32:5

**good** 6:8 8:22 9:7 56:20,23 57:7,16,18 58:6 60:20 62:15 66:13 83:16 156:12

**Gosh** 36:6

**Gotcha** 147:22

**government** 83:17

**governmental** 69:9

**grant** 135:24

**grass** 126:22

**great** 6:13 71:18 146:7

**greater** 148:22

**green** 24:5,6 30:16 62:17,21 63:2,10,14 64:5,10 66:23 67:9,12 68:17 126:13,17,18, 21,24 127:1,6,23 128:9,24 129:7 130:15,20

**Greeson** 80:10 82:8 83:1,11 84:14

**Greeson's** 69:14 70:1 82:23 84:6,9,11,20

**ground** 7:22

**group** 24:19 26:12,15 27:8 30:10 31:13,18, 24 32:2,8 33:5,11 36:9

**groups** 97:7 98:16

**Growler** 27:24 28:5, 12,22 29:10 46:3,4

**guess** 36:10,14 37:13 48:19 50:8 55:8 86:19 87:22

**guidance** 35:12,22 36:10 122:22 143:1

**guide** 96:20 97:2 109:20 120:24 121:6, 12,16 128:4 137:13 138:19,22 140:23

**guided** 37:10

**guidelines** 68:4 124:21 143:16

**guides** 109:13

**guiding** 121:20 122:3, 21 123:4,17 124:14,23 125:7,20 126:7 138:22

## H

**hand** 55:9

**handed** 39:17 58:21 78:5 148:3 153:19

**handing** 21:18 52:18

**handle** 9:19

**handwriting** 39:23

**hanger** 145:16,18

**happen** 7:9 96:20

**happened** 136:2,3 141:15

**happening** 103:23

**happy** 9:20 99:20

**hard** 15:17 98:14

**harmonious** 140:12, 18,20 141:2,10

**harmony** 142:18

**Hart** 53:4 54:7

Hart's 51:16

Hartford 105:7

head 8:10,11 21:1
29:21 49:8 124:1
143:22 145:6

heading 151:6

heads-up 114:3 115:4

Healthy 6:23

hear 24:14

hearing 13:13 28:7
41:5 45:9 46:14,17
47:2,6 48:7 49:11
51:5,8 52:3 53:17
56:16,17 77:6 78:7
91:21 93:6,11,15 94:2,
7,13 111:3,6 112:5,8
113:20,22 116:19
153:22

hearings 14:20 44:5

Heights 152:15,18

held 15:10

helped 37:7

Herb 70:19

hereinafter 6:2

hesitant 83:14

hey 141:12

high 62:6 148:16,19,
21 149:18 150:1,2,14
151:1,9,12,14,19,20,
24 152:1,3,4,10,12

high-level 50:22

highly 89:2,5,10 90:8
122:20

hip 132:24

hiring 37:11

hmm 40:2

hoc 33:17

holistically 121:23
122:23 141:9

homes 139:2,8,12,17,
18,20,21 141:5

hope 144:16

host 126:21

House 15:3

housing 101:21
105:21,22 136:12,15
137:16 138:2,11
139:4,24 140:11,18

huh-uhs 8:4

hundreds 68:12

hypothetical 123:12
124:1,10 125:6

hypothetically 67:5

**I**

Ice 90:1,2

idea 34:3 66:13 74:5
79:13 87:22 90:6
95:21 114:1

ideal 64:7

ideas 132:11 133:4,5
138:1

identify 138:8

ignore 84:24 85:3,6

impact 69:11 102:7
104:21 142:17

implementation
103:4

important 8:23 9:21
86:8 99:9 121:22

impose 76:12 138:9

imposing 94:5 106:6

Improvement 16:3

inaccurate 122:20

include 104:3 124:6,
24 132:3 133:21
152:1,4,8

included 41:19 42:5

including 17:14 30:11
65:3 66:18 102:8
108:19,20 109:8 137:5
146:13

inclusive 129:21
130:16

income 135:5,11,17,
20 136:1,8

incorporate 50:5

incorporation 89:23
90:7

independent 42:9

independently 13:6,
10

individual 37:20 38:4
63:12 131:21 139:6

individually 12:23

industrial 101:19,20
102:4,9

industry 64:1

influence 68:15

inform 76:19 77:3,12,
14 81:1 84:16 102:6

information 18:4
19:19 24:10,17 36:15
38:5 41:9,16,18 42:3,
19 56:12 57:14 59:1
67:22 68:7,9 108:16
121:5,7,8 138:5
144:10

informative 114:16

informed 97:12

informing 36:11

informs 33:18

Ingram 6:5,9 7:3,5
16:16 21:17 39:16
44:14,17 52:10,14
58:18 81:16,21 85:15
88:8 95:10 99:16,21
110:12 148:2 153:18
156:10

ingredient 125:17

initial 52:1 53:14
57:13 128:20

initially 52:2 53:16
55:13 83:14

innovative 138:1

input 65:23,24

inputs 97:10 144:9,13,
21 146:11,13

insights 114:4

instructions 51:18
53:8

integrated 121:24
122:24

intend 73:7

intended 115:5

intent 96:9 140:22

interact 18:18 19:1,6

interaction 19:12

interactions 19:5,14,
15

interest 96:5

interested 68:1
136:6,7

interesting 75:11
132:17 133:24

International 15:20

internet 146:21

interpret 110:5,8,17
124:22 125:19 126:2,
3,7 127:14 129:11,14
131:15,19 133:13,20

interpretation 136:22
146:15

interpreted 124:20

introduced 91:20
92:1,5 94:16 101:3
113:22 117:3

introducing 94:19

introductory 106:15

inverse 134:16

involved 66:20

involvement 33:21
45:5

involves 125:1

issue 19:21 41:22
58:22 83:7 99:1,4
141:12

issues 33:18 144:7,20

item 119:11

## J

**January** 11:15 12:4 13:7,12 16:12 20:12 42:23 88:12 91:21 92:12,13 93:11 94:1,7, 13 100:7,13,18 101:9 105:19 108:16 109:18 110:21 112:4,8 113:1, 2 114:2,16 115:6 116:14 120:9

**job** 19:11 54:10 55:1

**join** 31:18

**joined** 7:24

**July** 7:10,14

**jump** 60:24

**June** 7:10 34:1,20 148:6,11

**justifies** 138:5

**justify** 58:12 127:15 128:5 139:10

## K

**kind** 30:8 38:8 104:17 105:15 125:8 126:23 128:12 132:6,12,23 138:18 143:3,4 144:3 145:6 153:11

**kinds** 134:18

**Kiwanis** 15:22

**knowing** 91:9

**knowledge** 26:24 98:20 111:2 120:7,13 141:13 145:10

**Kowalczyk** 80:6

## L

**lack** 45:5 48:18

**land** 73:10,19,22 74:2, 7 76:13,14 107:13,20, 21 108:9 109:5,20 114:22 120:22 130:5

**landowner** 127:12

**landowner's** 65:23 109:11

**language** 8:10 108:17 118:20 129:18 131:14 133:20

**large** 9:18 32:7 36:12 97:8 119:8 126:13 127:5,23 128:9,24 129:7 130:15,20 142:19

**late** 106:2

**law** 80:21 85:21 90:1, 2,7

**Lawrence** 8:1 9:6

**laws** 80:22 120:1

**lawsuit** 28:14 147:8 151:7 153:9

**lawsuits** 153:10

**lawyer's** 40:2 78:3 150:21

**LC** 6:12,13 11:18 82:10 94:6,24 98:7 112:3 115:8,13 122:4, 10,24 124:3 134:12 147:5 149:10,16 154:9

**LC's** 94:12 102:9 104:6,12 106:9 108:11 109:12 114:21,23 120:24 125:1 127:7 129:6,24 139:2 143:16 150:15

**leader** 146:9

**leaders** 26:15,18 31:22

**leadership** 26:14 32:1

**leading** 41:2,4,8 48:9 56:22 86:21

**leaning** 137:19,20,22, 23

**learn** 77:19

**learned** 24:16

**leave** 37:23 151:16 155:14 156:11

**led** 37:11 102:20

**Lee** 39:19 40:4

**left** 10:14

**legal** 80:1 108:13

**length** 130:13

**letters** 98:17

**level** 137:7,8 149:16 152:4

**liaison** 16:6 20:12,14 51:23 53:12

**Lifestyle** 6:11,12 46:6 49:2 70:23 84:8 87:12 88:1 89:6

**Lifestyle's** 11:21 21:7 38:22 40:9,14,24 41:5 42:22 43:6,14 44:6,21 45:6,15,18 46:10,14 47:2,14,17,21 48:5,14 50:14 51:4,12,17 54:5 55:12 56:11 57:9 58:9 86:3 87:4,8,21 88:21 90:18 95:6,13 114:21 143:24 146:19 150:13 156:7

**Lifestyle/lc** 102:5

**Lifestyles** 6:10 39:2 48:14 49:11,14 50:4 51:24 86:14,18 89:7 90:4 122:4

**lifetime** 36:7

**light** 23:8 147:15

**likes** 80:19,20

**likewise** 129:3

**limitations** 143:5

**limited** 16:8

**limits** 139:13

**Lindsey** 79:7,12,20, 24 80:19

**list** 24:23 25:3,7

**listed** 65:21 116:20

**listen** 33:6 146:11

**listener** 146:7

**literal** 129:12

**literally** 131:6,7 134:6

**live** 65:6

**livestream** 117:12

**living** 105:14

**LLC** 89:13,18,24 90:8, 16

**locally** 134:18

**located** 129:8

**location** 60:23

**long** 37:2 136:17 140:12 142:16

**looked** 141:6

**lost** 95:7

**lot** 9:5,19 52:7,17 67:22 132:11 135:4

## M

**made** 25:5 47:9 48:12 53:5 54:15 74:14 76:23 77:18 78:14 80:7 117:7 119:16 120:8 137:5

**major** 17:2

**make** 9:5 10:1 16:13 23:18 35:12 39:10 56:6 57:3 63:1 65:19 70:13 73:3 75:1 79:5 83:12 99:5 117:2 119:18 134:12 141:2,9

**makes** 39:11 99:23 117:5 136:23

**making** 6:23 35:22 74:21 96:3 132:1 146:12

**mall** 152:15

**Management** 60:7,13 62:20 69:17

**manager** 18:13 19:13, 15,18 20:1 60:13,14 85:20 111:17 115:12

**manager's** 85:1

**mandate** 64:15

**manifest** 93:22

**manifested** 95:20

**manner** 75:1

map 18:2 131:7

mark 39:11 83:5 154:1

marked 21:15,19,22
39:14,18 52:19 58:16,
21 60:4 78:5 82:5
85:13,18 88:6,10
91:12 147:24 148:4
153:16,20

market 36:8,13

market-driven
134:20

Marlowe 70:19

mass 140:12

materials 42:22 46:23
50:21 56:21

math 16:7,9 155:22,24

matter 6:20 7:11,18
17:2 83:3 88:17
140:10

mattered 144:8

matters 14:3,11,21
16:23 17:3,7 18:18
20:7 29:15 85:2

maximum 139:13
142:21

means 131:16 138:21
150:1

meant 133:12 138:18,
22 140:23

measure 118:11

measurement 97:20,
22

medication 9:24

meet 45:13,17 46:5,9
47:13 48:2 83:20

meeting 11:10,13,20,
23 12:2,5,8,12 13:8
27:19,23 28:4,11,18,
21 29:1 41:3,8,13
45:23 46:21 48:9,16
51:12,16 52:21 56:19,
22,23 74:22 77:22
82:1 84:7,12 92:11
100:13 110:22,23
112:19,22 114:3 115:6
116:2,14 117:3,5,14

