*LIFESTYLE COMMUNITIES*

*vs.*

*CITY OF WORTHINGTON*

---

Deposition of

**Jason Sudy**

December 19, 2023

---



614.460.5000 | www.priohio.com | pri@priohio.com

1          IN THE UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF OHIO
2                  EASTERN DIVISION

3   LIFESTYLE COMMUNITIES,      )
    LTD., ET AL.,               )
4                               )
         Plaintiffs,            )
5                               )
         vs.                    )   Case No.
6                               )   2:22-cv-1775
    CITY OF WORTHINGTON,        )
7   OHIO,                       )
                                )
8        Defendant.             )

9


10


11                    DEPOSITION

12                   of JASON SUDY

13


14              Taken at the offices of
          Vorys Sater Seymour and Pease LLP
15              52 East Gay Street
              Columbus, Ohio 43215
16


17


18       on December 19, 2023, at 1:11 p.m.

19


20       Reported by: Julia Lamb, RPR, CRR

21


22                     -=0=-

23


24

1    APPEARANCES:

2        Christopher L. Ingram
         VORYS SATER SEYMOUR AND PEASE LLP
3        52 East Gay Street
         Columbus, Ohio 43215
4        614.464.5480
         clingram@vorys.com
5
                on behalf of the Plaintiffs.
6

7        Yazan S. Ashrawi
         FROST BROWN TODD
8        One Columbus, Suite 2300
         10 West Broad Street
9        Columbus, Ohio 43215
         614.559.7202
10       yashrawi@fbtlaw.com

11              on behalf of the Defendant.

12

13

14

15

16

17

18

19                     -=0=-

20

21

22

23

24

1                    STIPULATIONS

2               It is stipulated by and between

3    counsel for the respective parties that the

4    deposition of JASON SUDY, the Witness herein,

5    called by the Defendant under the applicable

6    Rules of Federal Civil Court Procedure, may be

7    taken at this time by the stenographic court

8    reporter and notary public by agreement of

9    counsel; that said deposition may be reduced to

10   writing stenographically by the court reporter,

11   whose notes thereafter may be transcribed

12   outside the presence of the witness; and that

13   the proof of the official character and

14   qualification of the notary is waived.

15                    -=0=-

16

17

18

19

20

21

22

23

24

1          INDEX OF EXAMINATION

2                                                    PAGE

3  BY MR. ASHRAWI:                                   5

4

5

6            INDEX OF EXHIBITS

7  EXHIBIT          DESCRIPTION              PAGE

8    1     Strategic Analysis adopted      50
           9-2-14
9
     5     1033 High Street (former        76
10         UMCH)

11   7     Resolution No. 04-2022          72

12   140   Expert Report of Jason Sudy,    7
           6-15-23
13
     141   Staff Memorandum City Council   37
14         Meeting, 12-13-21 (pages 21
           to 151 of 201)
15
     142   Comprehensive Plan Update &     41
16         2005 Strategic Plan for
           Worthington
17
     143   Opinion and Order filed         79
18         3-15-23

19

20

21

22

23

24

 1                    JASON SUDY

 2  being first duly sworn, as hereinafter certified,

 3  deposes and says as follows:

 4                  CROSS-EXAMINATION

 5  BY MR. ASHRAWI:

 6     Q.  Can you please state and spell your name

 7  for the record.

 8     A.  Sure.  It's Jason Sudy.  J-A-S-O-N,

 9  S-U-D-Y.

10     Q.  Mr. Sudy, have you ever been deposed

11  before?

12     A.  I have not.

13     Q.  I'm sure your counsel gave you a brief

14  rundown of the deposition process, but I'm going

15  to go over a few ground rules that will help

16  this process move quickly and efficiently.  So

17  first ground rule is that we both speak loudly

18  and clearly.  As you can see, Julia is taking

19  down a transcript of the record, and we want

20  that as clear as possible.  Avoid none verbal

21  responses such as head nods and uh-huhs and

22  huh-uhs; so yeses or nos to my questions.

23          If you don't understand one of my

24  questions, just let me know so I can rephrase.

1    I don't want you answering a question that I did

2    not ask.  And then if you need a break, feel

3    free to ask for one.  The only thing I ask is

4    that if there's a pending question you answer it

5    first.  Are those all acceptable to you?

6        A.  Yes.

7        Q.  Do you understand that you're here to

8    testify in your capacity as an expert in the

9    federal lawsuit that was filed by Lifestyle

10   Communities and Worthington Campus, LLC?

11       A.  I do.

12       Q.  And you understand that the lawsuit

13   centers around a property in Worthington that is

14   commonly referred to as the United Methodist

15   Children's Home or the UMCH property?

16       A.  Yes.

17       Q.  So if I refer to the property, we're

18   talking about that property.  Are you

19   comfortable with that?

20       A.  Understood.

21       Q.  Okay.  What did you do to prepare for

22   this deposition?

23       A.  As I outlined in my report, I reviewed a

24   number of documents, including the 2005

1   strategetic plan, the 2014 focus area plan

2   update specifically for this property.  In

3   addition, I reviewed meeting minutes for the

4   planning commission/ARB, meeting minutes for

5   city council.  I read the staff reports for both

6   of those.  I viewed the video as well for the

7   planning commission/ARB.

8       Q.  Let's do this real quick.

9       A.  And I visited the site.

10      Q.  Thank you.  I'm going to hand you what

11  we'll mark as Exhibit 139.

12          (Discussion off the record.)

13                 -=0=-

14          (Deposition Exhibit 140 marked.)

15                 -=0=-

16  BY MR. ASHRAWI:

17      Q.  I'm going to hand you what we'll mark as

18  Exhibit 140.  I'll represent to you, Mr. Sudy,

19  that this is a copy of the expert report that

20  you authored dated June 15, 2023, but if you can

21  look through it and confirm that is, in fact,

22  the case, and that it's a true and accurate copy

23  for the record.

24      A.  It appears to be so.

1      Q.  You just listed off a number of things

2   you did and materials you reviewed that were

3   included in your report as having been reviewed

4   for purposes of the report.  I just want to

5   confirm that that's the same answer to my

6   question, which is what did you do to prepare

7   specifically for this deposition?

8          MR. INGRAM:  Objection to form.

9          You may answer.

10     A.  I spoke to counsel, Christopher

11  specifically.  I re-reviewed my report, relooked

12  at the meeting minutes, the staff report,

13  re-reviewed -- is that right?  -- the council --

14  I'm sorry, the planning commission/ARB video,

15  and I visited the site again.

16     Q.  So I got that you reviewed your report?

17     A.  Yes.

18     Q.  Meeting minutes?

19     A.  Correct.

20     Q.  You watched the video from the ARB?

21     A.  Correct.  Yeah, planning commission

22  technically.

23     Q.  Planning commission video.

24          Any other material?

1      A.  Yes.  The relevant sections of the

2   zoning code, the 2014 update that was the focus

3   area update, as well as the -- I believe it was

4   an ordinance to amend.  I don't think it was a

5   resolution.  The piece of legislation to amend

6   that section.

7      Q.  Any other material that you can think of

8   that you reviewed?

9      A.  I don't recall as I'm sitting here.

10      Q.  Other than your counsel did you speak

11   with anyone in preparation for this deposition?

12      A.  No.

13      Q.  I notice in your report that you have

14   not in the last four years testified in any

15   case.  Is that accurate?

16      A.  Yes, that is accurate.

17      Q.  Have you testified ever in your career

18   as an expert?

19      A.  I testify all the time as an expert in

20   front of planning commissions, councils, and ARB

21   boards, that type of thing.

22      Q.  Let me ask a different question.  Have

23   you ever been recognized by a court of law as an

24   expert in anything?

1    A.  No.

2       MR. INGRAM:  Objection.  Calls for legal

3  conclusion.

4    Q.  Let's go over your educational

5  background.  Can you starting with -- we'll go

6  your undergraduate degree.  Can you walk me

7  through your educational background.

8    A.  Sure.  I received a degree in political

9  science, a minor in theater and maybe a minor in

10  English -- I can't recall if that's accurate --

11  from Case Western Reserve University in

12  Cleveland.

13    Q.  Do you have postgraduate degrees?

14    A.  I do.

15    Q.  In what?

16    A.  I have a master's in city and regional

17  planning from Ohio State.

18    Q.  Do you have any degrees or formal

19  education beyond that?

20    A.  I do not.

21    Q.  Do you hold any licenses?

22    A.  I do not.

23    Q.  Did you ever hold any professional

24  licenses?

1  A. I used to have the AICP.

2  Q. And for the record, what is the AICP?

3  A. It is the certification for planning.

4 American Institute of Certified Planners, I

5 believe.

6  Q. When did you have that certification?

7  A. I cannot recall.

8  Q. How long ago did it lapse or did you

9 terminate it?

10   MR. INGRAM: Objection to form. Assumes

11 facts not in evidence.

12   You can answer.

13  A. Ten years ago. I can't recall exactly

14 as I'm sitting here.

15  Q. Is there any -- well, let me ask this

16 question. Did the certification -- do you no

17 longer have the certification because you didn't

18 want it anymore, or was it terminated for any

19 particular reason, or why did it come to an end?

20   MR. INGRAM: Objection to form.

21  A. I decided to stop renewing it. As a

22 long-time practicing planner with a wide variety

23 of experience both teaching, and attending, and

24 speaking at conferences, I didn't find it was

1    very beneficial to me.

2        Q.  Does the certification -- does having

3    the certification allow you to do anything that

4    you would otherwise not be permitted to do as a

5    planner?

6            MR. INGRAM:  Objection to form.

7        A.  Not that I have encountered.

8        Q.  Do you maintain any informal annual

9    training or continuing education for planning

10   purposes?

11           MR. INGRAM:  Objection to form.

12       A.  Yes.  I attend -- every year I attend

13   local and/or regional planning conferences.  I

14   also attend a number of national planning

15   conferences on a varied basis, averaging I would

16   say probably one to one and a half a year.  I

17   speak at a lot of conferences, and I also still

18   occasionally do teach at Ohio State, which back

19   then would have been considered a certification

20   element, not sure if that still is since I

21   haven't been participating.

22       Q.  When was the last time you taught at

23   Ohio State?

24       A.  It was five years ago when I was at --

 1   five or -- shoot.  Hold on.  I'm sorry, I'm

 2   going to have to think about this based on the

 3   COVID time.  It confuses me a bit.

 4          It was, I guess, approximately six years

 5   ago when I taught there as an actual employed

 6   member of Ohio State's auxiliary faculty.  That

 7   being said, in the last three years I've taught

 8   numerous classes there, individual classes,

 9   where I've been asked to come speak to

10   individual classes.

11       Q.  So in the last three years you have not

12   been employed --

13       A.  Correct.

14       Q.  -- as a faculty member but you guest

15   lecture?

16       A.  Correct.

17          MR. INGRAM:  Mr. Sudy, make sure you let

18   him --

19          THE WITNESS:  Correct.

20          MR. INGRAM:  -- finish asking --

21          THE WITNESS:  Yes.

22          MR. INGRAM:  -- his question before you

23   answer.

24          THE WITNESS:  Absolutely.

1  BY MR. ASHRAWI:

2     Q.  In the last three years when you've

3  lectured at Ohio State, what have been the

4  topics of those lectures?

5     A.  Transportation and mobility, land use

6  and mobility, land use and technology.  That's

7  probably the general sense.  I can't recall

8  specifically at this point.

9     Q.  Is there any particular reason you are

10  no longer on faculty with OSU?

11     A.  Yes.  And I would like to clarify I was

12  part of -- we had a shifting title.  At the end

13  it was called auxiliary faculty.  Whatever that

14  means.  So it used to be adjunct and auxiliary.

15  They kind of shifted us around.  That being

16  said, it doesn't pay very well, and it takes a

17  lot of time, and it became a situation where it

18  was just a little too taxing on my schedule.

19     Q.  Any other annual continuing education or

20  ongoing presentations you make?

21        MR. INGRAM:  Objection to form.

22     A.  Maybe -- I guess in addition to the

23  conferences?  Is that what you're asking?

24     Q.  Yes.  Anything we have not discussed

 1  already.

 2      A.  I don't think so.

 3      Q.  Let's go through your work history.  Did

 4  you work in any capacity between graduating from

 5  Case Western and beginning your master's at Ohio

 6  State?

 7      A.  Yes.  A number of jobs, none of which

 8  would be related to city planning.

 9      Q.  Let's start then after you completed

10  your master's.  Where did you first become

11  employed?

12      A.  I worked during my master's at -- in

13  several nonprofit city organizations as part of

14  the tuition reimbursement internship process.

15  Nonprofit might not be the exact right term for

16  all of them.  I worked for the Greater Linden

17  Corporation -- Greater Linden Development

18  Corporation, and the North Linden Area

19  Commission, and I interned with the City of

20  Columbus implementing something they called the

21  UIRF fund, which I'm not sure still exists, but

22  it was an early infrastructure fund.  Then after

23  graduation I worked for a firm called MSI which

24  is now known as MKSK, and I worked there for

1  quite a long time.

2      Q.  Do you recall how many years?

3      A.  It was about 14 years.

4      Q.  And what was your position or positions

5  with MKSK beginning with the earliest

6  position --

7      A.  Sure.

8      Q.  -- if that changed?

9      A.  I began as an entry-level planner, and I

10 did a lot of GIS mapping and data analysis.

11 Then I progressed through sort of the planning

12 ranks.  It's a small organization so we didn't

13 have a lot of hierarchy within that structure.

14 Became more senior planner, project manager,

15 went on to have several other roles in the

16 company, including the director of business

17 development for the company which at that point

18 was -- had expanded to three offices.  And when

19 I was -- what was the title?  Associate

20 principal I believe was where I ended there

21 which was again sort of next step up toward

22 being a partial owner of the company.

23      Q.  Do you recall what years those 14 years

24 were?  1998 to 2012?

 1    A.  That's it.

 2    Q.  So after that you went to Side Street

 3  Planning?

 4    A.  Correct.  I started my own firm.

 5    Q.  Before we get to Side Street Planning,

 6  what clients did you work with at MKSK

 7  specifically that you recall?

 8    A.  There were many clients, and I will give

 9  you the few that I do recall, noting that there

10  are many more that I don't recall, certainly.

11    Q.  Sure.

12    A.  Most notable for site planning I was the

13  contracted city planner for the City of

14  Hilliard.  City of Hilliard at that point did

15  not have their own in-house city planner so I

16  worked to review all development review

17  applications for them and represent their

18  interests from a planning standpoint at all

19  boards, commissions and council.

20         I also worked with the Village of New

21  Albany in that same capacity as their contracted

22  village planner first and then became city

23  planner when they were incorporated as a city.

24  Similar kind of thing.  With New Albany it was

1   even more integrated as to a continual staff

2   role where we had standing meetings where, you

3   know, we would have half to an entire day per

4   week reviewing development applications, meeting

5   with clients, meeting with applicants, going

6   through the entire review process, attending

7   architectural review board, planning commission,

8   council meetings as well as representing New

9   Albany's interests on the Rocky Fork-Blacklick

10  Accord.

11          Other clients included Nationwide Realty

12  Investors where I helped do the master plan for

13  the Arena District; City of Columbus working on

14  the initial riverfront planning projects,

15  including North Bank Park.  I also worked out of

16  state in a number of different communities:

17  Winter Park, California, Orlando, Florida.

18  Might not have been Orlando itself.  I think it

19  was Winter Park.  There were a lot of clients,

20  probably over -- at least over 50 clients during

21  that time period.

22      Q.  You mentioned for Hilliard and New

23  Albany specifically you were the contracted city

24  planner/village planner?

1     A.  Correct.

2     Q.  Were there any other clients where you

3  served in that capacity that you recall?

4     A.  While I was at MKSK?

5     Q.  Yes.

6     A.  No.

7     Q.  Okay.  Now, we can turn to Side Street

8  Planning.  And this is a company you founded?

9     A.  Correct.

10     Q.  Okay.  Tell me about Side Street

11  Planning.

12     A.  I went out on my own, and I really

13  was -- it was just -- it was just me mostly, and

14  then I would contract with other subconsultants

15  and/or team with other firms in order to

16  complete projects, and worked for a number of

17  clients there as well.

18     Q.  Did you work for -- strike that.

19         As a -- as part of Side Street Planning

20  were you contracted as the municipal planner for

21  any particular municipality?

22     A.  I worked in that capacity for Grandview,

23  Grandview Heights.  I also worked in that

24  capacity for the City of Bexley.

1    Q.  Any other municipalities you can think

2  of?

3    A.  In that capacity?

4    Q.  Correct.

5    A.  No.

6    Q.  How did your substantive work compare or

7  differ from what you were doing at MKSK?

8        MR. INGRAM:  Objection to form.

9    A.  It didn't differ substantively.  I just

10  had all the responsibility.

11    Q.  You were doing the same sort of planning

12  stuff.  Is that accurate?

13        MR. INGRAM:  Objection to form.

14    A.  I would say yes.

15    Q.  Is Side Street Planning an ongoing

16  entity?

17    A.  It is not.

18    Q.  Looks like 2016 was when -- did it close

19  in 2016?

20    A.  Effectively, yeah.  I closed it, yes.

21    Q.  And any particular reason for that

22  closure?

23    A.  I was recruited to go work for OHM.

24    Q.  So you began work with OHM in 2016?

1    A.  Correct.

2    Q.  And you're currently with OHM.  Is that

3  correct?

4    A.  Correct.

5    Q.  You had a stint elsewhere in between?

6    A.  Correct.

7    Q.  Okay.  Let's take from 2016 on.  I'd

8  like to know your first stint with OHM, and it

9  looks like in 2018 you worked with HDR.  So for

10  the first two years, 2016 to 2018, with OHM what

11  were you doing there?

12    A.  I was brought in as a principal and

13  working on planning projects, running a variety

14  of planning projects.

15    Q.  During those two years from 2016 to 2018

16  when you were with OHM, did you serve as

17  municipal planner, contracted municipal planner?

18    A.  Yes.  I converted my Bexley contract

19  over to OHM.

20    Q.  Any other community?

21    A.  In that capacity?

22    Q.  Yes.

23    A.  No.

24    Q.  Aside from your work with Bexley, were

1  you working during that time with other public

2  entities, private developers?  What were you

3  doing?

4          MR. INGRAM:  Objection to form.

5          You can answer if you can.

6      A.  Almost exclusively public agencies:  Mid

7  Ohio Regional Planning Agency, City of Columbus,

8  City of Whitehall, City of Lorain, City of

9  Newburgh Heights.  Many cities and regional

10  planning agencies throughout this near region.

11      Q.  So in 2018 you went elsewhere, right?

12      A.  Correct.

13      Q.  Why is that?

14      A.  I was recruited by HDR to work with

15  them.

16      Q.  And I'm not as familiar with HDR.  Are

17  they a planning company?

18      A.  HDR's a multinational engineering firm,

19  whereas OHM is more of a regional engineering

20  firm that has also planning, landscape

21  architecture, architecture.

22      Q.  What did you get recruited to do for

23  HDR?

24      A.  I got recruited for a new division that

1  was specifically focusing on the integration of

2  new mobility technologies into land use

3  planning.

4      Q.  Did you do any of that mobility focus in

5  your prior work with OHM, Side Street or MKSK?

6      A.  Yeah, I had, particularly with OHM in

7  both transit and individual mobility and in

8  technology, yeah.

9      Q.  With -- when you were with HDR, did you

10  continue doing your public planning work with

11  the public agencies?

12      A.  Yes, less.  To a lesser degree, yes.

13      Q.  Did you continue your work with the City

14  of Bexley during that time?

15      A.  I discontinued my work with Bexley by my

16  request as it was not compatible with my travel

17  schedule since I was doing projects all over the

18  country.

19      Q.  With HDR did you serve as the municipal

20  planner for any other community?

21      A.  I did not.

22      Q.  So you went back to OHM?

23      A.  Correct.

24      Q.  And why's that?

1    A.  Two reasons.  The main reason was --

2  shorthand is COVID, and the second reason was

3  that that division that was formed was sort of

4  splintering with many of our core group going to

5  other entities and/or other areas within HDR,

6  and I was re-recruited to go back to OHM so I

7  did so.

8    Q.  And you've been with OHM since?

9    A.  Correct.

10    Q.  And you're a principal there?

11    A.  Correct.

12    Q.  So since returning to OHM, you are

13  serving as the City of Bexley planner?

14    A.  Correct.

15    Q.  Do you serve as the municipal planner

16  for any other community?

17    A.  No.

18    Q.  Since 2021, have you been contracted

19  with any local public entity to assist with

20  anything?

21    A.  Yes.

22    Q.  Which ones?

23    A.  City of Columbus, COTA.  Since what

24  year, I'm sorry?

1       Q.  Since returning to OHM.

2       A.  Since returning to OHM.  Okay.  Because

3  there are quite a few at HDR as well.  City of

4  Whitehall, City of Independence, City of

5  Cleveland.  I'm sure there are others.  Going

6  through my roster of projects.  I'm sorry, I

7  can't recall at this time others.

8       Q.  Let me ask you for Whitehall.  What were

9  you contracted to do for Whitehall?

10      A.  We teamed with a firm called ZoneCo, and

11  we lead their rewrite of their zoning code.  I

12  also had done some comprehensive planning for

13  them in my first stint at OHM that we built on.

14      Q.  When did you do the work for Whitehall

15  with respect to their comprehensive plan?

16      A.  I can't recall the exact year.  It was

17  in the first stint of working for OHM.

18      Q.  So sometime between 2016 and 2018?

19      A.  Correct.

20      Q.  Is most of your time spent working with

21  the City of Bexley or is there another

22  particular client that takes a majority of your

23  time?

24           MR. INGRAM:  Objection to form.

1      A.  I split time.  In the last few weeks

2  I've spent quite a bit of time working with

3  Bexley based on a higher caseload.  In general,

4  it goes up and down.  I have a retainer

5  contract.  OHM has a retainer contract with

6  Bexley which they utilize for us.  It's steady

7  with I'd guess you say lumps in it.  There's ups

8  and higher times of work.  I'm also working a

9  lot with City of Columbus and City of Cleveland

10  on a number of projects.

11      Q.  For the City of Columbus, in particular,

12  what type of work are you doing for them?

