**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **LIFESTYLE COMMUNITIES, LTD**., *et al.*, | ) | Civil Action 2:22-CV-1775 |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Judge Sarah D. Morrison |
| | ) | |
| **CITY OF WORTHINGTON, OHIO**, | ) | |
| | ) | |
| Defendant. | ) | Magistrate Judge Elizabeth P. Deavers |
| | ) | |

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# EXHIBIT 01
# Part 1

*LIFESTYLE COMMUNITIES*

*vs.*

*CITY OF WORTHINGTON*

Deposition of

**Raymond Lee Brown**

October 27, 2023



614.460.5000 | www.priohio.com | pri@priohio.com

1          IN THE UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF OHIO
2                   EASTERN DIVISION

3   LIFESTYLE COMMUNITIES,      )
    LTD., ET AL.,               )
4                               )
          Plaintiffs,           )
5                               )
          vs.                   )   Case No.
6                               )   2:22-cv-1775
    CITY OF WORTHINGTON,        )
7   OHIO,                       )
                                )
8         Defendant.            )

9

10

11                    DEPOSITION

12            of RAYMOND LEE BROWN

13

14        Taken at Worthington City Hall
              6550 North High Street
15           Worthington, Ohio 43085

16

17        on October 27, 2023, at 9:00 a.m.

18

19        Reported by: Julia Lamb, RPR, CRR

20

21                    -=0=-

22

23

24

```
 1   APPEARANCES:

 2        Christopher L. Ingram
          VORYS SATER SEYMOUR AND PEASE LLP
 3        52 East Gay Street
          Columbus, Ohio 43215
 4        614.464.5480
          clingram@vorys.com
 5
               on behalf of the Plaintiffs.
 6

 7        Paul J. Schumacher
          DICKIE McCAMEY
 8        600 Superior Avenue East, Suite 2330
          Cleveland, Ohio 44114
 9        216.390.1795
          pschumacher@dmclaw.com
10
               on behalf of the Defendant.
11

12

13

14

15

16

17

18                    -=0=-

19

20

21

22

23

24
```

<pre>
 1                    STIPULATIONS

 2             It is stipulated by and between

 3   counsel for the respective parties that the

 4   deposition of RAYMOND LEE BROWN, the Witness

 5   herein, called by the Plaintiffs under the

 6   applicable Rules of Federal Civil Court

 7   Procedure, may be taken at this time by the

 8   stenographic court reporter and notary public by

 9   agreement of counsel; that said deposition may

10   be reduced to writing stenographically by the

11   court reporter, whose notes thereafter may be

12   transcribed outside the presence of the witness;

13   and that the proof of the official character and

14   qualification of the notary is waived.

15                      -=0=-

16

17

18

19

20

21

22

23

24
</pre>

1                    INDEX OF EXAMINATION

2                                                PAGE

3   BY MR. INGRAM:                                7

4

5

6                    INDEX OF EXHIBITS

7   EXHIBIT            DESCRIPTION            PAGE

8     1      Land Use Plan                     66

9     7      Resolution No. 04-2022           254

10    11     Email, 1-18-22, with attached    249
             document
11
      21     UMCH Focus Area Checklist         69
12
      24     Email, 1-18-18                   113
13
      31     Summary of Phases for            115
14           Development of the UMCH
             Property, 11-27-18
15
      38     Staff Memorandum, 11-8-21        236
16
      45     Email, 10-5-20                   123
17
      52     Two-page email chain, 1-20-22    251
18
      54     Email chain, 4-15-15             96
19
      55     Minutes of the Special           87
20           Meeting Worthington
             Architectural Review Board,
21           Worthington Municipal
             Planning Commission, 6-29-15
22
      56     Email chain                       92
23
      57     Email chain, 3-27-20            118
24

| 1 | 59 | Minutes of the Regular | 142 |
|   |    | Meeting Worthington |  |
| 2 |    | Architectural Review Board, |  |
|   |    | Worthington Municipal |  |
| 3 |    | Planning Commission, 1-14-21 |  |
| 4 | 60 | Email, 3-31-21 | 207 |
| 5 | 61 | Three-page email chain, | 222 |
|   |    | 10-14-21 |  |
| 6 |    |  |  |
|   | 62 | Three-page email chain, | 223 |
| 7 |    | 10-14-21 |  |
| 8 | 64 | Email, 8-30-13, with attached | 41 |
|   |    | release titled City of |  |
| 9 |    | Worthington Launching |  |
|   |    | Visioning UMCH Process |  |
| 10 |   |  |  |
|   | 65 | Email, 2-19-14, with | 46 |
| 11 |    | attachments |  |
| 12 | 66 | Email, 9-27-13, with attached | 50 |
|   |    | memo, 9-27-13 |  |
| 13 |   |  |  |
|   | 67 | Two-page email chain | 62 |
| 14 |   |  |  |
|   | 68 | Two-page email chain, | 80 |
| 15 |    | 6-11-15, with attached UMCH |  |
|   |    | Focus Area Checklist |  |
| 16 |   |  |  |
|   | 69 | Email, 8-6-15 | 101 |
| 17 |   |  |  |
|   | 70 | Three-page email chain | 104 |
| 18 |   |  |  |
|   | 71 | Email, 6-13-17, with | 109 |
| 19 |    | attachments |  |
| 20 | 72 | Two-page email chain, 7-25-17 | 110 |
| 21 | 73 | Two-page email chain, 6-18-19 | 116 |
| 22 | 74 | Three-page email chain | 126 |
| 23 | 75 | One-page email chain, | 130 |
|   |    | 12-14-20 |  |
| 24 |   |  |  |

1    76    Email, 1-14-21, with attached    133
            Lifestyle Communities
2           Development Application for
            the UMCH Site, Questions from
3           City Councilmembers

4    77    Email, 1-14-21, with attached    140
            Planning Commission
5           Presentation, 1-14-21

6    78    Email, 1-27-21                    196

7    79    Three-page email chain           199

8    80    Email, 2-23-21                    203

9    81    Two-page email chain, 3-29-21    205

10   82    Two-page email chain,            218
            9-14-21, with attached
11          Proposed Master Plan and
            Improvements for the UMCH
12          Site Worthington

13   83    Portion of the Minutes of the    225
            Regular Meeting Worthington
14          Architectural Review Board,
            Worthington Municipal
15          Planning Commission, 10-14-21

16   84    Six-page email chain             255

17

18

19

20

21

22

23

24

1   those different people together to have the

2   conversation whether it be any consultants we

3   have for stormwater, traffic or the different

4   departments I've mentioned to, you know, provide

5   comments on whatever application is going before

6   planning commission that will ultimately go to

7   city council if it's a PUD rezoning.

8       Q.  And then are you also facilitating with

9   the applicants themselves?

10      A.  Usually what we will do is have the

11  applicant come in and present their proposal to

12  us, because it's sometimes difficult to

13  understand if something's dropped what it

14  actually even means.

15      Q.  And when you say come in to meet with

16  us, are you talking about meeting with city

17  staff?  Like what kind of meeting are you

18  referring to?

19      A.  It would be city staff, those different

20  departments I mentioned, and/or the consultants

21  coming in to sit down, hear what the proposal

22  is, kind of have them go through everything

23  that's been submitted, and then if it needs

24  stormwater comment or service in general comment

1  or fire and EMS concerns, that you kind of know

2  what's going on so that staff is writing the

3  memo, you can connect with those different

4  departments so they can give you their feedback

5  from what they heard or have reviewed as part of

6  the proposal.

7     Q.  So I take it site plan consideration for

8  a PUD or, you know, these mixed uses are more

9  complicated or more complex than the standard

10  zoning application.  Is that fair?

11     A.  Not always.

12     Q.  What do you mean by that?

13     A.  It depends on the -- where the project

14  is in a process.  If it's going through straight

15  rezoning or if it's -- what we have is something

16  called a development plan that if you're a

17  property over 2 acres in size, it has a

18  development plan associated with it, then you

19  also have a layer of architectural review board

20  on it.  It kind of acts as a mini PUD itself.

21  So it just depends on the complexity of what's

22  being proposed that sometimes those are more

23  complex than some of the PUDs we've had.

24     Q.  I gotcha.  So if it's a development

1    plan -- if the site is over 2 acres, and you

2    have a development plan requirement, and then

3    you're pulling in architectural review board

4    standards, you've got other various city

5    departments and maybe even consultants involved,

6    those are the types of site plan approvals or

7    development plan approvals that would be more

8    complicated or complex?

9       A.  Correct.

10      Q.  And for those specific complex site plan

11   applications I take it there's a fair amount of

12   back and forth that has to go on between all the

13   various stakeholders and the applicant?

14      A.  Project dependent.  We have some that

15   are very knowledgeable in the process and some

16   that you have to hand hold trying to help

17   through the process.

18      Q.  Okay.  And when you refer -- when you're

19   making that distinction, can you tell me what

20   you mean by -- what's the difference between

21   those -- who are you referring to, first of all,

22   and then my follow-up question's going to be how

23   are you making that distinction?

24         MR. SCHUMACHER:  Objection.  Compound.

1    BY MR. INGRAM:

2       Q.  Mr. Brown, I'm going to hand you what's

3    been marked as Exhibit 64.  Take an opportunity

4    to review that document.

5            MR. SCHUMACHER:  Mind if we take a

6    break?

7            MR. INGRAM:  Sure.  We can take a break

8    while the witness reviews the document.

9                   (Recess taken.)

10   BY MR. INGRAM:

11      Q.  Mr. Brown, have you had the opportunity

12   to review what's been marked as Exhibit 64?

13      A.  Yes.

14      Q.  Okay.  Exhibit 64 is an email from Anne

15   Brown directed to you and others.  Is that

16   correct?

17      A.  Yes.

18      Q.  And so for purposes of the record

19   LBrown@ci.worthington.oh.us, that was your work

20   email address here at Worthington?

21      A.  At the time, yes.

22      Q.  And that's changed a few years ago?

23      A.  Correct.

24      Q.  And the subject of Ms. Brown's email is

1  years.

2      Q.  Sure.  Do you recall was it a large

3  meet -- were there a lot of people there?  Was

4  it limited to particular stakeholders?  I'm

5  trying to get an idea of the room.

6      A.  I would say we probably had 25 or so

7  people.

8      Q.  And then after this design charrette

9  meeting with all those various representatives,

10  there were stakeholder interviews?

11      A.  Correct.

12      Q.  Did you participate in those?

13      A.  Some yes; some no.

14      Q.  Which interviews do you recall

15  participating in?

16      A.  The three that are listed there, I know

17  I probably attended all of those.

18      Q.  Okay.  Were there others then, I take

19  it?  Other stakeholder interviews I take it?

20      A.  Possibly.  I honestly don't know.

21      Q.  So you have stakeholder interviews

22  listed on your memo that's attached to

23  Exhibit 19, including UMCH, WARD, and

24  Worthington business community representatives.

1   When you -- for the stakeholder interviews when

2   you refer to the Worthington business community

3   representatives, are you lumping into that

4   category, then, I take it, the same

5   organizations that were listed under item number

6   2C?

7       A.  Yes.

8       Q.  About how many stakeholder interviews

9   did you participate in, if you can recall?

10      A.  Six to 10.

11      Q.  How many of those interviews were with

12  UMCH?

13      A.  I have to go back to look at my

14  calendar, but I feel like we kept them in the

15  loop.  I just have no idea if it's one meeting

16  or 30 meetings.

17      Q.  Sure.  Would UMCH have been party to or

18  participated in these stakeholder interviews or

19  was it more MKSK and perhaps someone from --

20  either you or someone from your staff sitting in

21  on these interviews?

22      A.  Clarification.  When you say -- when we

23  did the stakeholder interviews, you're asking if

24  UMCH sat in on the other stakeholders?

1      Q.  And my question is based on your land

2   planning experience has a political subdivision

3   ever gone to this length to create a land use

4   plan for one single property?

5           MR. SCHUMACHER:  Objection.  Asked and

6   answered.

7      A.  Not to my knowledge.

8      Q.  And so Worthington has a city population

9   of approximately 15,000 residents?

10      A.  Yeah, just under.

11      Q.  Just under.  So in your mind did this

12   fairly lengthy year-long process ultimately

13   reflect a community consensus on how the UMCH

14   property should be developed?

15           MR. SCHUMACHER:  Objection.

16      A.  I can't speak for the other groups

17   involved.  I felt it did, but I can't speak for

18   the other groups.

19      Q.  And I'm asking you.

20      A.  I felt so.

21      Q.  Okay.

22                    -=0=-

23        (Deposition Exhibit 67 marked.)

24                    -=0=-

1  BY MR. INGRAM:

2      Q.  Mr. Brown, I've handed you what's been

3  marked Exhibit 67.  Let me know after you've had

4  an opportunity to review it, please.

5      A.  Okay.

6      Q.  Mr. Brown, Exhibit 67 is numbered

7  Worthington 50277 through 50278.  It's an email

8  from Anne Brown, copying you, dated March 14,

9  2014.  The subject is UMCH.  Do you see that?

10     A.  Yes.

11     Q.  And it's an email chain.  I should

12 have -- to clarify my prior characterization, in

13 which Ms. Brown is addressing an email that it

14 looks like you had forwarded to her.  Do you see

15 that?

