# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **LIFESTYLE COMMUNITIES, LTD**., *et al.*, | ) | Civil Action 2:22-CV-1775 |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Judge Sarah D. Morrison |
| | ) | |
| **CITY OF WORTHINGTON, OHIO**, | ) | |
| | ) | |
| Defendant. | ) | Magistrate Judge Elizabeth P. Deavers |
| | ) | |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# EXHIBIT 02

*LIFESTYLE COMMUNITIES*

*vs.*

*CITY OF WORTHINGTON*

---

Deposition of

**Matthew Greeson**

October 06, 2023

---



614.460.5000 | www.priohio.com | pri@priohio.com

 1

            IN THE UNITED STATES DISTRICT COURT
 2             SOUTHERN DISTRICT OF OHIO
                  EASTERN DIVISION
 3

 4   LIFESTYLE COMMUNITIES,      )
     LTD., ET AL.,               )
 5                               )
          Plaintiffs,            )
 6                               )
          vs.                    )   Case No.
 7                               )   2:22-cv-1775
     CITY OF WORTHINGTON,        )
 8   OHIO,                       )
                                 )
 9        Defendant.             )

10

11

12                  DEPOSITION

13             of MATTHEW GREESON

14

15        Taken at Worthington City Hall
               6550 North High Street
16          Worthington, Ohio 43085

17       on October 6, 2023, at 9:00 a.m.

18

19        Reported by: Rhonda Lawrence

20

21                   -=0=-

22

23

24

     1    APPEARANCES:

     2

              Christopher L. Ingram
     3        VORYS SATER SEYMOUR AND PEASE LLP
              52 East Gay Street
     4        Columbus, Ohio 43215
              614.464.5480
     5        clingram@vorys.com

     6            on behalf of the Plaintiffs.

     7

              Paul J. Schumacher
     8        DICKIE McCAMEY
              600 Superior Avenue East, Suite 2330
     9        Cleveland, Ohio 44114
              216.390.1795
    10        pschumacher@dmclaw.com

    11            and

    12        Richard J. Silk, Jr.
              DICKIE McCAMEY
    13        10 West Broad Street, Suite 1950
              Columbus, Ohio 43215
    14        614.258.6000
              rsilk@dmclaw.com
    15            on behalf of the Defendant.

    16

    17

    18

    19

    20

    21

    22                     -=0=-

    23

    24

1                     STIPULATIONS

2              It is stipulated by and among counsel

3    for the respective parties that the deposition

4    of MATTHEW GREESON, the Witness herein, called

5    by the Plaintiffs under the applicable Rules of

6    Federal Civil Court Procedure, may be taken at

7    this time by the stenographic court reporter and

8    notary public pursuant to notice; that said

9    deposition may be reduced to writing

10   stenographically by the court reporter, whose

11   notes thereafter may be transcribed outside the

12   presence of the witness; and that the proof of

13   the official character and qualification of the

14   notary is waived.

15                      -=0=-

16

17

18

19

20

21

22

23

24

1                    INDEX OF EXAMINATION

2                                                    PAGE

3    BY MR. INGRAM:                                  6

4

5

6                    INDEX OF EXHIBITS

7    EXHIBIT            DESCRIPTION              PAGE

8      1        Land Use Plan                       65

9      6        Ordinance No. 04-2022              234

10      7       Resolution No. 04-2022             243

11     14       Memorandum to Greeson from          30
               Bitar, 1-11-12
12
        15      Memo to Council from Greeson,        39
13              2-21-12

14     16       Engagement of Special Counsel       48

15     17       Letter to Greeson from MSK          51
               Re: Proposal for Planning and
16             Urban Design Services

17     18       City of Worthington Launching       54
               Visioning UMCH Process press
18             release

19     19       Memo to Greeson from Brown,         55
               9-27-13
20
        20      Memo to Greeson from Hurley,         60
21              8-5-14

22     21       UMCH Focus Area Checklist           68

23     22       Email chain                         71

24     23       Email chain                         75

1                    INDEX OF EXHIBITS (continued)

2     EXHIBIT              DESCRIPTION              PAGE

3      24       Email from Brown to Greeson,    88
                1-18-18
4
       25       Email chain                     90
5
       26       Email from Greeson, 4-19-16     96
6
       27       Memo from Management Partners    100
7               to Greeson/Stewart, 4-2-18

8      28       Email from Greeson to            134
                Kowalczyk, 2-28-18
9
       29       Email chain                     141
10
       30       Email from Greeson to            145
11              Jenkins, 3-9-20

12     31       Florey Todd Summary of Phases    166
                for Development of the UMHC
13              Property

14     32       Memo to City Council from        169
                Greeson, 1-22-19
15
       33       Email chain                     180
16
       34       Email chain                     185
17
       35       Email chain                     190
18
       36       Email chain                     195
19
       37       Email chain                     200
20
       38       Staff Memorandum from Brown      209
21              to Greeson, 11-8-21

22

23

24

1   there's a balance of -- that could mean

2   economic, that could mean, you know,

3   opportunities for green space, and that could

4   mean opportunities for living.  Some balanced

5   combination of all of those potentially, as well

6   as development that supported the city's budget

7   and didn't zap its ability to continue to

8   provide high-quality services.

9       Q.  Okay.  She goes on to say in the next

10  sentence, in order to evaluate current market

11  reality and long-term viability for

12  redevelopment of the site, contracting with a

13  consultant is recommended.

14      What type of consultant would be

15  utilized to guide this redevelopment?

16      A.  Well, since we at that time had one

17  planner on staff, and now only have, I believe,

18  two -- "we" being the City of Worthington, which

19  I'm no longer a part of -- I believe she meant a

20  planning consultant that assisted in the wide

21  range of skill set to help do the things she's

22  outlined in the memo.

23      Q.  Okay.  And certainly, you can recall

24  MKSK being retained to update the city's 2005

1    comprehensive plan.  I believe their work

2    started a year after this.

3        A.  Yes.

4        Q.  Is this recommendation -- was this kind

5    of the genesis of that effort with MKSK?

6            MR. SCHUMACHER:  You mean this memo?

7            MR. INGRAM:  Correct.

8        A.  I don't think the sole memo was the

9    genesis of it.  The genesis of it was a very

10   important context sensitive piece of property in

11   our community that had been the source of a lot

12   of dialogue about its future in the 2005

13   comprehensive plan, if the -- you know, where

14   they were looking at if UMCH never ceased to

15   exist as a social service purpose on that

16   property and changed their mission, what might

17   it become.  Even prior to that, their discussion

18   about, you know, as they sold off pieces of the

19   property or contemplated pieces of the property,

20   it was important.  The operations had been

21   controversial, and periodically throughout

22   UMCH's operational history they had had conflict

23   with the community, and being a built-out

24   community, this property, whatever you want to

1  Cunningham to assist our council in

2  understanding improvements to our code, and they

3  adopted a change in the code to allow for

4  planned unit developments, which our code, which

5  was largely written in the very beginning of --

6  well, it was largely written in the early

7  '70s -- didn't accommodate.

8      Q.  Was the creation of the PUD and the -- I

9  guess the output from Ms. Cunningham's work --

10  did that occur before the 2014 comprehensive

11  plan update?

12      A.  I don't specifically recall, but I

13  believe so.

14                    -=0=-

15      (Deposition Exhibit 17 marked.)

16                    -=0=-

17  BY MR. INGRAM:

18      Q.  Mr. Greeson, you've been handed what's

19  been marked as Exhibit 17.  And for purposes of

20  the record, Exhibit 17 is a letter from MKSK to

21  you, dated June 12, 2013, Bates numbered

22  Worthington 62382 through 62392.  Do you see

23  that, Mr. Greeson?

24      A.  Yes.

1      A.  I believe the meeting of 8-24, or

2   meetings in that time frame.

3      Q.  And who was that meeting with?

4      A.  Representatives of WARD, OWA, and then I

5   believe Mr. Robinson.  Members of the community,

6   I should say, that were interested in the UMCH

7   project.

8      Q.  And Mr. Robinson, is this David

9   Robinson, the current president of the City

10  Council of Worthington?

11     A.  Yes.

12     Q.  And beneath his signature line of his

13  email it says, Keep Worthington Beautiful in

14  italics.  Do you see that?

15     A.  Yes.

16     Q.  What was Keep Worthington Beautiful, or

17  what is it?

18     A.  Keep Worthington Beautiful was a -- was

19  a campaign -- well, that was the nomenclature or

20  marketing slogan, whatever you would call it --

21  I'm not sure -- of the group that led a process

22  to amend the charter, which was Issue 38 on the

23  ballot and extended the time frame in which

24  signatures could be collected to place on the

1 ballot, voter consideration of a zoning

2 amendment.

3     Q.  And at this time Mr. Robinson was not on

4 City Council, correct?

5     A.  I don't believe so.  I can't remember

6 the exact date he got elected, but no, I don't

7 think so.

8     Q.  And based on your meetings with

9 Mr. Robinson, what was his role within the Keep

10 Worthington Beautiful campaign or whatever you

11 want to call it?

12     A.  I don't think I'm the one that can

13 define his role.  He was one of the leaders, I

14 would -- what that entailed, you'd have to ask

15 him.

16     Q.  Sure.  He was reaching out to you and

17 had met with you and obviously discussed the

18 UMCH property?

19     A.  I had not had extensive conversations

20 with Mr. Robinson about the property.  He was,

21 sometime in this time frame, beginning to join

22 kind of some of the conversations that had been

23 ongoing, mostly questions that I was getting

24 from other citizens and that kind of had formed

1                    CERTIFICATE

2   STATE OF OHIO      :
                          SS:
3   COUNTY OF FRANKLIN :

4          I, Rhonda Lawrence, a stenographic
    court reporter and notary public in and for the
5   State of Ohio, duly commissioned and qualified,
    do hereby certify that the within-named MATTHEW
6   GREESON was first duly sworn to testify to the
    truth, the whole truth, and nothing but the
7   truth in the cause aforesaid; that the testimony
    then given was taken down by me stenographically
8   in the presence of said witness, afterwards
    transcribed; that the foregoing is a true and
9   correct transcript of the testimony; that this
    deposition was taken at the time and place in
10  the foregoing caption specified.

11         I certify that I am not a relative or
    employee of any attorney or counsel employed by
12  the parties hereto and that I am not financially
    interested in the action.  I further certify
13  review of the transcript was not requested.

14         In witness whereof, I have hereunto
    set my hand at Columbus, Ohio, on this 20th day
15  of October, 2023.

16

17

18

19

20
                   *Rhonda Lawrence*
21                 Rhonda Lawrence
22                 Notary Public, State of Ohio

23  My commission expires:  October 9, 2028

24


EXHIBIT
14



# MEMORANDUM

TO:        Matthew H. Greeson, City Manager

FROM:    Lynda B. Bitar, Development Coordinator

DATE:     January 11, 2012

SUBJECT: United Methodist Children's Home (UMCH) Site Redevelopment

---

As you know, thirty-eight acres of the United Methodist Children's Home (UMCH) property on High Street are currently for sale. The property is in the S-1 Zoning District, which would allow only public and semi-public uses. Although a buyer has not been identified, a proposal to redevelop the property with a mix of office, residential and/or retail uses is expected from any future owner. The UMCH property was highlighted in the Comprehensive Plan Update and 2005 Strategic Plan (2005 Plan) for Worthington as an ideal site for a mixed use planned development with high density office, residential and limited retail. Two scenarios for redevelopment were part of the 2005 Plan, both of which included a large concentration of office development. Because Worthington is a fully developed community with few opportunities for redevelopment which will increase the tax base, it is critical that redevelopment of the site is guided to benefit the community in the future.

In order to evaluate current market reality and long-term viability for redevelopment of the site, contracting with a consultant is recommended. Such consultant would be asked to study the site, including physical features, as well as past findings and planning work, and guide discussions of this project with the neighbors of this property, as well as the entire community including the Municipal Planning Commission, Community Improvement Corporation and City Council. A plan would be expected that includes site design to maximize the economic potential of the land while being sensitive to surrounding residential uses and the prominent position in the City, and shall include the current and future viability of any recommended change. In addition, an evaluation of the current Code, and detailed steps to accomplish the plan, including but not limited to recommendations for specific zoning text, are expected.

Should a proposal for redevelopment be submitted to the City for review before the plan is complete, the consultant will be expected to assist the City in review of the proposal.

A group to interview potential consultants should be formed as soon as possible.

## Engagement of Special Counsel

The City of Worthington is contemplating the engagement of Special Legal Counsel to assist the City in reviewing and evaluating its Comprehensive Plan, Zoning Code and other development documents. Our goal is to provide the City with the maximum legal flexibility in preparing to deal with the land use challenges we face, challenges caused by increasing pressure from developers to maximize the use of scarce land resources.

More simply, the City wants to hire a zoning/land use lawyer to update the documents noted above so that the City can feel confident that its zoning and land-use related resources are not only up-to-date, but anticipate trends for the future. Although it would clearly be "your call," we anticipate that you might recommend, following your review and consideration, amendments to the City Comprehensive Plan and Zoning Code. We are anticipating you might even recommend an innovative approach to the issues!

Finally, while there are several locations around the City where review and evaluation are justified, we think it prudent to start with our two greatest challenges, the Wilson Bridge Corridor and the United Methodist Children's Home complex (UMCH). The UMCH site was only recently vacated as a place to care for troubled children. Because that is so, it is the right time to consider rezoning. We are concerned about both sites, but particularly UMCH. The City has had some preliminary contact with a prospective developer of the UMCH site who wants to develop a "big box" for Giant Eagle. It appears that the community would not be favorable to a "big box" at that location.

I will try to reach you by email or telephone on Thursday or Friday to ascertain your interest in being considered as Special Counsel to the City. Ultimately and if you have an interest, I will arrange for an interview with the City Manager (Matt Greeson), the Assistant City Manager (Robyn Stewart) the Development Coordinator (Lynda Bitar), the Development Manager (Jeff Harris) and me. The meeting may be as early as next week. We intend to extend invitations to three (3) Central Ohio lawyers of whom you are one. I will advise you more about our need to see reference materials and other information.

Please call me at 880-1464 or 395-7931 if you have an interest in working with us on this project.



EXHIBIT
16

Worthington 00317901





For Immediate Release:
September 4, 2013

Media Contact: Anne Brown
Community Relations/PIO
(614) 854-7173

# City of Worthington Launching Visioning UMCH Process

(Worthington, Ohio) - The City of Worthington is launching a process to update the community's vision for the United Methodist Children's Home property at 1033 High Street. The process is expected to result in an update to the City's Comprehensive Plan. The Comprehensive Plan serves as a land use policy document for the city. Its primary role is to create a vision for the city and provide recommendations to guide public policy, particularly in terms of land use-related issues.

The City has selected the Columbus-based planning and design firm MKSK to lead the effort. MKSK is a highly-regarded, Columbus-based firm which brings together landscape architects, urban designers, graphic designers and certified planners to help communities plan vibrant places. Their work includes the Arena District and Scioto Mile in Columbus; the "Imagine Charleston" Plan for Charleston, West Virginia; Cheapside Park in Lexington, Kentucky; and Riverscape Phase III in Dayton.

The goal of this initiative is to envision and evaluate potential redevelopment scenarios for the UMCH property that is located along the High Street Corridor north of downtown Worthington. The UMCH site was identified in the 2005 Worthington Comprehensive Plan as a key opportunity site for our land-locked city should it be sold and redeveloped in the future. The potential availability of this 41-acre property presents a rare opportunity for Worthington to experience redevelopment on a very visible site near the heart of Worthington. Starting in the fall of 2013, MKSK will meet with stakeholders, potential developers, and members of the Worthington community in order to determine improvement opportunities, economic development needs, and anticipated market demand for the site.

This planning process will involve opportunities for the public to engage in the discussion through both public meetings and a web interface. The City and MKSK aim to gain consensus around a range of acceptable redevelopment options that respond to market potential, community priorities, site-related infrastructure needs, and appropriate planning and urban design goals. The resulting Vision Plan will facilitate future development and illustrate possible benefits for the community, city, land owner, and developer.

The Vision Plan will be presented to the Worthington Planning Commission for consideration and recommendation to City Council as an update to the 2005 Worthington Comprehensive Plan. Currently, MKSK is gathering background information related to the site. Once that work is completed, the City will provide additional announcements regarding input opportunities as this project moves forward. Individuals are encouraged to sign up to receive email updates via the City of Worthington website at worthington.org. Click on the "e-News Sign-Up" icon in the middle of the home page, enter your email address and select the "Visioning UMCH" option. New information about the process and opportunities for public participation will be updated online as it is available. If you have questions, please email VisioningUMCH@ci.worthington.oh.us.

###



# MEMORANDUM

TO:        Mathew Greeson, City Manager

FROM:      R. Lee Brown, Director

DATE:      September 27, 2013

SUBJECT:   United Methodist Children's Home - Visioning UMCH

**Background:**
The City of Worthington is in the beginning phase of updating the community's vision for the United Methodist Children's Home (UMCH) property. The potential availability of this 41-acre property presents a rare opportunity for Worthington to experience redevelopment on a highly visible site near the heart of Worthington.

This planning process will be an update to the existing 2005 Worthington Comprehensive Plan; the existing plan identified this property as a key site for redevelopment. The existing plan examined improvement opportunities and redevelopment potential for the site to enhance the quality of life within Worthington. The proposed update will further clarify how the community would like to see the site develop in the future.

The public planning process will build community consensus on how the UMCH property develops in the future, while providing a potential new developer some confidence that their proposal would fit with the community, city, and land owner desires for the site as they go through the development process.

MSI Design, now known as MKSK, prepared the 2005 Worthington Comprehensive Plan and is extremely familiar with the history of Worthington and is creative in working with communities to create vibrant and sustainable places. MKSK will meet with stakeholders, potential developers, and members of the Worthington community to determine improvement opportunities, economic development needs, and anticipated market demand for the site.



EXHIBIT

19

Worthington 028538

**Potential Objectives:**
- Envision a range of future redevelopment scenarios that are aspirational yet feasible under current and anticipated market demands.
- Create redevelopment scenarios that recognize the critical resource and opportunity that developable ground represents within the city.
- Provide a mix of desirable uses that are compatible with surrounding neighborhoods and are currently under served in Worthington.
- Expand the City of Worthington's current tax base by incorporating uses that allow for new or enhanced sources of revenue.
- Address housing needs for current and future residents by providing new housing options that are underrepresented in the market and complement Worthington's current offerings.
- Strengthen the core of the city with a walkable and vibrant extension of Old Worthington that integrates with greater Worthington.
- Provide suitably located organizational green space that is appropriately scaled to the proposed development.
- Preserve and enhance existing natural features that are found on the site.
- Educate and involve the community on the potential use and development of the property.
- Generate employment opportunities within the city.

**Process:**
1. Kick-off Meeting – Completed
2. Stakeholder Interviews – Completed
   a. UMCH
   b. WARD
   c. Worthington Business Community representatives (CIC, CVB, OWBA, and Chamber of Commerce)
3. Walking Tour of UMCH Site – October 5th at 10:00 AM
   a. 1033 High Street, UMCH Administration Building Parking Lot
   b. The purpose is to walk around the property and gather input from the city and the community on their wants and desires for the site.
4. Design Charrette – Target date of mid-October
   a. Limited sized group comprised of representatives of various interested groups from the community. The purpose and result will be input into the conceptual ideas generated for the Public Open House. Will involve designated representatives of City Council, MPC, WARD, UMCH, OWA and School District.
5. Stakeholder Interviews – To be held after the Design Charrette
   a. UMCH
   b. WARD
   c. Worthington Business Community representatives
6. Online dialog hosted on the City's website – after Design Charrette
   a. Public comments on the options generated at the Design Charrette
7. Public Open House – Target date of early December
   a. Get community input on a variety of conceptual plan alternatives.
8. Developer Meetings – Target date of mid-December
   a. Reach out to the development community to obtain input on various alternatives.
9. Adoption Process
   a. Municipal Planning Commission – Target date of January 2014
   b. City Council – Upon recommendation of the MPC

| From: | Brown, Lee |
| --- | --- |
| Sent: | Thursday, January 18, 2018 12:48 PM |
| To: | Greeson, Matt |
| Cc: | Lindsey, Tom |
| Subject: | UMCH Talking Points |
| Attachments: | 4632_001.pdf |

Matt-

I received an email from Ed Miller with EMH&T concerning the UMCH site. They have been charged with the task of splitting off 5-acres of the UMCH site. It is my understanding from Ed that Lifestyle Communities is contractually obligated to purchase 5-acres from the Board.

I informed Ed that the site is located in the S-1 District (Special), and that it would need to meet legal minimum requirements of 2-acres for the lot size with 200-feet of road frontage. Please see attached map. I told him that the property would stay in the Architectural Review District if it was ultimately approved. We also discussed the uses that would be permitted on the site would need to match up with the uses for the S-1 District, and that if they wanted to do anything outside of those uses, they would need to rezone the property. I referenced a possible traffic study based on the highest possible use that would fit on the site under the S-1 District, but not 100% sure that we can tie them to that request, however I felt if this lot is created, it would have to have access and I wanted to think of worse can scenario. We could possibly require that there be "No Direct Access" to Evening and Longfellow and plat an easement of access through the remainder of the lot. Just thinking of ways to control.

I do not believe Lifestyle Communities has any plans at this time, however this just seems as a way to meet their contractual requirements for 5-acres.

We still have the control on the site as it relates to Development Plans, ARB control and any rezoning that would be requested.

I left a message for Bo Brownlee with Lifestyle Communities earlier today to see if he might have any additional information to provide.

We can discuss more later.

Lee

**R. Lee Brown, AICP**
Director

**City of Worthington**
**Planning & Building Department**
374 Highland Avenue
Worthington, OH 43085
Main Line: 614.431.2424
Direct Line: 614.781.3539
Fax: 614.842.6336
www.worthington.org



1

PR01117

# REPLAT OF LOT 2 OF UNITED METHODIST CHILDREN'S HOME AMENDED SUBDIVISION



PR01119

**Smith, Doug**

| | |
|---|---|
| From: | Greeson, Matt </O=COW-EXCHANGE/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=MGREESON> |
| Sent: | Tue 4/19/2016 8:20 PM (GMT-00:00) |
| To: | Michael, Bonnie <BMichael@ci.worthington.oh.us>;Myers, Scott <SMyers@ci.worthington.oh.us>;Norstrom, David <dnorstrom@ci.worthington.oh.us>;Smith, Doug <DSmith@ci.worthington.oh.us>;Dorothy, Rachael <RDorothy@ci.worthington.oh.us>;Foust, Douglas <Doug.Foust@ci.worthington.oh.us>;Troper, Michael <MTroper@ci.worthington.oh.us> |
| Cc: | Stewart, Robyn <RStewart@ci.worthington.oh.us>;McCorkle, David <DMcCorkle@ci.worthington.oh.us>;Brown, Anne <ABrown@ci.worthington.oh.us>;Brown, Lee <LBrown@ci.worthington.oh.us>;Fox, Pam <PFox@ci.worthington.oh.us> |
| Bcc: | |
| Subject: | UMCH Update |

Dear Council Members:

I want to share some information regarding the redevelopment of the UMCH property after having talked with David Fischer yesterday and today.

UMCH has decided it will NOT be planning, rezoning and developing the entire UMCH site right now. However, they will be proceeding with the following:

- A proposed 30,000 square foot Ohio Health medical office facility on High Street. This facility may have a portion of it (10,000 square feet +/-) that will be a 24 hour emergency room.
- The West Ohio Conference will acquire the current Conference Center from UMCH and implement plans to renovate the facility.

We will also be working with them on opportunities for other office users.

