# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **LIFESTYLE COMMUNITIES, LTD**., *et al.*, | ) | Civil Action 2:22-CV-1775 |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Judge Sarah D. Morrison |
| | ) | |
| **CITY OF WORTHINGTON, OHIO**, | ) | |
| | ) | |
| Defendant. | ) | Magistrate Judge Elizabeth P. Deavers |
| | ) | |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# EXHIBIT 03

*LIFESTYLE COMMUNITIES*

*vs.*

*CITY OF WORTHINGTON*

Deposition of

**Rebecca Hermann**

October 05, 2023



614.460.5000 | www.priohio.com | pri@priohio.com

1           IN THE UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF OHIO
2                   EASTERN DIVISION

3
LIFESTYLE COMMUNITIES,      )
4   LTD., ET AL.,            )
                            )
5        Plaintiffs,         )
                            )
6        vs.                 )   Case No.
                            )   2:22-cv-1775
7   CITY OF WORTHINGTON,     )
    OHIO,                    )
8                            )
         Defendant.          )
9

10

11                   DEPOSITION

12              of REBECCA HERMANN

13

14        Taken at Worthington City Hall
               6550 North High Street
15           Worthington, Ohio 43085

16

17        on October 5, 2023, at 9:01 a.m.

18

19        Reported by: Rhonda Lawrence

20

21                    -=0=-

22

23

24

1    APPEARANCES:

2          Christopher L. Ingram
             Emily J. Taft
3          VORYS SATER SEYMOUR AND PEASE LLP
             52 East Gay Street
4          Columbus, Ohio 43215
             614.464.5480
5          clingram@vorys.com
             ejtaft@vorys.com
6
                  on behalf of the Plaintiffs.
7

8          Paul J. Schumacher
             DICKIE McCAMEY
9          600 Superior Avenue East, Suite 2330
             Cleveland, Ohio 44114
10         216.390.1795
             pschumacher@dmclaw.com
11
                  on behalf of the Defendant.
12

13

14

15

16

17

18

19                      -=0=-

20

21

22

23

24

1                              STIPULATIONS

2                   It is stipulated by and among counsel

3       for the respective parties that the deposition

4       of REBECCA HERMANN, the Witness herein, called

5       by the Plaintiffs under the applicable Rules of

6       Federal Civil Court Procedure, may be taken at

7       this time by the stenographic court reporter and

8       notary public by agreement of counsel; that said

9       deposition may be reduced to writing

10      stenographically by the court reporter, whose

11      notes thereafter may be transcribed outside the

12      presence of the witness; and that the proof of

13      the official character and qualification of the

14      notary is waived.

15                              -=0=-

16

17

18

19

20

21

22

23

24

1 INDEX OF EXAMINATION

2 PAGE

3 BY MR. INGRAM: 5

4

5

6 INDEX OF EXHIBITS

7 EXHIBIT DESCRIPTION PAGE

8 1 Land Use Plan 49

9 2 Public Events and Related 51
Materials
10
3 Planning Process 68
11
4 Worthington, OH – Official 71
12 Website – MCH Development
Proposal posts
13
5 1033 High Street (former 88
14 UMCH) printout

15 6 Ordinance No. 04-2022 93

16 7 Resolution No. 04-2022 93

17 8 Minutes, 2-7-22 95

18 9 Minutes, 1-18-22 96

19 10 Agenda, 1-18-22 99

20 11 Email from Robinson, 1-18-22 132

21 12 Email from Daly, 1-28-22 142

22 13 Agenda, 2-7-22 146

23

24

1        MR. INGRAM:  Worthington are yours.

2    Counsel, I'll let you know in advance that not

3    all the Bates numbers printed out.  So sometimes

4    we have doc IDs on some of the exhibits.

5    BY MR. INGRAM:

6       Q.  Ms. Hermann, you've been handed what we

7    have marked as Exhibit 1.  And Exhibit 1 is what

8    I'm referring to as the land use plan.  Do you

9    recognize Exhibit 1 to be the amendment to the

10   City's comprehensive plan concerning the UMCH

11   property?

12        MR. SCHUMACHER:  A portion of it, right?

13      A.  The land use plan, this is the document

14   that I understand it to be.  Is that what you're

15   asking me?

16      Q.  Let me rephrase my question.  How about

17   that?

18      A.  Thank you.

19      Q.  Do you recognize Exhibit 1 to be the

20   amendment to the City's comprehensive plan

21   concerning the UMCH property that was adopted on

22   September 2nd, 2014?

23      A.  Yes.

24      Q.  As you indicated earlier, I'm going to

1    refer to Exhibit 1 as the land use plan.  Fair

2    enough?

3        A.  Yes, fair.

4        Q.  Are you familiar with the land use plan?

5        A.  Yes.

6        Q.  What is it?

7        A.  It's a guideline for municipalities to

8    encourage development and growth.

9        Q.  And are you familiar with the process

10   that was followed that ultimately reached in

11   what City Council adopted on September 2nd,

12   2014?

13       A.  I'm familiar with the process, yes.

14                    -=0=-

15       (Deposition Exhibit 2 marked.)

16                    -=0=-

17   BY MR. INGRAM:

18       Q.  I'm going to hand you what's been marked

19   as Exhibit 2.

20       A.  Thank you.

21       Q.  Review it.

22           Ms. Hermann, Exhibit 2 is the public

23   events and related materials that gave rise to

24   the land use plan.  Do you see that?

1  completely undefined, correct?

2        MR. SCHUMACHER:  Objection.

3    A.  Contiguous means it's connected.

4    Q.  Sure.  I'm trying to understand, if it's

5  not defined, how large of a green space is

6  called for here?

7        MR. SCHUMACHER:  Objection.

8    A.  I do not know what large is intended.

9    Q.  It also says that the green space be

10  central to the property.  Do you see that?

11        MR. SCHUMACHER:  And inclusive of the

12  Tucker Creek acreage.

13        MR. INGRAM:  I'm getting to that,

14  Counsel.

15        MR. SCHUMACHER:  All right.  Maybe you

16  should have your client engage with the

17  community and find out.

18    A.  Central to the property.  I don't know

19  what that means.

20    Q.  You don't know what central to the

21  property means?

22    A.  Central defined by a tennis ball in the

23  middle of it, I guess, a radius.  Is that

24  what --

1                    CERTIFICATE

2    STATE OF OHIO        :
                            SS:
3    COUNTY OF FRANKLIN :

4            I, Rhonda Lawrence, a stenographic
     court reporter and notary public in and for the
5    State of Ohio, duly commissioned and qualified,
     do hereby certify that the within-named REBECCA
6    HERMANN was first duly sworn to testify to the
     truth, the whole truth, and nothing but the
7    truth in the cause aforesaid; that the testimony
     then given was taken down by me stenographically
8    in the presence of said witness, afterwards
     transcribed; that the foregoing is a true and
9    correct transcript of the testimony; that this
     deposition was taken at the time and place in
10   the foregoing caption specified.

11           I certify that I am not a relative or
     employee of any attorney or counsel employed by
12   the parties hereto and that I am not financially
     interested in the action.  I further certify
13   review of the transcript was not requested.

14           In witness whereof, I have hereunto
     set my hand at Columbus, Ohio, on this 19th day
15   of October, 2023.

16

17

18

19

20

21           *Rhonda Lawrence*
             Rhonda Lawrence
22           Notary Public, State of Ohio

23   My commission expires:  October 9, 2028

24



## United Methodist Children's Home Focus Area

This section of the Worthington Comprehensive Plan was updated in 2014 for the United Methodist Children's Home focus area.

*Background*

The more than 40-acre United Methodist Children's Home (UMCH) site presents a rare opportunity for Worthington to experience redevelopment on a visible and sizable site near the heart of Worthington. The site is located north of Old Worthington along the North High Street Corridor. Originally, the United Methodist Children's Home included hundreds of acres that extended to the Olentangy River that are now residential neighborhoods.

The United Methodist Children's Home has been a compassionate steward of the land and an invested and contributing member of Worthington for over a century. It continues to provide critical services to the greater Central Ohio community.

Following serious consideration by the UMCH Board to sell this site and concerns of the community related to its potential redevelopment, the City reexamined the future land use recommendations of this plan to deliver more clear direction and intent.

The goal, as with all of the future land use recommendations in this plan, is to provide guidance as to the range of desired land uses and development in the event the private land owner and/or future developer requests rezoning of the property; and to assist the City with its review and evaluation of any proposal. The community dialogue and consensus represented by this plan will facilitate any future redevelopment process for this site in a manner that meets the needs of the greater community as well as the land owner.



*UMCH Focus Area boundaries (in red)*



Worthington 163580

*Context*

Located along North High Street across from the Louis J.R. Gooery Worthington Municipal Building and the Worthington Fire Station, the UMCH focus area is approximately a half-mile north of the Worthington Village Green.

This 44.5-acre site contains various built structures, including administrative offices and several residential and service structures that are a part of the UMCH program. It also includes the Conference Center and the Sunrise Senior Living assisted living community on either side of Wesley Boulevard. Once part of the larger UMCH property, the Sunrise Senior Living campus is on 3.5 acres with a long-term ground lease. The United Methodist Church occupies the Conference Center. Neither facility will be included in a UMCH property sale. It should be noted that the two existing residential lots that abut the north side of this site along the south side of Larrimer Avenue are included in this focus area plan at the request of their owners.

Though relatively flat, the site's most striking natural feature is a ravine and wooded area surrounding Tucker Creek. This natural area buffers the southern section of the site from single-family homes on quarter-acre lots along Greenbrier Court.

To the southwest, the site borders Evening Street. Directly to the west, the site borders the rear yards of single-family residences on third-of-an-acre lots on Evening Street. To the north, the site abuts Longfellow and Larrimer Avenues, with single-family residences on third-of-an-acre lots across the street. The focus area is served by signalized intersections with North High Street at Wesley Boulevard and at Larrimer Avenue. The existing site also has two additional access points on High Street between these two signals.

