*LIFESTYLE COMMUNITIES*

*vs.*

*CITY OF WORTHINGTON*

Deposition of

**Katherine Brewer**

October 11, 2023



614.460.5000 | www.priohio.com | pri@priohio.com

1

IN THE UNITED STATES DISTRICT COURT
2   SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION
3

4 LIFESTYLE COMMUNITIES,  )
LTD., ET AL.,     )
5           )
   Plaintiffs,   )
6           )
   vs.       ) Case No.
7           ) 2:22-cv-1775
CITY OF WORTHINGTON,   )
8 OHIO,        )
           )
9   Defendant.    )

10

11

12        DEPOSITION

13     of KATHERINE BREWER

14

15   Taken at Worthington City Hall
     6550 North High Street
16   Worthington, Ohio 43085

17  on October 11, 2023, at 10:32 a.m.

18

19   Reported by: Rhonda Lawrence

20

21       -=0=-

22

23

24

1    APPEARANCES:

2

        Christopher L. Ingram
3       VORYS SATER SEYMOUR AND PEASE LLP
        52 East Gay Street
4       Columbus, Ohio 43215
        614.464.5480
5       clingram@vorys.com

6            on behalf of the Plaintiffs.

7

        Paul J. Schumacher
8       DICKIE McCAMEY
        600 Superior Avenue East, Suite 2330
9       Cleveland, Ohio 44114
        216.390.1795
10      pschumacher@dmclaw.com

11           on behalf of the Defendant.

12

13

14

15

16

17

18

19                   -=0=-

20

21

22

23

24

1                          STIPULATIONS

2              It is stipulated by and between

3    counsel for the respective parties that the

4    deposition of KATHERINE BREWER, the Witness

5    herein, called by the Plaintiffs under the

6    applicable Rules of Federal Civil Court

7    Procedure, may be taken at this time by the

8    stenographic court reporter and notary public

9    pursuant to notice; that said deposition may be

10   reduced to writing stenographically by the court

11   reporter, whose notes thereafter may be

12   transcribed outside the presence of the witness;

13   and that the proof of the official character and

14   qualification of the notary is waived.

15                          -=0=-

16

17

18

19

20

21

22

23

24

1                  INDEX OF EXAMINATION

2                                                PAGE

3    BY MR. INGRAM:                              5

4

5

6                   INDEX OF EXHIBITS

7    EXHIBIT           DESCRIPTION              PAGE

8    1      Land Use Plan                      50

9    6      Ordinance No. 04-2-2022            33

10    7      Resolution No. 04-2022            42

11    8      Meeting minutes, 2-7-22           72

12    51     Email from Dorothy to Brewer,     29
            1-8-21
13
       52     Email from Robinson, 1-20-22    77
14
       53     Email from Brewer to            82
15            Robinson/Bleimes

16

17

18

19

20

21

22

23

24

                    KATHERINE BREWER

1  being first duly sworn, as hereinafter

2  certified, deposes and says as follows:

3                  CROSS-EXAMINATION

4  BY MR. INGRAM:

5      Q.  Please state your name for the record.

6      A.  My name is Katherine Barrett Brewer.

7      Q.  And good morning, Ms. Brewer.  I know we

8  just met.  My name is Chris Ingram, and I

9  represent Lifestyle Communities.  For ease of

10  reference during your deposition this morning,

11  I'm going to refer to my client as Lifestyle or

12  LC.

13      A.  Okay.

14      Q.  Do you understand who I'm referring to?

15      A.  I do.

16      Q.  Okay.  Now, you're an attorney, correct,

17  Ms. Brewer?

18      A.  That is correct.

19      Q.  All right.  And so you taken depositions

20  before yourself?

21      A.  I have been present at a deposition

22  where another attorney took one, but I have not

23  taken an actual deposition to date.

1    Q.  All right.  So have you ever been

2  deposed before?

3    A.  No, I have not.

4    Q.  Okay.  So why don't we then walk through

5  some of the ground rules for your deposition

6  this morning.

7    A.  Okay.

8    Q.  So first of all, if you do not

9  understand one of my questions, please let me

10  know.  Let me know what it is that you don't

11  understand and I'll do my best to either restate

12  it or rephrase it.  Okay?

13    A.  Okay.

14    Q.  And if you don't ask me to restate or

15  rephrase one of my questions, we're all going to

16  assume that you understood my question.  Fair?

17    A.  Yes, sir.

18    Q.  And if -- I guess, I should say that

19  we're joined this morning by Ms. Lawrence, who's

20  our court reporter, and she is preparing a

21  transcript of everything that is spoken, and so,

22  therefore, I'll be asking the questions, and

23  when you're responding -- you know, you're

24  nodding your head right now.  Ms. Lawrence can't

1  record head nods or body language, and so if you

2  can respond verbally, that will help us create a

3  good transcript.  Okay?

4      A.  Yes, sir.  Understood.

5      Q.  All right.  And so along that same vein,

6  it's important that we don't talk over each

7  other.  And so I will do my best to wait until

8  you've finished providing your answers before I

9  start my questions, and if you could do the same

10  in waiting for me to finish my question before

11  you start your answer, that will help

12  Ms. Lawrence.  Okay?

13      A.  Yes, sir.

14      Q.  And to the extent you need a break at

15  any time, I'll need you to finish answering any

16  question that's pending, and then we'll see what

17  we can do about, you know, when it would make

18  sense to take a break.  Okay?

19      A.  Yes, sir.

20      Q.  And it's important that we get your

21  full, complete and accurate testimony this

22  morning.  So I have to ask you, have you taken

23  any medication or drugs that would in any way

24  make it difficult for you to understand and

1    answer my questions today?

2        A.  No, I have not.

3        Q.  Okay.  So is there any reason at all

4    that you cannot give your full, complete and

5    accurate testimony this morning?

6        A.  No, there is not.

7        Q.  And you understand earlier you swore an

8    oath for your deposition today.  Do you

9    understand that's the same oath that you would

10   be asked to swear if you -- when you testify in

11   court in this matter?

12       A.  Yes, sir, I do.

13       Q.  Okay.  Ms. Brewer, is Mr. Schumacher

14   here your lawyer today?

15       A.  Yes, he is.

16       Q.  What did you do to prepare for your

17   deposition this morning?

18       A.  I spoke with Mr. Schumacher.

19       Q.  Okay.  Did you speak to anyone else in

20   order to prepare for your deposition?

21       A.  No, I did not.

22       Q.  And when did you speak to Mr. Schumacher

23   to prepare for your deposition?

24       A.  I don't recall the exact date, but I can

 1  verify it was last week.

 2      Q.  Okay.  So last week.  And did you review

 3  any documents to prepare for your deposition

 4  this morning?

 5      A.  I reviewed minute notes from a previous

 6  City Council meeting held on January 18th of

 7  2022.

 8      Q.  Did you review any other minute notes?

 9      A.  No, sir, I did not.

10      Q.  Did you review any other documents to

11  prepare for your deposition this morning other

12  than the minutes from City Council's January 18

13  meeting?

14      A.  I reviewed one email from a resident

15  that had asked me follow-up questions about what

16  had happened at the January 18th resident [sic],

17  and I read my response to this resident.

18      Q.  Do you recall the resident's name?

19      A.  I do not.

20      Q.  And when was that email response?

21      A.  I do not recall the exact date.

22      Q.  Did you review any other documents in

23  connection with your preparation for deposition

24  this morning?

1      A.  No, I did not.

2      Q.  Did you text message or in any way

3  communicate with anyone else about your

4  deposition this morning?

5      A.  No, I did not.

6      Q.  Have you reviewed the court filings in

7  this case?

8      A.  Yes, I have.

9      Q.  What court filings have you reviewed?

10      A.  I have reviewed the complaint and all of

11  the other docket entries for this lawsuit a few

12  times.

13      Q.  So when you say docket entries, did you

14  review the actual filings, or just the docket?

15      A.  I reviewed the filings associated with

16  the docket entries.

17      Q.  Thank you.

18      A.  You're welcome.

19      Q.  So Ms. Brewer, let's just briefly

20  discuss your background.  How long have you

21  lived in Worthington?

22      A.  Since March 28th and 29th of 2016.  My

23  husband and I also had a 10-month stint in

24  Worthington from November 2011 until August 2013

1  [sic].

2     Q.  That's very specific.

3     A.  I remember weird dates.

4     Q.  Okay.  What triggered you all to move

5  back to Worthington in 2016?

6     A.  Family.

7     Q.  Okay.  Was it your family, your

8  husband's family?

9     A.  Both.  My in-laws live in Worthington

10  Estates, and my parents live by Thomas -- excuse

11  me, Worthington Kilbourne.

12     Q.  All right.  So are you from Worthington?

13  Did you live here before 2011?

14     A.  I grew up in the neighborhood next to

15  Worthington Kilbourne.  Powell mailing address,

16  but Worthington schools.

17     Q.  Okay.  When did you graduate from

18  Wittenberg University?

19     A.  In 2007.  2007.  May of 2007.

20     Q.  And when did you graduate from law

21  school?

22     A.  In May of 2011.

23     Q.  And you have your own law practice,

24  correct?

 1        A.  That is correct.

 2        Q.  What areas of the law do you focus in on

 3   with your practice?

 4        A.  We focus on consumer bankruptcies,

 5   Chapter 7, Chapter 13, student loan workouts,

 6   and debt settlement.

 7        Q.  Okay.  Does your law practice in any way

 8   entail land use or zoning matters?

 9        A.  No, sir.

10        Q.  Did you take any courses in law school

11   regarding land use law?

12        A.  The only class that I believe would fall

13   under that category is real property law.

14        Q.  So general real property?

15        A.  Correct.

16             MR. SCHUMACHER:  I remember that.  I

17   think I got an A in that course.

18        Q.  So Ms. Brewer, do you have any

19   professional experience with land use or zoning

20   matters?

21        A.  No, sir, I do not.

22        Q.  When were you elected to Worthington

23   City Council?

24        A.  I won my election in November of 2021,

 1   and I was sworn in in January of 2022.  I don't

 2   remember the exact date.

 3       Q.  Prior to serving on City Council, did

 4   you serve on any other governmental boards or

 5   commissions?

 6       A.  I do not believe I have.

 7       Q.  Did you ever work for any political

 8   subdivisions?

 9       A.  No, I do not believe that I have.

10       Q.  And did you hold any elected office

11   prior to your position with City Council?

12       A.  No, I have not.

13       Q.  When was the first occasion that you ran

14   for City Council?  Was it the November election

15   of 2021?

16       A.  I initially decided to run in December

17   of 2020.

18       Q.  So what prompted your decision in

19   December of 2020 to run for council?

20       A.  Ironically, I was pursuing a term limits

21   initiative for City Council members, and that's

22   what started this all.  And through that

23   process, I was approached about running for City

24   Council by a current councilmember, and that is

1   what began all of this.

2       Q.  Okay.  And was that Ms. Dorothy?

3       A.  No.

4       Q.  Which councilmember approached you to

5   run?

6       A.  It was David Robinson.

7       Q.  And how did you come to know

8   Mr. Robinson?

9       A.  I had reached out to all of the current

10  City Council members about their thoughts on

11  their support of a term limits initiative.  I

12  had initially sent emails to each one of them.

13  The only one I never actually spoke with was

14  Scott Myers.  But they all had responded in

15  support or opposition to that, and that's how I

16  met Mr. Robinson.

17      Q.  Okay.  And when did Mr. Robinson

18  approach you about potentially running for City

19  Council?

20      A.  I do not recall.

21      Q.  Would it have been months or weeks prior

22  to December 2020, or was it around that same

23  time frame?

24      A.  It would be between September of 2020

1   and the end of the year.

2       Q.  When is your current term up on City

3   Council?

4       A.  It would be the first week of January,

5   year 2026.  It's a four-year term, and it began

6   January of 2022.

7       Q.  You can see me trying to do the math in

8   my head.

9           MR. SCHUMACHER:  If we could do math,

10  we'd be doctors.

11      A.  So that's my math face as well.

12      Q.  So your term, you still have two and a

13  half years, give or take, left in your term?

14      A.  That's correct.

15      Q.  All right.  And as you sit here today,

16  do you intend to run for re-election?

17      A.  I cannot answer that question.  I have

18  not decided.

19      Q.  Okay.  Fair enough.

20          Ms. Brewer, you are the president

21  pro-tem of Worthington City Council, correct?

22      A.  That's correct.

23      Q.  When did you become the president

24  pro-tem of council?

1      A.  I believe it was the second meeting in

2  January of 2022.

3      Q.  So is that January 18?

4      A.  I'm not looking at a calendar, but if

5  that's the second Monday in January, that's when

6  I believe that happened.  I can't recall the

7  date of the initial meeting that year.

8      Q.  There's a -- there was an organizational

9  meeting on January 3rd.  Then council, I

10  believe, met again on January 10th.  And then

11  there's a meeting on January 18th.  I'm not sure

12  if the organizational meeting counts or not.

13      A.  It would have either been the 10th or

14  the 18th, I believe.  But certainly, I can't say

15  which one, but I believe one of those two.

16      Q.  What does the president pro-tem position

17  entail, in your mind?

18      A.  To the best of my knowledge, it is to

19  run the meetings when the president cannot be

20  present to do so.

21      Q.  Okay.  Any other responsibilities for

22  the president pro-tem position?

23      A.  To the best of my knowledge, no.

24      Q.  And how did it come to be that you were

1  named the president pro-tem?

2      A.  It was suggested by another

3  councilmember that I apply for the position of

4  my colleagues.

5      Q.  And which councilmember made that

6  suggestion?

7      A.  David Robinson.

8      Q.  And how did you apply to the other

9  members of council?

10     A.  Whichever date in question, whether it

11  be January 10th or January 18th, those that

12  wanted to apply made a small speech to our

13  colleagues asking for their support, and I was

14  chosen for that role.

15     Q.  Did any other members of council, I'll

16  call it, run for the pro-tem position?

17     A.  Yes.

18     Q.  And who else ran for it?

19     A.  It was Councilmember Beth Kowalcyk.

20     Q.  And who supported you for the pro-tem

21  position?

22     A.  I believe it was myself, Mr. Robinson,

23  Mr. Bucher, and Mr. Smith.

24     Q.  So it was 4-3?

1     A.  Yes.

2     Q.  Okay.  You are City Council's

3  representative on the Municipal Planning

4  Commission, correct?

5     A.  Currently, yes.

6     Q.  And City Council has a representative on

7  planning commission.  Are you also a

8  representative for the Architectural Review

9  Board since they meet jointly?

10        MR. SCHUMACHER:  Objection.  Compound.

11    Q.  You can answer.

12        MR. SCHUMACHER:  Which question?

13    Q.  You can answer.

14        MR. SCHUMACHER:  Do you know which

15  question he's asked you to answer?

16        THE WITNESS:  I believe he's asked me

17  three different questions:  If I'm a

18  representative to the Architectural Review

19  Board, yes.  Whether or not they have a joint

20  representative, yes.  And whether or not I am

21  also the liaison to the Municipal Planning

22  Commission, yes.

23        MR. SCHUMACHER:  You're doing all the

24  work for him now.

1    Q.  Thank you, Ms. Brewer.

2         For purposes of the record, does the

3    planning commission and Architectural Review

4    Board meet jointly; in other words, at the same

5    time?

6    A.  Yes.

7    Q.  Are there -- are the members the same on

8    both the planning commission and the

9    Architectural Review Board?

10   A.  I don't know if there's any overlap, but

11   I believe generally at the meetings we attend

12   members of both are there.

13   Q.  And when did you first begin serving as

14   City Council's representative to the planning

15   commission and Architectural Review Board?

16   A.  In January of 2022.

17   Q.  And what is your role as council's

18   representative to -- I'll start with planning

19   commission, what does your role as the liaison

20   to the planning commission entail?

21   A.  My role as liaison to the MPC, Municipal

22   Planning Commission, is to attend the

23   semi-monthly meetings held, relay information

24   from City Council that I believe is pertinent to

 1  the MPC, and also take back information to City

 2  Council that -- decisions the MPC has made,

 3  items that are on the agenda.  And I'm invited

 4  to partake in the discussions if I see fit, but

 5  I do not get a vote in any of the decisions that

 6  they make.

