*LIFESTYLE COMMUNITIES*

*vs.*

*CITY OF WORTHINGTON*

---

Deposition of

**Matthew Greeson**

October 06, 2023

---



614.460.5000 | www.priohio.com | pri@priohio.com

1

IN THE UNITED STATES DISTRICT COURT
2
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION
3

4   LIFESTYLE COMMUNITIES,      )
    LTD., ET AL.,               )
5                               )
         Plaintiffs,            )
6                               )
         vs.                    )   Case No.
7                               )   2:22-cv-1775
    CITY OF WORTHINGTON,        )
8   OHIO,                       )
                                )
9        Defendant.             )

10

11

12                  DEPOSITION

13              of MATTHEW GREESON

14

15        Taken at Worthington City Hall
              6550 North High Street
16          Worthington, Ohio 43085

17       on October 6, 2023, at 9:00 a.m.

18

19       Reported by: Rhonda Lawrence

20

21                  -=0=-

22

23

24

1    APPEARANCES:

2

         Christopher L. Ingram
3    VORYS SATER SEYMOUR AND PEASE LLP
         52 East Gay Street
4    Columbus, Ohio 43215
         614.464.5480
5    clingram@vorys.com

6         on behalf of the Plaintiffs.

7

         Paul J. Schumacher
8    DICKIE McCAMEY
         600 Superior Avenue East, Suite 2330
9    Cleveland, Ohio 44114
         216.390.1795
10   pschumacher@dmclaw.com

11        and

12   Richard J. Silk, Jr.
         DICKIE McCAMEY
13   10 West Broad Street, Suite 1950
         Columbus, Ohio 43215
14   614.258.6000
         rsilk@dmclaw.com
15        on behalf of the Defendant.

16

17

18

19

20

21

22             -=0=-

23

24

1                           STIPULATIONS

2               It is stipulated by and among counsel

3      for the respective parties that the deposition

4      of MATTHEW GREESON, the Witness herein, called

5      by the Plaintiffs under the applicable Rules of

6      Federal Civil Court Procedure, may be taken at

7      this time by the stenographic court reporter and

8      notary public pursuant to notice; that said

9      deposition may be reduced to writing

10     stenographically by the court reporter, whose

11     notes thereafter may be transcribed outside the

12     presence of the witness; and that the proof of

13     the official character and qualification of the

14     notary is waived.

15                            -=0=-

16

17

18

19

20

21

22

23

24

1                    INDEX OF EXAMINATION

2                                                PAGE

3   BY MR. INGRAM:                               6

4

5

6                    INDEX OF EXHIBITS

7   EXHIBIT            DESCRIPTION              PAGE

8     1      Land Use Plan                       65

9     6      Ordinance No. 04-2022              234

10    7      Resolution No. 04-2022             243

11    14     Memorandum to Greeson from          30
             Bitar, 1-11-12
12
      15     Memo to Council from Greeson,       39
13           2-21-12

14    16     Engagement of Special Counsel       48

15    17     Letter to Greeson from MSK          51
             Re: Proposal for Planning and
16           Urban Design Services

17    18     City of Worthington Launching       54
             Visioning UMCH Process press
18           release

19    19     Memo to Greeson from Brown,         55
             9-27-13
20
      20     Memo to Greeson from Hurley,        60
21           8-5-14

22    21     UMCH Focus Area Checklist           68

23    22     Email chain                         71

24    23     Email chain                         75

1                    INDEX OF EXHIBITS (continued)

2    EXHIBIT            DESCRIPTION              PAGE

3      24      Email from Brown to Greeson,      88
               1-18-18
4
       25      Email chain                       90
5
       26      Email from Greeson, 4-19-16       96
6
       27      Memo from Management Partners    100
7              to Greeson/Stewart, 4-2-18

8      28      Email from Greeson to            134
               Kowalczyk, 2-28-18
9
       29      Email chain                      141
10
       30      Email from Greeson to            145
11             Jenkins, 3-9-20

12     31      Florey Todd Summary of Phases    166
               for Development of the UMHC
13             Property

14     32      Memo to City Council from        169
               Greeson, 1-22-19
15
       33      Email chain                      180
16
       34      Email chain                      185
17
       35      Email chain                      190
18
       36      Email chain                      195
19
       37      Email chain                      200
20
       38      Staff Memorandum from Brown      209
21             to Greeson, 11-8-21

22

23

24

1                    MATTHEW GREESON

2    being first duly sworn, as hereinafter

3    certified, deposes and says as follows:

4                    CROSS-EXAMINATION

5    BY MR. INGRAM:

6         Q.  Good morning.  Please state your name

7    for the record.

8         A.  My name is Matthew Henry Greeson.

9         Q.  Good morning, Mr. Greeson.  We just met.

10   As I mentioned, my name is Chris Ingram.  I'm an

11   attorney for the plaintiffs in this case,

12   Lifestyle Communities.  And so during the course

13   of your deposition today, I'll refer to our

14   client as Lifestyle or LC, I think is what it's

15   often referred to in some of the documents that

16   have been produced.  If I mention Lifestyle or

17   LC, you understand that that's who I'm referring

18   to?

19        A.  Yes.

20        Q.  Is that okay?

21        A.  Yes.

22        Q.  Have you ever been deposed before,

23   Mr. Greeson?

24        A.  No.

1      Q.  So this is your first deposition?

2      A.  Yes.

3      Q.  Well, let's walk through some ground

4   rules, then, for your deposition today.  So

5   first, I just want you to make sure that if I

6   ask you a question and you don't understand or

7   are confused about any aspect of my question,

8   please stop me, let me know.  Okay?

9      A.  Sure.

10     Q.  And if you don't ask me to repeat or

11  rephrase a question, we are all going to assume

12  that you understood my question.  Fair?

13     A.  That's fair.

14     Q.  And it's important that -- we have a

15  court reporter here with us this morning that is

16  creating a transcript of your deposition, and so

17  it's important that we don't talk over one

18  another.  And so if you would let me finish

19  asking my question before you begin your answer,

20  and I will likewise try to have you -- permit

21  you to finish your answer before I start my

22  question.  Okay?

23     A.  I assume we'll both do our best.

24     Q.  Fair enough.

And with that written transcript, our court reporter today cannot transcribe body language or shaking of the head. So we'll need you to provide verbal responses. So please do answer my questions and refrain from uh-huhs or huh-uhs as opposed to saying yes or no. Does that make sense?

A. Yes.

Q. Excellent. And you're doing great so far.

If you need to take a break at any time, just let me know, and we'll see what we can do about when it's best to take a break, and I will definitely need you to finish giving an answer while there's any question pending.

MR. SCHUMACHER: We're going to take a break when we need to after questions are done.

Q. Do you understand, Mr. Greeson?

A. I understand him, and I'm -- I'll let you know when I need a break.

Q. Okay. Now, it's important that we get your full, complete and accurate answers today. So I have to ask you, have you taken any medication or drugs or anything that would make

1  it difficult for you to understand and answer my

2  questions today?

3      A.  No.

4      Q.  So is there any reason at all why you

5  cannot give your full, complete and accurate

6  testimony today?

7      A.  No, other than it's -- other than there

8  may be things I don't recall because I've been

9  away from Worthington for a while.

10      Q.  Sure.  But other than -- what I'm really

11  getting at is, is there anything affecting your

12  mental capacity --

13      A.  No.

14      Q.   -- or your ability to think clearly

15  today?

16      A.  No.

17      Q.  Thank you.

18          Now, earlier you just swore an oath to

19  tell the truth in today's deposition.  Do you

20  understand that's the same oath that you would

21  be asked when testifying in court in this

22  matter?

23      A.  Yes.

24      Q.  Now, I want to talk about,

1  Mr. Greeson -- you mentioned before we went on

2  the record that you had been here at the city

3  for 15 years and you were the city manager,

4  correct?

5     A.  Yes, I was the city manager beginning in

6  December of 2007.

7     Q.  Okay.  And when did you leave the city?

8     A.  December of 2022.

9     Q.  Were you the city manager the entire

10  time from 2007 to 2022?

11     A.  Yes.  I was the city manager and

12  director of public safety.  I think it's titled

13  director of safety.

14     Q.  Great.

15        And you're here with Mr. Schumacher and

16  Mr. Silk.  Are they your attorneys today?

17     A.  They're the City of Worthington's

18  attorneys.

19     Q.  Are they your attorneys?

20     A.  I believe that -- they're not my

21  personal attorneys, no.

22     Q.  Okay.  And Mr. Greeson, what did you do

23  to prepare for your deposition today?

24     A.  I read some documents and I met with the

1  City's attorneys.

2      Q.  Did you talk to anyone other than the

3  City's attorneys?

4      A.  About the substance of the matter, no.

5  There are some people I made aware that I was

6  being deposed today.

7      Q.  As far as preparing for today's

8  deposition?

9      A.  No.  The City's attorneys and I read a

10  number of documents.

11      Q.  Okay.  Do you recall about how many

12  documents you reviewed?

13      A.  I don't remember the exact number, but I

14  can tell you what they were.

15      Q.  Okay.  What were they?

16      A.  I read minutes from meetings.  I read

17  the complaint again.  And I read the staff

18  report for the meetings in question.

19      Q.  Okay.  Can you -- were there any other

20  documents that you reviewed?

21      A.  Not that I recall.

22      Q.  And you reviewed meeting minutes plural.

23  Do you recall which meetings?

24      A.  I read the minutes for the last MPC

1   meeting and the City Council meeting.

2      Q.  And which City Council meeting minutes

3   did you review?

4      A.  The one in which the zoning case was

5   considered.

6      Q.  So would that have been the December

7   2021 meeting?

8      A.  I don't recall the specific date.

9      Q.  All right.  And you referenced the last

10  MPC meeting.  Was that in connection with the

11  rezoning and the --

12     A.  In which the denial recommendation was

13  proffered to the City Council.

14     Q.  Any other meeting minutes besides those?

15     A.  No.

16     Q.  You said you read the complaint again.

17  Any other -- any other documents from this case,

18  to the extent you knew?

19     A.  Not in the -- not recently.  I had read

20  the last -- the Court's last decision when it

21  came out.

22     Q.  Okay.  The order on reconsideration?

23     A.  Uh-huh.  Yes.  But not recently.

24     Q.  Good catch.

1          What did you do, Mr. Greeson, before you

2    were the city manager of Worthington?

3          A.  I held a variety of positions for the

4    County of Volusia in Florida.

5          Q.  Any of those positions pertain to zoning

6    or land use in Volusia County?

7          A.  I did not directly oversee the planning

8    department except for a short period of time

9    when I was the acting county manager; however, I

10   held a number of positions that interacted with

11   either the county's land or required a lot of

12   coordination and work with the growth and

13   resource management department of that county.

14         Q.  Okay.  And my geography is off.  Volusia

15   County, help orient me?

16         A.  It's the Daytona Beach area.

17         Q.  And so you're the acting county manager

18   in Volusia County?

19         A.  I held five positions in about 12 years

20   from an entry-level position and then I left as

21   the deputy county manager, so there was a period

22   I was acting county manager.

23         Q.  And during those 12 years, those were

24   all public positions?

 1      A.  Yes.

 2      Q.  And what did you do before Volusia

 3   County?

 4      A.  I worked for a small local government

 5   consulting firm for a little over a year right

 6   out of college.

 7      Q.  And what was the firm?

 8      A.  It was Arrington Florida Partnerships.

 9      Q.  And what did they do?

10      A.  They did various management consulting

11   projects for cities and counties around Florida.

12      Q.  What type of consulting projects?

13      A.  Could include strategic planning, it

14   might include budget analysis, corporation

15   studies, you know, anything that -- board

16   retreats, helping to work on behalf of city

17   managers and city councils and county managers,

18   county commissions.

19      Q.  So something like creating a

20   comprehensive plan for the city's future

21   development?

22      A.  No, they did not -- that consulting firm

23   didn't work on planning and land use.  If they

24   were involved in that, they would have involved

·1· ·another consultant that had expertise on that.

·2· ·It was more a general management consulting

·3· ·firm.

·4· · · ·Q.· Mr. Greeson, did you -- what college

·5· ·degrees have you obtained?

·6· · · ·A.· I have a bachelor's of arts with a major

·7· ·in political science and a master's in public

·8· ·administration.

·9· · · ·Q.· Any other graduate degrees?

10· · · ·A.· No.

11· · · ·Q.· Do you have any professional

12· ·certifications?

13· · · ·A.· Yes.· I'm an International City County

14· ·Management Association credential manager.

15· · · ·Q.· Okay.· Any other certifications?

16· · · ·A.· No.

17· · · ·Q.· So generally speaking, in your 15 years

18· ·as the city manager at Worthington, what were

19· ·your responsibilities as city manager?

20· · · ·A.· I oversee the day-to-day operations of

21· ·the city.

22· · · ·Q.· Okay.· Were you responsible to assist

23· ·City Council in leading and managing economic

24· ·development opportunities in the city?

1      A.  Yes.  In the sense that I oversaw the

2   staff, made budget recommendations and in some

3   cases policy recommendations related to those

4   matters.

5      Q.  When you say oversaw the staff, what do

6   you mean by that?

7      A.  All of the staff under the city charter

8   technically reports to the city manager or is

9   hired by and appointed by the city manager.

10      Q.  And you indicated that you made policy

11   recommendations with respect to economic

12   development opportunities.  What type of policy

13   recommendations were you responsible for making?

14      A.  I think wide ranging, and so not in

15   every instance does the city manager make policy

16   recommendations, but one of the manager's key

17   responsibilities under the city charter is to

18   recommend the city budget, and one of the

19   council's key duties is to, you know, adopt the

20   budget.  And so probably, first and foremost, it

21   was recommending how much money we might

22   allocate in the budget for anything that had to

23   do with economic development and what programs

24   the city might offer to advance the economic

·1· vitality of the city, and that could range.

·2· There's a wide range of those.

·3· · · Q.· And as city manager, what were your

·4· responsibilities with respect to rezonings in

·5· the city?

·6· · · A.· The planning and -- planning department

·7· ultimately reported to me at different times.

·8· They either reported to me or to Ms. Stewart,

·9· the assistant city manager.· And so in that way

10· I was somewhat responsible for overseeing their

11· work.· Mr. Brown, who is the director of that

12· department, oversaw -- currently oversees and

13· oversaw, during a good part of my tenure, that

14· function, and then he reported to me for many

15· years, and then later reported to Ms. Stewart.

16· · · Q.· Okay.· So with respect to rezonings in

17· the city, was Mr. Brown -- Lee Brown primarily

18· responsible for overseeing rezonings?

19· · · · · MR. SCHUMACHER:· Objection to the term

20· rezonings.

21· · · A.· Ultimately, it's the planning

22· commission's responsibility under the charter to

23· do that, so if you read the charter, the

24· planning commission authority is pretty

1 significant in that regard in terms of making

2 recommendations.  And so I would describe the

3 role of the planning department as, you know,

4 accepting applications, coordinating review,

5 preparing the packets, interacting with

6 applicants and members of the public who may

7 have questions, and helping administer the code

8 and the process, preparing it ultimately for the

9 planning commission's recommendations to the

10 City Council, in the case of rezonings.

11      Q.  Sure.  And then you said planning

12 commission, I think you said has ultimate

13 responsibility or has primary responsibility?  I

14 don't know.  I want to make sure I understand

15 what you said.  My real question is:  Where does

16 City Council fall into that?

17      A.  Well, they're the ultimate -- they make

18 the decision after having heard the planning

19 commission's recommendations, but the planning

20 commission plays a critical control, and they

21 have duties in the charter that are outlined

22 around, you know, long-range planning and those

23 responsibilities.

24      Q.  And so Mr. Brown, then, in the planning

·1· ·department, is responsible for the process, I

·2· ·think you said, and facilitating the planning

·3· ·commission's and then ultimately City Council's

·4· ·review; is that fair?

·5· · · · · ·MR. SCHUMACHER:· Objection.

·6· · · ·A.· Could you repeat -- I'm sorry.· Could

·7· ·you repeat that again?

·8· · · · · ·(Record read as requested.)

·9· · · · · ·MR. SCHUMACHER:· Do you understand the

10· ·question?

11· · · ·A.· Yeah.· I'm stuck on the word

12· ·facilitating.· So let me just better describe

13· ·what they do.· You know, they answer questions.

14· · · · · ·MR. SCHUMACHER:· Are you talking about

15· ·the planning commission?

16· · · ·A.· The staff.· Staff's role.· What's the

17· ·staff's role, in this case Mr. Brown and his

18· ·staff.· And you're specifically talking about

19· ·rezonings, right?

20· · · ·Q.· Correct.

21· · · ·A.· You're not -- because they oversee

22· ·building inspections and plan reviews and Ohio

23· ·Building Code administration, lots of other

24· ·things.· The breadth of that department is more

1· ·than just rezonings.· Ultimately, I think

2· ·they're responsible for taking in the

3· ·application, administering whatever applies, the

4· ·code, you know, the fee, administering what the

5· ·code calls for, asking for the materials that

6· ·are required by the code, reviewing that and

7· ·providing information to the planning commission

8· ·about the application, and helping assist the

9· ·planning commission and ultimately the City

10· ·Council in their review of it.

11· · · · · And I think, if you look at the

12· ·memorandum that Mr. Brown did for the case

13· ·involved here, he was fulfilling his obligation

14· ·by providing information that was necessary for

15· ·them to make an informed decision.· But I want

16· ·to be clear, facilitating doesn't always mean --

17· ·it doesn't mean deciding.

18· · · Q.· Gotcha.· That makes sense.· Thank you.

19· · · · · And so I take it, then, that Mr. Brown

20· ·and the planning department, they're meeting

21· ·with applicants and talking about rezoning

22· ·applications and the materials during the course

23· ·of preparing everything for both planning

24· ·commission and council's review; is that how it

1   works?

2        MR. SCHUMACHER:  Are we back to talking

3   generally now, or this specific case?

4        Q.  Do you understand my question,

5   Mr. Greeson?

6        A.  I do.

7        Q.  You may answer.

8        A.  I think it depends.  Certainly, the

9   staff is always -- let me be clear.  Yes, we

10  make the staff available to answer questions

11  to -- whether that be the public, certainly

12  provide the technical information that often the

13  city holds or sometimes the city holds.  I think

14  we meet with applicants, meet with residents

15  that might be concerned about the process and we

16  explain how the process might work.  And

17  generally outline the process.  Those take

18  different forms in different cases, I think.

19       Q.  And as far as the overall --

20       A.  Generally, yes.

21       Q.  Sure.  And with respect to the overall

22  process, were there any written policies or

23  procedures that staff is abiding by or that

24  guide staff's actions with respect to rezonings?

1      A.  The codified ordinances are the law

2  related to it, and so that's -- the charter and

3  the codified ordinances are, you know, one and

4  two.  There are other guiding documents that

5  inform the dialogue, but aren't necessarily

6  codified law.  So that would include the comp

7  plan, which is the subject of this discussion,

8  that would include the bike/ped plan, bike and

9  pedestrian plan.  That would include other

10  documents, other plans that the city might have

11  in place.

12      Q.  Okay.  And thank you.  My question is a

13  little bit different.  So let's just

14  hypothetically assume I'm a new employee in

15  Mr. Brown's department and I come to either

16  Mr. Brown or to the city manager and I ask,

17  okay, hey, I got this rezoning application, what

18  is my role as a staff member of the planning

19  department?  Do I need to meet with these

20  people?  What do I need to get from there?  Is

21  there some, you know, guiding document beyond

22  the legal documents that you referenced?

23      A.  I don't recall that there is.  I'm not

24  aware of one.

1      Q.  No policy or written procedure?  That's

2  really what I'm asking.

3      A.  I don't think there is a written

4  procedure that says for every single zoning

5  application this is exactly how you treat it,

6  nor do I think there's an obligation legally or

7  by policy that we do all these things.  I think

8  our obligation is to support the planning

9  commission and the council's decision-making

10  process and give them the information that they

11  need.  But there's nothing that says we have to

12  meet with an applicant or we have to answer a

13  citizen's phone call about the process.

14      Q.  And I was only asking you whether it

15  existed, not whether it was right or wrong.

16      A.  Sure.

17          MR. SCHUMACHER:  So are you going to

18  hire him, or not?

19          THE WITNESS:  As a planner?  We'll see

20  by the end of the day.

21          MR. SCHUMACHER:  Okay.

22  BY MR. INGRAM:

23      Q.  My prior line of questioning pertains

24  generally to rezonings.  How about for

1  development plan applications?  And really, I'm

2  asking about development plans for, you know,

3  large mixed-use developments, such as the one

4  across the street from where we are today.

5      A.  I think, under Worthington's code,

6  there's development plans and then there's PUDs.

7  Are you asking about planned unit developments?

8      Q.  Correct.  PUDs.

9      A.  Okay.  Which is a rezoning.  So I'm not

10  sure I have a different answer.

11      Q.  Perfect.  So same answers.  Got it.

12          MR. SCHUMACHER:  Obviously, we're

13  referring to this property?  It just seems that

14  the question and answer assumed something that

15  you didn't ask about, but it's your deposition.

16      A.  I'm not -- what's your question?

17      Q.  I actually didn't have a question.

18          MR. SCHUMACHER:  I don't think there is

19  a question anymore.

20          MR. INGRAM:  Mr. Schumacher was

21  intervening.  We'll move on.

22      A.  Yeah, I'm not --

23          MR. SCHUMACHER:  He calls it soliloquy.

24          MR. SILK:  Soliloquy.

1          MR. SCHUMACHER:  Soliloquy.  Thank you.

2    BY MR. INGRAM:

3          Q.  Now, while you were the city manager

4    here in Worthington, Mr. Greeson, who did you

5    answer to?

6          A.  The City Council, the seven-member City

7    Council.

8          Q.  Why did you leave the City of

9    Worthington city manager position to accept the

10   same role at the City of Kettering?

11         MR. SCHUMACHER:  Objection.  Relevance.

12         You can answer.

13         A.  It was a career opportunity for me to

14   move to a very reputable, larger community in

15   Ohio, and one that I held in high regard, and

16   its city manager was retiring after a long

17   period of time.  I held him in high regard.  I

18   held that city in high regard.  And it posed

19   some new challenges for me as well as an

20   opportunity to kind of run a bigger city, bigger

21   budget, different challenges.

22         Q.  The City of Kettering is enjoying

23   economic growth and development right now; isn't

24   that right?

1          MR. SCHUMACHER:  Objection.  Relevance.

2      A.  It's got both economic opportunity and

3  also has some challenges.

4      Q.  My grandmother was a kindergartener

5  teacher for like four decades in Kettering.

6      A.  That's great.  It's a wonderful

7  community.  I'm proud to be there.

8      Q.  All right.  For purposes of our

9  discussion today, Mr. Greeson, when I refer to

10  the UMCH property, or Lifestyle's property, or

11  frankly, the property, I'm going to be talking

12  about the property across the street that we're

13  pointing to, 1033 High Street, which is the

14  approximately 37.6 acres that are the center of

15  this dispute.  Do you understand what I'm

16  referring to?

17      A.  Yes.

18      Q.  And if you say the UMCH property or LC's

19  property, we're both going to assume that we're

20  talking about the property that we're looking at

21  right now, fair?

22      A.  Yes.

23      Q.  Okay.  When did the UMCH property come

24  onto the City's radar as a potential opportunity

1  for development?

2      A.  I think discussions about the future of

3  UMCH had been going on for, you know, quite some

4  time in the community, and I can't offer a

5  specific date, because I don't recall one.  But

6  I do know that the -- that potential development

7  predates my -- discussions predate my tenure

8  with the city.  Particularly, you know, there

9  was a lot of discussion with the rezoning with

10 the front acreage to what it is today and the

11 development of the -- whatever it's called, the

12 Bickford assisted living facility.  And so at

13 points in time, as UMCH sought to either lease

14 or sell or develop pieces of their land, it was

15 front of mind for the community, and it was a

16 subject of discussion, and I'm aware of that,

17 but I wasn't here for it.

18     Q.  Okay.  So when you first came to be

19 the -- did you move from the Daytona Beach area

20 to Worthington?

21     A.  I moved from DeLand, Florida to

22 Worthington, yes.

23     Q.  In 2007?

24     A.  In December of 2007.

1      Q.  Very stark memory.  Was it cold?

2      A.  It was snowing.

3      Q.  Welcome.

4          So when you moved to Worthington in

5   December of 2007 and became the city manager,

6   when did you first take notice of or learn about

7   the development opportunities of the UMCH

8   property?

9      A.  I'm not sure the exact date or time or

10  month, but I had read the 2005 comprehensive

11  plan which outlined the UMCH property as a focus

12  area, and became more -- became aware of UMCH

13  and their operations in December of 2007 because

14  I believe I attended a holiday event for the

15  UMCH staff.

16     Q.  Okay.

17     A.  So I'm not -- we weren't talking about

18  development.  I was learning about the

19  operations of the facility from the director who

20  had invited me to that event, but I had read the

21  comprehensive plan.

22     Q.  Did you read the -- I guess, why did you

23  start with or read the 2005 comprehensive plan?

24     A.  I believe I read it as an applicant to

1  familiarize myself with the community when I was

2  seeking the city manager position, and then, you

3  know, at some point read it again as a new city

4  manager.  I did the same as I moved to

5  Kettering.

6      Q.  And why were you reviewing -- both in

7  the Worthington example and in the City of

8  Kettering example, why did you decide to select

9  the comprehensive plan as something to review?

10     A.  I don't think I singled it out.  I read

11  every -- if you knew me better, you would know I

12  read every planning document, the budget that

13  was available to me online or, you know, readily

14  available otherwise.  And because it's an

15  important policy document in the life of the

16  city.

17     Q.  What you just referred to, you're

18  referring to the comprehensive plans?

19     A.  Yes, and the budget and the bike/ped

20  plan and the -- you know, anything that

21  council's adopted to help, you know, guide

22  decision-making.

23     Q.  Mr. Greeson, how long has the UMCH

24  property sat vacant as green space, from your

1    recollection?

2         A.  I don't have a specific recollection of

3    that.  I can't cite the month or year at this

4    point.  And it depends on what you believe is

5    green space.  There is a time period in which

6    they ceased operations, and then there was a

7    time in which -- where they demolished the

8    vacant buildings that formerly housed the social

9    service mission.  And so you define green space,

10   and there's a permit for the demolition that

11   could probably mark the date, and there's a time

12   in which they announced the ending of

13   operations.  Those might inform your question.

14        Q.  Do you know which years UMCH ceased

15   operations on that site?

16        A.  To tell you the truth, I can't remember

17   the specific year at this point.

18        Q.  Was it before you moved to Worthington?

19        A.  They ceased operations after I -- while

20   I was city manager.

21        Q.  Okay.  Fair enough.

22                     -=0=-

23            (Deposition Exhibit 14 marked.)

24                     -=0=-

1        MR. SCHUMACHER:  Are we at 14?

2        MR. INGRAM:  14.

3  BY MR. INGRAM:

4      Q.  Mr. Greeson, I've handed you what we've

5  marked as Exhibit 14.

6      A.  Okay.

7      Q.  And for the record, Exhibit 14 is a

8  memorandum Bates numbered Worthington 36387.

9        Mr. Greeson, Exhibit 14 is a memorandum

10  to you from Lynda Bitar, B-I-T-A-R, dated

11  January 11, 2012.  Do you see that?

12      A.  I do.

13      Q.  Earlier you said you're very meticulous

14  about reading everything.  I take it you would

15  have reviewed and were familiar with this

16  memorandum?

17        MR. SCHUMACHER:  Can you give him a

18  chance to read it?

19      A.  Yeah, I don't specifically recall this,

20  given it was 2012 and it's currently 2023.  But

21  I'll be glad to read it --

22      Q.  Sure.

23      A.  -- if you give me the time.

24      Q.  Of course.

1      A.  Okay.  I've completed my reading of it.

2  What's your question?

3      Q.  Okay.  First of all, who is Ms. Bitar?

4      A.  It's Bitar.  She is -- her title may

5  have changed, but development coordinator in the

6  planning and building department.  I can't

7  remember in 2012 whether she was housed in City

8  Hall under the city manager's office, but there

9  was a point in time in which that was the case.

10      Q.  Would she have reported to you at this

11  time?

12      A.  She may have, or to the assistant city

13  manager, later, and currently, she reports to

14  Mr. Brown.

15      Q.  So she starts her memorandum to you

16  with, as you know.  Do you see that?

17      A.  Yes.

18      Q.  And she talks about the UMCH property

19  being currently for sale.  Do you recall -- does

20  this refresh your recollection about the time of

21  when the UMCH property was vacant and they were

22  trying to sell the property?

23      A.  Yeah.  They ceased operations or they

24  announced they were going to cease operations,

1  and I don't remember whether they, you know,

2  articulated a desire to sell it before they

3  ceased operations or how that worked.  My memory

4  doesn't -- I don't retain -- didn't retain that.

5  But yes, we became aware that they were ceasing

6  operations and that they anticipated, over some

7  period of time, to no longer use it for UMCH's

8  social service mission and do some kind of

9  transaction, potentially a sale, that would lead

10  to development.

11      Q.  Ms. Bitar wrote to you here at the end

12  of the first paragraph, she says that, because

13  Worthington is a fully developed community with

14  few opportunities for redevelopment which will

15  increase the tax base, it is critical that

16  redevelopment of the site is guided to benefit

17  the community in the future.

18         This last bit here, that sentence, it is

19  critical that redevelopment of the site is

20  guided to benefit the community in the future,

21  what did you understand that to mean?

22      A.  I don't recall the memo personally, so I

23  would only be subjectively answering the

24  question now.  But I think she outlines that

1    there's a balance of -- that could mean

2    economic, that could mean, you know,

3    opportunities for green space, and that could

4    mean opportunities for living.  Some balanced

5    combination of all of those potentially, as well

6    as development that supported the city's budget

7    and didn't zap its ability to continue to

8    provide high-quality services.

9        Q.  Okay.  She goes on to say in the next

10   sentence, in order to evaluate current market

11   reality and long-term viability for

12   redevelopment of the site, contracting with a

13   consultant is recommended.

14       What type of consultant would be

15   utilized to guide this redevelopment?

16       A.  Well, since we at that time had one

17   planner on staff, and now only have, I believe,

18   two -- "we" being the City of Worthington, which

19   I'm no longer a part of -- I believe she meant a

20   planning consultant that assisted in the wide

21   range of skill set to help do the things she's

22   outlined in the memo.

23       Q.  Okay.  And certainly, you can recall

24   MKSK being retained to update the city's 2005

1    comprehensive plan.  I believe their work

2    started a year after this.

3        A.  Yes.

4        Q.  Is this recommendation -- was this kind

5    of the genesis of that effort with MKSK?

6            MR. SCHUMACHER:  You mean this memo?

7            MR. INGRAM:  Correct.

8        A.  I don't think the sole memo was the

9    genesis of it.  The genesis of it was a very

10   important context sensitive piece of property in

11   our community that had been the source of a lot

12   of dialogue about its future in the 2005

13   comprehensive plan, if the -- you know, where

14   they were looking at if UMCH never ceased to

15   exist as a social service purpose on that

16   property and changed their mission, what might

17   it become.  Even prior to that, their discussion

18   about, you know, as they sold off pieces of the

19   property or contemplated pieces of the property,

20   it was important.  The operations had been

21   controversial, and periodically throughout

22   UMCH's operational history they had had conflict

23   with the community, and being a built-out

24   community, this property, whatever you want to

1   call it, UMCH, Lifestyle, LC, the property, 1033

2   High Street, was viewed, probably still is

3   viewed, as one of the most sensitive sites in

4   the community, high profile, a lot of community

5   concern about its future, posed an opportunity

6   for Worthington.  I think she in this memo is

7   stating the obvious that we needed to do some

8   planning, given the fact that it's an important

9   property in the community and it appeared to be

10  in transition.

11       Q.  Did you ask her to prepare this

12  memorandum, or is this something she did on her

13  own?

14       A.  I don't remember.

15       Q.  You mentioned there were -- the UMCH's

16  prior use was controversial or there was some

17  issue with it.  Can you elaborate on what you're

18  referring to?

19       A.  Yeah, I don't think -- well, not

20  extensively at this point, because the details

21  of it have faded.  But over the course of time

22  at different intervals in the life of UMCH's

23  operation of a children's home on its property,

24  you know, there had been operational issues that

1  led the community to have various levels of

2  outcry.  And so prior to their decision to cease

3  to operate, there had been a period of time in

4  which they had management challenges.  I think

5  they had, you know, a number of different

6  directors and turnover in the director's roles.

7  But that really wasn't the community issue.

8          The community's issue was that they had

9  had some kids that left the campus and committed

10  some crimes.  There was a higher volume of

11  police interaction or calls to the site to

12  respond to issues that, you know, were arising.

13  And the neighborhood and the community got

14  frustrated with that and voiced their opinion in

15  various ways.

16          You know, I recall at some point one of

17  the county social service agencies pulled

18  funding from them, and so all of those things

19  were, I think, contributing factors to their

20  decision to not get out of the social service

21  business, because they're certainly a viable,

22  valuable continuing entity in the Columbus

23  region, but to no longer be in the housing

24  business and use this site to house children.

1      Q.  Okay.  And with respect to those issues

2  you just referred to and the public outcry, do

3  you know about what year range period you're

4  referring to?

5      A.  Well, it predates this memo, so I would

6  have to go back in time and --

7      Q.  Were you the city manager then?

8      A.  I was the city manager during the period

9  in which there was outcry prior to this memo

10  being written in 2012 and their decision to

11  start marketing the property.  However, I think,

12  if you read newspaper articles or researched

13  city files, you might find that that happened

14  episodically, you know, that there were a number

15  of times over history where issues on the

16  property became a concern to the community, and

17  there was some similar level of outcry.  And so

18  it wasn't the only time over history; it was

19  just one of the times.

20      Q.  Okay.

21      A.  From my understanding.

22      Q.  In Exhibit 14, Ms. Bitar makes reference

23  to the Community Improvement Corporation.  Do

24  you see that?  It's in the second paragraph.

1      A.  Yes.

2      Q.  And she raises the Community Improvement

3   Corporation, or the CIC, along with the planning

4   commission and the City Council.  What would the

5   CIC's role be with respect to guiding the future

6   development of the property?

7      A.  I'm not sure in this instance.  Well,

8   I'm not sure in 2012 what she was contemplating,

9   other than that we would have, you know, engaged

10   those members in the process so that their, you

11   know, involvement with the city was honored and

12   that we listened to them about their thoughts,

13   but they didn't have an active role in -- they

14   don't have an active role in comp planning by

15   law.  That's the planning commission's role.

16      Q.  Okay.

17      A.  I just don't specifically remember why

18   Ms. Bitar would have included that.

19                    -=0=-

20          (Deposition Exhibit 15 marked.)

21                    -=0=-

22   BY MR. INGRAM:

23      Q.  Mr. Greeson, I've handed you what's been

24   marked as Exhibit 15, which is Bates numbered

1  Worthington 28381 through 28382.  And Exhibit 15

2  is a memorandum from you to the Worthington City

3  Council, dated February 21st, 2012; is that

4  correct?

5       A.  Looks like this is a draft memorandum.

6  It's not on letterhead, nor is -- there are some

7  missing blanks, and I would not have sent this

8  in that form to City Council.  So this appears

9  to me to be a draft.

10      Q.  Okay.  Fair enough.  So draft memorandum

11  that you were -- you had prepared?

12      A.  Looks like it.

13          Do you want me to read it?

14      Q.  If you want to review it, go ahead.

15      A.  I would like to.

16      Q.  Have you had an opportunity to review

17  the full exhibit?

18      A.  I have.

19      Q.  Okay.  In the background in this draft

20  memorandum it says, as you know, I was

21  approached by Continental.  Do you see that?

22      A.  Yes.

23      Q.  And is that Mr. Frank Kass?

24      A.  Yes.

1      Q.  Were you approached by Mr. Kass?

2      A.  Yes.  It actually jogs my memory as

3  being one of the other things that contributed

4  to, you know, probably the need to do the

5  comprehensive plan update that was adopted --

6  whenever we readopted it, 2014.

7      Q.  Okay.  And Mr. Kass approached you

8  because Continental was seeking to construct a

9  Giant Eagle grocery store with other retail and

10  gas -- a gas station on the UMCH property,

11  correct?

12      A.  Yes.  I think that's outlined.

13      Q.  And --

14      A.  Although he never -- nobody ever made

15  formal application to that effect, so it was

16  conceptual.

17      Q.  You anticipated my next question.  So no

18  formal application had been filed as of February

19  2012, but it looks like, based on your writing

20  here, that city officials met to discuss this

21  concept proposed by Continental --

22          MR. SCHUMACHER:  Objection.

23      Q.  -- is that fair?

24          MR. SCHUMACHER:  Objection.  Compound

1    question.  Which question do you want him to

2    answer?

3        Q.  Do you understand my question?

4            MR. SCHUMACHER:  Do you want to have her

5    read it back?

6            THE WITNESS:  Yeah, I would benefit from

7    having it read back at this point.  Both of you

8    were talking.

9            MR. INGRAM:  Counsel, if you could

10   refrain from talking over me, I'd appreciate it.

11           MR. SCHUMACHER:  I'm sorry.  I wanted to

12   make my objection because the question was

13   clearly compound.

14           MR. INGRAM:  You can do so after I

15   finish asking my question.

16           MR. SCHUMACHER:  But I need to do that

17   before he answers, because if he answers a

18   compound question, a yes or no could be to

19   either of those questions, and my job is to make

20   sure the record's clear.  And I will continue to

21   do that.  But I will try not to speak over you.

22           And I'll ask you to wait until the

23   question is completed before you answer.

24           THE WITNESS:  Yes, sir.

1          MR. SCHUMACHER:  Thank you.

2          (Record read as requested.)

3          MR. SCHUMACHER:  Same objection.

4     A.  I believe this -- what looks like a

5  draft memo is accurate in that we met with --

6  yes, we met with representatives of Continental

7  in the times outlined.

8  BY MR. INGRAM:

9     Q.  Okay.  And based on those meetings, it

10  says that the proposal, particularly the large

11  format retail use, was inconsistent with the

12  2005 comprehensive plan update.  Do you see

13  that?

14     A.  Yes.

15     Q.  And did not garner support from the city

16  officials, correct?

17     A.  I don't recall the specific discussions

18  of the group, but no, it did not garner my

19  support.  And I believe what's written here is

20  accurate.

21     Q.  And why didn't you support it?

22          MR. SCHUMACHER:  Objection.  Relevance.

23     A.  I don't think -- for a variety of

24  reasons.  It did not reflect the -- what we

1  thought the community wanted and needed.  It

2  certainly didn't meet the objectives of the

3  comprehensive plan.  It was wholly inconsistent

4  with that.  But it also didn't address many of

5  the things we knew that the community thought

6  was important:  More office use, which is, you

7  know, 75 percent of the city's budget.  Well, I

8  don't know the current budget.  But over 70

9  percent of the budget is derived from income

10  taxes.  And so jobs and workers and income tax

11  revenue is critically important.  You know, park

12  space preservation, good architecture, all those

13  things are critical.  Defining characteristics

14  of Worthington.

15          You know, Worthington, you know, has

16  really worked hard to make itself a distinctive

17  community through good planning and good

18  stewardship and decision-making about

19  development over time and a lot of community

20  engagement around that.  And I think the type of

21  development proposal they were offering

22  didn't -- wasn't in keeping with that, a large

23  format retail use.  And it wasn't in keeping

24  with probably any site in Worthington.  If you

1    look at the comprehensive plan, you know, large

2    format retail was something that, you know, we

3    weren't -- we weren't aiming for strategically.

4            And then it didn't strike the right

5    balance of -- of uses and approaches across the

6    property.  Probably would have demanded more

7    services than revenue it created.  All of those

8    would have been reasons that I would have

9    contemplated.

10    Q.  Okay.  You referenced architectural

11    elements and other matters that contribute to a

12    distinctly Worthington, is the phrase you used,

13    development.  And so my question to you is what

14    documents or what policies would one go to to

15    understand how they could design something that

16    is distinctly Worthington?

17    A.  Ultimately, I think the comp plan and

18    the architectural review guidelines -- I didn't

19    say distinctively Worthington.  I said

20    distinctive; meaning, high quality, compatible

21    with and -- and I think that's a little

22    different.  But this is part of the

23    architectural review district, and it's also,

24    you know, again, reflecting that it's a context

1  sensitive site.  It's embedded in a -- partially

2  embedded in a neighborhood, surrounded on

3  multiple sides by homes.  It's across from the

4  City Hall, you know, which the city has worked

5  to make sure has character.  It doesn't look

6  like a strip mall over here.  It was designed to

7  look like the original Ohio Statehouse, so its

8  historic character was important.

9        And for all of those reasons, that site

10  is so sensitive and important, and you can --

11  you can imagine that a large format grocery

12  retail center is hard to make look and feel with

13  a large field of parking to fit into the context

14  sensitive setting that it's in.

15      Q.  And I'm sorry if I misheard you, by the

16  way.

17      A.  Yeah.

18      Q.  Thank you for pointing that out.

19        I thought I heard you mention or refer

20  to two documents in response to my question,

21  which was the comprehensive plan, and you said

22  the architectural --

23      A.  Review guidelines, which come later in

24  the process.

1      Q.  Sure.  And any other policies or

2  documents?

3      A.  I don't recall at this time what adopted

4  plans we had.  We later had a bike/ped plan and

5  some other documents that would have been

6  important.  It would have been the codified

7  ordinances, the comprehensive plan at that time,

8  and the architectural review guidelines.

9      Q.  Okay.

10      A.  I also don't recall whether I sent this.

11  Not that it matters.

12      Q.  Do you recall the circumstances of why

13  you would have prepared it?

14      A.  Yeah.  Well, I think they're outlined in

15  the memo.  Whether I sent it or whether I used

16  it just to organize my own thinking, I don't

17  remember.

18      Q.  You do conclude here we may need both

19  specialty planners and attorneys to assist us on

20  this matter as it moves forward.

21          Do you recall that?

22      A.  I see that I wrote that.  I wrote this,

23  it appears, after Ms. Bitar wrote her

24  memorandum, and so, obviously, we were thinking

1  about hiring planners to help assist with

2  updating the comprehensive plan.  It was

3  probably a good idea, but I don't remember the

4  specific details of writing -- I don't remember

5  writing this memo, is what I'm saying.

6     Q.  Okay.  That's fair.

7                -=0=-

8     (Deposition Exhibit 16 marked.)

9                -=0=-

10  BY MR. INGRAM:

11     Q.  I'm going to hand you what's been marked

12  as Exhibit 16.  For purposes of the record,

13  Exhibit 16 is an engagement of special counsel,

14  Bates numbered Worthington 317901.  Do you see

15  that, Mr. Greeson?

16     A.  I do.

17     Q.  Do you recall this document?

18     A.  No.

19     Q.  I'm going to let you review it.

20     A.  Uh-huh.

21     Q.  In the second paragraph --

22     MR. SCHUMACHER:  Have you had a chance

23  to review it?

24     THE WITNESS:  Not yet.

·1· · · · · · MR. INGRAM:· I thought I heard you say

·2· uh-huh.

·3· · · · · · MR. SCHUMACHER:· I am the guardian of

·4· the record.

·5· · · · A.· Okay.· I've read it.

·6· BY MR. INGRAM:

·7· · · · Q.· I just have a couple questions.· Really,

·8· drawing your attention to the third paragraph,

·9· it says, the UMCH site was only recently vacated

10· as a place to care for troubled children.

11· Because that is so, it is the right time to

12· consider rezoning.

13· · · · · · It goes on to say that the city had some

14· preliminary contact with a prospective developer

15· of the UMCH site who wants to develop a big box

16· for Giant Eagle.· Do you see that?

17· · · · A.· Yes.

18· · · · Q.· Did the city ultimately retain a special

19· counsel in connection for the rezoning --

20· · · · A.· Yes.

21· · · · Q.· · -- of the UMCH site?

22· · · · A.· Yes.· This is helpful in -- oh, sorry.

23· · · · Q.· Go ahead.

24· · · · A.· Did you finish your question?

1      Q.  Yes, I did.

2      A.  Okay.  Yes, and this is helpful in

3   jogging my memory.  While we did not obtain

4   special counsel solely related to UMCH, although

5   UMCH obviously was and is one of the most -- I

6   don't want to use the term context sensitive,

7   because I don't necessarily have better words,

8   but a very important site in the life of this

9   community, probably only second to the Village

10  Green, but established by the founders in 1803.

11  But I think we believed that not only because of

12  the possibility of, you know, a mix of use of

13  development at UMCH, but that we had other

14  areas, some of these are mentioned, but they're

15  not -- they're not -- it doesn't document them

16  all.

17          The Wilson Bridge Road corridor, which

18  we were also doing specialized planning around.

19  I think we started that process earlier than

20  this one.  The mall site, now called The Shops

21  at Worthington Place or High North.  And we

22  thought there was some deficiencies in the

23  zoning code.

24          I believe we ultimately hired Katherine

1  Cunningham to assist our council in

2  understanding improvements to our code, and they

3  adopted a change in the code to allow for

4  planned unit developments, which our code, which

5  was largely written in the very beginning of --

6  well, it was largely written in the early

7  '70s -- didn't accommodate.

8       Q.  Was the creation of the PUD and the -- I

9  guess the output from Ms. Cunningham's work --

10  did that occur before the 2014 comprehensive

11  plan update?

12       A.  I don't specifically recall, but I

13  believe so.

14                     -=0=-

15       (Deposition Exhibit 17 marked.)

16                     -=0=-

17  BY MR. INGRAM:

18       Q.  Mr. Greeson, you've been handed what's

19  been marked as Exhibit 17.  And for purposes of

20  the record, Exhibit 17 is a letter from MKSK to

21  you, dated June 12, 2013, Bates numbered

22  Worthington 62382 through 62392.  Do you see

23  that, Mr. Greeson?

24       A.  Yes.

1      Q.  Mr. Greeson, if you could turn to page 8

2  of 8 of the letter.  Is that your signature

3  there on the authorization line?

4      A.  Yes.

5      Q.  Is this an engagement letter where the

6  city retained MKSK?

7      A.  Yes.

8      Q.  Directing your attention to page 7, the

9  prior page, under compensation.  This engagement

10  letter covered $41,460 for MKSK's services.  Do

11  you see that?

12      A.  Yes.

13      Q.  Did the city pay any additional sums to

14  MKSK in connection with the 2014 comprehensive

15  plan update?

16      A.  I don't remember.

17         I will comment I wish planning services

18  were $41,000 nowadays.

19         MR. SCHUMACHER:  I think it's time for

20  that morning break.

21         MR. INGRAM:  We have been going about an

22  hour, Mr. Greeson.  Do you want to take a break?

23         THE WITNESS:  Yeah.  I drank a lot of

24  coffee.

1            (Recess.)

2  BY MR. INGRAM:

3       Q.  Prior to our break, Mr. Greeson, we were

4  reviewing Exhibit 17, the engagement letter from

5  MKSK to you.  Do you recall that?

6       A.  Yes.

7       Q.  I was looking at the attachment to the

8  engagement letter, and there's terms and

9  conditions and proposal, and it's a little hard

10  to read, so I have a magnifying glass here,

11  should you need it.  But it appears that your

12  initials are near where there are terms that

13  were crossed out?

14       A.  What page are you on?

15       Q.  Starting at page 62390, if you're

16  looking in the lower right-hand corner, so 90.

17  If you turn the page to 91, my question is

18  simply are those your initials?

19       A.  Yes.

20       Q.  So you reviewed, I take it, this

21  engagement letter and had the opportunity to

22  comment or strike anything that you disagreed

23  with; is that fair?

24       A.  I don't remember.  I may have signed off

1    on what the law director recommended as

2    provisions for striking.  Not having -- I

3    haven't read all of the strike-throughs, but

4    obviously, I authorized them.

5        Q.  Sure.  And my question was simply, I

6    guess, you, or perhaps the city, had the

7    opportunity to review and revise or strike

8    anything that it disagreed with in this

9    engagement letter; is that fair?

10        A.  Yes.

11        Q.  And so either you or someone from the

12    city would have reviewed this engagement letter

13    before you signed it?

14            MR. SCHUMACHER:  Objection.  Relevance.

15        A.  Yes.  The degree to which we -- the

16    degree to which we actually reviewed it and my

17    personal review of it I don't recall.

18                    -=0=-

19        (Deposition Exhibit 18 marked.)

20                    -=0=-

21    BY MR. INGRAM:

22        Q.  You've been handed, Mr. Greeson, what I

23    have been marked as Exhibit 18, which is the

24    City of Worthington launching visioning UMCH

1 process press release, Bates numbered

2 Worthington 62713.  Do you see that?

3      A.  Yes.

4      Q.  And with respect to your position as

5 city manager, would you have reviewed this press

6 release before it was issued by Ms. Brown?

7      A.  Maybe, but I don't specifically remember

8 reviewing it.

9      Q.  Okay.

10      A.  I may have, I may not have.

11      Q.  So you didn't always?

12      A.  I didn't always.  She's very capable.

13      Q.  This release was issued September 4,

14 2013, and it obviously references MKSK and

15 MKSK's work for the comprehensive plan update.

16 Do you recall why this press release was issued?

17          MR. SCHUMACHER:  Objection.  Relevance.

18      A.  I don't recall.  I imagine we were just

19 informing the public because it was important

20 property in our community.

21      Q.  Okay.  Thank you.

22                  -=0=-

23          (Deposition Exhibit 19 marked.)

24                  -=0=-

1  BY MR. INGRAM:

2      Q.  Mr. Greeson, you've been handed what's

3  been marked as Exhibit 19, which is a memorandum

4  to you from Mr. Brown, dated September 27, 2013,

5  Bates numbered Worthington 28538 through 28539.

6  Do you see that?

7      A.  Yes.

8      Q.  I want to direct your attention to the

9  second page.

10      A.  Let me read the document, if I may.

11      Q.  Sure.

12          Mr. Greeson, as I indicated earlier, I

13  want to direct your attention to page 2 under

14  process.  There's a reference to WARD, W-A-R-D,

15  in all caps.  Who is WARD?

16      A.  It's a group of citizens.  WARD is an

17  acronym for Worthington Alliance for Responsible

18  Development.  And they formed sometime during

19  this process, initially out of interest and

20  concern about how the UMCH property might

21  develop.

22      Q.  Okay.  And were there any city officials

23  or anyone from the city part of this WARD

24  organization?

1     A.  I interacted a lot -- quite a bit with a

2  WARD planning committee, and they're -- to my

3  recollection, at this period of time, there were

4  no city officials involved in that planning

5  committee.

6     Q.  At this point in time, you're referring

7  to September 2013?

8     A.  Yes.  Now, you may have something that

9  jogs my memory, but I -- I think it was mostly

10  people in the neighborhood around UMCH.

11     Q.  So in connection with MKSK's work, WARD

12  was interviewed, obviously, and then there's a

13  reference to the CIC.

14     A.  Uh-huh.

15     Q.  So CIC also participated in interviews?

16     A.  That's what this reflects.  I don't

17  specifically recall who on the CIC and to what

18  extent they were interviewed.

19     Q.  What is CVB?

20     A.  Convention and Visitors Bureau.

21     Q.  And how about the OWBA?

22     A.  That organization -- kind of the

23  successor organization to that is Worthington

24  Partnership, but that would have been Old

1    Worthington Business Association.

2        Q.  And what does the Worthington

3    Partnership or the Worthington Business

4    Association do, if you know?

5        A.  Essentially functions as a main street

6    organization advancing the vitality and economic

7    activity not only in Old Worthington but, you

8    know, throughout Worthington.

9        Q.  Now to the background on page 1.

10   Mr. Brown wrote to you that the proposed

11   update -- and that's the comprehensive plan --

12   will further clarify how the community would

13   like to see the site, being the UMCH site,

14   develop in the future.  Do you see that?

15       A.  Yes.

16       Q.  As the city manager, did you agree with

17   that characterization?

18           MR. SCHUMACHER:  Objection.  Relevance.

19       A.  I think we were seeking to understand

20   what the -- what the community, you know, was

21   interested in.

22       Q.  So did you agree with that

23   characterization?

24           MR. SCHUMACHER:  Same objection.

·1· · · A.· Well, I would have at that time.

·2· However, I'm not sure we were successful in

·3· having clear vision of what -- you know, what

·4· the community wanted.

·5· · · Q.· But with respect to the update to the

·6· comprehensive plan --

·7· · · A.· I would -- I would -- go ahead.· I'm

·8· sorry.

·9· · · Q.· With respect to the update to the

10· comprehensive plan, that was the goal, was to

11· solicit community input so that the city could

12· understand what the community would like to see

13· developed on that site into the future; is that

14· fair?

15· · · A.· That would have been one of the goals,

16· yes.

17· · · · · MR. SCHUMACHER:· I'm sorry, when was

18· this again?

19· · · A.· This was in 2013.· You know, obviously,

20· there's a lot that's happened since then.· But

21· among the goals we were pursuing was to try to

22· understand community aspirations, and I think

23· that wasn't the sole goal, but that was one of

24· the goals, and we pursued that through the

1    process outlined here.

2        Q.  Okay.  Anything else?  Any other --

3    you're pausing.  I just want to make sure

4    you're -- you're finished answering the

5    question.

6        A.  Yeah, I'm done.

7        Q.  Okay.

8                        -=0=-

9          (Deposition Exhibit 20 marked.)

10                       -=0=-

11        THE WITNESS:  We write a lot of memos,

12    don't we?  Or did.

13        MR. SCHUMACHER:  There's no question

14    pending.

15    BY MR. INGRAM:

16        Q.  Mr. Greeson, I'm handing you what's been

17    marked Exhibit 20, which is a memorandum from

18    Darren Hurley, parks and recreation director, to

19    you, dated August 5, 2014.  Do you see that?

20        A.  I do.

21        Q.  And just a few questions with respect to

22    Exhibit 20, Mr. Greeson.  First of all, Darren

23    Hurley was the city's parks and recreation

24    director in 2014; is that correct?

  1      A.  Yes.  And he is currently the city's

  2  parks and recreation director.

  3      Q.  Okay.  And attached to his memorandum to

  4  you was a position statement, dated July 23rd,

  5  2014, to the Worthington City Council from the

  6  Worthington Parks and Recreation Commission.  Do

  7  you see that?

  8      A.  I see that.

  9      Q.  What is the Worthington Parks and

 10  Recreation Commission?

 11      A.  It's an advisory commission to the City

 12  Council and the city on issues related to our

 13  parks and recreation department and system.

 14      Q.  And what is the parks and recreation's

 15  director involvement with the parks and

 16  recreation commission?

 17      A.  He is the staff liaison to it.

 18      Q.  Thank you.

 19          How are the commissioners selected?  Are

 20  they appointed or --

 21      A.  They are appointed by City Council.

 22      Q.  And who is Bob Burpee?

 23      A.  He was a member of the Parks and

 24  Recreation Commission, and at the time -- I

1    don't know if he is still -- a resident of the

2    city.

3         Q.  In Mr. Hurley's memo to you, he's

4    conveying to you that the Parks and Recreation

5    Commission made a motion that the Parks and

6    Recreation Commission urges City Council to

7    consider every opportunity available to maximize

8    the amount of UMCH property designated as park

9    space for the community.

10            Do you see that?

11        A.  Yes.

12        Q.  Do you recall that happening?

13        A.  I recall this memorandum and

14   recommendation, or input into the process, yes.

15        Q.  Did you participate in the input in the

16   process of reaching this recommendation?

17        A.  No, other than attending the meeting --

18   Mr. Hurley probably attending the meeting.  I

19   don't recall that we -- I didn't participate in

20   the Parks and Recreation Commission's

21   discussion, that I recall.

22        Q.  Okay.

23        A.  Nor do I recall even asking for their

24   feedback.

1      Q.  Okay.  Fair enough.

2           In their letter to City Council, the

3      commission said that, in a perfect world, we

4      would like for the site to be 100 percent

5      parkland and recreation space available for

6      community access and events.

7           Do you see that?  It's at the bottom of

8      the first page of their letter.

9      A.  Yes, I see what's written.

10      Q.  And they go on on the next page to say

11      that, with that said, we realize that the city

12      and parks department have limited resources to

13      purchase and to maintain such a large parcel of

14      land.

15           Do you see that?

16      A.  I do see that written.

17      Q.  Were there discussions about purchasing

18      any portion of the UMCH property for a park

19      then?

20      A.  We had no serious conversations or

21      interest in acquiring land at that time, so

22      this, that I recall, was not used to instigate,

23      you know, an active acquisition effort.  It was

24      just input into the process that was, you know,

1   taken in like any other piece of information.  I

2   don't have a specific recollection about

3   acquisition conversations, but I know that our

4   posture, if you will, at that time was that we

5   were interested in park space as a balance -- a

6   component of a balanced overall development

7   plan, not in acquisition of the site.

8      Q.  Okay.  And you mention in your answer

9   "at that time."  You're referring to the fall of

10  2014?

11         MR. SCHUMACHER:  It was August 5th,

12  2014, to be accurate.

13     A.  Yeah.  I would say just generally in

14  this time.  There's no serious effort or what I

15  would call robust conversation regarding

16  acquisition.  Any dialogue or analysis related

17  to that was -- I don't specifically recall.

18  There may have been some.  Mostly -- because

19  citizens and other people were saying why don't

20  you guys buy it, you know, asking those kind of

21  questions, and I recall answering, well, we

22  believe we can achieve meaningful park space as

23  a component part of an overall balanced

24  development.  And generally, the council and

1   management at that time did not have any

2   interest in acquisition of the property as, you

3   know, referenced in this perfect world

4   description on the second page of the document

5   you handed me.

6        Q.  In 2014?

7        A.  In 2014.

8        Q.  And I just have what's previously marked

9   as Exhibit 1.  And this is the land use plan.

10          MR. SCHUMACHER:  That's the whole thing.

11   My Exhibit 1 only has -- wait a minute.

12        Q.  Mr. Greeson --

13          MR. SCHUMACHER:  The one you handed me

14   yesterday has only --

15          MR. INGRAM:  Counsel, it's the same

16   exhibit.

17          MR. SCHUMACHER:  Oh, you had a whole

18   book there.  I'm sorry.

19          MR. INGRAM:  The binder I'm referring to

20   has all the exhibits from yesterday.

21          MR. SCHUMACHER:  Thank you.

22   BY MR. INGRAM:

23        Q.  Mr. Greeson, I just wanted for your

24   benefit to see the City Council's comprehensive

1  plan update that was adopted on September 2nd of

2  2014.  Do you see that?

3      A.  Yes.

4      Q.  And my question is that, based on the

5  fact that City Council adopted this update in

6  September of 2014, meanwhile, looking at Exhibit

7  20, you have a recommendation made to City

8  Council in July of 2014, would City Council have

9  considered this recommendation prior to adopting

10  the comprehensive plan update?

11      A.  When you say considered, what do you

12  mean?  Acted upon it?

13      Q.  Would it have reviewed and considered in

14  connection with the 2014 comprehensive plan

15  update.

16      A.  I'm sure we transmitted it to them.

17  They reviewed it.  My memory is that they took

18  it in as, you know, opinion of one of our

19  commissions.  I don't think they gave it a lot

20  of weight.  And it certainly didn't guide any --

21  it didn't result in any direction to the staff

22  to do anything but continue the process as we

23  were -- as we were doing.  In fact, I think some

24  of the councilmembers didn't like that they were

1 weighing in and weren't interested in

2 acquisition and found this a little

3 inconvenient.

4        That being said, the parks commission

5 has no role in zoning.  Their role might be to

6 offer ways to improve the park system, so it's

7 not surprising that people that love parks and

8 desire to be on a park commission might want

9 more parks.  But Worthington does a good job of

10 everybody respecting their roles, and it would

11 have been input into the process.  The planning

12 commission's role was to make the recommendation

13 on the overall plan to the City Council.

14    Q.  In 2014, did the city have the funds to

15 spend or purchase the UMCH property for a park?

16        MR. SCHUMACHER:  Objection.  Relevance.

17        Answer if you know.

18    A.  I can't speak to the specific balances

19 in 2014 without going back and reviewing those

20 documents, but we certainly had some financial

21 constraints.  Would have been concerned about

22 expending a large sum of money on new park

23 acquisition that that both cost upfront capital

24 and money to develop ongoing maintenance.  And

1  believed that, again, with a balanced

2  development, you know, there could be, you know,

3  amenities and park space that was part of the

4  development without having to acquire property.

5      Q.  Okay.  Fair enough.

6                    -=0=-

7          (Deposition Exhibit 21 marked.)

8                    -=0=-

9  BY MR. INGRAM:

10     Q.  Mr. Greeson, I've handed you what's been

11 marked as Exhibit 22 -- or 21.  And Exhibit 21

12 is entitled the UMCH Focus Area Checklist.  It's

13 on the planning and building letterhead, and

14 it's Bates numbered Worthington 28377 through

15 28380.  Do you see that, Mr. Greeson?

16     A.  Yes.

17     Q.  And I'll represent to you that from the

18 metadata of the file it looks to have been from

19 the March 4, 2015, date.  For our purposes, just

20 to orient on the timing space and our

21 discussion, at least from the metadata, this

22 looks to be from March of 2015.  Do you

23 recognize this document?

24     A.  No.  That doesn't mean I didn't see it

1    at the time.

2        Q.  Sure.

3        A.  I don't recall it.

4        Q.  With your involvement with the UMCH

5    focus area as the city manager, would you have

6    expected that the planning and building folks

7    provide you a copy of this checklist?

8        A.  They may have.  But it wouldn't have

9    been necessary as long as it was, you know,

10   drawn from the plan itself.  It appears to me to

11   be an internal tool to help, you know, guide

12   evaluation and not -- seek to not miss things

13   that were important.  It may not be

14   all-inclusive, and I don't have a specific

15   memory of its use.

16       Q.  Okay.  Who would have prepared this, if

17   you know?

18       A.  I expect it would be Mr. Brown, although

19   I don't specifically know that he prepared it.

20   Ms. Bitar may have contributed to it.

21       Q.  Was it standard to create checklists for

22   the redevelopment of private property in the

23   city?

24       A.  I don't know.  I don't know if they had

1    an internal -- I don't know if they did this

2    regularly or not.  They're very detail oriented.

3    So if there are other checklists like this,

4    there may be.  I'm not sure.

5        Q.  While you were city manager, were you

6    ever presented with a checklist of this nature

7    on any other project?

8        A.  I don't recall.  And I think you also --

9    you know, this is probably one of the, again,

10   most context sensitive larger sites.  A lot of

11   moving parts and pieces, and so certainly some

12   kind of tool to make sure that details aren't

13   lost.  And the evaluation process is important,

14   so I would have viewed this as good

15   administration for a more complex project or

16   site, and -- but I don't -- this has been a lot

17   of time and so I don't -- there's been a lot of

18   things that have happened since then and I

19   don't -- I don't have a specific memory of this

20   checklist or any others.

21       Q.  When Lifestyles submitted its

22   application to rezone the property in the 2020

23   time period, did the city create -- did anyone

24   from the city create, to your knowledge, a

1    checklist similar to this?

2        A.  I honestly don't recall.

3        Q.  Did you see one?

4        A.  I don't recall whether I did or not.

5                         -=O=-

6            (Deposition Exhibit 22 marked.)

7                         -=O=-

8    BY MR. INGRAM:

9        Q.  Mr. Greeson, you've been handed what's

10   been marked as Exhibit 22, which is an email

11   from you to Lee Brown and Jeff Harris, dated

12   July 30, 2015, and it's actually an email chain,

13   I'll call it.  Do you see that?

14       A.  Uh-huh.

15       Q.  And --

16       A.  Yes.

17       Q.  And just for the record, the email

18   address that's listed here in the from line, is

19   that -- was that your Worthington email address?

20       A.  It was at the time.  It changed later to

21   at Worthington.org.  But yes, that was the --

22   that was my email at the time.

23       Q.  Okay.

24       A.  It appears.

1    Q.  And you were sending an email about a

2  grant program in which the subject was $3.1

3  million of Clean Ohio Conservation Funds

4  available for Franklin County, and in your email

5  you say that I want to discuss this in

6  relationship to UMCH.  Do you see that?

7    A.  Uh-huh.

8    Q.  And in the email that you're

9  forwarding --

10    A.  Yes, I should say.

11    Q.  Good catch.

12      In the email that you were forwarding,

13  this grant program says that the funds can be

14  used to acquire green space and/or repair --

15  and/or restore riparian corridors.

16      Do you recall that?

17    A.  I see that I did it.  I don't have it --

18  yes, I recall it.

19    Q.  Okay.  With respect to the UMCH

20  property, what did you do with respect to

21  pursuing any grant funds?

22    A.  I think -- going off faded memory here,

23  but I think this was just internal staff looking

24  at grant funds that may become available and

1    discussing whether or not it had applicability

2    to the UMCH property.  And in this program it

3    would have been, you know, kind of the Tucker

4    Creek area.  There were times in the dialogue

5    with -- internally and with the community where

6    we were hearing that there was a desire to park

7    space that we said, well, if we needed to do

8    that as part of a development, there's ways to

9    accomplish that.  You can acquire it, you can

10   try to -- you can ask the developer to do it,

11   you can, you know, seek grant funds so it's not

12   all on the back of the developer, or not all

13   financially required by the developer.  And we

14   were just imagining approaches to addressing the

15   questions that we were getting from the

16   community.

17           We didn't apply for any grant funds.  We

18   weren't directed to apply for any grant funds.

19   I don't think we ever had any serious

20   conversation with council about applying for

21   grant funds, or nor did we take any of the

22   actions that would be necessary to actually

23   initiate acquisition of property like talking to

24   the property owner, appraisals, acquisition

1    attorneys, all of that stuff.  It was mostly

2    internal research.

3         Q.  Okay.  And with respect to this

4    particular grant opportunity and its

5    relationship or connection to the UMCH property,

6    you were reviewing this in connection with

7    acquiring green space, not to restore riparian

8    corridors, correct?

9              MR. SCHUMACHER:  Objection.  Misstates

10   his prior testimony.

11        A.  I think the area -- my knowledge of this

12   program, which is limited, is that in order to

13   be successful in obtaining funds, you got to

14   think about the conservation benefit of the

15   project.  So acquiring green space would -- it

16   would be most successful if it included

17   repairing corridors, which on that property

18   is -- that property being the LC property -- is

19   the Tucker Creek area.  So I'm not -- I'm not

20   sure where your question is going with that.

21        Q.  Well, I guess, I just wanted to

22   understand whether there were any issues with

23   the Tucker Creek area that needed repair or

24   restoration, or if you're saying --

 1      A.  I don't know the answer to that.

 2      Q.  Okay.

 3      A.  This was just seeing a grant opportunity

 4  and asking my staff to look into its

 5  applicability and utility for, you know, that

 6  site.

 7      Q.  Gotcha.  That makes sense.

 8          MR. SCHUMACHER:  This would be going

 9  much faster if Emily were here.  History lesson.

10          THE REPORTER:  Sometimes I cannot hear

11  you, Mr. Schumacher.

12          MR. SCHUMACHER:  Oh, believe me, you

13  don't want to hear me.

14          MR. INGRAM:  No, I think she needs to

15  hear you so all of your comments can go on the

16  record, Mr. Schumacher.

17          MR. SCHUMACHER:  I think you're doing a

18  fine job, Chris.  You heard that, right?

19                      -=0=-

20          (Deposition Exhibit 23 marked.)

21                      -=0=-

22  BY MR. INGRAM:

23      Q.  Mr. Greeson, I've handed you what's been

24  marked as Exhibit 24, which is an email from

1    Scott Myers to you, dated August 23rd, 2016.

2    And again, this is an email chain, for purposes

3    of the record.  Do you see that?

4        A.  Yes.

5        Q.  Mr. Myers was a member of City Council

6    at the time, correct?

7        A.  Yes.

8        Q.  And --

9            MR. SCHUMACHER:  Have you had a chance

10   to read it?

11           THE WITNESS:  Give me one more minute,

12   please.

13           MR. INGRAM:  Sure.  Sorry.  I thought he

14   had already read the email chain.

15       A.  Okay.

16       Q.  Turning to the second page of Exhibit

17   24, there is an email from David Robinson to

18   you, CC'ing Bonnie Michael.  Do you see that?

19       A.  Yes.

20       Q.  Do you recall receiving this message?

21       A.  I recall the meeting.  I don't recall

22   the specific message.

23       Q.  When you're referring to the meeting,

24   which meeting are you referring to?

1      A.  I believe the meeting of 8-24, or

2  meetings in that time frame.

3      Q.  And who was that meeting with?

4      A.  Representatives of WARD, OWA, and then I

5  believe Mr. Robinson.  Members of the community,

6  I should say, that were interested in the UMCH

7  project.

8      Q.  And Mr. Robinson, is this David

9  Robinson, the current president of the City

10  Council of Worthington?

11      A.  Yes.

12      Q.  And beneath his signature line of his

13  email it says, Keep Worthington Beautiful in

14  italics.  Do you see that?

15      A.  Yes.

16      Q.  What was Keep Worthington Beautiful, or

17  what is it?

18      A.  Keep Worthington Beautiful was a -- was

19  a campaign -- well, that was the nomenclature or

20  marketing slogan, whatever you would call it --

21  I'm not sure -- of the group that led a process

22  to amend the charter, which was Issue 38 on the

23  ballot and extended the time frame in which

24  signatures could be collected to place on the

1    ballot, voter consideration of a zoning

2    amendment.

3        Q.  And at this time Mr. Robinson was not on

4    City Council, correct?

5        A.  I don't believe so.  I can't remember

6    the exact date he got elected, but no, I don't

7    think so.

8        Q.  And based on your meetings with

9    Mr. Robinson, what was his role within the Keep

10   Worthington Beautiful campaign or whatever you

11   want to call it?

12       A.  I don't think I'm the one that can

13   define his role.  He was one of the leaders, I

14   would -- what that entailed, you'd have to ask

15   him.

16       Q.  Sure.  He was reaching out to you and

17   had met with you and obviously discussed the

18   UMCH property?

19       A.  I had not had extensive conversations

20   with Mr. Robinson about the property.  He was,

21   sometime in this time frame, beginning to join

22   kind of some of the conversations that had been

23   ongoing, mostly questions that I was getting

24   from other citizens and that kind of had formed

1  themselves in groups like WARD and OWA.  And so

2  he was an additional citizen part of those

3  groups that were, you know, cross-collaborating

4  and asking city officials questions.

5      Q.  Sure.  And looking at his email to you

6  in Exhibit 24, one of his questions is about

7  what an eventual park or green space would look

8  like on the UMCH property, fair?

9          MR. SCHUMACHER:  Did he ask that

10  question?

11      A.  I think he says the opposite.  So

12  questions about -- I'm reading from the second

13  page of the document you provided me.  It says,

14  questions about what an eventual park would look

15  like or how green space fits in with other goals

16  are premature at this point since they can only

17  be addressed after the residents obtain and

18  study the information we have requested.  And

19  there was a bunch of information they requested

20  that I had to take a while to compile and

21  respond to.

22      Q.  And what were their questions about that

23  you were compiling and responding to?

24      A.  I would have to review the record to

1  answer that question specifically because there

2  was a volume of questions.  It included

3  financial information, planning information, and

4  then more generally kind of the conceptual

5  options that are available to cities, you know,

6  when dealing with, you know, property

7  redevelopment.

8     Q.  Those questions did include, however,

9  questions about locating a park or additional

10  green space on the UMCH property, correct?

11    A.  Again, I would have to review the memos

12  that I wrote in response to them to recall the

13  specific questions that they answered -- they

14  asked.  But that was one of their interests.

15    Q.  Okay.  All right.  That being one of

16  their interests, you're referring to their

17  interest in a green space or park; is that fair?

18    A.  Yes, and how cities accomplish that as

19  part of -- either as part of development or

20  strategies for accomplishing that as well as

21  other goals.

22    Q.  And I think, if we turn to Councilman

23  Myers' email to you, he seems rather frustrated

24  that they're referring -- they being

1  Mr. Robinson refers to green space and park, but

2  doesn't define what that even means.  Do you see

3  that?

4       MR. SCHUMACHER:  Objection.  What's the

5  question?  If he sees that?

6    Q.  You can answer, Mr. Greeson.

7       MR. SCHUMACHER:  Because you didn't

8  quote that exactly.

9    A.  I'm sorry, I was reading while you were

10  asking.

11       MR. SCHUMACHER:  Excuse me.  I'm

12  objecting because you didn't quote it exactly,

13  and now you then asked him a question if he sees

14  it.  So all I want to know is, what are you

15  asking him?

16       MR. INGRAM:  Well, counsel, my question

17  was clear, was straightforward.

18       MR. SCHUMACHER:  No, it wasn't.

19       MR. INGRAM:  I'm not going to sit here

20  and read documents to him and ask him whether I

21  read it correctly or not.  There's a waste of

22  time.

23       MR. SCHUMACHER:  No.  You --

24       MR. INGRAM:  Can you let me finish

1    talking before you start?

2           MR. SCHUMACHER:  Yes.  Please do.

3    Please.

4           MR. INGRAM:  We're not going to sit

5    here -- I'm not going to read statements or

6    content from these exhibits and ask the witness

7    whether or not I read it correctly.  All I am

8    doing is directing his attention to the portion

9    of the document.

10          MR. SCHUMACHER:  Are you finished?

11          MR. INGRAM:  Go ahead.

12          MR. SCHUMACHER:  You misquoted the

13   document and then asked him if he sees that.

14   That question is imprecise.  If you're asking

15   him if he sees the quote in the document, that's

16   a different question.  But you can't misquote

17   the document and then say, do you see that.  All

18   right?  That is a misleading question.  So all

19   I'm saying is if you want to ask him if he sees

20   a sentence of the document, please do so.  Don't

21   misquote the sentence and then ask him if he

22   sees that.

23          MR. INGRAM:  Counsel, I have never said

24   I was quoting the document, number one.  Number

1    two --

2          MR. SCHUMACHER:  That's true.

3          MR. INGRAM:   -- if you would stop with

4    the speaking objections and just object to the

5    form, this could really go a lot faster.

6    BY MR. INGRAM:

7       Q.  Mr. Greeson, do you understand my

8    question?

9          MR. SCHUMACHER:  I'd like to make sure

10   the record is clear.

11      A.  No, I don't, because my ability to

12   multitask is apparently not as good as I thought

13   it was.  I was trying to read and listen to you

14   at the same time, which I was unsuccessful at.

15   Could you repeat your question?

16      Q.  All right.  Have you had an opportunity

17   to review Mr. Myers' email to you on Exhibit 24?

18      A.  I have read it as it is in front of me

19   here today.

20      Q.  Reading his email, at least to me he

21   appears frustrated.  Do you agree with that?

22          MR. SCHUMACHER:  Objection.

23      A.  I'm not going to characterize Mr. Myers'

24   posture on this email.

·1· · · · Q.· Okay.· He's making reference to

·2· ·Mr. Robinson's use of the terms green space and

·3· ·park.· Do you see that?

·4· · · · A.· Yes.

·5· · · · Q.· And Councilman Myers is noting that

·6· ·Mr. Myers doesn't define what that means, what

·7· ·he's referring to as either a green space or

·8· ·park.· Do you see that?

·9· · · · · · MR. SCHUMACHER:· Objection.

10· · · · A.· I do see that.· I think he's having a

11· ·hard time discerning what would satisfy his

12· ·constituents.

13· · · · Q.· "His constituents" being Mr. Robinson?

14· · · · A.· "His constituents" being all of the

15· ·voters of Worthington, of which at the time

16· ·Mr. Robinson was one.

17· · · · Q.· He goes on to say that they still want

18· ·us to do all their work with no real guidance of

19· ·what they want.· Do you see that?

20· · · · A.· I do see that.

21· · · · Q.· What was your understanding of what

22· ·Mr. Robinson wanted the city to do?

23· · · · · · MR. SCHUMACHER:· Objection.

24· · · · A.· There's a timing issue here.· I'm not

1  sure at this time.  I can say that members of

2  the group that I met with -- and I would put

3  Mr. Robinson in that category -- were desirous

4  of, you know, a significant park and believed

5  that the work we had done on the comprehensive

6  plan did not reflect a community consensus and

7  was, you know, not the right strategic

8  direction.

9        And so not all -- I don't think you can

10  characterize all people that were involved in

11  WARD and OWA and Keep Worthington Beautiful as

12  having the same thought process.  Although they

13  worked together, they may have different

14  opinions, but I think he was interested in a

15  significant park space.

16    Q.  And a significant park space being on

17  the UMCH property?

18    A.  Yes.  And -- and disagreed probably with

19  some of the strategies and goals outlined in the

20  comprehensive plan and reflected a body of

21  people in the community that thought differently

22  about that than maybe others.

23        Again, it was a center of a lot of

24  controversy, very context sensitive site, a lot

1   of people cared about -- and still care about

2   what happens to it.  So central to the future of

3   the city.  And there were strongly held beliefs

4   about the directions we would take.

5           So my posture at the time was to -- just

6   be clear about it, my posture at the time was --

7   we're talking 2016.  There was no development

8   application by UMCH or Lifestyle, whoever was in

9   control of it at the time.  And I was trying

10  to -- they weren't very -- you know, they

11  weren't communicating.  I'm not sure there was

12  anything that they had put out there that the

13  community could absorb.  So we were fielding

14  questions, trying to answer questions, and

15  provide information that might inform the public

16  dialogue about the future of, you know, what the

17  city -- the future of the property and the

18  city's position towards it.

19          And so I felt obligated at the time to

20  respond to citizens' questions and at least meet

21  with them and help, you know, create a better

22  climate for good decision-making.

23      Q.  Okay.  And Exhibit 23 is from the 2016

24  time frame.  Do you recall that Lifestyle had

1    previously provided the community with

2    conceptual plans and held a large public meeting

3    at the WEC in around the 2015 time frame?

4        A.  Yes.  Here we were maybe a year later.

5        Q.  Give or take.

6        A.  Yeah.  And -- yes, give or take.  Not

7    recalling the specific date of the meeting at

8    the WEC.  And they had, you know, not come

9    forward with anything new, that I recall.

10            MR. SCHUMACHER:  Objection.

11       A.  "They" being --

12            MR. SCHUMACHER:  Go ahead.  I'm sorry.

13       A.  "They" being Lifestyle.  Representatives

14   of Lifestyle or anybody else from UMCH, there

15   was nothing new under the sun, and so,

16   therefore, I think members of the community were

17   starting to ask questions, wondering what the

18   future would be, and suggesting that, you know,

19   potentially our planning was flawed.

20            Now that I provided that answer, I'm

21   going to go use the bathroom real quickly,

22   because I've obviously had more coffee than

23   everyone else.

24            MR. INGRAM:  All right.  Let's take a

1    break.

2          (Recess.)

3    BY MR. INGRAM:

4      Q.  Mr. Greeson, we are back from our second

5    break.

6      A.  I'll drink a little less.

7      Q.  When did the city first become aware of

8    Lifestyle's interest to purchase the UMCH

9    property?

10          MR. SCHUMACHER:  Objection.  The city,

11    or Mr. Greeson?

12      A.  I can't recall specifically.  In and

13    around the time we adopted the 2014

14    comprehensive plan amendment, I think.

15      Q.  So clearly before the meeting at the

16    WEC?

17      A.  Oh, yes.  Yes.

18      Q.  And do you recall how the city learned

19    of Lifestyle's involvement with the property?

20      A.  I don't have a specific recollection of

21    it.

22                      -=0=-

23          (Deposition Exhibit 24 marked.)

24                      -=0=-

1    BY MR. INGRAM:

2        Q.  Mr. Greeson, I've handed you what's been

3    marked as Exhibit 24, which is an email from Lee

4    Brown to you, dated January 18, 2018.  Do you

5    see that?

6        A.  Yes.  I'd like a chance to finish

7    reading it, please.

8        Q.  Sure.

9            Have you read the --

10       A.  Yes, I have.  I've read the memo you put

11   in front of me, Exhibit 24.

12       Q.  Exhibit 24 is an email --

13       A.  Yes.

14       Q.   -- from Mr. Brown to you, correct?

15       A.  Yes.

16       Q.  And the subject of the email is UMCH

17   talking points, correct?

18       A.  It is.

19       Q.  And so is Exhibit 24 something that you

20   would have -- an email that you would have

21   received and reviewed from Mr. Brown?

22       A.  Yes.

23       Q.  Do you recall this particular

24   circumstance in which Lifestyles was seeking to

1    split off 5 acres of the property for a

2    development?

3         A.  I generally recall the issue.  I didn't

4    remember the specific email.

5         Q.  Sure.  And what do you recall from that

6    issue?

7         A.  Basically what's outlined here in

8    Exhibit 24, and that they didn't pursue that, to

9    the best of my recollection, but that we --

10   Mr. Brown did his job, which was to communicate

11   with interested parties about what the

12   requirements and the codified ordinances

13   would -- would need to be followed.

14        Q.  Okay.  And do you recall why the 5 acres

15   depicted on the second page of Exhibit 24 were

16   not ultimately split off or why this was not

17   completed?

18        A.  I don't specifically recall, although

19   you might produce something that jogs my memory.

20   I don't specifically recall.

21        Q.  Okay.

22                    -=0=-

23          (Deposition Exhibit 25 marked.)

24                    -=0=-

1            MR. SCHUMACHER:  That's a jump.

2   BY MR. INGRAM:

3       Q.  Mr. Greeson, I've handed you what's been

4   marked as Exhibit 25, which is an email chain,

5   and I'm going to focus on the email from you to

6   members of City Council and others dated March

7   31st, 2020, the subject of which was the

8   OhioHealth UMCH project formal withdrawal of

9   zoning application.  Do you see that?

10      A.  Yes.

11      Q.  And do you recall sending this email?

12      A.  I don't have a specific recollection of

13  sending this email, but I did, and it would be

14  the type of thing I might provide to council in

15  order to inform them about what was happening --

16  important things that were happening in the

17  community.

18      Q.  Okay.  Did you have conversations with

19  anyone from OhioHealth about the zoning

20  application for their use of the UMCH site?

21      A.  I believe I was in some meetings related

22  to this application, not all of them.  And

23  yes -- so the answer to your question is yes,

24  although I don't have a specific recollection of

1    which meetings on what date or the content of

2    those meetings.

3        Q.  Sure.  Just generally, you're referring

4    to meetings, plural.  Were there a lot of

5    meetings?  How many meetings --

6        A.  You would have to ask Mr. Brown.  I

7    don't have a specific recollection.

8        Q.  And that was going to be my next

9    question.  Who would have joined you in those

10   meetings from the city?

11       A.  The staff that were involved in

12   development review, Mr. Brown, and potentially

13   others depending on -- well, let me back up.

14   OhioHealth had two forays into this site and

15   interest in the site.  One was first -- or this

16   area.  The first one was potentially developing

17   a smaller office building and stand-alone

18   ER/urgent care kind of thing in the parking lot

19   of the West Ohio Conference, which was later

20   subdivided from the larger UMCH property.

21           Then they also looked at the corner of

22   Larrimer and High Street, which I think is

23   what's being referenced here.  And so the staff

24   worked with OhioHealth in both iterations, one

1   of which would have not required a rezoning.  It

2   would have been a subdivision.  And then a

3   larger building that did require rezoning on the

4   corner.  And I think in both instances, you

5   know, were supportive, and we worked with them

6   professionally and diligently through the

7   process, as we would with anybody.

8       Q.  And with respect to OhioHealth's

9   rezoning application to utilize the corner of

10  Larrimer and High Street --

11      A.  Yes.

12      Q.   -- that's part of the UMCH property, or

13  the UMCH site, correct?

14      A.  Yes.  There were two homes that weren't

15  part of it that it's my understanding LC has

16  purchased.  I don't specifically recall when

17  they purchased those in relationship to this

18  OhioHealth project, but yes, the corner -- the

19  vacant land at the time, that corner is part of

20  the UMCH site.

21      Q.  And the corner from Larrimer and High,

22  would that project for OhioHealth have required

23  the rezoning?  I'm trying to decipher which of

24  the two projects you referenced would have

1  required the rezoning.  That's all.

2      A.  So I don't have a recollection of the

3  technical issues associated with this project.

4  You'd have to ask Lee about that and why it

5  required a rezoning and what pieces, you know,

6  triggered that or caused that.  But yes, we

7  worked with them.

8      Q.  And chronologically, you referenced two

9  OMCH proposals for this property, the UMCH

10  property?

11          MR. SCHUMACHER:  Excuse me.  OMCH?

12          MR. INGRAM:  Strike that.  Let me start

13  over.

14          MR. SCHUMACHER:  See, I'm listening.

15  BY MR. INGRAM:

16      Q.  You referenced two OhioHealth projects

17  for use of the UMCH site.  Just chronologically,

18  which came first, the Larrimer and High project

19  or the other project?

20      A.  My recollection, subject, you know, to

21  looking at the record, was that the project that

22  would have been placed in what is now a portion

23  of the West Ohio Conference's parking lot came

24  first.  Second came the corner of Larrimer and

1   Longfellow.  And then somewhere in there the

2   West Ohio Conference exercised what I presume

3   was their right under whatever contractual

4   relationships exist between them and UMCH to

5   split off the land that they sit on, making the

6   parent parcel smaller.

7        Q.  Because it was 40-something acres and

8   now it's 37?

9        A.  Correct.  So the frontage on High Street

10   and the overall acreage is smaller as a result

11   of that decision.

12        Q.  And earlier you said that we supported

13   OhioHealth's projects.  Who's the "we" that

14   you're referring to?

15        A.  Yeah.  Let me characterize that.

16   Basically staff.  I think we thought it was

17   consistent with the -- we thought the existing

18   zoning supported commercial development in that

19   area and was appropriate use for that corner.

20   But I don't -- what I don't recall is whether it

21   ever led to any specific recommendations.  My

22   memory is that at least one of those was

23   prepared to be put on the agenda and -- for

24   voting before it was withdrawn, and then, you

1  know, I think OhioHealth had done community

2  engagement and, you know, discussed the issue

3  fairly openly and were, you know, moving towards

4  more formal decisions before they withdrew.

5      Q.  And do you recall the circumstances that

6  led to the withdrawal of the application?

7      A.  I can't specifically remember at this

8  point.

9      Q.  Do you know why they did?

10      A.  My indirect understanding, not based on

11  direct knowledge, is that they couldn't reach

12  terms with Lifestyle.  But I'm not party to that

13  conversation, so I don't know directly.

14      Q.  And what is your indirect knowledge

15  based on?

16      A.  I don't remember.

17      Q.  Okay.  Just something you think you

18  heard or --

19      A.  Yes.

20      Q.  Do you recall from whom?

21      A.  No.  I don't recall there was any

22  specific concern with the city.

23                    -=0=-

24          (Deposition Exhibit 26 marked.)

1                    -=0=-

2  BY MR. INGRAM:

3     Q.  I've handed you what's been marked as

4  Exhibit 26, which is an email from you to

5  members of council and others from the City of

6  Worthington.

7     A.  Give me one more second.

8     Q.  Okay.

9         MR. SCHUMACHER:  (Indiscernible.)

10        THE REPORTER:  I'm sorry?  Excuse me?

11        MR. SCHUMACHER:  I'm talking to my

12  co-counsel.  Sorry.

13    A.  Okay.  Thank you.

14    Q.  Mr. Greeson, Exhibit Number 26 is an

15  email from you to members of Worthington council

16  and other folks from Worthington, dated April

17  19, 2016.  Do you see that?

18    A.  I do.

19    Q.  And the subject was the UMCH update?

20    A.  Yes.

21    Q.  I think I just grabbed the exhibits out

22  of order.  I meant to show you this one first

23  chronologically.  There's a reference here to

24  the proposed 30,000 square foot Ohio medical

1    office facility on High Street.

2        A.  Are we talking about 26?

3        Q.  26.  Yes.

4            MR. SCHUMACHER:  Exhibit.

5        A.  Exhibit 26.  Yes.  That's the project in

6    the parking lot of the West Ohio Conference, as

7    I described earlier.

8        Q.  Okay.  And so when you were -- when you

9    described the two different proposals, the first

10   one in time would have been the project outlined

11   in -- or you summarized in Exhibit 26, fair?

12       A.  Yes.

13       Q.  Okay.  And then the second proposal had

14   an actual formal application, and that's the

15   proposal at Larrimer and High Street, which is

16   referenced in Exhibit 25; is that accurate?

17       A.  So you'll have to ask Lee or look at the

18   record.  The 30,000 square foot OhioHealth

19   medical office facility may have also had a

20   formal application, but if my memory serves me

21   correct, it would have been a subdivision, not a

22   rezoning application.

23           I want to correct you.  No, they may

24   have both -- they may have both had formal

1  applications.  They're just applying for

2  different things.

3      Q.  Got it.  So there was only one rezoning

4  application that you were referencing earlier;

5  there may have been another type of approval

6  associated with the first project?

7      A.  That's what my memory is.  Again, I

8  think Mr. Brown would -- or the record might

9  clarify that.

10     Q.  And do you know what happened with

11 OhioHealth's first proposal that's referenced

12 here in Exhibit 26, why that didn't go forward?

13     A.  My memory is that the West Ohio

14 Conference decided to exercise whatever

15 authority they had related to their property and

16 to go ahead and purchase it and subdivide it off

17 from the larger UMCH parcel and ultimately

18 concluded it wasn't interested in moving forward

19 with part of their parking lot being developed.

20         Obviously, as city manager, I'm not

21 party to the private conversations between the

22 West Ohio Conference, the United Methodist

23 Children's Home, and Lifestyle, if they were

24 involved.  But I think the zoning and

1    subdivision laws weren't the issue.  I think the

2    issue was, you know, private.

3         Q.  Okay.  But do you have any direct

4    knowledge of what the issue was?

5         A.  I was not directly involved in it, no.

6         Q.  And did the West Ohio Conference

7    ultimately, then, continue to use the portion

8    that they subdivided; in other words, are they

9    still there today?

10        A.  I believe they are still here today.

11                    -=0=-

12        (Deposition Exhibit 27 marked.)

13                    -=0=-

14   BY MR. INGRAM:

15        Q.  Mr. Greeson, I've handed you what's been

16   marked as Exhibit 27, which is a memorandum from

17   Management Partners to you and Robyn Stewart,

18   dated April 2nd, 2018, with Bates numbered

19   Worthington 55122 through 55159.  Do you see

20   that?

21        A.  Yes, I do.  Can you give me -- this is a

22   substantial document.  Can you give me just a

23   few minutes?

24        Q.  Sure.  If you want to skim through the

·1· document and refamiliarize yourself with it.

·2· I'm not going to ask you a significant number of

·3· questions about the content of the memorandum,

·4· but take as much time as you like.

·5· · · · A.· Okay.· Thank you.

·6· · · · · · Okay.

·7· · · · Q.· Mr. Greeson, have you had an opportunity

·8· to review all of Exhibit 27?

·9· · · · A.· I have skimmed it, not read it

10· thoroughly.

11· · · · Q.· Okay.· It's our understanding that City

12· Council holds annual retreats.

13· · · · A.· Not always annual.

14· · · · Q.· Okay.

15· · · · A.· But periodic.

16· · · · Q.· Okay.· And do you recall, did City

17· Council conduct a retreat in 2018?

18· · · · A.· Yes.

19· · · · Q.· Okay.· And would this Exhibit 27, the

20· memorandum from Management Partners, have been

21· in connection with one of City Council's

22· retreats?

23· · · · A.· Yes.

24· · · · Q.· Okay.· Why did City Council hold these

1    retreats?

2        A.  I don't recall the specific one.  What

3    the rationale is, one, because it's a good

4    practice.  Two, often to build relationships,

5    develop priorities or focuses for the year, to

6    work through issues, if there are any that need

7    to be specifically discussed in a retreat

8    setting, and to spend time outside of a formal

9    council meeting where there's business decisions

10   that need to be made, you know, to talk about

11   strategic direction, goals, how we work

12   together, and how we can work better together.

13       And so this report reflects a lot of

14   conversation, as you can see, about council

15   expectations of staff, how council wants to work

16   together and a variety of things that the city

17   was working on at the time.

18       Q.  And these City Council retreats are

19   considered public meetings?

20       A.  Yes, always public meetings.

21       Q.  Are records kept from what's discussed

22   at those public meetings?

23       A.  This is the record in summary or

24   minutes, I believe, if you will, of the meeting.

1    Q.  Okay.  And members of council attend the

2   meeting -- the retreats, obviously.  And what

3   city staff attends?

4    A.  Different at different times.  So

5   sometimes it's just been the manager and the law

6   director, a few key staff.  Sometimes it's the

7   entire directors group, so all of the department

8   directors.  Other times it's been like Friday

9   night just the council and management, and then

10   Saturday the directors would come in.  So it's

11   varied.  It depends on what we're discussing.

12   And I don't specifically recall the attendance

13   of --

14    Q.  Sure.  I'm asking you generally.

15    A.  Yes, generally.

16    Q.  Does anyone from the city maintain

17   records as far as who attended the particular

18   retreat or what was discussed, things of that

19   nature?

20    A.  Exhibit 27 is the City's record.

21    Q.  Okay.

22    A.  There may also be additional records

23   that reflect who was there and, you know, what

24   was done, but I don't know that I can speak to

·1· ·those at this point.

·2· · · ·Q.· So Management Partners is obviously a

·3· ·third party or a consultant, correct?

·4· · · ·A.· Yes.

·5· · · ·Q.· And so the city, I take it, from time to

·6· ·time utilized facilitators for these retreats;

·7· ·is that fair?

·8· · · ·A.· Yes.

·9· · · ·Q.· And the city is relying on the

10· ·facilitator to provide the written record or the

11· ·notes for council's benefit; is that fair?

12· · · ·A.· Yes.

13· · · ·Q.· Did City Council utilize a facilitator

14· ·at all of its annual retreats?

15· · · · · ·MR. SCHUMACHER:· You're asking during

16· ·his tenure?

17· · · · · ·MR. INGRAM:· Yes.

18· · · ·A.· I don't have a specific recollection of

19· ·one that we didn't use it, but there may have

20· ·been a time we didn't use one.

21· · · ·Q.· Okay.

22· · · ·A.· In most instances we used a facilitator,

23· ·not always the same one.

24· · · ·Q.· And with respect to the retreats where

1    you would have used a facilitator --

2        A.  Yes.

3        Q.  -- would you have expected the

4    facilitator to provide a written summary of that

5    particular retreat, like we have here in Exhibit

6    27?

7        A.  Yes.  I'm not sure if there are any

8    instances where we didn't require that, but in

9    most instances I believe we relied on a

10   facilitator to give some summary.  And I can

11   think of four different facilitators we used

12   over the course of time.

13       Q.  And who are they?

14       A.  Jane Dockery, who at the time worked at

15   Wright State.  Marty Jenkins, who is

16   Organizational Resources Group, which he helped

17   develop the council expectations document that's

18   on the back pages of Exhibit 27.  Management

19   Partners.  Julia Novak from now Raftelis Novak

20   Consulting.  And Herb Marlowe, a company called

21   Analytica.  So that's more than four.  That's

22   five.

23       Q.  Very good memory.

24           And who would these facilitators provide

1  their retreat summaries to?  Would that be to

2  you in each instance?

3      A.  I believe so.

4      Q.  And with respect to the items that are

5  discussed at the City Council's retreats, who

6  selects what's going to be discussed at the

7  retreat?

8      A.  That's a good question.  They usually

9  emerge from a set of interviews that the

10  facilitator conducts, and then it's not always

11  issues, it's -- well, as you can tell here, we

12  framed it -- I don't have the agenda for this,

13  but there would be an accompanying agenda

14  probably, and it would have been -- it would

15  have -- we would have framed an agenda rooted in

16  the kind of themes that were heard from the

17  facilitator's interview of the participants, and

18  identified the things that needed to be focused

19  on in broad categories and that would have

20  formed kind of the steps of the -- of the

21  process.

22      Q.  Okay.  So if I'm following you, the --

23      A.  It would have been generally myself, the

24  facilitator, and the council president who would

1  have talked about how the weekend was going to

2  go.

3      Q.  So the facilitator would have

4  interviewed members of council, like each of the

5  members?

6      A.  Yes.

7      Q.  And would have --

8      A.  Maybe not in every instance, but in most

9  instances.

10     Q.  And would have been working with you and

11 any other city staff to identify what issues

12 were of interest or to be discussed at the -- at

13 that particular retreat?

14     A.  Yes.  And not always specific issues,

15 but themes that were coming out of it, like we

16 need to talk about council/staff relations, or

17 we need to talk about, you know, sustainability,

18 or what are the topics that we need to focus on.

19     Q.  And would that written agenda be shared

20 with the meeting participants before the

21 retreat?

22     A.  I think so, but I can't specifically

23 recall.

24     Q.  Would it have been -- would it be posted

1    publicly anywhere?

2        A.  I don't believe so.

3        Q.  And then where were these retreats

4    typically held?  Is there like one spot each

5    year?

6        A.  No.  Often -- often the WEC.  We've held

7    them at different places over the years.  Always

8    in the City of Worthington.

9        Q.  Okay.

10       A.  Yeah.  We've held them at the community

11   center.  We've held them at the educational

12   center.  We've held at least one at Linworth

13   Experiential School, and one at the Griswold

14   Senior Center.  So different places, but always

15   in a public facility and an accessible facility.

16   Always properly advertised and meeting the

17   requirements of Ohio law for public meetings.

18       Q.  Now, with respect to the 2018 retreat,

19   based on Management Partners' summary in Exhibit

20   27, the UMCH site was discussed at that retreat.

21   Do you see that at the bottom of page 3?

22       A.  Yes.

23       Q.  I know you just skimmed Exhibit 27.  I'm

24   going to give you a chance here to read a

1    portion here that concerns the UMCH site,

2    please.

3        A.  Okay.  I've read it.

4        Q.  Now that you've read that, do you recall

5    this particular retreat?

6        A.  I recall the retreat.  I can't recall

7    the specific discussion that led to these -- the

8    detailed specifics of what led to these bullets

9    being placed on this page, page 3 here.

10       Q.  Sure.  And there's a -- the bullets

11   you're referencing indicate that they are the

12   desired uses for this site.  Do you see that?

13           MR. SCHUMACHER:  Objection.  That's not

14   what it says.  It says, what are the desired

15   uses for the site?

16           MR. INGRAM:  And then the bullets list

17   it.

18           MR. SCHUMACHER:  Please don't misquote

19   the document.

20           MR. INGRAM:  I wasn't quoting it,

21   counsel.

22           MR. SCHUMACHER:  It sounded like you

23   were.  That's my objection.

24           What's the question, Rhonda?

1                    (Record read as requested.)

2           MR. SCHUMACHER:  Same objection.

3       A.  Yeah.  So I'm not sure what the question

4   is.  This isn't a policy document.  It's a

5   reflection of the conversation that occurred,

6   and so it's not law, it's not engrained in

7   plans.  It's a reflection of the conversation

8   that occurred and a summary of that related to

9   the children's home site.

10      Q.  Okay.  Well, as set forth in Exhibit 27,

11  on page 3 of the memorandum, the summary of the

12  conversation at that annual retreat, this

13  document says that, what are the desired uses

14  for the site?  Attract commercial/mixed-use

15  along High Street, develop park amenity/green

16  space and tree buffer, protect the Tucker Creek

17  area, and then prepare the density analyses

18  scenarios.

19      A.  Yes.

20      Q.  So with respect to the discussion at

21  City Council's retreat concerning the desired

22  uses for this site, were these the city

23  councilmembers' desired uses?  In other words --

24           MR. SCHUMACHER:  Objection.  Were you

1  finished?  I'm sorry.  Had you finished the

2  question?

3      Q.  Who was -- whose input is this

4  summarizing?

5          MR. SCHUMACHER:  Objection.  Compound

6  question.  I assume you wanted him to answer the

7  last question?

8      A.  You want to know whose input this is

9  capturing, right?

10      Q.  Correct.

11      A.  I think this is capturing the dialogue

12  at the meeting and the discussion.  In fact, it

13  says, for each topic, discussion points have

14  been captured and that, you know, these were

15  the -- you know, the things of what I would call

16  major points of consideration.

17      Q.  Okay.  And the portion where you just

18  referenced the input or discussion that was

19  captured was from the workshop involving city

20  councilmembers along with the city manager and

21  the leadership team?  Is that what you're

22  referring to?

23      A.  Again, I don't know -- I don't recall

24  who was specifically in the room beyond the

 1  council and myself at the time.  But yeah, that

 2  would -- there would have been a discussion.

 3  Whether it reflected consensus or not, I don't

 4  remember.

 5      Q.  As far as what was summarized here in

 6  this memorandum, I'm just trying to understand,

 7  is it summarizing City Council's views, is it

 8  summarizing your views, the city leadership

 9  teams, or was it the combination of all three?

10          MR. SCHUMACHER:  Objection.

11      A.  I think it summarizes the discussion and

12  what is important to work on and acknowledges

13  that these are the key aspects of the issue with

14  the United Methodist Children's Home site.  You

15  articulated correctly, I think, the people that

16  were in leadership, to some extent, me and

17  others, council.  I don't remember what

18  directors.  And whether it -- when you say

19  reflects our views, I can't at this juncture

20  remember whether this -- this accurately

21  captures the views of everybody that was in that

22  room.  I know that we use these as documents to

23  kind of guide work, not necessarily -- they

24  don't necessarily decide issues or cement

1  permanently the position of the city, if that

2  makes any sense.

3      Q.  Okay.  And so when you received this

4  memorandum, did you identify any inaccuracies in

5  the summary that was provided; in other words,

6  to the extent the discussion concerning the UMCH

7  site was inaccurate, did you contact Management

8  Partners and tell them to fix it?

9      MR. SCHUMACHER:  Objection.

10     A.  If this is the final document, then I --

11 then I didn't.  I'm not -- I'm not aware that I

12 did.

13     Q.  Are you aware of any revisions or

14 additional drafts of this document?

15     A.  I don't recall.  I don't remember other

16 drafts or whether I suggested modifications to

17 it based on, you know, my -- you know, my

18 hearing a different -- a different thing at the

19 meeting, or they misunderstood the issue that

20 was being discussed.  I generally wanted to

21 always make sure that it accurately reflected

22 the conversation and, you know, that they

23 understood the issue being discussed.

24     Q.  If there were other drafts or revisions

1  to this document, would you expect those to be

2  in writing?

3      A.  I would expect them to be probably in

4  emails transmitted to the city manager's office

5  in some form or fashion.

6      Q.  So we would have those if they existed?

7      A.  You would.

8      Q.  All right.  Staying on that page,

9  there's a bullet point there for the UMCH site,

10  what is the potential for revenue generation?

11  What portion of the discussion is that

12  summarizing, as far as revenue generation?  What

13  does that mean?

14      A.  I would need to look at the timeline for

15  this whole issue.  But there was concern at

16  different times.  It could mean a bunch of

17  things.  Let me talk a little bit about -- so

18  we're -- you know, it's important that there be

19  a balanced -- and I've used that term before --

20  set of uses on properties, any property, but

21  particularly large-scale properties of critical

22  importance in content sensitivity like UMCH so

23  that, you know, uses don't impact, you know --

24  the uses are additive economically and otherwise

1  to the quality of life of the community.  And

2  one of the things we were always concerned about

3  is job growth, office.  You know, I think the

4  comprehensive plan as well as our record says

5  it's really important to -- this is an

6  opportunity to have jobs to produce income tax

7  revenue.  And then anything else, park space,

8  housing, there had to be a balance of those

9  across the site.  So it was economically

10  additive to our community.

11       We were also worried about the cost of

12  serving the -- any developments in the

13  community.  And so, you know, we were starting

14  to wrestle with -- and I can't remember the

15  specific timelines and when it all occurred.

16  But during this process, we were starting to

17  wrestle with what might different scenarios cost

18  the city to serve, police, fire, water lines,

19  sewer maintenance, all of the various ways,

20  trash pickup.  And so there's some potential

21  that we were talking not only about the economic

22  income tax generation, but also thinking about

23  how that revenue generation offset the impacts

24  of service.

·1· · · ·Q.· Okay.· And with respect to these

·2· ·scenarios that you're referring to, there's also

·3· ·listed here the prepared density analyses

·4· ·scenarios.· Is that what you were referring to,

·5· ·or you're referring to something different?

·6· · · ·A.· I don't know what we were specifically

·7· ·referring to in this bullet.· I don't recall.

·8· · · ·Q.· Okay.· Did you or are you aware of any

·9· ·density analysis performed concerning the UMCH

10· ·site after this annual retreat?

11· · · ·A.· Again, I don't recall the timing of all

12· ·of these things, which came first and second.

13· ·But we did a detailed cost-to-serve analysis of

14· ·various development scenarios, and you probably

15· ·have that.

16· · · ·Q.· I'm sorry, what did you call that again?

17· · · ·A.· We did a detailed cost-to-serve

18· ·analysis, which contemplated different

19· ·development scenarios or -- and what the

20· ·corresponding costs associated with providing

21· ·public -- what the potential revenue generation

22· ·was as well as the cost to serve, deliver city

23· ·services.

24· · · · · · Again, we need -- you know, when -- good

1   city managers and financial people and planners

2   and city governments want to make sure that

3   we're -- that we have balance and that we -- and

4   this particular site so critically important, we

5   needed to have a sufficient revenue-producing

6   development to offset the cost to serve any

7   other type of development that might not be

8   revenue producing and demand services.

9        And so housing, for instance, in Ohio,

10  because of our tax structure, demands services.

11  The required trash pickup, city pays all of

12  that.  Some kinds of housing do.  Waterline

13  extensions, you know, street maintenance, all of

14  those kind of things, most forms of housing

15  demand have a cost.  They don't add to the -- in

16  the positive way to the revenue stream.  Office,

17  industrial, commercial tends to add to the

18  revenue stream creating dollars the city can use

19  to provide services and amenities.

20       So we were starting to think through

21  those use scenarios on that site, wrote a

22  cost-to-serve analysis, playing the staff's role

23  of informing public dialogue.  Again, not trying

24  to direct a particular outcome, not trying to

1  drive towards, as a staff, you know, some --

2  some desired policy outcome, but trying to

3  inform what had become a very fractious

4  community conversation about a critical

5  property.

6      Q.  Okay.  With respect to the analysis that

7  was performed, are you testifying that the city

8  had performed a cost-to-serve analysis for all

9  residential housing on the UMCH site?

10     A.  I'm not --

11         MR. SCHUMACHER:  Objection.

12     A.  Clarify that for me.

13         THE WITNESS:  I'm sorry.  I interrupted

14 you.

15         MR. SCHUMACHER:  That's all right.  I'm

16 going to get a document.

17 BY MR. INGRAM:

18     Q.  You mentioned that most residential uses

19 are -- tend to cost more than the revenue that's

20 generated.

21     A.  Yeah, as a general rule of thumb.

22     Q.  But that's not -- so your testimony --

23 or your last response is based on a general rule

24 of thumb, not on any particular analysis?

1      A.  I think you can look at analyses that

2   have been done by other communities that are

3   like Worthington where they hired companies that

4   do these significant detailed analyses, and

5   those reports would show you that those

6   communities, similar to Worthington, that

7   housing -- because Ohio municipalities are

8   dependent on income taxes -- and income taxes,

9   until the work from home era and still, are

10  largely derived from offices, manufacturing

11  sites, and other commercial activity, that that

12  land use is what supports the city's budget and

13  ability to provide services and amenities and

14  quality of life to its residents.  And

15  therefore, you know, we were seeking generally

16  to strike a balance in the community and on this

17  site between things that demanded -- potentially

18  demanded services versus revenue-producing

19  activity.

20      Q.  So my question is a little different.

21      A.  I'm sorry.

22      Q.  That's okay.  I'm just trying to

23  understand, the explanation you just provided,

24  was this explanation based on any specific

1     analysis that the city performed, or are you

2     responding based on the generalizations or rules

3     of thumb from your experience?

4          A.  Both.  I'm responding -- probably my

5     long-winded last answer, humbly, was based on my

6     general rule of thumb and my reading of similar

7     studies that have been done for other

8     communities regarding which land uses generate,

9     you know, what impacts they generate.

10          We also performed a cost-to-serve

11     analysis using some number of scenarios for

12     UMCH.  And I can't quote that one specifically,

13     but I know we did it based on several scenarios

14     for that property's development.

15          Q.  Okay.  And with respect to the UMCH

16     site, did the city ever perform an analysis of

17     any density of apartments or multifamily --

18     multifamily units on that site?

19          A.  I think the cost-to-serve analysis that

20     was conducted by the city includes at least one

21     scenario that has residential density comparable

22     to Lifestyle's 2015 proposal, or concept plan

23     they presented in the community or at the WEC.

24     And you can look at the cost-to-serve analysis

1  to verify that and further clarify it; but...

2      Q.  Were there any -- and you're getting to

3  my next question.  I'm trying to understand,

4  were there any other analyses beyond this

5  cost-to-serve analysis that you're discussing?

6      A.  Not that I specifically recall.  And if

7  there were, that were done by the city, it would

8  have been, you know, internal back of napkin,

9  you know, kind of local government nerds

10  imagining different things.

11         We did not commission, that I remember,

12  or conduct any more extensive evaluation

13  directed by the council or by me.

14      Q.  Okay.

15      A.  I'm aware there's some other scenarios

16  that members of the community conducted that we

17  didn't participate in, although some of our

18  information may have been used.

19      Q.  Okay.  And what are you referring to

20  there, from the members of the community aspect?

21      A.  Well, at some point there was a group,

22  Project Community Park, that produced a document

23  that, from their perspective, evaluated a park

24  acquisition and development scenario on that

1  site.  I did not, nor did any of my staff,

2  participate in that.  Although I think they

3  attempted to rely on information that we had

4  previously provided to the public.

5      Q.  And do you recall any other scenarios

6  from the community?  I'm sorry, analyses.

7      A.  There is a lot of records over the time,

8  over what -- what is this going on, since --

9  since 2007 for me almost.  There may be some,

10  but I just can't specifically recall.

11      Q.  All right.  Just briefly, I wanted to

12  ask you about appendix 3 to Exhibit 27, council

13  expectations.

14      A.  Sure.

15      Q.  You referred to these a few moments ago.

16  Were these council expectations?  What are they?

17  Were they adopted by council?

18      A.  Yeah.  I think they were adopted by

19  council.  Accepted by council might be the

20  better word.  And that would be in the record at

21  some point if they voted on them.  But they were

22  an effort to try to set a -- they're not rules.

23  In other words, they're not -- but they're kind

24  of aspirations for how we were going to work

1    together.

2        Q.  Okay.

3        A.  And something to refer to to guide our

4    own behaviors as we interact in what sometimes

5    can be a difficult environment reconciling

6    different opinions about the future of a great

7    community.

8        Q.  And these expectations, I can see here,

9    have been around since 2008, it looks like, at

10   least?

11       A.  Yeah.  Periodically modified and looked

12   at every time we had a retreat.

13       Q.  What rules govern City Council meetings?

14           MR. SCHUMACHER:  Objection.

15           You can answer.

16       A.  The charter, the codified ordinances,

17   and the council had some adopted rules of

18   procedure, if you will.  I don't remember what

19   we called them.  And Ohio law, of course.

20           MR. INGRAM:  Mr. Greeson, that's all the

21   questions I have for that document.

22           MR. SCHUMACHER:  Oh.  I thought you put

23   a period there.

24           MR. INGRAM:  It's about 12:25.  I don't

1  know if you're hungry, if you want to break for

2  lunch, or you want to keep going.  It's

3  completely up to you.

4          THE WITNESS:  Well, how long are we

5  going?

6          MR. INGRAM:  We're going to go the full

7  day today.  I know I talked to your counsel --

8  or to Mr. Schumacher yesterday and indicated

9  that we probably would go until 5:00 today.

10          THE WITNESS:  Okay.

11          MR. INGRAM:  I can continue forward, or

12  we can take a break.  Is there anything you have

13  today that prevents you from staying till 5:00?

14          THE WITNESS:  No, nothing prevents me

15  from staying till 5:00.  And if we're going to

16  do that, then I think a break is in order

17  because I may need some sustenance.

18          MR. INGRAM:  Yes.  Let's take a break

19  for lunch.

20                      -=o=-

21          Thereupon, the luncheon recess was taken

22  at 12:26 p.m.

23                      -=o=-

24

 1                    OCTOBER 6, 2023

 2                    FRIDAY AFTERNOON SESSION

 3                    1:20 P.M.

 4                    -=O=-

 5    BY MR. INGRAM:

 6       Q.  Mr. Greeson, we're back on the record

 7    after lunch.

 8           I wanted to ask you, earlier we had

 9    talked about any efforts by the city to acquire

10    or purchase a portion of the UMCH property, and

11    we were talking about that in the time frame

12    around 2015.  Do you recall that?

13       A.  I recall our conversation this morning,

14    yes.

15       Q.  Now, later, more recently, are you aware

16    of any efforts or discussions of the city

17    considering purchasing any portion of the UMCH

18    property?  And for a time frame, I'm thinking

19    from 2018 to 2022.

20       A.  Before I left?

21       Q.  Correct.

22       A.  2018 to 2022.  I think there was -- I'm

23    having a difficult time remembering

24    specifically.

1          MR. SCHUMACHER:  Chris, I assume you're

2    talking about other than any negotiations

3    between the parties --

4          MR. INGRAM:  Of course.

5          MR. SCHUMACHER:   -- in the litigation.

6          MR. INGRAM:  Yes.

7          MR. SCHUMACHER:  Thank you.

8       A.  I didn't -- I didn't engage in any

9    dialogue with Lifestyle regarding acquisition,

10   nor did we hire anybody to initiate acquisition,

11   nor do I believe there was any consensus of

12   council to aggressively pursue or actively

13   pursue acquisition.  I know there were some

14   outreach to Lifestyle sometime in early 2022 by

15   Mr. Robinson, that I'm aware of, but I don't

16   recall any specific details of that.

17      Q.  Okay.  What are you aware of as far as

18   the instance of Mr. Robinson reaching out to

19   Lifestyle in 2022?

20      A.  I was aware of it.  I was aware he

21   reached out to Bo Brownlee.  I just don't

22   remember the details of it.  I've had a lot of

23   transition in my life since then.

24      Q.  Were you a party to the conversation

1    that you're referring to between Mr. Robinson

2    and Mr. Brownlee?

3        A.  I wasn't a party to any direct

4    conversations between the two of them that I can

5    remember, and -- but I would have probably

6    talked to Mr. Robinson afterwards or beforehand,

7    but I don't have -- I don't have a recollection

8    of the details of -- my family moved jobs, moved

9    a lot.

10       Q.  Sure.  With respect to purchase or

11   acquisition of Lifestyle's property or the UMCH

12   property during the time frame -- during this

13   time frame now, were you asked to perform any

14   analyses or, I guess, for lack of a better term,

15   due diligence before one would reach out to the

16   landowner?

17           MR. SCHUMACHER:  Excuse me.  I'm sorry.

18   What time frame?

19           MR. INGRAM:  2018 to '22.

20           MR. SCHUMACHER:  2018 to '22?

21           MR. INGRAM:  Yeah.  That's the time

22   frame these questions pertain to.

23           MR. SCHUMACHER:  Thank you.

24       A.  So I don't remember what the -- when the

1   cost-to-serve analysis was, but that was not due

2   diligence related to acquisition.  That was

3   evaluating, informing the public dialogue.  It

4   was a public document.  It was informing the

5   range of options that would be available to the

6   city in terms of just good planning kind of

7   exercise.  I don't think so.  I don't have a

8   memory in that particular time period of any,

9   you know, intense analysis regarding

10  acquisition.  Nor do I think we had a lot of

11  clarity, any clarity, that we would pursue

12  acquisition.  So anything -- we may have, like,

13  what I would call back of napkin, you know, hey,

14  let's run some numbers, you know, kind of

15  curiosity type of things, we may have done as

16  staff.  I don't remember specifically.

17          But we didn't launch a diligent effort

18  to -- based on specific policy direction, to try

19  to acquire the property.  I mean, you know,

20  that's -- you know, I could give you examples of

21  where we did do that, and we didn't do the kind

22  of work that -- you know, appraisals and talking

23  to the owner and hiring real estate advisors and

24  all of that kind of work.  I was wrestling with

1  this because I was trying to remember if there

2  was any kind of staff back of the napkin kind of

3  imagining things kind of effort.  So I'm having

4  a hard time recalling it.

5      Q.  Okay.  You mentioned that you or staff

6  weren't given any clarity.  So were there

7  discussions by individual members of council

8  regarding the potential purchase or acquisition

9  of any portion of the UMCH during this time

10  frame?

11      A.  I can't speak to the specific time

12  frame, but at different junctures over the

13  course of time -- and I can't speak to exactly

14  when -- basically when I thought the property

15  might be in play or, you know, where the

16  strategic -- you know, when something was

17  happening, I raised with council in executive

18  session, you know, things look like they're

19  changing over there.  Is there any interest in

20  us doing anything?  And there's never any

21  consensus.  You know, there was no city-adopted

22  strategy around acquisition over there.

23      Q.  So did you feel like you were being told

24  to do different things, if there's no consensus?

1          MR. SCHUMACHER:  Objection.

2     Q.  I'm trying to understand what you're

3  saying.

4          MR. SCHUMACHER:  Objection.  Asked and

5  answered.  Do you want him to tell you again?

6     A.  Can you repeat, please?

7          (Record read as requested.)

8     A.  No lack of -- lack of -- so, you know,

9  city manager takes his or her direction from the

10  council majority, and so what we look for is the

11  majority of council saying we want to move in a

12  particular way.  And so when you don't have

13  that, you don't move forward.  Or you play the

14  inform, facilitate, provide information, do

15  research kind of role so that you can help the

16  council make informed policy decisions, but you

17  don't move forward.

18          So during the course of this, while

19  there may have been individual members that

20  thought we should acquire or that we should do

21  different things, there was no time in which I

22  was -- majority of council directed me to pursue

23  a strategy that involved that.

24     Q.  So during this --

1      A.  You know, a serious robust effort.

2      Q.  Okay.  So during this 2018-2022 time

3  frame, were there individual members of City

4  Council who were interested in the city seeking

5  to acquire or purchase a portion of the UMCH

6  site?

7          MR. SCHUMACHER:  Objection.  Relevance.

8          Go ahead.  You can answer.

9      A.  Yes.  And I think those are a matter of

10  public record, because I don't think anybody

11  shared with me any insights that they didn't

12  also voice publicly.  Mr. Robinson would have

13  been the best example of one who thought that

14  that was a strategic direction that we should

15  consider and felt very strongly that our

16  comprehensive plan was not the right -- didn't

17  reflect the right strategic direction.  And

18  there was obviously a lot of people in the

19  community that had strong feelings about the

20  uses that were outlined in the -- in the plan.

21  But, you know, he and probably Mr. Smith -- you

22  know, I can't remember all the election cycles.

23  But yeah, there were some councilmembers that,

24  you know, talked about that, both publicly

·1· ·and --

·2· · · ·Q.· How about privately?

·3· · · ·A.· Privately, but I can't remember a

·4· ·specific conversation.· I mean, I can't go back

·5· ·and say that they thought that that would be a

·6· ·good strategic direction, but it never reflected

·7· ·a majority of the council, you know, that we

·8· ·acted upon --

·9· · · ·Q.· So you --

10· · · ·A.· -- that I recall.

11· · · ·Q.· Okay.· So you've identified Councilman

12· ·Robinson and Councilman Smith.· Any other

13· ·councilmembers you recall at this time?

14· · · · · ·MR. SCHUMACHER:· Are we still talking

15· ·about 2018 to '22?

16· · · · · ·MR. INGRAM:· Yes.

17· · · ·A.· I'm trying to think who was on council.

18· ·Councilmember Bucher was on during that time.· I

19· ·don't feel comfortable speaking to the totality

20· ·of his position on this issue.· I didn't have a

21· ·ton of conversations with him about it.

22· · · ·Q.· Okay.

23· · · ·A.· And I'm not going to characterize their

24· ·positions because certainly this was a -- this

1    is an issue that evolved over a long period of

2    time with a lot of public input and a lot of --

3    a lot of, you know, emotional and intense public

4    engagement.  And I think they should reflect

5    their policy thoughts on it, not me.  Bottom

6    line is I don't have a specific memory, unless

7    you jog my memory with some document --

8        Q.  Okay.

9        A.   -- about --

10           MR. SCHUMACHER:  Don't encourage him.

11           THE WITNESS:  I know.

12        Q.  Mr. Greeson, as the city manager, you

13    had lots of public and private interactions with

14    members of City Council.  What about

15    Ms. Kowalczyk?

16           MR. SCHUMACHER:  Objection.  Compound.

17    Which question?

18        A.  I did have interaction with

19    Ms. Kowalczyk.  I don't have a specific memory

20    of a specific interaction with her.

21        Q.  Concerning the acquisition of the UMCH

22    site?

23        A.  Not specific.  Doesn't mean I didn't

24    have them.

1      Q.  You don't recall one way or the other,

2  in other words?

3      A.  Yeah.

4          THE WITNESS:  He's doing it.

5          MR. SCHUMACHER:  Told you not to

6  encourage him.

7          THE WITNESS:  Yeah.

8                      -=0=-

9          (Deposition Exhibit 28 marked.)

10                     -=0=-

11  BY MR. INGRAM:

12     Q.  Handing you what's been marked as

13  Exhibit 28, Mr. Greeson.

14         Mr. Greeson, Exhibit 28 --

15     A.  Bear with me one second here.

16         MR. SCHUMACHER:  He's still reading.

17     A.  Okay.

18     Q.  Now that you've had an opportunity to

19  review this email, Exhibit 28 is an email from

20  you to Councilperson Kowalczyk,

21  K-O-W-A-L-C-Z-Y-K, dated February 28, 2018.  And

22  is Bates stamped Worthington 58435 through

23  58463.  Do you see that?

24     A.  Yes.

1     Q.  Is this an email that you sent

2  Councilperson Kowalczyk?  Do you recognize this

3  email?

4     A.  I don't recall it, but I recognize it as

5  an email I wrote.  Certainly reflects that.

6     Q.  And Exhibit 28, based on your email

7  here, concerns follow-up to a conversation you

8  had with Ms. Kowalczyk related to the UMCH

9  property; is that fair?

10     A.  Yes, it certainly reflects that.

11     Q.  And you provided her with what you said

12  were helpful documents as attachments to this

13  email; is that fair?

14     A.  Yes.  Looks like she might have been

15  preparing for something.  And I provided

16  information -- obviously, I told her that we had

17  a ton of information available, but looks like I

18  provided her four things that I thought she

19  would benefit from reading.

20     Q.  I want to direct your attention to the

21  last paragraph of your email here on Exhibit 28

22  where you say, these are some thoughts on the

23  fund balance, which is the question you raised.

24  As far as strategies for ensuring green space,

1    there is a simple overview of three approaches

2    to this in the attached draft framework

3    document.

4           Do you see that?

5       A.  Yes, I do see that.

6       Q.  Do you recall now the discussion you had

7    with Councilperson Kowalczyk?

8       A.  I still don't recall it.

9       Q.  Okay.  And if you could turn to the

10   draft framework document you're referencing.

11   Where are the three approaches you're referring

12   her to in that framework document?

13      A.  I wrote the framework document; however,

14   I would have to re-read it to answer your

15   question.

16      Q.  All right.

17      A.  Because it appears I wrote it in 2016.

18      Q.  Okay.  Fair enough.  How about this,

19   let's start with -- so you drafted the framework

20   document?

21      A.  Yes.

22      Q.  Okay.  Starting at Bates page number

23   58457 of Exhibit 28.  Did anyone assist you in

24   drafting this framework document?

1      A.  I don't recall specifically.  It would

2  be a normal practice of mine to have some other

3  staff review my, you know, work, just to make

4  sure it makes sense, but I don't have a memory

5  of who might have done that or whether they did

6  it or not.

7      Q.  Okay.

8      A.  Whether that was done, I should say,

9  with better grammar.

10      Q.  Well, the fact that this document was

11  created in 2016, but you're attaching it to a

12  2018 email, would this be likely the last

13  version of -- or last draft, I should say, as

14  of -- you know, for that document?

15      A.  I don't know the answer to that.  I

16  remember working on it.  I don't believe I

17  picked it up after I completed it --

18      Q.  Okay.

19      A.  -- and re-did it some years later.  It

20  kind of rested.

21      Q.  Did anyone ask you to prepare this

22  framework for moving forward?

23      A.  Yeah.  So this -- again, I talked

24  earlier -- I talked earlier about the manager's

1  role in informing and facilitating, providing

2  information and framing policy options for not

3  only the council but the community.  This

4  document came out of dialogue with community

5  groups and council leadership where we were

6  getting a lot of questions.  And so we were

7  being asked questions about, you know, city

8  finances and our fiscal capacity to do things,

9  always recurring conversation in Worthington,

10  and about, you know, what the strategic paths --

11  what might be different strategic paths for

12  UMCH.  And this -- in fact, I think you asked me

13  some questions about some of the meetings that

14  we held with community groups earlier in the

15  day.  This came out of that dialogue and was an

16  attempt by me to kind of inform the discussion

17  that people were having.  It was not -- it was

18  not aimed at trying to drive a particular

19  outcome, but to help educate people on how

20  cities might approach different things,

21  different options, and some of the

22  considerations of each of those options.

23      Q.  Okay.  When you were preparing or

24  creating this framework, did you consult with

1    UMCH about it?

2        A.  I don't think I did.  No, I don't

3    believe I did.

4        Q.  And when you were preparing this

5    framework, did you consult with Lifestyles about

6    it?

7        A.  No.  I believe I consulted myself.  But

8    I certainly viewed this as a public document,

9    not as something that was aimed at anything but

10   informing my council and the public dialogue.

11   And in 2016, and probably all the way to 2018

12   and beyond, you know, Lifestyles had no

13   significant proposal.  The last time we had

14   heard from them on any large scale proposal was

15   in -- I believe that was 2015.  And so the

16   community was left -- other than the OhioHealth

17   and the smaller subdivision question, the

18   community was left to wonder what was going to

19   be the future of the larger UMCH property, and

20   certainly policy dialogue about that is

21   appropriate.

22       Q.  Okay.  But in connection with, in 2016,

23   determining what was to become of the property,

24   you didn't consult either UMCH or Lifestyles?

1      A.  Repeat the question again.

2          MR. INGRAM:  Read it back, please.

3          (Record read as requested.)

4      A.  Well, first of all, I wasn't determining

5  what was happening with the property.

6      Q.  My question is a little different.

7          MR. SCHUMACHER:  Let him finish his

8  answer.

9      A.  Well, I actually want to hear the

10  question again, then, because --

11      Q.  Well, you just previously said that the

12  community was wondering what was going on with

13  the property?

14      A.  Right.

15      Q.  In other words, what they're going to do

16  with it, they being either Lifestyle or UMCH,

17  right?

18      A.  Yes.

19      Q.  And so you're preparing this framework

20  in response or in connection with the community

21  dialogue that you just described, right?

22      A.  Right.

23      Q.  But you never consulted with or talked

24  to either UMCH or Lifestyles about what they

1    intended to do with the property?

2        A.  I don't recall consulting them

3    specifically about drafting this.  In reviewing

4    it, I clearly had some knowledge about what they

5    were doing, because I reflect that in the

6    paragraph, and there's a discussion about

7    OhioHealth in here.  So I may have had some

8    knowledge of what they were doing that I

9    reflected and shared, and I did that in the

10   background section, but I didn't -- I didn't --

11   I didn't engage them in writing what I thought

12   were options available to the city.  I

13   imagine -- I'd have to review all that, but I

14   suspect that I caveated everything in here, and

15   nor would I normally.  I wouldn't normally

16   consult a developer to outline what all our

17   policy options are as a city.

18       Q.  Okay.

19                      -=0=-

20       (Deposition Exhibit 29 marked.)

21                      -=0=-

22   BY MR. INGRAM:

23       Q.  I'm going to hand you what's been marked

24   as Exhibit 29.  Exhibit 29 is an email from you

1    to Councilmembers Michael and Myers, dated March

2    19, 2018, and it's Bates numbered Worthington

3    57946 through 57948.  Do you see that,

4    Mr. Greeson?

5        A.  I do.

6        Q.  And the subject of your email on Exhibit

7    29 is, retreat follow-up:  UMCH info.  Do you

8    recognize that?

9        A.  Yes.

10        Q.  And you were forwarding an email chain

11    between you and newly elected Councilmember

12    Robinson, correct?

13        A.  That appears to be the case, yes.

14        Q.  So if we turn to Mr. Robinson's email to

15    you, dated February 19, 2018, in which he CC'd

16    other members of council, it appears that

17    Mr. Robinson had requested an analysis from you;

18    is that fair?

19        A.  Yes.  In reading this, that appears to

20    be the case.

21        Q.  Do you recall this circumstance?

22        A.  I don't recall this specific email and

23    my forwarding of it.  Again, that's now five

24    years ago, if I have my timing right.  However,

1  the output that I talked about earlier, the cost

2  to serve, that's the output of this

3  conversation.

4      Q.  Okay.

5      A.  So, you know, you focused on the treat

6  notes earlier today, and there had been dialogue

7  occurring about what are the -- what's the true

8  cost and what are the different public impacts

9  of different development scenarios at the site.

10  And so I was wrestling with whether -- I'll be

11  honest with you, that's good government work to

12  analyze potential development outcomes and the

13  impact on fiscal health and, you know, traffic

14  and cost to serve.  But we were wrestling with

15  whether the staff had time to do that work and

16  whether the council leadership or the majority

17  of council wanted us to provide that work.

18          I ultimately concluded that we needed to

19  do it, it would be beneficial for the overall

20  dialogue the community was having and that the

21  council was having, and we produced the

22  cost-to-serve analysis.

23      Q.  So this is Mr. Robinson following up

24  from that retreat that we discussed earlier?

1      A.  Again, I don't recall the specific

2  emails and the sequencing of it all, but, you

3  know, we're clearly being asked to provide

4  information, and like good staff members we

5  produced a document that may not have answered

6  many of his specific questions, but we thought,

7  based on information that we could, you know,

8  readily obtain, that analyzed different

9  development scenarios and the costs to serve

10  them.

11      Q.  Mr. Robinson followed up with you

12  exactly a month later, and you forwarded

13  Mr. Robinson's response only to Ms. Michael and

14  Mr. Myers.  Why's that?

15      A.  At the time I believe they were council

16  president and president pro tem, the leadership

17  of the council.

18      Q.  Okay.  And --

19      A.  And I don't recall when we specifically

20  completed the cost to serve.  It took a while.

21  And we did it as we could fit it into the staff

22  time available.

23      Q.  Okay.  And what did you tell President

24  Michael or Pro Tem Myers?

1      A.  I don't specifically remember the

2  conversation.

3      Q.  Was anybody else party to that

4  conversation?

5      A.  I don't know.

6                      -=0=-

7        (Deposition Exhibit 30 marked.)

8                      -=0=-

9        MR. SCHUMACHER:  You brought a wheeled

10  cart, right?  I can help you later, if it's too

11  much to carry.

12        Did you ever take a deposition in New

13  York City?

14        MR. INGRAM:  Yes.

15        MR. SCHUMACHER:  The court reporters,

16  they won't carry the exhibits.  And they stop at

17  5:00, because they got to get the train.

18        This is 30.

19  BY MR. INGRAM:

20      Q.  And for the record, Mr. Greeson, you've

21  been handed what's been marked Exhibit 30 --

22      A.  Yes.

23      Q.  -- which is an email from you to Martin

24  Jenkins --

·1· · · A.· Yes.

·2· · · Q.· -- dated March 9, 2020, Bates numbered

·3· Worthington 58301 through 58367.· Do you see

·4· that?

·5· · · A.· Yes.

·6· · · Q.· Earlier I think you mentioned that

·7· Martin Jenkins was one of the facilitators for

·8· council annual retreats?

·9· · · A.· Yeah.· He periodically did council

10· retreat facilitation.· I'm not sure -- I can't

11· tell you every year he did one, but this would

12· have been -- yes.

13· · · Q.· The subject of your email is UMCH

14· background staff.· Is that background stuff?

15· · · A.· Yeah, I'm not -- yes, it probably would

16· be stuff.

17· · · Q.· There were reports that Dr. Herb

18· Marlowe --

19· · · A.· Yes.

20· · · Q.· · -- prepared in 2018, early 2019.· There

21· are drafts of those -- or a draft of the report,

22· and just at a very high level, what were those

23· reports?

24· · · A.· Dr. Marlowe is a consultant from Florida

1   who is experienced in public dispute resolution,

2   visioning strategic planning, helping cities and

3   counties navigate challenging public processes

4   where there's discord and community controversy.

5   And I reached out to him to get some insight

6   from him on could there be some kind of public

7   process that we could employ that would help --

8   I want him to assess the very challenging

9   environment we were in with many different

10  opinions about the strategic direction of the

11  property, and, you know, recognizing that it

12  was, again, highly context sensitive, critical

13  to the future of our community, and had a lot of

14  strongly held beliefs in the community.  I

15  wanted somebody that was objective to the

16  situation that was a skilled public process

17  architect, if you will, and facilitator to

18  assess the situation and identify whether he

19  thought there were any processes that could be

20  followed to help resolve the issues to the

21  benefit of the stakeholders involved.  Well, to

22  resolve the situation in a productive fashion.

23  So that's the work we hired him to do, and

24  you're seeing some of the by-product of that.

1      Q.  Okay.  And when you're referencing this

2  situation, you're referring to the development

3  of the UMCH site?

4      A.  Yes.  And again, I'm in my city manager

5  role.  I'm trying to facilitate.  I'm, you know,

6  trying to shape strategic policy options to be

7  considered to move forward on a critically

8  important property.

9      Q.  And ultimately -- well, it says that --

10  your email says that we chose to move forward

11  with a community visioning process that

12  Dr. Marlowe had recommended, fair?

13      A.  My email does say that, I believe, yes.

14      Q.  Okay.  What was Dr. Marlowe's community

15  visioning process?  What did he recommend?

16      A.  I would have to re-read this report,

17  which is -- you handed me, which is about a half

18  inch thick, in order to answer that question in

19  detail.

20      Q.  And I'm not asking --

21      A.  But essentially, we launched Vision

22  Worthington as a result of that, which was a

23  community visioning process that a different

24  consultant facilitated.

1    Q.  So the Visioning Worthington process,

2  that's for the city at large, correct?  That

3  doesn't pertain just to the UMCH site?

4    A.  No, but I think -- no, it's not, but you

5  can't ignore that the UMCH property -- again, I

6  kept saying it's in the heart of the town, it's

7  right across from the City Hall, it's on High

8  Street, it's one of the largest undeveloped --

9  or developable properties, you know, very

10  important in their strongly held beliefs about

11  what the right strategic direction is for that

12  property.  And while that process was for the

13  community at large, it certainly helps inform --

14  could help, to some degree, inform how the

15  community moves forward.

16        What Dr. Marlowe, I believe, was sensing

17  was that there were pretty different visions in

18  the community.  There was a divide in the

19  community around what strategic direction we

20  were going to take.  That tension, if you will,

21  exists throughout the community in terms of

22  growth and development of the city, and then it

23  also shows up related to this property because

24  it's so central to the community.

1      Q.  Okay.  So the UMCH property is almost a

2  microcosm, if you will, of that issue; is that

3  fair?

4          MR. SCHUMACHER:  Objection.

5      A.  I don't know if microcosm is the -- is

6  the right word.  It is more acute, I think,

7  because the property is so important, right?  So

8  it is, again, centrally located, across from

9  City Hall, it's got natural features, surrounded

10  by the neighborhood, yet on High Street, not too

11  far north of -- you know, kind of right between

12  our major centers at 270 and Old Worthington.

13  And so it is the most context sensitive and the

14  most strategic location, I think, in the city.

15  And it by itself is utterly important, but it's

16  also impacted by, you know, kind of a tension

17  that goes back to Worthington's creation of the

18  city between whether we're, you know,

19  maintaining the historic village character or we

20  become more like the Short North.  I mean, that

21  kind of tension.

22      Q.  Okay.

23          MR. SCHUMACHER:  You said the Short

24  North?

1        THE WITNESS:  Yeah.  It's an area.

2        MR. INGRAM:  It's down High Street,

3   counsel.

4        THE WITNESS:  Yeah, more densely

5   developed.

6   BY MR. INGRAM:

7     Q.  I want to direct your attention now to

8   the -- your memorandum that is attached and a

9   part of Exhibit 30.  If the look in the lower

10  right-hand corner, it's towards the very back,

11  beginning at page 58364.  To 64.

12        MR. SCHUMACHER:  58364.

13    A.  Yes.

14    Q.  And Mr. Greeson, attached to your -- you

15  attached a memorandum that you drafted dated

16  January 31st, 2020, the subject of your

17  memorandum was, responses to questions posed by

18  Councilmember Robinson regarding status of UMCH

19  comprehensive plan update.  Do you see that?

20    A.  Yes.

21    Q.  For purposes of the record, did you

22  draft this memorandum?

23    A.  Yes.

24    Q.  Did anyone help you?

1     A.  I don't believe anybody helped me,

2  although I believe it was likely reviewed by the

3  law director.

4     Q.  Okay.  And is that your signature there

5  on the first page of your memorandum?

6     A.  Yes.

7     Q.  The memo is directed to the members of

8  the City Council.  With whom did you share this

9  memo, other than the law director and members of

10  the City Council?

11     A.  I don't remember, but I imagine key

12  staff involved by Mr. Brown, probably

13  Ms. Steward, but I don't have a specific memory

14  of who received this.  Let me see if there are

15  CCs on it.  Or who helped -- you know, who

16  reviewed it before I sent it out.  It may have

17  had more than just the law director's eyes on

18  it, just to make sure that I wrote coherently.

19     Q.  And based on the subject of your

20  memorandum, was Councilmember Robinson, in 2020,

21  seeking to amend or revise the 2014

22  comprehensive plan amendment?

23     A.  I don't recall.  Obviously, in your --

24  you're well aware later -- I believe later --

1  you know, he wrote to the council regarding

2  amending the comprehensive plan.  At this

3  juncture, I don't recall what I knew about his

4  intentions, nor would I characterize them.  I

5  merely was trying to answer the questions and

6  provide the information that I thought would

7  inform the council's policy dialogue.

8      Q.  And I want to direct your attention to

9  the second-to-last paragraph of your memorandum

10  on page 3.  In looking at the second-to-last

11  paragraph, you write, council has in recent

12  years discouraged staff from proactively working

13  with LC (or Steiner).

14          Do you see that?

15      A.  I'm sorry, what page or paragraph?

16      Q.  Page 3, second-to-last paragraph.

17      A.  Okay.  I gotcha.

18          MR. SCHUMACHER:  Maybe you better read

19  the whole thing, then.

20          THE WITNESS:  I will.

21      Q.  And directing you to the last sentence

22  of that paragraph where you wrote, council has

23  in recent years discouraged staff from

24  proactively working with LC (or Steiner).

1          Do you see that?

2     A.  Yes.

3     Q.  Did I read that correctly?

4     A.  You read the memo that's before me

5  correctly.

6     Q.  Okay.  And LC, would that be Lifestyle?

7     A.  Yes.

8     Q.  And Steiner, is that Yaromir Steiner?

9     A.  Yes.

10     Q.  Who from council had discouraged staff

11  from proactively working with either Lifestyles

12  or Yaromir Steiner?

13     A.  I don't know that I can specifically

14  say.  I think we had a lack -- I think I

15  characterized earlier, a lot of community

16  discourse -- and let me make sure I'm thoroughly

17  answering -- I mean, appropriately answering

18  your questions.  I don't -- I can't recall --

19  the reason I said I can't specifically say is I

20  can't recall the specific conversations I had

21  with each councilmember about these topics.  So

22  it's difficult for me to say, oh, well, in X

23  year or Y date, you know, this councilmember

24  said this.

1            What I can say is that we had a lack of

2     consensus or a lack of clarity or agreement on,

3     you know, direction related to the property.

4     The community was, you know, fractious.  I mean,

5     we had the charter amended.  We had, you know,

6     this as a theme that ran through multiple

7     council elections.  We had strongly held views

8     on council about different aspects of the

9     comprehensive plan and potential directions for

10     the community.  And it was difficult to

11     navigate.

12            And I tried a number of things to inform

13     and facilitate dialogue.  You mentioned them

14     earlier.  We met with community members, we held

15     public meetings, or LC held the public meeting

16     in 2014 and got a vociferous response.  I

17     brought Dr. Marlowe in.  And none of that, from

18     my perspective, was successful, and I took

19     ownership in that in helping -- in yielding

20     clarity on the direction staff should take in

21     advancing particular goals around that property.

22     So this memo is likely me being

23     uncharacteristically frustrated or something

24     about where we were and outlining the options.

1    Once again, outlining the options that I thought

2    were available to the city.

3         Q.  Okay.  So an uncharacteristic statement.

4    But what I asked you was which councilmembers

5    had discouraged staff that you're referring to?

6         A.  So I can't go back to specific

7    conversations and say this councilmember

8    discouraged us on this date.  I can't remember

9    those.  But I think, in general, we had a lack

10   of clarity, and by that lack of clarity, we were

11   discouraged from doing anything proactive

12   because we didn't have -- we didn't know what

13   the council would support.

14        Q.  And when you reference staff here, are

15   you referring to any particular staff members?

16        A.  No.

17        Q.  To yourself?

18        A.  I think I'm just talking generally about

19   staff and city employees as a whole.

20        Q.  Okay.

21        A.  And myself.  But again, I can't point to

22   a specific conversation or a group conversation

23   that I have in my memory that informed that

24   sentence.

1      Q.  Yet, in each one of the instances that

2  you referenced, whether it's Mr. Marlowe's

3  visioning process, whether it's the framework

4  that you prepared, you didn't consult UMCH or LC

5  proactively, did you?

6      A.  This is -- go ahead.

7          MR. SCHUMACHER:  I'm trying to

8  understand the question, but go ahead.

9      A.  This is an important question.  Can you

10  read it back to me, please?

11         (Record read as requested.)

12     A.  Yes, in some instances.

13     Q.  Which instances?

14     A.  Let me -- I'll discuss that.  So in the

15  framework document, it was my thinking about

16  what the options were.  So I'm sharing with the

17  council and whoever wants to read it, you know,

18  what do I think of the options available.  Like

19  I said, I don't think I consulted a lot of

20  people on that.  I may have shared it internally

21  with staff.

22         In the case of Dr. Marlowe's work, I

23  believe he met with the board of -- and I'd have

24  to refresh my memory on this.  But I believe

1    UMCH was approached as part of that, and then I

2    met with Bo Brownlee on that and shared -- I

3    believe I shared with him one of the Dr. Marlowe

4    process drafts.  Additionally, Yaromir Steiner

5    was involved at that point.  He had had meetings

6    with councilmembers and staff.  No concept

7    proposal from Yaromir was received ever.  It was

8    more engagement but not specifics.  When Yaromir

9    came forward, I remember -- I don't know why I

10   remember this and not other things, but I

11   remember we were -- you know, we were -- we

12   didn't really know the -- all the UMCH and

13   Lifestyle relationships, but we were careful to,

14   you know, make sure Lifestyle knew we were

15   engaging with OhioHealth or Yaromir when it was

16   the subject of that -- of the property over

17   here.  So I did that.  And I believe Dr. Marlowe

18   talked to Yaromir as well.

19           So I don't think you can characterize it

20   as we never interacted with -- with either LC or

21   their representatives or people who were

22   advancing things that LC had an interest in.  I

23   think we did in that case.

24       Q.  Now, my question was about staff.  And

1    you mentioned that you had conversations with

2    Mr. Brownlee?

3        A.  I did.

4        Q.  What conversations are you referring to?

5        A.  I met with him once and talked

6    specifically about the Dr. Marlowe effort.  I

7    believe I gave him a draft, one of these drafts

8    that you have reflected here, and, you know,

9    said we're -- you know, I'm attempting to

10   develop some kind of alternative dispute

11   resolution process.

12       Q.  Did you have any other conversations

13   with Mr. Brownlee or anyone else from Lifestyles

14   regarding the development of the UMCH property,

15   you know, these proactive discussions, as you've

16   characterized it?

17       A.  When?

18       Q.  From leading up to January of 2020.

19       A.  I don't recall that I did.  I don't

20   specifically remember.

21       Q.  Your conversation with Bo Brownlee

22   concerning the --

23       A.  Again, we hadn't heard from them with

24   any substantive proposals from LC since 2015.

1   Most of the private interest, meaning -- came

2   from either OhioHealth, EMH&T in the one little

3   instance, or Yaromir.  Lifestyle had seemed to

4   go roughly largely dark.  And we weren't

5   proactively engaging them because we were having

6   a difficult time discerning our own interests.

7        Q.  With respect to the conversation you had

8   with Mr. Brownlee regarding Mr. Marlowe's -- or

9   Harlowe's?  Sorry.

10       A.  Marlowe.  It might be a typo.  It's

11  Marlowe.

12       Q.  Okay.  Marlowe.  With Mr. Marlowe's

13  visioning process, there are two attachments to

14  your email here in Exhibit 30.  Did you share

15  either of these attachments with Mr. Brownlee?

16       A.  I believe I shared information with him.

17  At what point in all this process I met with him

18  and what I specifically shared with him I don't

19  recall.  I remember the goal of my meeting with

20  him and reaching out with him was to inform him

21  that we were -- that we were talking about this

22  and that, you know, we were having some

23  engagement with Yaromir about it, and that --

24  you know, that it was a sincere effort on my

1    part.  I think what Dr. Marlowe found was that

2    it was a highly divided issue in our community.

3         Q.  Okay.  There were -- at page 5835 --

4         A.  35?

5         Q.  35.  Yes.  It's a conclusions and

6    recommendations for a decision-making process

7    regarding the future use of the UMCH property.

8    It's a report prepared by Herbert Marlowe, dated

9    August 30th, 2018.  It's marked draft.

10        A.  Yes.

11        Q.  Was this report ever finalized?

12        A.  I don't think it ever had a draft taken

13   off of it because I believe he approached it as

14   something that was -- you know, it's process

15   design.  It's not -- based on the feedback to

16   the drafts, that it would evolve.  And might

17   constantly evolve if we had moved forward with

18   some elements of this process.  So no, I don't

19   believe the draft ever came off of it.

20        Q.  Did the city ever implement any of the

21   conclusions or recommendations from Mr. Marlowe?

22        A.  I believe we -- well, we moved forward

23   with the visioning process.

24        Q.  Sorry.  My question was inartful.  I was

1    referring to this report starting on page 35.

2    Did the city implement any of the

3    recommendations out of this particular report

4    dated August 30, 2018?

5        A.  I would need to re-read it to answer

6    that question.  If you want me to read it, I

7    will.

8        Q.  That's okay.  If you don't recall,

9    that's fine.

10        So turning to page -- the second page of

11    Exhibit 30.  There's another report submitted by

12    Analytica dated January 18, 2019.

13        A.  What page is that?

14        Q.  It's the second page of the exhibit.

15        A.  Okay.  Analytica is Dr. Marlowe.

16        MR. SCHUMACHER:  Maybe we should read

17    the whole document.

18        Q.  So this is the second attachment to your

19    email.

20        A.  Okay.

21        Q.  And the January 18, 2019, report is

22    titled the Proposed Process Architecture for

23    Community-wide Visioning Process for the City of

24    Worthington, Ohio, and Proposed Process

1  Architecture for Development of Acquisition

2  Scenarios for UMCH property.

3      A.  Yes.

4      Q.  So there was two different reports, both

5  by Dr. Marlowe or his organization; is that

6  fair?

7      A.  I would need to go through this and try

8  to differentiate what is what because what I

9  can't tell is whether you're handing me, you

10  know, drafts that he did or things that he did

11  as he's interviewing people to think about it,

12  that he shared with me, or whether you're

13  handing me a draft at one stage of his thinking

14  and then a final draft or like a -- the draft

15  that got presented to council.  So just

16  off-the-cuff I can't distinguish the differences

17  here.

18      Q.  Mr. Greeson, I'm not handing you

19  anything.  These are attachments to your own

20  email.

21      A.  Okay.

22      Q.  And I'm just trying to understand -- if

23  you turn to your email itself, I'm trying to

24  understand which attachment is which.

1     A.  Well, then, you're going to have to give

2  me a little time.

3     Q.  Sure.

4     A.  I think my email answers your previous

5  questions.  He left the documents as draft,

6  presumably to reserve the ability to modify them

7  in content and approach as the community

8  co-created a process.  So he left it as draft.

9  I was correct in that.

10        And then my email outlines that in his

11  first report it's his assessment of the

12  situation and some potential process

13  recommendation, and then the -- and then a

14  refined version is the second document.

15     Q.  Right.  And so the question I have for

16  you is, when you're saying first or second, the

17  first one is later in time, and so I'm trying to

18  discern what you meant by first or second.

19     A.  Yeah, I don't know why that's the case.

20  So the first one would be August 30th, 2018.

21  It's after he's interviewed people and he's

22  contemplating a, you know, process for

23  reconciling the debate he heard.  And then the

24  second one, which is the one dated January 18th,

1    2019, he digs into -- it looks like more detail

2    on the actual scope of, you know, some of the

3    processes he contemplated earlier in the first

4    draft.

5        Q.  Okay.  Thank you.

6            Earlier you mentioned, Mr. Greeson, an

7    organization called Project Community Park.  Do

8    you recall that?

9        A.  Yes.

10       Q.  And what is your understanding of what

11   Project Community Park was seeking with respect

12   to the UMCH property?

13       A.  I think their records probably speak for

14   itself and that you probably have them, because

15   they're a matter of record and they have

16   websites and things like that, but essentially

17   that the city buy the land, that some large

18   portion of it be set aside and developed as a

19   park.

20       Q.  And Mr. Robinson -- Councilman Robinson

21   is a member of Project Community Park; is that

22   correct?

23       A.  I don't know his -- so I don't know how

24   they're structured.  I can only tell you who I

1    interacted with over time, and it's a community

2    organization.  Who a member is -- I don't know

3    if they have members or they just have a group

4    of people that are working together that are

5    leading it.  He has had some involvement with

6    members of -- or people who have participated in

7    Project Community Park.  What all his roles

8    were, I don't know.

9         Q.  Okay.

10                       -=0=-

11         (Deposition Exhibit 31 marked.)

12                       -=0=-

13   BY MR. INGRAM:

14        Q.  Mr. Greeson, you've been handed what's

15   been marked as Exhibit 31, which is a November

16   27, 2018, Summary of Phases for Development of

17   the UMCH Property on Adam F. Florey law firm

18   letterhead -- the Florey Todd Law Firm, I should

19   say, letterhead.  Do you see that?

20        A.  I do.

21        Q.  Are you familiar with Mr. Florey's

22   summary of phases for development of the UMCH

23   property?

24        A.  I remember it.  I can't say I am

1  in-depth familiar with it at this point unless I

2  re-read it.

3       Q.  Okay.  When is the first time you were

4  provided a copy of Exhibit 31?

5       A.  That's a good question.  I don't recall.

6  I don't believe I received it when it was

7  produced.  Mr. Robinson provided it to me at

8  some juncture, and I am probably spending more

9  time with it now than I did then.

10      Q.  So Mr. Robinson provided this to you?

11      A.  Yes.

12      Q.  Do you know who paid for this to be

13  created by Attorney Florey?

14      A.  I know that the city did not -- the city

15  did not solicit this memo, nor it did pay for

16  it.  And I don't know the answer to whether

17  anyone else solicited it and paid for it or

18  whether Mr. Florey proffered it on his own.  I

19  don't know.

20      Q.  So you don't know who paid for this?

21      A.  I don't even know if it was paid for.  I

22  have no idea.

23      Q.  Do you know attorneys who put forth

24  memos for free?

1      MR. SCHUMACHER:  Objection.

2  Argumentative.

3      MR. SILK:  Might have.

4      MR. SCHUMACHER:  You don't need to

5  answer that question.

6      A.  I don't know -- I don't know the genesis

7  of this.  I don't know who asked for it.  I

8  don't know if it was paid for.  I was provided

9  it.  I was not involved in asking for it.

10     Q.  What were the circumstances that -- in

11  which Councilman Robinson provided this summary

12  from Attorney Florey to you?

13     A.  I'm not sure.  I don't recall a specific

14  circumstance.  I don't recall specifically when.

15  And I can't remember that there was any, you

16  know, event that caused him to do that.  I just

17  remember that he provided it, probably inform --

18  you know, to give me information.

19     Q.  Did he provide you a hard copy?  Did he

20  email it to you?

21     A.  I believe it was a hard copy, and I

22  don't believe it ever left my desk until it was

23  provided to you.  Well, maybe I gave it to the

24  law director, but I don't remember doing

1    anything with it.

2        Q.  Okay.  Do you know, was there anyone

3    else in the room with you and Mr. Robinson when

4    he provided you this legal summary?

5            MR. SCHUMACHER:  Objection.  That

6    assumes facts not in evidence.

7        A.  I don't even remember how he provided it

8    to me.  I think it was in paper, but I don't

9    remember whether he handed it to me, whether it

10   was sent to me.  I don't remember.

11       Q.  Do you know Attorney Florey?

12       A.  I believe I have met him once.

13       Q.  Okay.  And has the city --

14       A.  No, I don't feel like I know him.

15       Q.  Has the city ever engaged Attorney

16   Florey for any legal matters?

17       A.  Not that I'm aware of.  Nor would I

18   agree with all of the stuff in this.

19                      -=0=-

20        (Deposition Exhibit 32 marked.)

21                      -=0=-

22           MR. SCHUMACHER:  He found it.

23           THE WITNESS:  Good work.

24

1    BY MR. INGRAM:

2        Q.  Mr. Greeson, you've been handed what's

3    been marked as Exhibit 32, which is a memorandum

4    from you to City Council, dated January 22nd,

5    2019, the subject of which is the exploratory

6    working paper, cost-to-serve analysis for the

7    UMCH property.  Do you see that?

8        A.  Yes.

9        Q.  And for purposes of the record, Exhibit

10   32 is Bates stamped Worthington 126963 through

11   126990.

12           Is that your signature --

13       A.  Yes.

14       Q.   -- on the first page of Exhibit 32?

15       A.  Yes.

16       Q.  And is this the cost-to-serve analysis

17   that you referenced this morning?

18       A.  Yes.

19       Q.  So originally, five scenarios were

20   drafted as part of this analysis, correct?

21       A.  I don't know if we -- let me read what I

22   wrote here.

23       Q.  Second sentence.

24       A.  Yeah, I think we didn't do a full

1  analysis on five scenarios, just going off

2  memory here.  There was an analysis done on five

3  scenarios, but there were -- kind of like here

4  are the scenarios we might analyze, and then got

5  some feedback from council and then went about

6  doing the analysis.  We didn't want to spend

7  time -- this was a period where we were

8  struggling to fit this into the work schedule,

9  and we didn't want to spend time evaluating 20

10  scenarios.  We wanted to narrow the field to

11  make sure we were giving council information

12  that was helpful.

13      Q.  So based on the earlier documents we

14  were looking at, the request for the scenarios,

15  it was discussed during the City Council retreat

16  in early 2018.  Councilman Robinson had some

17  follow-up emails to you about that.  And then in

18  January of '19 you provided this memorandum.  Is

19  that fair?

20      A.  Yeah, but I would say the cost of

21  different types of development had been an issue

22  and a question longer than that.  People were

23  seeking and desiring information that could

24  make -- you know, that would help them

1   understand the options, both in the community

2   and for the council, and they -- and so I don't

3   think it was only those limited emails and

4   debate.  It had kind of had been out there as an

5   issue, and we were finally bringing focus to it.

6        Q.  Okay.  And who prepared this analysis

7   set forth in Exhibit 32?

8        A.  Robyn Stewart, who was the assistant

9   city manager at the time, prepared it.  Other

10  staff, obviously, had to give input regarding

11  their services and their -- you know, and the

12  various costs.  But she was the primary author

13  or coordinator of the analysis.

14       Q.  And then ultimately you obviously signed

15  it.  Did you have some oversight or did you

16  participate with the preparation of this

17  analysis?

18       A.  I did not prepare it.  She's

19  exceptionally good.  But I would have read it

20  before it was distributed and perhaps I made

21  some comments on it to make it for clarity or --

22  but I don't recall any of my edits, if I made

23  any.  I don't recall whether I made any, quite

24  frankly.  But I'm sure I reviewed it before I

1  transmitted it.

2      Q.  Now, three of the scenarios that were

3  analyzed in this memorandum were developed by

4  staff, correct?

5      A.  Go back to the memo I wrote, since I

6  don't recall all the details.  That's what my

7  memo says, so I believe that to be true.

8      Q.  Okay.  Did you participate in creating

9  these three hypothetical scenarios?

10      A.  I don't specifically recall, but I

11  imagine I was part of the staff conversation

12  that discussed them.

13      Q.  Did you or any of your staff consult

14  with UMCH or Lifestyles in connection with

15  creating either of those three scenarios?

16      A.  I don't specifically recall that we did.

17  I don't have a specific memory of that.  I know

18  that we were being very careful to run the

19  analysis, figure out what the scenarios that we

20  were going to analyze were, what they wanted to

21  know about, and then objectively analyze it

22  without, you know, outside influence.  So I

23  don't know that we would have, but I can't

24  specifically remember.

1      Q.  Okay.  But the fourth scenario in the

2  analysis was based on the white paper issued by

3  the WARD organization in January 2018, correct?

4      A.  That appears to be what I wrote in the

5  memo, so yes.

6      Q.  And with respect to WARD's white paper,

7  what inputs from WARD did the analysis rely

8  upon?

9      A.  Other than what they wrote in their

10  paper?  Are you asking me if they had any -- if

11  there was any discussion with them other than

12  taking what they wrote in their white paper and

13  trying to analyze it?

14      Q.  Sure.  That's my question.

15      A.  Okay.  I don't recall that we had any

16  interaction with them where they would have

17  influenced them.  So no, I don't have any

18  specific memory of interacting with WARD or

19  Ms. Steward interacting with WARD on the details

20  of how we completed this.  I believe it was done

21  objectively without much outside influence once

22  we understood what we were analyzing.

23      Q.  And what data or what information was

24  used as part of this analysis to arrive at the

1  projections?

2      A.  Bear with me.  I will read some and

3  answer your question --

4      Q.  Take your time.

5      A.  -- to the best of my ability.

6          Can you repeat the question now?

7          (Record read as requested.)

8      A.  I think, if you look at -- it would be

9  the second page of the packet that you handed

10  me, the exhibit that you handed me.  I think

11  Ms. Stewart writes pretty clearly in answer to

12  your question, you know, each -- each -- each

13  department, each service area attempted to

14  determine what it would cost to provide

15  services.  Not a proportional allocation, but

16  each service area determining whether there

17  would be additional costs.  So looking at

18  whether or not it would cost -- require

19  additional staff, contract services or supplies

20  to serve different types of new development.

21  And so it relied somewhat on the expertise of

22  the staff and the various departments who in all

23  likelihood looked at their costs of their -- of

24  providing services to other aspects of

1    Worthington.

2        Q.  Okay.  But did staff interview anyone or

3    any experts in connection with the assumptions

4    they're making?  And I'll just give you an

5    example.  When we're talking about the

6    hypothetical residential portions of this

7    analysis, what value of the structures -- what

8    was the assumed valuation of the homes or the

9    apartments, or what was the assumption of how

10   much the income would be by the subsequent, you

11   know, residents, those kind of assumptions?

12       A.  Without thoroughly reviewing this report

13   and talking to some of the people that were

14   involved in it, I, at this point, can't recall

15   the specifics and all of the data points that we

16   drew upon or Ms. Stewart collected and asked for

17   in order to arrive at these scenarios or this

18   analysis.  My role was to review the overall --

19   is to call for it to be done, review the overall

20   work product, and then transmit it to council.

21   And I think, if you look at the third paragraph

22   on the first page, it pretty clearly says it's

23   hypothetical.  We did the best we could with the

24   information we had.  You know, it's rough

1  estimates and were developed by each department

2  based on their sense of how their services would

3  be impacted, utilizing assumptions that were

4  made and outlined in the document.  And, you

5  know, I think she does a good job caveating the

6  whole report there.  That should answer your

7  question.

8     Q.  Okay.  And to be specific, with respect

9  to the analysis set forth in Exhibit 32, to your

10  knowledge, no one reached out to Lifestyle to

11  get their input on any of the assumptions or

12  inputs here?

13        MR. SCHUMACHER:  To get Lifestyle's

14  input on the cost to the city?  Is that your

15  question?

16        MR. INGRAM:  I'm talking about this

17  entire analysis, not just the cost to the city.

18        MR. SCHUMACHER:  Why would they go to

19  Lifestyle to find out what it costs to run a

20  park or to provide services to a development, a

21  hypothetical development?

22     A.  I think that's a good point.  I mean, I

23  think, actually, I made that point earlier in

24  the day.  We would not customarily consult a

1    developer on what it costs to provide city

2    services to a particular development.  We

3    might -- there's cases where they require

4    developers to commission those studies, you

5    know, whether it's school impact studies or

6    service impact studies.  But we wouldn't

7    customarily do that.  And I don't recall that we

8    had any interaction with Lifestyle during this

9    analysis, nor would it be necessary to in order

10   to complete the work we were doing.

11        Q.  Okay.  So just so I understand, it

12   wouldn't be necessary to contact the property

13   owner in connection with what it desired to use

14   on its property, or develop on its property in

15   order to assess what revenues or costs could be

16   derived from it?  I just want to be clear.

17             MR. SCHUMACHER:  We hadn't had a

18   proposal since 2015, Chris.

19             MR. INGRAM:  Counsel, if you're going

20   to -- I don't understand.  Is this an objection?

21             MR. SCHUMACHER:  Yes.  That's an

22   objection.

23             MR. INGRAM:  Okay.  Well, if you can lay

24   off the speaking objections, I'd appreciate it.

 1        MR. SCHUMACHER:  At least it's not a

 2  solil --

 3        MR. SILK:  Soliloquy.

 4        THE WITNESS:  Can you re-read the

 5  question?

 6        (Record read as requested.)

 7        THE WITNESS:  Can you re-read the first

 8  section again?

 9        (Record read as requested.)

10     A.  No, I'm not aware that we reached out to

11  Lifestyle.

12     Q.  And was the analysis set forth in

13  Exhibit 32 ever revised or updated, to your

14  knowledge, Mr. Greeson?

15     A.  I don't believe so.  I'm not aware of

16  any revisions or update of it.  Maybe there's

17  been some since I left, but I'm not aware of

18  any.

19     Q.  Was an analysis similar to this

20  conducted when Lifestyle's rezoning application

21  and development plan was filed with the city?

22     A.  I don't think we conducted -- not that

23  I'm aware of.  Nor would -- nor would we

24  necessarily do that.

1          MR. INGRAM:  All right.  We've been

2    going for about an hour.  Probably a good spot

3    to take a break.

4          MR. SCHUMACHER:  We've come to an

5    agreement.

6          MR. INGRAM:  Is now a good time for a

7    break?

8          THE WITNESS:  That would be great.

9          (Recess.)

10                        -=0=-

11          (Deposition Exhibit 33 marked.)

12                        -=0=-

13    BY MR. INGRAM:

14      Q.  Mr. Greeson, I've handed you --

15          MR. SCHUMACHER:  I think he's still

16    reading.

17          THE WITNESS:  I'm almost done.  Hang on

18    one second.  Oh, I'm not almost done because I

19    think the second page I need to read, too.

20      Q.  And just for purposes of the record,

21    Mr. Greeson, I've handed you what's been marked

22    as Exhibit 33, which is an email chain, the

23    first email of which is from David Robinson,

24    carbon copying you as well, and it includes

1  other members of City Council, dated January

2  2nd, 2018.

3          And I would actually start at page 3,

4  the last page of Exhibit 33, if I could direct

5  your attention there first.

6      A.  If I may finish reading, I'd appreciate

7  it.

8      Q.  Sure.  You can finish reading the second

9  page.

10          MR. SCHUMACHER:  But not the third?

11      A.  Okay.

12      Q.  So have you read the entirety of Exhibit

13  33, Mr. Greeson?

14      A.  I think so.

15      Q.  Okay.  And I had the opportunity during

16  one of our breaks to review Mr. Robinson's bio

17  on City Council and confirmed that City

18  Councilman Robinson was elected in November

19  2017, and therefore first became a member of

20  City Council in January of 2018.  Does that

21  sound correct to you?

22      A.  It does.

23      Q.  And so when we're looking at page 3 of

24  Exhibit 33, Mr. Robinson is emailing

1    Councilperson Michael and CC'ing you on December

2    31st of 2017.  Do you see that?

3         A.  Yes.

4         Q.  And at this point in time, when he sent

5    this email, he's not a member of City Council,

6    correct?

7         A.  He's a councilmember elect at that

8    point.  He hasn't been sworn in.

9         Q.  Thank you.

10         And in December he was emailing -- I'm

11   sorry.  He emailed but also left a voice mail

12   with Council President Michael at the end of

13   December in 2017.  Do you see that?

14        A.  Yes.

15        Q.  And he asked Council President Michael

16   to put on the City Council agenda for City

17   Council's January 8, 2018, meeting, the topic of

18   the UMC portion of the comprehensive plan; is

19   that correct?

20        A.  That's what this -- these documents

21   indicate.

22        Q.  But that Council President Michael

23   declined to do so; is that fair?

24        MR. SCHUMACHER:  Are you asking him

1  whether that happened, or whether the document

2  reflects that?

3      Q.  Do you have any --

4      A.  I don't have a recollection of that

5  specific debate now all these years later.  But

6  I believe these documents to be accurate.  I'm

7  sure if Bonnie said it, that's what happened --

8  wrote it, that's probably what happened.

9      Q.  Mr. Greeson, with respect to the topic

10  of the UMC portion of the comprehensive plan,

11  that's referencing the 2014 amendment to the

12  comprehensive plan, correct, that we looked at

13  in Exhibit 1?

14      A.  I presume that that is what council

15  president at the time Michael -- I believe

16  that's what they're referencing, yes, to

17  Mr. Robinson and Ms. Michael in this email

18  exchange.

19      Q.  And then we see on page 2 Ms. Michael

20  indicated to Mr. Robinson that this topic is to

21  be included in our council retreat on February 9

22  and 10; is that correct?

23      A.  That's what she says, yes.

24      Q.  So is the -- was the September 2014 land

1    use plan for the UMCH site -- was that put on

2    the agenda for the 2018 City Council retreat at

3    Mr. Robinson's request or President Michael's

4    request?

5        A.  You went through the retreat documents

6    earlier, right?

7        Q.  The 2018 was set forth in Exhibit 27,

8    correct.

9        A.  I don't think expressly because of these

10   emails -- I mean, it appears in Exhibit 27

11   what's outlined is a process where the

12   facilitators met with councilmembers, myself,

13   and other key staff who identified issues that

14   might need to be discussed in a planning retreat

15   or -- and so I'm sure they would have

16   expressed -- I assume that they then expressed

17   that to the facilitators and that led to some

18   discussion at the retreat, but I don't remember

19   specifically how all that transpired.

20       Q.  Okay.  I do recall what Exhibit 27 said.

21   The purpose of my question is, is the way

22   President Michael's characterized her response

23   to at that time Mr. David Robinson in which she

24   says, to that end, I told you that this topic is

1    to be included in our council retreat February 9

2    and 10, and so based on what she says here in

3    her email, this is beyond just -- this topic

4    goes beyond an interview with the facilitator.

5        A.  What's your question?

6        Q.  I'm trying to figure out how --

7            MR. SCHUMACHER:  It was a statement, not

8    a question.

9        Q.  I'm trying to figure out how Exhibit 1,

10   the UMCH portion of the comprehensive plan, was

11   set to be discussed during the retreat, whether

12   that was at President Michael's direction, was

13   it Mr. Robinson's direction.  Do you recall?  Do

14   you know one way or the other?

15       A.  I don't recall.

16       Q.  Fair enough.

17                      -=0=-

18       (Deposition Exhibit 34 marked.)

19                      -=0=-

20   BY MR. INGRAM:

21       Q.  Have you had an opportunity to review

22   what's been marked Exhibit 34, Mr. Greeson?

23       A.  Yes.

24       Q.  Mr. Greeson, Exhibit 34 is an email from

·1· Council President Michael to you dated March

·2· 21st, 2020.· Do you see that?

·3· · · A.· Yes.

·4· · · Q.· And Council President Michael's email

·5· has the subject 2014 UMCH comprehensive plan

·6· update - motion to temporarily suspend.

·7· · · · · Do you see that?

·8· · · A.· Yes.

·9· · · Q.· President Michael says, Matt, we need to

10· talk on logistics.

11· · · · · Do you recall this particular issue

12· being discussed with Council President Michael?

13· · · A.· I remember the issue that is in the

14· email chain and Mr. Robinson's email and the

15· issue.· I don't recall the specific conversation

16· with Mrs. Michael.

17· · · Q.· Looking at Exhibit 34, there's a

18· forwarded message that she sent to you, and I

19· believe you were CC'd on that email anyways,

20· from David Robinson to members of City Council

21· and CC'ing you and others with the city, dated

22· September 20, 2020.· Do you see that?

23· · · A.· I do.

24· · · Q.· And looking at top paragraph of page 2

1   of Exhibit 34, among other things, Councilman

2   Robinson says, accordingly, I will be making a

3   motion at tomorrow night's meeting to

4   temporarily suspend the UMCH portion of the

5   comprehensive plan pending further update.

6   Please know that I am going to make this motion

7   in this rather sudden manner because of the

8   urgency that we act while we can.

9        Do you see that?

10   A.  I do.

11   Q.  Did Councilman Robinson talk to you

12   about this sudden motion to temporarily suspend

13   the UMCH portion of the comprehensive plan

14   before he sent this email?

15        MR. SCHUMACHER:  Objection.  Form.

16   A.  I don't have a specific memory of him --

17   of having a conversation with him.  I don't

18   recall.

19   Q.  You don't recall one way or the other

20   or --

21   A.  I don't recall a conversation.  I really

22   don't recall one way or the other.

23   Q.  And Mr. Robinson's email says, please do

24   not reply all.  Do you know why that would be?

1      A.  Yes, under -- we had well coached

2  councilmembers, if you get in a circular

3  exchange of emails, you can inadvertently create

4  a public meeting under Ohio law, and we were

5  diligent that if somebody proffered their

6  opinion via email that they didn't end up

7  getting into a debate that should happen in the

8  public via email.  And so we always advised our

9  councilmembers to say don't reply all, because

10  they could end up having a public meeting and

11  they didn't even intend to.

12      Q.  Okay.  Now, with respect to this

13  proposed -- to Councilman Robinson's proposed

14  motion, would that proposed motion have been set

15  forth on that meeting's agenda?

16          MR. SCHUMACHER:  This hypothetical

17  motion?

18      A.  When did he write it?  What day of the

19  week?

20      Q.  It was the night before the City Council

21  meeting.

22      A.  The agenda would have been released the

23  prior Thursday.

24      Q.  And in order to make it on the agenda,

1  is it generally understood that matters must be

2  presented to the clerk the Thursday before

3  the -- that meeting?

4      A.  To be on the written agenda that the

5  staff distributes and posts on the website.

6      Q.  Is there some other agenda?

7      A.  No.

8      Q.  Okay.

9      A.  But that doesn't mean that matters that

10  are not listed on the agenda can't come up in

11  the meeting.  There's opportunity for that, both

12  at the end of the meeting and beginning of the

13  meeting, whatever council wants.  But on the

14  written agenda would come out usually the

15  Thursday unless we supplement it.

16      Q.  And with respect to the logistics, now

17  that you've looked at Councilman Robinson's

18  email, do you recall what happened with this

19  particular effort?

20      A.  My recollection is that it didn't move

21  forward, that there was an interest in amending

22  the comp plan at that point.  I don't actually

23  recall right now if he made the motion and

24  whether there's a vote on it actually.  I don't

1    have a recollection of that.

2         Q.  We can refer to the meeting minutes.

3         A.  Yes.  I did not -- I don't think I read

4    those meeting minutes.

5                         -=0=-

6              (Deposition Exhibit 35 marked.)

7                         -=0=-

8              MR. INGRAM:  Sorry, I handed you the

9    wrong version.

10             MR. SCHUMACHER:  I think the highlighted

11   one is just fine.

12             THE WITNESS:  I didn't read it anyway.

13             MR. INGRAM:  That's fine.  I was looking

14   for my copy.

15   BY MR. INGRAM:

16        Q.  Mr. Greeson, I've handed you what's been

17   marked as Exhibit 35, which is an email from you

18   to members of council and other Worthington city

19   officials, dated September 24, 2020, with a

20   subject line, UMCH discussion.  Do you see that?

21        A.  I do.

22        Q.  And you were forwarding an email the

23   same date that you had received from Lee Brown

24   that contains a summary of the discussion that

1  you and Mr. Brown had along with the City's law

2  director with Tom Hart, who was the attorney for

3  Lifestyles.  Do you see that?

4      A.  Yes.

5      Q.  I want to direct your attention to the

6  second paragraph of the second page of Exhibit

7  35, in which Mr. Brown notes that we also

8  discussed what occurred this past Monday at City

9  Council concerning the UMCH site.  Do you see

10  that?

11      A.  I saw it earlier.  What paragraph?

12      Q.  Sure.  It's the second page, second

13  paragraph.

14      MR. SCHUMACHER:  You should give him the

15  highlighted version.

16      Q.  Here's the highlighted version.

17      A.  There you go.  Yes.

18      Q.  So my question is:  What happened at

19  that Monday meeting?  This is days after the

20  email that we just reviewed in paragraph 34.

21      A.  What happened at what Monday meeting,

22  City Council meeting?

23      Q.  Correct.  So in other words, during this

24  meeting that you had with Mr. Hart, one of the

1    issues summarized in --

2        A.  So one thing I know is we get detailed

3    minutes and we record the video of all of those

4    meetings, and I think you can go back and watch

5    it.  I can't at this point recall all the

6    details of that meeting.

7            MR. SCHUMACHER:  I'm going to object as

8    asked and answered.  I think you asked him that

9    question earlier, and he said he didn't remember

10   the details.  But you can probably piece it

11   together by looking at the video.

12       A.  I think that's right.  I mean, I -- I

13   think Mr. Robinson expressed his interests that

14   he articulated in the email and council had a

15   discussion about that.  I don't recall what

16   action was taken or whether he actually made a

17   motion, but we obviously were transparent with

18   Lifestyle about it.

19       Q.  Okay.  One of my questions is that --

20   what prompted your and Mr. Brown and

21   Mr. Lindsey's meeting with Mr. Hart?

22       A.  I don't specifically recall.  I don't

23   recall.

24       Q.  The subject is UMCH discussion, and you

·1· ·directed Mr. Brown to prepare a summary of that

·2· ·discussion.

·3· · · ·A.· Yeah.· And that had been our custom, if

·4· ·there was a sensitive issue or an important

·5· ·property or topic, would keep the council

·6· ·apprised of what was going on.· And so this

·7· ·would be customary for such an important site.

·8· · · ·Q.· So did you direct Mr. Brown to prepare

·9· ·summaries of all your discussions or meetings

10· ·with Lifestyles concerning the UMCH site?

11· · · ·A.· I don't recall if all, but if there was

12· ·substantive things to inform the council about,

13· ·we would share with them what was going on with

14· ·major developments.· So it was not unusual for

15· ·us to give them some information about sites

16· ·they maybe asked questions about.

17· · · ·Q.· Okay.

18· · · ·A.· Or had expressed concern about.

19· · · ·Q.· So to the extent there were substantive

20· ·discussions regarding the UMCH site involving

21· ·Mr. Brown or you with Lifestyle, should I expect

22· ·to be able to read a summary -- a written

23· ·summary of that meeting since it was customary?

24· · · ·A.· I don't know about every meeting, but at

1   times that were important, like they had gone

2   essentially dark for many years without much

3   interaction with them about any significant

4   development proposal.  We hadn't really had

5   anything substantive from them since 2015.  You

6   know, we had OhioHealth and we had Yaromir, but

7   really nothing from LC that would have suggested

8   that they were going to move forward with a

9   development that was anywhere like -- you know,

10  like they had in 2015.  And so now they were

11  coming forward to talk about it again and that's

12  notable.

13      Q.  From the context of Mr. Brown's summary

14  of the meeting you attended, it doesn't appear

15  that Mr. Hart was aware of what was discussed in

16  the prior Monday City Council meeting, because

17  he says he was going to have to -- or he was

18  going to view it online.  So who asked for this

19  meeting?

20      A.  I don't remember.

21          MR. SCHUMACHER:  Keep in mind we're

22  during COVID here.  These were all virtual.

23      A.  I mean, there's a couple things going on

24  in the life of the city at the time.  One is I'm

·1· ·managing an organization that's responding to

·2· ·COVID, and we were spending a lot of time on

·3· ·police matters because, after George Floyd was

·4· ·killed, we had 14 protests in Worthington of

·5· ·various sizes, and I had a lot of focus on that

·6· ·at the time.· That's what's going on in the city

·7· ·manager's life when all this is happening, too.

·8· · · · Q.· Okay.· My question was just simply who

·9· ·asked for the meeting?

10· · · · A.· I don't know.

11· · · · Q.· Okay.

12· · · · A.· I don't recall.

13· · · · · · · · · · · -=0=-

14· · · · · (Deposition Exhibit 36 marked.)

15· · · · · · · · · · · -=0=-

16· ·BY MR. INGRAM:

17· · · · Q.· Have you had an opportunity to review

18· ·what's been marked as Exhibit 36?

19· · · · A.· Yes, sir.

20· · · · Q.· Mr. Greeson, I've handed you what's been

21· ·marked as Exhibit 36, which is an email from you

22· ·to Councilmember Robinson and other members of

23· ·council and City of Worthington officials, dated

24· ·September 29, 2020.· Do you see that?

·1· · · A.· Yes.

·2· · · Q.· And your email is a response to

·3· Councilmember Robinson with a subject of UMCH

·4· discussion with LC.· Do you see that?

·5· · · A.· Yes.

·6· · · Q.· So if we look at Mr. Robinson's email to

·7· you on the same date, he's emailing you about

·8· Mr. Brown's summary that we just reviewed in

·9· Exhibit 35, correct?

10· · · A.· Yes.

11· · · Q.· And he asked in his email, simple

12· question:· Why did you bring to Mr. Hart's

13· attention the UMCH-related discussion we just

14· had at council?

15· · · · · ·MR. SCHUMACHER:· You misread that.· It

16· says, we had just had at council.· Sorry.

17· · · · · ·MR. INGRAM:· I'll rephrase and re-read.

18· · · · · ·MR. SCHUMACHER:· Guardian of the record.

19· BY MR. INGRAM:

20· · · Q.· So let's try this again, Mr. Greeson.

21· On page 2 of Exhibit 36, Councilmember Robinson

22· asked you, quote, simple question:· Why did you

23· bring to Mr. Hart's attention the UMCH-related

24· discussion we had just had at council?· End

1    quote.  Do you see that?

2        A.  Yes.

3        Q.  And then you respond to Councilmember

4    Robinson's question; is that fair?  Is that what

5    your email is doing?

6        A.  Pretty clearly.

7        Q.  All right.  And did you have any

8    discussions with Councilmember Robinson about

9    the question he posed to you?

10       A.  I don't remember having any

11   conversations with him.  I can't recall.

12           This email answers the question to some

13   degree in your last -- regarding your Exhibit

14   35, which I couldn't recall, which is you asked

15   who asked for the meeting.  It appears Mr. Hart

16   might have, based on this exhibit.  I don't

17   recall that; but...

18       Q.  Okay.  You don't recall it one way or

19   the other.  Well, here's the thing that puzzles

20   me a little bit, Mr. Greeson.  Because when I

21   look at your email, the second paragraph on the

22   first page of Exhibit 36, in the second sentence

23   of that paragraph you wrote, Councilmember Smith

24   asks staff to make the potential applicant aware

1  of the conversation.

2        Do you see that?

3        MR. SCHUMACHER:  It's the third

4  sentence.

5        MR. INGRAM:  I stand corrected.

6     A.  I see that.  I don't know what it means,

7  but I see that.

8     Q.  And so based on the context of these

9  emails, it at least appears to me that the UMCH

10  property -- or the UMCH portion of the

11  comprehensive plan was discussed during a City

12  Council hearing, and Councilmen Smith asked

13  staff to make the potential applicant aware of

14  that conversation.  Is that fair?

15        MR. SCHUMACHER:  That's a question?

16        MR. INGRAM:  Yes.

17        MR. SCHUMACHER:  Objection.  Form.

18     A.  Yes.  I think I outline that fairly

19  clearly in this email, and while my memory -- I

20  don't recall all the specifics, this jogs my

21  memory to some degree.  But I don't have

22  anything to add other than what's written in

23  this response to Mr. Robinson.

24     Q.  Okay.  But as far as the meeting that

1  you held with Mr. Hart on September 24, that

2  meeting came at Councilmen's Smith request

3  during the hearing; is that fair?

4      A.  No, I don't believe it did.

5      Q.  Okay.  Why's that?

6      A.  Bear with me.  You know, later in the

7  email I say, as it relates to things being

8  publicly discussed by council and directly

9  affecting a party who has asked to meet with us,

10  and I believe that refers to Mr. Hart asking to

11  meet with us.  He asked to meet with us, and

12  I -- and then I believe we informed them of what

13  had transpired in the council meeting.  That's

14  how I read this.  I don't have a specific

15  recollection of all those details.

16      Q.  Okay.  So you can't recall one way or

17  the other as to who asked for the meeting?

18      A.  No.

19      Q.  But you did know that Lifestyles was a

20  potential applicant at that time, correct?

21      A.  I didn't know what their interests were.

22  Of course, I thought they were a potential

23  applicant at some point, although we had not

24  heard from them in any substantive way since

1    2015.

2        Q.  Well, I'm just using the words here in

3    your own email, Mr. Greeson, where both

4    Mr. Smith apparently referred to Lifestyles as

5    the potential applicant and where you do

6    yourself in the last sentence of your email.

7            MR. SCHUMACHER:  He just told you that

8    he considered them a potential applicant.

9        A.  Yeah.  I think that's right.  Any

10   property owner is a potential applicant.  I

11   mean --

12       Q.  Okay.

13       A.  I don't remember what I knew about their

14   current interests at the time.  So I don't -- I

15   don't put a lot of weight in that language

16   because I don't know that it really means a lot

17   to me.  I wasn't trying to convey anything other

18   than that's what was said in the meeting.

19                        -=0=-

20          (Deposition Exhibit 37 marked.)

21                        -=0=-

22   BY MR. INGRAM:

23       Q.  Mr. Greeson, I've handed you what was

24   marked as Exhibit 37, which is an email from you

1  to Councilmember Robinson, dated October 13,

2  2020.  The subject of your email is the nature

3  of the UMCH comp plan update.  Do you see that?

4     A.  Yes.

5     Q.  And for purposes of the record, Exhibit

6  37 is Bates stamped Worthington 58372 through

7  58376, with page 76 being entirely blank.

8        MR. SCHUMACHER:  You're welcome.  So

9  it's not a million pages, it's 999,000.

10    Q.  And the attachment to -- the attachment

11  to your email to Councilmen Robinson includes a

12  memorandum written by you that we previously

13  looked at earlier?

14       MR. SCHUMACHER:  He was still reading

15  the document.  I think you were distracting him.

16  Sorry.

17       MR. INGRAM:  He already indicated he

18  read the exhibit, I thought.

19       MR. SCHUMACHER:  Sorry.

20    A.  I was in a contemplative mind-set here.

21  Go ahead.

22  BY MR. INGRAM:

23    Q.  And the attachment to your email in

24  Exhibit 37 is a memorandum that you issued, you

1  signed, and we've already discussed earlier

2  today.  Do you recall that?

3      A.  Yes.

4          MR. SCHUMACHER:  Another copy of the

5  same document.

6      Q.  You were asked by Councilmen Robinson on

7  October 24, 2019, to put in writing how one may

8  describe the nature of the UMCH comp plan update

9  process and final product.

10         Do you see that?

11     A.  I do see it.

12     Q.  And in your response, among other

13 things, you wrote, at this point, I'm not

14 comfortable with being asked to characterize the

15 comprehensive plan as a whole or any section as

16 anything other than the adopted policy document

17 of the City Council.

18         Do you see that?

19     A.  I do see that.

20     Q.  Okay.  So why did you not respond

21 directly to Councilmen Robinson's question?

22         MR. SCHUMACHER:  Objection.

23     A.  Let me re-read his email, please.

24     Q.  Go ahead.

1      A.  I'm not sure.  In re-reading his

2   question, he's using words like -- you know,

3   he's challenging -- his words, not mine --

4   challenging the notion that the update is a

5   consensus document, and so he's asking me to

6   characterize it with nontechnical terms.  My

7   role as a city manager is to, you know, work

8   with the policy documents of the City Council,

9   laws adopted by the city.  A comp plan's not

10  law, but the set of guidelines the council had

11  adopted.  This particular councilmember felt

12  very strongly that the strategic direction

13  outlined in the comprehensive plan -- he wasn't

14  the only one -- was directionally wrong, and

15  looks like I artfully avoided assigning

16  language, labels, characterizing the

17  comprehensive plan and just -- in some way that

18  might, you know, cause more division amongst my

19  councilmembers or between council and staff.  I

20  think that's what I was doing.

21      Q.  Fair enough.

22      A.  Trying to be a diplomat, I guess.

23      Q.  And in the course of your prior answer,

24  you referenced the strategic analysis and the

1  comprehensive plan, and you were pointing to

2  Exhibit 1; is that correct?

3      A.  Yes, I believe so.

4      Q.  Well, Exhibit 1 is right here, and this

5  is the document you were pointing to, correct?

6      A.  Yes.

7      Q.  Thank you.

8          You had already testified earlier this

9  morning that Councilmen Robinson disagreed with

10  Exhibit 1 as reflecting the consensus, if I

11  recall correctly.

12     A.  Sure.

13         MR. SCHUMACHER:  Hold on.  Can you read

14  that question back, please.

15         (Record read as requested.)

16         MR. SCHUMACHER:  Thank you.

17     A.  Yeah, I think that's fair.  Yes.  And he

18  wasn't the only one in the community that felt

19  that way.

20     Q.  And you said in your prior response he

21  wasn't the only one.  Were there any other

22  councilmembers that aligned with Mr. Robinson's

23  view?

24     A.  I think earlier in the -- well, I think

1   it's a matter of record, right?  At least at

2   this juncture, Mr. Smith -- and I don't recall,

3   you know, when Mr. Bucher more clearly

4   articulated his thoughts on it.  So I don't

5   recall when that happened.  So yeah, we did not

6   have unanimity amongst councilmembers about --

7   about the strategic direction outlined in the

8   comprehensive plan.

9           And I think, if you watch the video,

10  there were some people who, you know, felt -- my

11  guess is -- my memory of it is that you'll hear

12  people wrestling with a lot of things.  One is,

13  was this directionally correct?  Another is

14  whether it's just time, so much time had passed

15  without a development application and without

16  anything going on there that there were some

17  that thought -- well, while they may have had

18  more favorable feelings towards the 2014 comp

19  plan, there may have been -- there were

20  councilmembers that were okay with, you know,

21  the possibility of updating the comp plan

22  because the bones of it hadn't been updated

23  since '05, and a lot had changed since 2014 in

24  terms of the public's, you know, sentiment, and

1    there had been hundreds and hundreds of people

2    who would give an opinion and lots of

3    controversy.  So there were a variety of

4    opinions, and it was difficult to figure out

5    what the consensus or majority was.

6        Q.  Well, one thing you said, though, was

7    this email is from October 13, 2020, or your

8    response was.  And Councilman Robinson had sent

9    you a prior email a few days before on October

10   10th.  Do you see that?

11       A.  Yes, I do.

12       Q.  And Lifestyle had actually filed its

13   rezoning application with its proposed

14   development plan on October 5th of 2020.  So

15   there was a development plan pending before

16   council at the time.

17       A.  Okay.  Thank you for clarifying the

18   timeline.

19       Q.  And so after Lifestyles had submitted

20   its rezoning application and development plan,

21   did Councilmember Robinson or Councilman Smith

22   or Councilman Bucher seek to amend the

23   comprehensive plan or circulate a proposal to

24   amend the comprehensive plan?

1      A.  After they filed?

2      Q.  Correct.

3      A.  I don't recall that they did, no.  And

4  it would be part of the record you have if they

5  did.

6      Q.  And what I'm looking -- my question goes

7  more towards internal drafts or proposals that

8  were not made a public record.

9      A.  Again, you would have them, if they

10  existed, and I'm not aware of any.  The question

11  was comp plan amendments or -- no, I don't -- I

12  don't believe so.  I don't have any recollection

13  of that.

14      Q.  With respect to the emails you received

15  from Councilmen Robinson set forth in Exhibit

16  37, did you provide those emails to anyone?

17      A.  I don't know.  This response?

18      Q.  Or his emails to you about a comp plan

19  update concerning the UMCH property.

20      A.  In Exhibit 37, did I forward these, is

21  that what you're asking?

22      Q.  Or share them with anyone else.

23      A.  I don't remember.

24      Q.  2020, was Ms. Michael still the council

1  president?

2      A.  Yes, I believe so.

3      Q.  Did you discuss Mr. Robinson's

4  persistent inquiries about amending the comp

5  plan with Council President Michael?

6          MR. SCHUMACHER:  Objection to the

7  characterization.

8          You can answer.

9      A.  I don't know.  I don't recall.  But in

10  re-reading this email, I don't think it really

11  says a lot about amending it.  It's just how I

12  would characterize the original plan update in

13  2014.  So I don't know that I would have, but I

14  don't have any recollection one way or the

15  other.

16      Q.  I guess, when I said amendment, I guess

17  I was referring to the temporary suspension that

18  Mr. Robinson had been raising and referring to

19  just prior to this point.

20      A.  Yeah, no, I think he's, you know,

21  talking about how -- I think he's talking about

22  how I characterize the 2014 UMCH comp plan

23  update in these emails.  He's not talking about

24  the desire to amend it.

1      Q.  I see.

2      A.  That's how I read this, and I believe

3  that's how I responded, it appears.

4      Q.  Okay.

5                    -=0=-

6       (Deposition Exhibit 38 marked.)

7                    -=0=-

8       MR. SCHUMACHER:  Get some substance now.

9  BY MR. INGRAM:

10     Q.  While you're reviewing the document, for

11  purposes of the record, Mr. Greeson, I'm handing

12  you -- or I've handed you what's been marked as

13  Exhibit 38.  It's a staff memorandum to you from

14  Lee Brown, dated November 8, 2021, and is Bates

15  numbered Worthington 3135 through page 3171.  Do

16  you see that?

17     A.  Yes.  Okay.

18     Q.  Do you recognize Exhibit 38,

19  Mr. Greeson?

20     A.  Yes.

21     Q.  Have you reviewed it before?

22     A.  I have.

23     Q.  Were you involved in preparing any

24  portion of Exhibit 38?

1      A.  I was not, although I likely read it

2   before it went out the door.

3      Q.  Did you make any revisions to --

4      A.  I don't believe I made any revisions to

5   it.  Again, my role, I'm not the city planner.

6   My role is to, you know, be aware of what we

7   were doing to oversee it, but I was relying on

8   Mr. Brown's technical expertise, which is good.

9   And I don't think I substantively impacted it.

10      Q.  Did you discuss any portions of the

11   substance of this memorandum with Mr. Brown

12   before it was completed?

13      A.  I likely discussed his conclusions with

14   him, but I don't have a specific memory of that

15   conversation.

16      Q.  Okay.  And why do you say you likely

17   discussed his conclusions with him?

18      A.  Because I oversee -- ultimately oversee

19   the process and the work, and I think that's --

20   as city manager and one of our directors on a

21   big project and big sensitive issue like this, I

22   wasn't going to -- you know, he was likely going

23   to share his thoughts with me before he sent it

24   to the planning commission.  But like I said, I

1  can't tell you a specific time or date or the

2  content of that.  I'm just being forthright that

3  we likely talked about his analysis of it, and

4  then I likely reviewed it before it went out the

5  door.  I just don't have a very specific memory

6  of all that.

7      Q.  So other than Mr. Brown, are you aware

8  of any other city officials who participated in

9  the preparation of this memorandum in Exhibit

10 38?

11     A.  I think, at that juncture, Mr. Brown

12 reported to Ms. Stewart, who was one of his --

13 as assistant city manager.  We had done some

14 reorganization at some point where different

15 departments got realigned for reporting

16 relationships, and she had service parks and rec

17 and planning and development who reported to

18 her, and I believe she probably reviewed this

19 document to assist Mr. Brown in making sure that

20 we took a huge volume of information and wrote

21 it in a coherent fashion that was objective and

22 clear to the reader.  She's an excellent writer.

23     Q.  So would any of the recommendations set

24 forth in Exhibit 38 have been Ms. Stewart's

1   recommendations, or are they all Mr. Greeson's?

2        MR. SCHUMACHER:  Did you say Greeson?

3        MR. INGRAM:  I'm sorry.  Mr. Brown.

4        MR. SCHUMACHER:  If you want to stop

5   now, if it's too late for you, we can stop.

6   A.  Well -- so this is the staff memorandum

7   to the City Council, and went to the planning

8   commission first, as you well know, with a

9   planning staff -- planning and development

10  department's -- planning and building, I should

11  say, department's staff recommendation to the

12  planning commission, and then this memo

13  transmits both the planning commission's and the

14  staff's original recommendation.  And the

15  process for doing that is Mr. Brown writes me a

16  memo, as you see here, and then I send it to the

17  council through the agenda.  I think your

18  question was whose recommendation was it.

19  Q.  Let me clarify my question.  Sorry.  I'm

20  asking with respect to staff as opposed to

21  planning commission.

22  A.  Well, Mr. Brown developed the original

23  recommendation for the planning commission, and

24  certainly I oversaw that, and so when we say the

1  staff recommendation, I think it's all of ours.

2      Q.  But you didn't assist or provide the

3  recommendations, you just reviewed it at the

4  end, correct?

5      A.  Yes.  I may have talked to him about

6  some of his thinking and aspects of it along the

7  way, but again, I don't remember the details of

8  that.  I mean, he would have shared those with

9  me.  But no, I didn't write this.

10      Q.  And did you have any conversations with

11  Ms. Stewart pertaining to any of the

12  recommendations that were set forth in this

13  memorandum?

14      A.  I don't have a specific recollection of

15  conversations I had with her, but our offices

16  were right next to each other, so I imagine I

17  did.

18      Q.  But none that you recall?

19      A.  None that jump out at me.

20      Q.  Okay.  Did you disagree with any of the

21  staff recommendations in this memorandum?

22      A.  No, I did not.  I thought -- well, I'll

23  just say no, I did not at this point.

24      Q.  Okay.  And what did you think?  If you'd

1    round out your thought there.

2        A.  You know, the first thing is I think you

3    gave me the staff report for the second version

4    of the application.  The first version left a

5    lot to be desired.  It wasn't very clear on many

6    aspects of the overall development.  And while

7    they cleaned it up, you know, I think Mr. Brown

8    points out a number of areas where it's

9    deficient.

10           I'll go back to some comments I made

11    earlier.  I never -- I didn't think it struck

12    the balance that the comprehensive plan update

13    contemplated between housing and housing types

14    and office and economic-generating activity and

15    meaningful park space.  And the 2015 plan had

16    less density on --

17           MR. SCHUMACHER:  You said plan, or

18    application?

19        A.  Well, they had a 2015 concept plan that,

20    you know, had many objections from the

21    community, and I'm sure were listening to the

22    volume of -- when we had a whole website section

23    on UMCH issues where we kept people updated and

24    people's opinions were available and there was

1  masses of comments and community dialogue and,

2  you know, narrative during the many ensuing

3  years between 2015 and when they ultimately

4  filed.  And, you know, the public's concerns

5  about the balance of uses on the site weren't --

6  seemingly weren't considered because they got

7  more dense, probably less economically impactful

8  on less land following the subdivision off of

9  the West Ohio Conference.  And didn't reflect, I

10  think, their best effort.

11      Q.  Anything else?

12      A.  Well, that's a broadbrush.  I think

13  Mr. Brown does a very thorough job laying out

14  the staff's concerns on each aspect of the

15  comprehensive plan, and I've given you a broad,

16  general framework for what I thought, but I

17  thought he did a very good job looking at all

18  aspects of the comprehensive plan, fairly

19  pointing out where it's improved, and outlining

20  deficiencies that rise to the level of not

21  approving it.

22      Q.  Okay.  With your broadbrush answer, is

23  there anything else beyond the -- I wrote down

24  seven different things you've listed.

1      A.  Well, no, I'm not going to offer any

2   more at this point.  I think Mr. Brown's memo

3   does a good job of articulating the staff's

4   viewpoints on the application.

5      Q.  Okay.  I just want to make clear, I'm

6   asking is there anything else, and you're saying

7   you're not going to offer anything up beyond the

8   text of the memo itself.  Is there anything that

9   you're leaving out, or are you just going to

10   stand on Mr. Brown's memo?

11          MR. SCHUMACHER:  Objection.

12   Argumentative.

13      A.  I am not leaving anything out that comes

14   to my mind.

15      Q.  Thank you.

16      A.  I reserve the right to share that with

17   my counsel if he so desires at some point.

18   However -- not my counsel, the City's counsel.

19   However, I will comment that I think Mr. Brown's

20   memo's thorough.

21      Q.  And I'm just asking your understanding,

22   your thoughts with respect to the conclusions

23   set forth in Mr. Brown's memo.  Okay?  And I

24   just want to know what those are.

1      A.  I think I gave them to you.

2      Q.  All right.  And so you said with respect

3  to Exhibit 1 --

4          MR. SCHUMACHER:  Did you have more to

5  say?  I'm sorry.

6          THE WITNESS:  No.  I think he did a good

7  job.  I think he thoroughly outlined the -- I

8  think he did what the staff's job is, is to

9  review the plan and outline the issues

10  associated with it, and, you know, share our

11  thoughts on its deficiencies.  And, you know, he

12  did that.  I support what was written.

13  BY MR. INGRAM:

14      Q.  Okay.  Now, with respect to your

15  testimony regarding your opinion that the

16  application didn't strike a balance between the

17  land use plan set forth in Exhibit 1 with

18  respect to different housing types, what are you

19  referring to?

20      A.  Well, bear with me.

21          Yeah, I think Mr. Brown's memo does a

22  better job of articulating than I can on --

23      Q.  You're looking at a page.  Can you --

24      A.  Yeah.  003161.  There's a conversation

1  about residential density height and housing

2  types and, you know, the plan, and that whole

3  housing section, you know, talks about some of

4  the issues associated with then housing.

5  Essentially that the density was too much and

6  also that the variety didn't respond to some of

7  the needs that became expressed by the community

8  over time.

9     Q.  Okay.  But you were referring to housing

10  types and density in connection with the land

11  use plan.  Specifically where in the land use

12  plan does this application not strike the

13  appropriate balance?  Because when I look at the

14  section you just directed me to, that's

15  comparing with the 2015 plan -- or 2015 concept

16  version, but doesn't refer to Exhibit 1.

17     A.  How about we schedule a time when I

18  re-reviewed this and reviewed this and we can

19  have a debate about it.  But I haven't -- I

20  would need to read the 2014 comprehensive plan.

21  You asked me for my off-the-cuff opinion, and I

22  gave it to you.

23     Q.  Well, Mr. Greeson --

24     A.  Bottom line is I think Mr. Brown's memo

1  is what I reviewed at the time, and I thought it

2  reflected that that was the staff's opinion at

3  the time, and that was my opinion at the time,

4  because I agreed with it.  And the density in

5  particular is significantly different than it

6  was in 2015.  I mean, wasn't sufficient office,

7  wasn't sufficient green space, and the density

8  exceeded what I think the community would have

9  supported and was appropriate under the plan.

10     Q.  Okay.  Couple things, Mr. Greeson.

11  Number one, I'm not here to argue or debate with

12  you.  I'm here to understand --

13        MR. SCHUMACHER:  Objection.  I think you

14  are.

15     Q.  I'm here to understand your personal

16  knowledge --

17     A.  Yes.

18     Q.   -- and your understanding of why you're

19  agreeing with Mr. Brown's conclusions in this

20  memorandum.  And you provided me with -- I wrote

21  down seven different things.

22     A.  Right.

23     Q.  And the first four that I wrote down

24  related to -- all related to the land use plan

1    set forth in Exhibit 1.

2        A.  Yes.

3        Q.  And so now I want to ask follow-up

4    questions of why you -- what the basis was for

5    each one of --

6        A.  Of those seven things?

7        Q.  Correct.

8            MR. SCHUMACHER:  Let me interpose.

9        A.  This.

10           MR. SCHUMACHER:  "This," he's referring

11   to Exhibit 38.

12           Let me interpose an objection as to the

13   argumentative nature of your question, and also

14   to the relevance of a witness who's not on City

15   Council who doesn't have decision-making

16   authority.

17           He's pointed you to the staff report,

18   Exhibit 38.  He's told you to talk to Mr. Brown

19   about that in detail.  He's giving you his

20   off-the-cuff.  If you do want to argue with him

21   about that, there's a time and place for that,

22   and it's not in a deposition.

23   BY MR. INGRAM:

24       Q.  Okay.  Mr. Greeson --

1      A.  Yes, sir.

2      Q.  -- so with respect to the balance of

3  the types of housing and the density with the

4  land use plan, which balance or where in the

5  land use plan in Exhibit 1 were you referring

6  to --

7          MR. SCHUMACHER:  Same --

8      Q.  -- that the application failed to

9  achieve?

10          MR. SCHUMACHER:  Same objection that I

11  just made.

12      A.  So I would refer you to the staff memo,

13  and I would need to read that to cite the

14  specific sections, and then re-read this, but I

15  think the staff memo calls out fairly clearly

16  some of the deficiencies in the plan, in their

17  submittal.  I'm not sure that I have any other

18  comments because I'm not prepared to go

19  scripture and verse between sections of the UMCH

20  focus area plan from 2014 and their submittal.

21      Q.  And so what -- when you reference the

22  housing types or the density in connection with

23  the land use plan, what was -- what's that based

24  upon?

1         MR. SCHUMACHER:  Objection.

2      A.  I'm sorry, repeat your question.

3      Q.  I'm just trying to understand or

4   ascertain the basis for your reference to the,

5   in your mind, insufficiency of housing types or

6   the density as it -- in Lifestyle's application

7   as it related to the land use plan in Exhibit 1.

8         MR. SCHUMACHER:  Objection.

9   Argumentative.

10      A.  All right.  Bear with me.  I'm going to

11   read.

12      Q.  Take all the time you need.

13         MR. SCHUMACHER:  Until 5:00.

14         Is there a question pending?

15         MR. INGRAM:  Yes.

16         MR. SCHUMACHER:  What was the question?

17   I'm sorry.  I forgot.

18         (Record read as requested.)

19         MR. SCHUMACHER:  Objection.  You can

20   answer.

21      A.  First, I'm not sure my opinion matters,

22   first of all.  I'm no longer the city manager.

23   Second, the planning commission has the charter

24   duty to make the recommendation, and it's

1  ultimately a policy decision of the City

2  Council.  The manager's role and Mr. Brown's

3  role would be to facilitate process, provide

4  technical information, which he does in his

5  memo, and give any insights that we might choose

6  to offer.  However, we don't make policy.  It's

7  ultimately the City Council's decision and the

8  planning commission's important charter role to

9  offer them their opinion.

10         However, to answer your question, I'll

11  go density and housing type.  The density on the

12  site as was proposed was, I think, 600 units,

13  which was higher than the 2015 proposal with

14  less acreage.  And that's not answering the

15  question you asked, but I'm offering it.  And so

16  in that regard, I don't think that they listened

17  to the overwhelming outpouring of concern about

18  the density that was suggested in 2015 when they

19  drafted a proposal many years later with less

20  land.

21      Q.  Mr. Greeson --

22      A.  The second --

23         MR. SCHUMACHER:  I don't think he's

24  done.

1      A.  The second thing, which I think more

2  directly responds to your question, was the mix.

3  They proposed a mix of for-sale and for-rent

4  products throughout the site.  I think

5  predominantly for rent.  And the floor plan

6  options had few options for single-level living,

7  which is, as Mr. Brown outlines in his memo, one

8  of the things that we heard repetitively from

9  the community.  The strategic analysis or the

10  adopted UMCH focus area amendment of the

11  comprehensive plan in 2014 has objectives that

12  are pretty clearly outlined, and that includes

13  addressing the needs of current and future

14  residents by providing new housing types,

15  options that are underrepresented in the market

16  and complements Worthington's current offerings.

17  And if you do any listening to the community,

18  you'll hear that people want to be able to stay

19  in this community and have opportunities for

20  single-level living.  That's been expressed in

21  lots of different ways by the community over

22  time, and I think it was -- you know, that

23  different housing type that doesn't exist in our

24  market isn't offered.

1          I think, additionally -- bear with me.

2    I lost my place.  In the neighborhood core

3    section of the land use plan, there's also

4    discussion about introducing residential living

5    that is underrepresented in the market and

6    complements Worthington's current offering,

7    addressing the needs of aging Worthington

8    residents -- I emphasize there -- future young

9    professionals, and those desiring amenity-rich

10   living.  Perhaps you might need to hear that

11   again.  Addressing the needs of aging

12   Worthington residents.

13          MR. SCHUMACHER:  Do you want him to go

14   on?  Chris, do you want him to continue?

15   BY MR. INGRAM:

16     Q.  Are you finished answering?

17     A.  Yes.

18     Q.  And with respect to the for sale, for

19   rent residential house styles in Lifestyle's

20   application, how does that fall short or not fit

21   within the land use plan?  Can you point me to

22   that?

23          MR. SCHUMACHER:  Objection.

24   Argumentative.  Do we have that plan here?  I

1    don't think I have the plan.

2         MR. INGRAM:  It's Exhibit 1.

3         MR. SCHUMACHER:  I thought you were

4    referring to Lifestyle's plan and why it didn't

5    comport with Exhibit 1.  What I'm saying is, I

6    don't think we have Lifestyle's plan in front of

7    us.  And if you're asking the witness to compare

8    your client's deficient plan with the Exhibit 1

9    and with the staff memo Exhibit 38, then I think

10   we need to look at that.  If we're going to

11   debate this case here and on deposition, that's

12   what we're going to have to do.

13        A.  I don't think I outlined rental or for

14   rental as one of my opinions earlier.  I just

15   cited that it was the fact that they had a mix

16   in their proposal.  I don't have any comment on

17   that.

18        Q.  Okay.  It had written down for sale, for

19   rent as part of your response.

20        A.  I was just reciting that out of

21   Mr. Brown's memo that their proposal included a

22   mix of those, and I commented that it was

23   predominantly for rent, but it was a mix of for

24   rent.  I was just stating what I think are the

1    facts about their proposal based on what was in

2    Mr. Brown's memo. I wasn't commenting on this,

3    on the type of housing, or the -- whether it

4    was -- you could buy it or rent it.

5        Q. What new housing types in your mind were

6    missing?

7            MR. SCHUMACHER: Same objection as

8    before.

9            Go ahead.

10       A. Single-level living is among the others

11   and among -- is one of them. And then I would

12   have to review the proposal in more detail and

13   look at Mr. Brown's memo in more detail to

14   further answer the question.

15       Q. And then you repeated a reference to the

16   needs of aging residents with respect to the

17   neighborhood core.

18       A. Yes, sir.

19       Q. And what were you referring to there?

20       A. Single-level living, that we've heard in

21   the Worthington community for many years.

22       Q. To your knowledge, did you or a member

23   of the city staff communicate any concern that

24   there was not enough single-story residential

·1· ·products or housing, I should say, in their

·2· ·application?

·3· · · · · ·MR. SCHUMACHER:· Go ahead.

·4· · · · · ·THE WITNESS:· I thought you were raising

·5· ·your hand.

·6· · · · · ·MR. SCHUMACHER:· You did ask -- your

·7· ·question related to staff, right?

·8· · · · · ·MR. INGRAM:· To Mr. Greeson or his

·9· ·staff.

10· · · · · ·MR. SCHUMACHER:· Right.

11· · · ·A.· Yeah, I don't -- I didn't have a

12· ·specific -- when?

13· ·BY MR. INGRAM:

14· · · ·Q.· With respect to the --

15· · · ·A.· This application?

16· · · ·Q.· -- the Lifestyle application.· Yes.

17· · · ·A.· I didn't have a specific conversation.

18· ·It's clear in the comprehensive plan, it's

19· ·clearly in the body of information that the

20· ·public, you know, advanced over time, and you

21· ·would have to ask other staff who interacted

22· ·with them more frequently what was commented on.

23· · · ·Q.· Well, you interacted with Mr. Hart and

24· ·Mr. Brownlee, correct?

1      A.  At the beginning of the process,

2  briefly.

3      Q.  Okay.  And you didn't communicate this

4  issue to either of them, correct?

5      A.  I don't --

6          MR. SCHUMACHER:  When?  After this

7  application was filed?

8          MR. INGRAM:  Yes.

9          MR. SCHUMACHER:  Go ahead.

10      A.  So let me go back to my role.  I was not

11  managing the interaction with UMCH.  You asked

12  my thoughts on their application.  I gave them.

13  The official thoughts of staff on the

14  application are written in Mr. Brown's memo.

15  You asked my personal thoughts, and I gave them

16  to you.  And the official recommendation is

17  right here.  It's Exhibit 38.  I did not have

18  much interaction with Mr. Hart or Mr. Brownlee

19  during the process.  That was largely Mr. Brown,

20  to some degree Mr. Lindsey, and then before the

21  planning commission.  But I think the

22  comprehensive plan is clear and their

23  application wasn't totally responsive to it.

24      Q.  Okay.  And with respect to the

1  comprehensive plan in Exhibit 1, in addition to

2  housing types, you referenced, in your personal

3  opinion, insufficient office space, lack of

4  meaningful park space, and less

5  economic-generating activity.  Fair?

6      A.  Yeah.  I mean, go -- that sounds -- I'm

7  sure that's what I said.

8      Q.  Well, I just want -- I want to make sure

9  that I understand what your concerns were and --

10  because my question is:  Did you convey any of

11  those concerns with anyone from Lifestyle while

12  the application was pending?

13          MR. SCHUMACHER:  Other than what was

14  expressed by staff and the planning commission?

15  You're asking him personally?

16          MR. INGRAM:  Read back my question,

17  please.

18          THE WITNESS:  I'm going to get some

19  water.

20          MR. SCHUMACHER:  Can we go off the

21  record.

22          (A discussion is held off the record.)

23          (Record read as requested.)

24      A.  The application in -- whenever it was,

1    2021, I did not have much interaction with

2    Lifestyle or Mr. Hart.  I can't recall that I

3    specifically communicated that.  We were

4    encouraging and open, iterative process before

5    the planning commission.  So I was being -- I

6    also didn't want to unfairly interject myself in

7    a process that I thought should be -- you know,

8    would build trust in the community if it was,

9    you know, happening before the planning

10    commission.  So no.

11        Q.  Okay.

12        A.  I was not a part of all of the

13    conversations that occurred with them.

14        Q.  In preparation for your deposition

15    today, you had reviewed the meeting minutes from

16    the planning commission hearing on this

17    application.  Do you recall that?

18        A.  I do.

19        Q.  And do you recall that the commission

20    prevented Lifestyle from amending its

21    application?

22        A.  In the sense -- no, they didn't.  They

23    did amend their application, but only once.  I

24    mean, they had an application.  It was poorly

1    constructed.  They had many months to bring back

2    to the planning commission ideas, iterative

3    changes, or concepts for the planning commission

4    to react to.  I think Mr. Brown regularly

5    communicated with them to see if they had any

6    updates, because we were committed to making

7    sure that we were timely, that we got it before

8    the planning commission, and that we were

9    administering the process.  They took -- again,

10   they went relatively dark for a long period of

11   time, and then came back with a proposal that

12   was their one amendment.

13       Q.  Did --

14           MR. SCHUMACHER:  Are you done?

15           THE WITNESS:  Yeah.

16       Q.  Mr. Greeson, did you attend that

17   planning commission hearing?

18           MR. SCHUMACHER:  Which one?

19       Q.  The October 14, 2021, hearing.

20       A.  You know, I read the minutes.  I don't

21   remember.  I think I listened in.  I would have

22   to go back and look.

23       Q.  You don't recall one way or the other?

24       A.  No.  And I didn't pay attention in the

1  minutes of whether I was there or not.

2        MR. SCHUMACHER:  It was virtual.  Just

3  point of clarification.

4        Q.  Do you recall whether you attended

5  virtually?

6        A.  I don't recall.

7        Q.  And you just mentioned that you

8  thought --

9        A.  Busy time.

10       Q.   -- Mr. Brown was regularly

11  communicating with Lifestyle.  Do you know that,

12  or are you speculating?

13       A.  No, I know that he was reaching out at

14  least monthly to see if they had any updates.

15       Q.  And how do you know that?

16       A.  Because Mr. Brown reported to us.

17       Q.  And how did Mr. Brown report to you?

18       A.  I don't recall specifically.  It was

19  probably verbally.

20       Q.  Would there be emails or notes from

21  those conversations?

22       A.  With me, between Mr. Brown and me?

23       Q.  Yes.

24       A.  Probably not.  I do not have any, I

1   should say.

2       Q.  Okay.  Was there a file concerning this

3   application where there would be documentation

4   between the interactions of Mr. Brown and

5   Lifestyle's representatives?

6       A.  I don't know.

7       Q.  Can you recall any specific times when

8   Mr. Brown updated you with his conversations

9   with Lifestyle's representatives?

10      A.  Not specifically.

11      Q.  I've handed you, Mr. Greeson, what was

12  previously marked as Exhibit 6?

13      A.  Yes.

14      Q.  Which is Ordinance No. 4-2022.

15      A.  Okay.

16      Q.  You've reviewed Exhibit 6?

17      A.  (Nods head.)

18      Q.  Do you recall this moratorium ordinance?

19      A.  Yes.

20      Q.  Who was involved in drafting the

21  moratorium ordinance concerning the UMCH

22  property?

23      A.  The law director was the -- wrote it.  I

24  looked at it.  I believe Mr. Brown looked at it.

1  I may have -- I may be wrong about that.  My

2  memory may be faded on that.  But both

3  Mr. Lindsey and I were involved in it.

4      Q.  Okay.  And who originally proposed this

5  ordinance to you?

6          MR. SCHUMACHER:  Objection.  Relevance.

7          You can answer.

8      A.  Who requested it?  Is that what you're

9  asking?

10      Q.  Yeah, that's a more artful way of

11  stating it.

12      A.  Council President Robinson.

13      Q.  And when did Council President Robinson

14  request that this ordinance be prepared?

15      A.  I don't recall the specific time or

16  date.  It was early in his tenure as council

17  president.

18      Q.  So this ordinance was proposed and voted

19  upon at City Council's January 18, 2022,

20  meeting.

21      A.  Right.  It was not -- I'm sorry.  Repeat

22  the date.  January --

23      Q.  January 18, 2022.

24      A.  Right.  So it would have been between --

1   you know, in the week or so prior to that.

2       Q.  Okay.  And this ordinance or proposed

3   ordinance was not on City Council's agenda.  Do

4   you recall that?

5       A.  Yes, I do.

6       Q.  And do you know why this proposed

7   ordinance was not included on the agenda?

8       A.  Well, it wasn't done, for one, and I am

9   not sure it was finally -- when the agenda went

10  out the door, I'm not sure it was finally

11  concluded it was going on.  And I don't think

12  its content was completed until close to the

13  meeting.  I don't remember how close to the

14  meeting, but fairly close to the meeting.

15      Q.  So at this time, Councilmember Robinson

16  had become the City Council president?

17      A.  Correct.

18      Q.  In January of 2022.  So he's a brand-new

19  president?

20      A.  Correct.

21      Q.  And we'll call it the second week of

22  January or third week of January he approaches

23  you and Mr. Lindsey and requests that this

24  moratorium be prepared; is that fair?

1      A.  Sometime in that time frame.

2      Q.  Okay.  And did you communicate

3  Mr. Robinson's request that a moratorium be

4  prepared with respect to the UMCH property to

5  any other councilmembers?

6      A.  At some point in the process between his

7  request, our decision to prepare it and the

8  council voting on it, I spoke with each of the

9  councilmembers to inform them that we had

10  received this request and that it was coming and

11  that we were working on it.

12      Q.  How far in advance did you speak with

13  each member of council to the January 18th

14  meeting?

15      A.  Not -- I mean, again, we did not have it

16  complete, so I don't recall specifically.  It

17  was late in the week and over the weekend

18  probably.  I don't have a -- I don't have a

19  specific timeline that I recall.

20      Q.  Okay.  And that meeting was on a

21  Tuesday, Tuesday evening.

22      A.  All right.

23      Q.  And so to the best of your recollection,

24  you spoke with each member of council over the

1  preceding weekend or late the week before; is

2  that fair?

3      A.  Yeah, and it could have been as late as

4  Monday.  I don't remember.

5      Q.  So each member of council knew that

6  this -- that a moratorium would be proposed on

7  the UMCH site?

8          MR. SCHUMACHER:  Objection.  He didn't

9  say that.

10     A.  That it was being prepared and that

11  there was a likelihood that it was going to be

12  proposed.

13     Q.  Okay.

14     A.  Staff was not proposing it.

15     Q.  Of course.

16         Did you talk to any city staff about

17  this proposed moratorium prior to the hearing?

18     A.  I likely did.  I don't recall having --

19  who I talked to other than Mr. Lindsey.  I may

20  have talked some to Mr. Brown, although he was

21  not heavily involved in the dialogue about this.

22  Ms. Stewart may have been aware of it, but I

23  don't recall involving her.  I don't have a lot

24  of memory around other than Mr. Lindsey and I.

1      Q.  Did you notify anyone from Lifestyle

2  about this proposal in advance of the hearing?

3      A.  I did not, although they were at the

4  hearing.  Representatives of Lifestyle,

5  Mr. Miller, I believe, was at the meeting.

6      Q.  So you're referring to the February 7th

7  meeting, the following meeting.

8      A.  Okay.  That might be the case.  It's

9  been a long time.

10      Q.  I understand.

11          MR. SCHUMACHER:  It was a public

12  meeting, so anybody can come, even those who

13  live on Gay Street.

14      A.  No, I did not at the time contact

15  anybody in Lifestyle.

16      Q.  Just to be clear, the Ordinance 4-2022

17  was heard and voted upon during the January 18,

18  2022, hearing, and then there was --

19          MR. SCHUMACHER:  What was the result?

20      Q.  -- there was a February 7, 2022,

21  hearing, a discussion item, UMCH focus area

22  moratorium.  I have the agenda here if you'd --

23          MR. SCHUMACHER:  Is that marked already?

24          MR. INGRAM:  Yeah.

1          MR. SCHUMACHER:  Which one was it?

2          MR. INGRAM:  Exhibit 13.

3          MR. SCHUMACHER:  Thank you.

4    BY MR. INGRAM:

5      Q.   -- to refresh your recollection,

6    Mr. Greeson.

7      A.  Thank you.

8          MR. SCHUMACHER:  That was marked during

9    the prior deposition, not today.

10     A.  Further discussion.

11     Q.  Does that refresh your recollection as

12   to the sequence of events?

13     A.  Somewhat.  There's been a lot that's

14   happened since then.

15     Q.  Okay.

16         MR. SCHUMACHER:  Well, what's the

17   question, whether Mr. Miller was at the February

18   7th meeting, or the January 18th meeting?

19         MR. INGRAM:  That's not the question at

20   all.  He indicated he was confused, and so I was

21   just reminding him of the sequence of events

22   with the two hearings.

23         MR. SCHUMACHER:  I thought he said that

24   Mr. Miller was at the January 18th meeting, and

1  your questions were designed to -- what, to

2  clear up that confusion?

3        MR. INGRAM:  Yes.

4        MR. SCHUMACHER:  Thank you.

5        MR. INGRAM:  Just to clear up the

6  record.

7        MR. SILK:  So it was the question.

8        MR. SCHUMACHER:  All right.

9  BY MR. INGRAM:

10     Q.  And so my prior question, Mr. Greeson,

11  was whether you had shared the moratorium

12  pertaining to the UMCH property, the proposal,

13  with anyone from Lifestyle prior to the January

14  12th hearing.  You said you did not.  Are you

15  aware of anyone else from the city sharing this

16  proposed ordinance with anyone from Lifestyle

17  prior to that hearing?

18     A.  I'm not.

19     Q.  Were you asked by anyone not to share

20  this proposed moratorium with anyone from

21  Lifestyle?

22     A.  I don't recall specifically whether I

23  received a direct ask to do that.

24     Q.  What do you recall?

1          A.  That we discussed -- there was some

2    discussion about, you know -- I don't have a

3    vivid memory of it, but there was some

4    discussion about, you know, when this should be

5    shared, but I don't have a specific memory of

6    it.

7          Q.  Okay.  And was that --

8          A.  It would have been dialogue between

9    Mr. Robinson, Mr. Lindsey and I.

10          Q.  So there was a discussion involving you

11    and Mr. Lindsey and President Robinson

12    concerning when this proposed moratorium should

13    be shared; is that fair?

14          MR. SCHUMACHER:  Objection to the extent

15    that this invades the City's attorney-client

16    privilege.

17          A.  I don't know about when.  Maybe whether.

18    But I don't have a specific memory of it.  I

19    didn't share it, so clearly I concluded that we

20    shouldn't, or that I shouldn't.

21          Q.  Okay.

22          A.  So -- I don't have anything else to add.

23          Q.  Was the fact that a moratorium on the

24    development of the -- of LC's property is going

1  to be discussed during the January 18 hearing --

2  City Council hearing -- a citizen testified at

3  that hearing because he had heard about it in

4  the community.

5      A.  Okay.

6      Q.  Did you share this proposal or in any

7  way tell anyone else about this proposed

8  moratorium in advance of that meeting?

9      A.  Beyond council and staff, no.

10      Q.  Are you aware of any staff members

11  sharing the proposed moratorium with anyone in

12  the public?

13      A.  I'm not aware, and don't recall at this

14  point.

15      Q.  I'm handing you what was previously

16  marked as Exhibit 7, which was Resolution

17  No. 4-2022.  Have you had a chance to review

18  Exhibit 7?

19      A.  Yes.

20      Q.  Very similar questions on this

21  resolution as I had on the prior ordinance.

22      A.  Yes.

23      Q.  You can see here from the face of

24  Exhibit 7, Resolution No. 4-2022 was adopted by

1  City Council on January 18, 2022.  Do you see

2  that?

3       A.  Yes.

4       Q.  And do you recall that this resolution

5  was not on City Council's agenda for that

6  hearing?  Do you recall that?

7       A.  Yes.

8       Q.  Who drafted Resolution No. 4-2022?

9       A.  I don't recall.  I can only assume that

10  our law director did, but I don't specifically

11  recall who drafted the resolution.

12       Q.  So you don't know one way or the other?

13       A.  I don't -- no, I don't remember.

14       Q.  Okay.

15       A.  These kind of cover resolutions are

16  usually drafted by staff, but they're -- I don't

17  recall specifically.

18       Q.  Were you involved in drafting this

19  resolution in Exhibit 7?

20       A.  I don't believe so.

21       Q.  And then with respect to the amendment

22  to the comprehensive plan update that's attached

23  to the resolution, that would be pages 2 and 3

24  of Exhibit 7, were you involved at all in

1    drafting that comprehensive plan update?

2        A.  Let me go back and say I don't recall on

3    the resolution.

4        Q.  Okay.

5        A.  Let's me clarify my answer.  I don't

6    recall whether I reviewed it, because I don't

7    recall.  I was not involved in drafting the --

8    what did you describe this as?

9        Q.  The --

10           MR. SCHUMACHER:  Page 2 and 3.

11       Q.  The comprehensive plan update, or the

12   amendment to it.

13       A.  No, I was not involved in drafting it.

14       Q.  It would be helpful if it had a title.

15       A.  Yeah.

16       Q.  Okay.  Do you know who did?

17       A.  I believe it was -- I believe it was

18   drafted by Mr. Robinson.

19       Q.  And why do you believe that?

20       A.  He is the one that transmitted it to the

21   City Council.  I'm not aware of anybody else

22   being involved.

23       Q.  Did Mr. Robinson --

24       A.  I should say I don't remember anybody

1  else being involved.

2     Q.  With respect to this amendment to the

3  comprehensive plan, did you provide Mr. Robinson

4  with any specific information that was

5  incorporated or adopted into this amendment?

6     A.  No, I did not.  I wrote that memo in the

7  early part of -- whatever year it was, that

8  certainly said that amending the comprehensive

9  plan was one strategic approach to reshape

10  policy direction related to UMCH.  I also wrote

11  in that memo that the moratorium was a legal

12  policy option available to the city.  But I

13  didn't influence or shape this.  It's possible

14  that he sent this -- he did send this at some

15  point early in the day of the hearing out to

16  council, and he may have sent it earlier than he

17  sent it to council to staff.  I didn't make any

18  comment on it.  I don't know whether Mr. Lindsey

19  or Mr. Brown did.  I don't recall.  That

20  clarifies my earlier answer about whether

21  anybody else was -- touched this.

22     Q.  Okay.  So it's not like any city

23  consultants or anyone from the city assisted

24  Mr. Robinson, to your knowledge, to prepare or

1   create this amendment to the City's

2   comprehensive plan?

3       A.  I think, if staff made any comment on

4   it, it was reacting to the draft the day of the

5   meeting.

6       Q.  And did any --

7       A.  But I don't remember specific changes to

8   it that we influenced or having an opportunity

9   to substantively review it and impact it.

10      Q.  Did any of the city staff consult with

11  you regarding any proposed revisions or changes

12  to --

13      A.  Not that I can remember.  They can tell

14  you if they did or not.  I don't remember.

15      Q.  And similar to my questions with respect

16  to Exhibit 6, with Exhibit 7, did you share this

17  amendment to the comprehensive plan that

18  pertained to Lifestyle's property with

19  Lifestyles before the January 18 hearing?

20      A.  No.  I mean, I didn't get it until

21  January 18th, so I -- no, I did not.

22      Q.  Did you know, prior to January 18th,

23  that Council President Robinson had any

24  intention of amending the comprehensive plan as

1    it pertained to the UMCH property?

2        A.  I think you can look at the record from

3    years prior and know that this was a --

4    something that he desired to do at some

5    juncture.

6        Q.  Sorry.  That was an inartful question.

7    I intended to ask this specific revision that's

8    contained in Exhibit 7, did you have any

9    indication --

10       A.  Right.

11       Q.  -- that Mr. Robinson was going to move

12   forward with this prior to the January 18

13   hearing?

14       A.  I cannot -- I honestly can't recall our

15   specific conversations kind of on the heels of a

16   moratorium and whether -- what he told me about

17   this.  I don't recall.

18       Q.  And similar question, are you aware of

19   any indications or conversations President

20   Robinson would have had with any other city

21   staff concerning this comprehensive plan

22   amendment set forth in Exhibit 7?

23       A.  Not that I can recall or remember.

24       Q.  Were you directed or instructed by

1    Council President Robinson not to share the

2    contents of Exhibit 7 with anyone outside of the

3    city?

4        A.  I don't think so.  No, I don't recall

5    that.  I don't remember him -- there was not a

6    lot of time between when I got it and when, you

7    know, council got it and all of that.  No, I

8    don't remember that.

9        Q.  Have you come to understand whether

10   Council President Robinson shared the contents

11   of Exhibit 7 with any other councilmembers prior

12   to January 18?

13       A.  I don't know the answer to that.

14       Q.  Do you know whether President Robinson

15   shared the contents of Exhibit 7 with anyone

16   outside of the city prior to the hearing?

17       A.  I don't know the answer to that.

18       Q.  In your time as city manager, has there

19   ever been a moratorium directed to a specific

20   property in the city?

21       A.  I can't remember one.  We've had other

22   moratoriums.  Not that I can remember.

23       Q.  Any moratorium directed to one property,

24   is my question?

1          MR. SCHUMACHER:  You mean one that

2   passed?

3      A.  Well, right, this one -- yeah, probably

4   important to say for the record that this one

5   did not pass, which requires a super majority.

6          No.  I mean, there was a property on

7   Olentangy River Road that certainly was the

8   impetus for a moratorium in the Olentangy River

9   Road overlay, which resulted in the Olentangy

10  River Road overlay, and really there was only

11  one developable -- well, one vacant property out

12  there that stimulated that moratorium and the

13  work to create that overlay.  But I don't have a

14  memory of any other like that.

15     Q.  When did that occur?

16     A.  I think that was like -- that was --

17  might have even been before I got here because

18  it was being worked on when I got here.  So '07

19  sometime.  2007.

20     Q.  So you were not involved in the

21  Olentangy overlay?

22     A.  I was involved in it on the end of it.

23     Q.  But with respect to whether or not there

24  was a moratorium --

1      A.  I don't remember being involved in it,

2  no.

3      Q.  Do you know whether, in fact, the

4  moratorium was passed in connection with the

5  Olentangy overlay?

6      A.  There was a moratorium for a period of

7  time.

8      Q.  And I know you said the overlay -- there

9  was one developable piece, but there was more

10  than one property involved, correct?

11      A.  In that instance, yes.  I believe so.  I

12  don't actually recall the details of it.  It's

13  just a -- there was one property that was

14  driving it.

15      Q.  But you don't recall the details?

16      A.  No.

17      Q.  Okay.

18      A.  That one was 2007; so...

19      Q.  In your time as the city manager at the

20  City of Worthington following the January 18,

21  2022, meeting, has the city considered the

22  future development of the UMCH property?

23      A.  In what way?

24      Q.  So, for example, with the amendment to

1  the comprehensive plan there in Exhibit 7, has

2  the city considered reviewing or updating

3  Exhibit 7?

4      A.  So you would be talking --

5          MR. SCHUMACHER:  Go ahead.

6          THE WITNESS:  You raised your hand.

7          MR. SCHUMACHER:  No, my hand's getting

8  sore from my pen.

9      A.  So I left in December, early December of

10 2022.  So you're talking about in the roughly 11

11 months I worked for the city before I left?

12     Q.  Yes.

13     A.  Repeat your question.  Or could you

14 repeat the question?

15     Q.  I can rephrase the question now that we

16 have a time frame.

17     A.  Yeah.

18     Q.  And really, I want to know whether the

19 city considered the future development of the

20 UMCH property, were there discussions about that

21 during that time frame?

22         MR. SCHUMACHER:  From January 18th,

23 2022, until -- when was it -- December --

24         MR. INGRAM:  Until he left.

1          MR. SCHUMACHER:  Remember, the lawsuit

2    was filed in, I believe, March of '22.

3          A.  Yeah, I don't think -- not that I can

4    recall.

5          Q.  Okay.

6          MR. SCHUMACHER:  Chris, I'm interposing

7    an objection to the extent that it would include

8    any Rule 408 discussions we've had since the

9    lawsuit was filed.

10         MR. INGRAM:  Again, I'm not asking about

11   that.

12         MR. SCHUMACHER:  Okay.

13         MR. INGRAM:  You have a puzzled look on

14   your face, Mr. Greeson.

15         MR. SCHUMACHER:  Is there a question

16   pending?

17         MR. INGRAM:  He hasn't finished his

18   answer.

19         MR. SCHUMACHER:  Okay.

20         A.  So earlier in my engagement I told -- in

21   this whole dialogue I said there was some

22   outreach by Mr. Robinson to Mr. Brownlee

23   regarding the property in early 2022.  That may

24   have happened -- I think that happened after the

1    adoption of this amendment, but I don't think it

2    resulted in any substantive conversation.

3        Q.  And I believe you testified you were not

4    party to that discussion and weren't really

5    aware of what they discussed, correct?

6        A.  I don't recall being a party to it.  I

7    don't recall, you know -- I just recall nothing

8    happened.  And then the lawsuit was subsequently

9    followed.  So my puzzled look was because I was

10   trying to remember the sequence of events in

11   Mr. Robinson's outreach to Mr. Brownlee.

12       MR. INGRAM:  Okay, Mr. Greeson, thank

13   you very much for your time today.  The city

14   still has not yet exhausted its production of

15   documents to us.  And so to the extent there is

16   any additional information produced, we may have

17   more questions for you.  So I'm going to leave

18   your deposition open.  But I have no further

19   questions for you today.

20       THE WITNESS:  Thank you.

21                     -=o=-

22       Thereupon, the testimony of October 6,

23   2023, was concluded at 5:07 p.m.

24                     -=o=-

1                           CERTIFICATE

2    STATE OF OHIO        :
                                   SS:
3    COUNTY OF FRANKLIN :

4              I, Rhonda Lawrence, a stenographic
     court reporter and notary public in and for the
5    State of Ohio, duly commissioned and qualified,
     do hereby certify that the within-named MATTHEW
6    GREESON was first duly sworn to testify to the
     truth, the whole truth, and nothing but the
7    truth in the cause aforesaid; that the testimony
     then given was taken down by me stenographically
8    in the presence of said witness, afterwards
     transcribed; that the foregoing is a true and
9    correct transcript of the testimony; that this
     deposition was taken at the time and place in
10   the foregoing caption specified.

11             I certify that I am not a relative or
     employee of any attorney or counsel employed by
12   the parties hereto and that I am not financially
     interested in the action.  I further certify
13   review of the transcript was not requested.

14             In witness whereof, I have hereunto
     set my hand at Columbus, Ohio, on this 20th day
15   of October, 2023.

16

17

18

19

20
                      *Rhonda Lawrence*
21                    Rhonda Lawrence
22                    Notary Public, State of Ohio

23   My commission expires:  October 9, 2028

24

## Exhibits

**Exhibit 1** 65:9,11 183:13 185:9 204:2,4, 10 217:3,17 218:16 220:1 221:5 222:7 226:2,5,8 230:1

**Exhibit 6** 234:12,16 247:16

**Exhibit 7** 243:16,18, 24 244:19,24 247:16 248:8,22 249:2,11,15 252:1,3

**Exhibit 14** 30:23 31:5, 7,9 38:22

**Exhibit 15** 39:20,24 40:1

**Exhibit 16** 48:8,12,13

**Exhibit 17** 51:15,19, 20 53:4

**Exhibit 18** 54:19,23

**Exhibit 19** 55:23 56:3

**Exhibit 20** 60:9,17,22 66:6,7

**Exhibit 21** 68:7,11

**Exhibit 22** 68:11 71:6, 10

**Exhibit 23** 75:20 86:23

**Exhibit 24** 75:24 76:16,17 79:6 83:17 88:23 89:3,11,12,19 90:8,15

**Exhibit 25** 90:23 91:4 98:16

**Exhibit 26** 96:24 97:4, 14 98:5,11 99:12

**Exhibit 27** 100:12,16 101:8,19 103:20 105:5,6,18 108:19,20, 23 110:10 122:12 184:7,10,20

**Exhibit 28** 134:9,13, 14,19 135:6,21 136:23

**Exhibit 29** 141:20,24

142:6,7

**Exhibit 30** 145:7,21 151:9 160:14 162:11

**Exhibit 31** 166:11,15 167:4

**Exhibit 32** 169:20 170:3,9,10,14 172:7 177:9 179:13

**Exhibit 33** 180:11,22 181:4,12,13,24

**Exhibit 34** 185:18,22, 24 186:17 187:1

**Exhibit 35** 190:6,17 191:6,7 196:9 197:13, 14

**Exhibit 36** 195:14,18, 21 196:21 197:22

**Exhibit 37** 200:20,24 201:5,6,24 207:15,16, 20

**Exhibit 38** 209:6,13, 18,24 211:9,10,24 220:11,18 226:9 229:17

## $

**$3.1** 72:2

**$41,000** 52:18

**$41,460** 52:10

## -

**-=0=-** 30:22,24 39:19, 21 48:7,9 51:14,16 54:18,20 55:22,24 60:8,10 68:6,8 71:5,7 75:19,21 88:22,24 90:22,24 96:23 97:1 100:11,13 134:8,10 141:19,21 145:6,8 166:10,12 169:19,21 180:10,12 185:17,19 190:5,7 195:13,15 200:19,21 209:5,7

**-=O=-** 124:20,23 125:4 254:21,24

## 0

**003161** 217:24

**05** 205:23

**07** 250:18

## 1

**1** 58:9 65:9,11 183:13 185:9 204:2,4,10 217:3,17 218:16 220:1 221:5 222:7 226:2,5,8 230:1

**10** 183:22 185:2

**100** 63:4

**1033** 26:13 36:1

**10th** 206:10

**11** 31:11 252:10

**12** 13:19,23 51:21

**126963** 170:10

**126990** 170:11

**12:25** 123:24

**12:26** 124:22

**12th** 241:14

**13** 201:1 206:7 240:2

**14** 30:23 31:1,2,5,7,9 38:22 195:4 232:19

**15** 10:3 15:17 39:20,24 40:1

**16** 48:8,12,13

**17** 51:15,19,20 53:4

**18** 54:19,23 89:4 162:12,21 235:19,23 239:17 243:1 244:1 247:19 248:12 249:12 251:20

**1803** 50:10

**18th** 164:24 237:13 240:18,24 247:21,22 252:22

**19** 55:23 56:3 97:17 142:2,15 171:18

## 1:20 125:3

## 2

**2** 56:13 183:19 186:24 196:21 244:23 245:10

**20** 60:9,17,22 66:7 171:9 186:22

**2005** 28:10,23 34:24 35:12 43:12

**2007** 10:6,10 27:23,24 28:5,13 122:9 250:19 251:18

**2008** 123:9

**2012** 31:11,20 32:7 38:10 39:8 40:3 41:19

**2013** 51:21 55:14 56:4 57:7 59:19

**2014** 41:6 51:10 52:14 60:19,24 61:5 64:10, 12 65:6,7 66:2,6,8,14 67:14,19 88:13 152:21 155:16 183:11,24 186:5 205:18,23 208:13,22 218:20 221:20 224:11

**2015** 68:19,22 71:12 87:3 120:22 125:12 139:15 159:24 178:18 194:5,10 200:1 214:15,19 215:3 218:15 219:6 223:13, 18

**2016** 76:1 86:7,23 97:17 136:17 137:11 139:11,22

**2017** 181:19 182:2,13

**2018** 89:4 100:18 101:17 108:18 125:19, 22 127:19,20 132:15 134:21 137:12 139:11 142:2,15 146:20 161:9 162:4 164:20 166:16 171:16 174:3 181:2,20 182:17 184:2,7

**2018-2022** 131:2

**2019** 146:20 162:12,21 165:1 170:5 202:7

**2020**  70:22 91:7 146:2
151:16 152:20 159:18
186:2,22 190:19
195:24 201:2 206:7,14
207:24

**2021**  12:7 209:14
231:1 232:19

**2022**  10:8,10 125:19,
22 126:14,19 235:19,
23 236:18 239:18,20
244:1 251:21 252:10,
23 253:23

**2023**  31:20 125:1
254:23

**21**  68:7,11

**21st**  40:3 186:2

**22**  68:11 71:6,10
127:19,20 132:15
253:2

**22nd**  170:4

**23**  75:20 86:23

**23rd**  61:4 76:1

**24**  75:24 76:17 79:6
83:17 88:23 89:3,11,
12,19 90:8,15 190:19
199:1 202:7

**25**  90:23 91:4 98:16

**26**  96:24 97:4,14 98:2,
3,5,11 99:12

**27**  56:4 100:12,16
101:8,19 103:20
105:6,18 108:20,23
110:10 122:12 166:16
184:7,10,20

**270**  150:12

**28**  134:9,13,14,19,21
135:6,21 136:23

**28377**  68:14

**28380**  68:15

**28381**  40:1

**28382**  40:1

**28538**  56:5

**28539**  56:5

**29**  141:20,24 142:7

195:24

**2nd**  66:1 100:18 181:2

---

**3**

**3**  108:21 109:9 110:11
122:12 153:10,16
181:3,23 244:23
245:10

**30**  71:12 145:7,18,21
151:9 160:14 162:4,11

**30,000**  97:24 98:18

**30th**  161:9 164:20

**31**  166:11,15 167:4

**3135**  209:15

**3171**  209:15

**317901**  48:14

**31st**  91:7 151:16 182:2

**32**  169:20 170:3,10,14
172:7 177:9 179:13

**33**  180:11,22 181:4,13,
24

**34**  185:18,22,24
186:17 187:1 191:20

**35**  161:4,5 162:1
190:6,17 191:7 196:9
197:14

**36**  195:14,18,21
196:21 197:22

**36387**  31:8

**37**  95:8 200:20,24
201:6,24 207:16,20

**37.6**  26:14

**38**  77:22 209:6,13,18,
24 211:10,24 220:11,
18 226:9 229:17

---

**4**

**4**  55:13 68:19

**4-2022**  234:14 239:16
243:17,24 244:8

**40-something**  95:7

---

**408**  253:8

---

**5**

**5**  60:19 90:1,14

**55122**  100:19

**55159**  100:19

**57946**  142:3

**57948**  142:3

**58301**  146:3

**5835**  161:3

**58364**  151:11,12

**58367**  146:3

**58372**  201:6

**58376**  201:7

**58435**  134:22

**58457**  136:23

**58463**  134:23

**5:00**  124:9,13,15
145:17 222:13

**5:07**  254:23

**5th**  64:11 206:14

---

**6**

**6**  125:1 234:12,16
247:16 254:22

**600**  223:12

**62382**  51:22

**62390**  53:15

**62392**  51:22

**62713**  55:2

**64**  151:11

---

**7**

**7**  52:8 239:20 243:16,
18,24 244:19,24
247:16 248:8,22
249:2,11,15 252:1,3

**70**  44:8

---

**70s**  51:7

**75**  44:7

**76**  201:7

**7th**  239:6 240:18

---

**8**

**8**  52:1,2 182:17 209:14

**8-24**  77:1

---

**9**

**9**  146:2 183:21 185:1

**90**  53:16

**91**  53:17

**999,000**  201:9

---

**A**

**abiding**  21:23

**ability**  9:14 34:7 83:11
119:13 164:6 175:5

**absorb**  86:13

**accept**  25:9

**Accepted**  122:19

**accepting**  18:4

**access**  63:6

**accessible**  108:15

**accommodate**  51:7

**accompanying**
106:13

**accomplish**  73:9
80:18

**accomplishing**  80:20

**accurate**  8:22 9:5
43:5,20 64:12 98:16
183:6

**accurately**  112:20
113:21

**achieve**  64:22 221:9

**acknowledges**
112:12

**acquire** 68:4 72:14 73:9 125:9 128:19 130:20 131:5

**acquiring** 63:21 74:7, 15

**acquisition** 63:23 64:3,7,16 65:2 67:2,23 73:23,24 121:24 126:9,10,13 127:11 128:2,10,12 129:8,22 133:21 163:1

**acreage** 27:10 95:10 223:14

**acres** 26:14 90:1,14 95:7

**acronym** 56:17

**act** 187:8

**acted** 66:12 132:8

**acting** 13:9,17,22

**action** 192:16

**actions** 21:24 73:22

**active** 39:13,14 63:23

**actively** 126:12

**activity** 58:7 119:11, 19 214:14 230:5

**actual** 98:14 165:2

**acute** 150:6

**Adam** 166:17

**add** 117:15,17 198:22 242:22

**addition** 230:1

**additional** 52:13 79:2 80:9 103:22 113:14 175:17,19 254:16

**additionally** 158:4 225:1

**additive** 114:24 115:10

**address** 44:4 71:18, 19

**addressed** 79:17

**addressing** 73:14 224:13 225:7,11

**administer** 18:7

**administering** 20:3,4 232:9

**administration** 15:8 19:23 70:15

**adopt** 16:19

**adopted** 29:21 41:5 47:3 51:3 66:1,5 88:13 122:17,18 123:17 202:16 203:9,11 224:10 243:24 246:5

**adopting** 66:9

**adoption** 254:1

**advance** 16:24 237:12 239:2 243:8

**advanced** 228:20

**advancing** 58:6 155:21 158:22

**advertised** 108:16

**advised** 188:8

**advisors** 128:23

**advisory** 61:11

**affecting** 9:11 199:9

**AFTERNOON** 125:2

**agencies** 37:17

**agenda** 95:23 106:12, 13,15 107:19 182:16 184:2 188:15,22,24 189:4,6,10,14 212:17 236:3,7,9 239:22 244:5

**aggressively** 126:12

**aging** 225:7,11 227:16

**agree** 58:16,22 83:21 169:18

**agreed** 219:4

**agreeing** 219:19

**agreement** 155:2 180:5

**ahead** 40:14 49:23 59:7 82:11 87:12 99:16 131:8 157:6,8 201:21 202:24 227:9

228:3 229:9 252:5

**aimed** 138:18 139:9

**aiming** 45:3

**aligned** 204:22

**all-inclusive** 69:14

**Alliance** 56:17

**allocate** 16:22

**allocation** 175:15

**alternative** 159:10

**amend** 77:22 152:21 206:22,24 208:24 231:23

**amended** 155:5

**amending** 153:2 189:21 208:4,11 231:20 246:8 247:24

**amendment** 78:2 88:14 152:22 183:11 208:16 224:10 232:12 244:21 245:12 246:2,5 247:1,17 248:22 251:24 254:1

**amendments** 207:11

**amenities** 68:3 117:19 119:13

**amenity-rich** 225:9

**amenity/green** 110:15

**amount** 62:8

**analyses** 110:17 116:3 119:1,4 121:4 122:6 127:14

**analysis** 14:14 64:16 116:9,13,18 117:22 118:6,8,24 120:1,11, 16,19,24 121:5 128:1, 9 142:17 143:22 170:6,16,20 171:1,2,6 172:6,13,17 173:19 174:2,7,24 176:7,18 177:9,17 178:9 179:12,19 203:24 211:3 224:9

**Analytica** 105:21 162:12,15

**analyze** 143:12 171:4 173:20,21 174:13

**analyzed** 144:8 173:3

**analyzing** 174:22

**and/or** 72:14,15

**announced** 30:12 32:24

**annual** 101:12,13 104:14 110:12 116:10 146:8

**answering** 33:23 60:4 64:21 154:17 223:14 225:16

**answers** 8:22 24:11 42:17 164:4 197:12

**anticipated** 33:6 41:17

**anymore** 24:19

**apartments** 120:17 176:9

**apparently** 83:12 200:4

**appeared** 36:9

**appears** 40:8 47:23 53:11 69:10 71:24 83:21 136:17 142:13, 16,19 174:4 184:10 197:15 198:9 209:3

**appendix** 122:12

**applicability** 73:1 75:5

**applicant** 23:12 28:24 197:24 198:13 199:20, 23 200:5,8,10

**applicants** 18:6 20:21 21:14

**application** 20:3,8 22:17 23:5 41:15,18 70:22 86:8 91:9,20,22 93:9 96:6 98:14,20,22 99:4 179:20 205:15 206:13,20 214:4,18 216:4 217:16 218:12 221:8 222:6 225:20 228:2,15,16 229:7,12, 14,23 230:12,24 231:17,21,23,24 234:3

applications 18:4
20:22 24:1 99:1

applies 20:3

apply 73:17,18

applying 73:20 99:1

appointed 16:9 61:20,
21

appraisals 73:24
128:22

apprised 193:6

approach 138:20
164:7 246:9

approached 40:21
41:1,7 158:1 161:13

approaches 45:5
73:14 136:1,11 236:22

appropriately 154:17

approval 99:5

approving 215:21

approximately 26:14

April 97:16 100:18

architect 147:17

architectural 45:10,
18,23 46:22 47:8

architecture 44:12
162:22 163:1

area 13:16 27:19
28:12 68:12 69:5 73:4
74:11,19,23 92:16
95:19 110:17 151:1
175:13,16 221:20
224:10 239:21

areas 50:14 214:8

argue 219:11 220:20

argumentative 168:2
216:12 220:13 222:9
225:24

arising 37:12

Arrington 14:8

arrive 174:24 176:17

artful 235:10

artfully 203:15

articles 38:12

articulated 33:2
112:15 192:14 205:4

articulating 216:3
217:22

arts 15:6

ascertain 222:4

asks 197:24

aspect 7:7 121:20
215:14

aspects 112:13 155:8
175:24 213:6 214:6
215:18

aspirations 59:22
122:24

assess 147:8,18
178:15

assessment 164:11

assigning 203:15

assist 15:22 20:8
47:19 48:1 51:1
136:23 211:19 213:2

assistant 17:9 32:12
172:8 211:13

assisted 27:12 34:20
246:23

Association 15:14
58:1,4

assume 7:11,23 22:14
26:19 111:6 126:1
184:16 244:9

assumed 24:14 176:8

assumes 169:6

assumption 176:9

assumptions 176:3,
11 177:3,11

attached 61:3 136:2
151:8,14,15 244:22

attaching 137:11

attachment 53:7
162:18 163:24 201:10,
23

attachments 135:12

160:13,15 163:19

attempt 138:16

attempted 122:3
175:13

attempting 159:9

attend 103:1 232:16

attendance 103:12

attended 28:14
103:17 194:14 233:4

attending 62:17,18

attends 103:3

attention 49:8 52:8
56:8,13 82:8 135:20
151:7 153:8 181:5
191:5 196:13,23
232:24

attorney 6:11 167:13
168:12 169:11,15
191:2

attorney-client
242:15

attorneys 10:16,18,
19,21 11:1,3,9 47:19
74:1 167:23

Attract 110:14

August 60:19 64:11
76:1 161:9 162:4
164:20

author 172:12

authority 17:24 99:15
220:16

authorization 52:3

authorized 54:4

avoided 203:15

aware 11:5 22:24
27:16 28:12 33:5 88:7
113:11,13 116:8
121:15 125:15 126:15,
17,20 152:24 169:17
179:10,15,17,23
194:15 197:24 198:13
207:10 210:6 211:7
238:22 241:15 243:10,
13 245:21 248:18
254:5

## B

B-I-T-A-R 31:10

bachelor's 15:6

back 21:2 38:6 42:5,7
67:19 73:12 88:4
92:13 105:18 121:8
125:6 128:13 129:2
132:4 140:2 150:17
151:10 156:6 157:10
173:5 192:4 204:14
214:10 229:10 230:16
232:1,11,22 245:2

background 40:19
58:9 141:10 146:14

balance 34:1 45:5
64:5 115:8 117:3
119:16 135:23 214:12
215:5 217:16 218:13
221:2,4

balanced 34:4 64:6,
23 68:1 114:19

balances 67:18

ballot 77:23 78:1

base 33:15

based 41:19 43:9 66:4
78:8 96:10,15 108:19
113:17 118:23 119:24
120:2,5,13 128:18
135:6 144:7 152:19
161:15 171:13 174:2
177:2 185:2 197:16
198:8 221:23 227:1

basically 90:7 95:16
129:14

basis 220:4 222:4

Bates 31:8 39:24
48:14 51:21 55:1 56:5
68:14 100:18 134:22
136:22 142:2 146:2
170:10 201:6 209:14

bathroom 87:21

Beach 13:16 27:19

bear 134:15 175:2
199:6 217:20 222:10
225:1

**Beautiful** 77:13,16,18 78:10 85:11

**begin** 7:19

**beginning** 10:5 51:5 78:21 151:11 189:12 229:1

**behalf** 14:16

**behaviors** 123:4

**beliefs** 86:3 147:14 149:10

**believed** 50:11 68:1 85:4

**beneath** 77:12

**beneficial** 143:19

**benefit** 33:16,20 42:6 65:24 74:14 104:11 135:19 147:21

**Bickford** 27:12

**big** 49:15 210:21

**bigger** 25:20

**bike** 22:8

**bike/ped** 22:8 29:19 47:4

**binder** 65:19

**bio** 181:16

**bit** 22:13 33:18 57:1 114:17 197:20

**Bitar** 31:10 32:3,4 33:11 38:22 39:18 47:23 69:20

**blank** 201:7

**blanks** 40:7

**Bo** 126:21 158:2 159:21

**board** 14:15 157:23

**Bob** 61:22

**body** 8:2 85:20 228:19

**bones** 205:22

**Bonnie** 76:18 183:7

**book** 65:18

**bottom** 63:7 108:21

133:5 218:24

**box** 49:15

**brand-new** 236:18

**breadth** 19:24

**break** 8:11,13,17,20 52:20,22 53:3 88:1,5 124:1,12,16,18 180:3, 7

**breaks** 181:16

**Bridge** 50:17

**briefly** 122:11 229:2

**bring** 196:12,23 232:1

**bringing** 172:5

**broad** 106:19 215:15

**broadbrush** 215:12, 22

**brought** 145:9 155:17

**Brown** 17:11,17 18:24 19:17 20:12,19 22:16 32:14 55:6 56:4 58:10 69:18 71:11 89:4,14, 21 90:10 92:6,12 99:8 152:12 190:23 191:1,7 192:20 193:1,8,21 209:14 210:11 211:7, 11,19 212:3,15,22 214:7 215:13 220:18 224:7 229:19 232:4 233:10,16,17,22 234:4,8,24 238:20 246:19

**Brown's** 22:15 194:13 196:8 210:8 216:2,10, 19,23 217:21 218:24 219:19 223:2 226:21 227:2,13 229:14

**Brownlee** 126:21 127:2 158:2 159:2,13, 21 160:8,15 228:24 229:18 253:22 254:11

**Bucher** 132:18 205:3 206:22

**budget** 14:14 16:2,18, 20,22 25:21 29:12,19 34:6 44:7,8,9 119:12

**buffer** 110:16

**build** 102:4 231:8

**building** 19:22,23 32:6 68:13 69:6 92:17 93:3 212:10

**buildings** 30:8

**built-out** 35:23

**bullet** 114:9 116:7

**bullets** 109:8,10,16

**bunch** 79:19 114:16

**Bureau** 57:20

**Burpee** 61:22

**business** 37:21,24 58:1,3 102:9

**Busy** 233:9

**buy** 64:20 165:17 227:4

**by-product** 147:24

**C**

**call** 23:13 36:1 64:15 71:13 77:20 78:11 111:15 116:16 128:13 176:19 236:21

**called** 27:11 50:20 105:20 123:19 165:7

**calls** 20:5 24:23 37:11 221:15

**campaign** 77:19 78:10

**campus** 37:9

**capable** 55:12

**capacity** 9:12 138:8

**capital** 67:23

**caps** 56:15

**captured** 111:14,19

**captures** 112:21

**capturing** 111:9,11

**carbon** 180:24

**care** 49:10 86:1 92:18

**cared** 86:1

**career** 25:13

**careful** 158:13 173:18

**carry** 145:11,16

**cart** 145:10

**case** 6:11 12:4,17 18:10 19:17 20:12 21:3 32:9 142:13,20 157:22 158:23 164:19 226:11 239:8

**cases** 16:3 21:18 178:3

**catch** 12:24 72:11

**categories** 106:19

**category** 85:3

**caused** 94:6 168:16

**caveated** 141:14

**caveating** 177:5

**CC'D** 142:15 186:19

**CC'ING** 76:18 182:1 186:21

**CCS** 152:15

**cease** 32:24 37:2

**ceased** 30:6,14,19 32:23 33:3 35:14

**ceasing** 33:5

**cement** 112:24

**center** 26:14 46:12 85:23 108:11,12,14

**centers** 150:12

**central** 86:2 149:24

**centrally** 150:8

**certifications** 15:12, 15

**certified** 6:3

**chain** 71:12 76:2,14 91:4 142:10 180:22 186:14

**challenges** 25:19,21 26:3 37:4

**challenging** 147:3,8 203:3,4

chance 31:18 48:22 76:9 89:6 108:24 243:17

change 51:3

changed 32:5 35:16 71:20 205:23

changing 129:19

character 46:5,8 150:19

characteristics 44:13

characterization 58:17,23 208:7

characterize 83:23 85:10 95:15 132:23 153:4 158:19 202:14 203:6 208:12,22

characterized 154:15 159:16 184:22

characterizing 203:16

charter 16:7,17 17:22, 23 18:21 22:2 77:22 123:16 155:5 222:23 223:8

checklist 68:12 69:7 70:6,20 71:1

checklists 69:21 70:3

children 37:24 49:10

children's 36:23 99:23 110:9 112:14

choose 223:5

chose 148:10

Chris 6:10 75:18 126:1 178:18 225:14 253:6

chronologically 94:8,17 97:23

CIC 39:3 57:13,15,17

CIC's 39:5

circular 188:2

circulate 206:23

circumstance 89:24 142:21 168:14

circumstances 47:12 96:5 168:10

cite 30:3 221:13

cited 226:15

cities 14:11 80:5,18 138:20 147:2

citizen 79:2 243:2

citizen's 23:13

citizens 56:16 64:19 78:24

citizens' 86:20

city 10:2,3,5,7,9,11,17 12:1,2,13 13:2 14:16, 17 15:13,18,19,21,23, 24 16:7,8,9,15,17,18, 24 17:1,3,5,9,17 18:10,16 19:3 20:9 21:13 22:10,16 25:3,6, 8,9,10,16,18,20,22 27:8 28:5 29:2,3,7,16 30:20 32:7,8,12 34:18 38:7,8,13 39:4,11 40:2,8 41:20 43:15 46:4 49:13,18 52:6,13 54:6,12,24 55:5 56:22, 23 57:4 58:16 59:11 61:5,11,12,21 62:2,6 63:2,11 65:24 66:5,7,8 67:13,14 69:5,23 70:5, 23,24 76:5 77:9 78:4 79:4 84:22 86:3,17 88:7,10,18 91:6 92:10 96:22 97:5 99:20 101:11,16,21,24 102:16,18 103:3,16 104:5,9,13 106:5 107:11 108:8 110:21, 22 111:19,20 112:7,8 113:1 114:4 115:18 116:22 117:1,2,11,18 118:7 120:1,16,20 121:7 123:13 125:9,16 128:6 130:9 131:3,4 133:12,14 138:7 141:12,17 145:13 148:4 149:2,7,22 150:9,14,18 152:8,10 156:2,19 161:20 162:2,23 165:17 167:14 169:13,15 170:4 171:15 172:9 177:14,17 178:1 179:21 181:1,17,20 182:5,16 184:2 186:20,21 188:20 190:18 191:8,22 194:16,24 195:6,23 198:11 202:17 203:7, 8,9 210:5,20 211:8,13 212:7 220:14 222:22 223:1,7 227:23 235:19 236:3,16 238:16 241:15 243:2 244:1,5 245:21 246:12,22,23 247:10 248:20 249:3, 16,18,20 251:19,20,21 252:2,11,19 254:13

city's 11:1,3,9 14:20 26:24 34:6,24 44:7 60:23 61:1 86:18 103:20 119:12 191:1 216:18 242:15 247:1

city-adopted 129:21

clarification 233:3

clarifies 246:20

clarify 58:12 99:9 118:12 121:1 212:19 245:5

clarifying 206:17

clarity 128:11 129:6 155:2,20 156:10 172:21

Clean 72:3

cleaned 214:7

clear 20:16 21:9 42:20 59:3 81:17 83:10 86:6 178:16 211:22 214:5 216:5 228:18 229:22 239:16 241:2,5

clerk 189:2

client 6:14

client's 226:8

climate 86:22

close 236:12,13,14

co-counsel 97:12

co-created 164:8

coached 188:1

code 18:7 19:23 20:4,

5,6 24:5 50:23 51:2,3, 4

codified 22:1,3,6 47:6 90:12 123:16

coffee 52:24 87:22

coherent 211:21

coherently 152:18

cold 28:1

collected 77:24 176:16

college 14:6 15:4

Columbus 37:22

combination 34:5 112:9

comfortable 132:19 202:14

comment 52:17 53:22 216:19 226:16 246:18 247:3

commented 226:22 228:22

commenting 227:2

comments 75:15 172:21 214:10 215:1 221:18

commercial 95:18 117:17 119:11

commercial/mixed-use 110:14

commission 17:24 18:12,20 19:15 20:7,9, 24 23:9 39:4 61:6,10, 11,16,24 62:5,6 63:3 67:4,8 121:11 178:4 210:24 212:8,12,21,23 222:23 229:21 230:14 231:5,10,16,19 232:2, 3,8,17

commission's 17:22 18:9,19 19:3 39:15 62:20 67:12 212:13 223:8

commissioners 61:19

commissions 14:18

66:19

**committed** 37:9
232:6

**committee** 57:2,5

**communicate** 90:10
227:23 229:3 237:2

**communicated**
231:3 232:5

**communicating**
86:11 233:11

**communities** 6:12
119:2,6 120:8

**community** 25:14
26:7 27:4,15 29:1
33:13,17,20 35:11,23,
24 36:4,9 37:1,7,13
38:16,23 39:2 44:1,5,
17,19 50:9 55:20
58:12,20 59:4,11,12,
22 62:9 63:6 73:5,16
77:5 85:6,21 86:13
87:1,16 91:17 96:1
108:10 115:1,10,13
118:4 119:16 120:23
121:16,20,22 122:6
123:7 131:19 138:3,4,
14 139:16,18 140:12,
20 143:20 147:4,13,14
148:11,14,23 149:13,
15,18,19,21,24 154:15
155:4,10,14 161:2
164:7 165:7,11,21
166:1,7 172:1 204:18
214:21 215:1 218:7
219:8 224:9,17,19,21
227:21 231:8 243:4

**community's** 37:8

**Community-wide**
162:23

**comp** 22:6 39:14
45:17 189:22 201:3
202:8 203:9 205:18,21
207:11,18 208:4,22

**companies** 119:3

**company** 105:20

**comparable** 120:21

**compare** 226:7

**comparing** 218:15

**compatible** 45:20

**compensation** 52:9

**compile** 79:20

**compiling** 79:23

**complaint** 11:17
12:16

**complements** 224:16
225:6

**complete** 8:22 9:5
178:10 237:16

**completed** 32:1 42:23
90:17 137:17 144:20
174:20 210:12 236:12

**completely** 124:3

**complex** 70:15

**component** 64:6,23

**comport** 226:5

**compound** 41:24
42:13,18 111:5 133:16

**comprehensive**
14:20 28:10,21,23
29:9,18 35:1,13 41:5
43:12 44:3 45:1 46:21
47:7 48:2 51:10 52:14
55:15 58:11 59:6,10
65:24 66:10,14 85:5,
20 88:14 115:4 131:16
151:19 152:22 153:2
155:9 182:18 183:10,
12 185:10 186:5
187:5,13 198:11
202:15 203:13,17
204:1 205:8 206:23,24
214:12 215:15,18
218:20 224:11 228:18
229:22 230:1 244:22
245:1,11 246:3,8
247:2,17,24 248:21
252:1

**concept** 41:21 120:22
158:6 214:19 218:15

**concepts** 232:3

**conceptual** 41:16
80:4 87:2

**concern** 36:5 38:16
56:20 96:22 114:15
193:18 223:17 227:23

**concerned** 21:15
67:21 115:2

**concerns** 109:1 135:7
215:4,14 230:9,11

**conclude** 47:18

**concluded** 99:18
143:18 236:11 242:19
254:23

**conclusions** 161:5,
21 210:13,17 216:22
219:19

**conditions** 53:9

**conduct** 101:17
121:12

**conducted** 120:20
121:16 179:20,22

**conducts** 106:10

**Conference** 92:19
95:2 98:6 99:14,22
100:6 215:9

**Conference's** 94:23

**confirmed** 181:17

**conflict** 35:22

**confused** 7:7 240:20

**confusion** 241:2

**connection** 12:10
49:19 52:14 57:11
66:14 74:5,6 101:21
139:22 140:20 173:14
176:3 178:13 218:10
221:22 251:4

**consensus** 85:6
112:3 126:11 129:21,
24 155:2 203:5 204:10
206:5

**conservation** 72:3
74:14

**consideration** 78:1
111:16

**considerations**
138:22

**considered** 12:5
66:9,11,13 102:19
148:7 200:8 215:6
251:21 252:2,19

**consistent** 95:17

**constantly** 161:17

**constituents** 84:12,
13,14

**constraints** 67:21

**construct** 41:8

**constructed** 232:1

**consult** 138:24 139:5,
24 141:16 157:4
173:13 177:24 247:10

**consultant** 15:1
34:13,14,20 104:3
146:24 148:24

**consultants** 246:23

**consulted** 139:7
140:23 157:19

**consulting** 14:5,10,
12,22 15:2 105:20
141:2

**contact** 49:14 113:7
178:12 239:14

**contained** 248:8

**contemplated** 35:19
45:9 116:18 165:3
214:13

**contemplating** 39:8
164:22

**contemplative**
201:20

**content** 82:6 92:1
101:3 114:22 164:7
211:2 236:12

**contents** 249:2,10,15

**context** 35:10 45:24
46:13 50:6 70:10
85:24 147:12 150:13
194:13 198:8

**Continental** 40:21
41:8,21 43:6

**continue** 34:7 42:20
66:22 100:7 124:11
225:14

**continuing** 37:22

**contract** 175:19

**contracting** 34:12

**contractual** 95:3

**contribute** 45:11

**contributed** 41:3
69:20

**contributing** 37:19

**control** 18:20 86:9

**controversial** 35:21
36:16

**controversy** 85:24
147:4 206:3

**Convention** 57:20

**conversation** 64:15
73:20 96:13 102:14
110:5,7,12 113:22
118:4 125:13 126:24
132:4 135:7 138:9
143:3 145:2,4 156:22
159:21 160:7 173:11
186:15 187:17,21
198:1,14 210:15
217:24 228:17 254:2

**conversations** 63:20
64:3 78:19,22 91:18
99:21 127:4 132:21
154:20 156:7 159:1,4,
12 197:11 213:10,15
231:13 233:21 234:8
248:15,19

**convey** 200:17 230:10

**conveying** 62:4

**coordinating** 18:4

**coordination** 13:12

**coordinator** 32:5
172:13

**copy** 69:7 167:4
168:19,21 190:14
202:4

**copying** 180:24

**core** 225:2 227:17

**corner** 53:16 92:21
93:4,9,18,19,21 94:24
95:19 151:10

**corporation** 14:14
38:23 39:3

**correct** 10:4 19:20
24:8 35:7 40:4 41:11
43:16 60:24 74:8 76:6
78:4 80:10 89:14,17
93:13 95:9 98:21,23
104:3 111:10 125:21
142:12 149:2 164:9
165:22 170:20 173:4
174:3 181:21 182:6,19
183:12,22 184:8
191:23 196:9 199:20
204:2,5 205:13 207:2
213:4 220:7 228:24
229:4 236:17,20
251:10 254:5

**corrected** 198:5

**correctly** 81:21 82:7
112:15 154:3,5 204:11

**corridor** 50:17

**corridors** 72:15 74:8,
17

**cost** 67:23 115:11,17
116:22 117:6,15
118:19 143:1,8,14
144:20 171:20 175:14,
18 177:14,17

**cost-to-serve** 116:13,
17 117:22 118:8
120:10,19,24 121:5
128:1 143:22 170:6,16

**costs** 116:20 144:9
172:12 175:17,23
177:19 178:1,15

**council** 12:1,2,13
15:23 18:10,16 20:10
25:6,7 39:4 40:3,8
51:1 61:5,12,21 62:6
63:2 64:24 66:5,8
67:13 73:20 76:5
77:10 78:4 91:6,14
97:5,15 101:12,17,24
102:9,14,15,18 103:1,
9 104:13 105:17
106:24 107:4 112:1,17
121:13 122:12,16,17,
19 123:13,17 126:12
129:7,17 130:10,11,
16,22 131:4 132:7,17
133:14 138:3,5 139:10
142:16 143:16,17,21
144:15,17 146:8,9
152:8,10 153:1,11,22

154:10 155:7,8 156:13
157:17 163:15 170:4
171:5,11,15 172:2
176:20 181:1,17,20
182:5,12,15,16,22
183:14,21 184:2 185:1
186:1,4,12,20 188:20
189:13 190:18 191:9,
22 192:14 193:5,12
194:16 195:23 196:14,
16,24 198:12 199:8,13
202:17 203:8,10,19
206:16 207:24 208:5
212:7,17 220:15 223:2
235:12,13,16 236:16
237:8,13,24 238:5
243:2,9 244:1 245:21
246:16,17 247:23
249:1,7,10

**council's** 16:19 19:3
20:24 23:9 29:21
65:24 101:21 104:11
106:5 110:21 112:7
153:7 182:17 223:7
235:19 236:3 244:5

**council/staff** 107:16

**Councilman** 80:22
84:5 132:11,12 165:20
168:11 171:16 181:18
187:1,11 188:13
189:17 206:8,21,22

**councilmember**
132:18 142:11 151:18
152:20 154:21,23
156:7 182:7 195:22
196:3,21 197:3,8,23
201:1 203:11 206:21
236:15

**councilmembers**
66:24 111:20 131:23
132:13 142:1 156:4
158:6 184:12 188:2,9
203:19 204:22 205:6,
20 237:5,9 249:11

**councilmembers'**
110:23

**Councilmen** 198:12
201:11 202:6,21 204:9
207:15

**Councilmen's** 199:2

**Councilperson**

134:20 135:2 136:7
182:1

**councils** 14:17

**counsel** 42:9 48:13
49:19 50:4 65:15
81:16 82:23 109:21
124:7 151:3 178:19
216:17,18

**counties** 14:11 147:3

**county** 13:4,6,9,13,
15,17,18,21,22 14:3,
17,18 15:13 37:17
72:4

**county's** 13:11

**couple** 49:7 194:23
219:10

**court** 7:15 8:2 9:21
145:15

**Court's** 12:20

**cover** 244:15

**covered** 52:10

**COVID** 194:22 195:2

**create** 69:21 70:23,24
86:21 188:3 247:1
250:13

**created** 45:7 137:11
167:13

**creating** 7:16 14:19
117:18 138:24 173:8,
15

**creation** 51:8 150:17

**credential** 15:14

**Creek** 73:4 74:19,23
110:16

**crimes** 37:10

**critical** 18:20 33:15,19
44:13 114:21 118:4
147:12

**critically** 44:11 117:4
148:7

**cross-collaborating**
79:3

**CROSS-
EXAMINATION** 6:4

crossed 53:13

Cunningham 51:1

Cunningham's 51:9

curiosity 128:15

current 34:10 44:8
77:9 200:14 224:13,16
225:6

custom 193:3

customarily 177:24
178:7

customary 193:7,23

CVB 57:19

cycles 131:22

**D**

dark 160:4 194:2
232:10

Darren 60:18,22

data 174:23 176:15

date 12:8 27:5 28:9
30:11 68:19 78:6 87:7
92:1 154:23 156:8
190:23 196:7 211:1
235:16,22

dated 31:10 40:3
51:21 56:4 60:19 61:4
71:11 76:1 89:4 91:6
97:16 100:18 134:21
142:1,15 146:2 151:15
161:8 162:4,12 164:24
170:4 181:1 186:1,21
190:19 195:23 201:1
209:14

David 76:17 77:8
180:23 184:23 186:20

day 23:20 124:7
138:15 177:24 188:18
246:15 247:4

day-to-day 15:20

days 191:19 206:9

Daytona 13:16 27:19

dealing 80:6

debate 164:23 172:4
183:5 188:7 218:19

219:11 226:11

decades 26:5

December 10:6,8
12:6 27:24 28:5,13
182:1,10,13 252:9,23

decide 29:8 112:24

decided 99:14

deciding 20:17

decipher 93:23

decision 12:20 18:18
20:15 37:2,20 38:10
95:11 223:1,7 237:7

decision-making
23:9 29:22 44:18
86:22 161:6 220:15

decisions 96:4 102:9
130:16

declined 182:23

deficiencies 50:22
215:20 217:11 221:16

deficient 214:9 226:8

define 30:9 78:13 81:2
84:6

Defining 44:13

degree 54:15,16
149:14 197:13 198:21
229:20

degrees 15:5,9

Deland 27:21

deliver 116:22

demand 117:8,15

demanded 45:6
119:17,18

demands 117:10

demolished 30:7

demolition 30:10

denial 12:12

dense 215:7

densely 151:4

density 110:17 116:3,
9 120:17,21 214:16
218:1,5,10 219:4,7

221:3,22 222:6
223:11,18

department 13:8,13
17:6,12 18:3 19:1,24
20:20 22:15,19 32:6
61:13 63:12 103:7
175:13 177:1

department's 212:10,
11

departments 175:22
211:15

dependent 119:8

depending 92:13

depends 21:8 30:4
103:11

depicted 90:15

deposed 6:22 11:6

deposes 6:3

deposition 6:13 7:1,
4,16 9:19 10:23 11:8
24:15 30:23 39:20
48:8 51:15 54:19
55:23 60:9 68:7 71:6
75:20 88:23 90:23
96:24 100:12 134:9
141:20 145:7,12
166:11 169:20 180:11
185:18 190:6 195:14
200:20 209:6 220:22
226:11 231:14 240:9
254:18

deputy 13:21

derived 44:9 119:10
178:16

describe 18:2 19:12
202:8 245:8

description 65:4

design 45:15 161:15

designated 62:8

designed 46:6 241:1

desire 33:2 67:8 73:6
208:24

desired 109:12,14
110:13,21,23 118:2
178:13 214:5 248:4

desires 216:17

desiring 171:23 225:9

desirous 85:3

desk 168:22

detail 70:2 148:19
165:1 220:19 227:12,
15

detailed 109:8
116:13,17 119:4 192:2

details 36:20 48:4
70:12 126:16,22 127:8
173:6 174:19 192:6,10
199:15 213:7 251:12,
15

determine 175:14

determining 139:23
140:4 175:16

develop 27:14 49:15
56:21 58:14 67:24
102:5 105:17 110:15
159:10 178:14

developable 149:9
250:11 251:9

developed 33:13
59:13 99:19 151:5
165:18 173:3 177:1
212:22

developer 49:14
73:10,12,13 141:16
178:1

developers 178:4

developing 92:16

development 14:21
15:24 16:12,23 24:1,2,
6 25:23 27:1,6,11
28:7,18 32:5 33:10
34:6 39:6 44:19,21
45:13 50:13 56:18
64:6,24 68:2,4 73:8
80:19 86:7 90:2 92:12
95:18 116:14,19
117:6,7 120:14 121:24
143:9,12 144:9 148:2
149:22 159:14 163:1
166:16,22 171:21
175:20 177:20,21
178:2 179:21 194:4,9
205:15 206:14,15,20

211:17 212:9 214:6
242:24 251:22 252:19

**developments** 24:3,7
51:4 115:12 193:14

**dialogue** 22:5 35:12
64:16 73:4 86:16
111:11 117:23 126:9
128:3 138:4,15
139:10,20 140:21
143:6,20 153:7 155:13
215:1 238:21 242:8
253:21

**differences** 163:16

**differentiate** 163:8

**differently** 85:21

**difficult** 9:1 123:5
125:23 154:22 155:10
160:6 206:4

**digs** 165:1

**diligence** 127:15
128:2

**diligent** 128:17 188:5

**diligently** 93:6

**diplomat** 203:22

**direct** 56:8,13 96:11
100:3 117:24 127:3
135:20 151:7 153:8
181:4 191:5 193:8
241:23

**directed** 73:18 121:13
130:22 152:7 193:1
218:14 248:24 249:19,
23

**directing** 52:8 82:8
153:21

**direction** 66:21 85:8
102:11 128:18 130:9
131:14,17 132:6
147:10 149:11,19
155:3,20 185:12,13
203:12 205:7 246:10

**directionally** 203:14
205:13

**directions** 86:4 155:9

**directly** 13:7 96:13
100:5 199:8 202:21
224:2

**director** 10:12,13
17:11 28:19 54:1
60:18,24 61:2,15
103:6 152:3,9 168:24
191:2 234:23 244:10

**director's** 37:6
152:17

**directors** 37:6 103:7,
8,10 112:18 210:20

**disagree** 213:20

**disagreed** 53:22 54:8
85:18 204:9

**discern** 164:18

**discerning** 84:11
160:6

**discord** 147:4

**discouraged** 153:12,
23 154:10 156:5,8,11

**discourse** 154:16

**discuss** 41:20 72:5
157:14 208:3 210:10

**discussed** 78:17 96:2
102:7,21 103:18
106:5,6 107:12 108:20
113:20,23 143:24
171:15 173:12 184:14
185:11 186:12 191:8
194:15 198:11 199:8
202:1 210:13,17 242:1
243:1 254:5

**discussing** 73:1
103:11 121:5

**discussion** 22:7 26:9
27:9,16 35:17 62:21
68:21 109:7 110:20
111:12,13,18 112:2,11
113:6 114:11 136:6
138:16 141:6 174:11
184:18 190:20,24
192:15,24 193:2
196:4,13,24 225:4
230:22 239:21 240:10
242:2,4,10 254:4

**discussions** 27:2,7
43:17 63:17 125:16
129:7 159:15 193:9,20
197:8 252:20 253:8

**dispute** 26:15 147:1

159:10

**distinctive** 44:16
45:20

**distinctively** 45:19

**distinctly** 45:12,16

**distinguish** 163:16

**distracting** 201:15

**distributed** 172:20

**distributes** 189:5

**district** 45:23

**divide** 149:18

**divided** 161:2

**division** 203:18

**Dockery** 105:14

**document** 22:21
29:12,15 48:17 50:15
56:10 65:4 68:23
79:13 82:9,13,15,17,
20,24 100:22 101:1
105:17 109:19 110:4,
13 113:10,14 114:1
118:16 121:22 123:21
128:4 133:7 136:3,10,
12,13,20,24 137:10,14
138:4 139:8 144:5
157:15 162:17 164:14
177:4 183:1 201:15
202:5,16 203:5 204:5
209:10 211:19

**documentation**
234:3

**documents** 6:15
10:24 11:10,12,20
12:17 22:4,10,22
45:14 46:20 47:2,5
67:20 81:20 112:22
135:12 164:5 171:13
182:20 183:6 184:5
203:8 254:15

**dollars** 117:18

**door** 210:2 211:5
236:10

**draft** 40:5,9,10,19 43:5
136:2,10 137:13
146:21 151:22 159:7
161:9,12,19 163:13,14
164:5,8 165:4 247:4

**drafted** 136:19 151:15
170:20 223:19 244:8,
11,16 245:18

**drafting** 136:24 141:3
234:20 244:18 245:1,
7,13

**drafts** 113:14,16,24
146:21 158:4 159:7
161:16 163:10 207:7

**drank** 52:23

**drawing** 49:8

**drawn** 69:10

**drew** 176:16

**drink** 88:6

**drive** 118:1 138:18

**driving** 251:14

**drugs** 8:24

**due** 127:15 128:1

**duly** 6:2

**duties** 16:19 18:21

**duty** 222:24

**E**

**Eagle** 41:9 49:16

**earlier** 9:18 31:13
50:19 56:12 95:12
98:7 99:4 125:8
137:24 138:14 143:1,
6,24 146:6 154:15
155:14 165:3,6 171:13
177:23 184:6 191:11
192:9 201:13 202:1
204:8,24 214:11
226:14 246:16,20
253:20

**early** 51:6 126:14
146:20 171:16 235:16
246:7,15 252:9 253:23

**economic** 15:23
16:11,23,24 25:23
26:2 34:2 58:6 115:21

**economic-
generating** 214:14
230:5

**economically** 114:24
115:9 215:7

**edits** 172:22

**educate** 138:19

**educational** 108:11

**effect** 41:15

**effort** 35:5 63:23
64:14 122:22 128:17
129:3 131:1 159:6
160:24 189:19 215:10

**efforts** 125:9,16

**elaborate** 36:17

**elect** 182:7

**elected** 78:6 142:11
181:18

**election** 131:22

**elections** 155:7

**elements** 45:11
161:18

**email** 71:10,12,17,19,
22 72:1,4,8,12 75:24
76:2,14,17 77:13 79:5
80:23 83:17,20,24
89:3,12,16,20 90:4
91:4,5,11,13 97:4,15
134:19 135:1,3,5,6,13,
21 137:12 141:24
142:6,10,14,22 145:23
146:13 148:10,13
160:14 162:19 163:20,
23 164:4,10 168:20
180:22,23 182:5
183:17 185:3,24
186:4,14,19 187:14,23
188:6,8 189:18
190:17,22 191:20
192:14 195:21 196:2,
6,11 197:5,12,21
198:19 199:7 200:3,6,
24 201:2,11,23 202:23
206:7,9 208:10

**emailed** 182:11

**emailing** 181:24
182:10 196:7

**emails** 114:4 144:2
171:17 172:3 184:10
188:3 198:9 207:14,
16,18 208:23 233:20

**embedded** 46:1,2

**emerge** 106:9

**EMH&T** 160:2

**Emily** 75:9

**emotional** 133:3

**emphasize** 225:8

**employ** 147:7

**employee** 22:14

**employees** 156:19

**encourage** 133:10
134:6

**encouraging** 231:4

**end** 23:20 33:11
182:12 184:24 188:6,
10 189:12 196:24
213:4 250:22

**ending** 30:12

**engage** 126:8 141:11

**engaged** 39:9 169:15

**engagement** 44:20
48:13 52:5,9 53:4,8,21
54:9,12 96:2 133:4
158:8 160:23 253:20

**engaging** 158:15
160:5

**engrained** 110:6

**enjoying** 25:22

**ensuing** 215:2

**ensuring** 135:24

**entailed** 78:14

**entire** 10:9 103:7
177:17

**entirety** 181:12

**entitled** 68:12

**entity** 37:22

**entry-level** 13:20

**environment** 123:5
147:9

**episodically** 38:14

**ER/URGENT** 92:18

**era** 119:9

**essentially** 58:5
148:21 165:16 194:2
218:5

**established** 50:10

**estate** 128:23

**estimates** 177:1

**evaluate** 34:10

**evaluated** 121:23

**evaluating** 128:3
171:9

**evaluation** 69:12
70:13 121:12

**evening** 237:21

**event** 28:14,20 168:16

**events** 63:6 240:12,21
254:10

**eventual** 79:7,14

**evidence** 169:6

**evolve** 161:16,17

**evolved** 133:1

**exact** 11:13 28:9 78:6

**examples** 128:20

**exceeded** 219:8

**excellent** 8:9 211:22

**exceptionally** 172:19

**exchange** 183:18
188:3

**Excuse** 81:11 94:11
97:10 127:17

**executive** 129:17

**exercise** 99:14 128:7

**exercised** 95:2

**exhausted** 254:14

**exhibit** 30:23 31:5,7,9
38:22 39:20,24 40:1,
17 48:8,12,13 51:15,
19,20 53:4 54:19,23
55:23 56:3 60:9,17,22
65:9,11,16 66:6 68:7,
11 71:6,10 75:20,24
76:16 79:6 83:17

86:23 88:23 89:3,11,
12,19 90:8,15,23 91:4
96:24 97:4,14 98:4,5,
11,16 99:12 100:12,16
101:8,19 103:20
105:5,18 108:19,23
110:10 122:12 134:9,
13,14,19 135:6,21
136:23 141:20,24
142:6 145:7,21 151:9
160:14 162:11,14
166:11,15 167:4
169:20 170:3,9,14
172:7 175:10 177:9
179:13 180:11,22
181:4,12,24 183:13
184:7,10,20 185:9,18,
22,24 186:17 187:1
190:6,17 191:6
195:14,18,21 196:9,21
197:13,16,22 200:20,
24 201:5,18,24 204:2,
4,10 207:15,20 209:6,
13,18,24 211:9,24
217:3,17 218:16
220:1,11,18 221:5
222:7 226:2,5,8,9
229:17 230:1 234:12,
16 240:2 243:16,18,24
244:19,24 247:16
248:8,22 249:2,11,15
252:1,3

**exhibits** 65:20 82:6
97:21 145:16

**exist** 35:15 95:4
224:23

**existed** 23:15 114:6
207:10

**existing** 95:17

**exists** 149:21

**expect** 69:18 114:1,3
193:21

**expectations** 102:15
105:17 122:13,16
123:8

**expected** 69:6 105:3

**expending** 67:22

**experience** 120:3

**experienced** 147:1

**Experiential** 108:13

**expertise** 15:1 175:21
210:8

**experts** 176:3

**explain** 21:16

**explanation** 119:23,
24

**exploratory** 170:5

**expressed** 184:16
192:13 193:18 218:7
224:20 230:14

**expressly** 184:9

**extended** 77:23

**extensions** 117:13

**extensive** 78:19
121:12

**extensively** 36:20

**extent** 12:18 57:18
112:16 113:6 193:19
242:14 253:7 254:15

**eyes** 152:17

---

**F**

---

**face** 243:23 253:14

**facilitate** 130:14
148:5 155:13 223:3

**facilitated** 148:24

**facilitating** 19:2,12
20:16 138:1

**facilitation** 146:10

**facilitator** 104:10,13,
22 105:1,4,10 106:10,
24 107:3 147:17 185:4

**facilitator's** 106:17

**facilitators** 104:6
105:11,24 146:7
184:12,17

**facility** 27:12 28:19
98:1,19 108:15

**fact** 36:8 66:5,23
111:12 137:10 138:12
226:15 242:23 251:3

**factors** 37:19

**facts** 169:6 227:1

**faded** 36:21 72:22
235:2

**failed** 221:8

**fair** 7:12,13,24 19:4
26:21 30:21 40:10
41:23 48:6 53:23 54:9
59:14 63:1 68:5 79:8
80:17 98:11 104:7,11
135:9,13 136:18
142:18 148:12 150:3
163:6 171:19 182:23
185:16 197:4 198:14
199:3 203:21 204:17
230:5 236:24 238:2
242:13

**fairly** 96:3 198:18
215:18 221:15 236:14

**fall** 18:16 64:9 225:20

**familiar** 31:15 166:21
167:1

**familiarize** 29:1

**family** 127:8

**fashion** 114:5 147:22
211:21

**faster** 75:9 83:5

**favorable** 205:18

**features** 150:9

**February** 40:3 41:18
134:21 142:15 183:21
185:1 239:6,20 240:17

**fee** 20:4

**feedback** 62:24
161:15 171:5

**feel** 46:12 129:23
132:19 169:14

**feelings** 131:19
205:18

**felt** 86:19 131:15
203:11 204:18 205:10

**field** 46:13 171:10

**fielding** 86:13

**figure** 173:19 185:6,9

206:4

**file** 68:18 234:2

**filed** 41:18 179:21
206:12 207:1 215:4
229:7 253:2,9

**files** 38:13

**final** 113:10 163:14
202:9

**finalized** 161:11

**finally** 172:5 236:9,10

**finances** 138:8

**financial** 67:20 80:3
117:1

**financially** 73:13

**find** 38:13 177:19

**fine** 75:18 162:9
190:11,13

**finish** 7:18,21 8:14
42:15 49:24 81:24
89:6 140:7 181:6,8

**finished** 60:4 82:10
111:1 225:16 253:17

**fire** 115:18

**firm** 14:5,7,22 15:3
166:17,18

**fiscal** 138:8 143:13

**fit** 46:13 144:21 171:8
225:20

**fits** 79:15

**fix** 113:8

**flawed** 87:19

**floor** 224:5

**Florey** 166:17,18
167:13,18 168:12
169:11,16

**Florey's** 166:21

**Florida** 13:4 14:8,11
27:21 146:24

**Floyd** 195:3

**focus** 28:11 68:12
69:5 91:5 107:18
172:5 195:5 221:20

224:10 239:21

**focused** 106:18 143:5

**focuses** 102:5

**folks** 69:6 97:16

**follow-up** 135:7 142:7
171:17 220:3

**foot** 97:24 98:18

**for-rent** 224:3

**for-sale** 224:3

**forays** 92:14

**foremost** 16:20

**forgot** 222:17

**form** 40:8 83:5 114:5
187:15 198:17

**formal** 41:15,18 91:8
96:4 98:14,20,24
102:8

**format** 43:11 44:23
45:2 46:11

**formed** 56:18 78:24
106:20

**forms** 21:18 117:14

**forthright** 211:2

**forward** 47:20 87:9
99:12,18 124:11
130:13,17 137:22
148:7,10 149:15 158:9
161:17,22 189:21
194:8,11 207:20
248:12

**forwarded** 144:12
186:18

**forwarding** 72:9,12
142:10,23 190:22

**found** 67:2 161:1
169:22

**founders** 50:10

**fourth** 174:1

**fractious** 118:3 155:4

**frame** 77:2,23 78:21
86:24 87:3 125:11,18
127:12,13,18,22
129:10,12 131:3 237:1

252:16,21

**framed** 106:12,15

**framework** 136:2,10, 12,13,19,24 137:22 138:24 139:5 140:19 157:3,15 215:16

**framing** 138:2

**Frank** 40:23

**Franklin** 72:4

**frankly** 26:11 172:24

**free** 167:24

**frequently** 228:22

**Friday** 103:8 125:2

**front** 27:10,15 83:18 89:11 226:6

**frontage** 95:9

**frustrated** 37:14 80:23 83:21 155:23

**fulfilling** 20:13

**full** 8:22 9:5 40:17 124:6 170:24

**fully** 33:13

**function** 17:14

**functions** 58:5

**fund** 135:23

**funding** 37:18

**funds** 67:14 72:3,13, 21,24 73:11,17,18,21 74:13

**future** 14:20 27:2 33:17,20 35:12 36:5 39:5 58:14 59:13 86:2, 16,17 87:18 123:6 139:19 147:13 161:7 224:13 225:8 251:22 252:19

**G**

**garner** 43:15,18

**gas** 41:10

**gave** 66:19 159:7 168:23 214:3 217:1

218:22 229:12,15

**Gay** 239:13

**general** 15:2 118:21, 23 120:6 156:9 215:16

**generalizations** 120:2

**generally** 15:17 21:3, 17,20 23:24 64:13,24 80:4 90:3 92:3 103:14, 15 106:23 113:20 119:15 156:18 189:1

**generate** 120:8,9

**generated** 118:20

**generation** 114:10,12 115:22,23 116:21

**genesis** 35:5,9 168:6

**geography** 13:14

**George** 195:3

**Giant** 41:9 49:16

**give** 9:5 23:10 31:17, 23 76:11 87:5,6 97:7 100:21,22 105:10 108:24 128:20 164:1 168:18 172:10 176:4 191:14 193:15 206:2 223:5

**giving** 8:14 171:11 220:19

**glad** 31:21

**glass** 53:10

**goal** 59:10,23 160:19

**goals** 59:15,21,24 79:15 80:21 85:19 102:11 155:21

**good** 6:6,9 12:24 17:13 44:12,17 48:3 67:9 70:14 72:11 83:12 86:22 102:3 105:23 106:8 116:24 128:6 132:6 143:11 144:4 167:5 169:23 172:19 177:5,22 180:2,6 210:8 215:17 216:3 217:6

**gotcha** 20:18 75:7 153:17

**govern** 123:13

**government** 14:4 121:9 143:11

**governments** 117:2

**grabbed** 97:21

**graduate** 15:9

**grammar** 137:9

**grandmother** 26:4

**grant** 72:2,13,21,24 73:11,17,18,21 74:4 75:3

**great** 8:9 10:14 26:6 123:6 180:8

**green** 29:24 30:5,9 34:3 50:10 72:14 74:7, 15 79:7,15 80:10,17 81:1 84:2,7 135:24 219:7

**Greeson** 6:1,8,9,23 8:18 10:1,22 13:1 15:4 21:5 25:4 26:9 29:23 31:4,9 39:23 48:15 51:18,23 52:1,22 53:3 54:22 56:2,12 60:16, 22 65:12,23 68:10,15 71:9 75:23 81:6 83:7 88:4,11 89:2 91:3 97:14 100:15 101:7 123:20 125:6 133:12 134:13,14 142:4 145:20 151:14 163:18 165:6 166:14 170:2 179:14 180:14,21 181:13 183:9 185:22, 24 190:16 195:20 196:20 197:20 200:3, 23 209:11,19 212:2 218:23 219:10 220:24 223:21 228:8 232:16 234:11 240:6 241:10 253:14 254:12

**Greeson's** 212:1

**Griswold** 108:13

**grocery** 41:9 46:11

**ground** 7:3

**group** 43:18 56:16 77:21 85:2 103:7 105:16 121:21 156:22

166:3

**groups** 79:1,3 138:5, 14

**growth** 13:12 25:23 115:3 149:22

**guardian** 49:3 196:18

**guess** 28:22 51:9 54:6 74:21 127:14 203:22 205:11 208:16

**guidance** 84:18

**guide** 21:24 29:21 34:15 66:20 69:11 112:23 123:3

**guided** 33:16,20

**guidelines** 45:18 46:23 47:8 203:10

**guiding** 22:4,21 39:5

**guys** 64:20

**H**

**half** 148:17

**Hall** 32:8 46:4 149:7 150:9

**hand** 48:11 141:23 228:5 252:6

**hand's** 252:7

**handed** 31:4 39:23 51:18 54:22 56:2 65:5, 13 68:10 71:9 75:23 89:2 91:3 97:3 100:15 145:21 148:17 166:14 169:9 170:2 175:9,10 180:14,21 190:8,16 195:20 200:23 209:12 234:11

**handing** 60:16 134:12 163:9,13,18 209:11 243:15

**Hang** 180:17

**happen** 188:7

**happened** 38:13 59:20 70:18 99:10 183:1,7,8 189:18 191:18,21 205:5 240:14 253:24 254:8

**happening** 62:12
91:15,16 129:17 140:5
195:7 231:9

**hard** 44:16 46:12 53:9
84:11 129:4 168:19,21

**Harlowe's** 160:9

**Harris** 71:11

**Hart** 191:2,24 192:21
194:15 197:15 199:1,
10 228:23 229:18
231:2

**Hart's** 196:12,23

**head** 8:3 234:17

**health** 143:13

**hear** 75:10,13,15
140:9 205:11 224:18
225:10

**heard** 18:18 46:19
49:1 75:18 96:18
106:16 139:14 159:23
164:23 199:24 224:8
227:20 239:17 243:3

**hearing** 73:6 113:18
198:12 199:3 231:16
232:17,19 238:17
239:2,4,18,21 241:14,
17 243:1,2,3 244:6
246:15 247:19 248:13
249:16

**hearings** 240:22

**heart** 149:6

**heavily** 238:21

**heels** 248:15

**height** 218:1

**held** 13:3,10,19 25:15,
17,18 86:3 87:2 108:4,
6,10,11,12 138:14
147:14 149:10 155:7,
14,15 199:1 230:22

**helped** 105:16 152:1,
15

**helpful** 49:22 50:2
135:12 171:12 245:14

**helping** 14:16 18:7
20:8 147:2 155:19

**helps** 149:13

**Henry** 6:8

**Herb** 105:20 146:17

**Herbert** 161:8

**hereinafter** 6:2

**hey** 22:17 128:13

**high** 25:15,17,18
26:13 36:2,4 45:20
50:21 92:22 93:10,21
94:18 95:9 98:1,15
110:15 146:22 149:7
150:10 151:2

**high-quality** 34:8

**higher** 37:10 223:13

**highlighted** 190:10
191:15,16

**highly** 147:12 161:2

**hire** 23:18 126:10

**hired** 16:9 50:24 119:3
147:23

**hiring** 48:1 128:23

**historic** 46:8 150:19

**history** 35:22 38:15,
18 75:9

**hold** 101:24 204:13

**holds** 21:13 101:12

**holiday** 28:14

**home** 36:23 99:23
110:9 112:14 119:9

**homes** 46:3 93:14
176:8

**honest** 143:11

**honestly** 71:2 248:14

**honored** 39:11

**hour** 52:22 180:2

**house** 37:24 225:19

**housed** 30:8 32:7

**housing** 37:23 115:8
117:9,12,14 118:9
119:7 214:13 217:18
218:1,3,4,9 221:3,22
222:5 223:11 224:14,

23 227:3,5 228:1
230:2

**huge** 211:20

**huh-uhs** 8:6

**humbly** 120:5

**hundreds** 206:1

**hungry** 124:1

**Hurley** 60:18,23 62:18

**Hurley's** 62:3

**hypothetical** 173:9
176:6,23 177:21
188:16

**hypothetically** 22:14

---

**I**

**idea** 48:3 167:22

**ideas** 232:2

**identified** 106:18
132:11 184:13

**identify** 107:11 113:4
147:18

**ignore** 149:5

**imagine** 46:11 55:18
141:13 152:11 173:11
213:16

**imagining** 73:14
121:10 129:3

**impact** 114:23 143:13
178:5,6 247:9

**impacted** 150:16
177:3 210:9

**impactful** 215:7

**impacts** 115:23 120:9
143:8

**impetus** 250:8

**implement** 161:20
162:2

**importance** 114:22

**important** 7:14,17
8:21 29:15 35:10,20
36:8 44:6,11 46:8,10
47:6 50:8 55:19 69:13

70:13 91:16 112:12
114:18 115:5 117:4
148:8 149:10 150:7,15
157:9 193:4,7 194:1
223:8 250:4

**imprecise** 82:14

**improve** 67:6

**improved** 215:19

**Improvement** 38:23
39:2

**improvements** 51:2

**in-depth** 167:1

**inaccuracies** 113:4

**inaccurate** 113:7

**inadvertently** 188:3

**inartful** 161:24 248:6

**inch** 148:18

**include** 14:13,14 22:6,
8,9 80:8 253:7

**included** 39:18 74:16
80:2 183:21 185:1
226:21 236:7

**includes** 120:20
180:24 201:11 224:12

**income** 44:9,10 115:6,
22 119:8 176:10

**inconsistent** 43:11
44:3

**inconvenient** 67:3

**incorporated** 246:5

**increase** 33:15

**indication** 248:9

**indications** 248:19

**indirect** 96:10,14

**Indiscernible** 97:9

**individual** 129:7
130:19 131:3

**industrial** 117:17

**influence** 173:22
174:21 246:13

**influenced** 174:17
247:8

**info** 142:7

**inform** 22:5 30:13
86:15 91:15 118:3
130:14 138:16 149:13,
14 153:7 155:12
160:20 168:17 193:12
237:9

**information** 20:7,14
21:12 23:10 64:1
79:18,19 80:3 86:15
121:18 122:3 130:14
135:16,17 138:2
144:4,7 153:6 160:16
168:18 171:11,23
174:23 176:24 193:15
211:20 223:4 228:19
246:4 254:16

**informed** 20:15
130:16 156:23 199:12

**informing** 55:19
117:23 128:3,4 138:1
139:10

**Ingram** 6:5,10 23:22
24:20 25:2 31:2,3 35:7
39:22 42:9,14 43:8
48:10 49:1,6 51:17
52:21 53:2 54:21 56:1
60:15 65:15,19,22
68:9 71:8 75:14,22
76:13 81:16,19,24
82:4,11,23 83:3,6
87:24 88:3 89:1 91:2
94:12,15 97:2 100:14
104:17 109:16,20
118:17 123:20,24
124:6,11,18 125:5
126:4,6 127:19,21
132:16 134:11 140:2
141:22 145:14,19
151:2,6 166:13 170:1
177:16 178:19,23
180:1,6,13 185:20
190:8,13,15 195:16
196:17,19 198:5,16
200:22 201:17,22
209:9 212:3 217:13
220:23 222:15 225:15
226:2 228:8,13 229:8
230:16 239:24 240:2,
4,19 241:3,5,9 252:24
253:10,13,17 254:12

**initially** 56:19

**initials** 53:12,18

**initiate** 73:23 126:10

**input** 59:11 62:14,15
63:24 67:11 111:3,8,
18 133:2 172:10
177:11,14

**inputs** 174:7 177:12

**inquiries** 208:4

**insight** 147:5

**insights** 131:11 223:5

**inspections** 19:22

**instance** 16:15 39:7
106:2 107:8 117:9
126:18 160:3 251:11

**instances** 93:4
104:22 105:8,9 107:9
157:1,12,13

**instigate** 63:22

**instructed** 248:24

**insufficiency** 222:5

**insufficient** 230:3

**intend** 188:11

**intended** 141:1 248:7

**intense** 128:9 133:3

**intention** 247:24

**intentions** 153:4

**interact** 123:4

**interacted** 13:10 57:1
158:20 166:1 228:21,
23

**interacting** 18:5
174:18,19

**interaction** 37:11
133:18,20 174:16
178:8 194:3 229:11,18
231:1

**interactions** 133:13
234:4

**interest** 56:19 63:21
65:2 80:17 88:8 92:15
107:12 129:19 158:22
160:1 189:21

**interested** 58:21 64:5
67:1 77:6 85:14 90:11
99:18 131:4

**interests** 80:14,16
160:6 192:13 199:21
200:14

**interject** 231:6

**internal** 69:11 70:1
72:23 74:2 121:8
207:7

**internally** 73:5 157:20

**International** 15:13

**interpose** 220:8,12

**interposing** 253:6

**interrupted** 118:13

**intervals** 36:22

**intervening** 24:21

**interview** 106:17
176:2 185:4

**interviewed** 57:12,18
107:4 164:21

**interviewing** 163:11

**interviews** 57:15
106:9

**introducing** 225:4

**invades** 242:15

**invited** 28:20

**involved** 14:24 20:13
57:4 85:10 92:11
99:24 100:5 130:23
147:21 152:12 158:5
168:9 176:14 209:23
234:20 235:3 238:21
244:18,24 245:7,13,22
246:1 250:20,22
251:1,10

**involvement** 39:11
61:15 69:4 88:19
166:5

**involving** 111:19
193:20 238:23 242:10

**issue** 36:17 37:7,8
77:22 84:24 90:3,6
96:2 100:1,2,4 112:13
113:19,23 114:15

132:20 133:1 150:2
161:2 171:21 172:5
186:11,13,15 193:4
210:21 229:4

**issued** 55:6,13,16
174:2 201:24

**issues** 36:24 37:12
38:1,15 61:12 74:22
94:3 102:6 106:11
107:11,14 112:24
147:20 184:13 192:1
214:23 217:9 218:4

**italics** 77:14

**item** 239:21

**items** 106:4

**iterations** 92:24

**iterative** 231:4 232:2

---

**J**

**Jane** 105:14

**January** 31:11 89:4
151:16 159:18 162:12,
21 164:24 170:4
171:18 174:3 181:1,20
182:17 235:19,22,23
236:18,22 237:13
239:17 240:18,24
241:13 243:1 244:1
247:19,21,22 248:12
249:12 251:20 252:22

**Jeff** 71:11

**Jenkins** 105:15
145:24 146:7

**job** 42:19 67:9 75:18
90:10 115:3 177:5
215:13,17 216:3
217:7,8,22

**jobs** 44:10 115:6
127:8

**jog** 133:7

**jogging** 50:3

**jogs** 41:2 57:9 90:19
198:20

**join** 78:21

**joined** 92:9

**Julia** 105:19

**July** 61:4 66:8 71:12

**jump** 91:1 213:19

**juncture** 112:19 153:3
167:8 205:2 211:11
248:5

**junctures** 129:12

**June** 51:21

---

**K**

**K-O-W-A-L-C-Z-Y-K**
134:21

**Kass** 40:23 41:1,7

**Katherine** 50:24

**keeping** 44:22,23

**Kettering** 25:10,22
26:5 29:5,8

**key** 16:16,19 103:6
112:13 152:11 184:13

**kids** 37:9

**killed** 195:4

**kind** 25:20 33:8 35:4
57:22 64:20 70:12
73:3 78:22,24 80:4
92:18 106:16,20
112:23 117:14 121:9
122:23 128:6,14,21,24
129:2,3 130:15 137:20
138:16 147:6 150:11,
16,21 159:10 171:3
172:4 176:11 244:15
248:15

**kindergartener** 26:4

**kinds** 117:12

**knew** 12:18 29:11 44:5
153:3 158:14 200:13
238:5

**knowledge** 70:24
74:11 96:11,14 100:4
141:4,8 177:10 179:14
219:16 227:22 246:24

**Kowalczyk** 133:15,19
134:20 135:2,8 136:7

---

**L**

**labels** 203:16

**lack** 127:14 130:8
154:14 155:1,2 156:9,
10 230:3

**land** 13:6,11 14:23
27:14 63:14,21 65:9
93:19 95:5 119:12
120:8 165:17 183:24
215:8 217:17 218:10,
11 219:24 221:4,5,23
222:7 223:20 225:3,21

**landowner** 127:16

**language** 8:3 200:15
203:16

**large** 24:3 43:10 44:22
45:1 46:11,13 63:13
67:22 87:2 139:14
149:2,13 165:17

**large-scale** 114:21

**largely** 51:5,6 119:10
160:4 229:19

**larger** 25:14 70:10
92:20 93:3 99:17
139:19

**largest** 149:8

**Larrimer** 92:22 93:10,
21 94:18,24 98:15

**late** 212:5 237:17
238:1,3

**launch** 128:17

**launched** 148:21

**launching** 54:24

**law** 22:1,6 39:15 54:1
103:5 108:17 110:6
123:19 152:3,9,17
166:17,18 168:24
188:4 191:1 203:10
234:23 244:10

**laws** 100:1 203:9

**lawsuit** 253:1,9 254:8

**lay** 178:23

**laying** 215:13

---

**LC** 6:14,17 36:1 74:18
93:15 153:13,24 154:6
155:15 157:4 158:20,
22 159:24 194:7 196:4

**LC's** 26:18 242:24

**lead** 33:9

**leaders** 78:13

**leadership** 111:21
112:8,16 138:5 143:16
144:16

**leading** 15:23 159:18
166:5

**learn** 28:6

**learned** 88:18

**learning** 28:18

**lease** 27:13

**leave** 10:7 25:8 254:17

**leaving** 216:9,13

**led** 37:1 77:21 95:21
96:6 109:7,8 184:17

**Lee** 17:17 71:11 89:3
94:4 98:17 190:23
209:14

**left** 13:20 37:9 125:20
139:16,18 164:5,8
168:22 179:17 182:11
214:4 252:9,11,24

**legal** 22:22 169:4,16
246:11

**legally** 23:6

**lesson** 75:9

**letter** 51:20 52:2,5,10
53:4,8,21 54:9,12
63:2,8

**letterhead** 40:6 68:13
166:18,19

**level** 38:17 146:22
215:20

**levels** 37:1

**liaison** 61:17

**life** 29:15 36:22 50:8
115:1 119:14 126:23
194:24 195:7

---

**Lifestyle** 6:12,14,16
36:1 86:8,24 87:13,14
96:12 99:23 126:9,14,
19 140:16 154:6
158:13,14 160:3
177:10,19 178:8
179:11 192:18 193:21
206:12 228:16 230:11
231:2,20 233:11
239:1,4,15 241:13,16,
21

**Lifestyle's** 26:10
88:8,19 120:22 127:11
177:13 179:20 222:6
225:19 226:4,6 234:5,
9 247:18

**Lifestyles** 70:21
89:24 139:5,12,24
140:24 154:11 159:13
173:14 191:3 193:10
199:19 200:4 206:19
247:19

**likelihood** 175:23
238:11

**likewise** 7:20

**limited** 63:12 74:12
172:3

**Lindsey** 229:20 235:3
236:23 238:19,24
242:9,11 246:18

**Lindsey's** 192:21

**lines** 115:18

**Linworth** 108:12

**list** 109:16

**listed** 71:18 116:3
189:10 215:24

**listen** 83:13

**listened** 39:12 223:16
232:21

**listening** 94:14
214:21 224:17

**litigation** 126:5

**live** 239:13

**living** 27:12 34:4
224:6,20 225:4,10
227:10,20

---

local 14:4 121:9

located 150:8

locating 80:9

location 150:14

logistics 186:10
189:16

long 25:16 29:23 69:9
124:4 133:1 232:10
239:9

long-range 18:22

long-term 34:11

long-winded 120:5

longer 33:7 34:19
37:23 171:22 222:22

Longfellow 95:1

looked 92:21 123:11
175:23 183:12 189:17
201:13 234:24

lost 70:13 225:2

lot 13:11 27:9 35:11
36:4 44:19 52:23 57:1
59:20 60:11 66:19
70:10,16,17 83:5
85:23,24 92:4,18
94:23 98:6 99:19
102:13 122:7 126:22
127:9 128:10 131:18
133:2,3 138:6 147:13
154:15 157:19 195:2,5
200:15,16 205:12,23
208:11 214:5 238:23
240:13 249:6

lots 19:23 133:13
206:2 224:21

love 67:7

lower 53:16 151:9

lunch 124:2,19 125:7

luncheon 124:21

Lynda 31:10

**M**

made 11:5 16:2,10
41:14 62:5 66:7
102:10 172:20,22,23

177:4,23 189:23
192:16 207:8 210:4
214:10 221:11 247:3

magnifying 53:10

mail 182:11

main 58:5

maintain 63:13
103:16

maintaining 150:19

maintenance 67:24
115:19 117:13

major 15:6 111:16
150:12 193:14

majority 130:10,11,22
132:7 143:16 206:5
250:5

make 7:5 8:7,24 16:15
18:14,17 20:15 21:10
42:12,19 44:16 46:5,
12 60:3 67:12 70:12
83:9 113:21 117:2
130:16 137:3 152:18
154:16 158:14 171:11,
24 172:21 187:6
188:24 197:24 198:13
210:3 216:5 222:24
223:6 230:8 246:17

makes 20:18 38:22
75:7 113:2 137:4

making 16:13 18:1
84:1 95:5 176:4 187:2
211:19 232:6

mall 46:6 50:20

management 13:13
14:10 15:2,14 37:4
65:1 100:17 101:20
103:9 104:2 105:18
108:19 113:7

manager 10:3,5,9,11
13:2,9,17,21,22 15:14,
18,19 16:8,9,15 17:3,9
22:16 25:3,9,16 28:5
29:2,4 30:20 32:13
38:7,8 55:5 58:16 69:5
70:5 99:20 103:5
111:20 130:9 133:12
148:4 172:9 203:7
210:20 211:13 222:22
249:18 251:19

manager's 16:16 32:8
114:4 137:24 195:7
223:2

managers 14:17
117:1

managing 15:23
195:1 229:11

manner 187:7

manufacturing
119:10

March 68:19,22 91:6
142:1 146:2 186:1
253:2

mark 30:11

marked 30:23 31:5
39:20,24 48:8,11
51:15,19 54:19,23
55:23 56:3 60:9,17
65:8 68:7,11 71:6,10
75:20,24 88:23 89:3
90:23 91:4 96:24 97:3
100:12,16 134:9,12
141:20,23 145:7,21
161:9 166:11,15
169:20 170:3 180:11,
21 185:18,22 190:6,17
195:14,18,21 200:20,
24 209:6,12 234:12
239:23 240:8 243:16

market 34:10 224:15,
24 225:5

marketing 38:11
77:20

Marlowe 105:20
146:18,24 148:12
149:16 155:17 158:3,
17 159:6 160:10,11,12
161:1,8,21 162:15
163:5

Marlowe's 148:14
157:2,22 160:8,12

Martin 145:23 146:7

Marty 105:15

masses 215:1

master's 15:7

materials 20:5,22

Matt 186:9

matter 9:22 11:4
47:20 131:9 165:15
205:1

matters 16:4 45:11
47:11 169:16 189:1,9
195:3 222:21

Matthew 6:1,8

maximize 62:7

meaning 45:20 160:1

meaningful 64:22
214:15 230:4

means 81:2 84:6
198:6 200:16

meant 34:19 97:22
164:18

medical 97:24 98:19

medication 8:24

meet 21:14 22:19
23:12 44:2 86:20
199:9,11

meeting 11:22 12:1,2,
7,10,14 20:20 62:17,
18 76:21,23,24 77:1,3
87:2,7 88:15 102:9,24
103:2 107:20 108:16
111:12 113:19 155:15
160:19 182:17 187:3
188:4,10,21 189:3,11,
12,13 190:2,4 191:19,
21,22,24 192:6,21
193:23,24 194:14,16,
19 195:9 197:15
198:24 199:2,13,17
200:18 231:15 235:20
236:13,14 237:14,20
239:5,7,12 240:18,24
243:8 247:5 251:21

meeting's 188:15

meetings 11:16,18,23
43:9 77:2 78:8 91:21
92:1,2,4,5,10 102:19,
20,22 108:17 123:13
138:13 155:15 158:5
192:4 193:9

member 22:18 61:23
76:5 165:21 166:2
181:19 182:5 227:22
237:13,24 238:5

**members** 18:6 39:10
77:5 85:1 87:16 91:6
97:5,15 103:1 107:4,5
121:16,20 129:7
130:19 131:3 133:14
142:16 144:4 152:7,9
155:14 156:15 166:3,6
181:1 186:20 190:18
195:22 243:10

**memo** 33:22 34:22
35:6,8 36:6 38:5,9
43:5 47:15 48:5 62:3
89:10 152:7,9 154:4
155:22 167:15 173:5,7
174:5 212:12,16
216:2,8,10,23 217:21
218:24 221:12,15
223:5 224:7 226:9,21
227:2,13 229:14
246:6,11

**memo's** 216:20

**memorandum** 20:12
31:8,9,16 32:15 36:12
40:2,5,10,20 47:24
56:3 60:17 61:3 62:13
100:16 101:3,20
110:11 112:6 113:4
151:8,15,17,22 152:5,
20 153:9 170:3 171:18
173:3 201:12,24
209:13 210:11 211:9
212:6 213:13,21
219:20

**memory** 28:1 33:3
41:2 50:3 57:9 66:17
69:15 70:19 72:22
90:19 95:22 98:20
99:7,13 105:23 128:8
133:6,7,19 137:4
152:13 156:23 157:24
171:2 173:17 174:18
187:16 198:19,21
205:11 210:14 211:5
235:2 238:24 242:3,5,
18 250:14

**memos** 60:11 80:11
167:24

**mental** 9:12

**mention** 6:16 46:19
64:8

**mentioned** 6:10 10:1
36:15 50:14 118:18

129:5 146:6 155:13
159:1 165:6 233:7

**message** 76:20,22
186:18

**met** 6:9 10:24 41:20
43:5,6 78:17 85:2
155:14 157:23 158:2
159:5 160:17 169:12
184:12

**metadata** 68:18,21

**Methodist** 99:22
112:14

**meticulous** 31:13

**Michael** 76:18 142:1
144:13,24 182:1,12,
15,22 183:15,17,19
186:1,9,12,16 207:24
208:5

**Michael's** 184:3,22
185:12 186:4

**microcosm** 150:2,5

**Miller** 239:5 240:17,24

**million** 72:3 201:9

**mind** 27:15 194:21
216:14 222:5 227:5

**mind-set** 201:20

**mine** 137:2 203:3

**minute** 65:11 76:11

**minutes** 11:16,22,24
12:2,14 100:23 102:24
190:2,4 192:3 231:15
232:20 233:1

**misheard** 46:15

**misleading** 82:18

**misquote** 82:16,21
109:18

**misquoted** 82:12

**misread** 196:15

**missing** 40:7 227:6

**mission** 30:9 33:8
35:16

**Misstates** 74:9

**misunderstood**

113:19

**mix** 50:12 224:2,3
226:15,22,23

**mixed-use** 24:3

**MKSK** 34:24 35:5
51:20 52:6,14 53:5
55:14

**MKSK's** 52:10 55:15
57:11

**modifications** 113:16

**modified** 123:11

**modify** 164:6

**moments** 122:15

**Monday** 191:8,19,21
194:16 238:4

**money** 16:21 67:22,24

**month** 28:10 30:3
144:12

**monthly** 233:14

**months** 232:1 252:11

**moratorium** 234:18,
21 236:24 237:3
238:6,17 239:22
241:11,20 242:12,23
243:8,11 246:11
248:16 249:19,23
250:8,12,24 251:4,6

**moratoriums** 249:22

**morning** 6:6,9 7:15
52:20 125:13 170:17
204:9

**motion** 62:5 186:6
187:3,6,12 188:14,17
189:23 192:17

**move** 24:21 25:14
27:19 130:11,13,17
148:7,10 189:20 194:8
248:11

**moved** 27:21 28:4
29:4 30:18 127:8
161:17,22

**moves** 47:20 149:15

**moving** 70:11 96:3
99:18 137:22

**MPC** 11:24 12:10

**multifamily** 120:17,
18

**multiple** 46:3 155:6

**multitask** 83:12

**municipalities** 119:7

**Myers** 76:1,5 84:5,6
142:1 144:14,24

**Myers'** 80:23 83:17,23

---

**N**

**napkin** 121:8 128:13
129:2

**narrative** 215:2

**narrow** 171:10

**natural** 150:9

**nature** 70:6 103:19
201:2 202:8 220:13

**navigate** 147:3
155:11

**necessarily** 22:5 50:7
112:23,24 179:24

**needed** 36:7 44:1 73:7
74:23 106:18 117:5
143:18

**negotiations** 126:2

**neighborhood** 37:13
46:2 57:10 150:10
225:2 227:17

**nerds** 121:9

**newly** 142:11

**newspaper** 38:12

**night** 103:9 188:20

**night's** 187:3

**nods** 234:17

**nomenclature** 77:19

**nontechnical** 203:6

**normal** 137:2

**north** 50:21 150:11,
20,24

**notable** 194:12

**notes** 104:11 143:6 191:7 233:20

**notice** 28:6

**notify** 239:1

**noting** 84:5

**notion** 203:4

**Novak** 105:19

**November** 166:15 181:18 209:14

**nowadays** 52:18

**number** 11:10,13 13:10 37:5 38:14 82:24 97:14 101:2 120:11 136:22 155:12 214:8 219:11

**numbered** 31:8 39:24 48:14 51:21 55:1 56:5 68:14 100:18 142:2 146:2 209:15

**numbers** 128:14

---

**O**

**oath** 9:18,20

**object** 83:4 192:7

**objecting** 81:12

**objection** 17:19 19:5 25:11 26:1 41:22,24 42:12 43:3,22 54:14 55:17 58:18,24 67:16 74:9 81:4 83:22 84:9, 23 87:10 88:10 109:13,23 110:2,24 111:5 112:10 113:9 118:11 123:14 130:1,4 131:7 133:16 150:4 168:1 169:5 178:20,22 187:15 198:17 202:22 208:6 216:11 219:13 220:12 221:10 222:1, 8,19 225:23 227:7 235:6 238:8 242:14 253:7

**objections** 83:4 178:24 214:20

**objective** 147:15 211:21

**objectively** 173:21 174:21

**objectives** 44:2 224:11

**obligated** 86:19

**obligation** 20:13 23:6, 8

**obtain** 50:3 79:17 144:8

**obtained** 15:5

**obtaining** 74:13

**obvious** 36:7

**occur** 51:10 250:15

**occurred** 110:5,8 115:15 191:8 231:13

**occurring** 143:7

**October** 125:1 201:1 202:7 206:7,9,14 232:19 254:22

**off-the-cuff** 163:16 218:21 220:20

**offer** 16:24 27:4 67:6 216:1,7 223:6,9

**offered** 224:24

**offering** 44:21 223:15 225:6

**offerings** 224:16

**office** 32:8 44:6 92:17 98:1,19 114:4 115:3 117:16 214:14 219:6 230:3

**offices** 119:10 213:15

**official** 229:13,16

**officials** 41:20 43:16 56:22 57:4 79:4 190:19 195:23 211:8

**offset** 115:23 117:6

**Ohio** 19:22 25:15 46:7 72:3 92:19 94:23 95:2 97:24 98:6 99:13,22 100:6 108:17 117:9 119:7 123:19 162:24

188:4 215:9

**Ohiohealth** 91:8,19 92:14,24 93:18,22 94:16 96:1 98:18 139:16 141:7 158:15 160:2 194:6

**Ohiohealth's** 93:8 95:13 99:11

**Olentangy** 250:7,8,9, 21 251:5

**OMCH** 94:9,11

**ongoing** 67:24 78:23

**online** 29:13 194:18

**open** 231:4 254:18

**openly** 96:3

**operate** 37:3

**operation** 36:23

**operational** 35:22 36:24

**operations** 15:20 28:13,19 30:6,13,15, 19 32:23,24 33:3,6 35:20

**opinion** 37:14 66:18 188:6 206:2 217:15 218:21 219:2,3 222:21 223:9 230:3

**opinions** 85:14 123:6 147:10 206:4 214:24 226:14

**opportunities** 15:24 16:12 28:7 33:14 34:3, 4 224:19

**opportunity** 25:13,20 26:2,24 36:5 40:16 53:21 54:7 62:7 74:4 75:3 83:16 101:7 115:6 134:18 181:15 185:21 189:11 195:17 247:8

**opposed** 8:6 212:20

**opposite** 79:11

**option** 246:12

**options** 80:5 128:5 138:2,21,22 141:12,17 148:6 155:24 156:1

157:16,18 172:1 224:6,15

**order** 12:22 34:10 74:12 91:15 97:22 124:16 148:18 176:17 178:9,15 188:24

**ordinance** 234:14,18, 21 235:5,14,18 236:2, 3,7 239:16 241:16 243:21

**ordinances** 22:1,3 47:7 90:12 123:16

**organization** 56:24 57:22,23 58:6 163:5 165:7 166:2 174:3 195:1

**Organizational** 105:16

**organize** 47:16

**orient** 13:15 68:20

**oriented** 70:2

**original** 46:7 208:12 212:14,22

**originally** 170:19 235:4

**outcome** 117:24 118:2 138:19

**outcomes** 143:12

**outcry** 37:2 38:2,9,17

**outline** 21:17 141:16 198:18 217:9

**outlined** 18:21 28:11 34:22 41:12 43:7 47:14 60:1 85:19 90:7 98:10 131:20 177:4 184:11 203:13 205:7 217:7 224:12 226:13

**outlines** 33:24 164:10 224:7

**outlining** 155:24 156:1 215:19

**outpouring** 223:17

**output** 51:9 143:1,2

**outreach** 126:14 253:22 254:11

**overlay** 250:9,10,13, 21 251:5,8

**oversaw** 16:1,5 17:12, 13 212:24

**oversee** 13:7 15:20 19:21 210:7,18

**overseeing** 17:10,18

**oversees** 17:12

**oversight** 172:15

**overview** 136:1

**overwhelming** 223:17

**OWA** 77:4 79:1 85:11

**OWBA** 57:21

**owner** 73:24 128:23 178:13 200:10

**ownership** 155:19

---

**P**

**p.m.** 124:22 125:3 254:23

**packet** 175:9

**packets** 18:5

**pages** 105:18 201:9 244:23

**paid** 167:12,17,20,21 168:8

**paper** 169:8 170:6 174:2,6,10,12

**paragraph** 33:12 38:24 48:21 49:8 135:21 141:6 153:9, 11,15,16,22 176:21 186:24 191:6,11,13,20 197:21,23

**parcel** 63:13 95:6 99:17

**parent** 95:6

**park** 44:11 62:8 63:18 64:5,22 67:6,8,15,22 68:3 73:6 79:7,14 80:9,17 81:1 84:3,8 85:4,15,16 110:15 115:7 121:22,23

165:7,11,19,21 166:7 177:20 214:15 230:4

**parking** 46:13 92:18 94:23 98:6 99:19

**parkland** 63:5

**parks** 60:18,23 61:2,6, 9,13,14,15,23 62:4,5, 20 63:12 67:4,7,9 211:16

**part** 17:13 34:19 45:22 56:23 64:23 68:3 73:8 79:2 80:19 93:12,15, 19 99:19 151:9 158:1 161:1 170:20 173:11 174:24 207:4 226:19 231:12 246:7

**partially** 46:1

**participants** 106:17 107:20

**participate** 62:15,19 121:17 122:2 172:16 173:8

**participated** 57:15 166:6 211:8

**parties** 90:11 126:3

**Partners** 100:17 101:20 104:2 105:19 113:8

**Partners'** 108:19

**Partnership** 57:24 58:3

**Partnerships** 14:8

**parts** 70:11

**party** 96:12 99:21 104:3 126:24 127:3 145:3 199:9 254:4,6

**pass** 250:5

**passed** 205:14 250:2 251:4

**past** 191:8

**paths** 138:10,11

**pausing** 60:3

**pay** 52:13 167:15 232:24

**pays** 117:11

**pedestrian** 22:9

**pen** 252:8

**pending** 8:15 60:14 187:5 206:15 222:14 230:12 253:16

**people** 11:5 22:20 57:10 64:19 67:7 85:10,21 86:1 112:15 117:1 131:18 138:17, 19 157:20 158:21 163:11 164:21 166:4,6 171:22 176:13 205:10, 12 206:1 214:23 224:18

**people's** 214:24

**percent** 44:7,9 63:4

**perfect** 24:11 63:3 65:3

**perform** 120:16 127:13

**performed** 116:9 118:7,8 120:1,10

**period** 13:8,21 25:17 30:5 33:7 37:3 38:3,8 57:3 70:23 123:23 128:8 133:1 171:7 232:10 251:6

**periodic** 101:15

**periodically** 35:21 123:11 146:9

**permanently** 113:1

**permit** 7:20 30:10

**persistent** 208:4

**personal** 10:21 54:17 219:15 229:15 230:2

**personally** 33:22 230:15

**perspective** 121:23 155:18

**pertain** 13:5 127:22 149:3

**pertained** 247:18 248:1

**pertaining** 213:11

241:12

**pertains** 23:23

**phases** 166:16,22

**phone** 23:13

**phrase** 45:12

**picked** 137:17

**pickup** 115:20 117:11

**piece** 35:10 64:1 192:10 251:9

**pieces** 27:14 35:18,19 70:11 94:5

**place** 22:11 49:10 50:21 77:24 220:21 225:2

**places** 108:7,14

**plaintiffs** 6:11

**plan** 14:20 19:22 22:7, 8,9 24:1 28:11,21,23 29:9,20 35:1,13 41:5 43:12 44:3 45:1,17 46:21 47:4,7 48:2 51:11 52:15 55:15 58:11 59:6,10 64:7 65:9 66:1,10,14 67:13 69:10 85:6,20 88:14 115:4 120:22 131:16, 20 151:19 152:22 153:2 155:9 179:21 182:18 183:10,12 184:1 185:10 186:5 187:5,13 189:22 198:11 201:3 202:8,15 203:13,17 204:1 205:8,19,21 206:14, 15,20,23,24 207:11,18 208:5,12,22 214:12, 15,17,19 215:15,18 217:9,17 218:2,11,12, 15,20 219:9,24 221:4, 5,16,20,23 222:7 224:5,11 225:3,21,24 226:1,4,6,8 228:18 229:22 230:1 244:22 245:1,11 246:3,9 247:2,17,24 248:21 252:1

**plan's** 203:9

**planned** 24:7 51:4

**planner** 23:19 34:17 210:5

**planners** 47:19 48:1 117:1

**planning** 13:7 14:13, 23 17:6,21,24 18:3,9, 11,18,19,22,24 19:2, 15 20:7,9,20,23 22:18 23:8 29:12 32:6 34:20 36:8 39:3,14,15 44:17 50:18 52:17 57:2,4 67:11 68:13 69:6 80:3 87:19 128:6 147:2 184:14 210:24 211:17 212:7,9,10,12,13,21, 23 222:23 223:8 229:21 230:14 231:5, 9,16 232:2,3,8,17

**plans** 22:10 24:2,6 29:18 47:4 87:2 110:7

**play** 129:15 130:13

**playing** 117:22

**plays** 18:20

**plural** 11:22 92:4

**point** 29:3 30:4,17 32:9 36:20 37:16 42:7 57:6 79:16 96:8 104:1 114:9 121:21 122:21 156:21 158:5 160:17 167:1 176:14 177:22, 23 182:4,8 189:22 192:5 199:23 202:13 208:19 211:14 213:23 216:2,17 225:21 233:3 237:6 243:14 246:15

**pointed** 220:17

**pointing** 26:13 46:18 204:1,5 215:19

**points** 27:13 89:17 111:13,16 176:15 214:8

**police** 37:11 115:18 195:3

**policies** 21:22 45:14 47:1

**policy** 16:3,10,12,15 23:1,7 29:15 110:4 118:2 128:18 130:16 133:5 138:2 139:20

141:17 148:6 153:7 202:16 203:8 223:1,6 246:10,12

**political** 15:7

**poorly** 231:24

**portion** 63:18 82:8 94:22 100:7 109:1 111:17 114:11 125:10, 17 129:9 131:5 165:18 182:18 183:10 185:10 187:4,13 198:10 209:24

**portions** 176:6 210:10

**posed** 25:18 36:5 151:17 197:9

**position** 13:20 25:9 29:2 55:4 61:4 86:18 113:1 132:20

**positions** 13:3,5,10, 19,24 132:24

**positive** 117:16

**possibility** 50:12 205:21

**posted** 107:24

**posts** 189:5

**posture** 64:4 83:24 86:5,6

**potential** 26:24 27:6 114:10 115:20 116:21 129:8 143:12 155:9 164:12 197:24 198:13 199:20,22 200:5,8,10

**potentially** 33:9 34:5 87:19 92:12,16 119:17

**practice** 102:4 137:2

**preceding** 238:1

**predate** 27:7

**predates** 27:7 38:5

**predominantly** 224:5 226:23

**preliminary** 49:14

**premature** 79:16

**preparation** 172:16 211:9 231:14

**prepare** 10:23 36:11 110:17 137:21 172:18 193:1,8 237:7 246:24

**prepared** 40:11 47:13 69:16,19 95:23 116:3 146:20 157:4 161:8 172:6,9 221:18 235:14 236:24 237:4 238:10

**preparing** 11:7 18:5,8 20:23 135:15 138:23 139:4 140:19 209:23

**presented** 70:6 120:23 163:15 189:2

**preservation** 44:12

**president** 77:9 106:24 144:16,23 182:12,15, 22 183:15 184:3,22 185:12 186:1,4,9,12 208:1,5 235:12,13,17 236:16,19 242:11 247:23 248:19 249:1, 10,14

**press** 55:1,5,16

**presume** 95:2 183:14

**pretty** 17:24 149:17 175:11 176:22 197:6 224:12

**prevented** 231:20

**prevents** 124:13,14

**previous** 164:4

**previously** 65:8 87:1 122:4 140:11 201:12 234:12 243:15

**primarily** 17:17

**primary** 18:13 172:12

**prior** 23:23 35:17 36:16 37:2 38:9 52:9 53:3 66:9 74:10 188:23 194:16 203:23 204:20 206:9 208:19 236:1 238:17 240:9 241:10,13,17 243:21 247:22 248:3,12 249:11,16

**priorities** 102:5

**private** 69:22 99:21 100:2 133:13 160:1

**privately** 132:2,3

**privilege** 242:16

**pro** 144:16,24

**proactive** 156:11 159:15

**proactively** 153:12, 24 154:11 157:5 160:5

**procedure** 23:1,4 123:18

**procedures** 21:23

**process** 18:8 19:1 21:15,16,17,22 23:10, 13 39:10 46:24 50:19 55:1 56:14,19 60:1 62:14,16 63:24 66:22 67:11 70:13 77:21 85:12 93:7 106:21 115:16 147:7,16 148:11,15,23 149:1,12 157:3 158:4 159:11 160:13,17 161:6,14, 18,23 162:22,23,24 164:8,12,22 184:11 202:9 210:19 212:15 223:3 229:1,19 231:4, 7 232:9 237:6

**processes** 147:3,19 165:3

**produce** 90:19 115:6

**produced** 6:16 121:22 143:21 144:5 167:7 254:16

**producing** 117:8

**product** 176:20 202:9

**production** 254:14

**productive** 147:22

**products** 224:4 228:1

**professional** 15:11

**professionally** 93:6

**professionals** 225:9

**proffered** 12:13 167:18 188:5

**profile** 36:4

**program** 72:2,13 73:2 74:12

**programs** 16:23

**project** 70:7,15 74:15
77:7 91:8 93:18,22
94:3,18,19,21 98:5,10
99:6 121:22 165:7,11,
21 166:7 210:21

**projections** 175:1

**projects** 14:11,12
93:24 94:16 95:13

**prompted** 192:20

**properly** 108:16

**properties** 114:20,21
149:9

**property** 24:13 26:10,
11,12,18,19,20,23
28:8,11 29:24 32:18,
21,22 35:10,16,19,24
36:1,9,23 38:11,16
39:6 41:10 45:6 55:20
56:20 62:8 63:18 65:2
67:15 68:4 69:22
70:22 72:20 73:2,23,
24 74:5,17,18 78:18,
20 79:8 80:6,10 85:17
86:17 88:9,19 90:1
92:20 93:12 94:9,10
99:15 114:20 118:5
125:10,18 127:11,12
128:19 129:14 135:9
139:19,23 140:5,13
141:1 147:11 148:8
149:5,12,23 150:1,7
155:3,21 158:16
159:14 161:7 163:2
165:12 166:17,23
170:7 178:12,14 193:5
198:10 200:10 207:19
234:22 237:4 241:12
242:24 247:18 248:1
249:20,23 250:6,11
251:10,13,22 252:20
253:23

**property's** 120:14

**proportional** 175:15

**proposal** 43:10 44:21
53:9 98:13,15 99:11
120:22 139:13,14
158:7 178:18 194:4
206:23 223:13,19
226:16,21 227:1,12
232:11 239:2 241:12

243:6

**proposals** 94:9 98:9
159:24 207:7

**proposed** 41:21
58:10 97:24 162:22,24
188:13,14 206:13
223:12 224:3 235:4,18
236:2,6 238:6,12,17
241:16,20 242:12
243:7,11 247:11

**proposing** 238:14

**prospective** 49:14

**protect** 110:16

**protests** 195:4

**proud** 26:7

**provide** 8:4 21:12
34:8 69:7 86:15 91:14
104:10 105:4,24
117:19 119:13 130:14
143:17 144:3 153:6
168:19 175:14 177:20
178:1 207:16 213:2
223:3 246:3

**provided** 79:13 87:1,
20 113:5 119:23 122:4
135:11,15,18 167:4,7,
10 168:8,11,17,23
169:4,7 171:18 219:20

**providing** 20:7,14
116:20 138:1 175:24
224:14

**provisions** 54:2

**public** 10:12 13:24
15:7 18:6 21:11 38:2
55:19 86:15 87:2
102:19,20,22 108:15,
17 116:21 117:23
122:4 128:3,4 131:10
133:2,3,13 139:8,10
143:8 147:1,3,6,16
155:15 188:4,8,10
207:8 228:20 239:11
243:12

**public's** 205:24 215:4

**publicly** 108:1
131:12,24 199:8

**PUD** 51:8

**PUDS** 24:6,8

**pulled** 37:17

**purchase** 63:13 67:15
88:8 99:16 125:10
127:10 129:8 131:5

**purchased** 93:16,17

**purchasing** 63:17
125:17

**purpose** 35:15 184:21

**purposes** 26:8 48:12
51:19 68:19 76:2
151:21 170:9 180:20
201:5 209:11

**pursue** 90:8 126:12,
13 128:11 130:22

**pursued** 59:24

**pursuing** 59:21 72:21

**put** 85:2 86:12 89:10
95:23 123:22 167:23
182:16 184:1 200:15
202:7

**puzzled** 253:13 254:9

**puzzles** 197:19

---

**Q**

**quality** 45:20 115:1
119:14

**question** 7:6,7,11,12,
19,22 8:15 11:18
18:15 19:10 21:4
22:12 24:14,16,17,19
30:13 32:2 33:24
41:17 42:1,3,12,15,18,
23 45:13 46:20 49:24
53:17 54:5 60:5,13
66:4 74:20 79:10 80:1
81:5,13,16 82:14,16,
18 83:8,15 91:23 92:9
106:8 109:24 110:3
111:2,6,7 119:20
121:3 133:17 135:23
136:15 139:17 140:1,
6,10 148:18 157:8,9
158:24 161:24 162:6
164:15 167:5 168:5
171:22 174:14 175:3,
6,12 177:7,15 179:5

184:21 185:5,8 191:18
192:9 195:8 196:12,22
197:4,9,12 198:15
202:21 203:2 204:14
207:6,10 212:18,19
220:13 222:2,14,16
223:10,15 224:2
227:14 228:7 230:10,
16 240:17,19 241:7,10
248:6,18 249:24
252:13,14,15 253:15

**questioning** 23:23

**questions** 8:5,17 9:2
18:7 19:13 21:10
42:19 49:7 60:21
64:21 73:15 78:23
79:4,6,12,14,22 80:2,
8,9,13 86:14,20 87:17
101:3 123:21 127:22
138:6,7,13 144:6
151:17 153:5 154:18
164:5 192:19 193:16
220:4 241:1 243:20
247:15 254:17,19

**quickly** 87:21

**quote** 81:8,12 82:15
120:12 196:22 197:1

**quoting** 82:24 109:20

---

**R**

**radar** 26:24

**Raftelis** 105:19

**raised** 129:17 135:23
252:6

**raises** 39:2

**raising** 208:18 228:4

**ran** 155:6

**range** 17:1,2 34:21
38:3 128:5

**ranging** 16:14

**rationale** 102:3

**re-did** 137:19

**re-read** 136:14 148:16
162:5 167:2 179:4,7
196:17 202:23 221:14

**re-reading** 203:1 208:10

**re-reviewed** 218:18

**reach** 96:11 127:15

**reached** 126:21 147:5 177:10 179:10

**reaching** 62:16 78:16 126:18 160:20 233:13

**react** 232:4

**reacting** 247:4

**read** 10:24 11:9,16,17, 24 12:16,19 17:23 19:8 28:10,20,22,23, 24 29:3,10,12 31:18, 21 38:12 40:13 42:5,7 43:2 49:5 53:10 54:3 56:10 76:10,14 81:20, 21 82:5,7 83:13,18 89:9,10 101:9 108:24 109:3,4 110:1 130:7 140:2,3 153:18 154:3, 4 157:10,11,17 162:6, 16 170:21 172:19 175:2,7 179:6,9 180:19 181:12 190:3, 12 193:22 199:14 201:18 204:13,15 209:2 210:1 218:20 221:13 222:11,18 230:16,23 232:20

**reader** 211:22

**readily** 29:13 144:8

**reading** 31:14 32:1 79:12 81:9 83:20 89:7 120:6 134:16 135:19 142:19 180:16 181:6,8 201:14

**readopted** 41:6

**real** 18:15 84:18 87:21 128:23

**realigned** 211:15

**reality** 34:11

**realize** 63:11

**reason** 9:4 154:19

**reasons** 43:24 45:8 46:9

**rec** 211:16

**recall** 9:8 11:11,21,23 12:8 22:23 27:5 31:19 32:19 33:22 34:23 37:16 43:17 47:3,10, 12,21 48:17 51:12 53:5 54:17 55:16,18 57:17 62:12,13,19,21, 23 63:22 64:17,21 69:3 70:8 71:2,4 72:16,18 76:20,21 80:12 86:24 87:9 88:12,18 89:23 90:3,5, 14,18,20 91:11 93:16 95:20 96:5,20,21 101:16 102:2 103:12 107:23 109:4,6 111:23 113:15 116:7,11 121:6 122:5,10 125:12,13 126:16 132:10,13 134:1 135:4 136:6,8 137:1 141:2 142:21,22 144:1,19 152:23 153:3 154:18,20 159:19 160:19 162:8 165:8 167:5 168:13,14 172:22,23 173:6,10,16 174:15 176:14 178:7 184:20 185:13,15 186:11,15 187:18,19, 21,22 189:18,23 192:5,15,22,23 193:11 195:12 197:11,14,17, 18 198:20 199:16 202:2 204:11 205:2,5 207:3 208:9 213:18 231:2,17,19 232:23 233:4,6,18 234:7,18 235:15 236:4 237:16, 19 238:18,23 241:22, 24 243:13 244:4,6,9, 11,17 245:2,6,7 246:19 248:14,17,23 249:4 251:12,15 253:4 254:6,7

**recalling** 87:7 129:4

**received** 89:21 113:3 152:14 158:7 167:6 190:23 207:14 237:10 241:23

**receiving** 76:20

**recent** 153:11,23

**recently** 12:19,23 49:9 125:15

**recess** 53:1 88:2 124:21 180:9

**reciting** 226:20

**recognize** 68:23 135:2,4 142:8 209:18

**recognizing** 147:11

**recollection** 30:1,2 32:20 57:3 64:2 88:20 90:9 91:12,24 92:7 94:2,20 104:18 127:7 183:4 189:20 190:1 199:15 207:12 208:14 213:14 237:23 240:5, 11

**recommend** 16:18 148:15

**recommendation** 12:12 35:4 62:14,16 66:7,9 67:12 164:13 212:11,14,18,23 213:1 222:24 229:16

**recommendations** 16:2,3,11,13,16 18:2, 9,19 95:21 161:6,21 162:3 211:23 212:1 213:3,12,21

**recommended** 34:13 54:1 148:12

**recommending** 16:21

**reconciling** 123:5 164:23

**reconsideration** 12:22

**record** 6:7 10:2 19:8 31:7 43:2 48:12 49:4 51:20 71:17 75:16 76:3 79:24 83:10 94:21 98:18 99:8 102:23 103:20 104:10 110:1 115:4 122:20 125:6 130:7 131:10 140:3 145:20 151:21 157:11 165:15 170:9 175:7 179:6,9 180:20 192:3 196:18 201:5 204:15 205:1 207:4,8

209:11 222:18 230:21, 22,23 241:6 248:2 250:4

**record's** 42:20

**records** 102:21 103:17,22 122:7 165:13

**recreation** 60:18,23 61:2,6,10,13,16,24 62:4,6,20 63:5

**recreation's** 61:14

**recurring** 138:9

**redevelopment** 33:14,16,19 34:12,15 69:22 80:7

**refamiliarize** 101:1

**refer** 6:13 26:9 46:19 123:3 190:2 218:16 221:12

**reference** 38:22 56:14 57:13 84:1 97:23 156:14 221:21 222:4 227:15

**referenced** 12:9 22:22 45:10 65:3 92:23 93:24 94:8,16 98:16 99:11 111:18 157:2 170:17 203:24 230:2

**references** 55:14

**referencing** 99:4 109:11 136:10 148:1 183:11,16

**referred** 6:15 29:17 38:2 122:15 200:4

**referring** 6:17 24:13 26:16 29:18 36:18 38:4 57:6 64:9 65:19 76:23,24 80:16,24 84:7 92:3 95:14 111:22 116:2,4,5,7 121:19 127:1 136:11 148:2 156:5,15 159:4 162:1 208:17,18 217:19 218:9 220:10 221:5 226:4 227:19 239:6

**refers** 81:1 199:10

**refined** 164:14

**reflect** 43:24 85:6 103:23 131:17 133:4 141:5 215:9

**reflected** 85:20 112:3 113:21 132:6 141:9 159:8 219:2

**reflecting** 45:24 204:10

**reflection** 110:5,7

**reflects** 57:16 102:13 112:19 135:5,10 183:2

**refrain** 8:5 42:10

**refresh** 32:20 157:24 240:5,11

**regard** 18:1 25:15,17, 18 223:16

**region** 37:23

**regularly** 70:2 232:4 233:10

**related** 16:3 22:2 50:4 61:12 64:16 91:21 99:15 110:8 128:2 135:8 149:23 155:3 219:24 222:7 228:7 246:10

**relates** 199:7

**relations** 107:16

**relationship** 72:6 74:5 93:17

**relationships** 95:4 102:4 158:13 211:16

**release** 55:1,6,13,16

**released** 188:22

**relevance** 25:11 26:1 43:22 54:14 55:17 58:18 67:16 131:7 220:14 235:6

**relied** 105:9 175:21

**rely** 122:3 174:7

**relying** 104:9 210:7

**remember** 11:13 30:16 32:7 33:1 36:14 39:17 47:17 48:3,4

52:16 53:24 55:7 78:5 90:4 96:7,16 112:4,17, 20 113:15 115:14 121:11 123:18 126:22 127:5,24 128:16 129:1 131:22 132:3 137:16 145:1 152:11 156:8 158:9,10,11 159:20 160:19 166:24 168:15, 17,24 169:7,9,10 173:24 184:18 186:13 192:9 194:20 197:10 200:13 207:23 213:7 232:21 236:13 238:4 244:13 245:24 247:7, 13,14 248:23 249:5,8, 21,22 251:1 253:1 254:10

**remembering** 125:23

**reminding** 240:21

**rent** 224:5 225:19 226:19,23,24 227:4

**rental** 226:13,14

**reorganization** 211:14

**repair** 72:14 74:23

**repairing** 74:17

**repeat** 7:10 19:6,7 83:15 130:6 140:1 175:6 222:2 235:21 252:13,14

**repeated** 227:15

**repetitively** 224:8

**rephrase** 7:11 196:17 252:15

**reply** 187:24 188:9

**report** 11:18 102:13 146:21 148:16 161:8, 11 162:1,3,11,21 164:11 176:12 177:6 214:3 220:17 233:17

**reported** 17:7,8,14,15 32:10 211:12,17 233:16

**reporter** 7:15 8:2 75:10 97:10

**reporters** 145:15

**reporting** 211:15

**reports** 16:8 32:13 119:5 146:17,23 163:4

**represent** 68:17

**representatives** 43:6 77:4 87:13 158:21 234:5,9 239:4

**reputable** 25:14

**request** 171:14 184:3, 4 199:2 235:14 237:3, 7,10

**requested** 19:8 43:2 79:18,19 110:1 130:7 140:3 142:17 157:11 175:7 179:6,9 204:15 222:18 230:23 235:8

**requests** 236:23

**require** 93:3 105:8 175:18 178:3

**required** 13:11 20:6 73:13 93:1,22 94:1,5 117:11

**requirements** 90:12 108:17

**requires** 250:5

**research** 74:2 130:15

**researched** 38:12

**reserve** 164:6 216:16

**reshape** 246:9

**resident** 62:1

**residential** 118:9,18 120:21 176:6 218:1 225:4,19 227:24

**residents** 21:14 79:17 119:14 176:11 224:14 225:8,12 227:16

**resolution** 147:1 159:11 243:16,21,24 244:4,8,11,19,23 245:3

**resolutions** 244:15

**resolve** 147:20,22

**resource** 13:13

**resources** 63:12 105:16

**respect** 16:11 17:4,16 21:21,24 38:1 39:5 55:4 59:5,9 60:21 72:19,20 74:3 93:8 104:24 106:4 108:18 110:20 116:1 118:6 120:15 127:10 160:7 165:11 174:6 177:8 183:9 188:12 189:16 207:14 212:20 216:22 217:2,14,18 221:2 225:18 227:16 228:14 229:24 237:4 244:21 246:2 247:15 250:23

**respecting** 67:10

**respond** 37:12 79:21 86:20 197:3 202:20 218:6

**responded** 209:3

**responding** 79:23 120:2,4 195:1

**responds** 224:2

**response** 46:20 80:12 118:23 140:20 144:13 155:16 184:22 196:2 198:23 202:12 204:20 206:8 207:17 226:19

**responses** 8:4 151:17

**responsibilities** 15:19 16:17 17:4 18:23

**responsibility** 17:22 18:13

**responsible** 15:22 16:13 17:10,18 19:1 20:2 56:17

**responsive** 229:23

**rested** 137:20

**restoration** 74:24

**restore** 72:15 74:7

**result** 66:21 95:10 148:22 239:19

**resulted** 250:9 254:2

**retail** 41:9 43:11 44:23 45:2 46:12

**retain** 33:4 49:18

**retained** 34:24 52:6

**retiring** 25:16

**retreat** 101:17 102:7 103:18 105:5 106:1,7 107:13,21 108:18,20 109:5,6 110:12,21 116:10 123:12 142:7 143:24 146:10 171:15 183:21 184:2,5,14,18 185:1,11

**retreats** 14:16 101:12, 22 102:1,18 103:2 104:6,14,24 106:5 108:3 146:8

**revenue** 44:11 45:7 114:10,12 115:7,23 116:21 117:8,16,18 118:19

**revenue-producing** 117:5 119:18

**revenues** 178:15

**review** 12:3 18:4 19:4 20:10,24 29:9 40:14, 16 45:18,23 46:23 47:8 48:19,23 54:7,17 79:24 80:11 83:17 92:12 101:8 134:19 137:3 141:13 176:18, 19 181:16 185:21 195:17 217:9 227:12 243:17 247:9

**reviewed** 11:12,20,22 31:15 53:20 54:12,16 55:5 66:13,17 89:21 152:2,16 172:24 191:20 196:8 209:21 211:4,18 213:3 218:18 219:1 231:15 234:16 245:6

**reviewing** 20:6 29:6 53:4 55:8 67:19 74:6 141:3 176:12 209:10 252:2

**reviews** 19:22

**revise** 54:7 152:21

**revised** 179:13

**revision** 248:7

**revisions** 113:13,24 179:16 210:3,4 247:11

**rezone** 70:22

**rezoning** 12:11 20:21 22:17 24:9 27:9 49:12, 19 93:1,3,9,23 94:1,5 98:22 99:3 179:20 206:13,20

**rezonings** 17:4,16,18, 20 18:10 19:19 20:1 21:24 23:24

**Rhonda** 109:24

**right-hand** 53:16 151:10

**riparian** 72:15 74:7

**rise** 215:20

**River** 250:7,8,10

**Road** 50:17 250:7,9,10

**Robinson** 76:17 77:5, 8,9 78:3,9,20 81:1 84:13,16,22 85:3 126:15,18 127:1,6 131:12 132:12 142:12, 17 143:23 144:11 151:18 152:20 165:20 167:7,10 168:11 169:3 171:16 180:23 181:18, 24 183:17,20 184:23 186:20 187:2,11 192:13 195:22 196:3, 21 197:8 198:23 201:1,11 202:6 204:9 206:8,21 207:15 208:18 235:12,13 236:15 242:9,11 245:18,23 246:3,24 247:23 248:11,20 249:1,10,14 253:22

**Robinson's** 84:2 142:14 144:13 181:16 184:3 185:13 186:14 187:23 188:13 189:17 196:6 197:4 202:21 204:22 208:3 237:3 254:11

**robust** 64:15 131:1

**Robyn** 100:17 172:8

**role** 18:3 19:16,17 22:18 25:10 39:5,13,

14,15 67:5,12 78:9,13 117:22 130:15 138:1 148:5 176:18 203:7 210:5,6 223:2,3,8 229:10

**roles** 37:6 67:10 166:7

**room** 111:24 112:22 169:3

**rooted** 106:15

**rough** 176:24

**roughly** 160:4 252:10

**round** 214:1

**rule** 118:21,23 120:6 253:8

**rules** 7:4 120:2 122:22 123:13,17

**run** 25:20 128:14 173:18 177:19

———————

**S**

**safety** 10:12,13

**sale** 32:19 33:9 225:18 226:18

**sat** 29:24

**satisfy** 84:11

**Saturday** 103:10

**scale** 139:14

**scenario** 120:21 121:24 174:1

**scenarios** 110:18 115:17 116:2,4,14,19 117:21 120:11,13 121:15 122:5 143:9 144:9 163:2 170:19 171:1,3,4,10,14 173:2, 9,15,19 176:17

**schedule** 171:8 218:17

**school** 108:13 178:5

**Schumacher** 8:16 10:15 17:19 19:5,9,14 21:2 23:17,21 24:12, 18,20,23 25:1,11 26:1 31:1,17 35:6 41:22,24

42:4,11,16 43:1,3,22 48:22 49:3 52:19 54:14 55:17 58:18,24 59:17 60:13 64:11 65:10,13,17,21 67:16 74:9 75:8,11,12,16,17 76:9 79:9 81:4,7,11, 18,23 82:2,10,12 83:2, 9,22 84:9,23 87:10,12 88:10 91:1 94:11,14 97:9,11 98:4 104:15 109:13,18,22 110:2,24 111:5 112:10 113:9 118:11,15 123:14,22 124:8 126:1,5,7 127:17,20,23 130:1,4 131:7 132:14 133:10, 16 134:5,16 140:7 145:9,15 150:4,23 151:12 153:18 157:7 162:16 168:1,4 169:5, 22 177:13,18 178:17, 21 179:1 180:4,15 181:10 182:24 185:7 187:15 188:16 190:10 191:14 192:7 194:21 196:15,18 198:3,15,17 200:7 201:8,14,19 202:4,22 204:13,16 208:6 209:8 212:2,4 214:17 216:11 217:4 219:13 220:8,10 221:7,10 222:1,8,13, 16,19 223:23 225:13, 23 226:3 227:7 228:3, 6,10 229:6,9 230:13, 20 232:14,18 233:2 235:6 238:8 239:11, 19,23 240:1,3,8,16,23 241:4,8 242:14 245:10 250:1 252:5,7,22 253:1,6,12,15,19

**science** 15:7

**scope** 165:2

**Scott** 76:1

**scripture** 221:19

**second-to-last** 153:9,10,16

**section** 141:10 179:8 202:15 214:22 218:3, 14 225:3

**sections** 221:14,19

**seek** 69:12 73:11 206:22

**seeking** 29:2 41:8 58:19 89:24 119:15 131:4 152:21 165:11 171:23

**seemingly** 215:6

**sees** 81:5,13 82:13,15, 19,22

**select** 29:8

**selected** 61:19

**selects** 106:6

**sell** 27:14 32:22 33:2

**send** 212:16 246:14

**sending** 72:1 91:11, 13

**Senior** 108:14

**sense** 8:7 16:1 20:18 75:7 113:2 137:4 177:2 231:22

**sensing** 149:16

**sensitive** 35:10 36:3 46:1,10,14 50:6 70:10 85:24 147:12 150:13 193:4 210:21

**sensitivity** 114:22

**sentence** 33:18 34:10 82:20,21 153:21 156:24 170:23 197:22 198:4 200:6

**sentiment** 205:24

**September** 55:13 56:4 57:7 66:1,6 183:24 186:22 190:19 195:24 199:1

**sequence** 240:12,21 254:10

**sequencing** 144:2

**serve** 115:18 116:22 117:6 143:2,14 144:9, 20 175:20

**serves** 98:20

**service** 30:9 33:8 35:15 37:17,20 115:24

175:13,16 178:6 211:16

**services** 34:8 45:7 52:10,17 116:23 117:8,10,19 119:13,18 172:11 175:15,19,24 177:2,20 178:2

**serving** 115:12

**session** 125:2 129:18

**set** 34:21 106:9 110:10 114:20 122:22 165:18 172:7 177:9 179:12 184:7 185:11 188:14 203:10 207:15 211:23 213:12 216:23 217:17 220:1 248:22

**setting** 46:14 102:8

**seven-member** 25:6

**sewer** 115:19

**shaking** 8:3

**shape** 148:6 246:13

**share** 152:8 160:14 193:13 207:22 210:23 216:16 217:10 241:19 242:19 243:6 247:16 249:1

**shared** 107:19 131:11 141:9 157:20 158:2,3 160:16,18 163:12 213:8 241:11 242:5,13 249:10,15

**sharing** 157:16 241:15 243:11

**Shops** 50:20

**short** 13:8 150:20,23 225:20

**show** 97:22 119:5

**shows** 149:23

**sides** 46:3

**signature** 52:2 77:12 152:4 170:12

**signatures** 77:24

**signed** 53:24 54:13 172:14 202:1

**significant** 18:1 85:4,

15,16 101:2 119:4 139:13 194:3

**significantly** 219:5

**Silk** 10:16 24:24 168:3 179:3 241:7

**similar** 38:17 71:1 119:6 120:6 179:19 243:20 247:15 248:18

**simple** 136:1 196:11, 22

**simply** 53:18 54:5 195:8

**sincere** 160:24

**single** 23:4

**single-level** 224:6,20 227:10,20

**single-story** 227:24

**singled** 29:10

**sir** 42:24 195:19 221:1 227:18

**sit** 81:19 82:4 95:5

**site** 30:15 33:16,19 34:12 37:11,24 44:24 46:1,9 49:9,15,21 50:8,20 58:13 59:13 63:4 64:7 70:16 75:6 85:24 91:20 92:14,15 93:13,20 94:17 108:20 109:1,12,15 110:9,14, 22 112:14 113:7 114:9 115:9 116:10 117:4,21 118:9 119:17 120:16, 18 122:1 131:6 133:22 143:9 148:3 149:3 184:1 191:9 193:7,10, 20 215:5 223:12 224:4 238:7

**sites** 36:3 70:10 119:11 193:15

**situation** 147:16,18, 22 148:2 164:12

**sizes** 195:5

**skill** 34:21

**skilled** 147:16

**skim** 100:24

**skimmed** 101:9 108:23

**slogan** 77:20

**small** 14:4

**smaller** 92:17 95:6,10 139:17

**Smith** 131:21 132:12 197:23 198:12 199:2 200:4 205:2 206:21

**snowing** 28:2

**social** 30:8 33:8 35:15 37:17,20

**sold** 35:18

**sole** 35:8 59:23

**solely** 50:4

**solicit** 59:11 167:15

**solicited** 167:17

**solil** 179:2

**soliloquy** 24:23,24 25:1 179:3

**sore** 252:8

**sought** 27:13

**sound** 181:21

**sounded** 109:22

**sounds** 230:6

**source** 35:11

**space** 29:24 30:5,9 34:3 44:12 62:9 63:5 64:5,22 68:3,20 72:14 73:7 74:7,15 79:7,15 80:10,17 81:1 84:2,7 85:15,16 110:16 115:7 135:24 214:15 219:7 230:3,4

**speak** 42:21 67:18 103:24 129:11,13 165:13 237:12

**speaking** 15:17 83:4 132:19 178:24

**special** 48:13 49:18 50:4

**specialized** 50:18

specialty 47:19

specific 12:8 21:3
27:5 30:2,17 43:17
48:4 64:2 67:18 69:14
70:19 76:22 80:13
87:7 88:20 90:4 91:12,
24 92:7 95:21 96:22
102:2 104:18 107:14
109:7 115:15 119:24
126:16 128:18 129:11
132:4 133:6,19,20,23
142:22 144:1,6 152:13
154:20 156:6,22
168:13 173:17 174:18
177:8 183:5 186:15
187:16 199:14 210:14
211:1,5 213:14 221:14
228:12,17 234:7
235:15 237:19 242:5,
18 246:4 247:7 248:7,
15 249:19

specifically 19:18
31:19 39:17 51:12
55:7 57:17 64:17
69:19 80:1 88:12
90:18,20 93:16 96:7
102:7 103:12 107:22
111:24 116:6 120:12
121:6 122:10 125:24
128:16 137:1 141:3
144:19 145:1 154:13,
19 159:6,20 160:18
168:14 173:10,16,24
184:19 192:22 218:11
231:3 233:18 234:10
237:16 241:22 244:10,
17

specifics 109:8 158:8
176:15 198:20

speculating 233:12

spend 67:15 102:8
171:6,9

spending 167:8 195:2

split 90:1,16 95:5

spoke 237:8,24

spot 108:4 180:2

square 97:24 98:18

staff 11:17 16:2,5,7
19:16,18 21:9,10,23
22:18 28:15 34:17

61:17 66:21 72:23
75:4 92:11,23 95:16
102:15 103:3,6 107:11
118:1 122:1 128:16
129:2,5 137:3 143:15
144:4,21 146:14
152:12 153:12,23
154:10 155:20 156:5,
14,15,19 157:21
158:6,24 172:10
173:4,11,13 175:19,22
176:2 184:13 189:5
197:24 198:13 203:19
209:13 212:6,9,11,20
213:1,21 214:3 220:17
221:12,15 226:9
227:23 228:7,9,21
229:13 230:14 238:14,
16 243:9,10 244:16
246:17 247:3,10
248:21

staff's 19:16,17 21:24
117:22 212:14 215:14
216:3 217:8 219:2

stage 163:13

stakeholders 147:21

stamped 134:22
170:10 201:6

stand 198:5 216:10

stand-alone 92:17

standard 69:21

stark 28:1

start 7:21 28:23 38:11
82:1 94:12 136:19
181:3

started 35:2 50:19

starting 53:15 87:17
115:13,16 117:20
136:22 162:1

starts 32:15

state 6:6 105:15

Statehouse 46:7

statement 61:4 156:3
185:7

statements 82:5

stating 36:7 226:24
235:11

station 41:10

status 151:18

stay 224:18

staying 114:8 124:13,
15

Steiner 153:13,24
154:8,12 158:4

steps 106:20

Steward 152:13
174:19

stewardship 44:18

Stewart 17:8,15
100:17 172:8 175:11
176:16 211:12 213:11
238:22

Stewart's 211:24

stimulated 250:12

stop 7:8 83:3 145:16
212:4,5

store 41:9

straightforward
81:17

strategic 14:13 85:7
102:11 129:16 131:14,
17 132:6 138:10,11
147:2,10 148:6
149:11,19 150:14
203:12,24 205:7 224:9
246:9

strategically 45:3

strategies 80:20
85:19 135:24

strategy 129:22
130:23

stream 117:16,18

street 24:4 26:12,13
36:2 58:5 92:22 93:10
95:9 98:1,15 110:15
117:13 149:8 150:10
151:2 239:13

strike 45:4 53:22 54:7
94:12 119:16 217:16
218:12

strike-throughs 54:3

striking 54:2

strip 46:6

strong 131:19

strongly 86:3 131:15
147:14 149:10 155:7
203:12

struck 214:11

structure 117:10

structured 165:24

structures 176:7

struggling 171:8

stuck 19:11

studies 14:15 120:7
178:4,5,6

study 79:18

stuff 74:1 146:14,16
169:18

styles 225:19

subdivide 99:16

subdivided 92:20
100:8

subdivision 93:2
98:21 100:1 139:17
215:8

subject 22:7 27:16
72:2 89:16 91:7 94:20
97:19 142:6 146:13
151:16 152:19 158:16
170:5 186:5 190:20
192:24 196:3 201:2

subjectively 33:23

submittal 221:17,20

submitted 70:21
162:11 206:19

subsequent 176:10

subsequently 254:8

substance 11:4 209:8
210:11

substantial 100:22

substantive 159:24
193:12,19 194:5
199:24 254:2

**substantively** 210:9 247:9

**successful** 59:2 74:13,16 155:18

**successor** 57:23

**sudden** 187:7,12

**sufficient** 117:5 219:6,7

**suggested** 113:16 194:7 223:18

**suggesting** 87:18

**sum** 67:22

**summaries** 106:1 193:9

**summarized** 98:11 112:5 192:1

**summarizes** 112:11

**summarizing** 111:4 112:7,8 114:12

**summary** 102:23 105:4,10 108:19 110:8,11 113:5 166:16,22 168:11 169:4 190:24 193:1, 22,23 194:13 196:8

**sums** 52:13

**sun** 87:15

**super** 250:5

**supplement** 189:15

**supplies** 175:19

**support** 23:8 43:15, 19,21 156:13 217:12

**supported** 34:6 95:12,18 219:9

**supportive** 93:5

**supports** 119:12

**surprising** 67:7

**surrounded** 46:2 150:9

**suspect** 141:14

**suspend** 186:6 187:4, 12

**suspension** 208:17

**sustainability** 107:17

**sustenance** 124:17

**swore** 9:18

**sworn** 6:2 182:8

**system** 61:13 67:6

---

### T

**takes** 130:9

**taking** 20:2 174:12

**talk** 7:17 9:24 11:2 102:10 107:16,17 114:17 186:10 187:11 194:11 220:18 238:16

**talked** 107:1 124:7 125:9 127:6 131:24 137:23,24 140:23 143:1 158:18 159:5 211:3 213:5 238:19,20

**talking** 19:14,18 20:21 21:2 26:11,20 28:17 42:8,10 73:23 82:1 86:7 89:17 97:11 98:2 115:21 125:11 126:2 128:22 132:14 156:18 160:21 176:5,13 177:16 208:21,23 252:4,10

**talks** 32:18 218:3

**tax** 33:15 44:10 115:6, 22 117:10

**taxes** 44:10 119:8

**teacher** 26:5

**team** 111:21

**teams** 112:9

**technical** 21:12 94:3 210:8 223:4

**technically** 16:8

**tem** 144:16,24

**temporarily** 186:6 187:4,12

**temporary** 208:17

**tend** 118:19

**tension** 149:20 150:16,21

**tenure** 17:13 27:7 104:16 235:16

**term** 17:19 50:6 114:19 127:14

**terms** 18:1 53:8,12 84:2 96:12 128:6 149:21 203:6 205:24

**testified** 204:8 243:2 254:3

**testifying** 9:21 118:7

**testimony** 9:6 74:10 118:22 217:15 254:22

**text** 216:8

**theme** 155:6

**themes** 106:16 107:15

**thick** 148:18

**thing** 65:10 91:14 92:18 113:18 153:19 192:2 197:19 206:6 214:2 224:1

**things** 9:8 19:24 23:7 34:21 37:18 41:3 44:5, 13 69:12 70:18 91:16 99:2 102:16 103:18 106:18 111:15 114:17 115:2 116:12 117:14 119:17 121:10 128:15 129:3,18,24 130:21 135:18 138:8,20 155:12 158:10,22 163:10 165:16 187:1 193:12 194:23 199:7 202:13 205:12 215:24 219:10,21 220:6 224:8

**thinking** 47:16,24 115:22 125:18 157:15 163:13 213:6

**thought** 44:1,5 46:19 49:1 50:22 76:13 83:12 85:12,21 95:16, 17 123:22 129:14 130:20 131:13 132:5 135:18 141:11 144:6 147:19 153:6 156:1 199:22 201:18 205:17 213:22 214:1 215:16, 17 219:1 226:3 228:4

231:7 233:8 240:23

**thoughts** 39:12 133:5 135:22 205:4 210:23 216:22 217:11 229:12, 13,15

**thumb** 118:21,24 120:3,6

**Thursday** 188:23 189:2,15

**till** 124:13,15

**time** 8:11 10:10 13:8 25:17 27:4,13 28:9 30:5,7,11 31:23 32:9, 11,20 33:7 34:16 36:21 37:3 38:6,18 44:19 47:3,7 49:11 52:19 57:3,6 59:1 61:24 63:21 64:4,9,14 65:1 69:1 70:17,23 71:20,22 76:6 77:2,23 78:3,21 81:22 83:14 84:11,15 85:1 86:5,6, 9,19,24 87:3 88:13 93:19 98:10 101:4 102:8,17 104:5,6,20 105:12,14 112:1 122:7 123:12 125:11,18,23 127:12,13,18,21 128:8 129:4,9,11,13 130:21 131:2 132:13,18 133:2 139:13 143:15 144:15, 22 160:6 164:2,17 166:1 167:3,9 171:7,9 172:9 175:4 180:6 182:4 183:15 184:23 194:24 195:2,6 199:20 200:14 205:14 206:16 211:1 218:8,17 219:1, 3 220:21 222:12 224:22 228:20 232:11 233:9 235:15 236:15 237:1 239:9,14 249:6, 18 251:7,19 252:16,21 254:13

**timeline** 114:14 206:18 237:19

**timelines** 115:15

**timely** 232:7

**times** 17:7 38:15,19 43:7 73:4 103:4,8 114:16 194:1 234:7

timing 68:20 84:24
116:11 142:24

title 32:4 245:14

titled 10:12 162:22

today 6:13 7:4 8:2,22
9:2,6,15 10:16,23 11:6
24:4 26:9 27:10 83:19
100:9,10 124:7,9,13
143:6 202:2 231:15
240:9 254:13,19

today's 9:19 11:7

Todd 166:18

told 129:23 134:5
135:16 184:24 200:7
220:18 248:16 253:20

Tom 191:2

tomorrow 187:3

ton 132:21 135:17

tool 69:11 70:12

top 186:24

topic 111:13 182:17
183:9,20 184:24 185:3
193:5

topics 107:18 154:21

totality 132:19

totally 229:23

touched 246:21

town 149:6

traffic 143:13

train 145:17

transaction 33:9

transcribe 8:2

transcript 7:16 8:1

transition 36:10
126:23

transmit 176:20

transmits 212:13

transmitted 66:16
114:4 173:1 245:20

transparent 192:17

transpired 184:19

199:13

trash 115:20 117:11

treat 23:5 143:5

tree 110:16

triggered 94:6

troubled 49:10

true 83:2 143:7 173:7

trust 231:8

truth 9:19 30:16

Tucker 73:3 74:19,23
110:16

Tuesday 237:21

turn 52:1 53:17 80:22
136:9 142:14 163:23

turning 76:16 162:10

turnover 37:6

type 14:12 16:12
34:14 44:20 91:14
99:5 117:7 128:15
223:11 224:23 227:3

types 171:21 175:20
214:13 217:18 218:2,
10 221:3,22 222:5
224:14 227:5 230:2

typically 108:4

typo 160:10

## U

uh-huh 12:23 48:20
49:2 57:14 71:14 72:7

uh-huhs 8:5

ultimate 18:12,17

ultimately 17:7,21
18:8 19:3 20:1,9 45:17
49:18 50:24 90:16
99:17 100:7 143:18
148:9 172:14 210:18
215:3 223:1,7

UMC 182:18 183:10

UMCH 26:10,18,23
27:3,13 28:7,11,12,15
29:23 30:14 32:18,21
35:14 36:1 41:10 49:9,

15,21 50:4,5,13 54:24
56:20 57:10 58:13
62:8 63:18 67:15
68:12 69:4 72:6,19
73:2 74:5 77:6 78:18
79:8 80:10 85:17 86:8
87:14 88:8 89:16 91:8,
20 92:20 93:12,13,20
94:9,17 95:4 97:19
99:17 108:20 109:1
113:6 114:9,22 116:9
118:9 120:12,15
125:10,17 127:11
129:9 131:5 133:21
135:8 138:12 139:1,
19,24 140:16,24 142:7
146:13 148:3 149:3,5
150:1 151:18 157:4
158:1,12 159:14 161:7
163:2 165:12 166:17,
22 170:7 173:14 184:1
185:10 186:5 187:4,13
190:20 191:9 192:24
193:10,20 196:3
198:9,10 201:3 202:8
207:19 208:22 214:23
221:19 224:10 229:11
234:21 237:4 238:7
239:21 241:12 246:10
248:1 251:22 252:20

UMCH's 33:7 35:22
36:15,22

UMCH-RELATED
196:13,23

unanimity 205:6

uncharacteristic
156:3

uncharacteristically
155:23

underrepresented
224:15 225:5

understand 6:17 7:6
8:18,19 9:1,20 18:14
19:9 21:4 26:15 33:21
42:3 45:15 58:19
59:12,22 74:22 83:7
112:6 119:23 121:3
130:2 157:8 163:22,24
172:1 178:11,20
219:12,15 222:3 230:9
239:10 249:9

understanding 38:21
51:8 84:21 93:15
96:10 101:11 165:10
216:21 219:18

understood 7:12
113:23 174:22 189:1

undeveloped 149:8

unfairly 231:6

unit 24:7 51:4

United 99:22 112:14

units 120:18 223:12

unsuccessful 83:14

unusual 193:14

update 34:24 41:5
43:12 51:11 52:15
55:15 58:11 59:5,9
66:1,5,10,15 97:19
151:19 179:16 186:6
187:5 201:3 202:8
203:4 207:19 208:12,
23 214:12 244:22
245:1,11

updated 179:13
205:22 214:23 234:8

updates 232:6 233:14

updating 48:2 205:21
252:2

upfront 67:23

urgency 187:8

urges 62:6

utility 75:5

utilize 93:9 104:13

utilized 34:15 104:6

utilizing 177:3

utterly 150:15

## V

vacant 29:24 30:8
32:21 93:19 250:11

vacated 49:9

valuable 37:22

valuation 176:8

**varied** 103:11

**variety** 13:3 43:23 102:16 206:3 218:6

**verbal** 8:4

**verbally** 233:19

**verify** 121:1

**verse** 221:19

**version** 137:13 164:14 190:9 191:15, 16 214:3,4 218:16

**versus** 119:18

**viability** 34:11

**viable** 37:21

**video** 192:3,11 205:9

**view** 194:18 204:23

**viewed** 36:2,3 70:14 139:8

**viewpoints** 216:4

**views** 112:7,8,19,21 155:7

**village** 50:9 150:19

**virtual** 194:22 233:2

**virtually** 233:5

**vision** 59:3 148:21

**visioning** 54:24 147:2 148:11,15,23 149:1 157:3 160:13 161:23 162:23

**visions** 149:17

**Visitors** 57:20

**vitality** 17:1 58:6

**vivid** 242:3

**vociferous** 155:16

**voice** 131:12 182:11

**voiced** 37:14

**volume** 37:10 80:2 211:20 214:22

**Volusia** 13:4,6,14,18 14:2

**vote** 189:24

**voted** 122:21 235:18 239:17

**voter** 78:1

**voters** 84:15

**voting** 95:24 237:8

---

**W**

---

**W-A-R-D** 56:14

**wait** 42:22 65:11

**walk** 7:3

**wanted** 42:11 44:1 59:4 65:23 74:21 84:22 111:6 113:20 122:11 125:8 143:17 147:15 171:10 173:20

**WARD** 56:14,15,16,23 57:2,11 77:4 79:1 85:11 174:3,7,18,19

**WARD's** 174:6

**waste** 81:21

**watch** 192:4 205:9

**water** 115:18 230:19

**Waterline** 117:12

**ways** 37:15 67:6 73:8 115:19 224:21

**website** 189:5 214:22

**websites** 165:16

**WEC** 87:3,8 88:16 108:6 120:23

**week** 188:19 236:1,21, 22 237:17 238:1

**weekend** 107:1 237:17 238:1

**weighing** 67:1

**weight** 66:20 200:15

**West** 92:19 94:23 95:2 98:6 99:13,22 100:6 215:9

**wheeled** 145:9

**white** 174:2,6,12

**wholly** 44:3

**Why's** 144:14 199:5

**wide** 16:14 17:2 34:20

**Wilson** 50:17

**withdrawal** 91:8 96:6

**withdrawn** 95:24

**withdrew** 96:4

**wonderful** 26:6

**wondering** 87:17 140:12

**word** 19:11 122:20 150:6

**words** 50:7 100:8 110:23 113:5 122:23 134:2 140:15 191:23 200:2 203:2,3

**work** 13:12 14:16,23 17:11 21:16 35:1 51:9 55:15 57:11 84:18 85:5 102:6,11,12,15 112:12,23 119:9 122:24 128:22,24 137:3 143:11,15,17 147:23 157:22 169:23 171:8 176:20 178:10 203:7 210:19 250:13

**worked** 14:4 33:3 44:16 46:4 85:13 92:24 93:5 94:7 105:14 250:18 252:11

**workers** 44:10

**working** 102:17 107:10 137:16 153:12, 24 154:11 166:4 170:6 237:11

**works** 21:1

**workshop** 111:19

**world** 63:3 65:3

**worried** 115:11

**Worthington** 9:9 13:2 15:18 25:4,9 27:20,22 28:4 29:7 30:18 31:8 33:13 34:18 36:6 40:1, 2 44:14,15,24 45:12, 16,19 48:14 50:21 51:22 54:24 55:2 56:5, 17 57:23 58:1,2,3,7,8 61:5,6,9 67:9 68:14

71:19 77:10,13,16,18 78:10 84:15 85:11 97:6,15,16 100:19 108:8 119:3,6 134:22 138:9 142:2 146:3 148:22 149:1 150:12 162:24 170:10 176:1 190:18 195:4,23 201:6 209:15 225:7,12 227:21 251:20

**Worthington's** 10:17 24:5 150:17 224:16 225:6

**Worthington.org.** 71:21

**wrestle** 115:14,17

**wrestling** 128:24 143:10,14 205:12

**Wright** 105:15

**write** 60:11 153:11 188:18 213:9

**writer** 211:22

**writes** 175:11 212:15

**writing** 41:19 48:4,5 114:2 141:11 202:7

**written** 8:1 21:22 23:1,3 38:10 43:19 51:5,6 63:9,16 104:10 105:4 107:19 189:4,14 193:22 198:22 201:12 217:12 226:18 229:14

**wrong** 23:15 190:9 203:14 235:1

**wrote** 33:11 47:22,23 58:10 80:12 117:21 135:5 136:13,17 152:18 153:1,22 170:22 173:5 174:4,9, 12 183:8 197:23 202:13 211:20 215:23 219:20,23 234:23 246:6,10

---

**Y**

---

**Yaromir** 154:8,12 158:4,7,8,15,18 160:3, 23 194:6

**year** 14:5 30:3,17 35:2
38:3 87:4 102:5 108:5
146:11 154:23 246:7

**years** 10:3 13:19,23
15:17 17:15 30:14
108:7 137:19 142:24
153:12,23 183:5 194:2
215:3 223:19 227:21
248:3

**yesterday** 65:14,20
124:8

**yielding** 155:19

**York** 145:13

**young** 225:8

---

## Z

**zap** 34:7

**zoning** 12:4 13:5 23:4
50:23 67:5 78:1 91:9,
19 95:18 99:24