*LIFESTYLE COMMUNITIES*

*vs.*

*CITY OF WORTHINGTON*

---

Deposition of

**Peter Bucher**

October 10, 2023

---



614.460.5000 | www.priohio.com | pri@priohio.com

1

IN THE UNITED STATES DISTRICT COURT
2        SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION
3


4   LIFESTYLE COMMUNITIES,      )
LTD., ET AL.,               )
5                               )
Plaintiffs,           )
6                               )
vs.                   )  Case No.
7                               )  2:22-cv-1775
CITY OF WORTHINGTON,        )
8   OHIO,                       )
)
9        Defendant.            )


10


11


12                      DEPOSITION


13                   of PETER BUCHER


14


15       Taken at Worthington City Hall
6550 North High Street
16       Worthington, Ohio 43085


17     on October 10, 2023, at 9:26 a.m.


18


19       Reported by: Rhonda Lawrence


20


21                     -=0=-


22


23


24

1   APPEARANCES:

2

          Christopher L. Ingram
3         Emily J. Taft
          VORYS SATER SEYMOUR AND PEASE LLP
4         52 East Gay Street
          Columbus, Ohio 43215
5         614.464.5480
          clingram@vorys.com
6         ejtaft@vorys.com

7              on behalf of the Plaintiffs.

8

          Paul J. Schumacher
9         DICKIE McCAMEY
          600 Superior Avenue East, Suite 2330
10        Cleveland, Ohio 44114
          216.390.1795
11        pschumacher@dmclaw.com

12             and

13        Richard J. Silk, Jr.
          DICKIE McCAMEY
14        10 West Broad Street, Suite 1950
          Columbus, Ohio 43215
15        614.258.6000
          rsilk@dmclaw.com
16
               on behalf of the Defendant.
17

18

19

20

21

22

23                    -=0=-

24

1                    STIPULATIONS

2              It is stipulated by and among counsel

3    for the respective parties that the deposition

4    of PETER BUCHER, the Witness herein, called by

5    the Plaintiffs under the applicable Rules of

6    Federal Civil Court Procedure, may be taken at

7    this time by the stenographic court reporter and

8    notary public pursuant to notice; that said

9    deposition may be reduced to writing

10   stenographically by the court reporter, whose

11   notes thereafter may be transcribed outside the

12   presence of the witness; and that the proof of

13   the official character and qualification of the

14   notary is waived.

15                    -=0=-

16

17

18

19

20

21

22

23

24

1                    INDEX OF EXAMINATION

2                                              PAGE

3    BY MS. TAFT:                              5

4

5

6                     INDEX OF EXHIBITS

7    EXHIBIT          DESCRIPTION            PAGE

8    1       Land Use Plan                    16

9    6       Ordinance No. 04-2022            61

10   7       Resolution No. 04-2022           69

11   8       Minutes, 2-7-22                  82

12   9       Minutes, 1-18-22                 73

13   10      Agenda, 1-18-22                  63

14   30      Email from Greeson to           39
             Jenkins, 3-9-20
15
     31      Florey Todd Summary of Phases   41
16           for Development of the UMHC
             Property
17
     39      Email chain                      27
18
     40      Email from Greeson, 1-31-20      30
19
     41      City Council Minutes, 9-21-20    32
20
     42      Email chain                      43
21
     43      City Council Minutes,            54
22           12-13-21

23

24

   1                    PETER BUCHER

   2   being first duly sworn, as hereinafter

   3   certified, deposes and says as follows:

   4                    CROSS-EXAMINATION

   5   BY MS. TAFT:

   6      Q.  All right.  Can you please state your

   7   name for the record.

   8      A.  Yep.  Peter Bucher.

   9      Q.  Good morning, Mr. Bucher.  My name is

  10   Emily Taft.  I am counsel for Lifestyle

  11   Communities.

  12           Have you been deposed before?

  13      A.  No.

  14      Q.  So I'm just going to work through some

  15   of the ground rules with you for the deposition.

  16   If you don't understand a question, let me know.

  17   I can repeat myself and rephrase.  If you can't

  18   understand me, let me know.  I'll have Chris

  19   interpret or something.

  20           It's important that you and I don't talk

  21   over each other.  So if you can let me ask my

  22   questions first, then you can complete your

  23   answer before I'll start the next one.  Do you

  24   understand that.

 1      A.  Uh-huh.

 2      Q.  So you're giving a lot of head nodding.

 3  The record can't pick that up.  So if you could

 4  say yes or no, that would be great as well.

 5  Does that work?

 6      A.  Yes.

 7      Q.  If you need to take a break at any time,

 8  let me know.  I just ask that you let me finish

 9  the question that we're on and you answer it

10  before we go on that break.  Does that work?

11      A.  Yes.

12      Q.  So it's important that we get your full,

13  complete and accurate answers.  So are you on

14  any medication or drugs that would impair your

15  ability to give full and complete and honest

16  answers?

17      A.  No.

18      Q.  Is there any reason you can't give full,

19  complete and honest answers today?

20      A.  No.

21      Q.  So earlier you swore an oath to tell the

22  truth in this deposition.  Do you understand

23  that that's the same oath you would take at

24  trial in this case?

 1      A.  Yes.

 2      Q.  Is Paul here your lawyer?  Is he

 3  representing you today?

 4      A.  Yes.

 5      Q.  What did you do to prepare for this

 6  deposition?

 7      A.  Had a meeting -- excuse me.  Had a

 8  meeting with city attorneys about a week ago and

 9  discussed how this would go since I've never

10  done it before.  Yeah.

11      Q.  Did you meet with anyone else?

12      A.  No.  Just city attorneys.

13      Q.  Okay.  And did you read any documents?

14      A.  Read a few.  Looked at some materials

15  for meetings back in 2021, 2022, as well as

16  previous versions of the application, materials

17  in question, things like that.

18      Q.  So when you say the stuff about the

19  meetings, do you mean the minutes, or what were

20  you referencing?

21      A.  We looked at an overview of the agendas,

22  the project proposals, ARB/MPC materials, things

23  like that.

24      Q.  Which meetings are you talking about?

1      A.  December 2021, where the project was

2  considered; January 2022, where changes to the

3  comprehensive plan were approved.

4      Q.  And so that's City Council meetings; is

5  that right?

6      A.  Correct.

7      Q.  Did you review the complaint in this

8  case or any documents surrounding this case?

9      A.  Previously, leading up to this point,

10  and we've also gotten summaries of it as well

11  from our city attorneys.

12      Q.  And did you review materials from any

13  other meetings?  You mentioned 2022.

14      A.  Yeah.  I believe the 2021 ARB/MPC

15  meetings as well.

16      Q.  Did you attend that meeting when it

17  happened?

18      A.  I believe I attended virtually.

19      Q.  So I want to go briefly into your

20  background.  Did you graduate high school?

21      A.  Yes.

22      Q.  Did you go to college, obtain any

23  college degrees?

24      A.  Yes.  Bachelor's of science, Ohio State

 1    University.

 2        Q.  In what?

 3        A.  Environmental policy and decision

 4    making.

 5        Q.  And do you have any graduate degrees?

 6        A.  No.

 7        Q.  Any professional certifications?

 8        A.  No.

 9        Q.  Where are you currently employed?

10        A.  Currently, I'm employed at the Ohio

11    Environmental Council.

12        Q.  And what's your title there?

13        A.  Chief of staff.

14        Q.  And what does that entail?  What job

15    responsibilities do you have?

16        A.  I manage several folks.  We primarily

17    focus on our public policy advocacy, as well as

18    some of our political work through our family of

19    organizations.

20        Q.  Do you work primarily at the state

21    level, the federal level, local municipality

22    level?

23        A.  It's a mix of all of those.

24        Q.  Including localities?

1      A.  Some, yeah.

2      Q.  And how long have you worked there?

3      A.  Just over five years.  It will be six in

4  January.

5      Q.  Do you do any sort of land use work in

6  that role?

7      A.  Not really.

8      Q.  And where did you work prior to the ODC?

9      A.  Immediately before, a company called

10  Remington Road Group.

11      Q.  And what did you do with them?

12      A.  It was a mix of a lot of different

13  things from lobbying to organizing trade

14  associations to some campaign political work.

15      Q.  Is that also environmentally focused, or

16  what was the focus there?

17      A.  There was a few.  It was primarily not

18  environmentally focused.

19      Q.  And did you have any land use or zoning

20  experience through that?

21      A.  No.

22      Q.  And what was your job prior to that?

23      A.  Served at the Ohio House of

24  Representatives as a legislative aide.

 1     Q.  And for a specific representative or --

 2     A.  Yes.  Former Representative Michael

 3  Sheehy out of the Toledo area.

 4     Q.  And did you do any sort of land use or

 5  regulations like that?

 6     A.  No.  Primarily administrative work.

 7     Q.  And was this environmentally focused as

 8  well, or general?

 9     A.  There were some issues that touched on

10  the environment, but it was general.

11     Q.  Okay.  And prior -- when you were on

12  OEC, did you do any work with Worthington?

13     A.  I had those roles separated, given my

14  day job and my evening job, so I engaged

15  partners in my council capacity with some of the

16  professionals we worked with, both at the OEC

17  and other groups, but they were separated.

18     Q.  Okay.  Prior to serving on council, did

19  you hold any other elected positions?

20     A.  No.

21     Q.  So when you ran for City Council, is

22  that the first time you ran in an election?

23     A.  I informally ran for state rep, but

24  didn't get to the formal petition filing phase a

 1  few years before, so going through the

 2  paperwork, yes, the first time I officially ran.

 3      Q.  And why did you run for election?

 4      A.  Wanted to give back to my community, and

 5  given my skill set around policy development

 6  felt that this was a really good chance for me

 7  to serve my community.

 8      Q.  What were the key issues you ran on?

 9      A.  It's a mix, but I would say

10  environmental, of course, given my interest and

11  background is one.  Economic development is

12  critical for a city like this, so that's

13  something you have to talk about, as well as

14  public safety, city services, things like that.

15      Q.  When is your term up?

16      A.  It's up at the end of this calendar

17  year.

18      Q.  Are you intending to run for reelection?

19      A.  I am running right now.

20      Q.  And what are your campaign tenets that

21  you're running on this time?

22          MR. SCHUMACHER:  Objection.  Relevance.

23          You can answer.

24      A.  It's several of the same things I

 1    previously listed.  You get a myriad of topics

 2    when you're running again, and so economic

 3    development, environmental statability, city

 4    services, things like that.

 5       Q.  And so I'm sure you're aware the case is

 6    about the UMCH property.  It's now Lifestyle's

 7    property.  I'm going to call it Lifestyle's

 8    property, UMCH property, the property.  Do you

 9    understand what I'm referencing?

10       A.  Yes.

11       Q.  Is that one of your tenets that you're

12    running on?

13       A.  Not specifically, no.  There's a lot we

14    aren't able to say, given what we're working

15    through right now, and so I don't bring it up

16    specifically.

17       Q.  Are you involved in any like grassroot

18    or interest organizations?

19       A.  No.  I'm on some email lists, so I see

20    communications, but no formal involvement.  Just

21    signed up as a member of the public years ago,

22    and I'm still on several lists for different

23    groups here.

24       Q.  What groups does that include?

 1        A.  Building Worthington's Future,

 2   Worthington Partnership, Worthington Chamber of

 3   Commerce, Project Community Parks Worthington,

 4   Worthington Alliance for Responsible

 5   Development.  Probably some others, but pretty

 6   much every group that's got a list, I like to

 7   see all communications and see what people are

 8   saying on a number of issues.

 9        Q.  So let's start with WARD, which I

10   believe was the last one you mentioned.  Have

11   you participated at their meetings?

12        A.  No.  I've met with them throughout my

13   term individually, as requested by them, but I

14   don't attend their regular meetings.  I don't

15   even know if they have membership meetings.

16        Q.  Okay.  Have they endorsed you as a

17   candidate for City Council?

18        A.  They have not screened me nor endorsed

19   me.  An email went out that I believe says

20   they're supporting certain candidates, but I was

21   made aware after the decision went public, like

22   everyone else.

23        Q.  How about Keep Worthington Beautiful,

24   have you gone to their meetings?

 1      A.  No.  I believe that was an effort prior

 2  to my time even living back in the community, if

 3  I'm living back in the community.

 4      Q.  So living back in the community.  When

 5  did you move to Worthington?

 6      A.  We moved here in 2017.

 7      Q.  Had you lived here before that time?

 8      A.  I've lived in the school district, not

 9  the city limits proper.

10      Q.  And where did you grow up?

11      A.  North Columbus, on the west side of the

12  school district.

13      Q.  So I want to turn to Project Community

14  Park Worthington.  What has your involvement

15  with that organization been?

16      A.  I know several of the folks that lead

17  that organization.  I'm on their email list, I

18  believe, but really just monitor what they put

19  out as one organized group of citizens.

20      Q.  And who leads that organization?

21      A.  I don't know the official title.  I know

22  some of the folks that my understanding is the

23  lead.  Scott Taylor and Roger Beck, and I know

24  there's others.  I just can't remember their

 1  names.

 2     Q.  Did Project Community Park Worthington

 3  endorse you as a candidate for City Council?

 4     A.  As I said, they didn't screen or endorse

 5  anyone.  The language I've seen that came out,

 6  without my knowledge, was they are supporting a

 7  few folks in this election this year, but not

 8  endorsing.

 9     Q.  So have you done any interviews with

10  them?

11     A.  No.

12     Q.  I'm going to turn now to the exhibit

13  that's been previously marked as Exhibit 1.  Do

14  you recognize Exhibit 1?

15     A.  Yes.  It looks like the 2014

16  comprehensive plan guidelines for the UMCH site.

17     Q.  And so this was adopted September 2nd,

18  2024, correct?

19     A.  Looks like 2014.

20     Q.  2014.  Yeah.  Sorry.

21        Now, this was the comprehensive plan

22  section for the UMCH property when you joined

23  council in 2020, correct?

24     A.  Yes.

1     Q.  So do you know why the comprehensive

2  plan was revised in 2014 as it relates to the

3  property?

4         MR. SCHUMACHER:  I'm sorry, you said

5  2014?

6         MS. TAFT:  2014.

7     A.  This is before I was even back living in

8  the community, so you'd have to ask other folks

9  that were involved at the time; I was not.

10    Q.  So you had no involvement in the process

11 that went into creating this document?

12    A.  Correct.

13    Q.  The comprehensive plan, the 2014

14 version, it would require the property to be

15 rezoned, correct?

16        MR. SCHUMACHER:  Objection, to the

17 extent that calls for some legal conclusion.

18    A.  If you're referring to a project coming

19 forward that requires these sections to be

20 rezoned, yes, in theory.

21    Q.  The comprehensive plan discussed a

22 planned unit development, isn't that right, for

23 the property?

24    A.  Generally speaking, or for the 2021

 1   project application?

 2       Q.  For any sort of development of the

 3   property that would be compliant with this plan.

 4           MR. SCHUMACHER:  Objection.  You're

 5   asking for his interpretation of this

 6   comprehensive plan?

 7           MS. TAFT:  I'm asking what he views the

 8   comprehensive plan as saying.

 9           MR. SCHUMACHER:  Objection, again, to

10   the extent that calls for a legal conclusion.

11       A.  These comprehensive plans are guidelines

12   for project applications, and so that's what I

13   would describe it as, as a guideline for

14   somebody that potentially applied for a project

15   within some of these guides.

16       Q.  Could you turn to the third page,

17   please.

18       A.  This one?

19       Q.  Yeah.  So on the left-hand column, sort

20   of in the middle, there's a sentence that

21   starts, for this reason.  Can you read that

22   sentence?

23       A.  For this reason, it is expected that any

24   proposed development include rezoning of the

1    entire site to a planned unit development as an

2    early step.

