*LIFESTYLE COMMUNITIES*

*vs.*

*CITY OF WORTHINGTON*

---

Deposition of

**Raymond Lee Brown**

October 27, 2023

---



614.460.5000 | www.priohio.com | pri@priohio.com

1          IN THE UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF OHIO
2                EASTERN DIVISION

3   LIFESTYLE COMMUNITIES,        )
    LTD., ET AL.,                 )
4                                 )
         Plaintiffs,              )
5                                 )
         vs.                      )   Case No.
6                                 )   2:22-cv-1775
    CITY OF WORTHINGTON,          )
7   OHIO,                         )
                                  )
8        Defendant.               )

9

10

11                      DEPOSITION

12            of RAYMOND LEE BROWN

13

14        Taken at Worthington City Hall
               6550 North High Street
15            Worthington, Ohio 43085

16

17        on October 27, 2023, at 9:00 a.m.

18

19        Reported by: Julia Lamb, RPR, CRR

20

21                      -=0=-

22

23

24

1    APPEARANCES:

2        Christopher L. Ingram
         VORYS SATER SEYMOUR AND PEASE LLP
3        52 East Gay Street
         Columbus, Ohio 43215
4        614.464.5480
         clingram@vorys.com
5
                on behalf of the Plaintiffs.
6

7        Paul J. Schumacher
         DICKIE McCAMEY
8        600 Superior Avenue East, Suite 2330
         Cleveland, Ohio 44114
9        216.390.1795
         pschumacher@dmclaw.com
10
                on behalf of the Defendant.
11

12

13

14

15

16

17

18                      -=0=-

19

20

21

22

23

24

1                    STIPULATIONS

2              It is stipulated by and between

3    counsel for the respective parties that the

4    deposition of RAYMOND LEE BROWN, the Witness

5    herein, called by the Plaintiffs under the

6    applicable Rules of Federal Civil Court

7    Procedure, may be taken at this time by the

8    stenographic court reporter and notary public by

9    agreement of counsel; that said deposition may

10   be reduced to writing stenographically by the

11   court reporter, whose notes thereafter may be

12   transcribed outside the presence of the witness;

13   and that the proof of the official character and

14   qualification of the notary is waived.

15                    -=0=-

16

17

18

19

20

21

22

23

24

1                INDEX OF EXAMINATION

2                                       PAGE

3   BY MR. INGRAM:                        7

4

5

6                 INDEX OF EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Land Use Plan | 66 |
| 7 | Resolution No. 04-2022 | 254 |
| 11 | Email, 1-18-22, with attached document | 249 |
| 21 | UMCH Focus Area Checklist | 69 |
| 24 | Email, 1-18-18 | 113 |
| 31 | Summary of Phases for Development of the UMCH Property, 11-27-18 | 115 |
| 38 | Staff Memorandum, 11-8-21 | 236 |
| 45 | Email, 10-5-20 | 123 |
| 52 | Two-page email chain, 1-20-22 | 251 |
| 54 | Email chain, 4-15-15 | 96 |
| 55 | Minutes of the Special Meeting Worthington Architectural Review Board, Worthington Municipal Planning Commission, 6-29-15 | 87 |
| 56 | Email chain | 92 |
| 57 | Email chain, 3-27-20 | 118 |

7   EXHIBIT

8    1

9    7

10    11

11

12    21

13    24

14    31

15

16    38

17    45

18    52

19    54

20    55

21

22    56

23    57

24

| 1 | 59 | Minutes of the Regular Meeting Worthington Architectural Review Board, Worthington Municipal Planning Commission, 1-14-21 | 142 |
| 2 | | | |
| 3 | | | |
| 4 | 60 | Email, 3-31-21 | 207 |
| 5 | 61 | Three-page email chain, 10-14-21 | 222 |
| 6 | | | |
| | 62 | Three-page email chain, 10-14-21 | 223 |
| 7 | | | |
| 8 | 64 | Email, 8-30-13, with attached release titled City of Worthington Launching Visioning UMCH Process | 41 |
| 9 | | | |
| 10 | | | |
| | 65 | Email, 2-19-14, with attachments | 46 |
| 11 | | | |
| 12 | 66 | Email, 9-27-13, with attached memo, 9-27-13 | 50 |
| 13 | | | |
| | 67 | Two-page email chain | 62 |
| 14 | | | |
| | 68 | Two-page email chain, 6-11-15, with attached UMCH Focus Area Checklist | 80 |
| 15 | | | |
| 16 | | | |
| | 69 | Email, 8-6-15 | 101 |
| 17 | | | |
| | 70 | Three-page email chain | 104 |
| 18 | | | |
| | 71 | Email, 6-13-17, with attachments | 109 |
| 19 | | | |
| 20 | 72 | Two-page email chain, 7-25-17 | 110 |
| 21 | 73 | Two-page email chain, 6-18-19 | 116 |
| 22 | 74 | Three-page email chain | 126 |
| 23 | 75 | One-page email chain, 12-14-20 | 130 |
| 24 | | | |

| 1 | 76 | Email, 1-14-21, with attached | 133 |
| 2 | | Lifestyle Communities Development Application for | |
| 3 | | the UMCH Site, Questions from City Councilmembers | |
| 4 | 77 | Email, 1-14-21, with attached | 140 |
| 5 | | Planning Commission Presentation, 1-14-21 | |
| 6 | 78 | Email, 1-27-21 | 196 |
| 7 | 79 | Three-page email chain | 199 |
| 8 | 80 | Email, 2-23-21 | 203 |
| 9 | 81 | Two-page email chain, 3-29-21 | 205 |
| 10 | 82 | Two-page email chain, | 218 |
| 11 | | 9-14-21, with attached Proposed Master Plan and Improvements for the UMCH | |
| 12 | | Site Worthington | |
| 13 | 83 | Portion of the Minutes of the | 225 |
| 14 | | Regular Meeting Worthington Architectural Review Board, | |
| 15 | | Worthington Municipal Planning Commission, 10-14-21 | |
| 16 | 84 | Six-page email chain | 255 |

17

18

19

20

21

22

23

24

1                    RAYMOND LEE BROWN

2    being first duly sworn, as hereinafter certified,

3    deposes and says as follows:

4                    CROSS-EXAMINATION

5    BY MR. INGRAM:

6        Q.  Please state your name for the record.

7        A.  Raymond Lee Brown.

8        Q.  Good morning, Mr. Brown.  My name is

9    Chris Ingram.  I know we just met.  I'm an

10   attorney for Lifestyle Communities.  And for

11   ease of reference today as your deposition

12   proceeds, I'll refer to my client as LC or

13   Lifestyles.  And when I do that and if you want

14   to refer to them -- I don't know.  How do you

15   refer to Lifestyles?

16       A.  Either LC or Lifestyle.

17       Q.  Okay.  When we refer to either LC or

18   Lifestyles, we'll both understand that we're

19   referring to Lifestyle Communities.  Is that

20   okay with you?

21       A.  Yes.

22       Q.  All right.  Mr. Brown, have you ever

23   been deposed before?

24       A.  Once or twice.

1    Q.  Okay.  Why do you say once or twice?

2    A.  Because I've been doing this for 27

3  years.  I know it occurred when I was at

4  Franklin County, working for Franklin County,

5  but honestly can't remember anything about the

6  case.

7    Q.  Okay.  And so do you recall about when,

8  then, the deposition you're referring to would

9  have occurred?

10    A.  Maybe 2011, 2010, 2012, somewhere in

11  that...

12    Q.  Okay.  And you said you can't recall

13  anything about the case.  Was it a land use or

14  zoning matter?

15    A.  Sadly -- it was something to do with

16  process.  That's honestly all I can remember

17  about it.

18    Q.  Okay.  And was it in connection with

19  your employment with Franklin County?

20    A.  Yes.

21    Q.  Was the process concerning Franklin

22  County's process?

23    A.  Correct.

24    Q.  All right.  And were you a party to the

1   case or it was just...

2       A.  I was just a witness.

3       Q.  And you said once or twice.  Would the

4   other potential deposition have concerned the

5   same matter, the same case or was there

6   something different?

7       A.  I believe it was the same case, but it

8   all starts to blur.

9       Q.  Okay.  Fair enough.  Well, it sounds

10  like it's been quite some time since your last

11  deposition so why don't we walk through the

12  ground rules for your deposition today.  Okay?

13          First of all, if you don't understand a

14  question that I ask you, please let me know, and

15  you know, we'll -- I'll restate or try to

16  clarify the question for you.  Okay?  And if you

17  don't ask me to repeat or rephrase a question

18  that I've asked you, then we are all going to

19  assume here today that you understood my

20  question.  You understand that?

21      A.  Yes.

22      Q.  And it's important that you and I do not

23  talk over each other, and so I'll do my best to

24  wait until you've finished answering one of my

 questions. And likewise, I would ask that you refrain from starting your answer until I've completed my question. Okay? And the purpose of that is we're joined here with a court reporter who's transcribing everything that we're saying so that we can have a complete and accurate transcript of your deposition. Okay?

A. Yes.

Q. And you're doing a good job so far answering yes. You are nodding your head a little bit here. Just do keep in mind that our court reporter today cannot transcribe head nods or uh-huhs --

A. Yes.

Q. -- or huh-uhs. Yeses or nos and verbal responses will be helpful to our court reporter.

If you need to take a break at any time, let me know. You know, I'll need you to finish answering any pending question, and then just kind of depending on where we're at in the line of questioning, you know, we'll see when we can take a break, what would make the most sense. Okay?

A. Sounds good.

1      Q.  Now, it's important that we get your

2  full, complete and accurate answers today.  And

3  so I need to ask you have you taken any

4  medication or drugs or anything that would make

5  it difficult for you to understand and answer my

6  questions today?

7      A.  No.

8      Q.  Is there any reason at all why you

9  cannot give your full, complete and accurate

10  testimony today?

11      A.  No.

12      Q.  Earlier you swore an oath to tell the

13  truth in your deposition today.  Do you

14  understand that that is the same oath you would

15  be asked to testify in court during a trial?

16      A.  Yes.

17      Q.  Okay.  Mr. Brown, is Mr. Schumacher your

18  lawyer representing you here today?

19      A.  Yes.

20      Q.  What did you do to prepare for your

21  deposition?

22      A.  We sat down to go over the likelihood

23  of, you know, this is what to expect during the

24  questioning.

1    Q.  Okay.  And so who did you speak with

2  other than Mr. Schumacher to prepare for your

3  deposition?

4    A.  Rick -- I can't remember --

5    Q.  Mr. Silk?

6       MR. SCHUMACHER:  He only spoke with us.

7    A.  Yeah.

8    Q.  Did you speak with anyone other than

9  Mr. Schumacher or Mr. Silk?

10    A.  No.

11    Q.  So you didn't talk to any other

12  Worthington employees or former employees or

13  officials, anyone like that?

14    A.  No.

15    Q.  Did you review any documents to prepare

16  for your deposition?

17    A.  Yes.

18    Q.  What documents did you review?

19    A.  The staff memos that went to planning

20  commission, (indiscernible) board, city council.

21       COURT REPORTER:  What was the board you

22  said?

23    Q.  You said architectural review board?

24    A.  Yeah, architectural review board, city

1  council, and then the comprehensive plan

2  language, and watched the video.

3      Q.  Which videos did you watch?

4      A.  The city council hearing.

5      Q.  Okay.  And when -- are you referring to

6  the December 2021 city council hearing on

7  Lifestyle's application?

8      A.  Yes.

9      Q.  Did you watch the January or

10  February 2022 city council hearings?

11      A.  I was there live, but I didn't watch

12  video.

13      Q.  Okay.  Sure.

14      A.  No.  Sorry.

15      Q.  We'll get to that.

16          Did you watch any of the videos from the

17  planning commission's review of Lifestyle's

18  application in both of their hearings?

19      A.  Yes.

20      Q.  Did you watch any other videos of any --

21  in preparation for your deposition today?

22      A.  No.

23      Q.  Did you read any of the court filings to

24  prepare for your deposition today?

1    A.  No.

2    Q.  Did you review any transcripts from any

3  of the prior depositions?

4    A.  Meaning?

5      MR. SCHUMACHER:  No, you didn't.

6    Q.  In this case.  Okay.

7      MR. SCHUMACHER:  I haven't even had a

8  chance to review those.

9    Q.  And other than the staff memos and the

10  comprehensive plan language did you review any

11  other documents to prepare for your deposition

12  today?

13    A.  No.

14    Q.  Okay.  Mr. Brown, you're currently the

15  city's director of planning and buildings.  Is

16  that correct?

17    A.  Yes.

18    Q.  And you started with the city in that

19  role in August of 2013?

20    A.  Correct.

21    Q.  So about 10 years now?

22    A.  Yes.

23    Q.  Where did -- you mentioned Franklin

24  County so where did you work prior to taking

1    your current position with Worthington?

2        A.  I worked for Franklin County for 10

3    years.

4        Q.  Okay.  And that -- and so -- so that

5    would have been from approximately 2003 to 2013?

6        A.  Correct.

7        Q.  And what was your role at Franklin

8    County during that 10-year period?

9        A.  Planning administrator.

10        Q.  Anything else?  Did you hold the same

11    role?

12        A.  No.  The whole time.  Also planner.

13        Q.  Any other roles?

14        A.  Not during that 10-year span.

15        Q.  Okay.  How about prior to 2003?

16        A.  Licking County Planning Commission for

17    five years.

18        Q.  So back to 1998?

19        A.  Correct.

20        Q.  And what was your role with the Licking

21    County Planning Commission?

22        A.  Planner.

23        Q.  Any other roles with the Licking County

24    Planning Commission?

 1      A.  No.

 2      Q.  And prior to 1998 did you have any other

 3   roles?

 4      A.  Back to Franklin County for two years.

 5      Q.  And what was your title then?

 6      A.  Graduate intern or maybe called graduate

 7   planning intern now.  I'm not sure what they

 8   call it.

 9      Q.  All right.  And I saw you received your

10   bachelor's degree in geography and urban

11   development from the University of Kentucky.  Is

12   that correct?

13      A.  Yes.

14      Q.  And then you received your master's of

15   city and regional planning from Ohio State?

16      A.  Correct.

17      Q.  When did you obtain your bachelor's

18   degree?

19      A.  1995.

20      Q.  How about your master's degree?

21      A.  1998.

22      Q.  So were you in school while you were an

23   intern at Franklin County?

24      A.  Yes.

1      Q.  Do you have any other college degrees,

2  Mr. Brown?

3      A.  No.

4      Q.  Do you have any professional

5  certifications?

6      A.  Yes.

7      Q.  And can you tell us what those are.

8      A.  It's an AICP, American Institute of

9  Certified Planners, certification.

10     Q.  When did you obtain that certification?

11     A.  2011 or 2012.

12     Q.  So while you were at Franklin County as

13  the planning administrator, I take it?

14     A.  Yes.

15     Q.  Any other professional certifications,

16  Mr. Brown?

17     A.  No.

18     Q.  And is your AICP current?

19     A.  Yes.

20     Q.  With respect to your position as a

21  planner for Licking County's planning

22  commission, during that five-year span, you

23  know, what were the highlights when you look

24  back to that time period from your role as the

1  planner?

2      A.  Highlights meaning day to day?

3      Q.  Yeah.  Some of the big projects that you

4  worked on.

5      A.  We primarily did subdivision review for

6  all the townships and helped write their

7  comprehensive plans.

8      Q.  Okay.  Anything else?

9      A.  Day to day answered zoning questions,

10  process questions, just cold calls, things like

11  that.

12      Q.  Okay.  Sure.  When you said you helped

13  write comprehensive plans for the townships, can

14  you elaborate or explain your role in assisting

15  the townships with their comprehensive plans?

16      A.   In the day to day part of it or...

17      Q.  Just generally as your role as the

18  planner with Licking County.  I take it you

19  would have participated or been involved in --

20      A.  Correct.

21      Q.   -- helping the townships write their

22  comprehensive plans.  Can you kind of give me

23  insight into what you were doing or what you

24  were responsible for?

1          MR. SCHUMACHER:  Objection.  Compound.

2   Which question do you want him to answer?

3          Q.  You can answer.

4          MR. SCHUMACHER:  You made a statement

5   and then you made a question.

6          A.  I'm not sure which part I'm to answer

7   now.

8          Q.  Okay.  Fair enough.  What was your role

9   or involvement in helping these townships write

10  their comprehensive plans?

11         A.  It was myself, typically the director or

12  assistant director, and another planner would

13  work with the townships.  The townships usually

14  had initiated that they wanted a steering

15  committee.  So we kind of walked through an

16  outline of here's what a comprehensive plan can

17  do for the townships that had zoning.  Many of

18  the townships in Licking County did not even

19  have zoning.  So we would walk them through a

20  process to get a land use plan and what the land

21  use plan would be for them, that it was a

22  guiding document for them as development would

23  occur.

24         Q.  What do you mean as a guiding document

1    as development would occur?

2        A.  Licking County, being one county removed

3    from Columbus, was experiencing a lot of growth.

4    So as growth would occur, they were wanting to

5    know how to direct growth, whether it be from

6    commercial development, industrial development,

7    a lot of agriculture, residential development,

8    where that type of use should take place.

9            So we would, you know, draft the

10   document for them, but also have the steering

11   committee meetings, public meetings that the

12   comprehensive plan was the guiding document, not

13   law, explaining the difference between what

14   zoning is and the comprehensive plan.

15       Q.  So Licking County's a very rural area,

16   particularly back in 1998 to 2003, fair?

17       A.  Correct.

18       Q.  And so I take it these townships were

19   planning for development of that rural area?

20       A.  Correct.

21       Q.  And so when you say it's a guiding

22   document for the development and you mention

23   where the uses could occur, the comprehensive

24   plan then guides the townships into what the

1   potential or reasonable uses could be on, you

2   know, that redeveloped area.  Is that fair?

3       MR. SCHUMACHER:  Objection.

4   A.  Can you repeat it one more time?

5   Q.  Sure.

6       MR. INGRAM:  Do you want to read that

7   back?

8       MR. SCHUMACHER:  Oh, that was a bad

9   question.  You really want -- go ahead.  We're

10  still in Licking County, right?

11      MR. INGRAM:  Yes.

12  A.  I'm not sure who to look to.

13  Q.  So for your deposition I'll be asking

14  you the questions.  And if you don't understand

15  a question, just let me know.

16      MR. SCHUMACHER:  That's what he just

17  did.

18  A.  That why I was asking, but I wasn't

19  sure -- that's fine.

20  Q.  You were looking at your counsel, you're

21  looking at me.  Just if you don't understand a

22  question, just tell me that and I will --

23  A.  Well, that's why I wanted you to repeat

24  it, but I wasn't sure if she's repeating it or

1  you're repeating it.  So that's where I was --

2  sorry.

3       Q.  It's okay.  It's okay.  I just want to

4  make sure you understand my questions.

5       A.  I didn't.  That's where I was trying to

6  go.

7       Q.  All right.  Well, how about this.  Let's

8  start over.  Tabula rasa.

9          So with respect to these comprehensive

10 plans that you assisted the townships in Licking

11 County with, you've called it a guiding document

12 that guides where development could occur,

13 right?

14      A.  Yes.

15      Q.  Okay.  And at that time your

16 assistant -- these townships were basically

17 majority of which were farmland.  Is that

18 accurate?

19      A.  Not all but most were.

20      Q.  Right.  And these townships knew or

21 appreciated that a lot of that farmland would be

22 redeveloped into new uses --

23          MR. SCHUMACHER:  Objection.  Relevance.

24      Q.  -- and agricultural.  Is that fair?

1        MR. SCHUMACHER:  Objection.  Relevance.

2        You can answer.

3    A.  Correct.

4    Q.  So would this comprehensive plan then

5  provide the townships with guidance as to what

6  uses would be reasonable to redevelop that

7  farmland to.  Is that fair?

8        MR. SCHUMACHER:  Same objection.

9  Relevance.

10   A.  Correct.

11   Q.  Then when you moved on to -- I take it

12 you moved to Franklin County to be Franklin

13 County's planner?

14   A.  Yes.

15   Q.  And that would have been in 2003.  When

16 did you become the planning administrator?

17   A.  Maybe 2007.

18   Q.  And what is the difference in the roles

19 between a planner and the planning

20 administrator?

21   A.  The planning administrator was

22 responsible for the five other planners in the

23 office, the graduate interns, a secretary, two

24 code enforcement officers, and a GIS manager to

1    review their day-to-day opportunities and what

2    they were working on and guide them, which that

3    was more of that role.

4        Q.  So were you basically the boss?

5        A.  Yes.

6        Q.  Okay.  And just high level in your 10

7    years then from 2003 to 2013 at Franklin County

8    what were kind of -- similar question as to

9    Licking County.  What were kind of the

10   highlights or high level things that you were

11   working on during that period?

12           MR. SCHUMACHER:  Objection.  Relevance.

13       A.  So the day-to-day high level we worked

14   on land use plans for the townships, and we

15   worked on the Big Darby Accord master plan which

16   is a multi-jurisdictional planning effort for

17   the west side of Franklin County, zonings, and

18   then subdivisions.

19       Q.  So the land use plans for the townships,

20   would that work have been similar to what you

21   did in Licking County for Licking County's

22   townships?

23       A.  I would say the land use plans for

24   Franklin, there's very urban townships that have

1  a completely different feel than the rural

2  townships.  So it was a mix of built out

3  density, you know, townships to ones that were

4  complete farmland to the Darby one that I

5  mentioned.

6      Q.  And so with respect to the townships in

7  Franklin County, I take it they likely just were

8  facing different issues.  Is that fair?

9      A.  Similar issues.  A lot of it was very

10  similar as development growth.

11      Q.  You've used the terms comprehensive

12  plans and land use plans.  Are they different or

13  the same?

14      A.  In my mind the same.  I just interchange

15  them.  I apologize.

16      Q.  No, no, that's fine.  I refer to them as

17  land use plans, too, but I want to make sure you

18  and I had the same understanding.

19          And you said you worked on zonings

20  during that time frame.  Would that -- when you

21  say zonings, does that include applications to

22  rezone property?

23      A.  Correct.

24      Q.  Mr. Brown, in your experience have you

1  ever worked on behalf of a private developer in

2  connection with designing or seeking approval of

3  a private development before?

4      A.  No.

5      Q.  Mr. Brown, you were the first director

6  of planning and building in the city of

7  Worthington, correct?

8      A.  Correct.

9      Q.  They created that position when you

10  started?

11      A.  It was created a few months before I

12  started, but I was the first one.

13      Q.  Sure.  And what does your role as the

14  director of planning and building entail?

15      A.  Day to day it's the supervising of

16  staff.  There's only six of us, but it's a mix

17  of a planner, also building review, code

18  enforcement, property maintenance.

19      Q.  What six staff members generally report

20  to you in let's -- during the time frame of 2020

21  to '22?

22      A.  You mean their titles?  Their names?

23      Q.  Whatever's easiest for you to recall.

24      A.  We have the chief building official Don

1    Phillips.  He reviews all building plans and

2    permits that come into the office for

3    compliance.  We have a part-time code

4    enforcement officer Chris Kepler who's 15 to 20

5    hours a week.  And then we have Jerry Graves who

6    is our actual field inspector, the one out in

7    the field for building permits or as buildings

8    are being constructed.  And then we have Melissa

9    Cohen who is the building clerk, and then Lynda

10   Bitar who is our planner, and then the final one

11   who doesn't work for us anymore is Kenny Ganter

12   who was a planning assistant.

13       Q.  What is the planner's role in the city

14   of Worthington during the time frame that you've

15   been here?

16       A.  It's the day-to-day questions, it's

17   processing applications that need to go before

18   the architectural review board, board of zoning

19   appeals or municipal planning commission.

20       Q.  And what is your role as the director of

21   planning and building, then, with respect to,

22   you know, land use or zoning applications?

23       A.  Since we are a small department, it's

24   one of those all hands on deck.  So in addition

1    to being the supervisor, it's also helping write

2    memos, process applications, again, that go to

3    the different boards and commissions and on to

4    council.

5         Q.  So when you say write memos, would that

6    include like the staff reports?

7         A.  Yes.

8         Q.  So are you the individual responsible

9    for writing the staff reports to the planning

10   commission, the architectural review board and

11   city council?

12        A.  Yes and no.

13        Q.  Okay.

14        A.  It's -- again, since we are a small

15   staff, depending on what applications come in

16   and the shear volume, I will take on

17   applications and help write the memo in addition

18   to the planner, Lynda Bitar, writing the memo.

19        Q.  So for the high priority or the larger

20   projects do you take those memos?

21        A.  High priority?

22        Q.  The high priority projects or

23   applications.

24        A.  Hit or -- yes and no.  If it is an

1  application that goes on to city council, since

2  I'm the one that will be presenting to city

3  council, I will usually be the one to try to

4  take it from start to finish so we know what's

5  going on.

6     Q.  Gotcha.  When you say process the

7  applications, what do you mean by process?  What

8  does that entail?

9     A.  When -- depending on what type of

10  application we get, we take it and make sure

11  that the application is complete and compliant

12  so that it can go on to boards and commissions.

13  But once we get the applications, I will set up

14  what we call technical review committee meeting

15  and send the applications to the various

16  departments, whether it be service engineering,

17  parks and recreation, fire and EMS, police, to

18  solicit comments back on the application.  And

19  then if there are any policy documents that

20  apply to what is being proposed, look towards

21  those policy documents for guidance in writing

22  the memo.  And typically with most applications

23  there's some deficiencies.  And walk them --

24  walk the applicant through the process to get to

1  planning commission, or architectural review

2  board, or board of zoning appeals, or if it

3  needs to go to council, on up to council.

4      Q.  So generally speaking, I take it, if

5  you're processing the application and reviewing

6  those policy documents, you mention -- would you

7  be the one, then, to walk the applicants through

8  your review or analysis?

9      A.  Typically we refer the applicant to be

10  looking at the policy documents ahead of time.

11  It's usually brought up during the memo as it

12  goes through the process.

13      Q.  So is there a fair amount of back and

14  forth between applicants and either the planner

15  or you, whomever is processing that application

16  during a rezoning application?

17      A.  It would depend on the applicant and

18  their skill set and what's being proposed.  So

19  it could entail a lot of back and forth or

20  just -- some are just a couple phone calls.

21      Q.  Okay.  And what I'm -- what prompted my

22  question is in one of your prior responses you

23  mentioned that most applications have some kind

24  of deficiencies that have to be cured or maybe

1    it's incomplete.  So I take it this is fairly

2    routine for there to be back and forth between

3    someone from your department and the

4    applicant's.  Is that fair?

5            MR. SCHUMACHER:  Objection.  Asked and

6    answered.

7        A.  Not necessarily.  It would depend on

8    when they make application.  Our application

9    schedules are -- for example, we had planning

10   commission last night.  Today's the deadline.

11   Monday we'll sit down to go through all the

12   applications, and we have to have something out

13   the door by Thursday or Friday morning.

14           So there's sometimes back and forth, but

15   a lot of times it is you're trying to write the

16   memo, go through the applications, list the

17   deficiencies, but then when it goes to planning

18   commission they can hopefully address with the

19   board or commission, whichever one they're going

20   to, and then correct those.

21       Q.  I see.  So after your memo is produced

22   and the applicant sees it and it's provided to

23   the board, then there's an opportunity for the

24   applicant then to work with the planning

1    commission, in your example, to address those

2    issues that your memo identifies.  Is that fair?

3        A.  Not necessarily with planning commission

4    directly.  It's usually staff having the

5    conversations of what's outlined in the memo

6    that needs to be addressed.

7        Q.  I gotcha.  So there's more of a back and

8    forth between staff and the applicant, and then

9    that's brought to the planning commission

10   members once those issues are addressed.  Is

11   that what you're saying?

12       A.  Sometimes we don't -- we're not able to

13   design it or do their plan for them.  We just

14   have to try to give some guidance and listen to

15   the feedback and what's recommended in the

16   policy documents to kind of direct them to that

17   since we're -- sometimes you want to design, but

18   you can't design it for them so they need to do

19   it.

20       Q.  Sure.  But -- so you're telling them

21   what the standards are so that they can either

22   modify their designs to address those standards

23   or not.  It's really up to the applicant.  Is

24   that...

1      A.  It's up to the applicant to be the one

2   looking back to the policy documents, the code,

3   the actual planning and zoning code, and hearing

4   the comments that they've heard from the board

5   or commission members and/or those that attended

6   the meeting.  It was an item that was tabled,

7   and then would go back for future review.

8      Q.  Okay.  Do items get tabled for future

9   review when there are issues for the applicant

10   to address?

11          MR. SCHUMACHER:  I'm sorry, I didn't

12   hear the first part.  Do what?  I didn't hear

13   the first part of your question, Chris.

14      Q.  Do applications get tabled.

15      A.  If they're deficient?

16      Q.  So, for example, if the staff memo has

17   identified some issues in staff's opinion, does

18   planning commission then table the applications

19   so that the applicant can then either work with

20   staff and having these conversations to address

21   those issues before the planning commission were

22   to, you know, vote on the matter?

23      A.  They have the option to table or approve

24   or approve with conditions or deny.  They maybe

1  half the time will, you know, table an

2  application to give them the opportunity to come

3  back and try to address all the outstanding

4  issues or clarifications that have been brought

5  up during the meeting either by board and

6  commission members, staff or public comment.

7      Q.  Gotcha.  So with respect to applications

8  for site plan approval -- and I'm talking more

9  about, you know, planned use developments for

10  mixed uses.  Do you understand what I'm

11  referring to?

12      A.  Yes.

13      Q.  Okay.  With respect to applications for

14  site plan approval for PUDs, what has your role

15  been in that process here in Worthington?

16      A.  Facilitator.

17      Q.  What do you mean by facilitator?

18      A.  I think when you look at a planner,

19  they're bringing those different departments and

20  those different groups together to review an

21  application for compliance with either what's

22  outlined in the PUD ordinance for zoning and/or

23  what's being proposed in reference also to

24  policy documents.  So I look at my role to bring

1  those different people together to have the

2  conversation whether it be any consultants we

3  have for stormwater, traffic or the different

4  departments I've mentioned to, you know, provide

5  comments on whatever application is going before

6  planning commission that will ultimately go to

7  city council if it's a PUD rezoning.

8      Q.  And then are you also facilitating with

9  the applicants themselves?

10     A.  Usually what we will do is have the

11  applicant come in and present their proposal to

12  us, because it's sometimes difficult to

13  understand if something's dropped what it

14  actually even means.

15     Q.  And when you say come in to meet with

16  us, are you talking about meeting with city

17  staff?  Like what kind of meeting are you

18  referring to?

19     A.  It would be city staff, those different

20  departments I mentioned, and/or the consultants

21  coming in to sit down, hear what the proposal

22  is, kind of have them go through everything

23  that's been submitted, and then if it needs

24  stormwater comment or service in general comment

1  or fire and EMS concerns, that you kind of know

2  what's going on so that staff is writing the

3  memo, you can connect with those different

4  departments so they can give you their feedback

5  from what they heard or have reviewed as part of

6  the proposal.

7      Q.  So I take it site plan consideration for

8  a PUD or, you know, these mixed uses are more

9  complicated or more complex than the standard

10  zoning application.  Is that fair?

11     A.  Not always.

12     Q.  What do you mean by that?

13     A.  It depends on the -- where the project

14  is in a process.  If it's going through straight

15  rezoning or if it's -- what we have is something

16  called a development plan that if you're a

17  property over 2 acres in size, it has a

18  development plan associated with it, then you

19  also have a layer of architectural review board

20  on it.  It kind of acts as a mini PUD itself.

21  So it just depends on the complexity of what's

22  being proposed that sometimes those are more

23  complex than some of the PUDs we've had.

24     Q.  I gotcha.  So if it's a development

1  plan -- if the site is over 2 acres, and you

2  have a development plan requirement, and then

3  you're pulling in architectural review board

4  standards, you've got other various city

5  departments and maybe even consultants involved,

6  those are the types of site plan approvals or

7  development plan approvals that would be more

8  complicated or complex?

9    A.  Correct.

10    Q.  And for those specific complex site plan

11  applications I take it there's a fair amount of

12  back and forth that has to go on between all the

13  various stakeholders and the applicant?

14    A.  Project dependent.  We have some that

15  are very knowledgeable in the process and some

16  that you have to hand hold trying to help

17  through the process.

18    Q.  Okay.  And when you refer -- when you're

19  making that distinction, can you tell me what

20  you mean by -- what's the difference between

21  those -- who are you referring to, first of all,

22  and then my follow-up question's going to be how

23  are you making that distinction?

24        MR. SCHUMACHER:  Objection.  Compound.

1     A.  Which question first?  Can you repeat?

2     Q.  The first one.

3        When you said, you know, some have to be

4  handheld and some don't, who is the some that

5  you're referring to?

6     A.  I would say it's someone that is not

7  used to doing the development process.  We have

8  some individual property owners that try to come

9  in and do it themselves where what we typically

10  see with any type of bigger project, we see an

11  attorney, we see an actual engineer, a landscape

12  architect designer of some sort, but sometimes

13  we have an individual property owner that's

14  trying to do it themselves that does not have

15  the skill set.  So we try to refer them back to

16  our planning and zoning code to follow that

17  procedure, and then we refer them to the guiding

18  policy documents that they need to be looking at

19  to see how their proposal could do it again.

20  We're not able to design it for them, we just

21  direct them towards the tools that are there to

22  help.

23     Q.  Sure.  So using your example of, you

24  know, the inexperienced developer who has -- is

1  represented by counsel, has engineers, has the

2  professional consultants involved to help design

3  the development plan, I take it, though, still

4  in those complicated PUDs there's still going to

5  be a fair amount of back and forth between your

6  team, the city and that developer?

7      A.  Not always.

8      Q.  Okay.

9      A.  Since Worthington is more of a

10 landlocked community as we've seen

11 redevelopment, I think we have dealt with a lot

12 of locals that understand the process and/or

13 where to look for kind of guidance.  We have a

14 couple different policy documents that we review

15 as part of our daily life, and then our planning

16 and zoning code, they kind of understand that

17 process so it's really just dependent.

18      Q.  Okay.  And which policy documents were

19 you referring to there?

20     A.  We have our 2005 comprehensive plan, and

21 within that there was a 2014 update, and then a

22 2022 update.  We have parks master plan that's

23 either 2017 or 2019, and then we have a bicycle

24 and pedestrian plan that I've imposed one of the

1    dates of 2017 or 2019 on, that we look at those

2    documents as we're reviewing applications.

3         Q.  Any other policy documents?

4         A.  Off the top of my head, not that I can

5    think of.

6         Q.  So you were very quick to list the

7    comprehensive plan, the parks master plan, and

8    I'll call it the bicycle plan or the bicycle

9    path plan?

10        A.  Yeah.

11        Q.  Why is the comprehensive plan something

12   that you refer to?

13        A.  That's our guiding document that we look

14   to if we get -- if we get questions that are

15   outside of just your basic zoning, that's the

16   guiding document.  It's a guide for future

17   development.  It's not law, but it's a guide for

18   development.  So we look for that for reference

19   when we're doing a rezoning or another project

20   that would be going before boards and

21   commissions.

22        Q.  So that guides -- you said for future

23   development.  So would that -- would the

24   comprehensive plan then be used by your team to

1  guide which uses would be appropriate for a

2  particular property?

3       A.  Yes.

4       Q.  How about the parks master plan?

5       A.  With the parks master plan we would look

6  to the relevant section of what would be called

7  out, and usually in the parks master plan it

8  would talk about existing parks, connections to

9  parks.  With the bike/ped it blends into

10  sidewalk recommendations, bike path

11  recommendations, connectability through

12  developments.  We look to those documents to see

13  where there's continuity and what needs to be

14  referred to with the board, commission and/or

15  the applicant needs to be looking at.

16       Q.  Any other policy documents besides those

17  three?

18       A.  Probably missing one, but those are the

19  three that come to my head.

20       Q.  Those are the primary?

21       A.  Correct.

22                      -=0=-

23       (Deposition Exhibit 64 marked.)

24                      -=0=-

1    BY MR. INGRAM:

2        Q.  Mr. Brown, I'm going to hand you what's

3    been marked as Exhibit 64.  Take an opportunity

4    to review that document.

5            MR. SCHUMACHER:  Mind if we take a

6    break?

7            MR. INGRAM:  Sure.  We can take a break

8    while the witness reviews the document.

9                    (Recess taken.)

10   BY MR. INGRAM:

11       Q.  Mr. Brown, have you had the opportunity

12   to review what's been marked as Exhibit 64?

13       A.  Yes.

14       Q.  Okay.  Exhibit 64 is an email from Anne

15   Brown directed to you and others.  Is that

16   correct?

17       A.  Yes.

18       Q.  And so for purposes of the record

19   LBrown@ci.worthington.oh.us, that was your work

20   email address here at Worthington?

21       A.  At the time, yes.

22       Q.  And that's changed a few years ago?

23       A.  Correct.

24       Q.  And the subject of Ms. Brown's email is

1    final version of UMCH news release.  Do you see

2    that?

3        A.  Yes.

4        Q.  Okay.  Did you participate in drafting

5    or revising the attached news release, do you

6    recall?

7        A.  I do not.

8        Q.  Okay.  And this attached news release is

9    dated September 4, 2013.  It's titled City of

10   Worthington Launching Visioning UMCH Process.

11   Is that correct?

12       A.  Yes.

13       Q.  And according to this release it's

14   discussing the city's comprehensive plan in the

15   first paragraph.  Do you see that?

16       A.  Yes.

17       Q.  And in reference to the comprehensive

18   plan it says, quote, its primary role is to

19   create a vision for the city and provide

20   recommendations to guide public policy

21   particularly in terms of land use related

22   issues.  Is that correct?

23       A.  Yes.

24       Q.  And so you refer to the comprehensive as

1  a guiding document.  This would be consistent

2  with your views, I take it?

3      A.  Yes.

4      Q.  What was your role in the visioning UMCH

5  process, Mr. Brown?

6      A.  The consultant that was chosen, MKSK,

7  was chosen prior to me coming to the city.

8  However, it was working with them day to day

9  helping coordinate meetings, steering committee

10  meetings, different outreach and kind of working

11  with them as they took the guiding document

12  through.  I think we started September.  I think

13  it was adopted in September by council the

14  following year.

15     Q.  So it was a year-long process?

16     A.  Correct.

17     Q.  In your prior experience had you worked

18  with MKSK before?

19     A.  Directly, no.

20     Q.  How about indirectly?

21     A.  Being a planner, everyone knows everyone

22  so I've known half their team my entire planning

23  life.

24     Q.  Okay.  And based on your experience as a

1  planner, was the MKSK firm experienced in

2  comprehensive plan drafting?

3      A.  Yes.

4      Q.  In other words, they're pretty good at

5  what they do?

6      A.  Yes.

7      Q.  And I look here at the fourth paragraph

8  of this release.  It says, the city and MKSK aim

9  to gain consensus around a range of acceptable

10  redevelopment options that respond to market

11  potential, community priorities, site-related

12  infrastructure needs, and appropriate planning

13  and urban design goals.  Do you see that?

14      A.  Yes.

15      Q.  The resulting vision plan will

16  facilitate future development and illustrate

17  possible benefits for the community, city,

18  landowner and developer.  Is that accurate?

19      A.  Yes.

20      Q.  And so in the course of your work with

21  MKSK does that fairly characterize, you know,

22  the objectives of what you all were working to

23  accomplish?

24      A.  Yes.

1                    -=0=-

2          (Deposition Exhibit 65 marked.)

3                    -=0=-

4    BY MR. INGRAM:

5         Q.  Mr. Brown, you've been handed what's

6    been marked as Exhibit 65.  Take your time to

7    review it.

8              Mr. Brown, have you had an opportunity

9    to review Exhibit 65?

10        A.  Yes.

11        Q.  And Exhibit 65 is an email from you to a

12   lot of people dated February 19, 2014, with the

13   subject visioning UMCH development tour.  Is

14   that correct?

15        A.  Yes.

16        Q.  So this is an email you drafted and

17   sent?

18        A.  Yes.

19        Q.  Okay.  Just generally who are you -- how

20   did you select the recipients of Exhibit 65?

21        A.  They're city staff, board and commission

22   members, councilmembers, and then there were

23   the -- those in the neighborhood group that were

24   included on the visioning discussion invited to

1  attend the tour of the six or seven or eight

2  different sites.  We did a bus tour.

3      Q.  Okay.  Which neighborhood group or

4  groups are you referring to generally?

5      A.  There was representatives of WARD,

6  Worthington Alliance for Responsible

7  Development.  There may have been someone from

8  OWA, which is Old Worthington Association, which

9  I don't think they exist anymore, just looking

10 at the names.

11     Q.  Okay.  Any other groups?

12     A.  Not that I can recall.

13     Q.  Did Project Community Park exist then?

14     A.  Not to my knowledge.

15     Q.  Did you -- I take it did you attend the

16 development tour?

17     A.  Yes.

18     Q.  There were 10 sites that were toured on

19 this occasion, correct?

20     A.  Correct.

21     Q.  And was the city involved in selecting

22 those 10 sites?

23     A.  The consultant proposed them.  I think

24 staff reviewed them to see if we agreed or not,

1    but 10 years ago it blurs.

2        Q.  Would you have been involved in the

3    review and selection of the sites?

4        A.  Yes.

5        Q.  Who all attended the tour?

6        A.  I would say the majority of the people

7    on the email.  I don't believe we had an

8    attendance sheet.  Some of these names look

9    familiar that I remember being on the tour.

10        Q.  So generally speaking, you had

11    representatives from city council, from planning

12    commission, architectural review board, you had

13    representatives from WARD, OWA, and perhaps

14    other stakeholders?

15        A.  Correct.

16        Q.  Did anyone from UMCH or Lifestyles

17    attend the tour?

18        A.  I honestly can't remember.  We dealt

19    with David Fisher at the point.  I don't know if

20    he attended.  I honestly can't remember.

21        Q.  Fair enough.  And I take it touring 10

22    sites requires some bit of effort with this

23    robust group.  Was it helpful to tour these

24    other developments in connection with the UMCH

1  visioning process?

2      A.  For me personally, yes.  Those sites I

3  think were chosen to show different levels of

4  density and design to give people an idea of

5  when you try to conceptualize what does 40 acres

6  mean or what does a 5-story building mean, or

7  what does an acre mean, those were picked to

8  kind of give you an idea of here's what to

9  expect of a development, here's what so much

10  density looks like, here's what greenspace can

11  be done.  They were just to provide examples to

12  give people a context of what to look.

13      Q.  And you had tours of several residential

14  developments, but you also had tours of like

15  Grandview Yard, which is more of a mixed-use

16  development.  Is that fair?

17      A.  Correct.

18      Q.  Okay.

19      A.  Not a lot of residential back then at

20  Grandview Yard.

21      Q.  Sure.  I was looking at, for example,

22  Harrison Park back then, and then you had the

23  Yantis Drive and Ashton Green, New Albany

24  residential development, you had the residential

1  development on Gay Street in downtown Columbus.

2  So there's several multi-family and/or

3  single-family residential developments as part

4  of the tour?

5     A.  Correct.

6                 -=0=-

7       (Deposition Exhibit 66 marked.)

8                 -=0=-

9  BY MR. INGRAM:

10     Q.  Handing you what's marked as Exhibit 66.

11  Take an opportunity to review that, please.

12       Okay.  Exhibit 66 is an email from you

13  to Mr. Greeson and Ms. Stewart dated

14  September 27, 2013, with a subject UMCH briefing

15  memo.  Do you see that?

16     A.  Yes.

17     Q.  And is this an email you drafted?

18     A.  Yes.

19     Q.  And you attached a councilmember update?

20     A.  Yes.

21     Q.  And this councilmember update is a

22  memorandum that you drafted, I take it?

23     A.  Yes.

24     Q.  Okay.  And it's a memo from you to

1    Mr. Greeson?

2        A.  Correct.

3        Q.  Okay.  Why did you prepare this memo?

4        A.  Part of my roles and responsibilities

5    with projects is to keep -- at this point in

6    time I reported directly to Matt and to Robyn,

7    was to keep them involved and updated on what I

8    was actually doing day to day.

9        Q.  Okay.  And the subject of this

10   memorandum is the visioning UMCH process.  Is

11   that fair?

12       A.  Yes.

13       Q.  Okay.  So this would be the

14   comprehensive plan update process, correct?

15       A.  Correct.  For the UMCH site.

16       Q.  And was everything set forth in your

17   memo true and accurate as far as you understood

18   it?

19       A.  I believe so, yes.

20       Q.  And when I look at the third paragraph

21   of the background statement here in your memo,

22   it says the planning process will build

23   community consensus on how the UMCH property

24   develops in the future.  Do you see that?

1      A.  Yes.

2      Q.  It goes on to say, while providing a

3  potential new developer some confidence that

4  their proposal would fit with the community,

5  city and landowner desires for the site as they

6  go through the development process.  Is that

7  correct?

8      A.  Correct.

9      Q.  And so when I look at this process,

10  there's nine milestones.  Is that fair?

11      A.  Yes.

12      Q.  So there's a kickoff meeting,

13  stakeholder interviews.  Stakeholder interviews

14  were with the landowner at the time, UMCH, WARD,

15  and then you also have Worthington business

16  community representatives listed here, the CIC.

17  Is that the Community Improvement Corporation?

18      A.  Correct.

19      Q.  What is the CVB?

20      A.  The Convention Visitors Bureau.

21      Q.  For Worthington?

22      A.  Yes.

23      Q.  Okay.  OWBA?

24      A.  Old Worthington Business Association

1    which is now the partnership.

2        Q.  And Worthington Chamber of Commerce?

3        A.  Correct.

4        Q.  So numerous stakeholder interviews, I

5    take it, were completed?

6        A.  Yes.

7        Q.  You had a walking tour of the site,

8    right, and that was third?

9        A.  Yes.

10       Q.  And then what is this fourth item here?

11       A.  I'm trying to...

12       Q.  Most of the reason why I didn't state it

13   is because I don't know how to pronounce what

14   you've got there on process number four.

15       A.  Oh, the design charrette.

16       Q.  Charrette.  Thank you.

17       A.  We pulled together different groups.  We

18   held it at the WEC, which is the Worthington

19   Education Center.  I'm trying to remember back

20   to that.  But the charrette basically looks at

21   what MKSK was able to do.  We invited different

22   representatives from the different groups, and

23   went through this design charrette where they

24   laid out on the table the site and went through

1   kind of what do you want to see, where do you

2   see things going, kind of like big picture

3   bubbles on a map.  I think there were like four

4   or five different groups broke up, and then each

5   group kind of looked at common themes and common

6   threads to mesh four or five different land use

7   kind of layouts to one that had a similar theme.

8      Q.  Got it.  So let me see if I understand

9   you.  Essentially you have different conceptual

10   ideas or conceptions of what could be developed

11   on the UMCH property.  Is that fair?

12      A.  Not preconceived.  Developed at the

13   table.

14      Q.  I'm not following you, sorry.

15      A.  So with -- I don't think it was

16   preconceived with this one, but typically what

17   you see is you'll see a map.  If that was the

18   UMCH site, the different planners went through,

19   you know, discussion of mobility on the site,

20   connections, where did you want to see

21   greenspace saved, you know, the High Street

22   front edge, where would you want to see park

23   space.  All those were kind of circled on maps,

24   and they looked at the four or five different

1  groups to see if there was common themes of what

2  people wanted to see, and they looked at

3  different types of densities and discussions

4  laid out to the land use itself.

5      Q.  I see.  And so at this design charrette

6  meeting were there representatives from the

7  various groups set forth in your memo?

8      A.  Yes.

9      Q.  So you attended then?

10      A.  Yes.

11      Q.  There was one listed here on your memo.

12  How many of these meetings occurred?

13      A.  One design charrette?

14      Q.  Yeah.  How many design charrette

15  meetings were held?

16      A.  I believe we just had one big one up at

17  the Worthington Education Center.

18      Q.  I see.  Okay.  And you had

19  representatives from city council, planning

20  commission, WARD, UMCH, OWA, and the Worthington

21  School District?

22      A.  Correct.

23      Q.  Okay.  Were there others?

24      A.  Possibly.  I can't remember back 10

1   years.

2      Q.  Sure.  Do you recall was it a large

3   meet -- were there a lot of people there?  Was

4   it limited to particular stakeholders?  I'm

5   trying to get an idea of the room.

6      A.  I would say we probably had 25 or so

7   people.

8      Q.  And then after this design charrette

9   meeting with all those various representatives,

10  there were stakeholder interviews?

11     A.  Correct.

12     Q.  Did you participate in those?

13     A.  Some yes; some no.

14     Q.  Which interviews do you recall

15  participating in?

16     A.  The three that are listed there, I know

17  I probably attended all of those.

18     Q.  Okay.  Were there others then, I take

19  it?  Other stakeholder interviews I take it?

20     A.  Possibly.  I honestly don't know.

21     Q.  So you have stakeholder interviews

22  listed on your memo that's attached to

23  Exhibit 19, including UMCH, WARD, and

24  Worthington business community representatives.

1  When you -- for the stakeholder interviews when

2  you refer to the Worthington business community

3  representatives, are you lumping into that

4  category, then, I take it, the same

5  organizations that were listed under item number

6  2C?

7      A.  Yes.

8      Q.  About how many stakeholder interviews

9  did you participate in, if you can recall?

10     A.  Six to 10.

11     Q.  How many of those interviews were with

12  UMCH?

13     A.  I have to go back to look at my

14  calendar, but I feel like we kept them in the

15  loop.  I just have no idea if it's one meeting

16  or 30 meetings.

17     Q.  Sure.  Would UMCH have been party to or

18  participated in these stakeholder interviews or

19  was it more MKSK and perhaps someone from --

20  either you or someone from your staff sitting in

21  on these interviews?

22     A.  Clarification.  When you say -- when we

23  did the stakeholder interviews, you're asking if

24  UMCH sat in on the other stakeholders?

1     Q.  Yes.

2     A.  I do not believe so.

3     Q.  Okay.  So you were taking each of the

4  various group representatives kind of one by

5  one.  Is that fair?

6     A.  Correct.

7     Q.  All right.  And in the sixth process

8  item you have online dialogue hosted on the

9  city's website.  What did the city or MKSK have

10  in place for its online dialogue at this time?

11     A.  We did -- not necessarily a survey, but

12  it actually was pretty much a survey.  There

13  were different scenarios developed from the

14  original design charrette that people could vote

15  on that listed four or five different options of

16  scenarios, and densities, and layouts, and uses

17  on the site, and people were able to go online

18  and vote on them or make comments on them.

19     Q.  And do you recall the type of feedback

20  the city received?  I mean, was it a fairly

21  robust feedback or did you only get a couple

22  bites, couple votes?

23        MR. SCHUMACHER:  We're back in 2013,

24  still?

1       A.  I would have to look to see if we have

2  the information.  I feel like we had a good

3  response, but I couldn't tell you if that was 30

4  or -- well, I would know if it was 500, but I

5  feel like we had a good response.

6       Q.  Okay.  Fair enough.  Then there was in

7  addition to the online dialogue and voting

8  options provided to the public, there were

9  public open house meetings.  Did that happen?

10      A.  I believe so.  Again, I have to check my

11  calendars.  I know these dates are off.

12      Q.  Sure.  Do you recall how many open

13  house -- public open house meetings there were?

14      A.  No.

15      Q.  And how about for the eighth process

16  item you have developer meetings.

17      A.  Yes.

18      Q.  What do you mean by developer meetings?

19  What did that entail?

20      A.  We had reached out to -- I know we

21  reached out to a couple.  The only one I can

22  remember is the Harrison West development.  Sit

23  down with them and showed them here's the kind

24  of layout and scenarios that we're seeing from

1   the public process.  Do these seem realistic to

2   you to happen.

3       Q.  Sure.

4       A.  But I know we met with a couple, but the

5   only one I can remember is Harrison West

6   developer.

7       Q.  Do you recall who the developer was for

8   Harrison West?

9       A.  I'd have to look it up now.

10      Q.  Sure.

11      A.  They all start to blend.

12      Q.  So you mentioned so you vaguely recall

13  one, but there were several developers that you

14  ran these various potential design charrettes

15  by?

16      A.  Correct.

17      Q.  So you had input from the public, you

18  had input from the developers, from the

19  stakeholders, from the landowner.  There were

20  walking tours of the site, there was also the

21  bus tour of other developments across central

22  Ohio.  So fairly robust process.  Is that fair?

23          MR. SCHUMACHER:  Objection.  Compound.

24      A.  I believe so.

1    Q.  And all of this process was solely and

2  only focused to the UMCH property, correct?

3    A.  Correct.

4    Q.  In your experience -- in your land

5  planning experience how many other times have --

6  has a political subdivision gone to this length

7  or effort to create a land use plan for one

8  site?

9    A.  That, I honestly don't -- I don't know.

10    Q.  So this would be the only such example

11  in your experience?

12    A.  No.  I would -- I refer back to my

13  Franklin County days where we did the Darby

14  Accord Town Center Master Plan where it was a

15  confined area where development could occur over

16  in Prairie Township off of Broad Street and to

17  preserve the farmland around it.  That one was

18  focused.

19    Q.  Was that one single property or multiple

20  properties?

21    A.  It was -- the bulk of it was probably

22  three or four different properties but large.

23    Q.  So it was multiple properties, though?

24    A.  Correct.

1      Q.  And my question is based on your land

2  planning experience has a political subdivision

3  ever gone to this length to create a land use

4  plan for one single property?

5           MR. SCHUMACHER:  Objection.  Asked and

6  answered.

7      A.  Not to my knowledge.

8      Q.  And so Worthington has a city population

9  of approximately 15,000 residents?

10     A.  Yeah, just under.

11     Q.  Just under.  So in your mind did this

12  fairly lengthy year-long process ultimately

13  reflect a community consensus on how the UMCH

14  property should be developed?

15          MR. SCHUMACHER:  Objection.

16     A.  I can't speak for the other groups

17  involved.  I felt it did, but I can't speak for

18  the other groups.

19     Q.  And I'm asking you.

20     A.  I felt so.

21     Q.  Okay.

22                    -=0=-

23       (Deposition Exhibit 67 marked.)

24                    -=0=-

1   BY MR. INGRAM:

2       Q.  Mr. Brown, I've handed you what's been

3   marked Exhibit 67.  Let me know after you've had

4   an opportunity to review it, please.

5       A.  Okay.

6       Q.  Mr. Brown, Exhibit 67 is numbered

7   Worthington 50277 through 50278.  It's an email

8   from Anne Brown, copying you, dated March 14,

9   2014.  The subject is UMCH.  Do you see that?

10      A.  Yes.

11      Q.  And it's an email chain.  I should

12  have -- to clarify my prior characterization, in

13  which Ms. Brown is addressing an email that it

14  looks like you had forwarded to her.  Do you see

15  that?

16      A.  Yes.

17      Q.  And you forwarded her an inquiry from

18  Andrew King who was a news reporter for ThisWeek

19  News.  Is that correct?

20      A.  He was, yes.

21      Q.  And at the time Ms. Brown, what was her

22  position?

23      A.  I call her the public affairs officer,

24  but I know her title's different.

1      Q.  Public relations, media relations?

2      A.  Yes.

3      Q.  Sure.  So Ms. Brown, then, is responding

4   to the reporter.  Is that fair?

5      A.  Yes.

6      Q.  Okay.  Did you assist Ms. Brown in

7   crafting her response to Mr. King?

8      A.  I don't remember drafting the response

9   that she has in the upper portion.  The lower

10   portion I do remember.

11      Q.  Okay.  And why did you specifically

12   reach out to Mr. King in the email that you

13   sent?

14      A.  From what I recall, there was a

15   newspaper article that went out in ThisWeek

16   News, which is a weekly publication, and there

17   was a reference that the city owned -- it gave

18   the perception the city owned the property, and

19   we did not want -- you know, we wanted that to

20   be corrected because it was privately owned at

21   the time.  And I think that's why Anne reached

22   out to the news -- ThisWeek News once we had

23   reached out to the actual gentleman that wrote

24   the article.

1      Q.  I see.  And so this news article would

2  have run around the period that you all were in

3  the midst of the visioning process and all those

4  different things were occurring that we just

5  reviewed?

6      A.  Correct.

7      Q.  Okay.  And so it -- you wanted to

8  clarify any perceptions that based on all the

9  lengths the city was going to that, wait a

10  minute, the city doesn't actually own the

11  property, right?

12          MR. SCHUMACHER:  Objection.

13      A.  Correct.

14          MR. SCHUMACHER:  That misstates his

15  testimony.

16      Q.  Did you disagree at all with any of the

17  substance of Ms. Brown's email?

18      A.  It seems spot on.

19      Q.  Okay.

20          MR. INGRAM:  Mr. Brown, we've been going

21  for a little over an hour now.  Why don't we

22  take a break.

23                    (Recess taken.)

24

1    BY MR. INGRAM:

2        Q.  Mr. Brown, why don't we turn to what was

3    previously marked as Exhibit 1, which will be

4    behind tab one in the binder in front of you.

5    And you can take time to review Exhibit 1.  I

6    imagine you're pretty familiar with that.  Did

7    you review Exhibit 1 to prepare for your

8    deposition?  I think you told me that earlier

9    today.

10       A.  I looked over it.

11       Q.  I just have a few questions for you on

12   Exhibit 1.  So is Exhibit 1 the land use plan

13   that city council adopted on September 2nd,

14   2014, that applied to the UMCH property,

15   correct?

16       A.  Correct.

17       Q.  And Exhibit 1 is the guiding policy

18   document that you referred to this morning.  Is

19   that fair?

20           MR. SCHUMACHER:  Objection.

21       A.  It's the guiding document for just this

22   site, yes.

23       Q.  And when you say this site, you're

24   referring to the UMCH site at that time?

1          A.  Correct.

2          Q.  Which is now Lifestyle's property,

3     correct?

4          A.  I believe so, yes.

5          Q.  And I know earlier you were describing

6     your experience with the visioning process, and

7     Exhibit 1 is the result of that process,

8     correct?

9          A.  This is what was adopted by council,

10    yes.

11         Q.  Okay.  And you participated in the

12    process -- in the visioning process.  Did you

13    participate in the creation or drafting of

14    Exhibit 1?

15         A.  Drafting in what context?

16         Q.  Did you -- I just want to understand

17    your level of involvement with Exhibit 1 before

18    city council passed it.

19         A.  Exhibit 1 was drafted by MKSK.  We

20    reviewed it.  I reviewed it as the staff before

21    it went, but I didn't write it.

22         Q.  Okay.  But you had an opportunity to

23    review it before it went to planning commission,

24    before it went to city council, correct?

1    A.  Correct.

2    Q.  And in the course of your review did you

3  have back and forth with MKSK?  Did you provide

4  suggestions, things of that nature?

5    A.  Honestly, not a clue from 10 years ago.

6  Possibly.

7    Q.  Okay.  Do you recall anything that you

8  did during the course of your review of the land

9  use plan for the UMCH property before it was

10  adopted?

11    A.  No.

12    Q.  And just at a high level looking at the

13  land use plan for this property, the land use

14  plan has four general areas for the property.

15  Is that correct?

16    A.  Yes.

17    Q.  There's the Worthington Estates Edge.

18  Do you see that?

19    A.  Yes.

20    Q.  The Neighborhood Core in the middle of

21  the property is the second?

22    A.  Yes.

23    Q.  The Tucker Creek Reserve which goes

24  along Tucker Creek on the property.  Do you see

1  that?

2      A.  Yes.

3      Q.  And the High Street Mixed Use area.  Do

4  you see that?

5      A.  Yes.

6      Q.  So the land use plan goes through and

7  articulates the types of uses within each of

8  those four different areas on the site.  Is that

9  fair?

10     A.  Do it one more time.

11     Q.  Sure.

12         MR. INGRAM:  Can you read that back,

13  please.

14             (Record read as requested.)

15     A.  Correct.

16     Q.  If I could direct your attention to what

17  was previously marked as Exhibit 21, Mr. Brown.

18  And Exhibit 21 is the UMCH Focus Area Checklist.

19  Let me know after you've had an opportunity to

20  review Exhibit 21, Mr. Brown.

21     A.  What was the question again?

22     Q.  There's not one.  I just want to make

23  sure -- I wanted you to let me know after you've

24  reviewed it.

1      A.  Oh.  Yes.

2      Q.  Mr. Brown, it was indicated to me that

3  perhaps you drafted this UMCH Focus Area

4  Checklist.  Is that true?

5      A.  Possibly.  Probably.

6      Q.  Okay.  Do you recall one way or another?

7      A.  Honestly do not recall.

8      Q.  Okay.  There's not a date listed on

9  Exhibit 21, but I'll -- we went back and checked

10  the metadata associated with the file, and it

11  looked to be dated March 4, 2015.  Does that

12  sound about right?

13      A.  What was the date again?

14      Q.  March 4, 2015.

15      A.  Possibly.  I honestly just do not know.

16      Q.  Okay.  Do you recall reviewing or seeing

17  this document before?

18      A.  It looks familiar.

19      Q.  Do you know why this UMCH Focus Area

20  Checklist would have been created by the

21  planning and building department?

22      A.  I would assume it's a generic checklist

23  to hit the big ticket items as an application

24  would come through.

1      Q.  And given the breakdown of -- you see

2  High Street, Worthington Estates Edge,

3  Neighborhood Core, Tucker Creek Preserve.  Do

4  you see those bulleted categories?

5      A.  Yes.

6      Q.  This focus area checklist is following

7  the items listed in the land use plan set forth

8  in Exhibit 1, correct?

9          MR. SCHUMACHER:  Objection.

10      A.  Generically it appears to follow it.

11      Q.  Okay.  And so Exhibit 21 would contain

12  the big ticket items, as you put it, with

13  respect to the land use plan for the property

14  and along with the Worthington Design Guidelines

15  and a few additional items.  Is that fair?

16      A.  As outlined in this document?

17      Q.  Yes.

18      A.  Yes.

19      Q.  So the planning and building department

20  would have utilized this checklist, I think you

21  said, in connection with reviewing any

22  application for the redevelopment of the UMCH

23  property.  Is that fair?

24      A.  No.

1    Q.  Okay.  Why not?

2    A.  I would say this is a broad checklist.

3  When I would look at an application, these are

4  the broad points I would look for, but then I

5  would go back to the 2014 comp plan and go

6  through it detail at the macro level of trying

7  to answer all the things that are in the

8  subsections.

9    Q.  I see.  So Exhibit 21 would provide the

10  high level, big ticket items, but in the course

11  of your review of the application you would

12  expect either yourself or your staff to go into

13  the weeds, shall we say, in those documents?

14       MR. SCHUMACHER:  Objection.

15       You can answer.

16    A.  We would go back to the actual language

17  in Exhibit 1, the comp plan itself update.

18    Q.  So if you were going to go to each

19  individual -- or if you were to go through

20  Exhibit 1, why create the checklist then?

21  What's the point?

22       MR. SCHUMACHER:  Objection.

23    A.  Again, for me, I look at it as the high

24  level does it at least start to address some of

1  these before you then take the time to get into

2  reading sentence by sentence.

3     Q.  Okay.  And so for example, the High

4  Street corridor, it says there's a minimum of

5  two stories in height, maximum five stories,

6  architecture dependent.  Do you see that?

7     A.  Yes.

8     Q.  So for buildings within the High Street

9  corridor on the property those buildings would

10  need to be between two and five stories in

11  height.  Is that fair?

12     A.  Yes, but with the caveat that it goes

13  into more detail in the 2014 update of what that

14  needs to look like, because there was fears of,

15  you know, just tall, tunneling buildings.  So it

16  was architecture dependent was the main thing in

17  layout.

18     Q.  Okay.  But the maximum that was

19  anticipated was a five-story building within

20  that High Street Mixed Use area, correct?

21     A.  Dependent on architecture, yes.

22     Q.  When you say dependent on architecture,

23  can you elaborate or explain what you mean by

24  that?

1          MR. SCHUMACHER:  Objection.  Asked and

2     answered.

3          A.  We go back to what's in the land use

4     plan, the details of the land use plan, and also

5     take into account that the building would be an

6     architectural review district and looking at the

7     form, massing and scale of what the building

8     would be as part of that.

9          Q.  Okay.  Are there any objective standards

10    that you would apply or you would expect your

11    department to apply on this architecture

12    dependency element?

13         A.  In addition to what's referenced in the

14    exhibit -- 2014, we'd go back to architectural

15    review district code requirements, what's in the

16    actual zoning code within the reference

17    document, the Worthington Design Guidelines,

18    which is another document I failed to mention

19    that we do look at.  In addition to the other

20    policy documents, we look at the Worthington

21    Design Guidelines that makes recommendations for

22    buildings and how they're to be constructed in

23    Worthington.

24         Q.  I see here you have Worthington Design

1    Guidelines included as a bullet.

2         A.  Oh, below it.  Sorry.

3         Q.  That's okay.

4         Okay.  For additional information you've

5    got listed here at the very end of Exhibit 21,

6    fiscal impact study.  Do you see that?

7         A.  Yes.

8         Q.  So in connection with an application to

9    rezone or develop the UMCH property, was the

10   city anticipating a fiscal impact study be

11   completed?

12        A.  I honestly can't remember at this time.

13   I know that we were looking at -- one of the

14   main goals with the land use plan was to look

15   for income-producing properties for the city.

16   So I think we wanted to note the impact of what

17   commercial or office or medical would come in

18   weighing it to any of the other proposed uses.

19   I think that's the context of it.

20        Q.  Okay.  But you don't recall one way or

21   another?

22        A.  Correct.

23        Q.  Okay.  With respect to this fiscal

24   impact study, you had mentioned earlier that

1   consultants would sometimes be involved in the

2   application process.  Would a consultant -- an

3   outside consultant retained by the city be who

4   would perform this fiscal impact study or would

5   you expect the applicant to?

6          MR. SCHUMACHER:  Objection.  Multiple

7   compound questions there.  Which question?

8      Q.  Do you understand my question?

9      A.  Who's to do it?

10     Q.  Yeah.

11     A.  The city would expect the applicant to

12  do it --

13     Q.  Is there --

14     A.  -- and then we'd review it.

15     Q.  Is there a requirement within the city's

16  zoning code that applicants for rezonings or

17  development plan approval have a fiscal impact

18  study conducted?  That's not required, is it?

19     A.  Planning commission and our other boards

20  and commissions have the ability to ask for

21  additional information as needed.  I believe

22  that would probably fall under that.

23     Q.  But there's not -- if we were to go

24  through the city's zoning code, there's not a

1    requirement for an applicant to have a fiscal

2    impact study performed specifically, is there?

3        A.  I would say it would still fall under

4    other information required or asked from the

5    boards or commissions.  We would ask that.

6        Q.  My question's a little bit different.  I

7    understand that you're referring to this general

8    miscellaneous request for information.  My

9    question is under the zoning regulations or the

10   zoning code there's not a requirement that says

11   that an applicant must prepare or provide a

12   fiscal impact study, correct?

13       A.  So you're asking if the word fiscal

14   impact study is actually in the code?

15       Q.  Correct.

16       A.  Correct.

17       Q.  How about a market study, same thing?

18       A.  I would still say it would fall under

19   the miscellaneous, but the actual word market

20   study is not.

21       Q.  Okay.  What is intended or meant by this

22   pro forma that's listed here, actual numbers

23   needed for TIF discussion?

24       A.  So the city -- on certain projects

1    there's going to be off-site public improvements

2    needed and/or public garages, parking garages.

3    The city can do a TIF on a property.  So they

4    look at if it's valued at $100 today and your

5    development comes in and it's a million dollars,

6    we can grab off that difference to look at do we

7    want to offer a TIF to help with any of the

8    off-site improvements they need and/or to help

9    with public parking garages or anything like

10   that.  So that was referencing more of one

11   working with our economic development director

12   and looking at the numbers of what the

13   development would bring in to help pay for those

14   off-site improvements and/or for services

15   related to the development.

16       Q.  Okay.  And so for the TIFed

17   improvements, those could include -- you

18   mentioned off-site, but it could also include

19   on-site improvements as well, correct?

20       A.  Correct.

21       Q.  So when you reference a parking garage,

22   is it fair to say the city was contemplating a

23   public parking garage being built on the site?

24            MR. SCHUMACHER:  Objection.

1     A.  I wouldn't say we were expecting it.

2     Q.  Sure.

3     A.  But I think it was -- as a planner you

4  try to plan for all the alternatives that could

5  happen.  It was just to see if it was a scenario

6  that would be needed to help make it work, but

7  it can't just be used for private development.

8     Q.  Sure.  So the TIF -- the revenues

9  through the TIF go to public uses of property,

10  correct?

11     A.  Correct.

12     Q.  So like public roadways, parking garages

13  for the public.  Is that fair?

14     A.  Yes.

15     Q.  Okay.  And so as a planner your

16  department was considering whether or not a pro

17  forma would be necessary in the event that a TIF

18  would be pursued for this site.  Is that

19  correct?

20     A.  If one was requested, correct.

21     Q.  I forgot to ask you for the market study

22  were you or your department anticipating that

23  the applicant would conduct the market study or

24  would the city conduct the market study?

1      A.  It would be similar to the fiscal

2  impact.  We would ask the applicant to provide

3  it, and then we would review it.

4      Q.  And when you've got market study, what

5  type of market study is this referring to?

6      A.  I honestly don't remember now.  I think

7  it came from our development person at the time

8  wanting to know what was being proposed and how

9  to market it.  I honestly can't remember.

10      Q.  Okay.

11                    -=0=-

12      (Deposition Exhibit 68 marked.)

13                    -=0=-

14  BY MR. INGRAM:

15      Q.  Mr. Brown, I'm handing you what's being

16  marked as Exhibit 68.  Please let me know after

17  you've had an opportunity to review it.

18      A.  Okay.

19      Q.  Okay.  Mr. Brown, Exhibit 68 is an email

20  chain that you sent to Matt Greeson dated

21  June 11, 2015.  Do you see that?

22      A.  Yes.

23      Q.  So this is an email you prepared?

24      A.  Yes.

1     Q.  And part of the email chain it looks to

2  be an email you received from John Gallagher,

3  Director of Traffic Services, with CM Tran,

4  T-R-A-N.  Do you see that?

5     A.  Correct.

6     Q.  Who is John Gallagher?

7     A.  The city hired Carpenter Marty and John

8  Gallagher to review traffic since we do not have

9  our city engineer.  Where we're deficient in

10  skill set we use consultants.  So he was our

11  traffic consultant.

12     Q.  Was Carpenter Marty retained for the

13  development of the UMCH property specific or was

14  it broader than that?

15     A.  Broader.  We have a -- at the time we

16  had a yearly continuing services agreement with

17  Carpenter Marty whether it be this project or

18  any other.

19     Q.  Okay.  And in the first -- well, first

20  full sentence of his email he says, we gave them

21  some additions, changes to the bullet point

22  scope that Larry handed out.  Do you know who

23  Larry is?

24     A.  The only Larry I know that would have

1  been involved is with EMH&T, which might be

2  Larry Creed.  I'm not sure.

3      Q.  In this bullet point scope you've

4  attached what we previously reviewed from

5  Exhibit 21 --

6      A.  Correct.

7      Q.  -- the UMCH Focus Area Checklist.  Is --

8  I'm trying to discern what scope is being

9  referred to here.

10      A.  With typical developments if we're doing

11  a traffic analysis or traffic study there's a

12  scope created.  I read scope to be that scope

13  that was created for the traffic study since

14  John was involved, and I'm assuming that's Larry

15  Creed.

16      Q.  Okay.

17      A.  But I -- it's -- we've never referenced

18  this as a scope.

19      Q.  And when you're referring to this,

20  you're referring to Exhibit 21?

21      A.  Correct.

22      Q.  Now, at this point in time of June of

23  2015 there was no application pending before the

24  city concerning the development of the UMCH

1    site, correct?

2        A.  What do you mean by pending application?

3    Actual application or --

4        Q.  Yes.

5        A.  Actual application, no.

6        Q.  So why was Carpenter Marty analyzing the

7    UMCH site at this time?

8        A.  We had been approached by LC to look at

9    developing that property.

10       Q.  So as a result -- you know, on the heels

11   of the city's adoption of the land use plan, LC

12   approached the city.

13       A.  Correct.

14       Q.  Is that correct?

15           Okay.  And then in connection with LC's

16   approach to the city, then Carpenter -- the city

17   asked Carpenter Marty to start analyzing the

18   traffic for the site.  Is that right?

19       A.  I think we asked them to at least work

20   with whoever else he was going to use which I

21   assume was EMH&T to start working on a scope if

22   they were going to be making application.

23       Q.  Okay.  And when you mention -- when you

24   referenced Larry Creed from EMH&T, would EMH&T

1  have been the city's consultant or LC's

2  consultant?

3      A.  I believe he was LC's consultant.  He

4  was not ours.

5      Q.  Does the city use EMH&T for projects?

6      A.  We have for our northeast gateway

7  traffic improvement project.  Otherwise, I'd

8  have to check with the service engineering

9  department to see if they've used them

10  otherwise, but that's only one I know of.

11      Q.  So, yes, in at least one example, maybe

12  more, maybe -- maybe or maybe not others, right?

13          MR. SCHUMACHER:  Objection.

14          You can answer.

15      A.  I would say at least one.

16      Q.  Sure.  That's fair.

17          MR. SCHUMACHER:  I'm just a guardian of

18  the record, Chris.  You know that.

19      Q.  Now, with respect to this UMCH Focus

20  Area Checklist is it customary for the city to

21  prepare or for the planning and building

22  department to prepare a checklist of this nature

23  for the development of a single property?

24      A.  This department or any department?

1      Q.  Planning and building department.

2      A.  At the city of Worthington or...

3      Q.  Yes, your department.

4      A.  We do have some checklists.  This one

5   being -- since we're landlocked, we don't have a

6   lot of growth.  So really there's not a lot of

7   opportunities for something like this.  So I

8   think that's probably why this was created.

9      Q.  Okay.  So this UMCH Focus Area Checklist

10   is a unique checklist that your department

11   wouldn't typically prepare for other properties.

12   Is that fair?

13          MR. SCHUMACHER:  Objection.  Misstates

14   his testimony.

15      A.  No.  What I would say is we have other

16   checklists built into the code and/or of items

17   we note that are a consistent thing coming

18   before our boards and commissions.  We've not

19   had a large development so that's why we would

20   have created a checklist, to kind of, if

21   something's coming in, here is the generic kind

22   of things to look for before you would delve

23   down into greater detail.

24      Q.  Okay.  So for your department this UMCH

1   Focus Area Checklist is unique, fair?

2      A.  I wouldn't agree with that.  We have

3   other checklists.  This one is much larger.

4      Q.  Okay.  What other checklists are you

5   referring to?

6      A.  When we get an application submitted to

7   us, we go through a checklist for architectural

8   review board to make sure it has everything

9   submitted.  If it's a straight rezoning, which

10  we don't get a lot of, if it's a development

11  plan, it kind of outlines everything to look for

12  in those documents, and we just look through

13  that to then start writing a memo or at least

14  get the framework for a memo together.

15     Q.  So those other checklists you're

16  referring to, you're going through the zoning

17  code and looking at the application requirements

18  and ensuring that the application requirements

19  have been satisfied.  Is that fair?

20         MR. SCHUMACHER:  Objection.  Form.

21     A.  No.  With any application we're also

22  looking at those other policy documents.  So

23  we -- in our mind, depending what it is, it's

24  either the comp plan, bike and ped, parks or the

1  design guidelines that you're looking for.  Then

2  you go to those sections to kind of see what all

3  has been submitted to move it forward.

4       Q.  Okay.  Do you recall why this UMCH Focus

5  Area Checklist would have been provided to the

6  Carpenter Marty traffic engineers?

7       A.  No.

8       Q.  Okay.  I'm going to direct your

9  attention to what was marked as Exhibit 55.  And

10  as you're reviewing Exhibit 55, my questions are

11  going to be directed to the third page.

12       MR. SCHUMACHER:  So you only want him to

13  read the third page?

14       A.  The whole page or top part?

15       Q.  We'll get to that.  It's a 16-page

16  document.  Feel free to review it to the extent

17  you would like to.  If you want -- you know, I

18  can -- let me know once you're comfortable.

19       MR. SCHUMACHER:  I'm sorry, what was the

20  question?

21       MR. INGRAM:  There is no question.

22       MR. SCHUMACHER:  Oh.  Okay.

23       A.  I mean, I guess ask your question and

24  then I'll --

1    Q.  Okay.  Fair enough.  I didn't want you

2  to have to spend the whole morning reading a

3  single-spaced document meeting minutes.

4       MR. SCHUMACHER:  Well, let's have an

5  agreement, then, that if you have a question

6  that requires him to read the document, he's

7  free to do that, right?

8       MR. INGRAM:  Of course.

9       MR. SCHUMACHER:  Okay.  What's your

10  question, sir?

11  BY MR. INGRAM:

12    Q.  All right.  Mr. Brown, Exhibit 55 are

13  the minutes of the special meeting of the

14  Worthington Architectural Review Board and

15  Worthington Municipal Planning Commission held

16  on June 29, 2015.  Do you see that?

17    A.  Yes.

18    Q.  And you attended that meeting, correct?

19    A.  Correct.

20    Q.  And earlier you made reference to

21  Lifestyle approaching the city with a proposal

22  to redevelop the UMCH site, correct?

23    A.  Correct.

24    Q.  And this special meeting concerned a

1   preliminary concept that Lifestyles had offered

2   to the city, correct?

3      A.  I would say yes.  I don't know on

4   this -- I don't know if it was preliminary or

5   not, but that was their proposal to us.

6      Q.  Okay.  And Richard Hunter, he was a

7   member of the planning commission, correct?

8      A.  Correct.  He was chair.

9      Q.  Okay.  So Chairman Hunter explained that

10  this special meeting was just an informational

11  meeting only concerning the UMCH property and

12  the preliminary concept by the developer

13  Lifestyle Communities.  Is that fair?

14         MR. SCHUMACHER:  You mean is that what's

15  in the document, or are you asking if that's

16  fair?

17     A.  That's what's stated.

18     Q.  Okay.  And so there was not an

19  application filed with the city at this time by

20  Lifestyles or UMCH, correct?

21     A.  No formal application, correct, was

22  filed.

23     Q.  Or any application at all, correct?

24     A.  Correct.

1      Q.  And directing your attention to page 3,

2  the first sentence on that page says, city

3  officials asked UMCH to put things on hold while

4  they proceeded with a community-wide process and

5  come up with a comprehensive plan designed only

6  for the UMCH property to determine how your

7  property should develop.  Do you see that?

8      A.  Yes.

9      Q.  And that -- the reference here would be

10  to that vision UMCH process that you

11  participated in that resulted in the adoption of

12  Exhibit 1, correct?

13      MR. SCHUMACHER:  Objection.

14      A.  I don't know what city officials asked

15  them to put things on hold.  That would have

16  been before I was here.

17      Q.  That's not my question.  My question was

18  different.  Is this referring to the UMCH

19  visioning process that resulted in the adoption

20  of Exhibit 1?

21      MR. SCHUMACHER:  Objection.  This is

22  Mr. Fisher's statement.

23      A.  Repeat it one more time.  I apologize.

24      Q.  Okay.  This is referencing a

1   community-wide process to come up with a

2   comprehensive plan designed only for the UMCH

3   property.  That's the UMCH visioning process

4   that you participated in, correct?

5          MR. SCHUMACHER:  Objection.

6      A.  I don't know if that's what he means.  I

7   would assume.

8      Q.  Okay.  What did you understand it to

9   mean?

10         MR. SCHUMACHER:  Objection.  Relevance.

11     A.  Honestly, I don't even remember him

12  saying this.  So without the context I honestly

13  have no clue.

14     Q.  What other comprehensive plan amendment

15  process occurred in the city that would have

16  pertained to the UMCH property, Mr. Brown?

17         MR. SCHUMACHER:  Objection.

18  Argumentative.

19         You can answer.

20     A.  There's no other memo, but just a

21  comprehensive plan designed for this property.

22  I'm assuming it references the visioning.

23     Q.  Okay.  Are you aware of any other

24  processes that this could be referring to?

1      A.  Not from my time here.

2      Q.  And you anticipated earlier one of my

3   questions which is were you party to any

4   conversations with representatives from UMCH to

5   put things on hold?

6      A.  All I know is when I came on in August

7   of '23 -- of 2013 this was already in the works.

8   So I don't -- I wasn't privy to city officials

9   or city having conversations with UMCH.

10      Q.  From 2013 through June 29 of 2015 while

11   you were there at the city, did the city receive

12   any applications to redevelop or rezone the UMCH

13   property?

14      A.  What were the dates again?

15      Q.  From when you arrived at the city in

16   2013 through June 29 of 2015.

17      A.  Not to my knowledge.

18      Q.  Okay.  Mr. Brown, I want to direct your

19   attention to what has been previously marked

20   Exhibit 56.

21      A.  Okay.

22      Q.  Okay.  Mr. Brown, Exhibit 56 is an email

23   that you forwarded to Mr. Greeson on July 13th,

24   2015.  Do you see that?

1      A.  Yes.

2      Q.  With the subject UMCH development

3  alternative.

4      A.  Yes.

5      Q.  And you forward an email that

6  Mr. Coulter, C-O-U-L-T-E-R, sent to you and

7  others, correct?

8      A.  Yes.

9      Q.  And Mr. Coulter --

10        MR. SCHUMACHER:  Coulter.

11      Q.  -- Coulter was on the planning

12  commission at that time, correct?

13      A.  Correct.

14      Q.  Was he also on the architectural review

15  board?

16      A.  Correct.

17      Q.  Who's is J. Rush?

18      A.  I have no clue.

19      Q.  And Beth Mitchell?

20      A.  Beth is part of WARD and a neighboring

21  property on Larrimer.

22      Q.  So Beth Mitchell is a neighbor to the

23  UMCH site?

24      A.  Correct.

1     Q.  And then me@batesonline, who's that?

2     A.  That is Mike Bates.

3     Q.  And who's Mr. Bates?

4     A.  He is also a member of WARD and a

5  neighboring property owner.

6     Q.  And Mr. Coulter's email to J. Rush and

7  to you, CCing Beth Mitchell and Mike Bates,

8  starts with, as I was thinking after our meeting

9  this evening.  Do you see that?

10    A.  Yes.

11    Q.  Okay.  So was there a meeting between

12  the -- was he the planning commission president?

13    A.  He was just a member.

14    Q.  The member of the planning commission

15  and at least two representatives of WARD,

16  yourself.  Who else was at that meeting that

17  evening?

18    A.  I honestly don't even remember this

19  meeting.

20    Q.  Okay.  Why would a member of planning

21  commission and yourself be meeting with members

22  of WARD and Mr. Rush concerning LC's

23  development -- proposed development?

24    A.  I can't speak for Mikel.  For myself, if

1    we're invited to an interest group, whatever it

2    may be, we would meet with them.  Honestly don't

3    remember this meeting at all.

4        Q.  Okay.  And Mr. Coulter goes on to say, I

5    see three courses you can take based on the

6    meeting, and that's directed to you and to this

7    J. Rush.  Does that reflect your -- refresh your

8    recollection as to this meeting?

9        A.  No.

10       Q.  Does the -- do planning commission

11   members normally direct staff on what courses

12   they can take when reviewing or considering

13   development plan applications?

14       A.  Do they direct us?

15       Q.  Uh-huh.

16       A.  No.

17       Q.  So this would be unique for a planning

18   commission member to identify three courses that

19   your department could take with respect to a

20   particular development?

21           MR. SCHUMACHER:  Objection.

22       A.  I don't read this that it was directed

23   to me.

24       Q.  Well, it was sent to you and to J. Rush,

1  whoever that is.

2  MR. SCHUMACHER:  Is that a question or a

3  statement?

4  A.  I --

5  MR. SCHUMACHER:  Wait.  Is that a

6  statement or question?

7  MR. INGRAM:  Let the witness answer the

8  question.

9  MR. SCHUMACHER:  You just made a

10  statement.  I'm objecting to the form of your

11  question.

12  Q.  And you can answer, Mr. Brown.

13  MR. SCHUMACHER:  Go ahead, if you know.

14  A.  I have not a clue.

15  Q.  Okay.  Okay.  Can I direct your

16  attention now to what was marked as Exhibit 54.

17  Let me know after you've had an opportunity to

18  review Exhibit 54.

19  A.  Okay.

20  Q.  So Mr. Brown, Exhibit 54 is an email

21  chain that you forwarded to Mr. Greeson on

22  April 15 of 2015.  Do you see that?

23  A.  Yes.

24  Q.  In which you're forwarding comments that

1    you received from planning commission member

2    Coulter from the prior day.  Do you see that?

3        A.  Yes.

4        Q.  In which he's referencing conversations

5    that he had with David Fisher, the head of UMCH

6    at the time, correct?

7        A.  Appears so.

8        Q.  And Mr. Coulter says, Lee, below is a

9    synopsis of what David Fisher and I spoke about

10   this evening.  Do you see that?

11       A.  Yes.

12       Q.  Were you party to that conversation?

13       A.  Honestly, I have no idea.

14       Q.  And this synopsis, Mr. Coulter says he

15   forwarded it to the members of OWA.  Would you

16   have received that email?

17       A.  Well, OWA is the Old Worthington

18   Association that Mikel used to be a part of and

19   that was involved when we were doing the update,

20   but I don't know if I was on it.

21       Q.  And there's a reference that Mr. Fisher

22   had reached out to both Mr. Greeson and to

23   yourself to discuss Lifestyle's proposal and

24   what they sought to do.  Do you see that?  It's

1    in the last paragraph.

2        A.  Yes.

3        Q.  Okay.  Do you recall talking to

4    Mr. Fisher at this time?

5        A.  No.

6        Q.  Okay.  At this time Lifestyles was

7    proposing a planned unit development.  Do you

8    recall that?

9            MR. SCHUMACHER:  Talking about 2015 now?

10       A.  Are we still in the --

11       Q.  At this time.

12       A.  At this time?

13       Q.  Yeah.

14           MR. SCHUMACHER:  We're in agreement it's

15   2015?

16           THE WITNESS:  Yeah.

17           MR. SCHUMACHER:  I just want the record

18   to be clear.  Thank you.

19       A.  I believe that's what they proposed.

20       Q.  And as Mr. Coulter had indicated,

21   Lifestyles was seeking to attract medical

22   entities as part of that proposal.  Do you

23   recall that?

24       A.  That's what's stated.

1      Q.  I know, but did you recall that from

2  your conversations with Mr. Fisher or Lifestyles

3  representatives at that time?

4         MR. SCHUMACHER:  The one he didn't

5  recall?  Objection.

6      A.  I don't remember this one at all.

7      Q.  Okay.  So for a planned unit development

8  of this particular property would you agree or

9  do you agree with the expectation that we'll not

10  make a hundred percent of everyone in

11  Worthington happy, but that it will be a

12  negotiation process with give and take on both

13  sides?

14         MR. SCHUMACHER:  Objection.  Form.

15      A.  Repeat --

16         MR. SCHUMACHER:  Can you read the

17  question back?  Do you want her to read it back?

18         THE WITNESS:  Yeah, if you wouldn't

19  mind.

20         MR. SCHUMACHER:  It's not very good.

21         (Record read back as requested.)

22         MR. SCHUMACHER:  Objection.  Vague,

23  confusing, compound.

24         Answer if you can.

1     A.  I would say no.  I think there's a way

2  to get -- going through the rezoning process, I

3  think there's a way to get to something that

4  people can agree to.

5     Q.  Okay.  So when Mr. Coulter forwarded you

6  this email where he says, I do not expect that

7  we will make 100 percent of everyone in

8  Worthington happy, do you see that?  It's on the

9  second page.

10     A.  Yes, I see it.

11     Q.  So you disagree with Mr. Coulter?

12        MR. SCHUMACHER:  Objection.

13        You can answer.

14     A.  I mean, I can't speak for Mikel, but I

15  think there's a way to.

16     Q.  Did you respond to Mr. Coulter and tell

17  him that you disagreed with him, that there is a

18  way to get 100 percent consensus of everyone in

19  Worthington?

20        MR. SCHUMACHER:  Objection.  That

21  mischaracterizes his answer.

22     A.  I don't believe so.  I would have to

23  look at email.

24     Q.  Okay.  It goes on to say, it will be a

1    negotiation process with give and take on both

2    sides.  Do you see that?

3        A.  Yes.

4        Q.  Do you agree that with the PUD proposed

5    on this particular site that it would require a

6    negotiation process with give and take on both

7    sides?

8            MR. SCHUMACHER:  Objection.  Relevance.

9            You can answer.

10       A.  I think I kind of did, but I think

11   there's a way to get something that -- I still

12   believe there's a way to get to something that

13   most people would be happy with.

14       Q.  Okay.  And would that way involve a

15   negotiation process with give and take on both

16   sides?

17       A.  To a point, yes.

18                      -=0=-

19          (Deposition Exhibit 69 marked.)

20                      -=0=-

21   BY MR. INGRAM:

22       Q.  I'm handing you what's being marked as

23   Exhibit 69.  Let me know after you've had an

24   opportunity to review it, please.

1    A.  Okay.

2    Q.  Okay.  Exhibit 69 is an email from Matt

3  Greeson to you dated August 6, 2015, with a

4  subject of draft thoughts for meeting UMCH.  Do

5  you see that?

6    A.  Yes.

7    Q.  And Mr. Greeson writes to you, per our

8  discussion, here are draft key messages for our

9  meeting.  Do you see that?

10    A.  Yes.

11    Q.  And based on the context, was this a

12  meeting with Lifestyles?

13    A.  Not to my knowledge.

14    Q.  Okay.  Do you know which meeting this is

15  referring to?  With whom is really what I'm

16  after.

17    A.  No.

18    Q.  And so with the questions, what are you

19  doing to respond to the city council's letter,

20  Lifestyle's reactions to public meeting

21  comments, website, what have they received, what

22  did they see as their next steps, who are those

23  questions being directed to?

24    A.  It reads as directed to Lifestyle.

1      Q.  And so one of the key messages that you

2  and Mr. Greeson discussed was that the city does

3  not expect to abandon or modify its

4  comprehensive plan.  Do you see that?

5      A.  Yes.

6      Q.  And it goes on to say as one of the key

7  messages, we believe that the comprehensive plan

8  represents good planning and we should honor the

9  process we went through to establish it.  Is

10  that accurate?

11          MR. SCHUMACHER:  You mean that it's in

12  the document?

13      A.  Yes, that's what's stated.

14      Q.  Okay.  Did you agree with that key

15  message?

16      A.  Which message?

17      Q.  Those two sentences I read from

18  Exhibit 69.

19      A.  In relation to the plan, yes.

20      Q.  Okay.  And was this key message conveyed

21  to Lifestyle?

22      A.  I have not a clue.  They went radio

23  silence.

24      Q.  You don't recall one way or another?

1      A.   No.

2                          -=0=-

3           (Deposition Exhibit 70 marked.)

4                          -=0=-

5   BY MR. INGRAM:

6      Q.   Okay.  Mr. Brown, what's been marked as

7   Exhibit 70 is an email from you to Mr. Greeson

8   dated July 12, 2016 with a subject UMCH.  Do you

9   see that?

10     A.   Yes.

11     Q.   And is this an email that you sent?

12     A.   Yes.

13     Q.   And at this time Lifestyles approached

14  you with a proposal to move forward with a

15  medical office building for OhioHealth on the

16  site.  Do you recall that?

17     A.   I didn't remember it being Lifestyles,

18  but yes.

19     Q.   Well, the email you received was from

20  Anthony Lococo -- L-O-C-O-C-O --

21  @lifestylecommunities.com?

22     A.   Yes.

23     Q.   And Lifestyle's representative asked you

24  what process they would need to follow if they

1  were to move forward with just a medical office

2  building at that time.  Does that refresh your

3  recollection?

4      A.  The medical office building, yes.

5  Talking with Tony Lococo, no.

6      Q.  So you don't remember any conversations

7  with Mr. Lococo beyond this email.  Is that

8  fair?

9      A.  Beyond this email?

10     Q.  Yeah.

11     A.  Well, I've known him for 20 years.

12     Q.  Okay.

13     A.  So I -- I remember dealing with

14 OhioHealth and Daimler on OhioHealth's proposal.

15 I don't remember Lifestyle being involved.

16     Q.  How do you know Mr. Lococo?

17     A.  Through grad school.

18     Q.  So did you go to grad school together at

19 Ohio State?

20     A.  No.  He went to grad school with one of

21 my close friends and working colleague in my old

22 job.

23     Q.  Did you work with or have experience

24 working with Mr. Lococo professionally?

1      A.  I knew he was involved when we did the

2   2015 meeting.  That's it.

3      Q.  Okay.  And then obviously he remained

4   involved in 2016 because he's emailing you about

5   developing a portion of the UMCH property with a

6   medical building for OhioHealth, correct?

7      A.  Correct.

8      Q.  And I take it from your email it would

9   be possible to move forward with a medical

10  office building without a rezoning on a portion

11  of the site, or no?

12     A.  Related to the OhioHealth?

13     Q.  Uh-huh.  I'm sorry.  Yes.

14     A.  Correct.

15     Q.  Okay.  Without a rezoning, however, at

16  that time Lifestyle would still need to receive

17  approval from the planning commission and

18  architectural review board for development plan

19  approval, correct?

20     A.  Correct.

21     Q.  And the architectural review board would

22  also have to approve the architecture of the

23  proposal at that time, correct?

24     A.  Correct.

1      Q.  And then furthermore, at that time the

2  development plan would also need to be approved

3  by city council even without a rezoning,

4  correct?

5      A.  Correct.

6      Q.  So regardless whether a rezoning was

7  involved, city council, municipal planning

8  commission, and the architectural review board

9  must approve the development on the property,

10  correct?

11          MR. SCHUMACHER:  Objection.

12          You can answer.

13      A.  Correct.  As I mentioned with

14  development plans, they go to planning

15  commission and on to city council for approval,

16  and then the subdivision portion of the city

17  council has final approval of the new

18  subdivision of the property.

19      Q.  Okay.  You mentioned you had discussed

20  with Daimler concerning OhioHealth.  Was that in

21  connection with this 2016 proposal or something

22  different?

23      A.  We had a proposal that was going -- it

24  looks like it references this one, but I don't

1  remember them being involved, but Daimler and

2  OhioHealth that was going before my board and

3  commission in like the next 48 hours, and

4  OhioHealth pulled out when the conference center

5  exercised their rights to purchase their

6  property, and that property was half on this

7  proposed site.

8      Q.  Okay.  And so -- so this proposed 30,000

9  square foot building on the site, that would

10  have been along High Street?

11     A.  Correct.

12     Q.  But it couldn't have moved forward

13  because -- was it UMCH at the time exercised its

14  right or was it another party?

15     A.  The Ohio Conference Center exercised

16  their rights to purchase 3.4 acres.  They asked

17  them --

18         MR. SCHUMACHER:  The Ohio Conference

19  Center of UMCH.  You understand that, right?  He

20  asked you about UMCH.

21         THE WITNESS:  Oh.

22     A.  The Ohio Conference Center is the one

23  that exercised their right to purchase land from

24  the UMCH board.

1      Q.  Okay.  Is the Ohio Conference Center

2   associated with UMCH, do you know?

3      A.  I'm sure they're intertwined somewhere.

4   I have no clue.

5      Q.  Okay.

6                        -=0=-

7           (Deposition Exhibit 71 marked.)

8                        -=0=-

9   BY MR. INGRAM:

10     Q.  Okay.  Mr. Brown, I've handed you what's

11  been marked as Exhibit 70.  Let me know when

12  you've had an opportunity to read that.  I'm

13  sorry, 71.

14     A.  Okay.

15     Q.  Okay.  You've reviewed Exhibit 71, which

16  is Worthington 55581 through 55595.  And

17  Exhibit 71 is an email from you to other city of

18  Worthington officials dated June 13, 2017 with

19  the subject resolution sub 01-17.  Do you see

20  this?

21     A.  Yes.

22     Q.  So is this an email you prepared?

23     A.  Yes.

24     Q.  And this concerns a subdivision

1  pertaining to the UMCH property.  Is this

2  subdivision what you were referencing, what you

3  were just referencing?

4      A.  Correct.

5      Q.  So the West Ohio Conference of the

6  United Methodist Church was granted the option

7  to purchase the office building there along High

8  Street.  Is that correct?

9      A.  It's my understanding.

10      Q.  Okay.  And turning to the memorandum

11  starting on page 55594.  There's a memorandum

12  from you to Mr. Greeson.  Do you see that?

13      A.  Yes.

14      Q.  Did you prepare this memorandum?

15      A.  Yes.

16      Q.  To your knowledge, is everything set

17  forth in your memorandum true and correct?

18      A.  It appears so.

19                    -=0=-

20      (Deposition Exhibit 72 marked.)

21                    -=0=-

22  BY MR. INGRAM:

23      Q.  Mr. Brown, I'm going to hand you what's

24  been marked as Exhibit 72.  Let me know when you

1  had a chance to review it.

2      A.  Okay.

3      Q.  Okay.  Exhibit 72 is Worthington 59607

4  through 59608.  It's an email that you sent to

5  Bonnie Michael and copied Mr. Greeson, dated

6  July 25th, 2017.  Do you see that?

7      A.  Yes.

8      Q.  And Councilmember Michael emailed you

9  that same day concerning two houses on Larrimer.

10  Do you see that?

11      A.  Yes.

12      Q.  And she's referring to the two houses

13  that were part of the UMCH site plan in

14  Exhibit 1, correct?  You can pull out Exhibit 1.

15      A.  Yeah.  I know what you're -- yes.

16      Q.  Yes.  Okay.  But at the time UMCH didn't

17  own those two residential properties, correct?

18      A.  Correct.  At least to my knowledge they

19  did not.

20      Q.  And with respect to those two

21  residential properties, councilmember Michael

22  asked you if for some reason UMCH did not

23  purchase the two houses on Larrimer could the

24  owners of those two properties combine the lots

1    and put a small office building on the site.  Do

2    you see that?

3        A.  Yes.

4        Q.  And you said that in response the

5    property would need to be included with the UMCH

6    property to develop in the future or at least a

7    portion of the UMCH property.  Do you see that?

8            MR. SCHUMACHER:  Objection to the

9    hypothetical nature of the question.

10       A.  That's what I have stated here.

11       Q.  Okay.  So based on your response in your

12   email in Exhibit 72, Mr. Brown, would the

13   redevelopment of those two properties have to

14   follow the land use plan set forth in Exhibit 1?

15           MR. SCHUMACHER:  Objection to the

16   hypothetical nature of the question.

17           You can answer.

18       A.  Your question was asking if they were to

19   do an office building would they follow the land

20   use plan?

21       Q.  Any redevelopment of those two

22   properties.

23           MR. SCHUMACHER:  Same objection.

24       A.  Since they're currently zoned

1   residential, they'd have to go through the

2   rezoning process, and that's where we would look

3   to the policy documents for what should be

4   there.

5       Q.  And that would include the land use

6   plan, correct?

7       A.  Correct.

8                   (Recess taken.)

9   BY MR. INGRAM:

10      Q.  Direct your attention to Exhibit 24,

11  Mr. Brown.

12      A.  Okay.

13      Q.  Exhibit 24 is an email from you to

14  Mr. Greeson, CCing Mr. Lindsey, dated

15  January 18, 2018.  Do you recognize that?

16      A.  Yes.

17      Q.  The subject was UMCH talking points,

18  correct?

19      A.  Yes.

20      Q.  And your email indicates that you'd

21  received an email from EMH&T concerning the UMCH

22  property, right?

23      A.  Correct.

24      Q.  And Lifestyles was seeking to split

1    approximately 5 acres from the UMCH site,

2    correct?

3        A.  That's what they proposed, yes.

4        Q.  Okay.  And that's indicated in the

5    second page of Exhibit 24, that approximate area

6    of the 5 acres?

7        A.  Yes.

8        Q.  And you wrote to Mr. Greeson, quote,

9    just thinking of ways to control.

10           Do you see that?

11       A.  Which?

12       Q.  The last sentence of your second

13   paragraph.

14       A.  Yes.

15       Q.  Okay.  And then your fourth paragraph

16   you write, quote, we still have the control on

17   the site as it relates to development plans, ARB

18   control and any rezoning that would be

19   requested, end quote.

20           Do you see that?

21       A.  Yes.  That's what's stated.

22       Q.  Okay.  Is the "we" you're referring to

23   the city of Worthington?

24       A.  Yes, since those are our rules and

1  regulations.

2      Q.  Now, this 5-acre split-off never

3  occurred.  Do you recall why not?

4      A.  No.

5      Q.  I'm going to direct your attention to

6  what has been marked as Exhibit 31.  Let me know

7  once you had an opportunity to review

8  Exhibit 31.

9      A.  Okay.

10     Q.  Exhibit 31 is a Summary of Phases for

11  Development of the UMCH Property by Attorney

12  Adam Florey.  Do you see that?

13     A.  Yes.

14     Q.  When is the first time you saw this

15  document?

16     A.  Right now.

17     Q.  You've never seen it before?

18     A.  Does not look familiar to me at all.

19     Q.  Okay.  Have you heard anyone discuss

20  Mr. Florey's summary?

21     A.  I don't even know who he is.  I see he

22  has a Worthington...

23                    -=0=-

24         (Deposition Exhibit 73 marked.)

1                    -=0=-

2  BY MR. INGRAM:

3       Q.  Handing you what's been marked as

4  Exhibit 73, Mr. Brown.  Let me know when you've

5  had an opportunity to review it.  For purposes

6  of the record Exhibit 73 is Worthington 55320

7  through 55321.

8       A.  Okay.

9       Q.  Okay.  Exhibit 73 is an email from you

10  to Councilman Robinson, copying Mr. Greeson,

11  dated June 18, 2019.  Do you see that?

12       A.  Yes.

13       Q.  And the subject is a question from

14  resident regarding Lifestyle Communities

15  purchases, demos and trees.  Do you see that?

16       A.  Yes.

17       Q.  So Councilman Robinson had emailed you

18  earlier that morning concerning questions about

19  two residential properties at 47 and 57

20  Larrimer.  Do you see that?

21       A.  Yes.

22       Q.  And those would be the two residential

23  properties we just discussed a moment ago?

24       A.  Correct.

1    Q.  And Councilman Robinson had indicated

2  that it was his understanding that Lifestyle had

3  purchased those two properties?

4    MR. SCHUMACHER:  Objection.

5    You can answer.

6    A.  That's what he states.

7    Q.  And he's asking you about the demolition

8  of the homes on the property and trees.  Do you

9  see that?

10    A.  Yes.

11    Q.  Okay.  Now, turning to your response to

12  Councilman Robinson, when I look at your second

13  paragraph, you say, we will look at the trees as

14  part of a review of any plans coming forward.

15  The two parcels would be incorporated into any

16  review of the site and combined.  The properties

17  would be rezoning to a PUD.  Do you see that?

18    A.  Yes.

19    Q.  Why do you conclude that the two

20  residential properties would be rezoned to a

21  PUD?

22    A.  PUD versus a straight zoning category or

23  what?

24    Q.  Well, I'm asking you.  I'm just asking

1  you why you reached that conclusion that those

2  two properties would be rezoned to a PUD?

3      A.  Well, I guess the context, these parcels

4  are as big as this table in this room.  They're

5  not likely be able to develop on their own.  So

6  if any of the site had been recommended, we look

7  at a PUD on this portion of the site where the

8  zoning would have to change.  They're currently

9  zoned single family R10 residential.  So any

10  change, we'd be recommending the PUD because it

11  would be then assuming going into the bulk of

12  the LC property.

13      Q.  Okay.  So -- and the PUD conclusion,

14  that's influenced by the land use plan

15  applicable to the site, correct, in Exhibit 1?

16      A.  Correct.

17      Q.  I'm going to direct your attention to

18  what was marked as Exhibit 57.

19      A.  Okay.

20      Q.  So Mr. Brown, Exhibit 57 is an email

21  chain among you, Mr. Greeson, and Mr. McCorkle.

22  What was Mr. McCorkle's role in 2020?

23      A.  I believe he was still just economic

24  development director.

1    Q.  Okay.  And starting with the bottom

2  email on the first page, there's an email from

3  you to Mr. Greeson and Mr. McCorkle on March 27,

4  2020, the subject of which was OhioHealth.  Do

5  you see that?

6    A.  Yes.

7    Q.  And you had just gotten off the phone

8  with Todd Sloan.  Who's Mr. Sloan?

9    A.  Todd Sloan is Daimler.

10    Q.  And was Daimler seeking to find a site

11  for OhioHealth in Worthington?

12    A.  That's my understanding, yes.

13    Q.  And you wrote, it looks like they are

14  probably going to move forward with their

15  discussions with Ohm for the Holiday Inn site.

16  Is that Ohm Patel?

17    A.  Yes.

18    Q.  And he's a developer in the area?

19    A.  Correct.  He owns the old Holiday Inn

20  site.

21    Q.  And you go on to state that we also

22  discussed the southern portion of the Anthem

23  site and the NCR building.  So was OhioHealth

24  also considering two other potential sites?

1      A.  Yes.

2      Q.  And Mr. Greeson responded, do we think

3  any of their discussions rise to the level of

4  informing either the planning commission or city

5  council at this point.  Do you see that?

6      A.  Yes.

7      Q.  And you respond to Mr. Greeson saying

8  that, quote, it might be time to at least let

9  them know that the UMCH site is off the table,

10  end quote.

11          MR. SCHUMACHER:  The sentence goes on.

12  You just stopped the quote there.

13      Q.  Do you see that?

14      A.  I see it, yes.

15      Q.  Why did you write that the UMCH site is

16  off the table with respect to OhioHealth?

17          MR. SCHUMACHER:  Objection.

18  Mischaracterizes the document.

19          You can answer.

20      A.  It's my understanding in talking with --

21  which I feel bad I forgot his name now -- Todd

22  Sloan with Daimler that they had backed out of

23  their agreements and/or working with LC.

24      Q.  Okay.  You're going to have to explain

1    that one for me.  Who is the "they"?

2         A.  Daimler and OhioHealth were interested

3    in doing two different times on the UMCH site or

4    the LC site, whatever you want to call it, and

5    they could not come to agreement with LC is what

6    Daimler stated.

7         Q.  Okay.  So Daimler was also considering

8    either the Holiday Inn site, the Anthem site,

9    NCR building, but you wrote it might be time to

10   at least let them know that the UMCH site is off

11   the table.  Who are you referring to?

12        MR. SCHUMACHER:  And that they're

13   working with them on alternate locations.

14   That's what the sentence says, Chris.

15        A.  The way I meant it was boards,

16   commissions, council.  I think everyone still

17   thought that OhioHealth was going to be

18   somewhere on the UMCH site, and then in

19   discussions with Todd Sloan it was communication

20   had broke down and it wasn't going forward.

21        Q.  Okay.  Were you party to those

22   discussions or were you basing that conclusion

23   that the discussions with Lifestyles broke down

24   based on Tom Reis and Mikel Coulter's

1  conversations?

2      A.  Which -- I was not involved in the

3  discussions with OhioHealth.  Todd Sloan and

4  Daimler were involved.  So it's hearsay.  Todd

5  Sloan is the one that told us -- or told me that

6  it broke down.

7      Q.  Okay.  So you don't have any direct

8  knowledge or you didn't participate in any

9  conversations --

10     A.  Correct.

11     Q.  -- between --

12         MR. SCHUMACHER:  Wait until he finishes.

13     A.  Sorry.

14     Q.  -- Lifestyle and OhioHealth concerning

15  the development of an OhioHealth office building

16  on Lifestyle's property, correct?

17         MR. SCHUMACHER:  Objection.  Lifestyle

18  didn't own the property at this time.

19         You can answer.

20     A.  That's my understanding.

21     Q.  Okay.  And the reason why I asked you

22  about Tom Reis and Mikel Coulter is in your

23  email you say Tom Reis and Mikel Coulter are the

24  only two that know something is going on through

1  their connection in the development world.

2       What are you referencing there?

3  A.  From what I recall at the time -- you

4  have to ask Mikel or Tom -- was that they knew

5  that Daimler and OhioHealth were not interested

6  in working on the LC property site anymore.

7  Q.  Okay.  But again, you don't have any

8  knowledge of that.  That's what you're inferring

9  through conversations with Mr. Reis or

10  Mr. Coulter?

11       MR. SCHUMACHER:  Objection.  That

12  mischaracterizes his testimony.

13  A.  I would say more so from Todd Sloan with

14  Daimler since they were the actual developer.

15  Q.  Let's turn your attention to what's been

16  marked as Exhibit 45.

17  A.  Okay.

18  Q.  Okay.  Exhibit 45 is an email from you

19  to a lot of Worthington officials dated

20  October 5th, 2020, regarding the subject UMCH

21  site rezoning application.  Do you see that?

22  A.  Yes.

23  Q.  And your email begins with dear council,

24  municipal planning commission, and architectural

1  review board members.  So were you emailing city

2  council, planning commission, and architectural

3  review members as well as other city officials

4  here?

5      A.  Yes.

6      Q.  Okay.  And you wrote, I wanted to let

7  you know that we just received a rezoning

8  application concerning the UMCH site.

9          Did you send this email the same day

10  that Lifestyles filed its rezoning application,

11  do you recall?

12      A.  I believe they submitted on the 5th.  If

13  so, yes.

14      Q.  Okay.  So fairly immediately after

15  Lifestyle's application was filed, you were

16  emailing city council, planning commission,

17  architectural review board members as well as

18  other city officials about that application,

19  correct?

20      A.  Correct.

21      Q.  Okay.  Why did you immediately notify

22  all of these city officials about that

23  particular application?

24      A.  This application?

1      Q.  Yes.

2      A.  One, we've been talking about it for 10

3   years.  Usually any big projects we get in I

4   will try to give all the other councilmembers,

5   board and commission members a heads-up if we

6   got something in.  So this was just following

7   like past practice on a big application.

8      Q.  Why do you refer to this as a big

9   application?

10         MR. SCHUMACHER:  Objection.

11         You can answer.

12      A.  It was 550-some pages and came in a big

13   book.

14      Q.  Any other reasons?

15         MR. SCHUMACHER:  Objection.

16      A.  No.

17      Q.  So just mere volume is why you notified

18   all these officials?

19         MR. SCHUMACHER:  Objection.

20      Q.  It was 500 pages in length?

21         MR. SCHUMACHER:  Objection.  Asked and

22   answered.

23      A.  Again, as I mentioned, any big project

24   we have coming in, I will let them all know that

1   something's come in.  This one's been on the

2   radar, and then that's why they were notified.

3   The big application was a big application.

4           MR. INGRAM:  Tell you what, I've been

5   going on for a while.  You think now is a good

6   time for lunch?

7           THE WITNESS:  That's fine.

8           MR. INGRAM:  Let's take a lunch break.

9                (Recess taken.)

10                    -=0=-

11       (Deposition Exhibit 74 marked.)

12                    -=0=-

13  BY MR. INGRAM:

14      Q.  Welcome back from lunch, Mr. Brown.  I'm

15  going to hand you what's marked as Exhibit 74.

16  Let me know after you've had an opportunity to

17  review that exhibit, please.

18      A.  Okay.

19      Q.  Exhibit 74 is an email chain from

20  Councilman Robinson to you dated October 6,

21  2020, subject is the UMCH site rezoning

22  application.  Do you see that?

23      A.  Yes.

24      Q.  Turning to page 2, Councilman Robinson

1  responded or replied to your email.  That was

2  Exhibit 45 that we looked at prior to this lunch

3  break.  Do you see that?

4     A.  Yes.

5     Q.  And Councilman Robinson requested that

6  you provide to him each and every file that LC

7  submitted as part of their proposal with no

8  redactions, edits or omissions.  Is that fair?

9     A.  That's what's stated here.

10     Q.  Okay.  Did you provide Councilman

11  Robinson with the requested information?

12     A.  I must have.  It references the PDF link

13  I sent out.  Yes.

14     Q.  So do you agree with him that this was

15  an unusual request of a councilman to make?

16     A.  I'd have to defer to him on that.  For

17  me, it's not uncommon for a councilmember to ask

18  for the information related to a project.

19     Q.  How about the same day it's filed?

20     A.  I would say consistent.  I've had

21  councilmembers ask for information if they know

22  it's been filed.

23     Q.  Okay.  Do councilmembers commonly ask

24  for all information pertaining to an application

1    that is not pending before city council?

2         MR. SCHUMACHER:  Objection.

3    A.  Any application that's not going to end

4    up before them or any application in general?

5    Q.  Pending before city council.

6    A.  You're asking if I've -- sorry.

7         MR. SCHUMACHER:  If you don't know what

8    he's asking, then tell him.

9    A.  I've had them ask for -- whether it be

10   an architectural review board application that

11   stops at ARB or board of zoning appeals, it

12   doesn't always have to make it through its

13   process up to them if that was the question.

14   Q.  Okay.  So at this point in October 6th

15   of -- October 5th, sorry, of 2020, Lifestyle's

16   application has not even before city council,

17   correct?

18        MR. SCHUMACHER:  Objection.

19   Argumentative.

20        You can answer.

21   A.  At this point they just made application

22   on the 5th.

23   Q.  Right.  So it's not before city council

24   yet, correct?

1          MR. SCHUMACHER:  Objection.

2    Argumentative.

3          You can answer.

4     A.  It would be in the pipeline.

5     Q.  Okay.  So could city council review and

6    vote on this application as of October 5th or

7    6th of 2020?  Is that your testimony?

8          MR. SCHUMACHER:  Same objection.

9    Argumentative.

10    A.  One has been submitted, and we're

11   scheduled for hearing so they wouldn't be able

12   to do anything at this point in time on it.

13    Q.  Right.  Because under the zoning

14   procedures set forth in Worthington zoning code

15   planning commission has to review and consider

16   and make a recommendation to city council on the

17   application first, correct?

18          MR. SCHUMACHER:  Objection to the extent

19   you're asking him for a legal conclusion.

20          You can answer.

21    A.  That's what's outlined in our code,

22   zoning code.

23    Q.  And Mr. Robinson, on the morning of

24   October 6th, 2020, wrote to you that he would

1   like to have a short conversation today if your

2   schedule permits.  Do you see that?

3       A.  I see a reference in the email.

4       Q.  What did you and Mr. Robinson discuss

5   about Lifestyle's application when it was filed?

6       A.  Honestly three years later, maybe what

7   was submitted.  I honestly have no idea.

8       Q.  You don't recall.  Did you take any

9   notes from your conversations with Councilman

10  Robinson?

11      A.  No.

12                      -=0=-

13          (Deposition Exhibit 75 marked.)

14                      -=0=-

15  BY MR. INGRAM:

16      Q.  Mr. Brown, I've handed you what's been

17  marked as Exhibit 75.  It's an email from

18  Councilman Robinson to you dated December 14,

19  2020.  Do you see that?

20      A.  Yes.

21      Q.  And he's responding to an email you sent

22  him, correct?

23      A.  That's what it appears to be.

24      Q.  Why were you keeping City Councilman

1  Robinson posted about the traffic study

2  concerning Lifestyle's application in December

3  of 2020?

4      A.  I assume it was in relation to what was

5  going before -- would be going before the

6  planning commission and architectural review

7  board for relation to their application for

8  traffic.

9      Q.  Okay.  Do you recall one way or another?

10     A.  No.

11     Q.  Were you asked to keep Councilman

12  Robinson apprised of the consideration of

13  Lifestyle's application throughout the process?

14     A.  Repeat one more time.

15     Q.  Were you asked to keep Councilman

16  Robinson apprised of the consideration of

17  Lifestyle's application throughout the process?

18     A.  I think all the councilmembers wanted to

19  know what was going on throughout the process.

20  I mean, he's asked questions.

21     Q.  Okay.  Well, why didn't you email any

22  other councilmembers on December 14, 2020,

23  regarding when you would be discussing the

24  traffic study?

 1      A.  Not sure unless he was the one that just

 2   asked for it at that point.

 3      Q.  Okay.  But you don't recall one way or

 4   another?

 5      A.  No.

 6      Q.  So in your standard practice I take it

 7   you don't provide every councilmember with

 8   step-by-step updates of pending applications

 9   before the planning commission, do you?

10          MR. SCHUMACHER:  Objection.

11   Argumentative.

12      A.  If they call or ask for it, we do.  We

13   let them know where things are in the process.

14      Q.  Okay.  But city council has a member of

15   council who is the liaison to planning

16   commission, correct?

17      A.  Correct.

18      Q.  And that liaison can keep those other

19   members of council apprised of the developments,

20   correct?

21          MR. SCHUMACHER:  We talking about the

22   MPC now?

23      A.  You talking about the liaison to

24   council --

 1      Q.  Yes.

 2      A.  -- or to planning commission?

 3      Q.  Planning commission, yes.

 4      A.  I would assume so.  I can't speak for

 5  what the liaison actually tells them.

 6      Q.  Okay.

 7                      -=0=-

 8         (Deposition Exhibit 76 marked.)

 9                      -=0=-

10  BY MR. INGRAM:

11      Q.  I'm going to hand you what's being

12  marked as Exhibit 76, Mr. Brown.  Let me know

13  when you've had an opportunity to review it.

14         For purposes of the record Exhibit 76 is

15  marked Worthington 53954 through 53966.  Strike

16  that.  67.

17         MR. INGRAM:  But I believe,

18  Mr. Schumacher, Exhibit 76 is available on the

19  city's website.

20         MR. SCHUMACHER:  Starting to cheapen out

21  on us.

22      A.  Okay.

23      Q.  So Mr. Brown, Exhibit 76 is an email

24  that you sent on January 14, 2021 to looks like

1   members of council and other Worthington

2   officials, and the subject is council questions

3   - LC response.  Do you see that?

4       A.  Yes.

5       Q.  Did you draft this email?

6       A.  The email, yes.

7       Q.  Okay.  And attached to your email are

8   Lifestyle's responses to 48 questions city

9   councilmembers directed to Lifestyles concerning

10  its rezoning application, correct?

11      A.  That's what it appears to be, yes.

12      Q.  And as of noon on January 14, 2021, the

13  planning commission had not yet conducted any

14  hearings on Lifestyle's application, correct?

15      A.  Correct.

16      Q.  So how did it come to be that city

17  council directed 48 questions to Lifestyles

18  about its rezoning application before planning

19  commission even heard it?

20      A.  I think you'd have to ask council.  The

21  materials were all posted online when we

22  received them.  It's part of the public

23  information.  I believe they directed the

24  questions to Matt and to Robyn that we sent or

1  they sent or I sent to LC.

2      Q.  Okay.  So city councilmembers -- if I

3  understand you correctly, city councilmembers

4  directed questions to Matt or -- who was the

5  other person you said?

6      A.  Robyn Stewart.

7      Q.  -- Robyn Stewart, and then either one of

8  them or yourself sent those questions to

9  Lifestyle's representatives.  Is that fair?

10      A.  We would have probably sent it on to

11  their attorney.

12      Q.  You don't recall, though, one way or

13  another?

14      A.  Honestly, no.  It would have probably

15  been me since I was the contact with their

16  attorney.

17      Q.  And their attorney was Mr. Hart,

18  correct?

19      A.  Yes.

20      Q.  And did you participate in creating any

21  of these 48 questions that were directed to

22  Lifestyle?

23      A.  Creating the questions?

24      Q.  Yes.

 1      A.  No.

 2      Q.  Were you involved in collecting these

 3  questions from city councilmembers?

 4      A.  No.  I believe they all went to Matt and

 5  to Robyn.

 6      Q.  Who decided which questions would be

 7  forwarded to Lifestyles?

 8      A.  That, I do not know.

 9      Q.  Do you attend city council meetings,

10  Mr. Brown?

11      A.  Yes.

12      Q.  Were the creation -- were the creation

13  of this list of questions or the list of

14  questions themselves discussed in any open

15  meeting of city council?

16      A.  I honestly have no idea.  I attend 6 to

17  7 meetings a month.  I couldn't tell you.

18      Q.  Well, you would have been paying

19  attention with respect to this particular

20  application, correct?  It was a big one.

21          MR. SCHUMACHER:  Objection.

22  Argumentative.

23      A.  Well, this has gone on for 10 years.  It

24  all starts to blend.  They could have.  I

1  honestly have no idea.  I remember them talking

2  about questions and they were to be sent to Matt

3  and Robyn.  That's all I can tell you.

4      Q.  And in your experience here at

5  Worthington has city council ever directed a

6  property owner or applicant to answer 48

7  questions about an application that was not even

8  before city council?

9      A.  I know they've asked questions -- maybe

10  not of this level, but they've asked questions

11  on other applications.

12      Q.  Okay.  And have they asked questions in

13  this manner in which those questions required

14  written responses from the applicant?

15      A.  I'd have to go back and look at each

16  bigger project we've had, but possibly.  I don't

17  know.

18      Q.  Can you recall another example where

19  anything of this nature has ever occurred

20  before?

21      A.  Where they've asked questions or where

22  they've asked questions that are 48 questions?

23      Q.  Dozens of questions regarding an

24  application that's not even before them yet.

1          MR. SCHUMACHER:  Objection.  Relevance

2    to any issue in dispute not proportional to the

3    needs of the current case, but you may answer.

4      A.  I'd say, yes, they've asked questions of

5    things that may get to them eventually or even a

6    lot of questions related to items that don't

7    come before them ever if it just stops at

8    planning commission or ARB.

9      Q.  Okay.  My question's a little different.

10   Which examples are you referring to?

11          MR. SCHUMACHER:  His question's a little

12   different.

13      A.  The ones I can think of are maybe the

14   lodge redevelopment in Old Worthington; High

15   North which is the redevelopment of the

16   Worthington Mall; the Worthington Gateway, which

17   is redevelopment of the Holiday Inn site; and

18   East Wilson Bridge Road rezonings.

19          MR. SCHUMACHER:  Is that where Starbucks

20   is?

21          THE WITNESS:  It's further than the S

22   curve.

23      Q.  Okay.  So if I were to go to the city of

24   Worthington's website and search for questions

1  posed by city council to the applicants of

2  either the lodge redevelopment, High North

3  redevelopment, Worthington Gateway application,

4  or the East Wilson Bridge Road rezonings, would

5  I find their questions and answers listed on

6  Worthington's website?

7        MR. SCHUMACHER:  Objection.  Relevance.

8        You can answer.

9    A.  Like this layout?

10   Q.  Yes.

11   A.  There could be.  I don't know.  It may

12  be incorporated into the memo; so I don't know.

13   Q.  Okay.  Now, city council also directed

14  questions to staff, correct --

15   A.  I believe so.

16   Q.  -- around the same time?

17       Were you involved in preparing any --

18  the responses to city council's questions?

19   A.  Myself and others would have been.

20   Q.  And who would the others be?

21   A.  If it touched anything in law, Tom

22  Lindsey would have been involved or Lynda Bitar

23  in my office would have been involved.  Or if it

24  was something utility related, maybe the service

1  and engineering department coordination, or if

2  it was stormwater, our consultant, or traffic,

3  our consultant; so it would just depend who.

4      Q.  Okay.  Did the city engage a consultant

5  to determine the impact to the city budget were

6  Lifestyle's application to pass?

7      A.  A consultant?

8      Q.  Yes.

9      A.  Not to my knowledge.

10                    -=0=-

11        (Deposition Exhibit 77 marked.)

12                    -=0=-

13        MR. SCHUMACHER:  That's heavy.  The over

14  and under is 85.

15  BY MR. INGRAM:

16      Q.  Okay.  Mr. Brown, you've been handed

17  what's been marked as Exhibit 77.  For purposes

18  of the record, it's labeled Worthington 53968

19  through Worthington 54030.  Let me know after

20  you've had an opportunity to review it.  If it's

21  helpful, Mr. Brown, I don't anticipate asking

22  you any specific questions about the contents of

23  the presentation.

24      A.  Okay.

1          MR. SCHUMACHER:  When you do a slide

2    show this long...

3      Q.  Okay.  Mr. Brown, Exhibit 77 is an email

4    from you to certain Worthington city officials

5    dated January 14, 2021, with the subject LC

6    presentation.  Do you see that?

7      A.  Yes.

8      Q.  And you're providing Lifestyle's

9    presentation to those officials, and that

10   presentation was for the planning commission and

11   architectural review board's hearing on

12   January 14, correct?

13     A.  Correct.

14     Q.  And you write in your cover email, not

15   what I expected to be in their presentation.  Do

16   you see that?

17     A.  Yes.

18     Q.  Okay.  What did you expect?

19     A.  In 27 years I've never seen a

20   development come through that had no maps, site

21   plans, layouts.  It was all verbiage and an

22   overview of them as a company and their

23   developments.  It didn't really go into anything

24   that showed the site in context with what was

1    recommended in the comp plan.

2        Q.  Anything else?

3        A.  No.

4        Q.  Now, at that time, however, their

5    application and their development plan that was

6    part of their application contained maps,

7    layouts, the site context to which you're

8    referring to, correct?

9            MR. SCHUMACHER:  Objection.  Vague.

10       A.  That LC submitted?

11       Q.  Yes.

12       A.  That did include site plans and

13   renderings.

14       Q.  So the materials you're referring to as

15   not being present in this PowerPoint

16   presentation would and were included in

17   Lifestyle's application, correct?

18       A.   In their application materials, yes.

19       Q.  I want to direct your attention now,

20   Mr. Brown, to Exhibit 59.  And Exhibit 59 is the

21   Minutes of the Regular Meeting of the

22   Worthington Architectural Review Board,

23   Worthington Municipal Planning Commission held

24   on January 14, 2021.  Do you see that?

1    A.  Yes.

2    Q.  Mr. Brown, when did you first provide

3  Lifestyles with a copy of your staff report for

4  this hearing?

5    A.  Probably a week prior.

6    Q.  Do you know one way or another?

7    A.  It's typically whatever the Thursday or

8  Friday before that meeting would be.

9    Q.  So your standard practice is to provide

10  the applicant with a copy of your staff report

11  the Thursday or Friday before the hearing?

12    A.  Correct.

13    Q.  Okay.  Do you recall one way or another

14  if you did that in this instance?

15        MR. SCHUMACHER:  Objection.  Asked and

16  answered.

17    A.  It would have been on Thursday or

18  Friday.  Whatever the Friday or Thursday would

19  have been before that 14th day.

20    Q.  Okay.  My question is a little

21  different.  Do you specifically recall whether,

22  in fact, you did that on this occasion or not?

23        MR. SCHUMACHER:  Same objection.

24    A.  Me personally emailing it or...

1      Q.  Yes.

2      A.  It probably was Lynda Bitar sending it

3  out to the applicant and what we post on the

4  city's website, or it could have come from me.

5      Q.  So you don't know one way or the other

6  in this particular circumstance?

7      A.  It would have been one of us.

8      Q.  And for purposes of the record this

9  January 14, 2021 meeting would have been the

10  first planning commission or ARB hearing on

11  Lifestyle's application, correct?

12      A.  Correct.

13      Q.  When I look at -- you provided during

14  that hearing on January 14 the staff memo to the

15  members of planning commission and ARB, correct?

16      A.  Correct.

17      Q.  And was the staff memo your memo?

18      A.  I wrote the staff memo if that's what

19  you're asking.

20      Q.  And you provided it to Mr. Greeson and

21  gave him the opportunity to review and revise

22  it?

23      A.  I directly reported to Robyn Stewart and

24  Matt.  So one of the two would have been privy

1  to look at it.

2      Q.  Okay.  Did you provide it to anyone else

3  for their review prior to it being finalized?

4      A.  Possibly Lynda Bitar, the other planner

5  in the office, but those are the only -- unless

6  Tom Lindsey, our law director, looked at it, but

7  those are the only ones I can think of.

8      Q.  Okay.  Did you provide any drafts to any

9  members of city council?

10      A.  I did not.

11      Q.  Do you know if anyone else did?

12      A.  I do not.

13      Q.  Okay.  When I see the recommendation

14  here on page 2 of Exhibit 59, there's two

15  different recommendations as I see it.  There's

16  a recommended denial of the LC's application as

17  it currently stood, is the first, correct?

18      A.  Correct.  That's what's in the memo.

19      Q.  And then the second alternative would be

20  that if LC were to make significant

21  modifications and changes after listening to the

22  comments from city staff, board and commission

23  members, the Worthington community, staff would

24  recommend tabling the Lifestyle's application,

1    correct?

2        A.  Correct.  That's what's written.

3        Q.  Okay.  Why did you reach those two

4    recommendations?

5        A.  Because the applicant always has the

6    opportunity to make modifications after

7    listening to testimony, reading the staff's

8    memo, and I would have hoped after they read the

9    memo and saw where I thought there was

10   discrepancies with the comp plan, that they

11   would make changes for their next submittal.

12       Q.  Let's turn to page 26.  Is it fair to

13   say that as of January 14, 2021, Mr. Brown, you

14   felt that you needed more information about

15   Lifestyle's application to better understand it?

16       A.  I think more detailed information on

17   certain items versus the 500 pages that were

18   dropped.

19       Q.  Okay.  Was there anything -- any big

20   glaring omission or anything specific you're

21   referring to there?

22       A.  In the application they submitted?

23       Q.  In the information that you felt you

24   needed.

1     A.  I think there was the need, one, to have

2  the stormwater discussion and the traffic

3  discussion, and then looking at the topics in

4  the comp plan of the density mixes and types,

5  the connection points and open space, there need

6  to be more.

7     Q.  What information from the applicant did

8  you require pertaining to the density mixes?

9     A.  I didn't require anything.  I just

10  reviewed what they submitted.

11     Q.  What information did you need from the

12  applicant to have a better understanding of the

13  types of uses being proposed?

14     A.  I think in the context was what they

15  were proposing was a residential for-sale,

16  for-rent product, but what we had been hearing

17  from the community and was referenced in some of

18  the plans were the variety of housing types,

19  whether it be senior housing and affordable

20  housing, single-level living.  It was to better

21  understand what their product was.

22     Q.  Okay.  And that mix of the types of

23  housing that you just referenced, that's not

24  spelled out in the comprehensive plan, is it?

1      A.  Do you have a copy of the comp plan?

2      Q.  It's Exhibit 1.

3      A.  In the Neighborhood Core it talks about

4  developed with more than one housing type, more

5  than one density.  And then on the High Street

6  Mixed Use it talks about residential should be

7  subordinate to the office and medical office,

8  and then --

9      Q.  Okay.  Before we go further --

10         MR. SCHUMACHER:  Let him finish his

11  answer.  You asked a broad question.  He's going

12  to give you his answer.

13     A.  And then it goes in to talk about --

14  let's see what section.  I think it's the core

15  area.  The Neighborhood Core.  Create

16  opportunities under different types of housing

17  options that are not available in the city,

18  provide residential living that's unrepresented

19  in the market, complements Worthington's current

20  offerings, address the needs of aging

21  population, future young professionals.

22         MR. SCHUMACHER:  She's going to have a

23  hard time.

24     A.  Then it goes into reference examples of

1  mixed -- of single-family detached homes,

2  first-floor living, and on.

3     Q.  Anything else?

4     A.  Without reading the whole thing, no.

5     Q.  Okay.  So let's start then with the

6  Neighborhood Core.

7        MR. SCHUMACHER:  Chris, it's in the --

8  it's in the staff memo.

9     A.  I mean, all the -- all the deficiencies

10  I felt are referenced in the staff memo.  Even

11  when they made changes that were positive were

12  referenced in the staff memo.

13     Q.  Okay.  But you pointed me back to the

14  land use plan, and I asked you --

15     A.  Which is where it comes from in the

16  staff memo.

17     Q.  I asked you about where in the land use

18  plan it spells out the specific type of

19  residential uses that you referred to, and you

20  pointed out the Neighborhood Core.  And the

21  Neighborhood Core talks about single-family

22  homes, talks about walk-up townhomes, and

23  high-end flats.  Do you see that?

24     A.  Yes.

1     Q.  And Lifestyle's application included

2  townhomes and flats, correct?

3     A.  I believe so.

4     Q.  Okay.  I don't know what your counsel

5  just referred you to.

6        MR. SCHUMACHER:  Here it is.  It's all

7  right here, Chris.  Why don't you just read the

8  staff report.  It refers back to the comp plan.

9  It points out every deficiency.  But if you want

10  to sit here and debate with the land use planner

11  about it, that's not a productive use of time.

12  It's also well beyond the scope of discovery of

13  the relevant issues that remain in the lawsuit.

14        MR. INGRAM:  And, Counsel, it is

15  entirely inappropriate for you to coach the

16  witness and show the witness your highlighted

17  document while a question's pending and you know

18  that.

19        MR. SCHUMACHER:  I'm sorry that it was

20  highlighted, but this is a document that I've

21  been using.  It's also inappropriate for you to

22  continually ask questions about issues that the

23  Court has already decided.

24

1  BY MR. INGRAM:

2      Q.  In your prior answer, Mr. Brown, you

3  also raised the High Street Mixed Use section of

4  the land use plan.  Do you recall that?

5      A.  Yes.

6      Q.  Where in that section of the land use

7  plan were you referring to?

8          MR. SCHUMACHER:  Objection.  Relevance.

9      A.  Second paragraph on page 92, the High

10  Street Mixed Use zone consists of frontage of

11  the UMCH site long High Street.  It permits a

12  mix of office, residential, and retail uses with

13  a focus on commercial office and medical office

14  with subordinate residential and limited retail.

15      Q.  Okay.  With respect, though, to the

16  types of residential development it doesn't

17  spell out which types, does it?

18      A.  Meaning?  What do you mean?

19      Q.  This whole line of questioning

20  originated from your response that you needed

21  more information with respect to the types of

22  housing from Lifestyles, and you pointed me back

23  to the land use plan set forth in Exhibit 1, and

24  referenced the High Street Mixed Use portion of

1  that plan.  So I'm trying to understand which --

2  where is it spelling out which residential types

3  are appropriate for that section of Lifestyle's

4  property?

5          MR. SCHUMACHER:  And again, my objection

6  is that is covered in explicit detail in

7  Exhibit 59 that you refuse to acknowledge.

8          MR. INGRAM:  Counsel, you should refrain

9  from speaking objections and attempting to coach

10  your witness.

11          MR. SCHUMACHER:  Look, Chris, you are

12  intent on debating whether your client's

13  application met with the 2014 comprehensive

14  plan.  You've got before you a document that

15  details every deficiency that this witness

16  listed.  That document's 58 pages long, and now

17  you're trying to test his recollection with

18  that.  That's inappropriate.  It's also beyond

19  the scope of discovery in a case where the only

20  remaining issues are far from the issue that

21  you're trying to debate.

22  BY MR. INGRAM:

23      Q.  You may answer, Mr. Brown.

24      A.  I don't even know what you're asking

1   now.

2        MR. INGRAM:  Counsel, if you would stick

3   to form objections, perhaps this could go a

4   little easier so that the witness can keep track

5   of what's being asked.

6        MR. SCHUMACHER:  Perhaps we should call

7   the judge so that we can get to the bottom of

8   what's relevant to this deposition so that we're

9   not here all day.

10       MR. INGRAM:  Counsel, you have made that

11   threat at every single deposition in this case.

12   It's improper.

13       Can you read back the question that was

14   pending, please.  Thank you.

15         (Record read as requested.)

16   A.  In that context it just says it needs to

17   be subordinate to the office and retail.

18   Q.  Okay.  You also testified, Mr. Brown,

19   that you needed more information from Lifestyles

20   regarding the amount of open space.  Do you

21   recall that?

22   A.  I guess.

23        MR. SCHUMACHER:  Objection.  If you

24   don't know, tell him you don't know.

1     A.  I don't know.

2          MR. SCHUMACHER:  Don't guess.

3     Q.  Okay.  Well, when I asked you the types

4  of information that you felt you needed from

5  Lifestyles, I wrote down, and you correct me if

6  I misunderstood you, the density mixes, the

7  different types of residential uses, the amount

8  of open space, and that was based on the

9  comprehensive plan, and you also mentioned

10  additional details concerning stormwater,

11  traffic and interconnections.  Is that fair?

12     A.  That sounds like it.

13     Q.  Okay.  So what information concerning

14  the open space did you want to have from

15  Lifestyle at that time?

16          MR. SCHUMACHER:  Same objections.

17     A.  I need to find it in this.  Do we have

18  an actual memo?

19          MR. SCHUMACHER:  You mean not

20  Exhibit 58?

21          THE WITNESS:  I mean, this is --

22          MR. SCHUMACHER:  Why don't you take your

23  time and read Exhibit 59 so we can answer all of

24  Mr. Ingram's questions explicitly since he's

1    insisting on that.

2        A.  Okay.  What are we asking again?

3            (Record read as requested.)

4        A.  I think for us it was looking at where

5    it was laid out.  There wasn't all known

6    acreages or how they would interact with each

7    other or how they would connect.  And there was

8    also a reference in here in the staff memo of

9    amenities.  We have a requirement in the PUD

10   that you have certain amenities provided in the

11   open space.

12           And then throughout the comp plan it

13   talks about as density increases open space

14   needs to increase.  So there was just questions

15   around how that open space -- whether it was

16   private, public.  Some of it felt just like

17   pieces here and there at the end of apartment

18   buildings, how that all worked together to meet

19   the intent of the open space requirement.

20       Q.  Okay.  Now, the open space was set forth

21   in the application materials, though, correct?

22       A.  There was layout of open space, yes.

23       Q.  And with respect to stormwater and

24   traffic, those two items would have been handled

1   by the city's outside consultants.  Is that

2   fair?

3       A.  And also our service engineering

4   department.

5       Q.  Okay.  And were you aware at the time of

6   what information they would have needed, if any,

7   from Lifestyles?

8       A.  I would have to defer to them.

9       Q.  Okay.  And I believe you also mentioned

10  interconnectivity or interconnections.  What

11  were you referring to there?

12      A.  There's references in the land use plan

13  to have a more usable open space, linear views

14  into the site, and I thought I remember from the

15  original proposal, like I said, there was --

16  there were pieces here and there that could have

17  been consolidated to be more contiguous, usable

18  area versus kind of leftover where you take your

19  dog to pee.

20      Q.  And did you convey those thoughts to

21  Lifestyle prior to January 14 hearing, or would

22  the hearing have been the first opportunity for

23  them to hear that from you?

24      A.  They may have heard it when we had our

1  conversation with their attorney, but it would

2  have been in writing at this January meeting.

3      Q.  Okay.  But you can't recall one way or

4  another whether, in fact, that was shared to

5  Lifestyle's attorney prior to the hearing?

6      A.  I don't recall.

7      Q.  So directing your attention to page 26

8  of those minutes.

9          MR. SCHUMACHER:  Exhibit 59?

10         MR. INGRAM:  Yes.

11     Q.  For the residential density why does

12 your report to -- why does your report make

13 reference to the 2015 informal proposal?

14     A.  It makes reference since the comp plan

15 was adopted in 2014, and in 2015 when Lifestyle

16 came to that special meeting and presented to a

17 community where we had 350 people at the meeting

18 that were against the variety of housing styles

19 and types and amount, it was to put into context

20 of what they were coming back with with this

21 application in the January 14th meeting was less

22 acreage being used but more density than what it

23 was in their concept plan in 2015.

24     Q.  Okay.  But there's no specified maximum

1  density with respect to residential densities

2  applicable to this application, correct?

3      A.  I would disagree.

4      Q.  Okay.  Where is the maximum density

5  specified?

6      A.  Well, throughout this document it talks

7  about residential being subordinate in nature,

8  and then in the middle core section it talks

9  about a range of 6 to 14 units to the acre, but

10  it talks at least two or three times in there as

11  density increases open space needs to increase.

12      MR. SCHUMACHER:  And the witness was

13  referring to Exhibit 1.

14      A.  Sorry.  The comp plan.

15      Q.  Okay.  So referring to the comp plan in

16  the High Street Mixed Use portion of the site,

17  what's the maximum number of apartments that are

18  permitted?

19      A.  There is no reference.  However, it does

20  state residential shall be subordinate to the

21  commercial, office and medical.

22      Q.  So how many apartments are permitted?

23      MR. SCHUMACHER:  Objection.

24  Argumentative.

1          You can answer again.

2     A.  It would just need to be subordinate to

3  the office and medical.

4     Q.  Well, how's a developer supposed to know

5  how many units that is?

6     A.  I would think they would understand that

7  subordinate means less intense and our primary

8  focus is office and medical in that frontage.

9     Q.  Okay.  When you say less intense, how

10  can you compare the number of apartments to a

11  commercial, retail or office development?

12     A.  I guess in my mind I would look at the

13  square footages and heights of what's proposed

14  for office and medical and looking at what the

15  residential component of that would be, because

16  our goal with the plan was to bring in income

17  tax and revenue that could also support any

18  development on that property.

19     Q.  But earlier you told me there is a

20  maximum density that's permitted, but then now

21  you're pointing me to a subordinate standard.

22  And my simple question is how is one to know

23  what the maximum number of residential units

24  would be permitted in the High Street Mixed Use

1  district portion of the site?

2          MR. SCHUMACHER:  Objection.  That

3  mischaracterizes his prior answers, and it is

4  also asked and answered.

5          But you may answer again.

6      A.  I would still say it needs to be

7  subordinate.  The primary focus for that area

8  was to be income producing revenue of office

9  and/or medical office.  The core area does make

10  a range reference, but the High Street talks

11  about the residential needs to be subordinate.

12      Q.  Okay.  But sitting here today you can't

13  provide a maximum number of apartments that are

14  acceptable for the High Street Mixed Use portion

15  of the site, correct?

16          MR. SCHUMACHER:  Objection.

17  Argumentative.

18          You may answer again.

19      A.  I would still defer back to the concept

20  plan that they brought forth in 2015 that had

21  more acreage on the High Street frontage, and

22  had a lot of apartments, and we had 350 people

23  show up to the meeting against the amount of

24  density that was proposed.  And then when we

1  came back after they went radio silent for five

2  years, they came back with an application that

3  was less acreage and more property -- or more --

4  less acreage and more units and it wasn't

5  listening to what the community wanted to see.

6      Q.  Well, I understand that's what you

7  provide to planning commission on page 26 of the

8  minutes.  But my question, which you still

9  haven't answered, is what's the maximum number

10  of apartments?  What's the maximum density

11  that's acceptable in the High Street Mixed Use

12  portion of the site?  Because you're referencing

13  the land use plan.  What is it?

14      MR. SCHUMACHER:  Objection.  Asked and

15  answered several times.  You're starting to

16  badger the witness now.

17      A.  I would still say it needs to be

18  subordinate to those other main uses on the

19  site.  If you're asking whether it's 500 or 200

20  or 100?

21      Q.  Yes.

22      A.  No, it doesn't say that.  It says

23  subordinate.

24      Q.  Now, there's not a provision in the

1  zoning code that specifies that the density for

2  an application is subject to prior informal

3  proposals, correct?

4        MR. SCHUMACHER:  Can you read that

5  question back?  I'm not sure I caught that.

6            (Record read as requested.)

7        MR. SCHUMACHER:  Objection to the extent

8  that's asking for some legal opinion, but you

9  can answer.

10     A.  I would say as part of their community

11  outreach and their discussions having shown what

12  they showed in 2015 built on what was more in

13  the 2020 or '21 proposal.

14     Q.  Where in the zoning code, though --

15  where in the zoning code can -- are you basing

16  your reliance upon a prior informal proposal to

17  curtail or restrict the density on this

18  application?

19        MR. SCHUMACHER:  Objection to the extent

20  it asks for a legal conclusion.

21     A.  I don't believe it's in the zoning code.

22     Q.  And throughout your report to the

23  planning commission and architectural review

24  board you make references to, quote, the

1   community, and you make references to the 350

2   people who attended that 2015 informal meeting

3   at the WEC, correct?

4        A.  Correct.

5        Q.  So are you basing the positions you've

6   taken in your memo on what positions these 350

7   people said at that meeting?

8        A.  Built on that and then the 10 years of

9   what we've heard from the community.

10       Q.  Okay.  Is there a -- do you maintain --

11  are you aware of a list that the city has

12  maintained of the input received from, quote,

13  the community?

14       A.  We have what was published on the

15  website as part of this process.  There were 550

16  emails and letters that we posted that were also

17  sent to their attorney when we received them and

18  we posted them online.

19       Q.  Did anyone from the city, to your

20  knowledge, go back and determine of the 550

21  emails or letters that you referenced which of

22  those people also attended that meeting at the

23  WEC in 2015?

24       A.  No.

1    Q.  What did the city do to ascertain the

2  views or positions of the other remaining, give

3  or take, 15,000 residents concerning this

4  application?

5         MR. SCHUMACHER:  Objection.  Did you ask

6  what the city did?

7         MR. INGRAM:  Yes.

8    A.  The only thing I can speak to is what

9  I've heard whether it be by residents, public

10  meetings, making comments.  I don't know that

11  the city or if any councilmembers reached out

12  directly to hear anything.  It was just

13  listening at meetings and hearing people talk.

14    Q.  So prior to preparation of your staff

15  memo concerning this application, what did you

16  do to solicit the input from the other

17  14,000-plus residents of the community to get

18  their positions --

19         MR. SCHUMACHER:  Objection.

20  Argumentative.

21    Q.  -- on this application?

22         MR. SCHUMACHER:  You can answer.

23    A.  Listened.

24    Q.  Anything else?

1      A.  Not to my knowledge.

2      Q.  And there are varying opinions as to

3  what should ultimately be developed on LC's

4  property, correct, within the community?

5      A.  I would say so.

6      Q.  Okay.  So how did you yourself discern

7  which community opinions should prevail in this

8  case?

9      A.  For me in reviewing their application, I

10  go back to this document.

11      Q.  Referring to --

12      A.  To the comp plan.

13      Q.  -- Exhibit 1.

14      A.  I go back to the comp plan.  I can

15  listen to what we heard about housing types and

16  usable open space, but I went back to the plan

17  itself that talked about how the site should

18  develop.  When they got into housing, it was

19  just listening to what people had mentioned that

20  they wanted.

21      Q.  Okay.  And did you maintain a list of

22  each of the varying opinions that were conveyed

23  to the city pertaining to what should be

24  developed on Lifestyle's property?

1          MR. SCHUMACHER:  Objection.  Asked and

2    answered.

3          You can answer again.

4     A.  No, just the ones that are in the emails

5    and the letters that were received.

6     Q.  Okay.  How did you pick and choose which

7    opinions to follow and which ones to reject?

8     A.  I read them all and listened to them

9    all, but I still go back to the comp plan itself

10   as the guiding document for what I wrote my memo

11   on.

12    Q.  In your memo here on page 26 it says,

13   the applicant proposes a mix of for-sale and

14   for-rent products throughout the site that

15   include a mix of floor plans.  The mix of floor

16   plans has only a few options for single-level

17   living, which is one of the key things we have

18   heard from our residents that they would like to

19   see offered in the community.

20         Do you see that?

21    A.  Yes.

22    Q.  How many single-level townhomes did

23   Lifestyles need to have in order for you to find

24   that this criteria was satisfied?

1          MR. SCHUMACHER:  Objection.

2     A.  I don't even know how many were proposed

3  now at this point.

4     Q.  Okay.  My question's different.  How

5  many did they need to have for you to deem that

6  they had satisfied this criteria that you've

7  listed here?

8     A.  In this context with this plan, I don't

9  remember if they had one, two or 200.

10    Q.  So I'm not -- my question is not about

11 what Lifestyle was proposing.  My question is

12 how many single-level residential homes was

13 Lifestyle required to have in order for you to

14 consider this criteria you have listed here as

15 satisfied?

16    A.  I don't know of an actual number.  It

17 went back to the variety of housing types and

18 styles we heard and referenced in the plan, but

19 not an actual number.

20    Q.  And there's not an actual number of

21 single-level residential housing that is

22 specified in Exhibit 1, is there?

23    A.  Not to my knowledge.

24    Q.  Did you ever tell Lifestyles how many

1    single-level townhomes they needed to have in

2    order for you to recommend approval of this

3    criteria?

4        A.  No.  We're not to design it for them.

5    They need to be the ones.

6        Q.  Yeah, I didn't ask you about designing

7    it for them.  I'm asking you did you convey your

8    standard?

9        A.  No.

10       Q.  Turning to the next page under

11   Neighborhood Core, the overall density of

12   townhomes proposed for the Neighborhood Core did

13   satisfy the density requirements set forth in

14   Exhibit 1, correct?

15       A.  However I'll add the caveat that it

16   talked about with increased density you need to

17   have more increased open space.

18       Q.  Well, that wasn't my question.  My

19   question is Lifestyle's proposal for the

20   number -- the density of the townhomes proposed

21   for the Neighborhood Core did satisfy the

22   density limit set forth in Exhibit 1, correct?

23       A.  I'll disagree because there's the caveat

24   that if you have a higher density you're to have

1    more increased open space.

2        Q.  Okay.  So what was the maximum density

3    Lifestyles was permitted to have in the

4    Neighborhood Core?

5        A.  The maximum density as referenced in the

6    plan is 6 to 14.

7        Q.  Okay.  And they proposed 12, correct?

8        A.  That's what's stated here.

9        Q.  Twelve is less than 14.  So what

10   density -- what was the maximum density that

11   they were limited to having?

12       A.  Again, I'll defer back to there's the

13   caveat in there that if you do the higher

14   density to the higher end, they wanted to see

15   more contiguous usable open space on the site.

16       Q.  Okay.  Well, based on the open space

17   that had been permitted, what's the maximum

18   number of units per acre in the Neighborhood

19   Core you're holding Lifestyles to?

20       A.  I don't have -- is their application in

21   here that I can look?

22       Q.  No.

23       A.  I don't -- I don't know.  Like I said,

24   the range was 6 to 14 units to the acre with as

1  you got to the higher of the density that you

2  had more usable open space.

3      Q.  Okay.  Is there a limit specified

4  anywhere that would inform you as to the maximum

5  number of units per acre within the Neighborhood

6  Core in order to apply to Lifestyle's

7  application?

8      A.  I would still defer back to the 6 to the

9  14, the 14 being the highest, with that caveat

10  that the comp plan references more open space

11  being provided versus just remnants.

12      Q.  Is there a formula of open space to

13  maximum number of units permitted?  There's not,

14  is there?

15      A.  No.

16      Q.  Okay.  Second bullet point for

17  Neighborhood Core you wrote the proposed 12

18  units per acre does not incorporate a true mix

19  of housing options.  Do you see that?

20      A.  Which paragraph are you?

21      Q.  The second bullet under Neighborhood

22  Core.

23      A.  Okay.  I see it.

24      Q.  You go on to write this area should

1  provide a mix of residential living that is

2  underrepresented in the Worthington market and

3  addresses the needs of aging residents, future

4  young professionals and those desiring

5  amenity-rich living, correct?

6     A.  Correct.  That's what's stated.

7     Q.  All right.  What mix of residential

8  living specifically did Lifestyles need to have

9  in order for you to recommend approval of your

10  criteria here?

11     A.  I mean, not having their plan in front

12  of me, I honestly don't remember what they even

13  had, but the Neighborhood Core, if I remember

14  correctly, was all their townhouse style rental

15  market where we had heard, you know, a true mix

16  of styles, but that's all I remember from being

17  in there.

18     Q.  Okay.  My question's different.  I'm

19  asking about the standard that you're applying

20  here not as to what Lifestyles was proposing.

21  You wrote that this area should provide a mix of

22  residential living, right?  So what standard --

23  what is the specific makeup of the different

24  types of residential housing you're concluding

1  that Lifestyles has to have?

2     A.  The plan references to be developed with

3  more than one housing type and at more than one

4  density.  Again, it references the park space

5  increasing.  Introduce different types of

6  housing options that are not readily available

7  in the city.  Provide residential living that's

8  unrepresented in the market and complements

9  Worthington's current offerings for the

10  residents, future young professionals, all that.

11  I think it was just the one product that didn't

12  seem to take into account that variety of

13  housing style and type.

14     Q.  Okay.  So are there specific housing

15  styles and types that you're requiring for the

16  Neighborhood Core?

17     A.  I believe the thought was just a variety

18  of product, whether that be one-story,

19  two-story, two-plex, four-plex, or single-level

20  living or senior affordability component.  It

21  was that variety.

22     Q.  Okay.  So townhomes, patio homes,

23  apartments, that kind of variety, is that what

24  you're looking for?

1      A.  I would say that would fall within that

2  category.

3      Q.  Okay.  So with respect to the next

4  bullet it's going to be a similar question as to

5  the High Street Mixed Use portion of the site.

6  With respect to the Neighborhood Core you

7  reference here in this third bullet that the

8  community comments received on the 2015 proposal

9  indicated that the density and product was not

10  what the community wanted to see on this site.

11  What comments were you relying upon?

12      A.  Those that were spoke at the public

13  meeting.

14      Q.  And you're talking about the 2015

15  meeting at the WEC?

16      A.  Correct.

17      Q.  Anything else?

18      A.  I would say what we heard during the

19  planning process creating the comp plan, the 10

20  years in between the adoption of the comp plan

21  and then what was made application, and then all

22  the emails and letters we also received built on

23  what we were hearing.

24      Q.  As far as the comp plan process, we've

1  already covered that the comp plan specifies the

2  16 [sic] to 14 units per acre within the

3  Neighborhood Core is acceptable, correct?

4        MR. SCHUMACHER:  You said 16 to 14?

5        MR. INGRAM:  Six to 14.

6        MR. SCHUMACHER:  See, I'm helping.

7    A.  Again, I'll say that caveat that as you

8  got to that higher density it needed to be more

9  open space.

10    Q.  All right.  And we've covered that

11  already.

12        MR. SCHUMACHER:  Yes, we have.

13    Q.  Okay.  Turning to page 28.  I'm going to

14  direct your attention to the second bullet

15  that's your first sub bullet in which you wrote

16  that the renderings for the townhomes on the

17  northern portion of the Neighborhood Core, sub

18  area two, show front porches and garage --

19        MR. SCHUMACHER:  We're on the wrong

20  page.

21    Q.  Page 28.

22        MR. SCHUMACHER:  Okay.  Second bullet

23  point.

24    A.  Which bullet point?  Okay.

1     Q.  The first sub bullet point.

2     A.  I'm sorry.

3     Q.  All right.  Let me strike that and start

4  over.  So you wrote that the renderings for the

5  townhomes on the northern portion of the

6  Neighborhood Core, sub area number two, show

7  front porches and garage accessed by an

8  alleyway.  However, these units are all attached

9  townhomes with multiple floors, whereas the plan

10  recommends a variety.  Do you see that?

11     A.  Yes.

12     Q.  What variety of townhomes are you

13  requiring or would be necessary for you to

14  recommend approval for this criteria that you've

15  written here?

16     A.  Not being able to look at what they had

17  proposed, I don't know if it was in the context

18  of styles or it was a monotonous architecture.

19     Q.  Again, I'm not asking you about what was

20  proposed.  I'm asking about the standard you're

21  applying.

22     A.  I would say variety, more than just one

23  single type.

24     Q.  So would a variety constitute a mixture

1    of luxury residences, well-appointed walk-up

2    townhomes or high-end flats?

3        A.  I would say it would be that variety,

4    that versus all just one product.

5        Q.  Okay.  Did you convey that desired

6    variety to Lifestyles?

7            MR. SCHUMACHER:  Other than Exhibit 1?

8    Is that the question?

9            MR. INGRAM:  Yes.

10       A.  Their attorney we referenced to this and

11   he would have received the memo.

12           MR. SCHUMACHER:  You have to say what

13   you're referring to.

14       A.  The comp plan and the actual memo that

15   went to the planning commission, Exhibit 59.

16       Q.  And your staff memo for that meeting?

17       A.  If that's what this is.  These are the

18   minutes.

19       Q.  Okay.  Did you, in any other

20   circumstance, convey the variety you're looking

21   for to Lifestyles?

22       A.  My interaction would have been with

23   their attorney that they need to follow the

24   recommendations in Exhibit 1, the comp plan,

1    and/or the staff memo would have given them his

2    guidance.

3        Q.  Okay.  With respect to its application,

4    Lifestyles is required to have park space on the

5    redevelopment of its property, correct?

6        A.  There was recommendation for open space

7    as part of it, yes.

8        Q.  Now, the application did call for park

9    space in the Neighborhood Core and Tucker Creek

10   Preserve, but you concluded it was not enough

11   park space, correct?

12       A.  In my review of it, in looking at the

13   recommendations for density, if density was to

14   go up, you needed more open space, and that

15   should be usable versus just fragmented here and

16   there.

17       Q.  So how many acres of park space is

18   necessary for you to recommend approval of this

19   criteria that was imposed on the application?

20       A.  I don't believe there was a certain

21   number.  I think it would have been the variety

22   of the product, and the amount of the product,

23   and the density of it that would correlate to

24   how much open space you would need in addition

1  to the Tucker Creek area that was recommended.

2      Q.  Okay.  Is there -- when you're talking

3  about the amount of the product, the density of

4  the product, you're talking about the types of

5  development, correct?

6      A.  Correct.  I mean, the Neighborhood Core

7  talked about, you know, as density increases

8  that you need to have more open space.  So we're

9  looking at that open space needed to be a little

10  more substantial if you're going up in amount of

11  whether it be apartments or single-family homes

12  or the mixed that they proposed.

13      Q.  Okay.  But there's not some formula or

14  any objective standard to advise Lifestyle on

15  the number of acres of park space that was being

16  imposed, correct?

17      A.  I think with this application it just

18  got dropped.  There was no coordination or

19  conversation related to the -- sorry, did I say

20  the wrong...

21      Q.  No.

22          MR. SCHUMACHER:  No.  He didn't like

23  your answer.  Go ahead.

24      A.  I don't where I was now.

1        Q.  I'm asking about the standards that

2   you're applying to this application.

3        A.  For what?

4            MR. SCHUMACHER:  Wait.  Julie, why don't

5   you read back the question.

6            THE WITNESS:  Why don't we just stop for

7   a minute.

8            MR. INGRAM:  You want to take a break?

9            MR. SCHUMACHER:  We've been going for 90

10  minutes.

11                   (Recess taken.)

12              (Record read as requested.)

13  BY MR. INGRAM:

14       Q.  Do you understand the question,

15  Mr. Brown?

16       A.  I believe so.

17       Q.  Okay.

18       A.  Actual formula, no, just the references

19  in the plan that state, you know, certain areas

20  be subordinate and/or others as you increase

21  density, increase open space.

22       Q.  And as far as the standard that you're

23  applying, there's not a minimum number of acres

24  of park space that's required, correct?

1    A.  For just the core area?

2    Q.  The core area.

3    A.  Correct.

4    Q.  Turning to page 29 of Exhibit 59.  With

5  respect to the overall mix of land uses, after

6  March 2020 with the proliferation of work from

7  home, there's far less demand now for office

8  space, correct?

9        MR. SCHUMACHER:  Objection.

10    A.  For the work from home or --

11    Q.  Sure.  Let me rephrase.  So with respect

12  to the demand for office space just in general,

13  I'm speaking generally, you know, post

14  March 2020 and the proliferation of work from

15  home, there's far less demand now for office

16  space than there was pre 2020.  Is that fair?

17        MR. SCHUMACHER:  Objection.

18    A.  I think in Worthington it's a little bit

19  different.  We've seen -- I think maybe it's our

20  location on the outer belt.  We've seen more of

21  an increase of people wanting to have some

22  information.  However, building spec, we haven't

23  seen.  But I know for us to be able to keep the

24  services we have and/or provide additional

1    services we look to income producing as part of

2    any project that would come in.

3        Q.  Sure.  And you just referenced building

4    spec for offices.  Can you elaborate for the

5    record what you mean by that?

6        A.  Well, to build spec would be someone

7    just building without having a tenant lined up.

8    If it's something larger, they may not do it.

9    If it's something smaller in scale, they may do

10   it in order to be filled.

11       Q.  So to redevelop or develop Lifestyle's

12   property, that would more fall under the

13   building spec for any office user, correct?

14       A.  Not necessarily.  I mean, I think,

15   again, Worthington does not have a lot of class

16   A, what we -- right now only 20,000 square feet

17   of class A office which is the Cadillac version

18   of office.  Most of ours is B and C.  So we've

19   had a lot of interests in wanting class A

20   office, but we only have really by the mall

21   that's built now that is there, and then we have

22   a new four-story building going in at the

23   Holiday Inn site that will be class A that it's

24   going to be leased up and taken up.  So I think

 1   there's people that want to be in Worthington.

 2   We just don't have the product.

 3      Q.  Okay.  And Lifestyle's property provides

 4   an opportunity for needed class A office space,

 5   correct?

 6         MR. SCHUMACHER:  Objection.  Relevance.

 7         You can answer.

 8      A.  I think that was the primary goal when

 9   we did the comp plan, was to look at how, one,

10   the front portion of it's all zoned for

11   commercial and office, of how we can look at it

12   to provide services to our community and still

13   have the income tax coming in.  And if we get

14   new residents, how they can help pay for that

15   portion of those coming into the community, too,

16   so it can pencil out or balance.

17         MR. SCHUMACHER:  Oh, you said pencil

18   out.

19      Q.  And when you're referring to pencil out,

20   you're referring to making the economics work?

21      A.  I look at it from penciling out, looking

22   at everything from what's recommended in the

23   plans, what we get service-wise, what we'd have

24   to give up service-wise.  All of that is what I

1  was referencing.

2      Q.  And my question was a little bit

3  different than the one you answered, which is

4  Lifestyle's property across the street from

5  where we're sitting today provides the city with

6  an opportunity for new type A office space,

7  correct?

8      A.  The front portion's zoned for that, so

9  yes.

10      Q.  And, in fact, we know OhioHealth sought

11  to locate its medical office space on

12  Lifestyle's property, correct?

13          MR. SCHUMACHER:  Objection.  It was not

14  Lifestyle's property at the time.

15      A.  We did have two OhioHealth hopes to be

16  on that property.

17      Q.  Okay.  So with respect to page 29 and

18  the commercial uses you wrote that the

19  application proposes 60,000 square feet of

20  commercial retail, restaurant space, and 25,000

21  square feet of medical office space.  Do you see

22  that?

23      A.  Yes.

24      Q.  And you go on to say that the proposed

1  square footages are not consistent with the

2  recommendations found in the plan.  You see

3  that?

4      A.  Yes.

5      Q.  And the reference to the plan, that's to

6  Exhibit 1?

7      A.  Correct.

8      Q.  How many square feet of office space is

9  necessary for you to recommend approval if

10  25,000 square feet is not enough?

11      MR. SCHUMACHER:  Same objection.

12      A.  At least with this proposal -- I know

13  their second proposal flip flopped and increased

14  the numbers, but we have the reference that

15  throughout this comp plan income tax generating

16  employment uses such as office are critical to

17  the physical sustainability of the city, and

18  that's where we're to look at commercial office,

19  medical uses with subordinate residential and

20  then limited retail uses.  And I think with

21  limited retail they were showing that being

22  60,000 and office only being 25.  That if it was

23  to be limited, that number should have almost

24  been flipped.

1        Q.   Okay.  In your answer you were pointing

2   to page 92 of Exhibit 1, correct?

3        A.   Correct.

4        Q.   There's not any actual square footage

5   amounts listed in Exhibit 1 with respect to

6   either commercial or office space, correct?

7        A.   Correct.

8        Q.   And so what standard are you applying to

9   determine the overall number of square feet that

10   are necessary to warrant approval of this

11   criteria, Mr. Brown?

12        MR. SCHUMACHER:  Objection.  Asked and

13   answered.

14        A.   Repeat it one more time.

15             (Record read as requested.)

16        A.   If you're looking to a formula like

17   that, there is not one.  Again, going back to

18   the comprehensive plan or Exhibit 1, just

19   referencing that this is an important property

20   for us from an economic base, and that we look

21   at it for income generating employment so we can

22   provide services.  And that whatever development

23   would happen on that site wouldn't be a net

24   detriment for the city financially.  It could

1  help pay for itself.

2     Q.  And were you provided with an amount of

3  square footage of either commercial or office

4  space that the city deemed necessary to satisfy

5  that -- what you just mentioned?

6        MR. SCHUMACHER:  Objection.  Asked and

7  answered.

8     A.  Are you asking if I knew of an actual

9  number or a square footage amount?

10    Q.  For the economic side of this for the

11 city.

12    A.  We had discussions with our economic

13 development director, and I believe that's one

14 of the reasons their attorney, when they came

15 back for the second application, you saw a

16 complete flip in the commercial uses for retail

17 and then for the office and medical office.

18    Q.  Okay.  But you're not aware of any

19 specific square footage amount that the city is

20 requiring.  Is that fair?

21    A.  I think for us as staff we looked at

22 what could be on there today generating income

23 on the front portion, what could fit as kind of

24 here's kind of a mix that could fit on that

1  site.

2     Q.  Okay.  And with the flip flop that you

3  referenced in the -- in Lifestyle's second

4  concept proposed later in 2021, was that

5  sufficient?

6     A.  I believe it was -- I think I called it

7  out in the memo that was going in the positive

8  direction.  I mean, the more office and medical

9  office we can get the better, because then it

10  helps with services needed to service that site

11  if it's developed.

12     Q.  Okay.  And do you have an overall number

13  in mind?  You said it gets better.  What are you

14  looking for?

15        MR. SCHUMACHER:  Are we talking about

16  the 2021 proposal now?

17     A.  I'd have to go look at what the 2021 one

18  even referenced.

19     Q.  I'm just asking you is a there specific

20  number -- a square footage number that you're

21  looking for?  You said it got better, but what

22  was the goal here from your perspective?

23        MR. SCHUMACHER:  Objection.  Asked and

24  answered several times.

1    A.  That's why I go back to we went to push

2  for office -- as much office as possible and as

3  much medical office as possible.  That's why

4  there's a limit to the retail.

5          There was a discussion with the economic

6  development director.  I don't know if it was

7  200,000.  I honestly can't remember now at this

8  point, but it was trying to figure out what is

9  the most you can get that then helps with the

10  city finances and the finances that are needed

11  to service a development like this.

12    Q.  Did you convey to any Lifestyle

13  representative the minimum square footage of

14  office space that you were --

15    A.  We gave their attorney a recommendation.

16    Q.  And what recommendation did you provide

17  their attorney?

18    A.  I think it was 150 or 125 or that was at

19  least something we would be looking for.

20    Q.  And what was that recommendation based

21  upon?

22    A.  Again, trying to pencil out what

23  services may be required to service the site

24  with our existing financial issues and

1  constraints and what would be needed to service

2  a site if it was to develop, that that frontage

3  for office and medical office would help pay for

4  that.

5      Q.  So 150 to 200,000 square feet of office

6  space was the recommendation?

7      A.  I believe so, that's what it was.

8      Q.  And when was this recommendation

9  provided to Lifestyle's representatives?

10      A.  It would have been sometime between the

11  January meeting and whenever they made

12  application again to go back to planning

13  commission for October.

14      Q.  Who provided that recommendation?  Did

15  you?

16      A.  I believe it was myself and Dave

17  McCorkle in conjunction with talking to their

18  attorney.

19      Q.  Okay.  Who else was present?

20      A.  I'm not sure.  Matt could have been, but

21  I have not a clue.

22      Q.  Did you provide that recommendation in

23  writing or was it in a meeting?

24      A.  I believe since it was pandemic, it

1 would have been either phone call or virtual.

2 It may be in an email.  I have no idea now.

3  Q.  Did you make any other recommendations

4 that were conveyed to a Lifestyle representative

5 in that meeting?

6  A.  In that particular meeting?

7  Q.  Yes.

8  A.  That, I don't know.  I talked to their

9 attorney at least once or twice a month to check

10 on status of where LC was in their process.

11 Usually no update, and then he would touch base

12 with me if he knew anything that was happening,

13 and that was it.

14  Q.  Okay.  But my question was related to

15 recommendations that were conveyed by you to any

16 Lifestyle representatives.

17  A.  Related to the app?

18  Q.  To their application.

19  A.  I deferred their attorney to the staff

20 memo to look at the key four focus areas of

21 density, heights, connections, and there's

22 another one.

23  Q.  Park space?

24  A.  Contiguous usable open space.

1      Q.  Okay.  And was this 150,000 to 200,000

2  square feet of office space recommendation in

3  that memo or was that separately conveyed?

4      A.  In the memo that went to planning

5  commission?

6      Q.  No.  To Lifestyles.

7      A.  I don't believe it was -- if it was, it

8  was in an email.  I believe we just verbally

9  talked to their attorney.

10      Q.  Okay.  So other than that recommendation

11  and the items in your report or your memo, were

12  there any other recommendations that you

13  conveyed to Lifestyle concerning their

14  application?

15      A.  Just those four topic areas that I

16  referenced to their attorney.

17      Q.  Okay.  Turning to pages 30 and 31, the

18  greenspace, open space, parkland portion.

19          MR. SCHUMACHER:  Is it okay if I have my

20  book open?  I just want to know.

21          THE WITNESS:  I can't see that far

22  anyway so you're good.

23          MR. SCHUMACHER:  It's the way it is.

24      Q.  I want to direct your attention to the

1    first sub bullet on page 31.

2         A.  Okay.

3         Q.  Do you see where you wrote this proposal

4    does not provide amenities that we have heard

5    the community would like to see on the site.

6    What amenities were you referring to?  What

7    specifically?

8         A.  In the actual PUD requirements in the

9    planning and zoning code there's a breakdown of

10   amenities that are asked for as, you know, the

11   size of everything, but it goes through whether

12   it be bike racks, benches, open space, shelter

13   houses, playgrounds.  There's a reference for

14   amenities.

15        But then when you jump to the comp plan

16   or Exhibit 1, there is -- there are different --

17   there are additional references to what people

18   would like to see.  It goes into talking also

19   about the open space not just being used for

20   stormwater, but that it can be, but connections

21   to the neighborhoods and things like that.

22        Q.  Which specific amenities are you

23   pointing to in Exhibit 1 with respect to the

24   parkland?

1      A.  There's a section in the comp plan under

2  park space -- I think it's page 95.

3          MR. SCHUMACHER:  Where are you seeing

4  the page numbers?

5          THE WITNESS:  Bottom middle.

6          MR. SCHUMACHER:  Oh, there they are.

7  Sorry.

8          THE WITNESS:  Not great area to find

9  them.

10     A.  -- that went in to talk about community

11  gathering places or community gathering

12  functions, the park space is critical to provide

13  place making and development layouts as well as

14  that greenspace balance.

15     Q.  Okay.  But which specific amenities are

16  identified or called for in Exhibit 1 for the

17  park space?

18     A.  Well, I think we just referenced that,

19  you know, there be the park space and be open

20  and usable.  In the planning and zoning code

21  there's reference to actual amenities and that

22  can go until -- like I said, it can be bike

23  racks, benches, seating areas, things like that

24  in the planning and zoning code portion.

1      Q.  Okay.  So going to your criteria here on

2  page 31 of Exhibit 59, are you referring to the

3  proposal should include bike racks and other

4  things of that nature?

5      A.  Those are possibilities that are

6  referenced in the planning and zoning code, but

7  it could be a shelter house, a three-season, you

8  know, amphitheater or things like that as

9  amenities to be found in the open space, or

10  gazebo or whatever you would propose.

11      Q.  And I'm sorry, which plan are those

12  alternatives set forth in for those amenities?

13      A.  It's in the PUD section of the planning

14  and zoning code.

15      Q.  Okay.  So Mr. Brown, based on -- this is

16  the first hearing on a big application.  A lot

17  of the items that you've identified in your

18  report and presented to the planning commission.

19  Were you anticipating back and forth with

20  Lifestyles to work out or address those issues?

21          MR. SCHUMACHER:  Objection.  I'm sorry,

22  Chris.  That was compound.  Which question are

23  we asking?

24      A.  The back -- I guess at the meeting or

1  after the meeting?

2      Q.  Based on your second recommendation

3  where you recommended tabling the application so

4  that the applicant, in this case Lifestyles,

5  could revise its application.  Is that what you

6  were anticipating?

7      A.  That they would table or revise their

8  application?

9      Q.  That -- correct.  That it would be

10  tabled and that you would then work with or

11  negotiate with Lifestyles regarding the issues

12  that you identified.

13      A.  My hope was when we went to the meeting

14  with the denial recommendation and then the

15  follow up if they came back after hearing the --

16  or reading the staff memo, hearing the community

17  comments and board and commission comments, that

18  they would come back with something that really

19  addressed all those items and concerns, and then

20  they didn't for 10 more months.

21      Q.  For how long?

22      A.  About 10 months.

23      Q.  Sorry, your voice dropped.  I didn't

24  hear you.

1      A.  Sorry.  Ten months.

2      Q.  Okay.  So in that 10-month period,

3  Mr. Brown, did you ever tell Lifestyle what

4  densities they would need to have in order for

5  you to recommend approval of a revised plan?

6      A.  I talked to their attorney Mr. Hart, and

7  again, it was those four topics, that they need

8  to really look at their density and reducing

9  their density from what we heard at the meetings

10  and what was referenced in the staff memo,

11  contiguous usable open space, connection points

12  and heights.

13      Q.  My question is more limited.  Did you

14  convey to Lifestyle what densities?

15      A.  A number amount?

16      Q.  Correct.  Yes.

17      A.  No.  I referred them back to the plan

18  itself.

19                    -=0=-

20         (Deposition Exhibit 78 marked.)

21                    -=0=-

22  BY MR. INGRAM:

23      Q.  I'm handing you what's been marked as

24  Exhibit 78, Mr. Brown.  And Exhibit 78 is an

1    email from Ed Hofmann to you and others dated

2    January 27th of 2021.  Do you see that?

3        A.  Yes.

4        Q.  And it's forwarding, it looks like, an

5    email that you initiated to Tom Reis, R-E-I-S,

6    at Korda.  Do you see that?

7        A.  Yes.

8        Q.  And I don't see what you sent Mr. Reis

9    since I'm trying to ascertain what you would

10   have written him that he's responding to in

11   which Mr. Reis, R-E-I-S, says very interesting.

12   I don't see how this will ever come to an

13   agreeable development with LSC.  Do you see

14   that?

15       A.  I don't know who LSC is.

16       Q.  Do you think he meant to type

17   Lifestyles?

18       A.  Oh.  I'd have to ask Tom.

19       Q.  And who's Tom?

20       A.  Tom Reis, he is on the municipal

21   planning commission.  He is vice-chair.

22       Q.  Well, looking at the indicator here at

23   the very bottom of this email chain, do you see

24   where it says WARD Planning Group, January 27,

1    2021 pdf?

2        A.  Yes.

3        Q.  So clearly you both were emailing about

4    the WARD Planning Group, correct?

5            MR. SCHUMACHER:  Objection.

6        A.  I have no clue in the context of all

7    this.

8        Q.  Okay.  Is Mr. Reis involved with WARD?

9        A.  No.

10       Q.  So you don't recall anything about this

11   email?

12       A.  No.  Unless it was one of the letters we

13   would have received that then gets forwarded to

14   all the board and commission members, and

15   actually that's what it would have to have --

16   that's what it appears to be because all the

17   planning commission members are copied on it,

18   Scott Myers who was our council liaison to

19   planning commission, and Mr. Hart who was

20   Lifestyle's attorney.  Any time we would receive

21   an email or letter we would forward that on to

22   the board and commission and always copied

23   Lifestyle's attorney and Scott Myers.

24       Q.  Okay.  So you have Mr. Hofmann.  He's on

1    planning commission, too?

2        A.  Correct.

3        Q.  And Mr. Reis is, too?

4        A.  Correct.

5        Q.  So you have two planning commission

6    members discussing a letter from WARD concerning

7    Lifestyle's application in which Mr. Reis is

8    concluding I don't see how this will ever come

9    to an agreeable development.  Is that fair?

10       A.  I don't know the context without knowing

11   what was attached.  We'd have to ask Tom.

12       Q.  Okay.

13       A.  I never heard of LSC so -- but I know

14   what it means now.

15           MR. SCHUMACHER:  Well, only because he

16   told you.

17           THE WITNESS:  Right.

18           MR. SCHUMACHER:  Off the record.

19              (Discussion off the record.)

20                        -=0=-

21          (Deposition Exhibit 79 marked.)

22                        -=0=-

23   BY MR. INGRAM:

24       Q.  Okay.  Mr. Brown, you've been handed

1  what's been marked as Exhibit 79.  For the

2  record, Exhibit 79 is an email chain that starts

3  with an email from Robyn Stewart to you and

4  others from the city of Worthington dated

5  January 28, 2021 with the subject LC outreach.

6  Do you see that?

7      A.  Yes.

8      Q.  And if we go to the second to the last

9  page of Exhibit 79, there's -- it starts with an

10  email from Councilman Robinson to you.  Do you

11  see that?

12     A.  Yes.

13     Q.  In which Councilman Robinson asks you

14  who all did you recommend that Attorney Hart

15  contact as part of the community outreach.  Do

16  you see that?

17     A.  Yes.

18     Q.  And you responded, I don't believe we

19  provided them an official list of who to

20  contact.  We discussed that outreach was

21  important and they referenced WARD, BWF, Project

22  Park Group, and OWA, et cetera.  Do you see

23  that?

24     A.  Yes.

1      Q.  Where you wrote we discussed that

2   outreach was important and they referenced, are

3   you referring to Lifestyles there as the they?

4      A.  Where it says they should engage?

5      Q.  Where it says they referenced WARD.

6      A.  Oh, yes.  That would have been with

7   their attorney.

8      Q.  Okay.  Who is BWF?

9      A.  Building Worthington's Future.  They

10  are -- probably popped up in the last four to

11  five years -- more of a pro-development group in

12  the community.

13     Q.  What is your understanding of Building

14  Worthington's Future's interests in Lifestyle's

15  property?

16     A.  My understanding is just what I see on

17  their website.  You would have to probably talk

18  to them directly, but it appears from their

19  website it's more pro-development than the other

20  spectrum.

21     Q.  And what is your understanding,

22  Mr. Brown, of what Project Park Group's interest

23  in Lifestyle's property is?

24     A.  In all honesty, I've never met with

1  them.  I've just read their propaganda on their

2  website, that I know that they want it to be a

3  park.

4      Q.  And with respect to Old Worthington

5  Association, what is your understanding of what

6  they -- what their interest in Lifestyle's

7  property is?

8      A.  That, I don't know.  You would need to

9  talk to them.  I believe they're defunct now.

10  It was a group that were all in their 80s and

11  90s; so...

12          MR. SCHUMACHER:  Objection.

13      A.  It was a group that wasn't very active.

14          MR. SCHUMACHER:  Age bias.

15      A.  It was a group that was not very active.

16          MR. SCHUMACHER:  They all died.

17      Q.  Fair enough.  And then, Mr. Brown, what

18  is your understanding of WARD's interest in

19  Lifestyle's property?

20      A.  At least when they've come to the

21  meetings and what I've read on their website, it

22  seems -- there seems to be a fraction within

23  their group themselves.  So I think you would

24  have to probably talk to them directly, but it

1    seems to be a fraction of those that lean

2    towards let's make it all park to the OPG group

3    or whatever it's called, and those that want

4    some development on it but not as much as what

5    was proposed.

6        Q.  Okay.  So among just these few groups

7    here fair to say that there's a difference in

8    opinion as to what should be developed on

9    Lifestyle's property?

10            MR. SCHUMACHER:  By these citizen

11    groups, is that the question?

12        A.  With the four you just referenced,

13    the --

14        Q.  Yes.

15        A.  -- every acronym group?

16            That would be my interpretation of it,

17    but...

18        Q.  Okay.

19                    -=0=-

20        (Deposition Exhibit 80 marked.)

21                    -=0=-

22    BY MR. INGRAM:

23        Q.  Mr. Brown, I've handed you what's been

24    marked as Exhibit 80, which is a Microsoft Teams

1    meeting invite organized by you, correct?

2        A.  That's what it appears to be, yes.

3        Q.  And the subject of the Teams meeting was

4    UMCH discussion - next steps.  Is that correct?

5        A.  Yes.

6        Q.  And you have a list of required

7    attendees for this meeting.  Do you see that?

8        A.  Yes.

9        Q.  How did you select who was required to

10   attend this meeting?

11       A.  Well, I report to Matt and Robyn so they

12   were the direct reports.  Tom Lindsey's our law

13   director.  Scott Myers was the council liaison.

14   Mikel Coulter was the chair of the planning

15   commission, and then I believe we pulled Ed in

16   because Tom -- the vice chair was out of town,

17   and Lynda Bitar is the other planner in the

18   office.

19       Q.  Okay.  Was -- why wasn't anyone from

20   Lifestyle's invited?

21           MR. SCHUMACHER:  Objection.

22       A.  I have not a clue.  I think at this time

23   it was the meeting had happened six to eight

24   weeks before and we had not heard anything.

1      Q.  Okay.  Do you recall what was discussed

2  during this meeting concerning the next steps on

3  Lifestyle's application?

4      A.  Not at this time.

5      Q.  Did you take any notes from these

6  internal meetings?

7      A.  No.  It's usually -- especially when we

8  went to Teams, it was more just a conversation.

9      Q.  Does the city create transcripts of its

10  Teams meetings?

11      A.  For our public meetings, yes.

12      Q.  How about for your internal meetings

13  like this one?

14      A.  No.

15      Q.  Does the city record or save recordings

16  of its internal meetings like that described

17  here in Exhibit 80?

18      A.  No, just our public meetings.

19                    -=0=-

20        (Deposition Exhibit 81 marked.)

21                    -=0=-

22  BY MR. INGRAM:

23      Q.  Mr. Brown, you've been handed what's

24  being marked as Exhibit 81 which for purposes of

1    the record is an email from you to Councilman

2    Robinson dated March 29, 2021.

3        A.  Okay.

4        Q.  So directing your attention to the email

5    Councilman Robinson sent to you at 7:26 AM on

6    March 29.

7        A.  Yes.

8        Q.  Says, following last week's

9    communications with Mr. Brownlee, is there any

10   planned meeting or further scheduled

11   conversations between Lifestyles and staff.  Do

12   you see that?

13       A.  Yes.

14       Q.  And for purposes of the record,

15   Mr. Brownlee is with Lifestyles, correct?

16       A.  I believe so he's still there.

17       Q.  Or at least he was at that time?

18       A.  Correct.

19       Q.  Do you recall what communications were

20   provided to Mr. Brownlee during the prior week

21   in March of 2021 that Mr. Robinson's

22   referencing?

23       A.  Not a clue.

24       Q.  Okay.  Fair enough.

1        And he says, please keep me apprised

2    if/when such a meeting is scheduled as soon as

3    it is scheduled.  What is your understanding of

4    why Mr. Robinson wanted to be updated as soon as

5    any meeting was scheduled with Lifestyle?

6        A.  I would say with Councilmember Robinson,

7    he's highly engaged and wants to know what's

8    going on, a lot of questions, a lot of

9    information always requested.  I took it as he

10   just wants to be informed and kept in the loop.

11       Q.  Informed and kept in the loop on

12   Lifestyle's application?

13       A.  Typically anything and everything.  He's

14   very engaged and involved.

15       Q.  Does he inquire to be kept in the loop

16   on every single scheduled conversation between

17   an applicant and staff?

18       A.  Not every, but we do get peppered with a

19   lot of questions from him on applications

20   sometimes to the simplest to the more complex.

21       Q.  Okay.  I want to direct your attention

22   to Exhibit 60.

23       MR. SCHUMACHER:  Can you hold on just a

24   second.  I'm sorry, which exhibit?

1          MR. INGRAM:  60.

2          MR. SCHUMACHER:  I had it open already.

3   BY MR. INGRAM:

4      Q.  Okay.  Mr. Brown, Exhibit 60 is an email

5   from Robyn Stewart to the members of city

6   council and city staff, including yourself,

7   dated March 31st, 2021 with the subject:

8   Summary of meeting on UMCH.  Do you see that?

9      A.  Yes.

10     Q.  And Ms. Stewart writes to members of

11  city council, this email provides a summary of a

12  meeting regarding UMCH to keep you informed.

13  Scott Myers, Mikel Coulter, Lee Brown, Tom

14  Lindsey, and I met with LC representatives

15  yesterday afternoon at their request to discuss

16  their pending applications.  Do you recall that?

17     A.  Yes.  The meeting itself or the memo?

18     Q.  The -- what memo?

19     A.  This email to the -- I guess to council,

20  do I recognize that, or are you talking about

21  when we met with --

22     Q.  I'm talking about the meeting.

23     A.  Yes, the meeting where we met with Bo

24  and their attorney?

1    Q.  And Tom Hart, yes.

2    A.  Yes.

3    Q.  Okay.  And so you recall attending that

4  meeting?

5    A.  Yes.

6    Q.  And that was on March 30 of 2021,

7  correct?

8    A.  Correct.

9    Q.  Okay.  Did Ms. Stewart accurately

10  reflect a summary of that meeting in this email

11  set forth in Exhibit 60?

12    A.  I believe so.  I think the only thing I

13  saw or see that's kind of missing is there was a

14  reference I thought from Mr. Myers that talked

15  about we can't design the plan for you, but the

16  bones are what occurred.

17    Q.  Okay.  Can you elaborate or explain what

18  you're referring to?

19    A.  I think there was a reference during the

20  meeting of their attorney and Mr. Brownlee

21  asking -- or Mr. Hart and Mr. Brownlee I think

22  asking similar questions to you of what are the

23  actual numbers to get something that would work.

24  And there was a reference to keep going back to

1  the comp plan and then back to -- not this

2  document, but back to kind of those four

3  criteria that were outlined in my memo that

4  talked about contiguous usable open space,

5  reducing the density, connections, and then the

6  heights.  I see some of it referenced a little

7  bit down here.

8     Q.  Okay.  So based on your recollection of

9  the March 30 meeting, is Ms. Stewart omitting

10  any key aspects of that meeting or not?

11     A.  It primarily all seems to be here.

12     Q.  And in that meeting Lifestyle's

13  representatives came to the city requesting the

14  city's input on what would be acceptable to the

15  city for their development, correct?

16       MR. SCHUMACHER:  Objection.

17     A.  Are you asking back to the amount and

18  what we wanted to see amount-wise?

19     Q.  Correct.

20     A.  They asked that, and that's where I

21  think Mr. Myers said any of like the discussion

22  with negotiation to amounts really needed to

23  take place in public not behind closed doors.

24     Q.  Okay.  So Councilmember Myers at that

1  time was the liaison to planning commission,

2  correct?

3      A.  Correct.

4      Q.  And Councilmember Myers, at least

5  according to Exhibit 60, made it clear that any

6  back and forth dialogue about the amount of

7  various land use types in Lifestyle's proposal

8  must be done in public meetings.  Is that what

9  he said?

10         MR. SCHUMACHER:  Objection.

11     A.  I wouldn't say just with Lifestyle, but

12  with this that if there was any negotiation, it

13  needed to play out in public versus behind a

14  closed door where public weren't involved.

15     Q.  So why with respect to Lifestyle's

16  application was the city unwilling to provide

17  the number of apartments that would be

18  acceptable for Lifestyle's proposal?

19         MR. SCHUMACHER:  Objection.

20  Argumentative.

21     A.  I think our response was then going back

22  to the land use plan and then also taking into

23  account the testimony at the public meeting, all

24  the letters we received, and then the comments

1   back from the informational 2015 meeting that

2   the density and everything that they had

3   proposed initially in 2015 to the 2020

4   application had gone up, and the land had gone

5   down, but that was still too high.

6       Q.   Exactly.  And so with the too high

7   what -- there's no standard in Exhibit 1 as to

8   what density's acceptable.  We've established

9   that.  What standard -- why is the city refusing

10  to provide Lifestyles with an acceptable

11  standard?

12       MR. SCHUMACHER:  Objection.  That

13  mischaracterizes his prior answers to questions.

14      A.   I still go back to the range of that 6

15  to 14 that was referenced in the core, and then

16  it talked as you went up from the lower to the

17  higher that you have to have more open space

18  involved.  That if they would have been

19  listening as they looked at the memo and read

20  the comp plan, that they would start making

21  adjustments especially hearing from the public

22  back in 2015 and then the 2021 January meeting

23  that their numbers should have come down

24  significantly than -- I think it was 100 or 125,

1  I can't remember now, that it dropped and really

2  look at the comments of connectability,

3  contiguous usable open space, and then focus on

4  the office and medical office out front, limited

5  retail, but I think we felt it outlined a lot of

6  that for them.

7      Q.  But there's no density prescribed or

8  density limit with respect to the apartments,

9  correct?

10      MR. SCHUMACHER:  Objection.  Asked and

11  answered.  Argumentative.  He's explained this

12  several times to you.

13      Tell him again.

14      A.  I would still just go back to there is

15  that reference on the front portion that

16  residential be subordinate, and then that as

17  density increases open space increases.

18      Q.  So based on Councilman Myers' direction

19  the city staff and the city were not going to

20  articulate or provide Lifestyle with any

21  guidance on what number of apartments would

22  satisfy this subordinate criteria, correct?

23      MR. SCHUMACHER:  Objection.

24      Q.  Unless it was in a public meeting.

1          MR. SCHUMACHER:  Objection.  That

2  misstates the document, Exhibit 60.  That's not

3  what it says.

4      A.  I would say Councilmember Myers can't

5  speak for all of council.  He's just one

6  councilmember.  We report directly to Matt and

7  Robyn.  This was stated at the meeting, but we

8  felt that we'd already given them some guidance

9  in that -- I can't remember which book it's

10  in -- in the original memo that gave them some

11  direction of you need to drastically reduce the

12  density, bring up your contiguous usable open

13  space, worry about your heights and building

14  setbacks to get something that would be more in

15  line to actually just start having a

16  conversation.

17      Q.  Okay.  To start having the conversation.

18  And that conversation you're referring to does

19  it -- that needs to occur in the public

20  meetings?

21      A.  Correct.  Conversation when they --

22  well, we didn't have a conversation because they

23  made application.  We went to July.  At that

24  meeting in March with Bo Brownlee and Mr. Hart

1  they mentioned they would try to come back

2  within the first quarter.  I followed up with

3  their attorney each month and would check in,

4  and we never got anything for 10 months.  And

5  then we came in with an application -- there

6  were some positives that they had made changes

7  to that I referenced in the memo, but a large

8  bulk of it they had not really addressed.

9      Q.  During each of the conversations you

10 just referenced, during each of the

11 conversations you had with Lifestyles, did you

12 ever convey to Lifestyles the amount of various

13 land use types that they should incorporate in

14 their proposal?

15      A.  Do you mean giving them a number?

16      Q.  Yes.

17      A.  No.

18      Q.  During that March 30, 2021 meeting,

19 Mr. Brownlee sought the city's input on the

20 amount and type of open space, park and office

21 uses for their proposal, correct?

22      A.  Correct, which, as I mentioned in a

23 previous question, I think that we did give them

24 some direction on the office component.

1      Q.  Okay.  Was it during this March 30

2  meeting?

3      A.  Not during this meeting.

4      Q.  With respect to the specific amount of

5  greenspace and park space city staff was not

6  going to provide any specific amount to

7  Lifestyles, correct?

8      A.  Amount, no, but what I will say is in

9  discussions with them I kept telling them

10  contiguous usable open space.

11      Q.  Okay.  So just needed to be contiguous,

12  right?

13          MR. SCHUMACHER:  Objection.  That's not

14  what he said.

15      A.  Contiguous and usable, not just

16  fragments.

17      Q.  So contiguous usable open space.  Okay.

18  What's usable open space in your mind?

19      A.  In my mind it's not a plot that's as big

20  as this room that really dogs just go to pee and

21  poop on.  It was to have more of a functionality

22  and could be used to have a gazebo, have

23  benches, have a trees, throw a frisbee, throw a

24  ball around.  It was more of an actual usable

1  open space than just the fragments that were

2  kind of shown in the plan.

3      Q.  Is there any standard that you would

4  apply that would define what usable open space

5  constitutes?

6      A.  In my mind, again, usable is something

7  that's not in a ravine, it's not a detention

8  base, it's not a ditch.  It can be a treed area

9  or any of the things I mentioned previously.

10      Q.  My question's a little different.  I'm

11  asking you with respect to any standard.  In

12  other words, is usable open space defined in the

13  city's zoning code?

14      A.  No.

15      Q.  Mr. Brown, in your experience have you

16  been directed by a member of council not to

17  provide an applicant with an acceptable density?

18      A.  No.

19      Q.  During the March 30, 2021 meeting, what

20  did you say to the representatives of Lifestyle?

21          MR. SCHUMACHER:  Objection.  Asked and

22  answered.

23      A.  I think, again, it was focus on those

24  four key themes and look at the original staff

1  memo.

2      Q.  Okay.  Did you tell them to do anything

3  else?

4          MR. SCHUMACHER:  Objection.

5      A.  I honestly can't remember at this time,

6  I mean, two years later.

7      Q.  Okay.

8      A.  I find it very intriguing how you all

9  keep organized.

10         MR. SCHUMACHER:  I'm completely

11  disorganized.

12                      -=0=-

13          (Deposition Exhibit 82 marked.)

14                      -=0=-

15  BY MR. INGRAM:

16      Q.  Mr. Brown, I'm providing you what's been

17  marked as Exhibit 82.  And for purposes of the

18  record it's Worthington 54309 through 54325.

19         Okay.  Mr. Brown, looking at the email

20  chain here in Exhibit 82, it contains a couple

21  emails from you to -- one is to Ms. Brown, the

22  other is to Ms. Stewart on -- both of which are

23  on September 14th of 2021.  Do you see that?

24      A.  Yes.

1        Q.  And you were forwarding to both

2    Ms. Brown and to Ms. Stewart a copy of

3    Lifestyle's September 2021 revised concept site

4    plan.  Is that correct?

5        A.  Correct.

6        Q.  Okay.  So approximately five months

7    after the March 30 meeting Lifestyle provided

8    you with a revised concept plan, correct?

9        A.  Correct.

10        Q.  And what did you talk about with

11    Ms. Stewart with respect to this revised site

12    plan?  I'm picking up on your email here on the

13    first page of 82.

14        A.  I don't 100 percent recall, but I think

15    in emailing her and talking to LC's attorney,

16    there was the discussion on trying to not focus

17    on the nitty-gritty on the architecture, do the

18    broad 50,000 foot looking down kind of

19    discussion items.  I believe that was the

20    context of my conversation with her, that it

21    wouldn't go into this type of brick, this type

22    of window.  It was more let's look at the big

23    picture of what they're proposing in scale,

24    massing, form, density, open space, connections

1    to the neighborhood, those type of things.

2        Q.  Okay.  So if we turn to the last page of

3    Exhibit 82.  The last page.  The last page is a

4    letter from Tom Hart directed to you.  Do you

5    see that?

6        A.  Yes.

7        Q.  And that was the cover letter of the

8    revised concept plan, correct?

9        A.  Correct.

10       Q.  And Mr. Hart writes to you starting --

11   I'm picking up in the first -- actually the

12   second sentence:  As discussed, the applicant

13   wishes to present this revised concept site plan

14   at the October 14 Worthington Planning

15   Commission.

16       A.  Yes.

17       Q.  Which -- to your understanding, which

18   discussion is Mr. Hart referring to here?  Was

19   it the March 30 discussion or had you both had

20   follow-on discussions about this?

21       A.  I believe this one was the phone call

22   that we would have had right before this meeting

23   when we -- when he had proposed high level

24   looking down, and I agreed to start at something

1  bigger than to get into the nitpicky.  I don't

2  think it would have been -- because I had talked

3  to their attorney probably 10 times in between

4  that March and this -- whatever day this was

5  sent, the 14th.

6      Q.  Okay.  Consistent with that March 30

7  meeting, this revised concept plan is providing

8  a new revised mix and location of uses for the

9  application, a revised configuration of open

10  space and open space amenities, and it adjusted

11  the connectivity plan and neighborhood

12  engagement elements.  Is that fair?

13          MR. SCHUMACHER:  Objection.  It doesn't

14  say new.  Where are you reading, Mr. Ingram?

15  Are you misquoting the document or --

16          MR. INGRAM:  I'm not quoting the

17  document.

18          MR. SCHUMACHER:  Okay.  Note my

19  objection.

20      A.  Can you repeat one more time?

21          (Record read as requested.)

22      A.  Is that what you're stating or asking?

23      Q.  That's what I'm asking.

24      A.  I'd have to compare it to what was

1 originally proposed, but I think in my memo --

2          THE WITNESS:  Would you mind to repeat

3 it one more time.

4          (Record read as requested.)

5     A.  Partially.  The only one I question is

6 the connectivity planned and neighborhood

7 engagement elements.  I'm not sure -- on the

8 connectivity, I can't recall what that one

9 looked like, but I know with the neighborhood

10 engagement elements I think it improved, if I

11 remember from my staff memo.  I have to refer to

12 that staff memo.

13     Q.  We can get to that.

14          MR. SCHUMACHER:  Hopefully before five.

15     Q.  And so consistent with your discussions

16 with Mr. Hart and that March 30 meeting, overall

17 Lifestyles is providing a high level concept to

18 solicit the feedback of the planning commission

19 in an open meeting -- is that fair?  -- before

20 you get into the nitty-gritty I think as you

21 referred to it.

22     A.  Correct.  It was high level.

23     Q.  I want to now direct your attention to

24 Exhibit 61.  Mr. Brown, directing your attention

1    to Councilman Robinson's email to you on page 2

2    of this exhibit, he's forwarding you an email he

3    sent to members of the planning commission and

4    architectural review board, correct?

5        A.  That's what's here.

6        Q.  And he's urging them to consider denying

7    Lifestyle's proposal rather than tabling it,

8    correct?

9        A.  Yeah, the third page of his email states

10   I hope you'll consider denying LC proposal.

11       Q.  In your experience, Mr. Brown, has a

12   member of city council who is not the liaison to

13   the architectural review board or planning

14   commission wrote to members of those boards to

15   influence the outcome of their recommendations

16   on an application before?

17       A.  Not to my knowledge.

18       Q.  Turn to Exhibit 62, please.  And you

19   forwarded Mr. Robinson's email to Councilman

20   Myers, correct?

21       A.  Correct, since he's the council liaison.

22       Q.  Okay.  And did you agree with Councilman

23   Myers that it was inappropriate for Mr. Robinson

24   to send that email to the members of the

 1   planning commission and the architectural review

 2   board?

 3        A.  Did I agree with Scott thinking it was

 4   inappropriate?

 5        Q.  Correct.

 6        A.  I guess do you mean do I think it was

 7   inappropriate to send or do I think Scott

 8   thought it was inappropriate?

 9        Q.  Do you agree with Councilman Myers?  So

10   yes, did you think it was inappropriate for

11   Councilman Robinson to send that email?

12        A.  I had never seen it done before.  It

13   just more shocked me.

14        Q.  Yes, it is shocking.

15        MR. SCHUMACHER:  Objection.  Move to

16   strike the comment of counsel.

17        Q.  What did the architectural review board

18   and commission members tell you concerning

19   Mr. Robinson's email, if anything?

20        MR. SCHUMACHER:  Objection.  Relevance.

21        You can answer.

22        A.  I think more were just shocked that they

23   had not seen that direct approach to them

24   before.

1      Q.  Okay.  My question's a little bit

2  different.  Did any of those members discuss

3  Mr. Robinson's email with you?

4      A.  Just that they were shocked to have

5  received an email from him.

6      Q.  And what did you tell them, if anything,

7  about Mr. Robinson's email?

8      A.  I think generally I said look at it as a

9  citizen comment that we would get in line from

10  the citizens that were emailing us and that we

11  were posting.  I said take it with that.

12      Q.  You prefaced that with I think.  Do you

13  recall what you said or not?

14      A.  Not really.

15      Q.  Okay.  That's fair.

16          MR. INGRAM:  We've been going for a bit.

17  Why don't we take a break.

18                  (Recess taken.)

19                    -=0=-

20      (Deposition Exhibit 83 marked.)

21                    -=0=-

22  BY MR. INGRAM:

23      Q.  Mr. Brown, you've been handed what's

24  marked as Exhibit 83.

1    A.  Yes.

2    Q.  And Exhibit 83 contains a portion of the

3  minutes of the regular meeting of the

4  Worthington Architectural Review Board,

5  Worthington Municipal Planning Commission held

6  on October 14, 2021, and these meeting minutes

7  are on the Worthington Planning and Building

8  letterhead.  Do you see that?

9    A.  Yes.

10    Q.  With respect to this being a portion of

11  the regular meeting minutes, this portion of the

12  meeting minutes pertains to Lifestyle's

13  application, correct?

14    A.  Correct.

15    Q.  So there may have been other business

16  discussed during that planning commission and

17  architectural review board meeting, but this

18  excerpt pertained specifically to Lifestyle's

19  application.  Fair enough?

20    A.  Correct.

21    Q.  And you attended that meeting.  Is that

22  correct?

23    A.  Correct.

24    Q.  And consistent with your discussions

1    with Attorney Hart for this October 14, 2021

2    hearing, Lifestyles was presenting, again, a

3    high-level concept -- revised concept plan.

4    Fair?

5        A.  Correct.

6        Q.  And in view of that staff advised

7    against a motion recommending approval until

8    additional information is provided and reviewed,

9    correct?

10       A.  I think a recommendation was denial.

11       Q.  Turn to page 38 and it's going to be the

12   paragraph right above the bold discussion.

13       A.  Oh, okay.  Yes.  What was the question?

14   Were you asking just does it say that?

15       Q.  Yes.

16       A.  Yes, that's what's stated.

17       Q.  So in other words, Lifestyle is bringing

18   this high-level revised conceptual plan seeking

19   feedback from members of the planning commission

20   in an open public meeting so that there could be

21   an agreement reached on the overall concept.

22   Fair?

23           MR. SCHUMACHER:  Objection.  Misstates

24   the document.

1      A.  I would say their proposal came back

2  with the modifications, but still not meeting

3  what was in the land use plan and what we felt

4  they were hearing at the board and commission

5  meetings and the public comments.

6      Q.  Okay.  So during the hearing,

7  Mr. Brownlee said that Lifestyle was presenting

8  a revised conceptual site plan with the goal of

9  gaining feedback on such topics as a revised mix

10  and location of the uses, the configuration of

11  open space and open space amenities, and the

12  adjusted connectivity plan and neighborhood

13  engagement elements.  Isn't that what he said?

14      A.  That's what's referenced in the minutes.

15      Q.  Okay.  Do you have any reason to

16  disagree that's not what he said?

17          MR. SCHUMACHER:  It's on videotape.

18      A.  Yeah, I have to watch the video again.

19      Q.  Okay.  And Mr. Brownlee even says with

20  this concept plan filing Lifestyle's not asking

21  for a vote or recommendation at this stage, but

22  rather requesting dialogue on the updated

23  conceptual land plan, correct?

24          MR. SCHUMACHER:  Objection.

1      A.  That's what it says in the minutes.

2      Q.  Okay.  But you attended the meeting.  Do

3  you recall him saying that?

4      A.  It sounds familiar.

5      Q.  Okay.  And is that consistent with your

6  discussions with Mr. Hart as he referenced in

7  the cover letter to you that we discussed

8  earlier?

9      A.  Related for a high level review?

10     Q.  Yes.

11     A.  Yes.

12     Q.  And, in fact, I'll direct your attention

13  to page 42.  Mr. Hart said that Lifestyles was

14  asking the planning commission for dialogue.

15  This is a very complex site, and this issue has

16  been around for many years.  And Mr. Hart said

17  they want dialogue and collaboration at this

18  level with the commission and with the community

19  to get a baseline of site planning so they can

20  move on and take care of the other technical

21  issues: the architecture, the traffic,

22  stormwater, and so forth.

23         Do you recall him saying that?

24     A.  I believe so.

1     Q.  And that goal is consistent with seeking

2  input from the city's officials and the public

3  in a public meeting, correct?

4         MR. SCHUMACHER:  Objection.

5     A.  You're asking if that was consistent

6  with what he originally laid out or...

7     Q.  Whether it's consistent with the prior

8  discussions.

9     A.  Of hitting the broad topics?

10    Q.  Yes.

11    A.  Yes.

12    Q.  Directing your attention to page 45.

13  Second-to-last paragraph, it says, Mr. Brown

14  said with the history since he's been around for

15  the past eight years in Worthington and with the

16  life of this that the discussion needed to be

17  played out in public and not behind closed

18  doors.  There's been a large fear and discussion

19  that city staff or board and commission's

20  members were meeting with developers and trying

21  to offer some guidance, which is always great,

22  but with this proposal and this site being so

23  sensitive that it needed to play out in public

24  where everyone had the opportunity to hear

1  comments and offer the guidance as we would move

2  forward.  Do you recall saying that?

3      A.  I don't recall it, but it sounds like

4  what I would have said.

5      Q.  Okay.  So you believe the discussions as

6  to what could or couldn't be developed on

7  Lifestyle's property needed to play out in a

8  public meeting?

9      A.  Do I feel that way?

10     Q.  Yes.

11     A.  Yes, with this PUD it's so different

12  than a straight rezoning that there's

13  subjectivity in looking at the comp plan

14  recommendations and then what's, you know,

15  recommended to what could get through the board

16  and commission.

17     Q.  Okay.  And so to this point, Lifestyle's

18  not received any specific limitations on the

19  density or the specific types of mix of units

20  from the city, and so they proposed a broad

21  concept, right?

22          MR. SCHUMACHER:  Objection.  It

23  misstates prior testimony and it's also a

24  compound question.

1      A.  I would disagree, because I feel that

2  the January 14th or whatever day it was memo

3  gave them a lot of guidance where the

4  deficiencies were and where they could come back

5  and lower densities, more contiguous usable open

6  space, connections and dropping heights, that

7  that was their guidance.

8      Q.  Okay.  But you didn't tell them how many

9  apartments they could have, you didn't tell them

10  what the different types of residential uses

11  that needed to be in the Neighborhood Core, you

12  didn't tell them how many acres of park space or

13  open space they needed.  We've covered that.

14         MR. SCHUMACHER:  Objection.  We have.

15      Q.  And so that's the type of guidance

16  Lifestyle has sought from the city, but it

17  wasn't provided to them prior to this

18  October 14, 2021 meeting, was it?

19         MR. SCHUMACHER:  Objection.  Compound.

20  Which question are you asking?

21      A.  The guidance?

22      Q.  Correct.

23      A.  They were given guidance in that memo

24  that they needed to dramatically reduce density,

1    increase open space, look at heights and look at

2    connections.

3       Q.  Okay.  So they provide a high level

4    50,000 foot revised concept for this October 14

5    public meeting, correct?

6       A.  Correct.

7       Q.  Okay.  And the number -- the density of

8    the apartments was deemed too high, correct?

9          MR. SCHUMACHER:  When are we talking

10   about now?

11      A.  The proposal that came in October?

12      Q.  Yes.

13      A.  Correct.  It was still higher than what

14   was recommend -- or what was proposed in the

15   January meeting, and then five years prior, and

16   then formal proposal that had more acreage and

17   less density.

18      Q.  Okay.  But there's not an actual

19   standard of how many units was acceptable,

20   correct?

21         MR. SCHUMACHER:  Objection.  That

22   mischaracterizes prior testimony.

23      A.  I think I still go back to the land use

24   plan that states residential subordinate,

1    increase open space as you add density, that

2    they weren't doing that as part of the

3    progression.

4        Q.  Okay.  So other than the staff memo from

5    January, and the commentary provided by the

6    members of planning commission in January, and

7    the direction to increase the square footage of

8    office space, this revised concept plan provided

9    in October 14 of 2021 was the first opportunity

10   for Lifestyle to receive feedback on their

11   application, correct?

12       MR. SCHUMACHER:  Objection.  That

13   mischaracterizes prior testimony.

14       A.  On this new application, the

15   October 14th application?

16       Q.  I'm talking about on their application,

17   period.

18       A.  They had a year within that time to hear

19   their comments and their community outreach that

20   they were supposed to be doing to get the

21   feedback in addition to what was in the staff

22   memo and the October -- the January meeting to

23   the October meeting.

24       Q.  I'm talking about feedback from the

1    city, not from the community and the community

2    outreach.

3         MR. SCHUMACHER:  Objection.  Which

4    15,000 residents of the city are you asking for

5    now?

6         I'm sorry, I withdraw the objection.

7    A.  Repeat your question one more time then.

8    Q.  Okay.  I asked you this October 14, 2021

9    planning commission meeting is the first

10   opportunity for Lifestyles to receive feedback

11   on its revised proposal.  In other words --

12   A.  Public feedback or staff feedback?

13   Q.  Feedback from the city.

14   A.  City meaning city staff or...

15        MR. SCHUMACHER:  Objection.

16   Q.  City staff, city officials.

17   A.  They would have received the staff

18   memo --

19   Q.  Okay.

20   A.  -- prior to the meeting, and then would

21   be able to get board and commission comments and

22   public comments.

23   Q.  Okay.  Anything else?

24   A.  Not that I know of.

1        Q.  I'm going to direct your attention,

2   Mr. Brown, to Exhibit 38.

3        A.  Okay.

4        Q.  Exhibit 38 is a staff memorandum from

5   you to Mr. Greeson dated November 8, 2021.  Do

6   you see that?

7        A.  Yes.

8        Q.  And this staff memorandum was prepared

9   for a city council meeting.  Is that correct?

10       A.  Correct.  Or it was used for the

11  introductory to set up a hearing.  One of those.

12       Q.  I'm sorry, can you explain that?

13       A.  There's two different dates.  We have to

14  introduce an ordinance and set it for public

15  hearing.  So I believe this one -- this memo

16  probably would have gone to council where it set

17  the public hearing for the December 13th

18  meeting.

19       Q.  I see.  So would this staff memorandum

20  have been your memorandum to council for its

21  public meeting that ultimately occurred on

22  December 13, 2021?

23       A.  Correct.

24       Q.  So December 13 was the first and only

1   city council hearing on Lifestyle's application,

2   correct?

3     A.  Correct.

4     Q.  And with respect to -- for purposes of

5   the record, instead of tabling Lifestyle's

6   application and permitting it to revise its

7   concept plan or its application, planning

8   commission voted to recommend denial of

9   Lifestyle's application, correct?

10     A.  Correct.

11     Q.  The staff memo set forth in Exhibit 38

12   is largely similar to your prior memos

13   concerning the original application, correct?

14     A.  I believe so.

15     Q.  And with respect to the proposed revised

16   concept from the October planning commission

17   hearing there were some positive improvements

18   that you noted in Exhibit 38.  Is that fair?

19     A.  Correct.  I believe there were six or

20   seven or eight different positives.

21     Q.  Okay.  I want to direct your attention

22   to page 3162 in the lower right-hand corner.

23     A.  Okay.

24     Q.  With respect to the residential density,

1  height and housing types.  You wrote --

2      A.  You said --

3          MR. SCHUMACHER:  That's on 61.

4      A.  3162?

5      Q.  Yes.  So the top of -- so 3162 and I

6  turn back to the prior page.

7      A.  Okay.

8          MR. SCHUMACHER:  I'm sorry, which page

9  are we on?

10     Q.  Let's start with page 3161.

11     A.  Okay.

12     Q.  And I am directing your attention to the

13  section of your memo entitled residential

14  density, height and housing types.  And what

15  follows appears to be the same as what was in

16  your prior memo until I get to the next page on

17  page 3162.  The third paragraph from the top

18  reads that the overall density should be

19  dramatically reduced to better reflect what is

20  recommended in the plan and by the community.

21  The variety of housing types should also be

22  reconsidered to address the variety of housing

23  options needed and desired in the community.

24          Do you see that?

1      A.  I see it.

2      Q.  What overall density is recommended by

3  the community for Lifestyle's -- the development

4  of Lifestyle's property?

5      A.  I can't speak for the community.  I can

6  speak for what's in the land use plan.

7      Q.  Well, I'm referring here to your

8  memorandum.

9          MR. SCHUMACHER:  Were you finished with

10  your answer?

11      Q.  In your memorandum you say, the overall

12  density should be dramatically reduced to better

13  reflect what is recommended in the plan and by

14  the community.

15          So what overall density is recommended

16  by the community that you're referring to here?

17      A.  I think I would go back to the

18  January 14th proposed density was too high, back

19  to the 2015 density was too high, and it needed

20  to come in at a number below that 2015 proposal.

21      Q.  So the 2015 proposal is -- sets the

22  maximum density of residential housing for

23  Lifestyles?

24      A.  I wouldn't say maximum.

1          MR. SCHUMACHER:  Objection.  That's not

2    what he said.  That mischaracterizes his

3    testimony.

4          A.  That's not what I said.

5          Q.  Okay.  What did you say?

6          A.  The 2015 meeting we had over 350 people

7    at that meeting that felt that the density that

8    was proposed at the 2015 where we had the

9    acreage out front on the UMCH site was still way

10   too much and didn't have the variety that they

11   felt they wanted to see in the community.

12          And then when the 2021 version came in

13   the January, the density went even higher with

14   less acreage, and then it went down a little bit

15   at the October 14th meeting, but was still

16   higher than what was originally in the 2015.  So

17   that's where the community felt that that was

18   too high and too dense and too much on the site,

19   felt that wasn't in line with the comp plan,

20   that your numbers needed to come in under that.

21          Q.  Okay.  And when you say -- when you're

22   saying the community, you're talking about the

23   350 people who attended one meeting in 2015?

24          MR. SCHUMACHER:  Objection.  Asked and

1  answered many times.

2     A.  I would say still in addition to the

3  350, the 550-some emails, that some actually

4  spoke positive of the LC development but felt it

5  was still too dense, felt there should be

6  development on it, and what we've heard in the

7  10 years since then of the variety, the density

8  of it was still too much.

9     Q.  So this is -- so is your answer the same

10  with respect to what you've written here as to

11  what you testified earlier concerning your prior

12  report?

13        MR. SCHUMACHER:  Objection.  Report

14  speaks for itself.

15     A.  I still just go back to the comp plan

16  and the previous proposals.

17     Q.  Okay.

18     A.  As the -- as starting -- as a starting

19  point and that the community felt that that was

20  too dense and too much on that site.

21     Q.  When you say the community, though,

22  you're only zeroing in on a small fraction of

23  the community.  As of November 15 of 2021 you

24  had not taken any steps to ascertain what the

1  other 13,500 Worthington residents desired on

2  Lifestyle's property, did you?

3          MR. SCHUMACHER:  Objection.  This is a

4  democracy.  Chris, really -- I'm sorry.  I'll

5  withdraw my objection.

6      A.  No.  I think the thought was -- I don't

7  know where I am now.

8      Q.  I'm asking you about page 3162 of

9  Exhibit 38 where you reference a recommendation

10  by the community as to the overall density for

11  Lifestyle's site, the redevelopment of

12  Lifestyle's site.

13          MR. SCHUMACHER:  Objection.

14  Argumentative.  Asked and answered.

15      A.  I still would go back to my previous

16  comments about it going for the meetings,

17  getting feedback at the meetings that it was

18  still too high, they didn't listen, there was --

19  the community feedback was started back in the

20  2015 proposal.

21      Q.  Okay.  Anything else?

22          MR. SCHUMACHER:  Objection.

23      A.  Not that I can think of.

24      Q.  Turning to the next page, fourth bullet

1  point from the top.  You wrote that the 2020

2  proposal from Lifestyle Communities expressed a

3  mix of smaller estate lots, townhomes and flats

4  at approximately 12 units per acre.  However,

5  the community comments received indicated the

6  density and product was not what the community

7  wanted to see on the site.

8        Do you see that?

9     A.  Yes.

10    Q.  So exactly or specifically what was the

11 density and product the community wanted to see

12 on the site?

13    A.  I still go back to the land use plan

14 making that reference of 6 to 14 units to the

15 acre, increased open space, and then the

16 document talking about a variety -- the comp

17 plan talking about a variety of types, and then

18 what we were hearing at the meeting minutes --

19 or at the meetings, and the emails and letters,

20 that they wanted to see a different product,

21 whether that be a for sale, rental, single-level

22 living, senior, affordable, wanted to see more

23 of a mix and not as dense with the open space.

24    Q.  Well, single-level living was proposed

1  in the revised concept plan, correct?

2       MR. SCHUMACHER:  Objection.

3  Argumentative.

4       Go ahead.

5     A.  I believe there's some units that fell

6  into that category.

7     Q.  And, in fact, if you look down to the

8  next sub bullet you note that single-level --

9  single-level living is, quote, not abundantly

10  provided for in this proposal.  Do you see that?

11    A.  Yes.

12    Q.  In other words, there's not enough

13  single-level living in your opinion.  Is that

14  fair?

15    A.  I have to go back and look at the

16  application materials now.

17    Q.  Okay.  What were you trying to convey

18  with this bullet point, then?

19       MR. SCHUMACHER:  Maybe that they weren't

20  abundantly provided by the proposal.  Come on,

21  Chris.

22    A.  Not having their application materials

23  and looking, trying to think back, I think they

24  submitted a few floor plans that provided where

1  it could be a flat, but I don't think it was

2  predominant.  I think there were maybe 20 or so

3  units that could fall -- I have to go back and

4  they may be referenced in the memo somewhere.

5      Q.  How many single-level residential units

6  would be sufficient, then, Mr. Brown?

7      A.  I'd have to look at it in the context of

8  what was proposed.

9      Q.  And I'm not asking you about what was

10  proposed.  I'm asking you as far as what

11  standard you're applying.

12      A.  There is no minimum.  It's just

13  referenced in the guiding document.

14      Q.  Okay.  Turning to the next page,

15  page 3164, starting with the third sub bullet

16  from the top you wrote that the proposed open

17  space is an improvement over the previous

18  proposal as it creates a linear green from High

19  Street to the interior of the site to a

20  neighborhood green.  Do you see that?

21      A.  Yes.

22      Q.  You note that this is a positive

23  improvement towards meeting the goals found

24  within the land use plan, correct?

1      A.  Correct.

2      Q.  However, in the next bullet you write

3  that, the proposed open space does not seem to

4  meet the goal of creating contiguous usable open

5  space for those living in this development and

6  in all of Worthington.  Do you see that?

7      A.  Yes.

8      Q.  Okay.  What type of contiguous usable

9  open space would be necessary for you to

10  recommend approval?

11      A.  Instead of having a whole bunch of

12  little things popped here and there, dropping

13  density, adding open space that was adjacent to

14  Tucker Preserve so that it could expand up into

15  the site.

16      Q.  Okay.  Now, the revised concept, though,

17  had contiguous linear greens and open space from

18  Tucker Creek to the neighborhood green in the

19  middle of the development, as well as from High

20  Street from city hall all the way to the

21  neighborhood green in the center of the proposed

22  development, correct?

23      A.  Do you have an exhibit?

24      Q.  Sure.  I'll direct you to Exhibit 82.

1    Here, you can just -- Exhibit 82, page 6.

2        A.  What was your question again?

3        Q.  Well, there are clear contiguous open

4    space from Tucker Creek all the way north to the

5    neighborhood green that's in the center of the

6    site, and then there is contiguous linear open

7    space from city hall and High Street all the way

8    to a centralized neighborhood green.  Do you see

9    that?

10       A.  I see that, but I'll disagree.

11       Q.  Okay.  Why do you disagree?

12       A.  In my mind contiguous usable open space

13   in this area that was higher in density.  If you

14   go higher in density, you get more open space.

15   The contiguous usable open space would be

16   something adjacent to the Tucker Creek that you

17   can build upon and use versus a 10-foot path

18   that connected up.

19       Q.  Okay.  So you're pointing to subarea

20   three and subarea five on page 6 of Exhibit 82,

21   correct?

22       A.  Correct.

23       Q.  Okay.  And so are you saying -- I want

24   to understand what you're saying.  Are you

1  saying essentially you need a large park area

2  that subsumes subarea three and subarea five or

3  not?

4          MR. SCHUMACHER:  Wait a minute.

5  Objection.  Argumentative.  Where do I walk my

6  dog?

7      A.  Am I saying the whole thing needs to be

8  a park?  No.

9      Q.  Okay.  What are you saying?

10      A.  There needs to be more contiguous usable

11  open space in that core area where it goes if

12  you go dense, you're to have more usable open

13  space.

14      Q.  Okay.  How much more usable open space

15  needs to be provided, then, than the -- than

16  what's set forth on page 6 of Exhibit 82?

17      A.  I have what I believe in the land use

18  plan that's recommended and then what I think

19  the community also wants to see was more

20  contiguous usable open space.  I don't have an

21  acreage amount.

22      Q.  Okay.  Is it a call it as you see it

23  standard, then?

24          MR. SCHUMACHER:  Objection.

1 Argumentative.

2  A.  No.  I think it's a balance of looking

3 at if you're asked to increase density, you give

4 more open space.

5  Q.  Okay.  But we've already covered this,

6 Mr. Brown.  How much more open space?  But

7 there's not a formula, there's not --

8  A.  Correct.

9  Q.  -- an objective standard.  Okay.

10    I'm going to direct your attention to

11 Exhibit 11, Mr. Brown.

12    Okay.  Mr. Brown, Exhibit 11 is an email

13 from council president Robinson to members of

14 council, copying you and other staff members of

15 the city of Worthington, dated January 18, 2022.

16 Do you see that?

17  A.  Yes.

18  Q.  And this concerns a proposed moratorium

19 and amendment to the comprehensive plan as it

20 pertained to Lifestyle's property.  Do you

21 recall that?

22    MR. SCHUMACHER:  Have you reviewed it?

23  A.  I don't remember getting the email, but

24 I remember reading this.

1    Q. Okay. When is the first time you

2 learned of council president Robinson's desire

3 to impose a moratorium pertaining to Lifestyle's

4 property?

5    A. Late afternoon the day of the council

6 hearing.

7    Q. Was it as a result of this email or did

8 you learn before then?

9    A. I recognize the document. I don't

10 recognize the email, but when I found out that

11 he proposed to do a moratorium or the comp plan

12 amendment, it was in the afternoon of that

13 Monday, whatever the date would have been for

14 the city council meeting.

15    Q. Okay. So with respect to the comp plan

16 amendment --

17    A. Actually would have been Tuesday, sorry,

18 because it was a holiday.

19    Q. Good memory.

20    With respect to the comp plan amendment

21 that was adopted on January 18 of 2022

22 pertaining to Lifestyle's property, were you

23 aware of it prior to January 18th?

24    A. No.

1     Q.  And did -- who told you about it?

2     A.  Our law director that afternoon and Matt

3  Greeson, the city manager, that afternoon prior

4  to the council meeting.

5     Q.  Were you consulted in the drafting or

6  revising the comprehensive plan amendment?

7     A.  No.

8     Q.  Were you involved at all in preparing

9  the comprehensive plan amendment?

10     A.  This, no.

11     Q.  I'm going to direct your attention to

12  Exhibit 52.

13     A.  Okay.

14     Q.  Okay.  Mr. Brown, Exhibit 52 is an email

15  chain from council president Robinson to

16  Mr. Coulter, CCing Ms. Brewer and yourself dated

17  January 20, 2022.  Do you see that?

18     A.  Yes.

19     Q.  And the subject is ARB/MPC meetings with

20  Robinson, Brewer, correct?

21     A.  Correct.

22     Q.  And President Robinson originally in

23  this email chain set forth in Exhibit 52 reached

24  out to Mr. Coulter on January 20th to discuss

1  Lifestyle's property, correct?

2      A.  That's what this states.

3      Q.  And he's referring to the comprehensive

4  plan amendment that city council approved at the

5  January 18 meeting, correct?

6      A.  That's what it appears to.

7      Q.  And there's a discussion about you all

8  getting together to meet about Lifestyle's

9  property and the next steps concerning the

10  redevelopment of Lifestyle's property.  Is that

11  fair?

12      A.  I don't remember this ever happening.

13      Q.  You anticipated my next question.  Did

14  you ever have a meeting with Mr. Robinson and

15  Mr. Coulter concerning Lifestyle's property

16  after January 18 of 2022?

17      A.  Not to my knowledge.

18          MR. SCHUMACHER:  Chris, it's now 5:00.

19  We're well past the 7-hour limit even given a

20  lunch break and breaks so at this point I think

21  we should terminate the deposition.

22          MR. INGRAM:  No, we're not.

23          MR. SCHUMACHER:  Started at 9, took 45

24  minutes for lunch.

1          MR. INGRAM:  We've taken several breaks.

2    I've got two exhibits.

3          MR. SCHUMACHER:  I mean, we are past the

4    7 hours.  I kept track of it.  So if you're

5    going to keep -- if you'd been more efficient

6    with your time instead of wasting time arguing

7    about, you know, his staff memo and the comp

8    plan, we would probably be done by now.

9          MR. INGRAM:  I've got two exhibits.  I

10   don't anticipate taking more than 15 minutes.

11   Are you terminating?

12          MR. SCHUMACHER:  I'll give you five.

13   Let's get this done.  Come on.  It's -- look,

14   I -- I've been patient with you.  The witness is

15   obviously tired.  All right?  He's been doing

16   the best he can.  And if you're going to

17   continue to press on, I'm going to have to stop

18   the deposition.  I'm not going to let -- don't

19   look at me like that.  I'm not going to let my

20   witness continue to be badgered by questions

21   more than 7 hours in a day.  All right?  It's

22   not fair to the witness.  He's tired.  We're all

23   tired.  And that's why the court puts this limit

24   in place.

1        MR. INGRAM:  I object to your

2   characterization of any badgering of this

3   witness, Mr. Schumacher.  This deposition would

4   have gone a lot faster had you stuck to form

5   objections.  You refused to do so.  I only have

6   15 more minutes at most of questions for this

7   witness.

8        MR. SCHUMACHER:  I told you I'd give you

9   five.  Let's stop wasting the time.

10        MR. INGRAM:  Let's ask the witness.

11   Mr. Brown, are you comfortable proceeding for 15

12   more minutes?

13        THE WITNESS:  If we can finish up,

14   I'm...

15        MR. SCHUMACHER:  Let's get it done.

16   Come on.

17        MR. INGRAM:  Okay.  Thank you.

18   BY MR. INGRAM:

19     Q.  So Mr. Brown, the comprehensive plan

20   amendment adopted on January 18, 2022, is set

21   forth in Exhibit 7.  I have a copy here for you.

22     A.  Yes.

23     Q.  With respect to the redevelopment of

24   Lifestyle's property, does Exhibit 1 still apply

1    or was it replaced in its entirety by Exhibit 7

2    to your understanding?

3         MR. SCHUMACHER:  Objection to the extent

4    it calls for a legal conclusion.

5         You may answer.

6    A.  It's my understanding this completely

7    replaces the previous section that was updated

8    in 2014.

9    Q.  So to your understanding, Exhibit 7

10   completely replaces Exhibit 1 as of January 18,

11   2022, correct?

12        MR. SCHUMACHER:  Same objection.

13        You can answer.

14   A.  Correct.

15        MR. SCHUMACHER:  You know the old number

16   was 85.

17                      -=0=-

18        (Deposition Exhibit 84 marked.)

19                      -=0=-

20   BY MR. INGRAM:

21   Q.  Mr. Brown, I've handed you what's been

22   marked as Exhibit 84 numbered Worthington 32901,

23   and it also contains an attachment of a gmail

24   email chain.  Do you see that?

 1      A.  Yes.

 2      Q.  Okay.  And Exhibit 84 is an email from

 3  Susan Hinz, H-I-N-Z, to you dated January 20,

 4  2022.  Do you see that?

 5      A.  Yes.

 6      Q.  Who's Susan Hinz?

 7      A.  She is on the architectural review

 8  board, not planning commission.

 9      Q.  And she emailed you a conversation that

10  she had with Michael Sharvin?

11      A.  Yes.

12      Q.  Who's.  Michael Sharvin?

13      A.  Not a clue.

14      Q.  Are you familiar with this email chain?

15  Have you reviewed it before today?

16      A.  No.

17          There are so many names I'm going to

18  look up now.

19      Q.  Okay.

20          MR. INGRAM:  Mr. Brown, the city's

21  counsel I believe is still -- may still produce

22  documents in this case, and so to the extent

23  that there are additional documents that have

24  not been produced that pertain to you, I'm going

1  to leave your deposition open, but in the

2  meantime I do not have any further questions

3  today and appreciate your time.

4         COURT REPORTER:  Read and sign?

5         MR. SCHUMACHER:  He's keeping it open

6  even though we've gone 7 hours.

7                (Signature not waived.)

8                     -=O=-

9         Thereupon, the testimony of October

10  27, 2023, was concluded at 5:07 p.m.

11                     -=O=-

12

13

14

15

16

17

18

19

20

21

22

23

24

1                      CERTIFICATE

2     STATE OF OHIO      :
                            SS:
3     COUNTY OF FRANKLIN :

4            I, Julia Lamb, RPR, CRR, a
      stenographic court reporter and notary public in
5     and for the State of Ohio, duly commissioned and
      qualified, do hereby certify that the
6     within-named RAYMOND LEE BROWN was first duly
      sworn to testify to the truth, the whole truth,
7     and nothing but the truth in the cause
      aforesaid; that the testimony then given was
8     taken down by me stenographically in the
      presence of said witness, afterwards
9     transcribed; that the foregoing is a true and
      correct transcript of the testimony; that this
10    deposition was taken at the time and place in
      the foregoing caption specified.

11

            I do further certify that I am not a
12    relative, employee or attorney of any of the
      parties hereto; that I am not a relative or
13    employee of any attorney or counsel employed by
      the parties hereto; that I am not financially
14    interested in the action; and further, I am not,
      nor is the court reporting firm with which I am
15    affiliated, under contract as defined in Civil
      Rule 28(D).

16

            In witness whereof, I have hereunto
17    set my hand at Columbus, Ohio, on this 10th day
      of November, 2023.

18

19

20              *Julia Lamb*

21              Julia Lamb, RPR, CRR

22              Notary Public, State of Ohio

23    My commission expires:  10-10-27

24

## Exhibits

**Exhibit 1** 66:3,5,7,12,
17 67:7,14,17,19 71:8
72:17,20 90:12,20
111:14 112:14 118:15
148:2 151:23 158:13
165:13 167:22 168:14,
22 176:7,24 184:6
185:2,5,18 192:16,23
193:16 212:7 254:24
255:10

**Exhibit 7** 254:21
255:1,9

**Exhibit 11** 249:11,12

**Exhibit 21** 69:17,18,
20 70:9 71:11 72:9
75:5 82:5,20

**Exhibit 24** 113:10,13
114:5

**Exhibit 31** 115:6,8,10

**Exhibit 38** 236:2,4
237:11,18 242:9

**Exhibit 45** 123:16,18
127:2

**Exhibit 52** 251:12,14,
23

**Exhibit 54** 96:16,18,
20

**Exhibit 55** 87:9,10
88:12

**Exhibit 56** 92:20,22

**Exhibit 57** 118:18,20

**Exhibit 59** 142:20
145:14 152:7 154:23
157:9 176:15 180:4
194:2

**Exhibit 60** 207:22
208:4 209:11 211:5
214:2

**Exhibit 61** 222:24

**Exhibit 62** 223:18

**Exhibit 64** 41:23 42:3,
12,14

**Exhibit 65** 46:2,6,9,
11,20

**Exhibit 66** 50:7,10,12

**Exhibit 67** 62:23 63:3,
6

**Exhibit 68** 80:12,16,
19

**Exhibit 69** 101:19,23
102:2 103:18

**Exhibit 70** 104:3,7
109:11

**Exhibit 71** 109:7,15,
17

**Exhibit 72** 110:20,24
111:3 112:12

**Exhibit 73** 115:24
116:4,6,9

**Exhibit 74** 126:11,15,
19

**Exhibit 75** 130:13,17

**Exhibit 76** 133:8,12,
14,18,23

**Exhibit 77** 140:11,17
141:3

**Exhibit 78** 196:20,24

**Exhibit 79** 199:21
200:1,2,9

**Exhibit 80** 203:20,24
205:17

**Exhibit 81** 205:20,24

**Exhibit 82** 218:13,17,
20 220:3 246:24
247:1,20 248:16

**Exhibit 83** 225:20,24
226:2

**Exhibit 84** 255:18,22
256:2

---

## $

**$100** 78:4

---

## -

**-=0=-** 41:22,24 46:1,3
50:6,8 62:22,24 80:11,
13 101:18,20 104:2,4
109:6,8 110:19,21
115:23 116:1 126:10,
12 130:12,14 133:7,9
140:10,12 196:19,21
199:20,22 203:19,21
205:19,21 218:12,14
225:19,21 255:17,19

**-=O=-** 257:8,11

---

## 0

**01-17** 109:19

---

## 1

**1** 66:3,5,7,12,17 67:7,
14,17,19 71:8 72:17,
20 90:12,20 111:14
112:14 118:15 148:2
151:23 158:13 165:13
167:22 168:14,22
176:7,24 184:6 185:2,
5,18 192:16,23 193:16
212:7 254:24 255:10

**10** 14:21 15:2 24:6
47:18,22 48:1,21
55:24 57:10 68:5
125:2 136:23 163:8
173:19 195:20,22
215:4 221:3 241:7

**10-foot** 247:17

**10-month** 196:2

**10-year** 15:8,14

**100** 100:7,18 161:20
212:24 219:14

**11** 80:21 249:11,12

**12** 104:8 169:7 170:17
243:4

**125** 188:18 212:24

**13** 109:18 236:22,24

**13,500** 242:1

**13th** 92:23 236:17

**14** 63:8 130:18 131:22
133:24 134:12 141:5,
12 142:24 144:9,14
146:13 156:21 158:9
169:6,9,24 170:9

**174:2,4,5** 212:15
220:14 226:6 227:1
232:18 233:4 234:9
235:8 243:14

**14,000-plus** 164:17

**14th** 143:19 157:21
218:23 221:5 232:2
234:15 239:18 240:15

**15** 27:4 96:22 241:23
253:10 254:6,11

**15,000** 62:9 164:3
235:4

**150** 188:18 189:5

**150,000** 191:1

**16** 174:2,4

**16-page** 87:15

**18** 113:15 116:11
249:15 250:21 252:5,
16 254:20 255:10

**18th** 250:23

**19** 46:12 56:23

**1995** 16:19

**1998** 15:18 16:2,21
20:16

---

## 2

**2** 36:17 37:1 126:24
145:14 223:1

**20** 27:4 105:11 245:2
251:17 256:3

**20,000** 181:16

**200** 161:19 167:9

**200,000** 188:7 189:5
191:1

**2003** 15:5,15 20:16
23:15 24:7

**2005** 39:20

**2007** 23:17

**2010** 8:10

**2011** 8:10 17:11

**2012** 8:10 17:11

**2013** 14:19 15:5 24:7 43:9 50:14 58:23 92:7, 10,16

**2014** 39:21 46:12 63:9 66:14 72:5 73:13 74:14 152:13 157:15 255:8

**2015** 70:11,14 80:21 82:23 88:16 92:10,16, 24 96:22 98:9,15 102:3 106:2 157:13, 15,23 160:20 162:12 163:2,23 173:8,14 212:1,3,22 239:19,20, 21 240:6,8,16,23 242:20

**2016** 104:8 106:4 107:21

**2017** 39:23 40:1 109:18 111:6

**2018** 113:15

**2019** 39:23 40:1 116:11

**2020** 26:20 118:22 119:4 123:20 126:21 128:15 129:7,24 130:19 131:3,22 162:13 180:6,14,16 212:3 243:1

**2021** 13:6 133:24 134:12 141:5 142:24 144:9 146:13 187:4, 16,17 197:2 198:1 200:5 206:2,21 208:7 209:6 212:22 215:18 217:19 218:23 219:3 226:6 227:1 232:18 234:9 235:8 236:5,22 240:12 241:23

**2022** 13:10 39:22 249:15 250:21 251:17 252:16 254:20 255:11 256:4

**2023** 257:10

**20th** 251:24

**21** 69:17,18,20 70:9 71:11 72:9 75:5 82:5, 20 162:13

**22** 26:21

**23** 92:7

**24** 113:10,13 114:5

**25** 56:6 184:22

**25,000** 183:20 184:10

**25th** 111:6

**26** 146:12 157:7 161:7 166:12

**27** 8:2 50:14 119:3 141:19 197:24 257:10

**27th** 197:2

**28** 174:13,21 200:5

**29** 88:16 92:10,16 180:4 183:17 206:2,6

**2C** 57:6

**2nd** 66:13

---

**3**

**3** 90:1

**3.4** 108:16

**30** 57:16 59:3 191:17 209:6 210:9 215:18 216:1 217:19 219:7 220:19 221:6 222:16

**30,000** 108:8

**31** 115:6,8,10 191:17 192:1 194:2

**3161** 238:10

**3162** 237:22 238:4,5, 17 242:8

**3164** 245:15

**31st** 208:7

**32901** 255:22

**350** 157:17 160:22 163:1,6 240:6,23 241:3

**38** 227:11 236:2,4 237:11,18 242:9

---

**4**

**4** 43:9 70:11,14

**40** 49:5

**42** 229:13

**45** 123:16,18 127:2 230:12 252:23

**47** 116:19

**48** 108:3 134:8,17 135:21 137:6,22

---

**5**

**5** 114:1,6

**5-acre** 115:2

**5-story** 49:6

**50,000** 219:18 233:4

**500** 59:4 125:20 146:17 161:19

**50277** 63:7

**50278** 63:7

**52** 251:12,14,23

**53954** 133:15

**53966** 133:15

**53968** 140:18

**54** 96:16,18,20

**54030** 140:19

**54309** 218:18

**54325** 218:18

**55** 87:9,10 88:12

**550** 163:15,20

**550-some** 125:12 241:3

**55320** 116:6

**55321** 116:7

**55581** 109:16

**55594** 110:11

**55595** 109:16

**56** 92:20,22

**57** 116:19 118:18,20

**58** 152:16 154:20

**59** 142:20 145:14 152:7 154:23 157:9

176:15 180:4 194:2

**59607** 111:3

**59608** 111:4

**5:00** 252:18

**5:07** 257:10

**5th** 123:20 124:12 128:15,22 129:6

---

**6**

**6** 102:3 126:20 136:16 158:9 169:6,24 170:8 212:14 243:14 247:1, 20 248:16

**60** 207:22 208:1,4 209:11 211:5 214:2

**60,000** 183:19 184:22

**61** 222:24 238:3

**62** 223:18

**64** 41:23 42:3,12,14

**65** 46:2,6,9,11,20

**66** 50:7,10,12

**67** 62:23 63:3,6 133:16

**68** 80:12,16,19

**69** 101:19,23 102:2 103:18

**6th** 128:14 129:7,24

---

**7**

**7** 136:17 253:4,21 254:21 255:1,9 257:6

**7-hour** 252:19

**70** 104:3,7 109:11

**71** 109:7,13,15,17

**72** 110:20,24 111:3 112:12

**73** 115:24 116:4,6,9

**74** 126:11,15,19

**75** 130:13,17

**76** 133:8,12,14,18,23

**77** 140:11,17 141:3

**78** 196:20,24

**79** 199:21 200:1,2,9

**7:26** 206:5

---

**8**

**8** 236:5

**80** 203:20,24 205:17

**80s** 202:10

**81** 205:20,24

**82** 218:13,17,20 219:13 220:3 246:24 247:1,20 248:16

**83** 225:20,24 226:2

**84** 255:18,22 256:2

**85** 140:14 255:16

---

**9**

**9** 252:23

**90** 179:9

**90s** 202:11

**92** 151:9 185:2

**95** 193:2

---

**@**

**@ lifestylecommunitie s.com** 104:21

---

**A**

**abandon** 103:3

**ability** 76:20

**abundantly** 244:9,20

**acceptable** 45:9 160:14 161:11 174:3 210:14 211:18 212:8, 10 217:17 233:19

**accessed** 175:7

**accomplish** 45:23

**Accord** 24:15 61:14

**account** 74:5 172:12 211:23

**accurate** 10:7 11:2,9 22:18 45:18 51:17 103:10

**accurately** 209:9

**acknowledge** 152:7

**acre** 49:7 158:9 169:18,24 170:5,18 174:2 243:4,15

**acreage** 157:22 160:21 161:3,4 233:16 240:9,14 248:21

**acreages** 155:6

**acres** 36:17 37:1 49:5 108:16 114:1,6 177:17 178:15 179:23 232:12

**acronym** 203:15

**active** 202:13,15

**acts** 36:20

**actual** 27:6 33:3 38:11 64:23 72:16 74:16 77:19,22 83:3,5 123:14 154:18 167:16, 19,20 176:14 179:18 185:4 186:8 192:8 193:21 209:23 216:24 233:18

**Adam** 115:12

**add** 168:15 234:1

**adding** 246:13

**addition** 27:24 28:17 59:7 74:13,19 177:24 234:21 241:2

**additional** 71:15 75:4 76:21 154:10 180:24 192:17 227:8 256:23

**additions** 81:21

**address** 31:18 32:1, 22 33:10,20 34:3 42:20 72:24 148:20 194:20 238:22

**addressed** 32:6,10

195:19 215:8

**addresses** 171:3

**addressing** 63:13

**adjacent** 246:13 247:16

**adjusted** 221:10 228:12

**adjustments** 212:21

**administrator** 15:9 17:13 23:16,20,21

**adopted** 44:13 66:13 67:9 68:10 157:15 250:21 254:20

**adoption** 83:11 90:11, 19 173:20

**advise** 178:14

**advised** 227:6

**affairs** 63:23

**affordability** 172:20

**affordable** 147:19 243:22

**afternoon** 208:15 250:5,12 251:2,3

**Age** 202:14

**aging** 148:20 171:3

**agree** 86:2 99:8,9 100:4 101:4 103:14 127:14 223:22 224:3,9

**agreeable** 197:13 199:9

**agreed** 47:24 220:24

**agreement** 81:16 88:5 98:14 121:5 227:21

**agreements** 120:23

**agricultural** 22:24

**agriculture** 20:7

**ahead** 21:9 30:10 96:13 178:23 244:4

**AICP** 17:8,18

**aim** 45:8

**Albany** 49:23

**alleyway** 175:8

**Alliance** 47:6

**alternate** 121:13

**alternative** 93:3 145:19

**alternatives** 79:4 194:12

**amendment** 91:14 249:19 250:12,16,20 251:6,9 252:4 254:20

**amenities** 155:9,10 192:4,6,10,14,22 193:15,21 194:9,12 221:10 228:11

**amenity-rich** 171:5

**American** 17:8

**amount** 30:13 37:11 39:5 153:20 154:7 157:19 160:23 177:22 178:3,10 186:2,9,19 196:15 210:17 211:6 215:12,20 216:4,6,8 248:21

**amount-wise** 210:18

**amounts** 185:5 210:22

**amphitheater** 194:8

**analysis** 30:8 82:11

**analyzing** 83:6,17

**and/or** 33:5 34:22 35:20 39:12 41:14 50:2 78:2,8,14 85:16 120:23 160:9 177:1 179:20 180:24

**Andrew** 63:18

**Anne** 42:14 63:8 64:21

**answering** 9:24 10:10,19

**answers** 11:2 139:5 160:3 212:13

**Anthem** 119:22 121:8

**Anthony** 104:20

**anticipate** 140:21 253:10

**anticipated** 73:19 92:2 252:13

**anticipating** 75:10 79:22 194:19 195:6

**anymore** 27:11 47:9 123:6

**apartment** 155:17

**apartments** 158:17, 22 159:10 160:13,22 161:10 172:23 178:11 211:17 213:8,21 232:9 233:8

**apologize** 25:15 90:23

**app** 190:17

**appeals** 27:19 30:2 128:11

**appears** 71:10 97:7 110:18 130:23 134:11 198:16 201:18 204:2 238:15 252:6

**applicable** 118:15 158:2

**applicant** 29:24 30:9, 17 31:22,24 32:8,23 33:1,9,19 35:11 37:13 41:15 76:5,11 77:1,11 79:23 80:2 137:6,14 143:10 144:3 146:5 147:7,12 166:13 195:4 207:17 217:17 220:12

**applicant's** 31:4

**applicants** 30:7,14 35:9 76:16 139:1

**application** 13:7,18 29:1,10,11,18 30:5,15, 16 31:8 34:2,21 35:5 36:10 70:23 71:22 72:3,11 75:8 76:2 82:23 83:2,3,5,22 86:6,17,18,21 89:19, 21,23 123:21 124:8, 10,15,18,23,24 125:7, 9 126:3,22 127:24 128:3,4,10,16,21 129:6,17 130:5 131:2, 7,13,17 134:10,14,18 136:20 137:7,24 139:3 140:6 142:5,6,17,18 144:11 145:16,24 146:15,22 150:1 152:13 155:21 157:21 158:2 161:2 162:2,18 164:4,15,21 165:9 169:20 170:7 173:21 177:3,8,19 178:17 179:2 183:19 186:15 189:12 190:18 191:14 194:16 195:3,5,8 199:7 205:3 207:12 211:16 212:4 214:23 215:5 221:9 223:16 226:13,19 234:11,14, 15,16 237:1,6,7,9,13 244:16,22

**applications** 25:21 27:17,22 28:2,15,17, 23 29:7,13,15,22 30:23 31:12,16 33:14, 18 34:7,13 37:11 40:2 92:12 95:13 132:8 137:11 207:19 208:16

**applied** 66:14

**apply** 29:20 74:10,11 170:6 217:4 254:24

**applying** 171:19 175:21 179:2,23 185:8 245:11

**appreciated** 22:21

**apprised** 131:12,16 132:19 207:1

**approach** 83:16 224:23

**approached** 83:8,12 104:13

**approaching** 88:21

**approval** 26:2 34:8,14 76:17 106:17,19 107:15,17 168:2 171:9 175:14 177:18 184:9 185:10 196:5 227:7 246:10

**approvals** 37:6,7

**approve** 33:23,24 106:22 107:9

**approved** 107:2 252:4

**approximate** 114:5

**approximately** 15:5 62:9 114:1 219:6 243:4

**April** 96:22

**ARB** 114:17 128:11 138:8 144:10,15

**ARB/MPC** 251:19

**architect** 38:12

**architectural** 12:23, 24 27:18 28:10 30:1 36:19 37:3 48:12 74:6, 14 86:7 88:14 93:14 106:18,21 107:8 123:24 124:2,17 128:10 131:6 141:11 142:22 162:23 223:4, 13 224:1,17 226:4,17 256:7

**architecture** 73:6,16, 21,22 74:11 106:22 175:18 219:17 229:21

**area** 20:15,19 21:2 61:15 69:3,18 70:3,19 71:6 73:20 82:7 84:20 85:9 86:1 87:5 114:5 119:18 148:15 156:18 160:7,9 170:24 171:21 174:18 175:6 178:1 180:1,2 193:8 217:8 247:13 248:1,11

**areas** 68:14 69:8 179:19 190:20 191:15 193:23

**arguing** 253:6

**Argumentative** 91:18 128:19 129:2,9 132:11 136:22 158:24 160:17 164:20 211:20 213:11 242:14 244:3 248:5 249:1

**arrived** 92:15

**article** 64:15,24 65:1

**articulate** 213:20

**articulates** 69:7

**ascertain** 164:1 197:9 241:24

**Ashton** 49:23

**asks** 162:20 200:13

**aspects** 210:10

**assist** 64:6

**assistant** 19:12 22:16 27:12

**assisted** 22:10

**assisting** 18:14

**Association** 47:8 52:24 97:18 202:5

**assume** 9:19 70:22 83:21 91:7 131:4 133:4

**assuming** 82:14 91:22 118:11

**attached** 43:5,8 50:19 56:22 82:4 134:7 175:8 199:11

**attachment** 255:23

**attempting** 152:9

**attend** 47:1,15 48:17 136:9,16 204:10

**attendance** 48:8

**attended** 33:5 48:5,20 55:9 56:17 88:18 163:2,22 226:21 229:2 240:23

**attendees** 204:7

**attending** 209:3

**attention** 69:16 87:9 90:1 92:19 96:16 113:10 115:5 118:17 123:15 136:19 142:19 157:7 174:14 191:24 206:4 207:21 222:23, 24 229:12 230:12 236:1 237:21 238:12 249:10 251:11

**attorney** 7:10 38:11 115:11 135:11,16,17 157:1,5 163:17 176:10,23 186:14 188:15,17 189:18 190:9,19 191:9,16 196:6 198:20,23 200:14 201:7 208:24

209:20 215:3 219:15
221:3 227:1

**attract** 98:21

**August** 14:19 92:6
102:3

**aware** 91:23 156:5
163:11 186:18 250:23

**B**

**bachelor's** 16:10,17

**back** 15:18 16:4 17:24
20:16 21:7 29:18
30:13,19 31:2,14 32:7
33:2,7 34:3 37:12
38:15 39:5 49:19,22
53:19 55:24 57:13
58:23 61:12 68:3
69:12 70:9 72:5,16
74:3,14 99:17,21
126:14 137:15 149:13
150:8 151:22 153:13
157:20 160:19 161:1,2
162:5 163:20 165:10,
14,16 166:9 167:17
169:12 170:8 179:5
185:17 186:15 188:1
189:12 194:19,24
195:15,18 196:17
209:24 210:1,2,17
211:6,21 212:1,14,22
213:14 215:1 228:1
232:4 233:23 238:6
239:17,18 241:15
242:15,19 243:13
244:15,23 245:3

**backed** 120:22

**background** 51:21

**bad** 21:8 120:21

**badger** 161:16

**badgered** 253:20

**badgering** 254:2

**balance** 182:16
193:14 249:2

**ball** 216:24

**base** 185:20 190:11
217:8

**based** 44:24 62:1 65:8
95:5 102:11 112:11
121:24 154:8 169:16
188:20 194:15 195:2
210:8 213:18

**baseline** 229:19

**basic** 40:15

**basically** 22:16 24:4
53:20

**basing** 121:22 162:15
163:5

**Bates** 94:2,3,7

**begins** 123:23

**behalf** 26:1

**belt** 180:20

**benches** 192:12
193:23 216:23

**benefits** 45:17

**Beth** 93:19,20,22 94:7

**bias** 202:14

**bicycle** 39:23 40:8

**big** 18:3 24:15 54:2
55:16 70:23 71:12
72:10 118:4 125:3,7,8,
12,23 126:3 136:20
146:19 194:16 216:19
219:22

**bigger** 38:10 137:16
221:1

**bike** 41:10 86:24
192:12 193:22 194:3

**bike/ped** 41:9

**binder** 66:4

**bit** 10:11 48:22 77:6
180:18 183:2 210:7
225:1,16 240:14

**Bitar** 27:10 28:18
139:22 144:2 145:4
204:17

**bites** 58:22

**blend** 60:11 136:24

**blends** 41:9

**blur** 9:8

**blurs** 48:1

**Bo** 208:23 214:24

**board** 12:20,21,23,24
27:18 28:10 30:2
31:19,23 33:4 34:5
36:19 37:3 41:14
46:21 48:12 86:8
88:14 93:15 106:18,21
107:8 108:2,24 124:1,
17 125:5 128:10,11
131:7 142:22 145:22
162:24 195:17 198:14,
22 223:4,13 224:2,17
226:4,17 228:4 230:19
231:15 235:21 256:8

**board's** 141:11

**boards** 28:3 29:12
40:20 76:19 77:5
85:18 121:15 223:14

**bold** 227:12

**bones** 209:16

**Bonnie** 111:5

**book** 125:13 191:20
214:9

**boss** 24:4

**bottom** 119:1 153:7
193:5 197:23

**break** 10:17,22 42:6,7
65:22 126:8 127:3
179:8 225:17 252:20

**breakdown** 71:1
192:9

**breaks** 252:20 253:1

**Brewer** 251:16,20

**brick** 219:21

**Bridge** 138:18 139:4

**briefing** 50:14

**bring** 34:24 78:13
159:16 214:12

**bringing** 34:19 227:17

**broad** 61:16 72:2,4
148:11 219:18 230:9
231:20

**broader** 81:14,15

**broke** 54:4 121:20,23
122:6

**brought** 30:11 32:9
34:4 160:20

**Brown** 7:1,7,8,22
11:17 14:14 17:2,16
25:24 26:5 42:2,11,15
44:5 46:5,8 63:2,6,8,
13,21 64:3,6 65:20
66:2 69:17,20 70:2
80:15,19 88:12 91:16
92:18,22 96:12,20
104:6 109:10 110:23
112:12 113:11 116:4
118:20 126:14 130:16
133:12,23 136:10
140:16,21 141:3
142:20 143:2 146:13
151:2 152:23 153:18
179:15 185:11 194:15
196:3,24 199:24
201:22 202:17 203:23
205:23 208:4,13
217:15 218:16,19,21
219:2 222:24 223:11
225:23 230:13 236:2
245:6 249:6,11,12
251:14 254:11,19
255:21 256:20

**Brown's** 42:24 65:17

**Brownlee** 206:9,15,20
209:20,21 214:24
215:19 228:7,19

**bubbles** 54:3

**budget** 140:5

**build** 51:22 181:6
247:17

**building** 26:6,14,17,
24 27:1,7,9,21 49:6
70:21 71:19 73:19
74:5,7 84:21 85:1
104:15 105:2,4 106:6,
10 108:9 110:7 112:1,
19 119:23 121:9
122:15 180:22 181:3,
7,13,22 201:9,13
214:13 226:7

**buildings** 14:15 27:7
73:8,9,15 74:22
155:18

**built** 25:2 78:23 85:16 162:12 163:8 173:22 181:21

**bulk** 61:21 118:11 215:8

**bullet** 75:1 81:21 82:3 170:16,21 173:4,7 174:14,15,22,24 175:1 192:1 242:24 244:8,18 245:15 246:2

**bulleted** 71:4

**bunch** 246:11

**Bureau** 52:20

**bus** 47:2 60:21

**business** 52:15,24 56:24 57:2 226:15

**BWF** 200:21 201:8

**C**

**C-O-U-L-T-E-R** 93:6

**Cadillac** 181:17

**calendar** 57:14

**calendars** 59:11

**call** 16:8 29:14 40:8 63:23 121:4 132:12 153:6 177:8 190:1 220:21 248:22

**called** 16:6 22:11 36:16 41:6 187:6 193:16 203:3

**calls** 18:10 30:20 255:4

**care** 229:20

**Carpenter** 81:7,12,17 83:6,16,17 87:6

**case** 8:6,13 9:1,5,7 14:6 138:3 152:19 153:11 165:8 195:4 256:22

**categories** 71:4

**category** 57:4 117:22 173:2 244:6

**caught** 162:5

**caveat** 73:12 168:15, 23 169:13 170:9 174:7

**CCING** 94:7 113:14 251:16

**center** 53:19 55:17 61:14 108:4,15,19,22 109:1 246:21 247:5

**central** 60:21

**centralized** 247:8

**certification** 17:9,10

**certifications** 17:5,15

**certified** 7:2 17:9

**cetera** 200:22

**chain** 63:11 80:20 81:1 96:21 118:21 126:19 197:23 200:2 218:20 251:15,23 255:24 256:14

**chair** 89:8 204:14,16

**Chairman** 89:9

**Chamber** 53:2

**chance** 14:8 111:1

**change** 118:8,10

**changed** 42:22

**characterization** 63:12 254:2

**characterize** 45:21

**charrette** 53:15,16, 20,23 55:5,13,14 56:8 58:14

**charrettes** 60:14

**cheapen** 133:20

**check** 59:10 84:8 190:9 215:3

**checked** 70:9

**checklist** 69:18 70:4, 20,22 71:6,20 72:2,20 82:7 84:20,22 85:9,10, 20 86:1,7 87:5

**checklists** 85:4,16 86:3,4,15

**chief** 26:24

**choose** 166:6

**chosen** 44:6,7 49:3

**Chris** 7:9 27:4 33:13 84:18 121:14 149:7 150:7 152:11 194:22 242:4 244:21 252:18

**Church** 110:6

**CIC** 52:16

**circled** 54:23

**circumstance** 144:6 176:20

**citizen** 203:10 225:9

**citizens** 225:10

**city** 12:20,24 13:4,6,10 14:18 16:15 26:6 27:13 28:11 29:1,2 35:7,16,19 37:4 39:6 43:9,19 44:7 45:8,17 46:21 47:21 48:11 52:5 55:19 58:9,20 62:8 64:17,18 65:9,10 66:13 67:18,24 75:10, 15 76:3,11 77:24 78:3, 22 79:24 81:7,9 82:24 83:12,16 84:5,20 85:2 88:21 89:2,19 90:2,14 91:15 92:8,9,11,15 102:19 103:2 107:3,7, 15,16 109:17 114:23 120:4 124:1,3,16,18, 22 128:1,5,16,23 129:5,16 130:24 132:14 134:8,16 135:2,3 136:3,9,15 137:5,8 138:23 139:1, 13,18 140:4,5 141:4 145:9,22 148:17 163:11,19 164:1,6,11 165:23 172:7 183:5 184:17 185:24 186:4, 11,19 188:10 200:4 205:9,15 208:5,6,11 210:13,15 211:16 212:9 213:19 216:5 223:12 230:19 231:20 232:16 235:1,4,13,14, 16 236:9 237:1 246:20 247:7 249:15 250:14 251:3 252:4

**city's** 14:15 43:14 58:9 76:15,24 83:11

84:1 133:19 144:4 156:1 210:14 215:19 217:13 230:2 256:20

**Clarification** 57:22

**clarifications** 34:4

**clarify** 9:16 63:12 65:8

**class** 181:15,17,19,23 182:4

**clear** 98:18 211:5 247:3

**clerk** 27:9

**client** 7:12

**client's** 152:12

**close** 105:21

**closed** 210:23 211:14 230:17

**clue** 68:5 91:13 93:18 96:14 103:22 109:4 189:21 198:6 204:22 206:23 256:13

**CM** 81:3

**coach** 150:15 152:9

**code** 23:24 26:17 27:3 33:2,3 38:16 39:16 74:15,16 76:16,24 77:10,14 85:16 86:17 129:14,21,22 162:1, 14,15,21 192:9 193:20,24 194:6,14 217:13

**Cohen** 27:9

**cold** 18:10

**collaboration** 229:17

**colleague** 105:21

**collecting** 136:2

**college** 17:1

**Columbus** 20:3 50:1

**combine** 111:24

**combined** 117:16

**comfortable** 87:18 254:11

**comment** 34:6 35:24 224:16 225:9

commentary 234:5

comments 29:18 33:4
35:5 58:18 96:24
102:21 145:22 164:10
173:8,11 195:17
211:24 213:2 228:5
231:1 234:19 235:21,
22 242:16 243:5

Commerce 53:2

commercial 20:6
75:17 151:13 158:21
159:11 182:11 183:18,
20 184:18 185:6
186:3,16

commission 12:20
15:16,21,24 17:22
27:19 28:10 30:1
31:10,18,19 32:1,3,9
33:5,18,21 34:6 35:6
41:14 46:21 48:12
55:20 67:23 76:19
88:15 89:7 93:12
94:12,14,21 95:10,18
97:1 106:17 107:8,15
108:3 120:4 123:24
124:2,16 125:5 129:15
131:6 132:9,16 133:2,
3 134:13,19 138:8
141:10 142:23 144:10,
15 145:22 161:7
162:23 176:15 189:13
191:5 194:18 195:17
197:21 198:14,17,19,
22 199:1,5 204:15
211:1 220:15 222:18
223:3,14 224:1,18
226:5,16 227:19 228:4
229:14,18 231:16
234:6 235:9,21 237:8,
16 256:8

commission's 13:17
230:19

commissions 28:3
29:12 40:21 76:20
77:5 85:18 121:16

committee 19:15
20:11 29:14 44:9

common 54:5 55:1

commonly 127:23

communication
121:19

communications
206:9,19

Communities 7:10,
19 89:13 116:14 243:2

community 39:10
45:11,17 47:13 51:23
52:4,16,17 56:24 57:2
62:13 145:23 147:17
157:17 161:5 162:10
163:1,9,13 164:17
165:4,7 166:19 173:8,
10 182:12,15 192:5
193:10,11 195:16
200:15 201:12 229:18
234:19 235:1 238:20,
23 239:3,5,14,16
240:11,17,22 241:19,
21,23 242:10,19
243:5,6,11 248:19

community-wide
90:4 91:1

comp 72:5,17 86:24
142:1 146:10 147:4
148:1 150:8 155:12
157:14 158:14,15
165:12,14 166:9
170:10 173:19,20,24
174:1 176:14,24 182:9
184:15 192:15 193:1
210:1 212:20 231:13
240:19 241:15 243:16
250:11,15,20 253:7

company 141:22

compare 159:10
221:24

complements 148:19
172:8

complete 10:6 11:2,9
25:4 29:11 186:16

completed 10:3 53:5
75:11

completely 25:1
218:10 255:6,10

complex 36:9,23
37:8,10 207:20 229:15

complexity 36:21

compliance 27:3
34:21

compliant 29:11

complicated 36:9
37:8 39:4

component 159:15
172:20 215:24

compound 19:1
37:24 60:23 76:7
99:23 194:22 231:24
232:19

comprehensive 13:1
14:10 18:7,13,15,22
19:10,16 20:12,14,23
22:9 23:4 25:11 39:20
40:7,11,24 43:14,17,
24 45:2 51:14 90:5
91:2,14,21 103:4,7
147:24 152:13 154:9
185:18 249:19 251:6,9
252:3 254:19

concept 89:1,12
157:23 160:19 187:4
219:3,8 220:8,13
221:7 222:17 227:3,21
228:20 231:21 233:4
234:8 237:7,16 244:1
246:16

conceptions 54:10

conceptual 54:9
227:18 228:8,23

conceptualize 49:5

concerned 9:4 88:24

concerns 36:1 109:24
195:19 249:18

conclude 117:19

concluded 177:10
257:10

concluding 171:24
199:8

conclusion 118:1,13
121:22 129:19 162:20
255:4

conditions 33:24

conduct 79:23,24

conducted 76:18
134:13

conference 108:4,15,
18,22 109:1 110:5

compliant 29:11

compliant

confidence 52:3

configuration 221:9
228:10

confined 61:15

confusing 99:23

conjunction 189:17

connect 36:3 155:7

connectability 41:11
213:2

connected 247:18

connection 8:18 26:2
48:24 71:21 75:8
83:15 107:21 123:1
147:5 196:11

connections 41:8
54:20 190:21 192:20
210:5 219:24 232:6
233:2

connectivity 221:11
222:6,8 228:12

consensus 45:9
51:23 62:13 100:18

consideration 36:7
131:12,16

consistent 44:1 85:17
127:20 184:1 221:6
222:15 226:24 229:5
230:1,5,7

consists 151:10

consolidated 156:17

constitute 175:24

constitutes 217:5

constraints 189:1

constructed 27:8
74:22

consultant 44:6
47:23 76:2,3 81:11
84:1,2,3 140:2,3,4,7

consultants 35:2,20
37:5 39:2 76:1 81:10
156:1

consulted 251:5

contact 135:15
200:15,20

**contained** 142:6

**contemplating** 78:22

**contents** 140:22

**context** 49:12 67:15 75:19 91:12 102:11 118:3 141:24 142:7 147:14 153:16 157:19 167:8 175:17 198:6 199:10 219:20 245:7

**contiguous** 156:17 169:15 190:24 196:11 210:4 213:3 214:12 216:10,11,15,17 232:5 246:4,8,17 247:3,6,12, 15 248:10,20

**continually** 150:22

**continue** 253:17,20

**continuing** 81:16

**continuity** 41:13

**control** 114:9,16,18

**Convention** 52:20

**conversation** 35:2 97:12 130:1 157:1 178:19 205:8 207:16 214:16,17,18,21,22 219:20 256:9

**conversations** 32:5 33:20 92:4,9 97:4 99:2 105:6 122:1,9 123:9 130:9 206:11 215:9,11

**convey** 156:20 168:7 176:5,20 188:12 196:14 215:12 244:17

**conveyed** 103:20 165:22 190:4,15 191:3,13

**coordinate** 44:9

**coordination** 140:1 178:18

**copied** 111:5 198:17, 22

**copy** 143:3,10 148:1 219:2 254:21

**copying** 63:8 116:10 249:14

**core** 68:20 71:3 148:3, 14,15 149:6,20,21 158:8 160:9 168:11, 12,21 169:4,19 170:6, 17,22 171:13 172:16 173:6 174:3,17 175:6 177:9 178:6 180:1,2 212:15 232:11 248:11

**corner** 237:22

**Corporation** 52:17

**correct** 8:23 14:16,20 15:6,19 16:12,16 18:20 20:17,20 23:3, 10 25:23 26:7,8 31:20 37:9 41:21 42:16,23 43:11,22 44:16 46:14 47:19,20 48:15 49:17 50:5 51:2,14,15 52:7, 8,18 53:3 55:22 56:11 58:6 60:16 61:2,3,24 63:19 65:6,13 66:15, 16 67:1,3,8,24 68:1,15 69:15 71:8 73:20 75:22 77:12,15,16 78:19,20 79:10,11,19, 20 81:5 82:6,21 83:1, 13,14 88:18,19,22,23 89:2,7,8,20,21,23,24 90:12 91:4 93:7,12,13, 16,24 97:6 106:6,7,14, 19,20,23,24 107:4,5, 10,13 108:11 110:4,8, 17 111:14,17,18 113:6,7,18,23 114:2 116:24 118:15,16 119:19 122:10,16 124:19,20 128:17,24 129:17 130:22 132:16, 17,20 134:10,14,15 135:18 136:20 139:14 141:12,13 142:8,17 143:12 144:11,12,15, 16 145:17,18 146:1,2 150:2 154:5 155:21 158:2 160:15 162:3 163:3,4 165:4 168:14, 22 169:7 171:5,6 173:16 174:3 177:5,11 178:5,6,16 179:24 180:3,8 181:13 182:5 183:7,12 184:7 185:2, 3,6,7 195:9 196:16 198:4 199:2,4 204:1,4 206:15,18 209:7,8

210:15,19 211:2,3 213:9,22 214:21 215:21,22 216:7 219:4,5,8,9 220:8,9 222:22 223:4,8,20,21 224:5 226:13,14,20, 22,23 227:5,9 228:23 230:3 232:22 233:5,6, 8,13,20 234:11 236:9, 10,23 237:2,3,9,10,13, 19 244:1 245:24 246:1,22 247:21,22 249:8 251:20,21 252:1,5 255:11,14

**corrected** 64:20

**correctly** 135:3 171:14

**correlate** 177:23

**corridor** 73:4,9

**Coulter** 93:6,9,10,11 95:4 97:2,8,14 98:20 100:5,11,16 122:22,23 123:10 204:14 208:13 251:16,24 252:15

**Coulter's** 94:6 121:24

**council** 12:20 13:1,4, 6,10 28:4,11 29:1,3 30:3 35:7 44:13 48:11 55:19 66:13 67:9,18, 24 107:3,7,15,17 120:5 121:16 123:23 124:2,16 128:1,5,16, 23 129:5,16 132:14, 15,19,24 134:1,2,17, 20 136:9,15 137:5,8 139:1,13 145:9 198:18 204:13 208:6,11,19 214:5 217:16 223:12, 21 236:9,16,20 237:1 249:13,14 250:2,5,14 251:4,15 252:4

**council's** 102:19 139:18

**councilman** 116:10, 17 117:1,12 126:20,24 127:5,10,15 130:9,18, 24 131:11,15 200:10, 13 206:1,5 213:18 223:1,19,22 224:9,11

**councilmember** 50:19,21 111:8,21

127:17 132:7 207:6 210:24 211:4 214:4,6

**councilmembers** 46:22 125:4 127:21,23 131:18,22 134:9 135:2,3 136:3 164:11

**counsel** 21:20 39:1 150:4,14 152:8 153:2, 10 224:16 256:21

**county** 8:4,19 14:24 15:2,8,16,21,23 16:4, 23 17:12 18:18 19:18 20:2 21:10 22:11 23:12 24:7,9,17,21 25:7 61:13

**County's** 8:22 17:21 20:15 23:13 24:21

**couple** 30:20 39:14 58:21,22 59:21 60:4 218:20

**courses** 95:5,11,18

**court** 10:4,12,16 11:15 12:21 13:23 150:23 253:23 257:4

**cover** 141:14 220:7 229:7

**covered** 152:6 174:1, 10 232:13 249:5

**crafting** 64:7

**create** 43:19 61:7 62:3 72:20 148:15 205:9

**created** 26:9,11 70:20 82:12,13 85:8,20

**creates** 245:18

**creating** 135:20,23 173:19 246:4

**creation** 67:13 136:12

**Creed** 82:2,15 83:24

**Creek** 68:23,24 71:3 177:9 178:1 246:18 247:4,16

**criteria** 166:24 167:6, 14 168:3 171:10 175:14 177:19 185:11 194:1 210:3 213:22

**critical** 184:16 193:12

**CROSS-EXAMINATION** 7:4

**cured** 30:24

**current** 15:1 17:18 138:3 148:19 172:9

**curtail** 162:17

**curve** 138:22

**customary** 84:20

**CVB** 52:19

**D**

**daily** 39:15

**Daimler** 105:14 107:20 108:1 119:9,10 120:22 121:2,6,7 122:4 123:5,14

**Darby** 24:15 25:4 61:13

**date** 70:8,13 250:13

**dated** 43:9 46:12 50:13 63:8 70:11 80:20 102:3 104:8 109:18 111:5 113:14 116:11 123:19 126:20 130:18 141:5 197:1 200:4 206:2 208:7 236:5 249:15 251:16 256:3

**dates** 40:1 59:11 92:14 236:13

**Dave** 189:16

**David** 48:19 97:5,9

**day** 18:2,9,16 26:15 44:8 51:8 97:2 111:9 124:9 127:19 143:19 153:9 221:4 232:2 250:5 253:21

**day-to-day** 24:1,13 27:16

**days** 61:13

**deadline** 31:10

**dealing** 105:13

**dealt** 39:11 48:18

**dear** 123:23

**debate** 150:10 152:21

**debating** 152:12

**December** 13:6 130:18 131:2,22 236:17,22,24

**decided** 136:6 150:23

**deck** 27:24

**deem** 167:5

**deemed** 186:4 233:8

**defer** 127:16 156:8 160:19 169:12 170:8

**deferred** 190:19

**deficiencies** 29:23 30:24 31:17 149:9 232:4

**deficiency** 150:9 152:15

**deficient** 33:15 81:9

**define** 217:4

**defined** 217:12

**defunct** 202:9

**degree** 16:10,18,20

**degrees** 17:1

**delve** 85:22

**demand** 180:7,12,15

**democracy** 242:4

**demolition** 117:7

**demos** 116:15

**denial** 145:16 195:14 227:10 237:8

**dense** 240:18 241:5, 20 243:23 248:12

**densities** 55:3 58:16 158:1 196:4,14 232:5

**density** 25:3 49:4,10 147:4,8 148:5 154:6 155:13 157:11,22 158:1,4,11 159:20 160:24 161:10 162:1, 17 168:11,13,16,20, 22,24 169:2,5,10,14

**dear** 123:23

170:1 172:4 173:9 174:8 177:13,23 178:3,7 179:21 190:21 196:8,9 210:5 212:2 213:7,8,17 214:12 217:17 219:24 231:19 232:24 233:7,17 234:1 237:24 238:14,18 239:2,12,15,18,19,22 240:7,13 241:7 242:10 243:6,11 246:13 247:13,14 249:3

**density's** 212:8

**deny** 33:24

**denying** 223:6,10

**department** 27:23 31:3 70:21 71:19 74:11 79:16,22 84:9, 22,24 85:1,3,10,24 95:19 140:1 156:4

**departments** 29:16 34:19 35:4,20 36:4 37:5

**depend** 30:17 31:7 140:3

**dependency** 74:12

**dependent** 37:14 39:17 73:6,16,21,22

**depending** 10:20 28:15 29:9 86:23

**depends** 36:13,21

**deposed** 7:23

**deposes** 7:3

**deposition** 7:11 8:8 9:4,11,12 10:7 11:13, 21 12:3,16 13:21,24 14:11 21:13 41:23 46:2 50:7 62:23 66:8 80:12 101:19 104:3 109:7 110:20 115:24 126:11 130:13 133:8 140:11 153:8,11 196:20 199:21 203:20 205:20 218:13 225:20 252:21 253:18 254:3 255:18 257:1

**depositions** 14:3

**describing** 67:5

**design** 32:13,17,18 38:20 39:2 45:13 49:4 53:15,23 55:5,13,14 56:8 58:14 60:14 71:14 74:17,21,24 87:1 168:4 209:15

**designed** 90:5 91:2, 21

**designer** 38:12

**designing** 26:2 168:6

**designs** 32:22

**desire** 250:2

**desired** 176:5 238:23 242:1

**desires** 52:5

**desiring** 171:4

**detached** 149:1

**detail** 72:6 73:13 85:23 152:6

**detailed** 146:16

**details** 74:4 152:15 154:10

**detention** 217:7

**determine** 90:6 140:5 163:20 185:9

**detriment** 185:24

**develop** 75:9 90:7 112:6 118:5 165:18 181:11 189:2

**developed** 54:10,12 58:13 62:14 148:4 165:3,24 172:2 187:11 203:8 231:6

**developer** 26:1 38:24 39:6 45:18 52:3 59:16, 18 60:6,7 89:12 119:18 123:14 159:4

**developers** 60:13,18 230:20

**developing** 83:9 106:5

**development** 16:11 19:22 20:1,6,7,19,22 22:12 25:10 26:3 36:16,18,24 37:2,7

38:7 39:3 40:17,18,23 45:16 46:13 47:7,16 49:9,16,24 50:1 52:6 59:22 61:15 76:17 78:5,11,13,15 79:7 80:7 81:13 82:24 84:23 85:19 86:10 93:2 94:23 95:13,20 98:7 99:7 106:18 107:2,9,14 114:17 115:11 118:24 122:15 123:1 141:20 142:5 151:16 159:11,18 178:5 185:22 186:13 188:6,11 193:13 197:13 199:9 203:4 210:15 239:3 241:4,6 246:5,19,22

**developments** 34:9 41:12 48:24 49:14 50:3 60:21 82:10 132:19 141:23

**develops** 51:24

**dialogue** 58:8,10 59:7 211:6 228:22 229:14, 17

**died** 202:16

**difference** 20:13 23:18 37:20 78:6 203:7

**difficult** 11:5 35:12

**direct** 20:5 32:16 38:21 69:16 87:8 92:18 95:11,14 96:15 113:10 115:5 118:17 122:7 142:19 174:14 191:24 204:12 207:21 222:23 224:23 229:12 236:1 237:21 246:24 249:10 251:11

**directed** 42:15 87:11 95:6,22 102:23,24 134:9,17,23 135:4,21 137:5 139:13 217:16 220:4

**directing** 90:1 157:7 206:4 222:24 230:12 238:12

**direction** 187:8 213:18 214:11 215:24 234:7

**directly** 32:4 44:19 51:6 144:23 164:12 201:18 202:24 214:6

**director** 14:15 19:11, 12 26:5,14 27:20 78:11 81:3 118:24 145:6 186:13 188:6 204:13 251:2

**disagree** 65:16 100:11 158:3 168:23 228:16 232:1 247:10, 11

**disagreed** 100:17

**discern** 82:8 165:6

**discovery** 150:12 152:19

**discrepancies** 146:10

**discuss** 97:23 115:19 130:4 208:15 225:2 251:24

**discussed** 103:2 107:19 116:23 119:22 136:14 200:20 201:1 205:1 220:12 226:16 229:7

**discussing** 43:14 131:23 199:6

**discussion** 46:24 54:19 77:23 102:8 147:2,3 188:5 199:19 204:4 210:21 219:16, 19 220:18,19 227:12 230:16,18 252:7

**discussions** 55:3 119:15 120:3 121:19, 22,23 122:3 162:11 186:12 216:9 220:20 222:15 226:24 229:6 230:8 231:5

**disorganized** 218:11

**dispute** 138:2

**distinction** 37:19,23

**district** 55:21 74:6,15 160:1

**ditch** 217:8

**document** 19:22,24

20:10,12,22 22:11 40:13,16 42:4,8 44:1, 11 66:18,21 70:17 71:16 74:17,18 87:16 88:3,6 89:15 103:12 115:15 120:18 150:17, 20 152:14 158:6 165:10 166:10 210:2 214:2 221:15,17 227:24 243:16 245:13 250:9

**document's** 152:16

**documents** 12:15,18 14:11 29:19,21 30:6, 10 32:16 33:2 34:24 38:18 39:14,18 40:2,3 41:12,16 72:13 74:20 86:12,22 113:3 256:22,23

**dog** 156:19 248:6

**dogs** 216:20

**dollars** 78:5

**Don** 26:24

**door** 31:13 211:14

**doors** 210:23 230:18

**downtown** 50:1

**Dozens** 137:23

**draft** 20:9 102:4,8 134:5

**drafted** 46:16 50:17, 22 67:19 70:3

**drafting** 43:4 45:2 64:8 67:13,15 251:5

**drafts** 145:8

**dramatically** 232:24 238:19 239:12

**drastically** 214:11

**Drive** 49:23

**dropped** 35:13 146:18 178:18 195:23 213:1

**dropping** 232:6 246:12

**drugs** 11:4

**duly** 7:2

**E**

**earlier** 11:12 66:8 67:5 75:24 88:20 92:2 116:18 159:19 229:8 241:11

**ease** 7:11

**easier** 153:4

**easiest** 26:23

**East** 138:18 139:4

**economic** 78:11 118:23 185:20 186:10, 12 188:5

**economics** 182:20

**Ed** 197:1 204:15

**edge** 54:22 68:17 71:2

**edits** 127:8

**Education** 53:19 55:17

**efficient** 253:5

**effort** 24:16 48:22 61:7

**eighth** 59:15

**elaborate** 18:14 73:23 181:4 209:17

**element** 74:12

**elements** 221:12 222:7,10 228:13

**email** 42:14,20,24 46:11,16 48:7 50:12, 17 63:7,11,13 64:12 65:17 80:19,23 81:1,2, 20 92:22 93:5 94:6 96:20 97:16 100:6,23 102:2 104:7,11,19 105:7,9 106:8 109:17, 22 111:4 112:12 113:13,20,21 116:9 118:20 119:2 122:23 123:18,23 124:9 126:19 127:1 130:3, 17,21 131:21 133:23 134:5,6,7 141:3,14 190:2 191:8 197:1,5, 23 198:11,21 200:2,3, 10 206:1,4 208:4,11,

19 209:10 218:19
219:12 223:1,2,9,19,
24 224:11,19 225:3,5,
7 249:12,23 250:7,10
251:14,23 255:24
256:2,14

**emailed** 111:8 116:17
256:9

**emailing** 106:4 124:1,
16 143:24 198:3
219:15 225:10

**emails** 163:16,21
166:4 173:22 218:21
241:3 243:19

**EMH&T** 82:1 83:21,24
84:5 113:21

**employees** 12:12

**employment** 8:19
184:16 185:21

**EMS** 29:17 36:1

**end** 75:5 114:19
120:10 128:3 155:17
169:14

**enforcement** 23:24
26:18 27:4

**engage** 140:4 201:4

**engaged** 207:7,14

**engagement** 221:12
222:7,10 228:13

**engineer** 38:11 81:9

**engineering** 29:16
84:8 140:1 156:3

**engineers** 39:1 87:6

**ensuring** 86:18

**entail** 26:14 29:8
30:19 59:19

**entire** 44:22

**entirety** 255:1

**entities** 98:22

**entitled** 238:13

**essentially** 54:9
248:1

**establish** 103:9

**established** 212:8

**estate** 243:3

**Estates** 68:17 71:2

**evening** 94:9,17
97:10

**event** 79:17

**eventually** 138:5

**examples** 49:11
138:10 148:24

**excerpt** 226:18

**exercised** 108:5,13,
15,23

**exhibit** 41:23 42:3,12,
14 46:2,6,9,11,20
50:7,10,12 56:23
62:23 63:3,6 66:3,5,7,
12,17 67:7,14,17,19
69:17,18,20 70:9 71:8,
11 72:9,17,20 74:14
75:5 80:12,16,19 82:5,
20 87:9,10 88:12
90:12,20 92:20,22
96:16,18,20 101:19,23
102:2 103:18 104:3,7
109:7,11,15,17
110:20,24 111:3,14
112:12,14 113:10,13
114:5 115:6,8,10,24
116:4,6,9 118:15,18,
20 123:16,18 126:11,
15,17,19 127:2
130:13,17 133:8,12,
14,18,23 140:11,17
141:3 142:20 145:14
148:2 151:23 152:7
154:20,23 157:9
158:13 165:13 167:22
168:14,22 176:7,15,24
180:4 184:6 185:2,5,
18 192:16,23 193:16
194:2 196:20,24
199:21 200:1,2,9
203:20,24 205:17,20,
24 207:22,24 208:4
209:11 211:5 212:7
214:2 218:13,17,20
220:3 222:24 223:2,18
225:20,24 226:2
236:2,4 237:11,18
242:9 246:23,24
247:1,20 248:16

249:11,12 251:12,14,
23 254:21,24 255:1,9,
10,18,22 256:2

**exhibits** 253:2,9

**exist** 47:9,13

**existing** 41:8 188:24

**expand** 246:14

**expect** 11:23 49:9
72:12 74:10 76:5,11
100:6 103:3 141:18

**expectation** 99:9

**expected** 141:15

**expecting** 79:1

**experience** 25:24
44:17,24 61:4,5,11
62:2 67:6 105:23
137:4 217:15 223:11

**experienced** 45:1

**experiencing** 20:3

**explain** 18:14 73:23
120:24 209:17 236:12

**explained** 89:9
213:11

**explaining** 20:13

**explicit** 152:6

**explicitly** 154:24

**expressed** 243:2

**extent** 87:16 129:18
162:7,19 255:3 256:22

---

**F**

**facilitate** 45:16

**facilitating** 35:8

**facilitator** 34:16,17

**facing** 25:8

**fact** 143:22 157:4
183:10 229:12 244:7

**failed** 74:18

**fair** 9:9 19:8 20:16
21:2 22:24 23:7 25:8
30:13 31:4 32:2 36:10
37:11 39:5 48:21

49:16 51:11 52:10
54:11 58:5 59:6 60:22
64:4 66:19 69:9 71:15,
23 73:11 78:22 79:13
84:16 85:12 86:1,19
88:1 89:13,16 105:8
127:8 135:9 146:12
154:11 156:2 180:16
186:20 199:9 202:17
203:7 206:24 221:12
222:19 225:15 226:19
227:4,22 237:18
244:14 252:11 253:22

**fairly** 31:1 45:21 58:20
60:22 62:12 124:14

**fall** 76:22 77:3,18
173:1 181:12 245:3

**familiar** 48:9 66:6
70:18 115:18 229:4
256:14

**family** 118:9

**farmland** 22:17,21
23:7 25:4 61:17

**faster** 254:4

**fear** 230:18

**fears** 73:14

**February** 13:10 46:12

**feedback** 32:15 36:4
58:19,21 222:18
227:19 228:9 234:10,
21,24 235:10,12,13
242:17,19

**feel** 25:1 57:14 59:2,5
87:16 120:21 231:9
232:1

**feet** 181:16 183:19,21
184:8,10 185:9 189:5
191:2

**fell** 244:5

**felt** 62:17,20 146:14,23
149:10 154:4 155:16
213:5 214:8 228:3
240:7,11,17,19 241:4,
5,19

**field** 27:6,7

**figure** 188:8

**file** 70:10 127:6

**filed** 89:19,22 124:10, 15 127:19,22 130:5

**filing** 228:20

**filings** 13:23

**filled** 181:10

**final** 27:10 43:1 107:17

**finalized** 145:3

**finances** 188:10

**financial** 188:24

**financially** 185:24

**find** 119:10 139:5 154:17 166:23 193:8 218:8

**fine** 21:19 25:16 126:7

**finish** 10:18 29:4 148:10 254:13

**finished** 9:24 239:9

**finishes** 122:12

**fire** 29:17 36:1

**firm** 45:1

**first-floor** 149:2

**fiscal** 75:6,10,23 76:4, 17 77:1,12,13 80:1

**Fisher** 48:19 97:5,9,21 98:4 99:2

**Fisher's** 90:22

**fit** 52:4 186:23,24

**five-story** 73:19

**five-year** 17:22

**flat** 245:1

**flats** 149:23 150:2 176:2 243:3

**flip** 184:13 186:16 187:2

**flipped** 184:24

**floor** 166:15 244:24

**floors** 175:9

**flop** 187:2

**flopped** 184:13

**Florey** 115:12

**Florey's** 115:20

**focus** 69:18 70:3,19 71:6 82:7 84:19 85:9 86:1 87:4 151:13 159:8 160:7 190:20 213:3 217:23 219:16

**focused** 61:2,18

**follow** 38:16 71:10 104:24 112:14,19 166:7 176:23 195:15

**follow-on** 220:20

**follow-up** 37:22

**foot** 108:9 219:18 233:4

**footage** 185:4 186:3, 9,19 187:20 188:13 234:7

**footages** 159:13 184:1

**for-rent** 147:16 166:14

**for-sale** 147:15 166:13

**forgot** 79:21 120:21

**form** 74:7 86:20 96:10 99:14 153:3 219:24 254:4

**forma** 77:22 79:17

**formal** 89:21 233:16

**formula** 170:12 178:13 179:18 185:16 249:7

**forward** 87:3 93:5 104:14 105:1 106:9 108:12 117:14 119:14 121:20 198:21 231:2

**forwarded** 63:14,17 92:23 96:21 97:15 100:5 136:7 198:13 223:19

**forwarding** 96:24 197:4 219:1 223:2

**found** 184:2 194:9 245:23 250:10

**four-plex** 172:19

**four-story** 181:22

**fourth** 45:7 53:10 114:15 242:24

**fraction** 202:22 203:1 241:22

**fragmented** 177:15

**fragments** 216:16 217:1

**frame** 25:20 26:20 27:14

**framework** 86:14

**Franklin** 8:4,19,21 14:23 15:2,7 16:4,23 17:12 23:12 24:7,17, 24 25:7 61:13

**free** 87:16 88:7

**Friday** 31:13 143:8,11, 18

**friends** 105:21

**frisbee** 216:23

**front** 54:22 66:4 171:11 174:18 175:7 182:10 183:8 186:23 213:4,15 240:9

**frontage** 151:10 159:8 160:21 189:2

**full** 11:2,9 81:20

**functionality** 216:21

**functions** 193:12

**future** 33:7,8 40:16,22 45:16 51:24 112:6 148:21 171:3 172:10 201:9

**Future's** 201:14

## G

**gain** 45:9

**gaining** 228:9

**Gallagher** 81:2,6,8

**Ganter** 27:11

**garage** 78:21,23

174:18 175:7

**garages** 78:2,9 79:12

**gateway** 84:6 138:16 139:3

**gathering** 193:11

**gave** 64:17 81:20 144:21 188:15 214:10 232:3

**Gay** 50:1

**gazebo** 194:10 216:22

**general** 35:24 68:14 77:7 128:4 180:12

**generally** 18:17 26:19 30:4 46:19 47:4 48:10 180:13 225:8

**generating** 184:15 185:21 186:22

**generic** 70:22 85:21

**Generically** 71:10

**gentleman** 64:23

**geography** 16:10

**GIS** 23:24

**give** 11:9 18:22 32:14 34:2 36:4 49:4,8,12 99:12 101:1,6,15 125:4 148:12 164:2 182:24 215:23 249:3 253:12 254:8

**giving** 215:15

**glaring** 146:20

**gmail** 255:23

**goal** 159:16 182:8 187:22 228:8 230:1 246:4

**goals** 45:13 75:14 245:23

**good** 7:8 10:9,24 45:4 59:2,5 99:20 103:8 126:5 191:22 250:19

**gotcha** 29:6 32:7 34:7 36:24

**grab** 78:6

**grad** 105:17,18,20

graduate 16:6 23:23

Grandview 49:15,20

granted 110:6

Graves 27:5

great 193:8 230:21

greater 85:23

green 49:23 245:18,20 246:18,21 247:5,8

greens 246:17

greenspace 49:10 54:21 191:18 193:14 216:5

Greeson 50:13 51:1 80:20 92:23 96:21 97:22 102:3,7 103:2 104:7 110:12 111:5 113:14 114:8 116:10 118:21 119:3 120:2,7 144:20 236:5 251:3

ground 9:12

group 46:23 47:3 48:23 54:5 58:4 95:1 197:24 198:4 200:22 201:11 202:10,13,15, 23 203:2,15

Group's 201:22

groups 34:20 47:4,11 53:17,22 54:4 55:1,7 62:16,18 203:6,11

growth 20:3,4,5 25:10 85:6

guardian 84:17

guess 87:23 118:3 153:22 154:2 159:12 194:24 208:19 224:6

guidance 23:5 29:21 32:14 39:13 177:2 213:21 214:8 230:21 231:1 232:3,7,15,21, 23

guide 24:2 40:16,17 41:1 43:20

guidelines 71:14 74:17,21 75:1 87:1

guides 20:24 22:12 40:22

guiding 19:22,24 20:12,21 22:11 38:17 40:13,16 44:1,11 66:17,21 166:10 245:13

---

**H**

H-I-N-Z 256:3

half 34:1 44:22 108:6

hall 246:20 247:7

hand 37:16 42:2 110:23 126:15 133:11

handed 46:5 63:2 81:22 109:10 130:16 140:16 199:24 203:23 205:23 225:23 255:21

handheld 38:4

handing 50:10 80:15 101:22 116:3 196:23

handled 155:24

hands 27:24

happen 59:9 60:2 79:5 185:23

happened 204:23

happening 190:12 252:12

happy 99:11 100:8 101:13

hard 148:23

Harrison 49:22 59:22 60:5,8

Hart 135:17 196:6 198:19 200:14 209:1, 21 214:24 220:4,10,18 222:16 227:1 229:6, 13,16

head 10:10,12 40:4 41:19 97:5

heads-up 125:5

hear 33:12 35:21 156:23 164:12 195:24 230:24 234:18

heard 33:4 36:5 115:19 134:19 156:24

163:9 164:9 165:15 166:18 167:18 171:15 173:18 192:4 196:9 199:13 204:24 241:6

hearing 13:4,6 33:3 129:11 141:11 143:4, 11 144:10,14 147:16 156:21,22 157:5 164:13 173:23 194:16 195:15,16 212:21 227:2 228:4,6 236:11, 15,17 237:1,17 243:18 250:6

hearings 13:10,18 134:14

hearsay 122:4

heavy 140:13

heels 83:10

height 73:5,11 238:1, 14

heights 159:13 190:21 196:12 210:6 214:13 232:6 233:1

held 53:18 55:15 88:15 142:23 226:5

helped 18:6,12

helpful 10:16 48:23 140:21

helping 18:21 19:9 28:1 44:9 174:6

helps 187:10 188:9

hereinafter 7:2

high 24:6,10,13 28:19, 21,22 54:21 68:12 69:3 71:2 72:10,23 73:3,8,20 108:10 110:7 138:14 139:2 148:5 151:3,9,11,24 158:16 159:24 160:10, 14,21 161:11 173:5 212:5,6 220:23 222:17,22 229:9 233:3,8 239:18,19 240:18 242:18 245:18 246:19 247:7

high-end 149:23 176:2

high-level 227:3,18

higher 168:24 169:13, 14 170:1 174:8 212:17 233:13 240:13,16 247:13,14

highest 170:9

highlighted 150:16, 20

highlights 17:23 18:2 24:10

highly 207:7

Hinz 256:3,6

hired 81:7

history 230:14

hit 28:24 70:23

hitting 230:9

Hofmann 197:1 198:24

hold 15:10 37:16 90:3, 15 92:5 207:23

holding 169:19

holiday 119:15,19 121:8 138:17 181:23 250:18

home 180:7,10,15

homes 117:8 149:1,22 167:12 172:22 178:11

honestly 8:5,16 48:18,20 56:20 61:9 68:5 70:7,15 75:12 80:6,9 91:11,12 94:18 95:2 97:13 130:6,7 135:14 136:16 137:1 171:12 188:7 218:5

honesty 201:24

honor 103:8

hope 195:13 223:10

hoped 146:8

hopes 183:15

hosted 58:8

hour 65:21

hours 27:5 108:3 253:4,21 257:6

house 59:9,13 194:7

houses 111:9,12,23 192:13

housing 147:18,19, 20,23 148:4,16 151:22 157:18 165:15,18 167:17,21 170:19 171:24 172:3,6,13,14 238:1,14,21,22 239:22

how's 159:4

huh-uhs 10:15

hundred 99:10

Hunter 89:6,9

hypothetical 112:9, 16

**I**

idea 49:4,8 56:5 57:15 97:13 130:7 136:16 137:1 190:2

ideas 54:10

identified 33:17 193:16 194:17 195:12

identifies 32:2

identify 95:18

if/when 207:2

illustrate 45:16

imagine 66:6

immediately 124:14, 21

impact 75:6,10,16,24 76:4,17 77:2,12,14 80:2 140:5

important 9:22 11:1 185:19 200:21 201:2

impose 250:3

imposed 39:24 177:19 178:16

improper 153:12

improved 222:10

improvement 52:17 84:7 245:17,23

improvements 78:1, 8,14,17,19 237:17

inappropriate 150:15,21 152:18 223:23 224:4,7,8,10

include 25:21 28:6 78:17,18 113:5 142:12 166:15 194:3

included 46:24 75:1 112:5 142:16 150:1

including 56:23 208:6

income 159:16 160:8 181:1 182:13 184:15 185:21 186:22

income-producing 75:15

incomplete 31:1

incorporate 170:18 215:13

incorporated 117:15 139:12

increase 155:14 158:11 179:20,21 180:21 233:1 234:1,7 249:3

increased 168:16,17 169:1 184:13 243:15

increases 155:13 158:11 178:7 213:17

increasing 172:5

indicator 197:22

indirectly 44:20

indiscernible 12:20

individual 28:8 38:8, 13 72:19

industrial 20:6

inexperienced 38:24

inferring 123:8

influence 223:15

influenced 118:14

inform 170:4

informal 157:13 162:2,16 163:2

information 59:2 75:4 76:21 77:4,8 127:11, 18,21,24 134:23 146:14,16,23 147:7,11 151:21 153:19 154:4, 13 156:6 180:22 207:9 227:8

informational 89:10 212:1

informed 207:10,11 208:12

informing 120:4

infrastructure 45:12

Ingram 7:5,9 21:6,11 42:1,7,10 46:4 50:9 63:1 65:20 66:1 69:12 80:14 87:21 88:8,11 96:7 101:21 104:5 109:9 110:22 113:9 116:2 126:4,8,13 130:15 133:10,17 140:15 150:14 151:1 152:8,22 153:2,10 157:10 164:7 174:5 176:9 179:8,13 196:22 199:23 203:22 205:22 208:1,3 218:15 221:14,16 225:16,22 252:22 253:1,9 254:1, 10,17,18 255:20 256:20

Ingram's 154:24

initially 212:3

initiated 19:14 197:5

Inn 119:15,19 121:8 138:17 181:23

input 60:17,18 163:12 164:16 210:14 215:19 230:2

inquire 207:15

inquiry 63:17

insight 18:23

insisting 155:1

inspector 27:6

instance 143:14

Institute 17:8

intended 77:21

intense 159:7,9

intent 152:12 155:19

interact 155:6

interaction 176:22

interchange 25:14

interconnections 154:11 156:10

interconnectivity 156:10

interest 95:1 201:22 202:6,18

interested 121:2 123:5

interesting 197:11

interests 181:19 201:14

interior 245:19

intern 16:6,7,23

internal 205:6,12,16

interns 23:23

interpretation 203:16

intertwined 109:3

interviews 52:13 53:4 56:10,14,19,21 57:1,8, 11,18,21,23

intriguing 218:8

introduce 172:5 236:14

introductory 236:11

invite 204:1

invited 46:24 53:21 95:1 204:20

involve 101:14

involved 18:19 37:5 39:2 47:21 48:2 51:7 62:17 76:1 82:1,14 97:19 105:15 106:1,4 107:7 108:1 122:2,4 136:2 139:17,22,23 198:8 207:14 211:14 212:18 251:8

**involvement** 19:9
67:17

**issue** 138:2 152:20
229:15

**issues** 25:8,9 32:2,10
33:9,17,21 34:4 43:22
150:13,22 152:20
188:24 194:20 195:11
229:21

**item** 33:6 53:10 57:5
58:8 59:16

**items** 33:8 70:23 71:7,
12,15 72:10 85:16
138:6 146:17 155:24
191:11 194:17 195:19
219:19

---

**J**

**January** 13:9 113:15
133:24 134:12 141:5,
12 142:24 144:9,14
146:13 156:21 157:2,
21 189:11 197:2,24
200:5 212:22 232:2
233:15 234:5,6,22
239:18 240:13 249:15
250:21,23 251:17,24
252:5,16 254:20
255:10 256:3

**Jerry** 27:5

**job** 10:9 105:22

**John** 81:2,6,7 82:14

**joined** 10:4

**judge** 153:7

**Julie** 179:4

**July** 92:23 104:8 111:6
214:23

**jump** 192:15

**June** 80:21 82:22
88:16 92:10,16 109:18
116:11

---

**K**

**keeping** 130:24 257:5

**Kenny** 27:11

**Kentucky** 16:11

**Kepler** 27:4

**key** 102:8 103:1,6,14,
20 166:17 190:20
210:10 217:24

**kickoff** 52:12

**kind** 10:20 18:22
19:15 24:8,9 30:23
32:16 35:17,22 36:1,
20 39:13,16 44:10
49:8 54:1,2,5,7,23
58:4 59:23 85:20,21
86:11 87:2 101:10
156:18 172:23 186:23,
24 209:13 210:2 217:2
219:18

**King** 63:18 64:7,12

**knew** 22:20 106:1
123:4 186:8 190:12

**knowing** 199:10

**knowledge** 47:14
62:7 92:17 102:13
110:16 111:18 122:8
123:8 140:9 163:20
165:1 167:23 223:17
252:17

**knowledgeable**
37:15

**Korda** 197:6

---

**L**

**L-O-C-O-C-O** 104:20

**labeled** 140:18

**laid** 53:24 55:4 155:5
230:6

**land** 8:13 19:20 24:14,
19,23 25:12,17 27:22
43:21 54:6 55:4 61:4,7
62:1,3 66:12 68:8,13
69:6 71:7,13 74:3,4
75:14 83:11 108:23
112:14,19 113:5
118:14 149:14,17
150:10 151:4,6,23
156:12 161:13 180:5
211:7,22 212:4 215:13
228:3,23 233:23 239:6

243:13 245:24 248:17

**landlocked** 39:10
85:5

**landowner** 45:18
52:5,14 60:19

**landscape** 38:11

**language** 13:2 14:10
72:16

**large** 56:2 61:22 85:19
215:7 230:18 248:1

**largely** 237:12

**larger** 28:19 86:3
181:8

**Larrimer** 93:21 111:9,
23 116:20

**Larry** 81:22,23,24
82:2,14 83:24

**Late** 250:5

**Launching** 43:10

**law** 20:13 40:17
139:21 145:6 204:12
251:2

**lawsuit** 150:13

**lawyer** 11:18

**layer** 36:19

**layout** 59:24 73:17
139:9 155:22

**layouts** 54:7 58:16
141:21 142:7 193:13

**LBROWN@CI.**
**WORTHINGTON.OH.**
**US** 42:19

**LC** 7:12,16,17 83:8,11
118:12 120:23 121:4,5
123:6 127:6 134:3
135:1 141:5 142:10
145:20 190:10 200:5
208:14 223:10 241:4

**LC's** 83:15 84:1,3
94:22 145:16 165:3
219:15

**lean** 203:1

**learn** 250:8

**learned** 250:2

**leased** 181:24

**leave** 257:1

**Lee** 7:1,7 97:8 208:13

**leftover** 156:18

**legal** 129:19 162:8,20
255:4

**length** 61:6 62:3
125:20

**lengths** 65:9

**lengthy** 62:12

**letter** 102:19 198:21
199:6 220:4,7 229:7

**letterhead** 226:8

**letters** 163:16,21
166:5 173:22 198:12
211:24 243:19

**level** 24:6,10,13 67:17
68:12 72:6,10,24
120:3 137:10 220:23
222:17,22 229:9,18
233:3

**levels** 49:3

**liaison** 132:15,18,23
133:5 198:18 204:13
211:1 223:12,21

**Licking** 15:16,20,23
17:21 18:18 19:18
20:2,15 21:10 22:10
24:9,21

**life** 39:15 44:23 230:16

**Lifestyle** 7:10,16,19
88:21 89:13 102:24
103:21 105:15 106:16
116:14 117:2 122:14,
17 135:22 154:15
156:21 157:15 167:11,
13 178:14 188:12
190:4,16 191:13
196:3,14 207:5 211:11
213:20 217:20 219:7
227:17 228:7 232:16
234:10 243:2

**Lifestyle's** 13:7,17
67:2 97:23 102:20
104:23 122:16 124:15
128:15 130:5 131:2,

13,17 134:8,14 135:9
140:6 141:8 142:17
144:11 145:24 146:15
150:1 152:3 157:5
165:24 168:19 170:6
181:11 182:3 183:4,
12,14 187:3 189:9
198:20,23 199:7
201:14,23 202:6,19
203:9 204:20 205:3
207:12 210:12 211:7,
15,18 219:3 223:7
226:12,18 228:20
231:7,17 237:1,5,9
239:3,4 242:2,11,12
249:20 250:3,22
252:1,8,10,15 254:24

**Lifestyles** 7:13,15,18
48:16 89:1,20 98:6,21
99:2 102:12 104:13,17
113:24 121:23 124:10
134:9,17 136:7 143:3
151:22 153:19 154:5
156:7 166:23 167:24
169:3,19 171:8,20
172:1 176:6,21 177:4
191:6 194:20 195:4,11
197:17 201:3 206:11,
15 212:10 215:11,12
216:7 222:17 227:2
229:13 235:10 239:23

**likelihood** 11:22

**likewise** 10:1

**limit** 168:22 170:3
188:4 213:8 252:19
253:23

**limitations** 231:18

**limited** 56:4 151:14
169:11 184:20,21,23
196:13 213:4

**Lindsey** 113:14
139:22 145:6 208:14

**Lindsey's** 204:12

**linear** 156:13 245:18
246:17 247:6

**lined** 181:7

**link** 127:12

**list** 31:16 40:6 136:13
163:11 165:21 200:19
204:6

**listed** 52:16 55:11
56:16,22 57:5 58:15
70:8 71:7 75:5 77:22
139:5 152:16 167:7,14
185:5

**listen** 32:14 165:15
242:18

**listened** 164:23 166:8

**listening** 145:21
146:7 161:5 164:13
165:19 212:19

**live** 13:11

**living** 147:20 148:18
149:2 166:17 171:1,5,
8,22 172:7,20 243:22,
24 244:9,13 246:5

**locals** 39:12

**locate** 183:11

**location** 180:20 221:8
228:10

**locations** 121:13

**Lococo** 104:20 105:5,
7,16,24

**lodge** 138:14 139:2

**long** 141:2 151:11
152:16 195:21

**looked** 54:5,24 55:2
66:10 70:11 127:2
145:6 186:21 212:19
222:9

**loop** 57:15 207:10,11,
15

**lot** 20:3,7 22:21 25:9
30:19 31:15 39:11
46:12 49:19 56:3 85:6
86:10 123:19 138:6
160:22 181:15,19
194:16 207:8,19 213:5
232:3 254:4

**lots** 111:24 243:3

**lower** 64:9 212:16
232:5 237:22

**LSC** 197:13,15 199:13

**lumping** 57:3

**lunch** 126:6,8,14
127:2 252:20,24

**luxury** 176:1

**Lynda** 27:9 28:18
139:22 144:2 145:4
204:17

**M**

**macro** 72:6

**made** 19:4,5 88:20
96:9 128:21 149:11
153:10 173:21 189:11
211:5 214:23 215:6

**main** 73:16 75:14
161:18

**maintain** 163:10
165:21

**maintained** 163:12

**maintenance** 26:18

**majority** 22:17 48:6

**make** 10:22 11:4 22:4
25:17 29:10 31:8
58:18 69:22 79:6 86:8
99:10 100:7 127:15
128:12 129:16 145:20
146:6,11 157:12 160:9
162:24 163:1 190:3
203:2

**makes** 74:21 157:14

**makeup** 171:23

**making** 37:19,23
83:22 164:10 182:20
193:13 212:20 243:14

**mall** 138:16 181:20

**manager** 23:24 251:3

**manner** 137:13

**map** 54:3,17

**maps** 54:23 141:20
142:6

**March** 63:8 70:11,14
119:3 180:6,14 206:2,
6,21 208:7 209:6
210:9 214:24 215:18
216:1 217:19 219:7
220:19 221:4,6 222:16

**marked** 41:23 42:3,12
46:2,6 50:7,10 62:23

63:3 66:3 69:17 80:12,
16 87:9 92:19 96:16
101:19,22 104:3,6
109:7,11 110:20,24
115:6,24 116:3 118:18
123:16 126:11,15
130:13,17 133:8,12,15
140:11,17 196:20,23
199:21 200:1 203:20,
24 205:20,24 218:13,
17 225:20,24 255:18,
22

**market** 45:10 77:17,
19 79:21,23,24 80:4,5,
9 148:19 171:2,15
172:8

**Marty** 81:7,12,17 83:6,
17 87:6

**massing** 74:7 219:24

**master** 24:15 39:22
40:7 41:4,5,7 61:14

**master's** 16:14,20

**materials** 134:21
142:14,18 155:21
244:16,22

**Matt** 51:6 80:20 102:2
134:24 135:4 136:4
137:2 144:24 189:20
204:11 214:6 251:2

**matter** 8:14 9:5 33:22

**maximum** 73:5,18
157:24 158:4,17
159:20,23 160:13
161:9,10 169:2,5,10,
17 170:4,13 239:22,24

**Mccorkle** 118:21
119:3 189:17

**Mccorkle's** 118:22

**me@batesonline**
94:1

**meaning** 14:4 18:2
151:18 235:14

**means** 35:14 91:6
159:7 199:14

**meant** 77:21 121:15
197:16

**meantime** 257:2

**media** 64:1

**medical** 75:17 98:21 104:15 105:1,4 106:6, 9 148:7 151:13 158:21 159:3,8,14 160:9 183:11,21 184:19 186:17 187:8 188:3 189:3 213:4

**medication** 11:4

**meet** 35:15 56:3 95:2 155:18 246:4 252:8

**meeting** 29:14 33:6 34:5 35:16,17 52:12 55:6 56:9 57:15 88:3, 13,18,24 89:10,11 94:8,11,16,19,21 95:3, 6,8 102:4,9,12,14,20 106:2 136:15 142:21 143:8 144:9 157:2,16, 17,21 160:23 163:2,7, 22 173:13,15 176:16 189:11,23 190:5,6 194:24 195:1,13 204:1,3,7,10,23 205:2 206:10 207:2,5 208:8, 12,17,22,23 209:4,10, 20 210:9,10,12 211:23 212:1,22 213:24 214:7,24 215:18 216:2,3 217:19 219:7 220:22 221:7 222:16, 19 226:3,6,11,12,17, 21 227:20 228:2 229:2 230:3,20 231:8 232:18 233:5,15 234:22,23 235:9,20 236:9,18,21 240:6,7,15,23 243:18 245:23 250:14 251:4 252:5,14

**meetings** 20:11 44:9, 10 55:12,15 57:16 59:9,13,16,18 136:9, 17 164:10,13 196:9 202:21 205:6,10,11, 12,16,18 211:8 214:20 228:5 242:16,17 243:19 251:19

**Melissa** 27:8

**member** 89:7 94:4,13, 14,20 95:18 97:1 132:14 217:16 223:12

**members** 26:19 32:10 33:5 34:6 46:22 94:21 95:11 97:15 124:1,3, 17 125:5 132:19 134:1 144:15 145:9,23 198:14,17 199:6 208:5,10 223:3,14,24 224:18 225:2 227:19 230:20 234:6 249:13, 14

**memo** 28:17,18 29:22 30:11 31:16,21 32:2,5 33:16 36:3 50:15,24 51:3,17,21 55:7,11 56:22 86:13,14 91:20 139:12 144:14,17,18 145:18 146:8,9 149:8, 10,12,16 154:18 155:8 163:6 164:15 166:10, 12 176:11,14,16 177:1 187:7 190:20 191:3,4, 11 195:16 196:10 208:17,18 210:3 212:19 214:10 215:7 218:1 222:1,11,12 232:2,23 234:4,22 235:18 236:15 237:11 238:13,16 245:4 253:7

**memorandum** 50:22 51:10 110:10,11,14,17 236:4,8,19,20 239:8, 11

**memory** 250:19

**memos** 12:19 14:9 28:2,5,20 237:12

**mention** 20:22 30:6 74:18 83:23

**mentioned** 14:23 25:5 30:23 35:4,20 60:12 75:24 78:18 107:13,19 125:23 154:9 156:9 165:19 186:5 215:1,22 217:9

**mere** 125:17

**mesh** 54:6

**message** 103:15,16, 20

**messages** 102:8 103:1,7

**met** 7:9 60:4 152:13 201:24 208:14,21,23

**metadata** 70:10

**Methodist** 110:6

**Michael** 111:5,8,21 256:10,12

**Microsoft** 203:24

**middle** 68:20 158:8 193:5 246:19

**midst** 65:3

**Mike** 94:2,7

**Mikel** 94:24 97:18 100:14 121:24 122:22, 23 123:4 204:14 208:13

**milestones** 52:10

**million** 78:5

**mind** 10:11 25:14 42:5 62:11 86:23 99:19 159:12 187:13 216:18, 19 217:6 222:2 247:12

**mini** 36:20

**minimum** 73:4 179:23 188:13 245:12

**minute** 65:10 179:7 248:4

**minutes** 88:3,13 142:21 157:8 161:8 176:18 179:10 226:3, 6,11,12 228:14 229:1 243:18 252:24 253:10 254:6,12

**miscellaneous** 77:8, 19

**mischaracterizes** 100:21 120:18 123:12 160:3 212:13 233:22 234:13 240:2

**misquoting** 221:15

**missing** 41:18 209:13

**misstates** 65:14 85:13 214:2 227:23 231:23

**misunderstood** 154:6

**Mitchell** 93:19,22 94:7

**mix** 25:2 26:16 147:22 151:12 166:13,15 170:18 171:1,7,15,21 180:5 186:24 221:8 228:9 231:19 243:3,23

**mixed** 34:10 36:8 69:3 73:20 148:6 149:1 151:3,10,24 158:16 159:24 160:14 161:11 173:5 178:12

**mixed-use** 49:15

**mixes** 147:4,8 154:6

**mixture** 175:24

**MKSK** 44:6,18 45:1,8, 21 53:21 57:19 58:9 67:19 68:3

**mobility** 54:19

**modifications** 145:21 146:6 228:2

**modify** 32:22 103:3

**moment** 116:23

**Monday** 31:11 250:13

**monotonous** 175:18

**month** 136:17 190:9 215:3

**months** 26:11 195:20, 22 196:1 215:4 219:6

**moratorium** 249:18 250:3,11

**morning** 7:8 31:13 66:18 88:2 116:18 129:23

**motion** 227:7

**move** 87:3 104:14 105:1 106:9 119:14 224:15 229:20 231:1

**moved** 23:11,12 108:12

**MPC** 132:22

**multi-family** 50:2

**multi-jurisdictional** 24:16

**multiple** 61:19,23
76:6 175:9

**municipal** 27:19
88:15 107:7 123:24
142:23 197:20 226:5

**Myers** 198:18,23
204:13 208:13 209:14
210:21,24 211:4 214:4
223:20,23 224:9

**Myers'** 213:18

---

**N**

**names** 26:22 47:10
48:8 256:17

**nature** 68:4 84:22
112:9,16 137:19 158:7
194:4

**NCR** 119:23 121:9

**necessarily** 31:7 32:3
58:11 181:14

**needed** 76:21 77:23
78:2 79:6 146:14,24
151:20 153:19 154:4
156:6 168:1 174:8
177:14 178:9 182:4
187:10 188:10 189:1
210:22 211:13 216:11
230:16,23 231:7
232:11,13,24 238:23
239:19 240:20

**negotiate** 195:11

**negotiation** 99:12
101:1,6,15 210:22
211:12

**neighbor** 93:22

**neighborhood** 46:23
47:3 68:20 71:3 148:3,
15 149:6,20,21
168:11,12,21 169:4,18
170:5,17,21 171:13
172:16 173:6 174:3,17
175:6 177:9 178:6
220:1 221:11 222:6,9
228:12 232:11 245:20
246:18,21 247:5,8

**neighborhoods**
192:21

**neighboring** 93:20
94:5

**net** 185:23

**news** 43:1,5,8 63:18,
19 64:16,22 65:1

**newspaper** 64:15

**night** 31:10

**nitpicky** 221:1

**nitty-gritty** 219:17
222:20

**nodding** 10:10

**nods** 10:12

**noon** 134:12

**north** 138:15 139:2
247:4

**northeast** 84:6

**northern** 174:17
175:5

**nos** 10:15

**note** 75:16 85:17
221:18 244:8 245:22

**noted** 237:18

**notes** 130:9 205:5

**notified** 125:17 126:2

**notify** 124:21

**November** 236:5
241:23

**number** 53:14 57:5
158:17 159:10,23
160:13 161:9 167:16,
19,20 168:20 169:18
170:5,13 175:6 177:21
178:15 179:23 184:23
185:9 186:9 187:12,20
196:15 211:17 213:21
215:15 233:7 239:20
255:15

**numbered** 63:6
255:22

**numbers** 77:22 78:12
184:14 193:4 209:23
212:23 240:20

**numerous** 53:4

---

**O**

**oath** 11:12,14

**object** 254:1

**objecting** 96:10

**objection** 19:1 21:3
22:23 23:1,8 24:12
31:5 37:24 60:23 62:5,
15 65:12 66:20 71:9
72:14,22 74:1 76:6
78:24 84:13 85:13
86:20 90:13,21 91:5,
10,17 95:21 99:5,14,
22 100:12,20 101:8
107:11 112:8,15,23
117:4 120:17 122:17
123:11 125:10,15,19,
21 128:2,18 129:1,8,
18 132:10 136:21
138:1 139:7 142:9
143:15,23 151:8 152:5
153:23 158:23 160:2,
16 161:14 162:7,19
164:5,19 166:1 167:1
180:9,17 182:6 183:13
184:11 185:12 186:6
187:23 194:21 198:5
202:12 204:21 210:16
211:10,19 212:12
213:10,23 214:1
216:13 217:21 218:4
221:13,19 224:15,20
227:23 228:24 230:4
231:22 232:14,19
233:21 234:12 235:3,
6,15 240:1,24 241:13
242:3,5,13,22 244:2
248:5,24 255:3,12

**objections** 152:9
153:3 154:16 254:5

**objective** 74:9 178:14
249:9

**objectives** 45:22

**obtain** 16:17 17:10

**occasion** 47:19
143:22

**occur** 19:23 20:1,4,23
22:12 61:15 214:19

**occurred** 8:3,9 55:12
91:15 115:3 137:19

**209:16 236:21**

**occurring** 65:4

**October** 123:20
126:20 128:14,15
129:6,24 189:13
220:14 226:6 227:1
232:18 233:4,11
234:9,15,22,23 235:8
237:16 240:15 257:9

**off-site** 78:1,8,14,18

**offer** 78:7 230:21
231:1

**offered** 89:1 166:19

**offerings** 148:20
172:9

**office** 23:23 27:2
75:17 104:15 105:1,4
106:10 110:7 112:1,19
122:15 139:23 145:5
148:7 151:12,13
153:17 158:21 159:3,
8,11,14 160:8,9 180:7,
12,15 181:13,17,18,20
182:4,11 183:6,11,21
184:8,16,18,22 185:6
186:3,17 187:8,9
188:2,3,14 189:3,5
191:2 204:18 213:4
215:20,24 234:8

**officer** 27:4 63:23

**officers** 23:24

**offices** 181:4

**official** 26:24 200:19

**officials** 12:13 90:3,
14 92:8 109:18 123:19
124:3,18,22 125:18
134:2 141:4,9 230:2
235:16

**Ohio** 16:15 60:22
105:19 108:15,18,22
109:1 110:5

**Ohiohealth** 104:15
105:14 106:6,12
107:20 108:2,4 119:4,
11,23 120:16 121:2,17
122:3,14,15 123:5
183:10,15

**Ohiohealth's** 105:14

**Ohm** 119:15,16

**omission** 146:20

**omissions** 127:8

**omitting** 210:9

**on-site** 78:19

**one's** 126:1

**one-story** 172:18

**online** 58:8,10,17 59:7 134:21 163:18

**open** 59:9,12,13 136:14 147:5 153:20 154:8,14 155:11,13, 15,19,20,22 156:13 158:11 165:16 168:17 169:1,15,16 170:2,10, 12 174:9 177:6,14,24 178:8,9 179:21 190:24 191:18,20 192:12,19 193:19 194:9 196:11 208:2 210:4 212:17 213:3,17 214:12 215:20 216:10,17,18 217:1,4,12 219:24 221:9,10 222:19 227:20 228:11 232:5, 13 233:1 234:1 243:15,23 245:16 246:3,4,9,13,17 247:3, 6,12,14,15 248:11,12, 14,20 249:4,6 257:1,5

**OPG** 203:2

**opinion** 33:17 162:8 203:8 244:13

**opinions** 165:2,7,22 166:7

**opportunities** 24:1 85:7 148:16

**opportunity** 31:23 34:2 42:3,11 46:8 50:11 63:4 67:22 69:19 80:17 96:17 101:24 109:12 115:7 116:5 126:16 133:13 140:20 144:21 146:6 156:22 182:4 183:6 230:24 234:9 235:10

**option** 33:23 110:6

**options** 45:10 58:15

59:8 148:17 166:16 170:19 172:6 238:23

**order** 166:23 167:13 168:2 170:6 171:9 181:10 196:4

**ordinance** 34:22 236:14

**organizations** 57:5

**organized** 204:1 218:9

**original** 58:14 156:15 214:10 217:24 237:13

**originally** 222:1 230:6 240:16 251:22

**originated** 151:20

**outcome** 223:15

**outer** 180:20

**outline** 19:16

**outlined** 32:5 34:22 71:16 129:21 210:3 213:5

**outlines** 86:11

**outreach** 44:10 162:11 200:5,15,20 201:2 234:19 235:2

**outstanding** 34:3

**overview** 141:22

**OWA** 47:8 48:13 55:20 97:15,17 200:22

**OWBA** 52:23

**owned** 64:17,18,20

**owner** 38:13 94:5 137:6

**owners** 38:8 111:24

**owns** 119:19

---

**P**

**p.m.** 257:10

**pages** 125:12,20 146:17 152:16 191:17

**pandemic** 189:24

**paragraph** 43:15 45:7 51:20 98:1 114:13,15 117:13 151:9 170:20 227:12 230:13 238:17

**parcels** 117:15 118:3

**park** 47:13 49:22 54:22 172:4 177:4,8, 11,17 178:15 179:24 190:23 193:2,12,17,19 200:22 201:22 202:3 203:2 215:20 216:5 232:12 248:1,8

**parking** 78:2,9,21,23 79:12

**parkland** 191:18 192:24

**parks** 29:17 39:22 40:7 41:4,5,7,8,9 86:24

**part** 18:16 19:6 33:12, 13 36:5 39:15 50:3 51:4 74:8 81:1 87:14 93:20 97:18 98:22 111:13 117:14 127:7 134:22 142:6 162:10 163:15 177:7 181:1 200:15 234:2

**part-time** 27:3

**Partially** 222:5

**participate** 43:4 56:12 57:9 67:13 122:8 135:20

**participated** 18:19 57:18 67:11 90:11 91:4

**participating** 56:15

**partnership** 53:1

**party** 8:24 57:17 92:3 97:12 108:14 121:21

**pass** 140:6

**passed** 67:18

**past** 125:7 230:15 252:19 253:3

**Patel** 119:16

**path** 40:9 41:10 247:17

**patient** 253:14

**patio** 172:22

**pay** 78:13 182:14 186:1 189:3

**paying** 136:18

**pdf** 127:12 198:1

**ped** 86:24

**pedestrian** 39:24

**pee** 156:19 216:20

**pencil** 182:16,17,19 188:22

**penciling** 182:21

**pending** 10:19 82:23 83:2 128:1,5 132:8 150:17 153:14 208:16

**people** 35:1 46:12 48:6 49:4,12 55:2 56:3,7 58:14,17 100:4 101:13 157:17 160:22 163:2,7,22 164:13 165:19 180:21 182:1 192:17 240:6,23

**peppered** 207:18

**percent** 99:10 100:7, 18 219:14

**perception** 64:18

**perceptions** 65:8

**perform** 76:4

**performed** 77:2

**period** 15:8 17:24 24:11 65:2 196:2 234:17

**permits** 27:2,7 130:2 151:11

**permitted** 158:18,22 159:20,24 169:3,17 170:13

**permitting** 237:6

**person** 80:7 135:5

**personally** 49:2 143:24

**perspective** 187:22

pertain 256:24

pertained 91:16
226:18 249:20

pertaining 110:1
127:24 147:8 165:23
250:3,22

pertains 226:12

Phases 115:10

Phillips 27:1

phone 30:20 119:7
190:1 220:21

physical 184:17

pick 166:6

picked 49:7

picking 219:12 220:11

picture 54:2 219:23

pieces 155:17 156:16

pipeline 129:4

place 20:8 58:10
193:13 210:23 253:24

places 193:11

plan 13:1 14:10 19:16,
20,21 20:12,14,24
23:4 24:15 32:13 34:8,
14 36:7,16,18 37:1,2,
6,7,10 39:3,20,22,24
40:7,8,9,11,24 41:4,5,
7 43:14,18 45:2,15
51:14 61:7,14 62:4
66:12 68:9,13,14 69:6
71:7,13 72:5,17 74:4
75:14 76:17 79:4
83:11 86:11,24 90:5
91:2,14,21 95:13
103:4,7,19 106:18
107:2 111:13 112:14,
20 113:6 118:14
142:1,5 146:10 147:4,
24 148:1 149:14,18
150:8 151:4,7,23
152:1,14 154:9 155:12
156:12 157:14,23
158:14,15 159:16
160:20 161:13 165:12,
14,16 166:9 167:8,18
169:6 170:10 171:11
172:2 173:19,20,24
174:1 175:9 176:14,24

179:19 182:9 184:2,5,
15 185:18 192:15
193:1 194:11 196:5,17
209:15 210:1 211:22
212:20 217:2 219:4,8,
12 220:8,13 221:7,11
227:3,18 228:3,8,12,
20,23 231:13 233:24
234:8 237:7 238:20
239:6,13 240:19
241:15 243:13,17
244:1 245:24 248:18
249:19 250:11,15,20
251:6,9 252:4 253:8
254:19

planned 34:9 98:7
99:7 206:10 222:6

planner 15:12,22
17:21 18:1,18 19:12
23:13,19 26:17 27:10
28:18 30:14 34:18
44:21 45:1 79:3,15
145:4 150:10 204:17

planner's 27:13

planners 17:9 23:22
54:18

planning 12:19 13:17
14:15 15:9,16,21,24
16:7,15 17:13,21
20:19 23:16,19,21
24:16 26:6,14 27:12,
19,21 28:9 30:1 31:9,
17,24 32:3,9 33:3,18,
21 35:6 38:16 39:15
44:22 45:12 48:11
51:22 55:19 61:5 62:2
67:23 70:21 71:19
76:19 84:21 85:1
88:15 89:7 93:11
94:12,14,20 95:10,17
97:1 103:8 106:17
107:7,14 120:4 123:24
124:2,16 129:15 131:6
132:9,15 133:2,3
134:13,18 138:8
141:10 142:23 144:10,
15 161:7 162:23
173:19 176:15 189:12
191:4 192:9 193:20,24
194:6,13,18 197:21,24
198:4,17,19 199:1,5
204:14 211:1 220:14
222:18 223:3,13 224:1

226:5,7,16 227:19
229:14,19 234:6 235:9
237:7,16 256:8

plans 18:7,13,15,22
19:10 22:10 24:14,19,
23 25:12,17 27:1
107:14 114:17 117:14
141:21 142:12 147:18
166:15,16 182:23
244:24

play 211:13 230:23
231:7

played 230:17

playgrounds 192:13

plot 216:19

point 48:19 51:5 72:21
81:21 82:3,22 101:17
120:5 128:14,21
129:12 132:2 167:3
170:16 174:23,24
175:1 188:8 231:17
241:19 243:1 244:18
252:20

pointed 149:13,20
151:22

pointing 159:21 185:1
192:23 247:19

points 72:4 113:17
147:5 150:9 196:11

police 29:17

policy 29:19,21 30:6,
10 32:16 33:2 34:24
38:18 39:14,18 40:3
41:16 43:20 66:17
74:20 86:22 113:3

political 61:6 62:2

poop 216:21

popped 201:10
246:12

population 62:8
148:21

porches 174:18 175:7

portion 64:9,10 106:5,
10 107:16 112:7 118:7
119:22 151:24 158:16
160:1,14 161:12 173:5
174:17 175:5 182:10,

15 186:23 191:18
193:24 213:15 226:2,
10,11

portion's 183:8

posed 139:1

position 15:1 17:20
26:9 63:22

positions 163:5,6
164:2,18

positive 149:11 187:7
237:17 241:4 245:22

positives 215:6
237:20

possibilities 194:5

possibly 55:24 56:20
68:6 70:5,15 137:16
145:4

post 144:3 180:13

posted 131:1 134:21
163:16,18

posting 225:11

potential 9:4 21:1
45:11 52:3 60:14
119:24

Powerpoint 142:15

practice 125:7 132:6
143:9

Prairie 61:16

pre 180:16

preconceived 54:12,
16

predominant 245:2

prefaced 225:12

preliminary 89:1,4,12

preparation 13:21
164:14

prepare 11:20 12:2,15
13:24 14:11 51:3 66:7
77:11 84:21,22 85:11
110:14

prepared 80:23
109:22 236:8

preparing 139:17

251:8

**prescribed** 213:7

**present** 35:11 142:15 189:19 220:13

**presentation** 140:23 141:6,9,10,15 142:16

**presented** 157:16 194:18

**presenting** 29:2 227:2 228:7

**preserve** 61:17 71:3 177:10 246:14

**president** 94:12 249:13 250:2 251:15, 22

**press** 253:17

**pretty** 45:4 58:12 66:6

**prevail** 165:7

**previous** 215:23 241:16 242:15 245:17 255:7

**previously** 66:3 69:17 82:4 92:19 217:9

**primarily** 18:5 210:11

**primary** 41:20 43:18 159:7 160:7 182:8

**prior** 14:3,24 15:15 16:2 30:22 44:7,17 63:12 97:2 127:2 143:5 145:3 151:2 156:21 157:5 160:3 162:2,16 164:14 206:20 212:13 230:7 231:23 232:17 233:15, 22 234:13 235:20 237:12 238:6,16 241:11 250:23 251:3

**priorities** 45:11

**priority** 28:19,21,22

**private** 26:1,3 79:7 155:16

**privately** 64:20

**privy** 92:8 144:24

**pro** 77:22 79:16

**pro-development** 201:11,19

**procedure** 38:17

**procedures** 129:14

**proceeded** 90:4

**proceeding** 254:11

**proceeds** 7:12

**process** 8:16,21,22 18:10 19:20 28:2 29:6, 7,24 30:12 34:15 36:14 37:15,17 38:7 39:12,17 43:10 44:5, 15 49:1 51:10,14,22 52:6,9 53:14 58:7 59:15 60:1,22 61:1 62:12 65:3 67:6,7,12 76:2 90:4,10,19 91:1, 3,15 99:12 100:2 101:1,6,15 103:9 104:24 113:2 128:13 131:13,17,19 132:13 163:15 173:19,24 190:10

**processes** 91:24

**processing** 27:17 30:5,15

**produce** 256:21

**produced** 31:21 256:24

**producing** 160:8 181:1

**product** 147:16,21 172:11,18 173:9 176:4 177:22 178:3,4 182:2 243:6,11,20

**productive** 150:11

**products** 166:14

**professional** 17:4,15 39:2

**professionally** 105:24

**professionals** 148:21 171:4 172:10

**progression** 234:3

**project** 36:13 37:14 38:10 40:19 47:13

81:17 84:7 125:23 127:18 137:16 181:2 200:21 201:22

**projects** 18:3 28:20, 22 51:5 77:24 84:5 125:3

**proliferation** 180:6, 14

**prompted** 30:21

**pronounce** 53:13

**propaganda** 202:1

**properties** 61:20,22, 23 75:15 85:11 111:17,21,24 112:13, 22 116:19,23 117:3, 16,20 118:2

**property** 25:22 26:18 36:17 38:8,13 41:2 51:23 54:11 61:2,19 62:4,14 64:18 65:11 66:14 67:2 68:9,13,14, 21,24 71:13,23 73:9 75:9 78:3 79:9 81:13 83:9 84:23 89:11 90:6, 7 91:3,16,21 92:13 93:21 94:5 99:8 106:5 107:9,18 108:6 110:1 112:5,6,7 113:22 115:11 117:8 118:12 122:16,18 123:6 137:6 152:4 159:18 161:3 165:4,24 177:5 181:12 182:3 183:4,12,14,16 185:19 201:15,23 202:7,19 203:9 231:7 239:4 242:2 249:20 250:4,22 252:1,9,10, 15 254:24

**proportional** 138:2

**proposal** 35:11,21 36:6 38:19 52:4 88:21 89:5 97:23 98:22 104:14 105:14 106:23 107:21,23 127:7 156:15 157:13 162:13, 16 168:19 173:8 184:12,13 187:16 192:3 194:3 211:7,18 215:14,21 223:7,10 228:1 230:22 233:11, 16 235:11 239:20,21

242:20 243:2 244:10, 20 245:18

**proposals** 162:3 241:16

**propose** 194:10

**proposed** 29:20 30:18 34:23 36:22 47:23 75:18 80:8 94:23 98:19 101:4 108:7,8 114:3 147:13 159:13 160:24 167:2 168:12,20 169:7 170:17 175:17,20 178:12 183:24 187:4 203:5 212:3 220:23 222:1 231:20 233:14 237:15 239:18 240:8 243:24 245:8,10,16 246:3,21 249:18 250:11

**proposes** 166:13 183:19

**proposing** 98:7 147:15 167:11 171:20 219:23

**provide** 23:5 35:4 43:19 49:11 68:3 72:9 77:11 80:2 127:6,10 132:7 143:2,9 145:2,8 148:18 160:13 161:7 171:1,21 172:7 180:24 182:12 185:22 188:16 189:22 192:4 193:12 211:16 212:10 213:20 216:6 217:17 233:3

**provided** 31:22 59:8 87:5 144:13,20 155:10 170:11 186:2 189:9,14 200:19 206:20 219:7 227:8 232:17 234:5,8 244:10,20,24 248:15

**providing** 52:2 141:8 218:16 221:7 222:17

**provision** 161:24

**public** 20:11 34:6 43:20 59:8,9,13 60:1, 17 63:23 64:1 78:1,2, 9,23 79:9,12,13 102:20 134:22 155:16 164:9 173:12 205:11, 18 210:23 211:8,13,

14,23 212:21 213:24
214:19 227:20 228:5
230:2,3,17,23 231:8
233:5 235:12,22
236:14,17,21

**publication** 64:16

**published** 163:14

**PUD** 34:22 35:7 36:8,
20 101:4 117:17,21,22
118:2,7,10,13 155:9
192:8 194:13 231:11

**PUDS** 34:14 36:23
39:4

**pull** 111:14

**pulled** 53:17 108:4
204:15

**pulling** 37:3

**purchase** 108:5,16,23
110:7 111:23

**purchased** 117:3

**purchases** 116:15

**purpose** 10:3

**purposes** 42:18 116:5
133:14 140:17 144:8
205:24 206:14 218:17
237:4

**pursued** 79:18

**push** 188:1

**put** 71:12 90:3,15 92:5
112:1 157:19

**puts** 253:23

---

**Q**

**quarter** 215:2

**question** 9:14,16,17,
20 10:3,19 19:2,5
21:9,15,22 24:8 30:22
33:13 38:1 62:1 69:21
76:7,8 77:9 87:20,21,
23 88:5,10 90:17 96:2,
6,8,11 99:17 112:9,16,
18 116:13 128:13
143:20 148:11 153:13
159:22 161:8 162:5
167:10,11 168:18,19

173:4 176:8 179:5,14
183:2 190:14 194:22
196:13 203:11 215:23
222:5 227:13 231:24
232:20 235:7 247:2
252:13

**question's** 37:22 77:6
138:9,11 150:17 167:4
171:18 217:10 225:1

**questioning** 10:21
11:24 151:19

**questions** 10:1 11:6
18:9,10 21:14 22:4
27:16 40:14 66:11
76:7 87:10 92:3
102:18,23 116:18
131:20 134:2,8,17,24
135:4,8,21,23 136:3,6,
13,14 137:2,7,9,10,12,
13,21,22,23 138:4,6,
24 139:5,14,18 140:22
150:22 154:24 155:14
207:8,19 209:22
212:13 253:20 254:6
257:2

**quick** 40:6

**quote** 43:18 114:8,16,
19 120:8,10,12 162:24
163:12 244:9

**quoting** 221:16

---

**R**

**R-E-I-S** 197:5,11

**R10** 118:9

**racks** 192:12 193:23
194:3

**radar** 126:2

**radio** 103:22 161:1

**raised** 151:3

**ran** 60:14

**range** 45:9 158:9
160:10 169:24 212:14

**rasa** 22:8

**ravine** 217:7

**Raymond** 7:1,7

**reach** 64:12 146:3

**reached** 59:20,21
64:21,23 97:22 118:1
164:11 227:21 251:23

**reactions** 102:20

**read** 13:23 21:6 69:12,
14 82:12 87:13 88:6
95:22 99:16,17,21
103:17 109:12 146:8
150:7 153:13,15
154:23 155:3 162:4,6
166:8 179:5,12 185:15
202:1,21 212:19
221:21 222:4 257:4

**readily** 172:6

**reading** 73:2 88:2
146:7 149:4 195:16
221:14 249:24

**reads** 102:24 238:18

**realistic** 60:1

**reason** 11:8 53:12
111:22 122:21 228:15

**reasonable** 21:1 23:6

**reasons** 125:14
186:14

**recall** 8:7,12 26:23
43:6 47:12 56:2,14
57:9 58:19 59:12 60:7,
12 64:14 68:7 70:6,7,
16 75:20 87:4 98:3,8,
23 99:1,5 103:24
104:16 115:3 123:3
124:11 130:8 131:9
132:3 135:12 137:18
143:13,21 151:4
153:21 157:3,6 198:10
205:1 206:19 208:16
209:3 219:14 222:8
225:13 229:3,23
231:2,3 249:21

**receive** 92:11 106:16
198:20 234:10 235:10

**received** 16:9,14
58:20 81:2 97:1,16
102:21 104:19 113:21
124:7 134:22 163:12,
17 166:5 173:8,22
176:11 198:13 211:24
225:5 231:18 235:17

**reach** 64:12 146:3

243:5

**recess** 42:9 65:23
113:8 126:9 179:11
225:18

**recipients** 46:20

**recognize** 113:15
208:20 250:9,10

**recollection** 95:8
105:3 152:17 210:8

**recommend** 145:24
168:2 171:9 175:14
177:18 184:9 196:5
200:14 233:14 237:8
246:10

**recommendation**
129:16 145:13 177:6
188:15,16,20 189:6,8,
14,22 191:2,10 195:2,
14 227:10 228:21
242:9

**recommendations**
41:10,11 43:20 74:21
145:15 146:4 176:24
177:13 184:2 190:3,15
191:12 223:15 231:14

**recommended** 32:15
118:6 142:1 145:16
178:1 182:22 195:3
231:15 238:20 239:2,
13,15 248:18

**recommending**
118:10 227:7

**recommends** 175:10

**reconsidered** 238:22

**record** 7:6 42:18
69:14 84:18 98:17
99:21 116:6 133:14
140:18 144:8 153:15
155:3 162:6 179:12
181:5 185:15 199:18,
19 200:2 205:15
206:1,14 218:18
221:21 222:4 237:5

**recordings** 205:15

**recreation** 29:17

**redactions** 127:8

**redevelop** 23:6 88:22
92:12 181:11

redeveloped 21:2
22:22

redevelopment
39:11 45:10 71:22
112:13,21 138:14,15,
17 139:2,3 177:5
242:11 252:10 254:23

reduce 214:11 232:24

reduced 238:19
239:12

reducing 196:8 210:5

refer 7:12,14,15,17
25:16 30:9 37:18
38:15,17 40:12 43:24
57:2 61:12 125:8
222:11

reference 7:11 34:23
40:18 43:17 64:17
74:16 78:21 88:20
90:9 97:21 130:3
148:24 155:8 157:13,
14 158:19 160:10
173:7 184:5,14 192:13
193:21 209:14,19,24
213:15 242:9 243:14

referenced 74:13
82:17 83:24 147:17,23
149:10,12 151:24
163:21 167:18 169:5
176:10 181:3 187:3,18
191:16 193:18 194:6
196:10 200:21 201:2,5
203:12 210:6 212:15
215:7,10 228:14 229:6
245:4,13

references 91:22
107:24 127:12 156:12
162:24 163:1 170:10
172:2,4 179:18 192:17

referencing 78:10
90:24 97:4 110:2,3
123:2 161:12 183:1
185:19 206:22

referred 41:14 66:18
82:9 149:19 150:5
196:17 222:21

referring 7:19 8:8
13:5 34:11 35:18
37:21 38:5 39:19 47:4
66:24 77:7 80:5 82:19,

20 86:5,16 90:18
91:24 102:15 111:12
114:22 121:11 138:10
142:8,14 146:21 151:7
156:11 158:13,15
165:11 176:13 182:19,
20 192:6 194:2 201:3
209:18 214:18 220:18
239:7,16 252:3

refers 150:8

reflect 62:13 95:7
209:10 238:19 239:13

refrain 10:2 152:8

refresh 95:7 105:2

refuse 152:7

refused 254:5

refusing 212:9

regional 16:15

regular 142:21 226:3,
11

regulations 77:9
115:1

Reis 121:24 122:22,23
123:9 197:5,8,11,20
198:8 199:3,7

reject 166:7

related 43:21 78:15
106:12 127:18 138:6
139:24 178:19 190:14,
17 229:9

relates 114:17

relation 103:19 131:4,
7

relations 64:1

release 43:1,5,8,13
45:8

Relevance 22:23
23:1,9 24:12 91:10
101:8 138:1 139:7
151:8 182:6 224:20

relevant 41:6 150:13
153:8

reliance 162:16

relying 173:11

remain 150:13

remained 106:3

remaining 152:20
164:2

remember 8:5,16
12:4 48:9,18,20 53:19
55:24 59:22 60:5 64:8,
10 75:12 80:6,9 91:11
94:18 95:3 99:6
104:17 105:6,13,15
108:1 137:1 156:14
167:9 171:12,13,16
188:7 213:1 214:9
218:5 222:11 249:23,
24 252:12

remnants 170:11

removed 20:2

renderings 142:13
174:16 175:4

rental 171:14 243:21

repeat 9:17 21:4,23
38:1 90:23 99:15
131:14 185:14 221:20
222:2 235:7

repeating 21:24 22:1

rephrase 9:17 180:11

replaced 255:1

replaces 255:7,10

replied 127:1

report 26:19 143:3,10
150:8 157:12 162:22
191:11 194:18 204:11
214:6 241:12,13

reported 51:6 144:23

reporter 10:5,12,16
12:21 63:18 64:4
257:4

reports 28:6,9 204:12

representative
104:23 188:13 190:4

representatives 47:5
48:11,13 52:16 53:22
55:6,19 56:9,24 57:3
58:4 92:4 94:15 99:3
135:9 189:9 190:16
208:14 210:13 217:20

represented 39:1

representing 11:18

represents 103:8

request 77:8 127:15
208:15

requested 69:14
79:20 99:21 114:19
127:5,11 153:15 155:3
162:6 179:12 185:15
207:9 221:21 222:4

requesting 210:13
228:22

require 101:5 147:8,9

required 76:18 77:4
137:13 167:13 177:4
179:24 188:23 204:6,9

requirement 37:2
76:15 77:1,10 155:9,
19

requirements 74:15
86:17,18 168:13 192:8

requires 48:22 88:6

requiring 172:15
175:13 186:20

Reserve 68:23

residences 176:1

resident 116:14

residential 20:7
49:13,19,24 50:3
111:17,21 113:1
116:19,22 117:20
118:9 147:15 148:6,18
149:19 151:12,14,16
152:2 154:7 157:11
158:1,7,20 159:15,23
160:11 167:12,21
171:1,7,22,24 172:7
184:19 213:16 232:10
233:24 237:24 238:13
239:22 245:5

residents 62:9 164:3,
9,17 166:18 171:3
172:10 182:14 235:4
242:1

resolution 109:19

respect 17:20 22:9
25:6 27:21 34:7,13

71:13 75:23 84:19 95:19 111:20 120:16 136:19 151:15,21 155:23 158:1 173:3,6 177:3 180:5,11 183:17 185:5 192:23 202:4 211:15 213:8 216:4 217:11 219:11 226:10 237:4,15,24 241:10 250:15,20 254:23

**respond** 45:10 100:16 102:19 120:7

**responded** 120:2 127:1 200:18

**responding** 64:3 130:21 197:10

**response** 59:3,5 64:7, 8 112:4,11 117:11 134:3 151:20 211:21

**responses** 10:16 30:22 134:8 137:14 139:18

**responsibilities** 51:4

**responsible** 18:24 23:22 28:8 47:6

**restate** 9:15

**restaurant** 183:20

**restrict** 162:17

**result** 67:7 83:10 250:7

**resulted** 90:11,19

**resulting** 45:15

**retail** 151:12,14 153:17 159:11 183:20 184:20,21 186:16 188:4 213:5

**retained** 76:3 81:12

**revenue** 159:17 160:8

**revenues** 79:8

**review** 12:15,18,23,24 13:17 14:2,8,10 18:5 24:1 26:17 27:18 28:10 29:14 30:1,8 33:7,9 34:20 36:19 37:3 39:14 42:4,12 46:7,9 48:3,12 50:11 63:4 66:5,7 67:23

68:2,8 69:20 72:11 74:6,15 76:14 80:3,17 81:8 86:8 87:16 88:14 93:14 96:18 101:24 106:18,21 107:8 111:1 115:7 116:5 117:14,16 124:1,3,17 126:17 128:10 129:5,15 131:6 133:13 140:20 141:11 142:22 144:21 145:3 162:23 177:12 223:4, 13 224:1,17 226:4,17 229:9 256:7

**reviewed** 36:5 47:24 65:5 67:20 69:24 82:4 109:15 147:10 227:8 249:22 256:15

**reviewing** 30:5 40:2 70:16 71:21 87:10 95:12 165:9

**reviews** 27:1 42:8

**revise** 144:21 195:5,7 237:6

**revised** 196:5 219:3,8, 11 220:8,13 221:7,8,9 227:3,18 228:8,9 233:4 234:8 235:11 237:15 244:1 246:16

**revising** 43:5 251:6

**rezone** 25:22 75:9 92:12

**rezoned** 117:20 118:2

**rezoning** 30:16 35:7 36:15 40:19 86:9 100:2 106:10,15 107:3,6 113:2 114:18 117:17 123:21 124:7, 10 126:21 134:10,18 231:12

**rezonings** 76:16 138:18 139:4

**Richard** 89:6

**Rick** 12:4

**right-hand** 237:22

**rights** 108:5,16

**rise** 120:3

**Road** 138:18 139:4

**roadways** 79:12

**Robinson** 116:10,17 117:1,12 126:20,24 127:5,11 129:23 130:4,10,18 131:1,12, 16 200:10,13 206:2,5 207:4,6 223:23 224:11 249:13 251:15,20,22 252:14

**Robinson's** 206:21 223:1,19 224:19 225:3,7 250:2

**robust** 48:23 58:21 60:22

**Robyn** 51:6 134:24 135:6,7 136:5 137:3 144:23 200:3 204:11 208:5 214:7

**role** 14:19 15:7,11,20 17:24 18:14,17 19:8 24:3 26:13 27:13,20 34:14,24 43:18 44:4 118:22

**roles** 15:13,23 16:3 23:18 51:4

**room** 56:5 118:4 216:20

**routine** 31:2

**rules** 9:12 114:24

**run** 65:2

**rural** 20:15,19 25:1

**Rush** 93:17 94:6,22 95:7,24

**S**

**Sadly** 8:15

**sale** 243:21

**sat** 11:22 57:24

**satisfied** 86:19 166:24 167:6,15

**satisfy** 168:13,21 186:4 213:22

**save** 205:15

**saved** 54:21

**scale** 74:7 181:9 219:23

**scenario** 79:5

**scenarios** 58:13,16 59:24

**schedule** 130:2

**scheduled** 129:11 206:10 207:2,3,5,16

**schedules** 31:9

**school** 16:22 55:21 105:17,18,20

**Schumacher** 11:17 12:2,6,9 14:5,7 19:1,4 21:3,8,16 22:23 23:1,8 24:12 31:5 33:11 37:24 42:5 58:23 60:23 62:5,15 65:12, 14 66:20 71:9 72:14, 22 74:1 76:6 78:24 84:13,17 85:13 86:20 87:12,19,22 88:4,9 89:14 90:13,21 91:5, 10,17 93:10 95:21 96:2,5,9,13 98:9,14,17 99:4,14,16,20,22 100:12,20 101:8 103:11 107:11 108:18 112:8,15,23 117:4 120:11,17 121:12 122:12,17 123:11 125:10,15,19,21 128:2,7,18 129:1,8,18 132:10,21 133:18,20 136:21 138:1,11,19 139:7 140:13 141:1 142:9 143:15,23 148:10,22 149:7 150:6,19 151:8 152:5, 11 153:6,23 154:2,16, 19,22 157:9 158:12,23 160:2,16 161:14 162:4,7,19 164:5,19, 22 166:1 167:1 174:4, 6,12,19,22 176:7,12 178:22 179:4,9 180:9, 17 182:6,17 183:13 184:11 185:12 186:6 187:15,23 191:19,23 193:3,6 194:21 198:5 199:15,18 202:12,14, 16 203:10 204:21 207:23 208:2 210:16

211:10,19 212:12
213:10,23 214:1
216:13 217:21 218:4,
10 221:13,18 222:14
224:15,20 227:23
228:17,24 230:4
231:22 232:14,19
233:9,21 234:12
235:3,15 238:3,8
239:9 240:1,24 241:13
242:3,13,22 244:2,19
248:4,24 249:22
252:18,23 253:3,12
254:3,8,15 255:3,12,
15 257:5

**scope** 81:22 82:3,8,
12,18 83:21 150:12
152:19

**Scott** 198:18,23
204:13 208:13 224:3,7

**search** 138:24

**seating** 193:23

**Second-to-last**
230:13

**secretary** 23:23

**section** 41:6 148:14
151:3,6 152:3 158:8
193:1 194:13 238:13
255:7

**sections** 87:2

**seeking** 26:2 98:21
113:24 119:10 227:18
230:1

**sees** 31:22

**select** 46:20 204:9

**selecting** 47:21

**selection** 48:3

**send** 29:15 124:9
223:24 224:7,11

**sending** 144:2

**senior** 147:19 172:20
243:22

**sense** 10:22

**sensitive** 230:23

**sentence** 73:2 81:20
90:2 114:12 120:11

121:14 220:12

**sentences** 103:17

**separately** 191:3

**September** 43:9
44:12,13 50:14 66:13
218:23 219:3

**service** 29:16 35:24
84:8 139:24 156:3
187:10 188:11,23
189:1

**service-wise** 182:23,
24

**services** 78:14 81:3,
16 180:24 181:1
182:12 185:22 187:10
188:23

**set** 29:13 30:18 38:15
51:16 55:7 71:7 81:10
110:16 112:14 129:14
151:23 155:20 168:13,
22 194:12 209:11
236:11,14,16 237:11
248:16 251:23 254:20

**setbacks** 214:14

**sets** 239:21

**shared** 157:4

**Sharvin** 256:10,12

**shear** 28:16

**sheet** 48:8

**shelter** 192:12 194:7

**shocked** 224:13,22
225:4

**shocking** 224:14

**short** 130:1

**show** 49:3 141:2
150:16 160:23 174:18
175:6

**showed** 59:23 141:24
162:12

**showing** 184:21

**shown** 162:11 217:2

**sic** 174:2

**side** 24:17 186:10

**sides** 99:13 101:2,7,
16

**sidewalk** 41:10

**sign** 257:4

**signature** 257:7

**significant** 145:20

**significantly** 212:24

**silence** 103:23

**silent** 161:1

**Silk** 12:5,9

**similar** 24:8,20 25:9,
10 54:7 80:1 173:4
209:22 237:12

**simple** 159:22

**simplest** 207:20

**single** 61:19 62:4
84:23 118:9 153:11
175:23 207:16

**single-family** 50:3
149:1,21 178:11

**single-level** 147:20
166:16,22 167:12,21
168:1 172:19 243:21,
24 244:8,9,13 245:5

**single-spaced** 88:3

**sir** 88:10

**sit** 31:11 35:21 59:22
150:10

**site** 34:8,14 36:7 37:1,
6,10 51:15 52:5 53:7,
24 54:18,19 58:17
60:20 61:8 66:22,23,
24 69:8 78:23 79:18
83:1,7,18 88:22 93:23
101:5 104:16 106:11
108:7,9 111:13 112:1
114:1,17 117:16
118:6,7,15 119:10,15,
20,23 120:9,15 121:3,
4,8,10,18 123:6,21
124:8 126:21 138:17
141:20,24 142:7,12
151:11 156:14 158:16
160:1,15 161:12,19
165:17 166:14 169:15
173:5,10 181:23
185:23 187:1,10

188:23 189:2 192:5
219:3,11 220:13 228:8
229:15,19 230:22
240:9,18 241:20
242:11,12 243:7,12
245:19 246:15 247:6

**site-related** 45:11

**sites** 47:2,18,22 48:3,
22 49:2 119:24

**sitting** 57:20 160:12
183:5

**sixth** 58:7

**size** 36:17 192:11

**skill** 30:18 38:15 81:10

**slide** 141:1

**Sloan** 119:8,9 120:22
121:19 122:3,5 123:13

**small** 27:23 28:14
112:1 241:22

**smaller** 181:9 243:3

**solely** 61:1

**solicit** 29:18 164:16
222:18

**something's** 35:13
85:21 126:1

**sort** 38:12

**sought** 97:24 183:10
215:19 232:16

**sound** 70:12

**sounds** 9:9 10:24
154:12 229:4 231:3

**southern** 119:22

**space** 54:23 147:5
153:20 154:8,14
155:11,13,15,19,20,22
156:13 158:11 165:16
168:17 169:1,15,16
170:2,10,12 172:4
174:9 177:4,6,9,11,14,
17,24 178:8,9,15
179:21,24 180:8,12,16
182:4 183:6,11,20,21
184:8 185:6 186:4
188:14 189:6 190:23,
24 191:2,18 192:12,19
193:2,12,17,19 194:9

196:11 210:4 212:17 213:3,17 214:13 215:20 216:5,10,17,18 217:1,4,12 219:24 221:10 228:11 232:6, 12,13 233:1 234:1,8 243:15,23 245:17 246:3,5,9,13,17 247:4, 7,12,14,15 248:11,13, 14,20 249:4,6

**span** 15:14 17:22

**speak** 12:1,8 62:16,17 94:24 100:14 133:4 164:8 214:5 239:5,6

**speaking** 30:4 48:10 152:9 180:13

**speaks** 241:14

**spec** 180:22 181:4,6, 13

**special** 88:13,24 89:10 157:16

**specific** 37:10 81:13 140:22 146:20 149:18 171:23 172:14 186:19 187:19 192:22 193:15 216:4,6 231:18,19

**specifically** 64:11 77:2 143:21 171:8 192:7 226:18 243:10

**specifies** 162:1 174:1

**spectrum** 201:20

**spell** 151:17

**spelled** 147:24

**spelling** 152:2

**spells** 149:18

**spend** 88:2

**split** 113:24

**split-off** 115:2

**spoke** 12:6 97:9 173:12 241:4

**spot** 65:18

**square** 108:9 159:13 181:16 183:19,21 184:1,8,10 185:4,9 186:3,9,19 187:20 188:13 189:5 191:2

234:7

**staff** 12:19 14:9 26:16, 19 28:6,9,15 32:4,8 33:16,20 34:6 35:17, 19 36:2 46:21 47:24 57:20 67:20 72:12 95:11 139:14 143:3,10 144:14,17,18 145:22, 23 149:8,10,12,16 150:8 155:8 164:14 176:16 177:1 186:21 190:19 195:16 196:10 206:11 207:17 208:6 213:19 216:5 217:24 222:11,12 227:6 230:19 234:4,21 235:12,14,16,17 236:4,8,19 237:11 249:14 253:7

**staff's** 33:17 146:7

**stage** 228:21

**stakeholder** 52:13 53:4 56:10,19,21 57:1, 8,18,23

**stakeholders** 37:13 48:14 56:4 57:24 60:19

**standard** 36:9 132:6 143:9 159:21 168:8 171:19,22 175:20 178:14 179:22 185:8 212:7,9,11 217:3,11 233:19 245:11 248:23 249:9

**standards** 32:21,22 37:4 74:9 179:1

**Starbucks** 138:19

**start** 22:8 29:4 60:11 72:24 83:17,21 86:13 149:5 175:3 212:20 214:15,17 220:24 238:10

**started** 14:18 26:10, 12 44:12 242:19 252:23

**starting** 10:2 110:11 119:1 133:20 161:15 220:10 241:18 245:15

**starts** 9:8 94:8 136:24 200:2,9

**state** 7:6 16:15 53:12 105:19 119:21 158:20 179:19

**stated** 89:17 98:24 103:13 112:10 114:21 121:6 127:9 169:8 171:6 214:7 227:16

**statement** 19:4 51:21 90:22 96:3,6,10

**states** 117:6 223:9 233:24 252:2

**stating** 221:22

**status** 190:10

**steering** 19:14 20:10 44:9

**step-by-step** 132:8

**steps** 102:22 204:4 205:2 241:24 252:9

**Stewart** 50:13 135:6,7 144:23 200:3 208:5,10 209:9 210:9 218:22 219:2,11

**stick** 153:2

**stood** 145:17

**stop** 179:6 253:17 254:9

**stopped** 120:12

**stops** 128:11 138:7

**stories** 73:5,10

**stormwater** 35:3,24 140:2 147:2 154:10 155:23 192:20 229:22

**straight** 36:14 86:9 117:22 231:12

**street** 50:1 54:21 61:16 69:3 71:2 73:4, 8,20 108:10 110:8 148:5 151:3,10,11,24 158:16 159:24 160:10, 14,21 161:11 173:5 183:4 245:19 246:20

**Street all** 247:7

**strike** 133:15 175:3 224:16

**stuck** 254:4

**study** 75:6,10,24 76:4, 18 77:2,12,14,17,20 79:21,23,24 80:4,5 82:11,13 131:1,24

**style** 171:14 172:13

**styles** 157:18 167:18 171:16 172:15 175:18

**subarea** 247:19,20 248:2

**subdivision** 18:5 61:6 62:2 107:16,18 109:24 110:2

**subdivisions** 24:18

**subject** 42:24 46:13 50:14 51:9 63:9 93:2 102:4 104:8 109:19 113:17 116:13 119:4 123:20 126:21 134:2 141:5 162:2 200:5 204:3 208:7 251:19

**subjectivity** 231:13

**submittal** 146:11

**submitted** 35:23 86:6, 9 87:3 124:12 127:7 129:10 130:7 142:10 146:22 147:10 244:24

**subordinate** 148:7 151:14 153:17 158:7, 20 159:2,7,21 160:7, 11 161:18,23 179:20 184:19 213:16,22 233:24

**subsections** 72:8

**substance** 65:17

**substantial** 178:10

**subsumes** 248:2

**sufficient** 187:5 245:6

**suggestions** 68:4

**summary** 115:10,20 208:8,11 209:10

**supervising** 26:15

**supervisor** 28:1

**support** 159:17

**supposed** 159:4 234:20

survey 58:11,12

Susan 256:3,6

sustainability 184:17

swore 11:12

sworn 7:2

synopsis 97:9,14

**T**

T-R-A-N 81:4

tab 66:4

table 33:18,23 34:1 53:24 54:13 118:4 120:9,16 121:11 195:7

tabled 33:6,8,14 195:10

tabling 145:24 195:3 223:7 237:5

Tabula 22:8

taking 14:24 58:3 211:22 253:10

talk 9:23 12:11 41:8 148:13 164:13 193:10 201:17 202:9,24 219:10

talked 165:17 168:16 178:7 190:8 191:9 196:6 209:14 210:4 212:16 221:2

talking 34:8 35:16 98:3,9 105:5 113:17 120:20 125:2 132:21, 23 137:1 173:14 178:2,4 187:15 189:17 192:18 208:20,22 219:15 233:9 234:16, 24 240:22 243:16,17

talks 148:3,6 149:21, 22 155:13 158:6,8,10 160:10

tall 73:15

tax 159:17 182:13 184:15

team 39:6 40:24 44:22

Teams 203:24 204:3

205:8,10

technical 29:14 229:20

telling 32:20 216:9

tells 133:5

Ten 196:1

tenant 181:7

terminate 252:21

terminating 253:11

terms 25:11 43:21

test 152:17

testified 153:18 241:11

testify 11:15

testimony 11:10 65:15 85:14 123:12 129:7 146:7 211:23 231:23 233:22 234:13 240:3 257:9

theme 54:7

themes 54:5 55:1 217:24

thing 73:16 77:17 85:17 149:4 164:8 209:12 248:7

things 18:10 24:10 54:2 65:4 68:4 72:7 85:22 90:3,15 92:5 132:13 138:5 166:17 192:21 193:23 194:4,8 217:9 220:1 246:12

thinking 94:8 114:9 224:3

Thisweek 63:18 64:15,22

thought 121:17 146:9 156:14 172:17 209:14 224:8 242:6

thoughts 102:4 156:20

threads 54:6

threat 153:11

three-season 194:7

throw 216:23

Thursday 31:13 143:7,11,17,18

ticket 70:23 71:12 72:10

TIF 77:23 78:3,7 79:8, 9,17

TIFED 78:16

time 9:10 10:17 15:12 17:24 21:4 22:15 25:20 26:20 27:14 30:10 34:1 42:21 46:6 51:6 52:14 58:10 63:21 64:21 66:5,24 69:10 73:1 75:12 80:7 81:15 82:22 83:7 89:19 90:23 92:1 93:12 97:6 98:4,6,11, 12 99:3 104:13 105:2 106:16,23 107:1 108:13 111:16 115:14 120:8 121:9 122:18 123:3 126:6 129:12 131:14 139:16 142:4 148:23 150:11 154:15, 23 156:5 183:14 185:14 198:20 204:22 205:4 206:17 211:1 218:5 221:20 222:3 234:18 235:7 250:1 253:6 254:9 257:3

times 31:15 61:5 121:3 158:10 161:15 187:24 213:12 221:3 241:1

tired 253:15,22,23

title 16:5

title's 63:24

titled 43:9

titles 26:22

today 7:11 9:12,19 10:12 11:2,6,10,13,18 13:21,24 14:12 66:9 78:4 130:1 160:12 183:5 186:22 256:15 257:3

Today's 31:10

Todd 119:8,9 120:21 121:19 122:3,4 123:13

told 66:8 122:5 159:19 199:16 251:1 254:8

Tom 121:24 122:22,23 123:4 139:21 145:6 197:5,18,19,20 199:11 204:12,16 208:13 209:1 220:4

Tony 105:5

tools 38:21

top 40:4 87:14 238:5, 17 243:1 245:16

topic 191:15

topics 147:3 196:7 228:9 230:9

touch 190:11

touched 139:21

tour 46:13 47:1,2,16 48:5,9,17,23 50:4 53:7 60:21

toured 47:18

touring 48:21

tours 49:13,14 60:20

town 61:14 204:16

townhomes 149:22 150:2 166:22 168:1, 12,20 172:22 174:16 175:5,9,12 176:2 243:3

townhouse 171:14

Township 61:16

townships 18:6,13, 15,21 19:9,13,17,18 20:18,24 22:10,16,20 23:5 24:14,19,22,24 25:2,3,6

track 153:4 253:4

traffic 35:3 81:3,8,11 82:11,13 83:18 84:7 87:6 131:1,8,24 140:2 147:2 154:11 155:24 229:21

Tran 81:3

transcribe 10:12

transcribing 10:5

transcript 10:7

transcripts 14:2
205:9

treed 217:8

trees 116:15 117:8,13
216:23

trial 11:15

true 51:17 70:4 110:17
170:18 171:15

truth 11:13

Tucker 68:23,24 71:3
177:9 178:1 246:14,18
247:4,16

Tuesday 250:17

tunneling 73:15

turn 66:2 123:15
146:12 220:2 223:18
227:11 238:6

turning 110:10 117:11
126:24 168:10 174:13
180:4 191:17 242:24
245:14

Twelve 169:9

two-plex 172:19

two-story 172:19

type 20:8 29:9 38:10
58:19 80:5 148:4
149:18 172:3,13
175:23 183:6 197:16
215:20 219:21 220:1
232:15 246:8

types 37:6 55:3 69:7
147:4,13,18,22 148:16
151:16,17,21 152:2
154:3,7 157:19 165:15
167:17 171:24 172:5,
15 178:4 211:7 215:13
231:19 232:10 238:1,
14,21 243:17

typical 82:10

typically 19:11 29:22
30:9 38:9 54:16 85:11
143:7 207:13

**U**

Uh-huh 95:15 106:13

uh-huhs 10:13

ultimately 35:6 62:12
165:3 236:21

UMCH 43:1,10 44:4
46:13 48:16,24 50:14
51:10,15,23 52:14
54:11,18 55:20 56:23
57:12,17,24 61:2
62:13 63:9 66:14,24
68:9 69:18 70:3,19
71:22 75:9 81:13 82:7,
24 83:7 84:19 85:9,24
87:4 88:22 89:11,20
90:3,6,10,18 91:2,3,16
92:4,9,12 93:2,23 97:5
102:4 104:8 106:5
108:13,19,20,24 109:2
110:1 111:13,16,22
112:5,7 113:17,21
114:1 115:11 120:9,15
121:3,10,18 123:20
124:8 126:21 151:11
204:4 208:8,12 240:9

uncommon 127:17

underrepresented
171:2

understand 7:18
9:13,20 11:5,14 21:14,
21 22:4 34:10 35:13
39:12,16 54:8 67:16
76:8 77:7 91:8 108:19
135:3 146:15 147:21
152:1 159:6 161:6
179:14 247:24

understanding 25:18
110:9 117:2 119:12
120:20 122:20 147:12
201:13,16,21 202:5,18
207:3 220:17 255:2,6,
9

understood 9:19
51:17

unique 85:10 86:1
95:17

unit 98:7 99:7

United 110:6

units 158:9 159:5,23
161:4 169:18,24
170:5,13,18 174:2
175:8 231:19 233:19
243:4,14 244:5 245:3,
5

University 16:11

unrepresented
148:18 172:8

unusual 127:15

unwilling 211:16

update 39:21,22
50:19,21 51:14 72:17
73:13 97:19 190:11

updated 51:7 207:4
228:22 255:7

updates 132:8

upper 64:9

urban 16:10 24:24
45:13

urging 223:6

usable 156:13,17
165:16 169:15 170:2
177:15 190:24 193:20
196:11 210:4 213:3
214:12 216:10,15,17,
18,24 217:4,6,12
232:5 246:4,8 247:12,
15 248:10,12,14,20

user 181:13

utility 139:24

utilized 71:20

**V**

Vague 99:22 142:9

vaguely 60:12

valued 78:4

variety 147:18 157:18
167:17 172:12,17,21,
23 175:10,12,22,24
176:3,6,20 177:21
238:21,22 240:10
241:7 243:16,17

varying 165:2,22

verbal 10:15

verbally 191:8

verbiage 141:21

version 43:1 181:17
240:12

versus 117:22 146:17
156:18 170:11 176:4
177:15 211:13 247:17

vice 204:16

vice-chair 197:21

video 13:2,12 228:18

videos 13:3,16,20

videotape 228:17

view 227:6

views 44:2 156:13
164:2

virtual 190:1

vision 43:19 45:15
90:10

visioning 43:10 44:4
46:13,24 49:1 51:10
65:3 67:6,12 90:19
91:3,22

Visitors 52:20

voice 195:23

volume 28:16 125:17

vote 33:22 58:14,18
129:6 228:21

voted 237:8

votes 58:22

voting 59:7

**W**

wait 9:24 65:9 96:5
122:12 179:4 248:4

waived 257:7

walk 9:11 19:19 29:23,
24 30:7 248:5

walk-up 149:22 176:1

walked 19:15

**walking** 53:7 60:20

**wanted** 19:14 21:23 55:2 64:19 65:7 69:23 75:16 124:6 131:18 161:5 165:20 169:14 173:10 207:4 210:18 240:11 243:7,11,20,22

**wanting** 20:4 80:8 180:21 181:19

**WARD** 47:5 48:13 52:14 55:20 56:23 93:20 94:4,15,22 197:24 198:4,8 199:6 200:21 201:5

**WARD's** 202:18

**warrant** 185:10

**wasting** 253:6 254:9

**watch** 13:3,9,11,16,20 228:18

**watched** 13:2

**ways** 114:9

**website** 58:9 102:21 133:19 138:24 139:6 144:4 163:15 201:17, 19 202:2,21

**WEC** 53:18 163:3,23 173:15

**weeds** 72:13

**week** 27:5 143:5 206:20

**week's** 206:8

**weekly** 64:16

**weeks** 204:24

**weighing** 75:18

**well-appointed** 176:1

**west** 24:17 59:22 60:5, 8 110:5

**Whatever's** 26:23

**whichever** 31:19

**whomever** 30:15

**Wilson** 138:18 139:4

**window** 219:22

**wishes** 220:13

**withdraw** 235:6 242:5

**word** 77:13,19

**words** 45:4 217:12 227:17 235:11 244:12

**work** 14:24 19:13 24:20 27:11 31:24 33:19 42:19 45:20 79:6 83:19 105:23 180:6,10,14 182:20 194:20 195:10 209:23

**worked** 15:2 18:4 24:13,15 25:19 26:1 44:17 155:18

**working** 8:4 24:2,11 44:8,10 45:22 78:11 83:21 105:21,24 120:23 121:13 123:6

**works** 92:7

**world** 123:1

**worry** 214:13

**Worthington** 12:12 15:1 26:7 27:14 34:15 39:9 42:20 43:10 47:6, 8 52:15,21,24 53:2,18 55:17,20 56:24 57:2 62:8 63:7 68:17 71:2, 14 74:17,20,23,24 85:2 88:14,15 97:17 99:11 100:8,19 109:16,18 111:3 114:23 115:22 116:6 119:11 123:19 129:14 133:15 134:1 137:5 138:14,16 139:3 140:18,19 141:4 142:22,23 145:23 171:2 180:18 181:15 182:1 200:4 202:4 218:18 220:14 226:4, 5,7 230:15 242:1 246:6 249:15 255:22

**Worthington's** 138:24 139:6 148:19 172:9 201:9,14

**write** 18:6,13,21 19:9 28:1,5,17 31:15 67:21 114:16 120:15 141:14 170:24 246:2

**writes** 102:7 208:10 220:10

**writing** 28:9,18 29:21 36:2 86:13 157:2 189:23

**written** 137:14 146:2 175:15 197:10 241:10

**wrong** 174:19 178:20

**wrote** 64:23 114:8 119:13 121:9 124:6 129:24 144:18 154:5 166:10 170:17 171:21 174:15 175:4 183:18 192:3 201:1 223:14 238:1 243:1 245:16

**Y**

**Yantis** 49:23

**Yard** 49:15,20

**year** 44:14 234:18

**year-long** 44:15 62:12

**yearly** 81:16

**years** 8:3 14:21 15:3, 17 16:4 24:7 42:22 48:1 56:1 68:5 105:11 125:3 130:6 136:23 141:19 161:2 163:8 173:20 201:11 218:6 229:16 230:15 233:15 241:7

**Yeses** 10:15

**yesterday** 208:15

**young** 148:21 171:4 172:10

**Z**

**zeroing** 241:22

**zone** 151:10

**zoned** 112:24 118:9 182:10 183:8

**zoning** 8:14 18:9 19:17,19 20:14 27:18, 22 30:2 33:3 34:22 36:10 38:16 39:16 40:15 74:16 76:16,24

77:9,10 86:16 117:22 118:8 128:11 129:13, 14,22 162:1,14,15,21 192:9 193:20,24 194:6,14 217:13

**zonings** 24:17 25:19, 21


EXHIBIT
1

### United Methodist Children's Home Focus Area

This section of the Worthington Comprehensive Plan was updated in 2014 for the United Methodist Children's Home focus area.

#### Background

The more than 40-acre United Methodist Children's Home (UMCH) site presents a rare opportunity for Worthington to experience redevelopment on a visible and sizable site near the heart of Worthington. The site is located north of Old Worthington along the North High Street Corridor. Originally, the United Methodist Children's Home included hundreds of acres that extended to the Olentangy River that are now residential neighborhoods.

The United Methodist Children's Home has been a compassionate steward of the land and an invested and contributing member of Worthington for over a century. It continues to provide critical services to the greater Central Ohio community.

Following serious consideration by the UMCH Board to sell this site and concerns of the community related to its potential redevelopment, the City reexamined the future land use recommendations of this plan to deliver more clear direction and intent.

The goal, as with all of the future land use recommendations in this plan, is to provide guidance as to the range of desired land uses and development in the event the private land owner and/or future developer requests rezoning of the property; and to assist the City with its review and evaluation of any proposal. The community dialogue and consensus represented by this plan will facilitate any future redevelopment process for this site in a manner that meets the needs of the greater community as well as the land owner.



*UMCH Focus Area boundaries (in red)*



## Context

Located along North High Street across from the Louis J.R. Gooery Worthington Municipal Building and the Worthington Fire Station, the UMCH focus area is approximately a half-mile north of the Worthington Village Green.

This 44.5-acre site contains various built structures, including administrative offices and several residential and service structures that are a part of the UMCH program. It also includes the Conference Center and the Sunrise Senior Living assisted living community on either side of Wesley Boulevard. Once part of the larger UMCH property, the Sunrise Senior Living campus is on 3.5 acres with a long-term ground lease. The United Methodist Church occupies the Conference Center. Neither facility will be included in a UMCH property sale. It should be noted that the two existing residential lots that abut the north side of this site along the south side of Larrimer Avenue are included in this focus area plan at the request of their owners.

Though relatively flat, the site's most striking natural feature is a ravine and wooded area surrounding Tucker Creek. This natural area buffers the southern section of the site from single-family homes on quarter-acre lots along Greenbrier Court.

To the southwest, the site borders Evening Street. Directly to the west, the site borders the rear yards of single-family residences on third-of-an-acre lots on Evening Street. To the north, the site abuts Longfellow and Larrimer Avenues, with single-family residences on third-of-an-acre lots across the street. The focus area is served by signalized intersections with North High Street at Wesley Boulevard and at Larrimer Avenue. The existing site also has two additional access points on High Street between these two signals.

The current zoning of the UMCH focus area consists of commercial zoning C-2 Community Commercial (0.7 acres) and C-3 Office (9.3 acres) along its High Street frontage, SC Senior Citizen (3.5 acres) on the Sunrise site, and S-1 Special (31 acres) across the remainder of the site. Current permitted uses include churches, parochial schools, colleges, hospitals, and other institutional uses (S-1), medical centers and real



*Current zoning for the UMCH focus area.*

estate, insurance, and legal offices (C-3), and supermarkets, specialty stores, and retail stores (C-2).

### Future Land Use Focus Area Plan

The 2005 Comprehensive Plan identified the UMCH site as strategic for future growth, a matter particularly critical for an established community like Worthington. While the 2005 plan presented an example of two possible redevelopment scenarios, this update document provides a more in-depth consideration of appropriate redevelopment parameters that incorporate community and stakeholder feedback with current demographic, fiscal, and market trends.

### Design Intent

Worthington was founded as a master planned community. Because of the size, location, and importance of the UMCH site, it is critical that any redevelopment be master planned and consider the site as a whole. The following sections provide a framework and direction to the City, reviewing Boards and Commissions, and potential developers as to Worthington's desired vision for any change of use and redevelopment that might occur on the site.

Building upon the previously stated objectives, redevelopment of this site must create a high-quality, mixed-use development



Worthington 163581



*Future land use zones for the UMCH focus area.*

## Objectives

As part of the update of this focus area plan, a group of consolidated objectives was created. These objectives include:

1. Consideration of the redevelopment potential of this site recognizing the critical resource and opportunity this 40+ acre site represents within the City.
2. Provision of a mix of desirable uses and green space that are compatible with surrounding neighborhoods and are currently underserved in Worthington.
3. Addressing the needs of current and future residents by providing new housing types/options that are underrepresented in the market and complement Worthington's current offerings.
4. Recognition of the financial goals of UMCH to enable it to continue its mission within the region.
5. Expansion of the City of Worthington's tax base by incorporating uses that allow for new or enhanced sources of revenue.
6. Preservation and integration of the existing natural features found on the site related to Tucker Creek.
7. Creation of a well-planned, vibrant, walkable, and integrated development of the highest quality that meets or exceeds current best practices for mixed use development, including the provision of communal space and complete streets.

that is walkable, connected, and integrated within the site and with the City. This mix of uses should contain a range of residential types together with commercial office and neighborhood retail uses integrated with contributing and shared green space and amenities – all of which complement each other to create an active, vibrant place. Any proposed design must be sensitive to the neighborhoods adjacent to the UMCH site, as well as to the natural features related to Tucker Creek. Any development that occurs within the focus area should relate internally to the site and to an overall plan, even if it is built at different times. For this reason, it is expected that any proposed redevelopment include rezoning of the entire site to a Planned Unit Development as an early step. Because of the importance of achieving the full potential of the UMCH site for the City and Worthington community, it is expected that public-private partnership(s) will play a role in the planning and redevelopment of this site.

### Future Land Use

The future land use map for this focus area divides the site into four general zones:

- High Street Mixed Use (red on the plan)
- Worthington Estates Edge (yellow on the plan)
- Neighborhood Core (orange on the plan)
- Tucker Creek Preserve (green on the plan)

Each are described in more detail below:

### High Street Mixed Use

North High Street is the commercial spine of the City of Worthington. It is home to some of the City's most important corporations and the address for much of its retail and services. The UMCH site lies less than a half-mile from the center of Old Worthington and is situated between both this retail center and the Shops at Worthington Place.

As a result, this is a good location for commercial office use.



Worthington 163582

As discussed throughout this Comprehensive Plan, income-tax generating employment uses such as office are critical to the fiscal sustainability of the City. In addition, this site's close proximity to historic Old Worthington makes it a prime location for walkable residential development and denser, amenity-rich housing types similar to what is discussed in the Improving Housing Balance section of this document (page 73). This location along High Street is attractive for retail and service uses as well. It is not the desire of the City, however, to create a third retail center in close proximity to Old Worthington and the Shops at Worthington Place. Retail in this location should be neighborhood scale and serve the development that occurs on this site and that exists in the surrounding neighborhood; and it should help to activate the High Street frontage.

The High Street Mixed Use zone consists of the frontage of the UMCH site along High Street. It permits a mix of office, residential, and retail uses with the focus on commercial office and medical uses with subordinate residential and limited retail uses. Buildings in this zone should be a minimum of two stories and a maximum of five stories in height with attractive, four-sided architecture. Buildings in this zone should address the streets, activate the street frontage, and include opportunities for outdoor dining and other pedestrian-focused activities.

It is expected that the buildings adjacent to High Street will be commercial offices. Residential uses might occur behind as a transition to the Neighborhood Core. Neighborhood-oriented retail uses can complement the development in the first floors of office and residential buildings. The objective of the High Street Mixed Use zone is to create a high-quality, dense, walkable, connected, mixed-use development that creates a dynamic space and signature address to attract Class A office tenants along High Street and add vitality and life to the High Street corridor.

In order to create a walkable environment, it is expected that buildings will line public streets and most parking will be located at the center of blocks, screened from public streets by attractive buildings. Parking beneath buildings may also be considered, provided the public street frontage of a building is



*Conceptual view of possible new development along High Street.*

activated. By providing a mix of uses within the High Street Mixed Use zone, parking areas can be shared to optimize their use. To achieve the desired densities, parking decks are encouraged to be integrated into the site. Features expected as part of any parking deck or structure include masonry and architectural elements to dress up the exterior, windowed stair towers, and lush landscaping and pedestrian connections.

Parking structures and/or parking lots could be lined with residential and/or retail development to separate and screen them from the Neighborhood Core. Where the High Street Mixed Use zone is opposite existing single-family residential development, it is expected that the new development will consist of residential development and/or substantial and attractive buffers.

As with all development in the UMCH focus area, it is to be of high-quality in character and design with four-sided architecture. It should follow the *Worthington Design Guidelines*.

*Worthington Estates Edge*
This zone is where development in the UMCH focus area should create a desirable transition between it and the existing single-family housing development that surround its north and west sides. The surrounding development consists of homes on third-of-an-acre lots. The Worthington Estates Edge zone





*Future Land Use Map for the UMCH site (bird's eye view).*

calls for single-family residential development on lots between a third-of-an-acre and a fifth-of-an-acre. This equates to a residential density similar to Worthington Estates (3 dwelling units/acre) and Old Worthington (4-5 dwelling units/acre). The structures are limited to the same two-and-a-half story height as the surrounding neighborhood.

These may be single-family, detached homes that are more current, updated versions of what is found in the surrounding neighborhoods. Or they may be smaller homes with smaller yards that provide first floor living opportunities for Worthington residents — an option in which many residents expressed an interest during the community meetings. They may be something in between. Regardless, these homes must be of high-quality design, differentiated architecture, and in close proximity to amenities. This zone is for custom-built, individualized homes and not one for homes with repetitious floor plans.

Housing in this zone should consist of individual units, potentially with lots of different sizes, fronting on a street or streets. The use of cul-de-sacs is strongly discouraged. These new lots must include rear or side yards to provide a substantial

buffer and green landscape between these structures and the rear yards of existing homes. Attractive storm water systems designed as a naturalized amenity can be placed within the Worthington Estates Edge zone.

As with all development in the UMCH focus area, it is to be of high-quality in character and design with four-sided architecture. It should follow the *Worthington Design Guidelines*.

*Neighborhood Core*
The Neighborhood Core zone represents the most flexible zone of the UMCH focus area because it is internal to the site. It consists of a higher density neighborhood that creates a transition from the single-family homes along the periphery of the site to the more active uses proposed closer to High Street.

The Neighborhood Core calls for residential development at a density between six and fourteen dwelling units per acre (6-14 du/ac) gross density with a height limit of three stories. It is expected that the Neighborhood Core will be developed with more than one housing type and at more than one density level. The expected amount of park space and amenities correspondingly increases with the density. For a density





*Conceptual view of single family homes along a great street.*



*Conceptual view of townhouses facing a green commons.*

reference, Ville Charmante along West Wilson Bridge Road is over seven dwelling units per acre.

This area creates the opportunity to introduce different types of housing options that are not readily available in the city. This area should provide residential living that is underrepresented in the market and complements Worthington's current offerings, addressing the needs of aging Worthington residents, future young professionals, and those desiring amenity-rich living. For reference, more information on the need for this type of housing product is described in "Improving Housing Balance" on page 73.

Examples include a mix of single-family detached homes on small lots with rear alley garages, homes with great front porches for outdoor gathering, custom homes designed for first-floor living, luxury residences with integrated front autocourts, well-appointed walk-up townhomes, and a limited number of high-end flats. To be successful, the Neighborhood Core must incorporate common areas/shared green space(s). These parks create the community gathering and development focal point(s). Shared amenities and facilities should also be provided. In all cases, the buildings must have front doors on inviting tree and sidewalk-lined streets. The objective is not to have streets dominated by garages, so garages must be de-emphasized – set back or placed to the rear of structures, creating a very walkable neighborhood.

As with all development in this focus area, the community expects this development to be of high-quality in character and design, and adhere to the *Worthington Design Guidelines*.

*Tucker Creek Preserve*
The southern boundary of the UMCH focus area is the beautiful and wooded Tucker Creek ravine. This plan calls for preserving this area as a natural green space amenity for the site and the community. The creek and the steep slopes that surround it are not developable and the wooded areas along it are important contributing and environmental features.

The community expressed a strong desire to continue linking neighborhoods, parks, and destinations with multi-use trails throughout the City. This includes achieving a dedicated trail along Tucker Creek that highlights this natural feature and provides an amenity and potential connection between High Street and Evening Street.

As part of any development that occurs on the UMCH site, it is expected that any future developer preserve the Tucker Creek ravine and wooded area. Any storm water systems in this area must be designed as a naturalized, aesthetic landscape feature that fits in the environment.



Worthington 163585



*Conceptual view of a mixed-use development along a green commons.*

### Zone Boundaries

The boundaries between zones internal to the site are not absolutely fixed and could be adjusted at the margins. Depending upon the street layout and overall merits of a proposed development, these boundaries might shift. For example, the Worthington Estates Edge might grow or shrink slightly in some areas as part of a formal development plan submittal, or the Tucker Creek Preserve might grow in one area and shrink in another to better protect surveyed natural features. In order to provide appropriate parking and building screening, the High Street Mixed Use zone might be enlarged to the west.

There is one exception. As mentioned throughout this Comprehensive Plan, the need for revenue-producing land uses for the City of Worthington, particularly income-tax generating uses such as well-planned commercial office and medical, is of strategic importance. If a development plan is proposed that provides significant income tax revenue to the City, the High Street Mixed Use zone could expand into the Neighborhood Core zone. In the event of a substantial expansion of the High Street Mixed Use zone, the sensitive design and aesthetics of the edge treatment/buffer of the zone with the adjoining areas become critically important.

### Park Space

The creation of park space for community and public enjoyment is an important component for any redevelopment on the UMCH site. This is in addition to the Tucker Creek Preserve. Beyond serving community-gathering functions, the park space is critical to providing place-making in development layouts as well as a green space balance to the built environment contemplated in the High Street Mixed Use and Neighborhood Core zones.

In potential redevelopment scenarios, this additional park space was several acres divided between the High Street Mixed Use and Neighborhood Core zones. Park space could be used to provide linear park "windows" into the site from High Street; neighborhood-oriented parks internal to the site; and/or extension of the Tucker Creek preserve. The expected amount of park space and amenities correspondingly increases with the density of development proposed on the UMCH site. Park space as discussed here must be useable, contributing ground for residents, workers, and visitors of the redeveloped site, and not, for example, storm water controls or left-over ground.

It is expected that the developer(s) of the UMCH site will integrate usable park land into the development and work with the City to provide acreage in the High Street Mixed Use and Neighborhood Core zones as park space useable by the community.

Creating this additional park space within the UMCH focus area will address the community's desire for park space and amenities here. The public process generated numerous ideas for amenities worthy of further consideration. It is important that the City and the Worthington Parks and Recreation Commission work with the community to plan for and create parks that include the desired amenities in the appropriate places within the City and at this site.

### Design Guidelines

Because the UMCH focus area falls within the City of Worthington's Architectural Review District boundary, any new construction or alteration is subject to review and approval by the Architectural Review Board (ARB). The Board ensures the



high quality of design and site planning for any construction within the Architectural Review District. In order to meet the expectations of the ARB, any development on the UMCH site should adhere to the *Worthington Design Guidelines* used by the City and ARB to review development proposals.

The new residential development portion of the Residential Design Guidelines (page 31) provides guidance on site development, form, massing, and scale, setbacks, roof shape, exterior materials, windows, entries, ornamentation, and color. In general, the goal is to create residences and neighborhoods of a high quality of design with pleasant, intimate character and a strong sense of place and inviting human scale. Architecture and design should be rich and varied (not repetitive/homogeneous) with great attention to detail.

The new commercial development portion of the Commercial/ Institutional Design Guidelines (page 25) provides guidance on site development, scale, form, and massing, setbacks, roof shape, materials, windows, entries, ornamentation, color, and signage. In general, the goal is to build upon and extend the pedestrian scale and walkability of the city's commercial heart as well as create buildings that are long-lasting and have four-sided architecture that is attractive on all sides. Building forms, materials, and setbacks should be consistent with historic patterns and help continue traditional patterns into new development.

It is important that the commercial development encourage pedestrian connections and activities. The location along High Street and the close proximity to Old Worthington and existing neighborhoods creates the potential for strong pedestrian connections. In order to make this area inviting to pedestrian activity, wide sidewalks such as those in Old Worthington should be encouraged in order to allow for connections as well as additional activities. Pedestrian-scale signage, plantings, lawn areas, and street furniture will also create an inviting, walkable atmosphere. By implementing these recommendations and following the standards established in the *Worthington Design Guidelines*, the proposed commercial uses along High Street will introduce complementary uses

---

**Commercial Design Guidelines**

Excerpts from the *Worthington Design Guidelines* for new commercial and institutional construction include:

1. Tend toward simpler geometric forms and uncomplicated massing;
2. Carefully design facades with traditional storefronts to make buildings pedestrian-friendly;
3. Build up to the required setback to get pedestrians closer to the building;
4. Locate parking areas to the rear and avoid front setbacks;
5. Use buildings to screen off-street parking from view;
6. Create unimpeded pedestrian access to the front building façade from the public sidewalk;
7. Make roof shapes in scale with the building;
8. Use traditional materials with a focus on brick and limit poured concrete/concrete block to foundations;
9. Use large areas of glass for storefronts and more traditional patterning on upper floors;
10. Emphasize the primary entry on the street-facing principal façade; and
11. Help create a linkage between Old Worthington and newer areas through consistent design elements.
12. Use compatible colors.

---

and provide new amenities within walking distance of the Worthington community.

*Connectivity*

To achieve a high-quality, mixed use development that is walkable, safe, and successful, it is important that any development on the UMCH site be well connected both internally to the site and to the greater Worthington community. The UMCH site is ideally situated along High Street and within close proximity of Old Worthington, the Olentangy Trail, nearby neighborhoods, and Worthington Schools. Therefore, multiple connections should be created to encourage pedestrian, cyclist, and vehicular access to the area in a complete streets fashion.



Worthington 163587

### Residential Design Guidelines

Excerpts from the *Worthington Design Guidelines* for new residential construction include:

1. Avoid facing garages to the street and set them back from the main building plane;
2. Establish multiple connections to existing streets to integrate with the existing community fabric;
3. Carefully consider components of scale;
4. Match roof shapes to the appropriate architectural style;
5. Use building materials in traditional ways;
6. Consider substantial use of brick; fiber cement board is appropriate; and avoid the use of stucco;
7. Carefully design window patterns, sizes, and proportions;
8. Use good quality windows – all-aluminum and vinyl windows are discouraged;
9. Avoid blank wall or walls with few windows;
10. Orient entry doors toward the street, make them clearly visible, and aligned with the window rhythm;
11. Use ornamentation in traditional locations; and
12. Use compatible colors.

These street connections must be strategically and sensitively designed and located. It is not enough to simply connect the site to High Street. This development must be integrated into the greater community and neighborhoods. This could include connections to Evening Street and Longfellow Avenue/ Hayhurst Street. The development plan must show how these complete street connections are to be made. The objective of these new connections is to interconnect this site but strongly discourage cut-through vehicular traffic from High Street and commercial office uses through the Worthington Estates and Evening Street neighborhoods. In particular, the street system should be designed to discourage through commercial traffic from exiting to Evening Street.

In order to best determine the alignment of the new street connections, a detailed traffic study must be conducted. This study will help determine the alignment of new street connections and what needed street improvements are required, if any. The traffic study will be provided by the developer and approved by the City as part of any redevelopment proposal for the UMCH site.

Streets within the UMCH site should be designed to traditional neighborhood development and complete street standards. This means that they should be narrow travel lane widths (10 feet) with on-street parallel parking, street trees in tree lawns, decorative street lights, and accommodating sidewalks. Bike travel should also be accommodated through the development. The use of cul-de-sacs is strongly discouraged. Any dead-end streets should still provide pedestrian and bicycle connectivity to adjacent streets. Alleys are acceptable as a means of providing access to parking structures, garages, and service areas. Alleys should be sensitive to the overall design and aesthetics of the development and reflect the high design standards of the community, including placement of architecture and landscape along them for visual enhancement. The disposition of any alleys, public or private, will be determined as part of the development plan review; though it is expected that all streets throughout the development will be publicly dedicated.

*Street Intersection Options*

Because of the desired development described here, signalized intersections will be critical to providing access to the site and minimizing traffic impacts. At this time, access is provided at only one signalized intersection: Wesley Boulevard and High Street/Worthington-Galena Road. Currently through movement to Worthington-Galena Road from this site is not permitted. This restriction will need to be studied for removal as part of any redevelopment of the UMCH site. Additionally, it is very likely that a drive access will be necessary to the north to provide access to the Larrimer Avenue/High Street signalized intersection.

As mentioned in the existing conditions, it is likely that the UMC Conference Center and Sunrise Senior Living will not be part



of any initial redevelopment. Because these two buildings sit astride the primary entry to the site, and because of the importance of setting the tone and quality of any redevelopment at the gateway – it is possible that providing an additional signalized intersection on High Street will be requested to achieve the desired redevelopment.

This could take several forms, from creating a new intersection to relocating an existing one. It could also involve realigning Worthington-Galena Road between the Louis J.R. Goorey Worthington Municipal Building and the Fire Station as contemplated in one of the scenarios studied. Regardless, any such roadway and intersection improvement must be carefully considered from a safety and traffic viewpoint as well as a fiscal one. If requested, studies must be commissioned by the developer for City review to determine the potential for a High Street access change.

*High Street Frontage*

The potential redevelopment of the UMCH focus area as described herein creates a change in the consideration of setbacks along High Street in these blocks. To achieve the desired walkability, vitality, and screening of parking along Worthington's signature street, it is expected that multi-story buildings will be constructed closer to the High Street right-of-way, with parking located behind the buildings. The buildings should engage High Street with broad sidewalks, storefronts, front entries, and outdoor seating that provide an inviting strolling environment for pedestrians.

The buildings constructed along High Street will set the tone and impression for the entire UMCH focus area. As such their architecture, materials, quality, interest, aesthetics, and vitality are critical. These buildings should have a predominance of brick and complement the community character.

Buildings along High Street must have the majority of their building face fronting/parallel to the street. Buildings are expected to be at least two stories in height with substantially transparent storefronts on the first floor, whether retail or office, to activate the street. Operational building entries must be



*Conceptual view of possible new development along High Street.*

provided along High Street regardless of parking orientation. Neither single-story commercial buildings nor retail buildings on outlots are part of the vision for the UMCH focus area, nor are buildings placed in the middle of parking lots.

Generally it is anticipated that buildings will be setback from the High Street curb line an appropriate distance based upon the architecture and use(s) of the buildings. The streetscape section between the building and the curb should include a sizable tree lawn or street trees in planters (ten feet +/-), at least an eight-foot wide unobstructed sidewalk, and an outdoor seating and/or landscape planting area. As the building height increases, the buildings should consider the relationship between the setback, the street corridor, and the building height. It is expected that if fourth or fifth stories are included, a variety of techniques will be implemented to mitigate any potential "canyon" effect along High Street, such as the use of floor terracing, changes in building massing, insertion of a green commons, recessed seating and dining areas, and lush landscaping to name a few.

While it is preferred that parking be provided to the rear of building, if parking is provided in front, it should be consistent across the frontage and be limited to either one row (single bay) of parking or on-street parking for short customer visits.





*Potential High Street frontage examples.*

This would alter somewhat the streetscape described above. Parking visible between buildings should be screened by landscape and/or masonry wall.

As mentioned in the Parks Space Section, it is expected that some type of green civic space is provided that allows sight line vistas into the site from High Street and at least pedestrian and bicycle connection to the Neighborhood Core area, if not vehicular connection.

*Landscaping and Buffers*
Development within the UMCH focus area should be well-landscaped, with particular focus on the streetscapes, building edges, buffers, and public park/community commons. Landscaping should be substantial, lush, well-planned, and commonly-maintained. Landscape should emphasize native species where possible.

Buffers for any redevelopment of the UMCH focus area are the Worthington Estates Edge and Tucker Creek Preserve zones.

The Worthington Estates Edge provides rear yards adjacent to the existing rear yards and new single-family homes across the street from existing single-family homes, similar to other lots within the Worthington Estates neighborhood. The Tucker Creek Preserve maintains the ravine separating this site from the Greenbrier Court development.

*Storm Water*
As with any development, the quantity and quality of storm water runoff must be managed per Code. Comprehensive design of the storm water system for the UMCH focus area must be part of the development plan with needed controls located and sized prior to construction of any first phase. Storm water controls should be aesthetically integrated, be natural in appearance, and serve as amenities to the site. Sustainable and green measures should be included to the extent reasonable. Because of the storm water sensitivity of Tucker Creek, it is expected that storm water controls will meet or exceed all requirements.

*Public Private Partnerships*
There are several opportunities for public-private partnerships as part of any substantial redevelopment of this focus area. The community has expressed great interest in creating integrated public park space. In addition, parking decks may be important site improvements to achieve the desired office densities and tenants important to the City. Furthermore, relocation or creation of street intersections to facilitate gateway development and attract best-of-class commercial development may be necessary. Public-private partnership opportunities should be explored by the City and any developer of this site to achieve the full potential and quality of this site.





**STAFF MEMORANDUM**
**City Council Meeting – November 15, 2021**

Date:     November 8, 2021

To:       Matthew H. Greeson, City Manager

From:     R. Lee Brown, Director of Planning & Building

Subject:  Ordinance to rezone 37.8-acres at 1033 N. High St. from R-10 (Low Density
          Residential), S-1 (Special), C-2 (Community Shopping Center) and C-3
          (Institutions & Office) to PUD, Planned Use District for the redevelopment of the
          United Methodist Children's Home site.

---

**EXECUTIVE SUMMARY**
This Ordinance is to rezone 37.8-acres at 1033 N. High St. from R-10 (Low Density
Residential), S-1 (Special), C-2 (Community Shopping Center) and C-3 (Institutions &
Office) to PUD, Planned Use District for the redevelopment of the United Methodist
Children's Home site to a mixed-use development that would include detached single-
family home sites, townhomes, apartments, retail, restaurants, office and greenspace.

**RECOMMENDATION**

Introduce for a Public Hearing on December 13, 2021.

On October 14, 2021, the Municipal Planning Commission reviewed and recommended
***denial*** of the proposed rezoning by a unanimous vote. The Commission discussed the need
to significantly reduce density, height of buildings, increase contiguous usable open space
and vehicular connections. To view the meeting, please go to the Video Archives for October
14, 2021 ARB & MPC Meeting.

Staff is recommending ***denial*** of this application. The proposal does not meet the
recommendations found in the Comprehensive Plan and 2005 Strategic Update - UMCH
Focus Area – 2014, Bicycle & Pedestrian Plan – 2019 and the Park Master Plan - 2017. Please
see Staff Comments/Analysis below for additional details related to the recommendation.



EXHIBIT

tables' 38

Worthington 003135

The Development Plan labeled as Exhibit "C" provides the maximum density, number of stories, layout, setbacks, and open space for the site are set forth in the Development Plan dated September 9, 2021 and attached as Exhibit "C". Additional details, including PUD Text will need to be approved as part of the PUD Final Plan if City Council is supportive of the rezoning.

## BACKGROUND/DESCRIPTION

### Executive Summary
Thomas Hart on behalf of Lifestyle Communities has applied to rezone 37.8-acres from R-10 (Low Density Residential), S-1 (Special), C-2 (Community Shopping Center) and C-3 (Institutions & Office) to PUD, Planned Use District for the redevelopment of the United Methodist Children's Home site to a mixed-use development that would include detached single-family home sites, townhomes, apartments, retail, restaurants, office and greenspace.

### Applicable Plans
- Comprehensive Plan Update and 2005 Strategic Plan – UMCH Focus Area – 2014
- Comprehensive Plan Update and 2005 Strategic Plan
- Bicycle & Pedestrian Master Plan – 2019
- Park Master Plan – 2017
- Chapter 1177 – Architectural District
- Chapter 1174 – PUD Planned Unit Development

### Brief Background/Description
The United Methodist Children's Home (UMCH) site located at 1033 High St. is approximately 37-acres in size, that until recently had fifteen existing vacant buildings, parking lots and driveways on the site that the Board approved for demolition. The majority of the property is zoned S-1, Special, except in 1987 just under 10-acres of land along the N. High St. frontage was rezoned to C-3, Institutions and Offices (~9.2-acres) and C-2, Community Shopping Center (~0.6-acres). The parcels at 47 Larrimer Ave. and 57 Larrimer Ave. are zoned R-10, Low Density Residential (~0.5-acres) and are currently single-family homes that are vacant.

Approximately 3.42-acres at the northwest corner of High St. and Wesley Blvd. (private drive) with 428-feet of High St. frontage was purchased in 2017 by the West Ohio Annual Conference of the United Methodist Church and is not part of this application. Bickford Assisted Living & Memory Care facility at the southwest corner of High St. and Wesley Blvd. (private drive) is a separate 3.58-acre parcel and is also not part of this application.

### Current Zoning - Development Standards

| Zoning | Minimum Lot Width | Minimum Lot Area | Front Setback | Rear Setback | Side Setback | Max Height of Building Stories | Max Height |
|--------|-------------------|------------------|---------------|--------------|--------------|-------------------------------|------------|
| S-1 | 250-feet | 3-acres | 60-feet | 60-feet | 50-feet | 4-stories | 45-feet |
| C-2 | 150-feet | 1-acre | 50-feet | 30-feet | 20-feet | 3-stories | 45-feet |

| C-3 | 100-feet | 20,000 sq. ft. | 50-feet | 30-feet | 15-feet | 3-stories | 45-feet |
|------|----------|----------------|---------|---------|---------|-----------|---------|
| R-10 | 80-feet | 10,400 sq. ft./4.2 DU/acre | 30-feet | 30-feet | 8-feet | 2 ½-stories | 30-feet |
| Section 1149.07 – 100' front setback along this area of High Street | | | | | | | |

**Surrounding Zoning & Land Use**

The surrounding zoning is a mix of the following:

- R-10 - Low Density Residential – Worthington Estates and Greenbriar Hill
- R-16 – Very Low Density Residential – Worthingway & Medick Estates
- C-1 – Neighborhood Commercial – O'Reilly Family Pharmacy
- C-3 – Heritage Professional Building, AT&T, FC Bank, Worthington Municipal Complex, Laurels of Worthington, West Ohio Conference Center and The Grove
- SC – Senior Citizen – Bickford of Worthington

*Current Zoning Map*



Worthington 003138

*Aerial*



**Recent Land Use and Planning History Related to the Site (since 2014)**

- On September 2, 2014 City Council adopted an Amendment to the Comprehensive Plan Update & 2005 Strategic Plan for the United Methodist Children's Home Focus Area for the City of Worthington with the anticipation of redevelopment on the site that would include a mix of uses and open space across the entire site.
- On June 29, 2015 Lifestyle Communities presented an informal proposal to the Worthington Community for their vision for the UMCH site.
    - No formal application was submitted to the City to start the rezoning process.
    - Lifestyle Communities proposed the following:
        - 42.3-acres
        - 571± Total Residential Units
            - 350 Apartments
            - 221± Detached single-family estate lots, manor lots, cottage lots and townhomes.
                - Mix of for sale and for rent product
        - Approximately 150,000± sq. ft of medical office and a 20,000 sq. ft. conference center
        - Retail on first floor of the apartment buildings
        - Mix of 3 to 4 story buildings along High St.
        - Open Space
            - Shelter house – Tucker Creek Preserve
            - Multi-use trail – Tucker Creek Preserve
            - Formal greenspace in the form of a village green at the entrance to High St.
            - Community park to the rear of the site
            - Scattered open space throughout the site
- On February 9, 2017, OhioHealth made application to construct a new 20,000 sq. ft. two-story medical office building along the High Street frontage just north of the Conference Center.
    - The application was eventually withdrawn by OhioHealth when the West Ohio Annual Conference decided to exercise their option to purchase 3.42-acres of land that include the area where the new medical office building was to be constructed.
- On June 8, 2017, the Municipal Planning Commission reviewed and approved a request by the West Ohio Conference Annual Conference of the United Methodist Church to create a new 3.42-acre lot for their existing building and parking at the corner of High St. and Wesley Blvd. that met all the legal requirements to create a new lot as outlined in the Planning & Zoning Code. City Council ultimately approved the request on June 19, 2017.
- On March 26, 2020, the Municipal Planning Commission was scheduled to review a request by OhioHealth to rezone 3.35-acres at the corner of Larrimer Ave. and N. High St. from R-10 (Low Density Residential), S-1 (Special) and C-2 (Community Shopping Center) to the C-3 (Institutions & Office) to permit the construction of a new 60,000 sq. ft. three-story medical office facility that would house medical services, including

an emergency department, primary care, imaging and a host of specialty services.

- o The application was withdrawn by OhioHealth after they were unable to come to an agreement with the property owner to move forward on the site.
- On October 6, 2020, Thomas Hart, on behalf of Lifestyle Communities, filed an application to rezone 37.843-acres from the R-10 (Low Density Residential), S-1 (Special) and C-2 (Community Shopping Center) and C-3 (Institutions & Office) to a PUD, Planned Use District for the redevelopment of the United Methodist Children's Home site to a mixed-use development that would include detached single-family home sites, townhomes, apartments, retail, restaurants, office and greenspace.
- On January 14, 2021, the Architectural Review Board and the Municipal Planning Commission heard a presentation by the applicant for the development of the site. The Board and Commission ultimately tabled the applications.
  - o Lifestyle Communities proposed the following:
    - ▪ 37.8-acres
    - ▪ 730 Residential Units
      - 24 – Single-family
      - 94 – Multi-family – Townhome's w/garages
      - 72 – Multi-family – Townhomes & flats
      - 540 – Multi-family – Apartment's w/parking garage
    - ▪ 60,000 sq. ft. – Commercial/retail
    - ▪ 25,000 sq. ft. – Medical office
    - ▪ 6.4-acres – Tucker Creek
- On February 11, 2021, the Architectural Review Board approved the demolition and remediation of the fifteen vacant buildings, parking lots and access drives on the site.
- On September 9, 2021, Thomas Hart, on behalf of Lifestyle Communities, filed amended materials to their previously tabled rezoning application. These materials take a high-level look at density, mix of uses, height, layout, connections and open space. If the concepts are deemed workable, more details will be required before the MPC can complete its review of the proposal.

**September 9, 2021 – Proposal by the Applicant**
- Total Acreage = 37.8-acres (Parcel #s:100-006774, 100-002425 & 100-002427)
- 600 Residential Units
  - o 22 units – Single-family – For sale
  - o 86 units – Multi-family - Townhome's w/garages – For sale
  - o 72 units – Multi-family - Townhomes & flats – For Rent
  - o 420 units – Multi-family – Parking Garage – For Rent
- 24,000 sq. ft. – Commercial/retail
- 96,000 sq. ft. – Medical office
- 6.4 acres – Tucker Creek

| SUBAREA | USE | LOTS/UNIT/SQUARE FOOTAGE | STORIES | ACRES | DENSITY |
|---------|-----|------------------------|---------|-------|---------|
| **#1** | Single-family | 22 units | *2 ½ | 5.9-acres | 3.72 lots/acre |
| **#2** | Multi-family | 86 units | *3 | 9-acres | 9.55 DU/acre |
| **#3** | Multi-family | 72 units | *3 | 5.1-acres | 14.4 DU/acre |
| **#4** | Multi-family Commercial/Retail Medical Office | 420 units 24,000 sq. ft. 96,000 sq. ft. | *4 & 5 *3, 4 & 5 *3 | 11.4-acres | 37.16 DU/acre |
| **#5** | Tucker Creek | | | 6.4-acres | N/A |
| **TOTAL** | | 600-units | | 37.8-acres | 15.95 DU/acre |

*Staff Comments:*
\* The actual height has not been provided at this time, however, will be required in the future.

**Project Details as described in the application**

**Subarea #1**
- 5.9-acres
- 22 single-family lots
  - For sale product
  - 2 parking spaces per dwelling unit
  - Lot Width: Minimum – not referenced, however the information will be required in the future for review
  - Minimum Lot Size – not referenced, however the information will be required in the future for review
  - Unit Square Footage Minimum – not referenced, however the information will be required in the future for review
  - 2 ½ stories, 1 ½ stories or single-story buildings – max height information will be required in the future for review
  - Front Setback – not referenced, however the information will be required in the future for review
  - Rear Setback – not referenced, however the information will be required in the future for review
  - Side Yard – not referenced, however the information will be required in the future for review
  - Fronting on a proposed public roadway
  - 3.72 Dwelling Units/acre
  - Architectural Design & Standards Proposed – not referenced, however the details will be needed in the future to obtain architectural approval

**Subarea #2**
- 9-acres
- 86 townhomes
  - For sale product
  - Garages
  - 2.3 parking spaces per dwelling unit including the garage and parking lot
  - Unit Square Footage Minimum – not referenced, however the information will be required in the future for review
  - 2-3 stories: max height information will be required in the future for review
  - Lot sizes – not referenced, however the information will be required in the future for review
  - Front Setback – not referenced, however the information will be required in the future for review
  - Fronting on a proposed public and private roadway
  - Public and private open/green space – neighborhood green & linear green – acreage not provided, however will be required in the future
  - 9.55 Dwelling Units/acre
  - Architectural Design & Standards Proposed – not referenced, however details will be needed in the future to obtain architectural approval

**Subarea #3**
- 5-acres
- 72 townhomes
  - For rent product
  - Mix of garages & parking lot
  - 1.9 parking spaces per dwelling unit including the garage and parking lot
  - 3 stories – max height information will be required in the future
  - Mix of one-bedroom, two-bedroom and three-bedroom units
  - Front Setback – not referenced, however the information will be required in the future for review
  - Fronting on a proposed private roadway
  - Public and private open/green space – multi-family green – acreage not provided; however the information will be required in the future for review
  - 14.4 Dwelling Units/acre
  - Architectural Design & Standards Proposed – not referenced, however details will be needed in the future to obtain architectural approval

**Subarea #4**
- 11.3-acres
- 420 multi-family units
  - For rent product
  - Parking Garage – 4-story
  - Mix of 4 & 5 stories – max height will be required in the future
  - Mix of one-bedroom, two-bedroom and three-bedroom units
  - 37.16 Dwelling Units/acre

- - Architectural Design & Standards Proposed – not referenced, however details will be needed in the future to obtain architectural approval
- Commercial/Retail – first floor of the 5-story portion of Building A & Building B along the linear green
  - 24,000 sq. ft.
  - Access to two 4-level parking garages, surface lot and on-street parking
- Medical Office
  - 96,000 sq. ft.
  - Access to two 4-level parking garages, surface lot and on-street parking
  - 3 stories along High Street
- Setbacks:
  - High St. – not provided, however the information will be required in the future for review
  - Longfellow Ave. – not provided, however the information will be required in the future for review
  - Larrimer Ave. – not provided, however the information will be required in the future for review
  - Private Streets – not provided, however the information will be required in the future for review
  - Southeastern property line – not provided, however the information will be required in the future for review
- Fronting on a mixture of private roadways and existing roadways (High St., Larrimer Ave. and Longfellow Ave.)
- The previous proposal stated that the private streets will be 36-feet in width, 20-feet wide drive aisles and 8-feet for parallel parking spaces on each side and placed in a reserve that is 56-feet in width.
- Alleys are proposed to be 16-feet wide and placed in a reserve that is 20-feet in width.
- Surface parking lots shall be constructed with 9'x19' parking spaces with a drive aisle of 22-feet in width.
- Bicycle parking will be provided throughout the site.
- Cross access easements are proposed throughout the site.
- Public and private open/green space – linear green & trail connection – detailed acreage not provided, however will be required in the future
- Architectural Design & Standards Proposed – not referenced, however details will be needed in the future to obtain architectural approval

**Subarea #5**
- Tucker Creek Preserve
  - 6.4-acres
    - Proposed to be preserved as a natural area with a conservation easement, and/or possibly dedicated to the City for public ownership and use
    - A portion of the acreage will be dedicated as a stormwater basin for the development, will not be conveyed to the City and will be required to be maintained by the homeowners' association (HOA).

- 3.1 acres of the 6.4 acres is already located in an easement that restricts development in this area. This includes a mix of slope, stormwater, sanitary, water and channel easements.
  - Parking does not appear to be provided for those that would want to utilize the Tucker Creek Preserve. There is on street parking in the area, however not in the immediate vicinity.
  - Possible amenities:
    - Trails
    - Pavilion
    - Benches

**Traffic**

The applicant previously provided a Traffic Impact Study that was reviewed by the City's traffic consultant. The Traffic Impact Study will be required to be updated once we have a better understanding of the density, mix of land uses and connection points throughout the site. Preliminary findings of the Study included the following:

- When warranted, a new signal should be installed on High St. across from the Worthington Municipal Building.
- When a new signal is constructed, the existing southbound fire signal control should be moved to the new High St. signal.
- Pavement markings should be revised on High St. for a 100-feet northbound left turn lane at the new entrance on High. St.
- Pavement markings should be revised on High St. for a 200-feet southbound left turn lane to Worthington-Galena Rd.
- Signs, pavement markings and signal operation should be modified to allow for east/west movements at the intersection of High St., Wesley Blvd, Worthington-Galena Rd. and Crandall Dr.

**Parking**

The applicant provided the following summarizing the proposed parking included in the application.

| Subarea | Lots/Unit/SF | Parking Required | Proposed Surface Parking | Proposed Garage/Structure | Total |
|---|---|---|---|---|---|
| #1 | 22 | 1/unit = 22 | Garage/Driveway | 44 | 44 |
| #2 | 86 | 1/unit = 86 | 86 On-street 26 Parking Lot | 172 | 284 |
| #3 | 72 | 1/unit = 72 | 18 On-street & 55 Parking Lot | 80 | 153 |
| #4 | 420 units 24,000 SF 96,000 SF | 1/unit = 420 1/150 = 160 1/250 = 384 Total = 964 | 49 (On-Street) | 504 Building A 328 Build B (4 Level Parking Garage) | 881 |
| #5 | N/A | N/A | N/A | N/A | N/A |
| TOTAL | 600 | 1,144 | 234 | 1,128 | 1,392 |

*Staff Comments:*

Chapter 1174.05(b)(2) of the Planning & Zoning Code provides the following parking standards:

- Design. Parking and service areas shall be designed and located to protect the character of the area.
- Parking and service areas shall be designed and located to protect the character of the area.
- Non-Residential Uses – Parking shall be adequate to serve the proposed uses but shall not exceed 120% of the required parking found in Section 1171.01.
- Residential Uses – Not less than one parking space per dwelling unit.
- Bicycle Parking – Should be adequate to serve the proposed uses.
- The required parking referenced in the chart above appears to be inconsistent with the parking requirements found in the Planning & Zoning Code.

**Tree Preservation & Replacement**

A Tree Survey & Preservation Plan was previously provided by the applicant and was reviewed by the City Arborist. The following items were noted in the Tree Survey:

- 365 trees to be removed = 6,264 caliper inches
  - 29 dead
  - 28 poor condition
  - 2 Ash trees
  - 306 healthy trees
- 6,264 caliper inches – 1,069 caliper inches* = 5,195 caliper inches

* The dead and poor condition trees and Ash trees are not counted in determining the loss of caliper inches of trees for either replacement or fee payment, thus the associated caliper inches (1,069) associated with those trees is deleted from the total caliper inches of trees to be removed.

The previously submitted Tree Survey and Preservation Plan indicated tree replacement will be included as part of the redevelopment of the site and will be finalized with a detailed landscape plan at the Final Development Plan for the PUD. Tree replacement was described in the application as follows:

- Street Trees – provided on all public and private streets at 1 tree per 40 linear feet of street.
  - Minimum of 3-inch caliper at installation
  - Approximately 284 trees at 3 inches = 852 inches
- Alley/Parking Lot Island Trees
  - 30 trees at 2.5 inches = 75 inches
- Open Space Tree Plantings
  - 80 trees at 2.5 inches = 200 inches
- Buffer Plantings
  - Stormwater Pond – 10 trees at 2.5 inches = 25 inches
  - Bickford Assisted Living Facility – 8 evergreens at 3 inches/6 feet high = 24 inches
- Other Locations
  - Replacement trees can be located in other off-site public property locations.
- When considering the amount of caliper inches to be lost (5,195) and the total caliper inches of proposed replacement trees (1,176), the submittal notes there remains 4,019 inches that would need to be replaced with additional trees or a Tree Replacement Fee of $150/caliper inch for a total fee of $602,850.00 would be applied.

*Staff Comments:*

- Staff calculates the fee at $150/caliper inch for 4,019-inches for a fee of $602,850.00, not $554,400.00 per the previously submitted plan.
  - An Tree Preservation & Replacement Plan will likely be required to be updated to reflect the current proposal.
- All street trees and landscaping plans will need to be reviewed by the City Arborist.

Per the previous application, the applicant requested the following items in relation to the Tree Replacement Standards
- Requesting the dedication of Tucker Creek Preserve to count towards the Fee-in-lieu of Tree Replacement.
- Requesting the Fee-in-lieu of Tree Replacement and/or the number of trees replaced off-site shall be based on $150/caliper inch.
- The applicant states that full on-site replacement is not feasible and would result in overcrowding on the site.
- The applicant states this is an unreasonable burden on the property if the fee-in-lieu is paid or if replacement occurs off-site. The applicant previously requested a waiver of all fees.
- The applicant states that they are committed to a reasonable and balanced tree replacement standard that includes on-site replacement, off-site replacement, and crediting in order to meet the spirit and intent of the code, while resulting in fairness.
  - Applicant states they will work in good faith with City to find other off-site replacement location on public lands to help reduce the credit.

**Public Area Payments – Special Park Fund**
City Code contains the following requirements for contributions to the Special Park Fund:
- Commercial & Industrial Space = $100.00 per 1,000 sq. ft.
- Residential = $250.00 per dwelling unit

- Utilizing the Code requirements and applying them to the proposed development results in the following fee calculation: Proposed Uses:
  - Commercial – 120,000 sq. ft. = $12,000.00
  - Residential – 600 units = $150,000.00
  - Total Fee = $162,000.00

The applicant previously stated the property is valued at $165,688.00 per acre and believes the value of Tucker Creek Preserve is valued at $944,422.00 and believes there is a credit balance to the developer since the developer is proposing to dedicate the Tucker Creek Preserve to the City.

*Staff Comment:*
- The 3.1 acres of the 6.4 acres of the Tucker Creek Preserve is already located in an easement that restricts development in this area. This includes a mix of slope, stormwater, sanitary, water and channel easements. Staff questions the suggested value of the Tucker Creek Preserve given these easements and the associated restrictions on development.

**Public Space Amenities**

City Code requires public amenities which directly affect the quality and character of the public domain as part of PUD developments. The amount of required public amenities is calculated based on gross floor area.

*Staff Comment:*
- Not provided, however information related to public space amenities will be required in the future for review.

**Utilities**

The previous application included the following information concerning utilities:
- Water, sanitary sewer, surface drainage and utility facilities will be serviced by the existing available water/sewer lines and connections.
- Sanitary Sewer:
  - Existing 12-inch located along the southern property line
  - Existing 10-inch extends into the site from the 12-inch sewer line
- Water:
  - Existing 12-inch located along N. High St.
  - Existing 12-inch located along Wesley Blvd.
- Stormwater:
  - Proposed wet detention basin along the Tucker Creek Preserve near Evening St.
    - Mix of stormwater storage vaults and surface detention to be utilized in the open space areas and parking areas.
    - Proposed to be designed to meet all stormwater requirements for water quantity and water quality per Ohio EPA standards and City of Columbus stormwater requirements.

**Easements**

The previous application provided the following information regarding easements:
- Cross access easements, shared parking agreements, utility and access easements between subareas will be required.

*Staff Comment:*
- Cross access easements, shared parking agreements, utility and access easements between West Ohio Conference Center and the site should be discussed to assist in future redevelopment opportunities.

**Phasing Plan**

The previous application proposed the following phasing plan for construction:

- Developed based on zoning approval and finalized at the time of the Final Development Plan.
- Construction to begin with the single-family development. The commercial/office uses along High St. are subject to market conditions.

*Staff Comments:*

- The commercial office included in this proposal is the portion of the development that would provide economic benefit to the City and help offset the cost of services that are provided given the City's heavy reliance on income tax as a revenue stream. Staff is concerned that only the residential and retail portion of the project would get constructed without the commercial office needed in the High-Street Mixed-Use Zone.
- Staff is also concerned about the timeliness of construction of the open space that is to be provided on the site.

**Land Use Plans**

This section of the memorandum highlights the language related to this site contained in various land use plans and regulations of the City. Links to the full documents are included at the beginning of this memorandum and in the highlights below.

Worthington Comprehensive Plan – UMCH Focus Area - 2014

Since the Comprehensive Plan was updated in 2005 and included a strategic redevelopment plan for the site, City leaders have anticipated a redevelopment on the site that would include a mix of uses and open space across the site. The City studied the property again in 2014 and adopted amendments to the 2005 Comprehensive Plan in 2014, refining the stated desired outcome for the property. This area has been identified in the 2014 document as a good location for a mix of commercial uses along the High St. frontage, mix of residential uses and a significant amount of usable open space.

The 2005 Comprehensive Plan identified the UMCH site as strategic for future growth, a matter particularly critical for an established community like Worthington. While the 2005 plan presented an example of two possible redevelopment scenarios, this update document provides a more in-depth consideration of appropriate redevelopment parameters.

This section of the agenda item memorandum will highlight the language from the 2014 update to the Comprehensive Plan regarding types of land use on the site. The Plan update indicates ". . . redevelopment of this site must create a high-quality, mixed-use development that is walkable, connected, and integrated within the site and with the City. This mix of uses should contain a range of residential types together with commercial office and neighborhood retail uses integrated with contributing and shared green space and amenities – all of which complement each other to create an active, vibrant place. Any proposed design must be sensitive to the neighborhoods adjacent to the UMCH site, as well as to the natural features related to Tucker Creek. Any development that occurs within the focus area should relate internally to the site and to an overall plan, even if it is built at different times."

*Future Land Use Zones:* The 2014 update identified four general zones for the property:
- High Street Mixed Use
- Worthington Estates Edge
- Neighborhood Core
- Tucker Creek Preserve

*High Street Mixed Use:*
The High Street Mixed Use zone is described in the 2014 document as follows:

> North High Street is the commercial spine of the City of Worthington . . . [and] is a good location for commercial office use. . . [I]ncome tax generating employment uses such as office are critical to the fiscal sustainability of the City. In addition, this site's close proximity to historic Old Worthington makes it a prime location for walkable residential development and denser, amenity-rich housing types. . . This location along High Street is attractive for retail and service uses as well. It is not the desire of the City, however, to create a third retail center in close proximity to Old Worthington and the Shops at Worthington Place. Retail in this location should be neighborhood scale and serve the development that occurs on this site and that exists in the surrounding neighborhood; and it should help to activate the High Street frontage.

> The High Street Mixed Use zone consists of the frontage of the UMCH site along High Street. It permits a mix of office, residential, and retail uses with the focus on commercial office and medical uses with subordinate residential and limited retail uses. Buildings in this zone should be a minimum of two stories and a maximum of five stories in height with attractive, four-sided architecture. Buildings in this zone should address the streets, activate the street frontage, and include opportunities for outdoor dining and other pedestrian-focused activities.

> It is expected that the buildings adjacent to High Street will be commercial offices. Residential uses might occur behind as a transition to the Neighborhood Core. Neighborhood-oriented retail uses can complement the development in the first floors of office and residential buildings. The objective of the High-Street Mixed-Use zone is to create a high-quality, dense, walkable, connected, mixed-use development that creates a dynamic space and signature address to attract Class A office tenants along High Street and add vitality and life to the High Street corridor.

> In order to create a walkable environment, it is expected that buildings will line public streets and most parking will be located at the center of blocks, screened from public streets by attractive buildings. Parking beneath buildings may also be considered, provided the public street frontage of a building is activated. By providing a mix of uses within the High-Street Mixed-

Use zone, parking areas can be shared to optimize their use. To achieve the desired densities, parking decks are encouraged to be integrated into the site. Features expected as part of any parking deck or structure include masonry and architectural elements to dress up the exterior, windowed stair towers, and lush landscaping and pedestrian connections.

Parking structures and/or parking lots could be lined with residential and/or retail development to separate and screen them from the Neighborhood Core. Where the High-Street Mixed-Use zone is opposite existing single-family residential development, it is expected that the new development will consist of residential development and/or substantial and attractive buffers.

As with all development in the UMCH focus area, it is to be high-quality in character and design with four-sided architecture. It should follow the *Worthington Design Guidelines*.

*Worthington Estates Edge:*
The Worthington Estates Edge is described as follows:

This zone is where development in the UMCH focus area should create a desirable transition between it and the existing single-family housing development that surround its north and west sides. The surrounding development consists of homes on third-of-an-acre lots. The Worthington Estates Edge zone calls for single-family residential development on lots between a third-of-an-acre and a fifth-of-an-acre. This equates to a residential density similar to Worthington Estates (3 dwelling units/acre) and Old Worthington (4-5 dwelling units/acre). The structures are limited to the same two-and-a-half story height as the surrounding neighborhood.

These may be single-family, detached homes that are more current, updated versions of what is found in the surrounding neighborhoods. Or they may be smaller homes with smaller yards that provide first floor living opportunities for Worthington residents — an option in which many residents expressed an interest during the community meetings. They may be something in between. Regardless, these homes must be of high-quality design, differentiated architecture, and in close proximity to amenities. This zone is for custom-built, individualized homes and not one for homes with repetitious floor plans.

Housing in this zone should consist of individual units, potentially with lots of different sizes, fronting on a street or streets. The use of cul-de-sacs is strongly discouraged. These new lots must include rear or side yards to provide a substantial buffer and green landscape between these structures and the rear yards of existing homes. Attractive storm water systems designed as a naturalized amenity can be placed within the Worthington Estates Edge zone.

As with all development in the UMCH focus area, it is to be of high-quality in character and design with four-sided architecture. It should follow the *Worthington Design Guidelines*.

*Neighborhood Core:*
The document describes the Neighborhood Core zone as follows:

> The Neighborhood Core zone represents the most flexible zone of the UMCH focus area because it is internal to the site. It consists of a higher density neighborhood that creates a transition from the single-family homes along the periphery of the site to the more active uses proposed closer to High Street.

> The Neighborhood Core calls for residential development at a density between six and fourteen dwelling units per acre (6-14du/ac) gross density with a height limit of three stories. It is expected that the Neighborhood Core will be developed with more than one housing type and at more than one density level. The expected amount of park space and amenities correspondingly increases with the density. For a density reference, Ville Charmante along West Wilson Bridge Road is over seven dwelling units per acre.

> This area creates the opportunity to introduce different types of housing options that are not readily available in the city. This area should provide residential living that is underrepresented in the market and complements Worthington's current offerings, addressing the needs of aging Worthington residents, future young professionals, and those desiring amenity-rich living. .

> Examples include a mix of single-family detached homes on small lots with rear alley garages, homes with great front porches for outdoor gathering, custom homes designed for first-floor living, luxury residences with integrated front auto courts, well-appointed walk-up townhomes, and a limited number of high-end flats. To be successful, the Neighborhood Core must incorporate common areas/shared green space(s). These parks create the community gathering and development focal point(s). Shared amenities and facilities should also be provided. In all cases, the buildings must have front doors on inviting tree and sidewalk-lined streets. The objective is not to have streets dominated by garages, so garages must be de-emphasized – set back or placed to the rear of structures, creating a very walkable neighborhood.

> As with all development in this focus area, the community expects this development to be of high-quality in character and design and adhere to the *Worthington Design Guidelines*.

*Tucker Creek Preserve:*
Finally, the Tucker Creek Preserve zone is described in the document as follows:

The southern boundary of the UMCH focus area is the beautiful and wooded Tucker Creek ravine. This plan calls for preserving this area as a natural green space amenity for the site and the community. The creek and the steep slopes that surround it are not developable and the wooded areas along it are important contributing and environmental features.

The community expressed a strong desire to continue linking neighborhoods, parks, and destinations with multi-use trails throughout the City. This includes achieving a dedicated trail along Tucker Creek that highlights this natural feature and provides an amenity and potential bicycle and pedestrian connection between High Street and Evening Street.

As part of any development that occurs on the UMCH site, it is expected that any future developer preserves the Tucker Creek ravine and wooded area. Any storm water systems in this area must be designed as a naturalized, aesthetic landscape feature that fits in the environment.

The 2014 document goes on to indicate the boundaries of these zones are flexible and provides information about ways in which the size of the areas may vary. It then indicates the importance of park space with the following language:

The creation of park space for community and public enjoyment is an important component for any redevelopment on the UMCH site. This is in addition to the Tucker Creek Preserve. Beyond serving community-gathering functions, the park space is critical to providing place-making in development layouts as well as a green space balance to the built environment contemplated in the High Street Mixed Use and Neighborhood Core zones.

In potential redevelopment scenarios, this additional park space has several acres divided between the High Street Mixed Use and Neighborhood Core zones. Park space could be used to provide linear park "windows" into the site from High Street; neighborhood-oriented parks internal to the site; and/or extension of the Tucker Creek preserve. The expected amount of park space and amenities correspondingly increases with the density of development proposed on the UMCH site. Park space as discussed here must be useable, contributing ground for residents, workers, and visitors of the redeveloped site, and not, for example, storm water controls or left-over ground.

It is expected that the developer(s) of the UMCH site will integrate usable park land into the development and work with the City to provide acreage in the High Street Mixed Use and Neighborhood Core zones as park space useable by the community.

Creating this additional park space within the UMCH focus area will address the community's desire for park space and amenities here. The public process generated numerous ideas for amenities worthy of further consideration. It is important that the City and the Worthington Parks and Recreation Commission work with the community to plan for and create parks that include the desired amenities in the appropriate places within the City and at this site.

The 2014 document goes on to include information related to Design Guidelines, connectivity, street intersections, the High Street frontage, landscaping and buffers, storm water and public private partnerships which can be found in the full document.

## Worthington Comprehensive Plan – UMCH Focus Area – 2014 - High Street Frontage Guidelines:

The potential redevelopment of the UMCH focus area creates a change in the consideration of setbacks along High Street in these blocks. To achieve the desired walkability, vitality, and screening of parking along Worthington's signature street, it is expected that multi-story buildings will be constructed closer to the High Street right-of-way, with parking located behind the buildings. The buildings should engage High Street with broad sidewalks, storefronts, front entries, and outdoor seating that provide an inviting strolling environment for pedestrians. The buildings constructed along High Street will set the tone and impression for the entire UMCH focus area. As such their architecture, materials, quality, interest, aesthetics, and vitality are critical. These buildings should have a predominance of brick and complement the community character. Buildings along High Street must have the majority of their building face fronting/ parallel to the street. Buildings are expected to be at least two stories in height with substantially transparent storefronts on the first floor, whether retail or office, to activate the street. Operational building entries must be provided along High Street regardless of parking orientation. Neither single-story commercial buildings nor retail buildings on out lots are part of the vision for the UMCH focus area, nor are buildings placed in the middle of parking lots.

Generally, it is anticipated that buildings will be setback from the High Street curb line an appropriate distance based upon the architecture and use(s) of the buildings. The streetscape section between the building and the curb should include a sizable tree lawn or street trees in planters (ten feet +/-), at least an eight-foot-wide unobstructed sidewalk, and an outdoor seating and/or landscape planting area. As the building height increases, the buildings should consider the relationship between the setback, the street corridor, and the building height. It is expected that if fourth or fifth stories are included, a variety of techniques will be implemented to mitigate any potential "canyon" effect along High Street, such as the use of floor terracing, changes in building massing, insertion of a green commons, recessed seating and dining areas, and lush landscaping to name a few.

While it is preferred that parking be provided to the rear of building, if parking is provided in front, it should be consistent across the frontage and be limited to either one row (single bay) of parking or on-street parking for short customer visits. Parking visible between buildings should be screened by landscape and/or masonry wall.

Development within the UMCH should be well landscaped, with particular focus on the streetscapes, building edges, buffers, and public park/community commons. Landscaping should be substantial, lush, well-planned, and commonly maintained. Landscape should emphasize native species where possible.

Worthington Comprehensive Plan - 2005

The 2005 Comprehensive Plan identifies portions of High Street outside of the historic core as High Street Corridor (Extents Area) and as a place where consistent site design should be encouraged such as landscape screening and interior planting of surface parking areas, and where the location of large parking areas should be to the rear of the site. The corridor could accommodate redevelopment at a higher density, with such projects meeting the needs of the City, providing green setbacks and meeting the Architectural Design Guidelines. The plan recommends promoting a high-quality physical environment, encouraging the City to continue to emphasize strong physical and aesthetic design, and high-quality development. Also recommended is encouraging the private market to add additional commercial office space within the City. The UMCH property was specifically addressed in that section of the plan, with concepts establish for mixed use development on the site. This section specifically focused on the UMCH property was updated with the 2014 document.

Bicycle & Pedestrian Master Plan – 2019

The 2019 Bicycle & Pedestrian Master Plan was created to guide the development of bicycle and pedestrian routes, linking activity centers within the City, as well as the regional network. The plan recommends a multi-use path along High Street and sidewalks along the southern side of Longfellow Ave. to Larrimer Ave. The intersection of High Street/Worthington-Galena Rd./Wesley Blvd. was a signalized crossing that has been identified where there may be opportunities to improve safety and convenience for pedestrian crossings.

Park Master Plan – 2017

The 2017 Park Master Plan was created as a plan dedicated to maintaining our existing parks, meeting the needs of residents, and benchmarked effectively with other progressive cities is vitally important. The plan endeavors to provide City Council and the residents of Worthington prioritized park improvements for the years to come in an organized and strategic planning document. The plan recommends focusing on improving and maintaining existing park space, however as opportunities arise for additional park space as part of the UMCH site redevelopment the following should be considered:

- Natural spaces for passive recreation and the area along Tucker Creek would provide an opportunity for nature trails, education and interpretation opportunities, and a natural playground.
- Possible three season shelter is highly desirable for the community.
- Circular multi-use path around the perimeter of the development would be an opportunity.

Chapter 1177 - Worthington Design Guidelines and Architectural District Ordinance

This property is located within the Architectural Review District and as such is subject to the Architectural District Code (Ordinance) and the Worthington Design Guidelines. The Design

Guidelines contain the following recommendations for new commercial/institutional and new residential construction in the parts of the District outside of Old Worthington:

New Commercial/Institutional Sites

1. Scale, Form & Massing: Extension of the pleasant scale of Old Worthington into new areas is desirable. Consider breaking down larger buildings into a series of smaller masses with connectors between them. Inclusion of sidewalks, pedestrian-scaled signage, and planting and lawn areas will help communicate a sense of a walkable pedestrian scale. Simple geometric forms and uncomplicated massing tend to make buildings more user-friendly and help to extend the character of Old Worthington into the newer development areas. Carefully designed building facades that employ traditional storefronts -- or similarly sized windows on the first floor -- will help make new buildings more pedestrian-friendly.

2. Setbacks: Parking areas should be located toward the rear and not in the front setbacks if at all possible. Unimpeded pedestrian access to the front building facade from the sidewalk should be a primary goal. Building up to the required setback is desirable as a means of getting pedestrians closer to the building and into the main entrance as easily as possible.

3. Roof Shape: Generally, a traditional roof shape such as gable or hip is preferable to a flat roof on a new building. Roof shapes in a development do not have to be identical but can vary – just as in Old Worthington – to provide visual variety. Roof shapes should be in scale with the buildings on which they are placed. Study traditional building designs in Old Worthington to get a sense of how much of the facade composition is wall surface and how much is roof.

4. Materials: Traditional materials such as wood and brick are desirable in newer areas, but other materials are also acceptable. These include various metals and plastics; poured concrete and concrete block should be confined primarily to foundation walls. Large areas of glass are appropriate for the first floors of new buildings, where they resemble the commercial storefronts typical of older buildings. On upper floors, avoid large areas of glass in favor of a more traditional pattern of window openings spaced regularly across the building's wall. Avoid any use of glass with highly reflective coatings. Some of these may have a blue, orange, or silver color and can be as reflective as mirrors; they generally are not compatible with other development in Worthington. Before making a final selection of materials, prepare a sample board with preferred and optional materials.

5. Windows: On long facades, consider breaking the composition down into smaller "storefront" units, with some variation in first and upper floor window design. Use traditional sizes, proportions and spacing for first and upper floor windows. Doing so will help link Old Worthington and newer areas through consistent design elements.

6. Entries: Primary building entrances should be on the street-facing principal facade. Rear or side entries from parking lots are desirable, but primary emphasis should be given to the street entry. Use simple door and trim designs compatible with both the building and with adjacent and nearby development.

7. Ornamentation: Use ornamentation sparingly in new developments. Decorative treatments at entries, windows and cornices can work well in distinguishing a building and giving it character, but only a few such elements can achieve the desired effect. Traditional wood ornamentation is the simplest to build, but on new buildings

it is possible to use substitute materials such as metal and fiberglass. On brick buildings substitute materials can be used to resemble the stone or metal ornamental elements traditionally found on older brick buildings. As with all ornamentation, simple designs and limited quantities give the best results.

8. Color: For new brick buildings, consider letting the natural brick color be the body color, and select trim colors that are compatible with the color of the bricks. It may be acceptable to paint new brick walls. Generally, lighter colors should be used for this purpose, with darker colors for trim. Prepare a color board showing proposed colors.

9. Signage: Keep and repair any historic signage that is appropriate to the Architectural Review District. While the regulations permit a certain maximum square footage of signs for a business, try to minimize the size and number of signs. Place only basic names and graphics on signs along the street so that drive-by traffic is not bombarded with too much information. Free-standing signs should be of the "monument" type; they should be as low as possible. Such signs should have an appropriate base such as a brick planting area with appropriate landscaping or no lighting. Colors for signs should be chosen for compatibility with the age, architecture and colors of the buildings they serve, whether placed on the ground or mounted on the building. Signs must be distinctive enough to be readily visible, but avoid incompatible modern colors such as "fluorescent orange" and similar colors. Bright color shades generally are discouraged in favor more subtle and toned-down shades.

10. Sustainability: The City of Worthington and its Architectural Review Board are interested in encouraging sustainable design and building practices, while preserving the character and integrity of the Architectural Review District. Energy conservation methods are encouraged. Landscape concepts often complement energy conservation and should be maintained and replenished. Utilize indigenous plant materials, trees, and landscape features, especially those which perform passive solar energy functions such as sun shading and wind breaks. Preserve and enhance green/open spaces wherever practicable. Manage storm water run-off through the use of rain gardens, permeable forms of pavement, rain barrels and other such means that conserve water and filter pollutants. Utilize solar panels where appropriate that meet the guidelines outline in the Design Guidelines. Bike racks and other methods of facilitating alternative transportation should be utilized. Streetscape elements should be of a human scale. Make use of recycled materials; rapidly renewable materials; and energy efficient materials. Use of natural and controlled light for interior spaces and natural ventilation is recommended. Minimize light pollution.

New Residential Sites

1. Form, massing and scale: New structures should complement the form, massing, and scale of existing nearby structures. Also, building placement and orientation are important design considerations. Most main entrances should face the street and garages should avoid facing the street.

2. Setbacks: Observe the setbacks of adjacent and nearby structures.

3. Roof: Roof shapes for new buildings should be appropriate to the style or design of the building. If a new building does not follow a particular style but is instead a vernacular design, then roof shapes and heights similar to those in the neighborhood or nearby would be most appropriate.

4. Materials: Contemporary materials that simulate traditional ones are appropriate, but the preferred option is to use true traditional materials such as wood siding. Incompatible contemporary materials should be avoided. Brick has long been a traditional material in Worthington. Prepare a sample board for review by the Architectural Review Board.

5. Windows: For new buildings, multiple-paned windows generally are not appropriate. The exception is a building being built in a particular style -- such as Federal, Greek Revival or Colonial Revival -- that would have employed this window type. When in doubt, simple 1 over 1 double-hung sash windows are usually the simplest, least expensive and most appropriate choice. Using the excellent precedents of Worthington's many historic structures, carefully design the pattern of window openings; window sizes and proportions (they must be appropriate for the size and proportions of the wall in which they are placed); pattern of windowpanes and muntins; and trim around the windows. Good quality wood windows are readily available and more affordable than in the past. True wood windows are always the first preference. Aluminum- or vinyl-clad windows can be appropriate, but primarily on secondary facades and less conspicuous locations. All-aluminum or vinyl windows are not prohibited but are not encouraged. Avoid blank walls.

6. Entries: As with other design considerations, study Worthington's rich collection of 19th and 20th century architecture for design ideas for entrances and doors. For newly built buildings, simpler designs usually look better than more ornate ones. Avoid heavy ornamentation on doors and entrances. Observe entry placement on existing buildings. Whether located symmetrically or asymmetrically, entries usually are aligned with a window on the second floor so that a regular rhythm of openings is maintained on both floors. Entries should be located so they are easily visible, and they should be oriented toward the street.

7. Ornamentation: Observe Worthington's excellent historic architecture for information on the kinds and amounts of ornamentation employed on various building styles and periods. Use ornamentation conservatively. It will be most successful if used in traditional locations: around windows and doors; along a building's cornice or at the corners; in gables; or on gates and fences. Most ornamentation historically was made of simple forms built up to a desired level of complexity. When in doubt, follow the old rule that "less is more." Sometimes just a little ornamentation, well placed, can have a major impact without the need for more extensive (and expensive, and hard-to-maintain) ornamentation. Use compatible materials in ornamental elements. Frame houses should have wood ornamentation, although in cases where the ornamental elements are some distance from the viewer it may be possible to use substitute materials such as fiberglass.

8. Color: In general, avoid bright colors not typical in Worthington neighborhoods, such as various shades of purple or orange. For infill buildings being placed in an existing streetscape, select colors compatible with those already used along the streetscape. Many buildings follow a pattern of light colors for the building body and darker colors for the trim. Following this pattern is encouraged. In Worthington, the use of white or cream-colored trim also is common and would be appropriate for

new construction. Avoid using too many colors. Usually one body color and one trim color are sufficient.

9. Landscaping: Worthington's mature shade trees are the primary landscaping feature throughout the community. They are a major contributor to its character and help define its neighborhoods as stable, desirable places to live. In general, lawns are generous but not overly large, which contributes to the sense of human scale that is one of Worthington's important attributes. Other landscaping elements tend to be properly scaled and well-tended, which also tends to enhance neighborhood character. Maintain and nurture mature trees to prolong their lives. Plant and maintain street trees in planting areas between the street and sidewalk. Paving can sometimes reduce water absorption of the soil so much that trees do not get the moisture they require.


Chapter 1177.05 Standards for Review: Certificate of Appropriateness

**1177.05 Standards for Review: Certificate of Appropriateness**
The Board of Architectural Review, in deciding whether to issue a certificate of appropriateness, shall determine that the application under consideration promotes, preserves and enhances the distinctive historical village character of the community and would not be at variance with existing structures within that portion of the district in which the structure is or is proposed to be located as to be detrimental to the interests of the Districts as set forth in Section 1177.01. In conducting its review, the Board shall make examination of and give consideration to the elements of the application including, but not necessarily limited to:

(1) Height, which shall include the requirements of Chapter 1149;

(2) Building massing, which shall include in addition to the requirements of Chapter 1149, the relationship of the building width to its height and depth, and its relationship to the viewer's and pedestrian's visual perspective;

(3) Window treatment, which shall include the size, shape and materials of the individual window units and the overall harmonious relationship of window openings;

(4) Exterior detail and relationships, which shall include all projecting and receding elements of the exterior, including but not limited to, porches and overhangs and the horizontal or vertical expression which is conveyed by these elements;

(5) Roof shape, which shall include type, form and materials;

(6) Materials, texture and color, which shall include a consideration of material compatibility among various elements of the structure;

(7) Compatibility of design and materials, which shall include the appropriateness of the use of exterior design details;

(8) Landscape design and plant materials, which shall include, in addition to requirements of this Zoning Code, lighting and the use of landscape details to highlight architectural features or screen or soften undesirable views;

(9) Pedestrian environment, which shall include the provision of features which enhance pedestrian movement and environment and which relate to the pedestrian's visual perspective; and

(10) Signage, which shall include, in addition to requirements of Chapter 1170, the appropriateness of signage to the building.

(11) <u>Sustainable Features</u>, which shall include environmentally friendly details and conservation practices such as solar energy panels, bike racks, and rain barrels.

<u>Chapter 1174 - Planned Unit District - PUD</u>
The PUD: Planned Unit Development chapter of the Codified Ordinances includes the following purpose statement:

> The purpose of Planned Unit Development is to promote variety, flexibility and quality for the development of properties in the City of Worthington. Planned Unit Development allows for more creative planning and design and enables a greater range of uses than traditional Zoning regulations. Planned Unit Development allows for the design and mix of uses necessary to meet changing economic and demographic demands; permits implementation of development standards, plans, studies, and guidelines adopted by the City Council; and provides the opportunity to retain and enhance the character of the City, and the health, safety and general welfare of the inhabitants.

The chapter goes on to provide additional detail regarding PUD provisions, uses, standards, submission requirements, procedures, natural features and coordination with other provisions of the Planning and Zoning Code, which can be found in <u>Chapter 1174</u> of the Codified Ordinances of the City.

**Staff Comments/Analysis**
Staff has focused on broad discussion topics in this section and compared them to the language in the 2014 Comprehensive Plan Update to manage the initial review of the applications and materials. City staff comments/analysis included below is our interpretation of the materials provided. A full review of the detailed criteria in Chapter 1174 PUD Planned Unit Development is still needed and could not yet be completed due to the limited information available from the applicant.

*Discussion Topics:*
- Residential Density, Height & Housing Types
- Mix of Land Uses
- Greenspace/Open Space/Parkland
- Traffic/Connections
- Bicycle & Pedestrian Accommodations

*Residential Density, Height & Housing Types*
The overall density proposed on the site has been reduced by approximately 19% from 730 units to 600 units, however the density is still higher than the 2015 proposal and there is less acreage involved. The 2015 version included more acreage and High St. frontage that has since been sold. The overall site has been reduced by 3.4-acres and 428± feet of road frontage. The 2015 density discussed was 14 units/acre on 41.22-acres and is now 15.95 units/acre on 37.8-acres. The 2015 version was presented at a meeting that had over 350 people attend, and overall, the community was not supportive of the previous density, layout

and amount of usable open space and this proposal still has 29 additional units with less acreage than the 2015 proposal.

The applicant proposes a mix of for-sale and for-rent products throughout the site that include a mix of floorplans. The mix of floor plans has only few options for single-level living, which is one of the key things we have heard from our residents that they would like to see offered in the community.

The overall density should be dramatically reduced to better reflect what is recommended in the Plan and by the community. The variety of housing types should also be re-considered to address the variety of housing options needed and desired in the community.

*Worthington Estates Edge*
This area is identified in the 2014 Comprehensive Plan Update ("Plan") as a transition zone between the existing single-family housing to the west and north and application proposes single-family residential development on lots between a third-of-an-acre and a fifth-of-an-acre. Staff's review noted the proposal is generally consistent with the density recommendations found in the 2014 Comprehensive Plan Update with the following comments:
- The rear yard setbacks abutting the existing residential to the west should have a rear yard setback of 30-feet and the lots fronting on Longfellow Ave. should have a front yard setback of 30 feet to match the existing required setbacks of those homes found in Worthington Estates.
- Landscaping and buffers are key between the UMCH focus area and the neighboring residential.
- First-floor living opportunities are important to Worthington residents.
- Custom-built, individualized homes are desired according to the Plan and recommended to not have repetitious floor plans.
  - The previous submittal referenced a partnership with Bob Webb Homes. The previous application submitted a sample of 4-home plans that would be built by Bob Webb Homes with the caveat that the house models with the same footprint may be allowed under certain circumstances.
    - Not referenced, however information for this most recent will be required in the future for review.
  - The Plan states that architecture and design should be rich and varied (not repetitive/homogeneous) with great attention to detail.
- The Residential Design Guidelines provide guidance on site development, form, massing, scale, setbacks, roof shape, exterior materials, windows, entries and color.
- The Worthington Estates Edge would remain in the Architectural Review District.

*Neighborhood Core*
The Plan recommends this area for higher density residential development that creates a transition from the single-family homes along the periphery of the site to the more active uses proposed closer to High St. The recommendation in the Plan is for 6-14-units/acre with a height of 3-stories with more than one housing type at more than one density with

appropriate open space associated with the proposed density. Staff has the following comments:

- The applicant is proposing an overall density of 11.3-units/acre in this area with a for sale and for rent product that is 3 stories in height. Some units will have a garage and finished lower level.
- Residential development in this area of the site is recommended in the Plan at 6-14 units/acre with more than one housing type and at more than one density level. The proposed 11.3-units/acre does not incorporate a true mix of housing options. This area should provide a mix of residential living that is underrepresented in the Worthington market and addresses the needs of aging residents, future young professionals, and those desiring amenity-rich living.
- The 2015 proposal from Lifestyle Communities expressed a mix of estate lots, cottage lots, manor lots and townhomes on the site at approximately 178-units for 13-units/acre; however, the community comments received on that proposal indicated the density and product was not what the community wanted to see on the site.
- The 2020 proposal from Lifestyle Communities expressed a mix of smaller estate lots, townhomes, and flats at approximately 12-units/acre; however, the community comments received indicated the density and product was not what the community wanted to see on the site.
- Subarea #2 and subarea #3 are proposed to develop at different densities with a minimal mix of styles, however, there appears to be minimal units that provide single-level living.
  - Single-level living is one of the things the City has heard is desired by residents and is not abundantly provided for in this proposal.
- The Plan notes that this area creates the opportunity to introduce different types of housing options that are not available in the City.
  - Townhomes are the only housing option offered in this location besides a few single level living flat options.
- The northern portion of the Neighborhood Core (subarea #2) has been identified in the proposal as townhomes at 3 stories in height with garages that will be a for sale product.
  - This for sale product would serve as a transition from the detached single-family lots to the west and north to the rental products proposed to the south and east towards High St.
- The Comprehensive Plan recommends a mix of single-family detached homes on small lots with alley garages, homes with great front porches for outdoor gathering, custom homes designed for first-floor living, luxury residences with integrated auto courts, well-appointed walk-up townhomes, and a limited number of high-end flats.
- The southern portion of the Neighborhood Core (subarea #3) has been identified as townhomes at 3 stories in height with some units having attached garages and are a for rent product. This subarea #3 does appear to offer a limited amount of single level living options and is at the maximum density recommended in the Neighborhood Core.
- The rental product located in the southern portion of the Neighborhood Core (subarea #3) does not have a mix of housing types that included detached homes on

small lots with rear alley garages and front porches as referenced in the 2014 Plan.
- The application states that the total amount of public/private open space is approximately 1.3-acres in size, however there are only a few areas that are reasonably sized areas of open space in the Neighborhood Core. The areas shown are proposed for recreation, pavilion, seating area and other small green spaces between the townhomes and space at the end of buildings.
  - o The Plan recommends the creation of park space for the community and public enjoyment as an important component for any development on the site in addition to the area identified as the Tucker Creek Preserve.
  - o Park space is critical to providing place-making in development layouts.
  - o The proposed open space is an improvement over the previous proposal as it creates a linear green from High Street to the interior of the site to a neighborhood green.
    - ▪ This is a positive improvement towards meeting the goals found within the Plan.
  - o The proposed open space does not seem to meet the goal of creating contiguous usable open space for those living in this development and in all of Worthington. The proposed green space does not appear to build upon the green space that is identified as the Tucker Creek Preserve.
  - o The Plan calls for several acres of park space between the High Street Mixed Use and Neighborhood Core zones.
  - o According to the Plan, park space and amenities should increase with density and should be useable, contributing ground for residents, workers, and visitors to the site. Some areas shown appear to be squeezed in to provide open space. There is also an area identified for stormwater control, which is identified in the Plan as the type of ground that does not meet the park space goal, however stormwater management is critical for any development on the site.
  - o The Plan and the community have asked for additional park space with amenities within the UMCH site. At this time, it does not appear that the proposed green space meets the need for usable contiguous open space that can build upon the Tucker Creek Preserve as described in the Plan.

*High Street Mixed Use*
This area consists of the frontage of the UMCH site along High St. and is recommended in the Plan for a mix of office, residential, and retail uses with the focus on commercial office and medical uses with subordinate residential and limited retail uses. Staff has the following comments:
- The proposed 420 apartments with access to a proposed parking garage in this area does not appear to meet the intent of being subordinate residential.
- The apartments range in height of 4-5 stories in height with some buildings having first-floor retail.
- The location and height associated with the northern building (Building A) has been pulled away from Longfellow Ave. and Larrimer Ave.
  - o The increased setback, reduced height and gateway green helps to buffer the

proposed building from the neighboring residential uses to the northwest.
- This is a positive improvement towards meeting the goals found within the Plan.
    - The 4-story parking garage will be completely wrapped by the building and will have access from Larrimer Ave.
        - This is a positive improvement towards meeting the goals found within the Plan.
        - Access to the parking garage is provided from Larrimer Ave, however a secondary access should be discussed to provide easier access to the parking garage from the proposed new roadways.
- The location and height associated with the southern building (Building B) has been adjusted to be closer to the southern property line.
    - The setback along the southern property line has not been identified at this time, however, this information will be required in the future for review.
    - The 4-story parking garage will be wrapped on three sides.
        - The southern elevation of the parking garage will need to be addressed in the future as Worthington requires four-sided architecture.
        - Access to the parking garage is provided from the new roadway on the west side of southern building (Building B).
- There appears to be approximately 1.7-acres of open space along a linear green, trail connection and a gateway green.
- The amenities associated with the apartments are now separated from the communal open space, and the amenities are now screened by the apartment building and the medical office building along High Street whereas the previous version had the amenities adjacent to the Longfellow Ave. right-of-way.
    - This is a positive improvement towards meeting the goals found within the Plan.
- The 2015 version expressed a mix of medical office buildings, first-floor retail, and apartments at 350-units. Many community members previously stated that they felt that 350 apartments were too much on the site, however today we have 420 apartments proposed with less usable acreage.
- The site is 3.42 acres smaller with less High St. frontage and the apartment count is still 70-units higher in the area along High St.
- Residential use should be subordinate to the primary need for commercial office and medical uses in the High-Street Mixed-Use zone.
- According to the Plan, where the High Street Mixed Use is opposite existing single-family residential, it is expected that the new development will consist of residential development and/or substantial attractive buffers.
    - The apartments are now 4-stories in height towards the intersection of Larrimer Ave. and Longfellow Ave. and the buildings have been pulled away from the intersection and a gateway green has been proposed that provides an additional buffer to the residential to the northwest.
        - This is a positive improvement towards meeting the goals found within the Plan.

***Mix of Land Uses***

As stated in the Plan, redevelopment on this site must create a high-quality, mixed-use development that is walkable, connected, and integrated within the site and with the City. This mix of uses should contain a range of residential types together with commercial office and neighborhood retail uses integrated with contributing and shared green space and amenities – all of which complement each other to create an active, vibrant place. Staff has the following comments:

- Commercial Uses:
  - The application proposes 24,000 sq. ft. of commercial retail/restaurant space and 96,000 sq. ft. of medical office space. The proposed square footages are a positive change from the previous proposal. Office uses are more consistent with the recommendations found in the Plan.
    - This is a positive improvement towards meeting the goals found within the Plan, however it still hasn't reached the desired expectations. The amount of office space is still small in comparison with the amount of residential proposed on the site.
  - Income tax generating employment uses such as office are critical to the fiscal sustainability of the City.
  - Neighborhood scale retail was recommended in the Plan due to the proximity of this site to Old Worthington and the Shops at Worthington Place as a means to not create a third retail center.
  - The Plan calls for a mix of office, residential and retail uses with the focus on commercial office and medical uses with subordinate residential and limited retail uses.
    - The residential uses are not subordinate to the commercial office and medical use recommendations for the site. The proposed retail square footage appears to be more in line with the recommendations found in the Plan.
  - As a fully developed community there are few opportunities to attract new Class A office tenants in Worthington that are seeking new construction. This site is key to attracting new office development.
  - According to the Plan, neighborhood retail can complement the development in the first floors of office and residential buildings, however an abundance of retail would be out of alignment with the needs of the City seeking more opportunities for new commercial office development.
- Residential Uses:
  - The proposal shows a total of 600-units on the site with a mix of housing types and are marketed as a rental product and a for sale product. There would be 492 rental units and 108 for sale units on the site.
    - The City has heard from the community that there is a desire for owner-occupied housing units and housing types as a means to age in place and stay within the Worthington community.
  - The 2015 proposal from Lifestyle Communities included more acreage and High St. frontage; however, it had a lower density than what is proposed today. The overall site has been reduced by 3.4 acres and 428± feet of road frontage.

The previous density discussed was 14 units/acre on 41.22 acres and is now 15.95 units/acre on 37.8 acres. Over 350 people attend a meeting on this 2015 proposal, and the community was not supportive of the previous density, layout and amount of usable open space and this new proposal has approximately 70 additional units with less acreage.

- ▪ The City has received over 320 online comments with the majority of the comments referencing the density is still too high on the site.

- o The Plan recommends a range of residential types together with office and neighborhood retail and shared green space and amenities designed to be sensitive to the neighborhoods adjacent to the site, and protect the natural features related to Tucker Creek.
- o The proposed number of units does not seem consistent with the Plan and what has been expressed by the Worthington community.

### Greenspace/Open Space/Parkland

The Tucker Creek Preserve has been identified in the Plan as an area to preserve as a natural green space amenity for the site and the community. The creek and the steep slopes are not developable, and the wooded areas are important contributing and environmental features. There is a strong desire to continue linking neighborhoods, parks, and destinations with multi-use trails throughout the City. The creation of park space for community and public enjoyment is an important component for any development on the site in addition to the Tucker Creek Preserve. Staff has the following comments:

- The 2019 Bicycle & Pedestrian Master Plan also recommends a multi-use path along High Street and sidewalks along the southside of Longfellow Ave.
  - o These recommendations will need to be incorporated into any streetscape improvements along High Street and development along the Longfellow Ave. frontage.
- There is an opportunity to have a bicycle and pedestrian connection between High St. and Evening St. and around the entire site that would promote additional bicycle and pedestrian opportunities and access to greenspace/open space on the site.
  - o Sidewalks are proposed throughout the site and a multi-use trail running throughout the Tucker Creek Preserve and a north/south multi-use trail running through the center of the site. The Plan's vision was to build upon the Tucker Creek Preserve's existing assets.
  - o This proposal appears to address some of the amenities that we have heard the community would like to see on the site, however the contiguous usable open space appears to be lacking.
- The 2017 Park Master Plan also recommends focusing on improving and maintaining existing park space, however as opportunities arise for additional park space as part of the UMCH site redevelopment the following should be considered:
  - o Natural spaces for passive recreation and the area along Tucker Creek would provide an opportunity for nature trails, education and interpretation opportunities, and a natural playground.
  - o Possible three season shelter is highly desirable for the community.
  - o Circular multi-use path around the perimeter of the development would be an

opportunity.

- Park space is recommended in the Plan to provide a place for community gathering functions and to provide place-making in the development's layout as well as a greenspace balance to the uses proposed on the site.
  - o Contiguous usable greenspace/open space is key to what the community expects to the see on the site.
- According to the Plan, the amount of greenspace/open space is expected to increase as the density on the site increases.
  - o This proposal does not appear to be in line with that recommendation.
- The Plan indicates park space should be useable, contributing ground for residents, workers, and visitors to the site and not stormwater ponds or left-over ground.
  - o Tucker Creek Preserve is proposed to have trails, entry pavilion, trailhead pavilion, and linear green space in subarea #3, however it still appears to be cut off from the rest of the site.
  - o A stormwater pond is proposed along the Evening St. frontage abutting the Tucker Creek Preserve.
    - There might be better ways to incorporate stormwater management on the site that would be an attraction and benefit to the development.
  - o The Plan envisioned a possible three season shelter house, outdoor amphitheater, multi-use paths and more passive recreational uses in the areas around and in the Tucker Creek Preserve. The materials provided indicate the desire to add additional amenities in the appropriate places on this site that the community desires.
  - o Overall access to the Tucker Creek Preserve has been improved by incorporating open space and a trail connection through the site.
    - Contiguous usable greenspace/open space is key to what the community expects to the see on the site.
  - o It is expected that greenspace/open space be incorporated into the Neighborhood Core and the High Street Mixed Use zones as park space useable by the community.
- The Tree Survey & Preservation Plan has been provided. There appears to be an opportunity to save some high-quality species of trees along the perimeter of the site, however, there does appear to be some high-quality species of trees in the center of the site that will likely need to be removed as part of any development. There might be the possibility to incorporate some of these trees into the overall design.

***Traffic/Connections***

The City originally requested an updated Traffic Study for the site, however until there is more consensus on the density and uses on the site we have asked the applicant to hold off on submitting an updated study. The previous Traffic Study was prepared in 2015, updated in 2017 and again in 2018. City staff felt that it was appropriate for an updated Traffic Study using previous traffic counts for the City since traffic patterns and volume have substantially changed since the pandemic. Staff has the following comments to the previous Traffic Study:

- Bicycle and pedestrian improvements could be better incorporated into the overall design.

- Public and private roadways proposed on the site.
  - o Wesley Blvd. has been proposed to become a public roadway and dedicated to the City for maintenance.
    - ▪ City staff has concerns about how this road was constructed and whether it was constructed to public road standards since it was originally constructed as a private road.
- Compliance with the City's Complete Street Policy will be required for all newly constructed streets.
- The need for vehicular, bicycle and pedestrian connections to the existing roadways at Evening St., Longfellow Ave., Larrimer Ave., Wesley Blvd. and High St. and proposed new roadways on the site should be further discussed and reviewed.
  - o Bicycle and pedestrian connections through the site as well as with the adjacent neighborhoods and uses are important to meet the City's goals of enhancing bicycle and pedestrian accommodations.
  - o Vehicular connections to Evening, Longfellow and Larrimer are extremely sensitive and will need careful evaluation for the amount of traffic that may utilize these connections. Any connections should be constructed so as to limit cut through traffic and negative impacts on the neighborhood.
    - ▪ An updated Traffic Study will eventually be needed.
- Improvements along High St. as proposed with the development and streetscape improvements associated with these improvements need further consideration.
  - o Streetscape improvements will need to be discussed and incorporated into the overall design.
  - o Multi-use path along High Street should be incorporated into any streetscape improvements.
- Intersection streetscape improvements at Larrimer Ave. and High St. will need to be discussed and incorporated into the overall design.
- There is a need to address the intersection of High St., Wesley Blvd, Worthington-Galena Rd. and Crandall Dr. as part of this development as it relates to traffic being able to go east/west through the intersection and to provide improved bicycle and pedestrian connections.

### *Stormwater*

Stormwater management will be extremely important as this site develops. The previous application identifies a wet detention basin along Evening St. and stormwater storage vaults and surface detention facilities located within the open spaces and parking areas on the site. The City and its consultant, ms consultants, will be reviewing the final stormwater design to ensure compliance with Ohio EPA standards and the City's Stormwater Manual as the project progresses. The stormwater design has been proposed to outlet to the existing Tucker Creek along the southern property line. Staff has the following comments:

- A comprehensive look at the entire site for stormwater will be needed that can be developed in stages as the overall site would likely develop in phases over multiple years.
- According to the Plan, stormwater controls should be aesthetically integrated into the site and be natural in appearance and serve as an amenity to the site. The current

proposal just has the detention pond located along Evening St. and the proposed new roadway to the site. Vehicular and pedestrian safety will need to be discussed concerning the detention pond.

- Sustainable and green infrastructure needs to be incorporated into the overall development as stated in the Plan.
- The Plan states the expectation that stormwater controls on the site will be required to meet or exceed all requirements.

### Architecture

The property is located in the Architectural Review District and any new construction will need to meet the Worthington Design Guidelines and would be subject to review by the Architectural Review Board. The Plan provides additional guidelines for residential and commercial development. The two parcels that are currently zoned R-10 fronting on Larrimer Ave. would need to be added to the Architectural Review District. Staff has the following comments:

- Residential Development:
  - As the Plan states, architecture and design should be rich and varied (not repetitive/homogeneous) with attention to detail.
    - Once there is more agreement on density and layout on the site, architecture will be very important on the site and will require four-sided architecture throughout the development.
    - All proposed materials should follow the Worthington Design Guidelines.
    - The applicant has stated that the renderings provided in the application are just examples, and not intended to be the final design.
    - There are additional Residential Design Guidelines called out in the Plan and the Plan notes development should adhere to the Worthington Design Guidelines.
- Commercial Development:
  - The Plan notes the Worthington Design Guidelines provide guidance on site development, scale, form, and massing, setbacks, roof shape, materials, windows and signage. The Plan further states development should improve the pedestrian scale and walkability of the City's commercial heart and create four-sided architecture that is attractive on all sides. Building forms, materials, and setbacks should be consistent with historic patterns.
    - The southern building (Building B) parking garage appears to be exposed to the southern end.
      - Four-sided architecture will be required.
      - Setbacks from the southern property line should be discussed.
    - The scale, form and massing of Building B appears out of character for the portion of the building extending towards High Street.
    - The applicants has indicated the elevations provided are just examples, however the overall design and the scale, form and massing of the site will need to meet the intent of the guidelines.
    - Elevation examples were not provided for the medical office building

along High St., however the applicant previously stated that the buildings will have a setback of 25-feet from the public right-of-way.

- A setback of 25-feet is recommended; however, the street frontage should be activated and have usable entries according to the Plan.
- A multi-use path is also recommended along this portion of High Street.

- Streetscape improvements will need to be discussed at some point in the process. This would include new mast arms at Larrimer Ave. and High St. streetlights, street trees, landscaping, pedestrian sidewalks and/or paths.
- The small surface parking lot north of the northern building (Building A) will be required to be screened.
- There are additional Commercial Design Guidelines called out in the Plan that reference the Worthington Design Guidelines that should be considered.

**Miscellaneous:**
The UMCH Development Update is available at worthington.org/umch project page on the City's website offers the following additional information:

- Applications & materials associated with the current proposal.
- Ways to learn more about the proposal and understanding the rezoning and development review process while explaining what a PUD is.
- Ways to provide feedback throughout the public process.
- What are other people saying in the community. We have posted all comments at (UMCH Public Comments) or go to worthington.org/umch to view all comments. All comments are posted to the website and have been shared with the Board & Commission members and are now part of the record.
- UMCH Background Materials
- Notify Me – Gives you the opportunity to receive updates by email when there is new information available.

**ATTACHMENTS**
- Ordinance
- Exhibit A, Exhibit B & Exhibit C
- Application & Materials
- October 14, 2021, Meeting Minutes



## MINUTES OF THE SPECIAL MEETING
## WORTHINGTON ARCHITECTURAL REVIEW BOARD
## WORTHINGTON MUNICIPAL PLANNING COMMISSION
### June 29, 2015

The special meeting of the Worthington Architectural Review Board and the Worthington Municipal Planning Commission was called to order at 6:52 p.m. with the following members present: Richard Hunter, Chair; Kathy Holcombe, Secretary; Mikel Coulter; Amy Lloyd; and Edwin Hofmann. Also present were: Scott Myers, Worthington City Council Representative for the Municipal Planning Commission; Lee Brown, Director of Planning & Building; Lynda Bitar, Planning Coordinator and Clerk of the Municipal Planning Commission; and Melissa Cohan, Paralegal. James Sauer, Vice Chair; and Thomas Reis were absent.

Mr. Hunter called the meeting to order at 6:52 p.m., and all present recited the Pledge of Allegiance. Mr. Hunter explained that this evening's event was just an informational meeting only concerning the United Methodist Children's Home (UMCH) property and the preliminary concept by the developer, Lifestyle Communities. He introduced the guest speaker David Fisher, who is the founding principal of Kephart Fisher LLC, who is representing their client Lifestyle Communities.

Mr. Fisher said that he is a past Board member and past Chair for the United Methodist Children's Home, and he currently serves on the Board of Wesley Family Services located in Worthington, Ohio. Mr. Fisher explained that there are not any back room deals and that is not how they do business. He introduced other members of the Lifestyle Communities team that he brought with him: Mr. Michael DeAscentis, the founder and chairman of Lifestyle Communities, Mr. Chase Miller, who is in charge of land planning, and design, Mr. Anthony Lococo, also part of the land planning and design team, and Ms. Maria Gargrave, who is in house counsel for Lifestyle Communities.

Mr. Fisher said that they have a special website set up so people can view the presentation online. Updates will also be posted on the website (www.umchdevelopment.com or as an email feedback@umchdevelopment.com). The City of Worthington also has a link on their website. Mr. Fisher said that they will continue to keep an open dialogue while working with the Board members, city administration and the public.

Mr. Fisher said that he was glad to see a standing room only crowd. The number of people from the community that are in attendance, shows how important this project is to you. He said this project is also important to UMCH and Lifestyle Communities, so their hope is to be able to work together to find some common ground, and find a way to move forward together on this very important and strategic piece of property in the City of Worthington.



EXHIBIT

SS

PENGAD 800-631-6989

Worthington 003468

Mr. Fisher outlined what he wanted to accomplish at the meeting. He wanted to demonstrate their continued efforts to have a dialogue with the city administration, the Municipal Planning Commission and Architectural Review Board, and with the citizens of Worthington. Mr. Fisher said that he also wanted to provide some background and history of the United Methodist Children's Home.

The United Methodist Children's Home has owned land in this area for over one hundred years. The land extended from Dairy Queen to Shoedinger's on the west side of High Street and went all the way to the river. Back in those days the Children's Home was an orphanage that took care of children from broken homes and their mission was to teach the children how to be farmers or housewives. The boys would be sent out in the morning with a hoe and make a row that went all the way down to the river. They would jump in the river for a swim, and then make another row on their way back up to the house. He said that UMCH's mission has changed a little over the years but their main focus is primarily to serve children in need. UMCH has been a responsible member of the Worthington Community for over one hundred years, they are today, and they will remain a responsible member of the community in the future. They are not just selling off the land to take the money and run. Their sole member is the United Methodist Church, the west Ohio Conference, who has their headquarters at that site, and will continue to remain to have their headquarters there. UMCH is very concerned about how this site is going to be developed, and how the Methodist Church is treated in that process with respect to the church's headquarters remaining on that site.

Mr. Fisher said that when he joined the UMCH Board about ten years ago, this land was viewed as Holy ground, never to be sold by the Children's Home. At that time, UMCH had a very active residential treatment program. UMCH has owned that land for over a hundred years, and people could not have imagined that UMCH would ever dispose of the land, but things change. He said that the local community was part of that change. Many of the nearby residents were troubled by the events that occurred a few years ago when some of the children in the treatment program got out into the nearby neighborhood and caused some personal injury and harm. He said UMCH completely understood those concerns, but as a social service agency, they had to live by the rules, and could not lock the children indoors. Some of the residents spoke up in the community and some called the state social service agency and said that these problems cannot continue. There was a huge community outcry, and when that occurred, UMCH conceded to those demands, they did not challenge that decision, they accepted the will of the community, and decided that they would no longer serve as a residential treatment facility. That decision put a series of events in motion because UMCH no longer needed that acreage. Children were no longer being served, and the buildings are very costly to maintain. Something had to change. In 2008, UMCH consulted with some developers, and were working on a project for about eight months, but because of the downturn in the economy the developer decided they did not want to proceed. Mr. Fisher said that they went back to the drawing board and that is when more consultants were hired to come up ideas. Nothing happened until UMCH was approached by Continental Realty and they said that they wanted to buy the land. Mr. Fisher said that UMCH held a public meeting such as this one, and after that meeting, Mr. Cass decided that he did not want to proceed with building a Giant Eagle on this site. He said it was an open process throughout and this will be an open process this time.

Worthington 003469

City officials asked UMCH to put things on hold while they proceeded with a community wide process and come up with a comprehensive plan designed only for the UMCH property to determine how your property should develop. UMCH officials said okay, and they went off the grid for a few years while the city went through this public process to come up with a comprehensive plan. He said that he understood that there are a few people in the room that do not agree with the comprehensive plan, but all groups are working together to come up with a plan. Several developers had contacted UMCH during this process while they were asked to stand down while the community went through this process. Around the time this comprehensive plan was adopted, Lifestyle Communities contacted them to say they did not just want to be their developer, they want to own the property, and they had some exciting commercial medical users that they would like to bring to the City of Worthington. He said that they all share common ground, and all parties want what is best for Worthington. This ground needs to be developed in a manner that will strengthen the social fabric and the economic base of the City of Worthington while preserving its unique history and culture. Both UMCH and Lifestyle Communities want to be respectful of the community's views and opinions and they hope to receive the same in return while working through this process together.

Mr. Fisher said that he wanted to touch on economics while he had the podium. How this property is developed will have a significant impact on the tax base for the City of Worthington and its schools. This is property that has not seen much tax paid on it. Depending on how this property is developed, it can either put a lot of children in the schools, or it may not put a lot of children in the schools. The less children that go in the schools, and the more tax dollars to the schools that is a win-win situation for everybody. If this property is developed as it is proposed, there will be a significant increase in the amount of income tax dollars to the City of Worthington from high income individuals that will be working in Worthington on that site in the medical profession that will add stability and longevity to the current tax structure in the City of Worthington.

Mr. Fisher said that he wants people to understand, that while he is wearing his UMCH hat, he has to talk about where UMCH is going from here. This project has had an incredible impact on their mission as a social service agency. This is just a real estate deal. He wants people to understand that when newspaper articles come out negative about the UMCH site and all these terrible things that are about to occur, it has an impact on the families that they serve and an impact on the social service network that works with them and refers children to them. They do not see a difference between a real estate deal in Worthington, Ohio and the social services that UMCH provides. He asked the audience to please keep that in mind when they choose to make public comments in newspapers. UMCH is very proud of their mission and accomplishments. Every dollar that comes out of this sale will go back into their mission of helping hurting children and their families and that is not going to change, and he asked everyone to keep that in mind. There are no timelines at the moment. UMCH plans to continue working with everyone for a while to determine what the real issues are and what the best way is to develop this property before an application is filed and that process begins.

Mr. Fisher introduced Mr. Chase Miller, the head of land development for Lifestyle Communities (LC), who is going to give a presentation on the exact plan. Mr. Miller thanked everyone for their

Worthington 003470

time and for the opportunity to be a part of their community. The plan he presented consisted of a mix use, traditional or village style, walkable plan. Mr. Miller said he was going to give the audience a little bit of background information on LC, the developer, the Worthington Comprehensive Plan, and the plan that LC is proposing which is preliminary in nature.

Mr. Miller said that he first wanted to discuss some background information about LC. LC was started over seventeen years ago in central Ohio by Michael DeAscentis, Sr. & Jr., where they are still headquartered. Since that time they have developed over 10,000 multi-family and single family homes, both for sale and for rent. They are currently developing and operating a portfolio of over 5,000 multi-family units in three states and four markets. They have locations in Columbus, Louisville, Kentucky and Nashville, Tennessee. Mr. Miller said that LC is a build to own developer which means they do not build communities and walk away, they own and operate their properties on a long term basis.

LC has its own in-house development department, construction services, an in-house property management company, The Goat restaurants and fitness facilities. Their success has been largely driven by their development of townhouse style condominiums that were unique to the market at that time in 1998. They are proud to say that they survived the recession with their core values intact and employee over three hundred people. They were named by Columbus Business First as one of the Top 10 places to work, an honor that they have received for three consecutive years. Mr. Miller said they are excited about what they are planning today are mixed use walkable developments that include a full spectrum of housing like the plan that they are proposing tonight.

Mr. Miller said that empty nester housing market is still underdeveloped. Children have left home and homeowners would like to down size. Location is more important than ever and people want to live and invest in integrated communities. Their mission as a developer is to meet those needs with mixed use communities that deliver high quality housing and a high quality way of living. LC believes that the UMCH site is the perfect opportunity for this project.

Mr. Miller continued to discuss the background of the site, and that ten pages were added to the Comprehensive Plan. He reviewed three of the seven goals that are outlined in the plan, and discussed how they have hired professional design consultants to help them achieve those specific goals. Mr. Miller said that this presentation will be available after this meeting on their website.

Mr. Miller began showing the actual plan, and said he would give more detailed information while going forward with the presentation. There are 571 residential units in total shown on the plan. There is also a medical office, mixed use retail and some additional office space, which makes up an urban style of development which will attract young professionals and empty nesters. Mr. Miller also discussed where the three traffic signals would be located, where the connection to Evening Street will be and traffic patterns in great detail in relation to connectivity.

Mr. Miller went on to discuss the breakdown the sight into four zones which is called for in the comprehensive plan. The single family homes near the Worthington Estates edge would be custom built by different builders, subject to the Architectural Review Board, and part of a homeowners association. LC will only be developing the land for those homes, and the lots would sell for between $150,000 to $200,000 each. LC will specify to the custom builders that the homes are to

Worthington 003471

be built on 1/3 to 1/5 acre lots and with 1 ½ to 2 ½ stories. The completed value of the homes will be between $750,000 to $950,000 dollars. Mr. Miller presented a rendering of the area to show to the audience.

Mr. Miller next discussed the transition zone of the property, which is in the middle of the development. He said that the comprehensive plan calls for high density in the area with 8 to 14 units per acre, and they are planning for the lower number of units in that area, which would amount to approximately 250 homes in that area. The cottage style of homes would be between 1 ½ and 2 ½ stories, and there would be a set number of floor plans to choose from. One third of those plans would be targeted for empty nesters. These homes will be built as soon as they are purchased they will not be built out ahead of time. He also described the town homes and those would be 2 ½ to 3 ½ stories high.

Mr. Miller reviewed the NDRC report, which was developed with the help of the Mid-Ohio Regional Planning Commission (MORPC), which discussed metropolitan area trends. What this plan discussed was the shift in housing demands. The families of the nineties that wanted larger single family homes and accounted for about 78% of that market, will only make up about 22% of that market between now and 2030. There is a trend for more empty nester housing.

The High Street zone was discussed next, which would consist of 350 apartments and a hand full of locations for office space. The headquarters for UMCH church offices would also be located in this area, with 20,000 to 30,000 sq. ft. The apartments will be on the higher end of the price range, anywhere from $1,100 to $1,600 dollars per month.

The next slides depicted an area inside Walt Disney World, which Mr. Miller said was the happiest place on earth. What people do not realize is that the main buildings in Disney are just front facades with mechanicals hidden back behind where people cannot see them, which would be similar to the High Street development. The parking garages would be hidden behind the structures that would be built along High Street. Mr. Miller reviewed the commercial guidelines from the comprehensive plan. He also discussed the amenities package that would be available such as a fitness facility and a restaurant called The Goat. The fitness studio will have different types of group fitness classes such as spinning and Pilates.

Mr. Miller also discussed the four park areas that would be located throughout the site. He mentioned a non-profit organization that works on projects for public spaces and they have concluded that in order to do place making, there are four qualities that great parks must have. Parks must be accessible, people are engaged in activities there, the place is comfortable and has a good image, and it's a sociable place, where people come together and visit. All of these components will be available in their park spaces. He further discussed the importance of walkability within the development. Mr. Miller discussed a book called "Walkable City", written by Jeff Speck, who describes his theory of walkability. Walkable cities are much more sustainable, more successful economically, and better for us in terms of our health. In order for walkability to exist there are four key components that must exist. The walk must be useful, safe, comfortable and interesting. Mr. Miller described how each component fit into their project and demonstrated examples. Mr. Miller thanked everyone for their time and listening to the presentation.

Worthington 003472

Mr. Hunter explained that the question and comment portion of the meeting would be next.

Ms. Beth Mitchell of 58 Larrimer Ave., Worthington, Ohio. I am representing the WARD planning group who greatly appreciates UMCH, LC, and the City for hosting this meeting to share potential development plans of the UMCH property. WARD is a citizens group that was formed in 2012. Their mission statement identifies their goal as to ensure that the development of the UMCH property is done responsibly, with the consideration of benefits to the citizens. Over the past three years, WARD has been actively engaged in the process of the development of the property. WARD understands the need of UMCH to sell the property, and WARD believes that there is an obligation to the community regarding the development of the property. WARD's request is that the developer and UMCH consider what is developed and how it will affect the community long term even after UMCH and the developer are less engaged than they are today. They continue to believe the importance of open communication between the citizens of Worthington, UMCH, LC, and the City. This is a legacy piece of property in the main section of Worthington, forty-two acres which is mostly green space. Once asphalt or concrete is poured there is no turning back. WARD has previously expressed concern over the lack of proposed green space, the housing density, and the traffic to be generated by the proposed streets. The City previously hired MKSK as a consultant for the development and they stated that a growing and surviving city needs to attract young professionals who want to live in rental properties instead of owning a home. Therefore, there is a believed demand for apartments, which is hot right now, as witnessed by all of the apartment projects popping up all over Columbus, but what about long term. We believe that there are a lot of young professionals or millennials, those born after 1983, who strongly disagree that millennials want to live in apartments in Worthington. Columbus Dispatch, on June 7th, 2015, referenced a new study that indicated 82% of adult millennials said that it is important to have an opportunity to own a home with a backyard. WARD believes a re-evaluation of what is needed for Worthington is necessary, does Worthington really need 350 new apartments. There is a lack of housing in Worthington for empty nesters who want to down size. A WARD survey indicated that most Worthington residents, 86%, were in favor of green space and other types of public uses. Citizens have spoken at City Council meetings and many residents have commented on WARD's Facebook page to voice their desire for more green space. WARD does not believe that it is appropriate for Tucker Creek acreage to be included in the count of green space on the UMCH property. It is very misleading to include that land as part of the green space. WARD is in favor of there being a larger amount of green space. If anyone would like more information about WARD please check out our website at www.wardworthington.org.

Ms. Susie Kneedler of 263 Weydon Rd., Worthington, Ohio. I would like to echo Ms. Mitchell's comments and would like to see more consultations with experts in urban forestry, and experts that have designed the parks in London, England, since LC spoke about examples of the parks in London, and how to have low density, more greenery, and one story senior housing. I believe that this will change Worthington forever and the city will not be able to handle the increased amount of traffic, smog, noise and pollution. I believe that more research is needed.

Mr. Benjamin Coifman of 625 Seabury Dr., Worthington, Ohio. This development will increase Worthington's population by 10% and increase the number of voting age adults by even more than

Worthington 003473

that. The 571 housing units would increase the number of houses in Worthington by even more than 10%. The LC development will consist of 60% rental units compared to Worthington's current housing stock which is under 20%. The density of the proposed rental units would be about ten times the current average of Worthington.

I am concerned that LC would only be developing the higher density units while the rest of the structures would be built by a third party developer. I am also concerned that the price of the new housing units would be double or triple the amount of the current homes in nearby neighborhoods, and if those housing units did not sell well, would LC then convert that area to high density rental units. Worthington has reason to be cautious with developers because there are several recent examples of speculated real estate developments that have fallen far short of the promise. Some of the planned condominiums became rental units and in another case only half of the buildings were actually built leaving prime real estate sitting vacant. These problems are not related to LC, they did a good job of maximizing the number of units according to the comprehensive plan. I believe the comprehensive plan is the problem, not the developer. I am also concerned about the amount of traffic that will be generated and spoke about the example of the Dublin-Granville Road area and how congested the area is near St. Rt. 315. How can a city attract young professionals with an area so congested with traffic? The UMCH property is not right for large developers. In LC response to WARD, they said that they would need to build a minimum of 570 units for the development to be viable. At a lower density, this area would be attractive to smaller developers offering fewer houses at a time. In the comments from LC responses to WARD they said that the values of the 21 1/3 acre undeveloped lots would sell for between $150,000 to $250,000 dollars apiece. If that developer cannot offer the type of development that the community wants then we need to figure out what kind of incentives are needed to attract the right developers to deliver what is appropriate for Worthington. I strongly suggest maintaining the existing ratio of rental to owner housing which is about 20%. One thing a large developer can bring is a large infrastructure, but that does not have to come from the developer. UMCH could pursue a special improvement district or similar that Worthington could use the additional income to pay for the roads and infrastructure as portions of the site are developed. Instead of having an abrupt change in the retail and office density the plan should provide retail and commercial space along High Street at a high density. The success of the retail development should not be dependent on having 550 high density housing units within a three block area.

Ms. Kathy Hamer of 160 Longfellow Ave., Worthington, Ohio. I would like to echo my concerns about the high density and number of apartments. I am also concerned about the three or four story structures that would be located near Larrimer Ave. There is only one building near Caren Ave. that is three stories high. I feel that this area will be overbuilt and too large. I do like the plan for community space and would like to see more of that, such as something similar to Schiller Park in German Village that would promote good weather outdoor activities.

Ms. Ellen Scherer of 112 E. New England Ave., Worthington, Ohio. I would like to echo the comments of the previous speakers.

Mr. Roger Beck of 6695 Hayhurst St., Worthington, Ohio. I would like to echo the comments of the previous speakers. I also want to thank the WARD organization for their information. I have a spoiler alert for Mr. Miller of LC though, Worthington is already a walkable community. I grew

Worthington 003474

up in Worthington and graduated from Worthington Schools. I was also a teacher in the district for twenty-four out of thirty six years, and still live in Worthington. I have a comment about the discussion about Easton Town Center being a great place to relax, Worthington already has that too at the Graeter Ice Cream Store in downtown Worthington. We do not need Disney like designs in the neighborhood. I feel that the density is too high, and the amount of traffic that would be generated would be too heavy. I understand that the city gets its money from income tax, but why are so many apartments being built, and such a small amount of commercial and office space. I've also heard that apartments and single family homes do not pay their way through the schools. I am very concerned about what will happen to the schools. What happens when people do not want to pay more taxes? How much money does UMCH want for the land? I want to know if there is a magic number of how much that land would cost, and if would people be willing to pay for the land through a millage.

Sean Demaree of 313 Highland Ave., Worthington, Ohio. I am also concerned about the density and the amount of traffic. Building 350 apartments would make this more of a transient community where people move in and out year after year, and why would Worthington want that kind of population that doesn't care about establishing roots? I believe an increase of that type of population will increase the crime rate. If I paid a million dollars for a house I definitely would not want to be looking at an apartment building. I also want to make a point about LC. LC engages in a practice called sub metering. They install their own electric meters and they allow no natural gas, so it is an all-electric community. Then, they take an eighty dollar electric bill and make it a one hundred and sixty dollar electric bill, which is perfectly legal in the state of Ohio, but that is an underhanded and unfair practice. I am also concerned about losing the soccer field, and would like to see a green space that includes a soccer field.

Ms. Kay Keller of 670 Morning St., Worthington, Ohio. I would like to support and applaud that speakers that have spoken already. I agree the density of the number of housing units is too high. Why is the least favorite of the different types of housing units (apartments) the greatest percentage of this development? LC says that they may or may not have estate style housing and maybe a third party would build those, but what if they do not build those houses? A traffic study is not necessary to know how congested traffic will be with additional housing units. The traffic is already congested. How will this project affect future development and re-development along North High Street? What will the impact of this development have on the schools? How many more teachers will be needed? Will the schools have to redistrict to accommodate the new students? This developer has already built several kinds of these apartments all over Columbus, so where is the uniqueness for Worthington? The most important aspects of the new urbanism are the diversity, and the community interaction that it is designed to encourage and in differentiating places that we care so much about so that we don't feel that it is like every other place. I believe that this will set the tone for future development. I seriously question if this is in Worthington's best interest to have this site developed on such a large scale. I feel that this is designed to maximize the value of the land for the seller and to maximize the profit for the developer. What will this project do for the quality of life in Worthington? Worthington is a two hundred year old town that does not need a Disney like Main Street.

Worthington 003475

Mr. Tom Carter, of 2178 Castle Crest Dr., Worthington, Ohio. There are some facts that people need to face. Columbus is growing and is expecting the population to grow by another half million people by the year 2050. There is a trend of people wanting to live inside the outer belt loop. People want to live in denser, walkable communities. I believe that this developer has come up with a pretty good overall plan. Good planning takes time, and quality materials will age well. There is not going to be a park here unless people want to pony up the money like Mr. Beck suggested, so there is going to be development in this location. Worthington is going to see density, this is just a fact of life. The closer you live to downtown, the more you are going to be subject to density. It is important to work with the developer to see if we can come up with a mix of uses and solutions that can work. They have a talented group of world class designers, the developer is local, and UMCH has been here for over one hundred years. This is a great team they have put together. Let's take the time and effort and go through the process without being cynical, and make this the best it can be. Density will be coming to Worthington at some point in time and that is called progress. This developer has a vested interested in this property so let's give this a shot, and see what this developer can do to meet everyone's needs.

Ms. Paula Ryan, of 1044 Firth Ave., Worthington, Ohio. I am a 57 year resident of Worthington, and I have driven past the UMCH property almost every day of my life. I agree with what Mr. Carter said, there is going to be development here, and there needs to be development here. We need to work with whoever the developer is to make it the right thing. I do question the density, but believes the plan is adjustable. This is progress for the City of Worthington. For me personally, I have two grown children that I would like to see live here. My son is 24 years old, and works as a city planner. He would like to live in a walkable community. I look at this like a step to the future.

Mr. Doug Foust, 276 Highgate Ave., Worthington, Ohio. I am also a lifelong resident of Worthington. Commercial property along High Street is not a bad thing. I have been scratching my head over the UMCH project process over the past couple of years and I cannot reconcile why there is this disconnect between what so many neighbors have said and this succession of plans, conceptual or otherwise, of what it looks like. While several of those in city management seem incredulous when I say this, but there is a great sense on the part of so many that residents are not being heard. It finally hit me that the problem is the comprehensive plan. The plan has several basic fundamental flaws.

First, the plan embraces the notion that more single family housing is a bad thing, and that there is little or no room for it, and that is to be avoided. The plan states that only high density housing is logical. Single family homes are what attracted people to Worthington in the first place. Worthington cannot compete with the Short North. Worthington would like to stay as it is. Secondly, the plan is built around some demographic data. I found the sources for the pie charts on the plan which shows income, or one two or three residents, and he has come to realize that that data was edited and fails to present the complete picture. Specifically the plan refers repeatedly to underserved twenty something young professionals, ages 21 to 34, who are already the largest group in 43085. Third and finally, despite the assertions of the city manager and others, this is not a consensus document. The consensus means a majority, and you cannot call it a consensus until you run it past the residents at large. The UMCH speaker quoted that there has to be some trust

Worthington 003476

on the part of city management, but that trust has to be earned. Before entertaining this or any other plan you need to reevaluate portions of the comprehensive plan in the face of public input.

Ms. Wanda Davis, 6635 Masefield St., Worthington, Ohio. The definition of progress includes maybe not doing something to the land. I understand that the property development needs to be seen from not only from a financial point of view but from a holistic point of view. The development should not adversely impact the environment land, air, water, or people who live there presently. If you speak to FEMA, or if you read anything about the environment itself, the land, and how the particular property works, she would like to read a short response to that: "Development studies with FEMA will tell you that 90% of the rain water, ice and snow will create added runoff. Add that to the low permeability of the clay soil and glacial terrain makeup that slows ground water absorption rates, capacity is already a water drainage issue at the closest neighborhood. Added volume of water combined with current levels will also create further erosion in the neighborhood gullies, and along the Olentangy River banks due to new water velocity levels. It is unknown whether the existing culverts are large enough in diameter to accommodate more runoff. Consider the herbicides, pesticides, pathogens and other toxins, gas, oil, etc., road salt and debris that will be picked up and enter the ground water and street drains that exhaust into the Olentangy. This water fills our watershed. Nitrates in nearby watersheds are already an alarming red flag."

People have already spoken about the traffic on Evening Street, but it is very important to note that Evening Street School and the entrance to the high school is along that street and I think that there is a risk of danger to our children in this area. Heavier car and truck traffic on High and these streets would also impact and perhaps interfere with police, fire, municipal and nursing businesses. Revenue is necessary but the primary development should be to create a central park with building development to be determined. There should be no housing construction. The younger family generation faces the heaviest burden and they do not have the advantages we had of a rising economy, which is no longer. This group is straddled with national debt that earlier generations have created, a difficult employment market and ever increasing global impacts on our livelihoods. For ethical reasons, we should develop this central piece of land to help them raise their families and give them a place of well-being and healthy development and educational opportunities for their children, but a place benefiting and used by the entire community as well. Plans like this would not only avert an environmental disaster, vehicle frustrations at the crisis created by people in a high density situations and management problems but if this is a legacy property, has been said, then creating a space that carries on the earlier work of caring about each other should continue on that space. The Worthington City Council should investigate buying the property, they should consult a municipal financial advisor or seek other models and find an underwriter for Municipal long term bonds.

Mrs. Jo Rodgers, of 575 Evening St., Worthington, Ohio. I have been involved in the whole process over the past two years and the result in the chosen direction regarding the UMCH property as it is currently laid out in the comprehensive plan. It was an exhaustive process. It was fully open to the public, broadly publicized, written about in the Worthington News, published on the city's website, and communicated to WARD members by the city and more broadly by the WARD and city email list. This involved public meetings, public input, public tours, and then more

Worthington 003477

meetings and more input. Once done our best hope was that we would find a developer who would buy into our vision for the property, and from what I see, we have one. I am grateful and thrilled that there was someone out there that had the same vision for what the property could be that we the city itself had. I applaud the efforts that our plans are taken to heart. The plan isn't perfect but what I have seen so far this developer is willing to work with us. I share the concerns of many that the traffic will be more than just problematic, but I am encouraged that two separate studies are being done to examine the issue. The results of the studies will be the very best guide in how we move forward. Beyond saying that there will be more traffic, it is certainly a given, but I am content to wait for that result before making an uneducated guess on an overall impact. Tied to the traffic issue is density. If as many are speculating traffic issues do loom with the proposed density then ways to reduce proposed density will need to be found. There will always be those that are in disagreement with development but however, the comprehensive plan is our guidebook, built by our input to guide us as we change and grow. I would encourage the Board, Commission and Council to keep this guidebook firmly in mind as this process moves forward. We spent a great deal of time and energy creating our plan and now we are at the implementation stage. I encourage the Board and Commission to stick with the plan and work to make the end product the best it can be.

Mr. William Brown, of 60 W. North St., Worthington, Ohio. Listening to the first two speakers reminded me about a Mark Twain story about going to church. The preacher started off really well and Mark thought he was going to put twenty-five dollars on the plate and the preacher kept going so he thought he would cut that down a little bit. The preacher kept on going so he decided to knock the amount down a little more to five dollars. When the plate finally came around he took five dollars off the plate. All I know is what I read in the papers. This one paragraph in a particular mailing of LC includes a large portion that needs zoning changes in order to construct the apartments. I have heard nothing tonight about what those zoning changes are and that is just a knit picking thing. I second the person that asked would we be willing to tax ourselves to own this land. I believe paying what I pay on North Street that I could stand paying a little more taxes if I liked what they were going for and I suspect a lot of other people would feel the same way.

Ms. Susan Jones, of 6506 Masefield St., Worthington, Ohio. I went to a couple of those comprehensive plan meetings and I would just like to say that I never heard anybody say once that they a three story apartment buildings or homes and cottage homes that could be 2 ½ to 3 stories. I just wanted to be on record that I object to that height and I am also not happy with the building so close up to the street. This is a historic town not an urban setting.

Mr. Chet Ridenour, of 398 Highgate Ave., Worthington, Ohio. First of all I want to give a big thank you to everybody here who is coming to express their opinion. We need to hear everybody's opinion, even Mr. Carter's. In an effort not to repeat everybody's position, I would like say whatever plan you decide on, I think a lot of people in the community have felt a little bit sucker punched by the Planning & Zoning Committee in that I have referred to the CF Bank that was originally approved for a one story, 4000 sq. ft. building. It is actually a two story, 8000 sq. ft. building. Also the Hoying development at the mall was originally supposed to be a 4 story residential facility and now is higher than that because Mr. Hoying came back and said that in order to make this economically viable we need a variance for two more stories for commercial.

Worthington 003478

My concern is that what is LC comes in here and go, whatever plan is approved, are you guys going to go into a much smaller gathering and say, oh yeah, we will approve a zoning ordinance instead of 350 apartments, we will now have 550 apartments to make it economically viable. I would just ask the planning and zoning whatever they approve will they tell us what you are approving, and make that the final plan. Don't put a variance in there so that we are getting something in the end that we are not expecting.

Mr. Justin Taylor, of 6510 Evening St., Worthington, Ohio. This project is literally in my backyard. I am like the new kid on the block, I have only lived in Worthington for 11 years. My kids go to Evening Street Elementary so we are hear for the long haul and I plan to die in that house. People have already made a lot of great points. I think I am going to go against the flow a little bit, but I think the comprehensive plan is actually directionally correct. There are concerns, I think the guardrails may be a little too wide, and density is a proxy for all of the things we worry about. Do we really need million dollar homes backing up to $200,000 homes? What do you think about that? Think about the Giant Eagle, we are getting there. I just want to make one other point here, someone said that consensus is about majority, but consensus is also about the veto. This process is really important and so is the input. It is important to hold our city leaders accountable to managing this plan. Nobody is going to get what they draw up at home. Consensus is not about getting everything we want and please keep that in mind.

Mr. Adam Gibson, 306 Weydon Rd., Worthington, Ohio. I have talked with Matt Greeson and Doug Foust and I genuinely believe that there are no back room deals. I do believe something may be greasing the axel to make the needle lean to one side to either benefit the developer or to city income tax revenue. I am looking at this from a real estate perspective. I am an agent with Keller Williams. I look at this by the price point factor of the estate homes and the availability of the estate homes. So far this year Worthington has seen 380 homes come to market and are closing or pending. Currently now there are 30 active homes on the market. In Worthington Corporation limit proper, that number was only about 10 back in March. We have seen the effect of look what the Jones' got for their house, I'm going to hit the market, but what it also tells us is that there are 25 homes sitting on the market that are not meeting the needs of residents out looking for homes. An interesting point about that is that the price median is $320,000 dollars, the average is $383,000 dollars, so as we move the needle towards a million dollar mark I think you are pushing a price point that I don't think can be supported by a community like this. It can't be supporting old Worthington either. We don't sell million dollar houses in Worthington yet, but we are moving there. National Association of Realtors just published a study from 2011 to 2013, Worthington has the benefit of being the 3rd rated highest appreciating neighborhood in all of central Ohio behind Granville, and Galena. Look what Upper Arlington does, look what New Albany does, we are inside the 270 loop and we have seen an appreciation over that two year period of about $12,000 dollars. Whoever is doing the studies can make the numbers look as good as they want. Depending what side of the table I am on am I going to be advantageous to my seller or advantageous to my buyer, and I don't necessarily have to be 100%. The last point I was thinking about looking at the renderings, there is about 100 feet from the tree line to the next dwelling. There is a strong fabric in the Worthingway neighborhood, and people may call this the Worthington Estates edge, but see a tremendous amount of demand, and I don't want to see lots sit there. $150,000 to $250,000 for the lots is double the market value. I got into the process a

Worthington 003479

little bit late. I did not see this meeting publicized in the Worthington News this week, I did not see the meeting publicized in Sunday edition of the Dispatch. With full honest communication we can revisit a plan of this nature after we really start studying the numbers and the traffic impact studies but I would like to continue the conversations forward.

Mr. Jim Cheney, of 579 Blandford Dr., Worthington, Ohio. I have been a resident for 45 years, and I wanted to give you an idea of what brought me to Worthington. What brought me to Worthington years and year ago was that I was doing a survey to find a new home for our business. I went all up and down the east coast, back and forth from the Chicago area, and somebody told me that there was a place for sale in Worthington, Ohio. I said, you have got to be kidding me General Electric is a pretty big corporation so we took a very serious look at this community. We like the plant, and the plant is still here employing many people, and I am still here too because I like it. Forty-two acres is not going to make a new town out of this place, but it can do something about making this a lesser town out of this place. The plan with all of the apartments tends to degrade what I consider Worthington to be. As we look at this again, I think that the developer has done a very good job of planning but there is almost too much that they are trying to put into that amount of acreage. One thing that I object to more than anything is moving the apartments closer to the center of town. I was not too happy when they built the apartments near the mall, I think they look terrible, but that is alright because people like them. I also do not think that what we do with this area is going to change the pie charts on the demographics. I'd like to see us keep thinking about the project and make sure we do something good.

Mr. Nathan Palmer, of 410 Pittsfield Dr., Worthington, Ohio. I have lived in Worthington for six years with my wife and two sons. My seven year old will be a first grader at Wilson Hill Elementary School and I am extremely concerned about density. This plan will put a serious burden on our schools. I am also a high school social studies teacher and I know that a development like this is going to place a burden on our schools. One of the things that makes Worthington great is that we have a neighborhood school system. My kids can walk to their school, but what I was recently concerned about was a quote from Vickie Gnezda, who is the Communications Director for Worthington Schools, and she was quoted saying, in regards to this development and where these kids would go to school, "While we currently have space in the elementary schools throughout the district we cannot guarantee student placement in the nearest school. I think that is a concern. I know you can't always get your kids into the nearest school but this shows that these kids, who I believe are currently slated to go to Evening Street Elementary, according to the district's boundary map, the school district understands that that might not happen. So, where are those kids going to go? There has apparently been some preliminary discussion about sending these kids to Wilson Hill Elementary School. I do not know how we are going to accommodate that level of students. I don't think all of the people who move into this area are going to be simply young professionals without children or people who are empty nesters. We have a great school system, and people like myself moved into this community for the schools. I can't envision how we are going to accommodate and adequately support the students that will go to those schools. The other concern that I have is that many of us feel that the leaders that we have elected are not really voicing what we are concerned about. We are concerned about density and we are concerned that this is going to be too much. I would recommend that we revisit this comprehensive plan. Maybe we need a new survey. I know the

Worthington 003480

City had some type of survey that I filled out online but there was no quantitative data with that survey. It was just qualitative where you could just comment on different things that you liked and didn't like about particular plans. Maybe we need to do something like WARD did. That was the most comprehensive survey that I think has been done so far. In that particular survey there were 750 residents that responded. Over eighty percent of those that responded were opposed to the three story apartments and density proposed by LC. Maybe we need a third party to come in and do a new study and find out what parts of this plan, or something like it, that people are opposed to or in support of.

Ms. Barbara Patrick, of 334 Crandall Dr., Worthington, Ohio. I just had one thing to say. I think we should use our intellect to think things through, and in my own personal opinion, you have to trust your gut. I think what bothers me is the word progress. What defines progress, and progress is inevitable. It is coming, but we should all agree as to what that means. There is something disturbing about it to me that hasn't been answered.

Ms. Angela Strous, of 58 E. North St., Worthington, Ohio. I can't tell you the number of times that I had conversations with other people about getting a single family house in Worthington. I recently received a letter asking me if I wanted to sell my house, and they don't even know me. I also have a friend that canvassed the area around Worthingway and Worthington Estates and gave every person on that street a letter asking them if they would like to sell their home. Recently, I have friends on W. North Street who purchased a house next to a home that was for sale and sold the same day that it went on the market. They were talking to the person next door and that person said, I'm interested in selling. So, I think this is a good first step, but we definitely need more single family homes.

Mrs. Suzanne Seals, of 123 E. New England Ave., Worthington, Ohio. I would just like to say that many of us moved to Worthington because of its history and historic buildings to provide us with a sense of place. We don't have to create an urban village to feel like we have a sense of place. I have begun to wonder if the problem may be that this is the city's vision and not the resident's vision. Mr. Fisher mentioned that he is very frustrated about the process, as is LC. I feel that the residents are frustrated with this process, and I would like to make a few comments about the process. I am recalling the 2013 envisioning process of UMCH that done by MKSK and this does not look very different to me, from that, not considerably different, in spite of the fact that we have been saying there is too much density, too little green space, traffic, safety, and congestion and we are concerned about the schools. All of these concerns compromise the quality of life for those of us that are living here right now, and that doesn't mention the fact that our taxes will go up too to provide services for these residences, that will be a drain on the city rather than bringing in money. What has happened to the WARD findings? They seem to have been ignored. Another question when will residents input, concerns, and ideas be factored in, or is this meeting just another opportunity for all comments to be heard and to simply become part of the public record. I certainly hope not, but based on the presentation, it seems to me that our public sediments and concerns still have not been addressed. The firm that did the envisioning process in 2013 and also created the initial vision and also wrote the comprehensive plan and we are told that that will be the measure of this proposed plan. Again, the process has mostly ignored public sediment and it seems to be following the city's own plan since day one. We are told that the developer has to

Worthington 003481

have the density to do the project, but perhaps it is the wrong developer. We have been reminded repeatedly by the city that they don't own the property, however, the city can control the development that would be permitted here. In closing, I heard some really disturbing comments from residents. One resident that I was speaking to said we are invited to speak and share our comments but our comments are ignored, and then he says, seems a little bit like Russia doesn't it. Perhaps extreme, but that is his perspective. Another comment someone shared with me, what do we have to do to get Council to stop thinking about Worthington as their own private fiefdom. These perceptions don't speak well for Worthington's residents' satisfaction with the direction of development that is being promoted by our city government and our leaders. Finally, trust and good will has been mentioned. I think the city, UMCH, and the developer need to earn our trust and our good will by honoring with their actions some of the concerns of residents who live here right now.

Mr. John Huntington, of 435 Highgate Ave., Worthington, Ohio. The problem that I see is manifold. When you multiply the number of housing units by the number of cars for each resident you will come up with about 1000+ cars, and there will be some residents that have more, and probably not many with less. That is a lot of cars going in and out of a 42 acres of land. I am going to say something really rude, but I see a ghetto, a bad ghetto in the making. This is too dense. People were worried about the crime from a few break-ins by the residents of the UMCH, which I believe were not major crimes, but when you start with a series of small apartments, and in a few years there gets to be a rapid turnover, you are creating a place where things will not be best. We have several instances such as the apartments on the east side of Worthington that have attracted police attention and I really think that that kind of density, right in the heart of Worthington, is a bad thing socially. What I hear from the community is a discomfort with the idea of this large of population moving into the center of a low density population. They assume that it is not going to be good, but I tend to agree with them. The smaller communities in Ohio have a luxury of peace and quiet and ease of living that is going to be disrupted by the density of this particular development. I think the developer said he needed 500 units to make this project viable. That is an economic concern of the developer. It is not the concern of the population of Worthington that they are economically successful. Our concern is for the quality of life that affects us here. I have lived here for 47 years and I am not intending to leave. The point of this is that we are dealing with something that is uncomfortable for a working, successful, popular and viable community, and we are throwing a very large monkey wrench into the works. We have talked about a lot of problems and I think that all of them are more or less true. One of the most interesting problems was discussed by the female that talked about drainage and water pollution. That is serious business. My opinion of this is not only back to the drawing board but back to the drawing board with some very specific limitations. We need a welcome useful greenspace that would allow for sporting events, and public gatherings. That is what I would like to see.

Mr. Rob Vodinelic, of 458 Highgate Ave., Worthington, Ohio. I am familiar with the quality of work that LC does around town but I believe there is a strong need for more single family housing. The cottage homes are probably a good idea, but I am really concerned about school density. Classroom size keeps increasing year after year after year. What I would like to see is maybe taking some of the tax money and expanding or modernizing the schools and not busing kids all

Worthington 003482

over town. Maybe the tennis courts on Evening Street can be moved to expand the elementary school.

Mr. Rick Trippel, of 6695 W. Schreiner St., Worthington, Ohio. I agree with the comments that I heard about disparity about the density, traffic concerns, but one concern I have is the look and character of this new development as compared to what is already there now. This will substantially change what Worthington looks like in another ten or twenty years even if it is successful. I'm not sure how traffic studies will help the flow of traffic on the side streets. I believe that the opening of Fresh Thyme will also greatly affect our traffic.

Mr. Dan Kowalski, of 200 Franklin Ave., Worthington, Ohio. I am a little bit younger than most of the people that have spoken tonight, so hopefully I will capture that demographic that they said was 30% of Worthington. I looked at this plan before I came to the meeting tonight, and I am excited about it. I understand other people's concerns, traffic does seem like it will be an issue. Currently, we don't have any kids, but the schooling does seem like an issue as well. My biggest take away is that there does seem to be a need for those things, but if we look at this piece of property it is just sitting there doing nothing right now. I do feel that something needs to be done with it. I feel like people my age either want to live in the city, but I don't feel that most want to live in a traditional suburb. I grew up in the Columbus area, and I am from Dublin originally. Before I lived here, I never knew what Worthington had to offer. I think it does have a lot of things to offer to people my age. My wife and I love the ability to be able to walk to old Worthington, go to the Farmer's Market on Saturday, and I think that you see a lot of people my age drawn to those facts. I think the concerns about the types of individuals that would move into the apartments isn't as big as an issue as they think. People that are younger want less commitment. We see that through a lot of social issues today. A lot of people don't want the responsibility of taking care of a home. These seem like viable options for people my age. I can't speak for everyone, and I won't, but those are the things that I observe about other people my age. I know a lot of people that like the Worthington area. I don't think that there is a big concern about the types of people that can afford to move into a $1,600.00 apartment. Maybe if the prices go down because people cannot afford to live there. I guess I dream to be able to afford one of the houses in the back. After seeing the $750,000.00 price tag, I don't see that in my foreseeable future. The pricing of the housing does seem too high. Thank you for putting this meeting together to hear what the people have to say about the matter, and hopefully there will be something meaningful that comes out of these meetings.

Ms. Judy Haager, of 306 E. New England Ave., Worthington, Ohio. When and where can we get further information about future meetings and update? Mr. Hunter explained that there are websites available to check for updates: www.umchdevelopment.com and www.worthington.org. This has been a good meeting, and probably not the last one. Thank you all for your commentary this evening. As we move forward with this process you will see a lot of changes and I look forward to further communication and dialogue between the Boards, the developer, the City, and the residents. Thank you very much for your time. Meeting adjourned at 9:40 p.m.

Worthington 003483



MINUTES OF THE REGULAR MEETING
WORTHINGTON ARCHITECTURAL REVIEW BOARD
WORTHINGTON MUNICIPAL PLANNING COMMISSION
January 14, 2021

The regular meeting of the Worthington Architectural Review Board and the Worthington Municipal Planning Commission was called to order at 7:00 p.m. with the following members present: Mikel Coulter, Chair; Thomas Reis, Vice-Chair; Kathy Holcombe, Secretary; Edwin Hofmann; David Foust; Richard Schuster; and Susan Hinz. Also present was Worthington City Council Representative Scott Myers; Lee Brown, Director of Planning & Building; Lynda Bitar, Planning Coordinator; Tom Lindsey, Director of Law.

**A. Call to Order – 7:00 p.m.**

1.    Roll Call

2.    Pledge of Allegiance

3.    Oaths of Office

Mr. Brown previously swore in returning Architectural Review Board and Municipal Planning Commission member Mr. Foust; and Architectural Review Board members Mrs. Hinz and Mr. Schuster.

4.    Election of Officers

Mr. Reis nominated Mrs. Holcombe for Secretary; and Ms. Holcombe nominated Mr. Reis for Vice-Chair and Mr. Coulter for Chairman. Mr. Schuster seconded the motion. All members voted, "Aye," and the nominations were approved.

Mr. Reis moved to designate all members of the Municipal Planning Commission as representatives to the Board of Zoning Appeals. Mr. Hofmann seconded the motion. All Board members voted, "Aye," and the motion was approved.

5.    Approval of minutes of the December 10, 2020 meeting

Mr. Reis moved to approve the minutes and Mr. Foust seconded the motion. All Board members voted, "Aye," and the minutes were approved.

6.    Affirmation/swearing in of witnesses



PENGAD 800-631-6989

EXHIBIT

59

**B. Architecture Review Board – New Business**

1. Mixed Use – **1033 High St.** (Thomas Hart/Lifestyle Communities) **AR 70-2020**

   &

**C. Municipal Planning Commission – New Business**

1. **Planned Unit Development**

a. Mixed Use – **1033 High St.** (Thomas Hart/Lifestyle Communities) **PUD 03-2020**

Mr. Brown reviewed the following from the staff memo:

## Findings of Fact & Conclusions

## Executive Summary

Thomas Hart on behalf of Lifestyle Communities has applied to rezone 37.8-acres from R-10 (Low Density Residential), S-1 (Special), C-2 (Community Shopping Center) and C-3 (Institutions & Office) to PUD, Planned Use District for the redevelopment of the United Methodist Children's Home site to a mixed-use development that would include detached single-family home sites, townhomes, apartments, retail, restaurants, office and greenspace.

## Applicable Plans

- Comprehensive Plan Update and 2005 Strategic Plan – UMCH Focus Area – 2014
- Comprehensive Plan Update and 2005 Strategic Plan
- Chapter 1177 – Architectural District
- Chapter 1174 – PUD Planned Unit Development

## Recommendation

Staff is recommending **_denial_** of these applications as they currently stand today. If the applicant wishes to make significant modifications and changes to their applications after listening to the initial comments from City staff, Board & Commission members and the Worthington Community, staff would recommend tabling these applications. Please see Staff Comments/Analysis below for additional details related to the recommendation.

## Brief Background/Description

The United Methodist Children's Home (UMCH) site located at 1033 High St. is approximately 37-acres in size, with fifteen existing vacant buildings, parking lots and driveways on the site. The majority of the property is zoned S-1, Special, except in 1987 just under 10-acres of land along the N. High St. frontage was rezoned to C-3, Institutions and Offices (~9.2-acres) and C-2, Community

Shopping Center (~0.6-acres). The parcels at 47 Larrimer Ave. and 57 Larrimer Ave. are zoned R-10, Low Density Residential (~0.5-acres) and are currently single-family homes that are vacant.

Approximately 3.42-acres at the northwest corner of High St. and Wesley Blvd. (private drive) with 428-feet of High St. frontage was purchased in 2017 by the West Ohio Annual Conference of the United Methodist Church and is not part of this application. Bickford Assisted Living & Memory Care facility at the southwest corner of High St. and Wesley Blvd. (private drive) is a separate 3.58-acre parcel and is also not part of this application.

**Current Zoning - Development Standards**

| Zoning | Minimum Lot Width | Minimum Lot Area | Front Setback | Rear Setback | Side Setback | Max Height of Building Stories | Max Height |
|---|---|---|---|---|---|---|---|
| S-1 | 250-feet | 3-acres | 60-feet | 60-feet | 50-feet | 4-stories | 45-feet |
| C-2 | 150-feet | 1-acre | 50-feet | 30-feet | 20-feet | 3-stories | 45-feet |
| C-3 | 100-feet | 20,000 sq. ft. | 50-feet | 30-feet | 15-feet | 3-stories | 45-feet |
| R-10 | 80-feet | 10,400 sq. ft./4.2 DU/acre | 30-feet | 30-feet | 8-feet | 2 ½-stories | 30-feet |
| Section 1149.07 – 100' front setback along this area of High Street | | | | | | | |

**Surrounding Zoning & Land Use**

The surrounding zoning is a mix of the following:
- R-10 - Low Density Residential – Worthington Estates and Greenbriar Hill
- R-16 – Very Low Density Residential – Worthingway & Medick Estates
- C-1 – Neighborhood Commercial – O'Reilly Family Pharmacy
- C-3 – Heritage Professional Building, AT&T, FC Bank, Worthington Municipal Complex, Laurels of Worthington and The Grove
- SC – Senior Citizen – Bickford of Worthington

*Current Zoning Map*



*Aerial*



# Recent Land Use and Planning History Related to the Site (since 2014)

- On September 2, 2014 City Council adopted an Amendment to the Comprehensive Plan Update & 2005 Strategic Plan for the United Methodist Children's Home Focus Area for the City of Worthington with the anticipation of redevelopment on the site that would include a mix of uses and open space across the entire site.
- On June 29, 2015 Lifestyle Communities presented an informal proposal to the Worthington Community for their vision for the UMCH site.
  - No formal application was submitted to the City to start the rezoning process.
  - Lifestyle Communities proposed the following:
    - 42.3-acres
    - 571± Total Residential Units
      - 350 Apartments
      - 221± Detached single-family estate lots, manor lots, cottage lots and townhomes.
        - Mix of for sale and for rent product
    - Approximately 150,000± sq. ft of medical office and a 20,000 sq. ft. conference center
    - Retail on first floor of the apartment buildings
    - Mix of 3 to 4 story buildings along High St.
    - Open Space
      - Shelter house – Tucker Creek Preserve
      - Multi-use trail – Tucker Creek Preserve
      - Formal greenspace in the form of a village green at the entrance to High St.
      - Community park to the rear of the site
      - Scattered open space throughout the site
- On February 9, 2017, OhioHealth made application to construct a new 20,000 sq. ft. two-story medical office building along the N. High St. frontage just north of the Conference Center.
  - The application was eventually withdrawn by OhioHealth when the West Ohio Annual Conference decided to exercise their option to purchase 3.42-acres of land that include the area where the new medical office building was to be constructed.
- On June 8, 2017, the Municipal Planning Commission reviewed and approved a request by the West Ohio Conference Annual Conference of the United Methodist Church to create a new 3.42-acre lot for their existing building and parking at the corner of High St. and Wesley Blvd. that met all the legal requirements to create a new lot as outlined in the Planning & Zoning Code. City Council ultimately approved the request on June 19, 2017.
- On March 26, 2020, the Municipal Planning Commission was scheduled to review a request by OhioHealth to rezone 3.35-acres at the corner of Larrimer Ave. and N. High St. from R-10 (Low Density Residential), S-1 (Special) and C-2 (Community Shopping Center) to the C-3 (Institutions & Office) to permit the construction of a new 60,000 sq. ft. three-story medical facility that would house medical services, including an emergency department, primary care, imaging and a host of specialty services.
  - The application was withdrawn by OhioHealth after they were unable to come to

an agreement with the property owner to move forward on the site.
- On October 6, 2020, Thomas Hart, on behalf of Lifestyle Communities, filed an application to rezone 37.843-acres from the R-10 (Low Density Residential), S-1 (Special) and C-2 (Community Shopping Center) and C-3 (Institutions & Office) to a PUD, Planned Use District for the redevelopment of the United Methodist Children's Home site to a mixed-use development that would include detached single-family home sites, townhomes, apartments, retail, restaurants, office and greenspace.
  - The request was to go before the Architectural Review Board and the Municipal Planning Commission on November 12, 2020, however the applicant requested to table until the December 10, 2020 meeting. The applicant then requested to table the request to the meeting on January 14, 2021.

## Current Proposal by the Applicant

- Total Acreage = 37.8-acres (Parcel #s:100-006774, 100-002425 & 100-002427)
- 730 Residential Units
  - 24 units – Single-family
  - 94 units – Multi-family - Townhomes w/garages
  - 72 units – Multi-family - Townhomes & flats
  - 540 units – Multi-family – Parking Garage
- 60,000 sq. ft. of commercial/retail
- 25,000 sq. ft. of medical office
- 6.4 acres – Tucker Creek

| SUBAREA | USE | LOTS/UNIT/SQUARE FOOTAGE | Height | ACRES | DENSITY |
|---------|-----|--------------------------|--------|-------|---------|
| #1 | Single-family | 24 units | 35 feet | 5.9 acres | 4.1 lots/acre |
| #2 | Multi-family | 94 units | 60 feet* | 9 acres | 10.4 DU/acre |
| #3 | Multi-family | 72 units | 60 feet* | 5.1 acres | 14.4 DU/acre |
| #4 | Multi-family Commercial Medical Office | 540 units 60,000 sq. ft. 25,000 sq. ft. | 40'- 62'** *** *** | 11.4 acres | 47.8 DU/acre |
| #5 | Tucker Creek | | | 6.4 acres | |
| TOTAL | | 730-units | | 37.8 acres | 19.3 DU/acre |

*Staff Comments:*
\* The proposed height does not appear to be correct.
\*\* Does not appear to measure the height of the building to the peak or per the height of a building definition found in the Planning & Zoning Code.
\*\*\* Has not been provided.

**Project Details as described in the application**

**Subarea #1**
- 5.9 acres
- 24 single-family lots
    - For sale product
    - 2 parking spaces per dwelling unit
    - Lot Width: Minimum 55-feet wide
    - Minimum Lot Size: 6,875 sq. ft.
    - Unit Square Footage Minimum: 1,600 sq. ft. to 2,800 sq. ft.
    - 2 ½ stories, 1 ½ stories or single-story buildings – max height of 35 feet
    - Front Setback: 20 feet
    - Rear Setback: 20 feet
    - Side Yard: 5 feet
    - Fronting on a proposed public roadway
    - 4.1 Dwelling Units/acre
    - Architectural Design & Standards Proposed – See Development Text

**Subarea #2**
- 9 acres
- 94 townhomes
    - For sale product
    - Garages
    - 1.5 parking spaces per dwelling unit
    - Unit Square Footage Minimum: 1,000 sq. ft.
    - 2-3 stories: max height of 60 feet *(Staff Comment: This is the height noted in the application. The proposed height does not appear to be correct)*
    - Lot sizes of 16-feet to 24-feet wide by a minimum of 92-feet deep
    - Front Setback: 10 feet, porches no closer than 4 feet
    - Fronting on a proposed public and private roadway
    - 1.3-acres of public and private open/green space
    - 10.4 Dwelling Units/acre
    - Architectural Design & Standards Proposed – See Development Text

**Subarea #3**
- 5.1 acres
- 72 townhomes
    - For rent product
    - Mix of attached garages or access to a garage
    - 1.5 parking spaces per dwelling unit
    - Unit Square Footage Minimum: 700 sq. ft. to 1,300 sq. ft.
    - Max height of 60 feet *(Staff Comment: This is the height noted in the application. The proposed height does not appear to be correct)*
    - Dwelling Unit Mix:
        - One Bedroom: 30% at 700 sq. ft. – Approximately 28.2-units
        - Two Bedrooms: 60% at 1,100 sq. ft. – Approximately 56.4-units

- Three Bedrooms: 10% at 1,300 sq. ft. – Approximately 9.4-units
  - o Front Setback: 10-feet
  - o Fronting on a proposed private roadway
  - o 0.6 acres of public and private open/green space
  - o 14.1 Dwelling Units/acre
  - o Architectural Design & Standards Proposed – See Development Text

**Subarea #4**
- 11.4 acres
- 540 multi-family units
  - o For rent product
  - o Parking Garage
  - o Unit Square Footage Minimum: 500 sq. ft. to 1,300 sq. ft.
  - o 5-stories: Max height of 80 feet
  - o Dwelling Unit Mix:
    - One Bedroom: 30% at 500 sq. ft.; 162-units
    - Two Bedroom: 60% at 1,000 sq. ft.; 324-units
    - Three Bedroom: 10% at 1,300 sq. ft.; 54-units
  - o 47.8 Dwelling Units/acre
  - o Architectural Design & Standards Proposed – See Development Text
- Commercial Office/Retail – See Development Text for list of all uses
  - o 60,000 sq. ft.
  - o Two 5-level parking garages, two surface lots and on-street parking
  - o Max height of 80 feet
- Medical Office
  - o 25,000 sq. ft.
  - o Two 5-level parking garages, two surface lots and on-street parking
  - o Max height of 65 feet
- Setbacks:
  - o High St.: 25-feet
  - o Longfellow Ave.: 25-feet
  - o Larrimer Ave: 20-feet
  - o Private Streets: 10-feet
  - o Southern Property Line: 10-feet
- Fronting on a mixture of private roadways and existing roadways (High St., Larrimer Ave. and Longfellow Ave.)
- The applicant has proposed that private streets be 36-feet in width, 20-feet wide drive aisles and 8-feet for parallel parking spaces on each side and placed in a reserve that is 56-feet in width.
- Alleys are proposed to be 16-feet wide and placed in a reserve that is 20-feet in width.
- Surface parking lots shall be constructed with 9'x19' parking spaces with a drive aisle of 22-feet in width.
- Bicycle parking will be provided throughout the site.
- Cross access easements are proposed throughout the site.
- 1.2-acres of public and private open/green space

- Architectural Design & Standards Proposed – See Development Text

**Subarea #5**
- Tucker Creek Preserve
  - 6.4-acres
    - 5.7 acres – preserved natural area with a conservation easement, and/or dedicated to the City for public ownership and use
    - 0.7 acres – stormwater basin for the development, will not be conveyed to the City and will be maintained by the homeowners' association (HOA).
    - 3.1 acres of the 6.4 acres is already located in an easement that restricts development in this area. This includes a mix of slope, stormwater, sanitary, water and channel easements.
  - No additional amenities proposed at this time.

**Traffic**

The applicant has provided a Traffic Impact Study which is being reviewed by the City's traffic consultant. Preliminary findings of the Study include the following:
- When warranted, a new signal should be installed on High St. across from the Worthington Municipal Building.
- When a new signal is constructed, the existing southbound fire signal control should be moved to the new High St. signal.
- Pavement markings should be revised on High St. for a100-feet northbound left turn lane at the new entrance on High St.
- Pavement markings should be revised on High St. for a 200-feet southbound left turn lane to Worthington-Galena Rd.
- Signs, pavement markings and signal operation should be modified to allow for east/west movements at the intersection of High St., Wesley Blvd, Worthington-Galena Rd. and Crandall Dr.

**Parking**

The applicant provided the following table summarizing the proposed parking included in the application.

| Subarea | Lots/Unit/SF | Parking Required* | Proposed Surface Parking | Proposed Garage/Structure | Total |
|---------|--------------|-------------------|--------------------------|---------------------------|-------|
| #1 | 24 | 2/unit = 48 | Garage/Driveway | 48 | 48 |
| #2 | 94 | 1.5/unit = 141 | (See Note #1) | 188 (2-car) | 188 |
| #3 | 72 | 1.5/unit = 108 | 100 (Lot) (See Note #4) | 52 | 152 |
| #4 | 540 units 60,000 SF 25,000 SF | 1/unit = 540 | 66 (Lot) 85 (On-Street) | 853 (5 Level Parking Garage) | 1,004 |

| | | | | | |
|---|---|---|---|---|---|
| | | 1/150 = 400 1/250 = 100 Total = 1,040 | | | |
| #5 | N/A | N/A | N/A | N/A | N/A |
| TOTAL | 730 | 1,337 | 251 | 1,141 | 1,392 |

Notes:
1. On-street parking is included
2. Parking counts within subareas to be finalized with the final development plan
3. ADA accessible spaces will be provided
4. Includes spaces behind garage
5. Within subareas 2,3 & 4 alleys shall have "No Parking" signs

*Staff Comments:*

Chapter 1174 of the Planning & Zoning Code provides the following parking standards:

- The required parking referenced in the chart above appears to be inconsistent with the parking requirements found in the Planning & Zoning Code.
- Parking and service areas shall be designed and located to protect the character of the area.
- Non-Residential Uses – Parking shall be adequate to serve the proposed uses but shall not exceed 120% of the required parking found in Section 1171.01.
- Residential Uses – Not less than one parking space per dwelling unit.
- Bicycle Parking – Should be adequate to serve the proposed uses.

The application references a required parking amount for residential units that is incorrect. The parking requirement for residential uses is not less than one parking space per dwelling unit.

**Tree Preservation & Replacement**

A Tree Survey & Preservation Plan was provided by the applicant and was reviewed by the City Arborist. The following items were noted in the Tree Survey:

- 365 trees to be removed = 6,264 caliper inches
  - 29 dead
  - 28 poor condition
  - 2 Ash trees
  - 306 healthy trees
- 6,264 caliper inches – 1,069 caliper inches* = 5,195 caliper inches

* The dead and poor condition trees and Ash trees are not counted in determining the loss of caliper inches of trees for either replacement or fee payment, thus the associated caliper inches (1,069) associated with those trees is deleted from the total caliper inches of trees to be removed

The submitted Tree Survey and Preservation Plan indicated tree replacement will be included as part of the redevelopment of the site and will be finalized with a detailed landscape plan at the Final Development Plan for the PUD. Tree replacement was described in the application as follows:

- Street Trees – provided on all public and private streets at 1 tree per 40 linear feet of street.
  - Minimum of 3-inch caliper at installation
  - Approximately 284 trees at 3 inches = 852 inches
- Alley/Parking Lot Island Trees
  - 30 trees at 2.5 inches = 75 inches
- Open Space Tree Plantings
  - 80 trees at 2.5 inches = 200 inches
- Buffer Plantings
  - Stormwater Pond – 10 trees at 2.5 inches = 25 inches
  - Bickford Assisted Living Facility – 8 evergreens at 3 inches/6 feet high = 24 inches
- Other Locations
  - Replacement trees can be located in other off-site public property locations.
- When taking into account the amount of caliper inches to be lost (5,195) and the total caliper inches of proposed replacement trees (1,176), the submittal notes there remains 4,019 inches that would need to be replaced with additional trees or a Tree Replacement Fee of $150/caliper inch for a total fee of $554,400.00 would be applied.

*Staff Comments:*
- Staff calculates the fee at $150/caliper inch for 4,019-inches for a fee of $602,850.00, not $554,400.00.
- All street trees and landscaping plans will need to be reviewed by the City Arborist.

The applicant is requesting the following items in relation to the Tree Replacement Standards
- Requesting the dedication of Tucker Creek Preserve to count towards the Fee-in-lieu of Tree Replacement.
- Requesting the Fee-in-lieu of Tree Replacement and/or the number of trees replaced off-site shall be based on $150/caliper inch.
- The applicant states that full on-site replacement is not feasible and would result in overcrowding on the site.
- The applicant states this is an unreasonable burden on the property if the fee-in-lieu is paid or if replacement occurs off-site. The applicant is requesting a waiver of all fees.
- The applicant states that they are committed to a reasonable and balanced tree replacement standard that includes on-site replacement, off-site replacement, and crediting in order to meet the spirit and intent of the code, while resulting in fairness.
  - Applicant states they will work in good faith with City to find other off-site replacement location on public lands to reduce the credit.

**Public Area Payments – Special Park Fund**

City Code contains the following requirements for contributions to the Special Park Fund:
- Commercial & Industrial Space = $100.00 per 1,000 sq. ft.
- Residential = $250.00 per dwelling unit

- Utilizing the Code requirements and applying them to the proposed development results in the following fee calculation:Proposed Uses:

- Commercial – 85,000 sq. ft. = $8,500.00
- Residential – 730 units = $182,500.00
- Total Fee = $191,000.00

The applicant states the property is valued at $165,688.00 per acre and believes the value of Tucker Creek Preserve is valued at $944,422.00 and believes there is a credit balance to the developer since the developer is proposing to dedicate the Tucker Creek Preserve to the City.

*Staff Comment:*
- The 3.1 acres of the 6.4 acres of the Tucker Creek Preserve is already located in an easement that restricts development in this area. This includes a mix of slope, stormwater, sanitary, water and channel easements. Staff questions the suggested valued of the Tucker Creek Preserve given these easements and the associated restrictions on development.

**Public Space Amenities**

City Code requires public amenities which directly affect the quality and character of the public domain as part of PUD developments. The amount of required public amenities is calculated based on gross floor area. The application provided the following calculation:

| PUBLIC SPACE AMENITY CALCULATION | | | |
|---|---|---|---|
| BUILDNG TYPE | UNITS (Approximate) | GROSS FLOOR AREA PER UNIT MIN. (SF) (Approx) | GROSS FLOOR AREA PER TYPE MIN. (SF) |
| Townhomes- Subarea 2 | 94 | 1000 | 94,000 |
| Apartments - Subarea 3 | 72 | | |
| Anticipated Mix | | | |
| 1 Bed (30%) | 22 | 700 | 15,400 |
| 2 Bed (60%) | 43 | 1100 | 47,300 |
| 3 Bed (10%) | 7 | 1300 | 9,100 |
| Apartments- Subarea 4 | 540 | | |
| Anticipated Mix | | | |
| 1 Bed (30%) | 162 | 500 | 81,000 |
| 2 Bed (60%) | 324 | 1000 | 324,000 |
| 3 Bed (10%) | 54 | 1300 | 70,200 |
| Commercial | | | |
| Commercial | 1 | 60000 | 60,000 |
| Medical Office | 1 | 25000 | 25,000 |
| **Total** | | | **726,000** |
| 1 Public Space Amenity per 5,000 SF Gross Floor Area of Multi-Family | | | 5,000 |
| | | | |
| **Total Public Space Amenities Required** | | | **145** |

*Calculated by the applicant*

Staff Comment:
- Staff does not fully understand or agree with the above calculation at this time.


**Utilities**

The application includes the following information about utilities:
- Water, sanitary sewer, surface drainage and utility facilities will be serviced by the existing available water/sewer lines and connections.
- Sanitary Sewer:
  - Existing 12-inch located along the southern property line
  - Existing 10-inch extends into the site from the 12-inch sewer line
- Water:
  - Existing 12-inch located along N. High St.

- o Existing 12-inch located along Wesley Blvd.
- Stormwater:
  - o Proposed wet detention basin along the Tucker Creek Preserve near Evening St.
    - Mix of stormwater storage vaults and surface detention to be utilized in the open space areas and parking areas.
    - Proposed to be designed to meet all stormwater requirements for water quantity and water quality per Ohio EPA standards and City of Columbus stormwater requirements.

## Easements

The application provides the following information regarding easements:
- Cross access easements, shared parking agreements, utility and access easements between subareas will be finalized by the time of Final Plan.

## Phasing Plan

The application proposes the following phasing plan for construction:
- Developed based on zoning approval and finalized at the time of the Final Development Plan.
- Construction to begin with the single-family development. The commercial/office uses along High St. are subject to market conditions.

*Staff Comment:*
- The commercial office included in this proposal is the portion of the development that would provide economic benefit to the City and help offset the cost of services that are provided given the City's heavy reliance on income tax as a revenue stream. Staff is concerned that only the residential portion of the project will get constructed without the commercial office needed in the High Street Mixed Use Zone.
- Staff is also concerned about the timeliness of construction of the open space that is to be provided on the site.


# Land Use Plans

This section of the memorandum highlights the language related to this site contained in various land use plans and regulations of the City. Links to the full documents are includes at the beginning of this memorandum and in the highlights below.

Worthington Comprehensive Plan – UMCH Focus Area - 2014
Since the Comprehensive Plan was updated in 2005 and included a strategic redevelopment plan for the site, City leaders have anticipated a redevelopment on the site that would include a mix of uses and open space across the site. The City studied the property again in 2014 and adopted amendments to the 2005 Comprehensive Plan in 2014, refining the stated desired outcome for the property. This area has been identified in the 2014 document as a good location for a mix of

commercial uses along the High St. frontage, mix of residential uses and a significant amount of usable open space.

The 2005 Comprehensive Plan identified the UMCH site as strategic for future growth, a matter particularly critical for an established community like Worthington. While the 2005 plan presented an example of two possible redevelopment scenarios, this update document provides a more in-depth consideration of appropriate redevelopment parameters.

This section of the agenda item memorandum will highlight the language from the 2014 update to the Comprehensive Plan regarding types of land use on the site. The Plan update indicates ". . . redevelopment of this site must create a high-quality, mixed-use development that is walkable, connected, and integrated within the site and with the City. This mix of uses should contain a range of residential types together with commercial office and neighborhood retail uses integrated with contributing and shared green space and amenities – all of which complement each other to create an active, vibrant place. Any proposed design must be sensitive to the neighborhoods adjacent to the UMCH site, as well as to the natural features related to Tucker Creek. Any development that occurs within the focus area should relate internally to the site and to an overall plan, even if it is built at different times."

*Future Land Use Zones:* The 2014 update identified four general zones for the property:
- High Street Mixed Use
- Worthington Estates Edge
- Neighborhood Core
- Tucker Creek Preserve

*High Street Mixed Use:*
The High Street Mixed Use zone is described in the 2014 document as follows:

> North High Street is the commercial spine of the City of Worthington . . . [and] is a good location for commercial office use. . . [I]ncome tax generating employment uses such as office are critical to the fiscal sustainability of the City. In addition, this site's close proximity to historic Old Worthington makes it a prime location for walkable residential development and denser, amenity-rich housing types. . . This location along High Street is attractive for retail and service uses as well. It is not the desire of the City, however, to create a third retail center in close proximity to Old Worthington and the Shops at Worthington Place. Retail in this location should be neighborhood scale and serve the development that occurs on this site and that exists in the surrounding neighborhood; and it should help to activate the High Street frontage.

> The High Street Mixed Use zone consists of the frontage of the UMCH site along High Street. It permits a mix of office, residential, and retail uses with the focus on commercial office and medical uses with subordinate residential and limited retail uses. Buildings in this zone should be a minimum of two stories and a maximum of five stories in height with attractive, four-sided architecture. Buildings in this

zone should address the streets, activate the street frontage, and include opportunities for outdoor dining and other pedestrian-focused activities.

It is expected that the buildings adjacent to High Street will be commercial offices. Residential uses might occur behind as a transition to the Neighborhood Core. Neighborhood-oriented retail uses can complement the development in the first floors of office and residential buildings. The objective of the High Street Mixed Use zone is to create a high-quality, dense, walkable, connected, mixed-use development that creates a dynamic space and signature address to attract Class A office tenants along High Street and add vitality and life to the High Street corridor.

In order to create a walkable environment, it is expected that buildings will line public streets and most parking will be located at the center of blocks, screened from public streets by attractive buildings. Parking beneath buildings may also be considered, provided the public street frontage of a building is activated. By providing a mix of uses within the High Street Mixed Use zone, parking areas can be shared to optimize their use. To achieve the desired densities, parking decks are encouraged to be integrated into the site. Features expected as part of any parking deck or structure include masonry and architectural elements to dress up the exterior, windowed stair towers, and lush landscaping and pedestrian connections.

Parking structures and/or parking lots could be lined with residential and/or retail development to separate and screen them from the Neighborhood Core. Where the High Street Mixed Use zone is opposite existing single-family residential development, it is expected that the new development will consist of residential development and/or substantial and attractive buffers.

As with all development in the UMCH focus area, it is to be high-quality in character and design with four-sided architecture. It should follow the *Worthington Design Guidelines.*

*Worthington Estates Edge:*
The Worthington Estates Edge is described as follows:

This zone is where development in the UMCH focus area should create a desirable transition between it and the existing single-family housing development that surround its north and west sides. The surrounding development consists of homes on third-of-an-acre lots. The Worthington Estates Edge zone calls for single-family residential development on lots between a third-of-an-acre and a fifth-of-an-acre. This equates to a residential density similar to Worthington Estates (3 dwelling units/acre) and Old Worthington (4-5 dwelling units/acre). The structures are limited to the same two-and-a-half story height as the surrounding neighborhood.

These may be single-family, detached homes that are more current, updated versions of what is found in the surrounding neighborhoods. Or they may be smaller homes with smaller yards that provide first floor living opportunities for

Worthington residents — an option in which many residents expressed an interest during the community meetings. They may be something in between. Regardless, these homes must be of high-quality design, differentiated architecture, and in close proximity to amenities. This zone is for custom-built, individualized homes and not one for homes with repetitious floor plans.

Housing in this zone should consist of individual units, potentially with lots of different sizes, fronting on a street or streets. The use of cul-de-sacs is strongly discouraged. These new lots must include rear or side yards to provide a substantial buffer and green landscape between these structures and the rear yards of existing homes. Attractive storm water systems designed as a naturalized amenity can be placed within the Worthington Estates Edge zone.

As with all development in the UMCH focus area, it is to be of high-quality in character and design with four-sided architecture. It should follow the *Worthington Design Guidelines*.

*Neighborhood Core:*
The document describes the Neighborhood Core zone as follows:

The Neighborhood Core zone represents the most flexible zone of the UMCH focus area because it is internal to the site. It consists of a higher density neighborhood that creates a transition from the single-family homes along the periphery of the site to the more active uses proposed closer to High Street.

The Neighborhood Core calls for residential development at a density between six and fourteen dwelling units per acre (6-14du/ac) gross density with a height limit of three stories. It is expected that the Neighborhood Core will be developed with more than one housing type and at more than one density level. The expected amount of park space and amenities correspondingly increases with the density. For a density reference, Ville Charmante along West Wilson Bridge Road is over seven dwelling units per acre.

This area creates the opportunity to introduce different types of housing options that are not readily available in the city. This area should provide residential living that is underrepresented in the market and complements Worthington's current offerings, addressing the needs of aging Worthington residents, future young professionals, and those desiring amenity-rich living. . .

Examples include a mix of single-family detached homes on small lots with rear alley garages, homes with great front porches for outdoor gathering, custom homes designed for first-floor living, luxury residences with integrated front auto courts, well-appointed walk-up townhomes, and a limited number of high-end flats. To be successful, the Neighborhood Core must incorporate common areas/shared green space(s). These parks create the community

gathering and development focal point(s). Shared amenities and facilities should also be provided. In all cases, the buildings must have front doors on inviting tree and sidewalk-lined streets. The objective is not to have streets dominated by garages, so garages must be de-emphasized – set back or placed to the rear of structures, creating a very walkable neighborhood.

As with all development in this focus area, the community expects this development to be of high-quality in character and design and adhere to the *Worthington Design Guidelines*.

*Tucker Creek Preserve:*
Finally, the Tucker Creek Preserve zone is described in the document as follows:

The southern boundary of the UMCH focus area is the beautiful and wooded Tucker Creek ravine. This plan calls for preserving this area as a natural green space amenity for the site and the community. The creek and the steep slopes that surround it are not developable and the wooded areas along it are important contributing and environmental features.

The community expressed a strong desire to continue linking neighborhoods, parks, and destinations with multi-use trails throughout the City. This includes achieving a dedicated trail along Tucker Creek that highlights this natural feature and provides an amenity and potential bicycle and pedestrian connection between High Street and Evening Street.

As part of any development that occurs on the UMCH site, it is expected that any future developer preserves the Tucker Creek ravine and wooded area. Any storm water systems in this area must be designed as a naturalized, aesthetic landscape feature that fits in the environment.

The 2014 document goes on to indicate the boundaries of these zones are flexible and provides information about ways in which the size of the areas may vary. It then indicates the importance of park space with the following language:

The creation of park space for community and public enjoyment is an important component for any redevelopment on the UMCH site. This is in addition to the Tucker Creek Preserve. Beyond serving community-gathering functions, the park space is critical to providing place-making in development layouts as well as a green space balance to the built environment contemplated in the High Street Mixed Use and Neighborhood Core zones.

In potential redevelopment scenarios, this additional park space was several acres divided between the High Street Mixed Use and Neighborhood Core zones. Park space could be used to provide linear park "windows" into the site from High Street; neighborhood-oriented parks internal to the site;

and/or extension of the Tucker Creek preserve. The expected amount of park space and amenities correspondingly increases with the density of development proposed on the UMCH site. Park space as discussed here must be useable, contributing ground for residents, workers, and visitors of the redeveloped site, and not, for example, storm water controls or left-over ground.

It is expected that the developer(s) of the UMCH site will integrate usable park land into the development and work with the City to provide acreage in the High Street Mixed Use and Neighborhood Core zones as park space useable by the community.

Creating this additional park space within the UMCH focus area will address the community's desire for park space and amenities here. The public process generated numerous ideas for amenities worthy of further consideration. It is important that the City and the Worthington Parks and Recreation Commission work with the community to plan for and create parks that include the desired amenities in the appropriate places within the City and at this site.

The 2014 document goes on to include information related to Design Guidelines, connectivity, street intersections, the High Street frontage, landscaping and buffers, storm water and public private partnerships which can be found in the full document.

Worthington Comprehensive Plan – UMCH Focus Area – 2014 - High Street Frontage Guidelines:
The potential redevelopment of the UMCH focus area creates a change in the consideration of setbacks along High Street in these blocks. To achieve the desired walkability, vitality, and screening of parking along Worthington's signature street, it is expected that multi-story buildings will be constructed closer to the High Street right-of-way, with parking located behind the buildings. The buildings should engage High Street with broad sidewalks, storefronts, front entries, and outdoor seating that provide an inviting strolling environment for pedestrians. The buildings constructed along High Street will set the tone and impression for the entire UMCH focus area. As such their architecture, materials, quality, interest, aesthetics, and vitality are critical. These buildings should have a predominance of brick and complement the community character. Buildings along High Street must have the majority of their building face fronting/ parallel to the street. Buildings are expected to be at least two stories in height with substantially transparent storefronts on the first floor, whether retail or office, to activate the street. Operational building entries must be provided along High Street regardless of parking orientation. Neither single-story commercial buildings nor retail buildings on out lots are part of the vision for the UMCH focus area, nor are buildings placed in the middle of parking lots.

Generally, it is anticipated that buildings will be setback from the High Street curb line an appropriate distance based upon the architecture and use(s) of the buildings. The streetscape section between the building and the curb should include a sizable tree lawn or street trees in planters (ten feet +/-), at least an eight-foot-wide unobstructed sidewalk, and an outdoor seating and/or landscape planting area. As the building height increases, the buildings should consider the

relationship between the setback, the street corridor, and the building height. It is expected that if fourth or fifth stories are included, a variety of techniques will be implemented to mitigate any potential "canyon" effect along High Street, such as the use of floor terracing, changes in building massing, insertion of a green commons, recessed seating and dining areas, and lush landscaping to name a few.

While it is preferred that parking be provided to the rear of building, if parking is provided in front, it should be consistent across the frontage and be limited to either one row (single bay) of parking or on-street parking for short customer visits. Parking visible between buildings should be screened by landscape and/or masonry wall.

Development within the UMCH should be well landscaped, with particular focus on the streetscapes, building edges, buffers, and public park/community commons. Landscaping should be substantial, lush, well-planned, and commonly maintained. Landscape should emphasize native species where possible.

Worthington Comprehensive Plan - 2005
The 2005 Comprehensive Plan identifies portions of High Street outside of the historic core as High Street Corridor (Extents Area) and as a place where consistent site design should be encouraged such as landscape screening and interior planting of surface parking areas, and where the location of large parking areas should be to the rear of the site. The corridor could accommodate redevelopment at a higher density, with such projects meeting the needs of the City, providing green setbacks and meeting the Architectural Design Guidelines. The plan recommends promoting a high-quality physical environment, encouraging the City to continue to emphasize strong physical and aesthetic design, and high-quality development. Also recommended is encouraging the private market to add additional commercial office space within the City. The UMCH property was specifically addressed in that section of the plan, with concepts establish for mixed use development on the site. This section specifically focused on the UMCH property was updated with the 2014 document.

Chapter 1177 - Worthington Design Guidelines and Architectural District Ordinance
This property is located within the Architectural Review District and as such is subject to the Architectural District Code (Ordinance) and the Worthington Design Guidelines. The Design Guidelines contain the following recommendations for new commercial/institutional and new residential construction in the parts of the District outside of Old Worthington:
New Commercial/Institutional Sites
  1. Scale, Form & Massing: Extension of the pleasant scale of Old Worthington into new areas is desirable. Consider breaking down larger buildings into a series of smaller masses with connectors between them. Inclusion of sidewalks, pedestrian-scaled signage, and planting and lawn areas will help communicate a sense of a walkable pedestrian scale. Simple geometric forms and uncomplicated massing tend to make buildings more user-friendly and help to extend the character of Old Worthington into the newer development areas. Carefully designed building facades that employ traditional storefronts -- or similarly sized windows on the first floor -- will help make new buildings more pedestrian-friendly.
  2. Setbacks: Parking areas should be located toward the rear and not in the front setbacks if at all possible. Unimpeded pedestrian access to the front building facade from the sidewalk

should be a primary goal. Building up to the required setback is desirable as a means of getting pedestrians closer to the building and into the main entrance as easily as possible.

3. Roof Shape: Generally, a traditional roof shape such as gable or hip is preferable to a flat roof on a new building. Roof shapes in a development do not have to be identical but can vary – just as in Old Worthington – to provide visual variety. Roof shapes should be in scale with the buildings on which they are placed. Study traditional building designs in Old Worthington to get a sense of how much of the facade composition is wall surface and how much is roof.

4. Materials: Traditional materials such as wood and brick are desirable in newer areas, but other materials are also acceptable. These include various metals and plastics; poured concrete and concrete block should be confined primarily to foundation walls. Large areas of glass are appropriate for the first floors of new buildings, where they resemble the commercial storefronts typical of older buildings. On upper floors, avoid large areas of glass in favor of a more traditional pattern of window openings spaced regularly across the building's wall. Avoid any use of glass with highly reflective coatings. Some of these may have a blue, orange, or silver color and can be as reflective as mirrors; they generally are not compatible with other development in Worthington. Before making a final selection of materials, prepare a sample board with preferred and optional materials.

5. Windows: On long facades, consider breaking the composition down into smaller "storefront" units, with some variation in first and upper floor window design. Use traditional sizes, proportions and spacing for first and upper floor windows. Doing so will help link Old Worthington and newer areas through consistent design elements.

6. Entries: Primary building entrances should be on the street-facing principal facade. Rear or side entries from parking lots are desirable, but primary emphasis should be given to the street entry. Use simple door and trim designs compatible with both the building and with adjacent and nearby development.

7. Ornamentation: Use ornamentation sparingly in new developments. Decorative treatments at entries, windows and cornices can work well in distinguishing a building and giving it character, but only a few such elements can achieve the desired effect. Traditional wood ornamentation is the simplest to build, but on new buildings it is possible to use substitute materials such as metal and fiberglass. On brick buildings substitute materials can be used to resemble the stone or metal ornamental elements traditionally found on older brick buildings. As with all ornamentation, simple designs and limited quantities give the best results.

8. Color: For new brick buildings, consider letting the natural brick color be the body color, and select trim colors that are compatible with the color of the bricks. It may be acceptable to paint new brick walls. Generally, lighter colors should be used for this purpose, with darker colors for trim. Prepare a color board showing proposed colors.

9. Signage: Keep and repair any historic signage that is appropriate to the Architectural Review District. While the regulations permit a certain maximum square footage of signs for a business, try to minimize the size and number of signs. Place only basic names and graphics on signs along the street so that drive-by traffic is not bombarded with too much information. Free-standing signs should be of the "monument" type; they should be as low as possible. Such signs should have an appropriate base such as a brick planting area with appropriate landscaping or no lighting. Colors for signs should be chosen for compatibility with the age, architecture and colors of the buildings they serve, whether placed on the

ground or mounted on the building. Signs must be distinctive enough to be readily visible, but avoid incompatible modern colors such as "fluorescent orange" and similar colors. Bright color shades generally are discouraged in favor more subtle and toned-down shades.

10. Sustainability: The City of Worthington and its Architectural Review Board are interested in encouraging sustainable design and building practices, while preserving the character and integrity of the Architectural Review District. Energy conservation methods are encouraged. Landscape concepts often complement energy conservation and should be maintained and replenished. Utilize indigenous plant materials, trees, and landscape features, especially those which perform passive solar energy functions such as sun shading and wind breaks. Preserve and enhance green/open spaces wherever practicable. Manage storm water run-off through the use of rain gardens, permeable forms of pavement, rain barrels and other such means that conserve water and filter pollutants. Utilize solar panels where appropriate that meet the guidelines outline in the Design Guidelines. Bike racks and other methods of facilitating alternative transportation should be utilized. Streetscape elements should be of a human scale. Make use of recycled materials; rapidly renewable materials; and energy efficient materials. Use of natural and controlled light for interior spaces and natural ventilation is recommended. Minimize light pollution.

New Residential Sites

1. Form, massing and scale: New structures should complement the form, massing, and scale of existing nearby structures. Also, building placement and orientation are important design considerations. Most main entrances should face the street and garages should avoid facing the street.

2. Setbacks: Observe the setbacks of adjacent and nearby structures.

3. Roof: Roof shapes for new buildings should be appropriate to the style or design of the building. If a new building does not follow a particular style but is instead a vernacular design, then roof shapes and heights similar to those in the neighborhood or nearby would be most appropriate.

4. Materials: Contemporary materials that simulate traditional ones are appropriate, but the preferred option is to use true traditional materials such as wood siding. Incompatible contemporary materials should be avoided. Brick has long been a traditional material in Worthington. Prepare a sample board for review by the Architectural Review Board.

5. Windows: For new buildings, multiple-paned windows generally are not appropriate. The exception is a building being built in a particular style -- such as Federal, Greek Revival or Colonial Revival -- that would have employed this window type. When in doubt, simple 1 over 1 double-hung sash windows are usually the simplest, least expensive and most appropriate choice. Using the excellent precedents of Worthington's many historic structures, carefully design the pattern of window openings; window sizes and proportions (they must be appropriate for the size and proportions of the wall in which they are placed); pattern of windowpanes and muntins; and trim around the windows. Good quality wood windows are readily available and more affordable than in the past. True wood windows are always the first preference. Aluminum- or vinyl-clad windows can be appropriate, but primarily on secondary facades and less conspicuous locations. All-aluminum or vinyl windows are not prohibited but are not encouraged. Avoid blank walls.

6. Entries: As with other design considerations, study Worthington's rich collection of 19th and 20th century architecture for design ideas for entrances and doors. For newly built buildings, simpler designs usually look better than more ornate ones. Avoid heavy ornamentation on

doors and entrances. Observe entry placement on existing buildings. Whether located symmetrically or asymmetrically, entries usually are aligned with a window on the second floor so that a regular rhythm of openings is maintained on both floors. Entries should be located so they are easily visible, and they should be oriented toward the street.

7. Ornamentation: Observe Worthington's excellent historic architecture for information on the kinds and amounts of ornamentation employed on various building styles and periods. Use ornamentation conservatively. It will be most successful if used in traditional locations: around windows and doors; along a building's cornice or at the corners; in gables; or on gates and fences. Most ornamentation historically was made of simple forms built up to a desired level of complexity. When in doubt, follow the old rule that "less is more." Sometimes just a little ornamentation, well placed, can have a major impact without the need for more extensive (and expensive, and hard-to-maintain) ornamentation. Use compatible materials in ornamental elements. Frame houses should have wood ornamentation, although in cases where the ornamental elements are some distance from the viewer it may be possible to use substitute materials such as fiberglass.

8. Color: In general, avoid bright colors not typical in Worthington neighborhoods, such as various shades of purple or orange. For infill buildings being placed in an existing streetscape, select colors compatible with those already used along the streetscape. Many buildings follow a pattern of light colors for the building body and darker colors for the trim. Following this pattern is encouraged. In Worthington, the use of white or cream-colored trim also is common and would be appropriate for new construction. Avoid using too many colors. Usually one body color and one trim color are sufficient.

9. Landscaping: Worthington's mature shade trees are the primary landscaping feature throughout the community. They are a major contributor to its character and help define its neighborhoods as stable, desirable places to live. In general, lawns are generous but not overly large, which contributes to the sense of human scale that is one of Worthington's important attributes. Other landscaping elements tend to be properly scaled and well-tended, which also tends to enhance neighborhood character. Maintain and nurture mature trees to prolong their lives. Plant and maintain street trees in planting areas between the street and sidewalk. Paving can sometimes reduce water absorption of the soil so much that trees do not get the moisture they require.


Chapter 1177.05 Standards for Review: Certificate of Appropriateness
**1177.05 Standards for Review: Certificate of Appropriateness**
The Board of Architectural Review, in deciding whether to issue a certificate of appropriateness, shall determine that the application under consideration promotes, preserves and enhances the distinctive historical village character of the community and would not be at variance with existing structures within that portion of the district in which the structure is or is proposed to be located as to be detrimental to the interests of the Districts as set forth in Section 1177.01. In conducting its review, the Board shall make examination of and give consideration to the elements of the application including, but not necessarily limited to:

(1) Height, which shall include the requirements of Chapter 1149;
(2) Building massing, which shall include in addition to the requirements of Chapter 1149, the relationship of the building width to its height and depth, and its relationship to the viewer's and pedestrian's visual perspective;

(3) Window treatment, which shall include the size, shape and materials of the individual window units and the overall harmonious relationship of window openings;

(4) Exterior detail and relationships, which shall include all projecting and receding elements of the exterior, including but not limited to, porches and overhangs and the horizontal or vertical expression which is conveyed by these elements;

(5) Roof shape, which shall include type, form and materials;

(6) Materials, texture and color, which shall include a consideration of material compatibility among various elements of the structure;

(7) Compatibility of design and materials, which shall include the appropriateness of the use of exterior design details;

(8) Landscape design and plant materials, which shall include, in addition to requirements of this Zoning Code, lighting and the use of landscape details to highlight architectural features or screen or soften undesirable views;

(9) Pedestrian environment, which shall include the provision of features which enhance pedestrian movement and environment and which relate to the pedestrian's visual perspective; and

(10) Signage, which shall include, in addition to requirements of Chapter 1170, the appropriateness of signage to the building.

(11) Sustainable Features, which shall include environmentally friendly details and conservation practices such as solar energy panels, bike racks, and rain barrels.

Chapter 1174 - Planned Unit District - PUD
The PUD: Planned Unit Development chapter of the Codified Ordinances includes the following purpose statement:

The purpose of Planned Unit Development is to promote variety, flexibility and quality for the development of properties in the City of Worthington. Planned Unit Development allows for more creative planning and design and enables a greater range of uses than traditional Zoning regulations. Planned Unit Development allows for the design and mix of uses necessary to meet changing economic and demographic demands; permits implementation of development standards, plans, studies, and guidelines adopted by the City Council; and provides the opportunity to retain and enhance the character of the City, and the health, safety and general welfare of the inhabitants.

The chapter goes on to provide additional detail regarding PUD provisions, uses, standards, submission requirements, procedures, natural features and coordination with other provisions of the Planning and Zoning Code, which can be found in Chapter 1174 of the Codified Ordinances of the City.

## Staff Comments/Analysis

Staff has focused on broad discussion topics in this section and compared them to the language in the 2014 Comprehensive Plan Update to manage the initial review of the applications and materials. City staff has worked diligently to arrange meetings with the applicant to discuss the almost 500-page application and to clarify understanding of the proposal, however we have only

had two meetings at this time; one meeting to discuss traffic and then a brief discussion concerning the Development Text in the applications and materials. Timeliness in working with City staff to schedule meetings has not been easy. More timely and productive meetings are needed for City staff to better understand the applications and materials that have been provided. The staff comments/analysis included below is our interpretation of the materials we were provided. A full review of the detailed criteria in Chapter 1174 PUD Planned Unit Development is still needed and could not yet be completed due to the limited information available from the applicant.

***Discussion Topics:***
- Residential Density & Types
- Mix of Land Uses
- Greenspace/Open Space
- Traffic
- Stormwater
- Architecture
- Miscellaneous

## Residential Density & Housing Types

The overall density for the proposed residential development is notably higher than the density included in the 2015 informal proposal. The previous informal proposal from 2015 included more acreage and High St. frontage; however, it had a lower density than what is proposed today. The overall site has been reduced by 3.4 acres and 428± feet of road frontage. The previous density discussed was 14 units/acre on 41.22 acres and is now 19.3 units/acre on 37.8-acres. The 2015 version was presented at a meeting that had over 350 people attend, and overall, the community was not supportive of the previous density, layout and amount of usable open space and this proposal has approximately 200 additional units with less acreage.

The applicant proposes a mix of for-sale and for-rent products throughout the site that include a mix of floorplans. The mix of floor plans has only few options for single-level living, which is one of the key things we have heard from our residents that they would like to see offered in the community.

### Worthington Estates Edge

This area is identified in the 2015 Comprehensive Plan Update ("Plan") as a transition zone between the existing single-family housing to the west and north and application proposes single-family residential development on lots between a third-of-an-acre and a fifth-of-an-acre. Staff's review noted the proposal is generally consistent with the density recommendations found in the 2014 Comprehensive Plan Update with the following comments:
- The rear yard setbacks abutting the existing residential to the west should have a year yard setback of 30-feet and the lots fronting on Longfellow Ave. should have a front yard setback of 30 feet to match the existing required setbacks of those homes found in Worthington Estates.
- Landscaping and buffers are key between the UMCH focus area and the neighboring

residential.
- First-floor living opportunities are important to the Worthington residents.
- Custom-built, individualized homes are desired according to the Plan and recommended to not have repetitive floor plans, however the applicant submitted a sample of 4-home plans that would be built by Bob Webb Homes with the caveat that the house models with the same footprint may be allowed under certain circumstances.
  - The Plan states that architecture and design should be rich and varied (not repetitive/homogeneous) with great attention to detail.
- The Residential Design Guidelines provide guidance on site development, form, massing, scale, setbacks, roof shape, exterior materials, windows, entries and color.
- The Worthington Estates Edge would remain in the Architectural Review District.

*Neighborhood Core*

The Plan recommends this area for higher density residential development that creates a transition from the single-family homes along the periphery of the site to the more active uses proposed closer to High St. The recommendation is for 6-14-units/acre with a height of 3-stories with more than one housing type at more than one density with appropriate open space associated with the proposed density. Staff has the following comments:
- The applicant is proposing an overall density of 12-units/acre in this area with a for sale and for rent product that is 2-3 stories in height. Some units will have a garage and finished lower level.
- Residential development in this area of the site is recommended in the Plan at 6-14 units/acre with more than one housing types and at more than one density level. The proposed 12-units/acre does not incorporate a true mix of housing options. This area should provide a mix of residential living that is underrepresented in the Worthington market and addresses the needs of aging residents, future young professionals, and those desiring amenity-rich living.
- The 2015 proposal from Lifestyle Communities expressed a mix of estate lots, cottage lots, manor lots and townhomes on the site at approximately 178-units for 13-units/acre; however, the community comments received on that proposal indicated the density and product was not what the community wanted to see on the site.
- Subarea #2 and subarea #3 are proposed to develop at different densities with a minimal mix of styles, however, there appears to be minimal units that provide single-level living.
  - Single-level living is one of the things the City has heard is desired by residents and is not abundantly provided for in this proposal.
- The Plan notes that this area creates the opportunity to introduce different types of housing options that are not available in the City.
  - Townhomes are the only housing option offered in this location besides a few single-level living options.
- The northern portion of the Neighborhood Core (subarea #2) has been identified in the proposal as townhomes at 2-3 stories in height with garages that will be a for sale product.
  - This for sale product would serve as a transition from the detached single-family lots to the west and north to the rental products proposed to the south and east towards High St.

- The Comprehensive Plan recommends a mix of single-family detached homes on small lots with alley garages, homes with great front porches for outdoor gathering, custom homes designed for first-floor living, luxury residences with integrated auto courts, well-appointed walk-up townhomes, and a limited number of high-end flats.
  - The renderings for the townhomes on the northern portion of the Neighborhood Core (subarea #2) show front porches and garage accessed by an alleyway, however these units are all attached townhomes with multiple floors, whereas the Plan recommends a variety.
- The southern portion of the Neighborhood Core (subarea #3) has been identified as townhomes at 2-3 stories in height with some units having attached garages and are a for rent product. These units are extremely narrow at 15-feet with a height varying of 2-3 stories. This does appear to offer a limited amount of single-level living options and is at the maximum density recommended in the Neighborhood Core.
- The rental product located in the southern portion of the Neighborhood Core (subarea #3) does not have a mix of housing types that included detached homes on small lots with rear alley garages and front porches as referenced in the 2014 Plan. The application identifies this area for townhomes that do not have front porches for outdoor gathering.
- The application states that the total amount of public/private open space is approximately 1.9 acres in size, however there are only a few areas that are reasonably sized areas of open space in the Neighborhood Core. The areas shown are proposed for recreation, separate dog park, gazebo, seating area and other small green spaces between the townhomes and space at the end of buildings.
  - The Plan recommends the creation of park space for the community and public enjoyment as an important component for any development on the site in addition to the area identified as the Tucker Creek Preserve.
  - Park space is critical to providing place-making in development layouts. The proposed open space does not seem to meet the goal of creating contiguous usable open space for those living in this development and in all of Worthington. The proposed green space does not appear to build upon the green space that is identified as the Tucker Creek Preserve.
  - The Plan calls for several acres of park space between the High Street Mixed Use and Neighborhood Core zones.
  - According to the Plan, park space and amenities should increase with density and should be useable, contributing ground for residents, workers, and visitors to the site. The areas shown appear to be left-over ground and an area identified for stormwater control, which is identified in the Plan as the type of ground that does not meet the park space goal..
  - The Plan and the community have asked for additional park space with amenities within the UMCH site. At this time, it does not appear that the proposed green space meets the need for usable contiguous open space that can build upon the Tucker Creek Preserve as described in the Plan.

*High Street Mixed Use*

This area consists of the frontage of the UMCH site along High St. and is recommended in the Plan for a mix of office, residential, and retail uses with the focus on commercial office and

medical uses with subordinate residential and limited retail uses. Staff has the following comments:

- The proposed 540 apartments with access to a proposed parking garage in this area does not appear to meet the intent of being subordinate residential.
- The apartments range in height of 3-5 stories in height with some buildings having first-floor retail.
- The application states they are providing approximately 1.2 acres of open green spaces, however this includes several areas associated with the apartments and/or amenities associated with the apartments. This is the area for the clubhouse, pool, volleyball courts and an interior courtyard surrounded by the apartment buildings and parking garage.
- The 2015 version expressed a mix of medical office buildings, first-floor retail, and apartments at 350-units. Many community members previously stated that they felt that 350 apartments was too much on the site.
- The site is now 3.42 acres smaller with less High St. frontage and the apartment count has increased by 190 units in the area along High St.
- Residential uses might occur behind as a transition to the Neighborhood Core.
- Residential use should be subordinate to the primary need for commercial office and medical uses in the High Street Mixed Use zone.
- According to the Plan, where the High Street Mixed Use is opposite existing single-family residential, it is expected that the new development will consist of residential development and/or substantial attractive buffers.
  - The apartments are 5-stories in height towards the intersection of Larrimer Ave. and Longfellow Ave. and the amenities (clubhouse, pool & volleyball courts) associated with the apartments are located along the curve in Longfellow Ave. across the street from existing single-family residential. Proper buffer and setback need to be provided and should not be located directly across the street from existing residential development.

### *Mix of Land Uses*

As stated in the Plan, redevelopment on this site must create a high-quality, mixed-use development that is walkable, connected, and integrated within the site and with the City. This mix of uses should contain a range of residential types together with commercial office and neighborhood retail uses integrated with contributing and shared green space and amenities – all of which complement each other to create an active, vibrant place. Staff has the following comments:

- Commercial Uses:
  - The application proposes 60,000 sq. ft. of commercial retail/restaurant space and 25,000 sq. ft. of medical office space. The proposed square footages are not consistent with the recommendations found in the Plan.
  - Income tax generating employment uses such as office are critical to the fiscal sustainability of the City.
  - Neighborhood scale retail was recommended in the Plan due to the proximity of this site to Old Worthington and the Shops at Worthington Place as a means to not create a third retail center.
  - An application for the Shops at Worthington Place is currently under review to

demolish approximately 120,000 sq. ft. of an existing retail center at a key intersection in Worthington due to the challenges of competing with larger retail centers in in the region while this proposal calls for adding 60,000 sq. ft. of commercial retail/restaurant to this site.

- o The Plan calls for a mix of office, residential and retail uses with the focus on commercial office and medical uses with subordinate residential and limited retail uses.
  - ▪ The proposed retail and residential uses are not subordinate to the commercial office and medical use recommendations for the site.
- o As a landlocked community there are few opportunities to attract new Class A office tenants in Worthington that are seeking new construction. This site is key to attracting new office development.
- o According to the Plan, neighborhood retail can complement the development in the first floors of offices and residential buildings, however the abundance of retail proposed is out of align with the needs of the City seeking more opportunities for new commercial office development.

- Residential Uses:
  - o The proposal shows a total of 730-units on the site with a mix of housing types and are marketed as a rental product and a for sale product. There would be 612 rental units and 118 for sale units.
    - ▪ The City has heard from the community that there is a desire for owner-occupied housing units as a means to age in place and stay within the Worthington community.
  - o The 2015 proposal from Lifestyle Communities included more acreage and High St. frontage; however, it had a lower density than what is proposed today. The overall site has been reduced by 3.4 acres and 428+ feet of road frontage. The previous density discussed was 14 units/acre on 41.22 acres and is now 19.3 units/acre on 37.8 acres. Over 350 people attend a meeting on this 2015 proposal, and the community was not supportive of the previous density, layout and amount of usable open space and this new proposal has approximately 200 additional units with less acreage.
  - o The Plan recommends a range of residential types together with office and neighborhood retail and shared green space and amenities designed to be sensitive to the neighborhoods adjacent to the site, and protect the natural features related to Tucker Creek.
  - o The proposed number of units does not seem consistent with the Plan and what has been expressed by the Worthington community.

### *Greenspace/Open Space- Parkland*

The Tucker Creek Preserve has been identified in the Plan as an area to preserve as a natural green space amenity for the site and the community. The creek and the step slopes are not developable, and the wooded areas are important contributing and environmental features. There is a strong desire to continue linking neighborhoods, parks, and destinations with multi-use trails throughout the City. The creation of park space for community and public enjoyment is an important

component for any development on the site in addition to the Tucker Creek Preserve. Staff has the following comments:

- There is an opportunity to have a bicycle and pedestrian connection between High St. and Evening St. and around the entire site that would promote additional bicycle and pedestrian opportunities and access to greenspace/open space on the site.
  - Sidewalks are proposed throughout the site and a small multi-use trail along the rim of Tucker Creek Preserve; however, the vision was to build upon the Tucker Creek Preserve's existing assets. This proposal does not provide amenities that we have heard the community would like to see on the site.
- Park space is recommended in the Plan to provide a place for community gathering functions and to provide place-making in the development's layout as well as a greenspace balance to the uses proposed on the site.
  - Contiguous usable greenspace/open space is key to what the community expects to the see on the site.
- According to the Plan, the amount of greenspace/open space is expected to increase as the density on the site increases.
  - This proposal does not appear to be in line with that recommendation.
- The Plan indicates park space should be useable, contributing ground for residents, workers, and visitors to the site and not stormwater ponds or left-over ground.
  - Tucker Creek Preserve appears to be cut off from the rest of the site with the only access being a multi-use path that follows the perimeter of the multi-family units.
  - A stormwater pond is proposed along the Evening St. frontage abutting the Tucker Creek Preserve.
    - There might be better ways to incorporate stormwater management on the site that would be an attraction and benefit to the development.
  - The Plan envisioned a possible three season shelter house, outdoor amphitheater, multi-use paths and more passive recreational uses in the areas around and in the Tucker Creek Preserve. Nothing has been proposed at this time; however, the applicant has stated that they would be willing to work with the City on desired amenities in the appropriate places on this site.
  - Access to the Tucker Creek Preserve is blocked by the multi-family housing units in subarea #2 and #3.
    - Contiguous usable greenspace/open space is key to what the community expects to the see on the site.
  - It is expected that greenspace/open space be incorporated into the Neighborhood Core and the High Street Mixed Use zones as park space useable by the community.
    - Many of the proposed pockets of greenspace/open space do not appear overly inviting to the community.
- The Tree Survey & Preservation Plan should be discussed in greater detail. There appears to be an opportunity to save some high-quality species of trees along the perimeter of the site, however, there does appear to be some high-quality species of trees in the center of the site that will likely be removed as part of any development. There might be the possibility to incorporate some of these trees into the overall design.

*Traffic*

The City has requested an updated Traffic Study for the site. The previous Traffic Study was prepared in 2015, updated in 2017 and again in 2018. City staff felt that it was appropriate for an updated Traffic Study using previous traffic counts for the City since traffic patterns and volume have substantially changed since the pandemic. Staff has the following comments:

- City staff, including our traffic consultant Arcadis, met with the applicant and their engineer EMH&T on November 13, 2020 to discuss the following:
  - The need for an updated Traffic Study for the site.
    - As of January 7, 2020, we have not received an updated Traffic Study.
  - Bicycle and pedestrian improvements could be better incorporated into the overall design.
  - Public and private roadways proposed on the site.
    - Wesley Blvd. has been proposed to become a public roadway and dedicated to the City for maintenance.
      - City staff has concerns about how this road was constructed and whether it was constructed to public road standards since it was originally constructed as a private road.
  - Compliance with the City's Complete Street Policy will be required for all newly constructed streets.
  - The need for vehicular, bicycle and pedestrian connections to the existing roadways at Evening St., Longfellow Ave., Larrimer Ave., Wesley Blvd. and High St. and proposed new roadways on the site should be further discussed and reviewed.
  - Improvements along High St. as proposed with the development and streetscape improvements associated with these improvements need further consideration.
    - Streetscape improvements will need to be discussed and incorporated into the overall design.
  - Intersection streetscape improvements at Larrimer Ave. and High St. will need to be discussed and incorporated into the overall design.
  - There is a need to address the intersection of High St., Wesley Blvd, Worthington-Galena Rd. and Crandall Dr. as part of this development as it relates to traffic being able to go east/west through the intersection.

*Stormwater*

Stormwater management will be extremely important as this site develops. The application identifies a wet detention basin along Evening St. and stormwater storage vaults and surface detention facilities located within the open spaces and parking areas on the site. The City and its consultant, ms consultants, will be reviewing the final stormwater design to ensure compliance with Ohio EPA standards and the City's Stormwater Manual as the project progresses. The stormwater design has been proposed to outlet to the existing Tucker Creek along the southern property line. Staff has the following comments:

- A comprehensive look at the entire site for stormwater will be needed that can be developed in stages as the overall site would likely develop in phases over multiple years.
- According to the Plan, stormwater controls should be aesthetically integrated into the site

and be natural in appearance and serve as an amenity to the site. The current proposal just has the detention pond located along Evening St. and the proposed new roadway to the site. Vehicular and pedestrian safety will need to be discussed concerning the detention pond.

- Sustainable and green infrastructure needs to be incorporated into the overall development as stated in the Plan.
- The Plan states the expectation that stormwater controls on the site will be required to meet or exceed all requirements.

*Architecture*

The property is located in the Architectural Review District and any new construction would need to meet the Worthington Design Guidelines and would be subject to review by the Architectural Review Board. The Plan provides additional guidelines for residential and commercial development. The two parcels that are currently zoned R-10 fronting on Larrimer Ave. would need to be added to the Architectural Review District. Staff has the following comments:

- Residential Development:
  - As the Plan states, architecture and design should be rich and varied (not repetitive/homogeneous) with attention to detail.
    - The proposed architecture in subareas #1, #2 and #3 appears to be repetitive in design and layout for the proposed detached single-family homes, townhomes, and apartments.
    - The application references vinyl siding which is typically not permitted in the Architectural Review District.
    - All proposed materials should follow the Worthington Design Guidelines.
    - Renderings provided in the application do not seem to match with the submitted elevations.
    - There are additional Residential Design Guidelines called out in the Plan and the Plan notes development should adhere to the Worthington Design Guidelines.
- Commercial Development:
  - The Plan notes the Worthington Design Guidelines provide guidance on site development, scale, form, and massing, setbacks, roof shape, materials, windows and signage. The Plan further states development should improve the pedestrian scale and walkability of the City's commercial heart and create four-sided architecture that is attractive on all sides. Building forms, materials, and setbacks should be consistent with historic patterns.
    - The proposed architecture in subarea #4 does not appear complementary to the guidelines recommended for the site as it pertains to the multi-family buildings and the parking garages. The parking garages appear to be exposed to the High St. frontage.
    - The application references vinyl siding, stucco, faux balconies, faux chimneys and enclosed shuttered windows which are typically not permitted in the Architectural Review District.
    - The elevations are repetitive in design and the scale, form and massing of the site do not appear to meet the intent of the guidelines.
      - This is extremely apparent when you are looking at the apartment

buildings on the northern portion of the site.
- The renderings included in the packet do not seem to match with the submitted elevations.
- Elevations for the commercial buildings along High St. have not been submitted, however the application does state that the buildings will have a setback of 25-feet from the public right-of-way.
  - A setback of 25-feet is recommended; however, the street frontage should be activated and have usable entries according to the Plan.
- Streetscape improvements will need to be discussed at some point in the process. This would include new mast arms at Larrimer Ave. and High St. streetlights, street trees, landscaping, pedestrian sidewalks and/or paths.
- The surface parking lot along High St. between the proposed commercial buildings should be screened and/or set back from the High St. frontage.
  - The use of the High St. frontage should be utilized for something greater than a surface parking lot.
- There are additional Commercial Design Guidelines called out in the Plan that reference the Worthington Design Guidelines that should be considered.

## Miscellaneous:

City Council members provided a list of questions to City staff and to the applicant on December 3, 2020 related to their proposal. Currently City staff is still waiting on a response from the application for many of the questions. Lists of the questions submitted by City Council Members are available on the City's website.
- Lifestyle Communities Development Application for the UMCH Site – Applicant – Questions from City Council Members – Applicant
- Lifestyle Communities Development Application for the UMCH Site – City Staff – Questions from City Council Members – City Staff

The applicant provided an Economic Development Synopsis on the afternoon of January 7, 2021 and stated they have completed an Economic Development Study for the site; however, this study has not been submitted to the City for review at this time.

July 15, 2015 – City Council Letter to Lifestyle Communities or go to worthington.org/umch
City Council provided a letter to Lifestyle Communities on July 15, 2015 responding to their conceptual plans shared at a public meeting on June 29, 2015. Council reiterated the significance of this development to all Worthington residents and that they should continue to engage in a comprehensive, inclusive community outreach process to listen and respond to the interest of the Worthington residents. The issues raised by the community focused on abundant greenspace and parklands, stormwater, managing traffic to the neighborhoods, school capacity, mix of housing types, number of residential units and the sizes of buildings. These were just a few issues that Council stated should be incorporated into future discussions, studies and conceptual plans.

The UMCH Development Update is available at worthington.org/umch project page on the City's website offers the following information:

- Applications & materials associated with the current proposal.
- Ways to learn more about the proposal and understanding the rezoning and development review process while explaining what a PUD is.
- Ways to provide feedback throughout the public process.
- What are other people saying in the community. We have posted all comments at (UMCH Public Comments) or go to worthington.org/umch to view all comments. All comments are posted to the website and have been shared with the Board & Commission members and are now part of the record.
- UMCH Background Materials
- Notify Me – Gives you the opportunity to receive updates by email when there is new information available.

**Worthington City Charter**

The Charter provides the following information regarding the role of the Municipal Planning Commission:

SECTION 6.03 Powers and Duties of Municipal Planning Commission
The Municipal Planning Commission shall have the power to:
(1) Review and recommend any revisions to the Master Plan, official map, area plans, and development standards of the City as often as necessary but not less frequently than every five (5) years;
(2) Recommend to Council the disposition of requests for subdivision platting;
(3) Recommend to Council amendments to the zoning plan and ordinance of the Municipality;
(4) Recommend to Council zoning changes and zoning for newly annexed areas;
(5) Determine or recommend to Council, as provided by ordinance, the disposition of requests for conditional use permits;
(6) Cooperate with the regional planning commission and the planning commissions of area municipalities;
(7) Act as the Board of Architectural Review as provided by ordinance. The Council shall annually appoint as additional voting members of the Board of Architectural Review two representatives of the Architectural Review District, one or both of whom shall be a resident freeholder of said District;
(8) Perform such other duties, not inconsistent with this Charter, as may be required by ordinance.

In rendering a decision or recommendation, the Municipal Planning Commission shall articulate its basis therefor, in writing, by reference to the relationship that decision or recommendation has to the overall comprehensive planning goals of the City, which may be found in the Master Plan, the zoning map, a course of zoning or subdivision practices by the City, or any other acknowledged comprehensive strategy or goals previously established at the time of the decision or recommendation.

If the Commission is ready to act, the following motion can be approved or denied by the Municipal Planning Commission, or the item can be tabled.

*All motions are required to be presented in the positive.*

**Discussion:**

Mr. Coulter stated that the purpose of this meeting was to give the MPC, ARB and the community a chance to listen to the proposal by Lifestyle Communities for the development of the United Methodist Children's Home property. This meeting should be the first of many meetings and opportunities to make public comment. The meeting was structured in the following format which was to be followed as closely as possible:

- 7:00 pm – Presentation by applicant
- 8:00 pm – Start of Public Comments
- 9:00 pm – 10-minute break
- 10:00 pm – End of public comments/Start of Board comments/questions
- 11:00 pm – End of meeting

Verbal public comments were limited to those speakers that had already signed up.

E-mail comments sent to planning@worthington.org during the meeting would be summarized for the Board and Commission during the meeting. All emailed comments would be posted on the City's website.

Mr. Brown swore in Mr. Thomas Hart on behalf of Lifestyle Communities, 1033 High St., Worthington, Ohio, who said he was the zoning lawyer for the applicant. Along with Mr. Hart, was Mr. Steve Campbell, of Northstar Policy and Project Development Group. Mr. Hart said he wanted to say up front that their presentation was meant to be introductory and for that reason the presentation was not very visual. The presentation would be more narrative in words. Mr. Hart began his presentation for the Lifestyle Communities PUD Redevelopment Plan. He said he would discuss their Operating Assumptions and Goals, Park vs. Development, Process and Community Outreach, the Site Plan and Comprehensive Plan Goals, Mixed Use Context, addressing a Fundamental Need, Understanding Economic Impact, and Leveraging Developments for Community Needs. Mr. Hart said LC has been in business for about twenty-five years, and they are a proven development and operating organization. They provide a unique combination of community designs and one of a kind amenity packages and that has led to a lot of success attracting high earning residents. Mr. Hart said they are led by a seasoned management team whose members have at least twenty years of industry experience. As a company, LC currently owns and manages over 7,400 units across 17 properties, valued at 1.5 billion dollars. They are a builder and a holder not a flipper. They own and manage their own properties. Their inhouse capabilities include dedicated development/redevelopment, construction and property management, acquisition, marketing/brand management, entertainment and hospitality professionals. Mr. Hart showed a drawing depicting the company's footprint across the country, in the Midwest, South, and West. The headquarters are in Columbus, Ohio, with regional offices in Nashville, Tennessee and Denver, Colorado. Over that twenty-five-year period, they developed 15,000 units in the seven target markets, and they have target goals to reach unit counts of 2,500 to 4,000 in each of the seven markets.

Mr. Hart said LC caters to high earning post graduate singles, newly married professional couples, as well as empty nesters seeking the best-in-class amenities, and shared spaces which bring people together. They have created a branch which attracts affluent millennials as well as

downsizing active adults. Mr. Hart showed a couple of different case studies in their portfolio. He said they understood the uniqueness of Worthington and the site, and he showed how the company has established themselves in both urban and suburban context. Mr. Hart said the properties were very successful and he invited people to do some of their own research looking at the other properties on the internet. Some of their developments include properties in New Albany, Dublin, Hilliard and Sunbury.

Mr. Hart said in terms of their basic statements and assumptions and how they approach the site he first wanted to discuss Value and Character. He said private real estate investment of nearly $200 million at this site would protect and enhance existing property values nearby. In central Ohio, mixed-use projects in the cores of older suburban peer communities, such as in Grandview Heights, Upper Arlington, Dublin and Bexley, have added active, vibrant developments, offering housing choices at higher densities, and mid-rise heights, without degrading property values nearby or changing community character. New mixed-use developments are complementing older community strengths and attracting new investment, housing and economic diversity, value and vibrancy.

LC is a Columbus, Ohio developer and the owner of what it builds, not a seller or a flipper. As an owner, LC has to compete for residents on an ongoing basis in highly competitive markets based on design, quality, maintenance, and site amenities. LC has every incentive to see its built assets appreciate, not diminish in value. As an owner, LC also wants neighboring property values to stay positive and grow in value. There is no incentive or business strategy to build and own assets and allow them to decline or harm nearby values.

Mr. Hart said in terms of considering this property for a private park or a development, this site will develop for value in the marketplace and its development needs to be economically positive for the city and the community. This site will not be a park but will include significant open space. The City Comprehensive Plan calls for redevelopment on this site, with office, medical, commercial and residential, with single-family to multi-family transitioning, along with green space. Public parks require ongoing taxpayer dollars for maintenance and do not generate revenue. The current landowner has a right to sell the property for value to fund its continuing mission in the region. (Comp. Plan Objectives P.91) A positive development can be achieved that meets community goals and works in the market.

They are asking the community to consider the positive economic impact of this site vs. keeping it fallow: Baseline Economic Impact Analysis shows the compelling impact of committing to mixed-use development on the property. A park would forego job and income potential of the site itself, the offering of housing choices to the community and the site's potential to provide an economic boost to Worthington's retail, service, and core business district. Any viable development plan should include significant and connected open space, which can be public, private or shared, but this site should develop and provide a financial boost for the City as called for in the Comprehensive Plan.

The applicant has begun community outreach, appropriate for social distancing challenges. LC Team is addressing resident questions via zoom meetings. They have invited over 100 residents who have contacted city staff and/or desire to communicate with the applicant team. The have

and will schedule meetings with organized advocacy groups such as WARD, BWF, etc. They understand the outreach process necessary to consider development on this site and understand the importance of community interaction and the consideration of community input directly. Their goals are to take the time, gather community input, and work towards plan modifications that support the opportunities this site presents to the city, community as a whole, and the Applicant. They will continue outreach meetings throughout the process.

The project benefits and site plan goals are to create a critical mix of live, work, shop and entertainment uses. This plan attempts to attract and support office, medical, commercial and other economically beneficial job producing uses along the important High Street corridor helping connect Downtown Worthington and northern Worthington redevelopment sites, by establishing a vibrant live, work, shop and play district that generates revenue for the community. With its economy of scale, new homes, and built-in workforce and consumers with significant disposable incomes, appropriate density defines a self-sustaining mixed-use project. Feed Worthington's Core: Locating hundreds of residents on this site will drive employment uses and commercial activity and give existing core Worthington businesses an important boost.

Another clear plan benefit is they are trying to place housing close to where people work. This plan locates housing opportunities close to workplaces, shopping, restaurants, entertainment, outdoor amenities and the core of downtown Worthington so there is less reliance on vehicles. This site plan has potential to provide housing close to other future job centers – like the Anthem, Worthington Gateway, and Worthington Mall Re-developments.

One of the key goals is housing diversity. A key Comprehensive Plan emphasis:
The goal is to provide an increase in housing options and diversity of product types to attract downsizing active adults and empty nesters. As is well documented, the "baby boom" market segment is on the move and drives many different housing options. From apartment rentals by choice, smaller townhome footprints, to well apportioned and designed patio homes with mainly first floor living. This housing brings demand for shopping, food, services, amenities, and JOBS in close proximity.

Mr. Hart said the housing diversity and vibrancy attracts young professionals. They come with disposable income, growing career success and upcoming key spending years. They will establish roots in the community, drive the local economy and become the future buyers of existing Worthington homes. They are the "farm system" for the community's future prosperity and homes sales for value. The educated, professional, creative class of workers attracts employers. Employers and companies who want to grow will locate their businesses to accommodate the needs of this market segment.

The purpose of a Comprehensive Plan: "A comprehensive plan is created with input from the community and adopted as an official plan by City Council. As such, it provides strong legal underpinning when used as a basis for zoning, capital improvement, and land use-related decisions. In fact, the Comprehensive Plan should serve as a vital reference to inform city leaders and the community as public policies are developed and decisions are made. In summary, a Comprehensive Plan is the official statement of the municipal legislative body which sets forth its major policies concerning desirable future physical development." Page 2, Introduction

Comprehensive Plan Update 2005.

The Comprehensive Plan encourages housing alternatives, density and mixed-uses at the UMCH site.

- "Higher density residential development could be accommodated here along with transition areas for the single-family neighborhood to the west." Comp. Plan – page 90;
- "This site's close proximity to historic Old Worthington makes it a prime location for walkable residential development and denser, amenity-rich housing types similar to what is discussed in the improving Housing Balance section of the Comp. Plan – page 73, and 92;
- "This residential area would consist of cluster residential development and transition to more dense urban village residential development to help address the housing type imbalance of the City." Comp. Plan – page 90;
- Comp. Plan 2014 – Objective 3 "Addressing needs of current and future residents by providing new housing types/options that are under-represented in the market and complement Worthington's current offerings." – page 91;
- Housing density and options are needed to address the lack of updated multi-family and housing alternatives in Worthington, see pages 23 and 24;
- "If properly designed and located, these alternative housing types can be incorporated in Worthington's housing stock and fill missing segments that will provide living opportunities for those who want to remain in the City. However, because there is so little ground for new development, this will require redevelopment and densities to achieve."
- The addition of new housing choices under the LC Plan meets the City Comprehensive Plan goals for housing diversity and placing single-family near existing single-family, transitioning multi-family density in the middle of the site, and places the most intensity, residential, commercial and office uses toward High Street;
- See Development options illustrated in the Comprehensive Plan and the transition to more dense development from the Worthington Estates edge to High Street. (Comp. Plan pages 91-2014 and Figures 45 and 46 on page 89-2005;
- Comprehensive Plan recommended density is similar to Worthington Estates (3 du/ac) and Old Worthington (4 to 5 du/ac) page 92;
- LC Plan – Worthington Estates edge density is 4.1 du/ac;
- Projected homes values of $550,000.00 to $650,000.00 dollars built by Bob Webb homes;
- The Worthington Estates edge "may be smaller homes with smaller yards that provide first floor living opportunities for Worthington residents – an option in which many residents expressed an interest during the community meetings." Comp. Plan page 93;
- Comp. Plan recommended density at 6 to 14 du/ac;
- LC Plan Neighborhood Core is blended 12 du/ac;
- 94 owner occupied townhomes at 10.4 du/ac;
- 72 rental townhomes at 14.1 du/ac;
- For sale townhomes values at $250,000.00 to $450,000.00 dollars;
- Rental townhomes values $180,000.00 to $250,000.00 dollars;

- The Neighborhood Core is expected to include "more than one housing type and at more than one density level." Page 93

High Street Mixed-Use Residential

- Comp. Plan does not recommend a specific density for this area.
- LC Plan overall density is 19.3 du/ac on 37.8 acres with 10 acres (26.7%) open space.
- This level of density is not uncommon for mixed-use projects to succeed.
- "The objective of the High Street Mixed-Use zone is to create a high-quality, dense, walkable, connected, mixed-use development that creates a dynamic space and signature address to attract Class A office tenants along High Street and add vitality and life to the High Street corridor." Page 92;
- LC believes a significant residential component is needed in this subarea to:
  Support neighborhood retail and commercial activity;
  Feed existing Old Worthington businesses;
  Create vibrancy that attracts employment uses and the income generation to meet the Comp. Plan goals.

Housing Summary

- Diversity – Four different product types and price points from $180,000.00 to $650,000.00 dollars;
- All product types are under-represented in current Worthington market and designed to increase housing choices;
- Single-story living is offered with apartments, and Bob Webb Patio Homes;
- Housing co-located and work-spaces will attract employers.

Project Benefit and Site Plan Goals

- Preservation and Planning: Permanent preservation of the Tucker Creek subarea meets Comprehensive Plan and community goals, but the initial LC plan makes few programming or design assumptions.
- This was deliberate as a collaborative process is desired with city professionals and the community to develop design, function and connectivity parameters to best to integrate and protect the Tucker Creek Preserve.
- The plan spreads open spaces and community gathering areas throughout subareas to be near where people live and connects them with sidewalks and paths to create continuity.

Mixed-Use Context

- Context of this application, this site and its Comprehensive Plan is consistent with established communities updating their inner core with vibrant re-development in central Ohio and across the country.
- This approach harnesses the positive aspects of density and captures its value.

- Density, mixed-use vibrancy, and live, work play developments attract young professionals, active adults, downsizing existing residents and employers, who want housing and entertainment opportunities for their employees close to work.
- Rather than the 1990s vision of building spec office to attract workplace investment, the formula for successful local economies has been altered.
- Technology and productivity were driving such changes prior to the pandemic but the trend has accelerated.
- It will take more than building Class A office space to pull workers out of their homes in the post pandemic period.
- Work environments must compete to attract those high earning and sought-after professionals who have become accustomed to zero commute time and their workspace at home.
- Office and physical work environments that will succeed must look at strategies such as co-locating residences with workspaces and green spaces, as well as outdoor amenities. The walking strategy will be huge. Allowing people to stay out of cars, and rush hour traffic, to walk to work, and walk to get lunch, shop, and walk on work breaks in path connected open spaces will become competitive and quality of life markets. Employees and employers care about these factors because they translate to mental and physical health, productivity, and quality of life.

How the real estate market views this site and its potential:

- Providing shopping, restaurant and entertainment opportunities for hundreds of workers and residents near a venerable, and revitalized downtown core is a major competitive advantage for this site and for the City of Worthington.
- It's hard to think of a re-development opportunity, that can literally feed and enhance an existing downtown business core, with hundreds of new residents, and their significant disposable incomes, within walking distance.
- LC residents have an average household income of $107,000.00 company-wide. This meets the Comp. Plan goal of supporting the existing core business district.

Mixed-Use Context

- Established communities are committing to density, housing diversity, blending live, work, shop and entertainment environments to attract employers based on where their employees want to live.
- This vision attracts people and creates a place employees want to be, first, then attracts employers who locate to accommodate their employees, (And to compete for a top workforce)
- A portion of our presentation tonight will review how mixed-use development is being implemented in other communities and site in central Ohio with these strategies.

Comprehensive Plan Goals: Employment

- A critical issue identified in the Comp. Plan:

"Worthington requires development that generates employment within the City."

- "The objective of the High Street Mixed Use zone is to create a high-quality, dense, walkable, connected, mixed-use development that creates a dynamic space and signature address to attract Class A office tenants along High Street and add vitality and life to the High Street corridor." Page 92
- The applicant agrees with City revenue and employment goals at this site but believes a vibrant mix of uses, led by impactful residential growth and co-location of housing and workplaces will drive office and employment uses.
- From UA Website on Kingsdale Project: "...Density that mixes in residential and office space with existing uses is key to increasing the vibrancy of the Kingsdale Shopping Center and surrounding restaurants, amenities, and retail businesses. For retail and restaurants to thrive, you need to combine disposable income and density. We believe this development will help bring that to Kingsdale."
- From UA website on Kingsdale Project: "All signs indicate that the post-Covid office market will place a premium of offices that can provide amenities to attract workers to the office instead of wanting to work from home. We believe that office space surrounded by restaurants, grocery stores, apartments and a community center would fit that model."
- Locating mixed use density and attempting to create a critical mass of residential and commercial activity are challenging, but as our Economic Impact Analysis demonstrates, such economics scale and threshold of activity brings with it increases in value, significant revenue generation for the city and the school district.

Mr. Hart said he was going to turn the presentation over to Mr. Steve Campbell. Mr. Campbell discussed the following.

Housing Need and Economic Impact

Addressing a fundamental need:

- Central Ohio needs new homes
- Housing issues and barriers
- Vision Worthington tackles growth issues

Understanding Economic Impact

- Real estate investment, jobs and payroll
- Generating local taxes

Providing Context

- Leveraging Development to meet community needs
- Notable mixed-use development
- Municipal incentives
- Public and private investment
- LC proposal highlights and leveraging opportunities

Central Ohio Needs New Homes

Central Ohio's population is expected to exceed 3 million residents by 2050. Two recent studies estimate the region's housing needs:

- BIA, Columbus 2020, Columbus Realtors
  (2018): commissioned report by Vogt Strategic Insights that estimated the region would need to produce 450,000 new housing units based on the historical ratio of one new home per new job the region experienced in recent history.

- Mid-Ohio Regional Planning Commission (MORPC)
  (2020): released a Regional Housing Strategy
  (2020) estimated the region needs to add 266,000 additional housing units by 2050; 127,000 need by 2030.

MORPC: Housing Needs and Barriers

Core Regional Housing Issues
- Increased competition for homes, driven by population growth and low production rates
- Barriers limiting access to homes, lending practices, credit worthiness, housing instability and discrimination
- Limited supply of homes priced for low-income households
- Demand for more homes, server a wider range of ages, abilities and sizes, like Increasing racial and ethnic diversity
- Growing number of older and younger adults seeking lifestyle and home changes

Barriers That Rose To The Top
- Not in my back yard (NIMBY)
  Attitudes and negative perceptions about housing density and affordability result in lack of public and political support
- Increasing costs of residential development, including land costs, site selection, and regulatory costs and regulations can decrease production, particularly of housing of lower price points
- Uncertainty associated with local land use processes and standards and a need for broader assistance

Vision Worthington

- Many central Ohio communities are working through how to address important growth matters, like housing, within their unique histories, needs, goals, and culture.
- Worthington has just completed Vision Worthington, a community effort to address many important issues, including challenges of growth and development, as it looks to shape its future
- In this process, the community shared key demographic information about communities in the region, challenged residents to discuss important issues, and work towards a

common vision.

- The community's broader deliberations on growth raised many of the issues that the LC proposal is confronting, including density, scale, land use, housing choices, development on green space.
- Many of the aspirations expressed on growth issues are similar to the attributes of the LC proposal: mixed-use development, housing choice, connectivity, protecting streams and trees, and vibrancy along High Street.

Vision Worthington Shares Key Stats

- Worthington's housing stock is aging. Median year built is 1961 and 64% are 50+ years of age
- 79% of housing stock is owner-occupied and there is a low housing vacancy rate
- Housing stock is dominated by detached single-family units (79%)
- Over a third of Worthington's households are empty nest couples
- Compared to a composite of the similar communities of Bexley, Grandview Heights, and Upper Arlington, Worthington's:
  Median home values and rents and pace of "new home builds" are lower
  Median age and percentage of senior citizens aer higher
  Median income is lower

Vision Worthington Discusses Big Ideas

Worthington will expand housing choices to foster a more livable community for all ages and income levels.
- Insight:
  We want to increase housing options for all ages and price points and be more inclusive but there is a resistance to denser development and fear of losing greenspace and openness.
- Background
  Long-time residents or those residents who want to move into condos to age in place have difficulty finding these options in Worthington.
  If we want to encourage diversity, we need different types and prices of housing.
  A survey of 48% of the residents show people do not live in Worthington because of housing availability issues.

Vision Worthington-Community Aspirations

Future Worthington should:

- Be diverse
- Have mix of housing types
- Have more variety of businesses
- Have a strong tax base/City Budget
- Be pro-active, forward-thinking, preserve trees and the natural environment

- Connect High Street
- Retain historical character
- Focus on economic development, housing, land use, infrastructure

Worthington can improve:

- Diversity of commercial businesses
- Communication
- High Street corridor
- Multi-family housing infrastructure
- Mixed-use development
- Additional multigenerational population
- Restaurants
- Social Services
- Transportation

Understanding Economic Impact

Lifestyle Communities (LC) commissioned an economic impact analysis, breaking out its proposal as follows:
- Real Estate Investment: by subarea, phase, number, type and value of units, and total investment value
- Jobs and payroll – number of direct construction jobs, commercial and medical jobs, wages, and total payrolls
- Local taxes – income and property tax revenues for the city, schools, library and other recipients

Real Estate Investment, Jobs and Payroll

Residential and Commercial Investment, Green Space
- Provides 730 single family homes, townhomes, High Street corridor units
- Commercial & Medical offices (60k & 25K sq. ft.) and 2 parking garages
- Protects nearly 6 acres of green space along Tucker Creek
- Total value of these investments is nearly $200 million

Jobs and Payroll
- 801 direct construction jobs and $51 million in payroll over 4 years
- 145 commercial and medical jobs with initial payroll of $11 million/yr.
- Total commercial-medical payroll is nearly $450 million over 30 yrs.

Generating Local Tax Revenues
City Income Taxes
- As construction begins, jobs provide about $300,000 in annual tax revenue for 4 years
- At build out, annual tax revenues from medical and commercial jobs rise from about $300,000 a year to $500,000 a year over 30 years

Property Taxes
- The development will generate over $220 million in tax revenues over 30 years.
- City will collect $11 million in tax revenues over 30 years
- Other recipients:
  Schools $162 million
  Library $9.75 million
  County and township levies $40.6 million

Leveraging Mixed-Use Development to Meet Community Needs
- Central Ohio is a growing region and municipalities are facing tremendous growth issues that divide their communities
- Neighboring municipalities are embracing mixed-use development as a way to partner with developers to address growth by:
  Redeveloping tired areas
  Offering housing choices
  Creating jobs
  Meeting community needs
  Stimulating vibrancy

Municipal Tools and Incentives
CRA Tax Abatement
Tax Increment Financing
New Community Authority
Development Grant
Land Acquisition
Land Donation
Income Tax Rebate
Lodging Tax Rebate

LC Proposal
Mixed-Use Highlights
Housing Diversity with units
- Single Family Homes
- Two townhome styles
- High Street Units
- Offices space and jobs
- 60K sq. ft. commercial space with 100 jobs
- 25K sq. ft. medical office space with 45 jobs
- Vibrancy on High Street
- Two Parking Garages
- Protected stream and trees

Leveraging Opportunities
- Needs

Traffic safety and transportation
Investments
Park and trail development
Public parking
Other needs identified through process
- Tools, incentives and resources
TIFs
NCA
Millions in local tax revenues

Economic Impact Analysis Notes

- The economic impact analysis was presented by North Star Policy and Project Development LLC with the assistance of AIC Solutions LLC
- Residential and commercial investment values and build out information provided by Lifestyle Communities
- Tax revenue was calculated from current local income and property tax rates
- Property taxes are estimated to increase by 2% for the Franklin County Auditor's Triennial Reappraisal Update and 4% for the Franklin County Auditor's Sexennial Reappraisal Update
- Wage increases are estimated to increase by 2.5% annually over the next 30 years which was the average annual increase in Bureau of Labor Statistics Wage index from 2000-2019.
- Employment and wage impacts from constructing residential units were obtained from the National Association of Home Builders 2020 Housing Impact Model.
- Employment and wage impacts from constructing commercial square footage were obtained from the Bureau of Economic Analysis Regional Input-Output Modeling System II.
- Employment and wage estimates for the commercial and medical space were collected from the U.S. Energy Information Administration Commercial Building Energy Consumption Survey and the Bureau of Labor Statistics Occupational Employment and Wage Survey.

Mr. Coulter said they would open the discussion to hear from the nine to eleven people who signed up to speak.

Mrs. Bitar swore in the first speaker, Mr. Bill Knapp, said he wanted to comment about the updated 2014 version in the Comprehensive Plan. "The more than 40 acres of the UMCH site presents a rare opportunity for Worthington to experience redevelopment on a visible and sizeable site near the heart of Worthington. Worthington was founded on a master plan Community. Because of its size and importance of the UMCH site it is critical that any redevelopment be master planned and consider the site as a whole. He felt those words really spoke to the heart of Worthington. Mr. Knapp said he wanted to take a look at few of the objectives that were critical. He said he has lived in the area for twenty-five years and he and neighbors said they see the value in this site being used as a mixed-use area. They understand the commercial development is critical to the viability to the property but the key issue he would like to bring to the table is the density factor that he

heard from LC. In earlier presentations they were at 500 units, and now they are at 730. Mr. Knapp said he did not feel that number was compatible nor complimentary. He understood that LC markets luxury, but would they deliver a product that is that luxurious. He asked if the product would be enduring for continuation. Mr. Knapp felt the area that was listed as open space was a misnomer because it is non-buildable area anyway. He said he was very supportive of the commercial development along High Street but said apartments would not add to revenue like commercial property and business tenants. Mr. Knapp said they were not discussing the P and L to this matter, and the cost of delivering services to this area for 730 housing units. He wanted to know if they had to build that many units and why the density was so high. He was not in favor of the number of units proposed to be built.

Mrs. Bitar swore in Mr. Scott Taylor. He said he saw that in the Agenda that the MPC would be recommending denial of the LC request. Mr. Taylor said that LC's request doubles down on a previous attempt in 2017. They are scaling up the residential unit count from 500 units to 730 units. He said his only comment was, "Really?" He said nothing had been done in the last decade and wanted to know if it was time for the City to take a different approach. Mr. Taylor felt that there could be more commercial development instead of more residential units, and more modest residential development. Mr. Taylor said at the outreach meeting held by LC representatives, they made it clear the density had to be at that number for them to reach the profit goals for their project. Mr. Taylor said Mr. Hart was very cordial and professional, but this project was not a proper fit for the UMCH property. He asked why they would want to continue to think LC is a partner they want to work with and if there was another option.

Mrs. Bitar swore in Mr. Chet Ridenour, Highgate Ave., who said he lived near the proposed project at the UMCH site. Mr. Ridenour said he has been a Worthington resident for thirty-two years. He thanked the Board members for their time and said he wanted to go on record for strongly opposing the current LC proposal, and obsessively opposed to the large number of apartments in their plan. Mr. Ridenour said he did not want to be labeled as anti-development, he said was against bad development and the current proposal by LC for 540 apartments is not good for the community or the city. He said the development is especially bad because it is located adjacent from his neighborhood. Mr. Ridenour said the last proposal by LC they wanted to build 400 apartments and that was overwhelmingly rejected by the people of Worthington and now they are back and proposing even more apartments. He said this is a bad idea and a bad proposal and explained why. First, this would overcrowd the schools which are already crowded, and there are lotteries for children and grandchildren to get into all-day kindergarten. He said his own grandchildren that also live near the site have been subjected to lotteries to get into all day kindergarten and he knows of families that have had to go on a lottery list for care after school programs. What would hundreds of more children who live at the site do to the already crowded school system. If the Architectural Review Board (ARB) and the Municipal Planning Commission (MPC) move to approve the plan, they may have to answer to their friends as to why they voted to increase school crowding just so the LC company can have increased profits. Secondly, the LC plan is a bad idea because it will increase traffic especially along Evening Street which he has to travel frequently. There are hundreds of children that must cross Evening Street every day and how will that affect those children. What will you say to your fellow citizens of Worthington when they are sitting in that long line of traffic on State Route 161 after sitting all day at work and trying to turn into the neighborhood. He said he has already experienced having to wait for four traffic signals so he

could turn onto Evening Street to get home. What will LC's plan do for that traffic, it will worsen the traffic even more. Thirdly, this is Worthington's last chance to make a significant improvement in green space. The LC plan needs more green space, and the space needs to be aggregated. You can not have little spaces here and there, there needs to be an aggregate green space. Mr. Ridenour said there are many experienced professionals in Worthington, including real estate professionals and developers that would tell you LC would make a significant amount of money without building any apartments. With the apartments, LC would just make many more millions of dollars at the same time they increase the crowded schools, increase traffic and decrease the amount of green space, all which would decrease the quality of life in Worthington. He reminded the Board members of who they represent, and they represent the people of Worthington, and their quality of life. He said many fine people contributed to making the Worthington Vision statement.

Mr. Mike Duffey, said the current proposal was not that much different than the plan that was rejected by the citizens years ago. He said for many citizens, this proposal has gone from bad to worse and that is the general sense that he has gotten from across the community. All 730 units are going to need police, fire, EMS services, and trash pick-up. All will have access to residential rates to access facilities but compared to the 5000+ houses that exist in Worthington they will not pull their weight on taxes. This will leave the slack to be picked up by everyone else who already lives here, and it will happen at a time when Worthington's nonprofit pool complex is insolvent and aging facilities and a citizenry that wants more parks and recreation improvements across the city. The city is planning a three-million-dollar upgrade for McCord Park. Apartments generally do not produce income tax and have very little property tax revenue on a per unit base can not pay the bill for these types of improvements. Worthington currently has 5000 to 5200 homes depending on how you calculate it, 730 divided by this range, would be a 12 to 14 percent increase of the total housing stock in Worthington. This is a very large development on a very small piece of land. Worthington's Comprehensive Plan says many things. He said he was a voting member of City Council when it was passed. It is nonbinding and legally unenforceable. It is an area of ideas sometimes conflicting with themselves. You can find passages within the plan that discourages residential development and speaks clearly to the need for offices and income tax revenue. You can also find passages about walkability and mixed-use and people use the color of that argument for apartments and large density development. To sum this up, anyone that says that the Comprehensive Plan supports this proposal is not telling the whole story. A more universal theme is that UMCH and the Harding property are the two last remaining opportunities for smart growth in Worthington but are apartments smart growth. As the city studied the percentage of its land dedicated to residential verses commercial visa the other communities in central Ohio. The answer is they are already overweight on residential and have always been. When compared to emerging communities such as Dublin, Powell, New Albany, and their efforts to build commercial base. For scale in understanding the large office across the street from the UMCH, formerly known as Anthem, generated at its peak, 1.5 million dollars per year for the city. The UMCH property is actually larger than the Anthem site. It stands to reason that with appropriate office development the city could produce more than 1.5 million from that property and that is the opportunity cost that they have if they allow this proposal to move forward. The developer does not own the zoning for this property and the developer does not even have a moral right to the zoning and the zoning is owned by the community. Over the years, developers such as Kessler and CVS have attempted to litigate the use of property in Worthington and the city won that litigation twice. The requirement under the law is that we do not take from the landowners' land that they already own

and since they do not own a right to the new rezoning, we have no obligation to give them what they want. Any change in the zoning is a decision by the citizens of Worthington as a whole and not the developer. For this property, Mr. Duffey said he would argue that the potential zoning is most of its value. Almost all the value of what this land can be used for is the rezoning potential use not its current zoning use as S-1. In a sense, you might consider it that the citizens of Worthington have a larger stake in this land, a larger ownership stake, than the developer and the actual landowner because of their ownership of the zoning. The voice of the citizens of Worthington has been relatively clear when Charter Amendment Issue 38 was passed, it passed on a city-wide vote of 52%. It is the closest thing they have as a proxy or referendum on this property and it was specifically targeted towards this property at the time. It was considered controversial as an issue but nevertheless, 52% of Worthington's residents voted for it. The Charter amendment itself affords the citizens the right to referendum of rezoning which is almost a certainty if this property is rezoned as proposed. Some argue the City does not like apartments and that is unfair and biased but that is not true. The city and the citizenry have been very supportive of increased housing options over the past decade. The Heights as Worthington Place has 193 units which were built in 2014, after they had begun discussions about the UMCH property. Two new single-family homes were approved on New England Avenue, they approved the re-development of the Mason's Lodge and the re-development of Stafford Village with 86 new units and right there is over 275 new residential units constructed in Worthington with small or no yard, specifically targeted at empty nesters and with rental options. The city has added at least 5%, if not more, towards their total residential stock. This is not about the scarcity of housing units in Worthington, it is about profit for the developer verses the long-term best interest for the community and its taxpayers. Please side with Worthington taxpayers and consider proposals that are largely office, park land, and retail, not just residential. Do something that generates income tax which we badly need as a community and do not rezone this property for majority residential. If someone is an empty nester and wants housing close to downtown ask them if they would want to move into Stafford, there should be market rate housing there, not all of it will be assisted living. They can buy a condo in the former Worthington Inn. Worthington has changed its housing stock so much over the past ten to twenty years. They can achieve their goals for the infill development, and it does not have to be a mega complex and this property is too valuable to let this go to this use. For purposes of time, and set aside of other issues, such as better business ratings for this developer that should be looked into, and the poor quality of projects they have developed at other communities, the projects do not look like the water-colored renderings. You can drive around to the other communities and see what they look like. You can search the Columbus Dispatch and submetering and his October meeting discussed that. Please deny this proposal. If you do that clearly and unequivocally, it is certain that the landowner of this project will be forced to finally engage the community and have an open conversation one where the lawyer for LC is not same lawyer as the fiduciary of the property and it was never let to the market so that other people could propose something different.

Mrs. Bitar swore in Mr. John Byrnes. He and his wife strongly oppose the LC proposal for development and urged the Board to reject LC's request for a PUD. Mr. Byrnes said he is a long-time resident of Worthington and growing up in Worthingway to his high school years and lived on Selby Boulevard after law school. After twenty years he moved back to Worthington and the vibrancy and attractiveness of city is important to him. In addition to reviewing the LC plan, the traffic study, and community Strategic Plan, he participated in Tuesday's Focus Group with Mr. Hart. He summarized his objections and said he strongly objected to the residential density which

was even larger than it was proposed three years ago despite strong community opposition. The overall density of the 38 acres would be 19.3 dwelling units per acre with a subarea having the density of 47.8 dwelling units per acre. That compares to a density of three to five units per acre just blocks away, with some areas in Medic Estates having even less. Mr. Byrnes said Mr. Hart acknowledge the prior community's objections, residential planning has evolved in the past three years and notably with more people working from home, especially during the pandemic. Mr. Byrnes said reliance on the pandemic effect of the past nine months and the overall tone of the LC submission and Focus Group discussion, seems to be that LC wants to plow over the community and put in a PUD Agreement in place so they can negotiate exclusively with the city and minimize further scrutiny by the public as would be required for any normal zoning variance application. The Strategic Plan anticipated significant community input as the UMCH developments took shape and this point seems to be ignored by LC. Beyond changing the character of the surrounding neighborhoods, the high density will increase traffic through the long-established neighborhoods and have a significant impact on the quality of life in these neighborhoods. Traffic in the neighborhoods have been stable over the past fifty year. Multiple cars per home, plus commercial traffic flowing in and out of this development will just create a thorough fare for the 730 additional units each day. This would surely depress property values in Worthingway, Medick Estates, and old Worthington. Mr. Byrnes said the way to avoid this would be to not allow access to Evening Street or Longfellow Avenue. He said community integration for vibrancy could be done by adding pedestrian walkways and bike paths rather than vehicular access onto Evening Street or Longfellow Avenue. If residents are going to be working from home or walking or biking to work locations, there is no reason to offload commuters through the existing neighborhoods. All of the traffic can be re-directed to High Street. Community input has consistently criticized the density and the impact of traffic. No one who has purchased a home in the adjacent Worthington neighborhoods ever thought they would be connected to a dense apartment complex. In 2005, and 2014 the Strategic Plan called for mixed-use, including retail, to enhance vibrancy. In 2021, retail is now dominated by Amazon and restaurant dining includes Uber Eats. Imagine the increased flow of Amazon and FedEx trucks and Uber Eats making deliveries to these 730 homes in their anticipated home work locations or for their residential purchases. Community vibrancy has a different look today than it did in 2005, and 2014, and the Strategic Plan needs to accommodate that. LC said their targeted demographic is largely in young professionals, not families, which means a higher transient population. Mr. Burns said the looks of the architecture and the elevations presented seem somewhat different than the look and feel of the Strategic Plan. Mr. Byrnes strongly opposed the proposal.

Mrs. Bitar swore in Mr. Tom Hamer, who said he was going to read a statement that was prepared by WARD for the ARB and MPC.

WARD, the Worthington Alliance for Responsible Development, was created in 2012 in response to a proposal to put an 84,000 sq. ft. Giant Eagle and five acres of asphalt parking on the UMCH site. Since then, they have expanded their Board to include others from elsewhere in Worthington. They have taken an interest in development projects throughout the city. They have initiated and participated in 133 meetings amongst themselves and with other groups, and with City Council members, City Council candidates, and city staff. They held forums and conducted surveys and they communicate regularly with 400 subscribers on their Facebook page and 300 email contacts. Individual members participated in a visioning process. Their interest and commitment to, and

their love for Worthington, are strong, but their core focus remains the future of UMCH. WARD is not opposed to development. Central Ohio is growing, and development can bring economic vitality, well paying jobs, and city revenue. However, UMCH, is a special and unique place. What is now proposed by LC for this beautiful open legacy property, a special place near the center of the city, is completely inappropriate. Along High Street there would be five-story office buildings plus roof heights, and the rear of the property would be a closed community packed with 730 residences, a 27% increase over their 2015 proposal which never advanced because of the opposition from Worthington residents. They respectfully urge the Board members to reject this application. Mr. Hart, LC's attorney, stresses that LC is following the guidelines of the 2014 revision of the Comprehensive Plan. The city staff has done a commendable job of analyzing the LC proposal on short notice. We refer you to pages 9, 12, 26, 27, 28, 29, and 32 of the city staff's report that question or casts doubt on the developer's adherence to the Planning & Zoning Guide, the PUD regulations, and the language of the Comprehensive Plan itself. In a June 2015 letter to LC, City Council reiterated that LC should listen and respond to the interests of the Worthington residents. We refer you to pages 24, 25, 28, 29 and 30 of the staff report which indicates that elements of the LC proposal are not what the community wants. Mr. Hart contends that it is necessary to build dense housing to attract people with disposable income to strengthen Worthington's economy and bring revenue to the city. The assumption that revenue created by income taxes by employees in the commercial zone will outweigh costs and provide income stream for the city. Is this realistic in the UMCH context. Residential construction of any type which comes first in the LC proposal is always a cost to the city because of infrastructure and the extension of Worthington's excellent city services such as street maintenance, trash and leaf removal and snow plowing. How much trash would be generated and needed to be picked up by 730 new residents. Police, Fire and EMT runs would add to the city's burden. By LC's own acknowledgement, and confirmed by city staff, however, the office market is softening as a result of the pandemic and is questionable whether companies and workers will want to return to the same degree to office environments when they have become used to working remotely. It stated in their report that city staff is concerned that only the residential portion of the project would be constructed without the office. It should also be noted that other developers are in competition to create other new Class A office spaces elsewhere in Worthington. Other features of the LC proposal must be considered. A clubhouse, pool and volleyball court associated with five story apartments in this closed community would be constructed along Longfellow Avenue. What about the impact of noise and light in the surrounding area. This would be a direct violation of the Comp Plan Guidance that any proposed design should be sensitive to adjacent neighborhoods. What about traffic. This proposal would add 1095 cars on the property in addition to cars coming from the commercial zone. Larrimer Avenue is already busy when school busses are using the intersection, and how would the traffic flow on High Street be affected. Mr. Hamer referred to a survey from Worthington residents that said they favored significant green space. Eighty to eighty-eight percent of those surveyed did not want three, four and five story apartments. In the second survey, seventy-five percent of respondents felt that the 2015 LC proposal had way too many apartments. In the current LC proposal, 365 trees would be cut down, of which 306 are described as healthy. LC requested a waiver of any fees that would be incurred by tree replacement standards, and they even claimed that the city would owe them money in the form of a credit balance for the special park fund because they would dedicate the Tucker Creek Preserve to the city which is not able to be developed in any event. Submetering is a system which allows a landlord to build tenants for utility usage, resulting in profits for the landlord, and higher bills for the tenants. It has been

practiced at other LC properties. What about UMCH? Mr. Hamer said this proposal is radically wrong for UMCH. Mr. Hamer said WARD says, along with the majority of other Worthington residents, once you pave UMCH, it is gone for good. Instead of bowing to the hot thing now, let us take the long view and have a vision to enhance and preserve UMCH for future generations by having limited development, including housing, and an open and contiguous space with amenities for all of Worthington to enjoy, as Ward articulated in their January 2018 white paper, that would be true to Worthington's character.

9:00 p.m. – Ten Minute Break

Mrs. Bitar swore in Mr. Scott Farkas. Mr. Farkas said he and his family have lived in Worthington over twenty-five years. He has two daughters that attended Evening Street elementary school and graduated from Worthington high school. He said he has a degree in city and environmental planning, a law degree, and worked in the planning and zoning field for many years in a prior career. He said he was very familiar with comprehensive city planning, zoning, rezoning, community development, and planned unit developments (PUD) and has reviewed similar development scenarios numerous times. He said he was going to ask the MPC to revisit the UMCH portion of the Comprehensive Plan for a residential only development with green space similar to the Epcon development along Riverside Drive. They are developing 81 ranch homes, with private courtyards, a community pool and clubhouse, and there is a single point of ingress and egress off of Riverside Drive. That would alleviate the traffic concerns for residents who live on Evening Street. This type of project would provide needed housing for seniors and empty nesters in Worthington who want to downsize and that in turn would provide needed larger homes for younger families who want to move into Worthington. He said he and his wife are in the empty nester group and they are looking for a smaller home but there are not a lot of choices. As for the apartment portion of the Lifestyle proposal, he does not believe more apartments are needed. There are a lot of apartments available in Worthington, such as by the Worthington mall, across from the mall, and throughout the Worthington school district. He said it was also troubling that the number of apartments had increased instead of decreased since their last proposal. There was already so much opposition with the first proposal so that should tell you something about there objectives. With respect to the High Street portion of the proposal, he did not feel that Worthington needed any more retail or office space because there currently is vacant office space, and land available for retail and office development. Mr. Farkas said he wanted to point out that creating new office space does not guarantee that the space would be occupied. He said he did not believe that a source of taxes for the city should enter the equation for how the UMCH site is developed. Instead, if the city wanted to develop a site with apartments, retail shops, office space, medical facilities and parking on a single site that would provide tax revenue, he would suggest using the Anthem building. Mr. Farkas said the developer said on a web call the previous day that they had not done a transportation impact study yet, and that would take time. He said from his previous experience, it would be far more prudent to have performed some preliminary transportation modeling studies when a development proposal is presented. As a historical point of reference, in 1972, the Continent was promoted as an exciting development opportunity. That was a mix of residential, office, and commercial land uses that would enhance the general environment of the area. Forty-nine years later, that did not pan out. This is the last largest undeveloped parcel of land in Worthington and he asked the Board not to approve a project that they will look back on whether

forty-nine years or five year and think what on earth were we doing. Mr. Farkas urged the Board to reject the LC proposal and re-visit the Comprehensive Plan.

Mrs. Bitar swore in Ms. Trudi Snediker. She said the previous speakers had touched on the same issues and concerns that she had with the plan. The traffic issue would be horrendous for traffic on Evening Street, and Longfellow Avenue after adding 730 housing units. She said this would also be terrible for the schools. Evening Street elementary is already crowded and they have to use trailers for addition space. She said she takes issue with LC's position that this community will be filled with just empty nesters and millennials and would not have any effect on the schools. Ms. Snediker said you cannot prevent anyone from moving in there and you cannot guarantee that they will not have children. There would also be an additional burden on the Police and Fire Departments. If the schools are overcrowded then people will not want to come to Worthington, and Worthington will lose its attractiveness. She said that is one of the top reasons people move to Worthington because of the excellent school system. Ms. Snediker said the whole proposal is just ridiculous. She said Worthington cannot be compared to Upper Arlington. Upper Arlington does not have a downtown with a village feel, you cannot tell where one village begins, and one ends. She said whatever they decide to do with the property she hopes they include a park.

Mrs. Bitar swore in Ms. Susie Needler. Ms. Needler said she agreed with everyone else, and that this proposal was not good for Worthington. She said she was also speaking on behalf of her friends who all agreed that nothing with high density should be built, especially since Covid because no one knows whether people will want to work in offices again. People are choosing to live in low density single houses. She felt that Worthington needed a park on High Street, and LC Community was not a worthy partner for Worthington.

Mrs. Bitar reviewed the emails that had similar comments as the previous speakers. The emails will be posted to the City's website.

Mr. Reis said he reviewed the booklet from LC and he put together a summary of his thoughts and points he wanted to make. He said they were provided with a lot of information from Lifestyles and feedback from the community. It would appear there has clearly been a lack of communication regarding the primary aspect of this development and that being density. He said he believed the information before them indicates a density that no one on this Board, nor in the community can accept. There were many emails to this Board from the community expressing their total disagreement with the preposed plan. There were components of the development that are needed and would benefit the community if they can find a way to work together with Lifestyles. He said he was confident a solution could be found and that it would not only enhance the community but also generate the revenue to support the exceptional services we citizens benefit from our city. Mr. Reis said he was optimistic that the City Manager, City Staff, and City Council, the Board members, and all of those in the community, can work together with Lifestyles to come up they can all be proud of. He said from his personal perspective he hopes they can provide compatible green space in relationship with City Hall and the UMCH site, that would benefit all citizens of Worthington to enjoy, while planning an adjacent space with sound development. Along High Street, he would suggest appropriate office space for start-ups and those that wish to relocate to Worthington, retail, commercial and restaurant, with housing behind, such as the housing sites shown on the Lifestyle plans abutting Worthington Estates, patio homes, affordable housing, some

type of townhomes, and apartments, with reasonable density. In this way, we can serve the diverse needs of all types of housing, not only for our seniors, but for the young singles and married couples wishing to live here as well as those who may not have the means to live in our great city. He said he was confident that the city's leaders and citizens alike, together with the developer can work together to formulate a plan that would be a lasting legacy for generations to come.

Mr. Foust said if he were the developer, he would have taken the same basic approach, and the logical way to approach this would be to take a look at the Comprehensive Plan, and say hey, this is what your Comprehensive Plan says, and we have a development project here that meets all of your requirements. He said Mr. Duffey pointed out that the Comprehensive Plan includes a lot of different aspects and a lot of different suggestions. Worthington is not like Upper Arlington, Dublin, or Grandview, and Worthington has a few unique things. Mr. Foust said while reading through the letters from the community a few of the writers had some suggestions and pointed out that Worthington, heritage wise, is based upon a New England Village, that there is a village like character to this community that we want to maintain and that came about in two areas. He said when Council President Bonnie Michael looked at the original proposal she suggested taking a look at some of the historical buildings that had been torn down in Worthington, and re-create some of those or pick up the architectural detail from those buildings. Mr. Foust explained to Mr. Hart that Worthington does have this history and Worthington does have a unique look. Whatever Mr. Hart comes back with needs to have a wow factor. It needs to be uniquely Worthington and something the Board members, city staff and the community can say, yes, this is us.

Mr. Schuster said to tie onto what Mr. Foust was talking about, when he looked at the plans, the homes did not reflect the styles of homes that are reflected in Worthington. He said with four types of plans, and 24 houses on the street, there would be at least six houses that look the same, and he did not feel that would be appropriate for Worthington. When he looks at the renderings for the apartments there are no defining architectural features but its rather monotonous in its repetitiveness. Worthington does have a unique look and that would need to change. Mr. Schuster said they would strongly recommend more patio homes or single-story floor plans for the seniors that do want to stay in place. He said he noticed in the presentation that the designs were for active seniors, but many of the seniors would not want to climb two or three levels of stairs. Mr. Schuster said the density of the earlier proposal of 500 units was too dense, and 730 units was unacceptable. He said they would also like to see more contiguous green space that can be utilized by anyone. He said he hoped they can work together to come up with an acceptable style that reflects Worthington and that they can reach a density that is comfortable and provides the diversity of housing that people may seek.

Ms. Hinz said she agreed with Mr. Foust, and would like to see the wow factor, and really making this a Worthington project. She also agreed with Mr. Schuster's comments about the cookie cutter style of homes, and the proposal did not address the community concerns about the impact on traffic.

Mrs. Holcombe said the biggest thing they heard at the meeting and from friends she has spoken with are the concerns about density. She said along with everyone else, she is opposed to the apartments. The development of High Street is a great thing to do. Mrs. Holcombe said she read all the letters. One of the letters suggested to integrate a plan between old Worthington and the

mall and call it the "Worthington Mile." She said that integration is really important and if they used the restaurants, the office space and retail, along High Streets, the apartments could be above these particular buildings. Mrs. Holcombe said speaking as a Realtor, there is a desperate need for more housing, and not just Worthington, but everywhere. This is a very valuable piece of land and they need to be careful as to how its developed. She said she agreed with city staff and that this proposal should be denied, and she also agreed that the architecture is not what it needs to be. If they can agree as to how this site should be developed, then they can move forward to working on the New England style of charm.

Mr. Hofmann said he agreed with what all his Board and Commission members have previously said. He said he would ask the developer to step back as much as he can and really appreciate that Worthington is more than just a place, its an experience. People greatly love this neighborhood, and it is important to start there and then appreciate as Mrs. Holcombe said earlier, the importance of this site. He said the architecture is not as thoughtful as it needs to be. Worthington is a tremendous story that is rich with history and has all kinds of layers, and this needs to be a new story that evolves. This site is in the middle of the community, and everyone has spoken loud and clear. This needs to be poetry.

Mr. Myers said he wanted to ask a couple of questions. He said he was looking at page 5/22 and said he noticed two five-level parking garages and asked Mr. Hart who was going to pay for those. Mr. Hart said the garages would be paid for privately by their development. Mr. Myers asked if he was not expecting any public assistance with the structures and Mr. Hart said he would consider having a discussion about it, especially once the site becomes integrated. He said in most developments where you see offices there are public finance mechanisms involved. Mr. Hart said they would like to have a future discussion about it, but not at this point. Mr. Myers asked if this was going to be a phased project and Mr. Hart said yes, they would generally begin working west to east. Mr. Myers said he noticed the commercial development was listed as Phase II and asked if that was spec space or if they have tenants. Mr. Hart said they did not have users identified at this point. Mr. Myers said it currently showed on the same plan that there would be an access road that runs from New England Avenue to Evening Street and Mr. Hart said yes. Mr. Myers said he also noticed there was a signalized intersection at E Street and asked if that would be directly across the street from City Hall and Mr. Hart said yes. Mr. Myers asked Mr. Hart if he had a property interest in the Comprehensive Plan or if the Comprehensive Plan creates a property interest in Lifestyles and Mr. Hart said no, and he also did not agree with Mr. Duffey's analysis of zoning law. Mr. Hart said that zoning laws are about a balance of rights

Mr. Coulter said the Board appreciated the letters and emails that were submitted because it gives the Board input for what the citizenry is looking for and what their expectations are. He said this is the very beginning of a long process, there is a lot to digest and review. Mr. Coulter said someone made a comment earlier, and he had experienced the same thing as an architect while dealing with developers, and developers like to start off with a home run and get everything that they can. That is where you start to negotiate, and look at what is right, what needs to be modified and what needs to be changed. Mr. Coulter said that everyone agreed that the density is exceedingly high. He said one thing that had not yet been discussed was the heights that were proposed. There were some five-story buildings proposed and some three-story buildings proposed. He felt there was a complete lack of imagination with circulation in terms of how the streets were laid out, sidewalks,

how you get from point A to B, the plan seemed so cookie cutter, rectilinear and boring, and he felt some improvements could also be made on that. A number of the speakers talked about contiguous open public space. As he reviewed the plan there seemed to be some pockets of open space, but he realized that Worthington is a park centric city, and they do enjoy their parks. If you could put some of the pockets of space together to make them more contiguous the space would become more usable. Mr. Coulter said something else that had not been discussed yet were the Design Guidelines for the City of Worthington, and that is a do or die issue for him. If you do not pay attention to the Design Guidelines, the developer will never get his vote. He said this project needs to look like it has always been a part of Worthington and not a contemporary style. Mr. Coulter said they did not discuss sustainability of the project. This needs to be a walkable space where people can walk to the mall, walk downtown, and walk to the Olentangy River or wherever they want to walk to. The housing that is being proposed is high dollar housing, there has not been any moderate starter homes for people that want to come to Worthington to live. Mr. Coulter said he also appreciated the questions that have come from City Council. Mr. Brown said the developer answered those questions and the answers were posted to the City's website earlier in the afternoon. City Council is very interested in the project for all the right reasons.

Mr. Hart said he believed they were starting a collaborative process where they will be working with city staff, the Board and Commission members, and the community, to come up with something that will work. He said they received a lot of good feedback. Mr. Hart said they did a few things with their application that were meant to place hold. The park design and open spaces they did not want to presume too much because they wanted a collaborative effort on that. They have taken the comments they heard this evening to heart. He said they would like a bifurcated approach to this process where they focus on land use first and come to a conclusion on the land use plan, particularly in reference to the green space and the park, and then pick it up there with architecture. He agreed this is the beginning of a substantial process. Mr. Hart said he wanted to go back to the discussion about density, and he was not a part of the team from 2015, but that application was not filed, although they did receive feedback on it. There are a lot of details that need to be figured out and that did not happen back then, but also the world has changed since then. Mr. Hart said it would be a challenge to get people out of their homes and working back in office spaces. He said they agree with the part of the Comprehensive Plan that says Worthington needs employment and revenue generated out of this site. They see very different market conditions now than back then. Mr. Hart said they believe they need to start with residential first to fire up those other mixed uses. He said there is an affordability crisis right now which is more severe in some communities more than others, but it is a crisis of supply. Mr. Hart said they looked forward to more discussions.

Mr. Myers said he was struck by Mr. Hart's comment about how the world has changed and Mr. Myers said he agreed. He said this project has impacted his position with the City of Worthington immeasurably. He said they have gone through a highly contentious Charter initiative. Every City Council election since 2015, this has been the central issue. There have been five retreats that City Council has had since then, and this has been the central issue. Members of Council are on City Council because of this issue. Mr. Myers said he could not express in words the magnitude of this project and the weight that has been placed on City Council for the past five years, and he holds Mr. Hart's client responsible for that. He said he was disappointed that no one from Lifestyles showed up to the meeting. Mr. Myers said Mr. Coulter was correct, City Council members are

watching this project like hawks. There will be more questions from City Council and more input from Mr. Myers himself. He said this is the single most significant issue that Worthington has faced in his twenty years of service to the city. Mr. Coulter said they have one chance to get this right, and there will be several more discussions. This is just the beginning of the process.

Mr. Hart requested to table the applications. Mr. Reis moved to table the applications, and Mrs. Holcombe seconded the motion. All Board members voted, "Aye," and the applications were tabled.

### D. Other

There was no other business to discuss.

Mr. Brown stated that the January 28th meeting agenda would be rather lengthy considering we moved all the agenda items from the January 14th agenda to the next meeting.

### E. Adjournment

Mr. Foust moved to adjourn the meeting, and Mr. Schuster seconded the motion. All Board members voted, "Aye," and the meeting adjourned at 10:19 p.m.

| | |
|---|---|
| **From:** | Stewart, Robyn [Robyn.Stewart@worthington.org] |
| **Sent:** | 9/14/2021 12:00:58 PM |
| **To:** | Greeson, Matt [Matt.Greeson@worthington.org] |
| **Subject:** | FW: UMCH - LC Proposal |
| **Attachments:** | UMCH 09.11.2021.pdf; UMCH Cover Letter 09.11.2021.pdf |

FYI – We'll be posting this on the website and I'll be sending it to Council Members by the end of the day.

Robyn

**From:** Brown, Lee <Lee.Brown@worthington.org>
**Sent:** Tuesday, September 14, 2021 10:53 AM
**To:** Stewart, Robyn <Robyn.Stewart@worthington.org>
**Subject:** FW: UMCH - LC Proposal

Robyn-

Here is what I sent Anne.

Give me a call to discuss when you get a chance.  I will update you on my conversation.

Lee

**R. Lee Brown, AICP**
Director

**City of Worthington**
**Planning & Building Department**
374 Highland Avenue
Worthington, Ohio 43085
Main Line:  614.431.2424
Direct Line: 614.781.3539
www.worthington.org

**From:** Brown, Lee
**Sent:** Tuesday, September 14, 2021 10:29 AM
**To:** Brown, Anne <Anne.Brown@worthington.org>
**Subject:** UMCH - LC Proposal

Anne-

Please see attached.

Give me a call later to discuss.

Lee


EXHIBIT
82

**R. Lee Brown, AICP**
Director

**City of Worthington**
**Planning & Building Department**
374 Highland Avenue
Worthington, Ohio 43085
Main Line:  614.431.2424
Direct Line: 614.781.3539
www.worthington.org

Worthington 054311




Proposed Master Plan and Improvements for:

# THE UMCH SITE WORTHINGTON

Worthington, Ohio

September 2021

LRK

LRK, Inc.



# Site Location








## The UMCH Site
## Worthington

Worthington, Ohio

**LRK, Inc.**

Telephone 225.528.4905
©2021 LRK Inc. All Rights Reserved.

Worthington 054312

# EXISTING CONDITIONS



Larrimer Avenue

Longfellow Avenue

Evening Street

North High Street

Greenbrier Court

## THE UMCH SITE
## WORTHINGTON
Worthington, Ohio



0    200'    400'




Worthington 054313

LRK, Inc.

Telephone 725 928 4905
©2021 LRK Inc. All Rights Reserved.



LRK

# PRELIMINARY SPIRIT IMAGES















Streets built around the concept of connectivity create higher density neighborhoods rich in amenities.

Walkable, pedestrian-scale High Street frontage celebrates local retail & creates vibrant neighborhood gathering spaces

Strong ties to American Colonial architecture boast high-quality materials & incorporate a variety of residential types

## THE UMCH SITE WORTHINGTON
Worthington, Ohio



**LRK, Inc.**
Telephone 225.928.4905
©2021 LRK Inc. All Rights Reserved.

Worthington 054314






Worthington 054315

## Development Summary

**Subarea 1** — 5.9 acres
2.5-Story Single Family Lots (70x125) — 22 Lots

**Subarea 2** — 9.0 acres
3-Story Townhomes (For Sale) — 86 units

**Subarea 3** — 5.0 acres
3-Story Townhomes/Flats (For Rent) — 72 units

**Subarea 4** — 11.3 acres
Multifamily — 420 units
Ground Floor Commercial — 56,000 sf
Upper Floor Office — 64,000 sf

**Subarea 5** — 6.4 acres
Tucker Creek Open Space

## Mixed-Use Summary

**Building A**
Ground Floor Commercial — 8,000 sf
Multifamily — 255 units
4-Story Residential facing Residential
5-Story Mixed-Use facing Commercial

**Building B**
Ground Floor Commercial — 16,000 sf
Multifamily — 165 units
4-Story Residential at Trail
5-Story Mixed-Use at Linear Green

**Building C**
3-Story Commercial — 96,000 sf

## Density Summary (Dwelling Units per Acre)

| | |
|---|---|
| Subarea 1 | 3.72 Du/Ac |
| Subarea 2 | 9.55 Du/Ac |
| Subarea 3 | 14.4 Du/Ac |
| Subarea 4 | 37.16 Du/Ac |
| **Total** | **15.95 Du/Ac** |

### Legend




Mixed-Use Commercial
Ground Floor Commercial / Medical Office

Mixed-Use Residential
Ground Floor Commercial

Mixed-Use Residential
Ground Floor Residential

Residential
Townhomed Flats

Residential
Single Family Lots

## THE UMCH SITE WORTHINGTON
Worthington, Ohio



LRK, Inc.
Telephone 225.928.4905
©2021 LRK Inc. All Rights Reserved.

0   200'   400'




# Site Use Diagram

## Development Summary

**Subarea 1**     **5.9 acres**
2.5-Story Single Family Lots (70x125)    22 Lots

**Subarea 2**     **9.0 acres**
3-Story Townhomes (For Sale)    66 units

**Subarea 3**     **5.0 acres**
3-Story Townhomes/Flats (For Rent)    72 units

**Subarea 4**     **11.3 acres**
Multifamily    420 units
Ground Floor Commercial    56,000 sf
Upper Floor Office    64,000 sf

**Subarea 5**     **6.4 acres**
Tucker Creek Open Space

## Mixed-Use Summary

**Building A**
Ground Floor Commercial    8,000 sf
Multifamily    255 units
'4-Story Residential facing Residential
'5-Story Mixed-Use facing Commercial

**Building B**
Ground Floor Commercial    16,000 sf
Multifamily    165 units
'4-Story Residential at Trail
'5-Story Mixed-Use at Linear Green

**Building C**
3-Story Commercial    96,000 sf

## Density Summary

Density (Dwelling Units per Acre)

| | |
|---|---|
| Subarea 1 | 3.72 Du/Ac |
| Subarea 2 | 9.55 Du/Ac |
| Subarea 3 | 14.4 Du/Ac |
| Subarea 4 | 37.16 Du/Ac |
| **Total** | **15.95 Du/Ac** |



### Legend

**Regional Open Space**
Tucker Creek Reserve

**Neighborhood Green Space**
Park & Greens

**Commercial Frontage**
Ground Floor Commercial

**Formal Connection**
Neighborhood Green to City Hall / Internal Walkway

**Informal Trails**
Neighborhood to Tucker Creek

Larrimer Avenue
Longfellow Avenue
Evening Street
North High Street
Wesley Boulevard
Greenbrier Court
City Hall

Entry Pavilion
Gateway Green
Neighborhood Park Pavilion
Neighborhood Green
Linear Green
Trailhead Pavilion
Multifamily Green
Tucker Creek Regional Open Space
Trail Connection

Subarea 1
Subarea 2
Subarea 3
Subarea 4
Subarea 5

## THE UMCH SITE
### WORTHINGTON
Worthington, Ohio

LRK, Inc.
Telephone 225.928.4905
©2021 LRK Inc. All Rights Reserved.



Worthington 054316

# BUILDING HEIGHTS & PARKING



On the map: Larimer Avenue, Longfellow Avenue, Evening Street, North High Street, Wesley Boulevard, Greenbrier Court, Tucker Creek Regional Open Space

Subarea 1, Subarea 2, Subarea 3, Subarea 4, Subarea 5

4-Story 504, 4-Story 328 spaces, 26 spaces, 30 spaces, 25 spaces

## Parking Summary

### Total Parking

| | |
|---|---|
| On-Street Spaces | 153 spaces |
| Lot / Driveway Spaces | 103 spaces |
| Structured Garage Spaces | 832 spaces |
| Residential Garage Spaces | 274 spaces |
| **Total** | **1,362 spaces** |

### Parking by Subarea

| Subarea 1 | 44 spaces |
|---|---|
| On-Street Spaces | 0 spaces |
| Driveway Spaces | 22 spaces |
| Structured Garage Spaces | 0 spaces |
| Residential Garages | 22 spaces |

| Subarea 2 | 284 spaces |
|---|---|
| On-Street Spaces | 86 spaces |
| Parking Lot Spaces | 26 spaces |
| Structured Garage Spaces | 0 spaces |
| Residential Garage Spaces | 172 spaces |

| Subarea 3 | 153 spaces |
|---|---|
| On-Street Spaces | 18 spaces |
| Parking Lot Spaces | 55 spaces |
| Structured Garage Spaces | 0 spaces |
| Residential Garage Spaces | 80 spaces |

| Subarea 4 | 881 spaces |
|---|---|
| On-Street Spaces | 49 spaces |
| Parking Lot Spaces | 0 spaces |
| Structured Garage Spaces | 832 spaces |
| Residential Garage Spaces | 0 spaces |

| Subarea 5 | 0 spaces |
|---|---|
| On-Street Spaces | 0 spaces |
| Parking Lot Spaces | 0 spaces |
| Structured Garage Spaces | 0 spaces |
| Residential Garage Spaces | 0 spaces |

## Legend

- 5-Story
- 4-Story
- 3-Story
- 2.5-Story
- 1-Story

## THE UMCH SITE WORTHINGTON

Worthington, Ohio





Worthington 054317

LRK, Inc.
Telephone 225.928.4905
©2021 LRK Inc. All Rights Reserved.

0   200'   400'

# OPEN SPACE CHARACTER

## Open Space Summary

### Paths

| | |
|---|---|
| Walkways | 1,693 ft |
| Multi-use Trails | 3,223 ft |
| **Total** | **4,916 ft** |

### Park Space

| | |
|---|---|
| Tucker Creek Preserve | 6.41 ac |
| Gateway Green | 0.64 ac |
| Linear Green | 0.81 ac |
| Neighborhood Green | 0.51 ac |
| Trail Greenway | 0.56 ac |
| Multifamily Green | 0.44 ac |
| **Total** | **9.37 ac** |



Park Pavilion



Entry Pavilion

North High Street

Wesley Boulevard

Trailhead Pavillion

Greenbrier Court

Larrimer Avenue

Entry Pavillion

Gateway Green

Linear Green

Trail Connection

Longfellow Avenue

Linear Green

Neighborhood Green

Park Pavilion

Tucker Creek Regional Open Space

Multifamily Green

Evening Street

Entry Pavilion

### Legend

—— Walkway

<—> Multi-use Trail







Bike and Ped Trail







Multifamily Green



Townhome Green



THE UMCH SITE
WORTHINGTON
Worthington, Ohio

LRK, Inc.
Telephone 225.928.4905
©2021 LRK Inc. All Rights Reserved.

Worthington 054318

# Mixed Use Street at High Street



Worthington 054319



The UMCH Site
WORTHINGTON
Worthington, Ohio



LRK, Inc.
Telephone 225 928 4905
©2021 LRK Inc. All Rights Reserved.

# HIGH STREET & MIXED USE RESIDENTIAL CHARACTER



Larrimer Avenue

Entry Pavilion

Mixed-Use
8,000sf Ground Floor Commercial
255 Multifamily Units
4-Stories Residential facing Residential
5-Stories Mixed-Use facing Commercial

Gateway Green

Medical Office

3-Story Commercial
96,000 sf

The Goat

Plaza

Linear Green

Trail Connection

North High Street

Mixed-Use
16,000sf Ground Floor Commercial
165 Multifamily Units
5-Stories Mixed-Use @ Linear Green
4-Stories Residential @ Trail

### Legend
Mixed-Use Commercial
Ground Floor Commercial/Residential Above

Mixed-Use Residential
Ground Floor Commercial

Residential
Townhouses

Residential
Single Family Units



① Building Signage

② Commercial Character

③ Mixed-Use Residential Character

④ Active Pedestrian Realm



⑤ Gateway Green

⑥ Linear Green

⑦ Wayfinding

⑧ District Signage

# THE UMCH SITE WORTHINGTON
Worthington, Ohio

**LRK, Inc.**
Telephone 225.928.4905
©2021 LRK Inc. All Rights Reserved.



Worthington 054320



TOWNHOMES AND FLATS

THE UMCH SITE
WORTHINGTON
Worthington, Ohio





Worthington 054321

LRK, Inc.
Telephone 225 928 6905
©2021 LRK Inc. All Rights Reserved.

# Townhomes & Flats Character



Longfellow Avenue

Single Family Lots

Wesley Boulevard

Tucker Green

Neighborhood Green

Multifamily Green

Park Pavillion

Single Family Lots

Evening Street

Greenbrier Court

Tucker Creek Regional Open Space

**Legend**

Mixed-Use Commercial

Mixed-Use Residential

Mixed-Use Residential

Residential

Residential

Architectural Character

Architectural Character

Architectural Character

Townhome Green

Townhome Green

Street Frontage

# THE UMCH SITE WORTHINGTON
Worthington, Ohio


Worthington
Founded 1803



Worthington 054322

LRK, Inc.
Telephone 225 928 4905
©2021 LRK Inc. All Rights Reserved.





NEIGHBORHOOD STREET

THE UMCH SITE
WORTHINGTON
Worthington, Ohio



LRK, Inc.
Telephone 225.928.4905
©2021 LRK Inc. All Rights Reserved.



Worthington 054323

# TUCKER CREEK PRESERVE CHARACTER



Tucker Creek Preserve





## THE UMCH SITE WORTHINGTON
Worthington, Ohio







LRK, Inc.
Telephone 225.928.4905
©2021 LRK Inc. All Rights Reserved.

Worthington 054324

R. Lee Brown, AICP
Director
City of Worthington
Planning & Building Department
374 Highland Avenue
Worthington, Ohio 43085


Lee:

Lifestyle Communities is submitting the attached revised concept site plan for pending application PUD 03-2020 and the UMCH site. As discussed, the applicant wishes to present this revised concept site plan at the October 14 Worthington Planning Commission. The goal of this resubmission and the presentation will be to gain feedback from Planning Commission members on such general topics related to the revised plan, such as:
- The revised mix and location of uses;
- Configuration of open space and open space amenities;
- And the adjusted connectivity plan and neighborhood engagement elements.

After gaining Planning Commission feedback and direction on the revised concept site plan, the applicant will prepare to address the more technical aspects of the pending application, such as traffic impacts, stormwater, utility adjustments, etc.
Thank you as always for your consideration.
Tom Hart

IsaacWiles
Thomas L. Hart
**Attorney at Law**
Two Miranova Place, Ste. 700
Columbus, Ohio 43215-5098
t 614.340.7415 ◦ f 614.365.9516
d 614.340.7415
thart@isaacwiles.com
www.isaacwiles.



PORTION OF THE MINUTES OF THE REGULAR MEETING
WORTHINGTON ARCHITECTURAL REVIEW BOARD
WORTHINGTON MUNICIPAL PLANNING COMMISSION
October 14, 2021

The regular meeting of the Worthington Architectural Review Board and the Worthington Municipal Planning Commission was called to order at 7:00 p.m. with the following members present: Mikel Coulter, Chair; Thomas Reis, Vice-Chair; Kathy Holcombe, Secretary; David Foust; Richard Schuster; and Susan Hinz. Also present were: Council Representative Scott Myers; Lee Brown, Director of Planning & Building; and Lynda Bitar, Development Coordinator. Worthington City, and Kenneth Ganter, Planning & Building Assistant. Commission member Edwin Hofmann was absent.

## A. Call to Order – 7:00 p.m.

1. Roll Call

2. Pledge of Allegiance

3. Approval of the minutes of the September 23, 2021 meeting.

   Mr. Foust moved to approve the minutes and Mr. Reis seconded the motion.
   All Board members voted, "Aye," and the minutes were approved.

## B. Architectural Review Board – Regular Agenda – Unfinished Business

Mr. Reis moved to remove the following Agenda item from the table and Mr. Schuster seconded the motion. All Board members voted, "Aye," and motion was approved.

## C. Architecture Review Board – Old Business
1. Mixed Use – **1033 High St.** (Thomas Hart/Lifestyle Communities) **AR 70-2020**

&

Mrs. Holcombe moved to remove the following Agenda item from the table and Mr. Reis seconded the motion. All Board member voted, "Aye," and the motion was approved.

## D. Municipal Planning Commission – Old Business
1. **Planned Unit Development**
a. Mixed Use – **1033 High St.** (Thomas Hart/Lifestyle Communities) **PUD 03-2020**

## Findings of Fact & Conclusions



EXHIBIT

83

## Executive Summary

Thomas Hart on behalf of Lifestyle Communities has applied to rezone 37.8-acres from R-10 (Low Density Residential), S-1 (Special), C-2 (Community Shopping Center) and C-3 (Institutions & Office) to PUD, Planned Use District for the redevelopment of the United Methodist Children's Home site to a mixed-use development that would include detached single-family home sites, townhomes, apartments, retail, restaurants, office and greenspace.

## Applicable Plans

- Comprehensive Plan Update and 2005 Strategic Plan – UMCH Focus Area – 2014
- Comprehensive Plan Update and 2005 Strategic Plan
- Bicycle & Pedestrian Master Plan – 2019
- Park Master Plan – 2017
- Chapter 1177 – Architectural District
- Chapter 1174 – PUD Planned Unit Development

## Recommendation

Staff is recommending **_denial_** of these applications as they currently stand today. The proposal does not meet the recommendations found in the Comprehensive Plan and 2005 Strategic Update - UMCH Focus Area – 2014, Bicycle & Pedestrian Plan – 2019 and the Park Master Plan - 2017. Please see Staff Comments/Analysis below for additional details related to the recommendation.

## Brief Background/Description

The United Methodist Children's Home (UMCH) site located at 1033 High St. is approximately 37-acres in size, that until recently had fifteen existing vacant buildings, parking lots and driveways on the site that the Board approved for demolition. The majority of the property is zoned S-1, Special, except in 1987 just under 10-acres of land along the N. High St. frontage was rezoned to C-3, Institutions and Offices (~9.2-acres) and C-2, Community Shopping Center (~0.6-acres). The parcels at 47 Larrimer Ave. and 57 Larrimer Ave. are zoned R-10, Low Density Residential (~0.5-acres) and are currently single-family homes that are vacant.

Approximately 3.42-acres at the northwest corner of High St. and Wesley Blvd. (private drive) with 428-feet of High St. frontage was purchased in 2017 by the West Ohio Annual Conference of the United Methodist Church and is not part of this application. Bickford Assisted Living & Memory Care facility at the southwest corner of High St. and Wesley Blvd. (private drive) is a separate 3.58-acre parcel and is also not part of this application.

## Current Zoning - Development Standards

| Zoning | Minimum Lot Width | Minimum Lot Area | Front Setback | Rear Setback | Side Setback | Max Height of Building Stories | Max Height |
|--------|-------------------|------------------|---------------|--------------|--------------|-------------------------------|------------|
|        |                   |                  |               |              |              |                               |            |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **S-1** | 250-feet | 3-acres | 60-feet | 60-feet | 50-feet | 4-stories | 45-feet |
| **C-2** | 150-feet | 1-acre | 50-feet | 30-feet | 20-feet | 3-stories | 45-feet |
| **C-3** | 100-feet | 20,000 sq. ft. | 50-feet | 30-feet | 15-feet | 3-stories | 45-feet |
| **R-10** | 80-feet | 10,400 sq. ft./4.2 DU/acre | 30-feet | 30-feet | 8-feet | 2 ½-stories | 30-feet |
| Section 1149.07 – 100' front setback along this area of High Street | | | | | | | |

## Surrounding Zoning & Land Use

The surrounding zoning is a mix of the following:
- R-10 - Low Density Residential – Worthington Estates and Greenbriar Hill
- R-16 – Very Low Density Residential – Worthingway & Medick Estates
- C-1 – Neighborhood Commercial – O'Reilly Family Pharmacy
- C-3 – Heritage Professional Building, AT&T, FC Bank, Worthington Municipal Complex, Laurels of Worthington, West Ohio Conference Center and The Grove
- SC – Senior Citizen – Bickford of Worthington

*Current Zoning Map*



*Aerial*



**Recent Land Use and Planning History Related to the Site (since 2014)**

- On September 2, 2014 City Council adopted an Amendment to the Comprehensive Plan Update & 2005 Strategic Plan for the United Methodist Children's Home Focus Area for the City of Worthington with the anticipation of redevelopment on the site that would include a mix of uses and open space across the entire site.
- On June 29, 2015 Lifestyle Communities presented an informal proposal to the Worthington Community for their vision for the UMCH site.
  - o No formal application was submitted to the City to start the rezoning process.
  - o Lifestyle Communities proposed the following:
    - ▪ 42.3-acres
    - ▪ 571± Total Residential Units
      - 350 Apartments
      - 221± Detached single-family estate lots, manor lots, cottage lots and townhomes.
        - o Mix of for sale and for rent product
    - ▪ Approximately 150,000± sq. ft of medical office and a 20,000 sq. ft. conference center
    - ▪ Retail on first floor of the apartment buildings
    - ▪ Mix of 3 to 4 story buildings along High St.
    - ▪ Open Space
      - Shelter house – Tucker Creek Preserve
      - Multi-use trail – Tucker Creek Preserve
      - Formal greenspace in the form of a village green at the entrance to High St.
      - Community park to the rear of the site
      - Scattered open space throughout the site
- On February 9, 2017, OhioHealth made application to construct a new 20,000 sq. ft. two-story medical office building along the High Street frontage just north of the Conference Center.
  - o The application was eventually withdrawn by OhioHealth when the West Ohio Annual Conference decided to exercise their option to purchase 3.42-acres of land that include the area where the new medical office building was to be constructed.
- On June 8, 2017, the Municipal Planning Commission reviewed and approved a request by the West Ohio Conference Annual Conference of the United Methodist Church to create a new 3.42-acre lot for their existing building and parking at the corner of High St. and Wesley Blvd. that met all the legal requirements to create a new lot as outlined in the Planning & Zoning Code. City Council ultimately approved the request on June 19, 2017.
- On March 26, 2020, the Municipal Planning Commission was scheduled to review a request by OhioHealth to rezone 3.35-acres at the corner of Larrimer Ave. and N. High St. from R-10 (Low Density Residential), S-1 (Special) and C-2 (Community Shopping Center) to the C-3 (Institutions & Office) to permit the construction of a new 60,000 sq. ft. three-story medical office facility that would house medical services, including an emergency department, primary care, imaging and a host of specialty services.
  - o The application was withdrawn by OhioHealth after they were unable to come to

- an agreement with the property owner to move forward on the site.
- On October 6, 2020, Thomas Hart, on behalf of Lifestyle Communities, filed an application to rezone 37.843-acres from the R-10 (Low Density Residential), S-1 (Special) and C-2 (Community Shopping Center) and C-3 (Institutions & Office) to a PUD, Planned Use District for the redevelopment of the United Methodist Children's Home site to a mixed-use development that would include detached single-family home sites, townhomes, apartments, retail, restaurants, office and greenspace.
- On January 14, 2021, the Architectural Review Board and the Municipal Planning Commission heard a presentation by the applicant for the development of the site. The Board and Commission ultimately tabled the applications.
  - Lifestyle Communities proposed the following:
    - 37.8-acres
    - 730 Residential Units
      - 24 – Single-family
      - 94 – Multi-family – Townhome's w/garages
      - 72 – Multi-family – Townhomes & flats
      - 540 – Multi-family – Apartment's w/parking garage
    - 60,000 sq. ft. – Commercial/retail
    - 25,000 sq. ft. – Medical office
    - 6.4-acres – Tucker Creek
- On February 11, 2021, the Architectural Review Board approved the demolition and remediation of the fifteen vacant buildings, parking lots and access drives on the site.
- On September 9, 2021, Thomas Hart, on behalf of Lifestyle Communities, filed amended materials to their previously tabled rezoning application. These materials take a high-level look at density, mix of uses, height, layout, connections and open space. If the concepts are deemed workable, more details will be required before the MPC can complete its review of the proposal.

## September 9, 2021 – Proposal by the Applicant

- Total Acreage = 37.8-acres (Parcel #s:100-006774, 100-002425 & 100-002427)
- 600 Residential Units
  - 22 units – Single-family – For sale
  - 86 units – Multi-family - Townhome's w/garages – For sale
  - 72 units – Multi-family - Townhomes & flats – For Rent
  - 420 units – Multi-family – Parking Garage – For Rent
- 24,000 sq. ft. – Commercial/retail
- 96,000 sq. ft. – Medical office
- 6.4 acres – Tucker Creek

| SUBAREA | USE | LOTS/UNIT/SQUARE FOOTAGE | STORIES | ACRES | DENSITY |
|---|---|---|---|---|---|
| #1 | Single-family | 22 units | *2 ½ | 5.9-acres | 3.72 lots/acre |
| #2 | Multi-family | 86 units | *3 | 9-acres | 9.55 DU/acre |
| #3 | Multi-family | 72 units | *3 | 5.1-acres | 14.4 DU/acre |
| #4 | Multi-family Commercial/Retail Medical Office | 420 units 24,000 sq. ft. 96,000 sq. ft. | *4 & 5 *3, 4 & 5 *3 | 11.4-acres | 37.16 DU/acre |
| #5 | Tucker Creek | | | 6.4-acres | N/A |
| TOTAL | | 600-units | | 37.8-acres | 15.95 DU/acre |

*Staff Comments:*
* The actual height has not been provided at this time, however, will be required in the future.


**Project Details as described in the application**

**Subarea #1**
- 5.9-acres
- 22 single-family lots
  - For sale product
  - 2 parking spaces per dwelling unit
  - Lot Width: Minimum – not referenced, however the information will be required in the future for review
  - Minimum Lot Size – not referenced, however the information will be required in the future for review
  - Unit Square Footage Minimum – not referenced, however the information will be required in the future for review
  - 2 ½ stories, 1 ½ stories or single-story buildings – max height information will be required in the future for review
  - Front Setback – not referenced, however the information will be required in the future for review
  - Rear Setback – not referenced, however the information will be required in the future for review
  - Side Yard – not referenced, however the information will be required in the future for review
  - Fronting on a proposed public roadway
  - 3.72 Dwelling Units/acre
  - Architectural Design & Standards Proposed – not referenced, however the details will be needed in the future to obtain architectural approval

**Subarea #2**
- 9-acres
- 86 townhomes
  - For sale product
  - Garages
  - 2.3 parking spaces per dwelling unit including the garage and parking lot
  - Unit Square Footage Minimum – not referenced, however the information will be required in the future for review
  - 2-3 stories: max height information will be required in the future for review
  - Lot sizes – not referenced, however the information will be required in the future for review
  - Front Setback – not referenced, however the information will be required in the future for review
  - Fronting on a proposed public and private roadway
  - Public and private open/green space – neighborhood green & linear green – acreage not provided, however will be required in the future
  - 9.55 Dwelling Units/acre
  - Architectural Design & Standards Proposed – not referenced, however details will be needed in the future to obtain architectural approval

**Subarea #3**
- 5-acres
- 72 townhomes
  - For rent product
  - Mix of garages & parking lot
  - 1.9 parking spaces per dwelling unit including the garage and parking lot
  - 3 stories – max height information will be required in the future
  - Mix of one-bedroom, two-bedroom and three-bedroom units
  - Front Setback – not referenced, however the information will be required in the future for review
  - Fronting on a proposed private roadway
  - Public and private open/green space – multi-family green – acreage not provided; however the information will be required in the future for review
  - 14.4 Dwelling Units/acre
  - Architectural Design & Standards Proposed – not referenced, however details will be needed in the future to obtain architectural approval

**Subarea #4**
- 11.3-acres
- 420 multi-family units
  - For rent product
  - Parking Garage – 4-story
  - Mix of 4 & 5 stories – max height will be required in the future
  - Mix of one-bedroom, two-bedroom and three-bedroom units
  - 37.16 Dwelling Units/acre

- o Architectural Design & Standards Proposed – not referenced, however details will be needed in the future to obtain architectural approval
- Commercial/Retail – first floor of the 5-story portion of Building A & Building B along the linear green
  - o 24,000 sq. ft.
  - o Access to two 4-level parking garages, surface lot and on-street parking
- Medical Office
  - o 96,000 sq. ft.
  - o Access to two 4-level parking garages, surface lot and on-street parking
  - o 3 stories along High Street
- Setbacks:
  - o High St. – not provided, however the information will be required in the future for review
  - o Longfellow Ave. – not provided, however the information will be required in the future for review
  - o Larrimer Ave. – not provided, however the information will be required in the future for review
  - o Private Streets – not provided, however the information will be required in the future for review
  - o Southeastern property line – not provided, however the information will be required in the future for review
- Fronting on a mixture of private roadways and existing roadways (High St., Larrimer Ave. and Longfellow Ave.)
- The previous proposal stated that the private streets will be 36-feet in width, 20-feet wide drive aisles and 8-feet for parallel parking spaces on each side and placed in a reserve that is 56-feet in width.
- Alleys are proposed to be 16-feet wide and placed in a reserve that is 20-feet in width.
- Surface parking lots shall be constructed with 9'x19' parking spaces with a drive aisle of 22-feet in width.
- Bicycle parking will be provided throughout the site.
- Cross access easements are proposed throughout the site.
- Public and private open/green space – linear green & trail connection – detailed acreage not provided, however will be required in the future
- Architectural Design & Standards Proposed – not referenced, however details will be needed in the future to obtain architectural approval

**Subarea #5**
- Tucker Creek Preserve
  - o 6.4-acres
    - ▪ Proposed to be preserved as a natural area with a conservation easement, and/or possibly dedicated to the City for public ownership and use
    - ▪ A portion of the acreage will be dedicated as a stormwater basin for the development, will not be conveyed to the City and will be required to be maintained by the homeowners' association (HOA).

- 3.1 acres of the 6.4 acres is already located in an easement that restricts development in this area. This includes a mix of slope, stormwater, sanitary, water and channel easements.
  - o Parking does not appear to be provided for those that would want to utilize the Tucker Creek Preserve. There is on street parking in the area, however not in the immediate vicinity.
  - o Possible amenities:
    - Trails
    - Pavilion
    - Benches

**Traffic**

The applicant previously provided a Traffic Impact Study that was reviewed by the City's traffic consultant. The Traffic Impact Study will be required to be updated once we have a better understanding of the density, mix of land uses and connection points throughout the site. Preliminary findings of the Study included the following:
- When warranted, a new signal should be installed on High St. across from the Worthington Municipal Building.
- When a new signal is constructed, the existing southbound fire signal control should be moved to the new High St. signal.
- Pavement markings should be revised on High St. for a 100-feet northbound left turn lane at the new entrance on High. St.
- Pavement markings should be revised on High St. for a 200-feet southbound left turn lane to Worthington-Galena Rd.
- Signs, pavement markings and signal operation should be modified to allow for east/west movements at the intersection of High St., Wesley Blvd, Worthington-Galena Rd. and Crandall Dr.

**Parking**

The applicant provided the following summarizing the proposed parking included in the application.

| Subarea | Lots/Unit/SF | Parking Required | Proposed Surface Parking | Proposed Garage/Structure | Total |
|---------|--------------|------------------|--------------------------|---------------------------|-------|
| #1 | 22 | 1/unit = 22 | Garage/Driveway | 44 | 44 |
| #2 | 86 | 1/unit = 86 | 86 On-street 26 Parking Lot | 172 | 284 |
| #3 | 72 | 1/unit = 72 | 18 On-street & 55 Parking Lot | 80 | 153 |
| #4 | 420 units 24,000 SF 96,000 SF | 1/unit = 420 1/150 = 160 | 49 (On-Street) | 504 Building A 328 Build B (4 Level Parking Garage) | 881 |

| | | 1/250 = 384 Total = 964 | | | |
|---|---|---|---|---|---|
| #5 | N/A | N/A | N/A | N/A | N/A |
| TOTAL | 600 | 1,144 | 234 | 1,128 | 1,392 |

*Staff Comments:*

Chapter 1174.05(b)(2) of the Planning & Zoning Code provides the following parking standards:

- Design. Parking and service areas shall be designed and located to protect the character of the area.
- Parking and service areas shall be designed and located to protect the character of the area.
- Non-Residential Uses – Parking shall be adequate to serve the proposed uses but shall not exceed 120% of the required parking found in Section 1171.01.
- Residential Uses – Not less than one parking space per dwelling unit.
- Bicycle Parking – Should be adequate to serve the proposed uses.
- The required parking referenced in the chart above appears to be inconsistent with the parking requirements found in the Planning & Zoning Code.

**Tree Preservation & Replacement**

A Tree Survey & Preservation Plan was previously provided by the applicant and was reviewed by the City Arborist. The following items were noted in the Tree Survey:

- 365 trees to be removed = 6,264 caliper inches
  - 29 dead
  - 28 poor condition
  - 2 Ash trees
  - 306 healthy trees
- 6,264 caliper inches – 1,069 caliper inches* = 5,195 caliper inches

* The dead and poor condition trees and Ash trees are not counted in determining the loss of caliper inches of trees for either replacement or fee payment, thus the associated caliper inches (1,069) associated with those trees is deleted from the total caliper inches of trees to be removed.

The previously submitted Tree Survey and Preservation Plan indicated tree replacement will be included as part of the redevelopment of the site and will be finalized with a detailed landscape plan at the Final Development Plan for the PUD. Tree replacement was described in the application as follows:

- Street Trees – provided on all public and private streets at 1 tree per 40 linear feet of street.
  - Minimum of 3-inch caliper at installation
  - Approximately 284 trees at 3 inches = 852 inches
- Alley/Parking Lot Island Trees
  - 30 trees at 2.5 inches = 75 inches
- Open Space Tree Plantings
  - 80 trees at 2.5 inches = 200 inches
- Buffer Plantings
  - Stormwater Pond – 10 trees at 2.5 inches = 25 inches

- o   Bickford Assisted Living Facility – 8 evergreens at 3 inches/6 feet high = 24 inches
- Other Locations
  - o   Replacement trees can be located in other off-site public property locations.
- When considering the amount of caliper inches to be lost (5,195) and the total caliper inches of proposed replacement trees (1,176), the submittal notes there remains 4,019 inches that would need to be replaced with additional trees or a Tree Replacement Fee of $150/caliper inch for a total fee of $602,850.00 would be applied.

*Staff Comments:*
- Staff calculates the fee at $150/caliper inch for 4,019-inches for a fee of $602,850.00, not $554,400.00 per the previously submitted plan.
  - o   An Tree Preservation & Replacement Plan will likely be required to be updated to reflect the current proposal.
- All street trees and landscaping plans will need to be reviewed by the City Arborist.

Per the previous application, the applicant requested the following items in relation to the Tree Replacement Standards
- Requesting the dedication of Tucker Creek Preserve to count towards the Fee-in-lieu of Tree Replacement.
- Requesting the Fee-in-lieu of Tree Replacement and/or the number of trees replaced off-site shall be based on $150/caliper inch.
- The applicant states that full on-site replacement is not feasible and would result in overcrowding on the site.
- The applicant states this is an unreasonable burden on the property if the fee-in-lieu is paid or if replacement occurs off-site.  The applicant previously requested a waiver of all fees.
- The applicant states that they are committed to a reasonable and balanced tree replacement standard that includes on-site replacement, off-site replacement, and crediting in order to meet the spirit and intent of the code, while resulting in fairness.
  - o   Applicant states they will work in good faith with City to find other off-site replacement location on public lands to help reduce the credit.

**Public Area Payments – Special Park Fund**

City Code contains the following requirements for contributions to the Special Park Fund:
- Commercial & Industrial Space = $100.00 per 1,000 sq. ft.
- Residential = $250.00 per dwelling unit

- Utilizing the Code requirements and applying them to the proposed development results in the following fee calculation: Proposed Uses:
  - o   Commercial – 120,000 sq. ft. = $12,000.00
  - o   Residential – 600 units = $150,000.00
  - o   Total Fee = $162,000.00

The applicant previously stated the property is valued at $165,688.00 per acre and believes the value of Tucker Creek Preserve is valued at $944,422.00 and believes there is a credit balance to the developer since the developer is proposing to dedicate the Tucker Creek Preserve to the City.

*Staff Comment:*
- The 3.1 acres of the 6.4 acres of the Tucker Creek Preserve is already located in an easement that restricts development in this area. This includes a mix of slope, stormwater, sanitary, water and channel easements. Staff questions the suggested value of the Tucker Creek Preserve given these easements and the associated restrictions on development.

**Public Space Amenities**

City Code requires public amenities which directly affect the quality and character of the public domain as part of PUD developments. The amount of required public amenities is calculated based on gross floor area.

*Staff Comment:*
- Not provided, however information related to public space amenities will be required in the future for review.

**Utilities**

The previous application included the following information concerning utilities:
- Water, sanitary sewer, surface drainage and utility facilities will be serviced by the existing available water/sewer lines and connections.
- Sanitary Sewer:
  - Existing 12-inch located along the southern property line
  - Existing 10-inch extends into the site from the 12-inch sewer line
- Water:
  - Existing 12-inch located along N. High St.
  - Existing 12-inch located along Wesley Blvd.
- Stormwater:
  - Proposed wet detention basin along the Tucker Creek Preserve near Evening St.
    - Mix of stormwater storage vaults and surface detention to be utilized in the open space areas and parking areas.
    - Proposed to be designed to meet all stormwater requirements for water quantity and water quality per Ohio EPA standards and City of Columbus stormwater requirements.

**Easements**

The previous application provided the following information regarding easements:
- Cross access easements, shared parking agreements, utility and access easements between subareas will be required.

*Staff Comment:*

- Cross access easements, shared parking agreements, utility and access easements between West Ohio Conference Center and the site should be discussed to assist in future redevelopment opportunities.

**Phasing Plan**

The previous application proposed the following phasing plan for construction:
- Developed based on zoning approval and finalized at the time of the Final Development Plan.
- Construction to begin with the single-family development. The commercial/office uses along High St. are subject to market conditions.

*Staff Comments:*
- The commercial office included in this proposal is the portion of the development that would provide economic benefit to the City and help offset the cost of services that are provided given the City's heavy reliance on income tax as a revenue stream. Staff is concerned that only the residential and retail portion of the project would get constructed without the commercial office needed in the High-Street Mixed-Use Zone.
- Staff is also concerned about the timeliness of construction of the open space that is to be provided on the site.

**Land Use Plans**

This section of the memorandum highlights the language related to this site contained in various land use plans and regulations of the City. Links to the full documents are included at the beginning of this memorandum and in the highlights below.

Worthington Comprehensive Plan – UMCH Focus Area - 2014

Since the Comprehensive Plan was updated in 2005 and included a strategic redevelopment plan for the site, City leaders have anticipated a redevelopment on the site that would include a mix of uses and open space across the site. The City studied the property again in 2014 and adopted amendments to the 2005 Comprehensive Plan in 2014, refining the stated desired outcome for the property. This area has been identified in the 2014 document as a good location for a mix of commercial uses along the High St. frontage, mix of residential uses and a significant amount of usable open space.

The 2005 Comprehensive Plan identified the UMCH site as strategic for future growth, a matter particularly critical for an established community like Worthington. While the 2005 plan presented an example of two possible redevelopment scenarios, this update document provides a more in-depth consideration of appropriate redevelopment parameters.

This section of the agenda item memorandum will highlight the language from the 2014 update to the Comprehensive Plan regarding types of land use on the site. The Plan update indicates ". . . redevelopment of this site must create a high-quality, mixed-use development that is walkable, connected, and integrated within the site and with the City. This mix of uses should contain a range of residential types together with commercial office and neighborhood retail uses integrated with contributing and shared green space and amenities – all of which complement each other to create an active, vibrant place. Any proposed design must be sensitive to the neighborhoods adjacent to the UMCH site, as well as to the natural features related to Tucker Creek. Any development that occurs within the focus area should relate internally to the site and to an overall plan, even if it is built at different times."

*Future Land Use Zones:* The 2014 update identified four general zones for the property:
- High Street Mixed Use
- Worthington Estates Edge
- Neighborhood Core
- Tucker Creek Preserve

*High Street Mixed Use:*
The High Street Mixed Use zone is described in the 2014 document as follows:

> North High Street is the commercial spine of the City of Worthington . . . [and] is a good location for commercial office use. . . [I]ncome tax generating employment uses such as office are critical to the fiscal sustainability of the City. In addition, this site's close proximity to historic Old Worthington makes it a prime location for walkable residential development and denser, amenity-rich housing types. . . This location along High Street is attractive for retail and service uses as well. It is not the desire of the City, however, to create a third retail center in close proximity to Old Worthington and the Shops at Worthington Place. Retail in this location should be neighborhood scale and serve the development that occurs on this site and that exists in the surrounding neighborhood; and it should help to activate the High Street frontage.

> The High Street Mixed Use zone consists of the frontage of the UMCH site along High Street. It permits a mix of office, residential, and retail uses with the focus on commercial office and medical uses with subordinate residential and limited retail uses. Buildings in this zone should be a minimum of two stories and a maximum of five stories in height with attractive, four-sided architecture. Buildings in this zone should address the streets, activate the street frontage, and include opportunities for outdoor dining and other pedestrian-focused activities.

> It is expected that the buildings adjacent to High Street will be commercial offices. Residential uses might occur behind as a transition to the Neighborhood Core. Neighborhood-oriented retail uses can complement the development in the first floors of office and residential buildings. The objective of the High-Street Mixed-Use zone is to create a high-quality, dense, walkable, connected, mixed-use development that creates a dynamic space and signature address to attract Class A office tenants along High Street and add vitality and life to the High Street corridor.

> In order to create a walkable environment, it is expected that buildings will line public streets and most parking will be located at the center of blocks, screened from public streets by attractive buildings. Parking beneath buildings may also be considered, provided the public street frontage of a building is activated. By providing a mix of uses within the High-Street Mixed-Use zone, parking areas can be shared to optimize their use. To achieve the desired densities, parking decks are encouraged to be integrated into the site. Features expected as part of any parking deck or structure include masonry and architectural elements to dress up the exterior, windowed stair towers, and lush landscaping and pedestrian connections.

Parking structures and/or parking lots could be lined with residential and/or retail development to separate and screen them from the Neighborhood Core. Where the High-Street Mixed-Use zone is opposite existing single-family residential development, it is expected that the new development will consist of residential development and/or substantial and attractive buffers.

As with all development in the UMCH focus area, it is to be high-quality in character and design with four-sided architecture. It should follow the *Worthington Design Guidelines.*

*Worthington Estates Edge:*
The Worthington Estates Edge is described as follows:

This zone is where development in the UMCH focus area should create a desirable transition between it and the existing single-family housing development that surround its north and west sides. The surrounding development consists of homes on third-of-an-acre lots. The Worthington Estates Edge zone calls for single-family residential development on lots between a third-of-an-acre and a fifth-of-an-acre. This equates to a residential density similar to Worthington Estates (3 dwelling units/acre) and Old Worthington (4-5 dwelling units/acre). The structures are limited to the same two-and-a-half story height as the surrounding neighborhood.

These may be single-family, detached homes that are more current, updated versions of what is found in the surrounding neighborhoods. Or they may be smaller homes with smaller yards that provide first floor living opportunities for Worthington residents — an option in which many residents expressed an interest during the community meetings. They may be something in between. Regardless, these homes must be of high-quality design, differentiated architecture, and in close proximity to amenities. This zone is for custom-built, individualized homes and not one for homes with repetitious floor plans.

Housing in this zone should consist of individual units, potentially with lots of different sizes, fronting on a street or streets. The use of cul-de-sacs is strongly discouraged. These new lots must include rear or side yards to provide a substantial buffer and green landscape between these structures and the rear yards of existing homes. Attractive storm water systems designed as a naturalized amenity can be placed within the Worthington Estates Edge zone.

As with all development in the UMCH focus area, it is to be of high-quality in character and design with four-sided architecture. It should follow the *Worthington Design Guidelines.*

*Neighborhood Core:*
The document describes the Neighborhood Core zone as follows:

> The Neighborhood Core zone represents the most flexible zone of the UMCH focus area because it is internal to the site. It consists of a higher density neighborhood that creates a transition from the single-family homes along the periphery of the site to the more active uses proposed closer to High Street.

> The Neighborhood Core calls for residential development at a density between six and fourteen dwelling units per acre (6-14du/ac) gross density with a height limit of three stories. It is expected that the Neighborhood Core will be developed with more than one housing type and at more than one density level. The expected amount of park space and amenities correspondingly increases with the density. For a density reference, Ville Charmante along West Wilson Bridge Road is over seven dwelling units per acre.

> This area creates the opportunity to introduce different types of housing options that are not readily available in the city. This area should provide residential living that is underrepresented in the market and complements Worthington's current offerings, addressing the needs of aging Worthington residents, future young professionals, and those desiring amenity-rich living. . .

> Examples include a mix of single-family detached homes on small lots with rear alley garages, homes with great front porches for outdoor gathering, custom homes designed for first-floor living, luxury residences with integrated front auto courts, well-appointed walk-up townhomes, and a limited number of high-end flats. To be successful, the Neighborhood Core must incorporate common areas/shared green space(s). These parks create the community gathering and development focal point(s). Shared amenities and facilities should also be provided. In all cases, the buildings must have front doors on inviting tree and sidewalk-lined streets. The objective is not to have streets dominated by garages, so garages must be de-emphasized – set back or placed to the rear of structures, creating a very walkable neighborhood.

> As with all development in this focus area, the community expects this development to be of high-quality in character and design and adhere to the *Worthington Design Guidelines.*

*Tucker Creek Preserve:*
Finally, the Tucker Creek Preserve zone is described in the document as follows:

> The southern boundary of the UMCH focus area is the beautiful and wooded Tucker Creek ravine. This plan calls for preserving this area as a natural green space amenity for the site and the community. The creek and the steep slopes that surround it are not developable and the wooded areas along it are important contributing and environmental features.

The community expressed a strong desire to continue linking neighborhoods, parks, and destinations with multi-use trails throughout the City. This includes achieving a dedicated trail along Tucker Creek that highlights this natural feature and provides an amenity and potential bicycle and pedestrian connection between High Street and Evening Street.

As part of any development that occurs on the UMCH site, it is expected that any future developer preserves the Tucker Creek ravine and wooded area. Any storm water systems in this area must be designed as a naturalized, aesthetic landscape feature that fits in the environment.

The 2014 document goes on to indicate the boundaries of these zones are flexible and provides information about ways in which the size of the areas may vary. It then indicates the importance of park space with the following language:

The creation of park space for community and public enjoyment is an important component for any redevelopment on the UMCH site. This is in addition to the Tucker Creek Preserve. Beyond serving community-gathering functions, the park space is critical to providing place-making in development layouts as well as a green space balance to the built environment contemplated in the High Street Mixed Use and Neighborhood Core zones.

In potential redevelopment scenarios, this additional park space has several acres divided between the High Street Mixed Use and Neighborhood Core zones. Park space could be used to provide linear park "windows" into the site from High Street; neighborhood-oriented parks internal to the site; and/or extension of the Tucker Creek preserve. The expected amount of park space and amenities correspondingly increases with the density of development proposed on the UMCH site. Park space as discussed here must be useable, contributing ground for residents, workers, and visitors of the redeveloped site, and not, for example, storm water controls or left-over ground.

It is expected that the developer(s) of the UMCH site will integrate usable park land into the development and work with the City to provide acreage in the High Street Mixed Use and Neighborhood Core zones as park space useable by the community.

Creating this additional park space within the UMCH focus area will address the community's desire for park space and amenities here. The public process generated numerous ideas for amenities worthy of further consideration. It is important that the City and the Worthington Parks and Recreation Commission work with the community to plan for and create parks that include the desired amenities in the appropriate places within the City and at this site.

The 2014 document goes on to include information related to Design Guidelines, connectivity, street intersections, the High Street frontage, landscaping and buffers, storm water and public private partnerships which can be found in the <u>full document</u>.

Worthington Comprehensive Plan – UMCH Focus Area – 2014 - High Street Frontage Guidelines:
The potential redevelopment of the UMCH focus area creates a change in the consideration of setbacks along High Street in these blocks. To achieve the desired walkability, vitality, and screening of parking along Worthington's signature street, it is expected that multi-story buildings will be constructed closer to the High Street right-of-way, with parking located behind the buildings. The buildings should engage High Street with broad sidewalks, storefronts, front entries, and outdoor seating that provide an inviting strolling environment for pedestrians. The buildings constructed along High Street will set the tone and impression for the entire UMCH focus area. As such their architecture, materials, quality, interest, aesthetics, and vitality are critical. These buildings should have a predominance of brick and complement the community character. Buildings along High Street must have the majority of their building face fronting/ parallel to the street. Buildings are expected to be at least two stories in height with substantially transparent storefronts on the first floor, whether retail or office, to activate the street. Operational building entries must be provided along High Street regardless of parking orientation. Neither single-story commercial buildings nor retail buildings on out lots are part of the vision for the UMCH focus area, nor are buildings placed in the middle of parking lots.

Generally, it is anticipated that buildings will be setback from the High Street curb line an appropriate distance based upon the architecture and use(s) of the buildings. The streetscape section between the building and the curb should include a sizable tree lawn or street trees in planters (ten feet +/-), at least an eight-foot-wide unobstructed sidewalk, and an outdoor seating and/or landscape planting area. As the building height increases, the buildings should consider the relationship between the setback, the street corridor, and the building height. It is expected that if fourth or fifth stories are included, a variety of techniques will be implemented to mitigate any potential "canyon" effect along High Street, such as the use of floor terracing, changes in building massing, insertion of a green commons, recessed seating and dining areas, and lush landscaping to name a few.

While it is preferred that parking be provided to the rear of building, if parking is provided in front, it should be consistent across the frontage and be limited to either one row (single bay) of parking or on-street parking for short customer visits. Parking visible between buildings should be screened by landscape and/or masonry wall.

Development within the UMCH should be well landscaped, with particular focus on the streetscapes, building edges, buffers, and public park/community commons. Landscaping should be substantial, lush, well-planned, and commonly maintained. Landscape should emphasize native species where possible.

Worthington Comprehensive Plan - 2005
The 2005 Comprehensive Plan identifies portions of High Street outside of the historic core as High Street Corridor (Extents Area) and as a place where consistent site design should be encouraged such as landscape screening and interior planting of surface parking areas, and where the location of large parking areas should be to the rear of the site. The corridor could accommodate redevelopment at a higher density, with such projects meeting the needs of the City, providing green setbacks and meeting the Architectural Design Guidelines. The plan recommends promoting

a high-quality physical environment, encouraging the City to continue to emphasize strong physical and aesthetic design, and high-quality development. Also recommended is encouraging the private market to add additional commercial office space within the City. The UMCH property was specifically addressed in that section of the plan, with concepts establish for mixed use development on the site. This section specifically focused on the UMCH property was updated with the 2014 document.


Bicycle & Pedestrian Master Plan – 2019
The 2019 Bicycle & Pedestrian Master Plan was created to guide the development of bicycle and pedestrian routes, linking activity centers within the City, as well as the regional network. The plan recommends a multi-use path along High Street and sidewalks along the southern side of Longfellow Ave. to Larrimer Ave. The intersection of High Street/Worthington-Galena Rd./Wesley Blvd. was a signalized crossing that has been identified where there may be opportunities to improve safety and convenience for pedestrian crossings.


Park Master Plan – 2017
The 2017 Park Master Plan was created as a plan dedicated to maintaining our existing parks, meeting the needs of residents, and benchmarked effectively with other progressive cities is vitally important. The plan endeavors to provide City Council and the residents of Worthington prioritized park improvements for the years to come in an organized and strategic planning document. The plan recommends focusing on improving and maintaining existing park space, however as opportunities arise for additional park space as part of the UMCH site redevelopment the following should be considered:
- Natural spaces for passive recreation and the area along Tucker Creek would provide an opportunity for nature trails, education and interpretation opportunities, and a natural playground.
- Possible three season shelter is highly desirable for the community.
- Circular multi-use path around the perimeter of the development would be an opportunity.


Chapter 1177 - Worthington Design Guidelines and Architectural District Ordinance
This property is located within the Architectural Review District and as such is subject to the Architectural District Code (Ordinance) and the Worthington Design Guidelines. The Design Guidelines contain the following recommendations for new commercial/institutional and new residential construction in the parts of the District outside of Old Worthington:
New Commercial/Institutional Sites
1. Scale, Form & Massing: Extension of the pleasant scale of Old Worthington into new areas is desirable. Consider breaking down larger buildings into a series of smaller masses with connectors between them. Inclusion of sidewalks, pedestrian-scaled signage, and planting and lawn areas will help communicate a sense of a walkable pedestrian scale. Simple geometric forms and uncomplicated massing tend to make buildings more user-friendly and help to extend the character of Old Worthington into the newer development

areas. Carefully designed building facades that employ traditional storefronts -- or similarly sized windows on the first floor -- will help make new buildings more pedestrian-friendly.

2. Setbacks: Parking areas should be located toward the rear and not in the front setbacks if at all possible. Unimpeded pedestrian access to the front building facade from the sidewalk should be a primary goal. Building up to the required setback is desirable as a means of getting pedestrians closer to the building and into the main entrance as easily as possible.

3. Roof Shape: Generally, a traditional roof shape such as gable or hip is preferable to a flat roof on a new building. Roof shapes in a development do not have to be identical but can vary – just as in Old Worthington – to provide visual variety. Roof shapes should be in scale with the buildings on which they are placed. Study traditional building designs in Old Worthington to get a sense of how much of the facade composition is wall surface and how much is roof.

4. Materials: Traditional materials such as wood and brick are desirable in newer areas, but other materials are also acceptable. These include various metals and plastics; poured concrete and concrete block should be confined primarily to foundation walls. Large areas of glass are appropriate for the first floors of new buildings, where they resemble the commercial storefronts typical of older buildings. On upper floors, avoid large areas of glass in favor of a more traditional pattern of window openings spaced regularly across the building's wall. Avoid any use of glass with highly reflective coatings. Some of these may have a blue, orange, or silver color and can be as reflective as mirrors; they generally are not compatible with other development in Worthington. Before making a final selection of materials, prepare a sample board with preferred and optional materials.

5. Windows: On long facades, consider breaking the composition down into smaller "storefront" units, with some variation in first and upper floor window design. Use traditional sizes, proportions and spacing for first and upper floor windows. Doing so will help link Old Worthington and newer areas through consistent design elements.

6. Entries: Primary building entrances should be on the street-facing principal facade. Rear or side entries from parking lots are desirable, but primary emphasis should be given to the street entry. Use simple door and trim designs compatible with both the building and with adjacent and nearby development.

7. Ornamentation: Use ornamentation sparingly in new developments. Decorative treatments at entries, windows and cornices can work well in distinguishing a building and giving it character, but only a few such elements can achieve the desired effect. Traditional wood ornamentation is the simplest to build, but on new buildings it is possible to use substitute materials such as metal and fiberglass. On brick buildings substitute materials can be used to resemble the stone or metal ornamental elements traditionally found on older brick buildings. As with all ornamentation, simple designs and limited quantities give the best results.

8. Color: For new brick buildings, consider letting the natural brick color be the body color, and select trim colors that are compatible with the color of the bricks. It may be acceptable to paint new brick walls. Generally, lighter colors should be used for this purpose, with darker colors for trim. Prepare a color board showing proposed colors.

9. Signage: Keep and repair any historic signage that is appropriate to the Architectural Review District. While the regulations permit a certain maximum square footage of signs for a business, try to minimize the size and number of signs. Place only basic names and graphics on signs along the street so that drive-by traffic is not bombarded with too much

information. Free-standing signs should be of the "monument" type; they should be as low as possible. Such signs should have an appropriate base such as a brick planting area with appropriate landscaping or no lighting. Colors for signs should be chosen for compatibility with the age, architecture and colors of the buildings they serve, whether placed on the ground or mounted on the building. Signs must be distinctive enough to be readily visible, but avoid incompatible modern colors such as "fluorescent orange" and similar colors. Bright color shades generally are discouraged in favor more subtle and toned-down shades.

10. Sustainability: The City of Worthington and its Architectural Review Board are interested in encouraging sustainable design and building practices, while preserving the character and integrity of the Architectural Review District. Energy conservation methods are encouraged. Landscape concepts often complement energy conservation and should be maintained and replenished. Utilize indigenous plant materials, trees, and landscape features, especially those which perform passive solar energy functions such as sun shading and wind breaks. Preserve and enhance green/open spaces wherever practicable. Manage storm water run-off through the use of rain gardens, permeable forms of pavement, rain barrels and other such means that conserve water and filter pollutants. Utilize solar panels where appropriate that meet the guidelines outline in the Design Guidelines. Bike racks and other methods of facilitating alternative transportation should be utilized. Streetscape elements should be of a human scale. Make use of recycled materials; rapidly renewable materials; and energy efficient materials. Use of natural and controlled light for interior spaces and natural ventilation is recommended. Minimize light pollution.

New Residential Sites

1. Form, massing and scale: New structures should complement the form, massing, and scale of existing nearby structures. Also, building placement and orientation are important design considerations. Most main entrances should face the street and garages should avoid facing the street.

2. Setbacks: Observe the setbacks of adjacent and nearby structures.

3. Roof: Roof shapes for new buildings should be appropriate to the style or design of the building. If a new building does not follow a particular style but is instead a vernacular design, then roof shapes and heights similar to those in the neighborhood or nearby would be most appropriate.

4. Materials: Contemporary materials that simulate traditional ones are appropriate, but the preferred option is to use true traditional materials such as wood siding. Incompatible contemporary materials should be avoided. Brick has long been a traditional material in Worthington. Prepare a sample board for review by the Architectural Review Board.

5. Windows: For new buildings, multiple-paned windows generally are not appropriate. The exception is a building being built in a particular style -- such as Federal, Greek Revival or Colonial Revival -- that would have employed this window type. When in doubt, simple 1 over 1 double-hung sash windows are usually the simplest, least expensive and most appropriate choice. Using the excellent precedents of Worthington's many historic structures, carefully design the pattern of window openings; window sizes and proportions (they must be appropriate for the size and proportions of the wall in which they are placed); pattern of windowpanes and muntins; and trim around the windows. Good quality wood windows are readily available and more affordable than in the past. True wood windows are always the first preference. Aluminum- or vinyl-clad windows

can be appropriate, but primarily on secondary facades and less conspicuous locations. All-aluminum or vinyl windows are not prohibited but are not encouraged. Avoid blank walls.

6. Entries: As with other design considerations, study Worthington's rich collection of 19th and 20th century architecture for design ideas for entrances and doors. For newly built buildings, simpler designs usually look better than more ornate ones. Avoid heavy ornamentation on doors and entrances. Observe entry placement on existing buildings. Whether located symmetrically or asymmetrically, entries usually are aligned with a window on the second floor so that a regular rhythm of openings is maintained on both floors. Entries should be located so they are easily visible, and they should be oriented toward the street.

7. Ornamentation: Observe Worthington's excellent historic architecture for information on the kinds and amounts of ornamentation employed on various building styles and periods. Use ornamentation conservatively. It will be most successful if used in traditional locations: around windows and doors; along a building's cornice or at the corners; in gables; or on gates and fences. Most ornamentation historically was made of simple forms built up to a desired level of complexity. When in doubt, follow the old rule that "less is more." Sometimes just a little ornamentation, well placed, can have a major impact without the need for more extensive (and expensive, and hard-to-maintain) ornamentation. Use compatible materials in ornamental elements. Frame houses should have wood ornamentation, although in cases where the ornamental elements are some distance from the viewer it may be possible to use substitute materials such as fiberglass.

8. Color: In general, avoid bright colors not typical in Worthington neighborhoods, such as various shades of purple or orange. For infill buildings being placed in an existing streetscape, select colors compatible with those already used along the streetscape. Many buildings follow a pattern of light colors for the building body and darker colors for the trim. Following this pattern is encouraged. In Worthington, the use of white or cream-colored trim also is common and would be appropriate for new construction. Avoid using too many colors. Usually one body color and one trim color are sufficient.

9. Landscaping: Worthington's mature shade trees are the primary landscaping feature throughout the community. They are a major contributor to its character and help define its neighborhoods as stable, desirable places to live. In general, lawns are generous but not overly large, which contributes to the sense of human scale that is one of Worthington's important attributes. Other landscaping elements tend to be properly scaled and well-tended, which also tends to enhance neighborhood character. Maintain and nurture mature trees to prolong their lives. Plant and maintain street trees in planting areas between the street and sidewalk. Paving can sometimes reduce water absorption of the soil so much that trees do not get the moisture they require.


Chapter 1177.05 Standards for Review: Certificate of Appropriateness
**1177.05 Standards for Review: Certificate of Appropriateness**
The Board of Architectural Review, in deciding whether to issue a certificate of appropriateness, shall determine that the application under consideration promotes, preserves and enhances the distinctive historical village character of the community and would not be at variance with existing structures within that portion of the district in which the structure is or is proposed to be located

as to be detrimental to the interests of the Districts as set forth in Section 1177.01. In conducting its review, the Board shall make examination of and give consideration to the elements of the application including, but not necessarily limited to:

(1) Height, which shall include the requirements of Chapter 1149;
(2) Building massing, which shall include in addition to the requirements of Chapter 1149, the relationship of the building width to its height and depth, and its relationship to the viewer's and pedestrian's visual perspective;
(3) Window treatment, which shall include the size, shape and materials of the individual window units and the overall harmonious relationship of window openings;
(4) Exterior detail and relationships, which shall include all projecting and receding elements of the exterior, including but not limited to, porches and overhangs and the horizontal or vertical expression which is conveyed by these elements;
(5) Roof shape, which shall include type, form and materials;
(6) Materials, texture and color, which shall include a consideration of material compatibility among various elements of the structure;
(7) Compatibility of design and materials, which shall include the appropriateness of the use of exterior design details;
(8) Landscape design and plant materials, which shall include, in addition to requirements of this Zoning Code, lighting and the use of landscape details to highlight architectural features or screen or soften undesirable views;
(9) Pedestrian environment, which shall include the provision of features which enhance pedestrian movement and environment and which relate to the pedestrian's visual perspective; and
(10) Signage, which shall include, in addition to requirements of Chapter 1170, the appropriateness of signage to the building.
(11) Sustainable Features, which shall include environmentally friendly details and conservation practices such as solar energy panels, bike racks, and rain barrels.

Chapter 1174 - Planned Unit District - PUD
The PUD: Planned Unit Development chapter of the Codified Ordinances includes the following purpose statement:

> The purpose of Planned Unit Development is to promote variety, flexibility and quality for the development of properties in the City of Worthington. Planned Unit Development allows for more creative planning and design and enables a greater range of uses than traditional Zoning regulations. Planned Unit Development allows for the design and mix of uses necessary to meet changing economic and demographic demands; permits implementation of development standards, plans, studies, and guidelines adopted by the City Council; and provides the opportunity to retain and enhance the character of the City, and the health, safety and general welfare of the inhabitants.

The chapter goes on to provide additional detail regarding PUD provisions, uses, standards, submission requirements, procedures, natural features and coordination with other provisions of the Planning and Zoning Code, which can be found in Chapter 1174 of the Codified Ordinances of the City.

**Staff Comments/Analysis**

Staff has focused on broad discussion topics in this section and compared them to the language in the 2014 Comprehensive Plan Update to manage the initial review of the applications and materials. City staff comments/analysis included below is our interpretation of the materials provided. A full review of the detailed criteria in Chapter 1174 PUD Planned Unit Development is still needed and could not yet be completed due to the limited information available from the applicant.

*Discussion Topics:*
- Residential Density, Height & Housing Types
- Mix of Land Uses
- Greenspace/Open Space/Parkland
- Traffic/Connections
- Bicycle & Pedestrian Accommodations

***Residential Density, Height & Housing Types***

The overall density proposed on the site has been reduced by approximately 19% from 730 units to 600 units, however the density is still higher than the 2015 proposal and there is less acreage involved. The 2015 version included more acreage and High St. frontage that has since been sold. The overall site has been reduced by 3.4-acres and 428+ feet of road frontage. The 2015 density discussed was 14 units/acre on 41.22-acres and is now 15.95 units/acre on 37.8-acres. The 2015 version was presented at a meeting that had over 350 people attend, and overall, the community was not supportive of the previous density, layout and amount of usable open space and this proposal still has 29 additional units with less acreage than the 2015 proposal.

The applicant proposes a mix of for-sale and for-rent products throughout the site that include a mix of floorplans. The mix of floor plans has only few options for single-level living, which is one of the key things we have heard from our residents that they would like to see offered in the community.

The overall density should be dramatically reduced to better reflect what is recommended in the Plan and by the community. The variety of housing types should also be re-considered to address the variety of housing options needed and desired in the community.

*Worthington Estates Edge*

This area is identified in the 2014 Comprehensive Plan Update ("Plan") as a transition zone between the existing single-family housing to the west and north and application proposes single-family residential development on lots between a third-of-an-acre and a fifth-of-an-acre. Staff's review noted the proposal is generally consistent with the density recommendations found in the 2014 Comprehensive Plan Update with the following comments:
- The rear yard setbacks abutting the existing residential to the west should have a rear yard setback of 30-feet and the lots fronting on Longfellow Ave. should have a front yard setback of 30 feet to match the existing required setbacks of those homes found in Worthington Estates.
- Landscaping and buffers are key between the UMCH focus area and the neighboring residential.

- First-floor living opportunities are important to Worthington residents.
- Custom-built, individualized homes are desired according to the Plan and recommended to not have repetitious floor plans.
  - The previous submittal referenced a partnership with Bob Webb Homes. The previous application submitted a sample of 4-home plans that would be built by Bob Webb Homes with the caveat that the house models with the same footprint may be allowed under certain circumstances.
    - Not referenced, however information for this most recent will be required in the future for review.
  - The Plan states that architecture and design should be rich and varied (not repetitive/homogeneous) with great attention to detail.
- The Residential Design Guidelines provide guidance on site development, form, massing, scale, setbacks, roof shape, exterior materials, windows, entries and color.
- The Worthington Estates Edge would remain in the Architectural Review District.

*Neighborhood Core*
The Plan recommends this area for higher density residential development that creates a transition from the single-family homes along the periphery of the site to the more active uses proposed closer to High St. The recommendation in the Plan is for 6-14-units/acre with a height of 3-stories with more than one housing type at more than one density with appropriate open space associated with the proposed density. Staff has the following comments:
- The applicant is proposing an overall density of 11.3-units/acre in this area with a for sale and for rent product that is 3 stories in height. Some units will have a garage and finished lower level.
- Residential development in this area of the site is recommended in the Plan at 6-14 units/acre with more than one housing type and at more than one density level. The proposed 11.3-units/acre does not incorporate a true mix of housing options. This area should provide a mix of residential living that is underrepresented in the Worthington market and addresses the needs of aging residents, future young professionals, and those desiring amenity-rich living.
- The 2015 proposal from Lifestyle Communities expressed a mix of estate lots, cottage lots, manor lots and townhomes on the site at approximately 178-units for 13-units/acre; however, the community comments received on that proposal indicated the density and product was not what the community wanted to see on the site.
- The 2020 proposal from Lifestyle Communities expressed a mix of smaller estate lots, townhomes, and flats at approximately 12-units/acre; however, the community comments received indicated the density and product was not what the community wanted to see on the site.
- Subarea #2 and subarea #3 are proposed to develop at different densities with a minimal mix of styles, however, there appears to be minimal units that provide single-level living.
  - Single-level living is one of the things the City has heard is desired by residents and is not abundantly provided for in this proposal.

- The Plan notes that this area creates the opportunity to introduce different types of housing options that are not available in the City.
  - Townhomes are the only housing option offered in this location besides a few single level living flat options.
- The northern portion of the Neighborhood Core (subarea #2) has been identified in the proposal as townhomes at 3 stories in height with garages that will be a for sale product.
  - This for sale product would serve as a transition from the detached single-family lots to the west and north to the rental products proposed to the south and east towards High St.
- The Comprehensive Plan recommends a mix of single-family detached homes on small lots with alley garages, homes with great front porches for outdoor gathering, custom homes designed for first-floor living, luxury residences with integrated auto courts, well-appointed walk-up townhomes, and a limited number of high-end flats.
- The southern portion of the Neighborhood Core (subarea #3) has been identified as townhomes at 3 stories in height with some units having attached garages and are a for rent product. This subarea #3 does appear to offer a limited amount of single level living options and is at the maximum density recommended in the Neighborhood Core.
- The rental product located in the southern portion of the Neighborhood Core (subarea #3) does not have a mix of housing types that included detached homes on small lots with rear alley garages and front porches as referenced in the 2014 Plan.
- The application states that the total amount of public/private open space is approximately 1.3-acres in size, however there are only a few areas that are reasonably sized areas of open space in the Neighborhood Core. The areas shown are proposed for recreation, pavilion, seating area and other small green spaces between the townhomes and space at the end of buildings.
  - The Plan recommends the creation of park space for the community and public enjoyment as an important component for any development on the site in addition to the area identified as the Tucker Creek Preserve.
  - Park space is critical to providing place-making in development layouts.
  - The proposed open space is an improvement over the previous proposal as it creates a linear green from High Street to the interior of the site to a neighborhood green.
    - This is a positive improvement towards meeting the goals found within the Plan.
  - The proposed open space does not seem to meet the goal of creating contiguous usable open space for those living in this development and in all of Worthington. The proposed green space does not appear to build upon the green space that is identified as the Tucker Creek Preserve.
  - The Plan calls for several acres of park space between the High Street Mixed Use and Neighborhood Core zones.
  - According to the Plan, park space and amenities should increase with density and should be useable, contributing ground for residents, workers, and visitors to the site. Some areas shown appear to be squeezed in to provide open space. There is also an area identified for stormwater control, which is identified in the Plan as the type of ground that does not meet the park space goal, however stormwater management is critical for any development on the site.

  o The Plan and the community have asked for additional park space with amenities within the UMCH site. At this time, it does not appear that the proposed green space meets the need for usable contiguous open space that can build upon the Tucker Creek Preserve as described in the Plan.

*High Street Mixed Use*
This area consists of the frontage of the UMCH site along High St. and is recommended in the Plan for a mix of office, residential, and retail uses with the focus on commercial office and medical uses with subordinate residential and limited retail uses. Staff has the following comments:

- The proposed 420 apartments with access to a proposed parking garage in this area does not appear to meet the intent of being subordinate residential.
- The apartments range in height of 4-5 stories in height with some buildings having first-floor retail.
- The location and height associated with the northern building (Building A) has been pulled away from Longfellow Ave. and Larrimer Ave.
  - o The increased setback, reduced height and gateway green helps to buffer the proposed building from the neighboring residential uses to the northwest.
    - ▪ This is a positive improvement towards meeting the goals found within the Plan.
  - o The 4-story parking garage will be completely wrapped by the building and will have access from Larrimer Ave.
    - ▪ This is a positive improvement towards meeting the goals found within the Plan.
    - ▪ Access to the parking garage is provided from Larrimer Ave, however a secondary access should be discussed to provide easier access to the parking garage from the proposed new roadways.
- The location and height associated with the southern building (Building B) has been adjusted to be closer to the southern property line.
  - o The setback along the southern property line has not been identified at this time, however, this information will be required in the future for review.
  - o The 4-story parking garage will be wrapped on three sides.
    - ▪ The southern elevation of the parking garage will need to be addressed in the future as Worthington requires four-sided architecture.
    - ▪ Access to the parking garage is provided from the new roadway on the west side of southern building (Building B).
- There appears to be approximately 1.7-acres of open space along a linear green, trail connection and a gateway green.
- The amenities associated with the apartments are now separated from the communal open space, and the amenities are now screened by the apartment building and the medical office building along High Street whereas the previous version had the amenities adjacent to the Longfellow Ave. right-of-way.
  - o This is a positive improvement towards meeting the goals found within the Plan.
- The 2015 version expressed a mix of medical office buildings, first-floor retail, and apartments at 350-units. Many community members previously stated that they felt that

350 apartments were too much on the site, however today we have 420 apartments proposed with less usable acreage.
- The site is 3.42 acres smaller with less High St. frontage and the apartment count is still 70-units higher in the area along High St.
- Residential use should be subordinate to the primary need for commercial office and medical uses in the High-Street Mixed-Use zone.
- According to the Plan, where the High Street Mixed Use is opposite existing single-family residential, it is expected that the new development will consist of residential development and/or substantial attractive buffers.
    o The apartments are now 4-stories in height towards the intersection of Larrimer Ave. and Longfellow Ave. and the buildings have been pulled away from the intersection and a gateway green has been proposed that provides an additional buffer to the residential to the northwest.
        ▪ This is a positive improvement towards meeting the goals found within the Plan.

*Mix of Land Uses*

As stated in the Plan, redevelopment on this site must create a high-quality, mixed-use development that is walkable, connected, and integrated within the site and with the City. This mix of uses should contain a range of residential types together with commercial office and neighborhood retail uses integrated with contributing and shared green space and amenities – all of which complement each other to create an active, vibrant place. Staff has the following comments:
- Commercial Uses:
    o The application proposes 24,000 sq. ft. of commercial retail/restaurant space and 96,000 sq. ft. of medical office space. The proposed square footages are a positive change from the previous proposal. Office uses are more consistent with the recommendations found in the Plan.
        ▪ This is a positive improvement towards meeting the goals found within the Plan, however it still hasn't reached the desired expectations. The amount of office space is still small in comparison with the amount of residential proposed on the site.
    o Income tax generating employment uses such as office are critical to the fiscal sustainability of the City.
    o Neighborhood scale retail was recommended in the Plan due to the proximity of this site to Old Worthington and the Shops at Worthington Place as a means to not create a third retail center.
    o The Plan calls for a mix of office, residential and retail uses with the focus on commercial office and medical uses with subordinate residential and limited retail uses.
        ▪ The residential uses are not subordinate to the commercial office and medical use recommendations for the site. The proposed retail square footage appears to be more in line with the recommendations found in the Plan.

- o As a fully developed community there are few opportunities to attract new Class A office tenants in Worthington that are seeking new construction. This site is key to attracting new office development.
  - o According to the Plan, neighborhood retail can complement the development in the first floors of office and residential buildings, however an abundance of retail would be out of alignment with the needs of the City seeking more opportunities for new commercial office development.
- Residential Uses:
  - o The proposal shows a total of 600-units on the site with a mix of housing types and are marketed as a rental product and a for sale product. There would be 492 rental units and 108 for sale units on the site.
    - The City has heard from the community that there is a desire for owner-occupied housing units and housing types as a means to age in place and stay within the Worthington community.
  - o The 2015 proposal from Lifestyle Communities included more acreage and High St. frontage; however, it had a lower density than what is proposed today. The overall site has been reduced by 3.4 acres and 428± feet of road frontage. The previous density discussed was 14 units/acre on 41.22 acres and is now 15.95 units/acre on 37.8 acres. Over 350 people attend a meeting on this 2015 proposal, and the community was not supportive of the previous density, layout and amount of usable open space and this new proposal has approximately 70 additional units with less acreage.
    - The City has received over 320 online comments with the majority of the comments referencing the density is still too high on the site.
  - o The Plan recommends a range of residential types together with office and neighborhood retail and shared green space and amenities designed to be sensitive to the neighborhoods adjacent to the site, and protect the natural features related to Tucker Creek.
  - o The proposed number of units does not seem consistent with the Plan and what has been expressed by the Worthington community.

*Greenspace/Open Space/Parkland*
The Tucker Creek Preserve has been identified in the Plan as an area to preserve as a natural green space amenity for the site and the community. The creek and the steep slopes are not developable, and the wooded areas are important contributing and environmental features. There is a strong desire to continue linking neighborhoods, parks, and destinations with multi-use trails throughout the City. The creation of park space for community and public enjoyment is an important component for any development on the site in addition to the Tucker Creek Preserve. Staff has the following comments:
- The 2019 Bicycle & Pedestrian Master Plan also recommends a multi-use path along High Street and sidewalks along the southside of Longfellow Ave.
  - o These recommendations will need to be incorporated into any streetscape improvements along High Street and development along the Longfellow Ave. frontage.

- There is an opportunity to have a bicycle and pedestrian connection between High St. and Evening St. and around the entire site that would promote additional bicycle and pedestrian opportunities and access to greenspace/open space on the site.
  - Sidewalks are proposed throughout the site and a multi-use trail running throughout the Tucker Creek Preserve and a north/south multi-use trail running through the center of the site. The Plan's vision was to build upon the Tucker Creek Preserve's existing assets.
  - This proposal appears to address some of the amenities that we have heard the community would like to see on the site, however the contiguous usable open space appears to be lacking.
- The 2017 Park Master Plan also recommends focusing on improving and maintaining existing park space, however as opportunities arise for additional park space as part of the UMCH site redevelopment the following should be considered:
  - Natural spaces for passive recreation and the area along Tucker Creek would provide an opportunity for nature trails, education and interpretation opportunities, and a natural playground.
  - Possible three season shelter is highly desirable for the community.
  - Circular multi-use path around the perimeter of the development would be an opportunity.
- Park space is recommended in the Plan to provide a place for community gathering functions and to provide place-making in the development's layout as well as a greenspace balance to the uses proposed on the site.
  - Contiguous usable greenspace/open space is key to what the community expects to the see on the site.
- According to the Plan, the amount of greenspace/open space is expected to increase as the density on the site increases.
  - This proposal does not appear to be in line with that recommendation.
- The Plan indicates park space should be useable, contributing ground for residents, workers, and visitors to the site and not stormwater ponds or left-over ground.
  - Tucker Creek Preserve is proposed to have trails, entry pavilion, trailhead pavilion, and linear green space in subarea #3, however it still appears to be cut off from the rest of the site.
  - A stormwater pond is proposed along the Evening St. frontage abutting the Tucker Creek Preserve.
    - There might be better ways to incorporate stormwater management on the site that would be an attraction and benefit to the development.
  - The Plan envisioned a possible three season shelter house, outdoor amphitheater, multi-use paths and more passive recreational uses in the areas around and in the Tucker Creek Preserve. The materials provided indicate the desire to add additional amenities in the appropriate places on this site that the community desires.
  - Overall access to the Tucker Creek Preserve has been improved by incorporating open space and a trail connection through the site.
    - Contiguous usable greenspace/open space is key to what the community expects to the see on the site.
  - It is expected that greenspace/open space be incorporated into the Neighborhood Core and the High Street Mixed Use zones as park space useable by the community.

- The Tree Survey & Preservation Plan has been provided. There appears to be an opportunity to save some high-quality species of trees along the perimeter of the site, however, there does appear to be some high-quality species of trees in the center of the site that will likely need to be removed as part of any development. There might be the possibility to incorporate some of these trees into the overall design.

*Traffic/Connections*

The City originally requested an updated Traffic Study for the site, however until there is more consensus on the density and uses on the site we have asked the applicant to hold off on submitting an updated study. The previous Traffic Study was prepared in 2015, updated in 2017 and again in 2018. City staff felt that it was appropriate for an updated Traffic Study using previous traffic counts for the City since traffic patterns and volume have substantially changed since the pandemic. Staff has the following comments to the previous Traffic Study:
- Bicycle and pedestrian improvements could be better incorporated into the overall design.
- Public and private roadways proposed on the site.
  - o Wesley Blvd. has been proposed to become a public roadway and dedicated to the City for maintenance.
    - City staff has concerns about how this road was constructed and whether it was constructed to public road standards since it was originally constructed as a private road.
- Compliance with the City's Complete Street Policy will be required for all newly constructed streets.
- The need for vehicular, bicycle and pedestrian connections to the existing roadways at Evening St., Longfellow Ave., Larrimer Ave., Wesley Blvd. and High St. and proposed new roadways on the site should be further discussed and reviewed.
  - o Bicycle and pedestrian connections through the site as well as with the adjacent neighborhoods and uses are important to meet the City's goals of enhancing bicycle and pedestrian accommodations.
  - o Vehicular connections to Evening, Longfellow and Larrimer are extremely sensitive and will need careful evaluation for the amount of traffic that may utilize these connections. Any connections should be constructed so as to limit cut through traffic and negative impacts on the neighborhood.
    - An updated Traffic Study will eventually be needed.
- Improvements along High St. as proposed with the development and streetscape improvements associated with these improvements need further consideration.
  - o Streetscape improvements will need to be discussed and incorporated into the overall design.
  - o Multi-use path along High Street should be incorporated into any streetscape improvements.
- Intersection streetscape improvements at Larrimer Ave. and High St. will need to be discussed and incorporated into the overall design.
- There is a need to address the intersection of High St., Wesley Blvd, Worthington-Galena Rd. and Crandall Dr. as part of this development as it relates to traffic being able to go east/west through the intersection and to provide improved bicycle and pedestrian connections.

*Stormwater*

Stormwater management will be extremely important as this site develops. The previous application identifies a wet detention basin along Evening St. and stormwater storage vaults and surface detention facilities located within the open spaces and parking areas on the site. The City and its consultant, ms consultants, will be reviewing the final stormwater design to ensure compliance with Ohio EPA standards and the City's Stormwater Manual as the project progresses. The stormwater design has been proposed to outlet to the existing Tucker Creek along the southern property line. Staff has the following comments:

- A comprehensive look at the entire site for stormwater will be needed that can be developed in stages as the overall site would likely develop in phases over multiple years.
- According to the Plan, stormwater controls should be aesthetically integrated into the site and be natural in appearance and serve as an amenity to the site. The current proposal just has the detention pond located along Evening St. and the proposed new roadway to the site. Vehicular and pedestrian safety will need to be discussed concerning the detention pond.
- Sustainable and green infrastructure needs to be incorporated into the overall development as stated in the Plan.
- The Plan states the expectation that stormwater controls on the site will be required to meet or exceed all requirements.

*Architecture*

The property is located in the Architectural Review District and any new construction will need to meet the Worthington Design Guidelines and would be subject to review by the Architectural Review Board. The Plan provides additional guidelines for residential and commercial development. The two parcels that are currently zoned R-10 fronting on Larrimer Ave. would need to be added to the Architectural Review District. Staff has the following comments:

- Residential Development:
  - As the Plan states, architecture and design should be rich and varied (not repetitive/homogeneous) with attention to detail.
    - Once there is more agreement on density and layout on the site, architecture will be very important on the site and will require four-sided architecture throughout the development.
    - All proposed materials should follow the Worthington Design Guidelines.
    - The applicant has stated that the renderings provided in the application are just examples, and not intended to be the final design.
    - There are additional Residential Design Guidelines called out in the Plan and the Plan notes development should adhere to the Worthington Design Guidelines.
- Commercial Development:
  - The Plan notes the Worthington Design Guidelines provide guidance on site development, scale, form, and massing, setbacks, roof shape, materials, windows and signage. The Plan further states development should improve the pedestrian scale and walkability of the City's commercial heart and create four-sided architecture that is attractive on all sides. Building forms, materials, and setbacks should be consistent with historic patterns.
    - The southern building (Building B) parking garage appears to be exposed to the southern end.

- Four-sided architecture will be required.
- Setbacks from the southern property line should be discussed.
- The scale, form and massing of Building B appears out of character for the portion of the building extending towards High Street.
- The applicants has indicated the elevations provided are just examples, however the overall design and the scale, form and massing of the site will need to meet the intent of the guidelines.
- Elevation examples were not provided for the medical office building along High St., however the applicant previously stated that the buildings will have a setback of 25-feet from the public right-of-way.
  - A setback of 25-feet is recommended; however, the street frontage should be activated and have usable entries according to the Plan.
  - A multi-use path is also recommended along this portion of High Street.
- Streetscape improvements will need to be discussed at some point in the process. This would include new mast arms at Larrimer Ave. and High St. streetlights, street trees, landscaping, pedestrian sidewalks and/or paths.
- The small surface parking lot north of the northern building (Building A) will be required to be screened.
- There are additional Commercial Design Guidelines called out in the Plan that reference the Worthington Design Guidelines that should be considered.

**Miscellaneous:**
The UMCH Development Update is available at worthington.org/umch project page on the City's website offers the following additional information:
- Applications & materials associated with the current proposal.
- Ways to learn more about the proposal and understanding the rezoning and development review process while explaining what a PUD is.
- Ways to provide feedback throughout the public process.
- What are other people saying in the community. We have posted all comments at (UMCH Public Comments) or go to worthington.org/umch to view all comments. All comments are posted to the website and have been shared with the Board & Commission members and are now part of the record.
- UMCH Background Materials
- Notify Me – Gives you the opportunity to receive updates by email when there is new information available.

**Worthington City Charter**
The Charter provides the following information regarding the role of the Municipal Planning Commission:

SECTION 6.03 Powers and Duties of Municipal Planning Commission
The Municipal Planning Commission shall have the power to:
(1) Review and recommend any revisions to the Master Plan, official map, area plans, and development standards of the City as often as necessary but not less frequently than every five (5) years;
(2) Recommend to Council the disposition of requests for subdivision platting;
(3) Recommend to Council amendments to the zoning plan and ordinance of the Municipality;
(4) Recommend to Council zoning changes and zoning for newly annexed areas;
(5) Determine or recommend to Council, as provided by ordinance, the disposition of requests for conditional use permits;
(6) Cooperate with the regional planning commission and the planning commissions of area municipalities;
(7) Act as the Board of Architectural Review as provided by ordinance. The Council shall annually appoint as additional voting members of the Board of Architectural Review two representatives of the Architectural Review District, one or both of whom shall be a resident freeholder of said District;
(8) Perform such other duties, not inconsistent with this Charter, as may be required by ordinance.

In rendering a decision or recommendation, the Municipal Planning Commission shall articulate its basis therefor, in writing, by reference to the relationship that decision or recommendation has to the overall comprehensive planning goals of the City, which may be found in the Master Plan, the zoning map, a course of zoning or subdivision practices by the City, or any other acknowledged comprehensive strategy or goals previously established at the time of the decision or recommendation.

The Commission has three choices: approval of the following motion, denial of the following motion, or a vote to table for additional information. Given the lack of detailed information with this revised application, staff advises against a motion recommending approval until additional information is provided and reviewed. As noted above, staff's recommendation is denial of the applications as they stand today.

**Discussion:**
Mr. Brown swore in the applicants. Mr. Thomas Hart said they would start off the presentation with Mr. Bo Brownlee, General Counsel, Lifestyle Communities. Mr. Brownlee said they were presenting a revised conceptual site plan with the goal of gaining feedback on such topics as the revised mix and location of uses, the configuration of open space and open space amenities and the adjusted connectivity plan and neighborhood engagement elements. With this concept plan filing, they were not asking for a vote or recommendation at this stage, but rather requesting dialogue on the updated conceptual land plan. On the presentation specifically, Mr. Hart would walk them through a detailed description of the changes that they made. What would become obvious during the presentation is that they listened, but they have reacted to previous comments from the city and the Planning Commission. Mr. Brownlee said among other changes, they have increased park and open space, as well as, substantially improving the park space connectivity and access. Further, without any real guidance from the city or its representatives, they have taken the initiative to substantially reduce the residential density by approximately twenty percent, as well as, substantially increasing the commercial space by approximately forty percent, notwithstanding the challenge in retail and office environment in today's market.

Mr. Brownlee said with the apartment reduction noted, he would like to say they continue to have a strong belief that a large residential presence is needed at this site like most urban and suburban infill sites residential density is a solution not the enemy. Density creates the economies of scale and critical mass vibrancy to support mixed use and stimulate the demand for other key uses such as office, commercial restaurant service and other retail. In fact, the success of such a mixed-use development as called for under the Comp Plan relies on such economy of scale, critical mass and density. So, what next after this hearing? After gaining feedback and direction on the revised concept they will be better prepared to address the more technical aspects of the pending application such as traffic impacts, storm water, utility adjustments, and architecture. Mr. Brownlee said he just asks that as a reminder, the plan is conceptual, and they really view the purpose of tonight as generating dialogue, on this plan and the changes they made in order to better assess the need for further changes and next steps. Mr. Brownlee said they respectfully ask for the focus and comments on this conceptual plan rather than other topics that are not part of this filing. Mr. Brownlee said thank you and turned the discussion over to Mr. Hart for further review of their revised concept plan.

Mr. Hart reviewed the revised concept plan and how they acted on the feedback they received from lots of different sources along the way and as Mr. Brownlee stated earlier, they were focused on more site access, and engagement with the existing neighborhoods, more effective connectivity and use of Tucker Preserve and they also have a reflection of a reduction in density and in increase in office and commercial components.

Mr. Hart said one of first key goals to the plan changes is to improve access to and from existing neighborhoods and around the site and make the site part of the neighborhood, not separate from it. He explained the slide presentation showing the path and greenway access. Mr. Hart said they went to a plan that provides welcoming entries, and pavilions, and green spaces at all the neighborhood access points. There are parks, green spaces and pavilions at Evening Street on the south at the beginning of Tucker Drive, at Larrimer and Longfellow Streets on the north as well as a trailhead pavilion that gets you to the multi-use path at Wesley Boulevard. He said they opened up the site and added public gathering spaces at High Street, across from City Hall, with a connection to what is a significant linear grade that runs east to west which is about .81 acres and leads to an internal neighborhood drain to the west which is about a half of an acre that includes a larger pavilion amenity. Mr. Hart said the improved connectivity from neighborhood access and High Street with the path system crosses both north, south, east, and west. He explained the blue lines were the multi-use path, the yellow lines were the internal paths and sidewalks that lead to all parts of the site. One clear goal of this revised plan is to draw pedestrians into the site and draw neighbors into the site and to get Tucker Reserve activated as green space and also allow people to get to High Street where there will gathering areas, activities, and restaurants.

Mr. Hart said another example of what they are trying to do is engage High Street, so they made that area more open, more pedestrian, and really designed to drive the vibrancy they believe in that the site needs, more of an upfront gathering area with outdoor restaurant spaces and activity at the street level. They are trying to establish an attractive European Style outdoor plaza and bistro table setting. They are looking for what would be a vibrant oasis along High Street that is really part of people's daily lives, with both existing neighbors and future residents.

Mr. Hart said another related goal in what they are trying to do on High Street is to make it a key anchor for what they have heard about and had some discussions about with residents. The larger vision

of the Worthington Mile concept which is to connect old Worthington to Wilson Bridge Road and then loop around to the Olentangy Trail with a multi-use path loop to create a more pedestrian friendly environment, and to lessen the impact of traffic at the street level and to stimulate other development and redevelopment opportunities along the way in that key corridor. Mr. Hart said they feel that site could be a key anchor to that concept and really help launch what is a greater community vision of the Worthington Mile Concept.

Mr. Hart explained the next slide discussed how they would imagine Tucker Creek and it would be programmed with an internal path system, connecting the site to High Street, to the existing neighborhood by Evening Street and then into the site to the north and the west. Mr. Hart said for perspective slide 14 showed the Tucker Creek acreage and the relation to McPherson Commons down in the arena district, Tucker Creek is almost double the size of McPherson Commons and what they are really trying to do is activate Tucker and make it more usable. He said the path system is conceptual. When you are trying to activate a natural area, a wonderful area like Tucker, you have to be very careful how you locate paths inside that site and be as least disruptive as possible. He said they believed Tucker should be activated that way with that type of path system and other amenities. Mr. Hart said this would be an example of where they would want and need to collaborate with the city's professional staff as to how to program Tucker, but this showed their intent. He said there was another green within the multi-family area north of Tucker at the middle of the site and then another redundant connection trying to get people from Tucker into the site and onto the other path systems to the other green spaces.

Mr. Hart said he wanted to briefly discuss the storm pond which is required based upon regulatory requirements to control the volume of storm water, but it is on the western edge of Tucker. He said they propose it is their intent to naturalize the pond as a water feature, it would not look like a typical 1970's storm pond, the pond would look natural and be activated with the path system and have benches for seating. There would be a significant welcome Pavilion that would bring people into a nice water feature and be a focal point as they engage the Tucker Preserve. A water feature like that, with the proper safety features and done in a way that is nice and stays natural and is another way to buffer existing homes from new housing.

Mr. Hart said overall on open space, there were fewer open spaces than what they had before, but they are aggregated, less formal in terms of internal green spaces, but they do function for gathering, for active and passive use, and to get people connected and moving once they are in the site. The plan does create redundant pedestrian access and allows flow to the interior with the connected green spaces. Mr. Hart said they are trying to be welcoming, trying to facilitate gathering and make this part of the neighborhood not set apart from the neighborhood, which is some of the strong feedback they got, not only from staff, and the Planning Commission, but also the community members from the community meetings that were held.

The second main strategy in what they tried to do differently is that they tried to mitigate height better. Mr. Hart referred to slide seven and showed where the height was located in the interior portions of the site and mainly the High Street sub area with the darkest blue being five stories and the middle blue being three to four stories. He said they placed the most height on the site in the limited portion near High Street, near existing offices, and the institutional uses that are there where some height already exists and away from residential neighbors at the Larrimer and Longfellow Street area. They moved activities and height away from that same Larrimer and Longfellow Street corner and putting it towards High Street and closest to the other commercial buildings that are north of the site on High Street itself.

Mr. Hart said they tried to lessen the impact of garage height by wrapping it with residential and also by putting trail connections and other green spaces near the street level where the height is located so people are focused on that level on those green spaces and not the height of them. The five-story residential buildings face each other and are located away from other residential. The east west linear green that runs between the two five-story buildings reduces the canyon effect with space along with the green active area on the street level. On the north, the gateway green that they have located at Longfellow and Larrimer Streets and the trails at the pedestrian level are also used to buffer height from existing residential. In the middle of the site, there is graduation from five stories to four, and the existing institutional building, the office conference center use immediately to the south. Mr. Hart said generally height is also mitigated by the engagement of the street level uses like retail, like service, like office, restaurants in the plaza area along the High Street opening. He said they put planned intense uses like volleyball, pool, and restaurants away from existing residential, so they are shielded by buildings and close to High Street.

Mr. Hart said another one of major changes was the mix of their uses. They have less apartments and more commercial office space. The reduced apartment density is 19%, from 540 units to 420 units which was the number one comment they received. LC acted upon the suggestion with a significant reduction. The office square footage has increased in proportion to the apartment unit decrease. In terms of office and commercial the plan is updated from 85,000 square feet to 120,000 square feet for office and commercial. Mr. Hart said they listened to the city staff leadership who requested more economic impact and jobs and income tax at this site. He said they believe the adjusted plan is in line with the Comprehensive Plan goals about city jobs and income tax needs, He said they also believe this expanded the job base in this plan will help support the greater food, service, restaurant and entertainment uses and to build that 24/7 live, work, and play environment mixed-use site they are trying to accomplish. Mr. Hart said they do want to be clear that they agree with city staff's focus on that employment and tax base goal and the Comprehensive Plan goals, and this site needs to succeed as an office and commercial hub and support the city's tax base. He said they probably seek getting there differently than your professional staff and that is they do not see a sight here that automatically screams out to the market Class A office. Nothing around the site supports that notion. The best evidence of that is that the site has not delivered that use in over a decade. The Class A office environment and employment environment in today's market must be created. This site does not exist in a vacuum as far as what works for suburban infill and other mixed-use type development. Any city today has to be competitive and flexible to attract and fulfill employment tax needs. This site has to have that critical mass and value to the market of a vibrant live work play environment to attract the attention of employers and to accommodate what today's employees want and need in terms of living close to work, working at home, and the type of environment they seek. Anybody can look at other successful infill successful projects across central Ohio, really any major city, and its density that drives urban and suburban infill, that is what attracts employment uses today and it attracts employees. In this life, density is what pays the bills. It pays for upscale architecture, it pays for buying open space and protecting natural areas and setting them aside for community use, it pays for regional path infrastructure and other community facilities. Density is the key strategy to keep housing prices reasonable today, to the market and to meet people's goals of affordability, diversity, and opportunity in housing, density pays the bills.

Lifestyle Communities has their goat restaurant that opens up at the street level on High Street to the street plaza and they would expect to attract other restaurants to create synergies in addition to the goat, other food, coffee, and beverage users, medical offices, health and wellness services, personal care, yoga, fitness and professional services. He described the drawing and said they used color coding to

show the engagement of High Street in that area, where those uses would be, and how they would be aggregated to energize that opening from High Street into the site. Slide 10 showed the garage locations in gray and how they are wrapped and how traffic would access them and the goal was to keep traffic accessing from High Street and keep the traffic out of existing neighborhoods and keep it out of the interior of the site and mainly utilize High Street. Mr. Hart briefly walked through the character slides portion of the presentation.

Mr. Hart said they were asking the Planning Commission for dialogue, this is a very complex site, and this issue has been around for many years. He said they want dialogue and collaboration at this level with the Commission and with the community to get to a baseline of site planning so they can move on and take care of the other technical issues, the architecture, the traffic, storm water and so forth.

Mr. Coulter said before they get into questions and comments from Board and Commission members they asked the public as to who would like to speak this evening. Approximately ten people signed up and they would start speaking in the order that they signed up. The first three speakers were representatives of WARD. Mr. Brown said he wanted to remind the Board members and those who were listening to the meeting there was a big difference in the amount of the materials that were submitted. One of the reasons why was to look more broader in scope more at the 50,000-foot level looking down instead of getting into the detail. He said if they were not able to get into the broader topic discussion of residential density and height and housing types, the mix of land uses, green space and park land, and traffic connection comments, and bike and pedestrian, that it kind of negated even spending the time and money on their part and/or the city's part of looking at that level of detail until the broader topics. Mr. Brown said that was the goal tonight to have those broader topic discussions before getting into the nitty gritty detail you would typically see at the Architectural Review Board (ARB) and Municipal Planning Commission (MPC) and then ultimately City Council reviewing, but much more detail is needed. Mr. Brown said as it stands today, staff's recommendation was for the denial based on the existing land use plan.

The discussion was opened to the public. Mr. Brown swore in each speaker before speaking.

Mr. Michael Bates, 6560 Evening St., Worthington, Ohio. Mr. Bates said Mrs. Ellen Scherer would be delivering the statement from WARD. He said he was going to give his opinion as an abutting property owner. He appreciated Lifestyles' presentation and felt that staff did an excellent job of detailing the pluses and minuses of the proposal. He said what has him concerned is that there is still no evidence even though the presentation by Lifestyles' said they had community engagement but to his knowledge there has not been any community engagement. Mr. Bates said they had one meeting between Lifestyle and the WARD folks back on the previous proposal and then since then it's been totally quiet. What he wanted to remind the Commission specifically is they have a model now of community engagement. He said he saw it with Stafford Village, saw it with Granby Place, and the former Holiday Inn site, and even the High North project. Mr. Bates said he would expect that Lifestyle would have that community engagement especially considering their proposed density plan which he felt is still way too dense.

Mrs. Ellen Scherer, 112 E. New England Ave., Worthington, Ohio. Mrs. Scherer said Worthington Alliance for Responsible Development (WARD) is entering a statement into the record for tonight's meeting. The statement is as follows:

"This third time is NOT a charm. For the third time Lifestyle Communities (LC) has approached the City of Worthington with a high rise, high density development plan

for UMCH. And once again their plan is meeting substantial community opposition. The problem is they keep presenting things people don't want. There is little substantive change in what LC is now proposing. Six hundred residential units with two persons per unit would mean 1200 new residents, or the equivalent of 8.5% of Worthington's total population of 13,700 squeezed into the 25 acres that are available for residential use. Included are 420 apartments in four and five story towers. There is no provision for affordable housing; it's all at market rate. There is precious little greenspace in that 25 acres and what is there is broken up into piecemeal segments, most of which are walled off by the buildings that would be constructed. There is no sense of greater community engagement here; this is strictly a private for-profit proposal. Traffic is always a concern for Worthington residents. How will they feel about 1362 vehicles on the property? WARD supports responsible commercial development along High St. as a revenue generator for the city. But, echoing city staff, we are "concerned that only the residential and retail portion of the project would get constructed without the commercial office needed in the High Street Mixed-Use Zone." Especially since residential development is always a cost to the city. It is now abundantly clear after three tries that LC's business model requires high density with a preponderance of apartments. UMCH, on the other hand, is a beautiful open gem near the center of our city. These two visions of what might be are not compatible. Once UMCH is paved over it's gone for good. What's needed now is to reject LC and their plan and move to a discussion of how UMCH can become a resource for the entire community to enjoy. This is LC's third strike and they are out."

Ms. Maggie Sutton 250 Highgate Ave., Worthington, Ohio. "This is now the third time that LC has come to the city with a proposal, each one no better than the previous. This new proposal is being met with the same or even more opposition from the residents. They do not want high-rise high-density housing on this property. Research studies have shown that development projects with density higher than 50 units have a negative impact of crime in the area. Residential units or development projects with less than 50 units do not have a negative impact of crime in the area. Increased crime is not what any Worthington resident wants in our city. Additionally, LC's plan is not in conformity with the Comprehensive Plan updated in 2014. This plan calls for between six to fourteen dwelling units per acre which is still too high in her opinion, but she will digress. LC's proposal is to put over 37 dwelling units per acre. This Comprehensive Plan indicated no more than three stories and LC's plan has up to five. Even if LC promised to decrease the number of dwelling units per acre and keep the height to three stories, as has been done many other times in Worthington with other developers, give the developer an inch and they come back and ask for a mile, and they are usually granted that additional length. I don't trust that LC would keep their word and guarantee we would be looking at hundreds of apartments that are many stories tall and not what the majority of the residents want. The history of the land dates back over one hundred years when it was purchased by the United Methodist Church and used as an orphanage. Their mission was to strengthen our community by providing care, nurture and treatment for hurting children and families. Here we are a hundred years later and LC wants to come in and build apartments on this historically significant land that is almost directly in the heart of Worthington and the residents do not want that. Just look at the number of yard signs surrounding that property that endorse candidates in this year's City Council election that will not support what LC is proposing. To preserve the history of the land its critical that it continue to strengthen our community by providing for children and families. I implore you the Board to please deny LC's current proposal, thank you."

Mr. Chet Ridenour, 398 Highgate Ave., Worthington, Ohio said he has been a proud Worthington resident for thirty years. He thanked the ARB and MPC for giving him this time to speak at the meeting. He appreciated the opportunity and he thanked everyone that sits on the ARB and MPC committees. Both groups have a very difficult but important job, and their work is very much appreciated. Mr. Ridenour said he would like to echo the comments of the previous speakers. He said how many times are they going to listen to LC come back with the same old plan, it's the same song, the third verse, and he could almost sing it in his sleep. There are not significant changes as they professed in their presentation, and he felt by looking at the current LC plans and the one they previously presented it is evident that the LC company is just not listening. They are not listening to the citizens of Worthington. The current LC plan has too high of housing density and that would be greater than any other area in the City of Worthington. The plan has too many apartments and multiple high-rise buildings that are in appropriate and out of character for Worthington in its central core. Also, their plan shows little regard for the vast majority of Worthington's residents desire to have significant community green space. They even said in their opening plan that they reduced the amount of green space, but they have aggregated it and aggregation is fine but do not take it away. They need to add more green space. Mr. Ridenour said looking at the LC site plan reminded him of the long-ago Wendy's commercial when they asked the question, "Where's the beef?" He said he looks at the site plan and says "Where's the green space?" The vast majority of residents would like to see green space. This is a forty plus acre site with twenty-five acres for residential so why can't there be more green space? He said they can, but they are not listening, and they are ignoring the recommendation and wishes of the vast majority of Worthington residents. He asked that the members of the ARB and MPC remember that they are in a position to represent the people, not the LC company. He said he did not believe that most people in Worthington were anti-development, however, he does believe that the majority of people in Worthington are anti bad development and the current plan by LC is a bad development plan. The newest LC plan is bad for many reasons.

First of all, it will crowd our already overcrowded school system, there are lotteries for kindergarten, and there is a great number of people who are having trouble getting their children into after school care. Also, with the current LC plan there will be increased traffic along Larrimer, Evening, and Longfellow Streets. They will turn these streets into what were once nice quiet residential streets into high traffic streets. These are streets where children walk and cross everyday to go to school and they need to keep that in mind. Also, for anyone out there, that travel down State Route 161 and have to turn north on Evening Street to go to your home or business or take your children to or from school, just remember what all of this increased high-density housing is going to do to that turn. He said he has had to do that for years and right now, sometimes has to sit and wait through multiple lights to make the turn north on Evening Street from State Route 161. With high density housing on the children's home site, it will become a nightmare. Also, the current LC plan if approved will cause the people of Worthington to lose a once in a lifetime opportunity to create green space and add to the character and charm that is already present in Worthington. The LC plan if approved would be at the expense of the people of Worthington just so that the LC company can make more money. Please remember not one single apartment has to be built on this property for LC to make a significant amount of money. They will make millions even if not one single apartment is built, and they know that and there are multiple residents in this city that are familiar with large scale real estate developments and they know that and hopes that ARB and MPC people also appreciate that. Mr. Ridenour said if he was a teacher and the LC

company was one of my students and he gave them an assignment to come up with a site plan that was appropriate and supported by the majority of people in Worthington, if that was the assignment that he gave the LC company as his student, he would give them an F on this assignment. He said he would also recommend that the LC student be evaluated for a learning disability because he felt that they had one. He said the LC plan was bad and to please reject the plan and vote no for LC.

Mr. Michael Ball, 925 Robbins Way, Worthington, Ohio. Mr. Ball said he had two points and a question. He thanked the Board members for this opportunity to speak. He said he and his wife both support the idea of a mixed-use development at the children's home's former site. Mr. Ball said he understood that for commercial development to be successful you need density. In order for the shops in downtown Worthington, in order for them to be successful, they need shoppers, they need people here shopping and going to the restaurants. He said for him, density is not a bad word and density is a very good thing. He believes density is the engine that will allow this project to happen and will allow Worthington to continue to move forward because they are able to attract great businesses and great jobs. Mr. Ball said on a personal note, just his reaction to the plan that has been shown, he and his wife are ready to give up their four-bedroom home and he would love to have a patio home on this site. He said he would be delighted if all the single-family home housing went away, and it all became patio homes because he is not the only one in Worthington that would like one of those, so Worthington needs a lot of those. Mr. Ball said he is curious as to what the development and planning process should look like. He said they have heard a lot of criticism tonight about the plans submitted by LC and he was wondering what the collaborative process was that the city envisions that allows the city's point of view, their goals and aspirations for what is going to be helpful for the city and be able to be communicated and worked with the developer so that the developer is moving in the same direction. Mr. Ball said it seemed awfully time consuming for a developer to come up with a plan and then attend the meeting and get some input and then go back and re-do another plan and then come back again. He said he understood that this site is a potentially a 200-million-dollar investment in our city and how could they make this a more collaborative success.

Mr. Brown said with the history since he has been around for the past eight years in Worthington and with the life of this, that the discussion needed to be played out in public and not behind closed doors. There has been a large fear and discussion that city staff or Board and Commissions members were meeting with developers and trying to offer some guidance which is always great but with this proposal and this site being so sensitive that it needed to play out in public where everyone had the opportunity to hear comments and offer the guidance as we would move forward.

Mr. Coulter said they have really encouraged the developer, whoever it is, to get out and meet with the neighbors and get that input so that instead of coming into a meeting tonight where you do not hear a whole lot of positive from the neighbors they kind of have those discussions and they kind of come to some conclusions between the developers and the neighbors so when it does come forward in a public venue that everything is worked out and closer to a solution. Mr. Coulter said the issue with this one is that this is the third time around and he was not sure they were any closer now than when they were in 2015 when they looked at their first plan. He said in a lot of regards he liked the plan in 2015 better than this one. He would like to see this site developed sensibly and sensitive to the neighbors and to the city. This has to be a collaborative process and a public process, but it starts where whether it was Lifestyle or the previous developer to come forward

with a plan, they have to meet with the neighbors and have those discussions. Mr. Ball asked if that would a simultaneous process where they are meeting with the community simultaneously with the city members in order to move the project forward. Mr. Coulter said it can be and it has been in the past. He said Lifestyle has made a couple of presentations to city staff that he has attended in trying to get some direction, but it comes back to the same thing. He said he has not seen the progress in the plans that have come forward based on the comments that he and staff had and the comments from people in the community. Mr. Ball said the crux of the matter is what is the ratio of apartments necessary to support the maximum commercial and office space that they can get. He said obviously, commercial draws people but is not a big money maker for the city. Office buildings are a big money maker for the city so there is a ratio that says in order to support that amount of office space and commercial you need this much apartment building. He asked whose responsibility it was to come up with that and if it was Lifestyle Communities and do they listen to what they say or is it something that the city knows and the city could say to the developer, "This is what we are looking for." This is what we think will work because we want to maximum office space on this site because that is going to generate the revenue that allows the city to do all the things the city needs to do.

Mr. Coulter said the tax dollars are extremely important to the city such as the payroll taxes for the office space. He said in terms of the number of units that depends on the type of investment the developer wants to make. He said it is not their job to help the developers make money. Their job is to make sure they have a development that comes in and works for them, for the community and for the city. Mr. Brown said in working with the applicant over the years they have given guidance as to what they would like to see as far as office space square footage and tenant. There are studies that can be done. If LC did a study, this is what it would cost, and the city would take the study and have the city's consultants review it just to make sure they were not just listening to someone else's information without doing our due diligence. Mr. Brown said it was a balance of all those different uses and needs that need to be on the site. When you look at the Comprehensive Plan it does call for a mixed-use development, but it is looking at the true mix of uses but one of the common themes about the Comprehensive Plan has been with increased density there needs to be increased open space and that the residential should be subordinate in a lot of these areas. Mr. Brown said it needed to be that balance in those key talking points that he referenced earlier.

Ms. Paula Ryan, 1035 Bluffway Dr., Columbus, Ohio. Ms. Ryan said she was supportive of a development on this site, but not this particular plan. She said she would like to remind this group that the population of Central Ohio is expected to grow by one million people by the year 2050 according to a study done by the Mid-Ohio Regional Planning Commission (MORPC). She said if you need to see the data to go to MORPC's website. Ms. Ryan said Worthington just completed a very lengthy visioning process and identified some very key components for how to move the city forward. She said she would like to encourage this group to understand the population is going to grow significantly and how is Worthington going to take advantage of that, capture that, and what can that mean to our city in relationship to the visioning plan. She would like the group to focus on the visioning plan and the population growth. Ms. Ryan said she would politely like to understand where Ms. Sutton got her statistics because she thought she said any development over 50 units has an increase in crime. She said there are developments being built all over this area that are larger than 50 units such as Bridge Park in Dublin, Ohio, and crime has not increased in Bridge Park. She said using crime as a crutch is the wrong solution. Ms. Ryan said the collaborative

approach is something that is needed, and she also liked the questions Mr. Ball asked and the way Br. Brown responded to his questions. She would like to see this go one step further and asked what density means to Worthington because this was not the first-time density has been brought up and density will continue to be discussed as a development issue. Ms. Ryan felt it would be good for the group to determine what would be a good density for Worthington.

Mrs. Ellen Scherer said she emailed a letter of her own opinion to the city, as an individual resident. Mrs. Scherer said she felt the proposal would have a devastating effect in so many ways and they have not engaged with the residents, and she questioned how serious they are because they do not seem to listen and come back. They know that Tucker Creek can not be developed anyway. They are not offering diversity, and profit is their main goal.

Mr. Josh Posey, 238 Highgate Ave., Worthington, Ohio. Mr. Posey thanked the Board members for their time. He said he has been a lifelong resident of Worthington is whole life. Before moving to the corner of Evening Street and Highgate Avenue, his parents moved to Greenbrier Court in 1981 when they built their house, so the UMCH property has been in both in either his side yard or front yard his whole life. He said there was a saying, "Reasonable people with reasonable issues can come up with reasonable solutions. He felt LC needs to talk with the residents a little more, but the residents need to be open minded because LC has to be able to run a business as well. Mr. Posey said they need to move forward on this one way or another and if that requires a little more green space to accommodate the folks but LC should have the right to do something here, but for in order for them to do that here they need to do a better job of reaching out to the neighbors and the community to get their input. Mr. Posey said besides that, Worthington needs development, and more places to live in Worthington. Worthington needs more tax revenue, and more jobs. Other suburbs around Columbus have been able to make the mixed-use concept work, and he felt that Worthington should not be any different from that. He said everybody will not get all that they want but there should be a goal of compromise, by not only the residents, the City of Worthington, and LC.

Mr. Coulter said there were over 400+ email responses, and the vast majority shared the comments which were heard earlier this evening. There were also comments from others who were in favor of development on this site for mixed and there are also people who would like to see this site left as a park. Mr. Coulter explained that all the Board members read the emails and they do take those into consideration.

Mr. Hart said he would like to comment on some misinformation and rebut some of the things that have been said.

Mr. Ridenour asked how many times LC could come back with the same plan and Mr. Brown said anyone has a right if they want to change something on their property or go through a process, they can come through and make application, go through the Boards and Commission, and the Board has the opportunity to approve or with modifications, or table or deny applications and there is a waiting period that was denied to come back but it could be a Groundhog Day experience. Mr. Ridenour asked the staff and the Boards if they could be approached on an unlimited time and Mr. Brown said yes. Mr. Ridenour said he has lived in his community for 30 years and he loves living here and if people think Dublin, and Upper Arlington as so great because of the new developments

then those people can just move there. He said there are many people trying to find a spot to live in Worthington, and residents can sell their properties before the For Sale sign goes up in the yard.

Mr. Brown swore in Mr. Joe Sherman, 6603 McBurney Pl., Worthington, Ohio. Mr. Sherman said he was speaking as a resident, and that he also served on the Visioning Committee.

"My name is Joe Sherman and I come before you as a fellow resident and as the past Chair of the Worthington Community Visioning Committee. I am reaching out regarding Lifestyle Communities (LC) updated proposal for the UMCH property in advance of their presentation and discussion at your October 14, 2021 ARB/MPC meeting. Frankly after reading their revised concept plan for the future for Worthington, I was disappointed and under-whelmed as this proposal is nothing more than a rehash of their 2015 and 2020 submissions. Lifestyle Communities should respect and respond to our needs as a city not propose a development with its 4 and 5 story structures and 600 additional residences. The long-term financial consequences of a high-density residential development is not an economic boon to a city in the long term. The UMCH site should serve the long-term interests of the residents, not the short-term interests of a developer. LC's previous two submissions were soundly rejected by the community in 2015 at the WEC, and in 2021 by way of 300+ residents speaking out in opposition and only 4 in favor. I expect additional opposition will follow in response to this latest submission. LC has largely ignored that our city needs to generate income tax revenue from a multi-use development of the UMCH site in the ten acres of land along High Street already zoned for commercial use. Most fundamentally, their business model is simply inflexible and incompatible with Worthington's needs and values, simply ignoring what the resident's have said they want and expect. They are not the least bit interested in Worthington as a community, but merely as a place to bulldoze, literally and figuratively, a Lifestyle development into place.

As a refresher, let me share with you one of the seven vision statements from the Vision Worthington project: "Worthington's Leadership is Open, Forward Thinking and Collaborative. As a community we said that our elected leaders are known for listening and responding to the voice of its residents and carefully considering actions that affect our community. All the while striving for consensus building by encouraging and modeling respectful public dialogue demonstrating benefits for the common good and then making hard decisions to further progress." With this in mind, I would ask you to explicitly deny, as opposed to tabling, the Lifestyle Communities proposal for UMCH, thereby creating the context where a city acquisition becomes a possibility. By taking both ownership of the parcel and responsibility for its development, our city government would be in a position to finally realize the desires of Worthington. Why not ask the community if they would support the concept of a signature park project as we do not have any community gathering space like other cities. This public engagement and collaboration could lead to a different kind of development generating a lot of public spirit and could possibly be the cornerstone of the next phase of the Visioning Committee's work. It's this sense of community that ought to be cultivated and preserved above all else. Our future rests in each other.

Thank you for your consideration and best wishes on your decision."

Mr. Brown said as of 6:00 p.m. this evening, staff had received 437 emails concerning this project. He said the emails would be summarized and posted to the City's website tomorrow.

Mr. Hart said he wanted to make a couple of clarifications. He said in 2015, they did not officially file an application and never went through an official public hearing process through ARB, MPC or City Council. He said their only application was filed last October 2020, and their last hearing on this case was this past January. Mr. Hart said these three strikes you are out thing is not constitutional law as it applies to land use. He said they asked after January, after getting feedback, they did a tremendous amount of community outreach in lots of different ways. They asked for feedback from city professionals and with a couple of key city leaders and we were told you had to go to the Planning Commission for that. Mr. Hart said he did not have the political will or the political capital to meet with you behind closed doors, we were told to go to the Planning Commission. This is the first opportunity they had for actual dialogue at Planning Commission to listen and to talk with Planning Commission members because that is what they were told they had to do. So now, the residents have commented, and they heard about this movement of deny them, shut them down, three strikes you are out and that is a bunch of hooey, those are not the facts, and that is not reality. He said we are here, and we did adjust our plan. They have twenty percent less residential and a lot more office. The site plan they have today has twenty-five percent open space on thirty-seven acres. To put that into perspective, there are suburban single-family coves that do not require twenty-five percent open space. This is an infill site. Mr. Hart said it was wrong and legally inappropriate to tell us, "We are going to shut you down, at a concept plan hearing and the city is going to recommend denial before we had the dialogue and before we had a chance to discuss what we have done and how we improved the site." Mr. Hart said the staff plan, staff comment letter, staff report, is full of examples of how the site was improved. City staff made that clear on the record. He said they do not support everything obviously, but the staff report has many examples of how the site has been improved and he mentioned those in his presentation.

Mr. Hart said in fact, the Comprehensive Plan for this site says the building can have up to five stories and the plan says this is a site that can support density. He said they stand by the fact that the best proof and the best evidence that residential has to drive modern mixed-use developments and deliver that tax and employment nod that the city wants and needs. The best evidence of that are the projects all around Central Ohio. Worthington is not in a vacuum away from that market reality. Mr. Hart said he was sorry for jumping in, and he would normally never do such a thing in front of Planning Commission members but there was enough misinformation and lack of factual information that was provided that he felt he had to do that, and he apologized.

Mr. Coulter said he would take one last exception, when they last met, Mr. Hart was encouraged to meet with the neighborhood groups and specifically W.A.R.D., and when he checked with W.A.R.D. two weeks ago, no one had contacted them. Mr. Hart said he has done a lot of neighborhood outreach in his life, and he had met with them previously, and had a lot of dialogue, and he felt they acted upon some of the things they were asked to do, but they do not see it that way at all. Mr. Hart said there is a time when being told that you should just go away and we do not want to deal with you at all is not productive anymore. Mr. Coulter said there are people that want the developers to go away, but he was not one of those people. He said if you look at all of the individual Board members as a whole, versus individuals, they would like to see the property developed, but developed sensibly. Mr. Coulter said they need a better understanding of what is going to happen.

Mrs. Holcombe said she has read almost every letter or email that has been sent to the city. She said she felt a strong objection over LC not listening to what the residents are saying has been the number one thing that has come out of here. She said all of this has been said tonight and in emails that they are talking about the density, green space, and traffic control. She said it is mostly about the apartments and the residents are mostly uncomfortable with the number of apartments. Mrs. Holcombe said why they cannot control who buys the land and the buildings, they can help control the use. She said as a realtor, that has lived in Worthington for over forty years, this is an amazing piece of land she hopes the owners would come to some agreement with the residents and with the city. She felt Mr. Ball made some great comments and what does it take to make this sustainable. Mrs. Holcombe said she personally objected to the number of apartments that were proposed for this site. She said the city does need housing and people are clawing to get into Worthington and find housing. There is not enough housing here to represent all phases of life span. She said she was not against this project, but she believed they had a long way to go to figure out what is happening.

Mr. Reis said a lot had been said this evening, and there have been a lot of emails, and he has been on the Board now for seven years and they have been talking about this project for seven years. Worthington is landlocked. Worthington is not like Dublin, Hilliard, or Westerville, or Pickerington, Worthington is landlocked, so how this site is developed is important. He said he did not feel they need a dense style of build out just because the population in the greater metropolitan area is going to grow by a million people in 2025, he did not feel you have to have all million people within the City of Worthington. He said what they do need is responsible development and Worthington has great services and the cost of services is going to go up over time. Worthington has great schools and the cost for schools is going to go up over time. Both of those elements are recipients of the development of this site, so you need to think about that, and keep that in perspective. This site cannot be a big park, but they can have responsible greenspace and pathways but that is all a part of good planning. Residential housing is important, commercial development along High Street is important and there needs to be a compromise that generates revenue for the schools, which is residential development, and revenue for the city so they can continue the good services they have. This space cannot be a big green park and that is absolutely insane, but this site can be developed responsibly. If LC listens to what they have heard tonight from fellow Board members, and they work with the City Planner, and the City Manager, they can come to a compromise. He said he did not think five story apartments was a good scale for this area, and you can talk about that like other suburbs such as Dublin's Bridge Park, but this is almost within the historic downtown, and it is abutting the residents who are all-in single-family homes and understands they do not want five story buildings looking down into their homes. He felt the density needed to be controlled with some reasonable height and the multi-use along High Street is a requirement. He felt there was sensitivity brought to the meeting tonight with the addition of more greenspace and that is a step in the right direction. Mr. Reis said whatever is done here there will be more traffic and there is no doubt about it and there will be more wait time in traffic, but that is a part of progress and part of what we are going to have to do when this site is developed. Mr. Reis felt there needed to be some behind the scenes conversations that can be made public that can come to a reasonable solution here and LC must realize that they might not be able to make as much money as they wanted to turn around on this project and still come away with some money in their pockets. We all know developers want to make money and business is what this is all about.

Mr. Foust said he was like to expand on something Mr. Reis discussed about Worthington fitting in with the entire urban metropolitan, Central Ohio area. He said the charges they have been given by City Council and the community and one of the things they have looked at very clearly is how to define Worthington. What is Worthington's image, what is their look. He said the thing they keep coming back to is working with city staff, the residents, and City Council, is ideally what makes them unique is the village green, some of the older smaller buildings and what they described as unique New England village like character of the community. That is what defines Worthington and that is what makes them different from the other surrounding suburbs and Columbus. He said the developed proposed here would be a great defining feature if it were in the short north, or in parts of Arlington, or Grandview, but there are other residential areas in Arlington and Grandview where this would be at odds with the look and the feel of those communities, and he felt this is what they are up against here. He said what he believes needs to happen is that something needs to come back to them that is so clearly based on scale, proportion, living conditions that are characteristic of a New England type of environment of a village, and environment that it has a wow factor that everyone in this community and the Board and the majority of residents say wow this is wonderful, this is what we want to see. He said that is a hell of a challenge, and a hell of a charge, and he did not know if there were many developers that were willing to do that, but if the developer would like to get his involvement and his support of input, and the community, that is what is going to have to come back. Mr. Foust said he also wanted to point out some changes in land use ideas over the years where they are going through that right now over at East Wilson Bridge Road where the residents ten years ago thought it would be okay to have a certain type of development and now they are looking for ideas for different types of development, so things do change. Just because something was set five or ten years ago does not mean it would be valid now. He said Worthington needs something that makes it look like New England village.

Mr. Schuster said he would like to echo what Mr. Foust just said and he also wanted to recognize some of the staff's beginning steps that LC has taken, and he appreciates those because it does give him some encouragement that they can continue to work through this and ultimately end up with an outstanding project. One of the things that concerned him was the apartments, and in that same visioning statement that was mentioned before it indicated very clearly that the residential portion should be subordinate to the commercial portions on the site, and they have the exact opposite relative to the apartments. So, in his opinion, that means there needs to be a significant reduction in the apartments because he is also very concerned about sending that much additional traffic down residential streets such as Evening and Larrimer Streets, where children are walking to school and some of those streets do not have sidewalks and that is a tremendous concern to him.

Mr. Schuster said in addition, while he appreciated the 25% additional greenspace, unfortunately that greenspace is not specifically contiguous. The Tucker Preserve is unusable space. Mr. Schuster said he strongly encouraged the developer, as they look at the townhomes, and single homes, one of the significant needs is that they have as a community is housing for seniors who would like to stay in the community but who really are not interested in going up three flights of stairs and all the townhomes have three flights of stairs. He encouraged the developer to take a look at that, and perhaps come up with a way to increase even more the number of homes that would be appropriate for those that are getting a little older and do not want to climb the stairs. Mr. Schuster said he was also concerned about the significant loss of trees. They all love the mature

trees as part of the whole New England look and as far as he read through the proposal there are a significant number of trees that are going to be sacrificed. He said he understood some of those trees would be replaced but they would be replaced with really small caliber trees, but as we all know, that takes years and years to replace.

Mr. Schuster said he would like to thank LC for some of the adjustments they made, and that was a nice first baby step, but they would like to see more significant adjustments based upon the community feedback and on the Visioning Statement as well.

Mrs. Hinz said she would not repeat everything that was said but she wanted to follow up on two things Mr. Schuster mentioned. She felt that seniors were not the only ones who did not want to climb multiple flights of stairs and that people with small children moving in do not want to do that either. She said understanding the diversity of housing product and how people use it is important. Mrs. Hinz said at the City Council meeting last week about Central Ohio's economic segregation and that diversity and the housing product is important but many of the emails mentioned diversity. She said there are people banging on the doors to get into Worthington and they cannot make it economically impossible for new residents to come in. She said as far as the greenspace, she appreciated the aggregation of it, but she does feel like it is hidden, you cannot see it from High Street and cannot see it from and it's located behind Greenbrier Court. Mrs. Hinz was also concerned about the trees. She mentioned the previous meeting the Board members heard a very emotional story about a tree being destroyed. There are hundreds of trees being projected to come down which is devastating. The advertises that they are a "Tree City." She felt the trees were a very important part of the New England look and would like to see something that brings people here and keeps people here after they downsize.

Mr. Coulter said he was in favor of good development, and as an Architect, like many other members of the Board they look forward to projects like this. They have all seen projects that were not good developments that just did not belong where they were. He did not say this was one of those, but this needs to be thoughtfully carried out, so this works for everybody. The number of units is too many, even at 420, but he appreciated the fact that LC came back and did reduce the number by twenty percent but felt there were still too many apartments and what was driving that was the five stories. He said he had difficulty seeing a five-story building in that location and maybe that would be better located along High Street where the commercial property is, but he would have a difficult time with that as well. He felt five-story buildings on this site were too tall. Mr. Coulter said if you took the five-story buildings and made them into three-story buildings he might be more comfortable with that. He said people have advocated to leave the area as a park, but this site has never been used as a park. This is a piece of land that in points of time was used as soccer fields and other things, but this was never zoned a park. Mr. Coulter said when you talk about greenspace to him, greenspace is usable greenspace, not just a boulevard where you have a lot of nice trees and landscaping going down on streets on either side. That is something you can take your child to and play, it does not need to be a two-acre plot, but maybe a third acre.

Mr. Coulter said he had mentioned before the plan has had very little community input and that is something that every project they deal with is extremely important and is encouraged by City Council, and encouraged by City Staff, and they look forward to listening to everybody who writes or makes telephone calls. They might not always agree with everybody, but it is important for them

to know that they do get the community input. Mr. Coulter said they would never get one percent of the people to fall in love with this project, but they need to get more than ten percent, and they have got to get closer to the middle. The plan that was presented was unimaginative. He said there was nothing that he looked at from a bird's eye view that was a zing. There were a couple of things he did like, such as the entrance coming in off of High Street, that was somewhat monumental, but appropriate for a project like that. He also liked the larger pieces of property up against Evening Street on the west side, but he does not like rectangles and squares when it comes to residential neighborhoods. When you look at Worthington Estates, there is kind of a mix where you have some curbed streets, and some cul-de-sacs, some rectangles, but here a rectilinear shape would work best and if there was an opportunity to add vibrancy and make that look a little more exciting. Mr. Coulter said they talked about the diversity of housing, and Worthington is not known for having a lot of diversity in housing and any number of people, including the past City Council President who moved out of Worthington because he could not find a place to live in a home that was one story that was like a condominium where other people were taking care of the maintenance. He said to look at the townhomes and as Mrs. Hinz mentioned earlier, there are people who do not want to go up and down stairs. Mr. Coulter said he was only a couple of years away from not wanting to climb stairs and his wife is already at that point, so he will be looking for something more akin to that.

Mr. Myers said he did not want to be accusatory in any way, or anyone to be defensive about this, but there was a comment Mr. Hart made that peaked his ears. Mr. Myers said Mr. Hart said he was here with the conceptual plan for feedback, and he did not feel it was appropriate for the Board to act on the plan tonight. Mr. Myers said he had met with Mr. Hart on multiple occasions, and he met with Mr. Brownlee's predecessor, and met with the predecessor's predecessor, and over the last seven years he believed he has tried to be very straight forward, blunt and consistent in what he thought Worthington wanted from this developer. Mr. Myers said Mr. Hart has been given multiple opportunities with clear directive as to what they want, some of which was heard tonight, and one thing they have asked from Mr. Hart for repeatedly, was the economics of this. He said Mr. Hart first presented this project to the Board, there were a certain number of apartments that has ballooned. He asked if that was driven by economics, or by ask high and get low and they have had other questions asked which have not been answered. Mr. Myers said they made it very clear to them for seven years what it is that they want, and they have been consistent with that message, and he said he did not expect a response.

Mr. Hart said denying a conceptual plan they were trying to get feedback for was very unusual. He said "You feel like you have been clear and consistent," but what is the number? What is the open space number, what is the density number the city would find acceptable. Mr. Hart said they would like to know that too. What is the number that is going to work in a changing market? Think about how much the world has changed since 2015. He said they are stuck in a mode where they have been told the same thing all along, but he was not a part of most of that history. He said over that time period the world is dramatically different. What drives development and what drives employment uses, what drives office uses, is dramatically different. What they are trying to convey, they are in the market, they honestly believe this has to start with residential, there has to be that quantum, that threshold that economy scale to drive a project like this to get the city what it wants in terms of the economics and what is in the Comprehensive Plan and that does call for density. The condition is different than it was in 2015 and even last year. People are trying to get

a handle on the office market today to understand some landlords, people in the lease business, are not even legally sure if they can collect rent until recently. He said he was not disagreeing with Mr. Myers about having dialogue, but nobody has ever said this number would not meet our Comprehensive Plan. This number of office and commercial would meet our needs. This number of residential would be acceptable, and that has not been said. Mr. Hart said he was told to come to this process to have dialogue on those key issues and start with the land plan and so that is what they tried to do and that is the conversation they had last. Mr. Hart said he had a couple of clarifying questions he wanted to ask Mr. Coulter. Mr. Hart said he gave them specific information on the land plan and one of the things said was he did not want to see five stories but that it might be okay along High Street and he wanted to say height is how they save open space. Height limits the footprint of a building on the earth so that they can have more open space. Height is where it is acceptable of how it can work and how they can work it in is something that does help the amoeba of getting more open space. He said that is the kind of thing they want to sit down and do right now if this is their opportunity to go over that point.

Mr. Hart said they do have 420 units that would be single living with elevators, and some townhomes would also be flats, but all of the apartments would be single floor living with elevator service. He said his main point was height is also a solution that can work. Mr. Hart asked Mr. Coulter if height would work along High Street. Mr. Coulter said he did not want to see five stories in the interior of the project, and he could not make that any clearer. Mr. Coulter said they have looked at different scenarios along High Street. He said even if the Comprehensive Plan allowed five stories along High Street, it is not something he would agree with. Part of it comes down to the architecture, part of it comes down to do they really need to fit in with the other properties up and down High Street. Mr. Coulter said he was not in love with five story buildings near the heart of Worthington. He said as Mr. Foust pointed out, when he was giving his considerations, this and one other property in Worthington are the two largest single properties the City has left to see development. He said your building happens to be first, and your building was more prominent in visibility along High Street. Mr. Coulter said the density is too high, too many apartments and that is why he raised the question a few moments ago if you took the five-story apartment buildings down to three stories, what number of apartments does that leave you and can you make that financially work. Mr. Coulter said he could not answer that, and that Mr. Hart would have to answer that. He would like to get to a point where they can work with the density and get more comfortable with it. When you take the five-story building down to three-stories what that become. Is it 380? Is it 360? What is that number? Mr. Hart said that was clear helpful productive guidance. Mr. Hart said they also have to hit a mark where they are attracting the office and the restaurant and the services and the other dynamics and that is the key to the tension here in that marketplace. How much is enough to attract what the city wants there in terms of that income tax and need. Mr. Coulter said he appreciated that and agreed with that comment and it's a give and take. Mr. Hart said the only other thing he would like to ask about for himself is they tried really hard to have an open space plan that opens up the site to the neighborhood and it was a very clear comment they got from the W.A.R.D. meeting and the other community meetings that were closed off. He said they put greenspace on the perimeter and opened up parts of the site and the comment they have heard tonight its more about additional aggregation but is opening up the site like that at those key entrances for pedestrians is that something that you favor? Is that appropriate?

Mr. Coulter said for him personally, he liked the idea of opening the area up, but he could not see enough detail to completely understand it. He asked Mr. Hart what opening up meant. He also said he liked the apartments being pulled further away from Longfellow Avenue and closer to High Street, but the height was still an issue for him. He also liked there were several one-story units, but he could not tell what that was from the land plan.

Mr. Foust said the proposed entrance or exit off of Evening Street he would support that only if it were a cul-de-sac, that led to smaller or single-family homes in that area, he would not, under any circumstance, support a development that allows a way to cut through from High Street over to Evening Street.

Mr. Coulter said the real issue there, is if you look where Evening Street Elementary School is and you look where the sidewalks are along the side. Evening Street is a huge traffic jam at certain times of the day and you have little kids running around. The teachers and the parents do a wonderful job of watching them but there is enough traffic on Evening Street already without opening it up to the entire development. Mrs. Holcombe said she agreed with making Evening Street a cul-de-sac and not having a cut through from High Street or any of the businesses that are located in that area to be able to exit on High Street. Mr. Schuster said he felt the same thing applies to Larrimer and whether that ends up being a right turn only out of the development, so they have to go onto High Street, but that is the same issue with Larrimer Avenue. He said he would also be very concerned about running traffic through those areas. Mr. Coulter said a traffic plan would be needed and required further down the road but not in the immediate future. Mr. Coulter asked if the Board members or anyone else in the community wanted to make any additional comments. Mr. Coulter asked Mr. Hart how he wanted to proceed with this. Mr. Hart said he would appreciate tabling to a date certain so there was some certainty in the next hearing. He said he felt they got some substantive feedback tonight that they can work with and they would update the application. He said realistically with the holidays a February meeting would probably make sense because you lose about a month with holiday time but they would appreciate the ability to come back and update the plan again and update some of the technical information that goes with the plan. For example the issues with Evening and Larrimer Streets, and take a look at those from a traffic standpoint and update the plan along those lines.

Mr. Foust said every time they have had a big development before them and tabled it, not this specific developer, but in general, the developers have come back with some very minor changes and said we have listened to you and we made all these changes and here they are and they are looking at ninety to ninety-five percent of what they looked at before. Mr. Foust said they need something entirely different here and felt instead of tabling this that they start with a fresh new proposal and recommended that they vote on it. Mr. Coulter explained the applicant has asked to table the application and if they did not get a motion to table they would take a vote of either up or down. Mr. Brown explained they can either table, or deny, and if denied, then the vote would be up to City Council. If the Board moves to table, there needs to be a date certain for the next hearing.

Mr. Hart said to be recommended for denial on a concept plan where they do not have the full application in front of them with all of the technical information and they talked to the city about coming to the Planning Commission to have dialogue and to be denied or recommended denial

after that is not fair and does not meet basic due process equal protection standards, its not collaborative. There are citizens in the community that want them to have a collaborative process on this site. Knocking them down and sending them packing on a concept plan is not consistent with that request for collaboration. Mr. Foust said he was concerned what would be interpreted here if this is tabled is that this Board and this community fully support the concept plan with minor changes and that is why he suggested getting it off the table and start fresh with a new proposal, and if the rest of the Board members chose not to do that he would understand that perfectly well. Mr. Coulter asked for a motion to table. No one moved to table the application so a vote was taken.

**Municipal Planning Commission Motion:**
Mr. Foust moved:

**THAT THE REQUEST BY THOMAS HART ON BEHALF OF LIFESTYLE COMMUNITIES FOR APPROVAL TO REZONE THE PROPERTY 1033 HIGH ST., 47 LARRIMER AVE. AND 57 LARRIMER AVE. PER THE LEGAL DESCRIPTION PROVIDED SHOWING 37.843-ACRES AS A PLANNED UNIT DEVELOPMENT, AS PER CASE NO. PUD 03-2020, DRAWINGS NO. PUD 03-2020, DATED SEPTEMBER 9, 2021, BE RECOMMENDED TO THE CITY COUNCIL FOR APPROVAL BASED ON THE PLANNING GOALS OF THE CITY, AS REFERENCED IN THE <u>LAND USE PLANS</u> AND ON THE FINDINGS OF FACT AND CONCLUSIONS IN THE STAFF MEMO AND PRESENTED AT THE MEETING.**

Mrs. Holcombe seconded the motion. Mr. Brown called the roll. Mr. Reis, nay, he said enough earlier he did not feel they were ready yet; Mrs. Holcombe, nay for the same reason stated by Mr. Reis and more information is needed to make this feasible; Mr. Foust, nay, because they need a development plan that supports the New England Village concept that the community has committed us to push forward; and Mr. Coulter, nay, because of the reasons given earlier having to do with the height of the buildings; density; how the greenspace is used, and the diversity of housing. The motion failed.

There was no ARB motion in the staff memo.

Mr. Foust moved that the architectural design presented to us in the current plans information at the city meeting and discussion be approved. Mr. Reis seconded the motion. Mr. Brown called the roll. Mr. Schuster, nay, based on earlier comments; Mrs. Hinz, nay, based on previous conversation; Mrs. Holcombe, nay, based on not enough information; Mr. Reis, nay, for all the reasons stated earlier; Mr. Foust, nay, based on the reasons stated for the PUD denial; and Mr. Coulter, nay, based on not enough information. The motion failed.

Mr. Brown explained the PUD would go on to City Council for final review or the applicant has the opportunity to withdraw.

Mr. Reis moved to take the following three Agenda items off the table and Mrs. Holcombe seconded the motion. All Board members voted, "Aye," and the motion was approved.

**G. Other**

There was no other business to discuss.

**H. Adjournment**

Mr. Foust moved to adjourn the meeting and Mrs. Holcombe seconded the motion. All Board members voted, "Aye," and the meeting adjourned at 9:45 p.m.