*LIFESTYLE COMMUNITIES*

*vs.*

*CITY OF WORTHINGTON*

---

Deposition of

**Thomas Hart**

January 11, 2024

---



614.460.5000 | www.priohio.com | pri@priohio.com

1        IN THE UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF OHIO
2                  EASTERN DIVISION

3   LIFESTYLE COMMUNITIES,      )
    LTD., ET AL.,               )
4                               )
         Plaintiffs,            )
5                               )
         vs.                    )   Case No.
6                               )   2:22-cv-1775
    CITY OF WORTHINGTON,        )
7   OHIO,                       )
                                )
8        Defendant.             )

9

10

11                 DEPOSITION

12            of THOMAS L. HART

13

14          Taken at the offices of
        Vorys Sater Seymour and Pease LLP
15           52 East Gay Street
             Columbus, Ohio 43215
16

17

18       on January 11, 2024, at 9:30 a.m.

19

20       Reported by: Julia Lamb, RPR, CRR

21

22                 -=0=-

23

24

```
 1   APPEARANCES:

 2         Christopher L. Ingram
           VORYS SATER SEYMOUR AND PEASE LLP
 3         52 East Gay Street
           Columbus, Ohio 43215
 4         614.464.5480
           clingram@vorys.com
 5
                  on behalf of the Plaintiffs.
 6

 7         Paul J. Schumacher
           DICKIE McCAMEY
 8         600 Superior Avenue East, Suite 2330
           Cleveland, Ohio 44114
 9         216.390.1795
           pschumacher@dmclaw.com
10
                  on behalf of the Defendant.
11

12

13

14

15

16

17

18                        -=0=-

19

20

21

22

23

24
```

 1                    STIPULATIONS

 2          It is stipulated by and between

 3  counsel for the respective parties that the

 4  deposition of THOMAS L. HART, the Witness

 5  herein, called by the Defendant under the

 6  applicable Rules of Federal Civil Court

 7  Procedure, may be taken at this time by the

 8  stenographic court reporter and notary public by

 9  agreement of counsel; that said deposition may

10  be reduced to writing stenographically by the

11  court reporter, whose notes thereafter may be

12  transcribed outside the presence of the witness;

13  and that the proof of the official character and

14  qualification of the notary is waived.

15                    -=0=-

16

17

18

19

20

21

22

23

24

```
 1                    INDEX OF EXAMINATION

 2                                            PAGE

 3   BY MR. SCHUMACHER:                        6

 4

 5                    INDEX OF EXHIBITS

 6   EXHIBIT            DESCRIPTION           PAGE

 7      Hart 1  Certificate of                30
                Appropriateness Application
 8
        Hart 2  PUD - Preliminary Plan and    36
 9              Architecture Review Board
                Submittals, 10-2-2020
10
        Hart 3  One-page document, 7-15-15    47
11
        Hart 4  City Council Statement        49
12              Regarding UMCH Development
                Adopted Monday, October 12,
13              2015

14      Hart 5  Two-page email, 11-13-20      66

15      Hart 6  Two-page email chain          68

16      Hart 7  Three-page email chain        82

17      Hart 8  Certificate of                90
                Appropriateness Application
18
        Hart 9  Two-page email chain,         119
19              10-15-21

20      Hart 10 Three-page email chain        140

21      Hart 11 Four-page email chain         165

22      Hart 12 Email, 11-5-19                178

23      Hart 13 Copy of a newspaper article,  184
                1-26-22
24
```

1    35      Three-page email chain,        150
             9-24-20

2

     43      City Council Agenda, 12-13-21   145

3

     59      Minutes of the Regular          96

4            Meeting Worthington
             Architectural Review Board,

5            Worthington Municipal
             Planning Commission, 1-14-21

6

     83      Portion of the Minutes of the   98

7            Regular Meeting Worthington
             Architectural Review Board,

8            Worthington Municipal
             Planning Commission, 10-14-21

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1                    THOMAS L. HART

2    being first duly sworn, as hereinafter certified,

3    deposes and says as follows:

4                    CROSS-EXAMINATION

5    BY MR. SCHUMACHER:

6        Q.  Could you please state your full name

7    for the record.

8        A.  Thomas Leo Hart.

9        Q.  Mr. Hart, where are you employed?

10       A.  5029 Cemetery Road in Hilliard with

11   Nathan Painter & Associates firm, although I'm

12   self-employed, but that's where I work.

13       Q.  Okay.  So you're not -- you don't work

14   for Painter & Associates as an attorney?

15       A.  No.  I'm -- I work at their office.

16       Q.  I see.  Do you work with any other

17   attorneys in your practice?

18       A.  With Nathan Painter, yes.

19       Q.  Describe, then, the relationship with

20   Mr. Painter.

21       A.  Do you mean the business relationship --

22       Q.  Yes.

23       A.  -- or just the work we do?

24       Q.  The business relationship.

1      A.  I essentially rent from him.

2      Q.  Okay.

3      A.  Yeah.  In an of counsel capacity in the

4  business operation.

5      Q.  So you rent and you pay your own legal

6  malpractice coverage, those kinds of things?

7      A.  Correct.

8      Q.  How long have you had this relationship

9  with Painter & Associates?

10      A.  Let's see.  February of '22.  I'm sorry.

11  '21.

12      Q.  And prior to February of '21 where did

13  you work?

14      A.  Isaac Wiles.

15      Q.  I understand you were a partner there?

16      A.  Correct.

17      Q.  For how many years?

18      A.  Since 2014.  There had been a merger.

19  It was after the merger.  I think it was 2014.

20      Q.  And prior to Isaac Wiles where were you

21  employed?

22      A.  Wiles, Burkholder, Bringardner -- Wiles,

23  Boyle, Burkholder, Bringardner.

24      Q.  How many years did you work for them?

 1      A.  Since 2007.

 2      Q.  And before that?

 3      A.  I was in a home building company as one

 4  of the in-house counsels called Dominion Homes.

 5      Q.  How many years did you work for Dominion

 6  Homes?

 7      A.  About four and a half since 2003.

 8      Q.  And before that you were with BIA?

 9      A.  Correct.

10      Q.  What was your role at BIA?

11      A.  I was executive director from '97 --

12  late '97 until 2003.

13      Q.  As executive director of -- it was the

14  central Ohio BIA, wasn't it?

15      A.  Correct.

16      Q.  What was the -- what was your job duties

17  as executive director?

18      A.  Managing of the organization, devising a

19  public policy agenda for our advocacy and

20  lobbying, being the point person for

21  communications for home building in the region,

22  a lot of interaction with public officials,

23  public bodies and, you know, city councils,

24  county commissions, township trustees, managing

1  staff.  I also had to run home shows, like the

2  Parade of Homes.

3      Q.  And before working with BIA, where did

4  you work?

5      A.  I spent eight years in the legislature

6  as a lobbyist for the Ohio Manufacturers'

7  Association in various capacities.

8      Q.  Where did you go to law school?

9      A.  Capital University.

10     Q.  What year did you graduate?

11     A.  '94 I believe.

12     Q.  Your work with Isaac Wiles and the

13  firm -- the Isaac firm before that, what was the

14  nature of your practice there?

15     A.  I was a zoning lawyer, zoning land use

16  lawyer.

17     Q.  Is it fair to say that your career has

18  been essentially representing and advocating for

19  the building and developing side of property

20  development and land use?

21         MR. INGRAM:  Objection to form.

22         You may answer.

23     A.  After the statehouse -- after my

24  statehouse career, that's correct.

1      Q.  So with the BIA obviously you're

2  advocating public policy for the development of

3  housing, aren't you?  That was your role?

4      A.  Housing, land development, yes.

5      Q.  Okay.  And then as you moved into

6  private practice I assume you represented

7  developers who were intending to develop

8  property?

9      A.  Yes.

10      Q.  Have you ever represented a city or

11  municipality who was in a zoning battle with a

12  developer?

13          MR. INGRAM:  Objection to form.

14      A.  Our firm had a municipal practice; so

15  yes, I represented municipalities on zoning

16  issues.  I don't know if I would say it related

17  to battles, but I definitely represented

18  municipalities.

19      Q.  You've testified before a number of

20  municipal planning commissions and city councils

21  as an advocate for developers?

22      A.  Yes.

23      Q.  What is your role in this case,

24  Lifestyle versus the City of Worthington?

 1          MR. INGRAM:  Objection to form.

 2     A.  It's a very general question.  I'll

 3  answer initially by saying, you know, I was the

 4  developer's lawyer of record for the application

 5  that Lifestyles filed in 2020 I believe was the

 6  first time I was involved.

 7     Q.  You agreed to appear here voluntarily?

 8     A.  Yes.

 9     Q.  You're not being represented by the

10  Vorys Sater firm, are you?

11     A.  I am for this deposition by Chris.

12     Q.  Have you entered into any kind of

13  agreement with them in terms of payment of their

14  fees?

15     A.  No.

16     Q.  What have you done to prepare for the

17  deposition today?

18     A.  I met with Chris.  I viewed several

19  planning commission meeting videos and council

20  videos and then read the complaint that has been

21  filed.

22     Q.  When did you read the complaint?  When's

23  the first time you read the complaint?

24     A.  Well, I probably read the complaint

1  first time when it was filed.

2     Q.  In March of '22?

3     A.  I mean, I can't tell you exactly.

4     Q.  But if it was filed in March of '22, is

5  that the first time you would have read it?

6     A.  Contemporaneously with that date, yes.

7     Q.  Did you ever have the opportunity to

8  read the complaint before it was filed?

9     A.  No.

10     Q.  Did you meet with any of the Lifestyle

11  Communities' lawyers prior to its filing about

12  the litigation?

13     A.  Not that I can recall.

14     Q.  Other than the videos and -- other than

15  the videos of the municipal planning commission

16  meetings and the city council meetings that you

17  just referred to, have you reviewed any other

18  documents in preparation for the deposition?

19     A.  I don't think so, no.

20     Q.  Have you reviewed any of the depositions

21  that have been taken in this case?

22     A.  No.

23     Q.  Have you reviewed any summaries prepared

24  for you by the lawyers for Lifestyle

1   Communities?

2       A.  No.

3       Q.  The Plaintiff in the lawsuit is

4   Lifestyle Communities and Worthington -- is

5   Lifestyle Communities, Ltd. and Worthington

6   Campus.  Are you familiar with those

7   organizations?

8       A.  I'm familiar with Lifestyle Communities.

9       Q.  Do you know of any Lifestyle Communities

10  affiliate companies?

11      MR. INGRAM:  Objection to form.

12      You can answer if you can.

13      A.  No, I'm not -- not that I can -- not

14  that I can remember.

15      Q.  So when I refer to Lifestyle Communities

16  or Lifestyle, do you understand I mean the

17  Plaintiffs in this lawsuit as well as Lifestyle

18  Communities, Ltd.'s affiliate companies?

19      MR. INGRAM:  Same objections.

20      A.  Generally, yes.  Yeah.

21      Q.  Have you ever given a deposition before?

22      A.  Have I ever had one taken of me?

23      Q.  Yes.

24      A.  Yes.

 1      Q.  How many times?

 2      A.  I would say between five and 10.

 3  Probably not 10.  More around five.

 4      Q.  Have you ever taken a deposition like

 5  we're doing here today as a lawyer?

 6      A.  Yes.

 7      Q.  How many depositions do you think you've

 8  taken in your career?

 9      A.  About the same number.  Probably between

10  five and 10.

11      Q.  So the five to 10 depositions that

12  you've given, what types of matters were those

13  given in?

14      A.  One was a series -- a lawsuit against

15  the BIA when I was executive director.  We ran

16  some polling of public officials, and a former

17  mayor of a city sued the organization for

18  defamation, among other things, I think.  That

19  was one.

20      Q.  Do you know the name of the case or the

21  name of the mayor?

22      A.  Her name is Rita Ricketts, former Mayor

23  Rita Ricketts of Pickerington.

24      Q.  How do you spell that?

1      A.  R-I-C-K-E-T-T-S.  Her son's a prominent

2   lawyer in Pickerington, Rick Ricketts.

3      Q.  And you were about to mention another

4   one.

5      A.  Try to be brief on this.  The BIA would

6   build basically a charity home that we would

7   sell to raise money for our charitable

8   foundation at each Parade of Homes when I was

9   executive director.  And you know, we had a --

10  we would have a builder build it, and then we'd

11  sell it on the open market.

12         And one of those homes I believe -- you

13  know, home construction suit was filed, you

14  know, against that builder and the BIA as the --

15  we financed the house basically at that time.

16  And so there were multiple depositions I believe

17  on that case, you know, on construction defect

18  issues.

19     Q.  Any other cases where you've testified

20  in litigation between a developer and a

21  municipality of some kind?

22         MR. INGRAM:  Objection to form.

23     A.  I'll honestly say there may have been.

24  It's -- I don't remember them -- you know, that

1  kind of thing at this time, but it's possible.

2  It's been 25 years.

3      Q.  Is it fair to say that you acted as a

4  representative of Lifestyle Communities in

5  filing the application with the city of

6  Worthington?

7         MR. INGRAM:  Objection to form.

8      A.  Yes.

9      Q.  Have you ever done work such as that

10  before for Lifestyle Communities or one of its

11  affiliate companies?

12      A.  I don't believe so, no.

13      Q.  So is this the first time that you were

14  ever involved with any of Lifestyle Communities'

15  companies?

16         MR. INGRAM:  Objection to form.

17      A.  I may have done some other work for them

18  on related matters, you know, with helping with

19  different municipal processes or even some of

20  their construction issues, but whether that

21  happened before this or after that, there was

22  some other work I did for them that was not

23  zoning related.

24      Q.  Well, before we get to work that you may

1  have done after this matter, what type of

2  unrelated matters did you consult with them on

3  regarding municipal processes?

4       MR. INGRAM:  Objection to the extent

5  you're calling for this witness to disclose any

6  client confidential information.

7       To the extent you can answer this

8  question without disclosing any requests for

9  legal advice from you or any legal advice you

10  provided to any Lifestyle organization or its

11  affiliates, you may answer.

12   A.  Like any developer/home builder, they

13  have permitting processes, and approval

14  processes, and engineering approvals, things

15  that occur -- development approvals, things that

16  occur after zoning, and I believe I helped them

17  with a couple of those types of issues with the

18  city of Columbus.  That is a common thing in my

19  practice because of my involvement with city and

20  local governments.

21   Q.  So if I were to ask Lifestyle

22  Communities, have you paid Tom Hart any legal

23  fees for services prior to the city of

24  Worthington case, do you think they would answer

1   yes?

2        MR. INGRAM:  Objection.  Calls for

3   speculation.  Argumentative.

4        A.  Could you repeat the timeline part of

5   that question?

6        Q.  Prior to --

7        A.  Prior to.

8        Q.   -- working on the project involving the

9   city of Worthington.

10        MR. INGRAM:  Same objections.

11        A.  I'm not going to be able to tell you

12   whether the work I did for them outside of, you

13   know, this case was -- the subject matter of the

14   case was before or after I got involved in the

15   case, but you know, I definitely did some work

16   for them relating to issues with the city of

17   Columbus, potentially New Albany, but I don't

18   know when that -- I can't remember when that

19   was.

20        Q.  Would you have a file on those matters?

21        A.  File -- that file would be at Isaac

22   Wiles because that client stayed with that firm

23   when I left.  So I don't have any of their

24   files.

1      Q.  So basically what you're telling me is

2   you don't know if you received any compensation

3   from Lifestyle Communities before you started

4   working on the city of Worthington project?

5          MR. INGRAM:  Objection.

6   Mischaracterizes prior testimony.

7      Q.  It's a question.  You just don't know

8   one way or the other?

9      A.  I don't know.

10     Q.  What about after you became involved in

11  this particular project for the UMCH property,

12  have you worked for them again?

13     A.  It's really the same answer.  Whether

14  I -- I definitely did some other work for them,

15  limited, very limited, but whether it was before

16  or after, I can't recall.

17     Q.  All right.  For any work that was done

18  after, I'm assuming you would have record of

19  that work?

20     A.  Again, I don't -- I didn't take them

21  with me when I left Isaac Wiles, and Lifestyle's

22  not a client today.  I only took the files from

23  Isaac Wiles that were going to be ongoing

24  clients.

1    Q.  So since '21 when you left -- 2021 when

2  you left, you have not worked for Lifestyle

3  Communities or its affiliates?

4    A.  I believe that's correct.

5    Q.  When I speak about the UMCH property, do

6  you understand the property that I'm discussing?

7    A.  Yes.

8    Q.  So if I call it the property today, will

9  you understand that I'm talking about the 30 to

10  40 acres that's on High Street at about 1033

11  High Street?

12    A.  Yes.

13    Q.  Actually you would know specifically

14  where that property is because you were the

15  applicant to have that property rezoned, weren't

16  you?

17    A.  I was the agent for the applicant, yes.

18    Q.  But you were retained by Lifestyle

19  Communities to file those applications and

20  proposals, weren't you?

21        MR. INGRAM:  Objection.  Do not answer

22  that question.  That calls for the disclosure of

23  attorney-client privileged communications.

24        MR. SCHUMACHER:  So you're not going to

1    let him answer whether he was the zoning

2    attorney that was retained by Lifestyle

3    Communities to file the application to rezone

4    the property?

5         MR. INGRAM:  Your question -- your prior

6    question was a different one.

7        Q.  Well, were you the attorney retained by

8    Lifestyle Communities to file the application to

9    redevelop the UMCH property?

10       A.  One of the applications, I guess, yes.

11   Let me correct that.  I was only -- I wasn't

12   involved in any prior efforts or anything before

13   2020.

14       Q.  Were you authorized to speak on behalf

15   of Lifestyle Communities, Ltd. and Worthington

16   Campus, LLC on their behalf?

17       A.  Yes.

18        MR. INGRAM:  Objection to form.  Vague.

19   Ambiguous.

20        You can answer if you can.

21       Q.  I think you did.

22       A.  Yes, in terms of the application process

23   and the public hearing process.

24       Q.  You also testified in several public

1    hearings as the lawyer for Lifestyle Communities

2    on this application, didn't you?

3       A.  Yes.

4       Q.  And you did that under oath, didn't you?

5       A.  I can't recall -- you know, every

6    municipality's a little different in terms of

7    when they put you under oath.  I may have, but

8    I'm not -- I'm not sure they swear people in

9    during their processes.  I'd have to watch the

10   hearing again.  Some do.  Some don't.

11      Q.  Well, you stand behind the statements

12   you made at those hearings, don't you?

13      A.  Yes.

14      Q.  Have you ever attended any other public

15   meetings of the city of Worthington?

16      A.  Other than what?

17      Q.  Other than the municipal planning

18   commission meetings that you've attended and the

19   city council meetings that you've attended about

20   the UMCH property.

21      A.  Okay.  Well, it's likely that I have in

22   my years of going to municipal hearings that

23   I've been to their meetings before either in BIA

24   or Dominion or whatever.  I mean, it's likely.

1      Q.  So I know I asked you questions about

2   your work for Lifestyle Communities, but with

3   regard to the city of Worthington, have you made

4   prior applications to that community that you

5   recall?

6      A.  I don't recall.

7      Q.  Mr. Hart, may I call you Tom?

8      A.  Sure.

9      Q.  Tom, when were you first retained in

10   this particular matter to make the application

11   on behalf of Lifestyle Communities and

12   Worthington Campus?

13      A.  I'm not going to be able to give you or

14   remember an exact date.  There was a period of

15   time we started talking, and then the -- you

16   asked -- specifically you said the application.

17   That really didn't start until 2020, you know,

18   probably spring of 2020.

19      Q.  Well, let me ask you this -- go ahead.

20   I'm sorry.

21      A.  No.  Please.

22      Q.  Were you ever actually retained by

23   Lifestyle Communities as an attorney to

24   represent them?

1      A.  Yes.  I mean, technically they were an

2  existing client of the firm's.  So whether there

3  was -- there was no retainer letter for me

4  personally.  They had been working with other

5  folks there on all kinds of other corporate

6  matters and so forth, but they started talking

7  to me on and off, fits and starts, before 2020.

8  Exactly when that was, I don't remember.

9      Q.  Did you bill them for your services?

10         MR. INGRAM:  Objection to form.

11     A.  Yes.

12     Q.  Would the bills tell us when you were

13  first -- when you first started talking on and

14  off to them?

15     A.  I'm not sure.

16     Q.  I mean, if I send a subpoena to Isaac

17  Wiles for their billing records solely to

18  understand when you first started working -- the

19  date you first started working for Lifestyle

20  Communities on this project, meaning talking to

21  them on and off, would those records tell us the

22  answer to that question?

23         MR. INGRAM:  Objection.  Asked and

24  answered.  Now you're getting argumentative,

1    Counsel, and this is not even remotely relevant.

2         MR. SCHUMACHER:  Will you agree, then,

3    to provide me with the date from Isaac Wiles

4    records as to when Mr. Hart first started

5    working for Lifestyle Communities?

6         MR. INGRAM:  No.  It's not relevant.

7         MR. SCHUMACHER:  Okay.  We can agree to

8    disagree whether it's relevant.  I just want to

9    know when it happened, and he's telling me that

10   he can't remember the exact date.

11        Q.  But it was before 2020, right?

12        A.  Well, you asked about billing.

13        Q.  So that I can understand when you

14   started working for them.

15        A.  Well, I understand.

16        Q.  Okay.

17        A.  So what I'll tell you is those records

18   would show a lot of billing in 2020.  That's

19   when I was definitely working for them a lot and

20   billing a lot.  What I'm answering is before

21   that I'm not sure.  You know, there was fits --

22   before 2020 I talked to them.  Whether I billed

23   them or not, you know, there was some fits and

24   starts, initial conversations.  The work I

1 really started doing and really -- that you

2 definitely see bills on would be in 2020.

3     Q.  Okay.  I don't want to see the bills.  I

4 just want to know when.  Okay?  We clear?  You

5 certainly started talking to them in 2019,

6 didn't you?

7     A.  Yes, probably.  Yes.

8     Q.  Who first approached you, Tom?

9     A.  I know for sure it would have been a guy

10 named Jode Ballard.  Whether it was anyone else,

11 I can't say, but that was the main point person

12 that I dealt with.

13     Q.  Had you dealt with him before?

14     A.  No.

15     Q.  What was his role at Lifestyle

16 Communities?

17     A.  I can answer what his role was with me

18 and the project, but what he did there -- I

19 believe he was a landscape architect.  His role

20 with me was just the internal pointman for

21 Lifestyles on the project.

22     Q.  So when you say you first started

23 talking on and off, was he the person you

24 started talking to?

1      A.  Yes.

2      Q.  Were there others?

3      A.  Probably, but I don't remember if it was

4  anyone else besides him.

5      Q.  Did anyone request from you, since this

6  lawsuit was filed, communications or documents

7  from you that you may have had with Lifestyle

8  Communities?

9      A.  No.

10      Q.  Do you have emails and other documents

11  involving communications with Lifestyle

12  Communities about this project?

13      A.  That would be at Isaac Wiles.  No, I

14  don't.  I didn't take the files.

15      Q.  What did Mr. Ballard want from you,

16  then, when he first approached you?

17          MR. INGRAM:  Objection.  Calls for

18  speculation.

19      Q.  What did he discuss with you?

20          MR. INGRAM:  Objection.  To the extent

21  Mr. Ballard or anyone from Lifestyle requested

22  you to provide legal advice, I'm instructing you

23  not to answer that question.  To the extent you

24  can answer otherwise, you may do so.

1           MR. SCHUMACHER:  Chris, I'm not asking

2    for the legal advice.  I'm just asking whether

3    he asked him to do work.

4           MR. INGRAM:  Counsel, your question is

5    what did you discuss.  What did he discuss with

6    you.

7           MR. SCHUMACHER:  I just said I don't

8    want to know what he discussed.

9       Q.  I want to know what he asked you to do.

10   When did he retain you, or did he retain you?

11          MR. INGRAM:  Objection.  Asked and

12   answered.

13      Q.  All right.

14      A.  Not sure which question.

15      Q.  Let's start over.  You had conversations

16   with Mr. Ballard about this property, right?

17      A.  Yes.

18      Q.  All right.  Were any of those

19   discussions requests for legal opinions?

20      A.  Yes.

21      Q.  Okay.  Did you provide any legal

22   opinions to him in a written way?

23      A.  Honestly not sure if it was written or

24   just discussion.

1      Q.  Okay.  Tell me generally what it is that

2  Mr. Ballard wanted to talk about, then, in terms

3  of your involvement with this project.

4         MR. INGRAM:  Again, same instruction

5  that I just gave you with respect to you're not

6  permitted to disclose any legal advice or legal

7  questions asked of you from anyone from

8  Lifestyle.

9      A.  Much like all my zoning clients, he

10  wanted help with the application process.

11     Q.  And eventually you were officially hired

12  to help with the application process?

13         MR. INGRAM:  Objection to form.

14     A.  Yes.

15     Q.  And you became the attorney who signed

16  the application on behalf of Lifestyle

17  Communities?

18     A.  I'm not trying to be picky or something,

19  but every municipality has a different

20  application form process.  Sometimes the

21  attorneys sign as the agent or the applicant,

22  sometimes only the owner signs, sometimes only

23  the -- you know, the developer applicant signs.

24  So exactly whether I signed or not, you know, I

1    wouldn't be able to tell you, but was I the

2    person who helped prepare the application and

3    file it with the city, yes.

4         Q.  Prior to filing the application, did you

5    have any meetings with anyone from the city of

6    Worthington about the project?

7         A.  You're asking prior to the initial

8    application?

9         Q.  Yes.

10        A.  I'm not quite sure, but I believe I went

11   in to see Lee Brown right before we filed.  Now,

12   whether that was -- whether my memory is that

13   was either right before or contemporaneous with

14   the filing, I'm not sure.  Might have been the

15   day of.  So when you say prior, it may have been

16   the day of, it may have been two days before.

17   That's what I remember.

18             MR. SCHUMACHER:  Off the record.

19                (Discussion off the record.)

20                      -=0=-

21                (Hart Exhibit 1 marked.)

22                      -=0=-

23   BY MR. SCHUMACHER:

24        Q.  For the record, Mr. Hart, I'm handing

1    you what we've now marked as Hart Exhibit 1.  So

2    take a minute to look at that.

3         A.  (Witness complies).

4         Q.  Have you had a chance to look that over?

5         A.  Yes.

6         Q.  Am I correct that the first two pages of

7    Exhibit 1 are the original application that you

8    made on October 2nd, 2020 to the city of

9    Worthington?

10           MR. INGRAM:  Objection.  The first two

11   pages are only the first two pages.

12        Q.  That's why I asked the question.  Are

13   the first two pages a portion of the application

14   you made on October 20th -- I'm sorry,

15   October 2nd, 2020?

16        A.  It's just the cover pages to the

17   application form.

18        Q.  And page 3 is your letter submitting a

19   revised concept plan in September -- I think

20   September 10th of 2021.  Is that correct?

21        A.  Yes.

22        Q.  Okay.

23        A.  Could I correct something really quick?

24        Q.  Sure.

1    A.  I believe that I said earlier that I

2  left Isaac Wiles and went to Painter in '21, and

3  it was February '22.

4    Q.  Okay.

5    A.  Time flies.  I saw these dates, and I've

6  been with Painter since February of 2022.

7    Q.  Mr. Hart, I'm going to hand you what --

8       MR. SCHUMACHER:  I don't know how you

9  want to do this, Chris, but I got to take it

10  back.  You can make a copy if you want.

11    Q.  I'm handing you what I believe is your

12  October 2nd, 2020 initial application to the

13  city of Worthington on behalf of Lifestyle

14  Communities and its affiliate company.

15              (Recess taken.)

16  BY MR. SCHUMACHER:

17    Q.  We've now remarked Exhibit 1.  Is

18  Exhibit 1 a two-page application that you made

19  as applicant to the city of Worthington on

20  October 2nd, 2020?

21    A.  Yes.

22    Q.  Is that a true and correct copy of the

23  application you made to rezone the UMCH property

24  on behalf of Lifestyle Communities?

1          MR. INGRAM:  Objection to form.

2     A.  Yes.

3     Q.  Okay.  This document indicates at the

4  bottom please read the following statement and

5  sign your name.  Do you see that?

6     A.  Yes.

7     Q.  Is that your name under the

8  instructions, your signature?

9     A.  Yes.

10    Q.  And who else signed?

11    A.  I don't know.

12    Q.  Was that someone from UMCH?

13    A.  It looks like it.  I'm not sure.

14    Q.  Now, you made this application, right?

15    A.  Yes.

16    Q.  And you had to go get a signature from

17  the property owner as well as you, the

18  applicant, right?

19    A.  Yes.

20    Q.  Did you endeavor to go obtain a

21  signature from the actual property owner?

22    A.  Yes.

23    Q.  And you just don't recall who that was?

24    A.  Correct.  I don't remember who it was.

1    Q.  Lifestyle Communities and its affiliates

2  did not own the property on October 2nd, 2020?

3    A.  That's correct.

4    Q.  Did you ever review any development

5  agreements or contracts between UMCH and

6  Lifestyle Communities or its affiliates?

7        MR. INGRAM:  Objection to form.

8    A.  I don't recall whether I did or didn't.

9    Q.  Were they relevant or pertinent to your

10  work for Lifestyle Communities?

11        MR. INGRAM:  Objection to form.

12    A.  No.

13    Q.  This document also indicates that you --

14  that the information contained in this

15  application and in all attachments are true and

16  correct to the best of your knowledge.  You saw

17  that?

18    A.  Yes, I saw it.

19    Q.  Do you also see that the document that

20  you signed indicates that, "I further

21  acknowledge that I have familiarized myself with

22  all applicable sections of the Worthington

23  codified ordinances and will comply with all

24  applicable regulations"?  Do you see that?

1      A.  Yes, I see it.

2      Q.  And you signed that?

3      A.  Yes.

4      Q.  Did you do that?

5          MR. INGRAM:  Objection to form.

6      Q.  Did you do that?  Objection to form.

7          Did you do that?

8          MR. INGRAM:  Same objection.

9      A.  I don't understand what you're asking

10  me.

11     Q.  Did you review the codified ordinances

12  of the city of Worthington?

13     A.  Yes.

14     Q.  And you became familiar with those

15  ordinances?

16     A.  Generally, yes.

17     Q.  You needed to do that in order to

18  prepare and file an appropriate application,

19  didn't you?

20         MR. INGRAM:  Objection to form.

21     A.  Yes.

22     Q.  Now, I'm going to mark this document in

23  front of you in the binder as Exhibit 2.

24         MR. SCHUMACHER:  Mr. Ingram, would you

1    like a copy of this document or do you have one?

2          MR. INGRAM:  We've got a copy of it.

3          MR. SCHUMACHER:  Okay.  Could you put a

4    sticker on the front of it.

5          May I retain the original?

6          MR. INGRAM:  It's your deposition.

7          MR. SCHUMACHER:  I will retain the

8    original.

9                      -=0=-

10          (Hart Exhibit 2 marked.)

11                      -=0=-

12   BY MR. SCHUMACHER:

13       Q.  Mr. Hart, we now marked as Exhibit 2 the

14   complete binder that I believe you submitted to

15   the city of Worthington on October 2nd, 2020 to

16   rezone the UMCH property, correct?

17       A.  I'm not sure when I submitted it.

18       Q.  Let's look back at Exhibit 1.  Does

19   Exhibit 1 indicate you filed the application on

20   October 2nd, 2020?

21       A.  No.

22       Q.  When was it filed?

23       A.  I'm not exactly sure when it was filed.

24       Q.  Do you have a copy of the application

1    you filed with the city of Worthington?

2         A.  Personally?

3         Q.  Yes.

4         A.  No.

5         Q.  Are you disputing that the original

6    application to rezone the UMCH property was

7    filed on October 2nd, 2020?

8         A.  No, I'm not disputing it.

9         Q.  Well, then, why can't you say it was

10   filed on October 2nd, 2020?

11             MR. INGRAM:  Objection.  Asked and

12   answered.  Now you're getting argumentative.

13        Q.  I'm trying to understand why you can't

14   agree with me that that's the application you

15   filed on October 20th, 2020.  It's a simple

16   question.

17        A.  Signing applications and dating them and

18   then when they are filed are often different

19   things, different times.

20        Q.  Okay.  Was it generally within days of

21   October 2nd, 2020 that you filed this

22   application on behalf of Lifestyle Communities?

23        A.  Yes, likely.

24        Q.  And is Exhibit 2 the attachments and

1  documentation you presented to Lee Brown at the

2  city of Worthington to make this application?

3     A.  Yes.

4     Q.  If you could refer to page 5 of that

5  application.  I think it's 5.

6        MR. INGRAM:  Counsel, which section?

7     Q.  You'll get to it.  It's paginated there.

8  I think it's right here.  In the text of the

9  actual document.

10    A.  The zoning text?

11    Q.  Yeah.  No.  I'll get it.  Yeah.  Flip

12  the next page.

13       Before we get to that, did you prepare

14  this text starting at page 1 of this section?

15    A.  I prepared the text.

16    Q.  Okay.  And if you'll flip to the next

17  page.  This one here, page 5.  Under Section IV,

18  Roman numeral IV, development standards and

19  development standards text per subarea.  Do you

20  see that?

21    A.  Yes.

22    Q.  Did you prepare that?

23    A.  I likely had this table prepared by

24  someone else, by my assistant.

1      Q.  Did you get the information from someone

2  at Lifestyle Communities or one of its

3  affiliates?

4      A.  Yes.

5      Q.  That particular section of the

6  application proposes a total of 730 residential

7  units?

8      A.  Yes.

9      Q.  You knew at that time that 730

10  residential units was in excess of the informal

11  proposal that was made in 2015 by Lifestyle

12  Communities, didn't you?

13      MR. INGRAM:  Objection.  Assumes facts

14  not in evidence.

15      A.  No.

16      Q.  So you weren't aware of anything that

17  occurred in 2015 regarding Lifestyle Communities

18  informal application to the city of Worthington?

19      MR. INGRAM:  Objection.  Asked and

20  answered.

21      MR. SCHUMACHER:  I don't think he did.

22      A.  There was never an application to my

23  knowledge in terms of what people told me.  I

24  wasn't involved in it.

1        Q.  Right.  But you certainly were aware in

2   2020 that there had been a presentation at the

3   WEC by Lifestyle Communities' representatives

4   about this exact same project, didn't you?

5        MR. INGRAM:  Objection.

6   Mischaracterizes this witness's prior testimony.

7        A.  I knew there was a presentation.

8        Q.  And you didn't review any documents or

9   talk to anyone at Lifestyle Communities about

10  the residential density that was proposed in

11  2015.  Is that what you're saying?

12       A.  Yes.  That was not my focus.

13       Q.  So no one at Lifestyle Communities ever

14  informed you that they made a presentation at

15  the WEC in 2015 for this same property?

16       MR. INGRAM:  Objection.  Asked and

17  answered.

18       Q.  It's a different question.

19       A.  Are you asking me did they tell me about

20  the presentation?

21       Q.  Yes.

22       A.  Yeah.  They told me about the

23  presentation, yes.

24       Q.  Did you ever read any documents about

1    that presentation?

2        A.  I don't know.

3        Q.  You were certainly aware by the time you

4    gave testimony to the MPC and city council that

5    there had been a proposal in 2015 by Lifestyle

6    Communities?

7            MR. INGRAM:  Objection.  Asked and

8    answered about five times.

