*LIFESTYLE COMMUNITIES*

*vs.*

*CITY OF WORTHINGTON*

---

Deposition of

**Eric Gardner**

January 30, 2024

---



614.460.5000 | www.priohio.com | pri@priohio.com

1

IN THE UNITED STATES DISTRICT COURT
2          SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION
3


4   LIFESTYLE COMMUNITIES,      )
LTD., ET AL.,               )
5                               )
Plaintiffs,          )
6                               )
vs.                  )   Case No.
7                               )   2:22-cv-1775
CITY OF WORTHINGTON,          )
8   OHIO,                       )
)
9         Defendant.            )

10


11


12                    DEPOSITION

13         of ERIC J. GARDNER, MAI, CCIM

14


15              Taken at law firm of
VORYS SATER SEYMOUR & PEASE
16             65 East Gay Street
Columbus, Ohio 43215
17


18

19      on January 30, 2024, at 11:16 a.m.

20         Reported by: Rhonda Lawrence

21


22                    -=0=-


23


24

1    APPEARANCES:

2

         Christopher L. Ingram
3       VORYS SATER SEYMOUR AND PEASE LLP
         52 East Gay Street
4       Columbus, Ohio 43215
         614.464.5480
5       clingram@vorys.com

6            on behalf of the Plaintiffs.

7

         Yazan S. Ashrawi
8       FROST BROWN TODD
         One Columbus, Suite 2300
9       10 West Broad Street
         Columbus, Ohio 43215
10      614.559.7202
         yashrawi@fbtlaw.com
11
             on behalf of the Defendant.
12

13

14

15

16

17

18

19                    -=0=-

20

21

22

23

24

                              STIPULATIONS

1

2                    It is stipulated by and between

3    counsel for the respective parties that the

4    deposition of ERIC J. GARDNER, MAI, CCIM, the

5    Witness herein, called by the Defendants under

6    the applicable Rules of Federal Civil Court

7    Procedure, may be taken at this time by the

8    stenographic court reporter and notary public

9    pursuant to notice; that said deposition may be

10   reduced to writing stenographically by the court

11   reporter, whose notes thereafter may be

12   transcribed outside the presence of the witness;

13   and that the proof of the official character and

14   qualification of the notary is waived.

15                         -=0=-

16

17

18

19

20

21

22

23

24

1                   INDEX OF EXAMINATION

2                                                PAGE

3    BY MR. ASHRAWI:                             5

4

5

6                   INDEX OF EXHIBITS

7    EXHIBIT           DESCRIPTION              PAGE

8    1      Real Estate Appraisal &           17
            Market Damages Analysis,
9           Restricted Report Format

10   2      Letter from Gardner to            22
            Miller, 4-11-23
11
     3      Appraisal Process and Product     29
12          Types - Summary by Gardner
            Street
13
     4      Advisory Opinion 38               43
14
     5      The Appraisal of Real Estate      70
15
     6      Horner Appraisal Report           88
16
     7      Weiler Retrospective              88
17          Appraisal

18

19

20

21

22

23

24

1          ERIC J. GARDNER, MAI, CCIM

2  being first duly sworn, as hereinafter

3  certified, deposes and says as follows:

4            CROSS-EXAMINATION

5  BY MR. ASHRAWI:

6    Q.  Can you state your name for the record?

7    A.  Eric, middle initial J., last name

8  Gardner, G-A-R-D-N-E-R.

9    Q.  Mr. Gardner, I assume you've been

10  deposed before?

11    A.  Correct.

12    Q.  How many times?

13    A.  Numerous.

14    Q.  More than ten?

15    A.  Probably, yeah.

16    Q.  I'm going to go over a few ground rules,

17  which I'm sure you've heard before in your

18  previous depositions and from your counsel, so

19  bear with me.

20    A.  Sure.

21    Q.  I'm going to ask you a series of

22  questions, but if you don't understand any of my

23  questions or need me to repeat anything, just

24  please ask me to do so.  If you answer one of my

1  questions, I'm going to assume you understood

2  it.

3        If you need a break, let me know.  I'm

4  happy to accommodate.  If there's a pending

5  question, I just ask that you answer that first.

6  We can't talk over each other, so let me finish

7  my question before you answer, and I'll try to

8  do the same as you're answering my question.

9        Need to stick to verbal responses so the

10  court reporter can take a nice clean record.

11        Are all those okay with you?

12     A.  Yes.

13     Q.  Okay.  Any reason today why you would

14  not be able to give full, complete, truthful and

15  accurate testimony?

16     A.  No.

17     Q.  You swore an oath to tell the truth in

18  today's deposition.  Do you understand that

19  that's the same oath that will be asked of you

20  if you testify in a court?

21     A.  Yes.

22     Q.  You understand that you're here to

23  testify in a federal lawsuit that was filed by

24  Lifestyle Communities in Worthington Campus

1    against the City of Worthington?

2        A.  Yes.

3        Q.  And you understand that the lawsuit

4    centers around a piece of property in the City

5    of Worthington that's commonly known as the

6    United Methodist Children's Home or the UMCH

7    property?

8        A.  Yes.

9            MR. INGRAM:  Objection to form.

10       Q.  So moving forward, if I refer to the

11   property, you'll understand that I'm

12   referring -- unless I say otherwise -- to the

13   property that's central to this case?

14       A.  The totality of the property?

15       Q.  That's correct.  The three parcels that

16   make up just under 38 acres.

17       A.  Okay.

18       Q.  What did you do to prepare for this

19   deposition?

20       A.  I looked over my report, looked over the

21   file, talked to my attorney.

22       Q.  Did you look at any other documents,

23   other than your report and the documents in your

24   file?

1      A.  No.

2      Q.  Did you look at any deposition testimony

3  or transcripts?

4      A.  No.

5      Q.  Did you look at any other expert reports

6  that have been produced in this matter?

7      A.  Just what's in my file.

8      Q.  You had quite a large file.  I think it

9  was around 4,000 pages.  Were there any

10  particular documents or pages in that file that

11  you reviewed?

12          MR. INGRAM:  Objection.  Form.

13          You can answer if you can.

14      A.  I'm not sure I understand your question.

15      Q.  Sure.  Did you review all 4,000 pages

16  equally, or did you focus on particular

17  documents in your file?

18          MR. INGRAM:  Same objection.

19      A.  I looked at the totality of my -- of the

20  file contents.

21      Q.  There was in your file about 900 pages

22  that was a real estate development secondary

23  source, Principles and Process of Real Estate

24  Development.  Did you review that in preparation

1  for this deposition?

2      A.  You're talking about the book from the

3  Urban Land Institute?

4      Q.  Correct.

5      A.  So I've taught the development class at

6  the University of Cincinnati, and that was the

7  textbook that I've used.

8      Q.  Did you review that textbook

9  specifically in preparation for this deposition?

10     A.  I looked at it.  It was just part of --

11 kind of part of the body of knowledge.  I looked

12 at it in preparation of my report.

13     Q.  Outside of your files and your report,

14 any other -- any other document?

15     A.  Nothing compelling.

16     Q.  What about anything uncompelling?

17     A.  No.

18     Q.  Okay.  Besides your attorney, did you

19 discuss or talk about this deposition with

20 anyone?

21     A.  No.

22     Q.  Anyone in your office?

23     A.  They know I'm here.

24     Q.  Mr. Gardner, I want to talk a little bit

1    about your background.  How are you employed?

2        A.  I'm the president and I'm a member of

3    Gardner Street Commercial Real Estate Group,

4    LLC.

5        Q.  And what is the nature of that company?

6        A.  We are a commercial real estate services

7    firm.  We focus on valuation.

8        Q.  Do you provide any other commercial real

9    estate services besides valuation?

10       A.  Mostly valuation.  We do -- some

11   assignments don't require an opinion of value

12   and it's just more consulting.  So we get

13   involved in several consulting assignments on a

14   regular basis.

15       Q.  When you consult, are you still

16   providing some opinion or analysis on valuation,

17   or are you consulting on other aspects of

18   commercial real estate?

19           MR. INGRAM:  Objection.  Form.

20       A.  It just varies.  Depends on the scope of

21   work that is -- it just depends on the scope of

22   work.

23       Q.  You would say, though, primarily the

24   nature of the business is valuation work,

1  though, right?

2     A.  Primarily.

3     Q.  What's your educational background?

4     A.  I got an undergraduate degree in

5  business administration from the University of

6  Cincinnati.  I've got an MBA in finance from the

7  University of Dayton.  I hold the MAI

8  designation from The Appraisal Institute.  I

9  also hold the CCIM designation from the -- it's

10  a part of the National Association of Realtors.

11  CCIM stands for certified commercial investment

12  member.

13     Q.  Does the CCIM designation allow you to

14  do anything in terms of services offered

15  different than you would offer if you didn't

16  have it?

17        MR. INGRAM:  Objection to form.

18     A.  The CCIM is -- it's kind of considered

19  the Ph.D. of commercial real estate.  It's just

20  an additional certification/accreditation.

21     Q.  It's not tied directly to appraisals or

22  valuations specifically, is it?

23        MR. INGRAM:  Objection to form.

24     A.  Valuation is a part of that, but it's

 1    not -- typically, CCIMs are investment brokers,

 2    property managers, asset managers.  It's a

 3    rigorous -- it's a graduate degree, essentially,

 4    but it's a professional designation by those of

 5    us that practice in commercial and investment

 6    real estate.

 7        Q.  Can you remind me again what association

 8    gives this designation, National Association

 9    of -- and then I forgot?

10        A.  I believe it's Realtors.  But the CCIM

11    Institute is their own entity, but I believe

12    they're affiliated with the National Association

13    of Realtors, but I haven't kept up on the

14    structure.

15        Q.  What did it take to get that

16    designation?

17        A.  So I earned the MAI designation first,

18    and if you have that designation first you're --

19    at least at the time -- this goes back to the

20    early 2000s.  I was able to participate in what

21    was known as their fast-track program.  So I had

22    to take several of their core courses plus some

23    elective courses.  They were all a week long.

24    And then I sat for the national comprehensive

1  exam.  It was administered up in Washington,

2  D.C.

3          Typically, people have to do what's

4  known as a -- I did the demonstration report for

5  my MAI, so that counted as your project, but you

6  have to do a project, but I was given credit for

7  my demonstration report through The Appraisal

8  Institute.  So since I had done that, I think,

9  within the past five or seven years.

10     Q.  Is having an MAI a prerequisite to

11  having a CCIM designation?

12     A.  No.

13     Q.  It just allows you to fast track the

14  latter?

15     A.  Correct.

16     Q.  Is there any continuing education

17  required to keep up that designation, the CCIM

18  designation, that is?

19     A.  Yes.

20     Q.  And what is that like?

21          MR. INGRAM:  Objection to form.

22     A.  You have to maintain your -- a real

23  estate sales license and the continuing

24  education associated with that license.

1      Q.  So you have a real estate sales license,

2   then?

3      A.  Correct.

4      Q.  Any other licenses or designations

5   besides the MAI or the CCIM?

6      A.  I'm a certified general appraiser.  I

7   maintain that through Ohio, Kentucky, Indiana,

8   and Michigan.

9      Q.  Anything else?

10     A.  My CV is located in my report, but I

11  think those are the highlights.

12     Q.  What about your work history?  Take me

13  back to your first job in commercial real estate

14  and then work your way up to where you are now

15  with Gardner Street.

16         MR. INGRAM:  Objection to form.

17     A.  Started in third grade.  My mother was

18  the office manager for the Case & Wallace

19  Company, and she needed something for me to do

20  in the afternoons.  I ran the copier.  From

21  there -- I worked there part-time through grade

22  school.

23     Q.  What did Case & Wallace do?

24     A.  It's a commercial real estate appraiser

1  firm and property management firm.

2      Q.  And that was obviously before child

3  labor laws were in place.

4      A.  Apparently.  Well, I negotiated, because

5  I wanted to ride my bike to school.

6      Q.  There we go.

7      A.  And my elementary school was a mile away

8  from mom's office.  And where we lived I

9  couldn't ride my bike.

10          So from there I started as a co-op

11  student at the University of Cincinnati, 1992.

12  Worked for -- at the time it was Adkins Moy &

13  Wilkins, which became Property Advisors.  Was

14  there from '92 into '98.  '98 went to The Gem

15  Real Estate Group.  Then moved to Colliers

16  Turley Martin Tucker in 2006.  It's now referred

17  to as the Cushman & Wakefield office in

18  Cincinnati.  2010 moved to Pillar Valuation

19  Group.  In 2019, end of '19, we formed Gardner

20  Street Commercial Real Estate Group.

21      Q.  When you say we formed Gardner Street,

22  who is the "we" you were referring to?

23      A.  That's myself and then Derek Street.

24      Q.  Is Mr. Street also a MAI appraiser?

1      A.  Not yet.  He is a certified general

2  appraiser.  He's working toward the MAI

3  designation.  He's completed all the coursework.

4  The MAI takes about ten years to complete.

5  Derek's been in the business almost 20.  But

6  it's a process.

7      Q.  Any other owners or members of Gardner

8  Street?

9      A.  No, not at this time.

10      Q.  How many employees does Gardner Street

11  have?

12      A.  Currently, we have six.

13      Q.  Are those other appraisers or office

14  managers, or what's the breakdown?

15         MR. INGRAM:  Objection.  Form.

16      A.  So Mr. Street and I are the certified

17  general appraisers.  We have an office manager

18  part-time.  We have a part-time research

19  manager, and we have two senior analysts.

20      Q.  Did you grow up in the Cincinnati area?

21      A.  Grew up in Dayton, Ohio, northern

22  Cincinnati.

23      Q.  And Gardner Street is located in

24  Cincinnati now, correct?

1    A.  We're in Blue Ash.

2    Q.  Blue Ash.

3                      -=0=-

4        (Deposition Exhibit 1 marked.)

5                      -=0=-

6    BY MR. ASHRAWI:

7    Q.  I'm going to hand you what I think

8    you've already got in front of you and what

9    we'll mark as Gardner Exhibit 1.

10        Mr. Gardner, are you familiar with this

11   document?

12   A.  Yes.

13   Q.  This is the restricted report that you

14   prepared for this case, correct?

15   A.  Yes.

16   Q.  Is this a complete and accurate copy of

17   that report?  And take your time to look through

18   it.

19   A.  Yes.

20   Q.  I'm going to ask you a number of

21   questions about this report throughout the

22   deposition, but my first set of questions I want

23   to direct your attention to page 35, which is a

24   court case expert witness log from 2004 to the

1  current.  Do you see that?

2      A.  Yes.

3      Q.  My first question is, is this an

4  exhaustive list of all cases in which you were

5  retained as an expert witness since 2004?

6      A.  As it says at the top, just so we're

7  clear on it, we also -- my firm and I, we worked

8  on several real estate tax appeal cases.  We did

9  not include those within this.  And these are

10  the cases where I have provided either courtroom

11  testimony or a deposition.  To the best of my

12  knowledge, best of my ability, this is a

13  complete list.

14      Q.  Thank you for that clarification.  So

15  that the record is clear, this list, number one,

16  does not include your expert testimony work for

17  any Board of Revision or Board of Tax Appeal

18  case, unless otherwise stated, right?

19      A.  That is correct.

20      Q.  And it only includes cases in which you

21  either provided deposition testimony or

22  courtroom testimony; is that right?

23      A.  Correct.

24      Q.  Okay.  Thank you.

1          Is it fair to say that a majority of the

2   cases -- of the 50 cases listed here, a majority

3   of them are appropriation cases or condemnation

4   cases?

5       A.  No.

6       Q.  Tell me the breakdown of the nature of

7   these 50 different cases.

8       A.  We've got a column there that has the

9   nature of the case.  You know, certainly, a lot

10  of them are appropriation or condemnation cases,

11  but there's been a wide variety.  I'm sure, as

12  you're familiar with it in your practice, there

13  can be some valuation disputes.  Anything

14  from -- you know, there's been some zoning cases

15  here.  There's been a case in federal court out

16  in San Diego just of a valuation dispute on a

17  building between partners.  Certainly

18  appropriation cases.  Density matters, divorce

19  cases.  I think that covers it.  We tried to

20  list the nature of the case there on the column

21  that states nature of the case.

22      Q.  Yeah.  That's very helpful.  Let me ask

23  this question:  I see several instances where

24  the nature of the case is condemnation case and

1    then several instances where it says

2    appropriation case.  Are those one and the same,

3    or are you differentiating those type of cases?

4        A.  They're basically one and the same.

5        Q.  So I've counted 32 of the 50 as being

6    condemnation or appropriation cases.  And my

7    next question for you is, out of those cases,

8    are you -- were you retained by -- has there

9    been any condemnation or appropriation case

10   listed on here where you've been retained by the

11   appropriating agency or entity?

12           MR. INGRAM:  Objection to form.

13       Q.  And the reason I ask, Mr. Gardner, is

14   you certainly list the clients, but oftentimes

15   the client is the retaining attorney, so it's

16   unclear whether the underlying entity that

17   you're doing work for is the appropriating

18   agency or the landowner.  So that's my question.

19           MR. INGRAM:  Same objection.

20       A.  Item 14, Washington Township --

21   actually, item 1 -- line item 1, Stonelick

22   Township, we were hired by an insurance company.

23   I'm just going to have -- to answer your

24   question completely, I'm going to have to go

1    through these one by one.

2        Q.  Let me make it a little easier for you.

3    So 1 and 14 are not condemnation or

4    appropriation cases.  I'm focusing just on

5    those.  And if you need time to take a look at

6    those, that's fine.

7        A.  I'd have to go through them one by one.

8        Q.  Sure.

9        A.  Item 1, our client was ultimately

10   Stonelick Township.

11       Q.  Take your time, Mr. Gardner, I'm just

12   going to grab a cup of coffee.

13       A.  I believe, on the appropriation cases

14   where I've offered testimony, it tends to be for

15   property owners or counsel representing property

16   owners.

17       Q.  I know Fran Barrett is not representing

18   government agencies, so I checked those off the

19   list.

20       A.  Not always.

21           He's trying to retire.  He's not very

22   successful at that.

23       Q.  He's referred some matters over in that

24   effort to retire, which I appreciate.

1      A.  He's trying.

2      Q.  I know that your property tax cases

3  aren't listed on here.  But are you also

4  primarily retained by the underlying taxpayer,

5  taxpayer attorney in those cases, or what's the

6  percentage split in that work?

7      A.  Primarily, we get hired by landowners.

8                      -=0=-

9          (Deposition Exhibit 2 marked.)

10                     -=0=-

11  BY MR. ASHRAWI:

12     Q.  Mr. Gardner, I'm going to hand you what

13  we'll mark as Gardner Exhibit 2.  I will

14  represent to you, Mr. Gardner, this came from

15  your work file and is Bates numbered Gardner

16  1179 through Gardner 1182, and appears to be a

17  letter of agreement for expert real estate

18  services in this case.  Are you familiar with

19  this document?

20     A.  Yes.

21     Q.  Subject to the redactions, is this a

22  complete and accurate copy of the letter of

23  agreement for services in this case?

24     A.  Yes.

1      Q.  Was your scope of assignment included in

2   this letter?

