**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **LIFESTYLE COMMUNITIES, LTD**., *et al.*, | ) | Civil Action 2:22-CV-1775 |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Judge Sarah D. Morrison |
| | ) | |
| **CITY OF WORTHINGTON, OHIO**, | ) | |
| | ) | |
| Defendant. | ) | Magistrate Judge Elizabeth P. Deavers |
| | ) | |

---

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

---

# EXHIBIT 05

*LIFESTYLE COMMUNITIES*

*vs.*

*CITY OF WORTHINGTON*

Deposition of

**Mikel Coulter**

October 12, 2023



614.460.5000 | www.priohio.com | pri@priohio.com

· · · · · · · · ·1

· · · · · IN THE UNITED STATES DISTRICT COURT
· · · · · · · ·SOUTHERN DISTRICT OF OHIO
· · · · · · · · · ·EASTERN DIVISION
· · · · · · ·2

· · · · · · ·3


· · · · · · ·4· ·LIFESTYLE COMMUNITIES,· · ·)
· · · · · · · · ·LTD., ET AL.,· · · · · · ·)
· · · · · · ·5· · · · · · · · · · · · · · · )
· · · · · · · · · · ·Plaintiffs,· · · · · · )
· · · · · · ·6· · · · · · · · · · · · · · · )
· · · · · · · · · · ·vs.· · · · · · · · · · )· ·Case No.
· · · · · · ·7· · · · · · · · · · · · · · · )· ·2:22-cv-1775
· · · · · · · · ·CITY OF WORTHINGTON,· · · ·)
· · · · · · ·8· ·OHIO,· · · · · · · · · · · )
· · · · · · · · · · · · · · · · · · · · · · )
· · · · · · ·9· · · · · Defendant.· · · · · )


· · · · · · 10


· · · · · · 11


· · · · · · 12· · · · · · · · · DEPOSITION


· · · · · · 13· · · · · · · · of MIKEL COULTER


· · · · · · 14


· · · · · · 15· · · · · Taken at Worthington City Hall
· · · · · · · · · · · · · · 6550 North High Street
· · · · · · 16· · · · · · · Worthington, Ohio 43085


· · · · · · 17· · · · on October 12, 2023, at 9:01 a.m.


· · · · · · 18


· · · · · · 19· · · · · Reported by: Rhonda Lawrence


· · · · · · 20


· · · · · · 21· · · · · · · · · · · -=0=-


· · · · · · 22


· · · · · · 23


· · · · · · 24

     1    APPEARANCES:

     2

              Joseph R. Miller
     3        VORYS SATER SEYMOUR AND PEASE LLP
              52 East Gay Street
     4        Columbus, Ohio 43215
              614.464.5480
     5        jrmiller@vorys.com

     6             on behalf of the Plaintiffs.

     7

              Paul J. Schumacher
     8        DICKIE McCAMEY
              600 Superior Avenue East, Suite 2330
     9        Cleveland, Ohio 44114
              216.390.1795
    10        pschumacher@dmclaw.com

    11             and
              Yazan S. Ashrawi
    12        FROST BROWN TODD
              One Columbus, Suite 2300
    13        10 West Broad Street
              Columbus, Ohio 43215
    14        614.559.7202
              yashrawi@fbtlaw.com
    15
                   on behalf of the Defendant.
    16

    17

    18

    19

    20

    21

    22

    23                    -=0=-

    24

1                              STIPULATIONS

2                    It is stipulated by and among counsel

3      for the respective parties that the deposition

4      of MIKEL COULTER, the Witness herein, called by

5      the Plaintiffs under the applicable Rules of

6      Federal Civil Court Procedure, may be taken at

7      this time by the stenographic court reporter and

8      notary public pursuant to notice; that said

9      deposition may be reduced to writing

10     stenographically by the court reporter, whose

11     notes thereafter may be transcribed outside the

12     presence of the witness; and that the proof of

13     the official character and qualification of the

14     notary is waived.

15                          -=0=-

16

17

18

19

20

21

22

23

24

1                   INDEX OF EXAMINATION

2                                           PAGE

3   BY MR. MILLER:                           5

4

5

6                   INDEX OF EXHIBITS

7   EXHIBIT          DESCRIPTION           PAGE

8     1      Land Use Plan                  16

9     25     Email chain                    47

10    54     Email chain                    26

11    55     Meeting Minutes, 6-29-15       31

12    56     Email chain                    33

13    57     Email chain                    43

14    58     Email chain                    47

15    59     Meeting Minutes, 1-14-21       50

16    60     Email chain                    58

17    61     Email chain                    64

18    62     Email chain                    77

19    63     MPC Agenda, 10-14-21           79

20

21

22

23

24

1      A.  Yes.

2      Q.  Mr. Brown says in the first email at the

3  top of the first page, in reference to

4  Mr. Robinson's email, I think it took a few

5  board and commission members offguard.

6      A.  I see that.

7      Q.  Is he correct in that statement?

8      A.  It took me offguard.  I can't answer to

9  other members.

10      Q.  Why did it take you offguard?

11      A.  We weren't expecting it.  That's not

12  normal for what -- how we do business.

13      Q.  If we look at Mr. Myers' email in the

14  middle of that page --

15      A.  I see that.

16      Q.  He says near the end of that email about

17  Mr. Robinson, he will do whatever he wants.

18          Do you see that?

19      A.  I see that.

20      Q.  Do you agree with that statement?

21          MR. ASHRAWI:  Objection to form.

22          You can answer.

23      A.  Yes.

24      Q.  Why?

1                    CERTIFICATE

2    STATE OF OHIO      :
                              SS:
3    COUNTY OF FRANKLIN :

4            I, Rhonda Lawrence, a stenographic
     court reporter and notary public in and for the
5    State of Ohio, duly commissioned and qualified,
     do hereby certify that the within-named MIKEL
6    COULTER was first duly sworn to testify to the
     truth, the whole truth, and nothing but the
7    truth in the cause aforesaid; that the testimony
     then given was taken down by me stenographically
8    in the presence of said witness, afterwards
     transcribed; that the foregoing is a true and
9    correct transcript of the testimony; that this
     deposition was taken at the time and place in
10   the foregoing caption specified.

11           I certify that I am not a relative or
     employee of any attorney or counsel employed by
12   the parties hereto and that I am not financially
     interested in the action.  I further certify
13   review of the transcript was requested.

14           In witness whereof, I have hereunto
     set my hand at Columbus, Ohio, on this 26th day
15   of October, 2023.

16

17

18

19

20
                 *Rhonda Lawrence*
21               Rhonda Lawrence
22               Notary Public, State of Ohio

23   My commission expires:  October 9, 2028

24

8952

## McTigue Open Records

From:     Brown, Lee <LBrown@ci.worthington.oh.us>
Sent:     Wed 4/15/2015 1:35 PM (GMT-00:00)
To:       Greeson, Matt <MGreeson@ci.worthington.oh.us>
Cc:
Bcc:
Subject: FW: UMCH Meeting


FYI — Comments from Mikel.

Lee

**R. Lee Brown, AICP**
Director

**City of Worthington**
**Planning & Building Department**
374 Highland Avenue
Worthington, OH 43085
Main Line: 614.431.2424
Direct Line: 614.781.3539
Fax: 614.842.6336
www.worthington.org

**From:** mikcoulter@aol.com [mailto:mikcoulter@aol.com]
**Sent:** Tuesday, April 14, 2015 9:25 PM
**To:** Brown, Lee
**Subject:** Fwd: UMCH Meeting

Lee, below is a synopsis of what David Fisher and I spoke about this evening.  I sent this to the board members of OWA. I saw where the park issue last night made the news on AOL-Local.  They quoted Bonnie.


On Apr 14, 2015, at 8:23 PM, mikcoulter@aol.com wrote:

I had a phone conversation this evening with David Fisher, the head of UMCH.  He reviewed a proposed agenda that they will be following tomorrow evening:

1.  Introduction by David Fisher and a brief history of the project over the past several years.
2.  Discussion of the value of the project they are hoping to achieve for all of Worthington
3.  David will then turn the meeting over to the CEO of Life Style who will talk about a variety of projects that they have done around the country.
4.  Chase Miller will review preliminary design boards and talk about the development plan.
5.  They will then break it down into sub areas with some architectural details to include:
    a.  Retail
    b.  Apartments
    c.  Medical Building (s)
    d.  For sale to own cottages, homes, townhomes
6.  David will then do a wrap up.



EXHIBIT
54

What he proposes they do is a series of these meetings (3-4), working on changes to the plans based on what they hear from all of us, the city and what their traffic/utility/and financial consultants tell them.  They plan on proposing the project as a PUD since it makes it easier to reach an understanding of what the city will accept and approve.  It will also allow them to obtain commitments from the medical entities they are hoping to attract to the project.  I do not expect that we will make 100% of everyone in Worthington happy.  It will be a negotiation process with give and take on both sides.  I made it very clear to him that we will require the highest level of quality not only in terms of the design of the site attributes but the materials used and how it bridges the architectural gap between the Historic District and the other parts of Worthington.

The meeting will be at 6:30 pm, city hall, 2nd floor training room.  I hope all of you can be there to hear what they have to say so we can put together a response.  David also reached out to Matt Greeson and Lee Brown to tell them what he was going.  David was also going to contact Mike Bates with WARD and have a similar conversation with him before tomorrow night.

Mikel



MINUTES OF THE SPECIAL MEETING
WORTHINGTON ARCHITECTURAL REVIEW BOARD
WORTHINGTON MUNICIPAL PLANNING COMMISSION
June 29, 2015

The special meeting of the Worthington Architectural Review Board and the Worthington Municipal Planning Commission was called to order at 6:52 p.m. with the following members present: Richard Hunter, Chair; Kathy Holcombe, Secretary; Mikel Coulter; Amy Lloyd; and Edwin Hofmann. Also present were: Scott Myers, Worthington City Council Representative for the Municipal Planning Commission; Lee Brown, Director of Planning & Building; Lynda Bitar, Planning Coordinator and Clerk of the Municipal Planning Commission; and Melissa Cohan, Paralegal. James Sauer, Vice Chair; and Thomas Reis were absent.

Mr. Hunter called the meeting to order at 6:52 p.m., and all present recited the Pledge of Allegiance. Mr. Hunter explained that this evening's event was just an informational meeting only concerning the United Methodist Children's Home (UMCH) property and the preliminary concept by the developer, Lifestyle Communities. He introduced the guest speaker David Fisher, who is the founding principal of Kephart Fisher LLC, who is representing their client Lifestyle Communities.

Mr. Fisher said that he is a past Board member and past Chair for the United Methodist Children's Home, and he currently serves on the Board of Wesley Family Services located in Worthington, Ohio. Mr. Fisher explained that there are not any back room deals and that is not how they do business. He introduced other members of the Lifestyle Communities team that he brought with him: Mr. Michael DeAscentis, the founder and chairman of Lifestyle Communities, Mr. Chase Miller, who is in charge of land planning, and design, Mr. Anthony Lococo, also part of the land planning and design team, and Ms. Maria Gargrave, who is in house counsel for Lifestyle Communities.

Mr. Fisher said that they have a special website set up so people can view the presentation online. Updates will also be posted on the website (www.umchdevelopment.com or as an email feedback@umchdevelopment.com). The City of Worthington also has a link on their website. Mr. Fisher said that they will continue to keep an open dialogue while working with the Board members, city administration and the public.

Mr. Fisher said that he was glad to see a standing room only crowd. The number of people from the community that are in attendance, shows how important this project is to you. He said this project is also important to UMCH and Lifestyle Communities, so their hope is to be able to work together to find some common ground, and find a way to move forward together on this very important and strategic piece of property in the City of Worthington.

EXHIBIT

SS

PENGAD 800-631-6989

Mr. Fisher outlined what he wanted to accomplish at the meeting. He wanted to demonstrate their continued efforts to have a dialogue with the city administration, the Municipal Planning Commission and Architectural Review Board, and with the citizens of Worthington. Mr. Fisher said that he also wanted to provide some background and history of the United Methodist Children's Home.

The United Methodist Children's Home has owned land in this area for over one hundred years. The land extended from Dairy Queen to Shoedinger's on the west side of High Street and went all the way to the river. Back in those days the Children's Home was an orphanage that took care of children from broken homes and their mission was to teach the children how to be farmers or housewives. The boys would be sent out in the morning with a hoe and make a row that went all the way down to the river. They would jump in the river for a swim, and then make another row on their way back up to the house. He said that UMCH's mission has changed a little over the years but their main focus is primarily to serve children in need. UMCH has been a responsible member of the Worthington Community for over one hundred years, they are today, and they will remain a responsible member of the community in the future. They are not just selling off the land to take the money and run. Their sole member is the United Methodist Church, the west Ohio Conference, who has their headquarters at that site, and will continue to remain to have their headquarters there. UMCH is very concerned about how this site is going to be developed, and how the Methodist Church is treated in that process with respect to the church's headquarters remaining on that site.

Mr. Fisher said that when he joined the UMCH Board about ten years ago, this land was viewed as Holy ground, never to be sold by the Children's Home. At that time, UMCH had a very active residential treatment program. UMCH has owned that land for over a hundred years, and people could not have imagined that UMCH would ever dispose of the land, but things change. He said that the local community was part of that change. Many of the nearby residents were troubled by the events that occurred a few years ago when some of the children in the treatment program got out into the nearby neighborhood and caused some personal injury and harm. He said UMCH completely understood those concerns, but as a social service agency, they had to live by the rules, and could not lock the children indoors. Some of the residents spoke up in the community and some called the state social service agency and said that these problems cannot continue. There was a huge community outcry, and when that occurred, UMCH conceded to those demands, they did not challenge that decision, they accepted the will of the community, and decided that they would no longer serve as a residential treatment facility. That decision put a series of events in motion because UMCH no longer needed that acreage. Children were no longer being served, and the buildings are very costly to maintain. Something had to change. In 2008, UMCH consulted with some developers, and were working on a project for about eight months, but because of the downturn in the economy the developer decided they did not want to proceed. Mr. Fisher said that they went back to the drawing board and that is when more consultants were hired to come up ideas. Nothing happened until UMCH was approached by Continental Realty and they said that they wanted to buy the land. Mr. Fisher said that UMCH held a public meeting such as this one, and after that meeting, Mr. Cass decided that he did not want to proceed with building a Giant Eagle on this site. He said it was an open process throughout and this will be an open process this time.

Worthington 003469

City officials asked UMCH to put things on hold while they proceeded with a community wide process and come up with a comprehensive plan designed only for the UMCH property to determine how your property should develop. UMCH officials said okay, and they went off the grid for a few years while the city went through this public process to come up with a comprehensive plan. He said that he understood that there are a few people in the room that do not agree with the comprehensive plan, but all groups are working together to come up with a plan. Several developers had contacted UMCH during this process while they were asked to stand down while the community went through this process. Around the time this comprehensive plan was adopted, Lifestyle Communities contacted them to say they did not just want to be their developer, they want to own the property, and they had some exciting commercial medical users that they would like to bring to the City of Worthington. He said that they all share common ground, and all parties want what is best for Worthington. This ground needs to be developed in a manner that will strengthen the social fabric and the economic base of the City of Worthington while preserving its unique history and culture. Both UMCH and Lifestyle Communities want to be respectful of the community's views and opinions and they hope to receive the same in return while working through this process together.

Mr. Fisher said that he wanted to touch on economics while he had the podium. How this property is developed will have a significant impact on the tax base for the City of Worthington and its schools. This is property that has not seen much tax paid on it. Depending on how this property is developed, it can either put a lot of children in the schools, or it may not put a lot of children in the schools. The less children that go in the schools, and the more tax dollars to the schools that is a win-win situation for everybody. If this property is developed as it is proposed, there will be a significant increase in the amount of income tax dollars to the City of Worthington from high income individuals that will be working in Worthington on that site in the medical profession that will add stability and longevity to the current tax structure in the City of Worthington.

Mr. Fisher said that he wants people to understand, that while he is wearing his UMCH hat, he has to talk about where UMCH is going from here. This project has had an incredible impact on their mission as a social service agency. This is just a real estate deal. He wants people to understand that when newspaper articles come out negative about the UMCH site and all these terrible things that are about to occur, it has an impact on the families that they serve and an impact on the social service network that works with them and refers children to them. They do not see a difference between a real estate deal in Worthington, Ohio and the social services that UMCH provides. He asked the audience to please keep that in mind when they choose to make public comments in newspapers. UMCH is very proud of their mission and accomplishments. Every dollar that comes out of this sale will go back into their mission of helping hurting children and their families and that is not going to change, and he asked everyone to keep that in mind. There are no timelines at the moment. UMCH plans to continue working with everyone for a while to determine what the real issues are and what the best way is to develop this property before an application is filed and that process begins.

Mr. Fisher introduced Mr. Chase Miller, the head of land development for Lifestyle Communities (LC), who is going to give a presentation on the exact plan. Mr. Miller thanked everyone for their

Worthington 003470

time and for the opportunity to be a part of their community. The plan he presented consisted of a mix use, traditional or village style, walkable plan. Mr. Miller said he was going to give the audience a little bit of background information on LC, the developer, the Worthington Comprehensive Plan, and the plan that LC is proposing which is preliminary in nature.

Mr. Miller said that he first wanted to discuss some background information about LC. LC was started over seventeen years ago in central Ohio by Michael DeAscentis, Sr. & Jr., where they are still headquartered. Since that time they have developed over 10,000 multi-family and single family homes, both for sale and for rent. They are currently developing and operating a portfolio of over 5,000 multi-family units in three states and four markets. They have locations in Columbus, Louisville, Kentucky and Nashville, Tennessee. Mr. Miller said that LC is a build to own developer which means they do not build communities and walk away, they own and operate their properties on a long term basis.

LC has its own in-house development department, construction services, an in-house property management company, The Goat restaurants and fitness facilities. Their success has been largely driven by their development of townhouse style condominiums that were unique to the market at that time in 1998. They are proud to say that they survived the recession with their core values intact and employee over three hundred people. They were named by Columbus Business First as one of the Top 10 places to work, an honor that they have received for three consecutive years. Mr. Miller said they are excited about what they are planning today are mixed use walkable developments that include a full spectrum of housing like the plan that they are proposing tonight.

Mr. Miller said that empty nester housing market is still underdeveloped. Children have left home and homeowners would like to down size. Location is more important than ever and people want to live and invest in integrated communities. Their mission as a developer is to meet those needs with mixed use communities that deliver high quality housing and a high quality way of living. LC believes that the UMCH site is the perfect opportunity for this project.

Mr. Miller continued to discuss the background of the site, and that ten pages were added to the Comprehensive Plan. He reviewed three of the seven goals that are outlined in the plan, and discussed how they have hired professional design consultants to help them achieve those specific goals. Mr. Miller said that this presentation will be available after this meeting on their website.

Mr. Miller began showing the actual plan, and said he would give more detailed information while going forward with the presentation. There are 571 residential units in total shown on the plan. There is also a medical office, mixed use retail and some additional office space, which makes up an urban style of development which will attract young professionals and empty nesters. Mr. Miller also discussed where the three traffic signals would be located, where the connection to Evening Street will be and traffic patterns in great detail in relation to connectivity.

Mr. Miller went on to discuss the breakdown the sight into four zones which is called for in the comprehensive plan. The single family homes near the Worthington Estates edge would be custom built by different builders, subject to the Architectural Review Board, and part of a homeowners association. LC will only be developing the land for those homes, and the lots would sell for between $150,000 to $200,000 each. LC will specify to the custom builders that the homes are to

Worthington 003471

be built on 1/3 to 1/5 acre lots and with 1 ½ to 2 ½ stories. The completed value of the homes will be between $750,000 to $950,000 dollars. Mr. Miller presented a rendering of the area to show to the audience.

Mr. Miller next discussed the transition zone of the property, which is in the middle of the development. He said that the comprehensive plan calls for high density in the area with 8 to 14 units per acre, and they are planning for the lower number of units in that area, which would amount to approximately 250 homes in that area. The cottage style of homes would be between 1 ½ and 2 ½ stories, and there would be a set number of floor plans to choose from. One third of those plans would be targeted for empty nesters. These homes will be built as soon as they are purchased they will not be built out ahead of time. He also described the town homes and those would be 2 ½ to 3 ½ stories high.

Mr. Miller reviewed the NDRC report, which was developed with the help of the Mid-Ohio Regional Planning Commission (MORPC), which discussed metropolitan area trends. What this plan discussed was the shift in housing demands. The families of the nineties that wanted larger single family homes and accounted for about 78% of that market, will only make up about 22% of that market between now and 2030. There is a trend for more empty nester housing.

The High Street zone was discussed next, which would consist of 350 apartments and a hand full of locations for office space. The headquarters for UMCH church offices would also be located in this area, with 20,000 to 30,000 sq. ft. The apartments will be on the higher end of the price range, anywhere from $1,100 to $1,600 dollars per month.

The next slides depicted an area inside Walt Disney World, which Mr. Miller said was the happiest place on earth. What people do not realize is that the main buildings in Disney are just front facades with mechanicals hidden back behind where people cannot see them, which would be similar to the High Street development. The parking garages would be hidden behind the structures that would be built along High Street. Mr. Miller reviewed the commercial guidelines from the comprehensive plan. He also discussed the amenities package that would be available such as a fitness facility and a restaurant called The Goat. The fitness studio will have different types of group fitness classes such as spinning and Pilates.

Mr. Miller also discussed the four park areas that would be located throughout the site. He mentioned a non-profit organization that works on projects for public spaces and they have concluded that in order to do place making, there are four qualities that great parks must have. Parks must be accessible, people are engaged in activities there, the place is comfortable and has a good image, and it's a sociable place, where people come together and visit. All of these components will be available in their park spaces.   He further discussed the importance of walkability within the development. Mr. Miller discussed a book called "Walkable City", written by Jeff Speck, who describes his theory of walkability. Walkable cities are much more sustainable, more successful economically, and better for us in terms of our health. In order for walkability to exist there are four key components that must exist. The walk must be useful, safe, comfortable and interesting. Mr. Miller described how each component fit into their project and demonstrated examples. Mr. Miller thanked everyone for their time and listening to the presentation.

Worthington 003472

Mr. Hunter explained that the question and comment portion of the meeting would be next.

