# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **LIFESTYLE COMMUNITIES, LTD**., *et al.*, | ) | Civil Action 2:22-CV-1775 |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Judge Sarah D. Morrison |
| | ) | |
| **CITY OF WORTHINGTON, OHIO**, | ) | |
| | ) | |
| Defendant. | ) | Magistrate Judge Elizabeth P. Deavers |
| | ) | |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# EXHIBIT 09
# Part 1

*LIFESTYLE COMMUNITIES*

*vs.*

*CITY OF WORTHINGTON*

Deposition of

**David Robinson**

October 31, 2023



614.460.5000 | www.priohio.com | pri@priohio.com

1
          IN THE UNITED STATES DISTRICT COURT
2             SOUTHERN DISTRICT OF OHIO
                  EASTERN DIVISION
3

4    LIFESTYLE COMMUNITIES,      )
     LTD., ET AL.,               )
5                                )
          Plaintiffs,            )
6                                )
          vs.                    )  Case No.
7                                )  2:22-cv-1775
     CITY OF WORTHINGTON,        )
8    OHIO,                       )
                                 )
9         Defendant.             )

10

11

12                   DEPOSITION

13              of DAVID ROBINSON

14

15        Taken at Worthington City Hall
             6550 North High Street
16          Worthington, Ohio 43085

17      on October 31, 2023, at 9:02 a.m.

18

19        Reported by: Rhonda Lawrence

20

21                   -=0=-

22

23

24

1    APPEARANCES:

2

        Joseph R. Miller
3       VORYS SATER SEYMOUR AND PEASE LLP
        52 East Gay Street
4       Columbus, Ohio 43215
        614.464.5480
5       jrmiller@vorys.com

6           on behalf of the Plaintiffs.

7

        Paul J. Schumacher
8       DICKIE McCAMEY
        600 Superior Avenue East, Suite 2330
9       Cleveland, Ohio 44114
        216.390.1795
10      pschumacher@dmclaw.com

11          on behalf of the Defendant.

12

13

14

15

16

17

18

19                      -=O=-

20

21

22

23

24

1                        STIPULATIONS

2              It is stipulated by and between

3     counsel for the respective parties that the

4     deposition of DAVID ROBINSON, the witness

5     herein, called by the Plaintiff under the

6     applicable Rules of Federal Civil Court

7     Procedure, may be taken at this time by the

8     stenographic court reporter and notary public

9     pursuant to notice; that said deposition may be

10    reduced to writing stenographically by the court

11    reporter, whose notes thereafter may be

12    transcribed outside the presence of the witness;

13    and that the proof of the official character and

14    qualification of the notary is waived.

15                        -=0=-

16

17

18

19

20

21

22

23

24

1                     INDEX OF EXAMINATION

2                                              PAGE

3    BY MR. MILLER:                            6

4

5

6                     INDEX OF EXHIBITS

7    EXHIBIT            DESCRIPTION            PAGE

8       6      Ordinance 04-2022            131

9       7      Resolution 04-2022           136

10      9      Meeting minutes, 1-18-22     139

11      31     Summary of Phases for         58
               Development of UMCH Property
12
        32     Memo from Greeson to City     61
13             Council, 1-22-19

14      34     Email chain                   93

15      42     Email chain                   61

16      61     Email chain                  120

17      85     UMCH Development, a Multi-Use  25
               Community Center Proposal
18
        86     WARD pamphlet                 25
19
        87     Memo titled UMCH              30
20             Responsibility and
               Accountability
21
        88     Email chain                   38
22
        89     Email chain                   42
23
        90     Email chain                   46
24
        91     Email chain                   49

1          INDEX OF EXHIBITS (continued)

2    EXHIBIT              DESCRIPTION                PAGE

3     92      Email chain                             53

4     93      Project Community Park                  54
              Worthington's Mission and
5             Guiding Principles

6     94      Email from Greeson, 1-31-20             66

7     95      Email chain                             71

8     96      Email from Robinson to                  75
              Michael, 4-9-20
9
      97      Email chain                             81
10
      98      WARD Presents Proposals for             83
11            UMCH Sith, 1-2018

12    99      Email chain                             99

13    100     Blog, 11-24-20                         104

14    101     Email chain                            104

15    102     Email chain                            110

16    103     Blog post, 5-11-21                     119

17    104     Blog post, 10-18-21                    123

18    105     Email chain                            126

19    106     Blog post, 12-14-21                    131

20    107     Email chain                            142

21    108     Blog post, 1-30-22                     143

22    109     Email chain                            144

23

24

1    City Council?

2        A.  Since early January.  I forget if it was

3    the 2nd or 3rd.  It was the first meeting in

4    January of 2022.  I'm in the middle of my second

5    term right now.  I was first elected in 2017,

6    and I started serving on council in January of

7    2018.

8        Q.  How would you describe your civic life

9    before being elected to council?  Were you

10   involved here in the community?

11       A.  My wife and I moved here in -- and my

12   stepdaughter, Julia -- moved here in 2009, in

13   May of 2009.  And I was not involved in city

14   affairs until 2015, something like that.

15       Q.  And Mr. Robinson, what role did that

16   take in 2015?

17       A.  Well, actually, it was probably December

18   of 2014.  I came back from a trip -- business

19   trip overseas to England, and my wife had said

20   that she had spoken with a neighbor who was

21   saying that there was some issues up at the New

22   England and High Street Masonic properties, and

23   there was some residents there that were

24   speaking with the city about the possibility of

1    issue of the development of the UMCH or

2    Lifestyle Communities property?

3        A.  Back in 2017 -- the UMCH issue has been

4    a significant issue for the whole community for

5    ten years.  So yeah, of course it was.  It was

6    that along with many other issues.

7        Q.  Did you hold any role with the city

8    prior to becoming on City Council?

9        A.  Could you repeat that?

10        (Record read as requested.)

11        A.  No.

12        Q.  Are you familiar with an organization

13    called WARD, or Worthington Alliance for

14    Responsible Development?

15        A.  I am.

16        Q.  How would you describe your relationship

17    with WARD, if at all, prior to your election to

18    City Council?

19        A.  They are a citizen's group, one that I

20    admire.  They formed back in 2012, I think is

21    when it was.  Tom and Kathy Emmer were founding

22    members.  And so being a grassroots

23    organization, I admire citizens attempting to

24    engage and effect public policy.

1              So I knew and know members of WARD.

2    They have a planning group, is what they call

3    this, the leadership group.  I spoke with them

4    during the Keep Worthington Beautiful campaign.

5    They were, as a group, supportive of the effort.

6    That's when I got to know them to some degree.

7         Q.  I'm sorry to interrupt, but the Keep

8    Worthington Beautiful campaign, just so I'm

9    clear, you're referring to Issue 38 in 2015?

10        A.  Correct.  Yeah.  The campaign was called

11   Keep Worthington Beautiful.  It became Issue 38

12   as a ballot issue.  But the campaign itself was

13   called Keep Worthington Beautiful.

14        Q.  And you spearheaded that; is that fair

15   to say?

16        A.  Yeah, I'd say my wife and I, but very

17   quickly it became a community effort.  I think,

18   you know, just at one indication there were

19   probably 700 yard signs up by the end of the

20   campaign.  It was a loosely organized campaign,

21   volunteer group entirely, and I was happy to be

22   a part of that.

23        Q.  You know and I know, but for the record,

24   how would you describe Issue 38?  What did it

1    seek to do?  What did it achieve?

2        MR. SCHUMACHER:  Objection.  Compound

3    question.  Which question are you asking?

4        Q.  Did you understand my question?

5        A.  Not really.  It's multiple, it sounded

6    like, but what is the question?

7        Q.  I'm just trying to help you, sir, move

8    things along, great.  If your counsel continues

9    to object, it won't.

10        MR. SCHUMACHER:  Excuse me, Joe.  I just

11    want to make sure the record is clear, so if you

12    ask a compound question, I'm just bound to point

13    it out.

14        Q.  How would you describe Issue 38,

15    Mr. Robinson?

16        A.  The heart of the Keep Worthington

17    Beautiful campaign was -- I think it was the

18    heart of really an American tradition of

19    citizens seeking to have a voice in the affairs

20    of their community.  It did so by amending our

21    city charter specific to the right of

22    referendum, specifically related to rezoning

23    ordinances.  And it made the right of referendum

24    for rezoning ordinances an actual right; meaning

1    that, practically speaking, prior to Keep

2    Worthington Beautiful, there was a 20-day

3    effective date of rezoning ordinances.  And

4    anyone who's led or gotten involved with citizen

5    initiatives or campaign efforts knows that 20

6    days is not sufficient time to organize, to

7    speak with lawyers, to get language identified,

8    to gather the seven, eight hundred signatures

9    and so forth in a matter of 20 days.  If it's

10   wintertime, there's no conceivable way that can

11   be done.

12       So the simple but effective mechanism of

13   Keep Worthington Beautiful was give the citizens

14   more time, 60 days instead of 20, and not to

15   allow emergency rezoning either, rezoning.  So

16   that's what it did.  It really restored the

17   right of folks in the city to have a say about

18   rezoning, which is a big issue.  You know,

19   rezoning often creates effectively permanent

20   change in the community.

21      Q.  I've already done this at times,

22   Mr. Robinson, and I apologize for not --

23      A.  I'm sorry, I wasn't done.

24      Q.  Oh, go ahead.

1  their -- what their purposes are.

2      Q.  And I'm simply asking you, do you agree

3  with those purposes?

4      A.  The question didn't make sense to me.

5      Q.  Okay.

6      A.  Like do you agree with the U.S.

7  Constitution or something like that.  I

8  understand it.  Do I embrace it, do I share it,

9  but agree with, it's not a --

10     Q.  Okay.  Do you embrace or share those

11  purposes?

12     A.  Here's the way I understand -- here's

13  the way I would understand -- here's the way I

14  think about WARD, is they were asserting the

15  basic right of the citizens to be heard by their

16  city on an issue that's of real importance to

17  them.  And I agree with that.  The city should

18  do that.  WARD and the citizenry in general

19  ought to be engaged, listened to, and really

20  fundamental to the city's position on

21  significant issues in the city.  Yeah, so I

22  agree with that.

23     Q.  Are you familiar with an organization

24  called Project Community Park Worthington?

1     A.  I am.

2     Q.  Do you consider yourself to be a member

3 of that organization?

4     A.  No.  I did sign their petition, along

5 with 1,200 other people or so, but they don't

6 really have a membership, per se.

7     Q.  And what was set forth in that petition,

8 if you recall?

9     A.  Something like this -- again, it's been

10 years since I've read the mission and the

11 elements of the petition.  But essentially,

12 here's a broad stroke -- remember, this is back

13 in 2018, back when the United Methodist

14 Children's owned the property.  It was three

15 years after Lifestyle's presentation at the WEC.

16 There's not been any stirrings or messages from

17 the city about the property.  And so PCPW, the

18 citizens that started it and the people that,

19 you know, quickly gravitated around it, felt

20 like someone, apparently us, needs to come out

21 with an idea that -- for the property that

22 conforms with broad public opinion.

23     Q.  And I don't mean to interrupt you, but

24 you said "apparently us."  I took that to mean

1    the city?

2        A.  No.  This is PCPW, the citizens that

3    were forming it.

4        Q.  Okay.

5        A.  And --

6        Q.  And you said "the property."  I took

7    that to mean the UMCH property?

8        A.  Correct.

9        Q.  Okay.

10       A.  Thanks for clarification.

11       Q.  Go ahead.

12       A.  And so they said, hey, someone needs to

13   come out with a vision, an idea, because no

14   one's speaking about this right now, not UMCH,

15   not the city.  It's been three long years since

16   Lifestyle presented their idea.  Let's come out

17   with something to at least stimulate dialogue.

18   And our proposed vision is -- I think they used

19   terms like a multiuse or a mixed-use outcome

20   there that had substantial commercial along High

21   Street basically conforming with existing

22   zoning.  And then residential -- modest

23   residential in the northern perimeter, some

24   apartments, if I remember correctly, in with the

1    commercial properties, and then a large

2    contiguous green space in the middle that would

3    be -- I think they called it a community

4    commons.

5           And so the petition was here's our idea,

6    the outcome at the UMCH property.  It ought to

7    be in the public interest, conform with general

8    public opinion, ought to be focused long-term,

9    not short-term, and here's the rough idea of

10   what we have, the commercial, the housing, the

11   green space.  If you embrace and support this

12   general vision, would you sign this petition.

13   That was the gist of it.

14       Q.  And you signed the petition because you

15   embraced and supported that vision?

16       A.  Yeah.  I supported the idea that a

17   positive idea to facilitate and really prompt

18   discussion in the community and at the city was

19   a good thing and that their basic outline was a

20   reasonable place to start because it's in

21   conformity with public opinion.

22       Q.  You believe a large contiguous park on

23   the Lifestyle Communities property conforms with

24   the public vision?

1          MR. SCHUMACHER:  I'm sorry.  What was

2     the end of it?

3          MR. MILLER:  Conforms with the public

4     vision.

5          MR. SCHUMACHER:  Thank you.

6      A.  The desire for green space -- and

7     contiguous -- large contiguous green space over

8     at the UMCH property is something that is widely

9     supported by the public.  And that's -- I say

10    that, you know, based on a number of sources,

11    not just an anecdotal.  I say it's based on, you

12    know, essentially since I started engaging the

13    issue from the meeting at the WEC, which I did

14    go to, and listened, observed.  That's when I

15    got a palpable sense of public sentiment in the

16    immediate audience there, but beyond that,

17    there's been surveys.  I know WARD's done a

18    couple surveys, 2013, I think, and one maybe

19    2018, with six, seven, eight hundred

20    respondents.  And the desire for green space was

21    clear and unequivocal there.

22          And then the PCPW petition which readily

23    obtained -- I think the group got a

24    thousand-plus signatures in the matter of just a

1    few months.  And then another indication would

2    be the letters that the city receives.  Since

3    I've been on council, the one -- we receive

4    periodic letters, and then depending on what's

5    happening with city processes and whether

6    there's a proposal before the city, you know,

7    letters increase.  I know back in -- I think it

8    would have been '20 -- was it '21?  Yeah, '21

9    when Lifestyles had their proposal at the city

10   and it was before coming before the MPC, the ARB

11   and then council, we received 300-plus letters

12   from the public on that.  And the overwhelming

13   majority -- and by that I mean, 80, 90 percent

14   of it was stark, were calling for large

15   contiguous green space, and so all indications

16   are that is broad public sentiment.  And being

17   an elected official, you know, that's -- that is

18   what I feel compelled to represent.

19       Q.  It's fair to say, isn't it,

20   Mr. Robinson, that you pushed for the city to

21   purchase the UMCH for years for use as parkland?

22       A.  I wouldn't say that.

23       Q.  Okay.  We can discuss that in more

24   detail later.

1    public wants.  So it was kind of a mixed bag, I

2    would say.

3        Q.  And you wanted to call out to council in

4    this document, on the first page, at the end of

5    the first paragraph so which I'm pointing near

6    the bottom, quote, and to prevent apartments,

7    all the council needs to do is table any

8    rezoning motion that includes the apartments, or

9    more boldly, vote no?

10       A.  What about it?

11       Q.  You wanted council to know that, that

12   was of interest to you?

13       A.  Yeah, this fits in with not wanting

14   council to act like that they had no capacity

15   and responsibility to act on this issue.  And

16   that -- I know that may sound, you know,

17   farfetched.  But if you go back and watch -- and

18   I don't think they are actually archived.  But

19   if you go back and read transcripts for the many

20   folks in the public, there was frustration that

21   council wasn't acknowledging that for

22   development outside of existing zoning to happen

23   at the property, they would have to -- they

24   meaning council -- would have to consciously

1    choose and do something.  And sounds elemental,

2    and it is.  But that was the important point to

3    make is please don't act like a development is

4    going to happen outside of existing zoning

5    willy-nilly.  It's going to happen, if it does

6    happen, because you consciously choose to do so,

7    and that's -- that's the -- I think the intent

8    of that sentence there.

9        Q.  And for years, you chose to seek to

10   rescind the 2014 comp plan update?

11       A.  Just for time reference, the document we

12   were just looking at was written back in 2015,

13   when I was, you know, not on council.  I got

14   onto council in 2018.  And so I don't know

15   whether my public statements began before being

16   on council or when I was on council, but I

17   have -- I have voiced in a number of ways my

18   belief that the 2014 comp plan update is not the

19   consensus document it claims to be, and that all

20   parties would be better off if the comp plan

21   reflected the broad public consensus, and

22   therefore, we ought to amend it, change it,

23   update it.

24       Q.  And ultimately, in 2022, you were

1    process was based on much discussion and

2    deliberation.  When the whole comp plan is

3    updated moving forward, there will be

4    consultants, public meetings to get current

5    additional input.  So it would be a different

6    process moving forward.

7         Q.  We'll look at it later, but who wrote

8    the January 2022 update to the comp plan as

9    applied to the Lifestyle Communities' --

10        A.  I did.

11        Q.   -- property?  When did you do so?

12        A.  In the days or weeks before -- again,

13   this is something I thought about for many

14   years, but I don't remember the exact days that

15   I put it on paper.

16        Q.  January '22, though, is it fair to say?

17        A.  It is.

18        Q.  How long did it take you?

19        A.  I don't recall.

20        Q.  If you can look at what was marked

21   previously as Exhibit 34.

22        A.  I've not looked at 34.  Can I use the

23   restroom?

24             MR. MILLER:  We can take a break.

1    his testimony.

2        A.  Your question again, please.

3            MR. MILLER:  If you would read it back,

4    please.

5            (Record read as requested.)

6        A.  From multiple sources over ten years

7    now, the public has been consistent in

8    describing what they believe would be an

9    appropriate outcome of the property, and that

10   consistently includes significant contiguous

11   green space.

12                     -=0=-

13           (Deposition Exhibit 102 marked.)

14                     -=0=-

15   BY MR. MILLER:

16       Q.  Mr. Robinson, you've been handed what

17   we've had marked, I believe, Exhibit 102.

18   Please let me know when you're prepared to

19   proceed with examination on the document.

20       A.  Okay.  Okay.  I think I've got my mind

21   wrapped around it.  What's the question?

22       Q.  The question is, regarding the first

23   page of Exhibit 102, on April 11th, 2021, email

24   that you sent to Mr. Greeson?

1      A.  Yeah.

2      Q.  In your own words, describe for me what

3  you were trying to communicate to Mr. Greeson in

4  this email?

5          MR. SCHUMACHER:  Objection.

6      A.  Repeat the question.

7          (Record read as requested.)

8      A.  I was conveying to them, I believe, that

9  the statement in the park's master plan was not

10  consistent with broad public opinion,

11  specifically the phrase about the parks

12  commission is determined that there is -- what's

13  the phrasing here?

14     Q.  Our existing parks provide ample park

15  space per resident.

16     A.  Yeah, that's it.  And I draw the

17  connection here that this is analogous to the

18  claim in the 2013-14 comp plan update that it's

19  a consensus document, and I felt like this was

20  not constructive to be sending out as an

21  indication of current public sentiment at the

22  time.

23     Q.  In fact, you said in the middle of the

24  second paragraph, if I may -- forgive me for

1    Q.  Who is the primary drafter or author of

2    this ordinance?

3         MR. SCHUMACHER:  Same objection.

4         A.  Yeah.

5         MR. MILLER:  No, that does not -- I

6    understand your objection for the record.

7         Q.  But who was the primary author of this

8    ordinance?

9         A.  I can't say.

10        Q.  It's a combination of both your work

11   efforts?

12        MR. SCHUMACHER:  Same objection.

13        A.  Yeah, I can't say.  He and I spoke with

14   one another and collaborated.

15        Q.  Okay.  When was it drafted?

16        A.  I don't recall exactly when.  Obviously,

17   before the January 18th meeting.  I don't know

18   whether it was a week before, two weeks, day

19   before.  I can't remember.  But in the month of

20   January.

21        Q.  Okay.  Other than Mr. Lindsey, did

22   anyone else provide input to you on this

23   ordinance prior to its introduction that

24   evening?

1          A.  Well, broad answer would be, yeah,

2     hundreds of people over a decade.

3          Q.  I'm sorry, I'm asking specifically about

4     Ordinance 04-2022, as drafted, did you receive

5     input from anyone else on this ordinance prior

6     to its introduction?

7          A.  I don't recall.  It's so interrelated,

8     there's so many other issues I don't recall the

9     exact nature of how the wording and the issues

10    were formed.

11         Q.  Why did you seek its passage that

12    evening?

13         MR. SCHUMACHER:  Objection.  Relevance.

14         You can answer.

15         A.  It would have enabled the city to have

16    breathing space and time to reconsider the

17    comprehensive plan, to engage the public on the

18    issue.  We had just gotten through a 14-month

19    process that was unproductive for all parties,

20    and so it really was an effort, which I think,

21    as you know, ultimately failed, didn't get the

22    votes needed, to give us breathing space and to

23    sort of reset how we were approaching the issue

24    and engaging a property owner.

1    of a mixed-use development including commercial,

2    residential, and contiguous green space.  And

3    with enough flexibility in the language to

4    accommodate a range of plans, is the way I

5    thought of it as I drafted the language.  So it

6    really was an effort to break out of a cycle of

7    unproductive state of things.  So that's why --

8    that's why the action was taken.

9        Q.  Since you've been in office,

10   Mr. Robinson, have you required any other

11   property within the City of Worthington to be

12   developed with a large contiguous green space

13   central to the property?

14        MR. SCHUMACHER:  Objection.

15        You can answer.

16        A.  State the question again, please.

17        (Record read as requested.)

18        A.  The UMCH property would be the only

19   property in which that could be done, so the

20   answer would be no.

21        Q.  Would you agree with me that Resolution

22   Number 04-2022 did not appear on the public

23   agenda that evening for City Council's meeting

24   on January 18th, 2022?

1                         CERTIFICATE

2    STATE OF OHIO      :
                                SS:
3    COUNTY OF FRANKLIN :

4            I, Rhonda Lawrence, a stenographic
     court reporter and notary public in and for the
5    State of Ohio, duly commissioned and qualified,
     do hereby certify that the within-named DAVID
6    ROBINSON was first duly sworn to testify to the
     truth, the whole truth, and nothing but the
7    truth in the cause aforesaid; that the testimony
     then given was taken down by me stenographically
8    in the presence of said witness, afterwards
     transcribed; that the foregoing is a true and
9    correct transcript of the testimony; that this
     deposition was taken at the time and place in
10   the foregoing caption specified.

11           I certify that I am not a relative or
     employee of any attorney or counsel employed by
12   the parties hereto and that I am not financially
     interested in the action.  I further certify
13   review of the transcript was not requested.

14           In witness whereof, I have hereunto
     set my hand at Columbus, Ohio, on this 14th day
15   of November, 2023.

16

17

18

19

20
                    *Rhonda Lawrence*
21           Rhonda Lawrence
22           Notary Public, State of Ohio

23   My commission expires:  October 9, 2028

24

ORDINANCE NO. 04-2022



Enacting a Moratorium on Applications for Rezoning, Subdivision, Certificates of Appropriateness, Development Plan Approval, Conditional Use, or Permits for the United Methodist Children's Home Focus Area and Declaring an Emergency.

WHEREAS, City Council passed Resolution 37-2005 adopting the Comprehensive Plan Update and 2005 Strategic Plan for the City of Worthington to guide future development and growth; and,

WHEREAS, City Council passed Resolution 39-2014 adopting an amendment to the Comprehensive Plan Update and 2005 Strategic Plan for the United Methodist Children's Home Focus Area to guide future development of the site; and,

WHEREAS, the United Methodist Children's Home Focus Area included the following parcels; 1033 N. High Street – Parcel No. 100-006774-00, 32 Wesley Blvd – Parcel No. 100-006773-00, 6525 N. High Street – Parcel No. 100-006390-00, 47 Larrimer Avenue – Parcel No. 100-002425-00, and 57 Larrimer Avenue – Parcel No. 100-002427-00 (the "UMCH Properties"); and,

WHEREAS, City Council passed Resolution 40-2019 establishing the Community Visioning Committee to develop a well-grounded articulation of the community's aspirations for the future of Worthington; and,

WHEREAS, City Council passed Resolution 09-2021 adopting the Visioning Committee's vision statements and supporting principles; and,

WHEREAS, one of the vision statements addresses environmental stewardship in terms of dedication to preserving the natural environment and the community's appreciation of mature trees; and,

WHEREAS, the United States Sixth Circuit Court of Appeals recently invalidated a Canton, Michigan tree ordinance that required property owners to obtain a permit before removing certain trees and to either replace those trees or pay a flat fee per tree in lieu of replacement; and,

WHEREAS, there are over 600 trees on the UMCH Properties and the City's zoning code has provisions similar to the Canton, Michigan tree ordinance that will need to be reviewed and amended to incorporate an individualized determination of actual harm consistent with the Court of Appeals' decision; and,

WHEREAS, another of the vision statements recognizes that diversity strengthens the social fabric of the community and recommends implementing policies that create opportunities for people from a wide range of ages, abilities, and income levels to live in the community; and,

ORDINANCE NO. 04-2022

WHEREAS, City Council passed Resolution 77-2019 directing staff to make application to join the AARP Network of Age-Friendly Cities and Communities and recognizing the importance of having a wide range of housing options for older residents to support aging in place; and,

WHEREAS, the City Charter provides that the Municipal Planning Commission should review and recommend any revisions to the City's Master Plan and area plans every five (5) years and the City has not conducted a comprehensive review of the Current Comprehensive Plan since the passage of Resolution 39-2014; and,

WHEREAS, City Council believes it is necessary to conduct a thorough review of the Comprehensive Plan Update and 2005 Strategic Plan as amended in 2014 (the "Current Comprehensive Plan"): (1) to determine whether it reflects the consensus viewpoint of the community and current City Council, (2) to study the potential impacts of different types and density of potential development of the undeveloped parcels of the UMCH Properties on the environment, storm water management, sanitary sewer capacity, traffic patterns, and the provision of other public services, and (3) to investigate whether the Current Comprehensive Plan needs to be amended to better align with the visioning statements and supporting principles adopted by Resolution 40-2019; and,

WHEREAS, City Council believes it is a necessity to conduct a more detailed assessment of housing needs, including evaluating the current diversity of housing opinions available in the community, older adult and affordable housing needs and approaches, and the potential use of universal design regulations; and,

WHEREAS, City Council has determined it to be in the best interest of the health, safety, and welfare of the City of Worthington to enact a temporary moratorium to provide a pause in any consideration of development of the UMCH Properties until the completion of the review of the Current Comprehensive Plan and housing assessment; and,

WHEREAS, enacting this Ordinance as an emergency measure permits the temporary moratorium to be effective immediately and avoids the potential of a property owner filing an application to vest rights under the Current Comprehensive Plan prior to completion of the review and assessment and therefore City Council has determined it is in the best interest of the City of Worthington to waive notice of public hearing, to waive the twenty-one day waiting period, and to declare an emergency.

