# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **LIFESTYLE COMMUNITIES, LTD**., *et al.*, | ) | Civil Action 2:22-CV-1775 |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Judge Sarah D. Morrison |
| | ) | |
| **CITY OF WORTHINGTON, OHIO**, | ) | |
| | ) | |
| Defendant. | ) | Magistrate Judge Elizabeth P. Deavers |
| | ) | |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# EXHIBIT 13

*LIFESTYLE COMMUNITIES*

*vs.*

*CITY OF WORTHINGTON*

---

Deposition of

**Peter Bucher**

October 10, 2023

---



614.460.5000 | www.priohio.com | pri@priohio.com

1

     IN THE UNITED STATES DISTRICT COURT

2　　　　SOUTHERN DISTRICT OF OHIO
            EASTERN DIVISION

3


4  LIFESTYLE COMMUNITIES,　　　)
  LTD., ET AL.,　　　　　　　)

5　　　　　　　　　　　　　　)
      Plaintiffs,　　　　)

6　　　　　　　　　　　　　　)
      vs.　　　　　　　　)　Case No.

7　　　　　　　　　　　　　　)　2:22-cv-1775
  CITY OF WORTHINGTON,　　　)

8  OHIO,　　　　　　　　　　)
               )

9　　　　Defendant.　　　　　)


10


11


12　　　　　　　　　DEPOSITION


13　　　　　　　　of PETER BUCHER


14


15　　　　Taken at Worthington City Hall
         6550 North High Street

16　　　　Worthington, Ohio 43085


17　　　on October 10, 2023, at 9:26 a.m.


18


19　　　Reported by: Rhonda Lawrence


20


21　　　　　　　　　-=0=-


22


23


24

```
 1   APPEARANCES:

 2

         Christopher L. Ingram
 3       Emily J. Taft
         VORYS SATER SEYMOUR AND PEASE LLP
 4       52 East Gay Street
         Columbus, Ohio 43215
 5       614.464.5480
         clingram@vorys.com
 6       ejtaft@vorys.com

 7           on behalf of the Plaintiffs.

 8

         Paul J. Schumacher
 9       DICKIE McCAMEY
         600 Superior Avenue East, Suite 2330
10       Cleveland, Ohio 44114
         216.390.1795
11       pschumacher@dmclaw.com

12           and

13       Richard J. Silk, Jr.
         DICKIE McCAMEY
14       10 West Broad Street, Suite 1950
         Columbus, Ohio 43215
15       614.258.6000
         rsilk@dmclaw.com
16
             on behalf of the Defendant.
17

18

19

20

21

22

23                   -=0=-

24
```

1                    STIPULATIONS

2              It is stipulated by and among counsel

3    for the respective parties that the deposition

4    of PETER BUCHER, the Witness herein, called by

5    the Plaintiffs under the applicable Rules of

6    Federal Civil Court Procedure, may be taken at

7    this time by the stenographic court reporter and

8    notary public pursuant to notice; that said

9    deposition may be reduced to writing

10   stenographically by the court reporter, whose

11   notes thereafter may be transcribed outside the

12   presence of the witness; and that the proof of

13   the official character and qualification of the

14   notary is waived.

15                    -=0=-

16

17

18

19

20

21

22

23

24

1                    INDEX OF EXAMINATION

2                                                    PAGE

3    BY MS. TAFT:                                    5

4

5

6                     INDEX OF EXHIBITS

7    EXHIBIT             DESCRIPTION               PAGE

8     1      Land Use Plan                          16

9     6      Ordinance No. 04-2022                  61

10    7      Resolution No. 04-2022                 69

11    8      Minutes, 2-7-22                        82

12    9      Minutes, 1-18-22                       73

13    10     Agenda, 1-18-22                        63

14    30     Email from Greeson to                  39
             Jenkins, 3-9-20
15
      31     Florey Todd Summary of Phases          41
16           for Development of the UMHC
             Property
17
      39     Email chain                            27
18
      40     Email from Greeson, 1-31-20            30
19
      41     City Council Minutes, 9-21-20          32
20
      42     Email chain                            43
21
      43     City Council Minutes,                  54
22           12-13-21

23

24

1  the Tucker Creek acreage is a highly desirable

2  component of any outcome.  Commercial

3  development aimed at revenue generation for the

4  city and select service-oriented retail that is

5  compatible with the development is highly

6  desirable along High Street, roughly in

7  conformity with the existing C-2 and C-3 zoned

8  areas.  Residential housing, though requiring

9  rezoning, is desirable if it is creatively

10  executed and whether embedded within the

11  commercial areas of freestanding --

12         MR. SCHUMACHER:  Or.

13     A.   -- or freestanding is harmonious in

14  overall mass and scale form and impact around

15  surrounding communities -- upon surrounding

16  communities.

17         MR. SCHUMACHER:  It says neighborhoods.

18     A.  Oh, neighborhoods.  Excuse me.

19     Q.  Looking at the first component, what

20  does large contiguous green space mean?

21         MR. SCHUMACHER:  Objection.

22     A.  I think it's pretty well spelled out

23  what large contiguous green space means.

24     Q.  What does it mean?

1       A.  Large contiguous green space.

2           MR. SCHUMACHER:  I'm sorry.

3       Q.  So you're saying the definition is the

4   term itself?

5       A.  Yes.

6       Q.  How many acres does that mean?

7       A.  It's not spelled out.

8       Q.  How many acres does large contiguous

9   green space mean?

10      A.  We don't have a definition for it.  You

11  can see it right here.

12      Q.  What does central to the property mean?

13      A.  The physical location where it would be

14  most desirable on a future project.

