# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **LIFESTYLE COMMUNITIES, LTD**., *et al.*, | ) | Civil Action 2:22-CV-1775 |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Judge Sarah D. Morrison |
| | ) | |
| **CITY OF WORTHINGTON, OHIO**, | ) | |
| | ) | |
| Defendant. | ) | Magistrate Judge Elizabeth P. Deavers |
| | ) | |

---

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

---

# EXHIBIT 17

*LIFESTYLE COMMUNITIES*

*vs.*

*CITY OF WORTHINGTON*

---

Deposition of

**Jason Sudy**

December 19, 2023

---



614.460.5000 | www.priohio.com | pri@priohio.com

1          IN THE UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF OHIO
2                    EASTERN DIVISION

3    LIFESTYLE COMMUNITIES,      )
     LTD., ET AL.,               )
4                                )
          Plaintiffs,            )
5                                )
          vs.                    )    Case No.
6                                )    2:22-cv-1775
     CITY OF WORTHINGTON,        )
7    OHIO,                       )
                                 )
8         Defendant.             )

9


10


11                     DEPOSITION

12                   of JASON SUDY

13


14             Taken at the offices of
          Vorys Sater Seymour and Pease LLP
15                52 East Gay Street
                Columbus, Ohio 43215
16


17


18        on December 19, 2023, at 1:11 p.m.

19


20        Reported by: Julia Lamb, RPR, CRR

21


22                      -=0=-

23


24

1    APPEARANCES:

2         Christopher L. Ingram
          VORYS SATER SEYMOUR AND PEASE LLP
3         52 East Gay Street
          Columbus, Ohio 43215
4         614.464.5480
          clingram@vorys.com
5
               on behalf of the Plaintiffs.
6

7         Yazan S. Ashrawi
          FROST BROWN TODD
8         One Columbus, Suite 2300
          10 West Broad Street
9         Columbus, Ohio 43215
          614.559.7202
10        yashrawi@fbtlaw.com

11             on behalf of the Defendant.

12

13

14

15

16

17

18

19                      -=0=-

20

21

22

23

24

1                         STIPULATIONS

2             It is stipulated by and between

3    counsel for the respective parties that the

4    deposition of JASON SUDY, the Witness herein,

5    called by the Defendant under the applicable

6    Rules of Federal Civil Court Procedure, may be

7    taken at this time by the stenographic court

8    reporter and notary public by agreement of

9    counsel; that said deposition may be reduced to

10   writing stenographically by the court reporter,

11   whose notes thereafter may be transcribed

12   outside the presence of the witness; and that

13   the proof of the official character and

14   qualification of the notary is waived.

15                         -=0=-

16

17

18

19

20

21

22

23

24

1                    INDEX OF EXAMINATION

2                                              PAGE

3    BY MR. ASHRAWI:                             5

4

5

6                    INDEX OF EXHIBITS

7    EXHIBIT          DESCRIPTION              PAGE

8     1      Strategic Analysis adopted      50
             9-2-14
9
      5      1033 High Street (former       76
10            UMCH)

11    7      Resolution No. 04-2022         72

12    140    Expert Report of Jason Sudy,    7
             6-15-23
13
      141    Staff Memorandum City Council  37
14           Meeting, 12-13-21 (pages 21
             to 151 of 201)
15
      142    Comprehensive Plan Update &    41
16           2005 Strategic Plan for
             Worthington
17
      143    Opinion and Order filed        79
18           3-15-23

19

20

21

22

23

24

1    A.  Yes.

2    Q.  Do you know what collaboration or what

3  discussions city staff had with Lifestyle?

4    A.  I'm not aware of the full breadth of

5  those.  What I am aware of is the fact that at

6  the planning commission in a circumstance that

7  in my entire, you know, 26 now years of

8  experience would indicate is the exact time that

9  a tabling would occur after a discussion in the

10  early stages, a conceptual stage that was even

11  mentioned several times, though different cities

12  call that different things, of a PUD that you

13  would absolutely table that application by the

14  request of the applicant in order to facilitate

15  the interactive process with staff by stopping

16  that and then effectively creating a situation

17  where the ARB had to deny it as well because

18  there was effectively nothing to table.  You've

19  cut off the opportunity for staff to have that

20  interaction with the applicant instead of

21  promoting that which is essentially what a PUD

22  is all about.  Whether you agree or disagree

23  with the provisions of the PUD process, that

24  central tenant of a PUD is it has to be

1  collaborative throughout the entire process.

2      Q.  But you're not aware of what

3  collaboration happened before that point, right?

4      A.  Only from what I read in the complaint.

5      Q.  Because you didn't talk to anyone from

6  Lifestyle or the city, right?

7      A.  Correct.

8      Q.  Are you aware that Lifestyle's previous

9  proposal was tabled to make changes per staff

10  request?

11         MR. INGRAM:  Objection.  Assumes facts

12  not in evidence.

13      A.  Only aware of what I read in the staff

14  report.

15      Q.  Is that what the staff report said?

16         MR. INGRAM:  Same objection.

17      A.  That is what the staff report indicated,

18  yes.

19      Q.  Do you have any reason to --

20      A.  I will clarify I don't recall it

21  actually saying tabling, but the staff report

22  referred to an earlier application.

