**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **LIFESTYLE COMMUNITIES, LTD.**, *et al.*, | ) | Civil Action 2:22-CV-1775 |
| Plaintiffs, | ) ) | |
| v. | ) | Judge Sarah D. Morrison |
| **CITY OF WORTHINGTON, OHIO**, | ) ) ) | |
| Defendant. | ) ) | Magistrate Judge Elizabeth P. Deavers |

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# EXHIBIT 19

*LIFESTYLE COMMUNITIES*

*vs.*

*CITY OF WORTHINGTON*

Deposition of

**Katherine Brewer**

October 11, 2023



614.460.5000 | www.priohio.com | pri@priohio.com

```
 1
         IN THE UNITED STATES DISTRICT COURT
 2            SOUTHERN DISTRICT OF OHIO
                  EASTERN DIVISION
 3

 4   LIFESTYLE COMMUNITIES,      )
     LTD., ET AL.,               )
 5                               )
          Plaintiffs,            )
 6                               )
          vs.                    )   Case No.
 7                               )   2:22-cv-1775
     CITY OF WORTHINGTON,        )
 8   OHIO,                       )
                                 )
 9        Defendant.             )

10

11

12                    DEPOSITION

13               of KATHERINE BREWER

14

15        Taken at Worthington City Hall
               6550 North High Street
16             Worthington, Ohio 43085

17       on October 11, 2023, at 10:32 a.m.

18

19          Reported by: Rhonda Lawrence

20

21                     -=O=-

22

23

24
```

1   APPEARANCES:

2

         Christopher L. Ingram
3        VORYS SATER SEYMOUR AND PEASE LLP
         52 East Gay Street
4        Columbus, Ohio 43215
         614.464.5480
5        clingram@vorys.com

6            on behalf of the Plaintiffs.

7

         Paul J. Schumacher
8        DICKIE McCAMEY
         600 Superior Avenue East, Suite 2330
9        Cleveland, Ohio 44114
         216.390.1795
10       pschumacher@dmclaw.com

11           on behalf of the Defendant.

12

13

14

15

16

17

18

19                    -=0=-

20

21

22

23

24

1               STIPULATIONS

2           It is stipulated by and between

3    counsel for the respective parties that the

4    deposition of KATHERINE BREWER, the Witness

5    herein, called by the Plaintiffs under the

6    applicable Rules of Federal Civil Court

7    Procedure, may be taken at this time by the

8    stenographic court reporter and notary public

9    pursuant to notice; that said deposition may be

10   reduced to writing stenographically by the court

11   reporter, whose notes thereafter may be

12   transcribed outside the presence of the witness;

13   and that the proof of the official character and

14   qualification of the notary is waived.

15                     -=0=-

16

17

18

19

20

21

22

23

24

1  INDEX OF EXAMINATION

2  PAGE

3  BY MR. INGRAM:  5

4

5

6  INDEX OF EXHIBITS

7  EXHIBIT  DESCRIPTION  PAGE

8  1  Land Use Plan  50

9  6  Ordinance No. 04-2-2022  33

10  7  Resolution No. 04-2022  42

11  8  Meeting minutes, 2-7-22  72

12  51  Email from Dorothy to Brewer,  29
      1-8-21
13
     52  Email from Robinson, 1-20-22  77
14
     53  Email from Brewer to  82
15       Robinson/Bleimes

16

17

18

19

20

21

22

23

24

 1      Q.   As City Council's representative to the

 2   planning commission, have you ever directed

 3   members on how to vote on zoning matters that

 4   are before the planning commission?

 5      A.   Never.

 6      Q.   Why not?

 7      A.   Because that's not my role.

 8      Q.   Do you ever tell members of the planning

 9   commission your thoughts on how to vote on a

10   zoning matter that's pending before the planning

11   commission?

12      A.   Never.

13      Q.   And why not?

14      A.   That's not my role.

15      Q.   Are you aware of any instances where

16   your fellow councilmembers have directed the

17   members of the planning commission how to vote

18   on zoning matters that are before the planning

19   commission?

20           MR. SCHUMACHER:  Objection.  Relevance.

21           We're talking about January of 2022 to

22   the current time?

23      Q.   You can answer.

24      A.   Yes.

1  members' views on what was appropriate for the

2  property, what are you basing on what's

3  inappropriate or appropriate; in other words,

4  are there any standards or guidelines that

5  you're applying?

6    A.  I was thinking about the residents.

7  That is mostly who I had been speaking to in my

8  campaign about what their thoughts were, and so

9  balancing what residents had been telling me

10  about their thoughts for the property, that was

11  the main source of information I was relying on.

12    Q.  Okay.  So residents' views and opinions

13  that you had discussed the LC proposal

14  formulated your views on what was appropriate or

15  inappropriate for the development of Lifestyle's

16  property; is that fair?

