# DEVELOPMENT AGREEMENT

This Development Agreement (the "Agreement") is executed, delivered and made effective as of June 26, 2015 (the "Effective Date"), by and among THE UNITED METHODIST CHILDREN'S HOME WEST OHIO CONFERENCE OF THE UNITED METHODIST CHURCH, an Ohio non-profit corporation ("Owner"), and LC NORTH HIGH STREET, LTD., an Ohio limited liability company ("Developer").

## Preliminary Statements

A. Owner owns certain real property located in the City of Worthington, Franklin County, Ohio, known as Franklin County, Ohio Auditor Permanent Parcel Number 100-006391 containing approximately 40.773 acres ("Property"), which property is described in Exhibit A attached hereto and made a part hereof. For clarity, the Property does not include an additional approximately 3.575 acres of land known as Franklin County, Ohio Auditor Permanent Parcel Number 100-006390 that is also owned by Owner and located adjacent to the Property. Additionally, if the West Ohio Conference of the United Methodist Church ("WOC") does not agree to move to a new location on the Property, the Property subject to this Agreement shall not include the Conference Center, as defined below, subject to agreement to relocate and replace the current parking for the Conference Center, all as further provided in Section 9.3 hereof.

B. Owner and Developer desire that Developer serve as a master developer of the Property subject to the terms and conditions set forth in this Agreement.

## Agreement

NOW, THEREFORE, in consideration of the premises, as set forth in the foregoing Preliminary Statements, and of the mutual promises herein set forth, and for other good and valuable consideration, the parties do hereby make the following related agreements on and subject to the following terms, conditions, covenants, restrictions and provisions, intending to be legally bound hereby:

### ARTICLE I
### Definitions and Preliminary Agreements

1.1 **Preliminary Statements.** The Preliminary Statements above are incorporated herein as if fully rewritten herein.

1.2 **Definitions.**

(a) "Agreement" is defined in the preamble of this Agreement.

(b) "Authorized Representative" shall mean any person who is appointed as such pursuant to Section 13.14 hereof.

(c) "Budget" shall have the meaning given such term in Section 4.1 hereof.

8317177v7

EXHIBIT 2

CONFIDENTIAL

LC00001156

(d) "CCRs" means a Declaration of Covenants, Conditions and Restrictions to be placed upon the Property by Owner, subject to the approval rights of Developer and its affiliate Lifestyle Real Estate Holdings, Ltd., pursuant to Section 4(b) of the Multifamily PSA.

(e) "City" means the City of Worthington, Ohio.

(f) "Common Elements" shall have the meaning given such term in Section 7.6 hereof.

(g) "Conference Center" shall have the meaning given such term in Section 9.3 hereof.

(h) "Developer" as defined in the preamble of this Agreement.

(i) "Development Fee" shall mean a fee due Developer equal to four percent (4.0%) of the gross purchase price of any and all sales of the Property (including the sale of the Multifamily Property to an affiliate of Developer).

(j) "Effective Date" is defined in the preamble of this Agreement.

(k) "Final Approved Zoning Plan" shall have the meaning given such term in Section 4.1 hereof.

(l) "First Extended Term" shall have the meaning given such term in Section 2.2 hereof.

(m) "Force Majeure" means occurrence of any event beyond the reasonable control of the applicable party, such as strikes, acts of God, inability to obtain labor or materials, enemy action, civil commotion, acts of terrorism, fire, or other unavoidable casualty, which prevents or delays such party from completing its obligations under this Development Agreement, excluding the inability of such party to obtain capital or to pay money.

(n) "Initial Term" shall have the meaning given such term in Section 2.1 hereof.

(o) "Master Plan" shall mean a master plan for the development of the Property which shall include the Rezoning Plan, Site Development Plan, Budget, Price Schedule and all necessary engineering for the infrastructure needed for development of the Property in accordance with the Rezoning Plan and Site Development Plan and as finally determined in accordance with the Final Approved Zoning Plan.

(p) "Master Plan Entitlement Costs" shall mean all costs incurred by Developer in connection with the planning, zoning, entitling, and engineering the Property including, without limitation, attorneys' fees, land planning fees, architect fees, design fees, engineering fees, rendering and modeling fees and other production and material costs incurred.

(q) "Multifamily Property" shall mean a portion of the Property identified on the Final Approved Zoning Plan as to be developed with multifamily residential housing and certain amenities related thereto, including, but not limited to, a tavern, fitness center and leasing office.

CONFIDENTIAL

(r) "Multifamily PSA" shall mean that certain Real Estate Purchase Contract of even date herewith between Owner, as seller, and Lifestyle Real Estate Holdings, Ltd., an Ohio limited liability company, as buyer, regarding the Multifamily Property.

(s) "Person" or "Persons" means individuals, partnerships, limited liability companies, associations, corporations, limited liability partnerships, joint ventures, not for profit or voluntary associations, firms, joint-stock companies, trusts or any other form of private, public, or governmental entity, or one or more of them, as the context may require.

