*LIFESTYLE COMMUNITIES*

*vs.*

*CITY OF WORTHINGTON*

---

Deposition of

**Michael DeAscentis**

January 26, 2024

---



614.460.5000 | www.priohio.com | pri@priohio.com

1           IN THE UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF OHIO
2                  EASTERN DIVISION

3    LIFESTYLE COMMUNITIES,        )
     LTD., ET AL.,                 )
4                                  )
          Plaintiffs,              )
5                                  )
          vs.                      )    Case No.
6                                  )    2:22-cv-1775
     CITY OF WORTHINGTON,          )
7    OHIO,                         )
                                   )
8         Defendant.               )

9

10

11               VIDEOTAPED DEPOSITION

12            of MICHAEL DEASCENTIS II

13

14            Taken at the offices of
        Vorys Sater Seymour and Pease LLP
15            52 East Gay Street
              Columbus, Ohio 43215
16

17

18        on January 26, 2024, at 9:28 a.m.

19

20        Reported by: Julia Lamb, RPR, CRR

21

22                    -=0=-

23

24

1    APPEARANCES:

2         Joseph R. Miller
          Christopher L. Ingram
3         VORYS SATER SEYMOUR AND PEASE LLP
          52 East Gay Street
4         Columbus, Ohio 43215
          614.464.5480
5         jrmiller@vorys.com
          clingram@vorys.com
6
                on behalf of the Plaintiffs.
7

8         Paul J. Schumacher
          DICKIE McCAMEY
9         600 Superior Avenue East, Suite 2330
          Cleveland, Ohio 44114
10        216.390.1795
          pschumacher@dmclaw.com
11
                and
12
          Richard J. Silk, Jr.
13        DICKIE McCAMEY
          10 West Broad Street, Suite 1950
14        Columbus, Ohio 43215
          614.484.1187
15        rsilk@dmclaw.com

16              on behalf of the Defendant.

17

18

19

20   ALSO PRESENT:

21      Pat Flaherty, Videographer

22

23                      -=0=-

24

1                    STIPULATIONS

2              It is stipulated by and among counsel

3     for the respective parties that the videotaped

4     deposition of MICHAEL DEASCENTIS II, the Witness

5     herein, called by the Defendant under the

6     applicable Rules of Federal Civil Court

7     Procedure, may be taken at this time by the

8     stenographic court reporter and notary public by

9     agreement of counsel; that said deposition may

10    be reduced to writing stenographically by the

11    court reporter, whose notes thereafter may be

12    transcribed outside the presence of the witness;

13    and that the proof of the official character and

14    qualification of the notary is waived.

15                    -=0=-

16

17

18

19

20

21

22

23

24

1                    INDEX OF EXAMINATION

2                                              PAGE

3    BY MR. SCHUMACHER:                        13

4

5

6                    INDEX OF EXHIBITS

7    EXHIBIT           DESCRIPTION              PAGE

8     1        Email, 9-19-12                   25

9     2        Two-page email chain             27

10   Brownlee 2Development Agreement            31

11   Brownlee 3Real Estate Purchase            34
              Contract
12
      3        Two-page email chain             38
13
      4        Loan Summary                     39
14
      5        Two-page email chain             62
15
      6        Memo to Sam Koon                 69
16
      7        Email, 4-23-15                   80
17
      8        Three-page email chain           86
18
      9        Two-page email chain             90
19
      10       One-page email chain,            93
20             7-16-15, with attached
               letter, 7-15-15
21
      11       One-page email chain with       101
22             attached City Council
               Statement Regarding UMCH
23             Development Adopted Monday,
               October 12, 2015
24

| 1  | 12 | Email, 12-15-16                                                                              | 103 |
|----|----|----------------------------------------------------------------------------------------------|-----|
| 2  | 13 | Flowchart                                                                                    | 121 |
| 3  | 14 | Two-page email chain                                                                         | 132 |
| 4  | 15 | Two-page email chain, 6-3-19                                                                 | 132 |
| 5  | 16 | Lifestyle Communities Presentation Notes Building Worthington's Future meeting, 6-3-19       | 134 |
| 6  |    |                                                                                              |     |
| 7  |    |                                                                                              |     |
|    | 17 | One-page email chain                                                                         | 136 |
| 8  |    |                                                                                              |     |
|    | 18 | Two-page email chain                                                                         | 138 |
| 9  |    |                                                                                              |     |
|    | 19 | Michael DeAscentis Building Worthington's Future meeting, 6-3-19                             | 138 |
| 10 |    |                                                                                              |     |
| 11 |    |                                                                                              |     |
|    | 20 | Email, 6-28-19                                                                               | 142 |
| 12 |    |                                                                                              |     |
|    | 21 | Three-page email chain, 7-5-19                                                               | 144 |
| 13 |    |                                                                                              |     |
| 14 | 22 | Two-page email chain, 7-15-19                                                                | 144 |
| 15 | 23 | Letter, 10-7-19                                                                              | 150 |
| 16 | 24 | Email, 11-5-19                                                                               | 158 |
| 17 | 25 | One-page email chain, 12-23-20                                                               | 161 |
| 18 |    |                                                                                              |     |
|    | 26 | Two-page email chain, 4-9-21                                                                 | 168 |
| 19 |    |                                                                                              |     |
|    | 27 | Email, 1-27-21                                                                               | 191 |
| 20 |    |                                                                                              |     |
|    | 28 | Two-page email chain, 10-29-21                                                               | 198 |
| 21 |    |                                                                                              |     |
| 22 | 29 | Letter, 10-29-21                                                                             | 201 |
| 23 |    |                                                                                              |     |
| 24 |    |                                                                                              |     |

1                    INDEX OF OBJECTIONS

2                                    PAGE        LINE
    Objection by Mr. Miller         13          21
3   Objection by Mr. Miller         14          15
    Objection by Mr. Miller         15           7
4   Objection by Mr. Miller         15          12
    Objection by Mr. Miller         15          17
5   Objection by Mr. Miller         15          23
    Objection by Mr. Miller         16          24
6   Objection by Mr. Miller         17          11
    Objection by Mr. Miller         18          12
7   Objection by Mr. Miller         20           2
    Objection by Mr. Miller         20          11
8   Objection by Mr. Miller         20          15
    Objection by Mr. Miller         22           8
9   Objection by Mr. Miller         24           9
    Objection by Mr. Miller         25           1
10  Objection by Mr. Miller         26           3
    Objection by Mr. Miller         26          13
11  Objection by Mr. Miller         26          20
    Objection by Mr. Miller         27           6
12  Objection by Mr. Miller         27          21
    Objection by Mr. Miller         28           8
13  Objection by Mr. Miller         28          23
    Objection by Mr. Miller         29          18
14  Objection by Mr. Miller         30           1
    Objection by Mr. Miller         31           3
15  Objection by Mr. Miller         31          13
    Objection by Mr. Miller         32           5
16  Objection by Mr. Miller         32          22
    Objection by Mr. Miller         33           7
17  Objection by Mr. Miller         33          15
    Objection by Mr. Miller         34           3
18  Objection by Mr. Miller         35          24
    Objection by Mr. Miller         36           6
19  Objection by Mr. Miller         37           4
    Objection by Mr. Miller         37          13
20  Objection by Mr. Miller         37          22
    Objection by Mr. Miller         38          23
21  Objection by Mr. Miller         39          17
    Objection by Mr. Miller         40           7
22  Objection by Mr. Miller         40          12
    Objection by Mr. Miller         40          18
23  Objection by Mr. Miller         41           3
    Objection by Mr. Miller         41          16
24

| | | | |
|---|---|---|---|
| 1 | Objection by Mr. Miller | 41 | 23 |
| | Objection by Mr. Miller | 42 | 19 |
| 2 | Objection by Mr. Miller | 43 | 9 |
| | Objection by Mr. Miller | 43 | 13 |
| 3 | Objection by Mr. Miller | 43 | 19 |
| | Objection by Mr. Miller | 44 | 6 |
| 4 | Objection by Mr. Miller | 44 | 18 |
| | Objection by Mr. Miller | 45 | 19 |
| 5 | Objection by Mr. Miller | 46 | 15 |
| | Objection by Mr. Miller | 49 | 16 |
| 6 | Objection by Mr. Miller | 50 | 6 |
| | Objection by Mr. Miller | 51 | 4 |
| 7 | Objection by Mr. Miller | 51 | 8 |
| | Objection by Mr. Miller | 52 | 13 |
| 8 | Objection by Mr. Miller | 52 | 23 |
| | Objection by Mr. Miller | 53 | 6 |
| 9 | Objection by Mr. Miller | 53 | 18 |
| | Objection by Mr. Miller | 54 | 11 |
| 10 | Objection by Mr. Miller | 55 | 7 |
| | Objection by Mr. Miller | 57 | 6 |
| 11 | Objection by Mr. Miller | 57 | 12 |
| | Objection by Mr. Miller | 58 | 2 |
| 12 | Objection by Mr. Miller | 58 | 9 |
| | Objection by Mr. Miller | 58 | 14 |
| 13 | Objection by Mr. Miller | 58 | 22 |
| | Objection by Mr. Miller | 59 | 2 |
| 14 | Objection by Mr. Miller | 59 | 7 |
| | Objection by Mr. Miller | 59 | 12 |
| 15 | Objection by Mr. Miller | 59 | 20 |
| | Objection by Mr. Miller | 60 | 8 |
| 16 | Objection by Mr. Miller | 60 | 16 |
| | Objection by Mr. Miller | 60 | 21 |
| 17 | Objection by Mr. Miller | 64 | 2 |
| | Objection by Mr. Miller | 64 | 17 |
| 18 | Objection by Mr. Miller | 65 | 2 |
| | Objection by Mr. Miller | 65 | 12 |
| 19 | Objection by Mr. Miller | 65 | 19 |
| | Objection by Mr. Miller | 66 | 10 |
| 20 | Objection by Mr. Miller | 66 | 16 |
| | Objection by Mr. Miller | 66 | 20 |
| 21 | Objection by Mr. Miller | 68 | 2 |
| | Objection by Mr. Miller | 68 | 14 |
| 22 | Objection by Mr. Miller | 68 | 22 |
| | Objection by Mr. Miller | 69 | 6 |
| 23 | Objection by Mr. Miller | 70 | 2 |
| | Objection by Mr. Miller | 70 | 15 |
| 24 | | | |

| 1  | Objection by Mr. Miller | 70  | 24 |
|----|-------------------------|-----|----|
|    | Objection by Mr. Miller | 71  | 11 |
| 2  | Objection by Mr. Miller | 71  | 18 |
|    | Objection by Mr. Miller | 72  | 19 |
| 3  | Objection by Mr. Miller | 73  | 21 |
|    | Objection by Mr. Miller | 74  | 12 |
| 4  | Objection by Mr. Miller | 75  | 11 |
|    | Objection by Mr. Miller | 75  | 15 |
| 5  | Objection by Mr. Miller | 75  | 22 |
|    | Objection by Mr. Miller | 76  | 11 |
| 6  | Objection by Mr. Miller | 77  | 4  |
|    | Objection by Mr. Miller | 77  | 20 |
| 7  | Objection by Mr. Miller | 78  | 12 |
|    | Objection by Mr. Miller | 79  | 2  |
| 8  | Objection by Mr. Miller | 79  | 12 |
|    | Objection by Mr. Miller | 79  | 24 |
| 9  | Objection by Mr. Miller | 80  | 24 |
|    | Objection by Mr. Miller | 81  | 14 |
| 10 | Objection by Mr. Miller | 82  | 22 |
|    | Objection by Mr. Miller | 83  | 6  |
| 11 | Objection by Mr. Miller | 83  | 17 |
|    | Objection by Mr. Miller | 84  | 6  |
| 12 | Objection by Mr. Miller | 85  | 4  |
|    | Objection by Mr. Miller | 85  | 10 |
| 13 | Objection by Mr. Miller | 85  | 22 |
|    | Objection by Mr. Miller | 88  | 13 |
| 14 | Objection by Mr. Miller | 88  | 20 |
|    | Objection by Mr. Miller | 89  | 2  |
| 15 | Objection by Mr. Miller | 89  | 15 |
|    | Objection by Mr. Miller | 90  | 3  |
| 16 | Objection by Mr. Miller | 90  | 20 |
|    | Objection by Mr. Miller | 91  | 21 |
| 17 | Objection by Mr. Miller | 92  | 9  |
|    | Objection by Mr. Miller | 92  | 20 |
| 18 | Objection by Mr. Miller | 94  | 5  |
|    | Objection by Mr. Miller | 94  | 16 |
| 19 | Objection by Mr. Miller | 94  | 20 |
|    | Objection by Mr. Miller | 95  | 4  |
| 20 | Objection by Mr. Miller | 95  | 14 |
|    | Objection by Mr. Miller | 96  | 3  |
| 21 | Objection by Mr. Miller | 96  | 21 |
|    | Objection by Mr. Miller | 97  | 10 |
| 22 | Objection by Mr. Miller | 98  | 10 |
|    | Objection by Mr. Miller | 99  | 15 |
| 23 | Objection by Mr. Miller | 99  | 21 |
|    | Objection by Mr. Miller | 100 | 3  |
| 24 |                         |     |    |

```
 1    Objection by Mr. Miller              100          22
      Objection by Mr. Miller              101          22
 2    Objection by Mr. Miller              102          12
      Objection by Mr. Miller              102          18
 3    Objection by Mr. Miller              104          13
      Objection by Mr. Miller              104          24
 4    Objection by Mr. Miller              105          22
      Objection by Mr. Miller              106           3
 5    Objection by Mr. Miller              106          14
      Objection by Mr. Miller              106          23
 6    Objection by Mr. Miller              107           6
      Objection by Mr. Miller              107          12
 7    Objection by Mr. Miller              107          21
      Objection by Mr. Miller              108           1
 8    Objection by Mr. Miller              109          13
      Objection by Mr. Miller              109          18
 9    Objection by Mr. Miller              110          14
      Objection by Mr. Miller              110          22
10    Objection by Mr. Miller              111           2
      Objection by Mr. Miller              111          12
11    Objection by Mr. Miller              112           1
      Objection by Mr. Miller              112           4
12    Objection by Mr. Miller              112          12
      Objection by Mr. Miller              112          20
13    Objection by Mr. Miller              113           1
      Objection by Mr. Miller              113          17
14    Objection by Mr. Miller              114          13
      Objection by Mr. Miller              115          19
15    Objection by Mr. Miller              116           1
      Objection by Mr. Miller              116           5
16    Objection by Mr. Miller              116          19
      Objection by Mr. Miller              117          18
17    Objection by Mr. Miller              118          15
      Objection by Mr. Miller              119           2
18    Objection by Mr. Miller              119           8
      Objection by Mr. Miller              119          14
19    Objection by Mr. Miller              120          14
      Objection by Mr. Miller              121          18
20    Objection by Mr. Miller              121          24
      Objection by Mr. Miller              122           7
21    Objection by Mr. Miller              123           7
      Objection by Mr. Miller              123          13
22    Objection by Mr. Miller              124           5
      Objection by Mr. Miller              124          22
23    Objection by Mr. Miller              125           6
      Objection by Mr. Miller              125          18
24
```

