## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**LIFESTYLE COMMUNITIES, LTD., *et al.*,**

          **Plaintiffs,**      :

                          **Case No. 2:22-cv-1775**

      **v.**                    **Chief Judge Sarah D. Morrison**

                          **Magistrate Judge Elizabeth A. Preston Deavers**

**CITY OF WORTHINGTON, OHIO,**      :

          **Defendant.**

## OPINION AND ORDER

This matter is before the Court on the parties' cross-Motions for Summary Judgment. (Def.'s Mot., ECF No. 60; Pls.' Mot., ECF No. 65.) For the reasons below, summary judgment is **GRANTED** to Defendant City of Worthington.

## I.    FACTUAL BACKGROUND

Worthington, Ohio is a northside suburb of Columbus known for its walkability and aesthetic charm. (Comprehensive Plan[1], 8, 29.) High Street runs north-south, splitting Worthington up the middle. (*Id.*, 5.) Dublin Granville Road

---

[1] Although the parties do not include the full 2005 Worthington Comprehensive Plan in the record, it is referenced, linked, and cited throughout. The Comprehensive Plan is publicly available online at www.worthington.org/ DocumentCenter/View/155/Comprehensive-Plan. The Court may "take judicial notice of a public record whose existence or contents prove facts whose accuracy cannot reasonably be questioned." *Passa v. City of Columbus*, 123 F. App'x 694, 697 (6th Cir. 2005) (citing Fed. R. Evid. 201(b)(2)); *see also, e.g., Wedgewood Ltd. P'ship I. v. Twp. of Liberty, Ohio*, 456 F. Supp. 2d 904, 909 n.1 (S.D. Ohio 2006) (Marbley, J.) (taking judicial notice of zoning resolutions and meeting minutes as public records). A court may take judicial notice at any stage of the proceeding. Fed. R. Evid. 201(d).

does the same running east-west. (*Id.*) At their intersection lies the Worthington

Historic District, where a Village Green, shops, and cafes provide the backdrop for a

summertime farmers' market. (*Id.*, 8.) Walk north on High Street just one-half mile

and you'll find a nearly 38-acre parcel of vacant land. (*See* ECF No. 69-1, PAGEID

# 2844.) Until 2010, a residential facility for orphaned and at-risk boys called the

United Methodist Children's Home (UMCH) occupied the site. (*See* June 29, 2015

MPC/ARB Mtg. Minutes, ECF No. 60-1, PAGEID # 703.) "UMCH has owned that

land for over a hundred years, and people could not have imagined that UMCH

would ever dispose of the land, but things change." (*Id.*) And when UMCH shuttered

operations, the property's future was suddenly uncertain.

### A.    2014: Worthington's Comprehensive Plan was updated to include the UMCH Focus Area Plan.

Worthington had a Comprehensive Plan to guide development decisions

within the city, but the Plan dedicated little attention to the UMCH property

because the site had not been "on the market[.]" (Comprehensive Plan, 2, 88–90.)

When UMCH decided it "no longer needed that acreage" and began discussing

development, "[c]ity officials asked UMCH to put things on hold while they

proceeded with a community wide process [to] come up with a comprehensive plan

designed only for the UMCH property[.]" (June 29, 2015 MPC/ARB Mtg. Minutes,

PAGEID # 703–04.) That community-wide process concluded on September 2, 2014,

when Worthington City Council adopted the Focus Area Plan, an amendment to the

Comprehensive Plan addressing the UMCH property. (Focus Area Plan, ECF No.

69-1, PAGEID # 2843–53; *see also* Am. Res. 39-2014, available online at

www.worthington.org/ArchiveCenter/ViewFile/Item/1307.)

The Focus Area Plan's stated goal is

to provide guidance as to the range of desired land uses and development in the event the private land owner and/or future developer requests rezoning of the property; and to assist the City with its review and evaluation of any proposal.

(*Id.*, PAGEID # 2843.) To that end, the document recites objectives and intentions

for the future of the property:

**Objectives**

As part of the update of this focus area plan, a group of consolidated objectives was created. These objectives include:

1. Consideration of the redevelopment potential of this site recognizing the critical resource and opportunity this 40+ acre site represents within the City.

2. Provision of a mix of desirable uses and green space that are compatible with surrounding neighborhoods and are currently underserved in Worthington.

3. Addressing the needs of current and future residents by providing new housing types/options that are underrepresented in the market and complement Worthington's current offerings.

4. Recognition of the financial goals of UMCH to enable it to continue its mission within the region.

5. Expansion of the City of Worthington's tax base by incorporating uses that allow for new or enhanced sources of revenue.

6. Preservation and integration of the existing natural features found on the site related to Tucker Creek.

7. Creation of a well-planned, vibrant, walkable, and integrated development of the highest quality that meets or exceeds current best practices for mixed use development, including the provision of communal space and complete streets.

**Design Intent**

Worthington was founded as a master planned community. Because of the size, location, and importance of the UMCH site, it is critical that any redevelopment be master planned and consider the site as a whole. The following sections provide a framework and direction to the City, reviewing Boards and Commissions, and potential developers as to Worthington's desired vision for any change of use and redevelopment that might occur on the site.

Building upon the previously stated objectives, redevelopment of this site must create a high-quality, mixed-use development that is walkable, connected, and integrated within the site and with the City. This mix of uses should contain a range of residential types together with commercial office and neighborhood retail uses integrated with contributing and shared green space and amenities – all of which complement each other to create an active, vibrant place. Any proposed design must be sensitive to the neighborhoods adjacent to the UMCH site, as well as to the natural features related to Tucker Creek. Any development that occurs within the focus area should relate internally to the site and to an overall plan, even if it is built at different times. For this reason, it is expected that any proposed redevelopment include rezoning of the entire site to a Planned Unit Development as an early step. Because of the importance of achieving the full potential of the UMCH site for the City and Worthington community, it is expected that public-private partnership(s) will play a role in the planning and redevelopment of this site.

(*Id.*, PAGEID # 2844–45.)