118:1,16,23 154:1

meetings 11:6,8
20:14 26:20 27:6,10,
19 29:3,7,11 30:2
32:12,13,16 33:2
41:14 59:22 112:21
147:20

member 13:23 15:24
16:18 17:13 19:22
38:6 43:16,21 54:2,22,
24 55:20 56:2,3 57:3
58:2,13 59:10 63:9,12
66:24 94:15 96:2
104:4 108:2 109:19
110:8 120:4,15 122:2
123:3 125:7 131:13
133:19 134:8 138:7
144:3

members 14:9,20
18:8,19 19:7,8 20:4
33:9 53:5 74:14,19
82:9 85:20 88:11 89:1,
21 90:23 91:6,10
119:7 134:16,19
136:20 137:17

memo 57:14

memorandum 41:14
60:12 72:6,10,18

memory 113:3 130:12

memos 41:14 42:15
56:14

mention 65:14

mentioned 20:11
42:6 46:2 70:11 78:24
98:19 102:12 119:16
153:11

message 14:2 91:1

messages 47:20
94:12

messes 27:23

met 6:9 26:24 27:3,15
61:6

methodologies
35:23

methodology 35:23

Michael 32:4 85:19

Mike 145:24 146:3

Miller 90:1,2

mind 16:22 31:21
57:21 58:7 64:24 65:3
66:5 69:12 89:19 95:8
98:8 104:4 109:23
126:20 132:5,10 138:4
140:1 142:7 143:23
148:20,22 149:11,19
150:15,23 151:16,18
152:2

mind-set 142:11
153:7

minimum 127:22
128:2 139:13 142:20

minute 98:19 124:9

minutes 11:23,24
12:11 13:7,8,12 41:13
42:15 46:16,19 47:5
49:19,24 50:1,10
51:10 52:20 53:21
54:1 56:13,14 57:12
78:6 79:3,6 80:9,24
125:15

missed 42:8

Misstates 116:21

Mitchel 32:5

mixed-use 24:6
30:16,19,24 62:6
152:8

MLK 112:23 113:3

MO 30:9 113:8 115:10,
15

modus 30:9

moment 40:5 60:16
86:20 107:6

Monday 76:11 112:24
113:9

Mondays 112:21

month 27:21

months 7:12

moratorium 76:13
79:8,10 80:4 94:5,12
95:5 106:7 114:8,10,
20

motion 54:15,23 55:6,
19,22 56:6,8 74:21

75:1 76:23 117:2

motions 118:3,20

move 33:8 122:4,10
129:19

MPC 41:12 42:15

mug 9:18

multifamily 139:20,
21

Municipal 19:7 41:12
63:6 137:21

municipality 80:21

Myers 85:20

_____

**N**

names 32:6

National 105:12

nature 132:4

nature-focused
126:23

necessarily 121:4
142:21

neighborhoods
140:20 142:19

neighbors 31:18 97:8

net 134:7

newest 132:23

newsletter 58:23 59:4

nice 63:13 114:14,15

night 117:11

night's 74:22

nodded 49:8

nodding 21:1 29:21

nods 8:10 20:24 49:4
143:22

non-developable
130:5

nonagenda 119:11

nonprofit 6:24

nos 8:9

note 36:24

noted 62:20

notes 36:22 37:1
41:14 125:14 137:20

notice 117:9,17
118:10

notification 117:16

notified 40:9,11,20
118:16

notifying 78:24

November 71:8
103:23 104:2

nullifying 135:24

number 63:4 91:20
107:12 108:3,8 112:9
116:20 118:23 127:22
134:5 140:7,10,21
141:22 142:7,20
149:17 150:2,18,23
151:15,17 155:5

numbered 21:24

numbers 143:6
154:19

numerous 104:23

**O**

oath 10:8,10

object 48:17 67:3

objection 7:2 35:9
37:8 49:17 50:6 52:6
54:8 55:23 57:10,22
68:19 69:3,7 71:20
73:13 75:4 82:17 85:9
87:13 97:18 98:9
100:19 107:15,23
108:13 109:16 110:2,
10 116:3,21 118:13
119:1 120:16 121:2
122:6,14 123:7,21
125:3,22 127:8 130:23
138:12 140:3 149:20

objections 99:18

objective 35:12,22
36:16

obtain 79:1

occasionally 14:15
18:5

occasions 32:20

occur 27:10 105:17,18

occurring 61:3

October 25:19 38:23
39:20 40:10 42:22
45:2 47:1,10 48:15
49:3,10 85:22 86:22
103:23 156:16

office 15:9

offices 14:24 15:6

official 58:23 59:4
66:12,14 67:19 99:3
144:5,12

officials 88:12

offsetting 136:8

Ohio 6:22 15:3 117:13
118:17 119:12,24
132:21

opaque 89:1

open 56:4 83:18 96:6,
7 155:14 156:11

operandi 30:9

operated 6:24

opinion 90:8

opportunity 22:1,4
51:24 53:14 54:5,22
59:11 61:19 71:15
107:11 116:18 127:14
128:17

opposed 131:17
152:10,12

opposing 63:23

option 91:8

options 98:14

order 97:16 117:1
118:3

ordinance 91:14,20
92:1,3,6,22 93:5,10,14
94:17,21 96:1,10
99:22,23 100:6,10
101:3 106:13,15,19
113:16,17,21 117:3

ordinances 18:2
100:3

organization 23:15,
21 26:17 31:10,19,21
32:23 33:3 56:5

oriented 126:23

original 125:8 127:2
149:24

outcome 37:15
151:10

output 37:14 144:9,21

outputs 146:12

outreach 25:6 103:22
124:16

overcome 57:20

overseeing 152:19

oversight 37:13

owned 105:12

owner 63:5 68:1,14
77:12,15 95:1,2 96:12,
16 97:1,4 99:5 106:24
124:11,17 129:10
142:2

owner-occupied
154:20

owners 66:19 115:11
143:1

**P**

P-O-G-G-E-M-E-Y-E-
R 103:14

p.m. 156:17

PAC 31:13,16

package 42:16 51:10
56:13 92:19

packet 41:9,10,12,19
42:6,7,19 46:22 48:9

pages 50:17 109:3
120:22

paints 122:21

paper 30:13 33:13
39:11 93:21 125:11,12

papers 68:11

paragraph 72:4 78:21
126:14 151:4,7 154:15
155:21 156:1

parameters 133:15
147:10,12

paraphrasing 30:15

parcel 149:24

park 23:2,5,14,21,22
24:21 26:13,20 27:1,8,
16 28:5 29:2,8,15
45:18 62:17,21 63:2,
10 64:5,10 66:22 67:9,
11 68:16,17 126:22
132:3,9,12

Park's 26:5

parks 63:24 65:4
132:21,23

part 26:13 38:7 48:8,
19,21,23 51:10 58:11
68:8 77:20 83:5
101:20 102:11 126:19
129:20 134:1 152:19
154:5

participating 62:3

Partner's 69:17

Partners 60:7,13
62:20

party 83:20

pass 100:5

passed 100:9 143:15

past 27:11 32:14 33:3
57:13 59:2 143:11
153:13

pathway 79:18

patio 139:17,18 141:5

Paul's 44:9

pause 95:19

pending 9:12 43:15
44:21 45:12,15,19
46:7,11 74:23 88:22

people 14:7 32:8
36:15 65:5 144:8
145:20 147:20

people's 145:20

percent 135:4

period 136:1

permit 49:14

permitted 50:4

person 20:6 37:12

personal 115:15

personally 19:10 38:2 67:16 104:14 126:18 131:16 134:8 152:2 153:10

perspective 82:13 84:6,9 132:13

pertain 32:16 78:20 102:5

pertained 61:12 79:14

pertaining 12:2 14:10 34:1 35:8 44:2 50:14 62:13 72:21 74:10 100:6 114:21 117:18

pertains 13:2 87:23 123:6

pertinent 41:13,24

peruse 78:19

Pete 145:24 146:3

petition 25:7,14,22 26:2,4

phases 71:4,7

philosophically 144:3

phone 14:13 113:13, 14 115:3

phrase 143:20 152:24 153:6

phrased 103:20 151:2

phrases 151:22

phrasing 138:8

physical 131:8 142:10

physically 134:2

picked 153:13

piece 102:24 130:5

pieces 41:15,17 42:2 121:7,8

pinpoint 24:15

place 24:16 140:21

placing 28:8

plan 18:10 40:15 42:12 48:6,14 49:12, 16 50:5,15,18,20,22 51:4,7,13,22 52:2 53:12,16 68:10 72:23 73:11,16,19,23 74:2,7, 23 76:13,14 79:15,17, 20 80:13 100:18,22,24 101:6,9,22 102:7,22, 23 107:13,14,20,21 108:9,19 109:5,20 114:9,23 115:23 120:22 138:21 156:8

planned 17:12 18:17 19:16 143:13 149:6,8 150:6

planning 18:19 19:3,7 20:5 31:23 32:2,8 33:11 41:12 42:24 43:7,9,11,15,17,21 44:1,4,22 45:13,20 46:7,11,13 47:2,8 48:6,10,12,15 49:11 50:23 51:18,23 52:4 53:7,13,18 54:6,16 56:13 63:7 65:23 125:15 128:19 137:7, 21

plans 19:4 68:4 79:22 98:18

play 64:1 65:15

playground 65:11 133:1

plural 105:12

Poggemeyer 103:14

point 20:6 31:15 35:23 36:8 38:7 40:16,19 56:6 70:5 76:2 87:23 89:16 117:15 119:11 120:5 123:1 124:13 140:9

pointed 12:14

pointing 21:11 155:19

points 22:17,23 38:7 61:14,17 62:1

policies 17:14,21,23, 24 54:12 58:4 100:12 138:17

policy 18:5 19:21 54:10 55:1,4,10 56:8 58:5,12 66:8,9 78:15 91:5 100:8 118:6 126:4 144:14

political 144:24 145:3,9

polling 36:8 37:11,18, 20

pool 68:8

Porch 27:24 28:5,11, 21 29:9 46:3,4

portion 53:2 74:23 122:5 124:4 125:2 130:22

position 17:19 64:14 124:19 127:15 128:6 129:15 131:20 133:17 136:18 138:5 143:8

positions 30:13 146:18

possibility 81:2

possibly 63:8 65:18 66:2 84:14

post-covid 28:1

postcard 145:15

posted 146:22

posts 146:24 147:1

pot 9:20

potential 63:6 69:20 76:19 77:3 79:2 81:1 83:13 84:16 96:20

potentially 77:7 141:24

pour 9:17

Powerpoint 50:21

practice 59:17 83:17

practices 137:6

prep 10:18,19 12:22 13:2,4

prepare 10:16,22 11:1 12:20 13:3,10,18,21 37:7

prepared 34:24 36:23 69:6 71:9 124:18

preparing 33:24 35:7 68:24

present 44:16

presentation 53:4 153:23 154:6 156:2,4, 6

presented 48:6 93:19

presently 150:4

president 72:13,17 85:19 106:14 111:12, 14,17 112:13,17 113:24 114:17,19 115:2,14,17 120:3

pretty 31:17 58:5,10 130:3

prevent 96:16

previous 69:23 126:19 143:11

previously 50:13 52:18 60:4 77:21 82:5

principle 121:21 122:3,21 123:4,17 124:23 125:21 126:7

principles 124:15

printed 33:20

printout 148:4

prior 7:23 15:13,14,19 27:17,20 29:9 36:7 46:20 48:7 51:4,7,11 59:13 80:11 81:23 86:21 92:14 93:11,14 94:1,6,13 99:9 106:20 111:5 112:7,18 113:22 117:24 120:9 132:2 153:10

privilege 119:23

Pro-tem 85:19

proactively 26:8

process 19:17 37:10 38:9 39:9 57:4,5 63:6 65:22 67:21 77:10 78:11 80:1,3,18 98:1 99:10 102:1,13,15,18 103:9 104:11 124:12, 18 125:9 127:16,18 128:13,18,21 133:18 136:19 137:2,21 142:1,4 153:12

processes 80:22 127:11

produce 135:16,19

produced 155:11

production 155:12

products 103:7 104:19

professional 9:7 17:5,8 128:11

program 64:3

programmable 63:21,24 64:6,7,10,17, 18,23 65:10 66:23 67:13 68:17 126:20 132:3,6

programming 132:24

project 23:2,4,14,20, 22 24:21 26:5,13,19 27:1,7,16 28:5 29:2,8, 14 45:18 46:3 142:18 152:18

projects 103:7,20 104:3,19

promoting 30:10 145:18,19

prompted 79:8

properties 104:15 105:14

property 20:17,19,21, 22 21:2,4,7,8,9 23:6, 16 24:6,7 27:2,4 28:17,20 29:9 30:6,12 32:17,19 34:2,20 35:8 57:9 61:23 62:7,18 63:3,5,11 66:19 68:1, 14 71:8 72:24 77:8,12, 15 79:10,14 80:16 81:13 88:17 89:12,15