13      A.  We are working for the City of Columbus

14  as a subconsultant to another firm called

15  TranSystems on the bus rapid transit corridor

16  that is called the northwest corridor that goes

17  through Ohio State, theoretically up to Dublin

18  at some point, up Olentangy River Road.  We're

19  also a sub to a firm called WSP on the downtown

20  mobility study where we're looking at how to

21  integrate the downtown transportation network

22  with ongoing land use and population changes and

23  transportation changes that are happening.

24          We've been part of mobility contracts

1    for the City of Columbus as well as the -- as a

2    consultant on the bikeways planning update.  I

3    think those are all the ones -- oh, and I just

4    started something called an ETOD project for the

5    northwest corridor, and that is equitable

6    transit oriented development.  So we're

7    specifically looking at site planning

8    possibilities on five key sites along the

9    Olentangy River Road corridor for the City.

10        Q.  Are any of those projects for the City

11   of Columbus related to ongoing work for COTA as

12   well?  I know they've partnered on a few things.

13        A.  Sort of.  The BRT project is being

14   co-managed overall between the City of Columbus

15   and COTA just by management -- the way they

16   decided to manage it was that they split off the

17   corridor.  So the east/west corridor is being

18   managed by COTA.  City of Columbus is managing

19   the northwest corridor, but the collaboration

20   takes place throughout the process.

21        Q.  Since returning to OHM in 2021, have you

22   been -- outside of this matter have you been

23   retained by any private developers?

24        MR. INGRAM:  Objection to form.

1  Misstates the evidence.

2      A.  Have I personally?  Could you rephrase

3  the question?

4      Q.  Sure.  You just listed a number of

5  projects or clients you're working with --

6      A.  Right.

7      Q.  -- all of which are public sector

8  clients.  So my question is since 2021, have you

9  been retained or have you done work with any

10  private sector land developers?

11          MR. INGRAM:  Objection to form.

12      A.  I personally have not.

13      Q.  OHM has?

14      A.  Yes.

15      Q.  What is your board and commission

16  experience?  I know you're on the -- if I can

17  find it here -- Italian Village Commission.

18      A.  Correct.

19      Q.  I'll get to that in a second, but do you

20  sit on any other boards or commissions

21  currently?

22      A.  I do not.

23      Q.  What is your role on the Italian Village

24  Commission?

1      A.  I'm the chair of the commission.

2      Q.  And how long have you been on the

3  commission?

4      A.  Now, about 20 years, close to 20 years.

5      Q.  And is that an appointed seat?

6      A.  It is.

7      Q.  And you're appointed by the City of

8  Columbus?

9      A.  Yes, by the mayor's office.

10     Q.  And what is the oversight of the Italian

11  Village Commission?

12     A.  We are an historic review commission

13  that is charged with administering several plans

14  relevant to the neighborhood.  We have a set of

15  historic design guidelines that cover all of

16  Italian Village, and then we have a set of High

17  Street design guidelines which actually cover a

18  jurisdiction that's split between Victorian and

19  Italian Village, and we administer the Italian

20  Village side of that.

21     Q.  Are you a final decision-making body or

22  are you a recommending body or both?

23         MR. INGRAM:  Objection to form.

24     A.  Yeah, we are both.  We are a final

1  decision-making body for certificates of

2  appropriateness, and we are a recommending body

3  for rezonings and for zoning variances.

4       Q.  What types of matters do you see most

5  frequently for purposes of obtaining a

6  certificate of appropriateness in that position?

7            MR. INGRAM:  Objection to form.

8            You can answer if you can.

9       A.  That has shifted over the years as far

10  as overall it had been and sort of continues to

11  be one of the most rapidly evolving

12  neighborhoods in the city.  So we saw a lot of

13  large scale site plan review processes where we

14  would get multiple mixed use, multiple building,

15  variety of densities, styles, sort of all the

16  things you could get in a development of an

17  urbanized neighborhood.

18            On the other hand, we also get a new

19  back door.  We used to get almost exclusively

20  new development and very few of the more sort of

21  watchmaker tinkering applications.  Now I would

22  say we're probably a little more skewed toward

23  those while we have streamlined the city process

24  so they're able to give staff recommendations on

1  a lot of those smaller things they weren't able

2  to before.  So I think we're probably about

3  split now between doing what I would consider

4  legitimate site plan and architecture review and

5  helping someone have a new patio in their

6  backyard.

7      Q.  When you act as a recommending body on

8  rezonings, where does your recommendation go?

9  What process does it follow?

10         MR. INGRAM:  Objection to form.  Vague.

11     A.  It -- for the variances it goes to the

12  BZA.  For the rezonings I believe it goes

13  directly to council.  I cannot state with legal

14  certainty that that is the process.  I believe

15  that is the process.

16     Q.  Do you as the chair of the commission

17  sort of follow your cases to the next step

18  typically?

19         MR. INGRAM:  Objection to form.

20         You can answer if you can.

21     A.  Not really.  I guess I could say that I

22  see the results if they occur in the

23  neighborhood.

24     Q.  Any other boards or commissions that you

1    currently sit on?

2        A.  I don't.

3        Q.  Have you ever been elected to a city

4    council?

5        A.  No.

6        Q.  Have you ever been elected to any other

7    elected position or body?

8        A.  Public?

9        Q.  Yes.

10       A.  No.

11       Q.  Have you ever sat on a board of zoning

12   appeals or a planning and zoning commission?

13       A.  No.

14       Q.  I think I've asked this already, but let

15   me just double check.  You've never testified in

16   federal court or for a federal lawsuit, right?

17       A.  Correct.

18       Q.  Have you ever testified in a state civil

19   lawsuit?

20       A.  No.

21       Q.  I assume you've testified under oath in

22   administrative proceedings before local bodies?

23       A.  Yes.

24       Q.  Now, we're going to turn our attention

1    back to your report which we marked as

2    Exhibit 140.  Were you retained to do this

3    report by the Vorys firm or by someone else?

4         A.  I was retained by the Vorys firm.

5         Q.  Have you been retained by the Vorys firm

6    previously?

7         A.  No.

8         Q.  Have you worked with Eric Gardner

9    previously?

10        A.  Yes, though I don't recall when.

11        Q.  Did you speak with Eric Gardner or

12   anyone from his office during your preparation

13   of this report?

14        A.  No.

15        Q.  Did you receive any email correspondence

16   from Eric Gardner's office in relation to this

17   report?

18        A.  I don't believe so.

19        Q.  What were the terms of your engagement

20   with Vorys?

21        A.  Paid hourly to prepare an expert report.

22        Q.  I assume you're paid hourly for

23   testimony?

24        A.  Yes.

1    Q.  Were you given any instructions or

2    specific facts to consider as part of the

3    engagement?

4    A.  Only the complaint which I read.

5    Q.  Do you recall when you were engaged?

6    A.  I do not.

7    Q.  Was there a formal engagement letter or

8    proposal or agreement that was signed?

9    A.  There is.  There is one of those in the

10   record somewhere.

11   Q.  Do you maintain a work file for work

12   like this?

13   A.  I do.

14   Q.  I assume that would be in your work

15   file?

16   A.  I'm sure it is.

17   Q.  What was the scope of your work?  What

18   were you asked to do?

19   A.  The scope was to review the application

20   materials, the relevant documents, the relevant

21   meeting materials, everything I've set out in my

22   report, and to prepare a review of the

23   application as it compares to the relevant

24   documents in the city, and to also give my

1   opinion on the process of review that the

2   city -- was undertaken by the city and compare

3   that to my professional experience in other

4   project review.

5        Q.  Are you engaged with the Vorys firm as a

6   principal with OHM or individually?

7        A.  Individually.

8        Q.  Is OHM doing any work on this?

9        A.  Could you rephrase?

10       Q.  Sure.  Is anyone else from OHM assisting

11  you in this?

12       A.  No.

13       Q.  Does OHM know you've been retained on an

14  individual basis to do this work?

15       A.  Individuals at OHM do know that.

16       Q.  Have you been retained in your personal

17  capacity to provide expert services since

18  returning to OHM in 2021 before?

19       A.  No.

20       Q.  What about before 2021, have you ever

21  been retained in your personal capacity to

22  provide expert services?

23       A.  In a legal matter?

24       Q.  Yes.

1    A.   No.

2         MR. ASHRAWI:  Take a quick break?

3         MR. INGRAM:  Sure.

4              (Recess taken.)

5    BY MR. ASHRAWI:

6    Q.   Mr. Sudy, I want to just kind of walk

7    through your report which we marked as

8    Exhibit 140 starting with the scope and

9    methodology.  I see listed in the very first

10   paragraph that you reviewed the proposed mixed

11   use development by Lifestyle Communities in

12   light of applicable zoning standards,

13   Worthington's strategetic and comprehensive plan

14   for the subject property, and the city's

15   consideration of the development.  My first

16   question is when you say zoning standards, what

17   are you referring to specifically?

18   A.   I'm referring to the zoning code

19   sections that I believed were relevant to this

20   case.

21   Q.   I assume you don't have those section

22   numbers memorized off the top of your head?

23   A.   I do not.

24   Q.   Would it be safe to assume that those

1  zoning code sections related to the property's

2  zoning district and the permitted uses

3  thereunder?

4          MR. INGRAM:  Objection to form.

5      A.  It related to the current property

6  zoning and the proposed property zoning.

7                      -=0=-

8          (Deposition Exhibit 141 marked.)

9                      -=0=-

10  BY MR. ASHRAWI:

11      Q.  Before we go too much farther, I'm going

12  to hand you what we marked as Exhibit 141.

13  Mr. Sudy, I'll represent to you that Exhibit 141

14  includes a staff memorandum prepared for a

15  council meeting for December 13th, and includes

16  the Lifestyle Communities' proposal and rezoning

17  application, but if you could please take your

18  time, review this document.  My question's going

19  to be is this the proposal that you reviewed in

20  preparation for your expert report?

21          MR. INGRAM:  Counsel, for purposes of

22  the record Exhibit 141 is page 21 of 201 through

23  151 of 201.  Is that correct?

24          MR. ASHRAWI:  That's correct.

 1          MR. INGRAM:  Take your time to review

 2    that, Mr. Sudy.

 3          MR. ASHRAWI:  For the record, the 201 is

 4    the entire agenda packet for that council

 5    meeting.  This is the portion of it related to

 6    this matter.

 7    BY MR. ASHRAWI:

 8     Q.  Is that one highlighted?

 9     A.  Yes, it is highlighted.  It appears to

10    be the same report that I reviewed.

11     Q.  Do you mind if we trade?  I think that's

12    my version, although there's nothing written on

13    there.  But just in case I wrote anything bad

14    about Chris I'll just trade you.  I apologize

15    for making us take more time, but -- I'll

16    represent to you they're the same document, but

17    please double check me.

18     A.  Appears to be the same.

19     Q.  And is this the proposal obviously

20    behind the staff memorandum that you reviewed

21    for your expert report?

22     A.  Yes, this appears to be it.

23     Q.  In the last sentence of the first

24    paragraph under scope and methodology you

1   indicate that you were asked to review relevant

2   materials.  Other than the materials listed on

3   that same page, did you review anything else?

4        A.  Included in the materials from the

5   website was also the video, if that isn't

6   specifically noted here, for the ARB/planning

7   commission meeting.  I don't recall any other

8   things that I reviewed.

9        Q.  You also indicate that you conducted

10  relevant research.  What research did you

11  conduct?

12       A.  I went to the site to look at the site,

13  and I considered the review of the documents as

14  well as the review of the zoning code to be

15  research as well.

16       Q.  You didn't do any outside research

17  outside of these documents or visiting the site?

18           MR. INGRAM:  Objection to form.

19       A.  Could you clarify?

20       Q.  Sure.  Did you speak with anyone about

21  this assignment or your work?  Did you do any

22  outside planning research or was it all related

23  to your review of the materials and the site

24  visit?

1        MR. INGRAM:  Same objection.

2    A.  The context of this development is

3  similar to the context of projects that we do

4  for growing suburbs throughout the region.  So I

5  could say that there's sort of a body of

6  research that I've accomplished that this fits

7  into the context of.

8    Q.  Outside of that, though, there wasn't

9  anything else specific that you meant by

10  conducting relevant research?

11    A.  Yes, that is accurate.

12    Q.  And when you say you performed the

13  necessary investigation analysis on the subject

14  matter, is that also related specifically to the

15  materials and the site visit and your working

16  knowledge?

17    A.  Yes.

18    Q.  When you went to the site, what were you

19  looking for?

20        MR. INGRAM:  Objection to form.

21    A.  Could you be more specific?

22    Q.  Sure.  What's the point of the site

23  visit?

24    A.  The point of a site visit is to

1    understand that what you are looking at in two

2    dimensions is -- how what you're looking at in

3    two dimensions is applicable to the

4    three-dimensional world to see if there are any

5    distinguishing site characteristics that

6    wouldn't be evident from a plan to sort of field

7    verify the context of the photos and the overall

8    site plan within the real world situation that

9    you're investigating.

10                              -=0=-

11          (Deposition Exhibit 142 marked.)

12                              -=0=-

13   BY MR. ASHRAWI:

14       Q.  I'm going to hand you what we'll mark

15   now as --

16          MR. INGRAM:  142.

17       Q.   -- Exhibit 142.

18          MR. ASHRAWI:  This is another large

19   document, Chris, I only have two of.

20       Q.  Mr. Sudy, I'll represent to you that

21   this is the City of Worthington 2005

22   comprehensive plan, but please take a look at it

23   and let me know if this is the same 2005

24   comprehensive plan that you reviewed as part of

1    your work on this report?

2         MR. INGRAM:  I'm sorry, Yaz, I don't

3    have a copy.  Does this have the 2014 update?

4         MR. ASHRAWI:  No, this is just the 2005

5    plan.

6    A.  It appears to be.

7    Q.  You participated in this plan for the

8    city?

9    A.  I did.

10   Q.  In what capacity?

11   A.  I was a staff planner for the plan and

12   contributed some of the writing and editing in

13   the plan process.

14   Q.  And your work on this comprehensive plan

15   would have been in your capacity when you were

16   with MSI which then was MKSK?

17   A.  Correct.  I may have done this map, too.

18   I used to know how to do maps.  I don't know how

19   to do them very well anymore.  Software's passed

20   me by.

21   Q.  Ditto.

22        Do you recall if you did any particular

23   work or analysis that went into this

24   comprehensive plan other than the map and the

1  writing?

2      A.  Could you be more specific with regard

3  to the writing?

4      Q.  Sure.  I see a list of consultant team

5  members from MSI on page iii.  It lists, among

6  other people, Keith Myers, Chris Hermann, Jason

7  Sudy, and then Kathryn Meyer, and Aron Frazier.

8  What was your specific role, and if you recall,

9  what were the roles of the other members of the

10 consulting team?

11         MR. INGRAM:  Objection to form.  Vague.

12         You can answer to the extent you can.

13     A.  Keith Myers was a founding principal and

14 co-owner of the firm.  He was the M of MSI and

15 as such would oversee the planning department in

16 general.  I don't recall his specific role on

17 this, but I would hypothesize it was at more of

18 a distance or at a higher level, a little bit

19 removed.

20         Chris and I used to share a lot of the

21 same responsibilities at MSI, and I ran a number

22 of planning projects and had different planning

23 clients, and he would run different planning

24 clients, and we would often contribute to each

1   other's projects.

2        Seeing Aron Frazier on this means I did

3   not do this map, because we already hired

4   somebody who was better at doing maps than I

5   was, and he would have done the mapping GIS

6   analysis and probably just general plan

7   assistance.

8        Kathryn was more of a junior planner who

9   would have helped run the public process,

10  assemble the document and all those types of

11  things.

12       My recollection of this as best as I can

13  recall is that I contributed primarily to

14  writing the land use sections, and I also recall

15  that there was a robust discussion at that time

16  about the challenge of Worthington with regard

17  to declining school enrollment, and there was

18  quite a bit of -- sort of a general discussion

19  in central Ohio at that point based on the way

20  school funding took place and some strategies

21  that different communities were going through in

22  order to facilitate the best outcomes for them.

23  That's to the best of my knowledge what I worked

24  on on this plan admitting that it was some time

1   ago.

2      Q.  Do you recall not in your review but in

3   your original work on this plan the discussion

4   on the subject property?

5         MR. INGRAM:  Objection to form.

6      A.  I recall the discussions on the focus

7   areas that were identified overall equally.

8      Q.  Why did you review this 2005

9   comprehensive plan in preparation for the

10  report?

11     A.  Whenever I'm working in any city

12  regardless of the capacity, I think it's very

13  important to understand the progression of any

14  adopted planning materials that are in place.

15  It is my understanding that the 2014 update

16  really was meant to keep the bulk of this

17  document intact and supplement that.

18        So in my opinion, it's relevant in the

19  fact that it does convey at least some sense of

20  what the community is still thinking, albeit a

21  document that was originally created in 2005,

22  and that's why I reviewed it in order to

23  understand the larger context of the site.

24     Q.  If you turn to page 40, I think this is

1  a discussion on, in part, the UMCH home site.

2  In the second paragraph right there in the

3  middle it talks about the Methodist children's

4  home continues to care for troubled youth, but

5  has rezoned portions of its High Street frontage

6  for commercial.  Both uses are appreciated.  Do

7  you see where I'm reading?

8      A.  I do.

9      Q.  It talks about that any change of the

10  land use of this site should be carefully

11  reviewed by the city.  Do you recall back in

12  2005 the discussion or any discussion about the

13  future plans for that site specifically?

14      A.  Not that there were specific plans.  We

15  discussed that it was one of the key potential

16  redevelopment sites in the city and as such

17  should be identified in that way.

18      Q.  And it's probably one of few remaining

19  parcels -- large parcels to be developed in the

20  city of Worthington.  Would you agree?

21      A.  I would agree.

22      Q.  Would you agree from a planning

23  perspective for that reason among others it's

24  important to carefully review anything that goes

1  on there?

2      A.  I would.

3      Q.  Do you know how long that site has been

4  zoned under its current zoning?

5      A.  I do not.

6      Q.  Since at least 2005.  Is that right?

7      A.  I don't know if that's true.  It may or

8  may not be true.

9      Q.  Did you speak with anyone from the City

10  of Worthington for purposes of preparing your

11  report?

12      A.  No.

13      Q.  Do you know the city planner at the City

14  of Worthington?

15      A.  You're referring to Lee Brown?

16      Q.  Yes.

17      A.  Yes, I do.

18      Q.  Have you worked with him in a

19  professional capacity before?

20          MR. INGRAM:  Objection to form.

21      A.  Could you clarify in a professional

22  capacity?

23      Q.  Sure.  Has the City of Worthington or

24  Lee Brown specifically ever retained your

1   services or your company's services to do

2   planning work?

3       A.  He has never retained my services, and I

4   do think we have as a company worked -- OHM has

5   worked in Worthington, though I am unclear

6   whether -- what those projects have been, and

7   when the time frame was, and whether I was at

8   the firm at that time, and if Lee Brown was

9   there at the time.  I'm very unclear on whether

10  we --

11      Q.  That's mostly what I didn't know.  I

12  don't know when Lee was there so I guess another

13  question is have you ever worked with Lee Brown

14  on a planning project outside of the city of

15  Worthington that you recall?

16      A.  On a professional planning project?

17      Q.  Correct.

18      A.  No.

19      Q.  Have you ever worked with Lee Brown on a

20  personal planning project outside the city of

21  Worthington?

22      A.  Yes, in a student body project.  We were

23  in school at the same time.

24      Q.  Okay.  Was that at Case Western or was

1    that at Ohio State?

2       A.  Ohio State.

3       Q.  And you said you worked on a project

4    with Lee Brown at that time?

5       A.  Probably.  We were in a lot of studios

6    so I would imagine we were part of it.  I

7    couldn't recall what any of those projects might

8    have been.

9       Q.  Working with municipal governments, do

10   you know how municipal governments make most of

11   their money?

12          MR. INGRAM:  Objection to form.

13      A.  I have a general sense in the state of

14   Ohio.

15      Q.  It's through income taxes.  Is that

16   accurate?

17          MR. INGRAM:  Same objection.

18      A.  Yes.

19      Q.  In the 2005 comprehensive plan, I

20   believe on page 76, there's a discussion that

21   large redevelopment sites, including this one,

22   it would be in the best interest of the city to

23   have strong income-producing commercial uses.

24   Do you see that?

1          MR. INGRAM:  Hang on, Counsel.  If you

2    can give the witness time to turn to and read

3    the page.

4      Q.  Sure.  Take your time.

5      A.  I do see it, yes.

6      Q.  Would you agree with that statement that

7    the subject property or any infill property

8    should focus on income-producing commercial uses

9    for the benefit of the city?

10         MR. INGRAM:  Objection to form.  This

11   exceeds the scope of this witness's assigned

12   tasks in this case.

13     A.  I'd say not specifically the way it's

14   written.

15     Q.  Do you see on that same page that it

16   indicates predominance of residential

17   development on this site is not advisable or in

18   the city's best interest?

19     A.  I do.

20     Q.  Do you recall at the time why that was

21   not in the best interest of the city?

22         MR. INGRAM:  Objection to form.

23         You can answer if you can.

24     A.  Yeah, I don't recall.

1    Q.  I'm going to hand you now what has

2  previously been marked as Exhibit 1.  I'll

3  represent to you, Mr. Sudy, that Exhibit 1 is

4  the 2014 comprehensive plan update for the UMCH

5  focus area, but if you could page through that

6  exhibit and confirm whether you've seen this

7  document before and whether this is what you

8  reviewed as part of your report.

9    A.  I can confirm that I have seen it

10  before, that to my knowledge this is the update

11  from 2014, and I did use it as source material

12  as reviewed for my report.

13    Q.  What was the -- what's the purpose of

14  this document from your professional

15  perspective?

16    A.  In my perspective this is one of the

17  most powerful tools that we have as urban

18  planners, and as public planners, and as site

19  planners, and this is the idea of a focus area

20  plan.

21       And as I outlined in my staff -- or in

22  my report there are some overlapping terms in

23  public planning which would probably be well

24  served to define more completely at some point.

1    It's a different story in that comprehensive

2    plans unfortunately named comprehensive plans

3    due to the fact that that is often assumed to be

4    comprehensive of everything, and certainly they

5    are not, and every community picks and chooses

6    which things they want to focus on most

7    completely.

8            This is a tool, the focus area plan, and

9    is a tool used in almost every comprehensive

10   plan I've been a part of and most of them that

11   I've reviewed with the idea that a comprehensive

12   plan isn't truly comprehensive.  It can't look

13   in great detail of every single portion of the

14   city.  That would be burdensome on the cost of

15   the plan, it would be burdensome on those

16   reviewing the plan, it would be burdensome in

17   that it's very difficult to anticipate all the

18   foreseeable market conditions and changes and

19   things that would take place.