16     A.  Yes.

17     Q.  And you forwarded her an inquiry from

18 Andrew King who was a news reporter for ThisWeek

19 News.  Is that correct?

20     A.  He was, yes.

21     Q.  And at the time Ms. Brown, what was her

22 position?

23     A.  I call her the public affairs officer,

24 but I know her title's different.

1        Q.  Public relations, media relations?

2        A.  Yes.

3        Q.  Sure.  So Ms. Brown, then, is responding

4    to the reporter.  Is that fair?

5        A.  Yes.

6        Q.  Okay.  Did you assist Ms. Brown in

7    crafting her response to Mr. King?

8        A.  I don't remember drafting the response

9    that she has in the upper portion.  The lower

10   portion I do remember.

11       Q.  Okay.  And why did you specifically

12   reach out to Mr. King in the email that you

13   sent?

14       A.  From what I recall, there was a

15   newspaper article that went out in ThisWeek

16   News, which is a weekly publication, and there

17   was a reference that the city owned -- it gave

18   the perception the city owned the property, and

19   we did not want -- you know, we wanted that to

20   be corrected because it was privately owned at

21   the time.  And I think that's why Anne reached

22   out to the news -- ThisWeek News once we had

23   reached out to the actual gentleman that wrote

24   the article.

1                    CERTIFICATE

2    STATE OF OHIO       :
                              SS:
3    COUNTY OF FRANKLIN :

4            I, Julia Lamb, RPR, CRR, a
     stenographic court reporter and notary public in
5    and for the State of Ohio, duly commissioned and
     qualified, do hereby certify that the
6    within-named RAYMOND LEE BROWN was first duly
     sworn to testify to the truth, the whole truth,
7    and nothing but the truth in the cause
     aforesaid; that the testimony then given was
8    taken down by me stenographically in the
     presence of said witness, afterwards
9    transcribed; that the foregoing is a true and
     correct transcript of the testimony; that this
10   deposition was taken at the time and place in
     the foregoing caption specified.

11

             I do further certify that I am not a
12   relative, employee or attorney of any of the
     parties hereto; that I am not a relative or
13   employee of any attorney or counsel employed by
     the parties hereto; that I am not financially
14   interested in the action; and further, I am not,
     nor is the court reporting firm with which I am
15   affiliated, under contract as defined in Civil
     Rule 28(D).

16

             In witness whereof, I have hereunto
17   set my hand at Columbus, Ohio, on this 10th day
     of November, 2023.

18

19

20           *Julia Lamb*

21           _____
             Julia Lamb, RPR, CRR
22           Notary Public, State of Ohio

23   My commission expires:  10-10-27

24



390 S. Washington Avenue
Columbus, Ohio 43215

614.460.5000

www.priohio.com
pri@priohio.com

# WITNESS ERRATA SHEET

| | |
|---|---|
| Case Caption: | **LIFESTYLE COMMUNITIES vs CITY OF WORTHINGTON** |
| Deposition of: | **Bo Brownlee** |
| Date Taken: | **11/13/2023** |
| File Number | **JL326965** |

**INSTRUCTIONS**
If there are any corrections, indicate them on this form, giving
the change, page number, line number and reason for the
change.  Please print additional copies as needed or use a
blank piece of paper.

**REASONS FOR CHANGES**
1) To clarify the record.
2) To conform to the facts.
3) To correct transcription errors

Page _____ of _____

| Page # | Line # | Change | Reason # |
|---|---|---|---|
| 33 | 10 | "Is it. Based . . ." should be "Is it, based . . ." | 3 |
| 67 | 17 | "Joe Ballard" should be changed to "Jode Ballard" | 3 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

\* \* \* \* \*

I, **Bo Brownlee**, have read the foregoing transcript of my deposition given on **11/13/2023**; together with the
corrections on this page noting changes in form or substance, if any, it is true and correct.

Date: _12·27·23_      Signature: _____

**1145.05 RECONSIDERATION OF PRIOR FORMAL REZONING ACTION.**

No application for rezoning of any parcel of ground, once formally acted upon by either the Council or the Municipal Planning Commission, may be again considered for any rezoning change by Council or the Municipal Planning Commission until 180 days has elapsed from the date of formal action. In the event both Council and the Municipal Planning Commission have taken formal action, such time limit will be counted from the earlier of the two actions.
(Ord. 51-71. Passed 12-13-71.)



# DEVELOPMENT AGREEMENT

This Development Agreement (the "<u>Agreement</u>") is executed, delivered and made effective as of June **26**, 2015 (the "<u>Effective Date</u>"), by and among THE UNITED METHODIST CHILDREN'S HOME WEST OHIO CONFERENCE OF THE UNITED METHODIST CHURCH, an Ohio non-profit corporation ("<u>Owner</u>"), and LC NORTH HIGH STREET, LTD., an Ohio limited liability company ("<u>Developer</u>").

## Preliminary Statements

A.     Owner owns certain real property located in the City of Worthington, Franklin County, Ohio, known as Franklin County, Ohio Auditor Permanent Parcel Number 100-006391 containing approximately 40.773 acres ("<u>Property</u>"), which property is described in <u>Exhibit A</u> attached hereto and made a part hereof. For clarity, the Property does not include an additional approximately 3.575 acres of land known as Franklin County, Ohio Auditor Permanent Parcel Number 100-006390 that is also owned by Owner and located adjacent to the Property. Additionally, if the West Ohio Conference of the United Methodist Church ("<u>WOC</u>") does not agree to move to a new location on the Property, the Property subject to this Agreement shall not include the Conference Center, as defined below, subject to agreement to relocate and replace the current parking for the Conference Center, all as further provided in Section 9.3 hereof.

B.     Owner and Developer desire that Developer serve as a master developer of the Property subject to the terms and conditions set forth in this Agreement.

## Agreement

NOW, THEREFORE, in consideration of the premises, as set forth in the foregoing Preliminary Statements, and of the mutual promises herein set forth, and for other good and valuable consideration, the parties do hereby make the following related agreements on and subject to the following terms, conditions, covenants, restrictions and provisions, intending to be legally bound hereby:

## ARTICLE I
### Definitions and Preliminary Agreements

1.1     <u>Preliminary Statements</u>.     The Preliminary Statements above are incorporated herein as if fully rewritten herein.

1.2     <u>Definitions</u>.

(a)     "<u>Agreement</u>" is defined in the preamble of this Agreement.

(b)     "<u>Authorized Representative</u>" shall mean any person who is appointed as such pursuant to Section 13.14 hereof.

(c)     "<u>Budget</u>" shall have the meaning given such term in Section 4.1 hereof.

EXHIBIT

2

CONFIDENTIAL

(d)  "CCRs" means a Declaration of Covenants, Conditions and Restrictions to be placed upon the Property by Owner, subject to the approval rights of Developer and its affiliate Lifestyle Real Estate Holdings, Ltd., pursuant to Section 4(b) of the Multifamily PSA.

(e)  "City" means the City of Worthington, Ohio.

(f)  "Common Elements" shall have the meaning given such term in Section 7.6 hereof.

(g)  "Conference Center" shall have the meaning given such term in Section 9.3 hereof.

(h)  "Developer" as defined in the preamble of this Agreement.

(i)  "Development Fee" shall mean a fee due Developer equal to four percent (4.0%) of the gross purchase price of any and all sales of the Property (including the sale of the Multifamily Property to an affiliate of Developer).

(j)  "Effective Date" is defined in the preamble of this Agreement.

(k)  "Final Approved Zoning Plan" shall have the meaning given such term in Section 4.1 hereof.

(l)  "First Extended Term" shall have the meaning given such term in Section 2.2 hereof.

(m)  "Force Majeure" means occurrence of any event beyond the reasonable control of the applicable party, such as strikes, acts of God, inability to obtain labor or materials, enemy action, civil commotion, acts of terrorism, fire, or other unavoidable casualty, which prevents or delays such party from completing its obligations under this Development Agreement, excluding the inability of such party to obtain capital or to pay money.

(n)  "Initial Term" shall have the meaning given such term in Section 2.1 hereof.

(o)  "Master Plan" shall mean a master plan for the development of the Property which shall include the Rezoning Plan, Site Development Plan, Budget, Price Schedule and all necessary engineering for the infrastructure needed for development of the Property in accordance with the Rezoning Plan and Site Development Plan and as finally determined in accordance with the Final Approved Zoning Plan.

(p)  "Master Plan Entitlement Costs" shall mean all costs incurred by Developer in connection with the planning, zoning, entitling, and engineering the Property including, without limitation, attorneys' fees, land planning fees, architect fees, design fees, engineering fees, rendering and modeling fees and other production and material costs incurred.

(q)  "Multifamily Property" shall mean a portion of the Property identified on the Final Approved Zoning Plan as to be developed with multifamily residential housing and certain amenities related thereto, including, but not limited to, a tavern, fitness center and leasing office.

2

8317177v7

CONFIDENTIAL

LC00001157

(r) "Multifamily PSA" shall mean that certain Real Estate Purchase Contract of even date herewith between Owner, as seller, and Lifestyle Real Estate Holdings, Ltd., an Ohio limited liability company, as buyer, regarding the Multifamily Property.

(s) "Person" or "Persons" means individuals, partnerships, limited liability companies, associations, corporations, limited liability partnerships, joint ventures, not for profit or voluntary associations, firms, joint-stock companies, trusts or any other form of private, public, or governmental entity, or one or more of them, as the context may require.

(t) "Price Schedule" shall have the meaning given such term in Section 4.1 hereof.

(u) "Property" is defined in Preliminary Statement A above.

(v) "Preliminary Statements" means those paragraphs A and B above.

(w) "Rezoning Plan" shall have the meaning given such term in Section 4.1 hereof.

(x) "Second Extended Term" shall have the meaning given such term in Section 2.3 hereof.

(y) "Site Development Plan" shall have the meaning given such term in Section 4.1 hereof.

(z) "Term" shall mean Initial Term, as extended to include the First Extended Term and Second Extended Term, if applicable pursuant to Sections 2.2 and 2.3 of this Agreement.

(aa) "WOC" shall mean the West Ohio Conference of the United Methodist Church, the sole member of Owner.

(bb) "Zoning Approval Date" shall mean such date as all necessary and appropriate zoning ordinances to allow development of the Property in accordance with the Final Approved Zoning Plan have been approved by City Council of the City, signed by the Mayor or other applicable executive authority of the City and are free of any right of appeal or referendum.

ARTICLE II.
Term

2.1 Initial Term. The initial term of this Agreement shall commence on the Effective Date and expire on the first (1st) anniversary of the Effective Date (the "Initial Term"), subject to Developer's right to extend this Agreement pursuant to Sections 2.2 and 2.3 below.

2.2 First Extension Option. Provided Developer has diligently and continuously pursued during the Initial Term, and is still pursuing, approval of the Rezoning Plan by the City, Developer shall be entitled to extend the Term of this Agreement for an additional period of one (1) year expiring on the second (2nd) anniversary of the Effective Date of this Agreement ("First Extended Term"). Developer shall exercise its right under this Section to extend the Term of this Agreement by delivering written notice of such exercise to Owner on or before the last day of the

3

CONFIDENTIAL

LC00001158

Initial Term; provided that, if Developer fails to give such notice of its exercise of its right to extend the Term of this Agreement prior to the expiration of the Initial Term, this Agreement shall not expire until the earlier of: (a) such time as Owner has given Developer notice of such expiration and Developer has failed to give Owner notice of its exercise of the right to extend the Term of this Agreement within ten (10) days thereafter, or (b) such time as Developer has given notice to Owner that the Term of this Agreement has expired.

2.3    Second Extension Option. If the Zoning Approval Date occurs on or before the expiration of the Initial Term or the First Extended Term, as applicable, and Lifestyle Real Estate Holdings, Ltd., or its Affiliate, has closed on its purchase of the Multifamily Property pursuant to the Multifamily PSA, the Term of this Agreement shall be automatically extended to the date which is five (5) years after the Zoning Approval Date ("Second Extended Term").

2.4    Termination Upon Termination of Multifamily PSA. Notwithstanding anything contained herein to the contrary, under all circumstances, upon the termination of the Multifamily PSA, this Agreement shall automatically and immediately terminate, and upon termination of this Agreement, the Multifamily PSA shall automatically and immediately terminate.

ARTICLE III.
Exclusive Right to Develop and Market the Property

3.1    Right to Develop. Owner hereby grants Developer the exclusive right to develop the Property during the Term of this Agreement. Development of the Property by Developer shall be accomplished in accordance with the terms of this Agreement. During the Term of this Agreement, Owner shall not authorize any other person or entity to act on its behalf in the development of the Property without the prior written consent of Developer.

3.2    Right to Market. Owner hereby grants Developer the exclusive right to market the sale and or leasing of all or any portion of the Property during the Term of this Agreement. During the Term of this Agreement, Owner shall not authorize any other person or entity to act on its behalf in the marketing of the Property without the prior written consent of Developer. All marketing and sales of portions of the Property shall be in accordance with the Site Development Plan and the Price Schedule, unless the parties agree to a revision thereof or an exception thereto with respect to any sale, and shall be to users to be mutually agreed upon by Owner and Developer.