This decision came after they made some outreach to community stakeholders and found that there was a lack of support for a revised development strategy that included a reduced number of apartments (250), more emphasis on empty nester housing, no Evening Street curb cut and a community meeting facility. My sense is that they have an opportunity to monetize a portion of the land asset for their not-for-profit purposes and feel a need to go ahead and do that given the uncertainty of community support regarding the remainder of the site and, in particular, apartments.

The High Street frontage is largely zoned for commercial office and we will begin working with Lifestyle Communities, UMCH and Ohio Health on the site planning and other aspects of this development. While piece meal development of such a



EXHIBIT
26

large site is not ideal, we are confident that we can ensure that it is done consistent with the Comprehensive Plan and with an eye towards how it can develop cohesively over time.

The UMCH site is critically important to the community. It is a positive step that a portion of this project is moving forward and that we have the opportunity to enhance access to medical services and bring additional jobs into Worthington. In the next few days, Anne Brown will work with UMCH and Lifestyle Communities to put together appropriate public information for the website. This information will also be distributed by Lee Brown to the MPC/ARB. Please let me know if you have any questions. --Matt

*Matt Greeson*
City Manager
City of Worthington
6550 N. High Street
Worthington, OH 43085
614-436-0368 (Direct)
614-436-3100 (Main Office)
614-786-7355 (Fax)
mgreeson@ci.worthington.oh.us

_____ Information from ESET Endpoint Antivirus, version of virus signature database 13360 (20160419) _____

The message was checked by ESET Endpoint Antivirus.

http://www.eset.com

Message
_____

**From:**      Greeson, Matt [/O=COW-EXCHANGE/OU=EXCHANGE ADMINISTRATIVE GROUP
              (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=MGREESON]
**Sent:**      2/28/2018 5:19:26 PM
**To:**        Kowalczyk, Beth [BKowalczyk@ci.worthington.oh.us]
**Subject:**   Folllow Up
**Attachments:** ward owa project principles 6-29-15.pdf; ward statement 9-23-15.pdf; discussion - fiscal and land use impact slides
              10-16.pdf; draft framework document - Draft 10-14-16.pdf


Beth:

Per our conversation this morning, here are some UMCH related documents that you may find helpful.  I apologize for getting it to you late in the day.  We have a ton of info from years of UMCH related debate.  But, a few things that maybe helpful are:

a)     An early WARD OWA project principle document.  A short and quick read.
b)     A position statement that they made in 2015, asking for a variety of information.
c)     A presentation I made on how fiscal impact analyses work in 2016.
d)     The Draft Framework document that I talked to you about.  This was intended to be a launching point for consensus building conversations, but really didn't get traction.

On the issue of the fund balance, here is some information for digestion:

Acknowledge that you are very much studying the budgetary policies and practices of the City and have been digesting many of our financial documents and have looked at the Carryover Fund Balance Policy

It is required to be reviewed in 2019, but staff wants to do that this year because of the questions that have been asked and because we want to do it in advance of some large debt issuances that are planned for projects in the CIP

Our goal is to maintain our AAA bond rating so that we can ensure low interested rates on long term debt, therefore, saving resources.

The review will look at government finance best practices, cash flow considerations, what other communities are doing, etc.  While our fund balance looks big, we tend to have a little lower fund balance by percentage than some of our municipal peers.

We have a number of considerations like how to provide funding to the pool; dealing with some impending job loss, waterlines and sewers, bike and ped, energy efficiency and park investments that all need to be balanced.  Our options are to do nothing given a variety of uncertainties, increase the general fund balance percentage in the policy, or decide that when the fund balance reaches a certain percentage, dollars become available for one-time projects.

If we use one time money for projects (which is a big question), the inevitable question is which strategic priority would we spend it on?  Do we spend it on capital projects, reducing debt or buying parkland, etc.  This is where we need to be clear on our strategic priorities and tie those to our fiscal policy.  Because of our over-reliance on income taxes, I tend toward a rigorous analysis and cautious use of any one-time dollars, if any at all.

These are some thoughts on the Fund Balance which is the question you raise.  As far as strategies for ensuring green space, there is a simple overview of 3 approaches to this in the attached Draft Framework document.  I would be glad to go over those in detail with you at a future date.  I hope all this helps. –Matt


*Matt Greeson*
City Manager



EXHIBIT
28

Worthington 058435

City of Worthington
6550 N. High Street
Worthington, OH 43085
614-436-0368 (Direct)
614-436-3100 (Main Office)
614-786-7355 (Fax)
mgreeson@ci.worthington.oh.us

_____ Information from ESET Endpoint Security, version of detection engine 16981 (20180228)
_____

The message was checked by ESET Endpoint Security.

http://www.eset.com

Mr. Matt Greeson                                          June 30, 2015
City Manager
City of Worthington
6550 North High Street
Worthington, Ohio 43085

Dear Matt,

Enclosed is a joint statement by the Old Worthington Association and Worthington Alliance
for Responsible Development (WARD) regarding the development of the United Methodist
Children's Home property (UCMH).

We are asking you to review these principles and use them to respond to any UCMH
development proposals, including the one being put forward by Lifestyle Communities.
Additionally, we are asking you to schedule a meeting with us as soon as possible to talk
about these and related issues.

Thank you for your consideration.

                                    Sincerely,

Margaret Real                          Pamela S. Fair
Ohio Worthington Association            Worthington Alliance
                                        for Responsible Development

Worthington 058437

**OWA and WARD UMCH Project Principles**
**June 29, 2015**

The Old Worthington Association (OWA) and Worthington Alliance for Responsible Development (WARD) issued the following joint statement in May 2014. These community organizations are reissuing the statement, without changing the five principles, because we share a deep concern that the current Lifestyle Communities proposal to develop the United Methodist Children's Home (UMCH) property as a mixed use development does not align with the principles outlined in this statement. For example, there is no public/private partnership and placing 571 residential units on the property does not comport with our concern about density. With this misalignment in mind, we encourage City of Worthington officials to use these principles to respond to any UCMH development proposal.

1. Well Planned: Meets or exceeds current best practice standards for mixed-use property development.

2. Project includes a significant, financially workable public/private partnership that involves meaningful citizen participation and results in a project that exceeds in overall quality what the market place would likely produce without such a public/private partnership. The project will meet or exceed all relevant local government development standards and include more community green space (exclusive of Tucker Creek Ravine) than would normally be provided. This, in turn, will encourage high quality construction that will be architecturally pleasing and congruent with local architectural themes and traditions. Additionally, any publicly owned park space, active and/or undeveloped, would be designed to meet the needs of both park users and neighbors (residential, business and retail).

3. A project that is well balanced. It will include quality residential homes and condos that do not exceed two stories; class A office space and retail, including one or more restaurants; and it will be a project that is well constructed, aesthetically pleasing and one that ages well. Efforts will be made in planning the design of the development to limit potential friction among these business, residential and retail users and between them and adjacent (existing) developed space (houses, etc.).

4. A quality project that achieves appropriate levels of density and therefore limits the number of housing and office units to what can be developed on the site without creating unworkable traffic congestion problems. This approach will give special attention to neighborhood connectivity issues and to limiting potential friction between and among neighbors.

5. A project that includes office and retail buildings that complement downtown Worthington and provide the option of approved sidewalk seating as appropriate to support business activities. To the greatest extent possible, any new development will maintain existing tree lines and berming. The Tucker Creek easement will be protected with significant boundaries between existing and proposed development.

Margaret Real
Old Worthington Association

Pamela S. Fair
Worthington Alliance
for Responsible Development

**OWA/WARD Joint Questions and Comments on UMCH development**

**August 13, 2015**

1. The city should create (in writing) a UCMH project development principles/goals statement that guides negotiations and related policy positions. This statement should be reflective of and responsive to public questions and concerns about the project as proposed by Lifestyle Communities.

2. The city should hire a professional negotiator
   - The purpose of this request is to have an independent professional negotiator work on behalf of City Staff, Council, and the residents. The negotiator should be from outside the City and without a vested interest.
     - The person would be hired to focus on the best deal for the city and community.
     - Negotiator may be able to determine what other potential developers have contacted UMCH.
     - The negotiator would free up city staff time for other activities
     - We request a selection committee be formed to help select the negotiator. The committee would include one member from WARD, one member from OWA, and one "at-large" citizen.

3. The City is requested to provide 3 options how a PPP could be implemented, such as:
   - What are the scenarios for the City to buy some of the property?
   - What would be the purchase value and how would the cost be passed on?
   - What is the City's bond capacity for such a purchase?
   - What are the terms of a bond issue? For example: could this be constructed in a similar manner to the Worthington pool project?

Worthington 058439

4. Request from the City the data that supports the need for apartments in downtown Worthington and for data that supports the need for senior citizen housing .
5. OWA/WARD is requesting a written response from the City to these questions, requests and comments.

Additional Comments:
What is the status of the various studies: traffic, water/sewer that the public was told are in progress? When will results be shared publicly?

**Draft for Discussion Purposes Only – Draft Version Issued 10/14/2016**

**A Framework for Moving Forward (working title)**

**Introduction**

This document provides a list of common objectives for the UMCH property and preliminary or evolving thinking on how the community might move forward on this challenging issue. It explores options (tactics, alternatives or approaches) for pursuing each common objective. It is in draft form, is likely incomplete, but seeks to frame issues for the purpose of informing constructive dialogue.

**Background**

The issue of the larger redevelopment of UMCH has been at a standstill since last year with no or little action. Private discussions between residents and the developer did not yield forward action. No recent conversations have occurred between the developer and the City about comprehensive site development.

It is our understanding that Lifestyle Communities still has a contractual relationship with UMCH. Beneficial medical office has been proposed and will absorb a portion of the land. UMCH/Lifestyle is interested in, and the City encourages, additional office development on the site. These steps represent incremental development that while maybe good by themselves, have the potential - if not done right - to be detrimental to the overall site.

Citizens want to know what is happening. Resident organizations want to achieve green or park space and, in the absence of larger development conversations, may want the City to pursue acquisition. While the goal for some park space is shared, the desire to pursue it separately from an understanding of the larger site is not. It is unknown whether Lifestyle would even be interested in allowing the City to acquire a portion of the site and presumably would want to know how much land would be sought and what it can legally do with the remaining land.

The above is a description of a challenging inertia created by uncertainty. There is a necessity to create a framework for moving a potential project forward in a mutually beneficial manner. This document serves as a starting point for this. It borrows from OWA and WARD's idea about a principles statement, but also discusses how such principles (called objectives here) might be approached.

**Objectives**

A review of City, OWA and WARD documents reveals a number of broad, common objectives (no priority order):

- High-quality, mix of uses
- Expansion of the City's tax base - particularly with office and payroll tax
- Green and communal park space
- Preservation and enhancement of Tucker Creek

1

Worthington 058457

- New housing options
- Compatibility with the existing neighborhood
- Financial goals of UMCH
- Walkable, vibrant and connected
- Manageable traffic and other impacts
- Public Private Partnership

**Paths towards Achievement of Objectives**

In many ways, each of the objectives above are interconnected, resulting in the need to strike a balance among them. Better understanding of each objective may help illuminate the relative priority of each objective and the best approach to advance positive development. These pathways are explored below.

- **High quality, mix of uses**:

  There are a number of concepts related to the mix of uses:

  a. This has been explored as limited retail (neighborhood style), office, and a mix of residential property types.
  b. Mixed use is desirable over the current zoning (institutional, commercial).
  c. The City's historical strategy has been to limit retail outside of Old Worthington and the mall area to help protect and preserve these two parts of Worthington. This means not "stripping out" High Street.
  d. There is a desire for high quality architecture that adheres to Worthington's Design Guidelines and builds upon the community's distinctive character.
  e. There is an opportunity to create another special area of Worthington that provides a sense of place both on High Street and within the development.

  These overall objectives can best be accomplished through re-zoning to a Planned Unit Development (PUD), rather than incremental "straight" zoning projects, subdivisions and variances. One or two development phases will provide for more certainty and a more comprehensive approach to balancing all of the objectives. It also can result in a more impactful mix of uses than may occur piecemeal. PUD zoning can result in an agreement with the developer to include higher standards in some areas that straight zoning provides. Given the extensive text that is approved with PUD zoning describing the requirements for the zoning, it offers stronger long term protections that the development will stay true to the original proposal and approved standards than the current zoning.

  The change to PUD should start with a proposal, at least a conceptual one, from the developer. In order to get to approved PUD zoning for a large portion of the site, there would be an extensive expenditure of funds by the developer to produce detailed information on the site, traffic studies, engineering evaluations, surveys and architectural renderings.

2

Worthington 058458

There would be back and forth negotiations with the developer to evolve the plan for the site into an acceptable one. It is important to have a clear negotiating strategy when approaching this process. The objectives and concepts included in this document can provide a framework for the negotiations with the developer.

There is an established process when an application is received, however there can be extensive conversations and discussion prior to the submittal of an application (as has been seen already with this site). An important question focuses on the type of pre-application discussion that leads to the submittal of an application that can eventually receive consensus or support. There is no script for such a process, but it could include the following: traditional staff-developer negotiations, a series of developer led public meetings reacting to variations of proposals, or some other process that includes facilitation and/or mediation as a tool for consensus building.

There have been numerous references to public private partnerships (PPP) related to this site. Public private partnership negotiations for incentives, financing and infrastructure can be incorporated into these pre-application discussions. PPP is explored more fully later in this document.

- **Expansion of the City's tax base**

This site poses a significant opportunity to create needed commercial growth, particularly on High Street. Office development is particularly important since 73 percent of the City's revenue is from income taxes, mostly generated from employee payroll. Because the City has limited developable area, this is a high priority for the City. However, there are other community objectives, such as housing diversity and green space that must be weighed against the pressing need for revenue. Additionally, current trends emphasize the desire of modern businesses and workers to locate in mixed use environments instead of disconnected office parks.

One medical office building is currently moving through the approval process. It includes surface parking, with typical building heights and no tenant mix. It is unclear whether the developer and property owners are interested in continuing to develop the High Street frontage in a piecemeal fashion beyond the OhioHealth building. Any mix of uses, such as office or residential over retail (i.e. restaurant) would likely require rezoning.

City staff is aware of office users interested in Class A office space in a mixed use environment similar to what was previously proposed and think it is possible, based on demand, to fill 15,000 to 75,000 square feet of space. There are also restaurant users that would be interested in the area.

There are several possible paths forward:

    a. Incremental site development using subdivisions, variances, development plan approval and architectural review,

    b. PUD for High Street Mixed Use area, or

3

Worthington 058459

    c.    PUD for whole site, including High Street Mixed Use area

- **Green and Communal Space**

  There are multiple ways to pursue green space as part of a development.  Options already identified include:

  a.    Negotiate land set aside as part of development – Depending on the desired location and amount of green space, it is possible to use TIF, incentives or some other city revenues that would have to be identified (there aren't many available at this time) to add to required set asides.  The City has anticipated taking this approach to achieving park space. Benefits include negotiating the green space as part of an overall, well-planned development and financially partnering with the developer to achieve a more impactful or larger park space.

  b.    Pursue fee simple acquisition of the land – This presumes that Lifestyle and UMCH would be willing sellers.  This would require appraisals, analysis of site development costs, funding for acquisition, development and operations.  A benefit to this approach is it brings clarity to this issue by eliminating the question of whether a park can be achieved.  The downside is that this is financially costly; some of this acquisition and expense could be achieved through development negotiations at less cost to taxpayers.  Limited cash flow in the City's CIP (capital plan) makes it difficult to pursue this option, possibly necessitating additional revenues through fees or taxes.

  c.    Use bridge financing for public acquisitions – This option allows public owners to put land under contract or have a third party do it, in anticipation of receiving grants or passing tax levies.  These programs would have to be explored in more detail to ascertain their usefulness in this instance.  The likelihood of the grant revenue and/or additional tax levies is critical to the pursuit of this option.

  Each of the options above requires significant analysis, including appraisals of land, etc.  Should the community desire to pursue an approach that involves additional taxation, significant planning, public input and dialogue will be needed.

- **Preserve and Enhance Tucker Creek area**

  In the case of whole site development, requiring the Tucker Creek area to be set aside is feasible and desirable.  In fact, this was previously proposed by Lifestyle.  Existing stormwater easements create encumbrances to development of this area.  The City does not have stream setback requirements in its codified ordinances, as can be seen by the development on adjacent

4

Greenbriar Court.   However, assuming some rezoning will be requested for this and other areas, preservation is achievable.

- **New Housing Options**

Housing options can come in a variety of structural forms: multi floor buildings, duplexes, townhouses or brownstone styles, single floor patio homes, etc.  Anecdotal feedback and City plans suggest that empty nester housing (with single floor living options) is highly desirable in Worthington.  The City's zoning does not regulate form of ownership (rental vs. owner occupied), just units per acre.  Numbers of units, sizes of buildings and many aspects of these units can be controlled through the rezoning process and the PUD regulations.  The issue of number and type of units appears to be the most controversial.

There are a few options to try to achieve agreement on this topic:

    a.  Continued discussion – The developer could submit a modified proposal for formal or informal review and public discussion.

    b.  Market studies - which are typically paid for or provided by developers - could be commissioned to inform debate about how many and what kind of units are demanded or, if the analysis is crafted properly, needed in the community.

    c.  Development tours - The development landscape in Central Ohio continues to change, providing different examples.  Tours could be conducted by the City to target empty nester housing or other products.  We could also organize visits to other regions if development examples are identified.

    d.  Residential scenario model - Models could be built evaluating the various impacts (tax revenue, school children, etc.) of different mixes of residential.

- **Compatibility with existing neighborhood**

Considerations for this objective include:

    a.  Ensuring buffering either with vegetation or similar single family uses

    b.  Effective tree management and preservation strategies

    c.  Traffic studies and traffic management

    d.  High quality architectural standards

    e.  Gateway improvements into area

    f.  Bike and Pedestrian connections

Worthington 058461

g.  Modern stormwater management practices

City staff feels that many of these issues can be addressed through the development review process, particularly if it is a PUD, providing more clarity and certainty for adjacent neighborhoods.

- **Walkable, vibrant and connected**

    The City has placed a high emphasis on bicycle and pedestrian connections.  This is a significant opportunity to better connect the existing neighborhood, provide access to amenities that may be developed and, likewise, connect new residents to assets like the Olentangy Trail.  Sidewalks, trails, bike racks, and street parking should all be included.  Plans should take into consideration the whole site.  In the event that it develops incrementally, particular attention should be given to the High Street streetscape at each building.

    Sidewalks, streetscaping, streetlighting and other public improvements are part of any development and many can be required to meet standards consistent with the City's guidelines.  They are also eligible public improvements for reimbursement by incentives like TIFs.  As part of the negotiation, it is possible to pay for such public improvement in exchange for the developer helping defray the cost of other public objectives.

- **Management of Traffic and Impacts**

    Another issue of concern is connections into neighborhoods and traffic impacts in general.  Any consideration for an outlet into existing neighborhoods will be heavily studied.  The developer should be required to submit a traffic study for the proposed use or uses and allow for the methodology to be reviewed by the City's traffic engineering consultants and the City Engineer.  Impacts to all adjacent roads will be evaluated as part of the development review process.  Traffic is an inevitable outcome of development.  It is important to consider the degree of the impact, the timing of the impact, and the measures that can be used to mitigate impact.  No party believes that neighborhood connections are an absolute necessity.  However, there may be practical downsides to loading all the traffic onto High Street and the traffic signal at Larrimer that should be evaluated.  We are also a very connected community, with roads and pedestrian networks that connect neighborhoods.  We should strive to ensure that any new neighborhood feels physically and socially connected to others.  Likewise, new amenities in a new development should be accessible to existing neighborhoods.

- **Public Private Partnerships**

    There are a number of tools that can be used to achieve beneficial outcomes.  They include:

    a.  Tax Increment Financing (TIF)
    b.  Tax Abatements
    c.  Venture Grants (income tax incentive for new payroll growth)
    d.  New Community Authorities

6

Worthington 058462

    e.   Other funding/financing programs such as economic development roadwork grants, Property Assessed Clean Energy (PACE), collaboration with the Columbus-Franklin County Finance Authority, etc.

    f.    Negotiations with the developer that allow the developer to benefit in certain areas in exchange for things community benefits in other areas

If we are open to exploring a variety of methodologies for defraying the costs of public improvements, particularly streetscaping, roads, water, sewer, stormwater infrastructure, fiber, traffic signals, and some park space and park amenities, we may be able achieve more of the objectives desired by the City and/or community (with a particular emphasis on: Class A office, High Street streetscape, architectural and design quality, park, green space, public plazas and trails).  Willingness to explore these options that make a project more financially feasible can result in better outcomes for the community and the potential willingness by the developer to provide amenities desired by the community.

7

Worthington 058463

| From: | Greeson, Matt [/O=COW-EXCHANGE/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=MGREESON] |
|---|---|
| Sent: | 3/19/2018 1:13:47 PM |
| To: | Michael, Bonnie [BMichael@ci.worthington.oh.us]; Myers, Scott [SMyers@ci.worthington.oh.us]; Scott Myers [William.Myers2@ohioattorneygeneral.gov] |
| Subject: | FW: Retreat follow-up: UMCH info |

I am going to contact each of you to discuss the email below. I have had a follow with Council Member Robinson regarding it.

*Matt Greeson*
City Manager
City of Worthington
6550 N. High Street
Worthington, OH 43085
614-436-0368 (Direct)
614-436-3100 (Main Office)
614-786-7355 (Fax)
mgreeson@ci.worthington.oh.us

**From:** David Robinson [mailto:davidwhitfieldrobinson@gmail.com]
**Sent:** Monday, March 19, 2018 10:39 AM
**To:** Greeson, Matt
**Cc:** Robinson, David
**Subject:** Fwd: Retreat follow-up: UMCH info

Good morning Matt,

As you'll recall, the February 9/10, 2018, Council/Staff retreat concluded with a discussion about UMCH. As an outgrowth of the conversation, and at the concurrence of Council members, you agreed to provide rough information related to impacts on city finances of a possible acquisition of property at UMCH. A week after the retreat, not having received any of the requested information from you, I drafted and sent you an email (copied below) in an effort to help you focus and simplify your fulfillment of this task.

It is now four weeks since I sent the earlier email, and Council has still not received a reply to you in any form, much less the satisfaction of Council's instructions to you to generate and provide this basic information. I find your lack of response on this pivotal, time-sensitive issue to be a serious matter, and I ask that you answer this current request promptly with either the information requested, or a specific description of your timeline and plans to do so.

I look forward to your reply.

Best Regards,

David

David Robinson
614-893-4573 - cell
195 E Dublin Granville Rd
Worthington, OH 43085


EXHIBIT
29

Worthington 057946

From: **Robinson, David** <DRobinson@ci.worthington.oh.us>
Date: Mon, Feb 19, 2018 at 11:34 AM
Subject: Retreat follow-up: UMCH info
To: "Greeson, Matt" <MGreeson@ci.worthington.oh.us>
Cc: "Michael, Bonnie" <BMichael@ci.worthington.oh.us>, "Myers, Scott" <SMyers@ci.worthington.oh.us>,
"Dorothy, Rachael" <RDorothy@ci.worthington.oh.us>, "Foust, Douglas"
<Doug.Foust@ci.worthington.oh.us>, "Kowalczyk, Beth" <BKowalczyk@ci.worthington.oh.us>, "Smith,
Doug" <DSmith@ci.worthington.oh.us>, "Brown, Lee" <LBrown@ci.worthington.oh.us>, "Bartter, Scott"
<SBartter@ci.worthington.oh.us>, "Hurley, Darren" <DHurley@ci.worthington.oh.us>

Hello Matt,

Thank you for your candor, thoughtfulness, and focus at the recent Council/Staff retreat. I found the time
together to be very productive, both regarding specific issues and in furthering group understanding and
cohesion. This may sound over-the-top, but I wish we could hold such meetings every quarter or so if
circumstances warrant.