The current zoning of the UMCH focus area consists of commercial zoning C-2 Community Commercial (0.7 acres) and C-3 Office (9.3 acres) along its High Street frontage, SC Senior Citizen (3.5 acres) on the Sunrise site, and S-1 Special (31 acres) across the remainder of the site. Current permitted uses include churches, parochial schools, colleges, hospitals, and other institutional uses (S-1), medical centers and real


*Current zoning for the UMCH focus area.*

estate, insurance, and legal offices (C-3), and supermarkets, specialty stores, and retail stores (C-2).

*Future Land Use Focus Area Plan*

The 2005 Comprehensive Plan identified the UMCH site as strategic for future growth, a matter particularly critical for an established community like Worthington. While the 2005 plan presented an example of two possible redevelopment scenarios, this update document provides a more in-depth consideration of appropriate redevelopment parameters that incorporate community and stakeholder feedback with current demographic, fiscal, and market trends.

*Design Intent*

Worthington was founded as a master planned community. Because of the size, location, and importance of the UMCH site, it is critical that any redevelopment be master planned and consider the site as a whole. The following sections provide a framework and direction to the City, reviewing Boards and Commissions, and potential developers as to Worthington's desired vision for any change of use and redevelopment that might occur on the site.

Building upon the previously stated objectives, redevelopment of this site must create a high-quality, mixed-use development





*Future land use zones for the UMCH focus area.*

that is walkable, connected, and integrated within the site and with the City. This mix of uses should contain a range of residential types together with commercial office and neighborhood retail uses integrated with contributing and shared green space and amenities – all of which complement each other to create an active, vibrant place. Any proposed design must be sensitive to the neighborhoods adjacent to the UMCH site, as well as to the natural features related to Tucker Creek. Any development that occurs within the focus area should relate internally to the site and to an overall plan, even if it is built at different times. For this reason, it is expected that any proposed redevelopment include rezoning of the entire site to a Planned Unit Development as an early step. Because of the importance of achieving the full potential of the UMCH site for the City and Worthington community, it is expected that public-private partnership(s) will play a role in the planning and redevelopment of this site.

### Future Land Use

The future land use map for this focus area divides the site into four general zones:

- High Street Mixed Use (red on the plan)
- Worthington Estates Edge (yellow on the plan)
- Neighborhood Core (orange on the plan)
- Tucker Creek Preserve (green on the plan)

### Objectives

As part of the update of this focus area plan, a group of consolidated objectives was created. These objectives include:

1. Consideration of the redevelopment potential of this site recognizing the critical resource and opportunity this 40+ acre site represents within the City.
2. Provision of a mix of desirable uses and green space that are compatible with surrounding neighborhoods and are currently underserved in Worthington.
3. Addressing the needs of current and future residents by providing new housing types/options that are underrepresented in the market and complement Worthington's current offerings.
4. Recognition of the financial goals of UMCH to enable it to continue its mission within the region.
5. Expansion of the City of Worthington's tax base by incorporating uses that allow for new or enhanced sources of revenue.
6. Preservation and integration of the existing natural features found on the site related to Tucker Creek.
7. Creation of a well-planned, vibrant, walkable, and integrated development of the highest quality that meets or exceeds current best practices for mixed use development, including the provision of communal space and complete streets.

Each are described in more detail below:

### High Street Mixed Use

North High Street is the commercial spine of the City of Worthington. It is home to some of the City's most important corporations and the address for much of its retail and services. The UMCH site lies less than a half-mile from the center of Old Worthington and is situated between both this retail center and the Shops at Worthington Place.

As a result, this is a good location for commercial office use.



As discussed throughout this Comprehensive Plan, income-tax generating employment uses such as office are critical to the fiscal sustainability of the City. In addition, this site's close proximity to historic Old Worthington makes it a prime location for walkable residential development and denser, amenity-rich housing types similar to what is discussed in the Improving Housing Balance section of this document (page 73). This location along High Street is attractive for retail and service uses as well. It is not the desire of the City, however, to create a third retail center in close proximity to Old Worthington and the Shops at Worthington Place. Retail in this location should be neighborhood scale and serve the development that occurs on this site and that exists in the surrounding neighborhood; and it should help to activate the High Street frontage.



*Conceptual view of possible new development along High Street.*

The High Street Mixed Use zone consists of the frontage of the UMCH site along High Street. It permits a mix of office, residential, and retail uses with the focus on commercial office and medical uses with subordinate residential and limited retail uses. Buildings in this zone should be a minimum of two stories and a maximum of five stories in height with attractive, four-sided architecture. Buildings in this zone should address the streets, activate the street frontage, and include opportunities for outdoor dining and other pedestrian-focused activities.

It is expected that the buildings adjacent to High Street will be commercial offices. Residential uses might occur behind as a transition to the Neighborhood Core. Neighborhood-oriented retail uses can complement the development in the first floors of office and residential buildings. The objective of the High Street Mixed Use zone is to create a high-quality, dense, walkable, connected, mixed-use development that creates a dynamic space and signature address to attract Class A office tenants along High Street and add vitality and life to the High Street corridor.

In order to create a walkable environment, it is expected that buildings will line public streets and most parking will be located at the center of blocks, screened from public streets by attractive buildings. Parking beneath buildings may also be considered, provided the public street frontage of a building is

activated. By providing a mix of uses within the High Street Mixed Use zone, parking areas can be shared to optimize their use. To achieve the desired densities, parking decks are encouraged to be integrated into the site. Features expected as part of any parking deck or structure include masonry and architectural elements to dress up the exterior, windowed stair towers, and lush landscaping and pedestrian connections.

Parking structures and/or parking lots could be lined with residential and/or retail development to separate and screen them from the Neighborhood Core. Where the High Street Mixed Use zone is opposite existing single-family residential development, it is expected that the new development will consist of residential development and/or substantial and attractive buffers.

As with all development in the UMCH focus area, it is to be of high-quality in character and design with four-sided architecture. It should follow the *Worthington Design Guidelines*.

### Worthington Estates Edge

This zone is where development in the UMCH focus area should create a desirable transition between it and the existing single-family housing development that surround its north and west sides. The surrounding development consists of homes on third-of-an-acre lots. The Worthington Estates Edge zone





*Future Land Use Map for the UMCH site (bird's eye view).*

calls for single-family residential development on lots between a third-of-an-acre and a fifth-of-an-acre. This equates to a residential density similar to Worthington Estates (3 dwelling units/acre) and Old Worthington (4-5 dwelling units/acre). The structures are limited to the same two-and-a-half story height as the surrounding neighborhood.

These may be single-family, detached homes that are more current, updated versions of what is found in the surrounding neighborhoods. Or they may be smaller homes with smaller yards that provide first floor living opportunities for Worthington residents — an option in which many residents expressed an interest during the community meetings. They may be something in between. Regardless, these homes must be of high-quality design, differentiated architecture, and in close proximity to amenities. This zone is for custom-built, individualized homes and not one for homes with repetitious floor plans.

Housing in this zone should consist of individual units, potentially with lots of different sizes, fronting on a street or streets. The use of cul-de-sacs is strongly discouraged. These new lots must include rear or side yards to provide a substantial

buffer and green landscape between these structures and the rear yards of existing homes. Attractive storm water systems designed as a naturalized amenity can be placed within the Worthington Estates Edge zone.

As with all development in the UMCH focus area, it is to be of high-quality in character and design with four-sided architecture. It should follow the *Worthington Design Guidelines*.

### Neighborhood Core

The Neighborhood Core zone represents the most flexible zone of the UMCH focus area because it is internal to the site. It consists of a higher density neighborhood that creates a transition from the single-family homes along the periphery of the site to the more active uses proposed closer to High Street.

The Neighborhood Core calls for residential development at a density between six and fourteen dwelling units per acre (6-14 du/ac) gross density with a height limit of three stories. It is expected that the Neighborhood Core will be developed with more than one housing type and at more than one density level. The expected amount of park space and amenities correspondingly increases with the density. For a density





*Conceptual view of single family homes along a great street.*



*Conceptual view of townhouses facing a green commons.*

reference, Ville Charmante along West Wilson Bridge Road is over seven dwelling units per acre.

This area creates the opportunity to introduce different types of housing options that are not readily available in the city. This area should provide residential living that is underrepresented in the market and complements Worthington's current offerings, addressing the needs of aging Worthington residents, future young professionals, and those desiring amenity-rich living. For reference, more information on the need for this type of housing product is described in "Improving Housing Balance" on page 73.

Examples include a mix of single-family detached homes on small lots with rear alley garages, homes with great front porches for outdoor gathering, custom homes designed for first-floor living, luxury residences with integrated front autocourts, well-appointed walk-up townhomes, and a limited number of high-end flats. To be successful, the Neighborhood Core must incorporate common areas/shared green space(s). These parks create the community gathering and development focal point(s). Shared amenities and facilities should also be provided. In all cases, the buildings must have front doors on inviting tree and sidewalk-lined streets. The objective is not to have streets dominated by garages, so garages must be de-emphasized -- set back or placed to the rear of structures, creating a very walkable neighborhood.

As with all development in this focus area, the community expects this development to be of high-quality in character and design, and adhere to the *Worthington Design Guidelines*.

*Tucker Creek Preserve*

The southern boundary of the UMCH focus area is the beautiful and wooded Tucker Creek ravine. This plan calls for preserving this area as a natural green space amenity for the site and the community. The creek and the steep slopes that surround it are not developable and the wooded areas along it are important contributing and environmental features.