 7       Q.  And how about your role as the City

 8  Council representative to the Architectural

 9  Review Board?

10       A.  My role with the ARB, the Architectural

11  Review Board, is to bring information from those

12  meetings back to City Council, pertinent

13  information from City Council meetings to the

14  ARB, opine on any discussions we are having, but

15  I do not have a vote.

16       Q.  So similar responsibilities for both

17  boards; is that fair?

18       A.  Correct, yes.

19       Q.  And so from time to time the planning

20  commission is called upon to make

21  recommendations to City Council, correct?

22       A.  Yes.

23       Q.  Including in rezoning matters, correct?

24       A.  Yes.

1    Q.  As City Council's representative to the

2  planning commission, have you ever directed

3  members on how to vote on zoning matters that

4  are before the planning commission?

5    A.  Never.

6    Q.  Why not?

7    A.  Because that's not my role.

8    Q.  Do you ever tell members of the planning

9  commission your thoughts on how to vote on a

10  zoning matter that's pending before the planning

11  commission?

12    A.  Never.

13    Q.  And why not?

14    A.  That's not my role.

15    Q.  Are you aware of any instances where

16  your fellow councilmembers have directed the

17  members of the planning commission how to vote

18  on zoning matters that are before the planning

19  commission?

20        MR. SCHUMACHER:  Objection.  Relevance.

21        We're talking about January of 2022 to

22  the current time?

23    Q.  You can answer.

24    A.  Yes.

1    Q.  Okay.  And which instance -- which

2  instances are you familiar with?

3    A.  An email from Mr. Robinson.  I don't

4  remember the specific recipient, but I am aware

5  it was someone on the Municipal Planning

6  Commission or the Architectural Review Board.

7    Q.  Do you remember the timing of

8  Mr. Robinson's email to the planning commission

9  member or Architectural Review Board member?

10    A.  It was prior to the meeting at which the

11  ARB and MPC denied the most recent proposal from

12  LC.

13    Q.  Okay.  And that was before you were a

14  member of council, correct?

15    A.  Correct.

16    Q.  So how did you come to learn about

17  Mr. Robinson's email?

18    A.  He told me about it.

19    Q.  When did he tell you about it?

20    A.  I don't recall the exact date, but prior

21  to that ARB/MPC meeting, in which the most

22  recent proposal was denied.  It was prior to

23  that meeting.

24    Q.  And why were you and Councilman Robinson

1    talking about the Lifestyle's application that

2    was pending before the planning commission at

3    that time?

4        A.  At the time we were friends, and we

5    watched the meeting together.

6        Q.  Where were you when you watched the

7    meeting together?

8        A.  We were at my home.

9        Q.  Okay.  Why did you have Mr. Robinson at

10   your home to watch the planning commission

11   meeting that -- concerning Lifestyle's rezoning

12   application?

13       A.  I was curious.  I knew, if elected,

14   which at that point I hadn't been, that it would

15   be something I would be looking at as a

16   potential councilmember and an issue that I knew

17   I would be discussing.

18       Q.  Okay.  Did you take any positions with

19   respect to Lifestyle's zoning application when

20   it was pending before the planning commission?

21       A.  My personal opinion was that I was not a

22   supporter of the project itself.

23       Q.  Okay.  And why is that?

24       A.  Based on what I had seen since being a

1    resident in Worthington since 2016, the project

2    itself didn't seem to fit in the space that it

3    was being proposed for.

4        Q.  Okay.  Can you elaborate on your view

5    there?  When you say it didn't seem to -- the

6    project didn't seem to fit the space that it was

7    being proposed for, what do you mean by that?

8        MR. SCHUMACHER:  Objection.  Relevance.

9        A.  My vision for that property personally,

10   before I was elected, I wanted to see

11   residential housing, commercial, and green

12   space.  And my in-laws live in that

13   neighborhood, and the esthetic feel of the

14   number of units being proposed didn't seem --

15   for less of a better word, to vibe with the

16   current neighborhood.

17       Q.  Okay.  And your in-laws, you said they

18   live in that neighborhood.  Where do they live

19   in proximity to the UMCH property?

20       A.  They live on Alloway West, a few streets

21   away from the LC property.

22       Q.  Now, you said your vision then in your

23   last response.  It would imply to me that

24   perhaps your views have since changed; is that

1  fair?

2      A.  No, they are still the same.

3      Q.  Still the same?  Okay.

4      A.  Correct.

5      Q.  So when you and Councilman Robinson were

6  watching the planning commission meeting, what

7  did Mr. Robinson tell you about Lifestyle's

8  application at that time?

9          MR. SCHUMACHER:  Objection.  Hearsay.

10     A.  I do not recall.

11     Q.  What did you tell Mr. Robinson about

12  Lifestyle's application -- I'm sorry, what did

13  you tell Mr. Robinson -- yeah -- about

14  Lifestyle's application when he was at your home

15  and you all were watching the planning

16  commission meeting?

17     A.  I was in general agreement with what

18  members of the community that had joined in

19  virtually were indicating.  I was in agreement

20  with what the members of the ARB and MPC had

21  been saying, that it just wasn't -- as the

22  current project sat, it wasn't appropriate for

23  the land it was proposed on.

24     Q.  Okay.  When you say you agreed with the

1   members' views on what was appropriate for the

2   property, what are you basing on what's

3   inappropriate or appropriate; in other words,

4   are there any standards or guidelines that

5   you're applying?

6        A.  I was thinking about the residents.

7   That is mostly who I had been speaking to in my

8   campaign about what their thoughts were, and so

9   balancing what residents had been telling me

10  about their thoughts for the property, that was

11  the main source of information I was relying on.

12       Q.  Okay.  So residents' views and opinions

13  that you had discussed the LC proposal

14  formulated your views on what was appropriate or

15  inappropriate for the development of Lifestyle's

16  property; is that fair?

17       A.  Correct.  Either the residents I spoke

18  directly with or that I saw emails that had been

19  written to the city about the specific property.

20       Q.  Anything else?

21       A.  To the best of my knowledge, no.

22       Q.  Now, earlier I asked you about instances

23  where fellow councilmembers had directed MPC on

24  how to vote on matters that were pending before

1  the MPC.  And you raised the email from

2  Mr. Robinson.  Were there any other instances

3  that you can think of?

4      A.  To the best of my knowledge, no.

5      Q.  In connection with your role as City

6  Council's representative to the planning

7  commission, do you ever meet with planning

8  commission members about zoning matters that are

9  before them outside of public hearings?

10     A.  Never.

11     Q.  And why not?

12     A.  That's inappropriate.

13     Q.  If I were to ask you the series of last

14  questions as they pertain to the members of the

15  Architectural Review Board, would any of your

16  answers be different?

17     A.  No, they would not.  They would remain

18  the same.

19     Q.  Okay.  And I should have pointed this

20  out earlier for purposes of our record, but when

21  I refer to either the UMCH property, Lifestyle's

22  property, or the property, do you understand

23  that I'm referring to the property directly

24  across the street from where we are today?  Do

 1  you understand that?

 2     A.  Yes.  You made sure of that in the

 3  beginning, and I understand.

 4     Q.  Okay.

 5        MR. SCHUMACHER:  Again, object, because

 6  [inaudible] --

 7        THE WITNESS:  Well, Ukraine.  Or not

 8  Ukraine.  Israel.

 9        MR. SCHUMACHER:  No, it went up.  It was

10  down last week, and then it went up.  It keeps

11  going up.

12  BY MR. INGRAM:

13     Q.  When do you recall first following the

14  redevelopment of the UMCH property?

15        MR. SCHUMACHER:  You're asking her as a

16  citizen?

17        MR. INGRAM:  I'm asking her as her.

18     A.  At some point in the year 2020.

19     Q.  Okay.  And what triggered your curiosity

20  in 2020?

21     A.  That it had been sitting vacant for

22  quite a while.

23     Q.  Do you recall in January of 2021 signing

24  to receive updates from the planning commission

1  and Architectural Review Board hearings on

2  Lifestyle's application?

3      A.  I don't recall signing up for that.

4                    -=0=-

5          (Deposition Exhibit 51 marked.)

6                    -=0=-

7          MR. SCHUMACHER:  What are we at here?

8          MR. INGRAM:  51.

9          MR. SCHUMACHER:  50?

10         MR. INGRAM:  51.

11         MR. SCHUMACHER:  Hold on.

12  BY MR. INGRAM:

13      Q.  So while you're reviewing the document I

14  handed you, Ms. Brewer, for purposes of the

15  record, you've been handed what's been marked as

16  Exhibit 51, which is an email from Rachel -- an

17  email chain from Rachael Dorothy to Katherine

18  Brewer, dated January 8th, 2021.  Take your time

19  to review the Exhibit 51.

20         Ms. Brewer, first of all, is

21  kbrewer@woodbrewerlaw.com your email address?

22  Was it in January of 2021?

23      A.  Yes, it is.

24      Q.  Okay.  So did you receive this email

 1   from Councilwoman Dorothy?

 2       A.  It appears that I did.

 3       Q.  Do you recall receiving it?

 4       A.  Yes.

 5       Q.  And at the time Ms. Dorothy wrote to

 6   you, just double-checking, you have signed up

 7   for all these meeting updates already, correct?

 8   Do you see that?

 9       A.  I do.

10       Q.  And she's referring to the planning

11   commission and Architectural Review Board

12   meeting updates with respect to Lifestyle's

13   application, correct?

14       A.  Yes.

15       Q.  And so did you sign up for those

16   updates?

17       A.  I don't recall.

18       Q.  What events led up to Ms. Dorothy

19   sending you this email?

20       A.  As I indicated, I had reached out to all

21   the current councilmembers during the beginning

22   of my candidacy, and Rachael, I was trying to

23   make sure that I had information I needed to

24   stay up to date with things going on with the

·1· city.

·2· · · Q.· Okay.· I thought earlier you said that

·3· you had reached out to councilmembers regarding

·4· your term limits -- the term limits issue;

·5· whereas, this is the Lifestyle's application.

·6· · · · · MR. SCHUMACHER:· Objection.· That's not

·7· what she said.

·8· · · Q.· And feel free to correct me if I've got

·9· that wrong.

10· · · A.· You are correct, I did reach out to them

11· for the term limits initiative, but I also

12· mentioned that in January of 2020 is when I

13· decided to announce that I was running for

14· council, and so, without speaking for her, I

15· believe Ms. Dorothy was sending this to make

16· sure I was informed about everything going on

17· with the city.

18· · · Q.· Okay.· And you said January of 2020.

19· Did you mean January of 2021, that you announced

20· for council?

21· · · A.· No, I announced in January of 2020.

22· · · Q.· Okay.· I'm only confused, Ms. Brewer,

23· because when I asked you when you decided to run

24· for City Council, you said December 2020?

1      A.  Yes.  So I decided that I had wanted to

2  run in December, and I believe I made my

3  announcement at the end of December of 2020.

4      Q.  Okay.  Because you just said January of

5  2020, and that's what threw me off.

6          MR. SCHUMACHER:  You did.

7      A.  I apologize, then, yes.  Yes, the date

8  of this email is correct.  I apologize.

9      Q.  Okay.  So as of the date of the email

10  sent in Exhibit 51, you had announced your

11  candidacy for City Council, or were darn close

12  to doing so?

13      A.  That is correct.

14      Q.  Okay.  Again, are you -- did you sign up

15  for the planning commission or Architectural

16  Review Board commission meeting updates with

17  respect to the Lifestyle application?

18      A.  I don't specifically recall.

19      Q.  And while that application was pending

20  before the planning commission, obviously you

21  and Mr. Robinson virtually attended the fall

22  meeting.  Did you keep yourself abreast of

23  Lifestyle's application while it was pending

24  before the planning commission that year?

1        A.  No, I did not.

2        Q.  Did you attend any of the planning

3    commission or Architectural Review Board

4    hearings on Lifestyle's application other than

5    the October meeting?

6        A.  I do not believe so.

7        Q.  All right.  If you could turn to Exhibit

8    6, please, in your binder in front of you.  Take

9    a moment to review Exhibit 6, if you need.

10           Okay.  Ms. Brewer, do you recognize

11   Exhibit 6 as Ordinance No. 4-2022?

12       A.  Yes, I do.

13       Q.  And do you recall City Council's

14   consideration of this ordinance based on your

15   review of the minutes from the January 18, 2022,

16   hearing?

17       A.  Yes, I do.

18       Q.  When's the first time you saw this

19   proposed ordinance?

20       A.  At some point prior to the meeting on

21   January 18th, 2022.

22       Q.  Okay.  And the meeting on January 18th

23   was a Tuesday, because Martin Luther King day

24   was the day before.  How far in advance of the

1  Tuesday hearing was the first time you reviewed

2  this proposed ordinance?

3      A.  I believe a few days.

4      Q.  So over the weekend?

5      A.  Perhaps Sunday evening.

6      Q.  When's the first time anyone discussed

7  with you the substance of this ordinance?

8      A.  I do not specifically recall.

9      Q.  Okay.  Was it in prior -- prior to the

10  time that you reviewed a copy of this proposed

11  ordinance?  Did you talk about it first?

12      A.  Yes.  It would have been before January

13  18th, but I don't recall the specific date.

14      Q.  Okay.  Who provided you with the initial

15  copy or first copy of this ordinance?

16      A.  David Robinson.

17      Q.  And how many versions of this proposed

18  ordinance existed, to your knowledge, prior to

19  its introduction at the January 18 meeting?

20      A.  I do not know the answer to that.

21      Q.  So is this the only one, as far as you

22  know?

23      A.  To the best of my knowledge, yes.

24      Q.  And was -- how did Mr. Robinson convey

1    or provide you with a copy of this proposed

2    ordinance?

3        A.  He brought a copy to me at my home.

4        Q.  Is it common for President Robinson to

5    bring you proposed legislative measures in

6    person to your home?

7            MR. SCHUMACHER:  Objection.  In her

8    tenure as a councilmember?

9        Q.  You can answer.

10       A.  I believe this is the only item, since

11   this was only my first week on council, that was

12   ever brought to my home in this manner.

13       Q.  Has he ever done that since?

14           MR. SCHUMACHER:  Objection.  Relevance.

15           You can answer.

16       A.  No.

17       Q.  Was anyone else with Mr. Robinson when

18   he came to your home and provided you with a

19   copy of Ordinance No. 4-2022?

20       A.  I can't recall.

21       Q.  And what did President Robinson tell you

22   the evening that he brought this proposal to

23   your home?

24       A.  That based on previous situations with

1    proposals presented by LC, that enacting a

2    moratorium, such as this, was the best way to

3    preserve public dialogue about the LC property.

4         Q.  Okay.  Anything else?

5         A.  Not to the best of my knowledge.

6         Q.  You had mentioned that there were prior

7    discussions about the substance of this

8    ordinance, this moratorium, proposed moratorium.

9    With whom did you discuss a proposed moratorium

10   on the future development of Lifestyle's

11   property prior to that evening?

12        A.  I had had a phone call with Matt Greeson

13   and Tom Lindsey, and I believe Mr. Robinson was

14   on the call as well.

15        Q.  And about when did that phone call

16   occur?

17        A.  I can't recall.  Prior to that weekend.

18   I just don't recall the exact date.

19        Q.  Was it weeks or days before?

20        A.  I don't recall.

21        Q.  Okay.  And so when Mr. Robinson came to

22   your house the Sunday before the 18th, you were

23   expecting -- it wasn't like it was a surprise

24   that he provided this ordinance to you; is that

1  fair?

2      A.  That is fair.

3      Q.  Okay.  Did you do any research on

4  moratorium in connection with this proposed

5  ordinance set forth in Exhibit 6?

6      A.  No, I did not.

7      Q.  Did you provide any proposed changes or

8  ask for any changes to Exhibit 6 before it was

9  introduced to council?

10     A.  I don't believe so.

11     Q.  I should ask you, the phone call you

12  referenced with Messrs. Greeson, Lindsey and

13  Robinson, had you discussed the substance of

14  this proposed ordinance with anyone else before

15  that phone call?

16         MR. SCHUMACHER:  Objection, to the

17  extent I caution you not to disclose any

18  communications with counsel.

19     Q.  I'm not asking for the substance of any

20  communications.  I'm just asking whether you had

21  prior discussions before that other -- the phone

22  call you referenced.