3         Q.  Does that refresh your recollection of

4    what the comp plan was?

5              MR. SCHUMACHER:  Objection.  The

6    document speaks for itself.  What are you asking

7    the witness, if it's in the document?  We'll

8    stipulate it's in the document.

9         Q.  You can answer my question.

10        A.  Well, as he said, if it's in the

11   document, we can agree it's in there, but beyond

12   that, I would need a more specific question, I

13   think.

14             MR. SCHUMACHER:  Is there a question?

15             MS. TAFT:  One second.

16        Q.  So when the ARB/MPC would review a

17   application that came in, they had to apply that

18   comprehensive plan to the application; is that

19   correct?

20        A.  When an application comes in, these

21   documents are used as guides and reference, in

22   addition to what zoning might require as well

23   when they make these decisions.

24        Q.  For City Council, right?  It's a

1  guideline for City Council, but for the ARB and

2  MPC, they have to look at that; is that correct?

3      MR. SCHUMACHER:  Objection, to the

4  extent you're asking this witness for some legal

5  conclusion.

6  Q.  I'm asking for your understanding of the

7  zoning process.

8      MR. SCHUMACHER:  So you are asking for

9  his legal conclusion?

10      MS. TAFT:  I'm asking for his experience

11  with the zoning process.

12      Please stop your speaking objections.

13  A.  Both the ARB and MPC, as well as staff,

14  as well as council, when vetting a project,

15  would utilize this as well as zoning

16  requirements as well as public comments when

17  they make decisions on projects.

18  Q.  So what experience do you have with

19  rezoning applications?

20      MR. SCHUMACHER:  Objection.  Vague.

21  A.  We've dealt with several since I've been

22  on council.

23  Q.  Is your only experience with rezoning

24  applications with City Council, from your time

 1   on City Council?

 2      A.  Yes.

 3      Q.  So you've been on City Council for

 4   roughly four years.  How many rezoning

 5   applications have you held?

 6          MR. SCHUMACHER:  Objection.  Compound

 7   question.  Which question would you like him to

 8   answer?

 9          MS. TAFT:  There's only one question.

10          MR. SCHUMACHER:  No, there's two

11   questions you asked him.  Can you read that

12   back, please.

13          (Record read as requested.)

14          MR. SCHUMACHER:  One.

15          MS. TAFT:  That's not a question.

16          MR. SCHUMACHER:  Yes, it is.  What was

17   the next question?

18          (Record read as requested.)

19          MR. SCHUMACHER:  That's two.

20          MS. TAFT:  All right.  How about you

21   stop your speaking objections.

22          MR. SCHUMACHER:  No.  I'm giving you an

23   opportunity to cure an objection to form.  You

24   asked him two questions.  You didn't pause

1   between the two questions.  So if he answers the

2   question yes, he's answering two questions.

3          MS. TAFT:  I apologize.  My first one

4   was not a question.

5          MR. SCHUMACHER:  Why don't you give

6   proper form questions.

7          MS. TAFT:  Please keep your objections

8   to only form and stop doing speaking objections,

9   Paul.

10         MR. SCHUMACHER:  Well, if you read the

11  district opinions, you'll see that objections to

12  form give you an opportunity to cure bad

13  questions, which I just did.  And I will

14  continue to do so.

15         MS. TAFT:  Please stop your speaking

16  objections.  That is also in the rules if you

17  listen to the district court opinions.

18         MR. SCHUMACHER:  Okay.

19  BY MS. TAFT:

20      Q.  All right.  So you've been on City

21  Council for --

22         MR. SCHUMACHER:  Let's take it to the

23  Judge right now.

24      Q.  -- years, right?

 1          MR. SCHUMACHER:  Let's take it to the

 2   Judge right now.

 3          MS. TAFT:  Paul, please stop your

 4   speaking objections.

 5          MR. SCHUMACHER:  I will continue to

 6   defend my client as appropriate.  If you would

 7   like to call the Judge about this issue, you're

 8   welcome to.

 9          MR. INGRAM:  Counsel, are you

10   instructing this witness not to answer the

11   question?

12          MR. SCHUMACHER:  No.  I'm talking to the

13   lawyer who's questioning my witness, not to you.

14          MS. TAFT:  I'm going to continue with my

15   questioning.

16          MR. SCHUMACHER:  Please.

17   BY MS. TAFT:

18     Q.  Have you been on City Council for four

19   years?

20     A.  Approximately, yes.

21     Q.  How many rezoning applications have you

22   considered?

23     A.  I don't have the specific number handy,

24   but more than one.

 1     Q.  How many development plan applications

 2  have you considered?

 3     A.  Again, I don't have the specific number

 4  in front of me, but several.

 5     Q.  But more than just the one for the UMCH

 6  property; is that correct?

 7     A.  Yes.

 8     Q.  So what force did the comprehensive plan

 9  have in your review of those rezoning

10  applications?

11        MR. SCHUMACHER:  At City Council now

12  you're asking?

13        MS. TAFT:  Yes.  It's been with City

14  Council this whole time.

15     A.  Well, as one member of a seven-person

16  body on council, we review everything from the

17  comprehensive plan to the zoning laws to the

18  merits of the project, the contents of the

19  project, application, staff recommendations and

20  public input.  We review all those things

21  equally.

22     Q.  So during that process, is there

23  generally open lines of communication between

24  both city staff, City Council and the applicant?

 1          MR. SCHUMACHER:  Objection.  Are you

 2    still talking about the City Council

 3    deliberations?

 4        Q.  Please answer the question.  If you

 5    don't understand, I can rephrase.

 6          MR. SCHUMACHER:  Objection.  Form.

 7        A.  Please rephrase.

 8        Q.  Okay.  So during a rezoning application

 9    review process, is there generally open lines of

10    communication between city staff and the

11    applicant?

12        A.  Generally, I'd say yes.

13        Q.  How about between City Council and the

14    applicant?

15        A.  Generally, we work through staff when

16    working with the applicant.  I've never

17    contacted an applicant personally.

18        Q.  Have you contacted staff to reach out to

19    an applicant?

20        A.  Staff generally uses their discretion

21    when they engage or discuss with the project

22    applicant.

23        Q.  Do you ever give questions to staff to

24    ask an applicant about a project?

1     A.  No, I don't think so.  We would

2  potentially give them to the liaison of the ARB

3  or MPC, which is a nonvoting councilmember, but

4  that's the only extent of which we've passed

5  questions through the system.

6     Q.  So I'm going to turn to the OhioHealth

7  proposal that was on the property.  Do you

8  remember that application?

9     A.  I remember getting briefed by the

10  potential applicant and other colleagues that

11  were in the room, as well as staff.

12     Q.  Do you remember the time frame of when

13  that was?

14     A.  I couldn't tell you the month.

15     Q.  Was it around 2020, when you first got

16  on council?  Does that sound right?

17     A.  That sounds right.

18     Q.  So what was OhioHealth's proposal?

19     A.  What I remember being presented on was

20  to potentially apply to rezone and build on a

21  corner of the property an emergency care

22  facility, I think it was.

23     Q.  Was it just a portion of the property,

24  or was it seeking development of the property as

1  a whole?

2      A.  What I remember being presented about

3  was just a portion of the property.

4      Q.  How did City Council feel about that?

5      A.  I don't think we had any public stance

6  on it.  We were given briefings informally by

7  the potential applicant and then nothing went

8  further.

9                          -=0=-

10          (Deposition Exhibit 39 marked.)

11                         -=0=-

12  BY MS. TAFT:

13      Q.  I'm going to hand you what's going to be

14  marked Exhibit 39.  Is Exhibit 39 an email that

15  you sent to Lee Brown?

16          MR. SCHUMACHER:  Give him a chance to

17  read the document.

18          MS. TAFT:  Sure.

19      A.  Can you repeat the question?

20      Q.  Is Exhibit 39 -- I don't remember my

21  exact question, but what is Exhibit 39?

22      A.  Looks like a series of emails from

23  different folks to our staff and then a couple

24  clarifying questions from myself to Mr. Lee

1   Brown and our staff.

2     Q.  So do you know why OhioHealth did not

3   proceed with developing a location on the

4   property?

5     A.  Not that I can remember.

6     Q.  Do you know what made OhioHealth

7   withdraw its application?

8        MR. SCHUMACHER:  Objection.  Same

9   question.

10     A.  No, I don't remember.

11     Q.  The top email, did you speak with Matt

12   Greeson about OhioHealth withdrawing its

13   application?

14     A.  Matt and I would regularly talk about a

15   lot of things, but it's not impossible that I

16   spoke with him, but I don't remember

17   specifically having a conversation at this

18   point.

19     Q.  Would that have been a phone

20   conversation or in-person?

21     A.  I can't remember.  We had a mix of ways

22   we communicated.

23     Q.  Would you record that conversation in

24   any way, either with notes or --

 1          MR. SCHUMACHER:  Objection.  This is the

 2   question -- this is the discussion he doesn't

 3   remember?

 4       Q.  You can answer.

 5       A.  I don't know why I would have.  I met

 6   with Matt one-on-one regularly about all topics.

 7       Q.  Did the city want OhioHealth on the

 8   property?

 9          MR. SCHUMACHER:  Objection.

10       A.  I don't think the city had a stance

11   either way.  We were simply reviewing early

12   stages of an application and what was being

13   presented to us.

14       Q.  So your email at the top of page 2 you

15   ask whether there's any other word on what other

16   locations in Worthington OhioHealth might be

17   looking at.  Did you get an answer to that

18   question?

19       A.  I don't remember if I received an answer

20   or not.

21       Q.  Do you know, did OhioHealth find another

22   location in Worthington?

23          MR. SCHUMACHER:  Objection.

24       A.  Not that I'm aware of.

1      Q.  So they're not in Worthington today?

2          MR. SCHUMACHER:  Objection.

3      A.  No, I don't believe so.

4      Q.  You can put that aside.

5          Do you know when the city began amending

6   or suspending the 2014 comprehensive plan as

7   relates to the UMCH property?

8      A.  I believe the meeting we reviewed that

9   and took action was January 18, 2022.

10     Q.  That's the first time the city

11  considered it?

12     A.  There may have been previous

13  conversations in meetings, public meetings, but

14  I wouldn't say it was seriously considered until

15  January 2022, that I can remember.

16                      -=0=-

17        (Deposition Exhibit 40 marked.)

18                      -=0=-

19  BY MS. TAFT:

20     Q.  I'm going to hand you what's going to be

21  marked Exhibit 40.  Have you had a chance to

22  review it?

23     A.  Yes.

24     Q.  Do you recognize this document?

 1      A.  Vaguely.  Something all councilmembers

 2  received, responses to one member's questions to

 3  the city manager.

 4      Q.  So why was it created?

 5      A.  You'd have to ask Councilman Robinson at

 6  the time, but it looks like he had questions

 7  about the proposal and the site.

 8      Q.  Did you have --

 9      A.  I was just going to say the city manager

10  responded.

11      Q.  Did you finish?

12      A.  Yes.  Thank you.

13      Q.  Did you believe the comprehensive plan

14  had force at this time?

15          MR. SCHUMACHER:  I'm sorry.  I couldn't

16  hear the question.

17      Q.  Did you believe that the comprehensive

18  plan had force at this time?

19          MR. SCHUMACHER:  Objection, to the

20  extent that calls for some legal conclusion.

21      A.  It's remained the guiding document for

22  potential proposals on the site.

23      Q.  Did this memo spark conversation among

24  City Council members about amending the

1   comprehensive plan?

2       A.  Not that I remember.  I think it came up

3   maybe from Councilman Robinson at the time later

4   that year, but it essentially just lived in this

5   memo digitally.

6                       -=0=-

7           (Deposition Exhibit 41 marked.)

8                       -=0=-

9   BY MS. TAFT:

10      Q.  I'm going to hand you what's going to be

11  marked Exhibit 41.  Do you recognize this

12  exhibit?

13      A.  Yes.

14      Q.  Were you at this meeting?

15      A.  Yes.

16      Q.  Are these the minutes from the September

17  21, 2021, council meeting?

18      A.  Yes.

19      Q.  Was the 2014 comprehensive plan, as

20  relates to UMCH property, discussed at this

21  meeting?

22          MR. SCHUMACHER:  Do you need to read it?

23          THE WITNESS:  Yes, I need to read it.

24      A.  It looks like it was discussed.

 1      Q.  And what was said?

 2      A.  Well, you can refer to the paragraph in

 3   the reports of councilmembers, but it appears

 4   Mr. Robinson brought it up.

 5      Q.  Are the minutes accurate of what

 6   happened at that meeting?

 7          MR. SCHUMACHER:  Objection.

 8      A.  As best as I can remember, yes.

 9      Q.  You had a chance to review those

10   minutes, is that correct, after the meeting

11   occurred?

12      A.  We approve all the meeting minutes

13   sometime after the meetings occur.

14      Q.  And these were approved?

15      A.  It appears so.

16      Q.  Did City Council suspend or amend the

17   2014 comprehensive plan at this meeting?

18      A.  I don't believe so.

19      Q.  Why not?

20          MR. SCHUMACHER:  Objection.

21      A.  You'd have to ask all my colleagues, but

22   I believe there was a proposal.

23      Q.  What were your thoughts on

24   Mr. Robinson's proposal for suspending the 2014

1   comprehensive plan?

2      A.  I don't say I had fully formed thoughts.

3   I simply listened to a report of a colleague at

4   the end of our meeting.

5      Q.  What were your thoughts on Mr. Meyers'

6   discussion about transparency at this meeting?

7      A.  I need to read that section.

8         MR. SCHUMACHER:  Is there a particular

9   place?  We didn't memorize this before the

10  deposition.

11     A.  I may have found it.  I think it's the

12  second-to-last page.

13     Q.  Yeah.

14        MR. SCHUMACHER:  What's the question

15  again?

16     Q.  What were your thoughts on Mr. Meyers'

17  comments about transparency at this meeting?

18     A.  I don't know if I had thoughts.  Again,

19  I was listening to reports and comments of my

20  colleagues and simply listening.

21     Q.  Can you go to the third-to-last page.

22  Your comments are in the middle right after

23  Ms. Dorothy.  It says you expressed a little

24  concern about the time of us being at the last

1   meeting of the month.  What did you mean by

2   that?

3          MR. SCHUMACHER:  I'm sorry.  I can't

4   find it.

5      A.  I think, if I remember correctly, it was

6   just noting it was going to be our last meeting

7   before we reconvened, and so there's time in

8   between those meetings.  That's all.

9      Q.  You go on to say, but there definitely

10  needs to be community discussion.  What

11  community discussion were you wanting?

12         MR. SCHUMACHER:  Objection.  Relevance.

13     A.  About what folks wanted to see on that

14  site, if a potential project came forward, is

15  what I remember.

16     Q.  Were you imagining a similar process to

17  what the city went through for the 2014

18  comprehensive plan amendment?

19     A.  I don't think I had anything specific in

20  mind at that point.  I was simply reacting to

21  some of the discussion.

22     Q.  But you wanted public input on whatever

23  was going to replace the 2014 comprehensive

24  plan?

 1     A.  The opportunity to discuss it with the

 2  community, yeah.

 3     Q.  If you can turn to the next page.  It's

 4  the fourth-to-last sentence at the end of that

 5  section.  It says, Mr. Smith asked if staff

 6  could inform any potential applicant of that

 7  possibility.  Do you see that sentence?

 8     A.  Yes.

 9     Q.  Do you know what Mr. Smith was

10  requesting the city to do there?

11     A.  I'll need to read this page.

12     Q.  Go ahead.

13     A.  It appears, Mr. Smith's asking

14  Mr. Greeson to convey any potential applicant of

15  the discussion we had this evening, is how I

16  read it.