9        Q.  That's a different question.  When you

10   gave testimony at those hearings, you knew about

11   the 2015 proposal that Lifestyle had made,

12   didn't you?

13       A.  I knew about a presentation.

14       Q.  You spoke about it at those hearings,

15   didn't you?

16       A.  Well, you're calling it a present -- a

17   proposal.  It was an informal presentation to a

18   community -- a group of community folks.  It

19   wasn't --

20       Q.  All I'm asking you, Tom, is did you know

21   about the 2015 informal presentation to a group

22   of residents at the WEC in 2015?

23       A.  Yes.

24           MR. INGRAM:  Objection.  There's no

1    reason to raise your voice.  You're getting

2    argumentative, Counsel.

3         MR. SCHUMACHER:  I'm not raising my

4    voice.  I'm trying to speak over your

5    objections.

6    Q.  You knew about that presentation.

7    A.  I knew about the presentation, yes.

8    Q.  You knew that it was a presentation that

9    was presented by Lifestyle Communities' folks,

10   right?

11   A.  Yes.

12   Q.  You knew that they proposed a

13   residential density of 530 units?

14        MR. INGRAM:  Objection.

15   Mischaracterizes his prior testimony.

16   A.  No.

17   Q.  You didn't know about that.  You were

18   advised by Lifestyle Communities that that

19   presentation was met with community opposition,

20   didn't you?

21        MR. INGRAM:  Objection to form.

22   A.  I knew about the opposition during that

23   meeting.

24   Q.  All right.  So when you testify in front

1 of a federal court jury in this case, you're not

2 going to deny that you knew in 2015 that there

3 was substantial community opposition to the

4 residential density that was proposed at that

5 time by Lifestyle Communities in 2015, are you?

6   MR. INGRAM:  Objection to form.

7 Mischaracterizes this witness's prior testimony.

8 Compound.  Confusing.

9   You may answer to the extent you can.

10  Q.  Would you like Julia to repeat the

11 question?

12  A.  Well, it was several questions; so...

13   MR. SCHUMACHER:  Why don't you repeat

14 the question.

15   (Record read as requested.)

16   MR. INGRAM:  Same objections.

17  A.  I'll answer by saying I knew that the

18 people who attended the meeting -- the

19 community's 14,000 people, I believe, but the

20 people who attended the meeting were generally

21 opposed to whatever they presented, and I would

22 say on many different aspects of the proposal.

23 The details of that plan, I never focused on the

24 2015 plans.  That was not my job.  That had

1  happened years earlier.  I had nothing to do

2  with it.  And so, you know, to the extent you're

3  asking me about the details of that plan I'm not

4  going to be able to answer.

5      Q.  But you knew about it.  That's all I

6  want to make sure.

7      A.  I knew about the meeting.

8      Q.  And you knew it was an issue when you

9  made your application in October of 2020?

10         MR. INGRAM:  Objection.  Misstates his

11  prior testimony.

12      A.  What -- knew it was an issue.  What

13  issue?

14      Q.  You knew the issue that the residents

15  had negative feedback on in 2015 was an issue

16  when you made your presentation.

17         MR. INGRAM:  Objection.  Misstates his

18  prior testimony.  Asked and answered.

19      Q.  Right?

20      A.  Paul, I think I answered.

21      Q.  Okay.  When you made the application,

22  Exhibit 1 and 2, in October of 2020, you knew

23  that the issue of residential density was going

24  to be an issue that you were going to have to

1    combat or fight, didn't you?

2         MR. INGRAM:  Objection.

3    A.  We were following the comprehensive

4    plan, and you know, the comprehensive plan

5    almost requires density at this site.  I mean,

6    it talks about density and where density should

7    be, and certain parts of the comp plan give

8    specific densities, other parts are general, but

9    we were -- we filed an application to follow the

10   comp plan.

11   Q.  But you knew that the residential

12   density was an issue that the Worthington

13   citizens were concerned about?

14        MR. INGRAM:  Objection.  Calls for

15   speculation.

16   A.  I would answer by saying some.

17   Q.  Right.  So some of the residents were

18   concerned about residential density.  That's an

19   issue you knew about, right?

20        MR. INGRAM:  Objection.  Same objection.

21   A.  I think I just answered the same

22   question.

23   Q.  Yes.  And you argued as the city's

24   attorney and applicant at public hearings about

1   that residential density issue, didn't you?

2        MR. INGRAM:  Objection.  Misstates this

3   witness's prior testimony.

4        A.  As the city's -- could you maybe -- as

5   the city's attorney?

6        Q.  Uh-huh.  You were the city's attorney

7   and applicant speaking for the city at those

8   meetings, weren't you?

9        A.  No.

10       Q.  No.  So when you were speaking before

11  the municipal planning commission, you were not

12  speaking as the city zoning attorney?

13       A.  No.  Never been the city zoning

14  attorney.

15       Q.  So when you were speaking before the

16  city council in December of '21 when this

17  application was eventually considered by city

18  council, you were not speaking as their

19  representative?

20       MR. INGRAM:  Objection to form.  Who's

21  the their?

22       Q.  Worthington -- I'm sorry, Lifestyle

23  Communities and Worthington Campus.

24       A.  Okay.  I'm a little confused.  I think

1  you were -- Counsel, you were asking me if I was

2  speaking for the city in a number of questions

3  and you meant Lifestyle.  I was Lifestyle's

4  attorney.

5      Q.  Right.  And as Lifestyle's attorney you

6  were aware when the application was made that

7  there was going to be Worthington citizen

8  opposition to the residential density that was

9  proposed?

10      MR. INGRAM:  Objection.  Calls for

11  speculation.

12      A.  I didn't meet with citizens until after

13  we filed.  So there's -- I didn't have any

14  direct contact with citizens until after we

15  filed.

16      Q.  Did you ever review any of the documents

17  on the city of Worthington's website concerning

18  this particular property?

19      A.  Yes.

20      Q.  When did you do that?

21      A.  Prior to filing.

22      MR. SCHUMACHER:  Make this Hart 3.

23                    -=0=-

24      (Hart Exhibit 3 marked.)

1                           -=0=-

2    BY MR. SCHUMACHER:

3        Q.  Have you had a chance to review

4    Exhibit 3?

5        A.  Yes.

6        Q.  Have you ever seen that before?

7        A.  No.

8        Q.  Are you aware it has been posted on the

9    city's website for many years?

10       A.  No.

11       Q.  So you see in the document that it

12   mentions conceptual plans that were apparently

13   presented in a recent public meeting on

14   June 29th, 2015?  You see that in the first

15   paragraph?

16       A.  Yes.

17       Q.  That's the meeting we talked about

18   earlier that you heard about?

19       A.  Yes.

20       Q.  Was the content of the statement relayed

21   to you by anyone from Worthington Campus or

22   Lifestyle Communities?

23           MR. INGRAM:  Objection to form.

24       Q.  The substance of this document.

1      A.  No.

2      Q.  You never heard about the -- I'll

3  withdraw the question.

4            MR. SCHUMACHER:  Hart Exhibit 4.

5                      -=0=-

6            (Hart Exhibit 4 marked.)

7                      -=0=-

8            MR. INGRAM:  Counsel, Exhibit 4 is only

9  one page, but that doesn't appear to be the

10  entire document.

11            MR. SCHUMACHER:  It's the only thing I

12  had.  It may be.  I can go back on the website

13  and look.

14            It's only one page.

15  BY MR. SCHUMACHER:

16      Q.  Have you had a chance to review

17  Exhibit 4?

18      A.  Yes.

19      Q.  Have you ever seen this document before?

20      A.  No.

21      Q.  So in your research and preparation for

22  making an application in October of 2020 you did

23  not view this document on Worthington's website?

24            MR. INGRAM:  Objection.  Asked and

1    answered.

2         A.  No.

3         Q.  Would you agree, however, that the city

4    of Worthington in your experience has a long

5    established process for reviewing development

6    applications?

7         A.  After the experience, I'm not sure what

8    their process really is, but they have one.

9         Q.  Well, before you submitted this

10   application, did you know that any changes in

11   zoning would first have to be approved by the

12   city's municipal planning commission?

13        A.  They're a recommending body.  They don't

14   approve.

15        Q.  You said you reviewed the city of

16   Worthington's codified ordinances and zoning

17   regulations?

18        A.  Yes.

19        Q.  And you know, then, that any application

20   for the change in zoning would need to be

21   reviewed by the municipal planning commission

22   for their recommendation, right?

23        A.  Yes.

24        Q.  In this case the application you made,

1    Exhibit 1 and 2, was reviewed by the municipal

2    planning commission according to this long

3    established process, right?

4        MR. INGRAM:  Objection to form.

5        A.  Yes.  We had two hearings at the

6    planning commission.

7        Q.  And you spoke at both hearings?

8        A.  Yes.

9        Q.  And that recommendation, then, must be

10   approved by city council with the additional

11   opportunity for public comment, right?

12       A.  Approved or disapproved, yeah.

13       Q.  Right.  But a hearing is held before

14   city council?

15       A.  Yes.

16       Q.  That's the process that the city of

17   Worthington has long employed for these types of

18   applications, in your experience, right?

19       MR. INGRAM:  Objection to form.

20       Q.  Let me finish my question before you

21   object.

22       A.  Yes.

23       Q.  Do you see in the document that the city

24   council's statement that was made on

1    October 12th, 2015 indicates that the process is

2    being followed in the development of the United

3    Methodist Children's Home and that the city

4    encouraged UMCH and its developer to present

5    potential plans to the public for discussion?

6        A.  I'm not sure what the question is.

7        Q.  You see that paragraph, fifth paragraph

8    down?

9        A.  I see it.

10       Q.  And do you see the seventh paragraph

11   where the city council's statement on

12   October 12th, 2015 indicates that attendees at

13   the meeting had significant opposition to the

14   plan, and city council sent a letter to the

15   developer stating the citizens' comments should

16   be considered?

17       A.  Yes, I see it.

18       Q.  When did you first get involved in any

19   community outreach to gain support for the

20   application you filed on behalf of your client?

21           MR. INGRAM:  Objection to form.

22           You may answer to the extent you can.

23       A.  I would say community outreach began

24   after the initial application.  I'm not sure

1   exactly when.

2      Q.  What role did you have in any community

3   outreach on behalf of Lifestyle Communities or

4   its affiliates?

5      A.  I conducted it.

6      Q.  You were their zoning lawyer, right?

7      A.  Yes.

8      Q.  And you were the applicant?

9         MR. INGRAM:  Objection.  Asked and

10  answered.  We've been over this several times

11  now.

12     A.  I technically was the applicant as well

13  under their form, yes.

14     Q.  Okay.  What community outreach did you

15  do?

16     A.  Lee Brown kept a list that reached over

17  a hundred people of folks who would -- citizens

18  who had contacted his office wanting information

19  or asking questions.  I kept a running

20  compilation of those citizens, and then invited

21  them all to multiple Zoom meetings.  This was

22  during COVID so there was no -- they weren't

23  going to do any in-person meetings with those

24  folks.  So I probably conducted at least five to

1    six of those meetings where we invited whoever

2    was on that list and then matched you know -- we

3    tried to keep -- we tried to keep those meetings

4    under 20 people, just managing time, but we did

5    five or six of those with the list of people who

6    said they -- who the city wanted us to reach out

7    to.  So that was one example.  We met with

8    various groups, you know, formed interested

9    groups of citizens.  One group was called WARD.

10   I met with them for hours.  Met with -- there's

11   a Worthington business group.  I can't recall

12   the exact name.  Met with them I think three

13   times.

14        Q.  Building Worthington's Future?

15        A.  That's the one, yes.

16        Q.  They're pro development?

17        A.  I would say some of them are.  I would

18   say some of them are, you know, more like the

19   WARD folks, but they're all businesspeople is

20   what, you know, makes them -- defines them.  Met

21   with the school superintendent and his

22   professional staff twice to go over the

23   financial implications of the project to the

24   school district and get their -- make sure we

1    were correct on those calculations, and I would

2    say those are the main things we did, and then,

3    you know, I conducted all that.

4        Q.  Had Lifestyle Communities or its

5    affiliates done any kind of outreach prior to

6    your involvement and the work you did, to your

7    knowledge?

8        A.  I don't know.

9        Q.  Did they provide you with any

10   information about outreach they'd done?

11       A.  No.

12       Q.  When is the first time you reviewed the

13   city of Worthington's comprehensive plan?

14       A.  I don't know.

15       Q.  Obviously before you filed Exhibit 1 and

16   2?

17       A.  Likely.

18       Q.  Well, you --

19       A.  That would be my normal course, yes.

20       Q.  You testified you considered the

21   comprehensive plan when you made the application

22   so I presume you read it before you did so?

23       A.  Yes.

24       Q.  You knew that the comprehensive plan was

1    a guiding document?

2         MR. INGRAM:  Objection to form.

3    A.  No, not in Worthington.  In Worthington

4    you have to zone based on the comprehensive

5    plan.  So it's got a much different status than

6    most jurisdictions I'm familiar with.

7    Q.  And what -- which -- can you point me to

8    the codified ordinance that you're referring to

9    that requires --

10   A.  I'm not going to be able to do that.

11        MR. INGRAM:  Objection.  Counsel, do you

12   have a copy of the municipal code for him to

13   review?

14        MR. SCHUMACHER:  I could probably pull

15   that up here.

16   Q.  You -- have you read the Court's opinion

17   in this case on the motion to dismiss that was

18   filed?

19   A.  No.

20   Q.  So are you aware that the Court has

21   granted a portion of the city of Worthington's

22   motion to dismiss counts in this case?

23   A.  No.

24   Q.  So you're not aware of that at all?

1      A.  No.

2      Q.  So counsel's not made you aware of the

3   fact that this judge has dismissed a number of

4   the counts in that complaint?

5      A.  I think counsel did tell me that.

6      Q.  And did counsel advise you that the

7   Court ruled that the comprehensive plan is not

8   binding on the city?

9          MR. INGRAM:  Objection.  Do not answer

10  this question to the extent you would disclose

11  any of our communications.  To the extent you've

12  come to know this information outside of our

13  discussions, you may answer.

14     A.  Could you repeat the question.

15         MR. SCHUMACHER:  Julia.

16            (Record read as requested.)

17     A.  No.

18     Q.  Tell me about your interaction with

19  WARD.  Who exactly did you meet with at WARD?

20     A.  I'm not going to remember that.  That

21  was years ago now.

22     Q.  Can you tell me what WARD's mission is?

23     A.  No.

24     Q.  Can you tell me whether they were in

1  favor of the application that you made?

2       MR. INGRAM:  Objection.  Calls for

3  speculation.

4     Q.  You went to their meetings and you made

5  the application.

6       MR. INGRAM:  Same objection.

7     Q.  Did you get a sense for what their

8  feeling was about the application that you filed

9  on behalf of Lifestyle Communities?

10       MR. INGRAM:  Same objection.

11     A.  Yes.

12     Q.  What was it?

13     A.  Opposition.

14     Q.  Why were they opposed to your

15  application?

16       MR. INGRAM:  Same objection.

17     A.  To remember -- it'd be hard for me to

18  remember all the things those people said.  I

19  mean, it was things that related to zoning,

20  things that related to development, things that

21  didn't.  You know, just all over the place.

22     Q.  Did you meet with them just one time?

23  You said it was hours.

24     A.  Well, one time it was for hours.

1  Whether I met with them again, I can't recall.

2  I certainly had other conversations with, you

3  know, parts of their group.

4      Q.  Who were those people, the leadership?

5      A.  I can't remember the leader's name.

6      Q.  Tom, this was a citizen group, right?

7      A.  It was a group of residents who lived

8  fairly close to the site.

9      Q.  All right.  And they were opposed to the

10  development that you proposed?

11      MR. INGRAM:  Objection.  Calls for

12  speculation.

13      Q.  You just said they were in opposition.

14  They were in opposition to the plan that you

15  presented --

16      A.  I'm hesitating --

17      Q.  -- in Exhibit 1 and 2?

18      MR. INGRAM:  Same objection.

19      A.  I think they're -- you said that you --

20  I think they're opposed to everything.

21      Q.  All right.  Start again.  This WARD

22  group, a group of citizens that you met with,

23  after filing Exhibit 1 and 2, were opposed to

24  that application, right?

1          MR. INGRAM:  Objection.  Calls for

2  speculation.

3     A.  Members of that group certainly

4  expressed that in the meetings.

5     Q.  Well, it doesn't call for speculation,

6  Tom, does it?  You were there for hours, weren't

7  you?

8          MR. INGRAM:  Objection.  Asked and

9  answered and now you're getting argumentative,

10  Counsel.

11          MR. SCHUMACHER:  You're objecting as

12  speculative.  I'm asking the witness.

13     Q.  It's not speculative, Tom.  You were

14  present at the meeting.  You heard their

15  opposition to the plan that you had -- the

16  application you'd made, right?

17     A.  I think I answered.

18     Q.  Right, but you heard their -- they

19  were -- you heard their opposition, correct?

20          MR. INGRAM:  Same objection.

21     A.  Yes.  I answered yes.

22     Q.  And that frustrated you, didn't it?

23          MR. INGRAM:  Objection.

24     A.  Are you asking me whether their

1    opposition or their comments frustrated me?

2        Q.  Both.

3        A.  No.

4            MR. INGRAM:  Objection to form.

5        Q.  You're a zoning lawyer, right?  You've

6    done this before.

7        A.  Correct.

8        Q.  You're used to this kind of opposition,

9    aren't you?

10       A.  I'm used to opposition.  I'm not used to

11   getting yelled at for two and a half hours,

12   three hours.

13       Q.  What were they yelling about?

14       A.  I don't remember the exact vitriol,

15   subject matter of the vitriol.  I just remember

16   being -- experiencing it for about three hours.

17       Q.  You mentioned that in one of the

18   hearings that you testified at.

19       A.  Correct, yeah.

20       Q.  In this -- these were citizens of the

21   city of Worthington who were expressing

22   opposition about the application that you made.

23           MR. INGRAM:  Objection.

24       Q.  We're clear on that, right?

1          MR. INGRAM:  Objection to form.

2          You may answer to the extent you can.

3     A.  Yeah, it went beyond that, though.  I

4  mean, they were opposing capitalism and, you

5  know, private property -- use of private

6  property in general.  I mean, they were

7  expressing views that they should be able to use

8  the property for their own purpose.  So it was

9  not just -- you keep asking about, you know, the

10  opposition to the application.  It was more than

11  that.  It was quite philosophical.

12     Q.  Okay.  But there were citizens who spoke

13  at those meetings with you that were opposed to

14  specific items that were in the application,

15  right?

16     A.  Yes.

17     Q.  Like density of apartments, that was

18  raised, wasn't it?

19     A.  I can't sit here today and tell you

20  exactly what they said at that time.

21     Q.  The hundred or so residents who sent

22  emails or questions to Lee Brown, were those

23  people by and large opposed to the application

24  that you made or were they in favor of it?

1          MR. INGRAM:  Objection.  Vague and

2   ambiguous.

3          You can answer to the extent you can.

4      A.  I don't -- I can't give you -- I mean,

5   there was both.

6      Q.  Okay.  And in your experience that's the

7   kind of thing you'd expect, right, residents who

8   are for or against a particular development

9   proposal?

10     A.  Yes.

11     Q.  So the city of Worthington was no

12  different.  There were people who wanted this

13  development as you proposed it in Exhibit 1 and

14  2, and there were people who didn't?

15     A.  Yes.

16     Q.  Were you aware that there were members

17  of city council who were in favor of the

18  application that you had made and those who were

19  opposed to it?

20         MR. INGRAM:  Objection to form.

21  Compound.  Ambiguous.

22     A.  Aware of opposition, yes.  Aware of some

23  who wanted to see the process move forward and

24  there be open deliberations and negotiations

1  and -- you know, like you'd expect with any

2  planned district filing, they wanted a fair

3  process.  You know, that was clear.

4      Q.  Is there any particular member of

5  council that you recall who was against the

6  proposal that you had applied for?

7      A.  Yes.  I mean, I saw social media posts

8  by Mr. Robinson, and then I saw similar items by

9  Mr. Smith.  I mean, I can't tell you exactly

10  when and where, but I knew they wanted a park.

11      Q.  What about members of city council who

12  were in favor of the application that you had

13  filed?

14          MR. INGRAM:  Objection to form.  Is that

15  a question?

16      A.  In favor is a mischaracterization I

17  would say.  I'd say there were people like

18  Bonnie Michael and I forget the other lady's

19  name who wanted the process to go forward and

20  there be, as I said, fair, open deliberations,

21  discussions, you know, the process you'd expect

22  in any municipality.

23      Q.  Okay.  You did have discussions with the

24  municipalities certainly at the two MPC meetings

1    that you attended to make your presentations,

2    right?

3         MR. INGRAM:  Objection to form.

4       A.  I'll answer by saying I don't think

5    they're really discussions in the sense of

6    two-way, you know, feedback and communication.

7    I think they were more me trying to pull out

8    information from them and what -- you know, me

9    trying to -- in the end I tried to force them to

10   work with us.

11      Q.  And you also had the opportunity to meet

12   regularly with and communicate regularly with

13   Lee Brown who was the city planning director,

14   didn't you?

15        MR. INGRAM:  Objection.  Assumes facts

16   not in evidence.

17      A.  I talked and met with Lee on basically

18   housekeeping items.

19      Q.  It's fair to say that you communicated

20   with Lee Brown at least monthly, if not more

21   often, from October of 2020 when you filed your

22   initial application until the time that it was

23   eventually decided by city council in December

24   of '21?

1          MR. INGRAM:  Same objection.

2     A.  There was communication monthly.  There

3  was times we didn't communicate monthly.  There

4  were times we did more than communicate monthly,

5  yes.

6     Q.  Lee Brown sent you a copy of the agenda

7  for the municipal planning commission meetings

8  before they occurred, didn't he?

9     A.  I don't recall.

10                    -=0=-

11          (Hart Exhibit 5 marked.)

12                    -=0=-

13  BY MR. SCHUMACHER:

14     Q.  Have you had a chance to review

15  Exhibit 5?

16     A.  Not entirely.

17     Q.  Oh, sorry.

18     A.  Yes.

19     Q.  Is this an email -- an accurate email

20  exchange between you and Lee Brown, the director

21  of the city of Worthington's planning and

22  building department?

23     A.  Yes.

24     Q.  And this exchange occurred on

1  November 13th, 2020?

2      A.  Yes.

3      Q.  So within six weeks or so of your

4  application you and Tom [sic] were already

5  discussing an agenda for apparently a

6  presentation to the municipal planning

7  commission?

8      A.  I don't interpret it that way.

9      Q.  Oh, how do you interpret it?

10     A.  Looks to me like an agenda for a meeting

11 with their professional staff.

12     Q.  Did that meeting occur?

13     A.  Not sure if it occurred relating to

14 this.  We had meetings with them, but I'm not

15 sure if it occurred related to this email.

16     Q.  Well, those types of meetings that did

17 occur with the city of Worthington are typical,

18 aren't they?  It's the kind of thing you do.

19         MR. INGRAM:  Objection to form.

20         You can answer to the extent you can.

21     A.  I always ask for them.  I always ask for

22 those types of meetings, yes.

23     Q.  But you had them in this case, didn't

24 you, with Lee Brown and his staff?

1      A.  Well, I didn't have any with Matt

2  Greeson who's in here so I'm -- you know, we had

3  meetings with Lee Brown and some of the other

4  staff.

5      Q.  You met with them on traffic, didn't

6  you?

7      A.  We had a separate Zoom call on traffic,

8  yes.

9      Q.  You had a meeting regarding the parks

10  director to talk about trees, didn't you?

11      A.  I don't recall that one.

12      Q.  Do you recall receiving a list of

13  questions from city council about your

14  application?

15      A.  Yes, much later.  I mean, I would say

16  that was right before the council hearing at the

17  end of my involvement.

18                      -=0=-

19              (Hart Exhibit 6 marked.)

20                      -=0=-

21  BY MR. SCHUMACHER:

22      Q.  Have you had a chance to review

23  Exhibit 6?

24      A.  Yes.

1     Q.  Is that a true and accurate copy of an

2  email exchange you had between Lee Brown, the

3  director of city of Worthington planning and

4  building, and yourself between December 3rd,

5  2020 and December 7th, 2020?

6     A.  Yes.

7     Q.  Would you agree that Lee sent you a list

8  of questions from city council concerning your

9  application on or about December 3rd of 2020

10  within a few weeks of your application?

11     A.  I'm not sure.  I mean, there's no

12  attachment.

13     Q.  It says please see attached.

14     A.  Yeah, but I don't know what the

15  attachment is.  But I recall answering those

16  questions in writing, but I don't know when that

17  was.  I think it was much later.  I'm not sure

18  we did that at this time.

19     Q.  Do you see that he's asking you about

20  who at your engineering -- or Lifestyle's

21  engineering company would be reaching out to

22  their traffic consultants and the city engineer?

23     A.  Yes.

24     Q.  That's a normal process when working

1  with a city on an application, isn't it?

2      A.  Yes.

3      Q.  If you look up -- sorry, if you look at

4  the first page, then, you proposed that your

5  team was ready to meet on traffic as of

6  December 7th, 2020, right?

7      A.  Yes.

8      Q.  And you proposed that you schedule a

9  second meeting with the city's park director and

10  arborist about Tucker Preserve and park planning

11  and trees?

12      A.  Yes.

13      Q.  And again, that's a normal process that

14  you would engage in when working with a

15  municipality on an application like Exhibit 1

16  and 2, right?

17      A.  It's a normal expectation you would have

18  to work with them and work through details like

19  that, yes.

20      Q.  So you'd agree with me that at least as

21  of this time the city was working with you on

22  the application, wouldn't you?

23      A.  No.

24      Q.  No?  The city -- you don't think that

1  working with the city on traffic and trees is

2  consistent with the city who's working with you

3  on your application?

4      A.  If they would have done that, but they

5  didn't.

6      Q.  Are you saying that meeting didn't

7  occur?

8          MR. INGRAM:  Objection.

9      Q.  I'm sorry, I didn't let you answer.

10          MR. INGRAM:  Let the witness complete

11  his answer.  And Counsel, you're getting

12  argumentative with him.

13      A.  We had a meeting on traffic.  There was

14  no substance that came out of it.  It wasn't a

15  meeting that moved anything forward or decided

16  anything.  It was purely kind of a form, you

17  know, a meeting to talk about issues that never

18  went anywhere.  No conclusions, no findings, no

19  request from the city to do anything.

20      Q.  Did Lee Brown or anyone from the city

21  staff indicate any problems that they saw with

22  the application that you had made?

23          MR. INGRAM:  Objection to form.  Vague

24  and ambiguous.

1          To the extent you can answer, go ahead.

2     A.  His comments are a matter of record in

3  the staff reports.

4     Q.  You've read his staff report?

5     A.  I did previously.

6     Q.  Did you read it in preparation for your

7  deposition today?

8     A.  No.

9     Q.  You'd agree with me, wouldn't you, that

10  the staff report that Lee Brown wrote points out

11  some of the positive things about your

12  application, doesn't it?

13          MR. INGRAM:  Objection to form.

14          You can answer to the extent you can.

15     A.  To the -- I mean, to the extent I can

16  remember something -- reading something like

17  that years ago, the second -- the second staff

18  report for the resubmittal filing that was done

19  later, it did point out things that have been

20  improved from the first filing.

21     Q.  It also pointed out deficiencies related

22  to the comprehensive plan, didn't it?

23          MR. INGRAM:  Same objections.

24     A.  I don't remember the details of that.

1    Q.  I just want to make sure I understand

2  your answer.  So you don't recall that the staff

3  reports that were written by Lee Brown and

4  staff, you don't recall that they pointed out

5  deficiencies in the application as compared to

6  the city's comprehensive plan?

7    A.  You're asking me about documents that

8  are now, you know, what, two and three years

9  old.  So exactly what was in them, what they

10  said, I can't remember that.

11    Q.  Okay.  We can pull them out, but all I'm

12  asking you is didn't Lee Brown fairly present

13  positive and negative points about your

14  application in his staff review for the

15  municipal planning commission?

16        MR. INGRAM:  Objection.  Asked and

17  answered.

18    A.  You use the word fairly.  I would not

19  agree with that.  I didn't agree with his

20  analysis of the comprehensive plan.

21    Q.  But you do respect Lee Brown as a

22  professional?

23    A.  Of course.

24    Q.  And you've worked with him before and

1  you've worked with him since?

2      MR. INGRAM:  Objection.  Misstates his

3  prior testimony.

4      A.  I worked with him before this when he

5  was at the county.  I don't believe I worked

6  with him since.

7      Q.  Okay.

8      MR. INGRAM:  Counsel, we've been going

9  for about an hour now.  If you get to a point

10  where we could take a break, I would appreciate

11  it.

12      MR. SCHUMACHER:  Let's do it now and

13  I'll get the staff report out.

14      MR. INGRAM:  Okay.

15          (Recess taken.)

16  BY MR. SCHUMACHER:

17      Q.  Did you have a chance to talk to

18  Mr. Ingram at the break?

19      A.  Yes.

20      Q.  You said that you had a chance to review

21  the codified ordinances of the city of

22  Worthington?

23      MR. INGRAM:  Objection.  Misstates his

24  testimony.

1    Q.  Well, I withdraw the question.

2        When you signed Exhibit 1, you indicated

3   that you were familiar or would familiarize

4   yourself with the codified ordinances of the

5   city of Worthington, correct?

6    A.  I would have read the zoning code --

7   part of the zoning code portion of the comp

8   plan.

9    Q.  Well, the application requires you to do

10  that, doesn't it, as the applicant?

11   A.  Not the whole codified ordinances.

12  I'm -- it was a zoning matter.

13   Q.  Okay.  And you were aware of the fact

14  that the city of Worthington has a referendum

15  provision in their code?

16       MR. INGRAM:  Objection.  Assumes facts

17  not in evidence.

18   Q.  He hasn't answered the question yet.

19   A.  To the extent every municipality has --

20  almost every municipality has that, yes.

21   Q.  So you were aware of the fact that the

22  city of Worthington had an ordinance that --

23  actually a charter amendment that would permit

24  citizens to submit any change in zoning to a

1  referendum within 60 days?

2        MR. INGRAM:  Objection.  Calls for legal

3  conclusion.

4     Q.  You're a lawyer, aren't you?

5     A.  I'm generally aware of the referendum

6  law, yes.

7     Q.  And you were specifically aware of the

8  referendum in this particular case, weren't you?

9        MR. INGRAM:  Objection.  There is no

10  referendum in this case.

11     Q.  The referendum provision in the

12  Worthington code.

13        MR. INGRAM:  Objection.  Assumes facts

14  not in evidence.

15     A.  I don't recall whether I actually read

16  that section of the code.

17     Q.  Okay.  So are you telling me that you're

18  not aware of the fact that if your application,

19  Exhibit 1 and 2, were approved by the city of

20  Worthington that it could be subject to a

21  referendum?  Are you telling me you're not aware

22  of that in this case?

23        MR. INGRAM:  Objection to form.

24     A.  No.

1      Q.  So you were aware that if your

2   application had been approved by the city

3   council of Worthington in December of '21 that

4   it could be subject to a referendum?

5      A.  Yes.

6      Q.  And Lifestyle was aware of that, too,

7   weren't they?

8          MR. INGRAM:  Objection.  Calls for

9   speculation.

10     A.  I would guess so.

11     Q.  Well, you know that they were aware of

12  the referendum provision in the code, don't you,

13  Tom?

14         MR. INGRAM:  Same objection.

15     A.  Every developer is generally aware of

16  referendum law, correct, yes.

17     Q.  They retained a consultant to advise

18  them on how to beat a referendum in this case,

19  didn't they?

20         MR. INGRAM:  Objection.  Assumes facts

21  not in evidence.

22     A.  I have no knowledge of that.

23     Q.  Okay.  So you're not aware of the fact

24  that they hired a communication company called

1  Griffin in October of 2019 to assist them in an

2  effort to deter a referendum attempt?

3      MR. INGRAM:  Same objection.

4      A.  I don't remember being involved in that,

5  and don't know why they hired a communications

6  firm.

7      Q.  All I'm asking you is were you aware of

8  the fact that this developer in this case had

9  hired a consultant to assist them in deterring

10  an anticipated referendum attempt if your

11  application were approved?

12      MR. INGRAM:  Objection.  Asked and

13  answered.

14      A.  Yeah, that's not something I was

15  involved in.

16      Q.  That's all I want to know.

17      A.  Yeah.

18      Q.  But were you aware of the fact that

19  they'd done that?  That's my question.

20      MR. INGRAM:  Same objection.  Asked and

21  answered now for the third straight time.

22      A.  I don't remember exactly, you know, if I

23  knew about their hiring of Griffin, but I

24  certainly didn't know what they were hired for.

1    I didn't know what -- if you're -- you keep

2    asking me about was -- you know, were they hired

3    to do deal with the referendum.  I don't know

4    that.  I wasn't involved in that.

5        Q.  Okay.  Do you know the firm -- the

6    Griffin firm?

7        A.  I know of the firm.

8        Q.  Have you worked with -- I mean, have you

9    worked with them before?

10       A.  No.

11       Q.  Have you seen any of the reports that

12   they completed in 2019 about this issue?

13       A.  I don't think so.  I don't remember

14   that.

15       Q.  But it's not unusual in your experience

16   that a developer would retain such a consultant

17   to assist them in winning a political fight over

18   something like a referendum, right?

19           MR. INGRAM:  Objection.  Calls for

20   speculation.  Incomplete hypothetical.

21       A.  I've worked for a lot of developers.

22   It's pretty -- that would be rare that they

23   would hire somebody, you know, to -- before

24   filing an application they hire somebody to deal

1    with the referendum.

2        Q.  Let me ask you this question then.

3    Knowing what you knew in 2020 when you filed

4    this application, wouldn't you expect a company

5    like Lifestyle Communities to do that, to retain

6    a consultant to deter a referendum?

7            MR. INGRAM:  Objection.  Calls for

8    speculation.  Incomplete hypothetical.

9            You can try to answer this if I can.

10       A.  I don't know.

11       Q.  All right.  So all I want to know is

12   when you're testifying in front of this jury

13   you're not aware of whether Lifestyle --

14   withdraw that.

15           Would you agree with me that in 2020

16   when you filed this application you knew that

17   there was strong public opposition to the

18   Lifestyle Communities' plan?

19           MR. INGRAM:  Objection.  Asked and

20   answered earlier this morning several times.

21       A.  I think that's right.

22       Q.  But you were aware of that, weren't you,

23   that there was strong opposition in the

24   community?

1        MR. INGRAM:  Same objection.  It

2  misstates this witness's prior testimony.

3     A.  You keep saying at the time I filed.

4  Okay.

5     Q.  Yeah.

6     A.  The opposition became clear after that.

7  The opposition that I was involved in became

8  clear after that, not before I filed.

9     Q.  Okay.

10     A.  I didn't have public meetings with

11  people before I filed.

12     Q.  Okay.  Did you know that council

13  president Robinson introduced an idea to either

14  do away with or revise the comprehensive plan in

15  September of 2020 just weeks before you filed

16  your application?

17     A.  You're asking me was I aware of it then?

18     Q.  Yes.

19     A.  I'm not sure.  I'm not remembering when

20  I knew that.  I definitely know about it, but

21  when I became aware of it is -- he tried to do a

22  lot of things, I mean.

23     Q.  And as an elected official he had every

24  right to express his opinion as an elected

1  official, doesn't he?