3      A.  I believe so.

4      Q.  What was your scope of assignment for

5   this case?

6      A.  I would refer you to your Exhibit 1,

7   page 5 of our report, that lists out our scope

8   of work.

9      Q.  And is this the same scope of work that

10  was included in the letter of agreement?

11     A.  I would have to go back and look.  The

12  version you've handed me here is redacted

13  significantly.  But I believe it's very similar.

14     Q.  In this redacted portion, were there any

15  facts or information provided by the Vorys firm

16  or Mr. Miller to be considered in your

17  assignment?

18     A.  I'm not sure I understand your question.

19     Q.  Let me ask it a different way.  You're

20  retained by the Vorys firm, correct?

21     A.  Yes.

22     Q.  Did the Vorys firm provide to you

23  specific facts or information and ask you to

24  consider those in your assignment?

1          MR. INGRAM:  Objection to form.

2          You may answer to the extent you can.

3     A.  We were provided with various documents

4  that are contained within our file.

5     Q.  Other than those documents, did you

6  receive specific information either in email

7  form, letter correspondence, over the phone from

8  Vorys about specific facts or information that

9  they wanted you to consider?

10          MR. INGRAM:  Objection to form.  Asked

11  and answered.

12     A.  I've asked and answered that.  I don't

13  know that -- you have the totality of my file.

14     Q.  So the Vorys firm gave you a plan and

15  said appraise this property?  Was that the scope

16  of information and data they provided you to

17  perform this report?

18          MR. INGRAM:  Objection to form.

19  Mischaracterizes this witness's testimony.

20  Asked and answered.

21     Q.  You can answer.

22     A.  Can you rephrase your question?  I'm not

23  sure I understand it, how you've asked it.

24     Q.  Sure.  What did Vorys ask you to do when

1    they retained you?

2         MR. INGRAM:  Objection to form.  Asked

3    and answered.

4         A.  Analyze the subject property.

5         Q.  When you say analyze, did they ask you

6    to give an opinion of value?

7         MR. INGRAM:  Same objection.

8         A.  They asked us to consider the property

9    in a couple different scenarios, as spelled out

10   in my report.

11        Q.  So that's what I'm asking you.  My

12   question is:  What scenarios did Vorys provide

13   to you to consider?

14        A.  I'll do my best to answer your question

15   by turning -- directing you to page 7 of our

16   report.  Similar to all or most assignments in

17   our firm, we look at highest and best use, and

18   we looked at a couple different scenarios on the

19   subject property as spelled out in Scenario A

20   and Scenario B at the top of page 7 of my

21   report.

22        Q.  I understand you looked at those two

23   scenarios.  My question's a little bit

24   different.  My question is:  Did Vorys ask you

1  to look at these two scenarios separately?

2      MR. INGRAM:  Objection to form.

3      You can answer that question, if you

4  can.

5      A.  Again, they asked us to analyze the

6  subject property.  I wrote the highest and best

7  use.

8      Q.  You used the word analyze.  You perform

9  valuation services primarily, correct?

10     A.  Correct.

11     MR. INGRAM:  Objection to form.

12     Q.  So when you say analyze, is that

13  different than providing valuation services to

14  the property?  What are you analyzing?

15     MR. INGRAM:  Objection to form.

16     Q.  It's not a trick question.  I just want

17  to know what you're analyzing.

18     MR. INGRAM:  Same objections.

19     A.  To answer your first question, we looked

20  at the -- we developed the highest and best use.

21  To be clear, we don't always develop an opinion

22  of value.

23     Q.  Did you develop one in this case?

24     A.  Yes.

1    Q.  So when you say analyze the property,

2  that would include, in this scenario,

3  determining the highest and best use in the

4  various scenarios and then opining on value?

5    A.  In general, correct.

6    Q.  Anything else?

7    A.  No.

8    Q.  So I don't think I got the answer to

9  this question, so let me try to ask it a

10  different way.  I see that there are two

11  scenarios in your report, Scenario A and

12  Scenario B.  Who came up with those scenarios?

13    A.  We were asked to consider various

14  impact -- the various impact on the zoning, but

15  I came up with the -- I wrote the highest and

16  best use.

17    Q.  Mr. Gardner, if you turn to page 8 of

18  your report, at the top you have opinion of

19  value before Scenario A, this scenario assumes a

20  PUD zoning to allow for a mixed-use development.

21      Do you see that?

22    A.  Yes.

23    Q.  Did Vorys ask you to assume the PUD

24  zoning for Scenario A before valuation?

1          MR. INGRAM:  Objection to form.

2      A.  We were asked to look at the

3  comprehensive -- the land use plan, the

4  comprehensive plan from 2014, and what the value

5  of the property would be if you follow -- that

6  preparation, if you will, for the subject site,

7  for the totality of the property, what that

8  would look like for a mixed-use development.

9  Again, similar to the comprehensive plan.

10      Q.  Did Vorys identify or provide you with

11  any other assumptions to make while preparing

12  your report?

13      A.  The two scenarios that we've discussed

14  here today.

15      Q.  Okay.  Thank you.

16          Can you describe for me the difference

17  between an extraordinary assumption and a

18  hypothetical condition?

19      A.  Yes.

20      Q.  I'm going to ask you to do that, then.

21      A.  I'm going to direct you to page 4.

22  There's a definition of the extraordinary

23  assumption as stated in our report.  That's the

24  definition of the extraordinary assumption.

1      Q.  So let's start there.  If I'm reading

2  the definition correctly, if the assumption made

3  in Scenario A ends up not being true or

4  accurate, then that would potentially change

5  your analysis, correct?

6          MR. INGRAM:  Objection to form.

7      A.  Maybe.

8      Q.  So now, what is a hypothetical

9  condition, and how does that differ from an

10  extraordinary assumption?

11      A.  We have it defined on page 40 of our

12  report.

13      Q.  So in layman's terms, a hypothetical

14  condition is something that is contrary to a

15  known fact, but is used for the analysis

16  anyways; is that right?

17      A.  I'm going to stick to the formal

18  definition as stated on page 40 of my report.

19      Q.  And you didn't use any hypothetical

20  conditions in this report; is that right?

21      A.  Correct.

22                  -=0=-

23      (Deposition Exhibit 3 marked.)

24                  -=0=-

1    BY MR. ASHRAWI:

2        Q.  Mr. Gardner, I'm going to hand you what

3    we'll mark as Gardner Exhibit 3.  Are you

4    familiar with this document?

5        A.  Yes.

6        Q.  What is it?

7        A.  This summarizes the difference between

8    the two reporting formats that appraisers can

9    use.

10       Q.  Is this a document generated by Gardner

11   Street Group?

12       A.  Yes.

13       Q.  And this document also describes the

14   process and the service for all assignments; is

15   that correct?

16       A.  Yes.

17       Q.  And was this the same process used in

18   developing your opinion in this case?

19       A.  Yes.

20       Q.  Does this process begin before or after

21   the scope of work is identified?

22           MR. INGRAM:  Objection to form.

23       A.  It depends.

24       Q.  What does it depend on?

1        MR. INGRAM:  Same objection.

2    A.  The complexity of the property and the

3  assignment.

4    Q.  How would you describe the complexity of

5  this property and this assignment in this case?

6        MR. INGRAM:  Objection to form.

7        You may answer if you can.

8    A.  It's vacant land.  Vacant land is always

9  more complex.

10    Q.  And why is that?

11    A.  There's always uncertainty as the

12  highest and best use.

13    Q.  When there's uncertainty to the highest

14  and best use, how, then, do you come up with

15  your highest and best use?

16    A.  You go through the tests of highest and

17  best use and you look to the market.

18    Q.  Does any particular test, under the

19  highest and best use elements, govern over the

20  other?

21    A.  No.

22        MR. INGRAM:  Objection to form.

23    Q.  Would you say they're all weighted

24  appropriately or the same?

1         MR. INGRAM:  Objection to form.

2     A.  They're all part of the totality of

3  forming an opinion of highest and best use.

4     Q.  Under this process, in the middlish of

5  bullet 3, it talks about due diligence

6  documents, and more specifically, details

7  concerning any recent or pending sale, including

8  an investment package, copies of contracts

9  and/or closing statements.

10         You're aware that this property sold in

11  December of 2020; is that correct?

12     A.  Yes.

13     Q.  And did you review all of the sale

14  documents, closing documents and contracts

15  associated with that sale?

16     A.  "All" is a pretty strong word.  I don't

17  think I reviewed everything.

18     Q.  Did you review the purchase and sale

19  agreement?

20     A.  I'd have to look at my file.  I'm not

21  sure, as I sit here today.

22     Q.  So if it was in your file, would you

23  have reviewed it?

24     A.  If it was in my file, I looked at it.

1      Q.  Would you agree with me that that sale

2  was an arm's length transaction?

3          MR. INGRAM:  Objection.  Form.

4      A.  I believe it was.

5      Q.  In your second-to-last bullet point

6  under the process, you referred to analyzing

7  market information, such as comparable sales and

8  rentals.

9          In Scenario A, did you look at any

10  comparable sales?

11      A.  We considered comparable sales, but

12  ultimately couldn't find any.

13      Q.  Would the sale of the subject be

14  considered a comparable sale?

15      A.  No.  It's a sale of the subject.

16      Q.  Would you consider it in your analysis

17  of the value of the property?

18      A.  We did.

19      Q.  How was it factored in?

20      A.  It's --

21      Q.  I understand where the discussion is

22  located in the report.  My question is:  How was

23  it factored into your analysis?

24          MR. INGRAM:  If you can let the witness

1    answer your question before you fire off two or

2    three more.

3         MR. ASHRAWI:  Strike the first one, and

4    we'll stand on the second one.

5    A.  We reported the December 2020 sale on

6    page 5.

7    Q.  And where is it analyzed in your report?

8    A.  Also on page 5.

9    Q.  Is that the entirety of the analysis and

10   reporting of the sale?

11        MR. INGRAM:  Objection to form.

12   A.  We considered the dollar per acre of the

13   sale from December of 2020.

14   Q.  How so?

15   A.  We took the $5.2 million sale price and

16   we divided it by the 37.35 acres to arrive at a

17   sales price per acre of $139,224.

18   Q.  And was that sales price per acre then

19   considered and used in forming any of your

20   opinions of value?

21        MR. INGRAM:  Objection to form.  Asked

22   and answered.

23   A.  It's just a data point.

24   Q.  Continuing on Exhibit 3, which is the

1    Appraisal Process and Products Type - Summary by

2    Gardner Street.  The second big category, as you

3    previously mentioned, is an outline of the two

4    different reporting options per USPAP.  Do you

5    see that?

6        A.  Yes.

7        Q.  And in this case you -- Option 2 was

8    selected, the restricted appraisal report,

9    right?

10       A.  Yes.

11       Q.  Were you asked to do a restricted

12   appraisal report?

13       A.  When we're originally contacted, one of

14   the things I do is kind of educate the client on

15   the format that we have two reporting formats

16   that are available to appraisers under USPAP,

17   and simply educated the client on the two

18   reporting formats.

19       Q.  And then did the client ask you to use

20   Option 2, the restricted appraisal format?

21       A.  I don't know.

22       Q.  You don't recall if you made that

23   decision on your own or if you were directed to

24   use that format?

1      A.  I really don't recall.  I presented it

2  to the client on these are the two reporting

3  formats that we use that are available.

4      Q.  And then someone made the decision to go

5  with Option 2, but you don't know who, is

6  that --

7      A.  I really don't know who.

8      Q.  Okay.  Why would you choose one over the

9  other?  What are the factors you consider?

10         MR. INGRAM:  Objection.  Calls for

11  speculation.

12      A.  It really just depends on the client

13  preference, quite frankly.  The appraisal report

14  tends to be used by usually our lender clients

15  that are not familiar with the property.  They

16  want a full due diligence contained within the

17  documents.

18         The restricted format, most of our legal

19  clients tend to like that format better because

20  it's more clear and concise, more businesslike.

21  It hits the highlights.  It hits the core value

22  drivers without a lot of boilerplate.

23      Q.  Under the restricted appraisal report,

24  it talks about -- it's limited to the clients

1   and other named intended users because it may

2   not contain supporting rationale for all the

3   opinions and conclusions that are set forth.  Is

4   that a USPAP statement, or is that a Gardner

5   Street statement?

6       A.  I believe it's USPAP.

7       Q.  Would you say that your report does not

8   contain rationale for all of the opinions and

9   conclusions set forth therein?

10      A.  No.

11          MR. INGRAM:  Objection.  Form.

12      A.  I think my report is very clear.  I

13  think it provides all of the relevant

14  information.

15      Q.  And does it provide all of the

16  supporting rationale?

17      A.  You maybe could look at our file.

18      Q.  I'm not asking about the file.  I'm

19  asking about the report.

20      A.  Okay.

21      Q.  Does the report contain all the

22  supporting rationale for your opinions and

23  conclusions?

24      A.  The restricted report option does not

1  have to include all of that.  It's a summary.

2  It's just the format -- it's just the format of

3  the analysis.  It's a business -- it's more of a

4  businesslike report.  We do them frequently.  A

5  restricted report is in compliance with USPAP.

6      Q.  I understand that.  I just wanted to

7  know -- and I understand that it doesn't have to

8  contain the supporting rationale.  And I'm

9  asking you to confirm whether your report itself

10  contains all of the supporting rationale, or if

11  you have to look elsewhere for that rationale?

12      MR. INGRAM:  Objection to form.  Asked

13  and answered several times now.

14      Q.  You can answer.  Yes or no, does it have

15  the supporting rationale or not?

16      MR. INGRAM:  Same objection.

17      A.  I think, for an educated client, it

18  contains everything that they need to look at.

19      Q.  So it wouldn't contain everything that

20  an uneducated user would need; is that fair?

21      MR. INGRAM:  Objection to form.

22      A.  Maybe.

23      Q.  And Mr. Gardner, I know I'm going to get

24  an objection to it, because I know I've asked

1    it, but I forgot the answer, so bear with me.

2         On Exhibit 2, which is your redacted

3    letter of agreement, you had previously

4    testified that Vorys asked you to consider a

5    highest and best use consistent with a

6    comprehensive plan and then second scenario.  Is

7    that language -- is that scope or is that

8    information contained in this letter agreement,

9    to the best of your recollection?

10        MR. INGRAM:  Objection to form.

11        You can answer if you can.

12    A.  I don't know.

13        MR. ASHRAWI:  Chris, I would just ask

14    that you all re-review the redacted portions of

15    this, and if there's any information related to

16    those assumptions or facts, that we be provided

17    with an unredacted copy of that, or portions of

18    the unredacted copies of those.

19        MR. INGRAM:  Yeah, Yaz, we can certainly

20    take that up off-line, but we have produced what

21    Mr. Gardner relied upon.

22        MR. ASHRAWI:  Okay.  We'll take that

23    off-line.

24

1    BY MR. ASHRAWI:

2        Q.  Mr. Gardner, in the preparation of your

3    report, who all worked on your report?

4        A.  My staff and I.

5        Q.  Who specifically from your staff?

6        A.  For each and every report within our

7    office, at least four people touch every

8    assignment.  We work as a team.

9        Q.  Did Mr. Street contribute to any portion

10   of this report?

11       A.  I think he may have done a proofread,

12   but he was not -- at the time, he was not

13   primarily working on this one with me.

14       Q.  Safe to say you were the primary drafter

15   and analyst on this?

16       A.  Yes.

17       Q.  When you were analyzing the market

18   information -- you analyze market information as

19   part of your process, right?

20       A.  Yes.

21       Q.  Did you speak with any market

22   participants as part of that analysis?

23           MR. INGRAM:  Objection to form.

24       A.  Yes.

1      Q.  Who?

2      A.  I spoke with, in this case, the property

3  owner representative, Sam Stark.

4      Q.  I'm sorry, I'm going to pause you right

5  there.  Is Sam Stark the representative for

6  Lifestyle Communities or the property owner?

7      A.  Yes.  He was my primary contact.

8      Q.  Who else?

9      A.  We gather market information from a

10  variety of sources, which I'm sure you reviewed

11  in our file.  As I sit here today, Principle

12  Real Estate group.  It's Skip Eberly, who is an

13  MAI, CCIM here in Columbus.  Spoke with Debi

14  Wilcox, also an MAI and a CCIM.  Sam Kuhn, Sam

15  Kuhn & Associates.  Don Miller.  Don is also an

16  MAI.  I think those are the primary Columbus --

17  my peers within this market.

18      Q.  I'm going to ask you a little bit more

19  about each of these individuals, but outside of

20  those appraisers and your contact with the

21  property owner, did you speak with any others --

22  any other market participants?

23      A.  Spoke with a couple developers that we

24  work with on a regular basis.

1    Q.  Who did you speak with specifically?

2    A.  Chris Dobrozsi from Neyer Properties.

3  They have developed the Montgomery Quarter

4  project.  It's a mixed-use project in

5  Montgomery, Ohio.

6    Q.  Who else?

7    A.  Rob Smyjunas, Vandercar Holdings.

8    Q.  Could you spell that last name, to the

9  best of your ability.  It's for our friend here.

10    A.  Oh, boy.  That's a good one.

11    Q.  And if not, that's okay.

12    A.  I don't have my phone with me.  S -- I'm

13  going to butcher it.  Sorry, Rob.

14  S-M-Y-J-U-N-I-S [sic].

15    Q.  And I'm sorry, Rob is who?

16    A.  Vandercar Holdings.

17    And also Bob Fessler.  Also Bob's with

18  Fessler Development, but then they also -- he

19  also does work with Vandercar.

20    Q.  Anyone else?

21    A.  Not that I can think of.

22    Q.  Did you speak with any City of

23  Worthington officials?

24    A.  No.

1      Q.  Did you speak with any other

2  governmental officials in central Ohio?

3      A.  No.  No, I didn't.

4      Q.  You said Principle Real Estate Group.

5  That was Skip Weberly?

6      A.  Eberly, with an E.  E-B-E-R-L-Y.  That

7  one I can spell.

8          MR. INGRAM:  Sorry to interrupt.  We've

9  been going for a little over an hour now.  So

10  whenever it's a convenient time for a break.

11          MR. ASHRAWI:  Let's take a break right

12  now.

13          (Recess.)

14  BY MR. ASHRAWI:

15      Q.  Mr. Gardner, turning back to Exhibit 3,

16  which is the Appraisal Process and Products

17  Type - Summary sheet, you reference at the

18  bottom USPAP Advisory Opinion 38.  Is that in

19  relation to the restricted appraisal report?

20      A.  Yes.

21                     -=0=-

22          (Deposition Exhibit 4 marked.)

23                     -=0=-

24

1    BY MR. ASHRAWI:

2        Q.  I'm going to hand you what we'll mark as

3    Gardner Exhibit 4.  Do you know what this

4    document is?

5        A.  Yes.

6        Q.  This is Advisory Opinion 38, which is in

7    the USPAP manual; is that right?

8        A.  Yes.

9        Q.  And USPAP is the governing agency or

10   governing guidelines for your appraisal reports;

11   is that fair?