Ms. Beth Mitchell of 58 Larrimer Ave., Worthington, Ohio. I am representing the WARD planning group who greatly appreciates UMCH, LC, and the City for hosting this meeting to share potential development plans of the UMCH property. WARD is a citizens group that was formed in 2012. Their mission statement identifies their goal as to ensure that the development of the UMCH property is done responsibly, with the consideration of benefits to the citizens. Over the past three years, WARD has been actively engaged in the process of the development of the property. WARD understands the need of UMCH to sell the property, and WARD believes that there is an obligation to the community regarding the development of the property. WARD's request is that the developer and UMCH consider what is developed and how it will affect the community long term even after UMCH and the developer are less engaged than they are today. They continue to believe the importance of open communication between the citizens of Worthington, UMCH, LC, and the City. This is a legacy piece of property in the main section of Worthington, forty-two acres which is mostly green space. Once asphalt or concrete is poured there is no turning back. WARD has previously expressed concern over the lack of proposed green space, the housing density, and the traffic to be generated by the proposed streets. The City previously hired MKSK as a consultant for the development and they stated that a growing and surviving city needs to attract young professionals who want to live in rental properties instead of owning a home. Therefore, there is a believed demand for apartments, which is hot right now, as witnessed by all of the apartment projects popping up all over Columbus, but what about long term. We believe that there are a lot of young professionals or millennials, those born after 1983, who strongly disagree that millennials want to live in apartments in Worthington. Columbus Dispatch, on June 7th, 2015, referenced a new study that indicated 82% of adult millennials said that it is important to have an opportunity to own a home with a backyard. WARD believes a re-evaluation of what is needed for Worthington is necessary, does Worthington really need 350 new apartments. There is a lack of housing in Worthington for empty nesters who want to down size. A WARD survey indicated that most Worthington residents, 86%, were in favor of green space and other types of public uses. Citizens have spoken at City Council meetings and many residents have commented on WARD's Facebook page to voice their desire for more green space. WARD does not believe that it is appropriate for Tucker Creek acreage to be included in the count of green space on the UMCH property. It is very misleading to include that land as part of the green space. WARD is in favor of there being a larger amount of green space. If anyone would like more information about WARD please check out our website at www.wardworthington.org.

Ms. Susie Kneedler of 263 Weydon Rd., Worthington, Ohio. I would like to echo Ms. Mitchell's comments and would like to see more consultations with experts in urban forestry, and experts that have designed the parks in London, England, since LC spoke about examples of the parks in London, and how to have low density, more greenery, and one story senior housing. I believe that this will change Worthington forever and the city will not be able to handle the increased amount of traffic, smog, noise and pollution. I believe that more research is needed.

Mr. Benjamin Coifman of 625 Seabury Dr., Worthington, Ohio. This development will increase Worthington's population by 10% and increase the number of voting age adults by even more than

Worthington 003473

that. The 571 housing units would increase the number of houses in Worthington by even more than 10%. The LC development will consist of 60% rental units compared to Worthington's current housing stock which is under 20%. The density of the proposed rental units would be about ten times the current average of Worthington.

I am concerned that LC would only be developing the higher density units while the rest of the structures would be built by a third party developer. I am also concerned that the price of the new housing units would be double or triple the amount of the current homes in nearby neighborhoods, and if those housing units did not sell well, would LC then convert that area to high density rental units. Worthington has reason to be cautious with developers because there are several recent examples of speculated real estate developments that have fallen far short of the promise. Some of the planned condominiums became rental units and in another case only half of the buildings were actually built leaving prime real estate sitting vacant. These problems are not related to LC, they did a good job of maximizing the number of units according to the comprehensive plan. I believe the comprehensive plan is the problem, not the developer. I am also concerned about the amount of traffic that will be generated and spoke about the example of the Dublin-Granville Road area and how congested the area is near St. Rt. 315. How can a city attract young professionals with an area so congested with traffic? The UMCH property is not right for large developers. In LC response to WARD, they said that they would need to build a minimum of 570 units for the development to be viable. At a lower density, this area would be attractive to smaller developers offering fewer houses at a time. In the comments from LC responses to WARD they said that the values of the 21 1/3 acre undeveloped lots would sell for between $150,000 to $250,000 dollars apiece. If that developer cannot offer the type of development that the community wants then we need to figure out what kind of incentives are needed to attract the right developers to deliver what is appropriate for Worthington. I strongly suggest maintaining the existing ratio of rental to owner housing which is about 20%. One thing a large developer can bring is a large infrastructure, but that does not have to come from the developer. UMCH could pursue a special improvement district or similar that Worthington could use the additional income to pay for the roads and infrastructure as portions of the site are developed. Instead of having an abrupt change in the retail and office density the plan should provide retail and commercial space along High Street at a high density. The success of the retail development should not be dependent on having 550 high density housing units within a three block area.

Ms. Kathy Hamer of 160 Longfellow Ave., Worthington, Ohio. I would like to echo my concerns about the high density and number of apartments. I am also concerned about the three or four story structures that would be located near Larrimer Ave. There is only one building near Caren Ave. that is three stories high. I feel that this area will be overbuilt and too large. I do like the plan for community space and would like to see more of that, such as something similar to Schiller Park in German Village that would promote good weather outdoor activities.

Ms. Ellen Scherer of 112 E. New England Ave., Worthington, Ohio. I would like to echo the comments of the previous speakers.

Mr. Roger Beck of 6695 Hayhurst St., Worthington, Ohio. I would like to echo the comments of the previous speakers. I also want to thank the WARD organization for their information. I have a spoiler alert for Mr. Miller of LC though, Worthington is already a walkable community. I grew

Worthington 003474

up in Worthington and graduated from Worthington Schools. I was also a teacher in the district for twenty-four out of thirty six years, and still live in Worthington. I have a comment about the discussion about Easton Town Center being a great place to relax, Worthington already has that too at the Graeter Ice Cream Store in downtown Worthington. We do not need Disney like designs in the neighborhood. I feel that the density is too high, and the amount of traffic that would be generated would be too heavy. I understand that the city gets its money from income tax, but why are so many apartments being built, and such a small amount of commercial and office space. I've also heard that apartments and single family homes do not pay their way through the schools. I am very concerned about what will happen to the schools. What happens when people do not want to pay more taxes? How much money does UMCH want for the land? I want to know if there is a magic number of how much that land would cost, and if would people be willing to pay for the land through a millage.

Sean Demaree of 313 Highland Ave., Worthington, Ohio. I am also concerned about the density and the amount of traffic. Building 350 apartments would make this more of a transient community where people move in and out year after year, and why would Worthington want that kind of population that doesn't care about establishing roots? I believe an increase of that type of population will increase the crime rate. If I paid a million dollars for a house I definitely would not want to be looking at an apartment building. I also want to make a point about LC. LC engages in a practice called sub metering. They install their own electric meters and they allow no natural gas, so it is an all-electric community. Then, they take an eighty dollar electric bill and make it a one hundred and sixty dollar electric bill, which is perfectly legal in the state of Ohio, but that is an underhanded and unfair practice. I am also concerned about losing the soccer field, and would like to see a green space that includes a soccer field.

Ms. Kay Keller of 670 Morning St., Worthington, Ohio. I would like to support and applaud that speakers that have spoken already. I agree the density of the number of housing units is too high. Why is the least favorite of the different types of housing units (apartments) the greatest percentage of this development? LC says that they may or may not have estate style housing and maybe a third party would build those, but what if they do not build those houses? A traffic study is not necessary to know how congested traffic will be with additional housing units. The traffic is already congested. How will this project affect future development and re-development along North High Street? What will the impact of this development have on the schools? How many more teachers will be needed? Will the schools have to redistrict to accommodate the new students? This developer has already built several kinds of these apartments all over Columbus, so where is the uniqueness for Worthington? The most important aspects of the new urbanism are the diversity, and the community interaction that it is designed to encourage and in differentiating places that we care so much about so that we don't feel that it is like every other place. I believe that this will set the tone for future development. I seriously question if this is in Worthington's best interest to have this site developed on such a large scale. I feel that this is designed to maximize the value of the land for the seller and to maximize the profit for the developer. What will this project do for the quality of life in Worthington? Worthington is a two hundred year old town that does not need a Disney like Main Street.

Worthington 003475

Mr. Tom Carter, of 2178 Castle Crest Dr., Worthington, Ohio. There are some facts that people need to face. Columbus is growing and is expecting the population to grow by another half million people by the year 2050. There is a trend of people wanting to live inside the outer belt loop. People want to live in denser, walkable communities. I believe that this developer has come up with a pretty good overall plan. Good planning takes time, and quality materials will age well. There is not going to be a park here unless people want to pony up the money like Mr. Beck suggested, so there is going to be development in this location. Worthington is going to see density, this is just a fact of life. The closer you live to downtown, the more you are going to be subject to density. It is important to work with the developer to see if we can come up with a mix of uses and solutions that can work. They have a talented group of world class designers, the developer is local, and UMCH has been here for over one hundred years. This is a great team they have put together. Let's take the time and effort and go through the process without being cynical, and make this the best it can be. Density will be coming to Worthington at some point in time and that is called progress. This developer has a vested interested in this property so let's give this a shot, and see what this developer can do to meet everyone's needs.

Ms. Paula Ryan, of 1044 Firth Ave., Worthington, Ohio. I am a 57 year resident of Worthington, and I have driven past the UMCH property almost every day of my life. I agree with what Mr. Carter said, there is going to be development here, and there needs to be development here. We need to work with whoever the developer is to make it the right thing. I do question the density, but believes the plan is adjustable. This is progress for the City of Worthington. For me personally, I have two grown children that I would like to see live here. My son is 24 years old, and works as a city planner. He would like to live in a walkable community. I look at this like a step to the future.

Mr. Doug Foust, 276 Highgate Ave., Worthington, Ohio. I am also a lifelong resident of Worthington. Commercial property along High Street is not a bad thing. I have been scratching my head over the UMCH project process over the past couple of years and I cannot reconcile why there is this disconnect between what so many neighbors have said and this succession of plans, conceptual or otherwise, of what it looks like. While several of those in city management seem incredulous when I say this, but there is a great sense on the part of so many that residents are not being heard. It finally hit me that the problem is the comprehensive plan. The plan has several basic fundamental flaws.

First, the plan embraces the notion that more single family housing is a bad thing, and that there is little or no room for it, and that is to be avoided. The plan states that only high density housing is logical. Single family homes are what attracted people to Worthington in the first place. Worthington cannot compete with the Short North. Worthington would like to stay as it is. Secondly, the plan is built around some demographic data. I found the sources for the pie charts on the plan which shows income, or one two or three residents, and he has come to realize that that data was edited and fails to present the complete picture. Specifically the plan refers repeatedly to underserved twenty something young professionals, ages 21 to 34, who are already the largest group in 43085. Third and finally, despite the assertions of the city manager and others, this is not a consensus document. The consensus means a majority, and you cannot call it a consensus until you run it past the residents at large. The UMCH speaker quoted that there has to be some trust

Worthington 003476

on the part of city management, but that trust has to be earned. Before entertaining this or any other plan you need to reevaluate portions of the comprehensive plan in the face of public input.

Ms. Wanda Davis, 6635 Masefield St., Worthington, Ohio. The definition of progress includes maybe not doing something to the land. I understand that the property development needs to be seen from not only from a financial point of view but from a holistic point of view. The development should not adversely impact the environment land, air, water, or people who live there presently. If you speak to FEMA, or if you read anything about the environment itself, the land, and how the particular property works, she would like to read a short response to that: "Development studies with FEMA will tell you that 90% of the rain water, ice and snow will create added runoff. Add that to the low permeability of the clay soil and glacial terrain makeup that slows ground water absorption rates, capacity is already a water drainage issue at the closest neighborhood. Added volume of water combined with current levels will also create further erosion in the neighborhood gullies, and along the Olentangy River banks due to new water velocity levels. It is unknown whether the existing culverts are large enough in diameter to accommodate more runoff. Consider the herbicides, pesticides, pathogens and other toxins, gas, oil, etc., road salt and debris that will be picked up and enter the ground water and street drains that exhaust into the Olentangy. This water fills our watershed. Nitrates in nearby watersheds are already an alarming red flag."

People have already spoken about the traffic on Evening Street, but it is very important to note that Evening Street School and the entrance to the high school is along that street and I think that there is a risk of danger to our children in this area. Heavier car and truck traffic on High and these streets would also impact and perhaps interfere with police, fire, municipal and nursing businesses. Revenue is necessary but the primary development should be to create a central park with building development to be determined. There should be no housing construction. The younger family generation faces the heaviest burden and they do not have the advantages we had of a rising economy, which is no longer. This group is straddled with national debt that earlier generations have created, a difficult employment market and ever increasing global impacts on our livelihoods. For ethical reasons, we should develop this central piece of land to help them raise their families and give them a place of well-being and healthy development and educational opportunities for their children, but a place benefiting and used by the entire community as well. Plans like this would not only avert an environmental disaster, vehicle frustrations at the crisis created by people in a high density situations and management problems but if this is a legacy property, has been said, then creating a space that carries on the earlier work of caring about each other should continue on that space. The Worthington City Council should investigate buying the property, they should consult a municipal financial advisor or seek other models and find an underwriter for Municipal long term bonds.

Mrs. Jo Rodgers, of 575 Evening St., Worthington, Ohio. I have been involved in the whole process over the past two years and the result in the chosen direction regarding the UMCH property as it is currently laid out in the comprehensive plan. It was an exhaustive process. It was fully open to the public, broadly publicized, written about in the Worthington News, published on the city's website, and communicated to WARD members by the city and more broadly by the WARD and city email list. This involved public meetings, public input, public tours, and then more

Worthington 003477

meetings and more input. Once done our best hope was that we would find a developer who would buy into our vision for the property, and from what I see, we have one. I am grateful and thrilled that there was someone out there that had the same vision for what the property could be that we the city itself had. I applaud the efforts that our plans are taken to heart. The plan isn't perfect but what I have seen so far this developer is willing to work with us. I share the concerns of many that the traffic will be more than just problematic, but I am encouraged that two separate studies are being done to examine the issue. The results of the studies will be the very best guide in how we move forward. Beyond saying that there will be more traffic, it is certainly a given, but I am content to wait for that result before making an uneducated guess on an overall impact. Tied to the traffic issue is density. If as many are speculating traffic issues do loom with the proposed density then ways to reduce proposed density will need to be found. There will always be those that are in disagreement with development but however, the comprehensive plan is our guidebook, built by our input to guide us as we change and grow. I would encourage the Board, Commission and Council to keep this guidebook firmly in mind as this process moves forward. We spent a great deal of time and energy creating our plan and now we are at the implementation stage. I encourage the Board and Commission to stick with the plan and work to make the end product the best it can be.

Mr. William Brown, of 60 W. North St., Worthington, Ohio. Listening to the first two speakers reminded me about a Mark Twain story about going to church. The preacher started off really well and Mark thought he was going to put twenty-five dollars on the plate and the preacher kept going so he thought he would cut that down a little bit. The preacher kept on going so he decided to knock the amount down a little more to five dollars. When the plate finally came around he took five dollars off the plate. All I know is what I read in the papers. This one paragraph in a particular mailing of LC includes a large portion that needs zoning changes in order to construct the apartments. I have heard nothing tonight about what those zoning changes are and that is just a knit picking thing. I second the person that asked would we be willing to tax ourselves to own this land. I believe paying what I pay on North Street that I could stand paying a little more taxes if I liked what they were going for and I suspect a lot of other people would feel the same way.

Ms. Susan Jones, of 6506 Masefield St., Worthington, Ohio. I went to a couple of those comprehensive plan meetings and I would just like to say that I never heard anybody say once that they a three story apartment buildings or homes and cottage homes that could be 2 ½ to 3 stories. I just wanted to be on record that I object to that height and I am also not happy with the building so close up to the street. This is a historic town not an urban setting.

Mr. Chet Ridenour, of 398 Highgate Ave., Worthington, Ohio. First of all I want to give a big thank you to everybody here who is coming to express their opinion. We need to hear everybody's opinion, even Mr. Carter's. In an effort not to repeat everybody's position, I would like say whatever plan you decide on, I think a lot of people in the community have felt a little bit sucker punched by the Planning & Zoning Committee in that I have referred to the CF Bank that was originally approved for a one story, 4000 sq. ft. building. It is actually a two story, 8000 sq. ft. building. Also the Hoying development at the mall was originally supposed to be a 4 story residential facility and now is higher than that because Mr. Hoying came back and said that in order to make this economically viable we need a variance for two more stories for commercial.

Worthington 003478

My concern is that what is LC comes in here and go, whatever plan is approved, are you guys going to go into a much smaller gathering and say, oh yeah, we will approve a zoning ordinance instead of 350 apartments, we will now have 550 apartments to make it economically viable. I would just ask the planning and zoning whatever they approve will they tell us what you are approving, and make that the final plan. Don't put a variance in there so that we are getting something in the end that we are not expecting.

Mr. Justin Taylor, of 6510 Evening St., Worthington, Ohio. This project is literally in my backyard. I am like the new kid on the block, I have only lived in Worthington for 11 years. My kids go to Evening Street Elementary so we are hear for the long haul and I plan to die in that house. People have already made a lot of great points. I think I am going to go against the flow a little bit, but I think the comprehensive plan is actually directionally correct. There are concerns, I think the guardrails may be a little too wide, and density is a proxy for all of the things we worry about. Do we really need million dollar homes backing up to $200,000 homes? What do you think about that? Think about the Giant Eagle, we are getting there. I just want to make one other point here, someone said that consensus is about majority, but consensus is also about the veto. This process is really important and so is the input. It is important to hold our city leaders accountable to managing this plan. Nobody is going to get what they draw up at home. Consensus is not about getting everything we want and please keep that in mind.

Mr. Adam Gibson, 306 Weydon Rd., Worthington, Ohio. I have talked with Matt Greeson and Doug Foust and I genuinely believe that there are no back room deals. I do believe something may be greasing the axel to make the needle lean to one side to either benefit the developer or to city income tax revenue. I am looking at this from a real estate perspective. I am an agent with Keller Williams. I look at this by the price point factor of the estate homes and the availability of the estate homes. So far this year Worthington has seen 380 homes come to market and are closing or pending. Currently now there are 30 active homes on the market. In Worthington Corporation limit proper, that number was only about 10 back in March. We have seen the effect of look what the Jones' got for their house, I'm going to hit the market, but what it also tells us is that there are 25 homes sitting on the market that are not meeting the needs of residents out looking for homes. An interesting point about that is that the price median is $320,000 dollars, the average is $383,000 dollars, so as we move the needle towards a million dollar mark I think you are pushing a price point that I don't think can be supported by a community like this. It can't be supporting old Worthington either. We don't sell million dollar houses in Worthington yet, but we are moving there. National Association of Realtors just published a study from 2011 to 2013, Worthington has the benefit of being the 3rd rated highest appreciating neighborhood in all of central Ohio behind Granville, and Galena. Look what Upper Arlington does, look what New Albany does, we are inside the 270 loop and we have seen an appreciation over that two year period of about $12,000 dollars. Whoever is doing the studies can make the numbers look as good as they want. Depending what side of the table I am on am I going to be advantageous to my seller or advantageous to my buyer, and I don't necessarily have to be 100%. The last point I was thinking about looking at the renderings, there is about 100 feet from the tree line to the next dwelling. There is a strong fabric in the Worthingway neighborhood, and people may call this the Worthington Estates edge, but see a tremendous amount of demand, and I don't want to see lots sit there. $150,000 to $250,000 for the lots is double the market value. I got into the process a

Worthington 003479

little bit late. I did not see this meeting publicized in the Worthington News this week, I did not see the meeting publicized in Sunday edition of the Dispatch. With full honest communication we can revisit a plan of this nature after we really start studying the numbers and the traffic impact studies but I would like to continue the conversations forward.

Mr. Jim Cheney, of 579 Blandford Dr., Worthington, Ohio. I have been a resident for 45 years, and I wanted to give you an idea of what brought me to Worthington. What brought me to Worthington years and year ago was that I was doing a survey to find a new home for our business. I went all up and down the east coast, back and forth from the Chicago area, and somebody told me that there was a place for sale in Worthington, Ohio. I said, you have got to be kidding me General Electric is a pretty big corporation so we took a very serious look at this community. We like the plant, and the plant is still here employing many people, and I am still here too because I like it. Forty-two acres is not going to make a new town out of this place, but it can do something about making this a lesser town out of this place. The plan with all of the apartments tends to degrade what I consider Worthington to be. As we look at this again, I think that the developer has done a very good job of planning but there is almost too much that they are trying to put into that amount of acreage. One thing that I object to more than anything is moving the apartments closer to the center of town. I was not too happy when they built the apartments near the mall, I think they look terrible, but that is alright because people like them. I also do not think that what we do with this area is going to change the pie charts on the demographics. I'd like to see us keep thinking about the project and make sure we do something good.

Mr. Nathan Palmer, of 410 Pittsfield Dr., Worthington, Ohio. I have lived in Worthington for six years with my wife and two sons. My seven year old will be a first grader at Wilson Hill Elementary School and I am extremely concerned about density. This plan will put a serious burden on our schools. I am also a high school social studies teacher and I know that a development like this is going to place a burden on our schools. One of the things that makes Worthington great is that we have a neighborhood school system. My kids can walk to their school, but what I was recently concerned about was a quote from Vickie Gnezda, who is the Communications Director for Worthington Schools, and she was quoted saying, in regards to this development and where these kids would go to school, "While we currently have space in the elementary schools throughout the district we cannot guarantee student placement in the nearest school. I think that is a concern. I know you can't always get your kids into the nearest school but this shows that these kids, who I believe are currently slated to go to Evening Street Elementary, according to the district's boundary map, the school district understands that that might not happen. So, where are those kids going to go? There has apparently been some preliminary discussion about sending these kids to Wilson Hill Elementary School. I do not know how we are going to accommodate that level of students. I don't think all of the people who move into this area are going to be simply young professionals without children or people who are empty nesters. We have a great school system, and people like myself moved into this community for the schools. I can't envision how we are going to accommodate and adequately support the students that will go to those schools. The other concern that I have is that many of us feel that the leaders that we have elected are not really voicing what we are concerned about. We are concerned about density and we are concerned that this is going to be too much. I would recommend that we revisit this comprehensive plan. Maybe we need a new survey. I know the

Worthington 003480

City had some type of survey that I filled out online but there was no quantitative data with that survey. It was just qualitative where you could just comment on different things that you liked and didn't like about particular plans. Maybe we need to do something like WARD did. That was the most comprehensive survey that I think has been done so far. In that particular survey there were 750 residents that responded. Over eighty percent of those that responded were opposed to the three story apartments and density proposed by LC. Maybe we need a third party to come in and do a new study and find out what parts of this plan, or something like it, that people are opposed to or in support of.

Ms. Barbara Patrick, of 334 Crandall Dr., Worthington, Ohio. I just had one thing to say. I think we should use our intellect to think things through, and in my own personal opinion, you have to trust your gut. I think what bothers me is the word progress. What defines progress, and progress is inevitable. It is coming, but we should all agree as to what that means. There is something disturbing about it to me that hasn't been answered.

Ms. Angela Strous, of 58 E. North St., Worthington, Ohio. I can't tell you the number of times that I had conversations with other people about getting a single family house in Worthington. I recently received a letter asking me if I wanted to sell my house, and they don't even know me. I also have a friend that canvassed the area around Worthingway and Worthington Estates and gave every person on that street a letter asking them if they would like to sell their home. Recently, I have friends on W. North Street who purchased a house next to a home that was for sale and sold the same day that it went on the market. They were talking to the person next door and that person said, I'm interested in selling. So, I think this is a good first step, but we definitely need more single family homes.