NOW THEREFORE, BE IT ORDAINED by the Council of the Municipality of Worthington, County of Franklin, State of Ohio:

SECTION 1.   That there be and hereby is enacted a temporary moratorium on the acceptance of any applications for rezoning, subdivision, certificate of appropriateness, development plan approval, conditional uses, or permits involving the UMCH Properties to be in effect until January 18, 2023, or until City Council approves legislation explicitly revoking this moratorium, whichever occurs first.

**WORTHINGTON 000528**

ORDINANCE NO. 04-2022

SECTION 2. That there be and hereby is enacted a temporary moratorium on any consideration or approval by City staff, the Municipal Planning Commission, the Architectural Review Board, or City Council of any applications for rezoning, subdivision, certificate of appropriateness, development plan approval, conditional uses, or permits involving the UMCH Properties to be in effect until January 18, 2023, or until City Council approves legislation explicitly revoking this moratorium, whichever occurs first.

SECTION 3. That the temporary moratoriums provided in Sections 1 and 2 of this Ordinance shall not apply to applications and approvals necessary for repairs, maintenance, or minor renovation of existing buildings on the UMCH Properties.

SECTION 4. That the City Manager is authorized and directed to initiate a planning study and review of the Current Comprehensive Plan, with particular attention as to the undeveloped parcels of the UMCH Properties, including potential impacts of different types and density of developments on the environment, stormwater management, sanitary sewer capacity, traffic patterns, and provision of other public services, and an assessment of housing needs and recommendations for implementation.

SECTION 5. That the Law Director is authorized and directed to research and draft any amendments to the City's Zoning Code related to the preservation and replacement of mature trees, or the imposition of fees in lieu of replacement consistent with preserving the natural environment and the community's appreciation of mature trees and the recent U.S. Sixth Circuit Court of Appeals' decision requiring an individualized determination of actual harm.

SECTION 6. That it is the intention of the City Council, that if any section, sentence, or provision of this Ordinance or the application thereof to any person or circumstance shall be declared invalid, the remainder of this Ordinance shall be construed as not having contained said section, sentence, or provision and shall not be affected by such holding.

SECTION 7. That the City Council finds and determines that all formal actions of this City Council concerning and relating to the adoption of this Ordinance were taken in an open meeting of this City Council and that all deliberations of a majority of the City Council that resulted in the adoption were in meetings open to the public in compliance with the law.

SECTION 8. That this Ordinance is hereby declared to be an emergency measure necessary for the immediate preservation of the public health, safety and welfare of the Municipality due to the need to have the temporary moratorium effective prior to any potential vesting of rights under the Current Comprehensive Plan and to be effective immediately upon its passage and publication. That notice of passage of this Ordinance shall be posted in the Municipal Administration Building, the Worthington Library, the Griswold Center and the Worthington Community Center and shall set forth the title and effective date of the Ordinance and a statement that the Ordinance is on file in the office of the Clerk of Council.

**WORTHINGTON 000529**

ORDINANCE NO. 04-2022

SECTION 9. That the waiver of notice of public hearing, the waiver of the waiting period, the declaration of immediate effectiveness, and the adoption of this Ordinance was passed by a six-sevenths vote of the members of Council in accordance with the Charter of the City of Worthington, Ohio.

**FAILED TO PASS**

_____
President of Council

Attest

_____
Clerk of Council

**WORTHINGTON 000530**



EXHIBIT

## RESOLUTION NO. 04-2022

Adopting an Amendment to the Comprehensive Plan
Update and 2005 Strategic Plan, and the 2014 Amendment
(Resolution No. 39-2014), for the United Methodist
Children's Home Focus Area for the City of Worthington.

WHEREAS, City Council wishes to amend the Comprehensive Plan Update and
2005 Strategic Plan, including the 2014 Amendment (Resolution No. 39-2014), as it
pertains to the United Methodist Children's Home Focus Area, in order to guide future
use and development of the site and to encourage the social vibrancy and economic
health of the City; and,

WHEREAS, City Council has, since the last Comprehensive Plan Update related
to the United Methodist Children's Home Focus Area (Resolution No. 39-2014), received
on multiple occasions and through many mediums communications from members of the
public and public interest groups on the subject of UMCH development,which, in light of
the City's prior planning, has provided the insights and understandingsneeded to produce
a well-grounded and high quality revision to the Plan; and,

WHEREAS, City Council wishes to utilize the Comprehensive Plan as an
important source for guiding the development, wise growth, and long-term investmentsin
the community.

NOW, THEREFORE, BE IT RESOLVED by the Council of the Municipality of
Worthington, County of Franklin, State of Ohio:

SECTION 1. That the attached amendment to the Comprehensive Plan Update
and 2005 Strategic Plan, including the 2014 Amendment (Resolution No. 39-2014), as it
pertains to the United Methodist Children's Home Focus Area, be adopted to serve as a
guide for future use and development of the site.

SECTION 2. That the Clerk of Council be and hereby is instructed to record this
Resolution in the appropriate record book.

Adopted January 18, 2022

/s/ David Robinson
President of Council

Attest

/s/ D. Kay Thress
Clerk of Council

## United Methodist Children's Home Focus Area

This section of the Worthington Comprehensive Plan was updated in 2022 for the United Methodist Children's Home Focus Area. This section, following a short Background introduction, is stated in terms of guiding principles and general components for future development of the site. This text reflects, following the 2014 update, a current understanding of public opinion, market conditions, and evolving societal and environmental values.

### Background

The United Methodist Children's Home Focus Area, given the size and location of this undeveloped land, represents a unique opportunity for the City and residents of Worthington to enhance social vibrancy and economic prosperity in a sustainable manner. The site is located north of Old Worthington, and south of the High North and Worthington Gateway projects, along the High Street Corridor. This land, located between these historic and economic focal points, and directly across the street from City Hall, may serve as a centerpoint for City planning.

The goal of this update, as with the other content of this Plan, is to provide guidance regarding the range of desired land uses and development options, respectful of property valuation within current zoning, and to assist the City with its review and evaluation of any proposal. This Plan will guide and facilitate any future development process for this site in a manner that conforms with the well-being of the general public as well as the rightful interests of the property owners.

### Guiding Principles

- It is important that the development of the property be considered and executed holistically, as an integrated whole.
- Because of its size and central location, this undeveloped land represents a singular opportunity for the City of Worthington to develop the property in a manner that is extraordinary and that serves the long-term interests of the community. As an historic community, it is natural and appropriate for the City and its residents to think in this way.
- It is essential that any development of the site be harmonious and compatible with the fabric of surrounding neighborhoods and the natural environment. This pertains to traffic patterns, environmental impact, scale and density of any residential housing, impact on schools, and the architectural and aesthetic provisions inherent for any property, as are these parcels, located within the Architectural Review District. Stated positively, outcomes should increase community well-being and vibrancy, opportunities for social activities for persons of all ages, bicycle and pedestrian connectivity, commercial opportunities, and housing, appropriate in scale and type, that support these goals.
- We seek an outcome on this land that is distinctive, exceptional, and expressive of Worthington's own values and community ethos.

Worthington 057429

*General Components*

- Compatible with current S-1 zoning, a large contiguous greenspace, central to the property and inclusive of the Tucker Creek acreage, is a highly desirable component of any outcome.

- Commercial development, aimed at revenue generation for the City and select service-oriented retail that is compatible with the development, is highly desirable along High St., roughly in conformity with the existing C-2 and C-3 zoned areas.

- Residential housing, though requiring rezoning, is desirable, if:
    1. It is creatively executed, and,
    2. whether embedded within the commercial areas or free-standing, is harmonious in overall mass and scale, form, and impact upon surrounding neighborhoods.

Worthington 057430




EXHIBIT
9

# City Council Agenda

Minutes

## Tuesday, January 18, 2022 at 7:30 pm

## 6550 N. High Street, Worthington, Ohio 43085

### 1. Call to Order

**Minutes:**

Worthington City Council met in-person in Regular Session on Monday, January 18, 2022. President Robinson called the meeting to order at or about 7:30 p.m.

### 2. Roll Call

**Minutes:**

**Members Present**: Katy Brewer, Peter Bucher, Rebecca Hermann, Beth Kowalczyk, Bonnie Michael, Doug Smith and David Robinson

**Member(s) Absent**:

**Also Present**: City Manager Matt Greeson, Assistant City Manager Robyn Stewart, Assistant City Manager Economic Development Director David McCorkle, Law Director Tom Lindsey, Director of Finance Scott Bartter, Director of Planning & Building Lee Brown, Director of Parks & Recreation Darren Hurley, Chief of Police Robert Ware, Chief of Fire & EMS Mark Zambito, Clerk of Council D. Kay Thress

\*\* There were eight members of the public in attendance.\*\*

### 3. Pledge of Allegiance

**Minutes:**

President Robinson invited all to stand and join in reciting the Pledge of Allegiance to the flag.

### 4. Visitor Comments

**Minutes:**

When asked by President Robinson if there were any visitor comments for items not appearing on the agenda, Peter Macrae, 74 Orchard Drive, shared that he wishes to speak about an item that he believes will be presented as an emergency. He will hold his comments until the appropriate time.

## Approval of the Minutes

### 5. Approval of Minutes - November 15, 2021, December 6, 2021, December 13, 2021, December 20, 2021 (Special), December 20, 2021 (Joint), December 20,

**2021, and January 3, 2022 (Organizational)**

**Minutes:**

**MOTION** Mr. Bucher moved, Mr. Smith seconded a motion to approve the City Council meeting minutes of November 15, 2021, December 6, 2021, December 13, 2021, December 20, 2021 (Special Meeting), December 20, 2021 (Joint Meeting), December 20, 2021, and January 3, 2022 (Organizational Meeting)

**The motion to approve the minutes as presented carried unanimously by a voice vote.**

# New Legislation to Be Introduced

6. **Resolution No. 01-2022 Approving 2022 Large Grant Funding for the Worthington Partnership and the Worthington Historical Society**
   Approving 2022 Grant Funding for the Worthington Partnership and the Worthington Historical Society.

   **Minutes:**

   **Introduced by Ms. Michael.**

   Mr. Greeson reported this being a routine annual matter. As part of council's adoption of the 2022 operating budget, funds were appropriated for community grants to larger organizations, including the Worthington Partnership and the Worthington Historical Society. As part of the budget process, members heard presentations from those groups, and their requests were included in the budget. Because we are dispersing funds to outside organizations a subsequent resolution is necessary.

   Ms. Kowalczyk shared that because she serves on the board of the Partnership, she will abstain from the vote.

   **MOTION** Ms. Hermann moved, seconded by Mr. Smith to adopt Resolution No. 01-2022.

   **There being no additional comments, the motion to adopt Resolution No. 01-2022 passed by a voice vote.**

7. **Resolution No. 02-2022 Authorizing Parks and Recreation Custodial Services Contract**
   To Authorize the City Manager to Execute A Custodial Services Contract with Circle Building Services, Inc. for the Worthington Community Center and Griswold Center.

   **Minutes:**

   **Introduced by Mr. Bucher.**

   Mr. Hurley reported the Parks and Recreation Department solicited proposals for contractual cleaning of the Community Center and the Griswold Center. The Community Center has been cleaned contractually for many years but because of a retirement of cleaning personnel at the Griswold, we believe it is best to add that facility to this contractual custodial agreement. We have concluded that proposal process and interviewing and are recommending Circle Building Services for this contract that will be effective February 1st and run through the end of 2022. The monthly cost for custodial services at the Community Center will be $13,022 and at the Griswold Center $2,236. Those funds are already allocated in the Parks budget.

   **MOTION** Mr. Smith moved, seconded by Ms. Brewer to adopt Resolution No. 02-2022.

There being no additional comments, the motion to adopt Resolution No. 02-2022 passed unanimously by a voice vote.**

## 8. Resolution No. 03-2022 Approving a Right of Way Permit Renewal (Ohio Power Company)

Approving an Agreement and Permit for and between Ohio Power Company, an Ohio Corporation, to Occupy and Use the Right-of-Way for an Electric Distribution and Transmission System Within the City of Worthington Pursuant to and Subject to the Provisions of Chapter 949 of the Codified Ordinances of the City of Worthington.

### Minutes:

### Introduced by Mr. Bucher.

Mr. Greeson reported that the Codified Ordinances provide a set of criteria for companies that wish to operate utility and telecommunications in the right of way for utilities. We have a standardize agreement and periodic renewals are required. This renewal is for Ohio Power Company, otherwise known as AEP.

**MOTION** Ms. Michael moved, seconded by Ms. Hermann to adopt Resolution No. 03-2022.

**There being no additional comments, the motion to adopt Resolution No. 03-2022 passed unanimously by a voice vote.**

## 9. Ordinance No. 01-2022 Rezone 44-46 W. New England Ave. from the R-10 District, Low Density Residential to C-5, Central Commercial.

To Amend the Official Zoning Map of the City of Worthington, Ohio, to Change Zoning of Certain Land from R-10, Low Density Residential to C-5, Central Commercial at 44-46 W. New England Ave. (Parcel Number: 100-000679).

### Minutes:

President Robinson reported that Council is being asked to introduce this ordinance and refer it to the Municipal Planning Commission. This is to highlight to the public that this issue will be engaged by the council at a future date. The ordinance does not have a recommendation at this time and the public should not interpret its introduction as either approving or denying it but rather following the process established by the Codified Ordinances.

**Ms. Michael introduced and referred Ordinance No. 01-2022 to the Municipal Planning Commission.**

## 10. Ordinance No. 02-2022 Rezone 650 Andover St. from S-1, Special to R-10 District, Low Density Residential.

To Amend the Official Zoning Map of the City of Worthington, Ohio, to Change Zoning of Certain Land from S-1, Special to R-10, Low Density Residential at 650 Andover St. (Parcel Number: 100-000779).

### Minutes:

### Introduced by Ms. Hermann and refer to the Municipal Planning Commission.

## 11. Ordinance No. 03-2022 CRA Boundary Amendment

To Amend Worthington's Existing Community Reinvestment Area Boundaries and to authorize the City Manager to Submit a New Ohio Community Reinvestment Area Program Petition for Area Certification to the Ohio Department of Development.

### Minutes:
### Introduced by Mr. Smith.

**The public hearing on Ordinance No. 03-2022 is set for February 7, 2022.**

# Reports of City Officials

**12. Policy Item(s)**

   **a. New Liquor Permit - Hungarian Butcher**

     **Minutes:**

     President Robinson explained three actions Council members could take related to this request.

     Mr. Greeson shared that this is a relatively new business located in the Plaza at Linworth and W. Dublin-Granville Rd. This is a butcher who sells various meats and charcuteries. The C-2 liquor permit they are requesting allows for selling carryout in closed containers, particularly Hungarian wines.

     Ms. Michael shared that she has been there, and they have many wonderful Hungarian foods. She thinks this request is appropriate.

     **MOTION** Ms. Michael moved, seconded by Mr. Robinson to not request a hearing on this liquor permit request.

     **The motion carried unanimously by a voice vote.**

   **b. New Liquor Permit - American Legion Post 239**

     **Minutes:**

     President Robinson shared that the City had requested a thirty day extension to consider this request. Council has until February 7th to act if we choose to. No action is expected tonight. The intent of this item is to serve as an information item so that all members of council, new members and old ones have the same information. We have asked Marc Myers, an attorney who specializes in liquor issues to be present tonight to answer any questions that council members may have. Mr. Greeson interjected that unfortunately Mr. Myers has not made it to the meeting yet. Mr. Robinson commented that Mr. Lindsey can report on the topic in his stead. But before doing so, he wishes to acknowledge Commander Luksik of American Legion Post 239 who is in attendance along with some of his members. He has asked for some time to make a presentation after Mr. Lindsey comments.

     Mr. Lindsey reported that although he is not a liquor lawyer, he has dealt with liquor issues for municipalities in the past 20+ years so he has a working familiarity with the process. He has also discussed particulars as we understood them at the time with Mr. Myers in anticipation of tonight's determination as to whether to object. He reported not being in touch with Mr. Myers prior to tonight's meeting and apologized for his not being in attendance.

     As some members may recall, the city had a similar instance as to whether to object to additional permits requested by the Post last year and made the determination at that time not to object due to a multitude of factors. The D5 that is being sought in this request, if granted, would require the Post to forfeit

its D4 permit because you can't have two permits that cover the same opportunities.

Mr. Lindsey went on to address the significance of an objection to a permit request. He explained that objections to liquor permit requests do not in and of itself prompt a hearing. Sometimes it is a figurative action that you are taking versus a substantive action. An objection must meet the statutory provisions. In this instance, the concern about what the local zoning might be is not a consideration for the Liquor Control Commission. In fact, the statute is very clear for those districts that are commercial or industrial that it is not a factor at all in terms of their determination. Residential districts are not specifically mentioned in that provision and that is what this District currently is. He shared that Commander Luksik and the Post have been working with the Planning Department and Director Lee Brown in terms of application for rezoning. We had a prior general discussion with their legal counsel regarding that process to at least discuss what that process would entail. He thinks the Commander may speak to some of that and part of that would be what limitations they might be willing to impose on themselves as part of any rezoning that might occur. That would be a way to provide additional controls that are not available in the actual liquor permit itself.

Mr. Lindsey added that statutorily the D5 permit involves restaurants or clubs. While in the cold reading of the statute there might be an argument as to whether the Post meets the statutory definition of "club", Mr. Myers informed him that the actual application of that statute, that distinction has never been a prohibition to achieving the permit and one that he had asked Mr. Myers to speak to.

Ms. Kowalczyk asked if liquor license have an expiration date and if they need to be renewed. Mr. Lindsey reported there being a renewal process for all liquor permits. There would be an opportunity to voice objections on future renewals based on actual experience. Ms. Kowalczyk then asked if he knows how long the licenses last. Mr. Lindsey believes permits are renewed annually.

Commander Luksik thanked Council for the opportunity to comment. He put a presentation together in hopes of providing everyone with some background information regarding the American Legion. He shared that the Legion has been around a long time. We used to be the social hub of Worthington. They have hosted the Memorial Day parade for a hundred and two consecutive years as well as host the Patriot Day commemoration, provide military burials and motorcycle escorts for funeral processions and parades. They provide food and gifts at the VA weekly. He also shared some of the activities that the Legion is involved in nationally. They provide a safe and supportive place for veterans and their families to fraternize. It is just a place to come and just sit down and talk with other guys that have been around and involved in similar activities and experiences.

The Commander shared additional history regarding Post 239 in Worthington

and nationally. He explained that in 1991 they canvassed everyone in the entire city of Worthington and ask to be put on the ballot to get a liquor license. It was the first liquor license in Worthington. That initiative passed with D4 and D6 permits being issues. They have had it for the last thirty some years. By 2019 they noticed declining income. After numerous meetings to discuss the issue, they came up with the idea of renting out their classroom space to hold social events. They realized that people were not going to want to rent it unless they could provide alcohol. So almost three years ago they applied for a D1, D2, D3, and D5 license. Last year the City Council approved the D2 and D3 however the Post put them on hold because without the D1 they could not operate. They need to have all three at the same time so they were hoping that the census data would increase population and there would be another D1 available. Because they were next in line, they would get that license. When that didn't happen, they weren't quite sure what they were going to do. The only possible option was to find a D1 somewhere in the state, buy it and then TREX it into Worthington and asking Council to permit it. This D5 became available when someone didn't renew their permit. If the D5 is permitted, there would be no need for the D1 and they would turn in their D2, D3 and D4.

President Robinson asked if members were voting to approve the D5 liquor license because he thought it was just to object or not object to the issuance of the license. Mr. Lindsey agreed that Council could request a hearing, not request a hearing, or do nothing, which in essence means that they are not requesting a hearing. President Robinson understands this to be for future discussions, but he thinks the point of council decisions would relate to the rezoning request which he understands is what will be necessary if a D5 is the become operative, but council is neither approving nor denying the license.

Commander Luksik stated that ideally, they would have preferred to do both the liquor permit and rezoning at the same time however, the D5 just fell out of the sky. As Mr. Lindsey shared, they have already begun the rezoning process. They are looking to apply for Veterans Memorial status and will put together a very thorough package that include hours of operation for events, room rental contracts, and site plan. They have retained counsel to assist with that effort and are planning on having meetings both with the public and the city. As an American Legion Post, they have many rules and regulations that they must meet and follow. While liquor licenses allow for late night operations, their bartenders are volunteers and do not want to be operating as late as the license allows. They treat their neighbors the way they want to be treated. They are a legal non-conforming use and building and should already be zoned a Veterans Memorial, so they are trying to correct that. They have a solid track record of management operations for 102 years. This license will allow them to continue although in a very small scale but well-managed and well-conceived way to keep them in existence to continue serving the veterans in our community. Commander Luksik ended by thanking Council for the reboot grant. They

managed to replace the doors, fixed some ventilation, installed new electric panels, and working to get the heater fixed. Thank you so much.

President Robinson acknowledged Tom Holden. Mr. Holden reported being the commander of the 12th District to the American Legion. He resides in Westerville Ohio and is here tonight in support of American Legion Leisure Blackstone Post 239. He spoke about the groups volunteer efforts throughout the community and requested Council's support and approval of the requested legislation.

Ms. Deborah Waltz, 1151 Oxley Rd. Columbus Ohio 43212 shared that she belongs to a national organization called Blue Star Mothers of America that supports veterans. Her group meets at the Sharon Memorial Hall, which makes them a neighbor to the Legion. The Legion has helped them tremendously with numerous fund-raising activities and has been very supportive to Blue Star Mothers packing of 1000 packages in one day in July. They have the utmost respect for the men and women veterans who gather at the Legion in the spirit of comradery to aid their well-being and always needed support of each other.

Gregory Schick, 9148 Longstone Dr., Lewis Center shared that he has been a member of the VFW for the past 25 years. This Post has meant a lot to him. He has great friendships and we do have a beer occasionally after our meetings. We do many things in the community to make it a better place. Post 239 has been a great asset to your community, and he hopes and pray that you feel that this opportunity for them is a great opportunity for the community as well.

Commander Jim Barker, United States Navy retired, commented that he represents the U.S. Columbus base of the submarine veterans here in Columbus Ohio. They hold monthly meetings in the American Legion Post, and they have their annual picnics every summer there. His members have asked me to come and encourage Council to strongly consider this proposal. This Legion means a lot to his group and to this community. President Robinson reported it being an appropriate time for members to ask questions of Law Director Lindsey and/or Commander Luksik.

Ms. Brewer recalls Commander Luksik mentioned that their by-laws keep their hours from 4 to 8 p.m. She asked if that has ever not been the case or has it been consistent. Commander Luksik stated that they set the hours, not the by-laws. But there are things that cannot happen like the public can't come in and sit at the bar and drink. The bar is for Members Only. When asked by Ms. Brewer if the D5 liquor license was for members only, Commander Luksik replied, no. The D5 liquor license allows them to sell to the public and renting out the room for specific social activity is allowable but it is controlled. They can't allow loud music annoying the neighbors. That sort of activity is not allowed at any Post. Ms. Brewer asked if they ever had hours later than 8 p.m. Commander Luksik thinks hours were until 10:00 p.m. prior to the pandemic. The hours fluctuate with the crowd. If people show up, they stay later. If nobody shows up, the bartenders go home at 6:30. The Post has taken a big hit because of the

pandemic.

Ms. Kowalczyk thanked Commander Luksik for the presentation and everyone who spoke on behalf of Post 239. The Post has been a terrific community partner and she thanked them for serving our community and serving our area veterans and their families. She really appreciates it. Considering that you have laid out the parameters of the use of this liquor license and that is going to go through the public hearing process and council will be hearing that at some point, she has no objection to this moving forward.

Ms. Michael asked if there is any reason why we should not move forward and not object to this request.

President Robinson stated that any council member is free to make a motion in that regard if they choose. Because this evening's discussion was described as informational only, residents that he knows would like to be here to provide their own thoughts and counterpoints are not here. He believes that it would be valuable for Council to have this on the agenda again February 7th to discuss. Again, the actions before council are to do nothing or to pass a motion to not object or to object but he believes that further discussion in February would be fruitful given the significance of this issue.

Ms. Michael reiterated that residents would have plenty of opportunities to comment while this issue goes through the zoning process.

President Robinson agreed that the process moving forward has multi-steps before the MPC before coming back to council, so this is not a definitive moment. He would like to open this up to other questions. He has some questions as well.

Ms. Hermann shared that through the pandemic mental health has obviously been a very large concern. Speaking to Commander Luksik she asked if he would say that the Legion is a place where they gather to support each other. Commander Luksik agreed. Ms. Hermann commented that she appreciates everything that the Legion does to support veterans. They were there when her grandfather, a purple heart recipient, passed away and she greatly appreciates everything they do. They have been here for 100 years or so and have been good stewards. This is a group of people that have a broad and large sense of responsibility for the community around them. She just wanted to say thank you.