15      Q.  Which is where?

16      A.  The center.

17      Q.  The very center of the property?

18      A.  Generally speaking.

19      Q.  Desirable to who?

20      A.  The community.

21      Q.  The community that was involved in

22  drafting the resolution?

23      A.  The community who us as individual

24  councilmembers represent.

1   and the indication that there are additional

2   documents to be produced, I am leaving your

3   deposition open as I may have more questions for

4   you once that's exhausted.

5           THE WITNESS:  Okay.  Thank you.

6                      -=O=-

7           Thereupon, the testimony of October

8   10, 2023, was concluded at 11:17 a.m.

9                      -=O=-

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1                              CERTIFICATE

2    STATE OF OHIO      :
                             SS:
3    COUNTY OF FRANKLIN :

4           I, Rhonda Lawrence, a stenographic
     court reporter and notary public in and for the
5    State of Ohio, duly commissioned and qualified,
     do hereby certify that the within-named PETER
6    BUCHER was first duly sworn to testify to the
     truth, the whole truth, and nothing but the
7    truth in the cause aforesaid; that the testimony
     then given was taken down by me stenographically
8    in the presence of said witness, afterwards
     transcribed; that the foregoing is a true and
9    correct transcript of the testimony; that this
     deposition was taken at the time and place in
10   the foregoing caption specified.

11          I certify that I am not a relative or
     employee of any attorney or counsel employed by
12   the parties hereto and that I am not financially
     interested in the action.  I further certify
13   review of the transcript was not requested.

14          In witness whereof, I have hereunto
     set my hand at Columbus, Ohio, on this 24th day
15   of October, 2023.

16

17

18

19

20
                 *Rhonda Lawrence*
21               Rhonda Lawrence
22               Notary Public, State of Ohio

23   My commission expires:  October 9, 2028

24



# City Council Agenda

## Minutes

**Monday, September 21, 2020 at 7:30 pm**

**6550 N. High Street, Worthington, Ohio 43085**

### Virtual Meeting Information

Link through: worthington.org

Our Government – Live Stream

1. **Call to Order**

   **Minutes:**

   Worthington City Council met remotely in Regular Session on Monday, September 21, 2020, via Microsoft Teams video conference. President Michael called the meeting to order at or about 7:30 p.m.

2. **Roll Call**

   **Minutes:**

   **Members Present**: Peter Bucher, Rachael R. Dorothy, Beth Kowalczyk, Scott Myers, David Robins, Douglas K. Smith, and Bonnie D. Michael

   **Member(s) Absent**: None

   **Also Present**: City Manager Matt Greeson, Assistant City Manager Robyn Stewart, Law Director Tom Lindsey, Director of Finance Scott Bartter, Director of Service & Engineering Dan Whited, Director of Planning & Building Lee Brown, Director of Parks & Recreation Darren Hurley, Chief of Police Robert Ware, Chief of Fire & EMS Mark Zambito, Clerk of Council D. Kay Thress

3. **Pledge of Allegiance**

   **Minutes:**

   President Michael invited all to stand and join in reciting the Pledge of Allegiance to the flag.

4. **Visitor Comments**

   **Minutes:**

   There were no visitor comments.



# Special Presentation(s)

5. **Community Visioning Update**

   **Minutes:**

   Mr. Sherman updated Council that the Visioning Committee has met three times since his last update. A youth-focused survey was sent out and they received back 405 responses from the young people. We asked them what sort of community they would find themselves in 5-10 years, and a third said that they wanted to be in Worthington or a community like Worthington. They said that the community they want to live in needed to be diverse and open minded. These young people really dug in and it was a great process with them. The Committee also had meetings with the Lions Club and the Community Relations Commission. With David McCorkle's help, we had 12 business leaders surveyed and we learned from them that location is important, as are abatements and incentives, and public private partnerships are necessary. They heard very positive comments, and business leaders were upbeat about economic development opportunities. Committee members also attended the Farmers Market for two weekends with the goal to raise awareness, which they were able to do.

   The bigger community survey has been ongoing for two months and recently concluded. There were a couple common themes which include maintaining the historic integrity of Worthington, keeping the lines of communication open, and engaging all points of. Many people just said to, "Get something done", "Make decisions about the UMCH property", or to "Look at Dublin". The results of the survey will be a part of the final report.

   There are also several new and expanded pages on the website for people to participate and there has been a very nice uptick in traffic to the website.

   The Committee has 50 days left until the presentation to Council on the 9th of November. The Committee has talked about the draft vision process and where we want to go. A mailer was sent to all Worthington households that listed all six of the vision statements and the supporting principles. We included a postage paid return envelope for filling out and returning the mailer, or there is a QR code that will take people to the website and directly to the survey. We will then have an open online session to go through the draft visions and review them where people will break into small groups and really dig into the details. The goal will be to conclude by updating these vision statements again and a final version will go on the website. Moving towards the November Council presentation, the Committee is committed to hearing from the community.

   Mr. Robinson commended the Committee for their work, stating how he is pleased with their work. He asked if a mailer was sent out and who is that going to. Mr. Sherman responded that it is a mailer of the six visions and principles and that is

going to every household. Residents should see that in their mailboxes shortly. Mr. Robinson questioned if the objective is to get people to respond either via the mailer or online. Mr. Sherman said that is correct, people can say whether they agree or disagree with the vision statements and write what they would add. That can also be done on the website. Mr. Robinson asked if this is in addition to the previous survey that was put out to the public. Mr. Sherman replied that there was the public survey, and the Committee included pieces and parts that they heard from that in the draft statements. The public survey has been closed as of August 31st. Mr. Robinson asked if the students were high school students and what schools were they from. Mr. Sherman said that it included students from both high schools. Mr. Robinson asked about the businesspersons who were surveyed and if they said anything about why they located in Worthington. Mr. Sherman said they did ask that.