23      Q.  And it referred to an earlier

24  application where feedback was given by the city

1                      CERTIFICATE

2    STATE OF OHIO      :
                              SS:
3    COUNTY OF FRANKLIN :

4            I, Julia Lamb, RPR, CRR, a
     stenographic court reporter and notary public in
5    and for the State of Ohio, duly commissioned and
     qualified, do hereby certify that the
6    within-named JASON SUDY was first duly sworn to
     testify to the truth, the whole truth, and
7    nothing but the truth in the cause aforesaid;
     that the testimony then given was taken down by
8    me stenographically in the presence of said
     witness, afterwards transcribed; that the
9    foregoing is a true and correct transcript of
     the testimony; that this deposition was taken at
10   the time and place in the foregoing caption
     specified.
11
             I do further certify that I am not a
12   relative, employee or attorney of any of the
     parties hereto; that I am not a relative or
13   employee of any attorney or counsel employed by
     the parties hereto; that I am not financially
14   interested in the action; and further, I am not,
     nor is the court reporting firm with which I am
15   affiliated, under contract as defined in Civil
     Rule 28(D).
16
             In witness whereof, I have hereunto
17   set my hand at Columbus, Ohio, on this 4th day
     of January, 2024.
18

19

20           *Julia Lamb*

21           Julia Lamb, RPR, CRR
22           Notary Public, State of Ohio

23   My commission expires:  10-10-27

24


# SIGNATURE ADDENDUM

Case Caption: **Lifestyle Communities, Ltd., et al. vs. City of Worthington, Ohio [2:22-cv-1775]**
Deposition of: **Jason Sudy**
Date Taken: **12/19/2023**
File Number: **327268**

Dear Counsel:

As of **2/27/2024**, PRI Court Reporting, LLC does hereby certify that: **Jason Sudy** did not return an errata sheet for their deposition taken 12/19/2023. The deponent was notified by letter and/or e-mail about the review process and informed of Rule 30, providing the number of days within which to read and sign the deposition. The witness has not notified our office of their waiver or of illness or absence of the witness, or the refusal to sign. Therefore, the deposition may be used as fully as though signed.

Sincerely,

*Angie Starbuck*

Angie Starbuck
PRI Court Reporting, LLC

# EXPERT REPORT

# OF

# JASON SUDY

June 15, 2023

Prepared for:
Joseph R. Miller
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
Columbus, Ohio 43215

On behalf of:
Lifestyle Communities, Ltd. and Worthington Campus, LLC

In the matter of:
*Lifestyle Communities, Ltd., et al. v. City of Worthington, Ohio*
United States District Court for the Southern District of Ohio
Civil Action 2:22-cv-1775



# TABLE OF CONTENTS

SCOPE AND METHODOLOGY ..................................................................................................1

MATERIALS REVIEWED.......................................................................................................1

CERTIFICATION ..................................................................................................................2

DISCUSSION.........................................................................................................................3

I.    Introduction...............................................................................................................3

II.    Planning Background...............................................................................................3

    A.    Comprehensive Plans & Focus Area Plans: ...............................................3

        1.    Comprehensive Plans...................................................................4

        2.    Strategic Plans ............................................................................5

        3.    Focus Area Plans .........................................................................5

    B.    Worthington's Plan Documents...................................................................6

        1.    City of Worthington, Ohio, Comprehensive Plan Update & 2005 Strategic Plan for Worthington ............................................................6

        2.    Worthington's 2014 Comprehensive Plan Update for the United Methodist Children's Home Focus Area.................................................7

III.    Application Review .................................................................................................8

    A.    UMCH Focus Area Plan .............................................................................9

    B.    Zoning.......................................................................................................12

        1.    Lifestyle's property is well suited for a mixed-use PUD........................12

        2.    It is unreasonable for Worthington to maintain the current S-1 zoning designation on the Property. ...............................................................12

IV.    Irregularities in Worthington's Treatment of Lifestyle and Its Property....................13

    A.    The Typical Process...................................................................................13

    B.    The City's Treatment of Lifestyle .............................................................14

    C.    The City's aggressive dismissal of the Lifestyle application is both strange and alarming. ...............................................................................................15

CONCLUSIONS ..................................................................................................................17

ADDENDUM ......................................................................................................................20

    A.    Qualifications............................................................................................20

    B.    Prior Cases.................................................................................................20

    C.    Statement of Compensation .......................................................................20

## SCOPE AND METHODOLOGY

Vorys, Sater, Seymour and Pease LLP requested that I review and analyze a proposed mixed-use development to be developed by Lifestyle Communities, Ltd. in Worthington, Ohio, in light of applicable zoning standards, Worthington's strategic and comprehensive plan for the subject property, and the City's consideration of Lifestyle's development of the subject property. I was asked to review relevant materials, conduct relevant research, and perform the necessary investigation and analysis on the subject matter.

The methodology that I utilized during my analysis of this matter was in accordance with generally accepted principles. The basis for the following opinions include the materials reviewed, relevant references, and my education, knowledge, professional experience, and expertise.

## MATERIALS REVIEWED

I reviewed the following materials:

- Worthington, Ohio's 2005 Comprehensive Plan;

- The 2014 presentation by MKSK to Worthington City Council regarding the UMCH Focus Area Plan update;

- Worthington, Ohio's 2014 Comprehensive Plan Update for the United Methodist Children's Home (UMCH) Focus Area;

- Worthington, Ohio's 2022 update for the UMCH Focus Area;

- Portions of Worthington, Ohio's Codified Ordinances and Zoning Code;

- Materials from the City of Worthington's website – "1033 High Street (former UMCH)" – that includes among other things, the zoning application, materials presented to the Architectural Review Board and Municipal Planning Commission, and to City Council;

- Meeting minutes from relevant hearings concerning the development of Lifestyle's property; and

- The Complaint filed on March 24, 2022.

**CERTIFICATION**

I hereby certify that the opinions and conclusions expressed herein were formed to a reasonable degree of professional certainty. They are based upon the application of reliable principles and methodologies to all of the facts known by me when this report was issued, as well as the knowledge, skill, professional experience, expertise, training, and education. Should additional information be discovered, I reserve the right to appropriately amend or supplement these findings.