17    A.  Correct.  Either the residents I spoke

18  directly with or that I saw emails that had been

19  written to the city about the specific property.

20    Q.  Anything else?

21    A.  To the best of my knowledge, no.

22    Q.  Now, earlier I asked you about instances

23  where fellow councilmembers had directed MPC on

24  how to vote on matters that were pending before

1 the MPC.  And you raised the email from
2 Mr. Robinson.  Were there any other instances
3 that you can think of?
4    A.  To the best of my knowledge, no.
5    Q.  In connection with your role as City
6 Council's representative to the planning
7 commission, do you ever meet with planning
8 commission members about zoning matters that are
9 before them outside of public hearings?
10    A.  Never.
11    Q.  And why not?
12    A.  That's inappropriate.
13    Q.  If I were to ask you the series of last
14 questions as they pertain to the members of the
15 Architectural Review Board, would any of your
16 answers be different?
17    A.  No, they would not.  They would remain
18 the same.
19    Q.  Okay.  And I should have pointed this
20 out earlier for purposes of our record, but when
21 I refer to either the UMCH property, Lifestyle's
22 property, or the property, do you understand
23 that I'm referring to the property directly
24 across the street from where we are today?  Do

1  speak to his intent.

2     Q.  So why didn't you share this proposed
3  ordinance with anyone prior to City Council's
4  hearing on the 18th?

5     A.  I was advised not to.

6     Q.  By whom?

7     A.  By David Robinson.

8     Q.  And what did President Robinson advise
9  you not to do?

10     A.  Speak with anybody except councilmembers
11  about this.

12     Q.  And did you speak with any
13  councilmembers about a proposed moratorium on
14  Lifestyle's property prior to the January 18
15  hearing?

16     A.  I had spoken to Mr. Robinson and Pete
17  Bucher about it.

18     Q.  Okay.  Why did you speak to Mr. Bucher
19  about it?

20     A.  To discuss the substance of the
21  resolution -- or of the ordinance, excuse me.

22     Q.  Okay.  And what did you discuss with
23  Mr. Bucher about it?

24     A.  We discussed the fact that it would be

 1    A.  That is correct, yes.

 2    Q.  Did you have any additional
3 conversations with anyone prior to the January
4 18 hearing about amending the comprehensive plan
5 as it applied to Lifestyle's property?

 6    A.  To the best of my knowledge, no.

 7    Q.  Did you share a copy of the proposed
8 amendment to the comprehensive plan as it
9 applied to Lifestyle's property set forth in
10 Exhibit 7 with anyone prior to the January 18
11 hearing?

12    A.  No.

13    Q.  Why not?

14    A.  Because I was advised not to.

15    Q.  And was that President -- President
16 Robinson advised you not to share any copy of
17 Resolution No. 4-2022 with anyone prior to the
18 hearing?

19    A.  That is correct.

20    Q.  And why not?

21    A.  You would have to ask him as to why he
22 indicated that to me.

23    Q.  Did City Council obtain the planning
24 commission's feedback on this amendment to the

1    comprehensive plan before the January 18

2    meeting?

3        A.   I don't believe that would have been

4    obtained.

5        Q.   Because it wasn't shared with anyone on

6    planning commission prior to that hearing; is

7    that fair?

8        A.   I believe so.  I personally did not

9    share anything with them, so I can't speak to my

10   colleagues, but I personally did not share this

11   with anybody on the MPC or the ARB.

12       Q.   Why was Lifestyles not provided a copy

13   of this amendment to the comprehensive plan as

14   it applied to Lifestyle's property in advance of

15   the January 18 hearing?

16       A.   I was advised that, because of a prior

17   circumstance, it would be best to not advise any

18   other party because previously, when something

19   similar to this had been done, a project was

20   introduced that ultimately was denied, and so it

21   was to attempt to ensure public dialogue on the

22   property and forward the project.

23       Q.   Okay.  Anything else?

24       A.   To the best of my knowledge, no.

1  kids can play a variety of sports, maybe have

2  events on the space.  Just a space that could be

3  multifaceted in its use.

4      Q.  How much of the UMCH site should be

5  dedicated to this large green space for the

6  community?

7      A.  If I can reference one of my favorite

8  Supreme Court cases, it's like the Supreme Court

9  defines pornography, I don't have an exact

10 definition, but when I know it I'll see it.

11 I'll know, in my personal opinion, and based on

12 recommendations from ARB and MPC, if something

13 is proposed where green space is supported by

14 the required amount of density on that property.

15 I'm not an expert in -- let me back up.

16          I know that to make green space, I

17 guess, make sense within a community, you have

18 to have density around it for residents to use

19 the green space.  Again, I'm not an expert on

20 land use.  I'm not an expert on real estate.

21 But I will rely on the opinion of those experts

22 and city staff to what an appropriate size green

23 space is, based on the other uses on the

24 property as well.