(t) "Price Schedule" shall have the meaning given such term in Section 4.1 hereof.

(u) "Property" is defined in Preliminary Statement A above.

(v) "Preliminary Statements" means those paragraphs A and B above.

(w) "Rezoning Plan" shall have the meaning given such term in Section 4.1 hereof.

(x) "Second Extended Term" shall have the meaning given such term in Section 2.3 hereof.

(y) "Site Development Plan" shall have the meaning given such term in Section 4.1 hereof.

(z) "Term" shall mean Initial Term, as extended to include the First Extended Term and Second Extended Term, if applicable pursuant to Sections 2.2 and 2.3 of this Agreement.

(aa) "WOC" shall mean the West Ohio Conference of the United Methodist Church, the sole member of Owner.

(bb) "Zoning Approval Date" shall mean such date as all necessary and appropriate zoning ordinances to allow development of the Property in accordance with the Final Approved Zoning Plan have been approved by City Council of the City, signed by the Mayor or other applicable executive authority of the City and are free of any right of appeal or referendum.

ARTICLE II.
Term

2.1 Initial Term. The initial term of this Agreement shall commence on the Effective Date and expire on the first (1st) anniversary of the Effective Date (the "Initial Term"), subject to Developer's right to extend this Agreement pursuant to Sections 2.2 and 2.3 below.

2.2 First Extension Option. Provided Developer has diligently and continuously pursued during the Initial Term, and is still pursuing, approval of the Rezoning Plan by the City, Developer shall be entitled to extend the Term of this Agreement for an additional period of one (1) year expiring on the second (2nd) anniversary of the Effective Date of this Agreement ("First Extended Term"). Developer shall exercise its right under this Section to extend the Term of this Agreement by delivering written notice of such exercise to Owner on or before the last day of the

3

CONFIDENTIAL                                                                 LC00001158

Initial Term; provided that, if Developer fails to give such notice of its exercise of its right to extend the Term of this Agreement prior to the expiration of the Initial Term, this Agreement shall not expire until the earlier of: (a) such time as Owner has given Developer notice of such expiration and Developer has failed to give Owner notice of its exercise of the right to extend the Term of this Agreement within ten (10) days thereafter, or (b) such time as Developer has given notice to Owner that the Term of this Agreement has expired.

2.3 Second Extension Option. If the Zoning Approval Date occurs on or before the expiration of the Initial Term or the First Extended Term, as applicable, and Lifestyle Real Estate Holdings, Ltd., or its Affiliate, has closed on its purchase of the Multifamily Property pursuant to the Multifamily PSA, the Term of this Agreement shall be automatically extended to the date which is five (5) years after the Zoning Approval Date ("Second Extended Term").

2.4 Termination Upon Termination of Multifamily PSA. Notwithstanding anything contained herein to the contrary, under all circumstances, upon the termination of the Multifamily PSA, this Agreement shall automatically and immediately terminate, and upon termination of this Agreement, the Multifamily PSA shall automatically and immediately terminate.

ARTICLE III.
Exclusive Right to Develop and Market the Property

3.1 Right to Develop. Owner hereby grants Developer the exclusive right to develop the Property during the Term of this Agreement. Development of the Property by Developer shall be accomplished in accordance with the terms of this Agreement. During the Term of this Agreement, Owner shall not authorize any other person or entity to act on its behalf in the development of the Property without the prior written consent of Developer.

3.2 Right to Market. Owner hereby grants Developer the exclusive right to market the sale and or leasing of all or any portion of the Property during the Term of this Agreement. During the Term of this Agreement, Owner shall not authorize any other person or entity to act on its behalf in the marketing of the Property without the prior written consent of Developer. All marketing and sales of portions of the Property shall be in accordance with the Site Development Plan and the Price Schedule, unless the parties agree to a revision thereof or an exception thereto with respect to any sale, and shall be to users to be mutually agreed upon by Owner and Developer.

ARTICLE IV.
Contingencies

4.1 Contingencies. Developer's and Owner's obligations under this Agreement are subject to the Developer and Owner agreeing upon the following: (a) a rezoning plan and text that both parties shall present to the City ("Rezoning Plan"), (b) a site development plan for the Property illustrating the proposed uses (residential, office, retail, etc.) of the various parcels within the Property ("Site Development Plan"), (c) a budget for the development of the Property ("Budget"), (d) a schedule of the prices of the various parcels of the Property proposed to be sold

4

CONFIDENTIAL

LC00001159

by Owner ("Price Schedule"), and (e) a final approved development plan and development text for the Property consistent with the Rezoning Plan acceptable to Developer and Owner ("Final Approved Zoning Plan"). In the event that Developer and Owner cannot agree on the Rezoning Plan, Site Development Plan, Budget, Price Schedule and the Final Approved Zoning Plan on or before the expiration of the Initial Term or the First Extended Term, as applicable, then either party may, by delivery of written notice to the other on or before the end of Initial Term or First Extended Term, as applicable, terminate this Agreement. In the event the Zoning Approval Date for the Final Approved Zoning Plan does not occur by the end of the First Extended Term, the Agreement shall terminate.