| | | | |
|---|---|---|---|
| 1 | Objection by Mr. Miller | 126 | 5 |
| | Objection by Mr. Miller | 126 | 12 |
| 2 | Objection by Mr. Miller | 128 | 11 |
| | Objection by Mr. Miller | 128 | 21 |
| 3 | Objection by Mr. Miller | 129 | 9 |
| | Objection by Mr. Miller | 129 | 22 |
| 4 | Objection by Mr. Miller | 130 | 4 |
| | Objection by Mr. Miller | 132 | 4 |
| 5 | Objection by Mr. Miller | 133 | 12 |
| | Objection by Mr. Miller | 133 | 20 |
| 6 | Objection by Mr. Miller | 134 | 3 |
| | Objection by Mr. Miller | 136 | 2 |
| 7 | Objection by Mr. Miller | 136 | 21 |
| | Objection by Mr. Miller | 137 | 13 |
| 8 | Objection by Mr. Miller | 137 | 23 |
| | Objection by Mr. Miller | 139 | 7 |
| 9 | Objection by Mr. Miller | 139 | 18 |
| | Objection by Mr. Miller | 140 | 22 |
| 10 | Objection by Mr. Miller | 141 | 23 |
| | Objection by Mr. Miller | 142 | 10 |
| 11 | Objection by Mr. Miller | 143 | 5 |
| | Objection by Mr. Miller | 143 | 11 |
| 12 | Objection by Mr. Miller | 143 | 20 |
| | Objection by Mr. Miller | 144 | 3 |
| 13 | Objection by Mr. Miller | 145 | 16 |
| | Objection by Mr. Miller | 146 | 3 |
| 14 | Objection by Mr. Miller | 146 | 8 |
| | Objection by Mr. Miller | 146 | 17 |
| 15 | Objection by Mr. Miller | 147 | 11 |
| | Objection by Mr. Miller | 148 | 6 |
| 16 | Objection by Mr. Miller | 149 | 2 |
| | Objection by Mr. Miller | 149 | 10 |
| 17 | Objection by Mr. Miller | 149 | 16 |
| | Objection by Mr. Miller | 150 | 18 |
| 18 | Objection by Mr. Miller | 150 | 24 |
| | Objection by Mr. Miller | 151 | 12 |
| 19 | Objection by Mr. Miller | 152 | 22 |
| | Objection by Mr. Miller | 153 | 4 |
| 20 | Objection by Mr. Miller | 153 | 20 |
| | Objection by Mr. Miller | 154 | 9 |
| 21 | Objection by Mr. Miller | 154 | 17 |
| | Objection by Mr. Miller | 155 | 6 |
| 22 | Objection by Mr. Miller | 155 | 17 |
| | Objection by Mr. Miller | 156 | 4 |
| 23 | Objection by Mr. Miller | 157 | 2 |
| | Objection by Mr. Miller | 157 | 9 |
| 24 | | | |

```
 1    Objection by Mr. Miller          157          17
      Objection by Mr. Miller          157          23
 2    Objection by Mr. Miller          159           8
      Objection by Mr. Miller          159          16
 3    Objection by Mr. Miller          160           5
      Objection by Mr. Miller          160          24
 4    Objection by Mr. Miller          161           5
      Objection by Mr. Miller          162           6
 5    Objection by Mr. Miller          163           1
      Objection by Mr. Miller          163          14
 6    Objection by Mr. Miller          164           5
      Objection by Mr. Miller          165           8
 7    Objection by Mr. Miller          165          18
      Objection by Mr. Miller          166          22
 8    Objection by Mr. Miller          167          12
      Objection by Mr. Miller          169           4
 9    Objection by Mr. Miller          171          19
      Objection by Mr. Miller          173          12
10    Objection by Mr. Miller          174           2
      Objection by Mr. Miller          174          15
11    Objection by Mr. Miller          175           1
      Objection by Mr. Miller          175          18
12    Objection by Mr. Miller          176           4
      Objection by Mr. Miller          178          23
13    Objection by Mr. Miller          180           6
      Objection by Mr. Miller          180          14
14    Objection by Mr. Miller          181          16
      Objection by Mr. Miller          181          22
15    Objection by Mr. Miller          182          22
      Objection by Mr. Miller          184          11
16    Objection by Mr. Miller          184          23
      Objection by Mr. Miller          186           8
17    Objection by Mr. Miller          186          14
      Objection by Mr. Miller          186          19
18    Objection by Mr. Miller          187           7
      Objection by Mr. Miller          187          13
19    Objection by Mr. Miller          188          15
      Objection by Mr. Miller          190          17
20    Objection by Mr. Miller          193           2
      Objection by Mr. Miller          193          10
21    Objection by Mr. Miller          195          13
      Objection by Mr. Miller          196           3
22    Objection by Mr. Miller          197           9
      Objection by Mr. Miller          197          23
23    Objection by Mr. Miller          198           3
      Objection by Mr. Miller          198          17
24
```

```
 1    Objection by Mr. Miller          199        20
      Objection by Mr. Miller          201         4
 2    Objection by Mr. Miller          202         6
      Objection by Mr. Miller          202        22
 3    Objection by Mr. Miller          203        14
      Objection by Mr. Miller          203        20
 4    Objection by Mr. Miller          205         3
      Objection by Mr. Miller          207         1
 5    Objection by Mr. Miller          207         5
      Objection by Mr. Miller          207        11
 6    Objection by Mr. Miller          208        11
      Objection by Mr. Miller          208        21
 7    Objection by Mr. Miller          209         2
      Objection by Mr. Miller          209         8
 8    Objection by Mr. Miller          209        20
      Objection by Mr. Miller          210         2
 9    Objection by Mr. Miller          210        14
      Objection by Mr. Miller          211         1
10    Objection by Mr. Miller          211         5
      Objection by Mr. Miller          212         7

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

1          THE VIDEOGRAPHER:  Okay.  We're on the

2    record.  You want to swear in the witness.

3              MICHAEL DEASCENTIS II

4    being first duly sworn, as hereinafter certified,

5    deposes and says as follows:

6              CROSS-EXAMINATION

7    BY MR. SCHUMACHER:

8       Q.  Could you state your full name for the

9    record, please.

10      A.  Michael James DeAscentis II.

11      Q.  Do you also go by Michael DeAscentis

12    Jr.?

13      A.  Yes.

14      Q.  My name is Paul Schumacher.  I represent

15    the city of Worthington in the lawsuit that you

16    and your companies have filed against them.

17    You're aware of that lawsuit?

18      A.  Yes.

19      Q.  Is your father still involved in the

20    business?

21          MR. MILLER:  Objection to form.

22          You may answer.

23      A.  Yes.

24      Q.  And what role does your father play in

1    the company?

2        A.  Land development.

3        Q.  And I understand your title is chief

4    executive officer?

5        A.  Yes.

6        Q.  And that's of Lifestyle Communities

7    Limited?

8        A.  Yes.

9        Q.  And how long have you been CEO of that

10   company?

11       A.  Since 1996.

12       Q.  Can you tell me a little bit about the

13   company, when it was formed and what its

14   business is?

15           MR. MILLER:  Objection to form.

16           You may answer.

17       A.  Apartment development.

18       Q.  And when was it formed?

19       A.  1996.

20       Q.  Do you understand that you're here today

21   to testify in this federal lawsuit that your

22   company has filed?

23       A.  Yes.

24       Q.  Who is Worthington Campus, LLC?

 1      A.  I'm not sure.

 2      Q.  Is Worthington Campus, LLC an affiliate

 3  of Lifestyle Communities Limited?

 4      A.  I'm not sure.

 5      Q.  How many companies does Lifestyle

 6  Communities Limited have ownership interest in?

 7          MR. MILLER:  Objection to form.

 8          You may answer.

 9      A.  A lot.  More than 50.

10      Q.  Do you have access to a list of those

11  companies?

12          MR. MILLER:  Objection to form.

13      A.  Yes.

14      Q.  Would you be able to provide a copy of

15  that list to your attorney if we request one

16  from him?

17          MR. MILLER:  Same objection.

18          You may answer.

19      A.  Yes.

20      Q.  Thank you.

21          How many members are there in Lifestyle

22  Communities Limited?

23          MR. MILLER:  Objection to form.

24          You may answer if you understand the

1  question.

2      A.  I don't know.

3      Q.  Are you a 100 percent owner of Lifestyle

4  Communities Limited?

5      A.  No.

6      Q.  How many other owners or members are

7  there?

8      A.  I don't know.

9      Q.  More than two?

10     A.  Yes.

11     Q.  Does Lifestyle -- do you have access to

12  Lifestyle Communities Limited's articles of

13  incorporation or organization?

14     A.  Yes.

15     Q.  Would you be able to provide a copy of

16  those to your attorneys?

17     A.  Yes.

18     Q.  Thank you.

19         Have you ever been deposed before?

20     A.  Yes.

21     Q.  How many times?

22     A.  Once.

23     Q.  What was the nature of that matter?

24         MR. MILLER:  Objection to form.

·1· · · · · You may answer.

·2· ·A.· Architecture.

·3· ·Q.· Where was the case pending?

·4· ·A.· What city?

·5· ·Q.· Yes.

·6· ·A.· Columbus.

·7· ·Q.· Franklin County?

·8· ·A.· Yes.

·9· ·Q.· Who was the Plaintiff in the lawsuit

10· ·that you were deposed in?

11· · · · · MR. MILLER:· Objection to form.

12· · · · · You may answer if you know.

13· ·A.· David Whitt.

14· ·Q.· When did you give the deposition?

15· ·A.· Over five years ago.

16· ·Q.· Well, then you were at least familiar

17· ·with the process where I'm going to ask some

18· ·questions and you're going to provide answers

19· ·under oath?

20· ·A.· Yes.

21· ·Q.· If you don't understand a question that

22· ·I ask you, please tell me that you don't

23· ·understand the question --

24· ·A.· Okay.

1      Q.  -- or ask me to rephrase it, please.  Is

2  that --

3      A.  Yes.

4      Q.  Okay.  If I -- if you do answer a

5  question, however, I'm going to assume that you

6  heard me, understood the question and you

7  answered it truthfully.  Is that fair?

8      A.  Yes.

9      Q.  Thank you.

10        What did you do to prepare for the

11  deposition today?

12        MR. MILLER:  Objection to form.

13        You may answer.

14      A.  Met with my lawyers.

15        MR. MILLER:  And I would caution you,

16  Mr. DeAscentis, not to disclose anything that

17  you discussed with your lawyers.

18      Q.  Yeah, I don't want to know what you

19  talked about with your lawyers.

20        How many times did you meet with your

21  lawyers to prepare for the deposition?

22      A.  Once.

23      Q.  Did you review any documents in

24  preparation for your deposition?

1    A.  Yes.

2    Q.  Which documents?

3    A.  I don't know.  I mean, lots of

4  documents.

5    Q.  I have a stack in front of me here --

6    A.  Okay.

7    Q.  -- that's about 8 inches high.  Was it

8  at least this many documents --

9    A.  No.

10    Q.  -- or are we talking less than that?

11    A.  Less than that.

12    Q.  Okay.  Do you recall any of the

13  documents that you reviewed to prepare for this

14  deposition?

15    A.  Can you repeat the question?

16    MR. SCHUMACHER:  Julia, could you repeat

17  the question, please.

18      (Record read as requested.)

19    A.  Some emails from me to other people in

20  the company is the ones that I remembered.

21    Q.  I wanted to ask you about that.  I've

22  noticed that you have a number of different

23  email addresses within Worthington communities

24  limited and its affiliated companies.  Is that

1    true?

2          MR. MILLER:  Objection to form.  Just

3    FYI, you misspoke and said Worthington

4    communities rather than Lifestyle.

5          MR. SCHUMACHER:  I'm sorry.  Thank you,

6    Joe.

7       Q.  You have a number of email addresses

8    associated with Lifestyle Communities Limited

9    and its affiliated companies, don't you?

10      A.  Yes.

11          MR. MILLER:  Same objection.

12      Q.  Which email address do you typically go

13    by most of the time?

14      A.  Mdeascentis --

15          MR. MILLER:  I'm sorry.  Objection to

16    form.

17          You may answer.

18      A.  Mdeascentisjr@lifestylecommunities.com.

19      Q.  Where did you go to school?

20      A.  DeSales.

21      Q.  DeSales High School?

22      A.  Yes.

23      Q.  When did you graduate?

24      A.  1988.

1     Q.  College education?

2     A.  Yes.

3     Q.  Where?

4     A.  University of Dayton.

5     Q.  Flyer, 1980.  How about you?

6     A.  1992.

7     Q.  Any further education after college?

8     A.  No.

9     Q.  And your degree was in what?

10    A.  Accounting.

11    Q.  After graduating from college in 1992,

12 did you become employed anywhere?

13    A.  Yes.

14    Q.  Where?

15    A.  Deloitte --

16       MR. MILLER:  There's no question

17 pending.  You've answered the question.

18       MR. SCHUMACHER:  I said where.  I'm

19 sorry.

20       MR. MILLER:  Oh, you did.  I didn't pick

21 it up.  Sorry.

22    A.  Deloitte & Touche.

23    Q.  What did you do at Deloitte & Touche?

24    A.  Tax staff accountant.

1    Q.  And how long did you do that?

2    A.  Four years.

3    Q.  Where were you employed next?

4    A.  Lifestyle Communities.

5    Q.  Did you form that company with your

6  father or was it already existing?

7    A.  I formed it.

8       MR. MILLER:  Objection to form.

9       You may answer.

10    Q.  So you formed it by yourself in 1996?

11    A.  Actually a Vorys lawyer formed it for

12  me.

13    Q.  I'm sorry?

14    A.  A Vorys lawyer formed it for me.

15    Q.  Okay.  Did you have any other business

16  partners when you formed the company?

17    A.  Just my dad.

18    Q.  And his name is Michael DeAscentis Sr.?

19    A.  Correct.

20    Q.  Where does he reside?

21    A.  Franklin County.

22    Q.  Which part of Franklin County?

23    A.  New Albany.

24    Q.  And how about you, where do you reside?

1      A.  New Albany.

2      Q.  What was your dad's role, then, in the

3  company when you formed it in 1996?

4      A.  Land development.

5      Q.  You said earlier that Lifestyle

6  Communities Limited's business was apartment

7  development.  Was that the same focus in 1996?

8      A.  That's what it started out as.

9          MR. SCHUMACHER:  Were you able to get

10  those documents?

11          MR. INGRAM:  I can.  Not yet.

12          MR. SCHUMACHER:  Can we go off the

13  record, then.

14          THE VIDEOGRAPHER:  Off the record.

15              (Recess taken.)

16          THE VIDEOGRAPHER:  Okay.  We're back on

17  the record.

18  BY MR. SCHUMACHER:

19      Q.  Mr. DeAscentis, when -- you know that

20  the lawsuit here is involving a piece of

21  property in Worthington, Ohio that's known as

22  the UMCH property?

23      A.  Yes.

24      Q.  So if I refer to the property in this

1    case, in this deposition, will you understand

2    that I mean the property along High Street

3    approximately 40 acres that is the basis of the

4    lawsuit that you and your company filed?

5        A.  Yes.

6        Q.  It's accurate that you've been trying to

7    develop this property since as far back as 2012,

8    isn't it?

9            MR. MILLER:  Objection to form.

10           You may answer.

11       A.  I'm not sure the date we started.

12       Q.  You started working with the folks who

13   were trying to develop a Giant Eagle on the

14   premises, didn't you?

15       A.  No.

16       Q.  Do you know someone named Frank Kass?

17       A.  Yes.

18       Q.  Who's Frank Kass?

19       A.  He's a local developer.

20       Q.  Local where?

21       A.  Columbus, Ohio.

22       Q.  Are you familiar with a conceptual plan

23   he had to build a Giant Eagle grocery store on

24   this property together with an apartment layout?

1        MR. MILLER:  Objection to form.

2        You may answer.

3    A.  I can't recall.

4    Q.  You can't recall that.  Let me hand you

5  a document that we'll have marked as --

6        MR. SCHUMACHER:  What exhibit are we up

7  to now on your list?

8        COURT REPORTER:  You want to go off the

9  record?

10        MR. SCHUMACHER:  Yeah.  Okay.

11        THE VIDEOGRAPHER:  Off the record.

12                   -=0=-

13      (Deposition Exhibit 1 marked.)

14                   -=0=-

15        THE VIDEOGRAPHER:  We're back on the

16  record.

17  BY MR. SCHUMACHER:

18    Q.  I've handed you now a document we've

19  marked as DeAscentis Exhibit Number 1.  Have you

20  had a chance to review that?

21        MR. MILLER:  Take what time you need,

22  sir, to review the document.

23    A.  Yes.

24    Q.  This is a true and correct copy of an

1    email that was sent from Sean Cullen on

2    September 9th, 2012 at 8:58 PM to you?

3         MR. MILLER:  Objection to form.

4    September 19th.

5         MR. SCHUMACHER:  Did I say September

6    9th?

7         MR. MILLER:  September 9th.

8         MR. SCHUMACHER:  September 19th.  Thank

9    you.

10    Q.  Is this a true and correct copy of an

11    email that Mr. Cullen sent to you on

12    September 19th, 2012?

13         MR. MILLER:  Same objection.

14         You may answer.

15    A.  Yes.

16    Q.  Doesn't the body of the email refer to a

17    conceptual plan that Mr. Kass and Mr. Cullen

18    were proposing for the property that we're

19    talking about?

20         MR. MILLER:  Objection to form.

21         You may answer.

22    A.  It's a long time ago.

23    Q.  So you don't remember it?

24    A.  I don't.  I do remember Frank working on

1    this site.  I don't remember this email prior to

2    my involvement.

3        Q.  Well, you do remember that they were

4    proposing a grocery store on the site together

5    with a plan for residential apartments?

6            MR. MILLER:  Objection to form.

7        A.  I don't remember.

8        Q.  Okay.  I'm going to hand you what we'll

9    mark as Exhibit 2, then.

10                      -=0=-

11        (Deposition Exhibit 2 marked.)

12                      -=0=-

13            MR. MILLER:  And again, Michael, take

14    what time you need to review the document.

15            THE WITNESS:  Okay.

16    BY MR. SCHUMACHER:

17        Q.  Is this a true and correct copy of an

18    email that Chase Miller of Lifestyle Communities

19    sent to Sean Cullen on September 25th, 2012 with

20    a copy to you?

21            MR. MILLER:  Same objection.

22        A.  Yes.

23        Q.  And the subject of this email was a

24    conceptual layout for the UMCH property?

1      A.  Yes.

2      Q.  It appears that Mr. Miller also provided

3  a link to download the concept plan for this

4  proposal, didn't it?

5      A.  Yes.

6      Q.  Do you have a copy of this concept plan

7  in your files?

8          MR. MILLER:  Objection to form.

9          You may answer if you know.

10      A.  I don't.

11      Q.  All right.

12          MR. SCHUMACHER:  Well, we'd like to make

13  a specific request to the Plaintiff in the

14  lawsuit for a copy of the download concept plan

15  referred to in DeAscentis Exhibit 2.

16          MR. MILLER:  Noted.

17  BY MR. SCHUMACHER:

18      Q.  So Mr. DeAscentis, does this refresh

19  your recollection that there was a proposal by

20  Mr. Kass and his company to develop this

21  property for a grocery store, including some

22  apartments?

23          MR. MILLER:  Objection to form.

24          You may answer.

1      A.  I don't see the grocery store.  I see

2  the apartments on the email.

3      Q.  Yes.

4      A.  And Frank builds apartments.  Frank

5  builds grocery stores.

6      Q.  My question for you, sir, is are you

7  telling us that you don't remember that Mr. Kass

8  was proposing building a Giant Eagle on the site

9  along with these apartments?

10      A.  I was saying I don't see it in the

11  email.

12      Q.  I agree with you it's not in the email.

13  What I'm asking you, sir, is are you telling the

14  Court that you don't recall --

15      A.  I don't recall.

16      Q.  -- that he wanted to build a Giant

17  Eagle?

18          MR. MILLER:  Objection to form.

19          You may answer.

20      A.  I don't recall.

21      Q.  Okay.  So you don't recall how the

22  community reacted to the proposal to build the

23  Giant Eagle and an apartment complex on the

24  property.  Is that what you're saying?

1        MR. MILLER:  Objection to form.

2    A.  I don't recall.

3    Q.  Okay.  Who is Chase Miller?

4    A.  Chase was an employee that worked at the

5 company.

6    Q.  Which company?

7    A.  Lifestyle Communities.

8    Q.  When you say Lifestyle Communities, are

9 you referring to Lifestyle Communities Limited?

10    A.  Yes.

11    Q.  Thank you.

12        We can agree on that going forward?

13    A.  Yes.

14    Q.  Okay.  You would agree with me, I think

15 you testified earlier, that Lifestyle

16 Communities has maybe 50 affiliate companies?

17    A.  Yes.

18    Q.  Where is Mr. Miller now?  Is he still

19 employed?

20    A.  No.

21    Q.  When was he last employed at Lifestyle

22 Communities?

23    A.  I don't know.

24    Q.  He was involved in the development of

1   the property that we're talking about, isn't he?

2          MR. MILLER:  Objection to form.

3          You may answer if you understand the

4   question.

5      A.  Yes.

6      Q.  You knew that he participated in making

7   a presentation to the community in 2015, don't

8   you?

9      A.  I don't remember the year, but I know he

10  made a presentation.

11     Q.  Were you present at the presentation?

12         MR. MILLER:  Objection to form.

13         You may answer.

14     A.  I don't remember.

15     Q.  Let me hand you what has previously been

16  marked as Brownlee Exhibit 2.

17         MR. MILLER:  Michael, as always, I would

18  advise you to take what time you need to

19  familiarize yourself with the document.

20     A.  I mean, that'll take me a long time.

21     Q.  Well, let me -- maybe I can make it easy

22  for you.  Mr. Brownlee testified in his

23  deposition recently that Exhibit 2 to his

24  deposition is the development agreement that was

1    executed between the United Methodist Children's

2    Home and LC North High Street Limited on

3    June 26, 2015.  Are you aware of that?

4          MR. MILLER:  Objection to form.

5       A.  No.

6       Q.  So you're not -- you've never seen this

7    document before?

8          MR. MILLER:  Give the witness time to

9    review the document.

10         MR. SCHUMACHER:  Sure.  That's fine.

11         MR. MILLER:  Not saying --

12         MR. SCHUMACHER:  Take as much time --

13         MR. MILLER:  -- you need to review it

14   word for word -- hang on, Paul.  But he's asked

15   you if you've seen the document before.

16      A.  I don't remember.

17      Q.  Let me ask it this way.  Did your

18   company or one of your affiliate companies enter

19   into a development agreement with United

20   Methodist Children's Home on June 26, 2015?

21         MR. MILLER:  Objection to form.

22      A.  I'm not sure.

23      Q.  Have you had a chance to review it now?

24      A.  Yes.

1      Q.  Are you familiar with the document?

2      A.  Just from looking at it just now.

3      Q.  This is the development agreement that

4  your affiliate company entered into with the

5  United Methodist Children's Home, isn't it?

6          MR. MILLER:  Objection to form.  He

7  testified that he didn't recall.

8      Q.  Is that your testimony?

9      A.  Yes.

10      Q.  So you're the CEO of Lifestyle

11  Communities Limited and you don't recall

12  entering into a development agreement with UMCH

13  in 2015?

14          MR. MILLER:  Objection to form.  Asked

15  and answered.

16      Q.  Is that your testimony?

17      A.  Well, I didn't sign it.

18      Q.  I understand that.

19      A.  I wasn't aware that we had a development

20  agreement.

21      Q.  So you were never aware of the fact that

22  your company and its affiliated companies were

23  negotiating with UMCH to enter into a

24  development agreement for this property.  Is

1    that your testimony?

2        MR. MILLER:  Objection to form.

3    A.  I'm aware that we were negotiating to

4    purchase the property.

5    Q.  Okay.  And you ultimately did, didn't

6    you?

7    A.  Yes.

8    Q.  Let me hand you a copy of another

9    exhibit that was previously marked at Bo

10   Brownlee's deposition as Exhibit 3.  And before

11   I do that, who is Bo Brownlee?

12   A.  Bo Brownlee is a former employee that

13   was -- had several roles with the company for

14   probably 20 years.

15   Q.  And he recently retired?

16   A.  He recently left the company.

17   Q.  And he was general counsel?

18   A.  For some time.

19   Q.  When he left the company, he was the

20   general counsel of Lifestyle Communities

21   Limited?

22   A.  No.

23   Q.  What was his role when he left?

24   A.  Development director.

1      Q.  Okay.  When did he cease being general

2  counsel?

3      A.  I don't know.

4      Q.  Did he have a role in negotiating the

5  purchase of the real estate that forms the basis

6  of this lawsuit?

7      A.  I don't know.

8      Q.  You don't know.  All right.  Let's look

9  at Exhibit 3 from his deposition.

10     A.  Okay.

11     Q.  You've had a chance to review the

12  document?

13     A.  Yes.

14     Q.  Are you familiar with the document?

15     A.  Just by reading it just now.  I didn't

16  remember it.

17     Q.  You signed the document, didn't you?

18     A.  I did.

19     Q.  So you know it is the real estate

20  purchase contract that you and your company

21  entered into on April 20th, 2017 to purchase the

22  property from UMCH?

23        MR. MILLER:  Objection to form.

24        You may answer.

·1· · · ·A.· Yes.

·2· · · ·Q.· And as far as you know is that a true

·3· ·and correct copy of the document that you

·4· ·signed?

·5· · · · · ·MR. MILLER:· Objection to form.

·6· · · · · ·You may answer.

·7· · · ·A.· Yes.

·8· · · ·Q.· Did you have any role in negotiating or

·9· ·drafting that agreement?

10· · · ·A.· Negotiating, not drafting.

11· · · ·Q.· What was your role in negotiating it?

12· · · ·A.· Discussing with Denny Friedman I think

13· ·his name was, Denny, and David Fisher their

14· ·representative.

15· · · ·Q.· I'm sorry, I couldn't hear you.

16· · · ·A.· David Fisher and Denny Friedman I think

17· ·was the chairman of UMHC [sic].· Board member.

18· ·He was a board member.· I had discussions with

19· ·both of them over the years.

20· · · ·Q.· Were either Exhibit 2 -- Brownlee

21· ·Exhibit 2 or Brownlee Exhibit 3 documents that

22· ·you reviewed in preparation for your deposition

23· ·here today?

24· · · ·A.· I don't believe so.

·1· · · ·Q.· Okay.· You eventually did close to

·2· ·purchase the property, didn't you?

·3· · · · · ·MR. MILLER:· Objection to form.

·4· · · · · ·You may answer.

·5· · · ·A.· Yes.

·6· · · ·Q.· That closing didn't happen, though,

·7· ·until about January of 2021?

·8· · · ·A.· I don't recall the date.

·9· · · ·Q.· Do you recall obtaining a loan from a

10· ·bank to purchase the property pursuant to

11· ·Brownlee Exhibit 3?

12· · · · · ·MR. MILLER:· Objection to form.

13· · · ·A.· Is Brownlee Exhibit 3 the purchase

14· ·contract?

15· · · ·Q.· That's what it says.

16· · · ·A.· Yes.

17· · · ·Q.· Did you personally guarantee that loan?

18· · · ·A.· I don't remember.

19· · · ·Q.· So you don't remember personally

20· ·guaranteeing $6.5 million loan at all?

21· · · · · ·MR. MILLER:· Objection to form.

22· · · ·A.· No.

23· · · · · ·MR. SCHUMACHER:· Let's go off the record

24· ·for a second.

1        MR. MILLER:  Sure.

2        THE VIDEOGRAPHER:  Off the record.

3             (Recess taken.)

4        THE VIDEOGRAPHER:  Back on the record.

5                  -=0=-

6        (Deposition Exhibit 3 marked.)

7                  -=0=-

8  BY MR. SCHUMACHER:

9     Q.  Let me hand you a document that we'll

10  have marked as DeAscentis Exhibit 3.

11     A.  Okay.

12     Q.  Have you had a chance to review the

13  document we've marked as DeAscentis Exhibit 3?

14     A.  Yes.

15     Q.  And you see in the bottom right-hand

16  corner it says LC a bunch of zeroes and 7013?

17     A.  Oh, yes.

18     Q.  This is an email -- well, is this a true

19  and correct copy of an email that you sent on

20  December 27th, 2020 to Dick Miller and Joe

21  Pizzino at Lifestyle Communities?

22        MR. MILLER:  Objection to form.

23        You may answer.

24     A.  Yes.

1     Q.  Who are Dick Miller and Joe Pizzino?

2     A.  Dick is -- Dick Miller is my former CFO,

3  and Joe Pizzino is my accountant -- is an

4  accountant that works for us.

5     Q.  It looks like there's a document

6  attached here.  Says Worthington Campus (UMCH)

7  Land Acquisition Loan FCBank, and then it looks

8  like a date 12-2020.  You see that?

9     A.  Yes.

10     Q.  What is that?

11     A.  I'm assuming that's the date of the

12  loan.

13     Q.  Does this refresh your recollection that

14  you personally guaranteed a loan to acquire the

15  property?

16        MR. MILLER:  Objection to form.

17     A.  I don't know whether I -- I don't

18  remember whether I guaranteed it or not.

19                    -=0=-

20        (Deposition Exhibit 4 marked.)

21                    -=0=-

22  BY MR. SCHUMACHER:

23     Q.  We'll mark this as DeAscentis Exhibit 4,

24  then.

 1     A.  Okay.

 2     Q.  Have you had a chance to review

 3  Exhibit 4?

 4     A.  Yes.

 5     Q.  Did you receive Exhibit 4?

 6         MR. MILLER:  Objection to form.

 7     A.  I'm sorry, I don't understand.

 8     Q.  Did you as the CEO of Lifestyle

 9  Communities, Ltd. receive a copy of this loan

10  summary?

11         MR. MILLER:  Objection to form.  He's

12  received one this morning.  You mean --

13     Q.  At the time you obtained -- when

14  Exhibit 3 was sent to you, did you also receive

15  this attachment, the loan summary dated December

16  of 2020?

17         MR. MILLER:  Objection to form.

18         You may answer if you recall.

19     A.  I don't remember.

20     Q.  All right.  So you don't remember that

21  FCBank was going to loan a new company that you

22  established known as Worthington Campus, LLC,

23  which happens to be a Plaintiff in this lawsuit,

24  a $6.5 million loan that you were going to

1 personally guarantee?

2      MR. MILLER:  Objection.

3   Q.  You don't remember that?

4      MR. MILLER:  Objection to form.  Assumes

5 certain facts.  Mischaracterizes prior

6 testimony.  It's a different question.

7   A.  I remember we were getting a loan from

8 FCBank.  I don't remember whether I was going to

9 be a guarantor until reading this document.

10   Q.  So now that you've read the document, it

11 refreshes your recollection that the Plaintiff

12 in this lawsuit was going to be a borrower on a

13 $6.5 million loan to buy this property and you

14 were going to personally guarantee it?

15      MR. MILLER:  Same objections.

16   A.  Yes.

17   Q.  So I just want to make sure we're clear.

18 Until I showed you this document, you could not

19 recall that you personally guaranteed a $6.5

20 million loan to buy the property?

21   A.  No.

22      MR. MILLER:  Same objections.

23   Q.  I'm sorry?

24      MR. MILLER:  Asked and answered --

1          MR. SCHUMACHER:  Joe, if you --

2          MR. MILLER:  -- about three times.

3          MR. SCHUMACHER:  -- let the witness

4   answer.

5          MR. MILLER:  I've let him answer it

6   three times.

7          MR. SCHUMACHER:  You just stepped on

8   his -- you just stepped on his answer.  I don't

9   know if you got that, Julia.

10         COURT REPORTER:  I heard no.

11     A.  No.

12     Q.  So it took me showing you this document

13  for you to remember that you personally

14  guaranteed a $6.5 million loan to buy the

15  property for Worthington Campus, LLC, a newly

16  formed entity?

17     A.  Yes.

18         MR. MILLER:  Same objections.

19     Q.  All right.  Thank you.

20         You see where it says guarantor

21  covenants?

22     A.  Yes.

23     Q.  Do you know what $2 million of minimum

24  liquidity means?

1      A.  Yes.

2      Q.  What does it mean?

3      A.  It means that it would require me as the

4  guarantor to have at least $2 million in cash.

5      Q.  And you told the bank that you had

6  $50 million in minimum net worth which is the

7  net amounts due from affiliates.

8          MR. MILLER:  Objection to form.

9      Q.  Is that right?

10      A.  That's what this document says.

11      Q.  Isn't that true?

12          MR. MILLER:  Same objection.

13      A.  Are you asking me if I have $50 million

14  of net worth?

15      Q.  I'm asking you if you told the bank that

16  you had $50 million of minimum net worth so you

17  could personally guarantee this loan?

18          MR. MILLER:  Same objections.

19      A.  Yes.

20      Q.  Thank you.

21          So now you do remember buying this

22  property that you started to negotiate for in

23  2015?

24      A.  Yes.

1     Q.  Thank you.

2       By the way, that Exhibit 3 that you

3  executed in April of 2017 had a contingency for

4  you obtaining rezoning of the property, correct?

5     MR. MILLER:  Objection to form.  So

6  you're referring him back to Brownlee Exhibit 3?

7     MR. SCHUMACHER:  Yes.

8     A.  Is that the real estate purchase

9  contract?

10    Q.  That is.

11    MR. MILLER:  Do you want to direct his

12  attention to a specific provision?

13    Q.  Well, I want to know first are you

14  telling us that you don't remember that the

15  purchase contract you entered into had a

16  contingency for you to obtain zoning?

17    MR. MILLER:  Objection to form.

18    Q.  You don't know that generally?

19    A.  I don't.

20    MR. MILLER:  You've asked a couple

21  different questions.

22    MR. SCHUMACHER:  All right.

23    MR. MILLER:  Does he recall, does he

24  know.

·1· · · · · ·MR. SCHUMACHER:· All right.

·2· · · · · ·MR. MILLER:· Which question do you want

·3· ·to ask, Paul?

·4· · · · · ·MR. SCHUMACHER:· That's fine.

·5· · · A.· I don't remember.

·6· · · Q.· I just want to know when you testify in

·7· ·front of a federal court --

·8· · · A.· Yes.

·9· · · Q.· -- are you going to agree that you knew

10· ·that when you entered into this contract,

11· ·Brownlee Exhibit 3, that it had a contingency

12· ·for zoning?· That's all I want to know.

13· · · A.· Yeah.· I don't remember.

14· · · Q.· Okay.· So you don't remember that the

15· ·contract that you guaranteed eventually to buy

16· ·this property was contingent upon you obtaining

17· ·zoning -- rezoning of the property?

18· · · · · ·MR. MILLER:· Paul, asked and answered.

19· ·You can answer it, but this day is going to be

20· ·real long if you keep asking --

21· · · A.· I can't remember whether --

22· · · · · ·MR. MILLER:· -- him a question four

23· ·times.

24· · · A.· I can't remember whether we had a zoning

1    contingency or not.

2      Q.  Okay.  That's fine.

3      A.  We buy lots of different property.

4      Q.  I understand.

5      A.  It's hard for me to remember something

6    that was so long ago.  I just don't want to be

7    inaccurate.

8      Q.  I just want to be clear.

9      A.  Yeah.

10      Q.  Are you telling a jury that in April of

11    2017 when you signed this contract that you

12    weren't aware that it had a contingency for

13    rezoning?

14        MR. MILLER:  Asked and answered.

15      A.  I don't recall.  I mean, I can read it

16    and see what it says.

17      Q.  That's fine.  You're the CEO of the

18    company, and if you don't recall that there was

19    a zoning contingency in the contract, I don't

20    want to belabor the point.

21        MR. MILLER:  Who's testifying, Paul, the

22    witness or you?  All these questions about tell

23    the jury this, tell the jury that, ask a

24    question four times, Paul, we're going to be

1    here all day or we're just going to have to cut

2    it off.  Keep it direct.

3              MR. SCHUMACHER:  No.  I told you I'd try

4    to get done by three for your personal -- at

5    your personal request if it went well.  So if

6    you can avoid the soliloquies, then I think we

7    can --

8              MR. MILLER:  They're not soliloquies.  I

9    do think the witness --

10              MR. SCHUMACHER:  Then I think --

11              MR. MILLER:  -- is entitled to a level

12    of respect --

13              MR. SCHUMACHER:  Then I think we can

14    probably --