Today, the UMCH property comprises four different zoning districts:

| Zoning | Acreage | Use |
|--------|---------|-----|
| S-1 | 31 acres | Special (such as churches, parochial schools, colleges, and hospitals) |
| C-3 | 9.3 acres | Institutions & Offices (such as medical centers and real estate, insurance, and legal offices) |
| C-2 | 0.7 acres | Community Shopping Center (such as supermarkets, specialty stores, and retail) |
| R-10 | 0.5 acres | Low-Density Residential |

4

(*Id.*, PAGEID # 2844; Jan. 14, 2021 MPC/ARB Mtg. Minutes, ECF No. 60-4, PAGEID # 789–90; *see also* Comprehensive Plan, 18.) The zoning districts are arranged as follows:



*Current zoning for the UMCH focus area.*

(Focus Area Plan[2], PAGEID # 2844.) The Focus Area Plan proposes "future land use zones" for the property, informed by the Design Intent statement and Objectives. These zones include a mixed-use district fronting High Street, a single-family housing development bordering the existing residential neighborhood, a dense "Neighborhood C" on the interior, and a natural preserve surrounding Tucker Creek at the property's south end. (*Id.*, PAGEID # 2845–48.)

---

[2] Graphics are copied from the more legible version of the Focus Area Plan publicly available at www.worthington.org/ArchiveCenter/ViewFile/Item/1307.



*Future land use zones for the UMCH focus area.*

**B.    2015: UMCH and LC presented a concept proposal at a public meeting; residents expressed concerns.**

Nine months after the Focus Area Plan was adopted, UMCH executed a Development Agreement giving LC exclusive rights to develop and market the UMCH property. (Development Agreement, ECF No. 74-1, PAGEID # 4142.) The parties' rights and obligations under the Development Agreement hinged on Worthington City Council's final approval of a rezoning plan. (*Id.*, PAGEID # 4143.)

On June 29, 2015, just three days after the Development Agreement was signed, LC presented a conceptual development plan for the UMCH property at a public meeting of Worthington's Municipal Planning Commission (MPC) and Architectural Review Board (ARB). (*See* June 29, 2015 MPC/ARB Mtg. Minutes.) David Fisher, LC's attorney and former-chair of UMCH, opened the meeting by discussing the property's history and potential. (*Id.*, PAGEID # 703–04.) Chase

Miller, LC's head of land development, then presented the concept proposal. The proposal included 571 residential units—ranging from single-family homes to apartments—along with a medical office, mixed-use retail, and office space. (*Id.*, PAGEID # 705–06, 732–49.)



(*Id.*, PAGEID # 727.) Mr. Miller likened the proposed High Street corridor to Disney World, with "mechanicals" (such as parking garages) hidden behind buildings fronting the street. (*Id.*, PAGEID # 706.) He also described the development's "amenities package," including a gym, a restaurant, and four "park areas." (*Id.*)

After LC concluded its presentation, the floor opened for public comment. The first person to speak was a Worthington resident representing the Worthington Alliance for Responsible Development (WARD), "a citizens group that was formed in 2012 . . . to ensure that the development of the UMCH property is done responsibly, with the consideration of benefits to the citizens." (*Id.*, PAGEID # 707.) WARD

"expressed concern over the lack of proposed green space, the housing density, and the traffic to be generated by the proposed streets." (*Id.*) WARD disagreed with the mix of housing types set out in the Focus Area Plan, suggesting that it did not reflect realistic solutions for young professionals or empty nesters. (*Id.*) Because LC's proposal was based on the mix in the Focus Area Plan, WARD asked: "[D]oes Worthington really need 350 new apartments[?]" (*Id.*) Finally, WARD spoke "in favor of there being a larger amount of green space." (*Id.*)

Twenty-seven other residents offered comments. A few were excited about the proposal. For example, one man lauded LC's "talented group of world class designers" and advocated "tak[ing] the time and effort [to] go through the [development] process without being cynical," recognizing that "[d]ensity will be coming to Worthington at some point in time and that is called progress." (*Id.*, PAGEID # 710.) But a clear majority shared WARD's concerns: density (*id.*, PAGEID # 707, 708, 709, 714, 716, 717), increased traffic (*id.*, PAGEID # 707, 709, 717), loss of existing green space (*id.*, PAGEID # 707, 708, 709), and the impact on public services like schools and stormwater management (*id.*, PAGEID # 709, 711, 714, 716, 717). While many spoke at the meeting, at least two expressed a belief that public sentiment was being "ignored," with apparent concern that LC and Worthington officials were engaging in "back room deals." (*Id.*, PAGEID # 703, 710, 713, 715.) One of those two commenters was Doug Foust, who later served on Worthington City Council and the MPC—he attributed the "disconnect" to "basic fundamental flaws" in the Comprehensive Plan. (*Id.*, PAGEID # 710–11.)

Two weeks after the MPC/ARB Meeting, Worthington City Council sent LC a letter summarizing their take-aways:

> We remain committed to the principles outlined in the Comprehensive Plan and to the [MPC] process. At the same time, we are mindful that Council has been elected to represent the interests of all Worthington citizens and that we must always endeavor to do what is best for the community.
>
> The [UMCH] site is one of the best opportunities for redevelopment in all of Central Ohio and is vitally important to Worthington. We trust that you also appreciate the significance of this development to all Worthington citizens and will continue to engage in a comprehensive, inclusive community outreach process to listen and respond to the interests of Worthington citizens.
>
> The Comprehensive Plan provides a framework for development. There are numerous ways in which the expressed goals can be interpreted and translated to the site. We understand that your presentation represented an initial concept rather than a formal application or final proposal. Issues raised by the community such as creating abundant green space and parklands, effectively dealing with stormwater, cautiously managing the impact of traffic on adjacent neighborhoods, school capacity, the mix of housing types, amount of residential units and the sizes of buildings are among the many issues you should incorporate into future discussions, studies and conceptual plans.
>
> We trust that a proposal for this land that positively shapes the future of our community can be achieved through dialogue with the community, formal and informal neighborhood and community discussions, interaction with City planning personnel and eventually a thorough review by the [MPC].

(ECF No. 70-1, PAGEID # 3261.)

LC's concept proposal remained a topic of contention in Worthington, and in City Hall. At their October 12, 2015 meeting, City Council adopted (by a five-two vote[3]) the following Statement Regarding UMCH Development:

_____

[3] Minutes from the October 12, 2015 meeting are available online at www.worthington.org/ArchiveCenter/ViewFile/Item/1665.