90:5 94:6,12 95:1,2,6, 13,16,17 96:5,12,14, 16,18,21 97:1,3,4,13, 17 98:4,23 99:5,8 102:5,8,9 104:7,12,22 105:11,16 106:9,18, 20,24 108:12 109:14 114:21,22,23 115:10 121:1,22 122:5,11,22 123:24 124:11,16 125:1 127:7 129:1,2,3, 6,10,11,24 130:16,22 131:18 135:9 139:2 141:14 143:1,16,24 144:16 146:19 147:6 148:24 149:10,16 150:13,17 151:6

proposal 51:20 53:10 76:18 77:4,15 123:1 140:14 141:2 142:5, 11,12

proposals 127:12

propose 92:6 118:3,6, 19 121:9 128:17 137:10 141:17 143:7

proposed 48:15 49:12 50:22 65:20 70:23 79:9,13 91:24 93:5,10 94:17 96:1 99:22 150:11 154:9, 10,14

proposing 76:20

protected 119:23

provide 34:7 35:12 51:19 53:8 63:18 86:13,17 87:3,7,11,20

provided 41:9 56:12 57:15 60:13 69:14 72:6,9 88:9 92:16 93:5,8 111:5,24 112:1, 3 120:14

providing 154:5

provision 98:20

public 11:5,7,12,21 14:12 26:3 35:24 36:8, 12,19 37:16 41:10 59:22 63:5 65:22 89:1 91:9 97:6,7,8 98:16 99:9 103:22 104:1 117:5,14,15,16,22

118:1,10,15 119:7,9, 18,23 120:3,4,9,11,14 144:6 147:10,12,21

publication 33:17 59:3

publicly 38:12,20 83:19 116:1,8,11 118:16

publish 117:12

published 59:14 147:3

PUD 17:14 143:12,13, 14 149:16,23 150:8,14

pull 119:9

punch 78:4

purpose 102:18

purposes 21:5,21 71:6 76:4 82:6 85:17 109:11,12

put 19:23 59:6 95:19 117:9 141:22 152:5

Q

qualifies 136:15

qualify 37:14

qualitative 97:21

quantitative 97:20

question 8:17,20,21 9:3,4,11 13:2 16:14 17:9 22:7 23:17 27:5 33:8 38:13 42:17 43:20 49:21 50:8 52:7 53:23 55:1,4,8,9,10, 16,19 56:7 57:23 70:3 74:10 75:12 76:24 79:8 81:4 82:20 84:15 86:20 91:3 94:9 99:12 101:2,6 110:7,11 117:18 119:14 120:12 123:15 124:22 126:4 127:19 135:18 138:15 139:8 149:12 151:13 155:16,22

question's 13:1 78:20

questioning 62:12 67:17 147:15 155:23

questions 8:2,4,15 9:13 10:2 18:10 36:11, 17 37:4 39:4 50:14,15 66:8,10 72:21 73:9 114:5 129:17 155:13

quick 44:8 78:19

quote 52:8

quote/unquote 109:21

R

R-10 149:4

R-6 149:4

ran 15:3

rang 106:16

rarely 14:17,22

re-election 27:13 145:4,11,14,18 146:6 148:6

reach 98:15 115:10,13

reaching 136:20

read 39:3,5,7,9 41:7 53:1,2 66:3 73:2 74:11 84:23 85:8 92:17 95:10,12 96:10 119:6 122:17,19 140:24 142:3 154:1

reader 140:9,24

reading 75:15 92:19 110:16

ready 44:9

real 78:19

reason 10:4 55:5,7,8, 15 56:20,24 57:8 58:7, 14 75:18 90:10 115:9 120:5

reasons 55:11,21 56:24 107:2

rebates 136:8

Rec 132:21

recall 7:22 12:3,13,18 13:19 15:18 22:16,19, 21,24 25:18,21 26:9 27:6,20,24 28:10

29:11 32:6 33:24 34:4, 5,17,18,19 37:1 38:17, 20,24 40:23 41:1 43:2, 5 44:22,24 45:23 47:16 49:2,5,9,10,22 50:3 51:9,16 52:15 53:20 54:2,3,17,18 59:24 60:6 61:2,4 62:2,5,11,16,19 69:1, 4,21 70:3,9,12,14,17, 22 71:1 72:3,15,19 73:21,24 74:17 75:12, 13,14,15,16 76:7,15, 20 80:4,8,9,13 82:1 83:24 84:1 85:7,11 93:9 100:1,2 107:11 108:3 110:24 111:24 113:10 145:1,2 154:4 155:4,5

**recalling** 105:6

**recalls** 52:11,12

**receipt** 76:8

**receive** 55:3 110:19

**received** 22:13 25:13 75:15,19,21 111:2 144:11

**receiving** 75:17 83:24 84:1

**recent** 30:13

**Recess** 44:15 81:20

**reciprocate** 99:19

**recollection** 40:8,21 52:23 53:3 60:5 107:6

**recommendation** 47:9 48:13

**recommendations** 56:15 137:20

**recommended** 16:5

**record** 6:6 11:12 21:11,21 41:10 52:17 63:22 66:3 69:23 71:6 76:4 82:7 85:17 89:1 91:9,10 95:12 105:10 119:6,24 120:4 122:19 147:10,13,21 156:5

**records** 11:5,7,21 35:4,6 119:9 120:5

**recs** 63:24 132:12

**redevelop** 96:17

**redevelopment** 66:7

**reeks** 89:2,10

**refer** 6:11 11:7 21:7 29:23 43:10 51:17 53:6 54:5 67:1 68:5 73:10 95:15 127:1 149:24 156:2

**reference** 6:11 25:5 83:3 99:23 101:4 117:9 118:22 119:17 126:12 132:2 133:7 136:11

**referenced** 46:23 98:8 105:21,22 109:9 130:11 143:20

**referred** 17:21 23:20 24:19 74:7 78:16 96:24

**referring** 12:16 17:23 20:21,22 21:3 23:10, 12 25:3,14 35:14 41:18 48:20 62:9 64:23 66:1 76:21 79:9, 12,20 80:15 89:9,12, 20 90:11 93:16 94:1 97:2 101:14 116:6 117:21,23 119:21 125:8 132:19 145:11 151:14 152:21 153:1,3

**refers** 80:5 153:9 154:16

**reflects** 156:7

**refrain** 99:17

**refresh** 40:7 52:23 53:3 60:4 107:6

**reiteration** 86:10

**relate** 32:18

**related** 74:13 90:5

**relates** 17:24 41:24 83:18 146:18

**relating** 119:10

**Relationships** 6:23

**relevant** 104:12,15 138:16

**relied** 20:1

**rely** 97:1

**remarks** 106:15

**remember** 15:17 20:18 25:17 26:22 27:21 28:9,19 31:7,14 34:22 35:17 36:17 49:23 60:10 71:22 75:17 76:10 77:5,6 123:14 136:2 145:7

**rent** 155:3

**repeal** 76:13

**repeat** 8:19 95:9 119:5 122:18

**repeated** 122:16

**rephrase** 8:16,20

**replaced** 107:13

**reply** 90:23,24 91:5

**report** 70:11

**reporter** 8:1

**reports** 117:6

**represent** 6:9 33:6

**representation** 154:13

**representatives** 15:4 27:7,16 28:4 29:3,8 32:12,14 45:14,17 46:5 97:9,23

**representing** 66:12 67:20

**request** 51:16 83:16 119:9 120:5

**requested** 54:7 95:12 119:6 122:19

**requests** 53:5 54:12

**require** 128:13 135:23

**required** 117:13 127:6

**requirement** 99:11, 14,15 127:10

**requires** 98:21

**research** 36:9 42:9

**Residences** 105:12

**resident** 30:10 31:12, 17 41:23 57:15 66:18 67:23 68:10 97:7

**residential** 24:7 30:18,20 31:1,3,6 33:5 104:24 105:1,14,16 136:12,14 137:15 138:11 139:4 140:7, 11,14,17 149:4,14

**residents** 24:1,5,19, 20,23 25:2,8 33:18 36:13 41:21 56:17 98:16 102:21 125:14 137:22 144:17 146:7, 8,13,14

**residents'** 24:3

**resolution** 107:7,12 108:3,8,17 109:4,8,22 110:9,16,20 111:3,19 112:1,4,8 113:20 114:11 115:24 116:6, 7,20 117:3,10 118:9, 23 119:18 120:8,14 121:11 125:18 142:22 143:9,17

**resolutions** 111:11 117:7 118:4,21

**resolved** 108:18

**resource** 66:24 67:14, 17,20 134:11

**resources** 138:3

**respect** 18:7,17 26:12 31:9,20 41:4,17 45:11 51:20 53:9 55:18 64:4, 9 66:21 82:12 86:14 98:6 118:8 124:23 127:4 132:8 133:6 134:23 136:21 143:23 146:19 149:15 150:12

**respectful** 96:13

**respond** 8:4,8 84:18

**response** 82:24 86:15 119:13 128:1

**responses** 56:16

**responsibility** 144:5

**responsible** 29:18 30:10 36:1,3 143:21, 24 144:4,10,22

responsibly 144:13

restate 8:16 127:19

results 37:4,6,15,24 38:10,14,18

retail 133:8,11,16,21 134:7,10,14,15,17,18 152:9

retreat 60:1,8,15 61:2 62:14 70:16

retreats 59:19

revenue 69:20,21 70:4,7 134:24 135:4,5, 11,16,20

review 11:1,4 12:10, 19 13:6,7,12,17 19:3 21:20 22:1,5 26:6 40:5 41:6,11 42:1,4,11,18, 21,24 43:8,10 45:8 46:16,19 47:12 48:5, 13 51:7 59:12,13 61:19 71:12,15 73:3 82:6 91:17 92:14 100:17,23 101:5,8,12 107:11 116:15,19 147:2

reviewed 11:11,20,23 13:9 25:13,17,22 26:4 40:6,14,18 42:6 47:5 56:22 58:19 61:21 71:14 72:9 78:22 79:3 82:11 85:16 86:3 92:9 94:16 100:21 108:10 124:14

reviewing 22:16 40:22,24 51:9 56:12, 15 125:6

revise 59:12,13

revised 48:5 49:12,15 52:2,5 53:15,18 117:13 118:18 119:12, 24 154:8

revision 100:12

revisions 22:22 92:6

rezone 97:17 98:23 124:4 149:10 150:13

rezoning 11:21 38:23 40:9 44:21 50:17 53:15 54:16 57:1,9

90:18 94:5 97:5 99:6 105:1,18 122:11 149:15,23

rezonings 104:24

Rhonda 39:12

risk 80:10

Road 152:16

Robert's 56:5 117:1 118:2

Robinson 29:14 72:13,17 73:22 74:18, 21 76:11 82:8,24 112:13,17 114:1,20 115:14,17 120:2