20           So what happens is a focus area plan is

21   done, and typically throughout the comprehensive

22   plan process there is a robust public engagement

23   and discussion in order to determine where those

24   focus areas should most likely be.  And that

1    often takes place through listening to community

2    leaders to staff members to elected officials,

3    to public planning -- to members of the public,

4    and reviewing previous planning documents, and

5    sometimes looking at market evaluations, traffic

6    studies, any of those types of things.

7           So the determination of these focus

8    areas took place in the 2005 plan, and this was

9    identified as a primary site for the reasons

10   that you've previously mentioned.  Based on some

11   changes that took place, in particular the fact

12   that the children's home was no longer in

13   operation, the city apparently -- and again, I

14   don't -- can't describe their exact motivations.

15   My professional planning experience would be

16   when there's a major change in use or a

17   significant change of some sort at a site that's

18   been identified as a major focus area that's

19   typically the impetus for a city to think about

20   revising that focus area.

21          In the case of Worthington I think this

22   is even more powerful, because they chose to

23   look only at this one focus area.  It wasn't a

24   situation where they redid their whole

1  comprehensive plan, nor did they look at all of

2  their previous focus areas, nor did they

3  identify new focus areas.

4      They clearly identified some sort of

5  potential and likely shift in this area based on

6  changing conditions, and as such, did this plan.

7      They hired the firm that I had worked

8  for several -- many years before -- or several

9  years before, at that point known as MKSK, in

10  order to go through what I would consider a

11  robust public process.  I was not part of that

12  process.  I reviewed the list of meetings that

13  they undertook in order to accomplish this, and

14  I think from a professional planning practice

15  standpoint in my personal experience that was

16  what would be considered a robust process for a

17  site of this size and amendment of this size.

18      And as we can see, while I think it has

19  a whole lot of information in here it really,

20  you know, in sum total ranges from page 89 to

21  99.  So we're talking about, I guess, 11 pages

22  of new material that are generated out of a

23  really extensive year-long process.  And not

24  that there's a direct correlation between the

1    amount of time and the number of pages, but I

2    think there certainly is an indicator that there

3    was a huge amount of interest and community

4    input put into generating a very targeted

5    outcome for this plan.

6           So in using this plan at this -- in my

7    opinion is the most significant element to guide

8    the future development of this site, and I would

9    use this as a staff planner as basically my

10   bible to guide this development due to the fact

11   that it went through a robust public process and

12   it was adopted by the elected officials of the

13   city, which would mean to me that this is the

14   most accurate portrayal of the community's

15   wishes for how this could proceed as a

16   development site.  So that is why I really

17   focused on this as a key element in the overall

18   review process for understanding the site.

19       Q.  Thank you for that.  Let me see if I can

20   remember all my questions.

21       A.  Sure.

22       Q.  You would agree that MKSK is a reputable

23   and well respected planning company?

24       A.  I would.

1      Q.  You would agree that this document,

2   what's been previously marked as Exhibit 1, the

3   2014 focus area update, didn't change the zoning

4   for the subject property, right?

5      A.  It did not.

6      Q.  You would agree that it provided future

7   land use recommendations, correct?

8      A.  Correct.

9      Q.  You would also agree that it provided

10   guidance as to a range of desired land uses and

11   developments?

12         MR. INGRAM:  Objection to form.

13      A.  I would say it provided guidance toward

14   a relatively narrow range in some of the

15   subareas and then a somewhat larger range in

16   some of the subareas.

17      Q.  It didn't prescribe any particular

18   development in here, did it?

19      A.  It did not.

20      Q.  On page -- what's labeled as page 90,

21   which is the second page of the exhibit, the

22   area, the subject property, the current zoning

23   for that subject property is included both in

24   text and an image.  Do you see that?

1      A.  The zoning for the property, yes, I see

2   that.

3      Q.  So a large majority of the property is

4   zoned S1 special?

5      A.  Yes.

6      Q.  And that was also the zoning of the

7   property back in 2005.  Do you recall that?

8      A.  I do not recall that.

9      Q.  This document didn't change the

10  permitted uses on this subject property, right?

11     A.  Could you clarify?

12     Q.  Sure.  You would agree with me that the

13  zoning code, and the zoning districts, and the

14  permitted uses thereunder is what prescribes

15  what can or cannot be developed on the piece of

16  property, right?

17         MR. INGRAM:  Objection.  Calls for legal

18  conclusion.

19     A.  I mean, a zoning code functions as the

20  legal right to develop on a property.  I can say

21  that.

22     Q.  So my question is with this document did

23  those legal rights change as to this property?

24         MR. INGRAM:  Same objection.

1      A.  To my knowledge, no.

2      Q.  On page 91, which is the third page of

3  the exhibit, the first paragraph on the left

4  column, the last sentence talks about the

5  importance of the potential site to the

6  community and an expectation for public/private

7  partnership to play a role in the planning and

8  redevelopment of the site.  Do you see that?

9      A.  I do see it.

10      Q.  Do you know what type of public/private

11  partnership was contemplated or is being

12  contemplated for this site?

13      A.  For this particular site, I do not know.

14      Q.  Would you agree that public input among

15  other -- among input from other stakeholders is

16  critical in planning?

17          MR. INGRAM:  Objection to form.  Calls

18  for speculation.

19      A.  You have to be more specific for me.

20      Q.  Sure.  In your work as the City of

21  Bexley planner, does the city consider the

22  opinions or considerations that the public

23  brings with respect to various planning

24  projects?

1          MR. INGRAM:  Same objection and

2   incomplete hypothetical.

3      A.  It's difficult to answer that.  I mean,

4   generally it depends.  Depends on the --

5   depends.  That's all I can say.

6      Q.  What does it depend on?

7      A.  Depends on at what point different

8   elements of concern are raised, and how they're

9   raised, and the process by which they're raised.

10     Q.  Are all your professional opinions about

11  this site and this project under your scope

12  contained in your report?

13     A.  Could you rephrase?

14     Q.  Sure.  You provide your professional

15  opinions in the report, correct?

16     A.  Yes.

17     Q.  Do you have any opinions, professional

18  expert opinions, about the scope of work you

19  were tasked to do that you have not included in

20  your report?

21     A.  No.

22     Q.  Is it your opinion that the LC proposal,

23  which we've marked as Exhibit 141 for your

24  reference, meets the guidance that was provided

1   in the 2014 comprehensive plan update?

2       MR. INGRAM:  Objection to form.  A staff

3   memorandum is different than Lifestyle's

4   proposal, Counsel.

5       A.  Could you explain like your -- this is

6   the --

7       Q.  Sure.  I'm referring specifically to

8   Lifestyle's proposal, and my question is, is it

9   your opinion that the proposal that you reviewed

10  met the guidance provided in the 2014 comp plan

11  focus area?

12      A.  Yes.

13      Q.  The density in the proposal -- total

14  density of the proposal was 15.95 dwelling units

15  per acre.  Is that right?

16      A.  I'll need to refer to...

17      Q.  Turn to page 28 for reference.

18      A.  That is how the staff calculated it.

19  Yes, that is accurate.

20      Q.  You would agree that that density of

21  dwelling units per acre is greater than the

22  guidance provided in the 2014 strategetic plan,

23  right?

24      A.  No.

 1      Q.  What is the guidance in the 2014

 2  strategetic plan?

 3      A.  The guidance is per subarea, and this

 4  plan is very specific about the way that that

 5  issue is handled.  So this breaks out four

 6  subareas into -- or out of the overall whole

 7  site, one of which we can set aside from a

 8  density perspective as the Tucker Creek Preserve

 9  as that is intended to be preserved for a

10  natural feature reserve and has been submitted

11  for that in the Lifestyle plan.

12          So there are two other areas that have

13  specific recommendations as far as the number of

14  units.  I'm going to flip into this in my report

15  so I can give you the accurate numbers.  So in

16  the Worthington Estates Edge the plan says that

17  calls for single-family residential development

18  on lots between a third and a fifth of an acre.

19  This equates to a residential density similar to

20  Worthington Estates three dwelling units per

21  acre and Old Worthington four to five dwelling

22  units per acre.

23          MR. INGRAM:  Slow down.

24      A.  Sorry.  That is from the 2014 update on

1    page 92 to 93.

2         The Lifestyle plan includes

3    single-family lots at 3.72 units per acre.  So

4    that is, in fact, within the range that they

5    have prescribed.

6         Then moving to the Neighborhood Core,

7    the Neighborhood Core on page 93 says it calls

8    for development density between 6 and 14

9    dwelling units per acre, gross density, with

10   height limit of three stories.  And they

11   specifically mention there that they want -- the

12   plan anticipates that the Neighborhood Core will

13   be developed with more than one housing type and

14   more than one density level.

15        What this plan does is it offers two

16   different housing types in conformance with that

17   plan recommendation at two different density

18   levels in conformance with the plan

19   recommendation.  One of those densities at 9.55

20   and the other at 14.5.  I have not calculated

21   that specific average here.  Yet, I can attest

22   that when you average those acreages together

23   with the number of units it does come into the

24   range which is 6 to 14 in the Neighborhood Core,

1  which is exactly in keeping, and how I would

2  interpret that in any review that I was doing in

3  a professional staff capacity.

4         In the High Street mixed use area it's

5  very notable that there is not a density range,

6  and this is very typical in the way that these

7  plans are done in mixed use corridors.  I have

8  done plans like this.  I have implemented plans

9  like this.  I've read plans like this.  I've

10  worked in numerous communities that had similar

11  type of approaches where instead of a delineated

12  range of densities instead there is a general

13  form that is prescribed.

14         And in this case this form has to be a

15  minimum of two stories, and it could be up to

16  five stories, and that form is what dictates how

17  many units.  It could be -- you could have

18  extraordinarily few units or you could have very

19  many.

20         There's a particular project on Main

21  Street in the city of Bexley that is tens of

22  thousands of square feet and has four units in

23  it, because the people who built it decided they

24  wanted to have very large units.  There are

1    many, many more examples of buildings that are

2    this size that have a more typical unit count,

3    which is dictated by the natural constraints of

4    the site and the economics of the site in order

5    to facilitate a certain size of surface parking

6    and/or parking garage, and that's baked into the

7    essence.  And what this is suggesting is that

8    that is completely appropriate as far as a

9    strategetic analysis goes in this plan.

10       Q.  Is it your position that -- let's set

11   the mixed use subarea aside.  Is it your

12   position that if the subareas have a density

13   between 9 and 14 dwelling units per acre that

14   the city must approve the planned unit

15   development rezoning?

16       MR. INGRAM:  Objection to form.

17   Incomplete hypothetical.

18       A.  Could you make that more specific?

19       Q.  Sure.  You just got done telling me why

20   the density of the three subareas meet the

21   guidelines in the 2014 strategetic analysis and

22   home focus area, right?

23       A.  (Nods head).

24       Q.  Is it your position that by meeting the

1    guidance in this 2014 focus area document the

2    City of Worthington must approve the planned

3    unit development?

4        A.  The City of Worthington must, in my

5    opinion, use this document as the primary

6    guiding source of evaluation, and as many cities

7    they have a board that also considers

8    aesthetics, and that is a valid review tool that

9    can be used.  Unfortunately in this case, it

10   never progressed to the aesthetic review based

11   on the fact that it was cut short before the

12   architectural review board was able to

13   participate in that.

14       Q.  So back to my question.  In your

15   opinion, is the city required to approve the

16   planned unit development if it contains a

17   density for the Neighborhood Core between the 6

18   and 14 dwelling units per acre that's outlined

19   in the 2014 focus area document?

20           MR. INGRAM:  Objection.  Same objections

21   as before.  Incomplete hypothetical and asked

22   and answered this time.

23       Q.  You can answer my question.

24       A.  No.

 1      Q.  No, they're not required?

 2      A.  They're not required.

 3      Q.  Turning our attention to the

 4  multi-family -- excuse me, mixed use area.  If

 5  I'm understanding your testimony from earlier,

 6  and please correct me if I'm wrong, you

 7  testified that the 2014 focus area document

 8  we've identified as Exhibit 1 doesn't provide a

 9  specific density by way of dwelling unit per

10  acre number for that area.  Is that accurate?

11      A.  Correct.

12      Q.  So from your perspective does that mean

13  that a developer is permitted to provide

14  whatever density that developer wants?

15          MR. INGRAM:  Objection to form.

16      A.  Within the context of the overall

17  guidelines for that area.

18      Q.  And it's the city's prerogative to

19  accept or reject what that developer proposes in

20  that context.  Is that correct?

21          MR. INGRAM:  Objection.

22  Mischaracterizes this witness's prior testimony.

23      A.  It's the prerogative of the city to

24  evaluate whatever is proposed against this in

1  order to determine if it meets the standards

2  here.

3         MR. INGRAM:  For purposes of the record,

4  the witness was just pointing to Exhibit 1.

5         MR. ASHRAWI:  Thank you, Chris.

6         Can you read that answer back?  I'm

7  sorry I lost track.

8             (Record read as requested.)

9    Q.  So if a city has determined that, for

10  example in this case, the proposal's too dense,

11  you would agree that the city has the right to

12  request a lower density development in that

13  mixed use area.  Is that right?

14         MR. INGRAM:  Objection.  Assumes facts

15  not in evidence.  Incomplete hypothetical.

16  Calls for speculation.

17         You may answer if you can.

18    A.  I don't think that they have shown that.

19    Q.  Say that one more time.

20    A.  I don't think they have shown it's too

21  high of density.

22    Q.  Who's they in that statement?

23    A.  The staff and the planning commission.

24    Q.  How would you show that something is too

1    high -- too highly defense?

2        A.  In the case of this strategetic plan

3    since there is no set density range it would

4    have to exceed the building form, and that is

5    the only way that you could -- in my opinion, my

6    expert opinion in the hundreds of cases like

7    this that I've been involved in, that's the only

8    way that you can apply the standards in this

9    plan in order to determine what you would think

10   as a city or staff is an inappropriate density.

11   You have created a public document over a robust

12   public process that outlines the form of the

13   building.  It does not outline the density so

14   there is no maximum density in this plan.

15       Q.  So a developer can -- is entitled to

16   whatever density it wants, then?

17           MR. INGRAM:  Objection to form.  Asked

18   and answered and mischaracterizes this witness's

19   prior testimony.

20       A.  That -- a developer has to conform to

21   the -- doesn't have to.  A developer who does

22   conform to this plan would have a natural limit

23   on the density that they could create.

24       Q.  Are you aware that Lifestyle previously

1   proposed -- made a proposal with over 700 units

2   for the subject property?

3      A.  I am aware of the staff review that

4   states that.

5      Q.  Are you aware of Lifestyle Communities

6   presenting a plan to the city that included over

7   700 units?

8      A.  It is my understanding that happened.

9      Q.  Have you seen that proposal?

10      A.  I have not.

11      Q.  Is it your position, then, that the

12   700-plus unit proposal would be appropriate

13   under the guidelines of the 2014 focus area?

14          MR. INGRAM:  Objection.  Calls for

15   speculation.

16      A.  I haven't seen that plan so I don't know

17   if the form of that plan does, in fact, meet

18   this set of standards.

19      Q.  You would agree that a municipal

20   planning department in a city and their various

21   boards and commissions look at other documents

22   and information other than just the focus area

23   document, right?

24      A.  Most likely.

1    Q.  That would include the zoning code?

2    A.  Yeah, certainly.

3    Q.  Does the focus area document labeled as

4  Exhibit 1 reference multi-family or apartment

5  residential uses anywhere in the document for

6  this site?

7    A.  I will have to read it to see.

8    Q.  Take your time if you don't recall off

9  the top of your head.

10    A.  I do not recall.

11    Q.  If it's helpful, I can direct your

12  attention to page 94 where the document

13  discusses introducing different housing options

14  and the types of housing options that could be

15  used on that site.

16    MR. INGRAM:  Objection to form.

17  Mischaracterizes the document.

18    A.  Could you ask me the question again?

19    Q.  Sure.  Let's just focus on page 94 for

20  now.  You would agree that the document

21  indicates that this site creates an opportunity

22  to introduce different housing options, right?

23    A.  It does.

24    Q.  And then the document, again what we've

1  marked as Exhibit 1, the 2014 focus area,

2  includes examples of the different types of

3  housing options that would be desirable on this

4  site, does it not?

5       A.  It includes examples of some types of

6  housing types, yes, that would be desirable.

7       Q.  So let me -- so the examples include

8  single-family detached homes on small lots with

9  rear alley garages, right?

10          MR. INGRAM:  Objection.

11  Mischaracterizes this witness's prior testimony.

12      A.  Could you clarify what you're asking?

13      Q.  Sure.  I'm just reading from the

14  document and what is included as examples of a

15  mix of housing types.

16      A.  Yes, that is included in their list --

17  in the list.

18      Q.  As are homes with great front porches

19  for outdoor gathering, right?

20      A.  It is included.

21      Q.  Custom homes designed for first-floor

22  living, right?

23      A.  It is included.

24      Q.  Luxury residences with integrated front

1    auto courts, right?

2        A.  Yep.

3        Q.  Well-appointed walk-up townhomes?

4        A.  Yes.

5        Q.  And a limited number of high-end flats?

6        A.  Correct.

7        Q.  Which of these examples that are set out

8    in this 2014 focus area did LC include in their

9    proposal?

10       A.  They have flats and I believe some

11   townhomes, but I can't be certain of that in

12   this subarea.

13       Q.  In the Neighborhood Core subarea?

14       A.  In the Neighborhood Core subarea, yes.

15   Single-family homes are part of the Worthington

16   Estates Edge subarea.

17       Q.  I'm going to hand you what we previously

18   marked as Exhibit 7.  Do you know what this

19   document is?

20       A.  I believe I do.

21       Q.  What is it?

22       A.  This is the update to this portion of

23   the strategetic plan that was most recently

24   passed through council.

1      Q.  And you reviewed this document in

2  preparation for your report, right?

3      A.  I did.

4      Q.  This resolution 04-2022, which we marked

5  as Exhibit 7, this was adopted after the city

6  had already rejected the Lifestyle proposal for

7  redevelopment, planned unit development, right?

8      A.  That is my understanding.

9      Q.  Did this 2022 update change any of the

10  permitted uses permitted by zoning code on the

11  property?

12         MR. INGRAM:  Objection.  Calls for legal

13  conclusions.

14      A.  Not to my knowledge.

15      Q.  Did it rezone the property?

16      A.  Not to my knowledge.

17         MR. INGRAM:  Same objection.

18      Q.  Is there any part of this document that

19  is inconsistent with the 2014 focus area plan?

20      A.  Yes.

21      Q.  Can you walk me through those

22  inconsistencies?

23      A.  Yes.  The biggest inconsistency is

24  compatible with current S1 zoning.  That is not

1    what is outlined in the strategic analysis for

2    2014.

3        Q.  Can you identify where you're reading

4    and can you read the --

5        A.  On page 2 of 2 of the document you just

6    handed me under general components:  Compatible

7    with current S1 zoning, a large contiguous

8    greenspace, central to the property and

9    inclusive...

10       Q.  Was there a greenspace component to the

11   guidelines in the 2014 document?

12       A.  There were references, yes.

13       Q.  So how is the reference to this

14   greenspace different?

15       A.  Compatible -- it says seek an outcome on

16   this land.  Doesn't say seek an outcome of

17   greenspace.  It says seek an outcome on this

18   land that is compatible with current S1 zoning

19   if I'm understanding the way this is formatted.

20   Either way, compatible with current S1 zoning is

21   distinctly identified in the strategetic

22   analysis as not the highest and best use of that

23   property.

24       Q.  Anything else that's inconsistent with

1    the 2014 plan?

2        A.  It's extraordinarily vague and only

3    delineates -- it uses a lot of language that is

4    very unhelpful in the planning profession.

5    Words like harmonious.  Those are, as a

6    practicing professional for 25 years, the type

7    of words that we find to be of little use in our

8    staff efforts to try to review a site plan for

9    compatibility.  The vagueness of this speaks

10   to -- it's just -- it doesn't give any guidance

11   toward what the outcome should be as was

12   accomplished in this robust public process for

13   the strategetic analysis of 2014.

14       Q.  I think you used the term harmonious,

15   you said was kind of a vague term?

16       A.  Uh-huh.

17       Q.  Is that a yes?

18       A.  Yes.

19       Q.  Are there any other vague terms that are

20   used in this 2022 update?

21       A.  Exceptional, expressive, desirable,

22   harmonious again, respectful.  Those are very

23   difficult for a planner to use as a basis for

24   successful evaluation of a project.

1      Q.  Is it your position that the 2022

2   amendments replaced the 2014 focus area or

3   supplemented it?

4          MR. INGRAM:  Objection.  Calls for legal

5   conclusion.  Exceeds the scope of this witness's

6   tasks in this case.

7      A.  I'm not clear on the exact legal

8   ramifications of this.  I can't speak to their

9   intention.  I can say that it is certainly much

10  more vague and less satisfactory from a planning

11  standpoint than the 2014 robustly -- you know,

12  the results of a robust public process that was

13  accomplished.

14     Q.  You note on -- in your report that you

15  reviewed the 2014 presentation by MKSK regarding

16  the focus area document which we've labeled as

17  Exhibit 1.  Is that right?

18     A.  I reviewed the PowerPoint slides if that

19  is what you're referring to.

20     Q.  Yes.  Do you have any opinion about

21  those PowerPoint slides that is not contained in

22  here?

23         MR. INGRAM:  Objection.  Vague.

24     A.  No.

1    Q.  I'll hand you what we previously marked

2   as Exhibit 5.  Are you familiar with this

3   document?

4    A.  I don't think I am.  I don't think I am.

5    Q.  You can set that aside, then.

6    A.  Okay.

7    Q.  You indicated you reviewed the complaint

8   that is filed in this case, right?

9    A.  That is correct.

10    Q.  Have you reviewed any other pleadings or

11   court records since then?

12    A.  Related to this case?

13    Q.  Yes.

14    A.  No.

15    Q.  From a planning perspective, you would

16   agree that city council has discretion in

17   approving or denying a planned unit development

18   rezoning, right?

19        MR. INGRAM:  Objection.  Calls for a

20   legal conclusion.  Exceeds the scope of this

21   witness's tasks.

22    A.  They have discretion assuming they have

23   actually reviewed the information that would

24   provide them the ability to properly determine

1    whether or not it met the standards of the PUD.