ARTICLE IV.
Contingencies

4.1    Contingencies. Developer's and Owner's obligations under this Agreement are subject to the Developer and Owner agreeing upon the following: (a) a rezoning plan and text that both parties shall present to the City ("Rezoning Plan"), (b) a site development plan for the Property illustrating the proposed uses (residential, office, retail, etc.) of the various parcels within the Property ("Site Development Plan"), (c) a budget for the development of the Property ("Budget"), (d) a schedule of the prices of the various parcels of the Property proposed to be sold

4

8317177v7

LC00001159

by Owner ("Price Schedule"), and (e) a final approved development plan and development text for the Property consistent with the Rezoning Plan acceptable to Developer and Owner ("Final Approved Zoning Plan"). In the event that Developer and Owner cannot agree on the Rezoning Plan, Site Development Plan, Budget, Price Schedule and the Final Approved Zoning Plan on or before the expiration of the Initial Term or the First Extended Term, as applicable, then either party may, by delivery of written notice to the other on or before the end of Initial Term or First Extended Term, as applicable, terminate this Agreement. In the event the Zoning Approval Date for the Final Approved Zoning Plan does not occur by the end of the First Extended Term, the Agreement shall terminate.

## ARTICLE V.
### Agreement to Work Toward Satisfaction of Contingencies

5.1    Rezoning Plan and Site Development Plan.  Within ninety (90) days of the Effective Date, Developer will prepare and submit for Owner's comment or approval drafts of the Rezoning Plan and the Site Development Plan. After submission of the draft Rezoning Plan and Site Development Plan to Owner, Owner shall have thirty (30) days to provide comments to Developer on the same.  If Owner fails to provide any comments on the same within said time period, the Rezoning Plan and Site Development Plan will be deemed approved and agreed to by Owner.  If Owner provides comments on the draft Rezoning Plan or Site Development Plan, Developer and Owner will work together in good faith to resolve any differences regarding the same.

5.2    Budget.  When Developer has obtained all information needed to prepare the Budget, Developer shall provide Owner with a draft Budget.  After submission of the draft Budget to Owner, Owner shall have thirty (30) days to provide comments to Developer on the same.  If Owner fails to provide any comments on the same within said time period, the Budget will be deemed approved and agreed to by Owner.  If Owner provides comments on the draft Budget, Developer and Owner will work together in good faith to resolve any differences regarding the same.

5.3    Price Schedule.  When Developer has obtained all information needed to prepare the Price Schedule, Developer shall provide Owner with a draft Price Schedule.  After submission of the draft Price Schedule to Owner, Owner shall have thirty (30) days to provide comments to Developer on the same.  The price of the Multifamily Property shall be as set forth in that certain Real Estate Purchase Contract between Owner, as seller, and Lifestyle Real Estate Holdings, Ltd., as buyer, of even date herewith.  If Owner fails to provide any comments on the same within said time period, the Price Schedule will be deemed approved and agreed to by Owner.  If Owner provides comments on the draft Price Schedule, Developer and Owner will work together in good faith to resolve any differences regarding the same.

5.4    Final Approved Zoning Plan Approval.    Given the nature and timing of zoning approvals, review and approval of a Final Approved Zoning Plan will occur on an expedited basis in order that proposals or requirements of the City can be timely met and agreed upon by the parties to achieve the Zoning Approval Date of a Final Approved Zoning Plan acceptable to Owner and Developer at the earliest possible time.  Owner and Developer will act

5

CONFIDENTIAL

in a commercially reasonable manner given the anticipated timing of such reviews and approvals.

ARTICLE VI.
Development Obligations of Developer

6.1    Development of Master Plan.  Developer shall act as the master developer of the Property, and shall make commercially reasonable efforts to cause the Property to be planned, zoned, engineered and subdivided in accordance with the Rezoning Plan, Site Development Plan and Budget.  Developer shall select and hire all land planners, engineers, attorneys and other consultants for the development of the Property.  In undertaking its role as master developer, Developer shall incur all Master Plan Entitlement Costs, subject to reimbursement in accordance with Article IX hereof.  Developer reserves the right to use its in-house consultants and employees of One Lifestyle, Ltd., and its affiliates, for planning, zoning, entitling, and engineering the Property, and all such costs and expense of such in-house consultants up to $150,000.00, provided the same are reasonable and at market rates, shall be part of the Master Plan Entitlement Costs to which Developer is entitled to be reimbursed.  Owner and Developer acknowledge and agree that at the request of Developer, Owner engaged EMH&T to undertake some preliminary engineering work on the Property prior to the Effective Date.  Developer agrees to be responsible for the payment of this preliminary engineering work up to but not in excess of $5,000.00, and such payment by Developer shall be part of the Master Plan Entitlement Costs to which Developer is entitled to be reimbursed.  All other amounts due EMH&T for such preliminary engineering work in excess of $5,000.00 shall be paid by Owner.  After the Zoning Approval Date, Developer will work with commercially reasonable diligence to complete all engineering for the Master Plan.

6.2    Other Approvals.  Developer and Owner agree that the Rezoning Plan and the Site Development Plan will not be submitted to the City of Worthington for consideration of a rezoning for the Property until the same have been approved by West Ohio Conference of the United Methodist Church and the City of Worthington planning staff.  Developer and Owner agree to submit the Rezoning Plan and the Site Development Plan to Worthington Area Residents for Responsible Development ("WARRD") for comment and discussion, but approval of the same by WARRD shall not be a condition upon the submission of them to the City of Worthington.

6.3    Marketing of Parcels.  Developer shall exercise commercially reasonable efforts during the Term of this Agreement to market for sale all portions of the Property, other than the Multifamily Property, to procure buyers mutually acceptable to Owner and Developer for various portions of the Property that will pay prices not less than those set forth in the Price Schedule and that will develop the individual portions of the Property in accordance with the Final Approved Zoning Plan.

6.4    No Duties to Maximize Benefit to Owner.  Developer shall act in accordance with the terms of this Agreement and will seek the consent of Owner as set forth herein, but Developer shall not have any duty to maximize the return to Owner from the Development of the Property.

6

8317177v7

6.5    No Guaranty of Result. Owner acknowledges that Developer has not guaranteed Owner that the Master Plan, or any portion thereof, will be approved by any particular governmental authority or any private party, that all or any portion of the Property will be sold or that all or any portion of the Property will be sold at a particular prices or on particular terms.

ARTICLE VII.
Obligations of Parties

7.1    Continued Ownership. Except for the potential sale of the Conference Center to WOC pursuant to its current lease of the Conference Center, Owner shall continue to own the Property and shall not, without the prior written consent of the Developer take, direct, permit or allow any of the following: (a) the conveyance of any interest in the Property or the encumbrance of the Property, including but not limited to the granting of any easement, license, lease, deed, mortgage or indenture, (b) the execution of any declaration, covenant or restriction affecting the Property, other than the CCRs, or (c) the filing of any zoning or other land use applications relating to the Property.

7.2    Costs of Ownership. Owner shall pay all costs of ownership of the Property, including but not limited to any real estate taxes, assessments, service payments or other payments in lieu of taxes and utility charges, until such time as portions of the Property are sold, at which time Owner shall no longer be responsible for the costs of ownership with respect to the portion of the Property sold.

7.3    Insurance. Owner and Developer shall each obtain and maintain during the Term of this Agreement commercial general liability insurance covering the Property, which policy is to be on an occurrence basis with minimum limits of not less than Three Million Dollars ($3,000,000.00) per occurrence. Each party shall be named as an "additional insured" under the required policy of the other party and each party shall provide certificates evidencing such policy upon request of the other party.

7.4    Mutual Indemnity and Hold Harmless. Developer shall indemnify and hold harmless Owner, its officers, trustees, employees, sole member and agents, from any loss, cost or damages to persons or property arising out of inspections, surveys and studies undertaken by Developer and its agents, consultants and representatives on the Property and the insurance provided by Developer pursuant to Section 7.3 hereof shall provide coverage for such indemnity and hold harmless. Notwithstanding anything to the contrary contained herein or in the Multifamily PSA, the provisions of this Section 7.4 shall survive any termination of this Agreement or the Multifamily PSA by lapse of time or otherwise.  Owner shall indemnify and hold harmless Developer, its members, managers, officers, employees and agents, from any loss, cost or damages to persons or property arising out of the activities of Owner, its lessees, invitees, agents and representatives on the Property and the insurance provided by Owner pursuant to Section 7.3 hereof shall provide coverage for such indemnity and hold harmless. Notwithstanding anything to the contrary contained herein or in the Multifamily PSA, the provisions of this Section 7.4 shall survive any termination of this Agreement or the Multifamily PSA by lapse of time or otherwise.

7

CONFIDENTIAL

7.5    Cooperation and Support.  Owner shall cooperate with and support Developer in all of its rezoning, planning and development efforts consistent with this Agreement.  Said support shall include, but not be limited to, the execution of all necessary applications and requests, appearing and favorably testifying at all hearings and meetings relating to the Master Plan, and providing Developer and its agents, employees, consultants and contractors all information and documents relating to the Property in Owner's possession or under Owner's control. Owner shall cooperate with and support Developer in all of its efforts in connection with the marketing of the Property.  Said support shall include, but not be limited to, the execution of all necessary or appropriate  letters of intent, purchase contracts, affidavits, deeds, closing statements and other documents related to the sale of the Property, and providing Developer and its agents, employees, consultants and contractors and any prospective purchaser all information and documents relating to the Property in Owner's possession or under Owner's control.

7.6    Dedications and Granting of Easements.  It is anticipated that the Master Plan will provide for  common amenities, shared roads, common utilities and the like ("Common Elements").  Owner shall (a) grant all necessary easements and conveyances to allow for the development of  the Common Elements, and (b) grant (to the extent required and agreed by Owner) a mortgage interest in the Property or portions thereof as security for the financing of the construction of such Common Elements.

7.7    Subdivision and Platting.  Owner will execute any and all applications or plats required for subdivision of the Property in accordance with the Final Approved Zoning.

ARTICLE VIII.
Force Majeure

8.1    Developer shall be excused from performing any of its duties, obligations or undertakings provided in this Agreement in the event and so long as and to the extent that the performance of such duty, obligation or undertaking is prevented, delayed, retarded or hindered by any Force Majeure; provided that the provisions of this Section 8.1 shall not act to extend the Term hereof.

ARTICLE IX.
Reimbursement and Compensation of Developer

9.1    Right to Payment.  Developer shall be reimbursed for all Master Plan Entitlement Costs as portions of the Property are sold during the Term of this Agreement but not after.  In addition to reimbursement of the Master Plan Entitlement Costs, Developer, in exchange for its services as master developer, shall be paid the Development Fee.  The reimbursement of Master Plan Entitlement Costs and the payment of the Development Fee shall be paid in accordance with Section 9.2 hereof; provided that if Developer is not successful in having the Property rezoned to allow for development in accordance with the Master Plan prior to the expiration of the Term or Developer terminates or defaults in its obligation to purchase the Multifamily Property in accordance with the Multifamily PSA, Owner will not be required to reimburse Developer for any Master Plan Entitlement Costs or pay any Development Fee. Any Master Plan Entitlement Costs or Development Fees that have not been paid to Developer at the end of the Term of this Agreement shall be forfeited and no longer due and payable; provided that in the

8

CONFIDENTIAL

LC00001163

event that a sale of the Property has occurred prior to the end of the Term of this Agreement, but the Master Plan Entitlement Costs or Development Fees to be paid to Developer from such sale in accordance with this Agreement have not been paid to Developer for any reason (e.g. a delay in wiring by an escrow agent or a mistake in wiring such amounts to Owner and not Developer), such Master Plan Entitlement Costs or Development Fees shall not be forfeited and shall remain due and payable.

9.2    Method of Payment.  All proceeds received from each sale of all or any portion of the Property shall be allocated, distributed and paid in the following order and priority:

(a)    First, to expenses reasonably incurred in connection with the sale of the portions of the Property being sold, including third party brokerage fees, attorneys fees, consulting fees, title costs and closing costs, all as mutually agreed and approved by Developer and Owner;

(b)    Second, a portion of the Master Plan Entitlement Costs shall be paid to Developer such that the total amount of Master Plan Entitlement Costs from the current sale and prior sales paid to Developer is equal to the Reimbursement Percentage, as defined below, multiplied by the total Master Plan Entitlement Costs incurred as of the date of the current sale. "Reimbursement Percentage" shall mean, a fraction, expressed as a percentage, the numerator of which is the total gross sales proceeds paid by buyers of the Property through and including the current sale for which this waterfall is being applied, and the denominator of which is $8,500,000.00; provided that in no event shall the Reimbursement Percentage be greater than 100%.  Notwithstanding the foregoing, with respect to a sale of all or a portion of the Property which results in no additional portion of the Property being available for sale pursuant to the Master Plan (i.e. the last sale of the Property), all remaining Master Plan Entitlement Costs shall be paid to Developer;

(c)    Third, to Developer for Development Fee due on each sale;

(d)    Fourth, to Owner until Owner has received, in the aggregate from the sale of the Property, $7,000,000;

(e)    Fifth, eighty percent (80%) to Owner and twenty percent (20%) to Developer until Owner has received, in the aggregate from the sale of the Property, $8,000,000;

(f)    Sixth, seventy percent (70%) to Owner and thirty percent (30%) to Developer until Owner has received in the aggregate from the sale of the Property, $9,000,000; and

(g)    Thereafter, fifty percent (50%) to Owner and fifty percent (50%) to Developer.