I wanted to follow-up on one specific item—the provisioning of information regarding different land-use
scenarios at UMCH. As you made clear, what you will generate will not be concrete, specific, validated, ready-
for-the-bank numbers, but will be in the nature of estimates and probabilities, all based on the best information
and most reasonable range of assumptions available to us today. Further, my understanding is that the scope of
your analysis will be limited to impacts on city finances, and will not attempt to address issues regarding
impacts on traffic, sustainability, quality of life, community appeal and identity, or business environment. These
issues I believe will be engaged robustly in the upcoming public CP review process.

My basic request is that you focus on gathering and presenting information that is geared toward Council's
actual decision-making processes, and that you and staff not be burdened with the task of trying to be
comprehensive in order to address a wide range of inquiry. The core questions I have are as follows:
- What is the range of estimated net income tax revenue (over time), per acre, for different types of
commercial development (e.g., office, medical-service, retail, and "mixed-use"); please provide statement of
assumptions behind the estimates so that we can assess probabilities and alternatives.
- What is the range of estimated costs (one-time, and continuing), per acre, for different types
of residential development (e.g., single-family, condos, and apartments; will the Dublin study help here?);
please provide statement of assumptions behind the estimates so that we can assess probabilities and
alternatives.
- What is the range of estimated costs (one-time, and continuing), per acre, for different types of public
greenspace acquisition/development (e.g., passive, recreational, etc.); please provide statement of assumptions
behind the estimates so that we can assess probabilities and alternatives.
In addition to providing raw numbers, I believe it would be helpful if you provided several scenarios in order to
illustrate overall impact of different land-use options using the income/expense numbers you will have
developed. If you do this, I would suggest that your scenarios remain simple and focused on enabling Council to
make clear, comparative assessments. In other words, the most useful analysis would keep constant certain
factors (those that enjoy, in general terms, basic agreement) while varying others (those that may be seen as
most contested, and are therefore at the heart of upcoming decisions). What would not be helpful would be the
presentation of several scenarios where many factors blur and mix among the different scenarios in such a way
that we are left with no basis for discerning the pros and cons of different options. Please keep things
differentiated, clear, and explicit.

Specifically, I believe that a central issue before us is the relative costs and benefits of residential vs. public
greenspace. As such, it would be most helpful if you could provide several scenarios that would keep constant
two assumed factors: a) the front ten acres will be developed commercial (or, if you prefer, the front 6.5 acres,

which would be excluding the conference center's acreage); b) the seven along Tucker Creek will remain undeveloped; while the third element would be variable: c) the back twenty six acres, presented with varying proportions of residential and public greenspace. One scenario could be twenty six acres of residential, another could be twenty six acres of greenspace, and a third could be thirteen each. I fully realize that these scenarios are crude and simplistic, but they will give us a means of thinking based on numbers and not vague hunches or biases.

Lastly, I want to acknowledge that the actual, final development of the property is likely to not fit neatly in to the three categories of commercial, residential, and greenspace, and that the acreage allotted to each is fluid and possibly overlapping. The possibility of "mixed-use development" e.g., apartments above commercial, is an example of this. I understand this. But this fluidity makes it all the more important that City Council be provided with clear numbers based on discrete land-use categories, and the explicit assumptions underlying them, so that Council members can get a grasp on the essentials in our effort to make informed decisions in the public interest.

Thank you again Matt. I of course welcome any discussion about this request for information, with you, staff and/or other Council members. I look forward to working with all to bringing the UMCH issue to successful resolution.

David

Sent from my iPad


_____ Information from ESET Endpoint Security, version of detection engine 17082 (20180319)
_____

The message was checked by ESET Endpoint Security.

http://www.eset.com

**From:** Greeson, Matt [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=E02E0F169E0140A08552304F1CFBCF86-GREESON, MA]
**Sent:** 3/9/2020 1:45:29 PM
**To:** Martin Jenkins [martinjenkins58@gmail.com]
**Subject:** UMCH background staff
**Attachments:** Report 2 Proposed Processes (Draft 5).pdf; marlowe report 8-30-18.pdf; UMCH Comprehensive Plan Issue; Memorandum to City Council - 1-31-2020.pdf

Marty:

As requested, I am sending the reports that Dr. Herb Marlowe prepared in 2018/early 2019 regarding UMCH. In his initial report, I asked him to interview a lot of stakeholders, assess the issue and make process recommendations. In the 2nd attachment, he refined his process recommendations based on continued feedback. He left the documents as draft, presumably to reserve the ability to modify them in content and approach as the community co-created a process. Remember that multiple parties would have had to agree to some of the process to move forward. He recommended two things – one a process to develop a community vision and two to appoint a group to fully evaluate various UMCH scenarios. We chose to move forward with a community visioning process, but rejected at the retreat the UMCH scenario modeling effort. I am just providing these as background, not because I want to revisit them per se.

I have also attached a memorandum I wrote earlier this year in response to questions posed by Council Member Robinson about the status of the UMCH amendment to the Comprehensive Plan. It frames a series of options I believe the Council has on this issue. I have attached a follow up email I wrote to Council on this subject, which includes another email he wrote to me. I am very interested in determining which option the Council wishes to pursue and answering the related question about staff's role in it. This is one of the key matters we need to discuss at the retreat.

I hope this is helpful and appreciate your time today. --Matt



**MATT GREESON**
**CITY MANAGER**
**CITY OF WORTHINGTON**
6550 N. High Street
Worthington, Ohio 43085
Office: 614-436-0368
www.worthington.org



EXHIBIT

30

Worthington 058301

Proposed Process Architecture for Community-wide Visioning Process
for the City of Worthington, Ohio

and

Proposed Process Architecture for Development of Acquisition
Scenarios for United Methodist Children's Home (UMCH) property

Draft 5

Submitted by:

Analytica

January 18th, 2019

1

Worthington 058302

# Table of Contents

Introduction

    Organization of the report        3

    Community-aligned policy leadership        4

Chapters

1    Vision Process Architecture        5

2    Charter – Vision Committee        15

3.    UMCH Acquisition Scenario Development        19

4    Charter – UMCH Scenario Working Group        22

5    Council Decision Pathway        29

6    Interaction points of the two processes        30

7    Council Decisions Points        31

Introduction

2

## Organization of the Report

This report is organized in seven (7) chapters. Each chapter is described below.

Chapter 1: Proposed Community Vision Process Architecture. This chapter describes the proposed process in terms of its phases and deliverables and the process management issues that will need to be considered.

Chapter 2: Vision Committee Charter. This chapter describes the purpose, role, assigned work tasks, expected deliverables, time frame and reporting expectations of the committee.

Chapter 3: Proposed UMCH Scenario Working Group. This chapter describes the phases and deliverables as well as the process management issues that will need to be considered.

Chapter 4: UMCH Scenario Working Group. This chapter describes the purpose, role, assigned work tasks, expected deliverables, time frame and reporting expectations of the working group.

Chapter 5: Decision Pathway. This chapter provides a sequential order of decisions the Council will need to make if it chooses to enact either of these processes.

Chapter 6: Interaction Points. This chapter describes points in the two processes of Community Visioning and UMCH scenario development where information sharing would be of value.

Chapter 7: Council Guidance. This chapter provides a summary of points in each process where Council guidance or direction will be requested.

3

Worthington 058304

## Visioning: Community-aligned policy leadership

Leading a vision process for your city is an example of community-aligned policy leadership. This introduction discusses this concept.

For leadership to be effective it must be aligned with the needs, aspirations and values of the community members. Otherwise, no one will follow. The key word is "aligned". What does it mean to be aligned?

First, what does it not mean? To be aligned does not mean the elected official is an automaton, simply voting however the wind is blowing without their own judgement. Instead, aligned means to deeply understand the community's needs, aspirations and values and to act in ways that help fulfill those same needs, aspirations and values beyond a surface understanding.

Using needs, as an example, an elected official who deeply understands a community's needs can do several things which more fully address those needs. He or she can connect dots – seeing how one specific need may be related to other needs or how addressing some seemingly unrelated need can address the need at hand. He or she can re-frame needs, helping the community understand that some more fundamental issue needs to be addressed if the presenting need is to be truly addressed. He or she can prioritize needs, understanding that if need C is to be addressed effectively, needs A and B must be addressed first.

As an example, a common problem in many cities is the issue of opioid mis-use. Addiction, suicide, family disruption, crime are issues related to high rates of opioid mis-use. An elected official who understands these issues can connect high crime rates to high rates of opioid mis-use, laying the basis for a more effective crime reduction approach. An elected official who understands this problem can help frame multiple approaches to addressing it. This is important because a complex problem requires equally complex solutions. Jobs, health care interventions, public safety interventions, peer supports, educational programs are all elements of an effective prevention strategy.

A visioning process is designed to help better define and understand the community's needs, aspirations and values.

4

Worthington 058305

**Intent and Final Product**

The intent is to engage the community broadly in a discussion of the future they would prefer for Worthington via a process that strongly engages residents and other stakeholders.  This may include features of the City they want to keep and protect, new features they would like to see added, features they would like changed or eliminated, and the character and culture they want to have for the City.

The final product will be a "Statement of Preferred Future" which will summarize the community's perspectives on the above topic and identify those perspectives where there is broad concurrence.

**Process Phases**

*Phase 0: Project organization*

This phase consists of the following;
- Decision by Council to proceed with process
- Determination by Council if a public participation percentage rate standard is desired
- Review and adoption of Vision Committee Charter
- Appointment of Vision Committee
- Instruction to convene
- Committee Direction and Expectations – Discussion with Council
- Committee Orientation as to process and timeline – City Manager

*Phase 1:  Community Listening & Understanding*

Purpose

One intent of this phase is to engage the community in a conversation about the future of Worthington from the perspective of what to keep, what to change, and the character and culture of the community.  A second is to develop a knowledge base of how familiar are residents with very basic information about the city.  This phase begins the process of understanding what the community would see as added value.   In this phrase four questions are posed to the community via several methods.  The responses to these questions will provide the basis for phase 2 and 3.

5

Four Visioning questions to have the community answer:

What features of Worthington do you want the community to retain into the future?

What feature would you like to see added or enriched?  What, more of or less of, would add value to Worthington?

What value would you like Worthington to be known for?

What sentence or phrase would you want to describe Worthington ten (10) years from now?

Baseline questions

Most of the City operations are funded by payroll tax while it only receives 4% of the property tax bill.  How widely do residents understand that?

50% of the city's operations budget is spent on police and fire services.  Would you have expected a higher or lower percentage?

The responses to these questions can inform Council the degree to which some public education effort is needed to help make the Vision process more productive.

Formats for obtaining answers to these questions
There are variety of tools to obtain public perspective.  These should be examined from a cost/benefit perspective and the level of participation that reaches the desired level of validity

Vision Committee individual interviews.  Each member of the visioning committee will conduct 5 to 7 interviews of residents or business owners.  The only requirement is that a member interview a person they do not know or at least do not know well.  The intent is to avoid interviewing persons with whom one is regularly in contact.  A list of potential interviewees will be developed from recommendations from Council and the Visioning Committee.  This list should include persons that historically do not engage with City government and/or that represent more vulnerable members of the community. The Vision Committee will then draw names out of a hat, replacing the name if it is a person they know well.  The interview itself may be in person or over the phone with the focus being on the above four questions.

Vision Committee Invitational Hearings.  The Committee as a group will invite a cross-section of the community to address them in person and/or provide written responses to the four questions. While the interviews above are one-on-one, this is a person speaking to the full Committee.  Each speaker will be allocated five minutes to respond to the four questions with time also allocated for follow-up questions by the Committee.  Cross-section means all sections of the City are heard from, both residents and business owners are invited, representatives of organized groups in the City are heard from.  Council members may submit names of persons to be invited and the Committee itself will generate an invitation list.

6

Worthington 058307

<u>Vision Committee Public Hearings</u>.  In addition, the Committee will hold meetings open to all interested persons to enable any member of the public that wishes to address the four questions may do so.  They will be requested to provide a written summary also and may choose to submit written responses in lieu of speaking.

<u>Open Town Forum/Neighborhood Forums.</u>  This will be an interactive forum in which participants will discuss their responses to the questions with other attendees.  The participants will be furnished with a summary of the prior responses.  If appropriate, participants may be asked to indicate their top three priorities among the various ideas which have been offered.

<u>Neighborhood based ddor-to-door interview groups</u>.  In this tool, the City would delineate a number of neighborhoods and seek neighborhood volunteers who would do door-to-door or phone surveys asking the four visioning questions.  One alternative would be to engage high school students to do the door-to-door work.

<u>Web-based tools.</u>  There are a variety of web-based tools that can be used to drive public engagement.  These should be researched.  Examples are "Mind-mixer", "Community Remarks", "My Sidewalk", "Engagement HQ", "OpenGov", "Harvest"

Deliverable

A summary report for each of the four questions that also includes any prioritization information. A summary report on the baseline questions.

Worthington 058308

Purpose

The intent of this phase is to describe various possible futures for Worthington in the context of demographic trends, economic trends, and regional developments. There are features which shape or influence the future of any community. The intent of this phase is to understand those trends that are particularly relevant to Worthington, how they may influence the future of the City and how the City can impact them for desired impacts or results.

Process

Expert Perspectives. The Vision Committee will hear from speakers with expertise or knowledge on those trends which could influence Worthington and how Worthington can influence those trends. The speakers may be drawn from community members with such knowledge or persons external to the City. All meetings will be public and live-streamed or video recorded where feasible.

Trend Analysis and possible Scenario Development. Based on the perspectives they have heard, the Committee will identify what they view as the key trends that could impact Worthington, the degree of influence the City could have on those trends, and how those trends could be impacted. The commission may summarize this analysis as a set of scenarios that are reasonably possible. Once this work is drafted in whatever format the Committee finds most useful, it will be made publically available for comment. Based on public comment, further modifications may occur.

Deliverable:

Trend analysis and potentially (at the choice of the Committee) reasonably possible scenarios describing the future of Worthington. This analysis is based on phase 1 and phase 2 data. They should address a ten to fifteen- year time frame, although events occurring earlier than that should be included.

*Phase 3: Community Survey*

Purpose

The purpose of this phase is to refine and validate what the community views as their preferred future for Worthington in terms of features that would add value, their desires for the character and culture of the community, which trends/scenario would be preferred and the willingness to pay for any added features.

8

The survey will be designed based on responses to the four questions generated in phase 1 and the trends/scenarios generated in Phase 2. The purpose of the survey is to first determine the degree of concurrence on the various responses, second which responses are the highest priority and third which responses are of sufficient value for a financial investment (i.e. do we want it enough to pay for it?).

The survey will be developed by the Visioning Committee and approved by Council prior to distribution.

Survey Administration

Three surveys are proposed. One would be a scientific random sample survey designed to produce a statistically valid perspective of community preferences. The second would be an "interested party" survey which would be distributed to all persons who provided responses in phase 1. The third would be an open to all interested parties survey to which any resident or business owner could respond.

Deliverable

The responses to each survey will be published and a comparison of results from the three surveys will be published.

*Phase 4: Preferred Future Statement Development*

Purpose

This phase will prepare a statement describing the preferred future for Worthington based on the data from phases 1, 2 and 3 that show the highest levels of concurrence and the highest levels of priority. This statement, once adopted by the City Council, will form the basis for the City's strategic plan for the next five years. During the period, the intent of the statement will be translated into programs and projects which operationalize the intents of the statement.

Worthington 058310

Step 1: Draft 1. Draft 1 will be developed by the Visioning Committee and then posted for comment by the public.

Step 2: Public comment. During a two week period the public can make suggested edits to the Draft 1 statement. Respondents will be asked to provide their reasoning for the proposed change, citing where they can phase 1 or phase 2 data.

Step 3: Draft 2. The Vision Committee will revise draft 1 based on step 2 comments.

Step 4: (option for second round of public comment). Should the Vision Committee determine a second round of public input would be of value, they can conduct a second round resulting in Draft 3.

Step 5: Town Hall Forum. This will be open to all interested parties. Its intent is to discuss draft 2 (or 3) from the perspective of understanding why the draft 2 (3) version was written as it was and how it is viewed by participants.

Step 6: Final Vision Committee Statement. The Committee will develop its final statement using feedback from all above steps. In the event the Committee does not reach concurrence on all the document, members holding a minority view may develop an alternative statement. The document, along with any alternatives, will be forwarded to Council as the final work product of the Committee.

Deliverable: Draft Statement of the Preferred Future

*Phase 5: Preferred Future Statement*

Purpose

Final public comment and Council Discussion/Adoption

Process

Step 1: Public review. The Final Vision Committee Preferred Future Statement (along with any alternative statements) will be publically posted prior to Council discussion. Interested parties may submit alternative language.

Step 2: Council discussion and adoption. The Council will discuss, edit and adopt the statement.

Worthington 058311

## Process Management

The process will be managed by a Vision Committee. This section describes purpose of the Committee, the appointment process and the various role members will be expected to fulfill. The specific tasks of the Committee are described in Chapter 3: Vision Committee Charter.

Purpose of the Committee

The committee has a dual purpose. Its administrative purpose is to manage the process and communicate status to the Council and community. Its product purpose is to discern and articulate the needs, values, and aspirations of the community with respect to the future of Worthington.

Appointment Process Options

The Committee itself will be appointed by City Council. Four options for the composition of the Committee are presented below. The Council should discuss and select from either one of four listed options or combine them in some way for a fifth option.

Option 1: Eight Member Vision Committee (with identified alternates)

> In this option, each Council member would appoint a member and an alternate. The Council would appoint the Chair. The role of the alternate is to attend whenever the regular member is unable to attend. They would also assume the regular appointment seat in the event a regular member must resign. Alternates of course may attend all meetings and would be encouraged to do so.

Option 2: Fifteen (15) member Committee.

> In this option, Council members would each appoint one person. The Council as a body would appoint the Chair and seven other members to ensure the desired diversity of perspective including geography, age, gender, ethnicity or racial, "hard-to-reach" groups. There are no pre-appointed alternates. In the event a member resigns the relevant Council member or the Council as a whole would appoint a substitute.

Option 3: Utilize the regular committee appointment process that the City uses for other committees.

Option 4: Charge an existing committee with the project and/or augment an existing body to manage the project.

To the extent possible, the Council should include the following considerations in appointments:

- Geographic coverage of the city;
- Age, gender, ethnicity range representation;
- Residents who are active in various community groups;
- Inclusion of persons who work in the community;
- The various constituency groups of the community are represented;
- Inclusion of persons or perspectives that are infrequently heard;

Application for membership

Residents will be encouraged to apply for membership on the Committee. To apply the resident should provide his or her written response to the four questions as well as a resume or other background information.

Roles

The role of Vision Committee members will vary by project phase. These include:

Phase 1: Community listening. In this phase, Committee members are neutral listeners. Their role here is to listen to the community and understand what they are saying, not to debate it or put forth their own view.

Phase 2: Environmental Scan and Scenario Development. In this phase, Committee members are asked to be critical thinkers. They will be asked to examine various assumptions about the future to determine which could with reasonable probability occur. It is not the role of the Committee at this stage to express the future they want, rather to determine as objectively as possible what could occur from a probabilistic perspective.

Phase 3: Survey. In this phase, Committee members are asked to be critical readers. The questions about the survey they should ask include:

- Is the survey itself clear and understandable?
- Can the respondent be fairly asked to respond? Is there some knowledge required in order to be able to answer the question?
- Are the questions neutral or is there some implicit bias?
- Does it cover all the relevant points?
- Do these survey help provide information about trade-off preferences?

12

Worthington 058313

<u>Phase 4: Statement of the Preferred Future</u>.  In this phase, Committee members are asked to be both "Analyst" and "Advocate".  Their role as analyst is to understand if there is broad concurrence among the community and what the nature of that concurrence is.  Their role as advocate is to advocate for interests and positions they believe are in the best interest of the community.

The ideal committee members would bring the following attributes:

- Ability to listen and balance various perspectives;
- Ability to critically evaluate assumptions;
- Ability to read and absorb survey and other data points;
- A willingness to openly state their interests while respecting the interests of others whether similar or different
- A willingness to seek solutions that represent the long term best interests of the City.

Process Time Frame

The following are the approximate time frames for the project.  There can be overlap among phases.

Phase 1:  Community listening – 4 months
Phase 2: Environmental Scan and Scenario Development – 3 months
Phase 3: Survey – 2 months
Phase 4: Statement of Preferred Future – 3 months

The following chart shows the time frames and phase overlaps.

13

Worthington 058314

| Phase | Months | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 1 | x | x | x | x | | | | | |
| 2 | | | x | x | x | | | | |
| 3 | | | | | x | x | | | |
| 4 | | | | | | | x | x | x |

DRAFT

Worthington 058315

# Chapter 2:  Charter Vision Committee

**Charter**

## Purposes

1. Provide overall management of the vision process through its stages
2. Identify and coordinate with existing city bodies who can add value to the process
3. Provide guidance and advice for the community visioning process regarding community engagement, data gathering and data interpretation.
4. Through adopted processes hear from the community their needs, aspirations, and values that they would like to characterize the community in the future
5. Develop and conduct a community survey to validate a community-wide perspective on these needs, aspirations and values;
6. Develop a draft vision/positioning statement for community reaction and Commission adoption

## Role of the chair

1. Chair the visioning meetings
2. Develop agendas with staff support
3. Manage those agendas to ensure full discussion of all viewpoints
4. Manage the meetings to ensure productive use of time, maintaining focus on the agenda topic and promoting civil conversation and discussion
5. Actively seek to develop committee consensus where possible
6. Review meeting minutes (taken by staff) to ensure accuracy
7. Manage public comment when scheduled
8. Periodically brief the Council on status and emerging trends or issues
9. Periodically brief the Scenario Working Group on any topics relevant to their work

## Other membership and operational requirements

1. Commitment to role as an active listener in phase 1 of the vision process with an understanding that their role is not one of an advocate at that stage.
2. Commitment to actively participate during the life of the Committee
3. All meetings will be publically noticed and held in a facility that will enable public observation

Worthington 058316

### Time Frame and Schedule

It is desired that the Visioning Committee complete its work within nine months to a year. Should this time frame be unreasonable, the Committee shall propose to Council a time frame it can commit to.

### Work Tasks and Suggested Schedule

The Committee should refer to chapter 1: Process Architecture for a more detailed description.

Phase 1: Community Listening – Four Questions (4 months)

- Conduct random individual interviews (as described in Vision Process Architecture document)
- Conduct public hearings (as described in Vision Process Architecture document)
- Hold at least one open town forum (as described in Vision Process Architecture document)

Phase 2: Environmental Scan and Trend Analysis (3 months)

- Obtain expert perspective on demographic, economic and regional trends that could impact the future of the City. Examples of sources could include The Ohio State University, The mid-Ohio Regional Planning Commission, other professional entities
- Analysis of trends

Phase 3: Survey (2 months)

- Develop for Council approval a survey to determine public interest and perspective on key topics that have arisen in Phases 1 or 2
- Arrange for administration of the survey
- Review and interpret the survey findings (with technical assistance as needed)

Phase 4: The Preferred Future Statement (4 months)

- Development of draft statement for public comment
- Iterative revisions of statement until basic concurrence has developed within the Committee
- Submittal of draft statement to Council

Worthington 058317

## Role of Committee Members

Committee members will assume differing roles by project phase. Please refer to Chapter 1 for a discussion.

## Products and Deliverables

Phase 1: Community listening – Four Questions

- A written summary of common themes and key points from the various methods used to obtain answers to the Four Questions listed in Chapter 1.