The community expressed a strong desire to continue linking neighborhoods, parks, and destinations with multi-use trails throughout the City. This includes achieving a dedicated trail along Tucker Creek that highlights this natural feature and provides an amenity and potential connection between High Street and Evening Street.

As part of any development that occurs on the UMCH site, it is expected that any future developer preserve the Tucker Creek ravine and wooded area. Any storm water systems in this area must be designed as a naturalized, aesthetic landscape feature that fits in the environment.

94



*Conceptual view of a mixed-use development along a green commons.*

## Zone Boundaries

The boundaries between zones internal to the site are not absolutely fixed and could be adjusted at the margins. Depending upon the street layout and overall merits of a proposed development, these boundaries might shift. For example, the Worthington Estates Edge might grow or shrink slightly in some areas as part of a formal development plan submittal, or the Tucker Creek Preserve might grow in one area and shrink in another to better protect surveyed natural features. In order to provide appropriate parking and building screening, the High Street Mixed Use zone might be enlarged to the west.

There is one exception. As mentioned throughout this Comprehensive Plan, the need for revenue-producing land uses for the City of Worthington, particularly income-tax generating uses such as well-planned commercial office and medical, is of strategic importance. If a development plan is proposed that provides significant income tax revenue to the City, the High Street Mixed Use zone could expand into the Neighborhood Core zone. In the event of a substantial expansion of the High Street Mixed Use zone, the sensitive design and aesthetics of the edge treatment/buffer of the zone with the adjoining areas become critically important.

## Park Space

The creation of park space for community and public enjoyment is an important component for any redevelopment on the UMCH site. This is in addition to the Tucker Creek Preserve. Beyond serving community-gathering functions, the park space is critical to providing place-making in development layouts as well as a green space balance to the built environment contemplated in the High Street Mixed Use and Neighborhood Core zones.

In potential redevelopment scenarios, this additional park space was several acres divided between the High Street Mixed Use and Neighborhood Core zones. Park space could be used to provide linear park "windows" into the site from High Street; neighborhood-oriented parks internal to the site; and/or extension of the Tucker Creek preserve. The expected amount of park space and amenities correspondingly increases with the density of development proposed on the UMCH site. Park space as discussed here must be useable, contributing ground for residents, workers, and visitors of the redeveloped site, and not, for example, storm water controls or left-over ground.

It is expected that the developer(s) of the UMCH site will integrate usable park land into the development and work with the City to provide acreage in the High Street Mixed Use and Neighborhood Core zones as park space useable by the community.

Creating this additional park space within the UMCH focus area will address the community's desire for park space and amenities here. The public process generated numerous ideas for amenities worthy of further consideration. It is important that the City and the Worthington Parks and Recreation Commission work with the community to plan for and create parks that include the desired amenities in the appropriate places within the City and at this site.

## Design Guidelines

Because the UMCH focus area falls within the City of Worthington's Architectural Review District boundary, any new construction or alteration is subject to review and approval by the Architectural Review Board (ARB). The Board ensures the


Worthington 163586

high quality of design and site planning for any construction within the Architectural Review District. In order to meet the expectations of the ARB, any development on the UMCH site should adhere to the *Worthington Design Guidelines* used by the City and ARB to review development proposals.

The new residential development portion of the Residential Design Guidelines (page 31) provides guidance on site development, form, massing, and scale, setbacks, roof shape, exterior materials, windows, entries, ornamentation, and color. In general, the goal is to create residences and neighborhoods of a high quality of design with pleasant, intimate character and a strong sense of place and inviting human scale. Architecture and design should be rich and varied (not repetitive/homogeneous) with great attention to detail.

The new commercial development portion of the Commercial/ Institutional Design Guidelines (page 25) provides guidance on site development, scale, form, and massing, setbacks, roof shape, materials, windows, entries, ornamentation, color, and signage. In general, the goal is to build upon and extend the pedestrian scale and walkability of the city's commercial heart as well as create buildings that are long-lasting and have four-sided architecture that is attractive on all sides. Building forms, materials, and setbacks should be consistent with historic patterns and help continue traditional patterns into new development.

It is important that the commercial development encourage pedestrian connections and activities. The location along High Street and the close proximity to Old Worthington and existing neighborhoods creates the potential for strong pedestrian connections. In order to make this area inviting to pedestrian activity, wide sidewalks such as those in Old Worthington should be encouraged in order to allow for connections as well as additional activities. Pedestrian-scale signage, plantings, lawn areas, and street furniture will also create an inviting, walkable atmosphere. By implementing these recommendations and following the standards established in the *Worthington Design Guidelines*, the proposed commercial uses along High Street will introduce complementary uses

---

**Commercial Design Guidelines**

Excerpts from the *Worthington Design Guidelines* for new commercial and institutional construction include:

1. Tend toward simpler geometric forms and uncomplicated massing;
2. Carefully design facades with traditional storefronts to make buildings pedestrian-friendly;
3. Build up to the required setback to get pedestrians closer to the building;
4. Locate parking areas to the rear and avoid front setbacks;
5. Use buildings to screen off-street parking from view;
6. Create unimpeded pedestrian access to the front building façade from the public sidewalk;
7. Make roof shapes in scale with the building;
8. Use traditional materials with a focus on brick and limit poured concrete/concrete block to foundations;
9. Use large areas of glass for storefronts and more traditional patterning on upper floors;
10. Emphasize the primary entry on the street-facing principal façade; and
11. Help create a linkage between Old Worthington and newer areas through consistent design elements.
12. Use compatible colors.

---

and provide new amenities within walking distance of the Worthington community.

*Connectivity*

To achieve a high-quality, mixed use development that is walkable, safe, and successful, it is important that any development on the UMCH site be well connected both internally to the site and to the greater Worthington community. The UMCH site is ideally situated along High Street and within close proximity of Old Worthington, the Olentangy Trail, nearby neighborhoods, and Worthington Schools. Therefore, multiple connections should be created to encourage pedestrian, cyclist, and vehicular access to the area in a complete streets fashion.



Worthington 163587

## Residential Design Guidelines

Excerpts from the *Worthington Design Guidelines* for new residential construction include:

1. Avoid facing garages to the street and set them back from the main building plane;
2. Establish multiple connections to existing streets to integrate with the existing community fabric;
3. Carefully consider components of scale;
4. Match roof shapes to the appropriate architectural style;
5. Use building materials in traditional ways;
6. Consider substantial use of brick; fiber cement board is appropriate; and avoid the use of stucco;
7. Carefully design window patterns, sizes, and proportions;
8. Use good quality windows – all-aluminum and vinyl windows are discouraged;
9. Avoid blank wall or walls with few windows;
10. Orient entry doors toward the street, make them clearly visible, and aligned with the window rhythm;
11. Use ornamentation in traditional locations; and
12. Use compatible colors.

These street connections must be strategically and sensitively designed and located. It is not enough to simply connect the site to High Street. This development must be integrated into the greater community and neighborhoods. This could include connections to Evening Street and Longfellow Avenue/ Hayhurst Street. The development plan must show how these complete street connections are to be made. The objective of these new connections is to interconnect this site but strongly discourage cut-through vehicular traffic from High Street and commercial office uses through the Worthington Estates and Evening Street neighborhoods. In particular, the street system should be designed to discourage through commercial traffic from exiting to Evening Street.

In order to best determine the alignment of the new street connections, a detailed traffic study must be conducted. This study will help determine the alignment of new street connections and what needed street improvements are required, if any. The traffic study will be provided by the developer and approved by the City as part of any redevelopment proposal for the UMCH site.

Streets within the UMCH site should be designed to traditional neighborhood development and complete street standards. This means that they should be narrow travel lane widths (10 feet) with on-street parallel parking, street trees in tree lawns, decorative street lights, and accommodating sidewalks. Bike travel should also be accommodated through the development. The use of cul-de-sacs is strongly discouraged. Any dead-end streets should still provide pedestrian and bicycle connectivity to adjacent streets. Alleys are acceptable as a means of providing access to parking structures, garages, and service areas. Alleys should be sensitive to the overall design and aesthetics of the development and reflect the high design standards of the community, including placement of architecture and landscape along them for visual enhancement. The disposition of any alleys, public or private, will be determined as part of the development plan review; though it is expected that all streets throughout the development will be publicly dedicated.

### Street Intersection Options

Because of the desired development described here, signalized intersections will be critical to providing access to the site and minimizing traffic impacts. At this time, access is provided at only one signalized intersection: Wesley Boulevard and High Street/Worthington-Galena Road. Currently through movement to Worthington-Galena Road from this site is not permitted. This restriction will need to be studied for removal as part of any redevelopment of the UMCH site. Additionally, it is very likely that a drive access will be necessary to the north to provide access to the Larrimer Avenue/High Street signalized intersection.

As mentioned in the existing conditions, it is likely that the UMC Conference Center and Sunrise Senior Living will not be part



of any initial redevelopment. Because these two buildings sit astride the primary entry to the site, and because of the importance of setting the tone and quality of any redevelopment at the gateway – it is possible that providing an additional signalized intersection on High Street will be requested to achieve the desired redevelopment.

This could take several forms, from creating a new intersection to relocating an existing one. It could also involve realigning Worthington-Galena Road between the Louis J.R. Goorey Worthington Municipal Building and the Fire Station as contemplated in one of the scenarios studied. Regardless, any such roadway and intersection improvement must be carefully considered from a safety and traffic viewpoint as well as a fiscal one. If requested, studies must be commissioned by the developer for City review to determine the potential for a High Street access change.



*Conceptual view of possible new development along High Street.*

### High Street Frontage

The potential redevelopment of the UMCH focus area as described herein creates a change in the consideration of setbacks along High Street in these blocks. To achieve the desired walkability, vitality, and screening of parking along Worthington's signature street, it is expected that multi-story buildings will be constructed closer to the High Street right-of-way, with parking located behind the buildings. The buildings should engage High Street with broad sidewalks, storefronts, front entries, and outdoor seating that provide an inviting strolling environment for pedestrians.