23         MR. SCHUMACHER:  I'm not sure I

24  understand your question.  I thought you said in

1    your question -- you asked about the substance

2    of the call.  I'm just cautioning her not to

3    disclose any attorney-client communication.

4         A.  No, I did not.

5         Q.  Okay.  Did you tell anyone about a

6    proposed moratorium concerning Lifestyle's

7    property before the January 18 meeting?

8         A.  No, I did not.

9         Q.  Did you share the proposed Ordinance

10   No. 4-2022 with anyone prior to the January 18

11   meeting?

12        A.  No, I did not.

13        Q.  Did you discuss the substance of

14   proposed Ordinance 4-2022 with anyone prior to

15   the January 18 meeting other than President

16   Robinson, Mr. Greeson, or Mr. Lindsey?

17        A.  No, I did not.

18        Q.  The ordinance set forth in Exhibit 6

19   only applies to the UMCH property, correct?

20        A.  Correct.

21        Q.  And what's your understanding of why

22   this moratorium is sought to be placed on

23   Lifestyle's UMCH property?

24        A.  I was advised by Mr. Robinson that

1    events such as this had occurred before, and in

2    order to promote public dialogue, this was the

3    proper mechanism in which to do that.

4        Q.  Okay.  So you're referencing the prior

5    conversation you had with President Robinson the

6    Sunday before; is that fair?

7        A.  Correct.

8        Q.  Anything else?

9        A.  To the best of my knowledge, no.

10       Q.  What is your understanding of why the

11   ordinance set forth in Exhibit 6 was proposed as

12   an emergency?

13       A.  I don't recall the nature of that.

14       Q.  Feel free to re-review Exhibit 6.

15       A.  As stated in one of the whereas

16   paragraphs on page 2, labeled Worthington

17   000528, the emergency measure permits the

18   temporary moratorium to be effective

19   immediately.

20       Q.  Okay.  Right.  And so my question is:

21   Do you understand why an emergency was sought

22   for this moratorium?

23       A.  You would have to ask Mr. Robinson, as I

24   believe he was the author of this.  I can't

1    speak to his intent.

2        Q.  So why didn't you share this proposed

3    ordinance with anyone prior to City Council's

4    hearing on the 18th?

5        A.  I was advised not to.

6        Q.  By whom?

7        A.  By David Robinson.

8        Q.  And what did President Robinson advise

9    you not to do?

10       A.  Speak with anybody except councilmembers

11   about this.

12       Q.  And did you speak with any

13   councilmembers about a proposed moratorium on

14   Lifestyle's property prior to the January 18

15   hearing?

16       A.  I had spoken to Mr. Robinson and Pete

17   Bucher about it.

18       Q.  Okay.  Why did you speak to Mr. Bucher

19   about it?

20       A.  To discuss the substance of the

21   resolution -- or of the ordinance, excuse me.

22       Q.  Okay.  And what did you discuss with

23   Mr. Bucher about it?

24       A.  We discussed the fact that it would be

1   an emergency measure that would require six of

2   the seven to pass.

3      Q.  Anything else?

4      A.  I believe that's the extent of the

5   conversation.

6      Q.  Why didn't you discuss those same

7   matters with any of your other councilmembers?

8      A.  At the time, I didn't have relationships

9   with them at this point.

10      Q.  Who's the other freshman councilmember

11   coming in at the same time as you?

12      A.  Ms. Rebecca Hermann.

13      Q.  So you didn't reach out to your

14   co-freshman, Ms. Hermann?

15      A.  I did not.

16      Q.  Did you have a relationship with her at

17   the time?

18      A.  No, other than being newly elected

19   councilmembers, no.

20      Q.  You voted for the ordinance set forth in

21   Exhibit 6, correct?

22      A.  Yes, sir.

23      Q.  And why did you vote for Ordinance

24   No. 4-2022?

1          MR. SCHUMACHER:  Objection.  Relevance.

2     A.  I voted for it based on my belief at the

3  time that this was the best way to promote

4  dialogue about the property, and that is what I

5  wanted.

6     Q.  Anything else?

7     A.  No.

8     Q.  How did a moratorium against the future

9  development of Lifestyle's property promote

10  dialogue about the property?

11     A.  At the time it was my belief that it

12  would be a chance to engage with Lifestyles and

13  with residents, and it would essentially put a

14  pause on the building that was going on to allow

15  us to work together.  New council, fresh start.

16  And that was my belief when I voted for this.

17     Q.  Now, the dialogue and the back and forth

18  you're referencing, that can occur while an

19  application's pending, correct?

20     A.  To the best of my knowledge, correct.

21     Q.  Why don't you turn to the next exhibit,

22  Exhibit Number 7 in your binder, please.

23     A.  Okay.

24     Q.  Have you reviewed Exhibit 7?

1     A.  Yes, sir, I have.

2     Q.  Okay.  And for purposes of the record,

3  Exhibit 7 is Resolution No. 4-2022.  Do you see

4  that?

5     A.  Yes, sir, I do.

6     Q.  And City Council adopted Resolution

7  No. 4-2022 at that same January 18, 2022,

8  meeting, correct?

9     A.  That is correct, sir.

10     Q.  And you voted for it, correct?

11     A.  Yes, sir, I did.

12     Q.  In fact, you actually moved City Council

13  to adopt this resolution, right?

14     A.  I cannot recall, but if that is what are

15  in the minutes, I trust that they are correct.

16     Q.  Okay.  Was this the first resolution you

17  ever moved council to adopt?

18     A.  Yes.

19     Q.  Resolution 4-2022 only applies to

20  Lifestyle's UMCH property, correct?

21     A.  That is correct.

22     Q.  And Resolution 4-2022 was not on the

23  January 18 meeting agenda, was it?

24     A.  No, it was not.

1      Q.  And I'm going to have very similar

2  questions about this resolution as I did the

3  prior ordinance.  And so when did you first

4  receive a copy of the resolution set forth in

5  Exhibit 7?

6      A.  I believe it was the same time I

7  received the ordinance for the moratorium, the

8  weekend prior to this vote.

9      Q.  So did Mr. Robinson bring a copy of the

10  resolution along with the ordinance to you that

11  evening?

12      A.  Yes, he did.  I believe they were

13  together.

14      Q.  And this resolution set forth in Exhibit

15  7 amends the City's comprehensive plan as it

16  pertains to the Lifestyle's UMCH property,

17  correct?

18      A.  Correct.

19      Q.  So you had discussed the Sunday evening

20  before the January 18 meeting both a moratorium

21  and amending the comprehensive plan as it

22  applies to Lifestyle's property; is that fair?

23      A.  That's correct, sir.

24      Q.  Did you discuss anything else as it

1  pertained to Lifestyle's property?

2      A.  No, I can't recall that we would have.

3  No.

4      Q.  Who, to your knowledge, received a copy

5  of this amendment to the comprehensive plan in

6  advance of the January 18 hearing?

7      A.  I believe my colleagues on council.

8  That's the extent of my knowledge.  I believe it

9  was only to them.

10     Q.  Okay.  Did you -- strike that.

11         Who did you talk to, prior to your

12  meeting with Mr. Robinson at your house the

13  Sunday evening before, about an amendment to the

14  comprehensive plan as it pertained to

15  Lifestyle's UMCH property?

16     A.  Mr. Robinson, Mr. Bucher, and I believe

17  that topic was brought up with Mr. Greeson and

18  Mr. Lindsey on the phone call I referenced

19  before.

20     Q.  Okay.  So in each of the conversations

21  that you referenced before in connection with

22  the moratorium, you also talked about amending

23  the comprehensive plan as it applied to

24  Lifestyle's property; is that fair?

 1     A.  That is correct, yes.

 2     Q.  Did you have any additional

 3  conversations with anyone prior to the January

 4  18 hearing about amending the comprehensive plan

 5  as it applied to Lifestyle's property?

 6     A.  To the best of my knowledge, no.

 7     Q.  Did you share a copy of the proposed

 8  amendment to the comprehensive plan as it

 9  applied to Lifestyle's property set forth in

10  Exhibit 7 with anyone prior to the January 18

11  hearing?

12     A.  No.

13     Q.  Why not?

14     A.  Because I was advised not to.

15     Q.  And was that President -- President

16  Robinson advised you not to share any copy of

17  Resolution No. 4-2022 with anyone prior to the

18  hearing?

19     A.  That is correct.

20     Q.  And why not?

21     A.  You would have to ask him as to why he

22  indicated that to me.

23     Q.  Did City Council obtain the planning

24  commission's feedback on this amendment to the

1    comprehensive plan before the January 18

2    meeting?

3        A.  I don't believe that would have been

4    obtained.

5        Q.  Because it wasn't shared with anyone on

6    planning commission prior to that hearing; is

7    that fair?

8        A.  I believe so.  I personally did not

9    share anything with them, so I can't speak to my

10   colleagues, but I personally did not share this

11   with anybody on the MPC or the ARB.

12       Q.  Why was Lifestyles not provided a copy

13   of this amendment to the comprehensive plan as

14   it applied to Lifestyle's property in advance of

15   the January 18 hearing?

16       A.  I was advised that, because of a prior

17   circumstance, it would be best to not advise any

18   other party because previously, when something

19   similar to this had been done, a project was

20   introduced that ultimately was denied, and so it

21   was to attempt to ensure public dialogue on the

22   property and forward the project.

23       Q.  Okay.  Anything else?

24       A.  To the best of my knowledge, no.

1    Q.  When was the resolution set forth in

2  Exhibit Number 7 drafted?

3    A.  You would have to ask the drafter.

4    Q.  And who's that?

5    A.  Mr. Robinson.

6    Q.  Now, when Mr. Robinson provided you an

7  advanced copy of Resolution 4-2022, did you

8  propose any revisions or changes?

9    A.  I don't believe I did.

10    Q.  Why did you move your councilmembers to

11  adopt Resolution 4-2022?  Why did you support

12  it?

13    A.  I supported the language, as I thought

14  it would be a good guide for what I had heard

15  residents indicating they thought would be the

16  best use of that property, which I also shared

17  and share the same vision.  Page 2 indicates

18  green space, commercial development and housing.

19  And those were and are my vision for that

20  property.

21    Q.  Okay.  Anything else?  Any other reasons

22  why you support it?

23    A.  No.  I believe that's the extent of my

24  support.

1     Q.  Okay.  And so with respect to this

2  amendment to the comprehensive plan serving as a

3  good guide, from what you heard from residents,

4  are you referring to any particular residents?

5     A.  Residents I had spoken with either

6  verbally, on the phone, or via email.  I was

7  receiving a lot of emails at that time, so I

8  can't specifically point out any specific

9  resident.

10     Q.  Did you keep track or a tally of the

11  residents' views that were communicated to you

12  at the time?

13     A.  Can you specify what you mean by a

14  tally?

15     Q.  Sure.  You've indicated you heard from

16  lots of residents about the development of this

17  property.  And so I'm just trying to ascertain,

18  you know, which residents are you referring to?

19  Is there some grand master that -- where you

20  kept notes, anything of that nature?

21     A.  No.  It was more of a bird's eye view of

22  the majority of residents I talked to, without a

23  specific number, that this amalgamation of green

24  space, commercial development and residential

1  housing was what most, but not a specific

2  number, generally wanted to see there.

3      Q.  I want to direct your attention just

4  very briefly to Exhibit 1.  And Exhibit 1 is

5  what I refer to as the land use plan that

6  pertains to Lifestyle's property which was the

7  September 2nd, 2014, amendment to the city's

8  comprehensive plan as it pertained to the UMCH

9  site.  Do you see that?

10     A.  I do see the document.  Yes.

11     Q.  And with respect to the resolution set

12 forth in Exhibit 7, the amendment in Exhibit 7

13 amends Exhibit 1, fair?

14         MR. SCHUMACHER:  Objection.  I don't

15 think there's any foundation for Exhibit 1.

16         But go ahead.

17     A.  Can you ask your question again, please?

18     Q.  You're reading through Exhibit 1.  Feel

19 free to take your time.  Let me ask you this:

20 Have you seen the land use plan in Exhibit 1

21 before?

22     A.  Can you ask your first question again,

23 please.

24         MR. INGRAM:  Do you want to read that

1    back, please, Ms. Lawrence.

2         (Record read as requested.)

3    A.  I would generally agree that that is

4    fair.

5    Q.  Okay.  You say generally agree.  What do

6    you mean by that?

7    A.  Exhibit 1 is a specific focus on the

8    United Methodist Children's Home area, and the

9    purpose of Resolution 04-2022 was to amend that

10   specific portion of the comprehensive plan.  So

11   yes.

12   Q.  Okay.  Is Exhibit 1 still in effect

13   following City Council's adoption of Exhibit 7?

14        MR. SCHUMACHER:  Objection, to the

15   extent that calls for some legal conclusion.

16        You can answer.

17   A.  My understanding is yes, it replaces

18   that specific -- Exhibit 7 ordinance replaces

19   the specific section in Exhibit 1 of the

20   comprehensive plan.

21   Q.  Okay.  So in your mind, Exhibit 1 no

22   longer exists; it was replaced by Exhibit 7?

23   A.  Correct.

24   Q.  All right.  If you can turn back to

1    Exhibit 7.  Directing your attention to the

2    first guiding principle that applies to the

3    future development of Lifestyle's property, do

4    you see that on page 1 of 2 of the amendment?

5        A.  Yes.  Beginning with, it is important?

6        Q.  Yes.  It is important that the

7    development of the property be considered and

8    executed holistically as an integrated whole.

9        A.  I do see that, yes.

10        Q.  As a member of council and the

11    representative to the planning commission, what

12    does that first guiding principle mean to you?

13        A.  To me, personally, one councilmember,

14    when I see this principle, it's that we look at

15    the entirety of Worthington when deciding how we

16    would like to -- we -- I say we because a

17    decision also lands with MPC and ARB, but look

18    at the entirety of Worthington as we're making a

19    decision for the LC land.

20        Q.  And when you say looking to the entirety

21    of Worthington, what are we looking to?

22        A.  The esthetics of any buildings we might

23    construct, neighboring homes, ensuring that

24    development on that property was natural, if you

¹ will, and that it's consistent with the rest of

² the city.  But if you didn't know that was the

³ most recently built property, you wouldn't know

⁴ it by driving through, because it looks as if it

⁵ had been there the whole time.

⁶     Q.  Is there anything else?

⁷     A.  No.

⁸     Q.  Is there any guide or policy issued by

⁹ the city regarding the esthetics that you're

¹⁰ referencing?

¹¹     A.  I believe the design guidelines -- I

¹² don't know the specific section, but the design

¹³ guidelines that the Architectural Review Board

¹⁴ and municipal planning look at and use when

¹⁵ making decisions give general principles for

¹⁶ what should be used to make decisions.

¹⁷     Q.  Anything else other than the design

¹⁸ guidelines?

¹⁹     A.  I don't believe so.

²⁰     Q.  Okay.  You also mentioned neighboring

²¹ homes should be taken into consideration.

²²     A.  Yes.

²³     Q.  But earlier, as far as your view of this

²⁴ first guiding principle, you phrased this to be

1  in terms of the entire City of Worthington, and

2  so I'm wondering why you're now focusing only on

3  neighboring homes as opposed to other homes

4  throughout the city?

5      A.  Well, other homes as well, but if this

6  is going to be something that's developed, I

7  wouldn't hope that a line of homes on Larrimer,

8  for example, would look completely different

9  than any new residential development that could

10  be on the other side on the LC property.

11      Q.  And as far as whether or not the

12  residential development on LC's property looks

13  harmonious with the neighboring homes or not,

14  who makes that decision, in your mind?

15      A.  I guess that would ultimately fall to

16  council.

17      Q.  And what standards, what policies would

18  council apply to make that determination?

19      A.  I believe some of the documents, we look

20  at the codified ordinances, the zoning code,

21  design guidelines, things that have already been

22  looked at by the MPC and the ARB before their

23  decision would get to us as a whole, as council.

24      Q.  Okay.  So with respect to council's

 1   determination as to whether or not the

 2   residential homes proposed to be built on

 3   Lifestyle's property are harmonious with the

 4   neighboring homes --

 5       A.  And can I please add the comprehensive

 6   plan would be another guiding document.  I

 7   apologize for missing that.