17     Q.  Do you know why he asked Mr. Greeson to

18  do so?

19     A.  You'd have to ask him.

20     Q.  What was City Council's reaction to

21  Mr. Smith's request?

22     A.  I don't recall.

23     Q.  Was Lifestyle or UMCH informed after

24  this meeting of what happened?

 1        A.  I don't know.

 2        Q.  Following this meeting, did City Council

 3   have further discussions about suspending or

 4   amending the comprehensive plan?

 5        A.  Yes, at future meetings.

 6        Q.  How about between the time of this

 7   meeting and October 5th of 2020?

 8        A.  Not that I can recall.

 9        Q.  Did you have conversations with anyone

10   about amending or suspending the 2014

11   comprehensive plan during that time frame?

12        A.  Not that I can recall.

13        Q.  How about between --

14            MR. SCHUMACHER:  Wait a minute.  Did he

15   answer the last question?

16            MS. TAFT:  Yes.

17   BY MS. TAFT:

18        Q.  How about, were there -- did you have

19   discussions with anyone about amending or

20   suspending the comprehensive plan between

21   October 5th, 2020, and January 18, 2022?

22        A.  I believe a few days before the meeting

23   on January 18th, 2022, there was a little

24   discussion.

 Q. Before that, you had no discussions?
A. Not anything significant that I can remember.
Q. How about insignificant?
MR. SCHUMACHER: Objection.
A. There may have been some dialogue following our meeting with some of my colleagues about what was discussed, but nothing more than that.
Q. Which colleagues?
A. I talk to all my colleagues regularly. I can't recall exactly who my phone transcripts might have been at the time.
Q. But you did have discussions with someone?
A. I discussed a lot of topics with all my colleagues, whenever there's availability or need.
Q. So you're saying a dialogue happened after this September 21, 2021, meeting with your colleagues?
A. No. I would say sometimes we talk about reflections of the meetings, but it wasn't a dialogue or further planning.

 1      Q.  And what were your reflections of the

 2  meeting?

 3      A.  I don't recall.  Just how did the

 4  meeting go, what did people say, those type of

 5  things.

 6      Q.  How did the meeting go?

 7      A.  You can review the minutes, if you'd

 8  like.

 9      Q.  How do you think the meeting went?

10          MR. SCHUMACHER:  Objection.  Asked and

11  answered.

12      A.  I think it was a fairly normal meeting

13  and we had dialogue during the council report

14  section, as we do with most meetings.

15      Q.  Was City Council also considering

16  purchasing the property since you've been on

17  council?

18      A.  Not to my knowledge.

19      Q.  I'm going to hand you what's been

20  previously marked Exhibit 30.

21      A.  Exhibit 30?

22      Q.  Yes.  Who is Dr. Marlowe?

23          MR. SCHUMACHER:  I don't know if he's

24  finished reading that.

 1          THE WITNESS:  I need to finish reading.

 2          MR. SCHUMACHER:  You're speedy.

 3          THE WITNESS:  I'm a slow reader.

 4          MS. TAFT:  I'm not going to tell you how

 5   to take your deposition.  You can stop telling

 6   me how to take mine.

 7          MR. SCHUMACHER:  Well, you're speaking

 8   so quickly and not giving the witness a chance

 9   to read the document.  I'm just cautioning you.

10       A.  What was your question?

11   BY MS. TAFT:

12       Q.  Who is Dr. Marlowe and Analytica?

13       A.  I can't give you a good explanation of

14   that.  This report was generated before I joined

15   council.

16       Q.  Mr. Greeson shared it with council,

17   though, while you were on council, correct?

18       A.  It appears so, yeah.

19       Q.  Do you know why the city engaged

20   Analytica?

21       A.  Not that I remember.

22       Q.  Did you review these reports?

23          MR. SCHUMACHER:  The report attached to

24   the email?

 1          MS. TAFT:  Yes, from Analytica.  There

 2  are two.

 3      A.  Is the chapter 2 the second one, or is

 4  there another one in there?

 5      Q.  That's the first one.

 6          MR. SCHUMACHER:  What's the question, if

 7  he's reviewed that before, or do you want him to

 8  review it now?

 9      Q.  Have you reviewed it before?

10      A.  It may have been distributed, but I

11  can't recall this document much.

12      Q.  If you can go to Exhibit 31.  Do you

13  recognize Exhibit 31?

14      A.  Yes, I believe this has been sent to me,

15  but I'm not very familiar with the document.

16      Q.  You've seen it before, though?

17      A.  Yes.  It was sent to me via email.

18      Q.  When?

19      A.  I can't recall.

20      Q.  Who sent it.  Sorry?

21      A.  Probably during my first term, I would

22  guess, 2020, but -- is there another question?

23      Q.  Who sent it to you?

24      A.  I believe David Robinson forwarded it to

1  me as an FYI since it was out there.

2     Q.  Just as an FYI.  What does that mean?

3     A.  For your information.

4     Q.  What does that mean to you?

5     MR. SCHUMACHER:  Objection.  Asked and

6  answered.

7     A.  Relevant materials that existed about

8  this site.

9     Q.  Why was this relevant?

10    A.  Because it specifically mentions the

11  site.

12    Q.  It also discusses the city acquiring the

13  property; isn't that correct?

14    A.  It appears so.

15    Q.  So what did you do with this summary?

16    A.  I likely reviewed it and left it sitting

17  in my email.

18    Q.  Did you share it with anyone?

19    A.  I think only for the public records

20  request about this litigation.

21    Q.  Did you talk about it with Robinson?

22    A.  Most likely, but I don't recall any

23  specifics of any conversation.

24    Q.  Did you talk with anyone else on City

 1  Council about it?

 2     A.  Not that I remember.

 3     Q.  Did you talk with anyone at Worthington

 4  about it?

 5        MR. SCHUMACHER:  Objection.  That means

 6  everyone in the city?

 7     Q.  City staff about it.

 8     A.  I don't remember specifically talking

 9  about this report with anyone, that I can

10  remember.

11                    -=0=-

12        (Deposition Exhibit 42 marked.)

13                    -=0=-

14  BY MS. TAFT:

15     Q.  I'm going to hand you what's going to be

16  marked 42.  Let me know when you've had a chance

17  to review.

18     A.  Okay.

19     Q.  Is that the email that you were

20  referring to of Robinson sending this summary?

21     A.  Yes.

22     Q.  Forwarded a couple of times for the

23  public records request; is that correct?

24     A.  Yes.

 1      Q.  Why did Robinson call the document

 2  confidential?

 3      A.  You'd have to ask him that.  I don't

 4  know.

 5      Q.  And what does Robinson mean by next

 6  time?

 7      A.  I would assume he meant next time we

 8  talk, but you'd have to ask him.

 9      Q.  Was there a previous time that you

10  talked about the issue of acquiring -- the city

11  acquiring the property?

12          MR. SCHUMACHER:  Objection.

13      A.  No, we didn't specifically talk about

14  that, but he wanted to make sure I read this

15  report, from my knowledge, since it existed out

16  there, and it was generated before I joined

17  council.

18      Q.  So there was a prior time that you

19  talked about the city acquiring the property; is

20  that correct?

21          MR. SCHUMACHER:  Objection.  He didn't

22  say that.

23      A.  I don't specifically remember that other

24  than Mr. Greeson's email from March of 2020, and

1  then this was sent to me.  It wasn't a

2  conversation about acquiring.  It was generated

3  reports.

4      Q.  What did you do with that information

5  from the Florey law firm?

6      A.  As I mentioned, I probably reviewed it

7  once and then left it sitting in my email box.

8      Q.  You took no steps to further anything in

9  that summary?

10      A.  No.  I simply read it.

11      Q.  Okay.  So turning to when Lifestyle

12  submitted its application to the city for

13  rezoning and a PUD --

14          MR. SCHUMACHER:  I'm sorry.  Your voice

15  broke up.

16      Q.  For rezoning and a PUD.  When did the

17  city receive Lifestyle's application?

18      A.  I don't have the specific date in front

19  of me.  I'm sure it's somewhere documented.

20      Q.  Did you receive it immediately when it

21  was submitted?

22      A.  Not that I recall.  Sometimes staff

23  gives us informational heads-up when things come

24  in, especially when they're that publicly

 1  discussed, like that site, but I don't recall

 2  specifics.

 3      Q.  What was City Council's reaction to

 4  receiving the application?

 5      A.  It was simply informative that an

 6  application had been received.  I don't think

 7  there was a public reaction either way.

 8      Q.  Not public reaction, just reaction.

 9      A.  It was information gathering.  There was

10  no reaction.

11      Q.  What was your reaction to receiving the

12  application?

13      A.  Information gathering to try to

14  understand what the proposal was and wasn't.

15      Q.  Were you surprised that an application

16  came in?

17      A.  No.  We get applications in all the time

18  on different sites.

19      Q.  What does information gathering mean?

20      A.  Reviewing materials that are given to us

21  about a given project.

22      Q.  So that's what you did once you got the

23  application in.  But what was your reaction to

24  receiving the application?

 1     A.  I believe I just answered that.  It was

 2  just an FYI, for my knowledge, reviewing

 3  materials as --

 4     Q.  So you were indifferent to receiving the

 5  application?

 6     A.  Yes.

 7     Q.  Okay.  What materials did you review

 8  when the application came in?

 9     A.  I don't remember specifics, but I

10  imagine it was probably the project application

11  materials that were submitted, but I don't

12  recall exactly when or how.  I'm just assuming

13  that that's what we received.

14        MR. SCHUMACHER:  Don't assume.

15     Q.  Is that all that you reviewed?

16     A.  That's all that I remember.

17     Q.  Did you review the 2014 comprehensive

18  plan?

19     A.  Eventually.  Probably not right away

20  with the application.

21     Q.  You didn't review anything else upon

22  receiving the application?

23     A.  Not that I remember.

24     Q.  Who did you talk to when you heard that

1  Lifestyles submitted its application?

2      A.  I told you I don't remember being

3  informed, but I'm assuming it was Mr. Brown, on

4  staff.

5      Q.  That told you of the application; is

6  that what you mean?

7      A.  If anyone did, it would have likely been

8  Mr. Brown, yeah.

9      Q.  But who did you talk to after you

10  learned that the application had been submitted?

11     A.  I don't remember talking specifically to

12  anyone.

13     Q.  During the time that Lifestyle's zoning

14  application was before the MPC and ARB, did you

15  talk with any member of the planning commission?

16     A.  No.

17     Q.  Did you talk with any of the ARB?

18     A.  No.

19     Q.  Did anyone ask you to convey something

20  to the MPC about Lifestyle's application?

21     A.  I think at one point Mr. Myers, who was

22  our liaison as a councilmember, nonvoting

23  member, asked us as a body if we had any

24  questions or things that we wanted conveyed in a

1  meeting.  I don't remember specifics beyond

2  that, but he wanted to carry forth any questions

3  or comments as the liaison for us on that body.

4     Q.  So did you submit any questions,

5  comments, concerns?

6     A.  I can't remember.

7     Q.  Would you have kept any notes about

8  those questions, comments, or concerns?

9     A.  I take general notes at almost all of

10  our meetings, but I don't remember specifics.

11     Q.  And what do you do with those notes?

12     A.  Review them later sometimes, as

13  necessary, to try to remember a conversation,

14  just like our meeting minutes.

15     Q.  Have you produced those notes to your

16  council?

17     A.  I produced everything that was asked of

18  me for public records.

19     Q.  How about with discovery requests in

20  this case?

21     A.  I produced everything our counsel

22  advised us to produce.

23     Q.  Does that include your notes?

24     A.  I don't recall.

 1      Q.  Do you still have your notes?

 2      A.  From that time, I don't know.  I'd have

 3  to check.

 4      Q.  Did you talk with any members of City

 5  Council while Lifestyle's application was with

 6  the MPC and ARB?

 7      A.  As I said, I talked to my colleagues

 8  about a number of topics, so potentially.

 9      Q.  How about anything about the UMCH

10  property?

11          MR. SCHUMACHER:  Objection.  We're

12  talking about from October of 2020 until the

13  application was reviewed by City Council on

14  December --

15      Q.  No.  While it was under MPC and ARB's

16  review.  Just through November 2021.

17      A.  I listened to any meetings where it was

18  discussed, just for my own learning and

19  absorption of the community dialogue.  That's

20  all I can remember.

21      Q.  I'm not asking you about what you

22  reviewed.  I'm asking did you talk with anyone

23  about the application during that time frame?

24      A.  It may have come up in passing, but it

 1   wasn't specific.  The process was playing out,

 2   and we were waiting on the process to play out

 3   as it does with all project applications.

 4      Q.  But you had conversations?

 5      A.  Potentially.

 6          MR. SCHUMACHER:  About UM -- it's the

 7   most discussed topic in the city.

 8          MS. TAFT:  Paul, stop your speaking

 9   objections.

10      A.  I can't recall every specific

11   conversation I had about the site.  As Paul

12   said, it's talked about quite a bit.

13      Q.  You said you attended the MPC/ARB

14   hearings virtually; is that right?

15      A.  At least the last one.  I can't recall

16   if I attended any previous ones.

17      Q.  Did you watch those hearings or read the

18   transcript in preparation for today?

19      A.  I know I did for our council meetings

20   where they were discussed.  I don't recall if I

21   reviewed ARB/MPC notes or not.

22      Q.  Did you meet with any representatives

23   from WARD while the applications were pending?

24      A.  I don't recall specifics during that

 1  time frame of meeting with them.  I meet with

 2  groups as they request it.

 3      Q.  So you can't say either way whether you

 4  met with WARD during that time frame?

 5      A.  In that specific chunk of time, I can't

 6  recall.

 7      Q.  Did you meet with representatives from

 8  Project Community Park Worthington during that

 9  time frame?

10      A.  That specific time frame, I can't

11  recall.

12      Q.  You can't recall either way?

13      A.  I know I met with representatives, as I

14  said, but I can't remember exactly when those

15  occurred.

16      Q.  Did you meet with any Lifestyle

17  representatives while the application was

18  pending?

19      A.  Not that I can recall.

20      Q.  Did you direct city staff to meet with

21  Lifestyle while the application was pending?

22      A.  We don't direct staff to engage

23  applicants in specific ways.  They handle many

24  of those conversations themselves as they see

1  fit.

2      Q.  You did say that they asked for you to

3  bring questions, comments, concerns, though,

4  right?

5      A.  I said Councilmember Myers, Pro-Tem at

6  the time, asked for feedback as our voice on

7  that body, and I remember we had a discussion,

8  but I don't even remember what specifically was

9  submitted.

10     Q.  And Mr. Myers you're saying was the

11  voice because he was the liaison between the

12  ARB, MPC and City Council; is that right?

13     A.  Yes, the nonvoting liaison between

14  council to that body.

15     Q.  What is the last meeting that you can

16  recall that you attended with Project Community

17  Park Worthington?

18        MR. SCHUMACHER:  Objection.  Asked and

19  answered.

20     A.  I don't recall.

21     Q.  You don't recall any of the meetings you

22  attended?

23     A.  I don't recall the date.

24     Q.  Can you give me a general time frame?

 1         MR. SCHUMACHER:  Objection.  Counsel,

 2   you've asked and answered -- you've asked this

 3   question three times now and he's answered it.

 4   Would you like him to answer it again?

 5      Q.  Was it in 2020?

 6      A.  I don't recall.

 7      Q.  2021?

 8      A.  I don't recall.

 9      Q.  2022?

10      A.  I don't recall.

11         MR. SCHUMACHER:  Okay.  We're getting to

12   the point of harassing the witness now.  Do you

13   have a question on another topic?

14                        -=0=-

15         (Deposition Exhibit 43 marked.)