2      MR. INGRAM:  Objection.  Calls for legal

3  conclusion.

4      Q.  Does he?

5      MR. INGRAM:  Same objection.

6      Q.  Doesn't he?

7      MR. INGRAM:  Same objection.

8      A.  Any councilmember has a right to say

9  what they believe.

10      Q.  Thank you.

11      Lee Brown advised you in September of

12  2020 that city council had been considering

13  revising their comprehensive plan?

14      A.  I don't remember, you know, the timeline

15  of a discussion like that.

16      Q.  Your plan was not to file this

17  application, Exhibit 1 and 2, until November or

18  December of 2020, right?

19      A.  I wouldn't agree with that.  I don't

20  know.  I don't know what you mean.

21                    -=0=-

22          (Hart Exhibit 7 marked.)

23                    -=0=-

24

1    BY MR. SCHUMACHER:

2        Q.  Have you had a chance to review

3    Exhibit 7?

4        A.  Yes.

5        Q.  Who is Randy Arndt?

6        A.  I know him as an Ice Miller attorney who

7    I believe at the time was representing the

8    children's home.

9        Q.  UMCH?

10       A.  Yes.

11       Q.  You knew that you needed a signature

12   apparently on the application from the actual

13   property owner at that time, right?

14       A.  Yes.

15       Q.  Looks like you were scurrying quickly to

16   get that done on the same day, right?

17           MR. INGRAM:  Objection.  Misstates the

18   document.

19           MR. SCHUMACHER:  Let's let him describe

20   the document, Counsel.

21           MR. INGRAM:  Same objection.

22       Q.  You say, Randy, I followed up with calls

23   to your office and cell now just in an effort to

24   touch base in this matter.  Please give me a

1    call at your earliest convenience.

2        A.  Well, I'll tell you that I don't agree

3    with your comment scurrying.  I mean, that's a

4    little much.

5        Q.  Well, you heard from Tom -- from Lee

6    Brown that council had been considering amending

7    the comprehensive plan in September, right?

8        A.  I'm not sure about that.  I don't

9    remember that.

10       Q.  Okay.  Fine.  And despite the fact that

11   you wrote to Lee Brown that you intended to file

12   the application in November or December, you,

13   after learning that city council might amend the

14   comp plan, worked as quickly as possible to get

15   signatures on your application and file it by

16   October 2nd?

17           MR. INGRAM:  Objection to form.  Assumes

18   facts not in evidence.  Compound.

19       A.  No.

20       Q.  That's what happened, isn't it?

21           MR. INGRAM:  Same objections.

22       A.  No.

23       Q.  Okay.  So when you wrote at the bottom

24   of page 2 that based on your developing legal

1 position and the property rights involved, it

2 has become essential at this time that we are in

3 a position to file our applications timely and

4 as necessary at our discretion.  That's what you

5 wrote?

6      A.  Your question is did I write that?

7      Q.  Yes.

8      A.  Yes, I wrote that.

9      Q.  And you believed it at that time, didn't

10 you?

11      A.  What I was trying to do is get Randy to

12 pay attention to this and return my call and

13 sign -- get an application signed.

14      Q.  And you needed to do that to protect

15 your legal position and property rights?

16          MR. INGRAM:  Objection.  Calls for legal

17 conclusion.

18      A.  There's a process internally with any

19 developer when you work on an application,

20 especially one that thick, where you do all the

21 work, they spend all the money, and you decide

22 you're going to file.  When you file -- when you

23 decide you're going to file, you want to make

24 the next filing deadline because that puts

1  you -- you know, their deadlines are typically

2  monthly, really, in any municipality.  I believe

3  Worthington's the same.  So you file by date

4  certain, gives you a hearing by date certain.

5          So I am regularly in the process of

6  trying to get a property owner or, you know,

7  somebody else's lawyer, a seller's lawyer who my

8  clients are in contract with to file these

9  applications, and it typically is a fire drill

10  at the end in every case, and I don't see this

11  one any different.

12      Q.  But you don't always write that you're

13  doing so in order to protect your client's

14  developing legal position and property rights,

15  do you?

16      A.  Do I -- are you asking me do I always

17  write that?

18      Q.  Do you often write that?

19      A.  There are times when I use that kind of

20  phrase, yeah.  They're definitely --

21  definitely -- do I need to create a sense of

22  urgency to get sellers' lawyers to understand my

23  deadlines in my world of zoning and timing and

24  hearings and application requirements, yes.

1    Q.  But based on what you knew and learned

2    from Lee Brown about the city council's

3    intention to reconsider its own comprehensive

4    plan, you wanted to get this application filed

5    in order to protect your client's legal rights,

6    didn't you?

7         MR. INGRAM:  Objection.  Asked and

8    answered several times now, Counsel.

9    Q.  I just want to know what you're going to

10   tell the jury.

11        MR. INGRAM:  And he's already answered

12   that multiple times.

13   A.  A rather compound -- can you maybe read

14   the question again or ask it -- there were a

15   couple questions in there.

16   Q.  You did know about city council's

17   attempt to reconsider their comprehensive plan

18   in September of 2020.  We talked about that,

19   right?

20        MR. INGRAM:  Objection.  Misstates the

21   prior testimony.

22   Q.  It's a simple question, Tom.  Did you

23   know about that or not?

24   A.  No.

1    Q.  Did Lee Brown tell you or not?

2    A.  No, I don't think he did.

3    Q.  So if Lee Brown testifies that he told

4 you that city council had been reconsidering the

5 comprehensive plan, that's not true?

6       MR. INGRAM:  Objection.  Argumentative.

7 Asked and answered.  Time to move on, Counsel.

8    A.  I'll just say your question is always

9 going back to a specific date and time.

10    Q.  Okay.

11    A.  Lee and I -- there were -- there were --

12 that threat was, you know, stem to stern

13 throughout this whole process the whole time.

14 Robinson was throwing stuff out in social media.

15 Lee and I were talking about it.  If you're

16 trying to paint the picture that like in

17 September right then Lee called me and this made

18 me run and try to get a filing done, I'm

19 saying -- I'm telling you that is not accurate.

20    Q.  Okay.

21    A.  Because your question always goes back

22 to that September date.  Sure, I definitely

23 think Lee and I talked about different things

24 different councilpeople were talking about.

1  Councilpeople talk about everything all the

2  time, but it's not what motivated the filing of

3  the application.  It's not how you're

4  characterizing it.

5      Q.  Do you recall Lee Brown telling you to

6  go back and look at the recent city council

7  meeting in September of 2020?

8      A.  No, I don't remember that.

9      Q.  And do you recall telling him that you

10  would do that?

11      A.  No, I don't remember it.

12      Q.  And -- okay.

13          The application, Exhibit 1 and 2, was

14  eventually considered at the municipal planning

15  commission meeting on January 14th, 2021?

16      A.  You're asking about the initial

17  application or the resubmittal?  I'm unclear.  I

18  just want to get the right date.

19      Q.  I'm sorry.  I jumped ahead.  Yes.  In

20  September of '21 you revised Exhibit 1 and 2

21  somewhat.

22          MR. INGRAM:  Objection to form.  Is

23  there a question pending?

24      Q.  Do you recall submitting a revised

1    concept plan to the city of Worthington in

2    September of 2021?  I'm sorry.  Yeah, September

3    of 2021?

4        A.  Yeah, the dates -- I remember the

5    resubmittal.  The dates are -- I would take your

6    word for it if you have a document that says

7    that date.

8        Q.  I'm going to hand you what we'll mark as

9    Exhibit 8.

10                        -=0=-

11              (Hart Exhibit 8 marked.)

12                        -=0=-

13          MR. INGRAM:  Counsel, there is a lot of

14    exhibits going back and forth.  What is being

15    marked as Exhibit 8?

16          MR. SCHUMACHER:  This document.

17            (Discussion off the record.)

18    BY MR. SCHUMACHER:

19        Q.  Have you had a chance to review

20    Exhibit 8?

21        A.  Yes.

22        Q.  And the third page of that is your

23    letter submitting a revised concept plan to the

24    city of Worthington?

1      A.  Yes.

2      Q.  And attached to that is a portion of

3  that revised plan, isn't it?

4      A.  Yes.

5      Q.  Your letter at page 3 of the document

6  indicates that as discussed the applicant wishes

7  to present this revised concept site plan at the

8  October 14th Worthington planning commission,

9  right?

10      A.  Yes.

11      Q.  Did you have discussions with Lee Brown

12  about this application prior to writing this

13  letter?

14      A.  I believe so.  I don't remember exactly

15  when, but it appears that I did.

16      Q.  You revised the plan for your client to

17  change the mix and location of uses, right?

18          MR. INGRAM:  Objection to form.

19      A.  It was -- yes, it was -- we were in a

20  team inside the client with professionals,

21  engineers, architects.  The client was a team,

22  wasn't just me.

23      Q.  So you were communicating with people at

24  Lifestyle Communities about modifications to the

1    original application?

2         A.  Correct.

3         Q.  Was that in response to feedback that

4    you had gotten from either your outreach or the

5    community?

6         A.  Not entirely just that, but yeah -- in

7    part, yes.

8         Q.  If I read this correctly, the amount of

9    residential density was reduced from 730

10   residential units to 600?

11        A.  I remember about a 20 percent reduction

12   in residential.

13        Q.  The document that has -- the Bates

14   number at the bottom is Worthington 3250.  Are

15   you on that page?

16        A.  Yes, sir.

17        Q.  The development summary shows that the

18   revised concept plan reduced the amount of

19   residential units to 22 single-family lots, 86

20   three-story townhouses, 72 three-story townhomes

21   flats for rent, and 420 multi-family units,

22   right?

23        A.  Yes.

24        Q.  And if I can do my math correctly,

1 that's 600 residential units.  If you're trying

2 to do math as a lawyer, we have issues.

3     A.  We have issues.

4         That's generally accurate.

5     Q.  No, it is accurate, isn't it?  It's 600

6 residential units.

7     A.  Well, if you're going to make me do the

8 math, I will.

9     Q.  Yeah, I want to make sure that we have

10 an accurate count.

11         COURT REPORTER:  Should we note the

12 witness is writing on the exhibit?

13         MR. SCHUMACHER:  Fine with me.  Thanks

14 for noting that.

15     A.  I get 600.

16     Q.  All right.  So in response to -- or at

17 least partially in response to community

18 feedback your client reduced the residential

19 density from 730 units as originally proposed to

20 600 residential units, right?

21     A.  Yes.

22     Q.  And you testified at hearings that that

23 was about a 19 percent reduction in residential

24 units?

1    A.  Was -- I think it was 19 and change, but

2  yes.  Close to 20.

3    Q.  And you were aware of the fact that back

4  in 2015 Lifestyle Communities had proposed a

5  residential density that was in the range of 530

6  residential units?

7        MR. INGRAM:  Objection.  Asked and

8  answered and misstates this witness's prior

9  testimony.

10    Q.  So you don't -- are you saying you're

11  not aware of the fact that Lifestyle Communities

12  made an informal proposal to a group of citizens

13  like this that proposed 520-some residential

14  units?

15    A.  No.

16        MR. INGRAM:  Same objections.

17    Q.  You're not aware of that?

18    A.  I never looked at the number.

19    Q.  That's fine.

20    A.  There was no reason for me to look back.

21  You know, what was that?

22    Q.  2015.

23    A.  Yeah, almost six years.  Never an

24  application filed.

1     Q.  In all of your community outreach and

2  after listening to the comments of the public at

3  MPC meetings and city council meetings you did

4  learn that many community residents were opposed

5  to the residential density of all of the plans

6  that Lifestyle Communities proposed, right?

7         MR. INGRAM:  Objection.  Calls for

8  speculation.

9     A.  There's 14,000 or so people in the

10  community.  Some of the people we met with were

11  opposed to that.  Some thought it was very

12  positive.

13     Q.  And at the meetings that you attended

14  the vast majority of those who spoke from the

15  public were opposed primarily to the residential

16  density that your client proposed?

17         MR. INGRAM:  Objection.  Calls for

18  speculation.  Ambiguous and --

19         MR. SCHUMACHER:  We'll get to it, don't

20  worry.

21         MR. INGRAM:  -- compound.  If you've got

22  a document, give the witness the document then.

23     Q.  You're the attorney for the applicant.

24  You were aware of those facts, weren't you?

1        MR. INGRAM:  Objection.  Assumes facts

2    not in evidence.

3        MR. SCHUMACHER:  Let him answer the

4    question, Chris.

5    A.  Which question --

6        MR. INGRAM:  Counsel, let me pose my

7    objection.

8        MR. SCHUMACHER:  Okay.  Are you done?

9        MR. INGRAM:  Yes.

10   Q.  Can you answer the question?

11   A.  Which question?

12       MR. SCHUMACHER:  Could you read the

13   question back?

14       (Record read back as requested.)

15       MR. INGRAM:  Same objections.

16   A.  There were lots of different reasons

17   that people expressed opposition, many different

18   reasons.

19   Q.  We'll do it that way.  If you could look

20   at Exhibit 59.  Before we get going, let me just

21   ask you this about Exhibit 59.  Is that a

22   document you reviewed in preparation for your

23   deposition today?

24   A.  No.

1      Q.  Is that a meeting that you -- you

2   mentioned watching a video of a meeting.  Is

3   that one of the meetings that you watched?

4      A.  Let me see.

5         MR. INGRAM:  Counsel, if you could give

6   him an opportunity to review Exhibit 59.

7         MR. SCHUMACHER:  I know.  He's doing

8   that.

9      A.  Could you repeat the question.  I'm

10  sorry.

11     Q.  Is this one of the meetings that you

12  said you reviewed, in preparation for your

13  deposition, on video?

14     A.  Yes.

15     Q.  Do you believe that this is a true and

16  correct copy of the minutes of the regular

17  meeting of the Worthington Architectural Review

18  Board and municipal planning commission on

19  January 14th, 2021?

20        MR. INGRAM:  Counsel, if he could have

21  enough time to review the exhibit before you

22  start asking questions.

23     Q.  You can read every page if you'd like.

24     A.  Could you go back to that question?

1                    (Record read as requested.)

2       A.  Yes.

3       Q.  Do you stand by the comments that you

4  made during this meeting and that you reviewed

5  on the video?

6       A.  Yes.  I think they speak for themselves.

7  The testimony is what it is.

8       Q.  Okay.  Thank you.

9            If you could turn to Exhibit 83.  Have

10  you had a chance to review Exhibit 83?  Is that

11  a true and accurate copy of the minutes of the

12  meeting of October 14th, 2021 that you attended?

13       A.  Yes.

14       Q.  Would you stand by the statements that

15  you made at that meeting?

16       A.  Yes.

17       Q.  And do you recall hearing the comments

18  from the members of the municipal planning

19  commission as well as the members of the public

20  who spoke?

21       A.  I will admit on the record that when I

22  listened to the tape again, I fast forwarded

23  some of that.

24       Q.  You skipped over all of the negative

1    comments that you received for your proposal.

2    Is that what you're telling me?

3          MR. INGRAM:  Objection to form.

4      A.  I didn't say all.

5      Q.  Well, you didn't want to relive it.  Is

6    that what you're saying?

7          MR. INGRAM:  Same objections.

8      Q.  That's a question.  You didn't want to

9    relive that, Tom, did you?

10     A.  Fair -- fair question.

11     Q.  Now, you were told specifically by

12    members of the MPC that, quote, Tom and Bo, I

13    have met with both of you on multiple occasions.

14    Bo, I have met with your predecessor.  This is

15    Mr. Myers speaking.  You remember that comment?

16          MR. INGRAM:  Counsel, you're reading off

17    the document.  Can you point to where?

18     Q.  This is a transcript that I prepared

19    from the video recording, and I'm asking you do

20    you recall that comment by Mr. Myers?

21     A.  Generally I remember Scott -- you know,

22    kind of the thrust of his comments.

23     Q.  Do you remember him saying for the last

24    seven years I believe I have tried to be very

1  straightforward and blunt and direct and

2  consistent in what I thought Worthington wanted

3  from this development?  Do you recall that

4  comment, that type of comment from Mr. Myers on

5  October 14th, 2021?

6      A.  You're asking me do I remember him

7  saying that?

8      Q.  Yeah.

9      A.  Yes.

10      Q.  Do you remember him telling you that one

11  thing that they've asked from you repeatedly,

12  meaning you and your client, is that they've

13  never been able to get an answer to is what are

14  the economics of this?  Do you recall him

15  bringing that up?

16      A.  I'll answer by saying that was the

17  questions we were asking them as well.

18      Q.  Well, didn't he tell you that when you

19  first presented the project to us there were

20  certain -- a certain number of apartments and

21  now that's ballooned?  You remember him saying

22  that?

23      A.  I don't remember him specifically saying

24  that.

1    Q.  Okay.  What are the economics, Tom?

2         MR. INGRAM:  Objection to form.

3   Ambiguous.

4         To the extent you can answer, you may do

5   so.

6    Q.  As we sit back in October of '21 and

7   you're at that meeting, what did you know about

8   the economics of the proposal when it came to

9   the density of apartments that Mr. Myers was

10  raising?

11        MR. INGRAM:  Same objection.

12   A.  What I knew about the economics was from

13  outreach I did with, you know, sources in the

14  commercial real estate industry, particularly

15  the folks I know at Colliers, and you know,

16  about office and about what it takes to attract

17  office.  And you know, this -- and I believe I

18  said this to Worthington in testimony.  This was

19  office-mageddon, this was post COVID, extremely

20  challenging office environment.  This had never

21  been a class A office site in the view of the

22  market, in the view of people like me, people

23  like Colliers, you know, people like Lifestyles.

24        I knew the economics of the site were

1   that residential had to lead people back to

2   offices, residential mixed use, vibrancy,

3   restaurants, entertainment spaces.  There had to

4   be something more than just building an office

5   to make the project successful.  We wanted this

6   project to succeed.  Some of the greatest

7   satisfaction I have in my life professionally is

8   seeing projects I work on succeed.  That was my

9   job.  That's what Worthington's comprehensive

10  plan calls for.  They don't want something there

11  that would fail.

12          So the key economic point that you're

13  asking me and I'll tell you is residential had

14  to lead.  Now, what quantum of residential would

15  bring those people back into an office where

16  people could live, work, play, the typical mixed

17  use environment we probably talked about ad

18  nauseam, Kingsdale, Grandview Yard.  You know,

19  you can go around the horn and see this in many

20  different forms and examples, scales and sizes.

21  We tried to ask them over and over and over

22  again what they thought would work.  We wanted

23  to get to that point.  We wanted to get to the

24  sweet spot of what can they accept, what do they

1   think will work, what we think -- what we think

2   in the market.  That was the very nature of this

3   filing.  It was a planned district filing.

4   Planned district law in Ohio you expect

5   negotiation, you expect true, fair back and

6   forth deliberation.  We never got that.  They

7   would never -- they would never tell us a

8   number.  They would never even hint at what they

9   as a professional municipal staff or council

10  leaders would find acceptable.

11          It's ironic that Scott did that and

12  asked that question because that was our

13  question.  And it was a little bit, you know,

14  cagey on his approach to ask that question,

15  because that was a question we continually asked

16  them and tried real hard to get to, and they

17  would never answer that.

18          So, you know, the second filing we did

19  was a shot to try to introduce -- you know, to

20  show movement, to increase the office, to

21  increase the commercial, to lower the

22  residential, to put the density where the comp

23  plan called for density on High Street, to put

24  the residential behind that.  We almost hid the

1    residential behind, you know, to make it less

2    dominant, less prominent than the commercial,

3    the office, the inviting restaurant spaces, and

4    they just wouldn't work with us.

5           I've been doing this 25 years.  You have

6    an expectation to go into a community, read

7    their comprehensive plan, understand what they

8    want and deliver it.  That's our job, but -- and

9    we did.  That's exactly what we did.  And the

10   second plan was better after we got feedback,

11   but they would never tell us.

12          And Scott's question positioning like we

13   were the ones not divulging something was --

14   was -- smart guy, good guy, but it was

15   sophistry.  And after all that work and all that

16   time it was -- that was tough.  That was tough

17   to be told we will only deal with you in the

18   public planning commission process and then told

19   in that process we're not going to deal with

20   you.

21          So I guess that's my -- what I know

22   about economics is we were searching and

23   pleading with them to sit down with us on the

24   economic question itself.  We had to have that

1  project succeed.  They had to have the project

2  succeed.  That's what we were trying to get to.

3  They never worked with us.

4      Q.  Well, we've discussed this a few times

5  already, but you knew that there was opposition

6  to the density of residential units that were

7  posed by Lifestyle all along.  Can't we agree on

8  that?

9          MR. INGRAM:  Objection.  Asked and

10  answered.

11      A.  Yeah.  I mean, that would be opposition

12  to their comp plan itself which there are many

13  people opposed to that, but the comp plan said

14  residential density on that site, especially in

15  the High Street -- the High Street Edge, that

16  High Street area.

17      Q.  And Lifestyle knew that there was

18  political opposition to the comp plan itself,

19  didn't they?

20          MR. INGRAM:  Objection.

21      Q.  That was adverse to change it.

22          MR. INGRAM:  Objection.  Calls for

23  speculation.

24      A.  I mean I knew --

1      Q.  I'm not asking to speculate.  I'm asking

2  if you knew.

3      A.  Yeah.  What I knew is like the

4  Smith/Robinson stuff that they put out in social

5  media, that they wanted it -- all through this

6  whole process they were trying to change the

7  comp plan.

8      Q.  Where do you live?

9      A.  Bexley.

10     Q.  Okay.  But you were clearly aware that

11  there were elected members of council who were

12  representing their constituents in opposing a

13  high density apartment complex on this site, and

14  that was apparent, wasn't it?

15         MR. INGRAM:  Objection.  Asked and

16  answered numerous times today, Counsel, and

17  misstates the evidence and his prior testimony.

18     A.  I mean, I do think I answered that a

19  bunch.

20         MR. SCHUMACHER:  Can you restate the

21  question, Julia.

22         (Record read back as requested.)

23         MR. INGRAM:  Same objections, and

24  assumes facts not in evidence.

1      Q.  You are aware of that, Tom?

2      A.  I'll just say that again there were

3  14,000 people in that community.  I had a lot of

4  people contact me who lived there who wanted

5  restaurant choices, who wanted the possibility

6  of different -- you know, a lot of people want

7  to downsize into an apartment and rent.  A lot

8  of people want a smaller townhome they can own.

9  We had all kinds of people coming at us who

10  weren't, you know, showing up to meetings

11  telling us go, go, you know, this is great.

12  This is vibrant.  We don't want to have to drive

13  out of our town to have mixed use vibrancy.

14      Q.  That's not my question.  My question is

15  whether you were aware at the time that there

16  were politicians in the city, elected

17  representatives, who were advocating for a

18  development not as dense as yours?

19          MR. INGRAM:  Objection.

20      Q.  That's all I'm asking you.  You were

21  aware of that?

22          MR. INGRAM:  Objection.  First of all,

23  let him finish his answers before you ask --

24  reask the same question.  Same objections as

1    before to this question.

2        A.  Just to finish, I mean, we knew that a

3    couple members of council wanted a park and

4    really no development.  We knew that there were

5    people that were -- you know, supported that

6    position.  We also knew there's 14,000 other

7    people there who lots of people contacted us who

8    wanted exactly what we were proposing and wanted

9    the comp plan enacted.

10       Q.  Do you have a list of those people

11   anywhere?

12       A.  There's probably a bunch of contacts for

13   them back at Isaac Wiles in emails, yeah.  I

14   mean, I don't have them, no.

15       Q.  How would I get those?

16       A.  Some of it would be email.  Some would

17   be some of the -- some of the community meetings

18   I did.  We had people in those community

19   meetings saying that.  Some of it you could get

20   by talking to the same people in that

21   Worthington business group, some other

22   businesses we talked to.  It would be from a

23   variety of sources, but it was throughout that

24   whole project.

1    Q.  You understand that these 14,000 people

2  were represented by a seven member elected city

3  council?

4    A.  Yes.

5    Q.  And in your experience as a zoning

6  lawyer you understand that politicians try to

7  represent their constituents in different ways?

8       MR. INGRAM:  Objection.  Calls for

9  speculation.  Incomplete hypothetical.

10    A.  What I'll tell you is I'm -- I'm a

11  student for a quarter century of comprehensive

12  plans.  And the comprehensive plan in most

13  communities is the essence of what the community

14  wants and their aspirations for development and

15  future growth, and you know -- and in this case

16  for a specific site which is pretty rare that a

17  comp plan gets this detailed.  So I think it was

18  after about a year of their process to come

19  up -- which isn't unusual.  Most comp plans with

20  all the outreach they do take that long.  They

21  came up with a comp plan, and we filed

22  applications that met it.  So you know, the

23  expectation is you file an application that

24  meets the comp plan, you're going to get --

1  you're going to have a very good chance and

2  should get an approval of that development plan

3  based on the comp plan filing, based on what the

4  comp plan says.  And it's the comp plan that

5  represents not only just the sitting council's

6  viewpoints, but like the whole community over a

7  longer period of time no matter who's in office.

8  The comp plan speaks for the community's

9  aspirations on development.  So it goes beyond

10  just whoever's elected at the time.

11       So I think the comp plan's more

12  important, especially here in Worthington

13  because the zoning code says you zone based on

14  the comp plan which is also pretty unusual.  So

15  I would -- you know, this thing about

16  councilmembers, I mean councilmembers come and

17  go.  That comp plan's been there for -- I think

18  it started in '05.

19       Q.  You'd agree with me, though, that at

20  least at this October 14th, 2021 meeting all of

21  the members of the public who did speak were not

22  in favor of your proposal?

23       A.  No, I don't agree with that.

24       Q.  But the record speaks for itself.  You

1   agree?

2      A.  (Nods head).

3      Q.  Okay.  Back to Exhibit 59 for just a

4   moment.  Flip to page 47 of 58.  You see at the

5   bottom or near the bottom it says, Mr. Colter

6   said they would open the discussion to hear from

7   the 9 to 11 people to signed up to speak?

8      A.  Yes.

9      Q.  And you were there when these people

10  spoke?

11     A.  Well, it was Zoom, I believe.

12     Q.  Yeah, but you were listening to it?

13     A.  Yes.

14     Q.  You can, if you'd like, to read the

15  comments from those people, but I would ask you

16  would you agree that all of them were, who spoke

17  at this public meeting, against or in opposition

18  to the plan that you proposed?

19     A.  Without going through and reading, I

20  mean, we had people that came to these hearings

21  that weren't opposed that wanted -- that

22  specifically said we want the community to work

23  with you.  So whether it was all, I can't say

24  without reading them all.

1      Q.  It's a democratic process.  If you want

2  to speak, you speak.  All I'm asking you -- you

3  can read these if you'd like, but I'm -- please

4  do.  But every one of these people spoke in

5  opposition to your application.

6          MR. INGRAM:  Objection.  Asked and

7  answered.

8      Q.  Go ahead.  Read them all.  It's your

9  deposition.

10      A.  I think the record -- the record of what

11  they said would speak for itself.

12      Q.  Okay.  Fine.  All right.  Thank you.

13          After you made the presentation to the

14  MPC on January 14th of 2021 that we just looked

15  at in Exhibit 59, you could have withdrawn the

16  Lifestyle application, couldn't you?

17      A.  Yes.

18      Q.  You could have amended it further,

19  couldn't you?

20      A.  We tried to.

21      Q.  Right.  And that was --

22      A.  But we weren't able to.

23      Q.  Well, you did.  You did in September

24  when you submitted the revised concept plan that

1  we just marked I think as Exhibit 8?

2       MR. INGRAM:  Objection.  Misstates the

3  evidence in this case.

4       A.  I'm being technical, okay, as a zoning

5  attorney.  Our attempt at amendment was not

6  allowed; so no, we didn't amend it.  We tried

7  to.

8       Q.  Did you submit a revised concept plan on

9  September 10th, 2021 to Mr. Brown?

10      A.  Yeah, that was rejected in the hearing.

11      Q.  But you submitted it in September is my

12  point?

13      A.  Yeah, but it didn't get amended.

14      Q.  And then on October 14th, 2021 it was

15  considered in the meeting that we just

16  discussed?

17      A.  Yes.

18      Q.  And the recommendation was denial?

19      A.  Well, no, that's not what happened.

20      Q.  What happened?

21      A.  They rejected our attempt -- our

22  request.  There was no motion; so it was

23  rejected to amend the filing.  What they

24  approved -- what they recommended denial for was

1    the original application.  They would not

2    cooperate with us enough to allow us to put an

3    improved plan through the hearing process.  They

4    wouldn't let us amend it.  So when they made

5    their recommendation was on the original

6    application.

7         Q.  You're suggesting that the original

8    application was the 730 --

9         A.  Correct.

10         Q.  -- residential units?

11              You do recall Mr. Faust saying that he

12    wanted to avoid doing anything further and

13    really wanted to start a whole new process?

14         A.  I don't remember exactly what he said.

15    I do remember him speaking and something along

16    those lines.

17         Q.  Let's clean the slate and start over?

18         A.  That's your characterization of what he

19    did.

20         Q.  Isn't that what he said at the meeting?

21         A.  What he did at the meeting was make it

22    clear that he did not believe they should allow

23    us to amend the application.  When you combine

24    that with the fact that later on they told us we

1    couldn't apply for another six months --

2        Q.  Whoa, whoa, whoa.

3        A.  Well, I mean, it's all -- the whole

4    thing felt like the fix was in and we were

5    just -- we were just going through, you know, a

6    penalty phase of our relationship with them.

7        Q.  Well, the process that we discussed

8    early this morning was that you make a

9    presentation to the municipal planning

10   commission and they give a recommendation to

11   city council, right?

12       A.  Again, I'll answer by saying in 25 years

13   I don't think I've ever had a jurisdiction tell

14   us we couldn't amend our application and, you

15   know, move forward to deliberations on something

16   that we felt was better after we got feedback.

17   That was very unusual.  It was not the normal

18   course.  I didn't see them doing that with any

19   other applicant, and I haven't seen it in my

20   practice generally.

21       Q.  So again, the application that was

22   presented on October 14th, 2021 to the municipal

23   planning commission was the process that was

24   outlined in the zoning code of the city of

1  Worthington, isn't it?

2       MR. INGRAM:  Objection.  Asked and

3  answered.

4     A.  I'd have to read the code to understand

5  like what their -- what their code says about

6  requested amendments.  I don't have that in my

7  head.

8     Q.  But you're not disputing the fact that

9  Worthington went through the process outlined in

10  their code in dealing with your application, are

11  you?

12       MR. INGRAM:  Objection.  Misstates his

13  testimony.

14     Q.  You can sit in one chair or the other,

15  but not both.

16     A.  I don't know.

17     Q.  All right.  You don't know.  You're not

18  familiar enough with the zoning code of the city

19  of Worthington to know whether or not they

20  followed their process?

21     A.  Most codes have -- some codes have

22  specifics about an amendment, you know, when an

23  applicant attempts to amend.  So whether they

24  followed their code on that, I don't know.

1     Q.  You do know that that application was

2  eventually considered at the December 13th, 2021

3  city council meeting which you attended?

4     A.  The original application, not the

5  amendment, not what we tried to amend, yes.

6     Q.  And council voted on that application?

7     A.  I recall that, yes.

8     Q.  You spoke at the meeting?

9     A.  Yes.

10     Q.  And members of the public spoke at the

11  meeting?

12     A.  I believe so.

13     Q.  And the vote was unanimous to deny the

14  application?

15     A.  I think that's correct.

16     Q.  Under the Worthington --

17     A.  I'm not sure it was unanimous.

18     Q.  It was.

19     A.  Okay.

20     Q.  Under the Worthington code -- I'll show

21  it to you.  Under the Worthington code, your

22  client, the applicant, would have six months

23  from the date of the MPC denial to reapply.

24  Would you agree with me?

1        MR. INGRAM:  Objection.  Are you going

2  to show the witness what you said you were going

3  to show him?

4      Q.  The zoning code that you said you were

5  familiar with?

6      A.  Well --

7        MR. INGRAM:  You just said I'll show

8  you, Counsel.

9        MR. SCHUMACHER:  I'm going to show him

10  the minutes of the meeting.  I'll get there in a

11  minute.

12      A.  It's hard -- okay.

13        MR. INGRAM:  Objection to your prior

14  question.  It calls for a legal conclusion.

15      Q.  Let's make sure we understand each

16  other.

17      A.  Yeah.

18      Q.  You were aware of the fact that if your

19  application was denied at the MPC under the city

20  of Worthington's code, you could reapply six

21  months from that date?

22        MR. INGRAM:  Objection.

23  Mischaracterizes the evidence.

24      A.  The issue is what exactly does that code

1  say.  I can't tell you what it says.  Some codes

2  say six months exact -- six months, and they

3  make a distinction with the exact same

4  application.  You can't file the exact same

5  application.  Some codes say you can't file on

6  the site itself.  Some codes don't specify.  I

7  don't know what theirs says.  I just know they

8  tried to take the position that we couldn't

9  reapply, we had to wait six months, which I'm

10  not sure that was accurate, and I'm just saying

11  I don't know exactly what the code says.

12                      -=0=-

13            (Hart Exhibit 9 marked.)

14                      -=0=-

15  BY MR. SCHUMACHER:

16     Q.  Have you had a chance to review

17  Exhibit 9?

18     A.  Yes.

19     Q.  Does that refresh your recollection of

20  your communication with Mr. Fisher about this

21  Section 1145.05 of the waiting period of the

22  city of Worthington code?

23         MR. INGRAM:  Objection to form.

24     A.  Yeah, I don't know Mr. Fish -- the

1    Mr. Fisher you're referring to.

2         Q.  I'm sorry, Mr. --

3         A.  Brown.

4         Q.  I was thinking of Lee Fisher.

5         A.  Yeah, I know him.

6         Q.  Lee Brown, yes.

7         A.  I see the communication between myself

8    and Lee Brown.

9         Q.  All right.  This was the day after your

10   presentation to the MPC on October 14th, 2021,

11   isn't it?

12        A.  Yes.

13        Q.  Your application was met with both

14   public opposition and opposition from the MPC,

15   wasn't it?

16        A.  Yes.

17        Q.  And MPC voted to recommend denial of the

18   application to city council?

19        A.  They first would not amend our

20   application, and then they recommended denial on

21   the original 2020 application.

22        Q.  Actually, they wouldn't table your

23   application, right?

24        A.  Well, we first requested them to amend

1  our application.  I mean, I think the record's

2  real clear on that.  I remember that was our

3  goal.  We wanted the updated plan to be

4  considered moving forward with more hearings.

5  They first rejected that, and then the tabling

6  was for us to allow to continue with the new

7  resubmittal.

8      Q.  And so the day after that happened Lee

9  Brown -- you asked what code provision is going

10  to govern the timing or timing limitation on

11  refiling that he referenced that night before?

12      A.  What was your question?  Was that just a

13  statement?

14      Q.  Apparently the night before Lee

15  mentioned to you this refiling time deadline.

16          MR. INGRAM:  Is there a question,

17  Counsel?

18      Q.  Didn't that happen or not?

19      A.  I don't remember that.

20      Q.  This email -- all right.  Let's do it

21  this way.

22      A.  Refers to it.

23      Q.  Let's do it this way.  Exhibit 9, sir,

24  is a true and accurate copy of an email exchange

1  between you and Lee Brown on October 15th, 2021,

2  isn't it?