12       A.  Yes.

13       Q.  And this opinion discusses the

14   various -- various information about restricted

15   appraisal reports and the differences between

16   those reports and regular reports and other

17   aspects of the restricted appraisal report; is

18   that correct?

19       A.  Can you define what a regular report is?

20       Q.  Sure.  I'm using the term regular report

21   to mean the appraisal report identified in

22   Option 1 of your -- of our Exhibit 3.

23       A.  So a full report?

24       Q.  Full report.  Correct.

 1     A.  Because there's no such thing as a

 2  regular report.

 3     Q.  So would you -- and thank you for that.

 4  So would I be correct in calling what's referred

 5  to as Option 1 a full appraisal report?

 6     A.  No.  It's just an appraisal report.

 7     Q.  Okay.  An appraisal report.

 8         So back to Exhibit 4, is this a true and

 9  accurate copy of the USPAP guidelines for

10  restricted appraisal reports?

11         MR. INGRAM:  Objection to form.

12     A.  It is page 114, 115, 116 and 117 from

13  the advisory opinions.

14     Q.  Which is part of the USPAP manual and

15  guidelines; is that correct?

16     A.  It's a part of it, yes.

17     Q.  On the first page, on line 71, if you

18  look to the left, it talks about when a

19  restricted appraisal report may be appropriate.

20  Do you see that?

21     A.  Yes.

22     Q.  And there are three bullet points for

23  that.  The first says that the client

24  understands the limited utility of this option.

1          In this instance, was your client -- did

2   your client understand the limited utility of

3   the restricted appraisal report?

4          MR. INGRAM:  Objection to form.  Calls

5   for speculation.

6      A.  I believe so.  Or I should say I

7   educated them.

8      Q.  And did the client confirm that they did

9   not need the level of information required in an

10  appraisal report, as outlined in bullet point 3

11  under that heading?

12     A.  Yes.

13     Q.  And you indicated that you advised the

14  client that the report may not contain

15  supporting rationale for all of the opinions and

16  conclusions set forth in the report?

17         MR. INGRAM:  Objection to form.

18  Mischaracterizes this witness's prior testimony.

19     A.  We discussed that the restricted report

20  format would contain the conclusions.  We also

21  discussed, for example, you know, the restricted

22  report, by example, does not include a

23  neighborhood description.  It was felt that --

24  between the client and the City of Worthington,

1    that they really didn't need a full neighborhood

2    description describing the City of Worthington.

3    We assumed that all parties understood where the

4    City of Worthington is located, and so we did

5    not include a neighborhood description.  We

6    didn't include what I will call standard

7    boilerplate.  The restricted report option

8    focuses on the conclusions.

9        Q.  Beginning on that same page, the very

10   last line states that, some examples of

11   situations in which a restricted appraisal

12   report may be appropriate are, and then there

13   are four bullet points that continue onto the

14   next page.  And I want to go through those

15   examples.

16          The first one talks about the intended

17   use is consultation for acquisition or

18   disposition by a collector who's knowledgeable

19   about the subject property.

20          That's not the case here, is it?

21       A.  Correct.

22       Q.  The second example is a real property

23   owner wants to know the market value of their

24   property, but does not need to know details as

1  to how the appraiser arrived at that conclusion.

2      Is that the situation here?

3      MR. INGRAM:  Objection to form.

4   A.  It's generally reasonable.

5   Q.  And I assume the third and fourth

6  examples dealing with yearly or quarterly

7  appraisal reports or a preliminary hearing to

8  the disputed tax assessment, that's not

9  applicable here; is that right?

10      MR. INGRAM:  Objection to form.

11  A.  Not at this time.

12  Q.  Have you been asked to prepare any

13  appraisal report for tax dispute?

14  A.  For the subject property?

15  Q.  Yes.

16  A.  Not at this time.

17  Q.  Let me just clarify your answer.  When

18  you say not at this time, are you suggesting

19  that you have been asked to perform a report for

20  tax purposes sometime in the future, or that you

21  haven't been asked at all?

22  A.  We have not been asked at all.

23  Q.  On the last page of Exhibit 4, which is

24  Bates numbered in the bottom right-hand corner

1   as Gardner 76, the very first bolded line talks

2   about what an appraiser must disclose when using

3   a restricted appraisal report.  Do you see that?

4        A.  You're looking at line 109?

5        Q.  Yes.

6        A.  Yes, I do see that.

7        Q.  And Standard Rules 2-2(b), 8-2(b) and

8   10-2(b), those refer to USPAP rules; is that

9   correct?

10       A.  Yes.

11       Q.  And those require that the restricted

12  appraisal report must disclose clearly and

13  conspicuously those two statements which are

14  listed below, and I'll read them into the

15  record.  Clearly and conspicuously state a

16  restriction that limits use of the report to the

17  client and the named intended users; and clearly

18  and conspicuously warn that the report may not

19  contain supporting rationale for all of the

20  opinions and conclusions set forth in the

21  report.

22           Did I read that correctly?

23       A.  Yes.

24       Q.  Did you make those disclosures in your

1    restricted appraisal report?

2         MR. INGRAM:  Objection to form.

3         You may answer to the extent you can.

4    A.  Page 2 of our report, we clearly state

5    that the intended use is for use in a court

6    case.  Also, on page 2, the intended user is

7    Mr. Joseph R. Miller of the firm Vorys, Sater,

8    Seymour and Pease.

9    Q.  I understand that, Mr. Gardner.  My

10   question was:  Were these two disclosures that

11   are required by Standard Rules 2-2(b), 8-2(b),

12   and 10-2(b) regarding the restrictions on the

13   use of a restricted appraisal report included in

14   your restricted appraisal report?

15   A.  We discussed those with the client, and

16   it is clearly labeled that our report is a

17   restricted report format.  And it's clearly

18   understood that the restricted report format

19   focuses on the conclusions.

20   Q.  But those statements are not located in

21   the report, correct?

22        MR. INGRAM:  Objection to form.

23   A.  Page 36 contains a signed certification.

24   Page 37, 38, 39 include the assumptions and

1  limited conditions.

2      Q.  I want to now turn your attention back

3  to that Exhibit 1, your report that you have in

4  front of you, and specifically to page 35 with

5  your court case expert witness log.  I want to

6  confirm a couple things.

7          Number one, you've never -- you have not

8  previously testified in a federal case involving

9  a partial regulatory take, have you?

10     A.  I have testified in federal cases.  I

11  have testified where there is -- there has been

12  a total temporary regulatory taking.  However,

13  that case was not a federal case.

14     Q.  Which case was that?

15     A.  Line item 38, Green Acres Foundation

16  versus the City of Cincinnati.

17     Q.  And in that case, you were retained by

18  Barrett & Weber on behalf of Green Acres

19  Foundation?

20     A.  Correct.

21     Q.  And there was an allegation of a total

22  regulatory take -- total temporary regulatory

23  take?

24     A.  It was a total temporary regulatory

1  taking.

2      Q.  Did you prepare an appraisal report in

3  that case?

4      A.  Yes, we did.  Yes, we did.

5      Q.  And did you testify in a deposition or

6  in court for that case?

7      A.  I believe there were actually two

8  depositions, if I recall, and I did testify at

9  trial.

10      Q.  So you testified in two depositions and

11  at trial for that case?

12      A.  I believe there were two depositions.

13      Q.  What was the result of that case, if you

14  recall?

15      A.  City of Cincinnati owed the Green Acres

16  Foundation a lot of money.

17      Q.  Was it -- you said you prepared an

18  appraisal report in that case, right?

19      A.  It may have been a restricted report

20  option, but we did do -- it may have been a

21  restricted appraisal.  I don't know, as we sit

22  here today, but we did prepare a report and it

23  did contain values in it.

24      Q.  And you just don't know whether it was

1  an appraisal report or a restricted appraisal

2  report, right?

3      A.  I don't know.  I would have to go back

4  and look.

5      Q.  Any other cases involving regulatory

6  takings claims?

7      A.  Not that I can recall.

8      Q.  You've not been retained in any case

9  that was pending in Franklin County, is that

10  correct, that you testified in?

11      MR. INGRAM:  Objection to form.

12      A.  Only real estate tax appeal cases.

13      Q.  You've not testified in any case pending

14  in the Southern District of Ohio; is that

15  correct?

16      A.  Not that I'm aware of.

17      Q.  For any of your appropriation cases that

18  you've listed on here, are there any that -- or

19  condemnation cases -- are there any that you

20  specifically recall preparing a restricted

21  appraisal report for?

22      A.  We have prepared numerous restricted

23  appraisal reports for appropriation cases, some

24  for Frost Brown Todd.

1      Q.  Which ones for Frost Brown Todd?

2      A.  I don't know that they're on here

3   because they tend to all settle.

4      Q.  Sure.  So which ones?

5      A.  Offhand, I recall a Thorntons Gas

6   Station along Route 32 in Clermont County.

7      Q.  Any others?

8      A.  I would have to go back and look.

9   That's a fairly recent one.

10     Q.  And why did you do a restricted

11  appraisal report in that instance?

12     A.  The reason we do -- they're simpler and

13  easier.  They focus on the conclusions.  Clients

14  don't want the boilerplate.

15     Q.  In this one, did the client, who was

16  Frost Brown Todd, ask you to do a restricted

17  appraisal report for the Thorntons case?

18     A.  Yes.

19     Q.  Are there any other cases listed in the

20  table on page 35 that you recall specifically

21  doing a restricted appraisal report?

22     A.  You have to understand, the restricted

23  report option is fairly new under USPAP, so I'm

24  going to go from the bottom up.

1          We did do restricted reports at line

2    item 50, Oakes & Oakes.  That was a divorce

3    case.  There were about 40 properties involved.

4    I did offer testimony in that matter.  Those

5    were -- as I recall, those were all restricted

6    reports.

7          Stapleton, I think we -- I can't recall,

8    I would have to look at the file.  I believe we

9    did a restricted report, or we may have done one

10   on Stapleton.

11         Line item 46, I believe we -- that case

12   started back in 2009.  I think we did a summary

13   appraisal report on that one.  That case just

14   settled in the summer of 2023.  I believe that

15   was a summary appraisal report, which was a

16   previous USPAP reporting option.

17         We've performed several either summary

18   or restricted reports on various pipeline cases,

19   usually the ones that are noncomplex or not

20   maybe -- it really just depends.  We've done

21   some very complex ones in restricted or summary

22   report.

23      Q.  So the complexity of the assignment

24   doesn't impact whether you determine to do an

1  appraisal report or restricted?

2    A.  No, it does not.  No.

3    Q.  So far I have line item 50 and line item

4  46 -- or excuse me, line item 50 only as being a

5  restricted appraisal report.  Any others?  And

6  if you don't know, that's fine.  Just for the

7  ones that you know.

8      MR. INGRAM:  Objection.  Misstates this

9  witness's prior testimony.

10    Q.  Were there any others that you named

11  that you did a restricted appraisal report for?

12  Not a summary appraisal report, restricted.

13    A.  You have to understand, the restricted

14  report option just became available, I think, in

15  2020.  So before that, we had a summary option.

16  It was a change to USPAP.  Again, the -- I think

17  what you need to understand is it's really --

18  it's the format option, and oftentimes clients

19  don't want a neighborhood -- want or need or

20  desire like a neighborhood description.  So

21  again, this was a change in 2020.  So we did

22  summary reports on a lot of the property lines 1

23  through 44, 45, because the summary report

24  option was what was available under USPAP.

1      Q.  So is it your testimony that a summary

2  appraisal report under USPAP is the same thing

3  as a restricted appraisal report?

4          MR. INGRAM:  Objection to form.

5      A.  They are different.

6      Q.  Right.  I knew that.  That's why I asked

7  the question.

8      A.  Wonderful.

9      Q.  Back to my question.  Any others you can

10  recall that were restricted appraisal reports?

11  And I assume none before 2020, since that's when

12  it was implemented.

13      A.  That's correct.

14      Q.  Okay.  So just the one, line item 50,

15  then, right?

16          MR. INGRAM:  Objection to form.

17      A.  But there were multiple reports there.

18  As I testified to previously, there were over 40

19  different properties.

20      Q.  Okay.  Thank you.

21          Just to set the record clear, the

22  summary appraisal report is actually akin to

23  what you described in Option 1 as an appraisal

24  report, correct?

1     A.  No.

2     Q.  How is it different?

3     A.  When I first started in the industry in

4  the mid '90s, we had three different reporting

5  options.  We had a self-contained, we had a

6  summary, and then a restricted.  The summary

7  report option went away as of 2020.

8     Q.  Wait a second.  You just listed

9  restricted in there.  So are you saying

10  restricted appraisal reports were available in

11  the mid '90s?

12     A.  There's always been a restricted option.

13  There used to be three reporting formats.  Now

14  there are two.

15     Q.  I want to get into the substance of your

16  report a little bit.  I think you've testified

17  your report complies with USPAP, right?

18     A.  It complies with the spirit and intent

19  of USPAP, right.

20     Q.  You had excerpts in your report from The

21  Appraisal of Real Estate.  How does that play

22  into guidelines or standards that appraisers

23  use?

24     A.  They're really two separate and distinct

1    documents that you referred to.  The appraisal

2    of Real Estate is published by The Appraisal

3    Institute.  USPAP is published by The Appraisal

4    Foundation.

5        Q.  So what is the function or utility of

6    The Appraisal of Real Estate?

7            MR. INGRAM:  Objection to form.

8            You may answer to the extent you can.

9        A.  It's a textbook.

10       Q.  And you rely on The Appraisal of Real

11   Estate for various things when performing

12   appraisal work?

13       A.  I look at it.

14       Q.  But it's not something like USPAP where

15   you're either in compliance with or not, I guess

16   is my question; is that fair?

17           MR. INGRAM:  Objection to form.

18       A.  It's a textbook.

19       Q.  So unlike USPAP, you don't have to

20   certify that your report complies with The

21   Appraisal of Real Estate, right?

22       A.  Correct.

23       Q.  What is your ultimate opinion and

24   conclusion that you reach in this report?

1          MR. INGRAM:  Objection to form.

2     A.  My ultimate conclusion, shown on page

3     17, is that there is a substantial and

4     significant difference in value depending upon

5     either Scenario A, highest and best use as a

6     mixed-use development that would be consistent

7     with our highest and best use, which would be

8     consistent with the 2014 comprehensive plan.

9     Scenario A demonstrates what that value could

10     be.

11          Scenario B demonstrates if you do

12     nothing with the site, you do not make any

13     changes or accommodations to the SD -- I'm

14     sorry, S-1 zoning, which essentially limits the

15     property to mostly a park.  To be clear, 31

16     acres of the site just as green space.

17          So my ultimate conclusion is it

18     demonstrates there is a significant and

19     substantial difference in value between those

20     two scenarios.

21     Q.  Is it your expert opinion that

22     Lifestyle, or LC, the property owner, is owed

23     $52,162,000?

24          MR. INGRAM:  Objection to form.

1      A.  What my report demonstrates is, from a

2   market perspective, whether it's LC or any other

3   developer that had a reasonable expectation to

4   follow the 2014 comprehensive land use plan,

5   what could be developed on that site.

6      Q.  Under the opinion of value for Scenario

7   A, just so I understand it, is it your opinion

8   that the undeveloped vacant land is worth $55.5

9   million?

10     A.  On page 11 of my report, we spell out a

11  range of value under Scenario A, which assumes

12  the highest and best use as shown on page 7 and

13  provides a range between 47.5 million to 63.5

14  million with a final opinion of value under

15  Scenario A of 55.5 million.

16     Q.  I understand all that.  My question was

17  much simpler.  Does that represent the value of

18  the vacant land, or is there some improvement

19  value included in that opinion?

20         MR. INGRAM:  Objection to form.

21  Argumentative.

22     A.  That would be of the land as though the

23  property is developed with a project in total

24  that would have a market value as of January --

1   in January of the year 2026, with a projected

2   stabilized market value between 340 million to

3   $360 million.

4       Q.  Let me try to understand this better.

5   So that number, the $55.5 million number, or the

6   range, represents what the land -- what you

7   believe the land is worth assuming there is a

8   fully developed project, mixed-use development

9   on the land; is that accurate?

10      A.  Generally.

11      Q.  What is the -- in your report you note

12  that there were multiple scenarios and multiple

13  effective dates.

14          What is the effective date of your $55.5

15  million opinion?

16          MR. INGRAM:  Objection.  Misstates the

17  document.

18      A.  As shown on page 11, the effective date

19  is December of 2022.

20      Q.  How did you come up with that effective

21  date?

22      A.  There was a zoning application that was

23  submitted in 2021.  It was denied December 13th

24  of 2021.  If they would not have been denied, if

1  a developer could have moved forward with a

2  project, with a reasonable project, broken

3  ground and being able to move forward with a

4  project, we projected December of 2022 as a

5  reasonable effective date about a year later.

6      Q.  Have you ever developed a mixed-use

7  development?

8      A.  Not personally where I'm the developer.

9  I've been a consultant on several.

10     Q.  Is the 12-month projection just from

11  your personal knowledge, or how did you arrive

12  at that 12-month?

13     A.  Decades of experience.

14     Q.  So in this $55.5 million opinion of

15  value, you are assuming the property is fully

16  developed with a mixed-use development that was

17  submitted to the City of Worthington, right?

18         MR. INGRAM:  Objection to form.

19         You may answer to the extent you can.

20     A.  The effective date -- what we did is

21  looked forward about four years into January of

22  '26.  We looked at -- we considered actual

23  costs.  Looked forward and then discounted back

24  as we spelled out, I guess, on page 4 is an

1    extraordinary assumption number 1.

2        Q.  I understand that.  I guess my question

3    is different.  I understand that in your

4    Scenario A on page 7 you have a highest and best

5    use assumption of a mixed-use development.  I

6    didn't realize, until you testified today, that

7    assumption actually includes a fully improved,

8    fully developed parcel.  We can agree that, as

9    the property sits today, it's still vacant,

10   right?

11       A.  Today, it's vacant.

12       Q.  As of December of 2022, it was vacant,

13   right?

14       A.  It actually may have had some

15   improvements on it, is my understanding, but

16   those improvements were raised sometime -- I

17   don't know the exact date.  Effectively, from a

18   development perspective, yes, it was vacant

19   land.

20       Q.  So you are assuming a fact that it's

21   fully developed in the summer of 2022 that is

22   objectively not the case, right?

23           MR. INGRAM:  Objection to form.

24       A.  No.

1      Q.  So it was fully developed in December of

2  2022?

3      A.  No.

4          MR. INGRAM:  Objection to form.  Now

5  you're getting argumentative, counsel.

6      Q.  Well, I'm confused, because that's why I

7  asked the question about a hypothetical

8  condition.  We talked about the definition of a

9  hypothetical condition, right?  Do you recall

10  that testimony?

11      A.  Yes.

12      Q.  So a hypothetical condition is a

13  condition which is contrary to what is known by

14  the appraiser to exist on the effective date of

15  the assignment results, but is used for purposes

16  of the analysis.

17          December of 2022, this property wasn't

18  developed at all, right?

19          MR. INGRAM:  Objection to form.  Asked

20  and answered.  Argumentative.