Mrs. Suzanne Seals, of 123 E. New England Ave., Worthington, Ohio. I would just like to say that many of us moved to Worthington because of its history and historic buildings to provide us with a sense of place. We don't have to create an urban village to feel like we have a sense of place. I have begun to wonder if the problem may be that this is the city's vision and not the resident's vision. Mr. Fisher mentioned that he is very frustrated about the process, as is LC. I feel that the residents are frustrated with this process, and I would like to make a few comments about the process. I am recalling the 2013 envisioning process of UMCH that done by MKSK and this does not look very different to me, from that, not considerably different, in spite of the fact that we have been saying there is too much density, too little green space, traffic, safety, and congestion and we are concerned about the schools. All of these concerns compromise the quality of life for those of us that are living here right now, and that doesn't mention the fact that our taxes will go up too to provide services for these residences, that will be a drain on the city rather than bringing in money. What has happened to the WARD findings? They seem to have been ignored. Another question when will residents input, concerns, and ideas be factored in, or is this meeting just another opportunity for all comments to be heard and to simply become part of the public record. I certainly hope not, but based on the presentation, it seems to me that our public sediments and concerns still have not been addressed. The firm that did the envisioning process in 2013 and also created the initial vision and also wrote the comprehensive plan and we are told that that will be the measure of this proposed plan. Again, the process has mostly ignored public sediment and it seems to be following the city's own plan since day one. We are told that the developer has to

Worthington 003481

have the density to do the project, but perhaps it is the wrong developer. We have been reminded repeatedly by the city that they don't own the property, however, the city can control the development that would be permitted here. In closing, I heard some really disturbing comments from residents. One resident that I was speaking to said we are invited to speak and share our comments but our comments are ignored, and then he says, seems a little bit like Russia doesn't it. Perhaps extreme, but that is his perspective. Another comment someone shared with me, what do we have to do to get Council to stop thinking about Worthington as their own private fiefdom. These perceptions don't speak well for Worthington's residents' satisfaction with the direction of development that is being promoted by our city government and our leaders. Finally, trust and good will has been mentioned. I think the city, UMCH, and the developer need to earn our trust and our good will by honoring with their actions some of the concerns of residents who live here right now.

Mr. John Huntington, of 435 Highgate Ave., Worthington, Ohio. The problem that I see is manifold. When you multiply the number of housing units by the number of cars for each resident you will come up with about 1000+ cars, and there will be some residents that have more, and probably not many with less. That is a lot of cars going in and out of a 42 acres of land. I am going to say something really rude, but I see a ghetto, a bad ghetto in the making. This is too dense. People were worried about the crime from a few break-ins by the residents of the UMCH, which I believe were not major crimes, but when you start with a series of small apartments, and in a few years there gets to be a rapid turnover, you are creating a place where things will not be best. We have several instances such as the apartments on the east side of Worthington that have attracted police attention and I really think that that kind of density, right in the heart of Worthington, is a bad thing socially. What I hear from the community is a discomfort with the idea of this large of population moving into the center of a low density population. They assume that it is not going to be good, but I tend to agree with them. The smaller communities in Ohio have a luxury of peace and quiet and ease of living that is going to be disrupted by the density of this particular development. I think the developer said he needed 500 units to make this project viable. That is an economic concern of the developer. It is not the concern of the population of Worthington that they are economically successful. Our concern is for the quality of life that affects us here. I have lived here for 47 years and I am not intending to leave. The point of this is that we are dealing with something that is uncomfortable for a working, successful, popular and viable community, and we are throwing a very large monkey wrench into the works. We have talked about a lot of problems and I think that all of them are more or less true. One of the most interesting problems was discussed by the female that talked about drainage and water pollution. That is serious business. My opinion of this is not only back to the drawing board but back to the drawing board with some very specific limitations. We need a welcome useful greenspace that would allow for sporting events, and public gatherings. That is what I would like to see.

Mr. Rob Vodinelic, of 458 Highgate Ave., Worthington, Ohio. I am familiar with the quality of work that LC does around town but I believe there is a strong need for more single family housing. The cottage homes are probably a good idea, but I am really concerned about school density. Classroom size keeps increasing year after year after year. What I would like to see is maybe taking some of the tax money and expanding or modernizing the schools and not busing kids all

Worthington 003482

over town. Maybe the tennis courts on Evening Street can be moved to expand the elementary school.

Mr. Rick Trippel, of 6695 W. Schreiner St., Worthington, Ohio. I agree with the comments that I heard about disparity about the density, traffic concerns, but one concern I have is the look and character of this new development as compared to what is already there now. This will substantially change what Worthington looks like in another ten or twenty years even if it is successful. I'm not sure how traffic studies will help the flow of traffic on the side streets. I believe that the opening of Fresh Thyme will also greatly affect our traffic.

Mr. Dan Kowalski, of 200 Franklin Ave., Worthington, Ohio. I am a little bit younger than most of the people that have spoken tonight, so hopefully I will capture that demographic that they said was 30% of Worthington. I looked at this plan before I came to the meeting tonight, and I am excited about it. I understand other people's concerns, traffic does seem like it will be an issue. Currently, we don't have any kids, but the schooling does seem like an issue as well. My biggest take away is that there does seem to be a need for those things, but if we look at this piece of property it is just sitting there doing nothing right now. I do feel that something needs to be done with it. I feel like people my age either want to live in the city, but I don't feel that most want to live in a traditional suburb. I grew up in the Columbus area, and I am from Dublin originally. Before I lived here, I never knew what Worthington had to offer. I think it does have a lot of things to offer to people my age. My wife and I love the ability to be able to walk to old Worthington, go to the Farmer's Market on Saturday, and I think that you see a lot of people my age drawn to those facts. I think the concerns about the types of individuals that would move into the apartments isn't as big as an issue as they think. People that are younger want less commitment. We see that through a lot of social issues today. A lot of people don't want the responsibility of taking care of a home. These seem like viable options for people my age. I can't speak for everyone, and I won't, but those are the things that I observe about other people my age. I know a lot of people that like the Worthington area. I don't think that there is a big concern about the types of people that can afford to move into a $1,600.00 apartment. Maybe if the prices go down because people cannot afford to live there. I guess I dream to be able to afford one of the houses in the back. After seeing the $750,000.00 price tag, I don't see that in my foreseeable future. The pricing of the housing does seem too high. Thank you for putting this meeting together to hear what the people have to say about the matter, and hopefully there will be something meaningful that comes out of these meetings.

Ms. Judy Haager, of 306 E. New England Ave., Worthington, Ohio. When and where can we get further information about future meetings and update? Mr. Hunter explained that there are websites available to check for updates: www.umchdevelopment.com and www.worthington.org. This has been a good meeting, and probably not the last one. Thank you all for your commentary this evening. As we move forward with this process you will see a lot of changes and I look forward to further communication and dialogue between the Boards, the developer, the City, and the residents. Thank you very much for your time. Meeting adjourned at 9:40 p.m.

Worthington 003483



MINUTES OF THE REGULAR MEETING
WORTHINGTON ARCHITECTURAL REVIEW BOARD
WORTHINGTON MUNICIPAL PLANNING COMMISSION
January 14, 2021

The regular meeting of the Worthington Architectural Review Board and the Worthington Municipal Planning Commission was called to order at 7:00 p.m. with the following members present: Mikel Coulter, Chair; Thomas Reis, Vice-Chair; Kathy Holcombe, Secretary; Edwin Hofmann; David Foust; Richard Schuster; and Susan Hinz. Also present was Worthington City Council Representative Scott Myers; Lee Brown, Director of Planning & Building; Lynda Bitar, Planning Coordinator; Tom Lindsey, Director of Law.

**A. Call to Order – 7:00 p.m.**

1.      Roll Call

2.      Pledge of Allegiance

3.      Oaths of Office

Mr. Brown previously swore in returning Architectural Review Board and Municipal Planning Commission member Mr. Foust; and Architectural Review Board members Mrs. Hinz and Mr. Schuster.

4.      Election of Officers

Mr. Reis nominated Mrs. Holcombe for Secretary; and Ms. Holcombe nominated Mr. Reis for Vice-Chair and Mr. Coulter for Chairman. Mr. Schuster seconded the motion. All members voted, "Aye," and the nominations were approved.

Mr. Reis moved to designate all members of the Municipal Planning Commission as representatives to the Board of Zoning Appeals. Mr. Hofmann seconded the motion. All Board members voted, "Aye," and the motion was approved.

5.      Approval of minutes of the December 10, 2020 meeting

Mr. Reis moved to approve the minutes and Mr. Foust seconded the motion. All Board members voted, "Aye," and the minutes were approved.

6.      Affirmation/swearing in of witnesses



PENGAD 800-631-6989

EXHIBIT

59

**B. Architecture Review Board – New Business**

1. Mixed Use – **1033 High St.** (Thomas Hart/Lifestyle Communities) **AR 70-2020**

   &

**C. Municipal Planning Commission – New Business**

1. **Planned Unit Development**

a. Mixed Use – **1033 High St.** (Thomas Hart/Lifestyle Communities) **PUD 03-2020**

Mr. Brown reviewed the following from the staff memo:

## Findings of Fact & Conclusions

## Executive Summary

Thomas Hart on behalf of Lifestyle Communities has applied to rezone 37.8-acres from R-10 (Low Density Residential), S-1 (Special), C-2 (Community Shopping Center) and C-3 (Institutions & Office) to PUD, Planned Use District for the redevelopment of the United Methodist Children's Home site to a mixed-use development that would include detached single-family home sites, townhomes, apartments, retail, restaurants, office and greenspace.

## Applicable Plans

- Comprehensive Plan Update and 2005 Strategic Plan – UMCH Focus Area – 2014
- Comprehensive Plan Update and 2005 Strategic Plan
- Chapter 1177 – Architectural District
- Chapter 1174 – PUD Planned Unit Development

## Recommendation

Staff is recommending **_denial_** of these applications as they currently stand today. If the applicant wishes to make significant modifications and changes to their applications after listening to the initial comments from City staff, Board & Commission members and the Worthington Community, staff would recommend tabling these applications. Please see Staff Comments/Analysis below for additional details related to the recommendation.

## Brief Background/Description

The United Methodist Children's Home (UMCH) site located at 1033 High St. is approximately 37-acres in size, with fifteen existing vacant buildings, parking lots and driveways on the site. The majority of the property is zoned S-1, Special, except in 1987 just under 10-acres of land along the N. High St. frontage was rezoned to C-3, Institutions and Offices (~9.2-acres) and C-2, Community

Shopping Center (~0.6-acres). The parcels at 47 Larrimer Ave. and 57 Larrimer Ave. are zoned R-10, Low Density Residential (~0.5-acres) and are currently single-family homes that are vacant.

Approximately 3.42-acres at the northwest corner of High St. and Wesley Blvd. (private drive) with 428-feet of High St. frontage was purchased in 2017 by the West Ohio Annual Conference of the United Methodist Church and is not part of this application. Bickford Assisted Living & Memory Care facility at the southwest corner of High St. and Wesley Blvd. (private drive) is a separate 3.58-acre parcel and is also not part of this application.

**Current Zoning - Development Standards**

| Zoning | Minimum Lot Width | Minimum Lot Area | Front Setback | Rear Setback | Side Setback | Max Height of Building Stories | Max Height |
|---|---|---|---|---|---|---|---|
| **S-1** | 250-feet | 3-acres | 60-feet | 60-feet | 50-feet | 4-stories | 45-feet |
| **C-2** | 150-feet | 1-acre | 50-feet | 30-feet | 20-feet | 3-stories | 45-feet |
| **C-3** | 100-feet | 20,000 sq. ft. | 50-feet | 30-feet | 15-feet | 3-stories | 45-feet |
| **R-10** | 80-feet | 10,400 sq. ft./4.2 DU/acre | 30-feet | 30-feet | 8-feet | 2 ½-stories | 30-feet |
| Section 1149.07 – 100' front setback along this area of High Street | | | | | | | |

**Surrounding Zoning & Land Use**

The surrounding zoning is a mix of the following:
- R-10 - Low Density Residential – Worthington Estates and Greenbriar Hill
- R-16 – Very Low Density Residential – Worthingway & Medick Estates
- C-1 – Neighborhood Commercial – O'Reilly Family Pharmacy
- C-3 – Heritage Professional Building, AT&T, FC Bank, Worthington Municipal Complex, Laurels of Worthington and The Grove
- SC – Senior Citizen – Bickford of Worthington

*Current Zoning Map*



*Aerial*



# Recent Land Use and Planning History Related to the Site (since 2014)

- On September 2, 2014 City Council adopted an Amendment to the Comprehensive Plan Update & 2005 Strategic Plan for the United Methodist Children's Home Focus Area for the City of Worthington with the anticipation of redevelopment on the site that would include a mix of uses and open space across the entire site.
- On June 29, 2015 Lifestyle Communities presented an informal proposal to the Worthington Community for their vision for the UMCH site.
  - No formal application was submitted to the City to start the rezoning process.
  - Lifestyle Communities proposed the following:
    - 42.3-acres
    - 571± Total Residential Units
      - 350 Apartments
      - 221± Detached single-family estate lots, manor lots, cottage lots and townhomes.
        - Mix of for sale and for rent product
    - Approximately 150,000± sq. ft of medical office and a 20,000 sq. ft. conference center
    - Retail on first floor of the apartment buildings
    - Mix of 3 to 4 story buildings along High St.
    - Open Space
      - Shelter house – Tucker Creek Preserve
      - Multi-use trail – Tucker Creek Preserve
      - Formal greenspace in the form of a village green at the entrance to High St.
      - Community park to the rear of the site
      - Scattered open space throughout the site
- On February 9, 2017, OhioHealth made application to construct a new 20,000 sq. ft. two-story medical office building along the N. High St. frontage just north of the Conference Center.
  - The application was eventually withdrawn by OhioHealth when the West Ohio Annual Conference decided to exercise their option to purchase 3.42-acres of land that include the area where the new medical office building was to be constructed.
- On June 8, 2017, the Municipal Planning Commission reviewed and approved a request by the West Ohio Conference Annual Conference of the United Methodist Church to create a new 3.42-acre lot for their existing building and parking at the corner of High St. and Wesley Blvd. that met all the legal requirements to create a new lot as outlined in the Planning & Zoning Code. City Council ultimately approved the request on June 19, 2017.
- On March 26, 2020, the Municipal Planning Commission was scheduled to review a request by OhioHealth to rezone 3.35-acres at the corner of Larrimer Ave. and N. High St. from R-10 (Low Density Residential), S-1 (Special) and C-2 (Community Shopping Center) to the C-3 (Institutions & Office) to permit the construction of a new 60,000 sq. ft. three-story medical facility that would house medical services, including an emergency department, primary care, imaging and a host of specialty services.
  - The application was withdrawn by OhioHealth after they were unable to come to

an agreement with the property owner to move forward on the site.

- On October 6, 2020, Thomas Hart, on behalf of Lifestyle Communities, filed an application to rezone 37.843-acres from the R-10 (Low Density Residential), S-1 (Special) and C-2 (Community Shopping Center) and C-3 (Institutions & Office) to a PUD, Planned Use District for the redevelopment of the United Methodist Children's Home site to a mixed-use development that would include detached single-family home sites, townhomes, apartments, retail, restaurants, office and greenspace.
  - The request was to go before the Architectural Review Board and the Municipal Planning Commission on November 12, 2020, however the applicant requested to table until the December 10, 2020 meeting. The applicant then requested to table the request to the meeting on January 14, 2021.

## Current Proposal by the Applicant

- Total Acreage = 37.8-acres (Parcel #s:100-006774, 100-002425 & 100-002427)
- 730 Residential Units
  - 24 units – Single-family
  - 94 units – Multi-family - Townhomes w/garages
  - 72 units – Multi-family - Townhomes & flats
  - 540 units – Multi-family – Parking Garage
- 60,000 sq. ft. of commercial/retail
- 25,000 sq. ft. of medical office
- 6.4 acres – Tucker Creek

| SUBAREA | USE | LOTS/UNIT/SQUARE FOOTAGE | Height | ACRES | DENSITY |
|---|---|---|---|---|---|
| #1 | Single-family | 24 units | 35 feet | 5.9 acres | 4.1 lots/acre |
| #2 | Multi-family | 94 units | 60 feet* | 9 acres | 10.4 DU/acre |
| #3 | Multi-family | 72 units | 60 feet* | 5.1 acres | 14.4 DU/acre |
| #4 | Multi-family Commercial Medical Office | 540 units 60,000 sq. ft. 25,000 sq. ft. | 40'- 62'** *** *** | 11.4 acres | 47.8 DU/acre |
| #5 | Tucker Creek | | | 6.4 acres | |
| TOTAL | | 730-units | | 37.8 acres | 19.3 DU/acre |

*Staff Comments:*
\*    The proposed height does not appear to be correct.
\*\* Does not appear to measure the height of the building to the peak or per the height of a building definition found in the Planning & Zoning Code.
\*\*\*    Has not been provided.

**Project Details as described in the application**

**Subarea #1**
- 5.9 acres
- 24 single-family lots
    - For sale product
    - 2 parking spaces per dwelling unit
    - Lot Width: Minimum 55-feet wide
    - Minimum Lot Size: 6,875 sq. ft.
    - Unit Square Footage Minimum: 1,600 sq. ft. to 2,800 sq. ft.
    - 2 ½ stories, 1 ½ stories or single-story buildings – max height of 35 feet
    - Front Setback: 20 feet
    - Rear Setback: 20 feet
    - Side Yard: 5 feet
    - Fronting on a proposed public roadway
    - 4.1 Dwelling Units/acre
    - Architectural Design & Standards Proposed – See Development Text

**Subarea #2**
- 9 acres
- 94 townhomes
    - For sale product
    - Garages
    - 1.5 parking spaces per dwelling unit
    - Unit Square Footage Minimum: 1,000 sq. ft.
    - 2-3 stories: max height of 60 feet *(Staff Comment: This is the height noted in the application. The proposed height does not appear to be correct)*
    - Lot sizes of 16-feet to 24-feet wide by a minimum of 92-feet deep
    - Front Setback: 10 feet, porches no closer than 4 feet
    - Fronting on a proposed public and private roadway
    - 1.3-acres of public and private open/green space
    - 10.4 Dwelling Units/acre
    - Architectural Design & Standards Proposed – See Development Text

**Subarea #3**
- 5.1 acres
- 72 townhomes
    - For rent product
    - Mix of attached garages or access to a garage
    - 1.5 parking spaces per dwelling unit
    - Unit Square Footage Minimum: 700 sq. ft. to 1,300 sq. ft.
    - Max height of 60 feet *(Staff Comment: This is the height noted in the application. The proposed height does not appear to be correct)*
    - Dwelling Unit Mix:
        - One Bedroom: 30% at 700 sq. ft. – Approximately 28.2-units
        - Two Bedrooms: 60% at 1,100 sq. ft. – Approximately 56.4-units

- ▪ Three Bedrooms: 10% at 1,300 sq. ft. – Approximately 9.4-units
  - o Front Setback: 10-feet
  - o Fronting on a proposed private roadway
  - o 0.6 acres of public and private open/green space
  - o 14.1 Dwelling Units/acre
  - o Architectural Design & Standards Proposed – See Development Text

**Subarea #4**
- 11.4 acres
- 540 multi-family units
  - o For rent product
  - o Parking Garage
  - o Unit Square Footage Minimum: 500 sq. ft. to 1,300 sq. ft.
  - o 5-stories: Max height of 80 feet
  - o Dwelling Unit Mix:
    - ▪ One Bedroom: 30% at 500 sq. ft.; 162-units
    - ▪ Two Bedroom: 60% at 1,000 sq. ft.; 324-units
    - ▪ Three Bedroom: 10% at 1,300 sq. ft.; 54-units
  - o 47.8 Dwelling Units/acre
  - o Architectural Design & Standards Proposed – See Development Text
- Commercial Office/Retail – See Development Text for list of all uses
  - o 60,000 sq. ft.
  - o Two 5-level parking garages, two surface lots and on-street parking
  - o Max height of 80 feet
- Medical Office
  - o 25,000 sq. ft.
  - o Two 5-level parking garages, two surface lots and on-street parking
  - o Max height of 65 feet
- Setbacks:
  - o High St.: 25-feet
  - o Longfellow Ave.: 25-feet
  - o Larrimer Ave: 20-feet
  - o Private Streets: 10-feet
  - o Southern Property Line: 10-feet
- Fronting on a mixture of private roadways and existing roadways (High St., Larrimer Ave. and Longfellow Ave.)
- The applicant has proposed that private streets be 36-feet in width, 20-feet wide drive aisles and 8-feet for parallel parking spaces on each side and placed in a reserve that is 56-feet in width.
- Alleys are proposed to be 16-feet wide and placed in a reserve that is 20-feet in width.
- Surface parking lots shall be constructed with 9'x19' parking spaces with a drive aisle of 22-feet in width.
- Bicycle parking will be provided throughout the site.
- Cross access easements are proposed throughout the site.
- 1.2-acres of public and private open/green space

- Architectural Design & Standards Proposed – See Development Text

**Subarea #5**
- Tucker Creek Preserve
  - 6.4-acres
    - 5.7 acres – preserved natural area with a conservation easement, and/or dedicated to the City for public ownership and use
    - 0.7 acres – stormwater basin for the development, will not be conveyed to the City and will be maintained by the homeowners' association (HOA).
    - 3.1 acres of the 6.4 acres is already located in an easement that restricts development in this area. This includes a mix of slope, stormwater, sanitary, water and channel easements.
  - No additional amenities proposed at this time.

**Traffic**

The applicant has provided a Traffic Impact Study which is being reviewed by the City's traffic consultant. Preliminary findings of the Study include the following:
- When warranted, a new signal should be installed on High St. across from the Worthington Municipal Building.
- When a new signal is constructed, the existing southbound fire signal control should be moved to the new High St. signal.
- Pavement markings should be revised on High St. for a 100-feet northbound left turn lane at the new entrance on High. St.
- Pavement markings should be revised on High St. for a 200-feet southbound left turn lane to Worthington-Galena Rd.
- Signs, pavement markings and signal operation should be modified to allow for east/west movements at the intersection of High St., Wesley Blvd, Worthington-Galena Rd. and Crandall Dr.

**Parking**

The applicant provided the following table summarizing the proposed parking included in the application.

| Subarea | Lots/Unit/SF | Parking Required* | Proposed Surface Parking | Proposed Garage/Structure | Total |
|---------|--------------|-------------------|--------------------------|---------------------------|-------|
| #1 | 24 | 2/unit = 48 | Garage/Driveway | 48 | 48 |
| #2 | 94 | 1.5/unit = 141 | (See Note #1) | 188 (2-car) | 188 |
| #3 | 72 | 1.5/unit = 108 | 100 (Lot) (See Note #4) | 52 | 152 |
| #4 | 540 units 60,000 SF 25,000 SF | 1/unit = 540 | 66 (Lot) 85 (On-Street) | 853 (5 Level Parking Garage) | 1,004 |

| | | 1/150 = 400 1/250 = 100 Total = 1,040 | | | |
|---|---|---|---|---|---|
| #5 | N/A | N/A | N/A | N/A | N/A |
| TOTAL | 730 | 1,337 | 251 | 1,141 | 1,392 |

Notes:
1. On-street parking is included
2. Parking counts within subareas to be finalized with the final development plan
3. ADA accessible spaces will be provided
4. Includes spaces behind garage
5. Within subareas 2,3 & 4 alleys shall have "No Parking" signs

*Staff Comments:*

Chapter 1174 of the Planning & Zoning Code provides the following parking standards:
- The required parking referenced in the chart above appears to be inconsistent with the parking requirements found in the Planning & Zoning Code.
- Parking and service areas shall be designed and located to protect the character of the area.
- Non-Residential Uses – Parking shall be adequate to serve the proposed uses but shall not exceed 120% of the required parking found in Section 1171.01.
- Residential Uses – Not less than one parking space per dwelling unit.
- Bicycle Parking – Should be adequate to serve the proposed uses.