Mr. Smith asked about liability as it exists today and potentially in the future. There is potential liability with alcohol. He sees what they do today at the Post is potentially different from what they are hoping to do with this new liquor license. He asked how the Post specifically or the Legion at large addresses factors of liability. Commander Luksik replied that they have a separate insurance policy for the bar. He has already talked to their insurance agent and given the numbers that we are talking about, it is covered. They pay about $800 every 6 months for general insurance coverage. There is a separate policy specifically for liability. In that same vein, they have training for our bartenders for that very reason. Ubers are much better than policemen.

President Robinson shared that he has gotten to know Commander Luksik a little over the last six months and he appreciates the time that they have spent talking at the Post and he looks forward to talking with him again. He thinks everyone up here is grateful for the role of veterans in our country and specifically here in Worthington. Through this process and talking about Post 239 he has become much more aware of what you do and what you contribute to the community than he was beforehand. So he is very grateful for the role of the Post in this community and any questions he has about the desirability of the Post operating an event space with a D5 liquor license has nothing to do with him not being appreciative of what the Post does but rather what he considers to be broader concerns, as an elected official, for the well-being of the whole community. He is trying to balance and weigh different factors. He just wanted to say that to the commander. He respects him personally. He is grateful for what he does and for what the Post does. His questions shouldn't be interpreted or construed in any other way than that. Commander Luksik said that he understands.

President Robinson asked Mr. Lindsey if he could speak bit about what the D5 allows. Mr. Lindsey reported that Mr. Myers is now in attendance. Mr. Myers offered his apologies for being late as he forgot about the meeting. He stated that the D5 permit is generally regarded as the Cadillac of liquor permits. It allows for the sale of beer, wine and spiritous liquor (anything over 42 proof) Monday through Saturday from 5:30 a.m. until 2:30 a.m. Sunday sales, assuming that the location is in a precinct that is wet for Sunday, would allow for the sale of beer from 5:30 a.m., the sale of wine and spirits from 11 a.m. It allows for on-premises and off-premises consumption in sealed containers of beer and wine, no sealed containers of bottles of spirits but Ohio law recently changed because of the virus to allow for carry out of up to three drinks of spiritous liquor in sealed containers with each food order. He thinks that statute was primarily enacted for places like Mexican restaurants, so that you could get a margarita to go with your food order. Bottles of spirits can only be sold at state agency stores.

Mr. Myers added that historically the D1 permit (beer only), the D2 (wine only) and D3 (spirits only) was designed as a restaurant permit because without a 3A, they only allow for sales until 1 a.m. The D 5 was historically intended for nightclubs. A nightclub was defined as any place that was habitually open past midnight and provided live entertainment. In the early 80s the division of liquor control would sometimes reject applications for D5s for restaurants that did not qualify as a nightclub. That distinction was basically eliminated in the late 80s, early 90s. Now the D1, D2, and D3 and the D5 are basically interchangeable. The main distinction between them is the D1, D2, and D3 allow sales to 1:00 a.m. while the D5 allow sales till 2:30 a.m. If you have a D1, D2, and D3 you can pick up with is called a D3A which permits sales until 2:30 a.m. So a D1, D2, D3 plus a 3A is the equivalent of a D5. There is a little difference in the total permit

fees, but the privileges are identical.

Ms. Hermann understands they lost the D1. She asked how that occurred. It sounds as if the only reason they might be asking for a D5 is because it became available and because it replaces what they have. She knows it is not easy to get a liquor permit. Mr. Myers agreed. He stated that the Post, as he recalls, has a D4. The main restriction of a D4 is that it is sales to members only. There is also an issue with carryout sales. The D4 is considerably cheaper per year than the other what he would call, regular class permits. He shared that liquor permits are issued on a quota basis, depending upon the population of the taxing district. The problem here is that he doesn't believe there are any openings for D1s. If they cancelled the D4, the permit holder would have to give up beer, so their only choice is the D5, which has all the privileges. He suspects that they would prefer not to have a D5 because it is considerably more expensive, but they do not have a choice because there are no openings for the D1.

Mr. Smith stated that if he is reading the memo correctly, the 30-day extension was granted to February 9. He asked if that already exists. To Ms. Michael's point don't we have that time until February 9th. President Robinson replied that council has until the 9th to file an appeal or an objection. Mr. Smith clarified that the extension already exists as the deadline is February 9th. Mr. Myers agreed. He added that as a legislative Council they have 30 days to object or not object after an initial notice is received. By law you can extend that period for an additional 30 days. If you do nothing, the division of liquor control treats it as no objection. You can object and not request a hearing, but as a matter of law that is treated as no objection. If you do object, there will be a hearing if you request one, but you also bear the burden to prove why issuance of the permit would have a substantial or adverse impact upon the neighborhood.

President Robinson asked if the Post obtains the D5, do they lose their D4? Mr. Myers replied yes. You can't have permits with duplicative privileges at the same location. Mr. Robinson asked at what point will they have to decide whether to basically accept or make effective their ownership of the D5. Mr. Myers replied that they are on the list and in open status. When all the requirements are met and there are no objections, the D5 would be ready to issue when the D4 is canceled. With some careful work you can coordinate the cancellation of the D4 with issuance of the D5 so there is no down time. Mr. Robinson asked if the Post could extend that process if needed to work through the rezoning process as well as appearance before Council. If the rezoning is denied, he would hate for the Post to be caught without a D4. He asked how long they could retain a D5. Mr. Myers replied that they are on the list. If they are working toward obtaining the D5, the division of liquor control will give them as much time as possible. As he is sure the Post is aware, February 1st is renewal time. Today was actually the last day to pay the February 1, 2022 renewal without penalty so he is sure the Post has probably renewed its D4.

That carries that D4 to February 1, 2023. Theoretically there is really no problem. The Post doesn't risk losing the opportunity to get the D5 for another year.

Mr. Lindsey stated if the D5 fell through, he asked Mr. Myers to talk about how easy it would be to get the D4 again. Mr. Myers shared that he is pretty sure that is possible. D4 class permits are one permit for every 2,000 people. While he hasn't looked at Worthington's quota for a while, he would be surprised if there weren't plenty of openings in Worthington. He added that there would be no reason for the Post to give up its D4 until it was certain that all other issues have been resolved. He reiterated that zoning issues are specifically, by law, not considered by the Ohio Division of Liquor Control. Zoning is a matter of local governance.

President Robinson asked if licenses can be sold. In other words, if a D5 was obtained, would that be an asset evaluation that they might be interested in selling if that was a course of action they wanted to follow. Mr. Myers replied absolutely. Theoretically under Ohio law, one is not supposed to sell a naked liquor permit. The permit is to be sold in conjunction with the valid sale of business assets but as a practical matter, 90% of liquor permit transfers are the naked liquor permit being sold. You might sell the permit and one chair. The D5 permit as a TREX permit is worth $16,000 to $20,000.

President Robinson in referring to the Veterans Memorial zoning category asked Mr. Lindsey if the commercial operations that is being outlined allowable or a conditional use. Mr. Lindsey shared that he has asked Director Lee Brown to address this question. Mr. Brown reported that staff has been working with the Post legal counsel, Laura Comek. Since there has been a big upfront discussion regarding hours of operation and knowing what is planned, she is proposing going through our planned district route so that up front we know what we are getting: hours of operation, what is allowed to occur on the site, traffic, days of operations, number of events, capacity, outdoor events, etc. and therefore not having to go through amending the code to add a use just for this particular property. Then maybe get the zoning in place after the use has changed and then go through the conditional use route through the Planning Commission. We may possibly see something submitted in February to begin the process. It is a more holistic approach as to everything that could possibly happen or not happen so that Council would know what you are approving. The residents will also know what is going into effect if it is approved. Mr. Robinson commented that by planned district you are referring to PUD? Mr. Brown agreed.

Mr. Lindsey volunteering some additional information, stated that current scheduling of those Liquor Control hearings, if the council were to object and request a hearing, Mr. Myers indicated probably about 3 or 4 months from now. Mr. Brown added that the zoning process with the PUD, is probably two-to-three-month process to get it to city council and then the additional 60 days waiting period.

Ms. Michael asked if there is a risk of the Legion not being able to get the D5 if we must wait 3 months to decide, but we must decide whether to object by the next meeting. Mr. Lindsey replied to the process that they would be going through would be separate and independent of our zoning process. As Mr. Myers indicated Liquor Control won't care what the status of the zoning issue is so they will only be focused on whether they meet statutory requirements for the D5. It will just be that there will be two tracks going along and the Post will have to gage that and appropriately proceed down the two paths at the same time. President Robinson, in following up on Ms. Michael's question, asked if the Post is in danger of proceeding and achieving their D5 because of an extended City process. Mr. Lindsey replied that was the predicate for the question that he asked Mr. Myers about the ability to get a D4. Without more review we don't know the answer right now.

Mr. Myers shared that there is really no risk of the Post losing its D4 because there is no reason for the Post to cancel it until the D5 is ready to go. Assuming the Post has paid the renewal fee, the Post has the D4. It will not have to give up the D4 until everything is worked out and the Division of Liquor Control says it is ready to issue the D5, and you will have to cancel the D4.

President Robinson commented that to confirm his understanding, they are not at risk of losing the D5 even if there is an extended City process. Mr. Myers agreed.

Ms. Michael remarked how she is unsure why we want to bring everyone back for the next meeting just to go over what we just went over tonight.

**MOTION** Ms. Michael made a motion to not object to the D5 permit and we will have a zoning process that the request will go through.

In answer to Mr. Robinson's question regarding process, Mr. Lindsey replied that procedurally, now that Ms. Michael has made the motion, you will ask for a second. If there is a second to the motion, you could have further discussion as to rationales and reasons and then call for the vote. The motion is to not object. A "yes" vote would be to not object. A "no" vote would be that you disagree with that and would like to object.

**\*\*Ms. Hermann seconded the motion.\*\***

**DISCUSSION** Ms. Hermann understands that we have the liquor license and then we discuss zoning. Members agreed. Mr. Smith stated that this vote would supersede the extension that already exists to February 9th. Then we would not have an extension? Mr. Lindsey agreed that this would replace the extension. Once we notify them of Council's determination, that ends it.

Ms. Brewer had a question on timing. Mr. Brown indicated that counsel is preparing the details in a package of what we would expect, timing, events, and she asks that from the standpoint of her talking with some residents who had some concerns so if we were able to review something that gave us answers about timing, events that would happen, in her mind that would make sense.

You said that would be ready at about February because this will ultimately come back to us after the zoning process. Mr. Brown commented that he and Mr. Lindsey met with Laura Comek, who began outlining the process of what she wanted to do. In his discussion with her, she was hoping to file in February. With the way the PUD and the text would be it is really combining the zoning, conditional use, and the text all together so you would know up front what that would be. He thinks the goal is to have them make application in February so that they can get it to a February Planning Commission with a recommendation to Council in March. She plans to give us a draft this week of what she would make application for so he thinks they will know more at that time.

Mr. Greeson added that the timeline would depend on the Post deciding to file and then once referred to the MPC because it is a rezoning and unknown how long the MPC decides to deliberate on the matter. Those could affect the timeline. Ms. Michael added that a change in zoning, once it's approved by council, is another 60 days before it goes into effect.

President Robinson shared his hesitation in approving the motion is because it does not afford members of the public an opportunity to speak. This agenda item was presented to him and described as an opportunity for Council to ask questions of attorney Myers so that we could have more time to consider the issue before the February 7th meeting which will be our last opportunity to act on the extension. He had received specific inquiries from residents in the area asking if they should come to this meeting tonight and he advised them not to because he didn't want to create an event. He thought it was going to be low key with no action being taken and that members would just be asking some simple questions. When a member of the audience asked why he would discourage members of the public from coming to the meeting he replied that he wasn't discouraging them from coming. They asked if this was a meeting that they needed to attend, was there going to be any action taken, and he replied that it was going to be informational only. There will be plenty of opportunities in the future both on February 7th as well as during the zoning and return to council periods for you to come and speak. He did not anticipate Commander Lukzik and other veterans coming and giving extended testimony tonight. He appreciates that they did, but he personally feels an obligation to afford other members of the public a chance to come and speak on the 7th. That is his reasoning, but he will leave it up to the rest of the council to vote accordingly. He asked if there were any other comments/questions.

Mr. Bucher commented how given the extension until February 9th and we have a meeting on February 7th, his initial inclination is to wait and not inadvertently cause minor cross wires to cause anybody to feel like they couldn't speak if they would like to. He asked Mr. Lindsey the process by which the motion could be denied, and another motion extended to take no action tonight if that were the wish of the body. Mr. Lindsey replied that there are probably two approaches that could be used. Ms. Michael could choose to withdraw her motion, or

somebody could move to table the motion to the next meeting. Then that procedural matter would be voted on as well.

President Robinson asked if there is a motion to table the motion, is the tabling motion voted on first? Mr. Lindsey replied yes. Mr. Robinson stated that if that passes then what happens to the initial motion. Mr. Lindsey replied that the motion is tabled until a date certain meeting because obviously you need to vote at your February meeting on the 7th to meet the deadline. So, a motion to table until the February 7th meeting would be the form of that motion. If seconded and approved by a majority of council then that motion would come back to council on the 7th.

When asked by Mr. Robinson if she had any interest in withdrawing her motion, Ms. Michael replied not at this time.

**MOTION** Mr. Robinson made a motion to table Ms. Michael's motion. The motion was seconded by Mr. Bucher.

Ms. Kowalczyk stated that while she appreciates the fact that members of the public who have expressed concern about this issue, we've heard from them in the past and she believes we understand what their issues are. It is her understanding that those issues are not something that is evidence or justifiable to deny a liquor license so hearing from them and then passing a motion to object to the liquor license, it is unlikely that that is going to defeat the liquor license. They have the most impact going through the zoning process. So, they will have that opportunity to bring their concerns to the Municipal Planning Commission. She is not opposed to whether we wait or go forward but let's not waste people's time. Let's just get to the heart of the matter. This liquor license process is not where people's concerns are going to end up being potentially address and they can be most effective in their advocacy on that issue. She just wanted to put that out there. We can have another hearing, we can listen to their concerns, but the concerns that have been expressed will not support the objection of a liquor license.

Mr. Smith commented that he agrees with Ms. Kowalczyk's principal. He thinks a lot of the issues are going to get flushed out in the zoning process and the application for that but if there are folks out there who would like to address this issue, we have until the 9th of February, so he doesn't see in principle the need to rush it.

Responding to Ms. Kowalczyk, Mr. Robinson said that he doesn't claim to know the fullness of their current thinking. He believes they should have the ability to come and speak to members. He agrees it may be a long-drawn-out process, but he is not one to say to them that we've heard from you, and we don't need to hear from you again right now.

Ms. Michael stated if there is going to be another hearing with the public, she would want that hearing limited to why they would object to the liquor permit and not the things that would go into the Municipal Planning, the zoning, the hours, the operation, the use. Those are not things that the liquor control board

looks that so she doesn't know what comments that the public would have objecting to the liquor permit especially with the understanding that we have this whole zoning process that they will be going through. She could see them having great interest in the zoning. There should be a lot of public input into the zoning, but she doesn't see how the D4, D5 permit makes that big of a difference that they would really object to that.

Mr. Robinson commented that he does not presume to know ahead of time what the public will want to say. He thinks the Post presentation today dealt with the full range of issues. The history of the Post and so forth, well beyond the specifics about the liquor license so in the interest of fairness and equanimity amongst members of the public, he thinks they should be allowed to come and speak next week. He called for a vote on his motion to table this issue until the February 7th meeting.

**The vote passed 4 (Bucher, Smith, Brewer, Robinson) to 3 (Hermann, Kowalczyk, Michael) by a voice vote.**

Mr. Robinson added that if members have questions or comments that have not been addressed sufficiently tonight, they are invited to send them to staff, Mr. Lindsey in particular prior to the meeting on the 7th.

# Reports of Council Members

## 13. Reports of Council Members

**Minutes:**

President Robinson share that he anticipates doing this regularly in the order of seniority.

Ms. Kowalczyk thanked staff, community members and everyone who was involved in the Martin Luther King Jr Day presentation. It was a wonderful presentation. It is now available online on the city's website and she encouraged everyone to watch. It was a nice presentation.

Mr. Smith reported the Community Improvement Corporation met on Friday where we received an update from City staff on some projects around town, most of which City Council is familiar with.

Ms. Michael commented that she was also at the Community Improvement Corporation meeting. She gained some real good information and knowledge from some of our developers who are members and our newest member of the CIC, Beth Sommer from the Huntington Bank. She shared a lot of information, ideas, and strategies for development. It was quite informative and a good meeting. She also thanked the City's Service crew for getting all that snow removed and giving Worthington the wonderful look that the crew always does. Thank them for all their hard work.

# Other

## 14. Other Business

**Minutes:**

President Robinson stated that under the topic of Other Business would be the introduction and consideration of a new ordinance:

**Ordinance No. 04-2022** Enacting a Moratorium on Applications for Rezoning, Subdivision, Certificates of Appropriateness, Development Plan Approval, Conditional Use, or Permits for the United Methodist Children's Home Focus Area and Declaring an Emergency.

Mr. Robinson shared the process that will be used to work through this topic. He will attempt to briefly answer the question, why a moratorium? Then, why now? Finally, why by way of emergency?

**Why a moratorium on this particular property?** The comprehensive plan guides development in Worthington. Though it is not legally binding, it is intended to positively guide prospective developers about the city's desires and intents about the property. Lifestyle Communities (LC), the current owner of the property of which we are speaking about tonight has consistently referenced the current Comprehensive Plan during their various proposals. The plan was written back in 2014. Since that time the world has changed dramatically: changing demographics both in Worthington and elsewhere, Covid-19, undeniable indications of climate change, and heightened awareness on the part of many of us of social inequalities. As a result, he believes members have changed individually and as a community and our understandings of what would be the wisest and best use of this land. The Comprehensive Plan, however, cannot be updated or amended if there is a proposal currently before the city related to that property, hence the moratorium. If it passes and it is proposed for 12 months, it will give the community at large and the city council a pause ensuring that no proposals or applications would be submitted to the city or accepted or reviewed during this period, enabling us as a community to reassess what we believe would be most desirable at this property.

**Why a moratorium now?** For those that have been following this issue, you are aware that there was a proposal before the city until December of last year when following the MPC's recommendation of denial, City Council also denied LC's most recent proposal. It had a proposal before the city since October of 2020. So, for 14 months we were unable to take this type of action.

**Why by way of an emergency?** He just referenced that Lifestyles has had a proposal before the city since October of 2020. The background there is that City Council had discussed the content and the relevance of the Comprehensive Plan before we even commenced with the Visioning process. If you go back and read the resolution authorizing the Visioning process, there's a statement in there about how the Comprehensive Plan had effectively reached the end of its useful life. The discussion among the council members was that the Visioning process would better enable us to then subsequently amend the Comprehensive Plan. In September of 2020 there were indications that LC was interested in submitting a proposal, soon. Realizing that if they did so we would not be able to amend the Comprehensive Plan,

he advanced at a meeting in September that Council considers suspending the Comprehensive Plan. There was a draft resolution that would have affected that but there were sufficient voices on Council at that time saying that we really need to have advance notice of this for public discussion and we should not vote on it that evening. In spite his concerns and having had that discussion, it was not voted on and LC submitted a proposal before our next meeting there by blocking our efforts to do so. For the next 14 months through an actual firm proposal and then a secondary quasi proposal through significant processes with a Municipal Planning Commission and ultimately City Council, we had to respond to this proposal considering the 2014 Comprehensive Plan. So, a property owner can apply at any time and block our efforts to amend the Comprehensive Plan. That is why emergency discussion and hopefully action would serve the public interest by enabling Council to act in a way that then would allow robust and rigorous public dialogue and discussion towards amending the Comprehensive Plan.

So that is why a moratorium. What a moratorium would do. Why it is being proposed now, because we are just now able to and why by way of emergency would be to ensure that a third party would not be able to block Council's intentions.

Lastly, Mr. Robinson shared how there were two or three emails from folks, he believes with Building Worthington's Future, asking whether an emergency ordinance like this violated the Issue 38 Charter Amendment. He responded by saying that this ordinance does not violate either the letter or the spirit of Issue 38. Most probably know that he spearheaded that effort. He was intimately involved in drafting that language along with election lawyer, Don McTigue. The letter of the Charter amendment has two terms: one that the effective date of rezoning an ordinance is now 60 days and secondly germane to this evening that there shall be no emergency passage of rezoning ordinances nor the changing of the zoning code itself. The intent of that was to empower the residents. To enable residents, if desirable, to undertake a referendum to prevent what could be a permanent action, that is the approval of a rezoning and then a building. This ordinance in many ways is quite the opposite but the intent is the same. It is to empower the residents by giving this Council and by extension the public the ability to have a robust discussion about this vital piece of property. The effect of the emergency ordinance is not permanent. In fact, by its very nature, it is temporary. He believes by both the letter and the spirit of Keep Worthington Beautiful, Issue 38 this ordinance does not violate it and in fact he would say conforms to the spirit of that Charter Amendment. Those are his initial comments. He asked if someone would like to introduce this ordinance.

**Ordinance No. 04-2022 was introduced by Mr. Smith**

When asked by Mr. Robinson about the next steps, Mr. Greeson recommended that Mr. Lindsey go through the details of the ordinance and then members can ask questions. After the completion of the council questions, if it is his desire to afford the public to ask questions, then you can decide to refer those questions to the appropriate staff to answer. He thinks the questions should be to him and then the body to decide if you want staff to respond to them.

Mr. Robinson asked Mr. Lindsey to provide an overview of Ordinance No. 04-2022 as written. Mr. Lindsey explained that the ordinance as introduced does enact a moratorium. Moratoriums are a lawful action that councils can take to put a temporary pause on various applications or approvals of government actions. They are found not only in the zoning context, but in other contexts as well. For our purposes this one is in the development, land use, zoning category. A moratorium is an attempt to preserve the status quo to be legally enforceable and withstand constitutional review. The period of a moratorium needs to be reasonable for the purpose of the moratorium. Courts examine moratoriums based on the objective and the length of time. Moratoriums between 6 and 12 months are generally acceptable without scrutiny.

Mr. Lindsey going to basic process is the question of emergency and the question that President Robinson raised about Issue 38 and its effect on the charter and whether that would or wouldn't be subject to a 60-day. He agreed with Mr. Robinson that a moratorium does not change the city's zoning code because we are not amending the code. There is no change in the zoning classification of any property because of this ordinance, therefore, it is his legal opinion, based on the wording of the statute, based on his understanding of the purpose and intent of this Charter provision, that it is not subject to this 60-day.

Mr. Lindsey went on to explain that the ordinance has many "Whereas" clauses. Those clauses sort of lay out the process of how we have our current Comprehensive Plan and what actions have taken place that prompted the desire to put a temporary pause on actions until a study of the Comprehensive Plan can be done. The properties identified in the third "Whereas" clause include the five parcels that were part of the United Methodist Home Focus Area that was part of the study in the 2014 amendment of the plan. Those five parcels include the primary parcel that people think of currently as the vacant former UMCH site, the two Larrimer properties that LC purchased as part of their overall assemblage of property, the Bickford facility, and the conference center because all of those were part of the focus area at the time. If the goal is to re-examine the Comprehensive Plan as to that focus area it is to include all those properties. The ordinance speaks to the Visioning Committee and the work that they did and council's adoption of their visioning statements and guiding principles. It references two of those that appear to be relevant to this discussion, one of those being the preserving of the natural environment or environmental stewardship and the community's appreciation of mature trees.

Ms. Michael questioned why the two WHEREAS clauses related to trees need to be included in this ordinance. She understands that municipal attorneys are working on legislation related to trees so that cities can make decisions property by property. Mr. Lindsey replied that these two are included because with over 600 trees on this particular property the absence of language that would be acceptable to the Sixth Circuit Court of Appeals allowing for the individualized determination as required would mean that the city's current code which imposes a flat fee would be inconsistent with that provision. The objective of that ordinance language which was

to preserve or require replacement or in lieu of replacement require a fee that at least would provide a basis for other tree development and other things and perhaps a disincentive to the demolition or removal of trees. If a proposal were to come forward, we would not currently enforce that tree ordinance without an individualized determination. One reason for the moratorium is that it would allow the time for the Municipal Attorneys Association and your law director and others to come forward with appropriate amendments to address that issue so that no development of that property would occur without that being in place. That is why it is included as well as the Visioning Committee statement on preserving appreciation of mature trees.

When asked by Mr. Robinson if Mr. Lindsey's explanation addressed her question adequately, Ms. Michael stated she understands where you're coming from, but she just figured that's something we're going to be doing City wide because we are going to have to come up with some revision for all the trees in the city. Mr. Lindsey said maybe he misunderstood the question. What we will be doing will impact more than just the UMCH properties. The changes that we would anticipate to the code regarding trees will apply across the city. Ms. Michael stated that if this passes and then changes are made to the code in July, this property will be excluded. Mr. Lindsey clarified that the amendment of the tree provisions, whenever that may occur, then that basis for the moratorium would no longer be needed. But the moratorium is not just about the trees, it is also about the comprehensive plan study. In the same way the comprehensive plan may take approximately one year to complete, much like it did in 2014. But if the study, review, and recommendations concluded after six months and the tree ordinance was ready for consideration and a housing assessment was complete, Council can end the moratorium and development applications could be submitted and considered and approved. Mr. Robinson added that if this moratorium were to pass tonight, Council could at any point repeal the moratorium for whatever reason. It would not require the developments that were just cited. We could do so for a range of issues. Mr. Lindsey agreed. He added that the converse would also be true. The moratorium could be extended provided there is a reasonable basis and a reasonable period.

When asked by Ms. Kowalczyk if this moratorium, specifically related to the tree ordinance, would only apply to these properties, Mr. Lindsey agreed.