# Approval of the Minutes

6. **Approval of Minutes**
    a. **Meeting Minutes - September 8, 2020**

    **Minutes:**
    **MOTION:** Mr. Bucher moved, seconded by Ms. Kowalczyk to approve the meeting minutes as presented.
    **The motion passed unanimously by a voice vote.**

# Public Hearings on Legislation

7. **Ordinance No. 32-2020 Boundary Adjustment NE Gateway**
    Agreeing to the Adjustment of the Boundaries between the City of Columbus and the City of Worthington by Consenting to the Transfer from the City of Columbus to the City of Worthington of Approximately 2 acres and the Transfer from the City of Worthington to the City of Columbus of approximately 1.3 acres located in the Vicinity of the Intersection between Lakeview Plaza Boulevard, Sanctus Boulevard, and Worthington-Galena Road.

    **Minutes:**
    Mr. Greeson described how we are excited to get this project underway and a lot of staff have worked very hard on this.
    Mr. Lindsey explained that this legislation was introduced in July and tabled due to the need to record a deed after obtaining a property from Anheuser-Busch, but now we are prepared to move forward. There are three parcels involved in this boundary adjustment. The road is a split road, half in Worthington and half in Columbus. Two other parcels will also transfer hands. Worthington will transfer a portion of the roadway that was split to Columbus and receive two parcels. After the Worthington City Council acts, this will still require action from both the Columbus City Council and from Franklin County.
    **MOTION:** Mr. Smith moved, seconded by Mr. Myers to remove Ordinance No. 32-

2020 from the table.

**The motion passed unanimously by a voice vote.**
**MOTION:** Ms. Dorothy moved, seconded by Mr. Robinson to accept the revised
property descriptions as amended.
**The motion passed unanimously by a voice vote.**
**There being no additional comments, the clerk called the roll on Ordinance**
**No. 32-2020.**
**Vote results:** Ayes: 6 / Abstentions: 1 / Nays: 0

8. **Ordinance No. 35-2020 Stafford Village Subdivision**
Approving the Subdivision of Property, Vacating/ Extinguishing an Existing Sewer Easement, and Accepting a
New Sewer Easement (Northeast Corner of Hartford Street and East Stafford Avenue).

**Minutes:**
Mr. Brown described how this request is part of the final subdivision plat to
combine ten separate legal parcels to create one new lot of record. We will be
plotting a new 20ft easement dedicated to the City as part of the project with a 12ft
sewer line. With the new buildings constructed, the sewer will come in from the
east and connect near Hartford. This meets all statutory requirements and was
recommended for approval to City Council by the Municipal Planning Commission.
Mr. Robinson asked what is the purpose of combining these lots and is it necessary.
Mr. Brown responded that it is required, as we would not allow buildings to cross
multiple property lines. The code requires the lots be combined. We are having the
applicant relocate the sewer line to give better protection. Mr. Robinson asked
whether this does anything regarding setbacks, or any other effects related to
neighboring properties. Mr. Brown explained that everything that was approved
with the setbacks in February remains.
Ms. Dorothy asked if this was the last approval process before construction can
begin. Mr. Brown replied that they just need to make application for their permit.
This is part of the final stages of the PUD that requires public hearing. They are still
ready to go with an 18 month construction period starting in January.
**There being no additional comments, the clerk called the roll on Ordinance**
**No. 35-2020.**
**Vote results:** Ayes: 7 / Nays: 0

9. **Ordinance No 36-2020 Granting an Easement to Quikrete**
Granting a Non-Exclusive Easement to The Quikrete Companies, LLC and Authorizing the City Manager to
Enter into an Easement Agreement to Allow for the Use of a Portion of the Huntley Bevd Park property.

**Minutes:**
Mr. Greeson shared that Council will need to table this, as staff is still working out
the details with the company. In general, when this comes forward the goal is to
reduce some of the stacking that occurs on Huntley, creating a safer situation.

Mr. Lindsey expressed that he is 90% confident that we will have this agreement

ready in time for the October 5th meeting.

Mr. Myers stated that we have been down this road before, several years ago the same proposal was floated, and we granted the easement. Mr. Lindsey replied that was slightly different, it was a land lease that involved a slight difference in what they were doing with their property. After Council approved that land lease agreement, the company decided not to move forwards. In the past several years they have experienced additional accidents that occurred due to the stacking on Huntley. They will be bearing the cost of the improvements at the Huntley Bowl access road. A 25-year easement is being proposed.

**MOTION:** Mr. Bucher moved, seconded by Ms. Kowalczyk to table Ordinance No. 36-2020.

**The motion passed unanimously by a voice vote**

# New Legislation to Be Introduced

### 10. Ordinance No. 37-2020 Accept Amounts and Rates by Franklin County Budget Commission

Accepting the Amounts and Rates as Determined by the Budget Commission and Authorizing the Necessary Tax Levies and Certifying Them to the County Auditor and Declaring an Emergency.