Jason Sudy
Urban Planning Principal

6/15/23
Date

## DISCUSSION

### I.    Introduction

Lifestyle submitted an application to the City of Worthington that closely aligned to the city-initiated and city-approved Comprehensive Plan and the updated United Methodist Children's Home (UMCH) Focus Area section of that plan. Lifestyle had a reasonable expectation that the subject property would be zoned and developed in accordance with the City's action plan for the site, based on standard accepted professional planning practices throughout the Central Ohio region and the State of Ohio. Lifestyle was right to expect an interactive and collaborative process of city review, both in internal city staff meetings and with the relevant public boards and commissions.

Approval of the Lifestyle plan as submitted, or with minor modifications, is a reasonable assumption based on very high conformance of the proposed development with existing City-approved planning documents in place for the site at the time of the application.

This report outlines several key elements:

1) The planning background of this site and the context of associated planning processes for the site that were initiated by the City of Worthington.

2) A review of this application from the standpoint of conformance with the approved Comprehensive Plan and UMCH Focus Area section of that plan.

3) A discussion of the irregularities in this review process, as compared to standard accepted professional planning practices.

### II.    Planning Background

#### A.    Comprehensive Plans & Focus Area Plans:

To best understand the relationship of this application to the city-adopted plans for the site, it is useful to provide a brief description of the role of a comprehensive plan for a city, and the use

3

of focus area plans within an overall comprehensive plan.

### 1.  Comprehensive Plans

A comprehensive plan is a common term used to describe the overarching document created to guide the near and mid-term future of a municipality. (Other governmental entities such as counties and non-incorporated jurisdictions such as villages often also have comprehensive plans. While these plans function in a very similar way, for this discussion the explanation will be limited to municipal comprehensive plans for incorporated cities).

Several factors of comprehensive plans are useful to understand in the greater context. First, the term "comprehensive" is not ideal since it can be somewhat misleading. These plans do not cover every aspect of a city as the name would suggest. Most comprehensive plans in Ohio provide an overview of existing conditions including demographics, current land use, transportation, and natural features. Some cover related aspects such as market conditions, workforce, school district impacts and other topics, though this is determined on a community-by-community basis. A comprehensive plan usually includes an overall land use plan for the city, which is the most important element to guide future development. Changes to the land use plan are also often used as the basis to consider zoning changes on specific sites, corridors, or areas throughout a city. A comprehensive plan often contains a thoroughfare plan and may also have a natural features preservation and park plan, as well as other supporting elements deemed important by the local municipality. There is not a set time period that comprehensive plans are designated to cover, though many indicate a roughly 20-year timeframe or greater.

Because comprehensive plans are meant to address the entire city and they have a generally longer timeframe, the general plan portions can fall short of providing targeted development recommendations for key sites and near-term actionable recommendations. In order to manage

4

those needs, planners often take the approach of creating a strategic plan and/or focus area plans within the overall comprehensive plan.

## 2. Strategic Plans

Strategic plans are typically meant to cover a shorter timeframe, from immediate actions through the next ten years. Some rapidly expanding communities, such a New Albany, Ohio, in the late 1990s and early 2000s, tried to do a strategic plan update every five years or so, to accommodate the pace of change related to ongoing development. The distinction between a strategic plan and a comprehensive plan is not specifically defined, but a strategic plan typically focusses on key development areas, as well as near-term updates to infrastructure, community amenities and administrative processes that will steer ongoing change in a successful manner. The concepts of comprehensive and strategic plans can overlap, in particular if strategic plan elements such as focus area plans are included in the comprehensive plan.

## 3. Focus Area Plans

Focus area plans are a way of addressing the specific corridors and development sites. As subsets of comprehensive or strategic plans, focus area plans may provide more targeted recommendations for redevelopment. These may include a set of written guidelines for future land use and development approach, as well as conceptual site development diagrams indicating the general preference of the city regarding future site development. Specific areas selected for focus area plans are most often places where specific development or redevelopment opportunities could exist, or in locations that have a particular characteristic that the city would like to promote (*e.g.*: key sites, historic districts, primary corridors, *etc.*). Having a focus area plan for a specific site is highly useful in providing direction to residents and developers regarding the clear intent of the city with regard to preferred outcomes for change. Since these areas are directly addressed in the planning process, this gives the city boards and commissions, city administration, and the public

the opportunity to provide targeted input during the planning process in a way that is far more specific than in the case of an overall land use map in a comprehensive plan. Once adopted, these focus area plans are the roadmaps for development, and should be used to guide members of planning commission and city council, as well as city staff on the future development of the site. This is done by reviewing applications for conformity to the plan, which should be the primary consideration in considering approval.

* * *

All of these plans are developed to serve as key guiding documents in the ongoing development and redevelopment of a city. The overarching purpose to create a clear vision for the city that allows residents, city leaders, and developers to share a common understanding. While these are living documents and are amended over time, changes should be done in accordance with the overall plan goals and principals, in a methodical and public process, and in keeping with professional planning practices.

**B.    Worthington's Plan Documents**

    **1.    City of Worthington, Ohio, Comprehensive Plan Update & 2005 Strategic Plan for Worthington**

This is the current Comprehensive Plan for the City of Worthington. As is typical in a comprehensive plan, there are numerous elements covering existing conditions, land use, natural features, and demographics. An aspect relevant to this application are "Goals of the Plan" (Comprehensive Plan Update & 2005 Strategic Plan for Worthington, pg. 4) and those that most relate to the current application are:

1) Improve Worthington's economic base by encouraging appropriate development.