1                        CERTIFICATE

2   STATE OF OHIO        :
                              SS:
3   COUNTY OF FRANKLIN :

4               I, Rhonda Lawrence, a stenographic
    court reporter and notary public in and for the
5   State of Ohio, duly commissioned and qualified,
    do hereby certify that the within-named
6   KATHERINE BREWER was first duly sworn to testify
    to the truth, the whole truth, and nothing but
7   the truth in the cause aforesaid; that the
    testimony then given was taken down by me
8   stenographically in the presence of said
    witness, afterwards transcribed; that the
9   foregoing is a true and correct transcript of
    the testimony; that this deposition was taken at
10  the time and place in the foregoing caption
    specified.
11
                I certify that I am not a relative or
12  employee of any attorney or counsel employed by
    the parties hereto and that I am not financially
13  interested in the action.  I further certify
    review of the transcript was not requested.
14
                In witness whereof, I have hereunto
15  set my hand at Columbus, Ohio, on this 25th day
    of October, 2023.
16

17

18

19

20
                   *Rhonda Lawrence*
21
                   Rhonda Lawrence
22                 Notary Public, State of Ohio

23  My commission expires:  October 9, 2028

24

Message

**From:** Brewer, Katy [Katy.Brewer@worthington.org]
**Sent:** 1/30/2022 4:35:19 PM
**To:** George Bleimes [george.bleimes@gmail.com]; Robinson, David [David.Robinson@worthington.org]
**Subject:** Re: [EXTERNAL] Council Actions

Good Afternoon Mr. Bleimes,

Thank you for taking the time to express your thoughts and concerns via two emails. I will address your questions below in the order in which you posed them, and I'm certainly willing to have more dialogue about your concerns.

1. When I ran for Council over the past year, one of the tools of the City I was grateful for is our City website. On the website, there are hundreds of emails from residents expressing their dislike of the most recent LC proposals. I have spoken with hundreds of residents who feel the same way - as many people reached out to me during the campaign. I obviously only can speak to the residents that I have come into direct contact with, but based on my experience, the vast majority of citizens are not in support of what LC has proposed.

2. I can only speak for my personal views on this matter, but my hope is that the UMCH site will be developed with many different uses (commercial for more restaurants, possible small office space, a variety of housing options and yes, a large green space for the community).

3. In regards to your third question, I would direct you to my first answer - I can only speak to the residents that I have spoken with or corresponded with about their thoughts on the UMCH site. There are certainly more opinions about the development of UMCH and I am always willing to listen to all viewpoints and take them into consideration when I vote on an issue.

4. I can't comment on your fourth question because I cannot speak for LC and what action they may or may not take. My hope is that we can come to the table with them, with a new counsel and have fruitful discussions.

5. In regards to your question concerning any forums that were held by any Council members (including the one I held with Councilmember Bucher) - I can express my thought process on that (but not that of Mr. Bucher). I knew the choice in front of me on January 18 was one that would have varying opinions/thoughts. I wanted to be able to answer any questions residents had (those that agreed with me, disagreed with me, and those that just had questions). I wouldn't call it damage control, but an opportunity to show residents that I am honest, open and ready to move forward with productive dialogue.

I also find it important to express I value the results of the Visioning Plan and am dedicated to being able to put its core principles and ideas to use for the City.

I am happy to speak with you more if you would like, but I do respect your thoughts and thank you for taking the time to express your concerns.

Thank you,

Katy Brewer
Worthington City Council President Pro-Tem


EXHIBIT 53

Worthington 042827

From: George Bleimes <george.bleimes@gmail.com>
Sent: Sunday, January 30, 2022 2:44 PM
To: Council
Subject: [EXTERNAL] Council Actions



This message is from an external source. **Please exercise caution** when opening attachments or opening web links from external senders, especially if the message is unsolicited or unexpected. If you feel this may be a phishing attempt, please use the **Phish Alert button** or reach out to **helpdesk@worthington.org** for assistance.

Further comments and questions concerning the suppression of public comment at the January 18th city council meeting:

- Without backing up their claim, several members of council have said that their actions are a response to the "will of the people " or something like that. Don't the well researched and documented conclusions of the city's Visioning Plan refute that claim?
- More specifically, since it is well understood that the ultimate goal of several council members is to make the vast majority of the UMCH property a city park, don't the results of the vision plan survey indicate that what the community really wants is an appropriate mixed use of that property, not just a park?
- Which begs the question, who have council members been collaborating with that leads them to make their claims of acting in support of the community's will? Just the well organized and well funded anti-development groups?
- When the city gets sued over council's actions, how much time will city staff have to take away from their critical roles to defend those actions? What will that cost be to the taxpayers?
- Why were several council members compelled to have Town Hall style meetings soon after the events of January 18th? Damage control?

I guess that's what happens when a community's trust in its leaders is lost.

George Bleimes