## ARTICLE V.
## Agreement to Work Toward Satisfaction of Contingencies

5.1 Rezoning Plan and Site Development Plan. Within ninety (90) days of the Effective Date, Developer will prepare and submit for Owner's comment or approval drafts of the Rezoning Plan and the Site Development Plan. After submission of the draft Rezoning Plan and Site Development Plan to Owner, Owner shall have thirty (30) days to provide comments to Developer on the same. If Owner fails to provide any comments on the same within said time period, the Rezoning Plan and Site Development Plan will be deemed approved and agreed to by Owner. If Owner provides comments on the draft Rezoning Plan or Site Development Plan, Developer and Owner will work together in good faith to resolve any differences regarding the same.

5.2 Budget. When Developer has obtained all information needed to prepare the Budget, Developer shall provide Owner with a draft Budget. After submission of the draft Budget to Owner, Owner shall have thirty (30) days to provide comments to Developer on the same. If Owner fails to provide any comments on the same within said time period, the Budget will be deemed approved and agreed to by Owner. If Owner provides comments on the draft Budget, Developer and Owner will work together in good faith to resolve any differences regarding the same.

5.3 Price Schedule. When Developer has obtained all information needed to prepare the Price Schedule, Developer shall provide Owner with a draft Price Schedule. After submission of the draft Price Schedule to Owner, Owner shall have thirty (30) days to provide comments to Developer on the same. The price of the Multifamily Property shall be as set forth in that certain Real Estate Purchase Contract between Owner, as seller, and Lifestyle Real Estate Holdings, Ltd., as buyer, of even date herewith. If Owner fails to provide any comments on the same within said time period, the Price Schedule will be deemed approved and agreed to by Owner. If Owner provides comments on the draft Price Schedule, Developer and Owner will work together in good faith to resolve any differences regarding the same.

5.4 Final Approved Zoning Plan Approval. Given the nature and timing of zoning approvals, review and approval of a Final Approved Zoning Plan will occur on an expedited basis in order that proposals or requirements of the City can be timely met and agreed upon by the parties to achieve the Zoning Approval Date of a Final Approved Zoning Plan acceptable to Owner and Developer at the earliest possible time. Owner and Developer will act

CONFIDENTIAL

LC00001160

in a commercially reasonable manner given the anticipated timing of such reviews and approvals.

## ARTICLE VI.
### Development Obligations of Developer

6.1 Development of Master Plan. Developer shall act as the master developer of the Property, and shall make commercially reasonable efforts to cause the Property to be planned, zoned, engineered and subdivided in accordance with the Rezoning Plan, Site Development Plan and Budget. Developer shall select and hire all land planners, engineers, attorneys and other consultants for the development of the Property. In undertaking its role as master developer, Developer shall incur all Master Plan Entitlement Costs, subject to reimbursement in accordance with Article IX hereof. Developer reserves the right to use its in-house consultants and employees of One Lifestyle, Ltd., and its affiliates, for planning, zoning, entitling, and engineering the Property, and all such costs and expense of such in-house consultants up to $150,000.00, provided the same are reasonable and at market rates, shall be part of the Master Plan Entitlement Costs to which Developer is entitled to be reimbursed. Owner and Developer acknowledge and agree that at the request of Developer, Owner engaged EMH&T to undertake some preliminary engineering work on the Property prior to the Effective Date. Developer agrees to be responsible for the payment of this preliminary engineering work up to but not in excess of $5,000.00, and such payment by Developer shall be part of the Master Plan Entitlement Costs to which Developer is entitled to be reimbursed. All other amounts due EMH&T for such preliminary engineering work in excess of $5,000.00 shall be paid by Owner. After the Zoning Approval Date, Developer will work with commercially reasonable diligence to complete all engineering for the Master Plan.

6.2 Other Approvals. Developer and Owner agree that the Rezoning Plan and the Site Development Plan will not be submitted to the City of Worthington for consideration of a rezoning for the Property until the same have been approved by West Ohio Conference of the United Methodist Church and the City of Worthington planning staff. Developer and Owner agree to submit the Rezoning Plan and the Site Development Plan to Worthington Area Residents for Responsible Development ("WARRD") for comment and discussion, but approval of the same by WARRD shall not be a condition upon the submission of them to the City of Worthington.

6.3 Marketing of Parcels. Developer shall exercise commercially reasonable efforts during the Term of this Agreement to market for sale all portions of the Property, other than the Multifamily Property, to procure buyers mutually acceptable to Owner and Developer for various portions of the Property that will pay prices not less than those set forth in the Price Schedule and that will develop the individual portions of the Property in accordance with the Final Approved Zoning Plan.