15              MR. MILLER:  Most of these questions,

16    Paul, I --

17              MR. SCHUMACHER:  I'm not done talking.

18              MR. MILLER:  Most of these questions,

19    Paul, I could object not to just form but to

20    tone.  Dial it back.  The witness is being

21    respectful, and you're the one raising --

22              MR. SCHUMACHER:  Joe.

23              MR. MILLER:  -- your voice and treating

24    him discourteously.

1          MR. SCHUMACHER:  Joe, you've objected to

2  every question that's been asked so far and I've

3  just ignored that.  All right?  I will continue

4  to do that.

5          MR. MILLER:  Great.

6          MR. SCHUMACHER:  I don't know that it's

7  helpful for you to object to every question, but

8  if that's your choice, that's your choice.

9          MR. MILLER:  I'm just asking you to be

10  courteous and respectful to the witness.

11          MR. SCHUMACHER:  And I have been.

12  You've been interjecting.

13  BY MR. SCHUMACHER:

14     Q.  Mr. DeAscentis, if you could refer to

15  section 11 of Brownlee Exhibit 3.

16          MR. MILLER:  Say that again, Paul.  I'm

17  sorry.  Not the question, but just to what

18  you're referring.

19          MR. SCHUMACHER:  Brownlee Exhibit 3.

20          MR. MILLER:  Oh, just the exhibit in

21  general.  I'm sorry.

22          MR. SCHUMACHER:  I referred him to

23  section 11.

24          MR. MILLER:  Thank you.  That's what I

1    was asking.

2              THE WITNESS:  Okay.

3    BY MR. SCHUMACHER:

4        Q.  Have you had a chance to review section

5    11?

6              MR. MILLER:  Take what time you need to

7    do so if you're going to be asked specific

8    questions about section 11.

9        A.  Okay.

10       Q.  Have you had a chance to review section

11   11(a)?

12       A.  Yes.

13       Q.  That contract contains a contingency for

14   LC obtaining rezoning of the property?

15             MR. MILLER:  Objection to form.

16             You may answer.

17       A.  I mean, it's contingent on getting the

18   subdivision plat and then I think subsequent

19   properties zoned.  I mean, I didn't write it.

20       Q.  Okay.  That's fine.  So you're -- I'm

21   sorry, your company and you yourself have

22   developed dozens of properties, haven't you?

23       A.  Yes.

24       Q.  And you enter into contracts like this

1    all the time, don't you?

2        A.  Yes.

3        Q.  And this is like many of the contracts

4    you enter into, isn't it?

5            MR. MILLER:  Objection to form.

6            You may answer.

7        Q.  It contains contingencies, right?

8        A.  Well, this is a closing.

9        Q.  Sure.

10       A.  These are closing deliveries, not --

11   typically the contingency section's in the

12   front, I think.

13       Q.  Okay.  I understand you're not a lawyer,

14   right?

15       A.  Yeah.  I just want to make sure I'm

16   being accurate with my answer.

17       Q.  You're the deal guy, right?

18       A.  Yeah, but I don't write contracts.

19       Q.  Okay.  But when you make a deal to

20   acquire property that needs to be rezoned, you

21   typically use a contingency for the property to

22   get rezoned, don't you?

23       A.  Sometimes.

24       Q.  Okay.

1    A.  Depends on the price.

2    Q.  Sure.  And you did in this case, right?

3       MR. MILLER:  Objection to form.

4    A.  I don't know.

5    Q.  Okay.  Do you recall ever waiving that

6  contingency to obtain a lower price?

7       MR. MILLER:  Objection to form.

8       You may answer.

9       For this property, right?

10      MR. SCHUMACHER:  Yes, for this property.

11   A.  Yes.

12   Q.  And what do you recall about that,

13  Mr. DeAscentis?

14   A.  I knew you were going to ask me that.  I

15  mean, I think I remember.  I remember having a

16  conversation with Denny Friedman about --

17   Q.  Can you -- I can't hear you.

18   A.  I remember having a conversation with

19  Denny Friedman about him not wanting to wait for

20  a closing that was extended over a long period

21  of time.  I don't know whether it was contingent

22  upon zoning.  I don't remember.

23   Q.  I'm confused.  You said you did remember

24  the waiver of this contingency and now you said

1    you don't remember the contingency?

2        A.  Well, I remember having a conversation

3    with Denny about a closing and a price,

4    negotiating a price for a closing.

5        Q.  Okay.  And do you recall it --

6        A.  But I don't know reading this document

7    whether that closing was contingent on zoning

8    specifically.  I can't recall for sure.

9        Q.  We can agree that you knew that the

10   property that we're in this lawsuit about was

11   required to be rezoned?

12           MR. MILLER:  Objection.

13       Q.  We can agree on that, can't we?

14           MR. MILLER:  Objection to form.

15       A.  For us to development it?

16       Q.  Yes.

17       A.  Yes.

18       Q.  You knew back when you first got

19   involved in this project that the property along

20   High Street was zoned for S1, C1, C2 and a

21   certain residential district, didn't you?

22           MR. MILLER:  Objection to form.

23       A.  I don't recall the actual zoning that

24   was in place.

1      Q.  Fair enough.  But you do know that you

2   needed to obtain approval of the city council in

3   order to rezone the property to build

4   apartments?

5          MR. MILLER:  Objection.  Asked and

6   answered.

7      A.  I knew we had to rezone the property in

8   accordance with the comprehensive plan in order

9   to permit our development.

10     Q.  Have you read the comprehensive plan?

11     A.  I don't remember.

12     Q.  Is that one of the documents you

13   reviewed in preparation for your deposition?

14     A.  No.

15     Q.  Did you review any of the city council

16   minutes of their meetings about this property?

17         MR. MILLER:  Objection to form.

18     A.  In preparation?

19     Q.  Yes.

20     A.  No.

21     Q.  Have you ever read them?

22     A.  I don't remember.

23     Q.  You've developed mixed use properties in

24   many states, haven't you?

1      A.  Yes.

2      Q.  And you have employees who deal with

3   issues like obtaining rezoning so you can

4   develop properties, don't you?

5      A.  Yes.

6      Q.  Who are the people that were involved in

7   this project for the UMCH property that were

8   involved in rezoning the property or obtaining

9   the rezoning?

10         MR. MILLER:  Objection to form.

11      A.  Chase Miller, Bo Brownlee, and I know

12   Brent Miller, maybe Anthony Lococo.  Maybe

13   Anthony Lococo, I think.  I'm not sure.

14         MR. MILLER:  I don't want you to

15   guess --

16      A.  Yeah.  I'm not sure.

17         MR. MILLER:  If you need to qualify your

18   answer.

19      Q.  What was Brent Miller's role in the

20   company?

21      A.  President.

22      Q.  He's no longer with the company, either,

23   is he?

24      A.  No.

1      Q.  Do you know where he is?

2      A.  I think he's retired.

3      Q.  My question is do you know where he is?

4      A.  In Columbus, Ohio.

5      Q.  Have you spoken to him recently?

6          MR. MILLER:  Objection to form.

7          You may answer.

8      A.  No.

9      Q.  So you haven't spoken to him within the

10  last year and a half?

11     A.  Oh, yes.

12     Q.  Okay.

13     A.  You said recently.  I thought you meant

14  like the last couple days.

15     Q.  That's why I asked.

16     A.  Yeah.

17     Q.  So you stay in touch with Mr. Miller?

18     A.  Yes.

19     Q.  What about Chase Miller?

20     A.  No.

21     Q.  All right.  Do you know where he's

22  located now?

23     A.  Columbus, Ohio.

24     Q.  Have you spoken to him in the last

1    couple of years?

2        A.  Yes.

3        Q.  Do you stay in touch with him?

4        A.  No.

5        Q.  Anthony Lococo?

6        A.  Yes.

7        Q.  What is his role?

8        A.  He was a development associate that

9    worked for Chase.

10       Q.  Is he still with the company?

11       A.  No.

12       Q.  Do you know where he is?

13       A.  No.

14       Q.  Have you spoken to him in the last

15   couple years?

16       A.  No.

17           MR. MILLER:  If you'll just pause for a

18   minute in case I need to object, that would be

19   great.

20           MR. SCHUMACHER:  You can have a standing

21   objection to form if you'd like.

22       Q.  Every local government has different

23   requirements in terms of rezoning properties,

24   don't they?

1         A.  Yes.

2         Q.  You've fought the battle of trying to

3    obtain rezoning in many communities around the

4    country, haven't you?

5              MR. MILLER:  Objection to form.

6              You may answer.

7         A.  Yes.

8         Q.  Does your company typically obtain a

9    zoning report before they attempt to rezone --

10   I'm sorry, to develop a property?

11             MR. MILLER:  Objection to form.

12             You may answer if you understand the

13   question.

14        A.  I don't know what a zoning report is.

15        Q.  Do you ever engage outside consultants

16   to obtain information about the zoning

17   requirements in a particular area where you're

18   going to try to develop?

19        A.  Yes.

20        Q.  And do you -- is that something you do

21   in-house or do you go outside?

22        A.  It depends.

23        Q.  And who would you go outside to obtain

24   that type of information from?

1            MR. MILLER:  Objection to form.

2            You may answer.

3       A.  Sometimes it's engineers.  Sometimes

4  it's local law firms.

5       Q.  And in this case what did you do in

6  order to obtain information about trying to

7  rezone the property?

8            MR. MILLER:  Objection to form.

9       A.  I don't --

10           MR. MILLER:  At any time, Paul?

11      Q.  At any time during this -- the history

12  of this project.

13           MR. MILLER:  Objection to form.

14      A.  Can you repeat the question?

15      Q.  Yeah.  Who did you get involved in this

16  case to try to obtain rezoning of the UMCH

17  property?

18      A.  I wouldn't have hired anybody.  Our team

19  would have hired them.

20      Q.  Who would that be?

21           MR. MILLER:  Objection to form.  Team or

22  who they hired?

23           MR. SCHUMACHER:  Either one.

24      A.  Probably Brent Miller --

·1· · · · · MR. MILLER:· Objection to form.

·2· · · A.· -- or Bo Brownlee.

·3· · · Q.· All right.· Do you know who they hired

·4· to attempt to rezone this property for your

·5· company?

·6· · · · · MR. MILLER:· Same objections.

·7· · · A.· I mean, they would probably hire an

·8· engineer, an architect.

·9· · · Q.· Did you hire any lawyers in this case to

10· attempt to obtain rezoning of the property?

11· · · · · MR. MILLER:· Same objections.

12· · · A.· I didn't.· I'm sure they did.

13· · · Q.· I'm sorry, Mr. DeAscentis, if I didn't

14· say this before.· When I'm asking about you, I'm

15· assuming that as the chief executive officer of

16· the company that you know what's going on in the

17· company.· So my question is directed to you in

18· your role as CEO of the company.

19· · · · · MR. MILLER:· Objection to form.· And he

20· is answering personally.· Are you saying now

21· something different that you're expecting him to

22· answer for all of Lifestyle Communities?· Your

23· use of you, you seemingly go back and forth so

24· he's just trying to be accurate.

1          MR. SCHUMACHER:  Okay.

2    BY MR. SCHUMACHER:

3        Q.  Mr. DeAscentis, do you personally know

4    who Lifestyle Communities Limited or any of its

5    affiliate companies hired to attempt to rezone

6    this property?

7          MR. MILLER:  Objection to form.

8        A.  I know they hired LRK who's an

9    architectural firm.

10       Q.  No law firms?

11       A.  I'm sure they did.

12       Q.  So you don't -- you don't recall hiring

13   Tom Hart and his firm to do this work?

14       A.  I never hired Tom Hart.

15         MR. MILLER:  Objection to form.

16         You may answer.

17       Q.  So I want to know.  Michael DeAscentis

18   personally does not recall hiring Tom Hart and

19   his firm to obtain rezoning of this property?

20         MR. MILLER:  Objection to form.  That's

21   not what he said.

22       Q.  That's what I'm asking.  Are you telling

23   us --

24       A.  I don't recall.

1      Q.  -- that you don't recall hiring Tom

2   Hart?

3      A.  Oh, I'm saying I didn't hire Tom Hart.

4      Q.  I understand that.  You've made it very

5   clear that you have a lot of people who do

6   hiring for you.  My question is different.  My

7   question is does Michael DeAscentis recall

8   hiring Tom Hart to obtain rezoning of this

9   property?

10      A.  No.

11      Q.  Okay.  Very good.

12          MR. MILLER:  Paul, other than our false

13   start, we've been going about an hour.  No need

14   to do it now, but about every hour I like to

15   take just a very short break, 5 minutes to

16   stretch the legs.

17          MR. SCHUMACHER:  That's fine.

18          MR. MILLER:  So whenever you're at a

19   good point.

20          MR. SCHUMACHER:  I will certainly do

21   that.

22          MR. MILLER:  Okay.

23          MR. SCHUMACHER:  Why don't we break now

24   then.

1          THE VIDEOGRAPHER:  Off the record.

2                    (Recess taken.)

3          THE VIDEOGRAPHER:  Back on the record.

4          MR. SCHUMACHER:  You ready, Julia?

5          Okay.

6    BY MR. SCHUMACHER:

7          Q.  Mr. DeAscentis, do you recall entering

8    into a joint venture between Lifestyle

9    Communities and the United Methodist Children's

10   Home for the purpose of developing 30 acres on

11   High Street that we've referred to in this case

12   as the property?

13         A.  I recall the Brownlee exhibit that had

14   the development agreement in there.

15         Q.  Do you recall entering into that

16   agreement as early as 2013?

17         A.  I don't.

18                         -=0=-

19          (Deposition Exhibit 5 marked.)

20                         -=0=-

21          MR. SCHUMACHER:  Is this four, Julia?

22          COURT REPORTER:  Five.

23          MR. SCHUMACHER:  Five.

24          MR. MILLER:  Let's not think out loud.

1  Take a look at the exhibit and you'll be asked

2  questions about it.

3  BY MR. SCHUMACHER:

4      Q.  Have you had a chance to review

5  Exhibit 5?

6      A.  Yes.

7      Q.  Is this a true and correct copy of an

8  email you sent on September 9th, 2013 to

9  Jennifer Rea?

10      A.  Yes.

11      Q.  Who is she?

12      A.  A former assistant.

13      Q.  Your assistant?

14      A.  Yes.

15      Q.  You see where it says subject:  Forward:

16  re: re?

17      A.  Yes.

18      Q.  Do you know why it says that?

19      A.  I don't.

20      Q.  Okay.  Who's Sam Koon?

21      A.  Sam Koon is an appraiser in Franklin

22  County.

23      Q.  And why were you writing to him or

24  forwarding a message to him?

1        MR. MILLER:  Objection to form.  I'm not

2  seeing where the document reflects that.

3        MR. SCHUMACHER:  Yeah, me either that's

4  why I asked about the forward re re.

5        MR. MILLER:  Looks like Mr. DeAscentis

6  forwarded the message to his assistant.

7        MR. SCHUMACHER:  Right.

8        MR. MILLER:  Okay.  I don't see where it

9  was forwarded to Mr. Koon.

10     Q.  Let me ask you this question.

11     A.  I don't understand.

12     Q.  Let me ask you this question.  You wrote

13  to Sam on September 5th, 2013, didn't you?

14     A.  Yes.

15     Q.  What were you writing to him about?

16        MR. MILLER:  Objection to form.

17        You may answer.

18     A.  To schedule a meeting on the 16th.

19     Q.  About?

20     A.  Getting a contract with UMHC.

21     Q.  For what?

22     A.  The purchase of the property.

23     Q.  Why would Sam Koon be able to assist you

24  in purchasing a piece of property?

1        MR. MILLER:  Objection to form.

2     A.  He had some role with UMHC as a

3  consultant.

4     Q.  You mean UMCH?

5     A.  UMCH.

6     Q.  He worked for UMCH?

7     A.  I don't know.

8     Q.  He worked for you at one point, didn't

9  he?

10     A.  No.

11        MR. MILLER:  Objection to form.

12     Q.  You never paid him?

13     A.  Oh, yes.

14     Q.  When I said work for --

15     A.  I thought you meant employed by me.

16     Q.  But you paid him to work with you on a

17  joint venture?

18        MR. MILLER:  Objection to form.

19        You may answer if you know or understand

20  the question.

21     A.  I've used Sam Koon hundreds of times in

22  25 years.

23     Q.  He's the guy you use to buy property,

24  isn't he?

1      A.   No.

2      Q.   He's the -- what do you use him for,

3   then?

4      A.   He's an appraiser.

5      Q.   Okay.  And you use him to appraise

6   property --

7      A.   Appraise property.

8      Q.   -- that you want to buy?

9           MR. MILLER:  Objection to form.

10      A.   Sometimes.

11      Q.   Okay.  Who's David Fisher?

12      A.   He's a lawyer.

13      Q.   And you hired him to assist you in

14   purchasing this property at UMCH, didn't you?

15           MR. MILLER:  Objection to form.

16      A.   I don't know if we actually hired him.

17      Q.   He acted on your behalf in negotiating

18   with UMCH, didn't he?

19           MR. MILLER:  Same objection.

20      A.   Yes.

21      Q.   He also represented UMCH and its board,

22   didn't he?

23      A.   In some capacity.  I'm not sure which

24   one.

1    Q.  In such a capacity that you felt or your

2  company decided to obtain a waiver of any

3  conflict of interest for Mr. Fisher, attorney,

4  working for both UMCH and LC, right?

5    A.  That's what this email says.

6    Q.  I'm asking you, isn't that the case?

7    A.  I don't know if David was an -- a member

8  of UMHC or just a paid lawyer.  His dad was a

9  minister, a methodist minister, so he works for

10  a lot of methodist organizations sometimes as a

11  volunteer.  I don't know whether he was paid, I

12  don't know if he was an employee, I don't know

13  if he was on the board.  I don't remember.

14    Q.  You don't remember?

15    A.  He had some involvement.  I just can't

16  be accurate.

17    Q.  You have a good relationship with David

18  Fisher, don't you?

19    A.  Yes.

20    Q.  You knew he was a lawyer, right?

21    A.  Yes.

22    Q.  You used him as a lawyer to help

23  negotiate with the UMCH board to enter into this

24  contract, didn't you?

1        MR. MILLER:  Objection to form.

2        You may answer.

3        And again, you're saying you.  Do you

4   mean Lifestyle Communities?

5        MR. SCHUMACHER:  I do.

6        MR. MILLER:  Okay.  Sorry.

7    A.  Yes.

8    Q.  Mr. Fisher provided an offer to you

9   according to this email, didn't he?

10    A.  Can you repeat the question?

11    Q.  Mr. Fisher had made an offer to you

12   through Mr. Koon to acquire this property?

13        MR. MILLER:  Objection to form.  It's

14   not what the document says.

15    A.  I don't know.

16    Q.  Well, let's start again, then.

17    A.  Yeah.

18    Q.  In 2013 you made an offer to David

19   Fisher to acquire the UMCH property, you and LC

20   and you personally made that offer, right?

21        MR. MILLER:  Objection to form.

22        You may answer.

23    A.  Yes.

24    Q.  And this email suggests that David

1    Fisher was going to sign a waiver of conflict of

2    interest so that he could continue to negotiate

3    for you and your company to acquire the UMCH

4    property?

5          MR. MILLER:  Same objection.

6       A.  Yes.

7       Q.  Let me hand you what we've marked --

8    will mark as Exhibit...

9          MR. SILK:  Six.

10          MR. SCHUMACHER:  Six.

11                   -=0=-

12       (Deposition Exhibit 6 marked.)

13                   -=0=-

14          THE WITNESS:  Okay.

15    BY MR. SCHUMACHER:

16       Q.  This is the offer that you made to UMCH

17    through Mr. Koon, right?

18       A.  Yes.

19       Q.  And I don't expect you to understand or

20    know the details of the actual joint venture

21    agreement that you concluded with them, but you

22    would agree with me that Exhibit 6 is your idea

23    for the outline of what that agreement should

24    contain?

1              MR. MILLER:  Objection to form.

2       A.  I didn't prepare this.

3       Q.  That's your name at the bottom, isn't

4  it?

5       A.  It is.  I'm sure one of our development

6  people prepared this.

7       Q.  But you agree with me that this is

8  Michael DeAscentis's proposal or outline of a

9  proposal to Mr. Koon for entering into a joint

10  venture with UMCH?

11      A.  Yes.

12      Q.  How many of these types of deals have

13  you been involved in, Mr. DeAscentis?

14              MR. MILLER:  Objection to form.

15              You may answer if you understand the

16  question.

17      A.  How many development projects?

18      Q.  Yes.

19      A.  Hundreds.

20      Q.  Hundreds.  Can you explain to me what

21  Exhibit 6 outlines in terms of the financing of

22  this deal?  Are you able to do that --

23              MR. MILLER:  Objection --

24      Q.  -- based upon your experience?

1          MR. MILLER:  Objection to form.

2      A.  I don't understand the question.

3      Q.  Can you explain to me what Exhibit 6

4  contemplated in terms of the financial details

5  of a joint venture with UMCH to acquire and

6  develop this property?

7      A.  That we would -- we would partner to

8  jointly develop it and split the sale proceeds.

9      Q.  And how would you do that?

10          MR. MILLER:  Objection to form.

11  Document speaks for itself.

12      A.  At 7a it talks about how you -- do you

13  want me to read it?

14      Q.  No.  What do you refer to that paragraph

15  7 generally as?  Do you have a name for that

16  type of financing?

17          MR. MILLER:  Objection to form.

18      A.  Profit split.

19      Q.  Have you ever heard of a waterfall?

20      A.  Oh, yes.

21      Q.  Oh, you have.

22          MR. MILLER:  Paul --

23      Q.  Familiar with that term?

24          MR. MILLER:  Paul, you just asked the

1   question.

2          MR. SCHUMACHER:  Okay.  I'm sorry.

3          MR. MILLER:  He's answering your

4   questions --

5      A.  I've heard of a waterfall.

6          MR. MILLER:  -- in a much more measured

7   way than you're asking them.

8      Q.  Is this a waterfall?

9      A.  Yes.

10     Q.  Thank you.

11         Your offer to UMCH also included

12  paragraph 5, didn't it?

13     A.  Can you repeat the question?

14     Q.  You knew in 2013 when you made this

15  offer that the property would have to be

16  successfully rezoned for up to 350 residential

17  units?

18         MR. MILLER:  Objection to form.

19         You may answer.

20     A.  Can you repeat the question again?  I'm

21  sorry.

22         MR. SCHUMACHER:  Julia, could you read

23  that back, please.

24             (Record read as requested.)

1    A.  That's what this says.

2    Q.  And you knew that, didn't you?

3    A.  I don't recall at the time now.

4    Q.  So as we sit here today involved in a

5  federal lawsuit that your company's filed, you

6  don't remember that in 2013 you were aware of

7  the fact that the property would have to be

8  rezoned.  Is that what --

9    A.  Yes.

10    Q.  -- you're telling me?

11        Fine.  Thank you.

12    A.  I just didn't know the 350 units.  You

13  said that.

14    Q.  Oh.

15    A.  I just don't remember that.

16    Q.  Okay.  But you did remember -- you do

17  know now and you knew then in 2013 that this

18  property would have to be rezoned for any number

19  of residential units.

20        MR. MILLER:  Objection to form and asked

21  and answered.

22    Q.  Right?

23    A.  Yes.

24    Q.  Thank you.

1        Do you know who MKSK is?

2     A.  Yes.

3     Q.  Who are they?

4     A.  A local land planner.

5     Q.  Do you use them?

6     A.  I don't know.

7     Q.  Who is Tom Brigdon?

8     A.  Tom Brigdon is a local developer.

9     Q.  Did you ever do any deals with Tom

10  Brigdon?

11        MR. MILLER:  Objection to form.

12        You may answer.

13     A.  We tried once.

14     Q.  Didn't go?

15     A.  No.

16     Q.  That happens, right?

17     A.  Yes.

18     Q.  Do you recall telling him in 2014 that,

19  "Worthington's moving slow but in the right

20  direction as they hired MKSK as the planner and

21  our use is coming together"?

22     A.  I don't remember that.

23     Q.  Do you remember telling him generally

24  that you learned that the city hired MKSK as

1    their land use planner?

2       A.  I don't remember telling Tom that.

3          MR. MILLER:  Keep your voice up for the

4    record.

5          THE WITNESS:  Oh, yeah.  Sorry.

6       Q.  So do you recall any time after this

7    2013 joint venture meeting with anyone from the

8    city of Worthington personally about trying to

9    obtain approvals for this development?

10         MR. MILLER:  Objection to form.

11      A.  Yes.

12      Q.  When do you think -- when and with whom

13   do you recall meeting?

14         MR. MILLER:  Same objections.

15         You may answer.

16      A.  I don't recall when, but I met with

17   Matt -- Gleason, Greeson?

18      Q.  Greeson.

19      A.  -- Greeson several times.

20      Q.  Why did you meet with Matt Greeson?

21         MR. MILLER:  Objection to form.

22         You may answer.

23      A.  City -- I think he was a city manager.

24      Q.  What was the nature of your meeting with

1    him?

2        A.  To understand how our plan needed to be

3    in accordance with the comprehensive plan that

4    they had developed.  Typically we meet with

5    cities, we met with their representatives to

6    understand their plans.

7        Q.  And did you advise him at the time that

8    it was your intent to build a number of

9    apartments and condos on the property?

10        MR. MILLER:  Objection to form.

11        A.  I don't recall.  I don't recall.

12        Q.  Is that typically what you would do

13    since you're in the business --

14        A.  Yeah.

15        Q.  -- of developing apartments?

16        A.  Yes.

17        MR. MILLER:  Just wait until he finishes

18    his question --

19        THE WITNESS:  Okay.

20        MR. MILLER:  -- before you answer.

21        Q.  I'm sorry, the answer was yes?

22        A.  Yes.

23        Q.  When trying to develop this property,

24    did you have an intention in 2013 as to how many

1    residential units you needed to develop there in

2    order to make a profit?

3         MR. MILLER:  Objection to form.

4         You may answer.

5    A.  I don't remember.

6    Q.  I want to be clear on this.  You

7    personally and your company are a for-profit

8    company, right?

9    A.  Correct.

10   Q.  You want to make a profit.  And your

11   business is developing primarily apartments and

12   residential units, correct?

13   A.  Correct.

14   Q.  And LC typically owns those residential

15   units, don't they, and rent them?

16   A.  Yes.

17   Q.  And you rent them through a different

18   company, don't you, an affiliate company?

19        MR. MILLER:  Objection to form.

20   A.  Yes.

21   Q.  Do you also provide utility services for

22   those residential units in various locations?

23   A.  Yes.

24   Q.  Do you own a company that provides such

1    utility services?

2        A.  Yes.

3        Q.  Nationwide Energy Partners?

4        A.  Yes.

5        Q.  And you're the chief executive officer

6    of Nationwide Energy Partners?

7        A.  Yes.

8        Q.  And that company buys utility energy

9    products and resells it to apartments and condo

10   dwellers?

11           MR. MILLER:  Objection to form and as to

12   relevance.

13           You may answer.

14       A.  No.

15       Q.  What does New Energy Partners do, then?

16       A.  They're agent -- they're an agent for

17   property owners to manage their energy.

18       Q.  In the joint venture that you entered

19   into with UMCH was UMCH to obtain profit from

20   the development as well?

21       A.  Yes.

22       Q.  And was LC or its affiliate companies

23   also going to profit from more than just the

24   rental on those units?

1          MR. MILLER:  Objection to form.

2     A.  I don't understand the question.

3     Q.  Well, how does LC profit from

4  residential units?

5     A.  By developing them and charging rent and

6  collecting it.  Rental income.

7     Q.  And your business model, though, is that

8  you develop the property, have the apartments or

9  residences built, and then you continue to own

10  them and rent them.

11          MR. MILLER:  Objection to form.

12     Q.  Right?

13     A.  Sometimes.

14     Q.  But that's -- that was the model --

15     A.  That's the general.

16     Q.  That's the model that you had in mind

17  here, isn't it?

18     A.  Yes.

19     Q.  And I don't believe you'd made any

20  decisions on whether you're going to utilize

21  Nationwide Energy Partners or a similar company

22  to manage the properties.  Is that correct?

23          MR. MILLER:  Objection to form.  You're

24  talking about back in 2013 related to the offer

1  we saw?

2          MR. SCHUMACHER:  Yes.

3          MR. MILLER:  Same objection.

4      Q.  No decision had been made?

5      A.  Can you ask the question again?

6      Q.  It was a bad question.

7          Let me just mark this exhibit, then, and

8  maybe you can answer the question that way.

9                    -=0=-

10          (Deposition Exhibit 7 marked.)

11                    -=0=-

12          THE WITNESS:  Okay.

13  BY MR. SCHUMACHER:

14      Q.  Have you had a chance to review

15  Exhibit 7?

16      A.  Yes.

17      Q.  And it's got LC00005850 at the bottom

18  right-hand corner?

19      A.  Yes.

20      Q.  This is a true and accurate copy of an

21  email you sent on April 23rd, 2015 to Brent

22  Miller?

23          MR. MILLER:  Objection to form.

24          You may answer.

1      A.  Yes.

2      Q.  This is basically an outline of what you

3  were directing your people to do in order to

4  move this project forward?

5      A.  Yes.

6      Q.  You see where it says in the first

7  paragraph:  Brent, since you're taking the lead

8  on this deal for all other things than zoning

9  approval -- you see that sentence?

10      A.  Yes.

11      Q.  Who was taking the lead on all other

12  things zoning approval?

13          MR. MILLER:  Objection to form.  At this

14  time?

15      Q.  The day of this letter -- or this email,

16  yes.

17      A.  Since you're taking lead on this deal

18  for all other things than zoning approval.  I

19  don't know.

20      Q.  You see on the paragraph two where you

21  wrote, I think we want to sell developed pads or

22  lots so we can control the overall development

23  and earn extra dollars on our side of the JV?

24  Do you see that?

1     A.  Yes.

2     Q.  What did you mean by that?

3     A.  Part of our development -- part of our

4  business is buying and developing land and

5  selling it, and we would -- I think I

6  contemplated instead of just -- you know, we're

7  really not in the business of selling land.

8  We're in the business of developing land so we

9  would develop the lots and sell them.

10    Q.  And how were you going to make extra

11 dollars on that side of the JV or the joint

12 venture?

13    A.  We would split the land profit with

14 UMHC, and then we would put the money in to

15 develop the lots, and then we would get a return

16 on those extra development dollars, because the

17 lots are worth more developed than undeveloped.

18    Q.  You also were going to share profits on

19 the OhioHealth portion of this deal with David

20 Fisher and apparently another developer?

21        MR. MILLER:  Objection to form.

22    A.  I don't remember, but that's what this

23 says.

24    Q.  Do you know who the other developer was?

1      A.  I don't.

2      Q.  So David Fisher was going to participate

3  in the profits as well as you and OhioHealth?

4  I'm sorry, you and UMCH?

5          MR. MILLER:  Objection to form.

6          You may answer.

7      A.  Can you -- I'm sorry, can you repeat

8  that again?

9      Q.  Apparently David Fisher was going to

10  share in the profits on the OhioHealth portion

11  of this joint venture?

12      A.  Correct.

13      Q.  He was also going to share in the

14  profits of some of the retail business, wasn't

15  he?

16          MR. MILLER:  Objection to form.

17          You may answer.

18      A.  I don't recall.

19      Q.  Look at the second page of Exhibit 7

20  where it says retail/residential.

21      A.  Yes, that's what it says.

22      Q.  So who is the non-LC entity you're

23  referring to?

24      A.  I don't know.

1      Q.  But the idea was you were going to

2   create a non-LC entity who would own the retail

3   land in a joint venture with David Fisher,

4   right?

5          MR. MILLER:  Objection to form.

6          You may answer.

7      A.  I think own the retail, the actual

8   buildings.

9      Q.  Right.  You were going to do that with

10  David Fisher in a non-LC entity?

11     A.  Yes.

12     Q.  So you would create a -- you yourself

13  personally would create a different LC -- a

14  different legal entity and then share profits on

15  the retail buildings with David Fisher?

16     A.  Yes.

17     Q.  In addition -- well, you say, but the

18  ownership of the apartments will go with LEF.

19  You see that?

20     A.  Yes.

21     Q.  Who is LEF?

22     A.  Lifestyle Equity Fund.

23     Q.  That's one of LC's affiliate companies?

24     A.  Yes.

1        Q.  In other words, you own them?

2        A.  I'm sorry?

3            MR. MILLER:  Objection to form.

4        Q.  Your company owns them?

5        A.  LEF is a company that we own.

6        Q.  So you were outlining this deal for

7    Brent so that they could go negotiate this deal

8    that you've outlined, right?

9            MR. MILLER:  Objection to form.

10           You may answer.

11       A.  Yes.

12       Q.  You're the CEO?

13       A.  Yes.

14       Q.  You're giving direction to your

15   employees to go negotiate the deal outlined in

16   Exhibit 7?

17       A.  Yes.

18       Q.  And in addition you were also going to

19   benefit from flipping the two houses that were

20   on the north end of the site.

21           MR. MILLER:  Objection to form.

22           You may answer.

23       Q.  Isn't that what you wrote?

24       A.  Yes.

1       Q.  You didn't want to share that benefit

2   with UMCH.  You wanted to keep that for

3   yourself?

4       A.  Yes.

5       Q.  Thank you.

6           Do you recall meeting with an

7   organization in 2015 called WARD?

8       A.  I don't recall.

9       Q.  Who's Betsy Rechel, R-E-C-H-E-L?

10      A.  She used to be a personal accountant for

11  me.

12      Q.  Did you make a presentation to this

13  group known as WARD about your proposal to

14  develop the UMCH property?

15      A.  I don't remember.

16                      -=0=-

17         (Deposition Exhibit 8 marked.)

18                      -=0=-

19         THE WITNESS:  Okay.

20  BY MR. SCHUMACHER:

21      Q.  Have you had a chance to review

22  Exhibit 8?

23      A.  Yes.

24      Q.  Is this an email you sent to Ms. Rechel

1   on May 1st, 2015?

2       A.  Yes.

3       Q.  Do you recall making a presentation to

4   the city of Worthington outlining some of the

5   points that she then lists in the bottom of

6   page 1 of Exhibit 8 and page 2?

7       A.  I don't.

8       Q.  You'd agree that in May of 2015 the

9   nature of the proposal that you and LC were

10  making for this development was as listed in the

11  bottom of page 1 of Exhibit 8 and page 2,

12  wouldn't you?

13      A.  Yes.

14      Q.  And you'd agree that you did make

15  that -- the elements of that proposal known to

16  the city of Worthington when you met with them?

17      A.  I don't know that -- I don't remember

18  meeting with them.

19      Q.  Okay.

20      A.  In this -- our company probably did.  I