WHEREAS, the City has had a long established process for reviewing development applications with consideration by the Municipal Planning Commission (MPC);

WHEREAS, any changes in zoning approved by the MPC must be approved by City Council with additional opportunity for public comment;

WHEREAS, this process provides notice to the public and an opportunity for the public to review and comment on the application and the MPC has delayed consideration of applications when it considers sufficient input has not been received;

WHEREAS, this process has successfully helped the City to develop and redevelop areas of the City;

WHEREAS, this process is being followed in the development of the United Methodist Children's Home and the City encouraged UMCH and its developer to present potential plans to the public for discussion;

WHEREAS, plans were discussed with neighbors and at a special MPC public meeting;

WHEREAS, attendees at the meeting had significant opposition to the plan and City Council sent a letter to the developer stating the citizens' comments should be considered;

WHEREAS, no development plan has been submitted to the City; and,

WHEREAS, some citizens have indicated that the City Council supports the preliminary plan presented by the developer.

NOW LET IT BE KNOWN THAT CITY COUNCIL:

- Has never supported nor does it support the plan presented by UMCH and the developer,
- Supports the proven process, including public input, for considering development issues, and,
- Will only support UMCH redevelopment that enhances the community and meets, in the broadest sense, the objectives of the Comprehensive Plan.

(*Id.*, PAGEID # 3262.)

### C.   2016–17: Progress on the property stalled.

After Worthington City Council adopted the October 12, 2015 statement, progress on the property slowed. (*See, e.g.*, Robinson Dep., ECF No. 62-1, 20:14–17.) But three significant developments did occur over the next two years.

First, on April 18, 2016, Worthington City Manager Matt Greeson spoke to David Fisher about the status of development efforts. UMCH and LC had come up with a "revised development strategy that included a reduced number of apartments (250), more emphasis on empty nester housing, no Evening Street curb cut and a community meeting facility." (ECF No. 65-3, PAGEID # 1892.) But "outreach to community stakeholders" revealed "a lack of support." [4] (*Id.*)

Second, on April 20, 2017, UMCH and LC entered into a Real Estate Purchase Contract that superseded the Development Agreement. (ECF No. 61-1, PAGEID # 1013.) Under the Purchase Contract, LC would purchase the property from UMCH over several years for $ 6 million, as long as the property was rezoned. (*Id.*, PAGEID # 1022–23; *see also* Brownlee Dep., ECF No. 61-1, 43:9–20.)

And third, David Robinson was elected to the Worthington City Council in the November 2017 election. (Robinson Dep., 9:5–7.) Before being elected to City

---

[4] Upon finding a lack of support for a revised proposal, UMCH and LC initiated talks with a large health system to develop a 30,000 square foot medical office facility on High Street. (ECF No. 65-3, PAGEID # 1892.) City Manager Greeson emailed City Council members to share the news. He noted that, "[w]hile piece meal development of such a large site is not ideal," it was nevertheless "a positive step that a portion of this project is moving forward[.]" (*Id.*, PAGEID # 1893–93.) The deal ultimately fell through, with the health system walking away "after they were unable to come to an agreement with the property owner to move forward on the site." (ECF No. 60-5, PAGEID # 851.)

Council, Mr. Robinson participated in citizen-led initiatives focused on land-use in Worthington. For example, he "spearheaded" a 2015 ballot initiative to extend the time for citizens to force a referendum after rezoning decisions and to prohibit emergency rezoning. (*Id.*, 14:14–17, 15:16–16:20.) In Mr. Robinson's words, the initiative "restored the right of folks in the city to have a say about rezoning, which is a big issue [that] often creates effectively permanent change in the community." (*Id.*, 16:16–20.)

### D.   2018–20: Worthington City Council debated the future of the UMCH property and the Focus Area Plan.

On December 21, 2017, Councilmember-elect Robinson emailed City Manager Greeson about his intent to "make a motion before Council for consideration and passage of a Resolution" that would "void/invalidate/suspend" the Focus Area Plan. (ECF No. 72-7, PAGEID # 3787.) This email raised the curtain on a struggle within City Council over the future of development in Worthington.

In February 2019, Worthington City Council members discussed the UMCH property as part of a two-day "retreat." LC's then-Director of Development, Jode Ballard, observed the discussion. (ECF No. 72-9, PAGEID # 3793.) According to Mr. Ballard's notes, Councilman Robinson said "that LC lied" to Council and Councilman Scott Myers said, "UMCH and LC are not willing to talk with the City." (*Id.*, PAGEID # 3795.) When the conversation turned to next steps, Councilman Robinson surmised that "once the City Council denies LC . . . , that LC will buckle and realize the only option remaining is to the sell the land to the City." (*Id.*) Now-Councilman Doug Foust believed Council was "applying heat to UMCH by revoking

12

their tax exempt status." (*Id*.) At that point, City Manager Greeson described "an option in which the City obtains a park on the UMCH site and the development elements along High Street create value to the tax rolls to offset [the City's] costs of purchasing the park component." (*Id*.) Upon learning Mr. Ballard's identity, Council wound down the conversation. (*Id*.) Councilman Doug Smith closed by saying: "Anything that is proposed will be denied." (*Id*.)

Another year passed with little movement. But, in January 2020, Councilman Robinson posed several questions to City Manager Greeson about the Comprehensive Plan "as it relates to" the UMCH property. City Manager Greeson responded in a memo addressed to the entire City Council. (ECF No. 65-3, PAGEID # 2006–08.) There, he responds to a question about what staff would do if LC made a development proposal for the site and used the Comprehensive Plan (as amended by the Focus Area Plan) "as a basis for justifying their proposal," saying:

> We will certainly be open and clear with all involved that aspects of the plan do not enjoy community or Council consensus; that community-engagement will be critical to developing a proposal that is ultimately successful, and will encourage focus on elements the Council deems desirable (maybe-park space, office, a restaurant, and empty nester housing as examples). However, it should be clear that staff has no authority to invalidate this section of the Comprehensive Plan.