Robinson's 74:13 76:8,18,20 77:4,15 79:9,13 82:13 106:14 115:3

robust 96:13

Roger 28:23

role 18:11 65:15 66:6 126:1

rough 124:1

roughly 45:1 103:10, 11

rule 79:22 90:22 91:4

ruled 79:19

rules 7:23 56:5 117:1 118:3

run 14:23

running 148:5

runs 130:6

**S**

S-1 149:14

sake 73:9

sat 28:8

satisfies 127:23

Saturday 61:11 62:13 112:20

scale 140:13

scenarios 69:1

Schumacher 44:16

SCHUMCHER 39:10 44:10

Scott 28:23 29:4

screenshot 153:21, 24

seats 145:21

second-to-last 78:8, 16,18

secret 135:3

Secretary 89:22

section 110:16 121:10

seek 76:12

seeking 23:15 36:4

seeks 23:5 30:6

select 133:8,10,16,20 134:3,5,13

selecting 134:4

selection 134:6

send 47:20 54:15 91:10

sending 47:16 91:1

senior 105:14

sense 23:18 63:24 106:17 116:8

sentence 86:7

September 73:23 74:2,7,18 75:18 76:12 78:7 81:24 83:3 84:7 93:19 95:19 106:21

serve 16:6 51:22 53:12 109:13 120:23 121:12,16

served 15:12,20 16:2, 7,18

serves 130:12

service-oriented 133:8,10,16,21 134:4, 9,13,18

services 134:5

session 10:18,19 12:23 13:2,4 29:10 61:23

sessions 14:21 18:5

set 22:14,17,23 61:13 76:8 84:12 86:16 106:7 109:4 111:18 118:17 120:22 139:13 142:7 156:6

sets 111:12,14

setting 143:5

settlements 151:11 153:1

shaking 8:10

share 9:20 28:16 38:10,14 93:10 114:24 115:18

shared 38:17

sharing 38:20

shine 23:7 147:15

shook 145:6

short 140:6

show 116:19

Sidebar 78:13

signal 106:22 140:8

signed 25:11

significant 32:22 63:17,20 64:6 67:11 129:13 131:17,18,22 132:1,5 134:2

Silk 7:1,4 10:13 16:13 35:9 37:8 44:8,12 48:17 49:6,17 50:6 52:6,12 53:1 54:8 55:23 57:10,22 67:3 68:19 69:3,7 71:20 73:2,13 75:4,9 82:17 85:9 87:13 97:18 98:9, 24 99:19 100:19 107:15,23 108:13 109:16 110:2,10,14 116:3,21 118:13 119:1 120:16 121:2 122:6,14 123:7,21 125:3,22 127:8 130:23 138:12 140:3 149:20 156:14

**Similar** 43:20

**simple** 82:19 117:4

**simply** 126:21

**single** 139:2,7,12
141:4

**site** 19:4 40:15 52:2
53:16 61:12 64:13
65:16 66:7 67:9 68:18
69:1,6,21 70:24 94:22
102:8 121:13,17 123:6
124:5,7 131:9 132:15
140:2,19 141:14,16
142:6,8 143:13

**sitting** 10:13

**situation** 124:10

**Sixth** 99:23

**size** 62:22 63:2,15
66:22

**skew** 141:24

**slightly** 33:7 106:10

**slogan** 23:24

**small** 124:4 125:2

**smart** 134:20

**smile** 29:21

**Smith** 6:1,7,8,14 8:15
9:8,21 10:13 13:24
14:23 17:11 18:16
21:18 22:9 23:1 29:17
39:17 40:8 44:18
52:19 53:20 54:4,14
58:20 59:18 60:6,17
71:3 73:18 74:17
77:24 78:23 81:22
83:12 88:9 91:12
97:14 98:6 107:5,10,
21 109:1 115:22
116:13 118:24 119:14
120:21 121:10 129:16
135:2 148:3,15 153:19
155:9

**Smith's** 83:16

**smith@**
**bluestreakstrategies**
**.net.** 22:10

**smorgasbord** 68:6
98:13,14

**soccer** 64:2,11,12,17
65:1,3,12

**solely** 124:5

**soliciting** 114:4

**sort** 25:7 135:11

**sorts** 24:13

**sought** 73:22 95:5

**sounds** 8:22 148:13
156:12

**source** 66:23 67:15
77:5 134:11

**sources** 127:14
128:12 137:5

**space** 24:5,6 30:16
62:17,21 63:2,10,14
64:5,10,18 65:11
66:23 67:9,12 68:17
126:13,17,18,20,22,24
127:6,24 128:9,24
129:7 130:16,20
132:13

**spaces** 126:23 127:1

**span** 130:20 131:4

**speak** 10:21 14:19
32:24 66:16 99:2,3
120:18 137:17 142:1

**speaking** 18:16 144:2

**speaks** 138:16

**specialist** 65:5

**specialized** 37:20

**specific** 11:8 19:21
24:15 35:24 41:24
63:16 64:24 68:3,4
70:9 73:5 81:12 83:5
101:1 128:2 132:9,15,
19 133:3 134:4,11
142:20 143:5 150:23
151:15,17 153:4,14

**specifically** 41:20
60:2 61:10 62:4 66:2
103:5 120:18 123:18
127:10 128:16 129:6,
24 138:24 142:15

**specifics** 136:2

**Spectator** 33:14,16,
20,22 34:1,7,20

**spectrum** 65:10

**spell** 98:14

**spelled** 128:2

**spirit** 77:9,17 81:8,9
84:15

**sport** 64:19

**sports** 65:8

**spring** 106:2

**square** 122:12 123:6,
18 124:5

**stab** 50:9

**staff** 17:15 18:3,8,9,14
19:20,22 20:3 41:9,14
42:15 51:21 52:3
53:11,17 56:14 57:14
76:19 77:3,9,11,14
79:1 81:1,5,6 83:12
84:16 101:16 111:7,9,
11 115:13 120:2
125:14 126:9 128:10,
14,19 136:4 137:7

**staff's** 137:20

**Stafford** 105:8,9

**stakeholders** 66:18,
20 95:23 96:4 97:9,11
106:23 119:7 143:2

**stakeholders'** 98:18

**stand** 81:7 103:8
133:1

**stand-down** 151:10
152:24

**standard** 19:17 57:19
128:7,12 138:9

**standards** 118:17
128:10 137:11,13
138:17

**stands** 12:18 77:12

**start** 11:19 17:10 39:5
43:13 90:11 136:19
137:12

**started** 103:9 106:1

**state** 6:6

**State's** 89:23

**stated** 35:17 49:19
80:6 81:7

**statement** 12:18 13:9
37:16 52:13,15 69:24
74:14 81:8,9 102:23
103:3 140:8 150:1
155:15,19,24

**statements** 102:19,
24 103:6,16,19 104:6,
12,15,21

**stating** 74:20

**status** 77:18,20 78:24
79:1 81:10

**steps** 101:11,14
128:20

**stick** 99:17 147:21

**Sticking** 128:22

**stock** 31:6 139:24

**strategist** 36:14

**street** 20:23 21:10,12
62:6 139:2

**strike** 30:24 90:11
92:21 137:12

**stroke** 122:22

**strokes** 80:21

**strong** 31:17

**structure** 26:16 99:8

**stuck** 153:12

**studies** 101:13,17,18
102:6

**study** 101:19,21
102:4,11 105:21,22

**stuff** 65:7 133:2

**style** 30:20 31:3
105:15

**subject** 6:20 7:11,18
17:2 88:17 99:7
155:12

**subjective** 99:12,13

**submission** 124:13,
20 125:13

**submit** 97:4 122:24
127:13 128:5

**submits** 124:11

**submitted** 30:14
31:14

**submitting** 96:17
99:6

**subsequent** 87:24
100:6,13

**substance** 28:10 92:7
117:10

**substituted** 107:12

**sudden** 75:1

**sufficiently** 110:15

**suggested** 22:22

**summarizing** 60:14

**summary** 69:18 71:4,
7,13 72:7,14

**summer** 58:22

**Sunday** 112:20

**Sunshine** 119:24

**supplement** 107:19

**supplemented**
109:21

**support** 34:7 54:23
55:6,22 56:9 74:1
106:13 129:17 134:17
146:17 151:9

**supported** 73:18 74:5

**supporting** 145:23
146:6,15

**surrounding** 140:20

**survey** 35:8,11,13,14,
16,22 36:2,4,21 37:3,
4,7,24 38:10,14,18

**surveying** 36:5

**survive** 99:1

**suspend** 74:22 76:14
79:21

**swore** 10:8

**sworn** 6:2

---

**T**

**TAFT** 39:24 61:1

**taker** 36:24

**takes** 103:2

**taking** 131:7 136:7
144:13

**talk** 8:24 13:20 19:2,20
24:13 43:3,16 44:12
45:13 47:10,13 51:3,
11 56:18 80:20 94:4
112:7,12,16 113:21,23
115:7

**talked** 83:6 113:19
138:19

**talking** 12:22 21:9
22:17,22 28:19 34:13,
15 44:20 50:1 67:5,7
74:6 81:24 114:13
132:20,23 133:2,3
147:17

**Talks** 58:23 59:3
137:24

**tangible** 103:7,20
104:3,19 122:9
123:13,15

**tapestry** 38:8

**tax** 135:5,11,20 136:7,
8

**taxes** 135:5,17 136:1

**Taylor** 28:23 29:4

**team** 64:19 65:8 103:4

**TED** 137:24

**temperature** 66:16

**temporarily** 74:22
76:14

**tend** 134:7

**tenure** 32:10

**term** 16:8 148:16

**terrible** 39:23

**test** 133:1

**testified** 76:1

**testify** 10:11

**testifying** 99:17

**testimony** 9:22 10:6
30:23 116:22 118:12
156:16

**text** 14:2,6,7 47:20
94:11 143:4

**thereabouts** 154:4

**thereof** 45:5

**thing** 69:12 95:8
106:22 108:24 114:16
138:23

**things** 9:5 24:13,14
83:18 124:16 132:3,22
143:6 147:19

**thinking** 61:8 68:16
105:5 153:8

**thinks** 37:16

**thought** 57:4 77:10
125:9

**thoughtful** 146:9

**thoughts** 66:17 86:10
87:11,18,20

**thousand** 25:2

**thousand-plus** 24:23
25:8

**three-hole** 78:4

**time** 7:8,16 9:9,14
20:18 22:12,16 24:16
40:23 41:1,22 43:3,6,
14,22 44:20 45:7 46:1
47:14,18,23 48:3,12
58:11 61:6,7 71:12,18,
23 72:1,2 75:16 76:2
78:12 81:17 86:2,20
87:23 88:20,22,23
91:17 92:5,9 93:4,21
95:6,21 103:1 110:11,
13,24 116:24 117:4,7,
16 133:1 136:1
142:15,16 144:20
153:7