2        Q.  You would agree upon review of the

3    comprehensive plan, focus area, the updates and

4    upon considering those documents the city still

5    does not have a requirement to approve the

6    planned unit development.  Is that right?

7            MR. INGRAM:  Same objections.

8        A.  The requirement, yeah, I can't speak to

9    that from a legal perspective.

10       Q.  And just to clarify, I'm not asking from

11   a legal perspective.  I'm asking from a planning

12   perspective.

13           MR. INGRAM:  Same objections.

14       A.  It -- if all of the review process is

15   undertaken and the proper interaction with the

16   applicant and feedback is given and a

17   satisfactory conclusion is not eventually

18   reached, they would have the ability, yeah, to

19   turn that down.

20       Q.  Have you been made aware or advised that

21   the Court has dismissed some of Lifestyle's

22   legal claims against the city?

23       A.  I cannot recall.

24       Q.  Are you aware or have you been made

1    aware that the Court determined that the city's

2    comprehensive plan does not limit the city's

3    discretion in denying the planned unit

4    development zoning?

5          MR. INGRAM:  Objection to form.

6       A.  Could you clarify that?

7          MR. INGRAM:  Mischaracterizes the

8    Court's order.

9                      -=0=-

10         (Deposition Exhibit 143 marked.)

11                     -=0=-

12   BY MR. ASHRAWI:

13      Q.  I'm going to hand you what we'll mark as

14   Exhibit 143.  Mr. Sudy, this is the opinion and

15   order from the federal court dated March 15th,

16   2023.  My first question to you after you've

17   paged through that and review it is have you

18   seen this before?

19      A.  I have not.

20      Q.  Since you have not seen it, I won't ask

21   you questions about it.

22      A.  Okay.

23      Q.  I want to turn -- strike that.

24         MR. ASHRAWI:  Take a short break.  We've

1    been going for about an hour.

2          MR. INGRAM:  Sure.

3                (Recess taken.)

4   BY MR. ASHRAWI:

5      Q.  Mr. Sudy, I'm going to refer you back to

6   your expert report, and I'm looking at page 3

7   where you begin your discussion.  In the

8   introduction you indicate that Lifestyle had a

9   reasonable expectation that the subject property

10  would be zoned and developed in accordance with

11  the city's action plan for the site based on

12  standard accepted professional planning

13  practices through central Ohio region and the

14  State of Ohio.  Do you see that?

15     A.  I do.

16     Q.  Did you speak at anyone at Lifestyle

17  regarding their expectations for the rezoning?

18     A.  I did not.

19     Q.  Do you know who Bo Brownlee is?

20     A.  I don't.  I mean, actually I sort of do

21  because I saw his name in the record, but I

22  don't know Bo Brownlee.

23          Also, I wanted to clarify.  Earlier you

24  had asked me about the 700 density unit

1  development application.  I have reviewed that

2  one.  I was getting confused based on the

3  density numbers with a previous submittal that

4  they had made years ago so I just wanted to get

5  that in the record.

6      Q.  Thank you for that clarification.

7      A.  Yeah.

8      Q.  So what is the basis, then, for your

9  finding that Lifestyle had a reasonable

10  expectation that the property would be rezoned?

11      A.  In looking at their proposal with

12  comparison to the 2014 analysis, I would find

13  that to be highly in conformance.  And it

14  also -- there's also a suggestion that a PUD

15  would be an actual good rezoning category for

16  them to pursue.  By Lifestyle pursuing a PUD and

17  in my opinion conforming very closely to what is

18  in the 2014 plan, it should be a situation where

19  there's an iterative process with staff and the

20  boards and commissions to clarify some of the

21  details in order to reach a conclusion which in

22  my opinion would then make it a very reasonable

23  expectation that if you met this and followed

24  the zoning recommendation, you would get a

1  rezoning.

2      Q.  Are you aware that a Lifestyle

3  representative previously testified that they

4  understood the rezoning process to not be

5  guaranteed in this instance?

6          MR. INGRAM:  Objection to form.

7      A.  I'm not aware of that.

8      Q.  Would you agree with the state -- a

9  general statement that rezoning is not

10  guaranteed?

11          MR. INGRAM:  Objection.  Calls for an

12  incomplete hypothetical.  Calls for speculation.

13      A.  In the world of teaching about zoning,

14  which I did for many years at Ohio State, an

15  absolute extreme version would be, yes, no

16  zoning is guaranteed.  That being said, there's

17  a wide variety of expectation as to when you

18  would likely expect a rezoning and when you

19  wouldn't.  And I would put this particular

20  application based on the materials that have

21  been submitted and the recommendation for a PUD

22  to be in the category of highly likely to expect

23  a rezoning.

24      Q.  And just to clarify, again, that's your

1 opinion.  Nobody from Lifestyle told you

2 Lifestyle's expectations, right?

3       MR. INGRAM:  Objection.  Asked and

4 answered.

5    A.  Correct.  Yes.

6    Q.  In the beginning of the second paragraph

7 you reference that -- or you state that approval

8 of the Lifestyle plan as submitted or with minor

9 modifications is a reasonable assumption.  What

10 minor modifications did you have in mind?

11    A.  In reading the staff report, I found

12 there to be very little substantive issues at

13 odds with the plan to justify the recommendation

14 of denial.  That being said, there are always

15 some issues, particularly in complex mixed use

16 projects and particularly in PUDs where there

17 are a lot of steps.

18       Of the issues that were already raised,

19 the particular one that I frankly agree with

20 from staff is Wesley Boulevard was proposed to

21 be a public street, and there was -- staff

22 raised a concern over whether that had been

23 built to public street standards since they

24 would be accepting that and then be responsible

1  for the ongoing maintenance.  That's absolutely

2  a comment that I would have made as well if I

3  was reviewing this, and again, something that

4  would have been worked out over the process of

5  the PUD application with the applicant to

6  determine whether or not the city found that to

7  be an acceptable roadway or if it had to be

8  rebuilt, et cetera.

9        In addition, there are likely in any

10  PUD, especially a complex PUD, a number of minor

11  modifications that would take place once the

12  aesthetic elements were designed and discussed,

13  and you know, vetted with the different boards,

14  determined to be in or not as close in

15  conformance with what their aesthetic standards

16  might be.  And so not reaching that point, it's

17  impossible to say what those might have been.

18        There also might have been some minor

19  tweaks in the boundaries of the different

20  development districts or in the specific mix of

21  uses or types of uses based on aesthetic

22  considerations that would change the building

23  characteristics that the ARB might request and

24  be agreed to by the applicant.

1      Q.  You agree with me that the staff report

2  indicated that the developer was advised the

3  development was too dense?

4         MR. INGRAM:  Objection to form.

5      A.  I agree that there was discussion about

6  the density.  I can't recall whether or not the

7  developer was advised.

8      Q.  You clarified earlier that you had seen

9  the Lifestyle proposal of the 700-plus units,

10  right?

11     A.  Yes.

12     Q.  Do you recall that the city advised at

13  that time that that proposal was too dense?

14        MR. INGRAM:  Objection.

15  Mischaracterizes this witness's prior statement.

16     A.  I recall that there was a request to

17  have additional office space.

18     Q.  You don't recall anything about the

19  residential density?

20     A.  At that time I don't recall.  That being

21  said, I do recall that it was stated in the

22  staff report.

23     Q.  You would agree with me that Lifestyle

24  has the ability to file a new rezoning

1  application today, right?

2       MR. INGRAM:  Objection to the extent

3  you're seeking a legal conclusion from this

4  witness and this line of questioning exceeds

5  this expert's assigned tasks in this case.

6       A.  Yeah, I mean, that's just a statement of

7  can anybody ever file any zoning ever in the

8  world.  Yes, anyone can ever at any time.

9       Q.  Including Lifestyle?

10      A.  Including Lifestyle.

11      Q.  Are you aware of anything preventing

12  Lifestyle from doing that?

13      A.  I am not.

14      MR. INGRAM:  Same objections.

15      Q.  I'm turning now to the portion of your

16  report that's titled planning background.  You

17  go over the various plans: the comprehensive

18  plan, strategic plan, focus area plan.  I think

19  we've discussed a lot of that at a high level

20  already.  You would agree that none of those

21  plans outline permitted uses on the property,

22  right?

23      MR. INGRAM:  Objection.

24      A.  I would agree that they don't rezone the

 1    property.  They do specifically suggest quite a

 2    few uses.

 3        Q.  Are those current uses or future uses?

 4        A.  The plans describe current uses and

 5    outline future uses.

 6        Q.  And are those future uses permitted

 7    under the existing zoning for the property?

 8        A.  Some of them.

 9        Q.  Which ones?

10        A.  Some of the commercial uses are allowed

11    under the commercial zoning.

12        Q.  Anything else?

13        A.  I would imagine -- yes.  The Tucker

14    Creek open space would be allowed under the S1.

15        Q.  And there was a Tucker Creek open space

16    in the proposal that LC submitted, right?

17        A.  Yes.

18        Q.  Anything else?

19        A.  You have to -- I'm sorry, could you

20    clarify anything else?

21        Q.  Yeah.  Any other future land use

22    recommendations that are currently permitted by

23    the zoning code?

24        A.  I would say no.

1      Q.  In your planning experience and

2   background is public outreach part of the

3   development process?

4          MR. INGRAM:  Objection.  Calls for legal

5   conclusion.

6      A.  I would say that public -- the public

7   meeting process is always part of the

8   development review process.

9      Q.  And the public meeting process is an

10   important piece of the development process?

11          MR. INGRAM:  Objection.  Form.

12      A.  Yes, it is, and the public meeting

13   process is clearly defined as opposed to the

14   nebulous form of public outreach which can take

15   myriad forms.  Public meeting process is a

16   delineated process that's very clear and central

17   to the review of an application.

18      Q.  In your experience and background is it

19   common for local governments to ask land

20   developers to seek public buy-in for a

21   development project?

22          MR. INGRAM:  Objection.  Calls for

23   speculation.  Incomplete hypothetical.

24          You may answer to the extent you can.

1    A.  Sometimes.

2    Q.  Did you speak with anyone from the city

3  about the city's PUD rezoning process?

4    A.  I did not.

5      MR. INGRAM:  Objection.  Asked and

6  answered.

7    Q.  You reviewed the PUD rezoning process

8  outlined in the zoning code, right?

9    A.  That is correct.

10    Q.  And that the zoning code outlines what

11  must happen through that process, right?

12    A.  Yes.

13    Q.  Have you ever either owned property that

14  was rezoned in Worthington or worked on behalf

15  of a client that was rezoning property in the

16  city of Worthington?

17    A.  I personally have not.

18    Q.  Have you ever worked for the City of

19  Worthington on a planned unit development

20  rezoning project?

21    A.  I personally have not.

22    Q.  Have you ever personally rezoned

23  property anywhere in the state of Ohio?

24      MR. INGRAM:  Objection to form.

1    A.  I personally have not.

2    Q.  Have you represented a private landowner

3  in a rezoning process in the state of Ohio?

4       MR. INGRAM:  Objection to form.

5    A.  Yes.

6    Q.  When?

7       MR. INGRAM:  Same objection.

8    A.  I cannot recall sitting here.  I would

9  have to go back and look at project records to

10  determine that.

11    Q.  How many times would you say you've

12  represented a private landowner through a

13  rezoning process?

14    A.  I can't recall sitting here.  I'd have

15  to go back and look at it.  Under 10.

16    Q.  When was the last time to the best of

17  your recollection?

18    A.  I can't recall sitting here.  I have to

19  look into that.  Not in the last three years,

20  certainly.

21    Q.  Would you agree that through your review

22  of these documents and watching the videos and

23  whatnot that the city and its various boards and

24  commissions did consider the comprehensive plan,

1  the 2005 strategetic updates, the UMC focus area

2  from 2014, the bicycle and pedestrian plan of

3  2019, and the park master plan of 2017?

4      MR. INGRAM:  Objection to form.

5    A.  I would say that the planning commission

6  highly disregarded most of those plans.

7    Q.  So your position is they did not

8  consider those plans?

9    A.  They considered -- if they considered

10  them, which they did not seem to, they

11  considered them very erroneously and gave a

12  credibly flimsy and nonsubstantial reasoning for

13  a lot of the input at the hearing that I

14  watched.  There was some specific input, and

15  there was a lot of input that was, generally I

16  would characterize it as, I just don't like it.

17    Q.  What specific input do you recall?

18    A.  I just don't think this is right for

19  this site.  I just don't like how it -- I don't

20  like where the buildings are.  I don't like the

21  height.  I don't like -- they just said they

22  didn't like it, which is insubstantial for a

23  planning review in my opinion.

24    Q.  Thank you.  We'll come back to that in a

1  second.

2          I think you testified, and correct me if

3  I'm wrong, there was some specific input that

4  was provided?

5      A.  There was.

6      Q.  What was that specific input?

7      A.  There was concern over linking roads to

8  the existing streets, which I might point out is

9  directly opposite of what was recommended in the

10  2014 update.  There was concern about the

11  overall number of unit count.  And there was

12  concern about open space, the desire for more

13  open space.

14      Q.  Do any of the -- well, strike that.

15          Does the 2014 focus area plan set forth

16  a specific objective open space number?

17      A.  It sets forth a specific objective to

18  protect the Tucker Creek and then to integrate

19  overall open space within the development

20  without a specific target number.

21      Q.  You begin discussing some of what you

22  heard from the planning and zoning commission,

23  and you categorized it as I just don't like it.

24  Is that an accurate description?

1      A.  That is how I would characterize a lot

2  of what was said by the members.

3      Q.  You then went on, I believe, to say, at

4  least I heard part of it, some people didn't

5  like where the buildings were placed.  Do you

6  recall that?

7      A.  Yeah.  It was, again, very nebulous.  It

8  is basically exactly opposite of how as a

9  planning professional I advise anyone on a board

10  that I am staffing to answer a question, and how

11  as a volunteer I've been advised to answer a

12  question.  We're advised to give very specific

13  reasons that tie directly into your guiding

14  documents and not speculate and/or express our

15  personal opinions without having a solid reason,

16  and that's what I felt was happening a lot at

17  that meeting.

18      Q.  You would agree that the staff report

19  did give a specific concern about the unit

20  counts on the mixed use piece, right?

21          MR. INGRAM:  Objection.

22  Mischaracterizes this witness's prior testimony.

23      A.  I agree it did give -- it did state a

24  concern.  I don't agree that that is an accurate

1  interpretation of this document.

2     Q.  And you don't agree with the concern, I

3  assume, right?

4     A.  I don't agree with the concern.

5     Q.  Do you think in your professional

6  opinion that the 2014 focus area plan should

7  provide specific densities for the mixed use or

8  a specific acreage or percentage of greenspace?

9        MR. INGRAM:  Objection.  Calls for

10  speculation.

11     A.  I think that the way that it was handled

12  was accurate and the way -- or advisable in the

13  way that a planning document can set up a form

14  for mixed use.  Mixed use is hard to prescribe.

15  Involves market conditions and site conditions.

16  And by setting up an overall framework, it is

17  more successful in leading to a quality outcome.

18  Whereas, the individual districts that were

19  prescribed as transition districts --

20  residential districts to transition into the

21  existing residential I understand why they

22  prescribed the density in order to satisfy that

23  land use continuum from a dense urban frontage

24  from a less dense situation that would mirror

1  what was next to it.

2    Q.  And you would agree from a planning

3  perspective that not prescribing specific

4  densities for the mixed use portion or specific

5  greenspace numbers allows some flexibility when

6  considering a specific application, right?

7       MR. INGRAM:  Objection.  Misstates this

8  witness's prior testimony.

9    A.  I would say it allows flexibility, and

10  it also allows the form to be the most -- the

11  main focus of the development review which for

12  my practice and for most of the cities that I've

13  worked with -- all the cities in recent times

14  has been a primary concern of their development

15  process.

16    Q.  Would you agree that every -- that

17  different local governments have different

18  rezoning processes?

19       MR. INGRAM:  Objection.  Calls for

20  speculation.  Ambiguous and vague.

21    A.  I am aware of several different

22  municipalities zoning processes, and yes, they

23  have some different elements to each.

24    Q.  And I'm curious.  You've testified

1  earlier you've done some out-of-state work.  Do

2  you find differences outside of Ohio than you

3  would here in central Ohio?

4       MR. INGRAM:  Same objections.

5    A.  I have, yet surprisingly not very

6  different.

7    Q.  That was a legitimate -- I was very

8  curious about that.

9    A.  Depends on the state, but oftentimes not

10  very different.

11   Q.  Sure.  And you would agree every local

12  government has different zoning classifications

13  and different uses, land uses under those

14  classifications and varying degrees of

15  specificity in their comprehensive plans, right?

16       MR. INGRAM:  Objection.  Calls for

17  speculation, ambiguous, incomplete hypothetical.

18   A.  I can say just for the communities that

19  I've worked in that there have been

20  distinctions.

21   Q.  You indicate in your report that the

22  process should be collaborative, right?

23   A.  (Nods head).

24   Q.  Between the developer and the city?

1      A.  Yes.

2      Q.  Do you know what collaboration or what

3   discussions city staff had with Lifestyle?

4      A.  I'm not aware of the full breadth of

5   those.  What I am aware of is the fact that at

6   the planning commission in a circumstance that

7   in my entire, you know, 26 now years of

8   experience would indicate is the exact time that

9   a tabling would occur after a discussion in the

10  early stages, a conceptual stage that was even

11  mentioned several times, though different cities

12  call that different things, of a PUD that you

13  would absolutely table that application by the

14  request of the applicant in order to facilitate

15  the interactive process with staff by stopping

16  that and then effectively creating a situation

17  where the ARB had to deny it as well because

18  there was effectively nothing to table.  You've

19  cut off the opportunity for staff to have that

20  interaction with the applicant instead of

21  promoting that which is essentially what a PUD

22  is all about.  Whether you agree or disagree

23  with the provisions of the PUD process, that

24  central tenant of a PUD is it has to be

1    collaborative throughout the entire process.

2        Q.  But you're not aware of what

3    collaboration happened before that point, right?

4        A.  Only from what I read in the complaint.

5        Q.  Because you didn't talk to anyone from

6    Lifestyle or the city, right?

7        A.  Correct.

8        Q.  Are you aware that Lifestyle's previous

9    proposal was tabled to make changes per staff

10   request?

11           MR. INGRAM:  Objection.  Assumes facts

12   not in evidence.

13       A.  Only aware of what I read in the staff

14   report.

15       Q.  Is that what the staff report said?

16           MR. INGRAM:  Same objection.

17       A.  That is what the staff report indicated,

18   yes.

19       Q.  Do you have any reason to --

20       A.  I will clarify I don't recall it

21   actually saying tabling, but the staff report

22   referred to an earlier application.

23       Q.  And it referred to an earlier

24   application where feedback was given by the city

1  staff to the developer that led the developer to

2  amend the plan, correct?

3          MR. INGRAM:  Objection.

4  Mischaracterizes the evidence in the record,

5  Counsel.  And assumes facts not in evidence.

6  Objection to form.

7          You can answer if you can.

8      A.  The only element that I'm aware of was

9  the request for additional office which

10  according to the staff report accommodated and,

11  you know, comparing the plans clearly.

12      Q.  And that was the only feedback that you

13  recall seeing for that original?

14      A.  For the original that's the only

15  feedback I recall seeing.

16      Q.  Are you aware of the city taking any

17  action to rezone this property outside of

18  Lifestyle's proposals?

19      A.  No.

20      Q.  I think you've indicated a couple times

21  and you, I believe, indicate in your report

22  there was little substance for the

23  recommendation of the denial by the staff,

24  right?

1    A.  Yes.

2    Q.  I'm going to have you turn back to what

3  we've marked as Exhibit 141, which is the staff

4  memorandum and the Lifestyle proposal, and I'll

5  have you turn specifically to what's labeled in

6  the bottom right-hand corner page 47 of 201,

7  please.  Let me know when you're there.

8    A.  I am there.

9    Q.  Do you see the bold Staff

10  Comments/Analysis?

11    A.  The words Staff Comments/Analysis?

12    Q.  Yes.

13    A.  Yes.

14    Q.  First sentence under that heading you

15  would agree that staff has indicated in the

16  report that they've compared the materials to

17  the language in the 2014 comprehensive plan

18  update?

19    A.  They have indicated that in this report,

20  yes.

21    Q.  And they've included a list of

22  discussion topics that they then discuss in the

23  report which includes the residential density,

24  heights, housing types, mix of land uses,

1  greenspace, open space, park land, traffic, and

2  bike and pedestrian accommodations.  Do you see

3  that?

4      A.  I do.

5      Q.  You would agree that in discussing the

6  residential density staff provided a history of

7  the proposals and indicated that the proposal

8  was still too dense from their perspective.  Is

9  that a fair characterization of what staff

10  states?

11      MR. INGRAM:  Objection.  Calls for

12  speculation.

13      A.  Yes.  They believe -- staff believes

14  that density should be reduced.

15      Q.  What to you is not clear about the need

16  to reduce housing density?

17      A.  There is no requirement within that plan

18  for density, and the form of the proposal

19  creates its own density limit.  There is no

20  indication in any of that planning, which was a

21  year-long, robust community process, that there

22  needs to be or is a density limit in that area.

23  And the entire purpose of that was to create a

24  flexible mixed use district.  So there is no --

1    absolutely no reason why this plan in any way

2    supports lowering density or creates a situation

3    whereby density would have to be lowered to

4    conform to the 2014 plan.

5         MR. INGRAM:  And for purposes of the

6    record --

7         A.  I pointed to the 2014 plan.

8         MR. INGRAM:  -- the witness is pointing

9    to Exhibit 1.

10        MR. ASHRAWI:  Thank you.

11        Q.  You would agree that the staff also

12   indicated the need for additional housing types

13   including single-level living "which is one of

14   the key things we have heard from our residents

15   that they would like to see offered in the

16   community".  Do you agree with that statement?

17        A.  That they said that?

18        Q.  Yes.

19        A.  Yes, the staff said that.

20        Q.  What is unclear about the desire for

21   additional options for single-level living?

22        A.  One of the themes that runs through the

23   staff report is that they are interpreting

24   the -- they're interpreting what they believe

1   they have heard from the community outside of

2   this robust community development process that

3   reviewed the 2014 adopted plan, and speculating

4   on what they think are the most important

5   elements that they may or may not have heard by

6   some portions of the community.