9.3    Conference Center.  Owner and Developer acknowledge that the existing conference center owned by Owner, leased to WOC and located at the northwest corner of North

9

8317177v7

CONFIDENTIAL

LC00001164

High Street and Wesley Boulevard and described more particularly on Exhibit "B" attached hereto ("Conference Center") may be redeveloped as part of the Master Plan. Developer agrees that neither (a) the retained ownership and redevelopment of a new conference center as part of the Master Plan, nor (b) the exercise by WOC of its option to purchase the Conference Center under its lease which is in effect as of the date hereof shall be considered a sale of a portion of the Property that triggers the payment of a portion of the Development Fee, or reimbursement of a portion of the Master Plan Entitlement Costs. Owner and Developer acknowledge and agree that if WOC decides not to move to a new Conference Center, Owner has arranged for the current parking field for the Conference Center to be relocated and in doing so, the costs of such relocation and providing a new parking field shall be Master Plan Entitlement Costs.

ARTICLE X.
Representations and Warranties of Owner

Owner hereby represents and warrants to Developer as follows:

10.1  Authority. Owner has the full right and authority to enter into this Agreement and to consummate or cause to be consummated the actions and transactions contemplated by this Agreement. Each individual executing this Agreement on behalf of Owner has the requisite authority to do so for and on behalf of Owner.

10.2  Execution, Delivery and Enforceability. This Agreement has been duly executed and delivered by Owner and is the valid and binding obligation of Owner, enforceable in accordance with its terms, subject as to enforceability to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium, and similar laws affecting creditors' rights and remedies generally and to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

10.3  No Conflict. Performance under this Agreement will not result in any breach of or default (or an event which would, with the passage of time or the giving of notice or both, constitute a default) under any material agreement or other instrument which is either binding upon or enforceable against Owner.

10.4  No Actions. As of the Effective Date, there is no suit, action, or proceeding existing or, to Owner's knowledge, threatened which affects the Property or Owner's ability to consummate or cause to be consummated the actions and transactions contemplated by this Agreement.

10.5  Assessments. As of the Effective Date, Owner has not received any notice of any assessments constituting, or that will constitute, a lien on the Property, and no improvements have been installed by any public authority, the cost of which is to be assessed against the Property in the future; and Owner has not received any notice of any possible future improvements by any public authority, any part of the cost of which would or might be assessed against the Property.

10.6  Title. Owner owns marketable title to the Property, free and clear of all liens and encumbrances except zoning ordinances, legal highways, and covenants, conditions, easements

10

CONFIDENTIAL

LC00001165

and restrictions of record, and other than with respect to the rights of WOC under its lease of the Conference Center, there are no rights of possession, use or otherwise, outstanding in third persons and there are no unrecorded leases, land contracts, sale contracts, options or other documents affecting the Property.

10.7   Mechanics' Liens.  No work has been done by or on behalf of Owner on the Property which could give rise to any mechanics or similar liens, and no contracts are outstanding or are in effect with respect to the performance of any such work.

10.8   Claims.  As of the Effective Date, there is no litigation or claim pending or, to the best of Owner's knowledge, threatened against or involving or relating to the Property and, to the best of Owner's knowledge, there are no facts or circumstances which could give rise to such claim or litigation.

10.9   Condemnation.  Owner has not received notice of, and has no other knowledge or information of, any pending or contemplated condemnation action with respect to the Property, or any part thereof, or change in any governmental regulation or private restriction applicable to the Property, any pending or threatened judicial or administrative action or proceedings in any court or before any governmental authority or arbitration board or tribunal, or any such action or proceeding pending or threatened by adjacent landowners or other persons, any of which would result in any material change in the condition of the Property, or any part thereof, or to the access to the Property.

10.10   Environmental Violations.  Seller has not been provided with written notice: (i) that the Property has been used for the treatment, storage or disposal of any "Hazardous Substances" (as hereinafter defined); or (ii) of any pending investigations concerning the Property by any governmental agency charged by law with the enforcement of any Environmental Law.  For purposes of this Agreement, the term "Environmental Laws" shall mean all federal, state and local laws, including statutes, regulations, ordinances, codes, rules and other governmental restrictions and requirements, relating to environmental pollution, contamination or other impairment of any nature, any hazardous or other toxic substances, materials or wastes of any nature, whether liquid, solid and/or gaseous, including smoke vapor, fumes, soot, petroleum products, alides, alkalis, chemicals, wastes, by-products and recycled materials.  These Environmental Laws shall include, but not be limited to, the Federal Solid Waste Disposal Act, the Federal Clean Air Act, the Federal Clean Water Act, the Federal Resource Conservation and Recovery Act of 1976, the Federal Comprehensive Environmental Responsibility Cleanup and Liability Act of 1980, regulations of the Environmental Protection Agency, regulations of the Nuclear Regulatory Agency, regulations of any state department of natural resources or state environmental protection agency now or at any time hereafter in effect and local health department ordinances.  As used herein, "Hazardous Substances" means any quantities of hazardous substances, hazardous waste, hazardous materials, petroleum hydrocarbons, PCBs, urea formaldehyde foam insulation or asbestos substances as those terms are defined in any applicable local, state or federal law or regulation which are in excess of allowable levels prescribed by such applicable local, state or federal law or regulation.

11

CONFIDENTIAL   LC00001166

## ARTICLE XI.
### Confidentiality

11.1 The terms and provisions of this Agreement and all subsequent negotiations and the transactions anticipated thereby (including any purchase agreement) shall be strictly confidential. The parties and their respective agents and representatives shall not, except among themselves, talk about, write about or otherwise publicize or disclose at any time to any person or entity the terms of this Agreement, any purchase agreement related to the Property, or any fact concerning their negotiation, execution or implementation, unless the parties agree on a joint disclosure and participate therein. Without limiting the foregoing, the parties may disclose the general nature of the relationship between the parties, specifically that Developer is serving as a master developer for the Property. Notwithstanding the forgoing, the parties hereto may discuss the existence, terms and provisions of this Agreement and any purchase agreement with their respective directors, officers, managers, shareholders, members, employees, lenders and professional advisors who need to know such information for the purpose of evaluating and/or executing transactions which are the subject of this Agreement (it being understood that such persons shall be informed by the disclosing party of the confidential nature of such information and shall be directed to treat such information confidentially in accordance with the terms of this Agreement). Further notwithstanding the foregoing, Developer may disclose to potential purchasers, potential lessees of potential purchasers, governmental authorities, its lenders, employees, investors, attorneys and other consultants the fact that Developer is authorized by Owner to take the actions contemplated to be taken by Developer under this Agreement.

## ARTICLE XII.
### Defaults and Remedies

12.1 Defaults. Any party (the "defaulting party") shall be in default of this Agreement if it should either: (a) fail to make any payment due hereunder to the other party within ten (10) days of the date when due, or (b) fail to observe any of the terms, conditions, restrictions or provisions of this Agreement within: (i) a period of thirty (30) days after the other party (the "non-defaulting party") has given to the defaulting party written notice thereof, or (ii) ninety (90) days, if within the thirty (30) day period described in clause (i) the defaulting party has commenced efforts to cure such failure and is pursuing such cure in a commercially reasonable manner. If a default by Developer shall occur hereunder prior to the commencement of the Second Extended Term and not be timely cured as provided in this Section 12.1, Owner shall have the right to terminate this Agreement by written notice to Developer, and upon the termination of this Agreement by Owner, the Multifamily PSA shall automatically terminate contemporaneously. From and after the commencement of the Second Extended Term, the occurrence of a default hereunder shall not act to terminate this Agreement and all remedies of the parties hereunder shall be retained.

12.2 Remedies.

(a) Cure. Should a default continue uncured beyond the expiration of any applicable notice and cure period, the non-defaulting party may cure such default of the defaulting party under this Agreement; and if the non-defaulting party should do so, then it shall be entitled to be

12

CONFIDENTIAL

LC00001167

reimbursed for all reasonable costs and expenses incurred by it in connection therewith, from either the defaulting party, its contractors, or its insurance carriers.

(b)  Civil Actions. Should a default continue uncured beyond the expiration of any applicable notice and cure period, the non-defaulting party may sue the defaulting party for the specific performance of any obligation undertaken by the defaulting party in this Agreement, for injunctive or other equitable relief, or for actual damages incurred in any court of competent jurisdiction, including in any Ohio Court of Common Pleas or U.S. District Court, in order to recover any such amount as may be due and payable to the non-defaulting party. In no event shall either party be entitled to seek damages beyond its actual damages incurred and consequently, neither party shall be entitled to make a claim for damages in the nature of punitive, consequential or exemplary damages.

ARTICLE XIII.
Miscellaneous Provisions

13.1  Notices. All notices, consents, approvals and requests required or permitted hereunder shall be given in writing and shall be effective for all purposes if (a) hand delivered, (b) sent by certified or registered United States mail, postage prepaid, return receipt requested, (c) sent by expedited prepaid delivery service, either commercial or United States Postal Service, with proof of attempted delivery, or (d) sent by email, addressed as follows (or at such other address and Person as shall be designated from time to time by any party hereto, as the case may be, in a written notice to the other parties hereto in the manner provided for in this Section):

To Owner:  The United Methodist Children's Home West Ohio
Conference of the United Methodist Church
1033 High Street
Worthington, Ohio 43085
Attn: Sean Reilly, Executive Director
Email: sreilly@umchohio.org

With a copy to:  David W. Fisher, Esq.
Kephart Fisher LLC
207 N. Fourth Street
Columbus, Ohio 43215
Email: davidfisher@kephartfisher.com

To Developer:  LC North High Street, Ltd.
230 West Street, Suite 200
Columbus, Ohio 43215
Attn: Legal Department
Email: bbrownlee@lifestylecommunities.com

13

8317177v7

CONFIDENTIAL

LC00001168

With a copy to:          Steve Intihar, Esq.
                             Bricker & Eckler LLP
                             100 South Third Street
                             Columbus, Ohio 43215
                             Email: sintihar@bricker.com

A notice shall be deemed to have been given: in the case of hand delivery, at the time of delivery; in the case of registered or certified mail, when delivered; in the case of expedited prepaid delivery, on the date evidenced by the signed receipt; and in the case of email, upon confirmed receipt of the email by the sender's machine.

        13.2    <u>Assignment</u>. Given the unique nature of the relationship between Owner and Developer, the position of trust and responsibility placed on Developer hereunder, and the fact that an affiliate of Developer is in contract to purchase the Multifamily Property pursuant to the Multifamily PSA, this Agreement is not assignable by Owner or Developer and any attempted assignment by Developer shall result in immediate termination of this Agreement.

        13.3    <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Ohio.

        13.4    <u>Remedies Cumulative</u>. All rights and remedies of the parties hereto enumerated in this Agreement shall be cumulative and, except as specifically contemplated otherwise by this Agreement, none shall exclude any other right or remedy allowed at law or in equity, and said rights or remedies may be exercised and enforced concurrently. No waiver by any party of any covenant or condition of this Agreement, to be kept or performed by any other party to this Agreement, shall constitute a waiver by the waiving party of any subsequent breach of such covenant or condition, or authorize the breach or non-observance of any other occasion of the same or any other covenant or condition of this Agreement.

        13.5    <u>Duplicate Originals</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be a duplicate original, but all of which, taken together, shall constitute a single instrument.

        13.6    <u>Article and Section Captions</u>. The Article and Section captions contained in this Agreement are included only for convenience of reference and do not define, limit, explain or modify this Agreement or its interpretation, construction or meaning and are in no way to be construed as a part of this Agreement.

        13.7    <u>Severability</u>. If any provision of this Agreement or the application of any provision to any Person or any circumstance shall be determined to be invalid or unenforceable, then such determination shall not affect any other provision of this Agreement or the application of said provision to any other Person or circumstance, all of which other provisions shall remain in full force and effect.

        13.8    <u>Amendments in Writing</u>. No change, amendment, termination or attempted waiver of any of the provisions of this Agreement shall be binding upon any party unless in writing and signed by all of the parties hereto.

14

8317177v7

CONFIDENTIAL

LC00001169

13.9   Agreement for Exclusive Benefit of Parties. The provisions of this Agreement are for the exclusive benefit of the parties hereto and not for the benefit of any other Person, nor shall this Agreement be deemed to have conferred any rights, express or implied, upon any third Person.

13.10  No Partnership, Joint Venture or Principal-Agent Relationship. Neither anything contained in this Agreement nor any acts of the parties hereto shall be deemed or construed by the parties hereto, or either of them, or by any third Person, to create the relationship of principal and agent, or of partnership, or of joint venture, or of any association between the parties to this Agreement.