Phase 2: Environmental Scan and Trend Analysis

- A report on the key trends that could impact Worthington and how those trends could be impacted. This may be expressed as scenarios should the Committee so choose.

Phase 3: Survey

- Draft survey for Council approval
- Survey administration
- Survey results with draft interpretation

Phase 3: Statement of the Future

Draft statement describing:
- How the City wishes to position itself within the region, i.e. what will it be known for?
- Summary of needs to be address
- Summary of aspirations
- Summary of values
- Summary of common interests
- Preferred direction
- Trade-off discussion

## Reporting Expectations

1. The chair is expected to report to the Council at a minimum of once monthly.
2. All work products are draft documents until accepted and adopted by Council
3. Where there is unanimity on the Committee regarding a conclusion that carries with it a recommendation, such a recommendation may be made and will be understood as fully supported by the Committee. Where there is not unanimity, options or alternative

17

Worthington 058318

perspectives should be provided. The relative strength of these options may be indicated if the Committee so chooses.

## Life-cycle

1. The committee will terminate upon making its final report (Statement of the Future) to City Council.

DRAFT

Worthington 058319

# Chapter 3: UMCH Acquisition Scenario Process Architecture

## Intent and Purpose

The purpose of this process is to determine if and how the City could secure the United Methodist Children's Home (UMCH) property, in part or whole, for beneficial uses for the City. The mission of the Working Group doing this determination is to determine the viability of any options it develops.

## Process Phases

There are seven phases to this process. Each is described below

Phase 0: Project Initiation

This phase seeks to determine if there is a willing seller for the UMCH property. If there is, then Council may decide to move forward with the project. If not, the Council will need to make a go/no-go decision.

Phase 1: Project Organization

This phase sets the project in motion. It consists of the following actions by the Council:

- Editing and adoption of the Scenario Working Group Charter (as found in Chapter 4)
- Appointment of the Scenario Working Group (as found in Chapter 4)
- Authorization of expenditures for technical support or delineation of procedures for obtaining technical support

Phase 2: Proposals by the public

In this phase, the public can submit their concepts for the use of the property. The Working Group will then review those, identify overlaps and narrow, if needed, to a reasonable number of distinctive concepts for the property that have potential viability.

Phase 3: Technical Analysis and Scenario Development

In this phase, the Working Group is charged with developing at least two scenarios regarding acquisition of the UMCH property. These scenarios are described in Chapter 4. Additional scenarios may be developed at the judgment of the Working Group. This task begins with a review of the selected concepts from the public and reviews them to determine viability or how they might be modified or integrated to increase the viability

19

of the concept. The end-product of this task would be one or more scenarios that the Working Group determines is viable

As described in Chapter 4, this phase will be public and there should be an opportunity for public input as the scenarios are developed.

**Deliverable:** A minimum of two scenarios for public comment if two have been found to be feasible. If there is only one feasible scenario, it will be so posted.

Phase 4:  Comparative analysis of the scenarios

In this phase, the Working Group will develop a comparative analysis of the various scenarios using as an analytical guide factors listed in appendix A. In addition to comparing developed scenarios the comparison will include selected historical proposals for other uses so that the residents can compare the fullest range of options.

Phase 5: Public perspectives on any feasible scenarios and potential revisions

In this phase, the Working Group will publish for public comment the scenarios. After obtaining public comment through whatever means it deems most feasible, revised scenarios may be developed.

**Deliverable:** A minimum of two scenarios if two have been found to be feasible. If there is only one feasible scenario, it will be so presented.

Phase 6:  Community Survey or public referendum

If the survey mechanism is selected, two surveys are proposed. One would be a scientific random sample survey designed to produce a statistically valid perspective of community preferences with respect to the various UMCH scenarios. The second would be an open to all interested parties survey to which any resident or business owner could respond.

The Working Group would develop the survey in draft for Council approval. Once approved it would be administered and the data summarized. It would be the responsibility of the Working Group to develop interpretations of the data and report such to Council along with the survey results.

The other option is to hold a public referendum contrasting two scenarios.

Worthington 058321

**Deliverables:**

- Draft survey for Council approval
- Survey results
- Survey interpretation

Phase 7:  Policy Decision

Phase 5 is a policy decision by Council.  This could take the following forms:

- Council decision to pursue a specific scenario
- Council decision to schedule an Advisory Vote regarding public preference among two of the scenarios
- Council decision to accept both scenarios (assuming there are two) and decide based on private marketplace response
- Council decision to initiate action on one scenario to test private marketplace response



Worthington 058322

# Chapter 4: Charter – UMCH Scenario Working Group

## Purposes

1. Provide technical advice and quality control to ensure that at least two scenarios (as described below) involving public purchase or public-private purchase of the UMCH property are developed for public consideration and feedback and presentation to the Commission.
2. The scenarios may be developed concurrently or sequentially based on policy direction.
3. Develop additional scenarios (as described below) as needed in their judgement to provide the community with feasible options.
4. Ensure all scenarios are thorough, accurate and represent standard and acceptable business case analyses in which the residents can have confidence.
5. Monitor the analyses and presentation of all scenarios are of similar quality.

Note: If the UMCH process is effective and of value, then a similar process could be used to address other Signature Properties with the following tasks:

6. Identify other potential signature properties in the City. Signature properties of either of larger size to add substantive capacity or services or are located as to be particularly impactful to the City.
7. Identify future community needs for housing, commercial space, education, recreation or other public needs that the City should be proactive in addressing.

## Example Membership

Membership would be residents unless a needed skill set could not be found within the community. In that case, the Working Group could engage a technical consultant to provide that perspective to the Working Group. The role of the consultant in such a case would be solely to provide technical perspective.

- Banking and finance
- Business recruitment
- Commercial and residential real estate
- Construction
- Traffic and transportation
- Urban planning
- General resident

22

Worthington 058323

## Appointment Process

1. Nomination process
   a. Self-nomination, nomination by others, nomination by Council members
2. Council selection and appointment

## Role of the chair

1. Chair the work group meetings
2. Develop agendas with staff support
3. Manage those agendas to ensure full discussion of all viewpoints
4. Manage the meetings to ensure productive use of time, maintaining focus on the agenda topic and promoting civil conversation and discussion
5. Actively seek to develop work group consensus if needed
6. Review meeting minutes (taken by staff) to ensure accuracy
7. Manage public comment when scheduled
8. Periodically brief the Commission on status and emerging trends or issues
9. Periodically brief the Visioning Committee on any topics relevant to their work

## Other requirements

1. No member may have any direct or immediate financial stake in the purchase or development of the UMHC site.
2. Commitment to actively participate during the life of the Work Group.
3. Complete a conflict of interest form and modify if needed during the process.
4. All meetings will be publically noticed and held in a facility that will enable public observation.
5. Opportunities for public comment on work group products will be regularly available.

## Scenarios to be developed

Factors for Consideration in all scenarios

All proposed scenarios should address the following factors:

- Financial impact and ROI on the City including financial benefits and costs;
  o The ROI should include all City costs including acquisition, development, operations and maintenance and any other factors related to financial sustainability.
  o Is a scenario possible where there is no additional financial cost to the City? In essence the complete transaction would cover all the City's costs.

23

Worthington 058324

- Impact on school attendance zones and traffic and transportation;
- Additional cost per resident if any.
- Density rates
- Green space percentage
- Single floor housing data (if appropriate)
- # of units
- square footage of units
- Cost estimate per square foot
- Job potential
- Traffic
- School impact
- Property tax impact
- Environmental impacts
- Land
- Stormwater
- Compatibility with neighborhood
- Walkable
- Overall quality

*Scenario 1: Public-lead Acquisition with Private Partnership*

Intent: The intent of this scenario is to determine ways and means by which the City could acquire all of the UMCH property. The City would then partner with the private sector to develop portions of the property. The key to this scenario is that the City drives this option and maintains a high level of control.

Conditions. The Working Group should develop a scenario through which the entire UMCH property could be acquired under the following scenario-specific conditions:

1. Open space land is maximized to the extent feasible. This may include development of park amenities on some, or all of, the current S-1 zoned land;
2. City causes development of the commercially-zoned High Street frontage with the intent to attract high-wage jobs;
3. The City may consider leasing or selling any portion of the property to financially support this scenario;
4. Consideration should be given to the availability of any external funding sources that would assist the City in acquisition and development and what conditions might come with that funding;
5. If it is determined that acquisition cannot occur without additional City investment, the amount of that investment should be determined and the method of paying for that investment publicly stated; and

24

Worthington 058325

6. Based upon feedback from the Visioning Committee, the Working Group will develop one or more scenarios for the use of the land including public use facilities. As an example, this might include bathrooms, parking areas and walking trails. Costs for features should be determined as well as a method for paying for those features. If multiple scenarios are developed, they should be labeled 1A, 1B, etc.

*Alternative: - Scenario 2: Private-lead Acquisition with Public Partnership*

Intent: The intent of this scenario is to determine ways and means by which the City could partner with the private sector to acquire a portion of the UMCH property. The City would work with the property owner to lease or buy some, or all of, the current S-1 zoned land. The key to this scenario is that the private partner drives this option and will push for his/her vision for the property. While the private partner would maintain a high level of control, they would also do most of the work and take most of the risk. One scenario should determine ways and means by which the UMCH site could develop in a manner that is consistent with the 2014 Worthington Comprehensive Plan Update. This could include one or more scenarios should the Work Group so choose. The Work Group may also develop scenarios with other approaches than the Plan update should they deem such scenarios feasible.

Conditions. Property acquisition and development can be done by City, private developer, or any combination of the two working in a collaborative manner. The Working Group should develop a scenario through which a portion of the UMCH property could be acquired under the following scenario-specific conditions:

1. A significant portion of the non-commercially-zoned land is leased or purchased by the City from a private developer;
2. The City will develop park amenities on the acquired land;
3. One scenario should examine a development approach in which site development is consistent with the Comprehensive Plan Update, adopted September 2, 2014;
4. At the discretion of the Working Group a second scenario could be developed in which
    a. The private partner will develop the commercially-zoned High Street frontage;
    b. The private partner may consider residential development on the property;
5. Consideration should be given to the availability of any external funding sources that would assist the City in acquisition and development and what conditions might come with that funding;
6. The amount of the City's investment should be determined and the method of paying for that investment publicly stated; and
7. If multiple scenarios are developed, they should be labeled 2A, 2B, etc.

*Alternative - Scenario 3: Private proposal*

Intent: The intent of this scenario is that an actual proposal would be made by the current property interests based on their market analysis. This proposal would not include hypothetical

25

Worthington 058326

assumptions but rather an actual private sector investment proposal. The considerations of scenario 2 would not apply.

This scenario would be compared to scenario 1 to provide the residents with a choice as to their preferred use of the property. In addition to a comparative evaluation developed by all parties, the preferences of the community would then be determined via either a scientific survey or public vote.

Should Scenario 3 be developed, the need for the Working Group to develop Scenario 2 may be moot.

## Timing of Scenario Development

The decision here is whether to develop all scenarios simultaneously or to develop them in a sequence. One sequence option is to develop those scenarios which can be developed by the community first so that the residents can think among themselves before entertaining external ideas. A second sequence option is to develop scenario 1 and have a community conversation before developing or presenting other scenarios.

## Reporting Expectations

1. The chair is expected to report to the Council at a minimum of once monthly.
2. All work products are draft documents until accepted and adopted by Council.
3. It is not expected that the Work Group will make any recommendations as a body as to which Scenario is preferred. Rather the Work Group will report the pros and cons of each scenario. The work group may provide relative weightings of each pro or con.
4. Scenarios will be comparatively evaluated using the evaluation criteria provided in the Scenario Process Architecture document.

## Technical support and External Sources

It is envisioned service on this Work Group will require technical oversight of various projects needed to develop the scenarios, assess their feasibility and determine their financing requirements. It is not expected that Work Group members will do the technical work itself. The technical work will be conducted by City staff and various entities under contract to the City. The Work Group is authorized to request other specialized assistance as needed in the event the needed skill set is not already available or in the judgment of the Work Group an existing firm under city contract is not the best fit for the given task. Approval for additional assistance may be approved by the City Manager or Council depending upon purchasing requirements.

26

Worthington 058327

The Work Group may choose to hear from any external sources who have expertise in any range of these scenarios. This choice, if exercised, is not an endorsement of any external entity, not a sign of approval by the City itself. It is simply a source of data that the Work Group may find useful.

## Time Frame

The goal is to complete development of the two scenarios within six to nine months. If after beginning work on the scenarios this time expectation is deemed unreasonable, the Work Group may propose an achievable schedule that it is willing to commit to.

## Production and Discussion Process

The Work Group is engaged in a technical analysis task. At the same time, there is public interest in these scenarios and there are multiple alternatives within each scenario. For this reason, this technical analysis will need to be conducted with multiple opportunities for public input. The Work Group is authorized to select whatever public input mechanisms it deems most appropriate with the following expectations:

- All Work Group meetings are public.
- The public will be requested to offer any ideas for either scenario 1 and/or 2 in writing so that the Work Group can consider them in development of draft 1 of each scenario.
- The Work Group will offer a draft 1 of each scenario for public comment. These comments will be considered in the development of draft 2.
- The Work Group is authorized to engage in further iterations of this process if in their judgement such iterations add value;
- Whatever draft number is submitted to Council will be made publically available at least two weeks prior to Council consideration. Any written comments received from the public on that draft will be made available to the Council;
- The Chair or other Work Group member will make the formal presentation to Council. All Work Group members are invited to attend that discussion. If feasible, a workshop format would be preferable.
- Post Council discussion the Work Group may meet to make any modifications needed based on Council discussion.

## Deliverables

27

Worthington 058328

- Draft proposal for Scenario 1 as described earlier
- Scenarios 1A, 1B, etc. at the choice of the Work Group
- Draft proposal for Scenario 2 as described earlier

**Life Cycle**.

The Work Group will end upon Council acceptance of the scenarios.

DRAFT

Worthington 058329

# Chapter 5: Council Decision Pathway

This chapter details the decision pathway for Council to initiate actions on one or both processes described in chapters 1 and 2.

## Vision Process Architecture Decision Pathway

Decision 1:     Go/no decision on initiating process.  If no-go, stop.

Decision 2:     If go, review and adopt Vision Committee Charter

Decision 3:     Appoint Vision Committee members

Decision 4:     Authorize City Manager to convene

Decision 5:     Determine how to provide needed support

Decision 6:     Accept, modify or send reports or work products back for additional review

## ~~UMCH Scenario Working Group Decision Pathway~~
## UMCH Scenario/Signature Properties Working Group Decision Pathway

Decision 1:     Should the focus be on UMCH solely or all/any signature properties?

Decision 2:     if the sole focus is on UMCH, Is there a willing seller?  If yes, proceed?  If no, stop?

Decision 3:     Should scenarios 1 and 2 be developed concurrently or sequentially with 1 being substantively completed before 2 is considered?

Decision 3:     if proceeding, review and adopt Scenario Working Group Charter

Decision 4:     Appoint Working Group members

Decision 5:     Authorize City Manager to convene

Decision 6:     Determine how to provide needed support

Decision 7:     Accept, modify or send reports or work products back for additional review

Worthington 058330

# Chapter 6: Process Architecture Interaction

Purpose

The intent of this chapter is to describe how the Vision process and the UMCH scenario process could interact.

Interaction Table

The following table describes various potential interaction points as well as coordination issues.

| Vision Process | Interaction | UMCH Scenario Process |
|---|---|---|
| No equivalent phase | None | Phase 0: Willing Seller? Scope of working group |
| Phase 0: Organization | Avoid duplication of appointments | Phase 1: Organization |
| Phase 1: Community Listening | Inform Working Group of any relevant findings as to public desires that could impact scenario development | Phase 2: Analysis & Scenario |
| Phase 2: Environmental Scan & Scenarios | Inform Working Group of any relevant findings as to public desires that could impact scenario development | |
| | Inform Vision Committee of any perspectives that could influence scenarios | Phase 3: Public perspectives |
| Phase 3: Survey | Coordinate timing | Phase 4: Survey |
| Phases 4&5: Preferred Future Statement | Examine consistency of UMCH policy direction with Preferred Future Statement | Phase 5: Policy |

Worthington 058331

The following table summarizes those points in both processes where the Council will provide some form of guidance to either the Vision Committee or the UMCH Scenario Working Group. Final decision points are also noted.

| Vision Project | | |
|---|---|---|
| *Phase* | *Deliverable (if applicable)* | *Council Guidance* |
| 0: Project Organization | Draft process architecture | Decision to proceed with Vision process or not. Approval of proposed process as draft or modified |
| | Draft Charter | Review and adoption of Vision Committee Charter |
| | Draft Committee Models | Appointment of Vision Committee |
| | | Instruction to convene |
| 1: Community Listening | Draft Visioning Question | Approval of 4 questions |
| | Committee Summary Report | Receive and comment |
| 2: Environmental Scan & Scenario Development | Minimum of two scenarios | Receive and approve |
| 3: Community Survey | Draft survey | Receive and approve |
| | Survey results | Receive and comment |
| 4: Preferred Future Statement Development | Draft Statement(s) | Receive and comment |
| 5: Preferred Future Statement Final | Final Statement | Receive, edit, and adopt |
| | | |

| UMCH Scenario Project | | |
|---|---|---|
| *Phase* | *Deliverable (if applicable)* | *Council Guidance* |
| 0: Project Initiation | Mission of Working Group | Focus solely on UMCH property or broader focus on Signature Properties. |
| 0: Project Initiation | Willing Seller Letter | Decision as to move forward with project or not |
| 1: Project Organization | Draft process architecture | Approval of proposed process as is or modified |
| | Draft charter | Review and adoption of Scenario Working Group Charter |
| | Draft Working Group Model | Approval "as is" or modified |

Worthington 058332

|  | Appointment of Working Group | Approval |
|---|---|---|
|  | Expenditure authorization | Direction to Manager |
| 2: Technical Analysis and Scenario Development | Draft UMCH acquisition scenarios | Review and comment |
| 3: Public perspectives | Revised Draft scenarios | Review and comment |
| 4: Community Survey | Draft survey | Edit and approve |
|  | Survey results | Review and comment |
|  | Survey interpretation by Working Group | Review and comment |
| 5: Policy Decision | Option as identified in process architecture or later developed | Decision |

DRAFT

Worthington 058333

DRAFT

Worthington 058334



Conclusions and Recommendations for a decision-making process
regarding the future use of the United Methodist Children's Home
property in Worthington, Ohio

DRAFT 1.f.

Report prepared by:

Herbert A. Marlowe, Jr., Ph.D.
Principal, Analytica

August 30th, 2018

This report is submitted as a draft in the event place names or other identifying phrases are
incorrect, changes may be needed for purposes of clarification and that there are proposals
herein that will require discussion with outside parties. If so, clarifications, corrections or
acceptable modifications will be made in the final.

1

Worthington 058335

Table of Contents

Executive Summary                                                    3

Conclusions based on interviews                                      4

Recommendations: Two parallel community conversations               10

    Conversation One: The preferred future for Worthington     11

    Conversation Two: Proposed process for a community decision
regarding future uses of the United Methodist Children's Home site   14

Attachments

A       Process and schedule for Conversation One                   19

B       Skill sets                                                  21

C       Advisory Committee                                          22

D       Comparison criteria                                         25

E       Process and schedule for Conversation Two                   26

2

Worthington 058336

Analytica was engaged to review the history of land use decisions regarding the United Methodist Children's Home (UMCH) property to determine if a process could be designed that could lead to resolution regarding the future uses of the property. Community members and stakeholders were interviewed and various documents reviewed. This report summarizes the conclusions of those interviews and presents a proposed process to resolve the various uses for the property.

The land use decision is complex due to the unique nature and size of the property. Everyone agrees that its future use will be of significant impact to the community. Beyond this agreement, there are differing views on the best use. These various perspectives are discussed in the conclusions section of this report.

Given the significance of this land use decision, and the differing perspectives on what is best for the community, two community conversations are proposed which would occur in parallel. The first conversation, Conversation One, would focus not on the property but on the longer-term vision for Worthington. This conversation seeks to arrive at a broadly shared understanding and agreement as to what type of community Worthington should strive to become and/or remain. This conversation is important for a variety of reasons. With respect to the UMCH property, it will provide the context for assessing what land uses would be most consistent with the vision. It will also complete the first phase of a strategic planning process which will focus the City on its key priorities and results.

The second conversation, Conversation Two, is specific to the UMCH site. In this conversation three approaches to land use would be analyzed in-depth and compared so that residents can better determine which approach best fits the vision. These three approaches involve (1) a private sector approach in which a developer, after extensive community input, would propose an approach that the marketplace would support; (2) the development of a public-private approach in which various public goods are achieved through a private sector partnership, and (3) a public purchase option.

Each of these options will be developed in sufficient depth and presented to the public in sufficient detail that the informed resident can make their preference known. A variety of mechanisms are discussed for this final resolution.

The following conclusions were drawn from the various interviews conducted the week of July 20th with Worthington stakeholders.

**Conclusion #1:  There are points of shared or common agreement**

These include:

- There is broad agreement that the United Methodist Children's Home (UMCH) property is distinctive and that its future use of will significantly impact the future of Worthington.

- Given the importance of the payroll tax for operations of City government, use of a portion of the property for businesses with significant payrolls is an important consideration.

- An item of need for the community is single floor housing for staying in the community.

- A section of the property, Tucker's Creek, will need to remain in a natural state.

- Whatever happens on the property should be of the same quality or higher that currently exists in Worthington.

**Conclusion #2: At least two perspectives exist as to future use of the UMCH site**

Two differing perspectives as to the future use of the UMCH property were articulated during interviews.  There may of course be others.  These two are described below.

The belief that the City must adapt to national and regional trends in mixed use, denser development, "new urbanism" models to remain attractive for economic development, housing preferences and future growth.  This perspective views the development patterns of prospering communities nationally and regionally.  Also, it views the marketplace as:
- desiring more dense development with the ability to walk to many services;
- having an increasing preference for apartment living rather than home ownership;
- and a growing value emphasis on sustainable lifestyles which use less land and resources, prefer the variety of experiences that mixed use development allow.

4

This perspective concludes that due to the associated benefits of this development pattern in terms of job growth, property values, payroll income, and dynamism that come with those patterns Worthington must develop on a limited basis some of those features to remain a quality community. Two features of the above-mentioned development pattern are mixed use and increased density, which can generically be called "new urbanism". Those who hold this perspective believe that the continued regional growth will require some level of increased density, that home ownership patterns are changing and high end rentals are becoming increasingly important and needed, and that over-reliance on single family homes is detrimental to the future of the community. This perspective also believes that creative and knowledge-based businesses desire to locate in mixed use developments. This perspective also views much of the community's single family home stock as becoming outdated and not fitting the new expectations of the future. In sum, this perspective is concerned that Worthington will decline in quality unless is adopts and adapts to changing housing and economic patterns. The core strategy here is to maintain and enhance all existing assets while adding other assets that have proven to add value to other communities.

<u>The belief that current features of the community are highly distinctive and preserving this distinctiveness is the key to the continued quality of the community.</u> This perspective holds that the family nature (including multi-generational) of the community – single family homes, good schools that are within walking distance, attractive neighborhoods – is an enduring advantage. When that asset is combined with the historic downtown, good transportation network, community safety and the availability of daily amenities, the city will remain a highly attractive place to live. This perspective holds that the "bones" of the city are strong enough for it to remain vibrant into the future. From this perspective, continuing increases in quality and protection of a distinctive identity are what will assure community health. There is no need to fully respond to broader development trends given the unique strengths of the community. Rather maintaining the city's distinctive features and character make it a desirable niche in the greater region. It is maintaining and enriching Worthington's sense of place and distinctive family lifestyle that form the strategy for future success.