The buildings constructed along High Street will set the tone and impression for the entire UMCH focus area. As such their architecture, materials, quality, interest, aesthetics, and vitality are critical. These buildings should have a predominance of brick and complement the community character.

Buildings along High Street must have the majority of their building face fronting/parallel to the street. Buildings are expected to be at least two stories in height with substantially transparent storefronts on the first floor, whether retail or office, to activate the street. Operational building entries must be

provided along High Street regardless of parking orientation. Neither single-story commercial buildings nor retail buildings on outlots are part of the vision for the UMCH focus area, nor are buildings placed in the middle of parking lots.

Generally it is anticipated that buildings will be setback from the High Street curb line an appropriate distance based upon the architecture and use(s) of the buildings. The streetscape section between the building and the curb should include a sizable tree lawn or street trees in planters (ten feet +/-), at least an eight-foot wide unobstructed sidewalk, and an outdoor seating and/or landscape planting area. As the building height increases, the buildings should consider the relationship between the setback, the street corridor, and the building height. It is expected that if fourth or fifth stories are included, a variety of techniques will be implemented to mitigate any potential "canyon" effect along High Street, such as the use of floor terracing, changes in building massing, insertion of a green commons, recessed seating and dining areas, and lush landscaping to name a few.

While it is preferred that parking be provided to the rear of building, if parking is provided in front, it should be consistent across the frontage and be limited to either one row (single bay) of parking or on-street parking for short customer visits.





*Potential High Street frontage examples.*

This would alter somewhat the streetscape described above. Parking visible between buildings should be screened by landscape and/or masonry wall.

As mentioned in the Parks Space Section, it is expected that some type of green civic space is provided that allows sight line vistas into the site from High Street and at least pedestrian and bicycle connection to the Neighborhood Core area, if not vehicular connection.

*Landscaping and Buffers*
Development within the UMCH focus area should be well-landscaped, with particular focus on the streetscapes, building edges, buffers, and public park/community commons. Landscaping should be substantial, lush, well-planned, and commonly-maintained. Landscape should emphasize native species where possible.

Buffers for any redevelopment of the UMCH focus area are the Worthington Estates Edge and Tucker Creek Preserve zones.

The Worthington Estates Edge provides rear yards adjacent to the existing rear yards and new single-family homes across the street from existing single-family homes, similar to other lots within the Worthington Estates neighborhood. The Tucker Creek Preserve maintains the ravine separating this site from the Greenbrier Court development.

*Storm Water*
As with any development, the quantity and quality of storm water runoff must be managed per Code. Comprehensive design of the storm water system for the UMCH focus area must be part of the development plan with needed controls located and sized prior to construction of any first phase. Storm water controls should be aesthetically integrated, be natural in appearance, and serve as amenities to the site. Sustainable and green measures should be included to the extent reasonable. Because of the storm water sensitivity of Tucker Creek, it is expected that storm water controls will meet or exceed all requirements.

*Public Private Partnerships*
There are several opportunities for public-private partnerships as part of any substantial redevelopment of this focus area. The community has expressed great interest in creating integrated public park space. In addition, parking decks may be important site improvements to achieve the desired office densities and tenants important to the City. Furthermore, relocation or creation of street intersections to facilitate gateway development and attract best-of-class commercial development may be necessary. Public-private partnership opportunities should be explored by the City and any developer of this site to achieve the full potential and quality of this site.





# Planning Process

This planning process will involve opportunities for the public to engage in the discussion through both public meetings and a web interface. The City and MKSK aim to gain consensus around a range of acceptable redevelopment options that respond to market potential, community priorities, site-related infrastructure needs, and appropriate planning and urban design goals. The resulting Vision Plan will facilitate future development and illustrate possible benefits for the community, city, land owner, and developer.

The Vision Plan will be presented to the Worthington Planning Commission for consideration and recommendation to City Council as an update to the 2005 Worthington Comprehensive Plan. Currently, MKSK is gathering background information related to the site. Once that work is completed, the City will provide additional announcements regarding input opportunities as this project moves forward.



EXHIBIT

3




EXHIBIT
8
tabbies®

# City Council Agenda

Minutes

## Monday, February 7, 2022 at 7:30 pm

## 6550 N. High Street, Worthington, Ohio 43085

### 1. Call to Order

**Minutes:**

Worthington City Council met in-person on Monday, February 7, 2022. President
Robinson called the meeting to order at or about 7:34 p.m.

### 2. Roll Call

**Minutes:**

**Members Present:** Katherine Brewer, Peter Bucher, Rebecca Hermann, Beth
Kowalczyk, Bonnie Michael, Doug Smith, and David Robinson
Member(s) Absent:
Also Present: City Manager Matt Greeson, Assistant City Manager Robyn Stewart,
Assistant City Manager Economic Development Director David McCorkle, Law Director
Tom Lindsey, Director of Finance Scott Bartter, Director of Planning & Building Lee
Brown, Director of Parks & Recreation Darren Hurley, Chief of Police Robert Ware,
Chief of Fire & EMS Mark Zambito, Clerk of Council D. Kay Thress
There were twenty-one members of the public in attendance.

### 3. Pledge of Allegiance

**Minutes:**

President Robinson did not lead the Pledge of Allegiance as it was recited during the
Joint Meeting.

### 4. Visitor Comments

**Minutes:**

There were no visitor comments.

## Public Hearings on Legislation

### 5. Ordinance No. 03-2022 CRA Boundary Amendment

To Amend Worthington's Existing Community Reinvestment Area Boundaries and to authorize the City Manager
to Submit a New Ohio Community Reinvestment Area Program Petition for Area Certification to the Ohio
Department of Development.

**Minutes:**

Mr. McCorkle explained how this piece of legislation is for an adjustment to the

boundary of our Community Reinvestment Area (CRA) which is a property tax abatement program. A CRA is an exemption of real property taxes on an assessed value of improvements made to commercial, industrial, or residential parcels. The existing property taxes will continue to go to various taxing jurisdictions, and then the abated property tax load is shifted into the abated value of the project. The State allows up to 100%, 15-year property tax abatements. Jurisdictions must petition the State to create or amend a CRA area. Communities then choose eligible properties, limits, and negotiating procedures, along with the completion of a Housing Survey. There are also a required CRA Housing Council, Housing Officer, and Tax Incentive Review Council (TIRC). Commercial and industrial projects require an agreement negotiated before a project begins. If a CRA is more than 50% or longer than 10 years, school board approval is required. Annual reports are due to the Ohio Department of Development on March 31st of each year. To amend an existing CRA, a new Ohio Community Reinvestment Area Program Petition for Area Certification must be submitted.

He described how Worthington's CRA program consists of one CRA, located along three commercial and industrial corridors of the City, along Huntley and Proprietors Roads, Wilson Bridge Road, and High Street. Resolution 15-2007 amended Worthington's program to only allow commercial and industrial properties to be eligible, with a maximum of 10-years.

President Robinson asked if there was an explanation for excluding residential at the time. Mr. McCorkle replied that he was not sure of the logic of that decision.

Mr. McCorkle explained how Worthington has multiple requirements to be eligible for an abatement. First, you must conduct commercial or industrial activity on the property such as manufacturing, warehousing, wholesale, or office. There must be a minimum investment of at least $1,000,000 in new construction or improvements to the property. Finally, you must employ a minimum of 25 new employees or incur at least $1,000,000 in new annual payroll costs in the City. The maximum abatement is 10-years or 100%, we have not gone up to 100% before. The City has approved five CRAs since 2007, 4 were 75% for a period of 10 years and one was 50% for a period of 10 years.

He detailed how pursuant to the ORC and the criteria he previously mentioned, a new Ohio Community Reinvestment Area Program Petition for Area Certification must be submitted to the Ohio Department of Development and include the following: list of active CRAs, housing survey, approval ordinance, proof of public notice for approval ordinance, maps, written description of the CRA boundary, school district participation, and contact information. The steps that brought us here tonight started when the New England Development Company gave a presentation to City Council in December 2021 on a proposed hotel on West New England. They shared that a CRA was needed to make the project financially feasible, and proposed adding the hotel parcel to the existing CRA boundaries. Council directed staff to prepare legislation to consider adding the parcel and other relevant parcels not included in the original 2005 legislation, which has been prepared and is before Council tonight. This

ordinance only amends the CRA boundaries for eligibility purposes and a formal CRA project application and approvals would be needed before any parcel in the CRA received a property tax abatement. Staff identified 22 parcels that are commercially zoned to be added to the CRA boundaries.

Ms. Michael brought up how there has been discussion about the house west of the Worthington Inn, which is not commercial, and whether that has been included in this. Mr. McCorkle replied that the property is slated to come back to Council for rezoning on February 22nd. At the time of this preparation, that was not identified as commercial, however, Council does have the ability to include that. He pointed out how there are rezonings that come up periodically, so perhaps staff could periodically do a sweep of anything that has been rezoned commercial, but we would need to re-do this process to capture any parcels that are not on this list.

Mr. Courtland Bishop of 560 Morning Street expressed that he is nearly a lifelong resident of Worthington and has been around for a long time. In his opinion, it should be a partnership with the City and whoever is applying for one of these abatements, and it truly benefits the community in an ironclad manner, with the developer earning the abatement. It is a gift to the developer and the business that is coming here. His property is one of the ones that is being rolled into this, however, he will not apply for abatement and he does not want one. He thinks that his responsibility as a resident and business owner is to contribute to the community, which should come at a price for anyone who wants to be a part of it. He spent $1.3 million turning something that was an eyesore into something we could be proud of. He does not regret not getting money or abatement, and those are the types of commitments we should consider who have the true interests of Worthington at heart and not just because they bring a certain number of jobs. We are in a wonderful place where people want to be. We do not need people here to take advantage of the loopholes in the system. He is not opposed to the development proposed next door, but he also thinks that Council has a responsibility to make sure if someone is doing development, the infrastructure is there to support that building. In order to support things such as the hotel, we are going to have to invest in infrastructure. It will cost tax dollars to do these types of things.