 8       Q.  You referenced the zoning code, design

 9   guidelines, and the comprehensive plan, which

10   would be this Exhibit 7, correct?

11       A.  That's correct.  That portion of the

12   comprehensive plan.

13       Q.  Yes.  Anything else?

14       A.  To the best of my knowledge, no.

15       Q.  Similar question as it relates to your

16   testimony earlier, the development should feel

17   natural, what standards -- first of all, who

18   would make the determination as to whether or

19   not it felt natural, and it being a proposed

20   development on Lifestyle's property?

21            MR. SCHUMACHER:  I'm going to interpose

22   an objection here.  You can continue to ask her

23   questions about this document which was adopted

24   in January of 2022, but it clearly isn't

 1   relevant to any issue in dispute, unless, of

 2   course, you're just fishing for information

 3   about why -- about a new proposal that your

 4   client may be making for development of the

 5   land.  But seems to me we're wasting time to

 6   talk about issues that are well past the issues

 7   in dispute in the lawsuit.

 8        MR. INGRAM:  Counsel, I'd appreciate it

 9   if you would refrain from your speaking

10   objections.  You can make form objections.

11        But otherwise, please answer my

12   question.

13        MR. SCHUMACHER:  Well, I'm making that

14   in a form objection so that you have an

15   opportunity to cure my objection.  Go ahead.

16        MR. INGRAM:  Do you recall the question?

17        THE WITNESS:  Could you please repeat it

18   just so I make sure I'm answering properly.

19        (Record read as requested.)

20     A.  Well, that's a two-part question.  Which

21   part would you like me to answer first?

22   BY MR. INGRAM:

23     Q.  First of all, who makes the

24   determination of whether a proposed development

1  of Lifestyle's property feels natural?

2     MR. SCHUMACHER:  Objection.  Same

3  objection.

4     A.  I believe it's a combination of

5  residents, most importantly, opining on their

6  thoughts on what would be appropriate.

7  Procedurally, the MPC, the ARB, and City

8  Council.

9     Q.  And as a member of City Council, how do

10  you gauge resident input; in other words, how do

11  you determine what the residents want or don't

12  want?

13     MR. SCHUMACHER:  Objection.  Asked and

14  answered.

15     A.  I believe there's a lot of ways to

16  garner resident input.  I mentioned emails that

17  have been sent to the city over time with their

18  opinions, some for and some against, you know,

19  development.  Phone conversations, emails.  I

20  can only find out the information from those

21  residents I speak with.  So direct conversation

22  with residents is my way of determining, based

23  on more residents wanting something to what the

24  residents as a whole would like.

1  Q.  What is the City of Worthington's

2  population, Ms. Brewer?

3  A.  I believe it is just shy or pretty close

4  to 15,000.

5  Q.  And in connection with garnering the

6  residents' opinions or views, do you solicit the

7  opinions or views from all 15,000 residents?

8       MR. SCHUMACHER:  Objection.

9  Argumentative.

10  A.  I would say the city does solicit that.

11  All of our meetings are public notice, in

12  various forms, so that all members of the

13  community, whether it's online, Facebook, posted

14  at the community center, every citizen has a

15  right to show up to the meetings, send us

16  emails, asking us questions.  So everybody's

17  given the opportunity to indicate how they feel.

18  Q.  So other than placing items on the

19  agenda and publishing the agenda before a City

20  Council meeting, any other -- are there any

21  other instances where the city's residents'

22  opinions or thoughts are solicited by the city?

23       MR. SCHUMACHER:  Objection.  Asked and

24  answered.  Again, you can go ahead.

1     A.  I believe those are the only methods

2  that I previously mentioned that the city

3  employs.

4     Q.  So turning to the general components in

5  the amendment to the comprehensive plan that

6  applies to Lifestyle's property.

7     A.  Exhibit 7?

8     Q.  Yes, page 2 of Exhibit 7.

9        MR. SCHUMACHER:  I'm sorry, what was the

10  date of this document?

11        MR. INGRAM:  January 18.

12        MR. SCHUMACHER:  2022?

13        MR. INGRAM:  Yeah.

14        MR. SCHUMACHER:  Objection.  Relevance.

15        You can answer.

16     A.  Can you please ask the question again.

17     Q.  I didn't even get the question yet.  I

18  was just directing your attention to the page.

19        For the first general component listed

20  here, do you see the phrase "a large contiguous

21  green space"?

22     A.  Yes, sir, I do.

23     Q.  A large contiguous green space is

24  completely undefined, correct?

MR. SCHUMACHER: Objection.
A. In the context of this specific general component, yes.
Q. So as a member of council and as its liaison with the planning commission, what constitutes green space?
MR. SCHUMACHER: Objection. Relevance.
You can answer.
A. My personal opinion as one of our councilmembers is that green space is a space that is just green and there's no development on it. It's just a field, a best comparative noun.
Q. Okay. So property left in its natural state, how about that?
A. Correct.
Q. What constitutes a large contiguous green space?
A. My personal opinion is that it is a -- as opposed to broken up -- I know you can't -- you can't transcribe that, but broken up parcels or pieces. I just think of it as a large space unbroken by sidewalks, other development, in its natural state, like you said.
Q. So you're cluing in on the contiguous

1   nature of the phrase.

2        A.  Yes.

3        Q.  Let me ask you about large.  What's the

4   minimum number of acres on Lifestyle's property

5   that constitutes a large contiguous green space?

6             MR. SCHUMACHER:  Objection.  Relevance.

7   Can I have a continuing objection --

8             MR. INGRAM:  Sure.

9             MR. SCHUMACHER:   -- to the relevance of

10  a document that was generated January 18th of

11  2022?  Is that a yes?

12            MR. INGRAM:  Yes.

13            MR. SCHUMACHER:  Thank you.

14       A.  I don't have a specific figure in mind.

15  BY MR. INGRAM:

16       Q.  Okay.  Is there any guide or standard

17  that you would utilize to determine what

18  constitutes large in connection with this

19  general component being applied to Lifestyle's

20  property?

21       A.  I don't believe so.

22       Q.  Okay.  Following along in that first

23  general component, the next phrase is central to

24  the property.  Do you see that?

1      A.  I do.

2      Q.  Central to the property is likewise

3  undefined, correct?

4      A.  Correct.

5      Q.  So where specifically on Lifestyle's

6  property must this large contiguous green space

7  be located?

8      A.  I think, as the name states, somewhat

9  towards the middle of the property.

10      Q.  Okay.

11      A.  It can be accessed by every person or

12  amenity on the property fairly easily.

13      Q.  All right.  Are you familiar with --

14  strike that.

15          Do you see the next phrase in that first

16  general component there's a reference to the

17  Tucker Creek acreage?  Do you see that?

18      A.  Yes, I do.

19      Q.  Specifically, what is the Tucker Creek

20  acreage?

21      A.  To the best of my knowledge, it is a

22  portion of the LC property that cannot be

23  developed.

24      Q.  Okay.  Now, the Tucker Creek is not in

1    the center of the property, though, is it?

2        A.  No, it is not.

3        Q.  All right.  So under this first general

4    component, it says, a large contiguous green

5    space central to the property and inclusive of

6    the Tucker Creek acreage.  Do you see that?

7        A.  I do.

8        Q.  So what all -- what portion of

9    Lifestyle's property does this first general

10   component entail?

11       A.  The way that I was reading this is --

12   let me back up.  I can't provide an answer to

13   that.

14       Q.  Okay.  Why not?

15       A.  I don't know.

16       Q.  Okay.  Let's move, then, to the second

17   general component.

18       A.  Okay.

19       Q.  Do you see, with respect to the

20   commercial development, there's a reference to

21   select service-oriented retail?

22       A.  Yes, I do see that portion.

23       Q.  What constitutes select service-oriented

24   retail?

1      A.  In my mind, I see restaurants, retail

2  such as, you know, clothing, things like that.

3  Those were the items that I had in mind for

4  service-oriented retail.

5      Q.  And I'm getting -- what I want to

6  understand is, of all the various potential

7  retail uses that are service-oriented, this term

8  select, who gets to select which ones are

9  appropriate or not?

10      A.  Well, applicants for any new development

11  in Worthington go through the Municipal Planning

12  Commission and the Architectural Review Board.

13  So again, I'm not the author of this document,

14  but in my mind, applicants going through the

15  proper channels for development is what this was

16  referencing, in my mind, what I foresaw it as.

17      Q.  So the applicant could propose retail

18  uses in their site plan and there would be back

19  and forth with members of the planning

20  commission and city staff on the applicant's

21  proposal; is that fair?

22      A.  Correct, consistent with how the process

23  goes with the city for new applicants.

24      Q.  Based on general component to --

1    applicable to Lifestyle's property, what density

2    of commercial development is permitted under

3    this component?

4        A.  You have to ask the author.

5        Q.  It's not set forth in Exhibit 7, then?

6        A.  Not in my reading.

7        Q.  Okay.  Let's move to the third general

8    component applicable to the development of

9    Lifestyle's property.  Do you see the reference

10   there to -- the actual text, I should say, to

11   residential housing is desirable if it is

12   creatively executed?  Do you see that?

13       A.  Yes, I do.

14       Q.  Okay.  But creatively executed is not

15   defined, is it?

16       A.  No, it is not.

17       Q.  Who gets to decide whether the

18   residential housing proposed on Lifestyle's

19   property is, quote, creatively executed, end

20   quote?

21       A.  I do not know.

22       Q.  Are there any standards or policies by

23   the City of Worthington to guide any

24   decision-maker on whether a residential housing

1     proposal is creatively executed?

2         A.  To the best of my knowledge, no.

3         Q.  Looking at this third general component

4     applicable to Lifestyle's property, what types

5     of housing stock are permitted under this

6     component for Lifestyle's property?

7             MR. SCHUMACHER:  Object to the word

8     permitted.

9             You can answer.

10        A.  It depends on who you're asking.  If

11    you're asking me personally, I think a mix of

12    single family, condominiums, apartments is

13    appropriate under this definition.

14        Q.  And I'm asking you in connection with

15    you being a member of City Council, who, in

16    fact, moved that City Council adopt this very

17    text.  Does that impact or change your prior

18    answer?

19        A.  No, it does not.

20        Q.  Thank you.

21            So with respect to Lifestyle's property,

22    what density of single family homes would be

23    appropriate under this third general component

24    on Lifestyle's property?

1          A.  I would say similar density to the

2     surrounding neighborhood.  I'm certainly not an

3     expert on density, but I would say low to medium

4     density.

5          Q.  And with respect to the surrounding

6     neighborhood, to which neighborhood are you

7     referring?

8          A.  Worthington Estates West.

9               MR. SCHUMACHER:  Chris, we've been going

10    about 90 minutes.  Can we take a break now?

11              MR. INGRAM:  I'm almost to the end of

12    this line of questioning.

13              MR. SCHUMACHER:  You --

14              MR. INGRAM:  I'm with you, Paul.  We can

15    take a break here in a minute.  Let me wrap up

16    this line of questioning.

17              MR. SCHUMACHER:  I've never run across

18    anyone like you.

19    BY MR. INGRAM:

20         Q.  Same question with respect to the

21    density for apartments.  So looking at this

22    third general component, what's an appropriate

23    density of apartments on Lifestyle's property?

24              MR. SCHUMACHER:  Objection.  I thought

1  she just answered that as to condominiums and

2  apartments.

3      A.  I would repeat my previous answer, low

4  to medium density.

5      Q.  For apartments and condominiums?

6      A.  Yes.

7      Q.  Because earlier I asked you about single

8  family homes, and you referenced Worthington

9  Estates.

10      MR. SCHUMACHER:  I don't think that's

11  correct.  I thought her answer was as to -- we

12  can read it back.

13      A.  I guess, when I answered, I hadn't

14  thought -- I thought just as a whole whether or

15  not we had single family homes, apartments,

16  condominiums, that that be low to medium.

17      Q.  Okay.  Are there any apartments within

18  the Worthington Estates neighborhood?

19      A.  To the best of my knowledge, no.

20      Q.  Are there any condominiums in the

21  Worthington Estates neighborhood?

22      A.  No.  Surrounding, but not in.

23      Q.  Okay.  Since City Council adopted

24  Exhibit 7, no new guidelines for the development

1    of Lifestyle's property have been adopted,

2    correct?

3        A.  Yes, that's correct.

4            MR. INGRAM:  Now would be a good time

5    for a break.

6            (Recess.)

7    BY MR. INGRAM:

8        Q.  Ms. Brewer, what steps has the city

9    taken to update the city's comprehensive plan

10   that guides the development of the -- of

11   Lifestyle's property since January 18?

12           MR. SCHUMACHER:  Objection.  Relevance.

13       Q.  Of 2022, I should say.

14           MR. SCHUMACHER:  Objection.  Relevance.

15       A.  We do have a 30-, 60-, 90-day planning

16   calendar that we use, and that has been

17   introduced on that document.  I don't recall

18   which sector that's in, but it is in our future

19   plans.

20       Q.  Okay.  A 30-, 60-, 90-day planning

21   calendar, what's that?

22       A.  It's a document that all the

23   councilmembers and acting city manager,

24   Ms. Stewart, has to just keep ideas in our heads

1    so we can look forward 30, 60 or 90 days as to

2    issues that we have, projects that we want to

3    look at.  Just a way of keeping everything that

4    we're working on organized in more of a timely

5    manner.

6         Q.  And with respect to this 30-, 60-,

7    90-day planning calendar that you referenced,

8    are there any concrete or specific proposals

9    that pertain to updating the comprehensive plan

10   that would be applicable to Lifestyle's

11   property?

12            MR. SCHUMACHER:  Objection.

13        A.  Can you repeat that?  I apologize.

14            (Record read as requested.)

15        A.  Nothing specific at this time, to the

16   best of my knowledge.

17        Q.  Has the city taken any other steps

18   beyond the 30-, 60-, 90-day planning calendar

19   that you referenced to update its comprehensive

20   plan as it would apply to Lifestyle's property?

21        A.  We have engaged a consulting firm in

22   starting a housing assessment and a housing

23   study for the city.  It's not completed to date,

24   though.

1        Q.  Is that the Poggemeyer assessment?

2        A.  I don't know the exact name of the firm.

3        Q.  So with respect to this housing study

4    that you referenced, when did that work

5    commence?

6        A.  I can't recall the exact meeting, but it

7    was during this year, 2023, that the resolution

8    was introduced and approved to begin undertaking

9    the housing study.

10       Q.  And when is the housing study scheduled

11   or contemplated to be complete?

12       A.  I don't have the exact answer to that.

13       Q.  Do you have any understanding of how --

14   the duration of the study?  Is it going to take

15   months, weeks, years?  That's all I'm asking.

16           MR. SCHUMACHER:  Objection.  Relevance.

17       A.  I don't know.  I'm not sure.

18       Q.  And how would this housing study, in

19   your mind, pertain to any update of the

20   comprehensive plan that would be applicable to

21   Lifestyle's property?

22       A.  In my mind, the purpose of the housing

23   study is to take an inventory of what the city

24   has in terms of various types of housing and

1  provide a recommendation for the city based on

2  what additional housing we need.  And when I say

3  need, looking at external factors like the Intel

4  project.  You know, residents have -- a lot of

5  older residents note that we don't have housing

6  stock right now that's something that they can

7  remain in Worthington.  So I'm hopeful,

8  personally, that the study will tell us any

9  additional kind of housing that we need here and

10  what would help the city grow.

11       Q.  And is this housing study particular to

12  Lifestyle's property, or is it broader than

13  that?

14       A.  I believe it's the entire city.

15       Q.  I'm going to direct your attention,

16  Ms. Brewer, to Exhibit 8.

17       A.  Okay.

18       Q.  And Exhibit 8, for purposes of the

19  record, are the meeting minutes from City

20  Council's February 7, 2022, meeting.  Feel free

21  to review that.  Let me know when you're done.

22          If it's helpful, Ms. Brewer, given the

23  length of Exhibit 8, I'll be directing my

24  questions to page 11.  But feel free to read as

1    much as you want.

2        A.  Thank you.

3            I've gone up to page 11, and if your

4    questioning's going to expand beyond that, I'll

5    keep reading, but if it's specifically limited

6    to 11, I'm happy to stop for time's sake.