16                        -=0=-

17   BY MS. TAFT:

18      Q.  I'm going to mark -- the next exhibit

19   will be 43.  Let me know when you're ready for

20   questions.

21      A.  Okay.  Okay, I'm ready for questions.

22      Q.  Is Exhibit 43 the December 13, 2021,

23   City Council meeting minutes?

24      A.  Yes.

 1        Q.  Were you at this meeting?

 2        A.  Yes.

 3        Q.  Did you meet with any members of City

 4    Council prior to this meeting?

 5        A.  Not that I recall specifically about

 6    this meeting.

 7        Q.  Did you have any discussions about

 8    Lifestyle's application or the property prior to

 9    this meeting?

10        A.  Not that I can recall.  We get memos and

11    feedback from our city staff that summarizes

12    what's happened to date, so I may have discussed

13    it with staff, but I can't recall specifics.

14        Q.  When you say staff, who do you mean?

15        A.  I don't recall.  My guess would be it

16    would have been Mr. Greeson, maybe Mr. Brown if

17    there were questions, but I don't remember

18    specifically having those conversations.

19        Q.  What did you do to prepare for this

20    meeting?

21        A.  In preparation for this meeting, I would

22    have likely read the staff memo summarizing the

23    events that occurred in the process to this

24    point, read any constituent emails I may have

 1   gotten on this, and anything else in our packet

 2   that might have been related to this to prepare.

 3       Q.  Did you consult with anyone?

 4       A.  Not that I recall.

 5       Q.  So you said would have likely, but did

 6   you review all of those documents?

 7       A.  Yes.

 8       Q.  In preparation for this meeting?

 9       A.  Yes.

10       Q.  Any other documents?

11       A.  As I stated, constituent emails,

12   anything that would have occurred during the

13   meeting, but whatever's provided in our packet

14   is what I tend to review.

15       Q.  What you tend to review or what you did

16   review?

17       A.  What I did review.

18       Q.  Do you recall any other documents

19   besides those you've just listed that you

20   reviewed?

21           MR. SCHUMACHER:  Objection.  Asked and

22   answered.

23       A.  I believe I've already answered that.

24       Q.  So you're saying there were no other

1  documents you reviewed?

2        MR. SCHUMACHER:  Objection.  Asked and

3  answered.  He's answered the question.

4        MS. TAFT:  He hasn't.  I said of all the

5  other ones that you've listed, are there any

6  other documents, other than what you've listed,

7  that you reviewed?  That's explicitly what you

8  have not answered.

9     A.  Not that I can recall.

10     Q.  How did you vote on Lifestyle's

11  application at this meeting?

12        MR. SCHUMACHER:  Objection.  It's a

13  public record, counselor.

14     A.  You can find the votes in this meeting

15  minutes.

16     Q.  Are you not answering how you voted on

17  the application?

18        MR. SCHUMACHER:  No, he's going to

19  answer.

20     A.  I voted against the application, like

21  all my other colleagues.

22     Q.  Why did you vote against the

23  application?

24        MR. SCHUMACHER:  Objection.  Relevance.

 1     A.  In summation of all the feedback we got,

 2  as I previously laid out, I voted in the way

 3  that I thought my constituents wanted me to.

 4     Q.  Did you state all your reasons for

 5  denial on the record?

 6     A.  I'd have to re-review that section.

 7         It appears my reasons are in the

 8  minutes.

 9     Q.  Those are all of the reasons for why you

10  voted to deny?

11         MR. SCHUMACHER:  Objection.

12         You can answer.

13     A.  Yes.

14     Q.  I believe shortly after your statement

15  in the minutes at the bottom of that page --

16         MR. SCHUMACHER:  What page are we on?

17         MS. TAFT:  Sixth from the end.

18         MR. SCHUMACHER:  These are paginated,

19  aren't they?

20     A.  Which section?

21         MR. SCHUMACHER:  Why don't you just give

22  him the highlighted ones.

23     Q.  There's a statement that says,

24  Mr. Robinson asked for clarification that if the

1  proposal is denied tonight, LC would be free to

2  resubmit a proposal at the six-month mark from

3  the MPC in mid April.

4        Do you see that sentence?

5    A.  I believe so.

6    Q.  Was the city prohibiting Lifestyles from

7  reapplying to rezone its property for six

8  months?

9        MR. SCHUMACHER:  Objection.  Calls for a

10  legal conclusion.

11        MS. TAFT:  I'm asking what the city did.

12        MR. SCHUMACHER:  Well, if you'll refer

13  to --

14        MS. TAFT:  Paul, please stop your

15  speaking objections.

16        MR. SCHUMACHER:  -- the ordinances of --

17        MS. TAFT:  Paul, please, stop your

18  speaking objections.

19        MR. SCHUMACHER:  1145.05,

20  reconsideration of the formal zoning, it's right

21  there in the code.

22        MR. INGRAM:  Counselor, are you

23  testifying?

24        MR. SCHUMACHER:  No, but you're asking

1  him for a legal opinion.

2          MS. TAFT:  I am not.

3          MR. SCHUMACHER:  It's in the code.

4          MS. TAFT:  I'm asking what the city did.

5          MR. SCHUMACHER:  The city acts through

6  council.  He's one of seven councilmembers.

7          MR. INGRAM:  Counsel, Ms. Taft has

8  been --

9          MR. SCHUMACHER:  Who's taking the

10  deposition?

11          MR. INGRAM:  She has been as patient as

12  one could ask.  These objections --

13          MR. SCHUMACHER:  Well, speaking over the

14  witness --

15          MR. INGRAM:  -- and this testimony is

16  entirely improper.  Can you let Ms. Taft proceed

17  with the deposition?

18          MR. SCHUMACHER:  Perhaps we should call

19  the Judge, then.  Is that what you'd like to do,

20  counselor?

21          MR. SILK:  After he answers this

22  question, let's take a break.

23          MR. SCHUMACHER:  What was the question?

24

1    BY MS. TAFT:

2        Q.  Did the city prohibit Lifestyles from

3    reapplying -- from applying to rezone its

4    property for six months --

5            MR. SCHUMACHER:  Objection.

6        Q.  -- at the conclusion of this meeting?

7            MR. SCHUMACHER:  Objection.  Calls for a

8    legal conclusion.

9            You can answer.

10       A.  It's spelled out in our code what's

11   allowable and not allowable.  We followed our

12   code.

13       Q.  And that was prohibiting Lifestyle from

14   reapplying for six months; is that right?

15           MR. SCHUMACHER:  Objection.

16   Argumentative.

17       A.  If rezoning is involved, that's what I

18   believe our code reads.

19           MS. TAFT:  We can take a break.

20           (Recess.)

21   BY MS. TAFT:

22       Q.  We're going to turn to the January 2022

23   meetings now.  If you can open what's previously

24   been marked Exhibit 6 in that binder.  I'll give

 1  you a chance to read it.

 2      A.  Okay.

 3      Q.  Do you recognize Exhibit 6?

 4      A.  Yes.

 5      Q.  What is it?

 6      A.  Ordinance No. 04-2022.

 7      Q.  Does this ordinance only apply to the

 8  UMCH property?

 9          MR. SCHUMACHER:  Objection.  Relevance.

10      A.  That's what it outlines.

11      Q.  Do you know why Ordinance 04-2022 was

12  introduced at the January 2022 meeting?

13      A.  My recollection is it was introduced by

14  a member of council to potentially put in place

15  a moratorium on any new applications at the site

16  for one calendar year.

17      Q.  Why did City Council want to impose a

18  moratorium on the property?

19          MR. SCHUMACHER:  Objection.  He didn't

20  say that.  He said a member of council.  Don't

21  imply something.

22      A.  You'd have to ask other colleagues or

23  look at the minutes as to what was said, but it

24  was intended to give us time as a city to have

1    community dialogue around the site.

2        Q.  Did you vote for this ordinance?

3        A.  Yes.

4        Q.  Why did you vote for the ordinance?

5            MR. SCHUMACHER:  Objection.  Relevance.

6            You can answer.

7        A.  As I just stated, it would have given us

8    a concrete set of time to have the ability to

9    have that conversation with the property owner,

10   with the community about what that site should

11   be in the future.

12       Q.  Can you turn to Exhibit 10.  Is Exhibit

13   10 the agenda from the January 18, 2022,

14   meeting?

15           MR. SCHUMACHER:  Objection.

16       A.  It appears so, yes.

17       Q.  Was Ordinance 04-2022 on the agenda?

18       A.  No.

19       Q.  Why not?

20           MR. SCHUMACHER:  Objection.

21       A.  Through our reports of councilmembers

22   any item really can be brought up and discussed

23   for consideration.

24       Q.  Did City Council inform Lifestyle that

1   it was going to discuss an ordinance that

2   related only to its property prior to the

3   January 2022 meeting?

4          MR. SCHUMACHER:  I'm sorry.  Your

5   question was City Council?

6          MS. TAFT:  Yes.

7      A.  I'm not sure.

8      Q.  Did you?

9      A.  No.

10     Q.  Did the public have notice that

11  Ordinance 04-2022 would be discussed at the

12  January 2022 meeting?

13     A.  It's a public meeting, anybody can

14  attend or watch online.

15     Q.  But if a member of the public was

16  interested in that ordinance, did they know it

17  was going to be discussed at this meeting

18  prior -- did they -- strike that.

19          Would a member of the public, who was

20  interested in the ordinance, know to show up to

21  that meeting?

22     A.  Our meetings are open to anyone and

23  everyone.  They can stream from home.  They can

24  attend in person.

1    Q.  Would they know that Ordinance 04-2022

2  was going to be discussed at this meeting?

3       MR. SCHUMACHER:  Who would know?

4       MS. TAFT:  The public.

5       MR. SCHUMACHER:  Objection.  Asked and

6  answered.

7    A.  I believe I answered it, but I believe

8  it fell during the reports of council section,

9  where anything can really be brought up at the

10  wishes of a councilmember.

11    Q.  Would they have advance notice?

12    A.  As we already discussed, it wasn't on

13  the formal agenda.

14    Q.  So a member of the public, his name's

15  Tom Burns.  Do you know Tom Burns?

16    A.  Yes.

17    Q.  Do you remember him speaking at this

18  meeting?

19    A.  Yes.

20    Q.  How did he have notice of the ordinance?

21    A.  You would have to ask Tom Burns.

22    Q.  When did you receive a copy of the draft

23  ordinance?

24    A.  I believe it went out to all

1    councilmembers the evening of the meeting.

2        Q.  That email was the first time you

3    received the draft ordinance?

4        A.  I believe I discussed it with Council

5    President Robinson Saturday before the meeting.

6        Q.  What was discussed?

7        A.  His intentions to bring forward this

8    item.

9        Q.  What did you say?

10       A.  I listened and received the information.

11       Q.  And you said nothing?

12       A.  Not that I recall.

13       Q.  You don't recall saying, or you don't

14   recall whether you said nothing?

15       A.  I don't recall specifics of the

16   conversation other than him informing me of his

17   intention to bring forward action during the

18   reports section.

19       Q.  Did he tell you not to talk about the

20   ordinance with anyone?

21       A.  No.

22       Q.  Who else was there when you had this

23   discussion with Mr. Robinson?

24       A.  It would have been a phone call, I

  1  believe, so two of us.

  2     Q.  Who did you talk to about the ordinance

  3  prior to the meeting after you had this

  4  conversation with Mr. Robinson?

  5     A.  I don't remember having explicit

  6  conversations with anyone about this before the

  7  meeting other than Mr. Robinson.

  8     Q.  Did you help draft the ordinance?

  9     A.  He was the main author.

 10     Q.  He was the main author, but did you

 11  participate in the drafting?

 12     A.  Not that I remember.

 13     Q.  You don't remember?

 14     A.  That's what I just said.

 15     Q.  You don't remember either way, whether

 16  you did help with the drafting or you did not

 17  help with the drafting?

 18        MR. SCHUMACHER:  Objection.  Asked and

 19  answered.

 20     A.  I don't recall what the support of

 21  drafting the resolutions.

 22     Q.  Did Mr. Robinson discuss why the

 23  ordinance would be proposed as an emergency in

 24  that discussion that you had on the Saturday

 1  prior to the meeting?

 2     A.  Not that I recall as to why.  He said

 3  that that would be his intention to include that

 4  provision, but not the logic behind it.

 5     Q.  What were your thoughts on the ordinance

 6  being proposed as an emergency?

 7        MR. SCHUMACHER:  Objection.

 8     A.  It was new information.  I didn't have

 9  any thoughts yet.

10     Q.  Once you reviewed it, what were your

11  thoughts on the emergency status?

12        MR. SCHUMACHER:  Objection.  Relevance.

13     A.  I had no issues with it.

14     Q.  How do you know Issue 38 applied to this

15  ordinance?

16     A.  The same way it applies to every other

17  potential proposal.

18     Q.  So you're saying it requires 60-day

19  notice to the public?

20        MR. SCHUMACHER:  Objection, to the

21  extent that calls for his legal conclusion.

22     A.  You'd have to re-ask the question if

23  you're going to continue.

24     Q.  So you're saying that Issue 38 applied

1  to Ordinance 04-2022 as it does any other

2  ordinance; is that correct?

3       MR. SCHUMACHER:  Same objection.

4    A.  You'll have to be more specific.

5    Q.  How does Issue 38 apply to the

6  ordinance?

7       MR. SCHUMACHER:  Objection, to the

8  extent that calls for a legal conclusion.

9    A.  I don't feel I can give that legal

10 opinion on this.

11   Q.  What is your view on how Issue 38

12 applies to the ordinance?

13      MR. SCHUMACHER:  Objection.

14   A.  I don't have a view on how that applies

15 to the ordinance.

16   Q.  Did Ordinance 04-2022 pass?

17   A.  I don't have the minutes in front of me,

18 but I believe the answer is no.

19   Q.  Can you turn to Exhibit 7, please.

20   A.  Okay.

21   Q.  Do you recognize Exhibit 7?

22   A.  Yes.

23   Q.  What is it?

24   A.  Resolution No. 04-2022.

1     Q.  You introduced Resolution 04-2022 to

2  council, correct?

3     A.  Correct.

4     Q.  And that was also at the January 18,

5  2022 City Council meeting; is that right?

6     A.  Yes.

7     Q.  Does Resolution 04-2022 only apply to

8  Lifestyle's property?

9     A.  It's an amendment to that section of the

10  comprehensive plan.

11     Q.  What other property is affected by that?

12     A.  As I just said, it's an amendment to

13  that specific portion of our comprehensive plan

14  for that site.

15     Q.  Was Resolution 04-2022 on the meeting

16  agenda for January 18, 2022?  That was 10, if

17  you need to refresh.

18     A.  No.

19     Q.  When did you decide you were going to

20  introduce this resolution?

21     A.  When we were in the meeting and it's

22  discussed it's a motion to introduce and so I

23  said I would do that motion in the meeting.

24     Q.  Did you help draft the resolution?

1     A.  Not that I recall.

2     Q.  Did you discuss this resolution with

3  anyone prior to the meeting?

4     A.  As I previously stated with the other

5  ordinance, I believe we talked about it, myself

6  and President Robinson, maybe the Saturday

7  before, a few days before our meeting.

8     Q.  So you discussed the resolution and the

9  ordinance together?

10    A.  As I said with the ordinance, he

11  informed me of his intentions to draft these and

12  bring them forward.

13    Q.  Do you remember what you said about the

14  resolution in that meeting?

15    A.  No, I don't.

16    Q.  Did you speak about the resolution with

17  anyone else prior to the City Council meeting?

18    A.  Not that I remember.

19    Q.  Did Lifestyle have notice that the

20  resolution was going to be discussed at the

21  January 18, 2022, meeting?

22    A.  I don't know.

23    Q.  Did you provide Lifestyle notice?

24    A.  No.

 1      Q.  Do you know if any member of council

 2  did?