3       A.  Yes.

4       Q.  And he tells you that Section 1145.05 is

5  where this six-month waiting period is located?

6       A.  Yes.

7       Q.  Did you review it at that time?

8       A.  Likely.

9       Q.  Did you advise your client that you

10  could refile a different application with the

11  city of Worthington by April 14th, 2022?

12          MR. INGRAM:  Objection.  This question

13  calls for --

14       Q.  I'll withdraw the question.

15          Tom, did you know at that point that

16  under the code you could file a new application

17  after April 14th, 2022?

18       A.  Without looking at that section right

19  now, I don't know because those sections say

20  different things in different places.

21          MR. INGRAM:  Counsel, I'll note it's

22  12:37.  We've been going another hour and it's

23  lunchtime.

24          MR. SCHUMACHER:  Let's finish this.

1   BY MR. SCHUMACHER:

2       Q.  You're welcome to read the ordinance

3   that's currently posted on the website, if I

4   pulled the right one.  I think it's 1145.05.

5       A.  I'm sorry, what's your question?

6       Q.  That ordinance would permit you to

7   refile after April 14th, 2022.

8           MR. INGRAM:  Objection.

9       Q.  Six months later.

10          MR. INGRAM:  Objection.

11  Mischaracterizes the evidence.

12      A.  It's hard to say, because -- what they

13  would have done, and it would be speculative,

14  because again, does this mean -- their -- the

15  code's vague.  Does this mean the exact same

16  application?  Does it mean an application with

17  10 fewer units?  I mean, we would have been --

18  and that's always the case when something is

19  this vague.  I mean, an application with 10

20  fewer units would arguably not be the same

21  application.  So I don't know what they would

22  have done.

23      Q.  But --

24      A.  I think that means, I will say, if we

1  filed the exact same application with no changes

2  they probably would have rejected it.  I don't

3  know if we filed one with 10 less apartments

4  what they would have done.

5      Q.  So as you sat in your office on

6  October 15th, 2021 after hearing the public

7  opposition and having been rejected by the MPC,

8  you wondered about when you could reapply

9  because you asked Lee Brown, right?

10      A.  Yes.

11      Q.  Okay.  And you knew at that time that

12  you could simply withdraw the application

13  altogether before it went to city council.  That

14  was an option, wasn't it?

15      A.  Yeah.  It would have been an option,

16  yes.

17      Q.  But instead Lifestyle wanted to stand on

18  its legal rights and file a lawsuit against the

19  city?

20          MR. INGRAM:  Objection.

21      Q.  Were you made aware of that by

22  Lifestyle, by individuals at Lifestyle?

23          MR. INGRAM:  Objection.  Assumes facts

24  not in evidence.  Argumentative.

1      A.  Obviously we didn't know what was going

2  to happen when we went to city council.  So you

3  have to finish an application.  That's a general

4  approach to zoning.

5      Q.  So moving forward, on December 13th,

6  2021 when the application was heard in public

7  before city council and rejected by city

8  council, Lifestyle still had the opportunity to

9  refile a different application within six months

10  of the denial of the MPC.

11          MR. INGRAM:  Objection.

12      Q.  Can we agree on that?

13          MR. INGRAM:  Objection to form and

14  mischaracterizes the evidence and this witness's

15  prior testimony.

16      A.  What I've been trying to say is no,

17  because you don't know if they would have

18  accepted that.  We could have tried something

19  like that, but how -- my point is that code is

20  vague.  It's vague how they would have read it,

21  what they would have done with any application

22  whether it was exactly the same or we tried

23  something a little different.

24          I've been in places where if you file --

1 with a section that is similar where you file a

2 different application and, okay, the staff says,

3 well, this is different.  We got to hear it.

4 Other places they won't let you do anything no

5 matter how different.

6      Q.  But you were at the city council meeting

7 on December 13th, 2021 so you heard the

8 discussion, right?

9      A.  Zoom, yeah.

10      Q.  But you heard it?

11      A.  Yes.

12      Q.  And you participated in it?

13      A.  Yes.

14      Q.  And after that decision was made an

15 option for you and your client was to wait until

16 April of 2021 -- I'm sorry, April of 2022 and

17 file an application that was different than the

18 one that was just rejected?

19           MR. INGRAM:  Objection.

20      Q.  That was that legal avenue for you,

21 wasn't it?

22           MR. INGRAM:  Objection.  Calls for a

23 legal conclusion.  Asked and answered and

24 misstates this witness's prior testimony.  Calls

1   for speculation.

2          You may answer to the extent you can.

3          MR. SCHUMACHER:  Is there anything else?

4      A.  Well, I just -- I mean, after that whole

5   process we went through, we didn't know what

6   they were going to do.

7      Q.  I know.  But it was a legal option,

8   wasn't it?

9          MR. INGRAM:  Same objections.  He just

10  answered the question.

11     A.  It was an option.

12     Q.  Okay.  But instead of that option

13  Lifestyle decided to file a lawsuit in March of

14  2022.  You're aware of that because you read it,

15  right?

16         MR. INGRAM:  Same objections.

17     A.  I just don't know the exact date, but

18  that is -- a lawsuit was filed.

19     Q.  That's what happened.  Okay.

20         And my only question for you about that

21  is, is there anyone other than a lawyer who

22  represented Worthington -- lawyer who

23  represented Lifestyle or its affiliates who told

24  you that that was an option if this was rejected

1   at that city council meeting in December of '21?

2          MR. INGRAM:  Objection.  Vague and

3   ambiguous.  Compound.

4          You can answer to the extent you can.

5      A.  You're asking about the six-month --

6   waiting six months and filing?

7      Q.  No.  I'm asking you whether you were

8   aware that individuals at Lifestyle Communities,

9   not their lawyers, were intent on filing a

10  lawsuit if the application were rejected by city

11  council?

12         MR. INGRAM:  Objection.  Calls for

13  speculation.

14     A.  I didn't see any preconceived -- I mean,

15  it was -- it was -- my job was on the zoning,

16  keep working on it.  See what happens.  I've had

17  many experiences where planning commission says

18  no and council approves.

19     Q.  Okay.  Fair enough.

20         MR. SCHUMACHER:  Why don't we break for

21  lunch, and I don't think I'll have too much

22  after lunch.

23         MR. INGRAM:  Off the record.

24              (Recess taken.)

1   BY MR. SCHUMACHER:

2       Q.  Before we took a break, you mentioned

3   that you'd been approached by a number of people

4   who were in favor of either development of this

5   site generally or your specific plan that you

6   presented to the city of Worthington.  Is that

7   right?

8       A.  Yes.

9       Q.  Did Lifestyle Communities ask you for

10  those emails or documents concerning those

11  contacts in response to discovery requests in

12  this case?

13      A.  No.

14      Q.  So you have these or Isaac Wiles has

15  them?

16      A.  Maybe.  I didn't compile that list.  You

17  know, I just -- there were people that contacted

18  me.  The majority of those people and the

19  majority of that interaction would have been

20  with the Building Worthington's Future group,

21  because those guys wanted to see the site

22  developed.  They had their own opinions on

23  different aspects of it.  You can -- I think it

24  might still be a website, but there's -- of

1    theirs.  There's a concept called the

2    Worthington mile.  That was a lot of discussion

3    with that group about how this proposal fit into

4    the Worthington mile concept.  I think part of

5    their -- I think I testified about that at the

6    last MPC meeting, but they were -- that business

7    group and members of theirs -- by the way, one

8    of which testified at that same MPC meeting.

9        Q.  How many -- you keep saying there's

10   14,000 people in Worthington, but we both know

11   that all of them aren't going to speak either

12   publicly or through email about any particular

13   proposal, right?  You're not going to petition

14   or get an opinion from 14,000 people.  We can

15   agree on that?

16       A.  Yes, we can agree on that.

17       Q.  And the best you can do as a political

18   body is to listen to the constituents who do

19   express their opinions?

20       A.  No.

21           MR. INGRAM:  Objection.

22       Q.  Can we agree on that?

23           MR. INGRAM:  Objection.  Calls for

24   speculation.  Incomplete hypothetical.

1          You may answer to the extent you can.

2     A.  No.

3     Q.  Based on your experience --

4     A.  No.

5     Q.  All right.

6     A.  Here's why.

7     Q.  Okay.

8     A.  You can go in almost any major suburb in

9     Columbus, Columbus region, and find a

10    comprehensive plan.  You could typically read

11    how the comprehensive plan took some times

12    years, typically nine to 12 months, of community

13    outreach to put together the community's vision

14    for the future of the community in terms of

15    development through the comprehensive plan.

16         So when I show up in Worthington, you

17    know, hired by Lifestyle to try to find, you

18    know, middle ground and the answer, that's the

19    starting point, you know.  And with their code

20    treatment, that comp plan is more than a guide.

21    It's what you'd expect to be able to develop,

22    you know, if you're consistent with the comp

23    plan.  So the community speaks on these

24    development matters through that comp plan

1    development, through the process of input,

2    through the process of writing that plan, and

3    council adopts it.  So, you know, typically

4    planning commission hears the comp plan, council

5    adopts it.  So yeah, the main place you get the

6    expression of the community's desire for a given

7    area, in this case a specific site, is that comp

8    plan.  So that was the expectation we had, is to

9    focus on that and move through the process

10   consistent with that.

11       Q.  And in your experience things change

12   after comp plans are adopted, don't they?

13           MR. INGRAM:  Objection.  Assumes facts

14   not in evidence.

15       A.  Well, yes, and one of the things that

16   changed is we had office-mageddon.  So we

17   weren't going to have -- we weren't going to

18   have -- we were going to have to have

19   residential lead people back into

20   income-producing offices and commercial

21   facilities.  Residential had to be a key

22   component of whatever happened there based on

23   the change that had occurred.

24       Q.  That's your opinion, right?

1      A.  I'd say it's more than my opinion.

2  There's so much documentation on that, but --

3      Q.  But if a comprehensive --

4          MR. INGRAM:  Objection.  Let him finish

5  his answer.

6      A.  Yeah.  I would say -- this is very

7  consistent with my testimony on this case.  If

8  you went to the Kingsdale redevelopment, if you

9  went to Grandview Yard, Bridge Street, if you

10  went smaller scale to Bexley, Westerville, that

11  fact around that time is very consistent with,

12  you know, local and national market trends where

13  offices are almost shutting down.  And there has

14  to be some different game plan to bring people

15  back to that.

16          Make no mistake the comp plan says that

17  has to be a site where Worthington's tax base --

18  where Worthington, you know, brings an income on

19  its tax base.  And so the question is how do you

20  get there in that post-COVID environment.  And

21  you know, it was -- that's why we -- that's why

22  the plan, you know, submitted was structured the

23  way it was.  It had to be mixed use vibrancy

24  that got people back into the employment office

1  situations, office and commercial.

2      Q.  Thank you for your opinion.

3          If public opinion was against your

4  proposal, are you saying you would not listen to

5  that public opinion?

6          MR. INGRAM:  Objection.  Objection to

7  form.  Argumentative.

8      Q.  I mean, you can't have it both ways.

9  What I'm asking is if a number of people, a

10  large number of people in a community are

11  opposed to the density of the development you're

12  proposing, are you suggesting that city council

13  or the municipal planning commission should

14  ignore that information?

15          MR. INGRAM:  Objection.

16      Q.  That's my question.

17          MR. INGRAM:  Objection.  Incomplete

18  hypothetical.  Calls for speculation.

19          MR. SCHUMACHER:  Anything else?

20      Q.  Do you understand my question?

21      A.  Give me a chance to think.  Yes, I

22  understand your question.

23      Q.  Thank you.

24          MR. INGRAM:  Same objections.

1      A.  Couple things.  Number one, 25 years

2  doing this.  I have never -- I don't think I've

3  ever had a case where people didn't oppose it,

4  whether it's a run-of-the-mill gas station that

5  I had last night or, you know, housing or

6  whatever.  Opposition is just a fact of life.  I

7  mean, people post the future of the economy and

8  they say it in public.  You can't ignore it as

9  an elected official, but you can also sift

10  what's reality and what's not.

11         But the biggest tool in that whole

12  process is what the community has already said

13  where a larger body of community is involved in

14  developing the comprehensive plan.  And so, you

15  know, I would answer like this, and I'd answer

16  to somebody like Mr. Robinson or Mr. Smith, you

17  don't throw away the comp plan because you got

18  opposition to whatever next development's filed.

19         So you're right, you don't discount it,

20  but you have to weigh it.  And for what it's

21  worth -- and you know, Worthington is a

22  community that is kind of in danger of being

23  kind of left behind by all the other mixed use

24  and other suburb developments that are

1  occurring.  But the real sad thing is that

2  site's been sitting fallow for so long now, and

3  you know, is part of that because people are

4  opposed to anything there and the leadership

5  there can't figure it out?  I mean --

6      Q.  That's a possibility, isn't it?

7      A.  Yes.

8      Q.  And that's for the citizens of the city

9  of Worthington to decide, isn't it?

10      A.  Well, not only, because you know,

11  there's a property rights issue.  Okay?  And

12  people that own property in Worthington have

13  some rights, and you know, what happens when the

14  people of Worthington decide that a site

15  shouldn't be developed or that somebody else's

16  ground should be a park.  Pretty soon who

17  they're cannibalizing rights of are themselves.

18      Q.  Well, you're not suggesting that the

19  citizens of Worthington all want to make a park

20  at this location, are you?

21      A.  No, but I mean, some of the vocal

22  majority -- minority of people that showed up to

23  the hearings, that was their position.

24      Q.  But as you as a zoning lawyer filter

1    that information.  Those are your words.

2        A.  Sure.

3        Q.  Okay.  Just like you filter the

4    opposition expressed by, say, 300 residents who

5    may come to a public meeting expressing their

6    opposition to a development that has 530

7    residential units on the site.  You filter that.

8            MR. INGRAM:  Objection.  Calls for

9    speculation.

10       A.  Yeah, I wasn't there.  I wasn't at that

11   meeting, the one you're referring to.

12       Q.  Let's make it a hypothetical then.

13   You're counsel seems to think it should be a

14   hypothetical so let's make it a hypothetical.

15           If 350 people showed up at a public

16   meeting expressing overwhelming opposition to a

17   proposal at this site for 530 residential units,

18   would you consider that or filter it in your

19   words?

20           MR. INGRAM:  Same objection.

21       A.  With the comp plan and the code that are

22   the law?

23       Q.  Yeah.

24       A.  Yeah, I would filter it as well.

1      Q.  And, again, your opinion is that the

2  comp plan is law, but the district court judge

3  in this case completely disagrees with that.

4          MR. INGRAM:  Objection.

5      Q.  You don't know that?

6      A.  Yeah, that's not my --

7          MR. INGRAM:  Mischaracterizes --

8      Q.  Let's use that as a hypothetical.  If

9  the district judge in this case said that the

10  law is that the comp plan is not binding on the

11  city, it is only a guideline, and the city

12  decides to listen to the public who's opposed to

13  do a high-dense development, don't you think

14  that's the citizen's right as well as the

15  representatives of those citizens?

16          MR. INGRAM:  Objection.  Compound.

17  Calls for legal conclusion.  Calls for

18  speculation.

19      A.  I'm not going to answer what I think a

20  judge -- I'm not sure what the question was, but

21  I'm not going to speculate on a federal judge's

22  decision.

23      Q.  All right.  We'll talk about that later

24  then.

1          So did Lifestyle -- Lifestyle never

2  asked you for any of the documents that you've

3  talked about here today that would support

4  people -- citizens of Worthington who were in

5  favor of this development?

6          MR. INGRAM:  Objection.

7      Q.  They never asked you for that

8  documentation.

9          MR. INGRAM:  Asked and answered.

10     A.  I think that's right.

11     Q.  And it exists somewhere?

12         MR. INGRAM:  Same objections.  It's been

13  asked and answered now three times, Paul.

14         MR. SCHUMACHER:  All right.  Counsel,

15  please, I'll give you an opportunity to

16  supplement your document -- your responses to

17  our discovery requests because we didn't get any

18  of that information, and we want to --

19         MR. INGRAM:  Counsel, if you could

20  submit a subpoena to the Wiles -- to the law

21  firm that would have these files.

22         MR. SCHUMACHER:  We will.  I think we

23  already are.

24     A.  Yeah, what exists in terms of that, I

1  don't know.  I think, like I said, the main --

2  the main hours of discussion about -- from --

3  was with that business group in terms of their

4  support.

5      Q.  You had a couple meetings with Building

6  Worthington's Future, right?

7      A.  Couple meetings, a lot of phone calls.

8      Q.  And then you had five or six Zoom

9  meetings with about 10 residents each after your

10  application was filed?

11          MR. INGRAM:  Objection.  Misstates his

12  prior testimony when you asked him earlier --

13  the same question earlier this morning, Paul.

14          MR. SCHUMACHER:  I didn't want to get

15  these out, but we'll do it.  Why not.

16      A.  I can answer one part of that by saying

17  we knew we had a list that topped -- was over a

18  hundred.  We invited them all.  How many showed

19  up to each meeting, I'm not sure.

20                      -=0=-

21          (Hart Exhibit 10 marked.)

22                      -=0=-

23  BY MR. SCHUMACHER:

24      Q.  Have you had a chance to review

1  Exhibit 10?

2     A.  Yes, sir.

3     Q.  Is this a true and accurate copy of an

4  email exchange between you and Lee Brown and

5  yourself on or about December 31st, 2020?

6     A.  Yes.

7     Q.  Would you agree with me that he sent you

8  a list of about 90 people?

9     A.  Yes.  At the time 90, yep.

10     Q.  You were scheduling one-hour sessions by

11  Zoom for 10 residents at a time?

12     A.  We tried to do that, but I mean,

13  sometimes it was more; sometimes less.  We

14  didn't restrict them.  If 12 people signed up,

15  we didn't try to control that.

16     Q.  But can you tell me how many actually

17  attended any of these sessions?

18     A.  I can't today, no.

19     Q.  Do you have any notes?

20     A.  Not with me, not that I took from that

21  firm because it wasn't -- it was, you know, a

22  client that stayed with the firm, didn't come

23  with me when I left.

24     Q.  So you did record some notes about those

1    meetings?

2        A.  I'm sure I did.

3        Q.  Did you record the Zooms themselves?

4        A.  That, I don't know.

5        Q.  Did you prepare any summary of the input

6    you received in those five or six meetings that

7    you testified about?

8        A.  I don't know.  Don't recall.

9        Q.  Did Lifestyle Communities or their

10   counsel ask you for that information to respond

11   to discovery in this case?

12       A.  No.

13       Q.  Would you take the position that those

14   are privileged by attorney-client privilege?

15       A.  What I did in the Zoom meetings?

16       Q.  Yes.

17       A.  No.

18       Q.  So if notes or recordings of those

19   meetings described in Exhibit 10 exist, you're

20   not going to take the position that those are

21   somehow protected by attorney-client privilege?

22           MR. INGRAM:  Objection.  Calls for legal

23   conclusion.

24           MR. SCHUMACHER:  I'm asking him, not

1  you.

2      MR. INGRAM:  Same objection.

3      A.  Well, that's the whole -- the whole

4  deposition is you asking me, but if --

5      Q.  Mr. Ingram's not representing you, is

6  he?

7      MR. INGRAM:  Objection.  He already

8  testified that I am --

9      MR. SCHUMACHER:  Oh, okay.

10      MR. INGRAM:  -- earlier this morning.

11      A.  For the deposition, yeah, he's

12  representing me.

13      Q.  Fine.

14      A.  My answer would be it could be

15  privileged.  Whether I made -- whether I took

16  notes about the meeting, made notes in the

17  margin about, you know, anything that was

18  proprietary to Lifestyle -- I don't know if I

19  sent it to them so I can't say -- I can't answer

20  that question that it would not be privileged.

21      Q.  So when I'm in front of a jury in

22  federal court on this case and I'm asking you

23  questions about the public input that you, Tom

24  Hart, received in your outreach to the

1  community, I'm not going to be faced with some

2  objection of your lawyer that says, no, those

3  documents are privileged, am I?

4      A.  Well, how could we answer that

5  without --

6          MR. INGRAM:  Objection.

7      A.  -- without looking at them.

8      Q.  That's all I'm asking you.

9      A.  They might be.

10     Q.  Okay.  Good.

11     A.  They could be.

12     Q.  If that's the objection I'm going to get

13  in court, that's fine with me.

14         MR. INGRAM:  Counsel, objection.  You're

15  being argumentative.

16         MR. SCHUMACHER:  I don't know if I am.

17         MR. INGRAM:  You can move on and ask --

18         MR. SCHUMACHER:  We're going to subpoena

19  the documents, but if you want to supplement

20  your discovery responses, that would be helpful.

21  BY MR. SCHUMACHER:

22     Q.  And the last question:  Did you prepare

23  some agenda -- a written agenda for this Zoom

24  meeting with these residents?

1    A.  It looks like -- I'm not sure.  I don't

2  remember that far back.  It looks like what we

3  sent out -- you know, you could interpret this

4  to be an agenda because that's what went to

5  people.

6    Q.  Okay.  If you could refer to Exhibit 43,

7  please.  Have you had a chance to review

8  Exhibit 43?

9    A.  I skimmed it, yes.

10    Q.  Is that one of the meetings that you

11  attended virtually on December 13th, 2021?

12    A.  Yes.

13    Q.  Is that one of the videos that you

14  reviewed in preparation for your deposition?

15    A.  Yes.

16    Q.  If you would flip to page 2 of that

17  document, would you agree with me that this was

18  the public hearing on the ordinance number

19  58-2021 that you applied for to rezone this

20  property?

21    A.  Well, it's the ordinance -- referring to

22  the application.  It's the hearing on the

23  application.

24    Q.  And if you'll skim down, it says, about

1   10 lines down, this request is to rezone and

2   allow up to 600 residential units consisting of

3   22 single-family homes, 86 townhomes, 72

4   townhomes/flats, and 420 apartments along High

5   Street frontage.  Do you see that?

6       A.  Yes.

7       Q.  Would you agree with me, then, that on

8   December 13th of 2021 the city of Worthington

9   city council had a public hearing on your

10  revised concept plan that you submitted in

11  September of '21?

12      A.  No.  That must be a mistake.  That's not

13  what they -- that's not what they heard and

14  voted on.

15      Q.  I was going to ask you if this is a true

16  and correct --

17      A.  It's a mistake.

18      Q.  Is this a true and correct copy as far

19  as you know of the city council agenda?

20      A.  People make mistakes in the minutes.

21      Q.  Okay.  So you would refer to the actual

22  video of the hearing?

23      A.  I don't know, but I mean, what they

24  heard was our original app, not the amended one.

1  That's my -- that's what I think happened.

2      Q.  So if the actual ordinance that was

3  brought up for vote said, and I quote, "The

4  request before you is the 37.8 acres along High

5  Street to rezone to allow up to 600 residential

6  units," you disagree with the fact -- are you

7  disagreeing with that statement?

8          MR. INGRAM:  Objection.  Counsel, you're

9  just quoting from something in your hand that

10  you're not showing the witness.  He has no way

11  to verify.

12      Q.  I prepared a transcript of the hearing.

13  All I'm asking you, Tom, is do you recall that

14  Mr. Lee Brown said at the hearing that they were

15  considering your application to rezone to allow

16  up to 600 residential units?

17      A.  I don't remember that, but I know that

18  they rejected our amendment at planning

19  commission.  So then what they voted on at

20  planning commission was the original app with

21  the greater number of units and that's what

22  council heard.  You know, municipal clerks make

23  mistakes in minutes.

24      Q.  Fine.  You would defer to the actual

1    recording of the October 14th, '21 MPC hearing,

2    wouldn't you?

3        A.  I mean, I guess.  He may have misspoke

4    himself on that.  I don't know.

5        Q.  Okay.  Fine.

6        A.  But I know they did not amend -- they

7    would not amend our initial application.  So

8    what council -- what the council heard and

9    rejected had to be the original application.

10       Q.  Dispute the fact that the agenda, the

11   minutes, and the actual audio recording and

12   video recording of that December 13th, '21

13   meeting suggests otherwise?

14           MR. INGRAM:  Objection.  Argumentative.

15       A.  Yeah, I mean, I think -- I'm not sure

16   how to explain it, but I --

17       Q.  Fine.  All right.  That's good.

18           And the application that was rejected,

19   whichever one was rejected, by city council

20   after a public hearing on December 13th, 2021

21   could have been refiled in a different or more

22   conforming manner within six months.  We've

23   established that, right?

24           MR. INGRAM:  Objection.  Misstates this

1  witness's prior testimony.  This has been asked

2  and answered numerous times.

3      A.  I'm not sure what they would have

4  accepted.

5      Q.  In fact, you could still file another

6  application with the city of Worthington to

7  rezone this property even today, couldn't you?

8      A.  Not under the same circumstances.  I

9  mean, my understanding is they amended their

10  comp plan since that period.  So, you know, I

11  think they tried to -- not sure of the effect of

12  that amendment, but I don't think you could --

13  the comp plan I think has been -- has been

14  amended.

15      Q.  Nonetheless --

16      A.  You could file an application.

17      Q.  Nonetheless, you or any applicant could

18  file -- well, the property owner could file an

19  application to rezone the property under the

20  current comprehensive plan?

21      A.  Yeah.  I think it has a very small

22  commercial section up front.  The rest of it's

23  like open space from memory.

24      Q.  Have you been asked to make any such

1    application?

2         A.  No.

3         Q.  Are you still under retainer with

4    Lifestyle Communities in this case?

5         A.  No.

6         Q.  Did your work end once the application

7    was denied by city council in December of '21?

8         A.  Again, I don't remember.  There could

9    have been other stuff I worked for them on

10   besides this, minor -- minor issues, but I'm not

11   sure when that was.  In terms of work on this,

12   yeah, around that time my work concluded.

13        Q.  Could you refer to Exhibit 35, please.

14             Have you had a chance to review

15   Exhibit 35?

16        A.  Yes.

17        Q.  Would you agree with me that this is an

18   email exchange -- at least a portion of it is an

19   email exchange that you had with Lee Brown on

20   September 24th, 2020?

21             MR. INGRAM:  Objection.  Misstates the

22   document.

23        A.  It's not --

24        Q.  I'm sorry, with Mr. Greeson.  Excuse me.

1        MR. INGRAM:  Same objection.

2     A.  Yeah, it's not -- no, I don't agree with

3  that.  It's internal to them.

4     Q.  Oh, I'm sorry.  I'm sorry.  I was

5  looking at something else.  Let me start again.

6        Do you recall having a conversation with

7  Lee Brown where you told him that you did not

8  have a detailed site plan at this time, and that

9  time being September 24th of 2020?

10     A.  I don't recall that, but that's what

11  the -- his memo internally to Worthington says.

12     Q.  Do you recall telling Lee Brown that you

13  did not have an anticipated date to file, but

14  possibly November or December?

15     A.  I don't recall that.

16     Q.  All right.  So if Lee Brown testifies

17  that you told him that you were anticipating a

18  file date -- you didn't have a file date, but

19  possibly November or December, you just don't

20  recall one way or the other whether you said

21  that?

22        MR. INGRAM:  Objection.  Asked and

23  answered.

24     A.  Correct.

1     Q.  Did you tell Lee Brown on or about

2  September 24th, 2020 that you were -- any

3  particular number of apartments that you were

4  anticipating proposing for this site?

5         MR. INGRAM:  Objection to form.

6     A.  I don't recall that.

7     Q.  You just don't know?

8     A.  No, I don't remember telling him that is

9  what I'm saying.

10     Q.  All right.  But you do agree that within

11  two weeks of this you indeed filed an

12  application proposing 730 residential units on

13  this site?

14     A.  I think what I said before is I

15  acknowledge the date that I signed it.  When I

16  filed it could be a different date, but it was

17  somewhere around that time.

18     Q.  Okay.  We can agree that October 2nd is

19  in advance of November or December of 2020.

20     A.  Yes.

21     Q.  Right?

22     A.  Certainly.  Yes.

23     Q.  Something we agree on.

24         Do you recall reading Lee Brown's staff

1    report in this case?

2        A.  Which staff report?

3        Q.  The staff report that he prepared for

4    either the January '21 MPC meeting or the

5    October 14th, '21 MPC meeting.

6        A.  I'm sure I read them both.

7        Q.  Okay.  And you would agree with me that

8    he compared your application in both cases to

9    the comprehensive plan, didn't he?

10       A.  He did his analysis of that, correct.

11       Q.  And you respect him as a professional

12   land planner, don't you?

13       A.  Certainly do.

14       Q.  All right.  And in his second staff

15   report in October of 2021 he made reference to

16   the 2014 comp plan when he did his analysis of

17   your application.  Do you recall that?

18       A.  No, not without reading that, but I

19   don't doubt it, but I don't remember that.

20       Q.  Fair enough.  And I think we talked

21   about this already.  He had certain deficiencies

22   that he noted in his professional opinion with

23   reference to the comp plan and your application,

24   right?

1      A.  I don't know.  I don't remember.

2      Q.  Okay.  And he also pointed out some

3   changes you'd made between January of '21 and

4   October of '21 when you presented the revised

5   concept plan?

6      A.  I remember him saying we made

7   improvements, yeah.

8      Q.  Right.  Again, he was fair, he noted

9   where you improved, but he also pointed out

10  deficiencies?

11         MR. INGRAM:  Objection.  Misstates this

12  witness's prior testimony.  It's the same

13  question.

14     Q.  I'm just asking do you agree or

15  disagree?  That's all I'm asking.  If you think

16  he was completely unfair, tell me.

17     A.  Well, it's not --

18         MR. INGRAM:  Same objections.

19     A.  It's not black or white.  I don't agree

20  with his analysis.  So whether it's fair -- I

21  would say it's not fair --

22     Q.  Okay.

23     A.  -- what his analysis was.

24     Q.  But he did the analysis?

1     A.  He -- that's his job, yes.

2     Q.  So when he says in his October staff

3   report the overall density should be

4   dramatically reduced to better reflect what is

5   recommended in the plan by the community, you

6   disagree with that statement?

7         MR. INGRAM:  Objection.  Counsel, you're

8   reading from a document.  Why don't you show the

9   witness a copy of the document.

10    A.  It would be fair for me to read it.

11    Q.  Where's the staff report?  I don't want

12   to remark the exhibit.

13    A.  A lot of times they put their staff

14   report in the actual council minutes so it might

15   be in there.

16    Q.  It is.  I thought Mr. Ingram marked it.

17   I don't want to waste paper.  If you could refer

18   to Exhibit 83, page 28.

19    A.  28 of 57?

20    Q.  Yep.  There's a section on residential

21   density, height and housing types.

22    A.  Yes, sir.

23    Q.  Do you recall reading this section?

24    A.  I don't recall reading it, but I'm sure

1  I did.  I read staff reports.

2      Q.  Would you agree with me that your

3  revised site plan submitted in September of '21

4  reduced the overall density on the site by

5  approximately 19 percent from 730 units to 600

6  units?

7          MR. INGRAM:  Objection.  Asked and

8  answered.

9      A.  Just to be clear, residential density,

10  yes.

11      Q.  Okay.

12      A.  Commercial office went up.

13      Q.  Right.  But he noted that in the report?

14      A.  Yes.

15      Q.  That's a positive thing, isn't it, in

16  your view?

17      A.  Yeah.  One of the problems here is

18  he's -- he's referring and making analysis to

19  the 2015 version that was never filed, never a

20  formal application, didn't go anywhere.  That

21  was maddening.  That site included more acreage.

22      Q.  I'm glad you brought that up.

23      A.  It was a totally different --

24      Q.  I'm glad you brought that up.

1      A.  Well, let me finish.  It was a different

2  context, different time, before office-mageddon,

3  and you know, that was one of the battles I had

4  with Lee, Scott.  You know, we'll call them

5  the -- some of the folks that tried to work with

6  us at some points.  They kept going back to '15

7  and it was just completely irrelevant.  I

8  remember telling Scott -- it might have been in

9  public hearings -- I mean, that was like three

10  presidents ago, you know.

11      Q.  You did say that, yes.

12      A.  I did.  Or four maybe.  Three or four.

13      Q.  He disagreed with you, though, didn't

14  he?

15      A.  Well, let me finish.  I mean, the

16  problem with Lee's analysis starts with the

17  2015, you know.  Then it ends with this, you

18  know, admission to reduce density, but they

19  would never tell us what the right density was.

20  They would never try to work with us.  Lee is

21  truly a professional, good guy, but he was -- he

22  was told not to work with us.  That was clear.

23      Q.  You don't know that as a fact, do you?

24      A.  He told me that.

1      Q.  Who?

2      A.  Lee.

3      Q.  Who told you that?

4      A.  Lee told me that he would just handle

5   housekeeping administrative matters, that he

6   wasn't empowered, and then later on Scott said

7   we're not -- we're not empowering staff.  We're

8   not going to allow you to negotiate with staff

9   or work with staff.  You're going to have to do

10   everything at the planning commission.  So that

11   was clear for months that, you know, we were

12   only -- we were never allowed to work with Lee

13   Brown in Lee's full capacity as a master planner

14   and a significant professional.

15          Lee and I handled administrative

16   housekeeping functions, and then he wrote a

17   report that was disappointing because it didn't

18   reflect what we know to be his skill level and

19   his ability to -- again, a PUD application in

20   Ohio under Ohio law, planned district law, is

21   you have an expectation that you're negotiating,

22   you're -- that there's going to be

23   collaboration, there's going to be -- you can't

24   negotiate a TIF, and how to handle the economics

1  of a parking deck, and how to pay for that or

2  community authority or what other things need to

3  be funded in terms of traffic improvements in a

4  planning commission meeting.  You have to have

5  access to professional staff and their skill

6  level.

7        That -- that's the problem with Lee's --

8  that's what's missing from his report, that

9  whole process that we were denied.  I'm someone

10  who actually wants to get something done.  I

11  didn't take this on to set up a lawsuit.  Okay.

12  I took this on to get -- to be proud of

13  something that could get built in the real

14  world, and you know, I'm expressing frustration

15  which you probably don't want to hear.

16    Q.  Keep -- just let me know when you're

17  done.

18    A.  It's frustrating to go back and read his

19  staff report, because what's missing is but

20  Mr. Hart asked me 50 times, and others, what is

21  the right density, how do we get to that, how do

22  we support office and economic uses that are

23  going to help the city in this environment, you

24  know, post-COVID office environment.

 1    Q.  Are you done?

 2    A.  Yes, sir.

 3    Q.  I hate to do this.  Move to strike your

 4  answer as nonresponsive and thank you for your

 5  opinion.

 6    A.  Well, what was your question?  You asked

 7  me about --

 8    Q.  I'm going to ask a new question.

 9    A.  Go ahead.

10    Q.  You don't expect a city planner to

11  ignore a public meeting that occurred in 2015

12  where 350 people attended, do you?

13       MR. INGRAM:  Objection.  Asked and

14  answered multiple times.

15    Q.  As a zoning lawyer, you don't expect

16  them to ignore that, do you?

17       MR. INGRAM:  Same objection.

18    Q.  I know you don't think it's relevant,

19  but you don't expect a city planner to ignore

20  that fact?

21       MR. INGRAM:  Same objections.  Calls for

22  speculation.

23    A.  I do.

24    Q.  You expect him to ignore that?

1    A.  Yeah.

2    Q.  Okay.  That's all I need to know.

3        And in 2015 when that proposal was made

4    of 530 units, we were talking about more acreage

5    at the time, weren't we?