21      A.  Can you restate your question?

22      Q.  Sure.

23      A.  I'm confused by it.

24      Q.  I can restate it.

1          Your effective date for this report for

2     the 55.5 million opinion of value is December of

3     2022, right?

4        A.  Yes.

5        Q.  As of December of 2022, there was no

6     mixed-use development on the property, it was

7     effectively vacant, right?

8        A.  Correct.

9        Q.  Your report assumes a fully developed

10     mixed-use property as of December of 2022,

11     correct?

12        A.  You're mischaracterizing and

13     misunderstanding my report.  I'm not sure how

14     you're doing that, but I would direct you to

15     page 4, extraordinary assumption number 1.  I

16     think we've been very clear on our process.

17        Q.  And so that I understand your report --

18     because I admit I do not understand it.  So that

19     I understand your report -- I thought I asked

20     this already and I thought you told me that it

21     was fully developed.  Let me ask it a different

22     way.  Under your $55.5 million land valuation

23     effective December of 2022, is that valuing

24     vacant land or not?  Very simple question.

1          MR. INGRAM:  Objection to form.  Asked

2    and answered.  You may answer yet again, to the

3    extent you can.

4     A.  I think you need to read the totality of

5    my report, and I would direct you to

6    extraordinary assumption number 1.

7          MR. ASHRAWI:  Can you read back my

8    question to the witness.

9          And I'm going to ask you to just answer

10   yes or no, Mr. Gardner.  I'm not trying to be

11   difficult.  I just want to understand your

12   report.

13         (Record read as requested.)

14         MR. INGRAM:  Objection.  Argumentative.

15   Multiple questions.  Confusing.  Asked and

16   answered on numerous times now.  And I

17   understand, counsel, you may not like his

18   answer, but he's entitled to give his answer.

19   He's been respectful.

20         MR. ASHRAWI:  I don't know what his

21   answer is, Mr. Ingram.

22   BY MR. ASHRAWI:

23    Q.  It's a yes-or-no question.  Is that

24   vacant land value or improved land value?  Just

1    answer that question.

2          MR. INGRAM:  And there's no need to

3    raise your voice, counsel.

4          MR. ASHRAWI:  I wasn't raising my voice,

5    Mr. Ingram.  You're putting that on the record,

6    and it's untrue.

7          MR. INGRAM:  I think we can all agree

8    you're raising your voice and you're being very

9    animated, Mr. Ashrawi.

10          MR. ASHRAWI:  I'm being animated --

11          MR. INGRAM:  It's not necessary.

12          MR. ASHRAWI:  I'm being animated because

13    the witness can't answer a simple question, and

14    it's a very simple question.

15    BY MR. ASHRAWI:

16      Q.  Is it a vacant land value or improved

17    land value?  It's got to be one of those.  Which

18    one is it?

19      A.  On page 11 we clearly state, to

20    determine the opinion of value for the land in

21    the before scenario, we considered the projected

22    stabilized value of the entire development and

23    applied a land allocation percentage conclusion

24    to arrive at the stabilized land value for the

1   subject property.

2        Q.  So it's the land value for a fully

3   developed property, fully developed and

4   stabilized property, right?

5        A.  If you'll let me finish.

6            Once we determined the projected

7   stabilized land value of the subject property,

8   we calculated the present value of the land to

9   arrive at the final opinion of the -- final

10  opinion of the before value for the land.  Below

11  are our calculations.

12       Q.  I understand this is the before value of

13  the land.  My question is:  Is this the before

14  value of vacant land or improved land?

15       A.  I don't know how to answer your question

16  any clearer than I already have.

17           MR. ASHRAWI:  Why don't we take our

18  break, and then we'll finish up this afternoon.

19                        -=O=-

20           Thereupon, the luncheon recess was taken

21  at 1:26 p.m.

22                        -=O=-

23

24

1                    JANUARY 30, 2024

2                    TUESDAY AFTERNOON SESSION

3                    2:11 P.M.

4                         -=O=-

5  BY MR. ASHRAWI:

6     Q.  Mr. Gardner, earlier you indicated that

7  the December 2020 sale of this property was an

8  arm's length transaction.  Do you recall that?

9     A.  Yes.

10     Q.  Would you agree that a recent arm's

11  length sale of a property generally represents

12  the best identification of value?

13          MR. INGRAM:  Objection.  Calls for

14  speculation.  Incomplete hypothetical.

15          You may answer to the extent you can.

16     A.  It's simply a data point.

17     Q.  Is it your testimony, then, that a

18  recent arm's length sale does not represent the

19  best indication of value?

20          MR. INGRAM:  Same objections.

21     A.  I stand by my previous testimony.

22                         -=O=-

23       (Deposition Exhibit 5 marked.)

24                         -=O=-

1  BY MR. ASHRAWI:

2      Q.  I want to hand you what we'll mark as

3  Exhibit 5.  Are you familiar with these pages

4  from your work file?

5      A.  Yes.

6      Q.  What are they?

7      A.  These are some pages from The Appraisal

8  of Real Estate.

9      Q.  And are these true and accurate copies

10  of the pages with the page numbers indicated in

11  the corners of a physical copy of The Appraisal

12  Of Real Estate?

13          MR. INGRAM:  Objection to form.

14      A.  I believe so.

15      Q.  And you indicated that you sometimes

16  review or consult The Appraisal of Real Estate

17  when performing appraisal reports?

18      A.  It's a textbook.  Yes, we'll look at it.

19      Q.  You used the allocation method of

20  valuation for your analysis under Scenario A; is

21  that correct?

22      A.  Yes.

23      Q.  Were you directed to use that method of

24  valuation --

 1    A.  No.

 2    Q.  -- by your client?  I'm sorry?

 3    A.  No.

 4    Q.  So you elected to use that method,

 5  correct?

 6    A.  I did.

 7    Q.  You would agree with me that the sales

 8  comparison approach is usually the preferred

 9  method for developing a site value conclusion?

10        MR. INGRAM:  Objection to form.

11  Incomplete hypothetical.  Calls for speculation.

12        You may answer.

13    A.  No.

14    Q.  What is the preferred method?

15        MR. INGRAM:  Same objections.

16    A.  There are various tools, various

17  methodologies to value sites.  Sales comparison

18  approach being one, allocation being one,

19  extraction being one.  There's multiple

20  methodologies.

21    Q.  Would you agree with me that the cost

22  approach, the sale comparison approach, and the

23  income capitalization approach are the three

24  most used methods of valuation for property?

1          MR. INGRAM:  Objection.  Calls for

2     speculation.  Incomplete hypothetical.

3          A.  Those are the three approaches to value.

4          Q.  Is the allocation method not a fourth

5     approach to value?

6          A.  The three approaches to value are cost,

7     sales and income.  The allocation method is a

8     method used to value land that's used on a

9     regular basis.  Part of the site valuation.

10         Q.  So it's not -- you described the cost,

11    sales and income as approaches to valuation

12    versus methods of valuing sites?  I'm trying to

13    understand where the allocation method fits into

14    this.

15         MR. INGRAM:  Objection to form.

16         A.  In the whole umbrella of the three

17    approaches to value, the allocation method would

18    generally fall, on a broad sense, under the cost

19    approach because, as a key part of the cost

20    approach, you have to value the underlying site.

21         Q.  So your testimony is the allocation

22    method is a component of a cost approach

23    valuation?

24              MR. INGRAM:  Objection.

1      A.  Have you ever taken an appraisal class?

2      Q.  I get to ask the questions.

3      A.  I understand.  But I'm just trying to

4  understand because I'm trying to figure out how

5  I best answer your question.

6      Q.  Sure.  Let me direct you back to Exhibit

7  3.  Can you pull that for me?

8      A.  Sure.

9      Q.  In the last bullet point under the

10  section for process and service, you indicate

11  that you determined and performed the most

12  applicable approach to value - cost sales

13  income - and developed a commercially reasonable

14  range of market value and final opinion of

15  value.

16          Did you do that in this case?

17      A.  Yes.

18      Q.  Which approach to value did you believe

19  was most applicable?

20      A.  Well, we used the allocation method as

21  described in Exhibit 5.  And the allocation

22  method -- it's described on page 363 in the

23  middle of the page there.  Do you see that?

24      Q.  Yeah, I see that.

1    A.  It's a ratio.  I would point to the

2  allocation as described there on page 363, and

3  that description out of The Appraisal of Real

4  Estate, which is under land and site valuation

5  you see at the bottom, which really falls

6  underneath the cost approach.  Am I clear?

7    Q.  So the allocation method falls under the

8  cost approach?

9    A.  In a real macro sense, but it really can

10  stand on its own.

11    Q.  And that's what I'm trying to

12  understand.  So in this case --

13    A.  And I'm trying to teach you, but I don't

14  understand your background, so it's hard to --

15    Q.  So help me understand this.  You said

16  you determined the most applicable approach to

17  value.  What is -- very simple.  What did you

18  determine to be the most applicable approach to

19  value in this case?

20    MR. INGRAM:  Objection to form.

21    You can answer to the extent you can.

22    A.  On page 8 of our report, I described and

23  summarized the land allocation method.  I quote

24  The Appraisal of Real Estate, and you can walk

1   through the totality of it.  It's page 8 through

2   11 of my report.

3       Q.  So is the allocation method what you

4   determined to be the most applicable approach to

5   value?

6           MR. INGRAM:  Objection.  Misstates the

7   document.

8           You may answer to the extent you can.

9       A.  I stick to my previous testimony.

10      Q.  Your previous testimony didn't answer my

11  question.  So let me ask it again.  I'm not

12  referring to the report.  I'm asking you whether

13  or not you determined that the land allocation

14  method is the most applicable approach to value

15  for this assignment; yes or no?

16          MR. INGRAM:  Objection.  Misstates

17  Exhibit 1.

18          You can answer to the extent you can.

19      A.  On page 7 of my report, we developed the

20  highest and best use under two separate

21  scenarios.  Scenario A is consistent with the

22  2014 comprehensive plan, which would prescribe

23  what any reasonable developer would have a

24  reasonable expectation to develop on the subject

1    site.  And from there we did use the allocation

2    method, consistent with the 2014 comprehensive

3    land use plan.

4         Q.  All right.  I'm going to have you turn

5    to what's Bates numbered Gardner 79 in the

6    bottom right-hand corner of Exhibit 5.  In the

7    middle of the page it talks about the allocation

8    method.

9              Do you see that?

10        A.  Yes.

11        Q.  And there are some limitations to the

12   allocation method, correct?

13        A.  Yes.

14        Q.  In fact, this document states that the

15   allocation method does not produce conclusive

16   value indications unless ample sales data is

17   available.  Did I read that correctly?

18        A.  Yes.

19        Q.  And it also states that the method is

20   rarely used as a primary land valuation

21   technique for properties other than residential

22   subdivision lots.

23              Did I read that correctly?

24        A.  Yes.

1    Q.  And it also says that land-to-property

2  ratios can be difficult to support.

3        Did I read that correctly?

4    A.  Yes.

5    Q.  This is -- this property is not a

6  residential subdivision, correct?

7    A.  Under Scenario A, consistent with the

8  comprehensive -- the 2014 comprehensive land use

9  plan, part of the property may, in fact, be used

10  as single unit -- single unit development homes.

11    Q.  Your allocation method was applied to

12  the entire property, right, not just that

13  portion?

14    A.  Correct.

15    Q.  Did you provide any sales data to

16  support your allocation method under Scenario A?

17  Let me ask it a different way.  Strike that.

18        You didn't provide any sales data to

19  support your allocation method under Scenario A,

20  did you?

21        MR. INGRAM:  Objection.  Misstates the

22  document.

23    A.  Can you rephrase your question?

24    Q.  Did you provide any sales data in your

1    report to support your opinion to value under

2    the allocation method under Scenario A?

3       A.  Under Scenario A, the highest and best

4    use is stated on page 7.  On page 8 of our

5    report we describe the process, we describe the

6    land allocation method.  On page 9 we look at

7    land allocation for apartments, townhomes.

8    Single family residence on page 10, office

9    properties on page 10, Lifestyle centers on page

10   10.  Those allocations are summarized under the

11   various land use -- under the various land uses

12   on the top of page 11.

13      Q.  So there's no sales data in any of those

14   pages you just named, is there?

15          MR. INGRAM:  Objection.  Misstates the

16   document.

17      A.  Help me to understand what you mean by

18   sales data.

19      Q.  Do you have any data, in fact, words

20   about sales of property --

21          MR. INGRAM:  Objection.

22      Q.   -- that goes into your allocation

23   method?

24          MR. INGRAM:  Objection.  Argumentative.

1    Asked and answered numerous times.  I hope we

2    can move on.

3          MR. ASHRAWI:  He asked me to clarify the

4    question, Chris, and I did.  So clearly he

5    didn't answer the question, or he answered one

6    he didn't understood -- didn't understand.

7    Excuse me.

8       A.  No.

9       Q.  Thank you.

10      A.  Well, no to what you just said.  That's

11   not accurate.  You just misstated my words.

12      Q.  What did I misstate?

13      A.  I stand by my previous testimony.

14      Q.  What did I misstate, Mr. Gardner?

15      A.  You mischaracterized -- Scenario A is

16   described on page 8, 9, 10, 11, and 12 in my

17   report.

18      Q.  And on pages 8, 9, 11 and 12, is there

19   any data about any sales of property included in

20   those pages?  It's just a yes-or-no question.

21   I'm not trying to be tricky.

22      A.  I would refer you to -- on the top of

23   page 9, the opening paragraph that describes

24   what we did that I think is very clear, and what

1  we did is consistent with the allocation

2  market -- the allocation value and how it is

3  used in the market.

4      Q.  Yeah, I've read that paragraph.  I'm

5  just looking for any sales data, and I'm not

6  seeing it.  I just want to make sure I'm not

7  missing it.  That's all I'm asking you to do is

8  to direct me to anywhere in your report under

9  Scenario A using the allocation where there's

10  sales data.  And if there's not, that's fine.

11      A.  We looked to comparable properties

12  within the market for the allocation between

13  land and improvements and total value, which is

14  typical and customary when extracting the land

15  percentage for the allocation method.

16      Q.  And you used for that the valuations

17  included by the Franklin County auditor, right?

18      A.  Yes.

19      Q.  And you did so for apartments,

20  townhomes, single family residence, and office,

21  correct?

22      A.  We also considered Lifestyle Centers

23  within various different counties in Ohio, as

24  shown on page 10.

1      Q.  And I was -- forgive me.  I was focusing

2  specifically on your use of the Franklin County

3  auditor.  So you used the Franklin County

4  auditor totals for apartments, townhomes, single

5  family residence, office, and then two of the

6  Lifestyle Centers, right?

7      A.  Which is typical and customary

8  supporting documentation for the allocation

9  method.

10     Q.  I wasn't questioning that.  I was just

11  asking for a yes-or-no confirmation.

12         You indicate in the first paragraph on

13  page 9 that all the properties were in the

14  Worthington School District.  Why is that?

15     A.  The subject property is located within

16  the Worthington School District.

17     Q.  Does that give you a better indication

18  of land allocation, or if you go outside of that

19  school district, are those data points still

20  valid?

21         MR. INGRAM:  Objection to form.

22     A.  To be clear, as we stated on page 9, all

23  the properties were in the Worthington City

24  School District.  We also analyzed Lifestyle

1    Centers within Ohio.  We looked at the land

2    allocation of properties in Worthington because

3    they were in closer proximity to the subject

4    property.

5        Q.  Is proximity an important variable when

6    analyzing value of property?

7            MR. INGRAM:  Objection.  Incomplete

8    hypothetical.  Calls for speculation.

9        A.  It depends on what it is.

10        Q.  I'm talking about for this property.

11            MR. INGRAM:  Same objections.

12        A.  Again, it depends on what it is.

13    Proximity can be a key data point.  Other times

14    you use national data.  The overarching -- what

15    you want to do is look at property of a similar

16    highest and best use.

17        Q.  Did you visit any of the sites that you

18    listed on pages 9 and 10?

19        A.  Yes.

20        Q.  So you visited 351 Hutchinson Avenue in

21    Franklin County?

22        A.  Yes.

23        Q.  What's on that property?

24        A.  Multifamily apartments.

1      Q.  Did you visit 6374 Busch Boulevard in

2  Franklin County?

3      A.  I did.

4      Q.  Did you visit 6175 Northgate Road in

5  Franklin County?

6      A.  Yes.

7      Q.  Did you visit all the properties you

8  listed on pages 9 and 10?

9      A.  Yes.

10     Q.  Do you know how large some of these

11 Lifestyle Centers are?  For example, do you know

12 how many acres Easton Town Center is?

13     A.  As we sit here today, I don't have that

14 data in front of me.

15     Q.  What about the banks?

16     A.  I'm very familiar with that project.

17     Q.  Yeah, me too.  So how many acres do you

18 think it is?

19         MR. INGRAM:  Objection.  Calls for

20 speculation.

21     A.  I don't have that data in front of me.

22     Q.  How much investment monetarily went into

23 the banks?

24     A.  What part of the banks are you talking

1    about?

2       Q.  The whole area.

3       A.  Significant.

4       Q.  Do you have a number?

5       A.  I do not, as we sit here today.

6       Q.  You indicated earlier, I believe -- and

7    correct me if I'm wrong -- that there wasn't

8    ample sales data to do a comparison of the

9    overall property under Scenario A.  Is that

10   accurate?

11      A.  Yes.

12      Q.  Did you look for comparable sales under

13   Scenario A?

14      A.  We did.

15      Q.  How did you perform that search?

16      A.  We looked at what is typical and

17   customary.

18      Q.  So for this property, what were the

19   parameters -- search parameters?

20      A.  We have a mixed-use development, you

21   know, per the 2014 comprehensive plan that's

22   prescribed, and there really is no comparable

23   land sale for a property like that with all the

24   different mixed uses.

1    Q.  I guess I'm asking a more basic

2  question, like what actual searches did you

3  perform to arrive at that conclusion?

4         MR. INGRAM:  Objection to form.

5    A.  The subject property is highly unique.

6  It's located in a mature area.  There's really,

7  in my opinion, no comparable sales for 40 acres

8  for a mixed-use project that conform to the

9  various uses as prescribed per the 2014

10  comprehensive plan by the City of Worthington

11  for the subject property.  There were no comps.

12    Q.  I totally understand that there were no

13  comparable sales.  My question was a little bit

14  more basic.

15         MR. ASHRAWI:  Do you mind reading my

16  question back.

17         (Record read as requested.)

18    A.  Again, I go back to my previous

19  testimony.

20    Q.  Do you have a database of sales that you

21  maintain for Gardner Street?

22    A.  Yes.

23    Q.  Did you search through that database?

24    A.  Yes.

1    Q.  And how did you search through that

2    database?

3    A.  Well, our research person performs all

4    those researches.  She manages that database for

5    our firm.  You know, we look at size, we look

6    at -- we look at properties of a similar highest

7    and best use, and there really are no -- in my

8    opinion, there were no direct comparable sales

9    for the subject property.  There were sales

10   smaller of just a -- of different pieces.  But

11   the totality of the project, it's very unique.