The application references a required parking amount for residential units that is incorrect. The parking requirement for residential uses is not less than one parking space per dwelling unit.

**Tree Preservation & Replacement**

A Tree Survey & Preservation Plan was provided by the applicant and was reviewed by the City Arborist. The following items were noted in the Tree Survey:
- 365 trees to be removed = 6,264 caliper inches
  - 29 dead
  - 28 poor condition
  - 2 Ash trees
  - 306 healthy trees
- 6,264 caliper inches – 1,069 caliper inches* = 5,195 caliper inches

* The dead and poor condition trees and Ash trees are not counted in determining the loss of caliper inches of trees for either replacement or fee payment, thus the associated caliper inches (1,069) associated with those trees is deleted from the total caliper inches of trees to be removed

The submitted Tree Survey and Preservation Plan indicated tree replacement will be included as part of the redevelopment of the site and will be finalized with a detailed landscape plan at the Final Development Plan for the PUD. Tree replacement was described in the application as follows:

- Street Trees – provided on all public and private streets at 1 tree per 40 linear feet of street.
  - Minimum of 3-inch caliper at installation
  - Approximately 284 trees at 3 inches = 852 inches
- Alley/Parking Lot Island Trees
  - 30 trees at 2.5 inches = 75 inches
- Open Space Tree Plantings
  - 80 trees at 2.5 inches = 200 inches
- Buffer Plantings
  - Stormwater Pond – 10 trees at 2.5 inches = 25 inches
  - Bickford Assisted Living Facility – 8 evergreens at 3 inches/6 feet high = 24 inches
- Other Locations
  - Replacement trees can be located in other off-site public property locations.
- When taking into account the amount of caliper inches to be lost (5,195) and the total caliper inches of proposed replacement trees (1,176), the submittal notes there remains 4,019 inches that would need to be replaced with additional trees or a Tree Replacement Fee of $150/caliper inch for a total fee of $554,400.00 would be applied.

*Staff Comments:*
- Staff calculates the fee at $150/caliper inch for 4,019-inches for a fee of $602,850.00, not $554,400.00.
- All street trees and landscaping plans will need to be reviewed by the City Arborist.

The applicant is requesting the following items in relation to the Tree Replacement Standards
- Requesting the dedication of Tucker Creek Preserve to count towards the Fee-in-lieu of Tree Replacement.
- Requesting the Fee-in-lieu of Tree Replacement and/or the number of trees replaced off-site shall be based on $150/caliper inch.
- The applicant states that full on-site replacement is not feasible and would result in overcrowding on the site.
- The applicant states this is an unreasonable burden on the property if the fee-in-lieu is paid or if replacement occurs off-site. The applicant is requesting a waiver of all fees.
- The applicant states that they are committed to a reasonable and balanced tree replacement standard that includes on-site replacement, off-site replacement, and crediting in order to meet the spirit and intent of the code, while resulting in fairness.
  - Applicant states they will work in good faith with City to find other off-site replacement location on public lands to reduce the credit.

## Public Area Payments – Special Park Fund

City Code contains the following requirements for contributions to the Special Park Fund:
- Commercial & Industrial Space = $100.00 per 1,000 sq. ft.
- Residential = $250.00 per dwelling unit

- Utilizing the Code requirements and applying them to the proposed development results in the following fee calculation:Proposed Uses:

- o Commercial – 85,000 sq. ft. = $8,500.00
- o Residential – 730 units = $182,500.00
- o Total Fee = $191,000.00

The applicant states the property is valued at $165,688.00 per acre and believes the value of Tucker Creek Preserve is valued at $944,422.00 and believes there is a credit balance to the developer since the developer is proposing to dedicate the Tucker Creek Preserve to the City.

*Staff Comment:*
- The 3.1 acres of the 6.4 acres of the Tucker Creek Preserve is already located in an easement that restricts development in this area. This includes a mix of slope, stormwater, sanitary, water and channel easements. Staff questions the suggested valued of the Tucker Creek Preserve given these easements and the associated restrictions on development.

**Public Space Amenities**

City Code requires public amenities which directly affect the quality and character of the public domain as part of PUD developments. The amount of required public amenities is calculated based on gross floor area. The application provided the following calculation:

## PUBLIC SPACE AMENITY CALCULATION

| BUILDNG TYPE | UNITS (Approximate) | GROSS FLOOR AREA PER UNIT MIN. (SF) (Approx) | GROSS FLOOR AREA PER TYPE MIN. (SF) |
|---|---|---|---|
| Townhomes- Subarea 2 | 94 | 1000 | 94,000 |
| Apartments - Subarea 3 | 72 | | |
| Anticipated Mix | | | |
| 1 Bed (30%) | 22 | 700 | 15,400 |
| 2 Bed (60%) | 43 | 1100 | 47,300 |
| 3 Bed (10%) | 7 | 1300 | 9,100 |
| Apartments- Subarea 4 | 540 | | |
| Anticipated Mix | | | |
| 1 Bed (30%) | 162 | 500 | 81,000 |
| 2 Bed (60%) | 324 | 1000 | 324,000 |
| 3 Bed (10%) | 54 | 1300 | 70,200 |
| Commercial | | | |
| Commercial | 1 | 60000 | 60,000 |
| Medical Office | 1 | 25000 | 25,000 |
| **Total** | | | **726,000** |
| 1 Public Space Amenity per 5,000 SF Gross Floor Area of Multi-Family | | | 5,000 |
| | | | |
| **Total Public Space Amenities Required** | | | **145** |

*Calculated by the applicant*

Staff Comment:
- Staff does not fully understand or agree with the above calculation at this time.


**Utilities**

The application includes the following information about utilities:
- Water, sanitary sewer, surface drainage and utility facilities will be serviced by the existing available water/sewer lines and connections.
- Sanitary Sewer:
  - Existing 12-inch located along the southern property line
  - Existing 10-inch extends into the site from the 12-inch sewer line
- Water:
  - Existing 12-inch located along N. High St.

o Existing 12-inch located along Wesley Blvd.
- Stormwater:
  o Proposed wet detention basin along the Tucker Creek Preserve near Evening St.
    - Mix of stormwater storage vaults and surface detention to be utilized in the open space areas and parking areas.
    - Proposed to be designed to meet all stormwater requirements for water quantity and water quality per Ohio EPA standards and City of Columbus stormwater requirements.

## Easements

The application provides the following information regarding easements:
- Cross access easements, shared parking agreements, utility and access easements between subareas will be finalized by the time of Final Plan.

## Phasing Plan

The application proposes the following phasing plan for construction:
- Developed based on zoning approval and finalized at the time of the Final Development Plan.
- Construction to begin with the single-family development. The commercial/office uses along High St. are subject to market conditions.

*Staff Comment:*
- The commercial office included in this proposal is the portion of the development that would provide economic benefit to the City and help offset the cost of services that are provided given the City's heavy reliance on income tax as a revenue stream. Staff is concerned that only the residential portion of the project will get constructed without the commercial office needed in the High Street Mixed Use Zone.
- Staff is also concerned about the timeliness of construction of the open space that is to be provided on the site.

# Land Use Plans

This section of the memorandum highlights the language related to this site contained in various land use plans and regulations of the City. Links to the full documents are includes at the beginning of this memorandum and in the highlights below.

Worthington Comprehensive Plan – UMCH Focus Area - 2014
Since the Comprehensive Plan was updated in 2005 and included a strategic redevelopment plan for the site, City leaders have anticipated a redevelopment on the site that would include a mix of uses and open space across the site. The City studied the property again in 2014 and adopted amendments to the 2005 Comprehensive Plan in 2014, refining the stated desired outcome for the property. This area has been identified in the 2014 document as a good location for a mix of

commercial uses along the High St. frontage, mix of residential uses and a significant amount of usable open space.

The 2005 Comprehensive Plan identified the UMCH site as strategic for future growth, a matter particularly critical for an established community like Worthington. While the 2005 plan presented an example of two possible redevelopment scenarios, this update document provides a more in-depth consideration of appropriate redevelopment parameters.

This section of the agenda item memorandum will highlight the language from the 2014 update to the Comprehensive Plan regarding types of land use on the site. The Plan update indicates ". . . redevelopment of this site must create a high-quality, mixed-use development that is walkable, connected, and integrated within the site and with the City. This mix of uses should contain a range of residential types together with commercial office and neighborhood retail uses integrated with contributing and shared green space and amenities – all of which complement each other to create an active, vibrant place. Any proposed design must be sensitive to the neighborhoods adjacent to the UMCH site, as well as to the natural features related to Tucker Creek. Any development that occurs within the focus area should relate internally to the site and to an overall plan, even if it is built at different times."

*Future Land Use Zones:* The 2014 update identified four general zones for the property:
- High Street Mixed Use
- Worthington Estates Edge
- Neighborhood Core
- Tucker Creek Preserve

*High Street Mixed Use:*
The High Street Mixed Use zone is described in the 2014 document as follows:

> North High Street is the commercial spine of the City of Worthington . . . [and] is a good location for commercial office use. . . [I]ncome tax generating employment uses such as office are critical to the fiscal sustainability of the City. In addition, this site's close proximity to historic Old Worthington makes it a prime location for walkable residential development and denser, amenity-rich housing types. . . This location along High Street is attractive for retail and service uses as well. It is not the desire of the City, however, to create a third retail center in close proximity to Old Worthington and the Shops at Worthington Place. Retail in this location should be neighborhood scale and serve the development that occurs on this site and that exists in the surrounding neighborhood; and it should help to activate the High Street frontage.

> The High Street Mixed Use zone consists of the frontage of the UMCH site along High Street. It permits a mix of office, residential, and retail uses with the focus on commercial office and medical uses with subordinate residential and limited retail uses. Buildings in this zone should be a minimum of two stories and a maximum of five stories in height with attractive, four-sided architecture. Buildings in this

zone should address the streets, activate the street frontage, and include opportunities for outdoor dining and other pedestrian-focused activities.

It is expected that the buildings adjacent to High Street will be commercial offices. Residential uses might occur behind as a transition to the Neighborhood Core. Neighborhood-oriented retail uses can complement the development in the first floors of office and residential buildings. The objective of the High Street Mixed Use zone is to create a high-quality, dense, walkable, connected, mixed-use development that creates a dynamic space and signature address to attract Class A office tenants along High Street and add vitality and life to the High Street corridor.

In order to create a walkable environment, it is expected that buildings will line public streets and most parking will be located at the center of blocks, screened from public streets by attractive buildings. Parking beneath buildings may also be considered, provided the public street frontage of a building is activated. By providing a mix of uses within the High Street Mixed Use zone, parking areas can be shared to optimize their use. To achieve the desired densities, parking decks are encouraged to be integrated into the site. Features expected as part of any parking deck or structure include masonry and architectural elements to dress up the exterior, windowed stair towers, and lush landscaping and pedestrian connections.

Parking structures and/or parking lots could be lined with residential and/or retail development to separate and screen them from the Neighborhood Core. Where the High Street Mixed Use zone is opposite existing single-family residential development, it is expected that the new development will consist of residential development and/or substantial and attractive buffers.

As with all development in the UMCH focus area, it is to be high-quality in character and design with four-sided architecture. It should follow the *Worthington Design Guidelines*.

*Worthington Estates Edge:*
The Worthington Estates Edge is described as follows:

This zone is where development in the UMCH focus area should create a desirable transition between it and the existing single-family housing development that surround its north and west sides. The surrounding development consists of homes on third-of-an-acre lots. The Worthington Estates Edge zone calls for single-family residential development on lots between a third-of-an-acre and a fifth-of-an-acre. This equates to a residential density similar to Worthington Estates (3 dwelling units/acre) and Old Worthington (4-5 dwelling units/acre). The structures are limited to the same two-and-a-half story height as the surrounding neighborhood.

These may be single-family, detached homes that are more current, updated versions of what is found in the surrounding neighborhoods. Or they may be smaller homes with smaller yards that provide first floor living opportunities for

Worthington residents — an option in which many residents expressed an interest during the community meetings. They may be something in between. Regardless, these homes must be of high-quality design, differentiated architecture, and in close proximity to amenities. This zone is for custom-built, individualized homes and not one for homes with repetitious floor plans.

Housing in this zone should consist of individual units, potentially with lots of different sizes, fronting on a street or streets. The use of cul-de-sacs is strongly discouraged. These new lots must include rear or side yards to provide a substantial buffer and green landscape between these structures and the rear yards of existing homes. Attractive storm water systems designed as a naturalized amenity can be placed within the Worthington Estates Edge zone.

As with all development in the UMCH focus area, it is to be of high-quality in character and design with four-sided architecture. It should follow the *Worthington Design Guidelines*.

*Neighborhood Core:*
The document describes the Neighborhood Core zone as follows:

The Neighborhood Core zone represents the most flexible zone of the UMCH focus area because it is internal to the site. It consists of a higher density neighborhood that creates a transition from the single-family homes along the periphery of the site to the more active uses proposed closer to High Street.

The Neighborhood Core calls for residential development at a density between six and fourteen dwelling units per acre (6-14du/ac) gross density with a height limit of three stories. It is expected that the Neighborhood Core will be developed with more than one housing type and at more than one density level. The expected amount of park space and amenities correspondingly increases with the density. For a density reference, Ville Charmante along West Wilson Bridge Road is over seven dwelling units per acre.

This area creates the opportunity to introduce different types of housing options that are not readily available in the city. This area should provide residential living that is underrepresented in the market and complements Worthington's current offerings, addressing the needs of aging Worthington residents, future young professionals, and those desiring amenity-rich living. . .

Examples include a mix of single-family detached homes on small lots with rear alley garages, homes with great front porches for outdoor gathering, custom homes designed for first-floor living, luxury residences with integrated front auto courts, well-appointed walk-up townhomes, and a limited number of high-end flats. To be successful, the Neighborhood Core must incorporate common areas/shared green space(s). These parks create the community

gathering and development focal point(s). Shared amenities and facilities should also be provided. In all cases, the buildings must have front doors on inviting tree and sidewalk-lined streets. The objective is not to have streets dominated by garages, so garages must be de-emphasized – set back or placed to the rear of structures, creating a very walkable neighborhood.

As with all development in this focus area, the community expects this development to be of high-quality in character and design and adhere to the *Worthington Design Guidelines.*

*Tucker Creek Preserve:*
Finally, the Tucker Creek Preserve zone is described in the document as follows:

The southern boundary of the UMCH focus area is the beautiful and wooded Tucker Creek ravine. This plan calls for preserving this area as a natural green space amenity for the site and the community. The creek and the steep slopes that surround it are not developable and the wooded areas along it are important contributing and environmental features.

The community expressed a strong desire to continue linking neighborhoods, parks, and destinations with multi-use trails throughout the City. This includes achieving a dedicated trail along Tucker Creek that highlights this natural feature and provides an amenity and potential bicycle and pedestrian connection between High Street and Evening Street.

As part of any development that occurs on the UMCH site, it is expected that any future developer preserves the Tucker Creek ravine and wooded area. Any storm water systems in this area must be designed as a naturalized, aesthetic landscape feature that fits in the environment.

The 2014 document goes on to indicate the boundaries of these zones are flexible and provides information about ways in which the size of the areas may vary. It then indicates the importance of park space with the following language:

The creation of park space for community and public enjoyment is an important component for any redevelopment on the UMCH site. This is in addition to the Tucker Creek Preserve. Beyond serving community-gathering functions, the park space is critical to providing place-making in development layouts as well as a green space balance to the built environment contemplated in the High Street Mixed Use and Neighborhood Core zones.

In potential redevelopment scenarios, this additional park space was several acres divided between the High Street Mixed Use and Neighborhood Core zones. Park space could be used to provide linear park "windows" into the site from High Street; neighborhood-oriented parks internal to the site;

and/or extension of the Tucker Creek preserve. The expected amount of park space and amenities correspondingly increases with the density of development proposed on the UMCH site. Park space as discussed here must be useable, contributing ground for residents, workers, and visitors of the redeveloped site, and not, for example, storm water controls or left-over ground.

It is expected that the developer(s) of the UMCH site will integrate usable park land into the development and work with the City to provide acreage in the High Street Mixed Use and Neighborhood Core zones as park space useable by the community.

Creating this additional park space within the UMCH focus area will address the community's desire for park space and amenities here. The public process generated numerous ideas for amenities worthy of further consideration. It is important that the City and the Worthington Parks and Recreation Commission work with the community to plan for and create parks that include the desired amenities in the appropriate places within the City and at this site.

The 2014 document goes on to include information related to Design Guidelines, connectivity, street intersections, the High Street frontage, landscaping and buffers, storm water and public private partnerships which can be found in the full document.

Worthington Comprehensive Plan – UMCH Focus Area – 2014 - High Street Frontage Guidelines:
The potential redevelopment of the UMCH focus area creates a change in the consideration of setbacks along High Street in these blocks. To achieve the desired walkability, vitality, and screening of parking along Worthington's signature street, it is expected that multi-story buildings will be constructed closer to the High Street right-of-way, with parking located behind the buildings. The buildings should engage High Street with broad sidewalks, storefronts, front entries, and outdoor seating that provide an inviting strolling environment for pedestrians. The buildings constructed along High Street will set the tone and impression for the entire UMCH focus area. As such their architecture, materials, quality, interest, aesthetics, and vitality are critical. These buildings should have a predominance of brick and complement the community character. Buildings along High Street must have the majority of their building face fronting/ parallel to the street. Buildings are expected to be at least two stories in height with substantially transparent storefronts on the first floor, whether retail or office, to activate the street. Operational building entries must be provided along High Street regardless of parking orientation. Neither single-story commercial buildings nor retail buildings on out lots are part of the vision for the UMCH focus area, nor are buildings placed in the middle of parking lots.

Generally, it is anticipated that buildings will be setback from the High Street curb line an appropriate distance based upon the architecture and use(s) of the buildings. The streetscape section between the building and the curb should include a sizable tree lawn or street trees in planters (ten feet +/-), at least an eight-foot-wide unobstructed sidewalk, and an outdoor seating and/or landscape planting area. As the building height increases, the buildings should consider the

relationship between the setback, the street corridor, and the building height. It is expected that if fourth or fifth stories are included, a variety of techniques will be implemented to mitigate any potential "canyon" effect along High Street, such as the use of floor terracing, changes in building massing, insertion of a green commons, recessed seating and dining areas, and lush landscaping to name a few.

While it is preferred that parking be provided to the rear of building, if parking is provided in front, it should be consistent across the frontage and be limited to either one row (single bay) of parking or on-street parking for short customer visits. Parking visible between buildings should be screened by landscape and/or masonry wall.

Development within the UMCH should be well landscaped, with particular focus on the streetscapes, building edges, buffers, and public park/community commons. Landscaping should be substantial, lush, well-planned, and commonly maintained. Landscape should emphasize native species where possible.

Worthington Comprehensive Plan - 2005
The 2005 Comprehensive Plan identifies portions of High Street outside of the historic core as High Street Corridor (Extents Area) and as a place where consistent site design should be encouraged such as landscape screening and interior planting of surface parking areas, and where the location of large parking areas should be to the rear of the site. The corridor could accommodate redevelopment at a higher density, with such projects meeting the needs of the City, providing green setbacks and meeting the Architectural Design Guidelines. The plan recommends promoting a high-quality physical environment, encouraging the City to continue to emphasize strong physical and aesthetic design, and high-quality development. Also recommended is encouraging the private market to add additional commercial office space within the City. The UMCH property was specifically addressed in that section of the plan, with concepts establish for mixed use development on the site. This section specifically focused on the UMCH property was updated with the 2014 document.

Chapter 1177 - Worthington Design Guidelines and Architectural District Ordinance
This property is located within the Architectural Review District and as such is subject to the Architectural District Code (Ordinance) and the Worthington Design Guidelines. The Design Guidelines contain the following recommendations for new commercial/institutional and new residential construction in the parts of the District outside of Old Worthington:
New Commercial/Institutional Sites
 1. Scale, Form & Massing: Extension of the pleasant scale of Old Worthington into new areas is desirable. Consider breaking down larger buildings into a series of smaller masses with connectors between them. Inclusion of sidewalks, pedestrian-scaled signage, and planting and lawn areas will help communicate a sense of a walkable pedestrian scale. Simple geometric forms and uncomplicated massing tend to make buildings more user-friendly and help to extend the character of Old Worthington into the newer development areas. Carefully designed building facades that employ traditional storefronts -- or similarly sized windows on the first floor -- will help make new buildings more pedestrian-friendly.
 2. Setbacks: Parking areas should be located toward the rear and not in the front setbacks if at all possible. Unimpeded pedestrian access to the front building facade from the sidewalk

should be a primary goal. Building up to the required setback is desirable as a means of getting pedestrians closer to the building and into the main entrance as easily as possible.

3. Roof Shape: Generally, a traditional roof shape such as gable or hip is preferable to a flat roof on a new building. Roof shapes in a development do not have to be identical but can vary – just as in Old Worthington – to provide visual variety. Roof shapes should be in scale with the buildings on which they are placed. Study traditional building designs in Old Worthington to get a sense of how much of the facade composition is wall surface and how much is roof.

4. Materials: Traditional materials such as wood and brick are desirable in newer areas, but other materials are also acceptable. These include various metals and plastics; poured concrete and concrete block should be confined primarily to foundation walls. Large areas of glass are appropriate for the first floors of new buildings, where they resemble the commercial storefronts typical of older buildings. On upper floors, avoid large areas of glass in favor of a more traditional pattern of window openings spaced regularly across the building's wall. Avoid any use of glass with highly reflective coatings. Some of these may have a blue, orange, or silver color and can be as reflective as mirrors; they generally are not compatible with other development in Worthington. Before making a final selection of materials, prepare a sample board with preferred and optional materials.

5. Windows: On long facades, consider breaking the composition down into smaller "storefront" units, with some variation in first and upper floor window design. Use traditional sizes, proportions and spacing for first and upper floor windows. Doing so will help link Old Worthington and newer areas through consistent design elements.

6. Entries: Primary building entrances should be on the street-facing principal facade. Rear or side entries from parking lots are desirable, but primary emphasis should be given to the street entry. Use simple door and trim designs compatible with both the building and with adjacent and nearby development.

7. Ornamentation: Use ornamentation sparingly in new developments. Decorative treatments at entries, windows and cornices can work well in distinguishing a building and giving it character, but only a few such elements can achieve the desired effect. Traditional wood ornamentation is the simplest to build, but on new buildings it is possible to use substitute materials such as metal and fiberglass. On brick buildings substitute materials can be used to resemble the stone or metal ornamental elements traditionally found on older brick buildings. As with all ornamentation, simple designs and limited quantities give the best results.