Mr. Robinson commented that generally what Mr. Lindsey is doing is laying out the public interest in establishing this moratorium, trees being one of them and particularly relevant to the UMCH because of the large number of trees on the property and because of the state of flux or ambiguity of current legislation regarding trees. Mr. Lindsey agreed.

Ms. Hermann asked if there is a reason why we are not trying to do a separate moratorium for development where there are a lot of trees. She noted that the I Am Boundless site has a lot of trees. She doesn't understand why UMCH is being pulled out when they have a lot of trees as well. Mr. Lindsey commented that Council could do a tree moratorium Citywide or for all properties having more than x number of trees for instance. He added that Council also can amend this and the nature of this

coming forward.

Ms. Kowalczyk understands that this is one of several things listed in this ordinance but it's in here and it's relevant. She asked if this is the only way, any action that we can take in terms of the concerns related to the tree ordinance. Passing an order to cover what the court of appeals has issued is how we must preserve the time frame? This is the first time she has heard this. This seems to her like a drastic measure just on that piece of this ordinance. Mr. Lindsey replied that the number of trees on this particular property and the recency of the 6th Circuit Court of Appeals decision add to why it's part of the justification of this moratorium. It would be up to council whether to move forward with a moratorium if you did not have the tree issue as part of it. It is just an additional justification that would support the moratorium. He talked about a true tree ordinance and how its drafting will take some time to make sure we are consistent with what other municipalities have evaluated and how the court has ruled. He has provided Director Lee Brown with an interim fix which is based on an individualized assessment. He believes that is the best approach in the absence of a code change.

Ms. Hermann asked that given a denial from Council for the most recent Lifestyle's application, isn't there in effect a pause until April where they are not permitted to submit a new proposal. Mr. Lindsey replied yes. Based on our current code, they are limited for a six-month period after the MPC action was taken. So, there is a temporary limitation of their ability to seek rezoning, but it wouldn't necessarily apply to other actions that they could file, such as a building permit that is consistent with the current zoning. Such a request might impact the overall goals of the community as to how to best utilize that property in terms of a comprehensive plan. We are trying to be inclusive of all the different types of applications that might come forward that would negatively impact the ability to do a complete review of the comprehensive plan as to this property and so not having any development, maintaining a true status quo was the goal of the moratorium.

Mr. Robinson in recapping the discussion stated that Lifestyle Communities currently cannot submit a rezoning proposal until April so why do we need to act on this now? As Mr. Lindsey just point out there are other actions they could do in conformity with existing zoning that could likewise impede our ability to amend the comprehensive plan.

Ms. Hermann stated she has several concerns; one being that it's an emergency, and the public is not included in this conversation. She agrees that Council should readdress the comprehensive plan and she understands timeframes. She has a concern that we have a vision statement, Vision Worthington where we have all this information, and we didn't have conversations before this. We are not bringing the community in, and she is not going to presume to know what the entire public has to say about this. President Robinson agreed that those are very important concerns that we will talk about later in the meeting when council is discussing the issues. He asked if Mr. Lindsey's respond adequately addressed her question. Ms. Hermann replied she has concerns about how we are treating landowners on their ability to act

on their land without zoning changes. She understands that this is a contentious site but if the landowner wants to act within the zoning that is there, she just has concerns with Council rushing to a moratorium at this point. She hopes that Council gives every landowner the opportunity to speak within an appropriate amount of time with having an appropriate amount of information ahead of time. That it becomes a part of the agenda prior to Council stopping them or trying to stop them from developing on their land as zoned. That is her pause right now. She is really trying to wrap my head around this, but she is uncomfortable with that.

At Mr. Robinson's request Mr. Lindsey continued through each WHEREAS clause. The third WHEREAS on page 2 of the ordinance states City Council believing it is necessary to conduct a thorough review of the Comprehensive Plan update and 2005 Strategic Plan as amended in 2014 to determine whether the current plan needs to be amended to better align with the visioning statements and supporting principles adopted by Resolution 40-2019. Ms. Michael commented that this WHEREAS makes it sound like we are reviewing the entire comprehensive plan and not just as it relates to the UMCH property. Since the moratorium is limited to the UMCH property some rewording might be appropriate. Mr. Lindsey commented that the actual operative language of the moratorium itself is set forth in Section 1 and Section 2 and does refer to the UMCH properties so that's where it gets limited. The more generalized statement in the WHEREAS clause is that as part of a review of the comprehensive plan there are aspects of that plan that are broad as to all properties and there are some that are related to the focus area. So, he can't rule out that as staff looks at the comprehensive plan and its totality there are aspects of how that plan is written that may or may not be consistent with the community's concerns as it would impact the UMCH property. That would be his initial thoughts in terms of the drafting of it. Ms. Michael thinks it is a little overbroad and could possibly be amended and limited to the UMCH property. To do the entire comprehensive plan for all properties could take well over a year.

Ms. Hermann suggested using the terms comprehensive plan or comprehensive plan update. That was the term that was used in 2014 with Comprehensive Plan update. That was a strategic move because UMCH had decided in 2010 that they wanted to sell and so we used that term at the time to specifically speak about the section of UMCH. If that is what the intention here is, she would suggest we make that distinction of the 2005 plan which was the original comprehensive plan and then after 2010 when UMCH stated they wanted to sell that was when the group that initially did the project plan was recommissioned to do the update. Mr. Lindsey stated Resolution No. 37-2005, he believes in the first WHEREAS clause, it uses the update language as well because it was referencing back to the 1988 master plan. He doesn't have an objection if Council wants to amend the WHEREAS clause to clarify that we are talking about an update and that we are talking about the UMCH properties.

Mr. Robinson concurs that makes sense. There is no downside to focus and be specific. He asked that he be thinking about the appropriate language so that when we reach the appropriate point, we can make an amendment.

Ms. Kowalczyk asked if members have other proposed changes does he want them now or at the end. Mr. Robinson requested that they wait until they reach a point where we can make a series of amendments and then they could vote on all of them at one time.

Mr. Lindsey continued going through the WHEREAS clauses that basically lay out the background, basis, and the rationale for proceeding with the moratorium. He then went through each of the 9 Sections. Section 1 sets forth the temporary moratorium on the acceptance of any applications. At any point Council could determine that it is in the best interest to end the moratorium and could take action to do so.

Mr. Bucher asked if because the ordinance is approved by emergency, would revoking the legislation require the same type of emergency. Mr. Lindsey replied that it would depend on whether it was an emergency or passed as a regular ordinance and people would know that within the 21-day period, they would be able to resume application.

Ms. Hermann stated that Section 4 is extensive. She is not sure how stormwater management, sanitary sewer capacity, traffic patterns, etc. can be evaluated when you don't know what will be there. She asked for help understanding why those things are included because it also sounds expensive. She agrees with an assessment of housing needs, but she is not sure how all the other stuff can be accomplished. Mr. Lindsey replied that it speaks to the potential impacts of different types and density of developments on those things. It is a more generalized review and assessment than the sort of specific review that is done when somebody makes application, and we have a specific traffic study conducted for that development proposal. That's the distinction.

Mr. Robinson stated he believes that city council will have the opportunity to consider a range of studies and ways of approaching this issue of updating the comprehensive plan. His hope and what he would advocate for is a level of specificity that we have not received yet. Could it be expensive? It could be but the details of the directive to the city manager to proceed with this would be something that we would discuss probably at length amongst ourselves and with the community to determine how to proceed. This is a section in a moratorium ordinance outlining the general concept. That is how he reads it.

Ms. Kowalczyk added there is nothing prohibiting us from including some detail in here. This is a significant action that we are taking without advance public notice and she guesses this is the key to how people think they are going to resolve the issue about what goes on this property and what is allowed. To not have details on how this comprehensive plan review is going to occur. . .She asked if they were going to have an objective third-party because there are some strong opinions in this community about what they would like to see on this property. There are also a lot of needs that need to be met and this property poses an opportunity for that. She thinks we need to have a little more detail on how this assessment is going to occur before she can sign off on something this big. She understands we need to have a thorough conversation about it. Maybe that speaks to having another meeting where we can talk about it and not receive a resolution at 4:00 p.m. today with the details, which there are very little

in this ordinance. She thinks it merits council having that discussion and if we must have it, she is willing to sit and hashed out some language that gives some specifics on what she would like to see that assessment look like.

Mr. Robinson asked Mr. Lindsey if he could describe what constraints this language in this ordinance would establish moving forward for the ability of council to develop a process to amend the comprehensive plan. In other words, does it warrant a detailed discussion this evening? There is language in here that he is not pleased with either. There are things that he would like to add and amend as well but he just wants to make sure we understand what is at stake in this language in this ordinance this evening.

Mr. Lindsey stated the attempt on Sections 4 and 5 was to provide some specific direction in the ordinance to indicate that you are moving forward with those things that you are saying necessitate doing the moratorium. That is why they are in there. In and of themselves, this wording is not essential. If you were concerned about that then his quick thought in terms of replacement language would be to indicate that city council will at a set time provide specific direction as to the comprehensive plan so that you indicate that you are going to have further discussion about it.

Mr. Robinson agrees that this might be the most important section in this ordinance and if we get into the details it is going to turn into a proxy debate about the entire issue. He asked Ms. Kowalczyk if she thinks Mr. Lindsey's suggestion is a plausible way forward. She replied that considering this ordinance must be passed by six votes and subsequent actions do not require six votes, she is concerned that her vote will not count in the future. She thinks it is important that everyone agrees on how this process should move forward and she is not confident considering all that she has heard over the course of the election and things here in this chambers that we are not going to have a consensus of this Council on how this should proceed. So, without a little more meat on the bones on here, she is not comfortable with it right now.

Mr. Bucher asked if it would be useful for all of them to spell out community engagement in a way where they can have numerous meetings to discuss this. If this were to go forward, he would want to prioritize that as a body to ensure that we are going to be transparent about that community engagement process going forward. He asked Mr. Lindsey his thoughts on his suggestion. Mr. Lindsey replied that in terms of clarifying a robust process and providing for public hearings that will be part of how staff or any consultant we might hire will approach a comprehensive plan review, it is somewhat pre-assumed on his part but he understands the value in terms of the public knowing that you are committed to that so having language that says that is not contrary to the goal and the purpose of the ordinance so he would not be opposed to it.

Mr. Hermann added that throughout the years we have had multiple conversations about the UMCH site. She has read information from WARD, city staff, the Comprehensive Plan, PCPW, Building Worthington Future and Colonial Hills Civic Association. Each one of those, we all possibly agree there should be commercial on the front on High Street. They all tend to agree that Tucker Creek should be a

preserve held at seven acres. From what she has heard and PCPW has changed, and she has met personally with one of the leaders, they now agree with a buffer, single-family homes along the single-family home lines. She asked if that is what everyone else has heard as well. Do we all agree that that's what we've been hearing? In some form an integrated park space throughout with PCPW being the exception that they mostly want it park. With that being the case of all those groups and all the things we've gone through, she suggested council focus on the one thing that they do not tend to agree on, and that is housing: what type, how much and where. She knows that the comprehensive plan took two years. She was a part of that process. The comprehensive plan update took well over a year-and-a-half. If we are going to do a moratorium, she is concerned that unless they are pinpoint focused on our issue, we are going to go well over a year. That could cause litigation which she would like not to happen so she would encourage everyone here to consider that as a conversation piece. Focus on the big issue and utilize the moratorium for that.

Mr. Lindsey continued explaining the additional Sections in the ordinance.

With the completion of the ordinance overview, President Robinson reported public comments are next and then a short five-minute break. When we return, he will request a motion and second. If it receives those, the ordinance will be on the floor for Council discussion and debate, and presumably concluding with a roll call vote.

Ms. Kowalczyk asked if amendments to the motion should be entertained before we make the motion. Mr. Robinson commented that it seems appropriate to him to have a motion and second, put it onto the floor and then amend the ordinance on the floor itself. Mr. Lindsey explained there should be a motion and second and then at that point you would make motions to amend with a vote on those.

Ms. Hermann asked if members were able to continue conversation at this time. Mr. Robinson stated we will move to public comments then we will come back and presumably ask for a motion and second and then it will be time for full Council discussion and debate.

President Robinson invited Peter Macrae to come and address council. Mr. Macrae stated he is not an attorney and doesn't pretend to be one. He is an architect who owns a national virtual architectural practice here in Worthington. They currently have projects in about 30 states, and he is very proud of that. He is having a problem with, he read the language from Article 1, Section 1.04 of the City Charter from Issue 38 that says: no ordinance or other measure passed by the Council amending the City's zoning code or changing zoning for any property in the City shall go into effect until sixty (60) days following publication in order to afford an opportunity during that period for the filing of referendum petitions thereon; nor shall any such ordinance or measure be passed on an emergency basis. He asked where the 60-day public comment opportunity for this measure is. Council is just going to choose to go around that when Issue 38 was passed specifically to allow the public 60 days to comment on any rezoning application. His other question is that the intent seems to be to readdress the comprehensive plan. He thinks that is great, it is time to do that, but he believes it was said that if anybody tries to rezone or does any other private property

actions during that period, suddenly you can't make changes to the comprehensive plan. That doesn't make any sense to him. The last issue he has is that this is some egregious stuff directed at a single private property owner when you have a perfectly responsible process here in the city where something is brought to Council, it happened tonight, Council refers it to MPC, MPC reviews it and makes recommendations back to Council and Council acts. It happened on UMCH just recently and it was rejected. In fact, no constituency group that Ms. Hermann mentioned likes the darn thing, but the process worked. He believes this is egregious. He believes it is contrary to private property ownership and the rights of property owners. He also believes it is against the rights of the community to have a say. You are basically rejecting Issue 38's entire intent. He thinks this is wrong and he hopes that Council will do better.

Tom Burns, 1006 Kilbourne Drive, commented that as he wrote to members yesterday, he has some significant concerns about this resolution being taken as an emergency resolution. One of the foundational pillars of trust in government is transparency. When he looks at something that isn't on the agenda and finds out about it through kind of rumors and innuendoes and he sees it only because he called President Robinson and asked him about it and he was gracious with this time and explained exactly what was going on, he still has some serious concerns with the transparency. We are talking about something that is going to make some significant changes in our community. This is the most important property in the entire city. As councilwoman Hermann mentioned, there are dozens of groups that are very interested in this property. When we go forward and talk about something like this, for him to not see it on the agenda, for him to not see it as something that will receive significant public comment, he doesn't see many people here tonight. The last time the MPC had a meeting on this, there were like a hundred people in here. That is a very different proposition than what we are talking about here tonight. So, there is a significant transparency issue, and he hopes that this Council understands that it looks like this is an emergency resolution, it is nighttime, this is under the cover of dark and we are going to pass something is going to significantly change our community, significantly change the property and the rights of the property owner on the most important property in our city. When he said the words of foundational pillars are important, he thinks many made the point that it is much easier for the city to do it this way. There are issues that if the property owner were to come forward and do something under the currently zoning it would stop the ability to do a moratorium. Transparency is not something that we can put aside for matters of convenience. He has a foundational pillar in his basement. It would be much easier for him to move around his furniture if he could just remove it when it is inconvenient for him but that is not what a foundational pillar does. It supports his house, so it won't fall. Similarly, this foundational pillar supports the trust of the public. When we are talking about doing this via an emergency resolution that is where he has a problem. As Mr. Macrae mentioned, there is a process in the city, and it works very well. If Council wishes to do a moratorium he would suggest, send it to the MPC tonight,

receive public comment and bring back a recommendation to Council. Council can vote on it at that point but until the public has their say in what exactly is happening, it is very difficult for him to say that anything was gained. In fact, this is something that is anti-democratic in the sense that no one has the actual ability to comment on it. He thinks it is interesting that earlier in this meeting we talked about the need for more public on one of the other agenda items yet on this item we are ensuring that we have has little public comment and as little notice as possible. He thinks what that will do to the trust of the public in this Council, and you just started your terms, so we have a long time before anything is going to change, but that trust has been broken. He thinks it is extremely important that we don't do that right now because it is going to hurt our city in ways that we may not be able to fix.

**MOTION** Ms. Michael moved, Mr. Robinson seconded a motion to take a five minute break. The motion carried by a voice vote.

Council recessed at 10:32 p.m. Council returned to open session at 10:37 p.m. President Robinson shared that he was informed during the break that the ordinance has been introduced. Therefore, it is on the floor and open to discuss/debate.

Ms. Michael asked council members, who all stated they believe transparency is important, how they can square the way this ordinance has come to members tonight and transparency to the public. Mr. Robinson stated this is an extraordinary, unique issue in the city and we face a choice tonight, do nothing tonight or act as proposed. The action to vote on an emergency ordinance without prior notification in the agenda, he believes serves the public interest in enabling and allowing the very dialog and input and public process that he thinks everyone here is saying we want. What he doesn't hear being acknowledged by those who are criticizing this action is that if we do nothing what is likely to happen is that at some point there will be an action on the part of Lifestyle Communities that would then foreclose the possibility of us, meaning the community and city council to amend the comprehensive plan. That is the entire focus and intent of this activity tonight. It is to enable public dialogue and debate and input on having a say on the future of this property instead of being passive and not acting which is what he heard repeatedly last year as he ran for re-election. There is a deep desire that the city do something and act and that is what we are attempting to do tonight. Bear in mind, if members don't act tonight, we run the risk that we will be back in the position that we were fourteen months prior. We will be back on the hamster wheel that we've been on for 7 years. That is the rationale for acting in an extraordinary way. We can have subsequent conversations and meetings and hearings here at Council, out in the public, about this moratorium itself, about the comprehensive plan, about UMCH. We are not foreclosing dialogue at all; we are enabling it through this proposed action tonight.

Ms. Michael stated that she has a problem with first, members get a phone call saying that something was going to be coming through. Second, in essence being told not to talk to anybody but City staff or council members, which in essence is a gag order which in all the years she has been around, unless it was executive session or it was attorney-client privilege, she has never been told to not talk to other people. Third, not

getting the actual ordinance until approximately 2 hours before the meeting, and then turn around and say this is the way we need to do business. If this is a condition precedent, things are going to come out of the blue, they are not going to be on the agenda, they are going to be asked to go through as an emergency, it makes her wonder because it is like the antithesis of the way this Council and this city has been run for decades and that is beyond her time. Things have been on the agenda. She will discuss this but will not understand why this could not have been put on the agenda last Thursday, because you only had 4 days until we had the meeting, and it would have given the public an opportunity to talk. Earlier with the American Legion you were saying we couldn't vote on something because we are not affording other members of the community the opportunity to speak before we act. By not having this as an agenda item you are in essence saying, we can't have community members speak before we act. She is not finding some consistency here and she is finding it difficult.

President Robinson attempting to articulate the consistency, stated that the consistency is the public interest in being able to fully participate in decision-making processes here in our city. This step tonight is a proposal to enable the public to have a say about the future of this property. You asked why this item couldn't have been included on the agenda on Thursday. Why didn't we just broadcast it to the world? Our concern, and it was not merely hypothetical, our concern was that by publicly announcing a moratorium or a comprehensive plan resolution to amend the comprehensive plan, either one of those actions could have prompted Lifestyles Communities to submit a proposal that would have thwarted and made impossible the action that we are proposing tonight. That is why we are acting in this extraordinary way. This is not business as usual. This is not going to be a pattern. This is a unique extraordinary circumstance. Ms. Michael stated she hopes he is correct that this isn't going to be business as usual but right now we have a public information request from Lifestyle Communities that is usually something that is lending towards probable litigation and doing this action without giving the public ample opportunity to provide input on whether to do a moratorium, she doesn't know if we are going to be violating equal protection issues regarding that. She doesn't know if it will be setting us up for putative damages. She thinks the trust of the public is going to be hurt by not having the transparency and we can agree to disagree.

President Robinson commented that he has asked Mr. Lindsay about the legal implications of this. He invited him to speak in terms of its relevance and impact and probably effect. Mr. Lindsey stated that the passage of a moratorium under any circumstance doesn't rule out the possibility of somebody challenged the moratorium. That is the same as passage of any of your other legislation. You pass an ordinance that limits anybody's ability to do any activity, people can challenge them. This is no different. There are specific factors that courts look at in moratoriums. That is why we talked about how long a period, what is the basis for the moratorium, so all of those are factors a court would consider as to this type. He cannot tell you that the passage of this ordinance as drafted will or won't prompt litigation. He had indicated to Mr.

Robinson previously, if in fact a property owner were inclined to file litigation regarding any of the past activities of the Council or MPC regarding that property that he wouldn't be surprised that if they were going to file anyway that they would include some challenges to the moratorium. He thinks he was consistent in terms of that regard. Does he believe that this ordinance withstands a constitutional standard? Yes. He wouldn't draft it in a way that he thought would violate the constitution, but he is not a guarantee. He is not sure of the outcome. Members have heard him say that in the past and he will continue to say it. Lawyers provide legal advice based on their analysis of cases and laws but at the end of the day courts make decisions and court's decisions may or may not be consistent with the advice that either party receives. A party can say they are going to file a lawsuit. They are deciding based on the advice of their attorney to file a lawsuit and it might be contrary to the advice of the other party as to whether something was legal or not. At the end of the day, until a Court decides, we don't know whether it is or isn't and at the end of the day one of the lawyer's advice was correct and one was incorrect. That is the reality of the practice of law. He apologized and stated if there are specifics aspects of that he can go further.

Mr. Robinson thinks it is imperative that the city council's actions not the driven by, excessively influenced by, the intimidation or implied threats of legal action. He thinks that weakens us and ends up distorting the conduct of our Council towards the public interest. We can't control with Lifestyle Communities is going to do. He thinks several have found their conduct and proposals hard to fathom. We can't predict what they are going to do. What we can do and what we should do, and he thinks as elected officials we are responsible to do, is act with clarity in the public interest. That is what he has been proposing, he believes through this moratorium tonight. To not simply be passive / reactive and awaiting the next step from Lifestyle Communities. We have done that for years and years and years. He believes there are broad swaths of the public that are eager to change the dynamics and this moratorium is a way of simply creating time and space for us to pause to consider the issue in a changed world. It is that basic and that is why he is endorsing, proposing, and advocating for passage of this ordinance.

Ms. Hermann shared that we have a great process here. We have something that comes into our city, it is recommended to MPC, they go through the process, and we let the community know. We have conversations about it. It gets recommended or not recommended to city council, we have that choice. That can take several weeks. We saw that with the most recent plan that Lifestyle Communities produced. It went through the MPC process and then it came to city council. It is significant that staff recommended denial of that plan based on the comprehensive plan. The comprehensive plan is a basic document that we approved in 2002 through 2004. Several hundred people met with that. It was approved and it was adopted through the city. In 2010 we have our Vision 360. In it, it says that we want housing. In 2013, after the 2012 comprehensive plan updated was started, WARD did a survey and 96 were interested in the development of the UMCH property in some way: 49% wanted

patio homes, 47% single-family, 47% empty nester and 25% were interested somewhat or not interested in dense two-story single-family homes. The comprehensive plan was adopted in 2014 and it was voted on by the city council the time and it was a unanimous vote to accept. That went through a process of MPC, plenty of community input, and it came to city council with plenty of input in that as well. In 2016, WARD did another survey. The people, 25% desired no growth in Worthington, 75% of those participants desired more growth with 62% wanting commercial growth and 55% residential growth. We went through that process, and we have that information in hand. The one thing that we did after that, which also was recommended by the Vision 360, was that we do a Vision 2020 plan which is exactly what we did. It was a most unbiased plan that we've ever done in our history. It was done with no City staff or City Council involved. This was what our community told us they wanted. In this plan that Council adopted, Resolution No. 09-2021 it has statements such as: we had 1,050 community members, and the majority felt that multi-family housing was lacking. Eight of the nine groups listed lack of multi-family housing being an important issue. Non-residents - that was on their top of their list – employees, Gen-X, Millennials, older Boomers, young Boomers, and school district members. Of that, 2% mentioned no more apartments. Very few mentioned Park Only at UMCH. Many were positive about mixed development and working towards compromise with UMCH. Her point is that she doesn't have a problem with updating the comprehensive plan. She just doesn't know what direction we are planning on taking when we are hearing all this information and the comprehensive plan already gave us teeth to deny a plan that we didn't like. So, when they come back and if they come back and they submit another plan it goes through the process again where we have community input, it goes through MPC, the community can speak. Then it comes to council, and they are allowed again to give us their input. She is really trying to wrap her head around what is it we want to change with the comprehensive plan. The comprehensive plan is why they were able to deny them. She is trying her best to figure this out but in looking in 20 years of our history of people in our community telling us what they want, they want us to give them something. Lifestyle Communities needed some direction, and we weren't willing to do that. They mentioned that in the MPC meeting. We must tell them, we must talk with them and if they don't give us what we like, we will tell them they are not giving us what we like. She doesn't see why a moratorium or stopping them from doing anything is beneficial to our community. She thinks council has everything that we need. We can do it if we are honest and open. We say we want to do a housing study; we want to pinpoint what people want and what we need. That is where she is right now. Members didn't have enough time to really go over it. It was short notice. She thinks that is part of the problem because she can't wrap my head around it.

Mr. Smith commented that it is a great transition to the letter members received from Building Worthington Future (BWF), dated December 3, 2021, several weeks ago. The middle of it reads speaking specifically about the UMCH property: BWF has reviewed the proposal and has met with the developer to discuss its merit. On doing so our

organization would like to see the following elements incorporated into the revised proposal: as much continuous green spaces possible, accessible by the entire community is a public benefit, utilizing as much of the frontage for mixed-use commercial development as possible, more variety of housing stock including patio homes, empty nester housing, better connectivity and more focus on bike and pedestrian paths. In the beginning of the letter, they say they strongly recommend that the city form a collaborative task force to work with LC on further refining their plans for the site. These are beautiful words. We will not get the opportunity to do that if we don't act tonight. We will not get the opportunity because we have an aggressive property owner who will act for us. We need to act tonight.