**Minutes:**

**Ordinance No. 37-2020 was introduced by Mr. Smith**

Mr. Bartter detailed how this legislation continues the imposition of 5 mills of property tax and is an annual housekeeping item to meet a statutory deadline. Mr. Robinson asked why this is being done as an emergency. Mr. Bartter responded that we just received the information from Franklin County to fill in the blanks. Ms. Dorothy asked when was the last time that we changed our property tax millage. Mr. Bartter answered that it was changed in 2007 from 3 mills to 5 mills. Ms. Dorothy asked if we could increase that millage without voting. Mr. Bartter explained that Council could agree to increase up to 8 mills without a vote. Ms. Dorothy asked how much of the total property goes to City. Mr. Bartter explained that the City gets 5.5% of property taxes, and 68% goes to the school district. Mr. Robinson asked if that split has been standard. Mr. Bartter responded that split has been consistent.

**There being no additional comments, the clerk called the roll on Ordinance No. 37-2020. The motion carried by the following vote:**

**Vote results:** Ayes: 7 / Nays: 0

**MOTION:** Mr. Myers moved, seconded by Mr. Robinson to pass ordinance No. 37-2020 as an emergency.

**There being no additional comments, the clerk called the roll on Ordinance No. 37-2020 as an emergency. The motion carried by the following vote:**

**Vote results:** Ayes: 7 / Nays: 0

11. **Ordinance No. 38-2020 Alley Name Change (From No Name Alley to Gillman Alley)**

Changing the Name of the Alley Between Linworth Road and Hutchinson Road Currently Known as No Name Alley to Gillman Alley

**Minutes:**

**Ordinance No. 38-2020 was introduced by Mr. Robinson**

The Clerk was instructed to give notice of a public hearing on said ordinance(s) in accordance with the provisions of the City Charter unless otherwise directed.

# Reports of City Officials

12. **Policy Item(s)**

    a. **Letter of Support for Federal Funding - SR-161 & Linworth Intersection Project**

    **Minutes:**

    Mr. Greeson described how a few years ago, we entered into a study with MORPC, ODOT, Franklin County, Perry Township, and Columbus to look at how to improve the area around SR 161, which has been desired to be improved for decades for vehicles and bike and pedestrian accommodations. The number one project that has been recommended to move forward is the Linworth-161 intersection improvement. We have been working with project partners to explore an application for attributable funding from MORPC. Attributable funding are dollars coming from the federal government into the region for transportation projects. We can apply to MORPC to gain access to these dollars.

    Ms. Stewart explained how the Transportation Improvement District (TID) is in the process of finalizing the application due in October and we are working on the final pieces with them. They have asked each of the jurisdictions to submit letters of support and to indicate support for the local match required for federal funds. It is projected to be about $500,000 for design and ODOT is offering to cover the design costs. From there, it will be about $5-6 million for utility/row needs, and $2.5 million for construction. For federal funds, the local match is supposed to be 20%. It is being proposed that Worthington provide 50% of the local match since we have 65% of the frontage. Staff proposes indicating support of up to $800,000, which is anticipated to come from the Linworth TIF. We can also pursue OPWC funds, which if we are successful will further offset the 20% local match.

    President Michael asked if this grant is approved, when would we be seeing the design and construction. Ms. Stewart explained the federal funding window is 2025-2026 and design would most likely be in the 2023 timeframe. Ms. Dorothy asked to be reminded of the overall concept for this stretch of

road. Ms. Stewart explained that it included the addition of turn lanes, signal upgrades, alignment optimization, a shared use path on the southside, and sidewalk on the northside and on Linworth road. There would be a three lane roadway with a bidirectional turn lane in the middle along with sidewalks and shared use path. Ms. Dorothy explained that the other caveat was that because we were not going under the railroad tracks, there will still be a lot of queues no matter what with the trains. Ms. Stewart replied that this does not involve a grade separation due to the significant impacts on the businesses and other properties in the area. Ms. Dorothy shared she happy we agreed with the three lane concept and we are adding shared use paths and sidewalks, but she is not happy with the prioritizing of vehicular traffic. Mr. Greeson explained that the study only looked at the western edge of the Olentangy River Road intersection to Sawmill. He would forecast for the future that our next opportunity for improvement of traffic movement and possibly bike and pedestrian accommodations is in the Olentangy River Road intersection. After we accomplish this project, that may be the next one we talk about a number of years down the road.

**MOTION:** Mr. Bucher moved, seconded by Ms. Kowalczyk to approve of staff sending a letter of support.

**The motion passed unanimously by a voice vote**

## 13. Discussion Item(s)

### a. Trick-or-Treat Policy

**Minutes:**

Mr. Greeson presented how the City has had a practice adopted by Council of holding trick or treat on the actual calendar date of Halloween. That differs from much of the region where MORPC was asked to facilitate an agreement about what would happen in communities when trick or treat falls on a Saturday or Sunday. If so, it is then rescheduled for Thursday, which this year is on October 29th. In normal years, that is aimed to avoid Friday night football, Saturday night Buckeye games, and various other festivities. We have received recommendations to move trick or treat to that Thursday from various health leaders. If all communities are on the same date, you will not see people moving from community to community trick or treating, and we can avoid an influx of folks coming into Worthington when trick or treat is on a Saturday. It is staff's recommendation to move it to Thursday, October 29. Mr. Myers asked if this recommendation is for 2020 or for all years going forwards. Mr. Greeson replied that staff thinks it makes sense to do this going forward to be consistent with the regional agreement, but it has been Council preference to maintain on the 31st. Mr. Myers expressed that he understands

with the current health situation it makes sense to move to Thursday night. However, he also has admiration for Dr. Chosy and his intense lobbying that Halloween should be on Halloween. For stated reasons, he supports the move this year, but it is appropriate to open the debate next year.

Mr. Greeson explained how one question has been how do we do trick or treat and what are the health recommendations given COVID. Staff has distributed the Ohio Department of Health (ODH) guidelines as well as the Columbus Public Health (CPH) recommendations related to trick or treat. These will also be posted and available online.