2) Ensure that redevelopment enhances and compliments [sic] Worthington's character and quality of life.

3) Promote the provision of housing types to attract and accommodate all age groups.

The initially adopted 2005 plan included a targeted discussion of the applicant's site under the title "Methodist Children's Home Site" (Comprehensive Plan Update & 2005 Strategic Plan for Worthington, pgs. 88–90). This discussion of the site is within the portion of the plan called "Strategic Analysis" (Comprehensive Plan Update & 2005 Strategic Plan for Worthington, pgs. 69–100) which is a series of Focus Area Plans for various areas throughout the city.

The "Methodist Children's Home Site" section comprises a Focus Area Plan, which looks at potential development options for the site. Both options indicate a mix of uses that generally transition from commercial uses closer to High Street and primarily residential uses on the western portion of the site. While useful as background to understand the intent for development of the site stretching back to at least 2005, the more relevant planning document for the UMCH site is the 2014 update to that section which provides much more detail.

2. **Worthington's 2014 Comprehensive Plan Update for the United Methodist Children's Home Focus Area**

This is a detailed and specific Focus Area Plan for the UMCH site, which was adopted to replace the earlier section of the Comprehensive Plan. This Focus Area Plan update outlines a deliberate development strategy. There are several important considerations regarding this plan update:

1) Focus Area Plan updates are common when shifting conditions occur on key sites. These conditions may include a change in the intent for future use by the current property owner on an identified key redevelopment site, or a potential or completed change in ownership.

2) This type of Focus Area Plan is considered an action plan, outlining a detailed and specific set of development preferences for the site, and endorsed and adopted by the city. This is the exact type of planning approach municipalities throughout Ohio use to indicate community intent to the developers, and an applicant who adheres to the outlined planning approach should have a

7

reasonable expectation to use and develop its property in conformance with such a plan.

3) This planning update went through an extensive public process. A recap of the process steps is included in presentation slides entitled "Vision UMCH City of Worthington" (as presented to City Council on September 2, 2014, and available on the city website). The slide titled "Process" (Vision UMCH City of Worthington presentation, pg. 3) lists a set of project tasks and public meetings that occurred from September 2013 through September 2014. The public outreach and meetings included a site tour, stakeholder meetings, a design charrette, two public meetings, a two feedback periods, developer interviews, two Planning Commission meetings and one City Council meeting.

4) Based on the public process outlined for the focus area update, it is clear that the City spent significant time and resources to create the action plan for this site.

5) Given the significant investment and process that went into the development and adoption of this action plan, the site's development would be expected to materially conform to the action plan unless there was a specific impediment to the development that were not known in the planning process. This could include physical challenges such as latent issues buried in the soil, preservation of natural features, or topographical challenges that prevent economically feasible development. Short of this, the conformance with the proposed development plan would be seen as the most preferential approach.

6) In the event the City no longer wanted the site to be developed consistent with the action plan, the City could, and should, have amended the plan. Due to the numerous public outreach aspects of the 2014 update process, any subsequent update should take the same care and consideration to ensure that the greater goals of the City are represented by any change to the plan.

7) This action plan reflects the highest and best use for this prime development ground and illustrates the community's expectations for its development. Worthington City Council's adoption of the action plan expressly noted the extensive public involvement that took place as part of the planning process and stated that they wished "to utilize this document as a guide for development, growth and investment in the community."

### III. Application Review

Lifestyle's submitted application seeks approval of a mixed-use development in conformance with the UMCH Focus Area Plan update of 2014. Lifestyle requested a rezoning to the Planned Unit Development District designation in order to accommodate the proposed uses

reflecting the plan guidance for the site. The adopted plan must be used to evaluate the proposed land use approach, and then the City should collaborate with the applicant to determine the preferred zoning district to accomplish those goals.

## A. UMCH Focus Area Plan

As the City-adopted guiding document for the UMCH site, it should be used as the initial and ongoing basis for review.

Applications for development of the UMCH site must be evaluated for plan conformance for the following reasons:

1) The UMCH Focus Area Plan reflects the view of the community that the site should be re-developed.

2) Uses set forth in the action plan conform to the community's expectations for the site's redevelopment, as stated in the plan: "The community dialogue and consensus represented by this plan will facilitate any future redevelopment process for this site." (2014 UMCH Focus Area Update, pg. 89)

3) The primary intent of the UMCH Focus Area Plan is to guide members of planning commission and city council, as well as city staff on the future development of the site, as stated in the plan: "The goal . . . is to provide guidance as to the range of desired land uses and development in the event the private land owner and/or future developer requests rezoning of the property; and to assist the City with its review and evaluation of any proposal." (2014 UMCH Focus Area Update, pg. 89).

4) An action plan provides the community, the property owner, and developers' knowledge of the anticipated development for the subject site and limits to that site's development.

5) Lifestyle had a reasonable expectation that the subject property would be zoned and developed in accordance with the City's action plan for the site.

The following compares key aspects outlined in the UMCH Focus Area Plan to the proposed Lifestyle development:

1) *"Building upon the previously stated objectives, redevelopment of this site must create a high-quality, mixed-use development that is walkable, connected, and integrated within the site and with the City."* (2014 UMCH Focus Area Update, pgs. 90–91).

The Lifestyle proposal highly conforms to this guideline with regard to providing mixed-use development in a walkable, connected and integrated plan. The proposal includes a neo-traditional building pattern with frontages pulled close to the street, utilizing alleys and rear access to accommodate parking and vehicular access to the units. This limits driveways and other vehicular crossings of the sidewalks and creates a gridded system of streets. Combined with planned sidewalks throughout, the site plan is extremely walkable and connects to the greater sidewalk network already in place along High Street. The plan also indicates a centralized "promenade-style" walkway along a linear green, as well as shared-use recreational paths along Tucker Creek along with an internal linkage through the site. This is a very high level of pedestrian-friendly connectivity that will also accommodate bicycle users on the shared-use path.