6.4 No Duties to Maximize Benefit to Owner. Developer shall act in accordance with the terms of this Agreement and will seek the consent of Owner as set forth herein, but Developer shall not have any duty to maximize the return to Owner from the Development of the Property.

6

8317177v7

6.5 No Guaranty of Result. Owner acknowledges that Developer has not guaranteed Owner that the Master Plan, or any portion thereof, will be approved by any particular governmental authority or any private party, that all or any portion of the Property will be sold or that all or any portion of the Property will be sold at a particular prices or on particular terms.

ARTICLE VII.
Obligations of Parties

7.1 Continued Ownership. Except for the potential sale of the Conference Center to WOC pursuant to its current lease of the Conference Center, Owner shall continue to own the Property and shall not, without the prior written consent of the Developer take, direct, permit or allow any of the following: (a) the conveyance of any interest in the Property or the encumbrance of the Property, including but not limited to the granting of any easement, license, lease, deed, mortgage or indenture, (b) the execution of any declaration, covenant or restriction affecting the Property, other than the CCRs, or (c) the filing of any zoning or other land use applications relating to the Property.

7.2 Costs of Ownership. Owner shall pay all costs of ownership of the Property, including but not limited to any real estate taxes, assessments, service payments or other payments in lieu of taxes and utility charges, until such time as portions of the Property are sold, at which time Owner shall no longer be responsible for the costs of ownership with respect to the portion of the Property sold.

7.3 Insurance. Owner and Developer shall each obtain and maintain during the Term of this Agreement commercial general liability insurance covering the Property, which policy is to be on an occurrence basis with minimum limits of not less than Three Million Dollars ($3,000,000.00) per occurrence. Each party shall be named as an "additional insured" under the required policy of the other party and each party shall provide certificates evidencing such policy upon request of the other party.

7.4 Mutual Indemnity and Hold Harmless. Developer shall indemnify and hold harmless Owner, its officers, trustees, employees, sole member and agents, from any loss, cost or damages to persons or property arising out of inspections, surveys and studies undertaken by Developer and its agents, consultants and representatives on the Property and the insurance provided by Developer pursuant to Section 7.3 hereof shall provide coverage for such indemnity and hold harmless. Notwithstanding anything to the contrary contained herein or in the Multifamily PSA, the provisions of this Section 7.4 shall survive any termination of this Agreement or the Multifamily PSA by lapse of time or otherwise. Owner shall indemnify and hold harmless Developer, its members, managers, officers, employees and agents, from any loss, cost or damages to persons or property arising out of the activities of Owner, its lessees, invitees, agents and representatives on the Property and the insurance provided by Owner pursuant to Section 7.3 hereof shall provide coverage for such indemnity and hold harmless. Notwithstanding anything to the contrary contained herein or in the Multifamily PSA, the provisions of this Section 7.4 shall survive any termination of this Agreement or the Multifamily PSA by lapse of time or otherwise.

7

CONFIDENTIAL

LC00001162

7.5    Cooperation and Support. Owner shall cooperate with and support Developer in all of its rezoning, planning and development efforts consistent with this Agreement. Said support shall include, but not be limited to, the execution of all necessary applications and requests, appearing and favorably testifying at all hearings and meetings relating to the Master Plan, and providing Developer and its agents, employees, consultants and contractors all information and documents relating to the Property in Owner's possession or under Owner's control. Owner shall cooperate with and support Developer in all of its efforts in connection with the marketing of the Property. Said support shall include, but not be limited to, the execution of all necessary or appropriate letters of intent, purchase contracts, affidavits, deeds, closing statements and other documents related to the sale of the Property, and providing Developer and its agents, employees, consultants and contractors and any prospective purchaser all information and documents relating to the Property in Owner's possession or under Owner's control.

7.6    Dedications and Granting of Easements. It is anticipated that the Master Plan will provide for common amenities, shared roads, common utilities and the like ("Common Elements"). Owner shall (a) grant all necessary easements and conveyances to allow for the development of the Common Elements, and (b) grant (to the extent required and agreed by Owner) a mortgage interest in the Property or portions thereof as security for the financing of the construction of such Common Elements.

7.7    Subdivision and Platting. Owner will execute any and all applications or plats required for subdivision of the Property in accordance with the Final Approved Zoning.

ARTICLE VIII.
Force Majeure

8.1    Developer shall be excused from performing any of its duties, obligations or undertakings provided in this Agreement in the event and so long as and to the extent that the performance of such duty, obligation or undertaking is prevented, delayed, retarded or hindered by any Force Majeure; provided that the provisions of this Section 8.1 shall not act to extend the Term hereof.