21  don't know whether -- I can't recall whether I

22  was there or not.

23      Q.  Well, you'd agree that at least as of

24  May 1st, 2015 the intent of LC was to propose a

1   mixed use development on this site of 571 living

2   units consisting of 350 Lifestyle Community

3   rental apartments, 200 cottage townhouses, 21

4   estate homes, and a mix of office, retail,

5   apartment buildings along High Street with

6   additional details as listed in this document?

7        A.  Yes.

8        Q.  And you -- at the time you were making

9   that proposal you were getting significant

10  pushback from the members of the Worthington

11  community, weren't you?

12       MR. MILLER:  Objection to form.

13       You may answer.

14       A.  In this meeting?

15       Q.  At this time.  As of May of 2015 you

16  were already getting pushback from the citizens

17  of Worthington about the nature of your

18  proposal --

19       MR. MILLER:  Same objections.

20       Q.  -- weren't you?

21       MR. MILLER:  You may answer.

22       A.  Yes.

23       Q.  You knew zoning was going to be

24  difficult, or rezoning, right?

1        MR. MILLER:  Objection to form.

2    A.  No.

3    Q.  So you weren't concerned that it was

4  going to be difficult to get the property

5  rezoned because of the pushback from the

6  community.  Is that what you're telling me?

7    A.  We always get pushback from neighbors

8  and the community and that concerns us.

9    Q.  But in this case you knew that there was

10  a large number of citizens of the city of

11  Worthington who were opposed to the nature of

12  the development that you'd outlined on

13  Exhibit 8.

14        MR. MILLER:  Objection to form.

15    Q.  Right?

16    A.  Can you repeat the quest -- was that a

17  question?

18    Q.  Yes.

19    A.  Can you repeat it, please?

20        MR. SCHUMACHER:  Julia, could you repeat

21  it because I'm coughing.

22            (Record read as requested.)

23    A.  Yes.

24    Q.  You knew that zoning was going to be a

1    bitch, right?

2         MR. MILLER:  Objection to form.

3    A.  No.

4    Q.  Those are your words, aren't they?

5    A.  I don't recall.  I could have said that.

6    Sure.  I mean, I don't recall saying it.

7    Q.  You don't recall -- okay.  Let's mark

8    this as Exhibit 9.

9                      -=0=-

10        (Deposition Exhibit 9 marked.)

11                     -=0=-

12        THE WITNESS:  Okay.

13   BY MR. SCHUMACHER:

14   Q.  So on May 6, 2015 -- on that date you

15   had not -- you and your company, and Brent and

16   Chase Miller had not made any formal

17   presentation to the community about this

18   proposal, had they?

19        MR. MILLER:  Objection to form.

20   A.  I don't recall.

21   Q.  Okay.  Well, let me tell you that the

22   meeting at the Worthington -- the WEC center

23   occurred on June 29th of 2015.  All right?  And

24   I can show you that document later.

1    A.  Okay.  June 29th?

2    Q.  Yes.  You remember the meeting, right?

3  We talked about it earlier.  You didn't think --

4  you didn't know if you were there.

5    A.  Well, I went to a meeting, but I don't

6  know if it was a WARD meeting or a town hall

7  meeting or a resident meeting.

8    Q.  Okay.  We'll get to that.

9    A.  Okay.

10    Q.  Were you ever at a meeting where 300,

11  350 citizens were present?

12    A.  Yes.

13    Q.  Okay.  And do you recall that there was

14  significant opposition to your proposal, LC's

15  proposal?

16    A.  Yes.

17    Q.  But even before that meeting occurred,

18  you knew that zoning was going to be difficult,

19  getting rezoned?

20      MR. MILLER:  Objection to form.

21      You may answer.

22    A.  Yes.  That's what this email says.

23    Q.  And your employee Brent Miller asked if

24  you were concerned about anything in WARD's

1    comments or on Duffy's Facebook blog.  You see

2    that?

3         A.  Yes.

4         Q.  So apparently you looked at Duffy's

5    Facebook blog, didn't you?

6         A.  That's what this says.  I don't recall.

7         Q.  You were concerned, right?

8              MR. MILLER:  Objection.  Asked and

9    answered.

10             You may answer.

11        A.  I was concerned with the residents.

12        Q.  What did you write?

13        A.  Yes, concerned.  Zoning is going to be a

14   bitch.

15        Q.  Because you knew it was going to be very

16   difficult to overcome citizens' opposition to a

17   very dense apartment complex on the greenspace

18   that remained in Worthington, Ohio?

19             MR. MILLER:  Objection to form.

20        A.  I was concerned with getting the

21   residents on board.

22        Q.  Right.  In 2015, right?

23        A.  Yes.

24        Q.  Now, do you know if you were at this

1  meeting that occurred on June 29th, 2015 where

2  350 residents appeared, and Brent Miller, Chase

3  Miller, and David Fisher made a presentation to

4  the community?

5      A.  I was there for a period -- brief period

6  of time.

7      Q.  All right.  Do you recall receiving from

8  Worthington city council a letter following that

9  meeting?

10     A.  No.

11                    -=0=-

12         (Deposition Exhibit 10 marked.)

13                    -=0=-

14  BY MR. SCHUMACHER:

15     Q.  Have you had a chance to review

16  Exhibit 10?

17     A.  Yes.

18     Q.  You'd admit that you received a copy of

19  the letter attached on the second page of

20  Exhibit 10 on or about July 16th, 2015?

21     A.  Yes.

22     Q.  You see on the second page that's the

23  letter?

24     A.  Yes.

1      Q.  Do you have the conceptual plans that

2  were submitted at the June 29th, 2015 meeting in

3  front of the public?

4          MR. MILLER:  Objection to form and use

5  of the word you.

6      A.  I don't have the plans.

7      Q.  Does LC?

8      A.  I'm sure they do.

9      Q.  Do you recall looking at it in

10  preparation for your deposition?

11      A.  Yes.

12      Q.  Okay.  And it did propose the same

13  number of residential and commercial buildings

14  that we talked about earlier, didn't it?

15          MR. MILLER:  Objection to form.

16      A.  I don't recall.

17      Q.  Well, the document would speak for

18  itself, wouldn't it?

19          MR. MILLER:  Same objection.

20      A.  I mean, if I can see the document, I can

21  probably --

22      Q.  Sure.  Well, let's finish this first.

23  We'll get it.

24          The -- you also obtained a copy of the

1    minutes of the meeting that was held on

2    June 29th, 2015.  When I say you, I mean LC.

3          MR. MILLER:  Objection to form.

4          You may answer if you know.

5    A.  I don't know.

6    Q.  You said you were present for part of

7    the meeting?

8    A.  Yes.

9    Q.  And you'd agree with me that the

10   majority of the people present were not in favor

11   of the scope of the proposal that you'd made,

12   right?

13         MR. MILLER:  Objection to form.

14   A.  Yes.

15   Q.  And city council reiterated that to you

16   in this letter marked -- second page of

17   Exhibit 10, right?

18   A.  Reiterated?  I don't understand the

19   question.

20   Q.  They told you about the same thing.

21   They said there was opposition to your proposal,

22   and they suggested that you engage in a

23   comprehensive, inclusive community outreach

24   process to listen and respond to the interests

1    of Worthington citizens --

2         MR. MILLER:  Objection to form --

3    Q.  -- didn't they?

4         MR. MILLER:  -- and characterization of

5    the document which speaks for itself.  They also

6    say they remain committed to the principles

7    outlined in the comprehensive plan, and the

8    comprehensive plan provides a framework for

9    development.  They do not say in here that

10   there's significant opposition.

11        MR. SCHUMACHER:  Thank you, Counselor.

12   Q.  The city of Worthington was telling you

13   on July 15th, 2015 to continue a comprehensive,

14   inclusive community outreach process to listen

15   and respond to the interests of Worthington

16   citizens, Mr. DeAscentis, didn't they?

17   A.  Yes.

18   Q.  And you essentially did nothing for the

19   next four years.  Isn't that right?

20        MR. MILLER:  Objection.

21   A.  No.

22   Q.  What did you do after this letter to

23   engage the citizens and listen to the interests

24   of Worthington citizens?

1      A.  I don't recall specifically what we did.

2      Q.  Okay.  So you knew that zoning was going

3  to be a bitch, and you knew that the citizens

4  that you heard at the meeting were opposed to

5  the density of your proposal, and you received a

6  letter on July 15th from the city of Worthington

7  essentially saying that, and you don't recall

8  what you did to respond.

9           MR. MILLER:  Objection.

10  Mischaracterizes the exhibit --

11      Q.  Is that what you're saying?

12           MR. MILLER:  -- prior testimony.

13      A.  I don't know they were -- they were --

14  they were concerned with the density.

15      Q.  Among other things.

16      A.  Yeah.  The one I recall -- the one

17  conversation I recall is a resident stood up and

18  said apartments bring low income black people

19  and we don't want those people in Worthington.

20  That's when I got up and left.

21      Q.  Okay.  But the -- nonetheless, the city

22  was encouraging you to engage the citizens of

23  Worthington about your project?

24      A.  Yes.

1      Q.  Okay.  You'd agree that the citizens at

2  the meeting did raise issues, including creating

3  an abundant greenspace and parkland, right?

4      A.  Yes.

5      Q.  Dealing with stormwater, right, that was

6  raised?

7      A.  I don't recall.

8      Q.  The letter suggests it, doesn't it?

9          MR. MILLER:  Objection to form.  You

10  asked him if he knew that.

11         MR. SCHUMACHER:  Well, he just --

12         MR. MILLER:  He said he didn't recall.

13         MR. SCHUMACHER:  -- said he didn't.

14         MR. MILLER:  The letter says that.

15         MR. SCHUMACHER:  The letter says it.

16         MR. MILLER:  That's a different

17  question.

18     A.  I remember them asking about parkland

19  space in the meeting, but I don't remember

20  stormwater.

21     Q.  Do you remember comments about the

22  impact of traffic?

23     A.  Yes.

24     Q.  Do you remember comments about the

1   affects on schools?

2       A.  No.

3       Q.  Do you recall comments about the mix of

4   housing types and the interest of empty-nesters

5   and elderly?

6       A.  Yes.

7       Q.  Do you recall comments about the height

8   of buildings?

9       A.  No.

10      Q.  Given all of this, what did you do after

11  2015 to engage the community and have dialogue

12  with the community in order to try and get your

13  proposal accepted by the community?

14      MR. MILLER:  Objection to form.

15      A.  I don't know the timing.  I mean, I went

16  to several meetings with people in the community

17  at the direction of Matt Greeson's request of me

18  to do that.

19      Q.  Who?  When?

20      MR. MILLER:  Objection to form.

21      A.  I don't -- I don't know the dates.

22      Q.  Will you be able to tell us at trial

23  what efforts you made from July of 2015 until

24  you made your application formally to engage the

1  community?

2       MR. MILLER:  Objection to form.

3       You may answer if you understand the

4  question.

5       A.  Yes.

6       Q.  What efforts did you make?

7       A.  I met with some constituents in

8  Worthington.  I remember meeting with Bob

9  Larrimer.

10      Q.  Bob?

11      A.  Larrimer.  It's someone that Matt

12  Greeson asked me to meet with.

13      Q.  Did he own a home?

14      A.  Yes.

15      Q.  Anyone else?  You met with Bob Larrimer.

16      A.  I met with -- I met with some residents

17  on Evening Street.  I can't remember who they

18  were.  That was a street behind the property.

19      Q.  Did you conduct any surveys of the

20  residents of the city of Worthington?

21       MR. MILLER:  Objection to form.

22      A.  I didn't.

23      Q.  Did your company do that?

24      A.  I don't know.

1          MR. SCHUMACHER:  Let's mark this as

2   Exhibit 11 are we at?

3          COURT REPORTER:  Yes.

4                  -=0=-

5        (Deposition Exhibit 11 marked.)

6                  -=0=-

7          THE WITNESS:  Okay.

8   BY MR. SCHUMACHER:

9      Q.  Have you had a chance to review

10  Exhibit 11?

11     A.  Yes.

12     Q.  Is this a true and accurate copy of an

13  email that David Fisher sent to Cyndy Garn and a

14  number of other people, including you, on

15  October 14th, 2015?

16     A.  Yes.

17     Q.  Did Lifestyle Communities receive the

18  city council's statement regarding the UMCH

19  development that was adopted on Monday,

20  October 12th, 2015?

21          MR. MILLER:  Objection to form.

22     A.  I don't know.

23     Q.  You see the LC00019416 --

24     A.  Yes.

1      Q.  -- in the bottom right corner?

2          Do you understand that to be a document

3  produced by your lawyers in this case as one

4  that was from Lifestyle Communities Limited?

5      A.  Are you asking me if we produced this?

6      Q.  Yes.

7      A.  I don't know.

8      Q.  Well, you're not denying that you were

9  aware that your company received this

10  document --

11         MR. MILLER:  Objection to form.

12     Q.  -- are you?

13     A.  No.

14     Q.  At this point Lifestyle Communities had

15  not submitted any formal application for

16  rezoning the property, had they?

17         MR. MILLER:  Objection to form.

18         October of 2015?

19     A.  Can you repeat the question?

20         MR. SCHUMACHER:  Julia, please.

21            (Record read as requested.)

22     A.  I don't know.

23                  -=0=-

24        (Deposition Exhibit 12 marked.)

1                    -=0=-

2         MR. SCHUMACHER:  Did I give you the

3    wrong copy?

4         MR. MILLER:  No.  We were just noting

5    that one has a Bates number and then what

6    appears to be the perfect copy of the same

7    email, but perhaps it was covered by an exhibit

8    sticker.

9         MR. SCHUMACHER:  We were trying to find

10   the Bates numbered copy.  That's why.  But we

11   did eventually.

12        MR. MILLER:  We have been going about an

13   hour whenever you get to a stopping point.

14        MR. SCHUMACHER:  Yeah.  I'm actually

15   getting ready to break for -- half an hour

16   lunch?  I'm trying to accommodate your schedule.

17        MR. MILLER:  No, I appreciate that.  You

18   want to go off the record?

19             (Recess taken.)

20        THE VIDEOGRAPHER:  Okay.  Back on the

21   record.

22   BY MR. SCHUMACHER:

23     Q.  Have you had a chance to review

24   Exhibit 12?

·1· · · ·A.· Yes.

·2· · · ·Q.· This appears to be an email that you

·3· sent to yourself on December 15th, 2016.· Do you

·4· see that?

·5· · · ·A.· Yes.

·6· · · ·Q.· Was this a draft of something you were

·7· going to send to David and Bill?

·8· · · ·A.· I don't remember.

·9· · · ·Q.· Is David David Fisher?

10· · · ·A.· Probably, yes.

11· · · ·Q.· And who would Bill be?

12· · · · · ·MR. MILLER:· Objection to form.

13· · · ·A.· Bill?· Somebody with UMHC.· I'm sure.

14· It might have been Bill Friedman, not Denny

15· Friedman.· Bill -- Bill's somebody that worked

16· at UMHC, I think.· I'm not certain.

17· · · ·Q.· Is it fair to say that this draft email

18· contains your thoughts about further negotiation

19· for this deal with UMCH?

20· · · ·A.· Yes.

21· · · ·Q.· You are assuming a 10-year zoning

22· battle.

23· · · · · ·MR. MILLER:· Objection to form.

24· · · ·Q.· Is that right?

1      A.  No.

2      Q.  What did you mean by that comment, I'm

3  going to -- I'm going in to this assuming a

4  10-year battle?

5      A.  Well, that's -- I was negotiating price

6  with UMHC saying you guys have been holding it

7  for a long time.  It took you 10 years; so...

8      Q.  Ten years to do what?

9      A.  Well, they had a couple developers prior

10  to me when there was no zoning in place.

11      Q.  When there was what?

12      A.  No zoning in place.

13      Q.  Who were those developers?

14      A.  I think it was Pizzuti was one, I think

15  Frank Kass was the other one that tried to buy

16  it.

17      Q.  So you were aware there were other

18  developers who had attempted to buy the property

19  and obtain rezoning for a different kind of

20  development.

21          MR. MILLER:  Objection to form.

22      Q.  We can agree on that?

23      A.  They didn't obtain zoning.

24      Q.  But they had to and they abandoned those

1    plans?

2            MR. MILLER:  Objection to form.

3            You may answer.

4        A.  Yes.

5        Q.  And you knew that?

6        A.  Yes.

7        Q.  That's why you were offering what you

8    considered to be a very high price per acre for

9    the property?

10       A.  No.

11       Q.  You knew you were going to have to fight

12   this zoning battle, right?

13           MR. MILLER:  Objection to form.

14   Mischaracterizes the document and prior

15   testimony.

16       A.  No.  That was a pricing strategy to get

17   the price lowered.

18       Q.  Okay.  So when you -- when you said

19   that's an extremely high price for unzoned and

20   unentitled land, you meant that to be a

21   negotiating tactic, right?

22           MR. MILLER:  Objection to form.

23           You may answer.

24       A.  Yes.

1      Q.  Because, again, you knew that there was

2  going to be a lot of work to get this rezoned

3  given what you'd already learned about the

4  community pushback?

5          MR. MILLER:  Objection to form.

6  Mischaracterizes prior testimony.

7      A.  No.

8      Q.  That's not right?  You didn't know that

9  there was community pushback?  We just talked

10  about that.

11          MR. MILLER:  Objection to form.

12      A.  I knew I would get it zoned.

13      Q.  Okay.  But you knew there was community

14  opposition to the plan, didn't you?

15      A.  There's always community oppositions to

16  plans.

17      Q.  And there continued to be community

18  opposition to the plan throughout the course of

19  this matter, didn't it?

20          MR. MILLER:  Objection to form.

21      A.  Yes.

22      Q.  You never were able to obtain community

23  buy-in for the proposal that you'd made --

24          MR. MILLER:  Objection to form.

1      Q.  -- were you?

2          MR. MILLER:  Sorry, Paul.  Objection.

3          You may answer if you understand the

4  question.  I don't know what community buy-in

5  means.

6      A.  I don't know.

7      Q.  You don't -- you're not aware of the

8  fact that you were never able to get community

9  buy-in?

10     A.  Some of the people in the community.

11     Q.  And what efforts did you do to assess

12 the people in the community, the voters in the

13 community to determine if they would accept your

14 proposal?

15     A.  I don't know.

16     Q.  You don't know.  We'll get to that.

17         THE VIDEOGRAPHER:  Got about five

18 minutes.

19         MR. SCHUMACHER:  Yeah.  It's a good time

20 to break, then.

21         MR. MILLER:  Okay.

22             (Recess taken.)

23         THE VIDEOGRAPHER:  We're back on the

24 record.

1  BY MR. SCHUMACHER:

2      Q.  Mr. DeAscentis, just before the break

3  you said I knew I would get it zoned.  You

4  recall saying that?

5      A.  Yes.

6      Q.  Just a minute ago?

7      A.  Yes.

8      Q.  Thank you.

9          So you were aware that you would have to

10  also survive a referendum if one were brought by

11  the citizens of the city of Worthington, right?

12          MR. MILLER:  Objection to form.

13      A.  Yes.

14      Q.  So you must have information that make

15  you certain that you would survive a referendum.

16  Is that right?

17          MR. MILLER:  Same objection.

18      A.  I mean, in our experience those very

19  rarely are successful just because of the number

20  of residents in the community, and the math, and

21  the ballots, and so I wasn't worried about the

22  referendum.

23      Q.  How many residents are there

24  approximately in the city of Worthington, do you

1    know?

2       A.  I don't.

3       Q.  I've been told 14,000.  Does that sound

4    right?

5       A.  I don't know.

6       Q.  I don't either.  How many registered

7    voters are there in the city of Worthington, do

8    you know that?

9       A.  I don't.

10      Q.  And registered voters are what we're

11   talking about when we're talking about voting on

12   a referendum, correct?

13         MR. MILLER:  Objection to form.

14      A.  I don't know.

15      Q.  So my question's a little different.

16   Even though you've had experience with

17   referendums, in this case you must have

18   information that make you certain that you would

19   survive a referendum by the citizens of the city

20   of Worthington.  Is that right?

21         MR. MILLER:  Objection to form.

22      A.  No.

23      Q.  You don't have any information?  It's

24   just a guess?

1          MR. MILLER:  Objection to form.

2  Mischaracterizes prior testimony.

3      A.  Yeah.

4      Q.  Which is it?

5      A.  I've never been involved in a referendum

6  in all the developments we've done so it wasn't

7  a concern for me.

8      Q.  Okay.  Are you telling me that you don't

9  have information that you are relying upon to be

10  sure that you would survive a referendum?

11          MR. MILLER:  Objection to form.  Other

12  than the information that he just relayed to

13  you?

14          MR. SCHUMACHER:  His experience?  He

15  said he had no experience with a referendum.

16  Let me withdraw the question.

17  BY MR. SCHUMACHER:

18      Q.  Do you have any information or did you

19  develop any information to advise you, or your

20  companies, or your affiliates, or the people you

21  partnered with on this deal to determine if you

22  could survive a referendum by the voters of the

23  city of Worthington?

24          MR. MILLER:  Same objections.

1      A.  I did not.

2      Q.  Nothing?

3          MR. MILLER:  Same objections.

4      A.  I did not.

5      Q.  You and your companies did nothing?

6      A.  I don't know what the companies did.

7      Q.  Okay.  So you would agree with me, then,

8  that if the citizens of the city of Worthington

9  put this issue on the ballot after a successful

10  rezoning, you could lose?

11         MR. MILLER:  Objection to form.  Calls

12  for speculation.  Mischaracterizes prior

13  testimony.  He said he wasn't worried about a

14  referendum.

15         MR. SCHUMACHER:  It certainly does call

16  for speculation.

17     Q.  You don't know if you'd survive a

18  referendum, do you?

19         MR. MILLER:  Objection to form.

20     A.  I don't know.

21     Q.  Thank you.

22         When did you first employ Tom Hart to be

23  your lawyer to obtain rezoning in this case?

24         MR. MILLER:  Objection to form.  You,

1  your.

2      Q.  You don't remember?

3          MR. MILLER:  Ignores prior testimony.

4      Q.  All right.  Let's --

5          MR. MILLER:  Can you be a little more

6  precise?

7      Q.  Let's be clear.  When I say you, I'm

8  referring to you as the chief executive officer

9  of Lifestyle Communities Limited and its 50-some

10  affiliated companies.  You understand me?

11      A.  Yes.

12      Q.  Thank you.

13          When did you first employ Tom Hart to

14  achieve rezoning of this property?

15      A.  I don't know.

16          MR. MILLER:  Same objection.

17      Q.  You don't know?

18      A.  I don't know.

19      Q.  Do you have the information within your

20  companies?

21      A.  I'm sure.

22      Q.  You do know that Attorney Hart is the

23  one who made the application to the city of

24  Worthington, don't you?

1     A.  I don't know.

2     Q.  You do know that your attorney or

3  general counsel Bo Brownlee made presentations

4  at both the City of Worthington Municipal

5  Planning Commission and the City of Worthington

6  City Council, don't you?

7     A.  Yes.

8     Q.  Thank you.

9         Did you meet with any councilmembers at

10  any time during your quest to obtain this

11  rezoning?

12        MR. MILLER:  Objection to form.

13        You may answer.

14     A.  Yes.

15     Q.  Did you ever meet with David Robinson?

16     A.  Yes.

17     Q.  On how many occasions?

18     A.  I recall one time.

19     Q.  Do you remember where the meeting was?

20     A.  Rusty Bucket.

21     Q.  Do you remember who else was present?

22  Was it just the two of you, do you recall?

23     A.  No.  There was three or four people

24  there.

1      Q.  Three or four people from your

2  organizations or --

3      A.  No, three or four people at the table.

4  I remember sitting at the table.  I don't -- I

5  don't know for sure who was there.

6      Q.  Do you recall the conversation you had

7  directly with Mr. Robinson?

8      A.  Yeah.  David was very negative about our

9  company's product and our quality.

10     Q.  Do you know when this meeting occurred?

11     A.  I don't.

12     Q.  In relation to your application do you

13  know when it occurred?

14     A.  I don't.

15     Q.  Would you agree with me that David

16  Robinson has always been against a dense

17  apartment complex on this property?

18         MR. MILLER:  Objection to form.

19     A.  I don't know.

20     Q.  As long as you've known of him has it

21  been your understanding that he's been

22  anti-development of this property as an

23  apartment complex?

24         MR. MILLER:  Same objection.

1      A.  Yes.

2      Q.  Did you know him or speak to him before

3  he got on council?

4          MR. MILLER:  Objection to form.

5          You may answer.

6      Q.  If you know.

7      A.  I don't know --

8          MR. MILLER:  You said did you know him

9  or speak to him.

10      A.  I don't know when I met with him whether

11  he was on council or not.  I don't know.

12      Q.  Has Lifestyle Communities or any of its

13  affiliate companies or you personally

14  contributed to the campaign of any city of

15  Worthington councilmember from 2013 to the

16  current time?

17      A.  I don't --

18          MR. MILLER:  Objection to form.

19          You may answer to the extent you know.

20      A.  I don't know.

21      Q.  How would you find out if your company's

22  made such contributions?

23          MR. MILLER:  The companies themselves?

24          MR. SCHUMACHER:  Yes.

1          MR. MILLER:  You asked about companies

2    and individuals.

3      Q.  You've got 50 affiliate companies or

4    more.

5      A.  I'd probably go talk to one of our

6    lawyers.

7      Q.  Which lawyer?  Mr. Falk?

8      A.  No, he wouldn't know.

9      Q.  An in-house lawyer or outside lawyer?

10     A.  In-house lawyer, yeah.

11     Q.  Who is Yaromir Steiner?

12     A.  He is a mixed use developer manager.

13     Q.  How long have you known him?

14     A.  Maybe 15 years.

15     Q.  He's a successful developer in your

16   opinion?

17         MR. MILLER:  Objection to form.

18         You may answer.

19     A.  I don't -- I don't really have an

20   opinion about him as a successful developer.

21     Q.  Do you recall proposing an agreement

22   with him where you would work together to try to

23   develop this property?

24     A.  Yes.

1      Q.  Did you actually propose a joint venture

2  of some kind?

3      A.  I think he proposed -- I think he

4  proposed something to me.

5      Q.  Did that ever come to fruition with him?

6      A.  For a while, and then he decided not to

7  proceed.

8      Q.  Did he tell you why?

9      A.  I don't recall.

10      Q.  Do you recall him telling you that it

11  would take a six month -- six months of intense

12  effort to build a consensus on a plan in order

13  to get the city to approve the zoning request?

14          MR. MILLER:  Objection to form.

15          You may answer.

16      A.  I don't recall him saying that.

17      Q.  Okay.  You don't recall discussing

18  anything like that with him?

19      A.  Well, I remember talking to him about

20  being -- the whole -- the overall project and

21  his role and using his expertise.

22      Q.  Did you share with him your frustration

23  about the pushback that you'd been getting from

24  citizens of the city of Worthington?

1          MR. MILLER:  Objection to form.

2          You may answer.

3     A.  I don't remember telling him

4  specifically my opinion.

5     Q.  Do you recall him telling you that it

6  may or may not take a referendum?

7          MR. MILLER:  Objection to form.

8          What may or may not take a referendum?

9     Q.  Getting the zoning approved --

10    A.  No.

11    Q.  -- for your proposal that forms the

12 basis of this lawsuit that you brought.

13         MR. MILLER:  Objection to form.

14    A.  I don't remember him telling me that.

15    Q.  Okay.

16         MR. MILLER:  I believe lunch is served

17 whenever you're at an appropriate stopping

18 point.

19         MR. SCHUMACHER:  Okay.  Let's do it.

20         MR. MILLER:  You sure?

21         MR. SCHUMACHER:  Sure.

22         THE VIDEOGRAPHER:  Off the record.

23             (Recess taken.)

24         THE VIDEOGRAPHER:  Okay.  Back on the

1    record.

2   BY MR. SCHUMACHER:

3       Q.  Mr. DeAscentis, do you try to keep

4   abreast of the real estate developments in

5   central Ohio?

6       A.  Not much central Ohio anymore because

7   most of our work's down south.

8       Q.  Are you familiar with the village -- is

9   it the Village of Powell?

10      A.  Yes.  I used to live there.

11      Q.  You familiar with the referendum attempt

12  that was put up in the Village of Powell?

13          MR. MILLER:  Objection to form and

14  vague.

15      A.  No.

16      Q.  Never heard of it?

17      A.  A referendum attempt?

18      Q.  Uh-huh.

19      A.  (Shakes head).

20          MR. SCHUMACHER:  What exhibit number are

21  we at, Julia?

22          COURT REPORTER:  Thirteen.

23                  -=0=-

24          (Deposition Exhibit 13 marked.)

1                    -=0=-

2   BY MR. SCHUMACHER:

3       Q.  Have you had a chance to review

4   Exhibit 13?

5       A.  Yes.

6       Q.  Have you ever seen Exhibit 13 before?

7       A.  Yes.

8       Q.  Did you -- is this your handwriting on

9   the document?

10       A.  No.

11       Q.  Did you create the document?

12       A.  No.

13       Q.  Does this document provide a flowchart

14   for the deal that formed the basis of the

15   lawsuit that you filed against the city of

16   Worthington?

17           MR. MILLER:  Objection to form.

18       A.  Can you repeat the question?  I'm sorry.

19       Q.  This is the deal that you were -- it's a

20   flowchart of the deal that you were presenting

21   with your application to rezone the property at

22   UMCH in the city of Worthington.

23           MR. MILLER:  Objection to form.

24   Mischaracterizes the document.  I don't see a

1  deal flow here.  I see entities.

2      A.  This is a chart of the entity that owns

3  the land.

4      Q.  Okay.  And if I -- can you help me

5  interpret the document?

6          MR. MILLER:  Objection to form.

7      Q.  Let's start at the top.

8      A.  Yeah, that's me.

9      Q.  So you are the -- we talked about this

10  earlier.

11      A.  Yep.

12      Q.  You were the guarantor --

13      A.  Yeah.

14      Q.  -- of a bank loan of $6.55 million to

15  fund this purchase, correct?

16      A.  Yes.

17      Q.  And you --

18          MR. MILLER:  And let's wait until -- so

19  the record is clear -- until he finishes his

20  question --

21          THE WITNESS:  Okay.

22          MR. MILLER:  -- before you begin your

23  answer.

24      Q.  And you're also a hundred percent member

1    of LY Worthington Limited, an Ohio limited

2    liability company.  You see that?

3        A.  Yes.

4        Q.  And may I interpret it correctly that

5    you personally own LY Worthington Limited?

6            MR. MILLER:  Objection to form.

7            You may answer.

8        A.  I'm not sure.

9        Q.  Okay.  What is your understanding as the

10   chief executive officer of Lifestyle Communities

11   of this document?

12           MR. MILLER:  Objection to form.

13       A.  Well, this document would assume that I

14   owned a hundred percent of LY Worthington and

15   that entity owns a hundred percent of

16   Worthington Campus, LLC.

17       Q.  And Worthington Campus, LLC is one of

18   the Plaintiffs in this lawsuit, right?

19       A.  Yes.

20       Q.  They're the owner of the property -- one

21   of the owners of the property, right?

22       A.  I'm not for sure which entity owns the

23   property.

24       Q.  Is this a private deal that you've made

1    as Michael DeAscentis II or is this a deal that

2    you're making on behalf of Lifestyle Communities

3    Limited --

4         MR. MILLER:  Objection --

5    Q.  -- or one of its affiliate companies?

6         MR. MILLER:  Sorry.  Objection to form.

7         You may answer the question.

8    A.  Well, sometimes I take ownership to

9    entity -- parts of projects that are a component

10   of some of the larger mixed use developments

11   that we do.  So sometimes the entities are owned

12   by me.  Sometimes the entities are owned by

13   Lifestyle Communities and those other 50

14   entities.

15   Q.  Well, in the case of the property that's

16   located on High Street in Worthington, Ohio,

17   what is your role in that deal?

18   A.  I'm the owner.

19   Q.  Okay.  So this is Michael J. DeAscentis

20   II's deal at the end of the day, isn't it?

21        MR. MILLER:  Objection to form.  It

22   mischaracterizes prior testimony.

23   A.  I own the property.

24   Q.  Right.  Right.  Whether we're -- as we

1    follow this flowchart, whether we look at all

2    these different corporate entities, at the end

3    you're the person who is holding the bag, so to

4    speak?

5        MR. MILLER:  Objection to form.  I don't

6    understand that question.  I'm not sure how you

7    can answer it.

8        MR. SCHUMACHER:  You can object all you

9    want, Mr. Miller.

10       A.  I don't understand holding the bag.  I

11   mean, sometimes I own real estate through LC

12   entities, sometimes I own real estate

13   individually.  In this instance I owned it

14   individually.

15       Q.  All right.  So this lawsuit is your

16   lawsuit, isn't it?

17       MR. MILLER:  Objection to form.

18   Lifestyle Communities is a Plaintiff and a

19   developer of the property.

20       Q.  As is Worthington Campus, LLC of which

21   you're a hundred percent owner.  Didn't we

22   establish that?

23       A.  Yes.

24       Q.  All right.  So putting all the legal

1  legalities aside, at the end of the day this is

2  your lawsuit, Mr. DeAscentis, that you filed

3  against the city of Worthington, right?

4       MR. MILLER:  Objection to form.

5       A.  Yes.

6       Q.  It's your money that was invested into

7  this deal, right?

8       A.  Yes.

9       Q.  What do you project to earn from this

10  deal?

11       MR. MILLER:  Objection to form.  And

12  here -- you keep saying you.  I mean, Lifestyle

13  Communities is involved in the deal.  Lifestyle

14  Communities is the applicant and the developer.

15  Which do you want to know?

16       MR. SCHUMACHER:  Joe, he just testified

17  that this is his deal.  You didn't hear him say

18  that?

19       MR. MILLER:  He testified that he's the

20  owner of the land through --

21       MR. SCHUMACHER:  Okay.

22       MR. MILLER:  -- Worthington Campus, LLC.

23       Q.  All right.  If you could --

24       MR. MILLER:  If you want to understand

·1· the deal and how this works, you can ask him

·2· that.· If you want to mischaracterize his

·3· testimony, that's not appropriate.

·4· · · · · · MR. SCHUMACHER:· Your Honor, we move to

·5· strike the comments of counsel.

·6· · · · · · Julia, can you read back my last

·7· question for the witness.

·8· · · · · · · (Record read as requested.)

·9· · · ·A.· Do you want me to answer that?

10· · · ·Q.· Yes.

11· · · ·A.· Between the multi-family, and the