(*Id*., PAGEID # 2007.) City Manager Greeson then suggested five "options" for any Council members "concerned with . . . the status of the Comprehensive Plan[.]" (*Id*.) They included (i) maintain and apply the Comprehensive Plan; (ii) repeal all sections related to UMCH or that are points of disagreement; (iii) amend the Focus Area Plan; (iv) replace the Focus Area Plan; or (v) impose a housing moratorium

until the Comprehensive Plan has been re-written. (*Id.*, PAGEID # 2007–08.) City

Manager Greeson closed the memo by observing that

> it will be important for the Council to discuss . . . what role it wants the
> staff to play. In addition to providing a technical review. . ., staff often
> works to help steer developments towards desirable community
> outcomes. This is most easily achieved when our goals are clearly
> discernable. . . . Council has in recent years discouraged staff from
> proactively working with LC. . .; appetite for using alternative resolution
> processes has been limited.

(*Id.*, PAGEID # 2008.)

Nine months after Greeson's memo, Councilman Robinson finally raised the

issue during a City Council meeting. (*See* ECF No. 62-1, PAGEID # 1282–83; *see*

*also* Sept. 21, 2020 City Council Mtg. Minutes, available online at

www.worthington.org/ArchiveCenter/ViewFile/Item/3562.) He proposed temporarily

suspending the Focus Area Plan in order to "clear the air" and create "space for

fresh thinking and new ideas, unburdened from having to defend prior plans" that

did not reflect consensus among the community. (*Id.*) Other members of Council

expressed discomfort with "entertaining a motion to suspend, rescind or set aside a

document that was literally years in the making on a non-agenda item, at the end of

the meeting, without input from the public or staff, or any advance notification."

(Sept. 21, 2020 City Council Mtg. Minutes.) After discussion, Mr. Robinson agreed

to add his proposal to the agenda for October's meeting. (*Id.*)

### E. October 2020: LC filed a rezoning application.

Circumstances changed before Council could further discuss revisions to the

Focus Area Plan. On October 2, 2020, LC applied to rezone the UMCH property as a

Planned Unit Development (PUD). (ECF No. 73-4.) The application proposed a

familiar design, but with 725 residential units (up from the 2015 proposal's 571).

(*Id.*, PAGEID # 4097.)



(*Id.*, PAGEID # 4120.)

The record reflects the private reactions of some Worthington officials to the application. Councilman Robinson sent a cryptic email to Councilman Peter Bucher, attaching a November 2018 memo titled Summary of Phases for Development of the UMCH Property. (ECF No. 72-10, PAGEID # 3820; *see also* ECF No. 72-5, PAGEID # 3678–81.) The memo was prepared by a local land-use attorney for Project Community Park Worthington.[5] (*See* Robinson Dep., 60:2–13.) It describes "the anticipated phases or steps the City of Worthington will take in developing" the

---

[5] Project Community Park Worthington describes itself as a "grassroots organization of citizens . . . dedicated to preserving and transforming the contiguous greenspace within the UMCH property into a self-funding community commons." (ECF No. 72-5, PAGEID # 3694.)

UMCH property: planning, acquisition, sale of targeted portions of the property, and improvements and maintenance. (ECF No. 72-5, PAGEID # 3678–81.)

Others were less opaque. In an October 12, 2020 email to Worthington's Planning & Building Director, MPC member Mikel Coulter asked:

> Is LC aware of the buzz saw they are running into? Do we need to have a meeting with them to discuss it? I know they have a new team but is the new team aware of the past history of this site?

(ECF No. 72-12, PAGEID # 3838.)

### F.    October 2020: LC was also pursuing a reduced tax valuation.

When LC filed its rezoning application, it already had a complaint pending with the Franklin County Board of Revision to reduce the property's tax valuation from $ 12 million to $ 6 million. (*See* ECF No. 61-1, PAGEID # 1033.) The Board of Revision held a hearing on the complaint on October 19, 2020. (ECF No. 60-2.) At that hearing, LC General Counsel Bo Brownlee testified that LC was in contract to purchase the UMCH property. (*Id.*, PAGEID # 770.) He was asked whether LC had been "given any indication as to the likelihood of" their rezoning application being granted. (*Id.*, PAGEID # 774.) In response, Mr. Brownlee stated that Worthington "believes this will be a very difficult rezoning application to get approved" but that LC was "hopeful that with compromises and working with the city we can get there." (*Id.*) He then confirmed that the rezoning was "not a sure thing." (*Id.*)

Mr. Brownlee also disclosed during testimony that UMCH and LC had agreed to expedite the sale of the property. (*Id.*, PAGEID # 775.) Instead of the staged, multi-year closing process outlined in the Purchase Contract, LC had agreed to close by the end of 2020. (*Id.*) Mr. Brownlee told the Board of Revision that

16

UMCH "just didn't have the appetite for what was probably going to be a prolonged rezoning battle." (*Id*.) UMCH reduced the purchase price to $ 5.2 million (a discount of $ 800,000) and LC waived the rezoning contingency. (*Id*.) The sale closed on January 20, 2021. (ECF No. 80-1, PAGEID # 4550; *see also* ECF No. 60-3.)

### G. January 2021: The MPC/ARB tabled LC's rezoning application.

LC's rezoning application was heard at the January 14, 2021 meeting of the MPC/ARB. (Jan. 14, 2021 MPC/ARB Mtg. Minutes, ECF No. 60-4.) City staff had reviewed the application and recommended denial—but would recommend tabling the application instead if LC "wishe[d] to make significant modifications and changes . . . after listening to the initial comments from City staff, Board & Commission members and the Worthington Community[.]" (*Id*., PAGEID # 789.) Staff's comments and analysis, which are reproduced in the meeting minutes, reflect familiar concerns: increased density (*id*., PAGEID # 813), undesirable housing mix (*id*., PAGEID # 814), insufficient contiguous greenspace (*id*., PAGEID # 818), traffic (*id*., PAGEID # 819), and stormwater management (*id*.). Public comments were in the same vein. (*Id*., PAGEID # 834–41.) LC moved to table the application, and the motion was granted. (*Id*., PAGEID # 845.)