**timeline** 25:21 28:9
35:17,20

**times** 6:16 138:19

**tip** 101:23

**title** 148:5

**today** 9:23 10:2,6,14
13:18 20:23 21:6,10
31:12 89:17 93:18
103:8 155:13

**today's** 10:9,22 11:2
12:21 13:3,11,21

**told** 67:10 114:1
115:14

**tomorrow** 74:21
124:3

**tongue** 101:23

**top** 22:8 74:15

**topic** 32:19,22 41:24

**topics** 33:19 144:8

**total** 142:17

**total-ish** 154:17

**townhome** 155:3

**townhomes** 155:2

**training** 16:21,24

**transaction** 89:2

**transcribed** 8:11

**transcribing** 8:2

**transcript** 8:6

**transfer** 88:18 89:15
90:5

**transferred** 89:12

**transparency** 80:2

**transparent** 80:7
83:17

**treat** 78:14

**tree** 100:3,6

**trees** 100:12

**trendy** 132:24

**trick** 78:3,14

**tricky** 23:17

**true** 106:16 156:9

**Trustees** 15:21

**truth** 10:9

**Tucker** 129:22 130:1, 4,6,10,17,21 131:7

**Tuesday** 112:22 113:1,2 116:14

**turn** 60:3 71:2 82:23

**turned** 103:6

**two-hour** 83:4

**type** 31:6,10 56:5

**types** 19:4 69:10 101:17 127:1 134:5 135:13 139:24

**typically** 84:24 111:11 154:19

**U**

**Uh-huh** 7:15,21 27:14 46:24 60:24 132:7 154:11

**uh-huhs** 8:4

**ultimately** 63:7 102:20

**UMCH** 20:16,21 21:4,7 23:5,16 24:6 27:2,4 28:17,19 29:9 30:6,12 32:16,19,21 34:2,20 35:8 58:24 61:12,23 62:7,18 63:2,11 65:16 66:7 67:9 68:18 69:1, 6,20 70:24 71:8 72:23 74:22 79:10,14 80:16 81:12 82:9,15 88:17 94:22 95:1 102:8 109:14 151:6

**unclear** 89:17

**undefined** 126:15,16 129:4 130:19

**undergo** 101:16

**understand** 8:14 10:2,10 13:11 21:2,4 23:24 24:9 25:10 27:5 28:15 36:4 40:14 50:8 53:24 55:21 59:18 64:22 65:7 66:15 67:14,16 73:4 84:15 86:19 96:14 101:10 106:5 109:3 117:20 123:11 144:6,18

151:21

**understanding** 18:12 23:13,14 24:2,4,22,24 26:14 30:5,16 31:10 33:1 45:4 50:11 95:4, 24 96:2 99:4 108:6,9 109:2,7,19 125:20 130:9 146:5

**understood** 8:13,21 146:9

**unethical** 89:2,5,8,10, 14,20 90:9,13

**unit** 17:12 18:10,17 19:16 143:13 149:7,8 150:6

**units** 150:3,9,19 151:15,17 154:17,20 155:7,22

**update** 74:24

**urgency** 75:2 96:3

**V**

**vacuum** 126:2 141:6, 7

**Vaguely** 34:3

**variation** 25:10

**variety** 65:4,10 101:16 127:1,14 137:5

**verbal** 49:6

**verbatim** 110:16

**vernacular** 23:23

**version** 15:22 92:24 120:7,13

**versions** 92:22

**versus** 6:23

**video** 83:5

**videos** 117:12

**Village** 58:22 59:3 105:8,9

**virtue** 120:10

**vision** 24:1,3 25:1,9, 10 102:23 103:6,15,19 104:5

**visioning** 101:24 102:12,15,17,18,20,22 103:2,9 104:11

**vote** 41:3 54:10,13 55:1,7,9,12 56:10,20, 24 57:1,21 58:12 66:10 106:6,18 108:5 118:7 129:17 142:22 145:21

**voted** 57:16 58:8 105:19 106:11,13 108:2 110:9 123:4 131:14 133:19 142:5 152:13,17,18

**voting** 55:20 108:4 142:12 144:14

**W**

**wait** 9:1,3

**wanted** 30:22 55:7,9, 11 61:10 77:8,10,14 79:4 80:3 105:13 114:3

**wanting** 28:15

**WARD** 29:24 30:3,6 31:9,20 32:12,14,22 33:10 34:7,14 35:7 36:9 37:5,15,18 45:14 145:17,22 146:6,8,13

**WARD's** 36:21 37:7 144:24 145:3,9

**watch** 46:13 47:1 117:15

**weather** 114:14,15

**website** 26:2,5,7,9 89:23

**websites** 132:21

**WEC** 61:3,7

**week** 41:1,4 45:8 46:20 103:24

**weekend** 113:7

**weeks** 10:20

**West** 152:15

**When's** 40:23 71:18 92:9

**white** 68:11 110:18

**widen** 134:7

**Wilson** 152:16,22

**winter** 106:2

**wisdom** 24:18

**word** 70:4 92:17 106:10 118:11 121:4 137:3 153:11,13

**worded** 94:9

**wording** 110:17 116:9 128:3 131:11 133:12, 23 140:23 142:15

**words** 24:10 42:11 49:23 50:10 52:17 57:19 77:1 93:21 95:20 125:6,10,12 135:15 140:19

**work** 18:12 36:22,23 51:21 52:4 53:11,18 68:2 103:4

**worked** 29:13 144:20

**works** 80:18

**world** 65:6,8 137:24

**worst** 78:13

**Worthington** 15:9 16:3 18:1,9 21:24 23:2,15 29:18 58:24 59:5,7 61:1 88:12 89:13,17,24 90:15 95:8 104:16,22 105:11 109:12 149:2 150:18

**Worthington's** 150:6

**wrap** 124:1

**write** 43:20 147:1

**writes** 146:24

**writing** 12:16 40:2 153:8

**written** 39:24 53:21, 24 121:19 147:5,8

**wrote** 34:19 86:7 88:15,24 148:9 151:7

**www. dougsmithohio.com** 146:22

**Y**

**year** 27:11,17,22
  35:18 57:13 103:1
  104:3 106:3 145:12,13
  152:16

**year's** 145:14

**years** 11:9 16:7 32:15
  103:10 143:11

**yeses** 8:8

**youth** 65:6

**Z**

**zone** 149:3,4,7

**zoned** 150:19

**zoning** 16:22 17:3,7,
  12,14,21,23,24 18:2,9,
  17 19:3,6,16 42:12
  50:4 52:1 53:15 98:21
  99:2 149:13 150:4,6



EXHIBIT

7

tabbies

RESOLUTION NO. 04-2022

Adopting an Amendment to the Comprehensive Plan
Update and 2005 Strategic Plan, and the 2014 Amendment
(Resolution No. 39-2014), for the United Methodist
Children's Home Focus Area for the City of Worthington.

WHEREAS, City Council wishes to amend the Comprehensive Plan Update and
2005 Strategic Plan, including the 2014 Amendment (Resolution No. 39-2014), as it
pertains to the United Methodist Children's Home Focus Area, in order to guide future
use and development of the site and to encourage the social vibrancy and economic
health of the City; and,

WHEREAS, City Council has, since the last Comprehensive Plan Update related
to the United Methodist Children's Home Focus Area (Resolution No. 39-2014), received
on multiple occasions and through many mediums communications from members of the
public and public interest groups on the subject of UMCH development, which, in light of
the City's prior planning, has provided the insights and understandings needed to produce
a well-grounded and high quality revision to the Plan; and,

WHEREAS, City Council wishes to utilize the Comprehensive Plan as an
important source for guiding the development, wise growth, and long-term investments in
the community.

NOW, THEREFORE, BE IT RESOLVED by the Council of the Municipality of
Worthington, County of Franklin, State of Ohio:

SECTION 1. That the attached amendment to the Comprehensive Plan Update
and 2005 Strategic Plan, including the 2014 Amendment (Resolution No. 39-2014), as it
pertains to the United Methodist Children's Home Focus Area, be adopted to serve as a
guide for future use and development of the site.

SECTION 2. That the Clerk of Council be and hereby is instructed to record this
Resolution in the appropriate record book.

Adopted January 18, 2022


/s/ David Robinson
President of Council

Attest

/s/ D. Kay Thress
Clerk of Council

**United Methodist Children's Home Focus Area**

This section of the Worthington Comprehensive Plan was updated in 2022 for the United Methodist Children's Home Focus Area. This section, following a short Background introduction, is stated in terms of guiding principles and general components for future development of the site. This text reflects, following the 2014 update, a current understanding of public opinion, market conditions, and evolving societal and environmental values.

*Background*

The United Methodist Children's Home Focus Area, given the size and location of this undeveloped land, represents a unique opportunity for the City and residents of Worthington to enhance social vibrancy and economic prosperity in a sustainable manner. The site is located north of Old Worthington, and south of the High North and Worthington Gateway projects, along the High Street Corridor. This land, located between these historic and economic focal points, and directly across the street from City Hall, may serve as a centerpoint for City planning.

The goal of this update, as with the other content of this Plan, is to provide guidance regarding the range of desired land uses and development options, respectful of property valuation within current zoning, and to assist the City with its review and evaluation of any proposal. This Plan will guide and facilitate any future development process for this site in a manner that conforms with the well-being of the general public as well as the rightful interests of the property owners.

*Guiding Principles*

- It is important that the development of the property be considered and executed holistically, as an integrated whole.
- Because of its size and central location, this undeveloped land represents a singular opportunity for the City of Worthington to develop the property in a manner that is extraordinary and that serves the long-term interests of the community. As an historic community, it is natural and appropriate for the City and its residents to think in this way.
- It is essential that any development of the site be harmonious and compatible with the fabric of surrounding neighborhoods and the natural environment. This pertains to traffic patterns, environmental impact, scale and density of any residential housing, impact on schools, and the architectural and aesthetic provisions inherent for any property, as are these parcels, located within the Architectural Review District. Stated positively, outcomes should increase community well-being and vibrancy, opportunities for social activities for persons of all ages, bicycle and pedestrian connectivity, commercial opportunities, and housing, appropriate in scale and type, that support these goals.
- We seek an outcome on this land that is distinctive, exceptional, and expressive of Worthington's own values and community ethos.

Worthington 057429

*General Components*

- Compatible with current S-1 zoning, a large contiguous greenspace, central to the property and inclusive of the Tucker Creek acreage, is a highly desirable component of any outcome.

- Commercial development, aimed at revenue generation for the City and select service-oriented retail that is compatible with the development, is highly desirable along High St., roughly in conformity with the existing C-2 and C-3 zoned areas.

- Residential housing, though requiring rezoning, is desirable, if:
  1. It is creatively executed, and,
  2. whether embedded within the commercial areas or free-standing, is harmonious in overall mass and scale, form, and impact upon surrounding neighborhoods.

Worthington 057430



# City Council Agenda

Minutes

**Monday, December 13, 2021 at 7:30 pm**

## 6550 N. High Street, Worthington, Ohio 43085

## Virtual Meeting Information

1. **Call to Order**

   **Minutes:**

   Worthington City Council met remotely in Regular Session on Monday, December 13, 2021, via Microsoft Teams videoconference. President Michael called the meeting to order at or about 7:30 p.m.

2. **Roll Call**

   **Minutes:**

   **Members Present:** Peter Bucher, Rachael Dorothy, Beth Kowalczyk, Scott Myers, David Robinson, Doug Smith and Bonnie Michael

   **Member(s) Absent:** None

   **Also Present:** City Manager Matt Greeson, Assistant City Manager Robyn Stewart, Assistant City Manager Economic Development Director David McCorkle, Law Director Tom Lindsey, Director of Finance Scott Bartter, Director of Service & Engineering Dan Whited, Director of Planning & Building Lee Brown, Director of Parks & Recreation Darren Hurley, Chief of Police Robert Ware, Chief of Fire & EMS Mark Zambito, Management Assistant Ethan Barnhardt, Clerk of Council D. Kay Thress

3. **Pledge of Allegiance**

   **Minutes:**

   President Michael invited all to stand and join in reciting the Pledge of Allegiance to the flag.