7          As a professional reviewing plans, I

8   have to look to the most robust public process

9   that was taken place and the resulting

10  documentation that came out of that as the

11  guide.  Any individual can have any concern in

12  any community, and you know, in a community of

13  14 and a half thousand people there's no way to

14  know whether that housing option to me was a

15  significant portion and/or whether it should be

16  accommodated here or elsewhere.

17         In order to understand that, I would

18  look at the overall comprehensive plan, the

19  overall set of focus areas as a staff planner,

20  and I would look on this site to this guiding

21  document.  And I would try to understand the

22  greater balance of land uses throughout the

23  community and not ascribe any specific desire

24  only to one spot if that spot, in fact, was

1    outlined very clearly in a focus area plan.

2        Q.  Safe to say you disagree with staff's

3    comments as part of this proposal?

4        A.  I disagree with the comments that don't

5    align with the 2014 strategetic analysis,

6    particularly ones that specifically cite what

7    the community desires due to the fact that this

8    is the document that was produced by a

9    community -- robust community input.

10           In my interpretation as a planner, the

11   2014 strategetic analysis is what the community

12   desires until it's adopted or replaced through

13   another robust process that would be -- I don't

14   know if it has to be a year, but it certainly

15   has to involve a great deal of public input and

16   a series of public meetings and recommendations

17   by both the architectural review board and the

18   planning commission before council could act on

19   a replacement for that.

20       Q.  So I'm trying to understand how you go

21   exclusively from the 2014 focus area to an

22   acceptable plan where we've just discussed there

23   are no objective greenspace requirements or

24   density requirements for a mixed use.  So let me

1   ask you in your professional capacity if

2   Lifestyle's proposal included no residential

3   units in the mixed use area because there's no

4   density requirement whatsoever, that would

5   conform to the plan, right?

6          MR. INGRAM:  Objection.  Calls for

7   speculation.  Incomplete hypothetical.

8     A.   If Lifestyles create a building

9   structure that was in conformance with this plan

10  and included the uses that are outlined in this

11  plan, it would be in conformance.  What the

12  question is, is what is proposed is in

13  conformance.  We could speculate a whole manner

14  of things that could be proposed, and that's the

15  essence of both the guiding plan and the PUD.

16  And the process of getting to those specific

17  outcomes in a PUD is what's happened every time

18  a PUD has been utilized -- well, almost every

19  time a PUD is utilized in almost every

20  community.

21         One of the challenges of a PUD is, of

22  course, it is a bit burdensome to get to those

23  final specific elements with the development

24  text and the development plan and then

1    subsequent need to amend and update any of those

2    elements, which is why a lot of communities

3    don't use PUDs anymore, and they've gone to more

4    form-based zoning which is not available in

5    Worthington.

6         If we were advising on this site in

7    another community, we would probably advise them

8    to actually rezone the property with a

9    form-based approach, and then you would have

10   those specific standards.  You wouldn't have to

11   go through the iterative process that

12   Worthington's code dictates.

13        Q.  So this is not zoned for form-based

14   zoning, right?

15        A.  It is not.

16        Q.  And my question is generally -- I'm

17   generally -- genuinely curious what staff and

18   the city's role in this.  If you're telling me

19   there's any number of proposals that in your

20   opinion would conform to this, what is staff and

21   the city's role in adopting a PUD then?

22        MR. INGRAM:  Objection.  Calls for

23   speculation.  Vague.  Ambiguous.

24        You can answer to the extent you can.

1    A.  I don't know what the Worthington

2  staff's role is.  I can tell you what my role

3  has been, and I helped adopt the, at that point,

4  1600-acre New Albany Company PUD in the Village

5  of New Albany back when it was a village.  And

6  our role was rigorous, and it was highly

7  involved, and we worked in an incredibly

8  repetitive and iterative fashion throughout an

9  extensive public process that took the base

10  plans that we already had in place, applied

11  those through architectural and planning

12  evaluation, determined all of the specific

13  elements that were going to take place in the

14  PUD.  In fact, it's one of the most rigorous

15  times a planner can be involved.

16         And I don't believe that that has taken

17  place from what I'm reading in the Worthington

18  case in that the staff report mostly does a

19  light evaluation of a conceptual plan based on

20  this adopted 2014 plan in a way that I don't

21  think syncs, and relies extremely heavily on

22  speculation about what the community wants in

23  absence of looking to what was established

24  through a year-long community process.

1      Q.  Was there -- when you were working for

2   the Village of New Albany, you said that the PUD

3   process was one of the times that a planner

4   could most rigorously be involved in the PUD

5   process, right?

6      A.  Absolutely.

7      Q.  That's because there's flexibility in

8   density, uses, forms, et cetera, right?

9      A.  Correct.

10      Q.  So when you were working on that

11   1600-acre PUD, was there a comprehensive plan

12   that you were relying on?

13      A.  There was.

14      Q.  Did it still require a rezoning to PUD?

15      A.  It did.

16      Q.  Was the city in favor of the final

17   product?

18      A.  You have to -- can you rephrase?

19          MR. INGRAM:  Objection.  Form.

20      Q.  The city eventually -- the city council

21   eventually had to approve that PUD, right?

22      A.  That's correct.

23      Q.  How long did that process take?

24      A.  Years.

1      Q.  And there were iterations of the plan,

2   right?

3      A.  There were iterations along the way, and

4   in every, every step of the way the plan was

5   moved forward or tabled by every single board

6   that ever heard it, and it was far, far more

7   complex than what this is.  And every board was

8   willing to allow staff to have that latitude to

9   keep talking to the applicant and to figure out

10   the very extensive details that were necessary

11   in order to implement it.

12         And on a simpler PUD that's a fraction

13   of the acres that seems like it would be the

14   least thing that you would do, is allow the

15   staff to continually -- that's my alarm.  Excuse

16   me.

17            (Pause in the proceedings).

18   BY MR. ASHRAWI:

19      Q.  Mr. Sudy, when you were working on the

20   PUD in New Albany, was there discussion about

21   residential density?

22      A.  There was.

23      Q.  And there was some back and forth on

24   changes in density, right?

1    A.  There were.

2    Q.  And there were discussions on the mix of

3  housing options in that area, right?

4    A.  There were.

5    Q.  And the final and end product that was

6  approved by city council was less dense than

7  what it was proposed originally, right?

8       MR. INGRAM:  Objection.  Assumes facts

9  not in evidence.  And this whole line of

10  questioning is entirely irrelevant.  You can

11  answer to the extent you can.

12    A.  Well, there's multiple parts to that.  A

13  part of it was approved that was less dense, and

14  then it was modified to be much more dense.

15    Q.  What part was that?

16    A.  Village center.

17    Q.  Have you looked at any other PUD

18  rezonings that the City of Worthington has

19  undertaken?

20    A.  I have not.

21    Q.  Are you aware of the -- if the city has

22  undertaken any other PUD rezonings?

23    A.  I am not.

24    Q.  So you don't know what process the city

1  has utilized in the past for other PUD

2  rezonings?

3       MR. INGRAM:  Objection.  Misstates this

4  witness's prior testimony.

5     A.  I know it's outlined in the code which

6  is very similar to the other PUD.  I would hope

7  that they would conform to that process.

8     Q.  Is there a requirement for continued

9  staff engagement in the code after an

10  application has been filed?

11     A.  I can't speak to that.  It is such a

12  foregone conclusion and especially for PUDs.

13     Q.  But you don't know whether that's in the

14  zoning code?

15     A.  I do not know.

16     Q.  Are you aware of the other proposals,

17  any other PUD proposal or development proposal

18  that have been submitted to the city for this

19  site prior to Lifestyle's?

20     A.  Am I aware of any other PUD proposals?

21  I am not.

22     Q.  Are you aware of any other proposals or

23  considerations for the subject property's

24  development prior to Lifestyle's?

1      A.  I'm aware that there was a proposal, but

2  I'm very unfamiliar with it.

3      Q.  So you don't know any of the details of

4  that proposal?

5      A.  All I know is it was for a grocery

6  store, and that's all I know.

7      Q.  You mention in your report that

8  Lifestyle was cut off from interactive and

9  timely review.  My question is related to the

10  timely review portion.  Are you suggesting that

11  there was an untimely review of something?

12      A.  It's very hard to define the specific

13  elements of a process from the outside.  So you

14  have to look for indicators of what that might

15  be.  And particularly at the planning commission

16  hearing where the applicant seemed very eager to

17  understand any of the suggestions that were

18  concrete that were offered, that would indicate

19  that in the ensuing time between their earlier

20  proposal there had been very little guidance

21  given to them, and that is -- while developers

22  can take whatever time they want to move forward

23  and amend an application, you know, once that

24  process is in place as a city staff or an acting

1  city staff member, we feel it incumbent upon

2  ourselves to give feedback as quickly and as

3  immediately as we can.  So that's as much as I

4  can tell from the indications of the outcomes.

5        And then certainly after that, after

6  being denied without a tabling, you know, then

7  they're basically put in a situation where they

8  have to move forward with an existing denied

9  application and have no forward progress in that

10  amount of time until they go through the council

11  process.

12     Q.  Thank you for that explanation.  I just

13  wanted to clarify whether there was a certain

14  timeline that was not met by code.  So just to

15  clarify is that -- is that not the case?

16        MR. INGRAM:  Objection.  Asked and

17  answered.

18     A.  Yeah.  I can't speak to the code aspect.

19     Q.  Who authored and wrote up this report?

20     A.  I did.

21     Q.  Did you receive any assistance from

22  anyone?

23     A.  I did not.

24     Q.  Anyone type it for you?

1    A.  No.  I wish somebody would have.

2    Q.  Are there other drafts of this report?

3    A.  Probably.

4    Q.  Would those drafts be contained in your

5  working file?

6    A.  Yes.

7    Q.  Are there redline versions of this

8  report?

9    A.  Clarify.  Can you clarify?

10    Q.  Sure.  Have you exchanged or have you

11  redlined your report?  You know, Word provides

12  an opportunity to redline, make redline changes.

13    A.  I can't say as I necessarily did a track

14  change.

15    Q.  Would anyone else have redlined this

16  report?

17    A.  No.

18    Q.  Have you ever seen a rezoning request be

19  denied?

20    A.  Yes.

21    Q.  In your position as the chair of the

22  Italian Village Commission, has that board ever

23  recommended a denial of a rezoning?

24    A.  I can't speak for the whole history of

1  the board.  In the last 20 years, you know, I

2  don't know if we have.  We may not have.  I'd

3  have to look back at the record.  I don't know.

4  We try to be very collaborative and hopefully

5  get it to a resolution.  I can't say for certain

6  honestly.

7          MR. ASHRAWI:  Why don't we take a very

8  short break and I may be wrapped up.  I'm going

9  to try to extend this as long as I can.

10              (Recess taken).

11  BY MR. ASHRAWI:

12    Q.  Mr. Sudy, you would agree with me that

13  there are four different zoning classifications

14  currently on the subject property.  Is that

15  right?

16    A.  Yes, I believe that's true.  I have to

17  look at that.

18    Q.  I'll actually direct your attention to

19  what's previously been marked as Exhibit 5.

20  This is a document you said you hadn't seen

21  before.  I thought this was what you referenced

22  in your report when you noted reviewing

23  materials from the city's website, 1033 High

24  Street?

1      A.  This is not clear to me this is from the

2  website.  Is this -- can you explain the origin

3  of this document?

4      Q.  Sure.  It is on the website under this

5  heading.  You can sort of see the Worthington

6  emblem that's been --

7      A.  Gotcha.

8      Q.   -- Xeroxed probably several times.  But

9  in any event I'll ask you just to turn to the

10  second page or the back of the front page, and

11  this document lists out the zoning districts for

12  the property.  Can you just confirm based on

13  your understanding those are the zoning

14  districts that you understand to be on the

15  property?

16      A.  I need to look at the zoning map again

17  to verify that those are the actual names of the

18  zoning districts.  I'm not familiar with the

19  code to that extent I reviewed based on...

20      Q.  Let me ask you this.  You would agree

21  that the majority of the property is zoned this

22  S1 special district.  Do you recall that?

23      A.  Let me look at the -- I believe it was

24  outlined here in this plan.  I'm looking at the

1  comprehensive plan so this could be

2  significantly out of date.  Maybe it's in the --

3  oh, it's in this plan.  2014 plan.  So according

4  to the zoning map provided in the 2014

5  strategetic analysis the majority of the site is

6  S1.

7      Q.  And you reviewed the permitted uses

8  under S1, right?

9      A.  That's correct.

10     Q.  And you would agree that examples of

11  permitted uses include recreational facilities,

12  government buildings and service buildings.  Is

13  that -- based on your recollection, is that

14  accurate?

15     A.  I'm assuming that the -- by your -- this

16  review that the city has accurately represented

17  what is in their zoning code.  I would have to

18  see a copy of the actual zoning code in order to

19  verify that that was, in fact, the correct uses

20  that they've listed.

21     Q.  Let me ask a more general question.  You

22  would agree that the S1 district allows some

23  uses on that property, right?

24     A.  Yes.

1     Q.  Okay.

2          MR. ASHRAWI:  Those are all the

3   questions I have.  Thank you for your time

4   today, Mr. Sudy.

5          THE WITNESS:  Absolutely.

6          COURT REPORTER:  Read and sign?

7          MR. INGRAM:  Yes.

8          COURT REPORTER:  Ordering?

9          MR. ASHRAWI:  Yes, please.

10         COURT REPORTER:  Copy?

11         MR. INGRAM:  Yes, please.

12              (Signature not waived.)

13                      -=O=-

14         Thereupon, the testimony of December

15   19, 2023, was concluded at 4:18 p.m.

16                      -=O=-

17

18

19

20

21

22

23

24

1                    CERTIFICATE

2   STATE OF OHIO       :
                          SS:
3   COUNTY OF FRANKLIN :

4           I, Julia Lamb, RPR, CRR, a
    stenographic court reporter and notary public in
5   and for the State of Ohio, duly commissioned and
    qualified, do hereby certify that the
6   within-named JASON SUDY was first duly sworn to
    testify to the truth, the whole truth, and
7   nothing but the truth in the cause aforesaid;
    that the testimony then given was taken down by
8   me stenographically in the presence of said
    witness, afterwards transcribed; that the
9   foregoing is a true and correct transcript of
    the testimony; that this deposition was taken at
10  the time and place in the foregoing caption
    specified.
11
            I do further certify that I am not a
12  relative, employee or attorney of any of the
    parties hereto; that I am not a relative or
13  employee of any attorney or counsel employed by
    the parties hereto; that I am not financially
14  interested in the action; and further, I am not,
    nor is the court reporting firm with which I am
15  affiliated, under contract as defined in Civil
    Rule 28(D).
16
            In witness whereof, I have hereunto
17  set my hand at Columbus, Ohio, on this 4th day
    of January, 2024.
18

19

20          *Julia Lamb*

21          Julia Lamb, RPR, CRR
22          Notary Public, State of Ohio

23  My commission expires:  10-10-27

24

### Exhibits

**Exhibit 1** 51:2,3 56:2
66:8 67:4 70:4 71:1
76:17 102:9

**Exhibit 5** 77:2 115:19

**Exhibit 7** 72:18 73:5

**Exhibit 140** 7:14,18
33:2 36:8

**Exhibit 141** 37:8,12,
13,22 59:23 100:3

**Exhibit 142** 41:11,17

**Exhibit 143** 79:10,14

---

### -

**-=0=-** 7:13,15 37:7,9
41:10,12 79:9,11

**-=O=-** 118:13,16

---

### 0

**04-2022** 73:4

---

### 1

**1** 51:2,3 56:2 66:8 67:4
70:4 71:1 76:17 102:9

**10** 90:15

**1033** 115:23

**11** 54:21

**139** 7:11

**13th** 37:15

**14** 16:3,23 62:8,24
64:13 65:18 103:13

**14.5** 62:20

**140** 7:14,18 33:2 36:8

**141** 37:8,12,13,22
59:23 100:3

**142** 41:11,16,17

**143** 79:10,14

**15** 7:20

**15.95** 60:14

**151** 37:23

**15th** 79:15

**1600-acre** 107:4
108:11

**19** 118:15

**1998** 16:24

---

### 2

**2** 74:5

**20** 29:4 115:1

**2005** 6:24 41:21,23
42:4 45:8,21 46:12
47:6 49:19 53:8 57:7
91:1

**201** 37:22,23 38:3
100:6

**2012** 16:24

**2014** 7:1 9:2 42:3
45:15 51:4,11 56:3
60:1,10,22 61:1,24
64:21 65:1,19 66:7
69:13 71:1 72:8 73:19
74:2,11 75:1,13 76:2,
11,15 81:12,18 91:2
92:10,15 94:6 100:17
102:4,7 103:3 104:5,
11,21 107:20 117:3,4

**2016** 20:18,19,24 21:7,
10,15 25:18

**2017** 91:3

**2018** 21:9,10,15 22:11
25:18

**2019** 91:3

**2021** 24:18 27:21 28:8
35:18,20

**2022** 73:9 75:20 76:1

**2023** 7:20 79:16
118:15

**21** 37:22

**25** 75:6

**26** 97:7

**28** 60:17

---

### 3

**3** 80:6

**3.72** 62:3

---

### 4

**40** 45:24

**47** 100:6

**4:18** 118:15

---

### 5

**5** 77:2 115:19

**50** 18:20

---

### 6

**6** 62:8,24 65:17

---

### 7

**7** 72:18 73:5

**700** 69:1,7 80:24

**700-plus** 69:12 85:9

**76** 49:20

---

### 8

**89** 54:20

---

### 9

**9** 64:13

**9.55** 62:19

**90** 56:20

**91** 58:2

**92** 62:1

**93** 62:1,7

**94** 70:12,19

**99** 54:21

---

### A

**ability** 77:24 78:18
85:24

**absence** 107:23

**absolute** 82:15

**absolutely** 13:24 84:1
97:13 102:1 108:6
118:5

**accept** 66:19

**acceptable** 6:5 84:7
104:22

**accepted** 80:12

**accepting** 83:24

**accommodated**
99:10 103:16

**accommodations**
101:2

**accomplish** 54:13

**accomplished** 40:6
75:12 76:13

**Accord** 18:10

**accordance** 80:10

**accurate** 7:22 9:15,16
10:10 20:12 40:11
49:16 55:14 60:19
61:15 66:10 92:24
93:24 94:12 117:14

**accurately** 117:16

**acre** 60:15,21 61:18,
21,22 62:3,9 64:13
65:18 66:10

**acreage** 94:8

**acreages** 62:22

**acres** 109:13

**act** 31:7 104:18

**acting** 112:24

**action** 80:11 99:17

**actual** 13:5 81:15
116:17 117:18

**addition** 7:3 14:22
84:9

**additional** 85:17 99:9 102:12,21

**adjunct** 14:14

**administer** 29:19

**administering** 29:13

**administrative** 32:22

**admitting** 44:24

**adopt** 107:3

**adopted** 45:14 55:12 73:5 103:3 104:12 107:20

**adopting** 106:21

**advisable** 50:17 94:12

**advise** 93:9 106:7

**advised** 78:20 85:2,7, 12 93:11,12

**advising** 106:6

**aesthetic** 65:10 84:12,15,21

**aesthetics** 65:8

**agencies** 22:6,10 23:11

**Agency** 22:7

**agenda** 38:4

**agree** 46:20,21,22 50:6 55:22 56:1,6,9 57:12 58:14 60:20 67:11 69:19 70:20 77:16 78:2 82:8 83:19 85:1,5,23 86:20,24 90:21 93:18,23,24 94:2,4 95:2,16 96:11 97:22 100:15 101:5 102:11,16 115:12 116:20 117:10,22

**agreed** 84:24

**agreement** 34:8

**AICP** 11:1,2

**alarm** 109:15

**Albany** 17:21,24 18:23 107:4,5 108:2 109:20

**Albany's** 18:9

**albeit** 45:20

**align** 104:5

**alley** 71:9

**allowed** 87:10,14

**ambiguous** 95:20 96:17 106:23

**amend** 9:4,5 99:2 106:1 112:23

**amendment** 54:17

**amendments** 76:2

**American** 11:4

**amount** 55:1,3 113:10

**analysis** 16:10 40:13 42:23 44:6 64:9,21 74:1,22 75:13 81:12 104:5,11 117:5

**and/or** 12:13 19:15 24:5 64:6 93:14 103:15

**annual** 12:8 14:19

**answering** 6:1

**anticipate** 52:17

**anticipates** 62:12

**anymore** 11:18 42:19 106:3

**apartment** 70:4

**apologize** 38:14

**apparently** 53:13

**appeals** 32:12

**appears** 7:24 38:9,18, 22 42:6

**applicable** 36:12 41:3

**applicant** 78:16 84:5, 24 97:14,20 109:9 112:16

**applicants** 18:5

**application** 34:19,23 37:17 81:1 82:20 84:5 86:1 88:17 95:6 97:13 98:22,24 111:10 112:23 113:9

**applications** 17:17 18:4 30:21

**applied** 107:10

**apply** 68:8

**appointed** 29:5,7

**appreciated** 46:6

**approach** 106:9

**approaches** 63:11

**appropriateness** 30:2,6

**approval** 83:7

**approve** 64:14 65:2, 15 78:5 108:21

**approved** 110:6,13

**approving** 77:17

**approximately** 13:4

**ARB** 8:20 9:20 84:23 97:17

**ARB/PLANNING** 39:6

**architectural** 18:7 65:12 104:17 107:11

**architecture** 22:21 31:4

**area** 7:1 9:3 15:18 51:5,19 52:8,20 53:18, 20,23 54:5 56:3,22 60:11 63:4 64:22 65:1, 19 66:4,7,10,17 67:13 69:13,22 70:3 71:1 72:8 73:19 76:2,16 78:3 86:18 91:1 92:15 94:6 101:22 104:1,21 105:3 110:3