13.11  Written Consent Required. Whenever a party is requested to consent to or approve of any matter with respect to which its consent or approval is required by this Agreement, such consent or approval, if given, and unless a shorter time period is specified herein, shall be given in writing and shall be given within thirty (30) days of request therefor. Failure to consent, reject, approve or disapprove in writing within such thirty (30) day period (or such shorter time period as may be specified herein) shall be deemed to constitute consent and approval.

13.12  Reasonableness of Consent or Approval. Whenever a party is entitled to exercise some right under this Agreement only with the prior consent or approval of another party, such consent or approval shall not be unreasonably withheld, conditioned or delayed.

13.13  Estoppel Certificates. Upon the written request of any party (but no more often than twice in any calendar year), the other party shall, within fifteen (15) days thereafter, submit a certified statement, in writing, to the addressee specified in such request that the provisions of this Agreement are in full force and effect and that there has been compliance with all terms and provisions hereof by the respective parties hereunder, or if there are any such defaults or non-compliance, setting forth the nature of same.

13.14  Authorized Representative. Owner hereby appoints Cyndy Garn and Samuel D. Koon as its Authorized Representatives for purposes of dealing with Developer on behalf of Owner in respect of any and all matters in connection with this Agreement. Each Authorized Representative, acting without the other, shall have the power, in his or her discretion, to give and receive all notices, monies, consents, approvals, and other documents and instruments, and to take any other action on behalf of Owner. All actions by any Authorized Representative shall be final and binding on Owner. Developer may rely on the authority given to the Authorized Representatives until actual receipt by Developer of a duly authorized resolution substituting a different person as an Authorized Representative.

*[Signature page follows. No further text on this page.]*

15

CONFIDENTIAL

IN WITNESS WHEREOF, the parties have caused this Development Agreement to be executed by their duly authorized representatives, to be effective as of the Effective Date.

OWNER:

THE UNITED METHODIST CHILDREN'S HOME WEST OHIO CONFERENCE OF THE UNITED METHODIST CHURCH, an Ohio non-profit corporation

By: *Cyndy L Garn*

Name: *Cyndy L. Garn*

Title: *Board Chairperson*


DEVELOPER:

LC NORTH HIGH STREET, LTD., an Ohio limited liability company


By: _____

Name: _____

Title: _____

S-1

8317177v7

LC00001171

IN WITNESS WHEREOF, the parties have caused this Development Agreement to be executed by their duly authorized representatives, to be effective as of the Effective Date.

OWNER:

THE UNITED METHODIST CHILDREN'S HOME WEST OHIO CONFERENCE OF THE UNITED METHODIST CHURCH, an Ohio non-profit corporation

By: _____

Name: _____

Title: _____


DEVELOPER:

LC NORTH HIGH STREET, LTD., an Ohio limited liability company

By: _____

Name: L. Brent Miller

Title: President

S-1

CONFIDENTIAL

LC00001172

**Exhibit A**
**Legal Description of the Property**

Situated in the State of Ohio, County of Franklin and in the City of Worthington and bounded and described as follows:

Being all of Lot Number Two (2) of United Methodist Children's Home Amended Subdivision as the same is numbered and delineated on the record plat thereof, of record in Plat Book 83, Page 53, Recorder's Office, Franklin County, Ohio.

A-1

8317177v7

CONFIDENTIAL

LC00001173

**Exhibit B**
**Conference Center**



B-1

CONFIDENTIAL

LC00001174

# REAL ESTATE PURCHASE CONTRACT

**THIS REAL ESTATE PURCHASE CONTRACT** (the "Agreement") is entered into and effective as of April _20_ , 2017 (the "Acceptance Date"), by and between: (i) **THE UNITED METHODIST CHILDREN'S HOME WEST OHIO CONFERENCE OF THE UNITED METHODIST CHURCH**, an Ohio non-profit corporation ("Seller"), and (ii) **LIFESTYLE REAL ESTATE HOLDINGS, LTD.**, an Ohio limited liability company ("Buyer").

## RECITALS:

**A.** Seller owns certain real property containing approximately 40.763 acres located on the west side of High Street in the City of Worthington, Ohio, being Lot 2 of United Methodist Children's Home Subdivision, as the same is numbered and delineated on the plat thereof recorded in Plat Book 77, Page 38, as amended in recorded plat thereof recorded in Plat Book 83, Page 53, of the Franklin County, Ohio Records. Such Lot 2, less and excepting an approximately 3.5285 acre portion thereof located at the southeast corner of Lot 2 that is subject to a purchase option held by the West Ohio Conference of the United Methodist Church ("WOC") and, pursuant to Section 21 hereof, potentially excluding Wesley Boulevard, as defined below, is referred to herein as the "Property". Exhibit A attached hereto and made a part hereof, being an ALTA/ACSM Land Title Survey dated April 21, 2015, by EMHT of all lands currently owned by Seller, generally depicts the aforementioned exception and potential exception to the Property.

**B.** Seller desires to sell and Buyer desires to purchase the Property, upon the terms and conditions hereinafter set forth.

**C.** Seller and Buyer are parties to a pre-existing Real Estate Purchase Contract pertaining to the Property and other lands dated June 26, 2015 (the "Previous Purchase Agreement") and a Development Agreement pertaining to the Property and other lands dated June 26, 2015 (the "Previous Development Agreement"), both of which are null and void and of no further force or effect.

## AGREEMENT:

**NOW, THEREFORE,** the parties hereto, intending to be legally bound, hereby agree as follows:

**1.** **AGREEMENT TO PURCHASE AND SELL.** In consideration of the mutual covenants set forth herein, Buyer agrees to purchase and Seller agrees to sell and convey, upon the terms and conditions hereinafter set forth, the Property, together with all appurtenant rights, easements, tenements, hereditaments and appurtenances thereto. The purchase and sale of all of the Property shall occur in a number of closings (each a "Closing", collectively the "Closings") over a period of years not to exceed ten (10) years from the date hereof ("Final Permitted Closing Date"), subject to the further terms and conditions hereof. Notwithstanding anything to the contrary herein, at the Initial Closing (as hereinafter defined) Buyer shall acquire a portion of the Property resulting in payment of a Purchase Price (as hereinafter defined) of not less than One

**EXHIBIT**

3

Million Dollars ($1,000,000.00) pursuant to the terms and conditions set forth herein. Further, notwithstanding anything to the contrary contained herein, Buyer shall be obligated to purchase all of the Property on or before the Final Permitted Closing Date.

## 2. PURCHASE PRICE; PROPERTY EXPENSE PAYMENTS.

*(a)* Subject to the terms and conditions of Section 2(b) below, the total purchase price for the Property shall be the product of: (a) Two Hundred Thousand Dollars ($200,000.00), multiplied by (b) the number of Developable Acres, as hereinafter defined (the "Purchase Price"). The Purchase Price, less adjustments, credits and prorations as described in this Agreement, shall be paid in installments by Buyer in immediately available funds at each Closing pursuant to the terms and conditions set forth in this Agreement. "Developable Acres" shall mean all portions of the Property other than such portions containing a stream channel known as Tucker Creek and adjoining slopes that are not suitable for development by Buyer ("Tucker Creek Area") and the portion of the currently existing private street located in Lot 2 known as Wesley Boulevard from High Street to the Wesley Boulevard Western Terminus to be determined in accordance with Section 21 hereof ("Wesley Boulevard") (the Tucker Creek Area and Wesley Boulevard are referred to herein as the "Non-Developable Acres"). Notwithstanding anything to the contrary contained in this Agreement, to the extent Buyer is able to increase the density of use (e.g. housing units) on any Developable Acres or reduce the open space requirements on any Developable Acres, in each case, by use of the Tucker Creek Area in its density or open space calculations, the Tucker Creek Area shall be considered Developable Acres hereunder. Within thirty (30) days after the Acceptance Date, Buyer and Seller shall agree on a preliminary determination of Developable Acres and Non-Developable Acres based on engineering studies and recommendations made by EMHT, as surveyors and engineers for the development of the Property. Wesley Boulevard may be included in the portion of the Property acquired by Buyer at no cost subject to Section 21 hereof. To the extent Non-Developable Acres, other than Wesley Boulevard, are not considered Developable Acres as above provided but either Seller or Buyer desires them to be transferred to Buyer at no cost, Seller and Buyer agree, respectively, to convey and accept title to such Non-Developable Acres; provided Buyer shall not be obligated to accept such conveyance: (i) unless the same are free and clear of any environmental conditions unacceptable to Buyer or (ii) if such conveyance otherwise causes Buyer to incur any obligation with respect to such Non-Developable Acres not otherwise provided in the Wesley Boulevard Easement, as defined and provided in Section 21 hereof. In the event any Non-Developable Acres are sold by Seller to the City of Worthington or any park district or association for use as parkland and/or open space, all proceeds of such sale shall be the sole property of Seller and shall not act to offset the Purchase Price per Developable Acre to be paid by Buyer hereunder.

*(b)* Notwithstanding the foregoing provisions of Section 2(a) pertaining to establishment of the Purchase Price, in the event: (i) OhioHealth Corporation or an affiliate thereof proceeds with the development of a medical office building, freestanding emergency department or similar healthcare facility on a portion of the Property, either independently or through a lease transaction with Buyer or an affiliate of Buyer, and (ii) Closing with respect to such Property occurs within two (2) years after the Acceptance

Date, the Purchase Price for the portion of the Property so developed, up to a maximum of one and one-half (1.50) acres, shall be sold at a Purchase Price of Seven Hundred Fifty Thousand Dollars ($750,000) and no credit or offset shall be given to Buyer for the remaining Property to be purchased by Buyer hereunder as a consequence of such increased Purchase Price.

      *(c)*       For and in consideration of Seller's agreement to extend the period for Closings hereunder over an extended period of time through the Final Permitted Closing Date, Buyer covenants and agrees to pay certain ongoing expenses incurred by Seller for the upkeep, maintenance and potential taxation of the Property (each a "Property Expense Payment"). The upkeep and maintenance portion of such Property Expense Payment shall consist of a quarterly sum to be paid in advance for each calendar quarter based on an amount agreed to on a commercially reasonable basis between Buyer and Seller within thirty (30) days after the Acceptance Date, based on historical data provided by Seller to demonstrate and justify such upkeep and maintenance costs, including utility and insurance costs. Upon agreement between the parties as to the Property Expense Payment, Buyer shall immediately pay to Seller the quarterly sum due, prorated commencing on the Acceptance Date for the current calendar quarter. The Property Expense Payment shall be subject to following adjustments: (i) on a calendar year basis to the extent Seller demonstrates to Buyer on a commercially reasonable basis that its upkeep and maintenance costs have increased; provided that no annual increase shall exceed five percent (5%) of the annualized Property Expense Payments incurred during the previous calendar year; and (ii) in the event Seller loses its exemption from real estate taxes on any portion of the Property not yet purchased by Buyer or the Property becomes subject to any governmental assessments and Seller has complied with the provisions of Section 25 hereof, an increase to cover all real estate taxes or assessments applicable to such Property, subject to the further provisions of Section 25 hereof. All Property Expense Payments for upkeep and maintenance as above provided shall be due and payable five (5) Business Days after initial agreement within thirty (30) days after the Acceptance Date, as above provided, and thereafter on each January 1, April 1, July 1 and October 1 without further notice or billing from Seller, except with respect to adjustments as above provided. All Property Expense Payments applicable to real estate taxes and assessments shall be due and payable within thirty (30) days after written notice from Seller to Buyer. To the extent any Property Expense Payment is not paid by Buyer on its due date, Seller shall give Buyer notice of such failure to pay and Buyer shall have ten (10) days to cure such default. In the event Buyer fails to cure such default within such ten (10) day cure period, Seller shall have the right to terminate this Agreement. All Property Expense Payments shall be non-refundable to Buyer and non-applicable to the Purchase Price.

      **3.**     **DUE DILIGENCE DELIVERIES.** Pursuant to the Previous Purchase Agreement, Seller has provided to Buyer copies of all documentation in Seller's possession or to which Seller has reasonable access regarding the Property (the "Due Diligence Materials") and Seller has certified in writing to Buyer that all Due Diligence Materials have been delivered to Buyer. By execution and delivery of this Agreement, Seller ratifies, confirms and reconfirms such certification and certifies that no additional Due Diligence Materials have come into Seller's possession and control that would constitute Due Diligence Materials under the Previous

Contract. In the event that during the pendency of this Agreement, Seller comes into possession of or creates new Due Diligence Materials, Seller shall promptly provide copies of same to Buyer.

**4.     BUYER'S CONTINGENCY.** Buyer's obligations to purchase the Property pursuant to the terms of this Agreement shall be subject to the following contingency.  Buyer and/or its agents shall have a period commencing on the Acceptance Date and continuing until 5:00 P.M. Eastern time on June 9, 2017 (hereinafter the "Inspection Period") to fully inspect the Property and to evaluate Buyer's acquisition of the Property. Seller agrees to cooperate fully with Buyer in Buyer's inspection of the Property, including, but not limited to: (i) providing evidence that the Property is owned or controlled by Seller; and (ii) providing access to the Property at all reasonable times (subject to rights of tenants and privacy considerations for clients being served by Seller).  In the event Buyer is not satisfied with the results of its investigations, the condition of the Property or is otherwise not prepared to purchase the Property for any reason, then Buyer shall have the right, by delivery of written notice to the Seller on or before the last day of the Inspection Period, to terminate this Agreement, whereupon this Agreement shall be deemed terminated. In the event Buyer fails to timely deliver a written notice to Seller terminating this Agreement pursuant to this Section 4, this Buyer contingency shall be irrevocably waived.