**Conclusion #3: There has been a drawdown of social capital in the community**

Social capital is the ability of a community to work together to address shared issues in a productive manner.

From a longer historic perspective, changes of use of portions of the Methodist's property have always generated controversy. Long ago sales of land for housing were controversial. Further sales for development were resisted by owners of the original housing. Recently, a proposal for a Giant Eagle grocery or the following proposal by Lifestyle Communities were met by community opposition. These most recent events have led to controversy and distrust with various "agendas" being assumed and negative perceptions of others developed. While Worthington's social capital account is

5

certainly not exhausted, it has been stressed or "drawdown" consequently. And the use of the land remains unresolved.

**Conclusion #4: The experience of "not being heard, of not being responded to, of not being treated fairly" is broadly present.**

A variety of feelings currently exist and must be acknowledged in any future process.

Many persons, regardless of their position on the issue or role in the process, do not believe that their perspectives have either been heard or responded to by other participants. Others believe they have listened extensively, carefully and have responded. But because the response was not the desired response, it has been characterized as not listening. Others believe that UMCH has been treated unfairly in the process. The result of all these experiences is a combination of frustration, hurt feelings, distrust as alluded to in finding #3, and a perception of a lack of goodwill or hidden agendas on the part of others. The motivations of others are questioned and viewed as not considering the best for the community but rather a sole concern with self or narrow self-interest.

**Conclusion #5: Assumptions need to be identified and reviewed.**

Anytime a significant change is proposed, various assumptions are made about what that change could mean. Some assumptions can be factually checked, others only debated. Some of the assumptions that need to be considered in this situation include:

The impact of apartments. Some assume that apartments will bring a high number of children that could negatively impact a school district already at capacity in some situations. Others assume any developed apartments would target a higher income demographic with fewer children. Other concerns were transportation and traffic and transience of residents. The long-term quality of, or continued investment in, apartments was also a concern.

The city does not need, nor can it afford, additional open space. Existing parks and open areas are sufficient for current and future needs. In addition, there is a need for additional funding to maintain existing services and to continue reinvestment in existing parks. There is a list of needs for existing parks that would be limited or constrained by the addition of additional space.

The city is not competitive. The city in its current form will lose ground to surrounding cities who offer new features, more options or other characteristics that are or will be desired in the future by both businesses or residents.

Differing perceptions about density are based on differing assumptions about density. Some assume a significant increase in density is a negative, bringing noise, traffic and

6

Worthington 058340

other ills as well as changing the character of the community. Others assume a significant increase in density is responsive to clear trends in housing choices and business needs and there are overall benefits to the community. There are differing perceptions about density (see Conclusion #7). A review of the assumptions underlying these two perceptions is warranted.

**Conclusion #6: Differing definitions of, and perspectives about, growth are held in the community.**

For a community conversation to be productive, there must be a shared understanding of key words. One of those words is growth.

There is broad agreement that any city is dynamic and therefore must continue to evolve unless it wishes to decline. There are numerous examples of "ghost towns" that ceased to exist once the industry they were founded on ceased to exist. There are even more examples of cities in decline as their major industries moved away or failed when new economic drivers were not created. Neither of these cases are particularly relevant to Worthington. What is relevant is that there is much more competition for attracting and retaining jobs and businesses and re-investment in buildings. Worthington has some competitive advantages but also it has disadvantages to address to avoid decline.

If one accepts the phrase, "grow or die" as being a fact of life since every living thing is either in the process of growing or the process of dying (or both at the same time), the important discussion is about what the word "growth" means. Growth is often equated with population growth, expansion of the city's boundaries, growth in the tax base, growth in per capita income, or new construction, particularly higher rise construction in the business district(s). These are all valid uses. Yet there are other ways to define and understand growth.

The first and most obvious alternative definition is growth in quality of life. Schools are better, the transportation system is more efficient and effective, there is a range of higher quality services, shopping and entertainment, the community is even safer than it has been in the past, one can meet many needs without having to leave the city boundaries.

Another alternative definition of growth is a strengthening of community identity and sense of place. While much more difficult to quantify than quality of life factors, community pride, a positive sense of place, the experience of living somewhere that feels special are all real socio-psychological factors that influence personal satisfaction.

A third definition of growth is increasing capital formation. Two of these are rather obvious and often included in a popular definition of growth. Financial capital is one and that includes the income of the community, the public revenues and financial status of the government, employment rates. An economically vibrant city is a growing one in

7

the sense it has greater capacity to address needs and priorities. Physical capital is another commonly used definition. The quality of the city's infrastructure is another indicator of community quality and vibrancy.

There are two other forms of capital which receive less attention in discussions of growth. These are intellectual capital and social capital. Intellectual capital refers to the educational level of the community and the presence of knowledge-based industries. Social capital refers to the ability of the community to productively address common issues in a manner which strengthens rather than divides the community.

## Conclusion #7:  There are different perceptions about density

Much of the concern about the future use of the UMCH property has been about density of use.

What comprises dense development is a matter of experience, perception and context. There is the story regarding Daniel Boone that when he could see the smoke from someone's else fire over the mountain the area was getting too crowded for him. For persons used to living in rural areas, homes on five acre tracts can feel dense. At the opposite extreme, persons living in the core of highly dense cities would find a 6,000-square foot lot extremely spacious.

In addition to differing experiences of what is dense, there are also a range of attitudes about density. Some view density as good in that it makes better use of land, optimizes infrastructure, reduces traffic and creates a more interesting city. Others view density as bringing some of the problems of urban life such as noise, crime, traffic and transient persons not invested in the community. Both viewpoints can find supporting data for their perception. Both viewpoints exist in Worthington.

## Conclusion #8:  There are differing perspectives on risk.

Decision-making, at a community, corporate or individual level, is about balancing opportunity and risk. What the risks are, their likelihood, and how manageable are all factors to consider in the decision process. There are at least two views of future risk related to the UMCH property.

One is that if the community fails to develop the property along lines that other communities are developing, Worthington will be left behind as a preferred place to live. From this perspective, the city will not have the tax base it needs to continue to maintain a high level of service, will not be attractive to higher wage industries and the housing in Worthington will not grow in value commensurate with the growth rate of nearby communities. Worthington will simply not be on a quality par with its neighbors. Over time this heightens the possibility of decline.

The second view of risk is that development of the property at a significantly higher level of density than has previously been done in the surrounding area will be

8

inconsistent with the identity and character of the City. By allowing a significantly higher level of density, the city will lose those highly distinctive features which make it such an attractive place to live. An intangible but real asset will be lost and the distinctiveness that gives Worthington an advantage will cease.

**Conclusion #9: Confidence in city government has been weakened.**

The effectiveness of a local government is highly dependent upon the trust and confidence of its residents and businesses.



An unfortunate consequence of this controversy is that confidence in city government has been weakened from three perspectives. One, some believe that city government doesn't listen and has been non-responsive to their requests. A second perspective is that city government has listened only to the few who were the most visible and vocal and has failed to decide in the best interests of the full community. A third perspective is that the city has failed to be proactive with respect to a significant issue. Correct or not, these perceptions have weakened confidence. Whether this weakening is a serious issue or not is an open question.

9

Worthington 058343

## Recommendations: Two parallel community conversations

To resolve the future land use of UMCH, two community conversations are proposed. The first, termed Conversation One, will focus more broadly on the future of Worthington rather than on a specific site. The core question it is seeking to answer is what position does Worthington wish to hold among its surrounding communities, i.e. what is its preferred future?

The second conversation, termed Conversation Two, will focus specifically on the UMCH property. In this conversation, at least three alternative uses of the property will be discussed. One is a public purchase option. A second is a public-private partnership of some form. A third would be a private marketplace solution. The intent of Conversation Two is to fully explore these three alternatives (and various versions within them) so that the community is fully informed about the alternatives and better prepared to select and support one of the alternatives.



10

Worthington 058344

*Conversation One: A comprehensive, community-wide discussion about the preferred future for Worthington*

Purpose:

Develop a community generated and endorsed statement describing the preferred future for Worthington including identification of assets and opportunities, weaknesses and risks.

Rationale:

There is a twofold rationale for Conversation One. First, it completes the first step of a community visioning and strategic planning process in that it articulates a preferred future for Worthington. The second step would be to develop a strategic plan that determines how that preferred future will be pursued.

Second, it provides a context for the community discussion and decisions that comprise Conversation Two. The future use of the UMCH property ideally would be consistent with, and contribute to, Worthington's preferred future and strategic direction.

Host:

The City

Process architecture: Major Stages

Stage 1: A discussion of community character

The following questions will be discussed in stage 1 in a variety of discussion formats:

- What values distinguish Worthington?
- How would you describe the identity of Worthington? Does it have a "feel" about it that differs from other surrounding communities?
- What reasonably possible trends, events or factors could impact Worthington, positively or negatively, in the next 5 to 20 years?
- What opportunities could develop for Worthington; What risks must be managed?

Stage 2: Alternative scenarios of Worthington's future

Iterative Scenario Development

Scenario rating

11

Worthington 058345

Stage 3:  The vision for the future

       Drafting and iterative review of positioning statement

       American Assembly

       Adoption by Council

<u>Process architecture:  Events</u>

Stage 1:  A discussion of community character

       Events:

- Review of pertinent prior literature
- Selected interviews
- Focus groups
- Web-based interaction (tool to be selected with staff)
- Town Hall Meeting
- City blog
- Summary report

Stage 2: Alternative scenarios

- Review of pertinent prior literature
- Scenarios first draft
- Posting and distribution for community comment
- Advisory committee review and public comment
- Scenarios second draft
- Posting and distribution for community comment
- Advisory committee review and public comment
- Final scenarios
- Advisory committee approval
- Scenario rating

Stage 3: Vision for the Future

- Positioning statement first draft
- Posting and distribution for community comment
- Advisory committee review and public comment
- Positioning statement second draft
- Posting and distribution for community comment
- Advisory committee review and public comment

12

Worthington 058346

- Positioning statement draft for community consideration in American Assembly
- Advisory committee approval
- Posting and distribution for community review prior to assembly
- Design and logistics of American Assembly
- American Assembly (or similar process)
- Advisory committee verification of American Assembly version
- Presentation and adoption by Council

<u>Process architecture:  Schedule</u>

Attachment A presents the proposed schedule for Conversation One.



13

Worthington 058347

*Conversation Two:  A site specific conversation about the UMCH site*

Purpose:

> An analysis and discussion of three major alternatives for the use of the UMCH site with the intent of fully exploring each alternative so that the community can make an informed decision as to preferred use.

<u>Rationale for conversation two</u>

- Provide residents with broader choice of options
- Better inform residents as to costs and other implications
- Increase community trust and confidence in final decision as to site use

<u>Host:</u>

> The City

<u>Process architecture: Elements</u>

This conversation would have the following elements:

> It would be managed and facilitated by an external third party with no interest in any alternative and whose sole purpose is to ensure a productive and professional process.

> City staff and any engaged consultants sole function would be to provide various analyses and facts that would be needed by the community to select an alternative. (See attachment B for the recommended skill sets that will be needed)

> A group of residents appointed by the City Council will provide oversight to the process and guidance to staff and consultants as to both needed analyses and process architecture. (See attachment C for a recommended structure)

> Three major alternatives will be explored during an extensive community engagement process.   These alternatives can be understood as positions on a public-private continuum as described below.

> Public                         Public/Private                     Private

> _____

The public end of the continuum refers to an alternative in which the land is publically purchased.  To make the public purchase feasible, some portion may be sold for private

14

Worthington 058348

development. The key to understanding this alternative is that the City fully drives this option, does most of the work and takes most of the risk.

At the opposite pole, private, the land is privately purchased and developed. Public incentives or assistance may be provided as it could be for any development that would add value to the City. However, it is the private developer that is the driver for this alternative. The product of course should be beneficial for both public and private interests but the private party will expect significant benefit. In this alternative, the private developer does most of the work and takes most of the risk.

At this middle is the public/private alternative. This can take many forms. In this option both the public and private interests are collaboratively driving the nature of development with each making investments and each developing together an approach that is mutually beneficial. In this model work is shared as is risk.

Each of these options are described more fully below.

- A private marketplace approach in which a private developer would, after extensive engagement with the community, provide a proposal that in their expert opinion would be beneficial to the city and financially viable. This proposal should be of sufficient substance and depth that it could be approved by the City and the developer would be willing to move forward with its development through private funding mechanisms as well as normal public incentives. By participating in this community conversation both the private developer and the owner retain all their legal rights including confidentiality agreements and practices, their options to request public benefits, and the right to make their own decisions about the final proposal.

- A public-private approach in which the City and preferably the same private developer (but not necessarily) would explore a partnership in which various features that the community might prefer can be developed through a mix of public and private investment and financing. This approach will begin with two assumptions about community preferences that will be tested during the community engagement events. One, there is a community preference for a significant portion of the property to remain as open space. Second, there is a community preference for a less dense development pattern than has been here-to-fore considered. Other preferences and priorities may be identified during the community engagement stages of the project.

- A public purchase option. In this approach, an analysis will be conducted to determine if the City could afford to purchase the property itself. These would include but not limited to:

Worthington 058349

- An analysis which would determine whether acquisition could be debt free (perhaps after a reasonable length of time) and development costs would be covered;
- An analysis which would determine whether ongoing maintenance could be covered by revenue streams from the property;
- An analysis to determine if there could be overall economic gain to the City.

*A challenge for the public purchase option.* The public purchase analysis would be relatively straightforward were there a public for-sale price on the property. However, the current sale price is now confidential which makes the challenge for developing the public option one of determining "how much could we afford to bid?" This creates its own challenges and problems to be managed. But this is the context in which the public option must be developed unless the current owner/buyer choose to change the context.

16

Worthington 058350

Process architecture:  Community engagement

A key feature will be a coordinated community engagement process in which all three options are discussed

This process is envisioned as a collaborative effort that will generate the following results:

- Information needed by the private developer to prepare a proposal that will satisfy the developer's quality, reputation and financial requirements;

- Information needed to prepare a public-private proposal;

- Information needed to prepare a public purchase option;

- Sufficient opportunities for residents and other stakeholders to voice their preferences, concerns, and needs;

- Sufficient opportunities for the private developer to explain how his proposed plan will address voiced preferences, concerns, and needs;

- Sufficient opportunities for iterative community dialogue to determine how modifications of any of the three options would be viewed and received;

- An analysis, initially developed by city staff/consultants and reviewed by the Advisory Committee, of both the public-private and public purchase options as to financial feasibility and what actions would be needed to make either of these options feasible;

- A published comparison of the three options (or all viable options) on a variety of metrics (see attachment D for an initial list);

- The opportunity, via either public survey, town hall meetings, or varieties of e-dialogue, to compare the options, in a consensus seeking process to determine if one approach receives broad community support;

- A process and schedule consistent with the time needed by the private developer to prepare his proposal (see attachment E for initial draft);

17

Worthington 058351

<u>Process architecture: Final decision</u>

The goal of Conversation Two is that a final decision is made as to the future use of the property. There are a variety of pathways to this final decision. The selection of the pathway should be made after the options have been compared in public dialogue. Potential pathways could include the following as well as other pathways that develop during the project:

- A broad and clear consensus could develop which the City could then adopt or approve through its normal processes;

- Broad agreement does not materialize. Two options are then available. One, the developer could then submit his proposal, and the City approve it, following iterative review, with the intent and understanding that a referendum may occur. Two, the developer submits his proposal, the City goes through an iterative review but ultimately the City rejects it;

- Using the tool of an advisory election, the private developer proposal and whichever of the two public-related (public-private or public purchase) options have proven to be the most feasible, be subjected to a non-binding vote. If the private development option was preferred by the public, the private developer would then apply for development and the standard city processes would occur, including the possibility of referendum. If the public option was preferred by the community, the City would initiate appropriate actions. This would not preclude the private developer or owner from submitting their own proposal for city consideration of course.

18

| Illustrative Master Schedule |
|---|

| Stages & Events | Months | | | | | | |
|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| Stage 0:  Logistical preparation and project management | | | | | | | |
| Appointment of advisory committee | X | | | | | | |
| Identification and retrieval of relevant prior studies & projects | x | | | | | | |
| Review and selection of web-based engagement tool(s) | x | | | | | | |
| Meeting site selection and scheduling | x | | | | | | |
| Public communication plan | x | | | | | | |
| Advisory Committee meetings | x | x | x | x | x | x | x |
| Staff meetings as needed | x | x | x | x | x | x | x |
| Council briefings as needed | x | x | x | x | x | x | x |
| | | | | | | | |
| Stage 1: A discussion of community character | | | | | | | |
| Review of pertinent prior literature | x | | | | | | |
| Selected interviews | | x | | | | | |
| Focus groups | | x | | | | | |
| Web-based interaction | | x | x | | | | |
| Town Hall meetings | | | x | | | | |
| City blog | | x | x | | | | |
| Summary report | | | x | | | | |
| | | | | | | | |
| Stage 2: Alternative scenarios | | | | | | | |
| Review of pertinent prior literature | x | | | | | | |
| Scenarios first draft | | | x | | | | |
| Posting and distribution for community comment | | | x | | | | |
| Advisory committee review and public comment | | | x | | | | |
| Scenarios second draft | | | x | | | | |
| Posting and distribution for community comment | | | | x | | | |
| Advisory committee review and public comment | | | | x | | | |
| Final scenarios | | | | x | | | |
| Advisory committee approval | | | | | x | | |
| Scenario rating by community | | | | | x | | |
| Summary report | | | | | x | | |
| | | | | | | | |

19

Worthington 058353

| Stage 3: Vision for the Future | | | | | | |
|---|---|---|---|---|---|---|
| Positioning statement first draft | | | | x | | |
| Posting and distribution for community comment | | | | x | | |
| Advisory committee review and public comment | | | | x | | |
| Positioning statement second draft | | | | | x | |
| Posting and distribution for community comment | | | | | x | |
| Advisory committee review and public comment | | | | | x | |
| Positioning statement draft for community consideration in American Assembly | | | | | x | |
| Advisory committee approval | | | | | x | |
| Posting and distribution for community review prior to assembly | | | | | x | |
| Design and logistics of American Assembly | | | | | x | |
| American Assembly | | | | | | x |
| Advisory committee verification of American Assembly version | | | | | | x |
| Presentation and adoption by Council | | | | | | x |
| | | | | | | |



20

Worthington 058354

**Attachment B: Skill sets needed for development of public-private and public purchase options**

Consultants to supplement City staff skills and time requirements

Public finance and public-private development expertise
Design firm for renderings, graphic design
Traffic engineer/transportation planner
Neutral process facilitator

Local advisory committee

Banking and finance
Construction
Commercial and residential real estate
Land use and planning

21

Worthington 058355

**Attachment C:  Local Advisory Committee for Conversation One & Sub-Committee for Conversation Two**

### Charter

Proposal:

Establish an advisory committee for the community visioning process that will have a sub-committee with appropriate expertise to guide the UMCH conversation (conversation two).  While the focus of this committee is on the visioning process, the visioning products lay the basis for a strategic plan for the City.

Purpose:

1. Ensure there is oversight to both conversations so that needed coordination can occur, and coordinated communication to the public is provided.
2. Provide guidance and advice to the community visioning process regarding community engagement, data gathering and data interpretation.
3. Develop a draft vision/positioning statement for community adoption
4. Sub-committee:  Provide advice and quality control to ensure that the various public developments options are thorough, accurate and represent standard and acceptable business case analyses in which the residents can have confidence.
5. Sub-committee:  Monitor the analyses and presentation of public and private presentations to ensure that public presentations and analyses are of similar quality to any private work.

Role of the chair/co-chairs

1. Chair both the visioning meetings and the sub-committee meetings (they may alternate given personal schedules)
2. Develop agendas with staff support
3. Manage those agendas to ensure full discussion of all viewpoints
4. Manage the meetings to ensure productive use of time, maintaining focus on the agenda topic and promoting civil conversation and discussion
5. Actively seek to develop committee consensus where possible
6. Review meeting minutes (taken by staff) to ensure accuracy
7. Manage public comment when scheduled

Role of public ex-officio members

1. Provide the Committee with City perspectives on any topic
2. Inform the City Council of the status of Committee deliberations
3. No voting power

Worthington 058356

Role of private ex-officio member on sub-committee

1. Update committee on private development status as appropriate
2. Assist in coordination of timing to help community review all potential options in the same period;
3. No voting power

Other requirements

1. No committee or sub-committee member may have any financial stake in the purchase or development of the UMHC site. The private ex-officio member is exempt from this requirement.
2. Commitment to actively participate during the life of the Committee
3. All meetings will be publically noticed and held in a facility that will enable public observation

Life-cycle

1. The committee and sub-committee will terminate upon making its final report to City Council.

Example membership – Visioning Committee for Conversation One (ideal membership would be 7-9 members excluding chairs)

- Neighborhood representative(s)
- Economic development representative
- School board representative
- Civic group representative(s)


- 2 co-chairs
- 2 members of council as ex-officio

Example Membership: Specific sub-committee for development of public-related options of Conversation Two. These persons are full members of the Visioning Committee but agree to serve in a more intense sub-committee role that may limit their participation in the full committee work.

- Banking and finance
- Construction

23

Worthington 058357

- Commercial and residential real estate
- WARD representative
- OWA representative
- Representative of private developer as ex-officio
- 2 members of council as ex-officio

Process for appointment

1. Standard city committee appointment process



Worthington 058358

The following criteria should be considered for use in comparison of the various land use options developed during the community conversations:

- Density rates
- Percentage of open/greenspace
- Design of green space in terms of linear vs. rectangular design, i.e. visible size of green space
- Single floor housing data
    - # of units
    - total square footage of units
    - Cost estimate range per square foot
- Housing cost data
    - Projected cost range of housing for sale
    - Projected rental fees
- Job potential
- Traffic
- School impact
- Property tax
- Cost of public services – operational
- Capital cost to city
- Impact on residents in terms of either increased property tax, fees, or other charges
- Environmental impacts
    - Land
    - Stormwater
- Compatibility with neighborhood
- Walkable
- Overall quality

Worthington 058359

# Attachment E:  Process architecture and schedule, UMCH site

| Illustrative Master Schedule |
|---|

| Stages & Events | Months | | | | | | |
|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| Stage 0: Logistics and Project Management | x | | | | | | |
| Role definitions and boundaries | x | | | | | | |
| Advisory Committee appointments | x | | | | | | |
| Public communication plan | x | | | | | | |
| Review and modification of draft project plan | x | | | | | | |
| Site selection and scheduling | x | | | | | | |
| City identification and securing of needed skill sets | x | x | x | | | | |
| Advisory Committee meetings | x | x | x | x | x | x | x |
| City Council briefings | x | x | x | x | x | x | x |
| Staff meetings | x | x | x | x | x | x | x |
| | | | | | | | |
| Stage 1:  Assessment of community issues | | | | | | | |
| Community meetings | | x | x | | | | |
| Summary report | | | x | | | | |
| | | | | | | | |
| Stage 2: Analysis and design | | | | | | | |
| Development of private sector proposal | | | x | x | x | | |
| Development of public-private option | | | x | x | x | | |
| Development of public purchase option | | | x | x | x | | |
| | | | | | | | |
| Stage 3:  Public presentation and testing of all alternatives | | | | | | | |
| Advisory Committee briefing | | | | | x | | |
| Community presentation 1 | | | | | x | | |
| Design modifications if chosen | | | | | x | | |
| Community presentation 2 | | | | | | x | |
| Comparative analysis of all alternatives | | | | | | x | |
| | | | | | | | |

Worthington 058360

| | | | | | | |
|---|---|---|---|---|---|---|
| **Stage 4: Community preference testing (some options are listed here; specific action to be chosen by Advisory Committee)** | | | | | | |
| Community survey | | | | | | x |
| Community polling event | | | | | | x |
| Recommendation by Advisory Committee based on stage 3 comments | | | | | | x |
| Other? | | | | | | x |
| Summary of results from whatever technique selected | | | | | | x |
| | | | | | | |
| **Stage 5: Land Use Decision (some options are listed here; specific action to be chosen by City Council** | | | | | | |
| Endorsement of an alternative and subsequent approval/action steps | | | | | | x |
| Decision to hold an Advisory Election | | | | | | x |
| Decision to approve private sector proposal and plan for referendum | | | | | | x |
| Other? | | | | | | x |
| | | | | | | |



27

Worthington 058361

| | |
|---|---|
| **From:** | Greeson, Matt [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=E02E0F169E0140A08552304F1CFBCF86-GREESON, MA] |
| **Sent:** | 2/7/2020 6:12:55 PM |
| **To:** | Michael, Bonnie [Bonnie.Michael@worthington.org]; Myers, Scott [Scott.Myers@worthington.org]; Scott Myers [scott.myers@ohioattorneygeneral.gov]; Robinson, David [David.Robinson@worthington.org]; Kowalczyk, Beth [Beth.Kowalczyk@worthington.org]; Dorothy, Rachael [Rachael.Dorothy@worthington.org]; Bucher, Peter [Peter.Bucher@worthington.org]; Smith, Doug [Doug.Smith@worthington.org] |
| **CC:** | Stewart, Robyn [Robyn.Stewart@worthington.org]; Thress, D. Kay [Kay.Thress@worthington.org] |
| **Subject:** | UMCH Comprehensive Plan Issue |
| **Attachments:** | talking about UMCH / Comp Plan |

Dear Council Members:

On January 31, 2020, I wrote to provide responses to questions posed regarding the status of the UMCH Comprehensive Plan Update. Additionally, I provided comments on five options that I think are available to the Council.