Ms. Michael expressed how she supports this ordinance, and we have approved very few abatements. Just because someone is in a CRA area does not mean an automatic abatement is given out. We have been very careful with the abatements that have been given out in the past, making sure that they contribute to the community. She expressed that she wanted to amend the ordinance if the properties she mention earlier are rezoned, that they are included in this package.

**MOTION** Ms. Michael moved, seconded by Ms. Hermann to amend the ordinance if 44-46 W. New England is rezoned later this month, it is to be added to the CRA application, and if it is not rezoned then it should not be included.

President Robinson asked if we acted in this manner, whether the application would be held until after the rezoning vote. Mr. McCorkle nodded that was correct.

Mr. Smith brought up contracts with the CRA application and what specifics we could

contractually obligate the applicant. Mr. McCorkle replied that our contracts typically have a level of investment, job creation, and payroll. We ask for them to report annually, and the TIRC can recommend adjustments if they do not meet those criteria. We have had CRAs where the percentage was adjusted down due to underperformance. Mr. Smith asked what are our limitations to the contract. Mr. McCorkle described how in the past with incentives, we have had a development agreement in place so for example, with the Gateway Project, we had a TIF and an overarching development agreement that tied the zoning and the uses on the site, tying the PUD language to the TIF. A development agreement can be used to help hold the developer to certain criteria, whatever that criteria may be. Mr. Lindsey explained that agreements may include terms not proscribed by the ORC section, so we may include various limitations, but we may not provide the thing expressly called out in the code.

President Robinson noted that Mr. Bucher would not be at the meeting on the 22nd. Due to the importance of this rezoning, he planned to ask that we delay this issue to the first meeting in March. He is not sure of the urgency of submitting the CRA changes to the state. He does not have a problem with Ms. Michael's motion. Mr. McCorkle replied there is not an urgency to submit.

Ms. Hermann summarized that all we are doing tonight is saying where the CRA is going to be, so if it is a home and is residential, it would still come back to us to vote on at a different time. President Robinson said that right now, future additions to the CRA do not include the possibility for residential. Mr. McCorkle said that they could be added to the CRA boundaries, but residential would not be eligible. We have a separate application that would need to be completed and submitted to the City. Ms. Hermann said that if we just add to the CRA right now, we are not doing any harm. Ms. Michael reiterated that her motion says that if the rezoning goes through, it is added to our application, otherwise, it is not added to the application.

**The motion carried unanimously by a voice vote.**

Mr. Smith followed up on his previous question, and as long as we have a mechanism to hold folks accountable and make clear our intentions, that is what he was getting at and he is in favor of it.

Ms. Kowalczyk emphasized that she supports this amendment to the CRA, and it is an important tool in our toolbox for economic development. All we are voting on today is to expand the area that is inclusive of all the properties that would be eligible for the CRA and you would still need to go through the process of applying through the City and potentially have a development plan. This is a good first step.

President Robinson shared his thoughts that the CRA was a concept created in the 1960s and 1970s to aid with urban blight. He is in support of expanding our ability to offer these incentives but with the thinking, it ought to be done very discreetly and minimally with high standards. Echoing Mr. Myers' comments from last year, the approval of the CRA expansion should not be interpreted as an eventual approval of the proposed project. With that being said, he supports this when we vote as it is an important tool for the City to have.

**There being no additional comments, the clerk called the roll of Ordinance No. 03-2022 (As Amended). The motion carried by the following vote:**

Vote Results: Ayes: 7 / Nays: 0

## New Legislation - Resolution(s)

**6. Resolution No. 06-2022 Community Relations Commission Appointment**

Approving an Appointment to the Community Relations Commission.

**Minutes:**

**Introduced by Ms. Hermann.**

**MOTION** Mr. Smith moved to adopt Resolution No. 06-2022, seconded by Ms. Michael.

**There being no additional comments, Resolution No. 06-2022 passed unanimously by a voice vote.**

**7. Resolution No. 07-2022 Council Recommendation to Community Improvement Corporation**

Recommending Rebecca Hermann be Appointed to the Board of Directors of the Worthington Community Improvement Corporation.

**Minutes:**

Mr. Greeson overviewed how the CIC by statute can have an agency relationship with the City and this requires that four City officials be on the CIC board. Those officials are appointed by the CIC, but by practice are recommended by the City Council. Council will be recommending Ms. Hermann, who will be subsequently appointed by the CIC board.

**Introduced by Mr. Bucher**

**MOTION:** Ms. Kowalczyk moved to adopt Resolution No. 07-2022, seconded by Ms. Brewer.

**There being no additional comments, Resolution No. 07-2022 passed unanimously by a voice vote.**

## Reports of City Officials

**8. Policy Item(s)**

**a. American Legion Post 239 Liquor Permit Notice to Legislative Authority**

**Minutes:**

Mr. Greeson overviewed how last week, Council heard information about this from staff and the American Legion and then scheduled it for further discussion tonight. The three options available to Council are to request a hearing which is typically done in the form of an objection, making a motion not to object, or Council could do nothing. The advice was provided to Council that we would not have a strong basis to successfully object under the guidelines of the Ohio Division of Liquor Control.

Mr. Daniel Gibson of 701 Morning Street shared how he lives directly across from the American Legion post. He wanted to make clear that he supports the Post and its mission, but he adamantly objects to their plans which are incongruous

with the character of the neighborhood. The Post's closest neighbors also nearly unanimously oppose their plans as well, as indicated by the 20 neighbors who have signed a letter of opposition that has been circulated. He understands that the discussion tonight is whether or not to object to the D-5 permit, but there are good grounds for Council to make that objection. This issue is not and has never been about who is for our veterans and the Post, and who is against them. The residents have felt that it is about how to best support the Post and the financial needs without compromising resident interests and the character of the neighborhood. Neighbors have looked to engage in constructive dialogue and find alternative means to fulfill their financial needs, and meeting with the Post and working to secure ReBOOT funds last summer, and offering to advocate for a recurring City grant of $5000 in recognition of the contributions they have made to our City, and also exploring options to move to another location in Worthington that might be more suitable for their plans. Even when the Post declined to consider these alternatives, he offered to further discuss ways to find alternatives, which led to a meeting with the former District 12 commander who recommended that the residents and the Post have a meeting again, however the Post indicated they were not in favor of further discussion with residents. He and many residents are ready to recommence a constructive dialogue with the Post to reach an appropriate resolution to this issue. However, if the Post is only interested in pursuing liquor licenses and rezoning, which they are entitled to do, then he would ask the members of the Council to reject the false choice that has been presented to him. Supporting the Post in their mission does not require an endorsement of the Post's plans to become a commercial alcohol sales enterprise and a party rental business in the heart of residential Old Worthington. There is a better way. He believes there are grounds for an objection this evening, and he was heartened to see if the staff memo there were location-based objections, not just applicant-based reasons. In those statutes, it is indicated that location alone can give cause for a reason to reject if it does not fit within the character of the neighborhood. Those location considerations make the zoning issues relevant to this discussion, the rationale to date to allow the Post to obtain a D-5 permit is that the Post already has a license to serve their own members and the changes would not be that significant. But that rationale is at odds with the presumptions of zoning law which rejects the notion that being already incongruous with the neighborhood is an argument for becoming more incongruous. As this Council knows, the Post is a non-conforming use, and with that comes presumptions that are written into the law that they will cease to exist at that location in the future. As long as it does exist, it does not become less conforming. While they stand ready to have further dialogue with the Post to resolve this issue, he would submit that this issue is larger than the question of the D-5 permit and he would ask that Council carefully consider how they choose to proceed.

Ms. Kowalczyk asked for clarity in regards to the case law and the interpretation

of the law regarding residential considerations that zoning is not a consideration in the rejection of a liquor license. Mr. Marc Myers of 300 West Wilson Bridge, explained that for purposes of Ohio Liquor Law, the revised code, precludes the Division of Liquor Control from considering zoning issues in that zoning is considered a local matter and the issuance of a permit and of zoning are two separate issues. Ms. Kowalczyk followed up about the evidence to meet the grounds for denial for things such as the location of the established. Mr. Myers explained that the law provides that if the objecting authority can meet the burden of showing the issuance of the permit would have a substantial or adverse impact upon the neighborhood, then that is a basis for an objection. The burden is higher than if something fits into a neighborhood, it is that the City would have to show that issuance of the permit would have a substantial and adverse impact, which is extremely difficult to do. There is case law that provides that speculation is insufficient. Prior history is relevant, however, and if the City can show that a location has been a trouble spot that would have a substantial impact.

Mr. Smith asked about Mr. Gibson's point about non-conforming use and if Mr. Myers could interpret that as more of a local zoning issue. Mr. Myers replied that would be a zoning issue. Ohio has plenty authority over liquor permits, but local issues like zoning are a local authority.

Ms. Michael explained that because it is a non-conforming use, for there to be any change besides their current operations and what they are doing, will require going through the MPC and changing the zoning. Based on that, if they get the D-5 permit they will not be able to do anything differently without going through the zoning. She does not see why we should be filing an objection because we would not win. There will be a full discussion at the MPC level and then the issue would still come back to Council before anything happens. She does not understand why we would make the Legion jump through all of these hoops when the real hoops are coming at the MPC level.

Mr. Bucher echoed Ms. Michael's comments and expressed that the best course of action is to have no objection and then have a discussion when the rezoning application comes.