7        Q.  Fair enough.  Just let me know, okay?

8    And so with respect to Exhibit 8, City Council

9    had a discussion item published on its agenda

10   for that meeting labeled, UMCH focus area

11   moratorium, correct?

12       A.  Yes, that's correct.

13       Q.  Okay.  And so what's your understanding

14   of Council President Robinson's explanation that

15   evening that the moratorium has been met through

16   other meetings and there is no desire on my part

17   to pursue a moratorium at this point in time?

18       A.  You would have to ask President

19   Robinson.

20       Q.  You were there at the meeting, correct?

21       A.  Yes, I was.

22       Q.  Did he talk to you about the moratorium

23   after the January 18 hearing, so in between the

24   18th and the 7th?

1      A.  I can't recall.  I can't recall.

2      Q.  Ordinance No. 4-2022 was dropped for

3  consideration, correct?

4      A.  Yes.  It was voted down.  It was not

5  approved.

6      Q.  Well, Ordinance No. 4-2022 was voted

7  upon in the January 18 hearing, correct?

8      A.  Correct.

9      Q.  However, a majority of council voted for

10  that ordinance, correct?

11      A.  I apologize.  You said Ordinance 4 -- I

12  apologize.

13          MR. SCHUMACHER:  It is confusing.

14      A.  I apologize.

15          MR. SCHUMACHER:  Are you talking the

16  moratorium?

17          MR. INGRAM:  I'm talking about the

18  moratorium.

19      A.  Exhibit 6?

20      Q.  Yes.

21      A.  Yes, Exhibit 6 was voted upon and did

22  not pass.  I apologize.

23      Q.  Because Exhibit 6 required a super

24  majority, correct?

1    A.  Correct.

2    Q.  And the moratorium was discussed at the

3  council's following meeting on February 7th,

4  right?

5    A.  Yes.

6    Q.  However, City Council did not entertain

7  the moratorium ordinance after the 7th, correct?

8    A.  According to these notes, that's

9  correct.

10    Q.  Okay.  And I'm asking you a slightly

11  different question.  So after February 7th, City

12  Council has not passed a moratorium like what

13  was proposed in Ordinance No. 4-2022; is that

14  right?

15    A.  That's correct.

16    Q.  And members of City Council have a

17  retreat each year, correct?

18    A.  Yes.

19    Q.  Did you attend the 2022 council retreat?

20  I think it was held shortly after this February

21  7th meeting.

22    A.  Yes.

23    Q.  Was the redevelopment of Lifestyle's

24  property discussed at that retreat?

 1          MR. SCHUMACHER:  Objection.  Relevance.

 2      A.  I don't recall if it was.

 3      Q.  Did you take any written notes from that

 4  retreat?

 5      A.  I can't recall if I did or not.

 6      Q.  Are there any written summaries of what

 7  City Council discussed at the retreat?

 8      A.  Yes.  We had a moderator present, and I

 9  believe that -- either the moderator or her

10  assistant documented things as we went that day.

11      Q.  And who was the moderator in 2022?

12      A.  I apologize.  I can't remember.

13      Q.  Who would know here at the city who

14  moderated that retreat?

15      A.  Acting City Manager Ms. Stewart would

16  likely know.

17      Q.  And Ms. Stewart, or the city staff,

18  would have copies of the moderator's written

19  summaries from that retreat; is that accurate?

20      A.  Yes, it is.

21      Q.  Has Lifestyle's property been discussed

22  during any other council retreat that you

23  attended, to your knowledge?

24      A.  To the best of my knowledge, no.

1      Q.  Following the vote to amend the

2   comprehensive plan as it pertains to Lifestyle's

3   property, did you ever meet with members of

4   planning commission to discuss the future

5   development of Lifestyle's property?

6      A.  No.

7      Q.  Do you recall President Robinson

8   emailing the chairman of the planning commission

9   to schedule a meeting to discuss the development

10   of Lifestyle's property?

11      A.  You would have to ask President

12   Robinson.

13                    -=0=-

14         (Deposition Exhibit 52 marked.)

15                    -=0=-

16   BY MR. INGRAM:

17      Q.  Ms. Brewer, you've been handed what was

18   marked as Exhibit 52, which is an email from

19   David Robinson CC'ing you, dated January 20th,

20   2022.  Do you see that?

21      A.  I do see that.

22      Q.  And just for purposes of the record,

23   katy.brewer@worthington.org is your City Council

24   email address?

1     A.  Yes, sir, that's correct.

2     Q.  So do you recall receiving Exhibit 52?

3     A.  I don't specifically recall receiving

4  it.

5     Q.  Does this email chain set forth in

6  Exhibit 52 refresh your recollection on

7  President Robinson's communications concerning

8  the future development of Lifestyle's property?

9     A.  I don't specifically recall this email

10  chain, but I acknowledge I'm copied on it.

11     Q.  Do you have any reason to believe that

12  you would not have read or received this email?

13     A.  No.

14     Q.  Okay.  So after you received this email

15  from January 20th of 2022, did you have any

16  meetings or discussions with Mr. Coulter or

17  other members of the planning commission

18  concerning Lifestyle's property?

19        MR. SCHUMACHER:  Objection.  Relevance.

20     A.  I don't recall.

21     Q.  You don't know one way or the other?

22     A.  No, I don't.

23     Q.  Did you have any meetings with

24  Mr. Robinson about the future development of

1    Lifestyle's property after receiving Exhibit 52?

2        A.  I don't specifically recall.

3        Q.  How about with Mr. Brown, who's also

4    CC'd on this email chain?

5        A.  I don't recall.

6        Q.  Councilmember Brewer, to your knowledge,

7    have members of council discussed purchasing the

8    UMCH property from Lifestyles?

9        A.  Yes.

10       Q.  And when was that?

11           MR. SCHUMACHER:  Objection, to the

12   extent that this invades the attorney-client

13   communication privilege and Rule 408.  We

14   obviously entered in negotiations with you once

15   the lawsuit was filed, so I don't want her to

16   talk about that.

17       Q.  You understand your counsel's

18   instruction?

19       A.  Yes, I do.

20       Q.  Okay.  And so the discussions you're

21   referencing, did any of those occur outside of

22   your counsel's instruction?

23       A.  Yes.

24       Q.  And please tell me about those

1    discussions you're referencing.

2         A.  Mr. Robinson had referenced a thought of

3    possible acquisition.  I don't recall the

4    timeline for that.

5         Q.  Would that have -- would Mr. Robinson's

6    discussions of acquiring Lifestyle's property --

7    did that occur while you were a member of

8    council or before?

9         A.  While I was a member of council.

10        Q.  And do you recall just approximately

11   when within the last two years?

12        A.  I don't.

13        Q.  Okay.  Any other conversations from

14   fellow council members regarding the acquisition

15   of Lifestyle's property?

16        A.  No.

17        Q.  Okay.  And what all did Mr. Robinson

18   discuss in connection with the acquisition of

19   Lifestyle's property?

20             MR. SCHUMACHER:  Objection.  Relevance.

21             You can answer.

22        A.  I don't recall with specificity what he

23   had discussed, but I just remember a discussion

24   happening.

1        Q.  Who all was party to that discussion?

2   Who all was present?

3        A.  I believe just myself and Mr. Robinson,

4   and I don't recall if it was in person or on the

5   phone.

6        Q.  Okay.  Do you communicate via text

7   message with Mr. Robinson about city council

8   matters?

9        A.  No.

10       Q.  Have you ever texted any member of

11  council or city staff concerning Lifestyle's

12  property?

13       A.  Not to the best of my knowledge.

14       Q.  Councilmember Brewer, to your knowledge,

15  have any city officials discussed purchasing any

16  portion of Lifestyle's property?

17       A.  You have to ask those city officials.

18       Q.  So nothing to your knowledge?

19       A.  Nothing to the best of my knowledge.

20       Q.  Councilmember Brewer, what steps have

21  you taken to identify what development the city

22  wants on Lifestyle's property, if anything?

23           MR. SCHUMACHER:  Objection.  Relevance.

24       A.  Can you repeat the question?  I

 1  apologize.

 2          (Record read as requested.)

 3      A.  When you say the city, are you referring

 4  to capital C, the city, or the residents of the

 5  city?

 6      Q.  Capital C, the city.

 7      A.  Capital C, the city, since the lawsuit,

 8  nothing publicly has been said, that I'm aware

 9  of.

10      Q.  How about privately?  And I'm not asking

11  about -- being mindful of your counsel's prior

12  instruction -- any private discussions.

13      A.  Nothing, to the best of my knowledge.

14      Q.  Earlier you referenced an email that you

15  had reviewed in preparation for your deposition.

16  Do you recall that?  An email from a resident.

17      A.  Yes.

18                      -=0=-

19          (Deposition Exhibit 53 marked.)

20                      -=0=-

21      A.  Okay.

22      Q.  Ms. Brewer, I've handed you what's been

23  marked as Exhibit 53, which is an email reply

24  from you to President Robinson and George

1  Bleimes, B-L-E-I-M-E-S, Bates number Worthington

2  42827 through 42828.  Do you see that?

3      A.  I do.

4      Q.  Is Exhibit 53 the email that you

5  reviewed to prepare for your deposition?

6      A.  Yes, it is.

7      Q.  And why did you review this email to

8  prepare for your deposition out of all the

9  emails?

10      MR. SCHUMACHER:  Objection, to the

11  extent that invades the attorney-client

12  communication and work product.

13      A.  I'll defer to my counsel.

14      MR. SCHUMACHER:  You can answer.

15      A.  I believe this was an email that I had

16  turned over during the discovery process.

17      Q.  Okay.  I'm just asking because it's not

18  the only email, and I was just curious that you

19  chose this one.

20      MR. SCHUMACHER:  Is that your question?

21  She answered your question.

22      Q.  Was this the only email you reviewed to

23  prepare for your deposition today?

24      A.  Yes.

1      Q.  Directing your attention to item number

2  2 in your email, do you see that?

3      A.  In my email or Mr. Bleimes'?

4      Q.  In your reply.

5      A.  Okay.

6          MR. SCHUMACHER:  Can I note an objection

7  to the relevancy of this document?

8          MR. INGRAM:  Sure.

9          MR. SCHUMACHER:  Thank you.

10  BY MR. SCHUMACHER:

11      Q.  You wrote in your reply email here, I

12  can only speak for my personal views on this

13  matter, but my hope is that the UMCH site will

14  be developed with many different uses,

15  commercial for more restaurants, possible small

16  office space, a variety of housing options, and

17  yes, a large green space for the community.

18          Is that correct?

19      A.  Yes, that is.

20      Q.  With respect to this large green space

21  for the community that you're referencing, can

22  you describe what you have in mind for this

23  large screen space for the community?

24      A.  My personal thought is somewhere the

1  kids can play a variety of sports, maybe have

2  events on the space.  Just a space that could be

3  multifaceted in its use.

4      Q.  How much of the UMCH site should be

5  dedicated to this large green space for the

6  community?

7      A.  If I can reference one of my favorite

8  Supreme Court cases, it's like the Supreme Court

9  defines pornography, I don't have an exact

10  definition, but when I know it I'll see it.

11  I'll know, in my personal opinion, and based on

12  recommendations from ARB and MPC, if something

13  is proposed where green space is supported by

14  the required amount of density on that property.

15  I'm not an expert in -- let me back up.

16          I know that to make green space, I

17  guess, make sense within a community, you have

18  to have density around it for residents to use

19  the green space.  Again, I'm not an expert on

20  land use.  I'm not an expert on real estate.

21  But I will rely on the opinion of those experts

22  and city staff to what an appropriate size green

23  space is, based on the other uses on the

24  property as well.

1    Q.  Okay.  And so would it make sense, then,

2  to have apartments near or around this green

3  space you're referencing?

4    A.  I believe it would make sense to have a

5  variety of housing uses, yes, including

6  apartments.

7    Q.  Okay.  And how about townhomes?

8    A.  Yes.

9    Q.  And single family homes?

10    A.  Yes.

11    Q.  You also reference in your reply email

12  that you and Councilmember Bucher held a forum

13  concerning the Lifestyle property?

14    A.  Yes.

15    Q.  Where was the forum held?

16    A.  It was at the COhatch in downtown

17  Worthington.  I don't remember the building it's

18  above, but the COhatch in downtown Worthington.

19    Q.  I thought I saw a reference to that on a

20  Facebook post.  I think it said eight people had

21  marked or responded that they were attending.

22  About how many people attended that forum?

23        MR. SCHUMACHER:  Objection.  Relevance.

24        You can answer.

1     A.  I don't have an exact figure, but the

2  room was full.  I don't know the fire code

3  limits on the room, but it was full of people.

4     Q.  Okay.  Did you have a sign-in sheet?

5     A.  I don't recall.

6     Q.  Was that the first time you held a forum

7  concerning Lifestyle's property?

8     A.  Yes, it was.

9     Q.  And was that the last time you held a

10  forum concerning Lifestyle's property?

11     A.  Yes, it was.

12     Q.  Why did you hold the forum after you

13  voted to amend the comprehensive plan as it

14  pertained to Lifestyle's property?

15        MR. SCHUMACHER:  Same objection.

16        You can answer.

17     A.  I had anticipated there would be mixed

18  feedback on the issue, and I did get a good

19  amount of negative feedback, and I wanted to

20  present an opportunity to be transparent about

21  the reasons I voted like I did.  And I know

22  Mr. Bucher wanted the same opportunity to talk

23  to residents about discussing why he voted like

24  he voted.

1      Q.  And when you say negative feedback, are

2  you referring to negative feedback as to your

3  support for the resolution?

4      A.  Not necessarily the resolution, but the

5  manner in which it was voted upon without being

6  on the agenda.

7          MR. INGRAM:  Okay.  Councilmember

8  Brewer, at this time, I don't have any further

9  questions for you.  However, the city's counsel

10  has indicated to us that they have not exhausted

11  their production of documents, so I may yet

12  still have additional questions for you, so I'm

13  going to leave your deposition open today.

14  Okay?

15          THE WITNESS:  Okay.

16          MR. INGRAM:  Thank you.

17                    -=O=-

18          Thereupon, the testimony of October

19  11, 2023, was concluded at 12:37 p.m.