 3      A.  You'd have to ask them.  I'm not aware.

 4      Q.  Do you know who was involved in drafting

 5  the resolution?

 6      A.  Outside of Mr. Robinson, no, I don't.

 7      Q.  Did you vote for Resolution 04-2022?

 8      A.  Yes.

 9      Q.  Why?

10          MR. SCHUMACHER:  Objection.  Relevance.

11          You can answer.

12      A.  I felt that after some of the community

13  discussion that had gone on over the years, this

14  amendment to the comp plan for this section was

15  necessary, given the change in the city's

16  landscape for that site at the time.

17      Q.  Did Resolution 04-2022 pass?

18      A.  Yes.

19      Q.  Was there any public input in the

20  drafting of Resolution 04-2022?

21      A.  All of our meetings are public.

22      Q.  Was there any public input on this

23  resolution?

24      A.  You'd have to refer to the meeting

 1  minutes.

 2     Q.  Was this resolution amended at all

 3  during that meeting?

 4     A.  I don't recall.  You'd have to refer to

 5  the meeting minutes.

 6     Q.  If you could turn to Exhibit 9.  Feel

 7  free to review, and let me know if you see any

 8  amendment to the resolution made.

 9        MR. SCHUMACHER:  You want him to review

10  all 39 pages?

11     Q.  I can point you to where it was

12  discussed, but that's up to you.

13     A.  If you have it handy, please.

14     Q.  Yeah.  It's page 23.  22 is where it

15  starts.

16     A.  Can you repeat your question?

17        MS. TAFT:  Could you repeat my question.

18  Thank you.

19        (Record read as requested.)

20     A.  I don't see motions to amend the

21  resolution.

22     Q.  So the version that you introduced was

23  the one that ultimately was passed by City

24  Council; is that correct?

 1      A.  From what I can see in the minutes, yes.

 2      Q.  And was there any public input on the

 3  draft that you introduced?

 4          MR. SCHUMACHER:  I think she's referring

 5  to Exhibit 7 now.  Is that right?

 6          MS. TAFT:  Of the resolution.

 7      A.  Yeah, I'm referring to the notes.

 8          MR. SCHUMACHER:  Okay.  She's asking you

 9  now about the resolution.  Is that correct?

10          MS. TAFT:  Yes.  That was at the meeting

11  where he's reviewed the minutes.

12      A.  Looks like it was largely council

13  commentary.

14      Q.  The public comments that were made at

15  that meeting were negative about what was going

16  on; is that correct?

17      A.  Looks like there's only one public

18  comment that I can see.

19      Q.  And was it Mr. Tom Burns again?

20      A.  I believe so.

21      Q.  Was Resolution 04-2022 meant to be

22  temporary?

23      A.  It's an amendment to the comprehensive

24  plan section, so it could be amended again at

1  any future meeting.

2      Q.  Is the city working on a new

3  comprehensive plan?

4      A.  We've discussed it and some sub-elements

5  to it, such as a housing study, but I believe

6  we're working on the litigation to play through

7  before we address this site in the section of

8  the comp plan.

9      Q.  So has there been any new amendment

10  since this Resolution 04-2022 that was passed as

11  to the UMCH property comprehensive plan?

12      MR. SCHUMACHER:  You did sue us six

13  weeks later.

14      A.  Not that I'm aware of, no.

15      Q.  So what sort of development does

16  resolution 04-2022 provide a guideline of?

17      A.  You can see on page 2, Exhibit 7, it

18  lays out general components.

19      Q.  What are those general components?

20      A.  Would you like me to read them?

21      Q.  Sure.

22      A.  General components compatible with

23  current S-1 zoning, a large contiguous green

24  space central to the property and inclusive of

1  the Tucker Creek acreage is a highly desirable

2  component of any outcome.  Commercial

3  development aimed at revenue generation for the

4  city and select service-oriented retail that is

5  compatible with the development is highly

6  desirable along High Street, roughly in

7  conformity with the existing C-2 and C-3 zoned

8  areas.  Residential housing, though requiring

9  rezoning, is desirable if it is creatively

10  executed and whether embedded within the

11  commercial areas of freestanding --

12        MR. SCHUMACHER:  Or.

13    A.   -- or freestanding is harmonious in

14  overall mass and scale form and impact around

15  surrounding communities -- upon surrounding

16  communities.

17        MR. SCHUMACHER:  It says neighborhoods.

18    A.  Oh, neighborhoods.  Excuse me.

19    Q.  Looking at the first component, what

20  does large contiguous green space mean?

21        MR. SCHUMACHER:  Objection.

22    A.  I think it's pretty well spelled out

23  what large contiguous green space means.

24    Q.  What does it mean?

 1      A.  Large contiguous green space.

 2          MR. SCHUMACHER:  I'm sorry.

 3      Q.  So you're saying the definition is the

 4  term itself?

 5      A.  Yes.

 6      Q.  How many acres does that mean?

 7      A.  It's not spelled out.

 8      Q.  How many acres does large contiguous

 9  green space mean?

10      A.  We don't have a definition for it.  You

11  can see it right here.

12      Q.  What does central to the property mean?

13      A.  The physical location where it would be

14  most desirable on a future project.

15      Q.  Which is where?

16      A.  The center.

17      Q.  The very center of the property?

18      A.  Generally speaking.

19      Q.  Desirable to who?

20      A.  The community.

21      Q.  The community that was involved in

22  drafting the resolution?

23      A.  The community who us as individual

24  councilmembers represent.

1      Q.  Have you heard from constituents what is

2  desirable to them?

3      A.  I hear from a number of constituents

4  about a number of components about what could

5  happen at this site.

6      Q.  And did that input get put into this

7  resolution?

8      A.  That input over the years where this

9  property's been discussed went into my decision

10  to vote in favor of this amendment.

11      Q.  Turn to the residential housing

12  component.  What does creatively executed mean?

13      A.  I suppose it means a project that is

14  creative and fits in with the surrounding

15  community.

16      Q.  What sort of guidelines has the city

17  provided on what that means?

18      A.  Very few.  It's in the resolution.

19      Q.  What types of housing does the

20  comprehensive plan allow for?

21      A.  Housing, if rezoning was acquired, that

22  is harmonious in overall mass, scale, and impact

23  upon surrounding neighborhoods.

24      Q.  Do you know what that means?

 1      A.  It means housing similar to surrounding

 2  neighborhoods.

 3      Q.  What does harmonious mean?

 4      A.  Lack of impact on existing residents.

 5      Q.  Where's that defined in this resolution?

 6      A.  The word harmonious.

 7      Q.  That you're giving a definition to; is

 8  that correct?

 9          MR. SCHUMACHER:  Objection.

10      A.  The definition is harmonious, so it's up

11  to the interpretation of the city as well as

12  potential applicant to figure out what that

13  means for the site.

14      Q.  What density does that mean for the

15  site?

16          MR. SCHUMACHER:  Objection.  Asked and

17  answered.

18      A.  I've already answered that.

19      Q.  I haven't heard what density that means.

20          MR. SCHUMACHER:  Tell her again.

21      A.  Similar to surrounding neighborhoods.

22      Q.  Which is what density?

23      A.  Mostly single family homes.

24      Q.  What about along High Street, what

1  density is allowed there?

2        MR. SCHUMACHER:  Are you asking his --

3        MS. TAFT:  Based on the resolution.

4        MR. SCHUMACHER:  Are you asking his

5  opinion of density for the commercial

6  development now?

7        MS. TAFT:  I asked my question.

8     A.  Can you repeat your question?

9        MS. TAFT:  Can you repeat my question?

10       (Record read as requested.)

11    A.  Well, the resolution states commercial

12  development aimed at revenue generation for the

13  city and select service-oriented retail that is

14  compatible with development is highly desirable

15  along High Street.  Roughly in conformity with

16  existing C-2 and C-3 zoned areas.

17    Q.  What can Lifestyle do with its property

18  at this time?

19       MR. SCHUMACHER:  Objection.  Calls for

20  speculation.

21    A.  That's speculative, but the period has

22  passed where they wouldn't be allowed to reapply

23  for rezoning, so I suppose they could come

24  forward with an application any time they wish.

 1      Q.  For what?

 2      A.  A new project proposal.

 3      Q.  In compliance with this resolution?

 4      A.  This would be the guidelines, yes.

 5      Q.  So they have to obtain city approval for

 6  anything they do on the property; is that

 7  correct?

 8      A.  If they're applying to be rezoned.

 9      Q.  What if they aren't applying to be

10  rezoned?

11      A.  Then they would be compared to what the

12  current zoning speculations are for any

13  potential projects in the zones as they

14  currently exist.

15      Q.  But they have to submit an application

16  to do so, correct?

17          MR. SCHUMACHER:  Are you asking him

18  whether -- about rezoning?

19      Q.  No.  I'm asking if they submit an

20  application that does not require rezoning, they

21  still have to apply to develop the property; is

22  that correct?

23      A.  As far as I understand.

24      Q.  Did City Council discuss Ordinance

 1   04-2022 again after the January 18 meeting?

 2          MR. SCHUMACHER:  The ordinance, or the

 3   resolution?

 4          MS. TAFT:  The ordinance.

 5          MR. SCHUMACHER:  Why don't we just call

 6   it the moratorium.

 7          MS. TAFT:  The moratorium.  It's both of

 8   them; so...

 9      A.  Can you repeat your question?

10      Q.  Was a moratorium for the property

11   discussed after the January 2022 meeting?

12          MR. SCHUMACHER:  Objection.  Relevance.

13      A.  Not that I recall.

14      Q.  Can you go to Exhibit 8, please.  Are

15   these the minutes for the February 7, 2022, City

16   Council meeting?

17      A.  Yes, they are.

18      Q.  Was the moratorium discussed at this

19   meeting?

20      A.  I need to read this document before I

21   can answer that.

22          It appears so.

23      Q.  What was said about the moratorium?

24          MR. SCHUMACHER:  Objection.

1      A.  You can find the summary in the minutes

2  yourself.

3      Q.  What did you say about a moratorium at

4  that meeting?

5      A.  I'll need more time to review my

6  remarks.

7          The only section I can find my comments

8  are briefly echoing the need for community

9  engagement if this were to move forward.

10     Q.  Did you express all of your thoughts on

11  the moratorium on the record?

12     A.  It's the only ones I'm seeing.  If

13  you've got a section highlighted, I'd welcome

14  the page number.

15     Q.  That's all I had.  Did you have any

16  other thoughts beyond that statement you made on

17  the record?

18     A.  Not that I recall.

19     Q.  On page 11, at the very middle of the

20  page, there's a paragraph that starts, President

21  Robinson stated that for reasons not necessarily

22  agreeing...  Do you see that paragraph?

23     A.  Yes.

24     Q.  The last sentence in that paragraph,

 1    what did Mr. Robinson mean when he said that

 2    statement?

 3          MR. SCHUMACHER:  Objection.

 4    A.  You'd have to ask President Robinson.

 5    Q.  Did you agree with that statement?

 6    A.  The motion didn't pass, so I would agree

 7    that there wasn't interest in pursuing it at

 8    this time.

 9    Q.  Do you agree that the motivation behind

10    the moratorium discussion has been met through

11    other means?

12    A.  You'd have to ask him what he means by

13    that.

14    Q.  What do you think he meant by that?

15    A.  I can't speak to that.

16    Q.  What do you think he meant by that?  You

17    can speak to what you thought about his

18    statements.

19    A.  I don't have any thoughts about that.

20    Q.  You have no thoughts on that?

21    A.  His intent behind that phrasing, no, I

22    don't.

23    Q.  Did you think the motivation behind the

24    moratorium had been met by other means?

 1      A.  I don't have a stance on that.

 2      Q.  The ordinance was dropped from

 3   consideration at this meeting; is that right?

 4      A.  That's what it appears.

 5      Q.  So your one statement here reads,

 6   Mr. Bucher echoed support for figuring out where

 7   we go from here with stakeholder engagement.  It

 8   is absolutely critical.

 9          What stakeholder engagement were you

10   talking about?

11      A.  What page is that on?

12      Q.  14.  A little above the middle.

13      A.  I think my intention was just that we

14   need to map out how we engage the community, the

15   property owner, on discussing where this site

16   goes.

17      Q.  Who are all the stakeholders you're

18   referencing?

19      A.  I just mentioned two key sections of

20   that, the property owner and the community.

21      Q.  Are those the only stakeholders you're

22   talking about?

23      A.  There's a lot of stakeholders in a

24   community our size, so I'm sure there's others

1    that would fit in that bucket, but I feel I've

2    listed out some of the key constituencies.

3         Q.  I'm asking for all of them.

4         A.  Is that necessary?

5              MR. SCHUMACHER:  Objection.

6              MS. TAFT:  I asked the question.

7              MR. INGRAM:  Answer if you can.

8         A.  There are community groups that focus on

9    the outcomes of this property, there are

10   business leaders, there are chambers of

11   commerce, there are entities that care quite a

12   bit about what might happen at that property.  I

13   would lump them all into that stakeholder group.

14        Q.  Are those the only stakeholders?

15             MR. SCHUMACHER:  Objection.

16   Argumentative.

17        A.  The ones that come to mind.

18        Q.  So there could be more; is that what

19   you're saying?

20        A.  There could always be more.

21        Q.  So has this stakeholder engagement

22   occurred?

23             MR. SCHUMACHER:  Before or after you

24   sued us?

 1    A.  No.

 2         MR. SCHUMACHER:  I'm sorry.  I'll

 3  withdraw that comment.

 4    A.  Pending the litigation, no, this hasn't

 5  occurred.

 6    Q.  How about after this meeting, did

 7  anything start?

 8    A.  Not that I recall.

 9    Q.  The top of 15, counsel for Lifestyle --

10  the part of the record says, encouraged the City

11  Council to talk to his client.  Do you see that?

12    A.  Yes.

13    Q.  Has that happened?

14         MR. SCHUMACHER:  Objection.

15    A.  I'm unaware.

16    Q.  Have you had any conversations with

17  Lifestyle about the property?

18         MR. SCHUMACHER:  Other than

19  conversations with counsel or our attempts to

20  mediate the lawsuit?  Is that what you're

21  asking, counselor?

22         MS. TAFT:  I'm asking if he has had

23  any --

24         MR. SCHUMACHER:  Yes.  He's spoken with

 1  his legal counsel in the conduct of settlement

 2  negotiations in this case.  Is that what you're

 3  inquiring?

 4       MS. TAFT:  That's not with Lifestyle.

 5  I'm asking what conversations have you had with

 6  Lifestyle about the property.

 7       MR. SCHUMACHER:  Excuse me.

 8       MS. TAFT:  Outside of mediation.

 9       MR. SCHUMACHER:  I need to object to the

10  extent this invades the attorney-client

11  communication privilege.

12       You filed your lawsuit, I believe, in

13  March, early March of '22.  So since that time?

14       I would instruct my witness not to

15  discuss what was discussed with legal counsel,

16  and before that with the city law director.

17       A.  Our attorneys have spoken, but that's

18  all I'm aware of.

19       Q.  So my question is if you have spoken

20  with Lifestyle?

21       A.  No.

22       MS. TAFT:  I think that's all the

23  questions I have for you today.  Given some of

24  the other discovery that's come up during these

1    and the indication that there are additional

2    documents to be produced, I am leaving your

3    deposition open as I may have more questions for

4    you once that's exhausted.

5         THE WITNESS:  Okay.  Thank you.

6                   -=O=-

7         Thereupon, the testimony of October

8    10, 2023, was concluded at 11:17 a.m.