6        MR. INGRAM:  Objection.

7    Q.  There were 40 acres at that point.

8        MR. INGRAM:  Objection.

9    Mischaracterizes the evidence.

10   A.  It's more than 40.

11   Q.  Right.  It was more than you were

12   working with in 2020 and '21, right?

13       MR. INGRAM:  Objection.

14   Mischaracterizes the evidence.

15   Q.  So when you made your application shown

16   in Exhibit 1 and 2 for 730 residential units,

17   you were making that on a piece of property that

18   had less acreage than the previous informal

19   proposal in 2015.  Can we agree on that?

20   A.  We can agree on that with the fact that

21   the market had changed dramatically,

22   dramatically in the history of this country.

23   Q.  Right.  And things change all the time,

24   don't they?

1      A.  Of course.

2          MR. INGRAM:  Objection.

3      Q.  In fact, the comp plan could be enacted

4  in 2015 and needed to be changed a year later

5  when something like that happens, right?

6          MR. INGRAM:  Objection.  Calls for

7  speculation.

8          MR. SCHUMACHER:  No, that's

9  argumentative.

10          MR. INGRAM:  And it's argumentative.

11      Q.  Right?

12      A.  It had not --

13          MR. INGRAM:  Same objections.

14      A.  It had not been changed by the time we

15  filed.

16      Q.  But if public opinion were so opposed to

17  this particular proposal, you're not -- it's not

18  your opinion as a zoning lawyer that the city

19  representatives should ignore that citizen

20  opposition, is it?

21          MR. INGRAM:  Objection.  Ambiguous and

22  objection to form.

23          You may answer to the extent you can.

24      A.  Any public official that wants -- who's

1   elected and wants to be reelected has to do a

2   good job listening to public opinion.  That

3   doesn't mean they throw out their comp plan and

4   their code and how -- in their normal processes

5   with dealing with development.  That is the

6   essence of my life, my job --

7      Q.  I understand your opinion.

8      A.  -- to -- no, I'm just --

9      MR. INGRAM:  Let him finish, Counsel.

10     A.  I've seen better examples of dealing

11  with the public and what the public says and

12  what -- you know, what neighbors say and dealing

13  with what the rest of the community has said and

14  spoken though their comp plan and how to balance

15  the two.  If there's a failure on the leadership

16  of the city of Worthington, it's in that, in

17  balancing that appropriately.

18     Q.  But, Tom, you're aware of the fact that

19  councilmembers in the city of Worthington have

20  run for council based upon this issue alone,

21  whether they're for it or against it.  You're

22  aware of that, aren't you?

23     A.  I'm not.  I don't -- I didn't follow

24  their election campaigns, no.

1    Q.  Did Lifestyle Communities ever provided

2  you with their internal documents assessing

3  pro-development and anti-development candidates?

4        MR. INGRAM:  Objection to form.

5        You can answer to the extent you know.

6    A.  Yeah, I don't recall.

7    Q.  Would it surprise you that they have

8  such documentation?

9        MR. INGRAM:  Same objection.

10    A.  I don't really have a -- I don't know.

11  I don't have an opinion on that.

12    Q.  So as their zoning lawyer and as the

13  applicant in this case -- I want to be clear --

14  Lifestyle Communities and their affiliates did

15  not provide you with any of their data on pro-

16  and anti-development councilmembers in the city

17  of Worthington?

18        MR. INGRAM:  Objection to form.

19  Ambiguous.

20        You may answer to the extent you can.

21    A.  I think I did already answer.  I don't

22  remember that.

23    Q.  Well, you don't remember that they gave

24  it to you or you don't remember at all?

1          MR. INGRAM:  Same objections.

2     A.  Either.  Both.

3     Q.  Okay.  But you would agree with me with

4  regard to Exhibit 83 the city of Worthington's

5  professional planner provided a report comparing

6  your application to the language of the 2014

7  comprehensive update.  That's what he did?  I

8  understand you disagree with it, but he did

9  that.

10     A.  Well, you answered my question.  I

11  disagree with his analysis of the comp plan.

12     Q.  And that's fine.  But he did an analysis

13  based on the comp plan with reference to it.

14  You agree with me, don't you?

15     A.  Yes.

16     Q.  Okay.

17                    -=0=-

18          (Hart Exhibit 11 marked.)

19                    -=0=-

20  BY MR. SCHUMACHER:

21     Q.  Have you had a chance to review

22  Exhibit 11?

23     A.  Yes, sir.

24     Q.  Does this appear to be a true and

1  accurate copy of, at least a portion of it,

2  email exchange between you and Scott Green on

3  and about January 25th of 2021?

4      A.  Yes.

5      Q.  In that general time frame?

6      A.  Yep.

7      Q.  And this would be after your

8  presentation at the January 21st, 2021 municipal

9  planning commission meeting?

10     A.  Yes.

11     Q.  Did you attend this meeting with

12 Building Worthington's Future or BWF?

13     A.  I attended at least two meetings with

14 them so this -- I believe so.  I'm not exactly

15 sure when the date was.  Looks like this says it

16 was the 15th.

17     Q.  Is it Mr. Hermann -- I'm sorry, it must

18 be Mr. Scott who is, in the second page of this

19 exhibit, is suggesting that you not use

20 Kingsdale shopping center redevelopment as an

21 example of a similar redevelopment.  You see

22 that?  Paragraph E.

23     A.  Yeah.  I'm confused because there's

24 no -- I don't think there's a Mr. Scott.  You

1    might be referring to Scott Green.

2         Q.  Some of this is redacted, but who's

3    Scott Green?

4         A.  He's a member of that organization.

5    He's a guy that works at Park -- Park National.

6         Q.  And Jon Melchi, do you know him?

7         A.  Yes.

8         Q.  He's also a member of this Building

9    Worthington's Future organization?

10        A.  I don't know about that.  He's a

11   resident.

12        Q.  Former coworker with you at BIA?

13        A.  No, I never worked with him.  He's a

14   predecessor in the job I was in.

15        Q.  Is it fair to say he's pro development?

16        A.  Yes.

17        Q.  Is it fair to say that Scott Green is

18   pro development?

19        A.  Yes, generally.

20        Q.  It is hard to understand, but it seems

21   to me that Scott's writing to you on

22   January 25th, 2021 confirming this meeting that

23   was to occur on January 24th at the Park bank's

24   community room, right?

1      A.  I think that's right.

2      Q.  Then he said he wanted to share with you

3  his email to this, apparently, BWF group which

4  he then copies.  Is that fair?  Is that your

5  understanding?

6      A.  Prior to the meeting I wanted to share

7  with you my email to the group following your

8  presentation; so yes.

9      Q.  And it looks like he then lists a number

10  of items, and under one on the second page it

11  says, things Lifestyle needs to work on in their

12  future presentations and items we should address

13  when we meet with them in the next few weeks.

14  Do you see that?

15      A.  Yes.

16      Q.  Do you know what he meant by that?

17          MR. INGRAM:  Objection.  Calls for

18  speculation.

19      Q.  I'm not asking you to speculate.  I'm

20  asking you what your interpretation of that

21  statement is, sir?

22      A.  They were supportive of the application,

23  what we're trying to do, and they were

24  expressing their opinions on, you know,

1    different things we should emphasize or not

2    emphasize.

3        Q.  To try to gain approval of the municipal

4    planning commission?

5        A.  Make progress.

6        Q.  And one of those was, I think, telling

7    you or recommending to you not to use Kingsdale

8    shopping center redevelopment as an example.  Am

9    I reading that correctly?

10       A.  Yes.

11       Q.  What did that mean to you or why did

12   he --

13       A.  I don't know.

14       Q.  Did you continue to use Kingsdale as an

15   example, then?

16       A.  I did.

17       Q.  Okay.

18       A.  I believe I did.

19       Q.  Because you still felt it was a relevant

20   example?

21       A.  In-fill redevelopment of an older site

22   led by residential, supporting commercial, I

23   mean, I see these in-fill sites as pretty

24   similar with -- some are different scale,

1  different scope, but...

2      Q.  If you flip to the third page, I think,

3  there's a number three, Chris Hermann's second

4  email.  You see that?

5      A.  Yes.

6      Q.  Who wrote this?  Do you think this is

7  still this Scott Green?

8          MR. INGRAM:  Objection.  Calls for

9  speculation.

10     A.  It's hard to tell really.

11     Q.  I'm not asking you to speculate.

12     A.  I don't know who wrote it.

13     Q.  I'm asking if you know.  I thought that

14  was pretty clear.

15     A.  I don't know.

16     Q.  Well, with regard to that subparagraph

17  three that starts with reminding residents that

18  the choice facing our community is not -- how do

19  you say that word?

20     A.  Dichotomous.

21     Q.  Dichotomous.  That's a big word.  Do you

22  agree with that paragraph in general?

23     A.  I'll read it first.

24          MR. INGRAM:  Objection to form.

1  Compound.

2      A.  Okay.  I'm sorry, what was the question?

3      Q.  Well, do you agree in general with that

4  subparagraph three starting with reminding

5  residents?

6      A.  I really can't answer that.  I mean, I

7  don't know who wrote it.  I'm not -- I mean,

8  generally speaking, those folks were trying to

9  work with us.  They wanted this application to

10  be -- to have give and take.  They're leaders in

11  the community as well.  I think Chris Hermann

12  wrote -- I think he was the principal, not MKSK

13  that wrote the comp plan, at least the amendment

14  in '14.  So you know, that guy's a significant

15  land planner, but you know, what a business

16  group tells somebody like me that's trying to

17  work on a zoning application and what action I

18  take and, you know, what I filter -- one of your

19  favorite words.

20      Q.  No, that's your word.

21      A.  -- you know are -- I mean, I had a job

22  to do, and so they were helpful comments, you

23  know, they were supportive.  They continue to be

24  supportive.  One of the folks from this group

1  did testify at the second planning commission

2  meeting in support, but yeah, I don't agree with

3  everything they were saying.

4      Q.  I'm curious about a couple things, Tom.

5  This site, UMCH site, it says here does not

6  require rezoning.  Is that your understanding?

7      A.  Well, that's the guy's wife's opinion so

8  I don't know what that means.

9      Q.  Well, as I review Exhibit 1, you listed

10  the current zoning for the property, didn't you,

11  this Exhibit 1 over here?

12      A.  Yes.

13      Q.  And so it is true, isn't it, that

14  Lifestyle could build on the property, their own

15  property, within those zoning classifications,

16  couldn't they?

17          MR. INGRAM:  Objection.  Calls for

18  speculation.  Incomplete hypothetical.  Calls

19  for legal conclusion.

20      Q.  You're a zoning lawyer, right?

21          MR. INGRAM:  Same objections.

22      A.  You know, as an example, they're not in

23  the mega church business, or the private school

24  business, or mental health/drug/clinic/rehab

1  facility.  They're not in the business that the

2  super limited zoning that exists there today

3  would allow.  There'd be really no private

4  sector economic project of a mixed use variety

5  that would meet the comp plan that you could

6  file under that current zoning or that existing

7  zoning.

8        The existing zoning -- put another way,

9  the existing zoning, that S1 with the small

10  commercial, doesn't fit their comp plan.  So it

11  would be required to rezone the site to fit the

12  comp plan.  So, you know, it's easy for somebody

13  to say that it could be a mental health drug

14  clinic, but that wasn't what Lifestyle was ever

15  going to do, ever going to try.

16    Q.  But Lifestyle knew that when they

17  purchased the property, they knew what the

18  zoning was.

19        MR. INGRAM:  Objection.  Calls for

20  speculation.

21        MR. SCHUMACHER:  Really?  Calls for

22  speculation?

23        MR. INGRAM:  You're asking this witness

24  to put -- to understand the mind of a company.

1   This is not a 30(b)(6) witness.

2        MR. SCHUMACHER:  Let me withdraw the

3   question.

4        A.  Let me --

5        Q.  No, I'm withdrawing the question.

6        A.  I'll answer with your next one because

7   it's the comp plan that they filed for, not the

8   current zoning.

9        Q.  What do you know about Lifestyle

10  Communities' intent for purchasing the property,

11  anything?

12       A.  They knew that -- they came and told me

13  here's a comp plan, here's what it says.  We're

14  going to file to try to accomplish what's in

15  this plan.

16       Q.  What did they tell you they wanted to

17  accomplish?

18       MR. INGRAM:  Objection.  Asked and

19  answered.

20       A.  Yeah.  The initial plan I worked on.

21  Then as it evolved, the resubmittal.

22       Q.  All right.  So they told you they wanted

23  to build 730 residential units on this property?

24       MR. INGRAM:  Objection.  Asked and

1    answered.

2        A.  That's what they asked me to file and

3    pursue.

4        Q.  Okay.  Did they tell you how much they

5    could expect to profit from such a development?

6    Did they share that with you?

7        A.  No.

8        Q.  Did they tell you at any time given the

9    opposition to the density that you were

10   proposing that they could get away with less

11   than 600 residential units?

12       MR. INGRAM:  Objection to form.  Assumes

13   facts not in evidence.

14       A.  No.  They never said, you know, here's a

15   number.  They said let's resubmit and let's go

16   into the process and negotiate and see what we

17   can get.

18       Q.  As you're a lawyer, did you ever tell

19   them based on the public comments I've heard at

20   all of these meetings, based on the comments

21   I've heard on my Zoom calls, that a lower

22   residential density might be appropriate, lower

23   than what you proposed?

24       MR. INGRAM:  Objection.

1     Q.  Did that ever come up?

2          MR. INGRAM:  Objection to the extent

3     you're seeking this witness's legal advice to

4     Lifestyle with respect to their application.

5          You're instructed not to the divulge any

6     legal opinions you provided to Lifestyle.  To

7     the extent you can answer this question without

8     doing so, you may.

9     A.  What became clear to me personally is we

10    had to get -- we had to have that give and take

11    with Worthington, with their staff, with their

12    leadership.  That's what we had -- that's the

13    only way we were going to find out what could

14    work there, both economically, politically.

15    That's my -- the essence of my whole job is to

16    find where the politics and the economics of a

17    site are going to meet and are going to work so

18    that was --

19         MR. INGRAM:  Let him answer.

20    A.  -- that was not something I told them.

21    It's something I just knew from, you know, my

22    whole career.

23    Q.  Yeah.  I understand your answer and I

24    appreciate it.  My question is a little

1  different, to steal a line from one of my

2  colleagues.  Did you ever tell Lifestyle that

3  you felt based upon what you've been hearing

4  that the residential density was too high?

5  Simple question.  Guys, it's too high.  Did you

6  ever say that to them --

7        MR. INGRAM:  Same --

8     Q.  -- in any way?

9        MR. INGRAM:  Same objection and

10  instruction as the prior question.

11     A.  I don't believe I did.

12     Q.  And the other side of that is did they

13  ever tell you -- I think we talked about this,

14  but I want to be sure.  Did they ever tell you

15  we can't do this project unless we get X number

16  of residential units?

17     A.  No.

18     Q.  They never told you that?

19     A.  No.

20     Q.  So as the zoning lawyer attorney and

21  applicant for Lifestyle Communities you weren't

22  armed with those facts?

23     A.  Correct.

24     Q.  Fine.  I just have two more exhibits and

1    we're done.

2                      -=0=-

3              (Hart Exhibit 12 marked.)

4                      -=0=-

5    BY MR. SCHUMACHER:

6        Q.  Have you had a chance to review

7    Exhibit 12?

8        A.  Yes.

9        Q.  Have you ever seen this document before?

10       A.  I do not believe so.  I don't remember

11   seeing it.

12       Q.  Was any of that information ever shared

13   with you from Lifestyle Communities or any of

14   their representatives?

15       A.  Well, it -- I don't know.  It's possible

16   that I'm the one that was like trying to figure

17   out dates for them, but I don't know if I did

18   for this or not.

19       Q.  Do you think you were involved at this

20   point?  And just to be clear the date of the

21   email is November 5th, 2019.

22           MR. INGRAM:  Objection.  Asked and

23   answered repeatedly this morning.

24       A.  I don't recall.

1          MR. SCHUMACHER:  This document?  We just

2   introduced it.

3          MR. INGRAM:  No.  You've asked him

4   numerous times, Counsel, when he was first

5   involved.

6          MR. SCHUMACHER:  And he couldn't tell me

7   the exact date.

8      Q.  I'm asking him was this a date when you

9   were involved or not?

10      A.  I don't know.  What I can tell you is

11   what I said before, that it was 2020 that I

12   really started working with them, working on

13   this.  They may have contacted me in fits and

14   starts before that, but the date at which I

15   really started working and billing was 2020.

16      Q.  And my question for you is do you

17   believe you had any input or were involved in

18   the creation of these timelines shown in

19   Exhibit 12?

20          MR. INGRAM:  Objection.  Asked and

21   answered.

22      A.  Yeah, I don't know.

23      Q.  Okay.  The -- at the very bottom the

24   last paragraph, I want to direct your attention.

1    You see that?

2        A.  The potential timelines -- these

3    potential timelines?

4        Q.  Uh-huh.

5        A.  Yes.

6        Q.  Did you know about OhioHealth -- or what

7    did you know about OhioHealth?

8        A.  Very little.  I knew at different times

9    they were a possible co-applicant or they had I

10   think actually maybe negotiated to buy part of

11   the property or be part of an application at

12   some point, but it's -- I wasn't involved in any

13   dealings with them or working on that with

14   Lifestyle.  But I do remember when, you know,

15   after -- when COVID really hit, they were gone.

16   They were not going to be involved anymore

17   because of what happened economically to their

18   business.  So there was a time when they may or

19   may not have been involved.  It had nothing to

20   do with me.  I wasn't working on that, but then

21   there was a certain time when they were gone.

22       Q.  Do you know who Eric Buchanan is at

23   Lifestyle Communities?

24       A.  I don't remember the person's name.

1      Q.  You do now Jode Ballard, though.

2      A.  Jode Ballard, yes.

3      Q.  Jode.  Excuse me.  I bet everyone calls

4   him Jode.

5          It doesn't surprise you, though, that

6   Mr. Ballard had two different timelines

7   depending upon who was elected council for the

8   city of Worthington, does it?

9      A.  I don't -- I can't really answer

10  questions about what he -- I don't know where

11  this --

12     Q.  No.  My question is more general.  In

13  your experience doing these zoning cases for

14  developers does it surprise you that they would

15  have a different plan depending upon who got

16  elected in a community?

17         MR. INGRAM:  Objection.  Calls for an

18  incomplete hypothetical.

19     A.  I'm not sure if that -- I get hired to

20  zone no matter who's in office.

21     Q.  You told me several times about your

22  experience in zoning with other communities.

23  All I'm asking you is do you find this email

24  unusual or not?  Do you find it unusual that

1  they were going to have a different timeline for

2  rezoning submittals depending upon who got

3  elected?

4       MR. INGRAM:  Objection.  Ambiguous.

5  Calls for speculation.  You may answer to the

6  extent you can.

7     A.  I don't know.  It doesn't appear to be

8  something I was involved in.

9     Q.  And this OhioHealth, you knew that they

10  were considering building some kind of medical

11  office on the site -- on a portion of the site?

12       MR. INGRAM:  Objection.  He just

13  answered the questions about this.

14     A.  That was -- I do think I answered but

15  that was in the papers.  It was --

16     Q.  Yeah.  So it was something you knew

17  about?

18       MR. INGRAM:  Objection.  Asked and

19  answered.

20     Q.  It's not an incomplete hypothetical,

21  Tom, is it?  You knew that OhioHealth was

22  considering building a medical facility on this

23  site, didn't you?  Simple question.

24       MR. INGRAM:  Objection.  You're getting

1  argumentative.

2      A.  I'm just saying I answered that.

3      Q.  What was your answer?  I forgot.

4      A.  Okay.  It was -- there was a time in

5  which I was aware that that was a possibility,

6  but then there was a time it went away based on

7  the COVID economy.

8      Q.  Okay.  And in your opinion as a zoning

9  lawyer would OhioHealth be permitted under

10 current zoning to build a medical office

11 facility there?

12         MR. INGRAM:  Objection.  Calls for a

13 legal conclusion.  Incomplete hypothetical.

14         MR. SCHUMACHER:  It certainly does call

15 for a legal conclusion.

16         MR. INGRAM:  And speculation.

17     Q.  I'm asking you for your legal conclusion

18 as a zoning lawyer could OhioHealth build a

19 medical office facility on the site today given

20 the current zoning?

21         MR. INGRAM:  Same objections and

22 compound as well.

23         You may answer to the extent you can.

24     A.  I don't know.

1      Q.  You don't know?

2      A.  I don't know.  I never analyzed that.

3  It would take analysis.

4      Q.  Does the S1 zoning code permit medical

5  office facilities on that site?

6          MR. INGRAM:  Objection.

7      Q.  You don't know?

8      A.  I don't know.

9          MR. INGRAM:  Objection.  Calls for legal

10  conclusion.  Calls for speculation.  It's an

11  incomplete hypothetical.

12                    -=0=-

13          (Hart Exhibit 13 marked.)

14                    -=0=-

15          MR. INGRAM:  Counsel, I note it's

16  quarter after 2.  We've been going since a

17  little after 9.  Are we about done here?  Should

18  we break for lunch?

19          MR. SCHUMACHER:  I'll let you know when

20  it's time to break.

21  BY MR. SCHUMACHER:

22      Q.  Have you had a chance to review

23  Exhibit 13?

24      A.  Yes.

1      Q.  Do you recall -- well, just for the

2  record, Exhibit 13 is a copy of an article that

3  was published in The Columbus Dispatch on

4  January 26, 2022.  Do you see that?

5      A.  Yes.

6      Q.  Did you see this article when it was

7  published?

8      A.  I don't remember.

9      Q.  Do you recall providing information to

10  reporter Stephen Borgna, B-O-R-G-N-A, for this

11  article?

12      A.  I don't recall it, but it looks like I

13  did.

14      Q.  I'm going to ask you questions then

15  about it.  Well, you would agree with me that

16  you were the zoning attorney Tom Hart of Isaac

17  Wiles law firm in Columbus who was retained by

18  Lifestyle Communities, weren't you?

19      A.  Yeah.

20      Q.  Did you tell them that the company,

21  referring to Lifestyle, could choose to refile

22  another application to redevelop the site after

23  the failure of its latest proposal in December?

24      A.  Did I tell the paper that?

1      Q.  Yes.

2      A.  It looks like it, yes.

3      Q.  And you were aware that the client, your

4  client, Lifestyle, could do that, right?  We

5  talked about that.

6      A.  Well, what you tell a reporter to

7  message what you think should happen and what

8  Worthington may have let happen is complete

9  speculation.  I mean, who knows what they would

10  have done.

11      Q.  I just want to know if you told the

12  reporter that.  Is that accurate?

13      A.  It looks like I did.

14      Q.  Do you see the fourth paragraph on the

15  first page?

16      A.  Since 2015?

17      Q.  Yes.  The reporter wrote since 2015 the

18  company has submitted three proposals to rezone

19  and then redevelop the UMCH property into a

20  mixed use residential and commercial project.

21  Do you see that?

22      A.  Yes.

23      Q.  You don't agree with that, though.  We

24  talked about that.

1        A.  Correct.  There was not a -- there was

2    no third submittal.

3        Q.  There were two proposals, not three.

4        A.  Yeah.

5        Q.  But do you see where it says to date

6    each proposal has been scrapped because of poor

7    feedback from city officials and residents, or

8    did not receive authorization from city

9    officials who have cited several concerns with

10   the proposals, including density, greenspace and

11   the height of several buildings?  You see that

12   line?

13       A.  Yes.

14       Q.  Did you give that information to the

15   reporter?

16       A.  Don't think I would have, but I don't

17   know.

18       Q.  Do you agree that each proposal was

19   scrapped because of poor feedback from city

20   officials and residents?

21       A.  No, that's his -- what the reporter

22   thinks.

23       Q.  But did the city cite several concerns

24   with the proposals including density, greenspace

1    and the height of several buildings?

2        MR. INGRAM:  Objection to form.

3    A.  Yeah.  We talked about density.  The

4    greenspace part was really, really hard because

5    this is an in-fill site at 25 percent

6    greenspace.  So to the extent they did, if they

7    did, it was off.

8    Q.  But it was discussed?

9    A.  I'm just saying that our proposal had

10   25 percent greenspace in an in-fill site and

11   that's very unusual.  I mean, that's a lot of

12   greenspace on a 37-acre site, 25 percent of it.

13   Q.  But all I'm asking you --

14       MR. INGRAM:  Counsel, let him finish his

15   answer.

16   A.  On the height part --

17   Q.  Yeah.

18   A.  The height part was kind of the ultimate

19   because the planning commission chair, you know,

20   known and respected, he said he wouldn't agree

21   with five stories even though that's exactly

22   what the comp plan said.  And I pointed it out

23   to him, you know, that the comp plan says five

24   stories.  He said I know.  I don't agree with

1   that.  So they're not following their own comp

2   plan, and so, you know, yeah, they're citing

3   these things to the reporter, but I think

4   unfairly.

5        Q.  Okay.  When the commissioner mentioned

6   the five stories in that hearing, what he

7   actually told you was, Tom, I'd like to know

8   what the density would be if you reduced this to

9   three or four stories.  That's what he told you,

10  isn't it?

11       MR. INGRAM:  Objection.

12  Mischaracterizes --

13       MR. SCHUMACHER:  Well, let him answer

14  first before --

15       MR. INGRAM:  -- the evidence.

16       A.  I agree with my objecting lawyer.  He

17  said -- I believe he said he's never going to

18  agree with five stories even though the comp

19  plan says five stories.  I think he said that.

20       Q.  And didn't he invite you to tell him

21  what effect the density would have if you

22  reduced the height to three or four stories?

23       A.  I don't remember that.  I remember

24  asking him what the number was.  What's our

1   residential number.  What's our density.

2      Q.  Right.  And if the record shows that he

3   asked you how the density would be affected if

4   the residential height of those buildings were

5   reduced, would you agree that it's on the record

6   if it's in the record?  You want me to -- come

7   on, I'll read it.

8         MR. INGRAM:  Objection to form.  It's

9   compound.

10     A.  Yeah, if something is in the record, I

11  agree it's in the record, yes.

12     Q.  Okay.  So -- all right.  We're not going

13  to -- we'll talk about that at trial.  I'll have

14  it on the screen for you so you can actually see

15  what was said, and we'll play it so you can

16  actually see what was said.

17        MR. INGRAM:  Objection.  Counsel, now

18  you're getting argumentative.  It's getting late

19  in the afternoon.

20        MR. SCHUMACHER:  That was a statement.

21     Q.  Mr. Hart, you were authorized to speak

22  on behalf of the company for this application?

23  We talked about that.

24        MR. INGRAM:  Objection.  Form.

1    A.  Yes, for the application.

2    Q.  You see on the second page where -- they

3  quote you here, and all I'm asking you is this

4  an accurate quote.  Did you tell the reporter,

5  "They want to keep every option open"?

6    A.  My whole career I've spoken to reporters

7  since I was in the statehouse.  I've have media

8  training, lots of media training.  I know that

9  lots of things I've said to reporters were

10  misquoted so I'm not going to agree that I

11  actually said that.

12    Q.  That's fine.  That's why I'm asking you.

13  So what about the next sentence, do you believe

14  that you told him that because this may lead to

15  legal matters later, but they may also refile

16  and start the process over based on some of the

17  feedback they got at the city council meeting

18  (in December)?  Does that sound accurate?

19    A.  I'm not going to tell you that I think

20  anything a reporter prints is ever accurate.

21  That -- that sounds like what I would have

22  believed at the time, that, you know, there was

23  no -- there was no -- there was no

24  pre-conclusion going into this that there was

1  going to be legal matters.  It was let's see

2  what happens, let's see what we can get.  If --

3  if somebody from the city would have come to me

4  or Lifestyles and said, you know, we want to try

5  this again, we'll form a working group of our

6  leadership, we'll sit down with you and hash it

7  out, that's the direction that probably would

8  have happened.

9       Q.  Okay.

10      A.  But that didn't happen.

11      Q.  Right.  Right.  Because two months later

12  a 230-paragraph federal lawsuit was filed.

13          MR. INGRAM:  Objection.  Argumentative.

14      Q.  You are aware of that, right?

15          MR. INGRAM:  Same objection.

16      A.  I didn't know how many pages it was.

17      Q.  It was long.  It wasn't written

18  overnight.

19      A.  Well, he works hard.

20      Q.  And then at the bottom of that page it

21  says -- you see that last paragraph?

22      A.  Hart said?

23      Q.  Hart said, yep.

24      A.  Yes, I see it.

1      Q.  Is that an accurate statement?  Did he

2  get it right?

3      A.  Again, I'm not going to testify to what

4  I said and what he wrote, but generally speaking

5  that would be the case in any situation like

6  this.

7      Q.  All I want to know, Tom, is it -- do you

8  agree that it's likely that you said to him

9  what's in quotes, that the company wants to

10  "keep all options open," including the

11  possibility of a lawsuit?

12      A.  I may have said it.  I don't recall.

13      Q.  And again, I think we talked about this,

14  but I want to be sure.  When these comments were

15  made to this reporter on January 26, 2022 or

16  thereabouts, you were not aware that a lawsuit

17  was about to be filed?

18      A.  I think that's accurate.

19          MR. SCHUMACHER:  Thank you, Tom.  I

20  appreciate your time today.  That's all the

21  questions I have for you.

22          COURT REPORTER:  Read and sign?

23          MR. INGRAM:  Yes.

24          COURT REPORTER:  Would you want this

1  transcribed, Paul?

2          MR. SCHUMACHER:  Yes.

3          COURT REPORTER:  Is two weeks okay?

4  That would be the 25th.

5          MR. SCHUMACHER:  Yeah.  Is there any

6  chance of getting it a little bit sooner?

7          COURT REPORTER:  Yeah.  When would you

8  want it?

9              (Discussion off the record.)

10              (Signature not waived.)

11                      -=O=-

12          Thereupon, the testimony of January

13  11, 2024, was concluded at 2:24 p.m.

14                      -=O=-

15

16

17

18

19

20

21

22

23

24

```
 1                    CERTIFICATE

 2   STATE OF OHIO      :
                              SS:
 3   COUNTY OF FRANKLIN :

 4          I, Julia Lamb, RPR, CRR, a
     stenographic court reporter and notary public in
 5   and for the State of Ohio, duly commissioned and
     qualified, do hereby certify that the
 6   within-named THOMAS L. HART was first duly sworn
     to testify to the truth, the whole truth, and
 7   nothing but the truth in the cause aforesaid;
     that the testimony then given was taken down by
 8   me stenographically in the presence of said
     witness, afterwards transcribed; that the
 9   foregoing is a true and correct transcript of
     the testimony; that this deposition was taken at
10   the time and place in the foregoing caption
     specified.
11
            I do further certify that I am not a
12   relative, employee or attorney of any of the
     parties hereto; that I am not a relative or
13   employee of any attorney or counsel employed by
     the parties hereto; that I am not financially
14   interested in the action; and further, I am not,
     nor is the court reporting firm with which I am
15   affiliated, under contract as defined in Civil
     Rule 28(D).
16
            In witness whereof, I have hereunto
17   set my hand at Columbus, Ohio, on this 23rd day
     of January, 2024.
18

19

20         Julia Lamb
21         _____
           Julia Lamb, RPR, CRR
22         Notary Public, State of Ohio

23   My commission expires:  10-10-27

24
```

## Exhibits

**Hart Exhibit 1** 30:21
31:1,7 32:17,18 36:18,
19 44:22 51:1 55:15
59:17,23 63:13 70:15
75:2 76:19 82:17
89:13,20 161:16
172:9,11

**Hart Exhibit 3** 47:24
48:4

**Hart Exhibit 4** 49:4,6,
8,17

**Hart Exhibit 5** 66:11,
15

**Hart Exhibit 6** 68:19,
23

**Hart Exhibit 7** 82:22
83:3

**Hart Exhibit 8** 90:9,
11,15,20 113:1

**Hart Exhibit 9**
119:13,17 121:23

**Hart Exhibit 10**
140:21 141:1 142:19

**Hart Exhibit 11**
165:18,22

**Hart Exhibit 12**
178:3,7 179:19

**Hart Exhibit 13**
184:13,23 185:2

## -

**-=0=-** 30:20,22 36:9,11
47:23 48:1 49:5,7
66:10,12 68:18,20
82:21,23 90:10,12
119:12,14 140:20,22
165:17,19 178:2,4
184:12,14

**-=O=-** 194:11,14

## 0

**05** 110:18

## 1

**1** 30:21 31:1,7 32:17,
18 36:18,19 38:14
44:22 51:1 55:15
59:17,23 63:13 70:15
75:2 76:19 82:17
89:13,20 161:16
172:9,11

**10** 14:2,3,10,11
123:17,19 124:3
140:9,21 141:1,11
142:19 146:1

**1033** 20:10

**10th** 31:20 113:9

**11** 111:7 165:18,22
194:13

**1145.05** 119:21 122:4
123:4

**12** 131:12 141:14
178:3,7 179:19

**12:37** 122:22

**12th** 52:1,12

**13** 184:13,23 185:2

**13th** 67:1 117:2 125:5
126:7 145:11 146:8
148:12,20

**14** 171:14

**14,000** 43:19 95:9
107:3 108:6 109:1
130:10,14

**14th** 89:15 91:8 97:19
98:12 100:5 110:20
112:14 113:14 115:22
120:10 122:11,17
123:7 148:1 153:5

**15** 157:6

**15th** 122:1 124:6
166:16

**19** 93:23 94:1 156:5

## 2

**2** 35:23 36:10,13 37:24
44:22 51:1 55:16
59:17,23 63:14 70:16

76:19 82:17 84:24
89:13,20 145:16
161:16 184:16

**20** 54:4 92:11 94:2

**2003** 8:7,12

**2007** 8:1

**2014** 7:18,19 153:16
165:6

**2015** 39:11,17 40:11,
15 41:5,11,21,22 43:2,
5,24 44:15 48:14 52:1,
12 94:4,22 156:19
157:17 160:11 161:3,
19 162:4 186:16,17

**2019** 26:5 78:1 79:12
178:21

**2020** 11:5 21:13 23:17,
18 24:7 25:11,18,22
26:2 31:8,15 32:12,20
34:2 36:15,20 37:7,10,
15,21 40:2 44:9,22
49:22 65:21 67:1 69:5,
9 70:6 80:3,15 81:15
82:12,18 87:18 89:7
120:21 141:5 150:20
151:9 152:2,19 161:12
179:11,15

**2021** 20:1 31:20 89:15
90:2,3 97:19 98:12
100:5 110:20 112:14
113:9,14 115:22 117:2
120:10 122:1 124:6
125:6 126:7,16 145:11
146:8 148:20 153:15
166:3,8 167:22