12   You have 40 acres in a maturely developed area.

13   There were no good, compelling comparable sales

14   for the subject.

15   Q.  You're aware that there have been -- the

16   landowner has obtained at least two other

17   appraisal reports for this property, right?

18   A.  I looked at them.

19   Q.  They included comparable sales, correct?

20   A.  Not very good ones.

21   Q.  So your opinion is that those two

22   appraisal reports did not contain good

23   comparable sales of the subject?

24        MR. INGRAM:  Objection.  Misstates the

1  witness's testimony.

2      A.  My opinion is, when you go through each

3  of the comparable sales used in those other

4  reports, none of those sales really reflect the

5  subject property when you look at the

6  comparables one by one.

7                      -=0=-

8      (Deposition Exhibits 6-7 marked.)

9                      -=0=-

10 BY MR. ASHRAWI:

11     Q.  Just so we have a clean record, I'm

12 going to hand you what we'll mark as Exhibit 6

13 and Exhibit 7.

14      Mr. Gardner, I just handed you what we

15 marked as Exhibit 6 and 7.  Can you tell me what

16 those documents are, starting with 6?

17     A.  Exhibit 6 appears to be an appraisal

18 report performed by Ohio Real Estate

19 Consultants, Inc., dated November 30th, 2020,

20 for CNB Bank, and it was signed by Thomas R.

21 Horner.

22     Q.  And the effective date of valuation for

23 that appraisal report was November 5th, 2020,

24 right?

 1     A.  Correct.

 2     Q.  And was this one of the appraisal

 3  reports you were just referring to as -- you had

 4  previously reviewed?

 5     A.  I looked at it.

 6     Q.  And this appraisal report does use the

 7  sales comparison approach, right?

 8     A.  Yes.

 9     Q.  And is it your testimony that the

10  comparables used in this report, in your

11  opinion, are -- you would not use or are not

12  comparable to the site?

13         MR. INGRAM:  Objection.  Misstates this

14  witness's testimony.

15     A.  Well, first of all, you have to look at

16  the highest and best use.  Page 54, under

17  legally permissible, there's a sentence there,

18  this zoning will be specific to the proposed

19  uses in the developer's plan.

20     Q.  That's the same plan you reviewed,

21  right?

22     A.  I don't know what plan he reviewed.

23         The other thing that's interesting is on

24  page 55, under the discussion of legally

1  permissible, last sentence, if the current

2  zoning is approved, the total value, development

3  ready, could exceed $15 million, which is

4  different than the opinion of value as stated

5  within this report.

6      Q.  My question is a little different.  Is

7  it your testimony that, in your opinion, these

8  comparable sales are inappropriate or you

9  wouldn't use them yourself in a sales comparison

10 approach?

11     A.  Well, let's go through them one by one.

12     Q.  Sure.

13     A.  Page 63 is not a comparable sale, in my

14 opinion.  It's the subject property.

15     Q.  Have you ever used the sale of a subject

16 property as a land -- as a sales comparable in

17 any of your reports?

18     A.  It's really not the best methodology,

19 because the -- you're like a dog chasing its

20 tail.

21     Q.  I understand that's your testimony.  My

22 question was different.  Have you ever used the

23 sale of the subject property in one of your

24 appraisal reports that you can recall?

1      A.  Of the subject property?

2      Q.  Correct.

3      A.  Not in 20 years.

4      Q.  Okay.

5      A.  Because it's not -- there is

6   considerable debate and discussion within The

7   Appraisal Institute over that, and, in my

8   opinion, comparable sale 1 in this case is not

9   comparable sale 1.  It's just -- it's a -- as

10   stated -- first of all, it's not a sale.  It's

11   not closed.  It's a pending contract of the

12   subject property.  So it's not really a

13   comparable sale.

14      Q.  Okay.

15         MR. INGRAM:  And for purposes of the

16   record, the witness is pointing to Exhibit 6.

17         MR. ASHRAWI:  Thank you, Chris.

18         THE WITNESS:  Page 63.

19      A.  Land sale number 2 is in Dublin.  It was

20   sold by the City of Dublin to the State of Ohio.

21      Q.  Is that a problem?

22      A.  Could be.  It's just a data point.  It's

23   for a 225,000 square foot ambulatory medical

24   center that's planned for 33 acres.  I don't

1    think that is consistent with the

2    comprehensive -- the 2014 comprehensive land use

3    plan as prescribed by the City of Worthington, I

4    don't think would allow for a hospital to be

5    built.  It's inconsistent with the land use

6    plan.

7        Q.  The land use plan didn't prescribe

8    medical office?

9        A.  Maybe on part of it.  It prescribed a

10   mixed-use development.

11       Q.  Okay.

12           Land sale 3 is located in Westerville.

13   It occurred way back in 2019.  The buyer is

14   Otterbein University.  The site's under a

15   planned unit development district.  It's not

16   located in Worthington.  Again, an interesting

17   data point, but I don't think that is consistent

18   with the 2014 comprehensive land use plan as

19   prescribed by Worthington for the subject

20   property.

21           Land sale 4 is located in Hilliard.  It

22   occurred in 2020 for 470 mid-rise apartments.

23   Again, it's not for a mixed-use project, you

24   know, consistent with the 2014 comprehensive

1    land use plan.

2         Land sale 5 is located out in Delaware

3    County.  It sold back in 2018.  It's only an

4    8.32 acre site.  The grantor had received full

5    zoning approval after litigation -- excuse me.

6         MR. ASHRAWI:  I'm chuckling because --

7         THE WITNESS:  Can I get in on the inside

8    joke?

9         MR. ASHRAWI:  Yeah, we'll go off the

10   record.

11        (A discussion is held off the record.)

12    A.  Sale 6 in Plain City for a Costco.

13   Costco is a big box retailer, and this site is

14   15.96 acres.  Therefore, it's my opinion, when

15   you really take a close look and you peel away a

16   few layers of the onion on each comparison sale,

17   in highly technical terms, they're all weird, as

18   we were discussing.  So they're all different.

19        So I don't think -- at the end of the

20   day, I don't think any of these sales are a good

21   and accurate reflection of the subject property

22   subject to a reasonable expectation that any

23   developer would have looking at the 2014

24   comprehensive land use plan developed by the

1   City of Worthington for the subject property.

2      Q.  Same question for the comparable sales

3   in Exhibit 7, would you -- is it your testimony

4   that none of those comparable sales listed in

5   that Robert Weiler Company report reflect a

6   comparable property?

7      A.  It has similar issues.  I'm happy to go

8   through them if you would like.

9      Q.  Nope.  That's all I needed to know.

10        You keep using the term "what a

11  reasonable developer would reasonably expect."

12  Did you talk to the landowner about -- or your

13  representative from the property owner about

14  what their expectations were when they purchased

15  the property?

16     A.  Yes.

17     Q.  And who did you talk to specifically

18  about the expectations?

19     A.  Sam.  Sam Slater from Lifestyle

20  Communities.  I'm sorry, Sam Stark.  Sorry.

21     Q.  And what is Sam's position with

22  Lifestyle Communities?

23     A.  I believe he's a -- I'd have to look at

24  his former title.  He was development director.

1      Q.  And what did Sam tell you were Lifestyle

2   Community's expectations when they acquired this

3   property?

4      A.  Well, they had done a typical and

5   customary due diligence on the property.  They

6   put a lot of time, effort, research into what --

7   and they had reasonable market-based assumptions

8   on what could be built on the site.  They took a

9   very deep dive hard look at the 2014

10   comprehensive land use plan that the City of

11   Worthington had performed or had performed which

12   prescribed various land uses.  They felt they

13   had a reasonable expectation that they could

14   build something similar to what was prescribed

15   in that comprehensive land use plan.

16      Q.  Did you talk to anyone else from

17   Lifestyle about that?

18      A.  There was another gentleman, Joe -- I

19   can't think of his last name.  He's their CFO.

20   He was in a meeting.  I can't think of his last

21   name offhand.  That's it.

22      Q.  Is that documented anywhere in email

23   communication with them?

24      A.  No.  We just met in person.  They did

1    provide me -- and you were provided with it in

2    my file -- a couple of very detailed Excel files

3    with financial models which demonstrate the

4    various uses that they were planning.

5        Q.  You're aware now that the -- the

6    rezoning and the development plan were rejected

7    by the City of Worthington, right?

8        A.  Yes.

9        Q.  Have you read or reviewed any of the

10   court's opinions/orders in this case?

11       A.  I don't believe so.  You have my file.

12   I've looked over what's in my file.

13       Q.  Mr. Gardner, when was the last time you

14   appraised property in Franklin County?

15       A.  We worked on several parcels in Franklin

16   County in calendar year '23, and we have several

17   upcoming assignments.  I toured a property

18   yesterday afternoon for an appraisal assignment

19   here in Franklin County.

20       Q.  Are either of those -- is that

21   assignment related to an appropriation or

22   condemnation case?

23       A.  One is.

24       Q.  Who's the condemning authority in that

1    case?

2        A.  I believe the City of Columbus.

3        Q.  Where's the property located?

4        A.  We haven't been retained yet, so it's

5    really confidential information at this point in

6    time.  I just can't share it.

7        Q.  So what have you been retained for in

8    Franklin County for condemnation cases?

9        A.  In the past, we have worked on several

10   condemnation cases.  We were hired by Speedway,

11   which is now 7-Eleven.

12       Q.  In Franklin County?

13       A.  In Franklin County.

14       Q.  When was that?

15       A.  Over the 15 years we've worked on

16   numerous -- none of those -- not in Franklin

17   County -- involved a deposition or courtroom

18   testimony.  We settled -- all of those matters

19   were settled.

20           MR. ASHRAWI:  Can we take a short break

21   and maybe wrap it up soon?

22           MR. INGRAM:  Sure.

23           (Recess.)

24

1  BY MR. ASHRAWI:

2      Q.  Mr. Gardner, I'm looking at your report,

3  and specifically where you start your opinion of

4  value under Scenario B on page 13.  You did use

5  the sales comparison approach for this portion,

6  right?

7      A.  Yes.

8      Q.  And just so I'm clear, Scenario B

9  represents the current zoning on the property,

10  right?

11      A.  Yes.

12      Q.  And is your opinion of value in Scenario

13  B -- does that also have an effective date of

14  December of 2022?

15      A.  Yes.

16      Q.  And how did you identify the comparable

17  sales that you used for this analysis?

18      A.  We used multiple sets of comparable

19  sales, residential, commercial/medical, and then

20  green space.  We used comparable sales for

21  similar highest and best use.

22      Q.  For the green space sales -- well, let

23  me back up.  31 of the close to 38 acres are

24  zoned as S-1 special, right?

1    A.  Correct.

2    Q.  Do you have anywhere in your report --

3  I'm asking legitimately because I may have

4  missed it -- where it identifies each of the

5  zoning districts and the uses allowed under

6  each?

7    A.  Page 13 describes the three separate

8  parcels and what those zonings are, and the

9  zoning jurisdiction under the City of

10  Worthington.

11    Q.  Yeah, I see that.  I was looking if you

12  included like the table of permitted uses under

13  each zoning classification, but I'm not seeing

14  it in here.  That's not included, is it?

15    A.  For example, on page 13, we list out the

16  parcel ID, the zoning definition, the acreage,

17  and the zoning jurisdiction.

18    Q.  Yes, I see that.  I'm looking -- just so

19  I'm clear, I'm looking for anywhere in the

20  report that actually lists what uses are

21  permitted under each of those zoning

22  definitions.  I don't think that's in here, but

23  correct me if I'm wrong.

24    A.  So we have adequately described the

1  subject property and then who the zoning

2  jurisdiction is and what the zoning

3  classification is.  We did not attach each one

4  of those within this, but they would be easily

5  identifiable, easy to look up.

6      Q.  What are the permitted uses under the

7  S-1 district?

8      A.  Example uses under the S-1 could include

9  church, school, park.

10      Q.  Anything else?

11      A.  That's on a high level.  With what I

12  have in front of me today, those are the current

13  uses.

14      Q.  But when you did your sales comparison

15  approach, you only used sales of what you

16  described as green space land, correct?

17      A.  We looked at comparable sales of a

18  similar highest and best use for the four sales

19  identified on page 16.

20      Q.  Well, let's talk about what goes in

21  highest and best use.  The first one is what's

22  legally permissible under the zoning, right?

23          MR. INGRAM:  Objection.  Calls for a

24  legal conclusion.

1     A.  The first test of highest and best use

2  is what's legally permissible or what would be

3  reasonably permitted, is the first test of

4  highest and best use.

5     Q.  None of the comparables you used are

6  zoned in the City of Worthington or zoned in an

7  S-1 district, right?

8     A.  All of the comparable sales are located

9  within Franklin County.

10     Q.  Say that one more time.

11     A.  All of the comparable sales are located

12  within Franklin County.

13     Q.  Sure.  I understand that.  What I'm

14  saying is none of them are in the City of

15  Worthington and none of them are zoned S-1,

16  right?

17     A.  Correct.

18     Q.  On page 18 you have a section titled

19  total temporary regulatory take.  Do you see

20  that?

21     A.  Yes.

22     Q.  Were you asked to opine on temporary

23  carrying costs and taxes under a total temporary

24  regulatory take?

1      A.  Yes.

2      Q.  Were you ever asked to opine on a

3  partial regulatory take?

4          MR. INGRAM:  Objection to form.

5      A.  I don't understand your question.

6      Q.  Do you understand the difference between

7  a total regulatory take and a partial regulatory

8  take?

9      A.  Just to help me clarify, when you're

10  referring to partial, are you only talking about

11  part of the property?

12      Q.  Yes.

13      A.  Versus the total, meaning the totality,

14  the total of the property?

15      Q.  Correct.

16      A.  Yes, I understand what those are.

17      Q.  Were you ever asked to opine on the

18  result of a -- excuse me, a partial regulatory

19  take?

20      A.  No.

21          MR. ASHRAWI:  I have no more questions

22  for this witness.

23          Thank you, Mr. Gardner.

24

1                              -=O=-

2              Thereupon, the testimony of January

3      30, 2024, was concluded at 3:15 p.m.

4                              -=O=-

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1                    CERTIFICATE

2    STATE OF OHIO        :
                              SS:
3    COUNTY OF FRANKLIN :

4           I, Rhonda Lawrence, a stenographic
     court reporter and notary public in and for the
5    State of Ohio, duly commissioned and qualified,
     do hereby certify that the within-named ERIC J.
6    GARDNER, MAI, CCIM was first duly sworn to
     testify to the truth, the whole truth, and
7    nothing but the truth in the cause aforesaid;
     that the testimony then given was taken down by
8    me stenographically in the presence of said
     witness, afterwards transcribed; that the
9    foregoing is a true and correct transcript of
     the testimony; that this deposition was taken at
10   the time and place in the foregoing caption
     specified.
11
            I do further certify that I am not a
12   relative, employee or attorney of any of the
     parties hereto; that I am not a relative or
13   employee of any attorney or counsel employed by
     the parties hereto; that I am not financially
14   interested in the action; and further, I am not,
     nor is the court reporting firm with which I am
15   affiliated, under contract as defined in Civil
     Rule 28(D).
16
            In witness whereof, I have hereunto
17   set my hand at Columbus, Ohio, on this 13th day
     of February, 2024.
18

19

20

21
                 *Rhonda Lawrence*
22
                 Rhonda Lawrence
23               Notary Public, State of Ohio

24   My commission expires:  October 9, 2028

## Exhibits

**Exhibit 1**  17:4,9 23:6
51:3 76:17

**Exhibit 2**  22:9,13 39:2

**Exhibit 3**  29:23 30:3
34:24 43:15 44:22
74:6,7

**Exhibit 4**  43:22 44:3
45:8 48:23

**Exhibit 5**  70:23 71:3
74:21 77:6

**Exhibit 6**  88:12,15,17
91:16

**Exhibit 7**  88:13 94:3

---

### $

**$139,224**  34:17

**$15**  90:3

**$360**  62:3

**$5.2**  34:15

**$52,162,000**  60:23

**$55.5**  61:8 62:5,14
63:14 66:22

---

### -

**-=0=-**  17:3,5 22:8,10
29:22,24 43:21,23
70:22,24 88:7,9

**-=O=-**  69:19,22 70:4
103:1,4

---

### 1

**1**  17:4,9 20:21 21:3,9
23:6 44:22 45:5 51:3
56:22 57:23 64:1
66:15 67:6 76:17 91:8,
9

**10**  79:8,9,10 80:16
81:24 83:18 84:8

**10-2(b)**  49:8 50:12

**109**  49:4

**11**  61:10 62:18 68:19
76:2 79:12 80:16,18

**114**  45:12

**115**  45:12

**116**  45:12

**117**  45:12

**1179**  22:16

**1182**  22:16

**12**  80:16,18

**12-month**  63:10,12

**13**  98:4 99:7,15

**13th**  62:23

**14**  20:20 21:3

**15**  97:15

**15.96**  93:14

**16**  100:19

**17**  60:3

**18**  101:18

**19**  15:19

**1992**  15:11

**1:26**  69:21

---

### 2

**2**  22:9,13 35:7,20 36:5
39:2 50:4,6 91:19

**2-2(b)**  49:7 50:11

**20**  16:5 91:3

**2000s**  12:20

**2004**  17:24 18:5

**2006**  15:16

**2009**  55:12

**2010**  15:18

**2014**  28:4 60:8 61:4
76:22 77:2 78:8 85:21
86:9 92:2,18,24 93:23
95:9

**2018**  93:3

**2019**  15:19 92:13

**2020**  32:11 34:5,13
56:15,21 57:11 58:7
70:7 88:19,23 92:22

**2021**  62:23,24

**2022**  62:19 63:4 64:12,
21 65:2,17 66:3,5,10,
23 98:14

**2023**  55:14

**2024**  70:1 103:3

**2026**  62:1

**225,000**  91:23

**23**  96:16

**26**  63:22

**2:11**  70:3

---

### 3

**3**  29:23 30:3 32:5
34:24 43:15 44:22
46:10 74:7 92:12

**30**  70:1 103:3

**30th**  88:19

**31**  60:15 98:23

**32**  20:5 54:6

**33**  91:24

**340**  62:2

**35**  17:23 51:4 54:20

**351**  83:20

**36**  50:23

**363**  74:22 75:2

**37**  50:24

**37.35**  34:16

**38**  7:16 43:18 44:6
50:24 51:15 98:23

**39**  50:24

**3:15**  103:3

---

### 4

**4**  28:21 43:22 44:3
45:8 48:23 63:24
66:15 92:21

**4,000**  8:9,15

**40**  29:11,18 55:3 57:18
86:7 87:12

**44**  56:23

**45**  56:23

**46**  55:11 56:4

**47.5**  61:13

**470**  92:22

---

### 5

**5**  23:7 34:6,8 70:23
71:3 74:21 77:6 93:2

**50**  19:2,7 20:5 55:2
56:3,4 57:14

**54**  89:16

**55**  89:24

**55.5**  61:15 66:2

**5th**  88:23

---

### 6

**6**  88:12,15,16,17 91:16
93:12

**6-7**  88:8

**6175**  84:4

**63**  90:13 91:18

**63.5**  61:13

**6374**  84:1

---

### 7

**7**  25:15,20 61:12 64:4
76:19 79:4 88:13,15
94:3

**7-eleven**  97:11

**71**  45:17

**76**  49:1

**79**  77:5

**8**

**8** 27:17 75:22 76:1
79:4 80:16,18

**8-2(b)** 49:7 50:11

**8.32** 93:4

**9**

**9** 79:6 80:16,18,23
82:13,22 83:18 84:8

**900** 8:21

**90s** 58:4,11

**92** 15:14

**98** 15:14

**A**

**ability** 18:12 42:9

**accommodate** 6:4

**accommodations**
60:13

**accurate** 6:15 17:16
22:22 29:4 45:9 62:9
71:9 80:11 85:10
93:21

**acquired** 95:2

**acquisition** 47:17

**acre** 34:12,17,18 93:4

**acreage** 99:16

**acres** 7:16 34:16
51:15,18 52:15 60:16
84:12,17 86:7 87:12
91:24 93:14 98:23

**actual** 63:22 86:2

**additional** 11:20

**adequately** 99:24

**Adkins** 15:12

**administered** 13:1

**administration** 11:5

**admit** 66:18

**advised** 46:13

**Advisors** 15:13

**advisory** 43:18 44:6
45:13

**affiliated** 12:12

**afternoon** 69:18 70:2
96:18

**afternoons** 14:20

**agencies** 21:18

**agency** 20:11,18 44:9

**agree** 33:1 64:8 68:7
70:10 72:7,21

**agreement** 22:17,23
23:10 32:19 39:3,8

**akin** 57:22

**allegation** 51:21

**allocation** 68:23
71:19 72:18 73:4,7,13,
17,21 74:20,21 75:2,7,
23 76:3,13 77:1,7,12,
15 78:11,16,19 79:2,6,
7,22 81:1,2,9,12,15
82:8,18 83:2