8. Color: For new brick buildings, consider letting the natural brick color be the body color, and select trim colors that are compatible with the color of the bricks. It may be acceptable to paint new brick walls. Generally, lighter colors should be used for this purpose, with darker colors for trim. Prepare a color board showing proposed colors.

9. Signage: Keep and repair any historic signage that is appropriate to the Architectural Review District. While the regulations permit a certain maximum square footage of signs for a business, try to minimize the size and number of signs. Place only basic names and graphics on signs along the street so that drive-by traffic is not bombarded with too much information. Free-standing signs should be of the "monument" type; they should be as low as possible. Such signs should have an appropriate base such as a brick planting area with appropriate landscaping or no lighting. Colors for signs should be chosen for compatibility with the age, architecture and colors of the buildings they serve, whether placed on the

ground or mounted on the building. Signs must be distinctive enough to be readily visible, but avoid incompatible modern colors such as "fluorescent orange" and similar colors. Bright color shades generally are discouraged in favor more subtle and toned-down shades.

10. Sustainability: The City of Worthington and its Architectural Review Board are interested in encouraging sustainable design and building practices, while preserving the character and integrity of the Architectural Review District. Energy conservation methods are encouraged. Landscape concepts often complement energy conservation and should be maintained and replenished. Utilize indigenous plant materials, trees, and landscape features, especially those which perform passive solar energy functions such as sun shading and wind breaks. Preserve and enhance green/open spaces wherever practicable. Manage storm water run-off through the use of rain gardens, permeable forms of pavement, rain barrels and other such means that conserve water and filter pollutants. Utilize solar panels where appropriate that meet the guidelines outline in the Design Guidelines. Bike racks and other methods of facilitating alternative transportation should be utilized. Streetscape elements should be of a human scale. Make use of recycled materials; rapidly renewable materials; and energy efficient materials. Use of natural and controlled light for interior spaces and natural ventilation is recommended. Minimize light pollution.

New Residential Sites
1. Form, massing and scale: New structures should complement the form, massing, and scale of existing nearby structures. Also, building placement and orientation are important design considerations. Most main entrances should face the street and garages should avoid facing the street.
2. Setbacks: Observe the setbacks of adjacent and nearby structures.
3. Roof: Roof shapes for new buildings should be appropriate to the style or design of the building. If a new building does not follow a particular style but is instead a vernacular design, then roof shapes and heights similar to those in the neighborhood or nearby would be most appropriate.
4. Materials: Contemporary materials that simulate traditional ones are appropriate, but the preferred option is to use true traditional materials such as wood siding. Incompatible contemporary materials should be avoided. Brick has long been a traditional material in Worthington. Prepare a sample board for review by the Architectural Review Board.
5. Windows: For new buildings, multiple-paned windows generally are not appropriate. The exception is a building being built in a particular style -- such as Federal, Greek Revival or Colonial Revival -- that would have employed this window type. When in doubt, simple 1 over 1 double-hung sash windows are usually the simplest, least expensive and most appropriate choice. Using the excellent precedents of Worthington's many historic structures, carefully design the pattern of window openings; window sizes and proportions (they must be appropriate for the size and proportions of the wall in which they are placed); pattern of windowpanes and muntins; and trim around the windows. Good quality wood windows are readily available and more affordable than in the past. True wood windows are always the first preference. Aluminum- or vinyl-clad windows can be appropriate, but primarily on secondary facades and less conspicuous locations. All-aluminum or vinyl windows are not prohibited but are not encouraged. Avoid blank walls.
6. Entries: As with other design considerations, study Worthington's rich collection of 19th and 20th century architecture for design ideas for entrances and doors. For newly built buildings, simpler designs usually look better than more ornate ones. Avoid heavy ornamentation on

doors and entrances. Observe entry placement on existing buildings. Whether located symmetrically or asymmetrically, entries usually are aligned with a window on the second floor so that a regular rhythm of openings is maintained on both floors. Entries should be located so they are easily visible, and they should be oriented toward the street.

7. Ornamentation: Observe Worthington's excellent historic architecture for information on the kinds and amounts of ornamentation employed on various building styles and periods. Use ornamentation conservatively. It will be most successful if used in traditional locations: around windows and doors; along a building's cornice or at the corners; in gables; or on gates and fences. Most ornamentation historically was made of simple forms built up to a desired level of complexity. When in doubt, follow the old rule that "less is more." Sometimes just a little ornamentation, well placed, can have a major impact without the need for more extensive (and expensive, and hard-to-maintain) ornamentation. Use compatible materials in ornamental elements. Frame houses should have wood ornamentation, although in cases where the ornamental elements are some distance from the viewer it may be possible to use substitute materials such as fiberglass.

8. Color: In general, avoid bright colors not typical in Worthington neighborhoods, such as various shades of purple or orange. For infill buildings being placed in an existing streetscape, select colors compatible with those already used along the streetscape. Many buildings follow a pattern of light colors for the building body and darker colors for the trim. Following this pattern is encouraged. In Worthington, the use of white or cream-colored trim also is common and would be appropriate for new construction. Avoid using too many colors. Usually one body color and one trim color are sufficient.

9. Landscaping: Worthington's mature shade trees are the primary landscaping feature throughout the community. They are a major contributor to its character and help define its neighborhoods as stable, desirable places to live. In general, lawns are generous but not overly large, which contributes to the sense of human scale that is one of Worthington's important attributes. Other landscaping elements tend to be properly scaled and well-tended, which also tends to enhance neighborhood character. Maintain and nurture mature trees to prolong their lives. Plant and maintain street trees in planting areas between the street and sidewalk. Paving can sometimes reduce water absorption of the soil so much that trees do not get the moisture they require.


Chapter 1177.05 Standards for Review: Certificate of Appropriateness
**1177.05 Standards for Review: Certificate of Appropriateness**
The Board of Architectural Review, in deciding whether to issue a certificate of appropriateness, shall determine that the application under consideration promotes, preserves and enhances the distinctive historical village character of the community and would not be at variance with existing structures within that portion of the district in which the structure is or is proposed to be located as to be detrimental to the interests of the Districts as set forth in Section 1177.01. In conducting its review, the Board shall make examination of and give consideration to the elements of the application including, but not necessarily limited to:

(1) Height, which shall include the requirements of Chapter 1149;
(2) Building massing, which shall include in addition to the requirements of Chapter 1149, the relationship of the building width to its height and depth, and its relationship to the viewer's and pedestrian's visual perspective;

(3) Window treatment, which shall include the size, shape and materials of the individual window units and the overall harmonious relationship of window openings;

(4) Exterior detail and relationships, which shall include all projecting and receding elements of the exterior, including but not limited to, porches and overhangs and the horizontal or vertical expression which is conveyed by these elements;

(5) Roof shape, which shall include type, form and materials;

(6) Materials, texture and color, which shall include a consideration of material compatibility among various elements of the structure;

(7) Compatibility of design and materials, which shall include the appropriateness of the use of exterior design details;

(8) Landscape design and plant materials, which shall include, in addition to requirements of this Zoning Code, lighting and the use of landscape details to highlight architectural features or screen or soften undesirable views;

(9) Pedestrian environment, which shall include the provision of features which enhance pedestrian movement and environment and which relate to the pedestrian's visual perspective; and

(10) Signage, which shall include, in addition to requirements of Chapter 1170, the appropriateness of signage to the building.

(11) Sustainable Features, which shall include environmentally friendly details and conservation practices such as solar energy panels, bike racks, and rain barrels.

Chapter 1174 - Planned Unit District - PUD
The PUD: Planned Unit Development chapter of the Codified Ordinances includes the following purpose statement:

> The purpose of Planned Unit Development is to promote variety, flexibility and quality for the development of properties in the City of Worthington. Planned Unit Development allows for more creative planning and design and enables a greater range of uses than traditional Zoning regulations. Planned Unit Development allows for the design and mix of uses necessary to meet changing economic and demographic demands; permits implementation of development standards, plans, studies, and guidelines adopted by the City Council; and provides the opportunity to retain and enhance the character of the City, and the health, safety and general welfare of the inhabitants.

The chapter goes on to provide additional detail regarding PUD provisions, uses, standards, submission requirements, procedures, natural features and coordination with other provisions of the Planning and Zoning Code, which can be found in Chapter 1174 of the Codified Ordinances of the City.

## Staff Comments/Analysis

Staff has focused on broad discussion topics in this section and compared them to the language in the 2014 Comprehensive Plan Update to manage the initial review of the applications and materials. City staff has worked diligently to arrange meetings with the applicant to discuss the almost 500-page application and to clarify understanding of the proposal, however we have only

had two meetings at this time; one meeting to discuss traffic and then a brief discussion concerning the Development Text in the applications and materials. Timeliness in working with City staff to schedule meetings has not been easy. More timely and productive meetings are needed for City staff to better understand the applications and materials that have been provided. The staff comments/analysis included below is our interpretation of the materials we were provided. A full review of the detailed criteria in Chapter 1174 PUD Planned Unit Development is still needed and could not yet be completed due to the limited information available from the applicant.

***Discussion Topics:***
- Residential Density & Types
- Mix of Land Uses
- Greenspace/Open Space
- Traffic
- Stormwater
- Architecture
- Miscellaneous

## *Residential Density & Housing Types*

The overall density for the proposed residential development is notably higher than the density included in the 2015 informal proposal. The previous informal proposal from 2015 included more acreage and High St. frontage; however, it had a lower density than what is proposed today. The overall site has been reduced by 3.4 acres and 428± feet of road frontage. The previous density discussed was 14 units/acre on 41.22 acres and is now 19.3 units/acre on 37.8-acres. The 2015 version was presented at a meeting that had over 350 people attend, and overall, the community was not supportive of the previous density, layout and amount of usable open space and this proposal has approximately 200 additional units with less acreage.

The applicant proposes a mix of for-sale and for-rent products throughout the site that include a mix of floorplans. The mix of floor plans has only few options for single-level living, which is one of the key things we have heard from our residents that they would like to see offered in the community.

### *Worthington Estates Edge*

This area is identified in the 2015 Comprehensive Plan Update ("Plan") as a transition zone between the existing single-family housing to the west and north and application proposes single-family residential development on lots between a third-of-an-acre and a fifth-of-an-acre. Staff's review noted the proposal is generally consistent with the density recommendations found in the 2014 Comprehensive Plan Update with the following comments:
- The rear yard setbacks abutting the existing residential to the west should have a year yard setback of 30-feet and the lots fronting on Longfellow Ave. should have a front yard setback of 30 feet to match the existing required setbacks of those homes found in Worthington Estates.
- Landscaping and buffers are key between the UMCH focus area and the neighboring

residential.
- First-floor living opportunities are important to the Worthington residents.
- Custom-built, individualized homes are desired according to the Plan and recommended to not have repetitious floor plans, however the applicant submitted a sample of 4-home plans that would be built by Bob Webb Homes with the caveat that the house models with the same footprint may be allowed under certain circumstances.
  - The Plan states that architecture and design should be rich and varied (not repetitive/homogeneous) with great attention to detail.
- The Residential Design Guidelines provide guidance on site development, form, massing, scale, setbacks, roof shape, exterior materials, windows, entries and color.
- The Worthington Estates Edge would remain in the Architectural Review District.

*Neighborhood Core*

The Plan recommends this area for higher density residential development that creates a transition from the single-family homes along the periphery of the site to the more active uses proposed closer to High St. The recommendation is for 6-14-units/acre with a height of 3-stories with more than one housing type at more than one density with appropriate open space associated with the proposed density. Staff has the following comments:
- The applicant is proposing an overall density of 12-units/acre in this area with a for sale and for rent product that is 2-3 stories in height. Some units will have a garage and finished lower level.
- Residential development in this area of the site is recommended in the Plan at 6-14 units/acre with more than one housing types and at more than one density level. The proposed 12-units/acre does not incorporate a true mix of housing options. This area should provide a mix of residential living that is underrepresented in the Worthington market and addresses the needs of aging residents, future young professionals, and those desiring amenity-rich living.
- The 2015 proposal from Lifestyle Communities expressed a mix of estate lots, cottage lots, manor lots and townhomes on the site at approximately 178-units for 13-units/acre; however, the community comments received on that proposal indicated the density and product was not what the community wanted to see on the site.
- Subarea #2 and subarea #3 are proposed to develop at different densities with a minimal mix of styles, however, there appears to be minimal units that provide single-level living.
  - Single-level living is one of the things the City has heard is desired by residents and is not abundantly provided for in this proposal.
- The Plan notes that this area creates the opportunity to introduce different types of housing options that are not available in the City.
  - Townhomes are the only housing option offered in this location besides a few single-level living options.
- The northern portion of the Neighborhood Core (subarea #2) has been identified in the proposal as townhomes at 2-3 stories in height with garages that will be a for sale product.
  - This for sale product would serve as a transition from the detached single-family lots to the west and north to the rental products proposed to the south and east towards High St.

- The Comprehensive Plan recommends a mix of single-family detached homes on small lots with alley garages, homes with great front porches for outdoor gathering, custom homes designed for first-floor living, luxury residences with integrated auto courts, well-appointed walk-up townhomes, and a limited number of high-end flats.
  - The renderings for the townhomes on the northern portion of the Neighborhood Core (subarea #2) show front porches and garage accessed by an alleyway, however these units are all attached townhomes with multiple floors, whereas the Plan recommends a variety.
- The southern portion of the Neighborhood Core (subarea #3) has been identified as townhomes at 2-3 stories in height with some units having attached garages and are a for rent product. These units are extremely narrow at 15-feet with a height varying of 2-3 stories. This does appear to offer a limited amount of single-level living options and is at the maximum density recommended in the Neighborhood Core.
- The rental product located in the southern portion of the Neighborhood Core (subarea #3) does not have a mix of housing types that included detached homes on small lots with rear alley garages and front porches as referenced in the 2014 Plan. The application identifies this area for townhomes that do not have front porches for outdoor gathering.
- The application states that the total amount of public/private open space is approximately 1.9 acres in size, however there are only a few areas that are reasonably sized areas of open space in the Neighborhood Core. The areas shown are proposed for recreation, separate dog park, gazebo, seating area and other small green spaces between the townhomes and space at the end of buildings.
  - The Plan recommends the creation of park space for the community and public enjoyment as an important component for any development on the site in addition to the area identified as the Tucker Creek Preserve.
  - Park space is critical to providing place-making in development layouts. The proposed open space does not seem to meet the goal of creating contiguous usable open space for those living in this development and in all of Worthington. The proposed green space does not appear to build upon the green space that is identified as the Tucker Creek Preserve.
  - The Plan calls for several acres of park space between the High Street Mixed Use and Neighborhood Core zones.
  - According to the Plan, park space and amenities should increase with density and should be useable, contributing ground for residents, workers, and visitors to the site. The areas shown appear to be left-over ground and an area identified for stormwater control, which is identified in the Plan as the type of ground that does not meet the park space goal..
  - The Plan and the community have asked for additional park space with amenities within the UMCH site. At this time, it does not appear that the proposed green space meets the need for usable contiguous open space that can build upon the Tucker Creek Preserve as described in the Plan.

*High Street Mixed Use*

This area consists of the frontage of the UMCH site along High St. and is recommended in the Plan for a mix of office, residential, and retail uses with the focus on commercial office and

medical uses with subordinate residential and limited retail uses. Staff has the following comments:

- The proposed 540 apartments with access to a proposed parking garage in this area does not appear to meet the intent of being subordinate residential.
- The apartments range in height of 3-5 stories in height with some buildings having first-floor retail.
- The application states they are providing approximately 1.2 acres of open green spaces, however this includes several areas associated with the apartments and/or amenities associated with the apartments. This is the area for the clubhouse, pool, volleyball courts and an interior courtyard surrounded by the apartment buildings and parking garage.
- The 2015 version expressed a mix of medical office buildings, first-floor retail, and apartments at 350-units. Many community members previously stated that they felt that 350 apartments was too much on the site.
- The site is now 3.42 acres smaller with less High St. frontage and the apartment count has increased by 190 units in the area along High St.
- Residential uses might occur behind as a transition to the Neighborhood Core.
- Residential use should be subordinate to the primary need for commercial office and medical uses in the High Street Mixed Use zone.
- According to the Plan, where the High Street Mixed Use is opposite existing single-family residential, it is expected that the new development will consist of residential development and/or substantial attractive buffers.
  - The apartments are 5-stories in height towards the intersection of Larrimer Ave. and Longfellow Ave. and the amenities (clubhouse, pool & volleyball courts) associated with the apartments are located along the curve in Longfellow Ave. across the street from existing single-family residential. Proper buffer and setback need to be provided and should not be located directly across the street from existing residential development.

*Mix of Land Uses*

As stated in the Plan, redevelopment on this site must create a high-quality, mixed-use development that is walkable, connected, and integrated within the site and with the City. This mix of uses should contain a range of residential types together with commercial office and neighborhood retail uses integrated with contributing and shared green space and amenities – all of which complement each other to create an active, vibrant place. Staff has the following comments:

- Commercial Uses:
  - The application proposes 60,000 sq. ft. of commercial retail/restaurant space and 25,000 sq. ft. of medical office space. The proposed square footages are not consistent with the recommendations found in the Plan.
  - Income tax generating employment uses such as office are critical to the fiscal sustainability of the City.
  - Neighborhood scale retail was recommended in the Plan due to the proximity of this site to Old Worthington and the Shops at Worthington Place as a means to not create a third retail center.
  - An application for the Shops at Worthington Place is currently under review to

demolish approximately 120,000 sq. ft. of an existing retail center at a key intersection in Worthington due to the challenges of competing with larger retail centers in in the region while this proposal calls for adding 60,000 sq. ft. of commercial retail/restaurant to this site.

- o The Plan calls for a mix of office, residential and retail uses with the focus on commercial office and medical uses with subordinate residential and limited retail uses.
  - ▪ The proposed retail and residential uses are not subordinate to the commercial office and medical use recommendations for the site.
- o As a landlocked community there are few opportunities to attract new Class A office tenants in Worthington that are seeking new construction. This site is key to attracting new office development.
- o According to the Plan, neighborhood retail can complement the development in the first floors of offices and residential buildings, however the abundance of retail proposed is out of align with the needs of the City seeking more opportunities for new commercial office development.
- Residential Uses:
  - o The proposal shows a total of 730-units on the site with a mix of housing types and are marketed as a rental product and a for sale product. There would be 612 rental units and 118 for sale units.
    - ▪ The City has heard from the community that there is a desire for owner-occupied housing units as a means to age in place and stay within the Worthington community.
  - o The 2015 proposal from Lifestyle Communities included more acreage and High St. frontage; however, it had a lower density than what is proposed today. The overall site has been reduced by 3.4 acres and 428± feet of road frontage. The previous density discussed was 14 units/acre on 41.22 acres and is now 19.3 units/acre on 37.8 acres. Over 350 people attend a meeting on this 2015 proposal, and the community was not supportive of the previous density, layout and amount of usable open space and this new proposal has approximately 200 additional units with less acreage.
  - o The Plan recommends a range of residential types together with office and neighborhood retail and shared green space and amenities designed to be sensitive to the neighborhoods adjacent to the site, and protect the natural features related to Tucker Creek.
  - o The proposed number of units does not seem consistent with the Plan and what has been expressed by the Worthington community.

### *Greenspace/Open Space- Parkland*

The Tucker Creek Preserve has been identified in the Plan as an area to preserve as a natural green space amenity for the site and the community. The creek and the step slopes are not developable, and the wooded areas are important contributing and environmental features. There is a strong desire to continue linking neighborhoods, parks, and destinations with multi-use trails throughout the City. The creation of park space for community and public enjoyment is an important

component for any development on the site in addition to the Tucker Creek Preserve. Staff has the following comments:

- There is an opportunity to have a bicycle and pedestrian connection between High St. and Evening St. and around the entire site that would promote additional bicycle and pedestrian opportunities and access to greenspace/open space on the site.
  - Sidewalks are proposed throughout the site and a small multi-use trail along the rim of Tucker Creek Preserve; however, the vision was to build upon the Tucker Creek Preserve's existing assets. This proposal does not provide amenities that we have heard the community would like to see on the site.
- Park space is recommended in the Plan to provide a place for community gathering functions and to provide place-making in the development's layout as well as a greenspace balance to the uses proposed on the site.
  - Contiguous usable greenspace/open space is key to what the community expects to the see on the site.
- According to the Plan, the amount of greenspace/open space is expected to increase as the density on the site increases.
  - This proposal does not appear to be in line with that recommendation.
- The Plan indicates park space should be useable, contributing ground for residents, workers, and visitors to the site and not stormwater ponds or left-over ground.
  - Tucker Creek Preserve appears to be cut off from the rest of the site with the only access being a multi-use path that follows the perimeter of the multi-family units.
  - A stormwater pond is proposed along the Evening St. frontage abutting the Tucker Creek Preserve.
    - There might be better ways to incorporate stormwater management on the site that would be an attraction and benefit to the development.
  - The Plan envisioned a possible three season shelter house, outdoor amphitheater, multi-use paths and more passive recreational uses in the areas around and in the Tucker Creek Preserve. Nothing has been proposed at this time; however, the applicant has stated that they would be willing to work with the City on desired amenities in the appropriate places on this site.
  - Access to the Tucker Creek Preserve is blocked by the multi-family housing units in subarea #2 and #3.
    - Contiguous usable greenspace/open space is key to what the community expects to the see on the site.
  - It is expected that greenspace/open space be incorporated into the Neighborhood Core and the High Street Mixed Use zones as park space useable by the community.
    - Many of the proposed pockets of greenspace/open space do not appear overly inviting to the community.
- The Tree Survey & Preservation Plan should be discussed in greater detail. There appears to be an opportunity to save some high-quality species of trees along the perimeter of the site, however, there does appear to be some high-quality species of trees in the center of the site that will likely be removed as part of any development. There might be the possibility to incorporate some of these trees into the overall design.

*Traffic*

The City has requested an updated Traffic Study for the site. The previous Traffic Study was prepared in 2015, updated in 2017 and again in 2018. City staff felt that it was appropriate for an updated Traffic Study using previous traffic counts for the City since traffic patterns and volume have substantially changed since the pandemic. Staff has the following comments:

- City staff, including our traffic consultant Arcadis, met with the applicant and their engineer EMH&T on November 13, 2020 to discuss the following:
  - The need for an updated Traffic Study for the site.
    - As of January 7, 2020, we have not received an updated Traffic Study.
  - Bicycle and pedestrian improvements could be better incorporated into the overall design.
  - Public and private roadways proposed on the site.
    - Wesley Blvd. has been proposed to become a public roadway and dedicated to the City for maintenance.
      - City staff has concerns about how this road was constructed and whether it was constructed to public road standards since it was originally constructed as a private road.
  - Compliance with the City's Complete Street Policy will be required for all newly constructed streets.
  - The need for vehicular, bicycle and pedestrian connections to the existing roadways at Evening St., Longfellow Ave., Larrimer Ave., Wesley Blvd. and High St. and proposed new roadways on the site should be further discussed and reviewed.
  - Improvements along High St. as proposed with the development and streetscape improvements associated with these improvements need further consideration.
    - Streetscape improvements will need to be discussed and incorporated into the overall design.
  - Intersection streetscape improvements at Larrimer Ave. and High St. will need to be discussed and incorporated into the overall design.
  - There is a need to address the intersection of High St., Wesley Blvd, Worthington-Galena Rd. and Crandall Dr. as part of this development as it relates to traffic being able to go east/west through the intersection.