Ms. Hermann added, speaking of aggressive, doesn't this feel like an aggressive move that we might give them the feeling that we are not willing to talk. Mr. Smith replied that allowing for us to pass a moratorium will allow them to engage with the community. It will allow council members to engage with the community. It will allow the community to engage with them and council. It is the only way.

Ms. Brewer agreed with what both of her colleagues said. The comment that Ms. Hermann mentioned, she believes you said that it was in an MPC meeting and that stuck out to her too where Attorney Hart said, they gave you something. We didn't know how much you wanted. You didn't tell us how much you wanted. By trade she is a bankruptcy attorney, so she believes in a fresh start. She believes the opportunity and the time we need to talk with not only residents but to talk with LC and perhaps form a better relationship than we have in the past, it takes time. While it might cause initial negative feelings from the owner of the property, she thinks we can start fresh with them. We have a brand-new council, and her hope is that we open these lines of communication and we can really work to get all of the community groups we have, and we can really make a community collaborative effort to tell LC what we want because she doesn't think we are all that different on what we want. She thinks we all want what is in the vision principles and we just need to make some changes to a good comprehensive plan that may just need some updates. She thinks this is a fresh start that we all have tonight.

Ms. Kowalczyk agreed with her colleagues that it is very concerning that we have this proposal that was not put on the agenda and that was not open to public comment. It just really bothers her that members are having this conversation without giving the public the opportunity to consider it and offer their comments. She agrees we just had that discussion on the last vote. While she understands why this is being proposed this way, she doesn't agree with it. She doesn't believe it needs to be conducted by emergency moratorium. All the things that Ms. Hermann said about what the issue is here, let's really look at what is the issue. What are the disagreements? Most of the things that have been proposed by the community, by these other the groups, are in the comprehensive plan. She thinks the issues are and it was very clear in the election, certain people don't want apartments, people want the city to buy the property and create a park and people on this dais have pushed for that option and then looking at affordable housing. Those pieces are not in the comprehensive plan.

Two of those things, she thinks we can work through with any plan that LC forwards and instead of giving, it's nice to think they're going to say after a few months, they understand why we did the emergency moratorium for a year after several years and the past couple years where we were basically told not to engage with them. Let them just present a proposal. They did talk to the community. That is what that whole MPC processes is for. These things that we are talking about that are real issues can be vetted through that process. Ms. Hermann explained beautifully how that process is supposed to work. In the end, if we go through this and the comprehensive plan basically stays the same, where are we? Are we going to then entertain a proposal from LC again? She thinks we have one council member, the President of Council who has been quoted as saying he couldn't imagine any proposal that LC would put forth that he could support, so why are we going through this exercise? She is very concerned about the entire process, the way it was brought up and then the thinking behind it. We really owe our community the opportunity to have an open dialogue, a transparent dialogue, and a real dialogue. What council member Smith quoted was that we work with the developer. If members pass this tonight, she highly doubts that is going to happen. Instead, we're going to send a message to this developer and to developers in the future potentially that we could be doing this again. That we don't want to talk to developers. That we aren't working in a collaborative fashion. That we can't figure out how to do that and how to get to work with them to come up with proposals that meet the needs of the community. She wants a housing study. She wants to look at how we can serve older adults who continue to tell me her they are distraught because they can't stay in this community. We can do that. We don't need this moratorium to do that, and we should do that for the entire community, not just this property. Those are her thoughts

Mr. Bucher taking from comments made by former council member Myers during last month's discussion on this property and to councilman Smith's point about the need. LC has a track record of not genuinely engaging the community and truly hearing concerns, in my opinion, in a way where they might consider moving from their base model that we've seen three times. Without this action tonight, he doesn't believe we will be able to have a lengthy, unobstructed process to have a comprehensive plan update for this property, which he believes the community desperately wants and needs. He believes the timing is also critical as stated earlier because the city's only recently been able to take such action, to force a pause, to force a breath and to truly create space for community collaboration with groups, with members, with public, and with a developer to ensure that we as a community have ample time to not only continue to discuss this moratorium but also future update processes and details. He thinks we have with strong written or verbal commitment from this Council to act in a robust community engagement way following tonight's action. He is supportive of it currently.

President Robinson asked if it is worth considering amendments or do, we wish to vote on the ordinance as presented. It will require six to pass as written so we can probably all get a sense of the room. He asked if it is worth amending. If not, we will

move to a roll call.

Ms. Kowalczyk shared that she had considered amendments, but she thinks she will withdraw that.

Roll Call: Aye – 4 (Bucher, Smith, Brewer, Robinson), Nay – 3 (Hermann, Kowalczyk, Michael)

**Ordinance No. 04-2022 failed to obtain the six "Aye" votes needed to pass.**
**Next Item of Business**

At President Robinson's request, Mr. Lindsey explained to move forward with a public hearing and discussion of an ordinance regarding a moratorium, members would need to introduce an ordinance and schedule it for public hearing. An ordinance could be introduced this evening and then schedule it for a public hearing on the 7th if that is the goal. The legislation would have a new number and then anyone can introduce it. Mr. Robinson then asked what action is necessary to set the public hearing in February. Mr. Lindsey replied that members have an ordinance in front of them that would need a few adjustments, such as removing language that waived the right of a public hearing. Ms. Michael interjected that Ms. Kowalczyk indicated that she might have some amendments. The six-vote emergency clause is still in there. Is the intent to keep that? Mr. Robinson replied yes. Ms. Michael shared that she is aware of amendments that others would like included.

Mr. Robinson added that amendments can be made on the 7th as part of the discussion. Ms. Michael suggested amendments be submitted ahead of time so that everyone can see them as opposed to trying to do it on the fly at the council meeting. Mr. Robinson agreed. He added that to introduce it for a public hearing on the 7th of February, we would need a new number. Ms. Thress confirmed that it would be Ordinance No. 05-2022. *Mr. Lindsey set to work preparing the legislation for introduction. *

President Robinson understands that it is a late night, but he believes this warrants it and he asked members to bear with them. Ms. Michael suggested members introduce a new ordinance using the language that was voted down tonight and then prepare an amended version for members to consider on the 7th. When asked by Mr. Robinson if that suggestion is a possible way forward, Mr. Lindsey replied they could come back on the 7th having included it in the agenda, having made any suggested amendments so that whatever is in the packet would go out to the public. It would basically repeat what was considered tonight but would have provided more public awareness of it. You would provide for the public hearing that same night.

Mr. Robinson thinks the goal is to have public notification where we can discuss this and while it still may not pass, at least it would address that specific issue. He asked Mr. Lindsey to prepare an ordinance along the lines members discussed. Mr. Lindsey said he would be open to individuals sending proposed amendment to him and he will do his best to draft it. We must be continually mindful of, especially for the benefit of our two new council members but a reminder for all, we want to make sure our process is consistent with the open meetings act. That means you can't have a majority of you discussing those. As we do those inputs, he will send out a draft of

how he has heard and incorporated those but at that point members can't be replying "all" to an email because that in essence would be considered a meeting. You must trust him to do his best to incorporate them, he will provide them to members and then we will sort of go with it absent additional amendments being proposed to him. We will put it on the agenda as revised.

Mr. Greeson summarized that the packet would include the original ordinance introduced, and then the memo would reference the as amended. Mr. Lindsey thinks the plan now is that we are not introducing anything tonight, but we will essentially be doing an introduction and a public hearing and a vote all at the same time, but we will have at least told the public that is what we are doing. Mr. Robinson agreed. He asked if that would at least address the issue of prior notification? He was told yes.

President Robinson stated that given the outcome of the vote, failing to get six of seven and creating an immediate effect upon the capacity of Lifestyle Communities to introduce something, and our desire to have an amended comprehensive plan, he wishes to introduce a resolution, it is the one that he emailed to his colleagues late this afternoon and that he spoke about with several. This is a resolution text amending the comprehensive plan. [Mr. Robinson provided hard copies of the resolution].

Mr. Robinson shared how the process will be him briefly talking about it. Then he will request a motion and a second and open it for discussion, then public comment, further council discussion and then a roll call vote. The resolution would go into effect immediately as that is the nature of resolutions. It requires a majority vote of council. He explained that he has attempted tonight to make a case for why immediate action would serve the public interest in preventing a proposal being submitted where we would be, in his mind, burdened with operating under the current comprehensive plan. Having failed with the emergency moratorium this is an alternative approach to present what he would describe as a summary principled general statement text for the comprehensive plan. He attempted to be judicious and open to all the concerns held by his fellow council members. This is simply a plan, and it was articulated in language that he thinks is open to wide interpretations, as he thinks it should be at this point, but it would serve the function that if Lifestyle Communities submits a proposal that this would be the current operative comprehensive plan which he believes reflects more clearly the public thinking at this time. Not everybody, that would never happen, but it is a clearer expression of dialogue that we have heard and been exposed to over the years far more so than the 2014 plan. That is the rationale behind this.

**Resolution No. 04-2022** Adopting an Amendment to the Comprehensive Plan Update and 2005 Strategic Plan, and the 2014 Amendment (Resolution No. 39-2014), for the United Methodist Children's Home Focus Area for the City of Worthington.

### **Introduced by Mr. Bucher**

**MOTION** Ms. Brewer moved, Mr. Smith seconded a motion to adopt Resolution No. 04-2022.

Ms. Michael commented that having not received this until almost 6:00 tonight, she hasn't had a chance to really read this and digest it. In general, she is not opposed to a comprehensive plan review, but to vote on this tonight is a little too fast. Again, this was not on an agenda and did not give the public any notice to be able to see what we were considering. She suggested it be placed on the next to the agenda for the next meeting. That will provide an opportunity for the people to have input and give members a chance to read it and digest it.

Mr. Robinson stated the rationale behind acting on this this evening is the same is why it was important to pass the moratorium, which would have been a preferable course of action because it would have been completely without content and would have given members a year with time and space to consider and then amend the comprehensive plan. This resolution is Plan B and this in no way means that we cannot, and in fact he thinks we should have prompt, immediate public discussion following. If this passes tonight, then we can have the public discussion. He again stated if members don't act now, we are subjecting ourselves to the risk that an application or proposal will be brought to the city and we will be in the position again of having to review the proposal given the 2014 comprehensive plan. He is not willing to accept that. It is what we have done for seven years. It is time for action and that is what he is proposing tonight.

Ms. Kowalczyk shared that members just had a discussion about why the original ordinance that we would pass through an emergency process, at least some of us have expressed a concern that this wasn't put on the agenda, and now we have this resolution that we received late today, written by you, Council President Robinson expressing what you believe the city's intent and desire is for the comprehensive plan. She is appalled that we are sitting here discussing, okay so if you don't like this, I'm just going to rewrite the comprehensive plan piece that I don't like, put it out for a vote so that at least four of us can say "yea", we agree with that and we have disregarded everything we just talked about, about having a community opportunity for engagement.

Mr. Robinson reiterated that it does not preclude subsequent conversation. The effect would forestall and prevent us from having to work through another proposal with the 2014 comprehensive plan. When asked by Ms. Kowalczyk what the actual legal implication are of this resolution, Mr. Robinson replied that members would be operating within the code and regulatory environment. Like earlier, would there be a risk the council is free to pass by resolution a comprehensive plan update at any time? He asked Mr. Lindsey if there are any legal risks. Ms. Kowalczyk clarified that she was asking about the effectiveness of the resolution to make a change to the comprehensive plan rather than risks.

Mr. Lindsey replied that both the 2005 comprehensive plan update and strategic plan and the 2014 amendment were both passed by resolution. That has been the practice of how we adopt these comprehensive plans. So, the style and format, in terms of approving it by resolution is consistent with past practices. The WHEREAS represents Mr. Robinson's basis or understanding for making those changes. The comprehensive

plan, as is proposed, sets forth those sorts of guiding principles and general components consistent with comprehensive plans. As he understands the presentation, it is an indication of if there is concern with existing comprehensive plan language, this is an attempt at least to replace it with something different but not foreclosing the ability for Council to pass yet another resolution. Legally it would have the impact of replacing the existing with this language.

Mr. Robinson responded by saying the sense is that this is an extraordinary and appropriate course of action that is coming out of the blue. He stated this should have been done years ago. He does not like doing this as a newly elected president. It is not a precedent. It is not what he wants to do but he feels like because we have not done this, he thinks it should have been done in 2016 after the first LC proposal at the Worthington Education Center (WEC). It was obvious that the public wanted nothing of what they were proposing. He believes the city government should have acted to change the comprehensive plan at that time. We did not. He recognized that this is an extraordinary course of action, but it is emerging from years of inactivity on the part of the city. He wants to reassure members this is not an MO of David Robinson. This is him trying to act in a way that much of the public is clamoring for because of past in action. That is why.

Ms. Hermann asked if the proposed resolution is replacement language and if so what for? Or is the language in addition to? If so, what sections of the comprehensive plan update. Mr. Lindsey replied, the operative language in Section 1. would indicate that this attached Amendment Plan Update as it pertains to the adopted so it would be his interpretation of this has written that the proposal is a replacement of that which the 2014 adopted. So, we remove what was adopted in 2014 and replace it with this. The rest of the comprehensive plan would stay the same.

Mr. Hermann shared that the first LC conversation was not a proposal. It was a general conversation to get the input of the community at the time. Mr. Robinson interjected that the presentation was conducted in a MPC forum. Ms. Hermann stated that it was held at the WEC so that it would not be confused as being presented to the city. There was a purpose specifically to do that so that we could help our community understand that the only thing we were trying to do was to get an indication of what they wanted. You are correct, that meeting did not go well. At the time UMCH owned the property. She believes they had not purposely gone into a strict contact with LC. When we talk about these several years that have gone on, there are a lot of different reasons for that. UMCH still owned it. They had needs and desires for what they wanted to get out of that land. That's why the comprehensive plan update was created. UMCH had indicated they wanted to sell. Many were involved in that update. There were many different surveys, which she has already gone through. In 2018, Yaromir Steiner also came forward with indications that he had an interest in that property, but it did not work out. So, when we talk about the reasons why this has gone on so long, she understands the frustration, but we have to understand that there are multiple reasons why. It is not just LC's reasoning. She believes that the denial that the city staff gave for their plan is because of the comprehensive plan.

They used that as a tool. It is a guideline. It is not meant to pinpoint exactly what we want. That is what the housing study would do. It would provide more of a pinpoint for suggestion. A comprehensive plan is giving comprehensively to give a guideline to the city themselves so that they can make the choices. They can make the designations. She doesn't mind changing this and this language is fine, but she wants us to be very clear. Let's get it off the table. This back and forth for several years, there's no one place to put blame. We don't have that one place. There are many different things that have gone on over the last 15 years so if we do this, she has no problems with that but again we need to do a housing specific study. We have sat on the Visioning Plan for nine months when we could have been addressing conversations about the comprehensive plan at the time it was accepted. She doesn't know why that wasn't done. That is why as part of my candidacy she stated that she would not let it sit on the shelf. We do need to act but in doing so, she thinks members need to do it in a respectful manner to our community. She has a problem with these things coming up last minute because transparency, resident lead, resident caring, she came here because of that reason. She came because she loves this place not because she was trying to fix something she thought was wrong. So again, this language is fine. This care for our city but she doesn't understand why when we have a comprehensive plan that gave us teeth to deny that. It is just a piece of paper and it's just guidelines.

Ms. Michael still thinks there should be public input on the resolution. She goes back to the transparency and thinking that things should be on an agenda and people should have an opportunity to respond and have thoughts or comments regarding it. She has a problem with literally almost at midnight putting something through that wasn't on the agenda and the people haven't had a chance to be able to digest or participate in. We talk about being a citizen center, residents center, we talked about transparency and involving people. She has no problem with this coming forward at the next meeting. Mr. Robinson stated that is a risk that you are willing to assume and a disagreement of the assessment of the risk. He asked if there were any additional comments.

Tom Burns who spoke earlier this evening, shared that he is disappointed to be back here tonight. He thought this matter was settled. He is disappointed to see that four members voted against transparency and against citizen input. He has some quotes to share.

When Worthington residents are informed, engaged, and listened to, we make the best decisions. This should be City Council's guiding principle. That means Council should proactively share information and encourage us to truly listen and then act accordingly. This is how we achieve sound policies and healthy political culture. Council should be held to this standard.

That is a statement he wholeheartedly agrees with and that is something that he doesn't see happening tonight. This is his City Council who is making sure that he has no ability, the only reason he is here is because he lives four minutes down the street, and he happened to be up because he doesn't sleep particularly well. Where is the rest of the public input? This is a backup plan by President Robinson to ensure that we

have something if the emergency legislation was not passed. We wanted to make certain that we did something to keep certain things from happening in this community with no transparency and no ability for citizen input. The proposal in front of us right now, he can go through all the different people who went through the comprehensive plan, who took parts of the comprehensive plan, different things that they went through, lots of members of a community, it was a legislatively adopted option that had community input. Now this Council, who allegedly embodies the ideal that he just mentioned, wants to change that plan again, that was the will of the people, without listening to the will of the people. He thinks this is quite frankly wrong. He is appalled that he had to come back here and speak again in front of this Council. The foundation of public trust in government is transparency and that is not being served tonight. Show him who you are tonight. He wants to know. He has his opinion based on the last discussion and he think he will have it again after this. Quite frankly he thinks he is wasting his breath, but we will see. Show him who you are. Thank you for your time.

President Robinson shared that a closing comment of his would be that he understands the visceral reflexive judgment that prompt action like this goes contrary to public discourse, public interest. He gets it. As he said, he authored the Issue 38 language. He is committed wholeheartedly to resident empowerment. The irony is that by urging us to not do something like this tonight we would run the risk of not enabling the public to have that dialogue. That was the entire purpose of the proposed moratorium and this resolution to update the comprehensive plan is to avoid the developer from blocking an update to the comprehensive plan and our ability to have the public discourse toward that end if they have a proposal on the table. So, this is an action in itself in a manner that he doesn't like doing but that serves the greater good of enabling public discourse and we will if this passes tonight or even if it doesn't, we will as best we can depending on what Lifestyles decides to do.

Ms. Michael stated if this gets passed this is what it is. She doesn't know where the public dialogue comes in because we've already said okay public this is what our new plan is, and you've got it. She was part of the review of the last comprehensive plan, and we had many meetings, and she doesn't see why this must go in place even if Lifestyles comes up with something. What's to stop us from continuing to do a comprehensive plan update. Mr. Robinson said the last thing you shared was if in fact there is a proposal before the city, we cannot amend the comprehensive plan related to that property because they have a vested right in their proposal with the comprehensive plan in place when they file their proposal. Secondly, he thinks it would be hard to imagine if Lifestyles is before the MPC arguing, presenting, working back and forth with staff, while we are concurrently having a robust public discussion about that very property. He would not be surprised if they cried interference, or this is how can we be trying to advance our proposal on this basis when we are having public groups and city council advocating for different ideas. It is unimaginable. He thinks the reality, just like we experienced for 14 months, is if they have a proposal for us, we are responding to their proposal with the current comprehensive plan as the

basis of their proposal. Ms. Michael interjected that council has not had MPC/ARB review or input on and this is something that they work. That is another area of concern because that is input that she thinks would be valuable. Mr. Robinson agreed. He added that there is nothing to prevent us from doing that moving forward. This is an immediate action that would have an immediate effect and he is sure, as a council, we can and will discuss what the next steps are.

Ms. Hermann stated that she doesn't know how many people have read the comprehensive plan or the entire Vision Worthington statement. The back portion contain appendixes where you really get to the meat of it. Full disclosure, her husband is the one that wrote the comprehensive plan. MKSK is the one that won the RFP back in 2002-2004 so she was a part of that. She was also part of the comprehensive plan update. She was aware of the appendix, which is basically everybody that had input, who did, what did, what their priorities were or what their thoughts were. She would encourage council members to read the comprehensive plan and then read the Vision Worthington document because they are extremely similar with Vision Worthington asking for more housing, more multi-family, diversity, inclusive housing. As we move forward, she wants to make that clear that we spent over $150,000 and over a year on the Vision Worthington effort so if we are moving forward with any comprehensive change whatsoever, this is our community speaking to us. With that in mind, she doesn't have a problem with the verbiage that he wants to change but rather a problem that it is an emergency. As we move forward with transparency that is her full expectation.

A roll call vote ended with four "ayes" (Bucher, Smith, Brewer, Robinson) to three "nay" (Hermann, Kowalczyk, Michael).

**Resolution No. 04-2022 is hereby declared passed.**

# Executive Session

## 15. Executive Session

### Minutes:

Mr. Greeson confirmed that he would like an executive session to discuss board and commission appointments but that could wait until the next meeting. After some discussion, members agreed to convene in executive session.

MOTION Mr. Smith made a motion to go into executive session for the appointment of personnel and pending litigation. The motion was seconded by Mr. Robinson.

The clerk called the roll on Executive Session.

**Vote Results:** Ayes: 7 / Nays: 0

Council recessed at 11:49 p.m. from the Regular meeting session.

Council returned to open session at 12:07 a.m.

# Adjournment

## 16. Remaining Business Item

**Minutes:**

**Resolution No. 05-2022** Appointing Katherine B. Brewer to the Worthington Municipal Planning Commission. **Introduced by Mr. Bucher.**

**MOTION** Mr. Smith moved, seconded by Ms. Michael to appoint Katherine B. Brewer to the Municipal Planning Commission.

**There being no additional comments, the motion to adopt Resolution No. 05-2022 passed by a voice vote.**

## 17. Motion to Adjourn

**Minutes:**

There being no additional items to come before City Council, President Robinson declared the meeting adjourned at 12:09 a.m.

Contact: D. Kay Thress, Clerk of Council (Kay.Thress@worthington.org (614) 436-3100) | Minutes published on 03/16/2022, adopted on 03/21/2022

/s/ D. Kay Thress
Clerk of Council

Attest

/s/ David Robinson
President of Council



Adam F. Florey, Partner
Florey Todd, LTD.
7140 N. High St., Suite 240
Worthington, Ohio 43085
o. 614.427.1556
c. 614.256.3977
e. aflorey@law-flc.com

www.law-flc.com

**November 27, 2018**
**SUMMARY OF PHASES FOR DEVELOPMENT OF THE UMCH**
**PROPERTY**

This document provides a *summary* of the anticipated phases or steps the City of
Worthington will take in developing the property owned by the United Methodist
Children's Home, Parcel 100677400 (the "UMCH Property"), abutting High Street
in Worthington, Ohio ("Worthington" or the "City"). The typical phases for
development, modified as appropriate for this particular project, are the following:

**PHASE 1: PLANNING**
**PHASE 2: ACQUISITION**
**PHASE 3: SALE OF TARGETED PORTIONS OF THE UMCH**
**PROPERTY**
**PHASE 4: IMPROVEMENTS AND MAINTENANCE**

A more detailed memorandum (the "Memorandum"), though certainly not
comprehensive, is provided along with this summary. Neither this summary, nor
the Memorandum, should be construed as legal advice.

## PHASE 1: PLANNING

Without limitation, the Planning Phase will require the following:

(A)  Preparation of an alternate vision for the use of the UMCH Property,
coupled with necessary resolutions from Worthington City Council (the
"Council") approving the same.

(B)  Retention of appropriate professionals to guide the City through all phases
and contingencies.

(C)  Negotiation with the United Methodist Children's Home ("UMCH") for
acquisition of the UMCH Property.

(D)  Identification of funding source(s) for the initial purchase of the UMCH
Property.

(E)  Resolutions approving purchase, sale and improvement of the UMCH
Property.

Note: Potential Use of a Community Improvement Corporation through the
Planning Phase is discussed in the attached Memorandum and in the Phase 2
discussion, below.

### Planning Phase 1(A): Land Use

The Planning Phase will require the preparation of an alternate vision for the use
of the UMCH Property.



**EXHIBIT**

31

As background, on September 2, 2014, the Council passed Resolution No. 39-2014 (the "Resolution"), which adopted the land use plan for the UMCH Property prepared by MKSK (the "MKSK Plan"). Further, by adopting the MKSK Plan, the Council amended Worthington's 2005 Master Plan.

All development of the area must proceed in a manner consistent with the MKSK Plan. Accordingly, the Council must pass a new resolution that (1) rescinds the Resolution, and ideally (2) adopts a new resident focused plan for the UMCH Property.

### Planning Phase 1(B): Retaining Appropriate Professionals

As noted, during the Planning Phase, Worthington should solicit appropriate professional firms, including a law firm, design/planning firm, and possibly a financial professional. The legal process and requirements for hiring consultants is included within the attached Memorandum.

### Planning Phase 1(C): Negotiation with UMCH

Pursuant to the Ohio Revised Code, Worthington may acquire real property by purchase, gift, devise, lease, lease with a privilege to purchase, dedication or donation. While we anticipate the outright purchase of the UMCH Property by Worthington, each of the foregoing (or a combination of one or more) are all legal options.

In any event, Worthington and/or its representatives, will need to engage UMCH to negotiate acquisition of the Property. The possibility exists at this stage to reduce the purchase price by addressing other interests of UMCH. Those interests may include naming rights, acting in charity for the benefit of Worthington, easements, and tax ramifications.

### Planning Phase 1(D): Identify Funding Sources for the Initial Purchase

While a municipality can take property through a gift or lease, if the municipality wants to purchase real property, it must find a funding source. Potential sources of money include: (i) cash on hand from the municipality's general fund or within special fund created for the purpose of buying the property at issue; (ii) private donations; and/or (iii) debt.

The "special fund" through which the UMCH Property is purchased will be initially funded with a combination of all three of the foregoing sources. The current plan is to sell a portion of the UMCH Property, with the resulting revenue used to pay off the initial debt and adding resources to the special fund dedicated to improvements and maintenance of the dedicated park land.

### Planning Phase 1(E): Resolutions Approving Purchase

With the necessary planning complete, the Council can then move to pass additional resolutions or ordinances to fund and purchase the UMCH Property. At the same time, or subsequently (as appropriate), the Council would pass a resolution selling the commercial and residential portions of the UMCH property.