Mr. Robinson questioned how the health guidelines conform or do not conform with our own mask policy. Mr. Greeson explained that they recommend people wear a facemask, except for children under 2 years of age or those with medical conditions. It is recommended to do trick or treat with your family, making sure that a mask covers both the nose and mouth, avoiding doors with clusters of people, participate in outdoor activities, bring hand sanitizer to use, wash your hands, and only take wrapped candy/treats. We are appreciative of ODH and CPH for putting guidelines out that help shape how our communities can have a fun and safe Halloween.

**MOTION:** Mr. Bucher moved, seconded by Ms. Kowalczyk that for 2020 Trick-or-Treat occur on October 29.

**The motion passed unanimously by a voice vote**

b. **Possible Council Retreat Dates**

   **Minutes:**

   Mr. Greeson stated that there was an email sent out last week with some possible dates in January to hold a retreat. Of the five Councilmembers who responded, they were all were happy with 8th and 9th of January.

c. **Virtual vs. In-Person Meetings**

   **Minutes:**

   President Michael asked Councilmembers whether they should continue meeting virtually or is it time to meet back in person. Mr. Robinson asked how that would be managed. Mr. Greeson replied that not all of the logistics are worked out yet. If we choose to go back in person, other jurisdictions are requiring members of the public to sign up in advance by noon the day of. Then they are bringing people in one at a time in order to provide their in-person testimony. It could be possible to have some number of the public in the chambers if social distanced, but on bigger issues that would be difficult to determine who gets in and who does not. The fairest way would be to have a sign up system that is first come first served. That ensures we do not have a

large number in the room at any one time.

Ms. Kowalczyk asked if we would restrict the ability to submit comments by phone which has been more accessible for people to contribute. Mr. Greeson replied that we could still have people submit in writing and read that into the record. It would be technologically challenging to manage a "hybrid" meeting with both in-person and virtual participation. However, we would still stream everything, and that access would be available.

Mr. Myers wondered if there are other communities that have gone back live in-person. Mr. Greeson responded that Dublin, Westerville, and the Worthington School District have gone back in-person. Mr. Lindsey explained how a number of cities never went to completely virtual and they met in their chambers. Other cities came back sooner. The state orders never address public meetings. It is his understanding that Summit County was informed by email from ODH that they consider council meetings the exercise of a first amendment government meeting that falls under one of their provisions.

Ms. Kowalczyk asked if councilmembers would be wearing masks. Mr. Greeson stated that masks are mandatory. Ms. Kowalczyk expressed that it is probably more difficult to communicate with a mask on in person. There is no reason to go back in person. She does not see why we would change anything at this point. The school board was doing a hybrid model for a while with some members of school board coming in virtually. Mr. Lindsey described how trying to do both in the format we currently do it in with Teams and streaming, there were some complications to do that effectively without feedback. If members want to go live and have some telephone contact, we could figure it out. Part of the discussion about coming back in person included the development of plexiglass shields and that council would be spread out. Mr. Greeson noted that we would bring in the staff members making presentations or have the public speaking individually to limit the number of people in the room.

Mr. Myers expressed how he very much misses in-person meetings. He finds it difficult to conduct business by staring at a picture as opposed to having an interaction with someone, it is not effective governance or business. He understands the realities of what we are facing, but he would like to move back to in-person interaction as quickly as feasible and safe.

Mr. Robinson asked if we do go back in person would we also be wearing masks the entire time and would it be optional to not wear mask when talking. Ms. Thress described how the barriers would be so you do not have to wear mask and you would be protected by dividers and able to look around the room and see everyone. Mr. Robinson conveyed that he shares Mr. Myer's desire to look at one another and communicate in person, but he also

resonates with Ms. Kowalczyk's thoughts. He is neutral and could go either way.

Mr. Bucher suggested waiting one more month to flesh out details, but he encouraged having a phone dial-in option for those unable to attend in person.

Mr. Greeson stated that he hears the desire to write up operations plan for this, but there are mixed opinions on coming back in-person or with any specific timing.

President Michael requested to have this brought up again month to month to discuss more.

Mr. Greeson highlighted that included in the MPC package is the High North project which is the redevelopment of the Worthington Mall. This Thursday, Sept 24th will be the first opportunity for members of the public to hear about that proposal in more detail from the applicant and provide comment as well as opportunity for the applicant to receive feedback from the public and the MPC.

Mr. Robinson asked if or when Councilmembers will have a direct dialogue with the proposal. Mr. Greeson explained that they are planning to come back in town in early October and they would be willing to engage. Mr. Brown explained they are open to having the public discussion and are more than willing to discuss their project and proposal with anyone in the community if possible.

## Reports of Council Members

14. **Reports of Council Members**

   **Minutes:**

   Mr. Bucher touched on the Community Energy Savers campaign which is ending at end of September. We have had notable jumps in the unofficial numbers, and it is estimated we are about 93% of the way to AEP point goal and 82% towards the Columbia Gas goal. He is thankful for all the community members who have worked on this and encourages everyone to go to CommunityEnergySavers.com/Worthington and register to help us get $60,000 in grants for our small businesses. He brought up the voter registration deadline on Oct 5 and asked for a summary of the requirements and guidance from the state about health and safety for voting as we head towards November 3rd.

   Ms. Kowalczyk encouraged people to fill out their Census, which has a huge impact on funding, district drawing and stuff like that. The deadline to do it online is coming up soon.

   Mr. Smith shared that he likes the new agenda format.