2) *"This mix of uses should contain a range of residential types together with commercial office and neighborhood retail uses integrated with contributing and shared green space and amenities – all of which complement each other to create an active, vibrant place."* (2014 UMCH Focus Area Update, pg. 91).

The Lifestyle plan does incorporate all of these elements in the arrangement designated in the Focus Area Plan.

3) *"Any proposed design must be sensitive to the neighborhoods adjacent to the UMCH site, as well as to the natural features related to Tucker Creek."* (2014 UMCH Focus Area Update, pg. 91).

The Lifestyle plan locates the lower-density single-family lots adjacent to the existing homes located to the north and west of the site. The lots are at a compatible scale to the surrounding neighborhood. The south portion of the site is a preserve surrounding Tucker Creek, as outlined in the Focus Area Plan.

4) *Future Land Use*: As indicated in the Focus Area Plan, there are four suggested use areas for the site. (2014 UMCH Focus Area Update, pg. 91). The Lifestyle plan has designated use areas that align with those suggested in the plan, in both geography and suggested use:

   o **High Street Mixed Use:** *"The High Street Mixed Use zone consists of the frontage of the UMCH site along High Street. It permits a mix of office, residential, and retail uses with the focus on commercial office and medical uses with subordinate residential and limited retail uses. Buildings in this zone should be a minimum of two stories and a maximum of five stories in height with attractive, four-sided architecture."* (2014 UMCH Focus Area Update, pg. 92).

   The Lifestyle plan suggests this exact mix of uses and conforms to the prescribed height guidelines.

10

- **Worthington Estates Edge:** "*The Worthington Estates Edge zone calls for single-family residential development on lots between a third-of-an-acre and a fifth-of-an-acre. This equates to a residential density similar to Worthington Estates (3 dwelling units/acre) and Old Worthington (4-5 dwelling units/acre).*" (2014 UMCH Focus Area Update, pgs. 92–93).

  The Lifestyle plan includes single-family lots as the suggested edge use at 3.72 units per acre, in keeping with the range suggested in the plan.

- **Neighborhood Core:** "*The Neighborhood Core calls for residential development at a density between six and fourteen dwelling units per acre (6-14 du/ac) gross density with a height limit of three stories. It is expected that the Neighborhood Core will be developed with more than one housing type and at more than one density level.*" (2014 UMCH Focus Area Update, pg. 93).

  The Lifestyle plan includes two residential subareas in this zone, with densities of 9.55 and 14.4 du/acre, which is within the range of the plan when averaged together for the entire district. There are several housing types at differing density levels and limited to three stories, all within conformance to the plan.

- **Tucker Creek Preserve:** "*The southern boundary of the UMCH focus area is the beautiful and wooded Tucker Creek ravine. This plan calls for preserving this area as a natural green space amenity for the site and the community.*" "*The community expressed a strong desire to continue linking neighborhoods, parks, and destinations with multi-use trails throughout the City. This includes achieving a dedicated trail along Tucker Creek that highlights this natural feature and provides an amenity and potential connection between High Street and Evening Street.*" (2014 UMCH Focus Area Update, pg. 94).

  The Lifestyle plan includes a large preserve area surrounding Tucker Creek and calls for a series of recreational trails as suggested in the plan.

5) "*To achieve the desired densities, parking decks are encouraged to be integrated into the site.*" (2014 UMCH Focus Area Update, pg. 92).

   The Lifestyle plan integrates two parking garages totaling over 800 spaces into the High Street Mixed Use area, as recommended in the Focus Area Plan.

In short, the Lifestyle plan conforms with the UMCH Focus Area Plan. In a typical circumstance, the City should have been able to almost immediately begin working on the specific design details and zoning process with the applicant, since the significant site planning issues are aligned with the adopted community plan.

11

## B. Zoning

Lifestyle had a reasonable expectation that the subject property would be zoned and developed in accordance with the City's action plan for the site. The request to rezone to the Planned Unit Development District designation is both reasonable and suggested by the UMCH Focus Area Plan: *"Any development that occurs within the focus area should relate internally to the site and to an overall plan, even if it is built at different times. For this reason, it is expected that any proposed redevelopment include rezoning of the entire site to a Planned Unit Development as an early step."* (2014 UMCH Focus Area Update, pg. 91).

### 1. Lifestyle's property is well suited for a mixed-use PUD.

Location: Lifestyle's property is Worthington's largest undeveloped property along a key corridor within 270.

Market: Lifestyle's property provides a unique opportunity to provide a range of diverse housing and commercial development in an affluent, landlocked community, including:

1) The opportunity to provide attractive housing for senior citizens to age-in-place.

2) The opportunity to provide more available housing for young adults looking to return to Worthington after growing up on the City, or those wishing to establish Worthington as their home.

3) The opportunity to create more affordable housing stock overall.

The Site: Because the site is a blank canvas, the City does not have to provide incentives to demolish, assemble, or otherwise prepare the site for development.

### 2. It is unreasonable for Worthington to maintain the current S-1 zoning designation on the Property.

Uses under the S-1 designation are extremely limited, uneconomic, and not in conformance with the City-adopted 2014 UCMH Focus Area Study. The uses under the S-1 designation are not in conformance with the identified goals of the 2005 Comprehensive Plan, which outlines the

UMCH site as a key area to general tax revenue producing uses. Relegating thirty-seven acres in the heart of the City along a key corridor to public and semipublic uses such as cemeteries and churches is not reasonable.