ARTICLE IX.
Reimbursement and Compensation of Developer

9.1    Right to Payment. Developer shall be reimbursed for all Master Plan Entitlement Costs as portions of the Property are sold during the Term of this Agreement but not after. In addition to reimbursement of the Master Plan Entitlement Costs, Developer, in exchange for its services as master developer, shall be paid the Development Fee. The reimbursement of Master Plan Entitlement Costs and the payment of the Development Fee shall be paid in accordance with Section 9.2 hereof; provided that if Developer is not successful in having the Property rezoned to allow for development in accordance with the Master Plan prior to the expiration of the Term or Developer terminates or defaults in its obligation to purchase the Multifamily Property in accordance with the Multifamily PSA, Owner will not be required to reimburse Developer for any Master Plan Entitlement Costs or pay any Development Fee. Any Master Plan Entitlement Costs or Development Fees that have not been paid to Developer at the end of the Term of this Agreement shall be forfeited and no longer due and payable; provided that in the

8

8317177v7

CONFIDENTIAL

LC00001163

event that a sale of the Property has occurred prior to the end of the Term of this Agreement, but the Master Plan Entitlement Costs or Development Fees to be paid to Developer from such sale in accordance with this Agreement have not been paid to Developer for any reason (e.g. a delay in wiring by an escrow agent or a mistake in wiring such amounts to Owner and not Developer), such Master Plan Entitlement Costs or Development Fees shall not be forfeited and shall remain due and payable.

9.2 <u>Method of Payment</u>. All proceeds received from each sale of all or any portion of the Property shall be allocated, distributed and paid in the following order and priority:

(a) First, to expenses reasonably incurred in connection with the sale of the portions of the Property being sold, including third party brokerage fees, attorneys fees, consulting fees, title costs and closing costs, all as mutually agreed and approved by Developer and Owner;

(b) Second, a portion of the Master Plan Entitlement Costs shall be paid to Developer such that the total amount of Master Plan Entitlement Costs from the current sale and prior sales paid to Developer is equal to the Reimbursement Percentage, as defined below, multiplied by the total Master Plan Entitlement Costs incurred as of the date of the current sale. "Reimbursement Percentage" shall mean, a fraction, expressed as a percentage, the numerator of which is the total gross sales proceeds paid by buyers of the Property through and including the current sale for which this waterfall is being applied, and the denominator of which is $8,500,000.00; provided that in no event shall the Reimbursement Percentage be greater than 100%. Notwithstanding the foregoing, with respect to a sale of all or a portion of the Property which results in no additional portion of the Property being available for sale pursuant to the Master Plan (i.e. the last sale of the Property), all remaining Master Plan Entitlement Costs shall be paid to Developer;

(c) Third, to Developer for Development Fee due on each sale;

(d) Fourth, to Owner until Owner has received, in the aggregate from the sale of the Property, $7,000,000;

(e) Fifth, eighty percent (80%) to Owner and twenty percent (20%) to Developer until Owner has received, in the aggregate from the sale of the Property, $8,000,000;

(f) Sixth, seventy percent (70%) to Owner and thirty percent (30%) to Developer until Owner has received in the aggregate from the sale of the Property, $9,000,000; and

(g) Thereafter, fifty percent (50%) to Owner and fifty percent (50%) to Developer.

9.3 <u>Conference Center</u>. Owner and Developer acknowledge that the existing conference center owned by Owner, leased to WOC and located at the northwest corner of North

9

CONFIDENTIAL

LC00001164

High Street and Wesley Boulevard and described more particularly on Exhibit "B" attached hereto ("Conference Center") may be redeveloped as part of the Master Plan. Developer agrees that neither (a) the retained ownership and redevelopment of a new conference center as part of the Master Plan, nor (b) the exercise by WOC of its option to purchase the Conference Center under its lease which is in effect as of the date hereof shall be considered a sale of a portion of the Property that triggers the payment of a portion of the Development Fee, or reimbursement of a portion of the Master Plan Entitlement Costs. Owner and Developer acknowledge and agree that if WOC decides not to move to a new Conference Center, Owner has arranged for the current parking field for the Conference Center to be relocated and in doing so, the costs of such relocation and providing a new parking field shall be Master Plan Entitlement Costs.

ARTICLE X.
Representations and Warranties of Owner

Owner hereby represents and warrants to Developer as follows:

10.1 Authority. Owner has the full right and authority to enter into this Agreement and to consummate or cause to be consummated the actions and transactions contemplated by this Agreement. Each individual executing this Agreement on behalf of Owner has the requisite authority to do so for and on behalf of Owner.

10.2 Execution, Delivery and Enforceability. This Agreement has been duly executed and delivered by Owner and is the valid and binding obligation of Owner, enforceable in accordance with its terms, subject as to enforceability to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium, and similar laws affecting creditors' rights and remedies generally and to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

10.3 No Conflict. Performance under this Agreement will not result in any breach of or default (or an event which would, with the passage of time or the giving of notice or both, constitute a default) under any material agreement or other instrument which is either binding upon or enforceable against Owner.