12· residential, and the commercial between me and

13· the company, you know, we projected around

14· $350 million would be the value that we could

15· create.

16· · · ·Q.· Does that include submetering the

17· apartments for electricity and other utilities?

18· · · ·A.· No.

19· · · · · · MR. MILLER:· Objection to form and

20· relevance.

21· · · ·A.· No.

22· · · ·Q.· I'm sorry?

23· · · ·A.· No.

24· · · ·Q.· But you could also do that as well?

1      A.  I'm not sure.

2      Q.  There were over 300 apartments in every

3  proposal that you've made in this particular

4  project, haven't there been?

5      A.  Yes.

6      Q.  And your companies have often submetered

7  electricity and other utilities through other

8  companies such as the one we talked about,

9  Nationwide Energy that you're the CEO of, right?

10         MR. MILLER:  Same objections.

11     A.  I am the CEO of that company, but

12  there's very specific regulations related to

13  utility service.  We service 60,000 apartments

14  across three other states that we don't own.  So

15  it's -- it's not clear that you could do that in

16  Worthington.  I don't know if you could do that

17  in Worthington.

18     Q.  But you do it in other places, don't

19  you?

20         MR. MILLER:  Asked and answered.

21     A.  Yes.

22     Q.  And what you do is you buy utility

23  services like electricity and you mark it up to

24  the people that you rent those apartments to,

1    don't you?

2        A.  No.

3        Q.  Okay.  That's not what you do?

4        A.  No.

5        Q.  All right.  Do you make money on the

6    utility that you provide to those apartment

7    owner -- or renters?

8        MR. MILLER:  Objection to form as to

9    relevant.  I assume you're moving on soon.  This

10   has nothing to do with the lawsuit.

11       A.  Are you asking me as NEP?  Are you

12   asking me as LC?

13       Q.  NEP.

14       A.  Yes.

15       Q.  You knew that the city of Worthington

16   both through the citizen comment that you've

17   heard yourself as well as the feedback you've

18   gotten from government and others that

19   residences for empty-nesters and seniors was

20   desired at this particular property, right?

21       MR. MILLER:  Objection to form.

22       A.  Yes.

23       Q.  And so if Nationwide Energy were able to

24   get involved in this project down the road, you

·1· would be able to upcharge those citizens for

·2· their utility services, wouldn't you?

·3· · · · · MR. MILLER:· Objection to form and

·4· relevance.

·5· · · A.· No.

·6· · · Q.· No?

·7· · · A.· No.

·8· · · Q.· You wouldn't take the opportunity to

·9· upcharge those senior residents like you do in

10· other communities?

11· · · · · MR. MILLER:· Paul, this has nothing to

12· do with the lawsuit.· I don't know what points

13· you think you're scoring.· Nationwide Energy

14· Partners is a public utility in full conformity

15· with the law of the state of Ohio and other

16· states.· I've been indulgent here.· It has

17· nothing to do with this lawsuit.· How long are

18· you going to spend on Nationwide Energy

19· Partners?

20· · · · · MR. SCHUMACHER:· Are you finished?

21· · · · · MR. MILLER:· How long are you going to

22· spend on Nationwide Energy Partners?

23· · · · · MR. SCHUMACHER:· I'd like an answer to

24· my question when you're done with your speaking

1    objection.  Are you done?

2         MR. MILLER:  I don't get an answer to my

3    question.  I mean, this is a discovery

4    deposition.  I've afforded you latitude.  This

5    is getting ridiculous, because you're getting

6    mired down in an entity and submetering that has

7    nothing to do with this lawsuit.  So I'm asking

8    you to move on quickly.  Otherwise, we will just

9    cut off the questioning.  He's here to answer

10   your questions about this lawsuit.

11        MR. SCHUMACHER:  Could be two pages.

12        Julia, could you read back my actual

13   question so I can get an answer and move on.

14            (Record read as requested.)

15        A.  No.

16        Q.  Thank you.

17            You said earlier before lunch that you

18   attended a couple of or a few meetings of

19   residents in the city of Worthington?

20        A.  Yes.

21        Q.  Do you recall meeting with an

22   organization referred to as Building

23   Worthington's Future or BWF?

24        A.  Yes.

1      Q.  BWF was an organization that was in

2  favor of development in the city of Worthington?

3           MR. MILLER:  Objection.

4           You may answer if you know.

5      A.  Yes.

6      Q.  Can you take a look at a document we'll

7  mark as Exhibit 14.

8                     -=0=-

9        (Deposition Exhibit 14 marked.)

10                    -=0=-

11  BY MR. SCHUMACHER:

12     Q.  Have you had a chance to review --

13     A.  Yes.

14     Q.   -- Exhibit 14?

15          Does that refresh your recollection as

16  to the timing of when you may have met with BWF?

17     A.  Yes.

18     Q.  Okay.  Let me hand you a document we're

19  going to mark as Exhibit 15.

20                    -=0=-

21        (Deposition Exhibit 15 marked.)

22                    -=0=-

23  BY MR. SCHUMACHER:

24     Q.  Have you had a chance to review

1    Exhibit 15?

2        A.  Yes.

3        Q.  Does this refresh your recollection as

4    to the people from Building Worthington's Future

5    that you met with sometime in June or late May

6    of 2019?

7        A.  Yes.

8        Q.  Are those the people listed on

9    Exhibit 15?

10          MR. MILLER:  Objection to form.

11       A.  I don't know whether all those people

12   showed up.  Parker said that these were the

13   people that were coming.

14       Q.  Okay.  And you also indicated that you

15   would prefer that others, including Bonnie

16   Michael and Doug Foust and David Robinson, not

17   attend.

18          MR. MILLER:  Objection to form.

19       Q.  Is that a fair reading of Exhibit 15?

20       A.  Yes.

21       Q.  And as we discussed, you knew in 2019

22   that David Robinson, in particular, didn't favor

23   the plan for a dense residential development on

24   the property, right?

1          MR. MILLER:  Objection to form.

2     Q.  He was an opponent of the plan that you

3  were proposing?

4     A.  Yes.

5     Q.  Thank you.

6          And Parker MacDonell and Betsy MacDonell

7  were the leaders at the time of BWF, weren't

8  they?

9     A.  I don't know that.

10    Q.  You did apparently speak to this group,

11  right?

12    A.  Yes.

13    Q.  Okay.

14         MR. SCHUMACHER:  Sixteen.

15                    -=0=-

16      (Deposition Exhibit 16 marked.)

17                    -=0=-

18  BY MR. SCHUMACHER:

19    Q.  Have you had a chance to review

20  Exhibit 16?

21         MR. MILLER:  It's a multi-page document.

22  I think he's still reviewing.

23         MR. SCHUMACHER:  That's why I asked.

24         THE WITNESS:  Not yet.

1        MR. MILLER:  Do you know why this

2   document doesn't have a Bates number?

3        MR. SCHUMACHER:  That one doesn't.

4        MR. MILLER:  Do you know why?

5        MR. SCHUMACHER:  Pardon me?

6        MR. MILLER:  Do you know why?

7        MR. SCHUMACHER:  I don't.  I have

8   another one with a Bates number.

9        MR. MILLER:  I thought it had been

10  produced; so okay.

11        MR. SILK:  Probably has something to do

12  with the printer setup so it not fit the page,

13  because I was having that problem printing some

14  of these documents.

15        THE WITNESS:  Okay.

16  BY MR. SCHUMACHER:

17     Q.  Are these the notes that you used to

18  make the presentation to these 16 or so people

19  on June 3rd, 2019?

20     A.  No.  These aren't my notes.

21     Q.  They're not your notes.  Okay.

22        Were they prepared by your organization

23  for you?

24        MR. MILLER:  Objection to form.

1          A.  I don't know.

2          Q.  Were they sent to you by the people at

3     Building Worthington's Future?

4          A.  I don't know that either.  Usually when

5     I speak I don't use notes.

6                         -=0=-

7               (Deposition Exhibit 17 marked.)

8                         -=0=-

9               THE WITNESS:  Okay.

10    BY MR. SCHUMACHER:

11         Q.  Have you had a chance to review

12    Exhibit 17?

13         A.  Yes.

14         Q.  Is this an email -- a true and correct

15    copy of an email you sent on June 4th, 2019 to

16    Parker MacDonell with a copy to Jode Ballard at

17    Lifestyle Communities?

18         A.  Yes.

19              MR. MILLER:  Objection to form.

20         Q.  I'm sorry, what was your answer?

21         A.  Yes.

22         Q.  Did you write this email?

23         A.  To Parker?

24         Q.  Yeah.

·1· · · A.· Yes.

·2· · · Q.· So it is a true and correct copy of an

·3· email you wrote to Mr. Parker MacDonell, isn't

·4· it?

·5· · · · · MR. MILLER:· I thought he testified as

·6· much.

·7· · · A.· Yes.

·8· · · Q.· Okay.· Can I interpret this document to

·9· mean that you approved of Mr. MacDonell sending

10· some notes to the mailing list of BWF?

11· · · · · MR. MILLER:· Objection to form.

12· · · · · You may answer.

13· · · A.· Yes.

14· · · Q.· So when you wrote Jode will follow up

15· and okay to distribute notes as long as they are

16· coming from you and not from me or Jode, that's

17· what you meant?

18· · · A.· Yes.

19· · · Q.· But you still approved and looked at the

20· notes before they were sent, didn't you?

21· · · · · MR. MILLER:· Objection to form.

22· · · A.· I didn't look at the notes.

23· · · · · MR. SCHUMACHER:· Let's mark these as 18

24· and 19.· There are two different documents but

1    they go together.

2                          -=0=-

3         (Deposition Exhibits 18-19 marked.)

4                          -=0=-

5         MR. SCHUMACHER:  So the first --

6         MR. MILLER:  Paul, we've got to get them

7    marked.

8         MR. SCHUMACHER:  The June 6, 2019 we'll

9    do as 18.

10        MR. SILK:  She's trying to mark and type

11   at the same time.

12        MR. SCHUMACHER:  Sorry.

13        THE WITNESS:  Okay.

14        MR. SCHUMACHER:  Did we mark 18 as the

15   email from Jode Ballard?

16        Thank you.

17   BY MR. SCHUMACHER:

18     Q.  Do you recognize Exhibit 18 as an email

19   that Jode Ballard wrote on June 6, 2019 to

20   you -- I'm sorry, to Parker MacDonell with a

21   copy to you?

22     A.  Yes.

23     Q.  And this attached a document called

24   Michael DeAscentis Presentation Notes 6-3-19.

1    Do you see that?

2         A.  Yes.

3         Q.  Would Exhibit 19 be the draft of that

4    document that Mr. Jode prepared for you?

5              MR. MILLER:  Objection to form.

6         A.  Yes.

7         Q.  You see where Mr. Ballard says that he

8    went through the notes and sent them and made a

9    few clarifications?

10        A.  Yes.

11        Q.  Thank you.

12             So my question is did you have an

13   opportunity to review these before they were

14   then distributed by Mr. MacDonell as he

15   indicated he would like to?

16             MR. MILLER:  Objection to form.

17             You may answer if you know.

18        A.  I don't recall reviewing the notes.  I

19   asked Jode to review them.

20        Q.  And who is Jode?

21        A.  Jode was a development associate at the

22   time.

23        Q.  Is Jode still with your company or one

24   of your companies?

1     A.  No.

2     Q.  When did he leave?

3     A.  I'm not sure.

4     Q.  Would your company or one of your

5  companies have a last known address for Jode?

6     A.  I don't know.

7         MR. SCHUMACHER:  Counsel, we'd like to

8  request that you provide us with the last known

9  name and address for Jode Ballard.

10        MR. MILLER:  As with all your requests

11  today, noted.  We'll see to what it's responsive

12  and comply if so.

13        MR. SCHUMACHER:  All right.  We can call

14  him at trial, too.

15  BY MR. SCHUMACHER:

16    Q.  One thing I'm not clear on is did you

17  make this presentation on June 3rd of 2019, do

18  you know?

19    A.  I mean --

20        MR. MILLER:  Objection to form.  Are you

21  saying that exhibit --

22        MR. SCHUMACHER:  I'm just asking --

23        MR. MILLER:  Well, this presentation --

24  he said he was at the meeting.  And when you say

1    this presentation, are you referring, for

2    instance, to Exhibit 19, or what does that mean?

3            Seeing stone silence from opposing

4    counsel, you may answer the question if you

5    understand.

6        A.  I remember being at the meeting.  I'm

7    sure as most the times our development people

8    make presentations.  It's probably Jode's

9    presentation.  I was at the meeting.  I remember

10   being at Worthington Square Shopping Center.

11       Q.  Do you recall discussing the idea that

12   you needed to get community support, but that

13   wasn't working?

14       A.  No.

15       Q.  You don't remember that being discussed

16   at all with the 16 people who may have been at

17   this meeting?

18       A.  I don't recall.

19       Q.  You don't recall discussing this topic

20   with anyone there?

21           MR. MILLER:  Objection.  Asked and

22   answered.

23       A.  Yeah, I don't recall specifically that

24   topic coming up.

1      Q.  So if someone who attended the meeting

2  said that you indicated that LC was not going to

3  file until it got community support and that

4  that hasn't worked so you were going to try a

5  different approach, you don't recall that being

6  said?

7      A.  No.

8          MR. MILLER:  Objection to form.

9      A.  No.

10     Q.  Okay.  Fine.

11         MR. SCHUMACHER:  Twenty.

12                    -=0=-

13      (Deposition Exhibit 20 marked.)

14                    -=0=-

15  BY MR. SCHUMACHER:

16     Q.  Have you had a chance to review

17  Exhibit 20?

18     A.  Yes.

19     Q.  Do you see the little Bates number in

20  the bottom right-hand corner LC00018681?

21     A.  Yes.

22     Q.  Thank you.

23         Is this a true and correct copy of an

24  email that David Fisher sent to you on

1    June 28th, 2019?

2        A.  Yes.

3            MR. MILLER:  Objection to form.  Sorry.

4            You may answer.

5        Q.  I'm sorry, is it?

6        A.  Yes.

7        Q.  Do you have any reason to doubt its

8    authenticity?

9            MR. MILLER:  Objection to form.

10       A.  No.

11       Q.  And it was produced by your client

12   according to the Bates number in the right-hand

13   corner.

14           MR. MILLER:  Is that a question?

15           MR. SCHUMACHER:  Yes.

16       A.  My client?

17       Q.  Yeah.

18           MR. MILLER:  Same objection.

19       Q.  It was produced by the Plaintiffs in the

20   lawsuit.  Do you know one way or the other?

21       A.  I don't know.

22       Q.  That's fine.  As we discussed before,

23   you knew there was community opposition to your

24   plan, didn't you?

1         MR. MILLER:  Objection to form.

2     A.  Yes.

3     Q.  Okay.

4         MR. SCHUMACHER:  Exhibit 21.

5                     -=0=-

6         (Deposition Exhibit 21 marked.)

7                     -=0=-

8         THE WITNESS:  Okay.

9   BY MR. SCHUMACHER:

10    Q.  Have you had a chance to review Exhibit

11  21?

12    A.  Yes.

13    Q.  Does this appear to be a true and

14  correct copy of an email that you sent on

15  July 5th, 2019 to Sam Koon regarding the

16  Worthington council June updates and town hall?

17    A.  Yes.

18    Q.  Thank you.

19        MR. SCHUMACHER:  Twenty-two.

20                    -=0=-

21        (Deposition Exhibit 22 marked.)

22                    -=0=-

23        THE WITNESS:  Okay.

24

1    BY MR. SCHUMACHER:

2        Q.  Have you had a chance to review Exhibit

3    22?

4        A.  Yes.

5        Q.  Is this a true and correct copy of an

6    email that David Fisher sent to you on

7    July 15th, 2019 regarding the UMCH meeting?

8        A.  Yes.

9        Q.  Thank you.

10           Mr. DeAscentis, did your company retain

11   any public relations companies to assist in the

12   community outreach in the city of Worthington

13   for the project that brings us here for this

14   lawsuit?

15           MR. MILLER:  Objection to form.

16           You may answer.

17       A.  I don't know.

18       Q.  Did you know that Jode Ballard from your

19   company retained a consultant to assist in

20   securing the necessary rezoning of the city of

21   Worthington?

22       A.  I'm sorry, could you repeat the

23   question?

24           MR. SCHUMACHER:  Julia.

1          (Record read as requested.)

2          MR. MILLER:  Objection.

3          You may answer.

4     A.  Jode probably would have hired LRK, the

5  architect, I would guess.

6     Q.  How about Griffin Communications?

7          MR. MILLER:  Same objection.

8     Q.  Do you know them?

9     A.  No.

10     Q.  So it wouldn't surprise you then, it

11  sounds like, that Jode would have hired a

12  communications company to assist in gaining

13  support for your rezoning effort in the city of

14  Worthington, would it?

15     A.  No.

16          MR. MILLER:  Same objection.

17     Q.  I mean, you wanted to build community

18  support for the proposed rezoning, didn't you?

19     A.  Yes.

20     Q.  And you wanted to position the issue to

21  support passage of the rezoning if you could,

22  right?

23     A.  Typically we don't need community

24  support to get zoning when we have either zoning

1  or we have a comprehensive plan in place, but

2  since we're long-term holders we like the

3  residents -- we try -- we use best efforts to

4  get them on board, and that was at the direction

5  of Matt Greeson.

6     Q.  But you knew that in the city of

7  Worthington you needed to obtain approval of the

8  planning commission as well as city council,

9  didn't you?

10       MR. MILLER:  Objection to form.

11     A.  Yes.

12     Q.  Your lawyers advised you of that, didn't

13  they?

14       MR. MILLER:  Hey, take that question

15  back, please.

16       MR. SCHUMACHER:  I think it's a fair

17  question.

18       MR. MILLER:  No.

19       MR. SCHUMACHER:  We're talking about a

20  developer.

21       MR. MILLER:  Come on.  I know you didn't

22  mean to ask it like that.

23       MR. SCHUMACHER:  I withdraw the

24  question.  Fine.

·1· ·BY MR. SCHUMACHER:

·2· · · ·Q.· But you knew you had to get approval in

·3· ·this community.· It was no secret to you, was

·4· ·it?

·5· · · · · · MR. MILLER:· Objection to form.

·6· ·Mischaracterizes the testimony, and I don't know

·7· ·what approval of the community versus a rezoning

·8· ·by a city council, what that means exactly.

·9· · · · · · MR. SCHUMACHER:· Thank you again,

10· ·Mr. Miller.

11· · · ·Q.· In the city of Worthington you were

12· ·aware for many years before you made a formal

13· ·application that that application would have to

14· ·be approved by the city of Worthington city

15· ·council?

16· · · ·A.· Yes.

17· · · ·Q.· Simple question.

18· · · ·A.· Yes.

19· · · ·Q.· Right?

20· · · · · · Okay.· And you had to do everything you

21· ·could to convince the citizens, their

22· ·representatives in the city government, and

23· ·ultimately city council in order to have that

24· ·rezoning application approved.

1          MR. MILLER:  Objection --

2     Q.  You knew that.

3          MR. MILLER:  Sorry.  Objection to form.

4     A.  I knew I had to get city council's

5  approval.

6     Q.  And in so doing that they, the city

7  council, was telling you that you needed to get

8  public support.  Do you deny that?

9          MR. MILLER:  Objection to form.

10    A.  No.

11    Q.  And what you did is you hired a

12  communications company to position yourself to

13  support the passage of that rezoning in order to

14  deter a later referendum attempt, didn't you?

15         MR. MILLER:  Objection to form.

16  Mischaracterizes the facts --

17    A.  I didn't.

18         MR. MILLER:  -- and testimony as to --

19    Q.  Your company --

20         MR. MILLER:  -- extensive meetings and

21  outreach.

22    Q.  Your company did that, didn't they?

23    A.  I don't know.

24                    -=0=-

1          (Deposition Exhibit 23 marked.)

2                    -=0=-

3          MR. SCHUMACHER:  Twenty-three?

4          COURT REPORTER:  Yes.

5              (Discussion off the record.)

6          THE WITNESS:  Okay.

7    BY MR. SCHUMACHER:

8      Q.  Have you had a chance to review

9    Exhibit 23?

10     A.  Yes.

11     Q.  Was Jode Ballard an employee of

12   Lifestyle Communities on October 7th, 2019?

13     A.  Yes.

14     Q.  Would you admit that the document marked

15   as Exhibit 23 was received by Lifestyle

16   Communities or one of its affiliate companies?

17         MR. MILLER:  Objection to form.

18     A.  Yes.

19     Q.  Does this refresh your recollection

20   about retaining a communications company and a

21   survey company to complete work outlined in this

22   document?

23         MR. MILLER:  Objection to form.

24     Q.  Or do you still not remember it?

1    A.  I wasn't involved in hiring a --

2    Q.  That wasn't my question.

3    A.  -- communications company.

4    Q.  My question's a little different.

5    A.  Okay.  Could you repeat the question?

6    Q.  Does this refresh your recollection that

7  in your effort to obtain rezoning of the

8  property at issue in this lawsuit that you

9  retained a communications company and a survey

10  company to assist you?

11    MR. MILLER:  Objection to form.  Assumes

12  certain facts.  Use of the word you.

13    A.  I just want to make sure I understand

14  your question.  I don't know that we ever hired

15  this company.

16    Q.  Is that your answer?

17    A.  Yes.

18    Q.  You don't know if you ever hired?

19    A.  I don't know.

20    Q.  So if a report exists from the

21  Saperstein Associates Company, you've never

22  heard about it or seen it.  Is that your

23  testimony?

24    A.  Who's the Saperstein?

1    Q.  The outfit that's outlined in this

2  document.

3    A.  No, not that I'm aware of.

4    Q.  That's fine.

5    A.  I mean, our development people hire lots

6  of people.  I typically don't get involved --

7    Q.  That's fine.

8    A.  -- in managing consultants.

9    Q.  I'm sorry.

10      MR. MILLER:  He's answering your

11  question, Paul.  Let him speak.

12      MR. SCHUMACHER:  That's fine.

13  BY MR. SCHUMACHER:

14    Q.  So my question again, Mr. DeAscentis, is

15  a little different.  What I want to know is when

16  you filed this lawsuit against the city of

17  Worthington, were you aware at any time that

18  you'd hired a consultant or a communications

19  company to assist you in getting the rezoning

20  passed and to deter a referendum?

21      MR. MILLER:  Objection to form and use

22  of the word you.

23    A.  No.

24    Q.  Okay.  So you wouldn't know what the

·1· results of such survey were when your company

·2· received it.· Is that right?

·3· · · · · MR. MILLER:· Same objections.

·4· · · A.· I don't recall.

·5· · · Q.· I'm sorry?

·6· · · A.· I just don't recall.· I mean, again,

·7· we've developed hundreds of properties and I see

·8· all kinds of reports.· I don't specifically

·9· remember receiving anything from Griffin or a

10· survey document.

11· · · Q.· And you don't obviously know then what

12· the results of any survey that your company

13· initiated in this case, do you?

14· · · A.· I don't.

15· · · Q.· Now, we know that the application to

16· rezone the property that forms the basis of this

17· lawsuit was filed by your attorney Tom Hart on

18· October 2nd of 2020.· Are you aware of that?

19· · · · · MR. MILLER:· Objection to form.

20· · · A.· I know we filed an application.· I don't

21· know if Tom filed it or Bo filed it or who filed

22· it, but I know we filed an application.

23· · · Q.· Would you stipulate that it was filed on

24· October 2nd, 2020?

1        MR. MILLER:  I don't have the document

2    in front of me, but we can probably work

3    something like that out, yeah.  I mean, he's

4    given you his best truthful answer.

5        Q.  Did you, Michael DeAscentis, have some

6    timeline in your mind that you wanted to file

7    this application officially?

8        MR. MILLER:  Objection to form.

9        A.  No.

10       Q.  So let's start.  You knew in 2015 that

11   there was public pushback on the proposal, and

12   this application itself was filed on October 2nd

13   of 2020.  If you assume those facts, right, what

14   did you do between those two times in order to

15   try and get your application approved?

16       MR. MILLER:  Objection to form.  Asked

17   and answered.

18       You may answer it again.

19       A.  Matt Greeson encouraged me to go meet

20   with the people in the community, meet with the

21   school board, and so I mean, our people had

22   several meetings.  I went into some of them, and

23   obviously we did the work to prepare our plans.

24   I think we went out and looked to try to get

1  some tenants for the commercial property.  I was

2  specifically involved in trying to secure some

3  tenants.

4      Q.  Anything else you can think of?

5          MR. MILLER:  Objection to form.  Asked

6  and answered.

7          You may answer.

8      A.  Anything else I did?  No.

9      Q.  Well, here's what I don't understand.

10 This is your lawsuit, right, you're the person

11 who has the financial interest in the lawsuit.

12 And I want to know what is it that you or your

13 companies did between 2015 and 2020 to engage

14 the community that you already knew was pushing

15 back against a dense residential development?

16         MR. MILLER:  Objection to form and

17 compound question.  He's testified to the

18 extensive community outreach that he did,

19 mentioned that that others did.  I'm not sure

20 what more you want by continuing to ask this

21 question, Paul.

22     Q.  I want to know what you're going to tell

23 the jury in this case that you and your company

24 did.  I want you to articulate what it is you

1    did to try and get your zoning approved as you

2    said you were going to do.

3              MR. MILLER:  Objection to form.  Asked

4    and answered.

5        A.  We typical -- we did on this project

6    probably more than we do on other projects in

7    terms of trying to engage the community to get

8    their support.  So we go to meetings, we hear

9    what their concerns are, we ask them about their

10   product they want, ask them about the type of

11   product, ask them about greenspace.  We went to

12   various constituent groups.  We talked to

13   various people at city council.

14              I specifically worked a lot with Matt

15   Greeson, and he gave me the direction to go

16   engage Yaromir Steiner, he gave me the direction

17   of who to meet with.  And so again, we did more

18   on this project to get community support than we

19   typically do.  I'm a Columbus guy, and I felt

20   like we should -- we should do -- use, you know,

21   best efforts to see if they like the project.

22       Q.  But as we've discussed you continued to

23   get negative feedback from the community itself,

24   didn't you?

1          MR. MILLER:  Objection to form.

2     A.  Yes.

3     Q.  In fact, you and your company knew that

4  certain members, citizens of Worthington

5  actually ran for council with this particular

6  property as their main issue.  You knew that,

7  didn't you?

8          MR. MILLER:  Objection to form.

9     A.  I didn't.

10     Q.  You didn't?

11     A.  (Shakes head).

12     Q.  You didn't know that they were -- that

13  your company was looking at anti-development

14  councilpersons and pro-development

15  councilpersons?

16          MR. MILLER:  Objection.  Asked and

17  answered.

18     A.  I don't recall.

19     Q.  Do you typically engage with the local

20  politicians in efforts to obtain your rezoning

21  requests?

22          MR. MILLER:  Objection to form.

23          You may answer.

24     A.  Either the mayor and usually the city

1    manager is -- you know, me specifically.

2            MR. SCHUMACHER:  This is 24.

3                      -=0=-

4        (Deposition Exhibit 24 marked.)

5                      -=0=-

6            MR. MILLER:  I don't know.  We've been

7    going about an hour, Paul.

8            MR. SCHUMACHER:  I believe it's 24.

9            COURT REPORTER:  Yes.

10            MR. MILLER:  Did you hear me?

11            MR. SCHUMACHER:  Yeah.  I have it on a

12    timer if we get --

13            MR. MILLER:  Yeah, yeah.  I'm not saying

14    it's urgent.

15            MR. SCHUMACHER:  Unless you have -- if

16    you have to --

17            MR. MILLER:  No.

18            MR. SCHUMACHER:  -- take a break, we'll

19    take a break.

20            MR. MILLER:  Nope.  Just letting you

21    know.

22            THE WITNESS:  I'm ready.

23    BY MR. SCHUMACHER:

24        Q.  Have you had a chance to review

1    Exhibit 24?

2        A.  Yes.

3        Q.  Was Jode Ballard the point person on the

4    development of this property aside from the

5    rezoning itself?

6            MR. MILLER:  Objection to form.

7        A.  I don't know if he was point person.

8        Q.  Who was?

9        A.  Well, we had Chase Miller, we had Brent

10   Miller, and we had Bo Brownlee.  We typically

11   assemble a team and kind of take the team

12   approach to projects.

13       Q.  What was Jode's role, then?

14           MR. MILLER:  Objection to form.  Asked

15   and answered.

16           You may answer again.

17       A.  I don't know.

18       Q.  Who is Eric Buchanan?

19       A.  Eric was our chief development officer

20   out of Denver.  So typically the development

21   people would report to Eric.  Jode probably

22   reported to Eric.

23       Q.  The document itself lists two different

24   timelines for filing an application to rezone

1· · the UMCH property.· Isn't that what it is

2· · addressing?

3· · · · · ·MR. MILLER:· Objection to form.

4· · Mr. DeAscentis is not on this document.

5· · · · · ·MR. SCHUMACHER:· I understand that.

6· · · · · ·MR. MILLER:· He hasn't testified whether

7· · he's ever even seen it.

8· · · ·A.· I'm sorry, what was the question again?

9· · · ·Q.· You had two different timelines --

10· · · · · ·MR. MILLER:· You?

11· · · · · ·MR. SCHUMACHER:· Joe, please.

12· · · ·Q.· Mr. DeAscentis, did you yourself

13· · personally have any timeline in your mind as to

14· · when you wanted to make the formal application

15· · to rezone the property?

16· · · ·A.· No.

17· · · ·Q.· This document would suggest that Jode

18· · Ballard, your director of development who was on

19· · this team, had two different timelines depending

20· · upon who got elected.· Is that a fair reading of

21· · this document?

22· · · · · ·MR. MILLER:· Same objections.

23· · · ·A.· Yes.

24· · · ·Q.· So if I put this up in front of a jury,

1  you think they could have the same basic

2  understanding of what you've just said?

3          MR. MILLER:  Same objections.

4      A.  Yes.

5      Q.  Thank you.

6          Who's Steve Falk, F-A-L-K?

7      A.  Steve is a personal lawyer for me.

8      Q.  He's employed by Lifestyle Communities

9  Ltd.?

10     A.  No.

11     Q.  He's employed by who?

12     A.  LCCP, I believe.  Lifestyle capital --

13  Lifestyle Communities Capital Partners.

14     Q.  Who owns Lifestyle Communities Capital

15  Partners?

16     A.  Me, my father, some of our kids' trusts.

17  I think that's it.

18         MR. SCHUMACHER:  Let's mark this

19  Exhibit 25.

20                     -=0=-

21      (Deposition Exhibit 25 marked.)

22                     -=0=-

23         THE WITNESS:  Okay.

24

1    BY MR. SCHUMACHER:

2        Q.  Is this a true and accurate copy of an

3    email Steve Falk sent to you on December 23rd,

4    2020?

5            MR. MILLER:  Objection to form.

6            You may answer.

7        A.  Yes.

8        Q.  Now, by this point if we assume that

9    your application was made to the city of

10   Worthington to rezone the property on

11   October 2nd, 2020, this document would be after

12   that.  Is that fair?

13       A.  Yes.

14       Q.  Who is Allotta, A-L-L-O-T-T-A?

15       A.  He's a lawyer with Baker & Hostetler out

16   of Cleveland that does a lot of personal -- when

17   I say personal, I refer like non-LC, like real

18   estate work that's not specifically LC work, LC

19   projects.

20       Q.  Yeah, that's where I'm confused again.

21   Is the city of Worthington project that we've

22   been here about, is that an LC project or is

23   that a Michael DeAscentis project?

24           MR. MILLER:  Objection to form.

1      A.  It's kind of both.  The apartment,

2  multi-family residential component will be an LC

3  project, but the office, the retail, the

4  commercial, the single-family residential,

5  that'll be something that I do outside of LC to

6  make sure LC's team is just focused on what they

7  do.

8      Q.  Building those apartments?

9      A.  Correct.

10      Q.  And you would profit on both sides of

11  that, right?

12      A.  Yes.

13      MR. MILLER:  Objection to form.

14      You may answer.

15      A.  Yes.

16      Q.  Okay.  Who is Intihar, I-N-T-I-H-A-R?

17      A.  Steve Intihar is a lawyer with Bricker &

18  Eckler that handles the LC real estate stuff.

19      Q.  And who is Bo in this email referring

20  to?

21      A.  Bo Brownlee.

22      Q.  So if I interpret this right, the deal

23  that you wanted to pursue to develop property in

24  the city of Worthington was being handled by

1    lawyer Allotta, lawyer Intihar, lawyer Bo

2    Brownlee, and lawyer Tom Hart.  Do I have that

3    right?

4         MR. MILLER:  Objection to form.

5    A.  Well, not really.

6    Q.  Did I miss someone?

7    A.  Well, I mean, this is why I said this is

8    a cluster in my email here.  It was the roles

9    and responsibilities of -- was a cluster, who we

10   have that's responsible for the LC work and

11   who's responsible for the non-LC work.  That was

12   what I was talking to -- Steve handles the

13   non-LC stuff.  And so the cluster I was

14   referring to is, you know, I have a president

15   that runs the company, and he -- he really

16   frowns upon some of the LC people doing real

17   estate work, legal work and you know -- for

18   stuff that's outside LC's scope.

19        And since this was a mixed use project,

20   typically I would have on -- for the acquisition

21   and financing I would probably have not Steve

22   Intihar do it because he does LC's work.  I

23   would have Steve Falk use it with John Allotta.

24        So this is an email that I was sending

1  him saying, hey, the roles and responsibilities

2  of getting this property acquired and closed has

3  been a cluster, like you're not managing the

4  people right.

5      Q.  The people being these lawyers?

6      A.  Well --

7          MR. MILLER:  Objection to form.

8      A.  -- they're not all lawyers.

9      Q.  Including Mr. Falk, right?

10     A.  Steve was doing -- well, Steve wasn't

11 managing it the way that I wanted him to manage

12 the different people in the company.

13     Q.  Is it fair to say that you were not

14 happy with the Worthington acquisition because

15 of the interaction of the roles of these

16 lawyers?

17         MR. MILLER:  Objection to form.

18     A.  No.  It was the -- it was the

19 responsibility that Bo has to represent the

20 company, and then that Steve Falk has to

21 represent me personally, and that was the

22 cluster that I was upset with.

23     Q.  I see.  And that's because, again, you

24 were -- you were on both sides of the deal in

1   the sense of the residential development part

2   with LC and the retail side --

3       A.  Commercial side.

4       Q.  -- personally.  Commercial.  Thank you.

5           MR. SCHUMACHER:  Want to take a break?

6           THE VIDEOGRAPHER:  Off the record.

7                   (Recess taken.)

8           THE VIDEOGRAPHER:  Okay.  Back on the

9   record.

10  BY MR. SCHUMACHER:

11      Q.  Mr. DeAscentis, I wanted to go back to

12  something we talked about earlier to make sure I

13  understand the way this deal was set up.  I