During the MPC/ARB meeting, some members expressed disappointment in LC's failure to engage in community outreach or to incorporate feedback from the 2015 proposal into their application. (*Id*., PAGEID # 841, 844.) That message was reiterated to LC during a meeting with city staff on March 30, 2021. (*See* ECF No. 72-2, PAGEID # 3554–55 ("they first and foremost need to gain support in the community before they would see support from" the city).)

### H.  October 2021: The MPC/ARB recommended denying LC's rezoning application.

LC filed a revised development proposal in September 2021. (ECF No. 69-1, PAGEID # 2967–81.) That proposal reflected an increase in office and retail space, and a decrease in residential units to 600 (which was still up from the 2015 proposal). (ECF No. 60-5, PAGEID # 852, 883.)



(ECF No. 69-1[6], PAGEID # 2971.)

LC's revised proposal was set to be discussed at the October 14, 2021 MPC/ARB Meeting. That morning, Councilman Robinson emailed the MPC/ARB members encouraging them to deny LC's application. (ECF No. 72-5, PAGEID

---

[6] This graphic is copied from the more legible version publicly available online at www.worthington.org/ArchiveCenter/ViewFile/Item/3923.

# 3686.) He "recognize[d] the sensibility and fairness of the MPC's standard practice of giving applicants a chance to change course, by way of tabling a proposal" but "suggest[ed] that this approach [did] not apply to" LC's newest submission. (*Id.*) Councilman Robinson pointed out that "a denial would clean the slate in certain respects, enabling Council a freer hand to consider creative ways forward by way of a fresh start with LC." (*Id.*, PAGEID # 3687.) Recipients reported being "shocked" to receive the Councilman's "inappropriate" email. (Brown Dep., ECF No. 69-1, PAGEID # 2779; *see also* Coulter Dep., ECF No. 81-1, 76:19–77:8.) The meeting proceeded all the same.

After the meeting was called to order, the MPC/ARB turned to LC's revised proposal. (Oct. 14, 2021 MPC/ARB Mtg. Minutes, ECF No. 60-5, PAGEID # 846.) City staff recommended denial. (*Id.*, PAGEID # 847.) But LC urged the MPC/ARB not to take any definitive action, as they were merely "requesting dialogue on the updated conceptual land plan." (*Id.*, PAGEID # 883.) Neither the public nor the MPC/ARB were content with that approach—the differences between the second and third proposals were simply not enough. A WARD representative read the group's reaction into the record:

> This third time is NOT a charm. For the third time Lifestyle Communities (LC) has approached the City of Worthington with a high rise, high density development plan for UMCH. And once again their plan is meeting substantial community opposition. The problem is they keep presenting things people don't want. There is little substantive change in what LC is now proposing. Six hundred residential units with two persons per unit would mean 1200 new residents, or the equivalent of 8.5% of Worthington's total population of 13,700 squeezed into the 25 acres that are available for residential use. Included are 420 apartments in four and five story towers. . . . There is precious little greenspace in

> that 25 acres and what is there is broken up into piecemeal segments,
> most of which are walled off by the buildings that would be constructed.

(*Id.*, PAGEID # 887–88.) Another attendee asked, "how many times are they going

to listen to LC come back with the same old plan, it's the same song, the third verse,

and he could almost sing it in his sleep." (*Id.*, PAGEID # 889.) MPC/ARB members

shared the sentiment. Mikel Coulter observed that "this is the third time around

and he was not sure they were any closer now than [ ] they were in 2015[.]" (*Id.*,

PAGEID # 890.) And Richard Schuster thanked LC for "some of the adjustments

they made," which were "a nice first baby step[.]" (*Id.*, PAGEID # 897.)

When discussion closed, the MPC/ARB voted unanimously to recommend

that LC's application be denied. (*Id.*, PAGEID # 901.) The vote triggered a six-

month waiting period before LC could apply to rezone the UMCH property again.

WORTHINGTON, OHIO, CODE § 1145.05.[7] (*see* ECF no. 65-1, PAGEID # 1699).

## I.    December 2021: City Council denied LC's rezoning application.

LC's application went before Worthington City Council on December 13,

2021. (Dec. 13, 2021 City Council Mtg. Minutes, ECF No. 60-6.) LC presented,

citizens spoke, City Council members discussed, and a vote was taken. (*Id.*,

---

[7] The full text of this ordinance is:

> No application for rezoning of any parcel of ground, once formally acted
> upon by either the Council or the Municipal Planning Commission, may
> be again considered for any rezoning change by Council or the Municipal
> Planning Commission until 180 days has elapsed from the date of formal
> action. In the event both Council and the Municipal Planning
> Commission have taken formal action, such time limit will be counted
> from the earlier of the two actions.

PAGEID # 905–15.) LC's application to rezone the UMCH property to a PUD was denied, with none in favor and seven against. (*Id.*, PAGEID # 915.)

### J.    January 2022: City Council replaces the Focus Area Plan.

When City Council returned in the new year, David Robinson assumed the role of Council President. (Robinson Dep., 9:2–4.) At the end of one of the first meetings over which he presided, Council President Robinson proposed a moratorium on applications for rezoning or developing the UMCH property. (Jan. 18, 2022 Mtg. Minutes, ECF No. 72-5, PAGEID # 3639–77.) The topic had not been included in the meeting agenda. (*See* Jan. 18, 2022 Mtg. Agenda, available online at www.worthington.org/ArchiveCenter/ViewFile/Item/4039.) The meeting minutes reflect intense debate among Council members and members of the public. (Jan. 18, 2022 Mtg. Minutes, PAGEID # 3656–69.) One citizen called out the gambit as "anti-democratic." (*Id.*, PAGEID # 3664.) The moratorium needed six votes to pass, but only secured four. (*Id.*, PAGEID # 3670.)