4. **Visitor Comments**

   **Minutes:**

   There were no visitor comments.

## Approval of the Minutes

5. **Approval of Minutes - November 8, 2021**



**Minutes:**

**MOTION:** Mr. Bucher moved, Ms. Kowalczyk seconded a motion to approve the November 8, 2021 minutes as presented.

**The motion carried unanimously by a voice vote**

# Public Hearings on Legislation

6. **Ordinance No. 58-2021 Former United Methodist Children's Home Rezoning Application**

   To Amend the Official Zoning Map of the City of Worthington, Ohio, to Change Zoning of Certain Land from R-10 (Low Density Residential), S-1 (Special), C-2 (Community Shopping Center) and C-3 (Institutions & Office) to PUD, Planned Use District at 1033 N. High St., 47 Larrimer Ave. and 57 Larrimer Ave. (100-006774, 100-002427 & 100-002425).

   **Minutes:**

   Mr. Brown overviewed that the request here is to rezone approximately 37.8 acres at 1033 North High Street from our R-10 Low-Density Residential district, our S-1 Special District, our C-2 Community Shopping Center District, and our C-3 Institutions and Offices to a Planned Unit Development (PUD) for the United Methodist Children's Home Site (UMCH). As with any rezoning request, the steps include the application going before the Municipal Planning Commission (MPC) and then to the City Council. The MPC makes a recommendation to the City Council, but Council has the ability to approve, approve with modifications, or deny an application. This request is to rezone to allow for up to 600 residential units consisting of 22 single-family homes, 86 townhomes, 72 townhomes/flats, and 420 apartments along the High Street Frontage. It would also include a little over 24,000 square feet of commercial/retail, 96,000 square feet of medical office, and a 6.4-acre dedication along Tucker Creek along with the various open spaces on the lot. As a background, the application was made in October 2021 and went before the MPC/ARB in January 2021 where it was tabled. It came back with revised materials in September 2021 and went before the MPC in October. The MPC did unanimously deny the application due to the overall density of the site, the housing types provided, contiguous open space, heights of buildings, and connection points. Staff also recommended denial for similar reasons in addition to not meeting the recommendations of the Comprehensive Plan Strategic Update, the Bicycle and Pedestrian Plan, and the Parks Master Plan.

   Mr. Bo Brownless on behalf of the applicant discussed the background of the application and how Lifestyle Communities now owns the property. They intend to develop the site in a way that is consistent with the City's Comprehensive Plan and that can be viable under evolving market conditions. The mutual goals with the City should be to create a vibrant, live, work, entertainment, mixed-use development, offering housing diversity, as well as updated commercial, restaurant, and service use at the City, moving the City forward economically with a viable development that will stand the test of time. The rezoning here was specifically designed to be consistent with the Comprehensive Plan, with an emphasis on density in the High Street mixed-use zone. The Comprehensive Plan states that the objective of this zone is to create a

high-quality, dense, walkable, connected, mixed-use development that creates a dynamic space and signature address to attract Class-A offices along High Street. Buildings in this zone should be a minimum of two stories and a maximum of five stories. To achieve the desired densities, parking decks are encouraged to be integrated in the site. It is clear that the Comprehensive Plan is calling for density and height, and density is a key driver of a vibrant and successful mixed-use development.

The level of density LC is proposing here is not unusual and comparable to other successful infills, redevelopment, and mixed-use projects that are also led by residential components. The revised development plan introduced made many improvements and noted that the applicants listened to comments made during community outreach and from City Staff. This revised plan is less dense overall, reducing apartments by 19%, adding more office and commercial space, approving open space and path connections, improving access to existing neighborhoods, and activating the Tucker Creek Preserve for public use. They moved the height from Longfellow and Larrimer and towards High Street and the revised plan has nearly 25% open space, opening the site to be integrated with existing neighborhoods. As for the process, they filed a complete rezoning application consistent with the Comp Plan and had limited access or input from the City outside from their staff reports. The City leaders told them that they were unable or unwilling to meet the applicant outside the context of public MPC hearings in order to work through the development and site plan issues. Subsequently, the applicant has been left guessing about what type of plan would get MPC and Council support. The City agreed in order to move forward, the applicant could submit a revised site plan without fully amending the rezoning application in order to determine if the applicant was on the right path. The applicant then voluntarily made changes to reduce residential density and increase office space. When the applicant presented this new plan to the MPC to gather constructive feedback, the MPC refused to table the applicant and simply rejected the original applicant and moved it to City Council for approval or rejection. In their experience, it is unprecedented for any jurisdiction to refuse to work with an applicant on rezoning involving a PUD. The applicant wants the City and residents to know that LC remains committed to a path forward that satisfies mutual goals. In conclusion, three requests are being made to City Council this evening: 1) Refer the application back to the MPC with instructions they should provide a genuine and collaborative effort with respect to the development proposal 2) Empower the City staff to communicate and work directly on the development plan and serve as a liaison to the MPC and Council 3) They be afforded the opportunity to amend their initial rezoning application with a revised site plan as was initially discussed with staff, and be afforded a full hearing at the MPC to work through that revised application.

Mr. Tom Hart explained how we got here and how a greater detailed discussion with City Staff and leadership is required. Through this process, they were told that MPC is the only option to move forward. They had no other entry point for a key discussion on this proposal, but they did expect full and fair deliberations with multiple hearings.

Instead of those full hearings, after one hearing the MPC made their negative recommendation and they did not amend the application to include the updated plan. MPC's actions do not meet the standards for full, fair, and meaningful hearings on this application. What has occurred to date falls short of any applicant's right to full, fair, and meaningful public hearings on the record and in the context of a PUD request with all issues on the table and fully deliberated. It serves no clear purpose to recommend a negative vote when LC was actively attempting and is still willing to work towards a positive outcome. Over the course of his career, he has not seen any other significant redevelopment site in Central Ohio be handled this way. The MPC did not provide the opportunity for the give and take that would be necessary to refine the proposal and take into account all the input from residents and City leaders. The staff report identifies remaining issues and also identifies several improvements from the revised plan that was submitted. The handling and outcome of this application seem predetermined and the City appears to have treated this proposal differently than other similarly situated applicants. In terms of the next steps, this applicant has presented a complete application that meets the Comprehensive Plan and has reasonably requested to amend their site plan. They are asking for greater deliberation and negotiation, along with the opportunity to reach compromises. They would also like to have meaningful and detailed meetings with the professional City Staff on a variety of issues such as economic development, traffic, and incentives for public improvements. This applicant wants to work with the City and its professional staff to move this site forward and make it work in the real world.

Mr. Chet Ridenour expressed that the current LC proposal for the UMCH site is a bad proposal in many ways and bad for the City of Worthington and should be rejected. The housing density is too high for that site and the building heights are too tall. This proposal is not consistent with the center of Worthington. Our City is supposedly modeled after a small New England town, and he asked how many New England towns have multi-story high-rise apartment buildings in the center of town. We do not need it here. The current plan is very similar to all of the past iterations, with only small tweaks along the way, and LC just does not get it. How many times do people have to say to LC to decrease the density and amount of apartments. At the last MPC meeting, Mr. Hart stated that LC decreased the amount of aggregate green space when residents have been saying it should be increased. He reminded Council that in the last election, four of the candidates were supported by the WARD group and supported the WARD position for development on the UMCH property. Of the four candidates, they received 68% of the votes cast for City Council with Mr. Robinson and Ms. Brewer being the top two vote-getters. That should tell you something about what the people of Worthington want. Lastly, he would like to remind Council that they are here to represent the people of Worthington, not LC, and he asked that Council reject this plan for the UMCH site.

Mr. John Byrnes of 161 Tucker Drive commented how he agrees with the MPC's unanimous decision to deny the LC proposal and he urges Council to listen to staff's reasons for denial as well. These were all well-considered decisions over a significant

amount of time with resident input, as well as plenty of input from LC. There have been plenty of opportunities for LC to listen to the residents to create a new plan. He underscored how there is no need to change the current zoning plan for the property to achieve the City's goal of increased tax revenues. The current zoning would permit commercial development along High Street with public green space, or less dense residential development. The commercial development to generate tax revenues could be obtained without any change in the current zoning. The problem is that LC is an apartment developer and they want to put in their apartments first. In one of the focus groups he attended with LC's Tom Hart, he expressed doubts that there was actually sufficient market demand in Worthington for the amount of Class-A office space the City wants to have. He thinks that once LC builds their apartment complex, they will sell the property along High Street and some other company will have to take the risk to see if there is commercial demand there. In terms of the balance of the property, the best outcome would keep with the quiet residential neighborhoods that have been nearby for over 60-years. You go into the neighborhoods, not to destroy what property owners bought into when they entered into these neighborhoods, that is normal residential streets without being converted into thoroughfares for cars that come from the 600 new residents with a density of 49 units per acre. All streets in Worthington Estates and Worthington would be choked off and routed north to Wilson Bridge Road. This will have a huge impact on the current residents and their property values. It is telling that in the many years LC has been developing this plan, they have not conducted a legitimate, up-to-date traffic impact study. They are not being sincere when they have sought out community input. There are questions about whether or not the City's current master plan needs to be updated to reflect current realities. The illustrations put forth by LC with al-fresco dining and wine shops, do not take into consideration that the Worthington Inn has been vacant for almost two years. La Chatelaine does not open for dinner. There are already destination restaurants on High Street. He asked where the entrepreneurs are going to come from for these new restaurants and businesses. Our Economic Development team should work to fill in the holes we have already before paving over this gem of greenspace and leaving us with more vacancies. He remembers The Continent when it was new and gleaming, with all the premium amenities. Maybe LC should look to redevelop the Continent, rather than in downtown Worthington. We only have five square miles here, and this is a significant piece of downtown Worthington.

Ms. Beth Mitchell of 58 Larrimer Avenue shared how she is speaking tonight on behalf of WARD, the Worthington Alliance for Responsible Development. They want to go on record with the document they submitted and she will read it into the record tonight,

*To City Council Members:*

*At the Council Meeting, Monday, December 13, 2021, Lifestyle Communities (LC) will be asking Council for a rezoning of much of the UMCH property so they can proceed with their latest development proposal.*

*MPC and ARB Board members unanimously denied the LC proposal at their meeting*

*October 14, 2021. The MPC members stated:*

*• LC has not been listening to the city or residents. Over 450 emails were received-most not supporting the LC proposal. In addition, many residents spoke against the proposal. • Proposed development is too dense for this location in the Architectural Review District. • Does not have the look and feel of a New England village as called for in architectural review guidelines. • Proposed buildings are too tall for this location. • Does not provide significant contiguous greenspace. • Does not provide acceptable connectivity to neighborhoods with responsible traffic flow. WARD also notes: • Residents have stated multiple times the need for affordable housing and empty nester residences, neither of which are provided in this proposal. • Why would Council set aside the unanimous MPC and staff recommendations to reject the LC proposal, particularly considering the telling feedback received from residents? • Some who spoke in favor of the LC proposal at the MPC meeting, do not live within the City district (43085). Is it appropriate for non-residents to speak at our Worthington meetings? WARD supports the denial by MPC/ARB and requests that Council also deny rezoning of the Lifestyle Communities proposal.*

*WARD continues to recognize the UMCH property as centrally located and a legacy space with the potential to become a prime community asset."*

*Respectfully submitted by the WARD Planning Group*

Mr. Blair Davis commented that the argument commented by LC tonight is that the City has not treated them fairly. The reality, the MPC told them what we wanted in very specific terms, and three times they came back and ignored it. The people who are being unfair are LC towards the City.