**areas** 24:5 45:7 52:24 53:8 54:2,3 61:12 103:19

**Arena** 18:13

**Aron** 43:7 44:2

**ascribe** 103:23

**ASHRAWI** 5:5 7:16 14:1 36:2,5 37:10,24 38:3,7 41:13,18 42:4 67:5 79:12,24 80:4

102:10 109:18 115:7, 11 118:2,9

**aspect** 113:18

**assemble** 44:10

**assigned** 50:11 86:5

**assignment** 39:21

**assist** 24:19

**assistance** 44:7 113:21

**assisting** 35:10

**Associate** 16:19

**assume** 32:21 33:22 34:14 36:21,24 94:3

**assumed** 52:3

**assumes** 11:10 67:14 98:11 99:5 110:8

**assuming** 77:22 117:15

**assumption** 83:9

**attend** 12:12,14

**attending** 11:23 18:6

**attention** 32:24 66:3 70:12 115:18

**attest** 62:21

**authored** 7:20 113:19

**auto** 72:1

**auxiliary** 13:6 14:13, 14

**average** 62:21,22

**averaging** 12:15

**Avoid** 5:20

**aware** 68:24 69:3,5 78:20,24 79:1 82:2,7 86:11 95:21 97:4,5 98:2,8,13 99:8,16 110:21 111:16,20,22 112:1

___

**B**

**back** 12:18 23:22 24:6 30:19 33:1 46:11 57:7 65:14 67:6 80:5 90:9,

15 91:24 100:2 107:5
109:23 115:3 116:10

**background** 10:5,7
86:16 88:2,18

**backyard** 31:6

**bad** 38:13

**baked** 64:6

**balance** 103:22

**Bank** 18:15

**base** 107:9

**based** 13:2 26:3 44:19
53:10 54:5 65:10
80:11 81:2 82:20
84:21 107:19 116:12,
19 117:13

**basically** 55:9 93:8
113:7

**basis** 12:15 35:14
75:23 81:8

**began** 16:9 20:24

**begin** 80:7 92:21

**beginning** 15:5 16:5
83:6

**behalf** 89:14

**believed** 36:19

**believes** 101:13

**beneficial** 12:1

**benefit** 50:9

**Bexley** 19:24 21:18,24
23:14,15 24:13 25:21
26:3,6 58:21 63:21

**bible** 55:10

**bicycle** 91:2

**biggest** 73:23

**bike** 101:2

**bikeways** 27:2

**bit** 13:3 26:2 43:18
44:18 105:22

**Bo** 80:19,22

**board** 18:7 28:15
32:11 65:7,12 93:9
104:17 109:5,7 114:22

115:1

**boards** 9:21 17:19
28:20 31:24 69:21
81:20 84:13 90:23

**bodies** 32:22

**body** 29:21,22 30:1,2
31:7 32:7 40:5 48:22

**bold** 100:9

**bottom** 100:6

**Boulevard** 83:20

**boundaries** 84:19

**breadth** 97:4

**break** 6:2 36:2 79:24
115:8

**breaks** 61:5

**brings** 58:23

**brought** 21:12

**Brown** 47:15,24 48:8,
13,19 49:4

**Brownlee** 80:19,22

**BRT** 27:13

**building** 30:14 68:4,
13 84:22 105:8

**buildings** 64:1 91:20
93:5 117:12

**built** 25:13 63:23
83:23

**bulk** 45:16

**burdensome** 52:14,
15,16 105:22

**bus** 26:15

**business** 16:16

**buy-in** 88:20

**BZA** 31:12

---

**C**

**calculated** 60:18
62:20

**California** 18:17

**call** 97:12

**called** 14:13 15:20,23
25:10 26:14,16,19
27:4

**calls** 10:2 57:17 58:17
61:17 62:7 67:16
69:14 73:12 76:4
77:19 82:11,12 88:4,
22 94:9 95:19 96:16
101:11 105:6 106:22

**Campus** 6:10

**capacity** 6:8 15:4
17:21 19:3,22,24 20:3
21:21 35:17,21 42:10,
15 45:12 47:19,22
63:3 105:1

**care** 46:4

**career** 9:17

**carefully** 46:10,24

**case** 7:22 9:15 10:11
15:5 36:20 38:13
48:24 50:12 53:21
63:14 65:9 67:10 68:2
76:6 77:8,12 86:5
107:18 113:15

**caseload** 26:3

**cases** 31:17 68:6

**categorized** 92:23

**category** 81:15 82:22

**center** 110:16

**centers** 6:13

**central** 44:19 74:8
80:13 88:16 96:3
97:24

**certainty** 31:14

**certificate** 30:6

**certificates** 30:1

**certification** 11:3,6,
16,17 12:2,3,19

**certified** 5:2 11:4

**cetera** 84:8 108:8

**chair** 29:1 31:16
114:21

**challenge** 44:16

**challenges** 105:21

**change** 46:9 53:16,17
56:3 57:9,23 73:9
84:22 114:14

**changed** 16:8

**changing** 54:6

**characteristics** 41:5
84:23

**characterization**
101:9

**characterize** 91:16
93:1

**charged** 29:13

**check** 32:15 38:17

**children's** 6:15 46:3
53:12

**chooses** 52:5

**chose** 53:22

**Chris** 38:14 41:19
43:6,20 67:5

**Christopher** 8:10

**circumstance** 97:6

**cite** 104:6

**cities** 22:9 65:6 95:12,
13 97:11

**city** 7:5 10:16 15:8,13,
19 17:13,14,15,22,23
18:13,23 19:24 22:7,8
23:13 24:13,23 25:3,4,
21 26:9,11,13 27:1,9,
10,14,18 29:7 30:12,
23 32:3 34:24 35:2
41:21 42:8 45:11
46:11,16,20 47:9,13,
23 48:14,20 49:22
50:9,21 52:14 53:13,
19 55:13 58:20,21
63:21 64:14 65:2,4,15
66:23 67:9,11 68:10
69:6,20 73:5 77:16
78:4,22 84:6 85:12
89:2,16,18 90:23
96:24 97:3 98:6,24
99:16 108:16,20
110:6,18,21,24 111:18
112:24 113:1 117:16

**city's** 36:14 50:18 66:18 79:1,2 80:11 89:3 106:18,21 115:23

**civil** 32:18

**claims** 78:22

**clarification** 81:6

**clarified** 85:8

**clarify** 14:11 39:19 47:21 57:11 71:12 78:10 79:6 80:23 81:20 82:24 87:20 98:20 113:13,15 114:9

**classes** 13:8,10

**classifications** 96:12,14 115:13

**clear** 5:20 76:7 88:16 101:15 116:1

**Cleveland** 10:12 25:5 26:9

**client** 25:22 89:15

**clients** 17:6,8 18:5,11, 19,20 19:2,17 28:5,8 43:23,24

**close** 20:18 29:4 84:14

**closed** 20:20

**closely** 81:17

**closure** 20:22

**co-managed** 27:14

**co-owner** 43:14

**code** 9:2 25:11 36:18 37:1 39:14 57:13,19 70:1 73:10 87:23 89:8, 10 106:12 111:5,9,14 113:14,18 116:19 117:17,18

**collaboration** 27:19 97:2 98:3

**collaborative** 96:22 98:1 115:4

**Columbus** 15:20 18:13 22:7 24:23 26:9, 11,13 27:1,11,14,18 29:8

**column** 58:4

**comfortable** 6:19

**comment** 84:2

**comments** 104:3,4

**Comments/analysis** 100:10,11

**commercial** 46:6 49:23 50:8 87:10,11

**commission** 8:21,23 15:19 18:7 28:15,17, 24 29:1,3,11,12 31:16 32:12 39:7 67:23 91:5 92:22 97:6 104:18 112:15 114:22

**commission/arb** 7:4, 7 8:14

**commissions** 9:20 17:19 28:20 31:24 69:21 81:20 90:24

**common** 88:19

**commonly** 6:14

**communities** 6:10 18:16 36:11 44:21 63:10 69:5 96:18 106:2

**Communities'** 37:16

**community** 21:20 23:20 24:16 45:20 52:5 53:1 55:3 58:6 101:21 102:16 103:1, 2,6,12,23 104:7,9,11 105:20 106:7 107:22, 24

**community's** 55:14

**comp** 60:10

**company** 16:16,17,22 19:8 22:17 48:4 55:23 107:4

**company's** 48:1

**compare** 20:6 35:2

**compared** 100:16

**compares** 34:23

**comparing** 99:11

**comparison** 81:12

**compatibility** 75:9

**compatible** 23:16 73:24 74:6,15,18,20

**complaint** 34:4 77:7 98:4

**complete** 19:16

**completed** 15:9

**completely** 51:24 52:7 64:8

**complex** 83:15 84:10 109:7

**component** 74:10

**components** 74:6

**comprehensive** 25:12,15 36:13 41:22, 24 42:14,24 45:9 49:19 51:4 52:1,2,4,9, 11,12,21 54:1 60:1 78:3 79:2 86:17 90:24 96:15 100:17 103:18 108:11 117:1

**conceptual** 97:10 107:19

**concern** 59:8 83:22 92:7,10,12 93:19,24 94:2,4 95:14 103:11

**concluded** 118:15

**conclusion** 10:3 57:18 76:5 77:20 78:17 81:21 86:3 88:5 111:12

**conclusions** 73:13

**concrete** 112:18

**conditions** 52:18 54:6 94:15

**conduct** 39:11

**conducted** 39:9

**conducting** 40:10

**conferences** 11:24 12:13,15,17 14:23

**confirm** 7:21 8:5 51:6, 9 116:12

**conform** 68:20,22 102:4 105:5 106:20

111:7

**conformance** 62:16, 18 81:13 84:15 105:9, 11,13

**conforming** 81:17

**confused** 81:2

**confuses** 13:3

**consideration** 36:15

**considerations** 58:22 84:22 111:23

**considered** 12:19 39:13 54:16 91:9,11

**considers** 65:7

**constraints** 64:3

**consultant** 27:2 43:4

**consulting** 43:10

**contained** 59:12 76:21 114:4

**contemplated** 58:11, 12

**context** 40:2,3,7 41:7 45:23 66:16,20

**contiguous** 74:7

**continual** 18:1

**continually** 109:15

**continue** 23:10,13

**continued** 111:8

**continues** 30:10 46:4

**continuing** 12:9 14:19

**continuum** 94:23

**contract** 19:14 21:18 26:5

**contracted** 17:13,21 18:23 19:20 21:17 24:18 25:9

**contracts** 26:24

**contribute** 43:24

**contributed** 42:12 44:13

**converted** 21:18

convey 45:19

copy 7:19,22 42:3
117:18 118:10

core 24:4 62:6,7,12,24
65:17 72:13,14

corner 100:6

Corporation 15:17,18

correct 8:19,21 13:13,
16,19 17:4 19:1,9 20:4
21:1,3,4,6 22:12 23:23
24:9,11,14 25:19
28:18 32:17 37:23,24
42:17 48:17 56:7,8
59:15 66:6,11,20 72:6
77:9 83:5 89:9 92:2
98:7 99:2 108:9,22
117:9,19

correlation 54:24

correspondence
33:15

corridor 26:15,16
27:5,9,17,19

corridors 63:7

cost 52:14

COTA 24:23 27:11,15,
18

council 7:5 8:13 17:19
18:8 31:13 32:4 37:15
38:4 72:24 77:16
104:18 108:20 110:6
113:10

councils 9:20

counsel 5:13 8:10
9:10 37:21 50:1 60:4
99:5

count 64:2 92:11

country 23:18

counts 93:20

couple 99:20

court 9:23 32:16 77:11
78:21 79:1,15 118:6,8,
10

Court's 79:8

courts 72:1

cover 29:15,17

COVID 13:3 24:2

create 68:23 101:23
105:8

created 45:21 68:11

creates 70:21 101:19
102:2

creating 97:16

credibly 91:12

Creek 61:8 87:14,15
92:18

critical 58:16

CROSS-
EXAMINATION 5:4

curious 95:24 96:8
106:17

current 37:5 47:4
56:22 73:24 74:7,18,
20 87:3,4

Custom 71:21

cut 65:11 97:19 112:8

---

**D**

data 16:10

date 117:2

dated 7:20 79:15

day 18:3

deal 104:15

December 37:15
118:14

decided 11:21 27:16
63:23

decision-making
29:21 30:1

declining 44:17

defense 68:1

define 51:24 112:12

defined 88:13

degree 10:6,8 23:12

degrees 10:13,18
96:14

delineated 63:11
88:16

delineates 75:3

denial 83:14 99:23
114:23

denied 113:6,8 114:19

dense 67:10 85:3,13
94:23,24 101:8 110:6,
13,14

densities 30:15 62:19
63:12 94:7 95:4

density 60:13,14,20
61:8,19 62:8,9,14,17
63:5 64:12,20 65:17
66:9,14 67:12,21 68:3,
10,13,14,16,23 80:24
81:3 85:6,19 94:22
100:23 101:6,14,16,
18,19,22 102:2,3
104:24 105:4 108:8
109:21,24

deny 97:17

denying 77:17 79:3

department 43:15
69:20

depend 59:6

depends 59:4,5,7
96:9

deposed 5:10

deposes 5:3

deposition 5:14 6:22
7:14 8:7 9:11 37:8
41:11 79:10

describe 53:14 87:4

description 92:24

design 29:15,17

designed 71:21 84:12

desirable 71:3,6
75:21

desire 92:12 102:20
103:23

desired 56:10

desires 104:7,12

detached 71:8

detail 52:13

details 81:21 109:10
112:3

determination 53:7

determine 52:23 67:1
68:9 77:24 84:6 90:10

determined 67:9 79:1
84:14 107:12

develop 57:20

developed 46:19
57:15 62:13 80:10

developer 66:13,14,
19 68:15,20,21 85:2,7
96:24 99:1

developers 22:2
27:23 28:10 88:20
112:21

development 15:17
16:17 17:16 18:4 27:6
30:16,20 36:11,15
40:2 50:17 55:8,10,16
56:18 61:17 62:8
64:15 65:3,16 67:12
73:7 77:17 78:6 79:4
81:1 84:20 85:3 88:3,
8,10,21 89:19 92:19
95:11,14 103:2
105:23,24 111:17,24

developments 56:11

dictated 64:3

dictates 63:16 106:12

differ 20:7,9

differences 96:2

difficult 52:17 59:3
75:23

dimensions 41:2,3

direct 54:24 70:11
115:18

directly 31:13 92:9
93:13

director 16:16

disagree 97:22 104:2,
4

discontinued 23:15

discretion 77:16,22 79:3

discuss 100:22

discussed 14:24 46:15 84:12 86:19 104:22

discusses 70:13

discussing 92:21 101:5

discussion 7:12 44:15,18 45:3 46:1,12 49:20 52:23 80:7 85:5 97:9 100:22 109:20

discussions 45:6 97:3 110:2

dismissed 78:21

disregarded 91:6

distance 43:18

distinctions 96:20

distinctly 74:21

distinguishing 41:5

district 18:13 37:2 101:24 116:22 117:22

districts 57:13 84:20 94:18,19,20 116:11, 14,18

Ditto 42:21

division 22:24 24:3

document 37:18 38:16 41:19 44:10 45:17,21 51:7,14 56:1 57:9,22 65:1,5,19 66:7 68:11 69:23 70:3,5,12, 17,20,24 71:14 72:19 73:1,18 74:5,11 76:16 77:3 94:1,13 103:21 104:8 115:20 116:3,11

documentation 103:10

documents 6:24 34:20,24 39:13,17 53:4 69:21 78:4 90:22 93:14

door 30:19

double 32:15 38:17

downtown 26:19,21

drafts 114:2,4

Dublin 26:17

due 52:3 55:10 104:7

duly 5:2

dwelling 60:14,21 61:20,21 62:9 64:13 65:18 66:9

## E

eager 112:16

earlier 66:5 80:23 85:8 96:1 98:22,23 112:19

earliest 16:5

early 15:22 97:10

east/west 27:17

economics 64:4

Edge 61:16 72:16

editing 42:12

education 10:19 12:9 14:19

educational 10:4,7

effectively 20:20 97:16,18

efficiently 5:16

efforts 75:8

elected 32:3,6,7 53:2 55:12

element 12:20 55:7, 17 99:8

elements 59:8 84:12 95:23 103:5 105:23 106:2 107:13 112:13

email 33:15

emblem 116:6

employed 13:5,12 15:11

encountered 12:7

end 11:19 14:12 110:5

ended 16:20

engaged 34:5 35:5

engagement 33:19 34:3,7 52:22 111:9

engineering 22:18,19

English 10:10

enrollment 44:17

ensuing 112:19

entire 18:3,6 38:4 97:7 98:1 101:23

entities 22:2 24:5

entitled 68:15

entity 20:16 24:19

entry-level 16:9

equally 45:7

equates 61:19

equitable 27:5

Eric 33:8,11,16

erroneously 91:11

essence 64:7 105:15

essentially 97:21

established 107:23

Estates 61:16,20 72:16

ETOD 27:4

evaluate 66:24

evaluation 65:6 75:24 107:12,19

evaluations 53:5

event 116:9

eventually 78:17 108:20,21

evidence 11:11 28:1 67:15 98:12 99:4,5 110:9

evident 41:6

evolving 30:11

exact 15:15 25:16 53:14 76:7 97:8

examples 64:1 71:2, 5,7,14 72:7 117:10

exceed 68:4

exceeds 50:11 76:5 77:20 86:4

Exceptional 75:21

exchanged 114:10

exclusively 22:6 30:19 104:21

excuse 66:4 109:15

exhibit 7:11,14,18 33:2 36:8 37:8,12,13, 22 41:11,17 51:2,3,6 56:2,21 58:3 59:23 66:8 67:4 70:4 71:1 72:18 73:5 76:17 77:2 79:10,14 100:3 102:9 115:19

existing 87:7 92:8 94:21 113:8

exists 15:21

expanded 16:18

expect 82:18,22

expectation 58:6 80:9 81:10,23 82:17

expectations 80:17 83:2

experience 11:23 28:16 35:3 53:15 54:15 88:1,18 97:8

expert 6:8 7:19 9:18, 19,24 33:21 35:17,22 37:20 38:21 59:18 68:6 80:6

expert's 86:5

explain 60:5 116:2

explanation 113:12

express 93:14

expressive 75:21

extend 115:9

extensive 54:23 107:9 109:10

extent 43:12 86:2 88:24 106:24 110:11

116:19

**extraordinarily** 63:18
75:2

**extreme** 82:15

**extremely** 107:21

**F**

**facilitate** 44:22 64:5
97:14

**facilities** 117:11

**fact** 7:21 45:19 52:3
53:11 55:10 62:4
65:11 69:17 97:5
103:24 104:7 107:14
117:19

**facts** 11:11 34:2 67:14
98:11 99:5 110:8

**faculty** 13:6,14 14:10,
13

**fair** 101:9

**familiar** 22:16 77:2
116:18

**farther** 37:11

**fashion** 107:8

**favor** 108:16

**feature** 61:10

**federal** 6:9 32:16
79:15

**feedback** 78:16 98:24
99:12,15 113:2

**feel** 6:2 113:1

**feet** 63:22

**felt** 93:16

**field** 41:6

**figure** 109:9

**file** 34:11,15 85:24
86:7 114:5

**filed** 6:9 77:8 111:10

**final** 29:21,24 105:23
108:16 110:5

**find** 11:24 28:17 75:7
81:12 96:2

**finding** 81:9

**finish** 13:20

**firm** 15:23 17:4 22:18,
20 25:10 26:14,19
33:3,4,5 35:5 43:14
48:8 54:7

**firms** 19:15

**first-floor** 71:21

**fits** 40:6

**flats** 72:5,10

**flexibility** 95:5,9
108:7

**flexible** 101:24

**flimsy** 91:12

**flip** 61:14

**Florida** 18:17

**focus** 7:1 9:2 23:4
45:6 50:8 51:5,19
52:6,8,20,24 53:7,18,
20,23 54:2,3 56:3
60:11 64:22 65:1,19
66:7 69:13,22 70:3,19
71:1 72:8 73:19 76:2,
16 78:3 86:18 91:1
92:15 94:6 95:11
103:19 104:1,21

**focused** 55:17

**focusing** 23:1

**follow** 31:9,17

**foregone** 111:12

**foreseeable** 52:18

**Fork-blacklick** 18:9

**form** 8:8 11:10,20
12:6,11 14:21 20:8,13
22:4 25:24 27:24
28:11 29:23 30:7
31:10,19 37:4 39:18
40:20 43:11 45:5
47:20 49:12 50:10,22
56:12 58:17 60:2
63:13,14,16 64:16
66:15 68:4,12,17
69:17 70:16 79:5 82:6
85:4 88:11,14 89:24
90:4 91:4 94:13 95:10
99:6 101:18 108:19