**5.     PROPERTY   CONFIGURATIONS   FOR   CLOSING   AND   OTHER PROPERTY DEVELOPMENT MATTERS.**

*(a)*     The Developable Acres shall consist of "High Street Corridor Land" as depicted on the attached Exhibit A and all other portions of the Property consisting of Developable Acres which shall be referred to herein as "Non-High Street Corridor Land". The ratio of: (i) the aggregate amount of High Street Corridor Land that has been purchased by Buyer at any time to (ii) the aggregate amount of Non-High Street Corridor Land that has been purchased by Buyer at any time, is referred to herein as the "Property Allocation Ratio".  At such time as Buyer and Seller agree on the Developable Acres and Non-Developable Acres pursuant to Section 2(a) hereof, the parties shall establish a maximum ratio between the High Street Corridor Land and the Non-High Street Corridor Land based on the initial acreage contained in each that shall be the basis for all purchases of High Street Corridor Land hereunder (the "Maximum Property Allocation Ratio"). Thereafter, with respect to all purchases of High Street Corridor Land by Buyer hereunder, at the time of each such purchase, Buyer shall be required to simultaneously purchase a portion of Non-High Street Corridor Land such that after such purchase the Property Allocation Ratio shall not be greater than the Maximum Property Allocation Ratio; provided that Buyer shall not be required to purchase any Non-High Street Corridor Land at the time of the purchase of High Street Corridor Land if the Property Allocation Ratio after such purchase of High Street Corridor Land remains less than the Maximum Property Allocation Ratio.  By way of example if the Maximum Property Allocation Ratio is determined to be 1 acre of Developable Acres on the High Street Corridor Land to 2 acres of Developable Acres on the Non-High Street Corridor Land, for each acre of High Street Corridor Land purchased by Buyer in the aggregate, it must previously or simultaneously close on and purchase not less than 2 acres of Non-High Street Corridor Land in the aggregate.

*(b)* Based on the foregoing provisions of Section 5(a) above, Buyer and Seller shall determine the portion of the Property to be acquired at the Initial Closing, as hereinafter defined within thirty (30) days after the Acceptance Date (the "Initial Acquisition Parcels"). For purposes of this Agreement, all portions of the Property which are not included in the Initial Acquisition Parcels shall be defined as the "Remaining Property" until such time as Buyer acquires portions thereof, thereafter the Remaining Property shall mean all of the Property less the Initial Acquisition Parcels and additional portions of the Property subsequently acquired by Buyer hereunder. For each closing of the Remaining Property, Buyer and Seller shall agree on the Property included in such closing and Buyer shall be required to give Seller thirty days written notice of Buyer's intention to acquire all or a portion of the Remaining Property and each such Subsequent Acquisition Parcel (as hereinafter defined).

*(c)* With respect to the determination by Buyer and Seller of the Initial Acquisition Parcels and each Subsequent Acquisition Parcel, Buyer shall provide to Seller initially with respect to the Initial Acquisitions Parcels and thereafter from time to time with respect to Subsequent Acquisition Parcels to the extent modified, a Master Development Plan for the Property identifying all Initial Acquisition Parcels and Subsequent Acquisition Parcels as then anticipated by Seller (the "Master Development Plan") in order to assist Buyer and Seller in anticipating and agreeing on the logical and sequential development of the Property and in agreeing on terms of Development Agreements, as hereinafter defined, including, but not limited to, easements and other development agreements that impact portions of the Property not yet purchased by Buyer hereunder. From time to time as anticipated development of the Property is changed due to market, zoning, planning or engineering issues, Buyer shall have the right to update the Master Development Plan and promptly provide a copy of such updated Master Development Plan to Seller. Seller shall have no right to approve any update to the Master Development Plan unless same materially and adversely affects anticipated development of the remainder of the Property in accordance with the terms and conditions of this Agreement. The Master Development Plan shall at all times remain a confidential document, proprietary to Buyer in connection with its anticipated marketing, zoning and development of the Property and shall not be disclosed by Seller or its representatives without the express written consent of Buyer; subject to required disclosure due to legal process, in which event, Seller will cooperate with Buyer to limit disclosure of the Master Development Plan.

*(d)* Buyer's obligation to close on the Initial Acquisition Parcels is contingent upon Buyer and Seller entering into a cross easement and development agreement relating to Buyer's right to have access, as necessary, to and through the Remaining Property for purposes of ingress, egress and utilities, including without limitation regional storm drainage facilities and construction staging areas reasonably requested from time to time by Buyer (the "Development Agreement"). To the extent required, Seller shall execute specific recordable easements from time to time on the Remaining Property as required by Buyer on a commercially reasonable basis in connection with the development of portions of the Property acquired by Buyer. Notwithstanding the foregoing but subject to the provisions of Section 5(c) hereof with respect to the Master Development Plan, (i) Seller shall not be required to enter into any Development

Agreement or easement that will result in the Remaining Property having materially reduced development value if Buyer fails to close thereon hereunder, taking into consideration the then applicable Master Development Plan (ii) any access and utility easement rights shall be subject to the provisions of Section 21 hereof.

## 6. EVIDENCE OF TITLE AND SURVEY.

*(a)* Within fifteen (15) days following the Acceptance Date, Seller shall provide to Buyer a commitment for the issuance of an owner's title insurance policy for the Property and all appurtenant easements relating to the Property ("Preliminary Commitment") from Stewart Title Guaranty Company ("Escrow Agent" and "Title Insurer"). Such commitment shall show in Seller good and marketable title in fee simple, free and clear of all liens and encumbrances except: (a) those that Seller can discharge at each Closing, as applicable, by the payment of money; (b) those created by or assumed by Buyer; (c) the lien of real estate taxes and assessments not due at the time of each applicable Closing; (d) zoning ordinances; and (e) legal highways and covenants, restrictions, conditions and easements of record which, in Buyer's sole determination, do not interfere with Buyer's intended use of the Property (items (b) through (e) are referred to herein as the "Permitted Encumbrances") If title to all or part of the Property is unmarketable, or is subject to liens, encumbrances, easements, conditions, restrictions or encroachments which, in Buyer's sole judgment, would interfere with Buyer's proposed development of the Property (any such matter being hereinafter referred to as a "Title Defect"), then Buyer shall forthwith notify Seller of such Title Defect. Buyer has previously obtained an ALTA Survey of the Property from EMHT (the "Survey"). Buyer shall have ten (10) Business Days after receipt of the Preliminary Commitment to object to any Title Defect contained in the Preliminary Commitment or Survey by written notice to Seller. Buyer's failure to notify Seller of a Title Defect within such ten (10) Business Day period shall be deemed Buyer's acceptance of all exceptions set forth in the Title Commitment except for liens which are required to be paid at applicable Closing(s) by Seller and standard exceptions that are to be removed based on the closing affidavit to be provided as set forth below. Seller shall, within ten (10) Business Days after receipt of written notice of any Title Defect, use its best efforts to remedy or remove any Title Defect or notify Buyer that it will remedy or remove same as of an applicable Closing. If Seller is unable to remedy or remove any Title Defect, or advise Buyer that it will remedy or remove same as of an applicable Closing, Buyer may, on or before the tenth (10th) Business Day after the date of the expiration of Seller's ten (10) Business Day cure period, elect to terminate this Agreement. Notwithstanding any other provision of this Agreement, Seller shall cause all mortgages and other monetary liens on the respective portions of the Property to be released at applicable Closing(s).

*(b)* Within ten (10) days after the determination of the Initial Acquisition Parcels, Buyer shall obtain a title insurance commitment from the Title Company for the Initial Acquisition Parcels ("Initial Acquisition Commitment") in the applicable amount of the Purchase Price. The Initial Acquisition Commitment shall be subject only to Permitted Exceptions applicable to the Initial Acquisition Parcels. On the date of Initial

Closing, Buyer shall receive an owner's title insurance policy (in form and issued by the Title Company reasonably satisfactory to Buyer) in the amount of the Purchase Price of the Initial Acquisition Parcels. Seller shall pay for the cost of the owner's title insurance policy. Buyer shall pay any costs associated with any special endorsements and additional coverage requested by Buyer or Buyer's lender.

(c)     With respect to any Closings of the Remaining Property, within fifteen (15) days after Buyer's notice to Seller of Buyer's intention to Close on all or a portion of the Remaining Property (each a "Subsequent Acquisition Parcel"), Buyer shall obtain a title insurance commitment (each a "Subsequent Commitment", collectively, the "Subsequent Commitments") for the applicable Subsequent Acquisition Parcel that Buyer intends to acquire in the applicable amount of the Purchase Price for such Subsequent Acquisition Parcel. Each Subsequent Commitment shall be subject only to Permitted Exceptions applicable to the Subsequent Acquisition Parcel. On the date of the Closing of the applicable Subsequent Acquisition Parcel, Buyer shall receive an owner's title insurance policy (in form and issued by the Title Company reasonably satisfactory to Buyer) in the amount of the Purchase Price of the Subsequent Acquisition Parcel. Seller shall pay for the cost of the owner's title insurance policy. Buyer shall pay any costs associated with any special endorsements and additional coverage requested by Buyer or Buyer's lender.

(d)     From and after the full execution of this Agreement and during the term of this Agreement, through and including the Final Permitted Closing Date, Seller shall take no action nor allow actions to be taken which would render the title to the Remaining Property unmarketable nor shall it encumber the Remaining Property in any manner without the prior written consent of Buyer.

(e)     Within thirty (30) days after the determination of the Initial Acquisition Parcels, Buyer, at Buyer's expense, shall obtain a new survey of the Initial Acquisition Parcels ("Buyer's Initial Acquisition Parcels Survey"). With respect to any Closings of the Remaining Property, within thirty (30) days after of Buyer's notice to Seller of Buyer's intention to Close on a Subsequent Acquisition Parcel, Buyer, at Buyer's expense, shall obtain a new survey of the applicable Subsequent Acquisition Parcel (each a "Buyer's Subsequent Acquisition Parcel Survey"). With respect to all Closings hereunder, any modifications to subdivision plats to create Initial Acquisition Parcels or Subsequent Acquisition Parcels shall be at the sole cost and expense of Buyer; provided Seller will cooperate in the preparation and approval of the modification of such plats and shall sign and cause its mortgagees to sign any and all applications, plats and other documents necessary or appropriate to effect such modifications.

7.     **TAXES AND ASSESSMENTS.** The Property is currently exempt from real estate taxation due to the exempt use of the Property by Seller and it is the agreement and intention of Buyer and Seller to maintain such exemption throughout the pendency of this Agreement for all portions of the Property not yet purchased by Buyer hereunder. There are currently no assessments on the Property. To the extent the Property becomes subject to real estate taxes or assessments during the pendency of the transactions contemplated hereby, the

provisions of Section 2(c) and Section 25 hereof shall apply. There shall be no proration of real estate taxes and assessments at any Closing beyond any proration necessary to accomplish the provisions of Section 2(c) hereof.

      **8.**    **COVENANTS, WARRANTIES AND REPRESENTATIONS.** Seller covenants, warrants and represents to Buyer as follows. These covenants, warranties and representations shall be deemed made and restated at each Closing of the Property. After the Initial Closing, all references in this Section to the Property shall be as to the Remaining Property.

      *(a)*    *Authority.* Seller has the full right and authority to enter into this Agreement and to consummate or cause to be consummated the actions and transactions contemplated by this Agreement. Each individual executing this Agreement on behalf of Seller has the requisite authority to do so for and on behalf of Seller.

      *(b)*    *Execution, Delivery and Enforceability.* This Agreement has been duly executed and delivered by Seller and is the valid and binding obligation of Seller, enforceable in accordance with its terms, subject as to enforceability to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium, and similar laws affecting creditors' rights and remedies generally and to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

      *(c)*    *No Conflict.* Performance under this Agreement will not result in any breach of or default (or an event which would, with the passage of time or the giving of notice or both, constitute a default) under any material agreement or other instrument which is either binding upon or enforceable against Seller.

      *(d)*    *Assessments.* As of the applicable Closing Date, Seller has not received any notice of any assessments constituting, or that will constitute, a lien on the Property, and no improvements have been installed by any public authority, the cost of which is to be assessed against the Property in the future; and Seller has not received any notice of any possible future improvements by any public authority, any part of the cost of which would or might be assessed against the Property.

      *(e)*    *Title.* Seller owns marketable title to the Property, free and clear of all liens and encumbrances except zoning ordinances, legal highways, and covenants, conditions, easements and restrictions of record, and there are no rights of possession, use or otherwise, outstanding in third persons and there are no unrecorded leases, land contracts, sale contracts, options or other documents affecting the Property.