Attached is a follow-up email sent to me by Council Member Robinson. It would be very helpful to have clarity on what the Council as a whole feels on these matters. I am writing to respectfully request that the full Council provide direction as to whether it wants this issue to be placed on the agenda and discussed and, if so, when? Thank you for your consideration. --Matt



**MATT GREESON**
**CITY MANAGER**
**CITY OF WORTHINGTON**
6550 N. High Street
Worthington, Ohio 43085
Office: 614-436-0368
www.worthington.org

From:       Robinson, David [David.Robinson@worthington.org]
Sent:       2/5/2020 8:35:20 AM
To:         Greeson, Matt [Matt.Greeson@worthington.org]
Subject:    talking about UMCH / Comp Plan

Matt,

Thinking about our conversation yesterday post-breakfast: if you think it would be good for Council to directly engage the issue of the Comp Plan (and I think you do, as indicated by your thorough response to my initial email inquiry and your remarks at Council on Monday), have you considered direct outreach to Council members, particularly Bonnie and Scott? I would guess that when LC contacts the city and requests a meeting, or any time you have something of essential importance to discuss, that you simply call them and they respond affirmatively. Right? This is an example of where your leadership, or at least anticipatory management (which you are so good at practicing in a host of other areas [which I say genuinely and not simply to flatter]) would serve all of us.

If you'd like to discuss, please call. I am, as you know, committed to discussing this with Council, and I'll most likely initiate this with my colleagues if no one else will. To not engage this issues at this point in time would, I believe, be negligent and the opposite of leadership. It's not like we (the city, the Council, staff) have not been through this rodeo before. And, disturbingly, the way we handled Yaromir struck me (as I stated to you in a couple of emails back in 2018) as demonstrating that we have failed to learn the key lessons from Lifestyle-2015. So I'm not particularly optimistic right now (I am truly sorry about having to say this) about the way you and "leadership" will handle the upcoming process at UMCH. Back in 2017-18 we privileged Yaromir's immediate access to the city and, almost, set up a process that would have been truly "developer-driven" as opposed to "resident-centered." We barely dodged that bullet. And, unless something changes soon, we're about to do this all again with LC. In fact, we've already started with that "no notes" meeting that was held with LC recently. This is why a rescinding of the CP update would be a good idea, because it would help to rebalance our orientation and priorities, back to at least a neutral position with the residents.

This issue is at the core of why our city has been acrimonious in recent years, and I believe conflict will be perpetual unless "the city" (i.e., "leadership") finally, finally let's go of the ego and the belief that it knows better, and starts fully respecting the residents by not trying to manipulate information and minds, but instead fully and fairly works on their behalf. This has yet to happen. Stafford is a current demonstration of our skewed and backwards process of ours that tries to present itself as open and fair but in fact frustrates because it is nothing of the sort. Hence the continued, and fully justified, anger of those who see and understand.

David



**Office of the City Manager**

January 31, 2020

TO: Members of City Council

FROM: Matt Greeson ~~~
City Manager

SUBJECT: Responses to questions posed by Council Member Robinson regarding status of UMCH Comprehensive Plan Update

On January 24, 2020, Council Member Robinson posed via email several important questions regarding the Comprehensive Plan as it relates to the United Methodist Children's Home (UMCH) property. The following are his questions along with my responses. I have also provided comments, an outline of options I believe are available to the City, and key questions that need to be answered. I hope this information is helpful and would be glad to address any additional questions that may arise.

**What, in your mind, is the current status of the UMCH Comp Plan Update? Is it in full force, on par with the rest of the Comp Plan?**

When the City Council approved Resolution Number 2014-39, it amended the Comprehensive Plan, updating the existing section that discussed the UMCH property. Since then, no policy action has been taken or legislation adopted by Council to suggest that one section of the Comprehensive Plan holds more or less "force" than another. Nor, can staff independently or arbitrarily decide such a thing.

However, I do believe the City has some flexibility in determining what elements of the Comprehensive Plan it proactively pursues or places emphasis on. I discuss this further below.

**I think I remember Lee stating something along these lines at a council meeting last fall, that the Update is "current policy" or something to that effect. Or have the various statements from Council, usually made in the context of the Visioning Process, regarding the Comp Plan being at or near the end of its life (I can't remember the exact language from our resolution), sufficient to effectively negate its current relevance and standing?**

No. Until amended, replaced or repealed by Council action, it remains a part of the adopted policy framework by which development is and will be reviewed.

Worthington 058364

**Stated in practical terms, what will you and the rest of staff do if LC makes a proposal and cites the Comp Plan as a basis for justifying their proposal?**

**Will you accept their proposition without qualification?**

No. We will independently and objectively review any development proposal applying the adopted policies, plans, regulations and practices in place, including the Comprehensive Plan.

**Or will you claim that the Update is effectively no longer in force? Which is it? Or some other alternative?**

We will certainly be open and clear with all involved that aspects of the plan do not enjoy community or Council consensus; that community engagement will be critical to developing a proposal that is ultimately successful, and will encourage focus on elements the Council deems desirable (maybe park space, office, a restaurant, and empty nester housing as examples). However, it should be clear that staff has no authority to invalidate this section of the Comprehensive Plan.

**Additional Comments**

If the City Council is concerned with the answers above or the status of the Comprehensive Plan, here is what I see objectively as the options:

1. Maintain and apply plan – While elements of the plan may be out of date or not enjoy the consensus of all involved, our current track is to use the plan to direct development to the best of our ability. As stated above and discussed further below, the degree to which we are proactive in advancing some of the Plan's ideas is a point for consideration. It is likely that sometime after the Visioning Process is completed, a plan update would be in order.

2. Repeal all sections related to UMCH or sections that are points of disagreement – A Comprehensive Plan does not have to speak to a specific site or address all issues of land use concern. This makes guidance for staff, developers and the community less detailed; and more unclear and challenging to apply. However, it may increase flexibility for MPC and Council to determine what is best.

3. Amend the section – This option involves amending, adjusting or deleting sections that are at the heart of objections to previous proposals. For example, there are specific density references of 6 to 14 dwelling units per acre for the "Neighborhood Core" section. There are also height references up to 4 or 5 stories on High Street. Reduction or elimination of some of this language and

2

these numbers may make the plan less specific and, therefore, provide more flexibility for the MPC and Council to determine what is best.

4. Re-write and replace section - I do not think replacement could be done quickly, given that getting people to commit to interim dispute resolution or consensus building processes on this issue has been elusive. I expect coming up with fresh new language that enjoys agreement may face the same challenge. However, an attempt at this is always a conceptual option.

5. Housing moratorium until plan or regulation re-write – The Council has the authority to place a moratorium for a reasonable period on certain zoning classifications, types of building activity or uses. Moratoriums need to be based on advancing a legitimate government interest. When a city does this, it abridges property owners' rights to pursue development. It needs to be time limited with a commitment to specific planning action being taken during that time. It is conceivable that a moratorium on multi-family housing could be put in place, but it may be difficult to complete the Visioning process and create new Comprehensive Plan language that enjoys support within a constitutionally reasonable timeline.

Lastly, I think it will be important for the Council to discuss, possibly at the retreat, what role it wants the staff to play. In addition to providing a technical review as I have described above, staff often works to help steer developments towards desirable community outcomes. This is most easily achieved when our goals are clearly discernable. Examples include using tax increment financing (TIFs) for beneficial public infrastructure and tax abatements or income tax incentives to encourage office or other income producing activities. Council has in recent years discouraged staff from proactively working with LC (or Steiner); appetite for using alternative resolution processes has been limited.

If LC indeed plans to submit a proposal for development, it will be imperative that Council provide clear direction. The Comprehensive Plan recommends we pursue a public-private partnership to best achieve the goals of the plan. Do we want to proactively negotiate to try to shape the project to meet more of the expectations of the community and Council? Which elements or expectations are most critical to emphasize? What role do you want staff to play in these efforts? What does success look like in such endeavors? These are questions I believe should be discussed at the retreat or earlier.

Worthington 058366

Worthington 058367



**Office of the City Manager**

## MEMORANDUM

TO:  City Council

FROM:  Matt Greeson, City Manager

DATE:  January 22, 2019

SUBJECT:  EXPLORATORY WORKING PAPER – COST TO SERVE ANALYSIS FOR THE UMCH PROPERTY

---

In 2018, City Council asked the staff to evaluate the cost to provide City services to the UMCH property under various redevelopment scenarios. Five scenarios were drafted – three of which were hypothetical scenarios developed by staff, an additional hypothetical scenario was based on the white paper issued by WARD in January 2018, and the fifth scenario was based on the 2015/2016 proposal from Lifestyle Communities. Based on City Council feedback, the fifth scenario was eliminated from the analysis.

Attached is an exploratory working paper that evaluates the cost to provide City services and the revenue that is projected to be collected under the four scenarios. At this point, the evaluation does not include the cost to acquire and/or develop the parkland proposed under each scenario. The evaluation also does not include the cost to acquire any other part of the site for other purposes.

There are limitations to this analysis since it is based on hypothetical scenarios without concrete details. This analysis is an evaluation of the incremental cost to provide services, not a full allocation of the cost of City services. There are many assumptions made the in report. A change in the assumptions would impact the results of the evaluation. For these reasons, I believe this paper should be used for purposes of general knowledge, however I caution against expectations that the information will prove exactly accurate when an actual redevelopment occurs. It is unlikely an actual redevelopment will match the hypothetical details in any of the scenarios.

Assistant City Manager Robyn Stewart managed the development of this exploratory working paper. Please let me or her know if you have questions or would like additional information about the paper.



**EXHIBIT**

32

Worthington 126963

Exploratory Working Paper

Evaluation of the Cost to Serve the UMCH Property Under Various Hypothetical
Development Scenarios

January 22, 2019

## INTRODUCTION

City staff were asked by City Council to evaluate the cost to provide City services to a
redeveloped UMCH property along with the revenue that would be received by the City from the
property. Staff were asked to consider a variety of scenarios to give insight into the impact of
various types of land use. Staff originally developed five hypothetical scenarios. The first three
scenarios were developed by staff to evaluate the impact of various mixes of land uses on the
site. The fourth scenario is intended to align with the proposal generally described by the
Worthington Alliance for Responsible Development (WARD) in a white paper issued in January
2018. A fifth scenario reflected the proposal by Lifestyle Communities in 2015 and 2016. The
five scenarios were shared with City Council to gather input on the various options presented in
the scenarios. Based on City Council feedback, the fifth scenario was eliminated from the
analysis since it did not have City Council or community support, thus it was deemed not worth
the staff time to evaluate it.

The four scenarios presented in this evaluation are hypothetical and as a result, do not have much
specificity or many details associated with them. Staff needed to decide a number of
assumptions for each scenario in order to project expenses and revenue. The assumptions are
detailed for each scenario in this report. Arguments can be made to change the assumptions and
those changes would likely impact the amounts included in this report.

This is not a proportional allocation of the City's cost to provide services, rather it simply
evaluates each service area and determines whether there would be additional costs (e.g.
additional staff, contract services, supplies) required to serve the development. These costs are
very rough estimates and were developed by each department based on their sense of how their
service areas would be impacted, utilizing the assumptions that were made. **The cost to serve
the various scenarios does not include the cost to acquire and develop the park component.**
The costs are based more on intuition than a thorough analysis and breakdown of all the costs
associated with each service and how much should be allocated to each land use type. The cost
to serve and revenue generated from an actual re-development of the site will likely differ from
the amounts reflected in this working paper since it is unlikely any of the hypothetical scenarios
will exactly match the actual re-development.

## SCENARIOS

### Scenario 1: Primarily Park & Office

Park – 15 acres
Office – 15 acres - 300,000 sf
Residential (multi-family) – 3 acres at 20 units/acre – 60 units
Residential (single family) – 2 acres at 3 units/acre – 6 houses
Retail – 2 acres – 20,000 sf

Under Scenario 1, the park land is 15 acres, comprised of a multi-use trail and a three-season building with restrooms and a natural play area. The office space covers 15 acres with three stories in height, multiple tenants and a mix of employment types. The office space and retail space would likely need to include some structured parking. The single-family residential lots are anticipated to be a total of two acres with frontage on Longfellow Avenue. The multi-family housing would be a total of three acres, at a density of about 20 units per acre, which would result in about 60 units, served by private roadways. The retail use would cover about two acres and is anticipated to be about 20,000 square feet of space.

Wesley Boulevard is anticipated to be converted to a public street, driven by the need to serve the park. Private roadways to serve the office, retail and/or multi-family residential may connect to Wesley Boulevard. Public utilities are expected along the public and private streets. Based on these assumptions, the following infrastructure would be involved in this scenario:

| | |
|---|---|
| Total Public Roadway | 700 LF |
| Total Private Roadway | 5,000 LF |
| Public Sanitary Sewer | 5,700 LF |
| Public Water Service | 5,700 LF |
| Public Storm Sewer | 5,700 LF |

### Scenario 2: Blend of Office, Park & Residential

Park – 10 acres
Office – 15 acres – 300,000 sf
Residential (multi-family) – 5 acres at 20 units/acre – 100 units
Residential (empty nester) – 3 acres at 6 units/acre – 18 units
Residential (single family) – 2 acres at 3 units/acre – 6 houses
Retail – 2 acres – 20,000 sf

2

Worthington 126965

Under Scenario 2, the park land is 10 acres comprised of a multi-use trail and a three-season building with restrooms. The office space covers 15 acres with three stories in height, multiple tenants and a mix of employment types. The office space and retail space would likely need to include some structured parking. The single-family residential lots are anticipated to be a total of two acres with frontage on Longfellow Avenue. The multi-family housing would be a total of five acres, at a density of 20 units per acre, which would result in about 100 units, served by private roadways. The empty nester residential housing would be a total of three acres at a density of about six units per acre, which would result in about 18 units, served by private roadways. The retail use would cover about two acres and is anticipated to be about 20,000 square feet of space.

Wesley Boulevard is anticipated to be converted to a public street, driven by the need to serve the park. Private roadways to serve the office, retail and/or multi-family residential may connect to Wesley Boulevard. Public utilities are expected along the public and private streets. Based on these assumptions, the following infrastructure would be involved in this scenario:

| | |
|---|---|
| Total Public Roadway | 700 LF |
| Total Private Roadway | 4,000 LF |
| Public Sanitary Sewer | 4,700 LF |
| Public Water Service | 4,700 LF |
| Public Storm Sewer | 4,700 LF |

**Scenario 3: Primarily Office**

Park – 8 acres
Office – 20 acres – 400,000 sf
Residential (multi-family) – 5 acres at 20 units/acre – 100 units
Residential (single family) – 2 acres at 3 units/acre – 6 houses
Retail – 2 acres – 20,000 sf

Under Scenario 3, the park land is eight acres and comprised of a three-season building with restrooms and a multi-use trail. The office space covers 20 acres and is anticipated to be three or four stories in height with multiple tenants and a mix of employment types. The office space and retail space would likely need to include some structured parking, though some surface parking may be warranted. The single-family residential lots are anticipated to be a total of two acres with frontage on Longfellow Avenue. The multi-family housing would be five acres, at a density of 20 units per acre, which would result in about 100 units, served by private roadways.

3

The retail use would cover about two acres and is anticipated to be about 20,000 square feet of space.

Wesley Boulevard is anticipated to be converted to a public street, driven by the need to serve the park. Private roadways to serve the office, retail and/or multi-family residential may connect to Wesley Boulevard. Public utilities are expected along the public and private streets. Based on these assumptions, the following infrastructure would be involved in this scenario:

| | |
|---|---|
| Total Public Roadway | 700 LF |
| Total Private Roadway | 3,000 LF |
| Public Sanitary Sewer | 3,700 LF |
| Public Water Service | 3,700 LF |
| Public Storm Sewer | 3,700 LF |

### Scenario 4: Primarily Park (WARD Proposal)

Park – 25.5 acres
Office – 6.5 acres – 130,000 sf
Residential (empty nester) – 3 acres at 6 units/acre – 18 units
Residential (single family) – 2 acres at 3 units/acre – 6 houses

Under Scenario 4, the park land is 25.5 acres and comprised of a multi-use trail, a three-season building with restrooms and a splash pad/ice rink. The office space covers six and a half acres and is anticipated to be three stories in height with one to three tenants and a mix of employment types. The office space and retail space would have surface, not structured, parking. The single-family residential lots are anticipated to be a total of two acres and front on Longfellow Avenue. The empty nester housing would total three acres at a density of six units per acre, thus total 18 units, served by private roadways. There is no multi-family residential or retail in this scenario.

Wesley Boulevard is anticipated to be converted to a public street, driven by the need to serve the park. Private roadways to serve the office and/or empty nester housing may connect to Wesley Boulevard. Public utilities are expected along the public and private streets. Based on these assumptions, the following infrastructure would be involved in this scenario:

| | |
|---|---|
| Total Public Roadway | 700 LF |
| Total Private Roadway | 2,000 LF |
| Public Sanitary Sewer | 2,700 LF |
| Public Water Service | 2,700 LF |
| Public Storm Sewer | 2,700 LF |

4

Worthington 126967

## Summary of Scenarios with Assumptions

|  | Scenario 1 | Scenario 2 | Scenario 3 | Scenario 4 |
|---|---|---|---|---|
| **Park** | 15 acres<br>Trail, 3-season building, play area | 10 acres<br>Trail, 3-season building | 8 acres<br>Trail, 3-season building | 25.5 acres<br>Trail, 3-season building, splash pad/ice rink |
| **Office** | 15 acres<br>300,000 sf | 15 acres<br>300,000 sf | 20 acres<br>400,000 sf | 6.5 acres<br>130,000 sf |
| **Residential: Multi-Family** | 3 acres<br>60 units | 5 acres<br>100 units | 5 acres<br>100 units | |
| **Residential: Empty Nester** | | 3 acres<br>18 units | | 3 acres<br>18 units |
| **Residential: Single-Family** | 2 acres<br>6 houses | 2 acres<br>6 houses | 2 acres<br>6 houses | 2 acres<br>6 houses |
| **Retail** | 2 acres<br>20,000 sf | 2 acres<br>20,000 sf | 2 acres<br>20,000 sf | |
| **Structured Parking** | Yes<br>900 spaces | Yes<br>900 spaces | Yes<br>1,200 spaces | No |
| **Public Roadway** | 700 LF | 700 LF | 700 LF | 700 LF |
| **Private Roadway** | 5,000 LF | 4,000 LF | 3,000 LF | 2,000 LF |
| **Public Sanitary Sewer** | 5,700 LF | 4,700 LF | 3,700 LF | 2,700 LF |
| **Public Water** | 5,700 LF | 4,700 LF | 3,700 LF | 2,700 LF |
| **Public Storm Sewer** | 5,700 LF | 4,700 LF | 3,700 LF | 2,700 LF |

## PROJECTED EXPENDITURES

This section includes projections for additional expenditures associated with the City services that would be provided to any new development on the site. As was stated in the introduction, this is not a proportional allocation of the City's cost to provide services, rather it simply evaluates each service area and determines whether there would be additional costs (e.g. additional staff, contract services, supplies) required to serve the development. These costs are

5

Worthington 126968

very rough estimates and were developed by each department based on their sense of how their service areas would be impacted. They're based more on intuition than a thorough analysis and breakdown of all the costs associated with each service and how much should be allocated to each land use type. If a more thorough analysis that results in more accurate numbers is desired, the City should consider a contract with a consultant with expertise in this area. The cost of such consulting services is anticipated to be in the range of $35,000 - $50,000 and would likely take about four months to complete.

There are two types of expenditures related to new development. One type is associated with the initial development. These typically involve plan review and inspection during construction. The costs are incurred over a relatively short timeframe and do not carry forward after construction is completed. **These one-time costs do not include costs associated with land acquisition and development of park space.** The second type are costs incurred long term to provide ongoing services. Examples of this type of expenditures relate to police and fire protection, emergency medical response, trash collection and infrastructure maintenance.

In this section, expenditures are evaluated department by department. Some departments do not anticipate the need for additional funding; the additional service area would simply be absorbed into their current service provision. Longer turn-around times may occur but are not anticipated to be at the level that require additional financial resources. These areas are noted in this section.

Some impacts are the same across all of the scenarios and they will be described first. Additional impacts associated with each individual scenario will be described following the universal impacts section. The scenario-specific impacts will primarily affect Fire & EMS, Planning & Building, Parks Maintenance activities and the Service & Engineering Department.

**Projected Service Impacts Across All Scenarios (Universal Impacts)**

Fire & EMS:                     In the Fire & EMS Division, redevelopment of the site will have the most impact on fire prevention activities which are primarily focused on inspection of commercial buildings. There is one person dedicated full time to these activities and he is kept very busy with the current number of commercial buildings. Staffing for this function was reduced several years ago during the recession, resulting in a lack of excess capacity for fire prevention activities. The Division has asked for additional personnel in either a full-time or part-time capacity to assist with fire prevention activities, but such request has not been able to be funded to date. The addition of commercial space under each of these scenarios is expected to place even greater strain on the prevention function. Some of the scenarios have sufficient new

6

commercial space to result in the need to add a part-time fire prevention position for 20 hours per week.

The new land uses are anticipated to impact the emergency response activities of this division, although those impacts are not easy to quantify. The Division responds to a high volume of calls currently, particularly in the emergency medical area. This volume is expected to increase with the planned construction of the Kemper House memory care facility in Worthington and a new assisted living facility in Sharon Township as both of these types of facilities traditionally result in higher than average calls for emergency medical support. The addition of more new development at the UMCH site would be expected to increase demand also, although perhaps at a slower rate than if any of the scenarios involved senior living, especially targeted for those who struggle to live independently. The specific impacts of development at the UMCH site are difficult to quantify, thus this report does not note any specific increases in the cost for fire and EMS response. The situation is influenced by the automatic aid arrangement between the City of Worthington and the City of Columbus in which the closest unit responds to the emergency. This results in Columbus responding to emergencies in Worthington and vice versa. If Worthington is already tied up on emergency runs, then Columbus units respond.