**MOTION:** Ms. Michael moved, seconded by Ms. Kowalczyk for the City to not object to the liquor permit

Mr. Smith agreed with this course of action and spoke to the Legion saying that there are neighbors in the audience and a City who supports you, asking them to lean on that moving forward with these discussions.

President Robinson expressed that regardless of the ultimate decisions to be made here, this is not the proper forum or place for the City to weigh in, that will be at the MPC level and again at Council for the issues to be explored fully. He wanted to encourage further dialogue between the Post and neighbors and believes an outcome can be achieved that protects the interests of the Post firmly, while also fully acknowledging the rights of the neighborhood.

**The motion carried unanimously by a voice vote**

**b. Discussion Item - UMCH Focus Area Moratorium**

**Minutes:**

Mr. Greeson detailed how at the January 18th meeting, an ordinance that is included for reference, was introduced as an emergency that did not receive the necessary 6/7ths vote and did not pass. Council then discussed placing this dialogue and the issue of a moratorium back on the agenda for this meeting. Going back and looking at the record, the legislation was not re-introduced, and so this has been put on as a discussion item for the agenda rather than a public hearing. In addition, Council asked staff to collect input and possibly re-draft, which staff did. We concluded that the issue was of a lot of import and would benefit from having more dialogue and direction from Council prior to or before attempting to redraft the prior ordinance. Action is not necessarily required tonight.

Ms. Michael expressed that doing this is premature and also not following our Council expectations for 2021. Except for the two newest members, the other five Councilmembers agreed to Section 8 of those expectations to be clear about the decision-making process, and Section 8C states that when decisions are made, to move on, and that there is an appropriate time to revisit issues such as during budget time and goal setting. We are going to be doing goal setting this weekend, so she feels it is premature to discuss this tonight when we will examine our top priorities in the goal-setting. If we are going to have Council expectations that are approved, then we should follow them, otherwise, why do we have them.

Mr. Aaron Scherer of 6875 Bowerman Street East shared how he is a longtime resident and he house hunted for two years to be able to move to Worthington. This City has major housing issues and needs inclusive housing, which is what he is here to talk about. He does not like a lot of what has happened this year, but he does agree with one statement shared by President Robinson, which is that this property presents an extraordinary opportunity. It is an opportunity to address the needs of those people who cannot afford to move to Worthington, which was borne out in the Visioning process results. Going back to visioning, it should guide us because all Worthington residents should be represented in this process, and indicates that we want to be a more inclusive and connected city. His question is that the goal of this moratorium is to start a dialogue, but who is that dialogue with, and is that only those who are most vocal and can afford and have the flexibility to come to these meetings and sit for hours, or is it with all people. Worthington is not diverse, and Worthington was built on a housing and zoning policy to exclude people from this city. Most of the people who live here do so on the back of inequality built into the systems of this country. He urges Council to aim higher and to continue the process started with Visioning to hear from all residents of Worthington, and move forward to write a comprehensive

plan, and then work to rezoning. Let us work to rezone the City and actually address the needs of the City of Worthington now and into the future.

Mr. Tom Hamer of 160 Longfellow Avenue read a statement from WARD regarding Council's decision on January 18th to amend the Comprehensive Plan. On January 18, 2022, Worthington City Council made decisions with significant impact on efforts to develop the property at 1033 High Street, currently owned by LC Worthington Campus (Lifestyle Communities, LLC).

The WARD Planning Group (WARD PG) presents the following responses to decisions made by Worthington City Council, the process for presenting this business at Worthington City Council's meeting on January 18, 2022, and anticipated strategies now that new actions have been taken.

1) WARD Planning Group is strongly supportive of the four Guiding Principles on the update of the Comprehensive Plan approved by Worthington City Council. We affirm the decision to consider the whole parcel as an integrated property development initiative, rather than a piecemeal parceling which may maximize profit for the property owner, but neither serve the long-term interests of the city and its residents nor provide a visionary approach for this unique parcel. In the clearest terms possible, we strongly support language that any approach be harmonious and compatible with the fabric of surrounding neighborhoods and the environment. We have long maintained that this parcel, centrally located, should only be granted a zoning change when it is expressive of the will of the citizens of the city. We believe it is irresponsible to seek a zoning outcome that negatively impacts the citizenry, and are encouraged that our city council has moved forward toward more responsible development. We believe that corporations have a moral obligation to consider stakeholders rather than simply the shareholders. This is especially true when seeking permission to change existing zoning.

2) Since September 18, 2012, WARD PG has examined and explored the preferences of the citizenry, with multiple open meetings and surveys whose response rate surpassed even official city surveys and prior developer's efforts to survey our city's residents. Through these multiple initiatives, WARD PG has determined that our community's residents oppose high density and height for housing on this property. Significant green space beyond simply the Tucker Creek ravine (which cannot be developed regardless) has also been long seen as desirable. Residents have long supported High Street commercial development and creative housing space that meets the needs of the city and surrounding communities. WARD PG does not oppose housing, but does oppose high-rise, high-density housing. We applaud City Council's decision to amend the Comprehensive Plan to better align it with the will of the citizenry. Based on unanimous negative decisions from both the Municipal Planning Commission and City Council, it is clear to WARD PG that the language of the prior plan was too vague, and greater clarity would assist both the property owner, and the developer who might choose to ignore the will of the citizens while seeking a

zoning change. In either case, WARD believes that this amendment will spur better decision making.

3) Regarding process, WARD PG made the decision to understand the facts before weighing in on the process by our city council. Based on public statements, community meetings, blog posts and other information gathering, WARD has determined that the swift action on the part of City Council was strategically sound in seeking positive outcomes. We also believe that these decisions were driven by the views of the majority of the citizenry. Further, we believe that claims of acting arbitrarily and without knowledge of the citizenry's opinions and beliefs about this property lacks substance and suggests political tactics at best, and character assassination at worst. We implore individual citizens as well as community groups to focus on issues rather than ad hominem attacks. We look forward to a more civil and appreciative process.

4) Finally, the WARD Planning Group believes that we are already moving into a new phase. We anticipate new groups will begin to lobby the citizenry to shift their perspectives to support high density development to maximize profits for the property owner. Regardless of whether these efforts are funded by the property owner or pursued by individuals in the property development industry, we urge you to explore the funding, leadership constituency, and vested interests as you make your decisions and express your values and hopes for our whole community.

Mr. Joe Miller of 52 East Gay Street in Columbus, expressed he is here on behalf of Lifestyle Communities and Worthington Campus LLC, the actual property owner and applicant at issue here. The proposed moratorium and amendment to the City's comprehensive plan made without notice to his client whatsoever, are both illegal and unenforceable for numerous reasons. First, this Council is not permitted to single out and target this land with arbitrary restrictions as it has. Singling out and unilaterally amending this comprehensive plan, solely to impose restrictions on the development of this particular property is spot zoning, unlawful under the Equal Protection Clause. That resolution passed and the ordinance that may be passed tonight are not law of general application, they only apply to this one development and as such, due process requires that notice and opportunity to be heard is owed to the property owner. Yet, this Council has admitted publicly that it intentionally refused to provide notice to the property owner or the general public and move forward near midnight at the last meeting with no notice whatsoever. He gives Ms. Michael credit for acknowledging that she has never seen anything like that in decades of municipal government, nor has he in decades of land use litigation. Citizens certainly should not expect their Councilmember act so contrary to law. The so-called amendment to the comprehensive plan that it intends to impose of future development plans on this particular property, in disagreement with the prior speaker, is so utterly vague and repressive, they provide no objective criteria whatsoever to develop this property. A landowner cannot be subject to arbitrary

and capricious zoning restrictions like this. Respectfully, what has been already enacted and maybe enacted tonight, does not even serve the stated purpose. As a result of the prior application, his client's right to develop this property pursuant to the 2014 Comprehensive Plan has already been vested and cannot be taken away from this landowner. His client tried to work with the City and its staff consistently with that comprehensive plan but was denied the opportunity to do so. The prior speaker asked for dialogue, but that is what they ever wanted with the City, yet to date, it is undisputed that the City has refused to even talk with Lifestyle Communities about the development of this property, which is unlike any municipality in central Ohio or anywhere else. Instead, this Council's prior meeting and this proposed moratorium only further establish the City's clear refusal to work openly and honestly with Lifestyle and its animus towards his client. This City and its citizens and its property owners deserve better than public officials operating in secret, passing resolutions near midnight, that violate the constitutional rights of one of its stakeholders. This City should rethink its approach consistent with other municipalities that are growing in Central Ohio that have economic vitality, robust economies, and tax bases. A good start would be to respect private property rights in the City and drop this illegal, targeted, moratorium.

President Robinson stated that for reasons not necessarily agreeing with Ms. Michael, he agrees with the statement about the wisdom of not acting on the moratorium tonight. The motivation behind the moratorium discussion on the 18th was in his judgment, which has been met through other means and there is no desire on his part to pursue a moratorium at this time.

Ms. Michael conveyed that numerous people sent in comments regarding this that have been received through email and the majority were not in favor of a moratorium. People who spoke tonight discussed having a robust discussion and public dialogue, but nobody said that we really need to have a moratorium. Nowhere as part of this, has there been discussion we should look at this as part of the Council retreat. If we are talking about having public discussions and debates, nobody is going to have a problem with having those discussions.

Ms. Kowlacyzk expressed that she does not believe that the comprehensive plan now as amended reflects the will of the citizens as was very well stated by Mr. Scherer. There has been a visioning process that was conducted and a goal of that was to understand the will of the community, which was done through an extensive process, led by citizens who volunteered their time to complete it. We need to respect that process. Where we are now is her question, we have talked about a retreat, and there is this amended comprehensive plan, she would be interested to know if there is an actual plan for moving forward with this property where we are going to consider what should be done. Contrary to what Mr. Hamer and WARD assert, in her discussions with residents there is not a consensus. The only consensus she hears is no apartment, which is a separate discussion that we should have. We need to have a conversation about our

housing needs for our workforce, our older adults, and for promoting diversity and inclusion in the City. She recommends having a professional housing study conducted that uses the resources that MORPC has put together with their housing study, and looking at our visioning plan. There is also the question of where we are now and what we are doing with this discussion we are supposed to be promoting between residents and the developer.