20                    -=O=-

21

22

23

24

1                    CERTIFICATE

2    STATE OF OHIO      :
                              SS:
3    COUNTY OF FRANKLIN :

4         I, Rhonda Lawrence, a stenographic
     court reporter and notary public in and for the
5    State of Ohio, duly commissioned and qualified,
     do hereby certify that the within-named
6    KATHERINE BREWER was first duly sworn to testify
     to the truth, the whole truth, and nothing but
7    the truth in the cause aforesaid; that the
     testimony then given was taken down by me
8    stenographically in the presence of said
     witness, afterwards transcribed; that the
9    foregoing is a true and correct transcript of
     the testimony; that this deposition was taken at
10   the time and place in the foregoing caption
     specified.
11
          I certify that I am not a relative or
12   employee of any attorney or counsel employed by
     the parties hereto and that I am not financially
13   interested in the action.  I further certify
     review of the transcript was not requested.
14
          In witness whereof, I have hereunto
15   set my hand at Columbus, Ohio, on this 25th day
     of October, 2023.
16

17

18

19

20
                    *Rhonda Lawrence*
21
                    Rhonda Lawrence
22                   Notary Public, State of Ohio

23   My commission expires:  October 9, 2028

24

## Exhibits

**Exhibit 1** 50:4,13,15,
18,20 51:7,12,19,21

**Exhibit 6** 33:7,8,9,11
37:5,8 38:18 39:11,14
41:21 74:19,21,23

**Exhibit 7** 42:22,24
43:3 44:5,14,15 46:10
48:2 50:12 51:13,18,
22 52:1 55:10 59:7,8
65:5 68:24

**Exhibit 8** 72:16,18,23
73:8

**Exhibit 51** 29:5,16,19
32:10

**Exhibit 52** 77:14,18
78:2,6 79:1

**Exhibit 53** 82:19,23
83:4

## -

**-=0=-** 29:4,6 77:13,15
82:18,20

**-=O=-** 88:17,20

## 0

**000528** 39:17

**04-2022** 51:9

## 1

**1** 50:4,13,15,18,20
51:7,12,19,21 52:4

**10-month** 10:23

**10th** 16:10,13 17:11

**11** 72:24 73:3,6 88:19

**12:37** 88:19

**13** 12:5

**15,000** 58:4,7

**18** 9:12 16:3 33:15
34:19 38:7,10,15
40:14 43:7,23 44:20

45:6 46:4,10 47:1,15
59:11 69:11 73:23
74:7

**18th** 9:6,16 16:11,14
17:11 33:21,22 34:13
36:22 40:4 61:10
73:24

## 2

**2** 39:16 48:17 52:4
59:8 84:2

**2007** 11:19

**2011** 10:24 11:13,22

**2013** 10:24

**2014** 50:7

**2016** 10:22 11:5 24:1

**2020** 13:17,19 14:22,
24 28:18,20 31:12,18,
21,24 32:3,5

**2021** 12:24 13:15
28:23 29:18,22 31:19

**2022** 9:7 13:1 15:6
16:2 19:16 21:21
33:15,21 43:7 55:24
59:12 61:11 69:13
72:20 75:19 76:11
77:20 78:15

**2023** 71:7 88:19

**2026** 15:5

**20th** 77:19 78:15

**28th** 10:22

**29th** 10:22

**2nd** 50:7

## 3

**30** 70:1

**30-** 69:15,20 70:6,18

**3rd** 16:9

## 4

**4** 74:11

**4-2022** 33:11 35:19
38:10,14 41:24 43:3,7,
19,22 46:17 48:7,11
74:2,6 75:13

**4-3** 17:24

**408** 79:13

**42827** 83:2

**42828** 83:2

## 5

**50** 29:9

**51** 29:5,8,10,16,19
32:10

**52** 77:14,18 78:2,6
79:1

**53** 82:19,23 83:4

## 6

**6** 33:8,9,11 37:5,8
38:18 39:11,14 41:21
74:19,21,23

**60** 70:1

**60-** 69:15,20 70:6,18

## 7

**7** 12:5 42:22,24 43:3
44:5,15 46:10 48:2
50:12 51:13,18,22
52:1 55:10 59:7,8 65:5
68:24 72:20

**7th** 73:24 75:3,7,11,21

## 8

**8** 72:16,18,23 73:8

**8th** 29:18

## 9

**90** 67:10 70:1

**90-day** 69:15,20 70:7,
18

## A

**abreast** 32:22

**accessed** 62:11

**accurate** 7:21 8:5
76:19

**acknowledge** 78:10

**acquiring** 80:6

**acquisition** 80:3,14,
18

**acreage** 62:17,20
63:6

**acres** 61:4

**acting** 69:23 76:15

**actual** 5:24 10:14
65:10

**add** 55:5

**additional** 46:2 72:2,9
88:12

**address** 11:15 29:21
77:24

**adopt** 43:13,17 48:11
66:16

**adopted** 43:6 55:23
68:23 69:1

**adoption** 51:13

**advance** 33:24 45:6
47:14

**advanced** 48:7

**advise** 40:8 47:17

**advised** 38:24 40:5
46:14,16 47:16

**agenda** 20:3 43:23
58:19 73:9 88:6

**agree** 51:3,5

**agreed** 25:24

**agreement** 25:17,19

**ahead** 50:16 56:15
58:24

**Alloway** 24:20

**amalgamation** 49:23

**amend** 51:9 77:1 87:13

**amending** 44:21 45:22 46:4

**amendment** 45:5,13 46:8,24 47:13 49:2 50:7,12 52:4 59:5

**amends** 44:15 50:13

**amenity** 62:12

**amount** 85:14 87:19

**announce** 31:13

**announced** 31:19,21 32:10

**announcement** 32:3

**answering** 7:15 56:18

**answers** 7:8 27:16

**anticipated** 87:17

**apartments** 66:12 67:21,23 68:2,5,15,17 86:2,6

**apologize** 32:7,8 55:7 70:13 74:11,12,14,22 76:12 82:1

**appears** 30:2

**applicable** 65:1,8 66:4 70:10 71:20

**applicant** 64:17

**applicant's** 64:20

**applicants** 64:10,14, 23

**application** 23:1,12, 19 25:8,12,14 29:2 30:13 31:5 32:17,19, 23 33:4

**application's** 42:19

**applied** 45:23 46:5,9 47:14 61:19

**applies** 38:19 43:19 44:22 52:2 59:6

**apply** 17:3,8,12 54:18 70:20

**applying** 26:5

**approach** 14:18

**approached** 13:23 14:4

**approved** 71:8 74:5

**approximately** 80:10

**ARB** 20:10,14 22:11 25:20 47:11 52:17 54:22 57:7 85:12

**ARB/MPC** 22:21

**Architectural** 18:8,18 19:3,9,15 20:8,10 22:6,9 27:15 29:1 30:11 32:15 33:3 53:13 64:12

**area** 51:8 73:10

**areas** 12:2

**Argumentative** 58:9

**ascertain** 49:17

**assessment** 70:22 71:1

**assistant** 76:10

**assume** 6:16

**attempt** 47:21

**attend** 19:11,22 33:2 75:19

**attended** 32:21 76:23 86:22

**attending** 86:21

**attention** 50:3 52:1 59:18 72:15 84:1

**attorney** 5:17,23

**attorney-client** 38:3 79:12 83:11

**August** 10:24

**author** 39:24 64:13 65:4

**aware** 21:15 22:4 82:8

**B**

**B-L-E-I-M-E-S** 83:1

**back** 11:5 20:1,12 42:17 51:1,24 63:12

64:18 68:12 85:15

**background** 10:20

**balancing** 26:9

**bankruptcies** 12:4

**Barrett** 5:7

**based** 23:24 33:14 35:24 42:2 57:22 64:24 72:1 85:11,23

**basing** 26:2

**Bates** 83:1

**began** 14:1 15:5

**begin** 19:13 71:8

**beginning** 28:3 30:21 52:5

**belief** 42:2,11,16

**Beth** 17:19

**binder** 33:8 42:22

**bird's** 49:21

**Bleimes** 83:1

**Bleimes'** 84:3

**Board** 18:9,19 19:4,9, 15 20:9,11 22:6,9 27:15 29:1 30:11 32:16 33:3 53:13 64:12

**boards** 13:4 20:17

**body** 7:1

**break** 7:14,18 67:10, 15 69:5

**Brewer** 5:1,7,8,18 8:13 10:19 12:18 15:20 19:1 29:14,18, 20 31:22 33:10 58:2 69:8 72:16,22 77:17 79:6 81:14,20 82:22 88:8

**briefly** 10:19 50:4

**bring** 20:11 35:5 44:9

**broader** 72:12

**broken** 60:19,20

**brought** 35:3,12,22 45:17

**Brown** 79:3

**Bucher** 17:23 40:17, 18,23 45:16 86:12 87:22

**building** 42:14 86:17

**buildings** 52:22

**built** 53:3 55:2

**C**

**calendar** 16:4 69:16, 21 70:7,18

**call** 17:16 36:12,14,15 37:11,15,22 38:2 45:18

**called** 20:20

**calls** 51:15

**campaign** 26:8

**candidacy** 30:22 32:11

**capital** 82:4,6,7

**case** 10:7

**cases** 85:8

**category** 12:13

**caution** 37:17

**cautioning** 38:2

**CC'D** 79:4

**CC'ING** 77:19

**center** 58:14 63:1

**central** 61:23 62:2 63:5

**certified** 5:3

**chain** 29:17 78:5,10 79:4

**chairman** 77:8

**chance** 42:12

**change** 66:17

**changed** 24:24

**channels** 64:15

**Chapter** 12:5

**Children's** 51:8

**chose** 83:19

**chosen** 17:14

**Chris** 5:9 67:9

**circumstance** 47:17

**citizen** 28:16 58:14

**city** 9:6,12 12:23 13:3,
11,14,21,23 14:10,18
15:2,21 18:2,6 19:14,
24 20:1,7,12,13,21
21:1 26:19 27:5 31:1,
17,24 32:11 33:13
40:3 43:6,12 46:23
51:13 53:2,9 54:1,4
57:7,9,17 58:1,10,19,
22 59:2 64:20,23
65:23 66:15,16 68:23
69:8,23 70:17,23
71:23 72:1,10,14,19
73:8 75:6,11,16 76:7,
13,15,17 77:23 81:7,
11,15,17,21 82:3,4,5,
6,7 85:22

**city's** 44:15 50:7
58:21 69:9 88:9

**class** 12:12

**client** 5:12 56:4

**close** 32:11 58:3

**clothing** 64:2

**cluing** 60:24

**co-freshman** 41:14

**code** 54:20 55:8 87:2

**codified** 54:20

**COHATCH** 86:16,18

**colleagues** 17:4,13
45:7 47:10

**combination** 57:4

**commence** 71:5

**commercial** 24:11
48:18 49:24 63:20
65:2 84:15

**commission** 18:4,7,
22 19:3,8,15,19,20,22
20:20 21:2,4,9,11,17,
19 22:6,8 23:2,10,20

25:6,16 27:7,8 28:24
30:11 32:15,16,20,24
33:3 47:6 52:11 60:5
64:12,20 77:4,8 78:17

**commission's** 46:24

**commissions** 13:5

**common** 35:4

**communicate** 10:3
81:6

**communicated**
49:11

**communication** 38:3
79:13 83:12

**communications**
37:18,20 78:7

**Communities** 5:10

**community** 25:18
58:13,14 84:17,21,23
85:6,17

**comparative** 60:12

**complaint** 10:10

**complete** 7:21 8:4
71:11

**completed** 70:23

**completely** 54:8
59:24

**component** 59:19
60:3 61:19,23 62:16
63:4,10,17 64:24 65:3,
8 66:3,6,23 67:22

**components** 59:4

**Compound** 18:10

**comprehensive**
44:15,21 45:5,14,23
46:4,8 47:1,13 49:2
50:8 51:10,20 55:5,9,
12 59:5 69:9 70:9,19
71:20 77:2 87:13

**concluded** 88:19

**conclusion** 51:15

**concrete** 70:8

**condominiums**
66:12 68:1,5,16,20

**confused** 31:22

**confusing** 74:13

**connection** 9:23 27:5
37:4 45:21 58:5 61:18
66:14 80:18

**consideration** 33:14
53:21 74:3

**considered** 52:7

**consistent** 53:1 64:22

**constitutes** 60:6,16
61:5,18 63:23

**construct** 52:23

**consulting** 70:21

**consumer** 12:4

**contemplated** 71:11

**context** 60:2

**contiguous** 59:20,23
60:16,24 61:5 62:6
63:4

**continue** 55:22

**continuing** 61:7

**conversation** 39:5
41:5 57:21

**conversations** 45:20
46:3 57:19 80:13

**convey** 34:24

**copied** 78:10

**copies** 76:18

**copy** 34:10,15 35:1,3,
19 44:4,9 45:4 46:7,16
47:12 48:7

**correct** 5:17,19 11:24
12:1,15 15:14,21,22
18:4 20:18,21,23
22:14,15 25:4 26:17
30:7,13 31:8,10 32:8,
13 38:19,20 39:7
41:21 42:19,20 43:8,9,
10,15,20,21 44:17,18,
23 46:1,19 51:23
55:10,11 59:24 60:15
62:3,4 64:22 68:11
69:2,3 73:11,12,20
74:3,7,8,10,24 75:1,7,
9,15,17 78:1 84:18

**Coulter** 78:16

**council** 9:6 12:23
13:3,11,14,19,21,24
14:10,19 15:3,21,24
16:9 17:9,15 18:6
19:24 20:2,8,12,13,21
22:14 31:14,20,24
32:11 35:11 37:9
42:15 43:6,12,17 45:7
46:23 52:10 54:16,18,
23 57:8,9 58:20 60:4
66:15,16 68:23 73:8,
14 74:9 75:6,12,16,19
76:7,22 77:23 79:7
80:8,9,14 81:7,11

**council's** 9:12 18:2
19:14,17 21:1 27:6
33:13 40:3 51:13
54:24 72:20 75:3

**Councilman** 22:24
25:5

**councilmember**
13:24 14:4 17:3,5,19
23:16 35:8 41:10
52:13 79:6 81:14,20
86:12 88:7

**councilmembers**
21:16 26:23 30:21
31:3 40:10,13 41:7,19
48:10 60:10 69:23

**Councilwoman** 30:1

**counsel** 37:18 56:8
83:13 88:9

**counsel's** 79:17,22
82:11

**counts** 16:12

**courses** 12:10

**court** 6:20 8:11 10:6,9
85:8

**create** 7:2

**creatively** 65:12,14,
19 66:1

**Creek** 62:17,19,24
63:6

**CROSS-
EXAMINATION** 5:4

**cure** 56:15

**curiosity** 28:19

**curious** 23:13 83:18

**current** 13:24 14:9 15:2 21:22 24:16 25:22 30:21

**D**

**darn** 32:11

**date** 5:24 8:24 9:21 13:2 16:7 17:10 22:20 30:24 32:7,9 34:13 36:18 59:10 70:23

**dated** 29:18 77:19

**dates** 11:3

**David** 14:6 17:7 34:16 40:7 77:19

**day** 33:23,24 76:10

**days** 34:3 36:19 70:1

**debt** 12:6

**December** 13:16,19 14:22 31:24 32:2,3

**decide** 65:17

**decided** 13:16 15:18 31:13,23 32:1

**deciding** 52:15

**decision** 13:18 52:17, 19 54:14,23

**decision-maker** 65:24

**decisions** 20:2,5 53:15,16

**dedicated** 85:5

**defer** 83:13

**defined** 65:15

**defines** 85:9

**definition** 66:13 85:10

**denied** 22:11,22 47:20

**density** 65:1 66:22 67:1,3,4,21,23 68:4 85:14,18

**depends** 66:10

**deposed** 6:2

**deposes** 5:3

**deposition** 5:11,22, 24 6:5 8:8,17,20,23 9:3,11,23 10:4 29:5 77:14 82:15,19 83:5,8, 23 88:13

**depositions** 5:20

**describe** 84:22

**design** 53:11,12,17 54:21 55:8

**desirable** 65:11

**desire** 73:16

**determination** 54:18 55:1,18 56:24

**determine** 57:11 61:17

**determining** 57:22

**developed** 54:6 62:23 84:14

**development** 26:15 36:10 42:9 48:18 49:16,24 52:3,7,24 54:9,12 55:16,20 56:4, 24 57:19 60:11,22 63:20 64:10,15 65:2,8 68:24 69:10 77:5,9 78:8,24 81:21

**dialogue** 36:3 39:2 42:4,10,17 47:21

**difficult** 7:24

**direct** 50:3 57:21 72:15

**directed** 21:2,16 26:23

**directing** 52:1 59:18 72:23 84:1

**directly** 26:18 27:23

**disclose** 37:17 38:3

**discovery** 83:16

**discuss** 10:20 36:9 38:13 40:20,22 41:6 44:24 77:4,9 80:18

**discussed** 26:13 34:6

37:13 40:24 44:19 75:2,24 76:7,21 79:7 80:23 81:15

**discussing** 23:17 87:23

**discussion** 73:9 80:23 81:1

**discussions** 20:4,14 36:7 37:21 78:16 79:20 80:1,6 82:12

**dispute** 56:1,7

**docket** 10:11,13,14,16

**doctors** 15:10

**document** 29:13 50:10 55:6,23 59:10 61:10 64:13 69:17,22 84:7

**documented** 76:10

**documents** 9:3,10,22 54:19 88:11

**Dorothy** 14:2 29:17 30:1,5,18 31:15

**double-checking** 30:6

**downtown** 86:16,18

**drafted** 48:2

**drafter** 48:3

**driving** 53:4

**dropped** 74:2

**drugs** 7:23

**duly** 5:2

**duration** 71:14

**E**

**earlier** 8:7 26:22 27:20 31:2 53:23 55:16 68:7 82:14

**ease** 5:10

**easily** 62:12

**effect** 51:12

**effective** 39:18

**elaborate** 24:4

**elected** 12:22 13:10 23:13 24:10 41:18

**election** 12:24 13:14

**email** 9:14,20 22:3,8, 17 27:1 29:16,17,21, 24 30:19 32:8,9 49:6 77:18,24 78:5,9,12,14 79:4 82:14,16,23 83:4, 7,15,18,22 84:2,3,11 86:11