9                   -=O=-

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1                    CERTIFICATE

2    STATE OF OHIO       :
                          SS:
3    COUNTY OF FRANKLIN :

4            I, Rhonda Lawrence, a stenographic
     court reporter and notary public in and for the
5    State of Ohio, duly commissioned and qualified,
     do hereby certify that the within-named PETER
6    BUCHER was first duly sworn to testify to the
     truth, the whole truth, and nothing but the
7    truth in the cause aforesaid; that the testimony
     then given was taken down by me stenographically
8    in the presence of said witness, afterwards
     transcribed; that the foregoing is a true and
9    correct transcript of the testimony; that this
     deposition was taken at the time and place in
10   the foregoing caption specified.

11           I certify that I am not a relative or
     employee of any attorney or counsel employed by
12   the parties hereto and that I am not financially
     interested in the action.  I further certify
13   review of the transcript was not requested.

14           In witness whereof, I have hereunto
     set my hand at Columbus, Ohio, on this 24th day
15   of October, 2023.

16

17

18

19

20
                     *Rhonda Lawrence*
21
                     Rhonda Lawrence
22                   Notary Public, State of Ohio

23   My commission expires:  October 9, 2028

24

## Exhibits

**Exhibit 1**  16:13,14

**Exhibit 6**  61:24 62:3

**Exhibit 7**  69:19,21
74:5 75:17

**Exhibit 8**  82:14

**Exhibit 9**  73:6

**Exhibit 10**  63:12,13

**Exhibit 30**  39:20,21

**Exhibit 31**  41:12,13

**Exhibit 39**  27:10,14,
20,21

**Exhibit 40**  30:17,21

**Exhibit 41**  32:7,11

**Exhibit 42**  43:12

**Exhibit 43**  54:15,22

## -

**-=0=-**  27:9,11 30:16,18
32:6,8 43:11,13 54:14,
16

**-=O=-**  89:6,9

## 0

**04-2022**  62:6,11 63:17
64:11 65:1 69:1,16,24
70:1,7,15 72:7,17,20
74:21 75:10,16 82:1

## 1

**1**  16:13,14

**10**  63:12,13 70:16 89:8

**11**  83:19

**1145.05**  59:19

**11:17**  89:8

**13**  54:22

**14**  85:12

**15**  87:9

**18**  30:9 37:21 63:13
70:4,16 71:21 82:1

**18th**  37:23

## 2

**2**  29:14 41:3 75:17

**2014**  16:15,19,20 17:2,
5,6,13 30:6 32:19
33:17,24 35:17,23
37:10 47:17

**2017**  15:6

**2020**  16:23 26:15 37:7,
21 41:22 44:24 50:12
54:5

**2021**  7:15 8:1,14 17:24
32:17 38:20 50:16
54:7,22

**2022**  7:15 8:2,13 30:9,
15 37:21,23 54:9
61:22 62:12 63:13
64:3,12 70:5,16 71:21
82:11,15

**2023**  89:8

**2024**  16:18

**21**  32:17 38:20

**22**  73:14 88:13

**23**  73:14

**2nd**  16:17

## 3

**30**  39:20,21

**31**  41:12,13

**38**  68:14,24 69:5,11

**39**  27:10,14,20,21
73:10

## 4

**40**  30:17,21

**41**  32:7,11

**42**  43:12,16

**43**  54:15,19,22

## 5

**5**

**5th**  37:7,21

## 6

**6**  61:24 62:3

**60-day**  68:18

## 7

**7**  69:19,21 74:5 75:17
82:15

## 8

**8**  82:14

## 9

**9**  73:6

## A

**a.m.**  89:8

**ability**  6:15 63:8

**absolutely**  85:8

**absorption**  50:19

**accurate**  6:13 33:5

**acquired**  78:21

**acquiring**  42:12
44:10,11,19 45:2

**acreage**  76:1

**acres**  77:6,8

**action**  30:9 66:17

**acts**  60:5

**addition**  19:22

**additional**  89:1

**address**  75:7

**administrative**  11:6

**adopted**  16:17

**advance**  65:11

**advised**  49:22

**advocacy**  9:17

**affected**  70:11

**agenda**  63:13,17
65:13 70:16

**agendas**  7:21

**agree**  19:11 84:5,6,9

**agreeing**  83:22

**ahead**  36:12

**aide**  10:24

**aimed**  76:3 80:12

**Alliance**  14:4

**allowable**  61:11

**allowed**  80:1,22

**amend**  33:16 73:20

**amended**  73:2 74:24

**amending**  30:5 31:24
37:4,10,19

**amendment**  35:18
70:9,12 72:14 73:8
74:23 75:9 78:10

**Analytica**  40:12,20
41:1

**answering**  22:2 57:16

**answers**  6:13,16,19
22:1 60:21

**apologize**  22:3

**appears**  33:3,15
36:13 40:18 42:14
58:7 63:16 82:22 85:4

**applicant**  24:24
25:11,14,16,17,19,22,
24 26:10 27:7 36:6,14
79:12

**applicants**  52:23

**application**  7:16 18:1
19:17,18,20 24:19
25:8 26:8 28:7,13
29:12 45:12,17 46:4,6,
12,15,23,24 47:5,8,10,
20,22 48:1,5,10,14,20
50:5,13,23 52:17,21
55:8 57:11,17,20,23

80:24 81:15,20

applications 18:12
20:19,24 21:5 23:21
24:1,10 46:17 51:3,23
62:15

applied 18:14 68:14,
24

applies 68:16 69:12,
14

apply 19:17 26:20
62:7 69:5 70:7 81:21

applying 61:3 81:8,9

approval 81:5

approve 33:12

approved 8:3 33:14

Approximately 23:20

April 59:3

ARB 20:1,13 26:2
48:14,17 50:6 53:12

ARB's 50:15

ARB/MPC 7:22 8:14
19:16 51:21

area 11:3

areas 76:8,11 80:16

Argumentative 61:16
86:16

associations 10:14

assume 44:7 47:14

assuming 47:12 48:3

attached 40:23

attempts 87:19

attend 8:16 14:14
64:14,24

attended 8:18 51:13,
16 53:16,22

attorney-client 88:10

attorneys 7:8,12 8:11
88:17

author 67:9,10

availability 38:17

aware 13:5 14:21

29:24 72:3 75:14
88:18

---

## B

Bachelor's 8:24

back 7:15 12:4 15:2,3,
4 17:7 21:12

background 8:20
12:11

bad 22:12

Based 80:3

Beautiful 14:23

Beck 15:23

began 30:5

binder 61:24

bit 51:12 86:12

body 24:16 48:23 49:3
53:7,14

bottom 58:15

box 45:7

break 6:7,10 60:22
61:19

briefed 26:9

briefings 27:6

briefly 8:19 83:8

bring 13:15 53:3 66:7,
17 71:12

broke 45:15

brought 33:4 63:22
65:9

Brown 27:15 28:1
48:3,8 55:16

Bucher 5:1,8,9 85:6

bucket 86:1

build 26:20

Building 14:1

Burns 65:15,21 74:19

business 86:10

---

## C

C-2 76:7 80:16

C-3 76:7 80:16

calendar 12:16 62:16

call 13:7 23:7 44:1
60:18 66:24 82:5

called 10:9

calls 17:17 18:10
31:20 59:9 61:7 68:21
69:8 80:19

campaign 10:14
12:20

candidate 14:17 16:3

candidates 14:20

capacity 11:15

care 26:21 86:11

carry 49:2

case 6:24 8:8 13:5
49:20 88:2

cautioning 40:9

center 77:16,17

central 75:24 77:12

certifications 9:7

certified 5:3

Chamber 14:2

chambers 86:10

chance 12:6 27:16
30:21 33:9 40:8 43:16
62:1

change 72:15

chapter 41:3

check 50:3

Chief 9:13

Chris 5:18

chunk 52:5

citizens 15:19

city 7:8,12 8:4,11
11:21 12:12,14 13:3
14:17 15:9 16:3 19:24

20:1,24 21:1,3 22:20
23:18 24:11,13,24
25:2,10,13 27:4 29:7,
10 30:5,10 31:3,9,24
33:16 35:17 36:10,20
37:2 39:15 40:19
42:12,24 43:6,7 44:10,
19 45:12,17 46:3 50:4,
13 51:7 52:20 53:12
54:23 55:3,11 59:6,11
60:4,5 61:2 62:17,24
63:24 64:5 70:5 71:17
73:23 75:2 76:4 78:16
79:11 80:13 81:5,24
82:15 87:10 88:16

city's 72:15

clarification 58:24

clarifying 27:24

client 23:6 87:11

code 59:21 60:3
61:10,12,18

colleague 34:3

colleagues 26:10
33:21 34:20 38:7,10,
11,17,21 50:7 57:21
62:22

college 8:22,23

Columbus 15:11

column 18:19

comment 74:18 87:3

commentary 74:13

comments 20:16
34:17,19,22 49:3,5,8
53:3 74:14 83:7

commerce 14:3 86:11

commercial 76:2,11
80:5,11

commission 48:15

communicated
28:22

communication
24:23 25:10 88:11

communications
13:20 14:7

communities 5:11
76:15,16

community 12:4,7
14:3 15:2,3,4,13 16:2
17:8 35:10,11 36:2
50:19 52:8 53:16 63:1,
10 72:12 77:20,21,23
78:15 83:8 85:14,20,
24 86:8

comp 19:4 72:14 75:8

company 10:9

compared 81:11

compatible 75:22
76:5 80:14

complaint 8:7

complete 5:22 6:13,
15,19

compliance 81:3

compliant 18:3

component 76:2,19
78:12

components 75:18,
19,22 78:4

Compound 21:6

comprehensive 8:3
16:16,21 17:1,13,21
18:6,8,11 19:18 24:8,
17 30:6 31:13,17 32:1,
19 33:17 34:1 35:18,
23 37:4,11,20 47:17
70:10,13 74:23 75:3,
11 78:20

concern 34:24

concerns 49:5,8 53:3

concluded 89:8

conclusion 17:17
18:10 20:5,9 31:20
59:10 61:6,8 68:21
69:8

concrete 63:8

conduct 88:1

confidential 44:2

conformity 76:7
80:15

consideration 63:23
85:3

considered 8:2 23:22
24:2 30:11,14

constituencies 86:2

constituent 55:24
56:11

constituents 58:3
78:1,3

consult 56:3

contacted 25:17,18

contents 24:18

contiguous 75:23
76:20,23 77:1,8

continue 22:14 23:5,
14 68:23

conversation 28:17,
20,23 31:23 42:23
45:2 49:13 51:11 63:9
66:16 67:4

conversations 30:13
37:9 51:4 52:24 55:18
67:6 87:16,19 88:5

convey 36:14 48:19

conveyed 48:24

copy 65:22

corner 26:21

correct 8:6 16:18,23
17:12,15 19:19 20:2
24:6 33:10 40:17
42:13 43:23 44:20
69:2 70:2,3 73:24
74:9,16 79:8 81:7,16,
22

correctly 35:5

council 8:4 9:11
11:15,18,21 14:17
16:3,23 19:24 20:1,14,
22,24 21:1,3 22:21
23:18 24:11,14,16,24
25:2,13 26:16 27:4
31:24 32:17 33:16
37:2 39:13,15,17
40:15,16,17 43:1
44:17 49:16 50:5,13
51:19 53:12,14 54:23
55:4 60:6 62:14,17,20
63:24 64:5 65:8 66:4
70:2,5 71:17 72:1

73:24 74:12 81:24
82:16 87:11

Council's 36:20 46:3

Councilman 31:5
32:3

councilmember 26:3
48:22 53:5 65:10

councilmembers
31:1 33:3 60:6 63:21
66:1 77:24

counsel 5:10 23:9
49:21 54:1 60:7 87:9,
19 88:1,15

counselor 57:13
59:22 60:20 87:21

couple 27:23 43:22

court 22:17

created 31:4

creating 17:11

creative 78:14

creatively 76:9 78:12

Creek 76:1

critical 12:12 85:8

CROSS-
EXAMINATION 5:4

cure 21:23 22:12

current 75:23 81:12

**D**

date 45:18 53:23
55:12

David 41:24

day 11:14

days 37:22 71:7

dealt 20:21

December 8:1 50:14
54:22

decide 70:19

decision 9:3 14:21
78:9

decisions 19:23

20:17

defend 23:6

defined 79:5

definition 77:3,10
79:7,10

degrees 8:23 9:5

deliberations 25:3

denial 58:5

denied 59:1

density 79:14,19,22
80:1,5

deny 58:10

deposed 5:12

deposes 5:3

deposition 5:15 6:22
7:6 27:10 30:17 32:7
34:10 40:5 43:12
54:15 60:10,17 89:3

describe 18:13

desirable 76:1,6,9
77:14,19 78:2 80:14

develop 81:21

developing 28:3

development 12:5,11
13:3 14:5 17:22 18:2,
24 19:1 24:1 26:24
75:15 76:3,5 80:6,12,
14

dialogue 38:6,19,24
39:13 50:19 63:1

digitally 32:5

direct 52:20,22

director 88:16

discovery 49:19
88:24

discretion 25:20

discuss 25:21 36:1
64:1 67:22 71:2 81:24
88:15

discussed 7:9 17:21
32:20,24 38:8,16 46:1
50:18 51:7,20 55:12
63:22 64:11,17 65:2,

12 66:4,6 70:22 71:8,
20 73:12 75:4 78:9
82:11,18 88:15

**discusses** 42:12

**discussing** 85:15

**discussion** 29:2 34:6
35:10,11,21 36:15
37:24 53:7 66:23
67:24 72:13 84:10

**discussions** 37:3,19
38:1,14 55:7

**distributed** 41:10

**district** 15:8,12 22:11,
17

**document** 17:11 19:6,
7,8,11 27:17 30:24
31:21 40:9 41:11,15
44:1 82:20

**documented** 45:19

**documents** 7:13 8:8
19:21 56:6,10,18 57:1,
6 89:2

**Dorothy** 34:23

**draft** 65:22 66:3 67:8
70:24 71:11 74:3

**drafting** 67:11,16,17,
21 72:4,20 77:22

**dropped** 85:2

**drugs** 6:14

**duly** 5:2

_____

**E**

**earlier** 6:21

**early** 19:2 29:11 88:13

**echoed** 85:6

**echoing** 83:8

**economic** 12:11 13:2

**effort** 15:1

**elected** 11:19

**election** 11:22 12:3
16:7

**email** 13:19 14:19

15:17 27:14 28:11
29:14 40:24 41:17
42:17 43:19 44:24
45:7 66:2

**emails** 27:22 55:24
56:11

**embedded** 76:10

**emergency** 26:21
67:23 68:6,11

**Emily** 5:10

**employed** 9:9,10

**encouraged** 87:10

**end** 12:16 34:4 36:4
58:17

**endorse** 16:3,4

**endorsed** 14:16,18

**endorsing** 16:8

**engage** 25:21 52:22
85:14

**engaged** 11:14 40:19

**engagement** 83:9
85:7,9 86:21

**entail** 9:14

**entire** 19:1

**entities** 86:11

**environment** 11:10

**environmental** 9:3,
11 12:10 13:3

**environmentally**
10:15,18 11:7

**equally** 24:21

**essentially** 32:4

**evening** 11:14 36:15
66:1

**events** 55:23

**Eventually** 47:19

**exact** 27:21

**excuse** 7:7 76:18 88:7

**executed** 76:10 78:12

**exhausted** 89:4

**exhibit** 16:12,13,14
27:10,14,20,21 30:17,
21 32:7,11,12 39:20,
21 41:12,13 43:12
54:15,18,22 61:24
62:3 63:12 69:19,21
73:6 74:5 75:17 82:14