**2022** 32:6 122:11,17
123:7 126:16 127:14
185:4 193:15

**2024** 194:13

**20th** 31:14 37:15

**21** 7:11,12 20:1 32:2
46:16 65:24 77:3
89:20 101:6 128:1
146:11 148:1,12 150:7
153:4,5 154:3,4 156:3
161:12

**21st** 166:8

**22** 7:10 12:2,4 32:3
92:19 146:3

**230-paragraph**
192:12

**24th** 150:20 151:9
152:2 167:23

**25** 16:2 104:5 115:12
135:1 188:5,10,12

**25th** 166:3 167:22
194:4

**26** 185:4 193:15

**28** 155:18,19

**29th** 48:14

**2:24** 194:13

**2nd** 31:8,15 32:12,20
34:2 36:15,20 37:7,10,
21 84:16 152:18

## 3

**3** 31:18 47:22,24 48:4
91:5

**30** 20:9

**30(b)(6)** 174:1

**300** 137:4

**31st** 141:5

**3250** 92:14

**35** 150:13,15

**350** 137:15 160:12

**37-acre** 188:12

**37.8** 147:4

**3rd** 69:4,9

## 4

**4** 49:4,6,8,17

**40** 20:10 161:7,10

**420** 92:21 146:4

**43** 145:6,8

**47** 111:4

## 5

**5** 38:4,5,17 66:11,15

**50** 159:20

**5029** 6:10

**520-some** 94:13

**530** 42:13 94:5 137:6, 17 161:4

**57** 155:19

**58** 111:4

**58-2021** 145:19

**59** 96:20,21 97:6 111:3 112:15

**5th** 178:21

---

**6**

**6** 68:19,23

**60** 76:1

**600** 92:10 93:1,5,15,20 146:2 147:5,16 156:5 175:11

---

**7**

**7** 82:22 83:3

**72** 92:20 146:3

**730** 39:6,9 92:9 93:19 114:8 152:12 156:5 161:16 174:23

**7th** 69:5 70:6

---

**8**

**8** 90:9,11,15,20 113:1

**83** 98:9,10 155:18 165:4

**86** 92:19 146:3

---

**9**

**9** 111:7 119:13,17 121:23 184:17

**90** 141:8,9

**94** 9:11

**97** 8:11,12

---

**A**

**ability** 158:19

**accept** 102:24

**acceptable** 103:10

**accepted** 125:18 149:4

**access** 159:5

**accomplish** 174:14, 17

**accurate** 66:19 69:1 88:19 93:4,5,10 98:11 119:10 121:24 141:3 166:1 186:12 191:4, 18,20 193:1,18

**acknowledge** 34:21 152:15

**acreage** 156:21 161:4,18

**acres** 20:10 147:4 161:7

**acted** 16:3

**action** 171:17

**actual** 33:21 38:9 83:12 146:21 147:2,24 148:11 155:14

**ad** 102:17

**additional** 51:10

**address** 168:12

**administrative** 158:5,15

**admission** 157:18

**admit** 98:21

**adopted** 132:12

**adopts** 132:3,5

**advance** 152:19

**adverse** 105:21

**advice** 17:9 27:22 28:2 29:6 176:3

**advise** 57:6 77:17 122:9

**advised** 42:18 82:11

**advocacy** 8:19

**advocate** 10:21

**advocating** 9:18 10:2 107:17

**affected** 190:3

**affiliate** 13:10,18 16:11 32:14

**affiliates** 17:11 20:3 34:1,6 39:3 53:4 55:5 127:23 164:14

**afternoon** 190:19

**agenda** 8:19 66:6 67:5,10 144:23 145:4 146:19 148:10

**agent** 20:17 29:21

**agree** 25:2,7 37:14 50:3 69:7 70:20 72:9 73:19 80:15 82:19 84:2 105:7 110:19,23 111:1,16 117:24 125:12 130:15,16,22 141:7 145:17 146:7 150:17 151:2 152:10, 18,23 153:7 154:14,19 156:2 161:19,20 165:3,14 170:22 171:3 172:2 185:15 186:23 187:18 188:20,24 189:16,18 190:5,11 191:10 193:8

**agreed** 11:7

**agreement** 11:13

**agreements** 34:5

**ahead** 23:19 72:1 89:19 112:8 160:9

**Albany** 18:17

**allowed** 113:6 158:12

**altogether** 124:13

**ambiguous** 21:19 63:2,21 71:24 95:18 101:3 128:3 162:21 164:19 182:4

**amend** 84:13 113:6,23 114:4,23 115:14 116:23 117:5 120:19,

**24** 148:6,7

**amended** 112:18 113:13 146:24 149:9, 14

**amending** 84:6

**amendment** 75:23 113:5 116:22 117:5 147:18 149:12 171:13

**amendments** 116:6

**amount** 92:8,18

**analysis** 73:20 153:10,16 154:20,23, 24 156:18 157:16 165:11,12 184:3

**analyzed** 184:2

**answering** 25:20 69:15

**answers** 107:23

**anti-development** 164:3,16

**anticipated** 78:10 151:13

**anticipating** 151:17 152:4

**anymore** 180:16

**apartment** 106:13 107:7

**apartments** 62:17 100:20 101:9 124:3 146:4 152:3

**app** 146:24 147:20

**apparent** 106:14

**apparently** 48:12 67:5 83:12 121:14 168:3

**appears** 91:15

**applicable** 34:22,24

**applicant** 20:15,17 29:21,23 32:19 33:18 45:24 46:7 53:8,12 75:10 91:6 95:23 115:19 116:23 117:22 149:17 164:13 177:21

**application** 11:4 16:5

21:3,8,22 22:2 23:10,
16 29:10,12,16,20
30:2,4,8 31:7,13,17
32:12,18,23 33:14
34:15 35:18 36:19,24
37:6,14,22 38:2,5
39:6,18,22 44:9,21
45:9 46:17 47:6 49:22
50:10,19,24 52:20,24
55:21 58:1,5,8,15
59:24 60:16 61:22
62:10,14,23 63:18
64:12 65:22 67:4
68:14 69:9,10 70:1,15,
22 71:3,22 72:12 73:5,
14 75:9 76:18 77:2
78:11 79:24 80:4,16
81:16 82:17 83:12
84:12,15 85:13,19
86:24 87:4 89:3,13,17
91:12 92:1 94:24
109:23 112:5,16
114:1,6,8,23 115:14,
21 116:10 117:1,4,6,
14 118:19 119:4,5
120:13,18,20,21,23
121:1 122:10,16
123:16,19,21 124:1,12
125:3,6,9,21 126:2,17
128:10 140:10 145:22,
23 147:15 148:7,9,18
149:6,16,19 150:1,6
152:12 153:8,17,23
156:20 158:19 161:15
165:6 168:22 171:9,17
176:4 180:11 185:22
190:22 191:1

**applications** 20:19
21:10 23:4 37:17 50:6
51:18 85:3 86:9
109:22

**applied** 64:6 145:19

**apply** 115:1

**approach** 103:14
125:4

**approached** 26:8
27:16 129:3

**appropriately** 163:17

**approval** 17:13 110:2
169:3

**approvals** 17:14,15

**approve** 50:14

**approved** 50:11
51:10,12 76:19 77:2
78:11 113:24

**approves** 128:18

**approximately** 156:5

**April** 122:11,17 123:7
126:16

**arborist** 70:10

**architect** 26:19

**architects** 91:21

**Architectural** 97:17

**area** 105:16 132:7

**arguably** 123:20

**argued** 45:23

**argumentative** 18:3
24:24 37:12 42:2 60:9
71:12 88:6 124:24
134:7 144:15 148:14
162:9,10 183:1 190:18
192:13

**armed** 177:22

**Arndt** 83:5

**article** 185:2,6,11

**aspects** 43:22 129:23

**aspirations** 109:14
110:9

**assessing** 164:2

**assist** 78:1,9 79:17

**assistant** 38:24

**Associates** 6:11,14
7:9

**Association** 9:7

**assume** 10:6

**assumes** 39:13 65:15
75:16 76:13 77:20
84:17 96:1 106:24
124:23 132:13 175:12

**assuming** 19:18

**attached** 69:13 91:2

**attachment** 69:12,15

**attachments** 34:15
37:24

**attempt** 78:2,10 87:17
113:5,21

**attempts** 116:23

**attend** 166:11

**attended** 22:14,18,19
43:18,20 65:1 95:13
98:12 117:3 141:17
145:11 160:12 166:13

**attendees** 52:12

**attention** 85:12
179:24

**attorney** 6:14 21:2,7
23:23 29:15 45:24
46:5,6,12,14 47:4,5
83:6 95:23 113:5
177:20 185:16

**attorney-client** 20:23
142:14,21

**attorneys** 6:17 29:21

**attract** 101:16

**audio** 148:11

**authority** 159:2

**authorization** 187:8

**authorized** 21:14
190:21

**avenue** 126:20

**avoid** 114:12

**aware** 39:16 40:1 41:3
47:6 48:8 56:20,24
57:2 63:16,22 75:13,
21 76:5,7,18,21 77:1,
6,11,15,23 78:7,18
80:13,22 81:17,21
94:3,11,17 95:24
106:10 107:1,15,21
118:18 124:21 127:14
128:8 163:18,22 183:5
186:3 192:14 193:16

**B**

**B-O-R-G-N-A** 185:10

**back** 32:10 36:18
49:12 88:9,21 89:6

90:14 94:3,20 96:13,
14 97:24 101:6 102:1,
15 103:5 106:22
108:13 111:3 132:19
133:15,24 145:2 157:6
159:18

**balance** 163:14

**balancing** 163:17

**Ballard** 26:10 27:15,
21 28:16 29:2 181:1,2,
6

**ballooned** 100:21

**bank's** 167:23

**base** 83:24 133:17,19

**based** 56:4 84:24 87:1
110:3,13 131:3 132:22
163:20 165:13 175:19,
20 177:3 183:6 191:16

**basically** 15:6,15 19:1
65:17

**Bates** 92:13

**battle** 10:11

**battles** 10:17 157:3

**beat** 77:18

**began** 52:23

**behalf** 21:14,16 23:11
29:16 32:13,24 37:22
52:20 53:3 58:9
190:22

**believed** 85:9 191:22

**bet** 181:3

**Bexley** 106:9 133:10

**BIA** 8:8,10,14 9:3 10:1
14:15 15:5,14 22:23
167:12

**big** 170:21

**biggest** 135:11

**bill** 24:9

**billed** 25:22

**billing** 24:17 25:12,18,
20 179:15

**bills** 24:12 26:2,3

binder 35:23 36:14

binding 57:8 138:10

bit 103:13 194:6

black 154:19

blunt 100:1

Bo 99:12,14

Board 97:18

bodies 8:23

body 50:13 130:18 135:13

Bonnie 64:18

Borgna 185:10

bottom 33:4 84:23 92:14 111:5 179:23 192:20

Boyle 7:23

break 74:10,18 128:20 129:2 184:18,20

Bridge 133:9

bring 102:15 133:14

Bringardner 7:22,23

bringing 100:15

brings 133:18

brought 147:3 156:22, 24

Brown 30:11 38:1 53:16 62:22 65:13,20 66:6,20 67:24 68:3 69:2 71:20 72:10 73:3, 12,21 82:11 84:6,11 87:2 88:1,3 89:5 91:11 113:9 120:3,6,8 121:9 122:1 124:9 141:4 147:14 150:19 151:7, 12,16 152:1 158:13

Brown's 152:24

Buchanan 180:22

build 15:6,10 172:14 174:23 183:10,18

builder 15:10,14 17:12

building 8:3,21 9:19 54:14 66:22 69:4

102:4 129:20 140:5 166:12 167:8 182:10, 22

buildings 187:11 188:1 190:4

built 159:13

bunch 106:19 108:12

Burkholder 7:22,23

business 6:21,24 7:4 54:11 108:21 130:6 140:3 171:15 172:23, 24 173:1 180:18

businesses 108:22

businesspeople 54:19

buy 180:10

BWF 166:12 168:3

## C

cagey 103:14

calculations 55:1

call 20:8 23:7 60:5 68:7 84:1 85:12 157:4 183:14

called 8:4 54:9 77:24 88:17 103:23 130:1

calling 17:5 41:16

calls 18:2 20:22 27:17 45:14 47:10 58:2 59:11 60:1 76:2 77:8 79:19 80:7 82:2 83:22 85:16 95:7,17 102:10 105:22 109:8 118:14 122:13 126:22,24 128:12 130:23 134:18 137:8 138:17 140:7 142:22 160:21 162:6 168:17 170:8 172:17, 18 173:19,21 175:21 181:3,17 182:5 183:12 184:9,10

campaigns 163:24

Campus 13:6 21:16 23:12 46:23 48:21

candidates 164:3

cannibalizing 136:17

capacities 9:7

capacity 7:3 158:13

Capital 9:9

capitalism 62:4

career 9:17,24 14:8 176:22 191:6

case 10:23 12:21 14:20 15:17 17:24 18:13,14,15 43:1 50:24 56:17,22 67:23 76:8,10,22 77:18 78:8 86:10 109:15 113:3 123:18 129:12 132:7 133:7 135:3 138:3,9 142:11 143:22 150:4 153:1 164:13 193:5

cases 15:19 153:8 181:13

cell 83:23

Cemetery 6:10

center 166:20 169:8

central 8:14

century 109:11

certified 6:2

chair 116:14 188:19

challenging 101:20

chance 31:4 48:3 49:16 66:14 68:22 74:17,20 83:2 90:19 98:10 110:1 119:16 134:21 140:24 145:7 150:14 165:21 178:6 184:22 194:6

change 50:20 75:24 91:17 94:1 105:21 106:6 132:11,23 161:23

changed 132:16 161:21 162:4,14

characterization 114:18

characterizing 89:4

charitable 15:7

charity 15:6

charter 75:23

children's 52:3 83:8

choice 170:18

choices 107:5

choose 185:21

Chris 11:11,18 28:1 32:9 96:4 170:3 171:11

church 172:23

circumstances 149:8

cite 187:23

cited 187:9

citing 189:2

citizen 47:7 59:6 162:19

citizen's 138:14

citizens 45:13 47:12, 14 53:17,20 54:9 59:22 61:20 62:12 75:24 94:12 136:8,19 138:15 139:4

citizens' 52:15

city 8:23 10:10,20,24 12:16 14:17 16:5 17:18,19,23 18:9,16 19:4 22:15,19 23:3 30:3,5 31:8 32:13,19 35:12 36:15 37:1 38:2 39:18 41:4 46:7,12,13, 16,17 47:2,17 50:3,15 51:10,14,16,23 52:3, 11,14 54:6 55:13 56:21 57:8 61:21 63:11,17 64:11 65:13, 23 66:21 67:17 68:13 69:3,8,22 70:1,21,24 71:1,2,19,20 74:21 75:5,14,22 76:19 77:2 82:12 84:13 87:2,16 88:4 89:6 90:1,24 95:3 107:16 109:2 115:11, 24 116:18 117:3 118:19 119:22 120:18 122:11 124:13,19 125:2,7 126:6 128:1, 10 129:6 134:12 136:8 138:11 146:8,9,19

148:19 149:6 150:7 159:23 160:10,19 162:18 163:16,19 164:16 165:4 181:8 187:7,8,19,23 191:17 192:3

**city's** 45:23 46:4,5,6 48:9 50:12 70:9 73:6

**class** 101:21

**classifications** 172:15

**clean** 114:17

**clear** 26:4 61:24 64:3 81:6,8 114:22 121:2 156:9 157:22 158:11 164:13 170:14 176:9 178:20

**clerks** 147:22

**client** 17:6 18:22 19:22 24:2 52:20 91:16,20,21 93:18 95:16 100:12 117:22 122:9 126:15 141:22 186:3,4

**client's** 86:13 87:5

**clients** 19:24 29:9 86:8

**clinic** 173:14

**close** 59:8 94:2

**co-applicant** 180:9

**code** 56:12 75:6,7,15 76:12,16 77:12 110:13 115:24 116:4,5,10,18, 24 117:20,21 118:4, 20,24 119:11,22 121:9 122:16 125:19 131:19 137:21 163:4 184:4

**code's** 123:15

**codes** 116:21 119:1,5, 6

**codified** 34:23 35:11 50:16 56:8 74:21 75:4, 11

**collaboration** 158:23

**colleagues** 177:2

**Colliers** 101:15,23

**Colter** 111:5

**Columbus** 17:18 18:17 131:9 185:3,17

**combat** 45:1

**combine** 114:23

**comment** 51:11 84:3 99:15,20 100:4

**comments** 52:15 61:1 72:2 95:2 98:3,17 99:1,22 111:15 171:22 175:19,20 193:14

**commercial** 101:14 103:21 104:2 132:20 134:1 149:22 156:12 169:22 173:10 186:20

**commission** 11:19 12:15 22:18 46:11 50:12,21 51:2,6 66:7 67:7 73:15 89:15 91:8 97:18 98:19 104:18 115:10,23 128:17 132:4 134:13 147:19, 20 158:10 159:4 166:9 169:4 172:1 188:19

**commissioner** 189:5

**commissions** 8:24 10:20

**common** 17:18

**communicate** 65:12 66:3,4

**communicated** 65:19

**communicating** 91:23

**communication** 65:6 66:2 77:24 119:20 120:7

**communications** 8:21 20:23 27:6,11 57:11 78:5

**communities** 13:1,4, 5,8,9,15,18 16:4,10 17:22 19:3 20:3,19 21:3,8,15 22:1 23:2, 11,23 24:20 25:5 26:16 27:8,12 29:17 32:14,24 34:1,6,10 37:22 39:2,12,17 40:9,

13 41:6 42:18 43:5 46:23 48:22 53:3 55:4 58:9 80:5 91:24 94:4, 11 95:6 109:13 128:8 129:9 142:9 150:4 164:1,14 177:21 178:13 180:23 181:22 185:18

**Communities'** 12:11 16:14 40:3 42:9 80:18 174:10

**community** 23:4 41:18 42:19 43:3 52:19,23 53:2,14 80:24 92:5 93:17 95:1, 4,10 104:6 107:3 108:17,18 109:13 110:6 111:22 131:12, 14,23 134:10 135:12, 13,22 144:1 155:5 159:2 163:13 167:24 170:18 171:11 181:16

**community's** 43:19 110:8 131:13 132:6

**comp** 45:7,10 75:7 84:14 103:22 105:12, 13,18 106:7 108:9 109:17,19,21,24 110:3,4,8,11,14,17 131:20,22,24 132:4,7, 12 133:16 135:17 137:21 138:2,10 149:10,13 153:16,23 162:3 163:3,14 165:11,13 171:13 173:5,10,12 174:7,13 188:22,23 189:1,18

**companies** 13:10,18 16:11,15

**company** 8:3 32:14 69:21 77:24 80:4 173:24 185:20 186:18 190:22 193:9

**compared** 73:5 153:8

**comparing** 165:5

**compensation** 19:2

**compilation** 53:20

**compile** 129:16

**complaint** 11:20,22, 23,24 12:8 57:4

**complete** 36:14 71:10 186:8

**completed** 79:12

**completely** 138:3 154:16 157:7

**complex** 106:13

**complies** 31:3

**comply** 34:23

**component** 132:22

**compound** 43:8 63:21 84:18 87:13 95:21 128:3 138:16 171:1 183:22 190:9

**comprehensive** 45:3,4 55:13,21,24 56:4 57:7 72:22 73:6, 20 81:14 82:13 84:7 87:3,17 88:5 102:9 104:7 109:11,12 131:10,11,15 133:3 135:14 149:20 153:9 165:7

**concept** 31:19 90:1, 23 91:7 92:18 112:24 113:8 130:1,4 146:10 154:5

**conceptual** 48:12

**concerned** 45:13,18

**concerns** 187:9,23

**concluded** 150:12 194:13

**conclusion** 76:3 82:3 85:17 118:14 126:23 138:17 142:23 172:19 183:13,15,17 184:10

**conclusions** 71:18

**conducted** 53:5,24 55:3

**confidential** 17:6

**confirming** 167:22

**conforming** 148:22

**confused** 46:24 166:23

**Confusing** 43:8

**considered** 46:17 52:16 55:20 89:14 113:15 117:2 121:4

**consistent** 71:2 100:2 131:22 132:10 133:7, 11

**consisting** 146:2

**constituents** 106:12 109:7 130:18

**construction** 15:13, 17 16:20

**consult** 17:2

**consultant** 77:17 78:9 79:16 80:6

**consultants** 69:22

**contact** 47:14 107:4

**contacted** 53:18 108:7 129:17 179:13

**contacts** 108:12 129:11

**contained** 34:14

**contemporaneous** 30:13

**Contemporaneously** 12:6

**content** 48:20

**context** 157:2

**continually** 103:15

**continue** 121:6 169:14 171:23

**contract** 86:8

**contracts** 34:5

**control** 141:15

**convenience** 84:1

**conversation** 151:6

**conversations** 25:24 28:15 59:2

**cooperate** 114:2

**copies** 168:4

**copy** 32:10,22 36:1,2, 24 56:12 66:6 69:1 97:16 98:11 121:24

141:3 146:18 155:9 166:1 185:2

**corporate** 24:5

**correct** 7:7,16 8:9,15 9:24 20:4 21:11 31:6, 20,23 32:22 33:24 34:3,16 36:16 55:1 60:19 61:7,19 75:5 77:16 92:2 97:16 114:9 117:15 146:16, 18 151:24 153:10 177:23 187:1

**correctly** 92:8,24 169:9

**council** 11:19 12:16 22:19 41:4 46:16,18 51:10,14 52:14 63:17 64:5,11 65:23 68:13, 16 69:8 77:3 81:12 82:12 84:6,13 88:4 89:6 95:3 103:9 106:11 108:3 109:3 115:11 117:3,6 120:18 124:13 125:2,7,8 126:6 128:1,11,18 132:3,4 134:12 146:9, 19 147:22 148:8,19 150:7 155:14 163:20 181:7 191:17

**council's** 51:24 52:11 87:2,16 110:5

**councilmember** 82:8

**councilmembers** 110:16 163:19 164:16

**councilpeople** 88:24 89:1

**councils** 8:23 10:20

**counsel** 7:3 25:1 28:4 38:6 42:2 47:1 49:8 56:11 57:5,6 60:10 71:11 74:8 83:20 87:8 88:7 90:13 96:6 97:5, 20 99:16 106:16 118:8 121:17 122:21 137:13 139:14,19 142:10 144:14 147:8 155:7 163:9 179:4 184:15 188:14 190:17

**counsel's** 57:2

**counsels** 8:4

**count** 93:10

**country** 161:22

**counts** 56:22 57:4

**county** 8:24 74:5

**couple** 17:17 87:15 108:3 135:1 140:5,7 172:4

**court** 43:1 56:20 57:7 93:11 138:2 143:22 144:13 193:22,24 194:3,7

**Court's** 56:16

**cover** 31:16

**coverage** 7:6

**COVID** 53:22 101:19 180:15 183:7

**coworker** 167:12

**create** 86:21

**creation** 179:18

**CROSS-EXAMINATION** 6:4

**curious** 172:4

**current** 149:20 172:10 173:6 174:8 183:10,20

---

**D**

**danger** 135:22

**data** 164:15

**date** 12:6 23:14 24:19 25:3,10 86:3,4 88:9,22 89:18 90:7 117:23 118:21 127:17 151:13, 18 152:15,16 166:15 178:20 179:7,8,14 187:5

**dates** 32:5 90:4,5 178:17

**dating** 37:17

**day** 30:15,16 83:16 120:9 121:8

**days** 30:16 37:20 76:1

**deadline** 85:24 121:15

**deadlines** 86:1,23

**deal** 79:3,24 104:17,19

**dealing** 116:10 163:5, 10,12

**dealings** 180:13

**dealt** 26:12,13

**December** 46:16 65:23 69:4,5,9 70:6 77:3 82:18 84:12 117:2 125:5 126:7 128:1 141:5 145:11 146:8 148:12,20 150:7 151:14,19 152:19 185:23 191:18

**decide** 85:21,23 136:9,14

**decided** 65:23 71:15 127:13

**decides** 138:12

**decision** 126:14 138:22

**deck** 159:1

**defamation** 14:18

**defect** 15:17

**defer** 147:24

**deficiencies** 72:21 73:5 153:21 154:10

**defines** 54:20

**deliberation** 103:6

**deliberations** 63:24 64:20 115:15

**deliver** 104:8

**democratic** 112:1

**denial** 113:18,24 117:23 120:17,20 125:10

**denied** 118:19 150:7 159:9

**dense** 107:18

**densities** 45:8

**density** 40:10 42:13
43:4 44:23 45:5,6,12,
18 46:1 47:8 62:17
92:9 93:19 94:5 95:5,
16 101:9 103:22,23
105:6,14 106:13
134:11 155:3,21
156:4,9 157:18,19
159:21 175:9,22 177:4
187:10,24 188:3
189:8,21 190:1,3

**deny** 43:2 117:13

**department** 66:22

**depending** 181:7,15
182:2

**deposes** 6:3

**deposition** 11:11,17
12:18 13:21 14:4 36:6
72:7 96:23 97:13
112:9 143:4,11 145:14

**depositions** 12:20
14:7,11 15:16

**describe** 6:19 83:19

**desire** 132:6

**detailed** 109:17 151:8

**details** 43:23 44:3
70:18 72:24

**deter** 78:2 80:6

**deterring** 78:9

**develop** 10:7 131:21

**developed** 129:22
136:15

**developer** 10:12
15:20 29:23 52:4,15
77:15 78:8 79:16
85:19

**developer's** 11:4

**developer/home**
17:12

**developers** 10:7,21
79:21 181:14

**developing** 9:19
84:24 86:14 135:14

**development** 9:20
10:2,4 17:15 34:4
38:18,19 50:5 52:2
54:16 58:20 59:10
63:8,13 92:17 100:3
107:18 108:4 109:14
110:2,9 129:4 131:15,
24 132:1 134:11 137:6
138:13 139:5 163:5
167:15,18 175:5

**development's**
135:18

**developments**
135:24

**devising** 8:18

**Dichotomous**
170:20,21

**direct** 47:14 100:1
179:24

**direction** 192:7

**director** 8:11,13,17
14:15 15:9 65:13
66:20 68:10 69:3 70:9

**disagree** 25:8 147:6
154:15 155:6 165:8,11

**disagreed** 157:13

**disagreeing** 147:7

**disagrees** 138:3

**disappointing**
158:17

**disapproved** 51:12

**disclose** 17:5 29:6
57:10

**disclosing** 17:8

**disclosure** 20:22

**discount** 135:19

**discovery** 129:11
139:17 142:11 144:20

**discretion** 85:4

**discuss** 27:19 28:5

**discussed** 28:8 91:6
105:4 113:16 115:7
188:8

**discussing** 20:6 67:5

**discussion** 28:24
30:19 52:5 82:15
90:17 111:6 126:8

130:2 140:2 194:9

**discussions** 28:19
57:13 64:21,23 65:5
91:11

**dismiss** 56:17,22

**dismissed** 57:3

**Dispatch** 185:3

**Dispute** 148:10

**disputing** 37:5,8
116:8

**distinction** 119:3

**district** 54:24 64:2
103:3,4 138:2,9
158:20

**divulge** 176:5

**divulging** 104:13

**document** 33:3 34:13,
19 35:22 36:1 38:9
48:11,24 49:10,19,23
51:23 56:1 83:18,20
90:6,16 91:5 92:13
95:22 96:22 99:17
139:16 145:17 150:22
155:8,9 178:9 179:1

**documentation** 38:1
133:2 139:8 164:8

**documents** 12:18
27:6,10 40:8,24 47:16
73:7 129:10 139:2
144:3,19 164:2

**dominant** 104:2

**Dominion** 8:4,5 22:24

**doubt** 153:19

**downsize** 107:7

**dramatically** 155:4
161:21,22

**drill** 86:9

**drive** 107:12

**drug** 173:13

**duly** 6:2

**duties** 8:16

---

**E**

**earlier** 32:1 44:1 48:18
80:20 140:12,13
143:10

**earliest** 84:1

**early** 115:8

**easy** 173:12

**economic** 102:12
104:24 159:22 173:4

**economically** 176:14
180:17

**economics** 100:14
101:1,8,12,24 104:22
158:24 176:16

**economy** 135:7 183:7

**Edge** 105:15

**effect** 149:11 189:21

**effort** 78:2 83:23

**efforts** 21:12

**elected** 81:23,24
106:11 107:16 109:2
110:10 135:9 163:1
181:7,16 182:3

**election** 163:24

**else's** 86:7 136:15

**email** 66:19 67:15
69:2 108:16 121:20,24
130:12 141:4 150:18,
19 166:2 168:3,7
170:4 178:21 181:23

**emails** 27:10 62:22
108:13 129:10

**emphasize** 169:1,2

**employed** 6:9 7:21
51:17

**employment** 133:24

**empowered** 158:6

**empowering** 158:7

**enacted** 108:9 162:3

**encouraged** 52:4

**end** 65:9 68:17 86:10

150:6

endeavor 33:20

ends 157:17

engage 70:14

engineer 69:22

engineering 17:14
69:20,21

engineers 91:21

entered 11:12

entertainment 102:3

entire 49:10

environment 101:20
102:17 133:20 159:23,
24

Eric 180:22

essence 109:13 163:6
176:15

essential 85:2

essentially 7:1 9:18

established 50:5 51:3
148:23

estate 101:14

eventually 29:11
46:17 65:23 89:14
117:2

evidence 39:14 65:16
75:17 76:14 77:21
84:18 96:2 106:17,24
113:3 118:23 123:11
124:24 125:14 132:14
161:9,14 175:13
189:15

evolved 174:21

exact 23:14 25:10
40:4 54:12 61:14
119:2,3,4 123:15
124:1 127:17 179:7

examples 102:20
163:10

excess 39:10

exchange 66:20,24
69:2 121:24 141:4
150:18,19 166:2

Excuse 150:24 181:3

executive 8:11,13,17
14:15 15:9

exhibit 30:21 31:1,7
32:17,18 35:23 36:10,
13,18,19 37:24 44:22
47:24 48:4 49:4,6,8,17
51:1 55:15 59:17,23
63:13 66:11,15 68:19,
23 70:15 75:2 76:19
82:17,22 83:3 89:13,
20 90:9,11,15,20
93:12 96:20,21 97:6,
21 98:9,10 111:3
112:15 113:1 119:13,
17 121:23 140:21
141:1 142:19 145:6,8
150:13,15 155:12,18
161:16 165:4,18,22
166:19 172:9,11
178:3,7 179:19
184:13,23 185:2

exhibits 90:14 177:24

exist 142:19

existing 24:2 173:6,8,
9

exists 139:11,24
173:2

expect 63:7 64:1,21
80:4 103:4,5 131:21
160:10,15,19,24 175:5

expectation 70:17
104:6 109:23 132:8
158:21

experience 50:4,7
51:18 63:6 79:15
109:5 131:3 132:11
181:13,22

experiences 128:17

experiencing 61:16

explain 148:16

express 81:24 130:19

expressed 60:4 96:17
137:4

expressing 61:21
62:7 137:5,16 159:14
168:24

expression 132:6

extent 17:4,7 27:20,23
43:9 44:2 52:22 57:10,
11 62:2 63:3 67:20
72:1,14,15 75:19
101:4 127:2 128:4
131:1 162:23 164:5,20
176:2,7 182:6 183:23
188:6

extremely 101:19

F

faced 144:1

facilities 132:21 184:5

facility 173:1 182:22
183:11,19

facing 170:18

fact 57:3 75:13,21
76:18 77:23 78:8,18
84:10 94:3,11 114:24
116:8 118:18 133:11
135:6 147:6 148:10
149:5 157:23 160:20
161:20 162:3 163:18

facts 39:13 65:15
75:16 76:13 77:20
84:18 95:24 96:1
106:24 124:23 132:13
175:13 177:22

fail 102:11

failure 163:15 185:23

fair 9:17 16:3 64:2,20
65:19 99:10 103:5
128:19 153:20 154:8,
20,21 155:10 167:15,
17 168:4

fairly 59:8 73:12,18

fallow 136:2

familiar 13:6,8 35:14
56:6 75:3 116:18
118:5

familiarize 75:3

familiarized 34:21

fast 98:22

Faust 114:11

favor 58:1 62:24 63:17
64:12,16 110:22 129:4
139:5

favorite 171:19

February 7:10,12
32:3,6

federal 43:1 138:21
143:22 192:12

feedback 44:15 65:6
92:3 93:18 104:10
115:16 187:7,19
191:17

feeling 58:8

fees 11:14 17:23

felt 115:4,16 169:19
177:3

fewer 123:17,20

fight 45:1 79:17

figure 136:5 178:16

file 18:20,21 20:19
21:3,8 30:3 35:18
82:16 84:11,15 85:3,
22,23 86:3,8 109:23
119:4,5 122:16 124:18
125:24 126:1,17
127:13 149:5,16,18
151:13,18 173:6
174:14 175:2

filed 11:5,21 12:1,4,8
15:13 27:6 30:11
36:19,22,23 37:1,7,10,
15,18,21 45:9 47:13,
15 52:20 55:15 56:18
58:8 64:13 65:21 80:3,
16 81:3,8,11,15 87:4
94:24 109:21 124:1,3
127:18 135:18 140:10
152:11,16 156:19
162:15 174:7 192:12
193:17

files 18:24 19:22 27:14
139:21

filing 12:11 16:5 30:4,
14 47:21 59:23 64:2
72:18,20 79:24 85:24
88:18 89:2 103:3,18
110:3 113:23 128:6,9

filter 136:24 137:3,7,

18,24 171:18

**financed** 15:15

**financial** 54:23

**find** 103:10 131:9,17 176:13,16 181:23,24

**findings** 71:18

**fine** 84:10 93:13 94:19 112:12 143:13 144:13 147:24 148:5,17 165:12 177:24 191:12

**finish** 51:20 107:23 108:2 122:24 125:3 133:4 157:1,15 163:9 188:14

**fire** 86:9

**firm** 6:11 9:13 10:14 11:10 18:22 78:6 79:5, 6,7 139:21 141:21,22 185:17

**firm's** 24:2

**Fish** 119:24

**Fisher** 119:20 120:1,4

**fit** 130:3 173:10,11

**fits** 24:7 25:21,23 179:13

**fix** 115:4

**flats** 92:21

**flies** 32:5

**flip** 38:11,16 111:4 145:16 170:2

**focus** 40:12 132:9

**focused** 43:23

**folks** 24:5 41:18 42:9 53:17,24 54:19 101:15 157:5 171:8,24

**follow** 45:9 163:23

**force** 65:9

**forget** 64:18

**forgot** 183:3

**form** 9:21 10:13 11:1 13:11 15:22 16:7,16 21:18 24:10 29:13,20 31:17 33:1 34:7,11

35:5,6,20 42:21 43:6 46:20 48:23 51:4,19 52:21 53:13 56:2 61:4 62:1 63:20 64:14 65:3 67:19 71:16,23 72:13 76:23 84:17 89:22 91:18 99:3 101:2 119:23 125:13 134:7 152:5 162:22 164:4,18 170:24 175:12 188:2 190:8,24 192:5