**allocations** 79:10

**allowed** 99:5

**ambulatory** 91:23

**ample** 77:16 85:8

**analysis** 10:16 29:5,
15 33:16,23 34:9 38:3
40:22 65:16 71:20
98:17

**analyst** 40:15

**analysts** 16:19

**analyze** 25:4,5 26:5,8,
12 27:1 40:18

**analyzed** 34:7 82:24

**analyzing** 26:14,17
33:6 40:17 83:6

**and/or** 32:9

**animated** 68:9,10,12

**answering** 6:8

**apartments** 79:7

81:19 82:4 83:24
92:22

**Apparently** 15:4

**appeal** 18:8,17 53:12

**appears** 22:16 88:17

**applicable** 48:9
74:12,19 75:16,18
76:4,14

**application** 62:22

**applied** 68:23 78:11

**appraisal** 11:8 13:7
35:1,8,12,20 36:13,23
43:16,19 44:10,15,17,
21 45:5,6,7,10,19
46:3,10 47:11 48:7,13
49:3,12 50:1,13,14
52:2,18,21 53:1,21,23
54:11,17,21 55:13,15
56:1,5,11,12 57:2,3,
10,22,23 58:10,21
59:1,2,3,6,10,12,21
71:7,11,16,17 74:1
75:3,24 87:17,22
88:17,23 89:2,6 90:24
91:7 96:18

**appraisals** 11:21

**appraise** 24:15

**appraised** 96:14

**appraiser** 14:6,24
15:24 16:2 48:1 49:2
65:14

**appraisers** 16:13,17
30:8 35:16 41:20
58:22

**approach** 72:8,18,22,
23 73:5,19,20,22
74:12,18 75:6,8,16,18
76:4,14 89:7 90:10
98:5 100:15

**approaches** 73:3,6,
11,17

**appropriately** 31:24

**appropriating** 20:11,
17

**appropriation** 19:3,
10,18 20:2,6,9 21:4,13
53:17,23 96:21

**approval** 93:5

**approved** 90:2

**area** 16:20 85:2 86:6
87:12

**argumentative** 61:21
65:5,20 67:14 79:24

**arm's** 33:2 70:8,10,18

**arrive** 34:16 63:11
68:24 69:9 86:3

**arrived** 48:1

**Ash** 17:1,2

**Ashrawi** 5:5 17:6
22:11 30:1 34:3 39:13,
22 40:1 43:11,14 44:1
67:7,20,22 68:4,9,10,
12,15 69:17 70:5 71:1
80:3 86:15 88:10
91:17 93:6,9 97:20
98:1 102:21

**aspects** 10:17 44:17

**assessment** 48:8

**asset** 12:2

**assignment** 23:1,4,
17,24 31:3,5 40:8
55:23 65:15 76:15
96:18,21

**assignments** 10:11,
13 25:16 30:14 96:17

**Associates** 41:15

**association** 11:10
12:7,8,12

**assume** 5:9 6:1 27:23
48:5 57:11

**assumed** 47:3

**assumes** 27:19 61:11
66:9

**assuming** 62:7 63:15
64:20

**assumption** 28:17,
23,24 29:2,10 64:1,5,7
66:15 67:6

**assumptions** 28:11
39:16 50:24 95:7

**attach** 100:3

**attention** 17:23 51:2

**attorney** 7:21 9:18
20:15 22:5

**auditor** 81:17 82:3,4

**authority** 96:24

**Avenue** 83:20

**aware** 32:10 53:16
87:15 96:5

**B**

**back** 12:19 14:13
23:11 43:15 45:8 51:2
53:3 54:8 55:12 57:9
63:23 67:7 74:6 86:16,
18 92:13 93:3 98:23

**background** 10:1
11:3 75:14

**Bank** 88:20

**banks** 84:15,23,24

**Barrett** 21:17 51:18

**basic** 86:1,14

**basically** 20:4

**basis** 10:14 41:24
73:9

**Bates** 22:15 48:24
77:5

**bear** 5:19 39:1

**begin** 30:20

**Beginning** 47:9

**behalf** 51:18

**big** 35:2 93:13

**bike** 15:5,9

**bit** 9:24 25:23 41:18
58:16 86:13

**Blue** 17:1,2

**Board** 18:17

**Bob** 42:17

**Bob's** 42:17

**body** 9:11

**boilerplate** 36:22
47:7 54:14

**bolded** 49:1

**book** 9:2

**bottom** 43:18 48:24
54:24 75:5 77:6

**Boulevard** 84:1

**box** 93:13

**boy** 42:10

**break** 6:3 43:10,11
69:18 97:20

**breakdown** 16:14
19:6

**broad** 73:18

**broken** 63:2

**brokers** 12:1

**Brown** 53:24 54:1,16

**build** 95:14

**building** 19:17

**built** 92:5 95:8

**bullet** 32:5 33:5 45:22
46:10 47:13 74:9

**Busch** 84:1

**business** 10:24 11:5
16:5 38:3

**businesslike** 36:20
38:4

**butcher** 42:13

**buyer** 92:13

**C**

**calculated** 69:8

**calculations** 69:11

**calendar** 96:16

**call** 47:6

**calling** 45:4

**Calls** 36:10 46:4 70:13
72:11 73:1 83:8 84:19
100:23

**Campus** 6:24

**capitalization** 72:23

**carrying** 101:23

**case** 7:13 14:18,23
17:14,24 18:18 19:9,
15,20,21,24 20:2,9
22:18,23 23:5 26:23
30:18 31:5 35:7 41:2
47:20 50:6 51:5,8,13,
14,17 52:3,6,11,13,18
53:8,13 54:17 55:3,11,
13 64:22 74:16 75:12,
19 91:8 96:10,22 97:1

**cases** 18:4,8,10,20
19:2,3,4,7,10,14,18,19
20:3,6,7 21:4,13 22:2,
5 51:10 53:5,12,17,19,
23 54:19 55:18 97:8,
10

**category** 35:2

**CCIM** 5:1 11:9,11,13,
18 12:10 13:11,17
14:5 41:13,14

**CCIMS** 12:1

**center** 84:12 91:24

**centers** 7:4 79:9
81:22 82:6 83:1 84:11

**central** 7:13 43:2

**certification** 50:23

**certification/
accreditation** 11:20

**certified** 5:3 11:11
14:6 16:1,16

**certify** 59:20

**CFO** 95:19

**change** 29:4 56:16,21

**chasing** 90:19

**checked** 21:18

**child** 15:2

**Children's** 7:6

**choose** 36:8

**Chris** 39:13 42:2 80:4
91:17

**chuckling** 93:6

**church** 100:9

**Cincinnati** 9:6 11:6
15:11,18 16:20,22,24
51:16 52:15

**City** 7:1,4 42:22 46:24
47:2,4 51:16 52:15
63:17 82:23 86:10
91:20 92:3 93:12 94:1
95:10 96:7 97:2 99:9
101:6,14

**claims** 53:6

**clarification** 18:14

**clarify** 48:17 80:3
102:9

**class** 9:5 74:1

**classification** 99:13
100:3

**clean** 6:10 88:11

**clear** 18:7,15 26:21
36:20 37:12 57:21
60:15 66:16 75:6
80:24 82:22 98:8
99:19

**clearer** 69:16

**Clermont** 54:6

**client** 20:15 21:9
35:14,17,19 36:2,12
38:17 45:23 46:1,2,8,
14,24 49:17 50:15
54:15 72:2

**clients** 20:14 36:14,
19,24 54:13 56:18

**close** 93:15 98:23

**closed** 91:11

**closer** 83:3

**closing** 32:9,14

**CNB** 88:20

**co-op** 15:10

**coffee** 21:12

**collector** 47:18

**Colliers** 15:15

**Columbus** 41:13,16
97:2

**column** 19:8,20

**commercial** 10:3,6,8, 18 11:11,19 12:5 14:13,24 15:20

**commercial/medical** 98:19

**commercially** 74:13

**commonly** 7:5

**communication** 95:23

**Communities** 6:24 41:6 94:20,22

**Community's** 95:2

**company** 10:5 14:19 20:22 94:5

**comparable** 33:7,10, 11,14 81:11 85:12,22 86:7,13 87:8,13,19,23 88:3 89:12 90:8,13,16 91:8,9,13 94:2,4,6 98:16,18,20 100:17 101:8,11

**comparables** 88:6 89:10 101:5

**comparison** 72:8,17, 22 85:8 89:7 90:9 93:16 98:5 100:14

**compelling** 9:15 87:13

**complete** 6:14 16:4 17:16 18:13 22:22

**completed** 16:3

**completely** 20:24

**complex** 31:9 55:21

**complexity** 31:2,4 55:23

**compliance** 38:5 59:15

**complies** 58:17,18 59:20

**component** 73:22

**comprehensive** 12:24 28:3,4,9 39:6 60:8 61:4 76:22 77:2 78:8 85:21 86:10 92:2, 18,24 93:24 95:10,15

**comps** 86:11

**concise** 36:20

**concluded** 103:3

**conclusion** 48:1 59:24 60:2,17 68:23 72:9 86:3 100:24

**conclusions** 37:3,9, 23 46:16,20 47:8 49:20 50:19 54:13

**conclusive** 77:15

**condemnation** 19:3, 10,24 20:6,9 21:3 53:19 96:22 97:8,10

**condemning** 96:24

**condition** 28:18 29:9, 14 65:8,9,12,13

**conditions** 29:20 51:1

**confidential** 97:5

**confirm** 38:9 46:8 51:6

**confirmation** 82:11

**conform** 86:8

**confused** 65:6,23

**Confusing** 67:15

**considerable** 91:6

**considered** 11:18 23:16 33:11,14 34:12, 19 63:22 68:21 81:22

**consistent** 39:5 60:6, 8 76:21 77:2 78:7 81:1 92:1,17,24

**conspicuously** 49:13,15,18

**consult** 10:15 71:16

**consultant** 63:9

**Consultants** 88:19

**consultation** 47:17

**consulting** 10:12,13, 17

**contact** 41:7,20

**contacted** 35:13

**contained** 24:4 36:16 39:8

**contents** 8:20

**continue** 47:13

**continuing** 13:16,23 34:24

**contract** 91:11

**contracts** 32:8,14

**contrary** 29:14 65:13

**contribute** 40:9

**convenient** 43:10

**copier** 14:20

**copies** 32:8 39:18 71:9

**copy** 17:16 22:22 39:17 45:9 71:11

**core** 12:22 36:21

**corner** 48:24 77:6

**corners** 71:11

**correct** 5:11 7:15 9:4 13:15 14:3 16:24 17:14 18:19,23 23:20 26:9,10 27:5 29:5,21 30:15 32:11 44:18,24 45:4,15 47:21 49:9 50:21 51:20 53:10,15 57:13,24 59:22 66:8, 11 71:21 72:5 77:12 78:6,14 81:21 85:7 87:19 89:1 91:2 99:1, 23 100:16 101:17 102:15

**correctly** 29:2 49:22 77:17,23 78:3

**correspondence** 24:7

**cost** 72:21 73:6,10,18, 19,22 74:12 75:6,8

**Costco** 93:12,13

**costs** 63:23 101:23

**counsel** 5:18 21:15 65:5 67:17 68:3

**counted** 13:5 20:5

**counties** 81:23

**County** 53:9 54:6 81:17 82:2,3 83:21 84:2,5 93:3 96:14,16, 19 97:8,12,13,17 101:9,12

**couple** 25:9,18 41:23 51:6 96:2

**courses** 12:22,23

**coursework** 16:3

**court** 6:10,20 17:24 19:15 50:5 51:5 52:6

**court's** 96:10

**courtroom** 18:10,22 97:17

**covers** 19:19

**credit** 13:6

**CROSS-EXAMINATION** 5:4

**cup** 21:12

**current** 18:1 90:1 98:9 100:12

**Cushman** 15:17

**customary** 81:14 82:7 85:17 95:5

**CV** 14:10

**D**

**D.C.** 13:2

**data** 24:16 34:23 70:16 77:16 78:15,18, 24 79:13,18,19 80:19 81:5,10 82:19 83:13, 14 84:14,21 85:8 91:22 92:17

**database** 86:20,23 87:2,4

**date** 62:14,18,21 63:5, 20 64:17 65:14 66:1 88:22 98:13

**dated** 88:19

**dates** 62:13

**day** 93:20

Dayton 11:7 16:21

dealing 48:6

debate 91:6

Debi 41:13

Decades 63:13

December 32:11 34:5,13 62:19,23 63:4 64:12 65:1,17 66:2,5, 10,23 70:7 98:14

decision 35:23 36:4

deep 95:9

define 44:19

defined 29:11

definition 28:22,24 29:2,18 65:8 99:16

definitions 99:22

degree 11:4 12:3

Delaware 93:2

demonstrate 96:3

demonstrates 60:9, 11,18 61:1

demonstration 13:4, 7

denied 62:23,24

Density 19:18

depend 30:24

depending 60:4

depends 10:20,21 30:23 36:12 55:20 83:9,12

deposed 5:10

deposes 5:3

deposition 6:18 7:19 8:2 9:1,9,19 17:4,22 18:11,21 22:9 29:23 43:22 52:5 70:23 88:8 97:17

depositions 5:18 52:8,10,12

Derek 15:23

Derek's 16:5

describe 28:16 31:4 79:5

describes 30:13 80:23 99:7

describing 47:2

description 46:23 47:2,5 56:20 75:3

designation 11:8,9, 13 12:4,8,16,17,18 13:11,17,18 16:3

designations 14:4

desire 56:20

detailed 96:2

details 32:6 47:24

determine 55:24 68:20 75:18

determined 69:6 74:11 75:16 76:4,13

determining 27:3

develop 26:21,23 76:24

developed 26:20 42:3 61:5,23 62:8 63:6,16 64:8,21 65:1,18 66:9, 21 69:3 74:13 76:19 87:12 93:24

developer 61:3 63:1,8 76:23 93:23 94:11

developer's 89:19

developers 41:23

developing 30:18 72:9

development 8:22,24 9:5 27:20 28:8 42:18 60:6 62:8 63:7,16 64:5,18 66:6 68:22 78:10 85:20 90:2 92:10,15 94:24 96:6

Diego 19:16

differ 29:9

difference 28:16 30:7 60:4,19 102:6

differences 44:15

differentiating 20:3

difficult 67:11 78:2

diligence 32:5 36:16 95:5

direct 17:23 28:21 66:14 67:5 74:6 81:8 87:8

directed 35:23 71:23

directing 25:15

directly 11:21

director 94:24

disclose 49:2,12

disclosures 49:24 50:10

discounted 63:23

discuss 9:19

discussed 28:13 46:19,21 50:15

discusses 44:13

discussing 93:18

discussion 33:21 89:24 91:6 93:11

disposition 47:18

dispute 19:16 48:13

disputed 48:8

disputes 19:13

distinct 58:24

district 53:14 82:14, 16,19,24 92:15 100:7 101:7

districts 99:5

dive 95:9

divided 34:16

divorce 19:18 55:2

Dobrozsi 42:2

document 9:14 17:11 22:19 30:4,10,13 44:4 62:17 76:7 77:14 78:22 79:16

documentation 82:8

documented 95:22

documents 7:22,23 8:10,17 24:3,5 32:6,14 36:17 59:1 88:16

dog 90:19

dollar 34:12

Don 41:15

drafter 40:14

drivers 36:22

Dublin 91:19,20

due 32:5 36:16 95:5

duly 5:2

## E

E-B-E-R-L-Y 43:6

earlier 70:6 85:6

early 12:20

earned 12:17

easier 21:2 54:13

easily 100:4

Easton 84:12

easy 100:5

Eberly 41:12 43:6

educate 35:14

educated 35:17 38:17 46:7

education 13:16,24

educational 11:3

effective 62:13,14,18, 20 63:5,20 65:14 66:1, 23 88:22 98:13

effectively 64:17 66:7

effort 21:24 95:6

elected 72:4

elective 12:23

elementary 15:7

elements 31:19

email 24:6 95:22

**employed** 10:1

**employees** 16:10

**end** 15:19 93:19

**ends** 29:3

**entire** 68:22 78:12

**entirety** 34:9

**entitled** 67:18

**entity** 12:11 20:11,16

**equally** 8:16

**Eric** 5:1,7

**essentially** 12:3 60:14

**estate** 8:22,23 10:3,6, 9,18 11:19 12:6 13:23 14:1,13,24 15:15,20 18:8 22:17 41:12 43:4 53:12 58:21 59:2,6,11, 21 71:8,12,16 75:4,24 88:18

**exact** 64:17

**exam** 13:1

**examples** 47:10,15 48:6

**exceed** 90:3

**Excel** 96:2

**excerpts** 58:20

**excuse** 56:4 80:7 93:5 102:18

**exhaustive** 18:4

**Exhibit** 17:4,9 22:9,13 23:6 29:23 30:3 34:24 39:2 43:15,22 44:3,22 45:8 48:23 51:3 70:23 71:3 74:6,21 76:17 77:6 88:12,13,15,17 91:16 94:3