*Stormwater*

Stormwater management will be extremely important as this site develops. The application identifies a wet detention basin along Evening St. and stormwater storage vaults and surface detention facilities located within the open spaces and parking areas on the site. The City and its consultant, ms consultants, will be reviewing the final stormwater design to ensure compliance with Ohio EPA standards and the City's Stormwater Manual as the project progresses. The stormwater design has been proposed to outlet to the existing Tucker Creek along the southern property line. Staff has the following comments:

- A comprehensive look at the entire site for stormwater will be needed that can be developed in stages as the overall site would likely develop in phases over multiple years.
- According to the Plan, stormwater controls should be aesthetically integrated into the site

and be natural in appearance and serve as an amenity to the site. The current proposal just has the detention pond located along Evening St. and the proposed new roadway to the site. Vehicular and pedestrian safety will need to be discussed concerning the detention pond.

- Sustainable and green infrastructure needs to be incorporated into the overall development as stated in the Plan.
- The Plan states the expectation that stormwater controls on the site will be required to meet or exceed all requirements.

*Architecture*

The property is located in the Architectural Review District and any new construction would need to meet the Worthington Design Guidelines and would be subject to review by the Architectural Review Board. The Plan provides additional guidelines for residential and commercial development. The two parcels that are currently zoned R-10 fronting on Larrimer Ave. would need to be added to the Architectural Review District. Staff has the following comments:

- Residential Development:
  - As the Plan states, architecture and design should be rich and varied (not repetitive/homogeneous) with attention to detail.
    - The proposed architecture in subareas #1, #2 and #3 appears to be repetitive in design and layout for the proposed detached single-family homes, townhomes, and apartments.
    - The application references vinyl siding which is typically not permitted in the Architectural Review District.
    - All proposed materials should follow the Worthington Design Guidelines.
    - Renderings provided in the application do not seem to match with the submitted elevations.
    - There are additional Residential Design Guidelines called out in the Plan and the Plan notes development should adhere to the Worthington Design Guidelines.
- Commercial Development:
  - The Plan notes the Worthington Design Guidelines provide guidance on site development, scale, form, and massing, setbacks, roof shape, materials, windows and signage. The Plan further states development should improve the pedestrian scale and walkability of the City's commercial heart and create four-sided architecture that is attractive on all sides. Building forms, materials, and setbacks should be consistent with historic patterns.
    - The proposed architecture in subarea #4 does not appear complementary to the guidelines recommended for the site as it pertains to the multi-family buildings and the parking garages. The parking garages appear to be exposed to the High St. frontage.
    - The application references vinyl siding, stucco, faux balconies, faux chimneys and enclosed shuttered windows which are typically not permitted in the Architectural Review District.
    - The elevations are repetitive in design and the scale, form and massing of the site do not appear to meet the intent of the guidelines.
      - This is extremely apparent when you are looking at the apartment

buildings on the northern portion of the site.
- The renderings included in the packet do not seem to match with the submitted elevations.
- Elevations for the commercial buildings along High St. have not been submitted, however the application does state that the buildings will have a setback of 25-feet from the public right-of-way.
  - A setback of 25-feet is recommended; however, the street frontage should be activated and have usable entries according to the Plan.
- Streetscape improvements will need to be discussed at some point in the process. This would include new mast arms at Larrimer Ave. and High St. streetlights, street trees, landscaping, pedestrian sidewalks and/or paths.
- The surface parking lot along High St. between the proposed commercial buildings should be screened and/or set back from the High St. frontage.
  - The use of the High St. frontage should be utilized for something greater than a surface parking lot.
- There are additional Commercial Design Guidelines called out in the Plan that reference the Worthington Design Guidelines that should be considered.

## Miscellaneous:

City Council members provided a list of questions to City staff and to the applicant on December 3, 2020 related to their proposal. Currently City staff is still waiting on a response from the application for many of the questions. Lists of the questions submitted by City Council Members are available on the City's website.
- Lifestyle Communities Development Application for the UMCH Site – Applicant – Questions from City Council Members – Applicant
- Lifestyle Communities Development Application for the UMCH Site – City Staff – Questions from City Council Members – City Staff

The applicant provided an Economic Development Synopsis on the afternoon of January 7, 2021 and stated they have completed an Economic Development Study for the site; however, this study has not been submitted to the City for review at this time.

July 15, 2015 – City Council Letter to Lifestyle Communities or go to worthington.org/umch
City Council provided a letter to Lifestyle Communities on July 15, 2015 responding to their conceptual plans shared at a public meeting on June 29, 2015. Council reiterated the significance of this development to all Worthington residents and that they should continue to engage in a comprehensive, inclusive community outreach process to listen and respond to the interest of the Worthington residents. The issues raised by the community focused on abundant greenspace and parklands, stormwater, managing traffic to the neighborhoods, school capacity, mix of housing types, number of residential units and the sizes of buildings. These were just a few issues that Council stated should be incorporated into future discussions, studies and conceptual plans.

The UMCH Development Update is available at worthington.org/umch project page on the City's website offers the following information:

- Applications & materials associated with the current proposal.
- Ways to learn more about the proposal and understanding the rezoning and development review process while explaining what a PUD is.
- Ways to provide feedback throughout the public process.
- What are other people saying in the community. We have posted all comments at (UMCH Public Comments) or go to worthington.org/umch to view all comments. All comments are posted to the website and have been shared with the Board & Commission members and are now part of the record.
- UMCH Background Materials
- Notify Me – Gives you the opportunity to receive updates by email when there is new information available.

**Worthington City Charter**

The Charter provides the following information regarding the role of the Municipal Planning Commission:

SECTION 6.03 Powers and Duties of Municipal Planning Commission
The Municipal Planning Commission shall have the power to:
(1) Review and recommend any revisions to the Master Plan, official map, area plans, and development standards of the City as often as necessary but not less frequently than every five (5) years;
(2) Recommend to Council the disposition of requests for subdivision platting;
(3) Recommend to Council amendments to the zoning plan and ordinance of the Municipality;
(4) Recommend to Council zoning changes and zoning for newly annexed areas;
(5) Determine or recommend to Council, as provided by ordinance, the disposition of requests for conditional use permits;
(6) Cooperate with the regional planning commission and the planning commissions of area municipalities;
(7) Act as the Board of Architectural Review as provided by ordinance. The Council shall annually appoint as additional voting members of the Board of Architectural Review two representatives of the Architectural Review District, one or both of whom shall be a resident freeholder of said District;
(8) Perform such other duties, not inconsistent with this Charter, as may be required by ordinance.

In rendering a decision or recommendation, the Municipal Planning Commission shall articulate its basis therefor, in writing, by reference to the relationship that decision or recommendation has to the overall comprehensive planning goals of the City, which may be found in the Master Plan, the zoning map, a course of zoning or subdivision practices by the City, or any other acknowledged comprehensive strategy or goals previously established at the time of the decision or recommendation.

If the Commission is ready to act, the following motion can be approved or denied by the Municipal Planning Commission, or the item can be tabled.

*All motions are required to be presented in the positive.*

**Discussion:**

Mr. Coulter stated that the purpose of this meeting was to give the MPC, ARB and the community a chance to listen to the proposal by Lifestyle Communities for the development of the United Methodist Children's Home property. This meeting should be the first of many meetings and opportunities to make public comment. The meeting was structured in the following format which was to be followed as closely as possible:

- 7:00 pm – Presentation by applicant
- 8:00 pm – Start of Public Comments
- 9:00 pm – 10-minute break
- 10:00 pm – End of public comments/Start of Board comments/questions
- 11:00 pm – End of meeting

Verbal public comments were limited to those speakers that had already signed up.

E-mail comments sent to planning@worthington.org during the meeting would be summarized for the Board and Commission during the meeting. All emailed comments would be posted on the City's website.

Mr. Brown swore in Mr. Thomas Hart on behalf of Lifestyle Communities, 1033 High St., Worthington, Ohio, who said he was the zoning lawyer for the applicant. Along with Mr. Hart, was Mr. Steve Campbell, of Northstar Policy and Project Development Group. Mr. Hart said he wanted to say up front that their presentation was meant to be introductory and for that reason the presentation was not very visual. The presentation would be more narrative in words. Mr. Hart began his presentation for the Lifestyle Communities PUD Redevelopment Plan. He said he would discuss their Operating Assumptions and Goals, Park vs. Development, Process and Community Outreach, the Site Plan and Comprehensive Plan Goals, Mixed Use Context, addressing a Fundamental Need, Understanding Economic Impact, and Leveraging Developments for Community Needs. Mr. Hart said LC has been in business for about twenty-five years, and they are a proven development and operating organization. They provide a unique combination of community designs and one of a kind amenity packages and that has led to a lot of success attracting high earning residents. Mr. Hart said they are led by a seasoned management team whose members have at least twenty years of industry experience. As a company, LC currently owns and manages over 7,400 units across 17 properties, valued at 1.5 billion dollars. They are a builder and a holder not a flipper. They own and manage their own properties. Their inhouse capabilities include dedicated development/redevelopment, construction and property management, acquisition, marketing/brand management, entertainment and hospitality professionals. Mr. Hart showed a drawing depicting the company's footprint across the country, in the Midwest, South, and West. The headquarters are in Columbus, Ohio, with regional offices in Nashville, Tennessee and Denver, Colorado. Over that twenty-five-year period, they developed 15,000 units in the seven target markets, and they have target goals to reach unit counts of 2,500 to 4,000 in each of the seven markets.

Mr. Hart said LC caters to high earning post graduate singles, newly married professional couples, as well as empty nesters seeking the best-in-class amenities, and shared spaces which bring people together. They have created a branch which attracts affluent millennials as well as

downsizing active adults. Mr. Hart showed a couple of different case studies in their portfolio. He said they understood the uniqueness of Worthington and the site, and he showed how the company has established themselves in both urban and suburban context. Mr. Hart said the properties were very successful and he invited people to do some of their own research looking at the other properties on the internet. Some of their developments include properties in New Albany, Dublin, Hilliard and Sunbury.

Mr. Hart said in terms of their basic statements and assumptions and how they approach the site he first wanted to discuss Value and Character. He said private real estate investment of nearly $200 million at this site would protect and enhance existing property values nearby. In central Ohio, mixed-use projects in the cores of older suburban peer communities, such as in Grandview Heights, Upper Arlington, Dublin and Bexley, have added active, vibrant developments, offering housing choices at higher densities, and mid-rise heights, without degrading property values nearby or changing community character. New mixed-use developments are complementing older community strengths and attracting new investment, housing and economic diversity, value and vibrancy.

LC is a Columbus, Ohio developer and the owner of what it builds, not a seller or a flipper. As an owner, LC has to compete for residents on an ongoing basis in highly competitive markets based on design, quality, maintenance, and site amenities. LC has every incentive to see its built assets appreciate, not diminish in value. As an owner, LC also wants neighboring property values to stay positive and grow in value. There is no incentive or business strategy to build and own assets and allow them to decline or harm nearby values.

Mr. Hart said in terms of considering this property for a private park or a development, this site will develop for value in the marketplace and its development needs to be economically positive for the city and the community. This site will not be a park but will include significant open space. The City Comprehensive Plan calls for redevelopment on this site, with office, medical, commercial and residential, with single-family to multi-family transitioning, along with green space. Public parks require ongoing taxpayer dollars for maintenance and do not generate revenue. The current landowner has a right to sell the property for value to fund its continuing mission in the region. (Comp. Plan Objectives P.91) A positive development can be achieved that meets community goals and works in the market.

They are asking the community to consider the positive economic impact of this site vs. keeping it fallow: Baseline Economic Impact Analysis shows the compelling impact of committing to mixed-use development on the property. A park would forego job and income potential of the site itself, the offering of housing choices to the community and the site's potential to provide an economic boost to Worthington's retail, service, and core business district. Any viable development plan should include significant and connected open space, which can be public, private or shared, but this site should develop and provide a financial boost for the City as called for in the Comprehensive Plan.

The applicant has begun community outreach, appropriate for social distancing challenges. LC Team is addressing resident questions via zoom meetings. They have invited over 100 residents who have contacted city staff and/or desire to communicate with the applicant team. The have

and will schedule meetings with organized advocacy groups such as WARD, BWF, etc. They understand the outreach process necessary to consider development on this site and understand the importance of community interaction and the consideration of community input directly. Their goals are to take the time, gather community input, and work towards plan modifications that support the opportunities this site presents to the city, community as a whole, and the Applicant. They will continue outreach meetings throughout the process.

The project benefits and site plan goals are to create a critical mix of live, work, shop and entertainment uses. This plan attempts to attract and support office, medical, commercial and other economically beneficial job producing uses along the important High Street corridor helping connect Downtown Worthington and northern Worthington redevelopment sites, by establishing a vibrant live, work, shop and play district that generates revenue for the community. With its economy of scale, new homes, and built-in workforce and consumers with significant disposable incomes, appropriate density defines a self-sustaining mixed-use project. Feed Worthington's Core: Locating hundreds of residents on this site will drive employment uses and commercial activity and give existing core Worthington businesses an important boost.

Another clear plan benefit is they are trying to place housing close to where people work. This plan locates housing opportunities close to workplaces, shopping, restaurants, entertainment, outdoor amenities and the core of downtown Worthington so there is less reliance on vehicles. This site plan has potential to provide housing close to other future job centers – like the Anthem, Worthington Gateway, and Worthington Mall Re-developments.

One of the key goals is housing diversity. A key Comprehensive Plan emphasis:
The goal is to provide an increase in housing options and diversity of product types to attract downsizing active adults and empty nesters. As is well documented, the "baby boom" market segment is on the move and drives many different housing options. From apartment rentals by choice, smaller townhome footprints, to well apportioned and designed patio homes with mainly first floor living. This housing brings demand for shopping, food, services, amenities, and JOBS in close proximity.

Mr. Hart said the housing diversity and vibrancy attracts young professionals. They come with disposable income, growing career success and upcoming key spending years. They will establish roots in the community, drive the local economy and become the future buyers of existing Worthington homes. They are the "farm system" for the community's future prosperity and homes sales for value. The educated, professional, creative class of workers attracts employers. Employers and companies who want to grow will locate their businesses to accommodate the needs of this market segment.

The purpose of a Comprehensive Plan: "A comprehensive plan is created with input from the community and adopted as an official plan by City Council. As such, it provides strong legal underpinning when used as a basis for zoning, capital improvement, and land use-related decisions. In fact, the Comprehensive Plan should serve as a vital reference to inform city leaders and the community as public policies are developed and decisions are made. In summary, a Comprehensive Plan is the official statement of the municipal legislative body which sets forth its major policies concerning desirable future physical development." Page 2, Introduction

Comprehensive Plan Update 2005.

The Comprehensive Plan encourages housing alternatives, density and mixed-uses at the UMCH site.

- "Higher density residential development could be accommodated here along with transition areas for the single-family neighborhood to the west." Comp. Plan – page 90;
- "This site's close proximity to historic Old Worthington makes it a prime location for walkable residential development and denser, amenity-rich housing types similar to what is discussed in the improving Housing Balance section of the Comp. Plan – page 73, and 92;
- "This residential area would consist of cluster residential development and transition to more dense urban village residential development to help address the housing type imbalance of the City." Comp. Plan – page 90;
- Comp. Plan 2014 – Objective 3 "Addressing needs of current and future residents by providing new housing types/options that are under-represented in the market and complement Worthington's current offerings." – page 91;
- Housing density and options are needed to address the lack of updated multi-family and housing alternatives in Worthington, see pages 23 and 24;
- "If properly designed and located, these alternative housing types can be incorporated in Worthington's housing stock and fill missing segments that will provide living opportunities for those who want to remain in the City. However, because there is so little ground for new development, this will require redevelopment and densities to achieve."
- The addition of new housing choices under the LC Plan meets the City Comprehensive Plan goals for housing diversity and placing single-family near existing single-family, transitioning multi-family density in the middle of the site, and places the most intensity, residential, commercial and office uses toward High Street;
- See Development options illustrated in the Comprehensive Plan and the transition to more dense development from the Worthington Estates edge to High Street. (Comp. Plan pages 91-2014 and Figures 45 and 46 on page 89-2005;
- Comprehensive Plan recommended density is similar to Worthington Estates (3 du/ac) and Old Worthington (4 to 5 du/ac) page 92;
- LC Plan – Worthington Estates edge density is 4.1 du/ac;
- Projected homes values of $550,000.00 to $650,000.00 dollars built by Bob Webb homes;
- The Worthington Estates edge "may be smaller homes with smaller yards that provide first floor living opportunities for Worthington residents – an option in which many residents expressed an interest during the community meetings." Comp. Plan page 93;
- Comp. Plan recommended density at 6 to 14 du/ac;
- LC Plan Neighborhood Core is blended 12 du/ac;
- 94 owner occupied townhomes at 10.4 du/ac;
- 72 rental townhomes at 14.1 du/ac;
- For sale townhomes values at $250,000.00 to $450,000.00 dollars;
- Rental townhomes values $180,000.00 to $250,000.00 dollars;

- The Neighborhood Core is expected to include "more than one housing type and at more than one density level." Page 93

High Street Mixed-Use Residential

- Comp. Plan does not recommend a specific density for this area.
- LC Plan overall density is 19.3 du/ac on 37.8 acres with 10 acres (26.7%) open space.
- This level of density is not uncommon for mixed-use projects to succeed.
- "The objective of the High Street Mixed-Use zone is to create a high-quality, dense, walkable, connected, mixed-use development that creates a dynamic space and signature address to attract Class A office tenants along High Street and add vitality and life to the High Street corridor." Page 92;
- LC believes a significant residential component is needed in this subarea to:
  Support neighborhood retail and commercial activity;
  Feed existing Old Worthington businesses;
  Create vibrancy that attracts employment uses and the income generation to meet the Comp. Plan goals.

Housing Summary

- Diversity – Four different product types and price points from $180,000.00 to $650,000.00 dollars;
- All product types are under-represented in current Worthington market and designed to increase housing choices;
- Single-story living is offered with apartments, and Bob Webb Patio Homes;
- Housing co-located and work-spaces will attract employers.

Project Benefit and Site Plan Goals

- Preservation and Planning: Permanent preservation of the Tucker Creek subarea meets Comprehensive Plan and community goals, but the initial LC plan makes few programming or design assumptions.
- This was deliberate as a collaborative process is desired with city professionals and the community to develop design, function and connectivity parameters to best to integrate and protect the Tucker Creek Preserve.
- The plan spreads open spaces and community gathering areas throughout subareas to be near where people live and connects them with sidewalks and paths to create continuity.

Mixed-Use Context

- Context of this application, this site and its Comprehensive Plan is consistent with established communities updating their inner core with vibrant re-development in central Ohio and across the country.
- This approach harnesses the positive aspects of density and captures its value.

- Density, mixed-use vibrancy, and live, work play developments attract young professionals, active adults, downsizing existing residents and employers, who want housing and entertainment opportunities for their employees close to work.
- Rather than the 1990s vision of building spec office to attract workplace investment, the formula for successful local economies has been altered.
- Technology and productivity were driving such changes prior to the pandemic but the trend has accelerated.
- It will take more than building Class A office space to pull workers out of their homes in the post pandemic period.
- Work environments must compete to attract those high earning and sought-after professionals who have become accustomed to zero commute time and their workspace at home.
- Office and physical work environments that will succeed must look at strategies such as co-locating residences with workspaces and green spaces, as well as outdoor amenities. The walking strategy will be huge. Allowing people to stay out of cars, and rush hour traffic, to walk to work, and walk to get lunch, shop, and walk on work breaks in path connected open spaces will become competitive and quality of life markets. Employees and employers care about these factors because they translate to mental and physical health, productivity, and quality of life.

How the real estate market views this site and its potential:

- Providing shopping, restaurant and entertainment opportunities for hundreds of workers and residents near a venerable, and revitalized downtown core is a major competitive advantage for this site and for the City of Worthington.
- It's hard to think of a re-development opportunity, that can literally feed and enhance an existing downtown business core, with hundreds of new residents, and their significant disposable incomes, within walking distance.
- LC residents have an average household income of $107,000.00 company-wide. This meets the Comp. Plan goal of supporting the existing core business district.

Mixed-Use Context

- Established communities are committing to density, housing diversity, blending live, work, shop and entertainment environments to attract employers based on where their employees want to live.
- This vision attracts people and creates a place employees want to be, first, then attracts employers who locate to accommodate their employees, (And to compete for a top workforce)
- A portion of our presentation tonight will review how mixed-use development is being implemented in other communities and site in central Ohio with these strategies.

Comprehensive Plan Goals: Employment

- A critical issue identified in the Comp. Plan:

"Worthington requires development that generates employment within the City."

- "The objective of the High Street Mixed Use zone is to create a high-quality, dense, walkable, connected, mixed-use development that creates a dynamic space and signature address to attract Class A office tenants along High Street and add vitality and life to the High Street corridor." Page 92
- The applicant agrees with City revenue and employment goals at this site but believes a vibrant mix of uses, led by impactful residential growth and co-location of housing and workplaces will drive office and employment uses.
- From UA Website on Kingsdale Project: "…Density that mixes in residential and office space with existing uses is key to increasing the vibrancy of the Kingsdale Shopping Center and surrounding restaurants, amenities, and retail businesses. For retail and restaurants to thrive, you need to combine disposable income and density. We believe this development will help bring that to Kingsdale."
- From UA website on Kingsdale Project: "All signs indicate that the post-Covid office market will place a premium of offices that can provide amenities to attract workers to the office instead of wanting to work from home. We believe that office space surrounded by restaurants, grocery stores, apartments and a community center would fit that model."
- Locating mixed use density and attempting to create a critical mass of residential and commercial activity are challenging, but as our Economic Impact Analysis demonstrates, such economics scale and threshold of activity brings with it increases in value, significant revenue generation for the city and the school district.

Mr. Hart said he was going to turn the presentation over to Mr. Steve Campbell. Mr. Campbell discussed the following.

Housing Need and Economic Impact

Addressing a fundamental need:

- Central Ohio needs new homes
- Housing issues and barriers
- Vision Worthington tackles growth issues

Understanding Economic Impact

- Real estate investment, jobs and payroll
- Generating local taxes

Providing Context

- Leveraging Development to meet community needs
- Notable mixed-use development
- Municipal incentives
- Public and private investment
- LC proposal highlights and leveraging opportunities

Central Ohio Needs New Homes

Central Ohio's population is expected to exceed 3 million residents by 2050. Two recent studies estimate the region's housing needs:

- BIA, Columbus 2020, Columbus Realtors
  (2018): commissioned report by Vogt Strategic Insights that estimated the region would need to produce 450,000 new housing units based on the historical ratio of one new home per new job the region experienced in recent history.

- Mid-Ohio Regional Planning Commission (MORPC)
  (2020): released a Regional Housing Strategy
  (2020) estimated the region needs to add 266,000 additional housing units by 2050; 127,000 need by 2030.