13117

## PHASE 2: ACQUISITION

This phase is relatively self-explanatory. Once all planning phases are complete, including negotiations and financing, Worthington can then move to purchase the UMCH Property.

One of the necessary and incidental powers of local self-government is the power to acquire, control, use, and dispose of property for municipal purposes. A municipality can acquire real property in any manner that a private corporation might, including by purchase, gift or lease. Section 2.16 of Worthington's Charter requires that any determination *"to proceed with any public improvement, purchasing, leasing or transferring [of] property * * * shall be taken by ordinance."*

Purchase of the UMCH Property may also be completed through Worthington's Community Improvement Corporation, as the representative of Worthington. The Ohio Revised Code empowers a Community Improvement Corporation ("CIC") to borrow money, issue bonds, debentures, or notes, and secure indebtedness by a mortgage, pledge, or deed of trust. A CIC may also purchase, receive, hold, lease, acquire, will, convey, transfer, sublease, or dispose of real and personal property, as well as acquire the good will, business, rights, real and personal property, and any other assets of any other person, firm, partnership, or corporation.

## PHASE 3: SALE OF TARGETED PORTIONS OF THE UMCH PROPERTY

Municipalities are expressly authorized to sell or lease real property owned by the municipality if it is no longer needed for any municipal purposes. The Ohio Revised Code requires that a contract for the sale or lease of real property be made only upon approval of two-thirds of the members of the legislative authority, as well as by the board or officer having supervision or management of such real estate. After such authorization, the contract must be made with the highest bidder after competitive bidding by advertising once a week for five consecutive weeks in a newspaper of general circulation.

Note that the competitive bidding requirements associated with the sale of real property may be bypassed through the use of Worthington's CIC. As noted, any sale of a portion or portions of the UMCH Property would then be used to service or pay off debt incurred in the initial purchase; and to fund improvements or maintenance of the dedicated park.

## PHASE 4: IMPROVEMENTS AND MAINTENANCE TO THE UMCH PROPERTY

Improvements and maintenance to the UMCH Property would be undertaken either separately, or through a partnership, of Worthington and one or more private developers.

### Phase 4(A): Private Development of Commercial and Residential Portions

The sale and development of the commercial corridor along High Street within the UMCH Property would serve the economic development of Worthington; provide financing for Worthington's purchase and retention of the dedicated park area; and provide tax revenue for either the general fund or the special fund tied to the maintenance and improvement of the new park.

3

1000.001 2018.11.27 UMCH Summary

The same benefits would result from the platting and sale of small residential lots within the UMCH Property. Those limited lots would be sold individually or through a developer, thereby achieving an added benefit – satisfying some of the need for "empty nest" or downsized housing within Worthington.

Importantly, and consistent with the "resident centered" approach to overall development of the UMCH Property, the design professional selected by Worthington will provide relatively strict design criteria for both the commercial and residential portions of the UMCH Property.

### Phase 4(B): Worthington's Improvements to the Dedicated Park

Worthington would undertake initial improvements to the dedicated park land using the resources available within the special fund created by Council for that purpose. As noted, the special fund would be funded by the sale of targeted portions of the UMCH Property, discussed above, as well as long term revenue realized through specific assessments against the commercial and/or residential properties. As an analogy, those assessments are akin to payments to a homeowner's association or property manager by an individual property owner, which are then used for maintenance and improvements. Covenants that run with the land and require an additional assessment will be included in the title of the sold properties. Those covenants would then be owed by the developer(s), and any subsequent owner of the residential and commercial areas.

4

## Michael, Bonnie

From:    Bonnie.Michael@worthington.org
Sent:    Mon 9/21/2020 1:03 PM (GMT-00:00)
To:      Greeson, Matt <Matt.Greeson@worthington.org>
Cc:
Bcc:
Subject: Fwd: 2014 UMCH Comprehensive Plan Update -- motion to temporarily suspend

Matt

We need to talk on logistics.   I am free till 9:40 or 12:15-1:45 and 2:44 to 7:15

What's good for you?

Bonnie

Sent from my iPhone

Begin forwarded message:

**From:** "Robinson, David" <David.Robinson@worthington.org>
**Date:** September 20, 2020 at 4:32:25 PM EDT
**To:** "Bucher, Peter" <Peter.Bucher@worthington.org>, "Dorothy, Rachael"
<Rachael.Dorothy@worthington.org>, "Kowalczyk, Beth"
<Beth.Kowalczyk@worthington.org>, "Michael, Bonnie"
<Bonnie.Michael@worthington.org>, "Myers, Scott" <Scott.Myers@worthington.org>,
"Robinson, David" <David.Robinson@worthington.org>, "Smith, Doug"
<Doug.Smith@worthington.org>
**Cc:** "Greeson, Matt" <Matt.Greeson@worthington.org>, "Stewart, Robyn"
<Robyn.Stewart@worthington.org>, "Lindsey, Tom" <Tom.Lindsey@worthington.org>,
"Thress, D. Kay" <Kay.Thress@worthington.org>
**Subject: 2014 UMCH Comprehensive Plan Update -- motion to temporarily suspend**

***Please do not Reply All***

Dear fellow Council Members,

Way back when, pre-covid, prior to what was going to be our retreat weekend, I had
proposed to Matt and Council leadership that we discuss the status of the 2014 UMCH
Comprehensive Plan Update. Matt addressed this issue on 1.31.2020 via a
Memorandum to City Council, answering questions and presenting several possible
options for action by Council. As we know, covid struck, overtaking most agenda items
for the city other than those deemed essential and time-critical in that moment. As a
result, the status of the UMCH Update was pushed to a very back burner.



EXHIBIT
34

To the point: I believe we now face what may be a very short window of opportunity to discuss and act on this issue, and that we owe it to ourselves and the community to do so. The issue of UMCH, more than any other during the prior decade, has generated continued and intense interest—and acrimony—among the residents, and will continue to do so until successfully resolved. Accordingly, I will be making a motion at tomorrow night's meeting to "temporarily suspend" the UMCH portion of the Comprehensive Plan pending further update. Please know that I am going to make this motion in this rather sudden manner because of the urgency that we act while we can. I anticipate a thoughtful discussion—not about the whole of UMCH—but about the rationale for a suspension of the 2014 Update. I of course hope you will, upon reflection, support this motion.

In sum, my reasons for making the motion for suspension are:

1. The Update is already old, in years (prepared 2013-14) and content. Significant cultural and economic changes have taken place during the last seven years, and within Worthington itself significant demographic shifts further compound these broader societal evolutions. I believe that our commissioning of the current visioning process demonstrates our recognition that change is taking place. Our Comp Plan, especially regarding the central issue of UMCH, should likewise acknowledge, reflect, and support harmonization with these changes.
2. Experience (2012, 2015, to the present) has demonstrated that the current Plan does not enjoy the "consensus" status that it claims for itself. If we leave the current Plan in place, perpetuating this claim of authority, I believe it will continue to sour the mood, provoking further division in our community. Legitimate questions will arise as to why City Council has failed to listen and learn—and to act. Let's not embody the popular definition of insanity: To repeatedly do the same thing and expect different results.
3. Conversely, suspending the 2014 Plan would clear the air, clean the slate. We would create open psychological space for fresh thinking and new ideas, unburdened from having to defend prior plans and processes. All concepts and ideas—including high-density New Urbanism—could receive fair and equal treatment.
4. Lastly, and importantly, by proactively suspending the 2014 Plan, we can avoid the possibility of the city being placed in a vulnerable, defensive position, if a submitted development plan conforms in general with the Comp Plan and yet is rejected.

There are more reasons, and countless ways to express them, but this is a fourfold outline that I hope makes sense and is persuasive in some way for all of you. I look forward to discussing the motion at tomorrow's Council meeting. Thank you for your consideration.

David

David Robinson

14000

City Council Member
Worthington, Ohio
mobile - 614-893-4573
david.robinson@worthington.org
davidrobinsonblog.com

| | |
|---|---|
| From: | Greeson, Matt [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=E02E0F169E0140A08552304F1CFBCF86-GREESON, MA] |
| Sent: | 10/14/2021 2:08:30 PM |
| To: | Michael, Bonnie [Bonnie.Michael@worthington.org] |
| Subject: | FW: [EXTERNAL] Notes from David Robinson re tonight's ARB/MPC items |

FYI. I am going to ask that he (Council Member Robinson) forward his thoughts to Council Members.



**MATT GREESON**
CITY MANAGER
CITY OF WORTHINGTON
6550 N. High Street
Worthington, Ohio 43085
Office: 614-436-0368
www.worthington.org

**From:** David Robinson <davidwhitfieldrobinson@gmail.com>
**Sent:** Thursday, October 14, 2021 12:43 PM
**To:** Brown, Lee <Lee.Brown@worthington.org>
**Cc:** Greeson, Matt <Matt.Greeson@worthington.org>; McCorkle, David <David.McCorkle@worthington.org>
**Subject:** Re: [EXTERNAL] Notes from David Robinson re tonight's ARB/MPC items

Thank you Lee for forwarding the email to Susan.

David Robinson
614-893-4573 - cell
195 E Dublin Granville Rd
Worthington, OH 43085

On Thu, Oct 14, 2021 at 12:10 PM Brown, Lee <Lee.Brown@worthington.org> wrote:

I will forward your email to Susan so that she has the same information.

Scott Myers is currently the Council Liaison to ARB/MPC.

Lee

R. Lee Brown, AICP

Director

City of Worthington



EXHIBIT

61

Planning & Building Department

374 Highland Avenue

Worthington, Ohio 43085

Main Line: 614.431.2424

Direct Line: 614.781.3539

www.worthington.org


**From:** David Robinson <davidwhitfieldrobinson@gmail.com>
**Sent:** Thursday, October 14, 2021 12:05 PM
**To:** Brown, Lee <Lee.Brown@worthington.org>
**Cc:** Greeson, Matt <Matt.Greeson@worthington.org>; McCorkle, David <David.McCorkle@worthington.org>
**Subject:** [EXTERNAL] Notes from David Robinson re tonight's ARB/MPC items

 This message is from an external source. **Please exercise caution** when opening attachments or opening web links from external senders, especially if the message is unsolicited or unexpected. If you feel this may be a phishing attempt, please use the **Phish Alert button** or reach out to **helpdesk@worthington.org** for assistance.

Lee, I wanted to let you know I sent the below email this morning to six of the members of the ARB/MPC (I don't have Susan Hinz's email address). I know this is unusual, but Council effectively doesn't have a liaison with the ARB/MPC, at least as I understand that role, and this direct email is an alternative manner of communicating with our board/commission. Good luck tonight. David

---

Good morning xxx,

I know the ARB/MPC has got a lot on its plate, so I'll get right to the point. I've just reviewed the Agenda, and I wanted to share my thoughts on a couple of items.

First, the relatively simple proposal for the LCNB project. My only question is about the now-proposed setback being 1) closer to High St. than originally requested by the applicant, 2) closer to the street than adjacent buildings, and 3) closer than is called for in the current Comprehensive Plan. Yes, I realize that there are segments of the public, and members of Council and various Boards/Commissions that embrace the idea that proximity to a street by a bank "activates" the street. But this is a big, irreversible decision you are making, in our premier corridor. It seems to me that such an important decision should not be made in a piecemeal fashion, whether advocated by staff or not, but should instead be based on a fully considered strategic plan for the corridor as articulated in an updated Comprehensive Plan. Until that document has been prepared, I believe it would be appropriate for the MPC to act within the current prescribed bounds of the Comp Plan, and to approve a setback in line with the existing buildings north and south of the proposed development.

Regarding the LC proposal for the UMCH property, I hope you are still open as to whether to table or deny the application. While I recognize the sensibility and fairness of the MPC's standard practice of giving applicants a chance to change course, by way of tabling a proposal, I would suggest that this approach does not apply to the proposal on hand from Lifestyle Communities (LC). I say this because the most recent iteration of their plan is essentially a modest variation of a single plan, originally submitted in 2015, tweaked earlier this year, and then

Worthington 056853

modified again just last month. As I see it, the MPC, and the City as a whole, is now entertaining for the third time a singular concept for development reflective of what appears to be LC's rather inflexible business model.

So I think you would be entirely justified in denying the proposal in terms of standard procedures. Beyond procedural issues, I believe the effect of denying the proposal would be positive, signaling to LC that substantive changes are needed if a proposal is to warrant the time and attention of staff, you and the others on the Commission, and the public at large. Further, a denial would clean the slate in certain respects, enabling Council a freer hand to consider creative ways forward by way of a fresh start with LC.

For these reasons, and more, I hope you'll consider denying the LC proposal, thereby creating the context for something new and different. Surely, after six years, you can act with clarity to free us all from this repetitive and fruitless cycle.

Thank you,

David Robinson

195 E Dublin Granville Rd
Worthington, OH 43085
614-893-4573

Worthington 056854



# UMCH DEVELOPMENT

## A Multi-Use,
## Community-Centered Proposal

Presented by Project Community Park Worthington

August 2020



EXHIBIT

85

PENGAD 800-631-6989

# Table of Contents

UMCH Development Proposal                                      Page

    Background & Purpose                                       2

    Executive Summary                                          3

    About Project Community Park Worthington (PCPW)            5

    The Vision – Worthington's Community Commons               6

    Steps to Realize the Vision                                11

    Financial Impact Analysis                                  13

    Additional Tangible Benefits                               17

    Negative Impacts of High-Density Development at UMCH       20

    Conclusion                                                 21

    Appendices A, B, C                                         22

# UMCH Site Development Proposal

## Background & Purpose

This proposal, which we submit for public consideration, brings a new vision for the development of the United Method Children's Home (UMCH) property. It reflects the desires of Worthington residents to create a lasting legacy for the public good. Times are changing and bringing into sharp focus the need for new approaches and new solutions. We believe the residents of Worthington should finally experience the benefits that a community-centered development of this site will deliver.

The UMCH property, comprises roughly 44 acres, including the Methodist Church Conference Center at the corner of Wesley Blvd and High St. The UMCH parcel is located near the geographic center of Worthington, within one mile of over 50% of Worthington residents. It has been owned by UMCH (and its predecessors) since 1913, but ceased operations in 2010.

For more than a decade, this valuable parcel has been dormant and often the center of heated debates in our community. Initial plans posed by large developers received significant pushback from the community and were abandoned. Our group, Project Community Park Worthington, (PCPW) emerged to bring action transparently reflective of Worthington's citizenry and combined with a sound action plan. Through countless meetings and discussions, and a petition representing more than 1,000 Worthington resident signatures (see Appendix A), we present a culmination of these conversations in this proposal.

At the heart of our proposal is a large, community greenspace anchoring a new vibrant commercial corridor along High Street, and new residential housing that harmoniously integrates with Worthington Estates. We refer to it as Worthington Commons and envision a gathering place that is a point of pride for our community.

In May 2020, the Urban Land Institute held a webinar entitled, "Parks are Essential Business" which highlighted the importance of parks and greenspace, especially in light of the COVID-19 global pandemic. It argues not only for the physical and mental health benefits of large greenspace, but also makes the case for economic development implications. Parks are essential business – we couldn't agree more.

Consider one other central Ohio community: New Albany. It recently completed Rose Run Park after 20 years in the making, aspiring to provide "the physical, visual and emotional heart of the community." This is just one example of many in which a community prioritized the preservation of green or natural space, and purposefully integrated among other community assets. New Albany also demonstrates a project like this does not happen overnight.

We ask the city to adopt and genuinely pursue a community-centered solutioning process as the foundation for the UMCH site re-development going forward. This document is intended to aid this process, primarily by demonstrating (by using the city's own analysis) that high-density residential development is a significantly less viable financial alternative as compared to the PCPW multi-use approach presented in this document.

The UMCH site represents a "once-in-history" opportunity. It offers our community the chance to do something that's age-old and tried and true: preserve natural greenspace in the heart of our city for the well-being of residents and our natural world while layering in commerce, housing and amenities. We should maximize the value of the unique qualities found only at the UMCH site to create something that will energize and inspire both today, and future, generations of Worthington citizens.

We are grateful that you are willing to consider this proposal for our community, and we eagerly invite you to join our effort for the good of our entire community, for generations to come.

# Executive Summary

Unlike prior efforts, this proposal is grounded on the needs and desires of essential stakeholders: first and foremost, our residents, but also the United Methodist Church, present owners of the UMCH property, and the City of Worthington itself. Meeting these stakeholder needs is achieved by utilizing a "multi-use" development approach comprised of three distinct development types:

- a robust commercial zone: fronting the park and running along High St., providing a vibrant retail and restaurant corridor with offices above;
- a residential zone: sized and scaled to be compatible with the surrounding neighborhood, and
- a signature community commons: serving as the centerpiece, not just for this development, but the city as a whole.

**It is critical to note that the financials of this proposal enable the city to ultimately acquire this property, develop and maintain it on a self-sustaining basis.** This is accomplished based on three important features of this proposal

- The relatively large commercial zone, including new Class A office space, generates significant revenue in the form of city income tax.
- The relatively small amount of residential units (residential uses have a negative financial impact on city finances; see Financial Impact and Analysis section for additional details).
- We propose the city acquire the entire parcel and, along with professional services, act as master developer and sell off the commercial and residential portions (see Realizing the Vision section for additional details).

Alternative funding sources such as public/private partnerships, state and/or federal grants, endowments, and others should be explored to offset the city's initial outlay.

This design leverages the synergy of co-locating a signature public greenspace with commercial office space and retail amenities like restaurants. Potential blue-chip tenants will find a premier business location abutting a signature community commons all located on High St. just minutes from I-270. The intent is to market this new opportunity to those seeking an ideal location for a corporate headquarters and recruit a destination dining establishment, à la Milestone 229 along the Scioto Mile in downtown Columbus.

At the heart of the property, taking advantage of the natural beauty of the Tucker Ravine watershed and surrounding environs, this proposal envisions a signature public greenspace, accessible to all. We tentatively call this space Worthington Commons, as its essential purpose is to further connect our community, provide a vibrant gathering space all and do so within a peaceful, natural setting in the heart of our city.

## Multi-Use Definition

This proposal defines "multi-use," as the following:

- 10 acres Commercial & Retail
- 3 acres Residential
- 31 acres Greenspace, including:
  - 27 acres of parkland
  - 4 acres Tucker Creek watershed

## Acquisition Costs & Net-Revenue

*FINANCIAL ASSUMPTIONS*

| Fair Market Total Purchase Price<br>The acquisition of the total UMCH property (one-time) | - $12,378,900 |
|---|---|
| Sale of Select Parcels (one-time) | + $9,750,000 |
| Park Development Initial Costs<br>Services, Infrastructure, Capital Costs | - $455,750 |

*ANNUAL FINANCIAL PROJECTION*

| Total Annual Costs<br>Financed loan of purchase | - $285,659 |
|---|---|
| Total Annual Revenue<br>From Commercial Income Tax | + $668,400 |
| Annual Net Revenue | + $382,741 / year |

Important Notes: The fair market total purchase price is detailed in the Financial Impact and Analysis section. We've received feedback this is above market and too high of price. In an effort to demonstrate fairness to the property owner and not undervalue the parcel, we've kept the high number. This also demonstrates the "math" still allows for ultimately a self-sustaining model. The detail behind these figures, largely informed by the City's own 2018 cost-to-serve financial analysis, are further outlined in the Financial Impact and Analysis section.

## Community-Centered

Our core belief is that the UMCH parcel is a valuable, indeed an irreplaceable, asset and it must be used for the greatest common benefit to the residents of Worthington. Given its size and location it will be a natural focal point of the city. Beyond the residential and commercial functions, it could be available for any manner of community event, from weddings to Shakespeare in the park, sports from soccer to softball, corporate "get-a-way" meetings, community gardens, nature trails and the like. The community should participate in determining what specific amenities to include. We also see it as an "island of green" providing the ideal locale to unwind, relax and soak up the surrounding natural beauty of the park.

And its benefits go beyond the "feel good" variety as it will bring commerce to this city in the form of new businesses, new shoppers and new tourists (wishing they had a park like ours, no doubt!). Most importantly, will be accessible to all, available to all, and enjoyed by all.

# About Project Community Park Worthington (PCPW)

### Our Organization
PCPW is a true grassroots organization of citizens that built this effort step-by-step beginning in 2018. Neighbors and friends gathered for a backyard cookout shared concerns about development proposals for the UMCH site and wondered what they could do. After holding numerous house gatherings to discuss the site, it became obvious there was consensus around a better vision for the site. A working group led by four co-chairs – Kacey Brankamp, Roger Beck, Andy Hutter and Scott Taylor – formed to advance the work of the group which is dedicated to preserving and transforming the contiguous greenspace within the UMCH property into a self-funding community commons, playing the role of Worthington's Central Park.

### Mission
In accord with our city's long history, we advocate for bequeathing to future generations a valuable public asset at the UMCH property— a signature, multi-use community greenspace— for the benefit and enjoyment of all.

### Principles
- We embrace this goal because the UMCH property is a uniquely important site—due to its location, size, and physical features—for the future of our city, and we have just one opportunity to get it right.
- We believe that the developed site should reflect the interests and values of our city's residents—those who have sunk roots, made their homes, and both know and express the character of our city.
- We are committed to obtaining full disclosure of relevant information, in the service of informing a robust and reasoned public dialog about the future of this property and its impact on our community.

### City-wide Surveying and Petitioning
Our group gathered citizen input and built a vision of a community commons from dozens of community meetings and our booth at the Worthington's Farmer's market. We launched a website as a part of an outreach to Worthington residents, continuing this dialogue and refining our proposal. In the summer of 2019, we completed a literature drop, visiting every house in Worthington, raising awareness and gathering feedback. The result was a petition signature initiative which gathered over 1,000 signatures in support of the basic vision and mission. These signatures were presented to Worthington City Council on October 07, 2019.

# The Vision

PCPW strongly supports mixed use development because it can result in a financially desirable scenario for city finances and a far superior outcome better benefiting all Worthington residents (compared to apartment-heavy alternatives).

Our vision features a community commons at the heart of the property with commercial along the High St. corridor, and modest residential along the northern perimeter.

1. **Commercial** development along High St. We propose Class A office with ground-level retail and outdoor space adjacent to greenspace:
   - o Parking is an important topic that PCPW acknowledges and recognizes as a real challenge. Parking (for both the public amenities and the commercial office) should be addressed by design professionals.

2. **Greenspace** featured in the center and the Tucker creek ravine. Our vision is for an "active" park with a variety of amenities that would provide recreation and relaxation for visitors. The type of amenities, their location and the timing of their installation can be completed in phases based on input from residents, city's finances and other considerations. We have staged these amenities into:
   - o near term - could be developed in the timeframe of the park purchase, at low cost; and
   - o extended term - based on public feedback and priorities, built and delivered over time once the city acquires the site.

3. **Residential** along northern edge of site:
   - o Dedicate a 3-acre parcel along Larrimer Ave. We leave the type of housing, whether affordable, for seniors or others, out of this proposal. We suggest this be determined as part of the community-centered planning effort.
   - o We suggest exploring earmarking a portion of the income tax generated by the commercial strip to support either senior or affordable housing should the community determine one of those uses is appropriate for the site.

## CONCEPTUAL DESIGN

PCPW believes the blueprint for a signature development should be grounded in the expressed desires of Worthington's citizenry. We look forward to the results of the Visioning process to gain further insight in to the specifics of these desires. That said, we have put together this visual illustrating what could be done with this space. Our intent is to stimulate thinking and creativity, not necessarily dictate specific amenities for which we're advocating as part of this proposal. **By acquiring the site, the city and its residents have control over the types of amenities available to our community.**



This conceptual design illustrates structured parking (in tan color) within the Commercial Development corridor along High St. It is acknowledged that additional parking will be needed for park visitors. There are many parking options to be considered:

- where parking should be located,
- whether several small parking areas are preferable to one large parking lot,
- weighing the pros and cons of surface parking versus a multi-story parking structure, etc.

We opted to not define these parking option herein, but rather resolve this as part of the detail design phase of the park project.

## A LOOK AT TWO OF CENTRAL OHIO'S ICONIC PARKS – GOODALE AND SCHILLER

We take much inspiration from two grand, old, "signature" parks in our surrounding neighborhoods, specifically Goodale Park in Victorian Village and Schiller Park in German Village. Both parks were established in the latter half of the 19th century and over the last 100-plus years, both have become popular, indeed integral, fixtures within the communities they serve.



Goodale Park



Schiller Park

One point of interest is their relative size compared to the size of their surrounding communities:

- Goodale Park
  - Victorian Village acreage: 316.9
  - park acreage: 32.7
  - park as percent of community size: 10.3%
- Schiller Park
  - German Village acreage: 233.0
  - park acreage: 23.5
  - park as percent of community size: 10.0%

Of note, in both cases, these parks constitute approximately ten percent of the acreage of the community in which they are located.

PCPW is asking our city council to set aside 27 acres (not including the Tucker Creek watershed) in central Worthington. These 27 acres constitute 8.3 percent of Worthington's acreage. Note, the Tucker Creek acreage was excluded as it is a protected watershed and therefore will be part of any and all UMCH development proposals. This analysis is informative in that it demonstrates that this proposal is squarely in line with that of other iconic parks in the area – certainly not too big, and yet not too small.

Further, we feel that Worthington Commons has the critical mass in term of its geographic footprint to support a wide variety of amenities (as detailed below) and to offer the needed "insulation" from the thrum of city life to positively impact public health, civic well-being, and ultimately both residential property values and new business development.

For more than a century Schiller and Goodale parks have proven to be immensely popular civic assets - true crown jewels to their communities. As Worthington comes to a decision on the UMCH property, let us imagine what future citizens, in 20, 80, or 160 years, will be telling others about their hometown ...