   Mr. Myers passed on compliment from a citizen about the improvements to Hardy

Way, there was a circle that has now been turned into a football to make it easier for all traffic to get around.

Ms. Dorothy shared a compliment to the Service and Engineering team who are nearing the homestretch for all the different trials of traffic slowing down on Foster. She appreciates the work and thoughtfulness put into slowing down the traffic and she looks forward to the final results.

Mr. Robinson explained how he sent out an email regarding the Comprehensive Plan, specifically the 2014 UMCH update. At the turn of the year, it was brought up by Council whether the UMCH Comprehensive Plan update was serving us well or not, or whether we could talk about it at the retreat. However, COVID threw those plans out the window. He feels that now we are back in session, we ought to reconsider that. He is aware that there is a window of opportunity prior to the time when there might be an active proposal before the City, we do not know how long that window will be open. It is important to recognize the present situation that we have an existing plan and were there to be a proposal to come before the City, staff would be obligated to refer to that plan. He does not think that is a desirable position for the City to be in. Staff would be facilitating a proposal, consistent to a plan that bears similarity to the plan from 2015. In essence by doing nothing, the City is not in a neutral position, and it would essentially be an ongoing endorsement of the 2014 plan.

In his email, he suggested essentially suspending temporarily the efficacy and the effect of the plan for several reasons. First, the update is already old in terms of years and content. Events have happened over the past 7 years, which Visioning acknowledges that. The Comprehensive Plan should acknowledge and reflect these changes taking place. Next, the current plan does not enjoy the consensus status it claims for itself and threatens to sour the mood of public. By suspending, it would clear the air, creating psychological space to move on in open minded manner, by not having to defend or refer to the 2014 plan. Finally, the City can avoid being placed in a vulnerable position. There are three legal options: moratorium, repeal, and temporary suspension. He believes the temporary suspension would be desirable, and he would like to discuss that.

Mr. Myers conveyed that he would be a little troubled by entertaining a motion to suspend, rescind or set aside a document that was literally years in the making on a non-agenda item, at the end of the meeting, without input from the public or staff, or any advance notification. He is fine to set this as an agenda item in October, but he does not feel prepared to enter into a discussion, and it lacks transparency at this time.

Mr. Smith stated that with a discussion coming up, it might make sense to do what Mr. Robinson is proposing so we can have a conversation about the property itself.

We need to have reasonable conversations and the only way to do that is something like what Mr. Robinson is proposing.

Ms. Kowalczyk said she is concerned about the way it is set up right now, and Mr. Myers described it accurately that this is a precedent that we will have to set and we are going to set it aside when it is not appropriate for a particular discussion. She is concerned that there have been allegations about the plan that she would like to hear more details about from staff and others, specifically about what the impact of the plan is. There are questions that we need to have all the information to in order to have this discussion.

Ms. Dorothy asserted that she is not prepared to have this discussion tonight. She is concerned what weight our plans hold if they are or are not there. She wants more public input. It was quite a process for each comprehensive plan and the outreach involved. We are also in the middle of a visioning process that will get us to another iteration of the comprehensive plan. She is not ready to throw away all the work we have already done for the comprehensive plan as it stands now.

Mr. Bucher expressed that he would be supportive of this approach granting it provides us with the greatest flexibility. He is a little concerned about the time of us being at the last meeting of the month, and there may be an application made. But there definitely needs to be community discussion. However, it gives us pause for concern given where we are in certain projects.

Mr. Myers posited that if we do suspend, then we would have no comprehensive plan for UMCH, and we revert back to the original language that includes no height restrictions, no commercial on the front, or residential on the back. We are now wide open. Keep in mind, this is a planning document. If Council or MPC were to contradict the planning document, that could give Lifestyles an argument on appeal. It is not law; it is just guidance. Other than a desire for a park, and the opposition to rental properties, he has not heard specific objections to the current comprehensive plan. There is no reason to rush through a hasty decision.

Mr. Robinson asserted that this is not hasty or rushed. This issue has been the most discussed in our City in recent history. This proposal is not about the substance of the plan itself. This is a complex and divisive issue. Some things can be written into the resolution and this suspension could be revoked at any time. Mr. Myers stated that he has not heard complaints about the specifics about the plan, we have heard complaints about the use of the property. There are no complaints about the height or mix. Mr. Robinson explained that we are setting ourselves up by retaining the existing 2014 plan and if it is in place when a proposal is made, there will be many folks who will question what City Council has done for 5 years. He urged Council to do something to clear the air and allow for free thinking unencumbered by the 2014 update. He welcomes discussing this in October.

Mr. Smith stated that he likes Mr. Robinson's proposal if there is a sunset.

Mr. Lindsey detailed how a moratorium option most parallels what communities consider in a situation like this, by providing a period to consider changes in zoning and the comprehensive plan. Some cities will act on an emergency basis to put moratorium in place. The suggestion of a suspension and the impact on the comprehensive plan is a new twist and the repeal of the entire comprehensive plan would be the closest analogy to suspension. A suspension while temporary would essentially leave no particular guiding document for the properties named in suspension. The suspension in of itself does not change the zoning of the property. A resolution to suspend a portion of the comprehensive plan could have a specific effective date or conclusion date, and could be subject to some other action, such as some period of time after the Visioning Committee submits their report. A moratorium could be open ended. A suspension is slightly different and there is some concern a court would view it like a moratorium.

Ms. Kowalczyk asked if there is a suspension would we revert to what was there prior to the 2014 comprehensive plan. Mr. Lindsey replied that in general a repeal of a provision would revert to what was in place prior to the repeal. If you were to suspend any or all comprehensive plans prior to this property, you would be left only with zoning.