## IV. Irregularities in Worthington's Treatment of Lifestyle and Its Property

### A. The Typical Process

The typical review process for any application of this scale consists of several steps. While there are variations between different cities and for the different types and scales of development applications that are reviewed, developments for City-identified key sites should have a fairly robust and collaborative review process. The following is a typical planning approach for this type of application:

1) Staff conducts a preliminary meeting to establish conformance/lack of conformance with city plans.

2) If the plan is in conformance with adopted city plans (as is the case for the Lifestyle application) city staff should then collaborate with an applicant to establish the most appropriate path toward zoning and development review consistent with established City practices.

3) In the case of a PUD zoning, an informal process with City officials is critical to create plans, because they are more complicated than single-use developments. Mixed-use developments typically require a fair amount of back-and-forth concerning:

   o Location, arrangement, and intensity of uses

   o Aesthetic parameters

   o Vehicular access and circulation

   o Natural features preservation

   o Pedestrian and bicycle connectivity

4) Staff may suggest that the applicant undertake a conceptual review with boards or commissions to gauge initial reactions, providing staff guidance as to the general conformities of the plan, likely paths for zoning, and potential conflict points that remain to be resolved with the applicant.

13

5) In the case of a PUD, there is a more extensive application process that includes both a development plan and a development text, both of which are needed in the zoning process. The advantage of a PUD is that the applicant and the City can negotiate specific details in order to ensure the development outcome is detailed in the zoning and approvals process. This is likely the reason that the UMCH Focus Area Plan suggested PUD as the preferred zoning for the redevelopment of the site.

6) Utilizing the input from the conceptual board reviews and the ongoing guidance of staff, the applicant would refine the submittal to reflect the nuances of design and development, within the context of the overall land use strategy defined in the City-adopted plans.

7) Following a reasonable set of meetings and plan iterations, approval of the development plan and development text for a PUD would be approved, allowing the final details of each phase to be submitted as final development plans for subsequent review and approval.

## B.    The City's Treatment of Lifestyle

In the case of Lifestyle's application, which was both ongoing, and in conformance with the City-approved plan, any interruption to this process where either City staff or boards and commissions were no longer willing to communicate with applicant is very unusual.

It is my understanding that the process Worthington applied in this case was very different from its typical approach:

1) Refusing to permit staff to meet with and advise an applicant on the City's concerns or preferences for any PUD is unusual. For a large PUD on a City identified key site for redevelopment, it is notably irregular.

2) Refusing to meet with an applicant, and work through details of an application for such a key site as Lifestyle's does not indicate the City proceeding in good faith regarding the application process.

3) The Architectural Review Board, Planning Commission, and City Council must provide any applicant with clear expectations or specific issues to address in the approvals process, particularly for a large-scale development located on a City-identified key site.

4) Amending a PUD application is a common practice that benefits both the City and developer. Because the PUD process is, by nature, more complex than a basic zoning category, it is assumed that a back-and-forth will take place in order to refine and update details throughout the process. It is very unusual for

a City's zoning officials to refuse to allow an applicant to amend a PUD application, particularly in a circumstance such as this, where the amendment was intended to address the feedback (however vague) that the applicant received.

5) It is difficult to understand the reasons for Worthington's extraordinary actions in this process, outside of an intent to stop any development of this site.

6) If the City of Worthington wished to make this area into public use, at least two actions should have occurred:

   o Prior to receiving an application for development that conformed to the 2014 UMCH Focus Area Plan, the City should have undertaken a planning process to re-amend that Action Plan with a public process that matched the efforts of the 2014 update.

   o The City should have purchased the property at fair market value to dictate future use.

**C.     The City's aggressive dismissal of the Lifestyle application is both strange and alarming.**

The staff review of the application, while lengthy, provided little substance for denial of the application. After citing entire sections of the UMCH Focus Area Plan, the staff report generally lists how minor details may or may not conform, and then adds statements that more information is needed. Getting that additional information through an interactive back-and-forth iterative process is exactly what is called for in a PUD process and what was lacking here.

It became clear that the primary concern and staff justification for denial was the number of units in the development. That basis for denial is not justified for this development proposal based on the adopted 2014 UMCH Focus Area Plan. The proposed Lifestyle plan is within the density ranges for both the Neighborhood Core and Worthington Estates Edge use areas. For the High Street Mixed Use area, the Focus Are Plan does not specify a density range, instead referring to an overall massing and development pattern by assigning a height range, calling for denser housing and encouraging the use of parking garages. This scale of development inherently results

15

in more units per acre and, as such, the Lifestyle plan is in complete conformance with the density recommendations throughout the site.

I have personal experience in the review of multiple hundreds of development applications as a result of a focus on site design throughout a large portion of my career and volunteer life. From a staff perspective, my experience covers the entire process of municipal development application review. This has included meetings with applicants, site visits, and preparation of written staff reports for a wide range of boards, commissions, and city councils, as well as oral presentations of staff reports to those appointed and elected bodies. I gained that experience while serving as the contracted city planning consultant for several Central Ohio communities: the City of Hilliard (approx. 3 years), the Village/City of New Albany (approx. 6 years), and the City of Bexley (approx. 10 years). I have also assisted with development planning review and staff report preparation on an ad hoc consulting basis for several other Ohio communities over my 25-year career.

From a volunteer perspective, I have served on the Italian Village Commission (19 years, approximately 10 as Commission Chair) for the City of Columbus. Our role is as an appointed review board, specifically reviewing development applications for our neighborhood based on adherence to our adopted plans and staff guidance. In my time on the commission, we have reviewed a wide range of applications, from large-scale mixed-use redevelopment projects to small home alterations. We have the authority to grant or deny Certificates of Appropriateness for applications in Italian Village, and to recommend actions on rezonings and variances to the BZA and City Council.