10.4 No Actions. As of the Effective Date, there is no suit, action, or proceeding existing or, to Owner's knowledge, threatened which affects the Property or Owner's ability to consummate or cause to be consummated the actions and transactions contemplated by this Agreement.

10.5 Assessments. As of the Effective Date, Owner has not received any notice of any assessments constituting, or that will constitute, a lien on the Property, and no improvements have been installed by any public authority, the cost of which is to be assessed against the Property in the future; and Owner has not received any notice of any possible future improvements by any public authority, any part of the cost of which would or might be assessed against the Property.

10.6 Title. Owner owns marketable title to the Property, free and clear of all liens and encumbrances except zoning ordinances, legal highways, and covenants, conditions, easements

10

CONFIDENTIAL

LC00001165

and restrictions of record, and other than with respect to the rights of WOC under its lease of the Conference Center, there are no rights of possession, use or otherwise, outstanding in third persons and there are no unrecorded leases, land contracts, sale contracts, options or other documents affecting the Property.

10.7 Mechanics' Liens. No work has been done by or on behalf of Owner on the Property which could give rise to any mechanics or similar liens, and no contracts are outstanding or are in effect with respect to the performance of any such work.

10.8 Claims. As of the Effective Date, there is no litigation or claim pending or, to the best of Owner's knowledge, threatened against or involving or relating to the Property and, to the best of Owner's knowledge, there are no facts or circumstances which could give rise to such claim or litigation.

10.9 Condemnation. Owner has not received notice of, and has no other knowledge or information of, any pending or contemplated condemnation action with respect to the Property, or any part thereof, or change in any governmental regulation or private restriction applicable to the Property, any pending or threatened judicial or administrative action or proceedings in any court or before any governmental authority or arbitration board or tribunal, or any such action or proceeding pending or threatened by adjacent landowners or other persons, any of which would result in any material change in the condition of the Property, or any part thereof, or to the access to the Property.

10.10 Environmental Violations. Seller has not been provided with written notice: (i) that the Property has been used for the treatment, storage or disposal of any "Hazardous Substances" (as hereinafter defined); or (ii) of any pending investigations concerning the Property by any governmental agency charged by law with the enforcement of any Environmental Law. For purposes of this Agreement, the term "Environmental Laws" shall mean all federal, state and local laws, including statutes, regulations, ordinances, codes, rules and other governmental restrictions and requirements, relating to environmental pollution, contamination or other impairment of any nature, any hazardous or other toxic substances, materials or wastes of any nature, whether liquid, solid and/or gaseous, including smoke vapor, fumes, soot, petroleum products, alides, alkalis, chemicals, wastes, by-products and recycled materials. These Environmental Laws shall include, but not be limited to, the Federal Solid Waste Disposal Act, the Federal Clean Air Act, the Federal Clean Water Act, the Federal Resource Conservation and Recovery Act of 1976, the Federal Comprehensive Environmental Responsibility Cleanup and Liability Act of 1980, regulations of the Environmental Protection Agency, regulations of the Nuclear Regulatory Agency, regulations of any state department of natural resources or state environmental protection agency now or at any time hereafter in effect and local health department ordinances. As used herein, "Hazardous Substances" means any quantities of hazardous substances, hazardous waste, hazardous materials, petroleum hydrocarbons, PCBs, urea formaldehyde foam insulation or asbestos substances as those terms are defined in any applicable local, state or federal law or regulation which are in excess of allowable levels prescribed by such applicable local, state or federal law or regulation.

CONFIDENTIAL

LC00001166

## ARTICLE XI.
### Confidentiality

11.1 The terms and provisions of this Agreement and all subsequent negotiations and the transactions anticipated thereby (including any purchase agreement) shall be strictly confidential. The parties and their respective agents and representatives shall not, except among themselves, talk about, write about or otherwise publicize or disclose at any time to any person or entity the terms of this Agreement, any purchase agreement related to the Property, or any fact concerning their negotiation, execution or implementation, unless the parties agree on a joint disclosure and participate therein. Without limiting the foregoing, the parties may disclose the general nature of the relationship between the parties, specifically that Developer is serving a master developer for the Property. Notwithstanding the forgoing, the parties hereto may discuss the existence, terms and provisions of this Agreement and any purchase agreement with their respective directors, officers, managers, shareholders, members, employees, lenders and professional advisors who need to know such information for the purpose of evaluating and/or executing transactions which are the subject of this Agreement (it being understood that such persons shall be informed by the disclosing party of the confidential nature of such information and shall be directed to treat such information confidentially in accordance with the terms of this Agreement). Further notwithstanding the foregoing, Developer may disclose to potential purchasers, potential lessees of potential purchasers, governmental authorities, its lenders, employees, investors, attorneys and other consultants the fact that Developer is authorized by Owner to take the actions contemplated to be taken by Developer under this Agreement.