14  think you said that this Worthington Campus Ltd.

15  entity --

16          MR. SCHUMACHER:  LLC?

17          MR. SILK:  Yes.

18      Q.  -- LLC was set up to deal with or

19  develop the residential component of the

20  proposal.  Is that right?

21          MR. MILLER:  Objection to form.

22  Mischaracterizes prior testimony.

23          Go ahead.

24          MR. SCHUMACHER:  That's why I asked.

1        A.  I don't -- I don't think so.  I think

2    that entity was set up to do the acquisition.

3        Q.  Of the real estate?

4        A.  Of the -- of the total piece of

5    property.

6        Q.  Okay.  Did they, they being Worthington

7    Campus, did they receive any revenue in the

8    project from commercial retail or other, or do

9    they only receive it from the residential

10   portion?

11            MR. MILLER:  Objection to form.

12   Mischaracterizes his prior testimony.

13            MR. SCHUMACHER:  That's why I'm trying

14   to understand it.

15            MR. MILLER:  I think you got it

16   backward.

17       A.  Yeah.  Typically when we have mixed use

18   projects we'll take the property and then we'll

19   sell the residential piece to LC and then the

20   nonresidential piece I'll keep in a separate

21   non-LC entity.  You saw that reference to non-LC

22   entity.  And I don't know if that was

23   Worthington Campus or if that was a different

24   entity.  I'm not sure.

1      Q.  Okay.  Mr. Miller's objection made me

2  realize I think you just said Worthington Campus

3  was the entity that you used to acquire the

4  property to own it.  Is that right?

5      A.  I'm not positive who --

6      Q.  Okay.  All right.

7      A.  I know an entity that I own owns the

8  property.  I'm not sure what the name of the

9  entity is.

10      Q.  Okay.  And do both of the entities in

11  this -- that are Plaintiffs in this lawsuit,

12  which is Worthington Campus and Lifestyle

13  Communities Limited, receive income under the

14  proposal if you had been able to get the zoning?

15      A.  Yes.

16          MR. SCHUMACHER:  Let's mark Exhibit 26.

17                    -=0=-

18        (Deposition Exhibit 26 marked.)

19                    -=0=-

20  BY MR. SCHUMACHER:

21      Q.  Have you had a chance to review

22  Exhibit 26?

23      A.  Yes.

24      Q.  Is this a true and accurate copy of an

·1· email that Chad Thompson sent to you on

·2· April 9th, 2021?

·3· · · · · MR. MILLER:· Objection to form.

·4· · · A.· Yes.

·5· · · Q.· Does it look to be an accurate copy of

·6· the email that was exchanged between you and

·7· Mr. Thompson?

·8· · · A.· Yes.

·9· · · Q.· You see at the bottom there where you

10· wrote on Friday, April 9th, 2021 that paragraph

11· at the very bottom?

12· · · A.· Yes.

13· · · Q.· Were you referring to the UMCH project

14· there?

15· · · A.· I don't know.

16· · · Q.· Did you answer?· I'm sorry, I couldn't

17· hear you.

18· · · · · MR. MILLER:· He did.

19· · · A.· I don't know.

20· · · Q.· Oh, okay.· Because the subject line at

21· the top says Worthington, but the conversation

22· you have with him in the middle of the first

23· page of the document appear to be discussing a

24· meeting that you and/or Bo was going to attend.

1    A.  Yeah.  And I don't know what Oz is.

2    Q.  Okay.

3    A.  That's why I wasn't sure.

4    Q.  The sentence at the very bottom where

5  you write since it's likely we will not be doing

6  any apartments and this is all for sale, I'm

7  moving this project to home building division

8  and asking Sam to run point, do you see that?

9    A.  Yes.

10    Q.  Is Sam the same Sam that we referred to

11  earlier?  Koon?

12    A.  No.

13    Q.  Which Sam is this?

14    A.  Sam Stark.

15    Q.  Okay.  I'm assuming then that Sam Stark

16  runs your home building division?

17    A.  He doesn't.  He does planning.  He used

18  to be a salesperson with me.  Now he's in

19  planning, and this is where we were probably

20  planning to build.  Instead of selling off the

21  residential lots, we were actually going to

22  build on them.

23    Q.  Where?

24        MR. MILLER:  You had said earlier --

1      Q.  In Worthington?

2          MR. MILLER:  -- you don't know whether

3   this was a Worthington project.  I don't want

4   you to guess.

5      A.  We started a home building -- we use --

6   20 years ago I was building for-sale product.  I

7   started up in apartments, then I got into the

8   for sale, and then I started -- kept building

9   apartments, and then I started back in the

10  for-sale business about a year ago.  So this --

11  we have a home building division now that

12  actually Sam doesn't run.  So I'm not sure why I

13  said Sam to run point.

14     Q.  Well, if in April of 2021 you decided

15  not to build apartments at the property, the

16  UMCH property in Worthington, you were

17  considering building homes there?

18         MR. MILLER:  Objection.  Speculative.

19  Mischaracterizes prior testimony.  He said he

20  didn't know if this correspondence relates to

21  the Worthington project.

22         MR. SCHUMACHER:  Thank you, Mr. miller.

23         MR. MILLER:  Well, you're assuming it

24  does --

1        MR. SCHUMACHER:  A form objection is

2   fine.

3        MR. MILLER:  -- his prior testimony --

4        MR. SCHUMACHER:  I'm trying to let --

5        MR. MILLER:  -- under oath.

6        MR. SCHUMACHER:  If you let the witness

7   answer the question, maybe we can get somewhere.

8        Can you read back the question, Julia.

9            (Record read as requested.)

10    A.  Again, I was going to -- this would

11   indicate that I was going to -- instead of

12   selling off the lots because we had apartments

13   and residential lots, the townhomes.

14    Q.  Right.

15    A.  We were originally going to sell those

16   off.  This was I'm just going to build them.

17    Q.  Okay.

18    A.  Instead of selling them off to MI or

19   Ryan or a lot of the public -- we develop lots

20   and sell them off to builders.  This statement

21   indicates that I was saying, hey, we're just

22   going to build them.  Build on that section.  We

23   would build those houses.  This is related to

24   the non-LC stuff.

1        Q.   Instead of building apartments?

2        A.   Well, no.  Sam -- I mean, Sam works for

3   LC.  So LC may still build apartments, but for

4   the non-LC stuff I was going to build the units,

5   which typically we used to do.  We just started

6   to do again.

7        Q.   Well, let me ask you this.  You, Michael

8   DeAscentis, currently own the property that's on

9   High Street that we call the UMCH property,

10  right?

11            MR. MILLER:  Objection to form.

12       A.   Yes.

13       Q.   You sure?

14       A.   Am I sure I own it?

15       Q.   Yeah.

16       A.   Yeah.

17       Q.   Okay.  All right.

18       A.   I'm not sure what entity I own it in,

19  but I'm sure I own it.

20       Q.   Just want to make sure.  And if you

21  chose to you could -- you have the capability of

22  building single-family homes on that property.

23  Of course, you'd need to get that zoning

24  approved, right?

1          MR. MILLER:  Objection to form.

2      A.  Correct.

3      Q.  In fact, I think some portion of the

4  property is currently zoned for such residential

5  properties, isn't it?

6      A.  I think it's two houses that I bought

7  that you could build -- they have single-family

8  houses on them.

9      Q.  All right.  But one option for you,

10  Michael DeAscentis, is to apply to rezone the

11  entire property for a different type of

12  single-family home than you've been proposing so

13  far, right?

14          MR. MILLER:  Objection to form.

15      A.  I don't --

16          MR. MILLER:  I was going to say you may

17  answer if you understand the question.

18      Q.  Let me ask this.  You know how to build

19  homes and townhomes and apartments, don't you?

20      A.  Yes.

21      Q.  And if you chose to, you could develop

22  this particular 30-some acre property in

23  townhomes, couldn't you?

24          MR. MILLER:  Objection to form.

1      A.  The whole project?

2      Q.  Yeah.

3      A.  That's not what the comprehensive plan

4  calls for.

5      Q.  I'm not asking you about the

6  comprehensive plan.  I'm saying --

7      A.  You're asking me if I have the

8  capabilities?

9      Q.  Yes, do you have that capability?

10     A.  We have the capabilities to build

11  townhomes, apartments, single-family houses.

12     Q.  So if you chose -- if you, Michael

13  DeAscentis, chose to, you could change the mix

14  of properties or residences that you propose to

15  build on this site to a lower style -- lower

16  density style property --

17         MR. MILLER:  Objection.

18     Q.  -- and still make money?

19         MR. MILLER:  Well, that's what I was

20  going to ask.  Regardless of economic necessity?

21     A.  I don't know.

22     Q.  Well, let me ask -- that's a --

23  interesting you brought that up.  How do you

24  decide what kind of money you, Michael

1  DeAscentis, will make when you develop

2  apartments or any property?

3        MR. MILLER:  Objection to form.

4        You may answer the question if you

5  understand it.

6        How does he decide how much money he's

7  going to make?

8     A.  We typically look at the rents in the

9  submarket, and then we look at the demand, and

10  we look at the product type, and then we put

11  together a product type that matches the demand

12  and matches the rent that they're already

13  getting in the community.

14     Q.  Is it fair to say that you're an expert

15  in this area?

16     A.  No.

17     Q.  You've done -- you're a $500 million

18  company, aren't you?

19     A.  Yes.

20     Q.  And you've developed dozens and dozens

21  of residential developments around the country,

22  haven't you?

23     A.  Yes.

24     Q.  You know what a yield is, don't you?

1      A.  Yes.

2      Q.  Can you explain to me what a yield is in

3  your mind?

4      A.  Typically a yield is our -- we take the

5  cost of the project and we divide it by the NOI

6  and that's your development yield.

7      Q.  You divide it by the?

8      A.  Net operating income.

9      Q.  Thank you.

10      A.  Yeah.

11      Q.  And you come up with what?

12      A.  A percentage.

13      Q.  Okay.  These are based upon projections

14  you make of those factors, aren't they?

15      A.  Yes.

16      Q.  You have experience doing that?

17      A.  I mean, my team has a lot of experience

18  doing it.

19      Q.  And they report back to you as the CEO,

20  don't they?

21      A.  Yes.

22      Q.  And you're not going to take on a

23  project that doesn't have a yield rate that you

24  feel is something you want to get involved in,

1    isn't it?

2        A.  It's typically -- it's typically tied to

3    the risk that we're taking and that develop --

4    some projects are complicated to build, some

5    projects are easy to build.  Doing a highrise or

6    you're building a two-story apartment building,

7    they're different.  So the yield is different.

8        Q.  All right.  So in simple terms in this

9    project you are going to look at the number of

10   residential units, including rental apartments,

11   and try and project what kind of income you

12   would make on that development is one factor,

13   right?

14       A.  Yes.

15       Q.  And then you would take the cost of

16   actually building that development by hiring

17   contractors, by acquiring land, by obtaining

18   zoning approvals, all those costs and you make a

19   simple division, right?

20       A.  You first --

21           MR. MILLER:  Objection to form.

22           You may answer.

23       A.  You first have to do the commercial

24   income, too.

1    Q.  Okay.  Well, I want to focus on the

2  residential portion of it.  It would be the same

3  for either --

4    A.  No.

5    Q.  -- but it's the same calculation?

6    A.  No.  Different -- different rates.

7  Interest rates are different.

8    Q.  Sure, of course.

9    A.  Cap rates are different.

10    Q.  Sure.

11    A.  Land cost is different.

12    Q.  Right.

13    A.  Construction cost is different.

14    Q.  But those costs are still going to be

15  divided by the income to get to the yield?

16    A.  Correct.

17    Q.  Okay.  It's a pretty simple calculation,

18  isn't it, but there's a lot that goes into it?

19        MR. MILLER:  Objection to form.

20        You may answer.

21    A.  I don't -- well, is it a simple

22  calculation?  Yes, it's division.

23    Q.  Mr. DeAscentis, you're not going to get

24  involved in a project where you're not going to

1  get a substantial enough yield rate to make it

2  successful for your company and your employees,

3  are you?

4        MR. MILLER:  Objection to form.

5        You may answer.

6     A.  No.

7     Q.  And in the residential yield the more

8  apartments you have the more rents you're going

9  to receive, correct?

10    A.  Correct.

11    Q.  And the higher your yield's going to be?

12        MR. MILLER:  Objection to form.

13    Q.  Assuming all your costs are the same.

14    A.  The costs aren't the same.

15    Q.  Of course not.

16    A.  The more units the more cost.

17    Q.  Right.  But --

18    A.  Bigger doesn't always mean better.  I

19  can show you projects that I've done that have a

20  low amount of units that have a higher yield

21  than projects that I built that have a high

22  amount of units and a lower yield.

23    Q.  Please name those.

24    A.  Line Street, Charleston.

1      Q.  Hold on.  Lime Street?

2      A.  Line Street, LLC.  Line Street.

3      Q.  How do you spell that?

4      A.  L-I-N-E.

5      Q.  Street?

6      A.  Yep.

7      Q.  Where's that?

8      A.  Charleston, South Carolina.

9      Q.  Any others?

10          MR. MILLER:  Any other what?

11     Q.  Projects that have a yield that isn't

12  the same.

13     A.  Well, they're all different.

14          MR. MILLER:  Objection to form.

15     Q.  I'm sorry?

16     A.  Every project has a different yield.

17     Q.  Right.  So in the Line Street project,

18  for instance, how do you know that the yield is

19  high or low?  What do you look at?

20          MR. MILLER:  Objection to form.

21     A.  We look at the cost and the net

22  operating income, and we compare that to the

23  cost and the rents, interest rates, cap rates.

24  So it's different.  Every single project has a

1   different yield.

2      Q.  What does Michael DeAscentis look at in

3   order to evaluate the yield on any project?

4      A.  All those things.

5      Q.  Is it a spreadsheet?

6      A.  No.

7      Q.  Is it --

8      A.  Economic factors.

9      Q.  Is it a document?

10     A.  No.

11         MR. MILLER:  I don't know that he's done

12  answering, Paul.  And I do apologize.  There's

13  going to be a retirement party next door.

14     Q.  I'm sorry?

15     A.  No, it's not a document or spreadsheet.

16     Q.  So do you do this calculation yourself

17  on the back of a napkin?  How do you determine

18  the yield on a project that you're planning on

19  investing in?

20         MR. MILLER:  Objection to form.

21         You may answer.

22     A.  Our team assembles a bunch of data and

23  it's all different.

24     Q.  And what data did they assemble in this

1    case to inform you as to the yield rate you

2    could get on the Lifestyle project in

3    Worthington?

4        A.  Oh, I don't -- I don't know the exact

5    calculations sitting here.  I can -- I don't

6    know.  I don't have it at my -- it's a

7    complicated -- it's not just two pieces of data.

8    It's a lot of data.

9        Q.  And I'm sure --

10       A.  They put together a pro forma for us.

11       Q.  Okay.  So you do look at a pro forma?

12       A.  Yeah, I look at the financial analysis.

13       Q.  Okay.  All right.  Was there a pro forma

14   or an evaluation of the yield that was done in

15   2015 in June when you made the -- before you

16   made the presentation to the citizens at that

17   meeting?

18           MR. MILLER:  Objection to form.

19           You may answer --

20       A.  I don't know.

21           MR. MILLER:  -- if you know.

22       A.  I don't know.

23       Q.  You do know and we discussed that there

24   were -- there was a proposal to develop the

1  property, including approximately 571

2  residential units, a certain amount of

3  greenspace, a certain amount of commercial

4  space.  You remember that, right?

5      A.  Yes.

6      Q.  You certainly wouldn't make that

7  proposal without doing some kind of yield

8  analysis, would you?

9          MR. MILLER:  Objection to form.

10     A.  Yes.

11     Q.  You would do that?

12     A.  Sure.

13     Q.  Without doing it?

14     A.  Sure.

15     Q.  Because you have experience?

16     A.  Sure.

17     Q.  Okay.  Did you then make any such yield

18 analysis or pro forma before the application was

19 submitted in October of 2020 to actually develop

20 this property?

21         MR. MILLER:  Objection to form.

22         You may answer.

23     A.  I'm sure my team -- I'm sure my team

24 did.

1      Q.  Could you send an email to them right

2  now and say provide that to me?

3      A.  I probably have to send it to Bo and

4  he's no longer an employee, but I could track

5  him down.

6          MR. MILLER:  And if certainly it hasn't

7  been produced or that's a request you're making,

8  we can deal with it through discovery channels

9  versus his email at a deposition.

10     Q.  I'm trying to understand what it is that

11  you understand to be those things.

12         MR. MILLER:  I don't understand.

13     Q.  So I would like to see those.

14         MR. MILLER:  Okay.

15     A.  Sure.

16         MR. SCHUMACHER:  I'm making a formal

17  request for those.

18         MR. MILLER:  Have you ever served a

19  discovery request for those?

20         MR. SCHUMACHER:  I'm certain -- yes, we

21  have.

22         MR. MILLER:  Okay.  Well, we'll deal

23  with it outside the deposition.

24         MR. SCHUMACHER:  Okay.  All right.

1    BY MR. SCHUMACHER:

2       Q.  But as we sit here today can you tell me

3    at all what you believe the yield rate to be

4    when you made this application to actually

5    rezone the property in October of 2020?

6          MR. MILLER:  Objection to form.

7       A.  I don't recall the yield rate.

8       Q.  Give me an approximation.

9          MR. MILLER:  No, I don't want him to

10   guess.

11      Q.  Was it a good deal or a bad deal?

12         MR. MILLER:  Objection to form.

13      A.  I don't recall the yield rate.

14      Q.  Okay.  You didn't care what the yield

15   rate was, you just wanted to develop the

16   property?

17         MR. MILLER:  Objection to form.  He

18   didn't say that.

19      Q.  It's a question.

20      A.  I always care.

21      Q.  All right.  But you can't tell me

22   whether the yield rate was, in your opinion as a

23   very experienced developer, a good one or a bad

24   one on this deal?

1      A.  I don't recall the yield rate.

2      Q.  Okay.  Is it fair to say that the yield

3  rate would have gone up if you increased the

4  residential density from 531 to 730?

5          MR. MILLER:  Objection to form.

6      Q.  More apartments than you'd projected

7  before.

8      A.  Not necessarily.

9      Q.  Okay.  And you say -- can you prove that

10  to me by showing me the yield analysis?

11          MR. MILLER:  Objection to form.  He

12  doesn't have to prove anything in this

13  deposition.  He has to answer your questions and

14  he said he doesn't recall what the yield rate

15  is.

16          MR. SCHUMACHER:  Can you let him answer

17  now?

18      A.  Are you asking me to do the calculation?

19      Q.  No.  What I'm asking you is when you

20  present this case to a jury --

21      A.  Yep.

22      Q.  -- I'm going to ask you what's the

23  difference between the yield rate on the

24  proposal you made in 2015, on June 29th, and you

1· have your people, your lawyer Bo Brownlee, your

2· lawyer Lee Fisher -- or Lee Fisher -- David

3· Fisher make a proposal to the community and

4· compare that to what the yield rate Lifestyle

5· would have received and you would have received

6· when this project was increased to 730

7· residential units.· You can do that, can't you?

8· · · · · · MR. MILLER:· Paul, respectfully that's a

9· statement.· What's the question?

10· · · · · · MR. SCHUMACHER:· The question -- you

11· stepped over me again.

12· · · Q.· You can do that, can't you?

13· · · · · · MR. MILLER:· Objection to form.

14· · · A.· I can do -- if you give me the data, I

15· can do the analysis.

16· · · Q.· Okay.· I would like the data so that I

17· can look at it before I ask you that question.

18· Is that fair?

19· · · · · · MR. MILLER:· That's for his lawyers to

20· determine.· That's not for him to determine.

21· · · · · · MR. SCHUMACHER:· Well, no, no.

22· · · · · · MR. MILLER:· You know the course of

23· discovery here, Paul.

24· · · · · · MR. SCHUMACHER:· No, it's not.

·1· · · · · · MR. MILLER:· Whether he's going to give

·2· ·you documents and data and information, that's

·3· ·why he has lawyers, that's why the discovery

·4· ·process exists.

·5· · · · · · Don't answer that.

·6· ·BY MR. SCHUMACHER:

·7· · · ·Q.· Mr. DeAscentis, my question is only that

·8· ·when I ask you that question in front of a jury,

·9· ·isn't it fair that I have the documents before I

10· ·ask you that question so that I can understand

11· ·the analysis?

12· · · · · · MR. MILLER:· It all depends on the

13· ·relevance of the question, the relevance of the

14· ·analysis.· I don't see it today sitting here

15· ·today, and we can discuss it offline.

16· · · · · · Don't answer that question.· You're not

17· ·to decide what's appropriate for him to have

18· ·before a jury.

19· · · · · · MR. SCHUMACHER:· You're instructing him

20· ·not to answer the question?

21· · · · · · MR. MILLER:· Yes.· You're asking him to

22· ·make legal judgment calls in this litigation.

23· · · · · · MR. SCHUMACHER:· No.

24· · · · · · MR. MILLER:· That's me.

1        MR. SCHUMACHER:  I'm asking you to make

2   a business judgment.  I'm asking you --

3        MR. MILLER:  Not what you're entitled to

4   have before you ask questions before a jury.

5   Paul, that's for us to decide.  Let's deal with

6   it off line.

7        MR. SCHUMACHER:  Let me rephrase the

8   question, then.

9   BY MR. SCHUMACHER:

10   Q.  You would need the documents, including

11   the pro forma or any yield projections, in order

12   to assess the difference between yield rates

13   from a project that you proposed in 2015 and a

14   project you proposed in 2020, wouldn't you?

15        MR. MILLER:  Objection to form.

16        You may answer.

17   Q.  You can't do it --

18   A.  I would need information.

19   Q.  And you would be willing to provide that

20   to your attorneys?

21        MR. MILLER:  No, that -- that's best

22   determined between the attorneys.  Make a

23   request, Paul.  We'll deal with it.  You're not

24   going to ask this witness to make judgment calls

1    in discovery in this discovery deposition.

2          MR. SCHUMACHER:  Well, just for the

3    record, I'm making the request.  And what I

4    don't want to hear is that the discovery cutoff

5    has come up and you're not going to --

6          MR. MILLER:  Sounds like you regret not

7    requesting this information earlier.  We'll deal

8    with it off line.

9          MR. SCHUMACHER:  I did request this

10   information earlier.  I made lots of requests

11   and I didn't get all the information.

12         MR. MILLER:  Well, this is the first

13   we're hearing of it.

14         MR. SCHUMACHER:  Speaking of which,

15   let's mark this one.

16                      -=0=-

17      (Deposition Exhibit 27 marked.)

18                      -=0=-

19   BY MR. SCHUMACHER:

20      Q.  Have you had a chance to review

21   Exhibit 27?

22      A.  Yes.

23      Q.  Is this a true and accurate copy of an

24   email that Chad Thompson sent to you January 27,

1     2021?

2         A.  Yes.

3         Q.  It appears that there was an attachment,

4     something called the -- looks like the

5     December 4th, 2020 Worthington yield study

6     email.  You see that?

7         A.  Yes.

8         Q.  Do you believe that your company still

9     possesses the yield study?

10        A.  Yes.

11        Q.  Do you see where it says -- Chad says

12    per our texts earlier in the evening?

13        A.  Yes.

14        Q.  And this is regarding the LC Worthington

15    project?

16        A.  Yes.

17        Q.  And that's the project involved in this

18    lawsuit?

19        A.  Yes.

20        Q.  Did you provide your text email

21    communications with Mr. Thompson and others

22    about the Lifestyle Communities Worthington

23    project --

24            MR. MILLER:  Objection.

1        Q.  -- that forms the basis of this lawsuit?

2            MR. MILLER:  Objection to form.

3        A.  Can you repeat that?  I'm not sure I

4    understood.  Did I give Chad my text?

5            MR. SCHUMACHER:  Julia, could you read

6    back my question.  I thought it was pretty good.

7                (Record read as requested.)

8            MR. MILLER:  Same objection.

9        A.  Provide them to who?

10       Q.  To your lawyers.

11           MR. MILLER:  You can answer that

12   question.  Don't discuss any discussions you had

13   with your lawyers, but you can answer that

14   question, whether you provided emails and texts.

15       A.  Yes.

16       Q.  I couldn't hear you.

17       A.  Yes.

18       Q.  You did?

19       A.  I assume I did.

20       Q.  Your answer was I assume I did?

21       A.  Well, I remember --

22       Q.  Is that what you said?

23       A.  -- my assistant coming in and saying in

24   conjunction with the lawsuit they need to get

·1· ·ahold of all your information, and I said okay.

·2· ·I'd assume they -- I didn't personally go

·3· ·through my own texts and email, but I gave them

·4· ·access to all my devices.· So that's why I would

·5· ·say yes.

·6· · · ·Q.· I don't --

·7· · · · · ·MR. SCHUMACHER:· Mr. Miller, I don't

·8· ·believe we've received any -- certainly not the

·9· ·text that refers -- has been referred to in this

10· ·email.· So we would ask that you supplement your

11· ·discovery responses to provide text messages

12· ·from Mr. Michael DeAscentis that relate to the

13· ·Lifestyle Communities Worthington project at

14· ·issue in this lawsuit.

15· · · · · ·MR. MILLER:· So noted.· And as with all

16· ·of your requests today, we'll take a look at it

17· ·for responsiveness and the existence of the

18· ·documents.

19· · · · · ·MR. SCHUMACHER:· Are you suggesting we

20· ·didn't request text messages?

21· · · · · ·MR. MILLER:· I've said that for each of

22· ·your informal requests here today.

23· · · · · ·MR. SCHUMACHER:· That's not my question.

24· ·My question is are you suggesting --

1        MR. MILLER:  Luckily, I'm not under oath

2   and in deposition so I don't have to answer your

3   questions.  I'm simply saying I note your

4   request.  We'll look in to see whether you

5   requested it and whether responsive documents

6   exist.

7   BY MR. SCHUMACHER:

8      Q.  That document refers to a December 4th,

9   2020 yield analysis?

10      A.  Yes.

11        MR. MILLER:  Objection to form.

12      Q.  Thank you.

13        You just said you think you probably

14   have that?

15      A.  I don't know if I have it.  I said --

16      Q.  The company?

17      A.  The company.

18      Q.  Sorry to confuse you.

19        MR. MILLER:  Do you need to take a

20   break?

21        THE WITNESS:  No.

22      Q.  In addition to the yield analysis, do

23   you compile other documents to make up this pro

24   forma?

1        MR. MILLER:  Objection to form.  I'm not

2  sure I understand the question.

3        You may answer if you do.

4        MR. SCHUMACHER:  I'm not asking you.

5        MR. MILLER:  I understand.

6    Q.  Do you understand my question?

7    A.  I don't typically assemble that

8  information.  Our team does.  There's lots of

9  documents that they use in addition to yield

10  studies.

11    Q.  So to be sure I ask for all of them

12  correctly, what would I ask for?

13    A.  Interest rates, cap rates, occupancy

14  rates, rental rates, vacancy rates, income

15  rates, construction costs, cap rates, bad debt

16  expense.  I mean, there's -- I can provide you a

17  list, but it's a big one.

18    Q.  I would like the list.

19    A.  Okay.

20    Q.  But that would all be true as of the

21  time you're making the yield analysis because

22  those things all change?

23    A.  Every day.  Sometimes hourly.

24    Q.  Right.  So you make a yield analysis in

1  2015 based on the data you have at the time,

2  right?

3      A.  Yes.

4      Q.  And it would be recorded somewhere in

5  Lifestyle Communities possession?

6      A.  If we did one.

7          MR. MILLER:  If he did -- yeah,

8  objection to form.

9      A.  If we did one.

10     Q.  If you did one.

11     A.  Yeah.

12         MR. MILLER:  He testified to that

13  previously.

14     Q.  And if you did one at any other time

15  between 2015 and even today you'd still have the

16  data, wouldn't you?

17     A.  We'd have the analysis.  I don't know

18  that we would have the data that went with it,

19  but we'd have the --

20     Q.  And it's a written analysis, isn't it?

21         MR. MILLER:  Objection to form.

22     A.  Yes.

23     Q.  And that would be relevant to the issues

24  we're talking about here today, wouldn't it?

1        MR. MILLER:  Objection to form.

2        MR. SCHUMACHER:  You don't think --

3        MR. MILLER:  He's here as a fact witness

4   answering your questions.  If you want him to

5   make value judgments as to what's relevant to

6   the lawsuit, that doesn't -- that's not

7   appropriate.

8     Q.  I didn't -- not about the lawsuit.  It

9   would be relevant to an assessment of what kind

10  of profit you would be expecting at any

11  particular time when you make a proposal?

12    A.  Yes.

13    Q.  Thank you.

14        Are you still working with David Fisher?

15        MR. MILLER:  Objection to form.

16    A.  Yes.

17    Q.  Are you working on any projects with

18  David Fisher other than this project?

19    A.  Yes.

20                    -=0=-

21      (Deposition Exhibit 28 marked.)

22                    -=0=-

23        MR. SCHUMACHER:  Twenty-eight, I think.

24        COURT REPORTER:  Yes.

1              MR. MILLER:  While this witness is

2    reviewing this document, I made mention to it

3    earlier, but unfortunately I apologize.  There

4    is a retirement party going on next door for

5    Patti Hanlin, a fixture at our law firm for 46

6    years.

7              MR. SCHUMACHER:  Michael, is that

8    bothering you?  We can move to another room.

9              THE WITNESS:  No.

10             MR. MILLER:  I just want to make sure

11   everybody can hear.

12             MR. SCHUMACHER:  I'm fine.

13             THE WITNESS:  Okay.  I've read it.

14   BY MR. SCHUMACHER:

15       Q.  Is Exhibit 28 a true and correct copy of

16   an email that David Fisher sent to you on

17   October 29th, 2021?

18             MR. MILLER:  Objection to form.

19             You may answer.

20       A.  Yes.  It's actually got the wrong email

21   address, though.

22       Q.  Yeah.  I was about to ask you that

23   question.  It says FDL Farms Limited and then in

24   parenthesis has your email address.  What is

1   that?

2       A.  It's a farm I used to own out in -- out

3   by Longaberger baskets.  It's an old email

4   address.  It's probably -- you asked me earlier

5   I go by M. DeAscentis Jr.  This is when I

6   originally started the company.

7       Q.  But fortunately also used your Lifestyle

8   Communities email address so you got it, right?

9       A.  Well, he didn't put the J-R on there so

10  I'm actually not sure how I got it.  This

11  probably would have went to my dad.

12      Q.  Okay.  The document subject is a

13  forwarded email about the Methodist site LOI.

14  Is that what it says?

15      A.  Yes.

16      Q.  That's a letter of intent.  Is that what

17  it means?

18      A.  Yes.

19      Q.  LOI means.

20          Do you know Derek Rogers?

21      A.  No.

22      Q.  Do you recall in October of 2021

23  receiving information from David Fisher that

24  apparently someone wanted to make an offer for

1    the UMCH property that you owned?

2         MR. MILLER:  Objection to form.

3         You may answer.

4    A.  I remembered -- I remembered getting a

5    call that one of the Showes wanted to buy the

6    property.

7    Q.  Do you see in the middle of the first

8    page of Exhibit 28 it says -- that Derek Rogers

9    writes to David Fisher and provides key terms of

10   a proposal?

11   A.  Yes.

12        MR. SCHUMACHER:  Let's mark this 29.

13                   -=0=-

14        (Deposition Exhibit 29 marked.)

15                   -=0=-

16        THE WITNESS:  It's a big document.  I'm

17   generally ready unless you're asking me like

18   really specifics.

19   BY MR. SCHUMACHER:

20   Q.  I really only have questions about the

21   first page of Exhibit 29.

22   A.  Okay.

23   Q.  This -- does this refresh your

24   recollection that an actual firm offer was made

1  by New England Development Company LLC to

2  purchase the property on or about October 29th,

3  2021?

4          MR. MILLER:  Objection to form.

5      A.  Yeah.  I don't remember receiving this.

6  Remember -- I do remember getting a call that

7  the Showe family was interested in making a

8  proposal.

9      Q.  In October of 2021?

10     A.  Yes.

11     Q.  That's before your application to rezone

12  the property was denied by city council?

13     A.  October of 2021.  Before?  Yes.

14     Q.  The first page of the document is

15  apparently a letter directed to your attention

16  as CEO of Lifestyle Communities.  You see that?

17     A.  Yes.

18     Q.  And this is a document that you would

19  have received at the time, right?

20          MR. MILLER:  Objection to form.  Asked

21  and answered.

22     A.  Yes.

23     Q.  Okay.  Do you know the Showe family?

24     A.  I know Burke Showe, his dad.

1    Q.  S-H-O-W-E, Showe?

2    A.  Yes, Showe.

3    Q.  Is it Showe?

4    A.  Showe.

5    Q.  Thank you.

6    Did you know that they were investing in

7 downtown Worthington for over 30 years?

8    A.  I knew they owned the Worthington Inn.

9    Q.  Okay.  Would you agree that you've had a

10 long, arduous and frustrating process relative

11 to trying to develop the land there?

12    MR. MILLER:  Objection to form.

13    Q.  Is that a fair characterization?

14    A.  Yes.

15    Q.  Apparently they felt that they could

16 engage the community and develop this property

17 better than you could.  Is that a fair reading?

18    MR. MILLER:  Objection to form.

19 Speculative.  I don't know what they meant when

20 they wrote it.

21    MR. SCHUMACHER:  I don't care what you

22 think, Joe.  I just want to know what the

23 witness thinks.

24    Q.  I want to know if you think that's a

1    fair reading of the letter.  That's all I want

2    to know.

3         MR. MILLER:  You asked does he think

4    they meant.

5    A.  No.

6         MR. MILLER:  I don't think he knows what

7    they meant when they wrote it.

8    Q.  Okay.  That's fine.  You can say no.

9    A.  Yeah.  No, I don't know.

10   Q.  You can say yes.  You can say no.

11   A.  I mean, I don't know what --

12   Q.  I don't care.

13   A.  I don't know what they thought.  I don't

14   know about their relationship with anybody to

15   tell you the truth.

16   Q.  Nonetheless, they made you a

17   $10 million --

18   A.  Yes.

19   Q.  -- offer to purchase the property --

20   A.  Yes.

21   Q.  -- because, according to their letter,

22   they felt they could do a better job at engaging

23   the community to accept a multi-family mixed

24   retail and commercial development?

1        MR. MILLER:  Objection to form.