After the moratorium failed—rather, *because* the moratorium failed (*id.*, PAGEID # 3672 ("This resolution is Plan B[.]"))—Council President Robinson introduced a resolution to replace the Focus Area Plan with a two-page statement that he authored and had circulated to Council just two hours before their meeting was called to order. (*Id.*, PAGEID # 3672; Resolution 04-2022, ECF No. 63-1, PAGEID # 1472–74; Robinson Dep., 92:7–10; Michael Dep., ECF No. 85-1, 89:8–17.) The resolution passed, with four in favor and three against. (Jan. 18, 2022 Mtg. Minutes, PAGEID # 3676.) Resolution 04-2022 contains two substantive provisions: Guiding Principles and General Components. (Resolution 04-2022.) The General

21

Components section provides that "a large contiguous greenspace" is a highly desirable outcome; that commercial development along High Street is also highly desirable; and that residential housing is "desirable" if "creatively executed" and "harmonious" with surrounding areas. (*Id.*)

## II. PROCEDURAL HISTORY

LC filed this action on March 24, 2022, asserting claims under the First, Fifth, and Fourteenth Amendments to the U.S. Constitution, and corresponding provisions of the Ohio Constitution. (ECF No. 1.) In Opinions issued on March 15, 2023, and August 11, 2023, this Court dismissed most of LC's Complaint. (Mar. 15 Opinion, ECF No. 37; Aug. 11 Opinion, ECF No. 50.) Notably, the Court found that, because Worthington City Council at all times retained discretion to approve or deny rezoning applications, LC's due process claims failed for want of a protected property interest. (Mar. 15 Opinion, PAGEID # 513–21.) LC's equal protection claim also failed because the company did not identify any similarly situated entities that received better treatment. (*Id.*, PAGEID # 523–24.) Three claims now remain:

- Partial Regulatory Taking (U.S. and Ohio Constitutions)
- First Amendment Retaliation (U.S. and Ohio Constitutions)
- Declaratory Judgment

Both parties move for summary judgment on all three. (Def.'s Mot.; Pls.' Mot.)

## III. STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving

party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

## IV. ANALYSIS

### A. Partial Regulatory Taking

The Fifth Amendment, applicable to the states through the Fourteenth, provides that "private property shall not 'be taken for public use, without just compensation.'" *Murr v. Wisconsin*, 582 U.S. 383, 392 (2017) (quoting U.S. CONST. amend. V). The purpose of this Takings Clause "is to prevent the government from 'forcing some people alone to bear public burdens which, in all fairness and justice,

23

should be borne by the public as a whole.'" *Palazzolo v. Rhode Island*, 533 U.S. 606, 618 (2001) (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960)).

Though there are several flavors of takings claims, *see Andrews v. City of Mentor*, 11 F.4th 462, 468 (6th Cir. 2021), the claim at issue here is for a partial regulatory taking.[8] (*See* March 15, 2023 Opinion, PAGEID # 531.) A partial regulatory taking occurs when a use-restriction on property goes "too far." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922); *see also Knight v. Metro. Gov't of Nashville & Davidson Cty.*, 67 F.4th 816, 832 (6th Cir. 2023) (explaining that "the courts subjectively judg[e] how far is "too far"). Courts evaluate such claims using "essentially ad hoc, factual inquiries," *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978), into "a complex of factors," *Palazzolo*, 533 U.S. at 617, that can be distilled into three parts, known as the *Penn Central* test. Under the first *Penn Central* factor, courts examine "the economic impact of the regulation on the claimant." *Penn Central*, 438 U.S. at 124. They look next to "the extent to which the regulation has interfered with distinct investment-backed expectations." *Id*. Third and finally, courts review "the character of the governmental action." *Id*. "*Penn Central* does not supply mathematically precise variables, but instead provides important guideposts that lead to the ultimate determination" of whether a taking has occurred. *Palazzolo*, 533 U.S. at 634 (O'Connor, concurring). This framework is "designed to allow careful examination and weighing of all the

---

[8] The analysis required to determine whether a regulatory taking has occurred under the Ohio Constitution is the same as under the U.S. Constitution. *See State ex rel. R.T.G., Inc. v. State*, 780 N.E.2d 998, 1005 (Ohio 2002).

24

relevant circumstances." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 321 (2002) (internal quotation and citation omitted).

The Court now asks: Did Worthington's decision to deny LC's rezoning application—and then to replace the Focus Area Plan with Resolution 04-2022—go "too far" in restricting LC's use of the UMCH property? As a matter of law, the answer is no.

### 1.    Economic Impact

The first step in the *Penn Central* analysis requires evaluation of the economic impact of Worthington's actions on LC. The inquiry focuses "upon the magnitude" of the economic impact. *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 540 (2005). That said, the impact can be measured in many ways. *See Coal. for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435, 481 (6th Cir. 2004) (quoting *Dist. Intown Props. Ltd. P'ship v. District of Columbia*, 198 F.3d 874, 879 (D.C. Cir. 1999)). LC proposes that the economic impact of Worthington's actions is the difference between $ 55,500,000 (the value of the undeveloped land zoned for PUD) and $ 3,338,000 (the value of the undeveloped land zoned as-is). (Pls.' Mot., 20, 23.) Even accepting LC's calculation paradigm, "diminution in the value of property is insufficient to demonstrate a taking." *Raceway Park, Inc. v. Ohio*, 356 F.3d 677, 687 n.8 (6th Cir. 2004) (citing *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal*, 508 U.S. 602, 645 (1993)). The first factor thus weighs against a finding that Worthington took LC's property.

## 2. Investment-Backed Expectations

The Court next turns to LC's reasonable investment-backed expectations. These expectations are viewed objectively, and thus "must be more than a unilateral expectation or an abstract need." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005–06 (1984) (internal quotations and citation omitted). The record makes clear that LC had no reasonable expectation in rezoning—nor did it have a reasonable expectation that the Focus Area Plan would remain in place. From the time LC presented its first concept proposal in 2015, city officials and members of the public voiced opposition to their plan. Five years later, in September 2020, then-Councilman Robinson tried to rescind the Focus Area Plan during a public meeting (though, in an off-agenda discussion). And in October 2020, LC's corporate officer testified under oath that rezoning was "not a sure thing" and that it would be "very difficult" to get LC's rezoning application approved. That was three months before LC closed on the Purchase Contract. The company was, in other words, "well aware" of the existing restrictions, rezoning process, and general discord brewing around this development when it purchased the property.