Mr. Michael Sharvin and Ms. Amber Evans of 360 Tucker Drive expressed how they appreciate the comments from the residents and as a community we have come together in opposition to this project. Mr. Sharvin said that he has seen little to no reason to rezone any hardship that LC has brought or is asking for community input or work with the MPC. As Mr. Davis said, it seems like they are complaining they have not had enough communication, but he still sees zero reasons to rezone to allow the type of use being proposed. If they would like to use this property the way it is currently zoned, maybe he would be upset about that but would be in their power to do. LC is looking to rezone for its own economic purposes and they have always known what they are getting into with this property. They agree with the unanimous MPC decision to recommend denial of this rezoning.

Ms. Eleana Drakatos of 305 Bryant Avenue explained how she and her family are recent new residents of Worthington, moving in about three months ago. They moved here because of the uniqueness of the neighborhood. She offered that Council stated that Worthington is similarly situated with other communities where Worthington has had other developments, however, she would pose that it is not. The square mileage of Worthington itself is much smaller than somewhere like Upper Arlington. There would also be congestion and pollution generated with such a densely populated area and there is the potential for accidents and there would be difficulty in enforcing the speed limits near Evening Street.

Ms. Susie Kneedler stated that this plan would take away our location, changing life forever. We would never be able to have the Gary Smith Run. Worthington really needs a central park and we are park starved according to data that was put together comparing us to other communities. She added that with the Comprehensive Plan, everyone she met said that they were upset with the outcome by Chris Hermann and MKSK, and it did not represent what was asked for. Everyone really wanted to keep that beautiful land for some sort of park.

Mr. Joe Sherman conveyed how LC detailed how they own this property and plan to develop it, to satisfy a mutual need and would make it work in the real world. If we are going to make this happen, LC should respond and respect our needs as a City and not propose another self-serving development with so many residences and height of buildings. The long-term financial consequences of a high-density residential development will not be an economic boon to our City. LC has largely ignored that our City needs to generate income tax revenue from a multi-use development on the UMCH property. The UMCH site should serve the long-term interests of the residents, not the short-term interests of a developer. LC's business model is inflexible and incompatible with Worthington's needs and values, ignoring what the residents want and expect. LC only sees Worthington as a place to bulldoze both literally and figuratively your development into place. He joins those raising their voices in opposition, not out of fear of change, but out of simple common sense. He urges the Council to vote no.

Ms. Thress noted that all emails that came in before 4:20 pm today have been posted on the City's website. There have been about 12 emails since that time.

Mr. Smith asked the applicant for a better understanding of the comment of how the staff has not been communicating with them. He wondered if the staff has not been cooperating since 2011. Mr. Hart responded that after their initial presentation in January of this year, they asked for more detailed discussions with the professional folks in the City to go over things such as traffic, stormwater, how to program open space, connectivity, and architecture. These are things that you have to get to in order to reach a successful land-use plan and need some internal dialogue before going to the MPC. All these processes are open in the light of day because that is how zoning occurs. There is no infill site in any other community in Central Ohio that is not afforded that detailed discussion with the professional staff and City leadership. Mr. Smith clarified to be clear that prior to 2021, LC did not communicate or coordinate with City staff. Mr. Hart said that it is inaccurate to say that in total, Mr. Brown and the planning staff are always available to clarify code and procedure, but the difficult decision making is a collection of leadership and staff at all levels. Mr. Brown does a very good job representing the City as a professional. Mr. Smith asked about the relationship between LC and the City beginning in 2021. Mr. Hart said they filed their initial application in October of 2020. If you want to talk about 2015, he is ready to talk about that but is not relevant to today's climate. Mr. Brown helped in the months leading up to that application, but previously there was no formal application adjudicated or heard in the public hearing process in 2015, that was just an informal

public meeting.

President Michael explained how she remembers meeting with LC over ten years ago and they were talking about their plans, and she took out a City map and highlighter, stating what neighborhoods and people they needed to talk to get input. To this date, nobody has used that map or suggestion. LC has not really reached out to the community about what they feel. She wrote a letter to the editor six years ago about this property and has had several meetings with LC, to bring LC and the community closer together, but she feels like LC has not listened. Mr. Hart responded that they have conducted significant outreach, and what is being cited are examples before they submitted an application. When the application is actually filed, that is when there is greater detail on things like traffic and stormwater are done. He said that they are good listeners and there were about 100 people who commented on the application through virtual meetings and outreach, meeting with WARD, school district leaders, and business leaders. He does a lot of meetings, but there is a point where you getting yelled at and are just a venue for someone to vent their anger on you, and telling you a client should just socialize their site and turn it into a public space, there is a point where that is not productive anymore. There is a time when they want the process that can only come with MPC and Council consideration.

Mr. Robinson asked if Mr. Hart was at the 2015 public meeting. Mr. Hart said he was not, however, he does not believe it is relevant to today. Mr. Robinson asked what was heard from the community at that time and how was that expressed if at all in the October 2020 proposal. Mr. Hart explained that in 2015 they had a different amount of land under contract at that time with more acreage and High Street frontage, so the flexibility then compared to now is different, and more limited. We have been through an incredible change in office and medical uses, which are key things that the City has emphasized and they are trying to get there. The applicant wants to deliver on the tax base uses of office, commercial, and medical that are in the City comprehensive plan, but they think there is a different way to get there. Many people expect to work from home or close to home, which is part of their strategy. Mr. Robinson clarified that his question was focused on how you understand what the message was from the community in 2015 and how that translated, if at all, to the 2020 proposal. Mr. Hart explained that it is not an easy answer and relates to how things have changed since 2015. The housing market is what is dominant today and monetize this site to make the office and commercial be supported economically. That is the emphasis that is showing up all over Central Ohio in these mixed-use, infill sites that create work, live, play, entertainment vibrancy. You need the housing component because it will fund it. The comments LC is hearing from the residents about the plans are almost the same and almost breaks down into that a lot of people think they can control other people's property and want a public space there. A public park is not what is in the City's comprehensive plan and they would not be meeting the comprehensive plan. In the new plan, they have opened up the site to and from High Street, and in the north with a gateway green and a bumper space to the northern neighborhood, and to the south with two entries, one at Wesley and another

through Tucker. He cited that as a way they have listened, but it cannot be a public park and that is contrary to the comprehensive plan. Trying to socialize the site like this and making it into a public park that somebody else owns and has property rights and developer rights with, is also contrary to law. He is struggling with the harkening back to 2015 because it's not like there was a lot of support for any development on this site, and they are trying to move past 2015, and the City needs to do that as well.

Mr. Myers expressed his disappointment, he thought that he had explained where he was coming from, and he thought there was progress being made. When it is said that the 2015 situation is not relevant, he explained the relevance of 2015 and how it directly ties to the decision he made in March of 2021. He first met with LC in the spring of 2015 and was presented with a plan that he said he could support because he is committed to new urbanism and mixed-use, and this is the right property for the right mixed-use development. Then July of 2015 hits and the rug was pulled out from under him because there was a completely different plan presented then than was earlier that year and he felt like he had been taken. It wasn't about the development, the issue was trust and regaining that trust. 2015 is highly relevant to this community and him personally. Then we got a plan that is even denser. In March of 2021, he totally lost faith though he has tried so many times personally, and he went to staff and said that this is going to need to be done in the open. It is interesting how it is brought up how LC has heard meetings where citizens vent their anger, but that does not compare to what he has heard over the past seven years on this issue and in two campaigns he went through. That is why this had to be done in the public. He got the impression at the end of the MPC meeting, the majority of the MPC members thought that LC would withdraw the application and start from ground zero to restart the process. Tonight he has not heard a lot about the plan, but rather how LC is being unfairly treated.

Mr. Smith asked what is the current rental rate per month for a two-bedroom unit in a property similar to a demographic like Worthington. Mr. Hart replied that it is about $1700.

Ms. Dorothy emphasized that she still believes in the comprehensive plan and that Worthington is part of the Central Ohio area that is growing and it is a good problem to have. We have a little over 14,800 people here and we had our peak in 1970 with around 15,300 people. We have added more housing units but the family size for each of these units has decreased and we need more units. We have about the same amount of people in our 5.5 square miles as the City of Bexley which is 2.5 square miles, they have double the density but it is a very walkable community. Worthington was founded on a mixed-use development at the human scale and anything more than 4-5 stories become more than the human scale. We were founded as a New England town, but James Kilbourne also wanted Worthington to be the capital of Ohio and to grow with more opportunities for more people. The space at UMCH has been developed, it was forest space and there have been buildings on the site. There are sewer and water lines underneath the site, but it is not a pristine site and a perfect

green space. It is a space that should be mixed-use with opportunities for people in Worthington, including people who want to move here. Property values have been increasing and it is a very desirable place to be. People need a place to live, and they will tear down green space outside of Worthington to build. We need to provide some new spaces for people in live in Worthington and let them be a part of this vibrant community. There have been many twists and turns in this development saga for UMCH, and she would like the MPC to go back and work with LC, but there are a lot of things we need to think of other than just keeping things the way that they are. The question is if we are afraid of people or cars if we have mixed-use spaces that are walkable, we should not be nearly as afraid of cars as people seem to be. Every time we talk about more people, we talk about being afraid of cars. What if we created opportunities where we did not have to get in a car to get somewhere.

Mr. Smith explained how Council has heard a lot of feedback from residents and received close to 100 or more individual comments not supporting this proposal. LC has done a lot of outreach and he wondered if there are 100 or more resident comments supporting their proposal. Mr. Hart replied that they do not, but the City has nearly 15,000 residents. They are aware of the email campaign and input, but also know there are people who also want a more vibrant future for the community with diverse housing options, entertainment, retail, and employment opportunities. To let this site remain as is, they know there are many people who do not support that. Mr. Smith asked out of the City's residents if LC has ten letters of support. Mr. Hart replied that they do. Mr. Smith asked if those could be produced. Mr. Hart replied that he could do so.

President Michael brought up the importance of economic development and the potential for medical. She is concerned about the Ohio Health project, which was ready to be the economic cornerstone for this property, and then all of a sudden it disappeared. There were many supportive people of them being on that corner. She wondered what happened. Mr. Hart said he does not know the exact workings of their decision-making at that time, but since then, investment by healthcare organizations has been very difficult. However, residential is in demand and will drive this site. President Michael asked what was being offered that is not an apartment, for people who want to downsize and stay in the community. She has heard how people want to be able to downsize to age-friendly housing and have it not be an apartment. Mr. Hart explained how they are offering two townhome products in the middle of the site, away from High Street, some of those would be flats with first-floor living. Some of the homes would also be empty-nester housing. President Michael asked how many owner-occupied townhouse units are included in this plan. Mr. Hart responded that there are 86 owner-occupied and there are 72 townhomes with walk-ups and flats. The townhomes that are for sale, are not single-story and are walk-ups. President Michael explained how people want single-floor living space and she wrote that six years ago in a letter to the editor. That is where she feels flustered because it does not seem like it has made it into the plan. Mr. Hart explained how with ranch housing in a single-story, they take up a large footprint on the earth. The balance on this plan

is about having more open space and there is 25% open space on the plan amended to MPC. The more single-floor ranches take up more space.