**form-based** 106:4,9,
13

**formal** 10:18 34:7

**formatted** 74:19

**formed** 24:3

**forms** 88:15 108:8

**forward** 109:5 112:22
113:8,9

**found** 83:11 84:6

**founded** 19:8

**founding** 43:13

**fraction** 109:12

**frame** 48:7

**framework** 94:16

**frankly** 83:19

**Frazier** 43:7 44:2

**free** 6:3

**frequently** 30:5

**front** 9:20 71:18,24
116:10

**frontage** 46:5 94:23

**full** 97:4

**functions** 57:19

**fund** 15:21,22

**funding** 44:20

**future** 46:13 55:8 56:6
87:3,5,6,21

**G**

**garage** 64:6

**garages** 71:9

**Gardner** 33:8,11

**Gardner's** 33:16

**gathering** 71:19

**gave** 5:13 91:11

**general** 14:7 26:3
43:16 44:6,18 49:13
63:12 74:6 82:9
117:21

**generally** 59:4 91:15
106:16,17

**generated** 54:22

**generating** 55:4

**genuinely** 106:17

**get almost** 30:19

**GIS** 16:10 44:5

**give** 17:8 30:24 34:24
50:2 61:15 75:10
93:12,19,23 113:2

**good** 81:15

**Gotcha** 116:7

**government** 96:12
117:12

**governments** 49:9,10
88:19 95:17

**graduating** 15:4

**graduation** 15:23

**Grandview** 19:22,23

**great** 52:13 71:18
104:15

**greater** 15:16,17
60:21 103:22

**greenspace** 74:8,10,
14,17 94:8 95:5 101:1
104:23

**grocery** 112:5

**gross** 62:9

**ground** 5:15,17

**group** 24:4

**growing** 40:4

**guaranteed** 82:5,10,
16

**guess** 13:4 14:22 26:7
31:21 48:12 54:21

**guest** 13:14

**guidance** 56:10,13
59:24 60:10,22 61:1,3
65:1 75:10 112:20

**guide** 55:7,10 103:11

**guidelines** 29:15,17
64:21 66:17 69:13

74:11

**guiding** 65:6 93:13
103:20 105:15

---

**H**

**half** 12:16 18:3 103:13

**hand** 7:10,17 30:18
37:12 41:14 51:1
72:17 77:1 79:13

**handed** 74:6

**handled** 61:5 94:11

**Hang** 50:1

**happen** 89:11

**happened** 69:8 98:3
105:17

**happening** 26:23
93:16

**hard** 94:14 112:12

**harmonious** 75:5,14,
22

**HDR** 21:9 22:14,16,23
23:9,19 24:5 25:3

**HDR's** 22:18

**head** 5:21 36:22 64:23
70:9 96:23

**heading** 100:14 116:5

**heard** 92:22 93:4
102:14 103:1,5 109:6

**hearing** 91:13 112:16

**heavily** 107:21

**height** 62:10 91:21

**heights** 19:23 22:9
100:24

**helped** 18:12 44:9
107:3

**helpful** 70:11

**helping** 31:5

**hereinafter** 5:2

**Hermann** 43:6

**hierarchy** 16:13

**high** 29:16 46:5 63:4
67:21 68:1 86:19
115:23

**high-end** 72:5

**higher** 26:3,8 43:18

**highest** 74:22

**highlighted** 38:8,9

**highly** 68:1 81:13
82:22 91:6 107:6

**Hilliard** 17:14 18:22

**hired** 44:3 54:7

**historic** 29:12,15

**history** 15:3 101:6
114:24

**hold** 10:21,23 13:1

**home** 6:15 46:1,4
53:12 64:22

**homes** 71:8,18,21
72:15

**honestly** 115:6

**hope** 111:6

**hour** 80:1

**hourly** 33:21,22

**housing** 62:13,16
70:13,14,22 71:3,6,15
100:24 101:16 102:12
103:14 110:3

**huge** 55:3

**huh-uhs** 5:22

**hundreds** 68:6

**hypothesize** 43:17

**hypothetical** 59:2
64:17 65:21 67:15
82:12 88:23 96:17
105:7

---

**I**

**idea** 51:19 52:11

**identified** 45:7 46:17
53:9,18 54:4 66:8
74:21

**identify** 54:3 74:3

**iii** 43:5

**image** 56:24

**imagine** 49:6 87:13

**immediately** 113:3

**impetus** 53:19

**implement** 109:11

**implemented** 63:8

**implementing** 15:20

**importance** 58:5

**important** 45:13
46:24 88:10 103:4

**impossible** 84:17

**in-house** 17:15

**inappropriate** 68:10

**include** 70:1 71:7 72:8
117:11

**included** 8:3 18:11
39:4 56:23 59:19 69:6
71:14,16,20,23 100:21
105:2,10

**includes** 37:14,15
62:2 71:2,5 100:23

**including** 6:24 16:16
18:15 49:21 86:9,10
102:13

**inclusive** 74:9

**income** 49:15

**income-producing**
49:23 50:8

**incomplete** 59:2
64:17 65:21 67:15
82:12 88:23 96:17
105:7

**inconsistencies**
73:22

**inconsistency** 73:23

**inconsistent** 73:19
74:24

**incorporated** 17:23

**incredibly** 107:7

**incumbent** 113:1

**Independence** 25:4

**indication** 101:20

**indications** 113:4

**indicator** 55:2

**indicators** 112:14

**individual** 13:8,10
23:7 35:14 94:18
103:11

**individually** 35:6,7

**Individuals** 35:15

**infill** 50:7

**informal** 12:8

**information** 54:19
69:22 77:23

**infrastructure** 15:22

**INGRAM** 8:8 10:2
11:10,20 12:6,11
13:17,20,22 14:21
20:8,13 22:4 25:24
27:24 28:11 29:23
30:7 31:10,19 36:3
37:4,21 38:1 39:18
40:1,20 41:16 42:2
43:11 45:5 47:20
49:12,17 50:1,10,22
56:12 57:17,24 58:17
59:1 60:2 61:23 64:16
65:20 66:15,21 67:3,
14 68:17 69:14 70:16
71:10 73:12,17 76:4,
23 77:19 78:7,13 79:5,
7 80:2 82:6,11 83:3
85:4,14 86:2,14,23
88:4,11,22 89:5,24
90:4,7 91:4 93:21 94:9
95:7,19 96:4,16 98:11,
16 99:3 101:11 102:5,
8 105:6 106:22 108:19
110:8 111:3 113:16
118:7,11

**initial** 18:14

**input** 55:4 58:14,15
91:13,14,15,17 92:3,6
104:9,15

**instance** 82:5

**Institute** 11:4

instructions 34:1

insubstantial 91:22

intact 45:17

integrate 26:21 92:18

integrated 18:1 71:24

integration 23:1

intended 61:9

intention 76:9

interaction 78:15
97:20

interactive 97:15
112:8

interest 49:22 50:18,
21 55:3

interests 17:18 18:9

interned 15:19

internship 15:14

interpret 63:2

interpretation 94:1
104:10

interpreting 102:23,
24

introduce 70:22

introducing 70:13

introduction 80:8

investigating 41:9

investigation 40:13

Investors 18:12

involve 104:15

involved 68:7 107:7,
15 108:4

Involves 94:15

irrelevant 110:10

issue 61:5

issues 83:12,15,18

Italian 28:17,23 29:10,
16,19 114:22

iterations 109:1,3

iterative 81:19 106:11
107:8

**J**

J-A-S-O-N 5:8

Jason 5:1,8 43:6

jobs 15:7

Julia 5:18

June 7:20

junior 44:8

jurisdiction 29:18

justify 83:13

**K**

Kathryn 43:7 44:8

keeping 63:1

Keith 43:6,13

key 27:8 46:15 55:17
102:14

kind 14:15 17:24 36:6
75:15

knowledge 40:16
44:23 51:10 58:1
73:14,16

**L**

labeled 56:20 70:3
76:16 100:5

land 14:5,6 23:2 26:22
28:10 44:14 46:10
56:7,10 74:16,18
87:21 88:19 94:23
96:13 100:24 101:1
103:22

landowner 90:2,12

landscape 22:20

language 75:3 100:17

lapse 11:8

large 30:13 41:18
46:19 49:21 57:3
63:24 74:7

larger 45:23 56:15

latitude 109:8

law 9:23

lawsuit 6:9,12 32:16,
19

LC 59:22 72:8 87:16

lead 25:11

leaders 53:2

leading 94:17

lecture 13:15

lectured 14:3

lectures 14:4

led 99:1

Lee 47:15,24 48:8,12,
13,19 49:4

left 58:3

legal 10:2 31:13 35:23
57:17,20,23 73:12
76:4,7 77:20 78:9,11,
22 86:3 88:4

legislation 9:5

legitimate 31:4 96:7

lesser 23:12

letter 34:7

level 43:18 62:14
86:19

levels 62:18

licenses 10:21,24

Lifestyle 6:9 36:11
37:16 61:11 62:2
68:24 69:5 73:6 80:8,
16 81:9,16 82:2 83:1,8
85:9,23 86:9,10,12
97:3 98:6 100:4 112:8

Lifestyle's 60:3,8
78:21 83:2 98:8 99:18
105:2 111:19,24

Lifestyles 105:8

light 36:12 107:19

limit 62:10 68:22 79:2
101:19,22

limited 72:5

Linden 15:16,17,18

linking 92:7

list 43:4 54:12 71:16,
17 100:21

listed 8:1 28:4 36:9
39:2 117:20

listening 53:1

lists 43:5 116:11

living 71:22 102:13,21

LLC 6:10

local 12:13 24:19
32:22 88:19 95:17
96:11

long 11:8 16:1 29:2
47:3 108:23 115:9

long-time 11:22

longer 11:17 14:10
53:12

looked 110:17

Lorain 22:8

lost 67:7

lot 12:17 14:17 16:10,
13 18:19 26:9 30:12
31:1 43:20 49:5 54:19
75:3 83:17 86:19
91:13,15 93:1,16
106:2

lots 61:18 62:3 71:8

loudly 5:17

lower 67:12

lowered 102:3

lowering 102:2

lumps 26:7

Luxury 71:24

**M**

made 69:1 78:20,24
81:4 84:2

main 24:1 63:20 95:11

maintain 12:8 34:11

maintenance 84:1

**major** 53:16,18

**majority** 25:22 57:3
116:21 117:5

**make** 13:17 14:20
49:10 64:18 81:22
98:9 114:12

**making** 38:15

**manage** 27:16

**managed** 27:18

**management** 27:15

**manager** 16:14

**managing** 27:18

**manner** 105:13

**map** 42:17,24 44:3
116:16 117:4

**mapping** 16:10 44:5

**maps** 42:18 44:4

**March** 79:15

**mark** 7:11,17 41:14
79:13

**marked** 7:14 33:1
36:7 37:8,12 41:11
51:2 56:2 59:23 71:1
72:18 73:4 77:1 79:10
100:3 115:19

**market** 52:18 53:5
94:15

**master** 18:12 91:3

**master's** 10:16 15:5,
10,12

**material** 8:24 9:7
51:11 54:22

**materials** 8:2 34:20,
21 39:2,4,23 40:15
45:14 82:20 100:16
115:23

**matter** 27:22 35:23
38:6 40:14

**matters** 30:4

**maximum** 68:14

**mayor's** 29:9

**means** 14:14 44:2

**meant** 40:9 45:16

**meet** 64:20 69:17

**meeting** 7:3,4 8:12,18
18:4,5 34:21 37:15
38:5 39:7 64:24 88:7,
9,12,15 93:17

**meetings** 18:2,8
54:12 104:16

**meets** 59:24 67:1

**member** 13:6,14
113:1

**members** 43:5,9 53:2,
3 93:2

**memorandum** 37:14
38:20 60:3 100:4

**memorized** 36:22

**mention** 62:11 112:7

**mentioned** 18:22
53:10 97:11

**met** 60:10 78:1 81:23
113:14

**Methodist** 6:14 46:3

**methodology** 36:9
38:24

**Meyer** 43:7

**Mid** 22:6

**middle** 46:3

**mind** 38:11 83:10

**minimum** 63:15

**minor** 10:9 83:8,10
84:10,18

**minutes** 7:3,4 8:12,18

**mirror** 94:24

**mischaracterizes**
66:22 68:18 70:17
71:11 79:7 85:15
93:22 99:4

**Misstates** 28:1 95:7
111:3

**mix** 71:15 84:20
100:24 110:2

**mixed** 30:14 36:10
63:4,7 64:11 66:4

67:13 83:15 93:20
94:7,14 95:4 101:24
104:24 105:3

**MKSK** 15:24 16:5 17:6
19:4 20:7 23:5 42:16
54:9 55:22 76:15

**mobility** 14:5,6 23:2,
4,7 26:20,24

**modifications** 83:9,
10 84:11

**modified** 110:14

**money** 49:11

**motivations** 53:14

**move** 5:16 112:22
113:8

**moved** 109:5

**moving** 62:6

**MSI** 15:23 42:16 43:5,
14,21

**multi-family** 66:4
70:4

**multinational** 22:18

**multiple** 30:14 110:12

**municipal** 19:20
21:17 23:19 24:15
49:9,10 69:19

**municipalities** 20:1
95:22

**municipality** 19:21

**Myers** 43:6,13

**myriad** 88:15

**N**

**named** 52:2

**names** 116:17

**narrow** 56:14

**national** 12:14

**Nationwide** 18:11

**natural** 61:10 64:3
68:22

**nebulous** 88:14 93:7

**necessarily** 114:13

**neighborhood** 29:14
30:17 31:23 62:6,7,12,
24 65:17 72:13,14

**neighborhoods**
30:12

**network** 26:21

**Newburgh** 22:9

**nods** 5:21 64:23 96:23

**nonprofit** 15:13,15

**nonsubstantial**
91:12

**North** 15:18 18:15

**northwest** 26:16 27:5,
19

**nos** 5:22

**notable** 17:12 63:5

**note** 76:14

**noted** 39:6 115:22

**notice** 9:13

**noting** 17:9

**number** 6:24 8:1
12:14 15:7 18:16
19:16 26:10 28:4
43:21 55:1 61:13
62:23 66:10 72:5
84:10 92:11,16,20
106:19

**numbers** 36:22 61:15
81:3 95:5

**numerous** 13:8 63:10

**O**

**oath** 32:21

**objection** 8:8 10:2
11:10,20 12:6,11
14:21 20:8,13 22:4
25:24 27:24 28:11
29:23 30:7 31:10,19
37:4 39:18 40:1,20
43:11 45:5 47:20
49:12,17 50:10,22
56:12 57:17,24 58:17
59:1 60:2 64:16 65:20

66:15,21 67:14 68:17 69:14 70:16 71:10 73:12,17 76:4,23 77:19 79:5 82:6,11 83:3 85:4,14 86:2,23 88:4,11,22 89:5,24 90:4,7 91:4 93:21 94:9 95:7,19 96:16 98:11, 16 99:3,6 101:11 105:6 106:22 108:19 110:8 111:3 113:16

**objections** 65:20 78:7,13 86:14 96:4

**objective** 92:16,17 104:23

**obtaining** 30:5

**occasionally** 12:18

**occur** 31:22 97:9

**odds** 83:13

**offered** 102:15 112:18

**offers** 62:15

**office** 29:9 33:12,16 85:17 99:9

**offices** 16:18

**officials** 53:2 55:12

**oftentimes** 96:9

**Ohio** 10:17 12:18,23 13:6 14:3 15:5 22:7 26:17 44:19 49:1,2,14 80:13,14 82:14 89:23 90:3 96:2,3

**OHM** 20:23,24 21:2,8, 10,16,19 22:19 23:5,6, 22 24:6,8,12 25:1,2, 13,17 26:5 27:21 28:13 35:6,8,10,13,15, 18 48:4

**Olentangy** 26:18 27:9

**ongoing** 14:20 20:15 26:22 27:11 84:1

**open** 87:14,15 92:12, 13,16,19 101:1

**operation** 53:13

**opinion** 35:1 45:18 55:7 59:22 60:9 65:5, 15 68:5,6 76:20 79:14

**opinions** 58:22 59:10, 15,17,18 93:15

**opportunity** 70:21 97:19 114:12

**opposed** 88:13

**opposite** 92:9 93:8

**option** 103:14

**options** 70:13,14,22 71:3 102:21 110:3

**order** 19:15 44:22 45:22 52:23 54:10,13 64:4 67:1 68:9 79:8,15 81:21 94:22 97:14 103:17 109:11 117:18

**Ordering** 118:8

**ordinance** 9:4

**organization** 16:12

**organizations** 15:13

**oriented** 27:6

**origin** 116:2

**original** 45:3 99:13,14

**originally** 45:21 110:7

**Orlando** 18:17,18

**OSU** 14:10

**other's** 44:1

**out-of-state** 96:1

**outcome** 55:5 74:15, 16,17 75:11 94:17

**outcomes** 44:22 105:17 113:4

**outdoor** 71:19

**outline** 68:13 86:21 87:5

**outlined** 6:23 51:21 65:18 74:1 89:8 104:1 105:10 111:5 116:24

**outlines** 68:12 89:10

**outreach** 88:2,14

**overlapping** 51:22

**oversee** 43:15

**oversight** 29:10

**owned** 89:13

**owner** 16:22

**P**

**p.m.** 118:15

**packet** 38:4

**paged** 79:17

**pages** 54:21 55:1

**paid** 33:21,22

**paragraph** 36:10 38:24 46:2 58:3 83:6

**parcels** 46:19

**park** 18:15,17,19 91:3 101:1

**parking** 64:5,6

**part** 14:12 15:13 19:19 26:24 34:2 41:24 46:1 49:6 51:8 52:10 54:11 72:15 73:18 88:2,7 93:4 104:3 110:13,15

**partial** 16:22

**participate** 65:13

**participated** 42:7

**participating** 12:21

**partnered** 27:12

**partnership** 58:7,11

**parts** 110:12

**passed** 42:19 72:24

**past** 111:1

**patio** 31:5

**pause** 109:17

**pay** 14:16

**pedestrian** 91:2 101:2

**pending** 6:4

**people** 43:6 63:23 93:4 103:13

**percentage** 94:8

**performed** 40:12

**period** 18:21

**permitted** 12:4 37:2 57:10,14 66:13 73:10 86:21 87:6,22 117:7, 11

**personal** 35:16,21 48:20 54:15 93:15

**personally** 28:2,12 89:17,21,22 90:1

**perspective** 46:23 51:15,16 61:8 66:12 77:15 78:9,11,12 95:3 101:8

**photos** 41:7

**picks** 52:5

**piece** 9:5 57:15 88:10 93:20

**place** 27:20 44:20 45:14 52:19 53:1,8,11 84:11 103:9 107:10, 13,17 112:24

**plan** 7:1 18:12 25:15 30:13 31:4 36:13 41:6, 8,22,24 42:5,7,11,13, 14,24 44:6,24 45:3,9 49:19 51:4,20 52:8,10, 12,15,16,20,22 53:8 54:1,6 55:5,6 60:1,10, 22 61:2,4,11,16 62:2, 12,15,17,18 64:9 68:2, 9,14,22 69:6,16,17 72:23 73:19 75:1,8 78:3 79:2 80:11 81:18 83:8,13 86:18 90:24 91:2,3 92:15 94:6 99:2 100:17 101:17 102:1, 4,7 103:3,18 104:1,22 105:5,9,11,15,24 107:19,20 108:11 109:1,4 116:24 117:1, 3

**planned** 64:14 65:2, 16 73:7 77:17 78:6 79:3 89:19

**planner** 11:22 12:5 16:9,14 17:13,15,22, 23 18:24 19:20 21:17

23:20 24:13,15 42:11
44:8 47:13 55:9 58:21
75:23 103:19 104:10
107:15 108:3

**planner/village** 18:24

**planners** 11:4 51:18,
19

**planning** 7:4,7 8:14,
21,23 9:20 10:17 11:3
12:9,13,14 15:8 16:11
17:3,5,12,18 18:7,14
19:8,11,19 20:11,15
21:13,14 22:7,10,17,
20 23:3,10 25:12 27:2,
7 32:12 39:22 43:15,
22,23 45:14 46:22
48:2,14,16,20 51:23
53:3,4,15 54:14 55:23
58:7,16,23 67:23
69:20 75:4 76:10
77:15 78:11 80:12
86:16 88:1 91:5,23
92:22 93:9 94:13 95:2
97:6 101:20 104:18
107:11 112:15

**plans** 29:13 46:13,14
52:2 63:7,8,9 86:17,21
87:4 91:6,8 96:15
99:11 103:7 107:10

**play** 58:7

**pleadings** 77:10

**point** 14:8 16:17 17:14
26:18 40:22,24 44:19
51:24 54:9 59:7 84:16
92:8 98:3 107:3

**pointed** 102:7

**pointing** 67:4 102:8

**political** 10:8

**population** 26:22

**porches** 71:18

**portion** 38:5 52:13
72:22 86:15 95:4
103:15 112:10

**portions** 46:5 103:6

**portrayal** 55:14

**position** 16:4,6 30:6
32:7 64:10,12,24
69:11 76:1 91:7

114:21

**positions** 16:4

**possibilities** 27:8

**postgraduate** 10:13

**potential** 46:15 54:5
58:5

**powerful** 51:17 53:22

**Powerpoint** 76:18,21

**practice** 54:14 95:12

**practices** 80:13

**practicing** 11:22 75:6

**predominance** 50:16

**preparation** 9:11
33:12 37:20 45:9 73:2

**prepare** 6:21 8:6
33:21 34:22

**prepared** 37:14

**preparing** 47:10

**prerogative** 66:18,23

**prescribe** 56:17 94:14

**prescribed** 62:5
63:13 94:19,22

**prescribes** 57:14

**prescribing** 95:3

**presentation** 76:15

**presentations** 14:20

**presenting** 69:6

**Preserve** 61:8

**preserved** 61:9

**preventing** 86:11

**previous** 53:4 54:2
81:3 98:8

**previously** 33:6,9
51:2 53:10 56:2 68:24
72:17 77:1 82:3
115:19

**primarily** 44:13

**primary** 53:9 65:5
95:14

**principal** 16:20 21:12

24:10 35:6 43:13

**prior** 23:5 66:22 68:19
71:11 85:15 93:22
95:8 111:4,19,24

**private** 22:2 27:23
28:10 90:2,12

**proceed** 55:15

**proceedings** 32:22
109:17

**process** 5:14,16
15:14 18:6 27:20
30:23 31:9,14,15 35:1
42:13 44:9 52:22
54:11,12,16,23 55:11,
18 59:9 68:12 75:12
76:12 78:14 81:19
82:4 84:4 88:3,7,8,9,
10,13,15,16 89:3,7,11
90:3,13 95:15 96:22
97:15,23 98:1 101:21
103:2,8 104:13 105:16
106:11 107:9,24
108:3,5,23 110:24
111:7 112:13,24
113:11

**processes** 30:13
95:18,22

**produced** 104:8

**product** 108:17 110:5

**profession** 75:4

**professional** 10:23
35:3 47:19,21 48:16
51:14 53:15 54:14
59:10,14,17 63:3 75:6
80:12 93:9 94:5 103:7
105:1

**progress** 113:9

**progressed** 16:11
65:10

**progression** 45:13

**project** 16:14 27:4,13
35:4 48:14,16,20,22
49:3 59:11 63:20
75:24 88:21 89:20
90:9

**projects** 18:14 19:16
21:13,14 23:17 25:6
26:10 27:10 28:5 40:3

43:22 44:1 48:6 49:7
58:24 83:16

**promoting** 97:21

**proper** 78:15

**properly** 77:24

**property** 6:13,15,17,
18 7:2 36:14 37:5,6
45:4 50:7 56:4,22,23
57:1,3,7,10,16,20,23
69:2 73:11,15 74:8,23
80:9 81:10 86:21 87:1,
7 89:13,15,23 99:17
106:8 115:14 116:12,
15,21 117:23

**property's** 37:1
111:23

**proposal** 34:8 37:16,
19 38:19 59:22 60:4,8,
9,13,14 69:1,9,12 72:9
73:6 81:11 85:9,13
87:16 98:9 100:4
101:7,18 104:3 105:2
111:17 112:1,4,20

**proposal's** 67:10

**proposals** 99:18
101:7 106:19 111:16,
20,22

**proposed** 36:10 37:6
66:24 69:1 83:20
105:12,14 110:7

**proposes** 66:19

**protect** 92:18

**provide** 35:17,22
59:14 66:8,13 77:24
94:7

**provided** 56:6,9,13
59:24 60:10,22 92:4
101:6 117:4

**provisions** 97:23

**public** 22:1,6 23:10,11
24:19 28:7 32:8 44:9
51:18,23 52:22 53:3
54:11 55:11 58:14,22
68:11,12 75:12 76:12
83:21,23 88:2,6,9,12,
14,15,20 103:8
104:15,16 107:9

public/private 58:6, 10

PUD 78:1 81:14,16 82:21 84:5,10 89:3,7 97:12,21,23,24 105:15,17,18,19,21 106:21 107:4,14 108:2,4,11,14,21 109:12,20 110:17,22 111:1,6,17,20