      *(f)*    *Mechanics' Liens.* No work has been done by or on behalf of Seller or, to the best of Seller's knowledge, any tenant, permittee or licensee of Seller on the Property or any other portion of Seller's Property (other than Buyer and its agents and representatives) which could give rise to any mechanics or similar liens, and no contracts are outstanding or are in effect with respect to the performance of any such work. If any such work is performed prior to Closing, Seller shall discharge all obligations arising therefrom, and shall remain liable after the Closing for the discharge of all such obligations.

*(g)*     *Claims*.  There is no litigation or claim pending or, to the best of Seller's knowledge, threatened against or involving or relating to the Property and, to the best of Seller's knowledge, there are no facts or circumstances which could give rise to such claim or litigation.

*(h)*     *Condemnation*.  Seller has not received notice of, and has no other knowledge or information of, any pending or contemplated condemnation action with respect to the Property, or any part thereof, or change in any governmental regulation or private restriction applicable to the Property, any pending or threatened judicial or administrative action or proceedings in any court or before any governmental authority or arbitration board or tribunal, or any such action or proceeding pending or threatened by adjacent landowners or other persons, any of which would result in any material change in the condition of the Property, or any part thereof, or to the access to the Property.

*(i)*     *Environmental Violations*.  The provisions of this Section 8(i) are subject to the provisions of the last paragraph of this Section 8 whereby Seller has disclosed the possible presence of asbestos containing materials in certain buildings located on the Property and Buyer's agreement that any removal of the same from buildings acquired by Buyer hereunder shall be at Buyer's expense. Seller has not been provided with written notice: (i) that the Property has been used for the treatment, storage or disposal of any "Hazardous Substances" (as hereinafter defined); or (ii) of any pending investigations concerning the Property by any governmental agency charged by law with the enforcement of any Environmental Law.  For purposes of this Agreement, the term "Environmental Laws" shall mean all federal, state and local laws, including statutes, regulations, ordinances, codes, rules and other governmental restrictions and requirements, relating to environmental pollution, contamination or other impairment of any nature, any hazardous or other toxic substances, materials or wastes of any nature, whether liquid, solid and/or gaseous, including smoke vapor, fumes, soot, petroleum products, alides, alkalis, chemicals, wastes, by-products and recycled materials.  These Environmental Laws shall include, but not be limited to, the Federal Solid Waste Disposal Act, the Federal Clean Air Act, the Federal Clean Water Act, the Federal Resource Conservation and Recovery Act of 1976, the Federal Comprehensive Environmental Responsibility Cleanup and Liability Act of 1980, regulations of the Environmental Protection Agency, regulations of the Nuclear Regulatory Agency, regulations of any state department of natural resources or state environmental protection agency now or at any time hereafter in effect and local health department ordinances.  As used herein, "Hazardous Substances" means any quantities of hazardous substances, hazardous waste, hazardous materials, petroleum hydrocarbons, PCBs, urea formaldehyde foam insulation or asbestos substances as those terms are defined in any applicable local, state or federal law or regulation which are in excess of allowable levels prescribed by such applicable local, state or federal law or regulation.

*(j)*     *No Moratorium*.  Seller represents and warrants to Buyer that no moratorium has been imposed by any applicable governmental or quasi-governmental authority which would prohibit or adversely affect the development of the Property.

*(k)*     *Status Quo*.  Subject to the provisions of Section 21 hereof, after the execution of this Agreement, and at any time prior to the Final Permitted Closing Date, Seller shall not grant, sell or convey any interest in the Property, including easements or rights-of-way, to any person, corporation, public or private, governmental body or political subdivision without the

written permission of Buyer, nor permit entry on the Property by any person or contractor to change the physical condition of the Property. Compliance by Seller with the foregoing requirements shall be a condition to Buyer's obligation to close.

The covenants, representations and warranties in this Section 8 shall survive each Closing and shall not be deemed to have merged with the deed delivered by Seller at the applicable Closing; provided that if Buyer has not notified Seller in writing within twelve (12) months after any applicable Closing that one or more of the representations or warranties set forth herein was untrue when made or remade with respect to an applicable portion of the Property, Buyer shall have no rights against Seller in connection with such untrue representation or warranty. Notwithstanding the foregoing, the Property and all improvements located thereon shall be sold by Seller in their AS IS, WHERE IS condition, with all faults, without any representation by Seller as to the condition thereof and with the disclosure by Seller that due to the age of certain buildings, they may contain asbestos requiring abatement and removal at Buyer's expense.

**9. REAL ESTATE COMMISSION.** Seller and Buyer warrant and covenant that no person, realtor or real estate broker has acted as agent or broker in respect of the transaction herein contemplated. Seller and Buyer agree to indemnify, defend and hold the other harmless from all claims for any commission by any person arising out of the actions of the indemnifying party. Notwithstanding anything contained herein to the contrary, the indemnities contained herein shall survive each Closing.

**10. POSSESSION.** Possession of the applicable portion of the Property being purchased shall pass to Buyer at each applicable Closing; subject, in each case, to cooperation with Seller in the moving of its business and operations to a new site which may take up to sixty (60) days, so long as during such time period, Buyer shall be permitted to engage in full scale site development activities throughout the applicable portion of the Property. Seller shall indemnify and hold harmless Buyer, its successors and assigns, their members, managers, officers, employees, and agents, from any actual loss, cost or damages to persons or property arising out of Seller's possession of the Property after any Closing of the applicable Property, and, if Seller will maintain a presence on a portion of the Property after an applicable Closing pursuant to this Section, prior to such Closing, Seller shall provide to Buyer evidence of commercial general liability coverage for Seller and its agents, employees, contractors and representatives on an occurrence basis with minimum limits of not less than Three Million Dollars ($3,000,000) per occurrence. Notwithstanding anything to the contrary contained herein, the provisions of this Section shall survive Closing.

**11. CLOSING DELIVERIES AND CLOSINGS.**

*(a) Date of Closing.* The closing of the Initial Acquisition Parcels shall be referred to and defined herein as the "Initial Closing" and the date of the Initial Closing shall be referred to and defined herein as the "Initial Closing Date". The Initial Closing shall occur on or before the date which is the later of: (i) June 30, 2017, or (ii) the Business Day that is ten (10) Business Days after the approval of the applicable subdivision plat for the Initial Acquisition Parcels by all applicable parties. Thereafter, each applicable Closing for Subsequent Acquisition Parcels shall occur: (iii) if all Subsequent Acquisition Parcels have been zoned and planned by the City of Worthington pursuant to a planned unit development (PUD) zoning, within thirty (30) days after

such zoning has been approved free of any right of appeal or referendum, Buyer shall close on Subsequent Acquisition Parcels having a Purchase Price of not less than One Million Dollars ($1,000,000), and thereafter, Buyer shall close on one or more remaining Subsequent Acquisition Parcels on or before each anniversary of such first Subsequent Acquisition Parcel pursuant to this clause (iii) but in any event, all such Subsequent Acquisition Parcels shall be purchased by Buyer hereunder no later than the fifth (5th) anniversary of the first Subsequent Acquisition Parcels purchase pursuant to this clause (iii); (iv) if select Subsequent Acquisition Parcels but not all Subsequent Acquisition Parcels have been zoned and planned by the City of Worthington for single family home, patio home or for sale condominium development, within thirty (30) days after a final development plan has been approved for such Subsequent Acquisition Parcels for the portion of the Subsequent Acquisition Parcels to be purchased at such Closing, free of any right of appeal or referendum; (v) if select Subsequent Acquisition Parcels but not all Subsequent Acquisition Parcels have been zoned and planned by the City of Worthington for multifamily development (including condominiums to be developed and owned and rented under common ownership), within thirty (30) days after a final development plan has been approved for all such Subsequent Acquisition Parcels so zoned and planned, free or any right of appeal or referendum; and (vi) with respect to all Subsequent Acquisition Parcels being developed in accordance with their current zoning classification, within thirty (30) days after a final development plan has been approved for such Subsequent Acquisition Parcels free of any right of appeal or referendum. Notwithstanding the foregoing provisions of this Section 11(a), in any event, all portions of the Property shall be purchased by Buyer and all Closings hereunder shall occur prior to the Final Permitted Closing Date.  Further notwithstanding the foregoing, Buyer shall not be obligated to purchase any Subsequent Acquisition Parcel until the Business Day that is ten (10) Business Days after the approval of the applicable subdivision plat for the respective Subsequent Acquisition Parcel by all applicable parties.  Buyer covenants and agrees to use commercially reasonable efforts to obtain all required plat approvals at the earliest possible time in order that Closings are not materially delayed beyond the Closing time frames as outlined above.

(b)     **Seller's Deliverables.**  At each Closing, Seller shall deliver to Buyer and the Title Insurer, if necessary, the following:

(1)     Limited Warranty Deed conveying to Buyer fee simple title to the applicable portion of the Property being acquired subject only to the Permitted Encumbrances ("Deed");

(2)     A Non-Foreign Affidavit;

(3)     Evidence of Seller's authority to consummate the transactions described herein as may be reasonably required by Buyer and the Title Insurer;

(4)     An affidavit with respect to off-record title matters in accordance with community custom that is sufficient to cause the Title Insurer to delete all "standard exceptions" other than the "survey exception" from the Title Commitment;

(5)     With respect to the Initial Closing only, an executed counterpart of the Development Agreement;

(6) All easements, dedication plats and other documents required to be executed by Seller in connection with the Development Agreement; and

(7) A closing statement executed by Seller.

(c) **Buyer's Deliverables.** At the Closing, Buyer shall deliver an amount equal to the applicable Purchase Price for the portion of the Property being acquired subject to all credits and prorations provided for in this Agreement and a closing statement executed by Buyer. At the Initial Closing, Buyer shall deliver an executed counterpart of the Development Agreement and any easements required pursuant to the terms hereof.

(d) **Buyer's Closing Conditions.** Buyer's obligations under this Agreement at each applicable Closing are further expressly conditioned upon the occurrence (or non-occurrence, as the case may be) of the following, unless waived by Buyer (collectively, "Buyer's Closing Conditions"):

(1) Buyer obtaining at the applicable Closing from the Title Company an owner's policy of title insurance insuring marketable fee simple title to the portion of the Property being acquired, in the amount of the applicable Purchase Price subject only to the Permitted Encumbrances.

(2) The representations and warranties of Seller set forth in this Agreement shall have been true and correct when made and are true and correct as of the date of each respective Closing; provided that any change in any facts or circumstance between the Acceptance Date and the applicable Closing that would render any one or more of such representations and warranties untrue, while constituting a failure of Buyer's Closing Conditions, shall not constitute a default by Seller hereunder.

(3) Seller shall have executed and delivered the items set forth in Section 11(b) hereof and shall have performed all of its obligations under this Agreement.

(4) No action or proceeding brought by any person shall be pending before any court or administrative body or, to the best knowledge of Seller, be threatened to restrain, enjoin or otherwise prevent the consummation of the transactions contemplated by this Agreement or to recover any damages or obtain other relief as a result of the consummation of the transactions contemplated by this Agreement.

(e) **Costs and Expenses of Closing.** All title charges and conveyance fees, 50% of all escrow closing fees, and all other customary seller's expenses due, payable or incurred in connection with the transactions described herein shall be paid by Seller from the proceeds of the applicable Closing. Buyer shall be responsible for all fees associated with Buyer's preclosing investigation, 50% of all escrow closing fees and all costs arising in connection with any financing obtained by Buyer, and recording fees for the applicable Deed. Buyer and Seller shall each pay the fees and expenses of their respective legal counsel incurred in connection with the transaction described herein.

## 12. DEFAULTS; REMEDIES.

*(a)* Seller Default - If the purchase and sale of the Property, or any portion thereof, is not consummated because of Seller's failure or refusal to perform Seller's obligations hereunder, Buyer shall have as its sole and exclusive remedy the right to bring an action against Seller for specific performance, together with damages in the amount of actual costs incurred as a result of the need for Seller to enforce this Agreement, including, but not limited to, attorney's fees and other litigation expenses, and any actual costs directly attributable to the delay resulting from Seller's failure or refusal to perform. Buyer shall not be permitted to bring an action against Seller for other damages unless Seller has conveyed or encumbered the Property, or any portion thereof, in such a way that the remedy of specific performance is not available to Buyer. In no event shall Buyer be permitted to seek damages from Seller beyond its actual damages incurred and consequently, Buyer shall not be entitled to make a claim for damages in the nature of punitive, consequential, exemplary or lost profits damages. Any change in any facts or circumstances outside the control of Seller between the Acceptance Date and the Final Permitted Closing Date that would render any one or more of Seller's representations and warranties untrue shall not constitute a default by Seller or entitle Buyer to damages.

*(b)* Buyer Default – If Buyer shall default in any of its obligations hereunder, Seller's sole and exclusive remedy, except as otherwise provided in Section 14 hereof with respect to certain indemnification and hold harmless obligations of Buyer to Seller, shall be the right to terminate this Agreement after written notice of such default has been provided to Buyer and Buyer has failed to cure such default within a period of thirty (30) days after receipt of such notice.