General Government:    General Government consists of the administrative support areas of City Council, City Clerk, City Manager's Office, Communications, Personnel, Finance, Law, Information Technology, and Economic Development. Redevelopment of the site, regardless of scenario, is not anticipated to noticeably impact these areas and can be absorbed within the current resources allocated in this area.

Mayor's Court    Mayor's Court activity is driven primarily by traffic and parking violations and occasionally other violations of City Code provisions such as property maintenance concerns. Redevelopment of this site is not anticipated to impact Mayor's Court in any noticeable way.

Parks & Recreation:    Staff does not anticipate any noticeable impacts at the Community Center and Griswold Center. Additional users of the Community Center and Griswold Center that result from this redevelopment are

7

anticipated to be able to be absorbed by these facilities and their programs.

The Parks Maintenance Division is expected to feel the impact of any additional park space. The larger and more developed the park space, the greater the impact. The Parks staff have already absorbed new parkland in recent years without additional staff or funding. Any excess capacity that may have previously existed has already been absorbed.

Planning & Building:

The primary impact to the Department of Planning & Building of any development scenario will be during the planning, design and construction phases as the developer applies for architectural approval and building permits and during construction when the City will have inspection responsibilities. Since Worthington is a small, mostly built-out community, this Department has a small number of staff members. Staff time and expertise will need to be supplemented by consultants in the areas of traffic engineering, stormwater review and streetscaping requirements. The amount of time needed for review is similar across the four scenarios. Staff anticipates an additional $15,000 per year will be required for this consulting assistance for an estimated three-year period during the application review stage. Staff does not anticipate a need for consulting assistance in the building permit area, however timelines for review of all building projects can be expected to get longer during heavy review times for this development.

Police:

Redevelopment of this site is not anticipated to result in additional expenditures in the Police Division. Depending on the specific type of businesses, retail establishments and residential development, there may be more police responses, which could impact responses times to other calls, however they are not anticipated to rise to the level of needing more officers.

Service & Engineering:

The Service & Engineering Department will have impacts during the planning, design and construction phases of each of the scenarios, primarily related to stormwater analysis and site engineering estimated at $70,000. For each of the scenarios, Wesley Boulevard is converted to a public street which is anticipated to involve a complete re-build of the street with sidewalks and curb ramps. The estimated cost for this street work is $275,000, which is expected to be paid by the developer.

The City would have consultant costs associated with review of the plans and inspection during construction. Those costs are estimated at $40,000.

One-Time: | Planning & Building Consulting Fees | $45,000 |
| Stormwater & Site Engineering Consulting Fees | 70,000 |
| Wesley Blvd. Plan Review & Inspection | 40,000 |
| | $155,000 |

## Scenario 1: Primarily Park & Office - Expenditures

Fire & EMS: The addition of commercial space under this scenario is expected to result in the need to add a part-time fire prevention position for 20 hours per week. The cost of this part-time prevention person is estimated at $32,000.

Parks & Recreation: The addition of 15 acres of park land is anticipated to impact the parks maintenance activities. The Parks staff have already absorbed new parkland in recent years without additional staff or funding. Any excess capacity that may have previously existed has already been absorbed. The additional park acreage in this scenario and the associated uses identified for the park would result in the need to hire an additional staff member assigned to parks maintenance. The estimated annual cost for a top step Parks Maintenance Technician is $107,000.

In addition to the staffing impact, the Department is expected to need additional supplies such as trash bags, cleaning supplies, lawn care, landscaping and salt for walkways. Additional supplies under this scenario are estimated at $17,000. As with all of the City's parks, there are expected to be periodic capital projects that invest in the park space, particularly with a shelter and a play area. The cost of capital projects is estimated to average about $7,500 per year.

Planning & Building: One of the fees the City applies to development is a public area fee which supports parks and recreation activities. This fee is collected from the applicant (developer) and placed in a designated fund that is dedicated to the authorized activities. The amount must be matched by

9

the City. Scenario 1 is projected to collect $50,000 in public area fees, which is the same amount of the City's required match.

Service & Engineering: The Service & Engineering Department will have impacts associated with Scenario 1 during the design and construction phases as well as ongoing costs to maintain the infrastructure and serve the development. The impacts associated with the design and construction phases are related to the design and construction of infrastructure. Under Scenario 1, there is estimated to be 5,700 LF of new public sanitary sewer, water, and storm sewer lines. While the developer is anticipated to pay for the design and construction of this infrastructure, the City will contract for assistance with reviewing the plans and inspecting the work since the City will assume ownership after construction. The cost for this assistance is estimated at $225,000.

The Service & Engineering Department provides ongoing services to the community, including solid waste collection, leaf pick up, snow removal, and maintenance of streets, curbs, sanitary sewers, water lines and storm sewers. The construction of Scenario 1 is estimated to cost the City $7,000 per year for these services.

| One-Time: | Infrastructure Consulting Fees | $225,000 |
| | Public Area Fees | 50,000 |
| | | $275,000 |

| Annual: | Fire Prevention | $32,000 |
| | Parks Capital Investment | 7,500 |
| | Parks Maintenance Technician | 107,000 |
| | Parks Supplies | 17,000 |
| | Service & Engineering Services | 7,000 |
| | | $170,500 |

## Scenario 2: Blend of Office, Park & Residential - Expenditures

Fire & EMS: As noted in Scenario 1, the addition of commercial space under this scenario would result in the need to add a part-time fire prevention position for 20 hours per week. The cost of this part-time prevention person is estimated at $32,000.

10

| Parks & Recreation: | The addition of 10 acres of park land is anticipated to impact the parks maintenance activities. Although this scenario adds only ten acres of park space, the additional park acreage in this scenario and the associated uses identified for the park would result in the need for additional staff time in parks maintenance. Ideally a Parks Maintenance Technician would be added at a cost of $107,000. However, since only ten acres is being added to the parks system, this service area may be able to manage the additional space through additional contract assistance, which is estimated to cost $75,000 annually. Parks staff will continue to be very stretched, so while the contract option is not ideal, it is included in this scenario in recognition that only ten acres is added to the parks system. |
|---|---|

Additional supplies for Parks Maintenance under this scenario are estimated at $11,250. Periodic capital projects that invest in the park space are estimated to average about $5,000 per year.

| Planning & Building: | Scenario 2 is projected to collect $65,000 in public area fees, which is the same amount of the City's required match. |
|---|---|

| Service & Engineering: | Under Scenario 2, there is estimated to be 4,700 LF of new public sanitary sewer, water, and storm sewer lines. While the developer is anticipated to pay for the design and construction of this infrastructure, the City will contract for assistance with reviewing the plans and inspecting the work since the City will assume ownership after construction. The cost for this assistance is estimated at $200,000. |
|---|---|

Scenario 2 is estimated to cost the City $9,000 per year for the ongoing services provided by Service & Engineering.

| One-Time: | Infrastructure Consulting Fees | $200,000 |
|---|---|---|
| | Public Area Fees | 65,000 |
| | | $265,000 |

| Annual: | Fire Prevention | $32,000 |
|---|---|---|
| | Parks Capital Investment | 5,000 |
| | Parks Maintenance Contract Assistance | 75,000 |
| | Parks Supplies | 11,250 |
| | Service & Engineering Services | 9,000 |
| | | $132,250 |

Worthington 126974

**Scenario 3: Primarily Office - Expenditures**

Fire & EMS:    As noted in Scenarios 1 and 2, the addition of commercial space under this scenario is expected to place even greater strain and the prevention function and would result in the need to add a part-time fire prevention position for 20 hours per week. The cost of this part-time prevention person is estimated at $32,000.

Parks & Recreation:    The addition of eight acres of park land is anticipated to impact the parks maintenance activities. Although this scenario adds only eight acres of park space, the additional park acreage in this scenario and the associated uses identified for the park would result in the need for additional staff time in parks maintenance. Ideally a Parks Maintenance Technician would be added at a cost of $107,000. However, since only eight acres is being added to the parks system, this service area may be able to manage the additional space through additional contract assistance, which is estimated to cost $60,000 annually. Parks staff will continue to be very stretched, so while the contract option is not ideal, it is included in this scenario in recognition that only eight acres is added to the parks system.

Additional supplies for Parks Maintenance under this scenario are estimated at $9,000. Periodic capital projects that invest in the park space are estimated to average about $4,000 per year.

Planning & Building:    Scenario 3 is projected to collect $70,000 in public area fees, which is the same amount of the City's required match.

Service & Engineering:    Under Scenario 3, there is estimated to be 3,700 LF of new public sanitary sewer, water, and storm sewer lines. While the developer is anticipated to pay for the design and construction of this infrastructure, the City will contract for assistance with reviewing the plans and inspecting the work since the City will assume ownership after construction. The cost for this assistance is estimated at $150,000.

Scenario 3 is estimated to cost the City $11,000 per year for the ongoing services provided by Service & Engineering.

Worthington 126975

| One-Time: | Engineering Consulting Fees | $150,000 |
| | Public Area Fees | 70,000 |
| | | $220,000 |
| | | |
| Annual: | Fire Prevention | $32,000 |
| | Parks Capital Investment | 4,000 |
| | Parks Maintenance Contract Assistance | 60,000 |
| | Parks Supplies | 9,000 |
| | Service & Engineering Services | 11,000 |
| | | $116,000 |

## Scenario 4: Primarily Park (WARD Proposal) - Expenditures

| Fire & EMS: | There is more limited commercial space under this scenario, so unlike Scenarios 1, 2 and 3, this scenario is not expected to require a part-time fire prevention position. |
| --- | --- |
| Parks & Recreation: | The addition of 25.5 acres of park land is anticipated to impact the parks maintenance activities. The additional park acreage in this scenario and the associated uses identified for the park would result in the need to hire an additional staff member assigned to parks maintenance. The estimated annual cost for a top step Parks Maintenance Technician is $107,000. If different uses are constructed in the park, then the ongoing costs for operation and maintenance may vary. More intensive uses would cost more to operate and maintain. |
| | Additional supplies for Parks Maintenance under this scenario are estimated at $30,000. Periodic capital projects that invest in the park space are estimated to average about $12,750 per year. |
| Planning & Building: | Scenario 4 is projected to collect $20,000 in public area fees, which is the same amount of the City's required match. |
| Service & Engineering: | Under Scenario 4, there is estimated to be 2,700 LF of new public sanitary sewer, water, and storm sewer lines. While the developer is anticipated to pay for the design and construction of this infrastructure, the City will contract for assistance with reviewing the plans and inspecting the work since the City will assume ownership after construction. The cost for this assistance is estimated at $125,000. |

13

Scenario 4 is estimated to cost the City $6,000 per year for the ongoing services provided by Service & Engineering.

| One-Time: | Infrastructure Consulting Fees | $125,000 |
|-----------|-------------------------------|----------|
|           | Public Area Fees              | 20,000   |
|           |                               | $145,000 |

| Annual: | Parks Capital Investment | $12,750 |
|---------|-------------------------|---------|
|         | Parks Maintenance Technician | 107,000 |
|         | Parks Supplies | 30,000 |
|         | Service & Engineering Services | 6,000 |
|         | | $155,750 |

14

Worthington 126977

## Summary of Expenditure Projections

|  | Scenario 1 | Scenario 2 | Scenario 3 | Scenario 4 |
|---|---|---|---|---|
| **One-Time:** |  |  |  |  |
| Stormwater & Site Engineering Consulting Fees | $70,000 | $70,000 | $70,000 | $70,000 |
| Wesley Blvd. Plan Review & Inspection | 40,000 | 40,000 | 40,000 | 40,000 |
| Planning & Building Consulting Fees | 45,000 | 45,000 | 45,000 | 45,000 |
| Infrastructure Consulting Fees | 225,000 | 200,000 | 150,000 | 125,000 |
| Public Area Fees | 50,000 | 65,000 | 70,000 | 20,000 |
| **Total** | **$430,000** | **$420,000** | **$375,000** | **$300,000** |
| **Annual:** |  |  |  |  |
| Fire Prevention | 32,000 | 32,000 | 32,000 |  |
| Parks Capital Investment | 7,500 | 5,000 | 4,000 | 12,750 |
| Parks Maintenance Technician/Contract Assistance | 107,000 | 75,000 | 60,000 | 107,000 |
| Parks Supplies | 17,000 | 11,250 | 9,000 | 30,000 |
| Service & Engineering Services | 7,000 | 9,000 | 11,000 | 6,000 |
| **Total** | **$170,500** | **$132,250** | **$116,000** | **$155,750** |

Note:  These costs do not include the land acquisition and/or the development costs of the parkland.

15

Worthington 126978

# PROJECTED REVENUE

This section includes projections for the new revenue that would be received by the City under each of the four scenarios. Two revenue sources, income tax and property tax, would be annual, ongoing revenue streams, with income tax comprising the largest source of funding. The City levies a 2.5% income tax and five (5) mills of property tax. For the purposes of this analysis, the City inquired into the land value of the UMCH site with the Franklin County Auditor's office. They indicated that while the property is current tax exempt, they have valued the land at $6,263,000. The current value of the buildings is excluded from this analysis since the buildings are anticipated to be demolished as part of any redevelopment. The land value is assumed to be the base value under any abatement/tax increment financing component considered as part of these scenarios. Parkland would be tax exempt, so the percentage of the land allocated to park in each scenario is removed from the land value.

The City also assesses fees on development which are paid when the development is occurring. Since these are tied to development applications, they are one-time fees and are not recurring. The permit fees relate to building and architectural review fees. In addition, a public area fee is charged which supports parks and recreation activities.

The revenue estimates will be impacted if the City decides to offer economic development incentives to encourage redevelopment of the property. The City can utilize income tax-based or property tax-based incentives to attract jobs to the community or achieve other community objectives. The income-tax-based incentives involve grants to companies in consideration of new income tax collections that will come from new or retained jobs in Worthington. Property tax-based incentives can include tax abatements and/or tax increment financing (TIF). In those instances, a portion or all of the property taxes that would otherwise be paid on the increased value of the property are either not paid, in the case of an abatement, or are diverted to a special fund intended to benefit the development, in the case of a TIF. Taxes on the base land value would still be paid. Revenue projections that take into account potential development incentives are also included in this section.

## Scenario 1: Primarily Park & Office - Revenue

Under Scenario 1, the office space is estimated to have up to 1,500 employees with an average annual salary of $50,000/year. This would generate an estimated $1,875,000 in annual payroll withholdings for the City. Private construction costs are estimated at $80,000,000 under this scenario, generating approximately $116,000/year for the improvements and $6,600 for the land in property tax revenues.

16

In considering the one-time fees, building permit fees are estimated at $165,000, architectural fees at $2,000, and public area fees at $50,000.

*Projected Revenue without Incentives*

| | | |
|---|---|---|
| One-Time: | Permit Fees | $167,000 |
| | Public Area Fees | 50,000 |
| | | $217,000 |
| | | |
| Annual: | Income Tax Revenue | $1,875,000 |
| | Property Tax Revenue | 122,600 |
| | | $1,997,600 |

In Scenario 1, income tax-based incentives could be offered in conjunction with the 300,000 square feet of office to attract the 1,500 employees estimated in this scenario. If the incentive follows the City's historic pattern, grant(s) could be offered in the range of twenty percent of anticipated income tax collections over a seven-year period. This could equate to $2,800,000 over a seven-year period, or $375,000 for the first annual amount.

Property tax revenue could be impacted by any abatements or tax increment financing provided to encourage the development. The City has not historically offered property-tax based incentives for residential development, but it has for office and retail development. This type of incentive would likely be tied to the 17 acres of office and retail space.

This scenario includes some structured parking to serve the office and retail spaces. Structured parking typically costs $30,000 per parking space. For the purposes of this scenario, we plan for 60% of the projected employees to be accommodated by structured parking with the remaining 40% utilizing surface parking. If structured parking is constructed to accommodate 60% of the 1,500 projected employees, the cost for the parking would be $21,600,000. This cost would likely be funded by the developer primarily, but the City expects it would be asked to offset some of the cost of the parking structure, either through tax increment financing or a tax abatement, which would impact the revenue generated from the property.

Given the structured parking component of this scenario, we are projecting 100% abatement or TIF for ten years for the purposes of this analysis. If all of the property tax collections associated with the increased values of the development were affected by the incentive, then property tax collections would be reduced to $6,600, which is the projected tax on the base value of the land. To provide significant funding for the structured parking, the City would likely be asked to include the Worthington Schools' millage in the TIF and/or abatement. If the Schools' millage is included, the City would likely need to share income tax revenues with the Schools. The most

Worthington 126980

common agreement is the sharing of 50% of income tax revenue. Under this situation, the City's income tax revenue would be cut in half during the ten years of the incentive.

*Projected Revenue with Incentives*

| One-Time: | Permit Fees | $167,000 |
|---|---|---|
| | Public Area Fees | 50,000 |
| | | $217,000 |

| Annual: | Income Tax Revenue | $562,500 |
|---|---|---|
| | Property Tax Revenue | 6,600 |
| | | $569,100 |

## Scenario 2: Blend of Office, Park & Residential – Revenue

The office is estimated to have up to 1,500 employees at the site with an average annual salary of $50,000/year. This would generate an estimated $1,875,000 in annual payroll withholdings for the City. Private construction costs are estimated at $140,000,000 under this scenario, generating approximately $203,000/year for the improvements and $8,000 for the land in property tax revenues.

In considering one-time fees, building permit fees are estimated at $170,000, architectural fees at $5,000, and public area fees at $65,000.

*Projected Revenue without Incentives*

| One-Time: | Permit Fees | $175,000 |
|---|---|---|
| | Public Area Fees | 65,000 |
| | | $240,000 |

| Annual: | Income Tax Revenue | $1,875,000 |
|---|---|---|
| | Property Tax Revenue | 211,000 |
| | | $2,086,000 |

Scenario 2 has the same amount of office, retail and structured parking as Scenario 1 so the incentive impact to income tax and property tax revenues is the same. This scenario has a smaller percentage of the site dedicated to parkland, so the amount of property taxes collected from the base land value is slightly higher than in Scenario 1.

18

Worthington 126981

*Projected Revenue with Incentives*

| One-Time: | Permit Fees | $175,000 |
|-----------|-------------|----------|
|           | Public Area Fees | 65,000 |
|           |             | $240,000 |

| Annual: | Income Tax Revenue | $562,500 |
|---------|--------------------|----------|
|         | Property Tax Revenue | 8,000 |
|         |                    | $570,500 |

## Scenario 3: Primarily Office - Revenue

It is estimated there could be up to 2,000 employees at the site with an average annual salary of $50,000/year. This would generate an estimated $2,500,000 in annual payroll withholdings for the City. Private construction costs are estimated at $134,000,000 under this scenario, generating approximately $195,000/year for the improvements and $8,600 for the land in property tax revenues.

In considering the one-time fees, building permit fees are estimated at $183,000, architectural fees at $2,000, and public area fees at $70,000.

*Projected Revenue without Incentives*

| One-Time: | Permit Fees | $185,000 |
|-----------|-------------|----------|
|           | Public Area Fees | 70,000 |
|           |             | $255,000 |

| Annual: | Income Tax Revenue | $2,500,000 |
|---------|--------------------|------------|
|         | Property Tax Revenue | 203,600 |
|         |                    | $2,703,600 |

Scenario 3 is similar to Scenarios 1 and 2 except it includes 100,000 square feet of additional office, bringing the total amount of office to 400,000 square feet. Income tax incentives associated with attracting jobs to the office space could equate to $3,700,000 over a seven-year period, or $500,000 for the first annual payment.

Property tax revenue would be impacted by any abatements or tax increment financing provided to encourage the development. This type of incentive would likely be tied to the 20 acres of

19

Worthington 126982

office and retail space. Like Scenarios 1 & 2, this scenario has a structured parking component to serve the office and retail spaces. Using the same assumptions about structured parking as noted in Scenarios 1 and 2, structured parking constructed to accommodate 60% of the 2,000 projected employees would cost $36,000,000. As was noted in those scenarios, this cost would likely be funded by the developer primarily, but the City expects it would be asked to offset some of the cost of the parking structure, either through tax increment financing or a tax abatement, which would impact the revenue generated from the property. Using the same assumptions in Scenarios 1 & 2, property tax collections would be reduced to $8,600 and the City would share 50% of income tax revenue with the Schools during the ten years of the incentive.

*Projected Revenue with Incentives*

| One-Time: | Permit Fees | $185,000 |
|---|---|---|
|  | Public Area Fees | 70,000 |
|  |  | $255,000 |

| Annual: | Income Tax Revenue | $750,000 |
|---|---|---|
|  | Property Tax Revenue | 8,600 |
|  |  | $758,600 |

## Scenario 4: Primarily Park (WARD Proposal) – Revenue

It is estimated there could be up to 650 employees at the site with an average annual salary of $50,000/year. This would generate an estimated $812,000 in annual payroll withholdings for the City. Private construction costs are estimated at $44,000,000 under this scenario, generating approximately $64,000/year for the improvements and $3,400 for the land in property tax revenues.

In considering one-time fees, building permit fees are estimated at $55,000, architectural fees at $3,500, and public area fees at $20,000.

*Projected Revenue without Incentives*

| One-Time: | Permit Fees | $58,500 |
|---|---|---|
|  | Public Area Fees | 20,000 |
|  |  | $78,500 |

Worthington 126983

| Annual: | Income Tax Revenue | $812,000 |
| | Property Tax Revenue | 67,400 |
| | | $879,400 |

Incentives for Scenario 4 would likely only be tied to the 130,000 square feet of office space. Income tax incentives associated with attracting jobs to the office space could equate to $1,200,000 over a seven-year period, or $163,000 annually.

Property tax revenue would be impacted by any abatements or tax increment financing provided to encourage the development. This type of incentive would likely be tied to the 6.5 acres of office space. Since this scenario does not include any structured parking, we will use the most common percentage of 75% for ten years. If all of the property tax collections associated with the development were affected by the 75%, then property tax collections would be reduced to $19,400. This incentive is not expected to include the Schools' levy, so there would be no need to share income tax revenue with the Schools.

*Projected Revenue with Incentives*

| One-Time: | Permit Fees | $58,500 |
| | Public Area Fees | 20,000 |
| | | $78,500 |
| | | |
| Annual: | Income Tax Revenue | $649,000 |
| | Property Tax Revenue | 19,400 |
| | | $668,400 |

21

Worthington 126984

## Summary of Revenue Projections

| | Scenario 1 | Scenario 2 | Scenario 3 | Scenario 4 |
|---|---|---|---|---|
| **WITHOUT INCENTIVES** | | | | |
| **One-time:** | | | | |
| Permit Fees | $167,000 | $175,000 | $185,000 | $58,500 |
| Public Area Fees | 50,000 | 65,000 | 70,000 | 20,000 |
| **Total** | **$217,000** | **$240,000** | **$255,000** | **$78,500** |
| **Annual:** | | | | |
| Income Tax | $1,875,000 | $1,875,000 | $2,500,000 | $812,000 |
| Property Tax | 122,600 | 211,000 | 203,600 | 67,400 |
| **Total** | **$1,997,600** | **$2,086,000** | **$2,703,600** | **$879,400** |
| **WITH INCENTIVES** | | | | |
| **One-time:** | | | | |
| Permit Fees | $167,000 | $175,000 | $185,000 | $58,500 |
| Public Area Fees | 50,000 | 65,000 | 70,000 | 20,000 |
| **Total** | **$217,000** | **$240,000** | **$255,000** | **$78,500** |
| **Annual:** | | | | |
| Income Tax | $562,500 | $562,500 | $750,000 | $649,000 |
| Property Tax | 6,600 | 8,000 | 8,600 | 19,400 |
| **Total** | **$569,100** | **$570,500** | **$758,600** | **$668,400** |

A summary of the expenditure and revenue projections for each scenario, looking out 25 years, is attached as Appendix A.