President Robinson replied that these are vastly complicated issues and it is important to revisit the choice that this Council faced coming into this new year. There were three options before us related to UMCH as he sees it. We could as a new Council have done nothing and accepted the status quo, based on years of experience with the community and many conversations and surveys. We had a comprehensive plan written in 2014 that was the basis of us receiving and assessing development plans. The proposed plans that came before the public were roundly criticized and rejected. Most recently, the plan submitted in October of 2020 about ten days following an initial conversation by the Council about rescinding or updating the comprehensive plan, led to a 14-month process committing a significant amount of time to ultimately result in a denial by the MPC and Council of that proposal. He believed it was time the City recognize that the 2014 comprehensive plan was not reflective of public opinion and committed the City to a repeating process that is not productive for anyone. When coming into this new Council in January, we faced a choice to do nothing or to announce in advance the intention to discuss this, which would involve hazards for the public where any application or proposal would freeze our ability as a community to write our own plans, which is also unacceptable. The third option is the one we pursued, where we did not announce that we would discuss and potentially act. The discussion was open to the public and there was no attempt to discourage as much conversation that Council or the public wanted to make. The purpose was the enable us to proceed unbound by the 2014 comprehensive plan, and with an update that does in general principles embrace public opinion. This is not the end, but rather the beginning of the process. The choice we made was the right choice.

Ms. Hermann expressed how the reason she was so prepared at the last meeting was that she also wanted to update the comprehensive plan based on the Vision Worthington plan. In reading it, it says that very few respondents mentioned no more apartments. 12 out of 594 respondents said they did not want apartments. Very few respondents mentioned parks only at the UMCH development, with only 11 out of 594 saying so. When asked by President Robinson where she was reading that from, Ms. Hermann replied that it was from the Vision Worthington report that she asked everyone to read. She said in there, as she is looking, by stating what we did on the comprehensive plan, the S-1 which is special, institutional, hospital, church, and education, all of the things that are not mentioned in the updated comprehensive plan, the only thing mention is greenspace. She is not certain where this is supposed to

represent our community, because of this 18-month visioning process, and the time people put in, she does not see where the rest of the over 500 people are being represented here. She is here for her community. WARD said back in 2013, they reviewed the PUD and stated public support for the PUD. When we walk through the past 9 years, it has been confusing because things have shifted, things have changed. WARD was on board for quite some time, she spoke with them personally. As far as the comprehensive plan in 2014, LC was not even a thought at the time. For the comprehensive plan, they met with all kinds of people, including kids at the high school, college students, and stakeholders. UMCH at the time actually wanted to have a win-win solution, where they could get fair market value for their land. There was no developer in mind. We as a community wanted to know what the possibilities were. It was actually asking the community, the same way that Poggemeyer asked the community through the visioning process. It is fair to use this visioning to update the comprehensive plan, but they are extremely similar. If we get a professional in here, it will not take too long because what the visioning says is similar to our Vision 360 in 2010 and extremely similar to the 2014 comprehensive plan update. If we are not all willing to read this as a Council and pay attention to all of the hours and the volunteers, and everyone who put their time into this, that is disrespectful. She is happy to sit down with everyone and go over every year, because she is tired of this too and why we are having this conversation. LC came out in January and set up Zoom calls with WARD, and one member said that they were not going because they do not want apartments or anything they may offer. This is important to our City, she is doing the research and taking her time to make the dialogue and make the initiative. We need to talk about this vision plan and we need to talk.

Mr. Scherer came up to the podium again, asking if anyone was aware of when this property was last rezoned and the current zoning was put in place. He said it was at least 30 years ago. Ms. Michael explained that it goes back to when it was the orphanage and it was S-1 zoning, a lot of the initial zoning goes back to then when it extended all the way to the river. Mr. Scherer said that his question to Council is whether that zoning was prescriptive or descriptive because he agrees with what Ms. Hermann has said about the visioning, the 2014 comprehensive plan, and also all the work that went in the 2005 comprehensive plan. Citizens have been engaged in this process. There is a sense people are frustrated with the lack of urgency, but the problem is people have been engaged, but they just disagree. In that sense, he commends that Council is taking action and someone has to make a choice. His desire for Council is they truly listen to the broader swatch, even putting in a caveat of not just listening to the "majority" because as we learned in 2020, sometimes people cannot be part of the majority for a lot of reasons. Please think broadly when you address this.

President Robinson commented on the history of the zoning, and that the S-1

was established with the rest of the zoning map in 1971. The C-2 and C-3 parcels were subsequently created along with the unusual-looking continuation of the S-1 near Larimer and High as a result of UMCH as an institution creating a master plan including a vision where they could lease commercial space, providing a revenue source to support their mission and operations. It was both descriptive and prescriptive for the UMCH institution.

Mr. Smith asked a legal question to Mr. Lindsey, and Council should address the legal representative who is here tonight representing LC. He agrees with Mr. Scherer's comment and how visioning was meant to engage the broader public and how we can do that going forward. The retreat is a good place to start with that conversation.

President Robinson continued that since he was first on Council four years ago, he has thought that we should do studies such as a housing study, that would enable us to look at facts based on different scenarios. He thinks that he will advocate that we engage in some studies that will provide information for us to not just be talking about concepts and individual passions for specific outcomes. Mr. Bucher echoed support for figuring out where we go from here with stakeholder engagement, it is absolutely critical.

Ms. Kowalczyk shared that if you were not at the Chamber luncheon to hear the Ohio Director of Development talk about the new Intel project and the impact it will have on the greater Columbus community, that is something we need to consider as well when thinking about a housing study. There will be a significant amount of direct and indirect jobs and resources needed to support the project and there will be a lot of opportunities there. However, they will need access to housing, education, and other things. We have an opportunity to build our tax base by thinking about how we can incorporate and welcome people to our community.

Ms. Hermann added that in regards to Intel, they anticipate being up and running in three years. The average job salary will be $135,000 and it is fifteen minutes away from us. When Honda came online in Marysville, one of the major beneficiaries of that was Timken Company in Bucyrus, Ohio which is 45 minutes away. She hopes that something would happen at UMCH within five years and agrees with Ms. Brewer on that point. We need to look at other commercial sites as well and consider what things we can do.

Mr. Lindsey responded to Mr. Smith's question, that in general, Council takes action as a body here. This weekend we will be in a public meeting elsewhere, and Council acts in public meetings as a majority. Individual actions and statements are not those of the City, but they can have consequences. Mr. Miller's role and primary part of his practice area is litigation, and Mr. Bo Brownlee has indicated through Columbus Business First, that they intend to seek legal recourse. Mr. Miller's comment indicates concern about action taken by the City in the past. He would encourage not speaking directly to the lawyer, but to speak through your lawyers. However, you can talk to anyone you please,

which is within your discretion. Over time, he would encourage working with Mr. Greeson and staff in terms of your thoughts regarding this property and engaging the public.

Mr. Miller encouraged the City Council to talk to his client. There is a lot of talk about dialogue and engagement, why not engage with Lifestyle, they are ready and willing. Staff was instructed not to work informally with the applicant, only in public hearings which is something he has never seen in his career. There are things he has never seen in his career that expose the City to liability. You should be talking to his client, rather than avoiding working with a major stakeholder in this community. Before Intel was announced, MORPC was already saying this region would grow by 1,000,000 people by 2050. All new housing helps with the housing crisis. It is not Worthington's job or any other suburb's place to refuse to deal with this. Every city in the urban core has to deal with this reality.

Mr. Smith conveyed how at the December 13th meeting where we voted on the property at UMCH, former Councilmember Scott Myers had a nice monologue about the history that course corrects what Mr. Miller has said here tonight. He would advise everyone to go back and review that statement from Mr. Myers.

### c. Set Public Hearing for Ordinance No. 01-2022 (44-46 W. New England Ave.)

**Minutes:**
**MOTION:** President Robinson moved, seconded by Mr. Bucher to set the public hearing for Ordinance No. 01-2022 for March 7, 2022
**The motion carried unanimously by a voice vote**

### d. Set Public Hearing for Ordinance No. 02-2022 (650 Andover St.)

**Minutes:**
**MOTION:** President Robinson moved, seconded by Mr. Bucher to set the public hearing for Ordinance No. 02-2022 to be March 7, 2022
**The motion carried unanimously by a voice vote**

Mr. Greeson gave kudos to our Service and Engineering Department as well as our Parks Maintenance Team who worked tirelessly to clear the snow and ice from our roadways and public walkways last week under less than desirable conditions. Secondly, we do have a retreat this weekend and the agenda has been sent out. On a somber note, we lost a couple of retirees recently, our former firefighter Bill Noble who retired in 2008, and Bill Halfen who was our longtime traffic signal technician who retired a few years ago. On a happy note, Mr. Barnhardt and his wife welcomed their new baby over the weekend and we are happy for them.

# Reports of Council Members

## 9. Reports of Council Members

**Minutes:**

Mr. Bucher commended the Service and Parks crews for their work during the snowstorm, they did as good of a job as possible in the elements.