**emailing** 77:8

**emails** 14:12 26:18 49:7 57:16,19 58:16 83:9

**emergency** 39:12,17, 21 41:1

**employs** 59:3

**enacting** 36:1

**end** 15:1 32:3 65:19 67:11

**engage** 42:12

**engaged** 70:21

**ensure** 47:21

**ensuring** 52:23

**entail** 12:8 16:17 19:20 63:10

**entered** 79:14

**entertain** 75:6

**entire** 54:1 72:14

**entirety** 52:15,18,20

**entries** 10:11,13,16

**essentially** 42:13

**estate** 85:20

**Estates** 11:10 67:8 68:9,18,21

**esthetic** 24:13

**esthetics** 52:22 53:9

**evening** 34:5 35:22 36:11 44:11,19 45:13 73:15

**events** 30:18 39:1

85:2

**everybody's** 58:16

**exact** 8:24 9:21 13:2
22:20 36:18 71:2,6,12
85:9 87:1

**excuse** 11:10 40:21

**executed** 52:8 65:12,
14,19 66:1

**exhausted** 88:10

**exhibit** 29:5,16,19
32:10 33:7,9,11 37:5,8
38:18 39:11,14 41:21
42:21,22,24 43:3 44:5,
14 46:10 48:2 50:4,12,
13,15,18,20 51:7,12,
13,18,19,21,22 52:1
55:10 59:7,8 65:5
68:24 72:16,18,23
73:8 74:19,21,23
77:14,18 78:2,6 79:1
82:19,23 83:4

**existed** 34:18

**exists** 51:22

**expand** 73:4

**expecting** 36:23

**experience** 12:19

**expert** 67:3 85:15,19,
20

**experts** 85:21

**explanation** 73:14

**extent** 7:14 37:17 41:4
45:8 48:23 51:15
79:12 83:11

**external** 72:3

**eye** 49:21

---

**F**

**face** 15:11

**Facebook** 58:13
86:20

**fact** 40:24 43:12 66:16

**factors** 72:3

**fair** 6:16 15:19 20:17

25:1 26:16 37:1,2 39:6
44:22 45:24 47:7
50:13 51:4 64:21 73:7

**fairly** 62:12

**fall** 12:12 32:21 54:15

**familiar** 22:2 62:13

**family** 11:6,7,8 66:12,
22 68:8,15 86:9

**favorite** 85:7

**February** 72:20 75:3,
11,20

**feedback** 46:24
87:18,19 88:1,2

**feel** 24:13 31:8 39:14
50:18 55:16 58:17
72:20,24

**feels** 57:1

**fellow** 21:16 26:23
80:14

**felt** 55:19

**field** 60:12

**figure** 61:14 87:1

**filed** 79:15

**filings** 10:6,9,14,15

**find** 57:20

**finish** 7:10,15

**finished** 7:8

**fire** 87:2

**firm** 70:21 71:2

**fishing** 56:2

**fit** 20:4 24:2,6

**focus** 12:2,4 51:7
73:10

**focusing** 54:2

**follow-up** 9:15

**foresaw** 64:16

**form** 56:10,14

**forms** 58:12

**formulated** 26:14

**forum** 86:12,15,22

87:6,10,12

**forward** 47:22 70:1

**foundation** 50:15

**four-year** 15:5

**frame** 14:23

**free** 31:8 39:14 50:19
72:20,24

**fresh** 42:15

**freshman** 41:10

**friends** 23:4

**front** 33:8

**full** 7:21 8:4 87:2,3

**future** 36:10 42:8 52:3
69:18 77:4 78:8,24

---

**G**

**garner** 57:16

**garnering** 58:5

**gauge** 57:10

**general** 12:14 25:17
53:15 59:4,19 60:2
61:19,23 62:16 63:3,9,
17 64:24 65:7 66:3,23
67:22

**generally** 19:11 50:2
51:3,5

**generated** 61:10

**George** 82:24

**give** 8:4 15:13 53:15

**good** 5:8 7:3 48:14
49:3 69:4 87:18

**governmental** 13:4

**graduate** 11:17,20

**grand** 49:19

**green** 24:11 48:18
49:23 59:21,23 60:6,
10,11,17 61:5 62:6
63:4 84:17,20 85:5,13,
16,19,22 86:2

**Greeson** 36:12 37:12
38:16 45:17

**grew** 11:14

**ground** 6:5

**grow** 72:10

**guess** 6:18 54:15
68:13 85:17

**guide** 48:14 49:3 53:8
61:16 65:23

**guidelines** 26:4
53:11,13,18 54:21
55:9 68:24

**guides** 69:10

**guiding** 52:2,12 53:24
55:6

---

**H**

**half** 15:13

**handed** 29:14,15
77:17 82:22

**happened** 9:16 16:6

**happening** 80:24

**happy** 73:6

**harmonious** 54:13
55:3

**head** 6:24 7:1 15:8

**heads** 69:24

**heard** 48:14 49:3,15

**hearing** 33:16 34:1
40:4,15 45:6 46:4,11,
18 47:6,15 73:23 74:7

**hearings** 27:9 29:1
33:4

**Hearsay** 25:9

**held** 9:6 19:23 75:20
86:12,15 87:6,9

**helpful** 72:22

**hereinafter** 5:2

**Hermann** 41:12,14

**hold** 13:10 29:11
87:12

**holistically** 52:8

**home** 23:8,10 25:14

35:3,6,12,18,23 51:8

**homes** 52:23 53:21
54:3,5,7,13 55:2,4
66:22 68:8,15 86:9

**hope** 54:7 84:13

**hopeful** 72:7

**house** 36:22 45:12

**housing** 24:11 48:18
50:1 65:11,18,24 66:5
70:22 71:3,9,10,18,22,
24 72:2,5,9,11 84:16
86:5

**husband** 10:23

**husband's** 11:8

---

**I**

**ideas** 69:24

**identify** 81:21

**immediately** 39:19

**impact** 66:17

**imply** 24:23

**important** 7:6,20
52:5,6

**importantly** 57:5

**in-laws** 11:9 24:12,17

**inappropriate** 26:3,
15 27:12

**inaudible** 28:6

**including** 20:23 86:5

**inclusive** 63:5

**indicating** 25:19
48:15

**information** 19:23
20:1,11,13 26:11
30:23 56:2 57:20

**informed** 31:16

**Ingram** 5:5,9 28:12,17
29:8,10,12 50:24 56:8,
16,22 59:11,13 61:8,
12,15 67:11,14,19
69:4,7 74:17 77:16
84:8 88:7,16

**initial** 16:7 34:14

**initially** 13:16 14:12

**initiative** 13:21 14:11
31:11

**input** 57:10,16

**instance** 22:1

**instances** 21:15 22:2
26:22 27:2 58:21

**instruction** 79:18,22
82:12

**integrated** 52:8

**Intel** 72:3

**intend** 15:16

**intent** 40:1

**interpose** 55:21

**introduced** 37:9
47:20 69:17 71:8

**introduction** 34:19

**invades** 79:12 83:11

**inventory** 71:23

**invited** 20:3

**Ironically** 13:20

**Israel** 28:8

**issue** 23:16 31:4 56:1
87:18

**issued** 53:8

**issues** 56:6 70:2

**item** 35:10 73:9 84:1

**items** 20:3 58:18 64:3

---

**J**

**January** 9:6,12,16
13:1 15:4,6 16:2,3,5,9,
10,11 17:11 19:16
21:21 28:23 29:18,22
31:12,18,19,21 32:4
33:15,21,22 34:12,19
38:7,10,15 40:14 43:7,
23 44:20 45:6 46:3,10
47:1,15 55:24 59:11
61:10 69:11 73:23
74:7 77:19 78:15

**joined** 6:19 25:18

**joint** 18:19

**jointly** 18:9 19:4

---

**K**

**Katherine** 5:1,7 29:17

**katy.brewer@
worthington.org**
77:23

**kbrewer@
woodbrewerlaw.
com** 29:21

**keeping** 70:3

**kids** 85:1

**Kilbourne** 11:11,15

**kind** 72:9

**King** 33:23

**knew** 23:13,16

**knowledge** 16:18,23
26:21 27:4 34:18,23
36:5 39:9 42:20 45:4,8
46:6 47:24 55:14
62:21 66:2 68:19
70:16 76:23,24 79:6
81:13,14,18,19 82:13

**Kowalcyk** 17:19

---

**L**

**labeled** 39:16 73:10

**land** 12:8,11,19 25:23
50:5,20 52:19 56:5
85:20

**lands** 52:17

**language** 7:1 48:13

**large** 59:20,23 60:16,
21 61:3,5,18 62:6 63:4
84:17,20,23 85:5

**Larrimer** 54:7

**law** 11:20,23 12:2,7,
10,11,13

**Lawrence** 6:19,24
7:12 51:1

**lawsuit** 10:11 56:7
79:15 82:7

**lawyer** 8:14

**LC** 5:13 22:12 24:21
26:13 36:1,3 52:19
54:10 62:22

**LC's** 54:12

**learn** 22:16

**leave** 88:13

**led** 30:18

**left** 15:13 60:13

**legal** 51:15

**legislative** 35:5

**length** 72:23

**liaison** 18:21 19:19,21
60:5

**Lifestyle** 5:10,12
32:17 86:13

**Lifestyle's** 23:1,11,19
25:7,12,14 26:15
27:21 29:2 30:12 31:5
32:23 33:4 36:10 38:6,
23 40:14 42:9 43:20
44:16,22 45:1,15,24
46:5,9 47:14 50:6 52:3
55:3,20 57:1 59:6
61:4,19 62:5 63:9
65:1,9,18 66:4,6,21,24
67:23 69:1,11 70:10,
20 71:21 72:12 75:23
76:21 77:2,5,10 78:8,
18 79:1 80:6,15,19
81:11,16,22 87:7,10,
14

**Lifestyles** 42:12
47:12 79:8

**likewise** 62:2

**limited** 73:5

**limits** 13:20 14:11
31:4,11 87:3

**Lindsey** 36:13 37:12
38:16 45:18

**listed** 59:19

**live** 11:9,10,13 24:12,
18,20

lived 10:21

loan 12:5

located 62:7

long 10:20

longer 51:22

looked 54:22

lot 49:7 57:15 72:4

lots 49:16

low 67:3 68:3,16

Luther 33:23

## M

made 17:5,12 20:2
28:2 32:2

mailing 11:15

main 26:11

majority 49:22 74:9,
24

make 7:17,24 20:6,20
30:23 31:15 53:16
54:18 55:18 56:10,18
85:16,17 86:1,4

makes 54:14 56:23

making 52:18 53:15
56:4,13

manager 69:23 76:15

manner 35:12 70:5
88:5

March 10:22

marked 29:5,15
77:14,18 82:19,23
86:21

Martin 33:23

master 49:19

math 15:7,9,11

Matt 36:12

matter 8:11 21:10
84:13

matters 12:8,20 20:23
21:3,18 26:24 27:8
41:7 81:8

measure 39:17 41:1

measures 35:5

mechanism 39:3

medication 7:23

medium 67:3 68:4,16

meet 18:9 19:4 27:7
77:3

meeting 9:6,13 16:1,
7,9,11,12 22:10,21,23
23:5,7,11 25:6,16
30:7,12 32:16,22 33:5,
20,22 34:19 38:7,11,
15 43:8,23 44:20
45:12 47:2 58:20 71:6
72:19,20 73:10,20
75:3,21 77:9

meetings 16:19
19:11,23 20:12,13
58:11,15 73:16 78:16,
23

member 22:9,14
52:10 57:9 60:4 66:15
80:7,9 81:10

members 13:21 14:10
17:9,15 19:7,12 21:3,
8,17 25:18,20 27:8,14
58:12 64:19 75:16
77:3 78:17 79:7 80:14

members' 26:1

mentioned 31:12
36:6 53:20 57:16 59:2

message 10:2 81:7

Messrs 37:12

met 5:9 14:16 16:10
73:15

Methodist 51:8

methods 59:1

middle 62:9

mind 16:17 51:21
54:14 61:14 64:1,3,14,
16 71:19,22 84:22

mindful 82:11

minimum 61:4

minute 9:5,8 67:15

minutes 9:12 33:15
43:15 67:10 72:19

missing 55:7

mix 66:11

mixed 87:17

moderated 76:14

moderator 76:8,9,11

moderator's 76:18

moment 33:9

Monday 16:5

months 14:21 71:15

moratorium 36:2,8,9
37:4 38:6,22 39:18,22
40:13 42:8 44:7,20
45:22 73:11,15,17,22
74:16,18 75:2,7,12

morning 5:8,11 6:6,19
7:22 8:5,17 9:4,11,24
10:4

move 11:4 48:10
63:16 65:7

moved 43:12,17 66:16

MPC 19:21 20:1,2
22:11 25:20 26:23
27:1 47:11 52:17
54:22 57:7 85:12

multifaceted 85:3

municipal 18:3,21
19:21 22:5 53:14
64:11

Myers 14:14

## N

named 17:1

natural 52:24 55:17,
19 57:1 60:13,23

nature 39:13 49:20
61:1

necessarily 88:4

needed 30:23

negative 87:19 88:1,2

negotiations 79:14

neighborhood 11:14
24:13,16,18 67:2,6
68:18,21

neighboring 52:23
53:20 54:3,13 55:4

newly 41:18

nodding 6:24

nods 7:1

note 72:5 84:6

notes 9:5,8 49:20 75:8
76:3

notice 58:11

noun 60:12

November 10:24
12:24 13:14

number 24:14 42:22
48:2 49:23 50:2 61:4
83:1 84:1

## O

oath 8:8,9

object 28:5 66:7

objection 18:10 21:20
24:8 25:9 31:6 35:7,14
37:16 42:1 50:14
51:14 55:22 56:14,15
57:2,3,13 58:8,23
59:14 60:1,7 61:6,7
67:24 69:12,14 70:12
71:16 76:1 78:19
79:11 80:20 81:23
83:10 84:6 86:23
87:15

objections 56:10

obtain 46:23

obtained 47:4

occasion 13:13

occur 36:16 42:18
79:21 80:7

occurred 39:1

October 33:5 88:18

office 13:10 84:16

officials 81:15,17

older 72:5

online 58:13

open 88:13

opine 20:14

opining 57:5

opinion 23:21 60:9,18 85:11,21

opinions 26:12 57:18 58:6,7,22

opportunity 56:15 58:17 87:20,22

opposed 54:3 60:19

opposition 14:15

options 84:16

order 8:20 39:2

ordinance 33:11,14, 19 34:2,7,11,15,18 35:2,19 36:8,24 37:5, 14 38:9,14,18 39:11 40:3,21 41:20,23 44:3, 7,10 51:18 74:2,6,10, 11 75:7,13

ordinances 54:20

organizational 16:8, 12

organized 70:4

overlap 19:10

P

p.m. 88:19

paragraphs 39:16

parcels 60:20

parents 11:10

part 56:21 73:16

partake 20:4

party 47:18 81:1

pass 41:2 74:22

passed 75:12

past 56:6

Paul 67:14

pause 42:14

pending 7:16 21:10 23:2,20 26:24 32:19, 23 42:19

people 86:20,22 87:3

permits 39:17

permitted 65:2 66:5,8

person 35:6 62:11 81:4

personal 23:21 60:9, 18 84:12,24 85:11

personally 24:9 47:8, 10 52:13 66:11 72:8

pertain 27:14 70:9 71:19

pertained 45:1,14 50:8 87:14

pertains 44:16 50:6 77:2

pertinent 19:24 20:12

Pete 40:16

phone 36:12,15 37:11, 15,21 45:18 49:6 57:19 81:5

phrase 59:20 61:1,23 62:15

phrased 53:24

pieces 60:21

placing 58:18

plan 44:15,21 45:5,14, 23 46:4,8 47:1,13 49:2 50:5,8,20 51:10,20 55:6,9,12 59:5 64:18 69:9 70:9,20 71:20 77:2 87:13

planning 18:3,7,21 19:3,8,14,18,20,22 20:19 21:2,4,8,10,17, 18 22:5,8 23:2,10,20 25:6,15 27:6,7 28:24 30:10 32:15,20,24 33:2 46:23 47:6 52:11 53:14 60:5 64:11,19 69:15,20 70:7,18 77:4, 8 78:17