**exist** 81:14

**existed** 42:7 44:15

**existing** 76:7 79:4
80:16

**expected** 18:23

**experience** 10:20
20:10,18,23

**explanation** 40:13

**explicit** 67:5

**explicitly** 57:7

**express** 83:10

**expressed** 34:23

**extent** 17:17 18:10
20:4 26:4 31:20 68:21
69:8 88:10

_____

**F**

**facility** 26:22

**fairly** 39:12

**familiar** 41:15

**family** 9:18 79:23

**favor** 78:10

**February** 82:15

**federal** 9:21

**feedback** 53:6 55:11
58:1

**feel** 27:4 69:9 73:6
86:1

**fell** 65:8

**felt** 12:6 72:12

**figure** 79:12

**figuring** 85:6

**filed** 88:12

**filing** 11:24

**find** 29:21 35:4 57:14
83:1,7

**finish** 6:8 31:11 40:1

**finished** 39:24

**firm** 45:5

**fit** 53:1 86:1

**fits** 78:14

**Florey** 45:5

**focus** 9:17 10:16 86:8

**focused** 10:15,18
11:7

**folks** 9:16 15:16,22
16:7 17:8 27:23 35:13

**force** 24:8 31:14,18

**form** 21:23 22:6,8,12
25:6 76:14

**formal** 11:24 13:20
59:20 65:13

**formed** 34:2

**forward** 17:19 35:14
66:7,17 71:12 80:24
83:9

**forwarded** 41:24
43:22

**found** 34:11

**fourth-to-last** 36:4

**frame** 26:12 37:11
50:23 52:1,4,9,10
53:24

**free** 59:1 73:7

**freestanding** 76:11,
13

**front** 24:4 45:18 69:17

**full** 6:12,15,18

**fully** 34:2

**future** 14:1 37:5 63:11
75:1 77:14

**FYI** 42:1,2 47:2

_____

**G**

**gathering** 46:9,13,19

**general** 11:8,10 49:9
53:24 75:18,19,22

**generally** 17:24 24:23
25:9,12,15,20 77:18

**generated** 40:14
44:16 45:2

**generation** 76:3
80:12

**give** 6:15,18 12:4 22:5,
12 25:23 26:2 27:16
40:13 53:24 58:21
61:24 62:24 69:9

**giving** 6:2 21:22 40:8
79:7

**good** 5:9 12:6 40:13

**graduate** 8:20 9:5

**grassroot** 13:17

**great** 6:4

**green** 75:23 76:20,23
77:1,9

**Greeson** 28:12 36:14,
17 40:16 55:16

**Greeson's** 44:24

**ground** 5:15

**group** 10:10 14:6
15:19 86:13

**groups** 11:17 13:23,
24 52:2 86:8

**grow** 15:10

**guess** 41:22 55:15

**guideline** 18:13 20:1
75:16

**guidelines** 16:16
18:11 78:16 81:4

**guides** 18:15 19:21

**guiding** 31:21

**H**

**hand** 27:13 30:20
32:10 39:19 43:15

**handle** 52:23

**handy** 23:23 73:13

**happen** 78:5 86:12

**happened** 8:17 33:6
36:24 38:19 55:12
87:13

**harassing** 54:12

**harmonious** 76:13
78:22 79:3,6,10

**head** 6:2

**heads-up** 45:23

**hear** 31:16 78:3

**heard** 47:24 78:1
79:19

**hearings** 51:14,17

**held** 21:5

**hereinafter** 5:2

**high** 8:20 76:6 79:24
80:15

**highlighted** 58:22
83:13

**highly** 76:1,5 80:14

**hold** 11:19

**home** 64:23

**homes** 79:23

**honest** 6:15,19

**House** 10:23

**housing** 75:5 76:8
78:11,19,21 79:1

**I**

**imagine** 47:10

**imagining** 35:16

**immediately** 10:9
45:20

**impact** 76:14 78:22
79:4

**impair** 6:14

**imply** 62:21

**important** 5:20 6:12

**impose** 62:17

**impossible** 28:15

**improper** 60:16

**in-person** 28:20

**include** 13:24 18:24
49:23 68:3

**Including** 9:24

**inclusive** 75:24

**indication** 89:1

**indifferent** 47:4

**individual** 77:23

**individually** 14:13

**inform** 36:6 63:24

**informally** 11:23 27:6

**information** 42:3 45:4
46:9,13,19 66:10 68:8

**informational** 45:23

**informative** 46:5

**informed** 36:23 48:3
71:11

**informing** 66:16

**INGRAM** 23:9 59:22
60:7,11,15 86:7

**input** 24:20 35:22
72:19,22 74:2 78:6,8

**inquiring** 88:3

**insignificant** 38:4

**instruct** 88:14

**instructing** 23:10

**intended** 62:24

**intending** 12:18

**intent** 84:21

**intention** 66:17 68:3
85:13

**intentions** 66:7 71:11

**interest** 12:10 13:18
84:7

**interested** 64:16,20

**interpret** 5:19

**interpretation** 18:5
79:11

**interviews** 16:9

**introduce** 70:20,22

**introduced** 62:12,13
70:1 73:22 74:3

**invades** 88:10

**involved** 13:17 17:9
61:17 72:4 77:21

**involvement** 13:20
15:14 17:10

**issue** 23:7 44:10
68:14,24 69:5,11

**issues** 11:9 12:8 14:8
68:13

**item** 63:22 66:8

**J**

**January** 8:2 10:4
30:9,15 37:21,23
61:22 62:12 63:13
64:3,12 70:4,16 71:21
82:1,11

**job** 9:14 10:22 11:14

**joined** 16:22 40:14
44:16

**Judge** 22:23 23:2,7
60:19

**K**

**key** 12:8 85:19 86:2

**knowledge** 16:6
39:18 44:15 47:2

**L**

**Lack** 79:4

**laid** 58:2

**land** 10:5,19 11:4

**landscape** 72:16

**language** 16:5

**large** 75:23 76:20,23
77:1,8

**largely** 74:12

**law** 45:5 88:16

**laws** 24:17

**lawsuit** 87:20 88:12

**lawyer** 7:2 23:13

**lays** 75:18

**LC** 59:1

**lead** 15:16,23

**leaders** 86:10

**leading** 8:9

**leads** 15:20

**learned** 48:10

**learning** 50:18

**leaving** 89:2

**Lee** 27:15,24

**left** 42:16 45:7

**left-hand** 18:19

**legal** 17:17 18:10 20:4,9 31:20 59:10 60:1 61:8 68:21 69:8,9 88:1,15

**legislative** 10:24

**level** 9:21,22

**liaison** 26:2 48:22 49:3 53:11,13

**Lifestyle** 5:10 36:23 45:11 52:16,21 61:13 63:24 71:19,23 80:17 87:9,17 88:4,6,20

**Lifestyle's** 13:6,7 45:17 48:13,20 50:5 55:8 57:10 70:8

**Lifestyles** 48:1 59:6 61:2

**limits** 15:9

**lines** 24:23 25:9

**list** 14:6 15:17

**listed** 13:1 56:19 57:5, 6 86:2

**listen** 22:17

**listened** 34:3 50:17 66:10

**listening** 34:19,20

**lists** 13:19,22

**litigation** 42:20 75:6 87:4

**lived** 15:7,8 32:4

**living** 15:2,3,4 17:7

**lobbying** 10:13

**local** 9:21

**localities** 9:24

**location** 28:3 29:22 77:13

**locations** 29:16

**logic** 68:4

**long** 10:2

**looked** 7:14,21

**lot** 6:2 10:12 13:13 28:15 38:16 85:23

**lump** 86:13

**M**

**made** 14:21 28:6 73:8 74:14 83:16

**main** 67:9,10

**make** 19:23 20:17 44:14

**making** 9:4

**manage** 9:16

**manager** 31:3,9

**map** 85:14

**March** 44:24 88:13

**mark** 54:18 59:2

**marked** 16:13 27:10, 14 30:17,21 32:7,11 39:20 43:12,16 54:15 61:24

**Marlowe** 39:22 40:12

**mass** 76:14 78:22

**materials** 7:14,16,22 8:12 42:7 46:20 47:3, 7,11

**Matt** 28:11,14 29:6

**means** 43:5 76:23 78:13,17,24 79:1,13, 19 84:11,12,24

**meant** 44:7 74:21 84:14,16

**mediate** 87:20

**mediation** 88:8

**medication** 6:14

**meet** 7:11 51:22 52:1, 7,16,20 55:3

**meeting** 7:7,8 8:16 30:8 32:14,17,21 33:6, 10,12,17 34:4,6,17 35:1,6 36:24 37:2,7,22 38:7,20 39:2,4,6,9,12 49:1,14 52:1 53:15 54:23 55:1,4,6,9,20,21 56:8,13 57:11,14 61:6 62:12 63:14 64:3,12, 13,17,21 65:2,18 66:1, 5 67:3,7 68:1 70:5,15, 21,23 71:3,7,14,17,21 72:24 73:3,5 74:10,15 75:1 82:1,11,16,19 83:4 85:3 87:6

**meetings** 7:15,19,24 8:4,13,15 14:11,14,15, 24 30:13 33:13 35:8 37:5 38:23 39:14 49:10 50:17 51:19 53:21 61:23 64:22 72:21

**member** 13:21 24:15 48:15,23 62:14,20 64:15,19 65:14 72:1

**member's** 31:2

**members** 31:24 50:4 55:3

**membership** 14:15

**memo** 31:23 32:5 55:22

**memorize** 34:9

**memos** 55:10

**mentioned** 8:13 14:10 45:6 85:19

**mentions** 42:10

**merits** 24:18

**met** 14:12 29:5 52:4, 13 84:10,24

**Meyers'** 34:5,16

**Michael** 11:2

**mid** 59:3

**middle** 18:20 34:22 83:19 85:12

**mind** 35:20 86:17

**mine** 40:6

**minute** 37:14

**minutes** 7:19 32:16 33:5,10,12 39:7 49:14 54:23 57:15 58:8,15 62:23 69:17 73:1,5 74:1,11 82:15 83:1

**mix** 9:23 10:12 12:9 28:21

**monitor** 15:18

**month** 26:14 35:1

**months** 59:8 61:4,14

**moratorium** 62:15,18 82:6,7,10,18,23 83:3, 11 84:10,24

**morning** 5:9

**motion** 70:22,23 84:6

**motions** 73:20

**motivation** 84:9,23

**move** 15:5 83:9

**moved** 15:6

**MPC** 20:2,13 26:3 48:14,20 50:6,15 53:12 59:3

**MPC/ARB** 51:13

**municipality** 9:21

**Myers** 48:21 53:5,10

**myriad** 13:1

**N**

**name's** 65:14

names 16:1

necessarily 83:21

negative 74:15

negotiations 88:2

neighborhoods 76:17,18 78:23 79:2, 21

nodding 6:2

nonvoting 26:3 48:22 53:13

normal 39:12

North 15:11

notes 28:24 49:7,9,11, 15,23 50:1 51:21 74:7

notice 64:10 65:11,20 68:19 71:19,23

noting 35:6

November 50:16

number 14:8 23:23 24:3 50:8 78:3,4 83:14

**O**

oath 6:21,23

object 88:9

objection 12:22 17:16 18:4,9 19:5 20:3,20 21:6,23 25:1,6 28:8 29:1,9,23 30:2 31:19 33:7,20 35:12 38:5 39:10 42:5 43:5 44:12, 21 50:11 53:18 54:1 56:21 57:2,12,24 58:11 59:9 61:5,7,15 62:9,19 63:5,15,20 65:5 67:18 68:7,12,20 69:3,7,13 72:10 76:21 79:9,16 80:19 82:12, 24 84:3 86:5,15 87:14

objections 20:12 21:21 22:7,8,11,16 23:4 51:9 59:15,18 60:12

obtain 8:22 81:5

occur 33:13

occurred 33:11 52:15 55:23 56:12 86:22 87:5

October 37:7,21 50:12 89:7

ODC 10:8

OEC 11:12,16

official 15:21

officially 12:2

Ohio 8:24 9:10 10:23

Ohiohealth 26:6 28:2, 6,12 29:7,16,21

Ohiohealth's 26:18

one-on-one 29:6

online 64:14

open 24:23 25:9 61:23 64:22 89:3

opinion 60:1 69:10 80:5

opinions 22:11,17

opportunity 21:23 22:12 36:1

ordinance 62:6,7,11 63:2,4,17 64:1,11,16, 20 65:1,20,23 66:3,20 67:2,8,23 68:5,15 69:1,2,6,12,15,16 71:5,9,10 81:24 82:2,4 85:2

ordinances 59:16

organization 15:15, 17,20

organizations 9:19 13:18

organized 15:19

organizing 10:13

outcome 76:2

outcomes 86:9

outlines 62:10

overview 7:21

owner 63:9 85:15,20

**P**

packet 56:1,13

pages 73:10

paginated 58:18

paperwork 12:2

paragraph 33:2 83:20,22,24

Park 15:14 16:2 52:8 53:17

Parks 14:3

part 87:10

participate 67:11

participated 14:11

partners 11:15

Partnership 14:2

pass 69:16 72:17 84:6

passed 26:4 73:23 75:10 80:22

passing 50:24

patient 60:11

Paul 7:2 22:9 23:3 51:8,11 59:14,17

pause 21:24

pending 51:23 52:18, 21 87:4

people 14:7 39:4

period 80:21

person 64:24

personally 25:17

Peter 5:1,8

petition 11:24

phase 11:24

phone 28:19 38:12 66:24

phrasing 84:21

physical 77:13

pick 6:3

place 34:9 62:14

plan 8:3 16:16,21 17:2,13,21 18:3,6,8 19:4,18 24:1,8,17 30:6 31:13,18 32:1,19 33:17 34:1 35:18,24 37:4,11,20 47:18 70:10,13 72:14 74:24 75:3,8,11 78:20

planned 17:22 19:1

planning 38:24 48:15

plans 18:11

play 51:2 75:6

playing 51:1

point 8:9 28:18 35:20 48:21 54:12 55:24 73:11

policy 9:3,17 12:5

political 9:18 10:14

portion 26:23 27:3 70:13

positions 11:19

possibility 36:7

potential 26:10 27:7 31:22 35:14 36:6,14 68:17 79:12 81:13

potentially 18:14 26:2,20 50:8 51:5 62:14

preparation 51:18 55:21 56:8

prepare 7:5 55:19 56:2

presented 26:19 27:2 29:13

President 66:5 71:6 83:20 84:4

pretty 14:5 76:22

previous 7:16 30:12 44:9 51:16

previously 8:9 13:1 16:13 39:20 58:2 61:23 71:4

primarily 9:16,20 10:17 11:6

**prior** 10:8,22 11:11,18 15:1 44:18 55:4,8 64:2,18 67:3 68:1 71:3,17

**privilege** 88:11

**Pro-tem** 53:5

**proceed** 28:3 60:16

**process** 17:10 20:7, 11 24:22 25:9 35:16 51:1,2 55:23

**produce** 49:22

**produced** 49:15,17, 21 89:2

**professional** 9:7

**professionals** 11:16

**prohibit** 61:2

**prohibiting** 59:6 61:13

**project** 7:22 8:1 14:3 15:13 16:2 17:18 18:1, 12,14 20:14 24:18,19 25:21,24 35:14 46:21 47:10 51:3 52:8 53:16 77:14 78:13 81:2

**projects** 20:17 81:13

**proper** 15:9 22:6

**property** 13:6,7,8 16:22 17:3,14,23 18:3 24:6 26:7,21,23,24 27:3 28:4 29:8 30:7 32:20 39:16 42:13 44:11,19 50:10 55:8 59:7 61:4 62:8,18 63:9 64:2 70:8,11 75:11,24 77:12,17 80:17 81:6, 21 82:10 85:15,20 86:9,12 87:17 88:6