**formal** 156:20

**formed** 54:8

**forms** 102:20

**forward** 63:23 64:19 71:15 115:15 121:4 125:5

**forwarded** 98:22

**foundation** 15:8

**fourth** 186:14

**frame** 166:5

**front** 35:23 36:4 42:24 80:12 143:21 149:22

**frontage** 146:5

**frustrated** 60:22 61:1

**frustrating** 159:18

**frustration** 159:14

**full** 6:6 158:13

**functions** 158:16

**funded** 159:3

**future** 54:14 109:15 129:20 131:14 135:7 140:6 166:12 167:9 168:12

---

**G**

**gain** 52:19 169:3

**game** 133:14

**gas** 135:4

**gave** 29:5 41:4,10 164:23

**general** 11:2 45:8 62:6 125:3 166:5

170:22 171:3 181:12

**generally** 13:20 29:1 35:16 37:20 43:20 76:5 77:15 93:4 99:21 115:20 129:5 167:19 171:8 193:4

**give** 23:13 45:7 63:4 83:24 95:22 97:5 115:10 134:21 139:15 171:10 176:10 187:14

**glad** 156:22,24

**goal** 121:3

**good** 104:14 110:1 144:10 148:17 157:21 163:2

**govern** 121:10

**governments** 17:20

**graduate** 9:10

**Grandview** 102:18 133:9

**granted** 56:21

**great** 107:11

**greater** 147:21

**greatest** 102:6

**Green** 166:2 167:1,3, 17 170:7

**greenspace** 187:10, 24 188:4,6,10,12

**Greeson** 68:2 150:24

**Griffin** 78:1,23 79:6

**ground** 131:18 136:16

**group** 41:18,21 54:9, 11 59:3,6,7,22 60:3 94:12 108:21 129:20 130:3,7 140:3 168:3,7 171:16,24 192:5

**groups** 54:8,9

**growth** 109:15

**guess** 21:10 77:10 104:21 148:3

**guide** 131:20

**guideline** 138:11

**guiding** 56:1

**guy** 26:9 104:14 157:21 167:5

**guy's** 171:14 172:7

**guys** 129:21 177:5

---

**H**

**half** 8:7 61:11

**hand** 32:7 90:8 147:9

**handing** 30:24 32:11

**handle** 158:4,24

**handled** 158:15

**happen** 121:18 125:2 186:7,8 192:10

**happened** 16:21 25:9 44:1 84:20 113:19,20 121:8 127:19 132:22 147:1 180:17 192:8

**hard** 58:17 103:16 118:12 123:12 167:20 170:10 188:4 192:19

**hart** 6:1,8,9 17:22 23:7 25:4 30:21,24 31:1 32:7 36:10,13 47:22, 24 49:4,6 66:11 68:19 82:22 90:11 119:13 140:21 143:24 159:20 165:18 178:3 184:13 185:16 190:21 192:22, 23

**hash** 192:6

**hate** 160:3

**head** 111:2 116:7

**health** 173:13

**health/drug/clinic/ rehab** 172:24

**hear** 111:6 126:3 159:15

**heard** 48:18 49:2 60:14,18,19 84:5 125:6 126:7,10 146:13,24 147:22 148:8 175:19,21

**hearing** 21:23 22:10

51:13 68:16 86:4
98:17 113:10 114:3
124:6 145:18,22
146:9,22 147:12,14
148:1,20 177:3 189:6

**hearings** 22:1,12,22
41:10,14 45:24 51:5,7
61:18 86:24 93:22
111:20 121:4 136:23
157:9

**hears** 132:4

**height** 155:21 187:11
188:1,16,18 189:22
190:4

**held** 51:13

**helped** 17:16 30:2

**helpful** 144:20 171:22

**helping** 16:18

**hereinafter** 6:2

**Hermann** 166:17
171:11

**Hermann's** 170:3

**hesitating** 59:16

**hid** 103:24

**high** 20:10,11 103:23
105:15,16 106:13
146:4 147:4 177:4,5

**high-dense** 138:13

**Hilliard** 6:10

**hint** 103:8

**hire** 79:23,24

**hired** 29:11 77:24
78:5,9,24 79:2 131:17
181:19

**hiring** 78:23

**history** 161:22

**hit** 180:15

**home** 8:3,21 9:1 15:6,
13 52:3 83:8

**homes** 8:4,6 9:2 15:8,
12 146:3

**honestly** 15:23 28:23

**horn** 102:19

**hour** 74:9 122:22

**hours** 54:10 58:23,24
60:6 61:11,12,16
140:2

**house** 15:15

**housekeeping** 65:18
158:5,16

**housing** 10:3,4 135:5
155:21

**hundred** 53:17 62:21
140:18

**hypothetical** 79:20
80:8 109:9 130:24
134:18 137:12,14
138:8 172:18 181:18
182:20 183:13 184:11

---

## I

**Ice** 83:6

**idea** 81:13

**ignore** 134:14 135:8
160:11,16,19,24
162:19

**implications** 54:23

**important** 110:12

**improved** 72:20 114:3
154:9

**improvements** 154:7
159:3

**in-fill** 169:21,23 188:5,
10

**in-house** 8:4

**in-person** 53:23

**included** 156:21

**including** 187:10,24
193:10

**income** 133:18

**income-producing**
132:20

**incomplete** 79:20
80:8 109:9 130:24
134:17 172:18 181:18

182:20 183:13 184:11

**increase** 103:20,21

**individuals** 124:22
128:8

**industry** 101:14

**informal** 39:10,18
41:17,21 94:12 161:18

**information** 17:6
34:14 39:1 53:18
55:10 57:12 65:8
134:14 137:1 139:18
142:10 178:12 185:9
187:14

**informed** 40:14

**Ingram** 9:21 10:13
11:1 13:11,19 15:22
16:7,16 17:4 18:2,10
19:5 20:21 21:5,18
24:10,23 25:6 27:17,
20 28:4,11 29:4,13
31:10 33:1 34:7,11
35:5,8,20,24 36:2,6
37:11 38:6 39:13,19
40:5,16 41:7,24 42:14,
21 43:6,16 44:10,17
45:2,14,20 46:2,20
47:10 48:23 49:8,24
51:4,19 52:21 53:9
56:2,11 57:9 58:2,6,
10,16 59:11,18 60:1,8,
20,23 61:4,23 62:1
63:1,20 64:14 65:3,15
66:1 67:19 71:8,10,23
72:13,23 73:16 74:2,8,
14,18,23 75:16 76:2,9,
13,23 77:8,14,20 78:3,
12,20 79:19 80:7,19
81:1 82:2,5,7 83:17,21
84:17,21 85:16 87:7,
11,20 88:6 89:22
90:13 91:18 94:7,16
95:7,17,21 96:1,6,9,15
97:5,20 99:3,7,16
101:2,11 105:9,20,22
106:15,23 107:19,22
109:8 112:6 113:2
116:2,12 118:1,7,13,
22 119:23 121:16
122:12,21 123:8,10
124:20,23 125:11,13
126:19,22 127:9,16
128:2,12,23 130:21,23

132:13 133:4 134:6,
15,17,24 137:8,20
138:4,7,16 139:6,9,12,
19 140:11 142:22
143:2,7,10 144:6,14,
17 147:8 148:14,24
150:21 151:1,22 152:5
154:11,18 155:7,16
156:7 160:13,17,21
161:6,8,13 162:2,6,10,
13,21 163:9 164:4,9,
18 165:1 168:17
170:8,24 172:17,21
173:19,23 174:18,24
175:12,24 176:2,19
177:7,9 178:22 179:3,
20 181:17 182:4,12,
18,24 183:12,16,21
184:6,9,15 188:2,14
189:11,15 190:8,17,24
192:13,15 193:23

**Ingram's** 143:5

**initial** 25:24 30:7
32:12 52:24 65:22
89:16 148:7 174:20

**initially** 11:3

**input** 132:1 142:5
143:23 179:17

**inside** 91:20

**instructed** 176:5

**instructing** 27:22

**instruction** 29:4
177:10

**instructions** 33:8

**intended** 84:11

**intending** 10:7

**intent** 128:9 174:10

**intention** 87:3

**interaction** 8:22
57:18 129:19

**interested** 54:8

**internal** 26:20 151:3
164:2

**internally** 85:18
151:11

**interpret** 67:8,9 145:3

**interpretation** 168:20

**introduce** 103:19

**introduced** 81:13
179:2

**invite** 189:20

**invited** 53:20 54:1
140:18

**inviting** 104:3

**involved** 11:6 16:14
18:14 19:10 21:12
39:24 52:18 78:4,15
79:4 81:7 85:1 135:13
178:19 179:5,9,17
180:12,16,19 182:8

**involvement** 17:19
29:3 55:6 68:17

**involving** 18:8 27:11

**ironic** 103:11

**irrelevant** 157:7

**Isaac** 7:14,20 9:12,13
18:21 19:21,23 24:16
25:3 27:13 32:2
108:13 129:14 185:16

**issue** 44:8,12,13,14,
15,23,24 45:12,19
46:1 79:12 118:24
136:11 163:20

**issues** 10:16 15:18
16:20 17:17 18:16
71:17 93:2,3 150:10

**items** 62:14 64:8
65:18 168:10,12

**IV** 38:17,18


**J**

**January** 89:15 97:19
112:14 153:4 154:3
166:3,8 167:22,23
185:4 193:15 194:12

**job** 8:16 43:24 102:9
104:8 128:15 155:1
163:2,6 167:14 171:21
176:15

**Jode** 26:10 181:1,2,3,
4

**Jon** 167:6

**judge** 57:3 138:2,9,20

**judge's** 138:21

**Julia** 43:10 57:15
106:21

**jumped** 89:19

**June** 48:14

**jurisdiction** 115:13

**jurisdictions** 56:6

**jury** 43:1 80:12 87:10
143:21


**K**

**key** 102:12 132:21

**kind** 11:12 15:21 16:1
55:5 61:8 63:7 67:18
71:16 86:19 99:22
135:22,23 182:10
188:18

**kinds** 7:6 24:5 107:9

**Kingsdale** 102:18
133:8 166:20 169:7,14

**knew** 39:9 40:7 41:10,
13 42:6,7,8,12,22
43:2,17 44:5,7,8,12,
14,22 45:11,19 55:24
64:10 78:23 80:3,16
81:20 83:11 87:1
101:12,24 105:5,17,24
106:2,3 108:2,4,6
124:11 140:17 173:16,
17 174:12 176:21
180:8 182:9,16,21

**Knowing** 80:3

**knowledge** 34:16
39:23 55:7 77:22


**L**

**lady's** 64:18

**land** 9:15,20 10:4
153:12 171:15

**landscape** 26:19

**language** 165:6

**large** 62:23 134:10

**larger** 135:13

**late** 8:12 190:18

**latest** 185:23

**law** 9:8 76:6 77:16
103:4 137:22 138:2,10
139:20 158:20 185:17

**lawsuit** 13:3,17 14:14
27:6 124:18 127:13,18
128:10 159:11 192:12
193:11,16

**lawyer** 9:15,16 11:4
14:5 15:2 22:1 53:6
61:5 76:4 86:7 93:2
109:6 127:21,22
136:24 144:2 160:15
162:18 164:12 172:20
175:18 177:20 183:9,
18 189:16

**lawyers** 12:11,24
86:22 128:9

**lead** 102:1,14 132:19
191:14

**leader's** 59:5

**leaders** 103:10 171:10

**leadership** 59:4 136:4
163:15 176:12 192:6

**learn** 95:4

**learned** 87:1

**learning** 84:13

**led** 169:22

**Lee** 30:11 38:1 53:16
62:22 65:13,17,20
66:6,20 67:24 68:3
69:2,7 71:20 72:10
73:3,12,21 82:11 84:5,
11 87:2 88:1,3,11,15,
17,23 89:5 91:11
120:4,6,8 121:8,14
122:1 124:9 141:4
147:14 150:19 151:7,
12,16 152:1,24 157:4,
20 158:2,4,12,15

**Lee's** 157:16 158:13
159:7

**left** 18:23 19:21 20:1,2
32:2 135:23 141:23

**legal** 7:5 17:9,22
27:22 28:2,19,21 29:6
76:2 82:2 84:24 85:15,
16 86:14 87:5 118:14
124:18 126:20,23
127:7 138:17 142:22
172:19 176:3,6
183:13,15,17 184:9
191:15 192:1

**legislature** 9:5

**Leo** 6:8

**letter** 24:3 31:18 52:14
90:23 91:5,13

**level** 158:18 159:6

**life** 102:7 135:6 163:6

**Lifestyle** 10:24 12:10,
24 13:4,5,8,9,15,16,17
16:4,10,14 17:10,21
19:3 20:2,18 21:2,8,15
22:1 23:2,11,23 24:19
25:5 26:15 27:7,11,21
29:8,16 32:13,24 34:1,
6,10 37:22 39:2,11,17
40:3,9,13 41:5,11
42:9,18 43:5 46:22
47:3 48:22 53:3 55:4
58:9 77:6 80:5,13,18
91:24 94:4,11 95:6
105:7,17 112:16
124:17,22 125:8
127:13,23 128:8 129:9
131:17 139:1 142:9
143:18 150:4 164:1,14
168:11 172:14 173:14,
16 174:9 176:4,6
177:2,21 178:13
180:14,23 185:18,21
186:4

**Lifestyle's** 19:21
47:3,5 69:20

**Lifestyles** 11:5 26:21
101:23 192:4

**limitation** 121:10

**limited** 19:15 173:2

**lines** 114:16 146:1

**list** 53:16 54:2,5 68:12
69:7 108:10 129:16
140:17 141:8

**listed** 172:9

**listen** 130:18 134:4 138:12

**listened** 98:22

**listening** 95:2 111:12 163:2

**lists** 168:9

**litigation** 12:12 15:20

**live** 102:16 106:8

**lived** 59:7 107:4

**LLC** 21:16

**lobbying** 8:20

**lobbyist** 9:6

**local** 17:20 133:12

**located** 122:5

**location** 91:17 136:20

**long** 7:8 50:4 51:2,17 109:20 136:2 192:17

**longer** 110:7

**looked** 94:18 112:14

**lot** 8:22 25:18,19,20 79:21 81:22 90:13 107:3,6,7 130:2 140:7 155:13 188:11

**lots** 92:19 96:16 108:7 191:8,9

**lower** 103:21 175:21, 22

**Ltd.'s** 13:18

**lunch** 128:21,22 184:18

**lunchtime** 122:23

**M**

**maddening** 156:21

**made** 22:12 23:3 31:8, 14 32:18,23 33:14 39:11 40:14 41:11 44:9,16,21 47:6 50:24 51:24 55:21 57:2 58:1, 4 60:16 61:22 62:24 63:18 71:22 88:17 94:12 98:4,15 112:13 114:4 124:21 126:14

143:15,16 153:15 154:3,6 161:3,15 193:15

**main** 26:11 55:2 132:5 140:1,2

**major** 131:8

**majority** 95:14 129:18,19 136:22

**make** 23:10 32:10 38:2 44:6 47:22 54:24 65:1 73:1 85:23 93:7,9 102:5 104:1 114:21 115:8 118:15 119:3 133:16 136:19 137:12, 14 146:20 147:22 149:24 169:5

**makes** 54:20

**making** 49:22 156:18 161:17

**malpractice** 7:6

**managing** 8:18,24 54:4

**manner** 148:22

**Manufacturers'** 9:6

**March** 12:2,4 127:13

**margin** 143:17

**mark** 35:22 90:8

**marked** 30:21 31:1 36:10,13 47:24 49:6 66:11 68:19 82:22 90:11,15 113:1 119:13 140:21 155:16 165:18 178:3 184:13

**market** 15:11 101:22 103:2 133:12 161:21

**master** 158:13

**matched** 54:2

**math** 92:24 93:2,8

**Matt** 68:1

**matter** 17:1 18:13 23:10 61:15 72:2 75:12 83:24 110:7 126:5 181:20

**matters** 14:12 16:18 17:2 18:20 24:6

131:24 158:5 191:15 192:1

**mayor** 14:17,21,22

**meaning** 24:20 100:12

**means** 123:24 172:8

**meant** 47:3 168:16

**media** 64:7 88:14 106:5 191:7,8

**medical** 182:10,22 183:10,19 184:4

**meet** 12:10 47:12 57:19 58:22 65:11 70:5 168:13 173:5 176:17

**meeting** 11:19 42:23 43:18,20 44:7 48:13, 17 52:13 60:14 67:10, 12 68:9 70:9 71:6,13, 15,17 89:7,15 97:1,2, 17 98:4,12,15 101:7 110:20 111:17 113:15 114:20,21 117:3,8,11 118:10 126:6 128:1 130:6,8 137:5,11,16 140:19 143:16 144:24 148:13 153:4,5 159:4 160:11 166:9,11 167:22 168:6 172:2 191:17

**meetings** 12:16 22:15,18,19,23 30:5 46:8 53:21,23 54:1,3 58:4 60:4 62:13 64:24 66:7 67:14,16,22 68:3 81:10 95:3,13 97:3,11 107:10 108:17,19 140:5,7,9 142:1,6,15, 19 145:10 166:13 175:20

**meets** 109:24

**mega** 172:23

**Melchi** 167:6

**member** 64:4 109:2 167:4,8

**members** 60:3 63:16 64:11 98:18,19 99:12 106:11 108:3 110:21 117:10 130:7

**memo** 151:11

**memory** 30:12 149:23

**mental** 172:24 173:13

**mention** 15:3

**mentioned** 61:17 97:2 121:15 129:2 189:5

**mentions** 48:12

**merger** 7:18,19

**message** 186:7

**met** 11:18 42:19 54:7, 10,12,20 59:1,22 65:17 68:5 95:10 99:13,14 109:22 120:13

**Methodist** 52:3

**Michael** 64:18

**middle** 131:18

**mile** 130:2,4

**Miller** 83:6

**mind** 173:24

**minor** 150:10

**minority** 136:22

**minute** 31:2 118:11

**minutes** 97:16 98:11 118:10 146:20 147:23 148:11 155:14

**mischaracterization** 64:16

**mischaracterizes** 19:6 40:6 42:15 43:7 118:23 123:11 125:14 138:7 161:9,14 189:12

**misquoted** 191:10

**missing** 159:8,19

**mission** 57:22

**misspoke** 148:3

**misstates** 44:10,17 46:2 74:2,23 81:2 83:17 87:20 94:8 106:17 113:2 116:12 126:24 140:11 148:24 150:21 154:11

**mistake** 133:16
146:12,17

**mistakes** 146:20
147:23

**mix** 91:17

**mixed** 102:2,16
107:13 133:23 135:23
173:4 186:20

**MKSK** 171:12

**modifications** 91:24

**moment** 111:4

**money** 15:7 85:21

**monthly** 65:20 66:2,3,
4 86:2

**months** 115:1 117:22
118:21 119:2,9 123:9
125:9 128:6 131:12
148:22 158:11 192:11

**morning** 80:20 115:8
140:13 143:10 178:23

**motion** 56:17,22
113:22

**motivated** 89:2

**move** 63:23 88:7
115:15 132:9 144:17
160:3

**moved** 10:5 71:15

**movement** 103:20

**moving** 121:4 125:5

**MPC** 41:4 64:24 95:3
99:12 112:14 117:23
118:19 120:10,14,17
124:7 125:10 130:6,8
148:1 153:4,5

**multi-family** 92:21

**multiple** 15:16 53:21
87:12 99:13 160:14

**municipal** 10:14,20
12:15 16:19 17:3
22:17,22 46:11 50:12,
21 51:1 56:12 66:7
67:6 73:15 89:14
97:18 98:18 103:9
115:9,22 134:13
147:22 166:8 169:3

**municipalities** 10:15,
18 64:24

**municipality** 10:11
15:21 29:19 64:22
70:15 75:19,20 86:2

**municipality's** 22:6

**Myers** 99:15,20 100:4
101:9

---

### N

**named** 26:10

**Nathan** 6:11,18

**national** 133:12 167:5

**nature** 9:14 103:2

**nauseam** 102:18

**needed** 35:17 83:11
85:14 162:4

**negative** 44:15 73:13
98:24

**negotiate** 158:8,24
175:16

**negotiated** 180:10

**negotiating** 158:21

**negotiation** 103:5

**negotiations** 63:24

**neighbors** 163:12

**night** 121:11,14 135:5

**nods** 111:2

**Nonetheless** 149:15,
17

**nonresponsive**
160:4

**normal** 55:19 69:24
70:13,17 115:17 163:4

**note** 93:11 122:21
184:15

**noted** 153:22 154:8
156:13

**notes** 141:19,24
142:18 143:16

**noting** 93:14

**November** 67:1 82:17
84:12 151:14,19
152:19 178:21

**number** 10:19 14:9
47:2 57:3 92:14 94:18
100:20 103:8 129:3
134:9,10 135:1 145:18
147:21 152:3 168:9
170:3 175:15 177:15
189:24 190:1

**numeral** 38:18

**numerous** 106:16
149:2 179:4

---

### O

**oath** 22:4,7

**object** 51:21

**objecting** 60:11
189:16

**objection** 9:21 10:13
11:1 13:11 15:22 16:7,
16 17:4 18:2 19:5
20:21 21:18 24:10,23
27:17,20 28:11 29:13
31:10 33:1 34:7,11
35:5,6,8,20 37:11
39:13,19 40:5,16 41:7,
24 42:14,21 43:6
44:10,17 45:2,14,20
46:2,20 47:10 48:23
49:24 51:4,19 52:21
53:9 56:2,11 57:9
58:2,6,10,16 59:11,18
60:1,8,20,23 61:4,23
62:1 63:1,20 64:14
65:3,15 66:1 67:19
71:8,23 72:13 73:16
74:2,23 75:16 76:2,9,
13,23 77:8,14,20 78:3,
12,20 79:19 80:7,19
81:1 82:2,5,7 83:17,21
84:17 85:16 87:7,20
88:6 89:22 91:18 94:7
95:7,17 96:1,7 99:3
101:2,11 105:9,20,22
106:15 107:19,22
109:8 112:6 113:2
116:2,12 118:1,13,22
119:23 122:12 123:8,
10 124:20,23 125:11,
13 126:19,22 128:2,12

130:21,23 132:13
133:4 134:6,15,17
137:8,20 138:4,16
139:6 140:11 142:22
143:2,7 144:2,6,12,14
147:8 148:14,24
150:21 151:1,22 152:5
154:11 155:7 156:7
160:13,17 161:6,8,13
162:2,6,21,22 164:4,9,
18 168:17 170:8,24
172:17 173:19 174:18,
24 175:12,24 176:2
177:9 178:22 179:20
181:17 182:4,12,18,24
183:12 184:6,9 188:2
189:11 190:8,17,24
192:13,15

**objections** 13:19
18:10 42:5 43:16
72:23 84:21 94:16
96:15 99:7 106:23
107:24 127:9,16
134:24 139:12 154:18
160:21 162:13 165:1
172:21 183:21

**obtain** 33:20

**occasions** 99:13

**occur** 17:15,16 67:12,
17 71:7 167:23

**occurred** 39:17 66:8,
24 67:13,15 132:23
160:11

**occurring** 136:1

**October** 31:8,14,15
32:12,20 34:2 36:15,
20 37:7,10,15,21 44:9,
22 49:22 52:1,12
65:21 78:1 84:16 91:8
98:12 100:5 101:6
110:20 113:14 115:22
120:10 122:1 124:6
148:1 152:18 153:5,15
154:4 155:2

**office** 6:15 53:18
83:23 101:16,17,20,21
102:4,15 103:20 104:3
110:7 124:5 133:24
134:1 156:12 159:22,
24 181:20 182:11
183:10,19 184:5

**office-mageddon** 101:19 132:16 157:2

**offices** 102:2 132:20 133:13

**official** 81:23 82:1 135:9 162:24

**officially** 29:11

**officials** 8:22 14:16 187:7,9,20

**Ohio** 8:14 9:6 103:4 158:20

**Ohiohealth** 180:6,7 182:9,21 183:9,18

**older** 169:21

**one-hour** 141:10

**ongoing** 19:23

**open** 15:11 63:24 64:20 111:6 149:23 191:5 193:10

**operation** 7:4

**opinion** 56:16 81:24 130:14 132:24 133:1 134:2,3,5 138:1 153:22 160:5 162:16, 18 163:2,7 164:11 172:7 183:8

**opinions** 28:19,22 129:22 130:19 168:24 176:6

**opportunity** 12:7 51:11 65:11 97:6 125:8 139:15

**oppose** 135:3

**opposed** 43:21 58:14 59:9,20,23 62:13,23 63:19 95:4,11,15 105:13 111:21 134:11 136:4 138:12 162:16

**opposing** 62:4 106:12

**opposition** 42:19,22 43:3 47:8 52:13 58:13 59:13,14 60:15,19 61:1,8,10,22 62:10 63:22 80:17,23 81:6,7 96:17 105:5,11,18 111:17 112:5 120:14 124:7 135:6,18 137:4,

6,16 162:20 175:9

**option** 124:14,15 126:15 127:7,11,12,24 191:5

**options** 193:10

**order** 35:17 86:13 87:5

**ordinance** 56:8 75:22 123:2,6 145:18,21 147:2

**ordinances** 34:23 35:11,15 50:16 74:21 75:4,11

**organization** 8:18 14:17 17:10 167:4,9

**organizations** 13:7

**original** 31:7 36:5,8 37:5 92:1 114:1,5,7 117:4 120:21 146:24 147:20 148:9

**originally** 93:19

**outlined** 115:24 116:9

**outreach** 52:19,23 53:3,14 55:5,10 92:4 95:1 101:13 109:20 131:13 143:24

**overnight** 192:18

**overwhelming** 137:16

**owner** 29:22 33:17,21 83:13 86:6 149:18

---

**P**

**p.m.** 194:13

**pages** 31:6,11,13,16 192:16

**paginated** 38:7

**paid** 17:22

**paint** 88:16

**Painter** 6:11,14,18,20 7:9 32:2,6

**paper** 155:17 185:24

**papers** 182:15

**Parade** 9:2 15:8

**paragraph** 48:15 52:7,10 166:22 170:22 179:24 186:14 192:21

**park** 64:10 70:9,10 108:3 136:16,19 167:5,23

**parking** 159:1

**parks** 68:9

**part** 18:4 75:7 92:7 130:4 136:3 140:16 180:10,11 188:4,16,18

**partially** 93:17

**participated** 126:12

**partner** 7:15

**parts** 45:7,8 59:3

**Paul** 44:20 139:13 140:13 194:1

**pay** 7:5 85:12 159:1

**payment** 11:13

**penalty** 115:6

**pending** 89:23

**people** 22:8 39:23 43:18,19,20 53:17 54:4,5 58:18 59:4 62:23 63:12,14 64:17 81:11 91:23 95:9,10 96:17 101:22,23 102:1,15,16 105:13 107:3,4,6,8,9 108:5,7, 10,18,20 109:1 111:7, 9,15,20 112:4 129:3, 17,18 130:10,14 132:19 133:14,24 134:9,10 135:3,7 136:3,12,14,22 137:15 139:4 141:8,14 145:5 146:20 160:12

**percent** 92:11 93:23 156:5 188:5,10,12

**period** 23:14 110:7 119:21 122:5 149:10

**permit** 75:23 123:6 184:4

**permitted** 29:6 183:9

**permitting** 17:13

**person** 8:20 26:11,23 30:2

**person's** 180:24

**personally** 24:4 37:2 176:9

**pertinent** 34:9

**petition** 130:13

**phase** 115:6

**philosophical** 62:11

**phone** 140:7

**phrase** 86:20

**Pickerington** 14:23 15:2

**picky** 29:18

**picture** 88:16

**piece** 161:17

**place** 58:21 132:5

**places** 122:20 125:24 126:4

**Plaintiff** 13:3

**Plaintiffs** 13:17

**plan** 31:19 43:23 44:3 45:4,7,10 52:14 55:13, 21,24 56:5 57:7 59:14 60:15 72:22 73:6,20 75:8 80:18 81:14 82:13,16 84:7,14 87:4, 17 88:5 90:1,23 91:3, 7,16 92:18 102:10 103:23 104:7,10 105:12,13,18 106:7 108:9 109:12,17,21,24 110:2,3,4,8,14 111:18 112:24 113:8 114:3 121:3 129:5 131:10, 11,15,20,23,24 132:2, 4,8 133:14,16,22 135:14,17 137:21 138:2,10 146:10 149:10,13,20 151:8 153:9,16,23 154:5 155:5 156:3 162:3 163:3,14 165:11,13 171:13 173:5,10,12 174:7,13,15,20 181:15 188:22,23 189:2,19

**plan's** 110:11,17

**planned** 64:2 103:3,4 158:20

**planner** 153:12 158:13 160:10,19 165:5 171:15

**planning** 10:20 11:19 12:15 22:17 46:11 50:12,21 51:2,6 65:13 66:7,21 67:6 69:3 70:10 73:15 89:14 91:8 97:18 98:18 104:18 115:9,23 128:17 132:4 134:13 147:18,20 158:10 159:4 166:9 169:4 172:1 188:19

**plans** 43:24 48:12 52:5 95:5 109:12,19 132:12

**play** 102:16 190:15

**pleading** 104:23

**point** 8:20 26:11 56:7 72:19 74:9 99:17 102:12,23 113:12 122:15 125:19 131:19 161:7 178:20 180:12

**pointed** 72:21 73:4 154:2,9 188:22

**pointman** 26:20

**points** 72:10 73:13 157:6

**policy** 8:19 10:2

**political** 79:17 105:18 130:17

**politically** 176:14

**politicians** 107:16 109:6

**politics** 176:16

**polling** 14:16

**poor** 187:6,19

**portion** 31:13 56:21 75:7 91:2 150:18 166:1 182:11

**pose** 96:6

**posed** 105:7

**position** 85:1,3,15 86:14 108:6 119:8 136:23 142:13,20

**positioning** 104:12

**positive** 72:11 73:13 95:12 156:15

**possibility** 107:5 136:6 183:5 193:11

**possibly** 151:14,19

**post** 101:19 135:7

**post-covid** 133:20 159:24

**posted** 48:8 123:3

**posts** 64:7

**potential** 52:5 180:2,3

**potentially** 18:17

**practice** 6:17 9:14 10:6,14 17:19 115:20

**pre-conclusion** 191:24

**preconceived** 128:14

**predecessor** 99:14 167:14

**preparation** 12:18 49:21 72:6 96:22 97:12 145:14

**prepare** 11:16 30:2 35:18 38:13,22 142:5 144:22

**prepared** 12:23 38:15,23 99:18 147:12 153:3

**present** 41:16 52:4 60:14 73:12 91:7

**presentation** 40:2,7, 14,20,23 41:1,13,17, 21 42:6,7,8,19 44:16 67:6 112:13 115:9 120:10 166:8 168:8

**presentations** 65:1 168:12

**presented** 38:1 42:9 43:21 48:13 59:15

100:19 115:22 129:6 154:4

**Preserve** 70:10

**president** 81:13

**presidents** 157:10

**presume** 55:22

**pretty** 79:22 109:16 110:14 136:16 169:23 170:14

**previous** 161:18

**previously** 72:5

**primarily** 95:15

**principal** 171:12

**prints** 191:20

**prior** 7:12,20 12:11 17:23 18:6,7 19:6 21:5,12 23:4 30:4,7,15 40:6 42:15 43:7 44:11, 18 46:3 47:21 55:5 74:3 81:2 87:21 91:12 94:8 106:17 118:13 125:15 126:24 140:12 149:1 154:12 168:6 177:10

**private** 10:6 62:5 172:23 173:3

**privilege** 142:14,21

**privileged** 20:23 142:14 143:15,20 144:3

**pro** 54:16 167:15,18

**pro-** 164:15

**pro-development** 164:3

**problem** 157:16 159:7

**problems** 71:21 156:17

**process** 21:22,23 29:10,12,20 50:5,8 51:3,16 52:1 63:23 64:3,19,21 69:24 70:13 85:18 86:5 88:13 104:18,19 106:6 109:18 112:1 114:3,13 115:7,23 116:9,20 127:5 132:1,2,9

135:12 159:9 175:16 191:16

**processes** 16:19 17:3,13,14 22:9 163:4

**professional** 54:22 67:11 73:22 103:9 153:11,22 157:21 158:14 159:5 165:5

**professionally** 102:7

**professionals** 91:20

**profit** 175:5

**progress** 169:5

**project** 18:8 19:4,11 24:20 26:18,21 27:12 29:3 30:6 40:4 54:23 100:19 102:5,6 105:1 108:24 173:4 177:15 186:20

**projects** 102:8

**prominent** 15:1 104:2

**property** 9:19 10:8 19:11 20:5,6,8,14,15 21:4,9 22:20 28:16 32:23 33:17,21 34:2 36:16 37:6 40:15 47:18 62:5,6,8 83:13 85:1,15 86:6,14 136:11,12 145:20 149:7,18,19 161:17 172:10,14,15 173:17 174:10,23 180:11 186:19

**proposal** 39:11 41:5, 11,17 43:22 63:9 64:6 94:12 99:1 101:8 110:22 130:3,13 134:4 137:17 161:3,19 162:17 185:23 187:6, 18 188:9

**proposals** 20:20 186:18 187:3,10,24

**proposed** 40:10 42:12 43:4 47:9 59:10 63:13 70:4,8 93:19 94:4,13 95:6,16 111:18 175:23

**proposes** 39:6

**proposing** 108:8

134:12 152:4,12
175:10

**proprietary** 143:18

**protect** 85:14 86:13
87:5

**protected** 142:21

**proud** 159:12

**provide** 25:3 27:22
28:21 55:9 164:15

**provided** 17:10 164:1
165:5 176:6

**providing** 185:9

**provision** 75:15 76:11
77:12 121:9

**public** 8:19,22,23 10:2
14:16 21:23,24 22:14
45:24 48:13 51:11
52:5 80:17 81:10 95:2,
15 98:19 104:18
110:21 111:17 117:10
120:14 124:6 125:6
134:3,5 135:8 137:5,
15 138:12 143:23
145:18 146:9 148:20
157:9 160:11 162:16,
24 163:2,11 175:19

**publicly** 130:12

**published** 185:3,7

**PUD** 158:19

**pull** 56:14 65:7 73:11

**pulled** 123:4

**purchased** 173:17

**purchasing** 174:10

**purely** 71:16

**purpose** 62:8

**pursue** 175:3

**put** 22:7 36:3 103:22,
23 106:4 114:2 131:13
155:13 173:8,24

**puts** 85:24

---

**Q**

**quantum** 102:14

**quarter** 109:11 184:16

**question** 11:2 17:8
18:5 19:7 20:22 21:5,6
24:22 27:23 28:4,14
31:12 37:16 40:18
41:9 43:11,14 45:22
49:3 51:20 52:6 57:10,
14 64:15 75:1,18
78:19 80:2 85:6 87:14,
22 88:8,21 89:23 96:4,
5,10,11,13 97:9,24
99:8,10 103:12,13,14,
15 104:12,24 106:21
107:14,24 108:1
118:14 121:12,16
122:12,14 123:5
127:10,20 133:19
134:16,20,22 138:20
140:13 143:20 144:22
154:13 160:6,8 165:10
171:2 174:3,5 176:7,
24 177:5,10 179:16
181:12 182:23

**questions** 23:1 29:7
43:12 47:2 53:19
62:22 68:13 69:8,16
87:15 97:22 100:17
143:23 181:10 182:13
185:14 193:21

**quick** 31:23

**quickly** 83:15 84:14

**quote** 99:12 147:3
191:3,4

**quotes** 193:9

**quoting** 147:9

---

**R**

**R-I-C-K-E-T-T-S** 15:1

**raise** 15:7 42:1

**raised** 62:18

**raising** 42:3 101:10

**ran** 14:15

**Randy** 83:5,22 85:11

**range** 94:5

**rare** 79:22 109:16

**reach** 54:6

**reached** 53:16

**reaching** 69:21

**read** 11:20,22,23,24
12:5,8 33:4 40:24
43:15 55:22 56:16
57:16 72:4,6 75:6
76:15 87:13 92:8
96:12,14 97:23 98:1
104:6 106:22 111:14
112:3,8 116:4 123:2
125:20 127:14 131:10
153:6 155:10 156:1
159:18 170:23 190:7
193:22