**Exhibits** 88:8

**exist** 65:14

**expect** 94:11

**expectation** 61:3 76:24 93:22 95:13

**expectations** 94:14, 18 95:2

**experience** 63:13

**expert** 8:5 17:24 18:5, 16 22:17 51:5 60:21

**extent** 24:2 50:3 59:8 63:19 67:3 70:15 75:21 76:8,18

**extracting** 81:14

**extraction** 72:19

**extraordinary** 28:17, 22,24 29:10 64:1 66:15 67:6

---

### F

**fact** 29:15 64:20 77:14 78:9 79:19

**factored** 33:19,23

**factors** 36:9

**facts** 23:15,23 24:8 39:16

**fair** 19:1 38:20 44:11 59:16

**fairly** 54:9,23

**fall** 73:18

**falls** 75:5,7

**familiar** 17:10 19:12 22:18 30:4 36:15 71:3 84:16

**family** 79:8 81:20 82:5

**fast** 13:13

**fast-track** 12:21

**federal** 6:23 19:15 51:8,10,13

**felt** 46:23 95:12

**Fessler** 42:17,18

**figure** 74:4

**file** 7:21,24 8:7,8,10, 17,20,21 22:15 24:4, 13 32:20,22,24 37:17, 18 41:11 55:8 71:4 96:2,11,12

**filed** 6:23

**files** 9:13 96:2

**final** 61:14 69:9 74:14

**finance** 11:6

**financial** 96:3

**find** 33:12

**fine** 21:6 56:6 81:10

**finish** 6:6 69:5,18

**fire** 34:1

**firm** 10:7 15:1 18:7 23:15,20,22 24:14 25:17 50:7 87:5

**fits** 73:13

**focus** 8:16 10:7 54:13

**focuses** 47:8 50:19

**focusing** 21:4 82:1

**follow** 28:5 61:4

**foot** 91:23

**forgive** 82:1

**forgot** 12:9 39:1

**form** 7:9 8:12 10:19 11:17,23 13:21 14:16 16:15 20:12 24:1,7,10, 18 25:2 26:2,11,15 28:1 29:6 30:22 31:6, 22 32:1 33:3 34:11,21 37:11 38:12,21 39:10 40:23 45:11 46:4,17 48:3,10 50:2,22 53:11 57:4,16 59:7,17 60:1, 24 61:20 63:18 64:23 65:4,19 67:1 71:13 72:10 73:15 75:20 82:21 86:4 102:4

**formal** 29:17

**format** 35:15,20,24 36:18,19 38:2 46:20 50:17,18 56:18

**formats** 30:8 35:15,18 36:3 58:13

**formed** 15:19,21

**forming** 32:3 34:19

**forward** 7:10 63:1,3, 21,23

**Foundation** 51:15,19 52:16 59:4

**fourth** 48:5 73:4

**Fran** 21:17

**Franklin** 53:9 81:17 82:2,3 83:21 84:2,5 96:14,15,19 97:8,12, 13,16 101:9,12

**frankly** 36:13

**frequently** 38:4

**friend** 42:9

**front** 17:8 51:4 84:14, 21 100:12

**Frost** 53:24 54:1,16

**full** 6:14 36:16 44:23, 24 45:5 47:1 93:4

**fully** 62:8 63:15 64:7, 8,21 65:1 66:9,21 69:2,3

**function** 59:5

**future** 48:20

---

### G

**G-A-R-D-N-E-R** 5:8

**Gardner** 5:1,8,9 9:24 10:3 14:15 15:19,21 16:7,10,23 17:9,10 20:13 21:11 22:12,13, 14,15,16 27:17 30:2,3, 10 35:2 37:4 38:23 39:21 40:2 43:15 44:3 49:1 50:9 67:10 70:6 77:5 80:14 86:21 88:14 96:13 98:2 102:23

**Gas** 54:5

**gather** 41:9

**gave** 24:14

**Gem** 15:14

**general** 14:6 16:1,17 27:5

**generally** 48:4 62:10 70:11 73:18

**generated** 30:10

**gentleman** 95:18

**give** 6:14 25:6 67:18 82:17

**good** 42:10 87:13,20, 22 93:20

**govern** 31:19

**governing** 44:9,10

**government** 21:18

**governmental** 43:2

**grab** 21:12

**grade** 14:17,21

**graduate** 12:3

**grantor** 93:4

**green** 51:15,18 52:15 60:16 98:20,22 100:16

**Grew** 16:21

**ground** 5:16 63:3

**group** 10:3 15:15,19, 20 30:11 41:12 43:4

**grow** 16:20

**guess** 59:15 63:24 64:2 86:1

**guidelines** 44:10 45:9,15 58:22

### H

**hand** 17:7 22:12 30:2 44:2 71:2 88:12

**handed** 23:12 88:14

**happy** 6:4 94:7

**hard** 75:14 95:9

**heading** 46:11

**heard** 5:17

**hearing** 48:7

**held** 93:11

**helpful** 19:22

**hereinafter** 5:2

**high** 100:11

**highest** 25:17 26:6,20 27:3,15 31:12,13,15, 16,19 32:3 39:5 60:5,7

61:12 64:4 76:20 79:3 83:16 87:6 89:16 98:21 100:18,21 101:1,4

**highlights** 14:11 36:21

**highly** 86:5 93:17

**Hilliard** 92:21

**hired** 20:22 22:7 97:10

**history** 14:12

**hits** 36:21

**hold** 11:7,9

**Holdings** 42:7,16

**Home** 7:6

**homes** 78:10

**hope** 80:1

**Horner** 88:21

**hospital** 92:4

**hour** 43:9

**Hutchinson** 83:20

**hypothetical** 28:18 29:8,13,19 65:7,9,12 70:14 72:11 73:2 83:8

### I

**ID** 99:16

**identifiable** 100:5

**identification** 70:12

**identified** 30:21 44:21 100:19

**identifies** 99:4

**identify** 28:10 98:16

**impact** 27:14 55:24

**implemented** 57:12

**important** 83:5

**improved** 64:7 67:24 68:16 69:14

**improvement** 61:18

**improvements** 64:15,16 81:13

**inappropriate** 90:8

**include** 18:9,16 27:2 38:1 46:22 47:5,6 50:24 100:8

**included** 23:1,10 50:13 61:19 80:19 81:17 87:19 99:12,14

**includes** 18:20 64:7

**including** 32:7

**income** 72:23 73:7,11 74:13

**Incomplete** 70:14 72:11 73:2 83:7

**inconsistent** 92:5

**Indiana** 14:7

**indication** 70:19 82:17

**indications** 77:16

**individuals** 41:19

**industry** 58:3

**information** 23:15,23 24:6,8,16 33:7 37:14 39:8,15 40:18 41:9 44:14 46:9 97:5

**Ingram** 7:9 8:12,18 10:19 11:17,23 13:21 14:16 16:15 20:12,19 24:1,10,18 25:2,7 26:2,11,15,18 28:1 29:6 30:22 31:1,6,22 32:1 33:3,24 34:11,21 36:10 37:11 38:12,16, 21 39:10,19 40:23 43:8 45:11 46:4,17 48:3,10 50:2,22 53:11 56:8 57:4,16 59:7,17 60:1,24 61:20 62:16 63:18 64:23 65:4,19 67:1,14,21 68:2,5,7,11 70:13,20 71:13 72:10, 15 73:1,15,24 75:20 76:6,16 78:21 79:15, 21,24 82:21 83:7,11 84:19 86:4 87:24 89:13 91:15 97:22 100:23 102:4

**initial** 5:7

**inside** 93:7

**instance** 46:1 54:11

**instances** 19:23 20:1

**Institute** 9:3 11:8 12:11 13:8 59:3 91:7

**insurance** 20:22

**intended** 37:1 47:16 49:17 50:5,6

**intent** 58:18

**interesting** 89:23 92:16

**interrupt** 43:8

**investment** 11:11 12:1,5 32:8 84:22

**involved** 10:13 55:3 97:17

**involving** 51:8 53:5

**issues** 94:7

**item** 20:20,21 21:9 51:15 55:2,11 56:3,4 57:14

### J

**January** 61:24 62:1 63:21 70:1 103:2

**job** 14:13

**Joe** 95:18

**joke** 93:8

**Joseph** 50:7

**jurisdiction** 99:9,17 100:2

### K

**Kentucky** 14:7

**key** 73:19 83:13

**kind** 9:11 11:18 35:14

**knew** 57:6

**knowledge** 9:11 18:12 63:11

**knowledgeable**

47:18

**Kuhn** 41:14,15

---

**L**

**labeled** 50:16

**labor** 15:3

**land** 9:3 28:3 31:8
61:4,8,18,22 62:6,7,9
64:19 66:22,24 67:24
68:16,17,20,23,24
69:2,7,8,10,13,14 73:8
75:4,23 76:13 77:3,20
78:8 79:6,7,11 81:13,
14 82:18 83:1 85:23
90:16 91:19 92:2,5,7,
12,18,21 93:1,2,24
95:10,12,15 100:16

**land-to-property**
78:1

**landowner** 20:18
87:16 94:12

**landowners** 22:7

**language** 39:7

**large** 8:8 84:10

**laws** 15:3

**lawsuit** 6:23 7:3

**layers** 93:16

**layman's** 29:13

**LC** 60:22 61:2

**left** 45:18

**legal** 36:18 100:24

**legally** 89:17,24
100:22 101:2

**legitimately** 99:3

**lender** 36:14

**length** 33:2 70:8,11,18

**letter** 22:17,22 23:2,10
24:7 39:3,8

**level** 46:9 100:11

**license** 13:23,24 14:1

**licenses** 14:4

**Lifestyle** 6:24 41:6
60:22 79:9 81:22 82:6,
24 84:11 94:19,22
95:1,17

**limitations** 77:11

**limited** 36:24 45:24
46:2 51:1

**limits** 49:16 60:14

**lines** 56:22

**list** 18:4,13,15 19:20
20:14 21:19 99:15

**listed** 19:2 20:10 22:3
49:14 53:18 54:19
58:8 83:18 84:8 94:4

**lists** 23:7 99:20

**litigation** 93:5

**lived** 15:8

**LLC** 10:4

**located** 14:10 16:23
33:22 47:4 50:20
82:15 86:6 92:12,16,
21 93:2 97:3 101:8,11

**log** 17:24 51:5

**long** 12:23

**looked** 7:20 8:19 9:10,
11 25:18,22 26:19
32:24 63:21,22,23
81:11 83:1 85:16
87:18 89:5 96:12
100:17

**lot** 19:9 36:22 52:16
56:22 95:6

**lots** 77:22

**luncheon** 69:20

---

**M**

**macro** 75:9

**made** 29:2 35:22 36:4

**MAI** 5:1 11:7 12:17
13:5,10 14:5 15:24
16:2,4 41:13,14,16

**maintain** 13:22 14:7
86:21

**majority** 19:1,2

**make** 7:16 21:2 28:11
49:24 60:12 81:6

**management** 15:1

**manager** 14:18 16:17,
19

**managers** 12:2 16:14

**manages** 87:4

**manual** 44:7 45:14

**mark** 17:9 22:13 30:3
44:2 71:2 88:12

**marked** 17:4 22:9
29:23 43:22 70:23
88:8,15

**market** 31:17 33:7
40:17,18,21 41:9,17,
22 47:23 61:2,24 62:2
74:14 81:2,3,12

**market-based** 95:7

**Martin** 15:16

**matter** 8:6 55:4

**matters** 19:18 21:23
97:18

**mature** 86:6

**maturely** 87:12

**MBA** 11:6

**meaning** 102:13

**medical** 91:23 92:8

**meeting** 95:20

**member** 10:2 11:12

**members** 16:7

**mentioned** 35:3

**met** 95:24

**method** 71:19,23
72:4,9,14 73:4,7,8,13,
17,22 74:20,22 75:7,
23 76:3,14 77:2,8,12,
15,19 78:11,16,19
79:2,6,23 81:15 82:9

**Methodist** 7:6

**methodologies**
72:17,20

**methodology** 90:18

**methods** 72:24 73:12

**Michigan** 14:8

**mid** 58:4,11

**mid-rise** 92:22

**middle** 5:7 74:23 77:7

**middlish** 32:4

**mile** 15:7

**Miller** 23:16 41:15
50:7

**million** 34:15 61:9,13,
14,15 62:2,3,5,15
63:14 66:2,22 90:3

**mind** 86:15

**mischaracterized**
80:15

**Mischaracterizes**
24:19 46:18

**mischaracterizing**
66:12

**missed** 99:4

**missing** 81:7

**misstate** 80:12,14

**misstated** 80:11

**Misstates** 56:8 62:16
76:6,16 78:21 79:15
87:24 89:13

**misunderstanding**
66:13

**mixed** 85:24

**mixed-use** 27:20 28:8
42:4 60:6 62:8 63:6,16
64:5 66:6,10 85:20
86:8 92:10,23

**models** 96:3

**mom's** 15:8

**monetarily** 84:22

**money** 52:16

**Montgomery** 42:3,5

**mother** 14:17

**move** 63:3 80:2

moved 15:15,18 63:1

moving 7:10

Moy 15:12

Multifamily 83:24

multiple 57:17 62:12
67:15 72:19 98:18

**N**

named 37:1 49:17
56:10 79:14

national 11:10 12:8,
12,24 83:14

nature 10:5,24 19:6,9,
20,21,24

needed 14:19 94:9

negotiated 15:4

neighborhood 46:23
47:1,5 56:19,20

Neyer 42:2

nice 6:10

noncomplex 55:19

northern 16:21

Northgate 84:4

note 62:11

November 88:19,23

number 17:20 18:15
51:7 62:5 64:1 66:15
67:6 85:4 91:19

numbered 22:15
48:24 77:5

numbers 71:10

numerous 5:13 53:22
67:16 80:1 97:16

**O**

Oakes 55:2

oath 6:17,19

objection 7:9 8:12,18
10:19 11:17,23 13:21
14:16 16:15 20:12,19
24:1,10,18 25:2,7
26:2,11,15 28:1 29:6
30:22 31:1,6,22 32:1
33:3 34:11,21 36:10
37:11 38:12,16,21,24
39:10 40:23 45:11
46:4,17 48:3,10 50:2,
22 53:11 56:8 57:4,16
59:7,17 60:1,24 61:20
62:16 63:18 64:23
65:4,19 67:1,14 70:13
71:13 72:10 73:1,15,
24 75:20 76:6,16
78:21 79:15,21,24
82:21 83:7 84:19 86:4
87:24 89:13 100:23
102:4

objections 26:18
70:20 72:15 83:11

objectively 64:22

obtained 87:16

occurred 92:13,22

off-line 39:20,23

offer 11:15 55:4

offered 11:14 21:14

offhand 54:5 95:21

office 9:22 14:18 15:8,
17 16:13,17 40:7 79:8
81:20 82:5 92:8

officials 42:23 43:2

oftentimes 20:14
56:18

Ohio 14:7 16:21 42:5
43:2 53:14 81:23 83:1
88:18 91:20

onion 93:16

opening 80:23

opine 101:22 102:2,17

opining 27:4

opinion 10:11,16 25:6
26:21 27:18 30:18
32:3 43:18 44:6,13
59:23 60:21 61:6,7,14,
19 62:15 63:14 66:2
68:20 69:9,10 74:14
79:1 86:7 87:8,21 88:2
89:11 90:4,7,14 91:8
93:14 98:3,12

opinions 34:20 37:3,
8,22 45:13 46:15
49:20

opinions/orders
96:10

option 35:7,20 36:5
37:24 44:22 45:5,24
47:7 52:20 54:23
55:16 56:14,15,18,24
57:23 58:7,12

options 35:4 58:5

originally 35:13

Otterbein 92:14

outline 35:3

outlined 46:10

overarching 83:14

owed 52:15 60:22

owner 41:3,6,21 47:23
60:22 94:13

owners 16:7 21:15,16

**P**

p.m. 69:21 70:3 103:3

package 32:8

pages 8:9,10,15,21
71:3,7,10 79:14 80:18,
20 83:18 84:8

paragraph 80:23 81:4
82:12

parameters 85:19

parcel 64:8 99:16

parcels 7:15 96:15
99:8

park 60:15 100:9

part 9:10,11 11:10,24
32:2 40:19,22 45:14,
16 73:9,19 78:9 84:24
92:9 102:11

part-time 14:21 16:18

partial 51:9 102:3,7,
10,18

participants 40:22
41:22

participate 12:20

parties 47:3

partners 19:17

past 13:9 97:9

pause 41:4

Pease 50:8

peel 93:15

peers 41:17

pending 6:4 32:7
53:9,13 91:11

people 13:3 40:7

percentage 22:6
68:23 81:15

perform 24:17 26:8
48:19 85:15 86:3

performed 55:17
74:11 88:18 95:11

performing 59:11
71:17

performs 87:3

permissible 89:17
90:1 100:22 101:2

permitted 99:12,21
100:6 101:3

person 87:3 95:24

personal 63:11

personally 63:8

perspective 61:2
64:18

Ph.d. 11:19

phone 24:7 42:12

physical 71:11

piece 7:4

pieces 87:10

Pillar 15:18

pipeline 55:18

place 15:3

Plain 93:12

plan 24:14 28:3,4,9
39:6 60:8 61:4 76:22

77:3 78:9 85:21 86:10 89:19,20,22 92:3,6,7, 18 93:1,24 95:10,15 96:6

**planned** 91:24 92:15

**planning** 96:4

**play** 58:21

**point** 33:5 34:23 46:10 70:16 74:9 75:1 83:13 91:22 92:17 97:5

**pointing** 91:16

**points** 45:22 47:13 82:19

**portion** 23:14 40:9 78:13 98:5

**portions** 39:14,17

**position** 94:21

**potentially** 29:4

**practice** 12:5 19:12

**preference** 36:13

**preferred** 72:8,14

**preliminary** 48:7

**preparation** 8:24 9:9, 12 28:6 40:2

**prepare** 7:18 48:12 52:2,22

**prepared** 17:14 52:17 53:22

**preparing** 28:11 53:20

**prerequisite** 13:10

**prescribe** 76:22 92:7

**prescribed** 85:22 86:9 92:3,9,19 95:12, 14

**present** 69:8

**presented** 36:1

**president** 10:2

**pretty** 32:16

**previous** 5:18 55:16 70:21 76:9,10 80:13 86:18

**previously** 35:3 39:3 51:8 57:18 89:4

**price** 34:15,17,18

**primarily** 10:23 11:2 22:4,7 26:9 40:13

**primary** 40:14 41:7,16 77:20

**Principle** 41:11 43:4

**Principles** 8:23

**prior** 46:18 56:9

**problem** 91:21

**process** 8:23 16:6 30:14,17,20 32:4 33:6 35:1 40:19 43:16 66:16 74:10 79:5

**produce** 77:15

**produced** 8:6 39:20

**Products** 35:1 43:16

**professional** 12:4

**program** 12:21

**project** 13:5,6 42:4 61:23 62:8 63:2,4 84:16 86:8 87:11 92:23

**projected** 62:1 63:4 68:21 69:6

**projection** 63:10

**proofread** 40:11

**properties** 42:2 55:3 57:19 77:21 79:9 81:11 82:13,23 83:2 84:7 87:6

**property** 7:4,7,11,13, 14 12:2 15:1,13 21:15 22:2 24:15 25:4,8,19 26:6,14 27:1 28:5,7 31:2,5 32:10 33:17 36:15 41:2,6,21 47:19, 22,24 48:14 56:22 60:15,22 61:23 63:15 64:9 65:17 66:6,10 69:1,3,4,7 70:7,11 72:24 78:5,9,12 79:20 80:19 82:15 83:4,6,10, 15,23 85:9,18,23 86:5, 11 87:9,17 88:5 90:14,