MORPC: Housing Needs and Barriers

Core Regional Housing Issues
- Increased competition for homes, driven by population growth and low production rates
- Barriers limiting access to homes, lending practices, credit worthiness, housing instability and discrimination
- Limited supply of homes priced for low-income households
- Demand for more homes, server a wider range of ages, abilities and sizes, like Increasing racial and ethnic diversity
- Growing number of older and younger adults seeking lifestyle and home changes

Barriers That Rose To The Top
- Not in my back yard (NIMBY)
  Attitudes and negative perceptions about housing density and affordability result in lack of public and political support
- Increasing costs of residential development, including land costs, site selection, and regulatory costs and regulations can decrease production, particularly of housing of lower price points
- Uncertainty associated with local land use processes and standards and a need for broader assistance

Vision Worthington

- Many central Ohio communities are working through how to address important growth matters, like housing, within their unique histories, needs, goals, and culture.
- Worthington has just completed Vision Worthington, a community effort to address many important issues, including challenges of growth and development, as it looks to shape its future
- In this process, the community shared key demographic information about communities in the region, challenged residents to discuss important issues, and work towards a

common vision.
- The community's broader deliberations on growth raised many of the issues that the LC proposal is confronting, including density, scale, land use, housing choices, development on green space.
- Many of the aspirations expressed on growth issues are similar to the attributes of the LC proposal: mixed-use development, housing choice, connectivity, protecting streams and trees, and vibrancy along High Street.

Vision Worthington Shares Key Stats

- Worthington's housing stock is aging. Median year built is 1961 and 64% are 50+ years of age
- 79% of housing stock is owner-occupied and there is a low housing vacancy rate
- Housing stock is dominated by detached single-family units (79%)
- Over a third of Worthington's households are empty nest couples
- Compared to a composite of the similar communities of Bexley, Grandview Heights, and Upper Arlington, Worthington's:
Median home values and rents and pace of "new home builds" are lower
Median age and percentage of senior citizens aer higher
Median income is lower

Vision Worthington Discusses Big Ideas

Worthington will expand housing choices to foster a more livable community for all ages and income levels.
- Insight:
We want to increase housing options for all ages and price points and be more inclusive but there is a resistance to denser development and fear of losing greenspace and openness.
- Background
Long-time residents or those residents who want to move into condos to age in place have difficulty finding these options in Worthington.
If we want to encourage diversity, we need different types and prices of housing.
A survey of 48% of the residents show people do not live in Worthington because of housing availability issues.

Vision Worthington-Community Aspirations

Future Worthington should:

- Be diverse
- Have mix of housing types
- Have more variety of businesses
- Have a strong tax base/City Budget
- Be pro-active, forward-thinking, preserve trees and the natural environment

- Connect High Street
- Retain historical character
- Focus on economic development, housing, land use, infrastructure

Worthington can improve:

- Diversity of commercial businesses
- Communication
- High Street corridor
- Multi-family housing infrastructure
- Mixed-use development
- Additional multigenerational population
- Restaurants
- Social Services
- Transportation

Understanding Economic Impact

Lifestyle Communities (LC) commissioned an economic impact analysis, breaking out its proposal as follows:
- Real Estate Investment: by subarea, phase, number, type and value of units, and total investment value
- Jobs and payroll – number of direct construction jobs, commercial and medical jobs, wages, and total payrolls
- Local taxes – income and property tax revenues for the city, schools, library and other recipients

Real Estate Investment, Jobs and Payroll

Residential and Commercial Investment, Green Space
- Provides 730 single family homes, townhomes, High Street corridor units
- Commercial & Medical offices (60k & 25K sq. ft.) and 2 parking garages
- Protects nearly 6 acres of green space along Tucker Creek
- Total value of these investments is nearly $200 million

Jobs and Payroll
- 801 direct construction jobs and $51 million in payroll over 4 years
- 145 commercial and medical jobs with initial payroll of $11 million/yr.
- Total commercial-medical payroll is nearly $450 million over 30 yrs.

Generating Local Tax Revenues
City Income Taxes
- As construction begins, jobs provide about $300,000 in annual tax revenue for 4 years
- At build out, annual tax revenues from medical and commercial jobs rise from about $300,000 a year to $500,000 a year over 30 years

Property Taxes
- The development will generate over $220 million in tax revenues over 30 years.
- City will collect $11 million in tax revenues over 30 years
- Other recipients:
  Schools $162 million
  Library $9.75 million
  County and township levies $40.6 million

Leveraging Mixed-Use Development to Meet Community Needs
- Central Ohio is a growing region and municipalities are facing tremendous growth issues that divide their communities
- Neighboring municipalities are embracing mixed-use development as a way to partner with developers to address growth by:
  Redeveloping tired areas
  Offering housing choices
  Creating jobs
  Meeting community needs
  Stimulating vibrancy

Municipal Tools and Incentives
CRA Tax Abatement
Tax Increment Financing
New Community Authority
Development Grant
Land Acquisition
Land Donation
Income Tax Rebate
Lodging Tax Rebate

LC Proposal
Mixed-Use Highlights
Housing Diversity with units
- Single Family Homes
- Two townhome styles
- High Street Units
- Offices space and jobs
- 60K sq. ft. commercial space with 100 jobs
- 25K sq. ft. medical office space with 45 jobs
- Vibrancy on High Street
- Two Parking Garages
- Protected stream and trees

Leveraging Opportunities
- Needs

Traffic safety and transportation
Investments
Park and trail development
Public parking
Other needs identified through process
- Tools, incentives and resources
TIFs
NCA
Millions in local tax revenues

Economic Impact Analysis Notes

- The economic impact analysis was presented by North Star Policy and Project Development LLC with the assistance of AIC Solutions LLC
- Residential and commercial investment values and build out information provided by Lifestyle Communities
- Tax revenue was calculated from current local income and property tax rates
- Property taxes are estimated to increase by 2% for the Franklin County Auditor's Triennial Reappraisal Update and 4% for the Franklin County Auditor's Sexennial Reappraisal Update
- Wage increases are estimated to increase by 2.5% annually over the next 30 years which was the average annual increase in Bureau of Labor Statistics Wage index from 2000-2019.
- Employment and wage impacts from constructing residential units were obtained from the National Association of Home Builders 2020 Housing Impact Model.
- Employment and wage impacts from constructing commercial square footage were obtained from the Bureau of Economic Analysis Regional Input-Output Modeling System II.
- Employment and wage estimates for the commercial and medical space were collected from the U.S. Energy Information Administration Commercial Building Energy Consumption Survey and the Bureau of Labor Statistics Occupational Employment and Wage Survey.

Mr. Coulter said they would open the discussion to hear from the nine to eleven people who signed up to speak.

Mrs. Bitar swore in the first speaker, Mr. Bill Knapp, said he wanted to comment about the updated 2014 version in the Comprehensive Plan. "The more than 40 acres of the UMCH site presents a rare opportunity for Worthington to experience redevelopment on a visible and sizeable site near the heart of Worthington. Worthington was founded on a master plan Community. Because of its size and importance of the UMCH site it is critical that any redevelopment be master planned and consider the site as a whole. He felt those words really spoke to the heart of Worthington. Mr. Knapp said he wanted to take a look at few of the objectives that were critical. He said he has lived in the area for twenty-five years and he and neighbors said they see the value in this site being used as a mixed-use area. They understand the commercial development is critical to the viability to the property but the key issue he would like to bring to the table is the density factor that he

heard from LC. In earlier presentations they were at 500 units, and now they are at 730. Mr. Knapp said he did not feel that number was compatible nor complimentary. He understood that LC markets luxury, but would they deliver a product that is that luxurious. He asked if the product would be enduring for continuation. Mr. Knapp felt the area that was listed as open space was a misnomer because it is non-buildable area anyway. He said he was very supportive of the commercial development along High Street but said apartments would not add to revenue like commercial property and business tenants. Mr. Knapp said they were not discussing the P and L to this matter, and the cost of delivering services to this area for 730 housing units. He wanted to know if they had to build that many units and why the density was so high. He was not in favor of the number of units proposed to be built.

Mrs. Bitar swore in Mr. Scott Taylor. He said he saw that in the Agenda that the MPC would be recommending denial of the LC request. Mr. Taylor said that LC's request doubles down on a previous attempt in 2017. They are scaling up the residential unit count from 500 units to 730 units. He said his only comment was, "Really?" He said nothing had been done in the last decade and wanted to know if it was time for the City to take a different approach. Mr. Taylor felt that there could be more commercial development instead of more residential units, and more modest residential development. Mr. Taylor said at the outreach meeting held by LC representatives, they made it clear the density had to be at that number for them to reach the profit goals for their project. Mr. Taylor said Mr. Hart was very cordial and professional, but this project was not a proper fit for the UMCH property. He asked why they would want to continue to think LC is a partner they want to work with and if there was another option.

Mrs. Bitar swore in Mr. Chet Ridenour, Highgate Ave., who said he lived near the proposed project at the UMCH site. Mr. Ridenour said he has been a Worthington resident for thirty-two years. He thanked the Board members for their time and said he wanted to go on record for strongly opposing the current LC proposal, and obsessively opposed to the large number of apartments in their plan. Mr. Ridenour said he did not want to be labeled as anti-development, he said was against bad development and the current proposal by LC for 540 apartments is not good for the community or the city. He said the development is especially bad because it is located adjacent from his neighborhood. Mr. Ridenour said the last proposal by LC they wanted to build 400 apartments and that was overwhelmingly rejected by the people of Worthington and now they are back and proposing even more apartments. He said this is a bad idea and a bad proposal and explained why. First, this would overcrowd the schools which are already crowded, and there are lotteries for children and grandchildren to get into all-day kindergarten. He said his own grandchildren that also live near the site have been subjected to lotteries to get into all day kindergarten and he knows of families that have had to go on a lottery list for care after school programs. What would hundreds of more children who live at the site do to the already crowded school system. If the Architectural Review Board (ARB) and the Municipal Planning Commission (MPC) move to approve the plan, they may have to answer to their friends as to why they voted to increase school crowding just so the LC company can have increased profits. Secondly, the LC plan is a bad idea because it will increase traffic especially along Evening Street which he has to travel frequently. There are hundreds of children that must cross Evening Street every day and how will that affect those children. What will you say to your fellow citizens of Worthington when they are sitting in that long line of traffic on State Route 161 after sitting all day at work and trying to turn into the neighborhood. He said he has already experienced having to wait for four traffic signals so he

could turn onto Evening Street to get home. What will LC's plan do for that traffic, it will worsen the traffic even more. Thirdly, this is Worthington's last chance to make a significant improvement in green space. The LC plan needs more green space, and the space needs to be aggregated. You can not have little spaces here and there, there needs to be an aggregate green space. Mr. Ridenour said there are many experienced professionals in Worthington, including real estate professionals and developers that would tell you LC would make a significant amount of money without building any apartments. With the apartments, LC would just make many more millions of dollars at the same time they increase the crowded schools, increase traffic and decrease the amount of green space, all which would decrease the quality of life in Worthington. He reminded the Board members of who they represent, and they represent the people of Worthington, and their quality of life. He said many fine people contributed to making the Worthington Vision statement.

Mr. Mike Duffey, said the current proposal was not that much different than the plan that was rejected by the citizens years ago. He said for many citizens, this proposal has gone from bad to worse and that is the general sense that he has gotten from across the community. All 730 units are going to need police, fire, EMS services, and trash pick-up. All will have access to residential rates to access facilities but compared to the 5000+ houses that exist in Worthington they will not pull their weight on taxes. This will leave the slack to be picked up by everyone else who already lives here, and it will happen at a time when Worthington's nonprofit pool complex is insolvent and aging facilities and a citizenry that wants more parks and recreation improvements across the city. The city is planning a three-million-dollar upgrade for McCord Park. Apartments generally do not produce income tax and have very little property tax revenue on a per unit base can not pay the bill for these types of improvements. Worthington currently has 5000 to 5200 homes depending on how you calculate it, 730 divided by this range, would be a 12 to 14 percent increase of the total housing stock in Worthington. This is a very large development on a very small piece of land. Worthington's Comprehensive Plan says many things. He said he was a voting member of City Council when it was passed. It is nonbinding and legally unenforceable. It is an area of ideas sometimes conflicting with themselves. You can find passages within the plan that discourages residential development and speaks clearly to the need for offices and income tax revenue. You can also find passages about walkability and mixed-use and people use the color of that argument for apartments and large density development. To sum this up, anyone that says that the Comprehensive Plan supports this proposal is not telling the whole story. A more universal theme is that UMCH and the Harding property are the two last remaining opportunities for smart growth in Worthington but are apartments smart growth. As the city studied the percentage of its land dedicated to residential verses commercial visa the other communities in central Ohio. The answer is they are already overweight on residential and have always been. When compared to emerging communities such as Dublin, Powell, New Albany, and their efforts to build commercial base. For scale in understanding the large office across the street from the UMCH, formerly known as Anthem, generated at its peak, 1.5 million dollars per year for the city. The UMCH property is actually larger than the Anthem site. It stands to reason that with appropriate office development the city could produce more than 1.5 million from that property and that is the opportunity cost that they have if they allow this proposal to move forward. The developer does not own the zoning for this property and the developer does not even have a moral right to the zoning and the zoning is owned by the community. Over the years, developers such as Kessler and CVS have attempted to litigate the use of property in Worthington and the city won that litigation twice. The requirement under the law is that we do not take from the landowners' land that they already own

and since they do not own a right to the new rezoning, we have no obligation to give them what they want. Any change in the zoning is a decision by the citizens of Worthington as a whole and not the developer. For this property, Mr. Duffey said he would argue that the potential zoning is most of its value. Almost all the value of what this land can be used for is the rezoning potential use not its current zoning use as S-1. In a sense, you might consider it that the citizens of Worthington have a larger stake in this land, a larger ownership stake, than the developer and the actual landowner because of their ownership of the zoning. The voice of the citizens of Worthington has been relatively clear when Charter Amendment Issue 38 was passed, it passed on a city-wide vote of 52%. It is the closest thing they have as a proxy or referendum on this property and it was specifically targeted towards this property at the time. It was considered controversial as an issue but nevertheless, 52% of Worthington's residents voted for it. The Charter amendment itself affords the citizens the right to referendum of rezoning which is almost a certainty if this property is rezoned as proposed. Some argue the City does not like apartments and that is unfair and biased but that is not true. The city and the citizenry have been very supportive of increased housing options over the past decade. The Heights as Worthington Place has 193 units which were built in 2014, after they had begun discussions about the UMCH property. Two new single-family homes were approved on New England Avenue, they approved the re-development of the Mason's Lodge and the re-development of Stafford Village with 86 new units and right there is over 275 new residential units constructed in Worthington with small or no yard, specifically targeted at empty nesters and with rental options. The city has added at least 5%, if not more, towards their total residential stock. This is not about the scarcity of housing units in Worthington, it is about profit for the developer verses the long-term best interest for the community and its taxpayers. Please side with Worthington taxpayers and consider proposals that are largely office, park land, and retail, not just residential. Do something that generates income tax which we badly need as a community and do not rezone this property for majority residential. If someone is an empty nester and wants housing close to downtown ask them if they would want to move into Stafford, there should be market rate housing there, not all of it will be assisted living. They can buy a condo in the former Worthington Inn. Worthington has changed its housing stock so much over the past ten to twenty years. They can achieve their goals for the infill development, and it does not have to be a mega complex and this property is too valuable to let this go to this use. For purposes of time, and set aside of other issues, such as better business ratings for this developer that should be looked into, and the poor quality of projects they have developed at other communities, the projects do not look like the water-colored renderings. You can drive around to the other communities and see what they look like. You can search the Columbus Dispatch and submetering and his October meeting discussed that. Please deny this proposal. If you do that clearly and unequivocally, it is certain that the landowner of this project will be forced to finally engage the community and have an open conversation one where the lawyer for LC is not same lawyer as the fiduciary of the property and it was never let to the market so that other people could propose something different.

Mrs. Bitar swore in Mr. John Byrnes. He and his wife strongly oppose the LC proposal for development and urged the Board to reject LC's request for a PUD. Mr. Byrnes said he is a long-time resident of Worthington and growing up in Worthingway to his high school years and lived on Selby Boulevard after law school. After twenty years he moved back to Worthington and the vibrancy and attractiveness of city is important to him. In addition to reviewing the LC plan, the traffic study, and community Strategic Plan, he participated in Tuesday's Focus Group with Mr. Hart. He summarized his objections and said he strongly objected to the residential density which

was even larger than it was proposed three years ago despite strong community opposition. The overall density of the 38 acres would be 19.3 dwelling units per acre with a subarea having the density of 47.8 dwelling units per acre. That compares to a density of three to five units per acre just blocks away, with some areas in Medic Estates having even less. Mr. Byrnes said Mr. Hart acknowledge the prior community's objections, residential planning has evolved in the past three years and notably with more people working from home, especially during the pandemic. Mr. Byrnes said reliance on the pandemic effect of the past nine months and the overall tone of the LC submission and Focus Group discussion, seems to be that LC wants to plow over the community and put in a PUD Agreement in place so they can negotiate exclusively with the city and minimize further scrutiny by the public as would be required for any normal zoning variance application. The Strategic Plan anticipated significant community input as the UMCH developments took shape and this point seems to be ignored by LC. Beyond changing the character of the surrounding neighborhoods, the high density will increase traffic through the long-established neighborhoods and have a significant impact on the quality of life in these neighborhoods. Traffic in the neighborhoods have been stable over the past fifty year. Multiple cars per home, plus commercial traffic flowing in and out of this development will just create a thorough fare for the 730 additional units each day. This would surely depress property values in Worthingway, Medick Estates, and old Worthington. Mr. Byrnes said the way to avoid this would be to not allow access to Evening Street or Longfellow Avenue. He said community integration for vibrancy could be done by adding pedestrian walkways and bike paths rather than vehicular access onto Evening Street or Longfellow Avenue. If residents are going to be working from home or walking or biking to work locations, there is no reason to offload commuters through the existing neighborhoods. All of the traffic can be re-directed to High Street. Community input has consistently criticized the density and the impact of traffic. No one who has purchased a home in the adjacent Worthington neighborhoods ever thought they would be connected to a dense apartment complex. In 2005, and 2014 the Strategic Plan called for mixed-use, including retail, to enhance vibrancy. In 2021, retail is now dominated by Amazon and restaurant dining includes Uber Eats. Imagine the increased flow of Amazon and FedEx trucks and Uber Eats making deliveries to these 730 homes in their anticipated home work locations or for their residential purchases. Community vibrancy has a different look today than it did in 2005, and 2014, and the Strategic Plan needs to accommodate that. LC said their targeted demographic is largely in young professionals, not families, which means a higher transient population. Mr. Burns said the looks of the architecture and the elevations presented seem somewhat different than the look and feel of the Strategic Plan. Mr. Byrnes strongly opposed the proposal.

Mrs. Bitar swore in Mr. Tom Hamer, who said he was going to read a statement that was prepared by WARD for the ARB and MPC.

WARD, the Worthington Alliance for Responsible Development, was created in 2012 in response to a proposal to put an 84,000 sq. ft. Giant Eagle and five acres of asphalt parking on the UMCH site. Since then, they have expanded their Board to include others from elsewhere in Worthington. They have taken an interest in development projects throughout the city. They have initiated and participated in 133 meetings amongst themselves and with other groups, and with City Council members, City Council candidates, and city staff. They held forums and conducted surveys and they communicate regularly with 400 subscribers on their Facebook page and 300 email contacts. Individual members participated in a visioning process. Their interest and commitment to, and

their love for Worthington, are strong, but their core focus remains the future of UMCH. WARD is not opposed to development. Central Ohio is growing, and development can bring economic vitality, well paying jobs, and city revenue. However, UMCH, is a special and unique place. What is now proposed by LC for this beautiful open legacy property, a special place near the center of the city, is completely inappropriate. Along High Street there would be five-story office buildings plus roof heights, and the rear of the property would be a closed community packed with 730 residences, a 27% increase over their 2015 proposal which never advanced because of the opposition from Worthington residents. They respectfully urge the Board members to reject this application. Mr. Hart, LC's attorney, stresses that LC is following the guidelines of the 2014 revision of the Comprehensive Plan. The city staff has done a commendable job of analyzing the LC proposal on short notice. We refer you to pages 9, 12, 26, 27, 28, 29, and 32 of the city staff's report that question or casts doubt on the developer's adherence to the Planning & Zoning Guide, the PUD regulations, and the language of the Comprehensive Plan itself. In a June 2015 letter to LC, City Council reiterated that LC should listen and respond to the interests of the Worthington residents. We refer you to pages 24, 25, 28, 29 and 30 of the staff report which indicates that elements of the LC proposal are not what the community wants. Mr. Hart contends that it is necessary to build dense housing to attract people with disposable income to strengthen Worthington's economy and bring revenue to the city. The assumption that revenue created by income taxes by employees in the commercial zone will outweigh costs and provide income stream for the city. Is this realistic in the UMCH context. Residential construction of any type which comes first in the LC proposal is always a cost to the city because of infrastructure and the extension of Worthington's excellent city services such as street maintenance, trash and leaf removal and snow plowing. How much trash would be generated and needed to be picked up by 730 new residents. Police, Fire and EMT runs would add to the city's burden. By LC's own acknowledgement, and confirmed by city staff, however, the office market is softening as a result of the pandemic and is questionable whether companies and workers will want to return to the same degree to office environments when they have become used to working remotely. It stated in their report that city staff is concerned that only the residential portion of the project would be constructed without the office. It should also be noted that other developers are in competition to create other new Class A office spaces elsewhere in Worthington. Other features of the LC proposal must be considered. A clubhouse, pool and volleyball court associated with five story apartments in this closed community would be constructed along Longfellow Avenue. What about the impact of noise and light in the surrounding area. This would be a direct violation of the Comp Plan Guidance that any proposed design should be sensitive to adjacent neighborhoods. What about traffic. This proposal would add 1095 cars on the property in addition to cars coming from the commercial zone. Larrimer Avenue is already busy when school busses are using the intersection, and how would the traffic flow on High Street be affected. Mr. Hamer referred to a survey from Worthington residents that said they favored significant green space. Eighty to eighty-eight percent of those surveyed did not want three, four and five story apartments. In the second survey, seventy-five percent of respondents felt that the 2015 LC proposal had way too many apartments. In the current LC proposal, 365 trees would be cut down, of which 306 are described as healthy. LC requested a waiver of any fees that would be incurred by tree replacement standards, and they even claimed that the city would owe them money in the form of a credit balance for the special park fund because they would dedicate the Tucker Creek Preserve to the city which is not able to be developed in any event. Submetering is a system which allows a landlord to build tenants for utility usage, resulting in profits for the landlord, and higher bills for the tenants. It has been

practiced at other LC properties. What about UMCH? Mr. Hamer said this proposal is radically wrong for UMCH. Mr. Hamer said WARD says, along with the majority of other Worthington residents, once you pave UMCH, it is gone for good. Instead of bowing to the hot thing now, let us take the long view and have a vision to enhance and preserve UMCH for future generations by having limited development, including housing, and an open and contiguous space with amenities for all of Worthington to enjoy, as Ward articulated in their January 2018 white paper, that would be true to Worthington's character.