*We love our life in this quaint New England village. I think my favorite part about living here is our grand old park with huge trees and oodles of space for us to really get away from the hustle and bustle of the day, even if it's just for 30 minutes. And, best of all, it's right in the middle of the city; I walk to it every day!*

## EXAMPLES OF POSSIBLE NEAR-TERM, LOW COST AMENITIES:

### Paths & Trails
Walking paths and trails offer a low-cost, low-maintenance amenity to be enjoyed by all citizens. The terrain of the UMCH parcel offers the ideal physical location for paths and trails to both challenge our younger residents and provide a leisurely stroll for seniors. These trails would connect the Tucker ravine area in the south to the proposed 55-plus residential development at the north end of the park.



### Sports Fields
Soccer Moms and Dads agree ... Worthington *really* needs more playing fields. One of the biggest items of feedback we received from our constituents is a community park with ample space suitable for soccer, and other athletic, events.

Enabling our children to walk or ride a bike to soccer practice is a welcome alternative to Mom or Dad driving 15-30 minutes, one-way, to ferry their junior athletes to, and then from, practice. It is noted that sport fields are cost effective, as they are very low maintenance for Worthington's Parks & Recreation department



### Community Gardens
Worthington has a proud tradition of community gardens and many residents show a strong desire to work the soil. We propose a new set of gardens, augmenting those located at Worthington's community center.

There is ample room for the development of additional community gardens within the UMCH greenspace, at little, or no, cost to the city.



### The Big Park Experience
Tot lots and pocket parks serve a purpose and are found today in multiple locations across Worthington. Only a substantial park, one that surrounds you in green, one that offers 360 degrees of insulation from the hustle and bustle of the modern world, can provide that special sense of tranquility to recharge and refresh. That perfect Spring morning, when you have the rising sun all to yourself is what a big park is all about.



## EXAMPLES OF EXTENDED TERM AMENITIES:

### Event Venue
Dedicated space for weddings, corporate meetings, or
other social events is not available today in Worthington.
These centers have proven popular in neighboring towns
across central Ohio. As one example, Upper Arlington's
facility is currently booked eighteen months in advance and
generates approximately $50,000/year in revenue.
Revenues from facility rentals offset other park expenses.



### Amphitheater
Shakespeare in the park, afternoon music concerts,
alfresco weddings ... the potential uses of an outdoor
amphitheater are somewhat endless.

A small, and quite rundown, amphitheater already exists on
the UMCH property. PCPW proposes to upgrade this facility
to enable seating for an audience size of 80-100
landscaped into the existing slope.



### Food Truck Venue
The park plan envisions a road separating the commercial
from the greenspace that is "double-wide", meaning one
lane for traffic and a second lane for food trucks.



### Outdoor Education & Natural Play Areas
The Tucker Creek ravine flows through the southern section
of the UMCH property and offers a beautiful natural setting.
Nature has proven important in children's development in
every major way – emotionally, intellectually, socially,
spiritually, and physical (Kellert 2005).

Natural play areas have been gaining in popularity. The
Columbus and Franklin County Metro Parks offer off-trail
natural play areas at eight of their parks. There is
opportunity to provide passive natural play and also more
structured outdoor education in this lovely setting.



# REALIZING THE VISION – THE ACTION PLAN

Achieving the vision of a Worthington Commons – our community's Central Park – must involve the city taking a leadership position to make this happen. We believe it is time for the city to proactively act on behalf of its citizens and do what is best for this community.

### Phase 1: Planning
- Council hold a public meeting on the topic
- Prepare an alternate vision for the use of UMCH site, including necessary resolutions from Council. This could include freezing zoning at the property.
- Identify funding sources for professional services
- Retain appropriate professionals to guide the City through all phases and contingencies
- Negotiate with UMCH property owner for acquisition of the site
- Explore additional funding sources for initial purchase of property such as state/federal grants, donations, sponsorships, and endowments
- Pass resolutions for approving plan, including the purchase, sales and improvements of UMCH property

### Phase 2: Acquisition
A municipality can acquire real property in any manner that a private corporation might, including by purchase, gift or lease. Worthington's Charter (Section 2.16) requires any determination *"to proceed with any public improvement, purchasing, leasing or transferring [of] property***shall be taken by ordinance."* Purchase of the property may also be completed through Worthington's Community Improvement Corporation (CIC) as the representative of Worthington.

### Phase 3: Sale of Targeted Portions of Property
The sale and development of the commercial corridor along High St. and residential parcels bring revenue back to the city after acquisition and provide the self-sustaining funding model. Through work with retained professionals, the City can require relatively strict design criteria to meet housing desires determined in a community planning process, for example.

### Phase 4: Improvement and Maintenance of Property
Improvements and maintenance to the dedicated park space could be undertaken by the City, CIC or separate entity to be determined. Proceeds from the sale of the commercial and residential could be used initially to fund park development. We also recommend viewing park development in short term and long term phases or based on funding and community desires.

## THE IMPORTANCE OF ZONING

Zoning serves to protect and enhance the community's interests in land-use decisioning. As applied to the UMCH parcel, our view is that zoning can be the "one small step" our city council takes which becomes the "one giant leap" for Worthington and its citizens. In the case of the UMCH parcel, given its relatively large size and central location, prudent zoning becomes critical to Worthington's future in terms of livability, tax revenue, attractiveness to business and quality of life.



The current city zoning map was established in 1971. The UMCH parcel, is currently comprised of three zoning segments:

- **S-1/Special (blue):** allows for public and semi-public use including parks, and educational, religious, charitable or philanthropic purposes.
- **C-2 & C-3/Commercial (pink):** provides use for businesses such as shops, offices, banks restaurants, etc.
- **SC (aqua):** occupied by the Bickford Senior Living Center and not part of this proposal.

Note the R-10/Residential (green) zones lie outside of the footprint of the UMCH parcel. The boundaries of this parcel include:

- North: Longfellow Ave.
- East: High St (east);
- West: the back line of the residential lots along Evening St
- South: the north lot line of the residential development around Greenbrier Ct.
- Additionally, the small parcel of land south of Larrimer, where it intersects High St., was recently purchased by Lifestyles Community and is not part of this proposal.



Unlike the 2015 Lifestyle's proposal, which would rezone nearly all of the S-1 acreage to residential, this proposal seeks to add a modest strip of residential running along the south side of Larrimer.

Our goal is to maximize the amount of this acreage not paved over in the name of development for two key reasons:

- the unique and irreplaceable nature of this undeveloped parcel – there is nothing else like it in central Ohio, and
- the potential for residential at multiple other sites in Worthington.

Note that the southern portion of the S-1 is delineated as the Tucker Creek Ravine. We make this distinction to call out that this protected watershed cannot be developed, nor is it suitable for certain park amenities like sports fields, public gardens, etc.

# Financial Impact Analysis

The City of Worthington can afford this, and it is more profitable for the City than any other plan that has been presented by a developer, to date.

Previous development proposals have not offered a financially solvent proposal because only 4% of property tax dollars go to the City of Worthington (roughly 75% of this goes to the schools), and this makes up only 10% of the City's revenue.

For this reason, dense residential housing will actually create a strain on city services and not create the income Worthington needs. Income tax from jobs is a revenue source for Worthington, when balanced against modest residential and low-cost green-space.

This example (right) from Dublin clearly illustrates this general theme. There are many forms a development plan for this site may take and it's important to acknowledge that a thorough analysis of each must be conducted.



Below is a summary of the financial outcome of our Proposal.

### FINANCIAL ASSUMPTIONS

| | |
|---|---|
| **Fair Market Total Purchase Price** <br> The acquisition of the total UMCH property (one-time) | - $12,378,900 |
| **Sale of Select Parcels** (one-time) | + $9,750,000 |
| **Park Development Initial Costs** <br> Services, Infrastructure, Capital Costs | - $455,750 |

### ANNUAL FINANCIAL PROJECTION

| | |
|---|---|
| **Total Annual Costs** <br> Financed loan of purchase | - $285,659 |
| **Total Annual Revenue** <br> From Commercial Income Tax | + $668,400 |
| **Annual Net Revenue** | + $382,741 / year |

Important Notes: The fair market total purchase price is detailed below. We've received feedback this is above market and too high of price. In an effort to demonstrate fairness to the property owner and not undervalue the parcel, we've kept the high number. This also demonstrates the "math" still allows for ultimately a self-sustaining model. The detail behind these figures, largely informed by the City's own 2018 cost-to-serve financial analysis, are further outlined below.

The financial projections above are intentionally conservative and do not assume any speculative revenue from alternative sources. While the City can afford this proposal as outlined above, it is prudent to explore other funding sources such as state and federal grants, sponsorships and private donations, public/private partnerships and others.

## City of Worthington Revenue (Taxes)

On average over the last several years, Worthington has derived 73% of its revenue from income taxes, and 9% from property tax.

### Income Tax
- Worthington's income tax rate is 2.5%.
- A job in the City of Worthington paying a $50,000 salary generates approximately <u>$1,250 per year in tax revenue for the city.</u>

### Property Tax
- Worthington's property tax is 5 mills, which is 5/1,000th of the assessed value, which is 35% of the appraised value. So, the calculation is [appraised value] * 0.35 * 0.005 = $175
- Therefore, a residential unit worth $350,000 generates, on average, approximately <u>$612.50 per year in tax revenue for the city.</u>

## City of Worthington Expenses
Worthington's largest expenditure category is public safety at 44.29% of our budget.

- This amounts to just over $12.1 million per year.
- Our population is 14,725. This equates to a public safety cost of $827 per person.
- Worthington has an average of 2.46 persons per household.
- The average Worthington home costs the city ~$2,034 to serve.

### Conclusion
From a purely financial standpoint, it would be most profitable to build as much commercial office space as possible at the UMCH site rather than high density residential:

- - A single job paying $50,000 in salary *generates* $1,250 per year in tax revenue for the city. - -

- - The average Worthington home *costs* the city ~$2,034 to serve. - -

However, we believe Worthington residents do not wish to see only a commercial office park, as this single use does not reflect the desires of the community, nor would this be classified as the highest and best overall use for such a unique property. Our proposal includes as much commercial as appropriate for the site, maximizing revenue for the city and offsetting the property acquisition as described next.

## Acquisition & Financing

Below, we illustrate how short-term financing and long-term income tax revenue will actually create a net-positive revenue stream for the City.

We use the City's own 2018 cost-to-serve financial analysis of the property to illustrate this.

| Valuation Method | |
|---|---|
| 1- The Harding property (zoned S-1) recently appraised at<br>    Add a 30% premium for the prime location | ≈ $1.9mil (or $139,000/acre)<br>≈ $180,700/acre |
| 2- Franklin County Auditor recently appraised the UMCH commercial zones at ≈ $6,000,000. | |

| Acquisition, Sale & Financing | |
|---|---|
| **Parcels**<br>10 acres, C-3, C-2<br>27 acres, S-1<br>**Total Purchase Price** | -$7,500,000  (fair market value)<br>-$4,878,900  (above comparable fair market)<br>**$12,378,900** (recent appraisal of $12.5M) |
| Sale of Select Parcels<br>10 acres, C-3, C-2, to commercial developer<br>3 acres to residential developer<br>(1 / 5 acre lots @ $150,000 each)<br>**Total** | +$7,500,000<br>+$2,250,000<br><br>**+$9,750,000** |
| Net Property Acquisition Cost | $2,628,900 |
| Additional Development Costs<br>*according to the City's own cost-to-serve analysis*<br>Projected Services Impacts (police, EMS, fire)<br>Infrastructure Consulting & Fees<br>Parks & Rec Capital Investment & Services<br>**Total** | <br><br>$155,000  (one time)<br>$145,000  (one time)<br>$155,750  (annual)<br>**$455,750** |
| Total Financial Burden<br>Capital Expenditures (purchase + 1-time expenses)<br>Financed on a 30 year loan @ 2.0% | <br>$2,928,900<br>$3,897,282 |
| **Total Annual Cost** (the financed loan + annual costs) | **$285,659** |

## Breaking Even and Generating Revenue

The figures in the following analysis are informed by the City's own analysis, "Evaluation of the Cost to Serve the UMCH Property Under Various Hypothetical Development Scenarios", presented by City Manager Matt Greeson to City Council, on January 22, 2019.

Of the 4 different hypothetical development scenarios the city analyzed, "Scenario 4" is the closest to the PCPW proposal.  An excerpt of the City's expenditure and revenue projections for Scenario 4, looking out 25 years, is attached as Appendix B.

This Scenario calls for:
- 27 acres of parkland (currently S-1 zoning)
- 6.5 acres of office, with 130,000 sq. ft. of class A office (currently C-1 + C-2 zoning)
- 5 acres of residential*

The City's own analysis projects an annual total income of $879,400 (without incentives). Should incentives be offered, the city projects an annual income of $668,400.

| | |
|---|---|
| Total Cost<br>financed balance from property purchase<br>+ city consultant fees & infrastructure<br>+ annual passive park maintenance | - $285,659 |
| Projected Income | + $668,400 |
| Annual Net Income | + $382,741 / year |

### In Summary

After purchasing the land from UMCH for a fair-market price, selling portions of the property to carefully chosen developers, and financing the balance, the City can still make money from this development plan. The City can acquire a premier multi-use property, with a large contiguous greenspace, with very little long-term financial burden.

We believe with conviction that this scenario represents both the best possible financial outcome for the City of Worthington, and the best possible development outcome for our citizens. The City could obtain a signature property that would benefit Worthington for generations, while also maintaining cash-flow positive finances.

**We believe the most financially responsible solution to the UMCH site is for the City to acquire the parcel and control its redevelopment.**

# Additional Tangible Benefits

### Reasons Why the City of Worthington Should Control UMCH Development

#### Parks are Essential Business

The Urban Land Institute hosted a webinar in May 2020 called "Parks are Essential Business" presented by MKSK. Presenters Chris Hermann and Andrew Overbeck made a convincing case for the importance of parks especially in light of the COVID-19 pandemic. They presented data supporting the following facts about parks, greenspace and walkable communities:

- Improved health outcomes both physically and mentally, with more quantitative data available to support these claims
- Generate economic development through retail spending and employment
- Increase property values

They also pose the question, "do we have enough big parks?"



#### Attracting New Business

Both locally and nationally, co-locating green space and commercial development is viewed as a boon to business.

Our neighbors understand this. One example comes from the opening of the Scioto Mile along the Scioto River in Downtown Columbus. As part of the grand opening ceremony, Tony Collins, Director of Columbus Recreation & Parks, stressed that this greenspace was "an amenity that will attract new business development,"

Following this lead, our plan fronts the signature UMCH greenspace with a long commercial strip along High St. This is purposeful as it enables tenants in this strip to gain full commercial leverage from what we call "park power"!

## Taking Ownership of Our Future

This proposal serves as a call to action to our City Council to take charge of our shared future and chart a clear path forward for the city.

Given the significant value of the UMCH grounds, the largest undeveloped urban parcel in Central Ohio, it is incumbent upon our council to listen to its residents and then respond with the leadership necessary to best utilize this precious asset.



## Increasing Residential Property Values

With a signature park and greenspace established, it is reasonable to estimate that Worthington homeowners will experience an increase in the value of their homes.

For the purposes of this analysis, if home values were to increase by an average of just 1%, the total impact would be a $18.7m increase in total home value to Worthington residents[1].

It goes (almost) without mentioning, the city, county and school system will additionally benefit from increasing home values which will correspondingly lift property tax revenue.



## Increased Health Benefits

The Lancet Medical Journal published an article in November 2019 noting a strong correlation between increasing greenspace and decreasing mortality (see Appendix C). Further, it concludes, "**interventions to increase and manage green spaces should there be considered as a strategic public health intervention.**" In addition to the obvious physical health benefits of outdoor activities, simply having access to nature can alleviate some of the most important problems in public health (American Public Health Association). Benefits include improved relaxation and restoration, increased neighborhood cohesion, greater pro-social behavior, and increased feelings of happiness.

Within this footprint, the plan calls for trails, gardens, and sports fields all of which promote the types of outdoor activities, across generations, which offer proven health benefits.



### Ensuring Educational Excellence

As part of a 2019 internal assessment, a school board task force stated: "Worthington Schools' current growth rate is unprecedented. Add to that our aging facilities and ... we are addressing some serious challenges."

Building a significant number of new housing units at UMCH will bring additional students to the district at a time when it is already under strain.



### Promoting Environmental Stewardship

Trees, plants and preserved natural spaces are not only good, but vital for our environment. They improve our air quality, absorb rainwater, and provide habitats for wildlife. Conversely, significant development of hard surfaces at the UMCH site can cause negative environmental outcomes such as "heat islands", flooding in Tucker Ravine and sewer issues, in addition to stressing the watershed downstream.



### Consummating Worthington's Legacy

A core component of the original Worthington plan was a New England-style village commons where all could gather, interact and strengthen the bonds of friendship, community and public spirit. Thankfully, that footprint is still very much in place! It has served our 19th and 20th century population, numbering in the hundreds, then thousands, quite well indeed.

Today, Worthington is a city nearing 15,000 residents. Our major city-wide events typically must block off High St in order to provide the needed elbow room for all off us to participate and socialize.

Offering a combined total of some 31 acres of greenspace, the new Worthington Commons we propose will serve to meet the needs of our growing city and consummate the legacy of our town at its foundation. Worthington Commons will become the civic asset that will take us into the 22nd century.



# Negative Impacts of High-Density Development at UMCH

### Traffic Impact
High density residential development at UMCH would
dramatically impact traffic, both by increasing the overall
number of cars on the roads and by building a new access
road onto Evening St.

Note that Evening St. is the main drop-off / pick-up point for
school buses and parents of Evening Street Elementary. It is
also the primary access between the Estates neighborhood
and Thomas Worthington HS.



### Environmental Impact
As Medick Estate residents know, the lower stretch of
Tucker Rd. regularly floods during heavy rains, typically once
or twice a Spring.

Any form of large scale residential development upstream at
UMCH can only exacerbate this existing issue, potentially
overwhelming an already stressed watershed.



### School Over Crowding
As part of a 2019 internal assessment, a school board task
force stated: "Worthington Schools' current growth rate is
unprecedented. Add to that our aging facilities and ... we
are addressing some serious challenges."



### Once it's gone ... it's gone forever
- There is no other place in central Ohio with
  approximately 34 acres of contiguous greenspace.
- Residential development can be located in multiple
  locations across Worthington and in many more
  locales adjoining our community.
- A signature park, within walking distance of many of
  our residents, is a once in a lifetime opportunity to
  create a lasting legacy of a Community Commons
  for generations to come.



# Conclusion

We, the members PCPW, and our large base of supporters, believe strongly that now is the time for our city council to bring strong leadership to transform the UMCH site into a multi-use asset featuring a large community commons, vibrant commercial corridor along High Street, and a residential enclave integrated into the surrounding neighborhood.

In acquiring a thousand-plus signatures, as well as conducting individual conversations with our council members and other leaders, we have gained many insights. One that stands out in particular is that, regardless of your view of the property and what should become of it, as a broader community **we are not that far apart in our desires for the UMCH property.**

Certainly, all sides want to gain closure and move forward. We present this proposal to the community and city leadership, for inclusion and consideration in this very important dialogue.

On behalf of the members of PCPW, and the 1,000+ residents who have signed the petition, thank you for your consideration of our proposal.

Roger Beck

Kacey Brankamp

Andy Hutter

Scott Taylor

## Appendix A: PCPW Petition Signatures

| Last Name | First Name | Last Name | First Name | Last Name | First Name |
|---|---|---|---|---|---|
| Abell | Annie | Bates | Paul R | Brollier | Gordon |
| ackley | lloyd | Baumgartner | David | Brown | Kathryn |
| Adrion | Diane | Beard | Robert | Brown | Nathan |
| Albert | Karen | Beard | Ronda | Brown | Brittney |
| Albright | Peggy | Beck | Heidi | Bruck | Kelsey |
| Aldrich | Alison | Beck | Ryan | Bucher | Pete |
| Alexis | Ryan | Beck | Roger | Budkin | Mary |
| Allen | Pongsun C. | Beech | Chris | Buford | Lelie |
| Allen | Andrew | Beery | Sam | Burnham | Laura |
| Allen | Nancy | Belcher | Patrick | Burris | Kathryn |
| Allen | Phil | Bell | Randolph | Burton | William |
| Allender | Cory | Bender | Donna | Bush | Philipp |
| Alwood | Amy | Bendoly | Laura | Buss | Kristen |
| Ambro | Laura | Bennett | Barbara | Byard | Paul |
| Ament | John M | Bennett | Andrew | Byard | Phyllis |
| Ament | Tamara H | Bennett | Lindsay | Byrne | Megan |
| Andersen | Maria | Bent | Lee | Byrnes | John |
| Anderson | Stephen | Berg | Erin | Callender | Margaret |
| Anderson | Mariah | Berger | Megan | Campagnoli | Paul |
| Anderson | Jennifer | Bergman | Beth | Campbell | Sheila |
| Anspaugh | Andrew | Berkley | June | Campbell | Bob |
| Arcaro | Liz | Bertram | Jamie | Campbell | Susan |
| Armitage | Doug | Bertram | Mathew | Campbell | Christian |
| Armitage | Maria | Bidlack | Janna | Cantzler | Ryan |
| Armitage-Olson | Suzanne | Bidlack | Eric | Carter | Ellen |
| Armstrong | Erin | Birinyi | Frank | Caruso | Leslie |
| Armstrong | Mary Jane | Birmingham | Daniel | Caso | Francoise |
| Armstrong | Maureen | Birnie | Deborah | Caso | Luis |
| Arrasmith | Daniel | Bixler | Maren | Casson | Nicki |
| Arthmire | Mary | Blevins | Jason | Caughell | Alexandria |
| Ashley | Phillip | Blevins | Kelly | Caughell | John |
| Ashley | Pamela | Blevins | Dawn | Cavin | Cliff |
| Ashworth | Jeanne L. | Blevins | Jason | Cermak | Kay |
| Ashworth | Rob | Boes | Penny Masters | Cesario | Jean |
| Askin | Amy | Boriin | Pete | Cesario | Hayley |
| Athy | Don | Boucher | Todd | Chadwell | Sharon |
| Axelson | Chase | Bowman | Ben | Chakalis | Diane |
| Axelson | Katie | Bowman | Michelle | Chakalis | Arthur |
| Bachert | Ben | Bowman | Vicky | Chakroff | Jason |
| Bader | Anthony | Boyer | Drew | Chakroff | Chris |
| Bader | Victoria | Bradburn | Jennifer | Chaney | Michael |
| Baker | Amy | Bradley | Patricia | Chaney | Susan |
| Balch | Bradley | Bradley | L Richard | Chavez | Lindsay |
| Balogh | Mary | Brankamp | Adam | Cihla | Michelle |
| Barden | Curt | Brankamp | Kacey | Cinadr | Edward |
| Barden | Alicia | Brannon | Brandy | Clark | Karen |
| Bare | Daniel | Breedlove | Diane | Clark | Henry & Joyce |
| Barkhurst | Katherine | Brewer | William | Clark | Toni |
| Barnum | Peggy | Brewer | Janet | Clarke | Anne |
| BARR | THOMAS | Britcher | Andrea | Clauer | Allan |

| Last Name | First Name | Last Name | First Name | Last Name | First Name |
|---|---|---|---|---|---|
| barta | john | Britcher | Stephen | CLEVENGER | DIANE |
| Batcheck | Mark | Brock | Thomas | Cline | Holly |
| Susan | Bates | Brogan | Barbara | Clingan | Cynthia |
| Clingan | Paul | Dooley | Sarah | FINNERTY | ELIZABETH |
| Cly | Andrew | Dopkiss | Jessica | Fischer | Eric |
| Cochran | Allen | Dorman | Stephen | Fischer | Richard |
| Conover | Ryan | Dotzauer | William | Fischer | Beth |
| Conover | Breanna | Dougherty | Margaret A. | Fisher | Brian |
| Cooksey | Elizabeth | Downs | Jeff | Fitch | Brenda |
| Cooper | Kirk | Downs | Ashley | Ford | Stephen |
| Cooper | Deborah | doyle | sharon | Foust | Sarah |
| Cooper-Whitman | Matt | Dray | Cheryl | Foust | David B. |
| Corcoran | Lisa | Dudley | Lyndsey | fox | janet |
| Corcoran | Shawn | Dugan | Megan | Franks | Allan D |
| Couch | Kim | Dulgar | Amy | Franta | Philip J. |
| Couch | Phil | Dunn | Mary Ann | Frantz | Emily |
| Cox | Mary | Dunn | Thomas | Freeman | Julie |
| Cox | Lou | DuPuy | Rachel | Froehlich | Patrick |
| Cropper | Frankie | Dyas | Adam | Froh | Courtney |
| Cropper | John | Dyas | Lauren | Fubj | Joshua |
| Cross | Susan L. | Dye | Shawn | Fuller | Rachel |
| Crumpton | Jillian | Dye | Courtney | Gallagher | Sean |
| Culp | Leah | Eader | James | Gallagher | Amy |
| Cummings | Anne | Edison | Susan | Gallanis | Katelyn |
| Cunningham | Emily | Edison | Karen | Ganoom | Corey |
| Curtiss | Judith | Edwards | Jane | Ganucheau | Valcour |
| Curtiss | Dan | Eganhouse | Jennifer | Gardner | Susan |
| Dale | Eva | Elder | Ann R. | Gardner | Andrew |
| D'Amico | Lisa | Ellingson | Carol | Gardner | JoLee |
| Damsel | Kaley | Emery | Gregg | Gardner | Jeff |
| Damsel | William | Erickson | Matt | Garee | Charlotte |
| Damsel | Carol Lee | Erickson | Pete | Garee | Gail |
| Danhoff | Lindsey | Erickson | Tami | Garrard | Carol |
| Davis | Connie | Ervine | Beverley | Garrett | Philip |
| Davis | Stewart | Esch | William | Garris | Eric |
| Davis | Linda | Esch | Pamela | Garrison | Melissa |
| Davis | Carol | Estepp | Rachael | Garrison | Kellie |
| Davis | Richard | Evans | Marie | Gath | Chris |
| Dawson | David | Evans | Lacramioara | Gedrich | Ronald |
| Decker | Amber | Evans, Sr. | Grady F. | Geissbuhler | George |
| Decker | Lisa | Everhart | Emily | Geissbuhler | Michelle |
| Degroff | Valerie | Fahy | Kristi | Geizer | Karen |
| Demick | Chandra | Fanning | Casie | Gerardi | Elizabeth |
| Denny | Mark | Farrell | Susan | Gerber | Bruce |
| DeNoemer | Rachel | Feister | Katharine | Gerbes | Angelika |
| DiBartola | Michael | Ferris | Karen | Gharbo | Christa R. |
| Dicken | Emily | Ferris | Emma | Giampouranis | Amie |
| Dieken | Laurel | Ferris | Nathan | Gibb | Louis Raymond |
| Dipaolo | Darla | Ferris | Beth | Gibson | Adam |
| DiSabato | Kelly | Ferris | Brandy | Gifford | David |
| DiSabato | Eric | FIELDS | Corinne | Gifford | Marion |
| Distel | Lin | FIELDS | JUSTIN | Gilbert | Robin |
| Doherty | Heather | Finch | Joanna | Givens | Willard & Dona |
| Dolle | Laura | Finefrock | Lori | Gjostein | Rebecca |