Mr. Greeson explained that there may be a provision in the comprehensive plan that speaks to housing in general that might still be applicable. The Stafford Village site did not have specific comprehensive plan language but was reviewed with some application of other language. Mr. Lindsey explained that the question is with any moratorium prompted, there is a legal process to accomplish and consideration of what degree of transparency or process you want to go through to get to that. Mr. Robinson asked if this could be made an agenda item in early October. Ms. Kowalczyk stated that makes her feel better and is more transparent. Mr. Greeson described how the risk is that we get an application prior to then, and it would then fall under the existing guidelines. Mr. Smith asked if staff could inform any potential applicant of that possibly. Mr. Greeson replied they could do that. Mr. Robinson asserted that he is all for transparency and this is a proposal for merely a suspension. With that said, he appreciates this will be talked about in October.

# Other

# Executive Session

15. **To consider the compensation of public employees**

   **Minutes:**

   **MOTION:** Mr. Myers moved, seconded by Ms. Dorothy to go into executive session for the purpose of compensation of public employees.

   **Vote results:** Ayes: 7 / Nays: 0

Council adjourned to executive session at 9:39 p.m. from the Regular meeting session.

**MOTION:** Mr. Robinson moved, seconded by Ms. Kowalczyk to return to open session at 10:23 p.m.

Vote results: Ayes: 7 / Nays: 0

# Adjournment

16. **Motion to Adjourn**

   **Minutes:**

   **MOTION:** Mr. Bucher moved, seconded by Mr. Smith to adjourn.

   President Michael declared the meeting adjourned at 10:24 p.m.

Contact: D. Kay Thress, Clerk of Council (Kay.Thress@worthington.org 614-436-3100) | Minutes published on 10/01/2020, adopted on 10/05/2020

__/s/ Ethan C. Barnhardt_____
Management Assistant

__/s/ Bonnie D. Michael_____
Council President

| | |
|---|---|
| **From:** | Stewart, Robyn |
| **To:** | Thress, D. Kay |
| **Subject:** | FW: [EXTERNAL] Fwd: process for city acquisition of UMCH, etc., from zoning lawyer |
| **Date:** | Monday, January 24, 2022 4:57:38 PM |
| **Attachments:** | Florey, Summary, Word, 1001.002 2018.11.27 Summary of Phases for Development of UMCH Property vf.docx |

**From:** David Robinson <davidwhitfieldrobinson@gmail.com>
**Sent:** Monday, January 24, 2022 3:37 PM
**To:** Stewart, Robyn <Robyn.Stewart@worthington.org>
**Subject:** [EXTERNAL] Fwd: process for city acquisition of UMCH, etc., from zoning lawyer

 This message is from an external source.  **Please exercise caution** when opening attachments or opening web links from external senders, especially if the message is unsolicited or unexpected.  If you feel this may be a phishing attempt, please use the **Phish Alert button** or reach out to **helpdesk@worthington.org** for assistance.

Robyn, here's the second email located under the search term "acquisition."  Please note it includes the attachment from Florey's legal firm. David

---------- Forwarded message ---------
From: **David Robinson** <davidwhitfieldrobinson@gmail.com>
Date: Sun, Oct 11, 2020 at 8:25 PM
Subject: process for city acquisition of UMCH, etc., from zoning lawyer
To: Peter Bucher <pdbucher.84@gmail.com>

fyi, confidential (let's discuss next time):

David Robinson
614-893-4573 - cell
195 E Dublin Granville Rd
Worthington, OH 43085



EXHIBIT
42



Adam F. Florey, Partner
Florey Todd, LTD.
7140 N. High St., Suite 240
Worthington, Ohio 43085
o. 614.427.1556
c. 614.256.3977
e. aflorey@law-flc.com

www.law-flc.com

**November 27, 2018**
**SUMMARY OF PHASES FOR DEVELOPMENT OF THE UMCH PROPERTY**

This document provides a *summary* of the anticipated phases or steps the City of Worthington will take in developing the property owned by the United Methodist Children's Home, Parcel 100677400 (the "UMCH Property"), abutting High Street in Worthington, Ohio ("Worthington" or the "City"). The typical phases for development, modified as appropriate for this particular project, are the following:

**PHASE 1: PLANNING**
**PHASE 2: ACQUISITION**
**PHASE 3: SALE OF TARGETED PORTIONS OF THE UMCH PROPERTY**
**PHASE 4: IMPROVEMENTS AND MAINTENANCE**

A more detailed memorandum (the "Memorandum"), though certainly not comprehensive, is provided along with this summary. Neither this summary, nor the Memorandum, should be construed as legal advice.

## PHASE 1: PLANNING

Without limitation, the Planning Phase will require the following:

(A)  Preparation of an alternate vision for the use of the UMCH Property, coupled with necessary resolutions from Worthington City Council (the "Council") approving the same.

(B)  Retention of appropriate professionals to guide the City through all phases and contingencies.

(C)  Negotiation with the United Methodist Children's Home ("UMCH") for acquisition of the UMCH Property.

(D)  Identification of funding source(s) for the initial purchase of the UMCH Property.

(E)  Resolutions approving purchase, sale and improvement of the UMCH Property.

Note: Potential Use of a Community Improvement Corporation through the Planning Phase is discussed in the attached Memorandum and in the Phase 2 discussion, below.

### Planning Phase 1(A): Land Use

The Planning Phase will require the preparation of an alternate vision for the use of the UMCH Property.