On several occasions, I have appeared on the "other side of the table" representing the interests of an applicant before a board or commission.

16

For 13 years, I taught the required graduate-level Site Planning course at The Ohio State University's City and Regional Planning Department in the Knowlton School of Architecture. As a component of that class, graduate students were taught the basics of site plan analysis and review and produced a staff report on a real-world site as part of their final grade.

Having been closely involved in development application review and the development application process in Ohio for 25 years, I am not aware of a circumstance comparable to what occurred in this instance. Specifically, that an applicant was seemingly cut off from an interactive and timely review by a municipality in the middle of a development application process. To make matters worse, in this case, the development proposal in question so closely conforms to the fundamentals of the adopted plan for the site, it makes the aggressive dismissal of the Lifestyle application both strange and alarming.

## CONCLUSIONS

1. Lifestyle had a reasonable expectation to use and develop its property in conformance with the Comprehensive Plan and UMCH Focus Area Plan in effect at the time Lifestyle submitted its application.

2. Based on my experience, Lifestyle's proposed development of its property is entirely reasonable, and it is likely that other cities throughout Central Ohio would want such a development for the good of their residents.

   a. Given the substantial projected population growth for Central Ohio, local communities are seizing opportunities to add housing and economic development through mixed-use projects. This is particularly relevant as housing prices escalate and communities confront the lack of options for residents who, due to age, income, or family circumstance, do not prefer a single-family home but wish to remain in the city they know and love. There are many examples of this happening locally, and just a few of those are as follows:

      i. Dublin has created an entirely new district, Bridge Park, in a successful effort to add a variety of commercial uses and denser residential to the city.

      ii. Upper Arlington has transformed much of Lane Avenue with mixed-use projects including restaurants, retail, office and denser residential.

      iii. Bexley has begun to redevelop Main Street, with recent projects including a multi-story grocery and several infill mixed-use buildings. A large mixed-use development with denser residential is in the conceptual review stages.

      iv. New Albany developed a series of denser urban residential buildings that include both townhouses and flats in proximity to the mixed-use Village Center.

      v. Columbus has nurtured a number of mixed-use redevelopment areas outside of downtown, and particularly along High Street. A new zoning code update is underway, and densification of mixed-use corridors has been expressed as a primary goal.

      vi. Whitehall has a recent mixed-use project along Broad Street with another larger-scale version in the planning stages. There are also plans to bring denser residential developments to Main Street.

3. The Lifestyle development proposal highly conforms to the goals of the 2014 UMCH Focus Area Plan, as well as the type, location, arrangement, and intensity of uses outlined in that document.

4. From a planning and zoning perspective, Resolution 04-2022 is unreasonable and unrealistic.

   a. The Resolution's adoption was extraordinary in the manner it was passed. Acting without notice and without any public input process, City Council repealed the UMCH Focus Area Plan, which had undergone an extensive and costly planning, and public input process to reach a reasonable community consensus.

   b. The language adopted to replace the UMCH Focus Area Plan is notably vague and, therefore, unhelpful and unworkable for development.

      i. The Resolution does not provide the actionable site planning, land use and suggested design guidelines of the 2014 update. In place are Guiding Principles that contain generalized aspirations along with roughly defined land use intents.

      ii. Despite these changes, and the fact that this language was not in place at the time of Lifestyle's application, Lifestyle's PUD nonetheless conforms to the Resolution's vague guiding principles and general components.

5. From a planning and zoning perspective, Worthington's actions concerning the development of Lifestyle's property have not been reasonable.

6. In my 25 years of urban planning experience, I have never seen another municipality act this way towards a private property owner and take an approach to systematically stymie the review process for an existing development application. Even more startling is that the proposal concerns an attractive development of prime real estate in the heart of the city, aligned with nearly 20 years of City-endorsed planning, and in line with current best planning practices. With a long-sought mix of uses, this project will provide an economic boon and housing opportunity to the city and its residents, while also protecting natural resources and providing connectivity to the greater community.

# ADDENDUM

**A.      Qualifications**

See the attached curriculum vitae.

**B.      Prior Cases**

I have not testified as an expert witness at trial or by deposition in any other matters within the last four years.

**C.      Statement of Compensation**

All work performed in this matter, including research, writing, analysis, and testimony of any kind, will be billed at $260.00 per hour.

# Jason Sudy
## Urban Planning Principal

**Education**
- Master of City and Regional Planning, The Ohio State University, 1997
- Bachelor of Arts in Political Science, Case Western Reserve University, 1992

**Industry Tenure**
25 years

**Professional Affiliations**
- American Planning Association
- Italian Village Commission, 2004-present (current Chair)
- The Ohio State University Knowlton School of Architecture, Auxiliary Faculty 2005-2018

**Recent Speaking Engagements and Presentations**
- Urbanism Next:
  - Freight Supply Chain is Transforming Metro Land Use from the Inside Out (2023)
  - The Ama-zoning of America Continues (2019)
- Institute of Transportation Engineers: Annual Meeting:
  - 30 Minute Delivery: Understanding Micrologistics (2021)
- ITE: Metro Section of New York and New Jersey:
  - Parking and New Mobility: New Rules for a New Reality (2021)
- American Planning Association National Conference:
  - Live, Work, Play, Dispatch (2020)
  - Retail/freight/jobs/robotics = Land Use Revolution (2019)
  - Transit in the Age of Autonomy (2018)
- Congress for the New Urbanism National Conference:
  - Delivering on Place: Post-COVID Retail Strategies (2020)

## Background

Jason Sudy is an urban planning and transportation consultant with twenty-five years of experience in the public and private sectors. He has a focused interest on the relationship between mobility and land use, and the resulting impacts on our built environment. Jason frequently speaks at local and national conferences on the influence of changing mobility and land use on cities, and as a champion for positive change in evolving communities across the country. In addition to serving as the project lead for dozens of urban, community, corridor, land use and transportation planning projects, Jason has years of experience providing strategic planning, organizational and public facilitation for clients throughout the US and Europe.