## ARTICLE XII.
### Defaults and Remedies

12.1 <u>Defaults</u>. Any party (the "<u>defaulting party</u>") shall be in default of this Agreement if it should either: (a) fail to make any payment due hereunder to the other party within ten (10) days of the date when due, or (b) fail to observe any of the terms, conditions, restrictions or provisions of this Agreement within: (i) a period of thirty (30) days after the other party (the "<u>non-defaulting party</u>") has given to the defaulting party written notice thereof, or (ii) ninety (90) days, if within the thirty (30) day period described in clause (i) the defaulting party has commenced efforts to cure such failure and is pursuing such cure in a commercially reasonable manner. If a default by Developer shall occur hereunder prior to the commencement of the Second Extended Term and not be timely cured as provided in this Section 12.1, Owner shall have the right to terminate this Agreement by written notice to Developer, and upon the termination of this Agreement by Owner, the Multifamily PSA shall automatically terminate contemporaneously. From and after the commencement of the Second Extended Term, the occurrence of a default hereunder shall not act to terminate this Agreement and all remedies of the parties hereunder shall be retained.

12.2 <u>Remedies</u>.

(a) <u>Cure</u>. Should a default continue uncured beyond the expiration of any applicable notice and cure period, the non-defaulting party may cure such default of the defaulting party under this Agreement; and if the non-defaulting party should do so, then it shall be entitled to be

12

CONFIDENTIAL

LC00001167

reimbursed for all reasonable costs and expenses incurred by it in connection therewith, from either the defaulting party, its contractors, or its insurance carriers.

(b) <u>Civil Actions</u>. Should a default continue uncured beyond the expiration of any applicable notice and cure period, the non-defaulting party may sue the defaulting party for the specific performance of any obligation undertaken by the defaulting party in this Agreement, for injunctive or other equitable relief, or for actual damages incurred in any court of competent jurisdiction, including in any Ohio Court of Common Pleas or U.S. District Court, in order to recover any such amount as may be due and payable to the non-defaulting party. In no event shall either party be entitled to seek damages beyond its actual damages incurred and consequently, neither party shall be entitled to make a claim for damages in the nature of punitive, consequential or exemplary damages.

## ARTICLE XIII.
### Miscellaneous Provisions

13.1 <u>Notices</u>. All notices, consents, approvals and requests required or permitted hereunder shall be given in writing and shall be effective for all purposes if (a) hand delivered, (b) sent by certified or registered United States mail, postage prepaid, return receipt requested, (c) sent by expedited prepaid delivery service, either commercial or United States Postal Service, with proof of attempted delivery, or (d) sent by email, addressed as follows (or at such other address and Person as shall be designated from time to time by any party hereto, as the case may be, in a written notice to the other parties hereto in the manner provided for in this Section):

| | |
|---|---|
| To Owner: | The United Methodist Children's Home West Ohio Conference of the United Methodist Church<br>1033 High Street<br>Worthington, Ohio 43085<br>Attn: Sean Reilly, Executive Director<br>Email: sreilly@umchohio.org |
| With a copy to: | David W. Fisher, Esq.<br>Kephart Fisher LLC<br>207 N. Fourth Street<br>Columbus, Ohio 43215<br>Email: davidfisher@kephartfisher.com |
| To Developer: | LC North High Street, Ltd.<br>230 West Street, Suite 200<br>Columbus, Ohio 43215<br>Attn: Legal Department<br>Email: bbrownlee@lifestylecommunities.com |

13

CONFIDENTIAL

LC00001168

With a copy to: Steve Intihar, Esq.
Bricker & Eckler LLP
100 South Third Street
Columbus, Ohio 43215
Email: sintihar@bricker.com

A notice shall be deemed to have been given: in the case of hand delivery, at the time of delivery; in the case of registered or certified mail, when delivered; in the case of expedited prepaid delivery, on the date evidenced by the signed receipt; and in the case of email, upon confirmed receipt of the email by the sender's machine.

13.2 Assignment. Given the unique nature of the relationship between Owner and Developer, the position of trust and responsibility placed on Developer hereunder, and the fact that an affiliate of Developer is in contract to purchase the Multifamily Property pursuant to the Multifamily PSA, this Agreement is not assignable by Owner or Developer and any attempted assignment by Developer shall result in immediate termination of this Agreement.

13.3 Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Ohio.

13.4 Remedies Cumulative. All rights and remedies of the parties hereto enumerated in this Agreement shall be cumulative and, except as specifically contemplated otherwise by this Agreement, none shall exclude any other right or remedy allowed at law or in equity, and said rights or remedies may be exercised and enforced concurrently. No waiver by any party of any covenant or condition of this Agreement, to be kept or performed by any other party to this Agreement, shall constitute a waiver by the waiving party of any subsequent breach of such covenant or condition, or authorize the breach or non-observance of any other occasion of the same or any other covenant or condition of this Agreement.