2    Q.  Isn't that what the letter says?

3    A.  Yes.

4    Q.  Okay.  So again, to be fair, anyone

5  reading this letter would understand that

6  they're making a $10 million offer to purchase

7  the property?

8    A.  Yes.

9    Q.  All right.  And remind me.  What did you

10  purchase the property for?

11    A.  I figured you were going to ask me that.

12        MR. MILLER:  All we need is your best

13  recollection.

14    Q.  5.2 million sound familiar?

15    A.  I thought it was a little more than

16  that.

17    Q.  Well, yeah, but then you -- Bo got an

18  $800,000 credit back because you gave up the

19  contingency.  You remember that?

20    A.  Okay.  Yes.

21    Q.  So you purchased the property for 5.2

22  and you have an offer for 10 million.  Is that

23  fair?

24    A.  Yes.

1      Q.  All right.  You turned it down?

2      A.  I didn't respond to it.

3      Q.  You didn't accept it?

4      A.  Yes.  We're not in the business of

5   buying and selling land.  We're in the business

6   of buying and developing land.  All developers

7   think they can do it better.

8      Q.  I'm sorry, we are -- are you -- I

9   didn't --

10      A.  I was answering your question.  I turned

11   it down because we're not in the business of

12   buying and selling land.  We're in the business

13   of buying and developing land.

14      Q.  If you can get rezoning approved?

15      A.  Well, I knew I was going to get the

16   zoning approved because I had the comprehensive

17   plan, and I knew I was going to be able to

18   develop it.

19      Q.  But the city of Worthington Municipal

20   Planning Commission considered your plan in

21   relation to the comprehensive plan that existed

22   at the time and found it wanting, didn't they?

23          MR. MILLER:  Objection to form.

24      A.  Wanting?

1     Q.  They found that it did not meet the

2  comprehensive plan?

3        MR. MILLER:  Same objection.

4     A.  Yes.

5     Q.  Unanimous vote of the municipal planning

6  commission after considering your plan in two

7  public meetings found it to be not in accordance

8  with Worthington's comprehensive plan.

9        MR. MILLER:  Same objections.

10     Q.  Can we agree on that?

11     A.  Yes.

12     Q.  And then the application was presented

13  to city council in December of 2021 in a public

14  meeting again, right?

15     A.  Yes.

16     Q.  Were you at the meeting or did you watch

17  the meeting?

18     A.  Neither.

19     Q.  But you are aware that a unanimous city

20  council rejected the application for the reasons

21  they expressed on the public record?

22     A.  We wouldn't be here if they didn't

23  reject it.

24     Q.  Okay.  But you understand that, right?

1      A.  That they rejected it?

2      Q.  Yes.

3      A.  Yes.

4      Q.  And you also knew that -- or you now

5  know that you could -- you could have reapplied

6  with a different proposal within six months of

7  the rejection by the MPC?

8      A.  I don't know that.

9          MR. MILLER:  Objection to form.

10     Q.  You don't?

11     A.  No, I don't know that.

12     Q.  Mr. DeAscentis, if you didn't file the

13  lawsuit, you could have re -- I'm sorry, take

14  that back.  Strike that.

15         There's nothing preventing you from

16  filing a new application in the city of

17  Worthington to rezone this property even as of

18  today, is there?

19         MR. MILLER:  Objection to form.

20     A.  I don't know.

21         MR. MILLER:  You may answer if you know.

22     A.  I don't know.

23     Q.  Have you tried?

24         MR. MILLER:  Same objection.

1    A.  No.

2    Q.  Have you approached city council or any

3  members of the public to engage them on what

4  they desire for the property?

5    A.  I haven't.

6      MR. MILLER:  Objection to form.  You

7  mean -- you've asked about the extensive

8  outreach they did at the time.  You mean since

9  the application was denied?

10    Q.  Since the application was denied, have

11  you done anything?

12    A.  I haven't personally.  I don't know if

13  anybody else has on our team.

14    Q.  Have you instructed anyone on your team

15  to reevaluate the feedback you got from city

16  council and its residents to amend the plan to

17  seek rezoning?

18      MR. MILLER:  Objection to form.

19    A.  No.

20    Q.  Has LC or you obtained any appraisal of

21  the property since the denial of the rezoning

22  and adoption of Worthington's new comprehensive

23  plan in 2022?

24      MR. MILLER:  Objection to form.

1      A.  I don't know.

2      Q.  Could you obtain an appraisal of the

3   property -- and I don't want to know anything

4   about this litigation, but could you obtain an

5   appraisal of the property after the plan update

6   in January of 2022?

7      A.  Yes.

8      Q.  To your knowledge, Mr. DeAscentis, has

9   the city of Worthington ever had any resolution

10  or suggested resolution to rezone the property

11  to be used exclusively as a park?

12         MR. MILLER:  Objection to form.

13     A.  Have they asked me?

14     Q.  No.

15     A.  No.

16     Q.  Have they ever -- do you know if they've

17  ever done that?

18     A.  I'm sorry, could you repeat the

19  question?

20     Q.  To your knowledge, city council's never

21  had any proposal to rezone the property to be

22  used exclusively as a park, have they?

23         MR. MILLER:  Objection to form.

24     A.  I don't know.

1      Q.  Does Lifestyle Communities knows that --

2  know that?

3          MR. MILLER:  Same objection.

4      A.  I have no idea.

5      Q.  Have you or your team ever heard that

6  city council's appropriated money to purchase

7  the property?

8      A.  No.

9          MR. SCHUMACHER:  If I could have a few

10  minutes with my lawyer, I will probably be done

11  in less than 10 minutes.

12          MR. MILLER:  Sure.

13          THE VIDEOGRAPHER:  Off the record.

14              (Recess taken.)

15          THE VIDEOGRAPHER:  Back on the record.

16  BY MR. SCHUMACHER:

17      Q.  Mr. DeAscentis, I've asked you about a

18  number of documents today that either you or

19  your company L -- Lifestyle Communities Limited

20  or its 50-some affiliates have.  You remember

21  those questions?

22      A.  Yes.

23      Q.  And I'm not asking you for any

24  communication between you or your lawyers.  My

1    simple question is if I give you a list of the

2    things I've asked for can you direct your people

3    to obtain those materials and provide them to

4    your lawyers?

5            MR. MILLER:  Same objections.

6        Q.  Are you able to do that?

7        A.  Yes.

8        Q.  Okay.

9            MR. SCHUMACHER:  Thank you very much.

10   That's all the questions I have for you.  I

11   appreciate your time.

12           THE WITNESS:  All right.  Thank you.

13           MR. MILLER:  Thank you.  We'll read and

14   there may -- I don't know what you all have done

15   with prior depositions related -- relative to

16   the protective order, but we'll have to deal

17   with that as well.

18           THE VIDEOGRAPHER:  Off the record.

19               (Signature not waived.)

20                   -=O=-

21           Thereupon, the testimony of January

22   26, 2024, was concluded at 2:39 p.m.

23                   -=O=-

24

1                    CERTIFICATE

2   STATE OF OHIO       :
                              SS:
3   COUNTY OF FRANKLIN :

4           I, Julia Lamb, RPR, CRR, a
    stenographic court reporter and notary public in
5   and for the State of Ohio, duly commissioned and
    qualified, do hereby certify that the
6   within-named MICHAEL DEASCENTIS II was first
    duly sworn to testify to the truth, the whole
7   truth, and nothing but the truth in the cause
    aforesaid; that the testimony then given was
8   taken down by me stenographically in the
    presence of said witness, afterwards
9   transcribed; that the foregoing is a true and
    correct transcript of the testimony; that this
10  deposition was taken at the time and place in
    the foregoing caption specified.
11
            I do further certify that I am not a
12  relative, employee or attorney of any of the
    parties hereto; that I am not a relative or
13  employee of any attorney or counsel employed by
    the parties hereto; that I am not financially
14  interested in the action; and further, I am not,
    nor is the court reporting firm with which I am
15  affiliated, under contract as defined in Civil
    Rule 28(D).
16
            In witness whereof, I have hereunto
17  set my hand at Columbus, Ohio, on this 9th day
    of February, 2024.
18

19

20          *Julia Lamb*
21          Julia Lamb, RPR, CRR
22          Notary Public, State of Ohio

23  My commission expires:  10-10-27

24

## Exhibits

**DeAscentis Exhibit 1** 25:13,19

**DeAscentis Exhibit 2** 27:9,11 28:15 31:16, 23 36:20,21

**DeAscentis Exhibit 3** 34:10 35:9 36:21 37:11,13 38:6,10,13 40:14 44:2,6 45:11 48:15,19

**DeAscentis Exhibit 4** 39:20,23 40:3,5

**DeAscentis Exhibit 5** 62:19 63:5

**DeAscentis Exhibit 6** 69:12,22 70:21 71:3

**DeAscentis Exhibit 7** 80:10,15 83:19 85:16

**DeAscentis Exhibit 8** 86:17,22 87:6,11 89:13

**DeAscentis Exhibit 9** 90:8,10

**DeAscentis Exhibit 10** 93:12,16,20 95:17

**DeAscentis Exhibit 11** 101:2,5,10

**DeAscentis Exhibit 12** 102:24 103:24

**DeAscentis Exhibit 13** 120:24 121:4,6

**DeAscentis Exhibit 14** 132:7,9,14

**DeAscentis Exhibit 15** 132:19,21 133:1,9, 19

**DeAscentis Exhibit 16** 134:16,20

**DeAscentis Exhibit 17** 136:7,12

**DeAscentis Exhibit 18** 138:18

**DeAscentis Exhibit 19** 139:3 141:2

**DeAscentis Exhibit 20** 142:13,17

**DeAscentis Exhibit 21** 144:4,6,10,11

**DeAscentis Exhibit 22** 144:21 145:2,3

**DeAscentis Exhibit 23** 150:1,9,15

**DeAscentis Exhibit 24** 158:4 159:1

**DeAscentis Exhibit 25** 161:19,21

**DeAscentis Exhibit 26** 168:16,18,22

**DeAscentis Exhibit 27** 191:17,21

**DeAscentis Exhibit 28** 198:21 199:15 201:8

**DeAscentis Exhibit 29** 201:14,21

**Exhibit 2** 31:16

**Exhibit 3** 34:10 36:21 37:11,13 45:11 48:15, 19

## $

**$10** 204:17 205:6

**$2** 42:23 43:4

**$350** 127:14

**$50** 43:6,13,16

**$500** 176:17

**$6.5** 37:20 40:24 41:13,19 42:14

**$6.55** 122:14

**$800,000** 205:18

## -

**-=0=-** 25:12,14 27:10, 12 38:5,7 39:19,21

62:18,20 69:11,13 80:9,11 86:16,18 90:9, 11 93:11,13 101:4,6 102:23 103:1 120:23 121:1 132:8,10,20,22 134:15,17 136:6,8 138:2,4 142:12,14 144:5,7,20,22 149:24 150:2 158:3,5 161:20, 22 168:17,19 191:16, 18 198:20,22 201:13, 15

**-=O=-** 212:20,23

## 1

**1** 25:13,19 87:6,11

**10** 93:12,16,20 95:17 105:7 205:22 211:11

**10-year** 104:21 105:4

**100** 16:3

**11** 48:15,23 49:5,8 101:2,5,10

**11(a)** 49:11

**12** 102:24 103:24

**12-2020** 39:8

**12th** 101:20

**13** 120:24 121:4,6

**14** 132:7,9,14

**14,000** 110:3

**14th** 101:15

**15** 117:14 132:19,21 133:1,9,19

**15th** 96:13 97:6 104:3 145:7

**16** 134:16,20 135:18 141:16

**16th** 64:18 93:20

**17** 136:7,12

**18** 137:23 138:9,14,18

**18-19** 138:3

**19** 137:24 139:3 141:2

**1980** 21:5

**1988** 20:24

**1992** 21:6,11

**1996** 14:11,19 22:10 23:3,7

**19th** 26:4,8,12

**1st** 87:1,24

## 2

**2** 27:9,11 28:15 31:16, 23 36:20,21 87:6,11

**20** 34:14 142:13,17 171:6

**200** 88:3

**2012** 24:7 26:2,12 27:19

**2013** 62:16 63:8 64:13 68:18 72:14 73:6,17 75:7 76:24 79:24 116:15

**2014** 74:18

**2015** 31:7 32:3,20 33:13 43:23 80:21 86:7 87:1,8,24 88:15 90:14,23 92:22 93:1, 20 94:2 95:2 96:13 99:11,23 101:15,20 102:18 154:10 155:13 183:15 187:24 190:13 197:1,15

**2016** 104:3

**2017** 35:21 44:3 46:11

**2019** 133:6,21 135:19 136:15 138:8,19 140:17 143:1 144:15 145:7 150:12

**2020** 38:20 40:16 153:18,24 154:13 155:13 162:4,11 184:19 186:5 190:14 192:5 195:9

**2021** 37:7 169:2,10 171:14 192:1 199:17 200:22 202:3,9,13 207:13

**2022** 209:23 210:6

**2024** 212:22

**20th** 35:21

**21** 88:3 144:4,6,11

**22** 144:21 145:3

**23** 150:1,9,15

**23rd** 80:21 162:3

**24** 158:2,4,8 159:1

**25** 65:22 161:19,21

**25th** 27:19

**26** 32:3,20 168:16,18, 22 212:22

**27** 191:17,21,24

**27th** 38:20

**28** 198:21 199:15 201:8

**28th** 143:1

**29** 201:12,14,21

**29th** 90:23 91:1 93:1 94:2 95:2 187:24 199:17 202:2

**2:39** 212:22

**2nd** 153:18,24 154:12 162:11

---

**3**

**3** 34:10 35:9 36:21 37:11,13 38:6,10,13 40:14 44:2,6 45:11 48:15,19

**30** 62:10 203:7

**30-some** 174:22

**300** 91:10 128:2

**350** 72:16 73:12 88:2 91:11 93:2

**3rd** 135:19 140:17

---

**4**

**4** 39:20,23 40:3,5

**40** 24:3

**46** 199:5

**4th** 136:15 192:5 195:8

---

**5**

**5** 61:15 62:19 63:5 72:12

**5.2** 205:14,21

**50** 15:9 30:16 117:3 124:13

**50-some** 113:9 211:20

**531** 187:4

**571** 88:1 184:1

**5th** 64:13 144:15

---

**6**

**6** 69:12,22 70:21 71:3 90:14 138:8,19

**6-3-19** 138:24

**60,000** 128:13

---

**7**

**7** 71:15 80:10,15 83:19 85:16

**7013** 38:16

**730** 187:4 188:6

**7a** 71:12

**7th** 150:12

---

**8**

**8** 19:7 86:17,22 87:6, 11 89:13

**8:58** 26:2

---

**9**

**9** 90:8,10

**9th** 26:2,6,7 63:8 169:2,10

---

**A**

**A-L-L-O-T-T-A** 162:14

**abandoned** 105:24

**abreast** 120:4

**abundant** 98:3

**accept** 108:13 204:23 206:3

**accepted** 99:13

**access** 15:10 16:11 194:4

**accommodate** 103:16

**accordance** 53:8 76:3 207:7

**accountant** 21:24 39:3,4 86:10

**Accounting** 21:10

**accurate** 24:6 50:16 59:24 67:16 80:20 101:12 162:2 168:24 169:5 191:23

**achieve** 113:14

**acquire** 39:14 50:20 68:12,19 69:3 71:5 168:3

**acquired** 165:2

**acquiring** 178:17

**acquisition** 39:7 164:20 165:14 167:2

**acre** 106:8 174:22

**acres** 24:3 62:10

**acted** 66:17

**actual** 52:23 69:20 84:7 131:12 201:24

**addition** 84:17 85:18 195:22 196:9

**additional** 88:6

**address** 20:12 140:5, 9 199:21,24 200:4,8

**addresses** 19:23 20:7

**addressing** 160:2

**admit** 93:18 150:14

**adopted** 101:19

**adoption** 209:22

**advise** 31:18 76:7 111:19

**advised** 147:12

**affects** 99:1

**affiliate** 15:2 30:16 32:18 33:4 60:5 77:18 78:22 84:23 116:13 117:3 124:5 150:16

**affiliated** 19:24 20:9 33:22 113:10

**affiliates** 43:7 111:20 211:20

**afforded** 131:4

**agent** 78:16

**agree** 29:12 30:12,14 45:9 52:9,13 69:22 70:7 87:8,14,23 95:9 98:1 105:22 112:7 115:15 203:9 207:10

**agreement** 31:24 32:19 33:3,12,20,24 36:9 62:14,16 69:21, 23 117:21

**ahead** 166:23

**ahold** 194:1

**Albany** 22:23 23:1

**Allotta** 162:14 164:1, 23

**amend** 209:16

**amount** 180:20,22 184:2,3

**amounts** 43:7

**analysis** 183:12 184:8,18 187:10 188:15 189:11,14 195:9,22 196:21,24 197:17,20

**and/or** 169:24

**answering** 59:20 72:3 152:10 182:12 198:4

206:10

**answers** 17:18

**Anthony** 54:12,13
56:5

**anti-development**
115:22 157:13

**anymore** 120:6

**apartment** 14:17 23:6
24:24 29:23 88:5
92:17 115:17,23 129:6
163:1 178:6

**apartments** 27:5
28:22 29:2,4,9 53:4
76:9,15 77:11 78:9
79:8 84:18 88:3 97:18
127:17 128:2,13,24
163:8 170:6 171:7,9,
15 172:12 173:1,3
174:19 175:11 176:2
178:10 180:8 187:6

**apologize** 182:12
199:3

**apparently** 82:20
83:9 92:4 134:10
200:24 202:15 203:15

**appeared** 93:2

**appears** 28:2 103:6
104:2 192:3

**applicant** 126:14

**application** 99:24
102:15 113:23 115:12
121:21 148:13,24
153:15,20,22 154:7,
12,15 159:24 160:14
162:9 184:18 186:4
202:11 207:12,20
208:16 209:9,10

**apply** 174:10

**appraisal** 209:20
210:2,5

**appraise** 66:5,7

**appraiser** 63:21 66:4

**approach** 142:5
159:12

**approached** 209:2

**appropriated** 211:6

**approval** 53:2 81:9,
12,18 147:7 148:2,7
149:5

**approvals** 75:9
178:18

**approve** 118:13

**approved** 119:9
137:9,19 148:14,24
154:15 156:1 173:24
206:14,16

**approximately** 24:3
109:24 184:1

**approximation** 186:8

**April** 35:21 44:3 46:10
80:21 169:2,10 171:14

**architect** 59:8 146:5

**architectural** 60:9

**Architecture** 17:2

**arduous** 203:10

**area** 57:17 176:15

**articles** 16:12

**articulate** 155:24

**assemble** 159:11
182:24 196:7

**assembles** 182:22

**assess** 108:11 190:12

**assessment** 198:9

**assist** 64:23 66:13
145:11,19 146:12
151:10 152:19

**assistant** 63:12,13
64:6 193:23

**associate** 56:8
139:21

**Associates** 151:21

**assume** 18:5 123:13
129:9 154:13 162:8
193:19,20 194:2

**Assumes** 41:4 151:11

**assuming** 39:11
59:15 104:21 105:3
170:15 171:23 180:13

**attached** 39:6 93:19
138:23

**attachment** 40:15
192:3

**attempt** 57:9 59:4,10
60:5 120:11,17 149:14

**attempted** 105:18

**attend** 133:17 169:24

**attended** 131:18
142:1

**attention** 44:12
202:15

**attorney** 15:15 67:3
113:22 114:2 153:17

**attorneys** 16:16
190:20,22

**authenticity** 143:8

**avoid** 47:6

**aware** 13:17 32:3
33:19,21 34:3 46:12
73:6 102:9 105:17
108:7 109:9 148:12
152:3,17 153:18
207:19

**B**

**back** 23:16 24:7 25:15
38:4 44:6 47:20 52:18
59:23 62:3 72:23
79:24 103:20 108:23
119:24 127:6 131:12
147:15 155:15 166:8,
11 171:9 172:8 177:19
182:17 193:6 205:18
208:14 211:15

**backward** 167:16

**bad** 80:6 186:11,23
196:15

**bag** 125:3,10

**Baker** 162:15

**Ballard** 136:16
138:15,19 139:7 140:9
145:18 150:11 159:3
160:18

**ballot** 112:9

**ballots** 109:21

**bank** 37:10 43:5,15
122:14

**based** 70:24 177:13
197:1

**basic** 161:1

**basically** 81:2

**basis** 24:3 35:5
119:12 121:14 153:16
193:1

**baskets** 200:3

**Bates** 103:5,10 135:2,
8 142:19 143:12

**battle** 57:2 104:22
105:4 106:12

**begin** 122:22

**behalf** 66:17 124:2

**belabor** 46:20

**benefit** 85:19 86:1

**Betsy** 86:9 134:6

**big** 196:17 201:16

**Bigger** 180:18

**Bill** 104:7,11,13,14,15

**Bill's** 104:15

**bit** 14:12

**bitch** 90:1 92:14 97:3

**black** 97:18

**blog** 92:1,5

**Bo** 34:9,11,12 54:11
59:2 114:3 153:21
159:10 163:19,21
164:1 165:19 169:24
185:3 188:1 205:17

**board** 36:17,18 66:21
67:13,23 92:21 147:4
154:21

**Bob** 100:8,10,15

**body** 26:16

**Bonnie** 133:15

**borrower** 41:12

**bothering** 199:8

**bottom** 38:15 70:3 80:17 87:5,11 102:1 142:20 169:9,11 170:4

**bought** 174:6

**break** 61:15,23 103:15 108:20 109:2 158:18, 19 166:5 195:20

**Brent** 54:12,19 58:24 80:21 81:7 85:7 90:15 91:23 93:2 159:9

**Bricker** 163:17

**Brigdon** 74:7,8,10

**bring** 97:18

**brings** 145:13

**brought** 109:10 119:12 175:23

**Brownlee** 31:16,22 34:11,12 36:20,21 37:11,13 44:6 45:11 48:15,19 54:11 59:2 62:13 114:3 159:10 163:21 164:2 188:1

**Brownlee's** 34:10

**Buchanan** 159:18

**Bucket** 114:20

**build** 24:23 29:16,22 53:3 76:8 118:12 146:17 170:20,22 171:15 172:16,22,23 173:3,4 174:7,18 175:10,15 178:4,5

**builders** 172:20

**building** 29:8 131:22 133:4 136:3 163:8 170:7,16 171:5,6,8,11, 17 173:1,22 178:6,16

**buildings** 84:8,15 88:5 94:13 99:8

**builds** 29:4,5

**built** 79:9 180:21

**bunch** 38:16 182:22

**Burke** 202:24

**business** 13:20 14:14 22:15 23:6 76:13 77:11 79:7 82:4,7,8

83:14 171:10 190:2 206:4,5,11,12

**buy** 41:13,20 42:14 45:15 46:3 65:23 66:8 105:15,18 128:22 201:5

**buy-in** 107:23 108:4,9

**buying** 43:21 82:4 206:5,6,12,13

**buys** 78:8

**BWF** 131:23 132:1,16 134:7 137:10

---

**C**

**C1** 52:20

**C2** 52:20

**calculation** 179:5,17, 22 182:16 187:18

**calculations** 183:5

**call** 112:15 140:13 173:9 201:5 202:6

**called** 86:7 138:23 192:4

**calls** 112:11 175:4 189:22 190:24

**campaign** 116:14

**Campus** 14:24 15:2 39:6 40:22 42:15 123:16,17 125:20 126:22 166:14 167:7, 23 168:2,12

**cap** 179:9 181:23 196:13,15

**capabilities** 175:8,10

**capability** 173:21 175:9

**capacity** 66:23 67:1

**capital** 161:12,13,14

**care** 186:14,20 203:21 204:12

**Carolina** 181:8

**case** 17:3 24:1 51:2 56:18 58:5,16 59:9

62:11 67:6 89:9 102:3 110:17 112:23 124:15 153:13 155:23 183:1 187:20

**cash** 43:4

**caution** 18:15

**cease** 35:1

**center** 90:22 141:10

**central** 120:5,6

**CEO** 14:9 33:10 40:8 46:17 59:18 85:12 128:9,11 177:19 202:16

**certified** 13:4

**CFO** 39:2

**Chad** 169:1 191:24 192:11 193:4

**chairman** 36:17

**chance** 25:20 32:23 35:11 38:12 40:2 49:4, 10 63:4 80:14 86:21 93:15 101:9 103:23 121:3 132:12,24 134:19 136:11 142:16 144:10 145:2 150:8 158:24 168:21 191:20

**change** 175:13 196:22

**channels** 185:8

**characterization** 96:4 203:13

**charging** 79:5

**Charleston** 180:24 181:8

**chart** 122:2

**Chase** 27:18 30:3,4 54:11 55:19 56:9 90:16 93:2 159:9

**chief** 14:3 59:15 78:5 113:8 123:10 159:19

**Children's** 32:1,20 33:5 62:9

**choice** 48:8

**chose** 173:21 174:21 175:12,13

**cities** 76:5

**citizen** 129:16

**citizens** 88:16 89:10 91:11 96:1,16,23,24 97:3,22 98:1 109:11 110:19 112:8 118:24 130:1 148:21 157:4 183:16

**citizens'** 92:16

**city** 13:15 17:4 53:2,15 74:24 75:8,23 87:4,16 89:10 93:8 95:15 96:12 97:6,21 100:20 101:18 109:11,24 110:7,19 111:23 112:8 113:23 114:4,5,6 116:14 118:13,24 121:15,22 126:3 129:15 131:19 132:2 145:12,20 146:13 147:6,8 148:8,11,14, 22,23 149:4,6 152:16 156:13 157:24 162:9, 21 163:24 202:12 206:19 207:13,19 208:16 209:2,15 210:9,20 211:6

**clarifications** 139:9

**clear** 41:17 46:8 61:5 77:6 113:7 122:19 128:15 140:16

**Cleveland** 162:16

**client** 143:11,16

**close** 37:1

**closed** 165:2

**closing** 37:6 50:8,10 51:20 52:3,4,7

**cluster** 164:8,9,13 165:3,22

**collecting** 79:6

**college** 21:1,7,11

**Columbus** 17:6 24:21 55:4,23 156:19

**comment** 105:2 129:16

**comments** 92:1 98:21,24 99:3,7 127:5

**commercial** 94:13
127:12 155:1 163:4
166:3,4 167:8 178:23
184:3 204:24

**commission** 114:5
147:8 206:20 207:6

**committed** 96:6

**communication**
211:24

**communications**
146:6,12 149:12
150:20 151:3,9 152:18
192:21

**communities** 14:6
15:3,6,22 16:4,12
19:23 20:4,8 22:4 23:6
27:18 30:7,8,9,16,22
33:11 34:20 38:21
40:9 57:3 59:22 60:4
62:9 68:4 101:17
102:4,14 113:9 116:12
123:10 124:2,13
125:18 126:13,14
130:10 136:17 150:12,
16 161:8,13,14 168:13
192:22 194:13 197:5
200:8 202:16 211:1,19

**community** 29:22
31:7 88:2,11 89:6,8
90:17 93:4 95:23
96:14 99:11,12,13,16
100:1 107:4,9,13,15,
17,22 108:4,8,10,12,
13 109:20 141:12
142:3 143:23 145:12
146:17,23 148:3,7
154:20 155:14,18
156:7,18,23 176:13
188:3 203:16 204:23

**companies** 13:16
15:5,11 19:24 20:9
30:16 32:18 33:22
60:5 78:22 84:23
111:20 112:5,6
113:10,20 116:13,23
117:1,3 124:5 128:6,8
139:24 140:5 145:11
150:16 155:13

**company** 14:1,10,13,
22 19:20 22:5,16 23:3
24:4 28:20 30:5,6
32:18 33:4,22 34:13,

16,19 35:20 40:21
46:18 49:21 54:20,22
56:10 57:8 59:5,16,17,
18 67:2 69:3 77:7,8,
18,24 78:8 79:21 85:4,
5 87:20 90:15 100:23
102:9 123:2 127:13
128:11 139:23 140:4
145:10,19 146:12
149:12,19,22 150:20,
21 151:3,9,10,15,21
152:19 153:1,12
155:23 157:3,13
164:15 165:12,20
176:18 180:2 192:8
195:16,17 200:6 202:1
211:19

**company's** 73:5
115:9 116:21

**compare** 181:22
188:4

**compile** 195:23

**complete** 150:21

**complex** 29:23 92:17
115:17,23

**complicated** 178:4
183:7

**comply** 140:12

**component** 124:9
163:2 166:19

**compound** 155:17

**comprehensive**
53:8,10 76:3 95:23
96:7,8,13 147:1 175:3,
6 206:16,21 207:2,8
209:22

**concept** 28:3,6,14

**conceptual** 24:22
26:17 27:24 94:1

**concern** 111:7

**concerned** 89:3
91:24 92:7,11,13,20
97:14

**concerns** 89:8 156:9

**concluded** 69:21
212:22

**condo** 78:9

**condos** 76:9

**conduct** 100:19

**conflict** 67:3 69:1

**conformity** 130:14

**confuse** 195:18

**confused** 51:23
162:20

**conjunction** 193:24

**consensus** 118:12

**considered** 106:8
206:20

**consisting** 88:2

**constituent** 156:12

**constituents** 100:7

**construction** 179:13
196:15

**consultant** 65:3
145:19 152:18

**consultants** 57:15
152:8

**contemplated** 71:4
82:6

**contingencies** 50:7

**contingency** 44:3,16
45:11 46:1,12,19
49:13 50:11,21 51:6,
24 52:1 205:19

**contingent** 45:16
49:17 51:21 52:7

**continue** 48:3 69:2
79:9 96:13

**continued** 107:17
156:22

**continuing** 155:20

**contract** 35:20 37:14
44:9,15 45:10,15
46:11,19 49:13 64:20
67:24

**contractors** 178:17

**contracts** 49:24 50:3,
18

**contributed** 116:14

**contributions** 116:22

**control** 81:22

**conversation** 51:16,
18 52:2 97:17 115:6
169:21

**convince** 148:21

**copy** 15:14 16:15
25:24 26:10 27:17,20
28:6,14 34:8 36:3
38:19 40:9 63:7 80:20
93:18 94:24 101:12
103:3,6,10 136:15,16
137:2 138:21 142:23
144:14 145:5 162:2
168:24 169:5 191:23
199:15

**corner** 38:16 80:18
102:1 142:20 143:13

**corporate** 125:2

**correct** 22:19 25:24
26:10 27:17 36:3
38:19 44:4 63:7 77:9,
12,13 79:22 83:12
110:12 122:15 136:14
137:2 142:23 144:14
145:5 163:9 174:2
179:16 180:9,10
199:15

**correctly** 123:4
196:12

**correspondence**
171:20

**cost** 177:5 178:15
179:11,13 180:16
181:21,23

**costs** 178:18 179:14
180:13,14 196:15

**cottage** 88:3

**coughing** 89:21

**council** 53:2,15 93:8
95:15 114:6 116:3,11
144:16 147:8 148:8,
15,23 149:7 156:13
157:5 202:12 207:13,
20 209:2,16

**council's** 101:18
149:4 210:20 211:6

councilmember 116:15

councilmembers 114:9

councilpersons 157:14,15

counsel 34:17,20 35:2 114:3 127:5 140:7 141:4

Counselor 96:11

country 57:4 176:21

County 17:7 22:21,22 63:22

couple 44:20 55:14 56:1,15 105:9 131:18

court 25:8 29:14 42:10 45:7 62:22 101:3 120:22 150:4 158:9 198:24

courteous 48:10

covenants 42:21

covered 103:7

create 84:2,12,13 121:11 127:15

creating 98:2

credit 205:18

CROSS-EXAMINATION 13:6

Cullen 26:1,11,17 27:19

current 116:16

cut 47:1 131:9

cutoff 191:4

Cyndy 101:13

**D**

dad 22:17 67:8 200:11 202:24

dad's 23:2

data 182:22,24 183:7, 8 188:14,16 189:2 197:1,16,18

date 24:11 37:8 39:8, 11 90:14

dated 40:15

dates 99:21

David 17:13 36:13,16 66:11 67:7,17 68:18, 24 82:19 83:2,9 84:3, 10,15 93:3 101:13 104:7,9 114:15 115:8, 15 133:16,22 142:24 145:6 188:2 198:14,18 199:16 200:23 201:9

day 45:19 47:1 81:15 124:20 126:1 196:23

days 55:14

Dayton 21:4

deal 50:17,19 54:2 70:22 81:8,17 82:19 85:6,7,15 104:19 111:21 121:14,19,20 122:1 123:24 124:1, 17,20 126:7,10,13,17 127:1 163:22 165:24 166:13,18 185:8,22 186:11,24 190:5,23 191:7 212:16

Dealing 98:5

deals 70:12 74:9

Deascentis 13:3,10, 11 18:16 22:18 23:19 25:19 28:15,18 38:10, 13 39:23 48:14 51:13 59:13 60:3,17 61:7 62:7 64:5 70:13 96:16 109:2 120:3 124:1,19 126:2 138:24 145:10 152:14 154:5 160:4,12 162:23 166:11 173:8 174:10 175:13 176:1 179:23 182:2 189:7 194:12 200:5 208:12 210:8 211:17

Deascentis's 70:8

debt 196:15

December 38:20 40:15 104:3 162:3 192:5 195:8 207:13

decide 175:24 176:6 189:17 190:5

decided 67:2 118:6 171:14

decision 80:4

decisions 79:20

degree 21:9

deliveries 50:10

Deloitte 21:15,22,23

demand 176:9,11

denial 209:21

denied 202:12 209:9, 10

Denny 36:12,13,16 51:16,19 52:3 104:14

dense 92:17 115:16 133:23 155:15

density 97:5,14 175:16 187:4

Denver 159:20

deny 149:8

denying 102:8

depending 160:19

depends 51:1 57:22 189:12

deposed 16:19 17:10

deposes 13:5

deposition 17:14 18:11,21,24 19:14 24:1 25:13 27:11 31:23,24 34:10 35:9 36:22 38:6 39:20 53:13 62:19 69:12 80:10 86:17 90:10 93:12 94:10 101:5 102:24 120:24 131:4 132:9,21 134:16 136:7 138:3 142:13 144:6,21 150:1 158:4 161:21 168:18 185:9,23 187:13 191:1,17 195:2 198:21 201:14

depositions 212:15

Derek 200:20 201:8

Desales 20:20,21

desire 209:4

desired 129:20

details 69:20 71:4 88:6

deter 149:14 152:20

determine 108:13 111:21 182:17 188:20

determined 190:22

develop 24:7,13 28:20 54:4 57:10,18 71:6,8 76:23 77:1 79:8 82:9,15 86:14 111:19 117:23 163:23 166:19 172:19 174:21 176:1 178:3 183:24 184:19 186:15 203:11,16 206:18

developed 49:22 53:23 76:4 81:21 82:17 153:7 176:20

developer 24:19 74:8 82:20,24 117:12,15,20 125:19 126:14 147:20 186:23

developers 105:9,13, 18 206:6

developing 62:10 76:15 77:11 79:5 82:4, 8 206:6,13

development 14:2,17 23:4,7 30:24 31:24 32:19 33:3,12,19,24 34:24 52:15 53:9 56:8 62:14 70:5,17 75:9 78:20 81:22 82:3,16 87:10 88:1 89:12 96:9 101:19 105:20 132:2 133:23 139:21 141:7 152:5 155:15 159:4, 19,20 160:18 166:1 177:6 178:12,16 202:1 204:24

developments 111:6 120:4 124:10 176:21

devices 194:4

Dial 47:20

dialogue 99:11

**Dick** 38:20 39:1,2

**difference** 187:23 190:12

**difficult** 88:24 89:4 91:18 92:16

**direct** 44:11 47:2 212:2

**directed** 59:17 202:15

**directing** 81:3

**direction** 74:20 85:14 99:17 147:4 156:15,16

**directly** 115:7

**director** 34:24 160:18

**disclose** 18:16

**discourteously** 47:24

**discovery** 131:3 185:8,19 188:23 189:3 191:1,4 194:11

**discuss** 189:15 193:12

**discussed** 18:17 133:21 141:15 143:22 156:22 183:23

**discussing** 36:12 118:17 141:11,19 169:23

**discussion** 150:5

**discussions** 36:18 193:12

**distribute** 137:15

**distributed** 139:14

**district** 52:21

**divide** 177:5,7

**divided** 179:15

**division** 170:7,16 171:11 178:19 179:22

**document** 25:5,18,22 27:14 31:19 32:7,9,15 33:1 35:12,14,17 36:3 38:9,13 39:5 41:9,10, 18 42:12 43:10 52:6 64:2 68:14 71:11 88:6 90:24 94:17,20 96:5

102:2,10 106:14 121:9,11,13,24 122:5 123:11,13 132:6,18 134:21 135:2 137:8 138:23 139:4 150:14, 22 152:2 153:10 154:1 159:23 160:4,17,21 162:11 169:23 182:9, 15 195:8 199:2 200:12 201:16 202:14,18

**documents** 18:23 19:2,4,8,13 23:10 36:21 53:12 135:14 137:24 189:2,9 190:10 194:18 195:5,23 196:9 211:18

**dollars** 81:23 82:11, 16

**door** 182:13 199:4

**doubt** 143:7

**Doug** 133:16

**download** 28:3,14

**downtown** 203:7

**dozens** 49:22 176:20

**draft** 104:6,17 139:3

**drafting** 36:9,10

**due** 43:7

**Duffy's** 92:1,4

**duly** 13:4

**dwellers** 78:10

---

**E**

**Eagle** 24:13,23 29:8, 17,23

**earlier** 23:5 30:15 91:3 94:14 122:10 131:17 166:12 170:11,24 191:7,10 192:12 199:3 200:4

**early** 62:16

**earn** 81:23 126:9

**easy** 31:21 178:5

**Eckler** 163:18

**economic** 175:20 182:8

**education** 21:1,7

**effort** 118:12 146:13 151:7

**efforts** 99:23 100:6 108:11 147:3 156:21 157:20

**elderly** 99:5

**elected** 160:20

**electricity** 127:17 128:7,23

**elements** 87:15

**email** 19:23 20:7,12 26:1,11,16 27:1,18,23 29:2,11,12 38:18,19 63:8 67:5 68:9,24 80:21 81:15 86:24 91:22 101:13 103:7 104:2,17 136:14,15,22 137:3 138:15,18 142:24 144:14 145:6 162:3 163:19 164:8,24 169:1,6 185:1,9 191:24 192:6,20 194:3,10 199:16,20,24 200:3,8,13

**emails** 19:19 193:14

**employ** 112:22 113:13

**employed** 21:12 22:3 30:19,21 65:15 161:8, 11

**employee** 30:4 34:12 67:12 91:23 150:11 185:4

**employees** 54:2 85:15 180:2

**empty-nesters** 99:4 129:19

**encouraged** 154:19

**encouraging** 97:22

**end** 85:20 124:20 125:2 126:1

**energy** 78:3,6,8,15,17 79:21 128:9 129:23 130:13,18,22

**engage** 57:15 95:22 96:23 97:22 99:11,24 155:13 156:7,16 157:19 203:16 209:3

**engaging** 204:22

**engineer** 59:8

**engineers** 58:3

**England** 202:1

**enter** 32:18 33:23 49:24 50:4 67:23

**entered** 33:4 35:21 44:15 45:10 78:18

**entering** 33:12 62:7, 15 70:9

**entire** 174:11

**entities** 122:1 124:11, 12,14 125:2,12 168:10

**entitled** 47:11 190:3

**entity** 42:16 83:22 84:2,10,14 122:2 123:15,22 124:9 131:6 166:15 167:2,21,22,24 168:3,7,9 173:18

**Equity** 84:22

**Eric** 159:18,19,21,22

**essentially** 96:18 97:7

**establish** 125:22

**established** 40:22

**estate** 35:5,19 44:8 88:4 120:4 125:11,12 162:18 163:18 164:17 167:3

**evaluate** 182:3

**evaluation** 183:14

**evening** 100:17 192:12

**eventually** 37:1 45:15 103:11

**exact** 183:4

**exchanged** 169:6

**exclusively** 210:11, 22

**executed** 32:1 44:3

**executive** 14:4 59:15
78:5 113:8 123:10

**exhibit** 25:6,13,19
27:9,11 28:15 31:16,
23 34:9,10 35:9 36:20,
21 37:11,13 38:6,10,
13 39:20,23 40:3,5,14
44:2,6 45:11 48:15,19,
20 62:13,19 63:1,5
69:8,12,22 70:21 71:3
80:7,10,15 83:19
85:16 86:17,22 87:6,
11 89:13 90:8,10
93:12,16,20 95:17
97:10 101:2,5,10
102:24 103:7,24
120:20,24 121:4,6
132:7,9,14,19,21
133:1,9,19 134:16,20
136:7,12 138:18 139:3
140:21 141:2 142:13,
17 144:4,6,10,21
145:2 150:1,9,15
158:4 159:1 161:19,21
168:16,18,22 191:17,
21 198:21 199:15
201:8,14,21

**Exhibits** 138:3

**exist** 195:6

**existed** 206:21

**existence** 194:17

**existing** 22:6

**exists** 151:20 189:4

**expect** 69:19

**expecting** 59:21
198:10

**expense** 196:16

**experience** 70:24
109:18 110:16 111:14,
15 177:16,17 184:15

**experienced** 186:23

**expert** 176:14

**expertise** 118:21

**explain** 70:20 71:3
177:2

**expressed** 207:21

**extended** 51:20

**extensive** 149:20
155:18 209:7

**extent** 116:19

**extra** 81:23 82:10,16

**extremely** 106:19

**F**

**F-A-L-K** 161:6

**Facebook** 92:1,5

**fact** 33:21 73:7 108:8
157:3 174:3 198:3

**factor** 178:12

**factors** 177:14 182:8

**facts** 41:5 149:16
151:12 154:13

**fair** 18:7 53:1 104:17
133:19 147:16 160:20
162:12 165:13 176:14
187:2 188:18 189:9
203:13,17 204:1
205:4,23

**Falk** 117:7 161:6 162:3
164:23 165:9,20

**false** 61:12

**familiar** 17:16 24:22
33:1 35:14 71:23
120:8,11 205:14

**familiarize** 31:19

**family** 202:7,23

**farm** 200:2

**Farms** 199:23

**father** 13:19,24 22:6
161:16

**favor** 95:10 132:2
133:22

**FCBANK** 39:7 40:21
41:8

**FDL** 199:23

**federal** 14:21 45:7
73:5

**feedback** 129:17

156:23 209:15

**feel** 177:24

**felt** 67:1 156:19 203:15
204:22

**fight** 106:11

**figured** 205:11

**file** 142:3 154:6 208:12

**filed** 13:16 14:22 24:4
73:5 121:15 126:2
152:16 153:17,20,21,
22,23 154:12

**files** 28:7

**filing** 159:24 208:16

**financial** 71:4 155:11
183:12

**financing** 70:21 71:16
164:21

**find** 103:9 116:21

**fine** 32:10 45:4 46:2,
17 49:20 61:17 73:11
142:10 143:22 147:24
152:4,7,12 172:2
199:12 204:8

**finish** 94:22

**finished** 130:20

**finishes** 76:17 122:19

**firm** 60:9,13,19 199:5
201:24

**firms** 58:4 60:10

**Fisher** 36:13,16 66:11
67:3,18 68:8,11,19
69:1 82:20 83:2,9
84:3,10,15 93:3
101:13 104:9 142:24
145:6 188:2,3 198:14,
18 199:16 200:23
201:9

**fit** 135:12

**fixture** 199:5

**flipping** 85:19

**flow** 122:1

**flowchart** 121:13,20
125:1

**Flyer** 21:5

**focus** 23:7 179:1

**focused** 163:6

**folks** 24:12

**follow** 125:1 137:14

**for-profit** 77:7

**for-sale** 171:6,10

**form** 13:21 14:15 15:7,
12,23 16:24 17:11
18:12 20:2,16 22:5,8
24:9 25:1 26:3,20 27:6
28:8,23 29:18 30:1
31:2,12 32:4,21 33:6,
14 34:2 35:23 36:5
37:3,12,21 38:22
39:16 40:6,11,17 41:4
43:8 44:5,17 47:19
49:15 50:5 51:3,7
52:14,22 53:17 54:10
55:6 56:21 57:5,11
58:1,8,13,21 59:1,19
60:7,15,20 64:1,16
65:1,11,18 66:9,15
68:1,13,21 70:1,14
71:1,10,17 72:18
73:20 74:11 75:10,21
76:10 77:3,19 78:11
79:1,11,23 80:23
81:13 82:21 83:5,16
84:5 85:3,9,21 88:12
89:1,14 90:2,19 91:20
92:19 94:4,15 95:3,13
96:2 98:9 99:14,20
100:2,21 101:21
102:11,17 104:12,23
105:21 106:2,13,22
107:5,11,20,24 109:12
110:13,21 111:1,11
112:11,19,24 114:12
115:18 116:4,18
117:17 118:14 119:1,
7,13 120:13 121:17,23
122:6 123:6,12 124:6,
21 125:5,17 126:4,11
127:19 129:8,21 130:3
133:10,18 134:1
135:24 136:19 137:11,
21 139:5,16 140:20
142:8 143:3,9 144:1
145:15 147:10 148:5
149:3,9,15 150:17,23
151:11 152:21 153:19

154:8,16 155:5,16
156:3 157:1,8,22
159:6,14 160:3 162:5,
24 163:13 164:4
165:7,17 166:21
167:11 169:3 172:1
173:11 174:1,14,24
176:3 178:21 179:19
180:4,12 181:14,20
182:20 183:18 184:9,
21 186:6,12,17 187:5,
11 188:13 190:15
193:2 195:11 196:1
197:8,21 198:1,15
199:18 201:2 202:4,20
203:12,18 205:1
206:23 208:9,19
209:6,18,24 210:12,23

**forma** 183:10,11,13
184:18 190:11 195:24

**formal** 90:16 102:15
148:12 160:14 185:16

**formally** 99:24

**formed** 14:13,18 22:7,
10,11,14,16 23:3
42:16 121:14

**forms** 35:5 119:11
153:16 193:1

**fortunately** 200:7

**forward** 30:12 63:15
64:4 81:4

**forwarded** 64:6,9
200:13

**forwarding** 63:24

**fought** 57:2

**found** 206:22 207:1,7

**Foust** 133:16

**framework** 96:8

**Frank** 24:16,18 26:24
29:4 105:15

**Franklin** 17:7 22:21,
22 63:21

**Friday** 169:10

**Friedman** 36:12,16
51:16,19 104:14,15

**front** 19:5 45:7 50:12
94:3 154:2 160:24

189:8

**frowns** 164:16

**fruition** 118:5

**frustrating** 203:10

**frustration** 118:22

**full** 13:8 130:14

**fund** 84:22 122:15

**Future** 131:23 133:4
136:3

**FYI** 20:3

## G

**gaining** 146:12

**Garn** 101:13

**gave** 156:15,16 194:3
205:18

**general** 34:17,20 35:1
48:21 79:15 114:3

**generally** 44:18 71:15
74:23 201:17

**get all** 191:11

**Giant** 24:13,23 29:8,
16,23

**give** 17:14 32:8 103:2
186:8 188:14 189:1
193:4 212:1

**giving** 85:14

**Gleason** 75:17

**good** 61:11,19 67:17
108:19 186:11,23
193:6

**government** 56:22
129:18 148:22

**graduate** 20:23

**graduating** 21:11

**great** 48:5 56:19

**greenspace** 92:17
98:3 156:11 184:3

**Greeson** 75:17,18,19,
20 100:12 147:5
154:19 156:15

**Greeson's** 99:17

**Griffin** 146:6 153:9

**grocery** 24:23 27:4
28:21 29:1,5

**group** 86:13 134:10

**groups** 156:12

**guarantee** 37:17
41:1,14 43:17

**guaranteed** 39:14,18
41:19 42:14 45:15

**guaranteeing** 37:20

**guarantor** 41:9 42:20
43:4 122:12

**guess** 54:15 110:24
146:5 171:4 186:10

**guy** 50:17 65:23
156:19

**guys** 105:6

## H

**half** 55:10 103:15

**hall** 91:6 144:16

**hand** 25:4 27:8 31:15
34:8 38:9 69:7 132:18