This factor also weighs against a finding that Worthington took LC's property. *See, e.g.*, *Raceway Park*, 356 F.3d at 685 (statute did not interfere with reasonable investment-backed expectations in part because plaintiffs "were well aware" of allocation and distribution scheme "prior to making any investments"); *Oberer Land Devs. Ltd. v. Sugarcreek Twp., Ohio*, No. 21-3834, 2022 WL 1773722, *5 (6th Cir. June 1, 2022) (concluding that the denial of plaintiffs' "'ability to exploit a property interest' that they thought might be 'available for development' is

26

insufficient to establish a regulatory taking"); *Loreto Dev. Co. v. Vill. of Chardon*, 149 F.3d 1183 (table), 1998 WL 320981, at *4 (6th Cir. 1998) ("Loreto Development knew or should have known about the property restrictions before it entered into negotiations with Wal-Mart. Accordingly, Loreto Development did not have a reasonable expectation about using its property for a retail store that did not prescribe to existing zoning restrictions.").

LC makes two arguments for the opposite conclusion.[9] Neither succeeds. First, LC argues that "acquisition of title after the effective date of the state-imposed restriction does not bar a taking under *Penn Central*." (ECF No. 88, 4.) While that is true, "the regulatory regime in place at the time" LC acquired the UMCH property "helps to shape the reasonableness of [its] expectations." *Palazzolo*, 533 U.S. at 633 (O'Connor, J., concurring). As LC acknowledges, "a restriction that predates the landowner's acquisition is not dispositive but rather one of several factors to consider." (ECF No. 80, 22 n.8.)

LC further argues that Mr. Brownlee's testimony does not negate an expectation that its rezoning application would ultimately be approved. In support, LC offers expert opinion testimony of land planner Jason Sudy. Mr. Sudy reviewed the rezoning application and concluded that LC's "request to rezone to [PUD] is both reasonable and suggested by the" Focus Area Plan, and that its "plan conforms with" the Focus Area Plan. (ECF No. 72-14, PAGEID # 3864–65.) Even accepting

---

[9] LC also makes a passing argument that Mr. Brownlee's testimony before the Board of Revision, or the transcript, is inadmissible. (ECF No. 80, 24; ECF No. 88, 5.) Its reasoning is scant—with no citation to the Federal Rules of Evidence or to law–and is unpersuasive.

that as true, the Focus Area Plan was non-binding. (Mar. 15 Opinion, PAGEID # 518.) City Council had every right to deny LC's rezoning application, no matter how it compared to the Focus Area Plan.

### 3. Character of the Action

The third and final step in the *Penn Central* analysis is to consider the character of Worthington's actions. As the *Penn Central* Court explained it, "[a] 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." 438 U.S. at 124 (internal citation omitted). Worthington's actions—both in denying LC's rezoning application and in replacing the Focus Area Plan with Resolution 04-2022—fall into the latter category. *See, e.g.*, *id.* (recognizing zoning laws as "the classic example" of permissible government action that adversely affects real property interests); *see also Oberer*, 2022 WL 1773722, at *6 ("the legitimate denial of a rezoning application is not at all" equivalent to an appropriation of private property).

LC argues that Worthington's actions were the functional equivalent of a classic taking for three reasons. None warrants relief under the Fifth Amendment. First, LC argues that Worthington singled out LC and the UMCH property to block its development. LC cites three out-of-Circuit cases to support the proposition that being "singled out" is relevant to determining the character of the government action. (Pls.' Mot., 27.) To this Court's ears, that argument sounds in equal

28

protection, which is unavailable to LC. (*See* Mar. 15 Opinion, PAGEID # 522–24; Aug. 11 Opinion, PAGEID # 637–38.)

LC next argues that Worthington Resolution 04-2022 constituted "an indefinite *de facto* moratorium" on development of the UMCH property. (Pls.' Mot., 28–29.) In its view, the Resolution is so "utterly vague" that LC could not submit a compliant proposal because "no one knows how to interpret and apply its requirements." (*Id*.) The argument rings hollow, considering LC did not even attempt an interpretation.

Finally, LC argues that the Resolution "required that any development" include a public park. (Pls.' Mot., 29–31.) This argument has superficial appeal, given the Fifth Amendment anathema of forcing the public's burdens on the few. But the Resolution does not "require" a public park; it "outlines the features and attributes that are 'important' or 'highly desirable' to future development of the [p]roperty." (Mar. 15 Opinion, PAGEID # 521.) What's more, the desire for "large contiguous greenspace" is not new to the Resolution. The Comprehensive Plan recognized that redevelopment of the UMCH property "provides the opportunity to create a focus point green, park, or 'civic square' within the City campus." (Comprehensive Plan, 90.) And the Focus Area Plan highlighted "green space" in the Objectives and Design Intent statement, stating that any developer would be expected to "integrate usable park land into the development[.]" (Focus Area Plan, PAGEID # 2844–45, 2849.) The lack of such usable (*i.e.*, contiguous[10]) green space

---

[10] *See, e.g.*, Jan. 14, 2021 MPC/ARB Mtg. Minutes, PAGEID # 815 ("The proposed open space does not seem to meet the goal of creating contiguous usable

was a cited reason why city staff, the MPC, and Council denied LC's application. The Resolution simply underscored the city's existing expectation that any redevelopment of this unique and important site would incorporate usable park land (*i.e.*, contiguous greenspace) as a community amenity.

LC's Motion for Summary Judgment on its Partial Regulatory Takings claim is thus **DENIED** and Worthington's is **GRANTED**.

### B. First Amendment Retaliation

The First Amendment protects "the right of the people . . . to petition the government for redress of grievances." U.S. CONST. amend. I. The Sixth Circuit recognizes that government retaliation for petitioning is itself a violation of the First Amendment. *Gable v. Lewis*, 201 F.3d 769, 772 (6th Cir. 2000). To prevail on a First Amendment retaliation claim, a plaintiff must prove that (i) it engaged in protected conduct, (ii) an adverse action was taken against it that would deter a person of ordinary firmness from continuing to engage in that conduct, and (iii) there is a causal connection between the protected conduct and the adverse action. *Holzemer v. City of Memphis*, 621 F.3d 512, 520 (6th Cir. 2010) (further citation omitted). Consistent with the First Amendment's nuanced complexities, "whether activity is 'protected' or an action is 'adverse' will depend on context."