Mr. Bucher explained how some of the community engagement has been outlined and he asked about the process from LC on how community input has been considered and deliberate. We are clearly not seeing some of the things that are being raised. What is stopping LC from putting forward something less dense and accomplishing other goals. Mr. Hart replied that the portions of the staff report document the positive changes that have been made. That report when it gets into the analysis of the different subareas and changes made cites multiple improvements from the site plan between 2020 and 2021. There is good documentation in the staff report about the improvement, relating to more office square footage, a decrease of apartments, opening up the site with connection paths, and greenspace treatment. Zoning works by trying to balance property owner rights with community needs, there is no shot clock or sudden death, and requires a lot of work and give and take. While they are ready to make more improvements, to say they have not moved is not accurate.

Ms. Kowalczyk asked Council, respecting everything that has been said and understanding the history, what we are considering in terms of process. The applicant has asked for a particular outcome tonight about referring back to the MPC. She wondered what is the impact of that versus a denial and what should be the appropriate consideration regarding that process. President Michael replied that there are three options, we can approve, deny, or refer back to the MPC. If there is a referral back, there needs to be input to the MPC on why it was referred back and what Council is expecting them to be looking at. If there is a denial, there is a period of time that must pass before LC can submit a new plan. Mr. Smith asked of those three options that it is each member's prerogative to vote as they see necessary. Mr. Lindsey replied that like any legislative matter, Council as individuals vote on the matter before them. In this instance, the question of which of those three options to approve, deny or refer, those would require some discussion amongst Council leading to a motion to refer back, or to an up or down vote on what has been presented. Due to LC's desire to submit it as a conceptual plan, the staff report calls out the density and height and other considerations that do exist in the plan as submitted. If you were to approve it, it would be based upon those factors. When it goes to a final plan, that is when you would need significant additional information provided by the applicant including the PUD text, with more specific standards. Mr. Robinson asked for clarification that if the proposal is denied tonight, LC would be free to resubmit a proposal at the six-month mark from the MPC, in mid-April. Mr. Lindsey replied that is correct. Mr. Robinson brought up how each Councilmember would be free to vote yea or nay, and asked if a motion is made, would that be for approval or denial, or as opposed to yes or not on the proposal in general. Mr. Lindsey explained that if Councilmembers in discussion prior to voting were to be interested in the referring back, that is where it would be a motion because you would not be voting on the specific ordinance before you. President Michael explained how we have an ordinance in place and Council always votes in a positive mode, so the vote would be for

approval for the ordinance as submitted, yes or no, or someone could file a motion to amend the ordinance to do something other than vote yes or no.

Mr. Myers shared he is of the opinion that the best course of action is to affirm the denial so we can have a clean start. The parties can either walk away and explore other options, or LC can come back and resubmit their application in April starting the process over again. It would be easier to start fresh rather than trying to put a round peg in a square hole.

**MOTION:** Ms. Dorothy moved to send Ordinance No. 58-2021 back to the MPC. There was no second.

**The motion failed**

**There being no additional comments, the clerk called the roll on Ordinance No. 58-2021. Passage of the Ordinance failed by the following vote:**

**Vote Results:** Ayes: 0 / Nays: 7

## 7. Ordinance No. 60-2021 Appropriation for New and Replacement Equipment and Various Projects

Amending Ordinance No. 53-2021 (As Amended) to Adjust the Annual Budget by Providing for Appropriations from the Capital Improvements Fund Unappropriated Balance to Pay the Cost of the 2022 New and Replacement Equipment Items and for Certain Projects as Identified in the 2022 Five-Year Capital Improvements Program and all Related Expenses and Determining to Proceed with said Projects.

**Minutes:**

Mr. Greeson explained how last week, Council approved the five-year CIP. In the first year of that plan, there were equipment and amounts listed here in this ordinance. It is customary for Council to appropriate funds to implement the new and replacement equipment in the plan. Staff recommends approval.

**There being no additional comments, the clerk called the roll of Ordinance No. 60-2021. The motion carried by the following vote:**

**Vote Results:** Ayes: 7 / Nays: 0

## 8. Ordinance No. 61-2021 Community Reinvestment Area Amendment

An Ordinance Authorizing the City Manager to Enter into an Amended Community Reinvestment Area Agreement with Worthington 17, LLC, an Ohio Limited Liability Company, to Change the Starting Year of the Existing Abatement Period from Tax Year 2021 to Tax Year 2024.

**Minutes:**

Mr. McCorkle described how this ordinance is to amend the CRA exemption for 6700 North High Street which is the former Anthem Blue Cross/Blue Shield building. This was approved in 2019 with Ordinance 21-2019 and is a 75% ten-year tax abatement. When it was originally approved, it was anticipated renovations would occur in the building by 2020, however, that did not occur. In an effort to keep the full ten-year abatement in place as originally planned to attract prospective tenants, the staff is recommending that the exemption be amended. If approved, this would amend the start year of the CRA exemption for that property to the tax year 2024, and all other terms of the agreement will remain the same.

**There being no additional comments, the clerk called the roll of Ordinance No. 61-2021. The motion carried by the following vote:**

**Vote Results:** Ayes: 7 / Nays: 0

# New Legislation to Be Introduced

**9. Resolution No. 67-2021 Premium Pay for Lifeguards**

Authorizing a Temporary Premium Pay Rate for Part-Time Lifeguards (Class Specification Number 209)

**Minutes:**

**Introduced by Mr. Smith**

**MOTION:** Mr. Myers moved, seconded by Ms. Dorothy to adopt Resolution 67-2021

Mr. Hurley overviewed how we are experiencing an extreme shortage of lifeguard staff, which is impacting our service levels and ability to provide our swim facilities to our residents. We have had to scale hours back significantly and defer providing services such as swim lessons, water aerobics, and birthday party rentals. This is not just a Worthington issue, it is a widescale issue in both the public and private sector. There are many things that could help other than just pay, and we are examining other incentives. In the short term, we believe the best thing is to offer up to $2 per hour increase in pay to help recruit new lifeguards.

Mr. Myers clarified that this is a temporary premium on the rate and does not change the actual payscale. His understanding was confirmed.

**The motion carried unanimously by a voice vote**

**10. Resolution No. 68-2021 Expense Reimbursement for Future Debt Issuance**

Authorizing the Use of a Portion of the Proceeds of Bonds or Bond Anticipation Notes of the City of Worthington, in the Estimated Principal Amount of Not to Exceed $2,550,000, to be Issued for the Purpose of (I) Designing, Replacing, and Constructing Waterline Improvements on Colonial and Foster Avenues; and (II) Designing, Repairing, Rehabilitating, and Replacing Sanitary Sewer System Infrastructure, to Reimburse the City's General, Permanent Improvement, or Bond Construction Fund for Moneys Previously Advanced for such Purpose.

**Minutes:**

**Introduced by Mr. Robinson**

**MOTION:** Mr. Bucher moved, seconded by Ms. Kowalczyk to adopt Resolution No. 68-2021

Mr. Greeson explained how this is a reimbursement resolution that authorizes us to spend capital improvement funds to accomplish a couple of projects and then, later on, reimburse the CIP with bond proceeds once bonds are issued.

**The motion carried unanimously by a voice vote**

**11. Resolution No. 69-2021 Transfer of Funds**

Adjusting the Annual Budget by Providing for a Transfer of Previously Appropriated Funds.

**Minutes:**

**Introduced by Mr. Robinson**

**MOTION:** Mr. Bucher moved, seconded by Ms. Kowalczyk to adopt Resolution No. 69-2021

Mr. Greeson stated that this is a standard transfer resolution for a transfer of about $6500.

**The motion carried unanimously by a voice vote**

**12. Ordinance No. 62-2021 Amend Code Chapters 1151 (Nonconforming Uses) and 1181 (Wilson Bridge Corridor)**

**Minutes:**
**Introduced by Mr. Smith**

Mr. Robinson asked for more information on what we are referring the MPC to do and the breadth of their considerations. Mr. Greeson replied that last week when we were discussing the zoning cases, specifically the two that created nonconforming uses, Council expressed a desire to send to MPC a couple of general issues. The first is to consider amending Chapter 1151 that deals with nonconforming uses to make it more flexible for some of the homeowners that may have been affected by our rezoning decision. An example of that would be increasing the percentage of annual maintenance that can be done. The second is to refer Chapter 1181 which is the actual creation of the actual Wilson Bridge Road zoning districts and whether there can be any flexibility granted in amending that section of the code. Mr. Brown explained how what was heard from Council was to look at the maintenance and repair section of the nonconforming use section and ways to lessen the impact of the single-family uses. Hopefully, over the next month, we can start working on language for the MPC to consider to get a recommendation back to Council to change the planning and zoning code.

**MOTION:** Mr. Smith moved, seconded by Mr. Myers to refer this to the Municipal Planning Commission for review and send the recommendations back to Council.
**The motion carried unanimously by a voice vote**

13. **Ordinance No. 63-2021 Approving Revised Final Plat (6700 N High St)**

Approving a Final Plat for the Subdivision, Platting of an Access Easement, and Dedication of Land Currently Used for Public Right-of-Way on a Property at 6700 N. High St. (Advanced Civil Design/Worthington 17 LLC)

**Minutes:**
**Introduced by Mr. Smith**
**Set for public hearing on December 20, 2021**

# Reports of City Officials

14. **Policy Item(s)**
    a. **Motion to Withdraw - Ordinance No. 09-2020 (Rezone 47 and 57 Larrimer Ave, and a small portion of 1033 N. High St.)**

    **Minutes:**

    Mr. Lindsey explained how it was discovered in a review of past actions of Council that has not passed final conclusion, these two ordinances had been introduced but no action was taken on them. From Robert's Rules, tabling something to a date uncertain is a means of killing things, but generally, Councils vote up or down or withdraw to truly end a piece of legislation that was introduced. The first one involved the ordinance that would have dealt with Ohio Health's proposed development. Since Ohio Health requested it be withdrawn, we are now taking the action based on their request last March. On the next ordinance, in the efforts to get the pool refinished, we went out a couple of

different times to get bids and we had an ordinance introduced where we did not get bids and that ordinance was tabled. We then after further work, went back out to move forward with bids and a new ordinance was introduced. We were able to negotiate the work and came back to Council and went with the original ordinance introduce and still had this open ordinance on the same subject matter. It does not seem appropriate to vote down the respective ordinances, and staff is asking Council to withdraw the ordinanes.

**MOTION:** Mr. Myers moved, seconded by Ms. Dorothy to withdraw Ordinance No. 09-2020

**The motion carried unanimously by a voice vote**

b. **Motion to Withdraw - Ordinance No. 06-2021 (Community Center Pool Resurfacing)**

**Minutes:**

**MOTION:** Mr. Robinson moved, seconded by Mr. Bucher to withdraw Ordinance No. 06-2021

**The motion carried unanimously by a voice vote**

c. **Financial Report - November 2021**

**Minutes:**

Mr. Bartter explained that there is nothing particularly new with this report and income tax collections remain robust.

**MOTION:** Mr. Myers moved, seconded by Ms. Kowalczyk to accept the November 2021 financial report.

**The motion carried unanimously by a voice vote**

# Reports of Council Members

15. **Reports of Council Members**

**Minutes:**

Mr. Robinson thanked his colleagues for the discussion tonight and that he took personal satisfaction by voting with Mr. Myers. It is meaningful to find himself thinking accord with him.

# Other

# Executive Session

# Adjournment

16. **Motion to Adjourn**

**Minutes:**

**MOTION:** Mr. Myers moved, Ms. Dorothy seconded a motion to adjourn. The motion

carried unanimously by a voice vote.

**President Michael declared the meeting adjourned at 9:40 p.m.**

Contact: D. Kay Thress, Clerk of Council (Kay.Thress@worthington.org (614) 436-3100) | Minutes published on 01/13/2022, adopted on 01/18/2022

/s/ Ethan C. Barnhardt
Management Assistant

Attest

/s/ David Robinson
President of Council