PUDS 83:16 106:3 111:12

purpose 51:13 101:23

purposes 8:4 12:10 30:5 37:21 47:10 67:3 102:5

pursue 81:16

pursuing 81:16

put 55:4 82:19 113:7

---

**Q**

quality 94:17

question 6:1,4 8:6 9:22 11:16 13:22 28:3, 8 36:16 48:13 57:22 60:8 65:14,23 70:18 79:16 93:10,12 105:12 106:16 112:9 117:21

question's 37:18

questioning 86:4 110:10

questions 5:22,24 55:20 79:21 118:3

quick 7:8 36:2

quickly 5:16 113:2

---

**R**

raised 59:8,9 83:18,22

ramifications 76:8

ran 43:21

range 56:10,14,15 62:4,24 63:5,12 68:3

ranges 54:20

ranks 16:12

rapid 26:15

rapidly 30:11

re-recruited 24:6

re-reviewed 8:11,13

reach 81:21

reached 78:18

reaching 84:16

read 7:5 34:4 50:2 63:9 67:6,8 70:7 74:4 98:4,13 118:6

reading 46:7 71:13 74:3 83:11 107:17

real 7:8 41:8

Realty 18:11

rear 71:9

reason 11:19 14:9 20:21 24:1,2 46:23 93:15 98:19 102:1

reasonable 80:9 81:9,22 83:9

reasoning 91:12

reasons 24:1 53:9 93:13

rebuilt 84:8

recall 9:9 10:10 11:7, 13 14:7 16:2,23 17:7, 9,10 19:3 25:7,16 33:10 34:5 39:7 42:22 43:8,16 44:13,14 45:2, 6 46:11 48:15 49:7 50:20,24 57:7,8 70:8, 10 78:23 85:6,12,16, 18,20,21 90:8,14,18 91:17 93:6 98:20 99:13,15 116:22

receive 33:15 113:21

received 10:8

recent 95:13

recently 72:23

recess 36:4 80:3 115:10

recognized 9:23

recollection 44:12 90:17 117:13

recommendation 31:8 62:17,19 81:24 82:21 83:13 99:23

recommendations 30:24 56:7 61:13 87:22 104:16

recommended 92:9 114:23

recommending 29:22 30:2 31:7

record 5:7,19 7:12,23 11:2 34:10 37:22 38:3 67:3,8 80:21 81:5 99:4 102:6 115:3

records 77:11 90:9

recreational 117:11

recruited 20:23 22:14,22,24

redevelopment 46:16 49:21 58:8 73:7

redid 53:24

redline 114:7,12

redlined 114:11,15

reduce 101:16

reduced 101:14

refer 6:17 60:16 80:5

reference 59:24 60:17 70:4 74:13 83:7

referenced 115:21

references 74:12

referred 6:14 98:22, 23

referring 36:17,18 47:15 60:7 76:19

regard 43:2 44:16

region 22:10 40:4 80:13

regional 10:16 12:13 22:7,9,19

reimbursement 15:14

reject 66:19

rejected 73:6

related 15:8 27:11 37:1,5 38:5 39:22 40:14 77:12 112:9

relation 33:16

relevant 9:1 29:14 34:20,23 36:19 39:1, 10 40:10 45:18

relies 107:21

relooked 8:11

relying 108:12

remaining 46:18

remember 55:20

removed 43:19

renewing 11:21

repetitive 107:8

rephrase 5:24 28:2 35:9 59:13 108:18

replaced 76:2 104:12

replacement 104:19

report 6:23 7:19 8:3,4, 11,12,16 9:13 33:1,3, 13,17,21 34:22 36:7 37:20 38:10,21 42:1 45:10 47:11 51:8,12, 22 59:12,15,20 61:14 73:2 76:14 80:6 83:11 85:1,22 86:16 93:18 96:21 98:14,15,17,21 99:10,21 100:16,19,23 102:23 107:18 112:7 113:19 114:2,8,11,16 115:22

REPORTER 118:6,8, 10

reports 7:5

represent 7:18 17:17 37:13 38:16 41:20 51:3

representative 82:3

represented 90:2,12 117:16

representing 18:8

**reputable** 55:22

**request** 23:16 67:12
84:23 85:16 97:14
98:10 99:9 114:18

**requested** 67:8

**require** 108:14

**required** 65:15 66:1,2

**requirement** 78:5,8
101:17 105:4 111:8

**requirements**
104:23,24

**research** 39:10,15,16,
22 40:6,10

**reserve** 10:11 61:10

**residences** 71:24

**residential** 50:16
61:17,19 70:5 85:19
94:20,21 100:23 101:6
105:2 109:21

**residents** 102:14

**resolution** 9:5 73:4
115:5

**respect** 25:15 58:23

**respected** 55:23

**respectful** 75:22

**responses** 5:21

**responsibilities**
43:21

**responsibility** 20:10

**responsible** 83:24

**resulting** 103:9

**results** 31:22 76:12

**retained** 27:23 28:9
33:2,4,5 35:13,16,21
47:24 48:3

**retainer** 26:4,5

**returning** 24:12 25:1,
2 27:21 35:18

**review** 17:16 18:6,7
29:12 30:13 31:4
34:19,22 35:1,4 37:18
38:1 39:1,3,13,14,23
45:2,8 46:24 55:18

63:2 65:8,10,12 69:3
75:8 78:2,14 79:17
88:8,17 90:21 91:23
95:11 104:17 112:9,
10,11 117:16

**reviewed** 6:23 7:3
8:2,3,16 9:8 36:10
37:19 38:10,20 39:8
41:24 45:22 46:11
51:8,12 52:11 54:12
60:9 73:1 76:15,18
77:7,10,23 81:1 89:7
103:3 116:19 117:7

**reviewing** 18:4 52:16
53:4 84:3 103:7
115:22

**revising** 53:20

**rewrite** 25:11

**rezone** 73:15 86:24
99:17 106:8

**rezoned** 46:5 81:10
89:14,22

**rezoning** 37:16 64:15
77:18 80:17 81:15
82:1,4,9,18,23 85:24
89:3,7,15,20 90:3,13
95:18 108:14 114:18,
23

**rezonings** 30:3 31:8,
12 110:18,22 111:2

**right-hand** 100:6

**rights** 57:23

**rigorous** 107:6,14

**rigorously** 108:4

**River** 26:18 27:9

**riverfront** 18:14

**Road** 26:18 27:9

**roads** 92:7

**roadway** 84:7

**robust** 44:15 52:22
54:11,16 55:11 68:11
75:12 76:12 101:21
103:2,8 104:9,13

**robustly** 76:11

**Rocky** 18:9

**role** 18:2 28:23 43:8,
16 58:7 106:18,21
107:2,6

**roles** 16:15 43:9

**roster** 25:6

**rule** 5:17

**rules** 5:15

**run** 43:23 44:9

**rundown** 5:14

**running** 21:13

**runs** 102:22

---

**S**

**S-U-D-Y** 5:9

**S1** 57:4 73:24 74:7,18,
20 87:14 116:22
117:6,8,22

**safe** 36:24 104:2

**sat** 32:11

**satisfactory** 76:10
78:17

**satisfy** 94:22

**scale** 30:13

**schedule** 14:18 23:17

**school** 44:17,20 48:23

**science** 10:9

**scope** 34:17,19 36:8
38:24 50:11 59:11,18
76:5 77:20

**seat** 29:5

**section** 9:6 36:21

**sections** 9:1 36:19
37:1 44:14

**sector** 28:7,10

**seek** 74:15,16,17
88:20

**seeking** 86:3

**senior** 16:14

**sense** 14:7 45:19
49:13

**sentence** 38:23 58:4
100:14

**series** 104:16

**serve** 21:16 23:19
24:15

**served** 19:3 51:24

**service** 117:12

**services** 35:17,22
48:1,3

**serving** 24:13

**set** 29:14,16 34:21
61:7 64:10 68:3 69:18
72:7 77:5 92:15 94:13
103:19

**sets** 92:17

**setting** 94:16

**share** 43:20

**shift** 54:5

**shifted** 14:15 30:9

**shifting** 14:12

**shoot** 13:1

**short** 65:11 79:24
115:8

**shorthand** 24:2

**show** 67:24

**shown** 67:18,20

**side** 17:2,5 19:7,10,19
20:15 23:5 29:20

**sign** 118:6

**signature** 118:12

**signed** 34:8

**significant** 53:17 55:7
103:15

**significantly** 117:2

**similar** 17:24 40:3
61:19 63:10 111:6

**simpler** 109:12

**single** 52:13 109:5

**single-family** 61:17
62:3 71:8 72:15

**single-level** 102:13, 21

**sit** 28:20 32:1

**site** 7:9 8:15 17:12 27:7 30:13 31:4 39:12, 17,23 40:15,18,22,24 41:5,8 45:23 46:1,10, 13 47:3 50:17 51:18 53:9,17 54:17 55:8,16, 18 58:5,8,12,13 59:11 61:7 64:4 70:6,15,21 71:4 75:8 80:11 91:19 94:15 103:20 106:6 111:19 117:5

**sites** 27:8 46:16 49:21

**sitting** 9:9 11:14 90:8, 14,18

**situation** 14:17 41:8 53:24 81:18 94:24 97:16 102:2 113:7

**size** 54:17 64:2,5

**skewed** 30:22

**slides** 76:18,21

**Slow** 61:23

**small** 16:12 71:8

**smaller** 31:1

**Software's** 42:19

**solid** 93:15

**sort** 16:11,21 20:11 24:3 27:13 30:10,15, 20 31:17 40:5 41:6 44:18 53:17 54:4 80:20 116:5

**source** 51:11 65:6

**space** 85:17 87:14,15 92:12,13,16,19 101:1

**speak** 5:17 9:10 12:17 13:9 33:11 39:20 47:9 76:8 78:8 80:16 89:2 111:11 113:18 114:24

**speaking** 11:24

**speaks** 75:9

**special** 57:4 116:22

**specific** 34:2 40:9,21 43:2,8,16 46:14 58:19

61:4,13 62:21 64:18 66:9 84:20 91:14,17 92:3,6,16,17,20 93:12, 19 94:7,8 95:3,4,6 103:23 105:16,23 106:10 107:12 112:12

**specifically** 7:2 8:7, 11 14:8 17:7 18:23 23:1 27:7 36:17 39:6 40:14 46:13 47:24 50:13 60:7 62:11 87:1 100:5 104:6

**specificity** 96:15

**speculate** 93:14 105:13

**speculating** 103:3

**speculation** 58:18 67:16 69:15 82:12 88:23 94:10 95:20 96:17 101:12 105:7 106:23 107:22

**spell** 5:6

**spent** 25:20 26:2

**splintering** 24:4

**split** 26:1 27:16 29:18 31:3

**spoke** 8:10

**spot** 103:24

**square** 63:22

**staff** 7:5 8:12 18:1 30:24 37:14 38:20 42:11 51:21 53:2 55:9 60:2,18 63:3 67:23 68:10 69:3 75:8 81:19 83:11,20,21 85:1,22 93:18 97:3,15,19 98:9, 13,15,17,21 99:1,10, 23 100:3,9,11,15 101:6,9,13 102:11,19, 23 103:19 106:17,20 107:18 109:8,15 111:9 112:24 113:1

**staff's** 104:2 107:2

**staffing** 93:10

**stage** 97:10

**stages** 97:10

**stakeholders** 58:15

**standard** 80:12

**standards** 36:12,16 67:1 68:8 69:18 78:1 83:23 84:15 106:10

**standing** 18:2

**standpoint** 17:18 54:15 76:11

**start** 15:9

**started** 17:4 27:4

**starting** 10:5 36:8

**state** 5:6 10:17 12:18, 23 14:3 15:6 18:16 26:17 31:13 32:18 49:1,2,13 80:14 82:8, 14 83:7 89:23 90:3 93:23 96:9

**State's** 13:6

**stated** 85:21

**statement** 50:6 67:22 82:9 85:15 86:6 102:16

**states** 69:4 101:10

**steady** 26:6

**step** 16:21 31:17 109:4

**steps** 83:17

**stint** 21:5,8 25:13,17

**stop** 11:21

**stopping** 97:15

**store** 112:6

**stories** 62:10 63:15, 16

**story** 52:1

**strategetic** 7:1 36:13 60:22 61:2 64:9,21 68:2 72:23 74:21 75:13 91:1 104:5,11 117:5

**strategic** 74:1 86:18

**strategies** 44:20

**streamlined** 30:23

**street** 17:2,5 19:7,10, 19 20:15 23:5 29:17 46:5 63:4,21 83:21,23 115:24

**streets** 92:8

**strike** 19:18 79:23 92:14

**strong** 49:23

**structure** 16:13 105:9

**student** 48:22

**studies** 53:6

**studios** 49:5

**study** 26:20

**stuff** 20:12

**styles** 30:15

**subarea** 61:3 64:11 72:12,13,14,16

**subareas** 56:15,16 61:6 64:12,20

**subconsultant** 26:14

**subconsultants** 19:14

**subject** 36:14 40:13 45:4 50:7 56:4,22,23 57:10 69:2 80:9 111:23 115:14

**submittal** 81:3

**submitted** 61:10 82:21 83:8 87:16 111:18

**subsequent** 106:1

**substance** 99:22

**substantive** 20:6 83:12

**substantively** 20:9

**suburbs** 40:4

**successful** 75:24 94:17

**Sudy** 5:1,8,10 7:18 13:17 36:6 37:13 38:2 41:20 43:7 51:3 79:14 80:5 109:19 115:12 118:4

**suggest** 87:1

**suggesting** 64:7
112:10

**suggestion** 81:14

**suggestions** 112:17

**sum** 54:20

**supplement** 45:17

**supplemented** 76:3

**supports** 102:2

**surface** 64:5

**surprisingly** 96:5

**sworn** 5:2

**syncs** 107:21

---

**T**

**table** 97:13,18

**tabled** 98:9 109:5

**tabling** 97:9 98:21
113:6

**takes** 14:16 25:22
27:20 53:1

**taking** 5:18 99:16

**talk** 98:5

**talking** 6:18 54:21
109:9

**talks** 46:3,9 58:4

**target** 92:20

**targeted** 55:4

**tasked** 59:19

**tasks** 50:12 76:6
77:21 86:5

**taught** 12:22 13:5,7

**taxes** 49:15

**taxing** 14:18

**teach** 12:18

**teaching** 11:23 82:13

**team** 19:15 43:4,10

**teamed** 25:10

**technically** 8:22

**technologies** 23:2

**technology** 14:6 23:8

**telling** 64:19 106:18

**Ten** 11:13

**tenant** 97:24

**tens** 63:21

**term** 15:15 75:14,15

**terminate** 11:9

**terminated** 11:18

**terms** 33:19 51:22
75:19

**testified** 9:14,17
32:15,18,21 66:7 82:3
92:2 95:24

**testify** 6:8 9:19

**testimony** 33:23 66:5,
22 68:19 71:11 93:22
95:8 111:4 118:14

**text** 56:24 105:24

**theater** 10:9

**themes** 102:22

**theoretically** 26:17

**thereunder** 37:3
57:14

**thing** 6:3 9:21 17:24
109:14

**things** 8:1 27:12 30:16
31:1 39:8 44:11 52:6,
19 53:6 97:12 102:14
105:14

**thinking** 45:20

**thought** 115:21

**thousand** 103:13

**thousands** 63:22

**three-dimensional**
41:4

**tie** 93:13

**time** 9:19 12:22 13:3
14:17 16:1 18:21 22:1
23:14 25:7,20,23 26:1,
2 37:18 38:1,15 44:15,

24 48:7,8,9,23 49:4
50:2,4,20 55:1 65:22
67:19 70:8 85:13,20
86:8 90:16 97:8
105:17,19 112:19,22
113:10 118:3

**timeline** 113:14

**timely** 112:9,10

**times** 26:8 90:11
95:13 97:11 99:20
107:15 108:3 116:8

**tinkering** 30:21

**title** 14:12 16:19

**titled** 86:16

**today** 86:1 118:4

**told** 83:1

**tool** 52:8,9 65:8

**tools** 51:17

**top** 36:22 70:9

**topics** 14:4 100:22

**total** 54:20 60:13

**townhomes** 72:3,11

**track** 67:7 114:13

**trade** 38:11,14

**traffic** 53:5 101:1

**training** 12:9

**transcript** 5:19

**transit** 23:7 26:15
27:6

**transition** 94:19,20

**transportation** 14:5
26:21,23

**Transystems** 26:15

**travel** 23:16

**troubled** 46:4

**true** 7:22 47:7,8
115:16

**Tucker** 61:8 87:13,15
92:18

**tuition** 15:14

**turn** 19:7 32:24 45:24
50:2 60:17 78:19
79:23 100:2,5 116:9

**turning** 66:3 86:15

**tweaks** 84:19

**type** 9:21 26:12 58:10
62:13 63:11 75:6
113:24

**types** 30:4 44:10 53:6
62:16 70:14 71:2,5,6,
15 84:21 100:24
102:12

**typical** 63:6 64:2

**typically** 31:18 52:21
53:19

---

**U**

**Uh-huh** 75:16

**uh-huhs** 5:21

**UIRF** 15:21

**UMC** 91:1

**UMCH** 6:15 46:1 51:4

**unclear** 48:5,9 102:20

**undergraduate** 10:6

**understand** 5:23 6:7,
12 41:1 45:13,23
94:21 103:17,21
104:20 112:17 116:14

**understanding** 45:15
55:18 66:5 69:8 73:8
74:19 116:13

**understood** 6:20 82:4

**undertaken** 35:2
78:15 110:19,22

**undertook** 54:13

**unfamiliar** 112:2

**unhelpful** 75:4

**unit** 64:2,14 65:3,16
66:9 69:12 73:7 77:17
78:6 79:3 80:24 89:19
92:11 93:19

**United** 6:14

**units** 60:14,21 61:14, 20,22 62:3,9,23 63:17, 18,22,24 64:13 65:18 69:1,7 85:9 105:3

**University** 10:11

**untimely** 112:11

**update** 7:2 9:2,3 27:2 42:3 45:15 51:4,10 56:3 60:1 61:24 72:22 73:9 75:20 92:10 100:18 106:1

**updates** 78:3 91:1

**ups** 26:7

**urban** 51:17 94:23

**urbanized** 30:17

**utilize** 26:6

**utilized** 105:18,19 111:1

---

**V**

**vague** 31:10 43:11 75:2,15,19 76:10,23 95:20 106:23

**vagueness** 75:9

**valid** 65:8

**variances** 30:3 31:11

**varied** 12:15

**variety** 11:22 21:13 30:15 82:17

**varying** 96:14

**verbal** 5:20

**verify** 41:7 116:17 117:19

**version** 38:12 82:15

**versions** 114:7

**vetted** 84:13

**Victorian** 29:18

**video** 7:6 8:14,20,23 39:5

**videos** 90:22

**viewed** 7:6

**village** 17:20,22 28:17,23 29:11,16,19, 20 107:4,5 108:2 110:16 114:22

**visit** 39:24 40:15,23,24

**visited** 7:9 8:15

**visiting** 39:17

**volunteer** 93:11

**Vorys** 33:3,4,5,20 35:5

---

**W**

**waived** 118:12

**walk** 10:6 36:6 73:21

**walk-up** 72:3

**wanted** 63:24 80:23 81:4 113:13

**watched** 8:20 91:14

**watching** 90:22

**watchmaker** 30:21

**website** 39:5 115:23 116:2,4

**week** 18:4

**weeks** 26:1

**Well-appointed** 72:3

**Wesley** 83:20

**Western** 10:11 15:5 48:24

**whatnot** 90:23

**whatsoever** 105:4

**Whitehall** 22:8 25:4,8, 9,14

**why's** 23:24

**wide** 11:22 82:17

**Winter** 18:17,19

**wishes** 55:15

**witness's** 50:11 66:22 68:18 71:11 76:5 77:21 85:15 93:22 95:8 111:4

**Word** 114:11

**words** 75:5,7 100:11

**work** 15:3,4 17:6 19:18 20:6,23,24 21:24 22:14 23:5,10, 13,15 25:14 26:8,12 27:11 28:9 34:11,14, 17 35:8,14 39:21 42:1, 14,23 45:3 48:2 58:20 59:18 96:1

**worked** 15:12,16,23, 24 17:16,20 18:15 19:16,22,23 21:9 33:8 44:23 47:18 48:4,5,13, 19 49:3 54:7 63:10 84:4 89:14,18 95:13 96:19 107:7

**working** 18:13 21:13 22:1 25:17,20 26:2,8, 13 28:5 40:15 45:11 49:9 108:1,10 109:19 114:5

**world** 41:4,8 82:13 86:8

**Worthington** 6:10,13 41:21 44:16 46:20 47:10,14,23 48:5,15, 21 53:21 61:16,20,21 65:2,4 72:15 89:14,16, 19 106:5 107:1,17 110:18 116:5

**Worthington's** 36:13 106:12

**wrapped** 115:8

**writing** 42:12 43:1,3 44:14

**written** 38:12 50:14

**wrong** 66:6 92:3

**wrote** 38:13 113:19

**WSP** 26:19

---

**X**

**Xeroxed** 116:8

---

**Y**

**Yaz** 42:2

**year** 12:12,16 24:24 25:16 104:14

**year-long** 54:23 101:21 107:24

**years** 9:14 11:13 12:24 13:4,7,11 14:2 16:2,3,23 21:10,15 29:4 30:9 54:8,9 75:6 81:4 82:14 90:19 97:7 108:24 115:1

**yeses** 5:22

**youth** 46:4

---

**Z**

**Zoneco** 25:10

**zoned** 47:4 57:4 80:10 106:13 116:21

**zoning** 9:2 25:11 30:3 32:11,12 36:12,16,18 37:1,2,6 39:14 47:4 56:3,22 57:1,6,13,19 70:1 73:10,24 74:7,18, 20 79:4 81:24 82:13, 16 86:7 87:7,11,23 89:8,10 92:22 95:22 96:12 106:4,14 111:14 115:13 116:11,13,16, 18 117:4,17,18