13. **DAMAGE, DESTRUCTION OR EMINENT DOMAIN.** In the event that any portion of the Property not yet purchased hereunder by Buyer shall be materially impaired, damaged or destroyed by environmental casualty between the date of execution hereof and the date of such purchase, Buyer shall have the option to: (a) elect to proceed to close the purchase of the Property in accordance with the terms of this Agreement, in which event the Buyer shall be entitled to all insurance proceeds received or receivable by Seller as a result of such environmental casualty under any and all insurance policies covering that portion of the Property so damaged or destroyed; or (b) elect to terminate this Agreement with respect to such portion of the Property, in which event Seller shall retain all insurance proceeds and both parties shall be released from further liability or obligation hereunder, except as otherwise expressly provided herein to the contrary. Seller agrees that it shall give notice to Buyer of any such environmental casualty within ten (10) days after the occurrence thereof, and upon the receiving of such notice, Buyer shall have thirty (30) days within which to exercise the options granted in this Section 13. If Buyer fails to so exercise such options within said 30-day period, this Agreement shall terminate and thereafter both parties shall be released from further liability or obligation hereunder, except as otherwise expressly provided herein to the contrary. Buyer acknowledges that since all buildings and improvements located on the Property will be demolished in connection with Buyer's proposed development, the casualty or destruction of any of such buildings or improvements shall not give rise to a Buyer termination right hereunder and all insurance proceeds paid to Seller as a consequence of any such damage or destruction shall be the sole property of Seller; provided that if the cost of temporarily stabilizing, securing, demolishing and removing the buildings on the Property is increased as a result of a casualty over the cost of demolishing and removing the buildings without a casualty, Seller shall pay to Buyer such increased cost.

If, prior to the date of any applicable Closing, eminent domain proceedings shall be threatened or commenced against all or any part of the Property, Buyer may: (a) elect to proceed to close the purchase of such portion of the Property in accordance with the terms of this Agreement, in which event the Buyer shall be entitled to all payments payable to Seller on account of such taking as is applicable to the portion of the Property being purchased; or (b) elect to rescind this Agreement with respect to such portion of the Property affected by such proceedings, and in event such rescission applies to all the Property or all remaining portions of the Property not yet acquired by Buyer hereunder, and thereafter both parties shall be released from all further liability or obligation hereunder except as otherwise expressly provided herein to the contrary. If Buyer elects to rescind the Agreement in whole or in part, it shall so notify Seller in writing within twenty (20) days after Buyer has received written notice from Seller of such taking. Failure by Buyer to so notify Seller shall constitute an election to proceed to close on the purchase of such portion of the Property, and Buyer shall be entitled to all payments on account of such taking.

14.     **BUYER INDEMNITY AND HOLD HARMLESS.** Buyer shall indemnify and hold harmless Seller, its officers, trustees, employees, sole member and agents, from any actual loss, cost or damages to persons or property arising out of inspections, surveys and studies undertaken by Buyer and its agents, consultants and representatives on the Property and prior to undertaking any such inspections, surveys and studies, Buyer shall provide to Seller evidence of commercial general liability coverage for Buyer and its agents, consultants and representatives on an occurrence basis with minimum limits of not less than Three Million Dollars ($3,000,000) per occurrence. Notwithstanding anything to the contrary contained herein, the provisions of this Section shall survive Closing and any termination of this Agreement by lapse of time or otherwise.

15.     **NOTICES.** All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered by hand, within three (3) business days after deposited in the United States mail, Registered or Certified, Return Receipt Requested, postage prepaid or within one (1) Business Day after deposited with a well-known national overnight courier (e.g. Federal Express), as follows in the case of Buyer and Seller, or to such other address as may be hereafter notified by the respective parties.

| | |
|---|---|
| If to Buyer: | Lifestyle Real Estate Holdings, Ltd.<br>230 West Street, Suite 200<br>Columbus, Ohio  43215<br>Attn:  Legal Department<br>Email: bbrownlee@lifestylecommunities.com |
| with a copy to: | Bricker & Eckler LLP<br>100 South Third Street<br>Columbus, Ohio  43215<br>Attn:  Stephen Intihar<br>Email: sintihar@bricker.com |
| If to Seller: | The United Methodist Children's Home |

West Ohio Conference of the United
Methodist Church
431 East Broad Street
Columbus, Ohio 43215
Attn: Sean Reilly
Email: sreilly@umchohio.org

with a copy to:    Kephart Fisher LLC
207 North Fourth Street
Columbus, Ohio 43215
Attn: David Fisher
Email: davidfisher@kephartfisher.com

**16.**    **ENTIRE AGREEMENT.** This Agreement embodies the entire agreement among the parties in respect to the transaction herein contemplated. Any amendments hereto shall be in writing and executed by the parties hereto.

**17.**    **ASSIGNMENT.** Neither Buyer nor Seller shall have the right to assign this Agreement without first obtaining the prior written consent of the other party hereto; provided that Buyer may assign this Agreement at any time to one or more of its affiliates. Any entity that is managed by one or more of the individuals that manage Buyer, including Michael J. DeAscentis II or L. Brent Miller, shall be considered an "affiliate" for purposes of this Section. Any such permitted assignment by named Buyer herein shall not relieve such named Buyer from its obligations hereunder.

**18.**    **AUTHORIZED REPRESENTATIVE.** Seller hereby appoints its Board Chair as its Authorized Representative for purposes of dealing with Buyer on behalf of Seller in respect of any and all matters in connection with this Agreement. Authorized Representative shall have the power, in his or her discretion, to give and receive all notices, monies, consents, approvals, and other documents and instruments, and to take any other action on behalf of Seller. All actions by Authorized Representative shall be final and binding on Seller. Buyer may rely on the authority given to Cyndy Garn as the Authorized Representative until actual receipt by Buyer of a duly authorized resolution substituting a different person as Authorized Representative.

**19.**    **RELATIONSHIP TO PREVIOUS PURCHASE AGREEMENT AND PREVIOUS DEVELOPMENT AGREEMENT.** Notwithstanding anything to the contrary contained in the Previous Purchase Agreement and/or the Previous Development Agreement, neither the Previous Purchase Agreement nor the Previous Development Agreement is of any further force and effect and the same shall be null and void from and after the Acceptance Date.

**20.**    **WEST OHIO CONFERENCE LANDS.** Buyer acknowledges its understanding and agreement that the southeastern most portion of Lot 2 of the United Methodist Children's Home Subdivision of which the Property is a part, consisting of approximately 3.5285 acres ("Conference Center Parcel") and currently the location of the WOC, is being sold and conveyed to WOC pursuant to a purchase option contained in the current lease between Seller and WOC. Notwithstanding any previous disclosures or assurances made by Seller to Buyer or its affiliates, there can be no assurances given by Seller to Buyer that the Conference Center Parcel can be

reconfigured in such a way as to increase the amount of developable High Street frontage available to Buyer for purchase and/or development.

21. **WESLEY BOULEVARD.** Buyer acknowledges its understanding and agreement that Wesley Boulevard currently provides access to the Conference Center Parcel and the Sunrise Assisted Living Facility located adjacent to the southeastern end of the Property. Wesley Boulevard will be the subject of an Access and Utility Easement Agreement or Declaration ("Wesley Boulevard Easement") for the benefit initially of the Conference Center Parcel and the Sunrise Assisted Living Facility, but will allow for Buyer to elect to expand the benefit to extend to the Property. Any Wesley Boulevard Easement shall be subject to the approval of Buyer before it is executed and filed for record. The western terminus of the Wesley Boulevard Easement has yet to be determined, but Seller will attempt to cause such western terminus to be as depicted on the attached Exhibit A. In the event Buyer desires to use the Wesley Boulevard Easement for access to portions of the Property, Buyer will be required to join in the Wesley Boulevard Easement and participate in maintenance and other costs incurred thereunder, until such time, if ever, as Wesley Boulevard becomes a publicly dedicated street and join in the costs incurred in connection with the public dedication of Wesley Boulevard. If the Wesley Boulevard Easement calls for the inclusion of Wesley Boulevard in a reserve owned by an association of property owners created pursuant to the Wesley Boulevard Easement, Wesley Boulevard shall be excluded from the Property.

22. **TAX EXEMPTION; ASSESSMENTS.** The parties acknowledge the importance of maintaining the Property as exempt from real estate taxation based on Seller's continued use of the Property in furtherance of its tax exempt activities and agree to cooperate on a commercially reasonable basis to protect and preserve such tax exempt status for as long as possible with respect to all portions of the Property not yet acquired by Buyer hereunder. Seller agrees to exercise commercially reasonable efforts to maintain tax exempt activities on the Property until such time as Buyer's development activities render the continuation of such activities commercially unreasonable. Seller will not conduct or allow to be conducted any activities that would render the portions of the Property not acquired by Buyer to lose their tax exempt status. Seller will not consent to or impose any assessment on the Property without the prior written consent of Buyer. In the event that at any time, any portion of the Property still owned by Seller loses its exempt status and becomes subject to real estate taxation, the provisions of Section 2(a) and Section 25 hereof shall apply.

23. **RESTRICTIVE COVENANTS.** Prior to the Closing on the Initial Acquisition Parcels, Seller shall place of record on the entire property a Declaration of Restrictive Covenants restricting uses of the type listed on the attached Exhibit B. Buyer shall have the right to review and approve on a commercially reasonable basis, such Declaration of Restrictive Covenants prior to its recording.

24. **COOPERATION IN ZONING.** Seller agrees to cooperate with Buyer in all zoning and entitlement efforts pertaining to the Property.

25. **LOSS OF REAL ESTATE TAX EXEMPTION.** Notwithstanding anything to the contrary contained herein, to the extent any portions of the Property still owned by Seller lose their exemption for real property taxes, in lieu of the provisions of Section 2(c)(ii) hereof, Buyer

may elect to close on the remainder of the Property immediately, with Seller agreeing to Seller financing at 0% interest secured by a mortgage on such Property in lieu of cash at Closing, so long as Seller provides credit support for such obligation reasonably acceptable to Seller and agrees to repay the debt evidenced by such mortgage on each prorata portion of the Property mortgaged at the time any such portion of Property is rezoned, sold or otherwise developed. Repayment of such mortgage shall in any event be on the same terms as if Buyer had closed on all portions of the Property pursuant to Section 11(a) hereof.

26. **MISCELLANEOUS.** Each of the parties hereby represents and warrants to the other that it has all requisite power to enter into this Agreement and to perform the terms, covenants and conditions hereof; that the execution and delivery of this Agreement has been duly authorized by all necessary persons or entities, and when executed and delivered, this Agreement will be a legal, valid and binding obligation of such party, enforceable against it in accordance with its terms; and that its signatory is duly authorized and empowered to execute this Agreement on its behalf. Whenever a date specified herein shall fall on a weekend or legal holiday, the date shall be extended to the next business day. The headings used in this Agreement are for convenience only and are not to be considered as defining or limiting in any way the scope or intent of the provisions hereof. This Agreement shall be governed by and interpreted under the laws of the State of Ohio. Time shall be of the essence in the performance of all obligations under this Agreement. The term "Business Day" when used herein shall mean any day other than a Saturday, Sunday, legal holiday in Central Ohio or any other day on which banks located in Central Ohio are authorized or required to close for business. This Agreement has been the subject of negotiation by and between Buyer and Seller, each of whom has been represented by competent legal counsel and therefore no rule of constructively interpreting this Agreement more favorably to one party than the other shall apply.

[Remainder of Page Intentionally Left Blank]

**IN WITNESS WHEREOF**, the parties have entered into this Agreement as of the date first written above.

SELLER:

**THE UNITED METHODIST CHILDREN'S HOME WEST OHIO CONFERENCE OF THE UNITED METHODIST CHURCH,**
an Ohio non-profit corporation

By: _____
Name: Cyndy L. Gann
Title: Chairperson, UMCH Family Service

BUYER:

**LIFESTYLE REAL ESTATE HOLDINGS, LTD.,** an Ohio limited liability company

By: _____
Name: Michael DeAscentis II
Title: CEO

8319901v12

{00261230-13}A-1

EXHIBIT A



# ALTA/ACSM LAND TITLE SURVEY
LOTS 30, 31 & 32, QUARTER TOWNSHIP 3, TOWNSHIP 2, RANGE 18
UNITED STATES MILITARY LANDS
CITY OF WORTHINGTON, COUNTY OF FRANKLIN, STATE OF OHIO

HIGH STREET CORRIDOR LAND

WESLEY BOULEVARD EASEMENT WESTERN TERMINUS

UTILITY LEGEND

# EXHIBIT B

## RESTRICTIVE COVENANTS FOR UMCH LAND

The following activities and business shall be prohibited:

- Dance hall or disco where principal purpose is a dance venue
- Sale of sexually explicit products, materials or pornography
- Businesses engaging in sexually explicit activities (to be further defined)
- Sale of drug paraphernalia
- The operation of any smoke shop (e.g. "Tobacco for Less"), cigar and/or pipe store, or electronic smoke shop (e.g. selling e-cigarettes) that is primarily dedicated to the sale of tobacco and tobacco related products.
- Sale of beer, wine or liquor, except where at least Thirty-Five Percent (35%) of gross sales on an annual basis are from the sale of food and no general carry out sales of beer, wine or liquor are permitted to the general public as a so-called "carry-out store."
- Sales of firearms, ammunition or military armaments.

8319901v12