Worthington 126985

Appendix A

Worthington 126986

# Scenario 1

| | Year 1 | Year 2 | Year 3 | ... | Year 7 | Year 8 | ... | Year 10 | Year 11 | ... | Year 18 | ... | Year 25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Expenditures** | | | | | | | | | | | | | |
| Stormwater & Site Engineering Consulting Fees | 35,000 | 35,000 | 0 | | 0 | 0 | | 0 | 0 | | 0 | | 0 |
| Wesley Blvd. Plan Review & Insp. | 40,000 | 0 | 0 | | 0 | 0 | | 0 | 0 | | 0 | | 0 |
| Infrastructure Consulting Fees | 112,500 | 112,500 | 0 | | 0 | 0 | | 0 | 0 | | 0 | | 0 |
| Planning & Bldg Consulting Fees | 15,000 | 15,000 | 15,000 | | 0 | 0 | | 0 | 0 | | 0 | | 0 |
| Public Area Fees | 50,000 | 0 | 0 | | 0 | 0 | | 0 | 0 | | 0 | | 0 |
| Fire Prevention | 32,000 | 32,960 | 33,949 | | 38,210 | 39,356 | | 41,753 | 43,005 | | 52,891 | | 65,049 |
| Parks Capital Investment | 7,500 | 7,725 | 7,957 | | 8,955 | 9,224 | | 9,786 | 10,079 | | 12,396 | | 15,246 |
| Parks Maintenance Technician/Contract Assistance | 107,000 | 110,210 | 113,516 | | 127,764 | 131,597 | | 139,611 | 143,799 | | 176,855 | | 217,509 |
| Parks Supplies | 17,000 | 17,510 | 18,035 | | 20,299 | 20,908 | | 22,181 | 22,847 | | 28,098 | | 34,557 |
| Service & Engineering Services | 7,000 | 7,210 | 7,426 | | 8,358 | 8,609 | | 9,133 | 9,407 | | 11,570 | | 14,230 |
| **Total Expenditures** | **$423,000** | **$338,115** | **$195,883** | | **$203,586** | **$209,693** | | **$222,464** | **$229,138** | | **$281,811** | | **$346,591** |

*Note: These costs do not include the land acquisition and/or the development costs of the parkland.*

| | Year 1 | Year 2 | Year 3 | ... | Year 7 | Year 8 | ... | Year 10 | Year 11 | ... | Year 18 | ... | Year 25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue without Incentives** | | | | | | | | | | | | | |
| Permit Fees | 167,000 | 0 | 0 | | 0 | 0 | | 0 | 0 | | 0 | | 0 |
| Public Area Fees | 50,000 | 0 | 0 | | 0 | 0 | | 0 | 0 | | 0 | | 0 |
| Income Tax | 1,875,000 | 1,912,500 | 1,950,750 | | 2,111,555 | 2,153,786 | | 2,240,799 | 2,285,615 | | 2,625,453 | | 3,015,820 |
| Property Tax | 122,600 | 125,665 | 128,807 | | 142,178 | 145,733 | | 153,111 | 156,938 | | 186,550 | | 221,750 |
| **Total Revenue without Incentives** | **$2,214,600** | **$2,038,165** | **$2,079,557** | | **$2,253,733** | **$2,299,519** | | **$2,393,909** | **$2,442,553** | | **$2,812,003** | | **$3,237,570** |
| **Revenue with Incentives** | | | | | | | | | | | | | |
| Permit Fees | 167,000 | 0 | 0 | | 0 | 0 | | 0 | 0 | | 0 | | 0 |
| Public Area Fees | 50,000 | 0 | 0 | | 0 | 0 | | 0 | 0 | | 0 | | 0 |
| Income Tax | 562,500 | 573,750 | 585,225 | | 633,466 | 1,076,893 | | 1,120,399 | 2,285,615 | | 2,625,453 | | 3,015,820 |
| Property Tax | 6,600 | 6,765 | 6,934 | | 7,654 | 7,845 | | 8,242 | 156,938 | | 186,550 | | 221,750 |
| **Total Revenue with Incentives** | **$786,100** | **$580,515** | **$592,159** | | **$641,120** | **$1,084,738** | | **$1,128,642** | **$2,442,553** | | **$2,812,003** | | **$3,237,570** |

**Assumptions**

Expenditures will increase 3% annually

Income tax revenues will increase 2% annually

Property tax revenues will increase 2.5% annually

Income tax incentive will end after seven years

Property tax incentive will end after ten years

# Scenario 2

| | Year 1 | Year 2 | Year 3 | ... | Year 7 | Year 8 | ... | Year 10 | Year 11 | ... | Year 18 | ... | Year 25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Expenditures** | | | | | | | | | | | | | |
| Stormwater & Site Engineering Consulting Fees | 35,000 | 35,000 | 0 | | 0 | 0 | | 0 | 0 | | 0 | | 0 |
| Wesley Blvd. Plan Review & Insp. | 40,000 | 0 | 0 | | 0 | 0 | | 0 | 0 | | 0 | | 0 |
| Infrastructure Consulting Fees | 100,000 | 100,000 | 0 | | 0 | 0 | | 0 | 0 | | 0 | | 0 |
| Planning & Bldg Consulting Fees | 15,000 | 15,000 | 15,000 | | 0 | 0 | | 0 | 0 | | 0 | | 0 |
| Public Area Fees | 65,000 | 0 | 0 | | 0 | 0 | | 0 | 0 | | 0 | | 0 |
| Fire Prevention | 32,000 | 32,960 | 33,949 | | 38,210 | 39,356 | | 41,753 | 43,005 | | 52,891 | | 65,049 |
| Parks Capital Investment | 5,000 | 5,150 | 5,305 | | 5,970 | 6,149 | | 6,524 | 6,720 | | 8,264 | | 10,164 |
| Parks Maintenance Technician/Contract Assistance | 75,000 | 77,250 | 79,568 | | 89,554 | 92,241 | | 97,858 | 100,794 | | 123,964 | | 152,460 |
| Parks Supplies | 11,250 | 11,588 | 11,935 | | 13,433 | 13,836 | | 14,679 | 15,119 | | 18,595 | | 22,869 |
| Service & Engineering Services | 9,000 | 9,270 | 9,548 | | 10,746 | 11,069 | | 11,743 | 12,095 | | 14,876 | | 18,295 |
| **Total Expenditures** | **$387,250** | **$286,218** | **$155,304** | | **$157,913** | **$162,651** | | **$172,556** | **$177,733** | | **$218,589** | | **$268,837** |

*Note: These costs do not include the land acquisition and/or the development costs of the parkland.*

| **Revenue without Incentives** | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Permit Fees | 175,000 | 0 | 0 | | 0 | 0 | | 0 | 0 | | 0 | | 0 |
| Public Area Fees | 50,750 | 0 | 0 | | 0 | 0 | | 0 | 0 | | 0 | | 0 |
| Income Tax | 1,875,000 | 1,912,500 | 1,950,750 | | 2,111,555 | 2,153,786 | | 2,240,799 | 2,285,615 | | 2,625,453 | | 3,015,820 |
| Property Tax | 211,000 | 216,275 | 221,682 | | 244,695 | 250,813 | | 263,510 | 270,098 | | 321,061 | | 381,641 |
| **Total Revenue without Incentives** | **$2,311,750** | **$2,128,775** | **$2,172,432** | | **$2,356,250** | **$2,404,598** | | **$2,504,309** | **$2,555,712** | | **$2,946,514** | | **$3,397,461** |

| **Revenue with Incentives** | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Permit Fees | 167,000 | 0 | 0 | | 0 | 0 | | 0 | 0 | | 0 | | 0 |
| Public Area Fees | 65,000 | 0 | 0 | | 0 | 0 | | 0 | 0 | | 0 | | 0 |
| Income Tax | 562,500 | 573,750 | 585,225 | | 633,466 | 1,076,893 | | 1,120,399 | 2,285,615 | | 2,625,453 | | 3,015,820 |
| Property Tax | 8,000 | 8,200 | 8,405 | | 9,278 | 9,509 | | 9,991 | 270,098 | | 321,061 | | 381,641 |
| **Total Revenue with Incentives** | **$802,500** | **$581,950** | **$593,630** | | **$642,744** | **$1,086,402** | | **$1,130,390** | **$2,555,712** | | **$2,946,514** | | **$3,397,461** |

## Assumptions

Expenditures will increase 3% annually

Income tax revenues will increase 2% annually

Property tax revenues will increase 2.5% annually

Income tax incentive will end after seven years

Property tax incentive will end after ten years

## Scenario 3

| | Year 1 | Year 2 | Year 3 ... | Year 7 | Year 8 ... | Year 10 | Year 11 ... | Year 18 ... | Year 25 |
|---|---|---|---|---|---|---|---|---|---|
| **Expenditures** | | | | | | | | | |
| Stormwater & Site Engineering Consulting Fees | 35,000 | 35,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wesley Blvd. Plan Review & Insp. | 40,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Infrastructure Consulting Fees | 75,000 | 75,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Planning & Bldg Consulting Fees | 15,000 | 15,000 | 15,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| Public Area Fees | 70,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Fire Prevention | 32,000 | 32,960 | 33,949 | 38,210 | 39,356 | 41,753 | 43,005 | 52,891 | 65,049 |
| Parks Capital Investment | 4,000 | 4,120 | 4,244 | 4,776 | 4,919 | 5,219 | 5,376 | 6,611 | 8,131 |
| Parks Maintenance Technician/Contract Assistance | 60,000 | 61,800 | 63,654 | 71,643 | 73,792 | 78,286 | 80,635 | 99,171 | 121,968 |
| Parks Supplies | 9,000 | 9,270 | 9,548 | 10,746 | 11,069 | 11,743 | 12,095 | 14,876 | 18,295 |
| Service & Engineering Services | 11,000 | 11,330 | 11,670 | 13,135 | 13,529 | 14,353 | 14,783 | 18,181 | 22,361 |
| **Total Expenditures** | **$351,000** | **$244,480** | **$138,064** | **$138,510** | **$142,665** | **$151,354** | **$155,894** | **$191,730** | **$235,804** |

*Note: These costs do not include the land acquisition and/or the development costs of the parkland.*

| **Revenue without Incentives** | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Permit Fees | 185,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Public Area Fees | 70,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Income Tax | 2,500,000 | 2,550,000 | 2,601,000 | 2,815,406 | 2,871,714 | 2,987,731 | 3,047,486 | 3,500,604 | 4,021,093 |
| Property Tax | 203,600 | 208,690 | 213,907 | 236,114 | 242,016 | 254,269 | 260,625 | 309,801 | 368,257 |
| **Total Revenue without Incentives** | **$2,958,600** | **$2,758,690** | **$2,814,907** | **$3,051,520** | **$3,113,731** | **$3,242,000** | **$3,308,111** | **$3,810,405** | **$4,389,350** |

| **Revenue with Incentives** | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Permit Fees | 185,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Public Area Fees | 75,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Income Tax | 750,000 | 765,000 | 780,300 | 844,622 | 1,435,857 | 1,493,866 | 3,047,486 | 3,500,604 | 4,021,093 |
| Property Tax | 8,600 | 8,815 | 9,035 | 9,973 | 10,223 | 10,740 | 260,625 | 309,801 | 368,257 |
| **Total Revenue with Incentives** | **$1,018,600** | **$773,815** | **$789,335** | **$854,595** | **$1,446,080** | **$1,504,606** | **$3,308,111** | **$3,810,405** | **$4,389,350** |

### Assumptions

Expenditures will increase 3% annually

Income tax revenues will increase 2% annually

Property tax revenues will increase 2.5% annually

Income tax incentive will end after seven years

Property tax incentive will end after ten years

## Scenario 4

| Expenditures | Year 1 | Year 2 | Year 3 | . . . | Year 7 | Year 8 | . . . | Year 10 | Year 11 | . . . | Year 18 | . . . | Year 25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Stormwater & Site Engineering Consulting Fees | 35,000 | 35,000 | 0 | | 0 | 0 | | 0 | 0 | | 0 | | 0 |
| Wesley Blvd. Plan Review & Insp. | 40,000 | 0 | 0 | | 0 | 0 | | 0 | 0 | | 0 | | 0 |
| Infrastructure Consulting Fees | 62,500 | 62,500 | 0 | | 0 | 0 | | 0 | 0 | | 0 | | 0 |
| Planning & Bldg Consulting Fees | 15,000 | 15,000 | 15,000 | | 0 | 0 | | 0 | 0 | | 0 | | 0 |
| Public Area Fees | 20,000 | 0 | 0 | | 0 | 0 | | 0 | 0 | | 0 | | 0 |
| Fire Prevention | 0 | 0 | 0 | | 0 | 0 | | 0 | 0 | | 0 | | 0 |
| Parks Capital Investment | 12,500 | 12,875 | 13,261 | | 14,926 | 15,373 | | 16,310 | 16,799 | | 20,661 | | 25,410 |
| Parks Maintenance Technician/Contract Assistance | 107,000 | 110,210 | 113,516 | | 127,764 | 131,597 | | 139,611 | 143,799 | | 176,855 | | 217,509 |
| Parks Supplies | 30,000 | 30,900 | 31,827 | | 35,822 | 36,896 | | 39,143 | 40,317 | | 49,585 | | 60,984 |
| Service & Engineering Services | 6,000 | 6,180 | 6,365 | | 7,164 | 7,379 | | 7,829 | 8,063 | | 9,917 | | 12,197 |
| **Total Expenditures** | **$328,000** | **$272,665** | **$179,970** | | **$185,675** | **$191,245** | | **$202,892** | **$208,979** | | **$257,018** | | **$316,099** |

*Note: These costs do not include the land acquisition and/or the development costs of the parkland.*

| Revenue without Incentives | Year 1 | Year 2 | Year 3 | . . . | Year 7 | Year 8 | . . . | Year 10 | Year 11 | . . . | Year 18 | . . . | Year 25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Permit Fees | 58,500 | 0 | 0 | | 0 | 0 | | 0 | 0 | | 0 | | 0 |
| Public Area Fees | 20,000 | 0 | 0 | | 0 | 0 | | 0 | 0 | | 0 | | 0 |
| Income Tax | 812,000 | 828,240 | 844,805 | | 914,444 | 932,733 | | 970,415 | 989,823 | | 1,136,996 | | 1,306,051 |
| Property Tax | 67,400 | 69,085 | 70,812 | | 78,163 | 80,117 | | 84,173 | 86,278 | | 102,557 | | 121,908 |
| **Total Revenue without Incentives** | **$957,900** | **$897,325** | **$915,617** | | **$992,607** | **$1,012,850** | | **$1,054,589** | **$1,076,101** | | **$1,239,553** | | **$1,427,959** |

| Revenue with Incentives | Year 1 | Year 2 | Year 3 | . . . | Year 7 | Year 8 | . . . | Year 10 | Year 11 | . . . | Year 18 | . . . | Year 25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Permit Fees | 58,500 | 0 | 0 | | 0 | 0 | | 0 | 0 | | 0 | | 0 |
| Public Area Fees | 20,000 | 0 | 0 | | 0 | 0 | | 0 | 0 | | 0 | | 0 |
| Income Tax | 649,600 | 662,592 | 675,844 | | 731,555 | 932,733 | | 970,415 | 989,823 | | 1,136,996 | | 1,306,051 |
| Property Tax | 19,400 | 19,885 | 20,382 | | 22,498 | 23,061 | | 24,228 | 86,278 | | 102,557 | | 121,908 |
| **Total Revenue with Incentives** | **$747,500** | **$682,477** | **$696,226** | | **$754,053** | **$955,793** | | **$994,643** | **$1,076,101** | | **$1,239,553** | | **$1,427,959** |

### Assumptions
- Expenditures will increase 3% annually
- Income tax revenues will increase 2% annually
- Property tax revenues will increase 2.5% annually
- Income tax incentive will end after seven years
- Property tax incentive will end after ten years

**From:** Greeson, Matt [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=E02E0F169E0140A08552304F1CFBCF86-GREESON, MA]
**Sent:** 10/13/2020 1:25:39 PM
**To:** Robinson, David [David.Robinson@worthington.org]
**Subject:** RE: nature of UMCH comp plan update?
**Attachments:** Memorandum to City Council - 1-31-2020.pdf

David:

Thanks for following up on this. I thought we had follow up conversations that negated the need for a written response
and apologize if I misunderstood. At this point, I am not comfortable with being asked to characterize the
Comprehensive Plan as a whole or any section as anything other than the adopted policy document of the City Council. I
would be glad to provide the details of the process that was used to arrive at the recommendations to MPC and Council
and let it speak for itself. The memo I wrote in January speaks to the consensus issue on page 2 and I will let that
stand. I certainly may be misunderstanding what you are asking for and am willing to discuss it, but as a rule; City
Manager's should avoid making statements that exacerbate policy disagreements between Council members or may be
used to delegitimize the active policy of their elected body.

**From:** Robinson, David <David.Robinson@worthington.org>
**Sent:** Saturday, October 10, 2020 11:16 AM
**To:** Greeson, Matt <Matt.Greeson@worthington.org>
**Subject:** Fw: nature of UMCH comp plan update?

Matt, I don't believe this inquiry from a year ago (!) was ever addressed by you. Can you do so please? I know
this topic will come up in public conversation soon, and I think it would serve the interest of all to have clarity
in messaging from you. Thank you. David

**From:** Robinson, David
**Sent:** Thursday, October 24, 2019 12:57 PM
**To:** Greeson, Matt <Matt.Greeson@worthington.org>
**Subject:** nature of UMCH comp plan update?

Matt, could you please put in writing how one may describe the nature of the UMCH Comp Plan update
process (and final product)? You and I spoke about this a month ago or so and, partly in response to me
challenging the notion that the update is a "consensus" document (as the Comp Plan claims for itself), you said
things about the update plan being an "expert opinion" (or something like that) plan with the public serving as
a sounding board (or something like that). But I want to be precise in my language and not misquote. I'm
thinking about this in relation to the Visioning Committee and the documents they will be
reviewing. Thanks. David



EXHIBIT
37

Worthington 058372



**Office of the City Manager**

January 31, 2020

TO:        Members of City Council

FROM:   Matt Greeson ~~~~~
           City Manager

SUBJECT:   Responses to questions posed by Council Member Robinson regarding status of
           UMCH Comprehensive Plan Update

On January 24, 2020, Council Member Robinson posed via email several important questions
regarding the Comprehensive Plan as it relates to the United Methodist Children's Home
(UMCH) property. The following are his questions along with my responses. I have also
provided comments, an outline of options I believe are available to the City, and key questions
that need to be answered. I hope this information is helpful and would be glad to address any
additional questions that may arise.

**What, in your mind, is the current status of the UMCH Comp Plan Update? Is it in full
force, on par with the rest of the Comp Plan?**

> When the City Council approved Resolution Number 2014-39, it amended the
> Comprehensive Plan, updating the existing section that discussed the UMCH property.
> Since then, no policy action has been taken or legislation adopted by Council to suggest
> that one section of the Comprehensive Plan holds more or less "force" than another. Nor,
> can staff independently or arbitrarily decide such a thing.
>
> However, I do believe the City has some flexibility in determining what elements of the
> Comprehensive Plan it proactively pursues or places emphasis on. I discuss this further
> below.

**I think I remember Lee stating something along these lines at a council meeting last fall,
that the Update is "current policy" or something to that effect. Or have the various
statements from Council, usually made in the context of the Visioning Process, regarding
the Comp Plan being at or near the end of its life (I can't remember the exact language
from our resolution), sufficient to effectively negate its current relevance and standing?**

> No. Until amended, replaced or repealed by Council action, it remains a part of the
> adopted policy framework by which development is and will be reviewed.

Worthington 058373

**Stated in practical terms, what will you and the rest of staff do if LC makes a proposal and cites the Comp Plan as a basis for justifying their proposal?**

**Will you accept their proposition without qualification?**

No. We will independently and objectively review any development proposal applying the adopted policies, plans, regulations and practices in place, including the Comprehensive Plan.

**Or will you claim that the Update is effectively no longer in force? Which is it? Or some other alternative?**

We will certainly be open and clear with all involved that aspects of the plan do not enjoy community or Council consensus; that community engagement will be critical to developing a proposal that is ultimately successful, and will encourage focus on elements the Council deems desirable (maybe park space, office, a restaurant, and empty nester housing as examples). However, it should be clear that staff has no authority to invalidate this section of the Comprehensive Plan.

**Additional Comments**

If the City Council is concerned with the answers above or the status of the Comprehensive Plan, here is what I see objectively as the options:

1. Maintain and apply plan -- While elements of the plan may be out of date or not enjoy the consensus of all involved, our current track is to use the plan to direct development to the best of our ability. As stated above and discussed further below, the degree to which we are proactive in advancing some of the Plan's ideas is a point for consideration. It is likely that sometime after the Visioning Process is completed, a plan update would be in order.

2. Repeal all sections related to UMCH or sections that are points of disagreement -- A Comprehensive Plan does not have to speak to a specific site or address all issues of land use concern. This makes guidance for staff, developers and the community less detailed; and more unclear and challenging to apply. However, it may increase flexibility for MPC and Council to determine what is best.

3. Amend the section -- This option involves amending, adjusting or deleting sections that are at the heart of objections to previous proposals. For example, there are specific density references of 6 to 14 dwelling units per acre for the "Neighborhood Core" section. There are also height references up to 4 or 5 stories on High Street. Reduction or elimination of some of this language and

2

these numbers may make the plan less specific and, therefore, provide more flexibility for the MPC and Council to determine what is best.

4. Re-write and replace section - I do not think replacement could be done quickly, given that getting people to commit to interim dispute resolution or consensus building processes on this issue has been elusive. I expect coming up with fresh new language that enjoys agreement may face the same challenge. However, an attempt at this is always a conceptual option.

5. Housing moratorium until plan or regulation re-write — The Council has the authority to place a moratorium for a reasonable period on certain zoning classifications, types of building activity or uses. Moratoriums need to be based on advancing a legitimate government interest. When a city does this, it abridges property owners' rights to pursue development. It needs to be time limited with a commitment to specific planning action being taken during that time. It is conceivable that a moratorium on multi-family housing could be put in place, but it may be difficult to complete the Visioning process and create new Comprehensive Plan language that enjoys support within a constitutionally reasonable timeline.

Lastly, I think it will be important for the Council to discuss, possibly at the retreat, what role it wants the staff to play. In addition to providing a technical review as I have described above, staff often works to help steer developments towards desirable community outcomes. This is most easily achieved when our goals are clearly discernable. Examples include using tax increment financing (TIFs) for beneficial public infrastructure and tax abatements or income tax incentives to encourage office or other income producing activities. Council has in recent years discouraged staff from proactively working with LC (or Steiner); appetite for using alternative resolution processes has been limited.

If LC indeed plans to submit a proposal for development, it will be imperative that Council provide clear direction. The Comprehensive Plan recommends we pursue a public-private partnership to best achieve the goals of the plan. Do we want to proactively negotiate to try to shape the project to meet more of the expectations of the community and Council? Which elements or expectations are most critical to emphasize? What role do you want staff to play in these efforts? What does success look like in such endeavors? These are questions I believe should be discussed at the retreat or earlier.

3

Worthington 058375