Ms. Kowalczyk echoed the positive sentiments about our snow warriors, it is incredible the work they do. Mentioning walkability, she brought up sidewalk cleaning and asked that if the staff has not already, to notify property owners to clear their sidewalks per our City Code. If we can think of a way to either aid, encourage, or incentivize property owners to get the sidewalks clean, that would be desirable because they are un-walkable. Unfortunately plowing the streets will block sidewalks, so as we remind property owners of what they need to do, they cannot block sidewalks. She also reported as a member of the board of the McConnell Arts Center, how much she was impressed by the Lance Johnson exhibit. Additionally, the Farmers Market has resumed at the Worthington Mall and will be opening outdoors in April. The Chocolate Walk will be on March 3rd. She was excited that SWACO announced they are accepting, paper, plastic, and aluminum cups in recycling which is a big deal.

Ms. Brewer echoed her thanks to City staff for their job clearing the snow and ice. She reported on the January 27th ARB/MPC meeting, everything that was on their consent agenda was accepted with no issues, and some of the main issues coming to Council are the Tiltons Automotive plans, and the 44-46 West New England Avenue rezoning which was approved by a 4-1 vote of the Commission and will be coming to Council along with the Andover Street rezoning. She asked if there is anything that Council would like her to bring back to the ARB/MPC. The High North project is up on the next agenda and will be looking at the access drive and the Kroger parking lot.

President Robinson brought up an email from John Rist regarding Amtrak and their consideration of Columbus, suggesting that we send a letter to our state reps endorsing the idea is a good one. Mr. Greeson replied that staff would be happy to prepare a letter, as we already did one when this was known as the "Three C" project under the Strickland Administration. We will dust off that letter and modernize the language. President Robinson discussed the possibility of talking about deer, including Mr. Barnhardt's research and a feeding ordinance, and noted that has been delayed until Mr. Barnhardt can come back. However, he wanted to raise that issue for interested members of the public. Lastly, he has had a couple of conversations with Matt Lofy, the new Executive Director of the Chamber of Commerce and he is excited about the prospect of reenergizing that organization. He mentioned the opportunity to come before Council to speak and he is enthusiastic about doing so. We spend a lot of time talking with developers, but the business community in Worthington is sprawling, and it could be beneficial to get an overview from Mr. Lofy.

# Other Business

# Executive Session

**10. Executive Session**

**Minutes:**

**MOTION:** Ms. Brewer moved, seconded by Mr. Bucher to enter Executive Session for the purposes of conferences with an attorney for the City concerning disputes involving the City that are subject to pending or imminent court action and the discussion of possible land acquisition.

**The clerk called the roll on Executive Session with the motion carrying unanimously.**

**Council recessed at 9:40 p.m. from the Regular meeting session.**

**Council returned to open session at 10:27 p.m.**

# Adjournment

11. **Motion to Adjourn**

    **Minutes:**

    **Council voted unanimously to adjourn at 10:27 p.m.**

Contact: D. Kay Thress, Clerk of Council (Kay.Thress@worthington.org (614) 436-3100) | Minutes published on 03/08/2022, adopted on 03/21/2022

/s/ Ethan C. Barnhardt

Administrative Assistant

Attest

/s/ David Robinson

President of Council

## Michael, Bonnie

| From: | Robinson, David </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=06078A4E629C4DD7BA92321C7AAEE3A3-ROBINSON, D> |
|---|---|
| Sent: | Tue 1/18/2022 10:13 PM (GMT-00:00) |
| To: | Brewer, Katy <Katy.Brewer@worthington.org>;Hermann, Rebecca <Rebecca.Hermann@worthington.org>;Bucher, Peter <Peter.Bucher@worthington.org>;Kowalczyk, Beth <Beth.Kowalczyk@worthington.org>;Michael, Bonnie <Bonnie.Michael@worthington.org>;Robinson, David <David.Robinson@worthington.org>;Smith, Doug <Doug.Smith@worthington.org> |
| Cc: | Greeson, Matt <Matt.Greeson@worthington.org>;Brown, Lee <Lee.Brown@worthington.org>;Lindsey, Tom <Tom.Lindsey@worthington.org> |
| Bcc: | |
| Subject: | draft of Comprehensive Plan amendment for UMCH Focus Area and related Resolution |
| Attachments: | UMCH CP Update, 18.Jan.2022-pdf.pdf; UMCH RESOLUTION, CP Update, 18.Jan.2022-pdf.pdf |

Dear colleagues,

As you know, we'll be considering a moratorium ordinance this evening, written as an emergency so as to go in to effect upon passage, related to the UMCH properties. I know this is an extraordinary step to take, but one that I believe is not only warranted, but needed, to serve the public's interests. We'll have every opportunity to discuss this tonight in full. And in the future if desired.

It's my hope that this ordinance passes tonight, requiring 6 or more votes, because I believe it is in all of our interests to ensure, by way of this ordinance, that we and the community are given a pause, and are able to reconsider what is in the best interests of the community given all of the changes in recent years, and to then have our current thoughts guide future development by way of an amended Comprehensive Plan. If we do not take effective action tonight, it is possible that we could be prevented from engaging in this constructive public process prior to receipt of further development proposals.

As an alternative to the moratorium, Council could achieve related aims this evening by way of a Resolution, going in to effect upon passage, that would amend the Comprehensive Plan UMCH Focus Area. I think this is an inferior route. But I've prepared such a Resolution, and text for the CP amendment, and have attached it to this email, in the event that this is the direction that Council takes things this evening. Please know that, if we go this route, I view this amendment as an interim step, to a far more robust and coordinated process of amending the CP. But passing this CP amendment tonight, in the absence of a moratorium, would ensure that we are not bound to the 2014 plan moving forward. That's why I have prepared it.

See you tonight. I look forward to the discussion.

David


EXHIBIT
11

David Robinson
City Council President
Worthington, Ohio
mobile - 614-893-4573
david.robinson@worthington.org
davidrobinsonblog.com

RESOLUTION NO. xx-2022

Adopting an Amendment to the Comprehensive Plan
Update and 2005 Strategic Plan, and the 2014
Amendment (Resolution No. 39-2014), for the United
Methodist Children's Home Focus Area for the City of
Worthington.

WHEREAS, City Council wishes to amend the Comprehensive Plan Update and
2005 Strategic Plan, including the 2014 Amendment (Resolution No. 39-2014), as it
pertains to the United Methodist Children's Home Focus Area, in order to guide future
use and development of the site and to encourage the social vibrancy and economic
health of the City; and,

WHEREAS, City Council has, since the last Comprehensive Plan Update related
to the United Methodist Children's Home Focus Area (Resolution No. 39-2014),
received on multiple occasions and through many mediums communications from
members of the public and public interest groups on the subject of UMCH development,
which, in light of the City's prior planning, has provided the insights and understandings
needed to produce a well-grounded and high quality revision to the Plan; and,

WHEREAS, City Council wishes to utilize the Comprehensive Plan as an
important source for guiding the development, wise growth, and long-term investments
in the community.

NOW, THEREFORE, BE IT RESOLVED by the Council of the Municipality of
Worthington, County of Franklin, State of Ohio:

SECTION 1. That the attached amendment to the Comprehensive Plan Update
and 2005 Strategic Plan, including the 2014 Amendment (Resolution No. 39-2014), as it
pertains to the United Methodist Children's Home Focus Area, be adopted to serve as a
guide for future use and development of the site.

SECTION 2. That the Clerk of Council be and hereby is instructed to record this
Resolution in the appropriate record book.

Adopted _____

_____
President of Council

Attest:

_____
Clerk of Council

**United Methodist Children's Home Focus Area**

This section of the Worthington Comprehensive Plan was updated in 2022 for the United Methodist Children's Home Focus Area. This section, following a short Background introduction, is stated in terms of guiding principles and general components for future development of the site. This text reflects, following the 2014 update, a current understanding of public opinion, market conditions, and evolving societal and environmental values.

*Background*

The United Methodist Children's Home Focus Area, given the size and location of this undeveloped land, represents a unique opportunity for the City and residents of Worthington to enhance social vibrancy and economic prosperity in a sustainable manner. The site is located north of Old Worthington, and south of the High North and Worthington Gateway projects, along the High Street Corridor. This land, located between these historic and economic focal points, and directly across the street from City Hall, may serve as a centerpoint for City planning.

The goal of this update, as with the other content of this Plan, is to provide guidance regarding the range of desired land uses and development options, respectful of property valuation within current zoning, and to assist the City with its review and evaluation of any proposal. This Plan will guide and facilitate any future development process for this site in a manner that conforms with the well-being of the general public as well as the rightful interests of the property owners.

*Guiding Principles*

- It is important that the development of the property be considered and executed holistically, as an integrated whole.
- Because of its size and central location, this undeveloped land represents a singular opportunity for the City of Worthington to develop the property in a manner that is extraordinary and that serves the long-term interests of the community. As an historic community, it is natural and appropriate for the City and its residents to think in this way.
- It is essential that any development of the site be harmonious and compatible with the fabric of surrounding neighborhoods and the natural environment. This pertains to traffic patterns, environmental impact, scale and density of any residential housing, impact on schools, and the architectural and aesthetic provisions inherent for any property, as are these parcels, located within the Architectural Review District. Stated positively, outcomes should increase community well-being and vibrancy, opportunities for social activities for persons of all ages, bicycle and pedestrian connectivity, commercial opportunities, and housing, appropriate in scale and type, that support these goals.
- We seek an outcome on this land that is distinctive, exceptional, and expressive of Worthington's own values and community ethos.

*General Components*

- Compatible with current S-1 zoning, a large contiguous greenspace, central to the property and inclusive of the Tucker Creek acreage, is a highly desirable component of any outcome.
- Commercial development, aimed at revenue generation for the City and select service-oriented retail that is compatible with the development, is highly desirable along High St., roughly in conformity with the existing C-2 and C-3 zoned areas.
- Residential housing, though requiring rezoning, is desirable, if:
    1. It is creatively executed, and,
    2. whether embedded within the commercial areas or free-standing, is harmonious in overall mass and scale, form, and impact upon surrounding neighborhoods.