plans 69:19

play 85:1

Poggemeyer 71:1

point 23:14 28:18 33:20 41:9 49:8 73:17

pointed 27:19

policies 54:17 65:22

policy 53:8

political 13:7

population 58:2

pornography 85:9

portion 51:10 55:11 62:22 63:8,22 81:16

position 13:11 16:16, 22 17:3,16,21

positions 23:18

post 86:20

posted 58:13

potential 23:16 64:6

potentially 14:18

Powell 11:15

practice 11:23 12:3,7

preparation 9:23 82:15

prepare 8:16,20,23 9:3,11 83:5,8,23

preparing 6:20

present 5:22 16:20 76:8 81:2 87:20

presented 36:1

preserve 36:3

president 15:20,23 16:16,19,22 17:1 35:4, 21 38:15 39:5 40:8 46:15 73:14,18 77:7, 11 78:7 82:24

pretty 58:3

previous 9:5 35:24 68:3

previously 47:18 59:2

principle 52:2,12,14 53:24

principles 53:15

prior 13:3,11 14:21 22:10,20,22 33:20 34:9,18 36:6,11,17 37:21 38:10,14 39:4 40:3,14 44:3,8 45:11 46:3,10,17 47:6,16 66:17 82:11

private 82:12

privately 82:10

privilege 79:13

pro-tem 15:21,24 16:16,22 17:1,16,20

Procedurally 57:7

process 13:23 64:22 83:16

product 83:12

production 88:11

professional 12:19

project 23:22 24:1,6 25:22 47:19,22 72:4

projects 70:2

promote 39:2 42:3,9

prompted 13:18

proper 39:3 64:15

properly 56:18

property 12:13,14 24:9,19,21 26:2,10,16, 19 27:21,22,23 28:14 36:3,11 38:7,19,23 40:14 42:4,9,10 43:20 44:16,22 45:1,15,24 46:5,9 47:14,22 48:16, 20 49:17 50:6 52:3,7, 24 53:3 54:10,12 55:3, 20 57:1 59:6 60:13 61:4,20,24 62:2,6,9, 12,22 63:1,5,9 65:1,9, 19 66:4,6,21,24 67:23 69:1,11 70:11,20 71:21 72:12 75:24 76:21 77:3,5,10 78:8, 18 79:1,8 80:6,15,19 81:12,16,22 85:14,24 86:13 87:7,10,14

proposal 22:11,22
26:13 35:22 56:3
64:21 66:1

proposals 36:1 70:8

propose 48:8 64:17

proposed 24:3,7,14
25:23 33:19 34:2,10,
17 35:1,5 36:8,9 37:4,
7,14 38:6,9,14 39:11
40:2,13 46:7 55:2,19
56:24 65:18 75:13
85:13

provide 35:1 37:7
63:12 72:1

provided 34:14 35:18
36:24 47:12 48:6

providing 7:8

proximity 24:19

public 27:9 36:3 39:2
47:21 58:11

publicly 82:8

published 73:9

publishing 58:19

purchasing 79:7
81:15

purpose 51:9 71:22

purposes 19:2 27:20
29:14 43:2 72:18
77:22

pursue 73:17

pursuing 13:20

put 42:13

**Q**

question 6:16 7:10,16
15:17 17:10 18:12,15
37:24 38:1 39:20
50:17,22 55:15 56:12,
16,20 59:16,17 67:20
75:11 81:24 83:20,21

questioning 67:12,16

questioning's 73:4

questions 6:9,15,22
7:9 8:1 9:15 18:17

27:14 44:2 55:23
58:16 72:24 88:9,12

quote 65:19,20

**R**

Rachael 29:17 30:22

Rachel 29:16

raised 27:1

ran 13:13 17:18

re-election 15:16

re-review 39:14

reach 31:10 41:13

reached 14:9 30:20
31:3

read 9:17 50:24 51:2
56:19 68:12 70:14
72:24 78:12 82:2

reading 50:18 63:11
65:6 73:5

real 12:13,14 85:20

reason 8:3 78:11

reasons 48:21 87:21

Rebecca 41:12

recall 8:24 9:18,21
14:20 16:6 22:20
25:10 28:13,23 29:3
30:3,17 32:18 33:13
34:8,13 35:20 36:17,
18,20 39:13 43:14
45:2 56:16 69:17 71:6
74:1 76:2,5 77:7 78:2,
3,9,20 79:2,5 80:3,10,
22 81:4 82:16 87:5

receive 28:24 29:24
44:4

received 44:7 45:4
78:12,14

receiving 30:3 49:7
78:2,3 79:1

recent 22:11,22

recently 53:3

Recess 69:6

recipient 22:4

recognize 33:10

recollection 78:6

recommendation
72:1

recommendations
20:21 85:12

record 5:6 7:1 19:2
27:20 29:15 43:2 51:2
56:19 70:14 72:19
77:22 82:2

redevelopment
28:14 75:23

refer 5:12 27:21 50:5

reference 5:11 62:16
63:20 65:9 85:7 86:11,
19

referenced 37:12,22
45:18,21 55:8 68:8
70:7,19 71:4 80:2
82:14

referencing 39:4
42:18 53:10 64:16
79:21 80:1 84:21 86:3

referring 5:15 27:23
30:10 49:4,18 67:7
82:3 88:2

refrain 56:9

refresh 78:6

relates 55:15

relationship 41:16

relationships 41:8

relay 19:23

relevance 21:20 24:8
35:14 42:1 59:14 60:7
61:6,9 69:12,14 71:16
76:1 78:19 80:20
81:23 86:23

relevancy 84:7

relevant 56:1

rely 85:21

relying 26:11

remain 27:17 72:7

remember 11:3 12:16
13:2 22:4,7 76:12
80:23 86:17

repeat 56:17 68:3
70:13 81:24

rephrase 6:12,15

replaced 51:22

replaces 51:17,18

reply 82:23 84:4,11
86:11

reporter 6:20

represent 5:10

representative 18:3,
6,8,18,20 19:14,18
20:8 21:1 27:6 52:11

requested 51:2 56:19
70:14 82:2

require 41:1

required 74:23 85:14

research 37:3

resident 9:14,16,17
24:1 49:9 57:10,16
82:16

resident's 9:18

residential 24:11
49:24 54:9,12 55:2
65:11,18,24

residents 26:6,9,17
42:13 48:15 49:3,4,5,
16,18,22 57:5,11,21,
22,23,24 58:7 72:4,5
82:4 85:18 87:23

residents' 26:12
49:11 58:6,21

resolution 40:21
43:3,6,13,16,19,22
44:2,4,10,14 46:17
48:1,7,11 50:11 51:9
71:7 88:3,4

respect 23:19 30:12
32:17 49:1 50:11
54:24 63:19 66:21
67:5,20 70:6 71:3 73:8
84:20

respond 7:2

responded 14:14
86:21

responding 6:23

response 9:17,20
24:23

responsibilities
16:21 20:16

rest 53:1

restate 6:11,14

restaurants 64:1
84:15

retail 63:21,24 64:1,4,
7,17

retreat 75:17,19,24
76:4,7,14,19,22

review 9:2,8,10,22
10:14 18:8,18 19:3,9,
15 20:9,11 22:6,9
27:15 29:1,19 30:11
32:16 33:3,9,15 53:13
64:12 72:21 83:7

reviewed 9:5,14 10:6,
9,10,15 34:1,10 42:24
82:15 83:5,22

reviewing 29:13

revisions 48:8

rezoning 20:23 23:11

Robinson 14:6,8,16,
17 17:7,22 22:3,24
23:9 25:5,7,11,13 27:2
32:21 34:16,24 35:4,
17,21 36:13,21 37:13
38:16,24 39:5,23 40:7,
8,16 44:9 45:12,16
46:16 48:5,6 73:19
77:7,12,19 78:24 80:2,
17 81:3,7 82:24

Robinson's 22:8,17
73:14 78:7 80:5

role 17:14 19:17,19,21
20:7,10 21:7,14 27:5

room 87:2,3

Rule 79:13

rules 6:5

run 13:16,19 14:5
15:16 16:19 17:16

31:23 32:2 67:17

running 13:23 14:18
31:13

---

## S

sake 73:6

sat 25:22

schedule 77:9

scheduled 71:10

school 11:21 12:10

schools 11:16

Schumacher 8:13,18,
22 12:16 15:9 18:10,
12,14,23 21:20 24:8
25:9 28:5,9,15 29:7,9,
11 31:6 32:6 35:7,14
37:16,23 42:1 50:14
51:14 55:21 56:13
57:2,13 58:8,23 59:9,
12,14 60:1,7 61:6,9,13
66:7 67:9,13,17,24
68:10 69:12,14 70:12
71:16 74:13,15 76:1
78:19 79:11 80:20
81:23 83:10,14,20
84:6,9,10 86:23 87:15

Scott 14:14

screen 84:23

section 51:19 53:12

sector 69:18

select 63:21,23 64:8

semi-monthly 19:23

send 58:15

sending 30:19 31:15

sense 7:18 85:17
86:1,4

September 14:24
50:7

series 27:13

serve 13:4

service-oriented
63:21,23 64:4,7

serving 13:3 19:13

49:2

set 37:5 38:18 39:11
41:20 44:4,14 46:9
48:1 50:11 65:5 78:5

settlement 12:6

share 38:9 40:2 46:7,
16 47:9,10 48:17

shared 47:5 48:16

sheet 87:4

shortly 75:20

show 58:15

shy 58:3

sic 9:16 11:1

side 54:10

sidewalks 60:22

sign 30:15 32:14

sign-in 87:4

signed 30:6

signing 28:23 29:3

similar 20:16 44:1
47:19 55:15 67:1

single 66:12,22 68:7,
15 86:9

sir 6:17 7:4,13,19 8:12
9:9 12:9,21 41:22
43:1,5,9,11 44:23
59:22 78:1

sit 15:15

site 50:9 64:18 84:13
85:4

sitting 28:21

situations 35:24

size 85:22

slightly 75:10

small 17:12 84:15

Smith 17:23

solicit 58:6,10

solicited 58:22

sought 38:22 39:21

source 26:11

space 24:2,6,12 48:18
49:24 59:21,23 60:6,
10,17,21 61:5 62:6
63:5 84:16,17,20,23
85:2,5,13,16,19,23
86:3

speak 8:19,22 40:1,
10,12,18 47:9 57:21
84:12

speaking 26:7 31:14
56:9

specific 11:2 22:4
26:19 34:13 49:8,23
50:1 51:7,10,18,19
53:12 60:2 61:14 70:8,
15

specifically 32:18
34:8 49:8 62:5,19 73:5
78:3,9 79:2

specificity 80:22

speech 17:12

spoke 8:18 14:13
26:17

spoken 6:21 40:16
49:5

sports 85:1

staff 64:20 76:17
81:11 85:22

standard 61:16

standards 26:4 54:17
55:17 65:22

start 7:9,11 19:18
42:15

started 13:22

starting 70:22

state 5:6 60:14,23

stated 39:15

states 62:8

stay 30:24

steps 69:8 70:17
81:20

Stewart 69:24 76:15,
17

stint 10:23

**stock** 66:5 72:6

**stop** 73:6

**street** 27:24

**streets** 24:20

**strike** 45:10 62:14

**student** 12:5

**study** 70:23 71:3,9,10, 14,18,23 72:8,11

**subdivisions** 13:8

**substance** 34:7 36:7 37:13,19 38:1,13 40:20

**suggested** 17:2

**suggestion** 17:6

**summaries** 76:6,19

**Sunday** 34:5 36:22 39:6 44:19 45:13

**super** 74:23

**support** 14:11,15 17:13 48:11,22,24 88:3

**supported** 17:20 48:13 85:13

**supporter** 23:22

**Supreme** 85:8

**surprise** 36:23

**surrounding** 67:2,5 68:22

**swear** 8:10

**swore** 8:7

**sworn** 5:2 13:1

---

**T**

**talk** 7:6 34:11 45:11 56:6 73:22 79:16 87:22

**talked** 45:22 49:22

**talking** 21:21 23:1 74:15,17

**tally** 49:10,14

**telling** 26:9

**temporary** 39:18

**tenure** 35:8

**term** 13:20 14:11 15:2, 5,12,13 31:4,11 64:7

**terms** 54:1 71:24

**testify** 8:10

**testimony** 7:21 8:5 55:16 88:18

**text** 10:2 65:10 66:17 81:6

**texted** 81:10

**things** 30:24 54:21 64:2 76:10

**thinking** 26:6

**Thomas** 11:10

**thought** 31:2 37:24 48:13,15 67:24 68:11, 14 80:2 84:24 86:19

**thoughts** 14:10 21:9 26:8,10 57:6 58:22

**threw** 32:5

**time** 7:15 14:23 19:5 20:19 21:22 23:3,4 25:8 29:18 30:5 33:18 34:1,6,10 41:8,11,17 42:3,11 44:6 49:7,12 50:19 53:5 56:5 57:17 69:4 70:15 73:17 87:6, 9 88:8

**time's** 73:6

**timeline** 80:4

**timely** 70:4

**times** 10:12

**timing** 22:7

**today** 8:1,8,14 15:15 27:24 83:23 88:13

**told** 22:18

**Tom** 36:13

**topic** 45:17

**townhomes** 86:7

**track** 49:10

**transcribe** 60:20

**transcript** 6:21 7:3

**transparent** 87:20

**triggered** 11:4 28:19

**trust** 43:15

**Tucker** 62:17,19,24 63:6

**Tuesday** 33:23 34:1

**turn** 33:7 42:21 51:24

**turned** 83:16

**turning** 59:4

**two-part** 56:20

**types** 66:4 71:24

---

**U**

**Ukraine** 28:7,8

**ultimately** 47:20 54:15

**UMCH** 24:19 27:21 28:14 38:19,23 43:20 44:16 45:15 50:8 73:10 79:8 84:13 85:4

**unbroken** 60:22

**undefined** 59:24 62:3

**understand** 5:15 6:9, 11 7:24 8:7,9 27:22 28:1,3 37:24 39:21 64:6 79:17

**understanding** 38:21 39:10 51:17 71:13 73:13

**understood** 6:16 7:4

**undertaking** 71:8

**United** 51:8

**units** 24:14

**University** 11:18

**update** 69:9 70:19 71:19

**updates** 28:24 30:7, 12,16 32:16

**updating** 70:9

**utilize** 61:17

---

**V**

**vacant** 28:21

**variety** 84:16 85:1 86:5

**vein** 7:5

**verbally** 7:2 49:6

**verify** 9:1

**versions** 34:17

**vibe** 24:15

**view** 24:4 49:21 53:23

**views** 24:24 26:1,12, 14 49:11 58:6,7 84:12

**virtually** 25:19 32:21

**vision** 24:9,22 48:17, 19

**vote** 20:5,15 21:3,9,17 26:24 41:23 44:8 77:1

**voted** 41:20 42:2,16 43:10 74:4,6,9,21 87:13,21,23,24 88:5

---

**W**

**wait** 7:7

**waiting** 7:10

**walk** 6:4

**wanted** 17:12 24:10 32:1 42:5 50:2 87:19, 22

**wanting** 57:23

**wasting** 56:5

**watch** 23:10

**watched** 23:5,6

**watching** 25:6,15

**ways** 57:15

**week** 9:1,2 15:4 28:10 35:11

**weekend** 34:4 36:17 44:8

weeks 14:21 36:19
71:15

weird 11:3

West 24:20 67:8

When's 33:18 34:6

Whichever 17:10

Wittenberg 11:18

won 12:24

wondering 54:2

word 24:15 66:7

words 19:4 26:3 57:10

work 13:7 18:24 42:15
71:4 83:12

working 70:4

workouts 12:5

Worthington 10:21,
24 11:5,9,11,12,15,16
12:22 15:21 24:1
39:16 52:15,18,21
54:1 64:11 65:23 67:8
68:8,18,21 72:7 83:1
86:17,18

Worthington's 58:1

wrap 67:15

written 26:19 76:3,6,
18

wrong 31:9

wrote 30:5 84:11

———————————
Y
———————————

year 15:1,5 16:7 28:18
32:24 71:7 75:17

years 15:13 71:15
80:11

———————————
Z
———————————

zoning 12:8,19 21:3,
10,18 23:19 27:8
54:20 55:8