**property's** 78:9

**proposal** 26:7,18 31:7 33:22,24 46:14 59:1,2 68:17 81:2

**proposals** 7:22 31:22

**proposed** 18:24 67:23 68:6

**provide** 71:23 75:16

**provided** 56:13 78:17

**provision** 68:4

**public** 9:17 12:14 13:21 14:21 20:16 24:20 27:5 30:13 35:22 42:19 43:23 46:7,8 49:18 57:13 64:10,13,15,19 65:4, 14 68:19 72:19,21,22 74:2,14,17

**publicly** 45:24

**PUD** 45:13,16

**purchasing** 39:16

**pursuing** 84:7

**put** 15:18 30:4 62:14 78:6

---

**Q**

**question** 5:16 6:9 7:17 19:9,12,14 21:7, 9,15,17 22:2,4 23:11 25:4 27:19,21 28:9 29:2,18 31:16 34:14 37:15 40:10 41:6,22 54:3,13 57:3 60:22,23 64:5 68:22 73:16,17 80:7,8,9 82:9 86:6 88:19

**questioning** 23:13,15

**questions** 5:22 21:11, 24 22:1,2,6,13 25:23 26:5 27:24 31:2,6 48:24 49:2,4,8 53:3 54:20,21 55:17 88:23 89:3

**quickly** 40:8

---

**R**

**ran** 11:21,22,23 12:2,8

**re-ask** 68:22

**re-review** 58:6

**reach** 25:18

**reacting** 35:20

**reaction** 36:20 46:3,7, 8,10,11,23

**read** 7:13,14 18:21 21:11,13,18 22:10 27:17 32:22,23 34:7 36:11,16 40:9 44:14 45:10 51:17 55:22,24 62:1 73:19 75:20 80:10 82:20

**reader** 40:3

**reading** 39:24 40:1

**reads** 61:18 85:5

**ready** 54:19,21

**reapply** 80:22

**reapplying** 59:7 61:3, 14

**reason** 6:18 18:21,23

**reasons** 58:4,7,9 83:21

**recall** 36:22 37:8,12 38:12 39:3 41:11,19 42:22 45:22 46:1 47:12 49:24 51:10,15, 20,24 52:6,11,12,19 53:16,20,21,23 54:6,8, 10 55:5,10,13,15 56:4, 18 57:9 66:12,13,14, 15 67:20 68:2 71:1 73:4 82:13 83:18 87:8

**receive** 45:17,20 65:22

**received** 29:19 31:2 46:6 47:13 66:3,10

**receiving** 46:4,11,24 47:4,22

**Recess** 61:20

**recognize** 16:14 30:24 32:11 41:13 62:3 69:21

**recollection** 19:3 62:13

**recommendations** 24:19

**reconsideration** 59:20

**reconvened** 35:7

**record** 5:7 6:3 21:13, 18 28:23 57:13 58:5

73:19 80:10 83:11,17 87:10

**records** 42:19 43:23 49:18

**reelection** 12:18

**refer** 33:2 59:12 72:24 73:4

**reference** 19:21

**referencing** 7:20 13:9 85:18

**referring** 17:18 43:20 74:4,7

**reflections** 38:23 39:1

**refresh** 19:3 70:17

**regular** 14:14

**regularly** 28:14 29:6 38:11

**regulations** 11:5

**related** 56:2 64:2

**relates** 17:2 30:7 32:20

**Relevance** 12:22 35:12 57:24 62:9 63:5 68:12 72:10 82:12

**relevant** 42:7,9

**remained** 31:21

**remarks** 83:6

**remember** 15:24 26:8,9,12,19 27:2,20 28:5,10,16,21 29:3,19 30:15 32:2 33:8 35:5, 15 38:3 40:21 43:2,8, 10 44:23 47:9,16,23 48:2,11 49:1,6,10,13 50:20 52:14 53:7,8 55:17 65:17 67:5,12, 13,15 71:13,18

**Remington** 10:10

**rep** 11:23

**repeat** 5:17 27:19 73:16,17 80:8,9 82:9

**rephrase** 5:17 25:5,7

**replace** 35:23

**report** 34:3 39:13
40:14,23 43:9 44:15

**reports** 33:3 34:19
40:22 45:3 63:21 65:8
66:18

**represent** 77:24

**representative** 11:1,
2

**representatives**
10:24 51:22 52:7,13,
17

**representing** 7:3

**request** 36:21 42:20
43:23 52:2

**requested** 14:13
21:13,18 73:19 80:10

**requesting** 36:10

**requests** 49:19

**require** 17:14 19:22
81:20

**requirements** 20:16

**requires** 17:19 68:18

**requiring** 76:8

**residential** 76:8 78:11

**residents** 79:4

**resolution** 69:24
70:1,7,15,20,24 71:2,
8,14,16,20 72:5,7,17,
20,23 73:2,8,21 74:6,
9,21 75:10,16 77:22
78:7,18 79:5 80:3,11
81:3 82:3

**resolutions** 67:21

**responded** 31:10

**responses** 31:2

**responsibilities** 9:15

**Responsible** 14:4

**resubmit** 59:2

**retail** 76:4 80:13

**revenue** 76:3 80:12

**review** 8:7,12 19:16

24:9,16,20 25:9 30:22
33:9 39:7 40:22 41:8
43:17 47:7,17,21
49:12 50:16 56:6,14,
15,16,17 73:7,9 83:5

**reviewed** 30:8 41:7,9
42:16 45:6 47:15
50:13,22 51:21 56:20
57:1,7 68:10 74:11

**reviewing** 29:11
46:20 47:2

**revised** 17:2

**rezone** 26:20 59:7
61:3

**rezoned** 17:15,20
81:8,10

**rezoning** 18:24 20:19,
23 21:4 23:21 24:9
25:8 45:13,16 61:17
76:9 78:21 80:23
81:18,20

**Road** 10:10

**Robinson** 31:5 32:3
33:4 41:24 42:21
43:20 44:1,5 58:24
66:5,23 67:4,7,22 71:6
72:6 83:21 84:1,4

**Robinson's** 33:24

**Roger** 15:23

**role** 10:6

**roles** 11:13

**room** 26:11

**roughly** 21:4 76:6
80:15

**rules** 5:15 22:16

**run** 12:3,18

**running** 12:19,21
13:2,12

**S**

**S-1** 75:23

**safety** 12:14

**Saturday** 66:5 67:24
71:6

**scale** 76:14 78:22

**school** 8:20 15:8,12

**SCHUMACHER**
12:22 17:4,16 18:4,9
19:5,14 20:3,8,20
21:6,10,14,16,19,22
22:5,10,18,22 23:1,5,
12,16 24:11 25:1,6
27:16 28:8 29:1,9,23
30:2 31:15,19 32:22
33:7,20 34:8,14 35:3,
12 37:14 38:5 39:10,
23 40:2,7,23 41:6 42:5
43:5 44:12,21 45:14
47:14 50:11 51:6
53:18 54:1,11 56:21
57:2,12,18,24 58:11,
16,18,21 59:9,12,16,
19,24 60:3,5,9,13,18,
23 61:5,7,15 62:9,19
63:5,15,20 64:4 65:3,5
67:18 68:7,12,20 69:3,
7,13 72:10 73:9 74:4,8
75:12 76:12,17,21
77:2 79:9,16,20 80:2,
4,19 81:17 82:2,5,12,
24 84:3 86:5,15,23
87:2,14,18,24 88:7,9

**science** 8:24

**Scott** 15:23

**screen** 16:4

**screened** 14:18

**second-to-last** 34:12

**section** 16:22 34:7
36:5 39:14 58:6,20
65:8 66:18 70:9 72:14
74:24 75:7 83:7,13

**sections** 17:19 85:19

**seeking** 26:24

**select** 76:4 80:13

**sending** 43:20

**sentence** 18:20,22
36:4,7 59:4 83:24

**separated** 11:13,17

**September** 16:17
32:16 38:20

**series** 27:22

**serve** 12:7

**Served** 10:23

**service-oriented**
76:4 80:13

**services** 12:14 13:4

**serving** 11:18

**set** 12:5 63:8

**settlement** 88:1

**seven-person** 24:15

**share** 42:18

**shared** 40:16

**Sheehy** 11:3

**shortly** 58:14

**show** 64:20

**side** 15:11

**signed** 13:21

**significant** 38:2

**SILK** 60:21

**similar** 35:16 79:1,21

**simply** 29:11 34:3,20
35:20 45:10 46:5

**single** 79:23

**site** 16:16 19:1 31:7,22
35:14 42:8,11 46:1
51:11 62:15 63:1,10
70:14 72:16 75:7 78:5
79:13,15 85:15

**sites** 46:18

**sitting** 42:16 45:7

**six-month** 59:2

**Sixth** 58:17

**size** 85:24

**skill** 12:5

**slow** 40:3

**Smith** 36:5,9

**Smith's** 36:13,21

**sort** 10:5 11:4 18:2,19
75:15 78:16

**sound** 26:16

**sounds** 26:17

**space** 75:24 76:20,23 77:1,9

**spark** 31:23

**speak** 28:11 71:16 84:15,17

**speaking** 17:24 20:12 21:21 22:8,15 23:4 40:7 51:8 59:15,18 60:13 65:17 77:18

**speaks** 19:6

**specific** 11:1 19:12 23:23 24:3 35:19 45:18 51:1,10 52:5,10, 23 69:4 70:13

**specifically** 13:13,16 28:17 42:10 43:8 44:13,23 48:11 53:8 55:5,18

**specifics** 42:23 46:2 47:9 49:1,10 51:24 55:13 66:15

**speculation** 80:20

**speculations** 81:12

**speculative** 80:21

**speedy** 40:2

**spelled** 61:10 76:22 77:7

**spoke** 28:16

**spoken** 87:24 88:17, 19

**staff** 9:13 20:13 24:19, 24 25:10,15,18,20,23 26:11 27:23 28:1 36:5 43:7 45:22 48:4 52:20, 22 55:11,13,14,22

**stages** 29:12

**stakeholder** 85:7,9 86:13,21

**stakeholders** 85:17, 21,23 86:14

**stance** 27:5 29:10 85:1

**start** 5:23 14:9 87:7

**starts** 18:21 73:15 83:20

**statability** 13:3

**state** 5:6 8:24 9:20 11:23 58:4

**stated** 56:11 63:7 71:4 83:21

**statement** 58:14,23 83:16 84:2,5 85:5

**statements** 84:18

**states** 80:11

**status** 68:11

**step** 19:2

**steps** 45:8

**stipulate** 19:8

**stop** 20:12 21:21 22:8, 15 23:3 40:5 51:8 59:14,17

**stream** 64:23

**Street** 76:6 79:24 80:15

**strike** 64:18

**study** 75:5

**stuff** 7:18

**sub-elements** 75:4

**submit** 49:4 81:15,19

**submitted** 45:12,21 47:11 48:1,10 53:9

**sue** 75:12

**sued** 86:24

**summaries** 8:10

**summarizes** 55:11

**summarizing** 55:22

**summary** 42:15 43:20 45:9 83:1

**summation** 58:1

**support** 67:20 85:6

**supporting** 14:20 16:6

**suppose** 78:13 80:23

**surprised** 46:15

**surrounding** 8:8 76:15 78:14,23 79:1, 21

**suspend** 33:16

**suspending** 30:6 33:24 37:3,10,20

**swore** 6:21

**sworn** 5:2

**system** 26:5

---

**T**

**Taft** 5:5,10 17:6 18:7 19:15 20:10 21:9,15, 20 22:3,7,15,19 23:3, 14,17 24:13 27:12,18 30:19 32:9 37:16,17 40:4,11 41:1 43:14 51:8 54:17 57:4 58:17 59:11,14,17 60:2,4,7, 16 61:1,19,21 64:6 65:4 73:17 74:6,10 80:3,7,9 82:4,7 86:6 87:22 88:4,8,22

**taking** 60:9

**talk** 5:20 12:13 28:14 38:11,22 42:21,24 43:3 44:8,13 47:24 48:9,15,17 50:4,22 66:19 67:2 87:11

**talked** 44:10,19 50:7 51:12 71:5

**talking** 7:24 23:12 25:2 43:8 48:11 50:12 85:10,22

**Taylor** 15:23

**telling** 40:5

**temporary** 74:22

**tend** 56:14,15

**tenets** 12:20 13:11

**term** 12:15 14:13 41:21 77:4

**testifying** 59:23

**testimony** 60:15 89:7

**theory** 17:20

**things** 7:17,22 10:13 12:14,24 13:4 24:20 28:15 39:5 45:23 48:24

**third-to-last** 34:21

**thought** 58:3 84:17

**thoughts** 33:23 34:2, 5,16,18 68:5,9,11 83:10,16 84:19,20

**time** 6:7 11:22 12:2,21 15:2,7 17:9 20:24 24:14 26:12 30:10 31:6,14,18 32:3 34:24 35:7 37:6,11 38:13 44:6,7,9,18 46:17 48:13 50:2,23 52:1,4, 5,9,10 53:6,24 62:24 63:8 66:2 72:16 80:18, 24 83:5 84:8 88:13

**times** 43:22 54:3

**title** 9:12 15:21

**today** 6:19 7:3 30:1 51:18 88:23

**told** 48:2,5

**Toledo** 11:3

**Tom** 65:15,21 74:19

**tonight** 59:1

**top** 28:11 29:14 87:9

**topic** 51:7 54:13

**topics** 13:1 29:6 38:16 50:8

**touched** 11:9

**trade** 10:13

**transcript** 51:18

**transcripts** 38:12

**transparency** 34:6, 17

**trial** 6:24

**truth** 6:22

**Tucker** 76:1

**turn** 15:13 16:12 18:16 26:6 36:3 61:22 63:12

69:19 73:6 78:11

**turning** 45:11

**type** 39:4

**types** 78:19

## U

**Uh-huh** 6:1

**ultimately** 73:23

**UMCH** 13:6,8 16:16,22
24:5 30:7 32:20 36:23
50:9 62:8 75:11

**unaware** 87:15

**understand** 5:16,18,
24 6:22 13:9 25:5
46:14 81:23

**understanding** 15:22
20:6

**unit** 17:22 19:1

**University** 9:1

**utilize** 20:15

## V

**Vague** 20:20

**Vaguely** 31:1

**version** 17:14 73:22

**versions** 7:16

**vetting** 20:14

**view** 69:11,14

**views** 18:7

**virtually** 8:18 51:14

**voice** 45:14 53:6,11

**vote** 57:10,22 63:2,4
72:7 78:10

**voted** 57:16,20 58:2,
10

**votes** 57:14

## W

**Wait** 37:14

**waiting** 51:2

**wanted** 12:4 35:13,22
44:14 48:24 49:2 58:3

**wanting** 35:11

**WARD** 14:9 51:23
52:4

**watch** 51:17 64:14

**ways** 28:21 52:23

**week** 7:8

**weeks** 75:13

**west** 15:11

**whatever's** 56:13

**wishes** 65:10

**withdraw** 28:7 87:3

**withdrawing** 28:12

**word** 29:15 79:6

**work** 5:14 6:5,10 9:18,
20 10:5,8,14 11:6,12
25:15

**worked** 10:2 11:16

**working** 13:14 25:16
75:2,6

**Worthington** 11:12
14:2,3,4,23 15:5,14
16:2 29:16,22 30:1
43:3 52:8 53:17

**Worthington's** 14:1

## Y

**year** 12:17 16:7 32:4
62:16

**years** 10:3 12:1 13:21
21:4 22:24 23:19
72:13 78:8

## Z

**zoned** 76:7 80:16

**zones** 81:13

**zoning** 10:19 19:22
20:7,11,15 24:17
48:13 59:20 75:23
81:12