**reading** 72:16 99:16
111:19,24 152:24
153:18 155:8,23,24
169:9

**ready** 70:5

**real** 101:14 103:16
121:2 136:1 159:13

**reality** 135:10

**reapply** 117:23
118:20 119:9 124:8

**reask** 107:24

**reason** 42:1 94:20

**reasons** 96:16,18

**recall** 12:13 19:16
22:5 23:5,6 33:23 34:8
54:11 59:1 64:5 66:9
68:11,12 69:15 73:2,4
76:15 89:5,9,24 98:17
99:20 100:3,14 114:11
117:7 142:8 147:13
151:6,10,12,15,20
152:6,24 153:17
155:23,24 164:6
178:24 185:1,9,12
193:12

**receive** 187:8

**received** 19:2 99:1
142:6 143:24

**receiving** 68:12

**recent** 48:13 89:6

**recess** 32:15 74:15
128:24

**recollection** 119:19

**recommend** 120:17

**recommendation**
50:22 51:9 113:18
114:5 115:10

**recommended**
113:24 120:20 155:5

**recommending**
50:13 169:7

**reconsider** 87:3,17

**reconsidering** 88:4

**record** 6:7 11:4 19:18
30:18,19,24 43:15
57:16 72:2 90:17
96:14 98:1,21 106:22
110:24 112:10 128:23
141:24 142:3 185:2
190:2,5,6,10,11 194:9

**record's** 121:1

**recording** 99:19
148:1,11,12

**recordings** 142:18

**records** 24:17,21
25:4,17

**redacted** 167:2

**redevelop** 21:9
185:22 186:19

**redevelopment**
133:8 166:20,21
169:8,21

**reduce** 157:18

**reduced** 92:9,18
93:18 155:4 156:4
189:8,22 190:5

**reduction** 92:11
93:23

**reelected** 163:1

**refer** 13:15 38:4 145:6
146:21 150:13 155:17

**reference** 153:15,23
165:13

**referenced** 121:11

**referendum** 75:14
76:1,5,8,10,11,21
77:4,12,16,18 78:2,10
79:3,18 80:1,6

**referred** 12:17

**referring** 56:8 120:1 137:11 145:21 156:18 167:1 185:21

**Refers** 121:22

**refile** 122:10 123:7 125:9 185:21 191:15

**refiled** 148:21

**refiling** 121:11,15

**reflect** 155:4 158:18

**refresh** 119:19

**regard** 23:3 165:4 170:16

**region** 8:21 131:9

**regular** 97:16

**regularly** 65:12 86:5

**regulations** 34:24 50:17

**rejected** 113:10,21,23 121:5 124:2,7 125:7 126:18 127:24 128:10 147:18 148:9,18,19

**related** 10:16 16:18, 23 58:19,20 67:15 72:21

**relating** 18:16 67:13

**relationship** 6:19,21, 24 7:8 115:6

**relayed** 48:20

**relevant** 25:1,6,8 34:9 160:18 169:19

**relive** 99:5,9

**remark** 155:12

**remarked** 32:17

**remember** 13:14 15:24 18:18 23:14 24:8 25:10 27:3 30:17 33:24 57:20 58:17,18 59:5 61:14,15 72:16, 24 73:10 78:4,22 79:13 82:14 84:9 89:8, 11 90:4 91:14 92:11 99:15,21,23 100:6,10, 21,23 114:14,15

**referred** 12:17

121:2,19 145:2 147:17 150:8 152:8 153:19 154:1,6 157:8 164:22, 23,24 178:10 180:14, 24 185:8 189:23

**remembering** 81:19

**reminding** 170:17 171:4

**remotely** 25:1

**rent** 7:1,5 92:21 107:7

**repeat** 18:4 43:10,13 57:14 97:9

**repeatedly** 100:11 178:23

**report** 72:4,10,18 74:13 153:1,2,3,15 155:3,11,14 156:13 158:17 159:8,19 165:5

**reporter** 93:11 185:10 186:6,12,17 187:15,21 189:3 191:4,20 193:15,22,24 194:3,7

**reporters** 191:6,9

**reports** 72:3 73:3 79:11 156:1

**represent** 23:24 109:7

**representative** 16:4 46:19

**representatives** 40:3 107:17 138:15 162:19 178:14

**represented** 10:6,10, 15,17 11:9 109:2 127:22,23

**representing** 9:18 83:7 106:12 143:5,12

**represents** 110:5

**request** 27:5 71:19 113:22 146:1 147:4

**requested** 27:21 43:15 57:16 96:14 98:1 106:22 116:6 120:24

**requests** 17:8 28:19 129:11 139:17

**require** 172:6

**required** 173:11

**requirements** 86:24

**requires** 45:5 56:9 75:9

**research** 49:21

**resident** 167:11

**residential** 39:6,10 40:10 42:13 43:4 44:23 45:11,18 46:1 47:8 92:9,10,12,19 93:1,6,18,20,23 94:5, 6,13 95:5,15 102:1,2, 13,14 103:22,24 104:1 105:6,14 114:10 132:19,21 137:7,17 146:2 147:5,16 152:12 155:20 156:9 161:16 169:22 174:23 175:11, 22 177:4,16 186:20 190:1,4

**residents** 41:22 44:14 45:17 59:7 62:21 63:7 95:4 137:4 140:9 141:11 144:24 170:17 171:5 187:7,20

**respect** 29:5 73:21 153:11 176:4

**respected** 188:20

**respond** 142:10

**response** 92:3 93:16, 17 129:11

**responses** 139:16 144:20

**rest** 149:22 163:13

**restate** 106:20

**restaurant** 104:3 107:5

**restaurants** 102:3

**restrict** 141:14

**resubmit** 175:15

**resubmittal** 72:18 89:17 90:5 121:7 174:21

**retain** 28:10 36:5,7 79:16 80:5

**retained** 20:18 21:2,7 23:9,22 77:17 185:17

**retainer** 24:3 150:3

**return** 85:12

**review** 34:4 35:11 40:8 47:16 48:3 49:16 56:13 66:14 68:22 73:14 74:20 83:2 90:19 97:6,17,21 98:10 119:16 122:7 140:24 145:7 150:14 165:21 172:9 178:6 184:22

**reviewed** 12:17,20,23 50:15,21 51:1 55:12 96:22 97:12 98:4 145:14

**reviewing** 50:5

**revise** 81:14

**revised** 31:19 89:20, 24 90:23 91:3,7,16 92:18 112:24 113:8 146:10 154:4 156:3

**revising** 82:13

**rezone** 21:3 32:23 36:16 37:6 145:19 146:1 147:5,15 149:7, 19 173:11 186:18

**rezoned** 20:15

**rezoning** 172:6 182:2

**Rick** 15:2

**Ricketts** 14:22,23 15:2

**rights** 85:1,15 86:14 87:5 124:18 136:11, 13,17

**Rita** 14:22,23

**Road** 6:10

**Robinson** 64:8 81:13 88:14 135:16

**role** 8:10 10:3,23 26:15,17,19 53:2

**Roman** 38:18

**room** 167:24

**ruled** 57:7

run 9:1 88:18 163:20

run-of-the-mill 135:4

running 53:19

---

**S**

S1 173:9 184:4

sad 136:1

sat 124:5

Sater 11:10

satisfaction 102:7

scale 133:10 169:24

scales 102:20

schedule 70:8

scheduling 141:10

school 9:8 54:21,24
172:23

SCHUMACHER 6:5
20:24 25:2,7 28:1,7
30:18,23 32:8,16
35:24 36:3,7,12 39:21
42:3 43:13 47:22 48:2
49:4,11,15 56:14
57:15 60:11 66:13
68:21 74:12,16 83:1,
19 90:16,18 93:13
95:19 96:3,8,12 97:7
106:20 118:9 119:15
122:24 123:1 127:3
128:20 129:1 134:19
139:14,22 140:14,23
142:24 143:9 144:16,
18,21 162:8 165:20
173:21 174:2 178:5
179:1,6 183:14
184:19,21 189:13
190:20 193:19 194:2,5

scope 170:1

Scott 99:21 103:11
157:4,8 158:6 166:2,
18,24 167:1,3,17
170:7

Scott's 104:12 167:21

scrapped 187:6,19

screen 190:14

scurrying 83:15 84:3

searching 104:22

section 38:6,14,17
39:5 76:16 119:21
122:4,18 126:1 149:22
155:20,23

sections 34:22
122:19

sector 173:4

seeking 176:3

self-employed 6:12

sell 15:7,11

seller's 86:7

sellers' 86:22

send 24:16

sense 58:7 65:5 86:21

sentence 191:13

separate 68:7

September 31:19,20
81:15 82:11 84:7
87:18 88:17,22 89:7,
20 90:2 112:23 113:9,
11 146:11 150:20
151:9 152:2 156:3

series 14:14

services 17:23 24:9

sessions 141:10,17

set 159:11

seventh 52:10

share 168:2,6 175:6

shared 178:12

shopping 166:20
169:8

shot 103:19

show 25:18 103:20
117:20 118:2,3,7,9
131:16 155:8

showed 136:22
137:15 140:18

showing 107:10
147:10

shown 161:15 179:18

shows 9:1 92:17
190:2

shutting 133:13

sic 67:4

side 9:19 177:12

sift 135:9

sign 29:21 33:5 85:13
193:22

signature 33:8,16,21
83:11 194:10

signatures 84:15

signed 29:15,24 33:10
34:20 35:2 75:2 85:13
111:7 141:14 152:15

significant 52:13
158:14 171:14

Signing 37:17

signs 29:22,23

similar 64:8 126:1
166:21 169:24

simple 37:15 87:22
177:5 182:23

simply 124:12

single-family 92:19
146:3

sir 92:16 121:23 141:2
155:22 160:2 165:23
168:21

sit 62:19 101:6 104:23
116:14 192:6

site 45:5 59:8 91:7
101:21,24 105:14
106:13 109:16 119:6
129:5,21 132:7 133:17
136:14 137:7,17 151:8
152:4,13 156:3,4,21
169:21 172:5 173:11
176:17 182:11,23
183:19 184:5 185:22
188:5,10,12

site's 136:2

sites 169:23

sitting 110:5 136:2

situation 193:5

situations 134:1

six-month 122:5
128:5

sizes 102:20

skill 158:18 159:5

skim 145:24

skimmed 145:9

skipped 98:24

slate 114:17

small 149:21 173:9

smaller 107:8 133:10

smart 104:14

Smith 64:9 135:16

Smith/robinson
106:4

social 64:7 88:14
106:4

solely 24:17

son's 15:1

sooner 194:6

sophistry 104:15

sound 191:18

sounds 191:21

sources 101:13
108:23

space 149:23

spaces 102:3 104:3

speak 20:5 21:14 42:4
98:6 110:21 111:7
112:2,11 130:11
190:21

speaking 46:7,10,12,
15,18 47:2 99:15
114:15 171:8 193:4

speaks 110:8,24
131:23

specific 45:8 62:14
88:9 109:16 129:5
132:7

specifically 20:13

23:16 76:7 99:11
100:23 111:22

**specifics** 116:22

**speculate** 106:1
138:21 168:19 170:11

**speculation** 18:3
27:18 45:15 47:11
58:3 59:12 60:2,5 77:9
79:20 80:8 95:8,18
105:23 109:9 127:1
128:13 130:24 134:18
137:9 138:18 160:22
162:7 168:18 170:9
172:18 173:20,22
182:5 183:16 184:10
186:9

**speculative** 60:12,13
123:13

**spell** 14:24

**spend** 85:21

**spent** 9:5

**spoke** 41:14 51:7
62:12 95:14 98:20
111:10,16 112:4
117:8,10

**spoken** 163:14 191:6

**spot** 102:24

**spring** 23:18

**staff** 9:1 54:22 67:11,
24 68:4 71:21 72:3,4,
10,17 73:2,4,14 74:13
103:9 126:2 152:24
153:2,3,14 155:2,11,
13 156:1 158:7,8,9
159:5,19 176:11

**stand** 22:11 98:3,14
124:17

**standards** 38:18,19

**start** 23:17 28:15
59:21 97:22 114:13,17
151:5 191:16

**started** 19:3 23:15
24:6,13,18,19 25:4,14
26:1,5,22,24 110:18
179:12,15

**starting** 38:14 131:19
171:4

**starts** 24:7 25:24
157:16 170:17 179:14

**state** 6:6

**statehouse** 9:23,24
191:7

**statement** 33:4 48:20
51:24 52:11 121:13
147:7 155:6 168:21
190:20 193:1

**statements** 22:11
98:14

**stating** 52:15

**station** 135:4

**status** 56:5

**stayed** 18:22 141:22

**steal** 177:1

**stem** 88:12

**Stephen** 185:10

**stern** 88:12

**sticker** 36:4

**stories** 188:21,24
189:6,9,18,19,22

**straight** 78:21

**straightforward**
100:1

**Street** 20:10,11
103:23 105:15,16
133:9 146:5 147:5

**strike** 160:3

**strong** 80:17,23

**structured** 133:22

**student** 109:11

**stuff** 88:14 106:4
150:9

**subarea** 38:19

**subject** 18:13 61:15
76:20 77:4

**submit** 75:24 113:8
139:20

**submittal** 187:2

**submittals** 182:2

**submitted** 36:14,17
50:9 112:24 113:11
133:22 146:10 156:3
186:18

**submitting** 31:18
89:24 90:23

**subparagraph**
170:16 171:4

**subpoena** 24:16
139:20 144:18

**substance** 48:24
71:14

**substantial** 43:3

**suburb** 131:8 135:24

**succeed** 102:6,8
105:1,2

**successful** 102:5

**sued** 14:17

**suggesting** 114:7
134:12 136:18 166:19

**suggests** 148:13

**suit** 15:13

**summaries** 12:23

**summary** 92:17 142:5

**super** 173:2

**superintendent**
54:21

**supplement** 139:16
144:19

**support** 52:19 139:3
140:4 159:22 172:2

**supported** 108:5

**supporting** 169:22

**supportive** 168:22
171:23,24

**surprise** 164:7 181:5,
14

**swear** 22:8

**sweet** 102:24

**sworn** 6:2

**T**

**table** 38:23 120:22

**tabling** 121:5

**takes** 101:16

**talk** 29:2 40:9 68:10
71:17 74:17 89:1
138:23 190:13

**talked** 25:22 48:17
65:17 87:18 88:23
102:17 108:22 139:3
153:20 177:13 186:5,
24 188:3 190:23
193:13

**talking** 20:9 23:15
24:6,13,20 26:5,23,24
88:15,24 108:20 161:4

**talks** 45:6

**tape** 98:22

**tax** 133:17,19

**team** 70:5 91:20,21

**technical** 113:4

**technically** 24:1
53:12

**telling** 19:1 25:9
76:17,21 88:19 89:5,9
99:2 100:10 107:11
151:12 152:8 157:8
169:6

**tells** 122:4 171:16

**terms** 11:13 21:22
22:6 29:2 39:23
131:14 139:24 140:3
150:11 159:3

**testified** 10:19 15:19
21:24 55:20 61:18
93:22 130:5,8 142:7
143:8

**testifies** 88:3 151:16

**testify** 42:24 172:1
193:3

**testifying** 80:12

**testimony** 19:6 40:6
41:4,10 42:15 43:7
44:11,18 46:3 74:3,24

81:2 87:21 94:9 98:7
101:18 106:17 116:13
125:15 126:24 133:7
140:12 149:1 154:12
194:12

**text** 38:8,10,14,15,19

**There'd** 173:3

**thereabouts** 193:16

**thick** 85:20

**thing** 16:1 17:18 49:11
63:7 67:18 100:11
110:15 115:4 136:1
156:15

**things** 7:6 14:18
17:14,15 37:19 55:2
58:18,19,20 72:11,19
81:22 88:23 122:20
132:11,15 135:1 159:2
161:23 168:11 169:1
172:4 189:3 191:9

**thinking** 120:4

**thinks** 187:22

**Thomas** 6:1,8

**thought** 95:11 100:2
102:22 155:16 170:13

**threat** 88:12

**three-story** 92:20

**throw** 135:17 163:3

**throwing** 88:14

**thrust** 99:22

**TIF** 158:24

**time** 11:6,23 12:1,5
15:15 16:1,13 23:15
32:5 39:9 41:3 43:5
54:4 55:12 58:22,24
62:20 65:22 69:18
70:21 78:21 81:3 83:7,
13 85:2,9 88:7,9,13
89:2 97:21 104:16
107:15 110:7,10
121:15 122:7 124:11
133:11 141:9,11
150:12 151:8,9 152:17
157:2 161:5,23 162:14
166:5 175:8 180:18,21
183:4,6 184:20 191:22
193:20

**timeline** 18:4 82:14
182:1

**timelines** 179:18
180:2,3 181:6

**timely** 85:3

**times** 14:1 37:19 41:8
53:10 54:13 66:3,4
80:20 86:19 87:8,12
105:4 106:16 131:11
139:13 149:2 155:13
159:20 160:14 179:4
180:8 181:21

**timing** 86:23 121:10

**today** 11:17 14:5
19:22 20:8 62:19 72:7
96:23 106:16 139:3
141:18 149:7 173:2
183:19 193:20

**told** 39:23 40:22 88:3
99:11 104:17,18
114:24 127:23 151:7,
17 157:22,24 158:3,4
174:12,22 176:20
177:18 181:21 186:11
189:7,9 191:14

**Tom** 17:22 23:7,9 26:8
41:20 59:6 60:6,13
67:4 77:13 84:5 87:22
99:9,12 101:1 107:1
122:15 143:23 147:13
163:18 172:4 182:21
185:16 189:7 193:7,19

**tool** 135:11

**topped** 140:17

**total** 39:6

**totally** 156:23

**touch** 83:24

**tough** 104:16

**town** 107:13

**townhome** 107:8

**townhomes** 92:20
146:3

**townhomes/flats**
146:4

**townhouses** 92:20

**township** 8:24

**traffic** 68:5,7 69:22
70:5 71:1,13 159:3

**training** 191:8

**transcribed** 194:1

**transcript** 99:18
147:12

**treatment** 131:20

**trees** 68:10 70:11 71:1

**trends** 133:12

**trial** 190:13

**true** 32:22 34:15 69:1
88:5 97:15 98:11
103:5 121:24 141:3
146:15,18 165:24
172:13

**trustees** 8:24

**Tucker** 70:10

**turn** 98:9

**two-page** 32:18

**two-way** 65:6

**type** 17:1 100:4

**types** 14:12 17:17
51:17 67:16,22 155:21

**typical** 67:17 102:16

**typically** 86:1,9
131:10,12 132:3

**U**

**Uh-huh** 46:6 180:4

**ultimate** 188:18

**UMCH** 19:11 20:5 21:9
22:20 32:23 33:12
34:5 36:16 37:6 52:4
83:9 172:5 186:19

**unanimous** 117:13,
17

**unclear** 89:17

**understand** 7:15
13:16 20:6,9 24:18
25:13,15 35:9 37:13
73:1 86:22 104:7
109:1,6 116:4 118:15
134:20,22 163:7 165:8

167:20 173:24 176:23

**understanding** 149:9
168:5 172:6

**unfair** 154:16

**unfairly** 189:4

**United** 52:2

**units** 39:7,10 42:13
92:10,19,21 93:1,6,19,
20,24 94:6,14 105:6
114:10 123:17,20
137:7,17 146:2 147:6,
16,21 152:12 156:5,6
161:4,16 174:23
175:11 177:16

**University** 9:9

**unrelated** 17:2

**unusual** 79:15 109:19
110:14 115:17 181:24
188:11

**update** 165:7

**updated** 121:3

**urgency** 86:22

**V**

**vague** 21:18 63:1
71:23 123:15,19
125:20 128:2

**variety** 108:23 173:4

**vast** 95:14

**verify** 147:11

**version** 156:19

**versus** 10:24

**vibrancy** 102:2
107:13 133:23

**vibrant** 107:12

**video** 97:2,13 98:5
99:19 146:22 148:12

**videos** 11:19,20
12:14,15 145:13

**view** 49:23 101:21,22
156:16

**viewed** 11:18

**viewpoints** 110:6

**views** 62:7

**virtually** 145:11

**vision** 131:13

**vitriol** 61:14,15

**vocal** 136:21

**voice** 42:1,4

**voluntarily** 11:7

**Vorys** 11:10

**vote** 117:13 147:3

**voted** 117:6 120:17 146:14 147:19

---

**W**

**wait** 119:9 126:15

**waiting** 119:21 122:5 128:6

**waived** 194:10

**wanted** 29:2,10 54:6 63:12,23 64:2,10,19 87:4 100:2 102:5,22, 23 106:5 107:4,5 108:3,8 111:21 114:12,13 121:3 124:17 129:21 168:2,6 171:9 174:16,22

**wanting** 53:18

**WARD** 54:9,19 57:19 59:21

**WARD's** 57:22

**waste** 155:17

**watch** 22:9

**watched** 97:3

**watching** 97:2

**ways** 109:7 134:8

**website** 47:17 48:9 49:12,23 123:3 129:24

**WEC** 40:3,15 41:22

**weeks** 67:3 69:10 81:15 152:11 168:13 194:3

**weigh** 135:20

**Westerville** 133:10

**When's** 11:22

**whichever** 148:19

**white** 154:19

**whoa** 115:2

**whoever's** 110:10

**wife's** 172:7

**Wiles** 7:14,20,22 9:12 18:22 19:21,23 24:17 25:3 27:13 32:2 108:13 129:14 139:20 185:17

**winning** 79:17

**wishes** 91:6

**withdraw** 49:3 75:1 80:14 122:14 124:12 174:2

**withdrawing** 174:5

**withdrawn** 112:15

**witness's** 40:6 43:7 46:3 81:2 94:8 125:14 126:24 149:1 154:12 176:3

**wondered** 124:8

**word** 73:18 90:6 170:19,21 171:20

**words** 137:1,19 171:19

**work** 6:12,13,15,16,23 7:13,24 8:5 9:4,12 16:9,17,22,24 18:12, 15 19:14,17,19 23:2 25:24 28:3 34:10 55:6 65:10 70:18 85:19,21 102:8,16,22 103:1 104:4,15 111:22 150:6,11,12 157:5,20, 22 158:9,12 168:11 171:9,17 176:14,17

**worked** 19:12 20:2 73:24 74:1,4,5 79:8,9, 21 84:14 105:3 150:9 167:13 174:20

**working** 9:3 18:8 19:4 24:4,18,19 25:5,14,19

69:24 70:14,21 71:1,2 128:16 161:12 179:12, 15 180:13,20 192:5

**works** 167:5 192:19

**world** 86:23 159:14

**worry** 95:20

**worth** 135:21

**Worthington** 10:24 13:4,5 16:6 17:24 18:9 19:4 21:15 22:15 23:3, 12 30:6 31:9 32:13,19 34:22 35:12 36:15 37:1 38:2 39:18 45:12 46:22,23 47:7 48:21 50:4 51:17 54:11 56:3 61:21 63:11 67:17 69:3 74:22 75:5,14,22 76:12,20 77:3 90:1,24 91:8 92:14 97:17 100:2 101:18 108:21 110:12 116:1,9,19 117:16,20,21 119:22 122:11 127:22 129:6 130:2,4,10 131:16 133:18 135:21 136:9, 12,14,19 139:4 146:8 149:6 151:11 163:16, 19 164:17 176:11 181:8 186:8

**Worthington's** 47:17 49:23 50:16 54:14 55:13 56:21 66:21 86:3 102:9 118:20 129:20 133:17 140:6 165:4 166:12 167:9

**write** 85:6 86:12,17,18

**writing** 69:16 91:12 93:12 132:2 167:21

**written** 28:22,23 73:3 144:23 192:17

**wrote** 72:10 84:11,23 85:5,8 158:16 170:6, 12 171:7,12,13 186:17 193:4

---

**Y**

**Yard** 102:18 133:9

**year** 9:10 109:18 162:4

**years** 7:17,24 8:5 9:5 16:2 22:22 44:1 48:9 57:21 72:17 73:8 94:23 99:24 104:5 115:12 131:12 135:1

**yelled** 61:11

**yelling** 61:13

---

**Z**

**zone** 56:4 110:13 181:20

**zoning** 9:15 10:11,15 16:23 17:16 21:1 29:9 38:10 46:12,13 50:11, 16,20 53:6 58:19 61:5 75:6,7,12,24 86:23 109:5 110:13 113:4 115:24 116:18 118:4 125:4 128:15 136:24 160:15 162:18 164:12 171:17 172:10,15,20 173:2,6,7,8,9,18 174:8 177:20 181:13,22 183:8,10,18,20 184:4 185:16

**Zoom** 53:21 68:7 111:11 126:9 140:8 141:11 142:15 144:23 175:21

**Zooms** 142:3



# City of Worthington

**ARCHITECTURAL REVIEW BOARD**
Certificate of Appropriateness
Application

Case # ___AR 70-2021___
Date Received _____
Fee _$ 200 pd_____
Meeting Date _10/14/2021_
Filing Deadline_09/24/2021_
Receipt # _____

1. **Property Location**   1033 High Street, Parcel #100-006774; 100-002427; 100-002425

2. **Present/Proposed Use** S-1 Special; C-2 Community Shopping; C-3 Institutions/Mixed Use
   PUD

3. **Zoning District** S-1, C-3, C-2

4. **Applicant** _____

   Address   230 West Street, Ste. 200, Columbus, OH 43215

   Phone Number(s) 614-918-2000

   Email _____

5. **Property Owner** United Methodist Childrens Home

   Address  431 E. Broad St., Columbus, OH 43215

   Phone Number(s) 614-885-5020

   Email _____

6. **Project Description** ___modern amenitized mixed use development including single-
   family homes, ~~owner-occupied townhomes, for-rent townhomes~~
   and apartments, commercial uses such as office, medical offices, restaurants,
   work-facilities and outdoor recreation and ~~community spaces connected with~~
   paths and sidewalks, multi-story parking facilities and protected natural area

7. **Project Details:**

   a) **Design** See attached project narratives

   b) **Color**  Colors vary but are comparable with existing neighborhood

   c) **Size** 19 SF, 166 townhomes, 540 apartments; 60,000 SF commercial
   ~~25,000 SF medical~~

   d) **Approximate Cost** Estimate pending  **Expected Completion Date** 2 to 4 years from
   construction start

PLEASE READ THE FOLLOWING STATEMENTAND SIGN YOUR NAME:
The information contained in this application and in all attachments is true and correct to the best of my
knowledge. I further acknowledge that I have familiarized myself with all applicable sections of
the Worthington Codified Ordinances and will comply with all applicable regulations.

_Applicant (Signature)_          **10·02·2020**
                                 Date

_Property Owner (Signature)_ Childrens Home          10-2-2020
Chairperson                                          Date

**DEPOSITION EXHIBIT**
Hart 1  1-11-24



# City of Worthington

## PLANNED UNIT DEVELOPMENT
### PRELIMINARY PLAN APPLICATION

Case # PUD 03-2020
Date Received
Fee $1,300 pd
Meeting Date 10/14/2021
Filing Deadlin 09/24/2021

1. Property Location 1033 High St; Parcel#100-006774; 100-002427; 100-002425

2. Present Zoning S-1; Special; C-3 Institutions/Offices Present Use Institutional Office
   ~~C-2 Community Shopping Ctr~~

3. Proposed Use PUD with Mixed Uses of single family, multi-family, townhouses apartments, commercial and medical office

4. Applicant _____

   Address 230 West St, Ste 200, Columbus, OH 43215

   Home Phone N/A                     Work Phone 614-918-2000

5. Property Owner United Methodist Childrens Home

   Address 431 E. Broast St, Columbus, OH 43215

   Home Phone N/A                     Work Phone 614-885-5020

6. Project Description Modern, amenitized mixed use development including

   single family homes, owner-occupied townhomes, for rent townhomes and apartments, commercial uses such as office, medical offices, restaurants, work facilities and outdoor recreation and community spaces connected with paths and sidewalks, multi-story parking facilities and protected natural area.

## PLEASE READ THE FOLLOWING STATEMENT AND SIGN YOUR NAME:

The information contained in this application and in all attachments is true and correct to the best of my knowledge. I further acknowledge that I have familiarized myself with all applicable sections of the Worthington Codified Ordinances and will comply with all applicable regulations.

_____     10-02-2020
Applicant (Signature)           Date

_____     10-2-2020
Property Owner (Signature) Children's Home      Date
Champia



July 15, 2015

Dear Lifestyle Communities,

We, the majority of the Worthington City Council, appreciate the willingness of Lifestyle Communities to present conceptual plans in a recent public meeting on June 29, 2015. Each member of Council was in attendance and heard the comments and reactions from the community.

We remain committed to the principles outlined in the Comprehensive Plan and to the Municipal Planning Commission process. At the same time, we are mindful that Council has been elected to represent the interests of all Worthington citizens and that we must always endeavor to do what is best for the community.

The United Methodist Children's Home site is one of the best opportunities for redevelopment in all of Central Ohio and is vitally important to Worthington. We trust that you also appreciate the significance of this development to all Worthington citizens and will continue to engage in a comprehensive, inclusive community outreach process to listen and respond to the interests of Worthington citizens.

The Comprehensive Plan provides a framework for development. There are numerous ways in which the expressed goals can be interpreted and translated to the site. We understand that your presentation represented an initial concept rather than a formal application or final proposal. Issues raised by the community such as creating abundant green space and parklands, effectively dealing with stormwater, cautiously managing the impact of traffic on adjacent neighborhoods, school capacity, the mix of housing types, amount of residential units and the sizes of buildings are among the many issues you should incorporate into future discussions, studies and conceptual plans.

We trust that a proposal for this land that positively shapes the future of our community can be achieved through dialogue with the community, formal and informal neighborhood and community discussions, interaction with City planning personnel and eventually a thorough review by the Municipal Planning Commission.

Sincerely,

Bonnie D. Michael
President, Worthington City Council

DEPOSITION EXHIBIT

Hart 3 1-11-24

6550 N. High Street | Worthington, Ohio 43085 | 614.436.3100 | worthington.org



### City Council Statement Regarding UMCH Development
### Adopted Monday, October 12, 2015

Whereas, the City has had a long established process for reviewing development applications with consideration by the Municipal Planning Commission (MPC);

Whereas, any changes in zoning approved by the MPC must be approved by City Council with additional opportunity for public comment;

Whereas, this process provides notice to the public and an opportunity for the public to review and comment on the application and the MPC has delayed consideration of applications when it considers sufficient input has not been received;

Whereas, this process has successfully helped the City to develop and redevelop areas of the City;

Whereas, this process is being followed in the development of the United Methodist Children's Home and the City encouraged UMCH and its developer to present potential plans to the public for discussion;

Whereas, plans were discussed with neighbors and at a special MPC public meeting;

Whereas, attendees at the meeting had significant opposition to the plan and City Council sent a letter to the developer stating the citizens' comments should be considered;

Whereas, no development plan has been submitted to the City; and,

Whereas, some citizens have indicated that the City Council supports the preliminary plan presented by the developer.

Now let it be known that City Council:

- Has never supported nor does it support the plan presented by UMCH and the developer,
- Supports the proven process, including public input, for considering development issues, and,
- Will only support UMCH redevelopment that enhances the community and meets, in the broadest sense, the objectives of the Comprehensive Plan.



DEPOSITION EXHIBIT

Hart 4   1-11-24



**DEPOSITION EXHIBIT**

Hart 13 1-11-24

**WORTHINGTON**

# Lifestyle Communities considering next steps on proposal for former UMCH site in Worthington



**Stephen Borgna**
ThisWeek

Published 4:31 p.m. ET Jan. 26, 2022

Lifestyle Communities officials are weighing what to do next regarding the company's plans to redevelop the former United Methodist Children's Home site at 1033 N. High St. in Worthington.

The company's most recent proposal was turned down in December when Worthington City Council rejected a planned-unit-development rezoning request.

**Read more:** Worthington City Council denies Lifestyle Communities' rezoning request to redevelop former UMCH site

Since 2015, the company has submitted three proposals to rezone and then redevelop the UMCH property into a mixed-use residential and commercial project. To date, each proposal has been scrapped because of poor feedback from city officials and residents or did not receive authorization from city officials, who have cited several concerns with the proposals, including density, green space and the height of several buildings.

**Read more:** Lifestyle Communities plan draws large, vocal crowd

According to zoning attorney Tom Hart of the Isaac Wiles law firm in Columbus, who is retained by Lifestyle Communities, the company could choose to refile another application to redevelop the site after the failure of its latest proposal in December.

Council member Bonnie Michael previously told *ThisWeek* the company has the option to file another application in the six months after the vote.

In the meantime, Lifestyle Communities is seeking years of city communications related to the redevelopment proposals for the former UMCH property, which the company owns

through its Worthington Campus LLC, according to Hart, who said he is authorized by the company to speak on its behalf.

Lifestyle Communities has filed a public-records request stretching back nine years to Jan. 1, 2013, to determine if the company was treated "fairly" during its proceedings with the city, Hart said.

"They want to keep every option open," he said. "Because this may lead to legal matters later, but they also may refile and start the process over based on some of the feedback they got at the City Council meeting (in December).

"One thing a developer has to do in zoning is they have to protect their property rights. They have property rights, they have some development rights and they have a right to be treated fairly. A public-records request like that is just to make sure they are being treated fairly and to make sure there's no interaction where the deck is stacked against them."

The city of Worthington was sent a public-records request by the Vorys, Sater, Seymour and Pease LLP law firm in Columbus that sought communications related to the site, Hart said. It was filed on behalf of Lifestyle Communities, he said.

*ThisWeek* has contacted Vorys, Sater, Seymour and Pease for comment, but the law firm had not responded to the request as of Jan. 26.

Before its most recent rezoning request was rejected by council in December, Lifestyle Communities' proposal received a negative recommendation for PUD approval from the Worthington Municipal Planning Commission in October, despite a request from the company that the meeting serve as a starting point for dialogue and potential amendments to its proposal and not have a vote take place that evening.

**Read more:** Lifestyle Communities' latest UMCH proposal receives thumbs down from Worthington commission

"That does not happen typically in the 25 or so other jurisdictions I practice in," Hart said. "We're concerned about not being treated fairly. We want to see what the communications were internally."

Hart said if Lifestyle Communities were to find anything in the public records the company perceives as unfair treatment, the company wants to "keep all options open," including the possibility of a lawsuit.

In an email, Worthington spokesperson Anne Brown said Lifestyle Communities "asked for documents and correspondence between city officials and LC related to the rezoning request of the UMCH property," but she couldn't speculate about what the company was seeking.

Meanwhile, City Council on Jan. 18 voted 4-3 to approve a resolution to amend the city's comprehensive plan regarding the former UMCH site. The amendments included several principles that "serve as a guide for future use and development of the site," according to the resolution.

A proposed 12-month moratorium on applications and proposals for the former UMCH site also failed in a 4-3 vote Jan. 18.

Even though a majority voted for the moratorium, it required six out of seven votes to pass, according to council President David Robinson.

The moratorium was an emergency ordinance that would have gone into effect immediately instead of 21 days after the conclusion of the vote, and thus it needed six out of seven votes to pass, according to Michael.

For both measures, Katy Brewer, Pete Bucher, Doug Smith and Robinson voted in favor and Rebecca Hermann, Beth Kowalczyk and Michael voted against.

Robinson said the moratorium would have enabled the "community at-large" and City Council to "reassess what we believe would be most desirable at this property."

"It would in essence give us time and space to think clearly, talk with one another, to explore, to examine and then to articulate our beliefs," Robinson said.

*sborgna@thisweeknews.com*

*@ThisWeekSteve*