16,23 91:1,12 92:20 93:21 94:1,6,13,15 95:3,5 96:14,17 97:3 98:9 100:1 102:11,14

**proposed** 89:18

**provide** 10:8 23:22 25:12 28:10 37:15 78:15,18,24 96:1

**provided** 18:10,21 23:15 24:3,16 39:16 96:1

**providing** 10:16 26:13

**proximity** 83:3,5,13

**published** 59:2,3

**PUD** 27:20,23

**pull** 74:7

**purchase** 32:18

**purchased** 94:14

**purposes** 48:20 65:15 91:15

**put** 95:6

**putting** 68:5

## Q

**Quarter** 42:3

**quarterly** 48:6

**question** 6:5,7,8 8:14 18:3 19:23 20:7,18,24 23:18 24:22 25:12,14, 24 26:3,16,19 27:9 33:22 34:1 50:10 57:7, 9 59:16 61:16 64:2 65:7,21 66:24 67:8,23 68:1,13,14 69:13,15 74:5 76:11 78:23 80:4, 5,20 86:2,13,16 90:6, 22 94:2 102:5

**question's** 25:23

**questioning** 82:10

**questions** 5:22,23 6:1 17:21,22 67:15 74:2 102:21

**quote** 75:23

## R

**raise** 68:3

**raised** 64:16

**raising** 68:4,8

**ran** 14:20

**range** 61:11,13 62:6 74:14

**rarely** 77:20

**ratio** 75:1

**rationale** 37:2,8,16,22 38:8,10,11,15 46:15 49:19

**ratios** 78:2

**re-review** 39:14

**reach** 59:24

**read** 49:14,22 67:4,7, 13 77:17,23 78:3 81:4 86:17 96:9

**reading** 29:1 86:15

**ready** 90:3

**real** 8:22,23 10:3,6,8, 18 11:19 12:6 13:22 14:1,13,24 15:15,20 18:8 22:17 41:12 43:4 47:22 53:12 58:21 59:2,6,10,21 71:8,12, 16 75:3,9,24 88:18

**realize** 64:6

**Realtors** 11:10 12:10, 13

**reason** 6:13 20:13 54:12

**reasonable** 48:4 61:3 63:2,5 74:13 76:23,24 93:22 94:11 95:7,13

**recall** 35:22 36:1 52:8, 14 53:7,20 54:5,20 55:5,7 57:10 65:9 70:8 90:24

**receive** 24:6

**received** 93:4

**recent** 32:7 54:9

70:10,18

**recess** 43:13 69:20
97:23

**recollection** 39:9

**record** 5:6 6:10 18:15
49:15 57:21 67:13
68:5 86:17 88:11
91:16 93:10,11

**redacted** 23:12,14
39:2,14

**redactions** 22:21

**refer** 7:10 23:6 49:8
80:22

**reference** 43:17

**referred** 15:16 21:23
33:6 45:4 59:1

**referring** 7:12 15:22
76:12 89:3 102:10

**reflect** 88:4 94:5

**reflection** 93:21

**regular** 10:14 41:24
44:16,19,20 45:2 73:9

**regulatory** 51:9,12,
22,24 53:5 101:19,24
102:3,7,18

**rejected** 96:6

**related** 39:15 96:21

**relation** 43:19

**relevant** 37:13

**relied** 39:21

**rely** 59:10

**remind** 12:7

**rentals** 33:8

**repeat** 5:23

**rephrase** 24:22 78:23

**report** 7:20,23 9:12,13
13:4,7 14:10 17:13,17,
21 23:7 24:17 25:10,
16,21 27:11,18 28:12,
23 29:12,18,20 33:22
34:7 35:8,12 36:13,23
37:7,12,19,21,24 38:4,
5,9 40:3,6,10 43:19

44:17,19,20,21,23,24
45:2,5,6,7,19 46:3,10,
14,16,19,22 47:7,12
48:13,19 49:3,12,16,
18,21 50:1,4,13,14,16,
17,18,21 51:3 52:2,18,
19,22 53:1,2,21 54:11,
17,21,23 55:9,13,15,
22 56:1,5,11,12,14,23
57:2,3,22,24 58:7,16,
17,20 59:20,24 61:1,
10 62:11 66:1,9,13,17,
19 67:5,12 75:22 76:2,
12,19 79:1,5 80:17
81:8 88:18,23 89:6,10
90:5 94:5 98:2 99:2,20

**reported** 34:5

**reporter** 6:10

**reporting** 30:8 34:10
35:4,15,18 36:2 55:16
58:4,13

**reports** 8:5 44:10,15,
16 45:10 48:7 53:23
55:1,6,18 56:22 57:10,
17 58:10 71:17 87:17,
22 88:4 89:3 90:17,24

**represent** 22:14
61:17 70:18

**representative** 41:3,
5 94:13

**representing** 21:15,
17

**represents** 62:6
70:11 98:9

**requested** 67:13
86:17

**require** 10:11 49:11

**required** 13:17 46:9
50:11

**research** 16:18 87:3
95:6

**researches** 87:4

**residence** 79:8 81:20
82:5

**residential** 77:21 78:6
98:19

**respectful** 67:19

**responses** 6:9

**restate** 65:21,24

**restricted** 17:13 35:8,
11,20 36:18,23 37:24
38:5 43:19 44:14,17
45:10,19 46:3,19,21
47:7,11 49:3,11 50:1,
13,14,17,18 52:19,21
53:1,20,22 54:10,16,
21,22 55:1,5,9,18,21
56:1,5,11,12,13 57:3,
10 58:6,9,10,12

**restriction** 49:16

**restrictions** 50:12

**result** 52:13 102:18

**results** 65:15

**retailer** 93:13

**retained** 18:5 20:8,10
22:4 23:20 25:1 51:17
53:8 97:4,7

**retaining** 20:15

**retire** 21:21,24

**review** 8:15,24 9:8
32:13,18 71:16

**reviewed** 8:11 32:17,
23 41:10 89:4,20,22
96:9

**Revision** 18:17

**rezoning** 96:6

**ride** 15:5,9

**right-hand** 48:24 77:6

**rigorous** 12:3

**Road** 84:4

**Rob** 42:7,13,15

**Robert** 94:5

**Route** 54:6

**rules** 5:16 49:7,8
50:11

**S**

**S-1** 60:14 98:24 100:7,
8 101:7,15

**S-M-Y-J-U-N-I-S**
42:14

**Safe** 40:14

**sale** 32:7,13,15,18
33:1,13,14,15 34:5,10,
13,15 70:7,11,18
72:22 85:23 90:13,15,
23 91:8,9,10,13,19
92:12,21 93:2,12,16

**sales** 13:23 14:1 33:7,
10,11 34:17,18 72:7,
17 73:7,11 74:12
77:16 78:15,18,24
79:13,18,20 80:19
81:5,10 85:8,12 86:7,
13,20 87:8,9,13,19,23
88:3,4 89:7 90:8,9,16
93:20 94:2,4 98:5,17,
19,20,22 100:14,15,
17,18 101:8,11

**Sam** 41:3,5,14 94:19,
20 95:1

**Sam's** 94:21

**San** 19:16

**sat** 12:24

**Sater** 50:7

**scenario** 25:19,20
27:2,11,12,19,24 29:3
33:9 39:6 60:5,9,11
61:6,11,15 64:4 68:21
71:20 76:21 78:7,16,
19 79:2,3 80:15 81:9
85:9,13 98:4,8,12

**scenarios** 25:9,12,18,
23 26:1 27:4,11,12
28:13 60:20 62:12
76:21

**school** 14:22 15:5,7
82:14,16,19,24 100:9

**scope** 10:20,21 23:1,
4,7,9 24:15 30:21 39:7

**SD** 60:13

**search** 85:15,19 86:23
87:1

**searches** 86:2

**second-to-last** 33:5

**secondary** 8:22

**section** 74:10 101:18

**selected** 35:8

**self-contained** 58:5

**senior** 16:19

**sense** 73:18 75:9

**sentence** 89:17 90:1

**separate** 58:24 76:20
  99:7

**separately** 26:1

**series** 5:21

**service** 30:14 74:10

**services** 10:6,9 11:14
  22:18,23 26:9,13

**SESSION** 70:2

**set** 17:22 37:3,9 46:16
  49:20 57:21

**sets** 98:18

**settle** 54:3

**settled** 55:14 97:18,19

**Seymour** 50:8

**share** 97:6

**sheet** 43:17

**short** 97:20

**shown** 60:2 61:12
  62:18 81:24

**sic** 42:14

**signed** 50:23 88:20

**significant** 60:4,18
  85:3

**significantly** 23:13

**similar** 23:13 25:16
  28:9 83:15 87:6 94:7
  95:14 98:21 100:18

**simple** 66:24 68:13,14
  75:17

**simpler** 54:12 61:17

**simply** 35:17 70:16

**single** 78:10 79:8
  81:20 82:4

**sit** 32:21 41:11 52:21

84:13 85:5

**site** 28:6 60:12,16 61:5
  72:9 73:9,20 75:4 77:1
  89:12 93:4,13 95:8

**site's** 92:14

**sites** 72:17 73:12
  83:17

**sits** 64:9

**situation** 48:2

**situations** 47:11

**size** 87:5

**Skip** 41:12 43:5

**Slater** 94:19

**smaller** 87:10

**Smyjunas** 42:7

**sold** 32:10 91:20 93:3

**source** 8:23

**sources** 41:10

**Southern** 53:14

**space** 60:16 98:20,22
  100:16

**speak** 40:21 41:21
  42:1,22 43:1

**special** 98:24

**specific** 23:23 24:6,8
  89:18

**specifically** 9:9 11:22
  32:6 40:5 42:1 51:4
  53:20 54:20 82:2
  94:17 98:3

**speculation** 36:11
  46:5 70:14 72:11 73:2
  83:8 84:20

**Speedway** 97:10

**spell** 42:8 43:7 61:10

**spelled** 25:9,19 63:24

**spirit** 58:18

**split** 22:6

**spoke** 41:2,13,23

**square** 91:23

**stabilized** 62:2 68:22,
  24 69:4,7

**staff** 40:4,5

**stand** 34:4 70:21
  75:10 80:13

**standard** 47:6 49:7
  50:11

**standards** 58:22

**stands** 11:11

**Stapleton** 55:7,10

**Stark** 41:3,5 94:20

**start** 29:1 98:3

**started** 14:17 15:10
  55:12 58:3

**starting** 88:16

**state** 5:6 49:15 50:4
  68:19 91:20

**stated** 18:18 28:23
  29:18 79:4 82:22 90:4
  91:10

**statement** 37:4,5

**statements** 32:9
  49:13 50:20

**states** 19:21 47:10
  77:14,19

**Station** 54:6

**stick** 6:9 29:17 76:9

**Stonelick** 20:21 21:10

**Street** 10:3 14:15
  15:20,21,23 16:8,10,
  16,23 30:11 35:2 37:5
  40:9 86:21

**Street also** 15:24

**Strike** 34:3 78:17

**strong** 32:16

**structure** 12:14

**student** 15:11

**subdivision** 77:22
  78:6

**subject** 22:21 25:4,19
  26:6 28:6 33:13,15
  47:19 48:14 69:1,7

76:24 82:15 83:3 86:5,
  11 87:9,14,23 88:5
  90:14,15,23 91:1,12
  92:19 93:21,22 94:1
  100:1

**submitted** 62:23
  63:17

**substance** 58:15

**substantial** 60:3,19

**successful** 21:22

**suggesting** 48:18

**summarized** 75:23
  79:10

**summarizes** 30:7

**summary** 35:1 38:1
  43:17 55:12,15,17,21
  56:12,15,22,23 57:1,
  22 58:6

**summer** 55:14 64:21

**support** 78:2,16,19
  79:1

**supporting** 37:2,16,
  22 38:8,10,15 46:15
  49:19 82:8

**swore** 6:17

**sworn** 5:2

---

**T**

**table** 54:20 99:12

**tail** 90:20

**takes** 16:4

**taking** 51:12 52:1

**takings** 53:6

**talk** 6:6 9:19,24 94:12,
  17 95:16 100:20

**talked** 7:21 65:8

**talking** 9:2 83:10
  84:24 102:10

**talks** 32:5 36:24 45:18
  47:16 49:1 77:7

**taught** 9:5

**tax** 18:8,17 22:2 48:8,

13,20 53:12

**taxes** 101:23

**taxpayer** 22:4,5

**teach** 75:13

**team** 40:8

**technical** 93:17

**technique** 77:21

**temporary** 51:12,22, 24 101:19,22,23

**ten** 5:14 16:4

**tend** 36:19 54:3

**term** 44:20 94:10

**terms** 11:14 29:13 93:17

**test** 31:18 101:1,3

**testified** 39:4 51:8,10, 11 52:10 53:10,13 57:18 58:16 64:6

**testify** 6:20,23 52:5,8

**testimony** 6:15 8:2 18:11,16,21,22 21:14 24:19 46:18 55:4 56:9 57:1 65:10 70:17,21 73:21 76:9,10 80:13 86:19 88:1 89:9,14 90:7,21 94:3 97:18 103:2

**tests** 31:16

**textbook** 9:7,8 59:9, 18 71:18

**thing** 45:1 57:2 89:23

**things** 35:14 51:6 59:11

**Thomas** 88:20

**Thorntons** 54:5,17

**thought** 66:19,20

**tied** 11:21

**time** 12:19 15:12 16:9 17:17 21:5,11 40:12 43:10 48:11,16,18 95:6 96:13 97:6 101:10

**times** 5:12 38:13 67:16 80:1 83:13

**title** 94:24

**titled** 101:18

**today** 6:13 28:14 32:21 41:11 52:22 64:6,9,11 84:13 85:5 100:12

**today's** 6:18

**Todd** 53:24 54:1,16

**told** 66:20

**tools** 72:16

**top** 18:6 25:20 27:18 79:12 80:22

**total** 51:12,21,22,24 61:23 81:13 90:2 101:19,23 102:7,13,14

**totality** 7:14 8:19 24:13 28:7 32:2 67:4 76:1 87:11 102:13

**totally** 86:12

**totals** 82:4

**touch** 40:7

**toured** 96:17

**Town** 84:12

**townhomes** 79:7 81:20 82:4

**Township** 20:20,22 21:10

**track** 13:13

**transaction** 33:2 70:8

**transcripts** 8:3

**trial** 52:9,11

**trick** 26:16

**tricky** 80:21

**true** 29:3 45:8 71:9

**truth** 6:17

**truthful** 6:14

**Tucker** 15:16

**TUESDAY** 70:2

**Turley** 15:16

**turn** 27:17 51:2 77:4

**turning** 25:15 43:15

**type** 20:3 35:1 43:17

**typical** 81:14 82:7 85:16 95:4

**typically** 12:1 13:3

---

**U**

**ultimate** 59:23 60:2, 17

**ultimately** 21:9 33:12

**umbrella** 73:16

**UMCH** 7:6

**uncertainty** 31:11,13

**unclear** 20:16

**uncompelling** 9:16

**undergraduate** 11:4

**underlying** 20:16 22:4 73:20

**underneath** 75:6

**understand** 5:22 6:18,22 7:3,11 8:14 23:18 24:23 25:22 33:21 38:6,7 46:2 50:9 54:22 56:13,17 61:7, 16 62:4 64:2,3 66:17, 18,19 67:11,17 69:12 73:13 74:3,4 75:12,14, 15 79:17 80:6 86:12 90:21 101:13 102:5,6, 16

**understanding** 64:15

**understands** 45:24

**understood** 6:1 47:3 50:18 80:6

**undeveloped** 61:8

**uneducated** 38:20

**unique** 86:5 87:11

**unit** 78:10 92:15

**United** 7:6

**University** 9:6 11:5,7 15:11 92:14

**unlike** 59:19

**unredacted** 39:17,18

**untrue** 68:6

**upcoming** 96:17

**Urban** 9:3

**user** 38:20 50:6

**users** 37:1 49:17

**USPAP** 35:4,16 37:4,6 38:5 43:18 44:7,9 45:9,14 49:8 54:23 55:16 56:16,24 57:2 58:17,19 59:3,14,19

**utility** 45:24 46:2 59:5

---

**V**

**vacant** 31:8 61:8,18 64:9,11,12,18 66:7,24 67:24 68:16 69:14

**valid** 82:20

**valuation** 10:7,9,10, 16,24 11:24 15:18 19:13,16 26:9,13 27:24 66:22 71:20,24 72:24 73:9,11,23 75:4 77:20 88:22

**valuations** 11:22 81:16

**values** 52:23

**valuing** 66:23 73:12

**Vandercar** 42:7,16,19

**variable** 83:5

**varies** 10:20

**variety** 19:11 41:10

**verbal** 6:9

**version** 23:12

**versus** 51:16 73:12 102:13

**visit** 83:17 84:1,4,7

**visited** 83:20

**voice** 68:3,4,8

**Vorys** 23:15,20,22
24:8,14,24 25:12,24
27:23 28:10 39:4 50:7

---

**W**

**Wait** 58:8

**Wakefield** 15:17

**walk** 75:24

**Wallace** 14:18,23

**wanted** 15:5 24:9 38:6

**warn** 49:18

**Washington** 13:1
20:20

**Weber** 51:18

**Weberly** 43:5

**week** 12:23

**weighted** 31:23

**Weiler** 94:5

**weird** 93:17

**Westerville** 92:12

**wide** 19:11

**Wilcox** 41:14

**Wilkins** 15:13

**witness's** 24:19 46:18
56:9 88:1 89:14

**Wonderful** 57:8

**word** 26:8 32:16

**words** 79:19 80:11

**work** 10:21,22,24
14:12,14 18:16 20:17
22:6,15 23:8,9 30:21
40:8 41:24 42:19
59:12 71:4

**worked** 14:21 15:12
18:7 40:3 96:15 97:9,
15

**working** 16:2 40:13

**worth** 61:8 62:7

**Worthington** 6:24
7:1,5 42:23 46:24

47:2,4 63:17 82:14,16,
23 83:2 86:10 92:3,16,
19 94:1 95:11 96:7
99:10 101:6,15

**wrap** 97:21

**wrong** 85:7 99:23

**wrote** 26:6 27:15

---

**Y**

**Yaz** 39:19

**year** 62:1 63:5 96:16

**yearly** 48:6

**years** 13:9 16:4 63:21
91:3 97:15

**yes-or-no** 67:23
80:20 82:11

**yesterday** 96:18

---

**Z**

**zoned** 98:24 101:6,15

**zoning** 19:14 27:14,
20,24 60:14 62:22
89:18 90:2 93:5 98:9
99:5,9,13,16,17,21
100:1,2,22

**zonings** 99:8