9:00 p.m. – Ten Minute Break

Mrs. Bitar swore in Mr. Scott Farkas. Mr. Farkas said he and his family have lived in Worthington over twenty-five years. He has two daughters that attended Evening Street elementary school and graduated from Worthington high school. He said he has a degree in city and environmental planning, a law degree, and worked in the planning and zoning field for many years in a prior career. He said he was very familiar with comprehensive city planning, zoning, rezoning, community development, and planned unit developments (PUD) and has reviewed similar development scenarios numerous times. He said he was going to ask the MPC to revisit the UMCH portion of the Comprehensive Plan for a residential only development with green space similar to the Epcon development along Riverside Drive. They are developing 81 ranch homes, with private courtyards, a community pool and clubhouse, and there is a single point of ingress and egress off of Riverside Drive. That would alleviate the traffic concerns for residents who live on Evening Street. This type of project would provide needed housing for seniors and empty nesters in Worthington who want to downsize and that in turn would provide needed larger homes for younger families who want to move into Worthington. He said he and his wife are in the empty nester group and they are looking for a smaller home but there are not a lot of choices. As for the apartment portion of the Lifestyle proposal, he does not believe more apartments are needed. There are a lot of apartments available in Worthington, such as by the Worthington mall, across from the mall, and throughout the Worthington school district. He said it was also troubling that the number of apartments had increased instead of decreased since their last proposal. There was already so much opposition with the first proposal so that should tell you something about there objectives. With respect to the High Street portion of the proposal, he did not feel that Worthington needed any more retail or office space because there currently is vacant office space, and land available for retail and office development. Mr. Farkas said he wanted to point out that creating new office space does not guarantee that the space would be occupied. He said he did not believe that a source of taxes for the city should enter the equation for how the UMCH site is developed. Instead, if the city wanted to develop a site with apartments, retail shops, office space, medical facilities and parking on a single site that would provide tax revenue, he would suggest using the Anthem building. Mr. Farkas said the developer said on a web call the previous day that they had not done a transportation impact study yet, and that would take time. He said from his previous experience, it would be far more prudent to have performed some preliminary transportation modeling studies when a development proposal is presented. As a historical point of reference, in 1972, the Continent was promoted as an exciting development opportunity. That was a mix of residential, office, and commercial land uses that would enhance the general environment of the area. Forty-nine years later, that did not pan out. This is the last largest undeveloped parcel of land in Worthington and he asked the Board not to approve a project that they will look back on whether

forty-nine years or five year and think what on earth were we doing. Mr. Farkas urged the Board to reject the LC proposal and re-visit the Comprehensive Plan.

Mrs. Bitar swore in Ms. Trudi Snediker. She said the previous speakers had touched on the same issues and concerns that she had with the plan. The traffic issue would be horrendous for traffic on Evening Street, and Longfellow Avenue after adding 730 housing units. She said this would also be terrible for the schools. Evening Street elementary is already crowded and they have to use trailers for addition space. She said she takes issue with LC's position that this community will be filled with just empty nesters and millennials and would not have any effect on the schools. Ms. Snediker said you cannot prevent anyone from moving in there and you cannot guarantee that they will not have children. There would also be an additional burden on the Police and Fire Departments. If the schools are overcrowded then people will not want to come to Worthington, and Worthington will lose its attractiveness. She said that is one of the top reasons people move to Worthington because of the excellent school system. Ms. Snediker said the whole proposal is just ridiculous. She said Worthington cannot be compared to Upper Arlington. Upper Arlington does not have a downtown with a village feel, you cannot tell where one village begins, and one ends. She said whatever they decide to do with the property she hopes they include a park.

Mrs. Bitar swore in Ms. Susie Needler. Ms. Needler said she agreed with everyone else, and that this proposal was not good for Worthington. She said she was also speaking on behalf of her friends who all agreed that nothing with high density should be built, especially since Covid because no one knows whether people will want to work in offices again. People are choosing to live in low density single houses. She felt that Worthington needed a park on High Street, and LC Community was not a worthy partner for Worthington.

Mrs. Bitar reviewed the emails that had similar comments as the previous speakers. The emails will be posted to the City's website.

Mr. Reis said he reviewed the booklet from LC and he put together a summary of his thoughts and points he wanted to make. He said they were provided with a lot of information from Lifestyles and feedback from the community. It would appear there has clearly been a lack of communication regarding the primary aspect of this development and that being density. He said he believed the information before them indicates a density that no one on this Board, nor in the community can accept. There were many emails to this Board from the community expressing their total disagreement with the preposed plan. There were components of the development that are needed and would benefit the community if they can find a way to work together with Lifestyles. He said he was confident a solution could be found and that it would not only enhance the community but also generate the revenue to support the exceptional services we citizens benefit from our city. Mr. Reis said he was optimistic that the City Manager, City Staff, and City Council, the Board members, and all of those in the community, can work together with Lifestyles to come up they can all be proud of. He said from his personal perspective he hopes they can provide compatible green space in relationship with City Hall and the UMCH site, that would benefit all citizens of Worthington to enjoy, while planning an adjacent space with sound development. Along High Street, he would suggest appropriate office space for start-ups and those that wish to relocate to Worthington, retail, commercial and restaurant, with housing behind, such as the housing sites shown on the Lifestyle plans abutting Worthington Estates, patio homes, affordable housing, some

type of townhomes, and apartments, with reasonable density. In this way, we can serve the diverse needs of all types of housing, not only for our seniors, but for the young singles and married couples wishing to live here as well as those who may not have the means to live in our great city. He said he was confident that the city's leaders and citizens alike, together with the developer can work together to formulate a plan that would be a lasting legacy for generations to come.

Mr. Foust said if he were the developer, he would have taken the same basic approach, and the logical way to approach this would be to take a look at the Comprehensive Plan, and say hey, this is what your Comprehensive Plan says, and we have a development project here that meets all of your requirements. He said Mr. Duffey pointed out that the Comprehensive Plan includes a lot of different aspects and a lot of different suggestions. Worthington is not like Upper Arlington, Dublin, or Grandview, and Worthington has a few unique things. Mr. Foust said while reading through the letters from the community a few of the writers had some suggestions and pointed out that Worthington, heritage wise, is based upon a New England Village, that there is a village like character to this community that we want to maintain and that came about in two areas. He said when Council President Bonnie Michael looked at the original proposal she suggested taking a look at some of the historical buildings that had been torn down in Worthington, and re-create some of those or pick up the architectural detail from those buildings. Mr. Foust explained to Mr. Hart that Worthington does have this history and Worthington does have a unique look. Whatever Mr. Hart comes back with needs to have a wow factor. It needs to be uniquely Worthington and something the Board members, city staff and the community can say, yes, this is us.

Mr. Schuster said to tie onto what Mr. Foust was talking about, when he looked at the plans, the homes did not reflect the styles of homes that are reflected in Worthington. He said with four types of plans, and 24 houses on the street, there would be at least six houses that look the same, and he did not feel that would be appropriate for Worthington. When he looks at the renderings for the apartments there are no defining architectural features but its rather monotonous in its repetitiveness. Worthington does have a unique look and that would need to change. Mr. Schuster said they would strongly recommend more patio homes or single-story floor plans for the seniors that do want to stay in place. He said he noticed in the presentation that the designs were for active seniors, but many of the seniors would not want to climb two or three levels of stairs. Mr. Schuster said the density of the earlier proposal of 500 units was too dense, and 730 units was unacceptable. He said they would also like to see more contiguous green space that can be utilized by anyone. He said he hoped they can work together to come up with an acceptable style that reflects Worthington and that they can reach a density that is comfortable and provides the diversity of housing that people may seek.

Ms. Hinz said she agreed with Mr. Foust, and would like to see the wow factor, and really making this a Worthington project. She also agreed with Mr. Schuster's comments about the cookie cutter style of homes, and the proposal did not address the community concerns about the impact on traffic.

Mrs. Holcombe said the biggest thing they heard at the meeting and from friends she has spoken with are the concerns about density. She said along with everyone else, she is opposed to the apartments. The development of High Street is a great thing to do. Mrs. Holcombe said she read all the letters. One of the letters suggested to integrate a plan between old Worthington and the

mall and call it the "Worthington Mile." She said that integration is really important and if they used the restaurants, the office space and retail, along High Streets, the apartments could be above these particular buildings. Mrs. Holcombe said speaking as a Realtor, there is a desperate need for more housing, and not just Worthington, but everywhere. This is a very valuable piece of land and they need to be careful as to how its developed. She said she agreed with city staff and that this proposal should be denied, and she also agreed that the architecture is not what it needs to be. If they can agree as to how this site should be developed, then they can move forward to working on the New England style of charm.

Mr. Hofmann said he agreed with what all his Board and Commission members have previously said. He said he would ask the developer to step back as much as he can and really appreciate that Worthington is more than just a place, its an experience. People greatly love this neighborhood, and it is important to start there and then appreciate as Mrs. Holcombe said earlier, the importance of this site. He said the architecture is not as thoughtful as it needs to be. Worthington is a tremendous story that is rich with history and has all kinds of layers, and this needs to be a new story that evolves. This site is in the middle of the community, and everyone has spoken loud and clear. This needs to be poetry.

Mr. Myers said he wanted to ask a couple of questions. He said he was looking at page 5/22 and said he noticed two five-level parking garages and asked Mr. Hart who was going to pay for those. Mr. Hart said the garages would be paid for privately by their development. Mr. Myers asked if he was not expecting any public assistance with the structures and Mr. Hart said he would consider having a discussion about it, especially once the site becomes integrated. He said in most developments where you see offices there are public finance mechanisms involved. Mr. Hart said they would like to have a future discussion about it, but not at this point. Mr. Myers asked if this was going to be a phased project and Mr. Hart said yes, they would generally begin working west to east. Mr. Myers said he noticed the commercial development was listed as Phase II and asked if that was spec space or if they have tenants. Mr. Hart said they did not have users identified at this point. Mr. Myers said it currently showed on the same plan that there would be an access road that runs from New England Avenue to Evening Street and Mr. Hart said yes. Mr. Myers said he also noticed there was a signalized intersection at E Street and asked if that would be directly across the street from City Hall and Mr. Hart said yes. Mr. Myers asked Mr. Hart if he had a property interest in the Comprehensive Plan or if the Comprehensive Plan creates a property interest in Lifestyles and Mr. Hart said no, and he also did not agree with Mr. Duffey's analysis of zoning law. Mr. Hart said that zoning laws are about a balance of rights

Mr. Coulter said the Board appreciated the letters and emails that were submitted because it gives the Board input for what the citizenry is looking for and what their expectations are. He said this is the very beginning of a long process, there is a lot to digest and review. Mr. Coulter said someone made a comment earlier, and he had experienced the same thing as an architect while dealing with developers, and developers like to start off with a home run and get everything that they can. That is where you start to negotiate, and look at what is right, what needs to be modified and what needs to be changed. Mr. Coulter said that everyone agreed that the density is exceedingly high. He said one thing that had not yet been discussed was the heights that were proposed. There were some five-story buildings proposed and some three-story buildings proposed. He felt there was a complete lack of imagination with circulation in terms of how the streets were laid out, sidewalks,

how you get from point A to B, the plan seemed so cookie cutter, rectilinear and boring, and he felt some improvements could also be made on that. A number of the speakers talked about contiguous open public space. As he reviewed the plan there seemed to be some pockets of open space, but he realized that Worthington is a park centric city, and they do enjoy their parks. If you could put some of the pockets of space together to make them more contiguous the space would become more usable. Mr. Coulter said something else that had not been discussed yet were the Design Guidelines for the City of Worthington, and that is a do or die issue for him. If you do not pay attention to the Design Guidelines, the developer will never get his vote. He said this project needs to look like it has always been a part of Worthington and not a contemporary style. Mr. Coulter said they did not discuss sustainability of the project. This needs to be a walkable space where people can walk to the mall, walk downtown, and walk to the Olentangy River or wherever they want to walk to. The housing that is being proposed is high dollar housing, there has not been any moderate starter homes for people that want to come to Worthington to live. Mr. Coulter said he also appreciated the questions that have come from City Council. Mr. Brown said the developer answered those questions and the answers were posted to the City's website earlier in the afternoon. City Council is very interested in the project for all the right reasons.

Mr. Hart said he believed they were starting a collaborative process where they will be working with city staff, the Board and Commission members, and the community, to come up with something that will work. He said they received a lot of good feedback. Mr. Hart said they did a few things with their application that were meant to place hold. The park design and open spaces they did not want to presume too much because they wanted a collaborative effort on that. They have taken the comments they heard this evening to heart. He said they would like a bifurcated approach to this process where they focus on land use first and come to a conclusion on the land use plan, particularly in reference to the green space and the park, and then pick it up there with architecture. He agreed this is the beginning of a substantial process. Mr. Hart said he wanted to go back to the discussion about density, and he was not a part of the team from 2015, but that application was not filed, although they did receive feedback on it. There are a lot of details that need to be figured out and that did not happen back then, but also the world has changed since then. Mr. Hart said it would be a challenge to get people out of their homes and working back in office spaces. He said they agree with the part of the Comprehensive Plan that says Worthington needs employment and revenue generated out of this site. They see very different market conditions now than back then. Mr. Hart said they believe they need to start with residential first to fire up those other mixed uses. He said there is an affordability crisis right now which is more severe in some communities more than others, but it is a crisis of supply. Mr. Hart said they looked forward to more discussions.

Mr. Myers said he was struck by Mr. Hart's comment about how the world has changed and Mr. Myers said he agreed. He said this project has impacted his position with the City of Worthington immeasurably. He said they have gone through a highly contentious Charter initiative. Every City Council election since 2015, this has been the central issue. There have been five retreats that City Council has had since then, and this has been the central issue. Members of Council are on City Council because of this issue. Mr. Myers said he could not express in words the magnitude of this project and the weight that has been placed on City Council for the past five years, and he holds Mr. Hart's client responsible for that. He said he was disappointed that no one from Lifestyles showed up to the meeting. Mr. Myers said Mr. Coulter was correct, City Council members are

watching this project like hawks. There will be more questions from City Council and more input from Mr. Myers himself. He said this is the single most significant issue that Worthington has faced in his twenty years of service to the city. Mr. Coulter said they have one chance to get this right, and there will be several more discussions. This is just the beginning of the process.

Mr. Hart requested to table the applications. Mr. Reis moved to table the applications, and Mrs. Holcombe seconded the motion. All Board members voted, "Aye," and the applications were tabled.

## D. Other

There was no other business to discuss.

Mr. Brown stated that the January 28th meeting agenda would be rather lengthy considering we moved all the agenda items from the January 14th agenda to the next meeting.

## E. Adjournment

Mr. Foust moved to adjourn the meeting, and Mr. Schuster seconded the motion. All Board members voted, "Aye," and the meeting adjourned at 10:19 p.m.

## Kowalczyk, Beth

| From: | Stewart, Robyn </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=AE82BEA9B0B8479A840D743198DD0699-STEWART, RO> |
|---|---|
| Sent: | Wed 3/31/2021 2:48 PM (GMT-00:00) |
| To: | Michael, Bonnie <Bonnie.Michael@worthington.org>;Myers, Scott <Scott.Myers@worthington.org>;Scott Myers (scott.myers@ohioattorneygeneral.gov) <scott.myers@ohioattorneygeneral.gov>;Smith, Doug <Doug.Smith@worthington.org>;Dorothy, Rachael <Rachael.Dorothy@worthington.org>;Kowalczyk, Beth <Beth.Kowalczyk@worthington.org>;Robinson, David <David.Robinson@worthington.org>;Bucher, Peter <Peter.Bucher@worthington.org> |
| Cc: | Greeson, Matt <Matt.Greeson@worthington.org>;Brown, Lee <Lee.Brown@worthington.org>;Lindsey, Tom <Tom.Lindsey@worthington.org>;Coulter, Mikel <Mikel.Coulter@worthington.org> |
| Bcc: | |

Subject: Summary of meeting on UMCH

Members of City Council,

This email provides a summary of a meeting regarding UMCH to keep you informed. Scott Myers, Mikel Coulter, Lee Brown, Tom Lindsey and I met with LC representatives yesterday afternoon at their request to discuss their pending applications. Bo Brownlee and Tom Hart participated in the meeting on behalf of LC. Bo Brownlee indicated he believes they are at a point where an incremental process is not going to be effective and they wanted to explore more of a joint approach with the City. They'd like to more fully understand and prioritize the City's concerns with their proposal. They expressed a willingness to increase the amount of public space and office and decrease the apartment density.

Council Member Myers made it clear that any back and forth dialog about the amount of the various land use types in their proposal must be done in public meetings. LC needs to gain the support of the community in order to have any hope of ultimately gaining approval of whatever modified proposals they may submit.

LC expressed a need to better understand the needs and interests of the community in order to include those ideas in revised proposal(s). Mr. Brownlee indicated he would like to understand what Worthington wants and needs, for instance the amount and type of both open space/park and office. Then they would see what is left for the site and consider how to fill the remaining space and determine whether it would be a viable proposal for them. It was agreed that City staff could not provide information about the specific amount of greenspace/park or office that would make a proposal likely to receive support. However, the City has general information from other processes and studies about the type of office that is missing but desired in Worthington and the



EXHIBIT

60D

type of park amenities desired when considering the community as a whole. This big picture information, much of which is included in previously-prepared public documents, could be provided and LC could determine how or whether to incorporate it into revised proposal(s).

The overarching message we provided to LC was that we can provide big picture, general information about Worthington's needs and interests, but we are not in a position to work with them on the development of proposals or be their champion in support of proposals. Any advocacy of proposals needs to come from them to the community as they first and foremost need to gain support in the community before they would see support from the City.

Robyn



**ROBYN STEWART**

**ASSISTANT CITY MANAGER**

**CITY OF WORTHINGTON**

6550 N. High Street

Worthington, Ohio 43085

Office: 614-786-7354

Mobile: 614-315-9830

www.worthington.org

14069

**From:** Brown, Lee [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=6DAE73A94D8F4334817AC855AFEB2918-BROWN, LEE]
**Sent:** 10/14/2021 1:51:24 PM
**To:** Scott Myers [scott.myers@OhioAGO.gov]
**Subject:** RE: [EXTERNAL] Notes from David Robinson re tonight's ARB/MPC items

Understand. Matt just wanted me to pass it along so that you knew what occurred. I think it took a few Board and
Commission members off guard.

Lee

**R. Lee Brown, AICP**
Director

**City of Worthington**
**Planning & Building Department**
374 Highland Avenue
Worthington, Ohio 43085
Main Line: 614.431.2424
Direct Line: 614.781.3539
www.worthington.org

**From:** Scott Myers <scott.myers@OhioAGO.gov>
**Sent:** Thursday, October 14, 2021 1:23 PM
**To:** Brown, Lee <Lee.Brown@worthington.org>
**Subject:** RE: [EXTERNAL] Notes from David Robinson re tonight's ARB/MPC items

Got your VM and obviously I got the email. Not real sure what to say. I guess if you don't agree with Mr. Robinson, you
don't exist. As to his contacting the Board, I have let him know how inappropriate that is so many times that I have lost
track. He will do what every he wants, I have given up.

**From:** Brown, Lee <Lee.Brown@worthington.org>
**Sent:** Thursday, October 14, 2021 12:39 PM
**To:** Scott Myers <scott.myers@OhioAGO.gov>; Myers, Scott <Scott.Myers@worthington.org>
**Subject:** FW: [EXTERNAL] Notes from David Robinson re tonight's ARB/MPC items


**R. Lee Brown, AICP**
Director

City of Worthington
Planning & Building Department
374 Highland Avenue
Worthington, Ohio 43085
Main Line: 614.431.2424
Direct Line: 614.781.3539



EXHIBIT
62

<u>www.worthington.org</u>

**From:** David Robinson <<u>davidwhitfieldrobinson@gmail.com</u>>
**Sent:** Thursday, October 14, 2021 12:05 PM
**To:** Brown, Lee <<u>Lee.Brown@worthington.org</u>>
**Cc:** Greeson, Matt <<u>Matt.Greeson@worthington.org</u>>; McCorkle, David <<u>David.McCorkle@worthington.org</u>>
**Subject:** [EXTERNAL] Notes from David Robinson re tonight's ARB/MPC items

 This message is from an external source. **Please exercise caution** when opening attachments or opening web links from external senders, especially if the message is unsolicited or unexpected. If you feel this may be a phishing attempt, please use the **Phish Alert button** or reach out to <u>helpdesk@worthington.org</u> for assistance.

Lee, I wanted to let you know I sent the below email this morning to six of the members of the ARB/MPC (I don't have Susan Hinz's email address). I know this is unusual, but Council effectively doesn't have a liaison with the ARB/MPC, at least as I understand that role, and this direct email is an alternative manner of communicating with our board/commission. Good luck tonight. David

––––––––––––––

Good morning xxx,

I know the ARB/MPC has got a lot on its plate, so I'll get right to the point. I've just reviewed the Agenda, and I wanted to share my thoughts on a couple of items.

First, the relatively simple proposal for the LCNB project. My only question is about the now-proposed setback being 1) closer to High St. than originally requested by the applicant, 2) closer to the street than adjacent buildings, and 3) closer than is called for in the current Comprehensive Plan. Yes, I realize that there are segments of the public, and members of Council and various Boards/Commissions that embrace the idea that proximity to a street by a bank "activates" the street. But this is a big, irreversible decision you are making, in our premier corridor. It seems to me that such an important decision should not be made in a piecemeal fashion, whether advocated by staff or not, but should instead be based on a fully considered strategic plan for the corridor as articulated in an updated Comprehensive Plan. Until that document has been prepared, I believe it would be appropriate for the MPC to act within the current prescribed bounds of the Comp Plan, and to approve a setback in line with the existing buildings north and south of the proposed development.

Regarding the LC proposal for the UMCH property, I hope you are still open as to whether to table or deny the application. While I recognize the sensibility and fairness of the MPC's standard practice of giving applicants a chance to change course, by way of tabling a proposal, I would suggest that this approach does not apply to the proposal on hand from Lifestyle Communities (LC). I say this because the most recent iteration of their plan is essentially a modest variation of a single plan, originally submitted in 2015, tweaked earlier this year, and then modified again just last month. As I see it, the MPC, and the City as a whole, is now entertaining for the third time a singular concept for development reflective of what appears to be LC's rather inflexible business model.

So I think you would be entirely justified in denying the proposal in terms of standard procedures. Beyond procedural issues, I believe the effect of denying the proposal would be positive, signaling to LC that substantive changes are needed if a proposal is to warrant the time and attention of staff, you and the others on the Commission, and the public at large. Further, a denial would clean the slate in certain respects, enabling Council a freer hand to consider creative ways forward by way of a fresh start with LC.

For these reasons, and more, I hope you'll consider denying the LC proposal, thereby creating the context for something new and different. Surely, after six years, you can act with clarity to free us all from this repetitive and fruitless cycle.

Worthington 045499

Thank you,

David Robinson

195 E Dublin Granville Rd
Worthington, OH 43085
614-893-4573