| Last Name | First Name | Last Name | First Name | Last Name | First Name |
|---|---|---|---|---|---|
| Dollinger | Susan | Finley | Cortney | Glowacki | Erin |
| Gnezda | Eric | Haybron | Shawn | Hushak | Leroy |
| Goeller | Scott | Hayden | Deborah | Hushak | Virginia |
| Goeller | Allison | Hayes | Chris | Huss | Breanne |
| Gold | Sarah | Hayes | Natalie | Huss | Kyle |
| Gonzalez | Claudio | Hedberg | Carl | Hutter | Andrew |
| Goshe | Matthew | Hedberg | Angel | Hutter | Anne |
| Gould | Iulia | HEFNER | JENNIFER | IMMELT | JAMES |
| Graef | Michelle | Hein | Kasey | Ingham | Maureen |
| Grangaard | Dan | Heise | Emberly | isaac | susan & |
| Grangaard | Erin | Helling | Carol | Isaacson | Jack |
| Granger | Geri | Helling | Henry | Jackman | Jane |
| Granger | Mark S. | Henkaline | Gary | Jackman | Chris |
| Graven | Kirk | Hennigan | Laura | Jackson | Doris |
| Graven | Katie | Hess | Andrew | Jacobs | Susan |
| Gray | Priscilla | Hester | Patrick | Jaggers | Elizabeth A |
| Gray | William | Heyman | Martha | Jakes | Kathryn |
| Graziano | Erin | Heywood | John | James | Randy |
| Greco | Jessica | Hicks | Benjamin | Jennings | Patricia |
| Green | Lynn | Hicks | Mary | John | Chandy |
| Green | Stephen | Highley | Chris | Johnson | Keith |
| Greene | Kimberly | Hinson | Barbara | Johnson | Jared C |
| Greene | Merydith | Hipes | Steve | Johnson | Frank & Kit |
| Greene | Robert | Hiss | Amy | Johnson | April |
| Guitry | Noel | Hoag | David | Johnson | Zach |
| Guitry | Janet | Hoffmannbeck | Sue | Johnson | David |
| Guitry | Amy | Holden | Elizabeth | Johnson | Alycia |
| Gunther | Linda | Holden | Kay | Johnson-Ballinger | Christina |
| Guy | Suzanne | Holden-Harper | Quinn | Johnston | Sarah |
| Haager | Carl | Holdren | Carol | Jones | Katie |
| Hadden | Chris | Hollback | Kelly | Jones | Susan |
| Hall | brian | Holliday | KIli | Joseph | Amanda |
| Hall | Kathleen | Hollis | Lesley | Joseph | Marc |
| Hall | Kelly | Holsinger | Frederick | Judd | Sue |
| Hamer | Kathryn | Hoover | Rosalie | Jung | Catherine |
| Hamer | Thomas | Hoover | Shauna | Jurkowitz | Marianne S. |
| Hamilton | Matthew | Hoover | Eric | Kaminski | Kayleigh |
| Hamilton | Lauren | Horgan | Patrick | Karafa | Kasey |
| Hamilton | Matthew | Householder | Amy | karafa | nicholas |
| Hamric | Danielle | Howat | Erica | Karapetsas | Katie |
| Harden | Erik | Howat | Ian | Kasten | Brian |
| Harmeyer | Karen | Howell | Sandra | Kaszar | Suzanne |
| Harper | Jeff | Hubbard | Sherry | Keister | Anna |
| Harper | Bessie | Hudoba | Doug | Keister | Kent |
| Harper-Hess | Anna | Hudson | David | Kellenberger | Stephanie |
| Harris | Katie | Hudson | Nicolette | Keller | Ken |
| Harris | Alyssa | Huffman | Jaime | Keller | Kay |
| Harris | Sean | Huffman | Robert | Kendall | Dawn |
| HARRISON | ROBERT | Huffman | Tera | Kennedy | Wesley |
| Hart | Nannette | Hughes | Richard | Kennedy | Melissa |
| Hartley | Ethan | Hull | Kathy | Kigaraba | Noel Zawadi |
| Hartley | Maryann | Hunt | Hannah | Kimbrel | Sue |
| Harty-Morrison | Karina | Huntington | Susan | Kimchi-Woods | Judith |
| Hastrich | Kristan | Huntington | John | Kington | Cindy |

| Last Name | First Name | Last Name | First Name | Last Name | First Name |
|---|---|---|---|---|---|
| Kington | Bob | Lipstreu | Rich | McChesney | Ryan |
| Kipp | Ann | LITTLE | CAROLYN | McCourt | Nicole |
| Kirkbride | Judye | Litton | Noah | McCracken | Kate |
| Kirker | Heather | Loar | Tim | McDaniel | Jeff |
| Kleinhenz | Peter | Loar | Brenda | McELWEE | JUDITH |
| Kleinhenz | Jill | Long | Meghan | McEnery | Stephanie |
| Kleoudis | Natalie | Losey | Dustin | McGriff | Jennifer |
| Kleoudis | James | Losey | Jackie | McGuire | Mary |
| Kline | Dennis | Lothes | Kayla | McKee | Jim |
| Kline | Catherine | Lucas | Amanda | McKinney | Jack |
| Knapp | Bill | Lumsden | Luke | McKirnan | Alex |
| Knapp | Valerie | lundman | jean | McLaughlin | Maryellen |
| Kneedler | Susie | Lyons | Julie | McNabb | Heather |
| Kocel | Charles | Machle | Kathi | McNabb | Ben |
| Kocel | Elizabeth | MacLean | Jeff | McVey | Carly |
| Koch | Emily | MacLean | Meghan | Mead | Trista |
| Kociba | Lori | Maggiore | Fred | Meilton | Brian |
| Kocsis | Fran | Mahlin | Dave | Melville | Elizabeth |
| Koenig | Jennifer | Maier | Jennifer Lane | Mercadante | Linda |
| Konster | Eric | Main | Jordan | Mickey | Emma |
| Kort | Kathryn | Malone | Ryan | Mild | James |
| Kossmann | Beth | Mamlin | Leigh | Mild | Renee |
| Kraut | Eric | Mandrell | Chad | Miller | Heather |
| Kreischer | Lisa | Mandrell | Jessica | Miller | Julie |
| Kriebel | Janet | Mann | Mason | Miller | Halie |
| Kuhl | Amy | Manning | Maureen | Mitchell | Beth |
| Kuhnell | Sarah | Marker | Sara | Mitchin-Verhoef | Mechtelina |
| Kulikowski | David L. | Marks | Katherine | Monroe | Heather |
| Kulikowski | Judy | Marks | Ben | Montague | Juliette |
| Kull | Charles M. | Marschall | Gwynette | Moody-Ganoom | Liz |
| Kushner | Jennifer | Marsh | Lee | Mooney | Michele |
| Kyser | Scott | Marsh | Mary | Mooney | Bill |
| LaFontaine | Gregory | Marti | Edward | Moore | Jess |
| LaFontaine | Lara | Marti | Jane | Mottice | Robert |
| LAMB | NICHOLAS | Martin | Daniel C. | Mulligan | Michael |
| Lampe | Phil | Martindale | Lori | Murden | Isla |
| Lancaster | Boyce | Masters | Carol | Murphy | Sarah |
| Lang | Norma | Matejic | Sarah | Musgrove | Deborah |
| Lauducci | Patricia | Matic | Anthony | Mutti | Donald |
| Lavender | Steve | Matlack | Sarah | Myers | Jack and Kay |
| Lavender | Rachel | Matlack | James | Mykel | Ian |
| Law | Shawn | Matson | Bev | Nagel | Rosanne |
| Law | Barbara | Matthews | Stephen | Nasdeo | Kelly |
| Lawrenz | Anita | May | Casey | Neale | Judy |
| Lear | Deanna | Mayhood | Ruth | Neelan | Natalie |
| Leier | Jolene | McAlister | James | Neely | Michelle |
| Leier | Carl | McCallister | AnnMarie | Nesline | Richard |
| Lesley-Tecklenburg | Jane | McCarthy | Leslie | Nesline | Nancy |
| Levingston | Heather | McCarthy | Bryn | Newby | Kristen |
| Likirdopulos | Christina | McCarthy | Constance | Newcome | Lane |
| Lilly | B | McCarthy | Michael | Nittle | Timothy |
| Lin | Albert | McCarthy | Natalie | Nolan | Rachel |
| Lipstreu | Tiffany | McCarthy | Tim | Nolan | Gary |

| Last Name | First Name | Last Name | First Name | Last Name | First Name |
|-----------|------------|-----------|------------|-----------|------------|
| Norman | Erik | Ratliff | Glenn | Sandberg | Makenzi |
| Obee | Karen | Ratliff | Gretchen | Sater-Wee | Diane |
| Oberliesen | Janet | Rayburn | Mary | Saunders | Randy |
| Odom | Sylvia | Raynes | Phil | Savage | Kelly |
| Odom | John | Ream | Julie | Savage | Dan |
| Oglevee | Zachary | Reed | Caroline | Savage | Jerry |
| Oldfield | Lee | Reeves | James | Savage | Barb |
| Orebaugh | Jamie | Reeves | Julie | Schaub | Kristin |
| Ott | Rebecca | Reid | Matt | Schaublin | Matt |
| Ouellette | Sylvie | Reid | Brooke | SCHERER | ELLEN |
| Overly | Timothy | Reiger | John | Scherer | John Douglas |
| Ozkan | Erdal | Reiger | Andrea | Scherer | Nora |
| Pack | Cathy | Reik | Katherine | Schmidt | Jessica |
| Palmer | Nathan | Reiss | Janet | Schmitt | Laura |
| Palmer | Jeanetta | Reiss | Gary | Scholl | Joy |
| Panhuis | Tami | Rethman | Katherine | Scholl | Mike |
| Panhuis Belcher | Tiffany | Rethman | Craig | Schrader | Lucas |
| Parak | Jill | Rice | Margaret | Schuler | JoAnna |
| Parrett | Michelle | Rice | Mark | Schulhaus | Eric |
| Pascoe | Edwin | Richards | Lauren | Schulze | Ronald |
| Patterson | Joseph | Richards | Mark J. | Schulze | Mary |
| Patterson | Canady | Ridenour | Chester | Schumer | David |
| Paulsen | Kristina | Ridenour | Shelley | Schwotzer | Sondra |
| Payne | Cynthia | Riegner | David | Seals | Jim |
| Penzone | Gina | Rings | Jamie | Seals | Suzanne |
| Perchuk | Alex | Roberts | Linda | Seech | Beth |
| Perge | Nicholas | Roberts | Marie | Seed | Laura |
| Perge | Jennifer | Robertson | Jodi | Seed | Allen |
| perry | mary | Robertson | Mike | Seed | Jessica |
| Pfendler | Thomas | Robinson | David | Serrano | Deidre |
| Phillips | Gregory | Robinson | Lorraine | Sestile | Lindsay |
| Piloseno | Richard | Rochte | Maryclaire | Settle | Tiffany |
| Pischel | Julie | Roderick | Karen R. | Sever | Jeff |
| Plinke | Joanna | Rogers | Rachel | Severance | Sandra Lee |
| Plinke | Scott | Rogge | Mary | Severance | Greg |
| Poll | Brett | Rogge | David | Severance | Janien |
| Poma | Whitney | Roggenkamp | Renee | Severance | Sandra |
| Poma | Jonathan | Rosendale | Laurie | Seymour | Sally |
| Potenzini | Pete | Roskuski | Leslie | Seymour | Scott |
| Poulson | Gretchen | Ross | Laura | Shanahan | Daniel |
| Prats | Lindsay | Royalty | Linda | Shannan | Kevin |
| Price | Sarah | Ruffner | Melissa | Sharvin | Michael |
| priess | mike | Rush | Jim | Sharvin | Jim |
| Purves | Brendan | Rusnak | Laura | Shaw | Beverly |
| Putka | Steven | Rust | Rebecca | Shearer | Amelia |
| Putka | Wendy | Ryan | Bev | Sheehan | Donna |
| Quigley | Ryan | Ryan | Kevin | Sheehan | Timothy |
| Raab | Dean L. | Ryan | Abby | Sheridan | Jenn |
| Raab | Jacob | Saboley | Saundra | Sherlock | Suzanne |
| Rainier | Ryan | Sadvari | Sharon | Sherman | Joe |
| Rainier | Alison | Sadvari | Joshua W. | Sherman | Linda |
| Rankey | David | Salamone | Lauren | Sherwood | Charles |
| Ratliff | Kristin | Sandberg | Daniel | Shinaberry | Scott |

| Last Name | First Name | Last Name | First Name | Last Name | First Name |
|---|---|---|---|---|---|
| Shonk | Amber | Steinbrink | Jessica | Thompson | Mardella |
| Shumway | Martin | Stephan | John | Thompson | Pam |
| Siciliano | Deborah | stevens | thomas | Thompson | Amy |
| Siders Sanford | Jamie | stevens | robert | Thornton | Renee |
| Simmons | Scott | Stillwagon | Megan | Tinapple | Emilee |
| Simmons | Patti | Stimpert | Terri | Tonra | Christopher |
| Simon | Catherine | Stinson | Patricia | Tornes | Stephen |
| Sinclair | Amy | Stinson | Patricia | Toth | Anastasia |
| Sinclair | Daniel | Stiver | Tina | Toth | John |
| Sjostrom | Joe | Stoffregen | Craig | Toth | Alex |
| Slough | Bryan | Stoffregen | Amy | Trgovac | Tracey |
| Smith | Dale | Stolfi | David | Troester | Caren |
| Smith | Rachael | Stolfi | Jennifer | TRUXALL | DEBRA |
| Smith | Shellie | Stoller | Zachary | Truxall | Gabe |
| Smith | Andrew | Stone | Lisa | Tufano | Julie |
| Smith | Collin | Stone | Derek | Tyler | Corinne |
| Smith | Tiffany | Stoner | William | Urban | Elizabeth |
| Smith | Jeanette | Stoner | Cristine | Vance | Megan |
| Smith | Daniel | Storch | William | Vance | Erin |
| Smith | James | Strope | Patricia | Vance | Matthew |
| Smith | Sara | Suber | Nancy | Vanderveen | Natalie |
| Smith | Robert | Sullivan | glen | Vanderveen | John |
| Smith | Elizabeth | sullivan | matt | VanFleet | Linda |
| Smith | Victoria | Sullivan | Kathryn | Vasey | Libby |
| Smitih | Maxine | Sunderland | Dorothy | Vaughn | Ralph |
| Snavely | Dan | Suter | Joanna | Ventresca | Jordy |
| Snavely | Tiffany | Suttle | Amanda | Ventresca | Jim |
| Snediker | Gertrude | Suttner | Andy | Vogel | Heidi |
| Sokolnicki | Paul | Sykes | Matthew | Vujnovic | Karen |
| Solomon | Miriam H. | Taber | Jennifer | Vukovich | Lauren |
| Song | Jing | Taddeo | Jaelith | Wagner | Susan |
| Spadafore | James | Taft | Curtis | Walker | Susan |
| Spaulding | Melissa | Talbert | Sharyn | Walsh | Ted |
| Sproul | Margaret | Tapocsi | Greg | Waltz | Jordan |
| Spurgeon | Tulia | Tapocsi | Emily | Wander | Karen |
| Srkadi | Myra | Taylor | Joan | Ward | James |
| Stafford | Jacqueline | Taylor | Scott | Warren | Kay |
| Stanich | Jennifer | Taylor | Karen | Watson | Alison |
| Stansbury | Emily | taylor | Kristen | Watts | Robert |
| Stanton | Mindy | Taylor | Joshua | Watts | Julie |
| Starkey | Dustin | Taylor | Cate | Webb | Lillian |
| Stasiak | Susan | Taylor-Miesle | Heather | Weber | Ron |
| Stazenski | Dave | Teresi | Scott | Weber | Melissa |
| Steckler | Michael J | Terman | Stacy | Webster | Chris |
| Steele | Patrick | Terrien | Patrick | Webster | Stephen |
| Steele | Jennifer | Tessier | David | Whalen | Heather |
| Stefan | Natalie | Tessier | Jane | Whalen | Kelly |
| Stefan | Brett | Teufel | Stefan | Wheeler | Gregory |
| Stegemiller | Robert | Teufel | Linda | White | Gary |
| Stegemiller | Mary | Teufel | Rainer | White | Christopher |
| Steigerwald | David | Thomas | Lousa Gabriella | White | Mark |
| Steigerwald | Susan | Thompson | Shan | White | Tracy |
| Steinbrink | Tom | Thompson | Keith | Whitman | Emily |

| Last Name | First Name | Last Name | First Name | Last Name | First Name |
|---|---|---|---|---|---|
| Wickham | Sarah | Bragg | Robyn | | |
| Widder | Nikki | Cooper-Whitman | Darci | | |
| Wiesner | Evelyn | Eganhouse | Jeff | | |
| Wilkerson | Rochelle L. | Litton | Stacey | | |
| Wilkins | Jonathan | Ryan | Dan | | |
| Wilkins | Mairi | Stoner | Cristine | | |
| Wilkinson | Molly | Thompson | Michael | | |
| Willard | Katie | Widder | Kyle | | |
| Williams | Charles | | | | |
| Williams | Dorothy | | | | |
| Williamson | Martin | | | | |
| Williamson | Janice | | | | |
| Willis | Laura | | | | |
| Wilson | Bryan | | | | |
| Windle | Cory | | | | |
| Winter | Mary & Chester | | | | |
| Wise | Nadine L. | | | | |
| Wise | Rachel | | | | |
| Wise | Isaac | | | | |
| Wise | Aaron | | | | |
| Wise | Elias | | | | |
| Withrow | David | | | | |
| Woltz | Erin | | | | |
| Woods | James | | | | |
| Woods, III | James | | | | |
| wooster | angela | | | | |
| Wooster | Matt | | | | |
| Worthington | Sara | | | | |
| Wright | Heidrun | | | | |
| Wright | Lisa | | | | |
| Yates | Colette A. | | | | |
| Yates | Michael | | | | |
| Yeager | Katie | | | | |
| Yitsis | Greg | | | | |
| Yitsis | Marisa | | | | |
| Yost | William | | | | |
| Yost | Linda | | | | |
| Young | Christine | | | | |
| Young | Randal | | | | |
| Young | Rhonds | | | | |
| Young-Grabo | Julie | | | | |
| Yount | Connie | | | | |
| Zedeker | Rob | | | | |
| Zedeker | Jennifer | | | | |
| Zevallos | Ann | | | | |
| Zevallos | Ulises | | | | |
| Zhang | Baowen | | | | |
| Zipfel | Travis | | | | |
| Zurovchak | Sandra | | | | |
| Schulhaus | Katherine | | | | |
| Alexander | Ned F. | | | | |
| Alexis | Meg | | | | |
| Allen | Charles R. | | | | |

## Appendix B: Excerpt from City's Cost-to-Serve Analysis, Scenario 4

This is pulled directly from the City's Cost-to-Serve analysis, conducted in 2018, studying 4 basic outcomes for the UMCH property development.

Scenario 4 is the closest to the PCPW Proposal.

### Scenario 4

| | Year 1 | Year 2 | Year 3 ... | Year 7 | Year 8 ... | Year 10 | Year 11 ... | Year 18 ... | Year 25 |
|---|---|---|---|---|---|---|---|---|---|
| **Expenditures** | | | | | | | | | |
| Stormwater & Site Engineering Consulting Fees | 35,000 | 35,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wesley Blvd. Plan Review & Insp. | 40,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Infrastructure Consulting Fees | 62,500 | 62,500 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Planning & Bldg Consulting Fees | 15,000 | 15,000 | 15,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| Public Area Fees | 20,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Fire Prevention | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Parks Capital Investment | 12,500 | 12,875 | 13,261 | 14,926 | 15,373 | 16,310 | 16,799 | 20,661 | 25,410 |
| Parks Maintenance Technician/Contract Assistance | 107,000 | 110,210 | 113,516 | 127,764 | 131,597 | 139,611 | 143,799 | 176,855 | 217,509 |
| Parks Supplies | 30,000 | 30,900 | 31,827 | 35,822 | 36,896 | 39,143 | 40,317 | 49,585 | 60,984 |
| Service & Engineering Services | 6,000 | 6,180 | 6,365 | 7,164 | 7,379 | 7,829 | 8,063 | 9,917 | 12,197 |
| **Total Expenditures** | **$328,000** | **$272,665** | **$179,970** | **$185,675** | **$191,245** | **$202,892** | **$208,979** | **$257,018** | **$316,099** |

*Note: These costs do not include the land acquisition and/or the development costs of the parkland.*

| **Revenue without Incentives** | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Permit Fees | 58,500 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Public Area Fees | 20,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Income Tax | 812,000 | 828,240 | 844,805 | 914,444 | 932,733 | 970,415 | 989,823 | 1,136,996 | 1,306,051 |
| Property Tax | 67,400 | 69,085 | 70,812 | 78,163 | 80,117 | 84,173 | 86,278 | 102,557 | 121,908 |
| **Total Revenue without Incentives** | **$957,900** | **$897,325** | **$915,617** | **$992,607** | **$1,012,850** | **$1,054,589** | **$1,076,101** | **$1,239,553** | **$1,427,959** |

| **Revenue with Incentives** | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Permit Fees | 58,500 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Public Area Fees | 20,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Income Tax | 649,600 | 662,592 | 675,844 | 731,555 | 932,733 | 970,415 | 989,823 | 1,136,996 | 1,306,051 |
| Property Tax | 19,400 | 19,885 | 20,382 | 22,498 | 23,061 | 24,228 | 86,278 | 102,557 | 121,908 |
| **Total Revenue with Incentives** | **$747,500** | **$682,477** | **$696,226** | **$754,053** | **$955,793** | **$994,643** | **$1,076,101** | **$1,239,553** | **$1,427,959** |

**Assumptions**

Expenditures will increase 3% annually

Income tax revenues will increase 2% annually

Property tax revenues will increase 2.5% annually

Income tax incentive will end after seven years

Property tax incentive will end after ten years

Appendix C: Excerpt from Lancet Medical Journal

# Green spaces and mortality: a systematic review and meta-analysis of cohort studies

David Rojas-Rueda, Mark J Nieuwenhuijsen, Mireia Gascon, Daniela Perez-Leon, Pierpaolo Mudu

## Summary

**Background** Green spaces have been proposed to be a health determinant, improving health and wellbeing through different mechanisms. We aimed to systematically review the epidemiological evidence from longitudinal studies that have investigated green spaces and their association with all-cause mortality. We aimed to evaluate this evidence with a meta-analysis, to determine exposure-response functions for future quantitative health impact assessments.

**Methods** We did a systematic review and meta-analysis of cohort studies on green spaces and all-cause mortality. We searched for studies published and indexed in MEDLINE before Aug 20, 2019, which we complemented with an additional search of cited literature. We included studies if their design was longitudinal; the exposure of interest was measured green space; the endpoint of interest was all-cause mortality; they provided a risk estimate (ie, a hazard ratio [HR]) and the corresponding 95% CI for the association between green space exposure and all-cause mortality; and they used normalised difference vegetation index (NDVI) as their green space exposure definition. Two investigators (DR-R and DP-L) independently screened the full-text articles for inclusion. We used a random-effects model to obtain pooled HRs. This study is registered with PROSPERO, CRD42018090315.

**Findings** We identified 9298 studies in MEDLINE and 13 studies that were reported in the literature but not indexed in MEDLINE, of which 9234 (99%) studies were excluded after screening the titles and abstracts and 68 (88%) of 77 remaining studies were excluded after assessment of the full texts. We included nine (12%) studies in our quantitative evaluation, which comprised 8 324 652 individuals from seven countries. Seven (78%) of the nine studies found a significant inverse relationship between an increase in surrounding greenness per 0·1 NDVI in a buffer zone of 500 m or less and the risk of all-cause mortality, but two studies found no association. The pooled HR for all-cause mortality per increment of 0·1 NDVI within a buffer of 500 m or less of a participant's residence was 0·96 (95% CI 0·94–0·97; $I^2$, 95%).

**Interpretation** We found evidence of an inverse association between surrounding greenness and all-cause mortality. Interventions to increase and manage green spaces should therefore be considered as a strategic public health intervention.

**Funding** World Health Organization.

**Copyright** © 2019 World Health Organization; licensee Elsevier. This is an Open Access article published under the CC BY 3·0 IGO license which permits unrestricted use, distribution, and reproduction in any medium, provided the original work is properly cited. In any use of this article, there should be no suggestion that WHO endorses any specific organisation, products or services. The use of the WHO logo is not permitted. This notice should be preserved along with the article's original URL.

View the full article here: https://www.thelancet.com/journals/lanplh/article/PIIS2542-5196(19)30215-3/fulltext