As background, on September 2, 2014, the Council passed Resolution No. 39-2014 (the "Resolution"), which adopted the land use plan for the UMCH Property prepared by MKSK (the "MKSK Plan"). Further, by adopting the MKSK Plan, the Council amended Worthington's 2005 Master Plan.

All development of the area must proceed in a manner consistent with the MKSK Plan. Accordingly, the Council must pass a new resolution that (1) rescinds the Resolution, and ideally (2) adopts a new resident focused plan for the UMCH Property.

### Planning Phase 1(B): Retaining Appropriate Professionals

As noted, during the Planning Phase, Worthington should solicit appropriate professional firms, including a law firm, design/planning firm, and possibly a financial professional. The legal process and requirements for hiring consultants is included within the attached Memorandum.

### Planning Phase 1(C): Negotiation with UMCH

Pursuant to the Ohio Revised Code, Worthington may acquire real property by purchase, gift, devise, lease, lease with a privilege to purchase, dedication or donation. While we anticipate the outright purchase of the UMCH Property by Worthington, each of the foregoing (or a combination of one or more) are all legal options.

In any event, Worthington and/or its representatives, will need to engage UMCH to negotiate acquisition of the Property. The possibility exists at this stage to reduce the purchase price by addressing other interests of UMCH. Those interests may include naming rights, acting in charity for the benefit of Worthington, easements, and tax ramifications.

### Planning Phase 1(D): Identify Funding Sources for the Initial Purchase

While a municipality can take property through a gift or lease, if the municipality wants to purchase real property, it must find a funding source. Potential sources of money include: (i) cash on hand from the municipality's general fund or within special fund created for the purpose of buying the property at issue; (ii) private donations; and/or (iii) debt.

The "special fund" through which the UMCH Property is purchased will be initially funded with a combination of all three of the foregoing sources. The current plan is to sell a portion of the UMCH Property, with the resulting revenue used to pay off the initial debt and adding resources to the special fund dedicated to improvements and maintenance of the dedicated park land.

### Planning Phase 1(E): Resolutions Approving Purchase

With the necessary planning complete, the Council can then move to pass additional resolutions or ordinances to fund and purchase the UMCH Property. At the same time, or subsequently (as appropriate), the Council would pass a resolution selling the commercial and residential portions of the UMCH property.

## PHASE 2: ACQUISITION

This phase is relatively self-explanatory. Once all planning phases are complete, including negotiations and financing, Worthington can then move to purchase the UMCH Property.

One of the necessary and incidental powers of local self-government is the power to acquire, control, use, and dispose of property for municipal purposes. A municipality can acquire real property in any manner that a private corporation might, including by purchase, gift or lease. Section 2.16 of Worthington's Charter requires that any determination *"to proceed with any public improvement, purchasing, leasing or transferring [of] property * * * shall be taken by ordinance."*

Purchase of the UMCH Property may also be completed through Worthington's Community Improvement Corporation, as the representative of Worthington. The Ohio Revised Code empowers a Community Improvement Corporation ("CIC") to borrow money, issue bonds, debentures, or notes, and secure indebtedness by a mortgage, pledge, or deed of trust. A CIC may also purchase, receive, hold, lease, acquire, will, convey, transfer, sublease, or dispose of real and personal property, as well as acquire the good will, business, rights, real and personal property, and any other assets of any other person, firm, partnership, or corporation.

## PHASE 3: SALE OF TARGETED PORTIONS OF THE UMCH PROPERTY

Municipalities are expressly authorized to sell or lease real property owned by the municipality if it is no longer needed for any municipal purposes. The Ohio Revised Code requires that a contract for the sale or lease of real property be made only upon approval of two-thirds of the members of the legislative authority, as well as by the board or officer having supervision or management of such real estate. After such authorization, the contract must be made with the highest bidder after competitive bidding by advertising once a week for five consecutive weeks in a newspaper of general circulation.

Note that the competitive bidding requirements associated with the sale of real property may be bypassed through the use of Worthington's CIC. As noted, any sale of a portion or portions of the UMCH Property would then be used to service or pay off debt incurred in the initial purchase; and to fund improvements or maintenance of the dedicated park.

## PHASE 4: IMPROVEMENTS AND MAINTENANCE TO THE UMCH PROPERTY

Improvements and maintenance to the UMCH Property would be undertaken either separately, or through a partnership, of Worthington and one or more private developers.

### Phase 4(A): Private Development of Commercial and Residential Portions

The sale and development of the commercial corridor along High Street within the UMCH Property would serve the economic development of Worthington; provide financing for Worthington's purchase and retention of the dedicated park area; and provide tax revenue for either the general fund or the special fund tied to the maintenance and improvement of the new park.

The same benefits would result from the platting and sale of small residential lots within the UMCH Property. Those limited lots would be sold individually or through a developer, thereby achieving an added benefit – satisfying some of the need for "empty nest" or downsized housing within Worthington.

Importantly, and consistent with the "resident centered" approach to overall development of the UMCH Property, the design professional selected by Worthington will provide relatively strict design criteria for both the commercial and residential portions of the UMCH Property.

**Phase 4(B): Worthington's Improvements to the Dedicated Park**

Worthington would undertake initial improvements to the dedicated park land using the resources available within the special fund created by Council for that purpose. As noted, the special fund would be funded by the sale of targeted portions of the UMCH Property, discussed above, as well as long term revenue realized through specific assessments against the commercial and/or residential properties. As an analogy, those assessments are akin to payments to a homeowner's association or property manager by an individual property owner, which are then used for maintenance and improvements. Covenants that run with the land and require an additional assessment will be included in the title of the sold properties. Those covenants would then be owed by the developer(s), and any subsequent owner of the residential and commercial areas.