Jason has also served as the contracted planning consultant for a number of Central Ohio communities, providing ongoing service as an advisor, development review specialist, and project facilitator.

## Urban Planning Work Experience

**OHM Advisors, Columbus, OH**                                 **2016–2018; 2021-present**

Principal: As a Planning Principal, Jason leads a wide range of projects including transportation and transit plans, land use studies, zoning and development policy updates, as well as corridor and area strategic plans. Jason's robust set of clients is focused on municipalities, regional planning commissions, transit agencies, DOTs, housing agencies and other government entities, and as well as neighborhood advocacy organizations. Recent projects include the LinkUs Northwest Corridor BRT Phase 2 planning, the Columbus Downtown Multimodal Mobility Study, the Lakeview Connects Area Plan and the Knox County Economic Readiness Study. He also maintains an active and ongoing role performing development plan review and special project advising for the City of Bexley.

**HDR, Columbus, OH**                                                         **2018–2021**

National Lead, Transportation Technology Planning: At HDR, Jason worked in both national mobility policy as well as local land use planning and strategy. Straddling the efforts to merge transportation changes with the evolution of cities resulted in an interesting and challenging set of projects across the US. Working in both Central Ohio and with cities and MPOs across the nation allowed access to the best planning practices in transportation and land use.

**Side Street Planning, Columbus, OH**                                 **2012–2016**

Principal/Founder: Jason founded Side Street Planning to continue his neighborhood and focus area planning efforts, as well as regulatory planning related to codes and guidelines. At Side Street, Jason increased his interest and expertise in mobility-related planning, extending into project work centered on the interrelation between transportation and land use in the built environment.

**MSI / MKSK, Columbus, OH**                                             **1998–2012**

Associate Principal/Senior Planner; Jason led a host of urban design and planning projects throughout Ohio and across the US. In addition to waterfront, downtown, comprehensive, and neighborhood district planning, Jason was the contracted city planning consultant for planning application review for both New Albany, Ohio, and Hilliard, Ohio, during his time here.

# Jason Sudy
## Urban Planning Principal

**Downtown Columbus Multimodal Mobility Study: City of Columbus, OH**
Principal//Lead Planner

**Whitehall Zoning Code Update: City of Whitehall, OH**
Principal//Project Manager

**LinkUs Northwest Corridor Phase 2: City of Columbus, OH**
Principal/Project Manager

**Knox County Economic Readiness Study: ADF, Mount Vernon, OH**
Principal//Project Manager

**New Albany Traffic Calming Study: City of New Albany, OH**
Principal//Lead Planner

**Lakeview Connects Area Plan: OCI, Cleveland, OH**
Principal//Project Manager

**Lakeview Terrace Redevelopment Strategy: CMHA, Cleveland, OH**
Lead Planner

**Huron Main Street Corridor Study: City of Huron, OH**
Lead Planner

**SMART Corridors Mobility Study: SMART, Detroit, MI**
Principal//Lead Planner

**Medina County Public Transit Strategic Plan: MCPT, Medina, OH**
Principal//Lead Planner

**Haydite Minery Reuse Plan: City of Independence, OH**
Principal-in-Charge

**Insight 2050 Corridor Concepts: MORPC, Columbus, OH**
Principal//Lead Planner

**Manchester-Chateau Neighborhood Plan: City of Pittsburgh, PA**
Principal/Project Manager

**Mount Vernon Downtown Plan: City of Mount Vernon, OH**
Principal/Project Manager

**West Central Avenue Corridor Plan: City of West Carrollton, OH**
Principal-in-Charge

**Harvard Corridor Study: City of Newburgh Heights, OH**
Principal/Project Manager

**Marysville Comprehensive Plan: City of Marysville, OH**
Principal/Project Manager

**Siemens Redevelopment Assessment and Planning: City of Mount Vernon, OH**
Principal/Project Manager

**Lorain Comprehensive Plan: City of Lorain, OH**
Principal/Project Manager

**Avon Lake Comprehensive Plan: City of Avon Lake, OH**
Principal/Project Manager

**West Franklinton Plan: City of Columbus, OH**
Principal/Project Manager

**West Franklinton Economic Development Implementation Plan: City of Columbus, OH**
Principal/Project Manager

**University of Miami Medical Campus New Mobility Strategy: University of Miami, Miami, FL**
Principal/Project Manager

**Greater Cleveland Regional Transit Authority Strategic Plan: GCRTA, Cleveland, OH**
Technology and Stakeholder Lead

**Ames Area LRTP New Mobility Strategy: AAMPO: Ames, IA**
Technology Lead

**Downtown Greenville AV/CV Recommendations Memorandum: City of Greenville, SC**
Technology Lead

**Healthy Community Zoning Audits: Various Communities, OH**
Principal/Project Manager

**Grandview Traffic Advisory Plan: City of Grandview Heights, OH**
Principal/Project Manager

**Downtown Streetscape Standards & Guidelines, City of Columbus, OH**
Principal/Project Manager

**Dublin Corporate Area Plan and Office Competitiveness Study: City of Dublin, OH**
Principal/Project Manager

**Brice Tussing Market Study: City of Columbus, OH**
Principal/Planning Lead

**Zoning Code Modernization: City of Bexley, OH**
Principal/Project Manager