13.5 Duplicate Originals. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be a duplicate original, but all of which, taken together, shall constitute a single instrument.

13.6 Article and Section Captions. The Article and Section captions contained in this Agreement are included only for convenience of reference and do not define, limit, explain or modify this Agreement or its interpretation, construction or meaning and are in no way to be construed as a part of this Agreement.

13.7 Severability. If any provision of this Agreement or the application of any provision to any Person or any circumstance shall be determined to be invalid or unenforceable, then such determination shall not affect any other provision of this Agreement or the application of said provision to any other Person or circumstance, all of which other provisions shall remain in full force and effect.

13.8 Amendments in Writing. No change, amendment, termination or attempted waiver of any of the provisions of this Agreement shall be binding upon any party unless in writing and signed by all of the parties hereto.

14

CONFIDENTIAL

LC00001169

13.9 Agreement for Exclusive Benefit of Parties. The provisions of this Agreement are for the exclusive benefit of the parties hereto and not for the benefit of any other Person, nor shall this Agreement be deemed to have conferred any rights, express or implied, upon any third Person.

13.10 No Partnership, Joint Venture or Principal-Agent Relationship. Neither anything contained in this Agreement nor any acts of the parties hereto shall be deemed or construed by the parties hereto, or either of them, or by any third Person, to create the relationship of principal and agent, or of partnership, or of joint venture, or of any association between the parties to this Agreement.

13.11 Written Consent Required. Whenever a party is requested to consent to or approve of any matter with respect to which its consent or approval is required by this Agreement, such consent or approval, if given, and unless a shorter time period is specified herein, shall be given in writing and shall be given within thirty (30) days of request therefor. Failure to consent, reject, approve or disapprove in writing within such thirty (30) day period (or such shorter time period as may be specified herein) shall be deemed to constitute consent and approval.

13.12 Reasonableness of Consent or Approval. Whenever a party is entitled to exercise some right under this Agreement only with the prior consent or approval of another party, such consent or approval shall not be unreasonably withheld, conditioned or delayed.

13.13 Estoppel Certificates. Upon the written request of any party (but no more often than twice in any calendar year), the other party shall, within fifteen (15) days thereafter, submit a certified statement, in writing, to the addressee specified in such request that the provisions of this Agreement are in full force and effect and that there has been compliance with all terms and provisions hereof by the respective parties hereunder, or if there are any such defaults or non-compliance, setting forth the nature of same.

13.14 Authorized Representative. Owner hereby appoints Cyndy Garn and Samuel D. Koon as its Authorized Representatives for purposes of dealing with Developer on behalf of Owner in respect of any and all matters in connection with this Agreement. Each Authorized Representative, acting without the other, shall have the power, in his or her discretion, to give and receive all notices, monies, consents, approvals, and other documents and instruments, and to take any other action on behalf of Owner. All actions by any Authorized Representative shall be final and binding on Owner. Developer may rely on the authority given to the Authorized Representatives until actual receipt by Developer of a duly authorized resolution substituting a different person as an Authorized Representative.

*[Signature page follows. No further text on this page.]*

CONFIDENTIAL

LC00001170

IN WITNESS WHEREOF, the parties have caused this Development Agreement to be executed by their duly authorized representatives, to be effective as of the Effective Date.

OWNER:

THE UNITED METHODIST CHILDREN'S HOME WEST OHIO CONFERENCE OF THE UNITED METHODIST CHURCH, an Ohio non-profit corporation

By: *Cyndy L Garn*
Name: *Cyndy L. Garn*
Title: *Board Chairperson*

DEVELOPER:

LC NORTH HIGH STREET, LTD., an Ohio limited liability company

By: _____
Name: _____
Title: _____

8317177v7

CONFIDENTIAL

LC00001171

IN WITNESS WHEREOF, the parties have caused this Development Agreement to be executed by their duly authorized representatives, to be effective as of the Effective Date.

OWNER:

THE UNITED METHODIST CHILDREN'S HOME WEST OHIO CONFERENCE OF THE UNITED METHODIST CHURCH, an Ohio non-profit corporation

By: _____

Name: _____

Title: _____

DEVELOPER:

LC NORTH HIGH STREET, LTD., an Ohio limited liability company

By: _____

Name: _L. Brent Miller_

Title: _President_

S-1

8317177v7

CONFIDENTIAL LC00001172

## Exhibit A
## Legal Description of the Property

Situated in the State of Ohio, County of Franklin and in the City of Worthington and bounded and described as follows:

Being all of Lot Number Two (2) of United Methodist Children's Home Amended Subdivision as the same is numbered and delineated on the record plat thereof, of record in Plat Book 83, Page 53, Recorder's Office, Franklin County, Ohio.

CONFIDENTIAL

LC00001173

**Exhibit B**
**Conference Center**



B-1

8317177v7

CONFIDENTIAL
LC00001174