**handed** 25:18

**handled** 163:24

**handles** 163:18
164:12

**handwriting** 121:8

**hang** 32:14

**Hanlin** 199:5

**happen** 37:6

**happy** 165:14

**hard** 46:5

**Hart** 60:13,14,18 61:2,
3,8 112:22 113:13,22
153:17 164:2

**head** 120:19 157:11

**hear** 36:15 51:17
126:17 156:8 158:10
169:17 191:4 193:16

199:11

**heard** 18:6 42:10
71:19 72:5 97:4
120:16 129:17 151:22
211:5

**hearing** 191:13

**height** 99:7

**held** 95:1

**helpful** 48:7

**hereinafter** 13:4

**hey** 147:14 165:1
172:21

**high** 19:7 20:21 24:2
32:2 52:20 62:11 88:5
106:8,19 124:16 173:9
180:21 181:19

**higher** 180:11,20

**highrise** 178:5

**hire** 59:7,9 61:3 152:5

**hired** 58:18,19,22 59:3
60:5,8,14 66:13,16
74:20,24 146:4,11
149:11 151:14,18
152:18

**hiring** 60:12,18 61:1,
6,8 151:1 178:16

**history** 58:11

**Hold** 181:1

**holders** 147:2

**holding** 105:6 125:3,
10

**home** 32:2,20 33:5
62:10 100:13 170:7,16
171:5,11 174:12

**homes** 88:4 171:17
173:22 174:19

**Honor** 127:4

**Hostetler** 162:15

**hour** 61:13,14 103:13,
15 158:7

**hourly** 196:23

**houses** 85:19 172:23
174:6,8 175:11

housing 99:4

hundred 122:24
123:14,15 125:21

hundreds 65:21
70:19,20 153:7

**I**

I-N-T-I-H-A-R 163:16

idea 69:22 84:1 141:11
211:4

Ignores 113:3

II 13:3,10 124:1

II's 124:20

impact 98:22

in-house 57:21 117:9,
10

inaccurate 46:7

inches 19:7

include 127:16

included 72:11

including 28:21 98:2
101:14 133:15 165:9
178:10 184:1 190:10

inclusive 95:23 96:14

income 79:6 97:18
168:13 177:8 178:11,
24 179:15 181:22
196:14

incorporation 16:13

increased 187:3
188:6

individually 125:13,
14

individuals 117:2

indulgent 130:16

inform 183:1

informal 194:22

information 57:16,24
58:6 109:14 110:18,23
111:9,12,18,19 113:19
189:2 190:18 191:7,
10,11 194:1 196:8

200:23

INGRAM 23:11

initiated 153:13

Inn 203:8

instance 125:13
141:2 181:18

instructed 209:14

instructing 189:19

intense 118:11

intent 76:8 87:24
200:16

intention 76:24

interaction 165:15

interest 15:6 67:3
69:2 99:4 155:11
179:7 181:23 196:13

interested 202:7

interesting 175:23

interests 95:24 96:15,
23

interjecting 48:12

interpret 122:5 123:4
137:8 163:22

Intihar 163:16,17
164:1,22

invested 126:6

investing 182:19
203:6

involved 13:19 30:24
52:19 54:6,8 58:15
70:13 73:4 111:5
126:13 129:24 151:1
152:6 155:2 177:24
179:24 192:17

involvement 27:2
67:15

involving 23:20

issue 112:9 146:20
151:8 157:6 194:14

issues 54:3 98:2
197:23

**J**

J-R 200:9

James 13:10

January 37:7 191:24
210:6 212:21

Jennifer 63:9

job 204:22

Jode 136:16 137:14,
16 138:15,19 139:4,
19,20,21,23 140:5,9
145:18 146:4,11
150:11 159:3,21
160:17

Jode's 141:8 159:13

Joe 20:6 38:20 39:1,3
42:1 47:22 48:1
126:16 160:11 203:22

John 164:23

joint 62:8 65:17 69:20
70:9 71:5 75:7 78:18
82:11 83:11 84:3
118:1

jointly 71:8

Jr 13:12 200:5

judgment 189:22
190:2,24

judgments 198:5

Julia 19:16 42:9 62:4,
21 72:22 89:20 102:20
120:21 127:6 131:12
145:24 172:8 193:5

July 93:20 96:13 97:6
99:23 144:15 145:7

June 32:3,20 90:23
91:1 93:1 94:2 95:2
133:5 135:19 136:15
138:8,19 140:17 143:1
144:16 183:15 187:24

jury 46:10,23 155:23
160:24 187:20 189:8,
18 190:4

JV 81:23 82:11

**K**

Kass 24:16,18 26:17
28:20 29:7 105:15

key 201:9

kids' 161:16

kind 105:19 118:2
159:11 163:1 175:24
178:11 184:7 198:9

kinds 153:8

knew 31:6 45:9 51:14
52:9,18 53:7 67:20
72:14 73:2,17 88:23
89:9,24 91:18 92:15
97:2,3 98:10 106:5,11
107:1,12,13 109:3
129:15 133:21 143:23
147:6 148:2 149:2,4
154:10 155:14 157:3,6
203:8 206:15,17 208:4

knowledge 210:8,20

Koon 63:20,21 64:9,
23 65:21 68:12 69:17
70:9 144:15 170:11

**L**

L-I-N-E 181:4

land 14:2 23:4 39:7
74:4 75:1 82:4,7,8,13
84:3 106:20 122:3
126:20 178:17 179:11
203:11 206:5,6,12,13

large 89:10

larger 124:10

Larrimer 100:9,11,15

late 133:5

latitude 131:4

law 58:4 60:10 130:15
199:5

lawsuit 13:15,17
14:21 17:9 23:20 24:4
28:14 35:6 40:23
41:12 52:10 73:5
119:12 121:15 123:18
125:15,16 126:2

129:10 130:12,17
131:7,10 143:20
145:14 151:8 152:16
153:17 155:10,11
168:11 192:18 193:1,
24 194:14 198:6,8
208:13

**lawyer** 22:11,14 50:13
66:12 67:8,20,22
112:23 117:7,9,10
161:7 162:15 163:17
164:1,2 188:1,2
211:10

**lawyers** 18:14,17,19,
21 59:9 102:3 117:6
147:12 165:5,8,16
188:19 189:3 193:10,
13 211:24 212:4

**layout** 24:24 27:24

**LC** 32:2 38:16 49:14
67:4 68:19 77:14
78:22 79:3 84:13 87:9,
24 94:7 95:2 125:11
129:12 142:2 162:18,
22 163:2,5,18 164:10,
16 166:2 167:19 173:3
192:14 209:20

**LC's** 84:23 91:14
163:6 164:18,22

**LC00005850** 80:17

**LC00018681** 142:20

**LC00019416** 101:23

**LCCP** 161:12

**lead** 81:7,11,17

**leaders** 134:7

**learned** 74:24 107:3

**leave** 140:2

**Lee** 188:2

**LEF** 84:18,21 85:5

**left** 34:16,19,23 97:20

**legal** 84:14 125:24
164:17 189:22

**legalities** 126:1

**legs** 61:16

**letter** 81:15 93:8,19,23
95:16 96:22 97:6 98:8,

14,15 200:16 202:15
204:1,21 205:2,5

**letting** 158:20

**level** 47:11

**liability** 123:2

**Lifestyle** 14:6 15:3,5,
21 16:3,11,12 20:4,8
22:4 23:5 27:18 30:7,
8,9,15,21 33:10 34:20
38:21 40:8 59:22 60:4
62:8 68:4 84:22 88:2
101:17 102:4,14 113:9
116:12 123:10 124:2,
13 125:18 126:12,13
136:17 150:12,15
161:8,12,13,14 168:12
183:2 188:4 192:22
194:13 197:5 200:7
202:16 211:1,19

**Lime** 181:1

**limited** 14:7 15:3,6,22
16:4 19:24 20:8 30:9
32:2 33:11 34:21 60:4
102:4 113:9 123:1,5
124:3 168:13 199:23
211:19

**Limited's** 16:12 23:6

**link** 28:3

**liquidity** 42:24

**list** 15:10,15 25:7
137:10 196:17,18
212:1

**listed** 87:10 88:6
133:8

**listen** 95:24 96:14,23

**lists** 87:5 159:23

**litigation** 189:22
210:4

**live** 120:10

**living** 88:1

**LLC** 14:24 15:2 40:22
42:15 123:16,17
125:20 126:22 166:16,
18 181:2 202:1

**loan** 37:9,17,20 39:7,
12,14 40:9,15,21,24
41:7,13,20 42:14

43:17 122:14

**local** 24:19,20 56:22
58:4 74:4,8 157:19

**located** 55:22 124:16

**locations** 77:22

**Lococo** 54:12,13 56:5

**LOI** 200:13,19

**long** 14:9 22:1 26:22
31:20 45:20 46:6
51:20 105:7 115:20
117:13 130:17,21
137:15 203:10

**long-term** 147:2

**Longaberger** 200:3

**longer** 54:22 185:4

**looked** 92:4 137:19
154:24

**lose** 112:10

**lot** 15:9 61:5 67:10
107:2 156:14 162:16
172:19 177:17 179:18
183:8

**lots** 19:3 46:3 81:22
82:9,15,17 152:5
170:21 172:12,13,19
191:10 196:8

**loud** 62:24

**low** 97:18 180:20
181:19

**lower** 51:6 175:15
180:22

**lowered** 106:17

**LRK** 60:8 146:4

**Luckily** 195:1

**lunch** 103:16 119:16
131:17

**LY** 123:1,5,14

———————

**M**

———————

**Macdonell** 134:6
136:16 137:3,9 138:20
139:14

**made** 31:10 61:4
68:11,18,20 69:16
72:14 79:19 80:4
90:16 93:3 95:11
99:23,24 107:23
113:23 114:3 116:22
123:24 128:3 139:8
148:12 162:9 168:1
183:15,16 186:4
187:24 191:10 199:2
201:24 204:16

**mailing** 137:10

**main** 157:6

**majority** 95:10

**make** 28:12 32:21
41:17 50:15,19 77:2,
10 82:10 86:12 87:14
100:6 109:14 110:18
129:5 135:18 140:17
141:8 151:13 160:14
163:6 166:12 173:20
175:18 176:1,7 177:14
178:12,18 180:1
184:6,17 188:3 189:22
190:1,22,24 195:23
196:24 198:5,11
199:10 200:24

**making** 31:6 87:3,10
88:8 124:2 185:7,16
191:3 196:21 202:7
205:6

**manage** 78:17 79:22
165:11

**manager** 75:23
117:12 158:1

**managing** 152:8
165:3,11

**mark** 27:9 39:23 69:8
80:7 90:7 101:1
128:23 132:7,19
137:23 138:10,14
161:18 168:16 191:15
201:12

**marked** 25:5,13,19
27:11 31:16 34:9 38:6,
10,13 39:20 62:19
69:7,12 80:10 86:17
90:10 93:12 95:16
101:5 102:24 120:24
132:9,21 134:16 136:7
138:3,7 142:13 144:6,

21 150:1,14 158:4 161:21 168:18 191:17 198:21 201:14

**matches** 176:11,12

**materials** 212:3

**math** 109:20

**Matt** 75:17,20 99:17 100:11 147:5 154:19 156:14

**matter** 16:23 107:19

**mayor** 157:24

**Mdeascentis** 20:14

**Mdeascentisjr@ lifestylecommunitie s.com.** 20:18

**means** 42:24 43:3 108:5 148:8 200:17,19

**meant** 55:13 65:15 106:20 137:17 203:19 204:4,7

**measured** 72:6

**meet** 18:20 75:20 76:4 100:12 114:9,15 154:19,20 156:17 207:1

**meeting** 64:18 75:7, 13,24 86:6 87:18 88:14 90:22 91:2,5,6, 7,10,17 93:1,9 94:2 95:1,7 97:4 98:2,19 100:8 114:19 115:10 131:21 140:24 141:6, 9,17 142:1 145:7 169:24 183:17 207:14, 16,17

**meetings** 53:16 99:16 131:18 149:20 154:22 156:8 207:7

**member** 36:17,18 67:7 122:24

**members** 15:21 16:6 88:10 157:4 209:3

**mention** 199:2

**mentioned** 155:19

**message** 63:24 64:6

**messages** 194:11,20

**met** 18:14 75:16 76:5 87:16 100:7,15,16 116:10 132:16 133:5

**methodist** 32:1,20 33:5 62:9 67:9,10 200:13

**MI** 172:18

**Michael** 13:3,10,11 22:18 27:13 31:17 60:17 61:7 70:8 124:1, 19 133:16 138:24 154:5 162:23 173:7 174:10 175:12,24 182:2 194:12 199:7

**middle** 169:22 201:7

**miller** 13:21 14:15 15:7,12,17,23 16:24 17:11 18:12,15 20:2, 11,15 21:16,20 22:8 24:9 25:1,21 26:3,7, 13,20 27:6,13,18,21 28:2,8,16,23 29:18 30:1,3,18 31:2,12,17 32:4,8,11,13,21 33:6, 14 34:2 35:23 36:5 37:3,12,21 38:1,20,22 39:1,2,16 40:6,11,17 41:2,4,15,22,24 42:2, 5,18 43:8,12,18 44:5, 11,17,20,23 45:2,18, 22 46:14,21 47:8,11, 15,18,23 48:5,9,16,20, 24 49:6,15 50:5 51:3,7 52:12,14,22 53:5,17 54:10,11,12,14,17 55:6,17,19 56:17 57:5, 11 58:1,8,10,13,21,24 59:1,6,11,19 60:7,15, 20 61:12,18,22 62:24 64:1,5,8,16 65:1,11,18 66:9,15,19 68:1,6,13, 21 69:5 70:1,14,23 71:1,10,17,22,24 72:3, 6,18 73:20 74:11 75:3, 10,14,21 76:10,17,20 77:3,19 78:11 79:1,11, 23 80:3,22,23 81:13 82:21 83:5,16 84:5 85:3,9,21 88:12,19,21 89:1,14 90:2,16,19 91:20,23 92:8,19 93:2, 3 94:4,15,19 95:3,13

96:2,4,20 97:9,12 98:9,12,14,16 99:14, 20 100:2,21 101:21 102:11,17 103:4,12,17 104:12,23 105:21 106:2,13,22 107:5,11, 20,24 108:2,21 109:12,17 110:13,21 111:1,11,24 112:3,11, 19,24 113:3,5,16 114:12 115:18,24 116:4,8,18,23 117:1, 17 118:14 119:1,7,13, 16,20 120:13 121:17, 23 122:6,18,22 123:6, 12 124:4,6,21 125:5,9, 17 126:4,11,19,22,24 127:19 128:10,20 129:8,21 130:3,11,21 131:2 132:3 133:10,18 134:1,21 135:1,4,6,9, 24 136:19 137:5,11,21 138:6 139:5,16 140:10,20,23 141:21 142:8 143:3,9,14,18 144:1 145:15 146:2,7, 16 147:10,14,18,21 148:5,10 149:1,3,9,15, 18,20 150:17,23 151:11 152:10,21 153:3,19 154:1,8,16 155:5,16 156:3 157:1, 8,16,22 158:6,10,13, 17,20 159:6,9,10,14 160:3,6,10,22 161:3 162:5,24 163:13 164:4 165:7,17 166:21 167:11,15 169:3,18 170:24 171:2,18,22,23 172:3,5 173:11 174:1, 14,16,24 175:17,19 176:3 178:21 179:19 180:4,12 181:10,14,20 182:11,20 183:18,21 184:9,21 185:6,12,14, 18,22 186:6,9,12,17 187:5,11 188:8,13,19, 22 189:1,12,21,24 190:3,15,21 191:6,12 192:24 193:2,8,11 194:7,15,21 195:1,11, 19 196:1,5 197:7,12, 21 198:1,3,15 199:1, 10,18 201:2 202:4,20 203:12,18 204:3,6 205:1,12 206:23

207:3,9 208:9,19,21, 24 209:6,18,24 210:12,23 211:3,12 212:5,13

**Miller's** 54:19 168:1

**million** 37:20 40:24 41:13,20 42:14,23 43:4,6,13,16 122:14 127:14 176:17 204:17 205:6,14,22

**mind** 79:16 154:6 160:13 177:3

**minimum** 42:23 43:6, 16

**minister** 67:9

**minute** 56:18 109:6

**minutes** 53:16 61:15 95:1 108:18 211:10,11

**mired** 131:6

**mischaracterize** 127:2

**mischaracterizes** 41:5 97:10 106:14 107:6 111:2 112:12 121:24 124:22 148:6 149:16 166:22 167:12 171:19

**misspoke** 20:3

**mix** 88:4 99:3 175:13

**mixed** 53:23 88:1 117:12 124:10 164:19 167:17 204:23

**MKSK** 74:1,20,24

**model** 79:7,14,16

**Monday** 101:19

**money** 82:14 126:6 129:5 175:18,24 176:6 211:6

**month** 118:11

**months** 118:11 208:6

**morning** 40:12

**move** 81:4 127:4 131:8,13 199:8

**moving** 74:19 129:9

170:7

**MPC** 208:7

**multi-family** 127:11
163:2 204:23

**multi-page** 134:21

**municipal** 114:4
206:19 207:5

---

**N**

**named** 24:16

**napkin** 182:17

**Nationwide** 78:3,6
79:21 128:9 129:23
130:13,18,22

**nature** 16:23 75:24
87:9 88:17 89:11

**necessarily** 187:8

**necessity** 175:20

**needed** 53:2 76:2 77:1
141:12 147:7 149:7

**negative** 115:8
156:23

**negotiate** 43:22 67:23
69:2 85:7,15

**negotiating** 33:23
34:3 35:4 36:8,10,11
52:4 66:17 105:5
106:21

**negotiation** 104:18

**neighbors** 89:7

**NEP** 129:11,13

**net** 43:6,7,14,16 177:8
181:21

**newly** 42:15

**NOI** 177:5

**non-lc** 83:22 84:2,10
162:17 164:11,13
167:21 172:24 173:4

**nonetheless** 97:21
204:16

**nonresidential**
167:20

**north** 32:2 85:20

**note** 195:3

**noted** 28:16 140:11
194:15

**notes** 135:17,20,21
136:5 137:10,15,20,22
138:24 139:8,18

**noticed** 19:22

**noting** 103:4

**number** 19:22 20:7
25:19 73:18 76:8
89:10 94:13 101:14
103:5 109:19 120:20
135:2,8 142:19 143:12
178:9 211:18

**numbered** 103:10

---

**O**

**oath** 17:19 172:5
195:1

**object** 47:19 48:7
56:18 125:8

**objected** 48:1

**objection** 13:21 14:15
15:7,12,17,23 16:24
17:11 18:12 20:2,11,
15 22:8 24:9 25:1
26:3,13,20 27:6,21
28:8,23 29:18 30:1
31:2,12 32:4,21 33:6,
14 34:2 35:23 36:5
37:3,12,21 38:22
39:16 40:6,11,17 41:2,
4 43:8,12 44:5,17
49:15 50:5 51:3,7
52:12,14,22 53:5,17
54:10 55:6 56:21 57:5,
11 58:1,8,13,21 59:1,
19 60:7,15,20 64:1,16
65:1,11,18 66:9,15,19
68:1,13,21 69:5 70:1,
14,23 71:1,10,17
72:18 73:20 74:11
75:10,21 76:10 77:3,
19 78:11 79:1,11,23
80:3,23 81:13 82:21
83:5,16 84:5 85:3,9,21
88:12 89:1,14 90:2,19
91:20 92:8,19 94:4,15,

19 95:3,13 96:2,20
97:9 98:9 99:14,20
100:2,21 101:21
102:11,17 104:12,23
105:21 106:2,13,22
107:5,11,20,24 108:2
109:12,17 110:13,21
111:1,11 112:11,19,24
113:16 114:12 115:18,
24 116:4,18 117:17
118:14 119:1,7,13
120:13 121:17,23
122:6 123:6,12 124:4,
6,21 125:5,17 126:4,
11 127:19 129:8,21
130:3 131:1 132:3
133:10,18 134:1
135:24 136:19 137:11,
21 139:5,16 140:20
141:21 142:8 143:3,9,
18 144:1 145:15
146:2,7,16 147:10
148:5 149:1,3,9,15
150:17,23 151:11
152:21 153:19 154:8,
16 155:5,16 156:3
157:1,8,16,22 159:6,
14 160:3 162:5,24
163:13 164:4 165:7,17
166:21 167:11 168:1
169:3 171:18 172:1
173:11 174:1,14,24
175:17 176:3 178:21
179:19 180:4,12
181:14,20 182:20
183:18 184:9,21
186:6,12,17 187:5,11
188:13 190:15 192:24
193:2,8 195:11 196:1
197:8,21 198:1,15
199:18 201:2 202:4,20
203:12,18 205:1
206:23 207:3 208:9,
19,24 209:6,18,24
210:12,23 211:3

**objections** 41:15,22
42:18 43:18 59:6,11
75:14 88:19 111:24
112:3 128:10 153:3
160:22 161:3 207:9
212:5

**obtain** 44:16 51:6 53:2
57:3,8,16,23 58:6,16
59:10 60:19 61:8 67:2
75:9 78:19 105:19,23

107:22 112:23 114:10
147:7 151:7 157:20
210:2,4 212:3

**obtained** 40:13 94:24
209:20

**obtaining** 37:9 44:4
45:16 49:14 54:3,8
178:17

**occasions** 114:17

**occupancy** 196:13

**occurred** 90:23 91:17
93:1 115:10,13

**October** 101:15,20
102:18 150:12 153:18,
24 154:12 162:11
184:19 186:5 199:17
200:22 202:2,9,13

**offer** 68:8,11,18,20
69:16 72:11,15 79:24
200:24 201:24 204:19
205:6,22

**offering** 106:7

**office** 88:4 163:3

**officer** 14:4 59:15
78:5 113:8 123:10
159:19

**officially** 154:7

**offline** 189:15

**Ohio** 23:21 24:21
55:4,23 92:18 120:5,6
123:1 124:16 130:15

**Ohiohealth** 82:19
83:3,10

**operating** 177:8
181:22

**opinion** 117:16,20
119:4 186:22

**opponent** 134:2

**opportunity** 130:8
139:13

**opposed** 89:11 97:4

**opposing** 141:3

**opposition** 91:14
92:16 95:21 96:10
107:14,18 143:23

oppositions 107:15

option 174:9

order 53:3,8 58:6 77:2
81:3 99:12 118:12
148:23 149:13 154:14
182:3 190:11 212:16

organization 16:13
86:7 131:22 132:1
135:22

organizations 67:10
115:2

originally 172:15
200:6

outfit 152:1

outline 69:23 70:8
81:2

outlined 85:8,15
89:12 96:7 150:21
152:1

outlines 70:21

outlining 85:6 87:4

outreach 95:23 96:14
145:12 149:21 155:18
209:8

overcome 92:16

owned 123:14 124:11,
12 125:13 201:1 203:8

owner 16:3 123:20
124:18 125:21 126:20
129:7

owners 16:6 78:17
123:21

ownership 15:6 84:18
124:8

owns 77:14 85:4
122:2 123:15,22
161:14 168:7

Oz 170:1

P

p.m. 212:22

pads 81:21

pages 131:11

paid 65:12,16 67:8,11

paragraph 71:14
72:12 81:7,20 169:10

Pardon 135:5

parenthesis 199:24

park 210:11,22

Parker 133:12 134:6
136:16,23 137:3
138:20

parkland 98:3,18

part 22:22 82:3 95:6
166:1

participate 83:2

participated 31:6

partner 71:7

partnered 111:21

partners 22:16 78:3,6,
15 79:21 130:14,19,22
161:13,15

parts 124:9

party 182:13 199:4

passage 146:21
149:13

passed 152:20

Patti 199:5

Paul 13:14 32:14 45:3,
18 46:21,24 47:16,19
48:16 58:10 61:12
71:22,24 108:2 130:11
138:6 152:11 155:21
158:7 182:12 188:8,23
190:5,23

pause 56:17

pending 17:3 21:17

people 19:19 54:6
61:5 70:6 81:3 95:10
97:18,19 99:16 101:14
108:10,12 111:20
114:23 115:1,3 128:24
133:4,8,11,13 135:18
136:2 141:7,16 152:5,
6 154:20,21 156:13
159:21 164:16 165:4,
5,12 188:1 212:2

percent 16:3 122:24
123:14,15 125:21

percentage 177:12

perfect 103:6

period 51:20 93:5

permit 53:9

person 125:3 155:10
159:3,7

personal 47:4,5 86:10
161:7 162:16,17

personally 37:17,19
39:14 41:1,14,19
42:13 43:17 59:20
60:3,18 68:20 75:8
77:7 84:13 116:13
123:5 160:13 165:21
166:4 194:2 209:12

pick 21:20

piece 23:20 64:24
167:4,19,20

pieces 183:7

Pizzino 38:21 39:1,3

Pizzuti 105:14

place 52:24 105:10,12
147:1

places 128:18

Plaintiff 17:9 28:13
40:23 41:11 125:18

Plaintiffs 123:18
143:19 168:11

plan 24:22 26:17 27:5
28:3,6,14 53:8,10
76:2,3 96:7,8 107:14,
18 118:12 133:23
134:2 143:24 147:1
175:3,6 206:17,20,21
207:2,6,8 209:16,23
210:5

planner 74:4,20 75:1

planning 114:5 147:8
170:17,19,20 182:18
206:20 207:5

plans 76:6 94:1,6
106:1 107:16 154:23

plat 49:18

play 13:24

PM 26:2

point 46:20 61:19 65:8
102:14 103:13 119:18
159:3,7 162:8 170:8
171:13

points 87:5 130:12

politicians 157:20

portion 82:19 83:10
167:10 174:3 179:2

position 146:20
149:12

positive 168:5

possesses 192:9

possession 197:5

Powell 120:9,12

precise 113:6

prefer 133:15

premises 24:14

preparation 18:24
36:22 53:13,18 94:10

prepare 18:10,21
19:13 70:2 154:23

prepared 70:6 135:22
139:4

present 31:11 91:11
95:6,10 114:21 187:20

presentation 31:7,10,
11 86:12 87:3 90:17
93:3 135:18 138:24
140:17,23 141:1,9
183:16

presentations 114:3
141:8

presented 207:12

presenting 121:20

president 54:21
164:14

pretty 179:17 193:6

preventing 208:15

previously 31:15 34:9
197:13

**price** 51:1,6 52:3,4 105:5 106:8,17,19

**pricing** 106:16

**primarily** 77:11

**principles** 96:6

**printer** 135:12

**printing** 135:13

**prior** 27:1 41:5 97:12 105:9 106:14 107:6 111:2 112:12 113:3 124:22 166:22 167:12 171:19 172:3 212:15

**private** 123:24

**pro** 183:10,11,13 184:18 190:11 195:23

**pro-development** 157:14

**problem** 135:13

**proceed** 118:7

**proceeds** 71:8

**process** 17:17 95:24 96:14 189:4 203:10

**produced** 102:3,5 135:10 143:11,19 185:7

**product** 115:9 156:10, 11 171:6 176:10,11

**products** 78:9

**profit** 71:18 77:2,10 78:19,23 79:3 82:13 163:10 198:10

**profits** 82:18 83:3,10, 14 84:14

**project** 52:19 54:7 58:12 81:4 97:23 118:20 126:9 128:4 129:24 145:13 156:5, 18,21 162:21,22,23 163:3 164:19 167:8 169:13 170:7 171:3,21 175:1 177:5,23 178:9, 11 179:24 181:16,17, 24 182:3,18 183:2 188:6 190:13,14 192:15,17,23 194:13 198:18

**projected** 127:13 187:6

**projections** 177:13 190:11

**projects** 70:17 124:9 156:6 159:12 162:19 167:18 178:4,5 180:19,21 181:11 198:17

**properties** 49:19,22 53:23 54:4 56:23 79:22 153:7 174:5 175:14

**property** 23:21,22,24 24:2,7,24 26:18 27:24 28:21 29:24 31:1 33:24 34:4 35:22 37:2, 10 39:15 41:13,20 42:15 43:22 44:4 45:16,17 46:3 49:14 50:20,21 51:9,10 52:10,19 53:3,7,16 54:7,8 57:10 58:7,17 59:4,10 60:6,19 61:9 62:12 64:22,24 65:23 66:6,7,14 68:12,19 69:4 71:6 72:15 73:7, 18 76:9,23 78:17 79:8 86:14 89:4 100:18 102:16 105:18 106:9 113:14 115:17,22 117:23 121:21 123:20, 21,23 124:15,23 125:19 129:20 133:24 151:8 153:16 155:1 157:6 159:4 160:1,15 162:10 163:23 165:2 167:5,18 168:4,8 171:15,16 173:8,9,22 174:4,11,22 175:16 176:2 184:1,20 186:5, 16 201:1,6 202:2,12 203:16 204:19 205:7, 10,21 208:17 209:4,21 210:3,5,10,21 211:7

**proposal** 28:4,19 29:22 70:8,9 86:13 87:9,15 88:9,18 90:18 91:14,15 95:11,21 97:5 99:13 107:23 108:14 119:11 128:3 154:11 166:20 168:14 183:24 184:7 187:24

188:3 198:11 201:10 202:8 208:6 210:21

**propose** 87:24 94:12 118:1 175:14

**proposed** 118:3,4 146:18 190:13,14

**proposing** 26:18 27:4 29:8 117:21 134:3 174:12

**protective** 212:16

**prove** 187:9,12

**provide** 15:14 16:15 17:18 77:21 121:13 129:6 140:8 185:2 190:19 192:20 193:9 194:11 196:16 212:3

**provided** 28:2 68:8 193:14

**provision** 44:12

**public** 94:3 130:14 145:11 149:8 154:11 172:19 207:7,13,21 209:3

**purchase** 34:4 35:5, 20,21 37:2,10,13 44:8, 15 64:22 122:15 202:2 204:19 205:6,10 211:6

**purchased** 205:21

**purchasing** 64:24 66:14

**purpose** 62:10

**pursuant** 37:10

**pursue** 163:23

**pushback** 88:10,16 89:5,7 107:4,9 118:23 154:11

**pushing** 155:14

**put** 82:14 112:9 120:12 160:24 176:10 183:10 200:9

**putting** 125:24

---

**Q**

**qualify** 54:17

**quality** 115:9

**quest** 89:16 114:10

**question** 16:1 17:21, 23 18:5,6 19:15,17 21:16,17 29:6 31:4 41:6 45:2,22 46:24 48:2,7,17 55:3 57:13 58:14 59:17 61:6,7 64:10,12 65:20 68:10 70:16 71:2 72:1,13,20 76:18 79:2 80:5,6,8 89:17 95:19 98:17 100:4 102:19 108:4 111:16 121:18 122:20 124:7 125:6 127:7 130:24 131:3,13 139:12 141:4 143:14 145:23 147:14,17,24 148:17 151:2,5,14 152:11,14 155:17,21 160:8 172:7,8 174:17 176:4 186:19 188:9, 10,17 189:7,8,10,13, 16,20 190:8 193:6,12, 14 194:23,24 196:2,6 199:23 206:10 210:19 212:1

**question's** 110:15 151:4

**questioning** 131:9

**questions** 17:18 44:21 46:22 47:15,18 49:8 63:2 72:4 131:10 187:13 190:4 195:3 198:4 201:20 211:21 212:10

**quickly** 131:8

---

**R**

**R-E-C-H-E-L** 86:9

**raise** 98:2

**raised** 98:6

**raising** 47:21

**ran** 157:5

**rarely** 109:19

**rate** 177:23 180:1 183:1 186:3,7,13,15, 22 187:1,3,14,23

188:4

**rates** 179:6,7,9 181:23
190:12 196:13,14,15

**Rea** 63:9

**reacted** 29:22

**read** 19:18 41:10
46:15 53:10,21 71:13
72:22,24 89:22 102:21
127:6,8 131:12,14
146:1 172:8,9 193:5,7
199:13 212:13

**reading** 35:15 41:9
52:6 133:19 160:20
203:17 204:1 205:5

**ready** 62:4 103:15
158:22 201:17

**real** 35:5,19 44:8
45:20 120:4 125:11,12
162:17 163:18 164:16
167:3

**realize** 168:2

**reapplied** 208:5

**reason** 143:7

**reasons** 207:20

**recall** 19:12 25:3,4
29:14,15,20,21 30:2
33:7,11 37:8,9 40:18
41:19 44:23 46:15,18
51:5,12 52:5,8,23
60:12,18,24 61:1,7
62:7,13,15 73:3 74:18
75:6,13,16 76:11
83:18 86:6,8 87:3,21
90:5,6,7,20 91:13 92:6
93:7 94:9,16 97:1,7,
16,17 98:7,12 99:3,7
109:4 114:18,22 115:6
117:21 118:9,10,16,17
119:5 131:21 139:18
141:11,18,19,23 142:5
153:4,6 157:18 186:7,
13 187:1,14 200:22

**receive** 40:5,9,14
101:17 167:7,9 168:13
180:9

**received** 40:12 93:18
97:5 102:9 150:15
153:2 188:5 194:8
202:19

**receiving** 93:7 153:9
200:23 202:5

**recently** 31:23 34:15,
16 55:5,13

**recess** 23:15 38:3
62:2 103:19 108:22
119:23 166:7 211:14

**Rechel** 86:9,24

**recognize** 138:18

**recollection** 28:19
39:13 41:11 132:15
133:3 150:19 151:6
201:24 205:13

**record** 13:2,9 19:18
23:13,14,17 25:9,11,
16 37:23 38:2,4 62:1,3
72:24 75:4 89:22
102:21 103:18,21
108:24 119:22 120:1
122:19 127:8 131:14
146:1 150:5 166:6,9
172:9 191:3 193:7
207:21 211:13,15
212:18

**recorded** 197:4

**reevaluate** 209:15

**refer** 23:24 26:16
48:14 71:14 162:17

**reference** 167:21

**referendum** 109:10,
15,22 110:12,19
111:5,10,15,22
112:14,18 119:6,8
120:11,17 149:14
152:20

**referendums** 110:17

**referred** 28:15 48:22
62:11 131:22 170:10
194:9

**referring** 30:9 44:6
48:18 83:23 113:8
141:1 163:19 164:14
169:13

**refers** 194:9 195:8

**reflects** 64:2

**refresh** 28:18 39:13
132:15 133:3 150:19

151:6 201:23

**refreshes** 41:11

**registered** 110:6,10

**regret** 191:6

**regulations** 128:12

**reiterated** 95:15,18

**reject** 207:23

**rejected** 207:20 208:1

**rejection** 208:7

**relate** 194:12

**related** 79:24 128:12
172:23 212:15

**relates** 171:20

**relation** 115:12
206:21

**relations** 145:11

**relationship** 67:17
204:14

**relative** 203:10 212:15

**relayed** 111:12

**relevance** 78:12
127:20 130:4 189:13

**relevant** 129:9 197:23
198:5,9

**relying** 111:9

**remain** 96:6

**remained** 92:18

**remember** 26:23,24
27:1,3,7 29:7 31:9,14
32:16 35:16 37:18,19
39:18 40:19,20 41:3,7,
8 42:13 43:21 44:14
45:5,13,14,21,24 46:5
51:15,18,22,23 52:1,2
53:11,22 67:13,14
73:6,15,16 74:22,23
75:2 77:5 82:22 86:15
87:17 91:2 98:18,19,
21,24 100:8,17 104:8
113:2 114:19,21 115:4
118:19 119:3,14
141:6,9,15 150:24
153:9 184:4 193:21
202:5,6 205:19 211:20

**remembered** 19:20
201:4

**remind** 205:9

**rent** 77:15,17 79:5,10
128:24 176:12

**rental** 78:24 79:6 88:3
178:10 196:14

**renters** 129:7

**rents** 176:8 180:8
181:23

**repeat** 19:15,16 58:14
68:10 72:13,20 83:7
89:16,19,20 102:19
121:18 145:22 151:5
193:3 210:18

**rephrase** 18:1 190:7

**report** 57:9,14 151:20
159:21 177:19

**reported** 159:22

**REPORTER** 25:8
42:10 62:22 101:3
120:22 150:4 158:9
198:24

**reports** 153:8

**represent** 13:14
165:19,21

**representative** 36:14

**representatives** 76:5
148:22

**represented** 66:21

**request** 15:15 28:13
47:5 99:17 118:13
140:8 185:7,17,19
190:23 191:3,9 194:20
195:4

**requested** 19:18
72:24 89:22 102:21
127:8 131:14 146:1
172:9 193:7 195:5

**requesting** 191:7

**requests** 140:10
157:21 191:10 194:16,
22

**require** 43:3

**required** 52:11

**requirements** 56:23
57:17

**resells** 78:9

**reside** 22:20,24

**residences** 79:9
129:19 175:14

**resident** 91:7 97:17

**residential** 27:5 52:21
72:16 73:19 77:1,12,
14,22 79:4 94:13
127:12 133:23 155:15
163:2,4 166:1,19
167:9,19 170:21
172:13 174:4 176:21
178:10 179:2 180:7
184:2 187:4 188:7

**residents** 92:11,21
93:2 100:16,20
109:20,23 130:9
131:19 147:3 209:16

**resolution** 210:9,10

**respect** 47:12

**respectful** 47:21
48:10

**respectfully** 188:8

**respond** 95:24 96:15
97:8 206:2

**responses** 194:11

**responsibilities**
164:9 165:1

**responsibility** 165:19

**responsible** 164:10,
11

**responsive** 140:11
195:5

**responsiveness**
194:17

**results** 153:1,12

**retail** 83:14 84:2,7,15
88:4 163:3 166:2
167:8 204:24

**retail/residential**
83:20

**retain** 145:10

**retained** 145:19 151:9

**retaining** 150:20

**retired** 34:15 55:2

**retirement** 182:13
199:4

**return** 82:15

**revenue** 167:7

**review** 18:23 25:20,22
27:14 32:9,13,23
35:11 38:12 40:2 49:4,
10 53:15 63:4 80:14
86:21 93:15 101:9
103:23 121:3 132:12,
24 134:19 136:11
139:13,19 142:16
144:10 145:2 150:8
158:24 168:21 191:20

**reviewed** 19:13 36:22
53:13

**reviewing** 134:22
139:18 199:2

**rezone** 53:3,7 57:9
58:7 59:4 60:5 121:21
153:16 159:24 160:15
162:10 174:10 186:5
202:11 208:17 210:10,
21

**rezoned** 50:20,22
52:11 72:16 73:8,18
89:5 91:19 107:2

**rezoning** 44:4 45:17
46:13 49:14 54:3,8,9
56:23 57:3 58:16
59:10 60:19 61:8
88:24 102:16 105:19
112:10,23 113:14
114:11 145:20 146:13,
18,21 148:7,24 149:13
151:7 152:19 157:20
159:5 206:14 209:17,
21

**ridiculous** 131:5

**right-hand** 38:15
80:18 142:20 143:12

**risk** 178:3

**road** 129:24

**Robinson** 114:15
115:7,16 133:16,22

**Rogers** 200:20 201:8

**role** 13:24 23:2 34:23
35:4 36:8,11 54:19
56:7 59:18 65:2
118:21 124:17 159:13

**roles** 34:13 164:8
165:1,15

**room** 199:8

**run** 170:8 171:12,13

**runs** 164:15 170:16

**Rusty** 114:20

**Ryan** 172:19

**S**

**S-H-O-W-E** 203:1

**S1** 52:20

**sale** 71:8 170:6 171:8

**salesperson** 170:18

**Sam** 63:20,21 64:13,
23 65:21 144:15
170:8,10,13,14,15
171:12,13 173:2

**Saperstein** 151:21,24

**schedule** 64:18
103:16

**school** 20:19,21
154:21

**schools** 99:1

**Schumacher** 13:7,14
19:16 20:5 21:18 23:9,
12,18 25:6,10,17 26:5,
8 27:16 28:12,17
32:10,12 37:23 38:8
39:22 42:1,3,7 44:7,22
45:1,4 47:3,10,13,17,
22 48:1,6,11,13,19,22
49:3 51:10 56:20
58:23 60:1,2 61:17,20,
23 62:4,6,21,23 63:3
64:3,7 68:5 69:10,15
72:2,22 80:2,13 86:20
89:20 90:13 93:14
96:11 98:11,13,15
101:1,8 102:20 103:2,
9,14,22 108:19 109:1
111:14,17 112:15

116:24 119:19,21
120:2,20 121:2 125:8
126:16,21 127:4
130:20,23 131:11
132:11,23 134:14,18,
23 135:3,5,7,16
136:10 137:23 138:5,
8,12,14,17 140:7,13,
15,22 142:11,15
143:15 144:4,9,19
145:1,24 147:16,19,23
148:1,9 150:3,7
152:12,13 158:2,8,11,
15,18,23 160:5,11
161:18 162:1 166:5,
10,16,24 167:13
168:16,20 171:22
172:1,4,6 185:16,20,
24 186:1 187:16
188:10,21,24 189:6,
19,23 190:1,7,9 191:2,
9,14,19 193:5 194:7,
19,23 195:7 196:4
198:2,23 199:7,12,14
201:12,19 203:21
211:9,16 212:9

**scope** 95:11 164:18

**scoring** 130:13

**Sean** 26:1 27:19

**secret** 148:3

**section** 48:15,23 49:4,
8,10 172:22

**section's** 50:11

**secure** 155:2

**securing** 145:20

**seek** 209:17

**seemingly** 59:23

**sell** 81:21 82:9 167:19
172:15,20

**selling** 82:5,7 170:20
172:12,18 206:5,12

**send** 104:7 185:1,3

**sending** 137:9 164:24

**senior** 130:9

**seniors** 129:19

**sense** 166:1

sentence 81:9 170:4

separate 167:20

September 26:2,4,5,
7,8,12 27:19 63:8
64:13

served 119:16 185:18

service 128:13

services 77:21 78:1
128:23 130:2

set 166:13,18 167:2

setup 135:12

shakes 120:19 157:11

share 82:18 83:10,13
84:14 86:1 118:22

Shopping 141:10

short 61:15

show 90:24 180:19

Showe 202:7,23,24
203:1,2,3,4

showed 41:18 133:12

Showes 201:5

showing 42:12
187:10

sic 36:17

side 81:23 82:11
166:2,3

sides 163:10 165:24

sign 33:17 69:1

signature 212:19

signed 35:17 36:4
46:11

significant 88:9 91:14
96:10

silence 141:3

SILK 69:9 135:11
138:10 166:17

similar 79:21

simple 148:17 178:8,
19 179:17,21 212:1

simply 195:3

single 181:24

single-family 163:4
173:22 174:7,12
175:11

sir 25:22 29:6,13

sit 73:4 186:2

site 27:1,4 29:8 85:20
88:1 175:15 200:13

sitting 115:4 183:5
189:14

Sixteen 134:14

slow 74:19

soliloquies 47:6,8

sound 110:3 205:14

sounds 146:11 191:6

south 120:7 181:8

space 98:19 184:4

speak 94:17 116:2,9
125:4 134:10 136:5
152:11

speaking 130:24
191:14

speaks 71:11 96:5

specific 28:13 44:12
49:7 128:12

specifically 52:8 97:1
119:4 141:23 153:8
155:2 156:14 158:1
162:18

specifics 201:18

speculation 112:12,
16

Speculative 171:18
203:19

spell 181:3

spend 130:18,22

split 71:8,18 82:13

spoken 55:5,9,24
56:14

spreadsheet 182:5,
15

Square 141:10

Sr 22:18

stack 19:5

staff 21:24

standing 56:20

Stark 170:14,15

start 61:13 68:16
122:7 154:10

started 23:8 24:11,12
43:22 171:5,7,8,9
173:5 200:6

state 13:8 130:15

statement 101:18
172:20 188:9

states 53:24 128:14
130:16

stay 55:17 56:3

Steiner 117:11 156:16

stepped 42:7,8
188:11

Steve 161:6,7 162:3
163:17 164:12,21,23
165:10,20

sticker 103:8

stipulate 153:23

stone 141:3

stood 97:17

stopping 103:13
119:17

store 24:23 27:4 28:21
29:1

stores 29:5

stormwater 98:5,20

strategy 106:16

street 24:2 32:2 52:20
62:11 88:5 100:17,18
124:16 173:9 180:24
181:1,2,5,17

stretch 61:16

strike 127:5 208:14

studies 196:10

study 192:5,9

stuff 163:18 164:13,18
172:24 173:4

style 175:15,16

subdivision 49:18

subject 27:23 63:15
169:20 200:12

submarket 176:9

submetered 128:6

submetering 127:16
131:6

submitted 94:2
102:15 184:19

subsequent 49:18

substantial 180:1

successful 109:19
112:9 117:15,20 180:2

successfully 72:16

suggest 160:17

suggested 95:22
210:10

suggesting 194:19,
24

suggests 68:24 98:8

summary 40:10,15

supplement 194:10

support 141:12 142:3
146:13,18,21,24
149:8,13 156:8,18

surprise 146:10

survey 150:21 151:9
153:1,10,12

surveys 100:19

survive 109:10,15
110:19 111:10,22
112:17

swear 13:2

sworn 13:4

T

table 115:3,4

tactic 106:21

**taking** 81:7,11,17
178:3

**talk** 117:5

**talked** 18:19 91:3
94:14 107:9 122:9
128:8 156:12 166:12

**talking** 19:10 26:19
31:1 47:17 79:24
110:11 118:19 147:19
164:12 197:24

**talks** 71:12

**Tax** 21:24

**team** 58:18,21 159:11
160:19 163:6 177:17
182:22 184:23 196:8
209:13,14 211:5

**telling** 29:7,13 44:14
46:10 60:22 73:10
74:18,23 75:2 89:6
96:12 111:8 118:10
119:3,5,14 149:7

**Ten** 105:8

**tenants** 155:1,3

**term** 71:23

**terms** 56:23 70:21
71:4 156:7 178:8
201:9

**testified** 30:15 31:22
33:7 126:16,19 137:5
155:17 160:6 197:12

**testify** 14:21 45:6

**testifying** 46:21

**testimony** 33:8,16
34:1 41:6 97:12
106:15 107:6 111:2
112:13 113:3 124:22
127:3 148:6 149:18
151:23 166:22 167:12
171:19 172:3 212:21

**text** 192:20 193:4
194:9,11,20

**texts** 192:12 193:14
194:3

**that'll** 31:20 163:5

**thing** 95:20 140:16

**things** 81:8,12,18
97:15 182:4 185:11
196:22 212:2

**thinks** 203:23

**Thirteen** 120:22

**Thompson** 169:1,7
191:24 192:21

**thought** 55:13 65:15
135:9 137:5 193:6
204:13 205:15

**thoughts** 104:18

**tied** 178:2

**time** 20:13 25:21
26:22 27:14 31:18,20
32:8,12 34:18 40:13
49:6 50:1 51:21 58:10,
11 73:3 75:6 76:7
81:14 88:8,15 93:6
105:7 108:19 114:10,
18 116:16 134:7
138:11 139:22 152:17
196:21 197:1,14
198:11 202:19 206:22
209:8 212:11

**timeline** 154:6 160:13

**timelines** 159:24
160:9,19

**timer** 158:12

**times** 16:21 18:20
42:2,6 45:23 46:24
65:21 75:19 141:7
154:14

**timing** 99:15 132:16

**title** 14:3

**today** 14:20 18:11
36:23 73:4 140:11
186:2 189:14,15
194:16,22 197:15,24
208:18 211:18

**told** 43:5,15 47:3
95:20 110:3

**Tom** 60:13,14,18 61:1,
3,8 74:7,8,9 75:2
112:22 113:13 153:17,
21 164:2

**tone** 47:20

**top** 122:7 169:21

**topic** 141:19,24

**total** 167:4

**touch** 55:17 56:3

**Touche** 21:22,23

**town** 91:6 144:16

**townhomes** 172:13
174:19,23 175:11

**townhouses** 88:3

**track** 185:4

**traffic** 98:22

**treating** 47:23

**trial** 99:22 140:14

**true** 20:1 25:24 26:10
27:17 36:2 38:18
43:11 63:7 80:20
101:12 136:14 137:2
142:23 144:13 145:5
162:2 168:24 191:23
196:20 199:15

**trusts** 161:16

**truth** 204:15

**truthful** 154:4

**truthfully** 18:7

**turned** 206:1,10

**Twenty** 142:11

**Twenty-eight** 198:23

**Twenty-three** 150:3

**Twenty-two** 144:19

**two-story** 178:6

**type** 57:24 71:16
138:10 156:10 174:11
176:10,11

**types** 70:12 99:4

**typical** 156:5

**typically** 20:12 50:11,
21 57:8 76:4,12 77:14
146:23 152:6 156:19
157:19 159:10,20
164:20 167:17 173:5
176:8 177:4 178:2
196:7

## U

**Uh-huh** 120:18

**ultimately** 34:5
148:23

**UMCH** 23:22 27:24
33:12,23 35:22 39:6
54:7 58:16 65:4,5,6
66:14,18,21 67:4,23
68:19 69:3,16 70:10
71:5 72:11 78:19 83:4
86:2,14 101:18 104:19
121:22 145:7 160:1
169:13 171:16 173:9
201:1

**UMHC** 36:17 64:20
65:2 67:8 82:14
104:13,16 105:6

**unanimous** 207:5,19

**understand** 14:3,20
15:24 17:21,23 24:1
31:3 33:18 40:7 46:4
50:13 57:12 61:4
64:11 65:19 69:19
70:15 71:2 76:2,6 79:2
95:18 100:3 102:2
108:3 113:10 125:6,10
126:24 141:5 151:13
155:9 160:5 166:13
167:14 174:17 176:5
185:10,11,12 189:10
196:2,5,6 205:5
207:24

**understanding**
115:21 123:9 161:2

**understood** 18:6
193:4

**undeveloped** 82:17

**unentitled** 106:20

**United** 32:1,19 33:5
62:9

**units** 72:17 73:12,19
77:1,12,15,22 78:24
79:4 88:2 173:4
178:10 180:16,20,22
184:2 188:7

**University** 21:4

**unzoned** 106:19

**upcharge** 130:1,9

**update** 210:5

**updates** 144:16

**upset** 165:22

**urgent** 158:14

**utilities** 127:17 128:7

**utility** 77:21 78:1,8
128:13,22 129:6
130:2,14

**utilize** 79:20

**V**

**vacancy** 196:14

**vague** 120:14

**venture** 62:8 65:17
69:20 70:10 71:5 75:7
78:18 82:12 83:11
84:3 118:1

**versus** 148:7 185:9

**village** 120:8,9,12

**voice** 47:23 75:3

**volunteer** 67:11

**Vorys** 22:11,14

**vote** 207:5

**voters** 108:12 110:7,
10 111:22

**voting** 110:11

**W**

**wait** 51:19 76:17
122:18

**waived** 212:19

**waiver** 51:24 67:2
69:1

**waiving** 51:5

**wanted** 19:21 29:16
86:2 146:17,20 154:6
160:14 163:23 165:11
166:11 186:15 200:24
201:5

**wanting** 51:19
206:22,24

**WARD** 86:7,13 91:6

**WARD's** 91:24

**watch** 207:16

**waterfall** 71:19 72:5,8

**WEC** 90:22

**Whitt** 17:13

**withdraw** 111:16
147:23

**word** 32:14 94:5
151:12 152:22

**words** 85:1 90:4

**work** 60:13 65:14,16
107:2 117:22 150:21
154:2,23 162:18
164:10,11,17,22

**work's** 120:7

**worked** 30:4 56:9
65:6,8 104:15 142:4
156:14

**working** 24:12 26:24
67:4 141:13 198:14,17

**works** 39:4 67:9 127:1
173:2

**worried** 109:21
112:13

**worth** 43:6,14,16
82:17

**Worthington** 13:15
14:24 15:2 19:23 20:3
23:21 39:6 40:22
42:15 75:8 87:4,16
88:10,17 89:11 90:22
92:18 93:8 96:1,12,15,
24 97:6,19,23 100:8,
20 109:11,24 110:7,20
111:23 112:8 113:24
114:4,5 116:15 118:24
121:16,22 123:1,5,14,
16,17 124:16 125:20
126:3,22 128:16,17
129:15 131:19 132:2
141:10 144:16 145:12,
21 146:14 147:7
148:11,14 152:17
157:4 162:10,21

**Worthington's** 74:19
131:23 133:4 136:3
207:8 209:22

**write** 49:19 50:18
92:12 136:22 170:5

**writes** 201:9

**writing** 63:23 64:15

**written** 197:20

**wrong** 103:3 199:20

**wrote** 64:12 81:21
85:23 137:3,14 138:19
169:10 203:20 204:7

**Y**

**Yaromir** 117:11
156:16

**year** 31:9 55:10
171:10

**years** 17:15 22:2
34:14 36:19 56:1,15
65:22 96:19 105:7,8
117:14 148:12 171:6
199:6 203:7

**yield** 176:24 177:2,4,
6,23 178:7 179:15
180:1,7,20,22 181:11,
16,18 182:1,3,18
183:1,14 184:7,17
186:3,7,13,14,22
187:1,2,10,14,23
188:4 190:11,12
192:5,9 195:9,22
196:9,21,24

**yield's** 180:11

**Z**

**zeroes** 38:16

**zoned** 49:19 52:20
107:12 109:3 174:4

**zoning** 44:16 45:12,
17,24 46:19 51:22
52:7,23 57:9,14,16
81:8,12,18 88:23
89:24 91:18 92:13
97:2 104:21 105:10,
12,23 106:12 118:13
119:9 146:24 156:1
168:14 173:23 178:18
206:16