---

open space for those living in this development and in all of Worthington."), *id.* ("At this time, it does not appear that the proposed green space meets the need for usable contiguous open space that can build upon the Tucker Creek Preserve as described in the Plan."); Dec. 13, 2021 Council Mt. Minutes, PAGEID # 905 ("The MPC did unanimously deny the application due to the overall density of the site, the housing types provided, contiguous open space, heights of buildings, and connection points.").

30

*Thaddeus-X v. Blatter*, 175 F.3d 378, 388 (6th Cir. 1999); *see also id.*, ("First Amendment law is particularly context-driven."). If the plaintiff establishes a *prima facie* case of retaliation, the burden then shifts to the defendant to show that it would have taken the action even without the plaintiff's constitutional exercise. *Id.* at 399 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977)).

LC meets the first element: the rezoning application was a petition to the government for redress. *See EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 863 (6th Cir. 2012). On the second and third elements, LC argues that four adverse actions—(i) Council's direction that city staff "ignore" LC and its application, (ii) the application's denial, (iii) imposition of a 180-day waiting period, and (iv) passage of Resolution 04-2022—were motivated by the application's filing. Neither the record nor the law supports such a finding.

### 1.     City Council did not direct staff to ignore LC.

LC first argues that Worthington City Council "directed City staff to ignore" it and that staff "refus[ed] to engage" on the application. (Pls.' Mot., 33.) The record does not support LC's version of events. There is no evidence that any member of Council directed staff to ignore LC or its rezoning application.[11] Nor did staff ignore LC or its rezoning application. To the contrary; staff prepared extensive comments on LC's application, as reflected in the minutes for the January 2021 and October

---

[11] LC cites only City Manager Greeson's January 31, 2020 Memo to Council for support. The cited portion of the memo says, "Council has in recent years discouraged staff from proactively working with LC." (ECF No. 65-3, PAGEID # 1975.) That statement, drafted nine months before LC filed its rezoning application, cannot reasonably be construed as evidence that City Council directed staff to ignore LC.

2021 MPC/ARB meetings and the December 2021 City Council meeting. The record also reflects that city staff met with LC several times including shortly after its application was tabled. And LC heard from city officials and staff several times that substantive conversations about the future of the UMCH property needed to take place in public. As the record shows, this site is a unique property within Worthington; its development is sensitive and divisive, and residents required assurances that no "back-room deals" were playing out.

### 2. The application's denial was not motivated by its filing.

LC next argues that denial of its application was an adverse action motivated by LC's exercise of its right to petition. The Court must first acknowledge that a rezoning application cannot be adjudicated until it is filed—and, to that extent, every application's adjudication has a causal connection to its filing. But the Court does not understand LC's argument to be that every rezoning application denial is per se retaliation.[12] Instead, it construes LC's argument to be that City Council's denial was based on the application's *filing*, and not its *substance*.

There is no evidence that Worthington's decision was motivated by the filing of the petition itself. City staff recommended denial because the application did not meet the applicable land use plans, with the initial caveat that it would recommend

---

[12] Nor could LC make such an argument. The First Amendment protects an individual's right to petition the government for redress, but it does not obligate the government to listen or respond. *EJS Props.*, 698 F.3d at 864. Inherent in that paradigm is that the right to petition does not obligate the government to provide the requested redress. *Cf. Apple v. Glenn*, 183 F.3d 477, 479 (6th Cir. 1999) ("A citizen's right to petition the government does not . . . compel government officials to act on or adopt a citizen's views.").

tabling if LC made significant revisions. The MPC/ARB allowed LC to table its application and present revisions before concluding that the revisions were not sufficient to save the application. Only then did City Council deny LC's application. City Council's decision capped seven years of discussion between Worthington residents, staff, and officials, UMCH, and LC about the property's future: How many new residents would live in the residential sections? How much community-accessible parkland would be available? How would storm- and waste-water be managed? And how would local schools be impacted? It was only after the submission of three plans, each with unsatisfactory responses to these questions, that City Council denied LC's application and sent them back to the drawing board. With that history in mind, no reasonable jury could conclude that it was the act of filing the application—not its substance—that motivated the denial.

### 3. The 180-day waiting period was not an adverse action.

Third, LC asserts that imposition of the 180-day waiting period constituted an adverse action. It notes that this Court concluded at the motion-to-dismiss stage that it would be, "if true." (Aug. 11 Opinion, PAGIED # 640.) But the Court's conclusion was based on LC's representation at the time that the waiting period "cannot be found anywhere in the City's code" and was applied to LC alone. (ECF No. 45, PAGEID # 605.) Discovery has not borne that out. The waiting period is required by Worthington Ordinance § 1145.05 and there is no evidence that the ordinance is not uniformly and consistently applied. No reasonable jury could conclude that the routine application of a 40-year-old ordinance would deter a person of ordinary firmness from exercising their right to petition.

#### 4. **Resolution 04-2022 was not an adverse action.**

Finally, LC argues that Resolution 04-2022 was an adverse action motivated by its exercise of the right to petition. LC offers two reasons why the Resolution's passage would deter a person of ordinary firmness from filing a rezoning application. On review, neither succeed.

First, LC describes the Resolution as a moratorium on developing the UMCH property, which would deter further applications. But the Resolution is not the moratorium that LC considers it to be. *See* § IV.A.3, *supra*. Second, LC attacks the undemocratic and surreptitious tactics taken by Council President Robinson to pass the Resolution. The injury caused by those tactics is borne by the people of Worthington, not LC; their recourse is at the ballot box, not here.[13] And so, while Resolution 04-2022 may prevent rezoning applications sharing substantive similarities to LC's, no reasonable jury could find that it would deter a person of ordinary firmness from petitioning the government of the city of Worthington for redress.

LC's Motion for Summary Judgment on its First Amendment Retaliation claim is **DENIED** and Worthington's is **GRANTED**.

#### C. **Declaratory Judgment**

Finally, because LC's substantive claims fail, so too does its claim for declaratory judgment.

---

[13] The Court already concluded that LC could not assert a substantive or procedural due process claim. (Mar. 15 Opinion; Aug. 11 Opinion.)

## V.    CONCLUSION

For these reasons, LC's Motion for Summary Judgment is **DENIED** and the

City of Worthington's is **GRANTED**.


**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**